# EXHIBIT
# 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF OHIO

3                   EASTERN DIVISION

4    - - - - - - - - - - - - - -x MDL NO. 2804
                                :
5    In re: NATIONAL PRESCRIPTION : CASE NO. 1:17-MD-2804
     OPIATE LITIGATION          :
6                                :
                                 :
7    THIS DOCUMENT RELATES TO:   :
     "Case Track Nine"          :
8                                :
                                 :
9    - - - - - - - - - - - - - -x

10

11          Highly Confidential - Subject to Further
                   Confidentiality Review
12

13

14   VIDEOTAPED DEPOSITION OF ALBERTSONS 30(b)(6) -
     ANTHONY PROVENZANO
15
     August 10, 2023
16

17

18

19   Reported by
     Brooke R. Bohr
20   IDAHO CSR No. 753
     Federal Certified Realtime Reporter
21   NCRA Registered Professional Reporter

22

23

24

25

1          VIDEOTAPED DEPOSITION OF ALBERTSONS

2     30(b)(6) - ANTHONY PROVENZANO, taken at the

3     instance of the Plaintiffs, at HOLLAND & HART,

4     800 W. Main Street, Suite 1750, in the City of

5     Boise, State of Idaho, commencing at 10:11 a.m.,

6     on August 10, 2023, before Brooke R. Bohr, Court

7     Reporter, Registered Professional Reporter by

8     Testing, a Notary Public in and for the State of

9     Idaho, pursuant to notice, and in accordance with

10    the applicable rules of civil procedure.

11

12

13                  A P P E A R A N C E S

14

15    FOR PLAINTIFFS

16        Jay Lichter, Esq.
          BARON & BUDD
17        15910 Ventura Blvd., Suite 1600
          Los Angeles, CA 91436
18        jlichter@baronbudd.com

19

20    FOR ALBERTSONS

21        Brett Doran, Esq.
          GREENBERG TRAURIG LLP
22        77 West Wacker Drive, Suite 3100
          Chicago, IL 60601
23        (312) 456-8413
          doranb@gtlaw.com

24

25

1                    A P P E A R A N C E S

2

3    FOR KROGER (APPEARING VIA ZOOM)

4          Ryan Moore, Esq.
           BOWLES RICE LLP
5          United Square, Fifth Floor
           501 Avery Street
6          Parkersburg, WV 26101
           (304) 420-5515
7          rmoore@bowlesrice.com

8

9    PRESENT VIA ZOOM:

10         Gina Veldman - Tech
           Evan M. Janush
11         Julia Emfinger
           Leila Ayachi
12         Sadie Turner

13

14   ALSO PRESENT:

15             David Cromwell, Videographer

16

17                     * * * * *

18

19

20

21

22

23

24

25

```
 1                     W I T N E S S

 2

 3     ALBERTSONS 30(b)(6) - ANTHONY PROVENZANO      Page:

 4               Examination by Mr. Lichter            6

 5                      *  *  *  *  *
 6

 7                     E X H I B I T S

 8                                                   Page:

 9     1         Amended Notice of Deposition and       9
                 Document Request
10

11     2         LinkedIn Profile                      13

12     3         Defendant Albertsons' Supplemental    20
                 Objections and Answers To
13               Plaintiff's Combined Interrogatories
                 To Chain Pharmacy Defendants
14

15     4         Slip Sheet                            41

16     5         Spreadsheet                           54

17     6         Annual Controlled Substance Training  68
                 Bates No. ALB-MDLCT9-00386118 through
18               ALB-MDLCT9-00386152

19     7         E-mail Bates No. ALB-MDLCT9-00015802  76
                 through ALB-MDLCT9-00015807
20

21     8         E-mail Bates No. ALB-MDLCT9-00014044  95
                 through ALB-MDLCT9-00014046
22
       9         E-mail Bates No. ALB-MDLCT9-00033665 112
23               through ALB-MDLCT9-00033666

24     10        E-mail Bates No. ALB-MDLCT9-0041477  119
                 through ALB-MDLCT9-0041478
25
```

1    BOISE, IDAHO

2    August 10, 2023, 10:11 a.m.

3

4          THE VIDEOGRAPHER:  We are now on the record.

5              My name is David Cromwell.  I'm a

6    videographer for Golkow Litigation Services.

7              Today's date is August 10th, 2023, and

8    the time is 10:11 a.m.  This video deposition is

9    being held in Boise, Idaho, in the matter of

10   National Prescription Opiate Litigation.  The

11   deponent in Anthony Provenzano.

12             Counsel, please identify yourselves for

13   the video record.

14        MR. LICHTER:  Jay Lichter for plaintiff,

15   Tarrant County, Texas.

16        MR. DORAN:  Brett Doran from

17   Greenberg Traurig for the defendant, Albertsons,

18   today.

19          THE VIDEOGRAPHER:  The court reporter is

20   Brooke Bohr and will now swear in the witness.

21

22        ALBERTSONS 30(b)(6) - ANTHONY PROVENZANO,

23   produced as a witness at the instance of the

24   Plaintiff, having been first duly sworn, was

25   examined and testified as follows:

```
 1                      EXAMINATION

 2    BY MR. LICHTER:

 3         Q.   All right.  Good morning,

 4    Mr. Provenzano.

 5         A.   Good morning.

 6         Q.   Please state and spell your name for

 7    the record.

 8         A.   Anthony Provenzano, A-n-t-h-o-n-y

 9    P-r-o-v-e-n-z-a-n-o.

10         Q.   And you've had your deposition taken

11    before, correct?

12         A.   Correct.

13         Q.   Just to go over some basic ground

14    rules, which you probably are already familiar

15    with, throughout the deposition I'll be asking

16    you a series of questions.  And your counsel here,

17    Mr. Doran, might be objecting from time to time to

18    some of those questions.  Just so you know, unless

19    he specifically instructs you not to answer, I'm

20    entitled to get a response from you.

21              Do you understand that?

22         A.   Yes.

23         Q.   Okay.  Obviously, we have a court

24    reporter here taking down everything we're saying.

25    So it is important that we speak as clearly as we
```

1    can and try to avoid speaking over each other.

2              Is that okay?

3         A.   Yes.

4         Q.   Also, some of the questions I ask may

5    call for a yes or no answer.  You may

6    instinctively want to respond with uh-huh or

7    huh-uh.  That's usually difficult for the court

8    reporter to take down.  So I would ask that we

9    avoid those types of responses.

10             Is that okay?

11        A.   Yes.

12        Q.   Okay.  Are you taking any medications

13   today that may impair your ability to give

14   truthful testimony?

15        A.   No.

16        Q.   Any reason at all today you wouldn't be

17   able to give truthful testimony?

18        A.   No.

19        Q.   Throughout the deposition, we'll be

20   taking breaks.  I'm going to aim to take a break

21   every hour or so.  If for any reason you would

22   like to take a break while we're -- while the

23   deposition is going, you can let me know for,

24   you know, restroom, get a drink of water, anything

25   like that.  I would just ask that when we do take

1    a break, it not be while a question is pending.

2         Is that okay?

3         A.    Yes.

4         Q.    Okay.  And you've had your deposition

5    taken twice in the New Mexico opioid actions; is

6    that right?

7         A.    Yes.

8         Q.    Have you had your deposition taken any

9    other times?

10        A.    I've been deposed once in an unrelated

11   situation, yes.

12        Q.    Okay.  What type of situation was that?

13        A.    It was in regards to a suit with the

14   Accreditation Council for Pharmaceutical

15   Education --

16        THE COURT REPORTER:  A what?  A suit with --

17        THE WITNESS:  Involving the Accreditation

18   Council For Pharmaceutical Education, ACPE, where

19   I was on the Board of Directors.

20        THE COURT REPORTER:  If you could keep your

21   voice up for me, that would be great.  I just have

22   a fan over my head.

23        Q.    BY MR. LICHTER:  And were you a witness

24   in that case or a party in that case?  Both?

25        A.    Not a party.

1          Q.   Okay.  You were a witness?

2          A.   Yes.

3          Q.   Okay.  Did you testify at trial?

4          A.   No.

5          Q.   And do you know about when that case

6     happened, what year?

7          A.   I'm estimating, 2020.

8          Q.   Do you remember how that case

9     ultimately resolved?

10          A.   I don't.

11          Q.   You don't know if it settled?

12          A.   It's -- it's not still active, but I

13     don't -- I'm not sure of the final result.

14          Q.   Okay.  Did you testify as an expert

15     witness or a fact witness?

16          A.   Fact witness.

17          MR. LICHTER:  We'll mark this as Exhibit 1.

18          (Exhibit 1 marked.)

19          Q.   BY MR. LICHTER:  Have you seen this

20     document before?

21          A.   Yes.

22          Q.   Okay.  And I'll represent to you this

23     is Plaintiff's Amended Notice of 30(b)(6)

24     Deposition served on Albertsons in this action on

25     July 21st, 2023.

1            Does that sound right?

2       A.   Yes.

3       Q.   Okay.  If you'll turn to page 6 of the

4   document, this will be Section 3, subject matters

5   for testimony.

6            Do you see that?

7       A.   Yes.

8       Q.   And subject to the agreement between

9   my office and your attorneys, do you understand

10   that you're here today to testify on behalf of

11   the Albertsons defendants regarding the topics

12   described in this notice?

13       A.   Yes.

14       Q.   Okay.  And looking just at the first

15   set of topics, they are -- they are entitled

16   Distribution Topics, numbers 1 through 9.

17            Did you speak to anyone to help you

18   prepare to testify to the distribution topics

19   here?

20       A.   Yes.

21       Q.   And who did you speak to?

22       A.   I spoke with counsel, Brett, and a

23   couple of attorneys from -- from his company, some

24   house attorneys.  That's pretty much it.

25       Q.   Did you speak to any Albertsons

1    employees, current or past?

2         A.   No.

3         Q.   Do you know how long each meeting was

4    with counsel?

5         A.    In total?  In total, there were three

6    meetings, four hours, two hours and about eight

7    hours.  That included all topics, not just the

8    distribution topic though.

9         Q.   Okay.  And were you shown any

10   particular documents in preparation for today's

11   testimony?

12        A.   Yes.

13        Q.   Documents relating to all topics, as

14   well?

15        A.   Yes.

16        Q.   And same thing for the dispensing

17   topics 10 through 19, did you only speak with

18   counsel, no other Albertsons employees, to prepare

19   for today's deposition?

20        A.   I spoke with a couple of Albertsons

21   employees.

22        Q.   Do you recall who they were?

23        A.   Charles Painter.

24             Do you need me to spell names or

25   anything?

1      Q.   Not Charles Painter.

2      A.   That one is as it sounds.

3           Tori Aitken, A-i-t-k-e-n.

4      Q.   Anyone else?

5      A.   Julie Spier, S-p-i-e-r.

6      Q.   Anyone else?

7      A.   No.

8      Q.   Let's start with Mr. Painter.  Do you

9  recall what subjects you talked to Mr. Painter

10  about?

11     A.   It was asking about investigations

12  into -- into any specific cases in Texas.

13     Q.   Anything else with Mr. Painter?

14     A.   Not that I recall.

15     Q.   Do you know his job title with

16  Albertsons?

17     A.   He is a compliance manager -- manager

18  of compliance.

19     Q.   How about Tori Aitken?  Do you recall

20  what you spoke to --

21     A.   Same.

22     Q.   -- her about?

23     A.   Similar topics, yes.

24          And she's also a compliance manager.

25     Q.   How about Julie Spier?

1          A.    Julie, I asked -- I talked about a

2    PDMP program in Texas.  And she is a Director of

3    Pharmacy Operations for our southern division.

4          Q.    Do you recall about how long you spoke

5    to each of the three employees?

6          A.    Total of probably 15 minutes to

7    30 minutes each.  And Julie Spier was just the --

8    just a -- a message.  It wasn't over the phone.

9          Q.    It was an e-mail?

10         A.    It was a Teams message.

11         Q.    Okay.  And then toward the end, topics

12   20 to 22, those are described as Investigations

13   and Administrative Actions.

14              Other than Charles Painter,

15   Tori Aitken, Julie Spier and the topics we just

16   mentioned, did you speak to anybody else to help

17   prepare you today to testify as to those topics?

18         A.    No.

19         Q.    Have you brought any documents with you

20   today?

21         A.    No.

22         MR. LICHTER:  I'll set that one aside and

23   have the next document marked as Exhibit 2.

24         (Exhibit 2 marked.)

25         Q.    BY MR. LICHTER:  Have you seen this

1    document before?

2         A.    Yes.   It looks like my LinkedIn

3    profile.

4         Q.    Okay.   Yeah.   But for some black box

5    redactions throughout the document, this is a copy

6    of your current Linked -- LinkedIn profile; is

7    that right?

8         MR. DORAN:   Objection.

9         THE WITNESS:   It appears so, yes.

10        Q.    BY MR. LICHTER:   If we start on page 2

11   of the document, the section marked "Education,"

12   you attended the University of Illinois, Chicago

13   from 1985 to 1988 for a pre-pharmacy degree; is

14   that right?

15        A.    It is not a degree, but, yes,

16   pre-pharmacy coursework.

17        Q.    You attended UIC College of Pharmacy

18   from 1998 to 1992 for the Pharm D degree; is that

19   right?

20        A.    Correct.

21        Q.    And that's located in Chicago, as well?

22        A.    Correct.

23        Q.    Have you ever been a licensed

24   pharmacist?

25        A.    Yes.

1       Q.    In which states?

2       A.    Illinois.

3       Q.    Any other states?

4       A.    No.

5       Q.    Are you currently licensed in Illinois?

6       A.    Yes.

7       Q.    And when is the last time you actually

8    worked as a pharmacist?

9       A.    Dispensing prescriptions?  Is that what

10   you mean by worked as a pharmacist?

11      Q.    Yes.

12      A.    1995, estimate.

13      Q.    Have you ever had any other formal

14   education since high school that is not listed

15   here?

16      A.    Certification programs, if that counts

17   as formal education, yes.

18      Q.    What kind of certification programs?

19      A.    Various clinical topics.  Diabetes, I

20   was a certified diabetes educator for 15 years.

21   Other certification programs in asthma, res --

22   respiratory care, immunizations.  There's a number

23   of them.  If you need a list, I would have to look

24   them up.

25      Q.    Can you recall any others off the top

1    of your head?

2         A.    Not specifically, no.

3         Q.    You said a lot of those were

4    certification programs?

5         A.    Correct.

6         Q.    Do you currently hold all of the --

7    do you currently hold active certifications in all

8    of those programs that you took?

9         A.    I'm no longer a certified diabetes

10   educator.  That expired.  Most of them were so

11   long ago that I wouldn't consider them -- consider

12   them active.

13        Q.    Were any of the certifications related

14   to the dispensing or distribution of opioids?

15        A.    No.

16        Q.    We can look at the first page of the

17   document, the section marked "Experience."  It

18   says you worked for Albertsons companies for the

19   past 17 years; is that right?

20        A.    That's what it says.

21              I mean, all of the -- to summarize, our

22   company has gone through a number of mergers and

23   acquisitions.  I've worked for the same company,

24   essentially, for the last 30 years, 31 years.

25        Q.    That same company would be Albertsons?

1          A.    Albertsons and then changed names to

2    SuperValu and then changed names back to

3    Albertsons.  So it's -- yes.

4          Q.    Okay.  And you're currently the

5    Vice President of Pharmacy Compliance and

6    Government Affairs; is that right?

7          A.    Correct.

8          Q.    And you've been in that position since

9    2015?

10          A.    Yes.

11          Q.    That's for Albertsons companies?

12          A.    Yes.  We weren't always Albertsons

13    company in that timeframe, I believe.  We were

14    Albertsons, Inc., or some other variation of

15    corporate names.

16          Q.    Since 2015, it has always been an

17    Albertsons company that you've been employed by,

18    correct?

19          A.    Correct.

20          Q.    And what are the basic responsibilities

21    you handle in that position?

22          A.    I oversee pharmacy compliance issues,

23    as well as all of our interactions with government

24    agencies, boards of pharmacy, legislative

25    activities for pharmacy.

1          Q.    Have those responsibilities changed in

2     your position since 2015 at all or have they been

3     fairly consistent?

4          A.    Fairly consistent.

5          Q.    And who do you currently report to?

6          A.    Anthony Dalponte.

7                Do you want me to spell it?

8          THE COURT REPORTER:   Sure.

9          THE WITNESS:   D-a-l-p-o-n-t-e.

10         Q.    BY MR. LICHTER:   And do you know his

11    job title?

12         A.    He's Group Vice President of Pharmacy.

13         Q.    Are there any other Vice Presidents of

14    Pharmacy Compliance and Government Affairs or are

15    you the only one?

16         A.    I'm the only one.

17         Q.    And is your position national in

18    scope or are your responsibilities confined to a

19    particular geographic area?

20         A.    National in scope.

21         Q.    Have they always been?

22         A.    Yes.

23         Q.    Prior to that position, you were the

24    Director of Clinical Services from 2006 to 2013,

25    correct?

1        A.    Yes.

2        Q.    Okay.  That was also for Albertsons

3    companies or an iteration of Albertsons company?

4        A.    Yes, an iteration of Albertsons

5    companies, yes.  SuperValu was in some of that

6    timeframe.

7        Q.    Okay.  And what were the basic

8    responsibilities you handled in that position?

9        A.    I oversaw the development and

10   management of all patient care services or

11   clinical activities, whichever way you would like

12   to call them.  These were activities that are

13   outside of the normal traditionally dispensing

14   role of a pharmacist.

15       Q.    Can you give examples of that?

16       A.    Like pharmacists providing

17   immunizations or performing medication management

18   services or various disease management programs,

19   lab tests, things like that.

