# EXHIBIT
# 3

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4
 5  IN RE: NATIONAL PRESCRIPTION       )
    OPIATE LITIGATION                  )
 6                                     )  MDL No. 2804
    THIS DOCUMENT RELATES TO:          )  Case No. 17-md-2804
 7                                     )
    Track Eight: Cobb County, Georgia  )
 8  Case No. 1:18-op-45817             )
                                       )
 9  COBB COUNTY,                       )
                                       )
10          Plaintiff,                 )
                                       )
11             vs.                     )
                                       )
12  PURDUE PHARMA, L.P., et al.,       )
                                       )
13          Defendants.               )
    ----------------------------------
14  IN RE: NATIONAL PRESCRIPTION       )
    OPIATE LITIGATION                  )
15                                     )  MDL No. 2804
    THIS DOCUMENT RELATES TO:          )  Case No. 17-md-2804
16                                     )
    Track Nine: Tarrant County, Texas  )
17  Case No. 1:18-op-45274             )
                                       )
18
19            VIDEOTAPED DEPOSITION OF
20         CARMEN A. CATIZONE, MS, RPh, DPh
21                Chicago, Illinois
22             Thursday, May 23rd, 2024
23
24  REPORTED BY:  GREG S. WEILAND, CSR, RMR, CRR
25  JOB NO.:       6693104
```

Page 2

```
1
2
3
4                 May 23rd, 2024
5             8:35 a.m. Central Daylight Time
6
7         Videotaped Deposition of CARMEN A.
8   CATIZONE, MS, RPh, DPh, conducted via Zoom, taken
9   before GREG S. WEILAND, CSR, RMR, CRR, pursuant to
10  the Federal Rules of Civil Procedure for the United
11  States District Court pertaining to the taking of
12  depositions, at Suite 3100, 77 West Wacker Drive, in
13  the City of Chicago, Cook County, Illinois,
14  commencing at 8:35 a.m. Central Daylight Time, on
15  the 23rd day of May, 2024.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1   PRESENT:
2
3   ON BEHALF OF THE PLAINTIFFS:
4       MOTLEY RICE LLC
5       BY: MR. MICHAEL E. ELSNER
6          MS. EBONY WILLIAMS BOBBITT (via Zoom)
7          MS. AMANDA UNTERREINER (via Zoom)
8       28 Bridgeside Boulevard
9       Mount Pleasant, South Carolina 29464
10      (843) 216-9000
11      Email: melsner@motleyrice.com
12          ebobbitt@motleyrice.com
13          aunterreiner@motleyrice.com
14          - and -
15      THE LANIER LAW FIRM
16      BY: MR. EVAN M. JANUSH (via Zoom)
17          MS. LEILA AYACHI (via Zoom)
18          MS. SADIE TURNER (via Zoom)
19      10940 West Sam Houston Parkway North,
20      Suite 100
21      Houston, Texas 77064
22      (713) 659-5200
23      Email: evan.janush@LanierLawFirm.com
24          leila.ayachi@LanierLawFirm.com
25          sadie.turner@LanierLawFirm.com
```

Page 4

```
1   PRESENT (CONTINUED):
2
3   ON BEHALF OF THE PLAINTIFFS [continued]:
4       SIMMONS HANLY CONROY LLC
5       BY: MR. SANFORD SMOKLER (via Zoom)
6          112 Madison Avenue
7          New York, New York 10016-7416
8          (212) 784-6400
9          Email: ssmokler@simmonsfirm.com
10         - and -
11      BARON & BUDD
12      BY: MR. JAY LICHTER (via Zoom)
13         15910 Ventura Boulevard, Suite 1600
14         Encino, California 91436
15         (818) 839-2333
16         Email: jlichter@baronbudd.com
17
18
19
20
21
22
23
24
25
```

Page 5

```
1   PRESENT (CONTINUED):
2
3   ON BEHALF OF DEFENDANT PUBLIX SUPER MARKETS, INC.:
4       BARNES & THORNBURG LLP
5       BY: MS. MEREDITH THORNBURGH WHITE
6          MS. KARA KAPKE (via Zoom)
7          MR. J.T. LARSON (via Zoom)
8       11 South Meridian Street
9       Indianapolis, Indiana 46204
10      (317) 236-1313
11      Email: mwhite@btlaw.com
12          kara.kapke@btlaw.com
13          jtlarson@btlaw.com
14          - and -
15      BARNES & THORNBURG LLP
16      BY: MR. MITCHELL CHARCHALIS
17          390 Madison Avenue, 12th Floor
18          New York, New York 10017
19          (310) 284-3768
20          Email: mcharchalis@btlaw.com
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1 PRESENT (CONTINUED):

2

3 ON BEHALF OF DEFENDANT PUBLIX SUPER MARKETS, INC.

4 [continued]:

5    BARNES & THORNBURG LLP

6    BY: MS. REBECCA L. TRELA (via Zoom)

7       1717 Arch Street, Suite 4900

8       Philadelphia, Pennsylvania 19103

9       (445) 201-8911

10      Email: Rebecca.Trela@btlaw.com

11

12 ON BEHALF OF DEFENDANTS ALBERTSONS, INC.,

13 ALBERTSONS, LLC, SAFEWAY, INC., RANDALL'S FOOD &

14 DRUG, LP, AND UNITED SUPERMARKETS, LLC:

15    GREENBERG TRAURIG LLP

16    BY: MS. GRETCHEN N. MILLER

17       77 West Wacker Drive, Suite 3100

18       Chicago, Illinois 60601

19       (312) 456-6583

20       Email: millerg@gtlaw.com

21

22 ALSO PRESENT:

23    MR. NICK PAGE, The Videographer

24    MR. BILL HAMMOND (via Zoom)

25

---

Page 7

1       INDEX

2 May 23rd, 2024

3 TESTIMONY OF CARMEN A. CATIZONE, MS, RPh, DPh

4                   PAGE

5 Examination by Ms. Miller ........................14

6 Examination by Mr. Elsner ........................239

7 Further Examination by Ms. Miller ...............254

8 Further Examination by Mr. Elsner ...............263

9

10       DEPOSITION EXHIBITS

11 NUMBER          DESCRIPTION          PAGE

12 Exhibit 1    General Expert Report of Carmen    16

13    A. Catizone, MS, RPh, DPh

14 Exhibit 2    Invoices, February & March    18

15    2024; April 2024

16 Exhibit 3    Document titled Combating    28

17    prescription drug abuse: an

18    interview with Mark Trudeau and

19    Carmen Catizone

20 Exhibit 4    Document titled A Pharmacist's    53

21    Guide to Prescription Fraud

22

23

24

25

---

Page 8

1       DEPOSITION EXHIBITS (CONTINUED)

2 NUMBER          DESCRIPTION          PAGE

3 Exhibit 5    Document titled Prescription    57

4    Drug Trafficking Trends,

5    Synthetic Drugs and

6    Methamphetamine, Bates labeled

7    MNKOI 0001304524 and 0001304708

8 Exhibit 6    Emails sent in February 2014,    59

9    with attachment, Bates labeled

10    MNKOI 0006779286 through

11    0006779304

12 Exhibit 7    Document titled Stakeholders'    74

13    Challenges and Red Flag Warning

14    Signs Related to Prescribing

15    and Dispensing Controlled

16    Substances

17 Exhibit 8    Document titled Combating    80

18    Pharmaceutical Diversion, Bates

19    labeled MNKOI 0006779293

20    through 0006779301

21 Exhibit 9    Texas Administrative Code,    82

22    Title 22, Part 15, Chapter 291,

23    Subchapter A, Rule §291.29

24

25

---

Page 9

1       DEPOSITION EXHIBITS (CONTINUED)

2 NUMBER          DESCRIPTION          PAGE

3 Exhibit 10    Document titled Texas State    83

4    Board of Pharmacy, "Red Flags"

5    Checklist for Pharmacies, You

6    Might Be a Pill Mill If...

7 Exhibit 11    Expert Report of Craig J.    95

8    McCann, Ph.D., CFA [excerpt]

9 Exhibit 12    Document titled State    102

10    Participation Status

11    [5.06.2024. Subject to ongoing

12    corrections and updates]

13 Exhibit 13    Document titled Exhibit P, CVS    104

14    Pharmacy Inc. Injunctive Terms

15 Exhibit 14    Exhibit P, Pharmacy Controlled    104

16    Substance Compliance Program &

17    Anti-Diversion Injunctive Terms

18    [Walmart]

19 Exhibit 15    Exhibit P, Pharmacy Controlled    105

20    Substance Compliance Program &

21    Anti-Diversion Injunctive Terms

22    [Walgreens]

23 Exhibit 16    Injunction Order, In Re:    105

24    National Prescription Opiate

25    Litigation

3 (Pages 6 - 9)

Page 10

1    DEPOSITION EXHIBITS (CONTINUED)
2  NUMBER        DESCRIPTION        PAGE
3  Exhibit 17    Document titled Use of Opioids    146
4        for Chronic, Noncancer Pain
5        Quietly Gaining Acceptance,
6        Alex Otto
7  Exhibit 18    Email sent on July 8, 2013,    168
8        with attachment, Bates labeled
9        ALB-NM00015258 through 00015260
10  Exhibit 19    Email sent on July 21, 2014,    171
11        with attachment, Bates labeled
12        ALB-NM00029271 through 00029290
13  Exhibit 20    Transcript, Videotaped    183
14        Deposition of Carmen A.
15        Catizone, MS, RPh, DPh, taken
16        on Tuesday, January 25, 2022
17        [excerpt]
18  Exhibit 21    Document titled Report of the    199
19        Task Force on Prescription Drug
20        Abuse
21  Exhibit 22    Document titled Retail Pharmacy    255
22        Policies and Procedures, Bates
23        labeled ALB-NM00008034 through
24        00008035
25

Page 11

1    DEPOSITION EXHIBITS (CONTINUED)
2  NUMBER        DESCRIPTION        PAGE
3  Exhibit 23    Document titled Retail Pharmacy    256
4        Policies and Procedures, Bates
5        labeled ALB-NM00009720 through
6        00009796
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 12

1        THE VIDEOGRAPHER:  Good morning.  We are
2  going on the record at 8:35 a.m. on May 23rd,
3  2024.
4        Please note that the microphones are
5  sensitive and may pick up whispering and
6  private conversations.  Please mute your phones
7  at this time.
8        Audio and video recording continue to take
9  place unless all parties agree to go off the
10  record.
11        This is Media Unit Number 1 of the
12  video-recorded deposition of Carmen Catizone
13  taken in the matter of National Prescription
14  Opiate Litigation filed in the U.S. District
15  Court, Northern District of Ohio, Eastern
16  Division, Case Number 17MD2804.
17        The location of this deposition is being
18  held at the offices of Greenberg Traurig LLP,
19  located at 77 West Wacker Drive, Chicago,
20  Illinois.
21        My name is Nick Page, representing
22  Veritext.  I'm the videographer.
23        The court reporter is Greg Weiland, also
24  from the firm Veritext.
25        I'm not related to any party in this

Page 13

1  action, nor am I financially interested in the
2  outcome.  If there are objections to the
3  proceedings, please state them at the time of
4  your appearance.
5        Counsel and all present, including
6  remotely, will now please state their
7  appearances and affiliations for the record,
8  beginning with the noticing party.
9        MS. MILLER:  Gretchen Miller from
10  Greenberg Traurig on behalf of defendant
11  Albertsons.
12        MS. WHITE:  Meredith Thornburgh White with
13  Barnes & Thornburg on behalf of Publix
14  Supermarket.
15        MR. CHARCHALIS:  Mitchell Charchalis,
16  Barnes & Thornburg, on behalf of Publix.
17        MR. ELSNER:  Michael Elsner from the law
18  firm of Motley Rice on behalf of the plaintiff
19  Tarrant County and the Plaintiff's Executive
20  Committee in the MDL.
21        MS. WHITE:  I'm so sorry, we're not
22  getting what Gretchen is getting on our links.
23        THE VIDEOGRAPHER:  Going off the record at
24  8:37.
25

4 (Pages 10 - 13)

1          (Whereupon, a recess was taken
2          from 8:37 a.m. to 8:38 a.m.)
3          THE VIDEOGRAPHER:  Back on the record at
4   8:38.
5          (Witness sworn.)
6          CARMEN A. CATIZONE
7   after being first duly sworn, testified as follows:
8          EXAMINATION
9          EXAMINATION
10  BY MS. MILLER:
11     Q.   Good morning, Mr. Catizone.
12     A.   Good morning.
13     Q.   As mentioned by the videographer, we're
14  here regarding the lawsuit that has been filed
15  against Albertsons, in the opiate litigation, opioid
16  litigation.
17          Are you familiar with this matter?
18     A.   Yes, I am.
19     Q.   When were you first retained to work on
20  this matter?
21     A.   Probably May or so of 2020, I believe,
22  maybe.  Around there.
23     Q.   When you say May of 2020, that would be
24  with respect to the opioid litigation generally?
25     A.   Yes.

1     Q.   Okay.  When were you first retained in the
2   matter of Tarrant County to express opinions as to
3   Albertsons?
4     A.   That would have occurred, some initial
5   work, in late 2023, and I think things were then
6   postponed.  So the bulk of my work for this case
7   began in February of 2024.
8     Q.   You have been deposed and have testified a
9   number of times, both in this litigation and other
10  litigation; is that correct?
11     A.   Yes.
12     Q.   Okay.  So I'm not going to go over all of
13  the rules.
14          The one -- the one thing I do ask, though,
15  is that if you don't understand any of my questions,
16  please let me know, and I'll restate it.
17          Otherwise, if you do provide an answer to
18  a question, I will assume that you understood it.
19          Is that fair?
20     A.   Yes.
21     Q.   Okay.  On the subject of prior testimony,
22  you've given a number of depositions within the
23  opioid litigation that we're talking about, the MDL
24  opioid litigation, correct?
25     A.   Yes.

1     Q.   We have -- my time here today with you has
2   been limited on the understanding that you have
3   provided testimony a number of times before.
4          I just want to confirm that you stand by
5   that prior testimony that you've given within the
6   opioid litigation, as if that was your testimony
7   today?
8     A.   Yes.
9     Q.   I have handed you what I marked as
10  Exhibit 1, which is a copy of the report that you
11  prepared with respect to the Tarrant County matter
12  as to defendant Albertsons, correct?
13     A.   Yes.
14          (Exhibit 1 was marked for
15          identification.)
16          MS. MILLER:  Okay.  And it's a group
17     exhibit, so it includes your report, and then
18     there's also an Exhibit A.
19  BY MS. MILLER:
20     Q.   Can you tell me what Exhibit A represents?
21     A.   Exhibit A is my curriculum vitae.
22     Q.   Okay.  And then there's a second exhibit,
23  and what does that consist of?
24     A.   It's the material I considered in
25  preparing the report.

1     Q.   That list of materials that you considered
2   in preparing the report, is that a comprehensive
3   list of all materials you've reviewed with respect
4   to Albertsons?
5     A.   All of the materials that are mentioned in
6   the report since this was filed.  I did review some
7   depositions, and those are not listed on here, I
8   don't believe.
9     Q.   Okay.  And what depositions did you
10  review?
11     A.   I think the deposition from Mr. Provenzano
12  and for Covaci.  I believe those were the two.
13     Q.   Were there any other depositions that you
14  reviewed regarding Albertsons?
15     A.   Not that I can remember.
16     Q.   And those depositions are referenced
17  within citations in your report, correct?
18     A.   Any of the materials here are referenced
19  in the report, yes.
20     Q.   Okay.  So between materials that are
21  referenced within your report or materials that are
22  listed on your Materials Considered sheet, does that
23  reflect all of the materials that you have reviewed
24  and considered with respect to your opinions as to
25  Albertsons?

5 (Pages 14 - 17)

Page 18

1    A.  Yes, and with the exception of any
2  experience or knowledge that I've gained through my
3  career as being a pharmacist and regulator, yes.
4    Q.  Okay.  Great.
5        MS. MILLER:  I'm going to hand you what
6  I've marked as Exhibit 2.
7            (Exhibit 2 was marked for
8            identification.)
9        MS. MILLER:  This is a copy of your
10    invoices.  I apologize.  I gave you my copy.
11  BY MS. MILLER:
12    Q.  And there are two pages in this document.
13  The first is invoices referenced for February and
14  March of 2024, and the second is April of 2024.
15        Do you see that?
16    A.  Yes.
17    Q.  Do these invoices reflect all of the work
18  that you have done with respect to the
19  Tarrant County matter as to Albertsons?
20    A.  Yes.
21    Q.  Okay.  Prior to, you mentioned, late 2023,
22  have you ever done any work with respect
23  to evaluating Albertsons' compliance with controlled
24  substance regulations or standard of care?
25    A.  In preparing the other reports that have

Page 19

1  been part of this litigation, I've looked at
2  materials that involve some of the things that
3  Albertsons may have done in terms of policies.
4        But an evaluation or analysis, as I did
5  for this deposition in this case, didn't take place.
6    Q.  Okay.  And I know you've testified a
7  number of times in the past, and it's listed in your
8  CV.
9        You were the executive director of the
10  National Association of Boards of Pharmacy, or NABP,
11  from 1985 until 2020; is that correct?
12    A.  From 1988 to 2020.  1985, I was the test
13  and measurement director.
14    Q.  Great.  Thank you.  As the executive
15  director of NABP, did that also make you a member of
16  the NABP Executive Committee?
17    A.  An ex officio member.
18    Q.  Okay.  And what would have been your role
19  on the Executive Committee as an ex officio member?
20    A.  I was the secretary of the committee.
21        And, therefore, my responsibility was to
22  take the notes or official proceedings of the
23  committees, as well as to report to the committee on
24  the activities and actions of the NABP staff.
25    Q.  How many members are on the NABP Executive

Page 20

1  Committee?
2    A.  When I initially joined, there were 10.
3  The number grew to 12, and I believe now there's 15.
4    Q.  And who -- who were members of the
5  Executive Committee selected?
6    A.  The members of the organization can only
7  be state agencies that have the legislative
8  authority to regulate the practice of pharmacy, so
9  the Indiana Board of Pharmacy or the Illinois Board
10  of Pharmacy.
11        The representatives of those bodies elect
12  the members of the Executive Committee.
13    Q.  And are those members of the Executive
14  Committee members of the state boards?
15        So are they representative members of the
16  various state boards of pharmacy?
17    A.  Yes, they're appointed by the governor in
18  each state to serve on that board or advisory
19  committee.
20    Q.  Okay.  So within that pool of members of
21  state boards of pharmacy, then an Executive
22  Committee is elected?
23    A.  Correct.
24    Q.  And what's the role of the Executive
25  Committee within the NABP?

Page 21

1    A.  It's similar to any board of directors of
2  a corporation or company.  They're responsible for
3  the fiscal oversight, strategic planning, and
4  overall operations of the organization.
5    Q.  Do they have any role in developing
6  policy?
7    A.  Yes, they are the body that actually sets
8  policy.
9    Q.  NABP has had various task forces over the
10  years.
11        What is the purpose of a task force for
12  any particular issue?
13    A.  A task force is usually created when a
14  state or a member requests NABP to examine a
15  particular issue.
16        Once that's approved by the Executive
17  Committee, NABP will undertake that research and
18  analysis to provide information back to the states
19  collectively or policy recommendations or even
20  suggested model language for the states to use in
21  legislation or regulation to address the issue
22  that's been studied.
23    Q.  I understand from your prior testimony
24  that you were previously employed as a pharmacist at
25  Osco Drug, correct?

6 (Pages 18 - 21)

Page 22

1    A.  Yes.
2    Q.  All right.  And I understand over -- the
3  time period is about 1981 to 2004 of your entire
4  employment with Osco?
5    A.  Yes.
6    Q.  Okay.  And during that time period, you
7  were a pharmacy tech, a pharmacist, a pharmacist in
8  charge, and a floater, correct?
9    A.  Correct.
10    Q.  Okay.  When you reference "pharmacist in
11  charge," does that include being the pharmacy
12  manager, or is that a different person?
13    A.  A different person.
14    Q.  Okay.  Did you ever have the title of
15  pharmacy manager?
16    A.  No.
17    Q.  When you were a pharmacist at Osco, who
18  would you report to?
19    A.  I would report to the various store
20  managers.
21    Q.  When you say "store" -- "various store
22  managers," do you mean the pharmacy managers or a
23  grocery store manager?
24    A.  The -- the -- when I first started, Osco
25  was a standalone, and, therefore, the manager of

Page 23

1  that particular pharmacy.
2       And then when it was merged with
3  American Stores and Jewel, then it was the Jewel
4  manager, the grocery store manager, that was the
5  ultimate boss.
6    Q.  Okay.  Did you -- did you report to the
7  store manager with respect to any matters pertaining
8  to the practice of pharmacy?
9    A.  Yes.
10    Q.  Okay.  So with respect to filling
11  prescriptions, you would have reported to the
12  overall store manager?
13    A.  In terms of the metrics and other issues
14  that may have arisen with the prescriptions, yes.
15    Q.  And you made reference to "metrics."
16       What type of metrics are you referring to?
17    A.  The pharmacy would have to report and sit
18  down with the store manager on the number of scripts
19  that were being -- prescriptions that were being
20  filled each week, and then what the store manager
21  would allocate in terms of technician assistants and
22  also then pharmacist coverage.
23    Q.  So during the time you were -- you worked
24  for Osco, it was the store manager who allocated
25  staffing for the pharmacy?

Page 24

1    A.  Yes.
2    Q.  Okay.  Did that ever change during the
3  time that you were at Osco?
4    A.  No.
5    Q.  Did you report to a pharmacy manager?
6    A.  No.
7    Q.  Was there a pharmacy manager at the store
8  when you -- when you worked at Osco?
9    A.  No.
10    Q.  Did you ever report to any type of
11  district pharmacy manager?
12    A.  No.
13    Q.  Okay.  You have previously testified that
14  you received a bonus during your employment at Osco,
15  correct?
16    A.  No.
17    Q.  You did not receive any bonuses?
18    A.  No.
19    Q.  Okay.  Did you have any awareness or
20  knowledge of any other pharmacists receiving
21  bonuses?
22    A.  Just the store manager.  Not any
23  pharmacist.
24    Q.  Okay.  Did you have -- when you were
25  working as a pharmacist, did you have any

Page 25

1  understanding as to what the store manager's bonus
2  was?
3    A.  Yes.
4    Q.  What was your understanding?
5    A.  There were two components that impacted
6  the pharmacy that impacted the overall store's
7  bonus; that was the overall operational cost,
8  pharmacist staffing, technician staffing, and then
9  the pharmacy inventory.
10       The store had an inventory goal and budget
11  it had to meet.  And pharmacy had to stay within
12  their budget, and not over-order products that would
13  negatively impact the store's budget.
14    Q.  When you mention pharmacy inventory, does
15  that refer to both over-the-counter products as well
16  as prescription products?
17    A.  No, over-the-counter was a separate
18  department that had its own manager.  And they had
19  their own budgets and interactions with the store
20  manager.
21    Q.  So controlling pharmacy inventory would
22  have been based on prescription products only?
23    A.  Correct.
24    Q.  Okay.  And it was your prior testimony
25  that, to your knowledge, bonuses at Osco were not

7 (Pages 22 - 25)

Page 26

1 based on script counts, correct?
2     A.  Correct.  There were no bonuses for
3 pharmacists.
4          Every pharmacist in Chicago is a member --
5 was a member of the Teamsters Union.  And the
6 Teamsters set the pharmacist salaries and increases
7 over the years.  So that was a collective bargaining
8 agreement, I believe, between Osco and the
9 Teamsters, and I don't know how that was worked or
10 awarded.
11     Q.  You have previously testified that during
12 your time at Osco, you did follow up on red flags
13 that were presented for prescriptions for controlled
14 substance prescriptions, correct?
15     A.  Yes.
16     Q.  Okay.  And you mentioned that that was
17 handled at a store level, correct?
18     A.  Yes.
19     Q.  How -- how did you learn of what were
20 prescriptions that would present red flags?
21          MR. ELSNER:  Objection.
22          You can answer.
23          THE WITNESS:  That was something that I
24     gained from my pharmacy knowledge when --
25     pharmacy school, various courses that were

Page 27

1     taught.  And then based upon working with other
2     pharmacists when I was a technician, intern,
3     and a student pharmacist, I was also then
4     advised as to what red flags were and what the
5     procedures would be and dealing with those.
6 BY MS. MILLER:
7     Q.  When you say you were "advised as to what
8 red flags were and what the procedures would be,"
9 who were you advised by?
10     A.  The various pharmacists who I worked with
11 while I was a technician, student, and pharmacy
12 intern.
13     Q.  Okay.  And so you were a pharmacy intern
14 or a tech at Osco, correct?
15     A.  Correct.
16     Q.  Okay.  And so your supervisors at Osco
17 provided information on red flags and how to resolve
18 them?
19     A.  Correct, the staff pharmacist and the
20 pharmacist in charge.
21     Q.  You mentioned that you also gained
22 knowledge from pharmacy school.
23          Do you agree that pharmacists are trained
24 in pharmacy school to learn and understand red flags
25 with respect to controlled substance prescriptions?

Page 28

1     A.  Yes.
2     Q.  You joined NABP in 1981?
3     A.  '5.
4     Q.  '85, sorry.  I apologize.  I'm not good
5 with dates.  In 1985.
6          When you joined NABP, did you believe you
7 had sufficient knowledge regarding red flags as they
8 related to controlled substance prescriptions?
9     A.  I'm not understanding the question, but
10 maybe I can say it back to you to make sure.
11     Q.  Sure.
12     A.  In practice, the red flags, I felt
13 confident of in how to identify those red flags.
14          When I moved to NABP, I was always
15 learning new things about red flags, working more
16 closely with the DEA and other groups.
17          So I don't think I knew everything, and I
18 was always willing and able to learn new things
19 about red flags.
20          (Exhibit 3 was marked for
21          identification.)
22 BY MS. MILLER:
23          MS. MILLER:  I'm going to hand you what
24     I'm marking as Exhibit 3.
25

Page 29

1 BY MS. MILLER:
2     Q.  So Exhibit 3 that I've handed you is an
3 article or an interview that was prepared in
4 September 2014.
5          Do you recall doing this interview?
6     A.  Vaguely.
7     Q.  Okay.  I just wanted to direct you to
8 Page 3 of the interview, or of the document.
9          MR. ELSNER:  Mr. Catizone, you can take
10     whatever time you need to review this if you
11     haven't seen this in a long time.
12          THE WITNESS:  Okay.
13 BY MS. MILLER:
14     Q.  Yeah, the only question I have, which I
15 don't think is controversial, relates to --
16 actually, the question is on Page 2 and then the
17 answer is on Page 3.
18          The question is, "How can a pharmacist
19 decide whether a prescription passes the truth
20 test?"
21          And your answer was, "A pharmacist is
22 educated and trained to evaluate situations every
23 day and with every patient in order to make a
24 decision on whether a prescription is for a
25 legitimate medical need and thus pass the truth

Page 30

1 test. This decision draws from extensive training
2 and education a pharmacist receives prior to being
3 licensed to practice and the red flags that should
4 be detected when the prescription is presented."
5      Do you see that?
6   A.  Yes, I see that.
7   Q.  Okay.  Do you -- did you provide this --
8 do you recall providing this answer in this
9 interview?
10  A.  Yes.
11  Q.  Okay.  And do you agree with this answer
12 today?
13  A.  I agree, but in the context of Page 1,
14 where my response says that "There's no specific
15 criteria, and every situation is unique and would
16 need to be evaluated at the time using information
17 available and professional judgment of the
18 pharmacist."
19      So I would say, in the context there's
20 information needed, the pharmacist needs to evaluate
21 that information, and then that comment is true.
22  Q.  Okay.  And you agree that pharmacists
23 receive extensive training and education prior to
24 being licensed to practice to be able to identify
25 those situations?

Page 31

1   A.  Yes, they receive education, yes.
2   Q.  Okay.  I want to direct you to Page 8 to 9
3 of your report.
4      As I understand, you have been retained in
5 this case to provide opinions regarding pharmacy
6 standard of care; is that correct?
7   A.  Correct.
8   Q.  On Page 8, the bottom of Page 8, you --
9 there's a paragraph that starts with "Standards of
10 care."
11      If you move down to that paragraph,
12 there's the last line in that paragraph starts,
13 "Those practices and their standard of care are
14 reflected in national and state laws and regulations
15 as well as pharmacy practice organizations and
16 industry guidance."
17      Do you see that?
18  A.  Yes, I do.
19  Q.  Okay.  So the national and state laws and
20 regulations, pharmacy practice organizations, and
21 industry guidance, am I understanding correctly that
22 you are referring to those as places which help
23 establish the pharmacy standard of care?
24  A.  Yes, some of the sources, yes.
25  Q.  Okay.  I want to break those down a little

Page 32

1 bit.
2      So starting with the national and state
3 laws, obviously, in the national laws, we have the
4 Controlled Substances Act, correct?
5   A.  Correct.
6   Q.  And then there are administrative
7 decisions from the DEA that reflect expectations for
8 pharmacy standard of care as well, correct?
9   A.  Correct.
10  Q.  Okay.  With respect to state laws, in
11 particular, we are talking about the State of Texas
12 in this case.
13      In Texas, pharmacies and pharmacists are
14 subject both to the DEA regulations or federal laws
15 and Texas state law, correct?
16  A.  Texas and every other state, yes.
17  Q.  Okay.  For the practice of Texas, though,
18 pharmacists and pharmacies within Texas would not be
19 subject to other state laws, they're subject to
20 Texas law, correct?
21  A.  Correct.
22  Q.  And pharmacies and pharmacists in Texas
23 are regulated by the Texas Board of Pharmacy,
24 correct?
25  A.  Correct.

Page 33

1   Q.  And you have outlined regulations, the
2 Texas Professional Responsibility Regulations for
3 Pharmacies and Pharmacists are the regulations that
4 govern pharmacies within Texas, correct?
5   A.  That's a sampling of the regulations that
6 are pertinent for this report, yes.
7   Q.  Correct.  And they're on Page 53 to 55 of
8 your report.
9      You've referenced that the Texas Board of
10 Pharmacy has codified red flag factors in Board
11 Rule Section 291.29(f), correct?
12  A.  Yes, that's in the report.
13  Q.  Okay.  And that's what we're mostly
14 focused on, or at least my questions will mostly be
15 focused on, as pertaining to the identification of
16 red flags.
17      And those -- those red flag factors were
18 codified in 2018, correct?
19  A.  Yes.
20  Q.  Are you aware of whether there were any
21 red flag factors that were codified in the Texas
22 Board of Pharmacy regulations prior to 2018?
23  A.  I -- I'm not -- not specifically, no.
24  Q.  Okay.  In your analysis of the Texas
25 regulations, did you -- did you look at any of the

9 (Pages 30 - 33)

Page 34

1 legislative history pertaining to those regulations
2 to see what types of things were proposed but had
3 been rejected by the Texas Board of Pharmacy or the
4 Texas legislature?
5      A.   No.
6      Q.   And then the Texas Board of Pharmacy also
7 issued a guidance document to pharmacies in
8 February 2018, which you've referenced on Page 55 of
9 your report.
10          And that guidance document was referenced.
11 It was called "You Might Be A Pill Mill If ..."
12          Correct?
13     A.   Yes.
14     Q.   And is it your understanding that between
15 the regulations, the Board of Pharmacy regulations
16 that we've just referenced and this guidance
17 document, that this reflected what the Texas Board
18 of Pharmacy had considered as red flags for -- that
19 pharmacies should be aware of?
20          MR. ELSNER:  Objection.
21          THE WITNESS:  I'm not aware if there was
22     other materials that may have been issued by
23     the Texas board.  So I can say that this was
24     probably some, but I can't say whether it was
25     definitive and the only documents issued by the

Page 35

1      Texas board in regard to this.
2 BY MS. MILLER:
3      Q.   Okay.  Sitting here today, you're not
4 aware of anything else; is that correct?
5      A.   Correct.
6      Q.   When talking about national -- national
7 laws, and specifically the DEA, would you agree that
8 the DEA has not published a specific, defined set of
9 red flags that are mandatory for pharmacists to
10 follow in dispensing controlled substances?
11     A.   I would not agree with that.
12     Q.   Okay.  What -- in what way do you disagree
13 with that?
14     A.   I think earlier you mentioned that the DEA
15 used administrative actions as a means to talk about
16 the national law and that, but there were also court
17 cases.  And the DEA published those in the Federal
18 Register, and then used the Federal Register and the
19 administrative hearings as guidance documents or
20 tools when the DEA talked to pharmacy or pharmacy
21 groups.
22          And, in fact, the DEA made presentations
23 across the country on red flags using those very
24 same documents and exhibits.
25     Q.   Okay.  Actually, we will get back to that

Page 36

1 in a minute.
2      Okay.  Sticking with Page 8 to 9 of your
3 report, we talked about state laws, national and
4 state laws and regulations.
5      The next one you reference is pharmacy
6 practice organizations.
7      What are you referring to when you mean
8 "pharmacy practice organizations"?
9      A.   Organizations such as the United States
10 Pharmacopeial, P-h-a-r-m-a-c-o-p-i-e-a-l [sic],
11 which is a standard-setting organization and also
12 approves drug products and manufacturers.
13          Various groups like the practice groups
14 that have clinicians that develop guidelines and
15 standards that are then referenced or used by the
16 Centers for Disease Control or by boards of pharmacy
17 in their own laws and regulations.
18     Q.   Okay.  So other than the US Pharmacopeia,
19 can you give me other examples of organizations that
20 establish guidelines and standards?
21          And I'm specifically focused on with
22 respect to dispensing controlled substances.
23     A.   The American Pharmacists Association; the
24 National Association of Drug Inspector
25 Investigators, NADII; the Association or Federation

Page 37

1 of Regulatory Boards; the National Community
2 Pharmacists Association; the American Society of
3 Health-System Pharmacists; the American Medical
4 Association; the Family Practitioners Association.
5          There's probably a number of other ones
6 that I can't recall right now.
7      Q.   Okay.  Would those organizations include
8 state boards of pharmacy?
9      A.   Not officially, but members of state
10 boards may have served on those committees or be a
11 part of those organizations.
12     Q.   Okay.  Would you put NABP in that
13 category?
14     A.   Yes.
15     Q.   How about NACDS, the National Association
16 of Chain Drug Stores?
17     A.   To a limited degree.
18     Q.   Okay.  When you say "to a limited degree,"
19 what do you mean?
20     A.   NACDS wasn't usually involved in standard
21 setting.  If an issue arised -- arose, then NACDS
22 may issue a position statement or paper, and then
23 that would be evaluated and possibly used.
24     Q.   What about state medical boards?
25     A.   Yes.

