# EXHIBIT

# 8

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION

3    IN RE: NATIONAL PRESCRIPTION § MDL NO. 2804
     OPIATE LITIGATION            §
4                                 § CASE NO.:
                                  § 1:17-MD-2804
5                                 §
     THIS DOCUMENT RELATES TO:    § JUDGE DAN AARON
6    "Case Track Nine"            § POLSTER

7

8      *********************************************

9        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

10                CONFIDENTIALITY REVIEW

11       HYBRID REALTIMED/VIDEOTAPED DEPOSITION OF

12                      DAVID HICKS

13                     JULY 19, 2023

14     *********************************************

15

16

17

18

19

20

21

22

23

24

25

1          HYBRID REALTIMED/VIDEOTAPED DEPOSITION OF

2     DAVID HICKS, produced as a witness at the instance

3     of the Plaintiff, and duly sworn, was taken in the

4     above-styled and numbered cause on July 19, 2023,

5     from 10:17 a.m. to 1:49 p.m., before Karen L. D.

6     Schoeve, RDR, CRR, RSA, reported by computerized

7     machine shorthand, pursuant to the Federal Rules of

8     Civil Procedure and the provisions stated on the

9     record or attached hereto.

10

11          REPORTER'S NOTE:  Please note that due to the

12     quality of a Zoom videoconference and transmission

13     of data, overspeaking can cause audio distortion

14     which disrupts the process of preparing a

15     videoconference transcript.

16

17          Quotation marks are used for clarity and do

18     not necessarily reflect a direct quote.

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2

 3    FOR PLAINTIFF TARRANT COUNTY, TEXAS:

 4         JAY M. LICHTER, ESQUIRE
           BARON & BUDD, P.C.
 5         Encino Plaza
           15910 Ventura Boulevard, Suite 1600
 6         Encino, California 91436
           D: 818.305.6379
 7         T: 818.839.2333
           F: 214.520.1181
 8         jlichter@baronbudd.com

 9

      FOR DEFENDANT ALBERTSONS:
10
           PETER S. WAHBY, ESQUIRE
11         GREENBERG TRAURIG, LLP
           2200 Ross Avenue, Suite 5200
12         Dallas, Texas 75201
           D: 214.665.3662
13         T: 214.665.3600
           F: 214.665.3601
14         peter.wahby@gtlaw.com

15
      FOR DEFENDANT KROGER:
16
           PAUL L. FRAMPTON, JR., ESQUIRE
17         ATKINSON & FRAMPTON, PLLC
           2306 Kanawha Boulevard E
18         Charleston, West Virginia 25311
           T: 304.982.7577
19

20    ALSO PRESENT:

21        Colin Coughenour, Videographer
            Litigation Services
22

23    CERTIFIED STENOGRAPHIC COURT REPORTER:
          Karen L. D. Schoeve, CRR, RDR, RSA
24

25
```

1                           INDEX

2                                               PAGE

3    Appearances                                  3

4    Motion to strike                           110

5    Motion to strike                           111

6    Motion to strike                           112

7    Motion to strike                           114

8    Motion to strike                           115

9    Motion to strike                           116

10

11

12   DAVID HICKS

13        Examination By Mr. Lichter             7

14        Afternoon Session                     80

15        Examination (Continued) By Mr. Lichter   80

16

17

18

19   Changes and Signature                      120

20

21   Certified Stenographic

22   Court Reporter's Certificate               122

23

24

25

```
 1                      EXHIBIT INDEX

 2     NO.  DESCRIPTION                                PAGE

 3   Exhibit 1                                         13
            LinkedIn profile of David Hicks
 4          (5 pages)

 5   Exhibit 2                                         27
            E-mail thread between David Hicks and Julie
 6          Spier, et al., dated 08/26/11
            Subject: RX issue3563
 7          Bates stamped ALB-MDLCT9-00347523
            Highly Confidential
 8
     Exhibit 3                                         36
 9          E-mail thread between David Hicks and Store
            2588 c01, dated 10/28-30/16
10          Subject: Generic override
            Bates stamped ALB-MDLCT9-00350447 - 350448
11          Confidential

12   Exhibit 4                                         51
            E-mail thread between David Hicks and Rahul
13          Gandhi, dated 12/26-27/16
            Subject: McKesson special
14          Bates stamped ALB-MDLCT9-00351916
            Confidential
15
     Exhibit 5                                         69
16          E-mail thread between David Hicks and Julie
            Spier, et al., dated 01/12/19
17          Subject: SEVEN DAYS SUPPLY ON OPIATE NAIVE
            PATIENTS
18          Bates stamped ALB-MDLCT9-00383753
            Confidential
19
     Exhibit 6                                         80
20          E-mail thread with attachment between David
            Hicks and Jordan Jones, et al., dated
21          01/13/19 - 03/01/19
            Subject: -4290 Rx Issues
22          Bates stamped ALB-MDLCT9-00073285 - 73288
            Confidential
23
     Exhibit 7                                         94
24          Internal Albertsons Report, dated 01/24/20
            Bates stamped ALB-NM00011005 - 11011
25          Highly Confidential
```

```
 1   Exhibit 8                                           105
         Excel spreadsheet
 2       Bates stamped ALB-MDLCT9-00094579
         Confidential
 3
     Exhibit 9                                           108
 4       Data spreadsheet titled "Summary of
         Selected Hydrocodone and Oxycodone
 5       Dispensed by Albertsons Store 3625 in
         Dosage Units"
 6       (1 page)

 7   Exhibit 10                                          113
         Data spreadsheet titled "Summary of
 8       Selected Hydrocodone and Oxycodone
         Dispensed by Albertsons Store 1780 in
 9       Dosage Units"
         (1 page)
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S

 2                     THE VIDEOGRAPHER:  We're now on the

 3     record.  My name is Colin Coughenour.  I'm a

 4     videographer for Golkow Litigation Services.

 5                     Today's date is July 19th, 2023.  The

 6     time is 10:17 a.m.

 7                     This deposition is being held in

 8     Dallas, Texas, in the matter of Opioid Litigation,

 9     Track 9.

10                     The deponent is David Hicks.

11                     Would counsel please identify

12     themselves for the record.

13                     MR. LICHTER:  Good morning.  My name

14     is Jay Lichter for plaintiff Tarrant County, Texas.

15                     MR. WAHBY:  Peter Wahby of Greenberg

16     Traurig for the Albertsons defendants.

17                     THE VIDEOGRAPHER:  The court reporter

18     is Karen Schoeve.  Will now swear in the witness.

19                     MR. LICHTER:  Paul Frampton, by the

20     way, is also here for the Kroger defendants.

21                     DAVID HICKS,

22     having been first duly sworn to tell the truth, the

23     whole truth, and nothing but the truth, so help him

24     God, testified as follows:

25
```

1                         EXAMINATION

2    BY MR. LICHTER:

3        Q.   Good morning, Mr. Hicks.

4        A.   Good morning.

5        Q.   Would you please state and spell your name

6    for the record.

7        A.   David Hicks.  D-a-v-i-d H-i-c-k-s.

8        Q.   And just to go over some basic admonitions

9    of depositions, I'll be asking you a series of

10   questions throughout the deposition, and at various

11   times, your counsel, sitting beside you, may object

12   after I pose a question.

13              And just so you know, you are

14   obligated to answer and respond to my questions even

15   though your counsel objects, unless, of course, your

16   counsel instructs you not to answer.

17              Does that make sense?

18       A.   Yes, sir.

19       Q.   And we have a court reporter taking down

20   what we're saying here, so it's important that we

21   speak slowly so the court reporter can take down

22   what we are saying and that we avoid, to the best we

23   can, talking over each other.

24              Do you understand that?

25       A.   Yes.

```
 1          Q.    Okay.  And I may ask you some questions

 2     that call for a "yes" or "no" answer.

 3                  Just so you know, responses like

 4     "uh-huh" and "huh-uh" are difficult for the court

 5     reporter to take down.  So to the best you can, I'd

 6     ask that you avoid your responses.

 7                  Is that okay?

 8          A.    Yes.

 9          Q.    Are you taking any medications today that

10     may impair your ability to give truthful testimony?

11          A.    No.

12          Q.    Throughout the deposition, we'll be taking

13     breaks.  I'll aim to take a break about every hour.

14                  If, at any time, you would like to

15     take a break for whatever reason, you can -- you can

16     let me know.  We can go ahead and take a break.  I

17     would just ask that we not take a break while a

18     question is pending.

19                  So to that end, if a question is

20     pending, you would provide a response, and then we

21     can go ahead and cut to the break.

22                  Is that okay?

23          A.    Yes.

24          Q.    Have you ever had your deposition taken

25     before?
```

```
 1        A.   Yes.

 2        Q.   And how many times?

 3        A.   Once.

 4        Q.   When was that?

 5        A.   10 years ago.

 6        Q.   And were you and were you deposed as a

 7   party or as a witness?

 8        A.   As a witness.

 9        Q.   Okay.  And what kind of case was that?

10        A.   A prescription misfilled.

11        Q.   And was Albertsons a party to that case?

12        A.   I believe it was before the Albertsons

13   merger.

14        Q.   So would that have been Tom Thumb?

15        A.   Safeway.

16        Q.   Safeway.  Okay.

17             Do you remember how that case

18   resolved?

19        A.   I do not.

20        Q.   Okay.  Was the misfill for an opioid

21   medication?

22        A.   It was not.

23        Q.   What medication was it for?

24             MR. WAHBY:  Objection; form.

25        A.   Amlodipine, blood pressure medication.
```

1    BY MR. LICHTER:

2         Q.   And was that case in Tarrant County?

3         A.   The store it was involved in was in

4    Tarrant County.

5         Q.   Do you remember which store that was?

6         A.   Yes.

7         Q.   Where's that located?

8         A.   Grapevine, Texas.

9         Q.   Have you done anything to prepare for

10   today's deposition?

11            MR. WAHBY:  Object to the form of the

12   question to the extent your answer shares

13   information that you and I discussed.  What we

14   talked about in our time together I'd instruct you

15   not to answer.  But otherwise, you can answer the

16   question.

17        A.   Yes.

18   BY MR. LICHTER:

19        Q.   And what have you done?

20            MR. WAHBY:  Same objection.

21            Same instruction.

22        A.   Met with Peter.

23        Q.   Just one time?

24        A.   One in-person meeting, one Teams

25   conference call type meeting.

1        Q.    Was anybody else involved in those --

2    those two meetings?

3        A.    Yes.

4        Q.    Who else was involved?

5        A.    I can't remember everybody's name.  I

6    believe another attorney, Greg, was present.  Well,

7    Greg was present for the in-person meeting.

8              On the Teams call, I believe

9    Albertsons had one other attorney present, and I

10   can't recall her name.  And I can't recall if one or

11   two more people just from Peter's team was on.

12       Q.    Okay.  Do you recall about how long those

13   meetings lasted?

14       A.    Maybe an hour.

15       Q.    Did you review -- I guess other than

16   documents provided by your counsel, did you review

17   any documents to prepare for today's deposition?

18             MR. WAHBY:  Same objection.

19       A.    I guess -- can you ask that again?

20   BY MR. LICHTER:

21       Q.    Sure.  Other than documents that your

22   counsel may have shown you or provided to you, did

23   you review any documents to prepare for today's

24   deposition?

25       A.    No.

```
 1                    MR. LICHTER:  Let's go ahead and have

 2    the first document marked as Exhibit 1.

 3                    She'll hand that to you after she

 4    marks it.

 5                    THE COURT REPORTER:  I'm going to put

 6    the sticker on later.  Sorry.  I left it in my

 7    briefcase.

 8                    MR. LICHTER:  Okay.  Did you want to

 9    get them now?

10                    THE COURT REPORTER:  I can.

11                    Let's go off the record.

12                    Colin, please.

13                    MR. LICHTER:  Okay.  Can we go off the

14    record for a minute?

15                    THE VIDEOGRAPHER:  The time is

16    10:23 a.m.  We are off the record.

17                    (A recess was taken from 10:23 a.m. to

18                     10:27 a.m.)

19                    (Exhibit 1 marked.)

20                    THE VIDEOGRAPHER:  The time is

21    10:27 a.m., and we are on the record.

22    BY MR. LICHTER:

23        Q.   Okay.  Welcome back.  I guess we had just

24    marked Exhibit 1 when we took a break.

25                    And, Mr. Hicks, other than the black
```

1    box redactions on pages 3 and 4 of this document, is

2    this a copy of your online LinkedIn profile?

3         A.   Yes.

4         Q.   Did you prepare the information that's in

5    this document?

6         A.   Yes.

7         Q.   Is the information here accurate, as far

8    as you know?

9         A.   Yes.

10         Q.   Let's take a look at page 2 of the

11    document under the "Education" section.

12              It says here you attended the

13    University of Oklahoma Health Sciences Center from

14    1993 to 1996; is that correct?

15         A.   Yes.

16         Q.   And you received a bachelor's degree in

17    pharmacy from that school in 1996; is that correct?

18         A.   Yes.

19         Q.   Have you received any other formal

20    education after high school that isn't listed here?

21         A.   No.

22         Q.   Have you received any other degrees that

23    aren't listed here?

24         A.   No.

25         Q.   Do you currently hold any professional

```
 1     licenses or certifications?

 2          A.    Pharmacist.

 3          Q.    For what states?

 4          A.    Texas.

 5          Q.    Any others?

 6          A.    No.

 7          Q.    And when did you receive your license to

 8     become a pharmacist in Texas?

 9          A.    1996.

10          Q.    And you're currently a licensed

11     pharmacist?

12          A.    Yes.

13          Q.    Looking at the "Experience" section on

14     pages 1 and 2, that lists your work experience,

15     correct?

16          A.    Yes.

17          Q.    And the bottom of page 1 and the top of

18     page 2, I guess it indicates -- I think part of this

19     was cut off by the printout, but it indicates you

20     were a pharmacy manager at Tom Thumb supermarket

21     from 1997 to 2011 in Plano, Texas; is that right?

