# EXHIBIT 10

```
 1                   UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION

 3    IN RE:  NATIONAL PRESCRIPTION   )
      OPIATE LITIGATION               )
 4                                    )
      THIS DOCUMENT RELATES TO        )  MDL NO. 2804
 5                                    )  CASE NO. 17-MD-2804
      TRACK NINE                      )
 6                                    )
                                      )
 7    * * * * * * * * * * * * * * * * * * * * * * * * * *

 8               ORAL AND VIDEOTAPED DEPOSITION OF
                            SCOTT JOHNSON
 9                          JULY 12, 2023

10    * * * * * * * * * * * * * * * * * * * * * * * * * *

11               HIGHLY CONFIDENTIAL - SUBJECT TO

12                FURTHER CONFIDENTIALITY REVIEW

13

14          DEPOSITION OF SCOTT JOHNSON, produced as a

15    witness at the instance of the Plaintiffs, and duly sworn,

16    was taken in the above-styled and numbered cause on the

17    12th day of July 2023, from 10:00 a.m. to 12:02 p.m.,

18    before Kate E. Roundy, RPR, in and for the State of

19    Arizona, reported by machine shorthand, at the offices of

20    Greenberg Traurig, LLP, 2375 East Camelback Road, Suite

21    800, Phoenix, Arizona, pursuant to the Federal Rules of

22    Civil Procedure and the provisions stated on the record or

23    attached hereto.

24                   GOLKOW LITIGATION SERVICES
                 877.370.3377 ph | 917.591.5672 fax
25                      deps@golkow.com
```

```
 1                    A P P E A R A N C E S

 2

 3   For Plaintiff Tarrant County, Texas:

 4        BARON & BUDD P.C.
          By:  Jay Lichter, Esq.
 5             William Powers, Esq. (Via Zoom)
          15910 Ventura Boulevard, Suite 1600
 6        Los Angeles, California 91436
          (818) 839-2333
 7        jlichter@baronbudd.com
          wpowers@baronbudd.com
 8
          THE LANIER LAW FIRM, PC
 9        By:  Evan M. Janush, Esq. (Via Zoom)
          10940 West Sam Houston Parkway N, Suite 100
10        Houston, Texas 77064
          (713) 659-5200
11

12   For Defendant Albertsons:

13        GREENBERG TRAURIG, LLP
          By:  Gretchen N. Miller, Esq.
14             Emily Mankowski, Esq. (Via Zoom)
          77 West Wacker Drive, Suite 3100
15        Chicago, Illinois 60601
          (312) 456-6583
16        millerg@gtlaw.com
          mankowskie@gtlaw.com
17

18

19   ALSO PRESENT:

20        Dan Lawlor, Videographer

21        Corey Smith, Trial Tech (Via Zoom)

22        Corey Palumbo, Kroger (Via Zoom)

23        Sadie Turner, Lanier Law Firm (Via Zoom)

24

25
```

```
 1                         I N D E X

 2   WITNESS                                        PAGE

 3   SCOTT JOHNSON

 4         EXAMINATION BY MR. LICHTER                  6

 5         EXAMINATION BY MS. MILLER                  83

 6         FURTHER EXAMINATION BY MR. LICHTER         84

 7

 8

 9

10

11

12                       E X H I B I T S

13    NO.          DESCRIPTION                       PAGE

14   Exhibit 1    Scott Johnson's LinkedIn profile    10

15   Exhibit 2    E-mail chain ending May 13, 2013,   32
                  subject:  FW:  SOM-Albertsons, Bates
16                Nos. ALB-NM00021460 to 21465

17   Exhibit 3    E-mail chain ending November 26,    41
                  2023, subject:  RE:  Actavis
18                Controlled Substance Compliance,
                  Bates Nos. ALB-NM0001403 to 18405
19
     Exhibit 4    Ponca City Pharmacy July 26, 2013,  47
20                McKesson Meeting:  Talking Points -
                  Ponca Response, Bates Nos.
21                ALB-NM00006131 to 6133

22   Exhibit 5    July 10, 2014, e-mail, subject:  SOM, 55
                  Bates No. ALB-NM00017941
23
     Exhibit 6    October 31, 2014, e-mail with       58
24                attachment, subject:  Enhanced SOM
                  Pilot **URGENT**,  Bates Nos.
25                ALB-NM00014384 and 14386
```

1                    E X H I B I T S

2       NO.            DESCRIPTION                    PAGE

3    Exhibit 7    Pharmacy Supply Chain Compliance      64
                  Committee Agenda, March 18, 2014,
4                 10:00 - 3:00 p.m., Bates Nos.
                  ALB-NM00001409 to 1411
5
     Exhibit 8    E-mail chain ending June 6, 2016,     69
6                 with attachment, subject:  Ponca Draw
                  Down **Update**,  Bates Nos.
7                 ALB-NM00015706 to 15710

8    Exhibit 9    June 2, 2017 calendar request with    77
                  attached e-mails, subject:  New
9                 package size considerations, Bates
                  Nos. ALB-MDLCT9-00045707 to 45710
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2

 3              THE VIDEOGRAPHER:  We are now on the record.  My

 4   name is Dan Lawlor.  I'm the videographer representing

 5   Golkow Litigation Services.

 6              Today's date is July 12th, 2023, and the time is

 7   10:00 a.m.

 8              This video deposition is being held in Phoenix,

 9   Arizona, in the matter of Opiate Litigation, Track Nine,

10   Cause No. 17-MD-2804.

11              The deponent is Scott Johnson.

12              Counsel, please identify yourselves for the

13   record.

14              MR. LICHTER:  Good morning.  My name is

15   Jay Lichter for plaintiff, Tarrant County, Texas.

16              MS. MILLER:  Gretchen Miller on behalf of

17   Defendant Albertsons.

18              THE VIDEOGRAPHER:  And, counsel on Zoom, would

19   you like to identify yourselves?

20              MR. PALUMBO:  This is Corey Palumbo.  I represent

21   Kroger.

22              MR. SMITH:  We have two more that just joined.

23              THE VIDEOGRAPHER:  And, counsel on Zoom, we are

24   identifying counsel for the record.  If you would like to

25   identify, please do.
```

1        MR. JANUSH:  Evan Janush here, Lanier Law Firm,

2   on behalf of plaintiff Tarrant County.

3        THE VIDEOGRAPHER:  And other counsel will be

4   noted on stenographic record.

5        The court reporter is Kate Roundy and will now

6   swear in the witness.

7

8                    SCOTT JOHNSON,

9   called as a witness herein, having been first duly sworn

10  by the Certified Court Reporter, was examined and

11  testified as follows:

12       THE WITNESS:  I do.

13       THE COURT REPORTER:  Thank you.

14       THE VIDEOGRAPHER:  Please proceed.

15

16                    EXAMINATION

17  BY MR. LICHTER:

18     Q.   Okay.  Good morning, Mr. Johnson.

19          Will you please state and spell your name for the

20  record?

21     A.   Scott, S-c-o-t-t, Johnson, J-o-h-n-s-o-n.

22     Q.   And have you ever had your deposition taken

23  before?

24     A.   Yes.

25     Q.   About how many times?

1      A.    Several.

2      Q.    Can you give me an estimate of how many times?

3      A.    At least six.

4      Q.    At least six.

5            And for -- can you walk me through each of those

6    six and give me just kind of the general overview of what

7    each one was about?

8      A.    All were about antitrust cases.

9      Q.    Okay.  And was your role in each of them as a

10   witness or as a party?

11     A.    Witness.

12     Q.    Okay.  You've never been a party to a lawsuit?

13     A.    No.

14     Q.    Did you serve as an expert witness in those

15   cases?

16     A.    No.

17     Q.    Were any of those cases involving Albertsons?

18     A.    Yes.

19     Q.    How many of those?

20     A.    Most all were to my knowledge.

21     Q.    And when was the last one you were involved in?

22     A.    I don't recall the year.  I left Albertsons in

23   2020, so it was prior to that.

24     Q.    Do you have an estimate about when that may have

25   been?

```
 1        A.    I don't recall.

 2        Q.    Okay.  So you may already be familiar with some

 3   of the admonitions that witnesses usually get prior to a

 4   deposition.  I just want to go through a couple -- a

 5   couple of those right now.

 6              Throughout the deposition, your counsel,

 7   Ms. Miller, may object to questions as I ask them.  Just

 8   so you know, unless she specifically directs you not to

 9   answer, you're obligated to answer the questions to the

10   best of your ability.

11              Do you understand that?

12        A.    Yes.

13        Q.    Okay.  And, obviously, we have a court reporter

14   here taking down everything we're saying, so it's

15   important for us not to talk over each other.

16              So to the extent you can, wait for me to complete

17   asking my question before you provide a response.  That's

18   the best course of action here.

19              Do you understand that?

20        A.    Yes.

21        Q.    Okay.  And also, responses to some questions may

22   be yes or no.  I would ask you to try to avoid saying

23   uh-huh or huh-uh, just because it's difficult for the

24   court reporter to take that down or discern what's

25   actually being said.
```

 1          Does that make sense?

 2     A.   Yes.

 3     Q.   Are you taking any medications currently that may

 4   impact your ability to give truthful testimony?

 5     A.   No.

 6     Q.   Okay.  And we'll probably be taking breaks

 7   throughout this deposition.  I'm going to shoot for taking

 8   a small maybe a restroom break every hour or so.  If at

 9   any time during the deposition you would like to take a

10   break for any reason, feel free to let me know and unless

11   a question is pending, we'll -- we'll go ahead and take

12   that break.  Is that okay?

13     A.   Yes.

14     Q.   Okay.  And what have you done to prepare for

15   today's deposition?

16     A.   I have spent time with counsel on several

17   occasions.

18     Q.   Okay.  And which counsel?

19     A.   Gretchen Miller.

20     Q.   Anyone else?

21     A.   I don't recall the other names of the group.

22     Q.   Do you know about how many times you met with

23   counsel?

24     A.   I met with counsel I believe three times.

25     Q.   Okay.  Over the course of how long?

```
 1      A.   Over the course of approximately four months.

 2      Q.   Have you reviewed any documents to prepare for

 3  today's deposition?

 4      A.   I did see a couple documents from -- from

 5  Gretchen, yes.

 6      Q.   Do you remember what those documents were?

 7           MS. MILLER:  I'm going to object to the extent

 8  that that calls for privileged or attorney work product.

 9           MR. LICHTER:  Instructing him not to answer?

10           MS. MILLER:  I'm instructing him not to answer,

11  yes.

12           MR. LICHTER:  I'm going to go ahead and have the

13  first document marked as Exhibit 1.

14           (Exhibit 1 was marked for identification.)

15  BY MR. LICHTER:

16      Q.   Okay.  Have you seen this document before?

17      A.   Yes.

18      Q.   Okay.  Other than -- well, what is this document?

19      A.   Looks like a LinkedIn profile.

20      Q.   Okay.  And other than the redactions I made to

21  this document on pages 3 through 6, is this a current copy

22  of your online LinkedIn profile?

23      A.   Yes.

24      Q.   Okay.  Did you prepare the information here in

25  the profile?
```

```
 1      A.   Yes.

 2      Q.   Is the information in here accurate?

 3      A.   Yes.

 4      Q.   Okay.  Let's take a look at page 2 under the

 5   section marked "Education."

 6           Do you see that?

 7      A.   Yes.

 8      Q.   It says here you received a BS in pharmacy from

 9   North Dakota State University; is that correct?

10      A.   Yes.

11      Q.   And what year was that?

12      A.   1983.

13      Q.   Okay.  And you received an MS in pharmacy from

14   North Dakota State University; correct?

15      A.   Yes.

16      Q.   And what year was that?

17      A.   1986.

18      Q.   And you received an MBA from Keller Graduate

19   School of Management of DeVry University; correct?

20      A.   Yes.

21      Q.   And what year was that?

22      A.   I don't recall the year.

23      Q.   Okay.  Do you have an estimate about when that

24   may have been?  Was that within the last ten years?

