# EXHIBIT 12

CONFIDENTIAL

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF OHIO
 3                     EASTERN DIVISION
 4                       ---OOO---
 5    IN RE:  NATIONAL
      PRESCRIPTION OPIATE
 6    LITIGATION
                              MDL No. 2804
 7    This document relates to      Case No. 17-md-2804
      Track Eight: Cobb            Judge Dan Aaron Polster
 8    County, Georgia
      Case No. 1:18-op-45817
 9
      COBB COUNTY,
10              Plaintiff,
           vs.
11    PURDUE PHARMA, L.P.,
      et al.,
12              Defendants.
      _____/
13    IN RE: NATIONAL          MDL No. 2804
      PRESCRIPTION             Case No. 17-md-2804
14    OPIATE LITIGATION        Judge Dan Aaron Polster
15    This document relates
      to:  Track Nine: Tarrant
16    County, Texas
      Case No. 1:18-op-45274
17    _____/
18                    CONFIDENTIAL
19      VIDEOTAPED DEPOSITION OF ANNA LEMBKE, M.D.
20
21                    May 16, 2024
22
23
                      REPORTED BY:
24      EARLY K. LANGLEY RMR, RSA, B.A. (PBK)
                    CSR NO. 3537
25              JOB NO:  MW 6693057
```

CONFIDENTIAL

Page 2

1              I N D E X
2
3                    PAGE
4
   ANNA LEMBKE, M.D.                        11
5
   EXAMINATION BY MS. KAPKE                 11
6
   EXAMINATION BY MS. MILLER                155
7
   EXAMINATION BY MR. ARBITBLIT             206
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1  Exhibit 11   Spreadsheet titled Data Month:     51
2              200610; OxyContin Coupons and
              Savings Cards Redemption,
3              PPLPC004000089725
4  Exhibit 12   11/13/2006 Email, S. Seid to A.    53
5  Exhibit 13   1/20/2014 Launch of Adheris        57
              Butrans Adherence Program,
6              PPLP003345164
7  Exhibit 16   3/6/2001 Client Report, Publix     72
              Pharmacy, PKY181887328
8
9  Exhibit 17   Slide deck titled Assessment &     78
              Management of Pain:  Continuum of
10             Care, PLPLPC31000137304
11  Exhibit 18   2/21/2011 Message re OxyContin     60
              Abuse, PDD1701091369
12  Exhibit 19   2003 Endo document,               85
              ENDO-OPIOID_MDL-07391949
13
   Exhibit 20   Message from PDMP Commissioner     105
14             Brenda Fitzgerald, M.D.,
              6/28/2017
15
   Exhibit 23   Report with highlighting, not      138
16             received
17  Exhibit 24   Stanford-Lancet Commission on the  145
              North American Opioid Crisis,
18
   Exhibit 25   A. Lembke Supplemental Materials    148
19             Considered Since April 15, 2024
20  Exhibit 26   Printout of invoices, A. Lembke    155
21  Exhibit 28   A. Lembke's handwritten notes,     15
              front and back page
22
   Exhibit 29   NACDS Practice Memo, 9/2002,       160
23             PDD1706058152
24  Exhibit 30   9/15/2016 Email with attached DPO  185
              Meeting, ALB-NM00015374
25

Page 3

1          E X H I B I T S
2
   EXHIBIT NO.                    PAGE
3
4  Exhibit 1    A. Lembke's Cobb County Report,    14
              Track 8
5
   Exhibit 2    A. Lembke's Report Track 9         15
6
7  Exhibit 3    2014 Article titled "Curing the    18
              Disobedient Patient: Medication
              Adherence Programs as
8              Pharmaceutical Marketing Tools"
              Lamkin; Elliott, Footnote 478, A.
9              Lembke's report
10  Exhibit 4    Lamkin, Elliott article, Footnote  18
              478, A. Lembke report
11
   Exhibit 5    Stanford-Lancet Commission         19
12             Report, 2/2/2022, Footnote 79 of
              A. Lembke's report
13
   Exhibit 6    National Academy of Sciences,      19
14             Engineering, and Medicine report,
              Footnote 93 from A. Lembke's
15             Report
16  Exhibit 7    Pharmacy Times "The Evolution of   19
              the PDMP" referenced on page 157,
17             A. Lembke's Report
18  Exhibit 8    11/4/2015 article titled          20
              "Pharmacy staffing levels can
19             threaten patient lives,"
              DrugTopics
20
   Exhibit 9    4/25/2017 article titled          20
21             "Pharmacists' Workload
              Contributes to Errors,"
22             ScienceDaily
23  Exhibit 10   Spreadsheet re Butrans Stock and   48
              Save program, PPLPC004000282746
24
   Exhibit 10A   Highlighted version of Ex. 10     49
25

Page 5

1  Exhibit 31   9/15/2016 Email with attachment    186
              of complete DPO Meeting
2              ALB-NM00015374-15615
3  Exhibit 32   4/24/2014 Memo to G. Lewandowski,   203
              PPLPC017000552799
4
   Exhibit 33   Expert report, A. Lembke,          206
5              2/7/2024, Cobb County
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 6

1    DEPOSITION OF ANNA LEMBKE, M.D.
2
3        BE IT REMEMBERED, that pursuant to Notice,
4   and on May 16, 2024, commencing at the hour of
5   8:08 a.m., in the offices of Lieff Cabraser
6   Heimann & Bernstein, LLP, 275 Battery Street,
7   Suite 2900, San Francisco, CA, before me, EARLY
8   LANGLEY, a Certified Shorthand Reporter, State of
9   California, personally appeared ANNA LEMBKE, M.D.,
10  produced as a witness in said action, and being by
11  me first duly sworn, was thereupon examined as a
12  witness in said cause.
13            ---oOo---
14  APPEARANCES:
15  For the Plaintiffs:
16
17        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
18        BY: DON C. ARBITBLIT, ESQ.
19        275 Battery Street, 29th Floor
20        San Francisco, CA 94111
21        (415) 956-1000
22        Darbitblit@lchb.com
23
24
25

Page 7

1   For the Plaintiffs:
2
3        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
4        BY: MARK P. CHALOS, ESQ.
5        222 2nd Avenue South, Suite 1640
6        Nashville, TN 37201
7        (615) 313-9000
8        Mchalos@lchb.com
9
10  For the Plaintiff Cobb County:
11
12        SIMMONS HANLY CONROY, LLP
13        BY:  SARAH BURNS, ESQ. (Via Zoom)
14        One Court Street
15        Alton, IL 62002
16        (618) 693-3104
17        Sburns@simmonsfirm.com
18
19        SIMMONS HANLY CONROY, LLP
20        BY: THOMAS SHERIDAN, III, ESQ. (Via Zoom)
21        112 Madison Avenue, 7th Floor
22        New York, NY 10016
23        (212) 257-8482
24        Tsheridan@simmonsfirm.com
25

Page 8

1   For the Plaintiff Tarrant County:
2
3        THE LANIER LAW FIRM, PC
4        BY: ALEX ABSTON, ESQ. (Via Zoom)
5        BY: LEILA AYACHI, ESQ. (Via Zoom)
6        BY: EVAN M. JANUSH, ESQ. (Via Zoom)
7        10940 W. Sam Houston Pkwy N., Suite 100
8        Houston, TX 77064
9        (713) 659-5200
10       Alex.abston@lanierlawfirm.com
11       Leila.ayachi@lanierlawfirm.com
12       Evan.janush@lanierlawfirm.com
13
14
15  For the Defendant Publix Super Markets, Inc.:
16
17       BARNES & THORNBURG LLP
18       BY: KARA KAPKE, ESQ.
19       BY: FRANCIS X. MATTINGLY, ESQ.
20       11 South Meridian Street
21       Indianapolis, IN 46204
22       (317) 236-1313
23       Kara.kapke@btlaw.com
24       Fmattingly@btlaw.com
25

Page 9

1   For the Defendant Albertsons, Inc.:
2
3        GREENBERG TRAURIG, LLP
4        BY: GRETCHEN N. MILLER, ESQ.
5        77 West Wacker Drive, Suite 3100
6        Chicago, IL 60601
7        (312) 456-8400
8        Millerg@gtlaw.com
9
10
11  Also present:
12
13        KEIGO PAINTER, Videographer
14        MICHAEL P. KOHLER
15        BILL HAMMOND
16
17
18
19
20
21
22
23
24
25

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

1                 --oOo--
2         P R O C E E D I N G S
3                 --oOo--
4         THE VIDEOGRAPHER:  Good morning.  We are
5   going on the record at 8:08 a.m. on May 16, 2024.   0
6         Please note that the microphones are
7   sensitive and may pick up whispering and private
8   conversations.  Please mute your phone at this
9   time.  Audio and video recording will continue to
10  take place unless all parties agree to go off the
11  record.
12        This is Media Unit 1 of the video-recorded
13  deposition of Dr. Anna Lembke taken by the counsel
14  for defendants in the matter of National
15  Prescription Opiate Litigation, Cobb County,
16  v. Purdue Pharma, et al., filed in the United
17  States District Court, Northern District of Ohio,
18  Eastern Division, Case Number 1:18-op-45817.
19        The location of the deposition is 275
20  Battery Street, 28th Floor, San Francisco,
21  California 94111.
22        My name is Keigo Painter, representing
23  Veritext.  I'm the videographer.  The court
24  reporter is Early Langley from the firm Veritext.
25  I am not related to any party in this action, nor

Page 11

1   am I financially interested in the outcome.
2         If there are any objections to the
3   proceeding, please state them at the time of your
4   appearance.
5         Counsel and all present, including
6   remotely, will now state their appearances and
7   affiliations for the record, beginning with the
8   noticing attorney.
9         MS. KAPKE:  Kara Kapke and Frank Mattingly
10  from Barnes & Thornburg for Publix Super Markets.
11        MS. MILLER:  Gretchen Miller from
12  Greenberg Traurig on behalf of Defendant
13  Albertsons.
14        MR. CHALOS:  Mark Chalos on behalf of the
15  plaintiffs.
16        MR. ARBITBLIT:  Don Arbitblit for
17  plaintiffs.  And we are both with Lieff Cabraser.
18        THE VIDEOGRAPHER:  Would the court
19  reporter please swear in the witness.
20            ANNA LEMBKE, M.D.
21        sworn as a witness,
22        testified as follows:
23  EXAMINATION BY MS. KAPKE:
24        Q.  Good morning, Dr. Lembke.  My name is Kara
25  Kapke, and I represent Publix Super Markets.

Page 12

1         I know you've been deposed many times
2   before, so I won't go over ground rules, other
3   than, will you let me know if you don't understand
4   one of my questions?
5         A.  Yes.
6         Q.  Thank you.  Also let me know if you need a
7   break at any point.
8         Is this your first expert report in your
9   years of work in the opioid litigation where you
10  have offered opinions in a case brought against my
11  client, Publix?
12        A.  Yes.
13        Q.  Have you ever shopped at a Publix or an
14  Albertsons?
15        A.  I believe so, yes.
16        Q.  Publix or Albertsons or both?
17        A.  Albertsons.
18        Q.  I'll let Gretchen ask those questions, if
19  she wants.
20        Have you ever shopped at a Publix?
21        A.  Not that I remember.
22        Q.  So I assume, then, you've never obtained a
23  prescription at a Publix?
24        A.  Correct.
25        Q.  Do you have any opinions about Publix's

Page 13

1   role as a distributor, or do all of your opinions
2   specific to Publix relate to its role as a
3   dispenser and a pharmacy?
4         MR. ARBITBLIT:  Object to form.
5         You may answer.
6         THE WITNESS:  My report contains opinions
7   related to distributors more broadly, and I am
8   aware that Publix is a distributor, and I am aware
9   of some of the specifics, but I am not offering a
10  specific opinion on Publix's role as a
11  distributor.
12  BY MS. KAPKE:
13        Q.  Same question for Albertsons.  Would we
14  get the same answer?
15        MR. ARBITBLIT:  Object to form.
16        THE WITNESS:  I'm not aware that
17  Albertsons is a distributor.
18  BY MS. KAPKE:
19        Q.  Okay.  Got it.
20        Have you ever been to Georgia?
21        A.  I may have passed through Georgia.
22        Q.  How about Cobb County?
23        A.  I don't know.  I don't think so.
24        Q.  Have you ever been licensed to practice
25  medicine in Georgia?

4 (Pages 10 - 13)

CONFIDENTIAL

1     A. No.
2     Q. Have you ever worked at a retail pharmacy
3 chain?
4     A. No.
5     Q. Have you ever worked at a grocery store
6 that contained a retail pharmacy?
7     A. No.
8     Q. Have you ever interviewed anyone that
9 works at a Publix?
10     A. No.
11     Q. Have you ever interviewed anyone that
12 filled a prescription at a Publix?
13     A. No.
14     Q. Did you do any research relating to Cobb
15 County other than review what's in the materials
16 cited in your report and supplemental materials
17 cited that was recently provided to us?
18     A. No.
19     Q. Is there anything relevant to your
20 opinions, besides your experience, of course, that
21 you reviewed that is not listed in those two
22 materials considered lists?
23     A. No.
24        (Whereupon, Lembke Exhibit 1 was marked
25        for identification.)

1        (Whereupon, Lembke Exhibit 2 was marked
2        for identification.)
3 BY MS. KAPKE:
4     Q. In front of you, what we have premarked as
5 Exhibits 1 and 2, are your Cobb County report,
6 your Track 8 report, and your Track 9 report as
7 Exhibit 2.
8        Does Exhibit 1, your Track 8 report,
9 contain all of your opinions with respect to Cobb
10 County and Publix?
11     A. Yes, unless, of course, I'm asked to
12 elaborate on something, in which I -- in which
13 case, it may not be contained within here.
14     Q. Same question for Tarrant County and
15 Albertsons.
16     A. Yes.
17     Q. And I see in front of you, you've got some
18 notes. Is that okay if we mark those as an
19 exhibit?
20        MR. ARBITBLIT: Yes.
21        MS. KAPKE: Okay. We'll mark that as
22 Lembke Exhibit 28.
23        (Whereupon, Lembke Exhibit 28 was marked
24        for identification.)
25 BY MS. KAPKE:

1     Q. And the -- just describe what these are.
2     A. This is page numbers for each report so
3 that it's easier for me to get to the
4 Publix-specific and Albertsons-specific sections.
5     Q. Great. And we've highlighted on some
6 various exhibits various Publix statements, and we
7 tabbed some on the report as well, just to try to
8 direct your attention as well.
9        So as -- as I -- as you see down there,
10 also here today is counsel for Albertsons,
11 Gretchen Miller. After I finish my questions,
12 Gretchen will have the opportunity to ask you
13 additional questions.
14        And your answers to either of our
15 questions can be used in either Track 8 or
16 Track 9. Is that your understanding?
17     A. It is my understanding now.
18     Q. And you've been previously asked a lot of
19 questions in depositions and at trial in opioid
20 litigation, and I'm going to try very hard not to
21 repeat questions you've been previously asked or
22 cover ground you've already covered, and Gretchen
23 will do the same.
24        But as a precursor to that, I need to
25 confirm that you stand by that prior testimony.

1 Fair to say that you hold the same opinions today
2 as you did in your prior testimony in opioid
3 litigation?
4     A. Not entirely fair. As I've gotten access
5 to more material over time, some aspects of
6 emphasis may have changed. Overall, my opinions
7 are unchanged.
8     Q. You previously testified that on a
9 national level, in the first decade and a half of
10 this century, most of the doctors who were writing
11 opioid prescriptions thought that they were
12 writing for a legitimate medical purpose.
13        Does that include Cobb and Tarrant
14 Counties?
15     A. Yes.
16     Q. You previously testified that you have
17 never given a talk to pharmacists in which you
18 were advising pharmacists specifically what steps
19 they should follow before dispensing an opioid
20 medication.
21        Is that still true?
22     A. I'm not sure. I think it's very likely
23 that there have been pharmacists in the audience
24 when I've given broader talks on these topics.
25 I'm not recalling ever being invited specifically

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1  by a pharmacy organization, but even that is
2  possible.  I'm not exactly sure.
3      Q.  Okay.  I do have some follow-up questions
4  about your prior testimony, and I will be very
5  targeted, to the extent possible.
6          In the New York Attorney General action,
7  you talked a lot about your methodology, and one
8  of the statements you made was that you conducted
9  an in-depth analysis of over 600 papers regarding
10  opioids in the medical literature.
11         And I imagine that number has gone up
12  since you testified in 2020.  Correct?
13     A.  Yes.
14     Q.  I'm going to hand you several publications
15  that we have premarked as Lembke Exhibits 3
16  through 9.
17         (Whereupon, Lembke Exhibit 3 was marked
18         for identification.)
19  BY MS. KAPKE:
20     Q.  So Exhibit 3 is the Lamkin and Elliott
21  article that you mention in Footnote 478 of your
22  report; is that right?
23     A.  Yes, I recognize the article.
24         (Whereupon, Lembke Exhibit 4 was marked
25         for identification.)

Page 19

1  BY MS. KAPKE:
2      Q.  And then Exhibit 4 is the CDC brochure
3  from Footnote 479 of your report.
4          (Whereupon, Lembke Exhibit 5 was marked
5          for identification.)
6  BY MS. KAPKE:
7      Q.  Exhibit 5 is the Stanford-Lancet
8  Commission report mentioned throughout your
9  report.  I'm sure you're very familiar with that.
10     A.  Yes.
11         (Whereupon, Lembke Exhibit 6 was marked
12         for identification.)
13  BY MS. KAPKE:
14     Q.  Exhibit 6 is the National Academy of
15  Sciences, Engineering, and Medicine report
16  mentioned specifically with respect to pharmacies
17  in Footnote 93.
18         I didn't print the entire thing, but I did
19  print the introductory material, Summary, Chapter
20  7 on opioids, and the References.
21         (Whereupon, Lembke Exhibit 7 was marked
22         for identification.)
23  BY MS. KAPKE:
24     Q.  Exhibit 7 is a Pharmacy Times article
25  referenced on page 179 -- or excuse me --

Page 20

1  referenced on page 17- -- 157, referenced on
2  page 157 of your report.
3          Would you consider Exhibit 7 part of the
4  medical literature you referred to in the New York
5  case?
6      A.  I'd like a moment to look at this again.
7      Q.  Sure.
8      A.  And -- as well as, what page is it
9  footnoted on in the report?
10     Q.  157.
11     A.  157.
12         I would consider this article more of an
13  opinion piece.
14         (Whereupon, Lembke Exhibit 8 was marked
15         for identification.)
16         (Whereupon, Lembke Exhibit 9 was marked
17         for identification.)
18  BY MS. KAPKE:
19     Q.  Okay.  And then I'm going to hand you
20  Lembke Exhibit 8 and Lembke Exhibit 9.  They're
21  two articles about pharmacists' workload from
22  Footnotes 768 and 769 of your report.
23         Would you consider this part of the
24  medical literature you referred to in the New York
25  case?

Page 21

1      A.  Can you tell me what page?
2      Q.  768 and 769 are the footnotes.
3      A.  Okay.  Do you have the page numbers?
4      Q.  I don't.
5      MR. CHALOS:  It's at page 147.
6      THE WITNESS:  Yeah.
7          Can you repeat your question.
8      MS. KAPKE:  Sure.
9  BY MS. KAPKE:
10     Q.  Would you consider those two exhibits part
11  of the medical literature, or are they more
12  opinion pieces as well?
13     MR. ARBITBLIT:  Object to form.
14     THE WITNESS:  I would consider the
15  "Pharmacy staffing levels can threaten patient
16  lives" as a direct communication to pharmacy
17  professionals that cites medical literature but in
18  and of itself doesn't represent medical
19  literature.
20         I would consider "Pharmacists' Workload
21  Contributes To Error" as an article that's
22  communicating with healthcare professionals,
23  describing a study in the medical literature.
24  BY MS. KAPKE:
25     Q.  Okay.  Besides Exhibits 3 through 9, do

6 (Pages 18 - 21)

CONFIDENTIAL

1 any of the papers or other materials from the
2 medical literature that you cite specifically
3 discuss the role of pharmacies with respect to
4 opioids?
5     A. Could you orient me on the numbers of the
6 exhibits? I don't think these exhibit numbers.
7     Q. Sure. So I tried to pull out all of the
8 exhibits that you cite in your report --
9     A. Yeah.
10     Q. -- that are medical literature that relate
11 specifically to pharmacies and opioids, and that's
12 the exhibits in front of you.
13         Are there any -- is there anything else?
14 Is there any other medical literature that you
15 cite in your report that talks about the role of
16 pharmacies and opioids?
17         MR. ARBITBLIT: Object to the form of the
18 question.
19         And just to clarify, you're referring to
20 everything you've provided to the witness since 1
21 and 2, which were the reports, so -- just to
22 clarify?
23         MS. KAPKE: Correct.
24         THE WITNESS: Yeah, okay. So just for my
25 own clarification so I make sure I answer the

1 question you're asking, you are specifically
2 asking me whether these remaining exhibits,
3 Exhibit 3, 4, 5, and 6 discuss pharmacies?
4 BY MS. KAPKE:
5     Q. No. No.
6         I'm asking if there are any materials
7 besides Exhibits 3, 4, 5, 6, and 7 in the
8 medical -- sorry -- any materials besides
9 Exhibits 3 through 9 -- I'm not asking about
10 Exhibit 3 through 9. I'm asking about other
11 materials.
12         So besides what's in front of you, other
13 than your two reports, are there any articles in
14 the medical literature that specifically discuss
15 the role of pharmacies with respect to opioids?
16         MR. ARBITBLIT: That she's relied on?
17 BY MS. KAPKE:
18     Q. That you have relied upon.
19     A. My instinct would be to say yes, but I
20 would probably have to go through my report to
21 cite exactly which ones.
22     Q. Okay. I really -- I searched high and low
23 to find something besides those articles, so I'd
24 like you to do that. And I think -- if it's okay
25 with your counsel, let's take a break and have you

1 do that and find whatever other articles in the
2 medical literature there are that discuss the role
3 of pharmacies and opioids.
4         MR. ARBITBLIT: I'm not okay with taking a
5 break to do that, Counsel. It's a lengthy report,
6 and if she takes a break to go through the whole
7 report, that's going to extend our time beyond
8 what's contemplated.
9         If you want to have her take a few minutes
10 to look through it while we're on the record,
11 that's okay, but I'm not going to agree to take a
12 break for her to do that.
13         You're asking your questions, but you're
14 not entitled to say, "Take a break to look through
15 a 400-plus page report," and then come back when
16 you're ready.
17 BY MS. KAPKE:
18     Q. Are you familiar enough with your report
19 to answer my question without looking page by page
20 at it?
21     A. I have reviewed hundreds and hundreds of
22 articles. So to really be certain that I was
23 accurately answering your question, I would need
24 to take time.
25     Q. As you sit here today, can you name a

1 single article besides the ones that I put in
2 front of you in the medical literature that
3 discusses the role of opioids and pharmacies?
4     A. This is a very large report that I have
5 written over five years. I don't, unfortunately,
6 remember every article and exactly what it
7 discussed. So the answer is, I would need to
8 review the report.
9     Q. Would you have cited them in your report?
10     A. Yes.
11         MR. ARBITBLIT: Object to form.
12 BY MS. KAPKE:
13     Q. How long would it take you to do?
14     A. Well, I probably would have to go through
15 every single article and see whether or not it
16 specifically discussed pharmacies. There are
17 articles in here that may not in their heading or
18 in their summary have been about pharmacies but
19 may, indeed, in the body of the report have
20 discussed pharmacies.
21     Q. Did you call those in -- in the text
22 of your report, did you call any of those out?
23         MR. ARBITBLIT: Object to form.
24         THE WITNESS: I may have done. I may not
25 have done. I don't know.

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1 BY MS. KAPKE:
2     Q.  And that would be in the text of your
3 report either way?
4         MR. ARBITBLIT:  Object to form.
5         THE WITNESS:  I read many articles.  I --
6 if you want to know which of those articles
7 mentions pharmacies, I would need to go back and
8 review all those articles.
9         MR. ARBITBLIT:  Do we know whose ringing
10 is happening, what --
11        THE VIDEOGRAPHER:  That's when somebody
12 gets added to the room.
13        MR. ARBITBLIT:  Okay.
14 BY MS. KAPKE:
15    Q.  Here, you're relying on your experience,
16 your professional judgment, your review of the
17 medical literature, and your review of the
18 documents provided to you; correct?
19    A.  Yes.
20    Q.  Have you reviewed or analyzed Publix's
21 dispensing data production that contains patient
22 information?
23    A.  What do you mean by "patient information"?
24    Q.  The actual dispensing data records that
25 has the patient's name and the date of the fill

Page 27

1 and the quantity of the fill, that contains that
2 individualized, specific patient information.
3    A.  No.
4    Q.  On page 212 of your report, you reference
5 an email where a Publix pharmacy supervisor
6 identified 6 to 13 prescriptions that should not
7 have been filled.
8        Other than those 13 scripts, have you
9 identified any specific prescriptions that in your
10 opinion should not have been dispensed at Publix
11 stores in Cobb County?
12        MR. ARBITBLIT:  Object to form.
13        THE WITNESS:  My analysis beyond those
14 fraudulent prescriptions was in aggregate.
