# EXHIBIT 14

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION

3    Case No. 1:17-MD-2804

4    -------------------------------------------------

5    DEPOSITION OF NIKKI PRICE
     July 28, 2023
6

7    -------------------------------------------------

8    IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION:
                      CASE TRACK NINE
9

10   -------------------------------------------------

11        HIGHLY CONFIDENTIAL – SUBJECT TO FURTHER

12               CONFIDENTIALITY REVIEW

13

14         Pursuant to Notice and the Colorado Rules of Civil

15   Procedure, the videotaped deposition of NIKKI PRICE, was

16   taken by the Plaintiff on July 28, 2023, commencing at 10:04

17   a.m., at Greenberg Traurig LLP, 1144 15th Street, Suite 3300,

18   Denver, Colorado 80202, before Sandra A. Schramm, Registered

19   Professional Reporter and Notary Public within and for the

20   State of Colorado.

21

22

23

24

25

```
 1                   APPEARANCES:

 2


 3              FOR PLAINTIFF TARRANT COUNTY, TEXAS:

 4                        JAY M. LICHTER, ESQ.
                          BARON & BUDD, P.C.
 5                        Encino Plaza
                          15910 Ventura Blvd., Suite 1600
 6                        Encino, California 91436
                          jlichter@baronbudd.com
 7


 8              FOR THE DEFENDANT ALBERTSONS:

 9                        GRETCHEN MILLER, ESQ.
                          EMILY MANKOWSKI, ESQ.
10                        GREENBERG TRAURIG, LLP
                          77 W. Walker Drive, Suite 3100
11                        Chicago, Illinois 60601
                          millerg@gtlaw.com
12                        mankowskie@gtlaw.com


13              FOR DEFENDANT KROGER:

14                        PAUL FRAMPTON, ESQ.
                          BOWLES & RICE, LLP
15                        2306 Kanawha Boulevard E
                          Charleston, West Virginia 25311
16                        304-982-7577
                          pframpton@bowlesrice.com
17


18              ALSO PRESENT:

19                        Dan Lawlor, Videographer
                          Golkow Litigation Services
20


21


22


23


24


25
```

```
 1                    I N D E X

 2     DEPOSITION OF NIKKI PRICE

 3     EXAMINATION BY:                                    PAGE

 4          Mr. Lichter                                      4

 5          Ms. Miller                                     121

 6          Mr. Lichter                                    126

 7     DEPOSITION EXHIBITS                      INITIAL REFERENCE

 8     1 - Nikki Price's LinkedIn profile page          7

 9     2 - E-mail from Bobbie Riley to Julie           45
           Nguyen.  Subject:  Ponca Suspicious
10         Order Monitoring Draft

11     3 - E-mail from Scott Johnson to Nikki          69
           Price.  Subject:  SOM
12
       4 - Pharmacy Compliance Committee              72
13         Meeting Minutes

14     5 - E-mail from Darrell Adams to multiple       79
           recipients.  Subject:  Ponca Draw Down
15
       6 - E-mail from Bobbie Riley to Lynette         88
16         Berggren.  Subject: IMS Proposal

17     7 - E-mail from Matthew Churns to multiple      96
           recipients.  Subject: Controlled Substances
18         Store communication needed

19     8 - E-mail from Nasri Massaad to multiple      101
           recipients.  Subject: Monthly Compliance
20         Reports November 2018

21     9 - 2014 Performance Review Form               106

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  We are now on the record.  My

 3    name is Dan Lawlor.  I'm a videographer representing Golkow

 4    Litigation Services.

 5              Today's date is July 28th, 2023 and the time is

 6    10:04 a.m.  This video deposition is being held in Denver,

 7    Colorado in the matter of Opioid Litigation Track Nine, Cause

 8    Number 17-M.D-2804.

 9              The deponent is Nikki Price.  Counsel will be noted

10    on the stenographic record.  The court reporter is Sandy

11    Schramm and will now swear in the witness.

12                         NIKKI PRICE,

13    being first duly sworn in the above cause, was examined and

14    testified as follows:

15                         EXAMINATION

16    BY MR. LICHTER:

17         Q    Good morning, Mrs. Price.

18         A    Good morning.

19         Q    Will you please state and spell your name for the

20    record.

21         A    Nikki Price.  N-i-k-k-i, Price, P-r-i-c-e.

22         Q    And is Nikki short for Nicole?

23         A    Nope, just Nikki.

24         Q    And have you had your deposition taken before?

25         A    No.
```

1    Q    Just to go over a couple of admonitions or ground

2    rules as who how depositions typically work, throughout the

3    deposition I'll be asking you a series of questions, your

4    counsel here sitting next to you may object from time to

5    time.  Just so you know, even though your counsel objects,

6    you'll still obligated to answer the question unless, of

7    course, your counsel specifically instructs you not to answer

8    the question; do you understand that?

9    A    Yes.

10   Q    And we have a court reporter here taking down

11   everything we're saying, so it's important that we talk as

12   slowly as possible and try to avoid speaking over each other

13   to make life easy on her; is that okay?

14   A    Yes.

15   Q    I may ask you some yes or no questions.  It's -- I

16   know when people are communicating and talking in

17   conversation it's easy for some people to want to respond

18   with uh-huh and huh-uhs.  For the court reporter, it's

19   difficult to take those down, so to the extent the answer

20   calls for a yes or no, I'd ask that you respond with a yes or

21   no; does that make sense?

22   A    Yes.

23   Q    Are you taking any medications that would impair

24   your ability to give truthful testimony today?

25   A    No.

1          Q    Any reason today why you wouldn't be able to give

2     truthful testimony?

3          A    No.

4          Q    And I typically aim to take breaks throughout the

5     depositions generally every hour or so.  If for whatever

6     reason you'd like to take a break to use the restroom, to get

7     some water, anything, you can let me know during the

8     deposition, we can do that.

9               I would just ask that if we do take a break,

10    it not be while a question is still pending.  So if I have a

11    question posed, if we can finish the response to that and

12    then we can go ahead and take whatever break anybody here in

13    the room needs; is that okay?

14         A    Yes.

15         Q    You said you've never had your deposition taken

16    before, correct?

17         A    Correct.

18         Q    Okay.  And have you done anything to prepare for

19    today's deposition?

20         A    Yes.

21         Q    And what have you done?

22         A    Met with counsel.

23         Q    About how many times?

24         A    I believe three times.

25         Q    And other than Gretchen Miller sitting next to you,

1    were any other counsel present for those communications?

2         A    Emily.

3         Q    Emily.  Anyone else?

4         A    There were, but I'll be honest, I don't remember

5    their names.

6         Q    Do you recall about how long each of the three

7    meetings with counsel lasted?

8         A    A couple of hours.

9         Q    And were you shown any documents to prepare for

10   today's deposition?

11        A    Yes.

12        Q    Okay.  And other than documents that counsel has

13   shown you to prepare for today's deposition, did you review

14   any other documents?

15        A    Not that I'm aware of.

16        Q    Okay.  I'll go ahead and have the first document

17   marked as Exhibit 1.

18             (Whereupon, Exhibit No. 1 was marked for

19   identification.)

20        Q    Go ahead and take a look at that document.  And

21   have you seen this before?

22        A    Yes.

23        Q    Is this a current copy of your online LinkedIn

24   profile?

25        A    Yes.

 1          Q    Did you prepare the information that's included in

 2     here?

 3          A    Yes.

 4          Q    Is the information in here accurate as far as you

 5     know?

 6          A    Yes.  It hasn't been updated to my most recent

 7     role, but outside of that, yes.

 8          Q    Do you know when the last time it was updated?

 9          A    I do not.

10          Q    And what's your most recent role?

11          A    Director of Managed Care.

12          Q    Flip through to -- I'll just represent that I went

13     ahead and redacted some extraneous information on the last

14     few pages of the document, just so we're all aware with what

15     those black boxes are.

16                    Go ahead and turn to page 5 of the document.

17     Start with your -- the section titled Education; do you see

18     that?

19          A    Yes.

20          Q    It says here you attended Purdue University from

21     1988 to 1993; is that right?

22          A    Yes.

23          Q    And you received a B.S. degree in pharmacy in '93;

24     is that right?

25          A    Yes.

1     Q    You attended the Wharton School in 2005, correct?

2     A    Yes.

3     Q    And in 2005 you participated in the Glaxo Smith

4   Klein Executive Management Program for Pharmacy Leaders; is

5   that right?

6     A    Yes.

7     Q    Can you explain what that program entailed?

8     A    It is approximately about a week long for

9   individuals who are pharmacy leaders within the industry that

10  went through a leadership program.

11    Q    Did you attend any other classes or receive any

12  other degrees from Wharton while you were there?

13    A    No.

14    Q    And did you receive some sort of certificate of

15  completion for that program?

16    A    Yes.

17    Q    Do you know what it's called?

18    A    The Executive Management Program for Pharmacy

19  Leaders.

20    Q    And have you received any other formal education

21  after high school that isn't listed here?

22    A    No.

23    Q    Have you received any other degrees that aren't

24  listed here?

25    A    No.

1      Q     The next section below that is licenses and

2      certifications.  In 2011 says you received your MBTI

3      certification; is that right?

4      A     Yes.

5      Q     Can you explain what that is?

6      A     It's a Myers-Briggs certification that would allow

7      me to teach a Myers-Briggs course.

8      Q     Can you give us a brief explanation as to what a

9      Myers-Briggs course is?

10     A     Basically individual takes a survey, and based on

11     her personality traits and how they answer that would help

12     them understand how they interact with others, whether

13     they're introverts, extroverts, planners, kind of do things

14     last minute; are they, you know, how they kind of think and

15     how their thought process is through problem-solving.

16     Q     So do you administer those tests?

17     A     I don't administer the tests, but I go over the

18     results of the test.  That's what the certification is really

19     focused on.

20     Q     Okay.  And is that certification still active?

21     A     Yes, there's no expiration date with that.

22     Q     Okay.  In 2010 you received a Global Tier 1

23     Certification; is that right?

24     A     Achieve Global, yeah.

25     Q     Achieve Global Tier 1 certified, can you explain

1    what that is.

2          A    It was another certification that when I was a

3    director of education that allowed me to teach leadership

4    classes for -- that were Achieve Global courses.

5          Q    Were these related at all to the practice of

6    pharmacy?

7          A    No, all-around leadership.

8          Q    It also indicates you are a registered pharmacist

9    in the state of Indiana; is that right?

10         A    Yes.

11         Q    When did you become a registered pharmacist in

12   Indiana?

13         A    1993.

14         Q    Is that license currently active?

15         A    Yes.

16         Q    And have you ever been licensed in any other

17   states?

18         A    I recently obtained my license here in Colorado in

19   the fall of 2022.

20         Q    Have you ever worked as a practicing pharmacist?

21         A    Yes.

22         Q    And when was the first time?

23         A    In 1993.

24         Q    And what company did you work for?

25         A    At the time it was American Drug Stores.

1          Q      And how long were you working for American Drug

2     Stores as a practicing pharmacist?

3          A      Five years.

4          Q      Okay.  On page 4 of the document, second half of

5     the page on page 4, would this be in the work history section

6     of your LinkedIn profile?

7          A      Yes.

8          Q      Okay.  It says that from 1998 to 2003 you worked as

9     a national pharmacy recruiter for Albertsons; is that right?

10         A      Yes.

11         Q      And what types of positions were a recruiter for?

12         A      Pharmacist, grad interns and summer interns.

13         Q      And page 3 -- actually, sorry.  For -- while you

14    were a national pharmacy recruiter, what area were you based

15    in?

16         A      Indianapolis.

17         Q      Did you recruit nationwide for different positions

18    or was it just in the Indianapolis area?

19         A      My responsibilities were from the Dakotas on

20    eastward.

21         Q      And on page 3 it says from 2003 to 2007 you worked

22    as a divisional pharmacy manager for Albertsons/SuperValu; is

23    that right?

24         A      Yes.

25         Q      Just to see if we can clarify some background on

1     the Albertsons acquisitions, are you aware that in 2006

2     SuperValu acquired over 1,000 store locations from

3     Albertsons?

4          A     Yes.

5          Q     And then in 2013 SuperValu sold those Albertsons

6     stores back to Albertsons, right?

7          A     LLC, yes.

8          Q     Albertsons, LLC?

9          A     Yes.

10         Q     So from 2003 to 2006, what company did you work

11    for?

12         A     Albertsons.

13         Q     Okay.  And then in 2007 was it also Albertsons?

14         A     That's when SuperValu had taken over in 2006.

15         Q     So you were employed by SuperValu in 2007; is that

16    right?

17         A     Correct.

18         Q     And can you summarize your main duties and

19    responsibilities in this role?

20         A     Yes.  I oversaw 53 locations, pharmacies, in the

21    Chicago land area, responsible for the execution of

22    initiatives as well as the profitability and the staffing of

23    the stores.

24         Q     And when you say the profitability and staffing of

25    the stores, would that include the pharmacies?

1          A     Just the pharmacies.

2          Q     Just the pharmacies.  You said this was in the

3     Chicago area?

4          A     Yes.

5          Q     Was that area -- did you oversee the same area for

6     the entire time you worked as a divisional pharmacy manager?

7          A     Yes.  There were times that some stores would come

8     and go, but for the majority -- for the core stores, yes.

9          Q     Okay.  Did any of your duties in this role involve

10    Albertsons' Suspicious Order Monitoring Program for

11    controlled substances?

12         A     No.

13         Q     And page 4 at the top, it says you achieved the

14    company's highest warehouse utilization and improved sales

15    and prescription performance via targeted training and

16    fostered collaboration between store and pharmacy personnel;

17    do you see that?

18         A     Yes.

19         Q     What does it mean to improve pharmacy prescription

20    performance?

21         A     Increase prescription growth.

22         Q     Does that mean selling more prescriptions?

23         A     Yes.

24         Q     And how did you improve prescription performance

25    with targeted training?

1       A     Working with our pharmacy teams around customer

2    service, selling, and then also selling mechanisms, you know,

3    to patients, whether it's for OTC product, any type of

4    clinical services that we would have done, but really mainly

5    focused on customer service as well as just focusing on the

6    customer.

7       Q     Did your role in this position involve assuring

8    compliance with any State or Federal regulations?

9       A     Yes.

10      Q     Did it involve compliance in the area of dispensing

11   controlled substances?

12      A     Yes.

13      Q     Back on page 3, you worked as a Director of

14   Pharmacy Education for SuperValu, 2007 to 2012; is that

15   right?

16      A     Yes.

17      Q     Can you summarize your main duties and

18   responsibilities in this role?

19      A     Yes.  I was -- oversaw our pharmacy education

20   department that was responsible for new-hire training of

21   pharmacist technicians, as well as then training for when you

22   receive a promotion, such as to a pharmacy manager or for our

23   technicians to a certified tech or a technician specialist.

24   Also worked on mentorship programs, E-learnings that would be

25   requested from other operational functional groups.

```
 1          Q     And this position was strictly for, you were

 2     employed by SuperValu, correct?

 3          A     Correct.

 4          Q     Did any of your duties here involve suspicious

 5     order monitoring?

 6          A     No.

 7          Q     Going back to page 2.  From 2012 to 2015 you worked

 8     as the Director of Pharmacy Compliance for

 9     Albertsons/SuperValu; is that right?

10          A     Yes.

11          Q     You mentioned that from 2006 to 2013 SuperValu

12     owned and ran Albertsons store locations; is that right?

13          A     Yes.

14          Q     And then in 2013 it sold those locations back to

15     Albertsons, LLC?

16          A     Yes.

17          Q     Okay.  So would you have been working for SuperValu

18     in 2012 and then for Albertsons in 2013 to 2015?

19          A     SuperValu in 2012 and then Albertsons, LLC from '13

20     to '15, yes.

21          Q     Okay.  And can you summarize your main duties and

22     responsibilities in this role?

23          A     Yes.  So development of a Field Evaluation Team

24     that consisted of looking at our stores to identify

25     opportunity of risk and all things compliance.  So whether it
```

1    was a license on the wall, to insurance risk, DEA risk,

2    hazardous waste, anything that's related to compliance from

3    the pharmacy industry.

4              In addition, worked on diversion

5    opportunities, internal and external diversion within our

6    stores, and around controlled substances.

7        Q    And the Field Evaluation Team you mentioned you

8    developed, was that the P-CAT team?

9        A    No.

10       Q    And what was this team called?

11       A    Field Evaluation Team.

12       Q    What was that team's primary responsibility?

13       A    Going into stores and auditing them on a set of

14   questions that focused on all aspects of compliance within

15   the pharmacy.