20       Q.    In your role as Vice President of

21   Pharmacy Compliance and Government Affairs, do you

22   have any responsibilities as far as setting the

23   policies and procedures of Albertsons?

24       A.    I -- yes.  I help in the establishment

25   of the policies and procedures.

1          MR. LICHTER:  We can set this one aside.

2     The next document will be marked as Exhibit 3.

3          (Exhibit 3 marked.)

4          Q.   BY MR. LICHTER:  Have you seen this

5     document before?

6          A.   I don't recall it, no.

7          Q.   Okay.  Just looking at the first page,

8     this appears to be a document entitled, Defendant

9     Albertsons' Supplemental Objections and Answers to

10    Plaintiff's Combined Interrogatories To Chain

11    Pharmacy Defendants, served in this action dated

12    June 7th, 2023.

13          And you're not sure if you've seen this

14    document before?

15         A.   No.

16         Q.   Okay.  Go ahead and turn to page 3 of

17    the document and look at Interrogatory No. 11.

18          That reads:  "For each pharmacy or

19    entity You owned or operated in Tarrant County

20    from 1996 through the present:"

21          And then it asks for some specific

22    information for each pharmacy.

23          Do you see that?

24         A.   I do.

25         Q.   Okay.  For the record, I believe we've

1   spoken with your counsel and revised the dates to

2   span from 2006 to the present.

3          Further down the page in Albertsons'

4   response to the interrogatory where it says:

5   "Subject to and without waiving."

6          Do you see that?

7   A.   Yes.

8   Q.   Okay.  Go ahead and read that.

9          "Subject to and without waiving

10  Albertsons' objections stated in its original

11  Answer to this Interrogatory, subject to the

12  parties' subsequent meet and confer discussions,

13  and based on presently known and reasonably

14  available information, Albertsons supplements its

15  original Answer to this Interrogatory and provides

16  the following updated, complete list of

17  Albertsons' pharmacies located within

18  Tarrant County and in operation during the

19  relevant time period."

20         Do you see that?

21  A.   Yes.

22  Q.   Okay.  And then Albertsons includes a

23  chart that identifies certain pharmacy banner

24  names, store numbers, addresses and other

25  information.

1              Do you see that?

2         A.   I do.

3         Q.   Does this chart spanning pages 3, 4 and

4    5 of the document appear to be an accurate list of

5    the Albertsons pharmacies that have operated in

6    Tarrant County, Texas, since 2006?

7         A.   I don't know.

8         Q.   You haven't seen a chart like this

9    before?

10        A.   Not this specific chart, no.

11        Q.   I counted here 51 pharmacies in this

12   chart to be located in Tarrant County that have

13   been owned -- owned and operated by Albertsons.

14             Does that sound right?

15        MR. DORAN:  Objection.

16        THE WITNESS:  I don't know if 51 is the

17   exact number.  I can't confirm.  But it is not out

18   of reason.

19        Q.   BY MR. LICHTER:  You don't have a

20   different understanding of what that number may

21   be?

22        A.   No.

23        Q.   The second column in this chart is

24   titled "Banner."  Is that essentially the brand

25   name of a particular pharmacy that Albertsons

1    owns?

2         A.   Yes.

3         Q.   For the 34 banners identified in this

4    chart as Albertsons, did Albertsons own and

5    operate those pharmacies since the open date

6    identified in the second to last column of the

7    chart?

8         A.   I can't confirm, but I have no reason

9    to say it is not.

10        Q.   Okay.  You're not aware of any sort

11   of name changes or banner changes to the

12   Albertsons banner pharmacies in Tarrant County,

13   do you?

14        A.   I don't know specifically in

15   Tarrant County.  I know that we have changed

16   banner names over the years from -- just as an

17   example -- I'm not saying this is -- but Tom Thumb

18   might change to an Albertsons and Albertsons might

19   change to a Tom Thumb, as an example, over the

20   years.  So I can't verify, just because I didn't

21   produce this.  I don't know.

22        Q.   Okay.  So for the 15 banners identified

23   in this chart as Tom Thumb, you don't know if

24   Albertsons acquired those from the Safeway merger

25   in 2015 or if those names have been changed since

1    then?

2         A.   It is possible they've changed since

3    then.

4         Q.   Okay.  Generally speaking, if a

5    banner here is designated as a Tom Thumb, could

6    Albertsons have owned and operated that pharmacy

7    prior to the merger with Safeway in 2015?

8         MR. DORAN:  Objection.

9         THE WITNESS:  I guess it is possible.

10        Q.   BY MR. LICHTER:  And the two banners

11   identified in the chart as Market Street, do you

12   know if Albertsons acquired those from the

13   United Supermarkets merger in 2013?

14        A.   One of them has an open date of 2018.

15   That would have been after the merger.  So I can't

16   confirm that.

17        Q.   The far right column of the chart

18   identifies the close date for each pharmacy.

19             Do you see that?

20        A.   Yes.

21        Q.   I counted 32 pharmacies with no close

22   date.  Does that mean those pharmacies are

23   currently open, as far as you know?

24        A.   As far as I know.

25        Q.   Okay.  And then 19 pharmacies that have

1    a close date identified.  I assume that means

2    those pharmacies are no longer in operation; is

3    that right?

4         A.    That's how I would interpret it, yes.

5         Q.    Okay.  Do you know about how many

6    pharmacies Albertsons currently operates within

7    the state of Texas?  You can give me your best

8    estimate.

9         A.    150, estimate.

10        Q.    You can set this one aside.

11              At certain times, did Albertsons

12   distribute opioids to its company-owned pharmacies

13   from its distribution center in Ponca City,

14   Oklahoma?

15        A.    Yes.

16        Q.    That includes to its pharmacies located

17   in Tarrant County, correct?

18        A.    Yes.

19        Q.    Are you aware that it distributed

20   opioids from that distribution center between the

21   years 2006 and 2008?

22        MR. DORAN:  Objection.

23        THE WITNESS:  Yes, I'm aware.

24        Q.    BY MR. LICHTER:  Are you aware that

25   during the 2006 to 2008 timeframe, it distributed

1    Schedule III, IV and V drugs?

2        A.    Yes.

3        Q.    Are you aware that during 2006 to 2008

4    timeframe, it did not distribute Schedule II

5    drugs?

6        A.    Yes.

7        Q.    Do you know the reason for that?

8        A.    I don't.

9        Q.    Are you aware that during 2009 to 2012,

10   Albertsons stopped distributing drugs from its

11   distribution center altogether?

12       A.    Yes.

13       Q.    Do you know why it stopped?

14       A.    I do not know.

15       Q.    Are you aware that from 2013 to 2016,

16   Albertsons again distributed opioids to its

17   pharmacies from its Ponca City distribution

18   center?

19       A.    Yes.

20       Q.    Do you know why it chose to start

21   distributing again in 2013?

22       A.    No.

23       Q.    Are you aware that during the 2013 to

24   2016 timeframe, it distributed Schedule II, III,

25   IV and V drugs?

1      A.   Yes.

2      Q.   Do you know why it chose to distribute

3  Schedule II drugs during this time?

4      A.   I am not.

5      Q.   Are you aware that in 2016, Albertsons

6  again stopped distributing drugs from its

7  distribution center?

8      A.   Yes.

9      Q.   Do you know why it stopped?

10     A.   No.

11     Q.   Are you familiar with Albertsons'

12  Suspicious Order Monitoring System or SOMS in the

13  2006 to 2008 timeframe?

14     A.   Yes.

15     Q.   Are you aware that the Ponca City

16  distribution center had about 30 selectors at

17  any given time who had the job of receiving an

18  order, taking the medication off the shelf and

19  shipping it out to the pharmacy?

20     A.   I'm not aware of the number, but the

21  overall description sounds fitting.

22     Q.   Do you have any reason to dispute the

23  number of 30?

24     A.   No.

25     Q.   Okay.  And during this time at the

1    warehouse, this is the 2006-2008 timeframe, are

2    you aware that selectors would use their gut

3    feeling to determine whether an order did or did

4    not look right for shipping?

5         A.   I know they used their knowledge and

6    background, familiarity with the stores they were

7    shipping to.  I don't know if that qualifies as a

8    gut feeling or not, but that's my understanding.

9         Q.   Have you ever heard the phrase "gut

10   feeling" used in the context of Albertsons'

11   Suspicious Order Monitoring System?

12        A.   I read it somewhere.

13        Q.   Do you recall where you may have read

14   it?

15        A.   In one of the documents I've seen

16   recently.

17        Q.   Would that be an Albertsons document,

18   an internal Albertsons document, rather than

19   something written by counsel?

20        A.   I don't know.

21        Q.   Okay.  Are you aware that the selectors

22   used what -- what Albertsons previously called a

23   "common sense approach" to determine which orders

24   looked suspicious?

25        A.   Yes.

1      Q.   Albertsons didn't have any written

2  criteria or training for the selectors at this

3  time to help them figure out which orders were

4  suspicious, correct?

5      MR. DORAN:  Objection.

6      THE WITNESS:  I don't know.

7      Q.   BY MR. LICHTER:  Do you know that if a

8  selector -- this is still the 2006-2008 timeframe.

9  If a selector determined an order was unusual, he

10  would inform his supervisor of that fact?

11      A.   Yes.

12      Q.   And then the supervisor would call the

13  store to speak with the pharmacist, correct?

14      A.   As I understand it, yes.

15      Q.   And the purpose of that call was only

16  to confirm the accuracy of the order and ask the

17  pharmacist if the order was a mistake, correct?

18      MR. DORAN:  Objection.

19      THE WITNESS:  I understood it as the --

20  to -- to call to understand the reasoning for the

21  order and why it was felt to be above what they

22  would have expected.

23      Q.   BY MR. LICHTER:  So you understand

24  the reasoning for the call to be beyond asking

25  the pharmacist whether the order was a mistake or

1    not?

2         A.   That's how I understood it, yes.

3         Q.   And what is your understanding based

4    on?

5         A.   Discussion.  And I thought that some of

6    the documents that I read indicated that that

7    was -- that the -- I'm trying to -- the -- that

8    was the overall understanding of -- of the

9    process.  I think -- I'm trying to remember.  It

10   is a lot of material.  Yeah, I can't -- I can't

11   recall specifically, the more I think about it,

12   where I saw that.

13        Q.   Okay.  Have you read any prior

14   deposition transcripts in this case or any other

15   case related to Albertsons' distribution of

16   opioids?

17        A.   Yes.

18        Q.   Whose deposition transcript have you

19   read?

20        A.   David Beck's.

21        Q.   Okay.  I believe Mr. Beck was deposed

22   twice.  Do you recall if you read his -- his

23   deposition in his personal capacity or his

24   deposition as a 30(b)(6) representative of

25   Albertsons?

1        A.    I think it was a 30(b)(6).  And I

2   didn't read it completely, just for clarity sake.

3        Q.    Do you recall about how long ago you

4   read that transcript?

5        A.    Within the last two weeks.

6        Q.    Did you read any other transcripts?

7        A.    I read the -- not for distribution.

8        Q.    How about for dispensing?

9        A.    For dispensing, yes, I read

10  Jessica Covaci's.

11       Q.    That would be her 30(b)(6), as well?

12       A.    That was a 30(b)(6), yes.

13       Q.    Okay.  And was it your understanding

14  that the distribution center employees, if they

15  were told an order was a mistake, they would cut

16  the order down to what it was intended and ship it

17  out, in the 2006 to 2008 timeframe?

18       A.    Yes.

19       Q.    And is it your understanding that if

20  the order wasn't a mistake, that the distribution

21  center employee would ship that order out in full?

22       MR. DORAN:  Objection.

23       THE WITNESS:  Again, my understanding was

24  that if they agreed that there was a good reason

25  for the order to be placed as it was, they shipped

1    it out in full, yes.

2         Q.   BY MR. LICHTER:  And were the orders

3    that were processed by the distribution center,

4    were those shipped out the same day they were

5    received or were they held overnight?

6         MR. DORAN:  Objection.

7         THE WITNESS:  I believe they were held

8    overnight.

9         Q.   BY MR. LICHTER:  Do you know why they

10   would have been held overnight rather than shipped

11   out the same day?

12        A.   I'm not sure.  I thought it was just a

13   timing issue with logistics.

14        Q.   Albertsons' suspicious order monitoring

15   policies from 2006 to 2008 were national in scope,

16   correct?

17        A.   Yes.

18        Q.   Okay.  Those national policies would

19   have applied to orders received from Albertsons'

20   Tarrant County stores, correct?

21        A.   Yes.

22        Q.   And at this time, the 2006-2008

23   timeframe, were there any sort of automatic

24   process in place that would screen out or reject

25   or cut any orders before they were filled at the

1  warehouse?

2      A.   Yes.

3      Q.   Okay.  Can you explain how that process

4  worked?

5      A.   So it was on the distribution -- the

6  dispensing software had certain limits put in

7  there for each -- for each location.  And if the

8  order was above that, it automatically cut it down

9  to the maximum, whatever that limit was.  So

10  before it went to Ponca and -- got sent to Ponca,

11  it would go through that first screening and cut

12  back.

13      Q.   And that was an automated process?

14      A.   Yes.

15      Q.   Okay.  Was that also in place between

16  2013 and 2016?

17      A.   Yes.

18      Q.   So if the automated process would

19  screen out orders above a certain threshold before

20  they reached the distribution center, what would

21  the distribution center selectors or employees be

22  looking for when they were filling those orders?

23      A.   They --

24      MR. DORAN:  Objection.

25      THE WITNESS:  My understanding is they would

1    look for orders that were, again, based on their

2    experience and knowledge of the stores outside of

3    a normal size order.

4         Q.   BY MR. LICHTER:  So selector -- even

5    though there was an automated screening process

6    prior to an order reaching the distribution

7    center, the distribution center employees would

8    still encounter orders that were excessive?

9         MR. DORAN:  Objection.

10        THE WITNESS:  Orders that were higher than

11   what they would consider average, yes, or normal,

12   yes.

13        Q.   BY MR. LICHTER:  Okay.  And for the

14   orders that were automatically screened, you said

15   if an order exceeded a certain threshold it was --

16   was it rejected in the system and not filled at

17   all?

18        A.   You're talking about the automated --

19        Q.   The automated system?

20        A.   -- component?

21             I believe it was cut back to the

22   maximum.  I don't think it was rejected.

23        Q.   Okay.  Do you know if those orders that

24   were automatically cut down to that maximum

25   amount, do you know if anybody investigated those

1    orders one way or another?

2         A.   I don't know from -- from that specific

3    action.  I know of -- I know -- well, we're

4    talking about 2006 to 2008 still?

5         Q.   Yeah.

6         A.   I don't know if anyone did.

7         Q.   Are you aware of any other components

8    of Albertsons' Suspicious Order Monitoring System

9    for the 2006 to 2008 timeframe we didn't talk

10   about yet?

11        A.   I think we talked about that.

12             No.

13        Q.   Okay.  All right.  Moving on to the

14   2013 to 2016 timeframe.  Are you familiar with

15   Albertsons' suspicious order monitoring between

16   2013 and 2016?

17        A.   Yes.

18        Q.   Okay.  During this time, Albertsons

19   pharmacies throughout the country were submitting

20   their Schedule II orders to Ponca City via hard

21   copy forms in the mail, correct?  I think they are

22   called Form 222's?

23             MR. DORAN:  Objection.

24             THE WITNESS:  For most of the time period,

25   yes.

1          Q.    BY MR. LICHTER:  Okay.  Do you recall

2    if that practice stopped at any certain point?

3          A.    When stores would move over to CSOS,

4    the electronic processing, they would not

5    necessarily 100 percent stop.  There could still

6    be a reason for a 222.  But for the most part, the

7    stores would use CSOS instead.

8          Q.    When you say CSOS, that's C-S-O-S, the

9    Controlled Substance --

10         A.    Ordering System.

11         Q.    -- Ordering System?

12         A.    Yes.

13         Q.    And there wasn't a certain time where

14    all of the pharmacies ported over to CSOS?  They

15    all kind of do it on kind of an ad hoc basis?

16         A.    I wouldn't say it is ad hoc.  But I

17    think it was a rollout.  So it wasn't like an

18    overnight switch.

19         Q.    So by, I guess, 2016, when Albertsons

20    stopped distributing, were there any -- were there

21    any pharmacies continuing to submit Schedule II

22    orders via hard copy form in 2016, or were they

23    all on CSOS at some point?

24         A.    I don't believe they were all on CSOS.

25         Q.    Okay.  You said for 2013 to 2016, there

1    was -- there was an automated process in place,

2    just like in 2006 to 2008, that screened out

3    certain excessive orders; is that right?

4         A.   The preliminary cut, yes.

5         Q.   And were the -- the Form 222's

6    processed in that preliminary cut step?

7         A.   They would not have been part of that

8    preliminary cut.

9         Q.   Okay.  Also during this 2013 to 2016

10   timeframe, electronic orders submitted to the

11   distribute -- the distribution center were also

12   added to a spreadsheet to track the prior 10 to

13   12 orders that the pharmacy submitted; is that

14   right?

15        MR. DORAN:  Objection.

16        THE WITNESS:  Could you repeat that?  I'm

17   sorry.

18        Q.   BY MR. LICHTER:  Sure.

19             During this 2013 to 2016 timeframe,

20   electronic orders submitted to the distribution

21   center were added in a spreadsheet to track the

22   average prior orders of those -- those pharmacies

23   submitted; is that right?

24        A.   That's my understanding.  Something

25   similar to that, yes.

1          Q.   Okay.  Do you know if this was called

2     an above threshold report?

3          A.   It sounds familiar.

4          Q.   Okay.  Do you know if the orders that

5     were cut by the preliminary screening process,

6     do you know if they were included in this above

7     threshold report spreadsheet?