10 (Pages 34 - 37)

Page 38

1   Q.  You would include them?
2   A.  Yes.
3   Q.  How about the Federation of State Medical
4 Boards?
5   A.  Yes.
6   Q.  Looking to the organizations we've
7 identified, did the -- are you aware of the American
8 Pharmacists Association issuing any guidelines with
9 respect to identification of red flags with
10 controlled substance dispensing?
11   A.  They issued a number of guidance
12 documents, but I can't recall specific documents.
13   Q.  Okay.  Are you aware of the National
14 Association of Drug Inspectors, whether they issued
15 any guidance documents with respect to
16 identification of red flags and controlled substance
17 dispensing?
18   A.  Same response.  I can't identify specific,
19 but I'm aware that they did.
20   Q.  Okay.  You're aware that they issued
21 guidelines with respect to red flags specifically?
22   A.  Red flags and diversion, yes.
23   Q.  Okay.  But you're not aware of which ones
24 those --
25   A.  No.

Page 39

1   Q.  Okay.  The National Community Pharmacy
2 Association, are you aware of any guidance that they
3 issued with respect to red flags?
4   A.  The same response as the prior two.
5   Q.  Okay.  With respect to the American
6 Medical Association, would you consider that
7 information coming from the American Medical
8 Association to be reliable information with respect
9 to the use of controlled substances for pain relief?
10   MR. ELSNER:  Objection.
11   You can answer.
12   THE WITNESS:  I would have to see what the
13   information is.  And the reason I say that is
14   that the AMA questioned and criticized the role
15   of pharmacists in dispensing prescriptions, and
16   that was not information I would consider true
17   or accurate.
18   But other information they did issue
19   regarding opioids and prescribing, I would
20   consider true and accurate.
21 BY MS. MILLER:
22   Q.  Okay.  With respect to NACDS, would you --
23 would it be reasonable for a pharmacy to rely on
24 information that was presented by NACDS with respect
25 to the dispensing of controlled substances?

Page 40

1   MR. ELSNER:  Objection.
2   THE WITNESS:  To a limited degree.
3 BY MS. MILLER:
4   Q.  And what do you mean by that?
5   A.  NACDS represents the corporate structures
6 of chain pharmacies and not the individual
7 pharmacists and not the individual patients.
8   So they are truly a trade group, whose
9 best interest, at times, is the financial benefit of
10 its members and not necessarily the patient care.
11   Q.  Do you believe that that renders the
12 information that NACDS issued, with respect to
13 controlled substance dispensing, unreliable?
14   A.  No.
15   MR. ELSNER:  Objection.
16   THE WITNESS:  I think everything would
17   have to be evaluated, and people used what
18   information they found reliable or not.
19 BY MS. MILLER:
20   Q.  Okay.  How about NABP?  Would you consider
21 that to be a reliable source, one which pharmacies
22 could look to for information regarding controlled
23 substance dispensing?
24   A.  Probably during the years '85 to 2020, the
25 most reliable in the country, I would say.

Page 41

1   I was joking on that one.  But, yes,
2 they're reliable.
3   Q.  What about the Federation of State Medical
4 Boards?
5   Do you believe that it would have been
6 reliable for a pharmacy to look to the FSMB for
7 information pertaining to controlled substance
8 prescribing?
9   A.  Again, the information would need to be
10 evaluated and that information used as appropriate.
11   Q.  So when you say "the information would
12 need to be evaluated," are you saying that it would
13 not have been reasonable for a pharmacy to have
14 relied on information from the FSMB relating to the
15 use of controlled substances for pain?
16   MR. ELSNER:  Objection.
17   THE WITNESS:  My answer would be if the
18   information was clinically based and it was
19   evidence-based that could be verified, the
20   answer would be "yes."
21   If it was politically based, then I don't
22   think the pharmacies should rely upon that.
23   And as an example, the AMA has opposed
24   pharmacists administering immunizations, but
25   the data have showed that pharmacists are

11 (Pages 38 - 41)

1    administering more immunizations than
2    physicians.
3        So for a pharmacy not to administer
4    because the AMA said not to, I don't believe
5    that's a clinical- or evidence-based
6    recommendation or information.
7  BY MS. MILLER:
8    Q.  Okay.  You also referenced in your report,
9  on Page 9, industry guidance as forming the basis of
10  a pharmacy standard of care.
11       What are you referring to when you say
12  "industry guidance"?
13    A.  Guidance issued by the DEA, state boards
14  of pharmacy, medical boards, guidance to the
15  industry rather than industry-developed guidance.
16    Q.  Okay.  And would you include NABP in that
17  category?
18    A.  Yes.
19    Q.  So with respect to the DEA, would it --
20  would -- in your opinion, would it have been
21  reasonable for a pharmacy to rely on information it
22  received from DEA with respect to controlled
23  substance dispensing?
24    A.  Yes.
25    Q.  With respect to state boards of pharmacy,

1  specifically the Texas State Board of Pharmacy,
2  would it have been reasonable for pharmacies in
3  Texas to have relied on information from the state
4  board of pharmacy with respect to issues surrounding
5  dispensing of controlled substance prescriptions?
6    A.  Yes.
7    Q.  With respect to medical boards,
8  specifically the Texas Medical Board, would it have
9  been reasonable for pharmacies to rely on the
10  information coming from the Texas Medical Board with
11  respect to issues surrounding controlled substance
12  dispensing?
13    A.  I can't answer definitively, because I
14  wasn't and I'm not as familiar with the medical
15  boards as I was -- am with the pharmacy boards, so I
16  can't say.
17    Q.  When you say you're not as familiar with
18  the medical board, as a general category, being a
19  state medical board, do you believe it's reasonable
20  for a pharmacy to look to the medical board for
21  information with respect to controlled substance
22  prescribing and dispensing?
23    A.  Yes, in two areas; clinically and
24  evidence-based information, and, two, what the rules
25  and regulations of the state medical board may be.

1        Beyond that, I really can't say.
2    Q.  Okay.  As regarding the FDA, the Food and
3  Drug Administration, in your opinion, would it have
4  been reasonable for pharmacies to have relied on
5  information from the FDA with respect to controlled
6  substance prescribing or dispensing?
7        MR. ELSNER:  Objection.
8        THE WITNESS:  Yes, if it's clinical and
9    it's evidence-based.
10  BY MS. MILLER:
11    Q.  When you say "if it's clinical and it's
12  evidence-based," can you -- can you explain for me a
13  little bit more what you mean by that?
14    A.  Sure.  The FDA is a complex organization
15  with many interests, or agency.  And sometimes they
16  issue opinions that stray into the political arena.
17        And so an FDA advisory committee may
18  recommend against allowing birth control pills or
19  hormonal tablets being over the counter, and the FDA
20  may override that objection and say that
21  over-the-counter hormonal products are safe and
22  effective.
23        And so when it gets into those areas that
24  may not be scientific or evidence-based and it
25  becomes a political issue, then I think the

1  information has to be evaluated on a case-by-case
2  basis.
3    Q.  Okay.  So for representations from the
4  FDA, with respect to the safety or prescribing
5  parameters for controlled substances, would it have
6  been reasonable for pharmacies to rely on that type
7  of information from the FDA?
8        MR. ELSNER:  Objection.
9        THE WITNESS:  If it followed the advisory
10    committee recommendations and it could be
11    clinically or evidence-based, yes.
12  BY MS. MILLER:
13    Q.  We talked about the NACDS, the National
14  Association of Chain Drug Stores, briefly.
15        NABP worked with NACDS on various task
16  forces over the years, correct?
17    A.  Correct.
18    Q.  And my understanding is NACDS also
19  presented for its members a pharmacy law day at an
20  annual conference.
21        Do you recall that?
22    A.  I'm not familiar with that.
23    Q.  Okay.  Have you ever attended an NACDS
24  conference?
25    A.  No.

12 (Pages 42 - 45)

1    Q.   Okay.  We talked briefly about the
2 Federation of State Medical Boards.
3        Can you describe for me -- I'm going to
4 refer to it as the "FSMB," if that's okay.
5    A.   Yes, yes.
6    Q.   What is the FSMB?
7    A.   It's an organization similar to NABP in
8 that the members of FSMB are the state medical
9 boards and jurisdictions that regulate the practice
10 of medicine.
11    Q.   The FSMB issued guidelines regarding the
12 use of controlled substances for pain in 1998, which
13 later became a policy, a model policy, for use of
14 controlled substances.
15        Do you recall those guidelines?
16    A.   I recall, in general, them being issued,
17 but not the specific guidelines.
18    Q.   With respect to treatment
19 guidelines that are issued by the Federation of
20 State Medical Boards, do you -- do you believe that
21 those would have represented the generally accepted
22 standard of care for prescribers, as a statement of
23 the generally accepted standard of care for
24 prescribers?
25        MR. ELSNER:  Objection.

1        THE WITNESS:  I can't comment.  That's
2    outside of my area of expertise, so I wouldn't
3    know.
4 BY MS. MILLER:
5    Q.   Are there any publications that you would
6 point to that pharmacies and pharmacists could look
7 to for reliable information regarding controlled
8 substance dispensing?
9        MR. ELSNER:  Objection.
10        THE WITNESS:  Some of the things that
11    we've mentioned before, the Controlled
12    Substance Act.
13        The DEA also issues the Pharmacist's
14    Manual, and then the various state boards of
15    pharmacy have issued various guidance
16    documents.
17        And as you mentioned, the Texas Board of
18    Pharmacy sent "You Know You're A Pill Mill
19    If ..."
20        There were various publications and
21    documents issued by state boards.
22 BY MS. MILLER:
23    Q.   Okay.  I'm going to turn to the discussion
24 of red flags.
25        I understand -- am I correct in

1 understanding that a "red flag," as we are using it
2 in the context of this litigation, is intended to be
3 a warning about the characteristics of certain
4 prescriptions that should cause a pharmacist to look
5 more closely at the script?
6    A.   As a general description, yes.  If there's
7 a particular page or so that you want me to look at
8 then --
9    Q.   No, that's just a general question.
10    A.   Okay.
11    Q.   If -- to the extent a prescription is not
12 subject to a red flag or circumstances that would
13 cause the pharmacist to question the legitimacy of
14 the prescription, am I correct that a pharmacist can
15 appropriately fill that script without doing the
16 extra investigation that's called for when there's a
17 red flag?
18        MR. ELSNER:  Objection.
19        THE WITNESS:  I'm not fully understanding
20    the question.
21 BY MS. MILLER:
22    Q.   Sure.  I'll rephrase it.
23    A.   Thank you.
24    Q.   So my first question was, the purpose of a
25 red flag is to alert the pharmacist that there is a

1 question regarding the legitimacy of the
2 prescription that would require the pharmacist to do
3 additional investigation, correct?
4    A.   Correct.
5    Q.   Okay.  So my question is, if there's a
6 prescription, a controlled substance prescription,
7 that does not present a red flag and does not
8 present circumstances that would cause a pharmacist
9 to question the legitimacy of that prescription, can
10 the pharmacist fill that prescription without doing
11 that extra investigation that's required when you
12 have a red flag?
13        MR. ELSNER:  Objection.
14        THE WITNESS:  So if I can repeat back to
15    make sure I understand.
16        You're saying that if a pharmacist is
17    presented a prescription and there are no
18    therapeutic issues with the medications within
19    the prescribed dosage range and therapy, it's
20    appropriate for the patient, the physician is
21    writing within their scope of practice, and if
22    it's a controlled substance, there are no red
23    flags, can the pharmacist fill that
24    prescription?
25        Is that the question?

1 BY MS. MILLER:
2     Q.  Fill that prescription without having to
3 do additional investigation to look further into the
4 prescription?
5     A.  If it's a controlled substance
6 prescription, that separates that prescription from
7 noncontrolled and requires the pharmacist to do
8 additional investigation to ensure there are no red
9 flags.
10     If there are no red flags after that
11 analysis, then the pharmacist can fill the
12 prescription.
13     Q.  Okay.  Under -- and I understand from your
14 report and prior testimony that the concept of red
15 flags for pharmacists have been around for a long
16 time, correct?
17     A.  Yes.
18     Q.  Okay.  Would you agree with me that the
19 term "red flag" was not always used in general
20 vernacular for pharmacists, even though the concept
21 was there?
22     A.  That's hard to say, because I think in my
23 report, I mention how far back red flags are
24 mentioned.  And it goes way, way back.
25     They said -- but in terms of the jargon, I

1 would say "red flag" was a common term within the
2 jargon.  But I don't know when it started or --
3 so ...
4     Q.  Okay.  Would you agree with me that
5 there's no magic to the term "red flag"?
6     It's representing a concept of a
7 prescription that presents suspicious circumstances?
8     MR. ELSNER:  Objection.
9     THE WITNESS:  I don't understand "magic."
10 Define for me what do you mean by -- I'm
11 sorry --
12 BY MS. MILLER:
13     Q.  Sure.
14     A.  -- but I really didn't understand what you
15 mean.
16     Q.  Yeah.  No, I understand.
17     So if a pharmacist understood that he or
18 she was to do additional investigation when
19 suspicious circumstances presented themselves in a
20 controlled substance prescription, there's no magic
21 to that pharmacy -- pharmacist calling it a "red
22 flag"?
23     The important part is that they identify
24 that it's a suspicious circumstance, and they follow
25 up on it?

1     A.  In that context, I would say there is a
2 certain magic to it.
3     I think what we talked about just a
4 few minutes ago, if it's a controlled substance
5 prescription, and I look at it, there's one
6 assessment.
7     If I see a red flag, then the magic kicks
8 in, and I'm in a whole different position or
9 analysis.
10     So I would say, in terms of the magic, for
11 me, as a pharmacist, that would be the magic, to say
12 this is something that requires further analysis.
13     Q.  I understand what you're saying.  I'm more
14 focused on just the term "red flag," right, that
15 whether the pharmacist recognizes these are
16 suspicious circumstances, whether the pharmacist
17 calls it a "red flag" or not is not really
18 determinative of whether they have properly
19 addressed this prescription?
20     MR. ELSNER:  Objection.
21     THE WITNESS:  I'm having a difficult time
22 agreeing with that because the red flags have
23 been identified by the DEA and boards of
24 pharmacy.  So that has a special nomenclature
25 and a special attachment to a particular

1 situation with a prescription, patient, or
2 prescriber.
3     So it would trigger a magic or a response
4 from the pharmacist saying "This is a red
5 flag," and use that term.
6 BY MS. MILLER:
7     Q.  And is it your opinion that that was
8 always the case, or has that changed over time?
9     A.  That's always been the case.
10     (Exhibit 4 was marked for
11         identification.)
12     THE WITNESS:  Thank you.
13     MS. MILLER:  I hand you what I've marked
14 as Exhibit 4 to your deposition.
15 BY MS. MILLER:
16     Q.  This is a document from the DEA dated
17 February 2000 entitled the "Pharmacist's Guide to
18 Prescription Fraud."
19     Do you see that?
20     A.  Yes.
21     Q.  Have you seen this document before?
22     A.  I may have.  I can't recall.
23     Q.  Okay.  In this, it's addressing
24 prescriptions, controlled substance prescriptions
25 that -- in determining whether they are issued for

14 (Pages 50 - 53)

Page 54

1 legitimate medical purposes, correct?
2     A.  If I could have a few minutes to read the
3 document.
4     Q.  Sure.
5     A.  Thank you.
6         Okay.  I'm sorry, what was the question?
7     Q.  Do you agree that this document addresses
8 guidance regarding helping a pharmacist determine
9 whether a prescription was issued for a legitimate
10 medical purpose?
11     A.  After reading the document, I recall why
12 it was issued.  And I saw it, and I would say that
13 was part of the reason.
14         The other reason was there were reports to
15 the DEA and state boards of forged prescription and
16 stolen prescription blanks.
17         So the DEA was reacting to that particular
18 incident, as well as then affirming that the
19 pharmacist and the pharmacy have legal
20 responsibilities that they have to meet, so ...
21     Q.  Okay.  And referring down to towards the
22 bottom of the first page, there's a section that
23 says, "The following criteria may indicate that the
24 purported prescription was not issued for a
25 legitimate medical purpose."

Page 55

1         Do you see that?
2     A.  Yes.
3     Q.  All right.  And following that sentence,
4 there are a number of bullet points, including, "The
5 prescriber writes significantly more prescriptions
6 (or in larger quantities) compared to other
7 practitioners in your area."
8         And then there are a number of bullet
9 points that follow that, correct?
10     A.  Yes.
11     Q.  Would you characterize the items
12 identified in these bullet points as the red flags
13 that we've been talking -- some red flags that we
14 have been talking about pertaining to controlled
15 substance prescriptions?
16     A.  Some of the red flags.
17     Q.  Correct.  And so, though these may not
18 identify all of the red flags that have been
19 identified over time, would you agree with me that
20 the DEA is providing guidance on some red flags?
21     A.  I think they're identifying some of those
22 red flags.
23     Q.  Okay.  Would you agree with me that the
24 DEA does not use the term "red flags" in this
25 document?

Page 56

1     A.  In this particular document, yes, it's not
2 used.
3     Q.  In your report, you reference some DEA
4 decisions that were issued over time.  And
5 specifically in your report, you cited to a
6 decision, United Prescription Services, that was
7 issued in 2007.
8     A.  What page?
9     Q.  Page 27.
10         And then you reference Medicine Shoppe
11 Jonesboro as another decision on that page, correct?
12         MR. ELSNER:  I'm sorry, I missed the
13     first --
14         THE WITNESS:  I don't see United
15     Prescription in here as a reference.
16 BY MS. MILLER:
17     Q.  So if you look at the paragraph that
18 starts towards the top, "The corresponding
19 responsibility to ensure the dispensing of valid
20 prescriptions extends to the pharmacy itself.  The
21 Holiday decision was not the first DEA decision to
22 hold pharmacies responsible."
23         And then you cite, "Similar opinions were
24 issued in Medicine Shoppe Jonesboro and United
25 Prescription Services."

Page 57

1     A.  Okay.  Thank you.
2     Q.  Do you see that?  Okay.
3         And the United Prescription Services
4 decision was issued in 2007, as you reference in
5 footnote 55, and the Medicine Shoppe Jonesboro
6 decision was issued in 2008, correct?
7     A.  Yes.
8     Q.  Okay.  And you've cited some other DEA
9 administrative decisions as providing information
10 regarding different types of red flags, correct, and
11 that includes the Holiday CVS decision in 2012,
12 correct.
13         You mentioned that following -- or in
14 addition to the DEA decisions, that the DEA then
15 prepared presentations that it gave to the industry
16 identifying red flags as well, correct?
17     A.  Yes.
18         (Exhibit 5 was marked for
19         identification.)
20     MS. MILLER:  I'm going to hand you what
21 I've marked as Exhibit 5.
22 BY MS. MILLER:
23     Q.  I will represent to you that this an
24 excerpt from a very lengthy PowerPoint document that
25 the vast majority of it did not make any reference

15 (Pages 54 - 57)

Page 58

1  to red flags.  But there is one page that made a
2  reference to red flags, so that's the page that I
3  added to this document.
4      Do you see that?
5  A.  Yes.
6  Q.  Are you familiar with this presentation?
7  A.  I am not.
8  Q.  Okay.  This is a presentation that was
9  given by Joseph Rannazzisi to the American Society
10  of Interventional Pain Physicians on June 9th, 2012.
11      Do you see that?
12  A.  I see that, yes.
13  Q.  The page that lists potential red flags
14  has a number of references.
15      And would you agree that these are red
16  flags that the DEA provided guidance to industry
17  regarding?
18      MR. ELSNER:  Objection.
19      THE WITNESS:  I will say I see those
20  listed here on the page, but I'd like to see
21  the preceding page and any citations that
22  Mr. Rannazzisi may have used to address these.
23      Other than that, I can simply say, yeah,
24  there are a list of potential red flags on this
25  slide.

Page 59

1  BY MS. MILLER:
2  Q.  Okay.  I can get you the whole
3  presentation on a break.
4  A.  Thank you.
5  Q.  With respect to the red flags that are
6  listed on Page 2 of this document, do you agree that
7  these red flags are consistent with the red flags
8  that are reflected in some of the DEA administrative
9  decisions?
10  A.  Yes, some of the red flags, yes.
11      (Exhibit 6 was marked for
12      identification.)
13      THE WITNESS:  Thank you.
14      MS. MILLER:  I hand you what I've marked
15  as Exhibit 6 to your deposition.
16  BY MS. MILLER:
17  Q.  This document is an email exchange between
18  you and Robert -- I'm going to mispronounce his last
19  name.
20  A.  Giacalone.
21  Q.  -- Giacalone, as well as a couple of other
22  folks.  But, predominantly, the communications are
23  between you and Mr. Giacalone, correct?
24  A.  Correct.
25  Q.  Do you recall this email exchange?

Page 60

1  A.  Now that I see it, yes.  But I haven't
2  seen it in 10 years, 20 years.
3  Q.  Sure.  Feel free to take your time to look
4  at the email exchange.
5      It starts on the -- first email in the
6  exchange starts on February 17, 2014, and it's an
7  email from you to Mr. Giacalone.
8      Who is Mr. Giacalone?
9  A.  Mr. Giacalone was in the general counsel's
10  office of Cardinal Health, which is one of the
11  primary wholesale distributors.
12  Q.  And the email to you, the subject is
13  entitled "Red Flags."
14      And you state, "Bob, Here are some
15  suggestions taken from the Quarles & Brady
16  presentation."
17      And below that, am I correct in
18  understanding you are listing some examples of red
19  flags, correct?
20  A.  Yes.
21  Q.  Okay.  You make reference to -- with
22  respect to those red flags, you make reference to
23  certain attachments.
24      And do you see that there are attachments
25  to the email?

Page 61

1  A.  I see the attachment here, yes.
2  Q.  Okay.  Did you -- did you prepare these
3  attachments and attach them to this email?
4      MR. ELSNER:  Objection.
5      You can answer if you know.
6      THE WITNESS:  Yeah, I can't recall, but I
7  don't have anything to say that I didn't,
8  so ...
9  BY MS. MILLER:
10  Q.  Okay.  What was the purpose of your email
11  to Mr. Giacalone?
12  A.  Sure.  Cardinal Health and some other
13  sponsors had provided a grant to NABP to develop,
14  with a stakeholder group, a video on red flags.
15      And we were working with Mr. Giacalone, as
16  a representative of that group, to try and get the
17  outline and content for the video together.
18  Q.  Got it.  So your email on February 17th,
19  2014, to Mr. Giacalone, is this an outline of the
20  red flags you were proposing be included in the
21  video?
22      MR. ELSNER:  Objection.
23      THE WITNESS:  They were some suggestions,
24  yes.  And it also says it was just a starting
25  point, so ...

16 (Pages 58 - 61)

Page 62

1 BY MS. MILLER:
2    Q.  Great.  In referencing the attachments,
3 were those attachments the support that you were
4 providing for the basis for each particular red
5 flag?
6    A.  No.
7    Q.  So when you say, in the first section,
8 Number 1, "Dispensing pattern was indicative of
9 diversion even for those with no pharmacy training,"
10 and below that, it says, Subsection A, "Patients
11 travel long distances from residence to reach
12 prescriber or pharmacy," you reference "Attachment
13 at Number 3."
14       What are you -- what are you intending to
15 refer to when you say "Attachment at Number 3"?
16    A.  So if you look at the preceding sentence,
17 it says, "Here are some suggestions taken from the
18 Quarles & Brady presentation."
19       So I was referencing a presentation that
20 Quarles & Brady had made and what Quarles & Brady
21 may have thought were red flags, and what they may
22 have used in a presentation that they delivered
23 defining or talking about red flags.
24    Q.  Okay.  So the attachments -- would you
25 agree with me that the attachments are intended to

Page 63

1 be a reference for support for the red flag that
2 you're identifying?
3    A.  I'm trouble -- I'm having trouble using
4 the words "reference" and "support."
5       I would say it was an example of red flags
6 that others in pharmacy had used or talked about
7 that we had also seen and talked about.  But I'm not
8 sure where the support was.
9       But if somebody else talked about it, used
10 it, and it was DEA support, then the answer was
11 "yes."
12    Q.  All right.  So the attachments to the
13 email include the presentation that I had just
14 referenced in Exhibit Number 5, and it's also an
15 excerpt of that is a presentation from
16 Mr. Rannazzisi to the American Society of
17 Interventional Pain Physicians on June 9th of 2012.
18       It includes a page that's entitled
19 21 C.F.R. 1306.04 regarding corresponding
20 responsibility, correct?
21    A.  Yes, that slide is there.
22    Q.  Okay.  And then it also has that page of
23 potential red flags following that?
24    A.  Yes.
25    Q.  Do you see that?

Page 64

1    A.  I see that, yes.
2    Q.  Okay.
3       MR. ELSNER:  I'm sorry, I'm not following
4 you exactly.
5       Are these attachments to the email from
6 Robert --
7       THE WITNESS:  Giacalone.
8       MR. ELSNER:  -- Giacalone -- thank you --
9 or are these attachments to Mr. Catizone's
10 email?
11       They don't appear to be attachments to his
12 email.  I'm just not following exactly.
13       MS. MILLER:  That's part of my question.
14       MR. ELSNER:  Okay.
15       MS. MILLER:  This is the way the documents
16 were presented to us, so I don't know if
17 that --
18       MR. ELSNER:  And what is the metadata?
19 Does it say in the metadata?
20       MS. MILLER:  Sitting here today, I
21 couldn't tell you that.
22       MR. ELSNER:  Okay.  I didn't just -- I
23 don't even recognize some of these Bates
24 numbers.
25       So I was curious, this MNKOI, do you know

Page 65

1 what case that is?
2       MS. MILLER:  I believe these are
3 collected -- if you see at the bottom, the
4 source industry documents, these are documents
5 that were collected by the University of
6 California San Francisco from all the industry
7 documents produced in the litigation.
8       MR. ELSNER:  Okay.  Do you know if these
9 are in the productions in the MDL?
10       MS. MILLER:  My understanding is that
11 these all came from the MDL.
12       MR. ELSNER:  Okay.  I've just never seen
13 that Bates number before, in seven or
14 eight years so ...
15       MS. MILLER:  Yeah.  That, I don't know for
16 certain, other than that's my understanding, is
17 that's the source of where these documents came
18 from.
19       MR. ELSNER:  Okay.
20       MS. MILLER:  There were many documents
21 produced before we were ever a part --
22       MR. ELSNER:  I understand.
23       MS. MILLER:  -- of the MDL, so we had to
24 collect them anywhere we could find them.
25       MR. ELSNER:  I understand.

17 (Pages 62 - 65)

Page 66

1    MS. MILLER:  Okay.  So appreciate that
2  clarification.
3  BY MS. MILLER:
4    Q.  Do you know whether these documents were
5  attached to your email or to Mr. Giacalone?
6    A.  Since they reflect a number of different
7  presentations -- there's one from March, there's one
8  from November -- I can't recall which ones I may
9  have attached and which ones Mr. Giacalone may have
10  also then attached back and forth.
11    So I apologize, but I can't.
12    Q.  Okay.  No problem.  And I didn't mean
13  to -- I didn't mean to represent to you that these
14  were yours.  I was more asking the questions than
15  anything.
16    A.  I'm from Chicago.  No harm taken.
17    Q.  Okay.  So I am going to refer you to --
18  well, back up.
19    So, again, back on your email,
20  February 17th, 2014, you mentioned these are
21  suggestions taken from the Quarles & Brady
22  presentation.
23    Do you know what presentation you're
24  referring to there?
25    A.  That's why I'm a bit confused, because

Page 67

1  Quarles & Brady gave several presentations.  And
2  these documents don't have any of the markings or
3  listings from Quarles & Brady.
4    Q.  Okay.
5    A.  So that's why I can't confirm that I sent
6  these.  I would have sent Quarles & Brady slides,
7  not these slides.  So that's where I'm confused.
8    Q.  Okay.  Okay.  So these may be attachments
9  that Mr. Giacalone sent to you?
10    A.  Correct.
11    Q.  Okay.
12    A.  I can't recall.
13    Q.  Actually, and I take that -- and now that
14  I'm looking at the cover email, he -- on the first
15  page, February 20th, 2014, he says, "I pulled some
16  past DEA presentations and looked at what DEA
17  identified as pharmacy red flags and added those."
18    So these are probably him sending to you?
19    A.  Correct.
20    Q.  Okay.  So the presentations that were made
21  by Quarles & Brady, who at Quarles & Brady made
22  those presentations, do you recall?
23    A.  They have a pharmacy team of lawyers, but
24  it might have been Roger, and I can't recall his
25  last name.  But he's the principal of the pharmacy

Page 68

1  group.
2    It's either Fernandez or Hernandez, Roger.
3    Q.  Okay.  And what -- what was the context of
4  the presentations that Quarles & Brady made?  Who
5  were they giving the presentation to?
6    A.  I don't recall.  Quarles & Brady has a
7  number of cases before state boards of pharmacy, and
8  they also provide guidance and information to state
9  boards of pharmacy.
10    So I'm not sure who they were representing
11  or what the audience was or what the presentation
12  was intended for.
13    Roger Morris, I'm sorry.  It's
14  Roger Morris.
15    Q.  Morris.  Okay, great.
16    The presentation that they gave, was it
17  focused on identification of red flags?  Was that
18  the intent of the presentation?
19    A.  Again, I can't recall.  I may not even
20  have been present there, but we may have received
21  the presentation.  So I can't recall.
22    Q.  Okay.  The red -- the red flags that you
23  have identified in your email of February 7, 2014,
24  do you agree that these represent categories of red
25  flags that you had -- I guess, you have recognized

Page 69

1  as categories of red flags in 2014?
2    A.  Not as categories.
3    Q.  Okay.  That was a poor choice of words.
4    Would the red flags that you have outlined
5  in your email of February 17th, do you agree that
6  each of these items are red flags as you recognized
7  them in 2014?
8    MR. ELSNER:  Objection.
9    THE WITNESS:  I listed them as red flags,
10  so I would say that that would be what I would
11  have called them.
12  BY MS. MILLER:
13    Q.  Okay.  The first attachment to this email
14  references "Draft Number 2, Pharmacist Red Flags,
15  Combined List and DEA."
16    Do you see that?
17    A.  Yes.
18    Q.  Okay.  It appeared to me that this was the
19  list, the draft of the list that was put together
20  using both your input and Mr. Giacalone's --
21  Giacalone's input for potential inclusion into the
22  red flag video; is that correct?
23    A.  My recall --
24    MR. ELSNER:  Objection.
25    THE WITNESS:  -- would be this would

18 (Pages 66 - 69)

Page 70

1     Mr. Giacalone's list.  And I could tell that by
2     the type font.
3          When I was at NABP, our editors required
4     us to use Times Roman for everything we did,
5     and this is not that font.  So it would have
6     been Mr. Giacalone's.
7  BY MS. MILLER:
8     Q.   Okay.  So looking at his first email or
9  his email on the first page dated February 20, 2014,
10 he's emailing you.
11         It says, "In light of our meeting next
12 Tuesday, I took a shot at combining our two lists of
13 pharmacy red flags and prioritizing them.  See the
14 attached."
15         Does this -- does this reflect a
16 combination between the red flags you suggested and
17 then the red flags he is suggesting?
18    A.   It was a combination that he suggested.
19 I'm not sure -- I'd like to have seen my original
20 list to see what he included and what he didn't
21 include, but it was his compromised list, yes.
22    Q.   Okay.  And ultimately, this work product
23 turned into a video that was presented by NABP
24 regarding identification of red flags; is that
25 correct?