22          A.    Yes.

23          Q.    Was that at a single store?

24          A.    Yes.

25          Q.    And can you summarize your duties as a
```

1    pharmacy manager during this time?

2        A.    Responsible for the day-to-day operations

3    of the pharmacy, including being a pharmacist,

4    filling prescriptions, taking care of customers; and

5    then the managerial role, as far as managing

6    inventory, managing personnel, staffing, things like

7    that.

8        Q.    Did you oversee other pharmacists during

9    this time?

10       A.    The -- yes.

11       Q.    About how many?

12       A.    Over the 13 years I was there, probably

13   six different staff pharmacists came and went.

14       Q.    Did you also oversee techs?

15       A.    Yes.

16       Q.    About how many?

17       A.    I can't remember.  30, maybe.

18       Q.    Okay.  Again, I think this might have been

19   cut off by the printout also, but it indicates you

20   worked as a regional pharmacy manager at Tom Thumb

21   supermarket in Dallas/Fort Worth from 2011 to 2015;

22   is that right?

23       A.    Yes.

24       Q.    And can you describe the area your region

25   covered?

1        A.    Roughly west of DFW Airport.

2        Q.    And about how many stores were you in

3   charge of?

4        A.    I believe it was 36.  Sometimes more,

5   sometimes less, depending on store openings and

6   closings.

7        Q.    And can you summarize your duties as a

8   regional pharmacy manager during this time?

9        A.    Area -- as a general area supervisor, as a

10  manager overseeing my group of 36 stores, providing

11  support and -- honestly, I don't know how to

12  describe it.  Very all-encompassing, from staffing

13  to scheduling to customer service support,

14  operational support.

15       Q.    Anything in the area of compliance?

16       A.    Yes.

17       Q.    Would that be compliance with internal

18  policies and procedures or federal and state laws?

19            MR. WAHBY:  Objection; form.

20       A.    Both.

21  BY MR. LICHTER:

22       Q.    And are you aware that Albertsons acquired

23  the Tom Thumb pharmacies owned by Safeway in 2015?

24       A.    Yes.

25       Q.    Can you explain how that acquisition

1    affected your position in 2015?

2              MR. WAHBY:  Objection; form.

3         A.   It changed the alignment or arrangement of

4    stores.  You know, previously, I only was

5    responsible for Tom Thumb locations.  After the

6    merger, I had Tom Thumb and Albertsons locations in

7    the DFW area.  My grouping of stores changed, but it

8    was basically the same job.

9    BY MR. LICHTER:

10        Q.   Same duties, you mean?

11        A.   Same duties.  Same general duties, yes.

12        Q.   It says you worked as a division pharmacy

13   manager at Albertsons from 2015 to the present; is

14   that right?

15        A.   Yes.

16        Q.   That's your current position?

17        A.   Yes.  The two companies kind of had

18   different names for the same job.

19        Q.   Okay.  Can you describe the area your

20   region currently covers?

21        A.   I currently cover north -- northern

22   suburbs in the Dallas/Fort Worth metroplex.  Some

23   Dallas stores -- just the north half of the

24   metroplex -- or portion of the metroplex.

25        Q.   Do you know how many stores you're in

```
 1    charge of currently?

 2         A.    32.

 3         Q.    All of them are located in Texas?

 4         A.    Yes.

 5         Q.    Do you know how many are located in

 6    Tarrant County?

 7         A.    Four.

 8         Q.    Do you know those store numbers?

 9         A.    Yes.

10         Q.    Can you tell them to me?

11         A.    1789 -- no.  1780.  2580.  3625.  3854.

12         Q.    And those four stores in Tarrant County,

13    have you overseen those stores consistently since

14    2015?

15         A.    Not all of them.

16         Q.    Which ones have you?

17         A.    25 -- 1780.  2580.  I believe there was

18    a -- it was -- consistently, the other two?  No.  I

19    believe there was a break with 3625.  I really ...

20         Q.    Do you know when that break was?

21         A.    Not specifically.

22         Q.    Do you know about how long that break

23    lasted?

24         A.    About a year.

25         Q.    Do you know why there was a break?
```

```
 1          A.   From time to time, the company rearranges

 2     districts and store alignment, and we -- just -- the

 3     boundaries of our territory just shift.

 4          Q.   Is that the same for 3854?

 5          A.   3854, I just became responsible for about

 6     a month ago.

 7          Q.   Other than those four locations, are there

 8     any other locations in Tarrant County that you

 9     oversaw while working for Albertsons?

10          A.   Yes.

11          Q.   Which ones?

12          A.   I -- honestly, I would have to, like, see

13     a list or a map because I can't -- I mean, I could

14     start to number some stores I can recall, but I

15     don't know that it would be complete.

16          Q.   Okay.  Do you know about how many

17     additional stores you would have overseen in Tarrant

18     County besides the four we mentioned?

19          A.   Maybe a dozen.

20          Q.   Okay.  You mentioned your duties as a

21     division pharmacy manager at Albertsons were

22     basically the same as a regional pharmacy manager

23     for Tom Thumb?

24          A.   Yes.

25          Q.   Are there any specific requirements an
```

1    employee needs to meet to become a division pharmacy

2    manager for Albertsons?

3         A.   I know we have to be a licensed

4    pharmacist.

5         Q.   Do you know if those licenses have to be

6    active?

7         A.   I think so.

8         Q.   Anything else?

9         A.   Honestly, I don't know if there are

10   specific requirements the company currently looks

11   for.

12        Q.   Okay.  And who do you currently report to?

13        A.   Julie Spier.

14        Q.   And what's her title?

15        A.   Director of pharmacy operations.

16        Q.   Have you reported to her since 2015?

17        A.   Yes.

18        Q.   Have you held any other positions or roles

19   with Albertsons at any time?

20        A.   Before I was a manager, I was a relief

21   pharmacist in 1996 and 1997.

22        Q.   Is that essentially a floater pharmacist?

23        A.   Yes.

24        Q.   Anything else?

25        A.   No.

1      Q.   As far as you know, do each of the

2  pharmacies Albertsons owns in Tarrant County follow

3  the same dispensing policies and procedures set by

4  Albertsons?

5           MR. WAHBY:  Objection; form.

6      A.   Yes.

7  BY MR. LICHTER:

8      Q.   Are those policies and procedures set

9  nationally by the company, or are those different

10  from region to region?

11           MR. WAHBY:  Objection; form.

12      A.   Yes, they are set nationally.

13  BY MR. LICHTER:

14      Q.   Do you know which other division pharmacy

15  managers are responsible for the other locations in

16  Tarrant County?

17      A.   Yes.

18      Q.   Who are they?

19      A.   Don Bowman.

20      Q.   Anyone else?

21      A.   I don't believe so.

22      Q.   Are you aware of any other division

23  pharmacy managers responsible for stores in Tarrant

24  County if you're not responsible for them anymore?

25      A.   Can you repeat that?

```
 1          Q.   Do you know any prior division pharmacy

 2    managers for stores located in Tarrant County?

 3          A.   Yes.

 4          Q.   Who are they?

 5          A.   Currently with the company?  Or ever?

 6          Q.   Both.

 7                    MR. WAHBY:  Objection; form.

 8          A.   Kim Parta.

 9    BY MR. LICHTER:

10          Q.   Is she currently with the company?

11          A.   She is currently with the company.

12          Q.   Anyone else?

13          A.   There was a guy, DJ Adams.

14          Q.   He's currently with the company?

15          A.   I don't believe so.  I don't know for

16    sure.

17                    There's somebody named Nicole.  I

18    can't remember her last name.

19          Q.   Is she currently with the company?

20          A.   No.

21          Q.   Anyone else you can recall?

22          A.   I know the guy who had, like, my job

23    before me.

24          Q.   Who was that?

25          A.   But that wasn't with Albertsons.
```

1       Q.    What was his name?

2       A.    Rob Wheeler.

3       Q.    And that was for Tom Thumb?

4       A.    Yes.

5       Q.    And he doesn't work for Albertsons?

6       A.    No, no.

7       Q.    Anyone else?

8       A.    How far do you want me to go back?

9       Q.    Maybe since 2015?

10      A.    Since 2015?  No.

11      Q.    Okay.  How about prior to that?  Since

12   2006?

13              MR. WAHBY:  Objection; form.

14      A.    Danny Graham.

15   BY MR. LICHTER:

16      Q.    Did he work for Albertsons?

17      A.    Safeway.

18      Q.    He never worked for Albertsons?

19      A.    Not to my knowledge.

20      Q.    Anyone else you can recall that worked for

21   Albertsons?

22      A.    No.

23      Q.    Either currently or previously?

24      A.    No.

25      Q.    And do the different division pharmacy

1   managers for Albertsons often interact with each

2   other?

3        A.   Yes.

4        Q.   And under what circumstances do they

5   typically interact?

6             MR. WAHBY:  Objection; form.

7        A.   We have weekly meetings.  Since DFW is --

8   we kind of view this as one market.  And so we have

9   stores close to each other.  We share a float staff

10  or relief staff and corporate admin.  So we interact

11  over staffing, hiring decisions, sometimes HR

12  decisions.

13  BY MR. LICHTER:

14       Q.   Other than things like staffing and

15  hiring, is anything else typically discussed at the

16  weekly meetings?

17       A.   Yeah.  Everything.  Priorities for the

18  week, company initiatives, goals, expectations.

19       Q.   Do pharmacists communicate directly with

20  their division pharmacy managers, or do they usually

21  communicate with pharmacy managers themselves?

22             MR. WAHBY:  Objection; form.

23       A.   I don't understand.  Say that again.

24  BY MR. LICHTER:

25       Q.   Fair.  Do pharmacists typically

```
 1    communicate directly with their division pharmacy

 2    managers?

 3         A.    Yeah.

 4         Q.    Okay.  Under what circumstances do they

 5    usually communicate with them?

 6               MR. WAHBY:  Objection; form.

 7         A.    Just daily needs of whatever's going on in

 8    the pharmacy.  If they need assistance, either

 9    with -- just questions, you know, customer service

10    issues, staffing issues, compliance issues or

11    questions, general concerns, technology issues.

12    BY MR. LICHTER:

13         Q.    Okay.  And how do pharmacists typically

14    communicate with the DPMs?

15         A.    Phone calls, e-mails.

16         Q.    Is one more common than the other?

17         A.    Depends on the urgency.

18         Q.    For more urgent issues, is a phone

19    typically used?

20               MR. WAHBY:  Objection; form.

21         A.    I won't say typically used.  I would say

22    if somebody needs my attention right away, it

23    typically is a phone call.  If they got in a car

24    wreck on the way to work, they might not be able to

25    e-mail me at the time, so ...
```

1    BY MR. LICHTER:

2         Q.   And that's something a pharmacist would

3    reach out to you to discuss rather than the pharmacy

4    manager?

5                   MR. WAHBY:   Objection; form.

6         A.   Yes.

7    BY MR. LICHTER:

8         Q.   Are you familiar with the Texas State

9    Board of Pharmacy?

10        A.   Yes.

11        Q.   Okay.  Do they generally oversee pharmacy

12   regulation in the state of Texas?

13        A.   Yes.

14        Q.   And does the Texas Board of Pharmacy ever

15   send anything like notices or alerts to Albertsons

16   regarding certain patients or prescribers?

17        A.   I don't recall seeing anything from them

18   about -- about that.

19                  MR. LICHTER:  Let's go ahead and have

20   the next document marked as Exhibit 2.

21                  (Exhibit 2 marked.)

22   BY MR. LICHTER:

23        Q.   For the record --

24                  (Phone interruption.)

25   BY MR. LICHTER:

1      Q.   For the record, this document is Bates

2   numbered ALB-MDLCT9-00347523.

3            Have you seen this document before?

4      A.   (Examined exhibit.)  It looks like I wrote

5   it, so I'm sure I saw it at the time.

6      Q.   Have you seen it within the last few weeks

7   or months?

8      A.   No.

9      Q.   Is this --

10     A.   (Coughed.)  Excuse me.

11     Q.   Sure.

12            Is this an August 6th, 2011, e-mail

13  string between you and other Albertsons employees?

14     A.   I -- yes.  Well, this wasn't Albertsons at

15  the time.

16     Q.   Okay.  This was Tom Thumb?

17     A.   Yes.

18     Q.   I guess the top e-mail, though, is from

19  you to Julie Spier at her Albertsons.com e-mail

20  address; is that right?

21     A.   It appears as such.  We -- again, we

22  weren't Albertsons in 2011, so I think that's her

23  current e-mail.  But ...

24     Q.   So in 2011, did Julie Spier work for

25  Albertsons or for Tom Thumb?

```
 1                    MR. WAHBY:  Objection; form.

 2        A.   In 2011, Tom Thumb was part of the Safeway

 3   grocery chain.

 4   BY MR. LICHTER:

 5        Q.   I'm asking about Julie Spier, though,

 6   given that --

 7        A.   She worked for Safeway.

 8        Q.   Not for Albertsons?

 9        A.   Not for Albertsons.

10        Q.   Even though it indicates at the top that

11   you were e-mailing her at an Albertsons e-mail

12   address?

13        A.   Yeah, I don't know how that happened.

14        Q.   Can you look at the e-mail at the bottom

15   of the page?

16        A.   (Complied.)

17        Q.   And the bottom e-mail appears to be sent

18   from the store manager of Store 3563 who was

19   identified at the bottom as Clarence Ennis.

20             Does that look correct?

21        A.   Yes.

22        Q.   And Store 3563 is located in Texas; is

23   that right?

24        A.   Yes.

25        Q.   Do you know where in Texas?
```

1          A.    Duncanville.  I believe that's Dallas

2     County.

3          Q.    And would Clarence Ennis be the store

4     manager for 3563?

5          A.    As I recall, he was an assistant store

6     manager, but I am not certain of that.

7          Q.    Okay.  The e-mail was sent to you, Jackie

8     Tschosik, and John Mix; is that right?

9          A.    Yes.

10         Q.    Do you recall what their job titles were

11    at this time?

12         A.    Jackie Tschosik worked in our HR

13    department.  John Mix was a district manager for the

14    total store.

15         Q.    And both of them worked for Safeway at

16    this time?

17         A.    Safeway.

18         Q.    And this e-mail was sent on August 26th,

19    2011; is that right?

20         A.    It appears so.

21         Q.    Okay.  And the e-mail says, "Mr. Hicks, I

22    just went over to discuss O/R with Marc.  I asked

23    him if he had a chance to look at hours, He stated

24    he was to [sic] busy.  I tried to ask him that

25    looking at the script count so far he is going to

1    miss 100 O/R by 17 hours or more again this week."

2              Did I read that okay?

3        A.   Yes.

4        Q.   What does O/R stand for?

5              MR. WAHBY:  Objection; form.

6        A.   Operating ratio.

7    BY MR. LICHTER:

8        Q.   What does that mean?

9        A.   It was a labor ratio for stores to

10   schedule based off their prescription volume and the

11   needs of their technician staffing.

12             MR. WAHBY:  Objection; form.

13             Mr. Videographer, I want to make sure

14   that this recording -- this screen-in-screen,

15   there's two different recordings, right?  One, the

16   video, and then you have the Zoom.

17             THE VIDEOGRAPHER:  (Nodded head.)

18             MR. WAHBY:  So the main video -- the

19   recording is not gonna look like that with this --

20   with this demonstrative created with the witness,

21   correct?

22             THE VIDEOGRAPHER:  Yes, sir.  I'm

23   recording the feeds all separately.

24             MR. WAHBY:  Okay.  Thank you.

25             Go ahead.

```
 1     BY MR. LICHTER:

 2          Q.   Do you know who Marc is that's referenced

 3     here in this e-mail?