25      A.   I would say late 1990s.
```

1    Q.   And have -- have you received any other formal

2  education after high school that is not listed here?

3    A.   No.

4    Q.   Have you received any other degrees that aren't

5  listed here?

6    A.   No.

7    Q.   Do you have any current licenses or

8  certifications?

9    A.   Yes.

10   Q.   And what are those?

11   A.   I'm a licensed pharmacist in Arizona.  I'm a

12  licensed pharmacist in North Dakota.

13   Q.   Any other states?

14   A.   No.

15   Q.   Any other licenses or certifications?

16   A.   No.

17   Q.   And what year did you receive your license for

18  both of those states?

19   A.   1975, for North Dakota.  19- -- approximately

20  1990 for Arizona.  I'm not exactly positive.

21   Q.   And your work history section is on pages 1 to 2

22  marked "Experience."

23        Do you see that?

24   A.   Yes.

25   Q.   Okay.  And the information here begins at 2002;

1   is that right?

2       A.   Yes.

3       Q.   Okay.  Did you maintain any employment prior to

4   2002?

5       A.   Yes.

6       Q.   And where was that?

7       A.   With Albertsons or companies that were purchased

8   by Albertsons.

9       Q.   When did you first begin working for Albertsons

10  or companies purchased by Albertsons?

11      A.   July 1986.

12      Q.   And what position was that?

13      A.   Pharmacy intern.

14      Q.   And what was your position after that?

15      A.   Pharmacist.

16      Q.   And what year?

17      A.   1987.

18      Q.   And for '86 and '87, do you remember what company

19  you were working for?

20      A.   Sav-on drug.

21      Q.   How about after '87?

22      A.   I was a pharmacy manager.

23      Q.   For what company?

24      A.   Sav-on drug.

25      Q.   For how many years?

```
 1      A.   Approximately eight.

 2      Q.   Okay.  And after you were a pharmacy manager?

 3      A.   I was a pharmacy trainer.

 4      Q.   What year did you start as a pharmacy trainer?

 5      A.   1994.

 6      Q.   And was that still for Sav-on?

 7      A.   It was a corporate position.

 8      Q.   Okay.  For what company?

 9      A.   Sav-on.

10      Q.   And after that?

11      A.   I was a regional pharmacy manager.

12      Q.   For what years?

13      A.   Approximately 1994 to 2002.

14      Q.   And that was still for Sav-on?

15      A.   It was for Sav-on and if we were purchased, it

16   might have been Albertsons.  I don't recall.

17      Q.   As a regional pharmacy manager between '94 and

18   2002, what was the geographic area that you oversaw?

19      A.   Part of that time frame I had some southern

20   California locations, pharmacies.  And I also had

21   locations -- once I relocated to Arizona, I had locations

22   in the state of Arizona.

23      Q.   And about how many locations did you oversee?

24      A.   Approximately 60.

25      Q.   And then, I guess according to the LinkedIn
```

1   profile here, it says from 2002 to 2003 you were the

2   generic category manager at Albertsons; is that right?

3       A.   Yes.

4       Q.   And can you summarize your main duties and

5   responsibilities in that role?

6       A.   To interact with generic pharmaceutical companies

7   reviewing their products, seeing if they matched up with

8   our need for our company.

9       Q.   Did any of your duties in this role involve

10  Albertsons' suspicious order monitoring?

11      A.   No.

12      Q.   Okay.  And from 2003 to 2013, you were the

13  Albertsons director of pharmacy and general manager of

14  procurement; is that right?

15      A.   Yes.

16      Q.   And that was in the Boise, Idaho, area; correct?

17      A.   That was where the corporate office was.

18      Q.   Where were you located at the time?

19      A.   In Arizona.

20      Q.   Okay.  And can you summarize your main duties and

21  responsibilities in this role?

22      A.   My primary responsibility to interact with our

23  primary wholesaler of contract, as well as any brand or

24  generic manufacturers as far as product selection to help

25  with our stores.

1      Q.    So you had a role in helping to select which

2  actual medications Albertsons would receive from

3  wholesalers; is that accurate?

4      A.    No.  It would be selection of products we would

5  want to warehouse.

6      Q.    Okay.  And did any of your duties in this

7  position involve suspicious order monitoring?

8      A.    I don't believe so.  I don't recall when we

9  started working on that, to be honest with you, the time

10 frame.

11     Q.    Okay.

12     A.    But...

13     Q.    And then the printout for some reason cuts this

14 off a bit, but it says from 2013 to 2020 you were

15 Albertsons' group director of prescription procurement; is

16 that right?

17     A.    Yes.

18     Q.    Okay.  And what were your main duties and

19 responsibilities in that role?

20     A.    I expanded responsibility not only for brand

21 contracting, generic contracting, as well as primary

22 wholesaler agreement, responsibility for purchasing in the

23 contract for immunizations, blood pressure machines.

24 Whatever else I was asked to work on.

25     Q.    And were you located in Arizona during this time?

 1      A.   I relocated to Boise in 1995, I believe.  No,

 2  that's not correct.  I apologize.

 3           2015.  I'm sorry.

 4      Q.   And why did you relocate to Boise in 2015?

 5      A.   They closed the office in Arizona and I was given

 6  a choice to relocate to Idaho.

 7      Q.   And did your -- did any of your duties in this

 8  position involve suspicious order monitoring?

 9      A.   I was involved with the Ponca warehouse committee

10  that was formed for compliance, yes.

11      Q.   So all of your duties relating to suspicious

12  order monitoring were through the Ponca committee on

13  compliance?

14      A.   Yes.

15      Q.   Do you know what that committee was officially

16  called?

17      A.   I don't recall.

18      Q.   Do you know when you first joined that committee?

19      A.   I don't recall.

20      Q.   Do you have an estimate as to when that may have

21  been?

22      A.   No.

23      Q.   Would that have coincided with your job as group

24  director of prescription procurement?

25      A.   Yes.

```
 1        Q.    Okay.  So for the entire duration as a group

 2   director of prescription procurement, you would have been

 3   a member of the committee?

 4        A.    Whenever the committee was formed.  And I don't

 5   know the exact time frame the committee was formed.

 6        Q.    Okay.  Would you have been on the committee

 7   between 2003 and 2013 in your role as director of pharmacy

 8   and --

 9        A.    If there was such a committee, yes.

10        Q.    Okay.

11        A.    And if there was Ponca warehouse was open, yes.

12        Q.    So you don't remember what role you were in at

13   the time when you first joined the committee?

14        A.    I was part -- committee member.

15        Q.    You don't remember what your job title was at the

16   time you first joined the committee?

17        A.    Group director of pharmacy procurement.

18        Q.    Okay.  And you left Albertsons in 2020?

19        A.    Yes.

20        Q.    And why did you leave?

21        A.    To seek other employment.

22        Q.    Did you quit your position at Albertsons?

23        A.    Yes.

24        Q.    And did you quit as a result of any -- any issues

25   with the company of Albertsons itself?
```

```
 1       A.   No.

 2       Q.   And so I guess you found employment in September

 3   2020 as the director of Contracting Solutions at Econdisc,

 4   LLC; is that right?

 5       A.   Yes.

 6       Q.   Is that your current position?

 7       A.   No.

 8       Q.   What's your current position?

 9       A.   Associate general manager Contracting Solutions

10   at Econdisc --

11            THE COURT REPORTER:  Slow down.  Associate

12   general manager --

13            THE WITNESS:  General manager, Contracting

14   Solutions at Econdisc, LLC.

15   BY MR. LICHTER:

16       Q.   And what type -- type of company is Econdisc,

17   LLC?

18       A.   Econdisc is a group purchasing organization.

19       Q.   Is that for pharmaceuticals?

20       A.   It is for generic pharmaceuticals, yes.

21       Q.   And when you were the director of Contracting

22   Solutions, can you summarize your main duties and

23   responsibilities in that role?

24       A.   Main duties, I had approximately 45 suppliers

25   that I would direct and daily contact with on products
```

1  that they were willing to sell us or supply issues.  So

2  day-to-day operations for the -- the company.

3      Q.  So did you -- strike that.

4          Would Econdisc facilitate groups of pharmacies

5  receiving pharmaceuticals?

6      A.  Econdisc would contract with generic

7  pharmaceuticals on behalf of all their participants.  We

8  would not purchase any products.

9      Q.  And those participants would be pharmacies?

10     A.  It would be companies that owned pharmacies.

11 Yes.

12     Q.  Okay.  Do you know if Albertsons is one of those

13 companies?

14     A.  For a time period, yes, they were.  Not today.

15     Q.  Do you know when they stopped?

16     A.  Approximately 2018.  2017.  I'm not exactly

17 positive.

18     Q.  And do you have any sources of income other than

19 from Econdisc, LLC, today?

20     A.  Can you be more specific, please?  Sources of

21 income.

22     Q.  Yeah.  Do you receive money in any way, shape, or

23 form from any -- from any work you do other than for

24 Econdisc?

25     A.  For work I have done, no.

1      Q.   Do you receive other sources of income from

2   anything else?

3      A.   Yes.

4      Q.   From what?

5      A.   I have an Albertsons Legacy Fidelity account that

6   I get a distribution from on the cadence of years.

7      Q.   Anything else?

8      A.   No.

9      Q.   And at page 1 under your picture here on the

10  LinkedIn profile, couple lines down, it says Boise, Idaho,

11  United States.

12          Is that where you currently reside?

13     A.   No.

14     Q.   Where do you currently reside?

15     A.   Chandler, Arizona.

16     Q.   Okay.  How long have you been there?

17     A.   December 2022.

18     Q.   We can set this one aside.

19          And do you have a general familiarity with

20  Albertsons' history of self-distributing medications to

21  its pharmacies?

22     A.   Yes.

23     Q.   Okay.  Are you aware that at certain times

24  Albertsons distributed opioids to its pharmacies from its

25  distribution center in Ponca City, Oklahoma?

 1      A.   Yes.

 2      Q.   And that would have included distributions into

 3  Texas; correct?

 4      A.   I don't recall.  Yes, I would -- if we owned

 5  stores in Texas, yes, I do believe Albertsons did own

 6  stores, yes.

 7      Q.   Okay.  And that would also included distribution

 8  into Tarrant County, Texas, correct, provided Albertsons

 9  had stores there?

10      A.   Yes.

11      Q.   Okay.  Do you know if Albertsons ever have any

12  pharmacies in Tarrant County, Texas?

13      A.   I do not, no.

14      Q.   Are you aware that Albertsons distributed opioids

15  from that distribution center between 2006 and 2008?

16      A.   If that distribution center was servicing

17  pharmacies, yes.  I don't recall the exact dates.

18      Q.   Okay.  Are you aware that during this

19  2006-to-2008 time period it distributed Schedule III, IV

20  and V drugs to its pharmacies?

21      A.   If Ponca City was open and distributing, yes.

22      Q.   Okay.  And are you aware that during this time

23  Albertsons was not distributing Schedule II drugs to its

24  pharmacies?

25      A.   I don't recall when they built that vault.  So I

1    don't know the answer to that.

2        Q.   Okay.  Are you aware that during the 2009-to-2012

3    time period Albertsons stopped distributing drugs from its

4    distribution center all together?

5        A.   That seems relatively accurate, yes.

6        Q.   Okay.  Do you know why it stopped?

7        A.   I don't know the -- I don't recall the exact

8    reason why it stopped.  It may have had to do with

9    sourcing from a different source.

10       Q.   Do you recall any -- any other information on

11   that point, any general explanations as to why?

12       A.   It was a business decision by Albertsons to close

13   it.

14       Q.   Are you aware that from 2013 to 2016 Albertsons

15   again distributed opioids to its pharmacies from its Ponca

16   City distribution center?

17       A.   Yes.

18       Q.   Do you know why it started -- why it chose to

19   start distributing again in 2013?

20       A.   Albertsons contracted with Econdisc Contracting

21   Solutions.  One of their requirements was to be able to

22   warehouse generic pharmaceuticals.

23       Q.   And it contracted with Econdisc in 2013?

24       A.   Yes, approximately.  Correct.

25       Q.   Okay.  And as a condition of distributing again,

 1    Econdisc required Albertsons -- sorry -- strike that.

 2            Are you aware that during the 2013-to-2016 time

 3    period Albertsons distributed Schedule II, III, IV and V

 4    drugs?

 5        A.   Yes.

 6        Q.   Okay.  Do you know why it chose to distribute

 7    Schedule II drugs during this time?

 8        A.   Yes.  The primary reason was it was a better

 9    source of supply to buy direct from manufacturers to help

10    pharmacies and patients.

11        Q.   Do you remember what that source of supply was?

12        A.   We would purchase direct from the manufacturer.

13        Q.   Do you remember who that manufacturer was?

14        A.   There were several.

15        Q.   Do you remember who they were?

16        A.   There were -- whoever we contracted with for

17    controlled substances in -- and the movement warranted

18    that we would warehouse that in Ponca, we would.

19        Q.   But you --

20            Sorry.

21        A.   There were many.

22        Q.   Okay.  About how many?

23        A.   I do not remember.

24        Q.   Okay.  Are you aware that in 2016 Albertsons

25    again stopped distributing drugs from its distribution

```
 1   center?