15 BY MS. KAPKE:
16    Q.  And just to break that down, so because
17 your analysis was in the aggregate, the answer to
18 my question on whether you have identified any
19 specific prescriptions that in your opinion should
20 not have been dispensed at Publix stores in Cobb
21 County would be no?
22    A.  That's fair.
23    Q.  In the New York litigation, you confirmed
24 that you believe a number of entities contributed
25 to the opioid crisis but that you had not

Page 28

1 quantified the degree of responsibility that
2 should be allocated to those various entities.
3        Is that still true today?  You have not
4 quantified the degree of responsibility those
5 entities should be allocated?
6    A.  That's still true today.
7    Q.  And I'm going to list off a few groups or
8 entities and ask if you continue to believe that
9 they contributed to the opioid epidemic.
10        Doctors?
11    A.  Do you want me to respond "yes" or "no" to
12 each of those?
13    Q.  Yes, please.
14    A.  Okay.  Yes.
15    Q.  And not just pill mill doctors, but all
16 doctors; correct?
17        MR. ARBITBLIT:  Object to form.
18        THE WITNESS:  The medical profession,
19 including doctors, contributed to the opioid
20 epidemic and, as I've stated before, primarily
21 because they were miseducated and misinformed,
22 although there is a subset of pill mill doctors.
23 BY MS. KAPKE:
24    Q.  The FDA?
25    A.  Yes.

Page 29

1    Q.  State medical boards and the Federation of
2 State Medical Boards?
3    A.  Yes.
4    Q.  And that would include the Georgia
5 Composite Medical Board, which has the power to
6 investigate and discipline doctors in Georgia?
7    A.  I didn't specifically look at the Georgia
8 medical board except, I believe, beyond
9 inspectors -- depositions of several inspectors.
10    Q.  What about formulary and reimbursement
11 policies of insurance companies and other
12 third-party payers?
13    A.  Yes.
14    Q.  DEA?
15    A.  Yes.
16    Q.  The three big wholesale distributors of
17 McKesson, AmerisourceBergen, and Cardinal Health?
18    A.  Yes.
19    Q.  And, obviously, manufacturers?
20    A.  Yes.
21    Q.  Would you also say that healthcare systems
22 or related entities employing or overseeing
23 prescribers that collaborated with manufacturers
24 to promote pain as the fifth vital sign or aligned
25 physician incentive payments with patient

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1 satisfaction also bear some responsibility for the
2 opioid epidemic?
3     A.  Oh, my.  Can you restate that.  I didn't
4 understand the question.
5     Q.  Yeah.
6        Do you think that healthcare systems,
7 entities that employ doctors that collaborated
8 with manufacturers to promote pain as the fifth
9 vital sign or aligned physician incentive payments
10 with patient satisfaction also bear some
11 responsibility for the opioid epidemic?
12        MR. ARBITBLIT:  Objection to form.
13        THE WITNESS:  Yes.
14 BY MS. KAPKE:
15     Q.  And do you still agree with your statement
16 in the Track 3 trial that, quote (as read):
17        "This was really something that we
18        all need to take responsibility for, from
19        physicians to pharmacies, to
20        manufacturers, to distributors.
21        "Everybody had a role to play here,
22        and I think it's essential that we look
23        back and honestly reflect on what our role
24        was and try to do better"?
25     A.  Yes.

Page 31

1     Q.  In that sense, do you think that any
2 retail pharmacy that was dispensing opioids in the
3 early 2000s should take some responsibility for
4 the opioid crisis, at least where that pharmacy
5 was dispensing opioids?
6        MR. ARBITBLIT:  Object to form.
7        THE WITNESS:  I would want to analyze that
8 specific pharmacy before making that kind of
9 statement.
10 BY MS. KAPKE:
11     Q.  What would go into that analysis --
12 analysis?
13     A.  Similar to what has gone into my analysis
14 of Publix:  documents obtained in discovery, my
15 clinical experience, reviewing the medical
16 literature, my own research.
17     Q.  Could you make that determination looking
18 solely at an aggregate number of pills dispensed
19 or received -- strike that.
20        Could you make that determination looking
21 solely at ARCOS data?
22        MR. ARBITBLIT:  Object to form.
23        THE WITNESS:  I think ARCOS data would --
24 could be a strong indicator.
25 BY MS. KAPKE:

Page 32

1     Q.  So I understand you haven't reviewed
2 documents from other pharmacies in Cobb County
3 that were not defendants in this case that were
4 produced in discovery because they weren't
5 defendants, so they didn't produce documents.
6        If there were a pharmacy in Cobb County
7 that dispensed more pills than Publix or,
8 according to the ARCOS -- strike that.
9        If there were a pharmacy in Cobb County
10 that the ARCOS data showed received more pills
11 than Publix, would that pharmacy have a
12 responsibility for the opioid crisis?
13        MR. ARBITBLIT:  Object to form.
14        THE WITNESS:  Possibly.
15        But just because another pharmacy may have
16 received more pills than Publix would not
17 automatically discount or absolve Publix from its
18 contribution to the opioid crisis.
19 BY MS. KAPKE:
20     Q.  Other than routine inspections conducted
21 of all registrants, are you aware of any DEA
22 investigation into Publix?
23     A.  If I don't mention it in my report, then
24 I'm not aware.
25     Q.  Okay.  Do you want to take a second to

Page 33

1 review?
2     A.  I could, yes.  I could do that.
3     Q.  It's not in your report.  I'll tell you
4 that.  Would you agree with that?
5        MR. ARBITBLIT:  The segment of her report
6 that's Publix-specific, as you would see on
7 Exhibit 28, is quite limited compared to the
8 overall report.
9        So if she could take a minute to look, I
10 would rather have her answer the question.
11        MS. KAPKE:  I'm okay with that.
12        THE WITNESS:  Okay.
13        Can you repeat your question, or if I
14 could see it again on realtime.
15        MR. ARBITBLIT:  There's your question.
16        THE WITNESS:  Okay.
17 BY MS. KAPKE:
18     Q.  So I'll repeat it.  You just took six
19 minutes to go through the report.
20        Are you aware of any DEA investigation
21 into Publix other than routine inspections
22 conducted of all registrants?
23     A.  I'm not aware of any specific DEA
24 inspection of Publix.
25        But on 394 of my report, I do mention a

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1 2015 DEA intelligence report about the state of
2 Georgia, which does discuss behaviors like doctor
3 shopping and prescription fraud feeding opioid
4 dependency in the area.
5     Q.  And is that Publix specific?
6     A.  It doesn't appear to be, no.
7     Q.  Are you aware of whether DEA, the
8 Department of Justice, the Board of Pharmacy, or
9 any other regulatory or law enforcement body has
10 ever cited or fined Publix?
11     A.  Not that I am aware of.
12     Q.  Are you aware of whether any regulatory
13 body has ever concluded that Publix ignored red
14 flags?
15     A.  Not that I am aware of.
16     Q.  Are you aware of whether any regulatory
17 body has ever concluded that Publix ignored surges
18 in the numbers of opioids distributed and
19 dispensed at certain pharmacies?
20     A.  Not that I am aware of.
21     Q.  Are you aware of whether any regulatory
22 body has ever expressed any concern about the
23 volume of opioids distributed or dispensed by
24 Publix?
25     A.  Not that I am aware of.

Page 35

1     Q.  Can you turn to page 96 of your report.
2         And can you just read paragraph F to
3 yourself.
4     A.  Okay.
5     Q.  Are you aware of any evidence that Publix
6 has paid millions in settlements?
7     A.  No.
8     Q.  Are you aware that James Rafalski was not
9 disclosed as an expert in either the Cobb County
10 or Tarrant County litigations?
11     A.  No.
12     Q.  Are you relying on his prior reports in
13 cases not involving Publix for any of your
14 opinions with respect to Publix?
15     MR. ARBITBLIT:  Object to form.
16     THE WITNESS:  I'm relying on my own review
17 of the evidence.
18 BY MS. KAPKE:
19     Q.  So fair to say, then, you're not relying
20 on James Rafalski?
21     MR. ARBITBLIT:  Object to form.
22     THE WITNESS:  I'm not deferring to James
23 Rafalski.  It was -- his conclusions were among
24 many documents that I have read that have been --
25 that I've used to inform my opinion.  But my

Page 36

1 opinion on Publix does not rely on his
2 conclusions.  I have been able to form my own
3 conclusions through my own review.
4 BY MS. KAPKE:
5     Q.  Have you ever analyzed a specific pharmacy
6 and found that it was not responsible in some part
7 for the opioid crisis?
8     A.  My review is in aggregate, not based on
9 review of a single specific pharmacy.
10     Q.  I'm -- what I am asking is, have you ever
11 looked at the evidence for a single pharmacy chain
12 and said, "You know what?  This -- this pharmacy,
13 the evidence shows it's not responsible in some
14 part for the opioid crisis"?
15     A.  So the form of your question, as a
16 two-part question, is one that I tried to answer
17 before, but I'm having difficulty answering it as
18 you've phrased it.
19         Let me see if I can --
20     Q.  Yeah.
21     A.  -- take it apart.
22     Q.  Yeah.
23     A.  So I haven't analyzed any individual
24 pharmacy.  My analysis is in aggregate.  So I
25 haven't drawn conclusions based on any one

Page 37

1 individual pharmacy.  So you're asking me what
2 sounds like a hypothetical, because I haven't done
3 that.
4     Q.  Okay.  But you have done that as an expert
5 witness against CVS; correct?
6     A.  I have studied CVS pharmacies in
7 aggregate.
8     Q.  And opined that CVS pharmacies in the
9 aggregate are responsible in part for the opioid
10 crisis; right?
11     A.  Yes.
12     Q.  Okay.  And you've done that with respect
13 to Walgreens and Kroger and Meijer and Giant Eagle
14 and Walmart; correct?
15     A.  Yes.
16     Q.  And Albertsons and Publix in Track 8 and
17 9; correct?
18     A.  Yes.
19     Q.  Have you done any analysis of a pharmacy
20 and concluded it was not responsible in some part
21 for the opioid crisis?
22     MR. ARBITBLIT:  Object to form.
23     THE WITNESS:  The pharmacies that I have
24 offered opinions on, I have concluded that they
25 have all contributed to the opioid crisis.

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1 BY MS. KAPKE:
2    Q.  Your reports talk about numerous other
3 things that opioid manufactures, opioid
4 distributors, and specific pharmacies did to
5 increase the supply and sales of opioids.
6        I'm going to get into the specific claims
7 of what you talk about in detail with respect to
8 Publix in a bit, but I want to ask some very
9 targeted questions here.
10       You reference Manufacturer Product
11 Updates, or MPUs, on page 98 of your report.
12       MR. ARBITBLIT:  Is that a question?
13       MS. KAPKE:  Huh?
14       MR. ARBITBLIT:  Is that a question or --
15       MS. KAPKE:  No.  I figured she would turn
16 to page 98, and then I'm going to ask my question.
17       MR. ARBITBLIT:  All right.
18 BY MS. KAPKE:
19    Q.  Do you have any evidence that Publix or
20 Albertsons ever made an agreement with Purdue,
21 Janssen, Abbott Labs, Mallinckrodt, or any other
22 opioid manufacturer to receive payments in
23 exchange for distribution --
24       (Clarification requested by Reporter.)
25 BY MS. KAPKE:

Page 39

1    Q.  Do you have any evidence that Publix or
2 Albertsons ever made an agreement with Purdue,
3 Janssen, Abbott Labs, Mallinckrodt, or any other
4 opioid manufacturer to receive payments in
5 exchange for distribution of Manufacturer Product
6 Updates regarding opioids?
7    A.  Not specifically Manufacturer Product
8 Updates, but yes to payments regarding coupons,
9 refunds, and savings plans, which also function as
10 a form of advertisement.
11    Q.  Right, which is why I'm asking very
12 specific questions here.
13       So do you have any evidence that Publix or
14 Albertsons ever made an agreement with Janssen to
15 receive compensation to enclose a direct-to-
16 consumer promotion for the Duragesic patch in
17 prescriptions filled for oral opioid products?
18    A.  No.
19    Q.  Do you have any evidence Publix or
20 Albertsons ever received money to print
21 information related to opioids on receipts for
22 customer prescriptions?
23    A.  No.
24    Q.  Do you have any evidence Publix or
25 Albertsons ever received money to place posters,

Page 40

1 pamphlets, or physical advertising related to
2 opioids for patients adjacent to or near the
3 prescription counter?
4    A.  No.
5    Q.  Do you have any evidence Publix or
6 Albertsons created patient-facing brochures in
7 order to propagate myths about opioids?
8    A.  Publix and Albertsons both collaborated
9 with the National Association of Chain Drug
10 Stores, which did produce things like pamphlets,
11 et cetera, to specifically target and promote
12 opioids to patient consumers and pharmacists.
13    Q.  Other than through their collaboration
14 with NACDS, do you have any evidence that Publix
15 or Albertsons created patient-facing brochures in
16 order to propagate myths about opioids?
17    A.  No.
18    Q.  Do you have any evidence Publix or
19 Albertsons ever received money to include
20 information in an internal pharmacy newsletter
21 about opioids?
22    A.  No.
23    Q.  Do you have any evidence Publix or
24 Albertsons called Purdue a reliable leader?
25    A.  I'm going to need to look at my report for

Page 41

1 that one.
2        And is your question specifically, quote,
3 a reliable leader, unquote?
4    Q.  Yes, you can put "a reliable leader" in
5 quotes.
6    A.  Okay.  So some equivalent phrase is not --
7    Q.  Well, do you have evidence of an
8 equivalent phrase?
9    A.  Yeah, I'm going to look at my report.
10    Q.  Sure.
11    A.  Okay.  I'm going to need to go to CT9 to
12 answer the Albertsons part of your question.
13 BY MS. KAPKE:
14    Q.  Why don't -- why don't we just phrase it
15 as --
16       MS. KAPKE:  Hey, guys.  Sorry.
17 BY MS. KAPKE:
18    Q.  Why don't we just phrase it as, do you
19 have any evidence that Publix called Purdue a
20 reliable leader or similar phrasing?
21    A.  I do not have specific evidence of Publix
22 using that language, but I can infer from Publix's
23 behavior that they looked to Purdue as a reliable
24 leader.
25    Q.  How so?

11 (Pages 38 - 41)

CONFIDENTIAL

1     A.  Training their pharmacists.  That would be
2  a big one.
3     Q.  Okay.  So the continuing education.  Are
4  you referring to anything other than the
5  continuing -- continuing pharmacist education?
6     A.  Yes.
7     Q.  What?
8     A.  Relying on Purdue for rebates and coupons
9  for Purdue products, which is a form of
10  advertisement.
11     Q.  Okay.  Besides the coupons and the CEs,
12  anything that supports your inference there?
13     A.  I think that would be primary.
14     Q.  Okay.  Do you have any evidence that
15  Purdue Pharma used or promoted a Publix or
16  Albertsons employee as a key opinion leader?
17     A.  Can you repeat the question.
18     Q.  Do you have any evidence that Purdue
19  Pharma used or promoted a Publix or Albertsons
20  employee as a key opinion leader?  So --
21     A.  Yeah, I understand.
22     Q.  Okay.
23     A.  No.
24     Q.  Okay.  Do you have any evidence that
25  Purdue Pharma was ever a student of Publix or

1  Albertsons at a continuing medical education
2  event?
3     A.  No.
4     Q.  Do you have any evidence that a Publix or
5  Albertsons pharmacist felt physically intimidated
6  by his pharmacy managers to dispense prescription
7  opioids?
8     A.  What do you mean by "physically
9  intimated"?
10     Q.  I don't know, because that was a direct
11  quote from your report or testimony involving
12  another pharmacy.  So --
13     A.  Got it.  Okay.
14       I have --
15       MR. ARBITBLIT:  Object to form.
16       THE WITNESS:  Yeah, I have evidence that
17  Publix and Albertsons pharmacists felt intimidated
18  to dispense opioids.
19  BY MS. KAPKE:
20     Q.  Physically intimidated, in the sense that
21  you have referred to another pharmacy?
22       MR. ARBITBLIT:  Object to form.
23       THE WITNESS:  It would be great if you
24  could show me where and how I stated that before.
25  BY MS. KAPKE:

1     Q.  Okay.  We'll come back to that.
2       Do you have evidence Publix or Albertsons
3  did anything to encourage healthcare systems to
4  align physician incentive payments with patient
5  satisfaction?
6     A.  No.
7     Q.  Do you have any evidence Publix or
8  Albertsons collaborated with or supported Scott
9  Fishman's book called Responsible Opioid
10  Prescribing?
11     A.  No.
12       MS. KAPKE:  Okay.  Gretchen wanted a
13  break, so let's go off the record, if that's okay.
14       THE VIDEOGRAPHER:  We are going off the
15  record.  The time is 9:02.                    0
16       (Recess taken.)
17       THE VIDEOGRAPHER:  We're back on the
18  record.  The time is 9:11.
19  BY MS. KAPKE:
20     Q.  Do you understand you're still under oath,
21  Dr. Lembke?
22     A.  Yes.
23     Q.  Okay.  Opinion 6, starting at page 96 of
24  your report, and Appendix III are the only times
25  you specifically introduce any evidence about

1  Publix in your report; correct?
2     A.  No.
3       MR. ARBITBLIT:  Object to form.
4  BY MS. KAPKE:
5     Q.  Where else do you introduce evidence about
6  Publix?
7     A.  What do you mean by "introduce evidence"?
8     Q.  So I know you refer to Publix as a member
9  of the pharmaceutical opioid industry, and that's
10  throughout your report.  But is all of the
11  evidence you cite to support Publix being a member
12  of the pharmaceutical opioid industry contained in
13  Opinion 6 or Appendix III?
14       MR. ARBITBLIT:  Object to form.
15       THE WITNESS:  I'll have to look at these
16  page numbers.
17  BY MS. KAPKE:
18     Q.  And Opinion 6 is several hundred pages.
19     A.  Do you know the page it ends on?
20     Q.  I don't.  It's clipped in Exhibit 1, if
21  you want to look at that.
22     A.  I don't see a clip here.
23       MR. MATTINGLY:  It is on the top.
24       THE WITNESS:  It is on the top.
25       MR. MATTINGLY:  But I believe it ends on

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1  214.
2       THE WITNESS:  214?  Okay.
3       MR. MATTINGLY:  213.
4       THE WITNESS:  213?
5       I think that's fair to say.
6  BY MS. KAPKE:
7       Q.  Okay.  So I want to go through Opinion 6
8  in detail.  It has subparts (a) through (q) in it.
9       So let's start with subpart (a) regarding
10  a decision in California.
11       MR. ARBITBLIT:  Can I just ask, can I
12  remove these --
13       MS. KAPKE:  Yeah.
14       MR. ARBITBLIT:  -- so they're not --
15       MS. KAPKE:  Yeah.
16       MR. ARBITBLIT:  Don't want to distract her
17  during your inquiry.
18  BY MS. KAPKE:
19       Q.  That decision in California does not
20  relate to Publix; correct?
21       A.  I'm sorry.  What page number are you
22  referring to?
23       Q.  I think it's 96, and 97 then, subpart (a).
24       A.  Are you referring to the findings of fact
25  and conclusions of law issued by Judge Breyer in

Page 47

1  San Francisco?
2       Q.  Yes.
3       A.  Okay.  Can you repeat your question.
4       Q.  Yeah.
5       Publix was not a defendant in that case
6  and doesn't have stores in California; correct?
7       A.  Correct.
8       Q.  So subpart (a) doesn't have anything to do
9  with Publix; correct?
10       A.  Not necessarily.
11       Q.  Tell me how subpart (a) relates to Publix.
12       A.  Judge Breyer's opinion in that case
13  informs Publix's -- informs my evaluation of
14  Publix's conduct, in part.  For example, Judge
15  Breyer opined that pharmacies have a
16  responsibility to protect the public and protect
17  the public health.
18       Q.  You do not reference the Orange County
19  case before Judge Wilson.  Have you read Judge
20  Wilson's ruling in the Orange County case?
21       A.  Yes.
22       Q.  Has anyone conveyed to you the notion that
23  Judge Wilson said that the studies that you relied
24  upon for the conclusion that one in four patients
25  prescribed opioids would become addicted was

Page 48

1  inadequate?
2       MR. ARBITBLIT:  Object to form.
3       THE WITNESS:  I'm aware of -- I'm aware of
4  Judge Wilson's opinion, and I disagree with it.
5  BY MS. KAPKE:
6       Q.  We talked some about your opinions in
7  subpart (b) and subpart (b) -- or excuse me --
8  subpart (c) and its discussion of coupons and
9  rebates, so I want to get into detail on that.
10       So if you go to page 102, you mention two
11  stock and save programs.
12       Do you have any evidence Publix stores in
13  Cobb County received rebates from Purdue for
14  either of the stock and save programs you mention?
15       A.  These were national campaigns, so I can
16  infer that it's probable that Publix stores in
17  Cobb County were also participating in these
18  coupons and savings programs.
19       (Whereupon, Lembke Exhibit 10 was marked
20       for identification.)
21  BY MS. KAPKE:
22       Q.  Okay.  So I'm going to hand you
23  PPLPC004000282746 involving the Butrans stock and
24  save program that you cite.  I did not print the
25  other tabs in the spreadsheet for the other

Page 49

1  pharmacies, but Exhibit 10 is the printout of the
2  Publix tab from that exhibit.
3       And to make it a little easier, I printed
4  out and highlighted the four rows where the state
5  in Column O was GA.
6       MS. KAPKE:  And we'll mark that
7  highlighted version as Lembke Exhibit 10A.
8       (Whereupon, Lembke Exhibit 10A was marked
9       for identification.)
10  BY MS. KAPKE:
11       Q.  So Exhibit 10 and 10A show that Publix
12  received $48 for rebates from Purdue in Georgia
13  for Butrans; is that correct?
14       A.  Can you point me where the $48 is that you
15  are referring to?
16       Q.  I believe it's on the last page.
17       A.  Okay.
18       I'm going to ask you to point to it with
19  your finger.
20       Q.  Sure.  So -- okay.  We've got 12 -- sorry.
21  It's on page 2.  We've got $12, $12, $12 and $12,
22  four rows of $12 each for the Butrans rebates in
23  Georgia.
24       Do you have any reason to disagree with
25  that?

CONFIDENTIAL

Page 50

1     A.  No, I don't disagree with --
2     Q.  Okay.
3     A.  -- what's on this document.
4     Q.  And did you compare this spreadsheet and
5  the specific stores on it to the list of Publix
6  pharmacies in Cobb County?
7     A.  I'm not sure I understand your question.
8     Q.  Okay.  Can I see that real quick.
9        So here, we've got specific stores
10  highlighted, the Georgia stores.  There's four
11  specific stores.  There's one in Stockbridge,
12  Martinez, Lawrenceville, and Atlanta.
13     A.  Uh-huh.
14     Q.  Do you know if any of these four stores
15  are in Cobb County?
16     A.  I'm not sure.
17     Q.  Okay.  You mention rebates -- we're done
18  with that exhibit -- for Hysingla ER in Part E at
19  the bottom of page 102.
20        Irrespective of rebates, do you know how
21  many total Hysingla ER prescriptions have ever
22  been filled at Publix stores in Cobb County?
23     A.  No.
24     Q.  Does it matter to your opinion whether
25  it's 2, 200, 2,000, 20,000?

Page 51

1     A.  I would say it matters.  But even if it's
2  zero, it doesn't mean that Publix is not
3  implicated in this program, importantly because
4  people who are misusing prescription opioids will
5  travel outside their county in order to obtain
6  those opioids.
7     Q.  Do you -- would it matter to your opinion
8  whether Publix stores across Georgia, or even
9  across the company, had filled 200, 2,000, 20,000
10  Hysingla prescriptions?
11        MR. ARBITBLIT:  Object to form.
12        THE WITNESS:  It would matter to me if any
13  Publix store in any state relevant to this
14  litigation had participated in these coupons and
15  rebate programs.
16  BY MS. KAPKE:
17     Q.  Going back up to paragraph B on 102, you
18  note (as read):
19        "Hundreds of OxyContin coupons and
20        savings cards were redeemed at Publix and
21        Albertsons pharmacies."
22        (Whereupon, Lembke Exhibit 11 was marked
23        for identification.)
24  BY MS. KAPKE:
25     Q.  And, then, I'm going to hand you

Page 52

1  Exhibit 11.  And this is a printout of an Excel
2  spreadsheet, and my paralegal put the tab names on
3  a yellow Post-it note.
4        And this is, for the record, PPL- --
5        MR. ARBITBLIT:  Before you proceed, can I
6  have a copy of the exhibit, please.
7        MS. KAPKE:  Yeah.  Frank has it.
8        MR. ARBITBLIT:  Just wait for the question
9  until I have the exhibit, please.
10        MS. KAPKE:  Okay.  Can I read the Bates
11  number?
12        MR. ARBITBLIT:  Yeah, sure.
13        MS. KAPKE:  Okay.  The Bates number, for
14  the record, is PPLPC004000089725.
15  BY MS. KAPKE:
16     Q.  And this spreadsheet contains information
17  about PDT, or program to date, coupons redeemed
18  for OxyContin; correct?
19     A.  Yes.
20     Q.  And in all of Georgia, 18 Publix
21  pharmacies redeemed 43 coupons from Purdue and two
22  Purdue savings cards; is that correct?
23     A.  Do you actually want me to add it up?
24     Q.  There is a Georgia-specific tab that's
25  highlighted for Publix.

Page 53

1        And I've highlighted a few others on
2  there, too, but...