16       Q    Do you know about when that team was founded?

17       A    Fall 2012, I believe.

18       Q    So were audits being conducted on Albertsons stores

19   prior to that?

20       A    Yes.

21       Q    How did the founding of the Field Evaluation Team

22   change those audits?

23       A    The previous team focused more on insurance risk;

24   the Field Evaluation Team focused on all risk that could be

25   present in the pharmacy.

1          Q     And is this Field Evaluation Team currently still

2     up and running at Albertsons?

3          A     Yes.

4          Q     Do they still conduct compliance audits of the

5     pharmacies?

6          A     Yes.

7          Q     You mentioned that they identify different areas of

8     risk in compliance; is that right?

9          A     So the questions are already developed for them,

10    they're just auditing on the questions that have been

11    developed.

12         Q     So they physically travel to the pharmacies to

13    answer the questions?

14         A     Yes.

15         Q     Okay.  Prior to the fall of 2012 then, was

16    Albertsons auditing for compliance risk evaluations outside

17    of the insurance context?

18         A     Not that I'm aware of.

19         Q     You also mentioned in this role you worked in

20    internal and external diversion control?

21         A     Yes.

22         Q     Can you explain what internal diversion control is?

23         A     Potentially associates stealing, taking pills from

24    the pharmacy.

25         Q     So how did your job involve internal diversion?

1      A    By doing analytics, able to identify whether or

2    not, you know, based on purchases, based on dispensing, and

3    then utilizing local field resources to identify if there was

4    an issue within a pharmacy, if someone was stealing.

5      Q    So would you actually conduct investigations?

6      A    Yes.  I do the analytics for them, yes.

7      Q    Can you explain what that means by doing the

8    analytics?

9      A    So I'd pull purchase reports, I would pull their

10   dispensing history on a particular medication, and then I

11   would get Asset Protection involved to either put cameras in

12   or do interviews, to basically, you know, give them the data

13   points and then they take it from there to identify if that

14   individual was taking pills or not, taking drugs or not.

15     Q    And would you determine if internal diversion

16   investigation took place?

17     A    I'm sorry, can you restate the question?

18     Q    Yeah.  Yes.  Who at Albertsons would make the

19   decision that an investigation needed to take place for an

20   internal diversion issue?

21     A    That would typically be me.

22     Q    So how would that typically work?  Would you

23   receive a report or a complaint that something was missing

24   and then investigate further?

25     A    Correct.  I may receive a report from a pharmacy

1     that they're constantly having to update their on-hands.  We

2     also received a report called a loss prevention analyzer that

3     would identify stores that would be ordering a high amount of

4     product, but not dispensing, you know, product that

5     corresponded to that.

6          Q     And how about external diversion, what does that

7     mean?

8          A     More focused on either fraudulent prescriptions by

9     patients or potentially doctors writing a lot of high

10    percentages of controls.

11         Q     And how did your position involve looking at

12    external diversion?

13         A     In terms of?

14         Q     In terms of -- I guess is it the same sort of thing

15    you did for internal diversion, were you conducting

16    investigations after receiving reports?

17         A     Yes.

18         Q     And so was your -- were your duties overseeing

19    external diversion, were those sort of on an ad hoc basis

20    receiving certain reports for certain incidents rather than

21    the exercise of a corporate monitoring program?

22         A     Yes.

23         Q     So there weren't any corporate monitoring programs,

24    let's say monitoring specific patients throughout the country

25    that may be prone to external diversion; is that right?

```
1        A    Not that I'm aware of for patients.

2        Q    How about for prescribers?

3        A    Yes.

4        Q    Yes, there was?

5        A    Uh-huh, yes.

6        Q    Can you explain what that program entailed?

7        A    We -- at one point in time we had purchased IMS

8   data that allowed us to view prescribers' writing habits

9   compared to their peers, the same practice, and then we could

10  conduct investigations from there.

11       Q    So who would determine if an investigation was to

12  be conducted using the IMS data?

13       A    Myself.

14       Q    What criteria did you use to determine if an

15  investigation was warranted?

16       A    Looking at outliers in terms of the percent of

17  controlled substances written, the quantity of prescriptions,

18  controlled substance prescriptions written, was the primary

19  link to criteria.

20       Q    So you were monitoring that data on a nationwide

21  basis?

22       A    Yes.

23       Q    And do you know when that program was first

24  initiated at Albertsons?

25       A    I believe either late 2013, 2014.
```

1        Q    And it's still in place today?

2        A    No.

3        Q    When did it stop?

4        A    When we moved to another vendor.

5        Q    Do you recall about what year that was?

6        A    That was after my time.

7        Q    And when did your time end?

8        A    2015.

9        Q    So it stopped sometime after 2015?

10       A    It just translated to another vendor.

11       Q    Do you have a name of the other vendor?

12       A    I do not.

13       Q    And did this program have a beneficial name at

14   Albertsons, the monitoring program?

15       A    Just controlled substance monitoring program, I

16   believe.

17       Q    I've seen some references to CSMP, is that what

18   this refers to?

19       A    Yes.

20       Q    Okay.  Was that limited to reviewing IMS data for

21   prescriber anomalies or did it involve any other components?

22       A    It involved both internal and external diversion

23   pieces.

24       Q    Can you talk about what other pieces that would be?

25   I guess we talked about the prescriber monitoring of IMS

1    data, do you know what other specific pieces that program

2    would have entailed?

3         A    The SMP?

4         Q    Yes.

5         A    So looking at internal diversion, looking at

6    potentially -- I don't remember all the components, to be

7    honest, but it really focused on either our associates or

8    prescribers/patients.

9         Q    And so when this program was I guess evaluating

10   prescribers' writing habits, was this also on sort of an ad

11   hoc basis if you received a report on a certain prescriber,

12   or was this more a constant monitoring at the corporate level

13   of issues?

14        A    It was a combination of the two.

15        Q    Can you explain how that combination played out?

16        A    So there were times that we would receive reports

17   from our pharmacies that they were seeing a lot of

18   prescriptions that they felt either that they weren't for

19   sure on, that they were unique, that they hadn't seen before,

20   and they would, you know, bring forward to us potential

21   prescribers.

22                  And then on the national monitoring we would

23   look at by area, by division, those, you know, see if there

24   was individuals or prescribers that were writing at -- like

25   outliers.

1          Q      So there were times where you would look at certain

2    prescribers without having anyone else at Albertsons sort of

3    specifically flag those prescribers for you?

4          A      Yes.

5          Q      And were those -- I guess once a prescriber was

6    flagged, or once you started looking into them, what did

7    those investigations entail outside of reviewing IMS data?

8          A      I would work with the local operations team, I

9    would ask them to do a number of different things, one which

10   would go, you know, to that doctor's office location, look at

11   it from kind of the outside as far as, you know, was it in a

12   strip mall, did it have professional signage, did it look

13   like what you would expect a normal doctor's office or

14   professional doctor's office look like or was it kind of the

15   stereotypical what you were hearing about at that time as far

16   as like high pain management doctors, kind of the pill-mill

17   doctors.

18              We would also have them go into a pharmacy,

19   the local pharmacy, look at the hard copies of the

20   prescriptions, identify if patients were coming from a

21   distance, if there was any diagnosis codes on them, if there

22   were, you know, what type of quantities, what type of drugs

23   they were writing that we could then, you know, match up with

24   the IMS data as well.

25          Q      So you would tell the local operations teams

1      actually conduct the investigations themselves?

2          A    I would ask them to do -- kind of pull some data

3      points that I would not have access to without me physically

4      going to that store.

5          Q    Did you have anyone else on your team that was

6      helping out in compliance with these investigations?

7          A    At one point in time after we merged with LLC,

8      Debbie Beringer.

9          Q    Do you recall about what year that was?

10         A    I believe 2013.

11         Q    And how did she help out with this program?

12         A    She followed the very similar process that I did.

13         Q    So it was the two of you monitoring the IMS data

14     for all the stores in the country?

15         A    Yes.

16         Q    Okay.  Was anybody else involved in that?

17         A    No.

18         Q    Did Debbie Beringer still work for Albertsons?

19         A    No.

20         Q    Do you know about when she left?

21         A    I believe sometime in 2014.

22         Q    Did she work there on this program from 2013 to

23     2014?

24         A    Yes.

25         Q    So about one year?

1          A     Approximately.

2          Q     When she left, did anybody replace her in that

3     position to help you out with these investigations?

4          A     I believe Charlie Painter did.

5          Q     He came on in 2014?

6          A     I believe so.

7          Q     Until when?

8          A     So shortly right around that time we were merging

9     with Safeway and that's -- and they had a full team as well

10    and we were merging the two teams in early 2015 and he moved

11    into a different role in sometime in 2015.

12         Q     Were there ever more than two people in compliance

13    that were monitoring the IMS data for the country?

14         A     I don't recall after 2014.

15         Q     And when you would either investigate yourself or

16    order the operations team to investigate a certain

17    prescriber, would a report typically be generated on that

18    prescriber?

19         A     Not -- normally what we would do is make like a

20    store action report.  There was just -- depending on the

21    prescriber as far as what the next steps were and what the

22    investigation led to.

23         Q     So it wouldn't be specific investigation files on

24    certain prescribers that Albertsons had at any point; would

25    there be?

1          A    I don't recall.

2          Q    I've seen some, I guess, store dispensing

3    evaluation reports that kind of look at a store from

4    different angles, they look at certain prescribers of a

5    store, certain patients of a store, does that ring a bell as

6    to something you've dealt with at Albertsons?

7          A    A store action report, yes.

8          Q    A store action report.  I know that one section in

9    those reports that I've seen talk about certain prescribers;

10   is that consistent with your understanding of those reports?

11         A    Yes.

12         Q    So were these investigations, these prescriber

13   investigations that we're talking about, were these

14   investigations run to be a component of those reports?

15         A    Potentially.

16         Q    Okay.  Would they be run -- would those

17   investigations ever run and have no store report or action

18   report generated?

19         A    Can you restate the question?

20         Q    Sure.  Can there be an investigation of a

21   prescriber, for whatever reason, and then have there be no

22   store action report or no store prescriber review generated

23   in relation to that prescriber?

24         A    Yes.

25         Q    Was that common?

```
 1        A    No.

 2        Q    So I guess most of the time a prescriber was

 3   investigated for any reason, that investigation would appear

 4   in a store action report?

 5        A    Yes.

 6        Q    Okay.  Would that be something like 90 percent of

 7   the time it would be in a store action report?  Can you give

 8   me any sort of estimate as to how common that was?

 9        A    I'll be honest, I don't know.

10        Q    Okay.  But most of the time?

11        A    A percent of the time that I couldn't nail down.

12        Q    On page 2 on the top of the document is a little

13   cut off, I believe it said that you worked as the Director of

14   Pharmacy Operations for Albertsons/Safeway from 2015 to the

15   present; is that right?

16        A    Yes.

17        Q    Okay.  And again in 2015 Albertsons acquired

18   Safeway, correct?

19        A    Correct.

20        Q    So at this time you'd been working for Albertsons,

21   but exclusively for Safeway stores?

22        A    During which time?

23        Q    This 2015 to the present it says.

24        A    No.  The company had merged at that point in time

25   and I oversaw both Albertsons locations and Safeway
```

```
 1     locations.

 2          Q    So the company that employed you, would that have

 3     been Albertsons, LLC at this time?

 4          A    Yes.

 5          Q    Okay.

 6          A    Or I think it was renamed Albertsons Companies,

 7     Inc.

 8          Q    Okay.  And can you summarize your main duties and

 9     responsibilities in this role?

10          A    Yes.  I oversaw two divisions, so approximately 184

11     stores in eight states.  Responsibility for executing on

12     initiatives, ensuring profitability, go-to marketing

13     strategy, staffing of those stores.

14          Q    Was one of those states Texas?

15          A    No.

16          Q    Do you recall what those states were?

17          A    Yes.

18          Q    Can you list them?

19          A    Yes.  List them?

20          Q    Can you list them now?

21          A    Yes.  Idaho, Wyoming, Montana, South Dakota,

22     Nebraska, Colorado, New Mexico, and Utah.

23          Q    You mentioned that this LinkedIn profile is a

24     little out of date, you're not still currently in this

25     position, are you?
```

```
 1        A    No.

 2        Q    Okay.  When did this position end for you?

 3        A    March of 2023.

 4        Q    March of 2023?

 5        A    Yes.

 6        Q    And why did you leave?

 7        A    Opportunity in managed care role.

 8        Q    And what's a managed care role?

 9        A    I'm responsible for negotiating contracts with our

10   PDMs as well as identify peers and contracting with them for

11   our clinical services.

12        Q    And what company did you say you work for?

13        A    Albertsons Company.

14        Q    Still Albertsons, just a different position?

15        A    Yes.

16        Q    Jumping back a little in your role as Director of

17   Pharmacy Compliance in 2012 to 2015, did any of your

18   responsibilities relate to suspicious order monitoring?

19        A    More of the working on the pharmacy side piece of

20   it.

21        Q    Can you explain that?

22        A    Yes.  So I would receive reports that would

23   identify as stores that had potentially ordered higher

24   quantities of different controlled substances.  I would take

25   that and use that as like a data point to identify potential
```

```
 1      external or internal diversion within that store.

 2          Q    Who would send you those reports?

 3          A    They came from Ponca.  I don't remember who was the

 4      exact individual.  They came from multiple people.

 5          Q    When you say Ponca, are you referring to the Ponca

 6      City Distribution Center that Albertsons ran?

 7          A    Yes.

 8          Q    That's in Oklahoma?

 9          A    Yes.

10          Q    Do you recall if David Beck sent you those reports?

11          A    He did not.

12          Q    And what form did those reports take when you

13      received them?

14          A    Typically an Excel spreadsheet.

15          Q    And the Excel spreadsheet would contain orders from

16      certain pharmacy that exceeded a certain threshold; is that

17      right?

18          A    Yes.

19          Q    Do you know if those orders that were sent to you

20      were considered suspicious orders?

21          A    I don't know.

22          Q    Did your role as Director of Pharmacy Operations

23      have any involvement with Albertsons' Suspicious Ordering

24      Monitoring Program?

25          A    No.
```

1       Q    How about your current role?

2       A    No.

3       Q    Okay.  Let's set Exhibit 1 aside.  Are you aware

4    that at certain times Albertsons distributed opioids to its

5    pharmacies from its distribution center in Ponca City in

6    Oklahoma?

7       A    Yes.

8       Q    Are you aware it distributed opioids from that

9    distribution center between the years 2006 and 2008?

10      A    I'm sorry, from where?

11      Q    From Ponca City distribution center.  Let me phrase

12   it again.

13              Are you aware that Albertsons distributed

14   opioids from its Ponca City distribution center between 2006

15   and 2008?

16      A    No.

17      Q    Are you aware that during 2009 to 2012 Albertsons

18   stopped distributed drugs from that distribution center?

19      A    No, I don't think I was aware they were even

20   distributing between those time frames.

21      Q    Okay.  Are you aware that from 2013 to 2016

22   Albertsons distributed opioids to its pharmacies from the

23   Ponca City distribution center?

24      A    Yes.

25      Q    Are you aware during 2013 to 2016, the same time

```
1      period, it was distributing Schedule 2, 3, 4 and 5 drugs?

2           A    Yes.

3           Q    Are you aware that in 2016 Albertsons stopped

4      distributed drugs from that distribution center?

5           A    Yes.

6           Q    Do you know why it stopped?

7           A    My understanding is there was a decision made to go

8      to all DSD.

9           Q    What does that mean?

10          A    Going with a vendor distributor.

11          Q    Do you know why that decision was made?

12          A    I do not.

13          Q    Do you know who that vendor distributor was?

14          A    McKesson.

15          Q    We talked about this a little bit already, but have

16     you heard the phrase "suspicious ordering monitoring system"

17     outside of this deposition?

18          A    Yes.

19          Q    Okay.  Have you also heard it referred to SOMS,

20     S-O-M-S?

21          A    Most likely at some point in time.

22          Q    Okay.  What do you understand is suspicious order

23     monitoring system to be?

24          A    To identify orders of controlled substances that

25     may be considered an outlier versus another similar pharmacy
```

1    in volume, geographic area, and so on.

2        Q    Do you know when Albertsons first implemented a

3    suspicious order monitoring program?

4        A    I believe it was being worked on at the beginning

5    or sometime during 2013.

6        Q    So was it first being worked on sometime in 2013?

7             MS. MILLER:  Object to form.

8             THE DEPONENT:  I don't know exactly when it was

9    started.

10       Q    (By Mr. Lichter) Do you know about what year it

11   started?

12       A    Approximately the same time that Ponca started

13   distributing opioids.