8          A.   I don't believe they should have been.

9     I'm not 100 percent sure.

10         Q.   Okay.

11         MR. DORAN:  I'll just interject that a lot

12    of these questions are sort of going beyond sort

13    of the agreed scope of what he would be prepared

14    to talk about.  So, you know, I think a lot of

15    these questions and answers are sort of provided,

16    really, in his individual basis, just given the

17    kind of limitation and the scope on what he was

18    prepared here to talk about today.  So I just want

19    to put that on the record.

20         Q.   BY MR. LICHTER:  Okay.  Do you

21    recall -- in the context of the spreadsheet that

22    the distribution center employees had in 2013 to

23    2016, do you recall that they would call the

24    pharmacy in the event an order exceeded a certain

25    threshold?

1        A.    Yes.

2        Q.    Okay.  And do you know if the purpose

3    of that call was to confirm the accuracy of the

4    order and ask the pharmacist if it was a mistake?

5        A.    Similar, my understanding is that they

6    were calling to identify the reason for the order,

7    so that they could judge if it was appropriate or

8    not.

9        Q.    And the distribution center employee

10   making the call would document any information the

11   pharmacist gave as to why the order may have been

12   unusual; is that right?

13       A.    They documented some information.  I

14   don't know if it is any information.

15       Q.    Do you know what they were supposed to

16   document?

17       A.    I don't specifically know the

18   directions provided to them, no.

19       Q.    Are you aware that unless the order

20   was -- unless the pharmacist confirmed the order

21   was a mistake, that the orders would be shipped in

22   full?

23       A.    No.  I -- I'm not aware.  So I'm not

24   sure, no.

25       Q.    Do you have a different understanding

1    of that?

2         A.   My understanding was that they were

3    evaluating the purpose of the order -- or the

4    reason for the larger order, and, again, making a

5    decision on whether to ship or not.

6         Q.   Okay.  And in 2013 to 2016, the orders

7    were also held overnight and sent the next day for

8    logistical reasons?

9         A.   That's my understanding, yes.

10        Q.   And the 2013 to 2016 distribution

11   policies, SOMS policies, were also national in

12   scope, right?

13        A.   Yes.

14        MR. DORAN:  Objection.  Sorry.

15        Q.   BY MR. LICHTER:  Those would have also

16   applied to orders received from Albertsons'

17   Tarrant County stores; is that right?

18        A.   Yes.

19        Q.   Okay.  And talking about the automated

20   screening process prior to an order reaching the

21   distribution center, were -- were those orders

22   that were cut down investigated by anyone at

23   Albertsons?

24        A.   I don't recall.

25        Q.   And in all of the time that Albertsons

1    was distributing opioids to its pharmacies, it

2    never identified a single order as suspicious,

3    correct?

4         MR. DORAN:  Objection.

5         THE WITNESS:  As I understand it, yes.

6         Q.   BY MR. LICHTER:  And in all of the

7    time Albertsons was distributing opioids to its

8    pharmacies, it never reported a single order to

9    the DEA, correct?

10        MR. DORAN:  Objection.

11        THE WITNESS:  As I understand it, yes.

12        MR. LICHTER:  Okay.  If we can -- this is

13   where we're going to use the spreadsheet.  If we

14   can hop off the record for a couple minutes, so we

15   can figure out the logistics.

16        THE VIDEOGRAPHER:  The time is 10:54 a.m.

17   Off the record.

18        (Recess taken.)

19        THE VIDEOGRAPHER:  The time is 11:04 a.m.

20   On the record.

21        MR. LICHTER:  Okay.  We'll have the next

22   document marked as Exhibit 4.

23        (Exhibit 4 marked.)

24        Q.   BY MR. LICHTER:  Mr. Provenzano --

25        MR. LICHTER:  For the record, this slip

1    sheet is Bates labeled ALB-MALCT9-00000028.

2         Q.   BY MR. LICHTER:  And, Mr. Provenzano,

3    for the record, I've handed you a slip sheet of a

4    document we're going to look at.  And the slip

5    sheet identifies a spreadsheet produced by

6    Albertsons that contains thousands of lines of

7    data.  So to the extent we need to refer to the

8    spreadsheet itself, you can see the actual

9    spreadsheet on the screen in front of you.  I

10   didn't actually print out the hundreds of pages of

11   the spreadsheet itself today.

12             Does that all make sense?

13        A.   Yes.

14        Q.   Okay.  Do you see the spreadsheet now?

15        A.   Yes.

16        Q.   Okay.  Have you seen this spreadsheet

17   before?

18        A.   Yes.

19        Q.   Okay.  In discovery, your counsel

20   indicated the spreadsheet represents Albertsons'

21   above-threshold reports and available opioid

22   distribution data from the Ponca City distribution

23   center to Albertsons company-owned pharmacies

24   located in Tarrant County.

25             Does that seem accurate to you?

1      A.   Yes.

2      Q.   Okay.  And are you aware that the data

3   in the spreadsheet only covers August 2013 to

4   June 2016?

5      A.   Yes.

6      Q.   Okay.  Do you know whether any similar

7   data is available for the 2006 to 2008 timeframe?

8      A.   I don't know.

9      Q.   In looking at the spreadsheet, each row

10  represents an order that the Ponca City

11  distribution center received from one of its

12  pharmacies in Tarrant County; is that right?

13     A.   Yes.

14     MR. LICHTER:  And I'll ask the tech to

15  scroll all the way down to the bottom, so we can

16  see the total number of Tarrant County orders we

17  have on the spreadsheet for there.

18     Q.   BY MR. LICHTER:  I think the last row

19  with information on it is row 20,468.

20          Do you see that?

21     A.   Yes.

22     MR. DORAN:  I'll just -- I don't know

23  offhand if the spreadsheet includes just

24  Tarrant County stores or all of Texas, because we

25  ended up producing a supplement.  I just don't

1    know offhand if this is just Tarrant County stores

2    or all of the Texas stores.

3          MR. LICHTER:  Your supplement, was that an

4    overlay of the -- the single document or was it an

5    additional document?

6          MR. DORAN:  I can't recall.

7          Q.   BY MR. LICHTER:  So anyway, on the

8    spreadsheet, we're looking at about 20,500 orders,

9    is that right, approximately?

10         A.   Yes.

11         Q.   And scrolling all the way back to the

12   top, Column A is date.

13              Just so I know I'm reading this

14   correctly, the date of the first order would be

15   07 -- sorry -- 08/07/13 or August 7, 2013; is that

16   right?

17         A.   Yes.

18         Q.   Okay.  Do you know what the remainder

19   of that number identifies?

20         A.   I believe it is -- I thought it was a

21   store number.  But, no, I'm not sure.  I'm sorry.

22         Q.   Okay.  Column B is actually the store

23   number?

24         A.   Column B is store number.

25         Q.   Okay.  That's the Albertsons pharmacy,

1    I think, in Tarrant County.  But I think your

2    counsel expressed it might be all of Texas.  But

3    the store number of the Albertsons pharmacy,

4    either in Texas or Tarrant County, that submitted

5    the order to the distribution center; is that

6    right?

7         A.   Yes.

8         Q.   And Column E is the item description.

9    That's the name and strength of the medication of

10   the -- that the pharmacy ordered, correct?

11        A.   Yes.

12        Q.   Column F and G both say comments.  One

13   says comments and one says comments 2.

14             Do you see that?

15        A.   Yes.

16        Q.   And these contain any documentation

17   the DC employee made regarding his or her

18   conversation with the pharmacy about the order,

19   correct?

20        A.   Yes.

21        Q.   Okay.  And Column H is item size.  And

22   that's the amount of pills in each bottle ordered;

23   is that right?

24        A.   Yes.

25        Q.   Column K is quantity ordered.  That's

1    the number of bottles the pharmacy ordered; is

2    that right?

3         A.    Yes.

4         Q.    Okay.  Column L is AVG QTY.  I think

5    that stands for average quantity.

6              Is that your understanding?

7         A.    Yes.

8         Q.    That's the average of the prior 10 to

9    12 orders of that medication from that ordering

10   pharmacy; is that right?

11        A.    Yes, I believe so.

12        Q.    Okay.  Looking at Column P is exception

13   reason.  And that's the reason each order made it

14   onto the spreadsheet in the first place; is that

15   right?

16        A.    Yes, I believe so.

17        Q.    Okay.  If we can click on the drop-down

18   menu for this column to take a look at the

19   different exception reasons used in the

20   spreadsheet.  Hopefully we can all see that.

21              The first one is new NDC ordered.

22              Do you see that?

23        A.    Yes.

24        Q.    Do you know what that means?

25        A.    New product that the store hadn't had

1    before.

2         Q.   That's the reason the order would have

3    made it on the spreadsheet?

4         A.   Yeah.  Since it had no history -- it

5    had a history of zero, anything over zero is going

6    to be a -- would make it look like a larger than

7    usual order.

8         Q.   The next one is no set average for

9    store.

10             Do you see that?

11        A.   Yes.

12        Q.   And what does that mean?

13        A.   For some reason, the store doesn't have

14   an average established.  I don't know why.  I

15   don't have specifics on that one, no.

16        Q.   Okay.  Do you know if the orders -- if

17   these orders were still shipped in full, if there

18   were no set average for the stores for a

19   particular order?

20        A.   I don't know for sure, but I believe

21   they would be.

22        Q.   Okay.  And do you know if the Ponca

23   employee called the store if the store had no set

24   average for a particular store?

25        A.   I don't know.

1       Q.   Are you aware that there are no call

2   notes on the spreadsheets, no comments included

3   for orders coded as no set average for store?

4       A.   I am not.

5       Q.   Okay.  All right.  Next down is order

6   quantity greater than 20 percent of store average.

7            Does that mean that the quantity of

8   medication being ordered exceeded 20 percent of

9   the prior average for that store's order?

10      A.   Yes.

11      Q.   Okay.  Below that is order quantity

12  greater than store average plus SOM.

13           Do you know what that means?

14           So looking down, again, at the

15  drop-down box for the list of reasons --

16      A.   Yeah.  The drop-down disappeared, but

17  I'm trying to read it so I can -- can I see an

18  example again?  Can someone drop it back down

19  again?

20           Thank you.

21      Q.   Order quantity greater than average

22  plus SOM.

23           Do you know what that means?

24      A.   I don't.

25      Q.   The next one, subs to new NDC, do you

1    know what that means?

2         A.   That would mean a substitute from an

3    old NDC that either, for some reason, can't be

4    obtained to a different NDC.  So -- so same

5    strength product, same drug, just a different

6    manufacturer.

7         Q.   Okay.  The next one down, sub to new

8    NDC no set average.

9              Do you know what that means?

10        A.   Well, the first part of it, as I

11   described.  The last part of it, I wasn't -- I'm

12   not sure what no set average means.  But whatever

13   it means, my -- my understanding would be that

14   for some reason, there's no average for that item.

15        Q.   Okay.

16        A.   Or for that store, I should say.

17        Q.   Okay.  And then the last one, sub to

18   new NDC greater than 20 percent of store average.

19             Does that mean that new NDC for the

20   medication can't -- it also exceeded 20 percent?

21        A.   It also exceeded 20 percent of the

22   average, yes.

23        Q.   Okay.  Looking at Column Q --

24        A.   Okay.

25             MR. LICHTER:  You can exit that drop down

1    menu and look at Column Q.

2         Q.   BY MR. LICHTER:  That's bottles over.

3    That's the number of bottles in the current order

4    that exceeds the prior average of that medication;

5    is that right?

6         A.   Yes.

7         Q.   Okay.  Column R says percent over.

8    That's the percent the current order exceeds the

9    prior average of that medication; is that right?

10        A.   Yes.

11        Q.   Okay.  And generally speaking, if

12   there's no comment in the comment field, does that

13   mean there was no phone call from the distribution

14   center to the pharmacy?

15        MR. DORAN:  Objection.

16        THE WITNESS:  In which field?  I'm sorry.

17        Q.   BY MR. LICHTER:  The comments field.

18        A.   Yes, as I understand it.

19        Q.   Okay.  Are you aware that only 164

20   of the approximately 20,500 orders have any

21   information listed in the comment field here?

22        A.   I'm sorry.  Can I go -- go back to the

23   question?  I didn't -- I was rethinking.

24             So you're asking again -- can you

25   repeat that question?

1          Q.   Sure.

2               If -- if there's no comment in the

3     comment field, if the comment fields here are

4     blank --

5          A.   Blank, okay.

6          Q.   If Columns F and G, if those are blank,

7     does that mean there was no phone call from the

8     distribution center to the pharmacy?

9          MR. DORAN:  Objection.

10         THE WITNESS:  I don't think so.  That's not

11    my understanding.

12         Q.   BY MR. LICHTER:  What is your

13    understanding?

14         A.   There's no documentation on it.  It

15    doesn't tell me why.

16         Q.   Okay.  But it is your understanding

17    that if the distribution center did call a

18    pharmacy, they would document their notes from the

19    conversation in Column F or G, correct?

20         A.   That's what I would -- that's what

21    should happen, yes.

22         Q.   Okay.  Other than the -- the calls

23    noted in the spreadsheet, are you aware of any

24    other due diligence steps Albertsons took for any

25    of these orders before the orders were shipped to

1    pharmacies?

2        MR. DORAN:  Objection.

3        THE WITNESS:  Before they were shipped to

4    pharmacies?  Timing on it is a little tricky.  I

5    know that the -- the information was shared with

6    the compliance group afterwards.  But I don't know

7    if I could say that it happened before or after it

8    was shipped to the pharmacy.

9        Q.   BY MR. LICHTER:  So you don't know if

10   the information was shipped to compliance before

11   or after the order was shipped?

12       MR. DORAN:  Objection; form.

13       THE WITNESS:  My understanding, I believe

14   it was sent the same day as the order was -- as

15   the calls would have been made.  So it should have

16   gone out before the order was shipped.

17       Q.   BY MR. LICHTER:  Sorry.  What should

18   have gone out?

19       A.   The -- the spreadsheet should have been

20   sent to the compliance, I believe.

21       Q.   Before the order was shipped?

22       A.   I think, yes.

23       Q.   And was it your understanding that

24   orders would be held by Albertsons pending a

25   response from the -- I believe you said it was the

1      compliance department?

2          A.    Yes.

3          Q.    They would be held?

4          A.    No.  The compliance department used

5      this for -- kind of as -- as part of an overall

6      compliance process where they were looking at the

7      overall distribution -- not distribution, but also

8      dispensing of the pharmacy to see if there was

9      any -- anything that was popping up on this issue

10     that might make them want to look at a store

11     closer from dispensing purposes, not necessarily

12     from the order process, as I understand it.

13         Q.    So regardless of what happened after

14     the information was sent to compliance, the order

15     would still be shipped out, correct?

16         A.    My understanding, yes.

17         MR. LICHTER:  Okay.  I'll have the next

18     document marked as Exhibit 5.

19         MR. DORAN:  Are you still --

20         Q.    BY MR. LICHTER:  Well, so Exhibit 5 is

21     kind of an excerpt of the spreadsheet.  So it may

22     be helpful to refer back and forth.  But for now,

23     we can look at the new exhibit.  And if you need

24     to look back to the spreadsheet, you can let me

25     know and we can make that work.

1          A.    Thanks.

2          (Exhibit 5 marked.)

3          MR. DORAN:  We'll leave -- why don't we --

4     if you're going to refer back, just -- he'll -- he

5     has the hard copy of Exhibit 5 in front of him.

6     If you need to refer back to Exhibit 4, obviously

7     that needs to be put back on the screen.

8          Q.    BY MR. LICHTER:  That's fine.  Okay.

9     So we'll be looking at Exhibit 5 right now.  If

10    you would like to look back at the spreadsheet,

11    let us know and we'll put that up.

12             Is that okay?

13         A.    Yes.

14         Q.    Okay.  So I wanted to look at a few of

15    the specific orders that were in the spreadsheet

16    that we were just looking at.  I will represent to

17    you that I created this chart in Exhibit 5 by

18    copying information from the 11 columns in the

19    spreadsheet that we just looked at for a few

20    specific orders.

21             Does that make sense?

22         A.    Yes.

23         MR. DORAN:  And I'll just object to the

24    extent that this is obviously just an excerpt of

25    some of the columns, but not all of the columns.

1          MR. LICHTER:  Sure.

2          Q.   BY MR. LICHTER:  So the far left column

3     here in the document we're looking at says row.

4          Do you see that?

5          A.   Yes.

6          Q.   Okay.  And that refers to the row in

7     the Excel spreadsheet that we looked at.  So I

8     would like us to look at the information marked

9     for row 4965.

10          Do you see where that is?  I think it

11     is three down in this chart.

12          A.   I do, yes.

13          Q.   Okay.  According to the information

14     here in this chart, on February 15th, 2015,

15     Tarrant County Store No. 560 ordered 25 100-count

16     bottles of hydrocodone, which was 138 percent over

17     their prior average.

18          Do you see that?

19          A.   I do.

20          Q.   Okay.  Are you aware that store 560 is

21     located in Colleyville, Texas?

22          A.   I am not.  But I -- I assume that's

23     accurate.

24          Q.   Okay.  I'll represent that it is

25     located in Colleyville, Texas.

1          The comment included with this order

2    says:  "Used 3400 last week."

3          Do you see that?

4     A.   Yes.

5     Q.   So that means a distribution center

6    employee saw the order, called the pharmacy, and

7    the pharmacist told him the reason the order is

8    high is that Store No. 560 dispensed 3,400 of

9    these pills last week alone; is that right?

10    MR. DORAN:  Objection.

11    THE WITNESS:  That's what the person

12    documented based on the conversation with the

13    pharmacist, yes.