Page 71

1     A.   Yes.
2     Q.   Okay.  And that was presented in 2014; is
3  that correct?
4     A.   It was released in 2014, yes.
5     Q.   What was the purpose of that video?
6     A.   The American Medical Association and some
7  physician groups got into a dispute with Walgreens
8  and Walgreens pharmacists, because Walgreens
9  pharmacists were challenging controlled substance
10 prescriptions.  And the AMA said a pharmacist should
11 simply fill what they're given and should do no
12 checks, no verification, and not have any input into
13 the prescription whatsoever.
14         We were asked to mediate that dispute
15 between the pharmacies and medicine, and so we
16 convened a task force.  And the task force
17 identified the issues that were the most irritating
18 and the most dangerous to patient communications
19 between prescribers and pharmacists.
20         And as a result of that task force, we
21 identified key issues that should be in the video
22 that would help physicians and pharmacists better
23 communicate when confronted with these situations.
24    Q.   So that resulted in the production of this
25 video.

Page 72

1          It also resulted in the production of
2  what's been referred to as the "Stakeholders'
3  Challenges and Red Flag Warning Signs Related to
4  Prescribing and Dispensing Controlled Substances,"
5  correct?
6     A.   Correct.
7     Q.   Starting -- keeping with the video for the
8  moment, who -- who was the video presented to?
9     A.   I could tell what you we did, but I don't
10 know who the audience was.
11         What we did is, at our subsequent annual
12 meeting of the National Association of Boards of
13 Pharmacy, we invited each executive director of the
14 Boards of Pharmacy to tape an introduction to the
15 video, so they could use that in their states to
16 show to whoever they thought important, to post on
17 their websites, and then also for industry groups to
18 also use it for their members as well.
19         But I don't know who actually saw it or
20 who actually received it.
21         MS. MILLER:  We've been going for actually
22    an hour and a half.  Do you want to take a
23    five-minute break?
24         THE WITNESS:  I'm still good.
25         MS. MILLER:  Okay.  Are you guys okay?

Page 73

1          All right.  I'll keep going.  Let me know
2     any time if you need to take a break.
3  BY MS. MILLER:
4     Q.   Prior to the release of this video in
5  2014, to your knowledge, had the NABP released any
6  other guidance documents or information pertaining
7  to the identification of red flags?
8     A.   I'm sure we did, but I don't recall
9  specific documents.
10    Q.   You had -- we had previously talked about
11 different references and industry guidance that
12 informed the pharmacy standard of care.
13         Would this video be one of those items of
14 industry guidance that, in your opinion, informed
15 the pharmacy standard of care with respect to
16 controlled substance dispensing?
17    A.   Yes.
18    Q.   Is it your opinion that this video
19 provided useful guidance to pharmacists to detect
20 and resolve red flags?
21    A.   I hope so.  Yes.
22    Q.   Was it reasonable for pharmacies to use
23 this video as an educational tool for its
24 pharmacists regarding red flags?
25    A.   As one of the tools, yes.

19 (Pages 70 - 73)

Page 74

1    Q.  Back on Exhibit 6, looking at the list,
2  the draft list of pharmacist red flags that was
3  attached to the email chain, do you recall whether
4  you had any disagreement with any of the red flags,
5  as they were stated, as listed here?
6    A.  Excuse me.
7        I would say anything that didn't make the
8  video is probably where there was a disagreement, or
9  we decided it wouldn't be included.
10   Q.  Just because one of these didn't make the
11 video, would that be an indication that there was
12 disagreement over it?
13       Or is it possible it was not -- just not
14 prioritized for the video?
15   A.  The latter, not prioritized for the video.
16   Q.  Okay.  So my question is, specifically, do
17 you recall whether you had any disagreement with any
18 of the red flags as listed in this document?
19   A.  I can't recall, but I don't believe so.
20   Q.  Okay.
21       (Exhibit 7 was marked for
22       identification.)
23       MS. MILLER:  I hand you what I've marked
24 as Exhibit 7.  I just scribbled out my note
25 that came through on a copy, because I don't

Page 75

1  want that in the record.
2  BY MS. MILLER:
3    Q.  Okay.  So Exhibit 7 is a copy of the
4  document we had just briefly mentioned a moment ago,
5  the Stakeholders' Challenges and Red Flag Warning
6  Signs Related to Prescribing and Dispensing
7  Controlled Substances, correct?
8    A.  Yes.
9    Q.  Okay.  Are you familiar with this
10 document?
11   A.  Yes, I am.
12   Q.  Okay.  Can you describe for me what the
13 purpose of this document was?
14   A.  As mentioned earlier, it was to foster
15 communication between prescribers and pharmacists
16 regarding the challenges and red flags related to
17 controlled substances, and then provide guidance to
18 pharmacists and prescribers as to identifying the
19 problem, and some ways to actually address the
20 problem, and to hopefully work together on those
21 challenges.
22   Q.  Okay.  Were you -- were you personally
23 involved in the creation of this document?
24   A.  Yes.
25   Q.  Okay.  And in what way?

Page 76

1    A.  I was the final editor.
2    Q.  With respect to -- so the document
3  outlines some of the challenges and then identifies
4  issues for -- and starting on Page 4 for
5  Manufacturers; Page 5, Distributors; Page 6,
6  Prescribers/Physicians; and then Page 8,
7  Pharmacists, correct?
8    A.  Correct.
9    Q.  And then it identifies some challenges for
10 pharmacists with respect to dispensing controlled
11 substance prescriptions, correct?
12   A.  Correct.
13   Q.  And then it moves to -- starting on
14 Page 10, it identifies what the group has identified
15 as potential red flags, correct?
16   A.  Correct.
17   Q.  And those red flags, specific for
18 pharmacies, begins on Page 13?
19   A.  The red flags related to the purpose of
20 the document, yes.
21   Q.  Can you -- can you explain for me what you
22 mean by that?
23   A.  Sure.  If you go to Page 1 in the
24 Executive Summary --
25   Q.  Yeah.

Page 77

1    A.  -- the last paragraph, "In sum, the goal
2  of the stakeholder consensus document is to provide
3  healthcare practitioners with an understanding of
4  their shared responsibility to ensure that all
5  controlled substances are prescribed and dispensed
6  for a legitimate medical purpose as well as
7  providing guidance on which red flag warning lines
8  warrant further scrutiny."
9        And the rest of the paragraph continues
10 that outlines what really they were intended for.
11   Q.  Okay.  Got it.  So when we go to Page 13
12 under the Pharmacist section, was this section
13 intended to be guidance as to on which red flag
14 warning signs warranted further scrutiny by the
15 pharmacist?
16   A.  Some of the red flags, yes.
17   Q.  When you say "some of the red flags," are
18 you stating that this is -- that there are
19 additional red flags that were -- have been known
20 and identified that were not contained within this
21 document?
22   A.  Yes.
23   Q.  Okay.  Why were those red flags not
24 contained within those documents?
25   A.  The main purpose was those red flags may

20 (Pages 74 - 77)

1 have been more wholly held by an individual group.
2 So the pharmacist red flags that would involve
3 dispensing data, the physicians, manufacturers, and
4 others wouldn't have those data.
5      So this was looking at the red flags that
6 had some commonality across all of the consensus
7 stakeholder groups.
8      Q.  If the document was looking for
9 commonality across all the stakeholders' groups, why
10 was there a separate section for prescribers' red
11 flags on Page 11 and 12 versus pharmacists' red
12 flags on Page 13 and 14?
13      A.  Sure.  If you look, the title of the
14 document is a consensus.  To achieve consensus
15 between those various stakeholder groups is
16 impossible, almost.
17      How the document was prepared is, each
18 group, after meeting several times, was asked to
19 identify from their perspective the red flags that
20 the group agreed upon, so that, as a physician,
21 seeing a red flag that the pharmacist may have
22 alerted the physician to, the pharmacist was
23 sensitive to what that physician was seeing.
24      And similarly, the pharmacy wanted to
25 present back to physicians the red flags they were

1 seeing so that there would be a way to work together
2 on red flags that intersected both practices.
3      Q.  Okay.  To your recollection, under the
4 Pharmacists section of red flags, were there red
5 flags that the pharmacy group had considered
6 including in this document but did not include?
7      A.  I can't say because, again, each section,
8 if you look at the first page, the American
9 Pharmacists Association, the American Society of
10 Health-System Pharmacists, the national -- the
11 National Association of Chain Drug Stores, National
12 Community Pharmacists, Pharmaceutical Care
13 Management Association, Rite Aid and Walgreens and
14 CVS Health, would have the group, smaller group that
15 worked on it and came to a consensus.
16      NABP wasn't involved in that discussion.
17      Q.  Okay.  Would it have been reasonable for a
18 pharmacy to rely on information that was presented
19 in this document?
20      MR. ELSNER:  Objection.
21      THE WITNESS:  I think the information was
22 educational.  And the pharmacy could use that
23 information as it pertained to the practice and
24 it pertained to enhancing their knowledge in
25 their practice.

1 BY MS. MILLER:
2      Q.  I had -- I had written down the date of
3 July 2016 on this document, but I don't see a
4 document on this date.
5      Do you know when this document came out?
6      A.  It would have been 2014.
7      Q.  2014?
8      A.  Right.
9      Q.  That's what I thought.
10      (Exhibit 8 was marked for
11      identification.)
12      THE WITNESS:  Thank you.
13      MS. MILLER:  I've handed you what I've
14 marked as Exhibit 8 to your deposition.
15 BY MS. MILLER:
16      Q.  This is a copy of a PowerPoint
17 presentation that was given by Ruth Carter at the
18 Pharmacy Diversion Awareness Conference in
19 Albuquerque, New Mexico, on March 2nd and 3rd, 2013.
20      Do you see that?
21      A.  Yes.
22      Q.  Do you know who Ruth Carter is?
23      A.  Yes.
24      Q.  Who was she?
25      A.  She was the regulatory section

1 import/export unit chief.
2      Q.  With what organization?
3      A.  The DEA.
4      Q.  Okay.  Are you familiar with this
5 presentation?
6      A.  I probably have seen it, but I haven't
7 seen it in a long time.
8      Q.  Okay.  Would this be one of the
9 presentations that you had referenced earlier that
10 the DEA had given to industry regarding the
11 identification and resolution of red flags?
12      A.  Yes, and it was also attached in your
13 Exhibit 6 as well.
14      Q.  Looking through this document, would this
15 have been a reasonable source of information upon
16 which pharmacies could rely with respect to the
17 identification of red flags?
18      A.  Part of the reasonable information, yes.
19      Q.  Okay.  Would you agree with me that this
20 document reflects what Ruth Carter was communicating
21 to the pharmacy industry regarding what she had
22 identified as common red flags?
23      A.  Some of the common red flags, I believe,
24 yes.
25

Page 82

1        (Exhibit 9 was marked for
2        identification.)
3      MS. MILLER:  I hand you what I've marked
4  as Exhibit 9.
5  BY MS. MILLER:
6    Q.  Exhibit 9 is a copy of the Texas
7  Administrative Code for the Texas State Board of
8  Pharmacy Rule Section 291.29 entitled "Professional
9  Responsibility of Pharmacists."
10       Do you see that?
11    A.  I see that, yes.
12    Q.  Okay.  In my understanding from your
13  report, this is the regulation in which the Texas
14  Board of Pharmacy has outlined what it considered
15  controlled substance prescription red flags?
16    A.  Could you -- do you have a page in my
17  report so I can just make sure?
18    Q.  I think it was 55, but let me see.
19    A.  5-5?
20    Q.  53 to 55.
21    A.  That -- okay.  Yes.
22    Q.  Okay.  Specifically, the identification of
23  red flags in this document starts at Subsection (f),
24  correct?
25    A.  Yes.

Page 83

1    Q.  And you have -- you have outlined within
2  your report what red flags were outlined in this
3  rule as well, correct?
4    A.  Yes, some of those.  I didn't mention all
5  of them.
6    Q.  Okay.  So Exhibit 9 under Subsection (f)
7  is the complete list of red flags identified in the
8  Texas Board of Pharmacy regulations?
9    A.  Yes.
10       (Exhibit 10 was marked for
11       identification.)
12     MS. MILLER:  I hand you what I've marked
13  as Exhibit 10.
14  BY MS. MILLER:
15    Q.  Exhibit 10 is a document entitled "Texas
16  State Board of Pharmacy 'Red Flags' Checklist for
17  Pharmacies, You Might Be A Pill Mill If ..."
18       Correct?
19    A.  Yes.
20    Q.  And this is the document you referenced in
21  your report that was issued in February of 2018,
22  correct?
23    A.  Correct.
24    Q.  Okay.  Is your understanding that this is
25  a guidance document that was issued by the Texas

Page 84

1  State Board of Pharmacy for pharmacies with respect
2  to controlled substance dispensing?
3    A.  The hesitation, I'm not sure how Texas
4  classified it, if it was a guidance document or how
5  Texas enforced it.
6       But overall, I would say it probably was a
7  guidance document.
8    Q.  Okay.  Do you have any knowledge or
9  understanding as to how the Texas State Board of
10  Pharmacy used this document?
11    A.  I do not.
12    Q.  Okay.  In your opinion, was it reasonable
13  for pharmacies to refer to these documents with
14  respect to determining what constitutes red flags
15  within the State of Texas?
16    A.  As part of the information it references,
17  yes.
18    Q.  I'm not sure I understood your answer.
19  "As part of the information it references," can you
20  explain what you mean by that?
21    A.  Sure.  These were some of the guidance
22  documents.  They should also look to federal law,
23  also look to what standards of practice were, and
24  then also look at their own dispensing patterns,
25  data, prescribers.  All of that information needed

Page 85

1  to be taken in context.
2    Q.  We've gone through a number of different
3  documents that have outlined different iterations of
4  red flags that were published within the industry,
5  correct?
6    A.  Yes.
7    Q.  All right.  And there are some others
8  which I have with me.  We can go through them.  But
9  for the sake of time, I won't necessarily go through
10  them unless we need to.
11       Would you agree with me that within all
12  these documents that have been published in the
13  industry or presentations that were given in the
14  industry, that there are some differences between
15  these different documents and the red flags that
16  they have identified?
17    A.  Differences but not intent or substance,
18  yes.
19    Q.  Okay.  Would you agree with me that the
20  red flags that have been identified within the
21  industry have evolved over time?
22     MR. ELSNER:  Objection.
23     THE WITNESS:  I don't know what "evolved"
24  means.
25       I think some of the red flags have always

22 (Pages 82 - 85)

Page 86

1    been present. And then as new diversionary
2    trends have developed, those have been
3    identified as well.
4    BY MS. MILLER:
5        Q.  Okay. So there have been additional red
6    flags that have been identified, generally, as
7    recognized within the industry, as they have
8    evolved?
9        A.  Nuances of the red flags. And the
10   explanation would be there was always a red flag
11   concerning combination products and what those
12   combinations could be.
13       If new drugs came on the market or other
14   drugs were being abused, that became a new nuance of
15   the basic red flag. But it didn't change the
16   overall concern that you should never -- you should
17   exercise caution in dispensing certain combination
18   products or abuse -- products of abuse.
19       Q.  Would you agree with me, when we look back
20   to the older documents, starting with the DEA
21   Pharmacist's Guide to Prescription Fraud, when they
22   identify a list of -- one, two, three, four, five --
23   six red flags, it's referencing some general
24   concepts in red flags, correct?
25       A.  Which exhibit? 4, Exhibit 4?

Page 87

1        Q.  I forget. Yes. I forgot to write it
2    down.
3        A.  Again, I can't say categorically. I would
4    say these are some examples of red flags that were
5    becoming -- that DEA had been made aware of to issue
6    the guidance.
7        Q.  Correct. And the recitation of the red
8    flags identify a general concept of the -- of the
9    red flag, right?
10       When the DEA is referencing, you know,
11   "The prescriber writes significantly more
12   prescriptions (or in larger quantities) compared to
13   other practitioners in your area," correct, it's not
14   providing specific information as to what
15   constitutes a "large quantity," correct?
16       MR. ELSNER: Objection.
17       THE WITNESS: It's not giving the specific
18   numbers. No, it's not giving specific numbers.
19   BY MS. MILLER:
20       Q.  So that's what I mean by, you know, in a
21   document like this, it's presenting general concepts
22   but not specific parameters, by which pharmacists
23   need to -- or should be identifying this as a red
24   flag?
25       A.  I would agree and disagree.

Page 88

1        Q.  Okay.
2        A.  The agreement is there are not specific
3    numbers.
4        But the disagreement is the references in
5    DEA always go back to the standards of practice.
6    And for controlled substances, there is a maximum
7    quantity that pharmacists can prescribe, a dosing
8    regimen.
9        So the DEA would reference back, say,
10   anything above that dosing regimen becomes high.
11   They didn't give specific, but they said you have to
12   look back at the standards of care and reference
13   back that.
14       That would be my understanding of the
15   document.
16       Q.  Okay. And where would I find that
17   document where the DEA expressed those dosing limits
18   and what the standard of care was?
19       A.  I think it would be the interpretation of
20   the C.F.R., the Controlled Substance Act and various
21   standards of care. There's not a specific document
22   that made that statement, but it would be an
23   understanding that I, as a pharmacist, would have.
24       Q.  How would you have that understanding as a
25   pharmacist without a document from the DEA to tell

Page 89

1    you what their expectations were?
2        MR. ELSNER: Objection. You can answer.
3        THE WITNESS: As a pharmacist, any time a
4    prescription was issued above what the
5    recommended dosage range was, which was set by
6    the FDA based on safety and efficacy, I would
7    know that above that dose, that would be
8    problematic. And I would need to analyze.
9        And with controlled substances, the DEA
10   had repeatedly say, watch for prescribers -- in
11   this first bullet -- that write more or larger
12   quantities.
13       So anything above that would be just a
14   standard of care, basic pharmacy concept the
15   pharmacist should know.
16   BY MS. MILLER:
17       Q.  Okay. So the pharmacist should be looking
18   to the recommended dosage that was issued by FDA as
19   determining whether -- whether an amount is a large
20   quantity for that particular drug?
21       A.  Correct. And also, as it said,
22   "practitioners in your area." And that would be
23   data that the pharmacist probably doesn't have.
24   That would have to come from the corporation.
25       Q.  That reference to "practitioners in your

23 (Pages 86 - 89)

Page 90

1 area compared to" -- so the reference is "Prescriber
2 writes significantly more prescriptions compared to
3 other practitioners in your area," or in larger
4 quantities compared to other practitioners in your
5 area.
6        Would you agree with me that the
7 evaluation of the quantities that prescribers -- the
8 quantities of controlled substances that prescribers
9 in the area are prescribing is a relative analysis,
10 right? It's not a fixed analysis?
11        This is presenting a comparison to what
12 prescribers are prescribing in your area.
13        MR. ELSNER: Objection.
14        You can answer.
15        THE WITNESS: If I walk through it as a
16 pharmacist, so if I have a prescriber that
17 routinely -- I look at prescribers in my
18 patient area, and there are prescribers that
19 are routinely prescribing for what the
20 recommended dosage is, and then I have a
21 prescriber that's prescribing above that
22 repeatedly, I guess that would be my
23 comparison.
24        But it would be relative to the other
25 practitioners but also based upon what is

Page 91

1        recommended and what is the standard of care
2        that should be issued for that medication.
3 BY MS. MILLER:
4        Q. And would you agree with me that the
5 standard of care for medical prescribing at any
6 particular time is relevant to the pharmacist's
7 consideration as to whether a particular
8 prescription is a red flag?
9        MR. ELSNER: Objection.
10        THE WITNESS: Can you help me on that?
11 BY MS. MILLER:
12        Q. Sure. So we're talking about how this can
13 be a relative analysis, that the pharmacist should
14 be comparing a prescription compared to what other
15 prescribers in the area are prescribing, correct?
16        A. With the basis that there is an objective
17 point that the pharmacist must base their comparison
18 on, yes.
19        Q. Okay. And that's provided by the FDA?
20        A. Correct.
21        Q. Okay. Would you agree me that the
22 standard of care within the medical community for
23 prescribing of controlled substances is also a
24 relevant informational point for pharmacists?
25        MR. ELSNER: Objection.

Page 92

1        THE WITNESS: I believe so. But I'm not
2        fully understanding, but I believe so.
3 BY MS. MILLER:
4        Q. Okay. Should pharmacists be considering
5 what the generally accepted medical standard of care
6 is for prescribing of controlled substances at a
7 particular time?
8        A. I would say yes. And maybe, perhaps, in
9 the context of, if I have a family practitioner
10 that's prescribing pain management versus a pain
11 management specialist, you know, I would look at the
12 standard of care there.
13        But in terms of the general knowledge, the
14 pharmacist may have general knowledge of what that
15 standard of care may be.
16        Q. Okay. Would you agree with me that the
17 standard of care within the medical community with
18 respect to prescribing of controlled substances for
19 pain has changed over time?
20        MR. ELSNER: Objection.
21        THE WITNESS: The prescribing and
22        recommended prescribing hasn't changed, but the
23        philosophy of pain management, I would agree,
24        has changed.
25

Page 93

1 BY MS. MILLER:
2        Q. And that philosophy has been represented
3 in documents presented to the industry, such as the
4 CDC prescribing guidelines, correct?
5        A. Not the CD -- I don't agree it would be
6 the CDC guidelines. I think the CDC guidelines was
7 based upon doses and what the recommended doses
8 would be for safety.
9        I think the documents maybe you're
10 referring to is when people said pain is one of the
11 fifth treatment elements, and people were
12 disregarding what those CDC guidelines or what
13 recommended doses were.
14        That's what I was referring to the
15 philosophy has changed.
16        Q. Okay. Understood. I'm referring
17 specifically to guidelines that were available to
18 prescribers in the healthcare industry with respect
19 to dosing or prescribing controlled substances for
20 the use of -- for the treatment of pain.
21        A. Uh-huh.
22        Q. Okay. Would you agree with me that those
23 guidelines have changed over time?
24        A. The CDC documents did change somewhat over
25 time, yes.

24 (Pages 90 - 93)

Page 94

1    Q.  Okay.  Would you agree with me that
2  guidelines issued by the Federation of State Medical
3  Boards has changed over time?
4    A.  Yes.
5    Q.  Would you agree with me that guidelines by
6  the American Medical Association have changed over
7  time?
8    A.  That one, I can't comment, because I'm not
9  as familiar with their documents, but I would
10  probably say, yes, they have.
11    Q.  Okay.  So to circle back on that, would
12  you agree with me that what the generally accepted
13  standard of care for prescribing of controlled
14  substances at a particular time is relevant to the
15  pharmacist's assessment of whether a controlled
16  substance prescription presents a red flag?
17    A.  I would say the pharmacy standards of care
18  and the laws are relevant.  Some of the other
19  standards of care for physicians or other groups may
20  not be as relevant.
21    Q.  Okay.  Wouldn't it be important for a
22  pharmacist to understand whether prescriptions fall
23  within the generally accepted medical standard of
24  care?
25      MR. ELSNER:  Objection.

Page 95

1      THE WITNESS:  I would say they would be --
2  should be knowledgeable about whether it fell
3  within the standards of care, yes.
4      MS. MILLER:  Okay.  It's 10:25.  Let's
5  take a quick break.
6      THE VIDEOGRAPHER:  Off the record at
7  10:25.
8        (Whereupon, a recess was taken
9          from 10:25 a.m. to 10:37 a.m.)
10      THE VIDEOGRAPHER:  Back on the record at
11  10:37.
12        (Exhibit 11 was marked for
13          identification.)
14  BY MS. MILLER:
15    Q.  So in your report, you have outlined a set
16  of red flags upon which you have --
17    A.  Thank you.
18    Q.  -- evaluated Albertsons' dispensing in
19  Tarrant County.
20      Those red flags are outlined in your
21  report, but then I've also handed you what I've
22  marked as Exhibit 11, which is an excerpt from the
23  report of Craig McCann.
24      And do I understand correctly that you
25  provided your list of red flags to Mr. McCann for

Page 96

1  use in his expert work, correct?
2    A.  Correct.
3    Q.  Okay.  So this is an excerpt of his report
4  of the red flags that he used, and I just am
5  attaching it here because it's an easier list to
6  refer to.
7    A.  Do you need the highlighted copy?
8    Q.  Oh, did I give you the highlighted?
9    A.  Yeah.
10    Q.  Yeah, I mean, they're just highlights.  It
11  doesn't really matter but --
12    A.  I saw the secret answers, so I didn't --
13    Q.  Yeah.  The -- thank you.
14      It was just -- it's a shorter recitation
15  of those red flags without additional text between
16  them, so it was easier for me to refer to them.
17      Is that fair?
18    A.  Okay.
19    Q.  So this list, does this list reflect the
20  red flags that you identified for evaluation in this
21  case?
22    A.  Can I take a few minutes to --
23    Q.  Absolutely.
24    A.  Thank you.
25      Yes, yes, they are.

Page 97

1    Q.  Okay.  And you provided this list of red
2  flags to Mr. McCann, correct?
3    A.  Yes.
4    Q.  Okay.  And what -- what did you ask
5  Mr. McCann to do with respect to those red flags?
6    A.  To analyze the dispensing data to see how
7  many of the prescriptions would fall into the red
8  flag categories.
9    Q.  Okay.  Did you review Dr. McCann's expert
10  report in this case?
11    A.  I have.
12    Q.  Okay.  So looking at these red flags, as I
13  mentioned, the red flags that we have gone through
14  already this morning that were published as guidance
15  within the industry, would you agree with me that
16  those red flags -- and feel free to look through
17  them and compare, if you wish.
18      But those red flags, as they're stated in
19  the industry guidance, are a little bit different
20  than the way you've stated some of the red flags in
21  your report?
22    A.  Not different.  The red flags in my report
23  and the red flags that are also mentioned in the
24  other documents are the same.
25      There may be some red flags that are not

25 (Pages 94 - 97)

Page 98

1 included in my report that may be mentioned or not
2 mentioned in the other document.
3     Q.  Okay.  While you agree with me that the
4 concept of the red flags are the same, there is
5 some differences in the way that you have written
6 the red flags.
7         So if you look at Red Flag Number 1 on
8 Exhibit 11, this is your red flag, which states, "An
9 opioid was dispensed to a patient who traveled more
10 than 25 miles to visit the pharmacy.  The distance
11 here is calculated from the center of the patient's
12 ZIP code to the center of the pharmacy ZIP code."
13        Do you see that?
14     A.  Yes.
15     Q.  In the red flags that we've gone
16 through in industry guidance, none of those red
17 flags -- although the red flags may state that
18 distance is a factor, they don't identify 25 miles
19 as the limit for which that red flag is triggered,
20 correct?
21     A.  Correct.
22     Q.  Okay.  And as I understand your testimony
23 previously, you identified 25 miles as a limit based
24 on your review of telehealth rules, correct?
25     A.  Telehealth rules and -- yes.

Page 99

1     Q.  Okay.  Would you agree with me that the
2 identification of 25 miles as the trigger for the
3 red flag could be a question of professional
4 judgment of the pharmacist based on that pharmacy's
5 circumstances and surroundings?
6     A.  Yes.
7         MR. ELSNER:  Objection.
8         THE WITNESS:  Yes.
9 BY MS. MILLER:
10    Q.  "Yes," you would agree with that?
11        Is that "yes"?
12    A.  Yes.
13    Q.  Would you agree with me, by doing the
14 measurement of center of the ZIP code to center of
15 the ZIP code, that this would capture patients who
16 live less than 25 miles from the pharmacy itself?
17        MR. ELSNER:  Objection.
18        THE WITNESS:  That one, I would just say
19    from a common-sense point, but I didn't do the
20    analysis.  And possibly so, but I don't know
21    for certain.
22 BY MS. MILLER:
23    Q.  Okay.  But just from -- conceptually, if a
24 patient lived on the eastern edge of a county and
25 the pharmacy was on the western edge of the

Page 100

1 neighboring county, that potentially could be
2 flagged under this, if the center of the ZIP code to
3 the center of the ZIP code is more than 25 miles?
4     A.  Conceptually, yes.
5     Q.  You had referenced in your report, Page 62
6 of your report, you have provided -- the section is
7 entitled Notice to Chain Pharmacy Albertsons from
8 DEA Investigations and Suspensions.
9         You've listed a number of DEA activity,
10 not only regarding Albertsons, but Walgreens and
11 Walmart.  And on Page 62 to 63, you talk about
12 settlements that CVS and Walgreens and Walmart have
13 entered into with respect to opioid dispensing
14 claims, correct?
15    A.  Correct.
16    Q.  Okay.  And you reference that the
17 settlements resulted in injunctive relief, and that
18 there's an injunctive order that was entered in the
19 Track 3 trial, the Ohio trial within the MDL,
20 correct?
21    A.  Yes.
22    Q.  Okay.  And you describe that injunctive
23 relief, and noted that the injunctive order is
24 similar to the injunctive relief that was entered as
25 part of those settlements with Walgreens, Walmart,

Page 101

1 and CVS?
2     A.  And what page again?
3     Q.  I'm at 63 to 64, yeah.
4     A.  So the last paragraph that you're
5 referring to?
6     Q.  Starting at 63, you write, "... Florida
7 Attorney General brought civil actions against CVS
8 and Walgreens."
9         Then you reference lawsuits, Walmart, CVS,
10 and Walgreens.  They entered into settlements with
11 the Florida Attorney General that contained several
12 proactive diversion protection policies.
13        Do you see that?
14    A.  I see that, yes, I do.
15    Q.  And then, "In the MDL, the court entered a
16 judgment and injunctive order against Walmart, CVS,
17 and Walgreens implementing certain diversion
18 policies as well"?
19    A.  Yes.
20    Q.  Were you -- are you familiar with those
21 diversion policies in the injunctive relief
22 agreements and the injunctive order?
23    A.  No.
24    Q.  Okay.
25    A.  Except for what's in my report here and my

26 (Pages 98 - 101)

Page 102

1 review of that, but I wasn't involved in the
2 creation or issuance of those.
3    Q. Okay. But you reviewed them in preparing
4 your report, correct?
5    A. Correct.
6    Q. With respect to the settlement agreements,
7 do you have any understanding as to who has entered
8 into those settlement agreements with Walgreens,
9 Walmart, and CVS?
10    A. I have no idea.
11       (Exhibit 12 was marked for
12       identification.)
13    THE WITNESS: Thank you.
14    MS. MILLER: I've handed you what I've
15 marked as Exhibit 12.
16 BY MS. MILLER:
17    Q. This is a chart that I will represent to
18 you that we pulled from the website on the bottom of
19 this document, NationalOpioidSettlement.com. And it
20 purports to reflect what states have entered into
21 the national settlements between -- and particularly
22 of interest here -- CVS, Walgreens, and Walmart.
23    Do you see that?
24    A. I see that, yes.
25    Q. Okay. And do you see that it makes

Page 103

1 reference to "The vast majority of states have
2 entered into these settlement agreements with
3 Walgreens, Walmart, and CVS," correct?
4    A. I would think -- that's what the chart
5 says, yes.
6    Q. Okay. And the settlement agreements that
7 we're referring to, I'll represent to you, are the
8 settlement agreements you're referring to that have
9 the -- that included the diversion protection
10 policies that you make reference to.
11    I will ask you to accept that on my
12 representation. I won't hold you to that.
13    MR. ELSNER: I have an objection as to the
14    foundation for the question.
15 BY MS. MILLER:
16    Q. Were you aware that the State of Texas had
17 entered into this national settlement agreement with
18 Walgreens, Walmart, and CVS?
19    A. No.
20    Q. Okay. And were you aware that
21 Tarrant County has agreed to the settlement terms in
22 the agreement between Walgreens, Walmart, and CVS?
23    A. No.
24    MR. ELSNER: Objection. Sorry.
25

Page 104

1       (Exhibit 13 was marked for
2       identification.)
3    MR. ELSNER: This is -- I'm sorry, what
4 exhibit are we on?
5    MS. MILLER: 13.
6    I hand you what I've marked as Exhibit 13.
7    This is the injunctive -- the injunctive
8 terms for the CVS -- did I give you mine?
9 Well, it will direct you to where I want you to
10 go. That's fine. It's just highlights, right?
11 Oh, no -- yeah, it's just highlights.
12    Actually, that's fine. I'm happy to use
13 that because that will help direct you where
14 I'm going.
15    Page 13.
16    THE WITNESS: Thank you.
17    MS. MILLER: So the -- these are the
18 injunctive terms that were attached to the CVS
19 pharmacy agreement.
20       (Exhibit 14 was marked for
21       identification.)
22    MS. MILLER: I hand you Exhibit 14. These
23 are the injunctive terms for the Walmart
24 settlement agreement.
25

Page 105

1       (Exhibit 15 was marked for
2       identification.)
3    MS. MILLER: And then I'm going to hand
4 you what I've marked as Exhibit 15. These are
5 the injunctive terms for the Walgreens
6 settlement agreement.
7       (Exhibit 16 was marked for
8       identification.)
9    MS. MILLER: And then, last but not least,
10 Exhibit 16, I will represent to you is the
11 injunctive order from the MDL that you
12 referenced in the report.
13 BY MS. MILLER:
14    Q. I'm going to direct your attention to, in
15 Exhibit 13, to Page 13. And, actually, beginning on
16 Page 12, there's a reference at the bottom that
17 requires the pharmacy to require their pharmacists
18 to treat the following circumstances as patient red
19 flags.
20    Do you see that? Okay.
21    So if you look at Subsection d, the red
22 flag that's identified in this agreement states,
23 "The distance between a patient's residence and the
24 settling pharmacy receiving the designated
25 controlled substance prescription is farther than

27 (Pages 102 - 105)

Page 106

1  50 miles."
2       Do you see that?
3    A.  Yes, I do.
4    Q.  Okay.  Is it your opinion that setting
5  this red flag of the distance between the patient's
6  residence and the settling pharmacy at 50 miles
7  instead of 25 miles, is it your opinion that this
8  is -- would not be a reasonable red flag, or do you
9  believe that this is a reasonable red flag for a
10  pharmacy?
11       MR. ELSNER:  Objection.
12       THE WITNESS:  I have no basis to determine
13    that, because my red flags were based upon
14    prior DEA rulings and pharmacy practice.
15       I notice in this document that the court
16    also said that early refill of three days, when
17    I said five days.
18       So I think the court made a decision based
19    upon legal analysis, and whether or not it's
20    reasonable or not, I can't determine.  I can
21    say that I believe my red flags were
22    reasonable.
23  BY MS. MILLER:
24    Q.  Okay.  Would you agree with me that
25  reasonable pharmacists could disagree as to

Page 107

1  whether -- in their exercise of professional
2  judgment could disagree to whether the red flag as
3  referenced in your Exhibit 1 should be 25 miles or
4  50 miles?
5       MR. ELSNER:  Objection, foundation.
6       THE WITNESS:  I would say, myself
7    included, pharmacists are generally
8    anal-retentive, and I'm sure they would
9    disagree with any number, so ...
10  BY MS. MILLER:
11    Q.  My question is, in your opinion, is it
12  reasonable -- would it be reasonable within the
13  exercise of professional judgment for pharmacists to
14  disagree as to which constitutes a red flag,
15  25 miles or 50 miles?
16       MR. ELSNER:  Objection.
17       THE WITNESS:  All I can do in responding
18    to that is saying I feel that 25 is a
19    reasonable point to cause the pharmacist to do
20    an analysis.  50 miles, I don't have any
21    information to validate whether 50 is or not.
22       I know that, for me, 25, and for the red
23    flags I designed, was reasonable.  But I
24    can't -- I haven't analyzed the other.
25       Can a pharmacist feel that 50 or 100?