 4          A.   Marc was our pharmacy manager.

 5          Q.   For Store 3563?

 6          A.   Yes.

 7          Q.   Do you know what it means to "miss 100 O/R

 8     by 17 hours"?

 9          A.   Yes.

10          Q.   What does that mean?

11          A.   The goal was to hit a 100 percent and

12     if -- and the store was overspending technician

13     hours by 17 hours.

14          Q.   When you say "100 percent," what is that

15     measuring?

16          A.   Hours used.

17          Q.   So does this mean, then, that -- that this

18     store missed its 100 percent goal by 17 hours?

19               MR. WAHBY:   Objection; form.

20          A.   Its 100 percent goal by 17 hours, yes.

21     BY MR. LICHTER:

22          Q.   Okay.  And the e-mail continues.  It says,

23     "He handed me a slip of paper stating 'Patient

24     safety is our responsibility and if additional time

25     is required, it is acceptable.'  He told me this is
```

1    not up for date, then walked away."

2              Did I read that correctly?

3    A.   Yes.

4    Q.   The e-mail continues, "Mr. Hicks, we

5    understand that RX is only required to hit a 100

6    O/R, which puts more pressure on the other

7    departments to make up the difference and if I can't

8    count on my RX manager to at least aim for that goal

9    then I have an issue that we need to resolve."

10              Did I read that okay?

11   A.   Yes.

12   Q.   And what does it mean that O/R is only

13   required -- sorry -- that RX is only required to hit

14   a 100 O/R?

15              MR. WAHBY:  Objection; form.

16   A.   As I recall, from time to time, they

17   would -- I guess, for lack of a better way to

18   describe it, they would tighten the screws on how

19   much labor a store could use, and they would adjust

20   other departments or hold other departments to a

21   stricter standard, and they may have to hit

22   105 percent or 108 percent of their OR or of their

23   labor allotment.  And pharmacy was always excluded

24   from those stricter rules or stricter tightening of

25   the screws.

1    BY MR. LICHTER:

2         Q.   Was that consistent with Albertsons'

3    policies once you joined the Albertsons stores?

4         A.   Albertsons had a different metrics by

5    which they measured labor.

6         Q.   What was Albertsons's metric?

7         A.   They would go off a wage percent.

8         Q.   Can you explain what that means?

9         A.   Albertsons stores are allotted a certain

10   percentage of their sales to be spent on labor.

11        Q.   Do you know what percent that is?

12        A.   It varies store by store, based off

13   location.

14        Q.   And going back to the e-mail, do you know

15   why this would put more pressure on other

16   departments?

17        A.   The -- if I recall correctly, a store has

18   a labor budget.  So if one department used more than

19   their allotment, then that would have to come out of

20   another department.

21        Q.   And you said this policy excluded pharmacy

22   staff?

23             MR. WAHBY:  Objection; form.

24   BY MR. LICHTER:

25        Q.   Or no?

1       A.   The pharmacy has a labor budget.

2    The store has a labor budget.  Every department has

3    a labor budget.  When they get a little more strict

4    with the budget or when they start cutting the

5    budget, they cut other departments and typically not

6    pharmacy.

7       Q.   Do you know if this issue discussed in

8    these e-mails ever got resolved?

9            MR. WAHBY:  Objection; form.

10      A.   I don't recall.

11   BY MR. LICHTER:

12      Q.   Do you recall why you're forwarding this

13   e-mail to Julie Spier on August 26th, 2011?

14      A.   I don't.

15      Q.   Do you recall if she did anything or took

16   any action in response to receiving this e-mail?

17      A.   I don't.

18      Q.   And you don't recall if Julie Spier worked

19   for Albertsons or Safeway in 2011?

20      A.   She worked for Safeway in 2011.

21      Q.   Even though she has an Albertsons e-mail

22   address here, correct?

23      A.   Yeah.  I ...

24           MR. WAHBY:  Objection; form.

25      A.   I know we did not merge as a company until

1    2015.  We both worked for Tom Thumb/Safeway in 2011.

2              Maybe technology folks could answer

3    why her e-mail address changed.

4              MR. LICHTER:  Let's set that one aside

5    and have the next document marked as Exhibit 3.

6              (Exhibit 3 marked.)

7              MR. LICHTER:  Just for the record,

8    Exhibit 3 is Bates numbered ALB-MDLCT9-00350447.

9    BY MR. LICHTER:

10        Q.   Have you seen this document before?

11        A.   Looks like I was involved in the e-mail

12   chain, but I -- so I'm sure I saw it back in October

13   of 2016.

14        Q.   You don't recall seeing this within the

15   last few months?

16        A.   No.

17        Q.   Is this an e-mail string between you and

18   other Albertsons employees from October of 2016?

19        A.   Yes.

20        Q.   Let me start with the bottom of the first

21   page here, which appears to be an e-mail that goes

22   on to the second page.

23              Do you see that?

24        A.   Yes.

25        Q.   Okay.  Is this an e-mail from Christina at

1    Pharmacy Number 2588 to you on October 28th, 2016?

2        A.    Yes.

3        Q.    And are you aware that Pharmacy

4    Number 2588 is located in Texas?

5        A.    Yes.

6        Q.    Do you know where in Texas that pharmacy

7    is located?

8        A.    It used to be located in Coppell, Texas,

9    which I believe is in Dallas County.

10        Q.    And it's no longer located there?

11        A.    It's a closed --

12               MR. WAHBY:  Objection; form.

13        A.    It's a closed location.

14    BY MR. LICHTER:

15        Q.    Do you know about when it closed?

16        A.    Several years ago.  I don't know that I --

17    I don't recall when.

18        Q.    Do you recall why it closed?

19        A.    No.  That was a grocery decision.

20        Q.    And would this have been a pharmacy that

21    you oversaw at this time in 2016?

22        A.    I believe so, yes.

23        Q.    And do you know Christina's last name?

24        A.    Tran, T-r-a-n.

25        Q.    Do you recall what her position was at

1    this time?

2         A.   I think she was the staff pharmacist.

3         Q.   The top of the second page, Christina

4    writes to you, "David I have a customer that is

5    requesting we order a different manufacturer of her

6    hydrocodone 10/325.  The Mallinckrodt makes her sick

7    she says."  And she gives some info on the

8    hydrocodone, and she says she needs three bottles.

9    "Let me know if this is something we can do"; is

10   that right?

11        A.   Yes.

12        Q.   Hydrocodone, that's a Schedule 2

13   controlled substance, correct?

14        A.   Yes.

15        Q.   And that's an opioid?

16        A.   Yes.

17        Q.   In your experience, when a customer

18   requests a Schedule 2 drug from a certain

19   manufacturer for certain brands, is that considered

20   a red flag?

21        A.   Yes.

22        Q.   Okay.  And what's a red flag?

23        A.   I guess a -- what's a red flag?  It would

24   be something pertaining to a controlled substance

25   prescription that might indicate it's --

1                    I apologize.  I just don't know how to

2      define what red flags are, just kind of identifying

3      what they are.

4           Q.   Can I help you out?

5           A.   Sure.

6           Q.   Might it indicate that a prescription is

7      not going to be used for a legitimate medical

8      purpose?

9           A.   I think that -- I think that stigmatizes

10     all of them.  So might it be?  Yes.  But -- yes.

11          Q.   Do you agree with that definition?  If you

12     don't, feel free to provide your own.

13                    I just want to know what your

14     understanding of a red flag is.

15          A.   I would say -- yeah, a red flag would be

16     just something on the prescription that indicates it

17     either -- that there might be a problem with it.

18     And however we define problem, be that -- I don't

19     want to say not necessarily for legitimate medical

20     purpose because there are numerous red flags.

21                    The majority of them -- but I'd say

22     the majority of prescriptions are still for

23     legitimate medical purposes, even if a red flag is

24     present.

25          Q.   Okay.  So is it fair to say a red flag can

1    indicate the potential -- just the potential that

2    the prescription was not issued for a legitimate

3    medical purpose?

4              MR. WAHBY:  Objection; form.

5         A.   Yes.  Sure.

6    BY MR. LICHTER:

7         Q.   Do you agree with that definition?

8         A.   Yes.

9         Q.   Okay.  And you mentioned that a request

10   like this that we're seeing here can be considered a

11   red flag, correct?

12        A.   Yes.

13        Q.   Okay.  Why can that be considered a red

14   flag?

15        A.   I -- it just seems universally on the list

16   of red flags when somebody requests a certain

17   product or a certain brand that -- I don't know.

18   It's -- that just always seems to be one of the red

19   flags.

20        Q.   Okay.  Let's go back to the first page of

21   the document here, and we can look at the middle

22   e-mail.

23        A.   (Complied.)

24        Q.   And here this e-mail doesn't say

25   Christiana -- or --

```
 1        A.   Christina.

 2        Q.   Christina -- sorry -- at the bottom, but

 3   the content suggests it's from Christina to you, and

 4   sent on October 30, 2016.

 5                  Do you agree with that?

 6                  MR. WAHBY:  Objection; form.

 7        A.   Yes.

 8   BY MR. LICHTER:

 9        Q.   And the e-mail says, "The prescription is

10   for #150 per month."

11                  Do you see that?

12        A.   Yes.

13        Q.   Does that mean 150 hydrocodone pills per

14   month?

15        A.   I believe so.  That's the way I interpret

16   it.

17        Q.   Yeah.  And in your experience, when a

18   customer requests 150 hydrocodone pills in a month,

19   is that considered a red flag?

20                  MR. WAHBY:  Objection; form.

21        A.   I believe so.  Doing the math on the MME,

22   that would be a red flag.

23   BY MR. LICHTER:

24        Q.   When you say "based on the MME," does that

25   mean the MME for this amount of pills would be
```

```
 1    unusually high?

 2         A.   It would be -- I don't want to say

 3    unusually high.

 4              It would be -- anything over 50 MMEs

 5    is deemed to be -- I believe the CDC or maybe the

 6    DEA -- I can't remember who specifically made that

 7    indication, but anything over 50 MMEs would be

 8    something that a pharmacist would express caution

 9    on.

10         Q.   Anything over 50, you said?

11         A.   I believe that's the standard, yes.

12         Q.   And "MME" stands for?

13         A.   Morphine milliequivalents.

14         Q.   Morphine milligram equivalent; is that

15    right?

16         A.   Morphine milliequivalents.

17         Q.   Milli?  Is "milli" short for milligram?

18              MR. WAHBY:  Objection; form.

19         A.   I don't know.

20    BY MR. LICHTER:

21         Q.   Okay.  You said you did the math in your

22    head converting the 150 hydrocodone pills to MME.

23              Do you know what that MME would

24    translate it to?

25         A.   I believe it would be 50.
```

 1          Q.    And do you know the reasoning behind

 2     designating that amount of MME as a red flag?

 3          A.    No.

 4          Q.    Based on your experience as a licensed

 5     pharmacist, you don't have any idea why an MME of

 6     that measure would be considered a red flag?

 7                    MR. WAHBY:  Objection; form.

 8          A.    I think the greater the usage, the greater

 9     the chance of dependence or abuse.

10     BY MR. LICHTER:

11          Q.    Okay.  And then the middle paragraph here,

12     that same e-mail.

13                    Christina says, "She is a new customer

14     that gets chronic pain meds every month."

15                    In your experience, is the fact that

16     the patient is a new customer seeking this volume of

17     hydrocodone also a red flag?

18          A.    I'd need more information.  Just being a

19     new patient, I don't think would be a red flag.

20          Q.    And not a new patient seeking this volume

21     of hydrocodone?  That wouldn't give you enough

22     information?

23                    MR. WAHBY:  Objection; form.

24          A.    No.

25     BY MR. LICHTER:

1      Q.   And look at the top e-mail on the first

2   page.

3              This e-mail is from you to Christina

4   on October 30, 2016; is that right?

5      A.   Yes.

6      Q.   And you write, "I basically boil it down

7   to 'is she a good customer?'  If she's new to us

8   then we can't really say.  I don't like that she

9   claims we gave her something that we didn't.

10  Narcotics and hydrocodone special requests really

11  concern me.  I will have to trust your judgment on

12  what you want to do.  At the end of the day it is

13  about being profitable and we want to do the 500

14  count bottle.  As long as we are profitable then I

15  will approve."

16             Did I read that okay?

17     A.   Yes.

18     Q.   Okay.  Why do narcotics and hydrocodone

19  special requests really concern you?

20     A.   I would say -- I would say this is more

21  about any generic override.

22             You've identified one specifically

23  related to hydrocodone, but as a practice, I have to

24  approve all override requests for any generic

25  medication which is not on the company-preferred

1    list.

2            So the back-and-forth, as I recall,

3    from this e-mail is also about the cost of the

4    hydrocodone that she was wanting us to order.  This

5    brand was significantly more expensive and would

6    result in us selling the medication at a loss.

7            So the back-and-forth about a new

8    customer and those sorts of things would come down

9    to -- if I have a new customer that we haven't

10   established a business relationship with and I'm

11   immediately taking a loss on filling their

12   prescription, I don't like to do that.  We generally

13   don't want to do that.

14           We would want to steer them to our

15   preferred item, which would be our profitable item,

16   regardless of hydrocodone or blood pressure

17   medication.

18       Q.   Okay.

19       A.   So -- but if she is a customer that we've

20   established a relationship with, we know her

21   history, we know her -- her, you know -- and she's

22   getting all of her medications from us and she's

23   even buying all of her milk and eggs and bread from

24   us, then -- and we've established her as a normal

25   customer, then we may look at this as

1    "Therapeutically, does she need a different

2    medication because the product we normally offer her

3    makes her ill or sick or upset of stomach?"  So can

4    we provide her with another product that would

5    clinically benefit her?  Because she gets the

6    benefit of taking a medication without a side effect

7    of making her ill.

8         Q.   Okay.  So when you write here, "Narcotics

9    and hydrocodone special requests really concern me,"

10   your concern, then, is about profits as opposed to

11   the legitimacy or illegitimacy of the prescription

12   itself?

13        A.   No.  I'm concerned about both.

14        Q.   Okay.  And do -- are special requests for

15   narcotics and hydrocodone -- as we discussed, do you

16   agree that that's a red flag for that prescription?

17        A.   That is -- seems to be universally

18   considered a red flag.

19        Q.   And do you personally consider it a red

20   flag?

21        A.   Yeah, I won't -- I won't argue with the

22   experts on that.

23        Q.   Okay.  And when you say, "At the end of

24   the day it is about being profitable," is that a

25   priority you developed on your own, or does that

1    reflect a broader Albertsons policy for its

2    dispensing?

3         A.   I think that's kind of a universal

4    business practice, to be profitable.

5         Q.   So does that mean it's an Albertsons

6    policy, as a business?

7              MR. WAHBY:  Objection; form.

8         A.   I mean, it's not a -- it's not a hard stop

9    because we do still have the ability to make a

10   decision.  I'm still given the liberty to

11   potentially order a more expensive product and sell

12   it at a loss.

13   BY MR. LICHTER:

14        Q.   I get that, and I understand it might not

15   be a hard stop.

16              I'm asking about this line:  "At the

17   end of the day it is about being profitable."  If

18   that's -- if that's something that Albertsons handed

19   down to you as a -- as a businesses policy, or if

20   that's something that you independently developed

21   and ran with as a division pharmacy manager?

22              MR. WAHBY:  Objection; form.

23        A.   I don't recall.  I -- that may be me

24   making a -- talking through the scenario with -- or

25   working through a scenario with this -- in this

1    individual instance.

2    BY MR. LICHTER:

3        Q.   And do you know how this issue was

4    ultimately resolved?

5        A.   I don't recall.  And it appears, even

6    looking through this, as we're making this decision,

7    we're evaluating the pricing of different sized

8    bottles, and buying it in different quantities may

9    have been more profitable, which may have helped

10   make that decision.  But I don't remember how we --

11   how this ended up.

12       Q.   Okay.  Do you know if Albertsons ever

13   blocked this patient from receiving further opioid

14   prescriptions?

15       A.   Who's the patient?

16       Q.   The patient discussed on the second page

17   that's requesting the different manufacturer for the

18   opioid prescriptions.

19       A.   Yeah, but I have -- I have no idea who

20   this patient is to know what we ever did with them.

21       Q.   You don't know what the context if there

22   was any sort of block on this patient at all?

23            MR. WAHBY:  Objection; form.

24       A.   I have no idea.

25   BY MR. LICHTER:

```
 1          Q.   Are you aware of any instances in which

 2     Albertsons blocked specific patients from receiving

 3     opioid prescriptions?