 2        A.   Yes.

 3        Q.   Did it stop distributing all drugs?

 4        A.   All prescription drugs, yes.

 5        Q.   Do you know why it stopped in 2016?

 6        A.   Business decision to close the warehouse and move

 7   to a hundred percent DSD purchasing model with the

 8   wholesaler.

 9        Q.   And what does DSD stand for?

10        A.   Direct store delivery.

11        Q.   Do you remember who made that business decision?

12        A.   At the highest level of the organization.

13        Q.   You don't know specifically who?

14        A.   I would assume Mr. Miller.

15        Q.   And Mr. Miller is?

16        A.   Was the CEO.

17        Q.   Are you aware that while Albertsons was

18   self-distributing drugs, the warehouse would ship orders

19   the same day they were received?

20        A.   If it made sense for their routes, yes.

21        Q.   Can you explain that a little bit?

22        A.   If there was product received as an order that

23   could make a truck going to a location to be driven, yes.

24             Some locations had to be UPS-shipped.  So

25   depending on when the order came in, it would go out the
```

1  same day or the next day.

2      Q.   So other than for reasons of route efficiencies,

3  Albertsons typically shipped orders the same day they were

4  received; correct?

5      A.   Yes.

6      Q.   And I think we've used this phrase already a few

7  times in this deposition, but prior to this deposition,

8  have you heard the phrase "suspicious order monitoring

9  system" or "SOMS," S-O-M-S?

10     A.   Yes.

11     Q.   And what do you understand that to mean?

12     A.   Suspicious order monitoring was designed, I

13  believe, by the drug enforcement administration that

14  required registrants, if they were distributing product,

15  to have certain processes in place for that distribution.

16     Q.   Do you recall when it was the first time you

17  learned about suspicious order monitoring systems?

18     A.   No, I don't.

19     Q.   Do you recall generally when in your career that

20  may have been?

21     A.   I don't recall.

22     Q.   Do you know when Albertsons first implemented a

23  SOMS?

24     A.   I don't recall.

25     Q.   You don't have any sort of estimate as to when

1    that may have been?

2        A.   Well, it would have been when they had controlled

3    substances probably in their distribution center.

4        Q.   So for all times Albertsons self-distributed

5    prescription drugs, is it your testimony that they had a

6    suspicious order monitoring system in place?

7        A.   No.

8        Q.   And why not?  What -- for what period of time

9    would they not have had one in place?

10       A.   I don't know the exact time frame where they

11   went -- started or did start.  I don't know.

12       Q.   So is it your testimony that for a period of time

13   they were self-distributing drugs but did not have a

14   suspicious order monitoring system in place?

15           MS. MILLER:  Object to form.  Misstates

16   testimony.

17           THE WITNESS:  Yeah, I didn't -- I didn't state

18   that.  I said there was a time period in that 2013 time

19   frame that they had a suspicious order monitoring

20   discussions.

21   BY MR. LICHTER:

22       Q.   So let me ask it this way.

23           There was ever a time period where Albertsons was

24   self-distributing prescription drugs where it did not have

25   a suspicious order monitoring system in place?

```
 1        A.   I don't recall.

 2        Q.   Do you recall whether Albertsons had a suspicious

 3   order monitoring system in place in the 2006-to-2008 time

 4   frame that was self-distributing?

 5        A.   I don't recall.

 6        Q.   So would that mean you wouldn't be familiar with

 7   any of the details as to how a SOMS system may have

 8   operated in the 2006-to-2008 time frame?

 9        A.   I don't recall that.

10        Q.   Anything in the area of pre- -- prewarehouse,

11   warehouse or postwarehouse SOMS system between 2006 or

12   2008, you wouldn't have any information as to how that may

13   have operated?

14        A.   I do not.

15        Q.   Okay.  That saves us some questions, then.

16             How about for the 2013-to-2016 time period?  Do

17   you know whether Albertsons had a SOMS in place in the

18   2013-to-2016 time frame?

19        A.   I would say, yes, sometime in there.  I don't

20   know the exact time frame.

21        Q.   And are you familiar with any of the details as

22   to how the SOMS system operated in the 2013-to-2016 time

23   frame?

24        A.   Not very well, no.

25        Q.   But you have some knowledge of -- of how that
```

```
 1    operated?

 2        A.   Yes.

 3        Q.   Okay.  How about for this 2013-to-2016 time

 4    frame, do you know if Albertsons SOMS played any role

 5    before a pharmacy order for opioids reached the

 6    distribution center?

 7             MS. MILLER:  Object to form.

 8             THE WITNESS:  Would you repeat that, please?

 9    BY MR. LICHTER:

10        Q.   Sure.

11             For this 2013-to-2016 time frame, do you know if

12    the SOMS played any role before a pharmacy order for

13    opioids reached the distribution center?

14        A.   I don't know.

15        Q.   How about at the warehouse itself?  For this

16    2013-to-2016 time frame, do you know if Albertsons' SOMS

17    played any role in the Ponca City warehouse?

18        A.   I don't know exactly the time frame.  The SOMS

19    that would be from Ponca City to the pharmacies

20    themselves.