3     A.  That's referring to Rainbow Drug Store?
4     Q.  Right.  Go to the -- I think the first
5  tab, we've highlighted Publix for you, Publix in
6  Georgia.
7        So my question was, in all of Georgia, 18
8  Publix pharmacies redeemed 43 coupons from Purdue
9  and two Purdue savings cards; is that correct?
10     A.  Yes.  But it's also relevant that Publix
11  pharmacies in Florida redeemed over a thousand of
12  these coupons and savings cards.
13     Q.  The Georgia coupon redemptions of 43
14  coupons is the same number of coupons redeemed at
15  a single pharmacy in Georgia called Rainbow Drug
16  Store; correct?
17     A.  That makes sense.
18     Q.  How many counties are in Georgia?
19     A.  I don't know.
20     Q.  How many total Publix pharmacies were
21  operating as of 2006 when Purdue issued this
22  report?
23     A.  I don't know.
24        (Whereupon, Lembke Exhibit 12 was marked
25        for identification.)

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1 BY MS. KAPKE:
2    Q.  I'm going to hand you Exhibit 12, which,
3 for the record, is PPLPC004000089723.
4        And this is an email from Steve "Seid" or
5 "Seid" -- I'm not sure how you pronounce that --
6 at Purdue mentioning how good the coupon
7 redemption numbers looked for Purdue in Georgia.
8        And you cited this email; correct?
9    A.  Give me a moment to read it, please.
10    Q.  Sure.
11    A.  Okay.  I've read it.
12    Q.  You agree he notes Georgia had over a
13 thousand coupon redemptions with a combination of
14 chain and all others; correct?
15    A.  That's what it says here, yes.
16    Q.  But of those more than a thousand for all
17 of Georgia, only 43 were redeemed at any Publix
18 pharmacy in Georgia; correct?
19    A.  I'm not sure of the time frame that's
20 being referred to in this email.
21    Q.  Okay.  That's fair.
22        Other than these 43 Publix -- or excuse
23 me.  Strike that.
24        Other than these 43 Purdue coupons filled
25 somewhere in the entire state of Georgia within

Page 55

1 Publix's 156 pharmacies, do you have any knowledge
2 or evidence that Publix's Cobb County stores had
3 any involvement regarding, quote/unquote, free
4 samples of opioids?
5    A.  My understanding is that these data are
6 from a discrete period in time -- I think a single
7 year -- and I can infer that it wasn't just those
8 48 (sic) that -- that in the years that are not
9 documented here, there were also redemptions of
10 this coupon savings card.
11    Q.  The document itself says PTD, or program
12 to date.  Are you suggesting that that means that
13 that is reflective of only a single year?
14    A.  I don't know.  That would be my question.
15    Q.  Do you have any basis to believe that PTD
16 does not suggest program to date, meaning all of
17 the coupons up to the date of that spreadsheet?
18    A.  Well, I would like to know what the date
19 is, because if it's programs to date up to 2016,
20 then we have a whole bunch of years after that
21 that would be relevant.  That's my point.
22    Q.  For Purdue's OxyContin?
23        MR. ARBITBLIT:  Object to form.
24        THE WITNESS:  For the broader rebates
25 programs redemption and collaboration with Purdue

Page 56

1 around these types of programs.
2 BY MS. KAPKE:
3    Q.  Have you cited any other materials besides
4 this spreadsheet relating to free samples?
5    A.  This is what I cite in relation
6 specifically to the OxyContin program.
7    Q.  The next part of subpart (c) deals with
8 adherence programs.  Subsection romanette vi on
9 page 103 states, quote (as read):
10        "Opioid manufacturers, including
11        Purdue and Actavis, contracted with a
12        company called Adheris for prescription
13        adherence programs to be offered to retail
14        pharmacy chains, including Kroger, Publix,
15        and Albertsons, for prescription opioids,
16        including Butrans and Kadian."
17        That's intentional wording there, correct,
18 that manufacturers offered adherence programs to
19 Publix?  Correct?
20    A.  Yes.
21    Q.  Your report states that the Butrans
22 program will be offered to the Adheris Pharmacy
23 Network, which includes Publix.
24        MS. KAPKE:  And we'll mark PPLP003345164
25 as Exhibit 13.

Page 57

1        (Whereupon, Lembke Exhibit 13 was marked
2        for identification.)
3 BY MS. KAPKE:
4    Q.  Do you agree that this letter does not
5 mention Publix as a chain with approval?
6    A.  I agree that Publix is not mentioned here.
7        But for the record, Albertsons is
8 mentioned.
9        And just again for the record, in
10 reference to an earlier discussion, I think it's
11 important to note that this adherence program also
12 included letters and educational content mailed
13 directly to patients, just vis-à-vis our earlier
14 discussion of whether or not there were
15 patient-facing pamphlets.
16    Q.  You reference programs relating to Actavis
17 Kadian.  Do you have any evidence that Publix ever
18 participated in an adherence or marketing program
19 with respect to Kadian?
20    A.  No.
21    Q.  Did you review any testimony from Publix
22 witnesses about any participation in adherence
23 programs relating to opioids?
24    A.  I did review testimony from Publix
25 representatives regarding coupons, but not

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1 specifically mentioning the Adheris program.
2     Q. How about any adherence programs?
3       MR. ARBITBLIT: Object to form.
4       THE WITNESS: I'm not recalling any
5 testimony of a witness for Publix that
6 specifically mentioned the adherence program, but
7 I am recalling testimony regarding using coupons
8 and counseling to advise patients and encourage
9 certain types of prescriptions.
10 BY MS. KAPKE:
11    Q. What testimony was that; do you recall?
12    A. It was one of the Publix pharmacists
13 working in Cobb County. I'm not specifically
14 recalling now which one. And it may have been
15 more than one.
16    Q. Okay. Let's move on to subparts (d) and
17 (e) discussing continuing medical education.
18      First, I want to ask -- you talk earlier
19 in your report about drug company involvement in
20 continuing medical education programs given to
21 physicians.
22      Do you have any evidence that Publix or
23 Albertsons ever provided, sponsored, or had
24 anything to do with continuing medical education
25 programs that were given to physicians about

Page 59

1 opioids?
2    A. It's not uncommon for pharmacists to
3 attend lectures given for physicians or in their
4 title being designed for physicians and not
5 uncommon for physicians to potentially attend
6 lectures that might emphasize a pharmacy audience.
7      So I don't have specific evidence of
8 Publix and Purdue together putting on continuing
9 medical education specifically for physicians, but
10 it's not impossible that physicians were there in
11 the audience.
12    Q. Do you have any evidence that Publix or
13 Albertsons ever wrote, funded, or authored
14 articles about opioids?
15    A. Publix and Albertsons, in their
16 collaboration with the National Association of
17 train -- Chain Drug Stores, put out publications
18 that spread the misinformation that contributed to
19 the opioid epidemic.
20    Q. Other than through their membership with
21 NACDS, do you have any evidence that Publix or
22 Albertsons ever wrote, funded or authored articles
23 about opioids?
24    A. Give me one moment.
25      I need to look at the Albertsons --

Page 60

1    Q. Let me just ask it with respect to Publix,
2 then.
3      Other than through its membership with
4 NACDS, do you have any evidence that Publix ever
5 wrote, funded, or authored articles about opioids?
6    A. I have to take a little time here. I am
7 recalling something, and I don't know where it is,
8 so I need a moment.
9      I do think that the communications that
10 Publix sent out to its pharmacists that were
11 written by Purdue -- for example, on page 117 of
12 my report, Purdue -- sorry -- Publix disseminated
13 a Purdue press release, as said by Stephen Seid in
14 his email (as read):
15      "This is the announcement sent out by
16      Publix. It is our press release."
17      And I think indirectly, Publix was taking
18 funding more broadly in their collaboration with
19 Purdue, and this is evidence of the ways in which
20 their financial incentives promoted Publix to
21 disseminate misinformation that was created by
22 Purdue.
23      (Whereupon, Lembke Exhibit 18 was marked
24      for identification.)
25 BY MS. KAPKE:

Page 61

1    Q. Okay. I'll hand you what I premarked as
2 Lembke Exhibit 18.
3      Is this the press release you're talking
4 about?
5    A. Yes.
6    Q. And that's PDD1701091369, for the record.
7      Do you have any information to suggest
8 that the pharmacists or pharmacy supervisors of
9 Publix actually read this press release or, if
10 they did, they read beyond the first paragraph?
11      MR. ARBITBLIT: Object to form.
12      THE WITNESS: I don't think it's relevant
13 whether or not Publix pharmacists read this or how
14 many. I think it's likely that some portion read
15 this.
16      I think what's relevant here is the very
17 close collaboration between Purdue and Publix
18 around miseducating their pharmacists.
19      And per our earlier conversation, you did
20 ask whether or not Publix had ever used a term
21 like "Purdue is a leader."
22      And right here in this announcement, it
23 says -- (as read):
24      "For more than 15 years, Purdue has
25      been a leader in educating the healthcare

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1          community on responsible pain management
2          and the appropriate use of pain
3          medications,"
4          -- which, for me, is another piece of
5     evidence demonstrating the ways in which Publix
6     looked to Purdue as a leader, as an educator, and
7     used their material to educate their pharmacists
8     as a both explicit and implicit quid pro quo for
9     profit.
10    BY MS. KAPKE:
11         Q.  In the email that Paul Hines sent, you
12    would agree he just forwards the press release
13    without comment; correct?
14         MR. ARBITBLIT:  Object to form.
15         THE WITNESS:  I don't see comment on this
16    particular email.  There might have been comments
17    in other email, but I'm not seeing a comment here.
18    BY MS. KAPKE:
19         Q.  Do you have any information to suggest
20    that Publix ever sent any information from Purdue
21    to its pharmacists besides this one press release?
22         A.  This press release is emblematic of
23    Publix's reliance on Purdue to educate their
24    pharmacists about the safety and efficacy of
25    opioids.  This is only one small example.

Page 63

1          But as I said before, the coupons,
2     rebates, and savings programs were not just
3     financial transactions, which, in and of
4     themself -- in and of themselves, I think,
5     contributes to Publix's responsibility, but also,
6     they were direct-to-patient educational programs.
7          And as I described in my report, Publix
8     relied on Purdue to educate their pharmacists
9     about opioids, and in those continuing education
10    settings, they used PowerPoint slides that were
11    created by Purdue and Purdue key opinion leaders.
12    They might have had handouts and other documents,
13    as is very typical at a continuing education
14    event.
15         So I disagree with the statement that this
16    is, you know, in isolation.
17         Q.  Okay.  Besides the continuing education
18    programs, which we'll talk about in just a second,
19    do you have any information that Publix sent
20    information directly from Purdue to its
21    pharmacists besides this one press release?
22         MR. ARBITBLIT:  Object to form.
23         THE WITNESS:  I'm not now recalling
24    another example, but there might be.
25    BY MS. KAPKE:

Page 64

1          Q.  Do you have any information to suggest
2     that Purdue -- excuse me.  Strike that.
3          Do you have any information to suggest
4     that Publix ever received money from anyone to
5     distribute information about opioids to its
6     pharmacists, whether by letter, email, or on an
7     internal Publix website?
8          MR. ARBITBLIT:  Object to form.
9          THE WITNESS:  My understanding of the way
10    that the rebate programs work is that the patients
11    themselves pay less for the opioid and then the
12    difference is given to the pharmacy that used that
13    rebate plan.
14         And my understanding is that Publix was
15    involved and participated in those types of rebate
16    plans and so, yes, received direct money from
17    Purdue.
18         And the reason that's relevant, let me
19    emphasize again, is because those coupons,
20    savings, and Adheris programs were a form of
21    education to patient consumers.
22    BY MS. KAPKE:
23         Q.  But as we saw earlier, the Purdue coupons
24    were never redeemed in Cobb County; correct?
25         A.  It doesn't matter.  They were redeemed by

Page 65

1     Publix more broadly in the state of Georgia and
2     the neighboring state of Florida.  And patients
3     misusing, addicted to, dependent on opioids are
4     well known to travel far distances in order to get
5     illegitimate prescriptions filled.
6          Q.  Okay.  Do you have any evidence that
7     Publix or Albertsons ever made payments to
8     physicians relating to the marketing of opioids?
9          And scratch that.  I'll just ask with
10    respect to Publix.
11         Do you have any evidence that Publix ever
12    made payments to physicians relating to the
13    marketing of opioids?
14         A.  I have evidence that physicians were
15    employed to teach pharmacists in Marietta,
16    Georgia, and in Gainesville, Georgia.  I believe
17    those individuals were paid.  I don't know for
18    sure who paid them, whether it was Purdue or
19    Publix or a little bit of each.
20         Q.  And are you talking about the continuing
21    education programs in your -- that you reference
22    in your report?
23         A.  Yes, on page 116.  But -- maybe not
24    exclusively there, but yes, that's what I am
25    looking at now.

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1  Q.  Other than CEs, continuing educations, do
2  you have any evidence that Publix ever made
3  payments to physicians relating to the marketing
4  of opioids?
5  A.  No.
6  Q.  Do you have any evidence that Publix ever
7  influenced medical school curriculum related to
8  opioids?
9  A.  No.
10  Q.  And the reason I'm asking, to use your own
11  words on page 104, your opinions vis-à-vis the
12  pharmacies and continuing education relate to
13  continuing education programs that were,
14  quote/unquote, targeting their own pharmacists;
15  correct?
16  MR. ARBITBLIT:  Object to form.
17  THE WITNESS:  I'm referring to continuing
18  educations targeting their own pharmacists and
19  pharmacists in general, because that kind of
20  misinformation led to a sea change in how the
21  medical community more broadly thought about
22  safety and efficacy of opioids.
23  BY MS. KAPKE:
24  Q.  That's fair.
25  I'm just trying to make sure that I

Page 67

1  understand that you're not alleging that Publix
2  was trying to target physicians or prescribers
3  through continuing education.  Is that fair?
4  A.  That's fair.
5  Q.  Okay.  Okay.  I see in your report -- and
6  the cited documents there is a reference to one
7  presentation in Georgia for Publix in 2001 and
8  then two presentations in August of 2003 for
9  Publix in Georgia.
10  Are you aware of any other continuing
11  education involving Publix and Purdue?
12  A.  No.
13  Q.  Are you aware of any continuing education
14  that Publix corporate allowed other manufacturers
15  of opioids besides Purdue to present to its
16  pharmacists?
17  A.  I have evidence of Endo representatives
18  going into pharmacies to talk to Publix
19  pharmacists, and that is a form of, quote/unquote,
20  education.  I would call it miseducation.
21  Q.  Okay.  Other than the Endo detailing -- or
22  miseducation, and the three Publix and Purdue CEs,
23  are you aware of any continuing education that
24  Publix corporate allowed from manufacturers of
25  opioids?

Page 68

1  A.  My overall sense of Publix is that beyond
2  these early Purdue-sponsored designated continuing
3  education events for pharmacists, they were very
4  passive -- and I would argue even neglectful -- in
5  their education of their pharmacists around
6  opioids and controlled substances.
7  So, essentially, didn't train their
8  pharmacists as they should have done beyond
9  exposing them to the propaganda from Purdue, from
10  much of what was put out by the National
11  Association of Chain Drug Stores, with whom they
12  very closely collaborated, and further, from
13  absorbing what was the general misinformation in
14  the medical community at that time.
15  Q.  I appreciate that.  It would be helpful if
16  you would actually answer my question, though,
17  which is:
18  Other than the Endo dealing and these
19  three Publix and Purdue continuing educations, are
20  you aware of any continuing education that Publix
21  corporate allowed for manufacturers of opioids?
22  A.  I want to be very clear when I answer your
23  question that I understand you to mean by it --
24  you are talking about officially designated
25  continuing education that was labeled as such that

Page 69

1  pharmacists need to attend to maintain their
2  license, as opposed to a broader term that might
3  be interpreted as education more broadly.
4  That's why I'm making that distinction.
5  Does that make sense?
6  Q.  Okay.  So the -- do you have any evidence
7  besides those three CE programs that are CE
8  programs that Purdue or any other opioid
9  manufacturer collaborated with Publix involving
10  opioids?
11  A.  Not specific designated CE programs.  But
12  pharmacists, like physicians, are educated in many
13  different ways, as I've testified before.
14  Q.  Do you have any evidence that Publix
15  corporate requested payment for allowing Purdue to
16  make these three CE presentations to Cobb County
17  pharmacists?
18  A.  I don't have evidence of such, but I've
19  seen those types of transactions before between
20  pharmacies and Purdue.  But not specifically to
21  Publix.  I have no evidence of that.
22  Q.  Do you have any evidence that Publix
23  mandated or even strongly encouraged its Cobb
24  County pharmacists to attend these three CE
25  presentations?

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1      MR. ARBITBLIT:  Object to form.
2      THE WITNESS:  Publix puts an overwhelming
3   emphasis on the pharmacist's judgment and
4   training, within my opinion, except for the
5   misinformation that they supported, giving them
6   very little support for how they're supposed to
7   inform that judgment.
8      So I do believe that Publix strongly
9   encouraged its pharmacists to, in my opinion,
10   almost be solely responsible for educating
11   themselves, as opposed to using their resources
12   and their leverage and their policies to educate
13   pharmacists.
14   BY MS. KAPKE:
15      Q.  So the answer to my question would be, you
16   don't have any evidence that Publix encouraged its
17   Cobb County pharmacists to specifically attend the
18   three Purdue Pharma CE presentations?
19      MR. ARBITBLIT:  Object to form.
20      THE WITNESS:  I don't have evidence
21   that -- well, give me a moment.
22      I mean, Richard Gourash, who was a Publix
23   corporate person, is the one who arranged with
24   Purdue for these Purdue-sponsored, Purdue-led CE
25   events to happen.  That's on page 116 of my

Page 71

1   report.
2      A.  And --
3      MR. ARBITBLIT:  Are you finished with your
4   answer?
5      THE WITNESS:  Give me just one more
6   moment.
7      The fact that Paul Hines, again, was
8   forwarding Publix -- I'm sorry -- forwarding
9   Purdue material was indicative of messaging that
10   would tell Publix pharmacists to look to Purdue as
11   a leader, in quote (as read):
12          "educating the healthcare community
13          on responsible pain management and the
14          appropriate use of pain medications,"
15          unquote.
16      Again, in 2003, Publix representative
17   Richard Gourash met with Purdue corporate to
18   discuss collaborating on seven to eight programs
19   similar to those conducted in 2001.
20   BY MS. KAPKE:
21      Q.  Dr. Lembke, my --
22      A.  Yeah.
23      Q.  -- my question was very specific.
24      Do you have evidence that Publix
25   specifically encouraged its pharmacists to attend

Page 72

1   these three Purdue CE education programs?
2      MR. ARBITBLIT:  Object to form.
3      THE WITNESS:  The fact that a Publix
4   representative was seeking out Purdue and working
5   together with Purdue to make these CEs happen in
6   Georgia tells me that Publix corporate was
7   encouraging and in support of their pharmacists
8   attending those meetings.
9      I don't feel like I need to have specific
10   evidence of a communication to Purdue
11   pharmacists -- sorry -- to Publix pharmacists
12   saying, "Go to this CE event."
13      I have plenty of evidence showing that
14   Publix corporate expected its pharmacists to
15   attend continuing education and to be up to date
16   and to be almost solely responsible for managing
17   the dispensation of controlled substances.
18      (Whereupon, Lembke Exhibit 16 was marked
19      for identification.)
20   BY MS. KAPKE:
21      Q.  I want to introduce as -- what I have
22   marked as Exhibit 16, the subsequent client report
23   from Purdue for that CE.  It's Lembke Exhibit 16,
24   and it's PKY181887328.
25      Here, it says that after the Purdue

Page 73

1   presentation, representatives from the Georgia
2   Drugs and Narcotics Agency answered questions.
3      In your opinion, should Publix not have
4   allowed its pharmacists to listen to questions
5   from GDNA agents?
6      MR. ARBITBLIT:  Object to form.
7      THE WITNESS:  I'm sorry.  I think you
8   misstated your question.  I think you meant to
9   say --
10      MS. KAPKE:  You're right.  I did.
11   BY MS. KAPKE:
12      Q.  In your opinion, should Purdue -- no.
13      So should Publix not have allowed its
14   pharmacists to listen to questions from GDNA
15   agents?
16      MR. ARBITBLIT:  Object to form.
17      THE WITNESS:  I don't think that the
18   questions were from GDNA agents.  The questions
19   were from the audience to the GDNA agents.
20   BY MS. KAPKE:
21      Q.  Okay.  So should Publix -- I see what
22   you're saying.
23      Should Publix not have allowed its
24   pharmacists to listen to the Q and A involving
25   GDNA agents?

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1    MR. ARBITBLIT:  Object to form.
2    THE WITNESS:  It would really depend on
3 what those questions and, specifically, what the
4 answers were.
5 BY MS. KAPKE:
6    Q.  Were the GDNA agents in attendance duped
7 by Purdue?
8    A.  It wouldn't surprise me if they were.  I
9 don't know what they said at that event, so it's
10 hard for me to judge.
11    Q.  Do you believe that GDNA collaborated with
12 Purdue in promoting misleading messages?
13    MR. ARBITBLIT:  Object to form.
14    THE WITNESS:  I haven't studied that.  I
15 don't have documents.  I'm happy to look at
16 documents if you would like me to evaluate that.
17 BY MS. KAPKE:
18    Q.  Is the fact that the GDNA co-presented at
19 this CE evidence suggesting that GDNA collaborated
20 with Purdue in promoting misleading evidence --
21 misleading messages?
22    A.  Not in and of itself.
23    As you know from my report, I specifically
24 evaluated the material that was presented to the
25 pharmacists at the CE event, and I iterate in

Page 75

1 great detail the ways in which it contained
2 misleading messages about the safety and efficacy
3 of opioids.
4    So my claim here is not just the simple
5 fact that they had the event and that Georgia
6 pharmacists were present.  It's also specifically
7 to the content of what was communicated at the
8 event.  I would need to know the content of the
9 Georgia Drugs and Narcotics Agency Q and A in
10 order to speak to whether or not they contributed
11 to misinformation.
12    Q.  Do you have any evidence that back in the
13 early 2000s, when these CEs occurred, that Publix
14 corporate had any knowledge that the Purdue CEs
15 would be misleading?
16    MR. ARBITBLIT:  Object to form.
17    THE WITNESS:  I think the fact that Purdue
18 left it to -- sorry.
19    I think the fact that public -- Publix
20 corporate left to it Purdue to educate their
21 pharmacists was inherently wrong.
22 BY MS. KAPKE:
23    Q.  Is there specific evidence that you can
24 say Publix corporate knew that Purdue was acting
25 nefariously?

Page 76

1    MR. ARBITBLIT:  Object to form.
2    THE WITNESS:  There is plenty of evidence
3 showing that when members of the opioid
4 pharmaceutical industry, including opioid
5 manufacturers and especially Purdue, are
6 responsible for educating healthcare
7 professionals, that that -- that education is
8 biased and typically leads to more reliance or use
9 of their specific product.
10    The huge increase in opioid prescribing
11 and dispensing began in the late 1990s and was
12 especially, say, explosive in that first decade.
13    Whether or not in 2001, you know, Publix
14 had enough information to really know that that
15 was contributing to the public harm, I would have
16 to probably see what I could -- you know, I'd have
17 to re-review some of that.
18    I know that by 2003, there was the
19 Government Accountability report specifically
20 addressing the prescription opioid epidemic.
21    By 2007, there was the judgment against
22 Purdue.
23    By 2011, there was the CDC announcing a
24 prescription opioid epidemic.
25    So...

Page 77

1 BY MS. KAPKE:
2    Q.  Okay.  I'm going to ask a very specific
3 question.
4    Do you believe that when Publix corporate
5 agreed to allow the 2001 CE presentation, Publix
6 corporate had any idea that the CE would contain
7 misleading messages?
8    MR. ARBITBLIT:  Object to form.
9    THE WITNESS:  Publix corporate in 2001
10 should have known that a CE that was sponsored by
11 and led by Purdue Pharma would be biased.
12 BY MS. KAPKE:
13    Q.  And in your opinion, would that be true
14 for any manufacturer of any drug?
15    MR. ARBITBLIT:  Object to form.
16    THE WITNESS:  Yes.
17 BY MS. KAPKE:
18    Q.  You reference two CE presentations in
19 August 2020-- my notes say "August 2023," and I
20 know that that's wrong.  It's 2020- -- 2003.
21    So you reference two CE presentations at
22 the Publix regional office in Marietta, Georgia,
23 in August 2003.
24    Have you seen a client report for these
25 CEs or just the spreadsheet and planning email?

20 (Pages 74 - 77)

CONFIDENTIAL

1    A.  Just what I have cited in the report.
2        (Whereupon, Lembke Exhibit 17 was marked
3        for identification.)
4  BY MS. KAPKE:
5    Q.  Exhibit 17 is the deck you cited in your
6  footnote.  And for the record, that's
7  PPLPC31000137304.
8        I just have a couple of very quick
9  questions about the deck.
10       See how the front page on the deck
11  says "Name"?
12    A.  Yes, I see that.
13    Q.  That would indicate it would be filled in
14  later by the individual presenter; correct?
15    A.  I think we can assume that, yes.
16    Q.  So this is a generic slide deck that would
17  have been adapted locally; correct?