14       Q    And to your recollection that's in 2013?

15       A    I believe so.

16       Q    So are you familiar with whether Albertsons had a

17   suspicious order monitoring system in place in the 2006 to

18   2008 time frame?

19       A    I do not know.

20       Q    Are you familiar with the details as to its

21   suspicious order monitoring system in the 2013 to 2016 time

22   frame?

23       A    I was not involved in the development of the

24   program.

25       Q    But are you aware as to how that program ran during

1     this time period?

2          A    I know parts of it, I don't know all of it.

3          Q    How about for the 2013, 2016 time frame, do you

4     know if this suspicious order monitoring system played any

5     role before a pharmacy order for opioids reached the

6     distribution center?

7          A    Can you restate the question, please?

8          Q    Yes.  You mentioned that you know -- you're

9     familiar with parts of how the suspicious order monitoring

10    system operated in 2013 to 2016; is that right?

11         A    Yes.

12         Q    Okay.  Are you aware that the suspicious order

13    monitoring system operated at all before an order for opioids

14    reached the distribution center?

15         A    There was some type of max pick involved.

16         Q    Can you explain that?

17         A    That it would -- there was like a threshold, would

18    be a better way to describe it.  A max pick was at four

19    individual stores for individual drugs as far as when they --

20    if they tried to order more than that quantity, it would cut

21    it back to the threshold amount.

22         Q    Are you aware of any type of screening process for

23    orders submitted to the distribution center before orders

24    were actually picked?

25         A    I don't know the timing as far as when the drug was

1    picked versus when it was sent and when they reviewed the

2    orders.

3         Q    I guess other than the max pick or threshold

4    process, are you aware of any screening process used at any

5    time to screen certain orders from being filled?

6         A    Yes.

7         Q    Can you explain that?

8         A    There was a report that was sent to me.  Prior to

9    it being sent to me, an individual would make a phone call to

10   the store to identify or to ask why they were ordering the

11   quantity that they were ordering.  And that, my

12   understanding, was a screening -- one of the screening

13   processes, or a screening process.

14        Q    And those phone calls were made based on which

15   orders exceeded the max pick threshold?

16        A    I believe so.

17        Q    Prior to that process happening, are you aware of

18   the suspicious order monitoring system playing any role in

19   orders be submitted or filled?

20        A    I don't know.

21        Q    Do you know who set those max pick thresholds?

22        A    I don't know who identified them as far as what

23   quantities for what stores, but I do know it was done within

24   our ARx computer system.

25        Q    You said R -- ARx?

1        A    ARx.

2        Q    ARx computer system.  And that's the software that

3    the threshold report used?

4        A    Yes, it's the -- ARx is the pharmacy management

5    system that our pharmacists used to fill prescriptions.

6    Within in it, it had a management component that, you know,

7    if you drop below zero on a drug, it would automatically

8    reorder it.

9             And then based on, in this case four controls,

10   if there was a max pick in place, it would order it -- the

11   store team could manually adjust it to order additional drugs

12   if needed to.

13       Q    And do you know if this process we're talking about

14   here with max pick thresholds and the phone calls, were those

15   phone calls made by Ponca City warehouse employees?

16       A    Yes.

17       Q    Do you know what those phone calls entailed

18   typically?

19       A    My understanding is that they would ask whoever

20   they reached on duty, the pharmacist on duty, why the

21   increase or why the order quantity was what it was for a

22   particular drug on their order and then document those

23   responses.

24       Q    And do you know if those warehouse employees were

25   supposed to make any sort of determination based on their

1      communications with the pharmacies?

2            A    I do not know.

3            Q    Do you know was this process meant to identify

4      suspicious orders?

5            A    I don't know.

6            Q    Do you know if this process involved reporting

7      suspicious orders?

8            A    I don't know.

9            Q    Do you know if Albertsons ever identified a

10     suspicious order?

11           A    I don't know.

12           Q    Do you know if Albertsons ever reported a

13     suspicious order?

14           A    I don't know.

15           Q    In all your time as the Director of Compliance, you

16     have no insight into whether Albertsons was identifying or

17     reporting suspicious orders of opioids?

18           A    Not that I'm aware of.

19           Q    Do you know who would have been in charge of that?

20           A    Bobbie Riley and Lynette Berggren.

21           Q    So you mentioned for those phone calls that were

22     made by the Ponca City warehouse employees for orders that

23     exceeded a max pick threshold, you mentioned that the

24     conversations they had were documented?

25           A    Yes.

```
 1          Q    Do you know what, if anything -- strike that.

 2               Did Albertsons' Suspicious Order Monitoring

 3     Program play any sort of role after those conversations took

 4     place?

 5          A    I would receive the reports and then to me they

 6     were -- because I was working on the pharmacy piece trying to

 7     understand -- to me it was the data point to understand if

 8     there were additional things happening at that location that

 9     could point to potentially internal diversion or potentially

10     external diversion.

11          Q    So you personally would receive the call notes from

12     the Ponca City warehouse?

13          A    Yes.

14          Q    Would you receive those daily?

15          A    Yes.

16          Q    This is between 2013 and 2016?

17          A    When I left my role in mid-2015, so up until that

18     point.

19          Q    Okay.  And would you receive the call notes on a

20     spreadsheet?

21          A    Yes.

22          Q    And you said you received them daily, do you know

23     about what sort of volume you'd be looking at every day for

24     these call notes?

25          A    Not a lot, that I remember.
```

1      Q     Would it be under 100 every day?

2      A     Oh, yes, 100 percent, yes.

3      Q     Somewhere around 10 maybe?

4      A     Between 10 to 20.

5      Q     And these would be call notes made to pharmacies

6   around the country or were they limited by a certain

7   geographic area?

8      A     So our store teams would order twice a week.

9      Q     Okay.

10     A     And so depending upon the day, depending upon the

11  geographic area.

12     Q     So day by day the geographic area might change, but

13  as a general process, you were receiving daily notes for

14  calls to pharmacies made throughout the country; is that

15  fair?

16     A     Yes.

17     Q     And in your receipt of these call notes, did you

18  have any role in helping to identify suspicious orders?

19     A     No.

20     Q     Did you have any role in reporting suspicious

21  orders?

22     A     No.

23     Q     And what would your -- I guess what would you do

24  with the call notes when you received them typically?

25     A     So it was like I mentioned, a data point for me.

1       So I would follow up with the local DPM, or division of

2       pharmacy management or the local operator, and ask them to go

3       and review the store, again looking for other long lines, or

4       looking at prescriptions in terms of, you know, patient -- a

5       commonality of a physician or patients that were coming from

6       large distances away.

7               I might also look at negative adjustments that

8       were made within the pharmacy as well too and doing some

9       analytics from that end.

10      Q    And what was the purpose of you looking at these

11      call notes?

12      A    To identify if there was internal or external

13      diversion and following up with the store team or the local

14      operator to either identify if there was internal diversion

15      going on from an associate or if there was external diversion

16      where we needed to put the store on a store action plan and

17      do some additional education with that store team.

18      Q    Okay.  Was this part of the CSMP process we talked

19      about.

20      A    Yes.

21      Q    And after you received the call notes every day,

22      did you ever communicate with the Ponca City warehouse

23      employees regarding any of those orders?

24      A    Not that I remember.

25      Q    Would you have had any role in canceling or cutting

1     any of those orders on the call notes that you received?

2          A     No.

3          Q     Was anybody helping you review the call notes you

4     received?

5          A     Not that I remember.  Debbie may have helped here

6     and there if like I was on vacation or I had some other

7     projects that were pressing.

8          Q     Okay.  Generally a one-person job?

9          A     Typically, yes.

10         Q     Okay.  Do you know who took over your position

11    reviewing the call notes after you left the position?

12         A     I believe Jessica Covaci.  Could I clarify one

13    statement I made earlier?

14         Q     Of course.

15         A     When you were asking me the quantity, so there

16    maybe 10 to 20 on there, there would be a good percentage of

17    those that would have legitimate reasons, such as the

18    pharmacy manager is going on vacation next week and so they

19    would not be able to order CIIs while they were gone, so they

20    were kind of stacking up to prepare until that individual got

21    back.

22                    There may have been that there was a

23    backorder, they were not able to get that medication, so the

24    number of calls that actually I had to follow up on were very

25    low.

1      Q    Okay.  So does that mean that some of the calls --

2    some of the call notes that you received would have

3    documented illegitimate reasons for pharmacies ordering

4    certain quantities of controlled substances?

5      A    They would have been questionable.

6      Q    Questionable.  Were there any that you would have

7    characterized as illegitimate?

8      A    I don't remember.

9      Q    By the time you received the call notes from the

10   Ponca City warehouse, would those orders already have been

11   filled and shipped to the pharmacies?

12     A    I believe so.  Not 100 percent, though.

13     Q    But you never did anything like call the Ponca City

14   warehouse and say, hey, I received the call notes from this

15   store, do not fill that order, stop that order; you wouldn't

16   have done anything like that?

17     A    No, I don't know -- I don't remember the timing of

18   the -- from the time I received it to the time of the order

19   had already left the Ponca City warehouse, so I don't know if

20   I was even able to do that.

21     Q    But you don't recall ever actually calling the

22   warehouse back and saying not to fill a specific order of

23   anything?

24     A    No.

25     Q    So no, that's not something you ever did?

1       A    Not that I remember.

2       Q    And for these follow-ups you did on the call notes,

3    was any sort of -- was the investigation or any of the

4    follow-up ever documented in a report or in any other way?

5       A    Sometimes they would turn into a store action

6    report.

7       Q    If they did not turn into a store action report

8    would there be any documentation as to what the investigation

9    or follow-up entailed?

10      A    Not that I remember.

11      Q    Okay.  And again, after you receive the call notes

12   from the Ponca City warehouse, you -- neither you nor your

13   team was involved in identifying suspicious orders; is that

14   right?

15      A    Correct.

16      Q    And neither you nor your team was identified --

17   excuse me, was involved in reporting suspicious orders; is

18   that correct?

19      A    Correct.

20           MR. LICHTER:  We've been going for about an hour, I

21   think it's a good time to take a ten-minute break if that's

22   okay with everyone.

23           THE VIDEOGRAPHER:  We're going off record.  Time is

24   11:03.

25           (Whereupon, a break was taken from 11:03 a.m. to

1    11:15 a.m.)

2            THE VIDEOGRAPHER:  Time is 11:15.  Mr. Frampton,

3    you wanted to put your record on?

4            MR. FRAMPTON:  Yes.  I just wanted to note my

5    appearance at this deposition.  My name is Paul Frampton,

6    with the law firm of Bowles Rice LLP and I represent the

7    Kroger companies.

8            THE VIDEOGRAPHER:  Thank you.

9            MR. LICHTER:  I'll go ahead and have the next

10   document marked as Exhibit 2.

11           (Whereupon, Exhibit No. 2 was marked for

12   identification.)

13           MR. LICHTER:  For the record, this document is

14   Bates labeled ALB-NM00013528.

15           And Ms. Price, have you seen this document before?

16       A    Yes.

17       Q    When is the last time you saw it?

18       A    This week.

19       Q    And the first page of this document appears to be

20   two e-mails in the middle of the page.  The first e-mail

21   appears to be a March 14th, 2014 e-mail you sent to Jill

22   Regan and Bobbie Riley; is that right?

23       A    Yes.

24       Q    And who is Jill Regan?

25       A    Jill was I believe she -- I forget the actual title

1    of her name.  She was considered part of our compliance

2    department, but focused on third-party audits, insurance

3    audits.

4         Q    Years 2013 to 2016, about how many employees made

5    up the compliance department?

6         A    There were five, like managers, leaders, Bobbie,

7    and then four of us.  And then under Dwayne Clark, he oversaw

8    our Pharmacy Professional Services Department and I think he

9    had another ten under him.  And then Debbie, of course.  I

10   forgot about Debbie.

11        Q    Can you name those other five people?

12        A    Dwayne Clark -- Bobbie Riley, myself, Dwayne Clark,

13   Jill Regan, Courtney -- I can't remember Courtney's last

14   name, but she worked with Jill on insurance audits.

15        Q    Is that everyone?

16        A    I think that's the five, yes.

17        Q    Okay.  And do you recall, I guess the time of this

18   e-mail in March 2014, do you recall what Bobbie Riley's title

19   was?

20        A    Vice President of Pharmacy Compliance and

21   Government Affairs.

22        Q    Was she in charge of the compliance department at

23   this time?

24        A    Yes.

25        Q    So you reported to her?

1        A    Yes.

2        Q    The subject line of your e-mail reads, Ponca

3   Suspicious Order Monitoring Graph; do you see that?

4        A    Yes.

5        Q    Do you recall why you were sending this e-mail to

6   Jill Regan and Bobbie Riley?

7        A    I don't remember why I was sending it to Jill, but

8   this was a way of me trying to insert myself into the

9   suspicious order monitor implementation of which I don't

10  believe this was ever used.

11       Q    Why were you trying to insert yourself?

12       A    Just trying to have additional responsibility

13  within the department.

14       Q    You said but this was never used, are you referring

15  to the attachment to the e-mail on the second and third

16  pages?

17       A    Yes.

18       Q    Okay.  And staying on the first page, it looks like

19  the e-mail at the top is Bobbie Riley forwarding your

20  original e-mail to Julie Nguyen on April 30, 2014; is that

21  right?

22       A    Yes.

23       Q    Do you know who Julie Nguyen was at this time?

24       A    Yes.

25       Q    What was her title?

1        A     I believe she was in our procurement department.

2        Q     Do you know why Bobbie Riley would have been

3     forwarding your e-mail to Julie?

4        A     I believe Julie was handling some of the

5     accreditations that we needed for -- I forget what all the

6     accreditations were, why we needed -- some were for Medicare

7     and some were related to DME, specialty type -- I should say

8     more DME type, like wheelchairs, crutches, things of that

9     nature.  And I don't know if she had a role in any type of

10    accreditation for Ponca.

11       Q     What does DME stand for?

12       A     Durable Medical Equipment.

13       Q     If we can turn to the second page of this document,

14    which is the first page of the attachment.  Have you seen

15    this before?

16       A     Yes.

17       Q     And what are we looking at here?

18       A     This was a draft of what I had tried to put

19    together to help with the Ponca suspicious order monitoring

20    system.

21       Q     So you created this document?

22       A     Yes.

23       Q     Do you know when you created it?

24       A     It would have been prior to the date on the e-mail.

25       Q     Okay.  Would it have been just prior to the date on

1       the e-mail within the last few days of that date?

2           A    Probably within the two weeks before.

3           Q    Okay.  The title of this document is the Ponca

4       Suspicious Order Monitoring; is that right?

5           A    Yes.

6           Q    Where it says current state, it shows a flow chart

7       of two boxes, correct?

8           A    Yes.

9           Q    And can you explain what this chart represents?

10          A    I believe it represents what the current state of

11      the process was at that time.

12          Q    This was as of March 14 of 2014?

13          A    I believe so.

14          Q    When you say the process, are you referring to

15      Albertsons' suspicious order monitoring process?

16          A    Yes.

17          Q    Do you know for what years this was the state of

18      Albertsons' Suspicious Order Monitoring Program?

19          A    I don't.

20          Q    Was it at least that state for 2013 and 2014?

21          A    It would have been at that point in time in 2014.

22          Q    You don't know if it was the state between 2015 and

23      2016?

24          A    I do not.  I don't know if this was ever adopted.

25          Q    Before you said it wasn't adopted, you don't know

1     it was adopted?

2          A    I don't believe it was adopted.

3          Q    You don't believe it was adopted?  Okay.  Are you

4     aware of any other components of Albertsons' suspicious order

5     monitoring system that was in place for March 2014 that are

6     not reflected in this chart here?

7          A    No, not that I'm aware of.

8          Q    When you prepared this document, would you have

9     been aware of all components of Albertsons' suspicious order

10    monitoring program at the time?

11         A    Not -- I don't believe I knew all the ins and outs,

12    all the details, the minute details.

13         Q    Excluding the minute details, would you have been

14    aware of any other major components of the suspicious order

15    monitoring program when you put this chart together?

16         A    No, just what would be on this chart.

17         Q    So you -- you're unaware of any other components at

18    this time; is that right?

19         A    Correct.

20         Q    And the first box says greater than 20 percent over

21    average order.  Average is based on 11 orders; do you see

22    that?

23         A    Yes.

24         Q    If I say SOMS, can we take that to mean suspicious

25    order monitoring system just so we don't have to repeat the

1    phrase throughout the rest of this; is that okay?

2         A    Yes.

3         Q    This first box that we're looking at here, does

4    this mean that Albertsons' SOMS used an order threshold of

5    20 percent over the average of the previous 20 orders -- or

6    excuse me, previous 11 orders?