14    Q.   BY MR. LICHTER:  Right.  Okay.

15          And based on this comment, "used 3400

16    last week," was filling this order in full a

17    violation of Albertsons' policies or was it

18    compliant with them?

19    MR. DORAN:  Objection.

20    THE WITNESS:  It -- I can't answer that

21    without knowing more about the conversation that

22    was held.  So I don't know.

23    Q.   BY MR. LICHTER:  Okay.  But that's the

24    only information of the conversation that is

25    documented here, right?

1          A.    Correct.

2          Q.    Okay.

3          A.    It is.

4          Q.    If we can look at row 6066.

5                Are you there?

6          A.    I am.

7          Q.    Okay.  And the information here

8    indicates that on April 23rd, 2015, Tarrant County

9    Store No. 4267 ordered eight 100-count bottles of

10   hydrocodone, which was at 175 percent over their

11   prior average.

12               Do you see that?

13         A.    Yes.

14         Q.    I'll represent that Store 4267 is

15   located in Watauga, Texas.

16               Do you have any understanding to the

17   contrary?

18         A.    No.

19         Q.    Okay.  The comment says:  "new pt."

20               Do you see that?

21         A.    Yes.

22         Q.    And PT is generally shorthand for

23   patient, correct?

24         A.    Correct.

25         Q.    Okay.  So here, the reason for ordering

1     175 percent over the prior average of the store is

2     that one new patient presented a prescription

3     for -- at this store, correct?

4           MR. DORAN:  Objection.

5           Q.   BY MR. LICHTER:  Based on the

6     information here?

7           A.   I can't confirm that.  It could be --

8     the new patient could be -- an abbreviation for

9     patient.  It might be multiple patients or it

10    could be one patient.  I don't know for sure.

11          Q.   Okay.  So based on the information

12    here, you wouldn't be able to say whether filling

13    this order in full would violate Albertsons'

14    policies?

15          MR. DORAN:  Objection.

16          THE WITNESS:  No.

17          MR. DORAN:  Vague and ambiguous.  There's no

18    foundation.

19          THE WITNESS:  Correct.  There -- I couldn't

20    say because there's not enough information to make

21    that judgment -- to make that judgement from this

22    information on the sheet.

23          Q.   BY MR. LICHTER:  Okay.  If you can look

24    at row 6192.

25                According to the information here, on

1    June 22, 2015, Tarrant County Store 4124 ordered

2    seven 100-count bottles of hydromorphone, which

3    was 169 percent over their prior average.

4            Do you see that?

5        A.   Yes.

6        Q.   Okay.  I'll represent that Store 4124

7    is located in Fort Worth, Texas.

8            Do you have any understanding to the

9    contrary?

10       A.   No.

11       Q.   Okay.  And the comment says:  "A new pt

12   script, upt order."

13           Do you see that?

14       A.   Yes.

15       Q.   Okay.  So according to the comments

16   here, the reason the store ordered 169 percent

17   over the prior average is that the store had one

18   new patient with one new prescription, correct?

19       A.   Yes.  Yes.  I would define that -- I

20   would interpret that a new -- a new patient

21   script.

22       Q.   You interpret that as one new patient

23   prescription, correct?

24       A.   Yes.  Not meaning that the quantities

25   were that prescription specifically, but yes.

 1          Q.   Okay.  Based on this comment, do you

 2     have any opinion as to whether filling this order

 3     in full complied with Albertsons' policies?

 4          MR. DORAN:  Objection.

 5          THE WITNESS:  No.

 6          Q.   BY MR. LICHTER:  Okay.  Row 7953,

 7     according to that information, on September 3rd,

 8     2015, Tarrant County Store 4242 ordered ten

 9     100-count bottles of hydromorphone, which was

10     203 percent over the prior average.

11          Do you see that?

12          A.   Yes.

13          Q.   I'll represent Store 4242 is located in

14     Arlington, Texas.  Do you have any reason to

15     dispute that?

16          A.   No.

17          Q.   The comment here says:  "2 pts get 500

18     per month."

19          Do you see that?

20          A.   Yes.

21          Q.   So according to the -- the comment

22     here, the reason this store ordered 203 percent

23     over the prior average is that two patients were

24     receiving 500 hydromorphone pills per month,

25     correct?

1          MR. DORAN:  Objection.

2          THE WITNESS:  From what I read, yes.

3          Q.   BY MR. LICHTER:  Based on the

4     documentation that is indicated here, you have no

5     idea whether or not filling this order would have

6     complied with Albertsons' policies, correct?

7          MR. DORAN:  Objection.

8          THE WITNESS:  Correct.  Because you don't

9     know anything about the therapy of the patient,

10    correct.

11         Q.   BY MR. LICHTER:  Right.

12              In row 10692 on the second page of the

13    document.

14         A.   Yes.

15         Q.   Let me know when you're there.

16         A.   I'm here.

17         Q.   According to the information here, on

18    June 19th, 2016, Tarrant County Store No. 560

19    ordered 44 500-count bottles of Tramadol, which

20    was 2,833 percent over the prior average.

21              Do you see that?

22         A.   I do.

23         Q.   Okay.  And I think we previously

24    identified Store No. 560 as located in

25    Colleyville, Texas.

1          Any understanding to the contrary?

2     A.    No.

3     Q.    Okay.  And the comment says:

4  "Increased in to stores."

5          Do you see that?

6     A.    Yes.

7     Q.    Do you have any idea what that means?

8     A.    This was around the time that the --

9  the Ponca facility was getting out of

10  distribution.  So they were distributing their

11  product to the stores -- to basically get all of

12  the product out of Ponca and into -- into the

13  pharmacies because they were going out of

14  business -- out of the business.

15     Q.    So if I understand that right, when

16  Ponca was winding down its distribution process

17  from the Ponca City warehouse, in order to get rid

18  of the medications on the shelves, it would -- I

19  think it referred to it as pushing out the

20  medications to its pharmacies; is that right?

21     A.    That's correct.

22     Q.    Okay.  That would have included

23  pharmacies located in Tarrant County?

24     A.    Yes.

25     Q.    And it appears here, for this

1    particular order we're looking at, that the store

2    received 2,833 percent over its prior average

3    based on that push of that medication to the

4    Albertsons stores?

5        A.    That's correct.

6        Q.    Okay.  Looking at row 19026.  On

7    September 24, 2014, Tarrant County Store 4290

8    ordered ten 500-count bottles of hydrocodone,

9    which was 333 percent over the prior average.

10            Do you see that?

11       A.    Yes.

12       Q.    I'll represent Store 4290 is located in

13   Azle, Texas.

14            Any reason to dispute that?

15       A.    No.

16       Q.    That's A-z-l-e, Texas.

17            The comment says:  "Getting pts from

18   wal mart and CVS."

19            Do you see that?

20       A.    I do.

21       Q.    Okay.  Based on the limited information

22   here, does that mean that patients originally

23   presenting prescriptions at Walmart and CVS were

24   now going over to Albertsons Store 4290 to get

25   them filled?

1        A.    Yes.

2        Q.    Okay.  And that's the reason for the

3   333 percent increase over the store's prior

4   average?

5        A.    Yes.

6        MR. DORAN:  Objection.

7        Q.    BY MR. LICHTER:  No idea, based on

8   these comments, whether filling those orders would

9   have been a violation of Albertsons' policies?

10       MR. DORAN:  Objection.

11       THE WITNESS:  No.

12       Q.    BY MR. LICHTER:  Looking at row 20086,

13  on November 30, 2014.

14       A.    Um-hum.

15       Q.    Tarrant County Store 560 ordered 15

16  100-count bottles of Oxycodone --

17       THE COURT REPORTER:  I'm sorry.  Store 560

18  ordered --

19       Q.    BY MR. LICHTER:  15 100-count bottles

20  of Oxycodone, which was 196 percent over the prior

21  average.

22            Do you see that?

23       A.    I do.

24       Q.    Okay.  And I think we previously

25  identified Store 560 as located in Colleyville,

1    Texas.

2              The comment says:  "This is usually

3    what they get."

4              Do you see that?

5         A.   I do.

6         Q.   Okay.  But looking at the other

7    information in this chart, we know that's not

8    actually true, correct?

9         MR. DORAN:  Objection.

10        Q.   BY MR. LICHTER:  Because they exceeded

11   their threshold -- or exceeded the prior average,

12   I should say?

13        A.   I -- the only thing I can say is I

14   don't know if this is maybe an NDC switch to a

15   different NDC, but I can't tell from this.  And

16   that maybe has something to do with the -- with

17   the discrepancy in why that comment is made.

18   Perhaps they got the same product with a different

19   NDC.  And now that it is on a different NDC, it is

20   higher than that NDC was normally at.  But I'm not

21   sure.  That's my best --

22        Q.   BY MR. LICHTER:  Okay.  But there's no

23   indication that there was a switch in NDC based on

24   the comments included in the -- by the DC

25   employee?

1          A.    That's correct.

2          Q.    The DC employee only documented from

3     the conversation with the pharmacy that this is

4     usually what they get, correct?

5          A.    That's correct.

6          Q.    Even though, based on the data here,

7     that the order was 196 percent over that store's

8     prior average for that order, correct?

9          A.    Correct.

10         Q.    Okay.  In looking at the rest of the

11    comments on this chart, the comments noted in this

12    chart appear to you to be appropriate

13    justifications for shipping excessive opioid

14    orders into Tarrant County?

15         MR. DORAN:  Objection; no foundation.

16         THE WITNESS:  They're -- summary comments

17    are -- are hard to discern what really happened

18    in the conversation.  So they are not -- they are

19    not complete comments to truly describe what

20    happened in the conversation, or not ideal anyway.

21         Q.    BY MR. LICHTER:  Do any of the comments

22    jump out at you as being problematic or not

23    sufficient to justify shipping an order in full?

24         MR. DORAN:  Objection; no foundation.

25         THE WITNESS:  I can't judge it just by

1    the comments because I don't know what the

2    conversation was.  And so far, it is hard to --

3    it is -- it is not possible to tell if after the

4    conversation, the person decided that it was

5    appropriate or not.

6         Q.    BY MR. LICHTER:  Okay.  Do you know if

7    Albertsons ever identified any orders from its

8    Tarrant County pharmacies as suspicious?

9         A.    I don't.

10        Q.    You're not aware of any?

11        A.    No.

12        Q.    And do you know if Albertsons ever

13   canceled, rejected or refused to ship an order

14   from its Tarrant County pharmacy on the grounds

15   that it was suspicious?

16        A.    No.

17        Q.    No, you don't know, or no, you're not

18   aware of any?

19        A.    No, I'm not aware of any.

20        Q.    Okay.  And did Albertsons ever report

21   any orders from its Tarrant County pharmacies to

22   the DEA?

23        A.    I don't believe so.

24        MR. LICHTER:  Okay.  You can set that one

25   aside.

1          I'll have the next document marked as

2    Exhibit 6.

3          (Exhibit 6 marked.)

4          MR. DORAN:  Are we done with the --

5          MR. LICHTER:  We're done with the

6    spreadsheet, yes.

7          MR. DORAN:  I'll take my computer back.

8          MR. LICHTER:  For the record, this document

9    is Bates numbered ALB-MDLCT9-00386118.

10         Q.   BY MR. LICHTER:  Have you seen this

11   document before?

12         A.   Yes.

13         Q.   When is the last time you saw it?

14         A.   I think within the last couple of

15   weeks.

16         Q.   Okay.  Is this a copy of Albertsons'

17   annual controlled substance training PowerPoint?

18         A.   It is.  I'm not sure the version or the

19   year of it.  But, yes, it is -- it is one of the

20   versions.

21         Q.   Okay.  I'll represent to you that

22   the -- the metadata for this document identified a

23   document date of September 12th, 2018.

24         A.   Thank you.

25         Q.   Any reason to believe this document may

1   be from a different time or a different year?

2        A.   No.

3        Q.   This appears to be a copy of controlled

4   substance training that Albertsons used in 2018?

5        A.   Yes.

6        Q.   Just flipping through the document now,

7   it looks like each -- each page has a slide at the

8   top followed by speaker notes beneath each slide;

9   is that right?

10       A.   Yes.

11       Q.   Do you know who typically conducts this

12  training?

13       MR. DORAN:  Objection.

14       THE WITNESS:  2018?  This could have been --

15  if it was done initially -- the short answer is,

16  I'm not sure.  But it could have been done by a

17  live trainer or this could have been an online

18  program.  I don't know which way we were doing

19  this in 2018.

20       Q.   BY MR. LICHTER:  If it was done by a

21  live trainer, do you know what the title of the

22  person would have been?

23       A.   No.

24       Q.   No?

25            Do you know who would have been

1    receiving this training?

2         A.    Pharmacists.

3         Q.    Would that have included Albertsons

4    pharmacists located in Tarrant County, Texas?

5         A.    Yes.

6         Q.    This would have been nationwide

7    training?

8         A.    Yes.

9         Q.    Obviously, the title of the first

10   slide on the document indicates this is an annual

11   training.  So does that mean this was -- this

12   training was conducted once a year?

13        A.    Correct.

14        Q.    Do you know when Albertsons first began

15   giving this annual controlled substance training?

16        A.    It was probably around 2017, 2018.

17   This might be the version for that.

18        Q.    Okay.  Was Albertsons providing

19   controlled substance training to its pharmacists

20   prior to 2017, 2018?

21        A.    In different formats, part of policies

22   and procedures training and communication that

23   went out that way.  This was a more formalized

24   process as we were developing our programs, kind

25   of as part of our continued quality assurance and

1    improvement processes, we were always tweaking and

2    modifying.  And this was -- this was a more

3    formalized process.

4        Q.   So prior to, I guess, 2017, 2018, other

5    than the actual written policies and procedures

6    that Albertsons provided to its pharmacists, do

7    you know what sort of format controlled substance

8    training took prior to that year?

9        A.   I don't recall.

10       Q.   Okay.  And in 2017, 2018, when this

11   training was used, were there multiple types of

12   controlled substance training given throughout the

13   year or did this training generally encompass

14   everything in this PowerPoint?

15       A.   Could you repeat that?

16       Q.   Sure.

17            Were there, I guess, other multiple

18   types of controlled substance training that

19   Albertsons gives throughout the year, or is

20   the controlled substance training generally

21   encompassed in this document -- in this

22   PowerPoint?

23       MR. DORAN:  Objection.

24       THE WITNESS:  There are multiple trainings.

25   You're talking about 2017, 2018 specifically?

1    Q.   BY MR. LICHTER:  Yeah, when this

2  document was being used.

3    A.   I -- I would have to -- I would have to

4  look that up to see what he would we might have --

5  today, I know we absolutely have more -- more --

6  multiple different training programs.  But in

7  2018, I don't know if this was the only one or

8  not.

9    Q.   Okay.  Do you know when multiple

10  different training programs started to be used by

11  Albertsons?

12    A.   I know at minimum we were doing them in

13  probably around this timeframe.  And afterwards,

14  we started developing newer training programs on

15  top of this.  So we had a comprehensive controlled

16  substance training program.  We have a training

17  program on stimulants.  We have a training program

18  on Suphedrine, methamphetamine processes.  We have

19  a program on PDMP.  PDMP has probably been around

20  longer.

21    But so there's -- there's multiple

22  different controlled substance programs.  I just

23  couldn't tell you like dates on when each one

24  started.

25    Q.   But they would have started at some

1    point after 2018?

2         A.    There might have been -- the PDMP

3    one might have been earlier than that.  The

4    comprehensive one I mentioned was after this,

5    yes.

6         Q.    Okay.  We can jump down to page 31 of

7    the slide presentation.  That's Bates labeled

8    384619.

9              Let me know when you're there.

10        A.    I've got it.

11        Q.    The title of the slide is "Prohibitions

12   to Dispensing."

13             Do you see that?

14        A.    Yes.

15        Q.    Okay.  And the slide lists the

16   following five bullet points under that heading

17   "for office use."  Number 2 is casual sales.

18   Number 3, issued in the prescriber's name.

19   Number 4, issued for prescriber staff or family

20   member, not intended for legitimate medical

21   purpose.  And then number 5, pharmacist must use

22   professional judgment.

23             Do you see that?

24        A.    Yes.

25        Q.    So it looks like Albertsons identifies

1    four instances in which its pharmacists should not

2    dispense controlled substance prescriptions,

3    correct?

4         A.   Correct.

5         Q.   Okay.  And beneath the slide, let's

6    read the speakers notes.

7              It says:  "Controlled substances cannot

8    be dispensed if the prescription is issued or

9    written for office use, casual sale, issued by a

10   prescriber in the name of the prescriber, or if

11   issued to a prescribe's staff or family member

12   that is not for a legitimate medical purpose.  The

13   pharmacist should always use their professional

14   judgement when dispensing any controlled substance

15   including evaluating any red flags that might

16   exist.

17             "For example, does it make sense for a

18   dentist or a podiatrist to write a prescription

19   for Adderall?"

20             Did I read that okay?

21        A.   Yes.

22        Q.   I'll represent to you this is the only

23   slide in the presentation that references the

24   phrase "red flags."

25             Are you aware of any separate trainings

1    for Albertsons' pharmacists that dives deeper into

2    the area of identifying and resolving red flags

3    prior -- in or prior to this 2018 timeframe?

4         A.   When you say "training," a formal

5    training program like this, no.  Just in

6    communications -- in written communications to

7    stores.

8         Q.   Okay.  And would you consider the slide

9    to be a -- you're the VP of Pharmacy Compliance

10   and Government Affairs, correct?

11        A.   Yes.

12        Q.   Would you consider this slide to be a

13   thorough and robust training for Albertsons'

14   pharmacists on how to identify and resolve red

15   flags?