Page 108

1    That would be up to the pharmacist and then
2    whatever jurisdiction would be reviewing those
3    records.
4  BY MS. MILLER:
5    Q.  Okay.  In your opinion, with respect to
6  the pharmacy standard of care, is it your opinion
7  that a red flag of the distance between the
8  patient's residence and the pharmacy being farther
9  than 50 miles, is it your opinion that that is an
10  unreasonable establishment of a red flag pursuant to
11  the pharmacy standard of care?
12       MR. ELSNER:  Objection, foundation.
13       THE WITNESS:  I would say, based upon my
14    experience and knowledge, I would rely on the
15    25 miles.  I don't know what led the court to
16    decide on 50 miles.
17       So without seeing those data, I can't say,
18    but I would use the 25 miles as a pharmacist.
19  BY MS. MILLER:
20    Q.  Okay.  I would say this one is actually
21  not the court order.  This is the injunctive relief
22  terms upon which the states which entered into the
23  settlement agreement with these pharmacies agreed
24  upon, including the State of Texas.
25       Is this in a reasonable -- this agreement

Page 109

1  to 50 miles, is this counter to the pharmacy
2  standard of care?
3       MR. ELSNER:  Objection.
4       THE WITNESS:  Again, I think this was a
5    decision reached with legal parties.  I don't
6    know what the basis for the 50 was, if it was a
7    compromise between parties.
8       For me, I would not use the 50.  I feel
9    the 25 is a reasonable consideration.
10  BY MS. MILLER:
11    Q.  Okay.  I understand that you believe the
12  25 miles is a reasonable consideration, but you're
13  here expressing opinions on standard of care.
14    A.  Okay.
15    Q.  And what I'd like to know is, is using
16  50 miles in violation of the pharmacy standard of
17  care?
18       MR. ELSNER:  Objection, foundation.
19       You're using a settlement document to try
20    to establish standard of care, and he's not a
21    lawyer and wasn't involved in those
22    negotiations.
23       So I think it's an unfair ability to
24    allocate between the two.
25       So you can answer your questions, but I'm

28 (Pages 106 - 109)

Page 110

1  going to raise an objection to its use in this
2  way.
3      THE WITNESS:  I would say, based upon two
4  factors, that it is an unreasonable
5  determination.
6      And the two factors are my prior
7  experience and work and also the determination
8  that Albertsons made in its policy documents to
9  say that 15 to 20 miles should be the distance
10 that pharmacists should look at, and they did
11 not say 50 miles.
12     So with Albertsons' support of that and my
13 research, I would say 25 is reasonable and 50
14 is not reasonable.
15 BY MS. MILLER:
16     Q.  Okay.  So the same question ...
17     Would you agree with me that the red flag
18 calculations that you instructed Mr. McCann to do
19 were based on your red flag of 25 miles within Red
20 Flag Number 1, correct?
21     A.  Yes.
22     Q.  Would you agree -- did you ask Mr. McCann
23 to perform that calculation with respect to any
24 other distance of miles than 25?
25     A.  No.

Page 111

1      Q.  Okay.  Would you agree with me that if you
2  had set this red flag to 50 miles, rather than
3  25 miles, it's possible that Mr. McCann's red flag
4  calculations would be different?
5      MR. ELSNER:  Objection.
6      THE WITNESS:  I can't comment on the
7  dataset.  But I would say from just the
8  conceptual, it would make sense that that would
9  happen.
10 BY MS. MILLER:
11     Q.  I will represent to you that the same term
12 in Subsection d appears in the CVS agreement and in
13 the Walmart agreement in Exhibit 14 on Page 13 as
14 well.
15     And the Walgreens agreement, which is not
16 numbered -- and the Walgreens agreement, I will
17 represent to you that that contains the same term of
18 50 miles.
19     And I will represent to you, with
20 Exhibit 16 in the injunctive relief order on Page 9,
21 the order from the court also entered injunctive
22 relief as to the pharmacies based on including a red
23 flag of 50 miles.
24     Do you see that?
25     A.  Yes, I do.

Page 112

1      MR. ELSNER:  Same objection.
2  BY MS. MILLER:
3      Q.  Okay.  Red flag computation Number 2 from
4  your report and identified in Mr. McCann's summary,
5  states that "An opioid was dispensed to a patient
6  who traveled more than 25 miles to visit their
7  prescriber."
8      The distance here is calculated from the
9  center of the patient's ZIP code to the center of
10 the prescriber's ZIP code.
11     Same questions as with Red Flag Number 1.
12     Would you agree with me that in all of the
13 industry documents that reflected guidance regarding
14 red flags, that none of those industry documents
15 that we have gone through identified a specific
16 mileage of what would be considered a long distance
17 to trigger a red flag?
18     MR. ELSNER:  Objection.
19     THE WITNESS:  I think the industry
20 documents that reference in some cases do
21 identify distances, and some of those distances
22 are less than and more than 25 miles,
23 particularly some of the DEA cases.
24 BY MS. MILLER:
25     Q.  Okay.  Sitting here today, do you know

Page 113

1  which DEA cases identified as a red flag less than
2  25 miles?
3      A.  Not today, I can't recall.
4      Q.  You stated that some of them were more
5  than 25 miles, correct?
6      A.  Yes.
7      Q.  Would you agree with me that reasonable
8  pharmacists could disagree as to whether 25 miles is
9  an appropriate trigger for the red flag?
10     MR. ELSNER:  Objection.
11     THE WITNESS:  I'm sure pharmacists would
12 disagree with any number, but yes.
13 BY MS. MILLER:
14     Q.  Okay.  Would you agree that reasonable
15 pharmacists could disagree in the exercise of their
16 professional judgment that 25 -- as to the number
17 25 miles as a trigger for the red flag?
18     MR. ELSNER:  Objection.
19     THE WITNESS:  I'm having trouble with
20 "reasonable."  I don't know what they would be
21 looking at and how to qualify them as
22 reasonable.
23     I would say that 25 is a reasonable
24 trigger that I've determined.
25

29 (Pages 110 - 113)

Case: 1:17-md-02804-DAP Doc #: 5726-4 Filed: 10/30/24 31 of 70. PageID #: 652550

Page 114

1 BY MS. MILLER:
2    Q.  Okay.  I'll ask you to turn to Exhibit 13,
3 again, on -- this is the CVS injunctive terms, again
4 on Page 13, Subsection e references a red flag, "The
5 patient resides more than 100 miles from the
6 prescriber who issued the designated controlled
7 substance prescription."
8        Do you see that?
9    A.  Yes, I do.
10    Q.  I will represent to you that this term is
11 similar in other injunctive relief agreements to
12 which a majority of the state Attorney Generals have
13 agreed to.
14        In your opinion, is this red flag setting
15 the distance of 100 miles as being the trigger for
16 this red flag contrary to the pharmacy standard of
17 care?
18        MR. ELSNER:  Objection.
19        THE WITNESS:  Again, I would have to look
20    at the dataset to see what patients were
21    triggered by 100 miles versus 25 miles and how
22    that impacted the standard of care.
23        Without those data, I can't determine if
24    that's true or not.
25

Page 115

1 BY MS. MILLER:
2    Q.  Okay.  Did you analyze any data when
3 setting this red flag at 25 miles?
4    A.  I'm sorry, by "analyzing," could you
5 explain?
6    Q.  Well, you just said that you would need to
7 analyze data to determine whether 100 miles is
8 reasonable versus 25 miles.
9    A.  Okay.
10    Q.  And my question is, did you analyze any
11 data when you were setting -- when you were
12 establishing these red flags?
13    A.  Yes.
14    Q.  What data did you evaluate?
15    A.  One, I would look at the actual hard-copy
16 prescription to see what was actually prescribed for
17 the patient.
18        Then I would check to see whether or not
19 the medication was within the dosing ranges that
20 were recommended and safe for the patient.
21        Third, I would look to see if there were
22 any pharmacists' notes or any notes in that patient
23 profile or in that record that would say -- that
24 would disqualify 25 miles as a red flag.
25        And if I couldn't find any notes or

Page 116

1 couldn't see anything that would counter that, then
2 I would -- I have used the 25 miles as the indicator
3 for that.
4    Q.  Okay.  But in forming your opinions in
5 this case in identifying Red Flag Number 2, did you
6 look at any datasets to determine whether 25 miles
7 was an appropriate trigger for this red flag before
8 providing this to Mr. McCann to do his analysis?
9        MR. ELSNER:  Objection.
10        THE WITNESS:  No.
11 BY MS. MILLER:
12    Q.  Did you -- after having Mr. McCann perform
13 his analysis, did you analyze any data to determine
14 whether Red Flag Number 2 was an appropriate trigger
15 for this red flag?
16    A.  Yes.
17    Q.  What did you -- what did you look at?
18    A.  For every prescription that triggered a
19 red flag, I reviewed that prescription and the
20 information that I just detailed to you, anything in
21 the patient notes, anything that would explain that
22 prescription, any resolution, identification of the
23 red flags.
24        I did not come across anything in that
25 analysis that said that the 25 miles for those

Page 117

1 patients was not a relevant and reasonable red flag.
2        Had I come across that, I would have
3 notified here to counsel, Mr. McCann, to say there's
4 something wrong here, we need to adjust the numbers.
5 But I did not find any.
6    Q.  What would have identified to you that
7 25 miles was not a reasonable red flag?
8        What would you have found in the notes?
9    A.  I would have found something in the
10 patient notes saying this patient traveled to the
11 University of Chicago for special care, even though
12 the patient lived in Winnetka or someplace, and it
13 was more than 25 miles.
14        If I had seen that in the notes, that
15 would have helped me make a better decision.
16    Q.  Okay.  And so I'm a little bit lost
17 because my understanding is the red flag is the
18 trigger at the outset of the analysis, correct?
19    A.  Correct.
20    Q.  So when you established a red flag at 25,
21 25 miles, that's your statement to the pharmacist
22 that anything above 25 miles center of ZIP code to
23 center of ZIP code, the pharmacist should have
24 identified as a red flag up front?
25    A.  Correct.

30 (Pages 114 - 117)

Veritext Legal Solutions
www.veritext.com                                          888-391-3376

1   Q.  Correct?
2       In what way would reviewing the notes, a
3   sample of the notes after the fact, inform your
4   decision as to whether this was an appropriate flag
5   up front?
6   A.  Sure.  In my report, I think I cite,
7   twice, the percentage of prescriptions that I
8   believe Albertsons filled without enacting the
9   proper due diligence.  And that percentage is at
10  95 percent.  And that was based upon reviewing the
11  hard-copy prescription and all of the notes.
12      Had I found things in the notes that would
13  have told me differently, that 95 percent percentage
14  would have been significantly reduced, or reduced
15  based upon whatever number of prescriptions.
16      But I did not see anything to the contrary
17  to say that that 25-mile trigger was unreasonable or
18  that the data provided by Dr. McCann was inaccurate
19  regarding that red flag.
20  Q.  Okay.  The notes that you reviewed were
21  notes of -- were a sample of notes that were
22  triggered by the red flags that you've identified,
23  correct?
24  A.  I think they were -- Albertsons was
25  requested to provide 400 sample prescriptions, and

1   then associated prescriptions with those
2   prescriptions, and I looked at the notes for the
3   sample provided by Albertsons based upon that.
4   Q.  Okay.  If there isn't a red flag -- if a
5   pharmacist doesn't recognize a prescription as
6   triggering a red flag, would you agree with me that
7   there's not likely going to be due diligence notes
8   on that prescription?
9       MR. ELSNER:  Objection.
10      THE WITNESS:  If the pharmacist doesn't
11  recognize the red flag, in the case of
12  Albertsons, most of the prescriptions did not
13  have notes, 85 percent of them or 86 percent.
14      But if the pharmacist didn't recognize it,
15  the red flag would still be counted and
16  probably, based upon the percentage of notes
17  that were absent from Albertsons, I would
18  suspect there wouldn't be a note.
19  BY MS. MILLER:
20  Q.  Right.  As you testified before, if a
21  pharmacist is presented with a prescription that is
22  not red-flagged, then the pharmacist would not need
23  to do that extra due diligence, correct?
24      MR. ELSNER:  Objection.
25      THE WITNESS:  I'm trying to follow so I

1   can answer it.
2       There's two things that I think are on the
3   table here.
4       One, if you're saying in the pharmacist's
5   judgment there wasn't a red flag, then that
6   would occur.
7       But if that red flag was there and the
8   pharmacist should have known it, then that red
9   flag would have been counted and that
10  prescription should have been analyzed.
11  BY MS. MILLER:
12  Q.  I understand that.  I'm really focused on
13  whether there's a note.
14      So if the pharmacist doesn't recognize a
15  red flag, you would not expect the pharmacist to do
16  due diligence on that prescription, and, therefore,
17  there would not be due diligence notes on the
18  prescription, correct?
19  A.  Correct.
20  Q.  Okay.  So when you make reference to the
21  fact that you've estimated 95 percent of Albertsons'
22  notes -- or Albertsons' prescriptions do not have
23  appropriate notes, that's based on an assumption
24  that all of those prescriptions were subject to a
25  red flag that would have required notes, correct?

1   A.  No.  My statement was that 95 percent of
2   the prescriptions dispensed by Albertsons did not
3   perform the required components of due diligence.
4       And 86 percent of the notes that I
5   reviewed, approximately, had no comments whatsoever.
6   And of the 14 percent or so that I did review, less
7   than probably 1 percent had any relevant notes to
8   the actual prescription.
9   Q.  Correct.  But to the extent that those
10  prescriptions required notes, that would be based on
11  whether that prescription was subject to a red flag,
12  correct?
13  A.  I'm lost.  If the prescription has a red
14  flag, then there should have been notes.  It
15  requires notes.
16  Q.  Right.
17  A.  And who makes that determination of a red
18  flag, there are standards that have to be present in
19  those prescriptions.  And if the pharmacist doesn't
20  catch those standards or those red flags, there
21  wouldn't be a note, but there should be, and that's
22  what I looked at as to what should be and what was
23  missing.
24  Q.  Okay.  What I'm trying to get to is, if a
25  prescription is not subject to an identifiable red

31 (Pages 118 - 121)

Page 122

1 flag the pharmacist should have recognized, you
2 would not expect there to be notes on that
3 prescription, correct?
4     MR. ELSNER:  Objection.
5     THE WITNESS:  I believe so, yes.  I'm just
6  not really following, too, but I would say I
7  believe so.
8 BY MS. MILLER:
9  Q.  Okay.  What I'm getting at is your
10 opinions are that Albertsons did not have notes
11 on -- appropriate documentation on 95 percent of the
12 prescriptions?
13     A.  No.  My testimony is that Albertsons
14 failed to recognize the red flags, resolve the red
15 flags, and document the red flags in 95 percent of
16 the sample prescriptions that I reviewed.
17     And the notes were one of the determiners
18 of that 95 percent percentage.
19     Q.  And that is based on the red flags that
20 you have identified in your report as you've stated
21 them, correct?
22     A.  Correct, yes.
23     Q.  And with Red Flag Number 2, similar to Red
24 Flag Number 1, you did not ask Dr. McCann to analyze
25 prescriptions that would have been triggered by any

Page 123

1 number that was different than 25 miles?
2     A.  Correct.
3     Q.  Would you agree with me that if Dr. McCann
4  had used 100 miles as the geographical limit for Red
5  Flag Number 2, that his calculations would likely
6  have been different?
7     A.  In regard to the specific dataset, my
8  answer is I don't know.  But in terms of the
9  concept, probably, yes.
10     Q.  All right.  Turning to Red Flag Number 3,
11 which states, "Patient was dispensed opioid
12 prescriptions with overlapping days of supply that
13 were written by two or more prescribers," correct?
14     A.  Yes.
15     Q.  Okay.  And I think, as you've noted in
16 your report, do you agree that this flag is
17 triggered by multiple prescriptions, correct?
18     MR. ELSNER:  Objection.
19     THE WITNESS:  I think, yes.  I mean, to
20  have two or more prescribers, you'd have to
21  have at least two prescriptions, yes.
22 BY MS. MILLER:
23     Q.  Right, correct.  And you would agree with
24 me that with two or more prescriptions, the first
25 prescription presented to the pharmacist would not

Page 124

1 be identified as a red flag, based on this factor,
2 correct?
3     A.  No.
4     Q.  Okay.
5     A.  I don't agree with that.
6     Q.  You don't agree with that?
7     A.  No.
8     Q.  So how would the pharmacist appreciate a
9  red flag on the first prescription that it received,
10 before there was an additional prescription written
11 by a different prescriber?
12     A.  Again, two distinct but related concepts.
13     Upon presentation of that prescription to
14 the pharmacist, if it was a first-time new patient,
15 the pharmacist wouldn't know, may not know or
16 shouldn't know, depending upon the prescription.
17     But upon filling the second prescription
18 or seeing the other prescription, then that red flag
19 gets counted in the assessment.  And there should
20 have been notes in there, in the notes for that
21 second and associated prescription, saying, we've
22 identified that this first prescription was probably
23 also a red flag and shouldn't have been filled or
24 because of the following reasons.
25     I could not find any of that

Page 125

1 documentation.
2     Q.  With respect to Dr. McCann's calculations
3  of the number of prescriptions that were
4  red-flagged, did you ask Dr. McCann to disregard the
5  first prescriptions in his calculations?
6     A.  No.
7     Q.  Would you agree that Dr. McCann's red flag
8  calculations would have been lower if he had
9  disregarded the first prescription?
10     A.  From a -- just conceptually, yes.
11     Q.  Red Flag Number 4 is, "A patient was
12 dispensed opioid prescriptions with overlapping days
13 of supply at two or more pharmacies."
14     Correct?
15     A.  Correct.
16     Q.  Okay.  Same with Red Flag Number 3.
17     Would you agree with me that the
18 pharmacist, upon being presented with the first of
19 these prescriptions, would not have a basis to
20 identify it as a red flag under this factor?
21     MR. ELSNER:  Objection.
22     THE WITNESS:  That one, I disagree with.
23 BY MS. MILLER:
24     Q.  Okay.  Why do you disagree with that?
25     A.  And now I will raise that same objection

32 (Pages 122 - 125)

Page 126

1 with -- I mean, disagreement with Item 3.
2      If the pharmacist was viewing the PDMP
3 program for their first prescription, which, at some
4 point, was required by Texas Board of Pharmacy, the
5 pharmacist would have identified the multiple
6 prescribers for red flag 3 as well as the multiple
7 pharmacies in 4.
8      So that first prescription should have
9 been identified by the pharmacist.  I apologize for
10 that mistake.
11    Q.  How would a pharmacist -- if this is the
12 first prescription that a pharmacist is presented
13 and there are no other prescriptions that have been
14 issued for this patient, how would a pharmacist
15 recognize that as a red flag?
16    A.  In that singular hypothesis, then the
17 pharmacist wouldn't be able to recognize upon
18 presentation but would recognize somewhere down the
19 line.
20    Q.  Did you ask Dr. McCann to disregard the
21 first prescription in his calculations?
22    A.  No.
23    Q.  And would you agree with me that his red
24 flag calculations would be lower if he had
25 disregarded the first prescription?

Page 127

1      MR. ELSNER:  Objection.
2      THE WITNESS:  That doesn't obviate the red
3 flag, but conceptually the number would be
4 lower.
5 BY MS. MILLER:
6    Q.  Okay.  Red Flag Number 5, "Patient was
7 dispensed an opioid, a benzodiazepine, and a muscle
8 relaxer for overlapping days of supply," correct?
9    A.  Correct.
10    Q.  Okay.  And this is a red flag that's often
11 referred to as "the trinity" or "the holy trinity,"
12 correct?
13    A.  Correct.
14    Q.  Okay.  By wording this red flag as
15 referencing "overlapping days of supply," would you
16 agree that this would encompass prescriptions that
17 were presented to a pharmacy at different times?
18    A.  It could be, yes, could be.
19    Q.  Okay.  And would you agree with me,
20 similar to the last two flags we talked about, that
21 the first prescription that was presented to the
22 pharmacist would not have a basis to be recognized
23 as a red flag under this factor?
24    A.  I would, with the qualification that if
25 the prescriber was problematic and known to the

Page 128

1 pharmacy or if there was something else about the
2 patient, then it wouldn't be known to the pharmacist
3 on the first.
4      But if they had the other information, it
5 would be.
6    Q.  Okay.  And those are different -- those
7 are different sources of red flags, correct?
8    A.  Correct.
9    Q.  So right now, your -- or Dr. McCann's
10 calculations took each of these red flags
11 individually and identified what -- if a
12 prescription hit on each individual red flag?
13      It didn't require there to be other
14 instances of red flags in order for it to trigger in
15 Dr. McCann's analysis, correct?
16      MR. ELSNER:  Objection to form.
17      THE WITNESS:  I think that's correct.  But
18 I don't -- I wasn't involved in his analysis,
19 but it sounds like what that process might be,
20 but I'd have to ...
21 BY MS. MILLER:
22    Q.  Did you ask Dr. McCann to disregard any
23 initial prescriptions triggered by this red flag in
24 his calculations?
25    A.  No.

Page 129

1    Q.  And, again, would you agree with me that
2 his red flag calculations would be lower if he did
3 disregard the first prescription?
4    A.  Same response.  Still a red flag, but the
5 numbers conceptually would be lower.
6    Q.  Red Flag Number 6 is, "A patient was
7 dispensed an opioid, a benzodiazepine, and a muscle
8 relaxer on the same day, and all the prescriptions
9 were written by the same prescriber," correct?
10    A.  Correct.
11    Q.  Okay.  Would you agree with me that if a
12 prescription triggers Red Flag Number 6, by its very
13 nature, it would also trigger Red Flag Number 5,
14 which is broader than Red Flag Number 6?
15    A.  I think in Dr. McCann's, Number 6 is
16 broader -- 5 is broader.  Yes, 5 is broader than 6.
17    Q.  Okay.  So by its very nature, if a
18 prescription triggered Red Flag Number 6, it would
19 automatically also trigger Red Flag Number 5,
20 correct?
21    A.  For Number 6 to be triggered, there would
22 have to be three prescriptions.  And if those three
23 prescriptions were there, then it would trigger
24 Number 5.  One prescription wouldn't trigger 5.
25    Q.  Okay.  That's a good clarification.

33 (Pages 126 - 129)

Page 130

1    But the prescriptions, if the
2 prescriptions triggered Red Flag Number 6, would you
3 agree with me it would also automatically trigger
4 Red Flag Number 5?
5    A.  Yes.
6    Q.  Okay.  Dr. McCann performed calculations
7 of not just individual -- or prescriptions that
8 triggered individual red flags, but he also
9 performed calculations of prescriptions that
10 triggered multiple red flags, correct?
11    A.  Yes.
12    Q.  Did you ask Dr. McCann to exclude any
13 prescriptions in that analysis that would have
14 triggered only both red flag -- Red Flag 6 in these
15 calculations?
16    MR. ELSNER:  Objection.
17    THE WITNESS:  Any analysis of the data
18    that would involve deduplication, I left to
19    Dr. McCann and his expertise.  I was not
20    involved in how he made those determinations.
21 BY MS. MILLER:
22    Q.  Do you agree with me that Dr. McCann's
23 calculations of prescriptions that triggered
24 multiple red flags would have likely been lower had
25 he excluded prescriptions that triggered --

Page 131

1 automatically triggered Red Flag 5 and Red Flag 6?
2    MR. ELSNER:  Objection, foundation.
3    THE WITNESS:  I can't agree with that
4    because I don't know.  But I suspect it
5    doesn't, that McCann's data was deduplicated,
6    and you wouldn't have seen both red flags for
7    one patient.
8    But that would be a question for
9    Dr. McCann.
10 BY MS. MILLER:
11    Q.  Okay.  But in the preparation of your
12 report, do you -- do you know one way or the other
13 whether he did exclude that?
14    A.  I don't know.  I would assume that he did,
15 but I don't know for certain.
16    Q.  Okay.  Red Flag Number 7 is, "A patient
17 was dispensed an opioid and a benzodiazepine within
18 30 days of one another," correct?
19    A.  Correct.
20    Q.  We've gone through a number of sources,
21 industry sources and DEA sources for red flags, and
22 I'm going to actually turn you to your report.
23    Your discussion of the red flags triggered
24 by an opioid and a benzodiazepine starts on Page 40
25 and goes to Page 42, correct?

Page 132

1    A.  Uh-huh.
2    Q.  Okay.  Are there any sources that you have
3 identified for this red flag in which pharmacies
4 were provided guidance that an opioid and a
5 benzodiazepine, without a muscle relaxer, would
6 trigger a red flag?
7    A.  Yes.
8    Q.  What documents are those?
9    A.  If you look on Page 40, Reference 116, DEA
10 administrative decision and See Your Druggist
11 Pharmacy, I know that was sent.
12    If you look at all of 118, all of the
13 references are documents, the East Main Street
14 Pharmacy decision, Number 119 reference, Centers for
15 Disease Control on Page 41, 120, all of those
16 references were information that spotlighted and
17 highlighted the problems of prescribing benzos and
18 opioids.
19    Q.  But all of those references -- and correct
20 me if I'm wrong, but all of those references also
21 included a muscle relaxer?
22    A.  I don't believe all of them did, but --
23 that would be something to further check, but I
24 don't believe all the references did.
25    Q.  Okay.  If -- if you were aware of any

Page 133

1 references that provided guidance to pharmacies that
2 an opioid and a benzo, without a muscle relaxer,
3 would constitute a red flag, would you have included
4 them in your report?
5    MR. ELSNER:  Objection.
6    THE WITNESS:  I believe the references
7    note that.  If you look at, again, 117, 118,
8    and, again, my references standards of
9    practice, the FDA made that determination.  And
10    so there was a black box warning on those drugs
11    that were distributed to pharmacies and
12    pharmacists.
13    So pharmacists would have had that
14    information.  I didn't include in my report
15    what the dosing regimens were for opioids.
16    So that black box warning is not something
17    that I would have referenced, because it would
18    have been a standard of care and known to
19    pharmacists.
20 BY MS. MILLER:
21    Q.  Okay.  Other than the black box warning
22 that was issued by FDA, am I correct that any
23 guidance to pharmacies with respect to red flags, if
24 they had referenced an opioid and a benzo without a
25 muscle relaxer, would you have included those in

34 (Pages 130 - 133)

Page 134

1 your report?
2      MR. ELSNER: Objection.
3      THE WITNESS: I would -- I included as
4 relevant references as I thought possible
5 without including all of them. So at all
6 times, my report and my references are not
7 exhaustive.
8      And with all due respect, the black box
9 warning is significant in pharmacy. It's not
10 something that pharmacists would take lightly.
11 BY MS. MILLER:
12   Q. Okay. And when was the black box warning
13 issued by the FDA?
14   A. I don't have that date off the top of my
15 head.
16   Q. Okay. And then this -- this red flag, as
17 you have outlined it, defines it as an opioid and a
18 benzodiazepine within 30 days of one another,
19 correct?
20   A. Correct.
21   Q. Okay. What is the source of information
22 that triggers a red flag when they're prescribed
23 within 30 days of one another?
24   A. Again, it goes back to information from
25 the FDA and how long the opioid is in a person's

Page 135

1 system and how the interaction between the benzo and
2 the opioid would occur, and what that half-life is
3 for those drugs, and why the warning is attached to
4 it.
5   Q. Okay. So the FDA -- if I were to look to
6 FDA information, would I learn that the FDA issued a
7 warning that a patient cannot take an opioid within
8 30 days of a benzodiazepine?
9   A. What you would learn is what the
10 half-lives are and how long that drug stays in a
11 person's system and how long the potential for those
12 interactions is.
13      It would differ person to person, but it
14 would probably give you an idea that within that
15 30-day time period, that was most probably going to
16 happen.
17   Q. Is the half-life of an opioid different
18 than a half-life of a benzo?
19   A. Yes.
20   Q. Which one is shorter?
21   A. The shorter one will be the benzo, and it
22 goes back to the classification of controlled
23 substances.
24      So Schedule IIs, which many of the opioids
25 are, because they're more addictive and more

Page 136

1 dangerous and have a longer half-life and stay in
2 the body longer, that's part of the reason for the
3 classification, which is -- and a benzo is a
4 Schedule III, Schedule III or IV, depending on the
5 product.
6   Q. When referencing this red flag, that a
7 patient was dispensed an opioid and a benzodiazepine
8 within 30 days of one another, would you agree with
9 me that the calculations would capture prescriptions
10 within 30 days of one another regardless of which
11 prescription was first?
12      So it could be an opioid was dispensed on
13 day 1 and a benzo was dispensed on day 30, right?
14   A. (Nods head.)
15   Q. Correct?
16   A. Yes.
17   Q. It could also be that a benzo was
18 dispensed on day 1 and an opioid was dispensed on
19 day 30, correct?
20   A. Correct.
21   Q. And it's regardless of the number of days
22 of supply of that prescription, correct?
23   A. No, it would -- the days' supply would be
24 something to look at. If the opioid was for one
25 day, that wouldn't be a consideration.