 4                    MR. WAHBY:  Objection; form.

 5          A.   I can't recall.

 6     BY MR. LICHTER:

 7          Q.   To your knowledge, is that something that

 8     Albertsons does?

 9                    MR. WAHBY:  Objection; form.

10          A.   As a corporate practice --

11     BY MR. LICHTER:

12          Q.   Yes.

13          A.   -- or as individual pharmacists?

14          Q.   As a corporate pharmacist.

15          A.   I don't recall this occurring.  I don't

16     know that it -- if it has or hasn't.  I don't

17     remember seeing it.

18          Q.   Do you know if Albertsons ever flagged

19     this patient in the system for other pharmacists to

20     keep a close eye on?

21          A.   I don't know.

22                    MR. WAHBY:  Objection; form.

23     BY MR. LICHTER:

24          Q.   Is that something that Albertsons

25     typically did?
```

```
 1                    MR. WAHBY:  Objection; form.

 2          A.   Not that I recall.

 3    BY MR. LICHTER:

 4          Q.   Is that something that Albertsons ever did

 5    that you can recall?

 6                    MR. WAHBY:  Objection; form.

 7          A.   Not that -- I don't -- not that I recall.

 8    BY MR. LICHTER:

 9          Q.   Okay.  Do you know if Albertsons ever put

10    this patient on a list for future tracking or

11    monitoring on the corporate level, anything like

12    that?

13                    MR. WAHBY:  Objection; form.

14          A.   I don't know.

15                    MR. LICHTER:  Go ahead and set this

16    document aside.

17                    I think we've gone for about an hour.

18                    We can go ahead and take a 10-minute

19    break if everybody is --

20                    MR. WAHBY:  Do you want to risk that?

21                    MR. LICHTER:  I think we'll go ahead

22    and give it a try.

23                    THE VIDEOGRAPHER:  The time is

24    11:18 a.m., and we are off the record.

25                    (A recess was taken from 11:18 a.m. to
```

```
 1                    11:30 a.m.)

 2                    THE VIDEOGRAPHER:  The time is

 3    11:30 a.m., and we're back on the record.

 4                    MR. LICHTER:  Welcome back, everyone.

 5                    If we can have the next document

 6    marked as Exhibit 4.

 7                    (Exhibit 4 marked.)

 8                    MR. LICHTER:  For the record, this

 9    document is Bates numbered ALB-MDLCT9-00351916.

10    BY MR. LICHTER:

11        Q.   I added some highlighting and colored text

12    on the second page of this document, but outside of

13    that, have you seen this document before?

14        A.   I don't remember, but -- yeah.

15        Q.   You haven't seen it within the last few

16    months?

17        A.   No.

18        Q.   Is this a December 27, 2016, e-mail string

19    between you and Rahul Gandhi?

20        A.   Yes.

21        Q.   Based on his e-mail signature, looks

22    Mr. Gandhi works at Albertsons Pharmacy Number 4234

23    in McKinney, Texas; is that right?

24        A.   Yes.

25        Q.   And do you know what Mr. Gandhi's position
```

```
 1    was at this time?

 2         A.    Pharmacy manager.

 3         Q.    It starts on the e-mail at the bottom of

 4    the second page, page ending in Bates 917.

 5               It looks like Mr. Gandhi writes to you

 6    on December 26th, 2016; is that right?

 7         A.    Yes.

 8         Q.    And he writes, "Hi David, Can you please

 9    override the McKesson order for us, the patient only

10    want the HiTech brand Promethazine/Codeine syrup, he

11    and his wife both take it and they say any other

12    brand doesn't work for them.  They buy all of their

13    prescriptions from us and some of them are Hi [sic]

14    priced too."

15               Did I read that okay?

16         A.    Yes.

17         Q.    Can you explain the context of

18    Mr. Gandhi's request for you to override the

19    McKesson order?

20               MR. WAHBY:  Objection; form.

21               Object to the exhibit.

22         A.    Similar to the last exhibit, he's

23    requesting we order a nonpreferred item.

24    BY MR. LICHTER:

25         Q.    And is promethazine/codeine syrup an
```

1    opioid?

2         A.    Yes.

3         Q.    Okay.  And we mentioned this before, but

4    in your experience, when a patient requests a

5    specific brand or manufacturer for an opioid

6    medication, that's considered a red flag, correct?

7         A.    Yes.

8         Q.    In your experience, when multiple people

9    in the same house, like a husband and wife, both

10   request the same medication like they're doing here,

11   is that considered a red flag?

12        A.    Yes.

13        Q.    Why?

14        A.    I don't know.  It's just one of those.

15        Q.    Okay.

16        A.    It's on every list that that's a red flag.

17        Q.    Based on your training and experience as a

18   pharmacist, you don't have any reason why that might

19   be the case?

20              MR. WAHBY:  Objection; form.

21        A.    No.

22   BY MR. LICHTER:

23        Q.    How about when multiple people in the same

24   house take the same opioid medication, and both

25   request a specific brand or manufacturer for that

1   medication?

2              Is that also a red flag?

3              MR. WAHBY:  Objection; form.

4   BY MR. LICHTER:

5       Q.   Combination of red flags?

6              MR. WAHBY:  Objection; form.

7       A.   Yes.

8   BY MR. LICHTER:

9       Q.   Looks like you respond to Mr. Gandhi's

10  e-mail right above that on December 26, 2016.

11             Do you see that?

12      A.   Yes.

13      Q.   And you write, "So this is a highly abused

14  medication and highly sought after product.  Fax me

15  a copy of their PMP so I can review it."

16             Did I read that okay?

17      A.   Yes.

18      Q.   Okay.  So according to your mail, this

19  type medication would also be considered a red flag,

20  correct?

21      A.   More specifically, the brand they were

22  asking for.

23      Q.   The specific brand is highly abused?

24      A.   Yes.

25      Q.   And the specific brand is highly sought

1    after?

2        A.   This -- well, yes.  This specific brand

3    was a purple -- or grape-flavored/colored liquid.

4        Q.   Um-hum.

5        A.   That became very popular, kind of -- I

6    don't know how to describe it.  It kind of -- it

7    developed a following and -- it became the preferred

8    product.  For some reason, several manufacturers

9    made it.  There was -- from what I recall, there was

10   a green version which people didn't like, but there

11   was also a purple version that was popularized

12   through song and through culture, that became the

13   preferred product for people to ask for.

14       Q.   Was it preferred among people who abused

15   prescription medications?

16            MR. WAHBY:  Objection; form.

17   BY MR. LICHTER:

18       Q.   Who was it popular among?

19            MR. WAHBY:  Objection; form.

20       A.   I mean, when -- I don't know what -- I

21   don't know there was a specific person.  Maybe

22   younger, sometimes more urban --

23   BY MR. LICHTER:

24       Q.   Okay.

25       A.   -- clientele.  There was a rap song about

1    it, so it kind of became what people wanted.

2        Q.    Okay.

3        A.    So we did try to limit its availability.

4    And in this case, rather than just ordering it and

5    giving them what they wanted, we wanted them to --

6    wanted to scrutinize it a little bit closer.

7        Q.    Okay.  And you ask him in your e-mail to

8    "Fax me a copy of their PMP"?

9        A.    Um-hum.

10       Q.    And the PMP or PDMP, is that the

11   prescription drug monitoring program for the state

12   of Texas?

13       A.    Yes.

14       Q.    Can you explain what that is?

15       A.    Pharmacies submit their controlled

16   substance dispensings to a -- I believe it's watched

17   by the State Board of Pharmacy, and there's a --

18   kind of a State database of all controlled substance

19   dispensings.

20       Q.    So the State PDMP maintains these

21   submissions from all of the pharmacies in the state?

22       A.    Yes.

23       Q.    And that's something that pharmacists have

24   access to?

25       A.    Yes.

1      Q.   And that's something that's -- that

2  Albertsons corporate would have access to?

3              MR. WAHBY:  Objection; form.

4  BY MR. LICHTER:

5      Q.   Or just pharmacists?

6      A.   I think just pharmacists.

7      Q.   Okay.

8      A.   I don't think just anybody can get access

9  to it.

10     Q.   Okay.

11     A.   I think pharmacists, doctors, maybe nurse

12 practitioners.

13     Q.   Okay.  And why are you asking Mr. Gandhi

14 to send you this information here?

15     A.   I'm just speculating off of memory that I

16 would question the need for this particular product

17 and would question why they were asking for it.

18              So I would want -- maybe this is my

19 way of getting the pharmacist to do a little more

20 due diligence and scrutinize their patients a little

21 closer before we just special order in a product.

22     Q.   And how would reviewing the PMP

23 information help you address those concerns?

24     A.   You would see how many times they filled

25 this prescription, if there's any other medications.

 1                    PMP helps to just identify things that

 2      we may not have access to because this PMP will show

 3      all prescriptions from all pharmacies.  So -- when

 4      Albertsons would only have access to what was filled

 5      internally at an Albertsons store.

 6                    But it looks, in this case, like at

 7      least something else was filled in a Walgreens that

 8      maybe we wouldn't have known without checking this.

 9           Q.   Does it look like the majority of these

10      prescriptions were filled at Albertsons pharmacies?

11           A.   It does.

12           Q.   And would reviewing the PMP information --

13      would that help you evaluate whether a prescription

14      was issued for a legitimate medical purpose?

15                    MR. WAHBY:  Objection; form.

16           A.   Not necessarily.

17      BY MR. LICHTER:

18           Q.   Could it?

19           A.   I think every prescription needs -- I

20      think it's part of the puzzle -- or part of the

21      picture.

22           Q.   Right.  It gives --

23           A.   So yeah.

24           Q.   It gives you more information to help you

25      determine that; is that fair?

1      A.   Sure.

2      Q.   Okay.  And above that e-mail, at the

3  bottom of the first page and onto the second page,

4  it looks like Mr. Gandhi responds to you on

5  December 27, 2016; is that right?

6      A.   Yes.

7      Q.   And he says, "Hi David, below is the info

8  you asked for.  He also filled the same prescription

9  on 11/04/16 but not 12/02/16 but it's not listed on

10  PMP website."

11          Did I read that correctly?

12      A.   Yes.

13      Q.   And then on the following page, Mr. Gandhi

14  provides you the actual PMP information from this

15  patient; is that right?

16      A.   Yes.

17      Q.   And, again, I've highlighted portions and

18  added some red text to the section, but other than

19  those two points, that's what he said to you,

20  correct?

21          MR. WAHBY:  Objection; form.

22          Object to the exhibit.

23      A.   Yes.

24  BY MR. LICHTER:

25      Q.   Okay.  And it looks like he sends you the

1    PMP information on this patient from July 14th,

2    2016, to December 22, 2016, based on the far-left

3    column.

4              Does that appear correct?

5        A.   Yes.

6        Q.   Okay.  That's about six months of PMP

7    information?

8        A.   Yes.

9        Q.   And I added short red lines to divide each

10   of the months for the fill dates.

11             Do you see that?

12       A.   Yes.

13       Q.   Okay.  In the pharmacy context, have you

14   ever heard the phrase "Trinity" or Holy Trinity"?

15       A.   Yes.

16       Q.   Okay.  What do you understand that to

17   mean?

18       A.   Which one?

19       Q.   Trinity.

20       A.   When a patient receives a combination of

21   an opioid, a benzodiazepine, and a muscle relaxant.

22       Q.   And what is a Holy Trinity?

23       A.   That will specifically indicate the

24   benzodiazepine of alprazolam and muscle relaxant of

25   carisoprodol.

1      Q.   And what is the significance of a Trinity

2    or a Holy Trinity prescription?

3               MR. WAHBY:  Objection; form.

4      A.   I don't necessarily -- I don't understand.

5    What do you mean, "What is the significance"?

6    BY MR. LICHTER:

7      Q.   Is the Trinity or Holy Trinity

8    prescription something you learned about in pharmacy

9    school?

10     A.   No.

11     Q.   When did you learn about it?

12     A.   I don't remember.  2012.  2011.  When was

13   Katrina?  Sorry.

14     Q.   I don't recall.

15     A.   After Hurricane Katrina is when I became

16   more familiar with that.

17     Q.   Okay.  Did people start to present

18   prescriptions for the Trinity and Holy Trinity more

19   often after Katrina?

20               MR. WAHBY:  Objection; form.

21   BY MR. LICHTER:

22     Q.   I'm asking --

23     A.   I don't know that they were necessarily

24   more often.  I think that -- I just think through

25   the passage of time and as people obtained more

1    information about everything surrounding opioids or

2    prescriptions or abuse and dependence and all of

3    that stuff, more information was gathered year after

4    year after year.

5              And so while -- you asked me if I

6    learned about it in pharmacy school.  No.  But I

7    don't know if it was tracked like it is now, 27

8    years ago.

9              And even when you look at things --

10    like, when I was in pharmacy school, hydrocodone

11    wasn't a Schedule 2.  It is now.  Carisoprodol

12    wasn't scheduled at all.  It is now.

13              So as knowledge evolved, drugs

14    evolved, and thus red flags became something that

15    became more important, and Holy Trinity became part

16    of the dialogue around all this stuff.  But

17    specifically when that popped up, I really don't

18    remember.

19    Q.   Okay.  You mentioned that these types of

20    prescriptions are tracked now?

21              MR. WAHBY:  Objection; form.

22    BY MR. LICHTER:

23    Q.   More -- more so now than previously?

24    A.   We have PMP that tracks controlled

25    substances, right?

1        Q.    You tell me.

2        A.    I mean, yeah.  That's ...

3        Q.    Do you know why specifically the Trinity

4    would be tracked more now than previously?

5                MR. WAHBY:  Objection; form.

6        A.    I don't know whether the Trinity is

7    tracked more now.  I think all controlled substances

8    are tracked more now.

9    BY MR. LICHTER:

10       Q.    Okay.  Is the Trinity a drug cocktail

11   that's likely to be abused?

12               MR. WAHBY:  Objection; form.

13       A.    I think all controlled substances have the

14   potential to be abused.

15   BY MR. LICHTER:

16       Q.    Is the Trinity cocktail considered a --

17   considered a red flag?

18       A.    Yes.

19       Q.    Do you know why?

20       A.    Not specifically.

21       Q.    You have no idea why that's considered a

22   red flag?  Any general understanding you have?

23               MR. WAHBY:  Objection; form.

24       A.    Well, if you're getting multiple

25   controlled substances, benzodiazepines can

1    potentiate the effect of opioids.  So when taken in

2    combination, you can get a -- maybe a stronger

3    effect.  So that is a risk that you would want to

4    evaluate with the patient.

5    BY MR. LICHTER:

6        Q.   Any other reason why you can think of that

7    this would be considered a red flag?

8        A.   Why a Trinity would be a red flag?

9        Q.   Yes.

10            MR. WAHBY:  Objection; form.

11       A.   No.

12   BY MR. LICHTER:

13       Q.   We know what an opioid is.

14            What is a benzodiazepine?  What type

15   of medication is that?

16       A.   It's -- I guess it would be an antianxiety

17   or a sedative-type medication.

18       Q.   Okay.  Is it a depressant that slows down

19   the brain and nervous system?

20            MR. WAHBY:  Objection.

21       A.   Yes.

22   BY MR. LICHTER:

23       Q.   And then a muscle relaxant, which I think

24   you said is the third component of the Trinity.

25            That essentially relaxes muscles; is

1    that fair?

2         A.   Yes.

3         Q.   Based on your knowledge, is the Trinity

4    combination widely regarded as a red flag in the

5    pharmacy community?

6              MR. WAHBY:  Objection; form.

7         A.   Yes.

8    BY MR. LICHTER:

9         Q.   Okay.  We can look at some of the

10   highlighting I added here.

11              Every time this patient filled an

12   opioid prescription within six months of the PMP

13   report, I highlighted it in yellow.

14              Do you see that?

15        A.   Yes.

16        Q.   I also wrote "Opioid" in red next to the

17   first one.

18              Do you see that?

19        A.   Yes.

20        Q.   So those are the hydrocodones and the

21   promethazine and codeine prescriptions.

22              Does it appear that I highlighted

23   those accurately?

24              MR. WAHBY:  Objection; form.

25        A.   Yes.