21        Q.   Can you explain, I guess, your knowledge of how

22    SOMS played a role in that process?

23        A.   Part of the SOMS was for the distribution side of

24    the business to be able to have good monitoring system of

25    product that is moving from the Ponca warehouse to their
```

1   pharmacies.

2       Q.   Do you recall any of the details about how the

3   monitoring system worked in any capacity?

4       A.   That would be a Ponca question.  Ponca folks.  I

5   don't know the answer to that.

6       Q.   Okay.  And you said you didn't know if there was

7   a SOMS program in place that was actually at the warehouse

8   between 2013 and 2016; is that right?

9       A.   I don't recall.

10          MS. MILLER:  Object to form.

11          THE WITNESS:  I don't recall?

12  BY MR. LICHTER:

13      Q.   How about for the same time period, 2013 to 2016,

14  do you know if Albertsons SOMS played any role after an

15  order was selected at the Ponca City warehouse?

16      A.   That would be a question for the Ponca warehouse.

17  I don't know.

18      Q.   You don't have any information, one way or the

19  other?

20      A.   I don't have any information.

21      Q.   Okay.  Are you aware of whether Albertsons'

22  suspicious order monitoring system was intended to

23  identify suspicious orders?

24      A.   Yes, I believe that was the intent.

25      Q.   Do you know whether it ever did actually identify

1  any suspicious orders?

2      A.    Yes.

3      Q.    Yes, you know; or, yes, it did?

4      A.    Yes, it did.

5      Q.    It did?

6            Do you know what constituted a suspicious order?

7      A.    That would be whatever the parameters that Ponca

8  had set up for receiving the orders, if was an outlier

9  request or a trend.  They would have to make that

10 decision.

11     Q.    So if an order was an outlier, are you saying

12 that somebody at Ponca would decide whether or not the

13 order was suspicious or not?

14     A.    That would be a question for Ponca, how they made

15 those decisions.

16     Q.    I'm just asking as a -- as a process.

17           Is it your testimony that somebody at the Ponca

18 warehouse would determine whether or not an order was

19 suspicious?

20     A.    Yes.

21     Q.    Okay.  Was it the role or duty for anybody else

22 outside the warehouse at any time to determine whether an

23 order was suspicious?

24     A.    Not to my knowledge, no.

25     Q.    Okay.  Under Albertsons' SOMS at any time do you

1   know whether the program intended for orders identified as

2   suspicious to be reported to the DEA?

3       A.   I don't recall.

4       Q.   You don't recall if that was an intent of the

5   SOMS program?

6       A.   I don't recall, yes.

7       Q.   Do you know whether Albertsons ever actually

8   reported any suspicious orders to the DEA?

9       A.   I don't know.

10      Q.   Okay.  Okay.  We can have the next exhibit marked

11  as Exhibit 2.

12           (Exhibit 2 was marked for identification.)

13  BY MR. LICHTER:

14      Q.   And, for the record, this is Bates No.

15  ALB-NM00021460.

16           And have you seen this document before?

17      A.   Yes.

18      Q.   When is the last time you saw it?

19      A.   Probably when I wrote it.

20      Q.   Okay.

21      A.   At least my portion.

22      Q.   Okay.  So is this the -- a May 13, 2013, e-mail

23  string with e-mails that you sent and received?

24      A.   Yes.

25      Q.   Okay.  And for context 2013 is the year

 1    Albertsons restarted self-distributing prescription drugs

 2    after its five-year hiatus; is that correct?

 3         A.   That seems correct, yes.

 4         Q.   And let's start on page -- the page that is Bates

 5    No. 21462.

 6              Okay.  And on May 8th, 2013, you received this

 7    e-mail from Tom Napoli from Actavis; is that right?

 8         A.   Document 21462?

 9         Q.   Yes.

10         A.   Tom Napoli to me, yes.

11         Q.   Okay.  May 8th, 2013; is that right?

12         A.   Yes.

13         Q.   And at this time was Actavis a drug manufacturer

14    that supplied Albertsons' opioids to distribute to its

15    pharmacies?

16         A.   Yes, I believe so.

17         Q.   Okay.  And in the e-mail Tom Napoli writes to

18    you, Hi, Scott.  Pursuant to Mary's e-mail on Friday,

19    May 3rd, I just wanted to follow up with a question and a

20    request relative to your SOMS program.

21              After reviewing your excessive order monitoring

22    policy, I noticed that there was reference to, quote,

23    maximum order quantities, end quote, that are established

24    for locations.  Can you provide insight as to how these

25    levels are established, i.e., compared to similar pharmacy

1    locations in geographic area, et cetera.  I really

2    appreciate your insight.

3           Second paragraph.  Let's go ahead and read that.

4           It says, Additionally, since the Actavis

5    acquisition, we have been require -- requiring all of our

6    new and existing customers to sign a compliance

7    acknowledgment form attesting that they maintain a SOMS

8    program in accordance with federal regulations.  I would

9    greatly appreciate it if you could review and have the

10   document signed and returned, scanned image is fine, to me

11   as soon as practical.

12          Did I read that correctly?

13   A.   Yes.

14   Q.   Okay.  And let's flip back -- flip back to the, I

15   guess, the preceding page, Bates No. 21461.

16          And it looks like on May 10th, 2013, you write

17   back to Actavis with what appears to be a bullet point

18   summary of Albertsons' SOMS at the time; is that correct?

19   A.   Yes.

20   Q.   Okay.  And is this an accurate summary of

21   Albertsons' SOMS for the 2013-to-2016 time frame?

22   A.   This is what was provided to me, yes.

23   Q.   Okay.  As far as you know, this is an accurate

24   summary; correct?

25   A.   Correct.

1      Q.   Okay.  Are there any other components of the SOMS

2   for the 2013-to-2016 time frame you're aware of that are

3   not listed here?

4      A.   I don't know the answer to that.

5      Q.   Okay.  And it looks like you titled your summary

6   Excessive Order Monitoring Process at Selection by the

7   Warehouse; correct?

8      A.   Yes.

9      Q.   Okay.  And, again, I think you mentioned this

10   before, but you don't know whether or not any SOMS steps

11   occurred prior to an order reaching the warehouse for

12   selection; is that right?

13      A.   That's correct.

14      Q.   Okay.  And we can take a look at the first bullet

15   point here in the summary.

16           It says, During the selection of product

17   selectors have the ability to question any quantity

18   requested.

19           Do you see that?

20      A.   Yes.

21      Q.   Okay.  And this was essentially based on the

22   warehouse employees' gut feeling that there was a problem

23   with the order; correct?

24      A.   This is somewhere in the selection process

25   someone made a decision which questioned the quantity

1    requested.

2        Q.   Okay.  Do you recall if that was based on a gut

3    feeling of that person?

4        A.   I don't recall that term, "gut feeling."

5        Q.   Do you know if the -- if the process of

6    questioning an order was based on anything else or

7    anything in particular?

8        A.   I don't know.

9        Q.   Okay.

10           MR. LICHTER:  Can we briefly go off the record?

11   I don't see the documents pulled up on my screen here as

12   we're going through.  I don't know if you all do.

13           MS. MILLER:  I have it on mine.

14           MR. LICHTER:  Sure.

15           There we go.  Great.

16   BY MR. LICHTER:

17       Q.   Okay.  The second bullet point here in the

18   summary says, Questions will be directed to pharmacy

19   procurement and, ultimately, to pharmacy compliance for

20   tracking and investigating purposes.

21           Do you see that?

22       A.   Yes.

23       Q.   Do you know what types of questions went to

24   pharmacy procurement?

25       A.   Most of the questions would be why?  Is there a

1   larger quality or if they haven't ordered this before,

2   why.  Usually it's why.

3       Q.   And what did procurement do in response to those

4   questions?

5       A.   We would contact field operations to get answers

6   to those questions.

7       Q.   And why would the questions then go to pharmacy

8   compliance?

9       A.   For tracking and investigating purposes it

10  states.

11      Q.   Do you know what type of tracking was done?

12      A.   I do not.

13      Q.   Do you know what type of investigating was done?

14      A.   I do not.

15      Q.   Do you know if the investigating would occur

16  after the order was already selected and shipped by the

17  warehouse?

18      A.   I don't know the answer to that.

19      Q.   Third bullet points.  All controlled substances

20  will be audited for accuracy on product and quantity prior

21  to shipment to stores; is that right?

22      A.   Yes.

23      Q.   Do you know who conducted those audits?

24      A.   I do not.

25      Q.   The next section says Excessive Order Monitoring

1    Process for Maximum Order Quantity.

2         Do you see that?

3    A.   Yes.

4    Q.   And is this meant to summarize how the maximum

5    order quantity process worked?

6    A.   Yes.

7    Q.   And the first bullet says maximum pick quantity

8    is drug-specific.

9         Do you see that?

10   A.   Yes.

11   Q.   So each drug had its own maximum order quantity;

12   correct?

13   A.   That would be a question for the Ponca team.  It

14   states that, yes.

15   Q.   And do you know if that was the same number

16   across different stores?

17   A.   Say again, please.

18   Q.   Would that be the same number across different

19   stores?

20   A.   I don't know the algorithm that Ponca used for

21   that.

22   Q.   Okay.  The second bullet here says maximum pick

23   limit is established based on historical aggregate data

24   and coded prior to the selection process.

25        Do you see that?

1      A.   Yes.

2      Q.   Do you know who set these pick limits?

3      A.   I do not.

4      Q.   Do you know what would happen if an order reached

5   one of these pick limits?

6      A.   That would be a question for the Ponca team.

7      Q.   Well, I'm asking if you know.

8      A.   I don't know.

9      Q.   So you don't know if orders were shipped in full

10  or reduced or rejected?  No information?

11     A.   I wouldn't have that information, no.

12     Q.   Okay.  And third bullet in this section says

13  maximum pick limit review by drug for accuracy of limit is

14  completed at the very least quarterly.

15          Do you see that?

16     A.   Yes.

17     Q.   Do you know who conducted those reviews?

18     A.   I do not.

19     Q.   Do you know how these maximum pick limits were

20  set?

21     A.   No.

22     Q.   And then it says acknowledgment form completed.

23          Do you see that?

24     A.   Yes.

25     Q.   Okay.  If you look at 21465, I believe it's the

1    last page of this document.

2            And it looks like attached to the e-mails we were

3    just looking at, we have the signed compliance

4    acknowledgment form signed on behalf of Albertsons by

5    James Tsipakis, dated May 10, 2013; correct?

6       A.   Yes.

7       Q.   Okay.  And James Tsipakis was the VP of

8    prescription services for Albertsons at this time;

9    correct?

10      A.   That's what the title says, yes.

11      Q.   Do you have a different understanding as to what

12   his title may have been?

13      A.   No.

14      Q.   Okay.  Do you know if this was ultimately sent to

15   Actavis on May 10th, 2013?

16      A.   I believe so.  It says acknowledgment form

17   completed.  I assume I would have sent that.

18      Q.   Okay.  Can you flip over to the first page --

19      A.   Okay.

20      Q.   -- No. 21460, and it looks like on May 13, 2013,

21   you write it to a few people, including Jim Tsipakis, to

22   say, Team, I talked to Tom at Watson/Actavis today to

23   inquire if this was sufficient.  He indicated it was.

24            So this means that Tom over at Actavis accepted

25   your bullet point explanation of Albertsons' SOMS; is that

1    right?

2        A.    As well as the signed --

3        Q.    As well as the signed --

4        A.    -- compliance acknowledgment form.  Yes.

5        Q.    Okay.  And when you say it was sufficient, that

6    means that it was sufficient for Actavis to continue to

7    supply Albertsons with opioids; correct?

8        A.    It means the response was sufficient.

9        Q.    Sufficient for what?

10       A.    For the request to have the forms to sign to

11   complete it.

12       Q.    And --

13       A.    Execution with Actavis thereafter, I don't know.

14       Q.    Okay.  You can set this one aside.  I will have

15   the next document marked as Exhibit 3.

16            (Exhibit 3 was marked for identification.)

17   BY MR. LICHTER:

18       Q.    And the formatting of this document makes the

19   text very tiny.

20       A.    Oh, my goodness.

21       Q.    So, hopefully, our trial tech here can blow up

22   the sections that we're looking at.

23            MS. MILLER:  Can I move this so you can see it?

24   Oh, you have one.

25            THE WITNESS:  I have one.

 1            MR. LICHTER:  And it is also be on the giant

 2   screen there.

 3            THE WITNESS:  Okay.

 4            MS. MILLER:  Can you see that better?

 5            THE WITNESS:  I can see that much better.  Thank

 6   you.

 7   BY MR. LICHTER:

 8      Q.   I will represent this is how the document was

 9   produced to us.  I didn't make any changes to it one way

10   or the other.

11            And, again, we're marking this as Exhibit 3.  The

12   Bates number of this document is ALB-NM00018403.

13            And have you seen this document before?

14      A.   Yes.

15      Q.   When is the last time you saw it?

16      A.   I reviewed it briefly yesterday.

17      Q.   Okay.  And is this a November 26, 2013, e-mail

18   string with e-mails that you sent and received?

19      A.   Yes.  I'm not able to scroll this at all.

20           Okay.  Yes.

21      Q.   If there is any portion of the document --

22      A.   Okay.  Thank you.

23      Q.   -- you would like to see on the screen, you can

24   ask the trial tech to move it around for you.

25      A.   Thank you.

```
1      Q.   Sure.

2           And let's look at the first e-mail in the chain

3     which starts on the bottom of the first page.

4           And this is from William Simmons from Actavis on

5     November 13, 2013.

6           Do you see that?

7      A.   Yes.

8      Q.   Okay.  And he writes, Dear Valued Supply Chain

9     Partner, The following communication is being sent on

10    behalf of Tom Napoli, Associate Director of Controlled

11    Substance Compliance, Actavis Pharmaceuticals.

12          In support of our corresponding obligation to

13    maintain effective controls against diversion of

14    controlled substance product into the illicit market, the

15    Actavis DEA Affairs Department is taking the opportunity

16    to update the company's, quote, Know Your Customer,

17    unquote, program due diligence files.

18          Within this context, please see the attached

19    documentation detailing a request for updated information

20    and your requested actions in support of a continued and

21    strengthened customer partnership based on mutual

22    compliance.

23          Did I read that correctly?

24     A.   I believe so, yes.

25     Q.   Okay.  Do you know what he is referring to when
```

1    he says the Actavis Know Your Customer program?

2        A.   No.  The e-mail is from William Simmons to

3    himself, cc'ing Tom Napoli, so I don't recall.

4        Q.   Okay.

5        A.   Yeah.

6        Q.   And toward the bottom of the first page, you

7    respond to William Simmons on November 13th, 2013;

8    correct?

9        A.   Yes.

10        Q.   Okay.  And you write, Mr. Simmons, there are

11    certain statements in your documents that my legal team

12    would recommend changing.  Please send the documents in

13    Word format so we may redline and return.

14             Do you see that?

15        A.   Yes.

16        Q.   And the next e-mail in the chain is from you to

17    Lynette Berggren on November 15th, 2013; correct?

18        A.   No.  The next is from William Simmons back to me.

19        Q.   Sorry.  The e-mail right above that.  I

20    apologize.

21        A.   Okay.  Yes.

22        Q.   Okay.  Again, this is November 15, 2013, from you

23    to Lynette Berggren; correct?

24        A.   Yes.

25        Q.   Okay.  And you write, Lynette, I know you did not

```
 1   like statements made in the pdf version, so let's attempt

 2   to redline with something that is right for us and send

 3   back to Actavis.

 4          Do you see that?

 5     A.   Yes.

 6     Q.   And on November 26, 2013, Lynette responds,

 7   Scott, Attached is the redline Actavis compliance form;

 8   correct?

 9     A.   Yes, that's what it states.

10     Q.   Okay.  And we can look at the last page here on

11   the document Bates-numbered 18405.

12          And this is the compliance acknowledgment form

13   attached to this e-mail which is the redline version from

14   Lynette Berggren; correct?

15     A.   Yes.

16     Q.   Okay.  And let's look at the last sentence of the

17   first paragraph as it was originally written.