18    A.  Adapted or given in its entirety.
19    Q.  Sure.
20       Have you seen the specific deck for the
21  presentations to Publix?
22    A.  Yes.  Do I -- is this the same as what I
23  cite here in the report?
24    Q.  Yes.
25    A.  Okay.  Then I've seen it.  I describe it

1  in detail.
2    Q.  No, but I mean, have you seen the specific
3  one, where there's a name filled in?
4    A.  Ah, I see.
5        I don't recall one way or another.
6    Q.  Okay.  Do you know who made the
7  presentation?
8    A.  My understanding is that Purdue consultant
9  or paid employee -- I'm not sure which -- Mary
10  Beth Kowalski, provided this CE.
11    Q.  Slide 2 of the deck states (as read):
12       "Purdue provides the contents of this
13       program for informational purposes and for
14       your general interest only.  By using the
15       program, you hereby agree not to rely on
16       any of the information contained therein."
17       Did I read that correctly?
18    MR. ARBITBLIT:  Object to form.
19    THE WITNESS:  Well, that's what it says
20  here, yeah.
21  BY MS. KAPKE:
22    Q.  Do you have any reason to believe that the
23  presenter of the CEs given to Publix did not
24  include Slide 2 in his or her presentation?
25    A.  No.

1    Q.  Okay.
2    A.  But I also have enough experience to know
3  that paid consultants who give these canned slide
4  decks are giving them exactly as is.
5    Q.  So they would have included that slide?
6    A.  They would have included the slide, and
7  there would not have been much variation.  They
8  would have presented the material as Purdue
9  created it for them.
10    Q.  I'm going to move on to subpart (f) of
11  your Opinion 6.
12    A.  Do you know what page that is?
13    Q.  I'm pulling it up.
14       125.
15       Okay.  And I want to ask specifically an
16  unrelated question.
17       Is Publix one of the major chain
18  pharmacies?
19    MR. ARBITBLIT:  Object to form.
20    THE WITNESS:  My understanding is that
21  Publix is one of the largest privately held
22  companies and has a dominant presence in Georgia
23  and Florida.
24       So I guess, to answer your question more
25  specifically, my understanding is that it is a

1  major chain pharmacy in a specific region.
2  BY MS. KAPKE:
3    Q.  And the reason I'm -- I use that specific
4  term is, on page 155, romanette xiv, you say (as
5  read):
6        "This statement, in a document that
7        included input from all of the major chain
8        pharmacies..."
9        Are you including Publix in that?
10    MR. ARBITBLIT:  I'm not seeing the
11  romanette xiv on page 155.  So either the page is
12  inaccurate or the romanette is --
13    MS. KAPKE:  Oh, it's the romanette.  It's
14  xix.  I can't -- I cannot do romanettes.
15  Apologies for that.
16    MR. ARBITBLIT:  That's okay.
17  BY MS. KAPKE:
18    Q.  I'm basically trying to confirm that you
19  are not including Publix in that statement.
20    MR. ARBITBLIT:  Object to form.
21  BY MS. KAPKE:
22    Q.  And if you want, I can show you the
23  document.
24    A.  I'm sorry.  Your question is, was Publix
25  present at this convened meeting of the DEA

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1 compliance working group, or is it some other
2 question?
3     Q. Yeah, that's my question.
4     A. As far as I know, Publix was not present
5 for that convened meeting. But Publix was a
6 member -- is a member of the National Association
7 of Chain Drug Stores.
8     Q. Okay. Can you confirm whether Albertsons
9 was at that meeting?
10     A. To my knowledge, Albertsons was not at
11 that meeting.
12     Q. Okay. Do you have any evidence that
13 Publix or Albertsons ever provided, sponsored, or
14 had anything to do with Partners Against Pain?
15     A. No.
16     Q. Do you have any evidence that Publix or
17 Albertsons ever provided, sponsored, or had
18 anything to do with the American Pain Foundation?
19     A. Indirectly, both Publix and Albertsons had
20 a close association with Purdue and also with the
21 National Association of Chain Drug Stores, two
22 organizations that relied upon and cited
23 information produced by the American Pain
24 Society -- or the American Pain Foundation.
25 Sorry.

Page 83

1     Q. Do you have evidence that Publix or
2 Albertsons ever had any influence over guidelines
3 from the Federation of State Medical Boards?
4     A. No.
5     Q. Other than being a member of NACDS --
6     Is it okay if I refer to the National
7 Chain -- National Association of Chain Drug Stores
8 as NACDS?
9     A. That's fine, yes.
10     Q. Okay. Other than being a member of NACDS,
11 do you have any evidence that Publix or Albertsons
12 ever provided, sponsored, or had anything to do
13 with funding of the Pain Care Forum?
14     A. I know that Albertsons closely
15 collaborated with NACDS around lobbying efforts,
16 so I would really need to look at the CT9 report
17 to refresh my memory on whether or not that have
18 might have included collaborations with other
19 entities.
20     Q. What about with Publix specifically?
21 Other --
22     A. No.
23     Q. Okay. You said earlier that Publix... ah,
24 "very closely collaborated" with NACDS.
25     What evidence do you have about Publix's

Page 84

1 participation and, quote/unquote, very close
2 collaboration with NACDS?
3     A. Publix was a member of NACDS. I can infer
4 that Publix relied on NACDS to disseminate
5 information about controlled substances and
6 opioids to its pharmacists.
7     Publix created a computer-based education
8 in 2019, 2020 time frame, which was the first time
9 that they actually proactively sought to educate
10 their pharmacists on red flags, and that
11 educational module is very clearly informed by
12 NACDS, including little flags on each question
13 that say "NACDS."
14     Q. Other than the fact that Publix was a
15 member of NACDS and that NACDS did so, do you have
16 any evidence that Publix ever lobbied for or
17 against the rescheduling of hydrocodone?
18     A. No.
19     Q. Other than the fact that Publix was a
20 member of NACDS, do you have any evidence that it
21 collaborated with pro-opioid industry advocacy and
22 lobbying organizations?
23     A. It collaborated with Purdue. It
24 collaborated with Endo. It collaborated, as I
25 said, with NACDS. Those are the main ones.

Page 85

1     Q. Okay. Let's talk about Endo.
2     Your report talks about (as read):
3     "Endo's Percocet call notes from
4 2013."
5     I think that's a typo. You meant 2003;
6 correct?
7     A. That is correct.
8     Where is my cheat sheet?
9     Q. Okay. The Endo document you cite,
10 ENDO-OPIOID_MDL-07391949, contains 364,253 rows of
11 data, and it would be more than 6,000 pages if
12 printed, so we prepared a summary of the lines
13 referencing Publix stores in Cobb County, Georgia.
14     (Whereupon, Lembke Exhibit 19 was marked
15     for identification.)
16 BY MS. KAPKE:
17     Q. We've marked that summary as Lembke
18 Exhibit 19.
19     And I will represent that for the rows we
20 omitted of the Cobb County Publix stores, the
21 columns we omitted in the summary, other than the
22 header, are blank.
23     So for the Cobb County stores that I
24 excerpted, this is all of the information from the
25 spreadsheet.

22 (Pages 82 - 85)

CONFIDENTIAL

1       MR. ARBITBLIT:  Is there a particular page
2  of the witness's report you're referring to where
3  this is discussed?
4       MS. KAPKE:  143 and 144.
5       MR. ARBITBLIT:  Thank you.
6  BY MS. KAPKE:
7       Q.  Okay.  So this spreadsheet has five
8  entries on it where Shannon Drost in Column E is
9  the rep name, and then the org name is Publix,
10 Powder Springs Road.  And then in the notes, in
11 Column AF -- appear to be substantively identical,
12 saying "10/3/02 4:55:47."
13      Now, for these five entries, there is a
14 different call date.  I honestly don't know if
15 these are five calls or one call on 10-3-02.
16      Do you have an opinion either way?
17      MR. ARBITBLIT:  Object to form.
18      THE WITNESS:  I -- I could infer that
19 these are separate call dates, that these are
20 all -- these dates represent different call dates.
21 BY MS. KAPKE:
22      Q.  And then what would you make of the notes
23 in Column A4 (sic) for these calls, then?  What
24 is -- what does the note say?
25      MR. ARBITBLIT:  Object to form.

1       THE WITNESS:  You mean here?
2  BY MS. KAPKE:
3       Q.  Yes.
4       A.  It says (as read):
5           "Bob still claims that he does not
6       see a demand for Percocet 325 even though
7       Dr. Towadros is right around the corner
8       from him.  Go figure."
9           "Does not stock much Percocet at all.
10      Says that they don't see a lot of scripts
11      for Percocet."
12      What I would make of that is that it's a
13 very good example of how Endo drug reps, and drug
14 reps more broadly, could influence dispensing by
15 going and directly targeting pharmacists to
16 suggest that they might work closely and more
17 collaboratively with local doctors who are high
18 prescribers.  That was the standard strategy for
19 drug reps.
20      The fact that they don't stock much
21 Percocet at all doesn't mean that they weren't
22 stocking other opioids.
23      Q.  Do you have any evidence that Publix
24 corporate actually allowed this detailing, or is
25 it possible the Endo rep just walked into the

1  grocery store unannounced?
2       MR. ARBITBLIT:  Object to form.
3       THE WITNESS:  Even if it was
4  unannounced -- and I have no evidence, you know,
5  for or against that -- it's clear that this drug
6  rep had a conversation with the pharmacist and
7  that the pharmacist disclosed information about
8  opioids stock in the store.
9  BY MS. KAPKE:
10      Q.  That they don't stock much of that
11 particular opioid?
12      A.  As I said before, it may be that they just
13 didn't stock much of Percocet at that time and
14 they were stocking other opioids instead.  It's
15 very common for certain prescribers to prescribe
16 certain types of opioids and not others and for
17 stores to stock certain types of opioids and not
18 others.
19      Q.  Would Endo have wanted to sell any opioids
20 besides Percocet?
21      MR. ARBITBLIT:  Object to form.
22      THE WITNESS:  Endo would have wanted to
23 promote their opioid, but there's plenty of
24 evidence showing that the opioid industry wanted
25 to promote opioids more broadly to cause this

1  paradigm shift in opioid dispensing.
2  BY MS. KAPKE:
3       Q.  Fair.  And I'm asking because I don't
4  think most people would associate Endo with
5  Percocet specifically, and so I'm asking if you
6  can confirm that Percocet is Endo's drug.
7       MR. ARBITBLIT:  Object to form.
8       THE WITNESS:  I can't specifically
9  remember.
10 BY MS. KAPKE:
11      Q.  Okay.  That's fair.
12      Do you have any reason to suggest, after
13 looking at this spreadsheet, that Endo was
14 inquiring about a drug other than the drug that
15 they manufacture?
16      A.  As I said before, the simple fact that the
17 Endo rep was in the store having a conversation
18 with the pharmacist and that that was allowed is
19 consistent with a broader pattern of Publix
20 actively engaging and relying on the opioid
21 pharmaceutical industry to educate pharmacists,
22 pharmacy store managers, et cetera, about the
23 proper dispensation of opioids.
24      Q.  Doctor -- and I understand that you have
25 talking points that you want to get in, but we are

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1 going to be here all day if you don't answer my
2 question.
3      I asked:  Do you have any reason to
4 suggest that Endo was inquiring about a drug other
5 than the drug that they manufacture?
6      That's a very, very narrow question, and
7 it shouldn't be a complicated point.
8      A.  Well, then --
9      MR. ARBITBLIT:  Object -- object to form.
10 Object to the prelude.  Ask a question.
11 BY MS. KAPKE:
12      Q.  Do you have any reason to suggest that
13 Endo was inquiring about a drug other than the
14 drug that they manufacture?
15      A.  Yes.
16      Q.  At these Publix stores?
17      A.  Yes.
18      Q.  And what -- what is -- what were they
19 inquiring about?
20      MR. ARBITBLIT:  Object to form.
21      THE WITNESS:  As I have stated elsewhere
22 in this report, opioid manufacturers like Endo
23 were broadly promoting opioids as a class.
24      So they are not in the store merely to ask
25 specifically about their product or any specific

Page 91

1 product.  They're there to encourage pharmacists
2 to more easily and liberally dispense all opioids
3 for all pain conditions because that helped their
4 product.
5 BY MS. KAPKE:
6      Q.  So in your opinion, what should a pharmacy
7 have done to prevent detailing from pharmaceutical
8 reps?
9      A.  Well, Publix, in particular, since we're
10 talking about Publix, could have done so much more
11 to proactively educate their pharmacists about the
12 true risks and benefits of opioids, about red
13 flags, about how they can appropriately
14 investigate and document red flags, and much, much
15 more.
16      Q.  Not my question, though.
17      A.  Okay.
18      Q.  My question is:  What should a pharmacy
19 have done to prevent a pharmaceutical sales rep
20 from walking in the store and introducing
21 themselves at the pharmacy counter?
22      A.  That's part of training and education.
23      Q.  Okay.  We'll talk about training,
24 education, red flags in a bit.
25      I want to wrap up our discussion of your

Page 92

1 opinion that Publix collaborated with opioid
2 manufacturers and promoted opioids.  I want to
3 make sure that I have all of the evidence we're
4 talking about here.
5      We've got the three continuing education
6 programs that Publix allowed Purdue to offer to
7 Publix pharmacists in 2001 and 2003, the email
8 forward from Paul Hines, the visits by an Endo rep
9 where the Endo rep notes that they don't stock
10 much Percocet at all, and the $48 in Oxy rebates.
11      Are you aware of any evidence that Publix
12 corporate leadership was telling pharmacists what
13 to think about the use of pain and opioids besides
14 those things?
15      MR. ARBITBLIT:  Object to the form.
16      THE WITNESS:  I would add to that list
17 Publix's involvement with the National Association
18 of Chain Drug Stores --
19 BY MS. KAPKE:
20      Q.  Got it.
21      A.  -- which was very involved in using their
22 national foothold to miseducate pharmacists.
23      And I think it's important for
24 completeness to emphasize that beyond opening
25 their doors to Purdue, NACDS, Endo, Publix

Page 93

1 neglected evidence-based education around
2 controlled substances despite knowledge of the
3 opioid epidemic and despite having access to what
4 would have been appropriate and much-needed
5 education earlier on -- for example, red flags --
6 which they ultimately did incorporate later,
7 relying on information and conceptualization of
8 red flags from NACDS, which they had access to
9 much earlier.
10      I know that's not exactly -- or beyond --
11 that's somewhat beyond what you asked, but I think
12 for completeness, I need to emphasize there was
13 both a kind of -- sort of active engagement with
14 the industry and then a kind of delinquent
15 laziness otherwise.
16      That is just so you can understand my
17 opinion, because I know that's why you're here
18 today.
19      Q.  No, and I appreciate that.
20      And that's -- that's one of the questions
21 that I wanted to ask, is:  Just to kind of wrap up
22 the active engagement with industry versus the, as
23 you put it, delinquent laziness, I just -- I want
24 to understand, the active engagement with industry
25 is the examples we just talked about?  There's

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1  nothing else; correct?
2      A.  Nothing else that I have specifically in
3  the report.
4      MS. KAPKE:  Okay.  That's a good time for
5  a break, so why don't we take a short break.
6      THE VIDEOGRAPHER:  We are going off the
7  record.  The time is 10:30.
8      (Recess taken.)
9      THE VIDEOGRAPHER:  We're back on the
10  record.  Time is 10:41.
11  BY MS. KAPKE:
12      Q.  Okay.  I want to go through the rest of
13  Part 6 of your report.
14      So subsections (i) and (j) generally talk
15  about what pharmacies should have done and red
16  flags, and then subsections (k) through (p) of
17  your Track 8 report are about individual
18  pharmacies, with subsection (p) about Publix
19  specifically; is that correct?
20      A.  Yes.
21      Q.  Okay.  Are you aware of any evidence that
22  Publix has ever offered, quote/unquote, time
23  guarantees or, quote/unquote, promised time or a
24  similar concept to patients for prescription
25  fills?

Page 95

1      MR. ARBITBLIT:  Object to form.
2      THE WITNESS:  I'm recalling that in one of
3  the depositions -- at least one of the depositions
4  of a Publix pharmacist, they talked about wait
5  times and how they had metrics for wait times in
6  their pharmacies.
7  BY MS. KAPKE:
8      Q.  Whose deposition was that?
9      A.  I'm not recalling specifically which one.
10  And it could have been more than one.
11      Q.  Is that referenced in your report?
12      A.  No.
13      Q.  Are you aware of any evidence that Publix
14  has offered incentives or bonuses to pharmacists
15  for filling prescriptions based on wait times?
16      A.  Not specifically based on wait times, but
17  certainly on the number of prescriptions dispensed
18  and on overall performance.  And, typically,
19  metrics like wait times would be a part of that,
20  but I have not seen a specific document attesting
21  to wait times being included as part of the bonus
22  strategy.
23      Q.  You reference in your Appendix III the
24  work environment for Georgia pharmacists, and
25  several sections of your report discuss time

Page 96

1  pressures placed on pharmacists generally.
2      Are you aware of any statement anywhere,
3  whether in a deposition taken in this case, a
4  Publix statement, anything else, where a Publix
5  pharmacist complained that he or she did not have
6  enough time to do his or her job or to safely fill
7  prescriptions?
8      A.  Yes.
9      Q.  Where?
10      A.  Multiple depositions describe being
11  understaffed, difficulty completing the job within
12  their eight-hour day, having to stay additional
13  hours, having to get more tech time to help
14  complete the overwhelming number of tasks demanded
15  of them, et cetera.  Multiple depositions.
16      Q.  And do you reference those in your report?
17      A.  No.  I mean, I reference them in the sense
18  that I have reviewed them and they're in the
19  report, but I don't think I specifically talk
20  about that in the report.
21      Q.  Did you review any documents or
22  information regarding the number of prescriptions
23  that Publix expected its Georgia pharmacies or
24  pharmacists to fill per day or per hour?
25      A.  I remember references to that in the

Page 97

1  depositions of Publix pharmacists, but I did not
2  myself review any documents other than those
3  depositions.
4      Q.  Did you review any documents or
5  information or have any opinion regarding Publix's
6  expectations for how many prescriptions its
7  pharmacists fill per day as compared to any other
8  pharmacy?
9      A.  No.
10      Q.  Are you aware of any evidence specific to
11  Publix that Publix pressures pharmacists to rush
12  through the exercise of their corresponding
13  responsibility?
14      A.  Yes.
15      MR. ARBITBLIT:  Object to form.
16  BY MS. KAPKE:
17      Q.  What is that?
18      A.  Again, multiple depositions where Publix
19  pharmacists describe the difficulty they have
20  completing tasks, which I can infer includes red
21  flags, as well as evaluations of Publix
22  pharmacists that refer to their slowness or their
23  inefficiency or their inability to get stuff done
24  fast.
25      Q.  Tell me what you're referring to when

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

1 you're referring to "evaluations of Publix
2 pharmacists that refer to their slowness or their
3 inefficiency or their inability to get stuff done
4 fast."
5      A.  Depositions of Publix pharmacists include
6 questions about their managers evaluating their
7 performance, and included in those evaluations is,
8 as I'm recalling now, criticism of some Publix
9 pharmacists for not getting stuff done faster,
10 relying on too many techs to help, working too
11 many hours past the 40 hours that they're allotted
12 in a given week.
13      Q.  And is this all from the depositions that
14 you reviewed?
15      A.  Yes.
16      Q.  And did you reference that specifically in
17 your report?
18      A.  No.
19      Q.  Your report discusses bonuses at length
20 for many pharmacies.  I saw two references in your
21 report specific to Publix.
22      On page 211, you say (as read):
23         "In order to see the notes, the
24         pharmacist would have to have had -- have
25         had to click on the prior encounter to

Page 99

1         open it, an extra step that requires more
2         time and is disincentivized by Publix
3         bonus strategy, which pays pharmacists
4         more if they fill more prescriptions,
5         including for controlled substances."
6      And then the second reference to bonuses
7 that I saw was romanette -- I'm probably going to
8 get it wrong -- xiv, I think -- maybe xix -- I
9 don't -- on page 213.
10      A.  Yes, you're correct, xiv.
11      Q.  Okay.  And there, you cite a 2018
12 document, PUBLIX-MDLT8-00059249, and Lindsay
13 Burckhalter's deposition in that paragraph.
14      Did you review any other documents or
15 testimony regarding the Publix bonus system?
16      A.  Yes.
17      Q.  And are those on your supplemental
18 materials considered list?
19      A.  Yes.  And in -- I think in the main
20 materials considered list as well.
21      Q.  Okay.  And are those just the depositions
22 of Publix pharmacists?
23      A.  Yes, and Publix pharmacy managers and
24 Publix corporate leaders.
25      Q.  Besides depositions and the one document

Page 100

1 that I just referenced, are you aware of any
2 information about the Publix bonus system?
3      A.  No.
4      Q.  Would you agree that to be incentivized by
5 a bonus calculation, the pharmacist has to know
6 about the calculation?
7         MR. ARBITBLIT:  Object to form.
8         THE WITNESS:  No, I would not agree with
9 that.
10 BY MS. KAPKE:
11      Q.  Why not?
12      A.  Because it's clear to me based on
13 interviews with Publix pharmacists in Cobb County
14 that they understood that they had to fill as many
15 prescriptions as possible.
16      The common phrasing, quote/unquote,
17 nothing walks, was well understood by Publix
18 pharmacists, meaning that when a patient comes in
19 the door with a prescription, the pharmacist needs
20 to do everything possible to fill the
21 prescription.
22      The fact that there were colloquialisms
23 around that makes it clear to me that the
24 pharmacists understood the pressure on them to
25 make a profit for the store.

Page 101

1      It also came to my attention that Publix,
2 in particular, is a privately owned company that
3 its employees are part owners of or, I guess, have
4 stock in or shares of, so that's also a further
5 incentive beyond the bonus, the fact that they
6 directly profit as individuals if the store is
7 more profitable.
8      Q.  Do you think independent pharmacies
9 should -- that are owned and operated by a
10 pharmacist should be banned?
11         MR. ARBITBLIT:  Object to form.
12         THE WITNESS:  No.
13 BY MS. KAPKE:
14      Q.  Why not?
15      A.  I'm not somebody who has studied
16 corporations in terms of private versus public
17 versus part ownership of employees.  But, I mean,
18 I could -- it's common sense that if you are part
19 owner in an operation, you are potentially more
20 invested in the success of that company.  So I can
21 see that as a potentially good strategy and a way
22 to maybe more fairly distribute the wealth.
23      However, when it comes to a store that's
24 profiting from dispensing opioids in the midst of
25 an opioid crisis, that's problematic.

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

1    Q.  So that would be true of the independent
2  pharmacies owned and operated by a pharmacist that
3  were dispensing opioids in the midst of an opioid
4  crisis, that those pharmacies' ownership by
5  pharmacists would be problematic?
6    A.  I'm only commenting on the pharmacies that
7  I have had time to research.  I don't want to make
8  broad statements about other pharmacies that I
9  haven't investigated.
10    Q.  Do you believe that without corporate
11  training pharmacists should be allowed to dispense
12  opioids?
13      MR. ARBITBLIT:  Object to form.
14      THE WITNESS:  I'm not sure I understand
15  your question.
16  BY MS. KAPKE:
17    Q.  So a solo pharmacist who does not receive
18  training from a corporation but owns and operates
19  a pharmacy, should that person, who does not
20  receive training from corporate, be allowed to
21  dispense opioids?
22      MR. ARBITBLIT:  Object to form.
23  Incomplete hypothetical.
24      THE WITNESS:  It really depends on whether
25  or not they were exercising their corresponding

Page 103

1  responsibility.
2  BY MS. KAPKE:
3    Q.  Should DEA and states license those
4  people?
5      MR. ARBITBLIT:  Object to form.
6      THE WITNESS:  If they're acting in
7  accordance with the law and exercising their
8  corresponding responsibility and not harming the
9  public, then yes.
10  BY MS. KAPKE:
11    Q.  Have you reviewed any testimony from
12  Publix bench pharmacists where they can explain
13  what actually goes into their bonuses?
14    A.  I have reviewed depositions where they
15  have a pretty good general idea.
16    Q.  And what goes into the Publix bonus?
17    A.  I would probably have to review that
18  section of those depositions, but their -- it's
19  clear that their understanding is that -- I
20  shouldn't say "it's clear."
21      My recollection now is that they
22  appreciate that nothing walks and how many scripts
23  are dispensed is part of how the success and
24  busyness of the store is measured, which then
25  contributes to their bonus.

Page 104

1    Q.  Do you recall reading Shannon Bryce's
2  deposition?
3    A.  Yes.
4    Q.  And are you aware that she testified she
5  did not know that the bonus calculation included
6  script count?
7    A.  Yes.
8    Q.  And do you understand that store
9  profitability -- whether the individual store,
10  including the deli department or the frozen food
11  section, is profitable -- is also part of the
12  bonus calculation?
13    A.  Yes, I remember reading that.
14    Q.  Not specific to Publix, but just
15  generally, do you cite in your report any study or
16  analysis about how much a bonus would need to be
17  to impact a pharmacist's clinical judgment?
18      MR. ARBITBLIT:  Object to form.
19      THE WITNESS:  I don't cite any studies
20  like that.
21  BY MS. KAPKE:
22    Q.  Even more broadly than that, do you cite
23  in your report any study or analysis about how
24  small or large financial incentives need to be to
25  affect behavior?