7         A    Just based on what the document says, yes.

8         Q    And you put this document together, correct?

9         A    Correct.

10        Q    And do you know if those previous 11 orders were of

11   a certain drug by a certain pharmacy?

12        A    I would assume so.

13        Q    Okay.  And do you know who came up with this

14   threshold?

15        A    I do not.

16        Q    Okay.  You don't know the reason this threshold was

17   chosen?

18        A    I do not.

19        Q    Okay.  Do you know if the calculation of these

20   thresholds considered anything else?

21        A    I do not.

22        Q    Do you know what would happen if an order exceeded

23   the threshold?

24        A    I believe it ended up on the call report.

25        Q    And by that you mean it would appear on a

1    spreadsheet for the Ponca City warehouse employees?

2        A    Yes.

3        Q    And then Ponca City warehouse employees would

4    typically call the pharmacies to determine why an order

5    exceeded threshold; is that right?

6        A    Yes.

7        Q    Okay.

8        A    If there was anything else done with that, I don't

9    know.

10       Q    Okay.  And do you know for what years this

11   threshold was a component of Albertsons' SOMS?

12       A    I don't know the time frame, no.

13       Q    Do you know if an order exceeded the threshold, did

14   Albertsons consider that a suspicious order?

15       A    I don't know.

16       Q    And the second box here to the right says, send to

17   Compliance daily, no orders/products held; do you see that?

18       A    Yes.

19       Q    And can you tell us why it was sent to compliance

20   daily?

21       A    It was sent to me to follow up on as far as

22   understanding what happened at the pharmacy, what was

23   happening at the pharmacy in terms of was there internal or

24   external diversion.

25       Q    And this is what we talked about earlier, right --

1      A    Yes.

2      Q    -- to give you a data point for further review?

3      A    Correct.

4      Q    Is there anything else Compliance did with

5   information other than what we've already discussed?

6      A    I only know -- I can only speak to what I did.

7   Outside of that, I don't know.

8      Q    Okay.  So anything additional you did with this

9   information that we didn't already discuss?

10      A    No.

11      Q    And do you know what a no order/product held means?

12      A    I could not speak entirely to that, no.

13      Q    No?  Even though you made this chart?

14      A    Yes, it was ten years ago.

15      Q    Okay.  Do you know if it was Albertsons' policy not

16   to hold or cancel orders that exceeded the threshold?

17      A    I don't remember.

18      Q    Given your role as the Director of Pharmacy

19   Compliance at this time, did you believe this iteration of

20   Albertsons' SOMS was compliant with all State and Federal

21   laws?

22          MS. MILLER:  Object to form.

23          THE DEPONENT:  I only know, you know, I was not

24   involved in the full process of developing it.  We always

25   strove to be compliant with the law at any given time.

1          Q    (By Mr. Lichter) I understand that.  I'm asking

2     what your opinion was as the Director of Pharmacy Compliance?

3               MS. MILLER:  Same objection, including foundation.

4               THE DEPONENT:  I would -- I'd have to believe yes.

5          Q    (By Mr. Lichter) Okay.  And below the two boxes

6     we're looking at it says, this process needs to be enhanced

7     considering the following factors; do you see that?

8          A    Yes.

9          Q    Was it your opinion that the process needed to be

10    enhanced?

11         A    We were always -- as in any role, you learn

12    different things at different points in time and so you're

13    always trying to incorporate your learnings into making the

14    process better.

15               And so, you know, no matter what role I've

16    ever been in, trying to make the process better, there's

17    always an evolution of that to always strive to be the best.

18         Q    And your opinion here on this document was that the

19    process needed enhancement at this time, right?

20         A    Potentially.

21         Q    Do you know what that opinion was based on?

22         A    Learnings that I would have had based on just the

23    role that I had within the group.

24         Q    Would they have been learnings --

25         A    My responsibilities, whether learning from webinars

1    that we attended, whether, you know, from diversion programs

2    or diversion cases that I saw within the store.

3         Q    As webinars, you mentioned those would have been

4    related to suspicious order monitoring?

5         A    Just controlled substance in general.  The DEA was

6    putting on a number of webinars and programs at the time.

7         Q    Related to diversion?

8         A    Controlled substances in general.

9         Q    Okay.  Based on that background, that information,

10   the information from the DEA, it was your belief at this time

11   that the program needed enhancement, correct?

12        A    Potentially.

13        Q    Your first bullet point in this section says,

14   Responsibility of Parties Involved (Ponca and Pharmacy); what

15   does this mean?

16        A    My assumption is that it would be what are the

17   responsibilities of the parties involved between Ponca and

18   pharmacy.

19        Q    Does this mean that the -- those responsibilities

20   weren't delineated at this time?

21        A    I don't know.

22        Q    Well, your line above that says, this process needs

23   to be enhanced considering the following factors:  The first

24   factor is responsibility of parties involved.  How does that

25   factor contribute to the need for this program to be

1    enhanced?

2         A    I don't know what the true -- how the

3    responsibilities were delineated at that time.  My assumption

4    would be based on what I wrote is that there could be some

5    more delineation around that.

6         Q    Okay.  The next bullet, CSOS coming soon.  CSOS

7    stands for Controlled Substance Ordering System; is that

8    right?

9         A    Yes.

10        Q    Is that the electronic system by which pharmacies

11   would submit their orders to the Ponca City warehouse to have

12   their orders filled?

13        A    Yes.

14        Q    Why does this indicate the process needed to be

15   enhanced?

16        A    It was just a data point indicating that this was

17   coming through -- coming soon, to take that into account.

18        Q    The next bullet, monthly threshold versus max

19   order; what does that mean?

20        A    Again trying to get in my brain ten years ago.  I

21   would assume instead of looking at a max order pick, looking

22   at a monthly threshold for a particular drug or pharmacy, or

23   considering those factors making a decision around that.

24        Q    So based on this, was a monthly threshold in place

25   as opposed to a max order?

1      A    No, at that time the max order pick was in place.

2      Q    And how would a monthly threshold have enhanced the

3    program?

4      A    It was more what other vendors were doing at the

5    time, such as McKesson, so it would be something to consider

6    going forward.

7      Q    Do you know what other vendors were using as the

8    monthly threshold?

9      A    I don't know.  We only had interaction with

10    McKesson at the time.

11     Q    And the next bullet, Bottles versus Unit of Dose;

12    what does that mean?

13     A    I'll be honest, I don't know.

14     Q    Okay.  You don't recall how this would enhance the

15    program?

16     A    I do not.

17     Q    The next bullet, All SKU's versus limited GCNs; do

18    you know what that means?

19     A    I don't.

20     Q    Don't recall how that would enhance the program

21    either?

22     A    I do not.

23     Q    Okay.  Next bullet is, Order Averages and Store

24    Volumes; do you know what that means?

25     A    Based on the pharmacy prescription volume, again,

1     this list was more like factors to consider and not

2     necessarily the more kind of discussion points, and do the

3     averages match up with the store volumes, do those need to be

4     reviewed.

5           Q     And that's something that the SOMS program has

6     instituted at this time was considering?

7           A     Based on the box at the top, I believe it was.  I

8     think this was more just me asking -- would like to

9     understand how that current average is calculated.

10          Q     Okay.  That's what it says in the sub-bullet right

11    beneath that, Would like to understand how current average is

12    calculated and potentially expand this; do you see that?

13          A     Yes.

14          Q     Did you ever receive the information to help you

15    understand how that average was calculated?

16          A     I don't remember.

17          Q     And the next bullet point in the section says, DEA

18    Reporting; do you know what that means?

19          A     I don't.

20          Q     You don't know what that means?

21          A     Well, besides -- I don't know what it means in

22    context to this.

23          Q     Okay.  And below that section is another section

24    titled Recommendation.  It says Ponca Responsibilities; do

25    you see that?

1       A    Yes.

2       Q    And this means that the process described in this

3    section was a recommendation only and not already in place as

4    of April 2014; is that right?

5       A    Some of it may have been in place, some of it may

6    have been expansion, some of it may have been a

7    recommendation.

8       Q    So even though this section is titled

9    Recommendation, you're saying some of these may have already

10   been there?

11      A    Correct.

12      Q    Okay.  Do you know why it was titled Recommendation

13   then?

14      A    At the time, no.

15      Q    And these recommendations were made by you?

16      A    Yes.

17      Q    And these recommendations were directed to Bobbie

18   Riley?

19      A    Yes.

20      Q    Were they directed to anyone else?

21      A    I don't remember if I sent it to Lynette or not.

22      Q    Well, would Bobbie Riley have had the authority or

23   power to implement these recommendations?

24      A    In conjunction, it would have been a collaboration

25   with Ponca and Lynette, of course.

1      Q    The first box in this Recommendation section says,

2   Review Limited GCNs on each order with following

3   identification greater than 20 percent average and 1,000

4   units over average with exception.  Do you know what this

5   means?

6      A    The GCNs, are the, I believe at the time the way

7   the drugs were categorized.  So I believe this was actually

8   one of those that was already in place.

9      Q    Do you know how the 20 percent average interacted

10  with this 1,000 units over the average?

11     A    I don't remember.

12     Q    Do you know if this recommendation in this box --

13  or you said this was already in place at the time?

14     A    I believe so.

15     Q    Even though this is listed in the Recommendation

16  section and not the current state section?

17     A    Correct.

18     Q    The next box over says, Ponca calls store prior to

19  shipment to determine if it was ordered in error and if store

20  really wants it.  This is documented with date, time and

21  associate spoken.  Do you see that?

22     A    Yes.

23     Q    Why were you recommending this?

24     A    Again this was a process that was already in place.

25     Q    This was already happening also?

1        A    Yes.  These were the call logs that we discussed

2    earlier.

3        Q    But again, you put this in the recommendation

4    section, not the current state section?

5        A    Correct.

6        Q    Do you know why you did that?

7        A    It was just detailing out a process.  And some of

8    it, like I mentioned this earlier, this was an evolution, you

9    know, as you learn and so on.  And so you're going to keep

10    some pieces that you already have, but then maybe

11    enhancements to other things.

12        Q    Do you know if the call determined anything other

13    than whether the store -- the order was an error?

14            MS. MILLER:  Object to form.  You're asking about

15    the way it was or her recommendation?

16            MR. LICHTER:  I'm asking about what the -- the way

17    it was, let's start with.  Start with the way it was.

18            THE DEPONENT:  I'm sorry, could you repeat the

19    question?

20        Q    (By Mr. Lichter) Sure.  The second box here says,

21    Ponca calls store prior to shipment to determine if it was

22    ordered in error and if store really wants it.

23            At the time you sent this e-mail, were there

24    any other reasons that the Ponca City warehouse was calling

25    stores?

```
 1        A    They would call when there was -- on their

 2   exception report.

 3        Q    But the only reason that they were calling if an

 4   order was on the reception report, according to this, was to

 5   determine if it was ordered in error and if the store really

 6   wants it, correct?

 7             MS. MILLER:  Object to form.

 8             THE DEPONENT:  So they were asking why -- in

 9   addition, they were also asking why it was ordered.

10        Q    (By Mr. Lichter) Okay.  And then it says, this is

11   documented with date, time and associate spoken.  Was that

12   already happening when you made this recommendation?

13        A    Yes.

14        Q    So the first two boxes under the recommendation

15   section were already happening?

16        A    I believe so.

17        Q    Okay.  Third box says, Send to procurement

18   immediately if store wants product sent.  If unable to get

19   ahold of procurement, product is held until next order or cut

20   back to average; do you see that?

21        A    Yes.

22        Q    So under this recommendation, if the pharmacy

23   confirms it wants the product as ordered, the distribution

24   center employee submits the order to the procurement

25   department and the order gets filled as requested; is that
```

1    right?

2        A    I don't -- I'll be honest, I don't believe that's

3    -- our procurement department is the one that actually

4    purchases the medications for Ponca, and so I don't remember

5    why it was sent to Procurement if they were the ones that

6    released it, if -- or how that all worked.

7        Q    You don't know what it means the product is held

8    until next order or cut back to average?

9        A    That piece -- yes, I just don't understand -- I

10   don't remember what the role of Procurement was within this

11   process.

12       Q    So was your recommendation here for product to be

13   held until the next order cut back to average?

14       A    Yes, that was a recommendation.

15       Q    Was that already in place at this time?

16       A    I don't remember.

17       Q    The fourth box over says, Ponca to report to DEA on

18   repeat offenders.  Do you see that?

19       A    Yes.

20       Q    Do you know what a repeat offender is?

21       A    I would assume in this case it was the stores that

22   were consistently on the exception report that didn't have a

23   good reason.

24       Q    Why were you recommending this?

25       A    Because at the time that was what was the

1    responsibility of Ponca, in my opinion.

2         Q    Are you saying that this was already happening as

3    well?

4         A    My understanding, it was.

5         Q    Just so we're clear, all four of these boxes and

6    the recommendations section, you're testifying that these

7    were already in place at the time you sent this chart to

8    Bobbie Riley?

9         A    I do not know if the third box was in place.

10        Q    Okay.

11        A    And I don't remember the responsibilities of

12   Procurement within the process, so I cannot answer accurately

13   what that process was.

14        Q    So the first box was already in place, the second

15   box was already in place, and the fourth box was already in

16   place, and you're not sure about the third; is that right?

17        A    I believe so.

18        Q    Okay.  You mentioned before that after you sent

19   this to Bobbie Riley, you didn't know if your recommendations

20   were implemented; do you recall that?

21        A    Correct.

22        Q    It looks like all of these, with the exception of

23   maybe one, were already implemented when you sent this?

24        A    Correct.  The purpose of the document was to have

25   some conversations around the bullet points at the top,

1     around how those were going to interact, if those are

2     opportunities to enhance the process.

3          Q    Take a look at the next page, the last page of the

4     document.  Top says, Procurement Responsibilities; do you see

5     that?

6          A    Yes.

7          Q    And the -- did you create this chart also?

8          A    Yes, it was all part of the same document.

9          Q    Okay.  And the -- was this chart also part of your

10    recommended procedure?

11         A    I believe so.

12         Q    Okay.

13         A    Well, let me rephrase that.  I don't know.  Like I

14    mentioned earlier, I don't remember what the Procurement

15    responsibilities are, and so I don't know if they were in

16    place at this time or if this was a true recommendation.

17         Q    Okay.  The first box says, Contact DPM if product

18    is to be released.  Who would have contacted the DPM in this

19    instance?

20         A    I would assume someone in Procurement.

21         Q    DPM is Division Pharmacy Manager?

22         A    Yes.

23         Q    Do you know why they would have been contacting the

24    Division Pharmacy Manager if product is to be released?

25         A    I don't remember.

1      Q    Again, you don't know if this was in place or if

2    this was a recommendation that was not yet in place?

3      A    Correct.

4      Q    Okay.  Second box over says, DPM to follow up with

5    store team and back to Procurement with direction.  Can you

6    explain what that means?

7      A    I'll be honest, based on the first box, the second

8    box doesn't make sense to me.  Because if the product goes to

9    be released, I'm not sure why the DPM would need to follow up

10   on anything at this point.

11     Q    Okay.  I guess you wouldn't know why you would be

12   making this recommendation?

13     A    I do not remember.

14     Q    Okay.  You don't know if this was ever implemented

15   either?