16        A.   Can I browse through this quickly?

17        Q.   Sure.

18        A.   Yeah, this is -- as far as -- as far

19   as focusing on red flags, it is not -- I would

20   not describe it as a thorough -- this is more

21   focused on -- at this time, we were -- again,

22   part of our overall quality improvement processes

23   in the evolution of our programs is we continued

24   to evolve and change as the industry changed.

25   This, if you look, is more focused on losses and

 1    reporting and documentation of -- of records,

 2    which is why future trainings really did start to

 3    delve more into more detailed focus on red flags

 4    and -- and training around that, outside of the

 5    previous communication that we had already sent

 6    out in written format.

 7        Q.    Right.

 8              And that evolution and those additional

 9    trainings came on or after 2018, correct?

10        A.    Yes.  The -- the formal training, yes.

11        MR. LICHTER:  Okay.  We can set this one

12    aside.

13              I'll have the next document marked as

14    Exhibit 7.

15        (Exhibit 7 marked.)

16        MR. LICHTER:  For the record, this document

17    is Bates numbered ALB-MDLCT9-00015802.

18        Q.    BY MR. LICHTER:  Have you seen this

19    document before?

20        A.    Not this specific document, that I

21    recall, no.

22        Q.    Okay.  Is this a store compliance

23    evaluation conducted by Albertsons on August 28th,

24    2019, for Albertsons Store No. 4290?

25        A.    Yes.

1          Q.    Okay.  I'll represent to you that

2     according to the store chart we saw in Exhibit 3,

3     Store 4290 is located at 480 Northwest Parkway in

4     Azle, Texas, which is located in Tarrant County.

5               Any reason to dispute that?

6          A.    No.

7          Q.    According to this document, David Hicks

8     was the District Pharmacy Manager of this pharmacy

9     at the time, correct?

10         A.    Yes.

11         Q.    Okay.  And what are the general duties

12    of a District Pharmacy Manager?

13         A.    They oversee the overall operations of

14    a pharmacy for a given district.  So usually a

15    group of 20 to 40 stores -- pharmacies.

16         Q.    And toward the top of the document, it

17    says:  "Southern - RX Compliance Evaluation ABS."

18              Does that mean -- well, are the

19    Albertsons Tarrant County, Texas, stores located

20    in Albertsons' southern district of pharmacies?

21         A.    Southern division.

22         Q.    Southern division?  Okay.

23         A.    They are.  I don't know if any -- I

24    think -- there might be some United stores also in

25    that group.  But southern would definitely

1    encompass this -- this territory, yes.

2         Q.   Do you know about how many Albertsons

3    stores are in the southern division?

4         A.   That 150 number I gave you earlier was

5    probably what I was thinking of for southern

6    division.  So that might not be exclusively Texas,

7    but I don't know the number off the top of my

8    head, no.

9         Q.   Okay.  Is this document a fairly

10   typical example of other compliance evaluations

11   that Albertsons conducts for its stores in

12   Tarrant County, the same general information and

13   format --

14        A.   Yes.  It is -- it is a standard field

15   evaluation report, yes.

16        Q.   Okay.  Is this the standard field

17   evaluation report for -- throughout the country

18   that Albertsons uses?

19        A.   Yes.  Correct.  Yes.

20        Q.   Do you know when Albertsons first

21   started conducting reviews like this?

22        A.   I don't know about the reporting that

23   you're looking at, but we've been doing field

24   evaluations for -- prior to 2015.  So that's when

25   I started my position.  I know they were going

1    before that.

2          Q.   You don't know when they would have

3    first started?

4          A.   I don't know when they originally

5    started, no.

6          Q.   And you don't know when this iteration

7    of the reviews first came into being?

8          A.   This iteration, not exactly.  But I

9    think it was started before this 2019 time period.

10         Q.   Do you know how the reviews have

11   changed over time?

12         A.   The questions have changed, modified.

13   There's been changes in the -- so this specific

14   list of questions that you're looking at get --

15   fluctuate every year, couple of years.  We go

16   through and revise and update.  Again, part of our

17   continual quality process.

18              The -- more recently, we've had a

19   difference in some of the grading processes.  But

20   at this time, it was fairly consistent for this

21   time and prior.

22         Q.   Can you break down, I guess, the

23   general overview of how these reviews are

24   typically conducted by Albertsons?

25         A.   So, yeah, sure.

1            We have a group of what we -- the

2    term is field evaluators.  They are auditors,

3    basically.  And they go into a pharmacy with a

4    standard list of questions, and they audit the

5    pharmacy against performance of those questions,

6    given specific guidelines on what to do for each

7    question.  And that's usually done four times a

8    year.

9        Q.    Okay.

10       A.    For each store.

11       Q.    Are there usually specific planned

12   dates or are they kind of surprises to people who

13   work in the pharmacies?

14       A.    They are usually surprises to people

15   in the pharmacies.  They are strict guidelines.

16   They are -- usually, if you fail one question, you

17   fail the entire -- the entire audit.  So a failure

18   is one wrong.  It is a very high bar we set.

19       Q.    And how big is the team that conducts

20   these audits?

21       A.    Across the country?  I think like

22   today -- I can't tell you how many we had in 2019.

23   But today, we have around 40 of them.

24       Q.    Are the -- are specific auditors

25   assigned to specific stores or do they kind of --

1    is it -- is it a random assignment process?

2         A.   It is usually not random.  They are

3    geographic because, obviously, they have a lot of

4    driving to do to go from store to store.  So a

5    person would be assigned stores in -- in a given

6    area.

7         Q.   So generally, the same auditors that

8    are auditing and reviewing a certain set of

9    stores?

10        A.   Typically, yes.  Outside of turnover,

11   yes.

12        Q.   And when they conduct their audits, do

13   they speak with the pharmacist directly?  Who do

14   they talk to to conduct their audits?

15        A.   They will speak with the pharmacist on

16   duty.  Whatever they need to do to accomplish all

17   of the questions, get answers to all of the

18   questions.  They may have to talk to technicians

19   there.  But usually, all of their activity will be

20   limited to the pharmacy and the people in the

21   pharmacy.

22        Q.   Okay.  What's the purpose of these

23   evaluations?

24        A.   It is compliance quality control.  So

25   it looks at all different levels of compliance for

1    the pharmacy to identify if any stores are out of

2    compliance.  And we have action plans that are --

3    if someone fails or they are -- their field

4    evaluation, they can be put on an action plan to

5    resolve the situation.  And they will get a

6    followup visit, and it is tracked over time.  So,

7    you know, our goal is to get all of the stores

8    100 percent compliant on everything.

9          Q.   How long does the evaluation process

10   typically last?

11         A.   It is, again, changed over the years.

12   At this time, this process for the one in 2019 was

13   probably a three- to four-hour audit.

14         Q.   How long does it typically last today?

15         A.   About two hours, two to two and a half.

16         Q.   Is there a reason why the time dropped

17   down to about half?

18         A.   We had one of the -- some of the

19   questions changed that were more time-consuming,

20   and that's the only reason.

21         Q.   Do you recall which questions those

22   were?

23         A.   They were not based around the

24   controlled substance section.  They were in the

25   dispensing section around third party audits.

1      Q.   Okay.  And does anybody review the

2  evaluation after it is completed?

3      A.   Yes.  The DPM gets a copy.  Our

4  compliance director would get to see the copy.

5  The DPO, I believe, also might get the copy.  That

6  is the Director of Pharmacy Operations.  I'm not

7  100 percent sure on that though.

8      Q.   Do any of those people have any

9  specific roles or duties after they receive a copy

10  of the compliance evaluation?

11      A.   They -- they should -- for example, the

12  DPM would be asked to follow up with the pharmacy

13  to make sure that their action plan they are

14  putting together is put together and then followed

15  through on.  And then the -- for the next field

16  evaluation, that would be an opportunity to check

17  it, as well.

18      Q.   And is it the actual auditors that are

19  putting together the action plans or is that

20  someone else?

21      A.   No.  The pharmacy puts -- the

22  pharmacist at the pharmacy would put the action

23  plan together for themselves.

24      Q.   So the pharmacist, I guess, writes out

25  their own action plan for what they are going to

1    do?

2         A.    Yes.

3         Q.    Okay.  And the DPM assures that that

4    action plan is carried out?

5         A.    Yes.

6         Q.    Here on the document it indicates that

7    the total score here is a fail.

8              What's the significance of that?

9         A.    It means they got at least one wrong.

10   You only get a pass if it is ██████████ .

11        Q.    Okay.  So if any question is -- is

12   answered in the negative or wrong, the entire

13   score is a fail?

14        A.    Yeah.

15        Q.    Is that how it is currently scored?

16        A.    No.

17        Q.    How is it currently scored?

18        A.    It is currently scored as a ██████████

19   is a pass.  ██████████  of the points on the

20   available is a pass.  In addition, there's five

21   critical questions where if you fail any of the

22   five critical questions, you failed the whole

23   audit.

24        Q.    Do you recall what those five critical

25   questions are?

1          A.    Not all of them, no.

2          Q.    Are any of them related to controlled

3    substances?

4          A.    The controlled substance count is one

5    of them, I believe, yes.

6          Q.    So if the count of -- the count of

7    controlled substances stored on the shelf of the

8    pharmacy, if there's a discrepancy there, the

9    entire score is a fail?

10          A.    Yes.

11          Q.    Okay.  Let's flip to a different part

12    of the evaluation, starting on the second page of

13    the document.  This is, I guess, Section 1,

14    pharmacy operations.

15                Do you see that?

16          A.    Yes.

17          Q.    Okay.  And that entails seven specific

18    questions that the evaluator answers, correct?

19          A.    Correct.

20          Q.    And this deals with issues like whether

21    proper signage is posted, if employees are wearing

22    name tags, is there a list of texts and

23    pharmacists, stuff like that, right?

24          A.    That's correct.

25          Q.    Okay.  If you'll look at Section 2 on

1    the following page, pharmacy security.

2              Do you see that?

3         A.    Yes.

4         Q.    And that entails eight specific

5    questions that the evaluator answers, right?

6         A.    Yes.

7         Q.    And that deals with issues like whether

8    the entrances and exits are secured, whether

9    documents are shredded, whether protected health

10   information is -- is protected, personal health

11   information is protected; is that right?

12        A.    Yes.

13        Q.    Stuff along those lines?

14        A.    Yes.

15        Q.    And the next page is Section 3,

16   pharmacy drug handling and storage.

17              Do you see that?

18        A.    Yes.

19        Q.    And here are seven specific questions

20   that the evaluator answers, right?

21        A.    Correct.

22        Q.    And here it is dealing with things

23   like proper refrigeration temperature, expired

24   medications, hazardous waste storage, stuff like

25   that, right?

```
1           A.    Correct.

2           Q.    Okay.  Section 4 is pharmacy controlled

3    substances.

4                 Do you see that?

5           A.    I do.

6           MR. LICHTER:  Okay.  For the record, this is

7    Bates No. 15806.

8           Q.    BY MR. LICHTER:  And this section

9    entails six specific questions and one

10   miscellaneous place holder.

11                Do you see that?

12          A.    Yes.

13          Q.    Okay.  And can you explain the scoring

14   system that we see here?

15          A.    So there's a number of points assigned

16   per question from -- so a value perspective.

17   Because when you're done, a percentage is -- is

18   not a percentage of questions answered, but a

19   percentage of your points.

20                So you'll see questions assigned ████

21   ████████████████████████, etcetera.  So they base it

22   on different value.  And then how much you got of

23   that total value that you -- or the potential you

24   could have gotten and then what you actually

25   earned is what is documented.  So the maximum
```

1    amount you can get for points for each question

2    would be in that potential column.  And then the

3    actual -- the Field Evaluator found is in the

4    other column.

5         Q.   Okay.  Were the only potential scores

6    here a 0 or the maximum amount of points?

7         A.   We still gave a score.  So even though

8    it was like you get ██████████, it would be a

9    fail, but you'd know you had gotten ██████████,

10   which would help you understand if you were really

11   far off or not that far off from passing.

12        Q.   Okay.  And I would like to read the

13   specific questions for this section into the

14   record here.

15             Number 1:  "Does the pharmacist verify

16   the receipt of Schedule II product on the DEA

17   222?"

18             Do you see that?

19        A.   Yes.

20        Q.   And the DEA 222, that's the hard copy

21   form that pharmacists fill out and send to the

22   distribution center, correct?

23        A.   Yes.  And there's electronic 222's, as

24   well.

25        Q.   Okay.  And number 2:  Are controlled

1    substances -- Are controlled substance invoices

2    detailed, signed, dated, and filled by RPh?

3         A.    Filed, but yes.

4         Q.    Filed by RPh.

5               What does RPh stand for?

6         A.    Pharmacist, registered pharmacist.  It

7    is kind of an abbreviation for pharmacist.

8         Q.    Number 3:  "Is the monthly audit of

9    Schedule II Controlled Substances and the annual

10   Controlled Substance inventory on file?"

11              Correct?

12        A.    Correct.

13        Q.    Number 4:  "Does the quantity of

14   controlled substances on hand agree to the

15   perpetual inventory system?"

16              Is that right?

17        A.    Correct.

18        Q.    And that just means do the medications

19   on the shelf match the electronic inventory

20   system?

21        A.    What's in the system, yes.

22        Q.    Okay.  Number 5:  "Does the pharmacy

23   have the current Power of Attorney (POA) on file

24   and CSOS POA on file?"

25        A.    Correct.

1      Q.   And number 6:  Are emergency CII

2    prescriptions received within the 7 day timeframe

3    of being filed, correct?

4      A.   Filled, yes.

5      Q.   Filled, sorry.

6           Number 7, this just says:

7    "Miscellaneous question."

8           Do you know what typically happens

9    here?

10     A.   I don't on that one, no.  I think it

11   is -- if there's a specific question that we need

12   asking, that would be where it is asked.  But on

13   this one, it is not applicable.  So. . .

14     Q.   All right.  Would you agree that the

15   questions in this section, this pharmacy

16   controlled substances section, typically deal with

17   recordkeeping and stocking issues?

18     A.   Correct.  Yes.

19     Q.   And the parts of the compliance

20   evaluation that specifically deal with controlled

21   substances are contained in this section, correct?

22     A.   Primarily, yes.

23     Q.   Okay.  Is there another section you're

24   aware of that specifically deals with controlled

25   substances?

1          A.    Specifically controlled substances, no.

2          Q.    Okay.  So there's no part in the -- in

3    these evaluations we're looking at that confirms

4    whether prescriptions with red flags are being

5    properly investigated and resolved, correct?

6          A.    That's correct.  That's not part of

7    this audit.

8          Q.    And there's no part of the audit

9    that confirms whether the resolution of red flag

10   prescriptions have been properly documented,

11   correct?

12         A.    That's correct.

13         Q.    And there's no part of the compliance

14   evaluation that determines if nearby pill mills

15   are being serviced by the pharmacy, correct?

16         A.    That's correct.

17         Q.    No part of the evaluation that

18   considers whether controlled substance dispensing

19   levels or trends -- that considers dispensing

20   levels or trends for the pharmacy, correct?

21         A.    Correct.

22         Q.    Okay.  Look at Section 5, pharmacy

23   dispensing, at the bottom of the same page.  This

24   section deals with medications that need to be

25   returned to stock, prescriptions left in the will

1    call area, mail delivery, stuff like that,

2    correct?

3          A.    Yes, correct.   Sorry.

4          Q.    Are there any other components of the

5    compliance evaluations that are not included in

6    this document?

7          A.    There's other compliance evaluations

8    other than the field evaluation, if that's what

9    you're asking, yes.  As far as -- this is all

10   that is part of this specific type of compliance

11   evaluation.   There's other evaluations that we do

12   though.

13         Q.    Okay.   What are the other types of

14   evaluations that you do?

15         A.    So we have a process where our --

16   our DPM's, our District Pharmacy Managers,

17   visit pharmacies twice a year and evaluate the

18   dispensing habits and patterns, kind of the

19   things that you were talking about that weren't on

20   this list, are on that -- are part of that

21   evaluation.  So they'll look for prescriptions

22   being -- documentation of red flags, reviewing

23   prescriptions.  All of the things that you

24   mentioned would be part of that type of an

25   evaluation.

1            And then there's a self-evaluation

2   that stores do that -- where they will do a

3   self-evaluation of that four times a year.  And

4   the DPM goes in and, again, does their own

5   full-blown evaluation and follows up on those

6   self-evaluations, as well.

7       Q.   And the first one you mentioned where

8   the DPM's visit the pharmacies twice a year, is

9   there a name for those -- for those evaluations?

10       A.   I think we are just calling them --

11   we are horrible with names.  I think they are just

12   called controlled substance audits or something

13   like that.  I don't know the formal name we're

14   using right now honestly.

15       Q.   Do those have any specific format or

16   structure like the compliance evaluations we're

17   looking at now?

18       A.   They do.  There are specific things

19   they look at and need to document, yes.

20       Q.   So that's a list of questions to be

21   answered?

22       A.   It is probably not as formal as this

23   one.  This one has been around a long time.  But

24   it is -- it definitely has a list of -- of items

25   for the -- it is not listed as questions, but it

1    is -- no, let me correct that.  There are some

2    questions on there.  So, yes, it is formalized.

3         Q.   Do you know when that audit process was

4    first implemented by Albertsons?

5         A.   Originally, in its original form, I

6    want to say we started it 2017, '18 timeframe.

7    And then it has evolved over time.

8         Q.   Any specific ways that it has evolved,

9    that you know?

10        A.   It has become more formalized, more

11   strict documentation.  You know, kind of like

12   this is very detailed questions and -- and

13   documentation of it.  It was a little more

14   informal initially where -- less structured, I

15   guess, is the best way to say it.  It has just

16   become more structured.