Page 137

1   Q. Okay. But that's not captured in this red
2 flag, correct -- so, I mean, it is captured in this
3 red flag --
4   A. Correct.
5   Q. -- so there was a one-day opioid
6 prescription on day 1, and then a benzo prescription
7 on day 30, that would be captured by this red flag,
8 correct?
9   A. Yes.
10   Q. But you don't consider that would actually
11 be a red flag; is that fair?
12      MR. ELSNER: Objection.
13      THE WITNESS: Again, I would have to look
14 at the individual prescription to see what
15 other medications that patient was taking.
16 Maybe they were prescribed other opioids on
17 that same day as well.
18 BY MS. MILLER:
19   Q. Okay. But just under this parameter, if
20 it was just one opioid for one day, and there are no
21 others, and there's a benzo on day 30, you would not
22 consider that a red flag if there are no other
23 factors?
24   A. I would say --
25      MR. ELSNER: Objection.

35 (Pages 134 - 137)

Page 138

1     THE WITNESS:  -- in that hypothetical,
2     yes, but I didn't see that in any of the data.
3  BY MS. MILLER:
4     Q.  Did you ask Dr. McCann to look for that in
5  the data?
6     A.  No.
7     Q.  Did you look for that in the data?
8     A.  Yes.
9     Q.  Where did you look for that?
10     A.  I would review the hard copies of the
11  prescriptions, so I saw the quantity.  I looked at
12  the notes, and I calculated the days' supply of all
13  the medications in the sample and the associated
14  prescriptions.
15     Q.  Okay.  And that's in the 400-sample set
16  and associated prescriptions, correct?
17     A.  I think Albertsons provided 320-some, I
18  don't think Albertsons -- and they only provided
19  1400 associated prescriptions.
20     Q.  Okay.  Assuming that a pharmacist did
21  recognize this combination of prescriptions as a red
22  flag, would you agree that the pharmacist would not
23  be able to recognize the first prescription as a red
24  flag under this factor?
25     A.  The same answers as before.

Page 139

1     Q.  Okay.
2     A.  Depending on other factors and
3  circumstances, that's hypothetically possible, yes.
4     Q.  Okay.  Did you instruct Dr. McCann to
5  disregard the first prescription in his -- in
6  performing his calculations?
7     A.  No.
8     Q.  Okay.  Red Flag Number 8 is, "A patient
9  was prescribed an opioid and a benzodiazepine on the
10  same day and both prescriptions were written by the
11  same prescriber," correct?
12     A.  Correct.
13     Q.  All right.  Would you agree with me to --
14  similar, as we saw for Red Flags 5 and 6, that the
15  said prescriptions triggered Red Flag Number 8, it
16  would automatically also trigger Red Flag Number 7?
17     A.  Again, I think it would trigger.  But
18  whether it was counted by Dr. McCann, I don't know.
19     Q.  Okay.  I'm going to move to Red Flag
20  Number 10, which is, "A patient was dispensed an
21  opioid prescription of over 200 MME per day in or
22  before 2018 or over 90 MME per day after 2018,"
23  correct?
24     A.  Yes.
25     Q.  Okay.  Similar to the geographic red flags

Page 140

1  we've discussed, would you agree with me that the
2  red flags identified that we had identified of the
3  industry sources or in guidance documents outlining
4  red flags, that none of those red flags identified a
5  specific MME trigger for a red flag pertaining to
6  large quantities of opioids?
7     A.  Beyond the standard of care recommended
8  dosing, no.
9     Q.  What was the reason that you used 2018 as
10  your year for -- to change the MMEs that would
11  trigger the red flag?
12     A.  Those were documents released by the
13  Centers for Disease Control, CDC.
14     Q.  So in 2018 -- after 2018, you've
15  identified over 90 MME per day as triggering a red
16  flag based on the CDC guidelines, correct?
17     A.  Correct.
18     Q.  Okay.  So prior to 2018, you have 200 MMEs
19  as triggering this red flag, and what is that 200
20  MME based on?
21     A.  2016 CDC guidelines.
22     Q.  So the 200 MME is based on 2016
23  guidelines?
24     A.  I'm not sure of the year, but they were
25  the initial guidelines issued by CDC.

Page 141

1     Q.  Okay.  So for prescriptions that were
2  issued prior to 2016 or prior to the issuance of the
3  CDC guidelines, what would be the basis to determine
4  that 200 MMEs was -- or should trigger a red flag?
5     A.  In my report on Page 45 is the
6  substantiation for that, where it said, dosages of
7  100 MME or more per day were found to increase risk
8  for opioid overdose by factors of 2 to 8.9 percent,
9  and doses of 200 milligrams per day, there was a
10  continued increase in mortality rates.
11     So it was based upon information in the
12  literature.
13     Q.  Okay.  That's literature that was issued
14  in 2016, correct?
15     A.  I think there was other literature, if I
16  check some of the sources, that was prior to that.
17     But in 2010, that was issued, "Opioid
18  prescriptions for chronic pain and overdose: a
19  cohort study," in 2010.
20     2011, "Association Between Opioid
21  Prescribing Patterns and Opioid Overdose-Related
22  Deaths."
23     So that -- if you look at those
24  references, many of them were before 2016, and
25  that's what formed the basis for my 200 MME.

36 (Pages 138 - 141)

Page 142

1    Q.   Okay.  And am I correct that these are
2 medical articles, medical journal articles?
3    A.   They're published, referenced studies in
4 the professional literature; medical, pharmacy,
5 wherever they're published.
6    Q.   Okay.  The ones you have cited, these are
7 not pharmacy publications, correct?
8        MR. ELSNER:  Objection.
9        THE WITNESS:  They weren't published in
10       pharmacy journals, but they were -- I think
11       pharmacists are allowed to read medical
12       journals, but I don't -- I mean, but beyond
13       that, I don't know.
14 BY MS. MILLER:
15   Q.   Okay.  Red Flag Number 11, "An opioid was
16 dispensed to at least four different patients on the
17 same day, and the opioid prescriptions were for the
18 same base drug, strength, and dosage form and were
19 written by the same prescriber," correct?
20   A.   Correct.
21   Q.   Okay.  Similar with prior questions that
22 are triggered by multiple prescriptions, would you
23 agree the first three prescriptions would not be
24 recognized by a pharmacist as triggering this red
25 flag, which is based on four prescriptions, correct?

Page 143

1    A.   Depending on what those three
2 prescriptions were, they may recognize -- they may
3 be red flags recognized by the other red flags.
4    Q.   So there would be other red flags.  But
5 specifically to this red flag, this is the only --
6 only circumstance that would trigger a red flag, is
7 based on four prescriptions.
8        Would you agree with me that the first
9 three prescriptions would not trigger this red flag?
10   A.   Correct.
11       MR. ELSNER:  Objection.
12 BY MS. MILLER:
13   Q.   Did you instruct Dr. McCann to disregard
14 the first three prescriptions in his red flag
15 calculations?
16   A.   No.
17   Q.   And would you agree that his calculations
18 would be -- likely be different if he had done so?
19   A.   Conceptually, yes.
20   Q.   Moving to Red Flag Number 13, which is, "A
21 patient was dispensed more than 210 days of supply
22 of all opioids in a combined six-month period,"
23 correct?
24   A.   Correct.
25   Q.   All right.  And you discussed this one on

Page 144

1 Page 50 of your report.
2        And you note that the reason you've
3 identified this red flag, as you've explained, is
4 that prescription opioids used for pain relief
5 should be prescribed and taken for a short time, and
6 patient prescribed opioids for longer than
7 six months increases the risk of addiction and is a
8 red flag, correct?
9    A.   Yes.
10   Q.   Okay.  Has your -- what's the basis for
11 identifying this as a red flag?
12       Are there any industry sources that you
13 can point to that would tell pharmacies that this is
14 a red flag?
15   A.   The basic literature released by the FDA
16 for this drug, and then information that I've just
17 mentioned about the addictive powers and problems
18 with the drugs.
19   Q.   Okay.  And similar to questions before,
20 all the industry guidance and the lists of red flags
21 that we've discussed today, would you agree that
22 none of those specify a red flag based on more than
23 210 days of supply within a six-month period?
24   A.   It doesn't reference that but refers to
25 standards of care where that information would be

Page 145

1 found.
2    Q.   Okay.  And the standards of care where
3 that information would be found, the general concept
4 being that opioids should not be prescribed for a
5 long period of time, is that --
6    A.   Yes.
7        MR. ELSNER:  Objection.
8        THE WITNESS:  Yes.
9 BY MS. MILLER:
10   Q.   Am I understanding that correctly?
11   A.   That's the basics.
12   Q.   Would you agree with me that the standard
13 of care with respect to the long-term use of opioids
14 has changed over time?
15   A.   No.
16   Q.   We talked earlier about the Federation of
17 State Medical Boards' guidelines for prescribing
18 opioids for the treatment of pain.
19       Do you recall that?
20   A.   Yes.
21   Q.   Do you recall that the NABP, when you were
22 executive director, endorsed the Federation of State
23 Medical Boards' guidelines?
24   A.   Probably, yes.
25

37 (Pages 142 - 145)

Page 146

1        (Exhibit 17 was marked for
2        identification.)
3        MS. MILLER:  I'm going to hand you what
4    I've marked as Exhibit 17.
5        THE WITNESS:  Thank you.
6        MS. MILLER:  All right.  Exhibit 17 is an
7    article that was written in "Pharmacy Today" in
8    2001.
9 BY MS. MILLER:
10    Q.  Is "Pharmacy Today" a publication that is
11 recognized within the practice of pharmacy?
12    A.  It's not a referenced journal.  It's a
13 trade publication.
14    Q.  Okay.  You were -- feel free to review the
15 article, if you wish.
16        Looking on Page 2, you were quoted
17 regarding the NABP's endorsement of the pain
18 treatment guidelines from the Federation of State
19 Medical Boards.
20        Do you see that?
21    A.  Yes.
22    Q.  Do you remember providing an interview
23 with respect to that endorsement?
24    A.  Probably, yes.
25    Q.  Okay.

Page 147

1        MR. ELSNER:  Go ahead and take whatever
2    time you need to review it to answer
3    accurately.
4        THE WITNESS:  Okay.
5 BY MS. MILLER:
6    Q.  Okay.  This references that "The
7 guidelines represented a consensus among various
8 pain groups, the regulatory community law
9 enforcement groups, including DEA, on the
10 appropriate use of narcotics for pain management."
11        Do you agree with that statement?
12    A.  That was their statement saying these are
13 the people that agreed to it.  I don't have anything
14 to say yes or no.
15    Q.  Okay.  So it references, going down two
16 paragraphs, "By endorsing these guidelines,
17 Carmen Catizone, NABP executive director, told
18 Pharmacy Today, 'We hope to send a message to
19 pharmacies and state boards that appropriate pain
20 management is not something that is punishable and
21 that pharmacists should work with doctors to achieve
22 that,'" correct?
23    A.  Correct.
24    Q.  Okay.  And do you agree that -- do you
25 have any reason to disagree that that was a quote

Page 148

1 from you?
2    A.  No.
3    Q.  Okay.  The next one states, "Catizone
4 believes the endorsement will have a real effect on
5 pharmacies because, among other things, the
6 guidelines will make it clear that long-term use of
7 opioids and presenting prescription orders for large
8 volumes of opioids should no longer trigger
9 suspicions of abuse."
10        Do you see that?
11    A.  Yes.
12    Q.  Do you have any reason to disagree that
13 this was a correct attribution of your statement?
14    A.  It's not a direct quote, so I think it
15 could have been taken out of context, yes.
16    Q.  Okay.  Did you -- was it your opinion at
17 the time that the guidelines made it clear that
18 long-term use of opioids and presenting
19 prescriptions for large volumes of opioids should no
20 longer trigger suspicions of abuse?
21        MR. ELSNER:  Objection.
22        THE WITNESS:  At the time, I would have
23    made sure the qualifiers were in there, within
24    the standards of care and recommended dose and
25    guidelines.

Page 149

1        I would not have made a blanket statement
2    like that.
3 BY MS. MILLER:
4    Q.  Okay.  But you agree with me that it does
5 reference that long-term use of opioids is no
6 longer -- should not be considered a trigger, in and
7 of itself, for abuse?
8    A.  That's what the article says but not what
9 I would have said.
10    Q.  Okay.  Do you agree with me that the
11 Federation of State Medical Boards' guidelines did
12 provide for prescribing of long-term use of opioids?
13    A.  I'd have to --
14        MR. ELSNER:  Objection.
15        THE WITNESS:  I'd have to see those
16    guidelines to see what the recommendation was
17    and how long that long term was.
18 BY MS. MILLER:
19    Q.  We're going to come back.  I don't want to
20 take time on this, so we will come back to it.
21        After this article came out, did you issue
22 any type of publication or statement that would let
23 pharmacies know that these statements were
24 inaccurate as to your position?
25        MR. ELSNER:  Objection.

38 (Pages 146 - 149)

1    THE WITNESS:  Not directly, but we would
2  have released NABP documents that would have
3  clarified what I said.
4  BY MS. MILLER:
5    Q.  Okay.  If -- what type of NABP documents
6  would you have released?
7    A.  Probably with the release of the
8  guidelines to make sure that we informed pharmacists
9  they still had to adhere to standards of care and
10  recommended dosing, that they still had to follow
11  the laws for pharmacists, regardless of what
12  prescribers were doing.
13    Q.  Okay.  Sitting here today, are you aware
14  of any NABP document that you issued to that effect?
15    A.  Not aware, but I believe it probably did
16  happen, but I'm not aware specifically.
17    Q.  Okay.  During the time that you were
18  executive director of NABP, did you or the NABP ever
19  issue any publications or guidance documents to
20  pharmacists that the FSMB treatment guidelines were
21  inappropriate in any way?
22    MR. ELSNER:  Objection.
23    THE WITNESS:  If I'm reading this document
24  correctly, this article appeared in 2001, well
25  before the opioid crisis was known.

1  So I'm sure that after that -- and I know
2  that when we commented to FSMB on the
3  subsequent revision of their documents, that I
4  remember, and that specific document exists
5  where NABP disagreed with the guidelines and
6  asked FSMB to tighten up the guidelines.
7  But in 2001, we didn't have any idea that
8  the opioid problem was as big as it was.
9  BY MS. MILLER:
10    Q.  Okay.  You mentioned that you asked FSMB
11  to revise its guidelines.
12  Do you recall whether NABP issued any
13  publications to pharmacies advising them that the
14  FSMB guidelines were not appropriate?
15    MR. ELSNER:  Objection.
16    THE WITNESS:  We would have issued
17  pharmacy documents, but we would not have
18  directly criticized the FSMB guidelines.
19  BY MS. MILLER:
20    Q.  Okay.  The pharmacy documents that you
21  would have issued, sitting here today, can you think
22  of any particular documents that you did issue to
23  pharmacies that would contradict the FSMB
24  guidelines?
25    A.  Yes, and we would not have issued anything

1  to pharmacies.
2  What we would have done -- and I'm sure
3  the document does exist -- we would have sent to all
4  the state boards of pharmacy a copy of our comments
5  to FSMB, pointing out the areas where we thought
6  that the guidelines needed to be revised.
7  And that, in a sense, was our disagreement
8  with FSMB guidelines.  And that would have gone to
9  all the states.
10    Q.  Did the NABP withdraw its endorsement of
11  the FSMB guidelines?
12    A.  When they revised their new documents,
13  their new guidelines, I don't remember if we
14  endorsed them or not, because this document then
15  became moot when FSMB revised.
16    Q.  Since this document in 2001, have your
17  views on the use of opioids for long-term treatment
18  changed?
19    A.  Yes.
20    Q.  And how have they changed?
21    A.  After witnessing that approximately
22  900,000 people have died from opioid overdoses, my
23  view became that many of the prescribing and
24  dispensing patterns were contrary to standards of
25  care and were actually affecting the public nuisance

1  and causing people to die and be significantly
2  harmed.
3    Q.  When did you -- approximately when did you
4  change your opinion with respect to the use of
5  opioids for long-term treatment?
6    A.  That would have been about 2005-2006, four
7  or five years after this statement was made, based
8  upon what we were seeing in the states and what the
9  states were reporting to us about problems with
10  opioids.
11    Q.  Okay.  Similar with other questions, this
12  red flag triggers after the number of prescriptions
13  for a particular patient exceeds 210 days of supply
14  within six months, correct?
15    A.  Yes.
16    Q.  Okay.  Do you agree with me that the
17  prescriptions that the patient received prior to
18  exceeding 200 days of supply within six months would
19  not have been subject to this red flag?
20    MR. ELSNER:  Objection.
21    THE WITNESS:  This particular red flag,
22  yes.
23  BY MS. MILLER:
24    Q.  Okay.  Did you ask Dr. McCann to exclude
25  any prior prescriptions leading up to the point

Page 154

1 where the prescriptions exceeded 210 days of supply
2 within six months --
3    A.  No.
4    Q.  -- from his calculations?
5    A.  No.
6    Q.  Red Flag Number 14 was -- is "A patient
7 was dispensed an opioid and paid in cash," correct?
8    A.  Correct.
9    Q.  In a lot of -- a number of the examples,
10 and we can feel free to go back through them if we
11 wish, but would you agree with me that a number of
12 times, this red flag is expressed as applying when a
13 patient seeks to pay for an opioid prescription in
14 cash when insurance is otherwise available?
15       THE REPORTER:  "Is" or "isn't"?
16       MS. MILLER:  "Is."
17       THE WITNESS:  I don't believe so.
18 BY MS. MILLER:
19    Q.  All right.  I'll refer you to Exhibit
20 Number 6.
21       Okay.  Exhibit Number 6 on the list of
22 pharmacist red flags, Number 5.  Exhibit Number 6.
23    A.  All right.  What page?
24    Q.  The page which has the list of -- the
25 first attachment to the email exchange.

Page 155

1       Number 5, "Large percentage of controlled
2 substances are paid for in cash or patient uses
3 insurance to pay for noncontrolled substances but
4 then pays for controlled substances with cash when
5 insurance is available."
6       Do you see that?
7    A.  Uh-huh.
8    Q.  Okay.
9    A.  Yes.
10    Q.  So this one includes -- includes both
11 iterations, correct?
12    A.  Correct.
13    Q.  Okay.  And it refers to -- on the DEA list
14 in the exhibits, if you turn to Ruth Carter's
15 presentation where she identifies common red flags,
16 if you look on Page 11 of her presentation, it
17 states, "Cash payments in combination with other
18 circumstances."
19       Do you see that?
20    A.  Yes.
21    Q.  Okay.  So in that case, she's referencing
22 not paying in cash alone but also in combination
23 with other circumstances, correct?
24    A.  I'm not sure, but that's what it says.
25    Q.  That's what it says.

Page 156

1       May I ask you to turn to Exhibit
2 Number 10?
3    A.  Okay.
4    Q.  This is the Texas State Board of Pharmacy
5 "Red Flag" Checklist for Pharmacies, correct?
6    A.  Yes.
7    Q.  About a third of the way down, it
8 references, "People pay with cash or credit card
9 more often than through insurance," correct?
10    A.  Correct.
11    Q.  Okay.  So this one is identifying
12 circumstances in addition to paying with cash or
13 credit card, correct?
14       MR. ELSNER:  Objection.
15       THE WITNESS:  Is the answer [sic] does it
16    include cash and other circumstances, then the
17    answer is "yes."
18 BY MS. MILLER:
19    Q.  Okay.  So would you agree with me that the
20 red flag in different contexts has been stated
21 differently than what you have in your red flag,
22 which is that the patient was dispensed an opioid
23 and paid in cash?  It does not make any reference to
24 "other circumstances," correct?
25       MR. ELSNER:  Objection.

Page 157

1       THE WITNESS:  It does not.  It includes
2    the same thing that Albertsons says in its
3    policy, cash prescriptions or a patient that
4    asks to pay cash rather than insurance.
5       So it encompasses all of those situations
6    without qualifying.
7 BY MS. MILLER:
8    Q.  Okay.  So that's my question.
9       In some circumstances, it's referred to as
10 "paid with cash."  Other circumstances it's "paid
11 with cash when insurance was available or when other
12 circumstances exist," correct?
13    A.  Correct.
14    Q.  Would you agree with me that reasonable
15 pharmacists could disagree as to whether --
16    A.  Bless you.
17    Q.  -- a red flag is triggered, based just on
18 whether the patient paid in cash or whether there
19 were other circumstances available?
20    A.  Again, I would say the purpose of the red
21 flag, if a patient paid cash, that would be a
22 trigger.
23       Would pharmacists disagree that that
24 should be a trigger and there should be other
25 circumstances?

1      I'm sure that some pharmacists would say
2 that as well.
3      Q.  Okay.  And that would be pharmacists,
4 within the exercise of their professional judgment,
5 could have that disagreement?
6          MR. ELSNER:  Objection.
7          THE WITNESS:  Again, it depends on the
8      prescription.  It depends on the other
9      circumstances.
10 BY MS. MILLER:
11      Q.  So in -- when you say "it depends on the
12 prescription," that means there are other
13 circumstances that the patient or that the
14 prescriber -- sorry, the pharmacist is evaluating,
15 correct?
16          MR. ELSNER:  Objection.
17          THE WITNESS:  Beyond -- beyond just
18      whether it's cash or insurance, the other
19      circumstance.  But the cash would automatically
20      trigger a response.
21 BY MS. MILLER:
22      Q.  Okay.  So is it your -- is it your opinion
23 that a pharmacist who doesn't consider just the
24 payment of cash without other circumstances as a red
25 flag, is that contrary to the pharmacy standard of

1 care?
2          MR. ELSNER:  Objection.
3          THE WITNESS:  I'm just having trouble
4      answering that as comparing to what happens in
5      practice.
6          So I would say to ignore that red flag
7      would be a concern of the pharmacist to
8      investigate all the other information to make
9      sure that that red flag was resolved.
10 BY MS. MILLER:
11      Q.  Okay.  And when you say "that red flag,"
12 you're talking about just the fact that the customer
13 paid in cash, without -- and not in reference to
14 other circumstances around the prescription?
15      A.  Correct.
16      Q.  Okay.  So the prescription -- for the red
17 flags that have been identified in these other
18 sources that states that the red flag is when the
19 patient pays in cash with the presence of other
20 circumstances, is it your opinion that that
21 recitation of a red flag is contrary to the pharmacy
22 standard of care?
23      A.  I think the other references were "cash or
24 cash with other circumstances."  It wasn't just an
25 exclusive "cash with other circumstances."

1      Q.  Okay.  Go back to Ruth Carter's.
2      A.  With the Texas reference, Exhibit 10 that
3 you just referenced, people pay with cash or credit
4 card more often than through insurance.
5          So there's the order.
6      Q.  Okay.  That's cash or credit card.
7          Exhibit Number 8, Ruth Carter's
8 presentation, as we went through, "Cash payments in
9 combination with other circumstances," correct?
10      A.  That was what Ruth said.  That was just
11 one presentation.
12      Q.  Okay.  My question is, is this recitation
13 of the red flag, cash payments in combination with
14 other circumstances, contrary to the pharmacy
15 standard of care?
16          MR. ELSNER:  Objection.
17          THE WITNESS:  I'm -- I'm confused, so I
18      apologize.
19          I don't -- there are two circumstances --
20      one circumstance that would trigger is the
21      patient pays cash.
22          What would add additional credibility or
23      validity to the red flag or problem with the
24      red flag, not validity, is if they already had
25      existing insurance and there was no reason to

1      actually pay for cash.
2          That would just further support the red
3      flag, is the best way I can respond.
4          MR. ELSNER:  When you're at a good
5      stopping point, I'd like to take break.
6          MS. MILLER:  Sure.  We should have lunch
7      coming in, too, if we want to take a quick
8      lunch break.  I want to make sure it's here.
9          MR. ELSNER:  We can talk to him about
10      that.  That's fine.
11          MS. MILLER:  Okay.
12          THE VIDEOGRAPHER:  Off the record?
13          MS. WHITE:  Off or no?
14          MS. MILLER:  Off the record, yes.
15          THE VIDEOGRAPHER:  Off the record at
16      12:03.
17          (Whereupon, a recess was taken
18          from 12:03 p.m. to 12:42 p.m.)
19          THE VIDEOGRAPHER:  Back on the record at
20      12:42.
21 BY MS. MILLER:
22      Q.  I'm going to turn to your specific
23 opinions relating to Albertsons.  At Page 64 of your
24 report, you offer opinions regarding Albertsons'
25 policies and procedures.

41 (Pages 158 - 161)

1        Actually, backing up, with respect to your
2   entire report, would I be correct in understanding
3   that all of the bases for your opinions with respect
4   to Albertsons are included within your report?
5        A.   Yes, unless something comes up in the
6   deposition.
7        Q.   Okay.  Your understanding of the facts
8   upon which you based all your opinions regarding
9   Albertsons is written in your report, correct?
10       A.   Correct.
11       Q.   Okay.  To the extent that your
12   understanding of facts pertaining to Albertsons is
13   proven to be inaccurate, would you agree that that
14   could have an impact on your conclusions in this
15   case?
16       MR. ELSNER:  Objection.
17       THE WITNESS:  Is the question, if my
18       assessment of the facts were incorrect,
19       would -- that would change my report?
20   BY MS. MILLER:
21       Q.   Would that change your opinion?  Would you
22   agree that that could change your opinions?
23       Your opinions are based on, as you've
24   stated, your understanding of the facts.
25       A.   Right.

1        Q.   And my question is, if that understanding
2   of the facts is proven to be inaccurate, would you
3   agree that that could have an impact on what your
4   ultimate conclusions are in this case?
5        A.   I don't think it would change the ultimate
6   conclusion because I didn't -- I don't think I
7   misunderstood the facts, so I don't think it would
8   change the conclusion.
9        MS. MILLER:  What is going on with my --
10       can we pop off for a second?
11       THE VIDEOGRAPHER:  Off the record at
12       12:44.
13       (Whereupon, a recess was taken
14       from 12:44 p.m. to 12:46 p.m.)
15       THE VIDEOGRAPHER:  Back on the record at
16       12:46.
17   BY MS. MILLER:
18       Q.   So my question was not whether -- whether
19   your understanding of the facts was incorrect.
20       My question was, if it turns out that your
21   understanding -- I'm asking a hypothetical -- if it
22   turns out that your understanding of the facts are
23   inaccurate, would you agree that that could impact
24   the ultimate conclusions you have in this case?
25       MR. ELSNER:  Objection.

1        THE WITNESS:  That would be an almost
2        impossible hypothetical, because every single
3        fact would have to be wrong.  So I'd still have
4        to say it wouldn't change my conclusions,
5        so ...
6   BY MS. MILLER:
7        Q.   So you can't conceive of a fact that would
8   change your opinion in this case?
9        A.   No.
10       Q.   Okay.  Okay.  So turning to Page 64,
11   starting in the section Albertsons' Policies and
12   Procedures, you have provided opinions with respect
13   to Albertsons' policies in 2013, if you look on
14   Page 65.
15       And then turning to Page 67, you have
16   opinions regarding Albertsons' 2016 pharmacy
17   policies and procedures, and then the next paragraph
18   is 2018 policies and procedures manuals.
19       Do you see that?
20       A.   Yes.
21       Q.   Okay.  Am I correct in understanding that
22   you have not expressed any opinions with respect to
23   any Albertsons policies after 2018?  So the policies
24   and procedure manuals from 2019 or later.
25       A.   The only manuals I commented on were what

1   were provided to me by legal counsel in reference to
2   my report.
3        Q.   All right.  Starting -- you mentioned
4   prior to 2013, back on Page 64, Albertsons had no
5   pharmacy policies or procedures that addressed
6   identifying or resolving red flags for controlled
7   substance prescriptions, correct?
8        A.   Correct.
9        Q.   Do you know what Albertsons' policies
10   consisted of with respect to appropriate dispensing
11   of controlled substances prior to 2013?
12       A.   I did not review a policy manual prior to
13   2013.
14       Q.   Am I correct that your knowledge of
15   Albertsons' policies regarding appropriate
16   dispensing of controlled substances prior to 2013 is
17   based on the citations you reference in your report
18   in footnote 246?
19       A.   In regard to the policies, yes.
20       Q.   You make comments regarding Albertsons'
21   training.  This is a little bit on Page 64 and in
22   the following pages.
23       In particular, on Page 64, middle of the
24   document, you make reference to an internal
25   presentation which discussed Albertsons' response to

Page 166

1 the opioid crisis, Albertsons identified basic
2 efforts which had not yet been implemented by
3 July 29, 2019, correct?
4    A.  Correct.
5    Q.  Do you know what Albertsons' training
6 consisted of with respect to appropriate dispensing
7 of controlled substances prior to 2013?
8    A.  Based on the information I reviewed, I
9 could not find any documentation of training prior
10 to that.
11    Q.  Do you know what Albertsons' training
12 consisted of between 2013 and 2019?
13    A.  Based on the information I reviewed and
14 documented in my report, it involved a few mailings
15 to pharmacists, responsibility of the pharmacy
16 manager to communicate to pharmacists.
17       But there was no follow-up or no
18 documentation if that information was actually
19 presented to the pharmacists.
20    Q.  And what is that -- your conclusion that
21 there was no follow-up on what was presented to the
22 pharmacists, what is that based on?
23    A.  Depositions that I read as part of the
24 preparation for this.
25    Q.  You have expressed criticism that

Page 167

1 Albertsons first included a list of red flags in its
2 formal pharmacy policies and procedures document in
3 2016, correct?
4    A.  What page are we on?
5    Q.  I am on -- that's Page 67, I believe.
6    A.  26, that first paragraph?
7    Q.  Yes.
8    A.  Yes.
9    Q.  Okay.  You do make reference to some red
10 flag training or materials that Albertsons had
11 provided prior to 2016.
12       Is -- your criticism of the 2016 policy is
13 that Albertsons did not list, specifically list red
14 flags within the policies documents, but, instead,
15 those were contained in training documents?
16       Do you have a criticism with that?
17    MR. ELSNER:  Objection.
18    THE WITNESS:  No, I think my statement is
19 the report that it introduced the concept of
20 red flags, but it did not have any useful
21 guidance or requirements for pharmacists to
22 detect and resolved red flags, would be my
23 comment on that document.
24    MS. MILLER:  Okay.
25

Page 168

1       (Exhibit 18 was marked for
2       identification.)
3    MS. MILLER:  I hand you what I'm marking
4 as Exhibit 18.
5 BY MS. MILLER:
6    Q.  Okay.  So this is the 2013 email that I
7 believe you referenced which outlined a list of red
8 flags that was provided to pharmacies, correct?
9    A.  I don't think I referenced an email.  I
10 thought I referenced the policy and procedure.
11    Q.  So with respect to 2013, when I asked you
12 about training, you referenced mailings to
13 pharmacists.
14    A.  Oh.
15    Q.  Is this what you were referring to?
16    A.  I don't know.  I can't identify it.
17    Q.  Okay.  This -- in your report, Page 64 on
18 to Page 65, you state, "The first incarnation of
19 Albertsons' guidance to its pharmacists involving
20 red flags for controlled substance prescriptions
21 took the form of a two-page sheet entitled
22 'Appropriate Dispensing of Controlled Substances' in
23 2013," correct?
24    A.  Yes.
25    Q.  And does this appear to be that document?