```
 1    BY MR. LICHTER:

 2         Q.   And every time this patient filled a

 3    muscle relaxant, I highlighted it in blue.  I also

 4    wrote the word "Muscle Relaxant" in red next to the

 5    first one.

 6              Do you see that?

 7         A.   Yes.

 8         Q.   And those are carisoprodol and zolpidem

 9    tartrate prescriptions.

10              Did I do that correctly?

11         A.   Zolpidem is not a muscle relaxant.

12         Q.   Oh, it's not?  Zolpidem tartrate is not a

13    muscle relaxant?

14         A.   No.

15         Q.   What is it?

16         A.   It's a sedative.

17         Q.   And sedatives are depressants?

18         A.   It's a sleeping -- sleeping pill.

19              MR. WAHBY:  I restate the objection to

20    the exhibit.

21              MR. LICHTER:  That's the third

22    objection to the exhibit.  You can have a standing

23    objection to the use of it.

24              All right.

25    BY MR. LICHTER:
```

1          Q.   And -- and every time this patient filled

2     the benzodiazepine prescription, I highlighted those

3     in orange.  And I wrote the word "Benzodiazepine" in

4     red next to the first one.

5                    Do you see that?

6          A.   Yes.

7          Q.   Okay.  And that would be the clonazepam

8     prescriptions.

9                    Did I highlight those correctly?

10         A.   Yes.

11         Q.   Okay.  If you can flip back to the first

12    page.

13         A.   (Complied.)

14         Q.   And the next e-mail from the bottom is,

15    again, from Mr. Gandhi to you on December 27, 2016.

16                    Do you see that?

17         A.   Yes.

18         Q.   Okay.  And he writes, "Hi David, I just

19    added 1 more medication for a Medicaid covered NDC I

20    am very busy to send you the details but patient

21    needs it ASAP.  Can you please approve the NDC."

22                    And above that, you write in response,

23    "They've been submitted."

24                    Do you see that?

25         A.   Yes.

1        Q.   Can you explain what was submitted?

2        A.   The details of it?  No.  This appears to

3    be another override that we had to do for a

4    nonpreferred product, but it doesn't indicate which

5    drug it was.

6             I am assuming he just added onto

7    another e-mail chain -- to this existing e-mail

8    chain.  I don't think that this Medicaid related to

9    this patient because this patient did not appear to

10   be on Medicaid.

11       Q.   So the second e-mail from the bottom on

12   the first page, this is discussing a different

13   patient than the rest of the e-mails in this chain?

14       A.   I believe so.

15       Q.   Okay.  So back to the initial patient that

16   we were discussing for whom the PMP information was

17   sent.

18            Do you know if that patient ultimately

19   got approval to receive the highly-abused and

20   sought-after medication that he was seeking at the

21   beginning of the e-mail chain?

22            MR. WAHBY:  Objection; form.

23       A.   I don't know.

24   BY MR. LICHTER:

25       Q.   Okay.

 1          A.   I don't recall.

 2          Q.   And given the types of prescriptions we

 3     see in the PMP report, do you know if Albertsons

 4     ever blocked this patient from receiving future

 5     prescriptions?

 6          A.   I don't believe they did, but I don't know

 7     that there would be a need to block this patient.

 8          Q.   Do you know if this patient was ever

 9     flagged in any way by this Albertsons for its

10     pharmacists?

11          A.   I don't know.

12          Q.   Do you know if Albertsons ever put this

13     patient on a list for future tracking or monitoring

14     or anything like that?

15               MR. WAHBY:  Objection; form.

16          A.   I don't know.

17     BY MR. LICHTER:

18          Q.   So you can set this one aside, and we'll

19     go to the next document that we'll mark as

20     Exhibit 5.

21               (Exhibit 5 marked.)

22               MR. LICHTER:  For the record,

23     Exhibit 5 is Bates numbered ALB-MDLCT9-00383753.

24     BY MR. LICHTER:

25          Q.   Have you seen this document before?

1        A.    I mean, it looks like I responded to it,

2   so I wrote it, but I -- or I forwarded it, but I

3   don't remember.

4        Q.    Have you seen in e-mail string within the

5   last few months?

6              MR. WAHBY:  Objection; form.

7        A.    No.

8   BY MR. LICHTER:

9        Q.    Is this a January 12th, 2019, e-mail

10  string between you and other Albertsons employees?

11       A.    Yes.

12       Q.    If we can look at the long e-mail in the

13  second half of the document.  This appears to be

14  sent from the Pharmacy Store Number 4105 general

15  e-mail address to you and Kim Parta; is that right?

16       A.    Yes.

17       Q.    And the name of the person who sent it is

18  Kavitha; is that right?

19       A.    Yes.

20       Q.    Do you know Kavitha's last name?

21       A.    She is Indian.  It's -- I don't know how

22  to pronounce it.  It's long and starts with a "G."

23       Q.    Okay.  And do you know her title with

24  Albertsons at this time?

25       A.    Staff pharmacist.

1        Q.    I think you mentioned her before, but who

2   is Kim Parta?

3        A.    She's another one of the DPMs in DFW.

4        Q.    That's district pharmacy manager?

5        A.    Yes.

6        Q.    Are you aware that Store 1045 is located

7   in Texas?

8        A.    Yes.  That's in Dallas.

9        Q.    And Kavitha writes, "Hi, I just needed

10  some clarification on filling scripts on opiate

11  medications for acute pain.

12              "From what I understand, one the [sic]

13  steps taken to deal with opiate crisis is to limit

14  only 7 days supply on patients that are treated for

15  acute pain.  Some pharmacies like Walmart and Cvs

16  has a rule in place for that and some insurance

17  companies like caremark, medicare and Medicaid have

18  rejected scripts for more than 7 days supply unless

19  we got a prior authorization from the dr for a

20  larger quantity.  Cdc is also recommending the same

21  and the cms and learning cart training we did talk

22  about the same limitation?

23              "So is this rule a company policy or

24  insurance policy or rule or law and what is our

25  policy regarding this opioid -- opiate crisis???"

1     Three question marks.

2              Did I read that correctly?

3     A.   Yes.

4     Q.   So to summarize, it looks like Kavitha is

5     asking you, in the context of the opioid crisis,

6     what is Albertsons' policy regarding filling opioid

7     prescriptions for a supply that exceeds seven days;

8     is that fair?

9     A.   Yes.

10    Q.   Okay.  And she says other major chains and

11    insurance companies and government programs reject

12    these scripts if they don't at least get prior

13    doctor authorizations, right?

14    A.   Yes.

15    Q.   And Kavitha then writes, "If it is not an

16    Albertsons' policy, are we filling all scripts with

17    the quantity prescribed by the md irrespective if it

18    is for acute pain" -- sorry -- "for acute or chronic

19    pain with out limiting it to a seven days supply?

20              "Also, if the insurance is rejecting

21    and saying that we cannot fill it for more days

22    supply and the patient want to pay cash, can we

23    override the insurance rejection and fill the script

24    on cash which is the case with most patients??"

25              Did I read that okay?

1     A.   Yes.

2     Q.   And here she's asking, "If the insurance

3  rejects the script for exceeding seven days, can we

4  dispense it anyway if the patient wants to pay cash

5  for it?"

6          Is that fair?

7     A.   Yes.

8     Q.   And in your experience, is paying cash for

9  opioid prescriptions considered a red flag?

10     A.   It seems to be one of the universal red

11  flags.

12     Q.   Do you know why that's considered a red

13  flag?

14     A.   Because you're circumventing an insurance

15  company from seeing the claim.

16          When we bill a prescription, it

17  would -- I'm assuming here.  This is my

18  interpretation.

19          When you bill a prescription, you

20  would get an insurance to pay for it.  So if you

21  bill it again, they may not pay for it, and it

22  may -- before PMP, it used to help pharmacies

23  identify when you had doc- -- patients jumping

24  around to different pharmacies or getting early

25  refills.

1      Q.   And why can that be considered

2  problematic?

3           MR. WAHBY:  Objection; form.

4      A.   Because they would be getting multiple

5  prescriptions from multiple places.  It seems to be

6  less of a problem now that we have PMP, but I think

7  it's still universally considered a red flag even

8  though the information's available in different

9  places now.

10  BY MR. LICHTER:

11     Q.   Looking at the top of the page, you

12  respond to Kavitha on January 12th, 2019, correct?

13     A.   No.

14     Q.   Oh, sorry.  You sent the e-mail to Julie

15  Spier, and you cc'd Kim Parta and Don Bowman; is

16  that correct?

17     A.   Yes.

18     Q.   Okay.  And you say, "I get this question a

19  lot lately.  I keep saying it's up to their

20  professional discretion, but we may need a better

21  position as a company?"

22           Do you see that?

23     A.   Yes.

24     Q.   Okay.  And Kavitha's e-mail poses several

25  different questions.

 1                    So which one of them are you getting a

 2    lot lately?

 3        A.   As I recall, this was about the time that

 4    the -- recommendation rolled out on -- to limit

 5    acute meds to a seven-day supply.  And so people

 6    were asking, "Do we have a policy?  Are we limiting

 7    people to seven days' supply?"

 8        Q.   And when you say "people were asking," is

 9    that Albertsons' pharmacists that you oversee?

10        A.   Yes.

11        Q.   And were you getting this type of question

12    from the different pharmacies that you oversaw?

13        A.   From what I recall, yes.

14        Q.   Can you explain what you mean here by

15    Albertsons needs a "better position as a company,"

16    beyond leaving it up to a pharmacist's professional

17    discretion?

18                    MR. WAHBY:  Objection; form.

19        A.   I said, "we may need a better position."

20    BY MR. LICHTER:

21        Q.   Explain what you mean by that.

22        A.   The -- if I -- if I recall, as I received

23    multiple questions about the same issue, I thought

24    we -- maybe the company -- needed -- or maybe the

25    company needed to provide -- make a determination if

```
 1    we were going to also limit seven-day supplies.

 2                It was -- it was fairly complicated

 3    because we -- this has -- my memory isn't the best,

 4    but from what I recall, this was in January.  And

 5    January, everybody's insurance rolls over.

 6    Everybody gets new insurance at the beginning of a

 7    calendar year.

 8                So we had people who had been on

 9    opioids, but yet, if they're new with their

10    insurance, the insurance would view it as the first

11    time they've ever received that.  So those

12    insurances were limiting us to a seven-day supply.

13                And it becomes a very challenging

14    situation when they're not necessarily a new patient

15    or a new prescription.  But the insurance is viewing

16    it as new because you have -- because the insurance

17    is new.  The prescription wasn't new.  The patient

18    wasn't new.  The insurance is what was new.