18          The sentence that starts with the word "Further."

19          Do you see that?

20     A.   Yes.

21     Q.   Okay.  It says, "Further, customer acknowledges

22   that it will not distribute or dispense controlled

23   substances if it suspects that a prescription has not been

24   issued for a legitimate medical purpose or in the normal

25   course of professional practice or if it determines that
```

 1   questions exist regarding the proper usage and/or adequate

 2   legal compliance by its customer.

 3          Did I read that right as it was originally

 4   written?

 5      A.   Yes.

 6      Q.   Okay.  And Albertsons' redline version removes

 7   the promise that Albertsons will not dispense controlled

 8   substances if it suspects that a prescription has been

 9   issued for -- has not been issued for a legitimate medical

10   purpose or in the normal course of professional practice;

11   correct?

12      A.   Yes.

13      Q.   Okay.  Did Actavis have any issues with these

14   edits?

15      A.   I don't recall.

16      Q.   Do you agree with the appropriateness of these

17   edits?

18      A.   It wasn't my edits.

19      Q.   Okay.  Do you agree with the appropriateness of

20   the edits?

21      A.   That is -- that was legal decision.  Not my

22   decision, so I don't know.  I don't know if I agree or

23   not.

24      Q.   Okay.

25      A.   Okay?

1      Q.    Okay.

2      A.    All right.

3      Q.    Did Albertsons sign and return this

4  acknowledgment form to Actavis with these edits?

5      A.    I don't know.

6      Q.    You can set this one aside.

7            I have the next document marked as Exhibit 4.

8            (Exhibit 4 was marked for identification.)

9            MR. LICHTER:  Can I pass this to you, Gretchen?

10  BY MR. LICHTER:

11     Q.    Have you seen this document before?

12     A.    Yes.

13     Q.    I'm sorry.  Just for the --

14     A.    Briefly -- briefly, yes.

15     Q.    Okay.  I'm sorry.  Just for the record this is

16  Bates-numbered ALB-NM00006131.

17            And you said you have seen this before briefly;

18  correct?

19     A.    Briefly.  Just the first page I look at briefly.

20     Q.    Okay.  Do you remember the last time you saw it?

21  When was the last time you saw it?

22     A.    Yesterday or Monday.

23     Q.    Okay.  And is this a July 26, 2013, memo from

24  Jack Gagnon?

25     A.    Yes, Jack Gagnon, it looks like, is the author,

1  yes.

2      Q.   And he was the general manager at the Ponca City

3  distribution center in 2013; correct?

4      A.   Yes.  That is what it states, yes.

5      Q.   Okay.  And the title here is McKesson Meeting:

6  Talking Points - Ponca Response.

7          Do you see that?

8      A.   Yes.

9      Q.   Okay.  Do you know what this title is referring

10 to?

11     A.   I would infer this is a McKesson meeting that

12 Ponca was involved in and they wanted to give some

13 response.

14         I don't know where this went to, though.

15     Q.   Okay.  Do you recall whether you attended the

16 meeting with McKesson referenced here?

17     A.   I don't recall.

18     Q.   Would that have been something that you would

19 have been involved in at this time in 2013?

20     A.   I don't know if this is an in-person meeting or

21 telephonic meeting or if I was there.

22         Normally, I would be involved, yes.

23     Q.   So you could have been involved and you don't

24 remember?

25     A.   Correct.

1     Q.   Okay.  Do you know who else would have attended

2   this meeting?

3     A.   No.

4     Q.   Okay.  Do you have any idea what the purpose of

5   the meeting may have been?

6     A.   It looks like it has to do with controlled

7   substances, but, no, I don't know.

8     Q.   Okay.

9     A.   Yeah.

10    Q.   Looking at the middle of the first page where it

11   says 6613.

12         Do you see that?

13    A.   Yes.

14    Q.   Okay.  Right underneath that it says still having

15   problems with Ponca cutting orders based on gut feel.

16         Do you see that?

17    A.   I see that.

18    Q.   Okay.  And this is referring to the selectors at

19   the Ponca City distribution center reducing order

20   quantities based on their gut feelings and shipping them

21   out; correct?

22    A.   I don't know.

23    Q.   Okay.  You don't know about the context of this

24   document, whether or not -- or what it's referring to?

25    A.   I don't know if it says -- does it say selectors

1    in here anywhere.  I don't know that I see that it does.

2        Q.  Based on this -- based on the context of the

3    document, is it fair to say that this is referring to the

4    selectors at the Ponca City distribution center?

5            MS. MILLER:  Object to foundation.

6            THE WITNESS:  Yeah.  I don't know the answer to

7    that.

8            It would be something that Ponca would have to

9    decide whether it was selectors or somebody at Ponca, yes.

10   BY MR. LICHTER:

11       Q.  Okay.  And toward the end of this same paragraph

12   where it says "At Ponca."

13           Do you see that?

14       A.  Yes.

15       Q.  It says, At Ponca our IT department has written a

16   program to help us identify orders that are 20 percent

17   over the normal order quantity.

18           This information will be sent to Scott Johnson

19   and his team to review our, quote, gut feel, quote/end

20   quote, is for the protection of the company.

21           Do you see that?

22       A.  Yes.

23       Q.  Okay.  So in 2013 was the threshold for

24   identifying suspicious orders set at 20 percent over the

25   normal order quantity?

1      A.   It says the program has been written.  It doesn't

2  say it's been implemented, but...

3      Q.   So you don't know if -- if that was actually what

4  was happening?

5      A.   I don't know.

6      Q.   Okay.  And do you know if the threshold, whatever

7  it may have been, was applied at the prewarehouse phase or

8  at the warehouse selection phase?

9      A.   I don't know whether the -- that would -- no, I

10  don't.  No.

11      Q.   Okay.  Do you know what constituted the normal

12  order quantity?

13      A.   I do not.

14      Q.   Okay.  Do you recall whether the threshold --

15  whether it was 20 percent or any other number, do you

16  recall whether that ever changed while Albertsons was

17  distributing prescription drugs?

18      A.   I don't recall.

19      Q.   And do you know if this process was in place from

20  2013 to 2016?

21      A.   I don't recall.

22      Q.   Okay.  Do you know how Albertsons arrived at this

23  threshold calculation?

24      A.   That would be a Ponca question.  I don't know.

25      Q.   Do you know who decided that this would be the

1    threshold?

2       A.   No, I do not.

3       Q.   Okay.  It says -- excuse me.  This information

4    will be sent to Scott Johnson and his team to review.

5            Do you see that?

6       A.   Yes.

7       Q.   What information is he talking about?

8            MS. MILLER:  Object to foundation.

9            THE WITNESS:  It looks like it's to review a

10   written program to identify orders of 20 percent over

11   normal order quantity.

12   BY MR. LICHTER:

13      Q.   So that would that be orders that were 20 percent

14   over normal order quantity would be sent to you and your

15   team to review?

16      A.   No.  Just the process.

17      Q.   Just the process.

18           And who else was part of your team at this time?

19      A.   I had a number of people on my team that reported

20   to me.

21      Q.   About how many?

22      A.   Six, eight.

23      Q.   Do you remember any of their names?

24      A.   Yes.  They were not part of this process, but,

25   yes.

1      Q.   Do you remember any names of people that were

2   part of this process?

3      A.   This is just for me to review only.  It wasn't

4   for anyone else on my team to review.

5      Q.   Even though it says it's being sent to

6   Scott Johnson and his team to review, you're the only one

7   that reviewed this process?

8      A.   Yeah.  As far -- as far as I recall, yes.

9      Q.   Okay.  Do you know what the review entailed?

10     A.   Just a review.

11     Q.   Were you reviewing it for accuracy, for

12  compliance, for -- for anything in particular?

13     A.   It wasn't -- it wasn't for me to determine

14  accuracy or compliance.  It was just to look at it,

15  correct.

16     Q.   So what was the purpose of you -- your review?

17     A.   Because I had responsibility for pharmacy

18  procurement.  That's -- that was part of the reasoning.

19  Just to have the pharmacy procurement team just review

20  what they had set up.

21     Q.   Do you know if any changes were made to the

22  process as a result of your review?

23     A.   I don't recall.

24     Q.   Okay.  So actual orders that exceeded a threshold

25  weren't ever sent to you or your team to review; is that

1    correct?

2        A.    Correct.

3        Q.    Okay.  Do you know what it means when he says our

4    gut feel is for the protection of the company?

5        A.    That would --

6              MS. MILLER:  Object to foundation.

7              THE WITNESS:  That would be a question for

8    Jack Gagnon.

9    BY MR. LICHTER:

10       Q.    But I'm asking you if you know.

11       A.    I don't know.

12       Q.    Okay.  We can set this one aside.  We'll mark --

13             MS. MILLER:  Actually, before we start a new

14   document, can we do a break?

15             MR. LICHTER:  Sure.  Perfect.  Yeah.  We could do

16   ten minutes?  Is that okay with everyone?

17             THE WITNESS:  That's good for me.

18             THE VIDEOGRAPHER:  Okay.  We are going off

19   record.  The time is now 11:03.

20             (A recess was taken from 11:03 a.m. until

21   11:12 a.m.)

22             THE VIDEOGRAPHER:  We are going back on record.

23   The time is 11:12.

24             MR. LICHTER:  Okay.  I'll have the next document

25   marked as Exhibit 5.

```
 1            (Exhibit 5 was marked for identification.)

 2   BY MR. LICHTER:

 3       Q.   For the record, this is Bates-numbered

 4   ALB-NM00017941.

 5            And, Mr. Johnson, have you seen this document

 6   before?

 7       A.   No.

 8       Q.   Okay.  Looking at the document, does this appear

 9   to be a July 10, 2014, e-mail you sent to Nikki Price?

10       A.   Yes.

11       Q.   And who is Nikki Price?

12       A.   Nikki Price, I believe, was in the compliance

13   department at that time.

14       Q.   So she didn't report to you?

15       A.   No.

16       Q.   And your e-mail says, Lynette indicates we do not

17   need to report each time we remove product from an order.

18   We must report to DEA once we believe it to be suspicious.

19            Do you see that?

20       A.   Yes.

21       Q.   Is the Lynette you're talking about here Lynette

22   Berggren?

23       A.   Yes.

24       Q.   Okay.  When you say each time we remove product

25   from an order, are you referring to the practice of
```

```
 1    cutting or reducing opioid orders before they're shipped

 2    to Albertsons' pharmacies?

 3         A.   Yes.

 4         Q.   Okay.  And was it your understanding that if

 5    Albertsons cut an order and shipped it, it was not

 6    required to report that order to the DEA?

 7         A.   That's what it states.

 8         Q.   So that is your understanding?

 9         A.   That is what was written in the e-mail, yes.

10         Q.   Okay.  And do you have an understanding as to why

11    that was the case?

12         A.   I do not.

13         Q.   Do you know if there's a difference between a cut

14    order and a suspicious order?

15         A.   A cut order would be an order that did not ship

16    in full to a pharmacy.  Suspicious order, I don't know.

17         Q.   Do you know whether suspicious orders were cut

18    orders?

19         A.   I don't know if they were actually cut, to be

20    honest.  They probably were sometimes or in their opinion

21    they might be suspicious.

22         Q.   And when you say we do not need to report or we

23    must report, are you referring to the procurement

24    department or Albertsons as a whole?

25         A.   That would be Albertsons as a whole.
```

1      Q.    Your department didn't have any role in reporting

2    suspicious orders to the DEA; is that right?

3      A.    Correct.

4      Q.    Okay.  And you specifically didn't have any role

5    in reporting orders to the DEA; is that right?

6      A.    Correct.

7      Q.    Okay.  Do you know who was in charge of reporting

8    suspicious orders to the DEA?

9      A.    I do not.

10     Q.    Okay.  And in the e-mail you say, secondly for

11   guardrails and then you list what you identify as triggers

12   for certain bottle counts.

13           Do you see that?

14     A.    Yes.

15     Q.    Okay.  And can you explain what these triggers

16   are?

17     A.    I don't recall honestly.

18     Q.    Okay.  Do you know what would happen if a bottle

19   count reached a trigger?

20     A.    I don't know.

21     Q.    Do you know what period of time these figures

22   were in place?

23     A.    No, other than it's dated July 10, 2014.

24     Q.    Okay.  Do you know who would have set these

25   triggers?

```
 1        A.   I do not know.

 2        Q.   Do you know if the triggers ever changed?

 3        A.   I don't know.

 4        Q.   And do you know why you would be e-mailing this

 5   information to Nikki Price?

 6        A.   I don't recall.

 7        Q.   Okay.  All right.  Set this one aside.

 8             I will mark the next document as Exhibit 6.

 9             (Exhibit 6 was marked for identification.)

10   BY MR. LICHTER:

11        Q.   For the record, this is Bates-numbered

12   ALB-NM00014384.

13             And have you seen this document before?

14        A.   Yes.

15        Q.   When is the last time you saw it?

16        A.   Briefly, in the last one or two days.

17        Q.   Okay.  Was this an e-mail you sent to Tim Mills

18   and others on October 31, 2014, with an attachment?

19        A.   Yes.

20        Q.   And who is Tim Mills?

21        A.   Tim Mills was part of the IT team at Ponca City

22   warehouse.