Page 105

1    A.  No.
2    Q.  You make note of the fact that Publix's
3  dispensing policy does not require checking of the
4  PDMP unless required by the state and Georgia law
5  does not require pharmacists to consult the PDMP
6  before dispensing a controlled substance.
7      When did PDMP become available in Georgia?
8    A.  I believe it was 2017.
9    Q.  When did it become mandatory for Georgia
10  prescribers to register for?
11    A.  I believe it was 2018.
12    Q.  Do you agree that if no prescribers are
13  uploading information to PDMP, that it has very
14  little value?
15    A.  Yes.
16      (Whereupon, Lembke Exhibit 20 was marked
17      for identification.)
18  BY MS. KAPKE:
19    Q.  I'm going to hand you what we've premarked
20  as Exhibit 20.
21      And this is a printout of a PDMP
22  commissioner letter, where it states --
23      MR. ARBITBLIT:  You gave me two copies.
24  It's the same thing; right?
25      MS. KAPKE:  Yeah.  Sorry.

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

1  BY MS. KAPKE:
2    Q.  -- (as read):
3        "Currently, only about 10 percent of
4    prescribers in Georgia are registered in
5    the PDMP."
6        Any basis to disagree with that 2017
7  message from the Georgia Department of Public
8  Health.
9    A.  No.
10    Q.  Do you agree that whether or not Publix
11  mandated using PDMP in Georgia is irrelevant to
12  whether Publix pharmacies in Cobb County
13  contributed to the quadrupling of opioid
14  prescriptions nationally between the mid-1990s and
15  2012?
16        MR. ARBITBLIT:  Object to form.
17        THE WITNESS:  Could you state that again.
18  I had difficulty following that question.
19  BY MS. KAPKE:
20    Q.  Whether or not Publix mandated using PDMP
21  in Georgia, is that relevant to the question of
22  whether Publix pharmacies in Cobb County
23  contributed to the quadrupling of opioid
24  prescriptions nationally between the mid-1990s and
25  2012?

Page 107

1    A.  I mean, I wouldn't want to call it
2  irrelevant.  Obviously, the time frame is such
3  that there was no PDMP between the mid-1990s and
4  2012, but it's not irrelevant in the sense that
5  I'm looking at the pattern in aggregate.
6        And the fact that Georgia -- sorry -- that
7  Publix still to this day does not require their
8  pharmacists to check the PDMP prior to dispensing
9  a controlled substance is consistent with the
10  broader pattern starting much earlier with regard
11  to how Publix has approached opioid dispensing and
12  training their pharmacists and guiding their
13  pharmacists and supporting their pharmacists
14  around their corresponding responsibility.
15    Q.  The statement that "Publix still to this
16  day does not require their pharmacists to check
17  the PDMP prior to dispensing a controlled
18  substance," that's as of the last deposition that
19  was taken in this case; correct?
20    A.  My understanding is that --  I'm sorry.
21  Let me read your question again.
22    Q.  Let me -- let me rephrase it.
23    A.  Okay.
24    Q.  So do you have any information about what
25  Publix has done between when the last deposition

Page 108

1  of a Publix employee was taken in this case and
2  today?
3    A.  I believe that since that time, Publix has
4  implemented in their electronic medical record a
5  place in the notes for checking off whether the
6  pharmacist looked at or did not look at the PDMP.
7  But beyond that, I don't have any additional
8  knowledge.
9    Q.  So -- and the reason I wanted to just
10  confirm on that -- your statement would certainly
11  be true as of, for instance, Lindsay Burckhalter's
12  deposition, but do you have any knowledge of what
13  Publix has or has not done with respect to making
14  PDMP mandatory after Lindsay Burckhalter's
15  deposition?
16    A.  To my knowledge, they're still not
17  required to check the PDMP prior to dispensing.
18  They're required to be registered, and if they
19  find that there's something suspicious, then
20  they're supposed to check the PDMP.  But they are
21  not pro forma mandated to check the PDMP before
22  dispensing a controlled substance.
23        If that's changed, I'd love to hear about
24  it, but I'm not aware that it has changed.
25    Q.  Do you have criticisms on when or how PDMP

Page 109

1  was integrated into Publix's pharmacy management
2  system?
3        MR. ARBITBLIT:  Object to form.
4        THE WITNESS:  Is that a different question
5  than what you have already asked me?
6  BY MS. KAPKE:
7    Q.  Yeah, so I guess my question is, so as you
8  understand PDMP, in Georgia, did you have to go to
9  a website, log in, and check it separately?
10    A.  Yes.  You had to do that until, I believe,
11  recently.
12    Q.  Yes.  And that's my question.
13        Do you have criticisms of how Publix
14  integrated it into its pharmacy management system,
15  or do you understand that Publix could not have
16  integrated into its pharmacy management system
17  until it was implemented through the Georgia
18  Department of Public Health?
19        MR. ARBITBLIT:  Object to form.
20        THE WITNESS:  I don't have criticism of,
21  specifically, the logistics of them integrating it
22  in their PDMP.
23        But speaking more broadly to the when and
24  the how, they could have provided much more
25  support in their electronic medical records for

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1 investigating and clearing red flags, as I detail
2 in the report, much more training.
3     And they could have, from the get-go, as
4 soon as the PDMP was up and running and available,
5 required their pharmacists to check prior to
6 dispensing any controlled substance and to
7 document. And they did not do that.
8 BY MS. KAPKE:
9   Q. Okay. I want to discuss the monitoring
10 protocol that you implemented in 2013 at the
11 Stanford Outpatient Clinic.
12     You were asked questions in your Track 2
13 deposition about a system for monitoring orders
14 from the perspective of a clinician. Are we
15 talking about the same thing there?
16   A. Yes.
17   Q. Okay.
18   A. I know what you are talking about.
19   Q. That's what I thought, but I didn't want
20 to make that assumption.
21     Okay. I'm going to hand you -- I'm going
22 to try to short-circuit this.
23     MS. KAPKE: Oh, can I have her Track 2
24 deposition.
25 BY MS. KAPKE:

Page 111

1   Q. I'm going to hand you the questions from
2 your Track 2 deposition, ask you to read it and
3 tell me if they're -- if you -- things you have to
4 add to that or anything like that.
5     If you want, we can read it out loud. I
6 just -- I have further follow-ups, and I figured
7 this would be easier.
8   A. Great. Thank you.
9   Q. Yeah.
10     MS. KAPKE: And for the record, this is
11 her 2020 Track 2 deposition, I believe starting on
12 page 162.
13     MS. MILLER: Exhibit 21?
14     MR. MATTINGLY: 161.
15     MS. KAPKE: 161. Starting on 161.
16     MS. MILLER: Is this an exhibit?
17     MS. KAPKE: I didn't mark it as an
18 exhibit.
19     THE WITNESS: Do you have a question for
20 me?
21 BY MS. KAPKE:
22   Q. Yeah. So I know it's been four years
23 since you were asked those questions. Have you
24 made any changes to the monitoring protocol or
25 otherwise thought about what you want to add to

Page 112

1 that testimony?
2   A. So, you know, I was on the stand here.
3   Q. Yeah.
4   A. And looking back, I feel that I misused
5 the term "suspicious order monitoring system." I
6 used it for a policy that I had put in place as we
7 initiated our addiction medicine fellowship. So
8 for fellows who were in that program that started
9 in 2013.
10     I put in a requirement that prior to
11 prescribing any controlled substance, that you
12 needed to check the PDMP prior to doing that,
13 whether or not they were suspicious, and that's
14 what I was referring to.
15   Q. Right.
16   A. So I think I -- I misused the term. I
17 don't mean to imply here that I had a suspicious
18 order monitoring system as the DEA uses that term.
19   Q. Right.
20   A. Okay.
21   Q. And I -- actually, I'm more focused on the
22 actual protocol itself. That's --
23   A. Okay.
24   Q. I'm not worried about the -- what -- that
25 you called it that in 2020. I understand --

Page 113

1   A. Right.
2   Q. -- your caveat here. I just want to --
3 and I have further questions.
4   A. Okay.
5   Q. But I just want to see if there are things
6 you've added to that protocol for prescribers at
7 the Stanford Outpatient Clinic.
8   A. Yeah, I think this is a fairly good
9 representation of what I do. The one thing that I
10 would add is that we do get urine toxicology
11 screens.
12   Q. When did you start getting urine
13 toxicology screens?
14   A. Well, we started getting urine toxicology
15 screens pretty much immediately, I mean, in 2013,
16 when we started the program.
17   Q. Okay. So -- and you mentioned it's a
18 policy. Is it written down somewhere? Like, can
19 you just describe how this gets implemented? I
20 mean, I know there's various aspects of it, but
21 how do the clinicians integrate the protocol?
22     MR. ARBITBLIT: Object to form.
23     THE WITNESS: So we have a document that
24 describes the policies in the clinic that includes
25 information about how to safely steward opioids

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1  and other controlled substances.
2       But even more importantly, we met
3  regularly, and we have a large interdisciplinary
4  team meeting once a week in which we continue to
5  discuss and have quality improvement around these
6  issues.
7  BY MS. KAPKE:
8       Q.  Is that document, like, one page, two
9  pages?  How --
10      A.  I mean, it includes a lot of information
11 about how the clinic is run.  I think the document
12 by now is probably -- I don't know -- 10 pages,
13 15 pages, something like that.
14      Q.  Is it proprietary to your clinic, or is
15 that something you could produce to us?
16      A.  I'd have to look into that.
17      Q.  Okay.
18      A.  Yeah.
19      Q.  If you -- would you agree just to look
20 into it and if you can produce it to us --
21      A.  Yes.
22      Q.  -- produce it to your counsel?
23      MR. ARBITBLIT:  Object to form.  We'll
24 take it up if it's still timely discovery.
25 BY MS. KAPKE:

Page 115

1       Q.  Is there any part of the protocol that is
2  integrated into the EMR computer system?
3       A.  We have now PDMP checking integrated into
4  our electronic medical records.
5       Q.  Is that the only part that is incorporated
6  into the EMR?
7       MR. ARBITBLIT:  Object to form.
8       THE WITNESS:  No.  We have our notes
9  fields, where we talk in detail about red flags
10 and concerns that we have.
11      We have lab results, including urine
12 toxicology results.  That's included in the EMR.
13 BY MS. KAPKE:
14      Q.  Are there any nudges in the EMR and in the
15 protocol?  Do you know what I mean by that?
16      A.  Yeah, I do.
17      Yeah, so there are -- the nudges would be
18 the initial panel, where you can see diagnoses;
19 you can see medications for patients who are known
20 to be addicted or dependent.  That is visible.
21      And sometimes there are even alerts that
22 come up for specific patients who are known to
23 engage in doctor shopping or pharmacy shopping or
24 repeatedly show up into the emergency room
25 demanding opioids.

Page 116

1       Those are things that can be seen and
2  noted.
3       Q.  How do those alerts get implemented?
4       A.  The electronic medical record system has
5  evolved over time, and so those have evolved as
6  well with heightened awareness at Stanford around
7  this problem.
8       Q.  When is the first time you had an alert
9  about a particular patient that came up in the
10 electronic medical record?
11      A.  I don't know.
12      Q.  Would it be in the last five or six years?
13      MR. ARBITBLIT:  Object to form.
14      THE WITNESS:  I genuinely don't know.
15 BY MS. KAPKE:
16      Q.  Okay.  Who implemented that integration?
17 Was it -- I mean, did you program it, or did --
18 was there an outside vendor that programmed it?
19 Is it a particular department at Stanford?
20      A.  We have an electronic medical record team,
21 and they are the ones who make those changes with
22 input from many different entities.
23      Q.  Are you a part of that electronic medical
24 record team that handles those logistics, or do
25 you just provide the input into what types of

Page 117

1  alerts that could be used?
2       A.  I have provided input.
3       Q.  Do you know the technical limitations of
4  how that works from a technical perspective?
5       That was a bad question.  Let me ask it
6  again.
7       Do you -- do you have opinions on the
8  technical feasibility of implementing systems like
9  alerts into electronic medical records?
10      MR. ARBITBLIT:  Object to form.
11      THE WITNESS:  I mean, I have opinions
12 insofar as I could see what the electronic medical
13 record can already do for other types of issues
14 that patients and systems have, and so I can see
15 when a similar type of thing can be used for the
16 purposes of safely stewarding opioids.  But I'm
17 not a computer programmer.
18 BY MS. KAPKE:
19      Q.  And what types of -- similar types of
20 things -- strike that.
21      What types of things have you seen what
22 the electronic medical record can already do for
23 other types of issues that patients and systems
24 have?
25      A.  Well, let me just speak to what -- if I

30 (Pages 114 - 117)

CONFIDENTIAL

1 didn't -- I think I need to elaborate on what our
2 electronic medical record is already doing.
3      If in our EMR system, we prescribe a
4 controlled substance, we get an automatic pop-up
5 telling us that we need to check the PDMP. And
6 only after we have gone through the dual security
7 process and checked the PDMP, which now
8 fortunately, we can do from within our EMR, are we
9 allowed to proceed with prescribing.
10      So that's one example, as I have
11 mentioned.
12      Q. Let me just ask a follow-up about that
13 example specifically.
14      That is the type of thing that has to do
15 with the integration that we talked about earlier,
16 that you have to rely on the state PDMP data to be
17 able to do that; correct?
18      A. Well, there has to be a PDMP, yeah.
19      Q. Right. And when did you get that pop-up?
20      A. I'm not remembering. It was years ago
21 now, but I don't remember when.
22      Q. Okay. So we've got the pop-up of, "Have
23 you checked the PDMP?" And you can't proceed
24 further until you've checked "yes"; is that
25 correct?

1      A. That's correct. But in my clinic, we were
2 mandating checking prior to that.
3      Q. Okay. And then are there other limits
4 that come up besides that pop-up?
5      A. Like I said, there are ways --
6      First of all, our notes are found in a
7 single place, and it's very easy to go to the
8 notes section and scroll through notes in
9 chronological order and see what else is going on
10 with that patient.
11      We also have a function called Care
12 Everywhere, where we can go in and see if the
13 patient has presented at hospitals outside of
14 Stanford hospital, which is very useful, in
15 particular, for seeing a patient who is emergency
16 room shopping for opioids or other controlled
17 substances.
18      We've also developed a system internally
19 at Stanford for patients who are known to struggle
20 with a severe controlled substance problem and
21 engage in doctor shopping, drug seeking, to alert
22 providers in our system that this is a disease
23 process that this individual was struggling with.
24      So there's communication across treatment
25 settings, across providers. There's very good

1 documentation around these issues. There's
2 mandated PDMP checking and documentation.
3      Q. Do you have anything in the protocol that
4 says -- a pop-up, for instance, that says, "This
5 is X number of enemies," or "This is X number of
6 pills; do you really want to prescribe this," or
7 something like that?
8      MR. ARBITBLIT: Object to form.
9      THE WITNESS: There may well be something
10 around quantities, so recommended against quantity
11 limits and such.
12      But, you know, I don't prescribe
13 Schedule II opioids for pain, and I think that
14 those are more likely to be found in those
15 settings. And we have a very safe stewardship of
16 buprenorphine, which is the opioid that I
17 prescribe.
18 BY MS. KAPKE:
19      Q. Are you in favor of those type of pop-ups
20 for prescribers, the, you know, "This is a 30-day
21 supply; should you consider prescribing a 10-day
22 supply" types of pop-ups?
23      MR. ARBITBLIT: Object to form.
24      THE WITNESS: I know that those types of
25 electronic medical record nudges can have a large

1 impact. So when they are properly designed and
2 informed by the evidence, I think they can be
3 helpful. When they're not properly designed or
4 they're informed by things that aren't true and
5 not evidence-based, I think they can be harmful.
6      So it really depends on -- on what the --
7 the pop-up is doing.
8 BY MS. KAPKE:
9      Q. You've testified about how pharmacies have
10 different data than prescribers and failed to use
11 or analyze their own dispensing data to assist
12 pharmacies and pharmacists in identifying
13 prescriber-related red flags.
14      Do you know how pharmacy data is stored at
15 Publix?
16      MR. ARBITBLIT: Object to form.
17      THE WITNESS: What data specifically would
18 you be talking about?
19 BY MS. KAPKE:
20      Q. The dispensing data contained in the
21 individual medical records, individual pharmacy
22 dispensations for individual patients at Publix.
23      A. I have some knowledge.
24      Q. What is that knowledge?
25      A. For example, I know from interviews with

CONFIDENTIAL

Page 122

1 Publix pharmacists that they had kept hard copies
2 of prescriptions for controlled substances, that
3 they were required to scan in those hard copies;
4 that they had various notes fields in different
5 places that were, quote/unquote, difficult to dig
6 up, as I'm recalling from one of the depositions,
7 difficult to find, difficult to dig up, because
8 there were so many different notes fields and
9 different pharmacists would put notes in different
10 places, depending upon their own personal
11 practice.
12      I know that Publix pharmacists, because
13 they lacked, in my opinion, adequate support,
14 resources, and infrastructure for tracking things
15 like patients repeatedly coming in with fraudulent
16 prescriptions or with suspicious prescriptions or
17 prescribers who were writing illegitimate
18 prescriptions, that Publix pharmacists used
19 Post-its and emails and texts and phone calls to
20 communicate with each other, a kind of shadow
21 chart system to make up for the absence of a
22 system provided by Publix.
23      And I also know that Publix pharmacies
24 stores their prescriptions in cardboard boxes in
25 the back of their pharmacy that require a forklift

Page 123

1 to get them down.
2      Q.  Do you know how or whether pharmacy
3 dispensing data can be queried at Publix, run a
4 search on it?
5      A.  No.
6      Q.  Do you have an opinion that Publix should
7 have conducted searches of its dispensing data to
8 identify, quote/unquote, bad doctors, or
9 problematic doctors?
10      A.  Yes.
11      Q.  And do you have an opinion on when that
12 type of data analysis should have been done?
13      A.  It says within the Controlled Substances
14 Act that pharmacies have a responsibility to use
15 their own data to fulfill their corresponding
16 responsibility, so it should have been done at the
17 inception of Publix becoming a pharmacy.
18      Q.  Is that understanding of the Controlled
19 Substances Act from the East Main Street case,
20 from CVS Holiday, from the decisions?  Where is
21 that understanding of the Controlled Substances
22 Act from?
23      A.  Holiday CVS as well as other DEA cases,
24 Shoppe, S-h-o-- -- Medical Shoppe, which I believe
25 was around 2006.

Page 124

1      But I think there were also decisions as
2 early as the late 1990s, DEA decisions.  I'm not
3 recalling now the names.
4      Q.  Do you have an opinion on when that data
5 analysis of internal dispensing data was
6 technologically feasible?
7      A.  No.
8          MR. ARBITBLIT:  Object to form.
9 BY MS. KAPKE:
10      Q.  Do you have an opinion on electronic --
11      Let me -- sorry.  Let me -- let me have a
12 fuller answer there.
13      I think it was technologically feasible,
14 again, from the very beginning.  Even before
15 electronic medical records, it would have been
16 possible to create a system and keep files for
17 pharmacists to be able to be aware of who were the
18 patients, who were the doctors, what were the
19 types of fraudulent prescriptions that were coming
20 in.
21      And I believe that quite early on, Publix
22 had a -- had centralization of their customers so
23 that you could, at the very least, go in early and
24 see where else that customer had been beyond your
25 own Publix pharmacy.

Page 125

1      Q.  At another Publix?
2      A.  Yes, that's right.
3      Q.  Not at another pharmacy besides Publix,
4 just another Publix?
5      A.  That's right.
6      Q.  Okay.  Do you have an opinion on an
7 electronic prescription system that was available
8 on the market in 2006 that, in your opinion, had
9 better notes tracking than Publix's system?
10          MR. ARBITBLIT:  Object to form.
11          THE WITNESS:  Better notes tracking would
12 have been possible at Publix if, number one,
13 Publix had mandated proper documentation and,
14 number two, specified where in the existing system
15 that documentation should have occurred.  It
16 didn't necessarily require a more sophisticated
17 electronic medical record system.
18 BY MS. KAPKE:
19      Q.  You said (as read):
20          "It would have been possible to
21      create a system and keep files for
22      pharmacists to be able to be aware of who
23      were the patients, who were the doctors,
24      what were the types of fraudulent
25      prescriptions that were coming in."

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1    What would that system look like?
2        MR. ARBITBLIT: Object to form.
3        THE WITNESS: At the simplest level, that
4    would have been a system in which Publix
5    pharmacists were required to document at a place
6    that could be centralized and easily found by
7    other pharmacists any red flag, what they did to
8    investigate the red flag, and whether or not they
9    filled or not filled that prescription despite the
10   red flag and exactly what they did and what their
11   thinking process was if they did decide to
12   dispense or not dispense.
13       So a clear emphasis on and prioritization
14   of investigating and clearing red flags and all it
15   takes to do that properly.
16   BY MS. KAPKE:
17   Q. In your Track 3 deposition, you stated
18   that you have expertise in, among other things,
19   surveillance systems to detect misuse, addiction,
20   and diversion, including prescription drug
21   monitoring.
22       When you talk about surveillance systems,
23   are you talking about the system in which Publix
24   pharmacists would be required to document the red
25   flags and the documents and things like that, or

Page 127

1    are there other surveillance systems that you are
2    talking about?
3        MR. ARBITBLIT: Object to form.
4        Do you have the deposition -- the
5    transcript of the testimony you just referred to?
6        MS. KAPKE: Uh-huh.
7        MR. ARBITBLIT: I'd like the witness to
8    have an opportunity to look at it before
9    answering.
10       MS. KAPKE: That's fine.
11       MR. ARBITBLIT: Thank you for being so
12   prepared.
13       I think one of these is probably still
14   yours -- oh.
15       Well, I spoke prematurely. There's not
16   much context here about what came before or after
17   one particular answer, so...
18       And I don't see any -- I don't see the
19   word "surveillance," unless I'm missing it. Is
20   this the -- is this the excerpt you meant to show
21   me?
22       MS. KAPKE: No.
23       MR. ARBITBLIT: Compliment withdrawn.
24       MS. KAPKE: Sorry about that.
25       MR. ARBITBLIT: Or held in reserve.

Page 128

1        MS. KAPKE: It's page 9 of Track 3.
2    BY MS. KAPKE:
3    Q. While Frank is looking for that, let me
4    just ask, do you have experience in surveillance
5    systems?
6        MR. ARBITBLIT: Object to form.
7        THE WITNESS: What do you mean by
8    "surveillance systems"?
9    BY MS. KAPKE:
10   Q. Okay. Good point. And that's why I'm
11   asking.
12       MS. KAPKE: Did you not print that one
13   out?
14   BY MS. KAPKE:
15   Q. You, obviously, have a lot of experience
16   with prescription drug monitoring protocols, with
17   the Stanford monitoring protocol, and you've done
18   a lot of academic detailing on opioid stewardship.
19   I'm not trying to minimize that.
20       What I am trying to do is figure out if
21   there's something additional besides your
22   extensive work doing academic detailing that gives
23   you expertise to talk about systems involving
24   pharmacy opioid stewardship.
25       MR. ARBITBLIT: Object to form.

Page 129

1        THE WITNESS: I feel I have expertise on
2    systems involving pharmacy opioid stewardship
3    based on all the things that you have already
4    mentioned -- I feel that gives me expertise -- as
5    well as long clinical experience interacting with
6    pharmacies, interacting with pharmacists, and all
7    of the documents that I've reviewed for this
8    litigation.
9    BY MS. KAPKE:
10   Q. And part of what I'm asking about is to
11   try and just make sure that I understand. Is
12   there something else, besides all of that, that I
13   am missing or that I don't know about?
14   A. I don't think so.
15   Q. Okay.
16       MS. KAPKE: Okay. Do you have this one,
17   Frank?
18   BY MS. KAPKE:
19   Q. I think it's a -- and I don't want to put
20   words in your mouth, but I think it's a fair
21   summary of your opinions that the pharmacies
22   you've testified to should have put better systems
23   in place earlier. And we talked about the
24   documentation of red flags as part of that system.
25       Can you name me a specific system that

CONFIDENTIAL

Page 130

1 Publix had the means to put in place besides
2 encouraging their pharmacists to document red
3 flags?
4         MR. ARBITBLIT:  Object to form.
5         THE WITNESS:  Publix could have put in
6 place a much better training and educational
7 system.
8 BY MS. KAPKE:
9     Q.  Okay.  So better training, better
10 education, and encourage pharmacists to document
11 red flags.
12         Are there other systems that you think
13 Publix should have done?
14         MR. ARBITBLIT:  Object to form.
15 Mischaracterizes opinions.
16         THE WITNESS:  So I didn't say encourage --
17 BY MS. KAPKE:
18     Q.  And I didn't mean to misstate your
19 testimony.  I genuinely am trying to get --
20     A.  Yeah.
21     Q.  -- to the bottom of your opinion here.
22 So --
23     A.  Okay.
24         MR. ARBITBLIT:  Well, there's no pending
25 question that hasn't been objected to, so wait for

Page 131

1 a different question.
2 BY MS. KAPKE:
3     Q.  So what did I misstate about encourage
4 pharmacists to document red flags?
5         MR. ARBITBLIT:  Object to form.
6 BY MS. KAPKE:
7     Q.  Is it encourage pharmacists to document
8 red flag resolutions?