16     A    I do not.

17     Q    Could it have already been implemented?

18     A    Potentially.

19     Q    Third box says, Procurement to give direction to

20   Ponca and notify Compliance for possible suspicious ordering.

21   Can you explain what this part means?

22     A    Again, these boxes don't make sense together.

23   Based on the first box, if the product was to be released to

24   the store, I'm not for sure why the next two boxes would even

25   exist.

```
 1        Q    So you don't know what kind of direction would be

 2   given here in this third box?

 3        A    Correct.

 4        Q    So you don't know if the information in this third

 5   box was already in place or if it was just a recommendation

 6   at this time?

 7        A    I don't remember.

 8        Q    Below the section says, GCNs to be reviewed, and

 9   then it lists 16 different drug types; do you see that?

10        A    Yes.

11        Q    Can you explain what this means?

12        A    Again, GCNs are categories of drugs, if I remember

13   correctly, and these would have been the drugs I would have

14   recommended to be reviewed.

15        Q    So this was a recommendation or was it already in

16   place?

17        A    I don't remember which drugs we were reviewing at

18   the time.  So these all very well could have been in place.

19        Q    Do you know why you were recommending these 16?

20        A    I don't.  I don't remember if there was like any

21   additional ones that we were not already reviewing, or if

22   this is the same list that we were already reviewing.  Maybe

23   I was just trying to be thorough.

24        Q    And who would have been conducting the reviews?

25        A    They would have gone through the current process,
```

```
 1     which I believe was Ponca.

 2          Q    Do you recall how the drugs on this list here were

 3     picked to be included on the list?

 4          A    Based on DEA recommendations.

 5          Q    Does that mean that they were more likely to be

 6     diverted than other drugs?

 7          A    Diverted or written for large quantities, you know,

 8     what I call external diversion by prescribers or by patients.

 9          Q    You don't know which drug types were being reviewed

10     prior to this, if any?

11          A    I do not remember.

12          Q    I guess you don't know if this list was ever

13     implemented as a regulation or if it was already in place?

14          A    Correct.

15          Q    Do you recall discussing the context of this

16     document with Bobbie Riley?

17          A    I do not.

18          Q    Do you recall discussing the context of this

19     document with anybody?

20          A    I do not.

21          Q    And you said you don't know what the results of

22     sending this document to Bobbie Riley were?

23          A    Correct.

24          Q    Okay.  You don't know if any changes to Albertsons'

25     SOMS were made as a result of this document?
```

```
 1        A    Correct.

 2        Q    Do you recall having any other follow-ups with

 3   anyone on how Albertsons' SOMS was implemented or going to be

 4   implemented?

 5        A    No.

 6        Q    You said initially that the purpose of you sending

 7   this was to sort of tie yourself into the SOMS program; do

 8   you remember that?

 9        A    Yes.

10        Q    Were you tied into the SOMS program at any point

11   after sending this?

12        A    No.

13        Q    Okay.  Set this exhibit aside.  Next document

14   marked as Exhibit 3.

15             (Whereupon, Exhibit No. 3 was marked for

16   identification.)

17             MR. LICHTER:  For the record, this document is

18   Bates number ALB-NM00017941.

19        Q    (By Mr. Lichter) Have you seen this document

20   before?

21        A    Not since 2014.

22        Q    Okay.  So is this a July 10, 2014 e-mail you

23   received from Scott Johnson?

24        A    It appears so.

25        Q    Scott Johnson was the Director of Pharmacy
```

```
 1      Procurement for Albertsons at this time?

 2          A    Correct.

 3          Q    And the e-mail says, Lynette indicates we do not

 4      need to report each time we remove product from an order.  We

 5      must report to DEA once we believe it to be suspicious.  Do

 6      you see that?

 7          A    Yes.

 8          Q    Is he referring to cutting or reducing opioid

 9      orders before they're shipped to Albertsons pharmacies?

10          A    It appears to be so.

11          Q    Do you recall why he was sending you this e-mail?

12          A    I do not.

13          Q    Were you involved at all in the process of cutting

14      or reducing opioid orders?

15          A    Not that I remember.

16          Q    Were you involved at all in the process of

17      reporting opioid orders to the DEA?

18          A    No.

19          Q    Were you involved at all in identifying orders as

20      suspicious at any time?

21          A    No.

22          Q    Okay.  Based on this e-mail, was it your

23      understanding that cutting or reducing orders did not require

24      Albertsons to report an order to DEA?

25          A    Based on what is written, that would be my
```

1     assumption.

2          Q    Do you know if this reflected Albertsons' policy at

3     this time?

4          A    I do not.

5          Q    Is there a difference between a cut order and a

6     suspicious order?

7          A    I don't know.

8          Q    Below that Scott says, secondly, for guardrails,

9     and then lists what he identifies as triggers for certain

10    bottle counts; do you see that?

11         A    Yes.

12         Q    Can you explain what a trigger is?

13         A    I don't know.  I don't know if it's related to max

14    picks, I don't know if it's related to what's on the call

15    exception report.

16         Q    Do you know what would happen if a bottle count

17    reached one of these triggers?

18         A    I don't remember.

19         Q    Do you know what time period these figures were in

20    place for?

21         A    I don't.

22         Q    Do you know who set these triggers?

23         A    I do not.

24         Q    Do you know what these triggers are based on?

25         A    I do not.

1        Q    Do you know if the triggers ever changed?

2        A    I do not.

3        Q    And you don't recall the context of why you would

4    have been receiving this information from Scott Johnson at

5    all?

6        A    No.

7        Q    Do you recall any conversations you had with Scott

8    Johnson or anyone else regarding the information in this

9    document?

10       A    I do not.

11       Q    All right.  Let's set that aside.  Next document

12   marked is Exhibit 4.

13            (Whereupon, Exhibit No. 4 was marked for

14   identification.)

15            MR. LICHTER:  For the record, this document is

16   Bates labeled ALB-MN00126707.

17       Q    (By Mr. Lichter) Have you seen this document

18   before?

19       A    I believe so.

20       Q    When is the last time you saw it?

21       A    I think yesterday.

22       Q    Is this a copy of Albertsons December 9th, 2014

23   Pharmacy Compliance Committee Meeting Minutes?

24       A    Yes.

25       Q    What is the Pharmacy Compliance Committee?

```
1          A     It was made up of individual pharmacy compliance,

2    but then other areas of the business, such as HR, our managed

3    care team, our systems team, legal, operations, talking about

4    compliance-type items.

5          Q     Do you know how often this committee met?

6          A     I believe we met monthly.

7          Q     Monthly?  Were those meetings in person typically?

8          A     Typically, yes.

9          Q     Were you a member of the committee?

10         A     Yes.

11         Q     Do you remember for what years you were a member of

12   the committee?

13         A     I think 2013 to 2015.

14         Q     And this lists you as one of the meeting attendees

15   at the top, does that mean that you attended this meeting?

16         A     Correct.

17         Q     Do you recall attending this meeting?

18         A     Since my name is on it, I would assume I was there.

19         Q     Now, looks like each topic addressed at the meeting

20   is described in the chart with a prioritized agenda topic.

21   On the left the presenter in the middle and then the time on

22   the right; is that right?

23         A     Correct.

24         Q     If you turn to page 126710 where it says topic 8,

25   see that?
```

```
 1          A    Yes.

 2          Q    Okay.  And then it says Ponca Distribution Project

 3     Updates SOM; do you see that?

 4          A    Yes.

 5          Q    And the presenters for this topic are listed as

 6     Bobbie Riley and yourself; is that right?

 7          A    Correct.

 8          Q    What does that mean to be a presenter of the topic?

 9          A    Just to report out on any updates, things of that

10     nature.

11          Q    Okay.  So you and Bobbie Riley would have spoken to

12     the rest of the committee about topic number 8?

13          A    Yes.

14          Q    Okay.  It says, notes, Bobbie provided an update on

15     the continuing development of the SOM process for Ponca and

16     the guidance provided by outside DEA counsel.

17               Do you know what the continuing development to

18     the SOM process entailed at this time?

19          A    I do not.

20          Q    It also references the guidance provided by outside

21     DEA counsel; do you see that?

22          A    Yes.

23          Q    And who is outside DEA counsel?

24          A    I'll be honest, I don't remember the law firm that

25     was being utilized.
```

1      Q    Was it Quarles & Brady?

2      A    Potentially.

3      Q    Do you remember if the name of counsel was Larry

4   Cote?

5      A    That sounds familiar.

6      Q    Do you believe that to be the person that's

7   referenced here?

8      A    I believe so.

9      Q    Do you recall what guidance you gave to Albertsons

10   regarding the SOMS program?

11      A    I do not.  I was not involved in that.

12      Q    Do you know if that guidance was documented

13   anywhere?

14      A    I do not.

15      Q    Do you know if this guidance was ever implemented?

16      A    I do not.

17      Q    Even though you're named as one of the presenters

18   of this topic?

19      A    Correct.  I believe I was presenting on my piece of

20   it, which was around was the diversion investigation process.

21      Q    It says, Nikki reported on stores that were

22   currently on an action plan based on the criteria developed

23   through our diversion investigative process.  Do you see

24   that?

25      A    Yes.

1      Q    It says, the diversion investigative process, is

2    that what we talked about previously as far as you receiving

3    certain data points for stores and then coordinating with

4    other people to follow up on those stores?

5      A    Correct.

6      Q    Do you recall which stores you reported on here?

7      A    I do not.

8      Q    Then it says, Jim raised the issue about the

9    pushback that he anticipates from operators based on the

10   process.  Bobbie responded that they were aware of the

11   potential problem and have made a concerted effort to get out

12   in front of the issue to educate the diversion personnel

13   appropriately to defray any concerns.  Do you see that?

14     A    Yes.

15          MS. MILLER:  I would just make one clarification.

16   You said diversion instead of division.

17          MR. LICHTER:  Division, I'm sorry.  You're right.

18   I have division there.

19     Q    (By Mr. Lichter) What is the pushback from the

20   operators that's referenced here?

21     A    With store action plans there were guidance given

22   to the stores as far as having to call physicians,

23   prescribers on particular, you know, particular medications,

24   for example, or getting diagnosis codes that basically would

25   create additional time to fill a prescription within the

1      pharmacy.

2          Q    Why would there have been pushback on that?

3          A    Because it would take additional time to get that

4      prescription out.  So it could potentially put them behind in

5      filling the prescriptions because of a handful of

6      prescriptions taken into shelf time to fill.

7          Q    This is referring only to instructions given in

8      particular store action plans; is that right?

9          A    Correct.

10         Q    Do you know about how many -- an estimate of about

11     how many store action plans would have been issued in a given

12     year while you were the Director of Compliance?

13         A    In any given year, I don't remember.

14         Q    Would it have been in excess of 100 in a given

15     year?

16         A    No.

17         Q    Below 100?

18         A    In one year, probably below 100.

19         Q    Around 50?  Any sort of estimate you can give me

20     below 100 in any given year?

21         A    I'll be honest, I don't remember.

22         Q    Okay.  And you were in charge of creating those

23     action plans?

24         A    Yes.

25         Q    Where it says Bobbie responded that they were aware

1    of the potential problem, is that -- is the potential problem

2    the pushback that Albertsons anticipated from the stores?

3         A    Correct.

4         Q    Okay.  And it says Nikki reported that the reaction

5    from the stores is about 50-50; what does that mean?

6         A    There were stores that, you know, were like, okay,

7    we'll do it, we'll get it done, we'll do what you ask.  There

8    was other stores that would, you know, that that would be

9    where the pushback would be as far as like, oh, this is what

10   we have to do to ensure that we're dispensing appropriate

11   prescriptions.

12        Q    And how did the stores typically voice their

13   pushback?

14        A    They would tell me directly during -- when we

15   presented the store action plans to them, or they may tell

16   their DPM after the fact.

17        Q    Do you recall ever creating a store action plan for

18   any of Albertsons stores located in Tarrant County, Texas?

19        A    I do not.

20        Q    Could you have made action plans for that area and

21   you just don't recall?

22        A    No, I did not.

23        Q    No, you did not create?

24        A    I did not create any action plans for any stores in

25   Tarrant County that I'm aware of.

1      Q    Do you know if at any time store action plans were

2    created for any stores in Tarrant County by anybody else?

3      A    Oh, I don't know.

4      Q    Set this one aside.  The next document marked is

5    Exhibit 5.

6              (Whereupon, Exhibit No. 5 was marked for

7    identification.)

8              MR. LICHTER:  For the record, this document is

9    Bates number ALB-NM00015706.

10     Q    (By Mr. Lichter) Before you jump in here, you

11   mentioned that were no action plans that you created for any

12   stores in Tarrant County, Texas, right?

13     A    Correct.

14     Q    Do you recall ever investigating any prescribers in

15   or around Tarrant County, Texas for any reason?

16     A    That I don't remember.

17     Q    Okay.  How about investigating any patients in or

18   around Tarrant County, Texas?

19     A    That I don't remember.

20     Q    Did part of your investigation and data points

21   involve collecting or reviewing prescriptions themselves?

22     A    Yes.

23     Q    Was part of your review of those prescriptions to

24   look at or analyze red flags contained on those

25   prescriptions?

1      A   Yes.

2      Q   How did that factor into your investigations?

3      A   The red flags?

4      Q   Your review of red flag prescriptions.

5      A   Again, they would be data points to kind of create

6   a whole story, you know, a big picture of what was occurring

7   at the store.

8          So, you know, if there was -- you might see a

9   patient that was far away, that lived far away from a

10  prescriber, you know, far away from the pharmacy, you have to

11  take that and kind of in the big scheme of things, it could

12  mean, okay, yeah, there's a problem there, but it also could

13  mean that this patient is coming to a specialist out of state

14  for a particular medical condition that they don't have in

15  and around their area.

16         So you have to put them together to really

17  understand what's going on.  So looking to identify if

18  there's multiple red flags, if there's one or two red flags,

19  what that means, but you have to have -- you have to be able

20  to have all the data to be able to make a good exception or a

21  good theory of what was occurring in that store.

22     Q   Again, this is just one component of your

23  investigations on the way to creating a store action plan?

24     A   Correct.

25     Q   Do you know when this process of creating store

1      action plans was first implemented by Albertsons?

2           A    I don't remember.

3           Q    Do you remember about what year it may have been?

4           A    That's what I was trying to determine and I don't

5      remember if it was 2013 or 2014.

6           Q    One of those two years, though?

7           A    I believe so.

8           Q    Looking at Exhibit 5, have you seen this before?

9           A    Yes.

10          Q    When was the last time you saw it?

11          A    This week.

12          Q    Is this a June 6, 2016 e-mail you received from

13     Darrell Adams?

14          A    Yes.

15          Q    At this time Darrell Adams was the Manager of

16     Pharmacy Operations for Albertsons?

17          A    Yes.

18          Q    The e-mail says, DPOs, wanted to provide a couple

19     of updates that we have received.  Do you see that?

20          A    Yes.

21          Q    What are DPOs?

22          A    Director of Pharmacy Operations.

23          Q    Was that your title at this time?

24          A    Yes.

25          Q    And the e-mail continues, we only have a couple of

1    more weeks of Ponca inventory left.  Approximately

2    $8.6 million left to move, which is down from 25.4 million in

3    total inventory four weeks ago.  Do you see that?

4         A    Yes.

5         Q    Is this referencing the fact that the Ponca City

6    distribution center stopped distributing drugs in 2016?

7         A    Yes.

8         Q    So 25.4 million in inventory down to 8.6 million in

9    inventory refers to the amount of product left on the shelves

10   at the Ponca warehouse; is that right?

11        A    Yes.

12        Q    Okay.  A few lines down it says, all medications,

13   including CIIs are being pushed out to the stores.  Only

14   stores on CSOS are receiving the CIIs.  Stores will see

15   product coming in that they do not need or ordered in the

16   past.  This is a necessary evil with the Ponca flush.  Do you

17   see that?

18        A    Yes.

19        Q    And do you see that the phrase "including CIIs" is

20   bolded and underlined?

21        A    Yes.

22        Q    So does this mean Albertsons was sending out all of

23   its drugs including Schedule 2 and Schedule 3 opioids to its

24   pharmacies across the country even if they didn't order any?

25        A    Correct.

```
 1        Q    And was this push limited to certain geographic

 2   area or was this into all Albertsons stores across the

 3   country?

 4        A    It was into all Albertsons legacy stores.

 5        Q    Can you explain what that means?

 6        A    Yes.  Because at this time we had merged with

 7   Safeway.  So Safeway locations, because they were on

 8   different systems, that they would not receive this product

 9   and they had a different ordering process.

10        Q    Okay.  So this push was only going to Albertsons

11   stores and Albertsons banners rather than Safeway stores and

12   Safeway banners, correct?

13        A    Correct.  There could be Albertsons -- yes.

14        Q    Okay.  Do you know what other banners other than

15   the Albertsons banner would have been receiving these drugs

16   at this time?

17        A    Yes.  So it would have been any store that was tied

18   back to a legacy Albertsons.  So, for example, Jewel-Osco,

19   Shaw's, ACME, even though they don't have Albertsons on the

20   name on the outside, they were legacy Albertsons stores.

21        Q    So this push then would have included Albertsons

22   legacy stores in Tarrant County, Texas as far as you know?

23        A    Yes.  I don't know how many there are, but if there

24   are any, yes.

25        Q    Okay.  Again, this was pushing Schedule 2 and
```

1    Schedule 3 opioids to those stores that didn't actually order

2    them, correct?

3         A    Yes, including non-controls as well too.

4         Q    Controls and non-controls?

5         A    Yes.

6         Q    Do you agree that this process was a necessary

7    evil?

8              MS. MILLER:  Object to form.

9              THE DEPONENT:  I agree that this was a process that

10   was -- needed to happen.

11        Q    (By Mr. Lichter) So you agree it was necessary,

12   correct?

13        A    I think it was necessary.

14        Q    Do you agree with the evil component of that

15   statement?