17        Q.   Prior to that 2017-2018 time period,

18   there wasn't any audits being conducted on the

19   pharmacies regarding dispensing and trends, red

20   flags, stuff like that?

21        A.   I don't know if they weren't happening.

22   It wasn't a formalized process.

23        Q.   So there was an informal process in

24   place?

25        A.   DPM's, it is -- part of their job is to

1    look at everything on -- in the operations of the

2    pharmacy.  So they should be looking at that type

3    of thing in -- in their visit of pharmacies most

4    frequently of anyone.

5         Q.   So prior to 2017-2018, the review would

6    kind of be a component of the DPM's general duty

7    to -- to oversee the goings on of their

8    pharmacies, right?

9         A.   Correct.

10        MR. LICHTER:  Okay.  It is 12:00 o'clock

11   right now.  I don't know if you want to do a lunch

12   break.

13        MR. DORAN:  Yeah, that sounds good.  We can

14   go off the record.

15        THE VIDEOGRAPHER:  The time is 12:03 p.m.

16   Off the record.

17        (Lunch recess taken.)

18        THE VIDEOGRAPHER:  The time is 12:41 p.m.

19   On the record.

20        MR. LICHTER:  Okay.  Welcome back.

21             If we can have the next document marked

22   as Exhibit 8.

23        (Exhibit 8 marked.)

24        MR. LICHTER:  For the record, this document

25   is Bates No. ALB-MDLCT9-00014044.

1          Q.    BY MR. LICHTER:  And have you seen this

2     document before?

3          A.    Can I have a second to read it?

4          Q.    Sure.

5          A.    I don't recall seeing this, no.

6          Q.    Okay.  Just looking at the first page,

7     does this appear to be an August 29, 2019, e-mail

8     string between Jessica Covaci and other Albertsons

9     employees?

10         A.    Yes.

11         Q.    And who is Jessica Covaci?

12         A.    She was my Director of Pharmacy

13    Compliance.

14         Q.    Is she no longer?

15         A.    Correct.

16         Q.    What is she now?

17         A.    He's not employed with our company.

18         Q.    Do you know about when she left the

19    company?

20         A.    2022.  We're in 2023 now.  So I think

21    it was 2022 sometime.

22         Q.    Do you know why she left?

23         A.    No.

24         Q.    Do you know whether she was let go by

25    Albertsons or if she left on her own volition?

1          A.    She left on her own volition.

2          Q.    Okay.  We can start on page 14045, at

3     the bottom.  It is the second page of the

4     document.

5                It looks like someone from pharmacy

6     Store No. 4404 sending an e-mail to Raed Alzahrani

7     on August 7, 2019.

8                Do you see that?

9          A.    Yes.

10         Q.    Do you know who Raed Alzahrani is?

11               I'm sorry, "rani."

12         A.    I'm not going to try it either.

13               He was a DPM.  So a District Pharmacy

14     Manager.

15         Q.    Okay.  And looking at the bottom of the

16     last page, it looks like the person sending this

17     is named Dave Zandberg, Staff Pharmacist from

18     Store No. 4404.

19               Do you see that?

20         A.    Yes.

21         Q.    Do you know where Store 4404 is

22     located?

23         A.    I don't.  But based on this, it is

24     probably in the Oregon area.

25         Q.    And looking at the top of the last

1    page, Mr. Zandberg writes:  "This week we are

2    having patients come directly from the Wal-Mart

3    pharmacy to our counter with their prescriptions

4    after being told by the Wal-Mart that 'they follow

5    the government guidelines when filling opioid

6    prescriptions.'

7            "The inference is that we at Safeway do

8    not and therefore will fill those prescriptions."

9            Do you see that?

10    A.    Yes.

11    Q.    When this e-mail was sent in 2019,

12    Albertsons owned and operated the Safeway banner

13    of pharmacies, correct?

14    A.    Correct.

15    Q.    Okay.  And Albertsons had owned and

16    operated those pharmacies since 2015, correct?

17    A.    Correct.

18    Q.    Okay.  So at this time in 2019, this

19    pharmacy was operating under the rubric of

20    Albertsons national policies and procedures,

21    correct?

22    A.    Correct.

23    Q.    And the e-mail continues:  "I have

24    pointed out to you that we have had an increasing

25    number of C2 rx's being presented to us by current

1    and former Wal-Mart customers who find themselves

2    unable to get pain meds for post op pain and for

3    higher doses in the months since Wal-Mart

4    announced their change in policy."

5            Do you see that?

6        A.    Yes.

7        Q.    Do you know the change in Walmart's

8    policy he's referencing here?

9        A.    Not exactly.

10       Q.    Do you have any idea?

11       A.    I believe they put day supply limits on

12   some items and -- and some C2's, I think.  I'm not

13   exactly sure the details of it.

14       Q.    Was that a Walmart change that occurred

15   in 2019, as far as you know?

16       A.    I don't remember the timeline.  But it

17   could have, yes.

18       Q.    Were you aware of a -- are you aware of

19   a practice of patients rejected at other pharmacy

20   chains coming to Albertsons pharmacies to obtain

21   opioid prescriptions?

22       A.    I had heard that, yes.

23       Q.    When -- when did you first hear that?

24       A.    I couldn't tell you exactly.

25       Q.    Could you tell me the year that it may

1    have been?

2         A.    I mean, around this timeframe perhaps.

3         Q.    Around 2019?

4         A.    Yeah.

5         Q.    Did you hear that in the context of any

6    specific geographic area or was that an issue for

7    the company as a whole?

8         A.    I don't recall if it is any specific

9    geographic area.

10        Q.    So a few paragraphs down, he writes:

11   "I have also pointed out to you that our company's

12   relationship with GoodRx seems to make us the low

13   price leader on the common c2 rxs in our market.

14            "What is happening right now is people

15   are coming to us for opioids and expecting less

16   scrutiny and expecting to pay less money."

17            What is GoodRx?

18        A.    GoodRx is a discount card company.

19        Q.    So according to this pharmacist,

20   patients from other stores expected less scrutiny

21   from Albertsons pharmacies when trying to fill

22   opioid prescriptions, correct?

23        A.    No.  According to this, I read it as

24   they were expecting to be able to get them for

25   lower costs because -- because our GoodRx prices

1    were supposedly lower than others.

2         Q.   Do you see he used the phrase

3    "expecting less scrutiny"?

4         A.   I'm sorry.  Could you -- could you --

5    let me read that again.

6         Q.   Sure.

7              The sentence that begins:  "What is

8    happening right now" --

9         A.   That's what his statement is, yes.

10        Q.   Okay.

11        A.   I see that.

12        Q.   According to him, the patients go to

13   Albertsons expecting less scrutiny --

14        A.   That's what --

15        Q.   -- than other pharmacies?

16        A.   That's what he stated, yes.

17        Q.   Is this consistent with what you heard

18   about being an issue at Albertsons pharmacies

19   around 2019?

20        A.   We know that -- I know that GoodRx

21   pricing, we -- we were coming in lower.  And

22   we actually addressed that and the pricing for

23   products for -- for controlled substances,

24   specifically for GoodRx, was changed.  So that

25   was no longer the case after I found out about

1    it.

2         Q.   And when was that changed?

3         A.   Quickly after we found out about it.

4    So if I became aware around this time, it was

5    changed shortly thereafter.

6         Q.   So around 2019?

7         A.   I'm guessing, yes.

8         Q.   What about his point about customers

9    expecting less scrutiny from Albertsons?  Were any

10   changes made on or around 2019, based on that

11   observation?

12        A.   I don't know if I agree with that

13   comment.  That's his comment.  But we've

14   constantly been, as I said, evolving and enhancing

15   our overall procedures and policies and trainings

16   to educate our pharmacy teams to put in checks in

17   place, compliance programs in place, so that we

18   can, you know, be scrutinizing all of our

19   controlled substance activities.  Over the years,

20   we've been growing and evolving on this for -- for

21   quite a while.

22        Q.   Had it ever been brought to your

23   attention that Albertsons' pharmacists had this

24   opinion?

25        A.   No.

1      Q.   Below that, he says:  "I believe that
2  it is neither wise or ethical to be advertising
3  low prices on narcotics."
4           Do you see that?
5      A.   Yes.
6      Q.   And does Albertsons agree with that
7  statement?
8      MR. DORAN:  Objection.
9      THE WITNESS:  We don't advertise prices on
10  narcotics.  So I don't agree with that statement
11  at all.  As far as wise or ethical, I don't have a
12  comment on that.  We don't advertise prices on
13  narcotics.
14      Q.   BY MR. LICHTER:  So you don't know what
15  he's referring to here?
16      A.   No.  I think he's misinterpreting how
17  the process works.
18      Q.   Okay.  And he continues:  "I also
19  believe that Safeway will be on the wrong side of
20  history if it contributes more than its share to
21  the ongoing opioid crisis.
22           "While Wal-Mart's policy may be an over
23  reaction to the current climate, they have at
24  least articulated a policy which they are
25  following here in Dallas Oregon.

1                    "With state governments looking for

2      reimbursement for the cost of the opioid crisis it

3      may be prudent for Safeway to evaluate it's

4      position in the narcotic market."

5                    Do you see that?

6           A.    Yes.

7           Q.    You said that Albertsons changed its

8      policy regarding the pricing of controlled

9      substances around 2019; is that right?

10          A.    It wasn't a policy.  It was a

11     contractual agreement with GoodRx where we just --

12     when we -- we went to GoodRx and changed the

13     pricing.  So it wasn't a company policy.

14          Q.    Do you recall when the contract with

15     GoodRx began?

16          A.    I do not.

17          Q.    You don't know what year?

18          A.    I don't.

19          Q.    And according to this, it looks like

20     the store -- this pharmacist is from -- 4404 is

21     located in Dallas, Oregon; is that right?

22          A.    That sounds correct.

23          Q.    And the pharmacy -- pharmacy is located

24     in Oregon, but Albertsons' dispensing policies are

25     the same across the country, correct?

```
 1              MR. DORAN:  Objection.

 2              THE WITNESS:  Correct.

 3         Q.   BY MR. LICHTER:  Does Albertsons agree

 4    with the statement here that they would be on the

 5    wrong side of history if it contributes more than

 6    its share to the ongoing opioid crisis?

 7              MR. DORAN:  Objection.

 8              THE WITNESS:  As it is written, do I agree

 9    with that -- does Albertsons agree with that

10    statement?  I don't know if I can speak on how

11    Albertsons would agree or not agree with that

12    statement.

13         Q.   BY MR. LICHTER:  What about you

14    personally?

15         A.   It kind of -- it is a very qualified

16    statement.  I don't believe we contribute to our

17    share.  But it is qualified as an if/then.  So

18    that makes it difficult.  But I don't believe we

19    were contributing to more -- especially not more

20    than our share to the ongoing opioid crisis.  I

21    just disagree with the statement in general.  We

22    would never -- of course, we would never want to

23    be in that situation.  So it is -- it is a very

24    difficult statement to comment on.

25         Q.   Do you believe Albertsons has
```

1    contributed at all to the opioid crisis?

2        MR. DORAN:  Objection; foundation.

3        THE WITNESS:  There's -- Albertsons, I

4    believe, has done everything in our power to try

5    to make sure that we're dispensing prescriptions

6    responsibly.  I think there is -- this is an

7    entire sociological economic -- I don't even know

8    how to describe it.  But this is so much bigger

9    than just any one company.  I think it is

10    impossible to say that there's -- that no one

11    contributed to.  It is impossible to say that

12    everyone contributed to it.  So it is -- it is

13    such a bigger, more complex picture than did you

14    contribute to it.  And you would have to define

15    what contribute means, too.

16        Q.   BY MR. LICHTER:  So do you believe

17    Albertsons had any role in -- in the opioid

18    crisis?

19        MR. DORAN:  Objection.

20        THE WITNESS:  We dispense opioid products,

21    and we do so to the best of our ability in a

22    compliant fashion, making sure that the right

23    patients get the products.  No one is perfect

24    and -- but we do everything in our power and our

25    pharmacists do everything in their power to ensure

1    that they are doing it appropriately.

2            So I can't tell you we've never --

3    you know, pharmacists have never made a mistake.

4    Everything we've done is an ongoing evolution

5    and -- and process improvement.  But these are

6    highly trained, educated healthcare providers

7    in -- in the field.  We have the utmost focus on

8    doing things the right way and making sure our

9    patients and our communities are safe.  So never

10   deliberately would we ever have done anything to

11   contribute, quote, unquote, to the opioid crisis.

12        Q.   BY MR. LICHTER:  Would you agree that

13   an opioid crisis exists in the country?

14        MR. DORAN:  Objection.

15        THE WITNESS:  I believe that -- personally,

16   I believe that, yeah, there's -- there's a large

17   opioid problem right now.  And there -- especially

18   with -- I mean, the overdoses on fentanyl and

19   things like that, yes, 100 percent.

20        Q.   BY MR. LICHTER:  Do you believe that

21   problem exists in Tarrant County, Texas?

22        A.   I don't know.

23        Q.   All right.  And the e-mail ends with:

24   "Please pass this onto whoever above you that

25   might be in a position to affect policy."

1          Do you see that?

2     A.    Yes.

3     Q.    Would there be a specific person at --

4  at Albertsons that would have the ability to

5  change the company policy regarding its role in

6  the opioid crisis?

7     MR. DORAN:  Objection.

8     THE WITNESS:  Is there a specific person?

9  Our -- our pharmacy policies are -- are created

10 and guided and developed in combination with a

11 group of stakeholders involved, compliance being

12 one of them, myself being one of them.  So there

13 would be -- this could go to a number of people

14 that could have a position to affect policy.  But

15 compliance would be one of them.

16    Q.    BY MR. LICHTER:  Okay.  And you don't

17 believe this e-mail ever reached your desk,

18 correct?

19    A.    I -- I can't honestly say yes or no on

20 that.  Some of -- when you got to the end of it,

21 a little bit of it reminded me, especially the

22 GoodRx part, reminded me that we did have this

23 issue on GoodRx.  So it is possible I read this,

24 but I did not recognize it at first, no.

25    Q.    Okay.  We can go back to the first page

1    of the document.

2              Take a look at the middle e-mail on

3    this same chain.  It appears to be sent from

4    Raed Alzahrani to Jessica Covaci and Stephen Certo

5    on August 28, 2019.

6              Do you see that?

7         A.   Yes.

8         Q.   Do you know who Stephen Certo is?

9         A.   He's the DPO, Director of Pharmacy

10   Operations, for the Portland division.

11        Q.   And Mr. Alzahrani writes:  "Thank you

12   Jessica for your response.  I apologize I don't

13   think I articulated myself correctly in my

14   previous email, my question is how would you

15   suggest I word it to any pharmacist that asks, for

16   example would it be appropriate to say use your

17   judgment and the company won't retaliate against

18   you, but my concern is the word retaliate too

19   harsh.  I would like your opinion on the wording.

20   Should I say use your judgment and that's it.  I

21   just wanted to bounce the idea off of you on how I

22   should word it."

23              Do you see that?

24        A.   Yes.

25        Q.   And I guess it looks like Raed is

1    asking for some guidance on how to talk to other

2    Albertsons pharmacists who might be concerned that

3    using their profession judgment might result in

4    retaliation from Albertsons; is that right?

5         MR. DORAN:  Objection.

6         THE WITNESS:  I don't know exactly what

7    he's thinking when he wrote it, but that's what

8    it. . .

9         Q.  BY MR. LICHTER:  Based on the context

10   of the e-mail?

11        A.  Based on the context, that's what it

12   implies, yes.

13        Q.  And we can look at Ms. Covaci's

14   response at the very top on August 29, 2019.

15             She writes:  "Hi Raed - No worries at

16   all.  When things come in writing, I have to give

17   a written response.  This one's becoming more of a

18   canned response when we have pharmacy team members

19   that send in emails like the one you received."

20             Do you see that?

21        A.  Yes.

22        Q.  Did you have any idea as to the volume

23   of e-mails Albertsons has received from its

24   pharmacists related to the issues raised in Raed's

25   e-mail?

1          A.    No.

2          Q.    Given Ms. Covaci indicates there's been

3    so many e-mails like this to warrant a canned

4    response, does Albertsons have any sort of central

5    filing system where it maintains these e-mails or

6    other communications?

7          MR. DORAN:  Objection.

8          THE WITNESS:  Not that I know of.

9          Q.    BY MR. LICHTER:  Does Albertsons have

10   any sort of tracking and monitoring system for

11   when it receives e-mails like this from its

12   pharmacists?

13         A.    Not that I know of.

14         Q.    Does Albertsons maintain a special file

15   for e-mails it receives from its pharmacists like

16   this?

17         A.    A file?  Could you repeat the question

18   to make sure I heard it right?

19         Q.    Sure.

20               Does Albertsons maintain a special or

21   certain file for these e-mails that it receives

22   from its pharmacists, like the ones we're looking

23   at here?

24         A.    Nothing formalized, no.

25         Q.    Okay.  Anything informalized you're

1    aware of?

2         A.   It is possible.  I mean, Jessica --

3    Jessica Covaci may have kept a file on this.

4    Others may have files on this.  But I don't

5    have -- there's no central corporate file for an

6    e-mail like this.

7         Q.   Okay.  And you're not aware whether

8    Ms. Covaci or anyone else keeps these e-mails and

9    tracks them one way or the other, correct?

10        A.   No.

11        Q.   You can set this one aside.

12        MR. LICHTER:  The next document we'll have

13   marked Exhibit 9.

14        (Exhibit 9 marked.)

15        MR. LICHTER:  For the record, this document

16   is Bates No. ALB-MDLCT9-0003365.