Page 169

1    A.  Yes, it does.
2    Q.  Okay.  And you expressed the conclusion
3 that this document did not provide useful guidance
4 for pharmacists; is that correct?
5    A.  Correct.
6    Q.  Okay.  And then what is the basis for your
7 opinion that this document did not provide useful
8 guidance to pharmacists?
9    A.  Again, in my report, that beyond direction
10 for pharmacists to exercise professional judgment,
11 there's no requirement for pharmacists to take
12 specific actions or to investigate when encountering
13 any red flags, nor is there any requirement for
14 pharmacists to utilize any specific resources.
15       That was my comment on the document.
16    Q.  Okay.  So the fact that this document
17 doesn't require them to take any, in particular,
18 action on a red flag is the basis for your
19 conclusion that this is not useful guidance?
20    A.  The direction to take action, how to take
21 action, and how to document that action, is what my
22 comment would be based upon.
23    Q.  Okay.  What should this document have said
24 with respect to how to document that investigation?
25    A.  Based on the information and based upon

43 (Pages 166 - 169)

Page 170

1 what the requirements are, I would have written a
2 document to say, These are red flags. These red
3 flags have been identified by the DEA and other law
4 enforcement agencies.
5        When these red flags occur, the pharmacist
6 needs to so identify these red flags and resolve
7 those red flags and document that resolution, and
8 then establish a central place for those notes and
9 for that information to take place, rather than
10 listing what could be or might be and saying it's up
11 to you to make that decision.
12        The pharmacist, for these red flags, just
13 like any other standard of care requirement, doesn't
14 have the discretion to decide to follow it or not
15 follow it.
16    Q.  Okay. So when the document says, on the
17 first page, "If one or more red flags exist, the
18 pharmacist must exercise professional judgment in
19 deciding whether to dispense and use available
20 resources as necessary and appropriate," is it your
21 conclusion that Albertsons is telling the pharmacist
22 that they have discretion to determine whether
23 something is a red flag or not?
24    A.  No, I think what it's saying there is, in
25 situations where the pharmacist must take action,

Page 171

1 Albertsons is saying you don't have any
2 responsibility or requirement to do so, just do what
3 you please. And that's not correct.
4    Q.  Okay.
5        (Exhibit 19 was marked for
6        identification.)
7        MS. MILLER: I hand you what I've marked
8 as Exhibit 19.
9        THE WITNESS: Thank you.
10       MS. MILLER: I'm sorry, there's a cover
11 page to that. Thank you.
12       MR. ELSNER: Sorry, can I get one?
13       MS. MILLER: Oh, I'm sorry.
14       MR. ELSNER: That's okay. Thank you.
15 BY MS. MILLER:
16    Q.  Did you review this document in preparing
17 your opinions?
18    A.  Yes, I did.
19    Q.  Okay. In fact, you referenced this
20 document earlier.
21       When we were talking about the geographic
22 limits, you commented that Albertsons had in its
23 policies a red flag that was based on 15- to 20-mile
24 geographic distance, correct?
25    A.  Correct.

Page 172

1    Q.  All right. You would agree with me that
2 this document is not a policy, correct? This
3 document is a PowerPoint presentation, correct?
4    A.  Correct, it's a PowerPoint presentation.
5    Q.  Okay. I mean, you have some distinctions
6 in your report between formal policies and other
7 documents, correct?
8    A.  For Albertsons or for --
9    Q.  For Albertsons, yes. You make reference
10 to provisions of Albertsons' formal policies as
11 distinguished from other documents that Albertsons
12 may have issued, correct?
13    A.  Correct, correct.
14    Q.  Okay. And I just wanted to clarify.
15       This document is not a formal policy,
16 correct?
17    A.  It's a PowerPoint presentation. I'd have
18 to review it again to see whether it talks about the
19 policy, but it's just a PowerPoint presentation.
20    Q.  Correct. Okay. If you look at the cover
21 page, this document is dated July 21st, 2014, in the
22 cover email.
23       I turn you to Page 13 of the presentation.
24 And it references investigation. And it outlines
25 different factors, identifying bad actors, external

Page 173

1 diversion, analyzing data for red flags, and then
2 internal diversion.
3        And it continues on, and it talks about
4 red flags following on the next page, correct?
5    A.  Yes.
6    Q.  Okay. As you reviewed this, did you have
7 an understanding that this document reflected a
8 training session that pertained to, among other
9 things, red flags?
10    A.  I knew it was in use for training, but I
11 wasn't aware of what the specific training session
12 was, so ...
13    Q.  Okay. In forming your opinions as to
14 whether Albertsons had conducted training of its
15 pharmacists with respect to identification and
16 resolution of red flags, did you consider that
17 document?
18    A.  Yes.
19    Q.  Okay. When you -- you had offered the
20 opinion that Albertsons had no follow-up with
21 respect to its pharmacy mailings.
22       Would you -- would this PowerPoint
23 presentation, as presented to pharmacists,
24 contradict that opinion that there was no follow-up
25 by Albertsons?

44 (Pages 170 - 173)

Page 174

1      MR. ELSNER:  Objection.
2      THE WITNESS:  No, not specifically, and
3  no, in general.
4  BY MS. MILLER:
5    Q.  Okay.  So when you said there was no
6  follow-up with respect to its mailings regarding red
7  flags, what did you mean?
8    A.  So if you turn to Page 4 of the document,
9  when Albertsons conducted its own field evaluation
10  results, it only had a 22 percent pass rate.  And it
11  then broke down by division who the strong
12  performers were based upon percentage.  And, again,
13  those percentages were very low.
14      That was an indication to me, a hard data
15  indication, that training wasn't happening within
16  Albertsons.  And then in subsequent depositions,
17  there was discussion about whether or not they were
18  able to do the training, and the fact that they
19  weren't able to do the training, and that many of
20  the pharmacists still didn't have the information
21  they needed or didn't -- weren't aware of certain
22  things.
23      And that was the basis for my opinion.
24    Q.  Okay.  There's a whole lot of things in
25  that answer.  I'm going to start with the reference

Page 175

1  to these field evaluation results.
2      Do you know what was included in these
3  field evaluations?
4    A.  I believe it was the checklists that they
5  used when they would do subsequent or sometimes
6  periodic reviews of the pharmacies, and, in fact,
7  they were also supposed to do a mock DEA evaluation
8  that never was able to take place that was supposed
9  to be more stringent than these regional or periodic
10  reviews.
11    Q.  Okay.  Do you know what was required for a
12  pharmacy to receive a pass result in these field
13  evaluations?
14    A.  To the best of my recollection, there was
15  a set of criteria.  And if they failed certain
16  criteria, they wouldn't get a pass.
17      But I can't recall the specifics of that.
18    Q.  Okay.  Do you have any understanding as to
19  what type of score was necessary for a pharmacy to
20  receive a pass rate?
21    A.  I thought in the materials I read that
22  they wanted a score of somewhere above 75 percent,
23  but I can't say that for sure.
24    Q.  Okay.  If I were to tell you that it
25  actually required a score of 100 percent in order to

Page 176

1  receive a pass rate, would that be inconsistent with
2  your review of the documents?
3      MR. ELSNER:  Objection.
4      THE WITNESS:  I thought there was a place
5  that said they could not do well in certain
6  areas but there were certain areas that they
7  needed 100 percent passage.
8      But, again, I'm just recalling.  I'd have
9  to look at those documents again.
10  BY MS. MILLER:
11    Q.  Okay.  Do you have any understanding as to
12  whether the field evaluation results had a direct
13  connection to evaluation of red flags for
14  dispensing?
15    A.  I believe it did, based upon the fact that
16  the first couple pages said they did controlled
17  substance monitoring.  So I would believe that part
18  of the monitoring would involve red flags.
19    Q.  Okay.  That's an assumption on your part,
20  correct?
21      MR. ELSNER:  Objection.
22      THE WITNESS:  That's what the information
23  told me, yes.
24  BY MS. MILLER:
25    Q.  Okay.  In your review of depositions in

Page 177

1  this case, did you receive information as to whether
2  Albertsons did annual training with its pharmacists
3  regarding identifying and resolving red flags?
4    A.  I did not see any of that in the
5  materials.
6    Q.  Okay.  Do you know one way or the other
7  whether Albertsons did annual training with its
8  pharmacists regarding identifying and resolving red
9  flags?
10    A.  I did not recall seeing any of that in the
11  materials I reviewed.
12    Q.  Okay.  And the materials you reviewed
13  consisted of two depositions, correct?
14  Mr. Provenzano and Ms. Covaci?
15      MR. ELSNER:  Objection.
16      THE WITNESS:  Whatever else -- I'm sorry.
17      And whatever was referenced on the other
18  sheet, those are additional depositions.
19  BY MS. MILLER:
20    Q.  Okay.  Do you -- in your review of those
21  depositions, do you have any knowledge or
22  information as to what resources Albertsons provided
23  its pharmacists with respect to identifying and
24  resolving red flags?
25    A.  Yes.

45 (Pages 174 - 177)

Page 178

1   Q.   And what was that?
2   A.   In the depositions, there were a couple of
3   factors that stood out.
4        One, situations were reported back to
5   Albertsons corporate of fraudulent prescriptions or
6   problems with prescribers.  And it would take three
7   or four months for Albertsons to get back and look
8   at that issue and report back to the pharmacy
9   manager.
10       The other was the information that
11  corporate had in regard to dispensing data that was
12  reviewed by corporate personnel but never shared
13  back to the individual pharmacists.  And that's
14  directly mentioned in those depositions.
15       Q.   In reviewing documents related to
16  Albertsons, did you have any understanding as to
17  what information was available in Albertsons'
18  corporate portals for pharmacists with education
19  regarding identifying and resolving red flags?
20       MR. ELSNER:  Objection.
21       THE WITNESS:  No.
22  BY MS. MILLER:
23       Q.   Okay.  In your review of documents, did
24  you have any understanding as to whether Albertsons
25  provided its pharmacists with the NABP video that we

Page 179

1   discussed earlier today?
2   A.   Nothing indicated that that occurred.
3   Q.   Okay.  Have you ever designed a training
4   program for pharmacists regarding identifying and
5   resolving red flags?
6   A.   Yes.
7   Q.   And what was that?
8   A.   I was a part-time faculty at Quantico, in
9   DEA headquarters for FBI agents and DEA agents, and
10  I put together presentations quarterly for DEA
11  agents, FBI agents, and pharmacists that were
12  involved in investigating diversion and red flags.
13       Also, the program that you referenced
14  earlier, the PDAC program, the Pharmacy Diversion
15  Awareness, that Ruth Carter was a part of, I worked
16  with the DEA to design that program, and it actually
17  involved four different presentations.
18       One presentation by William Winsley, who
19  is the former executive director of the Ohio Board
20  of Pharmacy, past president of NABP.  I worked with
21  Bill to design that program.
22       The second was a presentation by
23  Ruth Carter or another member of the DEA.
24       The third presentation was from another
25  DEA person but from a different perspective in terms

Page 180

1   of recordkeeping, documentation.
2        And then the fourth presentation was by a
3   member or representative of the local Board of
4   Pharmacy to talk to pharmacists about what the
5   requirements were in that state.
6        So I worked with all of them on the
7   content and on the program and training for the
8   pharmacists.
9        Q.   Do you have any -- have you retained any
10  copies of those presentations?
11       A.   I personally haven't.  I believe NABP may
12  have those.
13       Q.   Okay.  Those training programs that you
14  referenced, would you refer -- would you consider
15  those to be reliable training materials for
16  pharmacists for identifying and resolving red flags?
17       A.   Again, part of the information that would
18  be required.
19       Q.   Okay.  In cases against -- in the prior
20  MDL case, you testified on, Walgreens, Walmart, and
21  CVS were defendants in that case, correct, in the
22  Ohio MDL case?
23       A.   I believe so, yes.
24       Q.   Okay.  And then you've also testified in a
25  case in San Francisco, in which Walgreens was a

Page 181

1   defendant, correct?
2   A.   Correct.
3   Q.   In that prior testimony, you had opined
4   that they're dispensing data information systems
5   were not adequate, correct?
6   A.   Correct.
7   Q.   Okay.  In those cases, you were asked
8   questions about whether you were aware of any other
9   pharmacy chain that had the type of information
10  system that you claimed those pharmacies should have
11  had.
12       And in the answer to that question, you
13  answered that Albertsons had a system, correct?
14       A.   Correct.
15       Q.   Okay.
16       A.   I testified Albertsons had information
17  available but not a system.
18       Q.   Okay.  What do you mean by that?
19       A.   If you turn to Page 75 on my report, I
20  referenced that again.
21       On Page 75, I think it's the second full
22  paragraph under "Albertsons failed."
23       "Based upon my review of documents and
24  testimony, Albertsons possessed dispensing data and
25  other information collected at a corporate level.

46 (Pages 178 - 181)

Page 182

1  Albertsons had access to extensive and detailed
2  prescription data and other information.  For
3  example, Albertsons collects dispensing data and
4  stores in its centralized data warehouses responses
5  and documents from defendant to indicate that
6  Albertsons also had access to third-party data."
7        That's the information I was referring to
8  in the prior testimony.
9     Q.  Okay.  And you had testified that you had
10  access to Albertsons data in your role as a
11  consultant, correct?
12     A.  Not to their data.
13     Q.  What did you have access to?
14     A.  A former client of ours has a medication
15  error reporting system and also a patient care
16  organization reporting system.
17        And in that context, we were giving a
18  presentation about the data that Albertsons had that
19  could be integrated into the medication error
20  reporting system and the types of reports that could
21  be generated, which included the diversionary
22  reports that I mentioned.
23        But at no time did I actually see the data
24  or see anything that was proprietary to Albertsons.
25     Q.  Okay.

Page 183

1          (Exhibit 20 was marked for
2          identification.)
3     MS. MILLER:  I hand you what I've marked
4  as Exhibit 20.
5  BY MS. MILLER:
6     Q.  This is an excerpt from the transcript of
7  your deposition in the San Francisco case.
8     A.  Uh-huh.
9     Q.  And if you turn to the second page of this
10  document, which is Page 59 of the transcript, you
11  will see a question starting on Line 12:
12        "Based on all of your expert work and your
13  35 years at the NABP, can you now identify any
14  pharmacy in the country that uses dispensing
15  data in the ways that you now say Walgreens is
16  required to?"
17        Do you see that?
18     A.  Uh-huh.
19     Q.  And your answer was:
20        "Based on my work with Albertsons Pharmacy
21  and some work with some of the CPSEN [sic]
22  network pharmacies that are operating in
23  North Carolina, I would say that they are using
24  dispensing data as well as independent
25  pharmacies that I've interacted with in

Page 184

1  West Virginia and in Ohio are using dispensing
2  data in a way that I mentioned."
3        Correct?
4     A.  Yes, sir -- yes, ma'am.
5     Q.  All right.  As you sit here today, are
6  you -- is your testimony different today than what
7  it was?
8     A.  No.
9        MR. ELSNER:  Objection.
10  BY MS. MILLER:
11     Q.  Okay.  So when you say "Albertsons is
12  using dispensing data in the way that you say
13  Walgreens is required to," what do you mean by that?
14     A.  So if you read, again, if we go back to
15  that answer on Page -- on Line 19, "Based upon my
16  work with Albertsons Pharmacy and some work with
17  pharmacy networks operating in North Carolina," the
18  reference now goes back to, "I would say they're
19  using dispensing dated as well as independent
20  pharmacies that I've interacted with in
21  West Virginia."
22        If you go on, the question is, "When did
23  you see the Albertsons system that you now say uses
24  dispensing data in the way that they are supposed
25  to?"

Page 185

1        There was an objection.
2        I said, "There is -- just prior to me
3  testifying four months ago," again, further on --
4  answer on Line 17, "proprietary information," "the
5  process and that for another client."
6        [As read]:  "We were asked to look at
7  medication error reporting systems and whether or
8  not the medication report error system would
9  integrate with dispensing data and how those
10  dispensing data systems would help trigger any
11  diversion problem, in all well medication errors
12  then should be documented and recorded, and that was
13  the substance of my work in that regard, sir."
14     Q.  Okay.  But based on that work, you
15  expressed the opinion in this case that Albertsons
16  was using dispensing data in a way that you thought
17  Walgreens was -- should have been using it?
18        MR. ELSNER:  Objection.
19        THE WITNESS:  And the fact that they had
20        it, they were using it at the corporate level,
21        and not sharing it then with their pharmacies
22        or pharmacists.
23  BY MS. MILLER:
24     Q.  But you didn't say that in this
25  deposition.

47 (Pages 182 - 185)

Page 186

1      MR. ELSNER:  Objection.
2      THE WITNESS:  Yeah, I did too.
3  BY MS. MILLER:
4    Q.  That Albertsons was not using the data?
5    A.  Yes, I did.
6    Q.  In your deposition in San Francisco --
7    A.  Oh.
8    Q.  -- did you testify that Albertsons was
9  not, in fact, using dispensing data in the way that
10  it should be required to?
11    A.  I think the clarification in my answer
12  indicated that it was for medication error purposes,
13  and I wasn't asked whether or not Albertsons wasn't
14  using it.
15      They asked, "Do you know of any other
16  pharmacy that has this data and could use the data
17  as the way Walgreens should?"
18      And that was my response.
19    Q.  Okay.  The question is actually whether
20  Albertsons uses that dispensing data.
21      MR. ELSNER:  Objection.
22      THE WITNESS:  And I said, "That's
23  proprietary," "I've signed," "but I can explain
24  the process."
25      I didn't say "yes" to that question,

Page 187

1  ma'am.  I did not answer affirmatively to that
2  question.
3  BY MS. MILLER:
4    Q.  Okay.  So sitting here today, is it your
5  opinion that Albertsons does not use dispensing data
6  to evaluate controlled substance dispensing?
7    A.  Not at the pharmacy level, and not
8  implementing that data as they should.
9    Q.  Okay.  You agree with me that Albertsons
10  does utilize dispensing data to evaluate controlled
11  substance prescribing at the corporate level?
12    A.  I think the data is available.  I think
13  it's reviewed by a limited number of individuals.
14  And I'm not sure it's actually implemented or put
15  into use for any meaningful purposes.
16    Q.  How is the data -- how is the data
17  utilized and put into use?
18      Do you have an understanding as to how
19  Albertsons uses that data?
20      MR. ELSNER:  Objection.
21      THE WITNESS:  So based, again, upon the
22  information in depositions, Albertsons received
23  significant amounts of data from third-party
24  sources.  I think it was IQVIA and IMS.
25      In those data, they identified prescribers

Page 188

1  and pharmacies with high dispensing totals of
2  opioids, hydrocodone, oxycodone, and who were
3  the highest prescribers of medication.
4      That information was provided to
5  Albertsons corporate.  And based upon the
6  information that was in the materials I
7  reviewed, it said it was never shared with the
8  pharmacists at those stores that would have
9  been interacting with those prescribers.
10      And that there were action plans that were
11  to be developed for certain stores, but there
12  was no follow through, that I could find, on
13  the action plans or what actions were taken as
14  regarding that data.
15      That's my understanding of how it was used
16  and collected.
17  BY MS. MILLER:
18    Q.  Okay.  Do you know what program Albertsons
19  had access to from IQVIA or IMS, which is the same
20  company?
21    A.  I think they were in Mr. Provenzano's
22  deposition.  He described the various data
23  agreements and the data that Albertsons sells from
24  its patient records and pharmacy to these
25  third-party firms, as well as, I think, to some

Page 189

1  manufacturers.
2      But I don't know beyond that what was in
3  the deposition, what it consisted of.
4    Q.  Okay.  Do you understand what tools that
5  Albertsons uses in -- from IQVIA to help evaluate
6  controlled substance dispensing in its pharmacies?
7    A.  The reports that I mentioned that
8  Albertsons had access to that identified stores that
9  were over, I think, ████████ of their past so many
10  weeks prescribing, and then the highest prescribers
11  of controlled substances, I know they received those
12  reports.
13      But I'm not sure of what the complete
14  package was that Albertsons received.
15    Q.  Okay.  You've never looked at that data
16  from IQVIA yourself, have you?
17    A.  No, I have not.
18    Q.  When you reference that Albertsons
19  received data regarding the highest prescribers in a
20  particular area in that IQVIA data, that's based on
21  your understanding from a deposition, correct?
22    A.  Correct.
23      MR. ELSNER:  Have you produced the IQVIA
24  data?
25      MS. MILLER:  Have I produced IQVIA data?

48 (Pages 186 - 189)

Page 190

1        MR. ELSNER:  Yeah.  You've asked him if he
2  looked at it.  Has Albertsons produced the --
3        MS. MILLER:  I don't believe there's a
4  pending request for IQVIA data.  It's not our
5  product either.  We don't own it.
6        MR. ELSNER:  Okay.
7        MS. MILLER:  That would be something to
8  ask IQVIA for.
9  BY MS. MILLER:
10     Q.   When you say this data was never shared
11  with pharmacists, that's based on your understanding
12  from reviewing a deposition?
13     A.   Yes.
14     Q.   With respect to pharmacy -- the pharmacy
15  information system that contains the dispensing
16  data, do you know what system Albertsons uses?
17     A.   I do not.
18     Q.   Do you -- are you familiar with different
19  pharmacy information systems?
20     A.   Only in a very general sense.
21     Q.   Okay.  Are you -- do you have an
22  understanding that while there may be some large
23  pharmacies that may develop their own pharmacy
24  information systems, that other pharmacies need to
25  buy those systems off the shelf, as off-the-shelf

Page 191

1  products?
2     A.   Yes.
3     Q.   Do you have any understanding as to
4  whether Albertsons used an off-the-shelf product
5  versus developing its own?
6     A.   No.
7     Q.   Do you have any information regarding what
8  a pharmacist sees at Albertsons when -- on its
9  information system when it is dispensing a
10  prescription?
11     A.   No.
12     Q.   Do you have any knowledge as to what
13  add-ons Albertsons uses with its pharmacy software
14  to assist with controlled substance dispensing?
15     A.   No.
16     Q.   Do you know what information Albertsons'
17  compliance team utilizes with respect to controlled
18  substance dispensing analytics?
19     A.   There was some information in the
20  depositions and reference to the PCAT team, but I
21  can't recall the specifics of those documents.
22     Q.   Do you have an understanding as to what
23  Albertsons did with the external data that it
24  received with respect to controlled substances?
25     A.   That was one of the questions that I had.

Page 192

1  No, I have no idea what they did with it.
2     Q.   On Page 66, you offered an opinion in the
3  first full paragraph, halfway down.
4        You stated, "There's no single specific
5  place for pharmacists to document measures taken to
6  determine the legitimacy of a prescription."
7        The next paragraph, you note, "This
8  creates a system in which critical information
9  regarding how and why red flags may have been
10  identified and resolved is elusive and difficult for
11  a pharmacist to find."
12        Do you recall that?
13     A.   Yes.
14     Q.   Okay.  You've testified you don't know
15  what a pharmacist sees on their information system
16  when they are dispensing a prescription, correct?
17        MR. ELSNER:  Objection.
18        THE WITNESS:  I don't see this.  I don't
19  know the screen, no.
20  BY MS. MILLER:
21     Q.   Okay.  You referenced testimony in which
22  there are different places for a pharmacist to
23  document their resolution of red flag information,
24  correct?
25     A.   Correct.

Page 193

1     Q.   Okay.  And that included the handwritten
2  or the hard-copy prescription, correct?
3     A.   Yes.
4     Q.   That included the patient profile notes,
5  correct?
6     A.   The column was Albertsons notes, yes.
7     Q.   And in those different places to document,
8  do you have any understanding as to whether that
9  information is available to the pharmacist within
10  the patient profile when they pull it up to dispense
11  a prescription?
12     A.   When I looked at the Notes information
13  that supposedly was available to the pharmacist, but
14  I did not see firsthand, there was no way to
15  understand what was the relevant note, because there
16  was just a compilation of notes with no dates within
17  that field.
18        And then there was a separate NOTE field,
19  capital N-O, capital T-E, that also had notes, but
20  most of those notes weren't relevant to the patient
21  profile or the prescription.
22        So if the pharmacist saw those as patient
23  profiles, I have no idea what that information meant
24  or what the pharmacist was documenting.
25     Q.   Okay.  And do you have any understanding

49 (Pages 190 - 193)

Page 194

1 as to whether the pharmacists who are reviewing that
2 on their own system did or did not have an
3 understanding as to what the notes reflected?
4    A. I have no way to comment on that.
5    Q. Okay. Do you know what steps a pharmacist
6 would need to take to view all the notes, and when
7 those notes were entered for -- on a particular
8 patient?
9      MR. ELSNER: Objection.
10      THE WITNESS: No.
11 BY MS. MILLER:
12    Q. On Page 65, it might be elsewhere in your
13 report, you expressed criticism of Albertsons'
14 policies stating that pharmacists should register
15 for access to the state PMP, rather than require it,
16 and require regular use, correct?
17    A. Correct.
18    Q. Okay. And the document you're referring
19 to is a 2013 document, correct, on Page 65?
20    A. Yes.
21    Q. Okay. Would you agree that not all states
22 had a PMP in 2013?
23    A. I would have to check the facts, but I
24 can't recall how many states did, nor how many
25 states didn't.

Page 195

1      I think Texas' program was available.
2 Legislation was passed in 2008, and then the program
3 was made operational. So I'm not sure if it was
4 available in how many states or not. I don't know.
5    Q. Okay. Your conclusion that Albertsons'
6 pharmacists were not required to register with the
7 PMP is based on the statement in this document,
8 correct?
9    A. Correct.
10    Q. Okay. Are you aware of any other
11 documents or any other practices or procedures that
12 Albertsons implemented to ensure that its
13 pharmacists registered with the PMP?
14    A. Not that I saw.
15    Q. Okay. Do you have any knowledge regarding
16 Albertsons pharmacists' use of the PMP, the actual
17 pharmacists' use of the PMP, outside of this
18 document?
19    A. Yes.
20      MR. ELSNER: Objection.
21 BY MS. MILLER:
22    Q. And what's that knowledge?
23    A. Again, in the sample data provided by
24 Albertsons, when I looked at pharmacists' notes on
25 checking the PMP, there was very little PMP checking

Page 196

1 done by the pharmacists.
2    Q. So are you stating that if there's not a
3 note that the pharmacist checked the PMP, that it's
4 your conclusion that the pharmacist did not, in
5 fact, check the PMP?
6    A. It's my assertion that if it's not
7 documented, then there's no way to know that it
8 actually happened or exists.
9    Q. Okay. So there's no way to know that it
10 happened, but there's also no way to know that it
11 didn't happen, correct?
12      MR. ELSNER: Objection.
13      THE WITNESS: I would say there's no way
14    to know it happened.
15 BY MS. MILLER:
16    Q. Do you have any knowledge or understanding
17 as to whether Albertsons' pharmacists in the State
18 of Texas, if there were pharmacists who did not
19 register for the PMP?
20    A. I have no knowledge to know whether they
21 registered or not.
22    Q. Prior to March 2020, you agree that, in
23 Texas, it was not mandatory for pharmacists to check
24 the PMP prior to dispensing any opioid -- checking
25 opioid scripts, correct?

Page 197

1      MR. ELSNER: Object to the time frame.
2      MS. MILLER: 2020, March 2020.
3      THE WITNESS: I don't think so. I think
4    it's covered in my report when Texas mandated,
5    if I can find it.
6 BY MS. MILLER:
7    Q. I didn't write the page down either.
8    A. It was in here this morning.
9    Q. Yeah, I know. I'm usually pretty good
10 about writing the page numbers down, and I didn't.
11 It's frustrating.
12      MS. MILLER: Note to you for next week,
13    write down all the page numbers in your
14    outline.
15      MS. WHITE: That's Missy's job.
16      MS. MILLER: Yeah.
17      THE WITNESS: It's on Page 18.
18 BY MS. MILLER:
19    Q. 18. I was looking too far deep.
20    A. This will give you exact dates. Texas
21 implemented a Prescription Drug Monitoring Program
22 known as the Texas PMP. The law was signed in 1981.
23      2008, the PMP monitor scheduled three,
24 blah, blah, blah. All pharmacies were required to
25 report controlled substances records beginning in

50 (Pages 194 - 197)

1 2017, and required to check the PMP beginning on
2 2020.
3    Q.  Okay, right.  So in September 2017,
4 pharmacies were required to report controlled
5 substance dispensing into the PMP.
6        And then March 1, 2020, is when they were
7 required to check the PMP prior to dispensing
8 opioids, correct?
9    A.  Correct.
10    Q.  Okay.  Is it your opinion that Albertsons
11 should have required its pharmacists to check the
12 PMP for every opioid script, regardless of whether
13 there was a red flag, prior to March 1, 2020?
14    A.  Yes.
15    Q.  All right.  So in checking the PMP, is it
16 your opinion that pharmacists should check the PMP
17 for every opioid prescription, whether there's a red
18 flag or not?
19    A.  Yes.
20    Q.  And when did you form the opinion that the
21 PMP check should be mandatory for every opioid
22 script?
23        MR. ELSNER:  Objection.
24        THE WITNESS:  It's been my -- part of my
25    process, part of my reasoning since PMPs were

1 developed.
2        MS. MILLER:  Okay.
3        (Exhibit 21 was marked for
4         identification.)
5        MS. MILLER:  I hand you what I've marked
6 as Exhibit Number 21.  This is a document from
7 the NABP.  It's a report of a task force on
8 prescription drug abuse.
9 BY MS. MILLER:
10    Q.  Do you recall this task force?
11    A.  Yes.
12    Q.  Did you participate in this task force?
13    A.  No, I did not.
14    Q.  Okay.  At the top, it notes that "The NABP
15 Executive Committee accepted all recommendations of
16 this task force with the following exception."
17        Under Recommendation 4, if you go a couple
18 lines down, it says, "The Executive Committee does
19 not support a mandate of the review of PMP data for
20 dispensing controlled substances at this time."
21        Do you see that?
22    A.  Yes.
23    Q.  Do you recall that this was NABP's
24 position, that they did not support a mandate of
25 review of PMP data?