19                And so the insurances were limiting us

20    to what we could dispense for that patient, and that

21    created a complicated situation because if we only

22    filled seven days, the patient would lose the

23    balance of their medication, and it would require

24    additional doctor visits and additional care to get

25    another prescription, or we would have to fill it as
```

1    cash to bypass the insurance company so that the

2    patient could get their full order.

3        Q.   And up until this time, is it fair to say

4    that Albertsons' policy in this area was to leave it

5    up to the professional discretion of the pharmacist?

6        A.   It's been fairly consistent for as long as

7    I can remember that it's -- we leave that decision

8    to the pharmacist.

9        Q.   And that's the policy today?

10            MR. WAHBY:  Objection; form.

11       A.   Yes.

12   BY MR. LICHTER:

13       Q.   So your suggestion here that Albertsons

14   may need a better position as a company, there was

15   no better position that was ever taken by

16   Albertsons?

17            MR. WAHBY:  Objection; form.

18       A.   I think my wording is incorrect here.  I

19   think it's more we just need guidance as a company.

20   Where if we encounter one of these situations where

21   an insurance is saying, "We're limiting a new script

22   to seven day supply," but it wasn't a new script,

23   how do we override that?  How do we bypass that?

24   Are we okay to go ahead and fill it as cash?

25            You know, yes, we are creating an

     1    additional red flag to fill it as cash, but we're

     2    doing it on behalf of the patient because they would

     3    want us to use their insurance normally, but their

     4    insurance is creating a barrier to us filling their

     5    prescription.  So how do we circumvent those

     6    barriers and still provide care to that customer?

     7    BY MR. LICHTER:

     8         Q.   Did Albertsons ever provide that

     9    additional guidance to its pharmacists to help them

    10    out in that area?

    11         A.   Not that I recall.  It just stayed

    12    consistent.  Evaluate each patient individually.

    13    Identify what you need to for that individual

    14    customer.  I think Albertsons has done a fairly good

    15    job at not laying blanket, "You must do this.  You

    16    can only do this.  You can never do this."

    17              It's always been a, "You need to look

    18    at that prescription, that patient.  Evaluate that

    19    situation individually.  And then make a

    20    determination on how to proceed."

    21              MR. LICHTER:  We can go ahead and take

    22    a lunch break if you guys are okay with that.

    23              MR. WAHBY:  Yeah.

    24              Do you want a lunch break, or do you

    25    want to keep chugging along?

```
 1                    THE WITNESS:  Oh, I don't care.  What

 2     time -- I don't know what time it is.

 3                    MR. LICHTER:  It's a little after 12.

 4                    THE VIDEOGRAPHER:  Let's go off the

 5     record.

 6                    The time is 12:06 p.m.  We are off the

 7     record.

 8

 9                    (A lunch recess taken from 12:06 p.m.

10                     to 1:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    AFTERNOON SESSION

 2              THE VIDEOGRAPHER:  The time is 1 p.m.,

 3    and we are on the record.

 4              MR. LICHTER:  Welcome back, everyone.

 5    Can I have the next document marked as Exhibit 6.

 6              (Exhibit 6 marked.)

 7              MR. LICHTER:  For the record, this

 8    document is Bates numbered ALB-MDLCT9-00073285.

 9              EXAMINATION (CONTINUED)

10    BY MR. LICHTER:

11        Q.   Mr. Hicks, have you seen this document

12    before?

13        A.   Again, another case where I wrote -- I saw

14    it when I wrote it -- or read it a couple years ago.

15        Q.   But you haven't seen it in the past few

16    months?

17        A.   No.

18        Q.   Does this appear to be a March 1, 2019,

19    e-mail string between you and other Albertsons

20    employees?

21        A.   Yes.

22        Q.   And page 73287 is an attachment to that

23    e-mail string; is that right?

24        A.   Yeah.

25        Q.   And the attachment is a March 2, 2019,
```

1    letter from you to ██████████ with the Subject

2    line of "Warning For Poor Work Performance, Poor

3    Customer Service and Compliance"; is that right?

4         A.   Yes.

5         Q.   And according to this letter, ██████

6    ██████ was a pharmacy manager at Albertsons Store

7    4290 in -- sorry -- Azle Texas?  Az-ley?

8         A.   Azle.

9         Q.   -- Azle, Texas; is that right?

10        A.   Yep.

11        Q.   And that's in Tarrant County; is that

12   right?

13        A.   Yes, I believe so.

14        Q.   Let's start with the second page of the

15   document, Bates numbered 73286, and this is a

16   January 13, 2019, e-mail from you to Jordan Jones;

17   is that right?

18        A.   Yes.

19        Q.   Okay.  And who is Jordan Jones?

20        A.   He was an HR manager.

21        Q.   For Albertsons?

22        A.   Yes.

23        Q.   And you write, (as read) "Jordan, as a

24   follow up to our conversation last week I am sending

25   you some notes around overall operations and job

1    execution at 4290.

2                   "Rx Manager ████████ is routinely

3    behind in day to day work duties.  Basically she and

4    her team are not efficiently moving prescriptions

5    through workflow.  This is creating longer than

6    needed wait times and impacting customer service.

7    Store routinely runs with 1 hour+ wait times to fill

8    prescriptions. (We've even had complaints from some

9    of our own employees about this.)  █████ frequently

10   works 2-3 hours past her shift, sometimes past

11   midnight, to catch up on each days work.

12   Prescriptions are left behind from one day to the

13   next and over time there are 100+ prescriptions back

14   logged and not completed."

15                   Did I read that okay?

16        A.   Yes.

17        Q.   Do you recall having these issues with

18   ████████████, the pharmacy manager at Store 4290?

19        A.   Yes.

20        Q.   Okay.  And a few paragraphs down, you

21   write, "in August 2018, Don Bowman had a visit with

22   █████ where they discussed workflow/efficiency/

23   organization.  Store was continuously behind on days

24   that █████ works.  Her time with DV was well behind

25   normal RPh standards- 5+ minutes per script.

1                    Did I read that okay?

2        A.   Yes.

3        Q.   Can you explain what you mean by "Her time

4   with DV was well behind RPh standards"?

5        A.   "DV" stands for data verification, so that

6   is the process by which a pharmacist validates the

7   information on the prescription as it's been

8   inputted into the computer system.  And -- and I

9   mean, honestly, ███ was just a very inefficient

10  pharmacist and worker and very poor performer and

11  routinely struggled in just about every aspect of

12  her job.

13       Q.   Okay.  Let's go to that first page of the

14  document, 73285, and look at the second e-mail on

15  the page, which is the long e-mail.

16       A.   (Complied.)

17       Q.   This is a February 28th, 2019, e-mail from

18  you to Jordan Jones with a Subject line "4290 Rx

19  Issues"; is that right?

20       A.   Yeah.

21       Q.   Okay.  And you write, "Jordan, as a follow

22  up to this visit, I went by to [sic] there has been

23  little improvement at store 4290.  I visited with

24  Brian and we both feel we are in need of change at

25  our manager position in Azle."

1              In the middle of the page, some of the

2    problems you list are "Rx sales ended ███████.

3    Rx script count ████████."

4              Do you see that?

5         A.   Um-hum.

6         Q.   Can you explain what these numbers mean?

7         A.   Their pharmacy sales were trending

8    negative, and their pharmacy prescription count were

9    trending negative, indicating they've been running

10   off customers and -- or losing customers and losing

11   business as --

12        Q.   And --

13        A.   Go ahead.

14        Q.   I'm sorry.

15             Were those negative numbers as

16   compared to prior -- the prior store numbers or some

17   sort of goal that Albertsons had for that store?

18        A.   That wasn't in comparison to goals.  That

19   was a year-over-year number.

20        Q.   And a third bullet says, "No outreach or

21   networking within the community to help turn around

22   and drive sales."

23             Can you explain the types of outreach

24   and networking Albertsons expected its pharmacists

25   to do in order to drive sales?

1        A.    I think with ███, we had given her an

2    opportunity to try to attract business into the

3    store since -- since the sales trend was running

4    negative.  So we might visit a doctor's office in

5    the area and introduce ourselves.  Possibly visit a

6    nursing home or senior center.  Is there anything

7    within the community where a pharmacy presence

8    might, you know -- you know, just win over a new

9    customer.

10        Q.    And those are options the actual

11    pharmacist is expected to do?

12        A.    From time to time, yes.

13        Q.    Okay.  The last bullet point says, "Labor

14    is missed on average 20 technician hours per week."

15              Can you explain what that means?

16        A.    Similar to what we talked about earlier,

17    they are given a -- based off their volume and their

18    business, the company has a labor model or a labor

19    standard which they're supposed to schedule towards.

20    And we found that ███ was a -- again, was a very

21    inefficient pharmacist and struggled to stay caught

22    up with work, so we would have to staff the pharmacy

23    with extra people to try to maintain staying caught

24    up with the business.

25        Q.    So for this store, then, there was an

1    average of 20 technician hours per week under --

2    under ████?

3        A.    Well, ████ was the pharmacy manager, and I

4    don't have a recollection of, like, what their --

5    where they fell on the labor model, what their

6    current volume was.

7              But at the time, I would have averaged

8    it out and -- just as a -- again, as a bullet point,

9    to show consistency on lack of meeting company

10   expectations and efficiency standards.

11       Q.    Okay.  And toward the bottom of this page,

12   you write, "Over the past 2 months I have had

13   several meetings, offering guidance and setting

14   expectations with ████.  I scheduled one of our high

15   talent Rx managers to work extra in this store for a

16   full week to help with training and offer additional

17   help with workflow and productivity.  This seemed to

18   have helped for a few weeks but has had minimal

19   lasting effect."

20             So in these e-mails, you describe ████

21   working extra hours after her shifts -- her shifts,

22   sometimes past midnight, and still being extremely

23   backlogged with the volume of prescriptions the

24   store of the dispensing; is that right?

25       A.    Um-hum.

1       Q.   Do you know about how many pharmacists and

2   technicians were working at this location at the

3   time?

4       A.   There would have been two full-time

5   pharmacists.

6       Q.   That's in addition to ███?

7       A.   No.  ████ plus one other --

8       Q.   Okay.

9       A.   -- staff pharmacist.

10              And I'm -- I'm guessing, but I believe

11   they had three full-time technicians at the time.

12       Q.   Is there a reason you didn't hire

13   additional staff for -- for more than a week in this

14   case?

15       A.   I mean, the need was to -- was for Jill to

16   become a more efficient pharmacist, not to layer in

17   more staffing to cover up her deficiencies.

18       Q.   Do you know if ████ or anyone else at the

19   pharmacy ever requested additional staff to help out

20   with the workload?

21       A.   I don't recall.

22       Q.   You then write, "One of her biggest

23   deficiencies continues to be the time it takes for

24   her to complete filling prescriptions.  ████ is very

25   deliberate with her checking and process and it

1    takes longer than average for her to move

2    prescriptions through the workflow process.  This

3    slows down the staff and productivity of the

4    pharmacy.  Eventually, all the other routine tasks

5    get left undone."

6              How did you become aware that this was

7    an issue?

8        A.   Observation.  We can run productivity

9    reports.  I think more -- I don't remember

10   specifically how did this first come to my

11   attention.  I think it was just more through

12   feedback about customer service issues, long wait

13   times, technicians grumbling that they were

14   stressed.  They were challenged to do their job

15   because their pharmacist -- or pharmacy manager was

16   very inefficient at her job.

17       Q.   Is there a certain goal of a number of

18   minutes the pharmacists are expected to fill

19   prescriptions within?

20       A.   No.

21       Q.   No?  There's nothing like a 15-minute

22   guarantee or anything like that at any Albertsons

23   pharmacy?

24       A.   No.  We kind of just have an expectation

25   of giving good service and taking care of our

```
 1    customers.

 2        Q.   Are pharmacists given any specific goals

 3    as far as how fast they should be filling

 4    prescriptions?

 5        A.   No.  I mean, there's no -- there's nothing

 6    that says that a prescription must be filled in X

 7    amount of time.

 8             There's just a very generic kind of

 9    idea about take care of your customers.  Give good

10    service, and make sure they go home happy.

11        Q.   When you say, " ███ is very deliberate

12    with her checking and process," would you agree that

13    pharmacists are supposed to be very deliberate with

14    prescription checking and processing?

15        A.   Of course, but ███ took it to an extreme.

16        Q.   And the next paragraph says, "After

17    another follow up visit yesterday, I visited for

18    awhile with Brian and we feel that ███ is simply

19    not cut out to do the job."

20             Who is Brian?

21        A.   Brian was the store director at the Azle

22    store.

23        Q.   Can you explain what actually ultimately

24    happened to ███?

25             MR. WAHBY:  Objection; form.
```

1          A.    So this is a confusing situation.  You'll

2     notice earlier there was reference to Don Bowman had

3     visited with her.

4                     Don had been the DPM at this location.

5     Due to shuffling lines in districts, I became the

6     DPM for a short period of time, and then it went

7     back to Don.

8                     So eventually, what happened is she

9     was -- she stepped down as manager, went to another

10    store and another location as a staff pharmacist.

11    Took her into a lower volume store.  She continued

12    to struggle there, and I do not recall if her

13    separation was voluntary or not.

14    BY MR. LICHTER:

15         Q.    When you say "she stepped down," does that

16    mean that she was demoted?

17         A.    I don't recall if she -- from what I

18    recall, she applied for another store location.  I

19    think she basically demoted herself, seeing the

20    writing was on the wall that she was not cutting it

21    as a pharmacy manager.  So she had an opportunity to

22    go into a lower-volume store with less

23    responsibilities.

24         Q.    Do you know about when she ultimately left

25    Albertsons?

```
 1        A.   I don't.

 2        Q.   Do you know if staffing was ever increased

 3   at this location on a permanent basis?

 4        A.   At the Azle location?

 5        Q.   Yeah.

 6        A.   It -- yeah.  I know we have -- well, this

 7   is not my location, but my understanding is

 8   there's -- the business returned, volume returned.

 9   The store's a lot busier than it used to be, so it

10   is definitely staffed with more people now than it

11   was back then.

12        Q.   So more pharmacists and more techs?

13        A.   Yes.

14        Q.   Do you know what would account for that

15   increase in business at this location?

16        A.   Better service.  Competent help being in

17   the store.  Not upsetting customers and running them

18   off.

19             THE WITNESS:  Is that fair to say?

20        A.   Sorry.  I mean, it's blunt.  She was

21   just -- I hope she doesn't ever see this.  Sorry.