23        Q.   Okay.  In your e-mail you write, Tim, based on

24   our call yesterday, we have decided to proceed to the next

25   step by enhancing the SOMS pilot.
```

1          Do you see that?

2     A.   Yes.

3     Q.   Can you explain what the SOMS pilot was?

4     A.   Suspicious order monitoring pilot.

5     Q.   Can you explain what the -- was that a program?

6  Was it a pilot program?

7     A.   It says it's a pilot program, yes.

8     Q.   Can you give any information as to what that

9  pilot program entailed?

10     A.   No.

11     Q.   You don't recall?

12     A.   I don't recall.

13     Q.   Is this something you would have known about at

14  the time you sent the e-mail?

15     A.   Possibly.

16     Q.   Do you know whose idea the SOMS pilot program

17  was?

18     A.   I do not.

19     Q.   Do you know if the SOMS pilot program was ever

20  actually implemented?

21     A.   I do not.

22     Q.   Do you know how the SOMS pilot program was

23  different than the program Albertsons already had in

24  place?

25     A.   I don't know.

1      Q.   Are -- you then write, we will ask you to turn on

2   the new process and run it in parallel with the current

3   process.  We want to capture the data for both components

4   to assess.

5           Do you see that?

6      A.   Yes.

7      Q.   And you -- so you don't know how the SOMS pilot

8   differed from the current process?

9      A.   I don't recall how -- how -- how it was

10  different.

11     Q.   Okay.  Do you know what type of data you wanted

12  captured here?

13     A.   No.

14     Q.   Okay.  Do you recall what the results were of the

15  assessment that you reference here?

16     A.   I do not.

17     Q.   Okay.  And the second half of the e-mail is

18  addressed to David.

19          Do you see that?

20     A.   Yes.

21     Q.   It says, Please continue your current SOMS calls

22  to stores as you are doing today and apply the new

23  questions previously developed.

24          I have attached the questions for your

25  convenience.  Please have Sandy Evans or yourself send the

1    daily response to both Nikki and myself.

2         Do you see that?

3    A.   Yes.

4    Q.   And was this portion of the e-mail meant for

5    David Beck who worked at the warehouse?

6    A.   Yes.

7    Q.   Okay.  Can you explain the process of sending the

8    daily response to both Nikki and yourself?

9    A.   If it was a daily response, if they contacted

10   stores, what was the response of the stores.

11   Q.   So that would be every day David Beck and/or

12   someone from his team would contact pharmacies for certain

13   orders; is that right?

14   A.   Yes.

15   Q.   Okay.  And those pharmacies would obviously

16   respond to whatever questions they had on their calls;

17   correct?

18   A.   Yes.  They were supposed to, yes.

19   Q.   And those responses were -- were noted by David

20   Beck and his team; correct?

21   A.   That's my understanding, yes.

22   Q.   Okay.  And then the pharmacist responses were

23   sent to you and Nikki Price?

24   A.   Yes.

25   Q.   Okay.  Were those responses contained on -- on a

1   daily spreadsheet that you received from them?

2       A.   I don't recall.

3       Q.   You don't recall the -- the form of the responses

4   in any way?

5       A.   I do not.

6       Q.   Okay.  Do you recall whether you received those

7   daily responses from them?

8       A.   I don't recall.

9       Q.   Okay.  Do you know why they would be sending you

10  and Nikki Price daily responses?

11      A.   I don't.  I know Nikki was a part of the

12  compliance team.  Maybe because we were both working

13  together on this.  That would be my only explanation.

14      Q.   So did you do anything one way or the other with

15  these responses that you would receive?

16      A.   I did not.

17      Q.   You did not do anything?

18      A.   No.

19      Q.   Okay.  Do you know if this process that we're --

20  that's being discussed here, this related to Albertsons'

21  SOMS program?

22      A.   Say again, please.

23      Q.   Yeah.  Is the process that we're discussing here

24  regarding the sending the responses -- the daily responses

25  to Nikki and yourself, was this a part of Albertsons'

```
 1    SOMS' program?

 2        A.   I don't know the answer to that.

 3        Q.   Okay.

 4        A.   It was just a request that we made.

 5        Q.   Okay.  So -- so they would send the responses to

 6    you and you wouldn't do anything with them?

 7        A.   I did not take action on them.  Correct.

 8        Q.   Okay.  Did anybody else on your team take action

 9    with them?

10        A.   Not on my team, no.

11        Q.   Okay.  Do you know if anybody at all took action

12    on them?

13        A.   I do not know.

14        Q.   Okay.  Then why are you requesting in this e-mail

15    for the responses to be sent to you?

16        A.   To review.  To look at.

17        Q.   So did you review them?

18        A.   I don't recall.

19        Q.   Okay.  So you didn't do anything -- you don't

20    recall doing anything like investigating any of the

21    responses or following up with pharmacies?  Anything like

22    that?

23        A.   I wouldn't do any investigating, that's -- that's

24    for certain.  Any investigation would be from the

25    compliance team.
```

1     Q.   Okay.

2     A.   It would not be me.

3     Q.   It wouldn't be you or anybody on your team;

4  correct?

5     A.   Correct.

6     Q.   And you don't know one way or the other whether

7  Nikki and the compliance team did anything with these

8  responses either; correct?

9     A.   I don't know.

10     Q.   Okay.  Okay.  Let's set this one aside.  Have the

11  next document marked as Exhibit 7.

12          (Exhibit 7 was marked for identification.)

13  BY MR. LICHTER:

14     Q.   For the record, this document is Bates-numbered

15  ALB-NM00001409.

16          Have you seen this document before?

17     A.   Yes.

18     Q.   Okay.  And when is the last time you saw it?

19     A.   Possibly 2014.

20     Q.   Okay.  Excuse me.

21          Is this the March 18th, 2014, pharmacy supply

22  chain compliance committee agenda?

23     A.   Yes.

24     Q.   Okay.  And you're listed here as a committee

25  member; correct?

1      A.    I'm listed as a meeting leader, yes.

2      Q.    Okay.  Were you also a --  Yeah.  Correct.

3      A.    And a committee member.

4      Q.    And a committee member.

5      A.    Thank you.

6      Q.    Okay.  Do you know for what years you were a

7   committee member?

8      A.    As long as I was in position, I was a committee

9   member and we held meetings, yes.

10     Q.    As long as you were in what position?

11     A.    Position of pharmacy procurement.

12     Q.    Okay.  And, generally, what was the committee

13  responsible for doing?

14     A.    It says the purpose is inform and collaborate

15  with distribution leadership on current compliance topics,

16  impacting the acquisition, and distribution of drugs and

17  related products by our Ponca facility.

18     Q.    And that was generally the responsibility of the

19  committee for every meeting?

20     A.    I don't know if this is the same response for

21  every committee meeting.  That's -- that's this document.

22     Q.    Well, as a member of the committee do you

23  remember a general overall goal of the committee that you

24  were on?

25     A.    Yeah.  The -- the overall goal was to assist the

1  Ponca team with the acquisition and distribution of drugs

2  out of that facility.

3      Q.  Okay.  And how often did the committee meet?

4      A.  Maybe quarterly.  Maybe twice a year.  I don't

5  recall.

6      Q.  But is one of the two quarterly or twice the

7  year?

8      A.  At least twice a year.  May have been more often

9  than that.

10      Q.  Okay.  And if you're listed here as a committee

11  member, does that mean you attended this meeting on

12  March 18th, 2014?

13      A.  I don't recall whether I attended, but I was on

14  the meeting.  Could have been telephonically.

15      Q.  Typically, would all of the committee members

16  have attended these meetings?

17      A.  No.

18      Q.  How was it decided which committee members would

19  attend?

20      A.  Depends on if they were on PTO or had conflicts,

21  maybe they could not attend.

22      Q.  Okay.  Other than things like -- what do you mean

23  by "PTO"?

24      A.  Paid time off.

25      Q.  Okay.  Other than paid time off and scheduling

1   conflicts, were all of the committee members generally

2   expected to attend these meetings?

3       A.   Yes.  If available, yes.

4       Q.   Okay.  And this agenda is organized in a chart

5   form with the prioritized agenda topics on the left, the

6   discussion leader for each topic in the middle and then

7   the time on the right; correct?

8       A.   Yes.

9       Q.   Okay.  If you look at page 1410.  It's the second

10  page of this document.

11          And the topic 8.  It says, Appointment of a

12  compliance manager duties to minimally include

13  DEA-controlled substance compliance.

14          Do you see that?

15      A.   Yes.

16      Q.   And you're listed as the discussion leader;

17  correct?

18      A.   Yes.

19      Q.   Can you explain what your discussion of this

20  topic entailed?

21      A.   I don't recall.

22      Q.   You don't recall any details, one way or the

23  other?

24      A.   I don't recall.  Sorry.

25      Q.   Do you know why a compliance manager was needed?

1          MS. MILLER:  Object to form.

2          THE WITNESS:  I don't know.

3    BY MR. LICHTER:

4      Q.   Did you ultimately appoint a compliance manager?

5      A.   I don't recall.

6      Q.   Do you recall what the duties of the compliance

7    manager were or supposed to be?

8      A.   I do not.

9      Q.   Okay.  Do you recall what the duty regarding

10   DEA-controlled substance compliance involved?

11     A.   I do not.

12     Q.   Okay.  But you were the discussion leader on this

13   topic; correct?

14     A.   Correct.

15     Q.   Okay.  That means you gave some sort of

16   presentation on this topic for this meeting.

17     A.   I don't recall.

18     Q.   Well, as a -- as the listed discussion leader is

19   that typically what that would mean?

20     A.   Discussion leader could be "This is topic 8."  So

21   I would open the discussion of topic 8.  It wouldn't

22   necessarily lead the discussion, but I would open the

23   discussion on topic 8.

24     Q.   Okay.  Is that typically what you did when you

25   were a discussion leader for certain topics?  You would

1    just announce the topic itself?

2        A.   Yes.

3        Q.   Without giving any additional information or

4    leading the discussion?

5        A.   Yes.

6        Q.   Okay.  Is that typical for all of the committee

7    members that are assigned as -- as discussion leaders?

8        A.   Others may have more information to offer.

9             For instance, on topic 4 is the general manager,

10   Jack Gagnon, may have led that discussion because he's

11   right there at the Ponca facility.

12       Q.   Do you know why you would be selected as the

13   discussion leader for topic 8?

14       A.   By default sometimes.

15       Q.   Okay.  It wasn't because you had any sort of

16   special information or insight as to that topic?

17       A.   No.  If it was a topic that was not specific to

18   someone as the meeting leader, my name went down.

19       Q.   Okay.  Set that one aside.

20            On to the next document marked as Exhibit 8.

21            (Exhibit 8 was marked for identification.)

22            THE WITNESS:  Thank you.

23   BY MR. LICHTER:

24       Q.   For the record, this document is Bates-labeled

25   ALB-NM00015706.

1          Have you seen this document before?

2     A.   I don't recall seeing this document, no.

3     Q.   Okay.  Does this appear to be a June 6, 2016,

4  e-mail you received from Darrell Adams?

5     A.   Yes.

6     Q.   Okay.  And in the signature block, it says

7  Darrell Adams was the manager of pharmacy operations for

8  Albertsons at this time; is that right?

9     A.   Yes.

10    Q.   Okay.  And the e-mail says:  DPOs, Wanted to

11  provide a couple updates that we have received.

12         What are DPOs?

13    A.   Director of pharmacy operations, I believe, or

14  division pharmacy operations.  One of the other titles.

15    Q.   Okay.  That wasn't your title at this time, was

16  it?

17    A.   No.

18         (Sneezing.)

19         MR. LICHTER:  Bless you.

20         THE COURT REPORTER:  Thanks.

21  BY MR. LICHTER:

22    Q.   Why were you being included in this e-mail?

23    A.   Because it's product that was leaving probably

24  Ponca and moving to stores.  And so anything product

25  movement I usually would be copied on.

```
 1      Q.   [Okay.  The e-mail continues, We only have a

 2   couple more weeks of Ponca inventory left approximately

 3   $8.6 million left to move which is down from 25.4 million

 4   in total inventory four weeks ago.

 5           Do you see that?

 6      A.   Yes.

 7      Q.   Is this referencing the fact that the Ponca City

 8   distribution center stopped distributing drugs in 2016?