9         MR. ARBITBLIT:  Object to form.
10         It's not her job to clarify your question.
11 Ask another question.
12         MS. MILLER:  She's got a question pending.
13 She can answer that.
14         MR. ARBITBLIT:  If you can answer it, you
15 can answer.
16         THE WITNESS:  Okay.  Yes, I think
17 mandating documentation around red flags, not just
18 encouraging; putting red flag checklists in place
19 that further mandate and encourage and prioritize
20 that activity.
21         As I've said, much, much more science-
22 informed training and emphasis on the importance
23 of investigating red flags and documenting that
24 investigation and the due diligence required to
25 investigate and clear or not clear red flags;

Page 132

1 providing pharmacists with an ability to
2 communicate with each other in a single pharmacy
3 and across pharmacies around patients who are
4 engaging in fraudulent or drug-seeking behavior,
5 prescribers who are engaging in writing
6 illegitimate prescriptions; having a system that
7 educates pharmacists about the bias when they're
8 exposed to literature and pamphlets and
9 educational material that was made or promoted by
10 the opioid pharmaceutical industry.
11         And, again, all of these sort of -- sort
12 of hidden incentives -- for example, as I've
13 stated before, opioid prescriptions should not be
14 included in a bonus plan or an incentive plan.
15 And pharmacists need enough time in order to
16 actually do the work of clearing red flags.
17         That's all part of the system.
18         So the pharmacy needs to provide the
19 training, the time, the incentives, and the
20 infrastructure, and I feel that Publix and
21 Albertsons did not provide adequate training time,
22 incentives, or infrastructure for their
23 pharmacists to be able to exercise their
24 corresponding responsibility.
25 BY MS. KAPKE:

Page 133

1     Q.  Okay.  I want to focus right now only on
2 the infrastructure part of that.
3     A.  Okay.
4     Q.  That's what I am trying to pin down.  And
5 I believe that you have talked about, within the
6 infrastructure, the places where you would have
7 notes fields.
8         Are there other aspects of the
9 infrastructure -- not talking about training time
10 or incentives -- that you think Publix or any
11 other pharmacy should have implemented?
12     A.  Part of the infrastructure is Publix's
13 reference and procedure guide, which, by my read,
14 Publix pharmacists had only limited or no
15 awareness of.
16         So more requirements to be familiar with
17 that reference and procedure guide, to have more
18 training on the reference and procedure guide, to
19 have electronic medical record support for
20 accomplishing what the reference and procedure
21 guide should have accomplished.
22         Publix didn't incorporate even a mention
23 of red flags in its reference and procedure guide
24 until 2012.  It should have been there much
25 earlier, along with training, support, all of

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1 that.
2    Q. You mentioned EMR support. Is the lack of
3 EMR support in the Publix system, the lack of
4 nudges, so to speak, part of your opinion about
5 what Publix did wrong here?
6    MR. ARBITBLIT: Object to form.
7 Mischaracterizes.
8 BY MS. KAPKE:
9    Q. And I'll just say, I'm genuinely asking.
10 I can't mischaracterize if I'm --
11   A. Yeah.
12   Q. -- if I'm asking a question.
13   A. I mean, I think the --
14     MR. ARBITBLIT: Object to the prelude to
15 the question.
16     THE WITNESS: We can all appreciate that
17 electronic medical records have evolved greatly
18 over the past 25 years, and my opinion is that as
19 soon as Publix was able to incorporate nudges and
20 infrastructure and support and mandates and
21 requirements and guardrails and stopgaps in their
22 EMR, they should have done so.
23     My read of the evidence is that they
24 dawdled; they didn't do it as soon as they could
25 have and as soon as they should have.

Page 135

1     And, further, my opinion is that even
2 separate from the EMR, they could have taken many
3 different steps to provide support, training,
4 infrastructure, et cetera.
5 BY MS. KAPKE:
6    Q. Can you give me a date that they would
7 have been able to incorporate those EMR support?
8     MR. ARBITBLIT: Object to form.
9     THE WITNESS: Well, as soon as they had --
10     You mean, in the electronic medical
11 record? Is that your -- you are specifically
12 asking about the EMR?
13 BY MS. KAPKE:
14   Q. Yes.
15   A. Okay. So from the very inception of the
16 EMR, they could have created a specific notes
17 field where all pharmacists would have been
18 required to go to document their investigation of
19 red flags, their thinking, their due diligence,
20 and whether they dispensed or did not dispense.
21     And they could have made it clear to all
22 of the pharmacists exactly which notes fields that
23 was, which they never did and still haven't done.
24     As soon as there was a PDMP, they could
25 have had in the EMR a place where they were

Page 136

1 required to check the PDMP before dispensing a
2 controlled substance, you know, which they did not
3 do.
4     From early on, they could have and should
5 have made a centralized place for pharmacists at
6 Publix to communicate with each other instead of
7 through Post-its, texts, phone calls, and email
8 messages about concerning patients, concerning
9 providers in the community.
10     I'm sure there's more, but that's what
11 comes to mind now.
12   Q. Is it your opinion that corporate
13 pharmacies should implement blocks on certain
14 prescribers so that pharmacists are not permitted
15 to fill scripts from those prescribers?
16   A. Yes.
17   Q. And in your opinion, is that true even if
18 those prescribers are still licensed by the DEA?
19   A. So let me say that if somebody -- if a
20 prescriber no longer has a valid DEA license,
21 there should be a block on that prescriber.
22     If that prescriber is in jail and
23 convicted of writing fraudulent or illegitimate
24 prescriptions, there should be a block on that
25 prescriber.

Page 137

1     Or even if there is a prescriber in the
2 community who is a well -- part of a well-known
3 pill mill, that there should be consideration, at
4 the very least, of a block on that prescriber.
5    Q. Do you identify any specific prescribers
6 who, in your opinion, should have been on a "do
7 not fill" list, such that Publix corporate blocked
8 individual pharmacists from dispensing scripts
9 to those prescribers?
10   A. I'll have to look at my report.
11   Q. Okay.
12   A. I'm not recalling any specific names right
13 now.
14   Q. Are you aware of any public statements
15 made by legislators in Cobb County and Georgia
16 about the corporate practice of pharmacy?
17   A. How are you defining "legislators"?
18   Q. Individuals who are elected
19 representatives.
20   A. Okay. So on page 394 of my report (as
21 read):
22        "Major Vincent Hester of Cobb County
23        Sheriff's Office made statements about
24        'Prescription pain sales on the street
25        have slowed way down with the increase in

CONFIDENTIAL

Page 138

1    heroin use'" and -- et cetera.
2        You can see what's written there.
3    Q.  Anything else?
4    A.  I think it's possible that comments made
5  here on behalf of the Georgia Department of Public
6  Health could have included elected officials.
7        It's possible that the comments, again, in
8  my appendix, on page 395 for the Cobb County
9  medical examiner's office could have included
10 elected officials -- sometimes those individuals
11 are elected -- as well as the Atlanta-Carolinas
12 High Intensity Drug Trafficking Areas.  I don't
13 know who sits on that committee.  They could have
14 included elected officials.
15       Page 396 of my report, Cobb and Douglas
16 Public Health, I don't know who sits on that
17 committee.  It could have been elected officials.
18       Page 397 of my report, the Georgia Bureau
19 of Investigation reported significant increase in
20 fentanyl and purple heroin.  Could have included
21 elected officials.
22   Q.  Okay.
23       MS. KAPKE:  I'm going to hand you what I
24 have marked as Lembke Exhibit 23.
25       (Whereupon, Lembke Exhibit 23 was marked

Page 139

1    for identification.)
2  BY MS. KAPKE:
3    Q.  And I have a very short question about
4  this.
5        There's a highlighted statement there, and
6  I just want to confirm whether you --
7        MS. KAPKE:  And Frank is looking for a
8  extra copy, and I don't think he has one.
9  BY MS. KAPKE:
10   Q.  The highlighted version, is that one of
11 those statements that you believe is misleading?
12       MR. ARBITBLIT:  Wait until I get a chance
13 to look at it after you're done since they don't
14 have a copy.
15 BY MS. KAPKE:
16   Q.  And, again, my question is very short.
17       Is the highlighted sentence misleading or
18 not?
19       MR. ARBITBLIT:  I think that --
20       THE WITNESS:  I'm just trying to figure
21 out what --
22       MR. ARBITBLIT:  -- even a short
23 question --
24       THE WITNESS:  -- what the document is.
25       MR. ARBITBLIT:  Context is always

Page 140

1  important.
2        MS. KAPKE:  How much time do we have left
3  on the record?  Or how much time has expired?
4        THE VIDEOGRAPHER:  On this record right
5  now?  One hour and ten minutes.
6        MR. ARBITBLIT:  Left?
7        THE VIDEOGRAPHER:  That we've been on in
8  this segment.
9        MR. ARBITBLIT:  Plus 2:12.
10       MS. KAPKE:  Okay.  Thanks.
11       MR. ARBITBLIT:  So we have 98 minutes of
12 testimony left.
13       MS. KAPKE:  Well, I --
14       MR. ARBITBLIT:  That's the math.
15       MS. KAPKE:  I -- well, while Dr. Lembke is
16 reading, I will state that we agreed to the
17 five-hour limitation because we were told that
18 there was a limited ambit of defendant-specific
19 information, and I believe that that is -- and the
20 way this deposition has proceeded, that we should
21 be allotted more time.  But I will just preserve
22 that for the record.
23       MR. ARBITBLIT:  Well, of course, we object
24 to that and would point out to whoever decides the
25 issue, if you bring it, that a lot of the

Page 141

1  questioning has had nothing to do with
2  defendant-specific issues.  So whatever time was
3  spent on those questions and answers is your
4  choice.
5        MS. MILLER:  And just make a record that,
6  to the contrary, there was a lot of Publix-
7  specific questioning and answers that took place
8  over the past period of time and which is not
9  attributed to Albertsons, so I will have
10 objections to the amount of time that I'm given.
11       MR. ARBITBLIT:  You --
12       MS. MILLER:  Let's move it along.
13       MR. ARBITBLIT:  You had your choice how to
14 divide up the time.
15       THE WITNESS:  Okay.  Can you repeat your
16 question.
17 BY MS. KAPKE:
18   Q.  Is the sentence in yellow misleading?
19       MR. ARBITBLIT:  I have not seen the
20 document yet since you haven't brought one.
21       MS. KAPKE:  Counsel, if you are going to
22 review the document, we'll go off the record.
23       MR. ARBITBLIT:  You have a responsibility
24 to provide copies for counsel.  That's basic rule
25 in this six-year long litigation.  I would be

36 (Pages 138 - 141)

CONFIDENTIAL

1 happy to have been looking at it if you had
2 brought a copy. It's not my job to do your job
3 for you.
4        MS. KAPKE:  At this point, you are,
5 frankly, just wasting time.
6        MR. ARBITBLIT:  I am not wasting time. I
7 have an -- I object to the question.
8        MS. KAPKE:  Okay. I'll withdraw the
9 question, then.
10        MR. ARBITBLIT:  Fine.
11 BY MS. KAPKE:
12     Q.  I'm going to ask a couple of quick
13 questions about the Stanford-Lancet Commission
14 report.
15        Which section of the report did you
16 facilitate?
17        MR. ARBITBLIT:  Object to form.
18 Misleading.
19        THE WITNESS:  That's not how the report
20 was constructed. We individually worked on
21 different sections, and then there was not
22 complete, but broad consensus. I am not now
23 recalling specifically which sections I worked on.
24 BY MS. KAPKE:
25     Q.  Okay. Were you ever in the 10 percent of

1 allowable dissenting voices to the conclusions or
2 recommendations of the report?
3     A.  Probably, because I am recalling that
4 there was not 100 percent consensus. But, again,
5 I would have to go back and carefully reread the
6 report to be able to tell you where that was,
7 assuming I can remember.
8     Q.  Do you agree that sensible opioid
9 stewardship programs recognize that patients can
10 be harmed by clinical decisions to prescribe or
11 not to prescribe opioids?
12     A.  Yes.
13     Q.  And would you agree that the same is true
14 with respect to dispensing, patients can be harmed
15 by clinical decisions to dispense or not to
16 dispense opioids?
17     A.  Yes.
18     Q.  Did you dispute or dissent from the last
19 paragraph on page 16?
20     A.  Page 16.  Okay.
21        This is the "Finally, the Commission"
22 paragraph?
23     Q.  Yes.  Why don't you read it out loud.
24     A.  Okay.  (As read):
25        "Finally, the Commission notes that

1 the spate of multibillion dollar lawsuits
2 surrounding the opioid crisis in the
3 U.S.A. can also create conflicts of
4 interest.
5        "We propose that restrictions on
6 regulatory bodies should apply not only to
7 material connections to the pharmaceutical
8 industry, but also to law firms suing some
9 element of the industry and to people
10 hired as expert witnesses by those firms."
11     Q.  Did you dispute or dissent from that
12 paragraph?
13     A.  So the discussion of that paragraph -- the
14 discussion that led to that paragraph was whether
15 or not people who had been engaged as medical
16 expert witnesses in opioid litigation should have
17 to declare that prior to giving a presentation or
18 submitting a journal article for publication.
19        And I was in wholehearted agreement that
20 they should have to do that. So I agreed with
21 this paragraph.
22     Q.  And on page 34, in the first column,
23 midway down, there is a recommendation that (as
24 read):
25        "Policymakers should consider

1 experimenting with requiring opioid
2 manufacturers to fund a program that would
3 reward pharmacy customers returning the
4 unused portion of controlled substance
5 prescriptions; for example, a discount
6 coupon for in-store purchases."
7        Do you see that?
8     A.  Page 34.  Could you point with your
9 finger?
10     Q.  Yeah, it's right there.
11        MS. KAPKE:  And we'll mark as
12 Exhibit 24 --
13        (Whereupon, Lembke Exhibit 24 was marked
14        for identification.)
15 BY MS. KAPKE:
16     Q.  Here's a copy from the --
17     A.  Okay. Thank you.
18     Q.  -- the website. It's the same language,
19 with British versus American spelling.
20     A.  Give me a moment to read the paragraph.
21     Q.  Sure.
22     A.  Thank you.
23        Frankly, I'm not fully understanding what
24 this paragraph means, especially the last
25 sentence, "e.g., a discount coupon for in-store

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

1 purchases."
2      To me, that doesn't fit with the rest of
3 the paragraph, which states that there should be
4 drug take-back programs that would be funded by
5 opioid manufacturers.
6      So I'm a little confused by this
7 paragraph.
8      Q.  Did you dispute or dissent from
9 Recommendation 5a?
10     A.  I don't have a recollection --
11 recollection of this specific paragraph.  And as I
12 said, the way that it finishes seems like a non
13 sequitur to me.
14     Q.  And Exhibit 24 is that recommendation on
15 the Stanford website; correct?
16     A.  I don't know what Stanford website you're
17 talking about.
18     Q.  Okay.  That's fair.
19     MS. KAPKE:  I -- we'll mark as
20 Exhibit 25 --
21     MR. ARBITBLIT:  Since you are going on, I
22 will just read for completeness from the same
23 paragraph above what you asked the witness to
24 agree to.
25     Quote (as read):

Page 147

1      "Prohibitions against pharmaceutical
2      industry influences in this arena are
3      justifiable entirely because of concerns
4      about protecting patients, but such rules
5      also protect" --
6 MS. KAPKE:  Counsel --
7 MR. ARBITBLIT:  (As read):
8      -- "prescribers who practice" --
9 MS. KAPKE:  Counsel --
10 MR. ARBITBLIT:  (As read):
11      -- "ethically and compassionately."
12 MS. KAPKE:  This is ridiculous.
13 MR. ARBITBLIT:  (As read):
14      "Like patients, physicians have a
15      right to expect that the rules under which
16      they prescribe were set based on
17      scientific evidence and intended solely to
18      benefit patients, not to enrich
19      corporations," end of quote.
20      It's not ridiculous.  It's the rule for
21 completeness.  It exists for a reason.
22     MS. KAPKE:  Okay.  And is that on
23 Exhibit 24?
24     MR. ARBITBLIT:  It's on the Stanford-
25 Lancet document --

Page 148

1      MS. KAPKE:  Is it on Exhibit 24?
2      MR. ARBITBLIT:  -- that you asked the
3 witness to look at.
4      MS. KAPKE:  And, frankly, I mean, we're
5 just wasting time, so I'm going to move on.
6      (Whereupon, Lembke Exhibit 25 was marked
7      for identification.)
8 BY MS. KAPKE:
9      Q.  I'm going to hand you Exhibit 25.  This is
10 the supplemental materials considered list that
11 you have reviewed since April 15th, which was
12 provided to us after our agreement, which is
13 another basis to void the agreement.
14      But putting that aside, have you reviewed
15 the materials on this list, Dr. Lembke?
16     A.  Yes.
17     Q.  Prior to reviewing these materials, had
18 you ever reviewed a Motion for Summary Judgment?
19     A.  Not that I am recalling.
20     Q.  Can you tell me in your own words what a
21 Motion for Summary Judgment is?
22     A.  A Motion for Summary Judgment is an
23 endeavor to get the Court to dismiss the case
24 because of overwhelming evidence for the
25 plaintiffs.

Page 149

1      Q.  Did you ask to review Publix's response to
2 this motion?
3      A.  No.  I didn't know there was a response to
4 the motion.
5      Q.  Was this just provided to you without you
6 asking, or did you ask to see it?
7      A.  It was provided without my asking.
8      Q.  You've previously testified that you are
9 very careful to look at things like any conflict
10 of interest that authors may have.  Is that still
11 the case?
12     A.  Yes.
13     Q.  Did you consider the conflict of interest
14 the authors of the Motion for Summary Judgment
15 have?
16     A.  Well, I mean, I wouldn't call it a
17 conflict of interest.  I would call it a given
18 that they have an interest in that perspective.
19 It's not really a conflict.  A conflict implies
20 possibly a hidden agenda or a side gig that might
21 be influencing what this entity is doing right
22 here now.  The Summary Motion for Judgment is
23 clearly the interest of the plaintiff.
24     Q.  And you'd agree that authors who stand to
25 make millions of dollars in attorneys fees if

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1 successful have an incentive to be misleading;
2 correct?
3      MR. ARBITBLIT:  Object to form.
4      (Clarification requested by Reporter.)
5 BY MS. KAPKE:
6   Q.  You'd agree that authors who stand to make
7 millions of dollars in attorneys fees if
8 successful have an incentive to be misleading?
9      MR. ARBITBLIT:  Same objection.
10      THE WITNESS:  In this case, who are the
11 authors that you're referring to?
12 BY MS. KAPKE:
13   Q.  The attorneys for Cobb County.
14      MR. ARBITBLIT:  Object to form.
15      THE WITNESS:  Yeah, so I have based my
16 opinion on my own investigations, not on this
17 document.
18      MS. KAPKE:  Okay.  Let's -- I got a note
19 from the court reporter (sic) that we need a media
20 change, so let's go off the record.
21      THE VIDEOGRAPHER:  We are going off the
22 record.  The time is 12:06.
23      (Off the record.)
24      THE VIDEOGRAPHER:  We are back on the
25 record.  Time is 12:07.

Page 151

1 BY MS. KAPKE:
2   Q.  I am going to hand you -- actually,
3 scratch that.
4      I want to ask about your Cobb
5 County-specific appendix in your report.  You
6 reference that from 2006 to 2019, Publix
7 pharmacies in Marietta received 9,444,880 pills,
8 or approximately 155 pills per person in Marietta.
9   A.  Can you give me a page number?  Sorry.
10   Q.  I think it's the first page of your Cobb
11 County appendix.
12   A.  The appendix is not demarcated in this
13 version.
14      Again, it's not really... it's just
15 continuous numbers, so may be the wrong report.
16      MR. ARBITBLIT:  This is --
17      THE WITNESS:  391.  Okay.  Maybe we can
18 just use this one.
19      All right.  I'm there.
20 BY MS. KAPKE:
21   Q.  Why did you use what is available on The
22 Washington Post website instead of the ARCOS data
23 as processed by plaintiffs' expert, Craig McCann?
24      MR. ARBITBLIT:  Object to form.
25      THE WITNESS:  Can you point me to the

Page 152

1 specific place you're talking about?  I was
2 looking for the report, of course, and didn't see
3 it.
4 BY MS. KAPKE:
5   Q.  Yeah.
6      Here it is, top of 391.
7   A.  Okay.
8      THE VIDEOGRAPHER:  And your mic.
9      MS. KAPKE:  Thanks.
10      THE WITNESS:  What's your question again?
11 BY MS. KAPKE:
12   Q.  Why did you use what's available on The
13 Washington Post website instead of the ARCOS data
14 processed by plaintiffs' expert, Craig McCann?
15   A.  No particular reason.  It seemed like a
16 reliable source.
17   Q.  Did you just filter the "buyer name"
18 column for "Publix" and the "buyer city" for
19 "Marietta"?
20   A.  I don't remember.
21   Q.  Okay.  Did you include in your report that
22 CVS pharmacies in Marietta received more than
23 double the number of pills as Publix pharmacies in
24 Marietta?
25      MR. ARBITBLIT:  Objection to form.

Page 153

1      THE WITNESS:  Are you quoting from my
2 report?
3 BY MS. KAPKE:
4   Q.  No, I'm not.
5      And I'll just ask, did you look at -- when
6 you pulled that information, did you look at the
7 CVS numbers or the Lacey's numbers or any other
8 numbers besides Publix?
9   A.  Not that I recall.
10   Q.  Do you know Publix's approximate market
11 share of opioid prescriptions dispensed in Cobb
12 County?
13   A.  No.
14   Q.  Do you know Publix's approximate market
15 share of prescriptions dispensed in Marietta or
16 Cobb County overall, including both opioids and
17 non-opioids?
18   A.  No.
19   Q.  You previously testified in your Track 3
20 deposition that (as read):
21      "Quantitatively, as I've said before,
22      per person, I believe that we need to
23      reduce prescribing back to the pre-1996
24      levels, and then qualitatively, it's
25      important that opioid prescribing be

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1  evidence-based."
2      Have you done an analysis of what
3  quantitatively, those numbers should look like for
4  Cobb County specifically?
5      A. No.
6      Q. Do you believe that for Cobb County, you
7  would factor in population growth at least?
8      A. That makes sense.
9      Q. Do you know how many individuals in Cobb
10  County came into contact with Publix opioid-
11  prescribing practices and policies?
12      MR. ARBITBLIT: Object to form.
13      THE WITNESS: I don't have a number for
14  that, no.
15  BY MS. KAPKE:
16      Q. Regardless of the number of individuals,
17  is it your opinion that Publix's opioid-
18  prescribing practices and policies injured each
19  and every person who came into contact with
20  Publix's opioid-prescribing practices and
21  policies?
22      MR. ARBITBLIT: Object to form. Calls for
23  a legal conclusion.
24      THE WITNESS: No.
25      MS. KAPKE: For the record, we'll mark the

Page 155

1  invoices that you provided -- that your counsel
2  provided to us as Lembke Exhibit 26.
3      (Whereupon, Lembke Exhibit 26 was marked
4      for identification.)
5  BY MS. KAPKE:
6      Q. Is it correct that you do not have --
7  strike that.
8      I'll just mark these for the record.
9      Okay. Are those your invoices?
10      A. Yes. They look like it.
11      MS. KAPKE: Okay. I am going to reserve
12  my right to ask additional questions after
13  Gretchen goes, if there's any time left, but I
14  will pass the baton over to Gretchen.
15      MR. ARBITBLIT: It's now 12:13. Lunch has
16  arrived, as far as I know. Do you want the eat?
17      MS. KAPKE: Let's go off the record.
18      THE VIDEOGRAPHER: We are off the record.
19  The time is 12:14.
20      (Lunch break taken.)
21      THE VIDEOGRAPHER: We are back on the
22  record. The time is 12:43.
23  EXAMINATION BY MS. MILLER:
24      Q. Good afternoon, Dr. Lembke. As I
25  introduced myself earlier, my name is Gretchen

Page 156

1  Miller. I represent Defendant Albertsons, who is
2  a defendant in the Track 9, or Tarrant County,
3  matter. So we're going to be referring to your
4  report as Exhibit 2 in this -- to this deposition.
5  Okay?
6      A. Yes.
7      Q. Now, your report, Exhibit 2, as I
8  understand it, has laid out all of the facts that
9  you have determined to be relevant with respect to
10  Albertsons. Is that fair?
11      A. Yes.
12      Q. And your opinions that you have expressed
13  in this case as they relate to Albertsons are
14  based on that recitation of facts; is that fair?
15      A. Yes.
16      Q. You've outlined in your list of materials
17  considered, which is attached to your report, all
18  of the documents and depositions you've reviewed
19  pertaining to Albertsons; is that correct?
20      A. Yes.
21      Q. How did you -- how did you obtain those
22  documents and depositions? Were they provided to
23  you -- selected for you, or did you request
24  specific items?
25      A. Both.

Page 157

1      Q. What were the items that you specifically
2  requested?
3      A. Are we talking about all of the materials
4  I reviewed or just --
5      Q. Just specific to Albertsons.
6      A. I don't remember.
7      Q. Okay. Were there particular depositions
8  that you had requested for your review?
9      A. Probably, but I'm not recalling specific
10  names.
11      Q. But fair to say that all of the
12  depositions that are listed in your materials
13  considered are the only ones that you have
14  reviewed?
15      A. Yes.
16      Q. In your report, there are a number of
17  instances where you refer to the "pharmaceutical
18  opioid industry."