16        A    Not necessarily.

17        Q    Okay.  Do you think pushing out these drugs to

18   those stores could have been dangerous or problematic?

19        A    In the stores that I oversaw that had this, the

20   majority of product that they received was non-controls.

21        Q    And what about for the stores that are were

22   receiving controls, did you have a concern that pushing these

23   drugs out to them was problematic or dangerous?

24        A    Because of the small quantities that were going

25   out, no, I did not.

1       Q    When you say small quantities, it was --

2       A    So the percentage of controls versus non-controls

3   that was being pushed out was small.

4       Q    Do you have any idea how small or what percentage

5   it would have been from the whole?

6       A    I do not.

7       Q    Okay.  So when you say it was a small percentage,

8   what is that based on?

9       A    Based on -- if you look back, there is a list of

10  drugs that was sent out that included, you know, what drugs

11  were being included, and when we looked through here, the

12  majority of them are non-controls.

13      Q    And you're referencing here the attachment to this

14  e-mail that we're looking at?

15      A    Yes.

16      Q    On the first page here, before we leave, the last

17  bullet says, I have attached the list of medications that are

18  going to be pushed and focused on for this week; do you see

19  that?

20      A    Yes.

21      Q    And then just like you're referencing here

22  it attaches the list of medications to this document,

23  correct?

24      A    Yes.

25      Q    Take a look at the attachment, which was a

1    spreadsheet Bates labeled ALB-NM00015710, which we picked it

2    up, and take a look at the second to the last page of the

3    attachment to see some of those specific medications

4    Albertsons pushed and focused on.

5              Let me know when you're there.

6    A    Yes.

7    Q    And about seven boxes from the bottom of this page

8    it lists 1200 micrograms of fentanyl lozenges; do you see

9    that?

10   A    Yes.

11   Q    Then it says 1600 micrograms of fentanyl lozenges;

12   do you see that?

13   A    Yes.

14   Q    A few below that it lists hydrocodone compound

15   syrup; do you see that?

16   A    Yes.

17   Q    And 800 micrograms of fentanyl lozenges; do you see

18   that?

19   A    Yes.

20   Q    And on the last page another hydrocodone

21   medication; do you see that?

22   A    Yes.

23   Q    In hindsight, do you think it could have been

24   dangerous or problematic for Albertsons to push out these

25   drugs that we've just named here to pharmacies across the

```
1       country that didn't even request them?

2                   MS. MILLER:  Object to form.

3                   THE DEPONENT:  Potentially.

4       Q    (By Mr. Lichter) Why is that?

5       A    For a number of different reasons.  If they didn't

6   need them, they were going to sit there on their shelves, it

7   could potentially cause, you know, a risk in the stores for

8   someone to steal them because they're not being used so

9   they're not being monitored as much.

10                  It could cause potential, you know, if a

11  patient found out that they were there, it could cause theft.

12  Those type of things.

13      Q    So the push would have presented a heightened risk

14  of diversion?

15      A    Potentially.

16      Q    Okay.

17                  MR. LICHTER:  This might be a good stopping point

18  for lunch.

19                  THE VIDEOGRAPHER:  We are going off record.  Time

20  is 12:11.

21                  (Whereupon, a lunch break was taken from 12:11 p.m.

22  to 12:54 p.m.)

23                  THE VIDEOGRAPHER:  Going back on record.  Time is

24  12:54.

25                  EXAMINATION (Cont'd)
```

1      BY MR. LICHTER:

2          Q    Welcome back, Ms. Price.  I'll go ahead and have

3      the next document marked as Exhibit 6.

4               (Whereupon, Exhibit No. 6 was marked for

5      identification.)

6               MR. LICHTER:  For the record, this document is

7      Bates numbered ALB-NM00029299.

8          Q    (By Mr. Lichter) I know the print on this document

9      is a little small, so hopefully you can see it blown up on

10     the screens here in front of us to help us out.

11               Have you seen this document before?

12         A    Yes.

13         Q    And when is the last time you saw it?

14         A    Maybe last week.

15         Q    Okay.  Is this an e-mail string you started with

16     Bobbie Riley on February 4, 2014?

17         A    Yes.

18         Q    On the bottom of the page on February 4, 2014 you

19     wrote to Bobbie Riley, maybe we can have a quick discussion

20     around this later today.  I spoke with the Director of

21     Government Affairs at Rite Aid, Janet Hart.  She was very

22     forthcoming.  They have a dedicated resource to monitor

23     physician prescribing habits for their chain.  That is all

24     this person does.  I think we could use a full-time resource

25     to look at physicians, pharmacies, LPAs, et cetera.  But we

1     could probably suffice initially with part time at 20 hours.

2     Do you see that?

3          A    Yes.

4          Q    Was Albertsons' monitoring physician prescribing

5     habits prior to this e-mail?

6          A    Not to the extent that we would have liked to with

7     the IMS.  We did it, you know, as we received information

8     from teams in regards to a physician, pretty firm, but also

9     offered to review physicians for us if we had a concern about

10    one as well too.

11         Q    Prior to this e-mail, was it more on sort of an ad

12    hoc basis?

13         A    Correct.

14         Q    And prior to this e-mail were you the one primarily

15    responsible for those monitoring efforts?

16         A    Yes.

17         Q    Okay.  Did Albertsons devote any additional

18    resources to monitor physician prescribing habits after this

19    e-mail?

20         A    Yes, we were able to, one, get IMS, which was a

21    database that we were able to review physician prescribing

22    habits as we discussed earlier; and then also we had Debbie

23    Beringer was with us at that time as well too.  And so part

24    of -- some of my time of investigations went to her so that I

25    could devote some to physician monitoring.

1      Q     So after this e-mail is when Debbie Beringer

2      started to help out with the physician monitoring?

3      A     She took more on a role of investigations off my

4      plate so that I could do the physician monitoring.

5      Q     And what was she investigating if you were doing

6      the physician monitoring?

7      A     The internal, you know, the other things that we

8      talked -- the CSMP that we talked about earlier.

9      Q     Okay.  So was she helping with the physician

10     component of that?

11     A     To a very small extent.  It was mainly me.

12     Q     Okay.  So did Albertsons ever hire a full-time

13     resource to look at physicians, pharmacies, LPAs, et cetera?

14     A     Eventually, yes.  So with -- at this time, I

15     believe the merger with Safeway had been announced and so we

16     knew that we would be merging with a team there and that's

17     when it was officially started being called the PCAT team.

18     Q     Do you know what PCAT stands for?

19     A     Pharmacy Compliance and Analyst -- I can't remember

20     the full name of it.  We've always just called it PCAT.

21     Q     What were they primarily responsible for?

22     A     So monitoring pharmacy teams, prescriber habits,

23     things of that nature.  So basically what I was doing as an

24     internal/external diversion.

25     Q     You said the PCAT team came on the scene around

1    2015?

2        A    Yes.  So once we merged, we met with them and

3    basically took their training documents and merged them with

4    our training documents and was able to use some of ours.  So

5    we were able to enhance some of their processes and then

6    that's when -- and then that was devoted from there.

7        Q    So did the PCAT team -- well, strike that.

8             Was the PCAT then a holdover from the Safeway

9    stores?

10       A    There were members -- yeah.  So they actually -- I

11   believe they actually -- Safeway called them PCAT.  If you

12   looked at what they did and what Debbie and I did, we

13   basically were a PCAT as well, we just didn't call ourselves

14   that.

15       Q    So then after the merger and Albertsons absorbed

16   them, how were the monitoring responsibilities split among

17   the actual PCAT team and you and Debbie?

18       A    That's when I was starting to transition into my

19   other role, so I can't -- I was more involved in their

20   initial training and establishing the procedures.  As far as

21   how it was broken up, I don't know.

22       Q    You said after you moved from that position, that

23   role was filled by Jessica Covaci?

24       A    Yes.

25       Q    Is she still in that position?

1        A    No.

2        Q    Do you know who currently is in that position?

3        A    Lena -- and I'll be honest, Lena's last name is

4   extremely difficult to pronounce, Israbian-Jamgoehian.

5        Q    Do you know how long she's been in that position?

6        A    Maybe two years, two and a half years.  2023 --

7   yeah, approximately that.

8        Q    And she filled that position after Jessica Covaci?

9        A    Yes.

10       Q    Since the PCAT team came on, you don't have any

11  information as to how -- as to what specific monitoring roles

12  they took on?

13       A    No.

14       Q    Okay.  Take a look at page 29302 of the document.

15  And is this the attachment to the e-mail string we just

16  looked at?

17       A    Yes.

18       Q    Is this the proposal for Albertsons to engage IMS

19  Health?

20       A    Yes.

21       Q    And we talked about them before, IMS is the company

22  that provided the data analytics for Albertsons, correct?

23       A    Correct.

24       Q    Okay.  Do you know why Albertsons was considering

25  engaging IMS Health at this time?

1     A    We -- I had established that we needed a tool to be

2     able to help monitor on a consistent basis and give us more

3     of -- when I was doing it, we could only look at our own

4     data, wherein IMS you could look at it -- they had data from

5     not only us, but other retail chains, and so you could really

6     see a fuller -- you have more data to support what we were,

7     you know, going after.

8          So basically it was -- trying to word it

9     correctly here.  You could really just see kind of a bigger

10    picture of that prescriber and what they're doing because it

11    was taken into account all of the prescriptions they were

12    writing and not just the ones that were being fill at our

13    stores.

14    Q    Was there any specific reason why you suggested a

15    third party like IMS at this time versus at any other time?

16    A    Just that it -- we knew that it would help fulfill

17    a gap compared to what we had had at that point in time.

18    Q    Can you explain what that gap was?

19    A    That we could only see the prescriptions that were

20    being filled at our pharmacies.  So if we were in a market

21    where maybe we had lower market share versus another

22    retailer, we're only seeing a very small percentage of the

23    prescriptions written versus seeing large amounts of

24    prescription history.  It gives a better view of what is

25    really occurring.

1        Q     After the three bullet points at the top of this

2    page, the first full paragraph reads, But, there is a gap in

3    monitoring the dispensing of controlled substances; is that

4    the gap you're referring to?

5        A     Yes.

6        Q     Okay.

7        A     I should add to that gap, it just allowed us to be

8    more proactive versus reactive in our control substance

9    monitoring.

10       Q     That would be by engaging IMS Health would allow

11   you to be more proactive?

12       A     Yes.

13       Q     I guess you would describe Albertsons' process

14   prior to engaging IMS Health as reactive?

15       A     As more we would receive reports from pharmacists

16   or I'd get a report and then we would investigate from there.

17   This would allow us to do a proactive approach by

18   consistently monitoring controlled substances written.

19       Q     Do you recall when Albertsons actually engaged IMS

20   Health?

21       A     Shortly after this e-mail.

22       Q     So it would have been February 2014?

23       A     Approximately.

24       Q     Again, paragraph continues, By monitoring the

25   dispensing patterns, internal diversion through prescription

1    filling as well as external diversion by physicians and

2    patients could be identified.

3                So this is -- is there additional benefits to

4    engaging IMS Health?

5        A    Correct.

6        Q    Okay.  And it says, Today we rely on our

7    pharmacists to make a professional judgment using only their

8    dispensing data, and if available State prescription

9    monitoring programs, PMP?

10       A    Yes.

11       Q    In addition, the DEA would see this as a positive

12   step toward monitoring controlled substance dispensing within

13   our pharmacies.  As a corporate entity, this is an area that

14   is lacking.

15                Now, do you agree with that last sentence at

16   the time your e-mail of February 2014, it was an area that

17   was lacking at Albertsons?

18       A    It was lacking in that we could only see one piece

19   of our data of, say, a prescriber, or a patient, or mainly

20   those two things, where this would allow us to be able to see

21   all of that and it would enhance our process.

22       Q    Prior to engaging IMS, did Albertsons' actual

23   pharmacists have visibility into any dispensing data to help

24   them in their dispensing duties?

25       A    Only their own store location.

1      Q    So they could look at the dispensing data of

2   whatever store they were working at at the time?

3      A    Correct.

4      Q    Okay.  Did that change after IMS was engaged?

5      A    No, but we would be able to identify this

6   proactively, target those areas, and then potentially put

7   stores on action plans to help them with that piece of it.

8      Q    But even after engaging IMS Health, the actual

9   pharmacist didn't have access to any additional information,

10  correct?

11     A    Correct.

12     Q    You can set this one aside.  I'll have the next

13  document marked as Exhibit 7.

14          (Whereupon, Exhibit No. 7 was marked for

15  identification.)

16          MR. LICHTER:  For the record, this document is

17  Bates number ALB-MN00016158.

18     Q    (By Mr. Lichter) Have you seen this document

19  before?

20     A    Yes.

21     Q    When was the last time you saw it?

22     A    When it would have been originally sent out.

23     Q    Okay.  So is this a March 1, 2016 e-mail you

24  received from Matthew Churns?

25     A    Yes.

1      Q    And at the time of this e-mail, he was the Manager

2    of Pharmacy Operations for Albertsons?

3      A    Yes.

4      Q    And the e-mail is addressed to DPOs under -- yes,

5    addressed to DPOs.  Can you remind us what DPO stands for?

6      A    Director of Pharmacy Operations.

7      Q    That was your title at this time?

8      A    Yes.

9      Q    And under review it says, compliance and operations

10   have been fielding many questions around language in the

11   policy and procedure around the topics, number one,

12   appropriate controlled substance dispensing.  Do you see

13   that?

14     A    Yes.

15     Q    Do you know what language from the policies and

16   procedures was calling Albertsons employees to ask questions

17   here?

18     A    I don't remember the exact language, no.

19     Q    Do you remember what area of the policies and

20   procedures is being referenced here?

21     A    Well, appropriate controlled substance dispensing.

22   I don't remember the actual content or the language that it

23   had in it.

24     Q    Do you know what types of questions were being

25   asked?

1      A    I think -- I don't remember on this specific time

2    frame.

3      Q    Do you remember for any time frame if questions

4    were being asked regarding appropriate dispensing of

5    controlled substances?

6      A    As our policies have evolved and added different

7    things or taken away different things, there usually are

8    questions around, you know, this, in particular around

9    controlled substances as far as what documentation, what is

10    the responsibility of the pharmacist in doing and dispensing

11    this.

12      Q    And it says, Compliance and Operations have been

13    fielding many questions; do you see that?

14      A    Yes.

15      Q    So would you have been fielding questions in this

16    area in your role as Director of Compliance?

17      A    Potentially.

18      Q    Do you recall receiving any?

19      A    Possibly.  I don't remember.  Like I said, there's

20    been a number of changes over the years in regards to our

21    policies and procedures, and each time we receive questions,

22    I don't remember exactly what they are or how many.

23      Q    How about in your role as the Director of Pharmacy

24    Operations?

25      A    That's what I'm speaking to.  I'm speaking to as a

1    Director of Pharmacy Operations, our -- we would have

2    received questions over the course of that time as they had

3    -- as the controlled substance policy has evolved.  I don't

4    remember what or how many.

5         Q    Got it.  How about in your role as Director of

6    Compliance?

7         A    I possibly did.

8         Q    You don't recall specifically?

9         A    I don't remember.

10        Q    Would these questions have been directly from

11   pharmacists at Albertsons stores?

12        A    Typically.

13        Q    Do you know how those questions were typically

14   asked as far as e-mail, telephone, or in meetings?

15        A    Probably potentially a combination of all three.

16   So they may have asked their DPM, they may have asked their

17   Director of Pharmacy Operations, they may have called in

18   directly into Matt Churns, for example, they may have been

19   called into Compliance.  They could have been done in

20   e-mails, they could have been done by phone.  If there was a

21   pharmacy manager meeting, they may have been cycled during

22   those.

23        Q    But pharmacists communicated with you directly

24   either in your role as the Director of Compliance or as the

25   Director of Pharmacy Operations, was there a typical mode of

1    communications that pharmacists used?

2        A    As a Director of Pharmacy Operations, I traveled

3    stores on a regular basis, so they would just ask me

4    directly.

5              When I was a Director of Pharmacy Compliance,

6    typically they would call me.

7        Q    Was there any sort of the central file that held

8    questions or concerns from Albertsons pharmacists regarding

9    compliance?

10       A    Oh, I don't know.

11       Q    But in your role as Director of Compliance, you

12   never had anything like a central role that you kept those

13   communications?

14       A    No, not that I remember.

15       Q    Okay.  So when a pharmacy does have concerns and it

16   raised them to the Director of Compliance or Director of

17   Pharmacy Operations, are those concerns typically documented

18   in any way?

19       A    Not that I'm aware of.  Typically we -- I would

20   answer the question directly to them.