17        Q.   BY MR. LICHTER:  And have you seen this

18   document before?

19        A.   It doesn't ring a bell.  I'm not sure.

20        Q.   Okay.  Looking at the first page, does

21   this appear to be a September 28, 2018, e-mail

22   chain between Albertsons employees with the

23   subject line:  "Narcan Do-dispense report P-06."

24        A.   Yes.

25        Q.   And looking at the second page, are we

1    looking at an e-mail from Ryan McCann to other

2    Albertsons employees on September 27, 2018?

3        A.    Yes.

4        Q.    Okay.  And it says Ryan McCann is the

5    Director of Pharmacy Operations for Jewel-Osco

6    pharmacies; is that right?

7        A.    That's correct.

8        Q.    And Albertsons acquired Jewel-Osco

9    pharmacies in 2013, correct?

10       A.    No.

11       Q.    No?  What year did it acquire

12   Jewel-Osco pharmacies?

13       A.    Well, when -- when Albertsons merged

14   with American stores back in 1999, I think.

15       Q.    It wasn't part of the merger with

16   United?

17       A.    No.

18       Q.    Okay.

19       A.    Jewel-Osco is an Illinois based chain.

20       Q.    So at this time, when this e-mail was

21   sent in 2018, it was operating under Albertsons'

22   national policies and procedures, correct?

23       A.    Correct.

24       Q.    Okay.  The e-mail says:  "See attached

25   Narcan dispensing report from P-06.  Great

1    opportunity to go after a high ticket item to help

2    drive some sales and protect against the opioid

3    crisis right now.  Definitely leaving money on the

4    table with the co-dispense rate with fentanyl only

5    at 2.5%."

6              Do you see that?

7         A.   Yes.

8         Q.   Okay.  Is Narcan a prescription drug

9    that reverses opioid overdoses?

10        A.   It is.

11        Q.   Okay.  And Narcan is just the brand

12   name of naloxone, right?

13        A.   Correct.

14        Q.   And does fentanyl have a higher

15   overdose rate than other opioid medications?

16        A.   Yes, especially illegal fentanyl.

17        Q.   Do you know what P-06 means?

18        A.   Period 6.

19        Q.   Do you know what that means?

20        A.   We divide our calendar into periods.

21        Q.   Okay.  How many periods?

22        A.   13.

23        Q.   Okay.  So when Ryan says Albertsons

24   has a -- a co-dispense rate with fentanyl only at

25   2.5 percent, does that mean only 2.5 percent of

1    Albertsons patients who receive a prescription for

2    fentanyl also receive a prescription for Narcan?

3         A.    From us, yes.

4         Q.    Right.

5               And according to the e-mail here,

6    Albertsons is leaving money on the table by not

7    dispensing Narcan as much as it could, which he

8    calls a high ticket item, correct?

9         A.    Correct.

10        Q.    Do you agree that Narcan is a high

11   ticket item?

12        A.    I honestly don't know the price of

13   Narcan.

14        Q.    Okay.  Flipping back to the first page.

15   The bottom e-mail, in response to Ryan's e-mail,

16   Chandni Clough, who is the Patient Care Services

17   Manager, says:  "Below is a list of plans with

18   BIN/PCN information that shows $0 copay claims for

19   Narcan based on 2018 dispensing information for

20   our division.  Great resource to increase naloxone

21   dispensing."

22               Do you see that?

23        A.    I do.

24        Q.    And the top e-mail on the page in

25   response to that, Ryan McCann responds to say:

1   "Good info on who to target for $0 copay

2   naloxone."

3           Do you see that?

4       A.   I do.

5       Q.   So the -- the information on who to

6   target refers to patients that would not have to

7   pay a co-pay to receive a naloxone prescription,

8   correct?

9       A.   Yes.  Because there's less barriers for

10  them to receiving the item, yes.

11      Q.   Right.

12          And even if the patient does not pay a

13  co-pay, Albertsons still makes money on the

14  naloxone prescription, correct?

15      A.   Possibly.

16      Q.   Is that why the e-mail frames not

17  dispensing naloxone as leaving money on the table?

18      MR. DORAN:  Objection; misstates the

19  document.

20      THE WITNESS:  I can't speak to why, since it

21  is -- those aren't my words.  It is -- it is a

22  generic colloquialism of leaving money on the

23  table.  But I think the comment about protecting

24  against the opioid crisis also is pertinent.  It

25  is an opportunity to protect against the opioid

1    crisis right now, which is in the sentence before

2    that.  I think that is where, you know, the focus

3    of the company is.  We are a business also, of

4    course, so filling prescriptions is part of --

5    part of the business.

6              But protecting against the opioid

7    crisis, this was a huge tool, especially around

8    this timeframe when it became -- became more

9    popular and pharmacists got the ability to

10   dispense it.

11             I don't remember in Illinois if it is

12   on standing order or they have prescriptive

13   authority.  It is probably standing order.  It was

14   a huge opportunity to have a positive impact on

15   the community, and we wanted to take advantage of

16   that.

17        Q.   BY MR. LICHTER:  The e-mail indicates

18   that Albertsons is going to be targeting patients

19   that have a $0 co-pay for naloxone; is that right?

20        A.   That's the terms he used, yes.

21        Q.   Is that something Albertsons was doing

22   at the time?

23        A.   Yeah.  The word "target" may sound --

24   sound negative here.  But it is really just, you

25   know, when you're -- when you have a product like

1    this that is important, the price of the product

2    can be a barrier.  So if you know who it is

3    inexpensive for and they need the product, it is

4    kind of saying, this is your -- this is your

5    population that needs the product and should have

6    less barriers to go after.

7           So that's the intent of this is to

8    educate everyone on a way to identify those who

9    have lower barriers.  So try to -- try to -- try

10   to get those patients to have -- have this product

11   with them to protect them.

12        Q.   And we're talking about Albertsons'

13   fentanyl patients, correct?

14        A.   That was, I believe, the group that

15   they were looking at.  Because especially at the

16   time that this was coming out, the -- I believe

17   one of the recommendations was looking at patients

18   who were on fentanyl because it is an extremely

19   potent opioid that patients who are on it should

20   have Narcan just as a protective item, just in

21   case.

22        Q.   Right.

23           And they are targeting the fentanyl

24   patients only, according to this e-mail, that had

25   a $0 co-pay for naloxone, right?

1     A.   They are identifying them, yes.  Yes.

2     Q.   As a -- I guess from a policy

3  standpoint, was Albertsons targeting its fentanyl

4  patients for anything else?

5     A.   No.

6     Q.   Did Albertsons target its fentanyl

7  patients for anything like heightened due

8  diligence or scrutiny or anything like that when

9  they presented a prescription?

10     MR. DORAN:  Objection.

11     THE WITNESS:  Due diligence in what?

12     Q.   BY MR. LICHTER:  In confirming that

13  prescriptions they presented were for a legitimate

14  medical purpose?

15     A.   No.  Because that's standard for all of

16  our -- that's our standard process and policy for

17  all of our controlled substances, not heightened

18  for fentanyl.

19     MR. LICHTER:  You can set this one aside.

20        The next document will be marked as

21  Exhibit 10.

22     (Exhibit 10 marked.)

23     MR. LICHTER:  This one, for some reason,

24  didn't get stapled.  It is a two-page document.

25  Hopefully it won't be a problem.

1            It is a little cut off at the bottom of

2     the page.  But for the record, the Bates No. for

3     this document is ALB-MDLCT9-0041477.

4            Q.   BY MR. LICHTER:  Have you seen this

5     document before?

6            A.   Yes.

7            Q.   When is the last time you saw it?

8            A.   It was a long time ago.  So probably

9     when it was written.

10           Q.   Okay.  And is this an August 22, 2019,

11    e-mail between -- e-mail string between you and

12    Lynette Berggren?

13           A.   Yes.

14           Q.   Okay.  And what was Lynette Berggren's

15    role with Albertsons at this time?

16           A.   She was a director of -- I don't know

17    her exact title, but she was in our legal

18    department.  She was a paralegal and director

19    of -- I can't remember her title.  Sorry.

20           Q.   Is she still with the company?

21           A.   No.

22           Q.   Do you know about when she left?

23           A.   She left -- I don't know.  I want to

24    say it was 2019, 2020 maybe.

25           Q.   Do you recall the circumstances of her

1    leaving?

2         A.    No.

3         Q.    Okay.  Starting on the second page of

4    the document, the bottom e-mail.  Is this an

5    August 12, 2019, e-mail from Jessica Covaci to

6    Lynette Berggren, that was ultimately forwarded to

7    you?

8         A.    Yes.

9         Q.    And Jessica writes:  "Lynette -

10   attached are copies of the appropriate dispensing

11   materials referenced to share with Larry.  It's a

12   standalone doc and the excerpt from P&P."

13              Who is the Larry referenced here?

14        A.    It looks like Larry Cot.

15        Q.    His last name is C-o-t-e?

16        A.    Correct.

17        Q.    And who is Larry Cote?

18        A.    He was outside counsel.  He works -- he

19   has his own independent practice.

20        Q.    Outside counsel for Albertsons?

21        A.    At times, yes.

22        Q.    Do you know when he was first retained

23   by Albertsons?

24        A.    I don't.

25        Q.    Any idea what year it may have been?

1      A.   I don't -- no.  Maybe 2016, '17, '18,

2   somewhere in that timeframe probably.

3      Q.   Do you know why he was initially

4   retained by Albertsons?

5      A.   Initially, no, I don't.

6      Q.   Do you know what the scope of his work

7   with Albertsons has been, since he has been

8   retained?

9      A.   I know he had worked with us on cases

10  that we've -- at least one case that we've had in

11  a different state.

12     Q.   When you say "case," do you mean a

13  lawsuit?

14     A.   I don't know if I would categorize it

15  as a lawsuit.

16     Q.   What would you categorize it as?

17     A.   This was a case involving one of our

18  pharmacies in -- in Wyoming.  I'm not sure how to

19  categorize it.  I don't remember if it was -- if

20  it was technically a lawsuit or not.  Sorry.

21     Q.   Do you remember what -- was it a

22  dispute?

23     A.   Yeah.  We were working with the DOJ in

24  Wyoming on this.

25     Q.   Okay.  And do you know if that issue

1    with the DOJ ultimately resolved at some point?

2         A.   It did.

3         Q.   Do you know how it resolved, what the

4    resolution was?

5         A.   Yes.  We ended up paying a fine for it.

6         Q.   Do you know what that fine was?

7         A.   Yeah.  I think it was a million

8    dollars.  I'm just thinking through.  I want to

9    make sure.  I think, yes.

10        Q.   Was that for dispensing violations at

11   Albertsons pharmacies?

12        MR. DORAN:  Objection.

13        THE WITNESS:  I believe so.

14        Q.   BY MR. LICHTER:  Were those violations

15   related to controlled substances?

16        A.   Yes.

17        Q.   And was Mr. Cote hired as a consultant

18   for Albertsons?

19        MR. DORAN:  Objection.

20             And I'll just sort of interject to

21   caution a little bit with respect to Larry Cote's

22   role.  He was an attorney, and I know that

23   their -- some of his work with the company would

24   be protected by attorney-client privilege.  We

25   understand that -- some of the communications he

1    had, we have produced in this matter, largely

2    because of certain rulings that have suggested

3    that some of the advice that might be more

4    regulatory is not protected by attorney-client

5    privilege.  But we certainly disagree.  With that

6    ruling, we are abiding by and produced some of

7    these communications.

8            But I just want to caution the witness

9    to be careful with respect to where that legal and

10   regulatory divide exists.  So answer to the extent

11   you can.  And -- and if I feel like we're getting

12   into more of the legal part, I might object.  So I

13   just wanted to put that on the record to caution

14   you on Larry Cote's role.

15           So -- and I apologize, that was really

16   lengthy, and I know you had a pending question.

17   So if you want to read the question back.

18       Q.   BY MR. LICHTER:  It was, was Mr. Cote

19   hired as a consultant for Albertsons?

20       A.   I believe he was our outside counsel.

21   So if that counts as a consultant, then yes.  If

22   it is not, then no.

23       Q.   Do you know if he was hired in a role

24   other than as outside counsel?

25       A.   I don't know.  I -- I -- I guess I'm

1    not sure.

2         Q.   Okay.  In the e-mail, the reference to

3    P&P, does that stand for policies and procedures?

4         A.   It does.

5         Q.   And the appropriate dispensing

6    materials referenced in that e-mail, is that the

7    appropriate dispensing of controlled substances

8    document that Albertsons developed in 2013?

9         A.   Can you point it out, so I can read it

10   again?

11        Q.   Sure.

12             It is in Jessica's e-mail that says:

13   "Lynette - attached are copies of the appropriate

14   dispensing materials referenced to share with

15   Larry.  It is a standalone doc and the excerpt

16   from P&P."

17             So my question is, this reference to

18   appropriate dispensing materials, is that a

19   reference to the 2013 document entitled

20   Appropriate Dispensing of Controlled Substances,

21   or do you understand that to be something else?

22        MR. DORAN:  Objection.

23        THE WITNESS:  I honestly don't remember.

24        Q.   BY MR. LICHTER:  Okay.  Do you know

25   Albertsons was sharing its dispensing policies

1    with Larry Cote at this time, in 2019?

2         A.    I assume it was something he requested.

3         Q.    No other reason you can think of?

4         A.    Other than it likely involved the case

5    at Store 60.

6         Q.    So the subject where it says, DEA 0060,

7    you understand that to be a reference to

8    Albertsons Store No. 60 in Wyoming?

9         A.    Yes.

10        Q.    Okay.  Go to page 1 of the document,

11   the middle e-mail from Lynette Berggren to

12   Jessica Covaci.  I think you're also cc'd on it.

13             Is this an e-mail you received from

14   Jessica Covaci on August 22, 2019?

15             Do you see that there?

16        A.    In the middle of page?

17        Q.    Page 1.  The e-mail that says, FYI?

18        A.    That is from Lynette Berggren, not from

19   Jessica Covaci.

20        Q.    Sorry.  From Lynette Berggren to

21   Jessica Covaci with you cc'd?

22        A.    That's correct.  Yes.

23        Q.    You received that from Lynette Berggren

24   on August 22, 2019?

25        A.    Yes.

1      Q.   That e-mail says:  "FYI.  See below --

2  Larry's suggestions for our red flags document and

3  P&P's."

4           Do you know what -- what she's

5  referring to here by the red flags document?

6      A.   Our company -- we have a standalone

7  red flags document.  And we also incorporated it

8  into our policies and procedures at some point in

9  time prior to this.  But essentially, it is -- it

10  is our kind of training on -- policies and

11  training on corresponding responsibility.

12     Q.   Okay.  Right above that, you respond to

13  say:  "My thoughts in red."

14          Do you see that?

15     A.   Yes.

16     Q.   Okay.  We can move down to the bottom

17  of the e-mail on that page to see the thoughts

18  that you included.  This e-mail obviously isn't in

19  color.  But this is the e-mail, at the bottom of

20  the page, that you just referenced where you

21  included your thoughts in red, correct?

22     A.   That's what it looks like, yes.

23     Q.   Okay.  And this is originally an

24  August 22, 2019, e-mail from Larry Cote to

25  Lynette Berggren, correct?

```
1          A.    Correct.

2          Q.    Okay.  In Larry Cote's original e-mail,

3    he writes:  "Just a few comments on these:

4               "Do you want/need to articulate a

5    policy that if the red flags cannot be resolved,

6    the pharmacists should not fill the rx?"

7               Do you see that?

8          A.    Yes.

9          Q.    Okay.  And at this time, was Larry Cote

10   included in this discussion to help draft or edit

11   Albertsons' dispensing policies?

12         MR. DORAN:  Objection.

13         THE WITNESS:  I don't recall a specific

14   purpose.  I don't recall.

15         Q.    BY MR. LICHTER:  Okay.  From a policy

16   standpoint, is it important for Albertsons'

17   pharmacists to resolve red flags on prescriptions

18   before they dispense those prescriptions?

19         A.    Yes.

20         Q.    Why is it important?

21         A.    Why is it important?

22         Q.    Yes.

23         A.    Because we want to make sure that we're

24   dispensing appropriately for patients that have a

25   legitimate medical need and an appropriate
```

1    relationship with the prescriber.

2         Q.   And the way to determine that

3    legitimate medical need is to resolve any red

4    flags, correct?

5         A.   That's one of the ways, yes.

6         Q.   Okay.  Is documentation of that

7    resolution important?

8         A.   Yes.  We -- we -- we definitely want

9    our pharmacists to document.

10        Q.   Why is it important?

11        A.   For questions that come up later and

12   so that there can be proof of what was performed.

13   Not that lack of documentation means it wasn't

14   performed, but the documentation helps reinforce

15   the fact that the -- the resolution happened.

16        Q.   Okay.  So, again, Larry's e-mail asks:

17   "Do you want/need to articulate a policy that if

18   the red flags cannot be resolved, the pharmacist

19   should not fill the prescription?"

20             And then your response that you

21   included is:  "No.  Pharmacist may need to fill

22   another script to prevent withdrawal, etc. (last

23   and final fill).  We need to word it to give them

24   some flexibility for patient safety sake."

25             Is that right, that was one of the

1    thoughts you included in the e-mail?

2        A.   Yes.  Yes.

3        Q.   So was it Albertsons' policy in 2019

4    that if a pharmacist could not resolve the red

5    flags identified on an opioid prescription, the

6    pharmacist was still allowed to dispense the

7    prescription?

8        A.   The pharmacist was always expected

9    to use their professional judgment when filling

10   prescriptions.  So -- and included in that

11   would -- would be looking at all of the red

12   flags, identifying and -- identifying and

13   resolving them.