1    A.  Yes.
2    Q.  Okay.  And what -- do you know what the
3 basis for that position was?
4    A.  Yes.
5    Q.  What was the basis for that position?
6    A.  The Executive Committee, as the oversight
7 body, disagreed with mine and staff recommendation
8 that it should be mandated because they were seeking
9 to get the PMPs adopted in all of the states.
10        And the concern there was, if NABP came
11 out and said that the PMP should be mandated, then
12 those people in the states, particularly attorneys
13 who opposed access to this information based upon
14 privacy restrictions, would kill any effort to
15 implement a PMP.
16        So it was a compromise by the Executive
17 Committee to try and get the PMPs implemented at
18 first, rather than to try and get everything at once
19 and not have the implementation that was needed.
20    Q.  Okay.  So it's your opinion that
21 Albertsons should have adhered to a standard of care
22 of requiring a check of the PMP prior to dispensing
23 every opioid prescription, despite the fact that
24 Texas did not require that of its pharmacists, nor
25 did the NABP recommend requiring that of its

1 pharmacists, correct?
2    A.  Correct.
3    Q.  Do you -- are you aware of whether the
4 NABP, during the time you were executive director,
5 ever published any statement or guidance to
6 pharmacies that the PMP check should be mandatory
7 for every opioid prescription prior to dispensing?
8    A.  I believe at the end of my tenure at NABP,
9 those statements were made.
10    Q.  Okay.  And that would have been in 2020?
11    A.  Probably around 20 -- beginning in 2016 to
12 2020, somewhere in that time.
13    Q.  And in what form of document would that
14 statement have been made?
15    A.  It may have been in an interview with me.
16 It may have been through the PMP committees.
17        What happened is NABP organized all of the
18 PMP directors into an advisory committee, and I know
19 at those meetings -- I'm not sure if they still
20 retained the minutes -- but at those meetings, NABP
21 would make the recommendation that it should be
22 mandated.
23    Q.  Are you aware of any document, industry
24 guidance, source, in 2013 or before then, that would
25 have advised pharmacies that standard of care

1 required them to mandate checking the PMP prior to
2 dispensing every opioid prescription, regardless of
3 whether there's a red flag?
4     A.   Not as a mandate.
5     Q.   You referenced -- on Page 70, you
6 reference pharmacy workload studies and metrics,
7 correct?
8     A.   Yes.
9     Q.   And the number of -- you reference a
10 number of studies that were done.
11         Are you aware of whether any Albertsons
12 pharmacist participated in any of these studies that
13 you've referenced?
14     A.   Specifically, no.  But conceptually, yes.
15     Q.   Okay.  When you say "conceptually, yes,"
16 what do you mean by that?
17     A.   When you would ask me questions prior,
18 where you say, if the data were different, would you
19 get a different answer, and I would say
20 "conceptually, yes," I would say it's highly likely
21 that Albertsons pharmacies that were registered in
22 the states would have received a survey and would
23 have responded to that, but I have no information to
24 say that they did or did not.
25     Q.   Okay.  Do you have an opinion as to how

1 many scripts, on average, it's reasonable for a
2 pharmacist to fill per hour or per day?
3         MR. ELSNER:  Objection.
4         THE WITNESS:  I would say depending upon
5     how much technician help a pharmacist has, that
6     would be a factor to consider, as well as the
7     volume of that pharmacy.
8         I think if I had an opinion, requiring a
9     pharmacist or asking a pharmacist to fill 60
10    prescriptions an hour, which is one
11    prescription every minute, is not a reasonable
12    total.
13        And so if a pharmacist worked an
14    eight-hour shift, 8 times 60 is 480
15    prescriptions.  500 prescriptions a day would
16    not be reasonable.
17        If you give each prescription 20 minutes,
18    and that's on average, not including
19    significantly bad prescriptions, then you're
20    talking about three prescriptions per hour
21    times eight hours.  You're talking 24
22    prescriptions a day.  That's probably not the
23    lower limit of that.
24        So it's probably somewhere between 24 and
25    500, but I don't know what that exact number

1 would be.
2 BY MS. MILLER:
3     Q.   Okay.  And if we break it down by hour,
4 somewhere between three per hour and --
5     A.   60.
6     Q.   -- 60 per hour, okay.
7         Would you agree that opioid prescriptions
8 take a longer time to complete the process for
9 dispensing than noncontrolled substances?
10    A.   Opiates and any controlled substance, yes.
11    Q.   Do you know what the average percentage of
12 opioid prescriptions to noncontrolled substance
13 prescriptions are for a chain pharmacy?
14    A.   I know that the percentage is somewhere
15 between 15 and 20, and there was a number in
16 documents that Albertsons produced that said
17 percentages over 13 percent or around 13 percent is
18 something that would need to be looked at.
19    Q.   So, generally, Albertsons expected that
20 there would be less than 13 percent, correct?
21    A.   That's what the documents seem to say,
22 yes.
23    Q.   Would you agree it's important to
24 understand how many scripts a particular pharmacy
25 fills on average so that the pharmacy can make

1 appropriate staffing decisions?
2     A.   Yes.
3     Q.   Have you ever been involved in determining
4 what appropriate staffing is based on a volume at a
5 pharmacy?
6     A.   As a pharmacist, yes.
7     Q.   And that was at the time you were at Osco?
8     A.   Correct.
9     Q.   Do you recall what those parameters were
10 that you used?
11    A.   Yes.  At Osco, we were filling between 3
12 and 500 prescriptions per day, and that was two
13 pharmacists with limited technician help.
14        So what was unreasonable in terms of
15 staffing is, as a pharmacist, you'd fill 100
16 prescriptions from 9:00 in the morning until 12:00,
17 which is about 30 or 40 per hour, and the request
18 was that we needed a technician on duty just about
19 every hour except during the slow periods when the
20 pharmacist was filling maybe 5 or 10 prescriptions
21 per hour.
22    Q.   You made reference to deposition
23 testimony, and I'm on Page 68, where you talked
24 about Albertsons looking to increase prescription
25 volume as a goal for its pharmacists.

52 (Pages 202 - 205)

Page 206

1    Do you recall that?
2    A.   Yes.
3    Q.   Did you see any documents that you
4  reviewed that provided what the average script time
5  was for pharmacists at Albertsons?
6    A.   Yes.
7    Q.   And what -- do you recall what that was?
8    A.   Two different documents.  There was a
9  deposition for one of the pharmacy managers where
10 they were taking disciplinary action or writing up
11 an action plan for a pharmacist and a technician,
12 who they claimed talked too much, and that it was
13 taking longer than 20 minutes for patients to get
14 their prescriptions.
15    And then there was times in the Albertsons
16 policy that said all prescriptions for patients
17 waiting should be between 15 and 20 minutes.  And if
18 it was called in, I think it was an hour or two.
19 And if it was to be picked up later, it would be
20 four hours.
21    So I saw that was in the policy documents.
22    Q.   And in the policy references, were those
23 references mandates or targets?
24    A.   I guess that depends on Albertsons,
25 whether people are supposed to follow the policies

Page 207

1  or not.
2    I would think if it's a policy, it was
3  mandated.
4    Q.   Okay.  But that's an assumption on your
5  part, correct?
6    MR. ELSNER:   Objection.
7    THE WITNESS:   I think policies generally
8    mean that, that that's what you follow.
9  BY MS. MILLER:
10    Q.   Okay.  That reference that you mentioned
11 to the 15 to 20 minutes per waiting, you didn't find
12 that in Albertsons' -- what you referred to as their
13 formal pharmacy practice policy, did you?
14    MR. ELSNER:   Objection.
15    THE WITNESS:   I believe that was in the
16    policy guidelines, policy, one of those
17    documents.
18  BY MS. MILLER:
19    Q.   Okay.  And the document you're referring
20 to, you would have cited in your report, correct?
21    A.   Yes.
22    Q.   Okay.  You mentioned another document that
23 you saw that referenced what Albertsons' average
24 rate was of scripts per hour; is that correct?
25    A.   It was that -- the deposition where the

Page 208

1  pharmacy manager was saying that Albertsons expects
2  a 20-minute turnaround time on prescriptions.
3    Q.   Okay.  Did you see any data in the
4  documents that you reviewed that actually give the
5  actual script, average script time?
6    A.   No.
7    Q.   If Albertsons' actual script time average
8  per pharmacist was less than five scripts per hour,
9  would you consider that to be a reasonable number?
10    A.   Without seeing the prescriptions, I can't
11 comment if it's reasonable or not, because some
12 prescriptions could take less than 20 and some could
13 take more than 20.
14    Q.   Okay.  But as a general rule, you agree
15 that it's important to look at these numbers to
16 understand appropriate staffing, and that's
17 numbers-based, not looking at specific
18 prescriptions, correct?
19    A.   No.
20    MR. ELSNER:   Objection.
21    THE WITNESS:   But the rule, the general
22    rule that I follow is that every pharmacist
23    should be afforded the time needed to perform
24    the due diligence for each prescription.
25    And that metric, I don't know how you set

Page 209

1    that.  The pharmacist has to do their due
2    diligence and make sure the patient is served.
3  BY MS. MILLER:
4    Q.   You agree if a pharmacy makes a
5  determination that its script counts are high, it's
6  appropriate for the pharmacy to add more staff,
7  correct?
8    A.   Yes.
9    Q.   Okay.  Wouldn't you have to evaluate the
10 script count numbers as part of that evaluation?
11    MR. ELSNER:   Objection.
12    THE WITNESS:   As one part, yes.
13  BY MS. MILLER:
14    Q.   Are you aware of any evidence that
15 Albertsons penalized any pharmacists for refusals to
16 fill opioid prescriptions?
17    A.   I could not find any data that Albertsons
18 maintained of pharmacists refusing to fill, and so I
19 don't know if they ever disciplined either -- oh,
20 I'm sorry.
21    Yes, in one of the depositions, there was
22 a pharmacist who was disciplined because they
23 refused to fill a prescription.  But the action,
24 they said, was because of how the pharmacist
25 communicated with the patient, not the actual act of

53 (Pages 206 - 209)

Page 210

1 refusing to fill.
2      So that was the only thing I saw mentioned
3 in any of the data.
4      Q.  Okay.  Would you agree that standard of
5 care for pharmacists includes treating customers
6 appropriately with respect to opioid prescriptions?
7      MR. ELSNER:  Objection.
8      THE WITNESS:  Yes.
9 BY MS. MILLER:
10     Q.   You've offered opinions regarding an
11 Albertsons store bonus plan on Page 69.  And in your
12 opinion, you have concluded that this store bonus
13 plan applies to pharmacists, correct?
14     A.   That was my understanding, yes.
15     Q.   Okay.  What's that understanding based on?
16     A.   As noted there in the report, the bonus
17 plan that I reviewed, and then that paragraph under
18 the ▮▮▮▮▮▮▮▮▮▮▮
19      If the prescription volume of pharmacy
20 fills increases, pharmacists are eligible to receive
21 increasing bonus payments in the ▮▮▮▮▮▮▮▮▮▮.
22      It was based upon that store bonus plan
23 that I reviewed.
24     Q.  Okay.  If you were to learn that
25 pharmacists were not eligible for this bonus, would

Page 211

1 that impact your opinions regarding Albertsons
2 incentivizing pharmacists with this bonus plan?
3      A.  If the pharmacists weren't pressured or
4 incentivized on script volume, then I might look at
5 that number again, but I'm not sure it would change
6 my opinion.
7      Q.  Okay.  And when you say "pharmacists
8 weren't pressured or incentivized on script volume,"
9 have we already -- outside of this bonus plan, have
10 we already covered the evidence that you were
11 relying on to suggest that pharmacists were
12 pressured or incentivized on script volume?
13      MR. ELSNER:  Objection.
14      THE WITNESS:  I didn't understand that,
15  I'm sorry.
16 BY MS. MILLER:
17     Q.  So I'm trying to understand your
18 qualification, okay.
19      We've gone through -- you've referenced a
20 deposition which discussed a policy seeking
21 pharmacists to have a certain level of script
22 volume, correct?
23     A.  No.  That was filling prescriptions in a
24 certain number of minutes, is what we discussed.
25     Q.  Within a certain number of minutes, okay.

Page 212

1      Other than that document or that
2 deposition testimony document, is there any other
3 evidence that you're pointing to outside of the
4 bonus plan for your opinion that Albertsons
5 incentivized or pressured pharmacists on script
6 volume?
7      MR. ELSNER:  Objection.
8      THE WITNESS:  Whatever is in the report,
9  those documents are what I based it on.
10 BY MS. MILLER:
11     Q.  Okay.  So to the extent that -- well,
12 scratch that.
13      Would you agree with me that a store bonus
14 plan that is not applicable to pharmacists is not an
15 incentive for pharmacists to fill prescriptions?
16      MR. ELSNER:  Objection.
17      THE WITNESS:  I'll try to answer.
18      I think anything that pressures the
19 pharmacist in terms of script volume, whether
20 there is an incentive there, compromises the
21 pharmacist's ability to due diligence.
22      And I guess the other document I would
23 reference is when pharmacists contacted
24 corporate to complain that their technician
25 hours had been cut, even though their

Page 213

1 prescription volume was raised.
2      And the response back from the pharmacy
3 manager at corporate was, "We've been asked to
4 cut costs by 10 percent."
5      And the pharmacy was saying back to them,
6 "I can't do that without adequate help."
7      So there's some pressure there in terms of
8 budget and staffing that was exerted on the
9 pharmacy that was impacting the pharmacists'
10 ability to perform their duties as necessary.
11 BY MS. MILLER:
12     Q.  Okay.  And that's in one circumstance.
13      Do you know whether that pharmacy was
14 located in Tarrant County, Texas?
15     A.  I can't recall.  I'd have to review the
16 deposition.  But I thought it might be.
17     Q.  You have expressed opinions regarding
18 individual doctors starting on Page 77.
19      In this section of the report, you've
20 identified four doctors, Lloyd Weldon, Gregory Skie,
21 Arnold Morris, and Christopher Ince, I don't know if
22 I'm pronouncing that correctly, I-n-c-e.
23     A.  Yes.
24     Q.  Correct?  How did you identify these
25 doctors as a focus of your report?

Page 214

1    A.  I began with a broad general search, in
2  which I use standard search engines to look for
3  "Texas doctors disciplined Texas opioids."
4        From that, I garnered a list of
5  physicians.  I then went to the Texas Medical Board
6  site and did the same type of general search.
7        And then I looked at doctors in the
8  prescribing data and gave the names of these
9  doctors, then, over to Dr. McCann, to run data on
10  how many of those doctors flagged.
11        And that's the chart on Page 79.
12    Q.  Okay.
13    A.  And then subsequent to each of those
14  doctors.
15    Q.  Do you have any documents or notes
16  regarding how many -- how many doctors came up in
17  your search under the "Texas doctors disciplined for
18  opioid" search?
19    A.  I do not.
20    Q.  Would it be fair to assume that it was
21  more than four?
22    A.  Yes.
23    Q.  Do you have any idea how many more than
24  four?
25    A.  I really don't.

Page 215

1    Q.  Okay.  And so then you identified these
2  doctors by looking at Albertsons' dispensing data;
3  is that correct?  You narrowed the list to these
4  doctors?
5    A.  Correct.
6    Q.  Do you -- is it your opinion that these
7  four prescribers represent -- or present a
8  representative sample of Albertsons' dispensing in
9  Tarrant County?
10    A.  I'm representing it presented a sample of
11  the type of activities that Albertsons engaged and
12  didn't engage in that helped me form my opinion.
13    Q.  Okay.  Did you do an assessment as to what
14  percentage of Albertsons' dispensing in
15  Tarrant County were to these doctors?
16    A.  I believe that there's information in the
17  report that talks about that.
18        For example, Page 78, Albertsons filled
19  over 2300 prescriptions at their Tarrant County
20  pharmacies that were written by Weldon from 2006 to
21  '15.  Within each of those, I believe I mentioned
22  specifically how many of those prescriptions were
23  filled in Tarrant County.
24    Q.  Well, you mentioned how many were filled
25  in Tarrant County, and you mentioned 1200 of them

Page 216

1  were opioid prescriptions.
2        But did you do an evaluation as to the
3  percentage those 1200 scripts, what percentage of
4  prescriptions Albertsons dispensed in Albertsons --
5  in Tarrant County?
6        Sorry.  I'm getting tired.
7        MR. ELSNER:  Objection.
8        THE WITNESS:  For that individual doctor
9    or total?
10  BY MS. MILLER:
11    Q.  Correct, yeah.
12    A.  No.
13    Q.  What's the percentage that Albertsons
14  dispensed to this doctor, in comparison to its
15  dispensing in Tarrant County?
16    A.  I didn't do that one.
17    Q.  Okay.
18    A.  Or Dr. McCann wasn't asked to do that for
19  me.
20    Q.  So did you employ any type of methodology,
21  statistical analysis, to determine if this was a
22  representative sample of Albertsons' dispensing in
23  Tarrant County?
24        MR. ELSNER:  Objection.
25        THE WITNESS:  I'm sorry.  I don't

Page 217

1    understand the question.
2  BY MS. MILLER:
3    Q.  Did you employ any methodology to suggest
4  that this Dr. Lloyd Weldon is representative of
5  Albertsons' dispensing in Tarrant County?
6    A.  The answer is yes.
7    Q.  Okay.  And what methodology did you use?
8    A.  The methodology I described where I
9  identified those doctors, and I looked at how
10  prevalent those doctors' prescribing were, and the
11  sample prescriptions that Albertsons provided.
12    Q.  Okay.  And so in terms of how prevalent
13  those prescriptions were, are you saying that you
14  did an evaluation and concluded that it was a
15  significant number of prescriptions that Albertsons
16  was dispensing to this doctor as compared to other
17  doctors?
18    A.  I'm testifying that it was a significant
19  number.
20        If you'd turn to Page 79, it says, "For
21  instance, in 2009, Albertsons Store 41 filled an
22  oxycodone," and then it says that there were 23
23  pills per day.  And it also gives totals later of
24  how many prescriptions were dispensed or dosage
25  units in Tarrant County per population.

55 (Pages 214 - 217)

Page 218

1    So I did that analysis for these
2 prescribers.
3    Q.  Okay.  So you compared -- okay.  I think I
4 understand your answer.
5    Did you do any evaluation as to whether
6 there were any prescriptions that were dispensed by
7 Albertsons after Mr. Weldon was disciplined?
8    A.  I think that's mentioned in the report as
9 well, that some prescriptions were.
10    Q.  Okay.  And can you refer to me?
11    So he was disciplined in 2013, correct?
12    A.  Well, it started before that.
13    Albertsons, on Page 78, Albertsons filled
14 over 2300 written by Weldon from 2006 to '15.  I
15 think he was beginning to be disciplined, on the
16 prior page, on 2002, 2006, 2007, and 2010.
17    So those disciplinary actions were all
18 pending.  And in the time period, Albertsons
19 dispensed, as I mentioned in the report, 2300
20 prescriptions.
21    Q.  Okay.  But it was the 2013 order which
22 modified his DEA license, correct?
23    A.  He was -- to eliminate his ability to
24 prescribe Schedule II.
25    But prior to that, in 2012, filed against

Page 219

1 Weldon for prescribing opioids or benzodiazepines,
2 excessively prescribed controlled substances,
3 including quantities in improper combinations.
4    So there were disciplinary actions taken
5 against this prescriber since 2002 that spoke to
6 every one -- spoke to some of the red flags, and
7 information should have been known to Albertsons.
8    Q.  Okay.  Whether you say this information
9 should have been known to Albertsons, how should
10 Albertsons have received that information?
11    A.  The information is sent out to the
12 pharmacies and to corporate by the medical board and
13 sometimes in the pharmacy board newsletters.
14    Q.  Do you have any knowledge that these
15 actions prior to 2013 were, in fact, sent from the
16 Texas Medical Board to Albertsons?
17    A.  I don't have that information.  I just
18 comment on what the process usually is for the
19 medical and pharmacy boards to get the information
20 out.
21    Q.  Do you know whether or not that is the
22 process for the Texas Medical Board?
23    A.  Yes.
24    Q.  Okay.  Do you -- you mentioned that
25 prescriptions were filled from 2006 to 2015, but

Page 220

1 then you say separately that there were 1200 opioid
2 prescriptions.
3    Did you do any analysis to see whether
4 opioid prescriptions were filled after 2013?
5    A.  I can't recall that data.
6    Q.  Okay.  Okay.  The next prescriber is
7 Gregory Skie.  And in 2020, he was disciplined and
8 required to surrender his DEA license, correct?
9    A.  Correct.
10    Q.  Okay.  Prior to 2020, the Texas Medical
11 Board allowed him to keep his DEA license, correct?
12    A.  He was -- they allowed him to keep it, but
13 he was disciplined multiple times.
14    Q.  Okay.  And same answer [sic].
15    Do you have any information or evidence
16 that Albertsons received information from the Texas
17 Medical Board regarding these disciplinary actions
18 prior to 2020?
19    A.  No.
20    Q.  Do you know what the process is at
21 Albertsons for pharmacists to look at a prescriber's
22 DEA license before dispensing?
23    A.  The only information I have were two bits
24 of information that I gleaned from the data and from
25 the information.

Page 221

1    I know a pharmacist reported problems with
2 a physician and possible fraudulent prescribing to
3 corporate.  And there was no action for three to
4 four months.
5    It was an electronic prescription.  And
6 the pharmacist was concerned that the electronic
7 prescribing information or validation of the
8 physician had been compromised.
9    So I don't know how that was reported or
10 what happened.
11    The other information was the significant
12 number of wrong DEA numbers that existed in the
13 Albertsons data, which indicated that either those
14 numbers were being entered incorrectly or they
15 weren't being checked before the pharmacists
16 actually dispensing the prescriptions.
17    Q.  Okay.  I saw reference that the DEA
18 numbers were missing --
19    A.  Missing.
20    Q.  -- from the data.
21    But do you have an opinion that they were
22 entered incorrectly?
23    A.  I think within that data, they mention
24 that some of the DEA numbers, there wasn't the
25 proper identification of the physician.

56 (Pages 218 - 221)

Page 222

1     And, for example, I think it was Lloyd
2 Weldon, where they had different names and
3 different -- just different names for the same DEA
4 number.
5     Q.  Okay.  The dispensing data, so just so I'm
6 understanding your opinion, you're referencing that
7 the dispensing data that Dr. McCann reviewed, in
8 that dispensing data category, it was missing the
9 DEA number for a number of physicians, correct?
10     A.  And also then for doctors, if they could
11 not identify because there were multiple names for
12 the same DEA number, which I would consider an
13 incorrect DEA number.
14     Q.  Did you do any evaluation as to whether
15 there was any patterns in the data that was missing
16 the DEA numbers by year?
17     A.  No, and there was a whole year of data
18 that Albertsons lost for some reason, so I wasn't
19 able to look at that data year.
20     Q.  Okay.  Do you have any understanding as to
21 how Albertsons' historical dispensing data has been
22 stored and collected?
23         MR. ELSNER:  Objection.
24         THE WITNESS:  I know -- all I know is two
25 facts; that it was stored in some sort of

Page 223

1 central warehouse, and then Albertsons lost a
2 whole year's worth of dispensing data.
3     But I'm not sure why they lost that
4 dispensing data.
5 BY MS. MILLER:
6     Q.  Okay.  Are you familiar with Albertsons'
7 history in that there has been many changes to the
8 company over time, including mergers with Safeway,
9 divestitures of pharmacy divisions?
10     Are you familiar with that history?
11     A.  Yes.  I mean, from an outside observer's
12 perspective.
13     Q.  Okay.  One of my questions is, with
14 respect to the dispensing data that is missing, the
15 dispensing data that was missing was from around
16 2010-2011, somewhere in that time period.
17     So I would refer to that as historical
18 data.  It's not the active data that Albertsons was
19 using on its current pharmacy system.
20     I'm not asking you to comment on that.
21 Just that's what I'm referring to.
22     And, again, you've testified you're not
23 familiar with what Albertsons' pharmacy systems
24 consist of, correct?
25     A.  Correct.  But the question you asked me is

Page 224

1 do I know how Albertsons stores its data.  So I
2 thought that would refer to the historical data,
3 but ...
4     Q.  Okay, yes.  Are you -- are you familiar
5 with Albertsons' requirements for recording DEA
6 license numbers into its pharmacy systems?
7     A.  The actual process, no.  But I know the
8 requirement is that for all controlled substances, a
9 DEA number must be present, and it must be correct.
10     Q.  Okay.  What I'm getting at is you haven't
11 evaluated the dispensing data for that section of --
12 where the DEA number is missing, you haven't
13 evaluated whether that data came from historical
14 data storage or from Albertsons' current pharmacy
15 information system, correct?
16     A.  I haven't done that, but it's still a
17 violation of the Controlled Substance Act not to
18 have a DEA number for that prescription.
19     Q.  That violation of the Controlled Substance
20 Act to not have that information --
21     A.  Readily retrievable.
22     Q.  And for how far back?
23     A.  It's up to the DEA.
24     Q.  Okay.  So you don't have an opinion as to
25 how far back Albertsons needs to store the DEA

Page 225

1 information, correct?
2     A.  My opinion is that it shouldn't be
3 missing, but beyond that, no.
4         MS. MILLER:  Okay.  The -- I lost track of
5 where I was going.  Give me a second.  Got off
6 on a sidetrack.
7 BY MS. MILLER:
8     Q.  I'm going to go back to starting with
9 Dr. Weldon.
10     Would you agree with me that although
11 Dr. Weldon was disciplined, that does not
12 necessarily mean that he did not treat legitimate
13 patients with legitimate medical need?
14         MR. ELSNER:  Objection.
15         THE WITNESS:  I can't agree with that
16 statement.
17 BY MS. MILLER:
18     Q.  So you do not agree that it's possible
19 that Dr. Weldon had patients with legitimate medical
20 needs?
21         MR. ELSNER:  Objection.
22         THE WITNESS:  I have no way to
23 substantiate that.  I can only go by the
24 information that showed that Weldon was
25 disciplined regarding controlled substances,

57 (Pages 222 - 225)

Page 226

1  and any controlled substance prescription that
2  Weldon issued would have raised a red flag
3  simply because of his past history and his
4  prescribing patterns.  And, therefore, those
5  needed to be resolved.
6      And whether they were legitimate or not,
7  beyond that, I have no way to comment on that.
8  BY MS. MILLER:
9      Q.  And your basis that that would have raised
10 a red flag is based on an assumption that Albertsons
11 would have had that information regarding those
12 disciplinary actions, correct?
13     A.  That Albertsons should have had that
14 information.
15     Q.  And if I were to ask that same question
16 with respect to the other prescribers, that would be
17 the same answer, correct?
18     A.  Yes.
19     Q.  I want to go to Page 4 of your report.
20     The third bullet point down, you express
21 an opinion that "Albertsons failed to adequately
22 staff their pharmacies to meet requirements of the
23 CSA and state law."
24     What is that opinion based on?
25     A.  Both in the CSA and within Texas law, it

Page 227

1  says that there should be adequate staffing to
2  ensure that the requirements of the CSA are met and
3  that the closed system remains a closed system.
4      Q.  Okay.  What is the basis of your opinion
5  that Albertsons failed to adequately staff its
6  pharmacies?
7      A.  The basis for that are the hard data that
8  showed how many prescriptions had red flags, how
9  many prescriptions had multiple red flags, and how
10 those prescriptions and the flags were not
11 identified, resolved, or documented.
12     Based upon that data, that's where I draw
13 that conclusion.  And, again, deposition of the
14 pharmacists that were saying that they didn't have
15 the staffing that they needed or that the staffing
16 was being cut for budgetary purposes.
17     Q.  The data that you're -- we're referencing,
18 how many prescriptions had red flags and how many
19 had multiple red flags, you're referring to the red
20 flag calculations that were provided by Dr. McCann,
21 correct?
22     A.  Correct.
23     Q.  In this bullet point, you have identified
24 red flags commonly recognized in pharmacy practice
25 include, and you've outlined a list of bullet

Page 228

1  points, correct?
2      A.  Correct.
3      Q.  Okay.  I have the same question.  In this
4  section where you've identified red flags that are
5  commonly recognized in practice, would you agree
6  with me that the language in these red flags are a
7  little bit different than the language that you have
8  presented in the red flags you provided to
9  Dr. McCann in this case?
10     A.  The wording may be somewhat different, but
11 it doesn't change the red flag and doesn't change
12 what the red flag means.
13     Q.  Okay.  And it's stating a general concept
14 of a red flag.
15     So taking the first one, "Patient is
16 traveling long distances to their pharmacy or
17 prescriber," correct?
18     A.  Correct.
19     Q.  All right.  And you identify this as a
20 commonly recognized flag in pharmacy practice,
21 correct?
22     A.  Correct.
23     Q.  Right.  But you don't identify that that
24 is -- what's commonly recognized is a limit of
25 25 miles within this red flag, correct?

Page 229

1      MR. ELSNER:  Objection.
2      THE WITNESS:  Correct, because this was
3  simply a summary, and I knew that I was going
4  to discuss that in greater detail later in the
5  document.
6  BY MS. MILLER:
7      Q.  Is it your opinion that it is commonly
8  recognized in pharmacy practice that patients
9  traveling within 25 miles from center of ZIP code to
10 center of ZIP code is a red flag?
11     A.  Yes.
12     Q.  Okay.  Are you aware that Anna Lembke has
13 been retained to offer expert opinions in this case?
14     A.  I'm sorry.  Who?
15     Q.  Anna Lembke.
16     A.  No.
17     Q.  You have not -- you have not reviewed her
18 expert report in this case, I take it?
19     A.  No.  No, I have not.
20     Q.  Okay.  Are you aware she has expressed
21 opinions that various entities have collaborated
22 with drug manufacturers such as Purdue by receiving
23 money from them?
24     A.  I have no information on what she's
25 saying.

58 (Pages 226 - 229)

Page 230

1   Q.  Okay.  Do you agree with her opinion that
2 entities that receive money from pharmacies or
3 distributors of opioids can be -- I lost my word.
4 I'm tired.
5       Do you agree -- would you agree with an
6 opinion that entities that receive money from
7 industry groups, such as manufacturers or
8 distributors of opioids, could be considered
9 unreliable sources of information, based on the fact
10 that they've received money from those
11 organizations?
12   A.  I cannot agree with a blanket statement
13 like that.  And, in fact, it would even impugn
14 Albertsons who receives rebates from manufacturers
15 of opioids for the drugs they dispense.
16      So that's a statement that I do not agree
17 with at all.
18   Q.  Okay.  And, in fact, NABP received money
19 from manufacturers and distributors of opioids over
20 the years as well, correct?
21      MR. ELSNER: Objection.
22      THE WITNESS:  They only received one
23 grant, and that grant then was given directly
24 to the states.
25      Any other funding from manufacturers is

Page 231

1 used for educational programming that's
2 overseen by the American Council on Pharmacy
3 Education, according to their guidelines.  And
4 none of that money makes it into NABP or
5 influences NABP.
6 BY MS. MILLER:
7   Q.  Okay.  That's my question.
8      And, in fact, manufacturers and
9 distributors within the industry, as we have seen in
10 the documents today, worked with NABP and other
11 organizations in developing educational materials
12 for pharmacies and pharmacists, correct?
13      MR. ELSNER: Objection.
14      THE WITNESS:  Yes.
15 BY MS. MILLER:
16   Q.  Would I be correct in understanding that
17 you would not agree that the fact that manufacturers
18 and distributors participated in the development of
19 those educational tools renders them unreliable?
20      MR. ELSNER: Objection.
21      THE WITNESS:  Because it was overseen and
22 managed by NABP, we wouldn't have allowed any
23 impropriety.  So I would agree that under
24 NABP's control, the answer is no.
25      They should be -- they would be reliable

Page 232

1 information, as presented by NABP.
2 BY MS. MILLER:
3   Q.  A couple questions regarding the drug
4 buprenorphine.
5      Am I correct in understanding that
6 buprenorphine is a drug that one of its uses is for
7 the treatment of opioid use disorder?
8      MR. ELSNER:  Objection, scope, foundation.
9      THE WITNESS:  I believe so, yes.
10 BY MS. MILLER:
11   Q.  Would you agree that it's important for
12 patients who use buprenorphine for treatment of
13 opioid use disorder to adhere to their treatment
14 plan?
15   A.  Yes.
16   Q.  And it would be important for patients who
17 use buprenorphine to continue to fill their
18 prescriptions on a timely basis in order to adhere
19 to their treatment plan?
20   A.  Yes.
21      MS. MILLER:  Why don't we take a quick
22 five-minute break.  I'm kind of wrapping up my
23 notes here.
24      THE VIDEOGRAPHER:  Off the record at 2:16.
25

Page 233

1      (Whereupon, a recess was taken
2       from 2:16 p.m. to 2:28 p.m.)
3      THE VIDEOGRAPHER:  Back on the record at
4 2:28.
5      MS. MILLER:  Okay.  I have just a
6 few minutes left.  I want to go back to a
7 question I forgot to ask on the red flags.
8      Do you have the list of red flags handy?
9      THE WITNESS:  Is that Exhibit 6?
10      MS. MILLER:  It wasn't 6.
11      MR. ELSNER:  13 maybe?
12      MS. MILLER:  Or you could use your report
13 if you want.
14      MR. ELSNER:  11.
15      MS. MILLER:  11, thank you.
16 BY MS. MILLER:
17   Q.  Okay.  Specifically referring to Red Flag
18 Number 5, which is "Patient was dispensed an opioid,
19 benzo, and a muscle relaxer for overlapping days of
20 supply," and Red Flag 6, "Patient was dispensed an
21 opioid of benzo and a muscle relaxer on the same day
22 and all the prescriptions were written by the same
23 prescriber," would you agree with me that if a
24 prescription was triggered by either of these red
25 flags, 5 or 6, it would automatically be triggered

59 (Pages 230 - 233)

Page 234

1 by Red Flag Number 7, which is "Patient was
2 dispensed an opioid and a benzo within 30 days of
3 one another"?
4     A.  I don't believe that's the way McCann
5 calculated that.  I believe that he looked at the
6 red flags and how they applied and then tried to
7 avoid the deduplication.  But I'm not sure how that
8 analysis was done.
9     Q.  Okay.  Well, that's a different question.
10        So on my question, would you agree with me
11 that if a set of prescriptions triggered Red Flag 5
12 and Red Flag 6, they would automatically trigger Red
13 Flag 7 as well?
14     A.  No.  In the context of when the final
15 assessment was done, if it was only an opioid and a
16 benzo in 5 and 6, that would trigger 7.
17        If there were three prescriptions, like in
18 5 or 6, then depending upon the circumstances, it
19 would just trigger 5 or 6.
20     Q.  Okay.  So if a patient was dispensed an
21 opioid, a benzo, and a muscle relaxer, is it your
22 testimony that it would not be -- it would not be
23 included in the red flag calculation Number 7, for
24 Number 7?
25     A.  If they were all on the same day?  And

Page 235

1 you're talking 5 or 6?
2     Q.  Well, so 5 is for overlapping days of
3 supply; 6 is on the same day.
4     A.  Yeah.  Again, I would -- I'm not sure how
5 Dr. McCann calculated that.
6     Q.  Okay, yeah.  Well, that's a different
7 question.
8     A.  Yeah.
9     Q.  But based on the way these are written,
10 would you agree with me that if a patient was
11 dispensed an opioid, a benzo, and a muscle relaxer
12 on the same day, that set of prescriptions would
13 trigger Red Flag 5, Red Flag 6, and Red Flag 7?
14     A.  Yeah, I don't know how to respond.
15     Q.  Just by the way they're written, right?
16        If someone had both an opioid and a benzo
17 that were prescribed on the same day or
18 overlapping days of supply, that would trigger Red
19 Flag 7, correct, because they're within 30 days of
20 each other?
21        Do you agree with that?
22     A.  I guess, yes.
23     Q.  Okay.  And so, therefore, if they were
24 prescribed an opioid, benzo, and a muscle relaxer,
25 that includes an opioid and a benzo within 30 days

Page 236

1 of each other, correct?
2        It's just the addition of a muscle relaxer
3 on top of it?
4     A.  Yeah, I'm not -- I would have to look at
5 the data just to see how that was netted out.
6     Q.  So sitting here today, you don't know
7 whether Dr. McCann excluded calculations -- when he
8 was calculating what hit on multiple red flags, you
9 don't know whether he excluded prescriptions that
10 would have triggered 5, 6, and 7 all at the same
11 time?
12        MR. ELSNER:  Objection.
13        THE WITNESS:  Yeah, my understanding is
14 that if there are multiple red flags in a
15 prescription, that they would be noted and
16 triggered.
17        Now, whether or not any red flags were
18 only counted once because they were -- touched
19 upon the others, that I'm not sure.  But any
20 red flag that would be in those data would be
21 counted.
22        So if there was a benzo and opioid, that
23 would count.  If there was a benzo, opioid, and
24 a muscle relaxant, then that would be a red
25 flag as well.