22   BY MR. LICHTER:

23        Q.   And the warning letter that's the

24   attachment to this e-mail to page 73287, you sent

25   that to ████████ on March 2, 2019; is that right?
```

1        A.    Yes.

2        Q.    And in the middle of the page before the

3    bullets, you write, (as read) "Your unacceptable Q4

4    metrics are as follows:  Rx sales ended

5    ██████████."

6                 Is there a specific threshold

7    Albertsons has for this metric, where a drop in

8    prescription sales becomes unacceptable?

9        A.    No.  It -- with ████, it was a combination

10   of everything, and it really boiled down to service.

11                 It's hard to put a metric on service.

12   But through bad service and bad management, it leads

13   to not -- it leads to loss of business.

14       Q.    And the second bullet point there, "Rx

15   script count ██████████."

16                 Same question there.  Is there a

17   specific threshold that Albertsons has for this

18   metric where a drop in the prescription count

19   becomes unacceptable?

20       A.    No.

21       Q.    Are pharmacists given any sort of goals,

22   as far as prescription sales or prescription counts

23   when they're working at Albertsons?

24       A.    No -- I mean, we -- the goal is to always

25   increase sales, increase business, you know, to kind

1    of be moving forward.

2              But no store has a "Hey, you must fill

3    300 prescriptions today, or there's consequences."

4        Q.   Just the goal, then, to always increase

5    prescription sales?

6              MR. WAHBY:  Objection; form.

7        A.   I think the goal of any business is to

8    always have business and -- I don't know that our

9    goal is always to grow, but it's certainly to not

10   lose what you have or to -- I mean, you got to --

11   you're in business to do business, right?

12   BY MR. LICHTER:

13       Q.   Sure.  So you don't know if it's one of

14   Albertsons' goals to grow its prescription sales?

15             MR. WAHBY:  Objection; form.

16       A.   I -- the goal is -- we do have a goal to

17   grow.  But I don't know that we have a goal that

18   we -- this person has to grow this much.

19   BY MR. LICHTER:

20       Q.   Sure.  Does Albertsons' goal to grow --

21   does that include prescription sales?

22             MR. WAHBY:  Objection; form.

23   BY MR. LICHTER:

24       Q.   Or is that somehow excluded from its goal?

25       A.   I -- I -- I mean, it's all -- it's all

1    together.  I mean, I'd say yes.

2         Q.   Yes, it includes prescription sales?

3         A.   Yes.

4              MR. LICHTER:  Can I have the next

5    document marked as Exhibit 7?

6              (Exhibit 7 marked.)

7              MR. LICHTER:  Okay.  For the record,

8    this document is Bates numbered ALB-NM00011005.

9    BY MR. LICHTER:

10        Q.   Have you seen this document before?

11        A.   No.

12        Q.   Represent to you this is an internal

13   Albertsons report dated January 24, 2020, that

14   discusses the controlled substance dispensing of

15   Albertsons Pharmacy Number 3914, located in Silver

16   City, New Mexico.

17             And up toward the top, it says, "DPM,"

18   who is noted as Dave Carrick.

19             Do you know Mr. Carrick?

20        A.   No.

21        Q.   I'd like to go over some parts of this

22   document together.

23             The bottom of page 1 identifies some

24   prescription fill data for this store, as far as

25   weekly prescriptions filled, what percent are

1    Schedule 2s compared to the company average.

2              Do you see that?

3       A.   Yeah.

4       Q.   And below that, it identifies the number

5    of stores in the state of New Mexico at 29 and

6    identifies IQVIA controlled substance dispensing

7    ratings.

8              Do you see that?

9       A.   Yes.

10      Q.   Do you know what IQVIA controlled

11   substance dispensing ratings are?

12      A.   Vaguely.

13      Q.   What do you understand them to be?

14      A.   I know that our corporate office -- or I

15   don't know if it's our compliance team.

16              Somebody in our corporate office has

17   a -- I guess, access to all of this data, and they

18   rate -- I mean, similar to what this is, they rate

19   stores based off their dispensings.

20              I don't know specifically what IQVIA

21   is or stands for.  I've never accessed the program

22   or seen it in action.

23      Q.   Have you ever been provided IQVIA

24   controlled substance dispensing data?

25      A.   Yes.

1          Q.    From Albertsons?

2          A.    Yes.

3          Q.    In what context?

4          A.    I had a store that they sent -- it was

5    several -- it was a couple years ago, but it

6    appears -- from looking at this, it looks like it

7    would have been a very similar document they sent to

8    me on one of my stores.

9          Q.    Do you remember which store that was?

10         A.    I think I had it on Store 226 in Sherman,

11   which is up by the Red River.

12         Q.    Is Sherman the county?

13         A.    Grayson County.

14         Q.    Grayson County?

15         A.    No -- yes, Grayson County.

16         Q.    Okay.  And then on the top of page 2, you

17   see that IQVIA dispensing ratings chart there?

18         A.    Yeah.

19         Q.    Do you recall a similar chart like this in

20   the document you saw for Store 226?

21         A.    I think so.

22         Q.    Okay.  And below the chart, it indicates,

23   "A review of all prescriptions dispensed from

24   10/19/19 - 1/20/2020 was performed and details

25   provided below."

1           Do you see that?

2      A.   Um-hum.  Sorry.  Yes.

3      Q.   Thanks.  It then gives a section on

4  overall insights for that store based on its review

5  of the prescriptions dispensed.

6           Do you see that?

7      A.   Yes.

8      Q.   Okay.  Below that section at the bottom is

9  a section titled, "Patients," which appears to

10  identify specific information for what looks like a

11  few dozen Albertsons patients.

12           Do you see that on the following

13  pages?

14      A.   Yes.

15      Q.   And page 4 of this document, the next

16  section is entitled, "Prescribers," which discusses

17  "Top prescribers by volume for CS prescriptions."

18           Do you see that?

19      A.   Yes.

20      Q.   And it looks like it gives IQVIA ratings

21  for each of the prescribers, broken down by

22  different controlled substance drugs.

23           Do you see that?

24      A.   Yes.

25      Q.   I think that starts on page 5.

1        A.    (Complied.)

2        Q.    And looking on page 6, on -- the next

3    section is entitled, "Geography."  It appears to

4    discuss the Silver City population and surrounding

5    areas as it relates to controlled substance

6    dispensing at that store.

7              Do you see that?

8        A.    Yes.

9        Q.    And then the very last page is a "Store

10   Action Plan" that appears to identify a plan of

11   action for the store based on the above dispensing

12   review.

13             Do you see that?

14       A.    Yes.

15       Q.    And you said you received a document

16   similar to this for Store 226, which is located in

17   Grayson County; is that right?

18       A.    Yes.

19       Q.    Have you received documents similar to

20   this for any other stores you oversee?

21       A.    I don't recall.

22       Q.    Do you recall if you received documents

23   similar to this for any stores you oversee in

24   Tarrant County?

25       A.    Not that I recall.

1      Q.   Do you know about how many of these

2    documents similar to this you've received from

3    Albertsons at all?

4      A.   I -- I'm pausing because I think I also

5    received one for another store in Grayson County.

6      Q.   Okay.

7      A.   But I don't remember if it was necessarily

8    this exact document or this exact IQVIA data.

9          But I do have another store in Grayson

10   County, the Denison store.

11     Q.   Okay.

12     A.   And --

13     Q.   Do you remember that store number?

14     A.   716.

15     Q.   Other than those two stores, do you recall

16   receiving a similar document like this?

17     A.   I don't -- I don't remember.  I don't -- I

18   don't think so, but ...

19     Q.   Okay.  You don't have any memory of

20   receiving a document like this for any of your

21   stores in Tarrant County; is that right?

22     A.   Correct.

23     Q.   Do you know why you received a document

24   similar to this for those two stores in Grayson?

25     A.   I know the Sherman one.  We were looking

1    at doing an acquisition of an independent pharmacy,

2    and they were reviewing -- from what I recall, they

3    were looking at the controlled substances of the

4    store we were doing an acquisition on and comparing

5    that to the controlled substance dispensing of our

6    Sherman location -- of our company Sherman location.

7                    And from what I recall, they kind of

8    denied proceeding with the acquisition due to the

9    independent pharmacy's controlled substance

10   dispensings or ratings.

11       Q.   Was that because the controlled substance

12   dispensing at the potential new pharmacy was higher

13   than the Sherman store?

14       A.   I believe so.

15       Q.   Any other reason you can recall as to why

16   the acquisition didn't take place?

17       A.   No.  They -- they told me they sold too

18   many controlled substances.  It was -- didn't want

19   to proceed with it.

20       Q.   And why were they sending this information

21   to you in that process?

22       A.   Well, being -- at the time, I was DPM over

23   that location.  Anytime we have an acquisition lead,

24   they try to get feedback from the division on the

25   viability of -- what we would perceive the viability

1    of the new business would be.  Is it -- you know, I

2    guess get -- get on-the-ground knowledge of what do

3    we know about that business.

4                    Is it a customer base that would start

5    shopping at our store?  If we're about to invest in

6    buying a business or buying a -- or taking over an

7    independent pharmacy, what's the likelihood we would

8    hold on to that business?  What's the return on

9    investment?  Things like that.

10                   So they asked for feedback from me or

11   from somebody in the division that could say, "Hey,

12   this is a -- this would not be good.  This store is

13   across the street, and we would attract a lot of

14   this business."  Or is this store across the street

15   from a Kroger or a CVS, and more than likely, the

16   Kroger would grab that business, so that would make

17   it less valuable to us.

18       Q.   Do you recall whether you gave Albertsons

19   any feedback as a part of its analysis on whether to

20   go forward with this acquisition?

21       A.   So my feedback on this store would have

22   been that it -- at least from the location, it would

23   have been a viable independent.  They were on the

24   same side of the highway.  It was fairly close.  I

25   think it was about half a mile or less than a mile

1    away.  There was no other competition between it and

2    us.  So it seemed on the surface, at least on -- you

3    know, driving past it on the ground, it seemed like

4    it would have been a worthwhile acquisition.

5              And then my understanding, we have a

6    team that does due diligence and looks through

7    their -- the other -- you know, the independent's --

8    the independent pharmacy's files and script

9    information, patient information and kind of dives

10   more into the data that I did not have access to.

11       Q.   So you didn't give any advice to

12   Albertsons against the acquisition for that

13   potential new store; is that fair?

14       A.   Oh, I think once we saw -- I remember once

15   we saw this for that store, everybody was kind of --

16   a little hands off on wanting to proceed it --

17   proceed with it.

18       Q.   So I'm confused.  Did you get the

19   dispensing data for the store Albertsons already

20   owned or for the new potential store it was looking

21   to acquire?

22       A.   Well, I don't -- I don't know how much

23   information I got.

24              I was part of a conversation that,

25   "Hey, this is what we're looking at.  This is some

1    issues we potentially have."

2              "Well, then, hey, it's not worth

3    proceeding if those are the concerns."

4         Q.   As part of that conversation, did you

5    actually see a document similar to the exhibit that

6    we're looking at now, or were -- just --

7         A.   Yes.

8         Q.   Yes.  Okay.

9              And that was -- again, that was for

10   the store Albertsons already owned or the store it

11   was looking to acquire?

12        A.   Honestly, I don't recall.

13        Q.   It could have been for either one?

14        A.   It could have been for either one.

15        Q.   Okay.  And then the second store you

16   mentioned that you may have received a similar

17   document, that was Store 716?

18        A.   Yes.

19        Q.   Okay.  Do you remember the circumstances

20   as to why you received -- may have received a

21   similar document in that case?

22        A.   I don't.  I can't even remember when it

23   was.

24        Q.   You don't know if that was because -- was

25   it a concern about the dispensing of that store or

1    any other reason?

2        A.   Honestly, I don't recall.  As I -- as I

3    talked through the acquisition thing, I know that

4    our Denison store did also -- or they actually did

5    proceed with acquiring a Kroger that had closed

6    down, so I can't remember if it was part of that or

7    secondary to that because of dispensing issues or

8    dispensing concerns.  But that was, I think, maybe

9    2018/2019, so I -- I just don't remember.

10       Q.   Denison was probably 2018/2019?

11       A.   Yes.

12       Q.   Do you recall what year the Sherman store

13   may have been?

14            MR. WAHBY:  Objection; form.

15       A.   I think that was within the last year or

16   18 months.  It was a little more recently, so I

17   think that's why it's a little fresher.

18   BY MR. LICHTER:

19       Q.   So other than those potential two

20   instances for those stores where you may have seen a

21   document similar to the one we're looking at, has

22   Albertsons ever provided you information on

23   dispensing trends for certain prescribers at the

24   stores you oversee?

25       A.   Not that I recall.

1      Q.   Okay.  How about information on dispensing

2  trends for certain patients for the pharmacies you

3  oversee?

4      A.   No, not that I recall.

5      Q.   Any information on dispensing trends for

6  the store as a whole, not relating to demographics

7  or anything like that?

8      A.   I don't think so.

9      Q.   Okay.  No analytic information from the

10  IQVIA data that we talked about before for any of

11  the pharmacies you oversee?

12              MR. WAHBY:  Objection; form.

13      A.   Not that I recall.

14  BY MR. LICHTER:

15      Q.   Do you know whether Albertsons provides

16  any of that information to its pharmacists that you

17  oversee?

18      A.   No, I don't know.

19      Q.   Set this one aside.

20      A.   (Complied.)

21              MR. LICHTER:  And we'll have the next

22  document marked Exhibit 8.

23              (Exhibit 8 marked.)

24              MR. LICHTER:  For the record, this

25  document is Bates numbered ALB-MDLCT9-00094579.

1    BY MR. LICHTER:

2        Q.   I'll represent to you this is an extract

3    from a March 4th, 2021, Excel sheet Albertsons

4    produced in this action with the Bates number I just

5    read, with some highlighting that I added.

6             Do you see that?

7        A.   (Examined exhibit.)  Yes.

8        Q.   This appears to be a list of, I think, 32

9    Albertsons pharmacies for which you are noted as the

10   division pharmacy manager or DPM as of March 2021.

11            Does that seem right?

12       A.   Yes.

13       Q.   And the highlighted stores here are the

14   ones I believe are located in Tarrant County, Texas.

15            Does that highlighting seem accurate?

16       A.   Yes.

17       Q.   Did I leave out any stores that you

18   oversee located in Tarrant County?

19       A.   I don't believe so.

20       Q.   And does this chart appear to accurately

21   reflect your current assignments?

22            MR. WAHBY:  Objection; form.

23       A.   What do you mean?

24   BY MR. LICHTER:

25       Q.   The stores that you're currently assigned

1    to oversee?

2         A.   No.  They've changed.

3         Q.   Okay.  Which ones have changed?

4         A.   As far as the Tarrant County ones?  Or all

5    of them?

6         Q.   All of them.  Any of them.

7              MR. WAHBY:  Objection; form.

8         A.   226.  716.  1784.  1788.  1925.  2578.

9    2964.  3099.  3579.  3645.  3853.  4112.  4187.

10   4234.  4239.  4265.

11   BY MR. LICHTER:

12        Q.   And those numbers that you just read to

13   me, are those --

14        A.   No longer stores that I would supervise.

15        Q.   Okay.  And those are all -- those were all

16   in Texas?

17        A.   Yes.

18        Q.   This accurate was -- sorry.

19             This chart was accurate as of

20   March 2021; is that right?

21        A.   Yes.

22        Q.   Okay.  And what's the reason for the

23   change in the stores you oversee since then?

24             MR. WAHBY:  Objection; form.

25        A.   The division created a new district and

1    realigned stores with different DPMs, and kind of

2    the pharmacy alignment adjusted with the store

3    alignment.

4    BY MR. LICHTER:

5        Q.   But you currently oversee Store 1780?

6        A.   Yes.

7        Q.   And you currently oversee Store 2580?

8        A.   Yes.

9        Q.   You currently oversee Store 3625?

10       A.   Yes.

11       Q.   Do you currently oversee any other stores

12   in Tarrant County?

13       A.   Yes.

14       Q.   Which ones?

15       A.   3854.

16       Q.   Any others?

17       A.   No.

18       Q.   Okay.  You can set this one aside.

19       A.   (Complied.)

20            MR. LICHTER:  Have the next document

21   marked Exhibit 9.

22            (Exhibit 9 marked.)

23   BY MR. LICHTER:

24       Q.   I'll represent to you this chart we're

25   looking at is a summary of the opioid dispensing

1    data that Albertsons produced for Store 3625 in

2    dosage units, created by Dr. Craig McCann in this

3    litigation.

4              And a dosage unit is essentially a

5    pill, correct?

6              MR. WAHBY:  Object.  Objection; form.

7              Object to the use of this exhibit, and

8    it's not Bates labeled.

9    BY MR. LICHTER:

10       Q.   Is a dosage unit essentially a pill?

11       A.   I believe so.  I think -- I assume so.

12       Q.   In your training as a pharmacist --

13       A.   It may also being a milliliter if we're

14    talking about a liquid.

15       Q.   Okay.  So a single pill or a milliliter;

16    is that fair?

17       A.   Yes.

18       Q.   Okay.  And the top indicates Store 3625 is

19    located at 302 South Park Boulevard in Grapevine,

20    Texas; is that correct?

21       A.   Yes.

22       Q.   And that's located in Tarrant County; is

23    that right?

24       A.   Yes.

25       Q.   And you oversee Store 3625, correct?

1      A.   Yes.

2      Q.   Do you have any idea what the population

3   of Grapevine, Texas, is?

4      A.   No.

5      Q.   I'll represent to you that according to

6   the U.S. Census Bureau, the population of Grapevine,

7   Texas, was 50,872 people in 2021.  So that's about

8   51,000 people.

9           MR. WAHBY:  Objection; form.

10           Object to the sidebar.  And move to

11   strike.

12   BY MR. LICHTER:

13      Q.   And, first, it looks like for every year

14   since 2006, Albertsons Store 3625 dispensed more

15   opioid pills into Grapevine than the actual number

16   of people who live there.

17           Do you see that?

18           MR. WAHBY:  Objection; form.

19      A.   Yes.

20   BY MR. LICHTER:

21      Q.   In looking at the year 2015, Albertsons

22   Store 3625 dispensed 104,832 dosage units of opioids

23   into Grapevine.

24           Do you see that?

25      A.   Yes.