 9      A.   Yes.  They were slowly winding down --

10      Q.   Okay.

11      A.   -- correct.

12      Q.   So 25.4 million in inventory down to 8.6 million

13   in inventory refers to the amount of product left on the

14   shelves at the Ponca warehouse; correct?

15      A.   Yes.

16      Q.   Okay.  And a few lines down it says:  All

17   medications, including C2s, are being pushed out to the

18   stores.  Only stores on CSOS are receiving the C2s.  Store

19   will see product coming in that they do not need or

20   ordered in the past.  This is a necessary evil with the

21   Ponca flush.

22           Did I read that right?

23      A.   Yes.

24      Q.   Okay.  Do you see that the phrase including C2s

25   is bolded and underlined?
```

 1      A.   Yes.

 2      Q.   Okay.  So does this mean Albertsons was sending

 3   out all of its drugs, including Schedule II and Schedule

 4   III opioids to its pharmacies across the country, even if

 5   the pharmacies didn't order them?

 6           MS. MILLER:  Object to form.

 7           THE WITNESS:  Yes.

 8   BY MR. LICHTER:

 9      Q.   Okay.  That was your understanding of what was

10   going on here?

11      A.   Yes, because they were closing that warehouse for

12   the pharmacy.

13      Q.   Right.  And was this, quote, push limited to

14   certain geographic areas or was this to all Albertsons

15   stores that you use CSOS?

16      A.   It says only stores on CSOS are receiving C2s.

17   So those are specific stores.

18      Q.   Okay.  Those are specific stores?

19      A.   Yes.

20      Q.   But -- but other than that limitation, these were

21   being pushed out to all of Albertsons' stores across the

22   country; right?

23      A.   Yes, based on historical movement.

24      Q.   Yeah.

25      A.   If they use the product, yes, they would receive

1    some product.

2         Q.   Okay.  And what does CSOS stand for?

3         A.   Control substance ordering system.

4         Q.   And what is that?

5         A.   It's an electronic process to request and receive

6    controlled substances or C2s.  Excuse me.

7         Q.   Okay.  So all of the Albertsons pharmacies across

8    the country that were on this electronic ordering system

9    would receive Schedule II controlled substances even

10   though they hadn't ordered these; is that right?

11        A.   Only if they used them in the past.

12        Q.   Right.

13        A.   If they had no use of them in the past, they

14   would not receive that product.

15        Q.   Right.  But they wouldn't have ordered these ones

16   that are being pushed out to them; is that fair?

17        A.   Fair.

18        Q.   Okay.  Do you know if most of Albertsons'

19   pharmacies used the CSOS program at this time?

20        A.   I don't recall.

21        Q.   Okay.  And this would have pushed unwanted

22   Schedule II and Schedule III opioids into stores located

23   in Tarrant County that didn't actually order them; right?

24        A.   If they had historical usage, yes.

25        Q.   Right.  Okay.

1          Do you know why this would be a necessary evil?

2     A.   Business decision to clothe the -- close the

3  pharmacy Ponca warehouse distribution to move the product

4  and felt it best to move to the stores for usage for

5  patients.

6     Q.   Okay.  So is it necessary because Albertsons

7  would lose money if the drugs wouldn't -- weren't pushed

8  out?

9     A.   No.  It was -- it was a request by the business

10  to move the inventory from the Ponca warehouse to the

11  stores if they would use the product potentially.

12     Q.   So what's -- what is necessary in the phrase

13  "necessary evil" mean?  Why is it necessary to push these

14  drugs out?

15     A.   If a store used a certain quantity of something

16  and they received a larger than an amount, that would be a

17  necessary evil, or if they didn't want it, they had

18  historical usage, we would send them some product.

19     Q.   Do you know why this process would be considered

20  evil?

21     A.   No.  It's not my e-mail.

22     Q.   It's not -- not your phrase, but do you know why

23  that phrase was used here in the context of what is going

24  on?  Do you know why the phrase "necessary evil" was used?

25          MS. MILLER:  Object to foundation on this

1    document.

2         THE WITNESS:  Yeah, the only reason I can think

3    of would be that it added physical inventory to the stores

4    and we had a constraint of working capital.

5    BY MR. LICHTER:

6    Q.   Okay.  And the last bullet here says:  I have

7    attached the list of medications that are going to be

8    pushed and focused on for this week.

9         Do you see that?

10   A.   Yes.

11   Q.   I would like to go ahead and take a look at the

12   attachment, which was a spreadsheet Bates-labeled

13   ALB-NM00015710, which we printed.

14        And if you can look at the second to last page of

15   the attachment to see some of the specific medications

16   Albertsons, quote, pushed and focused on.

17        And let me know when you're there.

18   A.   Yes.

19   Q.   Okay.  And we get started about seven or so boxes

20   from the bottom.  Do you see where it says Fentanyl 1200

21   microgram lozenges?

22   A.   Yes.

23   Q.   Okay.  And then below that it says Fentanyl 1600

24   microgram lozenges; correct?

25   A.   Yes.

1      Q.   A few lines down it says Fentanyl 800 microgram

2   lozenges; correct?

3      A.   Yes.

4      Q.   I also see hydrocodone compound syrup; correct?

5      A.   Yes.

6      Q.   Okay.  And these are all opioid medications;

7   correct?

8      A.   These seem to be opioids, yes.

9      Q.   And on the very last page here of the spreadsheet

10   another hydrocodone medication at the bottom; correct?

11      A.   Yes.

12      Q.   Would Albertsons have lost money if they did not

13   push these medications out to the pharmacies that didn't

14   order them?

15          MS. MILLER:  Object to form.

16          THE WITNESS:  They could be returned for -- to

17   our company that we contracted with when it became

18   outdated to recover money, yes.

19   BY MR. LICHTER:

20      Q.   Would Albertsons have missed out on potential

21   profit of selling the medications if they did return those

22   to the manufacturers?

23          MS. MILLER:  Object to form.

24          THE WITNESS:  I don't know.  I couldn't tell you

25   if all the products that were dispensed are profitable or

 1    not.

 2    BY MR. LICHTER:

 3       Q.    Okay.  In hindsight, do you think it may have

 4    been a bad idea for Albertsons to push out these drugs to

 5    pharmacies across the country that didn't request them?

 6             MS. MILLER:  Object to form.

 7             THE WITNESS:  It was requested by the business to

 8    accomplish this.

 9    BY MR. LICHTER:

10       Q.    Sure.  Yeah.  I -- I don't dispute that.

11             I'm asking if you think that was a bad idea.

12       A.    It wasn't my opinion.

13       Q.    Do you have an opinion?

14       A.    I do not.

15       Q.    Set this one aside.

16             The next document marked as Exhibit 9.

17             (Exhibit 9 was marked for identification.)

18             THE WITNESS:  Thank you.

19    BY MR. LICHTER:

20       Q.    For the record, this document is Bates-numbered

21    ALB-MDLCT9-00045707.

22             And have you seen this document before?

23       A.    May I review it first, please?

24       Q.    Sure.

25       A.    Thank you.

1      Q.   Let me know when you're ready.

2      A.   Okay.  I'm ready.

3      Q.   Have you seen this document before?

4      A.   No.

5      Q.   Okay.  Does this appear to be a June 2, 2017,

6   calendar request that you sent yourself along with a few

7   attached e-mails?

8      A.   Okay.

9      Q.   Is that what it appears to be?

10     A.   Yes.

11     Q.   Okay.  And let's flip over to page 45710, which

12  is the last page of the document.

13     A.   Okay.

14     Q.   And the first e-mail on this page appears to be

15  an e-mail you sent to McKesson on April 18th, 2017;

16  correct?

17     A.   Yes.

18     Q.   Okay.  And you write to Jill Owen from McKesson

19  to say:  Jill, the following families of drugs are causing

20  some diversion issues.  We are curious given our demand

21  could we move to 100 count on all items and when.

22          Do you see that?

23     A.   Yes.

24     Q.   And the drugs apparently causing diversion issues

25  are Tramadol 50 milligrams, generic Tylenol No. 3,

1    Carisoprodol 350 milligrams, hydrocodone combination

2    products, with a note that we believe these are already

3    100 count.  And then the final one here is oxycodone and

4    oxycodone combination products with a note, we believe

5    already 100 count.

6           Do you see those?

7    A.    Yes.

8    Q.    Can you explain what kinds of diversion issues

9    these drugs were causing?

10   A.    These would be diversion issues at store level.

11   Q.    What does that mean?

12   A.    These would be identified as potential products

13   that could be diversion at a store by one of the employees

14   in a pharmacy.

15   Q.    So there was an issue with each of these drugs

16   involving Albertsons' pharmacists diverting them; is that

17   correct?

18   A.    I don't know if there's an issue with each drug.

19   These are the list of products that we were asked to see

20   if we could move to 100 count.

21   Q.    Weren't you asking to see if they could be moved

22   to a hundred count?

23   A.    Yes.

24   Q.    Okay.  Did you create this list?

25   A.    I don't recall.

1      Q.   Do you know how you became aware that these drugs

2   were causing diversion issues?

3      A.   I don't recall.

4      Q.   Were there certain geographic locations where

5   these issues were taking place?

6      A.   It doesn't state that.  No.

7      Q.   You don't have any information that you can

8   recall?

9      A.   Correct.

10      Q.   Do you know when Albertsons first learned these

11   types of drugs were causing diversion issues?

12      A.   I don't recall.

13      Q.   Okay.  How would moving these drugs to 100 count

14   bottles address the -- the diversion issues?

15      A.   It was a request made by the business to move 100

16   count so they could track product easier, inventories,

17   physical inventories.

18           It required now you have to count hundred count

19   bottles to -- in some circumstances you can count

20   100-count bottles for an inventory as full bottle.  Some

21   drugs have to be counted individually as required by DEA

22   as far as the quantities go.

23      Q.   Okay.  Do you know how big the bottles would have

24   been before being moved down to 100-count bottles?

25      A.   I don't know.

1     Q.   Okay.  And if the hydrocodone combo products and

2   the oxycodone combo products, the last couple on the list

3   here, those are already at 100 count, do you know why

4   those are included on the list?

5     A.   Just a quality control check, make certain that

6   we believe there's 100 count only today, at that time.

7     Q.   Okay.  And did Albertsons do anything other than

8   e-mail McKesson to address the diversion issues it saw

9   with these drugs?

10          MS. MILLER:  Object to the form and foundation.

11          THE WITNESS:  I don't know.

12  BY MR. LICHTER:

13    Q.   Okay.  Did Albertsons ever try to recall or take

14  back the Schedule II and III medications it pushed out to

15  pharmacies that the pharmacies didn't order?

16    A.   At the closure of the Ponca facility?

17    Q.   Yeah.

18    A.   I don't believe so, no.

19    Q.   Do you know if the diversion issues mentioned

20  here ever got resolved?

21    A.   I don't know.

22    Q.   Do you know if Albertsons still considers these

23  as having diversion issues?

24          MS. MILLER:  Object to foundation.

25          THE WITNESS:  I don't know.

```
 1   BY MR. LICHTER:

 2        Q.   Have you ever had any role in Albertsons'

 3   suspicious order monitoring system?

 4        A.   In the system itself?

 5        Q.   Yeah.

 6        A.   No.

 7        Q.   No.

 8             Do you know if your procurement department ever

 9   had a role in the suspicious order monitoring system?

10        A.   Not to my knowledge, no.

11        Q.   Okay.

12             MR. LICHTER:  All right.  I don't have any more

13   questions.

14             MS. MILLER:  Okay.  Can we take a quick break?

15             MR. LICHTER:  Sure.

16             THE VIDEOGRAPHER:  We are going off the record.

17   Time is 11:44.

18             (A recess was taken from 11:44 a.m. until

19   11:51 a.m.)

20             THE VIDEOGRAPHER:  We are going back on the

21   record.  The time is 11:51.

22             MS. MILLER:  Okay.

23

24                      (Next page, please.)