19      Is it fair to say that when you use that
20  term, you are not necessarily referring to
21  Albertsons or Publix in every instance that you
22  have referred -- that you've used that term in
23  your report?
24      A. That's correct.
25      Q. And the way that we would know when

40 (Pages 154 - 157)

1 Albertsons or Publix is considered part of the
2 pharmaceutical opioid industry, as you refer to it
3 in your report, would be if there's a reference to
4 Albertsons or Publix specifically?
5      MR. ARBITBLIT:  Object to form.
6      THE WITNESS:  Generally speaking, that's
7 true, but I can't say that's true in every
8 situation.
9 BY MS. MILLER:
10     Q.  You have -- both in your report and in
11 your prior publications and your books, you have
12 provided a pretty lengthy, thorough discussion
13 about information from manufacturers and
14 distributors who have disseminated information to
15 the healthcare community which has had significant
16 impact, as you have put it, on governmental
17 regulatory bodies, professional medical societies,
18 academic physicians, and others in the healthcare
19 industry; is that fair?
20     A.  Yes.
21     Q.  I'm going to turn you to page 138 of your
22 report in Exhibit 2.
23     You, in that -- on page 138, you start a
24 discussion regarding the NACDS, which you've
25 discussed already earlier today.  In particular,

1 you've noted -- or you've described a publication
2 called the Practice Memo that the NACDS
3 disseminated; correct?
4      A.  Yes.
5      MS. MILLER:  I'll go ahead and mark this.
6      Are we at Exhibit 26?
7      We have stickers.
8      May I borrow these?
9      MS. KAPKE:  Yes, of course.  Sorry.
10     MS. MILLER:  Do you know where you left
11 off on exhibits?  I can check.
12     MR. ARBITBLIT:  We have --
13     MR. CHALOS:  26 was the last one.
14     MS. MILLER:  26 was the last one?  I have
15 24 in my pile, but I didn't get all of the
16 exhibits.
17     MS. KAPKE:  I thought we marked the
18 invoices.
19     MR. ARBITBLIT:  I don't recall you marking
20 them.  You handed them to the witness and asked if
21 they were her invoices.  I don't recall whether
22 they were marked.
23     But there was also something that you
24 marked earlier as 28, which was probably just as
25 cautionary.

1      MS. MILLER:  Oh, wait.  Okay.  I've got
2 it.  Yeah, there's 29 on here, so let's mark this
3 as Exhibit 29.
4      Would you mind putting that on there?
5 Thank you.
6      MR. ARBITBLIT:  "I voted."
7      Want it at the bottom?
8      MS. MILLER:  Sure.
9      (Whereupon, Lembke Exhibit 29 was marked
10     for identification.)
11 BY MS. MILLER:
12     Q.  Okay.  Specifically referring to your
13 reference in this Practice Memo, you had
14 criticisms about some statements that are in this
15 Practice Memo.
16     And as you've noted, this one was issued
17 September of 2002.  Do you see that at the top?
18     My question is:  Is it your opinion that
19 pharmacies -- it was unreasonable for pharmacies
20 to rely on publications from the NACDS in 2002?
21     A.  The Practice Memo from 2002 is an example
22 of the kinds of misleading messages that
23 Albertsons relied on to miseducate it pharmacists.
24     Your question, at what point did they know
25 better or should they have realized that this

1 content was not evidence-based, it's hard to put
2 an exact date, but I would certainly say not long
3 thereafter.
4      Q.  Okay.  So you can't identify a date where
5 you feel like it was -- or it's your opinion that
6 it was unreasonable for pharmacies to rely on
7 information from NACDS?
8      MR. ARBITBLIT:  Object to form.
9      THE WITNESS:  So if I were forced to put a
10 date on it, I would probably say around 2003 --
11 well, let me -- let me rephrase that -- or let me
12 restate that.
13     In 2001, Barry Meier's Pain Killer was
14 published, which was an exposé of the
15 pharmaceutical industry, including their undue
16 influence on the medical community's perceptions
17 of risks and benefits.
18     So I think it's fair to say that by 2001,
19 Albertsons should have begun to question these
20 industry-influence messages, including what was
21 coming from NACDS.
22     And over time, they should have questioned
23 even more, as more and more evidence became
24 available.
25 BY MS. MILLER:

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1    Q.  Is it your opinion that it was
2  unreasonable for pharmacies to rely on their state
3  boards of pharmacy for -- as a source of
4  information regarding controlled source
5  dispensing -- controlled substance dispensing?
6        MR. ARBITBLIT:  Object to form.
7        THE WITNESS:  To the extent that the state
8  board of pharmacy was propagating misleading
9  messages, yes, it was unreasonable for pharmacies
10  to rely on the state boards of pharmacy as a
11  source of information regarding controlled
12  substance dispensing.
13  BY MS. MILLER:
14    Q.  And how would -- how would pharmacies know
15  that the state board of pharmacy is propagating
16  false information?
17    A.  Pharmacies, according to the Controlled
18  Substance Act, have a duty to pay attention to the
19  many different sources, including news reports,
20  that would inform their opioid stewardship and
21  their understanding of red flags.
22        And by 2001, 2002, this country was
23  already seeing an explosion in the opioid supply
24  and the numbers of people getting addicted to
25  opioids and dependent on opioids and dying from

Page 163

1  opioids.  And those reports were coming out in the
2  news as well as, as I said earlier, some DE- --
3  early DEA decisions and statements.
4    Q.  Was -- is it your opinion that it was
5  reasonable for pharmacies to rely on the DEA as a
6  source of information regarding controlled
7  substance dispensing?
8        MR. ARBITBLIT:  Object to form.
9        THE WITNESS:  The information and
10  messaging from the DEA that was evidence-based was
11  appropriate to rely on.  Any messaging that might
12  have come from DEA -- from the DEA or DEA
13  representatives that was not informed by the
14  evidence would have been unreasonable to rely
15  upon.
16  BY MS. MILLER:
17    Q.  So, in short, it's not reasonable for
18  pharmacists to rely on the DEA as a source of
19  information regarding controlled substance
20  dispensing?
21    A.  That's not exactly what I said.
22        Relying on the DEA and DEA decisions is
23  important, but if a given representative of the
24  DEA is stating something that's not accurate, it
25  would not be reasonable to blindly follow what

Page 164

1  that person said.
2    Q.  So it is your opinion that pharmacies had
3  an obligation to understand when the DEA was
4  saying something that was accurate or not; is that
5  fair?
6    A.  That's fair.
7    Q.  Would it have been reasonable for
8  pharmacies to look to the National Association of
9  Boards of Pharmacy for information regarding
10  controlled substance dispensing?
11        MR. ARBITBLIT:  Object to form.
12        THE WITNESS:  It would have been
13  reasonable for pharmacies to look toward that
14  source, the National Association of Boards of
15  Pharmacy, but not to blindly accept what that
16  organization disseminates, especially as it was
17  influenced by Purdue Pharma and others.
18  BY MS. MILLER:
19    Q.  So it's your opinion that pharmacies had
20  an obligation to understand when the National
21  Association of Boards of Pharmacy was presenting
22  information supplied by Purdue or other industry
23  representatives?
24    A.  That's part of my response, yes.
25    Q.  And pharmacies had an obligation to

Page 165

1  understand if the information coming from the
2  National Association of Boards of Pharmacy was
3  misleading or incorrect in any way?
4    A.  Yes.
5    Q.  You've expressed criticism of the
6  Federation of State Boards of -- of State Medical
7  Boards.  And I can turn you to your report on page
8  78, if you wish.
9        You have outlined that the -- I'm going to
10  refer to it as the FSMB, if you don't mind, for
11  short -- that the FSMB issued guidelines on the
12  use of controlled substances for pain management
13  in 1998, which later was -- became the model
14  policy on the use of controlled substances for
15  pain management in 2004.
16        Do you see that?
17    A.  Yes.
18    Q.  Do you have specific criticisms about
19  those guidelines?
20    A.  I have lots of criticisms of those
21  guidelines.  I detail them in the report.
22    Q.  Substantively, what are -- what are your
23  criticisms of those guidelines?  I see references
24  in here that there was -- they were developed with
25  funding from the industry.  But substantively, do

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1 you have any disagreements with those guidelines?
2      MR. ARBITBLIT: Object to form.
3      THE WITNESS: You'll have to give me a
4 moment to re-read this section of my report.
5 BY MS. MILLER:
6    Q. Okay.
7    A. Is Appendix II included in this?
8    Q. I don't know.
9    A. I think it is.
10    Q. I have it on page 408.
11    A. Do you have the guideline itself?
12    Q. I don't. I just -- you have -- I'm just
13 going based on your report at the moment.
14    A. Okay.
15    Q. Actually, I probably do have the
16 guideline, but I don't want to take time to go
17 through the entire guideline.
18    A. Okay.
19    Q. I just want to know from you. You have
20 noted that the FSMB received funding from the
21 pharmaceutical industry, and you have stated that
22 if they are -- you have considered them part of
23 the cause of the opioid misinformation.
24      I'm trying to drill down to -- as to what
25 that was. If you don't have that readily

Page 167

1 available or if it's all stated in your report and
2 there's nothing further, then...
3    A. It's stated in my report, and there's
4 nothing further, so that's why I'm hesitating a
5 bit. I could go through and enumerate and
6 essentially reflect back to you what is on my
7 report on page 78 --
8    Q. Okay.
9    A. -- 79 --
10    Q. That's not necessary.
11    A. Yeah.
12    Q. I just want to confirm that that's --
13 everything is in your report.
14    A. Yes. And also Appendix II, which also
15 refers to the individuals behind that report.
16    Q. Okay. So in your opinion, was it not
17 reasonable for pharmacies to rely on information
18 from the FSMB back in 1998 and 2004, when these
19 guidelines came out?
20    A. That's correct.
21    Q. And why would it not have been reasonable
22 for pharmacies to rely on it at that time?
23    A. As I say in the report, those guidelines
24 were clearly influenced by the opioid
25 pharmaceutical industry and included many of the

Page 168

1 misleading messages described herein and thereby
2 contributed to the overprescribing and
3 overdispensing of opioids that created opioid
4 epidemic.
5    Q. So is it your opinion that pharmacies had
6 an obligation to understand that opioid
7 manufacturers contributed to the development of
8 the FSMB guidelines?
9    A. Yes, and also to appreciate that the
10 guidelines were not evidence-based. So even
11 separate from the inherent bias due to the
12 industry, appreciating that the messaging in
13 guidelines was essentially thinly veiled marketing
14 and not evidence-based.
15    Q. Was it reasonable for pharmacies to rely
16 on the FDA as a source of information regarding
17 controlled substances?
18    A. Yes, to the extent that the information
19 from the FDA was accurate and evidence-based.
20    Q. And is it your opinion that pharmacies had
21 an obligation to understand what information
22 coming from the FDA was evidence-based and
23 accurate?
24    A. Yes.
25    Q. Going to ask you a few questions about

Page 169

1 Albert- -- your opinions on Albertsons
2 specifically.
3      I'll turn you to page 103 of your report.
4      You were asked some questions earlier as
5 well about the Butrans stock and save program,
6 which is under Section A on page 103.
7      Do you have an understanding as to how
8 that program worked, how it operated?
9    A. My understanding is, as stated here in the
10 report, that Albertsons (as read):
11      "received payments for participation
12      in Purdue's Butrans stock and save
13      program, including $8,268 paid to
14      Albertsons for claims from multiple Sav-On
15      pharmacy locations in Ft. Worth and
16      Arlington, Texas."
17    Q. But outside of that, did you understand
18 how the logistics of that program worked?
19      MR. ARBITBLIT: Object to form.
20      THE WITNESS: What do you mean by
21 "logistics"?
22 BY MS. MILLER:
23    Q. How did -- how did Albertsons earn the
24 $8,000-plus payment that you've referenced here?
25    A. I'm not sure.

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

1    Q.  Are you aware that no pharmacists were --
2 had knowledge of this program?
3        MR. ARBITBLIT:  Object to form.
4        THE WITNESS:  I'm not aware of that one
5 way or another.
6 BY MS. MILLER:
7    Q.  Would it change your opinion to learn that
8 the pharmacists at Albertsons would not have been
9 aware of this program?
10    A.  It wouldn't change my opinion, no.
11    Q.  Would it change your opinion to learn that
12 Albertsons made no changes to its ordering of
13 Butrans as a result of this program?
14        MR. ARBITBLIT:  Object to form.
15        THE WITNESS:  That wouldn't change my
16 opinion, no.
17 BY MS. MILLER:
18    Q.  And you're not aware, actually, as
19 of whether Albertsons ordered any additional
20 product as a result of this program that it
21 otherwise would have ordered?
22    A.  To me, that's not really important.
23 What's important is that they made opioids cheaper
24 for patient consumers, thereby --
25    Q.  Do you know that that was -- that it was

Page 171

1 made cheaper for the patients as a result of this
2 program?
3    A.  Well, that's my understanding of what a
4 rebate program is.
5    Q.  Okay.  And then that's the basis for your
6 opinion that Albertsons -- that this program had
7 an impact on prescriptions to patients?
8    A.  The main basis for my opinion was that
9 Alberts (sic) took money from Purdue, showing a
10 pattern of collaboration, as a way to promote
11 OxyContin.  That's the basis of my opinion.
12    Q.  Okay.  And that opinion is based on an
13 assumption that -- actually, we're talking about
14 Butrans right now.
15    A.  Oh, I thought we were talking about the
16 rebate stock and save program.
17    Q.  Right.  Stock and save program under
18 Section A --
19    A.  Yeah.
20    Q.  -- is for Butrans.
21        Do you see that?
22    A.  (As read):
23        "...rebate program" --
24        MR. ARBITBLIT:  Misleading.
25        THE WITNESS:  (As read):

Page 172

1        -- "for 80 milligrams OxyContin
2        tablets to provide customers with a
3        significant cost savings."
4        So I had understood that this line of
5 questioning referred to Section A, which includes
6 at the top a rebate program for 80 milligrams of
7 OxyContin.
8 BY MS. MILLER:
9    Q.  Okay.  Well, I'll just direct you.  So
10 that first sentence of Section A does not refer to
11 Albertsons.
12    A.  Okay.
13    Q.  Do you see that?
14        It's the second sentence, refers to
15 Albertsons, which is a Butrans stock and save
16 program.
17        Do you see that?
18    A.  Yes.
19    Q.  I'll represent to you that I'm not aware
20 of any reference that Albertsons participated in
21 this first program, so my questions are just
22 limited to the second program.
23        So, again, just to be clear, your opinion
24 is based on an assumption that this stock and save
25 program resulted in cheaper prescriptions to

Page 173

1 patients; is that correct?
2    A.  Let me clarify that.  My assumption is
3 that Purdue's Butrans stock and save program
4 resulted in $8,268 being paid to Albertsons for
5 claims on that stock and save program for Butrans.
6 That's my understanding.
7    Q.  And my question is, how would Albertsons
8 receiving $8,000 -- $8,268 for -- pursuant to the
9 stock and save program have had an impact on
10 opioid dispensing in Tarrant County, Texas?
11    A.  I can infer from this that Purdue promoted
12 Butrans to Albertsons through this program, which,
13 in turn, might have led some pharmacists to
14 recommend Butrans or some customers to ask for
15 Butrans.
16    Q.  So if pharmacists were not aware of this
17 program, would you agree that this would not have
18 caused them to recommend Butrans to any patients?
19    A.  Not necessarily.  Patient consumers and
20 even prescribers are price-sensitive, and if
21 either the prescriber or the patient consumer was
22 aware that Butrans was less expensive than another
23 comparable product, that might have driven them to
24 either prescribe that product or request that
25 product.

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1    Q.  So, again, that opinion is based on an
2  assumption that this program made the product less
3  expensive for the consumer?
4    A.  Yes.
5    Q.  If that -- if it were shown that that, in
6  fact, did not make the product less expensive for
7  the consumer, would that change your opinion?
8    A.  Not necessarily.  I would want to have a
9  better understanding of why Purdue paid Albertsons
10  8,000-plus dollars.
11    And, again, this is all sort of in
12  recognition of a pattern of for-profit
13  collaboration between Albertsons and Purdue.  In
14  isolation, it's just one more sort of -- I don't
15  want to say nail in the coffin, but that's what
16  comes to mind now, one more piece of evidence of
17  collaboration with Purdue.
18    Q.  Okay.  So then the next is a reference to
19  the OxyContin -- Section B, OxyContin coupon and
20  savings card.  Do you have any understanding as to
21  how that program worked?
22    A.  My understanding is that OxyContin coupons
23  and saving cards made it possible for patients to
24  obtain OxyContin for less money than they would
25  have without the card or the savings program.

Page 175

1    Q.  And do you have any knowledge of any
2  Albertsons pharmacist recommending OxyContin to
3  any patient as a result of this program?
4    MR. ARBITBLIT:  Object to form.
5    THE WITNESS:  My knowledge of how coupon
6  programs work for opioids is that when they're
7  available in a chain pharmacy, it's a national
8  policy, and that it's common for pharmacists to
9  pull those out as a way to save money for their
10  patient customers or for patients to somehow
11  obtain them to use them to get cheaper drugs.
12  BY MS. MILLER:
13    Q.  Do you have any knowledge or understanding
14  that these cards were disseminated by Albertsons?
15    A.  Well, they were redeemed at Albertsons
16  pharmacies.
17    Q.  Correct.  So you don't have any knowledge
18  or information that these were given to anybody by
19  Albertsons?
20    MR. ARBITBLIT:  Object to form.
21    THE WITNESS:  I'm not sure it's important.
22  The key is that these cards could be redeemed at
23  an Albertsons.
24  BY MS. MILLER:
25    Q.  Well, I think it is important to the

Page 176

1  promotion.  Your opinion's about the promotion of
2  opioids; correct?  You have expressed opinions
3  that Albertsons helped promote opioids; right?
4    MR. ARBITBLIT:  Object to form.
5    THE WITNESS:  My opinion is that
6  Albertsons contributed to the opioid oversupply,
7  which caused a public nuisance.  And part of that
8  contribution is the use of coupons and savings
9  cards that made opioids cheaper, that made it more
10  possible for people to obtain them.
11    So the promotion is part of it and the
12  general oversupply piece is another related part
13  of it.
14  BY MS. MILLER:
15    Q.  You've referenced in Section E on page 103
16  Albertsons participated in Purdue's free trial
17  card offer for Hysingla ER.  Do you have any
18  understanding as to how that program worked?
19    A.  My understanding is that with a free trial
20  card offer for Hysingla, a patient consumer at an
21  Albertsons would get Hysingla for less money or,
22  possibly, no money.
23    Q.  Were you aware that these cards were only
24  eligible for prescriptions that were paid for by
25  insurance?

Page 177

1    A.  No.
2    Q.  Would that change your opinion in any way?
3    A.  No.
4    Q.  Do you have any knowledge or information
5  that suggests that Albertsons dispensed more
6  prescriptions pursuant -- dispensed more opioids
7  pursuant to prescriptions as a result of these
8  programs that we've mentioned?
9    MR. ARBITBLIT:  Object to form.
10    THE WITNESS:  I think there's good
11  evidence that more illegitimate prescriptions for
12  opioids were dispensed as a result of these
13  coupons and savings programs, and I don't think
14  that Albertsons would be an exception to that.
15  BY MS. MILLER:
16    Q.  You have a discussion about discount cards
17  with respect to Albertsons.  And can you tell me
18  what your understanding is of a discount card in
19  the context of this discussion?
20    A.  A discount card is something that allows a
21  patient consumer to obtain a given product for
22  less money than they would without the discount
23  card.
24    Q.  And so GoodRx would be an example?
25    A.  I think so, yes.

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1     Q.  And is your understanding that those
2  discount cards such as GoodRx apply to all kinds
3  of prescriptions, not just opioids?
4     A.  I'm not sure.
5     Q.  Do you have any understanding as to how
6  the contracts that pharmacies have for discount
7  cards work?
8     A.  Not specifically, no.
9     Q.  Do you have any idea who Albertsons
10  contracted with to obtain these discount cards?
11     A.  I think it varied.  Sometimes they
12  contracted with the manufacturer whose product the
13  discount cards pertain to.  Sometimes they
14  contracted with the distributor, like McKesson.
15  So I think it varied.
16     Q.  Do you have that knowledge with respect to
17  Albertsons?
18     A.  No.
19     Q.  You've expressed an opinion as to why
20  Albertsons did not refuse to honor discount cards
21  for opioids.  Do you recall that in your report?
22     A.  Yes.
23     Q.  If the evidence were to show that
24  Albertsons' contracts required them to honor
25  discount cards for all prescriptions and not

Page 179

1  exclude opioids, would that change your opinion
2  about Albertsons --
3     MR. ARBITBLIT:  Object to form.
4  BY MS. MILLER:
5     Q.  -- in this report?
6     A.  Probably not.
7     Q.  Okay.  And why not?
8     A.  Even given that reality, Albertsons could
9  have and should have been more proactive in
10  changing whatever their contract was in order to
11  exclude opioids from their coupons and discount
12  card programs, as -- as other pharmacies did.
13     Q.  But that's based on an assumption that
14  Albertsons had that negotiating power with the
15  companies it was negotiating with; correct?
16     MR. ARBITBLIT:  Object to form.
17     THE WITNESS:  I'm not sure.
18  BY MS. MILLER:
19     Q.  In general, you believe that discount
20  cards such as GoodRx should not -- should never be
21  used with opioids; am I understanding that
22  correctly?
23     A.  Yes.
24     Q.  And so it's your opinion that patients
25  without insurance who have prescriptions that are

Page 180

1  legitimate for opioids should not be allowed to
2  use a discount card to fill that prescription?
3     A.  Yes.
4     Q.  Do you consider opioids as an essential
5  medication for certain patients?
6     A.  Yes.
7     Q.  And so for those patients for whom opioids
8  are an essential medication, do you hold the
9  opinion that they should not be entitled to use a
10  discount card?
11     MR. ARBITBLIT:  Object to form.
12     THE WITNESS:  I mean, essentially, yes.
13     But the evidence is strongly against the
14  use of opioids for most patients for chronic pain,
15  and there's a growing body of evidence that even
16  for acute pain, opioids are not the best choice.
17     Most patients who are using discount cards
18  are ambulatory outpatients, not inpatients, where
19  there are more indications for the use of opioid
20  as an essential tool.  For inpatients, these
21  discount cards would not be relevant anyway.
22  BY MS. MILLER:
23     Q.  I'm going to turn you to page 140 of your
24  report, referencing NACDS.
25     You have outlined a discussion that

Page 181

1  Albertsons participated with NACDS to lobby to
2  delay a mandate to require mandatory checking of
3  the PDMP for all opioid prescriptions; correct?
4     A.  Yes.
5     Q.  And that's specific to requiring it for
6  all opioid prescriptions, not just those subject
7  to red flags; correct?
8     A.  Yes.
9     Q.  Am I correct that you do not outline any
10  other type of lobbying activity that Albertsons
11  participated in with NACDS?
12     A.  That's correct.
13     Q.  Are you aware of any other organizations
14  that did not support mandatory checking of PDMP
15  for all opioid prescriptions?
16     A.  NACDS.
17     Q.  Outside of NACDS.  Are you aware of any
18  other organizations that did not support that
19  mandate?
20     A.  I'm not aware of any, but it wouldn't
21  surprise me if it was a long list.
22     Q.  You've expressed some opinions regarding
23  the amount of time that it takes for pharmacists
24  to fill scripts and mandate -- or metrics
25  pertaining to that that certain pharmacies have

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1 implemented.
2      I'm going to turn you to -- actually, I
3 don't believe you've expressed any opinions as
4 to -- specific as to any metrics that Albertsons
5 promulgated for their pharmacists.  Correct?
6      MR. ARBITBLIT:  Object to form.
7      THE WITNESS:  Well, I have opinions about
8 that, but I'm not recalling if those opinions are
9 detailed in this report.
10 BY MS. MILLER:
11      Q.  Okay.
12      A.  Except -- I'm sorry.  I'm probably
13 forgetting.  Let me look for a moment at the
14 case-specific appendix.
15      Q.  Okay.  I can refer you to -- page 230 and
16 231 is the only place where I see you talk about
17 pharmacy scripts as it relates to Albertsons --
18      A.  Right.
19      Q.  -- metrics for times for scripts.
20      A.  Uh-huh.
21      Q.  My question is a little more specific.
22      Do you have any opinions that Albertsons
23 presented any metrics for filling scripts to its
24 pharmacists?
25      A.  Can you describe what you mean by

Page 183

1 "metrics"?
2      Q.  Any requirements of how many scripts to
3 fill per time period.
4      A.  Not to my knowledge, no.
5      Q.  Outside of what you have written in your
6 report, do you have any other information or
7 evidence that you have based your opinions on that
8 suggest Albertsons put pressure on its pharmacists
9 with respect to filling scripts per a certain
10 amount of time?
11      A.  No.
12      Q.  You referenced an article -- some articles
13 regarding chain stores generally, about filling
14 scripts and a certain number of scripts per hour,
15 suggesting that those are unreasonable.  What is a
16 reasonable amount of time per scripts for a
17 pharmacy to have?
18      MR. ARBITBLIT:  Object to form.
19      THE WITNESS:  It would really depend on
20 the prescription.
21 BY MS. MILLER:
22      Q.  So if it depends on the prescription, how
23 can you have an opinion that a certain number of
24 scripts per hour is too many?