21       Q    Okay.  I guess back to the e-mail, the questions

22   that Matt Churns is referencing regarding the appropriate

23   controlled substance dispensing that Albertsons was receiving

24   from its pharmacists, do you recall how this issue noted in

25   this e-mail was resolved, if at all?

1     A    I don't.  I don't know what the issue is to be able

2     to answer the question.

3     Q    Let's set this one aside.  I'll have the next

4     document marked as Exhibit 8.

5              (Whereupon, Exhibit No. 8 was marked for

6     identification.)

7              MR. LICHTER:  For the record, Exhibit 8 is Bates

8     numbered ALB-MDLCT9-00002535.

9     Q    (By Mr. Lichter) Have you seen this document

10    before?

11    A    Yes.

12    Q    When is the last time you saw it?

13    A    Back in 2018.

14    Q    So is this an e-mail string you received from Nasri

15    Massaad on November 19, 2018?

16    A    Yes.

17    Q    And who is Nasri Massaad?

18    A    He is the VP of Pharmacy Operations.

19    Q    And at this time you would have been the Director

20    of Pharmacy Operations?

21    A    Yes.

22    Q    Nasri's e-mail to you says, DPOs, we are

23    significantly behind on the controlled training.  What's your

24    plan to get there prior to next report?  Do you see that?

25    A    Yes.

1      Q     What does it mean to be behind on the controlled

2     training.

3      A     On your completion percentage rate of the number of

4     pharmacists who had completed the controlled substance

5     training.

6      Q     So there was a low number of Albertsons pharmacists

7     who had completed their controlled substances training at

8     this time?

9      A     At that particular time, yes.

10      Q     Okay.  Do you know if this was a nationwide issue

11     or was it confined to a specific geographic area?

12      A     I don't know.  We'd have to look at the report.

13      Q     Are these controlled substance trainings important?

14      A     Yes.

15      Q     Why?

16      A     To ensure that our pharmacists understand their

17     expectations, but also just education around controlled

18     substances and kind of the state of the matter at that time,

19     at that particular time frame.

20      Q     Does it also help prevent diversion to make sure

21     the pharmacists are up to date on their controlled substance

22     trainings?

23      A     Of course.

24      Q     Do you know why Albertsons was behind on these

25     trainings?

1      A    I don't know exactly.  I don't know when they were

2    sent out versus the time of this report.  So the gap in time

3    between the training was released to the time that this

4    e-mail was sent, it is during a very busy time of year for

5    pharmacists for flu shot season, but at that point you still

6    -- we still need to get these trainings completed.

7      Q    Nasri says, What's your plan to get there prior to

8    next report?  Did you have a plan to get there?

9      A    As a Director of Pharmacy Operations, yes.

10      Q    Do you know what your plan would have been?

11      A    Yes, we would have been following up with every

12    store from communications as well as doing store travels and

13    setting expectations that these individuals need to get their

14    training done.  We may have set time aside for them to get it

15    done as well too.

16      Q    When he says "a plan to get there", do you know

17    what "get there" means?

18      A    I believe based on the bottom of the e-mail, there

19    is -- was the expectation that we needed to get to

20    100 percent completion rate.

21      Q    And attachments to these e-mails begin on page

22    2536, correct, on the next page of the document?

23      A    Yes.

24      Q    And this page has a chart that appears to be titled

25    Controlled Substance Preventing Diversion and Promoting

1    Patient Safety with Opioids; do you see that?

2        A    Yes.

3        Q    Is that the name of the training that the e-mail is

4    discussing?

5        A    I believe so.

6        Q    So does this chart here identify the status of

7    trainings involving patient safety with opioids in 2018?

8        A    Yes.

9        Q    And the right-hand column lists the percentage of

10   these trainings that are complete for different Albertsons

11   pharmacy regions, correct?

12       A    Yes.

13       Q    And the grand total for all the regions with

14   complete opioid safety trainings or complete controlled

15   substance safety trainings is 47.41 percent, correct?

16       A    Correct.

17       Q    Do you know what geographic region Tarrant County,

18   Texas was located in?

19       A    I believe it would be in southern.  Second from the

20   top.

21       Q    Yes, okay.  And where it says east, this is under

22   the designation of east, correct?

23       A    Yes.

24       Q    There's east and west and pharmacy?

25       A    Yes.

```
 1          Q     Was that how the different regions were divided

 2    among the country?

 3          A     Yes.

 4          Q     Okay.  And the southern region was in the eastern

 5    division, correct?

 6          A     Correct.

 7          Q     Okay.  And looks like for the southern, the sum of

 8    the incomplete controlled substance trainings says 103; is

 9    that right?

10          A     Correct.

11          Q     And a sum of complete controlled substance

12    trainings is 243, correct?

13          A     Correct.

14          Q     And that would be the number of pharmacists who

15    have -- the number of Albertsons pharmacists who have

16    completed or not completed the controlled substance training;

17    is that right?

18          A     Yes.  At this time it would have also included as a

19    merged company both Safeway and Albertsons locations.

20          Q     Right.  So every pharmacy under the Albertsons

21    umbrella at this time?

22          A     Yes.

23          Q     And then for the southern region, the far right

24    column, it says that the percent completes was 70.23 percent

25    complete, correct?
```

1        A     Correct.

2        Q     And that's the percent complete, that's the amount

3    of -- the percentage of pharmacists who have completed their

4    controlled substance safety training, correct?

5        A     Correct.

6        Q     Do you know what the percent complete for the

7    controlled substance safety training for the southern

8    division, what it currently is?

9        A     No, I don't.

10       Q     Okay.  Do you know if it ever improved after this

11   e-mail?

12       A     Yes, we would -- I don't know for specific, but I

13   know as a company we improved and got up into the high 90

14   percentages.

15       Q     Set that one aside.  The next document marked as

16   Exhibit 9.

17             (Whereupon, Exhibit No. 9 was marked for

18   identification.)

19       Q     Have you seen this document before?

20       A     It's been a long time.

21       Q     But did you see it before?

22       A     Yes.

23             MR. LICHTER:  For the record, this is Bates number

24   ALB-MDL-CT9n_Price_000023, and it ends at 000032.

25       Q     (By Mr. Lichter) Is this your 2014 employee

1      performance review from Albertsons?

2          A    Yes.

3          Q    Okay.  And in 2014 your job title with Albertsons

4      was Director of Pharmacy Compliance, correct?

5          A    Correct.

6          Q    And in this position were you eligible to receive

7      bonuses from Albertsons?

8          A    I believe so.

9          Q    Do you know if those were annual bonuses?

10         A    I believe they were paid out twice a year, like

11     halfway through the year and at the end of year.

12         Q    Do you know --

13         A    But it was based over the annual period.

14         Q    Okay.  Do you know how those bonuses were

15     calculated?

16         A    I believe it was based on the performance of the

17     divisions, but I don't remember the criteria.

18         Q    Would that have been the geographic divisions?

19         A    Yes.

20         Q    So your role as Director of Pharmacy Compliance was

21     national in scope, right?

22         A    Correct.

23         Q    So would your bonuses have been based on the

24     Albertsons store performances as a whole throughout the

25     country?

1        A    I believe so.  I believe that was the case.  It's

2    been a while.

3        Q    Okay.  And were those based on total store sales?

4        A    I don't remember the criteria.

5        Q    Do you remember if the criteria would have included

6    pharmacy sales?

7        A    If it included total sales, pharmacy sales would

8    have been a part of that.

9        Q    Do you know whether controlled substance or opioids

10   would have ever been excluded from that calculation?

11       A    I don't know.

12       Q    Turn to the page that's Bates number 26 at the

13   bottom.  And the middle of this page there's a section in the

14   chart titled Comments and Examples Regarding Previously

15   Established Expectations; do you see that?

16       A    Yes.

17       Q    The second bullet point down reads, For the

18   external diversion focus, this is an area of opportunity.  I

19   continue to work with Analytics to determine the best report

20   to help in identifying stores that need to be reviewed

21   further.  I researched and presented a vendor tool to the

22   head of pharmacy that would identify the stores to be

23   investigated.  Through this process, I should have relied on

24   my past experience in how I proposed this tool as this

25   delayed the decision-making process.  Do you see that?

```
1          A    I do.

2          Q    Did you write this part of the review form?

3          A    I believe so.

4          Q    And this vendor that you're referencing here, would

5     that have been IMS?

6          A    I believe so.

7          Q    Do you remember who the head of pharmacy was that

8     you reference here?

9          A    I believe it was Dan Salemi.

10         Q    And again you ultimately -- or Albertsons

11    ultimately wound up engaging IMS based on your --

12         A    Correct.

13         Q    -- recommendation, correct?

14         A    Yes.

15         Q    Below that bullet point is a box that says, Next

16    Review Cycle Expectations.  Do you see that?

17         A    Yes.

18         Q    It says, Expand CMPS to include purchasing and a

19    thorough identification process for both external and

20    internal diversion.  Take lead on F14 initiative for this

21    area.  Do you see that?

22         A    Yes.

23         Q    CSMP, again that's the Controlled Substance

24    Monitoring Program?

25         A    Yes.
```

1        Q    Okay.  And that program was focused on dispensing,

2    correct?

3        A    Correct.

4        Q    Was it also -- or was Albertsons' distribution of

5    drugs a component of the CSMP?

6        A    Yes.

7        Q    In what way?

8        A    In terms that I would receive the call logs, and so

9    I could see that.  I would also receive threshold reports

10   from McKesson.

11       Q    Any other way?

12       A    Those were the main ways.

13       Q    Okay.

14       A    Excuse me, one other way was that when I would

15   receive reports, and I forget who they came from, I don't

16   remember them coming directly from McKesson, but reports of

17   drugs being ordered through McKesson that were not our

18   preferred generic.

19       Q    And who would provide you those reports?

20       A    That's what I cannot remember.  But they were

21   originally McKesson generated.  If they came from Operations

22   or they came from McKesson directly, I just don't remember.

23       Q    And why did they go to you?

24       A    Because there was two pieces.  Operations was

25   looking at it from a financial piece because they cost more.

1    I was looking at it from a compliance piece whereas there

2    would be patients who would request specific manufacturers

3    for medications.

4              So, for example, hydrocodone, most of the

5    pills, most of the generic manufacturers is just a white

6    pill, but there was one manufacturer that that was a yellow

7    pill.  So there were patients who specifically would request

8    the yellow pill indicating that it worked better for them,

9    giving all types of excuses, but in reality what that could

10   lead to is that it's an easily identifiable opioid on the

11   street and has a higher street-market value.

12   Q    Was it your job to either approve or disapprove of

13   that request?

14   A    No.  I would be followed, but that would be again

15   one of those other kind of data points that would initiate an

16   investigation into that store.

17   Q    Do you know whose job it would have been to

18   determine if those requests were granted?

19   A    I'm sorry, could you rephrase the question as far

20   as granting what request?

21   Q    Yes.  You mentioned that I guess some patients

22   would request certain manufacturer medications, who would

23   ultimately decide if those requests were granted?

24   A    The pharmacy team.

25   Q    The actual pharmacist on the ground?

1      A    Yes.

2      Q    Okay.  Did the CSMP ultimately expand to include

3    the purchasing that's referenced here?

4      A    Yes.  Like what I just explained would have been

5    one piece of that as well.

6      Q    And did it also come to include a thorough

7    identification process for external and internal diversion?

8      A    So just to clarify, like when it says 2000

9    performance review form, it actually is encompassing the year

10   2013.  We called it 2014 because that was the year that it

11   was actually given to me.

12     Q    Okay.

13     A    And we would have been receiving IMS right about

14   that same time frame.

15     Q    Okay.  So the IMS --

16     A    That IMS would have been helping us identify a

17   thorough identification process.

18     Q    That's what's being referenced here, the IMS

19   report?

20     A    Yes.

21     Q    Okay.  Do you know if that process underwent any

22   other substantive changes after IMS was incorporated?

23     A    Not that I can remember.

24     Q    And is this program still in operation as far as

25   you know?

1          A    IMS or CSMP?

2          Q    Let's start with IMS.

3          A    I believe they've changed vendors, but I don't --

4     after I left the position.

5          Q    How about CSMP?

6          A    That is basically a PCAT.

7          Q    Okay.  Can you explain the F14 initiative that you

8     reference here?

9          A    I believe it was just expanding the CSMP program.

10         Q    Okay.  What we just discussed?

11         A    Yes.

12         Q    Okay.  Let's turn to page 30, Bates labeled 30.

13              And looking at the second box down it says,

14    Increase exposure to pharmacy industry events that would

15    focus on drug diversion, CSPM, and other pharmacy

16    compliance-related topics.  Do you see that?

17         A    Yes.

18         Q    Actually this is under the heading of Personal

19    Development Goal Setting; is that right?

20         A    Correct.

21         Q    Can you describe the different industry events that

22    are being referenced here?

23         A    Our DEA conferences, NADDI, which is the National

24    Association Drug Diversion, I believe.  And there are also

25    NACDS work groups had some of these.  So it would be industry

1    events that would be related to that, to those organizations.

2        Q    The comments to the right say, Continue to be

3    involved on NACDS work groups, attend a regional DEA

4    conference, and become a member of NADDI with potentially

5    attending conference.  Do you see that?

6        A    Yes.

7        Q    NACDS, that's the National Association of Chain

8    Drug Stores?

9        A    Yes.

10        Q    Was Albertsons a member at this time?

11        A    Yes.

12        Q    Were you involved with NACDS?

13        A    I was from drug supply chain and also through

14    compounding.

15        Q    Are those the work groups you were involved in?

16        A    I believe so, yes.

17        Q    What types of issues did drug supply chain work

18    group discuss with NACDS?

19        A    If I remember correctly, it was more how to kind of

20    navigate through the laws of the new act that was coming

21    through to ensure that medications that were entering the

22    United States were not like imposters, that they had a secure

23    supply chain.

24        Q    Any other issues you would have been involved in

25    with NACDS?

```
 1          A    Not that I can remember.

 2          Q    Was anyone else from Albertsons involved with

 3    NACDS?

 4          A    Yes.

 5          Q    Who?

 6          A    Bobbie was, Ron Richmond, he was part of our

 7    managed care team.

 8          Q    Was Bobbie Riley?

 9          A    Yes.  And I'm sure -- and then I know Dan Salemi

10    was as well too.  I believe there were others, I just don't

11    remember all the names.

12          Q    Was Albertsons involved in any work groups with

13    NACDS that involved drug diversion?

14          A    I don't remember.

15          Q    That was never an area that you participated in

16    with NACDS?

17          A    If they had one, I most likely would have been on

18    it.

19          Q    Do you recall for what years you were an active

20    participant with NACDS?

21          A    I don't.

22          Q    Are you currently?

23          A    No.

24          Q    Would you have been an active participant

25    throughout your role as the Director of Compliance?
```

```
 1         A    Bobbie would have been taken on more of that role

 2    because part of her role was government affairs and that's

 3    where that would have been fallen under.

 4         Q    You don't recall any specific information from

 5    NACDS at any time regarding the diversion of controlled

 6    substances?

 7         A    Oh, yes.  I mean, we used -- they collaborated with

 8    the AMA on some training as far as identifying red flags and

 9    things of that nature, and we utilized that training from

10    them.

11         Q    Did Albertsons ever incorporate any of the training

12    into their own policies and procedures?

13         A    I believe so because it was the identification of

14    red flags, that was the gist of it.

15         Q    Do you recall about when that would have been?

16         A    I believe it was late 2013.  Like August or so,

17    '13.

18         Q    That's when Albertsons would have incorporated the

19    NACDS policies on red flags?

20         A    That's when we would have communicated the training

21    out to our teams, I believe.

22         Q    Okay.  And you mentioned that Albertsons also

23    incorporated that training into its own policies and

24    procedures?

25         A    At some point in time, yes.
```

1    Q    Would that have been after 2013?

2    A    I don't remember.

3    Q    And did you attend any regional DEA conferences

4    that are referenced here?

5    A    I don't think they had any more after that piece of

6    it, that I remember.

7    Q    After what piece of it?

8    A    Excuse me, so the DEA after that time frame, I

9    should say.

10    Q    When this performance review was --

11    A    Delivered, yeah.

12    Q    -- delivered?

13    A    I don't remember there being a lot of regional DEA

14    conferences after 2013.

15    Q    Did you ever attend any DEA conferences?

16    A    I did not.

17    Q    Okay.  Have you ever spoken with anybody at DEA?

18    A    I'm sure I have at some point in time.

19    Q    Do you know if you'd spoken with anyone at DEA

20    regarding any diversion issues while you were at Albertsons?

21    A    That's what I would have been speaking to them

22    about.