14            Correct, that if the red flags

15   couldn't be resolved, the pharmacist should take

16   appropriate action on that specific prescription,

17   which may include, and likely include, not filling

18   it most of the time, yes.

19       Q.   But Albertsons didn't prohibit its

20   pharmacists from filling prescriptions, even

21   though red flags couldn't be resolved on it; is

22   that right?

23       A.   We required their -- their professional

24   judgment to take place.  There was no -- I have to

25   say our policies exactly how they were written at

1    the time.  But we did say that red flags needed to

2    be resolved before -- before dispensing.

3        Q.   Aren't you saying right here that

4    red flags do not need to be resolved prior to

5    dispensing in the event the pharmacist's

6    discretion is in play?

7        MR. DORAN:  Objection; misstates the

8    document.

9        THE WITNESS:  Those were -- well, if you

10   read up above, those were comments on -- on his.

11   Those weren't final policies that went out.  So

12   this was comments and then comments on his

13   comments.  So don't -- you can't interpret these

14   as the actual policies that went out.  These were

15   just comments and feedback.

16       Q.   BY MR. LICHTER:  So this was not an

17   Albertsons policy at this time?

18       A.   I would have to look at our policies to

19   see exactly how it is worded.

20       Q.   Would you have been -- would your

21   comment here -- could your comment here have

22   violated an Albertsons policy when you wrote it?

23       A.   The comment -- I'm just rereading the

24   statements.  So pardon my pause.

25       Q.   Sure.

1        A.   You know, at this time, I would have to

2    see what the policies dictated at this time to see

3    if that comment was an actual -- would have

4    contradicted it.  So I'm not sure.

5        Q.   So sitting here, you don't know whether

6    or not your answer to this question was a -- was

7    in accord with Albertsons' policies?

8        A.   I'm saying at the time we were -- we

9    were discussing options.  And my comment at the

10   time was a suggestion, and I don't -- I don't know

11   or recall exactly how we ended up filing this.  We

12   just ended up saying we're going to talk about it

13   later.  And I don't recall the final decision on

14   that.  I would have to look at the policies at

15   that time to see what the final decision was, if

16   anything was changed.

17       Q.   And this was your suggestion as the

18   Vice President of Pharmacy Compliance at the time?

19       A.   It was my thoughts at the time, yes.

20       Q.   Okay.  And you don't know one way or

21   the other if those thoughts contradicted

22   Albertsons' policies and procedures?

23       A.   I would have to look at the exact

24   policy as it was written at that time.  I don't

25   remember that right now.  But it was -- you know,

1    we were taking patient safety into -- into mind at

2    the time.  And I don't remember how that was later

3    interpreted and whether we made any changes based

4    on that.

5          Q.   So do you know if Albertsons' policies

6    ever prohibited pharmacists from filling

7    prescriptions that had unresolved red flags on

8    them?

9          A.   I don't think our policies specifically

10   had a prohibition of filling prescriptions.

11         Q.   That had unresolved red flags on them,

12   correct?

13         A.   Correct.

14              The comment there, again, was -- again,

15   patient safety is something that has to be taken

16   into mind.  And there's actions that a pharmacist

17   could do to ensure a patient is safely handled and

18   withdrawn off of a product that perhaps is at too

19   high of a dose or -- or a dose that they are not

20   comfortable with.

21         Q.   And one of the examples you gave here

22   in your comment is that if a patient is in

23   withdrawal, that would be an appropriate

24   circumstance by which to dispense an opioid

25   prescription with an unresolved red flag?

1         A.    I think the comment says to prevent

2    withdrawal.

3         Q.    Right.

4         A.    So I'm not sure if you're familiar with

5    withdrawal, but it can be a --

6         Q.    I have passing familiarity.  But if you

7    would like to explain your comment further.

8         A.    It can be -- it can be very

9    significant, especially in this almost

10   life-threatening, typically, situation.  So if a

11   patient was on a very high dose -- I'm giving an

12   example.

13            If a patient was on a high dose of an

14   opioid and a pharmacist was not comfortable with

15   that high dose of an opioid, for professional

16   reasons, if they were to completely cut that

17   patient off, one potential impact could be that

18   patient could go into withdrawal.  So you have

19   to consider and weigh all of those balances,

20   which is why we always rely on professional

21   judgment for the final decision on whether to

22   dispense or not.

23        Q.    Are you familiar with Albertsons'

24   Controlled Substance Monitoring Program or CSMP?

25        A.    Yes.

1        Q.    Okay.  What do you understand that to

2   be?

3        A.    It is a conglomerate of all our

4   activities and actions we use to oversee and

5   monitor the dispensing and handling of controlled

6   substances in our company.

7        Q.    Does it also include distribution of

8   controlled substances?

9        A.    No.  It is on the dispensing side.

10       Q.    Did Albertsons ever conduct any formal

11  audits or investigations to determine if it's

12  suspicious monitoring was compliant with any state

13  or federal laws?

14       A.    Can you repeat the question, please?

15       Q.    Sure.

16             Did Albertsons --

17       A.    We're talking about distribution again

18  now?

19       Q.    Yeah.

20       A.    Okay.

21       Q.    Did Albertsons ever conduct any formal

22  audits or investigations to determine if its

23  suspicious order monitoring was compliant with any

24  state or federal laws?

25       A.    Not that I'm aware of.

1          Q.    How about third party audits or

2    investigations?

3          A.    Third party audits?  Meaning using an

4    outside entity?

5          Q.    Yes.

6          A.    I want to make sure I'm clear.

7          Q.    Right.  Yes.

8          A.    Not that I'm aware of.

9          Q.    Has Albertsons ever -- excuse me,

10   strike that.

11                Has Albertsons ever been a member of

12   the Healthcare Distribution Alliance?

13         A.    I don't know.

14         Q.    Okay.  If Albertsons has ever been a

15   member of the National Association of Chain

16   Drugstores?

17         A.    Yes.

18         Q.    Do you know for what states?

19         A.    I don't, but we're still a member.

20         Q.    Do you know what working groups

21   Albertsons is involved in?

22         A.    A number of them.  Did you want me to

23   try to list them?

24         Q.    You can.

25         A.    Or if you have a specific question.

1      Q.    Did -- any working groups related to

2   dispensing of controlled substances?

3      A.    I guess there is a group focused on --

4   I don't know the exact name of it, so I can't tell

5   you the exact name of it.  There's a group focused

6   on opioids and opioid legislation and activities

7   around opioids.

8      Q.    Do you know who represents the

9   Albertsons in that working group?

10     A.    Right now, it is my Director of

11  Compliance.  And I'm --she's the primary and I am

12  secondary on that group.

13     Q.    What's her name?

14     A.    Ready?  Lenna Israbian-Jamgochian.

15  L-e-n-n-a -- I'm going to try to spell it.

16     Q.    I didn't know if she needed you to

17  spell it.

18          THE COURT REPORTER:  Please.

19          THE WITNESS:  I-s-r-a-b-i-a-n -

20  J-a-m-g-o-c-h-i-a-n.  I'm going by memory and

21  without writing it out.  So I hope that's correct.

22     Q.    BY MR. LICHTER:  Okay.  And you said

23  you both are involved in -- in this working group?

24     A.    Yes.

25     Q.    Okay.  Do you know for how long

1    Albertsons has been involved in this opioid

2    working group?

3         A.   Since it began.  I think it is a couple

4    of years -- well, it has probably been maybe three

5    or four years, just estimate.

6         Q.   And how often does the working group

7    meet?

8         A.   Rarely.

9         Q.   More than once a year?

10        A.   Ad hoc.  Lately, no.  Initially, it

11   probably was when it first started out.  But no,

12   not much at all.

13        Q.   And you were saying that they -- they

14   meet on an ad hoc basis?

15        A.   Yes.

16        Q.   What would be the reason for the group

17   to meet?

18        A.   They call a meeting.  They want to

19   discuss usually some legislation or something that

20   is -- that is active around opioids for an -- for

21   an informative purpose.

22        Q.   Has Albertsons ever incorporated any

23   information from the NACDS into its formal

24   policies and procedures?

25        A.   Not that I can recall.

1          Q.   Has Albertsons ever been a member of

2    the Pharmaceutical Research and Manufacturers of

3    America?

4          A.   Not that I know of.

5          Q.   Has Albertsons been a member of any

6    other trade groups related to the distribution or

7    dispensing of opioids?

8          A.   Specifically of opioids?  Not that I'm

9    aware of, no.

10         Q.   How about of controlled substances?

11         A.   No.

12         Q.   No other working groups related to

13   dispensing of controlled substances that we

14   haven't covered yet?

15         A.   No.

16         Q.   Does Albertsons have any corporate

17   policies in place that dictates the minimum amount

18   of staff required to work at any given pharmacy?

19         A.   Minimum required?

20         Q.   Yeah.

21         A.   Just legalities.  We have to have a

22   pharmacist, obviously, on duty for a pharmacy.

23   But minimum required can -- required being the

24   key word, no.

25         Q.   Are there any limitations to the number

1    of hours the pharmacist is allowed to work a given

2    day or week?

3           A.    There's state laws.  We -- we follow

4    state laws in that area, as far as if there's --

5    if that state institutes a minimum or maximum.

6    Not minimum, but maximum number of hours.  I don't

7    think there's a set standard across the country, I

8    guess is what I'm saying.

9           Q.    As far as Albertsons' policies are

10   concerned, right?

11          A.    To the best of my knowledge.

12          Q.    So the same answer for limitations on

13   the number of hours that a pharmacy technician is

14   allowed to work?

15          A.    Correct.  Yeah.

16                These are HR policies.  And I just want

17   to -- I'm not an expert on the HR policies.

18          Q.    Okay.  Are there any particular

19   prescription fill goals Albertsons establishes for

20   its pharmacists?

21          A.    For a pharmacist?  No.

22          Q.    For anyone?

23          A.    I mean, for a division.  I mean, then

24   that gets broken down.  There are goals.  There's

25   volume goals.  But not for an individual

```
 1    pharmacist or an individual person.
 2         Q.   Are goals set for individual stores?
 3         A.   I don't know if they are set at store
 4    level.  They are set at a more macro level and
 5    then divided out.  How each division divides those
 6    out may be different, but I don't know of a
 7    national way that each store is -- so I guess part
 8    of my answer is I don't know for sure.  But I do
 9    know that they are set at a larger -- at a higher
10    level.
11         Q.   How about goals for prescription fill
12    timing?  Albertsons establish anything like that
13    for its stores?
14         A.   No.
15              You mean like so many prescriptions a
16    minute or something like that?
17         Q.   Or filling a prescription in under
18    5 minutes, 15 minutes, anything like that?
19         A.   No.
20         Q.   Okay.  Has there ever been?
21         A.   Not that I recall, no.
22         Q.   Okay.  Are you aware of any external
23    audits or investigations conducted on any
24    Albertsons pharmacies located in Tarrant County,
25    related to the dispensing of opioids?
```

1        A.   External investigations?  So I

2    became aware of DEA inspections at a couple of

3    Texas locations in 2019.  And we provided some

4    prescriptions to the DEA that were for a

5    prescriber that were requested.  I don't know the

6    store numbers off the top of my head though.  I

7    just became aware of it recently.

8        Q.   Two store numbers?

9        A.   Pardon me?

10       Q.   Two store numbers?

11       A.   I believe it was two that were in

12   Tarrant County.  And the other one was in Texas,

13   but it may not have been Tarrant County.

14       Q.   Those were all in or around 2019, you

15   said?

16       A.   Yes.  Yes.

17       Q.   Those all involve the DEA asking

18   records for certain prescribers?

19       A.   A prescriber, yes.

20       Q.   A prescriber?

21            Was it the prescriber for each of the

22   requests?

23       A.   I believe so, yes.

24       Q.   Do you know the name of the prescriber?

25       A.   It is like -- I don't know it began

1    with an A, it is like Aruba or Abdullah or -- I

2    don't remember exactly.  Sorry.

3        Q.   Other than requests for this doctor's

4    prescriber records, are you aware of any other

5    audits or investigations on any Tarrant County

6    pharmacies?

7        A.   No.

8        Q.   And other than the compliance audits

9    that we previously discussed and the general

10   gambit of the District Pharmacy Manager

11   responsibilities, are you aware of any other

12   internal audits or investigations for any of

13   Albertsons' pharmacies in Tarrant County?

14       A.   So I don't know if -- we do store

15   reviews.  I mean, part of our CSMP is our pharmacy

16   to do store dispensing reviews.  And we've done a

17   number of reviews, including those in

18   Tarrant County, I would assume.

19       Q.   So do you know -- you said, "I would

20   assume."  Do you know for a fact whether

21   Albertsons has conducted any specific store

22   reviews for its pharmacies in Tarrant County?

23       A.   I know in Texas.  I just don't know if

24   they are in Tarrant County.  They probably have

25   for Tarrant County, too.  It is a big county.

 1          Q.   Do you know about how many would have

 2    been conducted in Texas?

 3          A.   I don't.

 4          Q.   Any ballpark estimate?  Would it be

 5    100 or 5?

 6          A.   Over what timeframe?

 7          Q.   Over the entire timeframe.

 8          A.   I don't know.  These were mostly

 9    prospective -- I mean, type of reviews.  So I'm

10    going to guess less than 100, more than 5.

11          Q.   Okay.

12          A.   Sorry.

13          Q.   You can't do any better than that?

14          A.   I -- I honestly don't know.  I couldn't

15    even guess at this point.

16          Q.   But none that you're aware of occurring

17    in Tarrant County?

18          A.   I'm just not 100 percent sure it was

19    Tarrant County.  I know there were a couple that

20    in were in Texas that -- that we did.  I just

21    don't recall if they were specifically

22    Tarrant County.  I apologize.

23          Q.   Other than those requests for

24    prescriber records, are you aware of any other

25    communications between Albertsons and the DEA,

```
 1    relating to the distribution or dispensing of

 2    opioids in Tarrant County?

 3         A.   No, not that I can recall.

 4         Q.   How about the same question for

 5    communications between Albertsons and the Texas

 6    State Board of Pharmacy?

 7         A.   Regarding?

 8         Q.   Regarding the distribution or

 9    dispensing of -- of opioids in Tarrant County?

10         A.   Not that I recall.

11         Q.   Regarding those requests for the

12    prescriber records of that Dr. Aruba or something

13    similar --

14         A.   I feel really bad because I probably

15    totally butchered it.

16         Q.   Do you recall if there was any

17    resolution to those inquiries?

18         A.   I believe the prescriber was indicted.

19    That's all I know.

20         Q.   Okay.  Are you aware of any

21    communications between Albertsons and any other

22    governmental or administrative body relating to

23    Albertsons' distribution or dispensing of opioids

24    in Tarrant County?

25         A.   No.
```

1        Q.    Okay.  Aware of any administrative or

2    enforcement actions taken by any government body

3    related to Albertsons' Tarrant County pharmacies?

4        A.    No.

5        MR. LICHTER:  Okay.  I have nothing further.

6        MR. DORAN:  I don't have any questions.

7        MR. LICHTER:  Okay.  Do you want to see if

8    anybody on the phone has any questions for the

9    witness?

10        Okay.  I think we can go off the

11    record.

12        THE VIDEOGRAPHER:  This concludes the

13    deposition.  The time is 1:42 p.m.  Off the

14    record.

15        (The deposition concluded at 1:42 p.m.)

16                    -oo0oo-

17

18

19

20

21

22

23

24

25

```
 1                 V E R I F I C A T I O N

 2

 3      STATE OF IDAHO          )
                                )
 4      County of _____   )

 5

 6             I, 30(b)(6) - ANTHONY PROVENZANO, being

 7   first duly sworn on my oath, depose and say:

 8             That I am the witness named in the

 9   foregoing deposition, taken on August 10, 2023,

10   consisting of pages numbered 1 to 148, inclusive;

11             That I have read the said deposition and

12   know the contents thereof; that the questions

13   contained therein were propounded to me; that the

14   answers to said questions were given by me, and

15   that the answers as contained therein (or as

16   corrected by me therein) are true and correct.

17

18             _____

                             DEPONENT
19

20   Signed and sworn before me this    of      ,    .

21   _____

22   NOTARY PUBLIC
     _____
23   Residing at
     _____
24   My commission expires

25
```

1              R E P O R T E R ' S   C E R T I F I C A T E

2

3

4              I, BROOKE R. BOHR, a Notary Public in

5      and for the State of Idaho, do hereby certify:

6              That prior to being examined, the

7      witness named in the foregoing deposition was by

8      me duly sworn to testify the truth, the whole

9      truth, and nothing but the truth;

10              That said deposition was taken down by

11      me in shorthand at the time and place therein

12      named and thereafter reduced into typewriting

13      under my direction, and that the foregoing

14      transcript contains a full, true, and verbatim

15      record of the said deposition.

16              I further certify that I have no

17      interest in the event of the action.

18              WITNESS my hand and seal August 23,

19      2023.

20

21
         NOTARY PUBLIC in and for the State of Idaho;
22       residing at Meridian, Idaho.

23
         My commission expires October 23, 2025.
24       CSR No. 753

25

```
1                 -   -   -   -   -
                    E  R  R  A  T  A
2                 -   -   -   -   -   -

3

4    PAGE   LINE   CHANGE

5    _____  _____  _____

6        REASON: _____

7    _____  _____  _____

8        REASON: _____

9    _____  _____  _____

10       REASON: _____

11   _____  _____  _____

12       REASON: _____

13   _____  _____  _____

14       REASON: _____

15   _____  _____  _____

16       REASON: _____

17   _____  _____  _____

18       REASON: _____

19   _____  _____  _____

20       REASON: _____

21   _____  _____  _____

22       REASON: _____

23   _____  _____  _____

24       REASON: _____

25
```