Page 237

1 BY MS. MILLER:
2     Q.  You've made reference to the number of red
3 flags or number of prescriptions in opioids
4 dispensing data that hit on multiple red flags.
5        And you provided a percentage that was
6 given to you by Dr. McCann, correct?
7     A.  Correct.
8     Q.  Okay.  But sitting here today, you don't
9 know whether Dr. McCann excluded prescriptions that
10 hit on Red Flag 5, 6, and 7 together to reference
11 that as multiple red flags?
12        MR. ELSNER:  Objection.
13        THE WITNESS:  I would say I think that
14 they did hit on those and included those,
15 thinking about it more now.
16 BY MS. MILLER:
17     Q.  Okay.  You would agree with me that the
18 underlying concept for a prescription with these red
19 flags is essentially the same.  It's just with a
20 little bit different nuance to it, correct?
21     A.  No.  I would say that each red flag poses
22 its own, an additional risk.  So every time there's
23 another multiple -- another red flag that adds to
24 the multiple, you've increased the danger to the
25 patient and the possibility of diversion of that

60 (Pages 234 - 237)

Page 238

1 prescription.
2    Q.  Okay.  So if we were to take Red Flag
3 Number 6 as an example, "Patient was dispensed an
4 opioid, a benzodiazepine, and a muscle relaxer on
5 the same day, and prescriptions were written by the
6 same prescriber," it's your opinion that if this
7 were the only circumstances of this prescription, it
8 was these three prescriptions issued on the same day
9 by the same prescriber, that that should count, in
10 calculation, as multiple red flags, as opposed to
11 one red flag?
12    A.  Correct.
13    Q.  Okay.  In your list of red flags as
14 reflected in Exhibit 11, you do not identify the use
15 of discount cards as a red flag in that list,
16 correct?
17    A.  Correct.
18    Q.  In all the authorities and the examples of
19 red flags that we've looked through today, would you
20 agree that none of those examples identified the use
21 of discount cards as a red flag?
22    MR. ELSNER:  Objection.
23    THE WITNESS:  I think some of those
24    documents said "and other information."  So
25    discount cards would fall maybe in the "other

Page 239

1    information."
2 BY MS. MILLER:
3    Q.  Okay.  But you didn't -- you didn't
4 identify any red flags that specifically identified
5 discount cards as a red flag?
6    A.  Correct.
7    MS. MILLER:  Okay.  I think those are all
8 the questions that I have for you.
9    THE WITNESS:  Thank you.
10    MR. ELSNER:  I just have a few follow-up
11 questions.
12    EXAMINATION
13 BY MR. ELSNER:
14    Q.  So, Mr. Catizone, you were asked a few
15 questions about some prior testimony that you gave
16 in the CT4 San Francisco litigation.
17    Do you recall that?
18    A.  Yes, sir.
19    Q.  Okay.  And it related to an answer to a
20 question that you gave about Albertsons' systems.
21    At the time that you gave that testimony,
22 had you done any review or analysis of any of the
23 policies and procedures at Albertsons?
24    A.  No.
25    Q.  Had you looked at their dispensing-related

Page 240

1 systems, any programs that they had with respect to
2 due diligence related to controlled substances, when
3 you offered that statement?
4    A.  No, sir.
5    Q.  Okay.  What about the review of dispensing
6 data and notes and the resolution of red flags?
7    Did you have access to any dispensing data
8 or notes, resolutions, or any of that type of data
9 at the time that you made this statement?
10    A.  No, sir.
11    Q.  Okay.  I'd like to have you pull out
12 Exhibit 20.  And this is the excerpt of the
13 transcript that you were shown.
14    I want to show you a part of the
15 transcript that you were not shown.
16    If you'd turn to Page 61 and Line 12, you
17 were specifically asked a question:
18    "Okay.  But if you were to give an opinion
19    against Albertsons, you would say that at least
20    when it comes to systems, they're doing okay?"
21    And your answer was:
22    "I'd have to see what I was asked to
23    review and what evidence was presented before I
24    can make an opinion.  And I don't want to
25    present an opinion before looking at the

Page 241

1    information, sir."
2    Was that the answer that you gave?
3    A.  Yes, sir.
4    Q.  Okay.  Do you stand by that answer today?
5    A.  Yes, sir.
6    Q.  Since you gave this testimony in 2022,
7 have you now had the opportunity to review
8 Albertsons' systems as well as their policy and
9 procedures and their dispensing data related to
10 controlled substances in Tarrant County?
11    A.  The policies, procedures, dispensing data,
12 and whatever systems were referenced in the
13 documents, but not the actual systems that
14 pharmacists would see or interact with.
15    Q.  Okay.  And so the opinions that you're
16 offering today, are those based on your review of
17 Albertsons' systems that you didn't have the chance
18 to review at the time that you made this statement
19 in 2022?
20    A.  Yes.
21    Q.  Okay.  I want to turn now a little bit to
22 some of the questions about the red flags because I
23 got confused in some of the vernacular.
24    And you can -- maybe it's easiest just to
25 pull out your report, which is Exhibit 1.  And if

61 (Pages 238 - 241)

1 we'd turn to those flags, maybe we start with
2 distance.
3      If you look at Page -- let's start with
4 35. So you describe the flags of distance related
5 to pharmacy distance and prescriber distance as
6 being traveling more than 25 miles.
7      Is that the flag that you described?
8      A.  Yes, sir.
9      Q.  Is that flag discretionary in the sense
10 that one pharmacist could think it's 23 miles and
11 another pharmacist think it's 100 miles, in your
12 opinion?
13      A.  No.
14      Q.  And when it comes to a prescription which
15 is presented for 25 miles or more, what is your
16 expectation of what the pharmacist should do when
17 presented with a prescription like that?
18      A.  The best way I can explain it is to give a
19 clinical example, and why that there's not a
20 discretion whether or not a pharmacist disagrees
21 with that.
22      If I have a prescription that's written
23 for a child and that prescription is an adult dose
24 that I know would harm or kill that child, I have no
25 discretion to say "I disagree with pharmacists who

1 won't fill this prescription," and fill that
2 prescription.
3      That same vigilance and due diligence has
4 to be attached to a controlled substance
5 prescription.
6      So when the pharmacist sees a 25-mile
7 trigger, the pharmacist has to stop and investigate
8 that prescription.
9      There's no discretion to say, "I think it
10 should be 100.  I think it should be 50."
11      Based upon the information I've seen, the
12 evidence experience, 25 miles is that indicator that
13 draws the pharmacist, just like a dose that could
14 cause harm to a child.  And it should be
15 investigated and analyzed.
16      Q.  Okay.  And should the analysis of how that
17 prescription is resolved be documented?
18      A.  Yes.
19      Q.  Okay.  And you're not suggesting that
20 every prescription that -- for which a patient had
21 to travel 25 miles to a pharmacy is automatically a
22 diverted prescription, right?
23      A.  Correct.
24      Q.  Okay.  You're saying that it could be
25 diverted.  It's simply a red flag that needs to be

1 investigated; is that fair?
2      A.  Yes, sir.
3      Q.  Okay.  So it could be that the
4 prescription is evidence of actual diversion, or it
5 could be that the prescription could be resolved?
6      A.  Yes, sir.
7      Q.  Okay.  And if a prescription is resolved
8 and then filled, what is your expectation of what
9 the pharmacist should do before filling that
10 prescription?
11      A.  There should be clear documentation of
12 what the red flag was, how the pharmacist resolved
13 it, and any other additional notes the pharmacist
14 thinks is important.
15      Q.  Okay.  And that documentation requirement,
16 is that a pharmacy practice standard?
17      A.  It's referenced in state and federal law
18 that says there must be appropriate recordkeeping
19 for any controlled substance that's distributed and
20 dispensed.  And it's a standard of care in terms of
21 the documentation of what's happened with the
22 patient and that patient's care.
23      Q.  And does the DEA give guidance like that
24 on documentation?
25      A.  They mention that it's a requirement, and

1 then it's deferred to the standards of care.  And
2 the state practice acts is to actually define what
3 that might be.
4      Q.  Do you know whether Albertsons has a
5 policy for its employees as to whether or not they
6 should document a prescription that presents a red
7 flag?
8      A.  In the documents I reviewed, one of the
9 tenets of Albertsons' policies was document,
10 document, document.  In fact, one particular
11 reference said that, "Document, document, document."
12      There was no equivocation about whether or
13 not documentation should happen or whether it was
14 important or a policy.
15      Q.  And what about in reviewing a state
16 prescription monitoring program?
17      Is there a policy and procedure at
18 Albertsons that when a pharmacist reviews those
19 programs, that they should document the results of
20 that review?
21      A.  Yes, the policy said that once an issue is
22 identified and resolved with the PMP, it should be
23 documented in the patient's profile or record.
24      Q.  And when a pharmacy, like Albertsons, has
25 a policy and procedure regarding documentation or

1 any of the red flags, does that itself reflect a
2 standard of care?
3      A.  I believe it reflects a standard of care
4 and, to a certain extent, a mandate.
5         If the policy at the pharmacy is you can't
6 steal or you can't use controlled substances for
7 personal use.  And I say "I'm not going to adhere to
8 that policy," I'm probably terminated, fired, or
9 arrested.
10         So I would imagine if it's a policy,
11 there's a mandate or a requirement and a standard
12 that Albertsons or others are holding their
13 employees to.
14      Q.  And, in fact, the Albertsons policy with
15 respect to distance is actually shorter than
16 25 miles, correct?
17         MS. MILLER:  Object to form.
18         THE WITNESS:  Correct.
19 BY MR. ELSNER:
20      Q.  What is the -- do you recall what
21 Albertsons' policy is with respect to distance?
22      A.  15 to 20 miles.
23      Q.  Okay.  And that's actually less than --
24 stricter than the red flag that you've -- that's
25 reflected in the DEA policies and procedures in

1 cases and also reflected in your opinions here,
2 true?
3      A.  True.
4      Q.  Okay.  But you still ran your analysis
5 based on 25 miles, not the stricter Albertsons
6 policy?
7      A.  Correct.  Dr. McCann was asked to run the
8 data.
9      Q.  Okay.  And you instructed him in how to
10 run that --
11      A.  Correct.
12      Q.  -- is that correct?
13      A.  Correct.
14      Q.  Okay.  What about with respect to cash?
15         I know that there was a question about
16 whether the documentation has to reflect cash with
17 insurance.
18         If a patient pays cash for a controlled
19 substance prescription, is that a red flag, in your
20 opinion?
21      A.  Yes.
22      Q.  Always?
23      A.  Yes.
24      Q.  Okay.  I want to have you take a look at
25 Exhibit 6.  And I -- this is the red flags that

1 were being exchanged between you and the
2 Cardinal Health official in 2014.
3         And just on the page that says Draft
4 Number 2, Pharmacist Red Flags, under Number 5, it
5 says, "Large percentage of controlled substance
6 prescriptions are paid for in cash or the patient
7 uses insurance."
8         Is that right?
9      A.  Yes, sir.
10      Q.  Okay.  And I want to show you one that you
11 weren't shown, which is on the very last page.  And
12 this is the -- if we move three pages before it,
13 Prescription Drug Trafficking and Abuse Trends,
14 Pharmacy Diversion Awareness Conference in
15 Louisville, Kentucky, on November 16th and 17th,
16 2013, a presentation by Alan Santos.
17         Are you with me?
18      A.  Yes, sir.
19      Q.  Okay.  On the very last page, it describes
20 a red flag of cash.
21         How is it described in the last page?
22      A.  "Many customers paying cash for their
23 prescriptions."
24      Q.  Okay.  And so -- and did Albertsons have a
25 policy with respect to cash --

1      A.  Yes, sir.
2      Q.  -- as to whether that was a red flag?
3      A.  Yes.
4      Q.  And what was the Albertsons position?
5      A.  I believe it was cash or paying for --
6 using cash when they have insurance.
7      Q.  Okay.  Let's make sure we've got it
8 exactly right.
9         If you look on Page 51.
10      A.  It says, "Cash prescriptions or patient
11 that asks to pay cash rather than use insurance
12 card."
13      Q.  Okay.  So even Albertsons' policy, is it
14 true that cash was a red flag?
15      A.  Yes.
16      Q.  And your expectation with the red flag of
17 cash would have been what?
18      A.  Again, the prescription process should be
19 halted, and the pharmacist analyze the reason and
20 rationale for the patient using cash, when 90-some
21 percent of patients have insurance to cover their
22 prescription medications.
23      Q.  And you were asked a series of questions
24 about some of the flags which require the collection
25 of multiple prescriptions.

63 (Pages 246 - 249)

1        Do you know what I'm referring to?

2    A.   Yes, sir.

3    Q.   Okay.  And so if we look at a couple of

4 examples of those, I think under "Doctor Shopping"

5 is an example, as "A patient dispensed an opioid

6 prescription with overlapping days' supply written

7 by two or more prescribers," is one example.

8        Is that a red flag?

9    A.   Yes.

10   Q.   Also, "Pharmacy Shopping.  A patient was

11 dispensed opioid prescriptions with overlapping days

12 of supply at two or more pharmacies."

13       Is that right?

14   A.   Yes, sir.

15   Q.   Why is it a red flag for a patient

16 to go to multiple doctors and get the same

17 prescription, or to go to multiple pharmacies to

18 fill opioid prescriptions?

19   A.   Because it's an individual that's trying

20 to circumvent the system and obtain a supply of

21 controlled substances and breach the closed

22 distribution system.  And it increases the

23 possibility that those medication could be diverted

24 and sold on the street or misused by the patient.

25   Q.   Okay.  So when you encounter a patient

1 where you see in the second prescription that, oh,

2 boy, this same patient has seen two or more doctors

3 to get an opioid prescription, and it triggers that

4 red flag that they might be engaged in diversion; is

5 that right?

6    A.   Yes, sir.

7    Q.   Okay.  Are both of those prescriptions

8 evidence of that potential diversion?

9    A.   Yes.

10   Q.   Okay.  And so did you intend for

11 Dr. McCann to count both of those prescriptions?

12   A.   Yes.

13   Q.   Why?

14   A.   Even though the pharmacist may have not

15 recognized that first prescription was a red flag or

16 may not be a legitimate prescription, the

17 retroactive analysis and the analysis that's done

18 before any other prescriptions are filled indicate

19 that that first prescription is critical to making

20 that determination.

21       And once it was determined that there was

22 a red flag that was caused, or part of that first

23 prescription, it has to be counted as a red flag

24 because it's not a legitimate prescription, or it's

25 not free of red flags from that point forward.

1    Q.   Okay.  And what is your expectation of

2 what the pharmacist should do when they encounter

3 that second prescription, and it's clear to them

4 that this patient has gone to multiple doctors to

5 obtain that prescription, obtain the same opioid

6 prescription?

7    A.   Those prescriptions should be documented

8 in the records saying that this prescription was

9 filled and subsequently the patient had -- this

10 prescription was filled, this is the red flag that

11 those prescriptions constitute, and here is how I

12 resolved those red flags, and here's the

13 recommendation or here are the next steps on what we

14 need to do with that patient.

15   Q.   Okay.  And does this same type of analysis

16 apply to the other prescriptions in your red flags

17 that require multiple prescriptions?

18   A.   Yes, sir.

19   Q.   Okay.  And the last thing I wanted to ask

20 about, you were asked some questions about some of

21 the disciplined prescribers who had scripts filled

22 at Albertsons.

23       You were asked about whether you had done

24 some kind of statistical analysis about whether --

25 the number of prescriptions they wrote and how that

1 compared to all the prescriptions filled by

2 Albertsons in Tarrant County.

3       Do you remember that?

4    A.   Yes, sir.

5    Q.   So with respect, let's just say, with

6 Dr. Weldon --

7    A.   What page?

8    Q.   Let me find it.

9       So if we look at Page 80, in the second

10 paragraph under Dr. Skie, Albertsons pharmacies in

11 the county filled over 1,500 prescriptions written

12 by Dr. Skie, and over 1,000 of them were for

13 opioids.

14       So just with respect to him and all of the

15 other prescribers that you describe here, do

16 prescriptions that Albertsons dispensed in

17 Tarrant County for these disciplined doctors pose a

18 risk to the public?

19   A.   Yes.

20       MS. MILLER:  Object to form.

21 BY MR. ELSNER:

22   Q.   Do the prescriptions that Albertsons

23 dispensed in Tarrant County from these disciplined

24 prescribers, could they contribute to diversion?

25   A.   Yes.

Page 254

1     MS. MILLER:  Object to form.
2 BY MR. ELSNER:
3     Q.   And could these same prescriptions written
4 by these disciplined prescribers and dispensed at
5 Albertsons over time, could they contribute to the
6 public nuisance in Tarrant County?
7     MS. MILLER:  Object to form.
8     THE WITNESS:  Yes.
9 BY MR. ELSNER:
10     Q.   And is that true even if there's only
11 1,500 of those prescriptions?
12     A.   Yes.
13     Q.   What if there were 1,000 of those
14 prescriptions?
15     A.   Any prescription that's outside of the
16 system, that there's evidence that it's not
17 legitimate and it's not been dispensed
18 appropriately, contributes to all of the factors
19 that you said; diversion, public nuisance, and harm
20 to the public.
21     MR. ELSNER:  All right.  Thank you,
22 Mr. Catizone.  Those are my questions.
23     FURTHER EXAMINATION
24 BY MS. MILLER:
25     Q.   Am I correct in understanding that with

Page 255

1 respect to the prescriptions written by those
2 prescribers that you've identified, you don't have
3 any evidence that any of those specific
4 prescriptions were diverted, correct?
5     A.   No, I do not.
6     Q.   With respect to your discussion about the
7 multiple prescriptions that trigger a red flag, am I
8 correct in understanding that you were not
9 expressing an opinion that it was inappropriate for
10 the pharmacist to fill the first of those
11 prescriptions?
12     A.   Absent any other circumstances or red
13 flags, I can't say that that was inappropriate.
14     Q.   Okay.  You were asked some questions about
15 Albertsons' policies, and I want to be very clear
16 here because your report very distinctly
17 distinguishes between policies and training
18 materials.
19     And given that distinction in your report,
20 I want to go through it.
21     (Exhibit 22 was marked for
22     identification.)
23     MS. MILLER:  So this is a copy I've marked
24 as Exhibit 22 of Albertsons' 2016 policy.
25

Page 256

1 BY MS. MILLER:
2     Q.   This is an excerpt which identifies -- or
3 which lists the red flags.
4     Do you see that?
5     A.   Yes, I do.
6     Q.   Okay.  Do you see any reference to a
7 geographic distance for any of these red flags?
8     A.   Yes.
9     Q.   Where?
10     A.   The one that says, "The prescriber's
11 practice is out of state."
12     Q.   Okay.  Out of state.  But that doesn't
13 identify a certain number of miles, correct?
14     A.   No.
15     (Exhibit 23 was marked for
16     identification.)
17     MS. MILLER:  Okay.  I'm going to hand you
18 what I've marked as Exhibit Number 23, which is
19 Albertsons' 2018 policy.  I will direct you to
20 Page 69 and the bottom reference to that.
21 BY MS. MILLER:
22     Q.   This is Exhibit 23.
23     On Page 69 of this policy is a list of
24 identifying red flags, correct, 69 onto Page 70?
25     A.   Okay.

Page 257

1     Yes.
2     Q.   So other than that same reference that the
3 prescriber's practice is out of state, would you
4 agree with me that none of these red flags
5 identifies a geographic distance?
6     A.   Yes.
7     Q.   Okay.  I'm going to refer you back to
8 Exhibit 19 in your stack of documents.  19.  This is
9 the PowerPoint presentation.
10     A.   I'm just -- sorry, I'm trying to process
11 this, where the distance isn't there.  And then
12 later it says there's a policy requiring that all
13 pharmacists must register or use a drug monitoring
14 program.  So I'm trying to put that in the scope of
15 your question.
16     But I'm sorry, go ahead.
17     Q.   Okay.  My question's right now focused on
18 geographic distance.
19     A.   Okay.
20     Q.   So I've just referred to you the policies
21 on which you have opined, Albertsons' policies on
22 which you've opined in your report.
23     Exhibit 19 is the PowerPoint presentation
24 that we discussed earlier, and this is what you cite
25 to on Page 36 of your report.

Page 258

1        You reference that Albertsons lists
2  "Patients and prescribers are 15 to 20 miles apart.
3  Prescriber and pharmacy are over 60 miles apart."
4        Do you see that in your report?
5    A.  Yes.
6    Q.  Okay.  I'll ask you to turn to Page 15 of
7  the PowerPoint presentation.
8        Okay.  So this is the page that you've
9  cited to.
10        Do you see what's at the top of the
11  document, what the very top says?
12    A.  "Triangle."
13    Q.  Okay.  Do you have any understanding as to
14  what was presented in this PowerPoint presentation
15  when it's referred to as a "triangle"?
16    A.  I do not.
17    Q.  Okay.  So you are -- when you reference
18  that there's basis for patient and prescriber being
19  15 to 20 miles apart, would you agree with me that
20  you've made the assumption that this is a red flag,
21  in and of itself, as opposed to being combined with
22  the second bullet point, which is prescriber and
23  pharmacy are over 60 miles apart?
24    A.  Again, as you've said, without having that
25  presentation or being able to hear what they say, I

Page 259

1  can't agree with that statement or not.
2    Q.  Okay.  You don't know one way or the
3  other, right?
4    A.  Correct.
5    Q.  When a pharmacist is presented with a
6  prescription, how does a pharmacist know that the
7  prescription or that patient is -- lives 25 miles
8  away from the pharmacy if it's calculated center of
9  ZIP code to center of ZIP code?
10        What's your expectation of how a
11  pharmacist would calculate that?
12        MR. ELSNER:  Objection.  Unless you're
13    going to produce us the underlying data with
14    your patients' addresses, I think it's unfair
15    to challenge how this flag is done when we
16    don't have the addresses.
17        If you want to produce them to us, we will
18    run the flags on their actual addresses.
19  BY MS. MILLER:
20    Q.  They have -- you have listed a percentage
21  of prescriptions that you're saying are red-flagged.
22        I'm asking, how is -- how is a pharmacy
23  supposed to adhere to that red flag that you've
24  presented?
25    A.  I can respond as a pharmacist.

Page 260

1        One of the requirements of standards of
2  care is that the pharmacist has a good knowledge of
3  the surrounding areas and community of their
4  pharmacy and the patients.  So when they receive the
5  prescription that would be outside of that
6  familiarity, it would trigger the pharmacist to
7  check that.
8        So if I'm working on North Michigan Avenue
9  and I get a prescription for 56th and Laflin on the
10  South Side of Chicago, I know that's not within my
11  patient population, and I would do some research.
12        Now, some of those addresses, I'm going to
13  know that's more than 25 miles away from downtown
14  and it's going to cause it.
15        Others that I may not be familiar with, I
16  would look up and say, "Let's look at the ZIP code,
17  let's look at the address and see how far away that
18  is."  And then ask the patient, "Why are you coming
19  to this pharmacy," or resolve the red flag by
20  establishing that that's a legitimate distance for
21  the patient to travel to your pharmacy.
22        That's how a pharmacist would do it.
23    Q.  Okay.  So when we're looking at Red Flag
24  Numbers 1 and 2 that are measured by center of ZIP
25  code to center of ZIP code, would you agree with me

Page 261

1  that that calculation could be overinclusive, in
2  that it would include some patients that are less
3  than 25 miles away from the pharmacy itself?
4    A.  I think, again, we're talking
5  conceptually.  That red flag would say stop and
6  resolve it.  And if it's outside or inside, that
7  documentation would establish that.
8    Q.  Okay.  In the example that we discussed
9  earlier this morning, you have a pharmacy that's on
10  the edge line of a ZIP code and a patient who is on
11  the edge of the neighboring ZIP code, but they're
12  only a couple miles apart, would you agree with me
13  that that pharmacist is not likely to recognize that
14  distance as a red flag under the 25-mile limit, as
15  you've stated it?
16        MR. ELSNER:  Objection.
17        THE WITNESS:  I can't agree with that, for
18    two reasons.
19        One, again, if it was familiar to their
20    facility, yes.  If I look at the new policy
21    that you showed me for Albertsons and if it's
22    out of state, so if I'm right on the
23    Illinois-Indiana border and I'm only two miles
24    away from Indiana, Albertsons is saying that
25    that's a red flag, and I have to stop and fill

66 (Pages 258 - 261)

Page 262

1    that.  Even though that may be familiar to the
2    pharmacist and under the 25 miles, that would
3    trigger a red flag.
4        So I think each circumstance, the red flag
5    automatically stops, and then the pharmacist
6    has to use all the information available to
7    decide and then document that red flag.
8    BY MS. MILLER:
9    Q.  Would you agree with me that the
10   circumstances are different based on where the
11   pharmacy is located and the pharmacy's knowledge of
12   the surrounding area, correct?
13       MR. ELSNER:  Objection.
14       THE WITNESS:  The circumstances are
15   different, but the flag remains the same.
16   BY MS. MILLER:
17   Q.  So if you have two ZIP codes within the
18   same state and the pharmacy is in one ZIP code, the
19   patient is in another ZIP code, but they're two
20   miles apart, is it your testimony that the
21   pharmacist should consider that a red flag because
22   it's 25 miles between center of ZIP code to center
23   of ZIP code?
24   A.  No, I think we're confounding the red
25   flag.

Page 263

1        The red flag is, if the pharmacist can
2    determine or senses that the patient is 25 miles
3    away.  If there are two ZIP codes that are two miles
4    apart and I'm working in that pharmacy, I know where
5    that adjoined, and I know that's two miles away.
6    Therefore, I'm not going to measure that regardless
7    if it's two ZIP codes, three ZIP codes away.
8        I think the ZIP codes that McCann used
9    were simply to establish some uniformity, instead of
10   going address by address.  Because patients'
11   addresses were not available to -- in the dataset,
12   and there would be no other way to calculate that by
13   McCann unless he had all that information, which
14   wasn't made available.
15   Q.  Okay.  What he could have calculated was
16   whether a patient was out of state from a pharmacy,
17   though, correct?
18   A.  By ZIP codes, yes.
19   Q.  Or just a different state, correct?
20   A.  Yes.
21       MS. MILLER:  Okay.  Those are all the
22   questions I have.
23       FURTHER EXAMINATION
24   BY MR. ELSNER:
25   Q.  Just it sounded like, Mr. Catizone, there

Page 264

1    was a point that you wanted to make about
2    registering for the Prescription Drug Monitoring
3    Program.
4    A.  I was just confused about the question
5    about what's a policy at Albertsons, what's not a
6    policy, and how some documents say that you don't
7    have to register for the PMP, and now this document
8    says, and some say 15 and 20.
9        I regarded that information, anything that
10   was presented by Albertsons to their employees, as
11   something that Albertsons wanted followed, whether
12   it was policy or guidance.
13       And that was the point I was confused on,
14   is that distinction that was being made.
15   Q.  In your opinion, as an expert in this
16   field, is it important that there be consistent and
17   clear direction provided to pharmacists as to the
18   training and the appropriate flags to examine?
19   A.  Yes.
20   Q.  And have you seen that in Albertsons'
21   policies?
22   A.  No.
23       MR. ELSNER:  No other questions.  Thank
24   you.
25       MS. MILLER:  Nothing further.

Page 265

1    THE WITNESS:  Thank you.
2    THE VIDEOGRAPHER:  Off the record at 3:04.
3        (Whereupon, the deposition was
4        concluded at 3:04 p.m.)

67 (Pages 262 - 265)

Page 266

```
1         C E R T I F I C A T E
2      The within and foregoing deposition of the
3   witness, CARMEN CATIZONE, MS, RPh, DPh, was taken
4   before GREG S. WEILAND, CSR, RMR, CRR, at
5   Suite 3100, 77 West Wacker Drive, in the City of
6   Chicago, Cook County, Illinois, commencing at 8:35
7   a.m., on the 23rd day of May, 2024.
8      The said witness was first duly sworn and
9   was then examined upon oral interrogatories; the
10  questions and answers were taken down in shorthand
11  by the undersigned, acting as stenographer; and the
12  within and foregoing is a true, accurate and
13  complete record of all the questions asked of and
14  answers made by the aforementioned witness at the
15  time and place hereinabove referred to.
16      The signature of the witness was not
17  waived and the deposition was submitted to the
18  deponent as per copy of the attached letter.
19      The undersigned is not interested in the
20  within case, nor of kin or counsel to any of the
21  parties.
22      Witness my signature on this 28th day of
23  May, 2024.
24
25  GREG S. WEILAND, CSR, RMR, CRR   License No. 084-003472
```

Page 267

```
1         Veritext Legal Solutions
            1100 Superior Ave
2              Suite 1820
           Cleveland, Ohio 44114
3           Phone: 216-523-1313
4
   May 28, 2024
5
   To: MICHAEL E. ELSNER
6
   Case Name: National Prescription Opiate Litigation - Track 8 (Cobb
7  County) v.
8  Veritext Reference Number: 6693104
9  Carmen A. Catizone, MS, RPh, DPh       Deposition Date:  5/23/2024
10
   Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript.  Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change.  Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
   shown
17
   above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24
25 NO NOTARY REQUIRED IN CA
```

Page 268

```
1         DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
      ASSIGNMENT REFERENCE NO: 6693104
3      CASE NAME: National Prescription Opiate Litigation - Track 8
   (Cobb County) v.
      DATE OF DEPOSITION: 5/23/2024
4      WITNESS' NAME: Carmen A. Catizone, MS, RPh, DPh
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
   as transcribed by the court reporter.
8
9  Date            Carmen A. Catizone, MS, RPh, DPh
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
      They have read the transcript;
13      They signed the foregoing Sworn
        Statement; and
14      Their execution of this Statement is of
        their free act and deed.
15
      I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18      Notary Public
19
      Commission Expiration Date
20
21
22
23
24
25
```

Page 269

```
1         DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
      ASSIGNMENT REFERENCE NO: 6693104
3      CASE NAME: National Prescription Opiate Litigation - Track 8
   (Cobb County) v.
      DATE OF DEPOSITION: 5/23/2024
4      WITNESS' NAME: Carmen A. Catizone, MS, RPh, DPh
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9      I request that these changes be entered
   as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13
   Date            Carmen A. Catizone, MS, RPh, DPh
14
      Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17      They have read the transcript;
      They have listed all of their corrections
18      in the appended Errata Sheet;
      They signed the foregoing Sworn
19      Statement; and
      Their execution of this Statement is of
20      their free act and deed.
21      I have affixed my name and official seal
22 this _____ day of_____, 20____.
23
      Notary Public
24
      Commission Expiration Date
25
```

68 (Pages 266 - 269)

Page 270

```
1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2          ASSIGNMENT NO: 6693104
3  PAGE/LINE(S) /     CHANGE     /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
       _____    _____
20 Date          Carmen A. Catizone, MS, RPh, DPh
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

Veritext Legal Solutions

www.veritext.com                                        888-391-3376