```
 1          Q.   Again, in a city of about 51,000 people,

 2    that comes out to about two opioid pills that year

 3    for every person in Grapevine.

 4                Did Albertsons ever provide you any

 5    information or data to determine whether or not that

 6    level of dispensing into Grapevine is reasonable?

 7                MR. WAHBY:  Objection; form.

 8                Object to the sidebar.  And move to

 9    strike.

10    BY MR. LICHTER:

11          Q.   You can answer.

12          A.   No.

13          Q.   And over on the bottom left of the chart,

14    it indicates Albertsons Store 3625 dispensed a grand

15    total of 1,223,062 opioid dosage units into

16    Grapevine from 2006 to 2021.

17                Do you see that figure?

18          A.   Yes.

19          Q.   Okay.  Again, in a city of about 51,000

20    people, that comes out to about 24 opioid pills per

21    person in Grapevine.

22                Albertsons never provided you any data

23    or information to determine if that level is

24    reasonable, did it?

25                MR. WAHBY:  Objection; form.
```

```
 1                    Object to the sidebar.

 2                    Move to strike.

 3    BY MR. LICHTER:

 4         Q.   You can answer.

 5         A.   Not that I recall.

 6         Q.   Based on the numbers we're looking at, do

 7    you have any opinion as to whether this Albertsons

 8    location was filling more opioid prescriptions than

 9    it should have?

10                    MR. WAHBY:  Object to the form.

11         A.   Ask that question again.

12    BY MR. LICHTER:

13         Q.   Based on the number -- the numbers that

14    we're looking at here, do you have any opinion as to

15    whether this Albertsons location was filling more

16    opioid prescriptions than it should have?

17                    MR. WAHBY:  Objection; form.

18         A.   No.

19    BY MR. LICHTER:

20         Q.   Would additional information or data from

21    Albertsons be helpful in determining whether or not

22    dispensing levels that we're looking at were

23    reasonable or unreasonable?

24                    MR. WAHBY:  Objection; form.

25         A.   I don't know.  I mean, maybe, but it
```

1    depends on the data and the -- yeah, I don't know.

2    BY MR. LICHTER:

3        Q.   Okay.  Set this one aside.

4        A.   (Complied.)

5            MR. LICHTER:  The next document marked

6    as Exhibit 10.

7            (Exhibit 10 marked.)

8    BY MR. LICHTER:

9        Q.   And I'll represent to you this chart we're

10   looking at is a summary of the opioid dispensing

11   data Albertsons produced for Store 1780 in dosage

12   units created by Dr. Craig McCann in this

13   litigation.

14           And the top indicates Store 1780 is

15   located at 1000 Keller Parkway in Keller, Texas; is

16   that right?

17           MR. WAHBY:  Object.  Objection; form.

18           Object to the exhibit.  It's not Bates

19   labeled.  Origin unclear.

20       A.   Yes.

21   BY MR. LICHTER:

22       Q.   And that's located in Tarrant County,

23   correct?

24       A.   Yes.

25       Q.   And you oversee Store 1780, correct?

1          A.   Yes.

2          Q.   And do you have any idea what the

3     population of Keller, Texas, is?

4               MR. WAHBY:  Objection; form.

5          A.   No.

6     BY MR. LICHTER:

7          Q.   I'll represent to you that according to

8     the U.S. Census Bureau, population of Keller, Texas,

9     was 45,397 people in 2021.  So about 45,000 people.

10              And in looking at the chart, it

11    appears that for every year since 2006, Albertsons

12    Store 1780 dispensed more opioid pills into Keller

13    than the actual number of people that lived there.

14              Do you see that?

15              MR. WAHBY:  Objection; form.

16              Object to the sidebar.  And move to

17    strike.

18         A.   Yes.

19    BY MR. LICHTER:

20         Q.   And did Albertsons ever provide you any

21    information or data to determine if that level of

22    dispensing into Keller is reasonable?

23              MR. WAHBY:  Objection; form.

24         A.   No.

25    BY MR. LICHTER:

1      Q.   Looking at the year 2015, Albertsons

2  Store 1780 dispensed 109,103 dosage units into

3  Keller.  In a city of about 45,000 people, that's --

4  that comes out to over two opioid pills for every

5  person in Keller.

6            Again, Albertsons never gave you any

7  information or data to determine whether that figure

8  would be reasonable, did it?

9            MR. WAHBY:  Objection; form.

10           Object to the sidebar.

11           Move to strike.

12     A.   No.

13  BY MR. LICHTER:

14     Q.   And over on the bottom left of the chart,

15  it indicates Albertsons Store 1780 dispensed a grand

16  total of 1,361,979 opioid dosage units into Keller

17  from 2006 to 2021.

18           Do you see that?

19     A.   Yeah -- yes.

20     Q.   Again, city of about 45,000 people, that

21  comes out to about 30 opioid bills per person into

22  Keller in that time period.

23           Again, Albertsons never provided you

24  any information or data to determine whether that

25  level of dispensing would be reasonable, did it?

1              MR. WAHBY:  Objection; form.

2              Object to the sidebar.

3              Move to strike.

4      A.   No.

5   BY MR. LICHTER:

6      Q.   Do you recall in an earlier document we

7   looked at, an Albertsons pharmacist asked you about

8   dispensing 150 hydrocodone pills in a month to a

9   certain patient who requested they come from a

10  certain manufacturer?

11     A.   Yes.

12     Q.   Do you recall that in your response, you

13  told her, "At the end of the day it is about being

14  profitable"?

15             MR. WAHBY:  Objection; form.

16     A.   Yes.

17  BY MR. LICHTER:

18     Q.   Do you think that philosophy may have had

19  an impact on some of the numbers we're seeing from

20  these other Albertsons pharmacies in Tarrant County?

21             MR. WAHBY:  Objection; form.

22     A.   No.

23  BY MR. LICHTER:

24     Q.   Do you know how pharmacy bonuses are

25  calculated in Tarrant County for Albertsons?

 1        A.   Yes.

 2             MR. WAHBY:  Objection; form.

 3   BY MR. LICHTER:

 4        Q.   Can you explain?

 5        A.   All store management is eligible for a

 6   bonus based off the sales and profit of the total

 7   store.

 8        Q.   And does that store management include the

 9   pharmacy managers?

10        A.   Yes.

11        Q.   When you say "the total store," does that

12   include the sales from the pharmacy?

13        A.   Every department.

14        Q.   Including the pharmacy?

15        A.   Yes.

16        Q.   Does that include the sale of controlled

17   substances?

18        A.   Yes.

19        Q.   Are you aware if Albertsons has any

20   corporate monitoring for its Tarrant County

21   pharmacies in the area of problematic doctors?

22             MR. WAHBY:  Objection; form.

23        A.   I'm not aware.

24   BY MR. LICHTER:

25        Q.   How about corporate monitoring in Tarrant

1    County for problematic patients?

2         A.   Not that I'm aware of.

3              MR. WAHBY:  Objection; form.

4    BY MR. LICHTER:

5         Q.   Corporate monitor in Tarrant County for

6    red flag prescriptions?

7              MR. WAHBY:  Objection; form.

8         A.   Not that I'm aware of.

9    BY MR. LICHTER:

10        Q.   Any corporate monitoring in Tarrant County

11   for Trinity prescriptions?

12        A.   Not that I'm aware of.

13             MR. LICHTER:  I have no further

14   questions.

15             MR. WAHBY:  We'll reserve our

16   questions until the time of trial.

17             Thank you.

18             MR. LICHTER:  Does -- posing to

19   anybody on Zoom.  Mr. Frampton?  Anybody have any

20   questions for the witness?

21             MR. FRAMPTON:  This is Paul Frampton.

22   I have no questions.

23             MR. LICHTER:  All right.

24             MR. WAHBY:  We're off the record.

25             THE VIDEOGRAPHER:  The time is

```
1    1:49 p.m., and we are off the record.

2

3                 (The following discussion was held for

4                  administrative purposes.)

5

6                 THE COURT REPORTER:  Mr. Wahby, would

7    you like the witness to read and sign?

8                 MR. WAHBY:  Yes.

9                 THE COURT REPORTER:  And you have a

10   standing order?

11                MR. WAHBY:  Yes.

12                THE COURT REPORTER:  Mr. Frampton, do

13   you have a standing order?

14                MR. FRAMPTON:  No, I do not.

15                THE COURT REPORTER:  Did you need a

16   copy?

17                MR. FRAMPTON:  Yes, please.

18                THE COURT REPORTER:  And Mr. Lichter,

19   I believe you have a standing order as well.

20                MR. LICHTER:  Yes, we do.

21                THE COURT REPORTER:  Thank you.  Have

22   a nice day, everyone.

23

24                (Hybrid deposition concluded at

25                 1:49 p.m., July 19, 2023.)
```

1                    CHANGES AND SIGNATURE

2    WITNESS NAME:  DAVID HICKS

3    DATE:  JULY 19, 2023

4    PAGE/LINE      CHANGE                    REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

1          I, DAVID HICKS, have read the foregoing

2     deposition and hereby affix my signature that same

3     is true and correct, except as noted above.

4

5                              _____

6                              DAVID HICKS

7

   THE STATE OF _____)

8
   COUNTY OF _____)

9

10         Before me, _____, on

11    this day personally appeared DAVID HICKS, known to

12    me (or proved to me under oath or through

13    _____) (description of

14    identity card or other document) to be the person

15    whose name is subscribed to the foregoing instrument

16    and acknowledged to me that they executed the same

17    for the purposes and consideration therein

18    expressed.

19         Given under my hand and seal of office this

20    _____ day of _____, 2023.

21

22

23                              _____

24                              NOTARY PUBLIC IN AND FOR

25                              THE STATE OF _____

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION

 3    IN RE:NATIONAL PRESCRIPTION   § MDL NO. 2804
      OPIATE LITIGATION             §
 4                                  § CASE NO.:
                                    § 1:17-MD-2804
 5                                  §
      THIS DOCUMENT RELATES TO:     § JUDGE DAN AARON
 6    "Case Track Nine"            § POLSTER

 7

 8         ********************************************

 9         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

10                   CONFIDENTIALITY REVIEW

11          HYBRID REALTIMED/VIDEOTAPED DEPOSITION OF

12                         DAVID HICKS

13                       JULY 19, 2023

14         ********************************************

15

16                    CERTIFIED STENOGRAPHIC

17                  COURT REPORTER'S CERTIFICATE

18

19         I, Karen L. D. Schoeve, Registered Diplomate

20    Reporter, Certified Realtime Reporter, and Realtime

21    Systems Administrator, residing in the State of

22    Texas, do hereby certify that the foregoing

23    proceedings were reported by me and that the

24    foregoing transcript constitutes a full, true, and

25    correct transcription of my stenographic notes, to
```

1    the best of my ability and hereby certify to the

2    following:

3         By agreement of all attending attorneys, the

4    witness, DAVID HICKS, was duly sworn by the officer

5    and that the transcript of the oral deposition is a

6    true record of the testimony given by the witness;

7         That the original deposition was delivered to

8    Jay M. Lichter, custodial attorney;

9         That a copy of this certificate was served on

10   all parties and/or the witness shown herein on

11   July 25, 2023.

12        I further certify that the signature of the

13   witness was requested by the witness or a party

14   before the completion of the deposition and the

15   signature is to be returned within 30 days from date

16   of receipt of the transcript.

17        If returned, the attached Changes and

18   Signature Page contains any changes and the reasons

19   therefor.

20        That pursuant to information given to the

21   deposition officer at the time said testimony was

22   taken, the following includes counsel for all

23   parties of record:

24

25

```
 1    FOR PLAINTIFF TARRANT COUNTY, TEXAS:

 2         JAY M. LICHTER, ESQUIRE
           BARON & BUDD, P.C.
 3
      FOR DEFENDANT ALBERTSONS:
 4
           PETER S. WAHBY, ESQUIRE
 5         GREENBERG TRAURIG, LLP

 6    FOR DEFENDANT KROGER:

 7         PAUL L. FRAMPTON, JR., ESQUIRE
           ATKINSON & FRAMPTON, PLLC
 8

 9         I further certify that I am neither counsel

10    for, related to, nor employed by any of the parties

11    in the action in which this proceeding was taken,

12    and further that I am not financially or otherwise

13    interested in the outcome of the action.

14         Subscribed and sworn to on this the 25th day

15    of July, 2023.

16

17

18

19    _____
      Karen L.D. Schoeve, RDR, CRR
20    Realtime Systems Administrator
      NCRA Exp. Date:  09-30-24
21    Litigation Services
      Firm Registration No. 726
22    3960 Howard Hughes Parkway, Suite 700
      Las Vegas, Nevada 89169
23    T: 877.370.3777
      F: 917.591.5672
24

25
```