25
```

```
 1                        EXAMINATION

 2   BY MS. MILLER:

 3      Q.  Mr. Johnson, just a couple of follow-up

 4   questions.

 5           You were asked at the beginning of the deposition

 6   if there was any medication that might have -- that you

 7   were taking currently that might impact your memory.

 8           And I know there were a number of questions today

 9   in which you didn't -- you didn't recall the answer to.

10   And so I just wanted to -- to clarify.

11           Are there any medical conditions that you have

12   had that might have impacted your memory, as you sit here

13   today?

14      A.  Yes. ███████████████████████████████

15   ██████████████████████████████████████████

16   ███████████████████   ███████████████████████████

17   ████████████████████████████████████████████████

18   █████████████████████   ███████████████████████

19   ███████████████████████████████████████

20   ████████   ████████████████████████████

21      Q.  Okay.  The -- have -- have you testified today --

22   as you sit here today, however, to the best of your memory

23   and recollection?

24      A.  Yes.

25      Q.  Okay.  You were asked some questions about cut
```

1   orders versus suspicious orders.

2            Do you recall providing testimony about that

3   today?

4        A.   Yes.

5        Q.   And you testified about a process that there

6   would be -- if there were questions about an order, that

7   procurement would go follow up with field ops and you

8   mentioned compliance might -- is listed as having -- doing

9   some tracking and investigation of orders.

10           Do you recall that?

11       A.   Yes.

12       Q.   Do you have any independent recollection of after

13   those investigations, either by procurement or compliance,

14   do you have any independent recollection of an order being

15   determined by Albertsons as suspicious for purposes of

16   reporting to the DEA?

17       A.   I do not.

18           MS. MILLER:  Those are all the questions I've

19   got.

20           MR. LICHTER:  I just have a couple follow-ups.

21

22                    FURTHER EXAMINATION

23   BY MR. LICHTER:

24       Q.   ██████████████████████████████████████████

25   ███████████████████████████.

1     A.   Me too.

2     Q.   You said it does affect your memory; is that

3   correct?

4     A.   Yes.

5     Q.   And I know throughout this deposition there were

6   a lot of "I don't recall," "I don't know" responses.

7          Is that fair to say?

8     A.   Yes.

9     Q.   ████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ███████████

12    A.   ██████████████████████████████

13    Q.   ██████   ████████████████████████, that wouldn't

14  necessarily have an impact on your -- your present

15  opinions about any of the documents that we've looked at

16  today or any of the points we've discussed today; correct?

17    A.   Correct.

18    Q.   Okay.  And you're -- you're a trained, licensed

19  pharmacist; right?

20    A.   Yes.

21    Q.   And I think you mentioned that you're licensed --

22  a licensed pharmacist in two states:  Arizona and North

23  Dakota?

24    A.   Yes.

25    Q.   Correct?

1          And so you've -- you've been trained in the

2   practice of pharmacy.  You've been trained in the

3   dispensing of controlled substances; is that right?

4        A.   Yes.

5        Q.   Okay.  And in the dispensing of opioids; is that

6   right?

7        A.   Yes.

8        Q.   Is it fair to say that you agree that compliance

9   with all state and federal laws regarding the

10  distribution, the dispensing of opioid medications is of

11  upmost importance?

12       A.   Yes.

13       Q.   Okay.  Because opioid medications are dangerous;

14  correct?

15          MS. MILLER:  Object to form.

16          THE WITNESS:  Yes.  They can be.

17  BY MR. LICHTER:

18       Q.   Okay.  And they can cause addiction; right?

19          MS. MILLER:  Object to form.

20          THE WITNESS:  Yes, they can.

21  BY MR. LICHTER:

22       Q.   And so it's -- it's critically important for a

23  company like Albertsons that runs pharmacies throughout

24  the country to comply with every state, every federal law

25  and rule and regulation regarding opioid medications;

1   correct?

2         MS. MILLER:  Object to form.

3         THE WITNESS:  It is important for all companies

4   to comply with the state and federal regulations.

5   BY MR. LICHTER:

6       Q.   Including Albertsons?

7       A.   Including Albertsons.

8       Q.   Right.  And in your -- your time with Albertsons,

9   you spent many years as an employee of the company at

10  various different levels; correct?

11      A.   Yes.

12      Q.   Is your opinion that Albertsons at all times was

13  living up to the highest standard of compliance with

14  regards to how they were handling the distribution and

15  dispensing of opioid medications?

16        MS. MILLER:  Object to form.

17        THE WITNESS:  I don't know the answer to that

18  question because I have nothing to compare it to.  I don't

19  know anybody else's suspicious order monitoring practice.

20  I only saw one -- one.  That's all I saw.

21  BY MR. LICHTER:

22      Q.   Well, you have your training as a pharmacist;

23  right?  You went to school for a lot of years.  You're --

24  you're licensed in multiple states.

25        I find it hard to believe that you don't have an

 1    opinion just based on your educational background as to

 2    whether or not Albertsons was living up to the highest

 3    standard of care in the distribution and dispensing of

 4    controlled substances?

 5           MS. MILLER:  Object to form.

 6           THE WITNESS:  The distribution is not part of my

 7    responsibility.

 8           So, as a pharmacist, it would be my

 9    responsibility in dispensing medications appropriately for

10    legitimate medical use.

11    BY MR. LICHTER:

12       Q.  You did, though, have a window as to what

13    Albertsons was doing regarding the distribution of

14    controlled substances; correct?

15       A.  Yes.

16           MS. MILLER:  Object to form.

17    BY MR. LICHTER:

18       Q.  You're on documents where you describe the

19    suspicious order monitoring system to Albertsons' opioid

20    suppliers; right?

21       A.  Yes.

22       Q.  We looked at documents where I think specifically

23    Tom Napoli, you are summarizing the step-by-step process

24    of Albertsons' suspicious order monitoring system;

25    correct?

1      A.    I shared the process.  I wouldn't -- this -- I

2    did not develop the process.

3      Q.    Sure.  You shared the process.

4            And as a trained licensed pharmacist, you --

5    you're aware, and it's consistent with your educational

6    background, that the handling of controlled substances

7    including the distribution requires the upmost standard of

8    care because of how dangerous opioids are; correct?

9            MS. MILLER:  Object to form.

10           THE WITNESS:  For -- again, I'll go back to the

11   fact of my experience as a pharmacist only.  I don't know

12   the responsibility of the warehouse and distribution.  I

13   was focused on inbound product from suppliers to -- to

14   Ponca.

15           I don't know what the perfect scenario would look

16   like.  I don't have a visual on that.

17   BY MR. LICHTER:

18     Q.    And, sitting here today, you can't say even

19   though you're a licensed pharmacist in multiple states,

20   you actually have no opinion on Albertsons' distribution

21   practices regarding opioids, whether or not it was safe,

22   whether or not it was being dealt with with the highest

23   level of care?  No opinion at all?

24     A.    No, that's --

25           MS. MILLER:  Object to form.

```
 1              THE WITNESS:  -- that's not true.

 2              I was very hopeful as a business that we were

 3    making the right progress on a suspicious order monitoring

 4    system.  Absolutely.

 5    BY MR. LICHTER:

 6       Q.   Hopeful.  Sure.

 7              Did -- did Albertsons for all the times you had

 8    insight into its SOMS program, did it live up to that

 9    hope?

10              MS. MILLER:  Object to form.

11              THE WITNESS:  I don't know what the end game goal

12    was.  I don't know the answer to that question.

13              You always try to have continuous improvement.  I

14    think Albertsons always strived for continuous

15    improvement.  I don't know if they ever got there.  I

16    don't know.

17    BY MR. LICHTER:

18       Q.   Okay.  And in the dispensing context, is -- is

19    that -- I would assume you have a different answer based

20    on your position that as a licensed pharmacist your

21    concern was more on the dispensing side?

22       A.   Correct.

23       Q.   Okay.  Is it your opinion that at all times

24    Albertsons' opioid dispensing practices lived up to the

25    highest level of care that it could have?
```

1           MS. MILLER:  Object to form and foundation.

2           THE WITNESS:  The actual dispensing is based on

3   each pharmacist's decisionmaking at the time of

4   dispensing.

5   BY MR. LICHTER:

6       Q.   I'm asking as far as Albertsons' policies and

7   procedures, as to the rules that they had their

8   pharmacists operating under.

9           Do you think -- is it your opinion, sitting here

10  today, that Albertsons always set the highest standard of

11  care for its pharmacists to operate under regarding the

12  dispensing of opioids?

13      A.   I sure hope so.

14      Q.   I'm not asking if you hope so; I'm asking if you

15  think that -- did it always live up to that standard of

16  care?

17      A.   I didn't do any dispensing as an Albertsons

18  pharmacist.

19      Q.   Okay.  But you did -- you were a district

20  pharmacy manager --

21      A.   Yes.

22      Q.   -- and you oversaw pharmacists?

23      A.   Yes.

24      Q.   So you -- you were familiar with the policies and

25  procedures they were operating under?

1      A.   Yes.

2      Q.   You knew the -- the issues and difficulties they

3   faced as they worked under your care and purview; correct?

4           MS. MILLER:  Object to form.

5           THE WITNESS:  Correct.

6   BY MR. LICHTER:

7      Q.   So is it your opinion -- is it your position that

8   Albertsons, as a company, always and consistently guided

9   and helped its pharmacists with the highest standard of

10  care in how they were dispensing opioid prescriptions?

11          MS. MILLER:  Object to form.  Foundation.

12          THE WITNESS:  I believe the policies and

13  procedures for the business would speak to that, which I

14  didn't write.  But I'm hoping so, yes.

15  BY MR. LICHTER:

16     Q.   So, yes, you do think that they consistently

17  lived up to that standard?

18     A.   I think they tried every -- at all instances to

19  live up to that standard, yes.

20     Q.   Okay.

21          MR. LICHTER:  I have no further questions, but I

22  did want to put on the record the point that we discussed.

23          MS. MILLER:  Yep.

24          MR. LICHTER:  If that's okay.

25          Just for the record, my office for the plaintiff

1    has not yet received the personnel file for Mr. Johnson,

2    even though that file was due at least 72 hours prior to

3    the start of the deposition.

4              Counsel for Albertsons has represented that they

5    intend on producing that personnel file to us as soon as

6    they have it, and we intend on keeping this deposition

7    open for the purpose of asking questions about that

8    personnel file once it is received.

9              MS. MILLER:  Okay.

10             MR. LICHTER:  And nothing further.

11             I don't know if we want to open it to counsel

12   that's on the phone.

13             Does anybody have any questions for Mr. Johnson?

14             (No response.)

15             MS. MILLER:  I think that's a no.

16             MR. LICHTER:  I think that's a no.  So that's it.

17             THE VIDEOGRAPHER:  All right.  This concludes

18   today's deposition.  We are going off -- we are going off

19   the record.  The time is 12:02.

20             (The oral and videotaped deposition concluded at

21   12:02 p.m.)

22

23

24             (Signature was waived.)
                    SCOTT JOHNSON
25

1                         CERTIFICATE

2
              I, Kate E. Roundy, Registered Certified Shorthand
3     Reporter, do hereby certify that prior to the commencement
      of the examination SCOTT JOHNSON was duly remotely sworn
4     by me to testify to the truth, the whole truth, and
      nothing but the truth.
5
              I DO FURTHER CERTIFY that the foregoing is a
6     verbatim transcript of the testimony as taken
      stenographically by me at the time, place, and on the date
7     hereinbefore set forth, to the best of my ability.

8
              I DO FURTHER CERTIFY that I am neither a relative
9     nor employee nor attorney nor counsel of any of the
      parties to this action, and that I am neither a relative
10    nor employee of such attorney or counsel, and that I am
      not financially interested in the action.

11

12    _____

13    KATE E. ROUNDY
      Certified Court Reporter
14    Registered Professional Reporter
      Dated:  June 21, 2023
15

16

17

18

19

20    PREPARED BY:

21    KATE E. ROUNDY, RPR
      Arizona Certified Reporter
22    Certificate No. 50582

23

24

25