25      MR. ARBITBLIT:  Object to form.

Page 184

1      THE WITNESS:  I don't think I gave the
2 opinion that a certain number of scripts per hour
3 is too many.
4      My opinion is, more broadly, on the time
5 pressure on pharmacists, with lack of
6 prioritization of their available time for
7 investigating red flags and other due diligence
8 pertaining to their corresponding responsibility.
9 BY MS. MILLER:
10      Q.  Okay.  You have not expressed those types
11 of opinions as to Albertsons with respect to the
12 amount of time; correct?
13      MR. ARBITBLIT:  Object to form.  Vague.
14      THE WITNESS:  Well, I have expressed an
15 opinion on page 231, where I talk about how an
16 Albertsons' slide showed that part of their
17 corporate opportunity included reducing pharmacist
18 hours.
19      Also, in the deposition by Jessica Covaci,
20 there was affirmation that, quote/unquote, script
21 growth was a key to Albertsons' success, as well
22 as descriptions by Jessica Covaci about pharmacy
23 hours, working 12 hours, often without another
24 pharmacist there, with a system that made it very
25 difficult for them to track trends or know really

Page 185

1 what was happening vis-à-vis these types of red
2 flag encounters.
3 BY MS. MILLER:
4      Q.  You reference a slide that talks about
5 script growth being a goal, but do you know what
6 the starting point was from that discussion, where
7 they were in terms of how many scripts on average
8 were being filled per hour?
9      A.  No.
10      Q.  Would it matter to know that number --
11      A.  Probably.
12      Q.  -- to your opinions?
13      (Whereupon, Lembke Exhibit 30 was marked
14      for identification.)
15 BY MS. MILLER:
16      Q.  Okay.  I'm going to hand you Exhibit 30.
17 This is -- I'll represent to you is an excerpt
18 from the presentation that you have referenced on
19 this page.  I have the whole thing, but it's quite
20 lengthy, and there's -- really, only this page
21 refers to the question.
22      MR. ARBITBLIT:  I think you should mark
23 the whole thing, lengthy or not.
24      MS. MILLER:  You want this Exhibit 31?
25      MR. ARBITBLIT:  I've changed my mind.

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

1      MS. MILLER:  You're welcome to look
2  through it, if you like.
3      MR. ARBITBLIT:  Just kidding, Ms. Miller.
4  MS. MILLER:  Do you want to mark it?
5  MR. ARBITBLIT:  Yeah.
6  MS. MILLER:  Okay.
7      (Whereupon, Lembke Exhibit 31 was marked
8      for identification.)
9  BY MS. MILLER:
10  Q.  Okay.  Looking on Exhibit 30, which I'll
11  represent to you is an excerpt from Exhibit 31, do
12  you see the reference to "Average Scripts Per
13  Hour"?
14  A.  Yes, I do.
15  Q.  All right.  And the average represented in
16  this document is less than five scripts per hour.
17      Do you see that?
18  A.  Uh-huh.
19  Q.  So that comes to about 12 minutes per
20  script.
21  A.  Uh-huh.
22  Q.  I imagine you don't expect to -- you don't
23  opine that that is too little time for
24  pharmacists, do you?
25  A.  I think --

Page 187

1      MR. ARBITBLIT:  Object to form.
2      THE WITNESS:  I think this is insufficient
3  data for me to draw any conclusion.  You could
4  have a 12-hour shift in which within two hours,
5  you're processing the bulk of the prescriptions,
6  and the rest of the day, you have almost nothing.
7  So it's important to have more data on, you know,
8  what hours are being -- what is actually included
9  in that calculation.
10  BY MS. MILLER:
11  Q.  All right.  And am I correct that you have
12  not offered any opinions regarding Albertsons --
13  any bonus structure at Albertsons?
14  A.  Honestly, I would have to go through the
15  Albertsons sections.  I'm not remembering.
16  Q.  Okay.  If it's not in your report, you
17  don't hold an opinion about it; is that fair?
18  A.  That's fair.
19  Q.  You've expressed opinions that --
20  regarding Albertsons' training.  I'm going to turn
21  you to page 226 of your report.
22      Actually, I take that back.  231 of your
23  report.
24      You have referenced testimony from Tony
25  Provenzano that Albertsons -- about Albertsons

Page 188

1  making changes to its controlled substance
2  training, and you have expressed opinions in your
3  report that Albertsons did not do controlled
4  substance training prior to this time period in
5  2018.
6      My question for you is:  Do you have an
7  understanding as to what the training consisted of
8  at Albertsons regarding red flags?
9  A.  My sense, in the reading of these
10  documents, is that there was little training as
11  regards to red flags prior to this time period.
12  Q.  What -- what -- do you have understanding
13  as to what training Albertsons did offer?
14      MR. ARBITBLIT:  Object to form.
15      THE WITNESS:  My understanding is that
16  Albertsons offered very little training.
17  BY MS. MILLER:
18  Q.  And how do you know that?
19  A.  I base that on the testimony of Tony
20  Provenzano, on the testimony of Jessica Covaci, on
21  the fact that it wasn't until 2016 that Albertsons
22  included red flags in its policies and procedures;
23  it wasn't until 2018 or so that it mandated any
24  kind of due diligence around red flags.
25  Q.  Are you aware of any studies that show

Page 189

1  that training pharmacists on red flags is more or
2  less effective than having information about red
3  flags in a policy manual?
4      MR. ARBITBLIT:  Object to form.
5      THE WITNESS:  When do you mean by
6  "studies"?
7  BY MS. MILLER:
8  Q.  Are you referring to anything to suggest
9  that -- that it's not -- it's less effective to
10  have red flags listed in a policy as opposed to
11  training your pharmacists on red flags?
12      MR. ARBITBLIT:  Object to form.
13      THE WITNESS:  I mean, I think it's common
14  sense that you would have to both list it in your
15  policy and train people on it to make sure they're
16  aware of the policy, reading the policy, and
17  incorporating the guidelines within the policy
18  into everyday practice.
19  BY MS. MILLER:
20  Q.  And that can't be done by training on red
21  flags alone, in your opinion; correct?
22  A.  I mean, that's a hypothetical.
23      You know, in general, policies are
24  important, as testified by Jessica Covaci, because
25  they also allow for the corporation to have

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1 consequences and mandatory retraining for those
2 who are not following the policy.  If it's not in
3 the policy, they feel -- then they have little
4 recourse for holding the pharmacist responsible
5 for knowing it.
6        So neither one is sufficient alone.
7    Q.  I'm going to change a little bit direction
8 and ask you some questions generally.
9        You've expressed the opinion that the use
10 of prescription opioids has caused the subsequent
11 heroin and fentanyl crises; correct?
12    A.  Not just the use of prescription opioids.
13 The prescription opioid oversupply.
14    Q.  My first question for you has to do with
15 that statement of oversupply.  How would one go
16 about defining what oversupply is?
17    A.  The increase in opioid prescribing and
18 dispensing from the late 1990s to the peak in
19 approximately 2012.
20    Q.  But how would one quantify what is an
21 oversupply of prescription opioids?
22        MR. ARBITBLIT:  Object to form.
23        THE WITNESS:  The fact that the fourfold
24 increase in opioid prescribing directly correlates
25 with the fourfold increase in opioid addiction and

Page 191

1 opioid overdose deaths is a very strong indicator
2 that the oversupply, the fourfold increase in a
3 short period of time, across the nation led to
4 widespread harms.
5 BY MS. MILLER:
6    Q.  But you haven't relied on any more
7 specific metrics other than to look at the
8 increase in prescription opioids and increase in
9 overdose deaths; correct?
10        MR. ARBITBLIT:  Object to form.
11        THE WITNESS:  What do you mean by "more
12 specific metrics"?  What would be --
13 BY MS. MILLER:
14    Q.  If I were to try and figure out what -- at
15 what point was there oversupply, when did we get
16 to oversupply, how would -- how could someone go
17 about doing that, other than just a general
18 assessment of there was an increase in overdose
19 deaths?
20        MR. ARBITBLIT:  Object to form.
21        THE WITNESS:  I think the definition of
22 "epidemic" is a good place to start.  An epidemic
23 is a sudden increase in harms in a population over
24 a discrete period of time, and that's what we saw
25 with opioids as a result of increased dispensing

Page 192

1 and increased prescribing.
2        I don't think it's possible to say, "When
3 it's this much above what this baseline was, then
4 we have harms."
5        This was, obviously, a gradual phenomenon.
6 In some ways, you could argue not that gradual,
7 but it was an increase that caused widespread
8 population harm, again, as measured by the
9 corresponding increase in metrics around those
10 harms.
11 BY MS. MILLER:
12    Q.  You've expressed the opinion that the
13 gateway hypothesis is an explanation for a causal
14 connection between prescription opioids and harm;
15 correct?
16        MR. ARBITBLIT:  Object to form.
17 BY MS. MILLER:
18    Q.  Is that correct?
19        MR. ARBITBLIT:  Object to form.
20        THE WITNESS:  The gateway hypothesis
21 specifically describes individuals who began with
22 an opioid prescription; became addicted to,
23 dependent on, or misused that opioid; and then
24 moved from prescription opioids to illicit
25 sources.

Page 193

1 BY MS. MILLER:
2    Q.  Do you agree with me, though, that there
3 are other factors that could have caused -- or
4 that did cause and attributed to people moving
5 from prescription drug use to illicit drug use?
6    A.  Other factors...
7    Q.  Such as genetic, developmental, and
8 environmental factors.
9    A.  So those are factors that address risks
10 for addiction, and included in environmental
11 factors is access, including access to opioids
12 directly or indirectly through a doctor's
13 prescription.
14    Q.  And that would also include ease of access
15 to illicit opioids such as heroin and fentanyl;
16 correct?
17    A.  Yes.
18    Q.  Are you familiar with the common liability
19 of addiction theory, or also referred to as common
20 vulnerability?
21    A.  I have not heard that specific term, no.
22    Q.  You have not heard of common liability of
23 addiction theory?
24    A.  No.  Maybe under a different language.
25    Q.  Have you heard of common vulnerability?

49 (Pages 190 - 193)

CONFIDENTIAL

1    A.  Is that referring to genetic
2 vulnerability?
3    Q.  It's that drug use is part of a general
4 repertoire of risky behavior.
5       MR. ARBITBLIT:  Object to form.
6       THE WITNESS:  I guess I'd like to see a
7 description of it written by somebody who's put
8 that out there.  I could respond better to your
9 question.
10 BY MS. MILLER:
11    Q.  Okay.  That's fine.  Fair enough.
12       I wanted to ask you a few questions going
13 back to pharmacy information systems.
14       I understand you have, you know, expressed
15 that you are not an expert in the systems itself,
16 correct, of the development of those systems
17 itself; correct?
18    A.  Which systems are you talking about?
19    Q.  The pharmacy information systems.  So the
20 operating systems that pharmacies work on.
21    A.  That's correct.
22    Q.  Are you aware of what products are
23 available on the market for pharmacy information
24 systems?
25    A.  I have read about some of those systems.

1    Q.  Okay.  Are you aware that many pharmacies
2 purchase those systems from other companies?
3    A.  Yes, I have read that.
4    Q.  Do you have any knowledge as to what
5 products were available in 2006?
6    A.  No.
7    Q.  Do you have any knowledge as to what
8 information system Albertsons has used?
9    A.  Not that I am recalling right now.
10    Q.  Do you have any information as to what
11 features were available in the pharmacy systems
12 that Albertsons has used?
13    A.  No.
14    Q.  Do you have any knowledge regarding how
15 Albertsons uses its dispensing data in its
16 compliance programs?
17    A.  It has changed over time is my
18 understanding.
19    Q.  I'd just -- if it's -- to the extent you
20 have any understanding, would it be included in
21 your report?
22    A.  Yes, it would.
23    Q.  And the same question with respect to what
24 pop-ups are available on a pharmacist's screen
25 when it fills a prescription at Albertsons; is it

1 fair to say if you had an understanding of that,
2 you would have included that in your report?
3    A.  Yes.
4    Q.  You were asked some questions about
5 Exhibit 7 earlier, which was an article from the
6 Pharmacy Times.  It should be in that stack.
7    A.  No, no.  It's behind here.
8    Q.  Oh, okay.
9    A.  Yeah.
10    Q.  You cited to the Pharmacy Times -- and I
11 don't know if you need the article or not.  But
12 just generally, you cited to this article in the
13 Pharmacy Times in your report.
14       My question is:  Do you consider the
15 Pharmacy Times a reasonable resource upon which
16 pharmacies could have looked to for information
17 about controlled substance dispensing?
18       MR. ARBITBLIT:  Object to form.
19       THE WITNESS:  It would have depended.
20 BY MS. MILLER:
21    Q.  And that would be the same answer as
22 previously, that pharmacies -- it's your opinion
23 that pharmacies had an obligation to understand
24 what information being published by Pharmacy Times
25 was accurate or inaccurate?

1    A.  Pharmacies would have an obligation to
2 know the evidence base, including decades of
3 knowledge about the addictive nature of opioids
4 and the need to use them at low doses, short term,
5 and to exercise their corresponding
6 responsibility.
7       That was not new information.  It was not
8 new information in the early aughts, in the 1990s,
9 in the 1980s, in the 1970s.  That was well-known
10 for many decades.
11    Q.  In your prior answer about other entities
12 or individuals who you considered had some degree
13 for responsibility for contributing to the opioid
14 crisis, you were asked about doctors, and you
15 qualified your answer by saying that the medical
16 profession -- you did place some fault because
17 they were miseducated and misinformed; right?
18       Correct?
19    A.  Yes.
20    Q.  How are pharmacists different?
21    A.  Pharmacists, I believe, were also largely
22 miseducated and misinformed, but pharmacies and
23 corporate leadership were not.
24    Q.  How can you come to that conclusion?
25    A.  Because of the fact that corporate

50 (Pages 194 - 197)

CONFIDENTIAL

1 leadership was well aware of the DEA judgments and
2 yet did not do what was in their power to give
3 pharmacists the training, time, infrastructure,
4 resources, or incentives to be able to exercise
5 their good judgment and their corresponding
6 responsibility.
7      I can stop there.
8      Q. You earlier were asked whether you had any
9 evidence that Publix authored, funded any articles
10 about opioids.  I wanted to ask you the same
11 question about Albertsons.
12      If -- if you haven't referenced it in your
13 report, are you aware of any evidence that
14 Albertsons authored or funded or supported any
15 articles regarding opioids?
16      A. Only what's referenced in my report.
17      Q. Okay.  And you do not reference in your
18 report any CE programs that Albertsons
19 participated in with Purdue; correct?
20      A. Give me a moment.
21      Q. Well, I can -- again, I'll just ask it the
22 same way.
23      If it's not in your report, would it be
24 correct that you don't have an opinion regarding
25 it?

1      I will -- I will represent to you that
2 there is no reference to it in your report.  And
3 if you -- you can give me the qualification that
4 if it's not in your report...
5      So I'll ask it -- I'll ask it this way:
6 If you have not referenced any CE programs that
7 Albertsons participated in with Purdue, is it fair
8 to say you don't have an opinion about any
9 Albertsons CE programs?
10      A. If I haven't referenced it in my report,
11 then I haven't opined on it in my report.
12      I always want to reserve the possibility
13 that if I obtain new material, I can have an
14 opinion on that.
15      Q. Okay.  If I were to represent to you that
16 Albertsons did not participate in any CE programs
17 with Purdue, would that have any impact on your
18 opinions with respect to Albertsons?
19      A. No.
20      Q. You were asked some questions about red
21 flags, and you've expressed the opinions that the
22 pharmacies did kind of express -- provide
23 information to their pharmacists about red flags
24 too late.
25      My question is:  Would you agree with me

1 that you don't have to label something as a red
2 flag for the concept to be understood?
3      MR. ARBITBLIT:  Objection to the --
4 BY MS. MILLER:
5      Q. Correct?
6      MR. ARBITBLIT:  -- misleading prelude.
7      If you understand the question, you can
8 answer it.
9      THE WITNESS:  Can you ask the question
10 again.
11 BY MS. MILLER:
12      Q. Yeah.
13      Just because it's labeled as a red flag --
14 well, let me back up.
15      "Red flag" is a term that's been developed
16 to reference suspicious circumstances surrounding
17 a prescription; is that fair?
18      A. Yes.
19      Q. There's nothing magic about the term "red
20 flag," is there?
21      MR. ARBITBLIT:  Object to form.
22      THE WITNESS:  I agree that you could use a
23 different term, but the commonly accepted term in
24 the field -- in the medical field is "red flag."
25 BY MS. MILLER:

1      Q. Okay.  There's -- if a pharmacy provided
2 education to its pharmacists about suspicious
3 circumstances surrounding a prescription but
4 didn't call it red flags, do you find any -- do
5 you find any fault by the fact that they haven't
6 labeled it as red flag training?
7      MR. ARBITBLIT:  Object to form.
8 Incomplete hypothetical.
9      THE WITNESS:  Their lack of the use of the
10 specific term "red flag" is not necessarily an
11 indication that the training was not good.  I
12 would really have to examine the specific
13 training.
14      MS. MILLER:  That's fair enough.
15      Crossing off questions as I go here, I
16 promise.
17      Okay.  I think I'm almost through.  Just
18 give me one second.
19      Okay.  I think I'm going to wrap up.  Can
20 you give me, like, one second just --
21      MR. ARBITBLIT:  Sure.
22      MS. MILLER:  Can we take a quick two-
23 minute break?
24      MR. ARBITBLIT:  Sure.
25      MS. MILLER:  Thank you.

51 (Pages 198 - 201)

CONFIDENTIAL

1     THE VIDEOGRAPHER:  We're going off the
2 record.  The time is 1:48.
3         (Recess taken.)
4     THE VIDEOGRAPHER:  We're back on the
5 record.  The time is 1:52.
6 BY MS. MILLER:
7     Q.  You were asked some questions earlier
8 about adherence programs, and I'm going to turn
9 you to page 112 of your report.
10     Okay.  You -- you were shown a document
11 earlier and referenced that Albertsons -- which
12 referenced that Albertsons had -- was on a list of
13 pharmacies that approved the Purdue Butrans
14 adherence program.  Do you recall that?
15     A.  Can you point me to where --
16     Q.  I don't remember what number it was.  Hold
17 on.
18     So in your report, you are -- I'm
19 referencing -- subsection vi on page 112 discusses
20 adherence programs, and Albertsons is referenced
21 in there.
22     The exhibit is -- why am I not seeing this
23 exhibit?
24     Oh, I think it's Exhibit 13.
25     A.  Okay.  I do have page 112 open, and I do

1 see that section.
2     (Whereupon, Lembke Exhibit 32 was marked
3         for identification.)
4 BY MS. MILLER:
5     Q.  Okay.  I'm going to turn you to
6 Exhibit 32, which I've just handed you --
7     A.  Yes.
8     Q.  -- at a break.
9     Okay.  This is referencing a summary of
10 the different adherence programs, dated
11 April 2014.
12     Do you see that?
13     A.  Yes.
14     Q.  Okay.  That -- and I'll represent to you
15 Exhibit 13, if you can get your hands on it, was a
16 document dated January 2014, which it referenced
17 the Butrans Adheris program.
18     So just going through Exhibit 32, you can
19 see -- under the "McKesson Pharmacy Intervention
20 Program," you see there is no reference to
21 Albertsons in this section; correct?
22     A.  Correct.
23     Q.  You're not aware of any evidence to
24 suggest that Albertsons participated in the
25 McKesson Pharmacy Intervention Program; correct?

1     A.  Correct.
2     Q.  With respect to the Adheris program, you
3 can see Albertsons is not referenced in the
4 Butrans adherence program as listed here in
5 Exhibit 32; correct?
6     A.  That's correct.
7     Q.  If I were to represent to you that
8 Albertsons did not participate in the Butrans
9 Adheris DirectAdhere Program, would that impact
10 your opinions any way?
11     A.  No.
12     MR. ARBITBLIT:  Object to form.
13 BY MS. MILLER:
14     Q.  I'm going to turn you to the second page,
15 which is the Pleio GoodStart Program.
16     Do you see that?
17     A.  Yes.
18     Q.  Okay.  And this one does have a reference
19 to Albertsons in it, I will represent to you,
20 that -- of participating in the Pleio GoodStart
21 Program.
22     Do you have any understanding as to what
23 that program involved?
24     A.  Yes.
25     Q.  What's your understanding?

1     A.  That they would -- that the program would
2 send messages to patient consumers delivered by
3 email, text, or recorded audio; they would email
4 patient brochures; there would be support calls
5 from Pleio GoodStart agents with mention of the
6 Butrans.com website.
7     Q.  Do you have any understanding as to which
8 patients would have received this information?
9     A.  Presumably, patients prescribed Butrans.
10     Q.  So it would be patients who had already
11 been prescribed Butrans; correct?
12     A.  Yes.
13     Q.  Do you see on the bullet point, the --
14 under "Description," the third bullet -- bullet
15 point down, it references that there have been a
16 total of 331 Butrans patients engaged in this
17 program?
18     A.  Yes, I see that.
19     Q.  Okay.  And do you have any understanding
20 as to whether this was limited to a specific
21 geographic area, or is this memo discussing
22 nationally?
23     A.  I'm not sure, but it seems like it's a
24 national program.
25     Q.  Are you aware of any information to

52 (Pages 202 - 205)

suggest that any of these patients who were on this program received prescriptions for Butrans that they otherwise would not have received from their doctors?

A. No.

MS. MILLER: Okay. I know we have a limitation on time, and I believe I'm right up against that. Just for the record, I do have more questions that I would have otherwise asked today had it not been for this time limitation.

MS. KAPKE: I am -- will say the same.

And like I noted off the break, I'm going to mark as Exhibit 33 the section of your Track 8 report that you were looking at and made some circles on earlier.

(Whereupon, Lembke Exhibit 33 was marked for identification.)

MR. ARBITBLIT: Are you done? I have two questions.

EXAMINATION BY MR. ARBITBLIT:

Q. Dr. Lembke --

A. Yes.

Q. -- do you plan at trial to give testimony based only on the opinions stated in your reports presented as Exhibit 1 and 2 and the materials

considered originally for those reports?

A. Yes.

Q. Is it correct to say that you don't intend to offer any opinions or testimony regarding documents on the supplemental materials considered list?

A. Yes.

MR. ARBITBLIT: Thank you.

We're done.

THE VIDEOGRAPHER: We are off the record at 1:58 p.m., and this concludes today's testimony given by Dr. Anna Lembke. Total number of media units used was six and will be retained by Veritext.

(Whereupon, the deposition was concluded at 1:58 p.m.)

REPORTER'S CERTIFICATE

I, EARLY LANGLEY, a Certified Shorthand Reporter, State of California, do hereby certify:

That ANNA LEMBKE, M.D., in the foregoing deposition named, was present, and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place; that before completion of the proceedings, review of the transcript was not requested.

IN WITNESS WHEREOF, I have hereunder subscribed my hand on May 27, 2024.

Earley Langley

EARLY LANGLEY, CSR NO. 3537
State of California

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

May 29, 2024

To: DON C. ARBITBLIT

Case Name: National Prescription Opiate Litigation - Track 8 (Cobb County) v.

Veritext Reference Number: 6693057

Witness: Anna Lembke, M.D. Deposition Date: 5/16/2024

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

CONFIDENTIAL

Page 210

1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
        ASSIGNMENT REFERENCE NO: 6693057
3       CASE NAME: National Prescription Opiate Litigation - Track 8
        (Cobb County) v.
        DATE OF DEPOSITION: 5/16/2024
4       WITNESS' NAME: Anna Lembke, M.D.
5       In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
6       my testimony or it has been read to me.
7       I have made no changes to the testimony
        as transcribed by the court reporter.
8
        _____
9   Date        Anna Lembke, M.D.
10      Sworn to and subscribed before me, a
        Notary Public in and for the State and County,
11      the referenced witness did personally appear
        and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
            Statement; and
14      Their execution of this Statement is of
            their free act and deed.
15
        I have affixed my name and official seal
16
        this _____ day of_____, 20____.
17
        _____
18      Notary Public
19
        _____
        Commission Expiration Date
20
21
22
23
24
25

Page 212

1       ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2       ASSIGNMENT NO: 6693057
3   PAGE/LINE(S) /      CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____    _____
20  Date        Anna Lembke, M.D.
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23
    _____
    Notary Public
24
    _____
25  Commission Expiration Date

Page 211

1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
        ASSIGNMENT REFERENCE NO: 6693057
3       CASE NAME: National Prescription Opiate Litigation - Track 8
        (Cobb County) v.
        DATE OF DEPOSITION: 5/16/2024
4       WITNESS' NAME: Anna Lembke, M.D.
5       In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
6       my testimony or it has been read to me.
7       I have listed my changes on the attached
        Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9       I request that these changes be entered
        as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11      as this Certificate, and request and authorize
        that both be appended to the transcript of my
12      testimony and be incorporated therein.
13
        _____
    Date        Anna Lembke, M.D.
14
        Sworn to and subscribed before me, a
15      Notary Public in and for the State and County,
        the referenced witness did personally appear
16      and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18          in the appended Errata Sheet;
        They signed the foregoing Sworn
19          Statement; and
        Their execution of this Statement is of
20          their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of_____, 20____.
23
        _____
24      Notary Public

        _____
25      Commission Expiration Date