23    Q    In what context?

24    A    Either identifying a prescriber for them or asking

25    about a prescriber, clarifying questions on their policies.

1        Q     And you mention NADDI previously, N-A-D-D-I, do you

2     know what that stands for?

3        A     I believe it stands for National Association -- I

4     think it's Drug Diversion.  And I can't remember the I.  I

5     think that's what it stands for.  I can't say for sure.

6        Q     Was that a trade group?

7        A     Yes.

8        Q     And Albertsons was a member?

9        A     I don't remember if we were or not.

10       Q     Did you have any involvement with NADDI?

11       A     I ended up not becoming a member, but utilized --

12    would use their resources on their website.

13       Q     What sort of resources did they have available?

14       A     Just -- and I don't remember anything like

15    specific, but it was related around drug diversion cases,

16    things that they had identified.

17       Q     Were you involved in any particular work groups

18    with NADDI?

19       A     I don't know if they had any.

20       Q     In your time as Director of Compliance for

21    Albertsons, did you participate in any other events or work

22    groups that we haven't discussed that focused on drug

23    diversion?

24       A     Not that I can remember.

25       Q     How about any events or work groups that focused on

```
 1      Albertsons' CSMP?

 2          A    Not that I remember.

 3          Q    How about suspicious order monitoring?

 4          A    No.

 5          Q    Have you heard the phrasing that there's an opioid

 6      crisis in the country currently?

 7          A    Yes.

 8          Q    Would you agree that there's an opioid crisis in

 9      the country currently?

10              MS. MILLER:  Object to foundation.

11              THE DEPONENT:  I believe there has been for some

12      period of time.

13          Q    (By Mr. Lichter) And still currently?

14          A    Yes.

15          Q    Do you know about how far that period of time would

16      have gone back?

17              MS. MILLER:  Object to foundation.

18          Q    (By Mr. Lichter) Based on your own opinion.

19          A    Around 2012, 2013.

20          Q    You're saying in your opinion that's about when the

21      crisis probably started?

22          A    I'll be honest, I don't know, not having a lot of

23      knowledge.  I was in education prior to that, I think it may

24      have been there, but it was more identified in 2012.

25          Q    Do you agree that there's an opioid crisis in
```

1    Tarrant County, Texas?

2            MS. MILLER:  Object to form and foundation.

3            THE DEPONENT:  I don't know.

4       Q    (By Mr. Lichter) You don't have an opinion one way

5    or the other?

6       A    I don't know enough about Tarrant County to know.

7       Q    In your opinion, does Albertsons bear any level of

8    responsibility for the opioid crisis?

9            MS. MILLER:  Object to form, foundation.

10           THE DEPONENT:  I feel that as a company, we put

11   resources, plans, processes in place of the knowledge that we

12   had at that point in time with as much help as we could from

13   NACDS and trade groups and even competitors that we were as

14   compliant as we could potentially be at that point in time.

15      Q    (By Mr. Lichter) I guess my question is a little

16   different.  From one of evolving compliance is whether you

17   believe Albertsons bears any responsibility for the opioid

18   crisis?

19           MS. MILLER:  Same objections.

20           THE DEPONENT:  Based on the tools that we had at

21   that time and the information that was provided that we could

22   get our hands on, I feel -- I still feel the same way, that

23   we did as best as we potentially could and that we prevented

24   things, we educated our store teams around everything that

25   was out there in terms of drug diversion.

1      Q    (By Mr. Lichter) So in hindsight, you don't think

2    there's anything Albertsons could have done to fix the

3    problem?

4            MS. MILLER:  Object to form, foundation.

5            THE DEPONENT:  I don't think we could have fixed

6    the problem on our own.

7      Q    (By Mr. Lichter) Do you think you could have helped

8    alleviate the problem at all?

9            MS. MILLER:  Same objections.

10           THE DEPONENT:  I believe we did.

11     Q    (By Mr. Lichter) You believe you did?

12     A    I believe we did help the problem within our own

13    stores.

14           MR. LICHTER:  Okay.  I have no further questions.

15           MS. MILLER:  I have a few.

16                    EXAMINATION

17    BY MS. MILLER:

18     Q    Can you go back to Exhibit 2.  You were asked some

19    questions on Exhibit 2, especially the attachment, with some

20    outlines on suspicious order monitoring.  When you prepared

21    this, was this document intended to be a complete recitation

22    of Albertsons' program at Ponca?

23     A    No.

24     Q    If you can look at Exhibit 5.  You were asked a

25    number of questions about this document.  In particular, it

1    notes that in the week of June 6 -- or June 7, 2016, there

2    was approximately $8.6 million that was left to move out of

3    Ponca because it was closing, right?

4         A    Correct.

5         Q    You mentioned that it would -- that $8.6 million

6    worth of product would be distributed to all Albertsons

7    legacy stores?

8         A    Correct.

9         Q    How many Albertsons legacy stores were there?

10        A    Approximately 1,000.

11        Q    Okay.  So if $8.6 million that was left to be

12   distributed to the Albertsons -- 1,000 Albertsons stores,

13   doing some math, that comes out to about?

14        A    $8,600.

15        Q    $8,600 of product?

16        A    Yes.

17        Q    Of that product, would that have included product

18   that the stores would have ordered anyway?

19        A    Yes.

20        Q    You were shown a list attached to this e-mail.

21   These were the drugs that were being distributed --

22        A    Yes.

23        Q    -- to those 1,000 stores, correct?

24        A    Correct.

25        Q    So this one has -- it's a printout so it doesn't

1    have the full Excel.  I asked Emily to pull up the native

2    spreadsheet so we could count the number of drugs, or present

3    to you.

4              There's a number of pages here, I will just

5    represent to you we counted there were 294 different MPC code

6    drugs on this list.

7              MR. LICHTER:  Objection.

8              MS. MILLER:  I'm just representing that.

9         Q    (By Ms. Miller) Does that -- based on the number of

10   drugs you see in this chart, did that seem at least within

11   scope?

12        A    Yes.

13        Q    Of this 294 drugs that I will represent are on this

14   list, you were asked to address a few of them at the end.

15             Of those, the ones that you were asked to

16   address, those were all controlled to opioids, correct?

17        A    Correct.

18        Q    And I counted you were asked about six drugs that

19   were CII opioids?

20        A    Correct.

21        Q    Looking at this list, those are all the CII opioids

22   that I saw through this entire list.  Have you identified any

23   other CII opioids as you look through this list?

24        A    No.

25        Q    Okay.  So of the 294 drugs, there are six CII

```
1    drugs.  Of that, there were $8,600 of product that was

2    distributed per store --

3         A    Yes.

4         Q    -- correct?  So the seven opioids, or six opioids,

5    is about 2 percent of the drugs that were distributed to

6    these 1,000 stores?

7         A    Correct.

8         Q    And again, only a portion of that amount that was

9    distributed to those stores this week were drugs that the

10   store didn't otherwise order, correct?

11        A    Correct.

12        Q    Okay.  I'll ask you to turn to Exhibit 8.  So this

13   was the document that talked about the fact that there were

14   stores who had not yet completed -- pharmacists who had not

15   yet completed all of their trainings, correct?

16        A    Correct.

17        Q    This list, if you look on the first page, it talks

18   about the attached report, and the report references Q2

19   training courses that were due September 7, 2018, correct?

20        A    Correct.

21        Q    So the training that's being referenced, the

22   controlled substance training that's been being referenced,

23   that isn't all of the training that the pharmacists in these

24   stores would have experienced in your career, we're just

25   talking about Q2, correct?
```

```
 1        A     Correct.

 2        Q     Can you describe for us what some of the other

 3   trainings pharmacists would have received on controlled

 4   substances?

 5        A     In addition to this one?

 6        Q     Yeah.

 7        A     We put out -- so over the course of time?

 8        Q     Yes, to the best of your recollection.

 9        A     So we had put out the Red Bloods training.  We'd

10   also put out a NACDS video.  We had put out a drugstore news

11   continuing education on controlled substances.  And then on

12   an annual basis, we put out a controlled substance training

13   that was developed by the company as well as a controlled

14   substance policy in attestation that we considered training

15   in addition to this.

16        Q     In your role as DPO at this time, did you in fact

17   follow up with the stores to the pharmacists in your division

18   to make sure that they completed all of their training that

19   was referenced in here?

20        A     Yes.

21        Q     And would that have been part of your normal

22   practice in your job to make sure that was done?

23        A     Yes.

24        Q     You had mentioned that you began the field

25   evaluation process in 2012; is that right?
```

1        A    Yes.

2        Q    And that prior to that, that program, that field

3    evaluation program wasn't functioning at Albertsons, it was a

4    different type of audit program, correct?

5        A    Yes.

6        Q    But that's separate from the controlled substance

7    monitoring that the company was doing, correct?

8        A    Correct.

9        Q    And that existed -- at least it changed over time,

10   right?

11       A    The field evaluation process?

12       Q    The controlled substance monitoring.

13       A    Oh, yes, the controlled substance monitoring

14   program changed, yes.

15       Q    Okay.  But that didn't start in 2012, that's

16   separate from the field evaluation, correct?

17            MR. LICHTER:  Objection.

18            THE DEPONENT:  Correct.

19            MS. MILLER:  Great.  Those are all the questions I

20   have.

21                        EXAMINATION

22   BY MR. LICHTER:

23       Q    I have a couple of follow-ups there.  Looking back

24   at Exhibit 2, the charts that you circulated to Bobbie Riley

25   with your recommendations, I think you mentioned that the

1    charts that you identified here and the information you

2    provided weren't meant to be a complete recitation of the

3    suspicious order monitoring program; is that right?

4         A    Correct.

5         Q    Did these charts encompass your full knowledge of

6    this suspicious order monitoring system as you -- in your

7    role as the Director of Pharmacy Compliance?

8         A    As I mentioned earlier, I did not -- I didn't know

9    all the details that were associated within the program

10   itself.

11        Q    Right, but these charts were to identify everything

12   you did know at that time; is that right?

13        A    Correct.

14             MS. MILLER:  Object to form.

15        Q    (By Mr. Lichter) And then Exhibit 5, I think you

16   were also asked about, this is about the push from Ponca on

17   the medications including CIIs.  Do you see Exhibit 5?

18        A    Yes.

19        Q    And I think you and your counsel did some math

20   breaking down the $8.6 million that was left to move; do you

21   recall that?

22        A    Yes.

23        Q    That 8.6, it says, according to this e-mail, it's

24   actually down from $25.4 million in total inventory from just

25   four weeks ago; is that right?

1      A    Yes.

2      Q    Okay.  Do you know if the push on medications began

3      when there was $25.4 million in inventory four weeks prior to

4      this e-mail?

5      A    I do not remember, but based on the e-mail, it was

6      saying much of the decrease was due to normal draw-down from

7      normal ordering.

8      Q    Okay.  And the drugs that are listed on the

9      attachment to this e-mail, I think your counsel counted 294

10     of them, and you and I went through and looked at maybe four

11     or five or six specific opioid medications, right?

12     A    Correct.

13     Q    And I think she arrived at a number that 2 percent

14     of the drugs were the opioids that we looked at; do you

15     recall that?

16     A    Yes.

17     Q    This chart doesn't identify the volume of any

18     particular drug that was pushed out to the stores that didn't

19     order them, does it?

20     A    No.

21     Q    Are you aware, as you sit here today, of the volume

22     of any particular medications on this list that was pushed

23     out to the Albertsons stores?

24     A    No.

25     Q    Are you aware of the volume of any of the opioid

1    medications, the fentanyl or hydrocodone that we looked at

2    that was pushed out to the stores?

3        A    No.

4        Q    Okay.  To that 2 percent, that would have just been

5    the percent of the type of drugs, not the volume of drugs; is

6    that fair?

7        A    That's correct.

8        Q    Okay.  And looking at Exhibit 8, this is the e-mail

9    and attachment about Albertsons' lack of controlled substance

10    training; do you recall being asked that by your counsel?

11       A    Yes.

12       Q    And I think she pointed out that the e-mail

13    identifies that these are just quarter -- Q2 trainings; is

14    that right?

15       A    Correct.

16       Q    So this e-mail doesn't list out or identify what

17    other trainings Albertsons' given out that may be lacking; is

18    that right?

19            MS. MILLER:  Object to form.

20       Q    (By Mr. Lichter) Or may be missing?

21       A    For what time frame?

22       Q    This is for November 2018.

23       A    So these would have been the trainings that were

24    released at the time and the results of those trainings.

25       Q    Right.  Just limited to the Q2 trainings in this

1    e-mail, correct?

2        A    Correct.

3        Q    So this wouldn't have identified the missing red

4    flag trainings or other trainings that some pharmacists may

5    not have had at the time, correct?

6            MS. MILLER:  Object to form.

7            THE DEPONENT:  Correct.  But they are -- they

8    typically are reported on until we hit our threshold goal of

9    whether it's 100 percent, depending on what the training

10   requirement is for that particular training.

11       Q    (By Mr. Lichter) So looking at this e-mail, do you

12   have any idea what percent of pharmacists were missing any of

13   the other controlled substance dispensing training?

14       A    No.  My assumption would be that we had met the

15   goals of those controlled substance trainings.

16       Q    Why would you assume that?

17       A    Because they're not being reported on.

18       Q    But again this e-mail is just confined to the

19   second quarter training courses, correct?

20       A    Correct.

21           MR. LICHTER:  Okay.  I have nothing further.

22           Does counsel for Kroger have any questions before

23   we sign off?

24           MR. FRAMPTON:  I have no questions.  Thank you.

25           THE VIDEOGRAPHER:  This concludes today's

1      deposition.  We're going off record, time is 1:53.

2              THE COURT REPORTER:  Can I get Counsel's orders on

3      the record, please?

4              MR. LICHTER:  Just whatever standing order we have

5      in place.  I don't need a rough draft.

6              MS. MILLER:  Yes, I think the regular transcript,

7      E-Tran.  I can have my paralegal follow up.

8              THE COURT REPORTER:  Mr. Frampton, do you have a

9      standing order?

10             MR. FRAMPTON:  Do you know if we have a standing

11     order?  We certainly don't need anything special.  We don't

12     need anything expedited.  If you would ask about that and I

13     will as well.

14             THE COURT REPORTER:  Thank you.  Ms. Miller, will

15     you handle signature?

16             MS. MILLER:  Yes.  Thank you.

17             (Whereupon, the deposition concluded at 1:53 p.m.)

18

19

20

21

22

23

24

25

1          I, NIKKI PRICE do hereby certify that I have read

2     the foregoing transcript and that the same and accompanying

3     amendment sheets, if any, constitute a true and complete

4     record of my testimony.

5

6                            _____
                             Signature of Deponent
7
                             (   ) No amendments
8                            (   ) Amendments attached

9
             Acknowledged before me this _____ day of
10
       _____, 2023.
11

12              Notary Public: _____

13              My commission expires _____

14              Seal:

15

16     SAS

17

18

19

20

21

22

23

24

25

```
 1    STATE OF COLORADO  )

 2                       )  ss.     REPORTER'S CERTIFICATE

 3    COUNTY OF DENVER   )

 4            I, Sandra A. Schramm, do hereby certify that I am a

 5    Registered Professional Reporter and Notary Public within the

 6    State of Colorado; that previous to the commencement of the

 7    examination, the deponent was duly sworn to testify to the

 8    truth.

 9            I further certify that this deposition was taken in

10    shorthand by me at the time and place herein set forth and

11    was thereafter reduced to typewritten form, and that the

12    foregoing constitutes a true and correct transcript.

13            I further certify that I am not related to,

14    employed by, nor of counsel for any of the parties or

15    attorneys herein, nor otherwise interested in the result of

16    the within action.

17            In witness whereof, I have affixed my signature

18    this 9th day of August, 2023.

19

20

21                      Sandra A. Schramm
                        Sandra A. Schramm, RPR, CRR
22                      216 – 16th Street, Suite 600
                        Denver, Colorado  80202
23                      My commission expires May 23, 2026.

24

25
```

```
1                    –   –   –   –   –
                         E R R A T A
2                    –   –   –   –   –

3

4       PAGE  LINE  CHANGE

5       ____  ____  _____

6          REASON: _____

7       ____  ____  _____

8          REASON: _____

9       ____  ____  _____

10         REASON: _____

11      ____  ____  _____

12         REASON: _____

13      ____  ____  _____

14         REASON: _____

15      ____  ____  _____

16         REASON: _____

17      ____  ____  _____

18         REASON: _____

19      ____  ____  _____

20         REASON: _____

21      ____  ____  _____

22         REASON: _____

23      ____  ____  _____

24         REASON: _____

25
```