# EXHIBIT 17

Page 1

1        IN THE UNITED STATES DISTRICT COURT

           NORTHERN DISTRICT OF OHIO

2             EASTERN DIVISION

3  - - - - - - - - - - - - - x

    IN RE: NATIONAL        :

4  PRESCRIPTION OPIATE     :

    LITIGATION.           :  Case No. 17-MD-2804

5                      :

    This document relates   :

6    to Tracks 8 and 9.    :

  - - - - - - - - - - - - - x

7                  Thursday, May 30, 2024

                    Washington, D.C.

8

9

10

11

12  Videotaped Deposition of:

13          JOSEPH T. RANNAZZISI,

14  called for oral examination by counsel for the

15  Defendants, pursuant to notice, at the law offices of

16  Motley Rice, LLC, 401 Ninth Street, Northwest,

17  Suite 1001, Washington, D.C. 20004, before Christina

18  S. Hotsko, RPR, CRR, of Veritext Legal Solutions, a

19  Notary Public in and for the District of Columbia,

20  beginning at 9:14 a.m., when were present on behalf

21  of the respective parties:

22

Page 2

1        A P P E A R A N C E S
2  On behalf of Plaintiff Cobb County:
     THOMAS SHERIDAN, III, ESQUIRE (Via Zoom)
3    Simmons Hanly Conroy, LLP
     112 Madison Avenue, Seventh Floor
4    New York, New York 10016
     (212) 257-8482
5    tsheridan@simmonsfirm.com
6
     On behalf of Plaintiff Tarrant County:
7    SADIE TURNER, ESQUIRE (Via Zoom)
     LEILA AYACHI, ESQUIRE (Via Zoom)
8    The Lanier Law Firm, PC
     10940 West Sam Houston Parkway North, Suite 100
9    Houston, Texas 77064
     (713) 659-5200
10   sadie.turner@lanierlawfirm.com
11
     On behalf of the Witness:
12   DONALD A. MIGLIORI, ESQUIRE
     Motley Rice, LLC
13   28 Bridgeside Boulevard
     Mt. Pleasant, South Carolina 29464
14   (843) 216-9000
     dmigliori@motleyrice.com
15
16  On behalf of Albertsons:
     JOHN F. GIBBONS, ESQUIRE
17   EMILY E. MANKOWSKI, ESQUIRE
     Greenberg Traurig, LLP
18   77 West Wacker Drive, Suite 3100
     Chicago, Illinois 60601
19   (312) 456-8400
     gibbonsj@gtlaw.com
20
21
22

Page 3

1     A P P E A R A N C E S  C O N T I N U E D
2  On behalf of Publix Super Markets, Inc.:
     MICHAEL P. KOHLER, ESQUIRE
3    Miller & Martin, PLLC
     1180 West Peachtree Street, Northwest
4    Regions Plaza, Suite 2100
     Atlanta, Georgia 30309
5    (404) 962-6100
     michael.kohler@millermartin.com
6
     KARA KAPKE, ESQUIRE
7    Barnes & Thornburg, LLP
     11 S. Meridian Street
8    Indianapolis, Indiana 46204-3515
     (317) 236-1313
9    kkapke@btlaw.com
10
     Also Present:
11   Orson Braithwaite, Video Technician
     Kathleen Lucas (Via Zoom)
12   Sophia Pritchett (Via Zoom)
     Bill Hammond (Via Zoom)
13
14
15
16
17
18
19
20
21
22

Page 4

1        C O N T E N T S
2  EXAMINATION BY:                    PAGE
3    Counsel for Albertsons          08
4    Counsel for Publix              196
5    Counsel for Witness             386
6
7  RANNAZZISI DEPOSITION EXHIBITS:  *        PAGE
8  Exhibit 1   Rannazzisi Expert Report, 15 Apr 2024   08
9  Exhibit 2   Due Diligence Compliance Invoice      54
                23 May 2024
10
     Exhibit 3   Rannazzisi Expert Report, 22 Aug 2022   58
11
     Exhibit 4   Rannazzisi Expert Report, 24 Jan 2024   60
12
     Exhibit 5   Deposition Transcript 14 Dec 2022    65
13
     Exhibit 6   Due Diligence Compliance Invoice    198
14              16 May 2023
15  Exhibit 7   DEA Press Release, June 2013     232
16  Exhibit 8   Rannazzisi Declaration, CVS Litigation   238
17  Exhibit 9   Rannazzisi Declaration, Cardinal Health   239
                Litigation
18
     Exhibit 10   Rannazzisi Statement before Congress   244
19              29 April 2014
20  Exhibit 11   DEA Report of Investigation, Sept 2008   280
21  Exhibit 12   DEA Report of Investigation, Sept 2011   286
22  Exhibit 13   DEA Report of Investigation, 21 July 2015   291

Page 5

1  RANNAZZISI DEPOSITION EXHIBITS:  *        PAGE
2
     Exhibit 14   DEA Report of Investigation, 24 July 2015   297
3
     Exhibit 15   DEA Report of Investigation, May 2015   298
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21        *  (Exhibits attached to transcript.)
22

2 (Pages 2 - 5)

Page 6

1        P R O C E E D I N G S
2        VIDEO TECHNICIAN:  Good morning.  We are
3 going on the record at 9:14 a.m. on May 30th,
4 2024.
5        Please note that the microphones are
6 sensitive and may pick up whispering and private
7 conversations.  Please mute your phones at this
8 time.
9        Audio and video recording will continue
10 to take place unless all parties agree to go off
11 the record.
12        This is media unit 1 of the
13 video-recorded deposition of Mr. Joseph Rannazzisi
14 in the matter of National Prescription Opiate
15 Litigation, Track 8 and Track 9, Cobb County,
16 filed in the Northern District of Ohio, case
17 number 17-MD-2804.
18        My name is Orson Braithwaite representing
19 Veritext Legal Solutions, and I am the
20 videographer.
21        The court reporter is Christina Hotsko
22 from the firm Veritext Legal Solutions.

Page 7

1        Counsel will now state their appearances
2 and affiliations for the record.
3        MR. GIBBONS:  John Gibbons and Emily
4 Mankowski on behalf of Albertsons.
5        MR. KOHLER:  Michael Kohler with Miller &
6 Martin, on behalf of Publix Super Markets, Inc.
7        MS. KAPKE:  Kara Kapke with Barnes &
8 Thornburg, also on behalf of Publix.
9        MR. MIGLIORI:  Don Migliore with Motley
10 Rice for the witness.
11        VIDEO TECHNICIAN:  Do you want remote
12 counsel to introduce themselves?
13        MR. GIBBONS:  Is remote counsel going to
14 identify themselves or not?  No?  Okay.
15        VIDEO TECHNICIAN:  Thank you.  Will the
16 court reporter please swear in the witness.
17 Whereupon,
18        JOSEPH T. RANNAZZISI,
19 being first duly sworn or affirmed to testify to
20 the truth, the whole truth, and nothing but the
21 truth, was examined and testified as follows:
22

Page 8

1        EXAMINATION BY COUNSEL FOR ALBERTSONS
2 BY MR. GIBBONS:
3     Q.  Mr. Rannazzisi, as you've just heard, I'm
4 John Gibbons, a lawyer at Greenberg Traurig, and I
5 represent Albertsons in the series of cases that
6 have been filed against them.
7        I have read your previous deposition
8 testimonies, plural, and some of your trial
9 testimonies, plural, and so I don't feel the need
10 to go over any ground rules.  I figure you know
11 them all.  Let's just have one.
12        I will not interrupt you, and I'll let
13 you completely answer.  And if you could do the
14 same, we'll make the court reporter very happy.
15 Is that okay?
16     A.  That would be great.
17        (Rannazzisi Deposition Exhibit 1 marked
18        for identification and attached to the
19        transcript.)
20 BY MR. GIBBONS:
21     Q.  What we have in front of you is Exhibit
22 Number 1 which I will identify for the record as

Page 9

1 the expert report of Joseph Rannazzisi In Re:
2 National Prescription Opiate Litigation, in
3 relation to case number 1:18-OP-45274, dated
4 April 15th, 2024.
5        Is that what is in front of you?
6     A.  Yes, it is.
7     Q.  If I could direct your attention to
8 page 1 of that expert report with the heading
9 Executive Summary.
10        Do you see that?
11     A.  Yes.
12     Q.  It states, Plaintiff Tarrant County,
13 Texas, has asked me to provide an opinion
14 regarding the distribution practices of
15 Albertsons.  The issues examined specifically
16 concern their policies and procedures with respect
17 to maintaining effective control against the
18 diversion of pharmaceutical opioids during the
19 period from 2006 to 2014, and beyond.
20        Did I read that accurately?
21     A.  Yes.
22     Q.  Who specifically asked you to provide

1 this opinion?

2    A. Motley Rice.

3    Q. Who at Motley Rice?

4    A. Mr. Elsner and Mr. Migliori.

5    Q. Did anyone at Tarrant County, Texas, ask

6 you to do anything in relation to this case?

7    A. I never was in contact with anybody from

8 Tarrant County.

9    Q. The paragraph I just read, does that

10 accurately summarize your engagement?

11    MR. MIGLIORI: Objection to form.

12    Go ahead.

13    THE WITNESS: Yes, it does. Because the

14 attorneys were representing Tarrant County.

15 BY MR. GIBBONS:

16    Q. The third paragraph -- and it's rather

17 lengthy, so I'll just ask you to read it to

18 yourself.

19    It discusses Albertsons' role as a

20 distributor and Albertsons' need to have effective

21 controls against diversion.

22    Did I summarize that accurately?

1    MR. MIGLIORI: Objection to form.

2    Go ahead.

3    THE WITNESS: Yes.

4 BY MR. GIBBONS:

5    Q. And the second sentence says, For the

6 reasons discussed more fully herein, Albertsons

7 failed to fulfill their obligations by instituting

8 ineffective diversion control programs, thereby

9 creating conditions that allowed diversion and

10 oversupply of opioids in Tarrant County, Texas.

11    Did I read that correctly?

12    A. Yes, sir.

13    Q. So is it fair for me to conclude that you

14 are not providing expert opinions related to

15 Albertsons' dispensing practices?

16    A. I'm not providing opinions regarding the

17 dispensing practices. I think there was another

18 expert that was doing dispensing.

19    Q. Okay. So you are not that expert. You

20 are not an expert on Albertsons' dispensing

21 practices.

22    A. That's correct. I'm not an expert on

1 their dispensing practices.

2    Q. Okay. Would it be fair to say, if I

3 drilled down on that, that you will not be opining

4 on whether Albertsons' pharmacists conducted

5 adequate corresponding responsibility analysis?

6    MR. MIGLIORI: Objection to form.

7    Go ahead.

8    THE WITNESS: Well, there are sections of

9 my report where I discuss corresponding

10 responsibility, because it goes hand in hand with

11 distribution. So I -- in the report, there are

12 sections where I discuss statements made -- or

13 documents where statements were made regard

14 corresponding responsibility just to show -- as a

15 bridge to show where distribution -- the

16 connection between distribution.

17    But I'm not opining on their dispensing

18 particularly, just certain documents that discuss

19 their dispensing practices.

20 BY MR. GIBBONS:

21    Q. Okay. And I have read those sections of

22 your report, but my question is a really narrow

1 one.

2    You are not holding yourself out in this

3 deposition as providing expert opinion as to

4 whether Albertsons' pharmacists conducted adequate

5 corresponding responsibility analysis in their

6 dispensing of opioids; is that correct?

7    MR. MIGLIORI: Objection to form. And

8 foundation.

9    Go ahead.

10    THE WITNESS: Well, I discuss the

11 statements where dispensing was the subject of the

12 document, but I'm just discussing it as it relates

13 to the distribution of opioids, not as the

14 dispensing opioids.

15 BY MR. GIBBONS:

16    Q. I understand that. I have read where

17 you're discussing statements.

18    My question, though, is, are you holding

19 yourself out as an expert in this deposition as to

20 whether Albertsons' pharmacists adequate

21 corresponding responsibility analysis in the

22 dispensing of opioids?

Page 14

1     A. So overall --
2        MR. MIGLIORI: Objection. Asked and
3  answered.
4        Go ahead.
5        THE WITNESS: Overall, I'm not providing
6  an opinion on the dispensing practices. My
7  statements within the document are very narrow and
8  related to statements made by their pharmacists.
9  BY MR. GIBBONS:
10    Q. Would it be fair for me to say that
11  you're also not holding yourself out as an expert
12  on the adequacy of Albertsons' dispensing policies
13  and procedures?
14    A. I wasn't asked to comment on their
15  dispensing. So no, I'm not an expert on their
16  dispensing procedures.
17    Q. For Albertsons.
18    A. For Albertsons. Yes.
19    Q. All right. I'd like to turn your
20  attention to the appendix A, which is your CV.
21        And tell me when you're there.
22    A. I am here.

Page 15

1     Q. I'm going to ask you to turn to
2  appendix A-4.
3     A. Yes.
4     Q. You were a staff pharmacist from 1984 to
5  1986; is that right?
6     A. Yes, sir.
7     Q. And were you at a VA? Is that where you
8  were?
9     A. I was both VA outpatient -- operated like
10  a pharmacy -- and then inpatient where we did just
11  inpatient work related to hospitalized patients.
12    Q. Okay. So -- I missed your statement
13  there. You did VA outpatient work where?
14    A. At the VA and at Cold Spring -- there's
15  two VA facilities. There's one at Cold Spring
16  Road and there's one downtown on West 10th Street.
17        I did outpatient services at both West
18  10th Street and Cold Spring Road, and then I did
19  inpatient at West 10th Street.
20    Q. Got it. And you did that for
21  approximately two years?
22    A. Two years.

Page 16

1     Q. That was right out of pharmacy school?
2     A. Yes.
3     Q. Is it accurate that, during the last 38
4  years, you've not practiced as a pharmacist?
5     A. Yeah -- I've maintained my license, but I
6  have not practiced -- I wasn't behind the bench,
7  as they say.
8     Q. Is it also accurate that you've never
9  worked as a pharmacist in a large pharmacy chain?
10    A. I worked briefly at Hook's at 71st and
11  Michigan Road.
12    Q. Do I see that on your CV?
13    A. No, because that was where I did my -- I
14  guess you'd call it a residence now.
15    Q. And how long were you there for?
16    A. I think three months.
17    Q. And this was before you got your license
18  as a pharmacist?
19    A. Before I was licensed, but in my fifth
20  year as a -- I guess you'd call it a student.
21    Q. And what year was that?
22    A. In '84.

Page 17

1     Q. So it would be true that, since 1984,
2  you've never worked as a pharmacist in a pharmacy
3  chain?
4     A. Yes.
5     Q. And I'm assuming, based on reading your
6  CV, that you've never worked for a large pharmacy
7  chain in any capacity; is that fair to say?
8     A. That's correct.
9     Q. Okay. Your CV lists a number of
10  positions you've held at the DEA. And as I
11  mentioned earlier, I've read a lot of the
12  transcripts where you've discussed those, and so I
13  only have a few questions about your background.
14    A. Sure.
15    Q. You started as a diversion investigator
16  special agent out of the Indianapolis office from
17  '86 to '88; is that right?
18    A. Yes, it is.
19    Q. And in the second sentence of your
20  description of that job, you say as follows:
21  Identified potential weaknesses in the registrant
22  drug delivery system due to physical security

5 (Pages 14 - 17)

1 weaknesses or noncompliance with 21 CFR and
2 attempted to correct such violations in order to
3 prevent controlled substance diversion into the
4 illicit marketplace.
5          Did I read that accurately?
6     A. Yes, sir, you did.
7     Q. Now, you said you attempted to correct --
8 strike that.
9          You say you attempted to identify
10 potential weaknesses in the drug delivery system.
11          Could you explain more what you were
12 trying to do?
13     A. Sure. It depends on the class of
14 registrant. So if it's a manufacturer, we'd be in
15 the facilities looking at their diversion
16 controls, how they're maintaining effective
17 controls against diversion, their physical
18 security, their paperwork, their documents,
19 inventories, their transfer documents.
20          Just -- so that would be for a
21 manufacturer.
22          For distributor, same concept. Physical

1 security. Are they providing the necessary
2 inventory or transfer paperwork to things like
3 ARCOS? Are they maintaining the appropriate
4 documents, the 222 forms, their invoices. Have
5 they been conducting their biannual inventories?
6 Are they maintaining a cage that's in compliance
7 with the Act? Are they maintaining a vault that's
8 in compliance with the Act?
9          And then, finally, pharmacies. We would
10 be in pharmacies looking at prescriptions, making
11 sure that the elements of the prescriptions are in
12 play, looking at the prescriptions to see if the
13 pharmacist was actually dispensing in a manner
14 that's consistent with the Controlled Substances
15 Act.
16          So depending on the registrant, that's
17 how we would determine what we're doing. But in
18 all of those cases, we were looking to see if
19 there was holes in the system where potentially we
20 could button up so there is no diversion.
21     Q. And can you recall any distributors that
22 you would have investigated back in that time

1 frame?
2     A. Yeah. We did -- for sure Eli Lilly, and
3 then one of Eli Lilly's distribution points. I
4 think we did Bindley Western. This is going back.
5 I can't remember -- I know there were others.
6          And then, for the pharmacies, we were all
7 over the pharmacies --
8     Q. Can you remember any specific pharmacy
9 chains you might have --
10     A. Oh --
11     Q. -- inspected --
12     A. -- well, not distribution, but definitely
13 for dispensing. We were in and out of Hook's
14 pharmacies. I believe Osco was one of the
15 pharmacies we were in and out of. People's Drug.
16 And then the small independent pharmacies as well.
17     Q. Do you recall ever looking into any
18 pharmacies related to Albertsons?
19     A. No. Not in Indianapolis, no.
20     Q. And you state that you attempted to
21 correct such violations when you found them.
22          Did I read that right?

1     A. Yes.
2     Q. Can you describe what you did to attempt
3 to correct such violations when you found them?
4     A. Sure. So for instance, recordkeeping
5 violations. We'd make sure that the pharmacies
6 were maintaining copies of the 222s, the
7 distributors were maintaining them. We made sure
8 they were filled out appropriately. If they
9 weren't filled out appropriately, we'd explain to
10 them why it's not filled out correctly and ask
11 them to make sure that the pre- -- that the
12 paperwork is done appropriately.
13          Same thing with making the distribution
14 paperwork readily retrievable. The worst thing
15 you can do is walk in and say, I'd like to see all
16 your schedule 325 invoices, and they say, oh,
17 well, it's offsite; we can't give them to you now.
18          Things like that we would correct. You
19 have to bring it back on site. You must record
20 the amount that you sent. You must maintain
21 these -- this paperwork in a certain way. And it
22 goes down the chain to pharmacies. The same

1 concept with prescriptions.  Find prescriptions
2 that might not have the doctor's signature or
3 might not have the correct number, or the
4 pharmacist wrote in the number, or that it doesn't
5 have the correct DEA number.  Things like that.
6     All those are correctable, and, you know,
7 we just support the pharmacists or support the
8 distributors to ensure that they have the
9 appropriate guidance to make sure that those areas
10 of the Code of Federal Regulations and the
11 Controlled Substances Act are complied with.
12     Q.  And you said in that answer that you
13 would explain to them, meaning whoever the
14 registrant was, what their deficiencies were,
15 what, in an attempt to help them comply with the
16 law?
17     A.  Yes.
18     Q.  Did you find that to be one of the duties
19 that you had as a DEA diversion investigator?
20     A.  In certain areas, absolutely, yes.
21     Q.  In this area.
22     A.  When we're talking about documentation,

1 deficiencies.
2     A.  Okay.  Well, if a distributor has taken a
3 massive loss and not filed any kind of theft or
4 loss statements, that's a problem.  And they know
5 they're required to maintain theft and loss
6 statements.  So that's one where we'd say, well,
7 you have to do this.  And it's probably one that
8 we would not -- we would have to go to the next
9 level of enforcement or administrative
10 enforcement, which would be either a field hearing
11 or a letter of admonishment or a -- all the way up
12 to an administrative action.
13     Q.  Let me ask it this way:  When you used
14 term "diversion controls" --
15     A.  Uh-huh.
16     Q.  -- at a distributor, what did you mean by
17 that?
18     A.  Maintaining effective controls against
19 diversion is outlined in 1301.74, and it basically
20 lays out, but it deals with physical security and
21 it also deals with -- I guess you would call it
22 administrative security.

1 talking about security -- a lot of issues with
2 security that we had -- you know, when we did an
3 inspection, things had to be upgraded, alarms had
4 to be updated, central station monitoring had to
5 be -- there was things like that.
6     So yes, we tried to make corrections on
7 site so it wouldn't go to the next level.
8     Q.  And one of the areas you referenced when
9 you were inspecting distributors was diversion
10 controls.
11     Did I hear that right?
12     A.  Yes.
13     Q.  And would you have the same philosophy as
14 it relates to diversion controls?  If you saw
15 deficiencies in a distributor's diversion
16 controls, would you explain that to them in an
17 attempt to correct those deficiencies to comply
18 with the law?
19     A.  It -- it depends on the types of
20 deficiencies.
21     Q.  Tell me the areas that you would not try
22 to explain a distributor's diversion control

1     Q.  But it would also entail policies and
2 procedures at the distributor as it relates to
3 those functions of preventing diversion; would
4 that be fair to say?
5     MR. MIGLIORI:  Objection to form.
6     THE WITNESS:  I think that policies and
7 procedures, depending on the policies and
8 procedures in place, yeah, we did ask for policies
9 and procedures when we were out there.  Of course
10 we did.  But it just depends.  Certain policies
11 and procedures, it's up to the distributor.
12 BY MR. GIBBONS:
13     Q.  Okay.  But I'm asking about your role as
14 a diversion investigator.
15     You would, as you said, look at a
16 distributor's policies and procedures in relation
17 to any controls they had in relation to diversion;
18 is that right?
19     A.  Right.
20     Q.  And would you have the same philosophy if
21 you saw deficiencies in those policies and
22 procedures regarding diversion, you would explain

7 (Pages 22 - 25)

Page 26

1  it to them and then hope to correct them so they
2  wouldn't be in violation of the law?
3      MR. MIGLIORI:  Objection to form.
4      Go ahead.
5      THE WITNESS:  Again, it depends on -- of
6  course, our primary job, when we were out there,
7  was to look at all their control policies and
8  procedures, the way they're operating their
9  controlled substance business and to make
10  corrections.
11      But some things we have to leave it to
12  them.  While we may look at their policies and
13  procedures and we might ask them a question, we
14  rely on what they say.
15      Now, physical security is easy.  I mean,
16  I can go in and do a physical security sweep
17  and -- without looking at their policies and
18  procedures and know if their physical security is
19  in place.  And then we look at their policies and
20  procedures to see who's going in and out, how many
21  people are authorized to go into a cage or a
22  vault, and things like that.

Page 27

1      But there are other policies and
2  procedures that are not as apparent.  So...
3  BY MR. GIBBONS:
4      Q.  Do you recall any instance in which you
5  explained any deficiencies in a distributor's
6  policies and procedures in relation to diversion
7  control?
8      A.  Way back when?
9      Q.  Yeah, I'm talking about --
10      A.  Yeah --
11      Q.  -- your experience in '98 -- '86 to '88.
12      A.  I mean, that's a long time ago.  I'm sure
13  we sat down -- we always had an entry conference
14  with the company, and we also had an exit
15  conference, and we would have daily meetings at
16  the end of the day to discuss some findings,
17  especially when we did audits.
18      So yes, we would discuss that, but I just
19  don't recall specifics on --
20      Q.  Okay.  Last question in this area.
21      But you felt that was part of your duties
22  and responsibilities as a diversion investigator

Page 28

1  to explain these deficiencies, if and when you saw
2  them in a company's policies and procedures?
3      MR. MIGLIORI:  Objection to form.
4      THE WITNESS:  It depends -- yes.  It
5  depends on -- yeah, most of the time we did do
6  that.  Yes.
7  BY MR. GIBBONS:
8      Q.  Okay.  You then continued to work at the
9  DEA from 1986 to 2015; is that right?
10      A.  Yes.
11      Q.  And if my math is correct, approximately
12  a 29-year career?
13      A.  Yeah.  29-1/2 years.  Yeah.
14      Q.  29-1/2 years.  It's like my four-year-old
15  math.  I don't have a four-year-old, but...
16      In those years, did you ever conduct a
17  SOMs investigation personally?
18      A.  Well, when I was with the diversion --
19  when I was with the Office of Diversion Control, I
20  had to review the SOMs investigations when they
21  came into the -- to my office, and especially if
22  there was an order to show cause action or a

Page 29

1  letter of admonition, I looked at what they were
2  doing and their findings.  Yes.
3      Q.  And I appreciate that nuance, but my
4  question is a little more narrow.
5      Did you ever personally conduct a SOMs
6  investigation?
7      A.  I personally did not conduct a SOMs
8  investigation.
9      Q.  Did you ever inspect a distribution
10  center like Ponca, which was Albertsons' district
11  center?
12      A.  Again, I never inspected a distribution
13  center at Ponca, but I did, as a diversion
14  investigator, yes, I did do a distribution center.
15      Q.  Okay.  I want to talk about your
16  compensation.  And we can go about this any number
17  of different ways.
18      A.  Sure.
19      Q.  In your 29-1/2 years, are you able to
20  tell me the highest salary you had achieved in
21  your DEA career?
22      A.  I think the highest salary I had was

8 (Pages 26 - 29)

Page 30

1  $186,000.
2      Q.  And I did spend some time in the
3  government.  I don't recall we ever got any
4  bonuses, but let me ask.
5          Did you get bonuses in any of your years
6  as a DEA employee?
7      A.  Yes, I did get bonus -- yeah, I did get a
8  bonus.
9      Q.  The 186,000, was that cumulative of
10  salary and bonus or --
11      A.  That was cumulative of salary and bonus.
12      Q.  And was this later in your career that
13  you achieved 186,000?
14      A.  Yes.
15      Q.  What month in 2015 did you retire?
16      A.  October 31st, 2015.
17      Q.  Halloween?
18      A.  Yeah.
19      Q.  Any significance to that?  Just have to
20  ask.
21      A.  No.  That was the day.
22      Q.  Okay.

Page 31

1      A.  It was just that was the day.  It was the
2  last day in October 2015, yeah.
3      Q.  Could you explain for us all of the
4  reasons that you left the DEA?
5      A.  Yeah --
6          MR. MIGLIORI:  Objection to form.
7          Go ahead.
8          THE WITNESS:  Well, they decided to bring
9  in a new deputy assistant administrator.  The new
10  deputy assistant administrator was taking the
11  reins of the Office of Diversion Control.  I --
12  they were not sure where they were going to
13  transfer me.  I had done enough transfers in my
14  career.  My daughters were young, and we just
15  didn't want to do another transfer.  And I decided
16  it was time.  I decided it was time.
17          So I put in my paperwork when he got
18  there.  I think there was a month crossover, and
19  then I pulled plug.
20  BY MR. GIBBONS:
21      Q.  Are there any other reasons --
22      A.  That was --

Page 32

1      Q.  -- that --
2      A.  -- the main reason.  Any other reasons?
3  I don't know what you're --
4      Q.  I am not hunting for anything --
5      A.  Yeah.
6      Q.  -- except all of the reasons that led to
7  your decision to end your career after 29-1/2
8  years at the DEA.
9          MR. MIGLIORI:  Objection to form.
10          Go ahead.
11          THE WITNESS:  The reason was that I
12  was -- basically, somebody was promoted into my
13  position, and they couldn't give me an answer of
14  where I was going.  And that was basically the
15  reasons.
16  BY MR. GIBBONS:
17      Q.  Okay.  Because I wasn't limiting myself
18  to primary.  I'm limiting myself to any reason
19  that fueled your decision.  I've heard your
20  answers so far.
21          Anything else?
22          MR. MIGLIORI:  Objection to form.

Page 33

1          Go ahead.
2          THE WITNESS:  Anything else?  I don't
3  know -- I guess -- the administrator decided to
4  make a transfer and, to be honest with you, I
5  don't know what his reasoning was, but we didn't
6  see eye to eye on certain things.  And so -- that
7  was the other thing.  You know, he was an acting
8  administrator, and so -- but other than that -- it
9  was more -- I couldn't tell you what I was going
10  to do.  And I would have to tell my family, well,
11  get ready, we're going to be transferred, which
12  I've told them before, and I don't -- it never
13  went over real well, especially with two young
14  girls, one of which was starting -- or in the
15  midst of high school.
16          So I just decided it was time.
17  BY MR. GIBBONS:
18      Q.  Who was the deputy assistant
19  administrator that took your position?
20      A.  A guy named Lou Milione.
21      Q.  And you said you didn't see eye to eye on
22  certain things.

9 (Pages 30 - 33)

1    Did any of them include how to work with
2 the pharmaceutical industry in relation to the
3 opioid crisis?
4    A. Well, I don't think he was there long
5 enough to determine what I did or didn't do in the
6 pharmaceutical industry, unless he was listening
7 to people in the pharmaceutical industry.
8    So I believed at that point in time that
9 I was doing everything that I could to enlighten
10 the pharmaceutical industry on what they should be
11 doing.
12    So -- I don't know.  He wasn't there.  We
13 got there in May or June, and I left in October.
14    Q. Fair enough.  But I'm just following up
15 on an answer you gave.  You said you and Lou did
16 not see eye to eye on some things.  What --
17    A. Oh --
18    Q. -- were those things?
19    A. Lou or the administrator?
20    Q. Okay.  Who was the administrator you
21 didn't see eye to eye with?
22    A. Rosenberg.

1    Q. Chuck Rosenberg?
2    A. Chuck Rosenberg, yeah.
3    Q. Okay.  What did you and Rosenberg not see
4 eye to eye on?
5    A. Well, now you're getting into things that
6 I can't talk about because I'm -- the Department
7 of Justice has limited what I could talk about.
8 And now those are internal discussions and that
9 couldn't be -- I couldn't talk about that.
10    Q. So you believe your Touhy obligation to
11 prevent you from answering that question?
12    A. Yes.
13    Q. Was the pharmaceutical industry putting
14 pressure on the DEA to work in a different manner
15 at or about the time of your departure from the
16 DEA?
17    MR. MIGLIORI:  Objection.  Form and
18 foundation.
19    Go ahead.
20    THE WITNESS:  I think the pharmaceutical
21 industry was upset that we were forcing them to
22 comply with the Act and the Code of Federal

1 Regulations.  And because of that, they were
2 contacting whoever they could to listen, to
3 tell -- for instance, Congress, for instance, the
4 Department of Justice, and maybe DEA -- to
5 basically ask us to back off.
6    And when thousands and thousands of
7 people are dying, I didn't think it was
8 appropriate to back off.
9 BY MR. GIBBONS:
10    Q. Did that play any role in your decision
11 to retire from the DEA?
12    A. No.  My problem was I did not want to
13 transfer again.  And I was going to get
14 transferred because there was no place for me in
15 headquarters.  I was the deputy chief of
16 operations at the time.  There was already a new
17 deputy chief of operations and two other deputy
18 chiefs of operations, so I would have to be
19 transferred.  And so -- I had nowhere to go.  And
20 you know -- unless I was going back to
21 Indianapolis or Detroit or New York, and none of
22 those places had openings, I was going somewhere

1 where I didn't want to go.
2    Q. Understood.
3    VIDEO TECHNICIAN:  Excuse me.  Does
4 someone have a charm or a chain or a key or
5 something like that?
6    THE WITNESS:  Oh, I might be rubbing
7 against my belt buckle.  I'll stop that.
8 BY MR. GIBBONS:
9    Q. After you retired from the DEA, Chuck
10 Rosenberg testified before Congress on June
11 the 22nd, 2016.
12    Are you familiar with that testimony?
13    A. Yeah.  People called me about that --
14    Q. Okay.  I'm just going to read you a quote
15 and ask you about it.
16    He states, We've also been opaque.  I
17 think we've been slow.  I think we've -- I think
18 we've been opaque.  I think we haven't responded
19 to them.  We're trying to issue guidelines for
20 them more quickly.  We're trying to answer their
21 questions.
22    You're aware of that --

10 (Pages 34 - 37)

Page 38

1        MR. MIGLIORI:  Objection.
2  BY MR. GIBBONS:
3        Q.  -- testimony?
4        MR. MIGLIORI:  Objection to form.
5        THE WITNESS:  Yeah.  And he was totally
6  off base.  He had no idea what we were doing at
7  the time, and he just -- it's almost like he just
8  went and had a script that he was reading that
9  somebody wrote for him.  Maybe industry.
10 BY MR. GIBBONS:
11       Q.  Okay.  I think you answered my question,
12 then.  You do not believe the DEA, under your
13 direction, then, was slow in responding to the
14 opioid crisis?
15       A.  Absolutely not.  In fact, if you look at
16 what DEA was doing dating back to the internet
17 crisis, we were the only federal agency working
18 internet cases at the time.  We were the only ones
19 out there putting bad pharmacies and doctors --
20 holding the distribution companies accountable for
21 their internet sales, which were basically all
22 illegal.

Page 39

1        So there was no one out there doing it
2  but DEA and the state and locals that we worked
3  with.
4        So the idea that we were slow, we were in
5  the fight from the very beginning.  And people who
6  say that just basically show their ignorance.
7        Q.  So one of the things he said in his
8  statement was that the DEA was slow in issuing
9  guidance or answering the industry's questions.
10       Do you dispute that?
11       A.  We had a call center that would answer
12 any questions.  We had a liaison and policy
13 section that answered questions.  We had local
14 offices that were answering questions.
15       If you picked up the phone and called the
16 local office, the local office would answer your
17 questions.
18       We sent out guidance letters in both 2006
19 and 2007.  We actually went out and did pharmacy
20 diversion awareness conferences.
21       I mean, we were all over the place.  And
22 we were answering questions at those conferences.

Page 40

1        So the idea that we were opaque -- I made
2  it very clear what our goals were, to bring the
3  industry into compliance.
4        So the idea that, you know, we were
5  opaque and we weren't answering questions is
6  ludicrous.
7        Q.  Let me ask you a very narrow question
8  about suspicious orders.
9        From the early 2000s or so to your
10 retirement in 2015, did the DEA provide internal
11 guidance to distributors about what constituted a
12 suspicious order?
13       A.  Those letters that went out basically
14 explained what suspicious orders are.  And before
15 that, we were in the -- in the facilities, our
16 inspection teams were in the facilities talking
17 about suspicious orders.
18       Q.  And -- and what guidance?  Can you
19 summarize the guidance that you believe the DEA
20 provided distributors?
21       A.  Well, I don't have the letters in front
22 of me, but the letters talked about what a

Page 41

1  suspicious order is.  They talked -- depending on
2  which letter, they talked about where you could
3  find information on suspicious orders.
4        They made it very clear that a suspicious
5  order monitoring program is -- the DEA cannot
6  dictate to you, because we don't know your
7  business practices, we don't know your client
8  base, we can't tell you how to create your
9  suspicious order monitoring program.  But any
10 suspicious order monitoring program must have the
11 ability to maintain -- to identify orders of
12 unusual size, orders that substantially deviate
13 from a normal pattern and unusual frequency.  And
14 that's outlined in 1301.74.
15       So -- and then we went on to explain
16 that.  So I don't -- I don't know, you know, what
17 else we could have done, doing all those meetings
18 and actually meeting with groups and -- that was
19 basically it.  So...
20       Q.  Okay.  So you -- looking back on your
21 career, you don't think you could have done
22 anything different in relation to providing more

11 (Pages 38 - 41)

Page 42

1 specific guidance to distributors in relation to
2 what is a suspicious order or what is an
3 appropriate SOMs program?
4     MR. MIGLIORI: Objection to form.
5     THE WITNESS: A suspicious order
6 definition is in the Code of Federal Regulations.
7 It's very clear. And it's an order of unusual
8 size, frequency or substantially deviating.
9     As I've testified before, that's very
10 clear. And if there was questions on it, they
11 could call us and ask us. But the calls were,
12 well, should I distribute this quantity? Or this
13 guy ordered this -- I can't make that decision for
14 them. That was -- Department of Justice and DEA
15 had longstanding rules about telling them what
16 they can and can't do. And I think that dates
17 back to the NWDA documents that -- many years ago.
18 BY MR. GIBBONS:
19     Q. Okay. We'll cover that a little more
20 carefully when I get around to the regulation.
21     A. Okay.
22     Q. Let me just finish up with your CV now.

Page 43

1     Within months of you retiring -- I think
2 it was April of 2016 you started working at Alpha
3 6?
4     A. Yes.
5     Q. What was Alpha 6?
6     A. It's a software company. It does, like,
7 software solutions and also does hardware work.
8 It's a tech company.
9     Q. And what did you do there?
10     A. I was helping them just with different
11 programs. They were looking at potentially doing
12 a pharmaceutical -- some kind of -- different
13 pharmaceutical programs, and so they hired me to
14 help them navigate different pharmaceutical.
15     Q. Do you have a background in software
16 solutions?
17     A. No. I think they were using me for my
18 pharmacy background.
19     Q. At a high level. You don't know how to
20 write code, do you?
21     A. No. They -- no. They had their own code
22 writers. They were just hitting me up for, you

Page 44

1 know, questions regarding certain things, you
2 know -- certain things to look for. They were
3 trying to develop software --
4     Q. In what area?
5     A. Pharmaceuticals. Mostly for state -- I
6 guess for -- it would be for states -- state and
7 agencies that were regulatory agencies, things
8 like that.
9     Q. Okay. They said -- you said that they
10 were hitting you up for information, given your
11 background as a DEA agent.
12     What -- give us some examples of what
13 type of information you were providing to Alpha 6.
14     A. I --
15     MR. MIGLIORI: Objection to form.
16     Go ahead.
17     THE WITNESS: It wasn't in -- nothing,
18 they just wanted to know, like, how regulatory --
19 a state regulatory agency reviewed things. They
20 were looking at the PDMPs and trying to see if
21 they could create better PDMPs. There was nothing
22 really -- it was just all things that I had looked

Page 45

1 at before. I'm very knowledgeable in the PDMPs
2 and -- so things like that.
3     I mean, they were looking at how they
4 could integrate certain, like, geographic or
5 demographic information into a software program to
6 help the PDMPs.
7     So they were just, you know, looking at
8 certain things that would help the regulatory
9 agencies better understand the drug flow through
10 their communities.
11 BY MR. GIBBONS:
12     Q. So Alpha 6 was providing guidance to the
13 regulatory agency as opposed to the other side,
14 meaning the industry itself?
15     A. Yeah, they were -- this was -- I don't
16 know if it ever got off the ground, but they
17 weren't providing anything; they were just looking
18 into it. I was hired to help them look at the
19 software package and see what the state and local
20 agencies could use.
21     Q. Did any of this work look at SOMs
22 programs?

12 (Pages 42 - 45)

1    A.  I think on a state level, yeah, anything

2  that would have to do with PDMPs naturally would

3  have some kind of view because they would want to

4  know how much drug is coming into their -- so

5  yeah.  I mean, was it a SOMs program?  I don't

6  know necessarily if it was a SOMs program, but it

7  was a program that would maybe integrate for the

8  state and locals how the drug flow was going

9  through their communities.

10      They didn't have and we don't have

11  access -- and the states didn't have access at

12  that point in time to drug distribution data,

13  ARCOS data.  So -- I mean, it was on an as-needed

14  basis with a formal request.  So you weren't going

15  to get a state who was going to get all of the

16  ARCOS data for that state.  It just doesn't happen

17  that way.

18      So I think it was more drug flows

19  pursuant to the PDMP data that we were looking at.

20    Q.  Okay.  So you were not advising this

21  company, Alpha 6, as it relates to how a

22  distributor could or should create an adequate

1  SOMs program; is that fair to say?

2    A.  Yeah.  It was more -- we were gearing

3  towards the state and locals.

4    Q.  What led you to take that position at

5  Alpha 6?

6    A.  I had a friend who worked there and said

7  they're looking to get into state and local

8  programs with pharmaceuticals and would I be

9  interested in coming on.  I said sure.  I met with

10  them.  They were very -- they were gentlemen.

11  They were very nice.  They just said, you know,

12  we're just looking at this; we don't know where

13  it's going to go, but, you know, would you be

14  interested?  And I said sure.

15    Q.  What was your compensation?

16    A.  It was right around 200,000.

17    Q.  And you were there for about a year; is

18  that right?

19    A.  Yeah.  I was there, but not really a year

20  because, during that time period, I had open heart

21  surgery, so I was out for three months.  And then,

22  when I came back, I was just not ready to work,

1  and it wasn't fair to them, so I just told them I

2  was going to leave.

3    Q.  And was that the sole reason for you

4  leaving Alpha 6?

5    A.  That was the primary reason.  Yeah.

6    Q.  What were the other reasons?

7    A.  There wasn't -- well, I didn't know if I

8  was going to be alive.

9    Q.  Health.

10    A.  Yeah.  That was the main reason, yeah.

11    Q.  It had nothing to do with your

12  performance or anything like that, is what I'm

13  getting at?

14    A.  Oh, no.

15    Q.  Okay.

16    A.  Absolutely not.  No.  Actually, they

17  were -- it was a great company to work for.  They

18  really treated their employees well.  Those guys

19  were gentlemen.  I just -- I was in pretty bad

20  shape after my surgery, so I -- you know, I just

21  didn't think it was the right thing to do to

22  continue to go there and work and not be able to

1  travel and do everything they wanted me to do.

2    Q.  Understood.

3      Do you know if Alpha 6 continued to

4  exist, or does it still exist today?

5    A.  I'm sure it exists today.

6    Q.  You then moved to -- or started at Due

7  Diligence Compliance, LLC; is that right?

8    A.  That's, yeah, my company.

9    Q.  Are you the owner of that company?

10    A.  Yes.

11    Q.  Is anyone else a part owner of the LLC?

12    A.  No.

13    Q.  You've been its only president; is that

14  right?

15    A.  Yes.

16    Q.  Do you have any employees besides

17  yourself?

18    A.  No.

19    Q.  Who came up with the name Due Diligence

20  Compliance, LLC?

21    A.  I did.

22    Q.  What went into that name choice?

13 (Pages 46 - 49)

Page 50

1    A.  Because I was mainly focused on federal,
2  state, and local agencies looking for help, and
3  due diligence is a requirement in the
4  pharmaceutical industry, not just in controlled
5  substances, but for many things.
6        And so I thought due diligence was an
7  appropriate term.
8    Q.  Okay.  And you stated that federal,
9  state, and local agencies were looking for
10  assistance in that area; is that right?
11    A.  Uh-huh.  Yes, sir.
12    Q.  And over the years, have you provided
13  assistance to federal, state, and local
14  authorities?
15    A.  Generally, I've provided it through
16  litigation, but I've done things outside of
17  litigation.  For instance, if a pharmacy board
18  needs somebody to come in and instruct on
19  corresponding responsibility, that's part of it.
20  I'll come in and do the corresponding
21  responsibility lecture for them.
22        If a medical board wants me to come out

Page 51

1  and do a discussion with doctors on prescribing
2  and dispensing matters, I would do that.
3        So it just -- it depends on what I'm
4  being asked to do.  There's certain things, you
5  know, I just don't generally do.
6        But for the most part, I'll take on
7  presentations.  Or, in litigation, I'll help the
8  states through their litigation teams prepare for
9  trial, provide expert testimony.  It just depends
10  on what I'm doing at the time.
11    Q.  Okay.  I think I understand.
12        So when you say that you provide
13  assistance to federal, state, and local
14  authorities, you would consider this engagement by
15  Tarrant County as providing assistance to a
16  federal, state, or local entity; is that fair to
17  say?
18    A.  That's correct.
19    Q.  As opposed to assisting the plaintiffs'
20  lawyers in suing pharmaceutical chains,
21  distributors, or manufacturers.
22    MR. MIGLIORI:  Objection to form.

Page 52

1    THE WITNESS:  Well, the plaintiffs'
2  lawyers are working for the state, so -- I guess
3  you could say that.  But in the end, the client is
4  the state.  So...
5  BY MR. GIBBONS:
6    Q.  Who pays your bills?
7    A.  I'm sure they come through the --
8    MR. MIGLIORI:  Objection to form.
9  Foundation.
10    Go ahead.
11    THE WITNESS:  -- the attorneys.
12  BY MR. GIBBONS:
13    Q.  And I think you said earlier in the
14  deposition that you've not ever talked to anyone
15  at Tarrant County; is that right?
16    A.  I have not.
17    Q.  You've just dealt with the lawyers for
18  Tarrant County, who are private lawyers who are
19  being paid for suing manufacturers or distributors
20  or pharmacy chains; is that right?
21    A.  Yeah.  They represent the county in this
22  litigation.  So yes.

Page 53

1    Q.  Could you estimate for me per year, if
2  you can, the amount of money you've earned in
3  providing these sorts of professional services?
4    A.  I -- I mean, you have the bills for
5  these -- for this litigation.  I don't -- I could
6  get that -- the totals by year.  It depends.  You
7  know, anywhere from 200,000 to -- I mean, early
8  on, there was really very little.  I guess, by the
9  third year, I made over $200,000.  And I think the
10  most I've ever made was in the mid-3s.  But most
11  of the time it's between 2 and 250.  And that
12  started in 2007 [sic], I guess.
13    Q.  What year?
14    A.  2017.  Yeah.
15    Q.  So by the third year, you were making at
16  least 200,000, and your high-water mark has been
17  around the mid-3s?
18    A.  Yeah.  That was the high...
19    Q.  And would it be fair to say that, in
20  every one of those years, you made more money
21  providing those professional services than you
22  ever made in your high-water mark as a DEA agent?

14 (Pages 50 - 53)

Page 54

1     A. Oh, absolutely.  Yes.

2     Q. Can you estimate for us the cumulative

3  amount you've earned by providing these

4  professional services?  And I'm going to give you

5  a guidepost.

6     In 2022, you testified in a matter in

7  Florida that it was north of 1.1 million.

8     A. Yeah.

9     Q. I'm trying to figure out where has it

10  gone from your testimony in 2022.

11     A. Probably close to 1.5.

12     (Rannazzisi Deposition Exhibit 2 marked

13      for identification and attached to the

14      transcript.)

15  BY MR. GIBBONS:

16     Q. I'm going to show you what we'll have

17  marked as Exhibit Number 2 and ask if you

18  recognize that.

19     A. Yes.

20     Q. Can you tell us what that is?

21     A. That is my bill for this litigation.

22     Q. Okay.  When you say a bill for this

Page 55

1  litigation, this is the case that involves Tarrant

2  County and Albertsons, right?

3     A. Yes.

4     Q. Okay.  And you've billed $90,050; is that

5  right?

6     A. Yes.  Since October of '23.

7     Q. And I'm assuming you've recorded more

8  hours on this matter; is that right?

9     A. I have, but not -- just in preparation

10  for and then the deposition, so it won't be that

11  much.

12     Q. Is that the total billing in relation to

13  this matter?

14     A. Except for the deposition today and the

15  prep -- two days of prep or three days of prep or

16  whatever.

17     Q. How many hours did you spend preparing

18  for the deposition?

19     A. I didn't bring that with me, but --

20     Q. Generally.

21     A. Probably 20.

22     Q. And what did you do to prepare for the

Page 56

1  dep?

2     A. Read my reports.  Went over the statute

3  and regulations again.  Just went over documents.

4  Documents were a big deal.  I wanted to just go

5  through the documents one more time, make sure I

6  had all of the documents in my head.  You know,

7  other than that, that's it.

8     Q. And I don't want to get into the

9  substance of any conversations you would have had

10  with counsel, but did you meet with counsel prior

11  to this dep?

12     A. I met with counsel for about a half hour

13  over the phone.

14     Q. So the other 19-1/2 hours or so that you

15  estimate spending in preparation was you reviewing

16  documents.

17     A. Yeah, I didn't even include that, to be

18  honest with you.  Yeah.

19     Q. Okay.  I want to go back to your report.

20  We're done with that.

21     VIDEO TECHNICIAN:  Excuse me, Counsel.

22  Could you move your water bottle?

Page 57

1  BY MR. GIBBONS:

2     Q. Okay.  You have Exhibit Number 1 in front

3  of you?

4     A. Yes.

5     Q. Now, in reading pages 1 to 22 -- and

6  please feel free to leaf through it.

7     A. Uh-huh.

8     Q. Is it fair for me to say that almost all

9  of that was copied from other reports you had

10  previously written?

11     MR. MIGLIORI:  Objection to form.

12     THE WITNESS:  Yeah, pretty much.  Yeah.

13     MR. GIBBONS:  Let me show you what we're

14  going to mark as Exhibit Number 3.

15     MS. MANKOWSKI:  Can we go off the record

16  for a minute?

17     MR. MIGLIORI:  Sure.

18     MR. GIBBONS:  We're going to go off the

19  record for one second.

20     VIDEO TECHNICIAN:  The time is 10:07 a.m.

21  We're off the record.

22     (Discussion off the record.)

15 (Pages 54 - 57)

Page 58

1      VIDEO TECHNICIAN:  The time is 10:08 a.m.
2  We're on the record.
3      (Rannazzisi Deposition Exhibit 3 marked
4      for identification and attached to the
5      transcript.)
6  BY MR. GIBBONS:
7      Q.  Mr. Rannazzisi, I have in front of you
8  what we've marked as Exhibit Number 3, which is an
9  expert report by yourself dated August 22, 2022.
10      Do you have that?
11      A.  Yes.
12      Q.  Okay.  On page 1 of Exhibit Number 3, you
13  also start with an executive summary.
14      Do you see that?
15      A.  Yes.
16      Q.  And in that first paragraph, you are
17  discussing the distribution practices of CVS,
18  Kroger, Meyer, Walgreens, and Walmart; is that
19  right?
20      A.  Yes.
21      Q.  And in the second paragraph -- would it
22  be fair to say, if I compared your second

Page 59

1  paragraph on Exhibit Number 3 to your third
2  paragraph of Exhibit Number 1, they basically say
3  the same thing --
4      MR. MIGLIORI:  Objection.
5  BY MR. GIBBONS:
6      Q.  -- except for the names of the parties?
7      MR. MIGLIORI:  Objection.  Speaks for
8  itself.
9      THE WITNESS:  Yes.  And the counties.
10  Yes.
11  BY MR. GIBBONS:
12      Q.  And the counties.
13      And in relation to CVS, Kroger, Meyer,
14  Walgreens, and Walmart, your opinion was that they
15  also failed to have effective controls against the
16  diversion of controlled substances through their
17  failure to design and operate a SOMs program
18  reasonably calculated to detect and stop
19  suspicious orders; is that right?
20      MR. MIGLIORI:  Objection to form.
21  Document speaks for itself.
22      Go ahead.

Page 60

1      THE WITNESS:  Yes, sir.
2      MR. GIBBONS:  Let me show you what we'll
3  mark as Exhibit Number 4.
4      (Rannazzisi Deposition Exhibit 4 marked
5      for identification and attached to the
6      transcript.)
7  BY MR. GIBBONS:
8      Q.  And for the record, this is an expert
9  report of yourself dated January 24, 2024?
10      A.  Yes.
11      Q.  And if I turn to page 1 of this report,
12  would it be fair to say that you are basically
13  alleging the same SOM deficiencies against Kroger
14  and Publix?
15      MR. MIGLIORI:  Objection to form.
16      THE WITNESS:  Yes.
17  BY MR. GIBBONS:
18      Q.  And does it basically read the same
19  except for the names of the parties and the
20  counties?
21      A.  Yes.
22      Q.  Do you have any idea as to what the MME

Page 61

1  market share for those seven companies were in
2  Tarrant County for the years you examined, 2006 to
3  2014?
4      A.  No.
5      Q.  If we put aside independent pharmacies,
6  would you agree with me that those seven companies
7  captured a very large percentage of the remaining
8  market share as defined by MME?
9      A.  Well, I can't agree with you because I
10  don't know the exact MMEs in total.  So I couldn't
11  -- I'm sure that, you know, together, they have a
12  substantial amount, but I never looked at that, to
13  be honest with you.
14      Q.  Okay.  But it wouldn't surprise you that
15  those seven would have a substantial market share
16  as either defined by MME or some other relevant
17  factor; is that fair to say?
18      MR. MIGLIORI:  Objection to form.
19      THE WITNESS:  I -- that wouldn't surprise
20  me, no.
21  BY MR. GIBBONS:
22      Q.  Okay.  From the time frame of 2006 to

16 (Pages 58 - 61)

Page 62

1  2014, are you aware of any distributor that had an
2  effective SOM program?
3      A.  Well, I don't know because all the
4  distributors -- I didn't -- I haven't looked at
5  every distributor.  I've only looked at certain
6  distributors.
7      Q.  And that's fair, but that's not my
8  question.
9          I'm asking you, as you sit here now, can
10  you independently identify one distributor that,
11  in your opinion, had an effective SOM program for
12  these years 2006 to 2014?
13          MR. MIGLIORI:  Objection to form.
14          THE WITNESS:  No.
15  BY MR. GIBBONS:
16      Q.  Do you have any reasonable basis for
17  believing that any distributor had any effective
18  SOM program during those years?
19      A.  The distributors that I reviewed did not
20  have an effective SOM program.  I can't tell you
21  what other -- I don't know what I don't know.  But
22  the distributors that I reviewed did not have

Page 63

1  effective SOM programs.
2      Q.  And cumulatively you've been paid
3  $1.5 million to look into this area; is that fair
4  to say?
5          MR. MIGLIORI:  Objection to form and
6  scope.
7          THE WITNESS:  That's fair, to look at the
8  SOM programs.  Yes.
9  BY MR. GIBBONS:
10      Q.  And in all the work you've done, can you
11  name one distributor that you believe had
12  effective SOMs programs?
13          MR. MIGLIORI:  Objection.  Same
14  objections.
15          THE WITNESS:  Based on the information
16  that I reviewed, the internal documents, their
17  policies, procedures, and protocols, no.
18  BY MR. GIBBONS:
19      Q.  I'm going to ask you to turn to Exhibit 1
20  now.  I'm mostly done with those other exhibits.
21      A.  Okay.  Great.
22      Q.  This is back on Exhibit Number 1.  I'm

Page 64

1  going to ask you to turn to page 8.
2      Are you there?
3      A.  Yes.
4      Q.  Okay.  Under the heading suspicious
5  orders, you write, A key component to the
6  reporting and security requirements is the
7  requirement to design and operate a system to
8  detect and disclose to the registrant suspicious
9  orders which include orders of unusual size,
10  orders deviating substantially from a normal
11  pattern, and orders of unusual frequency.
12      Do you see that?
13      A.  Yes, sir.
14      Q.  And then you cite 21 CFR 1301.74(b),
15  right?
16      A.  Yes.
17      Q.  Now, in previous testimony -- and I'm
18  happy to give you that if you'd like to see it --
19  you've testified, quote, over and over again that
20  1301.74(b) is a very simple provision.
21      A.  Yes.
22      Q.  Do you agree with that statement today?

Page 65

1      A.  Yes.
2      Q.  Okay.  And as you've previously
3  testified, there's three basic criteria to that,
4  right?  Unusual size, unusual frequency, or an
5  order deviating substantially from the norm.
6      A.  Yes.  That's why it says "which include."
7  I mean, it could be expanded out from that, but
8  that's the foundational baseline, those three.
9          MR. GIBBONS:  Let me mark as Exhibit
10  Number 5 testimony you've previously given.
11          (Rannazzisi Deposition Exhibit 5 marked
12          for identification and attached to the
13          transcript.)
14  BY MR. GIBBONS:
15      Q.  And for the record, Exhibit Number 5 is a
16  deposition transcript dated December the 14th,
17  2022.
18      A.  Uh-huh.
19      Q.  Do you have that in front of you?
20      A.  Yes.
21      Q.  I just want to ask you about one
22  statement you make in there.  And I'm -- would ask

17 (Pages 62 - 65)

1 you to turn to page 46.

2    A.  Okay.  Got it.

3    Q.  And read to yourself beginning on line 20

4 through the end of that answer, which stops on

5 page 47.

6        MR. MIGLIORI:  I just want to make sure

7 we're on the same place.  You said page 46?

8        MR. GIBBONS:  Yeah.  On the bottom, line

9 20.  Starting with, "Look, the beauty of 1301.74."

10        MR. MIGLIORI:  I just wanted to make

11 sure.  You asked him to start in the middle of an

12 answer.  I just --

13        MR. GIBBONS:  Oh, yeah, you can --

14        MR. MIGLIORI:  -- encourage you to read

15 the question and the --

16        MR. GIBBONS:  -- whole thing if you want.

17        MR. MIGLIORI:  -- answer, not just half

18 the answer.

19        THE WITNESS:  Okay.

20 BY MR. GIBBONS:

21    Q.  I'm going to ask you a question.

22 Where -- you say, and I quote, "I just, it's so

1 easy to adapt any system to that three criteria,

2 the baseline, the foundational criteria of

3 1301.74(b)."

4        Do you see that?

5    A.  Yes.

6    Q.  Do you still believe that's true as you

7 sit here today?

8        MR. MIGLIORI:  Objection.  Out of

9 context.

10        Go ahead.

11        THE WITNESS:  Yes, I do.

12 BY MR. GIBBONS:

13    Q.  And I think you previously testified, but

14 I just want to make sure, you don't have any tech

15 experience; is that right?

16    A.  No, I don't have any tech experience.

17    Q.  And you've never adapted a computer

18 system for a company; is that true?

19    A.  No, I have not.

20    Q.  You've never written or created

21 algorithms; is that right?

22    A.  That is correct.

1    Q.  You don't write code?

2    A.  No, I do not.

3    Q.  And you've never created software of any

4 kind; is that right?

5    A.  That is correct.

6    Q.  So what is your basis for saying it's

7 easy to adopt a system to those three criteria of

8 the regulation?

9        MR. MIGLIORI:  Objection to form.

10        THE WITNESS:  Because people were running

11 manual systems looking at that information.  The

12 fact is that everybody goes to unusual size

13 because that's the low-hanging fruit.  It's easy.

14 Maybe unusual frequency.  But no one is doing a

15 substantial deviation, and that is fairly easy.

16        And if you'd like, I could expand on

17 that.

18 BY MR. GIBBONS:

19    Q.  No.  I just want to get at this point,

20 the basis for you asserting that it's easy to

21 adapt a system to the three criteria of that

22 regulation.

1        I heard you say what people focused on.

2    A.  Uh-huh.

3    Q.  But I'm asking for any basis you have in

4 your background to say it's easy to adopt a system

5 to those three criteria.

6        MR. MIGLIORI:  Objection to form.

7        Go ahead.

8        THE WITNESS:  And that's exactly why the

9 department and DEA does not tell somebody how to

10 create a system.  It is easy.  It is easy, and I'm

11 sure there are companies out there doing it now.

12        But if you don't put the time and the

13 effort to determine how you want to create your

14 system and how you want it to operate, and if you

15 don't have the resources to operate the system and

16 to conduct due diligence investigations, then it's

17 going to crash and burn.

18        But -- it just depends on the will of the

19 company that's operating the system to ensure that

20 it operates appropriately.  So...

21 BY MR. GIBBONS:

22    Q.  Okay.  And I appreciate that having the

18 (Pages 66 - 69)

Page 70

1  desire and the will to do that is one thing.
2      My question is, though, what is your
3  background to inform a jury that it's easy to
4  adopt a system to those three regulations?
5      MR. MIGLIORI:  Objection to form.
6      THE WITNESS:  My background as a
7  pharmacist and as a regulator, seeing the systems
8  and evaluating systems in my role as the deputy
9  assistant administrator of the Drug Enforcement
10  Administration, I think I have a pretty good
11  background on what could be adapted and how it
12  could be adapted.
13      It's -- again, I have no -- no doubt that
14  developing the system is not that difficult.  It's
15  putting the time and energy in the system.
16      My background is the head regulator of
17  controlled substances for the Department of
18  Justice.
19  BY MR. GIBBONS:
20      Q.  But I thought you testified you had never
21  seen a SOMs program that didn't have deficiencies.
22      A.  Well, when I was looking at them.  But

Page 71

1  all those SOM systems have changed.  Since we've
2  done litigation on them, I'm sure they've changed.
3      Q.  Okay.  I just want to flush this out.
4      You previously testified, I believe, that
5  you never saw a SOMs program of a distributor that
6  didn't have deficiencies.
7      Did I hear that correct?
8      A.  That's correct.
9      MR. MIGLIORI:  Objection.  Misstates the
10  full testimony.
11      Go ahead.
12      THE WITNESS:  That's correct.  From the
13  systems that I reviewed -- and depending on the
14  years I reviewed it -- those systems were not
15  operationally compliant with the law.  However,
16  things have changed.  I have not had the
17  opportunity to go back in and look at the systems
18  that were being operated by certain companies.
19  Because remember, we were looking at systems, you
20  know, between 2006 and 2014, and then we expanded
21  into 2016 or '17 later in the litigation, and '18.
22      But, you know, early on, when I was

Page 72

1  looking at, you know, certain distributors, I was
2  looking at what they had functionally from 2005 to
3  2014.  So I'm sure they've changed.  They'd be
4  silly not to change because their systems were not
5  in compliance with the Act.
6  BY MR. GIBBONS:
7      Q.  I appreciate that, but I'm still trying
8  to boil down to your basis for saying it's easy to
9  adopt a system to those three criteria if, in
10  fact, you don't write code, you don't have a tech
11  background, and you've never seen a system that
12  didn't have deficiencies.
13      MR. MIGLIORI:  Objection to form.
14      Go ahead.
15      THE WITNESS:  Again, because during that
16  time period that I reviewed, they were not
17  appropriately monitoring, overseeing, and
18  developing systems that could do what is supposed
19  to be done.
20      I don't know what their reasons are, but
21  it's a very, very simple three-criteria system.
22  And my background is I was a regulator for those

Page 73

1  companies.  And if it was something that was so
2  difficult, I'm pretty sure I would have heard from
3  the companies saying, we can't do this.  But in
4  fact, they could.
5      Because in 2008, they -- what is it?
6  The -- one of the organizations -- I think it was
7  the HDMA at that point in time -- released a
8  document showing what is required within those
9  systems.  And that came right from HDMA, which I'm
10  pretty sure everybody was a member of.
11      So if HDMA could do it and could create
12  a -- policies, procedures, and protocols for a
13  system, I'm pretty sure the companies could.
14  BY MR. GIBBONS:
15      Q.  Aside from the answer you've just given,
16  is there any other basis for you to state that
17  it's easy to adopt a system to those three
18  criteria?
19      MR. MIGLIORI:  Objection to form.
20      Go ahead.
21      THE WITNESS:  No, I'm pretty sure that
22  covered it.

19 (Pages 70 - 73)

Page 74

1 BY MR. GIBBONS:
2    Q.  You stated in one of your answers that
3 you think that there are companies who are doing
4 it today.
5        Is that a guess or do you know of
6 companies that are writing those sorts of SOMs
7 algorithms and code today?
8        MR. MIGLIORI:  Objection to form.
9        THE WITNESS:  I think that that would be
10 a guess, but it's based on the fact that I know
11 what their systems were and I know what happened
12 in the litigation.  And these are major
13 corporations.  I'm pretty sure that a major
14 corporation is not going to just fall back and
15 say, okay, well, we're just going to continue to
16 do it and hope we don't get caught again.  So my
17 guess is they did it.
18        I'd like to think they did it because
19 these systems are important to maintain effective
20 controls against diversion and prevent the
21 diversion of controlled substances into the
22 community.

Page 75

1 BY MR. GIBBONS:
2    Q.  But as you sit here today, you can't name
3 me a company that is doing that work, can you?
4    A.  I cannot because I've not reviewed their
5 current systems.
6    Q.  And somewhere in your answer I think you
7 said that there might have been companies doing it
8 back in the time frame that you looked at, 2006 to
9 2014.
10        Did I hear that right?
11    A.  There could have been.  I just didn't
12 look at all companies.  I just looked at --
13    Q.  Do you know for a fact of any company
14 that was doing that for distributors or was
15 offering that for sale to distributors back in
16 that time frame?
17        MR. MIGLIORI:  Objection to form.  Asked
18 and answered.
19        THE WITNESS:  I don't know if there were
20 any companies doing it at that point in time
21 because I have not seen every companies'
22 documents, policies, and procedures.

Page 76

1 BY MR. GIBBONS:
2    Q.  And that's fair.  I'm not asking you --
3    A.  Yeah.
4    Q.  -- whether you looked at it.  I'm asking
5 if you know, given your vast experience in this
6 area, whether there were companies that marketed
7 their ability to create such systems for
8 distributors back in that time frame, 2006 to
9 2014?
10        MR. MIGLIORI:  Same objection.
11        THE WITNESS:  I don't know.
12        MR. MIGLIORI:  Want to do a bio break?
13        MR. GIBBONS:  Yeah.  Please tell me if
14 you need a break.
15        THE WITNESS:  No, I'm okay.  It's up to
16 you guys.  I'm fine either way.
17        MR. MIGLIORI:  We can take five minutes.
18        MR. MIGLIORI:  If you don't mind.
19        MR. GIBBONS:  Yeah, sure.  Let's go off
20 the record for five minutes or so.
21        VIDEO TECHNICIAN:  The time is 10:27 a.m.
22 This ends unit 1.  We're off the record.

Page 77

1        (A recess was taken.)
2        VIDEO TECHNICIAN:  The time is 10:36 a.m.
3 This begins unit number 2.  We're on the record.
4 BY MR. GIBBONS:
5    Q.  Mr. Rannazzisi, could you turn to page 9
6 of your expert report, which is Exhibit 1?
7    A.  Yes.
8    Q.  And at the very top you state, In my
9 opinion, any mechanism or process designed to
10 detect orders that are of unusual size, unusual
11 frequency, or deviate substantially from a normal
12 pattern is designed to detect suspicious orders.
13        Do you see that?
14    A.  Okay.  It says, I am aware, not in my
15 opinion -- okay.  I see that.  In my opinion --
16 yeah.
17    Q.  Yeah, feel free to read it.
18    A.  Yes.  Okay.
19    Q.  Is there a threshold where size becomes
20 unusual?
21    A.  It's -- like everything else, it depends
22 on the pharmacy.  Depends on the system that

20 (Pages 74 - 77)

Page 78

1 you're operating. There's no one size fits all.
2 That's why you have to know your clients, your
3 customers.
4     Q. Is there any research you're familiar
5 with that informs a company when size becomes
6 unusual?
7     A. Any research?
8     Q. Correct.
9     A. Conducted by?
10     Q. Anyone.
11     A. I -- unless whoever the researcher is
12 knows your customer base, no.
13     Q. Is there any statistical test you're
14 aware of to apply to determine when size becomes
15 unusual?
16     A. It's -- a statistical test?
17     Q. Correct.
18     A. No.
19     Q. And if I asked you the same questions
20 about frequency, would they be the same answers?
21     MR. MIGLIORI: Objection to form.
22     THE WITNESS: I think with frequency,

Page 79

1 it's, again, depending on your customer base and
2 how the frequency limitation is being breached.
3 BY MR. GIBBONS:
4     Q. So you're not aware of any research that
5 would inform a company as to when frequency
6 becomes unusual, as that term is used in the reg?
7     MR. MIGLIORI: Objection.
8     THE WITNESS: That's -- it's an
9 interesting question.
10 BY MR. GIBBONS:
11     Q. Thank you.
12     A. It's not breached -- okay. So you might
13 have a company that does -- I don't know -- two
14 distributions per week in a certain pharmacy,
15 okay, but that company is not monitoring what that
16 pharmacy is purchasing from a third-party vendor,
17 so they'll never know what the frequency breach is
18 because they're not monitoring the third-party
19 vendor sales.
20     So it's difficult if your system is not
21 accounting for third-party vendors.
22     So -- you know, so I don't know what

Page 80

1 research would encompass looking at third-party
2 vendor sales as well.
3     Q. And I appreciate that statement. My
4 question, though, is more broad.
5     Is there any research that you can think
6 of by an independent third party, regulatory
7 agency, anyone, that would inform a company as to
8 when frequency becomes unusual?
9     MR. MIGLIORI: Objection to form.
10     THE WITNESS: That would have to be under
11 the company. The company would have to do that
12 research.
13 BY MR. GIBBONS:
14     Q. And are you aware of any statistical test
15 that a company should apply to determine when
16 frequency becomes unusual?
17     MR. MIGLIORI: Objection to form.
18     THE WITNESS: Again, unless the company
19 is actually monitoring third-party vendor sales
20 and they know of third-party vendor sales to their
21 particular pharmacies, I don't know of any.
22

Page 81

1 BY MR. GIBBONS:
2     Q. Let's assume, for purposes of this
3 question, that a company is monitoring third-party
4 orders as it relates to the answer you just gave.
5     Would there be any statistical test
6 you're aware of to determine when frequency became
7 unusual?
8     MR. MIGLIORI: Objection to form.
9     THE WITNESS: That would have to be the
10 company's statistical analysis. It's all part of
11 operating the SOM.
12     So I'm not aware of any, but I would hope
13 that the companies would be doing that.
14 BY MR. GIBBONS:
15     Q. And in writing your report and coming up
16 with your opinion, did you apply any test in
17 relation to Albertsons' customer base, whether it
18 be in relation to unusual size or unusual
19 frequency?
20     A. I went -- I looked at the Albertsons
21 policies and procedures. From the policies and
22 procedures, then I looked at all of the documents

21 (Pages 78 - 81)

Page 82

1 related to the operation of their systems.  Then I
2 looked at the depositions.  And from that, I
3 formulated my response.
4      I didn't do any independent research on
5 each particular pharmacy.
6      Q.  So it would be fair to say that you
7 didn't look at any statistics or data to come up
8 with your opinions as it relates to Albertsons'
9 customer base and whether it violated the reg as
10 it relates to unusual size or frequency?
11      MR. MIGLIORI:  Objection to form.
12      THE WITNESS:  I didn't have to.  If
13 Albertsons was following their policies and
14 procedures and what their employees and former
15 employees were saying they were doing, they were
16 not operating a system that maintained effective
17 controls against diversion, regardless of what
18 their pharmacies were doing.  Their systems were
19 not operating appropriately.
20 BY MR. GIBBONS:
21      Q.  And I've read that in your report, but
22 that wasn't my question.  My question wasn't

Page 83

1 whether you had to do it on the data.  I'm asking
2 if you did it.
3      Did you do anything like that?
4      MR. MIGLIORI:  Objection to form.  Asked
5 and answered.
6      THE WITNESS:  No, I did not.
7 BY MR. GIBBONS:
8      Q.  Let's turn to page 14 of your report,
9 Exhibit 1.
10      And in the second paragraph under
11 threshold criteria -- do you see that?
12      A.  Yes, sir.
13      Q.  You write that complex systems may
14 analyze the data collected and then focus on any
15 number of the following nonexclusive criteria to
16 set a variety of reasonable thresholds.
17      Do you see that?
18      A.  Yes, sir.
19      Q.  And then you outline seven bullet points
20 there; is that right?
21      A.  Yes.
22      Q.  I want you to read the second, fourth,

Page 84

1 and fifth bullet point to yourself.
2      A.  The second and -- which --
3      Q.  The second one starts with --
4      A.  Yeah.
5      Q.  -- "meeting or exceeding a threshold for
6 a certain drug product and dosage strength."
7      Do you see that?
8      A.  Yes.
9      Q.  Okay.  Skip down two more.  "Anomalies
10 with respect" -- read that one.
11      A.  Yes.
12      Q.  And then fifth one starts with "Purchases
13 of high-dose-strength formulations."  Do you see
14 that?
15      A.  Yes.
16      Q.  What is the basis in research for using
17 dosage strength as a criteria to detect suspicious
18 orders?
19      A.  Well, that's -- basically, if you look at
20 the previous cases done on pharmacies, which are
21 available and which we expected the companies to
22 look at -- it was on the DEA website and in the

Page 85

1 Federal Register -- you'll see that most
2 pharmacies that are operating illegally were doing
3 large -- large dose controlled substances, such as
4 oxy 30.
5      The -- the cases speak for themselves.
6 If you're a person with opioid use disorder or
7 you're a person who's selling drugs that are
8 illegally obtained from pharmacies, you're going
9 to get the highest dose possible.  And the oxy 30s
10 and the oxy 15s were the gold standard for opioid
11 use disorder people and also people who were
12 illegally selling.  They needed those drugs.
13      So when you have a pharmacy, say, in
14 Florida and they're lined up outside the door and
15 everybody is getting an oxycodone 30-milligram
16 prescription filled, that is a problem.  And
17 that's reflected in all of the cases that we've
18 done.
19      So if you read the cases and you looked
20 at the cases -- for instance, I know that
21 Walgreens was mentioned in one of the cases and so
22 was McKesson where they were talking about it.

22 (Pages 82 - 85)

Page 86

1 All you had to do was look at the McKesson case or
2 the Walgreens case and you could see that the main
3 problem was oxy 30 or oxy 15 or oxy 10.
4        And -- so that's why it's in there.
5    Q. Okay.  And I heard that answer, previous
6 cases.
7        Is there anything else besides what you
8 just said in your answer to support the basis and
9 research for using dosage strength as a criteria
10 to detect suspicious orders?
11    A. Absolutely.  Whenever we did a pharmacy
12 diversion awareness conference, we talked about
13 the high-dose products.  We talked about the
14 combination products using the three-drug
15 combination or three-drug panel.  We explained
16 why.  When we do corresponding responsibility
17 presentations, we always talked about that.
18        And I did those personally.  I went out
19 and did them when I was with DEA.  Unless I was
20 double-booked somewhere, it was my presentation
21 that they were listening to.  And the reason we
22 did that was because we wanted them to understand

Page 87

1 that we were the -- I was the person, and this is
2 what I'm telling you.  This is why you have to
3 look at these drugs.
4        And so it was pretty -- it was based on
5 our cases, based on what we saw, based on what the
6 state and local officers were telling us, what
7 they were seeing, you know, with boots on the
8 ground.  So that's where that came from.
9    Q. Okay.  Now, in relation to Albertsons,
10 did you perform any analysis of dosage strength to
11 detect suspicious distribution transactions?
12    A. No, I did not.
13    Q. Did you perform any analysis as to
14 Albertsons in relation to the oxy 30s or the
15 oxy 15s, which you claim was a sign of potential
16 diversion?
17    A. It's a factor within the systems that
18 should be analyzed.  But no, I did not do that.
19    Q. You used an example of some case in which
20 people were lined up outside of a pharmacist in
21 Florida, which is an indication of -- of potential
22 wrongdoing; is that right?

Page 88

1    A. Uh-huh.
2    Q. Yes?
3    A. Yes.
4    Q. Do you have any evidence that that ever
5 happened at any Albertsons store?
6    A. Evidence of -- that I found in the
7 records that there were some anomalies in --
8    Q. No, that wasn't my --
9    A. -- dispensing --
10    Q. -- question.
11    A. But as far as patients lined up out the
12 door?  No, there's nothing in the documents that
13 show that.
14    Q. Let me ask you to turn the page to
15 page 15.  And under the first two bullet points at
16 the top, I'm going to ask you about that first
17 sentence, which states, Customer-specific
18 thresholds for a basic class.
19        Do you see that?
20    A. Yes.
21    Q. Could you read that to yourself?
22    A. Yes.

Page 89

1    Q. Okay.  So you're using that a company
2 should look at six to nine months of dispensing
3 data; is that what you write?
4    A. Yes.
5    Q. What is the basis in research for using
6 that time frame?
7    A. It establishes a pattern.  And what you
8 could see -- generally, with drug seekers or --
9 they share information with each other.  So if a
10 pharmacy is starting -- is not doing the
11 appropriate corresponding responsibility, you'll
12 see a dramatic rise in a particular drug's
13 dispensing.  And -- you'll see that, and it will
14 continue.  And it might be under threshold or it
15 might not be under threshold.  It might just not
16 be caught by threshold.
17        And so a six-month to nine-month period
18 will show that dramatic increase, which means that
19 the pharmacy should be looking at the
20 corresponding responsibility analysis of the
21 pharmacist within that -- you know, the company
22 should be looking at the corresponding

23 (Pages 86 - 89)

Page 90

1 responsibility analysis within that pharmacy.
2    Q.  Okay.  I was specifically asking whether
3 this is your opinion that six to nine months sets
4 a pattern or whether there is any other basis in
5 research for using that time frame.
6       MR. MIGLIORI:  Objection to form.
7       THE WITNESS:  That's my opinion.  And I
8 think my opinion is also based on looking at
9 previous cases and -- where we saw dramatic
10 increases in a particular dosage form over that
11 type of period to show that, you know, indeed,
12 there was an increase.  There was never any
13 trough.  There was always increase, increase,
14 increase, increase, increase.
15 BY MR. GIBBONS:
16    Q.  Okay.  So is the answer to my question,
17 no, there's no basis in research for using that
18 six to nine months of dispensing data?
19       MR. MIGLIORI:  Objection.  Asked and
20 answered.
21       THE WITNESS:  It's my -- my opinion.
22 There's no basis in research, no.

Page 91

1 BY MR. GIBBONS:
2    Q.  And --
3    A.  Well, hold on a second.  Yeah, I think
4 there is a basis in research.  East Main Street
5 Pharmacy.  East Main Street Pharmacy was a
6 pharmacy in Ohio, Columbus, Ohio.  And they showed
7 increases within a certain period of time, and it
8 was all from the same doctor, Dr. Volkman, and it
9 was from the same drug combination.
10       So yeah, I think the research shows that.
11 And I say six to nine months because, if you look
12 at a pharmacy and you're trying to maintain what
13 the pharmacy's dispensing and ordering patterns
14 are, that gives you a very, very good -- I think a
15 six-month is a minimum, but I think a six-month
16 will tell you a lot about that pharmacy.
17    Q.  Is it your belief that East Main Street
18 outlined six to nine months of data as
19 establishing a pattern?
20    A.  I think -- my belief is based on the fact
21 that when East Main Street started filling
22 prescriptions for Paul Volkman, that was the

Page 92

1 pattern that was set in six months.
2    Q.  Okay.  But that's not my question.
3       I'm concentrating on your use of the six
4 to nine months of dispensing data to establish a
5 pattern.
6       Is it your belief that East Main Street
7 stands for that proposition?
8    A.  It's my belief that East Main Street is
9 an example of a pharmacy that was showing a
10 pattern of several months.  Yes.
11    Q.  Okay.
12    A.  Based on my --
13    Q.  Do you have any -- did you conduct any
14 analysis as to whether any Albertsons store or
15 pharmacy had a dramatic increase in the dosage of
16 its, let's say, oxys or hydros?
17    A.  My job was to evaluate the systems that
18 were written in the depositions based on system.
19 I didn't do a by-pharmacy analysis.
20    Q.  So in your last answer where you were
21 discussing a corresponding responsibility and that
22 high dosage could tip you off that there were

Page 93

1 abusers of that, you didn't do any of that
2 analysis in relation to Albertsons stores, right?
3       MR. MIGLIORI:  Objection to form.  And
4 misstates the testimony.
5       Go ahead.
6       THE WITNESS:  No, I didn't do by
7 pharmacy.  But after reviewing documents showing
8 increases in -- and looking at what the pharmacy
9 supervisors were saying and approving in threshold
10 increases and how quickly they were doing it and
11 for the excuses they were using, I didn't have to
12 look at the pharmacies.  I could tell that the
13 pharmacy increases, in my opinion, were related to
14 diversion.  And we could go through them if you'd
15 like.  They're in the report.
16 BY MR. GIBBONS:
17    Q.  Okay.  Yeah, no, I've read them.
18       But as it relates to dosages, you didn't
19 get down to that detail.
20    A.  Well, actually, in there, they were
21 related to dosages.
22    Q.  You believe that you saw data at

24 (Pages 90 - 93)

Page 94

1 Albertsons stores that will stand for the
2 proposition that there was an increase of dosages
3 to various controlled substances that would have
4 led a good compliance department to understand
5 that there was diversion?
6    A.  Yes.  Because they were breaching
7 threshold.
8         The reason those pharmacies -- and the
9 reason those particular instances were in the
10 report is because somebody had to increase a
11 threshold.  Okay?  And the question is, so, if you
12 increase the threshold, how did you -- what was --
13 what were you looking at?  And based on the
14 examples that were -- that I reviewed in the
15 documents, it didn't look like they were looking
16 at anything.
17    Q.  Okay.  We'll get to that.
18    A.  Okay.
19    Q.  All right.  In the same paragraph towards
20 the bottom, you state, A reasonable threshold
21 would also incorporate a method to avoid threshold
22 creep and to prevent use of inflated historical

Page 95

1 ordering patterns that do not reflect current
2 ordering patterns, such as re-evaluation of
3 customer thresholds at least annually.
4         Do you see that?
5    A.  Yes.
6    Q.  What is the method for avoiding threshold
7 creep?
8    A.  Well, one of the biggest things to avoid
9 threshold creep is not having a rolling
10 increase -- a rolling number.
11        So when I talk about a rolling number, if
12 you use a certain time period to establish your
13 average and the last order period is dropped and a
14 new order period, you're always going to have --
15 if you have a bad pharmacy, there's always going
16 to be an increase.  And therefore, you're going to
17 see that threshold increase and increase and
18 increase up.  That's called threshold creep.
19        And several systems that I've reviewed
20 have that kind of system where they use a rolling
21 average.  Rolling average is not good, especially
22 if it inflates the threshold so high that no one

Page 96

1 is able to actually identify an order of interest
2 for further evaluation.
3    Q.  And that's the method?
4    A.  Well, that's one of the methods.  Yeah.
5    Q.  Is there any other method?
6    A.  Of?  For threshold creep?
7    Q.  Yeah.
8    A.  That's the main one, when you have a
9 rolling -- I'm sure there are others, but the main
10 one I've seen over and over again is this idea
11 that you have a rolling average that's always
12 changed within a month, within 12 orders, within
13 20 orders.  But there's always this idea that we
14 drop the last order, the oldest order, and the
15 newest order comes.  That causes threshold creep.
16    Q.  And you would agree with me that there
17 would be legitimate reasons for increased
18 thresholds, right?
19    A.  Oh, yes.  Absolutely.  But that's why you
20 do due diligence.  If you do due diligence, you'll
21 understand -- and you could document, well, there
22 was a reason:  A surgical center just moved in

Page 97

1 next door.
2    Q.  Right.
3    A.  An oncology center or an oncologist just
4 moved in.  Absolutely.  But if you don't do your
5 due diligence, you'd never know that.
6    Q.  Okay.  We'll get to that one.
7        Okay.  I'm going to ask you to turn to
8 page 25.
9    A.  Okay.
10    Q.  And this is describing SOM period 1, 2001
11 to 2008 at Albertsons.
12        Do you see that?
13    A.  Yes.
14    Q.  And you state that this was Albertsons'
15 first attempt at drafting a formal SOMs program
16 that was occurring in 2001.
17    A.  Yes.
18    Q.  Is it your opinion that Albertsons did
19 not have a formal SOMs program prior to 2001?
20    A.  Well, if they did, I don't believe it was
21 in a drafted form of policies and procedures.
22        So based on this draft, it was my opinion

25 (Pages 94 - 97)

Page 98

1 that they never -- they didn't have it prior to
2 this draft.
3    Q. Any other basis for reaching that
4 conclusion?
5    A. Just based on this draft.
6    Q. On the top of page 27 you state that this
7 was Albertsons' first attempt at putting in a
8 threshold system.
9       Do you see that?
10    A. Page 27?
11    Q. Yeah.
12    A. I don't -- page 27?  Where is that?
13    Q. Well, second full paragraph down it says,
14 It appears that ACI -- meaning Albertsons -- did
15 not have any threshold criteria to help it detect
16 suspicious orders until this draft policy in
17 October of 2001.
18       Do you see that?
19    A. Yes.
20    Q. Okay.
21    A. And I didn't -- there was no documents
22 prior to 2001 that showed that you guys had

Page 99

1 anything.
2    Q. Okay.  And so the documents you reviewed
3 led you to make that statement; is that right?
4    A. Yes.
5    Q. And then you state that -- in that same
6 paragraph, The threshold system proposed in the
7 draft policy was based on historical order
8 quantities.  This method does not consider that
9 the historical purchases may be inflated due to a
10 deficient or absent SOM program.
11       Do you see that?
12    A. Yes.
13    Q. Okay.  And why did you use the word "may"
14 there?
15    A. Well, because it could have been
16 inflated.  The only way to tell if it was inflated
17 or not is to actually have some documentation
18 showing how they created those max order
19 quantities.
20    Q. So you don't know one way or the other?
21    A. No.  Because there was no documentation
22 to show how you create MOQs.

Page 100

1    Q. At least that you saw, right?
2    A. At least that I saw.  But I'm guessing
3 that I was provided with all the documents.
4    Q. And you state there that Albertsons'
5 threshold system was based on the store's
6 historical order quantities.
7       Do you find fault with that?
8    A. If the historical order quantities are
9 inflated due to a pharmacy not conducting
10 corresponding responsibility accordingly, yes, I
11 do, because you're allowing them to have an
12 inflated level of threshold.
13       So again, it goes back to the MOQ:  How
14 did you create the MOQ?  What was the basis for
15 your MOQ?
16    Q. But my question is about Albertsons
17 stores.
18       Do you have any proof that these numbers
19 were inflated because of a store not abiding by
20 its corresponding responsibility?
21    A. I don't have any information on the MOQ
22 because it's never been documented anywhere.

Page 101

1    Q. So you don't know one way or the other if
2 these historical order quantities were inflated
3 because of a store not abiding by its
4 corresponding responsibilities; is that fair to
5 say?
6    A. I don't know because I don't have the
7 MOQ.  It's just -- but again, this is just on a
8 threshold basis.  So it's only looking at one of
9 the three criteria.  There was never a frequency
10 evaluation, nor was there a substantial deviation
11 evaluation.  So...
12    Q. Did you review any Albertsons documents
13 prior to 2001?
14    A. I think 2001 was the earliest, yes.
15    Q. That you reviewed?
16    A. That I reviewed, yes.
17    Q. Did you ask anyone specifically if there
18 were documents that predated 2001 that you wanted
19 to review?
20       MR. MIGLIORI:  Objection.
21       THE WITNESS:  I just don't recall.  I
22 mean, I just -- I asked for all documents related

1 to the Albertsons SOMs.  That was the first thing
2 I asked, I needed to see all documents related to
3 the SOMs.  And once I had a handle on what the
4 SOMs looked like and compared it to the
5 depositions, then I had a better feel for what the
6 SOMs was.
7 BY MR. GIBBONS:
8     Q.  In that same paragraph at the bottom
9 where you're defining the system being deficient,
10 you say the deficient [sic] is --
11     VIDEO TECHNICIAN:  Counsel --
12 BY MR. GIBBONS:
13     Q.  -- exponentially compounded in
14 Albertsons' case because Albertsons' pharmacies
15 could order from third-party vendors, thereby
16 circumventing the threshold process altogether and
17 hiding frequency anomalies in the ordering
18 patterns.
19     Do you see that?
20     A.  Could you -- which paragraph are you --
21     Q.  Yeah.  I'm on page 27.
22     A.  Yeah.

1     Q.  And it's the second full paragraph.
2     MR. KOHLER:  John, the videographer.
3     VIDEO TECHNICIAN:  Your hand is blocking
4 the microphone.
5 BY MR. GIBBONS:
6     Q.  Do you see where I'm at?  The last
7 sentence of that paragraph.
8     A.  Yes.  Okay.  I've got that.
9     Q.  Right.  So you're citing a deficiency
10 that Albertsons' pharmacies could order from a
11 third-party vendor; is that right?
12     A.  Yes.
13     Q.  Did you analyze how often that happened?
14     A.  No, I did not.
15     Q.  Did you do any quantitative analysis in
16 that area at all?
17     A.  No.  I didn't have to.  It was in the
18 documents.  There was issues, I believe, with one
19 of the third-party vendors where they were --
20 where pharmacies were ordering over threshold.
21 And the third-party vendor was contacting
22 Albertsons.

1     Q.  Do you have a recollection of how many
2 times that happened, or are you talking about a
3 single instance?
4     A.  I'm pretty sure it was multiple
5 instances.
6     Q.  Are you sure of that?
7     MR. MIGLIORI:  Objection.  The report
8 speaks --
9     THE WITNESS:  It's in the report.  I
10 could go --
11     MR. MIGLIORI:  Hold on.  Hold on.
12     THE WITNESS:  Oh, I'm sorry.  I'm sorry.
13     MR. MIGLIORI:  Objection.  The report
14 speaks for itself.
15     Go ahead.
16     THE WITNESS:  I think it's -- if you
17 want, I can go back to the report and look, but
18 I'm pretty sure it's in here.
19 BY MR. GIBBONS:
20     Q.  You're pretty sure that you detailed how
21 many times a third-party vendor would have --
22 would have alerted Albertsons that they were over

1 their threshold?
2     MR. MIGLIORI:  Objection to form.
3 Different question.
4     THE WITNESS:  I don't know -- I didn't do
5 everything.  I just -- there were certain things I
6 used as examples, and I'm pretty sure there were
7 multiple examples.  But I -- if you want, we can
8 go through them.
9 BY MR. GIBBONS:
10     Q.  No, that's fine.
11     Do you recall who the pharmacy needed to
12 notify if they did, in fact, order from a
13 third-party vendor at Albertsons?
14     A.  It depends on what time period.
15     Q.  Well, break it out for me.
16     A.  If they were -- if they're doing CSOS,
17 there would be a CSOS administrator.  If they were
18 doing manual handwritten 222 forms or they were
19 just ordering pursuant to a phone call, I don't
20 think they have to notify anybody.
21     There was nothing in the documents that
22 showed they had to notify anybody.  So...

27 (Pages 102 - 105)

1    Q.  In your review of Albertsons' policies
2  and procedures, did you see whether anyone in
3  compliance was monitoring such third-party
4  ordering?
5    A.  What time period?
6    Q.  2001 to 2014.
7    A.  That's two different time periods.
8    Q.  Well, you outlined the SOMs as being 2001
9  to 2008 and then '13 and '14 --
10    A.  Right.
11    Q.  -- right?
12        Deal with each of those time periods,
13  then.
14    A.  Well, 2001 to 2008, they were using the
15  max order quantity.  And because of that, I don't
16  believe -- pharmacy compliance might have been
17  looking at it, but I don't see them making any
18  corrections to it.
19        In 2013, when they started again, I think
20  they were using a hybrid system.  In 2008, they
21  also used repackers as well.  And the repackers
22  were just looking for orders out of the ordinary.

1        When we went to 2014 -- or 2013, they
2  were using the hybrid system, and one of the
3  systems was 20 percent over average.  And they
4  used that right up until they -- they stopped
5  distributing out of Ponca City in 2016.
6        I'm pretty sure that there was no review
7  over that.  All the reviews were being done at
8  the -- at the distributor level.  And there's a
9  document -- I don't remember who wrote it, but
10  they were worried that they weren't looking at
11  third-party distributions.  It was in a document.
12  And I think it's in the -- I'm sure it's in the
13  report.
14    Q.  So you don't believe anyone was
15  monitoring third-party orders in the compliance
16  department at Albertsons in the earlier 2001 to
17  2008 time frame?
18    A.  No.  In fact, it's in -- again, there was
19  a document on a committee meeting -- I think it
20  was the PSSCC -- and one of the people was saying,
21  look, we need to monitor third-party vendors, and
22  I don't see us -- we need to find a system that

1  monitors all distribution, not just ours.
2        And that was in, like, 2015 or '16.
3    Q.  At the end there you say that This
4  ordering from third-party vendors would circumvent
5  the threshold process altogether in hiding
6  frequency anomalies in the ordering patterns.
7        Do you see that?
8    A.  Where is that?
9        MR. MIGLIORI:  What page?
10  BY MR. GIBBONS:
11    Q.  The last sentence of the same paragraph
12  we were talking about.
13    A.  Which -- I'm sorry.  Which --
14        MR. MIGLIORI:  Yeah --
15  BY MR. GIBBONS:
16    Q.  Page 27, third paragraph --
17        MR. MIGLIORI:  Third paragraph.
18  BY MR. GIBBONS:
19    Q.  Right where we were -- well, second full
20  paragraph.
21    A.  Okay.  (Reading.)
22        Yeah.

1    Q.  Is that just a theoretical possibility,
2  or did you actually see proof in your records that
3  that happened at Albertsons?
4    A.  Well --
5        MR. MIGLIORI:  Objection.  It's
6  footnoted.
7        Go ahead.
8        THE WITNESS:  I believe that that had
9  come out in depositions.  But also, the fact is if
10  no one is monitoring it and you're ordering from a
11  third party, it will not show up on your frequency
12  evaluation.  But it didn't matter because they
13  weren't monitoring frequency.
14        So, you know, looking at this, if you're
15  not monitoring frequency, you're not going to pick
16  it up.  But even if you were monitoring frequency,
17  you wouldn't pick it up because you're not
18  monitoring third-party vendor frequency.
19        And in the documents, they were worried
20  about that.  They were worried that people were
21  going to the third-party vendor to circumvent.
22

28 (Pages 106 - 109)

Page 110

1 BY MR. GIBBONS:
2     Q. Right. And that circles back to our
3 question and answer about if anyone was monitoring
4 third-party vendor orders, right?
5     A. Yes.
6     Q. All right. On page 28 --
7     A. Uh-huh.
8     Q. -- at the top, your heading is, Finalized
9 standard operating procedures policy, August 2002,
10 and distribution centers controlled drug manual,
11 September of 2002.
12        Do you see that?
13     A. Yes.
14     Q. And then in that paragraph below that
15 heading, you note that Albertsons hired an
16 external consultant, Buzzeo Associates.
17        Do you see that?
18     A. Yes.
19     Q. To help them draft these SOPs and drug
20 manual?
21     A. Uh-huh.
22     Q. Yes?

Page 111

1     A. Yes.
2     Q. And were you familiar with Buzzeo
3 associates?
4     A. I'm familiar with Ron Buzzeo. He was a
5 DEA agent --
6     Q. Okay.
7     A. -- at one point in time.
8     Q. Would you agree with me that that's
9 appropriate for a company to hire outside experts
10 to help them draft their policy and guidelines?
11     A. Well, yes.
12     Q. And in fact, that's something you did
13 when you left the DEA, right?
14     A. No, I never helped people -- no.
15     Q. You didn't do that?
16     A. It would -- what, help people document --
17 or --
18     Q. Companies or regulators?
19     A. No. I've never worked for a company.
20     Q. Okay. You said you know Ron Buzzeo?
21     A. I know of Ron Buzzeo. I think I've met
22 him a couple of times.

Page 112

1     Q. My understanding, he was the former
2 deputy director of Office of Diversion Control.
3     A. Yes. He was the number two at diversion
4 control.
5     Q. And did your careers overlap?
6     A. No. He left way before I got to
7 headquarters. Years before I got to headquarters.
8     Q. Did he have a reputation in the industry
9 that you're aware of?
10     A. I don't generally pay attention to
11 people's reputations. I take them for what my
12 feeling is on them. And he seemed like a pretty
13 straight guy.
14     Q. Did he seem like he knew this area of the
15 law -- not the law -- yeah, this area of
16 regulation?
17        MR. MIGLIORI: Objection. Foundation.
18        THE WITNESS: He was deputy -- a deputy
19 director of the Office of Diversion Control. If
20 he didn't know the law, he was in bad straits.
21 But I'm pretty sure he knew the law. That's the
22 whole idea behind being the deputy director is

Page 113

1 you're the guy who's going to evaluate, and you
2 need to know the law to evaluate.
3 BY MR. GIBBONS:
4     Q. Okay. On page 29, you discuss the drug
5 manual that Buzzeo helped the company write; is
6 that right?
7     A. I don't know exactly what Buzzeo's role
8 was. Sometimes they helped the company, but the
9 company dictates what the policies and procedures
10 are. They just want somebody who's going to put
11 it in an appropriate format.
12        So I don't know what Ron's company was
13 doing in this form, but -- so I just couldn't tell
14 you exactly what -- if he helped them write it or
15 he just formatted it and told them this is what
16 you need. So I just --
17     Q. Did you read any deposition he gave in
18 relation to Albertsons?
19     A. No, I did not.
20     Q. Okay. Putting aside for this question
21 how the manual was implemented --
22     A. Uh-huh.

29 (Pages 110 - 113)

1    Q. -- as written, was it deficient, in your
2  mind?
3    A. Was the system deficient?
4    Q. Was the drug manual, as written,
5  deficient?
6    A. I didn't -- I concentrated my efforts on
7  the program areas within the drug manual that I
8  was tasked with reviewing. I didn't go over the
9  security provisions. I didn't go over certain
10  things. If I'm not mistaken, that manual has a
11  ton of different areas that the distribution
12  center has to monitor and evaluate.
13        I just concentrated my efforts on the
14  areas that were pertinent to my review.
15    Q. So just to wrap that up, you're not
16  offering an opinion in this case that the manual,
17  as written, was deficient in some way?
18    A. I didn't evaluate the whole manual. But
19  I did evaluate this section.
20    Q. Okay.
21    A. And as -- this section is not complying
22  with the 1301.74(b).

1    Q. Okay. Turn to page 31 if you would.
2    A. Sure.
3    Q. And you have a heading that the MOQ was
4  easily circumvented.
5        Do you see that?
6    A. Which paragraph? The first paragraph?
7    Q. The heading, The MOQ was easily
8  circumvented.
9    A. Oh, okay. Middle of the page.
10    Q. Are you there?
11    A. Yeah, I got it.
12    Q. Okay. And then in the second paragraph
13  below that heading that starts with "Also the
14  MOQ" -- do you see that?
15    A. Yes.
16    Q. Halfway down that paragraph you state,
17  The materials I reviewed did not establish any
18  criteria during SOM period 1 by which to evaluate
19  the justification for ordering over the maximum.
20        Do you see that?
21    A. Yes.
22    Q. Is it your opinion that the criteria to

1  evaluate the justification for ordering over the
2  max quantity needed to be in writing?
3    A. Yes.
4    Q. Why?
5    A. Well, to form a consistent program when
6  you're evaluating somebody that breaches the max
7  order quantity, there has to be some guidelines
8  set up. There's got to be some criteria. There's
9  got to be some direction from whoever's doing the
10  manual. If there's no criteria, no guidelines,
11  then how is the reviewer going to know when or
12  when not to approve? What is he looking at, or --
13  he or she is looking at? Are they looking at just
14  general information? Are they actually going in
15  and looking at dispensing data? Why is this
16  pharmacy all of a sudden ordering way above the
17  MOQ?
18        And that criteria has got to be written
19  somewhere. If not, there's no consistency in your
20  program. And if there's no consistency in your
21  program, the program is destined to fail.
22    Q. So it's your opinion that a policy is

1  deficient without such written criteria?
2    A. Yes. There's no guidance.
3    Q. Your last sentence says, Indeed, the
4  director of pharmacy professional services and
5  compliance could have accepted any justification
6  provided by a pharmacy simply to avoid reporting
7  suspicious orders.
8        Do you see that?
9    A. Yes.
10    Q. Is there any proof that you saw that that
11  ever happened at Albertsons?
12    A. Is there any proof?
13    Q. That you saw in all the documents you
14  reviewed that that ever happened at Albertsons.
15    A. Well, no, because there were no -- there
16  were no documents showing threshold increases or
17  MOQ increases that I could review. The basis for
18  due diligence investigation is previous breaches
19  of threshold. It's pretty well known.
20        If there's no documents to review, I
21  can't tell whether there was a problem.
22    Q. Right. But your last sentence is

30 (Pages 114 - 117)

Page 118

1 basically saying that the director of pharmacy
2 could have accepted any justification as a pretext
3 to avoid reporting suspicious orders.
4     I'm asking you whether you saw any
5 evidence that that, indeed, and in fact happened.
6     A. Yeah, I guess so, because no suspicious
7 orders were ever reported.
8     Q. I don't understand the answer.
9     A. If --
10    Q. You believe you saw evidence that the
11 director of pharmacy at Albertsons accepted a
12 justification as a pretext to avoid reporting
13 suspicious orders?
14    A. What I'm saying is there were never any
15 suspicious orders reported. And we know that
16 there were breaches in the MOQ.
17     So without documents showing what the MOQ
18 was, what the breach was, and how it was -- it was
19 basically evaluated, I don't know if that's the
20 case or not. But it could be the case.
21    Q. I understand the theoretical possibility.
22 I'm asking if you saw any proof that that actually

Page 119

1 and in fact happened.
2     A. I did not have a document that says, by
3 the way, this happened.
4     Q. It doesn't have to be a document. It
5 could have been a DEA investigative report. It
6 could have been a lawsuit filed. It could be a
7 lot of things. You've already --
8     MR. MIGLIORI: Those are all documents --
9 BY MR. GIBBONS:
10    Q. -- told us all these things you read in
11 relation to other pharmacies.
12     I'm asking you, in relation to
13 Albertsons, did you see any evidence of anything
14 you reviewed that that, in fact, happened?
15     MR. MIGLIORI: Objection. That was asked
16 and answered.
17     Those are all documents.
18     THE WITNESS: I did not see anything like
19 that saying -- that somebody said, oh, I didn't do
20 the evaluation and I'm going to -- just to prove
21 it so I don't have to report it as a suspicious
22 order. There's nothing like that in the

Page 120

1 documents.
2 BY MR. GIBBONS:
3     Q. Okay. I have the same question if you go
4 over to page 32. The very top paragraph. The
5 last sentence of that top paragraph says,
6 Pharmacies could easily circumvent the MOQ
7 threshold system by manipulating the dosage
8 strength and bottle sizes it ordered, allowing a
9 continuous, unimpeded flow of opioids and other
10 controlled substances to be dispersed from the
11 pharmacy.
12    A. Yes.
13    Q. Did you see any proof that that actually
14 and in fact happened at Albertsons?
15     MR. MIGLIORI: Objection to form.
16     THE WITNESS: No, I did not, because,
17 again, there were no documents, in relation to
18 doing due diligence, on a pharmacy or how they
19 evaluated the MOQ and how they approved the MOQ.
20 BY MR. GIBBONS:
21    Q. Did you start your answer with "no" and
22 then give an explanation? I just want to make

Page 121

1 sure the record is clear on that.
2     A. Yes.
3     Q. That fussied [sic] it up even worse --
4     MR. MIGLIORI: I was going to say --
5 BY MR. GIBBONS:
6     Q. -- but that's okay. I think it reads
7 clear enough.
8     Let me ask you to turn to page 38.
9     A. Okay.
10    Q. Okay. On the bottom of page 38 -- and
11 you can read it for yourself -- it starts with the
12 paragraph, This is confirmed by an April 2013
13 e-mail from Lynette Berggren.
14     Do you see that?
15    A. Yes.
16    Q. Okay. So -- feel free to read that, but
17 it references KVK Tech and a SOM survey they were
18 conducting in April of 2013.
19     Is that right?
20    A. Yes.
21    Q. Okay. And you would agree with me that
22 this e-mail exchange happened before Albertsons

31 (Pages 118 - 121)

Page 122

1 had restarted their -- distributing controlled
2 substances from Ponca to their stores, right?
3     A.  Yes.  A little bit before.
4     Q.  Okay.  And in fact, Albertsons had not
5 distributed controlled substances to their stores
6 for five years prior to this April 2013 e-mail
7 exchange; is that right?
8     A.  That's correct.
9     Q.  Now, you said "shortly before."  Is that
10 important to you?
11     A.  Where did I say "shortly before"?  I'm
12 sorry.
13     Q.  In your previous answer, you said the
14 e-mail exchange was shortly before Albertsons
15 started redistributing or distributing controlled
16 substances from Ponca to their stores.
17     A.  Well, yeah, I think it's very important.
18     Q.  Why?
19     A.  Because if you don't have a SOMs system
20 in place that's goal to actually evaluate
21 appropriately and in compliance with the law, then
22 you shouldn't be distributing controlled

Page 123

1 substances until that system is in place.
2     Q.  But this is before they started
3 redistributing controlled substances from Ponca to
4 their stores.  They hadn't yet started doing it,
5 and yet you're highlighting something that
6 happened before they even were operational.
7     A.  Well, if I'm not mistaken, they started
8 doing the -- shortly thereafter, but they had no
9 system -- they were going by a system that was not
10 an appropriate system.  They started -- they
11 started their distribution activities with a
12 system that didn't do anything.  That's why they
13 created the 20 percent plus.  And that was done
14 after they had already started distributing.  And
15 the 20 percent plus wasn't appropriate either.
16     Q.  Okay.  That's a different issue.
17     Are you aware of any requirement in the
18 regs or the law that a distribution center has to
19 have a documented SOMs program before it resumes
20 distribution of controlled substances?
21     A.  No.  It has to have a system in place to
22 maintain -- to identify and report suspicious

Page 124

1 orders, identify orders that are of unusual size,
2 frequency, substantially deviating from a normal
3 pattern, and it has to be reported when found.
4     Q.  That --
5     A.  So the system in place that they had when
6 they started did not do that.
7     Q.  I understand that.  We're not there yet.
8     I'm asking, does that system need to be
9 in place before the distribution center actually
10 starts distributing controlled substances?
11     MR. MIGLIORI:  Objection.
12     Go ahead.
13     THE WITNESS:  Okay.  On the day they
14 distribute -- on the day they start distribution,
15 it should be in place.
16 BY MR. GIBBONS:
17     Q.  I agree with that.  I'm not asking about
18 when they start distributing.
19     I'm asking, if it's a month or three
20 months before, did they need to have a SOMs
21 program in place?
22     MR. MIGLIORI:  Objection.  That's not

Page 125

1 your prior question.
2     Go ahead.
3     THE WITNESS:  It depends on when -- what
4 they presented to the DEA investigators that did
5 their pre-license inspection.  So if they
6 presented a system prior to operation that wasn't
7 necessarily the system that was in compliance,
8 then that's a problem.
9 BY MR. GIBBONS:
10     Q.  Do you have any evidence that Albertsons
11 presented a system to the DEA that was deficient?
12     A.  I don't know because I don't know what
13 they presented to DEA.
14     Q.  That's my point.  You don't know one way
15 or the other, right?
16     A.  Well, what I do know is that they were
17 using the carryover system from 2008, and that was
18 deficient.
19     Q.  Did you read Lynette Berggren's testimony
20 in relation to this KV [sic] Tech survey?
21     A.  Yes.
22     Q.  Did you consider it?

32 (Pages 122 - 125)

1    A.  Yes.

2    Q.  And what, if any, relevance did it have

3  to your opinion?

4       MR. MIGLIORI:  Objection.  Overly broad.

5       Go ahead.

6       THE WITNESS:  They were on the cusp of

7  distributing controlled substances from their

8  facility, Ponca City.  They didn't have a system

9  in play, and that's why this is in there.  Because

10  even though this might have been focused on

11  Murdoch, I think Berggren would have said, well,

12  our system -- our system that we're operating is

13  going to be fine.  But she didn't say that.

14       She said, I have -- if I have a choice of

15  saying yes or no to whether the system is

16  compliant with 1301.74, I guess I have to say no.

17       Now, while she's talking about --

18  potentially talking about Murdoch, the fact is is

19  that this was a system that was in play in 2008,

20  and it was a system that was carried over.

21       So I don't believe Berggren was saying it

22  because she believed that the system was

1  appropriate.

2  BY MR. GIBBONS:

3    Q.  I asked you if you read Berggren's --

4    A.  Yes, I did.

5    Q.  -- deposition and if it had any influence

6  on your opinion, and you're citing her e-mail --

7    A.  Uh-huh.

8    Q.  -- which you've got in your report.

9       I'm asking you, did you read her

10  explanation as to what her words meant in that

11  e-mail.

12       MR. MIGLIORI:  Objection to form.

13       Go ahead.

14       THE WITNESS:  I'm sure I read them.

15  BY MR. GIBBONS:

16    Q.  You don't footnote it anywhere here.

17    A.  Well -- it's not footnoted?

18       MR. MIGLIORI:  Take your time.

19  BY MR. GIBBONS:

20    Q.  Berggren's deposition testimony.

21    A.  No, this was -- because this was a

22  document.  It was a document where she wrote in

1  e-mail traffic -- she wrote exactly what I put on

2  the document.

3    Q.  I understand that.  You're taking words

4  on an e-mail and you're extrapolating to support

5  your opinion.

6       I'm asking whether you considered her

7  deposition testimony where she explained what she

8  meant by that e-mail.

9    A.  I'm sure --

10       MR. MIGLIORI:  Objection to form.

11       THE WITNESS:  I'm sorry.

12       I'm sure I did.

13  BY MR. GIBBONS:

14    Q.  But you didn't footnote that or show how

15  that influenced your opinion one way or the other.

16    A.  I don't -- if you want to review what her

17  statement was, I'm sure we could do it now.  I

18  mean, I'm pretty confident what I wrote is

19  consistent with what was in the document.  She

20  might --

21    Q.  But as you sit here --

22    A.  -- have said, I don't remember.  Because

1  a lot of the deposition witnesses could not

2  remember what they did or what they meant.  But --

3  and maybe that's why I did not include it.

4       However, you know, I -- I'm pretty sure

5  that was straightforward.

6    Q.  Did you ever read or talk with Jim

7  Tsipakis, who you reference in this paragraph?

8    A.  I don't recall if Tsipakis was one of the

9  documents I read -- I mean was one of the

10  depositions I read.  But I know I used one of his

11  documents.

12    Q.  You're citing one e-mail with two

13  sentences --

14    A.  Yeah.

15    Q.  -- right?

16    A.  And -- where is that?  What page is that?

17    Q.  38 and 39.

18    A.  Okay.  Okay.  I read it.

19    Q.  My question is, you're taking two

20  sentences in an e-mail that Jim wrote, and you're

21  concluding that this showed corporate disregard

22  for the overall compliance by not cooperating with

33 (Pages 126 - 129)

Page 130

1 a supplier that is simply trying to determine if
2 their customer is in compliance with the law.
3      Do you see that?
4    A.  Yes.
5    Q.  Besides that e-mail, did you read
6 anything else about testimony or e-mails that
7 Tsipakis gave in relation to this KVK survey?
8    A.  No, because I think this was pretty
9 straightforward.  It was his e-mail.  He wrote it.
10 If the vendor refuses to ship, we can do a
11 risk-benefit analysis and work with legal in
12 response or move the business to a different
13 vendor.
14      That's pretty straightforward.
15    Q.  Yeah.  I -- I read your report.  I read
16 that e-mail, those two sentences.
17      I'm asking, did you read anything else
18 before you gave that conclusion that I just read
19 in the top of page 39 --
20      MR. MIGLIORI:  Objection.
21 BY MR. GIBBONS:
22    Q.  -- that it's showing corporate disregard

Page 131

1 for the overall compliance by not cooperating with
2 one supplier --
3      MR. MIGLIORI:  Objection.
4 BY MR. GIBBONS:
5    Q.  -- on a survey --
6      MR. MIGLIORI:  Objection.
7 BY MR. GIBBONS:
8    Q.  -- predating when Ponca began to resupply
9 controlled substances to their stores?
10      MR. MIGLIORI:  Objection to form.
11 Compound.
12      Go ahead.
13      THE WITNESS:  No, I stand by that
14 statement.
15      MR. GIBBONS:  Okay.  Why don't we take a
16 short five-minute break, and then I think I can
17 wrap up before lunch.
18      MR. KOHLER:  Okay.
19      VIDEO TECHNICIAN:  The time is 11:34 a.m.
20 This ends unit 2.  We're off the record.
21      (A recess was taken.)
22      VIDEO TECHNICIAN:  The time is 11:43 a.m.

Page 132

1 This begins unit number 3.  We're on the record.
2 BY MR. GIBBONS:
3    Q.  I'm going to ask you to turn to page 46
4 in your report, Exhibit 1.
5    A.  Okay.
6    Q.  And there's a heading there that's
7 halfway down the page, Review and analysis of
8 above threshold reports and call logs from
9 August 2013 to June 2016.
10      Do you see that?
11    A.  Yes.
12    Q.  And at the very bottom of that paragraph,
13 you state, With 0.6 percent of the controlled
14 substance-related orders in Texas investigated,
15 Albertsons clearly struggled to provide sufficient
16 resources to fulfill their due diligence
17 obligations, resulting in a total failure to
18 identify and stop the shipment of suspicious
19 orders to their pharmacies.
20      Do you see that?
21    A.  Yes.
22    Q.  Now, I understand your due diligence

Page 133

1 opinions that are detailed in your report.
2      My question is, can you identify one
3 shipment that was ordered for an improper purpose?
4      MR. MIGLIORI:  Objection.
5      THE WITNESS:  I could identify pharmacies
6 that were showing reasons for their increase, but
7 there was nothing in comments in the vast majority
8 of those orders.
9      So no, I can't tell you that, but I can
10 tell you that there were pharmacy examples or
11 pharmacy call logs that basically said things that
12 should have immediately -- immediately -- caused
13 whoever their user was to stop and say something
14 is wrong here; we need to do an investigation.
15 BY MR. GIBBONS:
16    Q.  And I understand that's your opinion in
17 relation to the due diligence obligations.  And I
18 read all that.  But my question was a very, very
19 narrow one.
20      Can you identify one shipment that was
21 ordered for an improper purpose?
22      MR. MIGLIORI:  Objection.  Form.

34 (Pages 130 - 133)

1      THE WITNESS:  No, I cannot identify one
2  shipment.
3  BY MR. GIBBONS:
4      Q.  My same question relates to -- can you
5  identify any shipment that was ordered for an
6  illegal purpose?
7      A.  Again, without the comments, I have no
8  idea.  I mean, I just -- I can't identify
9  something if the information is not there.
10     Q.  Okay.  I want to ask you a hypothetical
11 set of questions here.  Okay?
12     A.  Okay.
13     Q.  I want you to assume that not one
14 controlled substance was ever improperly dispensed
15 from any Albertsons pharmacy.  Okay?  Do you
16 understand that?
17     A.  Uh-huh.
18     Q.  Yes?
19     A.  Yes.
20     Q.  So not one pill was improperly dispensed
21 from the pharmacy.
22     Are you with me?

1      A.  Yes.
2      Q.  Okay.  Under that hypothetical, no
3  shipment of a suspicious order from Albertsons'
4  warehouse to its pharmacies could have contributed
5  to an opioid epidemic; isn't that right?
6      MR. MIGLIORI:  Objection to form and
7  foundation and incomplete.
8      Go ahead.
9      THE WITNESS:  I just -- because it's a
10 hypothetical, I -- I don't know how I'd answer
11 that.  I don't deal in hypotheticals.  I deal in
12 facts.  And that's not what I -- I don't know how
13 I could answer that.
14 BY MR. GIBBONS:
15     Q.  Well, as an expert witness --
16     A.  Yeah.
17     Q.  -- I am allowed to ask you hypothetical
18 questions, and I'm asking you a hypothetical
19 question, and I'm asking for your answer based on
20 that hypothetical question.  That's why I said
21 repeatedly it's a hypothetical.
22     A.  Okay.

1      Q.  Can you answer it?
2      MR. MIGLIORI:  Objection.  It's an
3  incomplete hypothetical.
4      Answer it if you can.
5      THE WITNESS:  See, I don't know if I can
6  answer that --
7  BY MR. GIBBONS:
8      Q.  Why not?
9      A.  Because first of all, it's a
10 hypothetical.  Second of all, in the report
11 there's very specific instances of -- of
12 pharmacies that -- where the comments showed there
13 was a problem.
14     So I -- I mean, I know what you're
15 saying.  You're saying, well, if they never, ever
16 dispensed out anything illegal.  But that's not
17 what this shows.  That's not -- what it shows is a
18 pattern of comments that should have triggered a
19 massive response from somebody, and that's not
20 what occurred here.
21     You're asking me, well, if no one ever --
22 if they never distributed something illegal or

1  inappropriately, could they not -- I don't know.
2  I can't answer that because I don't know -- I
3  mean, I just can't answer that.  That's --
4      Q.  Okay.  I'm trying to alleviate your
5  problem with the hypothetical --
6      A.  Okay.
7      Q.  -- and going back to reality where I've
8  read your opinions based on the reports and based
9  on the data and the documents you reviewed.
10     I'm not asking about any of that.  I'm
11 asking you a hypothetical, which started as the
12 premise being that not one controlled substance
13 was ever improperly dispensed from an Albertsons
14 pharmacy.
15     So then my question then becomes, how
16 could a shipment have contributed to the opioid
17 epidemic based on that hypothetical foundation?
18     MR. MIGLIORI:  Objection to form.  It's
19 compound and it's incomplete.
20     Go ahead.
21     THE WITNESS:  I don't know.  I'm just not
22 comfortable asking that question --

35 (Pages 134 - 137)

1 BY MR. GIBBONS:

2     Q.  Why not?

3     A.  -- answering that question.

4     Q.  Why not?

5     A.  Because, I mean, it's not what I

6 observed.  And I know it's hypothetical, but I

7 didn't observe that.  And if -- because I didn't

8 observe it, my answer would -- I just don't think

9 my answer would be appropriate because that's not

10 what I observed.  And so --

11     Q.  Your answer is highly appropriate as an

12 expert in relation to hypotheticals that counsel

13 poses.

14         So I'm asking you, is there any reason

15 you can't answer that hypothetical, like you don't

16 understand it?  Saying you don't want to answer it

17 doesn't seem to be the right option here.

18     A.  So let me get this straight.  The

19 question is, if there never was a drug controlled

20 substance dispensed illegally --

21     Q.  Or improperly.

22     A.  Well, could you define "improperly"?

1     Q.  You define it.

2     A.  Well, it's not my question.  It's your

3 question.

4     Q.  I'm going to ask you to define the word

5 "improperly."

6         MR. MIGLIORI:  Objection.  Overly broad.

7 Vague.  Form.

8         THE WITNESS:  Again, what is -- what do

9 you mean by improperly?  What --

10 BY MR. GIBBONS:

11     Q.  Something that violates --

12     A.  I know what "improperly" --

13     Q.  -- the law.

14     A.  -- means.

15     Q.  Something that violates the regs.

16     A.  That's not --

17         MR. MIGLIORI:  Stop.

18         Objection.  Completely vague.  Objection

19 to form.

20 BY MR. GIBBONS:

21     Q.  We can spend a while defining these terms

22 if you want to do that.

1     A.  Well, I think it's important that we

2 define the terms --

3     Q.  Okay.

4     A.  -- so I can make the answer --

5     Q.  In the world of dispensing --

6     A.  Yes.

7     Q.  -- what does the word "improperly" mean

8 to you?

9     A.  Well -- in a corresponding responsibility

10 sense?

11     Q.  Just define it for us.

12     A.  Okay.

13         MR. MIGLIORI:  Objection.  Overly broad.

14 Improper hypothetical.

15         Go ahead.

16         THE WITNESS:  If it's based on

17 corresponding responsibility, the pharmacist has

18 not done the appropriate due diligence, evaluating

19 red flags to determine a resolution of the red

20 flags and then dispensing medication or not

21 dispensing the medication.

22         So that's -- that becomes -- it crosses

1 the line.  If they're knowingly doing it, it's

2 definitely illegal.  If they're not knowingly

3 doing it, they're administratively -- they're

4 making a mistake.

5         But there's other types of dispensing.

6 If a pharmacist is selling prescriptions, well,

7 that's totally illegal.  It has nothing to do with

8 corresponding responsibility.  He's selling

9 prescriptions.  If he's dispensing out the back

10 door or he's stealing medication --

11 BY MR. GIBBONS:

12     Q.  That's illegal --

13     A.  -- that's totally illegal.

14         So I need to know, when you say

15 "improper," are you just talking about

16 corresponding responsibility, or are you talking

17 about all aspects of the --

18     Q.  In my hypothetical, I'm talking about all

19 aspects of improper or illegal dispensing, and I'm

20 asking you to assume that no improper, as broadly

21 defined as you can think it, or illegal dispensing

22 ever happened at an Albertsons pharmacy.

36 (Pages 138 - 141)

1     That's my predicate to the question.

2     Are you still struggling with the

3  predicate?

4     MR. MIGLIORI:  Objection to form.  Vague.

5  Improper hypothetical.

6     THE WITNESS:  What I'm struggling with is

7  the fact that I have to go through now and think

8  about everything that could happen with those

9  drugs, and it's going to -- it will take a while

10  to go through this, quote/unquote, hypothetical

11  because there are many factors.

12     So if you want, just give me a second,

13  let me go through all the ways that drugs could be

14  diverted.  And --

15  BY MR. GIBBONS:

16     Q.  But I'm asking you to assume that none of

17  that happened.  Anything you could possibly think

18  of in relation to improper diversion, illegal

19  diversion, I'm asking you to assume it never

20  happened --

21     MR. MIGLIORI:  Objection.

22

1  BY MR. GIBBONS:

2     Q.  -- at an Albertsons pharmacy.

3     MR. MIGLIORI:  Objection.  Now you've

4  changed the question.  You went from dispensing to

5  diversion.

6     MR. GIBBONS:  No -- okay.

7  BY MR. GIBBONS:

8     Q.  Dispensing.

9     MR. MIGLIORI:  Objection.  Vague.  I

10  don't even know where this hypothetical is now.

11  It's an improper hypothetical.

12     Answer it if you can.

13     THE WITNESS:  I just -- I just don't know

14  if I can answer that question.  I mean, I just

15  don't know.

16  BY MR. GIBBONS:

17     Q.  So if you were asked this question in a

18  courtroom, your statement to the jury is I just

19  don't know that I can answer that question?  I

20  just want to make sure we're on the same page.

21     A.  Yeah, that would be my answer --

22     Q.  Okay.

1     A.  -- I just don't know.

2     Q.  Now I'll -- I'll flip the coin on you.

3     A.  Uh-huh.

4     Q.  I want you to assume as this predicate,

5  that every script was dispensed legally and

6  properly, and in compliance with all laws and

7  regulations from every Albertsons pharmacy.

8     A.  Uh-huh.

9     Q.  Okay?  Under that hypothetical, no

10  shipment of a suspicious order from Albertsons'

11  warehouse to its pharmacies could have contributed

12  to the opioid epidemic; isn't that true?

13     MR. MIGLIORI:  Improper hypothetical.

14  Overly broad.  Vague.

15     Go ahead.

16     THE WITNESS:  Are they conducting the due

17  diligence on the orders that are going into the

18  pharmacy?

19  BY MR. GIBBONS:

20     Q.  Absolutely, because every script was

21  dispensed legally and properly and in compliance

22  with all laws and regulations.

1     MR. MIGLIORI:  Objection.  That's not

2  even a hypothetical now.

3  BY MR. GIBBONS:

4     Q.  That is the predicate to the question,

5  and I was trying to clear up your hesitation.

6     MR. MIGLIORI:  Objection.  Improper.

7  Vague.  Compound.

8     Go ahead if you can.

9     THE WITNESS:  I just -- if the pharmacy

10  has never dispensed a bad prescription, what

11  you're asking is, therefore, the distribution

12  can't be related to diversion within the --

13  BY MR. GIBBONS:

14     Q.  Contributing to the opioid epidemic.

15     MR. MIGLIORI:  Objection.  Same

16  objections.

17     THE WITNESS:  I don't know because the

18  opioid epidemic is just not based -- I mean, it's

19  largely based on the prescriptions going out, but

20  it also has things to do with the amount of

21  purchases that are made and potentially diverted

22  through illegal means.

37 (Pages 142 - 145)

Page 146

1  So if you fill every prescription correct
2  but you're pocketing 500 hydrocodone tablets a day
3  or a week and or you're selling them out the back
4  door --
5  BY MR. GIBBONS:
6  Q.  No one is asking about that.  That --
7  A.  Well, you are.
8  Q.  -- has nothing to do with my
9  hypothetical.
10  A.  But you are.
11  Q.  I asked about scripts that were dispensed
12  legally and properly in compliance with all laws
13  and regs.  I never said anything about somebody
14  stealing hydrocodone and selling it out the back
15  door.
16  MR. MIGLIORI:  Well, wait a minute --
17  THE WITNESS:  Hold on a second.
18  MR. MIGLIORI:  -- you said any possible
19  improper -- you said the broadest possible
20  definition.  Now you're saying it's limited.
21  MR. GIBBONS:  That was five minutes ago.
22  We have moved on to the other side of the coin.

Page 147

1  MR. MIGLIORI:  No, no, we haven't.  The
2  hypothetical is completely vague and compound, and
3  you're comparing dispensing with diversion
4  control.  It's apples and oranges.
5  THE WITNESS:  See, that's my problem with
6  hypotheticals.  You could be a great pharmacist
7  during the day, doing your corresponding
8  responsibility, but then you start diverting
9  illegally.
10  So if you don't have a -- if you don't
11  have a SOM in place that's going to pick up
12  anomalies within ordering patterns like that,
13  yeah, you could have the greatest pharmacy
14  dispensing in the world, but if you're losing
15  drugs through non-dispensing means, then you are
16  contributing.
17  BY MR. GIBBONS:
18  Q.  Okay.
19  A.  So I'm having a --
20  Q.  I'll give you that.  Losing drugs through
21  non-dispensing means can happen.  We all agree
22  with that.  That could help cause an epidemic, if

Page 148

1  you had a pharmacist that was stealing and selling
2  out the back door.
3  I'm asking you to assume that that didn't
4  happen either.  No pharmacist was stealing and
5  selling out the back door and all other scripts
6  were dispensed legally and properly, in compliance
7  with all laws and regs.
8  So then my question remains, no shipment
9  of a suspicious order from Albertsons' warehouse
10  to its pharmacies could then have contributed to
11  the opioid epidemic; isn't that true?
12  MR. MIGLIORI:  Objection.  Improper
13  hypothetical.  Now incredibly vague and compound.
14  And objection to form.
15  Go ahead.
16  THE WITNESS:  Well, what about
17  third-party vendors?
18  BY MR. GIBBONS:
19  Q.  What about third-party vendors is
20  confusing you in my hypothetical?
21  A.  Because if that pharmacy is ordering from
22  third-party vendors and those drugs are being

Page 149

1  diverted -- I know, I just --
2  Q.  I already took diversion -- illegal,
3  criminal diversion out of the hypothetical.  It
4  doesn't matter how they get them.
5  In my hypothetical, the pharmacy is not
6  doing that.
7  Is there a reason you don't want to
8  answer the question?
9  MR. MIGLIORI:  Objection.  It's because
10  it's unanswerable.  Just by saying it louder
11  doesn't make it a better question.
12  It's -- objection.  Vague.  Compound.
13  Improper hypothetical.
14  THE WITNESS:  And the other reason is, I
15  didn't come here to answer hypotheticals.  I came
16  here to report on my findings relating to a
17  particular group of documents and depositions and
18  what I found.
19  You're asking me hypotheticals that I'm
20  not prepared to answer because it's a
21  hypothetical.  If you ask me about my report, you
22  ask me any portion of my report, I'll explain what

38 (Pages 146 - 149)

1 I meant, and I have no problems doing that.
2       But you're now asking me a hypothetical
3 that I just can't answer because I don't know.
4 And no matter what answer I give, it's -- it's not
5 going to be because -- it's not going to be
6 correct because it's a hypothetical.  And that's
7 why I'm not answering this question.
8       I just don't have the, you know, ability
9 to answer this question based on the facts that
10 you're giving me.
11 BY MR. GIBBONS:
12    Q.  Okay.  So if I asked you this question in
13 front of a jury during a trial, you're going to
14 tell the jury you can't answer hypothetical
15 questions because of all these things you can't
16 think of right now; you're only here to answer
17 about things in your report?
18       MR. MIGLIORI:  No, that's not what he
19 said.  And to be clear, he said based on the facts
20 that you gave me.  If he's given a proper
21 hypothetical, he knows that he has a role to play
22 in answering the questions being asked that gets

1 through a judge, which --
2       MR. GIBBONS:  That's not very clear to
3 me.
4       MR. MIGLIORI:  -- in my opinion, this
5 question would not get clear to a judge.
6       MR. GIBBONS:  That's not very clear to
7 me.
8       MR. MIGLIORI:  Well, read the last
9 answer.
10 BY MR. GIBBONS:
11    Q.  You believe that you can answer a
12 properly detailed hypothetical?
13    A.  Yeah.  I believe I could.  However, I
14 just don't think that -- that's a pretty broad
15 hypothetical.  And I don't -- you know --
16    Q.  Okay.  The record is going to speak for
17 itself.
18    A.  Okay.
19    Q.  And if we have to take it to a judge, I'm
20 pretty comfortable that I've eliminated about
21 every question you could have about scripts that
22 are correctly filled by Albertsons' pharmacists.

1 But --
2    A.  Okay.
3    Q.  -- we're just going to keep spinning
4 wheels here because you won't answer the question.
5       MR. MIGLIORI:  Well --
6       MR. GIBBONS:  So we'll just certify it.
7 We'll decide, if we go before a court on this
8 question, because I would like an answer to that
9 hypothetical, but I'm not going to get it today.
10       MR. MIGLIORI:  Okay.  We can submit this
11 transcript to the judge to show --
12       MR. GIBBONS:  Well, that's why we have a
13 transcript.
14       MR. MIGLIORI:  -- that it's as clear as
15 mud.
16 BY MR. GIBBONS:
17    Q.  Okay.  Let's turn over to page 51.  And
18 in the very top paragraph, four sentences down,
19 you are discussing Albertsons' bonus plan.
20       Do you see that?
21    A.  Yes.
22    Q.  Okay.  Do you want to read that to

1 yourself for a second?
2    A.  I'm familiar with the section.
3    Q.  Okay.  Prescription volume per week put
4 the pharmacy into a certain category; is that
5 right?
6    A.  Yes.
7    Q.  ██████████████████; is that right?
8    A.  Yes.
9    Q.  And that prescription volume was for all
10 prescriptions, not just controlled substances,
11 right?
12    A.  I'm assuming yes.  I would hope yes,
13 because that's a heck of a lot controlled
14 substance prescriptions.
15    Q.  Did you read the bonus plan?
16    A.  Yes.
17    Q.  Was it the volume for all
18 prescriptions --
19    A.  It appeared --
20    Q.  -- and not just controlled substances?
21    A.  It appeared to be the volume of all
22 prescriptions, yes.

39 (Pages 150 - 153)

Page 154

1    Q.  Do you know what the percentage
2  controlled substances are of Albertsons' overall
3  prescription volume per week?
4    A.  No, I do not.
5    Q.  Did you explore that at all?
6    A.  No.
7    Q.  I'm assuming you didn't look at that by
8  store, right?
9    A.  No.  That wasn't in any of the documents.
10    Q.  And did you see how much bonus money was
11  actually paid to the pharmacy employees?
12    A.  I believe there were some documents
13  showing ████████████████.
14    Q.  Okay.  And did you understand that, as
15  part of the bonus plan at Albertsons, there were
16  caps put on the bonuses?
17    A.  Caps based on the prescription volume.
18    Q.  Caps put on the total amount of bonus
19  money that an employee could receive under the
20  bonus program.
21    A.  I don't remember that.
22    Q.  Would that be important to your analysis?

Page 155

1    A.  No, because you're still basing the
2  pharmacy -- basing on the pharmacy output, and so
3  no.
4    Q.  Is it your position and opinion that
5  providing any financial incentive such as a bonus
6  tied to prescription volume would undermine
7  corresponding responsibility?
8    A.  If it's tied to controlled substance
9  prescription volume?  Yes, I do.
10    Q.  But it's not tied to controlled substance
11  volume here.
12    A.  Actually, it is.
13    Q.  In part, right?
14    A.  If a pharmacy -- if a pharmacy has
15  prescription levels and you have a pharmacist
16  who's not conducting corresponding responsibility
17  appropriately, those prescription numbers are
18  going to go up because he's not denying scripts.
19  He's allowing scripts.
20        So therefore, yes, you can't do that.  I
21  mean, if you want to do it for, you know, legend
22  drugs, that's fine.  But as soon as you add

Page 156

1  controlled substances into the equation, that
2  changes the whole flavor of the bonus program.
3    Q.  Okay.  Let me ask it slightly different,
4  then.
5        Is it your opinion that providing any
6  financial incentive to us, like, a bonus we see
7  here at Albertsons, tied to prescription volume
8  that would incorporate controlled substance
9  volume, would undermine corresponding
10  responsibility?
11    A.  If controlled substances are within the
12  equation, yes, I believe it would.
13    Q.  And what is your basis for that opinion?
14    A.  Holiday CVS.
15    Q.  That it could lead to a pharmacist to
16  ignore their corresponding responsibility?
17        MR. MIGLIORI:  Objection to form.
18        Go ahead.
19        THE WITNESS:  If you look at the two
20  stores in Holiday CVS, 5195 and 219, both of those
21  stores were -- managers had a high volume of
22  controlled substance scripts and they were both

Page 157

1  receiving significant -- very significant bonuses.
2  So yes.
3        And that's just the one that pops into my
4  head.  I'm sure I could find others, but --
5  BY MR. GIBBONS:
6    Q.  Did you --
7    A.  -- in fact --
8    Q.  I'm sorry.
9    A.  -- in the Walgreens case, if I'm not
10  mistaken, Walgreens removed the bonus program
11  related to controlled substances.
12        So yeah, I mean, there's a whole litany
13  of cases where controlled substance bonuses had a
14  play in what they were doing.  And once that was
15  removed, it kind of -- it kind of helped the
16  pharmacist make a decision.
17    Q.  Did you see any proof that that ever
18  happened with any Albertsons employee?
19    A.  I'm not aware of, based on the documents,
20  that that ever happened at Albertsons.
21    Q.  Are you aware of whether Albertsons was
22  ever cited for such behavior?  You cited cases

40 (Pages 154 - 157)

Page 158

1  like CVS and Walmart, but --
2      A.  Walgreens.
3      Q.  Walgreens.
4      A.  Could you repeat the question?
5      Q.  Yeah.  Was Albertsons ever cited for such
6  tactics?
7      A.  Not that I'm aware of.
8      Q.  Okay.  In the last sentence of that same
9  paragraph on 51 -- are you with me?
10     A.  Yes.
11     Q.  -- you state, Any system that provides
12  personal financial incentives to fill
13  prescriptions (to include controlled substance
14  prescriptions) undermines corresponding
15  responsibility analysis and could lead to
16  diversion.
17         Do you see that?
18     A.  You said page 51?
19     Q.  Yep.  Second-to-last sentence under that
20  bonus paragraph.  Do you see where that starts,
21  Covaci testified?
22     A.  Yeah.

Page 159

1      Q.  Okay.  Go to the very bottom of that
2  paragraph.
3      A.  Yes.
4      Q.  Where -- you say could lead to diversion,
5  right?
6      A.  Uh-huh.
7      Q.  Do you have any -- did you see any proof
8  that it actually led to diversion at Albertsons?
9      A.  There was a couple of instances where a
10  store manager was talking about whether he would
11  approve a -- a drug transaction or not.  The
12  pharmacist was -- the pharmacist was concerned
13  about the patient.  The patient was demanding that
14  a certain type of drug manufacturer was dispensed.
15  They know that is a red flag.  They identified it
16  as a red flag.
17         Then the patient also lied and said that
18  you dispensed this before, which -- they said no,
19  we could have never dispensed that; we don't carry
20  that generic.
21         And the supervisor, the pharmacy
22  supervisor, which I guess would be their district

Page 160

1  manager, said, look, you make the decision, but
2  all I care about:  Is it a good customer and is it
3  profitable?
4          I think that's pretty straightforward.
5      Q.  And so you took that example as proof
6  that Albertsons' bonus setup led to diversion?
7      A.  The bonus process is tied into
8  profitability.  Now, I didn't say those words.
9  Your district manager said those words.
10     Q.  Yeah, I understand that.  But I'm asking
11  for your basis for saying that Albertsons' bonus
12  system could lead to diversion.
13     A.  Yeah.
14     Q.  And I'm asking you, is there any proof
15  that it did.
16     A.  Do I have any proof?  No, I don't have
17  any proof.  I just know historically what I've
18  seen.
19     Q.  Okay.
20     A.  So...
21     Q.  Let's turn over to page 52.  You have a
22  heading that says 2014 SOP changes:

Page 161

1  Verified-accredited wholesale distributors.
2          Do you see that?
3      A.  Yes.
4      Q.  Verified-accredited wholesale
5  distributors is also known as VAWD?
6      A.  Yes.
7      Q.  Okay.  And the National Association of
8  the Boards of Pharmacies [sic] administers the
9  VAWD program?
10     A.  Yes.
11     Q.  Okay.  And at times they do that in
12  conjunction with states?
13     A.  Well, some states require VAWD before you
14  could do work.  I think Indiana is one of them.
15  They require a VAWD certification before you can
16  dispense or distribute into their states.  Yes.
17     Q.  And in accrediting a distributor and
18  their distribution activities, the NABP looks at a
19  company's policies and procedures to ensure they
20  comply with the Controlled Substance Act; isn't
21  that true?
22     A.  That is correct.

41 (Pages 158 - 161)

1  Q.  So would it be fair to say that, at least
2  from a policies and procedures standpoint, if the
3  NABP awarded Albertsons VAWD accreditation, it
4  concluded Albertsons' distributor policies and
5  procedures were compliant with the CSA?
6  A.  Well, they would -- they would approve it
7  based on what the company has given them.  And in
8  this case, in the case of Albertsons, the -- it
9  appears, based on the documents that I reviewed,
10 that the initial VAWD application was turned back
11 because the SOM policy was not correct.  So they
12 changed the SOM policy and resubmitted it.
13     Q.  Okay.  That wasn't my question.
14     A.  Well --
15     Q.  You were just giving some background
16 before the VAWD was accredited to Albertsons.
17     I'm asking you that, from a policies and
18 procedures standpoint, if and when the NABP gave
19 Albertsons VAWD accreditation, it concluded that
20 Albertsons' policies and procedures were compliant
21 with the Controlled Substances Act; isn't that
22 true?

1      MR. MIGLIORI:  Objection.  Asked and
2  answered.
3      THE WITNESS:  The document that was
4  submitted to the National Association of Boards of
5  Pharmacy is the only thing they could go on.  So
6  whatever is in that document, they would approve.
7  Now, obviously, they didn't approve the first one,
8  but they did approve the second one.
9      So the question is, is that what they
10 were actually doing.  And --
11 BY MR. GIBBONS:
12     Q.  You're aware that the NABP accredited
13 Albertsons under VAWD, right?
14     A.  I'm aware of that.  And --
15     Q.  And so my question to you is when --
16     MR. MIGLIORI:  Objection -- wait, wait.
17 He didn't finish his answer.
18     MR. GIBBONS:  Oh.
19     MR. MIGLIORI:  You interrupted him.
20     THE WITNESS:  I'm aware --
21 BY MR. GIBBONS:
22     Q.  I just asked if you were aware.

1      A.  I'm aware of --
2      Q.  It's a yes or no.
3      MR. MIGLIORI:  He didn't finish his
4  answer.
5      THE WITNESS:  But -- I can tell you that
6  this statement that was made to VAWD and the
7  National Association was written in such a way
8  that it would not capture actually what they were
9  doing.  Because the first line says, Suspicious
10 orders include orders of unusual size, orders
11 deviating substantially from a normal pattern,
12 orders of unusual frequency.
13     But the system you were using didn't do
14 unusual frequency, nor did it do substantial
15 deviation.
16     So the way it's written, it looks like,
17 oh, we met all the VAWD criteria.  But if the
18 National Association of Boards of Pharmacy went
19 out and actually inspected and did an inspection
20 where they actually had a monitor, the SOM, they
21 would find that they weren't doing frequency or
22 substantial deviation.

1      So what's on paper might look great, but
2  in reality, didn't cover compliant -- it wasn't a
3  compliant SOM with 1301.74(b).  That's why I'm
4  saying that.
5  BY MR. GIBBONS:
6      Q.  I'm not asking about practice.  I'm
7  asking about a policy --written policies and
8  procedures.
9      And my question is, at least from a
10 written policies and procedures standpoint, if and
11 when the NABP gave VAWD accreditation to
12 Albertsons, it concluded that Albertsons' written
13 policies and procedures were compliant with the
14 Controlled Substances Act; isn't that true?
15     A.  Okay.  Their written -- I'll go along
16 with their written policies and procedures.  Yes.
17     Q.  Let me ask you to turn over to page 66.
18 And you've got a heading that says, "Conclusion."
19     Do you see that?
20     A.  Yes.
21     Q.  And thereafter you've got several pages
22 of paragraphs.  Do you see that?

42 (Pages 162 - 165)

Page 166

1   A. Uh-huh.
2   Q. Before the next heading.
3   A. Yes.
4   Q. What was your purpose in having the
5 section entitled, "Conclusion" here?
6   A. Well, I wanted to basically create my
7 findings in one closing paragraph so if people
8 just wanted to -- to just get to the end and see
9 why I had certain opinions, it pretty much
10 encompassed what I was looking for.
11   Q. So this was a closing paragraph summing
12 up your previous 65 pages?
13   A. It was a closing paragraph summarizing
14 that particular section or that particular period,
15 if I'm not mistaken.
16   Q. Okay.  If I asked you to turn to page 67,
17 starting with the second full paragraph down that
18 starts with "Finally, ACI's due diligence efforts
19 failed to" -- do you see that paragraph?
20   A. Yes.
21   Q. All right.  These paragraphs, starting
22 with that one and going on to page 68, are talking

Page 167

1 about corresponding responsibility, aren't they?
2   A. Yes.
3   Q. I didn't see that you had mentioned
4 corresponding responsibility in your previous 66
5 pages, so I'm curious as to why it's in your
6 conclusion paragraph.
7   A. For that particular SOM period?
8   Q. Yeah.
9   A. Well, because that --
10   Q. Well -- go ahead.
11   A. That particular SOM period dealt with
12 20 percent over average, which required them to
13 call the pharmacies and make a determination of
14 why these pharmacies are going 20 percent over.
15       A lot of the order lines, the log sheet
16 lines, had comments in there that were totally
17 inappropriate, such as, I've got a patient on
18 320 oxy 30s every two weeks and I need more.  New
19 pain clinic moved into the area, and they were
20 approved.  They were just approved.
21       Furthermore, those log sheets, based on
22 deposition testimony and documents, show that,

Page 168

1 when they were making those calls, when Hooper and
2 the rest of them were making those calls, all they
3 were doing was verifying that those pharmacies
4 wanted what they ordered.
5       So there was no corresponding
6 responsibility investigation because everything
7 was approved.  In fact, Beck said that:  We
8 approved everything.  We approved it.  If it was
9 what the pharmacist wanted, they got approved.
10   Q. I --
11   A. That's why it was in there.  Because
12 corresponding responsibility starts when you get
13 anomalies in ordering patterns.  And that's what
14 the 20 percent over average was.  It was supposed
15 to detect anomalies n ordering patterns.
16       So because of that, somebody should have
17 conducted an investigation rather than just doing
18 a -- just doing a call and saying, yeah, it's
19 fine --
20   Q. Okay.  In that paragraph you write -- are
21 you with me still in that --
22   A. Uh-huh.

Page 169

1   Q. -- paragraph which started "Finally"?
2       Quote, this allowed prescriptions issued
3 without legitimate medical purpose to be filled
4 unfettered and undetected because Albertsons did
5 not have a formal corresponding responsibility
6 until 2016 and formal corresponding responsibility
7 training until 2018.
8       Do you see that?
9   A. That's correct.
10   Q. Can you point us to one prescription that
11 was issued without a legitimate medical purpose?
12   A. I didn't get a chance to look at
13 prescriptions to determine whether they were
14 issued for -- without a legitimate medical
15 purpose.
16       MR. MIGLIORI:  And just because you went
17 too quickly, objection.  Foundation.
18       Go ahead.
19 BY MR. GIBBONS:
20   Q. So you cannot point us to one
21 prescription that was issued without a legitimate
22 medical purpose?

Page 170

1    MR. MIGLIORI:  Objection.  Foundation.
2    Go ahead.
3    THE WITNESS:  Well, I didn't get a chance
4  to review those prescriptions.  However, Carmen
5  Catizone did, and I looked at his findings.
6  BY MR. GIBBONS:
7    Q.  Okay.  Well, Catizone's findings are
8  Catizone's findings.  You can adopt them or not
9  adopt them.
10    I'm asking if you personally looked at
11  whether one prescription was issued without a
12  legitimate medical purpose?
13    MR. MIGLIORI:  Objection.  Asked and
14  answered.
15    Go ahead.
16    THE WITNESS:  Well, I would have to say
17  that based on the log entries, I'm pretty sure
18  that there were a few prescriptions that were
19  issued without legitimate medical purpose and --
20  that's my opinion.
21    However, after reading Catizone and
22  basically looking at Catizone's analysis, I had no

Page 171

1  problem saying that.
2  BY MR. GIBBONS:
3    Q.  Okay.  Can you point to one prescription
4  that was filled improperly because of a lack of
5  training at Albertsons?
6    MR. MIGLIORI:  Objection.  Foundation.
7    Go ahead.
8    THE WITNESS:  Well, the one prescription
9  that I discussed, the 320 oxy 30s, that's a hell
10  of a lot of MMEs, and there was no indication of
11  what that pharma- --- what they were treating.  No
12  indication of -- if no one is doing the
13  corresponding responsibility analysis and no one
14  is doing, on the distribution side, an analysis of
15  what they're ordering anomaly-wise, then, you
16  know -- so, no, I mean, I can't point to it.  But
17  based on what I saw in the call logs and what I
18  saw in Catizone's report, based on that, I would
19  say that they were not doing their corresponding
20  responsibility; and therefore, if they're not
21  doing their corresponding responsibility,
22  prescriptions are leaving without any type of...

Page 172

1  BY MR. GIBBONS:
2    Q.  I understand that.  You've written that.
3    A.  Uh-huh.
4    Q.  But you can't point us to any
5  prescription that actually fits that bill, can
6  you?
7    MR. MIGLIORI:  Objection.  Foundation.
8    Go ahead.
9    Asked and answered.
10    THE WITNESS:  I can't tell you a specific
11  prescription, no.
12  BY MR. GIBBONS:
13    Q.  Let me ask you to turn to page 68.  And
14  in the only full paragraph on that page it starts
15  out, It should be noted.
16    Do you see that?
17    A.  Yes.
18    Q.  Okay.  I'm going to ask about this
19  sentence.  You write, This apathetic attitude is
20  truly remarkable, considering the corresponding
21  responsibility is not only in place to resolve red
22  flags that may be indicative of diversion and

Page 173

1  determine if a prescription was written for a
2  legitimate medical purpose, but can also prevent
3  the misuse/abuse of a controlled substance that
4  could result in overdose or death.
5    Do you see that?
6    A.  Uh-huh.
7    Q.  Yes?
8    A.  I stand by that.
9    Q.  What do you mean by "apathetic"?
10    A.  Well, you've got to read the whole
11  paragraph.  The --
12    Q.  I did.
13    A.  -- fact of the matter is --
14    Q.  I'm asking you how use the word
15  "apathetic."  What does it mean to you?
16    A.  It means that they just didn't -- it was
17  almost like, ah, so what.  Okay?  And let me
18  explain why.
19    In this case, Provenzano is a pharmacist
20  is and appears to be a pharmacist who's been a
21  pharmacist for a long period of time.  The fact is
22  one of his people said, we have a problem with

44 (Pages 170 - 173)

1 this one pharmacy, and that pharmacy was ignoring
2 red flags.  It appears that they didn't pick up or
3 were ignoring red flags.
4        Instead of saying, well, we need to look
5 at this, his thing was, well, that was three or
6 four years ago.  And -- they were doing a
7 retrospective analysis.  That's three, four years
8 ago and, quite frankly, we didn't have a
9 dispensing policy in place during that period of
10 time, and even if we did, the country's
11 consciousness was not in tune with what was going
12 on with the opioid crisis.
13        I'm not looking at it as an expert now.
14 I'm stunned as an expert.  I'm looking at it as a
15 pharmacist.  When you're a pharmacist, your
16 responsibility is to your patients.  Okay?  Your
17 responsibility is to ensure that your patients
18 that are accepting drugs being dispensed from your
19 pharmacy -- and when they leave, you're confident
20 that that drug is not going to harm them.  Okay?
21        If you're not conducting a red flag
22 analysis, you don't have any idea what's going to

1 happen to that drug.  So yeah, that was an
2 apathetic attitude from a vice-president of
3 pharmacy operations on, yeah, so what?  We didn't
4 have a policy.  We had a -- 2013 or '12 we sent
5 out some guidance, but there was no policy, and
6 then we had the policy in 2016 and so -- stop.
7      Q.  I thought earlier in the deposition we --
8 I had heard you were not here as an expert to
9 offer expert opinions on dispensing; is that
10 right?
11        MR. MIGLIORI:  Objection.  You've asked
12 him repeatedly questions about corresponding
13 responsibility, and now you're trying to pin him
14 back.
15        MR. GIBBONS:  No, no, no, I'm not trying
16 to do anything.
17 BY MR. GIBBONS:
18      Q.  I'm using the words you use in your
19 report.
20        But I thought you said earlier you're not
21 here as an expert on Albertsons' dispensing
22 policy.  Is that correct?

1        MR. MIGLIORI:  Objection.  He's answering
2 your questions.
3        Go ahead.
4        Object to form.
5        THE WITNESS:  I'm not talking as an
6 expert in dispensing.  I'm telling you now that,
7 in addition to my problems as a regulator, as a
8 pharmacist, I have a problem with it.
9        This is -- and, look, don't get me wrong.
10 I teach corresponding responsibility, so I could
11 do that.  But that was not my charge in this.  But
12 when I find documents where a pharmacist is
13 basically downplaying the fact that, you know, it
14 wasn't really within the consciousness of the
15 country during 2014 so it wasn't really an opioid
16 crisis and we didn't do anything until 2016, yeah,
17 that's an apathetic attitude.  That's why --
18 BY MR. GIBBONS:
19      Q.  Is that an opinion you intend to offer at
20 trial?
21      A.  If I'm asked --
22        MR. MIGLIORI:  The report speaks for

1 itself.
2        Go ahead.
3        THE WITNESS:  If I'm asked, yes.
4 BY MR. GIBBONS:
5      Q.  And the complete basis that underlined
6 that opinion is in your report; is that fair to
7 say?
8      A.  Yes.
9        MR. MIGLIORI:  And he just testified.
10 BY MR. GIBBONS:
11      Q.  I'm sorry?
12      A.  Yes.
13      Q.  Turn over to page 69, please.
14      A.  Okay.
15      Q.  You state at the bottom of the first full
16 paragraph there that, However, Albertsons did not
17 require the pharmacist to use any specific
18 resource, but left it up to the pharmacist's
19 discretion on what to do; that is, use
20 professional judgment when they encounter a red
21 flag.  There was no affirmative requirement that a
22 pharmacist investigate when they encounter a red

45 (Pages 174 - 177)

1 flag.

2     Do you see that?

3   A. Yes. Yes.

4   Q. And you footnote a Covaci deposition on

5 one page; is that right?

6   A. Yes.

7   Q. Do you have any other basis for making

8 that statement?

9   A. Yeah. If you go back and look at

10 corresponding responsibility, they did send out

11 a -- in 2012 or '13, they sent out, like, an

12 e-mail guidance. They didn't incorporate it until

13 2016.

14     Now, the problem with Albertsons is, if

15 it's not incorporated into a policy and procedure,

16 it's not a disciplinary action. So they can't

17 take discipline on a pharmacist for not doing

18 corresponding responsibility.

19     Plus, in their document -- in the

20 documents, it showed that it was just suggestions

21 on what to look at, but they never really said you

22 must look at it, you must look at the PDMP, you

1 must look at this, you must look at that. Not

2 until 2016 or '17.

3     So the fact is is, yeah, that

4 basically -- there's no affirmative requirement

5 that a pharmacist investigate when they encounter

6 a red flag because it was all just suggestive.

7   Q. All you cited was Covaci's deposition,

8 right?

9   A. I cite -- yeah, I cited Covaci's

10 deposition. Yes.

11   Q. And what you just answered was a further

12 support to that sentence?

13   A. I'm sorry?

14   Q. Your answer, your previous answer, was in

15 further support of that statement, that there was

16 no affirmative requirement that a pharmacist

17 investigate when they encounter a red flag?

18   A. I don't -- I'm not following you. You

19 need to say that again.

20   Q. Well, you footnoted that sentence with

21 Covaci's dep. I asked you whether there's any

22 other basis besides Covaci's dep.

1   A. Well, yeah, I just explained it wasn't

2 put into formal policy.

3   Q. Yeah.

4   A. If it's not in formal policy, then it's

5 not disciplinary. You can't take a disciplinary

6 action if it's not in policy.

7   Q. Yeah. You explained that.

8   A. Yeah. And earlier, in some of the

9 documents, it was a suggested -- suggested that

10 they do that. There was no requirement that they

11 did it.

12     The requirement didn't happen until 2016

13 or '17.

14   Q. How come you didn't footnote that?

15   A. Because it was in the documents, and

16 those documents were footnoted. Probably

17 different area, but it was footnoted.

18   Q. Let me ask you to turn your attention

19 further down that page. In the middle of the page

20 it starts to discuss PDMP.

21     Do you see that?

22   A. Yes, sir.

1   Q. Okay. The September 27, 2018 version of

2 the retail pharmacies policies and procedures

3 manual required all pharmacists to register with

4 the PDMP and check the PDMP for controlled

5 substance prescriptions when circumstances exist

6 that cause the pharmacist to question the validity

7 or appropriateness of the prescription. This was

8 the first time Albertsons required its pharmacists

9 to register with their state PDMP.

10     Do you see that?

11   A. Yes.

12   Q. Do you find that deficient?

13   A. It depends. I don't know when the full

14 PDMP started in Texas. I think Texas was one of

15 those states that had variations of the PDMP.

16 They set up in different time periods.

17     So I'm not sure when Texas did the full

18 thing, but I find -- because it was a national

19 requirement, I -- yeah, I have a problem with it.

20 Because you have states like New York that have

21 been doing it since 1920. So...

22   Q. Let's talk about your opinion in relation

Page 182

1 to Tarrant County.

2     A. Okay.

3     Q. Isn't it true that Texas didn't mandate

4 pharmacists checking the PDMP until March of 2020?

5     A. Okay. Just because the state doesn't

6 mandate it doesn't mean that the company can't

7 mandate it so they can better perform

8 corresponding responsibility.

9     The PDMP is probably one of the single

10 most useful tools to show patients who are doctor

11 shopping, patients who are pharmacy shopping,

12 patients who are doing thing illegally.

13     So if the resource is there and all you

14 have to do is sign up for it, I don't see why you

15 wouldn't mandate it. It doesn't make any sense.

16     Q. Do you know when the PDMP became

17 accessible to pharmacists in Texas?

18     MR. MIGLIORI: Objection. Foundation.

19     THE WITNESS: I do not.

20 BY MR. GIBBONS:

21     Q. Would you agree with me that a company

22 can't mandate pharmacist to check the PDMP if it,

Page 183

1 in fact, is not accessible in that state?

2     MR. MIGLIORI: Objection. Foundation.

3     THE WITNESS: I'd have to see what the

4 accessibility parameters are. Because it depends

5 on the state and it depends on what they're --

6 what they're allowed to look at. Some states you

7 could look at everything. Some states you just

8 could look at schedule IIs. Some states -- it

9 just depends. So I don't know. I don't know the

10 basis of it.

11     But remember -- I know this is a Tarrant

12 County case, but this is a national -- a

13 national -- a company that goes nationally. So

14 why wouldn't you put that in your policies and

15 procedures? Even if, in Texas, they weren't

16 allowed to access until 2016 or whatever, it still

17 should be in their policies and procedures for the

18 other states.

19 BY MR. GIBBONS:

20     Q. Do you know one way or the other whether

21 Albertsons was out of compliance with state regs

22 in Texas in 2000 -- up to 2017?

Page 184

1     MR. MIGLIORI: Objection. Foundation.

2     THE WITNESS: State regs related to what?

3 BY MR. GIBBONS:

4     Q. PDMP.

5     A. I don't know.

6     MR. MIGLIORI: Objection. Foundation.

7 BY MR. GIBBONS:

8     Q. Let me ask you to turn to page 70. I

9 promise we're getting near the end.

10     A. Okay.

11     Q. You've got a heading that says,

12 Controlled substance prescriptions dispensed

13 without resolving red flags.

14     Do you see that?

15     A. Yes.

16     Q. Let me ask you to go back to Exhibit

17 Number 3 --

18     A. Okay.

19     Q. -- which is your 8/22/2022 report.

20     A. Okay.

21     Q. And turn to page 153.

22     A. I got it.

Page 185

1     Q. Are you there?

2     A. Yes.

3     Q. You copied that paragraph word for word

4 except for the parties' names; isn't that right?

5     A. I believe that's correct. Yes.

6     Q. Why did you do that?

7     A. Because every time I read a report

8 like -- that I'm going to make reference to,

9 there's no need to change it. It's -- I look at

10 what is in the report, I read the whole report, I

11 look at what's in the report, I look at his

12 conclusion. And if there's nothing different from

13 his previous reports or his statements, I just

14 include it as the -- as the paragraphs making

15 reference to his reports.

16     Q. Okay. So here -- and I'm in Exhibit 1,

17 page 70.

18     A. Okay.

19     Q. You state, As part of my review of

20 materials in this case, I reviewed a draft of the

21 expert report of Carmen Catizone. Mr. Catizone

22 opines as the controlled substances prescriptions

47 (Pages 182 - 185)

Page 186

1 dispensed by Albertsons despite the presence of

2 unresolved red flags.

3     Do you see that?

4     A.  Yes.

5     Q.  That's flat-out false, isn't it?

6     A.  I don't understand.

7     Q.  Carmen Catizone's draft report in 2022

8 never mentioned Albertsons.

9     A.  No.  This is from Albertsons -- his

10 recent report.

11     Q.  What draft Carmen Catizone recent report

12 are you talking about?

13     A.  Catizone did a report for this -- this

14 document, for this case.

15     Q.  You say, I've reviewed a draft of the

16 expert report of Carmen Catizone.

17     A.  Yes.

18     Q.  What draft report of Carmen Catizone did

19 you review?

20     A.  The one for this particular case.

21     Q.  You believe that there's a draft Carmen

22 Catizone report as opposed to a final --

Page 187

1     MR. MIGLIORI:  Oh --

2 BY MR. GIBBONS:

3     Q.  -- Carmen Catizone report?

4     MR. MIGLIORI:  -- geez.

5     THE WITNESS:  No.

6     MR. MIGLIORI:  Objection to form.

7     Go ahead.

8     THE WITNESS:  No.  I reviewed the final

9 report.  I reviewed the final report -- actually,

10 the final report is broken down, but I reviewed

11 the final report, and that's what it is.  It says

12 draft, but it's a final --

13 BY MR. GIBBONS:

14     Q.  No, no.  It doesn't say -- it says, I

15 reviewed a draft of the expert report.

16     MR. MIGLIORI:  He's answering your

17 question.

18     THE WITNESS:  It's -- it's the expert --

19 Carmen Catizone's expert report.  That's what I

20 reviewed.

21 BY MR. GIBBONS:

22     Q.  Below that you have another paragraph

Page 188

1 that says, "Conclusion."

2     A.  Yes.

3     Q.  Why do we have a second conclusion?

4     A.  Because the first conclusion that we

5 talked about was on SOM period 2.

6     Q.  What does this conclusion have to do

7 with?

8     A.  It's an overall conclusion.

9     Q.  And then, on page 71, you continue your

10 conclusion, right?

11     A.  Yeah.

12     Q.  Why is the font different on 71 from the

13 rest of your report?

14     A.  Oh.  Because when I made my -- when I

15 signed it, I was at home, and so I just sent

16 the -- I just faxed the signature page.

17     Q.  And at the very bottom, before your

18 signature, you say, For these reasons and the

19 reasons stated herein, it is my opinion that

20 defendant caused and was a substantial factor in

21 causing the pharmaceutical opioid epidemic in

22 Tarrant County.

Page 189

1     Do you see that?

2     A.  Yes.

3     Q.  Can you point to one opioid prescription

4 that was diverted or oversupplied in Tarrant

5 County?

6     MR. MIGLIORI:  Objection.  Asked and

7 answered.  And foundation.

8     Go ahead.

9     THE WITNESS:  Again, I can't point to one

10 prescription.  I can report the policies and

11 procedures in place, the call logs, and the

12 findings of the Catizone expert report.  And based

13 on that -- based on all the other documents I

14 reviewed and the depositions, I make that

15 statement.  It's my opinion.  I can't point to one

16 specific prescription, but I think there's more

17 than enough information in the report to show how

18 that occurred.

19     MR. MIGLIORI:  I want to make sure my

20 objection was recorded as including foundation.

21     Go ahead.

22

48 (Pages 186 - 189)

BY MR. GIBBONS:

2     Q. You read David Beck's deposition

3 testimony. I think you said that. Right?

4     A. There's three Beck depositions, if I'm

5 not mistaken.

6     Q. Did you read them all?

7     A. Yes.

8     Q. Okay. And Beck claimed in his deposition

9 that the DEA visited the distribution center at

10 Ponca.

11     Do you recall that?

12     A. I recall there was an inspection of

13 Ponca. Yes.

14     Q. Yes. More than one?

15     A. I can't tell you if it was more than one.

16     Q. Okay. You would agree with me that the

17 DEA would have inspected distribution centers

18 cyclically during that time frame that you were

19 employed by the DEA, right?

20     A. Yes.

21     Q. And when the DEA inspected, whenever they

22 did that, they could have inspected the SOMs

1 programs at these distribution centers, right?

2     A. I'm sure they did inspect the SOMs

3 program.

4     Q. And they could have looked at the

5 policies and procedures in relation to the

6 SOMs programs, right?

7     A. What they do is they request policies and

8 procedures and they request a -- an explanation

9 from the distribution center manager, the ops

10 manager, explain how this works.

11     Q. And are you aware of any violations

12 arising out of any DEA inspections of Albertsons'

13 distribution center?

14     A. I don't recall if there were any

15 violations.

16     Q. To your knowledge, was Albertsons'

17 distribution center ever the subject of a DEA

18 enforcement action?

19     A. Of an enforcement action? You mean --

20     Q. Yeah.

21     A. I don't recall if there was, but I -- I

22 doubt very much it was. Not during my tenure

1 anyway.

2     Q. Now, your expert report dated April of

3 2024 -- and you analyzed, in part, Albertsons'

4 policies and procedures from as far back as 2001

5 and 2002, right?

6     A. Uh-huh.

7     Q. Yes?

8     A. Yes.

9     Q. And you detailed, as you did in your

10 report, various deficiencies in the written

11 policies and procedures, right?

12     A. Uh-huh.

13     Q. That's something that the DEA had access

14 to if and when they investigated and inspected the

15 distribution center at Ponca, right?

16     A. Can they -- no, they didn't have access

17 to all of the documents that I had. They didn't

18 have access to depositions. They didn't have --

19 all they had was the policies and procedures in

20 place and a verbal explanation of how it works.

21 They didn't have everything that I had.

22     And -- and -- to be fair to those

1 inspectors, those inspectors are there to look and

2 make sure there's a SOM program in place, and they

3 have to rely on what the company is telling them.

4 If they were going to -- to do a SOM inspection,

5 they would have to be there for a month because

6 they'd have to look at how the threshold works.

7 They would have to look at how they're monitoring

8 unusual frequency, how they're monitoring

9 substantial deviation. They don't have that kind

10 of time. They can't monitor the day-to-day

11 everything. They have to get in and get out

12 because they have another inspection to go

13 through.

14     So I had a lot more than they would ever

15 have, because I got to actually look at what the

16 employees were saying about the system. They

17 didn't have that luxury.

18     Q. I understand that. But you detailed, in

19 part, in your report deficiencies in the written

20 policies and procedures --

21     A. Uh-huh.

22     Q. -- right?

49 (Pages 190 - 193)

Page 194

1    A. Uh-huh.

2    Q. Yes?

3    A. Yes.

4    Q. But -- written policies and procedures
5 would have been available to the DEA on their
6 inspections, as I think you've previously
7 testified, right?

8    A. I don't know what was given to them.

9    Q. I'm not asking that.

10    A. See, but that's the point. The point is
11 what you're asking me -- and I'm telling you --
12 you're asking me to tell -- to agree with you
13 based on what they've -- they saw. And I have no
14 idea what they saw. I have no idea what they
15 presented. I don't know.

16    Q. I'm not asking you what they saw.

17    A. Okay.

18    Q. I'm asking you, as the head of the DEA at
19 that time, were the written policies and
20 procedures in place at the distribution center
21 available to the DEA during their inspection?

22    A. I would hope so. Yes.

Page 195

1    Q. And as far as you know, you don't have
2 any evidence that the DEA, on these inspections,
3 ever pointed out any deficiencies in the written
4 policies and procedures that you have now
5 testified were deficient some 20-plus years ago;
6 isn't that right?

7    A. I do not know because I have not seen
8 reports that indicate that. I don't know.

9    MR. GIBBONS: Okay. I'm done, I think.

10    MR. KOHLER: Do you want to take a break?

11    MR. MIGLIORI: Well, lunch has been here
12 for a little while, so do you want to do that?
13 Procedurally -- I know that this is a combined
14 deposition. I don't know if I'm going to have any
15 kind of cleanup or redirects. I don't care when I
16 do it. I can do it at the very end. I can do it
17 after -- I don't know how you plan to divide up
18 your time, I guess is my question.

19    MR. GIBBONS: We can go off the record.

20    VIDEO TECHNICIAN: The time is 12:48 p.m.
21 This ends unit 3. We're off the record.

22    (A recess was taken.)

Page 196

1    VIDEO TECHNICIAN: The time is 1:19 p.m.
2 This begins unit number 4. We're on the record.

3    EXAMINATION BY COUNSEL FOR PUBLIX SUPER MARKETS
4 BY MR. KOHLER:

5    Q. Okay. Good afternoon, Mr. Rannazzisi. I
6 introduced myself to you earlier. Michael Kohler
7 for Publix Super Markets, Inc.

8    We're in Washington, D.C., today, right?

9    A. Yes, sir.

10    Q. And we're at the offices of Motley Rice,
11 correct?

12    A. Yes.

13    Q. Just to follow up on some questions you
14 were asked earlier, Due Diligence Compliance is
15 your company, correct?

16    A. Yes.

17    Q. And you mentioned that you've made about
18 $1.5 million or so since late 2016, early 2017; is
19 that fair?

20    A. Yeah, probably since early -- mid-2017.

21    Q. Okay. And that was -- and all that
22 revenue was generated through Due Diligence

Page 197

1 Compliance, LLC?

2    A. Yes.

3    Q. And was all that for work that you've
4 done on the opiate litigation?

5    A. Yeah. I mean, encompassing that is,
6 like, presentations that I've been asked to do
7 where they'll pay whatever.

8    Q. Okay.

9    A. Things like that.

10    Q. Of the -- and has Motley Rice hired you
11 in multiple -- Motley Rice hired you in the Cobb
12 County litigation, too, correct?

13    A. Yes.

14    Q. And they've hired you in other
15 litigation; is that fair?

16    A. Yes.

17    Q. All right. How much -- and did you enter
18 into a written contract with Motley Rice?

19    A. Yes.

20    Q. And does that contract set forth the
21 terms and conditions of your engagement?

22    A. I believe it does. Yes.

Page 198

1    Q. And how much -- and is it your
2 expectation that Motley Rice pays your bills?
3    A. Yes.
4    Q. How much has Motley Rice paid -- of the
5 $1.5 million that Due Diligence Compliance has
6 received, how much of that has been paid by
7 Motley Rice?
8    A. For the two -- I don't have the bills
9 handy. Probably -- this is a guesstimate because
10 I just don't remember -- but probably around
11 300,000 total.
12    Q. And who's your point of contact at
13 Motley Rice?
14    A. Mr. Elsner and Mr. Migliori.
15    Q. And you're referring to Mr. Don Migliori
16 here?
17    A. Yes.
18    Q. Let's look at some invoices, I think, in
19 this case.
20        (Rannazzisi Deposition Exhibit 6 marked
21        for identification and attached to the
22        transcript.)

Page 199

1 BY MR. KOHLER:
2    Q. I'm going to hand you what I've marked as
3 Exhibit 6.
4        These are invoices you've submitted with
5 respect to your work on the Cobb County case,
6 correct?
7    A. Yes.
8    Q. And this invoice -- the first invoice is
9 for a little over $15,000, correct?
10    A. Yes.
11    Q. And the next invoice is a little over
12 $75,000, right?
13    A. Yes.
14    Q. And is this the invoice that you've
15 submitted to Motley Rice for payment?
16    A. Yes. These were submitted for payment.
17 Yes.
18    Q. All right.
19    A. I've been paid for both of these.
20    Q. All right. And do you provide detailed
21 billing with respect to the work you perform?
22    A. I do provide detailed billing. Yes.

Page 200

1    Q. Is this the detailed billing, Exhibit 6?
2    A. No. There's -- I'm sure there's another
3 document of detailed billing.
4    Q. And that detailed billing shows what you
5 did on what day and how much time you spent on it?
6    A. Yeah, I'm pretty sure that's correct.
7    Q. So this is just a summary --
8    A. Yes.
9    Q. -- invoice that was given to us, not the
10 actual invoice that was submitted to Motley Rice?
11    A. Well, there are two invoices. This is
12 the invoice that they pay on.
13    Q. Okay. On here there's a $500 an hour
14 number and a $250 an hour number, correct?
15    A. Right.
16    Q. What's the 250 an hour number?
17    A. Travel time.
18    Q. All right. So you charge 250 for travel?
19    A. Yes.
20    Q. All right. How did you come up with your
21 $500 an hour rate?
22    A. That was negotiated in 2018, I guess,

Page 201

1 with a different law firm.
2    Q. Have you charged more than $500 for your
3 time?
4    A. No.
5    Q. Have you charged less than $500 for your
6 time?
7    A. Yeah. I believe we started at 300.
8    Q. And this $500 an hour, that's been your
9 time in the Cobb County case?
10    A. Yes.
11    Q. And it looks -- did you start rendering
12 services on the Cobb County case starting in
13 September of 2022?
14    A. Yes.
15    Q. We met -- prior to the deposition, when
16 we were exchanging pleasantries, I think you said
17 you drove over today -- to the office today; is
18 that right?
19    A. Yes.
20    Q. Was that from Annandale, Virginia?
21    A. Yes.
22    Q. How long have you lived in Annandale?

51 (Pages 198 - 201)

Page 202

1    A.  Probably 20 years.
2    Q.  I don't believe there's any Publix
3 Super Markets in and around Annandale; is that
4 fair?
5    A.  That's correct.
6    Q.  Have you ever lived in Cobb County,
7 Georgia?
8    A.  No.
9    Q.  Do you have any family or friends that
10 live in Cobb County?
11    A.  No.
12    Q.  Have you ever worked in Cobb --
13    A.  Well, I take that back.  I've got -- I'm
14 pretty sure I've got friends that live in Cobb
15 County, or thereabouts.  Yeah.
16    Q.  Well, thereabouts is -- there's --
17    A.  I mean, Cobb County -- yeah.  I mean,
18 where Cobb County sits, I think that's a suburb of
19 Atlanta, so yeah, I'm pretty sure there's a couple
20 of --
21    Q.  Who are your friends that you believe
22 live in Cobb County?

Page 203

1    A.  There were a couple of former agents.
2    Q.  And who are they?
3    A.  I think Dave Jacobson at one time lived
4 there, and he's recently moved -- or moved last
5 year.
6         And another guy is, I think, Richard
7 Crock.
8    Q.  Okay.  Did you consult with Mr. Jacobson
9 or Mr. Crock in preparing your report in this
10 case?
11    A.  No.
12    Q.  Have you ever worked in Cobb County?
13    A.  I've been down in the Atlanta metro area
14 working at DEA and working -- you know, so I might
15 have been.  I might not have been.  I just don't
16 know.  I mean, Atlanta is a pretty big place.
17    Q.  Well, I'm not talking about Atlanta; I'm
18 talking --
19    A.  Well, because --
20    Q.  -- about Cobb --
21    A.  -- we go into the suburbs.  Yeah.
22    Q.  That's fine.  But to your recollection,

Page 204

1 as you sit here today, do you ever recall working
2 in Cobb County?
3    A.  No.  I mean, I don't recall working in
4 Cobb County.
5    Q.  You've never had an office in Cobb
6 County, fair?
7    A.  No.  It's in Atlanta.
8    Q.  Have you ever worked in the -- have you
9 ever had an office in the State of Georgia?
10    A.  I've worked in the State of Georgia.
11 There's a DAL -- there's multiple DEA offices in
12 Georgia.
13    Q.  I'm not talking about on a temporary
14 basis.  I'm talking, you know, kind of a permanent
15 basis.
16    A.  Oh, no, never worked there permanently.
17 I was never assigned there.
18    Q.  What's the furthest south you ever lived?
19    A.  I guess it would be Indianapolis.
20    Q.  With respect to your departure from the
21 DEA, you would have considered a transfer to some
22 cities, right, and not others; is that fair?

Page 205

1    A.  Yeah.
2    Q.  The cities you would have considered
3 transferring to was New York, Detroit,
4 Indianapolis?
5    A.  Yes.
6    Q.  Would you have considered transferring to
7 Atlanta or any place in Florida?
8    A.  Well, since I didn't -- you generally go
9 where -- for work where you've worked before
10 because you have connections with the state and
11 locals in those areas, and it's real easy to pick
12 up where you left off.
13         So I had connections in all three states
14 with state and local officers.  And so, if I was
15 going to go back and -- you know, into those
16 states with DEA and continue, it's nice to have --
17 to not have to go out and look at -- develop new
18 relationships.  You already have the relationships
19 in place.
20    Q.  So you wouldn't have been interested in
21 transferring to Atlanta or Florida, correct?
22    A.  I was looking for a transition that would

52 (Pages 202 - 205)

Page 206

1 allow me just to take up and continue.
2    Q. Have you ever taken opioids?
3    A. I have taken opioids probably -- after my
4 surgery, I had to take opioids.
5    Q. Before that, had you?
6    A. No.
7    Q. And that was your open heart surgery you
8 mentioned earlier?
9    A. Uh-huh.
10    Q. Is that a yes?
11    A. Okay.  Yes.
12    Q. Any issues with you taking the opioids?
13    A. No.  It was low-dose opioids.  And I took
14 three doses, four doses, then I was done it.
15    Q. No issues with addiction?  No issues with
16 any disorders with that -- taking --
17    A. No.
18    Q. Have you had anybody close to you that
19 has been addicted to opioids?
20    A. Addicted?  Well, I've known several
21 people who have had problems with addiction.
22 But -- not had problems with addiction, who have

Page 207

1 had relatives with problems with addiction.
2    Q. Anybody close to you been addicted to
3 opioids?
4    A. I'm trying to think.  Not close to me.
5 But again, there's people I know whose child
6 overdosed and died.
7    Q. Have your children or family members have
8 any issues with opioid use?
9    A. No.  I was -- I've been very, very
10 blessed.
11    Q. Anybody close to you have died because of
12 an opioid issue?
13    A. There was a judge I know whose son passed
14 away from an opioid overdose.
15    Q. And was that son close that you?
16    A. No.  The judge was close to me.
17    Q. Now, I understand -- I've tried to read a
18 lot of what you've already testified to, so I'm
19 trying not to replow the same fields.
20       But for clarification, prior to you
21 retiring from the DEA, right before that, you were
22 reassigned, correct?

Page 208

1    A. No.  I was pending assignment.
2    Q. You were -- in terms of your supervisory
3 responsibilities, that had changed pretty
4 dramatically prior to your retirement, fair?
5    A. Yeah.  I was basically told, you're
6 pending reassignment --
7    Q. Right.
8    A. -- and -- just to find an office.
9    Q. And I believe that you went from
10 supervising over 300 folks to none; is that right?
11    A. Pretty much.  Yeah.
12    Q. Do you believe, as you sit here today,
13 that the pharmaceutical industry had any role in
14 that?
15    A. I don't know if the pharmaceutical
16 industry had a role in it.  I know that the
17 administrator, the acting administrator that was
18 brought in, made that decision.  So...
19    Q. All right.  But as you sit here today, do
20 you believe that the pharmaceutical industry had
21 any role in that decision to demote you?
22    A. I'm not sure that -- the government

Page 209

1 doesn't work that way.  I'm sure that the
2 pharmaceutical industry was very vocal in what I
3 was doing.  But I can't sit here today and say
4 they had a role in what -- I mean, they're vocal.
5 But the -- a reassignment comes down to somebody
6 in the Department of Justice or the Drug
7 Enforcement Administration making a decision to
8 reassign.  And, you know --
9    Q. When you --
10    A. -- how that decision is made, I'd be
11 speculating.
12    Q. All right.  When you retired, you were
13 the subject of an investigation; is that right?
14    A. I was the subject of two investigations.
15    Q. Were those -- was one or both of those
16 the result of some members of the House of
17 Representatives accusing you of intimidating
18 Congress?
19    A. That's one of them.  Yes.
20    Q. And one of them was from the State of
21 Tennessee and I believe the other one was from
22 Pennsylvania; is that right?

53 (Pages 206 - 209)

Page 210

1    A.  Yes.
2    Q.  All right.  You gave a -- in
3 October 2017, you were featured on 60 Minutes,
4 correct?
5    A.  That's correct.
6    Q.  I believe in that episode you recounted
7 an incident in which the DOJ called you in to
8 discuss your handling of the opioid crisis, right?
9    A.  That's correct.
10    Q.  That conversation upset you; is that
11 fair?
12    A.  Did it upset me?  I think it upset the
13 deputy attorney generally more than it upset me.
14    Q.  Well, I'm not asking you about the deputy
15 attorney general.  I'm asking you.  Did it upset
16 you?
17    A.  It didn't upset me.  Just --
18    Q.  Okay.
19    A.  -- I questioned it --
20    Q.  All right.
21    A.  -- because I was called over to --
22    Q.  Well, hold on.  I'm just asking --

Page 211

1    MR. MIGLIORI:  Let him finish.
2 BY MR. KOHLER:
3    Q.  Well, I'm just asking if --
4    MR. MIGLIORI:  Let him finish.
5 BY MR. KOHLER:
6    Q.  -- it upset you.  I don't need to hear a
7 soliloquy about --
8    A.  No --
9    Q.  -- everything else.
10    A.  No, that's fine --
11    MR. MIGLIORI:  He can answer your
12 question.
13 BY MR. MIGLIORI:
14    Q.  Did it upset you?  Yes or no.
15    MR. MIGLIORI:  No, it's not a yes or no
16 question.  Upset isn't an objective -- if he had
17 feelings about it -- you're asking his feelings.
18 Let him emote.  He's here to emote.
19 BY MR. KOHLER:
20    Q.  I'm asking -- is the emote -- were you
21 upset, yes or no?
22    MR. MIGLIORI:  Answer the question how

Page 212

1 you see -- feel [sic] fit.
2    THE WITNESS:  I don't think it was upset.
3 It was -- I was questioning why I was brought over
4 there to discuss an investigation when we had done
5 many, many investigations prior and then, all of a
6 sudden, this investigation -- somehow it just was
7 brought to the top and they just decided we need
8 to know about this investigation.
9 BY MR. KOHLER:
10    Q.  You went back to your staff after that
11 conversation, correct?
12    A.  I did go back to my staff.
13    Q.  And you told your staff members that this
14 was war, correct?
15    A.  I told them I want you to -- yeah, I said
16 that, and I said, I want you to continue doing
17 what you're doing and...
18    Q.  Who -- who was it war against?  When you
19 said it was -- you know, this is war, who was it
20 war against?
21    A.  I think it was war against the people who
22 were not following the Controlled Substances Act

Page 213

1 and the Code of Federal Regulations.  And at that
2 point in time, I said, I want you to continue,
3 because everybody was, like, well, maybe -- you
4 know, what are we going to do?  We should probably
5 stop.
6    And you can't stop violat- -- you can't
7 stop enforcing the law.
8    Q.  All right.  And was that war against
9 Publix when you made that declaration to your
10 staff?
11    A.  It was anybody that was violating the
12 Controlled Substances Act and the Code of Federal
13 Regulations.  People who were not complying.  And
14 I think it was pretty clear what we were talking
15 about.  We had people who were exerting external
16 pressure on the Department of Justice to have us
17 slow down.  And we weren't going to do that.
18 That's why I said, it's war.
19    Q.  All right.
20    A.  We don't -- we don't back down on our
21 obligation to investigate violations of the Act
22 and the Code of Federal Regulations.

54 (Pages 210 - 213)

Page 214

1    Q.  Was Publix -- when you made that
2    declaration, was Publix on your radar when you
3    said that?
4    A.  No.
5    Q.  All right.
6    A.  It wasn't -- it was the cases that were
7    pending that we got called over for.
8    Q.  Do you know who the attorney is for Cobb
9    County?  The Cobb County attorney.
10   A.  The Cobb County --
11   MR. MIGLIORI:  Objection.
12   THE WITNESS:  -- district attorney?
13   BY MR. KOHLER:
14   Q.  No.  The attorney for Cobb County.
15   MR. MIGLIORI:  I don't understand.  In
16   this case?
17   MR. KOHLER:  No.  The Cobb County
18   attorney.
19   MR. MIGLIORI:  Objection.  Form.
20   BY MR. KOHLER:
21   Q.  Do you know who Bill Rowling is?
22   A.  No.

Page 215

1    Q.  Have you ever spoken to Bill Rowling?
2    A.  No.
3    Q.  To your knowledge, have you ever met
4    Mr. Rowling?
5    A.  No.
6    Q.  Do you know who Lisa Cupid it?
7    A.  No.
8    Q.  She's the chairwoman of the Cobb County
9    Board of Commissioners.  Have you ever spoken to
10   her?
11   A.  No.
12   Q.  Do you recall whether or not you've ever
13   given a presentation to the Cobb County Board of
14   Commissioners?
15   A.  No, I don't believe I have.
16   Q.  Do you know anybody -- any commissioner
17   that sits on the Cobb County board?
18   A.  No, I do not.
19   Q.  The contract that you -- well, let me
20   back up.
21   Did you ever enter into a contract with
22   Cobb County with respect to the services you're

Page 216

1    providing in this case?
2    A.  No.  It's through Motley Rice.
3    Q.  To your knowledge, did Cobb County ever
4    approve that contract you entered into with
5    Motley Rice?
6    MR. MIGLIORI:  Objection.  Foundation.
7    THE WITNESS:  I have no idea.
8    BY MR. KOHLER:
9    Q.  Have you ever spoken to someone who had a
10   prescription filled from a Publix Cobb County
11   pharmacist?
12   A.  No.
13   Q.  Do you know a gentleman named Brian
14   Rucker?  He worked with the DEA from -- I believe
15   from '99 to 2013.
16   Does that name ring a bell?
17   A.  He was a diversion investigator?
18   Q.  I'm -- just whatever you --
19   A.  I seem to remember that name as a
20   diversion investigator.
21   Q.  Any -- do you recall anything about
22   Mr. Rucker, whether he was good at his job or

Page 217

1    trustworthy or anything that you may remember
2    about him or his reputation?
3    A.  I don't recall.
4    Q.  As you sit here today, nothing remarkable
5    about Mr. Rucker that you recall?
6    A.  No.
7    Q.  Have you, at any point in time, had any
8    professional or personal dealings with Lacey's
9    Pharmacy on Church Street in Marietta?
10   A.  No.
11   Q.  What about Lacey Drug Company on South
12   Main Street in Acworth?
13   A.  No.
14   Q.  What about Poole's Pharmacy on Whitlock
15   Avenue, next to Waffle House there?
16   A.  No.
17   Q.  What about Cooper Drug Company in Powder
18   Springs?
19   A.  No.
20   Q.  Prior to today, have you ever heard of
21   any of these pharmacies?
22   A.  No.

55 (Pages 214 - 217)

Page 218

1    Q.  Have you ever shopped at a Publix
2  Super Market?
3    A.  Yes.
4    Q.  How many times have you shopped at a
5  Publix Super Market?
6    A.  Quite a few, because there was a Publix
7  in Tennessee near Knoxville, and when my daughter
8  went to school, we used to go there.
9    Q.  Did she go to the University of
10  Tennessee?
11    A.  Yes, she did.
12    Q.  How many times did you go to that
13  supermarket, give or take?
14    A.  Probably 20.
15    Q.  When is the last time you went to that
16  supermarket?
17    A.  It had to be three years ago, four years
18  ago.
19    Q.  Anything remarkable about your
20  experiences shopping at Publix during those 20
21  times or so?
22    A.  No.

Page 219

1    Q.  Other than that supermarket near
2  Knoxville, have you shopped at any other Publix
3  Super Market?
4    A.  No.
5    Q.  What about -- have you ever gotten a
6  prescription filled at a Publix Super Market?
7    A.  No.
8    Q.  To your knowledge, did your daughter ever
9  have any of her prescriptions filled at that
10  Publix Super Market?
11    A.  Not that I'm aware of.
12    Q.  Have you ever been to a Publix
13  Super Market in Cobb County?
14    A.  No, I have not.
15    Q.  During your time at the DEA, did you ever
16  have any professional dealings with Publix, to
17  your recollection?
18    A.  No.
19    Q.  Have you ever recommended to somebody not
20  to shop at Publix?
21    A.  No.
22    Q.  Have you ever recommended to somebody not

Page 220

1  to have their prescriptions filled at Publix?
2    A.  No.
3    Q.  As you sit here today, do you believe
4  Publix is a threat to the folks in Cobb County?
5    MR. MIGLIORI:  Objection.  Form.
6    Go ahead.
7    THE WITNESS:  Well, based on Publix's
8  SOMs, it does concern me that their SOMs were not
9  working appropriately from 2000s all the way
10  through to 2020.  But I don't know if they're a
11  threat now because I don't know what system
12  they're utilizing.  I mean, I don't know how the
13  system that they're utilizing is working.
14  BY MR. KOHLER:
15    Q.  In 2019, do you believe Publix was a
16  threat to the folks in Cobb County?
17    A.  I believe in 2019 that Publix was
18  operating a system, a SOM system, that was not
19  working.  And because it was not working, yes,
20  the -- anytime you're operating a SOM system, you
21  become a threat.
22    Q.  All right.  So from 2006 to 2019, in your

Page 221

1  opinion, Publix Super Market was a threat to the
2  folks in Cobb County?
3    A.  My opinion was that Publix Super Market
4  was not appropriately monitoring controlled
5  substances through their SOM system, which was --
6  opened the door for potential diversion.
7    Q.  Have you ever notified anybody at the DEA
8  about your concerns relating to Publix's
9  operations in Cobb County?
10    A.  No, I did not.
11    Q.  Have you ever notified anybody in law
12  enforcement about your concerns relating to
13  Publix's operations in Cobb County?
14    A.  No.
15    Q.  Have you ever notified any regulator
16  about your concerns relating to Publix's
17  operations in Cobb County?
18    A.  No.
19    Q.  I believe I got this from the report.
20  While you were at the DEA, you were responsible
21  for oversight and control of all regulatory
22  compliance inspections and investigations, as well

56 (Pages 218 - 221)

Page 222

1 as all civil and criminal investigations of about
2 1.6 million DEA registrants; is that right?
3     A. That's correct.
4     Q. That would have included distributors,
5 correct?
6     A. Manufacturers, distributors, pharmacies,
7 doctors. Any practitioner. Researchers. Yeah.
8     Q. That would also include Publix in both
9 its capacity as a self-distributor and a
10 pharmacist; is that fair?
11     A. Yes.
12     Q. I think in your report you also said you
13 were the DEA liaison to law enforcement and
14 regulatory agencies at the federal, state, and
15 local levels, correct?
16     A. Yes.
17     Q. Was there particular years in which you
18 served as that liaison?
19     A. Yeah. From the time I took the job full
20 time in 2005 right up until the time I retired.
21     Q. And that would have been October 2015?
22     A. Yes.

Page 223

1     Q. Did you ever have any personal
2 interactions with anyone from the State of Georgia
3 at the state level concerning the diversion of
4 opioids in the State of Georgia?
5     A. Yes, I did.
6     Q. Do you recall who that person was?
7     A. Rick Allen.
8     Q. I'm sorry?
9     A. Rick Allen.
10     Q. And which --
11     A. Also --
12     Q. Who's he with?
13     A. -- Vernon -- I can't think of his last
14 name now. One was with GBI.
15     Q. Mr. Allen?
16     A. No. Rick was with the Georgia Bureau of
17 Narcotics.
18     Q. Okay. And that was Mr. Allen. Do you
19 recall anybody else's name?
20     A. GBI -- Vernon. Oh, God, I can't think of
21 his name.
22     Q. Can you think of anyone else at the state

Page 224

1 level?
2     A. No. They were both at the state level.
3     Q. When you were wearing the liaison hat, I
4 guess during that '05 to '15 period, do you recall
5 having any personal interactions with anyone from
6 the Cobb County concerning the diversion of
7 opioids in the county?
8     A. No.
9     Q. Not the county level?
10     A. No.
11     Q. Were there any discussions, to your
12 recollection, at the state level of any concerns
13 about the opioid diversion in Cobb County?
14 Specifically Cobb County.
15     A. No. I think, at that point in time, the
16 concern was state-wide and multistate. Georgia
17 was seeing an influx of drugs coming in from
18 Florida and also people from Florida setting up
19 shop in Georgia.
20     Q. And what time -- to the best of your
21 recollection, when was the last time you had
22 meetings at the state level with folks at Georgia?

Page 225

1     A. It was probably in the 2014 time frame.
2 2014 time frame.
3     Q. Do you recall any concerns expressed by
4 the State of Georgia regarding Publix's
5 operations?
6     A. No. We just discussed in general what
7 was going on.
8     Q. So nothing pertaining to Publix, correct?
9     A. That's correct.
10     Q. All right. I want to make sure I
11 understand the type of discipline a registrant can
12 face if they get sideways of the Controlled
13 Substances Act or its regulations.
14         You've got, obviously, criminal, right?
15     A. Uh-huh.
16     Q. That's a yes?
17     A. Yes.
18     Q. Civil, where the -- presumably the DEA
19 will file a civil action, right?
20     A. U.S. attorney files a civil action.
21     Q. Then administrative; is that right?
22     A. Yes.

57 (Pages 222 - 225)

1    Q. Different type.  I think you touched on
2 some of these earlier.  You mentioned a field
3 hearing.
4    A. Field hearing.
5    Q. Tell me briefly what a field hearing is.
6    A. Well, first of all, there's letter of
7 admonition.
8    Q. Okay.  Let's go in order.  Okay.  Letter
9 of admonishment, right?
10    A. Yeah.
11    Q. What's next?
12    A. Then a field hearing.
13    Q. What's next?
14    A. Order to show cause.
15    Q. What's next?
16    A. Order to show cause with an immediate
17 suspension order attached.
18    Q. What's next?
19    A. There would be no next because they would
20 not be allowed -- once that goes through, they're
21 not allowed to practice with controlled
22 substances.

1    Q. What about just like -- just a warning?
2 Is that something --
3    A. Generally --
4    Q. -- that's below a letter of admonishment?
5    A. Yeah, a warning would be something so
6 minor that, you know, they just correct it on site
7 and they just say, look, we're going to have you
8 correct this on site.
9    Q. Okay.  And tell me briefly what a field
10 hearing is.
11    A. A field hearing is done where there were
12 violations and the special agent in charge in the
13 field actually brings the parties in, with their
14 attorneys, and explains that -- what the
15 violations are and asks how the violations will be
16 corrected.
17    Q. Would you agree that, from '05 to 2015,
18 the DEA was particularly vigilant in investigating
19 the distribution and dispensing practices of
20 registrants in the State of Florida?
21    A. The State of Florida got the most -- got
22 the most media attention, but they were vigilant

1 pretty much in multiple states all over the
2 country.
3    Q. Including Florida, fair?
4    A. Including Florida.  Yes.
5    Q. Particularly in the Lakeland area?
6    A. Lakeland, Orlando.  Yeah.
7    Q. Particularly along the I-4 corridor.
8 Would you agree with that?
9    A. Yeah, I mean -- yes.  75 and I-4.
10    Q. You would -- in 2007, the DEA suspended
11 Cardinal Health's registration to distribute
12 controlled substances from its Lakeland, Florida,
13 distribution center, correct?
14    A. Yes.
15    Q. This suspension was based, in part,
16 because of failures relating to its suspicious
17 order monitoring and reporting as to opioid
18 hydrocodone, right?
19    A. Yes.
20    Q. In 2007, the DEA suspended
21 AmerisourceBergen's registration to distribute
22 controlled substances from its Orlando

1 distribution center due to its failures related to
2 suspicious order monitoring and reporting as to
3 opioid hydrocodone, right?
4    A. Yes.
5    Q. The DEA suspended the registration of
6 McKesson's Lakeland, Florida, distribution center
7 as to certain schedule II opioids, correct?
8    A. I don't -- it wasn't schedule II; it was
9 schedule III.
10    Q. Okay.  Do you remember what year that was
11 with McKesson's distribution center in Lakeland?
12    A. I don't remember if it was a surrender or
13 a suspen- -- or a -- it had to be 2008.
14    Q. Okay.  2012, the DEA suspended CVS
15 Health's registration to dispense controlled
16 substances at two pharmacies in Sanford, Florida,
17 correct?
18    A. Yes.
19    Q. And that was because of its -- the
20 pharmacists' failures to comply with corresponding
21 responsibility obligations as to prescription
22 opioids, correct?

Page 230

1   A. Yes.
2   Q. In 2012, the DEA entered into a
3  settlement with Cardinal Health relation, in part,
4  to its failures concerning suspicious order
5  monitoring and reporting as to prescription
6  opioids, correct?
7   A. Yes.
8   Q. And as part of that settlement, the DEA
9  suspended Cardinal's Lakeland, Florida,
10 distribution center registration, right?
11   A. Yes.
12   Q. And Cardinal, I think, paid a $34 million
13 fine, correct?
14   A. That sounds correct, yes.
15   Q. And Cardinal admitted in writing of its
16 failures related to suspicious order monitoring
17 and reporting, correct?
18      MR. MIGLIORI:  Objection to form.
19      THE WITNESS:  I believe that was in the
20 memorandum.  Yes.
21 BY MR. KOHLER:
22   Q. In 2013, the DEA entered into a

Page 231

1  settlement agreement with Walgreens whereby
2  Walgreens acknowledged failures to comply with
3  suspicious order monitoring and reporting
4  obligations and its pharmacists' failure to comply
5  with their corresponding responsibility
6  obligations with respect to opioid prescriptions;
7  is that right?
8   A. 2013?
9   Q. Yes, sir.
10   A. Yeah, I believe that's correct.
11   Q. And that settlement resulted in Walgreens
12 surrendering its registrations for its Jupiter,
13 Florida, distribution center, correct?
14   A. I believe that was correct.  Yes.
15   Q. And also, they had to surrender, I think,
16 six retail pharmacy registrations in Florida as
17 well, correct?
18   A. Yes.
19   Q. All right.  When the DEA would issue a
20 press release, were you involved in reviewing or
21 approving those press releases?
22   A. No.  We have a press office that does

Page 232

1  that.  That's not -- that's why you rarely will
2  see me on the news.  It's not -- my job was to
3  oversee the investigations.  It wasn't to go on
4  the press and do press releases.
5   Q. You would become familiar with press
6  releases that the DEA's office would issue, fair?
7   A. My execs would look at the press
8  releases, and sometimes I'd look at them, but for
9  the most part I relied on my execs to make sure
10 that the press releases were accurate and make
11 sure they actually talked about what happened.
12   Q. Okay.
13      (Rannazzisi Deposition Exhibit 7 marked
14      for identification and attached to the
15      transcript.)
16 BY MR. KOHLER:
17   Q. I'm going to hand you Exhibit 7.
18      This is a press release -- this is a DEA
19 press release from June of 2013, correct?
20   A. Yes.
21   Q. Do you recall -- does this -- do you
22 recall seeing this press release before?

Page 233

1   A. I'm sure at some time I saw this press
2  release.
3   Q. All right.  I'm going to refer you to the
4  last paragraph of the press release before we get
5  to the appendix A.  Okay?
6   A. Okay.
7   Q. It says, Since 2009, the DEA, along with
8  federal, state, and local counterparts, have
9  partnered to combat the prescription drug abuse
10 epidemic that has plagued Florida, culminating in
11 Operation Pill Mill Nation I and II and Operation
12 Oxy Alley.  These investigations have resulted in
13 charges against more than 172 individuals,
14 including 51 doctors and 54 [sic] clinic/pharmacy
15 owners, the seizure of approximately 2.5 million
16 dosage units of controlled substances,
17 approximately $16.6 million, real property and
18 exotic cars.  In addition, approximately 42
19 doctors and 11 pharmacies have lost their DEA
20 registrations through the issuance of immediate
21 suspension orders.  As well, approximately 192
22 doctors and 68 pharmacies have voluntarily

59 (Pages 230 - 233)

1 surrendered their DEA registrations following an
2 official visit from the DEA.  Lastly, the DEA also
3 taken actions against seven other Florida-based
4 distributors.
5     Did I read that correctly?
6     A. That's what it says.  Yes.
7     Q. And you would agree that none of what the
8 DEA is talking about here at all involved Publix,
9 whether as a pharmacist or as a distributor, fair?
10     A. I'm trying to think about those
11 investigations, because those are three separate
12 operations.
13     I don't recall Publix being in those
14 operations.
15     Q. Okay.  From 2005 until you left the DEA
16 in October of 2015, you would agree the DEA never
17 brought any criminal charges against Publix,
18 right?
19     A. Yeah, I --
20     MR. MIGLIORI:  Objection to form and
21 founding.
22     Go ahead.

1     THE WITNESS:  As far as I know, they
2 never brought any administrative or civil actions
3 against -- or criminal actions against Publix.
4 BY MR. KOHLER:
5     Q. The DEA never brought any enforcement
6 actions against Publix, correct?
7     A. I'm not aware of any, no.
8     Q. And that's something that you would be
9 aware of, right, given your role during that time
10 period?
11     A. It depends.  I mean, yeah, if it's like a
12 field hearing based on violations, it doesn't
13 generally get to my level.  But if an order to
14 show cause was issued, it would, because I have to
15 sign the order to show cause.
16     Q. Fair enough.  The DEA never issued
17 immediate suspension orders against Publix, right?
18     A. Again, I would have to sign that, and
19 that's not -- I don't recall that ever coming to
20 my office.
21     Q. And the DEA never issued orders to show
22 cause to revoke or suspend Publix's registrations,

1 correct?
2     A. I don't recall them ever doing that.
3     Q. The DEA, to your knowledge, never issued
4 a letter of admonishment against Publix, correct?
5     A. That, I don't know.  I mean, a letter of
6 admonishment would come from the division.  It
7 would not come from my office.
8     Q. But you're not aware of that ever
9 happening --
10     A. I'm not aware of...
11     Q. During the time period where you were at
12 the DEA, the DEA never made any public allegations
13 against Publix alleging that it was in violation
14 of the Controlled Substances Act or its
15 regulations, correct?
16     MR. MIGLIORI:  Objection.  Foundation.
17     THE WITNESS:  Could you --
18 BY MR. KOHLER:
19     Q. I'm sorry?
20     A. Could you repeat that question?
21     Q. During the time that you were at the DEA,
22 it never made any public allegations against

1 Publix alleging that it was in violation of the
2 Controlled Substances Act or its regulations,
3 correct?
4     MR. MIGLIORI:  Objection to foundation.
5     Go ahead.
6     THE WITNESS:  I don't recall any --
7 anything like that.
8 BY MR. KOHLER:
9     Q. The DEA didn't enter into any settlement
10 agreements with Publix relating to any alleged
11 failure to comply with the Controlled Substances
12 Act or its regulations, correct?
13     MR. MIGLIORI:  Same objection.
14     THE WITNESS:  Not that I'm aware of.
15 BY MR. KOHLER:
16     Q. When you -- when the DEA was pursuing
17 enforcement actions against CVS and Cardinal for
18 violating the Controlled Substances Act and its
19 regulations, to help prove the DEA's case, you
20 relied upon Publix; is that fair?
21     MR. MIGLIORI:  Objection to form.
22     THE WITNESS:  I -- I don't recall.  I

Page 238

1 know we used comparators, but I don't recall if
2 Publix was one of them.
3 BY MR. KOHLER:
4     Q. And when you were using a comparator,
5 that comparator, in your belief, was somebody that
6 was probably in compliance with the law, and
7 that's why you were using it as a comparator?
8     A. No. We were looking at -- when we look
9 at comparators, we're saying, well, here's a
10 pharmacy -- here's three pharmacies in this
11 neighborhood with this one pharmacy. These three
12 pharmacies are -- are doing -- dispensing, you
13 know, 5,000 hydrocodone tablets a month. This
14 pharmacy is dispensing 150,000. That's how we use
15 comparators. We're not necessarily saying these
16 are wrong. We're showing that there's a stark
17 difference between what these three pharmacies are
18 dispensing and what this pharmacy is dispensing.
19     (Rannazzisi Deposition Exhibit 8 marked
20         for identification and attached to the
21         transcript.)
22

Page 239

1 BY MR. KOHLER:
2     Q. I'm going to hand you what we marked as
3 Exhibit 8.
4     Mr. Rannazzisi, this is the declaration
5 that you gave with respect to the enforcement
6 action against CVS, correct?
7     A. Yes.
8     MR. KOHLER: And let's go ahead and mark
9 this one as Exhibit 9.
10     (Rannazzisi Deposition Exhibit 9 marked
11         for identification and attached to the
12         transcript.)
13 BY MR. KOHLER:
14     Q. Exhibit 9 is the declaration you gave in
15 support of the DEA's enforcement action against
16 Cardinal, correct?
17     A. Yes.
18     Q. Okay. Let's just -- let's take -- let's
19 just take the CVS declaration.
20     A. Okay.
21     Q. We talked briefly about comparator. If
22 you could turn to page 22, paragraph 51, of your

Page 240

1 declaration.
2     A. Okay.
3     Q. And this is what you're doing here,
4 right? You're describing -- and let's focus on
5 store -- CVS store 5195, right?
6     A. Yes.
7     Q. You pointed out that there was over
8 1.2 million dosage uses of oxycodone for a certain
9 time period, correct?
10     A. Okay.
11     Q. And then you say, Additionally, in close
12 proximity stands Publix Pharmacy 641 that's
13 located in Sanford, Florida. And you point out
14 that that Publix pharmacy had only purchased
15 25,700 units of oxycodone in 2011, correct?
16     A. Yes.
17     Q. And you -- and this was submitted in --
18 you know, you testified, in the case that CVS
19 brought in the District of Columbia, correct?
20     A. Yes.
21     Q. And if you look at the declaration you
22 submitted to Cardinal, Cardinal was distributing a

Page 241

1 lot of these shipments to -- these orders to these
2 CVS pharmacies, fair?
3     A. Could you repeat that again?
4     Q. I'm sorry. Cardinal distributed a lot of
5 these oxycodone products to that CVS -- or to CVS,
6 fair, during this time period?
7     A. Yes.
8     Q. All right. Let's look at your Cardinal
9 declaration. I believe that's declaration [sic]
10 number 9; is that right?
11     A. Yes.
12     Q. Okay. And then -- here -- and this was
13 submitted also to support the DEA's enforcement
14 action against Cardinal, correct?
15     A. Okay.
16     Q. Is that right?
17     A. Yes.
18     Q. And on paragraph 79, you again compare
19 what we just talked about in the prior
20 declaration -- again, comparing the CVS store of
21 the 1.2 million dosage units, compared to the
22 Publix pharmacy nearby. I think it was less than

61 (Pages 238 - 241)

1 two miles nearby, right?

2    A.  Okay.

3    Q.  Is that right?

4    A.  1.2 million -- yeah.  It's close.  Close.

5    Q.  Okay.  Do you recall any other time in

6 which you held Publix up as a comparator to some

7 other registrant which you were pursuing

8 enforcement actions against?

9    A.  I don't recall.  I mean, the comparator

10 is just that.  It's just showing stark difference

11 in pharmacies.

12       That one particular pharmacy, that Publix

13 Pharmacy, was within the location area, and so we

14 used it as a comparator.

15    Q.  And you would use it as a comparator,

16 though, but you want to make sure that it wasn't

17 too far -- you would look at other possible

18 comparators, too.  It wasn't just Publix you were

19 looking at in that trade area, fair?

20    A.  We were looking at the closest pharmacies

21 to that pharmacy.

22    Q.  But there would sometimes be multiple

1 pharmacies that you could use as comparators,

2 fair?

3       MR. MIGLIORI:  Objection.  Form.

4 Foundation.

5       Go ahead.

6       THE WITNESS:  It just demands.  I mean,

7 it depends on the location.  But if that Publix

8 was the closest pharmacy, that's what we used.

9 You know, when we're doing comparators, we're just

10 looking -- I don't want to do a comparator that's

11 20 miles away because that's not fair to the

12 defendant.

13 BY MR. KOHLER:

14    Q.  But if you have multiple pharmacies in or

15 around the target, you have a choice of which

16 comparators to use, fair?

17    A.  It's in close proximity.  We try and be

18 fair.  So generally, if there's two or three

19 pharmacies, we would include two or three

20 pharmacies.  But if a Publix Pharmacy is -- or a

21 Walgreens or whatever is within a block of the

22 other pharmacy, that's what we're going to use

1 because it makes sense to use a close -- a

2 pharmacy in close proximity.

3       (Rannazzisi Deposition Exhibit 10 marked

4       for identification and attached to the

5       transcript.)

6 BY MR. KOHLER:

7    Q.  Okay.  I'm going to hand you Exhibit 10.

8       This is a statement that you gave to

9 Congress in 2014, correct?

10    A.  Yes.

11    Q.  I want to kind of focus -- this was

12 covered in part in your declarations, but I want

13 to focus on page 6 of your statement and -- where

14 it says, "Enforcement" there.

15       And you explained to Congress that the

16 DEA uncovered two types of illegal schemes used to

17 divert controlled substances during this time

18 period; is that right?

19    A.  Yes.

20    Q.  And controlled substances in this

21 context, we're talking about opioids, fair?

22    A.  Yes.

1    Q.  You state here that, quote, Florida was

2 the epicenter of many illegal operations whereby

3 hundreds of millions of dosage units of controlled

4 substances were diverted into the illegal --

5 illicit marketplace across the United States,

6 right?

7    A.  That's correct.

8    Q.  All right.  The first scheme you

9 identified was between '05 and '09, and that was

10 the diversion of millions of -- dosage units of

11 schedule III hydrocodone products was facilitated

12 by rogue internet pharmacies and unscrupulous

13 prescribers who provided prescriptions to drug

14 seekers utilizing these sites; is that correct?

15    A.  Yeah.  Schedule III hydrocodone, and

16 there were other drugs, too --

17    Q.  All right.

18    A.  -- but we just kept it to the

19 hydrocodone.

20    Q.  And the hydrocodone is an opioid; is that

21 right?

22    A.  It is an opioid.

Page 246

1    Q.  And it was reclassified, what, in 2014?
2    A.  October of 2014 it went to a schedule II
3  from schedule III.
4    Q.  These internet pharmacies that you
5  mentioned, they were shut down in part because of
6  the passage of the Ryan Haight Online Pharmacy
7  Consumer Protection Act, correct?
8    A.  Yeah.  The domestic-based pharmacies
9  pretty much went out of business once they passed
10  Ryan Haight.
11    Q.  You would agree that Publix did not
12  distribute opioids to internet pharmacies, right?
13    A.  I don't recall a case where Publix was
14  involved in an opioid scheme -- an internet
15  scheme.
16    Q.  You -- okay.  And you always understood
17  Publix did not distribute a controlled substance
18  to anybody but itself, right?
19    A.  Yes.
20    Q.  You would agree that Publix did not
21  distribute hydrocodone combination products to
22  internet pharmacies.

Page 247

1    A.  Again, I don't recall a case where Publix
2  was involved.  We did have cases with chain
3  pharmacies, but Publix -- I don't recall Publix
4  being one of them.
5    Q.  All right.  So with respect to this
6  phase -- this first phase that you're talking
7  about to Congress, you would agree that Publix was
8  not part of this problem that you identified in
9  this statement; is that fair?
10    A.  I agree that I don't recall Publix being
11  involved.  Yes.
12    Q.  All right.  The second scheme you talk
13  about is the rise of the pain clinics in Florida,
14  correct?
15    A.  Yes.
16    Q.  And these pain clinics were dispensing
17  oxycodone medication, right?
18    A.  Yes.
19    Q.  And they were dispensing them -- they
20  were dispensing them, correct?
21    A.  Originally, the clinics were dispensing
22  them.  Then the State of Florida passed a law that

Page 248

1  it would only be a three-day dispensing limit.
2  And then, after they passed that law, then they
3  said, you know what, there's no dispensing out of
4  pain clinics.
5    So it just depends on what year.  I think
6  that was '10 and '11.  But eventually no one --
7  there was no dispensing out of pain clinics.
8    Q.  And you would agree that the pain clinics
9  were not relying on retail pharmacists to dispense
10  the medication; is that fair?
11    A.  No.
12    Q.  You disagree with that?
13    A.  Yes.  Some rogue doctors were just
14  writing scripts.  They would not dispense out
15  of -- they felt that there was too much heat
16  coming to dispensing opioids.
17    So it depends on the clinic.
18    Q.  Okay.
19    A.  Some clinics definitely dispensed and
20  other clinics just wrote prescriptions.
21    Q.  Are you aware of Publix dispensing any
22  prescription that was made by these pill mills at

Page 249

1  the time?
2    MR. MIGLIORI:  Objection.
3    THE WITNESS:  I don't have any
4  information about that.
5  BY MR. KOHLER:
6    Q.  You would agree that Publix did not
7  operate pain clinics during this time period.
8    A.  No.
9    Q.  You wouldn't agree with that?
10    A.  I -- no, Publix was a dispenser and a
11  distributor.  I don't think -- I don't know of any
12  information that I've reviewed that shows that
13  they were operating a pain clinic.
14    Q.  You would agree Publix did not distribute
15  oxycodone during this time period, right?
16    A.  I'm trying to go back.  They didn't start
17  distributing until they went to Rocket Court.  So
18  that would have been 2016.  So they didn't
19  distribute during that time period.
20    Q.  And you would agree Publix never
21  distributed to pill mill clinics; is that fair?
22    MR. MIGLIORI:  Objection.

1       THE WITNESS:  Well, Publix, at that
2  point, prior to that point, was only distributing
3  IIIs, IVs, and Vs, and I don't believe they
4  distributed outside of their pharmacy base.  So
5  no.
6  BY MR. KOHLER:
7       Q.  So you agree with me, correct?
8       A.  Yes.
9       Q.  All right.  I want to talk about
10 registrations briefly, and renewals and
11 inspections.
12          You would agree that you cannot
13 distribute controlled substances without becoming
14 registered with the DEA, correct?
15      A.  You cannot distribute?  You said
16 distribute?
17      Q.  Distribute.
18      A.  Yes.  You have to be a reg- -- well --
19 yes, that's correct.
20      Q.  All right.  From start to finish, just
21 how long does that process typically take from the
22 application to get an approval from the DEA?

1       A.  For a distributor?
2       Q.  Yes, sir.
3       A.  An initial distribution?  You're talking
4  about an initial --
5       Q.  Initial -- never distributed before.
6  Initial distribution.
7       A.  There has to be -- well, you apply.  An
8  inspection is set up.  They go through physical
9  security.  They go through recordkeeping.  They
10 have to explain what's required of them during
11 their application.  They have to sign a document
12 saying that they will maintain effective controls
13 against diversion as part of their registration.
14          And once everything is -- all of the
15 operations look good, DEA will go ahead and
16 process their registration.
17      Q.  So soup to nuts --
18      A.  I can't --
19      Q.  -- how long?
20      A.  It just --
21      Q.  Are we talking months?  Years?
22      A.  It depends.  I mean --

1       Q.  Average time.
2       A.  There is no average time.  Because if you
3  think about it, if they go on site and their cage
4  is wrong, they have to do a cage -- a rebuilding
5  of the cage or a rebuilding of the vault --
6       Q.  All right.
7       A.  -- or a change.  So that depends on their
8  contractors and whether they can do it or not,
9  because the --
10      Q.  All right.  So during this time period,
11 the DEA is doing due diligence, fair, with respect
12 to the application, right?
13      A.  Yes.
14      Q.  And the purpose of this due diligence
15 process is to make sure the applicant is qualified
16 to distribute controlled substances, correct?
17      A.  Yes.
18      Q.  And you would agree that the DEA doesn't
19 want people distributing controlled substances
20 that may be a threat to the community, right?
21      A.  Well -- yes.
22      Q.  And you would agree that distributors

1  will not be registered if their registration is
2  inconsistent with the public interest, correct?
3       A.  Well -- yes.
4       Q.  During your time at the DEA from '05 to
5  '15, did you play any part in the registration
6  process?
7       A.  The registration -- we had a whole unit
8  that did registrations.  No.
9       Q.  Were you part of it?
10      A.  I oversaw them.  Like every other section
11 in the Office of Diversion Control, I oversaw
12 them, but we had section chiefs that handled the
13 sections.  So we had a section chief that was
14 over...
15      Q.  Publix was issued its first registration
16 to distribute controlled substances in '05,
17 correct?
18      A.  Yes.
19      Q.  And the DEA registered Publix to
20 distribute class III to class V controlled
21 substances, right?
22      A.  Yes.

Page 254

1    Q.  And I think you answered Albertsons'
2  attorney's question earlier.
3        That registration has to be renewed
4  yearly, correct?
5    A.  Yes.
6    Q.  I'm assuming the DEA doesn't rubber-stamp
7  renewals, correct?  Is that fair?
8    A.  No, they -- they go through -- they make
9  sure that there are no active pending
10  investigations.  They make sure that their state
11  licenses are up to par, that they have the state
12  licenses.
13    Q.  So the DEA does undertake due diligence
14  to determine whether the registrant's registration
15  should be renewed, fair?
16    A.  Yes.
17    Q.  And one of the factors the DEA considers
18  in renewing a registrant's registration is its
19  history of compliance with the Controlled
20  Substances Act and its regulations, fair?
21    A.  Yes.
22    Q.  And during your time at the DEA, did you

Page 255

1  ever play any part in the renewal process, other
2  than overseeing some of the section folks?
3    A.  I just oversaw the section.
4    Q.  All right.  And of course, during your
5  time at the DEA, Publix's registration to
6  distribute controlled substances was always
7  renewed, correct?
8    A.  I don't have the information.  I'm sure
9  it was because, according to the documents I
10  reviewed, they had an active registration.  Yeah.
11    Q.  If a registrant's -- if a
12  distributor's -- if a distributor's registration
13  was not renewed or the recommendation was not to
14  renew it, would that reach to your level?
15    A.  Yes.
16    Q.  All right.  And to your knowledge, did
17  anybody ever -- at the DEA ever recommend to you
18  not to renew Publix's registration?
19    A.  Not that I can recall.
20    Q.  If a registrant wants to -- so we talked
21  earlier about the initial -- the initial signup to
22  be a distributor.

Page 256

1        What about a situation where a registrant
2  wants to expand the class of controlled substances
3  it distributes?  Must it get permission from the
4  DEA to do so?  So in Publix's case, if it -- if it
5  wasn't distributing class II, would it have to get
6  permission to distribute class II?
7    A.  Well, it would have to do a physical
8  alteration of their distribution facility, because
9  class II, those have to go into a vault.  So they
10  would have to basically build a vault.
11    Q.  I know you didn't give a time period of
12  how long the initial registration process lasts.
13        What about when you want to expand to
14  start distributing class II?  Do you have any idea
15  abou8t how long that process typically takes?
16    A.  It depends.  Do they have a vault?  Is
17  the vault built already?  Is it compliant with the
18  CFR?  There's a lot of things to be considered.
19        But, you know, if they have a vault and
20  they built it in compliance with the CFR, it
21  should go fairly quickly.
22    Q.  In deciding whether to permit a

Page 257

1  registrant to distribute schedule II controlled
2  substances, does the DEA consider the registrant's
3  history of compliance with the Controlled
4  Substances Act and its regulations?
5    A.  Yeah, I think that's one of the factors
6  in 823.
7    Q.  Is it more difficult to obtain a
8  registration from the DEA to distribute class II
9  controlled substances?
10    A.  It's not necessarily more difficult.
11  It's just there's -- there's added requirements.
12  Okay?  So is it more difficult?  No.  If a company
13  knows what they need to do to get the vault in
14  place, to make sure the security is in place, and
15  to know what paperwork is done, it should go
16  fairly smoothly.
17    Q.  Were you -- during your time at the DEA,
18  were you involved at all, other than at the
19  overview level, of making decisions about whether
20  to allow a current registrant to expand the type
21  of controlled substances they distribute?
22    A.  Unless there was a problem or there was

65 (Pages 254 - 257)

Page 258

1 an active investigation, generally, I left that to
2 the field to make those decisions on expanding to
3 schedule II or, you know, whatever other schedule
4 they were --
5    Q. When did the DEA approve Publix's ability
6 to distribute class II?
7    A. Well, they started distributing class II
8 in 2016, so probably around that time.
9    Q. The DEA performs routine inspections of
10 registrant distributors, correct?
11    A. Yes.
12    Q. And on average, how often do these take
13 place, these inspections?
14    A. They were generally every four to five
15 years. And somewhere during my tenure, I cut it
16 back to two to three years.
17    Q. Okay.
18    A. And it's back to five years, I think,
19 now.
20    Q. And these inspections occur at the
21 warehouse or the distribution facility, fair?
22    A. Manufacturing, distribution. Yeah.

Page 259

1    Q. And DEA agents perform these inspections?
2    A. Diversion investigators do. Yes.
3    Q. And they're employed by the DEA, fair?
4    A. Yes.
5    Q. And the DEA pays these inspectors?
6    A. Yes.
7    Q. Are these inspectors -- you mentioned
8 earlier that you had received some bonuses from
9 time to time while at the DEA; is that right?
10    A. Uh-huh. Yes.
11    Q. What did you have to do to earn a bonus
12 at the DEA?
13    A. It's on merit. Like -- in 2000- -- I
14 don't know. At one point in time in my career I
15 earned a presidential meritorious service award.
16 That was a bonus. It was based on my work
17 performance in the programs that I was involved in
18 at that point in time.
19    Q. Would that include how much enforcement
20 actions you brought against --
21    A. No.
22    Q. It had nothing to do with -- that wasn't

Page 260

1 part of the decisionmaking process?
2    A. No. The decisionmaking process was they
3 look at all of the SESs throughout the department
4 and then outside of the department, and based on
5 programs and what you're doing and how you're
6 doing it.
7    And I think at that point in time, I was
8 awarded because I was spearheading the
9 methamphetamine initiative, looking at chemicals
10 and things like that.
11    So I think I was granted that -- I was
12 granted that because of my work with
13 methamphetamine labs and how we're addressing
14 them.
15    Q. The inspectors that go out to inspect a
16 distributor or manufacturer, are they at all
17 financially incentivized to find violations? Are
18 they compensated in any way based upon violations
19 they find?
20    A. No. Their -- their compensation or their
21 bonuses -- they don't get bonuses. They get
22 awards. And that's based on their work

Page 261

1 performance, which means -- it has nothing to do
2 with -- it has to do with how they conduct
3 themselves professionally, if they're actually
4 doing investigations that are significant. But, I
5 mean, they're not saying, oh, we got -- we made 50
6 arrests so give me -- that's not how it works.
7    Q. The qualifications of these inspectors,
8 is it your expectation that these inspectors would
9 understand the Controlled Substances Act?
10    A. Well, they have to. They don't have a
11 choice.
12    Q. And that they would be familiar with and
13 understand the regulations with respect to the
14 Controlled Substances Act?
15    A. Yes.
16    Q. Is it the expectations of these
17 inspectors that they know and understand a
18 registrant's duties and obligations under the Act?
19    A. Yes.
20    Q. On average, how often -- how long do
21 these typical inspections last?
22    A. Depends on the size of the distributor or

66 (Pages 258 - 261)

1 the manufacturer.  If you're a small distributor,
2 it could go fairly quickly, maybe three, four,
3 five days.  If you're a large distributor with a
4 huge customer base, it's going to go a lot longer.
5     Q.  And you would agree that the purpose of
6 these inspections is to make sure the registrant
7 is complying with the Controlled Substances Act
8 and its regulations; is that fair?
9     A.  I think the purpose is to ensure that the
10 security provisions are -- the provisions within
11 the Act are being followed.
12     Q.  If the -- is it your expectation that if
13 the inspector identifies any concerns relating to
14 the registrant's operations, then that would be
15 something that would be documented?
16     A.  If there's findings, it's generally
17 documented.  Yes.
18     Q.  Well, was that your expectation, that
19 they would, in fact, be documented if they found
20 anything wrong during their inspection?
21     A.  Well, yeah.  That's what the DEA 6 is
22 for.  So yes.

1     Q.  And that would be -- not necessarily even
2 a violation.  If they had any concerns arising out
3 of their inspection, that those concerns would be
4 documented, not necessarily something rising to
5 the level of a violation.
6        Would you agree with that?
7     A.  Well, it just depends on who's drafting
8 the 6, because I've seen things where they've said
9 we made onsite corrections; they were minor
10 corrections which we made onsite.  That's in the
11 report.
12        Sometimes violations are identified in
13 the report that require more than an onsite
14 inspection.  It just depends, so...
15     Q.  Prior to doing an onsite inspection, that
16 inspector has access to ARCOS data, correct?
17     A.  Yes.
18     Q.  And that data gives the DEA visibility
19 into a distributor's distribution practices, fair?
20     A.  Yes.
21     Q.  That also -- that ARCOS data also gives
22 the DEA visibility into dispensing practices,

1 fair?
2     A.  No.
3     Q.  All right.  That data includes name of a
4 pharmacy?
5     A.  What, the ARCOS data?
6     Q.  Yes, sir.
7     A.  ARCOS data, yeah, name of --
8     Q.  It includes the DEA number associated
9 with that pharmacy?
10     A.  Yes.
11     Q.  Each location that -- that pharmacy
12 location?
13     A.  Yes.
14     Q.  And if you're a chain, you've got
15 multiple locations, in that case, you would have
16 multiple DEA numbers, correct?
17     A.  Yes.
18     Q.  It identifies whether it's a retail or a
19 chain pharmacy; is that right?
20     A.  Yes.
21     Q.  Provides information related to dosage
22 units of opioid drugs shipped to the pharmacy?

1     A.  Yes.
2     Q.  Provides the total weight of the dosage
3 units, fair?  In milligrams.
4     A.  I know where you're going with the total
5 weight, but it's depending on how you're pulling
6 the ARCOS data --
7     Q.  But that's stuff that's available in the
8 ARCOS data, right?
9     A.  Yeah, total weight.  But generally
10 they're looking at dosage units and they're
11 looking at drug strength.
12     Q.  It also includes the MME?
13     A.  It can.
14     Q.  This was all information that was
15 available to the inspector prior to going out to
16 inspect a distribution center, fair?
17     A.  Yeah, but it definitely was not current.
18 So, remember, ARCOS is generally -- could be as
19 much as six months behind.  So if they're doing an
20 inspection today, they're looking at data that's
21 fairly old.
22     Q.  You consider six months old?

Page 266

1    A. Yeah.
2    Q. Okay.  When you were looking at ARCOS
3 data, you were looking at it from, what, 2006 to
4 2014 and then 2014, what, to '19?
5    A. That's -- I was looking at the full
6 range.
7    Q. Right.
8    A. Whatever was provided by SLCG I was
9 looking at.  But remember, when they're going out
10 on inspection, they don't have that realtime data,
11 because ARCOS is always behind.  So you have to --
12    Q. But they still have access to data,
13 right?
14    A. Yeah, they have access to --
15    Q. They have access --
16    A. -- data.
17    Q. -- to the ARCOS data, correct?
18    A. From six months ago, yes.
19    Q. Okay.  So -- but they still have access
20 to it, correct?
21    A. Yes.
22    Q. All right.  The inspector would also have

Page 267

1 access to any suspicious order reports that have
2 been filed by the distributor, too, right?
3    A. If the suspicious order report was filed
4 with that particular office that's doing the
5 inspection, yes.
6    Q. And they would also be aware if no
7 suspicious order reports were filed with that
8 office, right?
9    A. That is correct.
10    Q. And the purpose of these inspections is
11 ultimately to protect the community to prevent the
12 diversion of controlled substances, right?
13    A. It's to identify violations that could
14 create instances of diversion.
15    Q. If the inspector needs additional
16 information from the registrant, the inspector can
17 simply ask for it, right?
18    A. Yes.  During the daily reviews or
19 closeout.  Yes.
20    Q. And are there are consequences if the
21 registrant refuses to provide the inspector
22 additional information?

Page 268

1    A. Are there consequences?  Well, it depends
2 on what information.  Of course there's going to
3 be consequences.  They're going to say, why can't
4 you provide it?
5    Q. The registrant has a duty to cooperate
6 with the inspector, fair?
7    A. Under notice of inspection, yes, they do.
8    Q. And part of that duty to cooperate is if
9 the inspector wants information, the inspector is
10 entitled to that information, correct?
11    A. He's entitled to it if it's part of the
12 recordkeeping or security provisions of the
13 Controlled Substances Act.
14    Q. And so you would agree that there are
15 consequences to the registrant if they don't
16 provide information requested by the inspector,
17 fair?
18    A. Yes.
19    Q. You would agree that there are
20 consequences if the registrant provides inaccurate
21 information to the inspector, fair?
22    A. Yes.

Page 269

1    Q. And you would agree that there are
2 consequences if the registrant provides
3 purposefully false information to the inspector,
4 fair?
5    A. Yes.
6    Q. You would agree -- you mentioned, I
7 think, a DEA form 6 earlier.  Was it a 6 form?  Is
8 that the ROI?
9    A. Yes.
10    Q. You would agree that the inspector,
11 before going out to perform his or her inspection,
12 that they would also have access to prior ROIs, to
13 the extent one was done, fair?
14    A. Yes.
15    Q. And after the inspector completes the
16 inspection, the inspection [sic] would prepare the
17 report, right?
18    A. Yes.
19    Q. And the purpose of this report was to
20 document his or her findings, right?
21    A. Yes.
22    Q. Who -- when this -- and the -- when this

68 (Pages 266 - 269)

1 was drafted up, who had access to this report?

2     A. At -- the cyclical inspection report?

3     Q. Yes, sir.

4     A. The investigators, the groups -- any of

5 the investigators in the office, the group

6 supervisor, all the way up to the SAC.

7     Q. And if you wanted access to it, you could

8 get access to an ROI, correct?

9     A. I'm sure I could. I would just call

10 somebody and say, send me the ROI.

11     Q. But people outside the DEA did not have

12 access to these reports, fair?

13     A. No.

14     Q. These reports were authored not for any

15 audience outside the DEA, fair?

16     A. They're investigative reports. They're

17 for the U.S. attorney, if need be, and DEA.

18 That's it.

19     Q. And again, these reports would document

20 any violations they found with respect to their

21 inspection, correct?

22     A. Yes.

1     Q. If there were any concerns about a report

2 or something covered in a report, would you expect

3 that those violations or concerns would be

4 addressed with the registrant or the appropriate

5 authorities?

6     A. Well, part of the inspection process is

7 to explain what the violations were and what

8 course of action would be taken.

9     Q. Are you aware of the DEA conducting these

10 routine inspections of Publix's distribution

11 warehouse while you were at the DEA?

12     A. Well, any inspection that was done while

13 I was at DEA was done under my supervision. So

14 that's just the way it is. I can't tell you every

15 inspection that was done, because they do quite a

16 few.

17     Q. So if -- your expectation would be if

18 Publix started distributing controlled substances

19 in 2005, that there would certainly be several

20 onsite inspections that would occur during your

21 time period at the DEA.

22     A. They have to do a pre-registrant

1 inspection.

2     Q. No. I'm talking after -- after they

3 start distributing, there would be these onsite

4 inspections that occur, correct?

5     A. The cyclicals? Yes.

6     Q. Yes, sir, that's what I'm --

7     A. Uh-huh.

8     Q. While you were at the DEA from '05 to

9 '15, were you aware of Publix committing any

10 recordkeeping violations?

11     A. Again, unless it came to an order to show

12 cause, I wouldn't see it unless I specifically

13 asked for it.

14     Q. So the question was, during the time

15 period in which you were at the DEA, were you ever

16 aware of Publix committing any recordkeeping

17 violations?

18     MR. MIGLIORI: Asked and answered.

19     Go ahead.

20     THE WITNESS: I don't recall because I

21 wouldn't have seen the recordkeeping violations

22 unless it rose to an order to show cause. And I

1 don't recall any orders to show cause.

2 BY MR. KOHLER:

3     Q. What about with respect to reporting

4 ARCOS data to the DEA? Did Publix commit any

5 violations with respect to that while you were at

6 the DEA?

7     A. Unless it was -- reached the level of

8 order to show cause, I wouldn't know that.

9     Q. What about any physical security

10 violations? Did Publix commit any of those while

11 you were at the DEA?

12     A. Again, unless it rose to the level of an

13 order to show cause, I would not know that. It

14 would be at the special agent in charge --

15 assistant special agent in charge or diversion

16 program manager level.

17     Q. Did you review any of the reports of

18 investigation concerning Publix in preparing your

19 report?

20     A. I believe I did.

21     Q. How many did you review?

22     A. I don't recall.

69 (Pages 270 - 273)

1    Q.  Do you know which one you reviewed?

2    A.  I reviewed at least one, maybe two

3 cyclical.

4    Q.  And what was your purpose of reviewing

5 those one or two --

6    A.  Because I just wanted to see what was in

7 there, what they did and who did it and...

8    Q.  Did anything stand out about what was in

9 those one or two reports you looked at?

10    A.  No.  They were pretty standard reports.

11    Q.  Are you aware of any reports of

12 investigation concerning Publix raising any

13 concerns about Publix's SOM system not complying

14 with the Act or its regulations?

15    A.  No.  As I previously testified, the

16 investigators rely on the company to tell them

17 what they're doing, how they're performing.  They

18 rely on -- they sit down and they say, so explain

19 how your SOM works.  They have to do it that way

20 because they don't have this unbelievable amount

21 of time to go through.  Because to do a SOM

22 appropriately, to inspect a SOM, they would have

1 to be there and watch it work, which means they're

2 going to have to be there to watch a threshold

3 breach or a frequency anomaly or substantial

4 deviation.

5    Q.  And they could do that, right?

6    A.  Only if they're there for a month

7 because --

8    Q.  But they can do that, right?  If they

9 wanted to do that, they could have done that,

10 right?

11    A.  No, they couldn't, because they didn't

12 have the time.  Because these inspectors are going

13 from one inspection, clean it, go to the next

14 one --

15    Q.  But you could have told them, I want --

16 park your rear end in Publix and sit there for as

17 long as it takes and tell me about this SOM

18 system, right?

19        MR. MIGLIORI:  Objection.  Argumentative.

20 BY MR. KOHLER:

21    Q.  You could have done that, right?

22    A.  No, because --

1        MR. MIGLIORI:  Objection.  Argumentative.

2        THE WITNESS:  -- that not an --

3        MR. MIGLIORI:  Stop, stop, stop.  Both of

4 you, give me a chance.  Okay?

5        THE WITNESS:  I apologize.

6        MR. MIGLIORI:  Let's ratchet it down.

7        Objection.  Form.  Argumentative.

8        Go ahead.

9        THE WITNESS:  No, I couldn't.

10 BY MR. KOHLER:

11    Q.  Okay.

12    A.  Because we didn't have that kind of

13 resource allocation.  I --

14    Q.  You could have asked for additional

15 resources, right?

16    A.  I did.  They just weren't available.

17 Congress -- we always ask for additional

18 resources.  We couldn't possibly do what we were

19 doing and add more steps to the inspection process

20 unless we had more people.  And that wasn't

21 available.

22    Q.  The one or two ROIs that you -- what are

1 you referring to?  6 or --

2    A.  DEA 6.

3    Q.  DEA 6?

4    A.  Yeah.

5    Q.  Okay.  The one or two you looked at, did

6 any of them raise any concerns about Publix's SOM

7 system?

8    A.  I don't believe they did.  I mean, that

9 was a while ago.

10    Q.  Do you know Linda Stocum?

11    A.  Slokum [sic]?  I've heard that name.

12 Yes.

13    Q.  Do you know Randy Rine?

14    A.  I've heard that name, too.

15    Q.  What about James Graumlich?

16    A.  No.

17    Q.  Susan Slyker?

18    A.  I know Sue Slyker, yes.

19    Q.  Deborah George?

20    A.  I know Deborah George.

21    Q.  Roshaun McElhenny, M-c-E-l-h-e-n-n-y?

22    A.  No.

Page 278

1   Q. Richard Albert?

2   A. No.

3   Q. What about Susan Langston?

4   A. I know Susan Langston.

5   Q. Do you find Susan Langston credible?

6   A. Yes. Susan Langston worked for me.

7   Q. Do you find her honest?

8   A. Yes.

9   Q. Do you find her well trained?

10  A. Yes.

11  Q. What about the other people? Have you

12  formed any opinions about their trustworthiness or

13  their work ethic, their ability to know the CSA

14  and its regulations?

15      MR. MIGLIORI: Objection to form. Vague.

16  Overly broad.

17      Go ahead.

18      THE WITNESS: The employees that I do

19  know, they're competent employees. Yes.

20  BY MR. KOHLER:

21  Q. Anybody on that list of folks I gave you

22  that you have concerns about their ability to

Page 279

1   carry out their jobs as DEA agents?

2   A. No.

3   Q. In fact, your expectation would be that

4   these folks would know the Controlled Substances

5   Act and its regulations, correct?

6   A. Yes.

7       MR. KOHLER: Do we need to take a break?

8       MR. MIGLIORI: I wouldn't mind a

9   five-minute break.

10      MR. KOHLER: I'm sorry. I didn't

11  realize --

12      THE WITNESS: No, that's all right.

13      MR. KOHLER: We'll take a five-minute

14  break.

15      VIDEO TECHNICIAN: The time is 2:34 p.m.

16  This ends unit 4. We're off the record.

17      (A recess was taken.)

18      VIDEO TECHNICIAN: The time is 2:44 p.m.

19  This begins unit number 5. We're on the record.

20      MR. KOHLER: Thank you.

21  BY MR. KOHLER:

22  Q. Mr. Rannazzisi, we took a short break.

Page 280

1   You're aware you're still under oath, correct?

2   A. Yes, sir.

3   Q. Okay. We talked -- I was using maybe an

4   incorrect word. I was referring to some of these

5   DEA inspectors. Is that their true title? The

6   people that are going out to the distribution

7   centers to perform these inspections, what's their

8   actual title?

9   A. They're diversion investigators.

10  Q. Okay. We talked about ROIs, what you

11  call --

12  A. DEA 6.

13  Q. DEA 6. I'm going to go through some of

14  these. Okay?

15  A. Okay.

16      (Rannazzisi Deposition Exhibit 11 marked

17      for identification and attached to the

18      transcript.)

19  BY MR. KOHLER:

20  Q. I'm going to show you what we marked as

21  Exhibit 11.

22      And you would agree that this is a DEA 6,

Page 281

1   correct?

2   A. Yes.

3   Q. And this is -- this involves Publix. It

4   was prepared in 2008. And this is after it

5   started -- this is kind of their first one after

6   it started distributing controlled substances,

7   fair?

8       MR. MIGLIORI: Objection. Foundation.

9       Go ahead.

10      Are you representing that or is that

11  self-evident?

12      MR. KOHLER: It's from --

13      MR. MIGLIORI: I don't care. I just want

14  the record --

15      MR. KOHLER: It's from September of '08.

16  I think we started in December of 2015.

17      THE WITNESS: '5.

18      MR. KOHLER: I'm sorry, 2005.

19      THE WITNESS: Yeah.

20  BY MR. KOHLER:

21  Q. Do you recall looking at this ROI in

22  preparing your report?

71 (Pages 278 - 281)

Page 282

1  A.  I -- I probably -- yeah, I'm -- every ROI
2  that was -- I looked at.  So...
3  Q.  Do you recall seeing this particular one?
4  A.  I don't recall -- I mean, I looked at the
5  ROIs.  So...
6  Q.  Publix wasn't cited for any recordkeeping
7  or security violations, correct?
8  A.  No.
9  Q.  And the case was closed, correct?
10  A.  Yeah, I -- I guess it was --
11  Q.  Well, it says it on the first page,
12  right?  It says, Since no further action is
13  anticipated, this case is closed, right?
14  A.  Okay.  Yes.
15  Q.  Okay.  If you go to page 15 of the
16  report, subsection (f), it talks about suspicious
17  orders, right?
18  A.  Yes.
19  Q.  So in this situation, you would agree
20  that the DEA is trying to understand how we handle
21  suspicious orders, fair?
22  A.  That's -- yes.  They were -- he -- the

Page 283

1  investigator, the diversion investigator, it
2  appears he asked about their suspicious order
3  system.
4  Q.  All right.  And so -- and this is
5  documented in the -- in this ROI, right?
6  A.  Yes.
7  Q.  And what's -- based upon this
8  description, is that what you understand to be the
9  PIM system?  Is that fair?
10  A.  Publix inventory management system, yeah.
11  Q.  Okay.  And you would agree that there's
12  nothing about this description that at least this
13  inspector wrote in here that gave any pause or
14  concerns about the system, fair?
15  A.  The problem is we don't know exactly what
16  they reviewed.  Did they review the hard copy or
17  did they just take the description of the system
18  from Mr. Bamberger?
19  Q.  Okay.  Regardless of what they reviewed,
20  they didn't note any concerns about Publix's
21  system here, correct?
22  A.  Because, generally, they go with what the

Page 284

1  company says.  So I have no idea what the company
2  told them.
3  Q.  Okay.  But again, my question is, they
4  didn't document any concerns they had with
5  Publix's SOM system in 2008, right?
6  A.  According to this, no.
7  Q.  All right.  Let's go to the -- page 16.
8  It's titled, "Intelligence."  And it says, The
9  investigation disclosed no information concerning
10  street use of legitimately manufactured controlled
11  substances.  The firm sells only to Publix stores,
12  but does not have an excessive order reporting
13  system -- but does have an excessive order
14  reporting system whereby a printout is sent to the
15  Orlando district office for all orders deviating
16  by a certain percentage from normal ordering
17  patterns.
18      Okay?  So when the investigator says this
19  investigation disclosed no information concerning
20  street use of legitimately manufactured controlled
21  substances, what does that mean?
22  A.  I -- I guess they found that there was no

Page 285

1  street use of legitimately manufactured controlled
2  substances --
3  Q.  You would --
4  A.  -- related to Publix.  But --
5  Q.  You would agree that the DEA diversion
6  investigator has found that there's been no
7  diversion of Publix's controlled substances.
8  A.  No.  What this is saying -- remember,
9  they're talking about excessive order reporting
10  now, not suspicious order reporting.  There's a
11  major difference.  An excessive order is not
12  recognized anywhere in the statute of regulations,
13  but a suspicious order is.
14  Q.  Do you see the next -- where it says
15  "indexing" on the bottom of that page?  Do you see
16  where it's redacted?
17  A.  Indexing?  Yes.
18  Q.  Yeah.  What is -- I'm not asking what's
19  here, but what's typically -- what does indexing
20  mean for purposes of this inspection?  What are
21  they documenting there?
22  A.  What they're documenting?  It could be

72 (Pages 282 - 285)

Page 286

1 any number of things.  But who was at the
2 inspection during that point in time, who they
3 were dealing with at the company, you know, who --
4 yeah, I mean, the employees they interviewed,
5 things like that.
6     Q.  All right.  Let's -- I'll show you
7 another ROI.  Okay?
8     A.  Okay.
9        (Rannazzisi Deposition Exhibit 12 marked
10         for identification and attached to the
11         transcript.)
12 BY MR. KOHLER:
13     Q.  Number 12 -- Exhibit 12.  And this is one
14 couple of years later, right?  From 2011, right?
15     A.  Okay.
16     Q.  Don't disagree with that, correct?
17     A.  Yes.
18     Q.  Okay.  This says the onsite investigation
19 took place from August 1 to September 29th of
20 2011.
21        So they were onsite for nearly two full
22 months?

Page 287

1     A.  That could be.  It might have -- they
2 might have done a period of time and then they had
3 to leave and then they took up the investigation
4 after they came -- there's any number of reasons
5 why that happens.
6     Q.  But this certainly suggests to the reader
7 that the investigation took place from August 1 to
8 September 29th, right?
9     A.  Well, that's what it says, but, again, it
10 could be that there was a break in the
11 investigation for some reason and then they came
12 back and finished it.
13     Q.  All right.  Well, you would agree if
14 there was a break in the investigation, maybe they
15 would do an ROI or a DEA 6 form and then, when
16 they picked it back up, they would do together one
17 and then, if they picked it back up again, they
18 would do another one; isn't that typically how
19 they handle it?
20     A.  No.
21     Q.  Okay.
22     A.  Because the investigation is encompassing

Page 288

1 one investigation.  So --
2     Q.  All right.  So -- again, this case was
3 closed out, right?
4     A.  Okay.
5     Q.  When you say "okay," you agree with me,
6 right?
7     A.  Yes.
8     Q.  All right.  No violations found with this
9 investigation, fair?
10     A.  It doesn't appear that there were
11 violations.  Yes.
12     Q.  If you go to page 16 of 20, again, due
13 diligence suspicious orders comes up again during
14 this investigation, right?
15        Subsection (f).  Do you see that,
16 Mr. Rannazzisi?
17     A.  Yes.
18     Q.  All right.  So again, this is -- the --
19 Publix's SOM system is being specifically talked
20 about at this investigation, correct?
21     A.  Yes.
22     Q.  And again, they're describing the PIM

Page 289

1 system.
2     A.  Uh-huh.
3     Q.  Is that right?
4     A.  Yes.
5     Q.  All right.  Let's go to the next one.
6        I'm going to hand you Number 13 --
7     A.  Could I just hold on one second?
8     Q.  Yeah.  Yeah.
9     A.  I just want to read this.
10     Q.  What sparked your interest?  Which
11 paragraph?
12     A.  The next page, 17.  That's -- I'm pretty
13 sure that that's not what happens.
14     Q.  What are you referring to?
15     A.  Is programmed to establish a maximum
16 order quantity based on the store's order history.
17 If a suspicious order is received, it is flagged
18 by the computer system and sent to the manager for
19 review.  The manager contacts the store to
20 ascertain the reason for the order and either
21 approves or denies the order.
22     Q.  You don't believe that's what happens?

73 (Pages 286 - 289)

1   A. No.

2   Q. All right. Did you note that in your

3 report, that there appears to be a discrepancy

4 between what's reported by the DEA diversion

5 investigator and what you found?

6   A. No, because they were not afforded the

7 opportunity to have the documents that I had.

8 They did not have any of your internal memos.

9 They did not have any of your e-mails. They

10 didn't have any of your depositions. They didn't

11 have any of that. All they had was Mr. Bamberger

12 sitting there and telling them, well, this is what

13 our system does.

14   Q. They could have talked to a pharmacist

15 manager, could they not?

16   A. If they were made available.

17   Q. They could have talked to a pharmacist,

18 right? They could have asked for e-mails, right?

19   A. Generally, if they ask for e-mails, they

20 would have to issue a subpoena, and there's no

21 reason to if the person onsite says, this is how

22 we do it --

1   Q. And you would agree that it is a problem

2 if somebody from Publix misrepresents something to

3 the DEA diversion inspector, right?

4   A. Oh, absolutely.

5   Q. That's a big problem, right?

6   A. Yes, it is.

7   Q. And you would agree that that person is

8 motivated to make sure that they're not -- that

9 they're telling the truth, right?

10   A. Well, it would be very difficult for me

11 to understand during -- why a company would not

12 explain exactly what they were doing if asked

13 during an inspection. Yes.

14   (Rannazzisi Deposition Exhibit 13 marked

15   for identification and attached to the

16   transcript.)

17 BY MR. KOHLER:

18   Q. I've handed you what we've marked as --

19 I'm sorry, can you tell me that?

20   A. 13.

21   Q. 13.

22   So let's fast-forward a couple years

1 later. This is now July of 2015, correct?

2   A. Yes.

3   MR. MIGLIORI: Are these all the same

4 facility? Or are these different --

5   MR. KOHLER: We only have one facility.

6   THE WITNESS: Yeah. Well, they have --

7   MR. MIGLIORI: So the answer --

8   THE WITNESS: -- two, but only one was

9 operating during that time period.

10 BY MR. KOHLER:

11   Q. The -- and so here, this was a two-day

12 investigation, right? They noted -- it started on

13 the 14th and ended on the 15th?

14   A. Correct.

15   Q. And it notes here the investigation

16 pending -- this investigation is pending, meaning

17 it's ongoing, right? Pending the receipt of

18 additional information regarding our system to

19 detect and report suspicious orders, to include an

20 outline of the firm's process and the specific

21 person/department responsible for determining

22 suspicious orders, correct?

1   A. Yes.

2   Q. Okay. If you go to page 10 of 15, the

3 diversion investigator here is talking about their

4 findings with respect to our -- our system,

5 correct?

6   A. Yes.

7   Q. If you go to page 15, where it talks

8 about special assignments, it says, This case is

9 currently pending in [sic] the Orlando district

10 office review. And that would be district that

11 Publix would report to, correct?

12   A. Yeah. Can I read this paragraph real

13 quick?

14   Q. Well --

15   MR. MIGLIORI: If you need to read

16 something, you read it. But he's got a question

17 pending, so let him ask the question and then you

18 can take whatever time you need.

19 BY MR. KOHLER:

20   Q. The -- let me back up.

21   Did you review this particular ROI in

22 preparing your report?

74 (Pages 290 - 293)

Page 294

1    A. I believe I did review this one.
2    Q. And so if there's anything remarkable
3  about this ROI, you would have put it in your
4  report, fair?
5       MR. MIGLIORI:  Objection.  It's listed in
6  his reliance materials.
7       THE WITNESS:  Yeah, it's -- I don't
8  recall if there was anything remarkable in it
9  because I used to read these all the time, but --
10 BY MR. KOHLER:
11   Q. But if you're preparing your report --
12   A. Yeah.
13   Q. -- and you're finding something that you
14 believe is materially different than what your
15 investigator -- your diversion investigator is
16 putting, would that not be something you would
17 want to put in your report?
18   A. No, because the investigator was not
19 afforded the information that I was afforded.  He
20 didn't get to look at a deposition.  He didn't get
21 to see what the employees were saying about their
22 system.  He didn't get any internal e-mails.  He

Page 295

1  didn't get any of that.
2    Q. But that's not something you would want
3  to document in your report, that what was being
4  told to the diversion investigator in 2008, 2011,
5  2015 is different than what you found during --
6  with the benefit of all this information that you
7  have now?
8    A. No, because --
9    Q. Okay.
10   A. -- I don't know what the -- what
11 information they obtained.  I don't know -- it
12 doesn't say that Mr. Bamberger gave me a total
13 review of the system.  It doesn't say anything
14 like that.  I can only go factually with what I
15 know.
16   Q. Okay.  Fair.
17   A. And what I know is what was in your
18 documents.
19   Q. Okay.  So I'm going to hand you --
20   A. Can I finish -- I just want to --
21      MR. MIGLIORI:  Take your time.
22

Page 296

1  BY MR. KOHLER:
2    Q. What are you referring to?  What page is
3  that?
4    A. This is page 10, during the inspection.
5    Q. Okay.
6    A. Okay.
7    Q. You would agree that Mr. Hewell advised
8  that he was aware of the DEA requirements
9  regarding the reporting of suspicious orders and
10 confirmed that Publix has not reported any
11 suspicious orders to the DEA, right?
12      You know who Mr. Hewell is, right?
13   A. Of course I do.
14   Q. And so the DEA certainly knows in 2015
15 that Publix hadn't made a single suspicious order
16 report to that office, correct?
17   A. That's right.
18   Q. All right.
19   A. It also says that the firm maintains a
20 history of any and all threshold adjustments to
21 the customer, but there was no document showing
22 that there were threshold --

Page 297

1    Q. Okay.
2    A. I didn't see any documents showing that
3  there was a threshold adjustment.
4       (Rannazzisi Deposition Exhibit 14 marked
5        for identification and attached to the
6        transcript.)
7  BY MR. KOHLER:
8    Q. All right.  I've handed you Exhibit 14.
9  And you would agree this is an ROI three days
10 later, right?
11   A. Okay.
12   Q. You would agree with that, right?
13   A. Yes.
14   Q. All right.  And so, here, it's had the
15 benefit of the records that they requested from
16 Publix, right?  They had asked for -- in the
17 previous ROI they asked for records.  They
18 finished up that ROI.  And then they're now
19 preparing another ROI three days later with the
20 benefit of these additional records, right?
21   A. Okay.  Yes.
22   Q. Yes.  All right.

75 (Pages 294 - 297)

1      And based upon the record -- the
2  additional records that were provided, of the
3  records viewed by the investigators, no
4  recordkeeping violations were discovered;
5  additionally, no security violations were cited,
6  correct?
7      A. That's what it says.  Yes.
8      Q. Okay.  And they closed the case, correct?
9      A. Yes.
10     Q. Let's go to -- let's go to 15.
11        (Rannazzisi Deposition Exhibit 15 marked
12         for identification and attached to the
13         transcript.)
14  BY MR. KOHLER:
15     Q. I've handed you Exhibit 15.  We're going
16  to fast-forward two years to 2017.
17        I guess the big thing that happened here
18  is now we've got our new distribution center,
19  right?
20     A. Yes.  Rocket Court, yeah.
21     Q. And this one is distributing
22  controlled -- schedule II controlled substances,

1  correct?
2      A. Yes.
3      Q. And in fact, on the first page of this,
4  it talks about this is the first in-depth
5  investigation for their new DEA registration,
6  correct?
7      A. Yes.
8      Q. And it says, the onsite inspection took
9  place from March 29th to March 30th, and the
10  follow-up investigation, including verifications,
11  ran through May 15th of 2017, correct?
12     A. Yes.
13     Q. And if you look on the second page, no
14  further action is necessary, and they closed out
15  the file, right?
16     A. Yes.
17     Q. And no violations documented in this
18  either, correct?
19     A. I've got to look and see.
20        I'm trying to see where the review of the
21  SOM is.
22     Q. It's --

1      A. Do you know where it is?
2      Q. Yeah.  It's page 5, paragraph 7.  Do you
3  see it there at the bottom?  Do you see it?
4      A. Yes.  Thank you.  Thank you.
5      Q. And this is describing the e-SupplyLink,
6  right?
7      A. Yeah.  I have no doubt that this is a
8  verbal explanation that they took and reduced to
9  writing.  But again --
10     Q. You're speculating, right?
11     A. No, I'm not --
12     Q. Okay.
13     A. Well, I'm speculating, yes.
14     Q. Okay.
15     A. But during that time period, what they
16  didn't say was that your own employee said that
17  the system is not working.  That's in a memo.  I
18  think it's a Zillgitt memo.
19     Q. Yeah.  And that's based -- did you ever
20  talk to Mr. Zillgitt about that background of
21  that, get that e-mail in context or anything?
22     A. The e-mail was pretty straightforward.

1  The committee decided that the thing was not
2  working.  That was a pretty straightforward
3  statement.  I didn't need to analyze it.  It was a
4  pretty straightforward statement.
5      Q. All right.  On page 6 of this -- the
6  diversion investigator reminded the folks at
7  Publix that DEA does not approve or disapprove of
8  a registrant's system of disclosing suspicious
9  orders.  The firm representatives were advised
10  that the firm's system is required to be effective
11  in reporting suspicious orders to DEA.
12        That's similar language that you used in
13  your, I think, '06 or 07 'letters, right?
14     A. Yes.
15     Q. But you would agree that if they had any
16  concerns or heartburns about our SOM system, they
17  would have noted it in this report, right?
18     A. Well, if they were told, they would.
19     Q. Yeah.
20     A. But if they're not told and they're not
21  afforded information regarding the SOM,
22  particularly internal documents showing that the

76 (Pages 298 - 301)

Page 302

1 SOM is not working or describing that the SOM is
2 not working, I think that that would make its way
3 into the report.
4    Q.  Did -- at any time during -- you would
5 agree that DEA investigators -- DEA diversion
6 investigators did, in fact, investigate some
7 registrants' SOM systems during enforcement
8 actions, fair?
9    A.  Oh, yes, they did.
10    Q.  And so you all absolutely had the tools
11 to investigate registrants' SOM systems in
12 enforcement actions, right?
13    A.  But this is not an enforcement action.
14 This is an inspection.  And there's different --
15 you can't confuse the two.  An enforcement action
16 means that we've already established the
17 violations, now we're going to go in --
18    Q.  Yeah --
19    A.  -- and show --
20    Q.  -- and my point is --
21    A.  This is -- this is --
22       MR. MIGLIORI:  Let him finish.

Page 303

1       THE WITNESS:  -- a cyclical inspection.
2 BY MR. KOHLER:
3    Q.  And my point is that --
4       MR. MIGLIORI:  Let him finish.
5 BY MR. KOHLER:
6    Q.  -- there were never any violations with
7 respect to Publix that gave you concern and which
8 required you to go in and inspect their SOM system
9 from 2005 to 2015, correct?
10    A.  Because the inspectors were talking to
11 the distribution manager, the ops manager, whoever
12 they were talking to, and the ops manager was
13 telling them how -- I mean, they -- they're
14 dressing up their system so it looks good.  But
15 internally, there's -- people are saying the
16 system doesn't work.
17    Q.  Okay.
18    A.  I mean, I think that's something that
19 should have been disclosed to DEA.  And the fact
20 that it wasn't disclosed gives me pause to say
21 what else wasn't disclosed.
22    Q.  We just looked at an ROI in which the DEA

Page 304

1 diversion investigator wanted additional
2 information with respect to the SOM system and
3 held the investigation open to get that
4 information, right?
5    A.  Right.
6    Q.  And that person provided documents that
7 outlined Publix's SOM system, did it not?
8    A.  We have no idea what those documents said
9 because I've never seen those documents --
10    Q.  Well, they were provided to the DEA
11 diversion investigator.
12    A.  That's fine, but I can't comment on
13 something I can't see.  I would have loved to have
14 seen the documents to -- to basically see what
15 they actually said.
16    Q.  Did you ask for any of those in preparing
17 your report?
18    A.  I was only -- the documents I was given
19 out of Relativity is what was related to the SOMs.
20    Q.  Yeah.  You would agree that --
21       MR. MIGLIORI:  Hold on a second.  Hold on
22 a second.  This is the second time it's been said.

Page 305

1 These are documents produced by the DEA and by
2 your company.  You keep asking whether you asked
3 for documents.
4       If you know of documents that exist that
5 you didn't produce --
6       MR. KOHLER:  That's not what I'm saying.
7       MR. MIGLIORI:  Okay.
8 BY MR. KOHLER:
9    Q.  Did -- you would agree that all the
10 non-publicly available stuff that you reviewed to
11 prepare your report was provided to you by the
12 attorneys for Cobb County, correct?
13       MR. MIGLIORI:  Through -- whoa --
14       Go ahead.  Answer the question.
15       MR. KOHLER:  Yeah, there's nothing wrong
16 with the question.
17       MR. MIGLIORI:  Well, there is, because
18 the documents come from you.  Whether we have them
19 or not or whether he gets them from us -- I didn't
20 produce your documents.
21       MR. KOHLER:  Let me rephrase my question.
22

77 (Pages 302 - 305)

Page 306

1 BY MR. KOHLER:
2   Q. Every non-publicly available that you
3 reviewed to prepare your report was given to you
4 by your attorneys, right?
5   A. Yes. They dumped all of the documents
6 that they received into my lap and said, here it
7 is --
8   Q. Okay.
9   A. -- do whatever you've got to do. So...
10   Q. What did I do with Exhibit 4?
11   A. Exhibit 4?
12   Q. That was the one I put out to the side.
13 If you could --
14   A. Hold on. I'll find it.
15     10, 8 -- getting close.
16   Q. It's this right here (indicating).
17   A. Okay. There we go. Okay.
18   Q. Okay. So this has already been
19 identified. This is the report you gave with
20 respect to Publix in the Cobb County case,
21 correct?
22   A. Yes.

Page 307

1   Q. And I want to -- I had similar questions
2 that Albertsons' attorney had as well.
3     To be clear, your opinions are solely
4 related to Publix's role as a distributor, not as
5 a dispenser, fair?
6     MR. MIGLIORI: Objection. The report
7 speaks for itself.
8     Go ahead.
9     THE WITNESS: Well, as I explained
10 previously, my report has instances where I
11 reviewed certain things that go to corresponding
12 responsibility. However, my role in this
13 litigation was to look at the distribution
14 functions. However, there is interplay between
15 distribution and corresponding responsibility.
16 BY MR. KOHLER:
17   Q. You're not going to provide any expert
18 opinions in this case regarding Publix's
19 dispensing practices, correct?
20   A. Just what's in the report.
21   Q. And you're not going to -- and you have
22 not been asked to provide any opinions on Publix's

Page 308

1 dispensing practices or procedures, correct?
2   A. No, it's just what's in the report.
3   Q. When did the attorneys first approach you
4 about providing an opinion in this case?
5   A. Well, it was a month before I actually
6 started receiving documents, which was in 2022, I
7 guess.
8   Q. Your first bill was -- it looked like you
9 had noted September of 2023.
10     When were you first approached about
11 providing --
12   A. 2023, yes.
13   Q. Was it 2023?
14   A. Well, it's -- do you have the bills
15 handy? It would be in the bills.
16   Q. Okay.
17   A. It would be a month before the first time
18 I received it. So on the date to and from in the
19 bill, that first date, it probably would be about
20 three weeks to a month before.
21   Q. All right. Who reached out to you about
22 your willingness to give an opinion in this case?

Page 309

1   A. It would have probably been Mike Elsner.
2   Q. At Motley Rice?
3   A. Yes.
4   Q. Okay. At the time -- it was Elsner,
5 E-l-s-n-e-r?
6   A. Yes.
7   Q. At the time Mr. Elsner approached you
8 about giving a potential opinion in this case, had
9 you already formed any opinions concerning
10 Publix's distribution practices?
11   A. No.
12   Q. Had you formed any opinions concerning
13 Publix on its dispensing practices?
14   A. No, because I had no documents to review.
15 I mean, I -- I review documents, and then I form
16 an opinion. I don't have any preconceived
17 opinions going in.
18   Q. All right. Were you surprised that
19 Publix was a party in this case and that you were
20 being asked to give an opinion?
21   A. Was I surprised they were a party? No.
22 I mean, I --

Page 310

1    Q.  Did that not surprise you?  You'd been
2  investigating Florida intently for all those
3  years.  Never was on your radar.  Your daughter
4  and you go shop at Publix.  Were you, like, wow,
5  this is Publix; you're asking me to render an
6  opinion about Publix?
7        Did that -- you're, like -- that didn't
8  cross your mind at all or anything like that?
9        MR. MIGLIORI:  Objection to form.
10        Go ahead.
11        THE WITNESS:  It really didn't.  You
12  asked me to look at and review policies and
13  procedures relating to a -- SOMs, and I do it.
14  And if I don't find anything, I basically say,
15  there's nothing here.
16  BY MR. KOHLER:
17    Q.  But you've never not found anything,
18  right?
19    A.  Well --
20    Q.  You've never not found a distributor's
21  SOM system that you didn't think was up to par,
22  right?

Page 311

1    A.  Based on the documents, policies and
2  procedures provided by the company through the
3  litigation, no, I have not.
4    Q.  And just to be clear, the invoices I
5  handed you are not the sum total of the invoices,
6  right?  There's additional invoices that reflect
7  what you did, when you did it, and how much time
8  it took you, right?
9    A.  Yeah, there's a log.
10    Q.  All right.
11    A.  It's a log; it's not a --
12    Q.  All right.  As you sit here today, do you
13  have any changes or additions you want to make to
14  that report?
15        MR. MIGLIORI:  Objection.  Overly broad.
16        Go ahead.
17        THE WITNESS:  No.
18  BY MR. KOHLER:
19    Q.  Have you formed any opinions regarding
20  Publix's operations that are not identified in
21  that report?
22    A.  Well, if there are operations not

Page 312

1  identified in the report, I didn't get the
2  documents to see it.
3    Q.  The time period of this report, is it
4  fair to say that's from -- what time period?
5    A.  Well, are you talking about the time
6  period that I drafted the report --
7    Q.  No.  What time period does your opinions
8  cover?
9    A.  December 2005 up to 20-- I guess 2020,
10  when you started OrderInsite.
11    Q.  So in the executive summary, you use
12  similar language in a lot of these reports.  You
13  say period from '06 to '14 and beyond.
14    A.  Yeah.
15    Q.  Why didn't you just say 2006 to 2020?
16    A.  Because the system that was in place,
17  OrderInsite, I never really had the opportunity to
18  look at it because it was just operational at that
19  point in time, and we had no documents related to
20  it other than the brief documents that I got for
21  OrderInsite.
22        I guess I could have said that.  I could

Page 313

1  have said, well, I did a full analysis right up
2  through 2019, because that's when you did
3  e-SupplyLink.  And -- but e-SupplyLink is pretty
4  detailed in my report.
5        So -- and as far as why didn't I say
6  2005?  Because it was December 2005, and I'm not
7  even sure -- I couldn't tell you when they started
8  in December 2005.  So I just said 2006 because --
9    Q.  All right.  In your executive summary you
10  say, For reasons discussed more fully herein,
11  Kroger and Publix each failed to fulfill their
12  obligations by instituting ineffective diversion
13  control programs; therefore -- thereby creating
14  conditions that allowed diversion and the
15  oversupply of opioids in Cobb County.
16        Did I read that correctly?  That's in the
17  summary page there, third paragraph.
18    A.  I believe so.  Hold on, I'm...
19        MR. MIGLIORI:  If you weren't
20  following --
21        THE WITNESS:  Yeah, I have to got to
22  go --

79 (Pages 310 - 313)

1 BY MR. KOHLER:

2    Q.  Oh, I'm sorry.  I thought you were on

3 the --

4    A.  No, I was on --

5    Q.  Go to page 1.

6    A.  I was on the Publix section.

7    Q.  Right around here (indicating).  Start

8 off, For the reasons discussed more fully herein.

9       Do you see that?

10    A.  Yes.

11    Q.  Did I read that correctly, both Kroger

12 and Publix created conditions that allowed the

13 diversion and oversupply of opioids in Cobb

14 County?

15       MR. MIGLIORI:  Objection.  I don't know

16 how he would know whether you read it earlier --

17 the document speaks for itself.  It says what it

18 says.

19       THE WITNESS:  Yeah.

20 BY MR. KOHLER:

21    Q.  What percentage of the diversion and

22 oversupply of opioids in Cobb County did Kroger

1 cause?

2       MR. MIGLIORI:  Objection.  Foundation.

3       Go ahead.

4       THE WITNESS:  I have no idea what their

5 percentage was.

6 BY MR. KOHLER:

7    Q.  Is it 1 percent?

8    A.  Again --

9       MR. MIGLIORI:  Asked and answered.

10       THE WITNESS:  My role was to look at

11 their SOMs.

12 BY MR. KOHLER:

13    Q.  All right.  But you come out here and you

14 state in this executive summary that we both

15 contributed to the oversupply and diversion of

16 opioids in Cobb County.  And I'm just curious, is

17 Kroger more responsible?  Is it less responsible

18 than Publix?

19       MR. MIGLIORI:  Objection.  The document

20 speaks for itself.

21       THE WITNESS:  I think that any

22 distributor that doesn't have an operational SOM

1 system has got a substantial role.  And I can't

2 quantify the substantial role other than they have

3 a substantial role because they don't have a

4 system in place that works.  And if the system is

5 not working, diversion soon follows.

6 BY MR. KOHLER:

7    Q.  All right.  So you can't tell me whether

8 Kroger was more culpable in the diversion and

9 oversupply of opioids or Publix, right?  You can't

10 say that, can you?

11    A.  No.  My role was to look at each

12 individual system and, based on depositions,

13 documents, e-mails, and things that were provided,

14 make a determination if the SOMs were complying

15 with 21 CFR and the Controlled Substances Act.

16    Q.  All right.  Where would I go in

17 Cobb County to find the oversupply of opioids in

18 the county?  Where would I go?  If I wanted to

19 find the oversupply of opioids, where would I go

20 to find it?

21       MR. MIGLIORI:  Objection to form.

22       THE WITNESS:  I'm not following.

1 BY MR. KOHLER:

2    Q.  You say that there's an oversupply of

3 opioids in Cobb County that my client caused.  I

4 live in Cobb County, and I want to go and find

5 them to make sure my kids aren't going around to

6 find these oversupply of opioids.

7       Where would I go?

8    A.  Well, you could go to the distributors

9 and find out how they're --

10    Q.  No, no, I'm saying in Cobb County, where

11 would I go?

12       MR. MIGLIORI:  Don't interrupt him.

13       MR. KOHLER:  But he's not answering my

14 question.  I said in Cobb County --

15       MR. MIGLIORI:  He said three words and

16 you interrupted him again.

17       MR. KOHLER:  He said you go to

18 distributors.  I'm asking --

19       MR. MIGLIORI:  I understand you're

20 passionate about your client.  But ratchet it

21 down.  He's trying to answer your question and

22 you're interrupting him.

80 (Pages 314 - 317)

1      THE WITNESS:  I would go to the
2  distributors to look at who they are distributing
3  to in Cobb County, then go to the pharmacies and
4  see what those pharmacies are --
5  BY MR. KOHLER:
6      Q.  Okay.  Which pharmacy -- which Publix
7  Pharmacy do I need to go to in Cobb County to find
8  the oversupply?
9      A.  I don't know.  I think if you looked at
10  Mr. Catizone's -- Dr. Catizone's report, he kind
11  of outlines what --
12      Q.  I'm asking you.  You said there's an
13  oversupply in Cobb County.
14      A.  Yes.
15      Q.  I need to make sure that my kids don't go
16  to that Publix retail pharmacy and be subject to
17  this oversupply.
18      And you've seen the ARCOS data, right?
19      A.  I've looked at the ARCOS data --
20      MR. MIGLIORI:  Objection.
21      THE WITNESS:  -- in Cobb County, yes.
22

1  BY MR. KOHLER:
2      Q.  For Publix, correct?
3      A.  For everybody.
4      Q.  For Publix, too, right?
5      A.  Yes.
6      Q.  And you've seen all their retail
7  pharmacies in Publix, correct, and in Cobb County,
8  correct?
9      A.  Yes.
10      Q.  Which Publix -- which retail pharmacy do
11  I need to tell my kids to stay away from because
12  there's an oversupply?
13      MR. MIGLIORI:  Objection.  Form.
14  Foundation.  Scope and time.  And calm down.
15      MR. KOHLER:  I'm not --
16      THE WITNESS:  Here's the deal.  You're
17  asking what Publix Pharmacy you should go to.  I
18  don't know.
19  BY MR. KOHLER:
20      Q.  All right.
21      A.  They're your client.  You should ask
22  them.

1      Q.  All right.  Do you know Mr. McCann?
2      A.  I've met Mr. McCann on a couple of
3  occasions.  Yes.
4      Q.  When is the last time you've spoken to
5  Mr. McCann?
6      A.  It's been a long time.
7      Q.  Did you review any part of Mr. McCann's
8  expert report that was given in the Cobb County
9  case?
10      A.  I'm pretty sure I did because that the
11  Cobb County -- all of the Cobb County pharmacies.
12      Q.  What part of his report did you review?
13      A.  I reviewed the appendixes.
14      Q.  And what part of the appendix interested
15  you?
16      A.  Well, I wanted to see what the -- what
17  the -- pharmacy list in the county, how many
18  pharmacies are in the county, what was the range
19  of purchases during that time period.
20      Q.  Did you assist Mr. -- it's Dr., right?
21      A.  It's Dr. McCann.  Yes.
22      Q.  Dr. McCann.  Sorry.

1      Did you assist Dr. McCann in any way
2  preparing his expert report in this case?
3      A.  Absolutely not.
4      Q.  Did you provide any input to Dr. McCann
5  to use on the use of the SOM flagging methods in
6  his report?
7      A.  Absolutely not.  I haven't talked to
8  Dr. McCann since this litigation started in 2017
9  or '18.
10      Q.  Did you analyze the SOM flagging methods
11  used by Dr. McCann in his report?
12      A.  The SOM flagging methods?
13      Q.  Yeah.
14      A.  No, I don't believe I did.
15      Q.  So you didn't make a determination about
16  whether or not the SOM flagging methods he used
17  comply with the Controlled Substances Act or its
18  regulations?
19      A.  No.
20      Q.  Do you intend to offer any testimony in
21  this case regarding whether any of the SOM
22  flagging methods discussed by Dr. McCann satisfies

Page 322

1 the requirements of 1301-74 [sic]?

2    A. I don't believe it's in my report, so no.

3    Q. Having the benefit of having worked at

4 the DEA for 30 years, was there anything that you

5 felt would have been useful in preparing your

6 report that the DEA had that you didn't -- you

7 weren't privy to, that you would say, you know

8 what, I wish I would have had that or had access

9 to that information to help in preparing my

10 report?

11    A. No. I pretty much got everything I

12 needed. The ARCOS data was -- you know, SLCG had

13 the ARCOS data. So no, there was really nothing I

14 needed from --

15    Q. In preparing your report, did you talk to

16 anybody at the DEA?

17    A. No, I don't talk to people at the DEA --

18    Q. Did you --

19    A. -- period.

20    Q. I'm sorry?

21    A. Period. I don't talk to people at DEA,

22 not until this litigation is over. It wouldn't be

Page 323

1 appropriate.

2    Q. What about former people that worked at

3 the DEA? In preparing your report.

4    A. No, not in preparing my report. There's

5 one DEA person who actually reviews and provides,

6 like, editorial comment and makes sure that my

7 cites are correct, does the reliance list, and

8 makes sure that, if I say something, it's clear

9 and it's not confusing. And other than that,

10 there's no one else.

11    Q. Who is that?

12    A. That would be Mimi Paredes.

13    Q. I'm sorry?

14    A. Mimi Paredes.

15    Q. Did she do that with this report?

16    A. She did that with this report.

17    Q. Okay. And did you pay her?

18    A. No. She's separate. She works for

19 Motley Rice as well.

20    Q. Oh, I'm sorry. So she -- she's employed

21 by Motley Rice?

22    A. She's a -- I guess you would consider her

Page 324

1 a contractor of Motley Rice.

2    Q. Did you talk to anybody with the Georgia

3 drugs and narcotics agency to help prepare your

4 report?

5    A. No. I try and avoid talking to anybody

6 when I'm preparing my report. I don't need any

7 external help reviewing documents. So until my

8 report is over and done with and submitted, I

9 don't talk to anybody about my report.

10    Q. But in help preparing your opinions, you

11 didn't go out and talk to anybody to get

12 information? You didn't do any independent

13 investigation? All you did was rely upon the

14 stuff that the attorneys gave you?

15    A. The documents speaks for themselves. The

16 documents --

17    Q. All right.

18    A. -- that I review speak for themselves.

19 No one from the outside of Publix is going to tell

20 me something that's not within those documents,

21 because they're not privy to that information.

22       But when I look at your documents, when I

Page 325

1 look at your depositions and I see what people are

2 saying, that helps me along. But just calling

3 somebody at the Georgia Bureau of Investigation

4 and saying, what do you know about Publix, that's

5 not going to help me.

6    Q. Did you talk to anybody in Cobb County

7 about -- you know, in helping you prepare your

8 report?

9    A. No. I did the normal demographics --

10 look at. I looked at hospital emergency room

11 admissions and things like that. But no, I did

12 not -- I did not talk to anybody there.

13    Q. Did you tell anybody in Cobb County, hey,

14 you know, I believe Publix caused the opioid

15 crisis in Cobb County?

16    A. Again, I've never talked to anybody in

17 Cobb County regarding my report.

18    Q. And other than -- other than what you

19 pulled off of the Wiki page about Cobb County, is

20 that all you really know about Cobb County?

21    A. No, I did more than the Wiki page. Plus,

22 I reviewed certain emergency room data and things

82 (Pages 322 - 325)

Page 326

1 like that.

2    Q.  Did you talk to anybody at Wellstar about

3 that stuff?

4    A.  No.

5    Q.  Did you talk to the chief of police over

6 in Cobb County?

7    A.  No.

8    Q.  What about Marietta -- the City of

9 Marietta chief of police --

10    A.  No.

11    Q.  -- about your conclusions?

12    A.  No, not Marietta or Acworth or any of the

13 others.  But I could tell you that they wouldn't

14 have the information I was looking for because

15 what I was looking for was basic information and

16 detailed information on the SOM program.  And they

17 couldn't provide that.  I'm sure they wouldn't

18 know what that is.

19    Q.  But your opinion is that you believe that

20 Publix caused conditions that may have led to the

21 oversupply of opioids in the county, right?

22        MR. MIGLIORI:  Objection to form.

Page 327

1    Go ahead.

2        THE WITNESS:  Yes.

3 BY MR. KOHLER:

4    Q.  And so you don't believe that the chief

5 of police or the head of Wellstar would be able to

6 comment about, yeah, because of Publix's

7 oversupply, it caused harm to the county?

8    A.  Well, again, that was not my role.

9    Q.  Yeah.

10    A.  And, I mean, the report and the instances

11 in the report that are documented pretty much

12 showed what I -- what my findings are.  So...

13    Q.  Did you analyze any dispensing data for

14 Publix's pharmacy in or outside of Cobb County?

15    A.  No dispensing data -- I didn't analyze

16 any dispensing data.

17    Q.  Did you perform a comparison of any

18 Publix Cobb County pharmacy against any other

19 pharmacies in the county?

20    A.  A comparison as far as what?

21    Q.  Between the Publix Cobb County pharmacies

22 and any other -- like a Kroger or a Walgreens or a

Page 328

1 CVS or --

2    A.  No.

3    Q.  Did you analyze the dosage breakdown at

4 Publix Cobb County pharmacies?

5    A.  I did not.

6    Q.  Did you conduct any store-level analysis

7 of Publix Cobb County pharmacies?

8    A.  No.

9    Q.  Did you review or consider any of

10 Publix's CII Pull reports concerning its

11 Cobb County pharmacies?

12    A.  I don't think I had access to their C2

13 pill reports.

14    Q.  Did you ever perform an analysis of how

15 many chain versus independent pharmacies are in

16 Cobb County?

17    A.  No.

18    Q.  Did you perform any analysis -- are you

19 all right?

20    A.  Yeah.

21    Q.  Did you perform any analysis of the

22 controlled substances ordered versus

Page 329

1 non-controlled substances ordered by Publix

2 Cobb County pharmacies?

3    A.  I was not provided with that information.

4    Q.  So the answer would be, no, you didn't

5 perform that analysis?

6    A.  No.

7    Q.  Did you perform an analysis of the method

8 of payment by Publix's customers at Publix's

9 Cobb County pharmacies when they purchased opioid

10 medication?

11    A.  Again, that information was not provided.

12 So...

13    Q.  You provided an expert report in

14 February of 2020 in the Ohio case, correct?

15    A.  Yes.

16    Q.  And in that report, you concluded that

17 the distributors McKesson, Cardinal,

18 AmerisourceBergen, and H.D. Smith each failed to

19 design and operate SOMs in a manner reasonably

20 calculated to detect suspicious orders, correct?

21    A.  I don't know if that -- I don't even know

22 if that document is unsealed. I can't -- that

83 (Pages 326 - 329)

Page 330

1  document was sealed, and the judge has never given
2  approval for that document to be released.  So if
3  you have that document, I --
4       Q.  Well, is that the opinion you gave --
5           MR. MIGLIORI:  Objection.
6  BY MR. MIGLIORI:
7       Q.  -- in that case?
8           MR. MIGLIORI:  Objection.  Do you need
9  counsel, if you're talking about a privilege?
10          THE WITNESS:  If it -- I don't know.  I'm
11  asking.  It's a sealed document --
12          MR. MIGLIORI:  Well, I don't want you to
13  get in trouble.  My job is just to make sure --
14          THE WITNESS:  It's Judge McConaghy
15  court --
16          MR. KOHLER:  That's fine.
17          THE WITNESS:  In fact, McConaghy sealed
18  that and said, this -- this order -- this is
19  sealed.
20  BY MR. KOHLER:
21       Q.  Are you talking about the report you gave
22  in that case is sealed?

Page 331

1       A.  Yeah.  The judge sealed -- once the
2  settlement was done, the judge sealed the report
3  and said --
4           MR. KOHLER:  Can we take a two-minute
5  break?
6           MR. MIGLIORI:  Yeah, I don't want him to
7  get into --
8           VIDEO TECHNICIAN:  The time is 3:30 p.m.
9  This ends unit 5.  We're off the record.
10          (A recess was taken.)
11          VIDEO TECHNICIAN:  The time is 3:40 p.m.
12  This begins unit number 6.  We're on the record.
13          MR. KOHLER:  Okay.  We will go back on.
14  BY MR. KOHLER:
15       Q.  Thanks for the break, Mr. Rannazzisi.
16  When we broke, I was getting into some questions
17  about the expert opinion you rendered in the State
18  of Ohio case, right?
19       A.  Yes.
20       Q.  Okay.  And there are some concerns about
21  what you can and can't do.
22          MR. KOHLER:  Don, do you want to explain

Page 332

1  that for the record?
2           MR. MIGLIORI:  Yes.  During the break, I
3  learned just from the witness that the witness has
4  been instructed by -- not Motley Rice, but other
5  counsel that's retained him in the Ohio case that
6  he's not to talk about that testimony or that
7  report without express permission from the
8  attorney general's office directly and that the
9  report had been put under seal by the Court.
10          I understand from you all that you've
11  signed a protective order with respect to it, but
12  his concerns are the direct admonitions he
13  received from the attorney general in Ohio, that
14  that enjoys some kind of protection that he's not
15  to violate without express permission.
16          So he's not trying to be obstreperous,
17  but he also doesn't want to step into something
18  he's not authorized to do.
19          MR. KOHLER:  Okay.  So -- I did have some
20  questions about that report, but I don't want you
21  to get in trouble, so I won't ask.  I had an
22  exhibit and some questions about that, so I will

Page 333

1  move on.
2           But I want to -- Don, I want to reserve
3  my right, if need be down the road, to --
4           MR. MIGLIORI:  We'll try to work with you
5  on whatever -- however we have to solve that
6  problem.
7           MR. KOHLER:  Okay.  We'll move on, then.
8  BY MR. KOHLER:
9       Q.  Let's talk -- let's talk about the SOM
10  system.
11      A.  Okay.
12      Q.  While you were at the DEA, you would
13  agree that the DEA did not have any internal
14  guidance as to what is a suspicious order.
15      A.  Well, we used the definition under
16  1301.74(b), and then we sent separate guidance to
17  the industry, distributors, and manufacturers in
18  those three letters in 2006 and 2007.
19      Q.  Okay.  My question was, other than the
20  reg you mentioned, was there any internal guidance
21  at the DEA other than the reg with respect to what
22  is a suspicious order?

84 (Pages 330 - 333)

1    MR. MIGLIORI:  Objection to form.

2    Go ahead.

3    THE WITNESS:  I believe there's a -- in

4 this litigation, there's a training manual cite

5 that discusses the internal -- what is expected of

6 the investigators regarding suspicious orders and

7 what a suspicious order is, yes.

8 BY MR. KOHLER:

9    Q.  I'm sorry, what --

10    A.  There's a training manual.  I --

11 generally they don't release it, but somebody

12 released it, and it was in one of the

13 litigation --

14    Q.  And what is that?

15    A.  -- one of the cases.

16    There's a -- there's a diversion

17 investigative training manual where they discuss

18 SOMs.

19    Q.  Okay.  And would this have been -- do you

20 know when it would first discuss what a suspicious

21 order is?

22    A.  I'm pretty sure it covered that.  Like I

1 said, it's -- I've seen that document before.

2 I've never used it, but I've seen it before.

3    Q.  And would the --

4    A.  In this liti- -- not in this litigation

5 but in previous litigations.

6    Q.  Would the diversion investigators that we

7 talked about earlier, would they have been privy

8 to this diversion inspector training manual?

9    A.  I believe so, yes.

10    Q.  Would you agree that two companies can

11 have different suspicious order monitoring systems

12 but both still comply with the CSA and the regs?

13    A.  Well, yeah.  That's the whole basis of

14 why the department and DEA has said that it's up

15 to the companies to develop their systems, and the

16 DEA does not approve a system.

17    Q.  What different factors do you consider

18 and evaluate in order to determine if it's

19 suspicious in nature?

20    A.  Well, depending on the system you're

21 operating, you look at three things.  You look at

22 whether the system is a -- identifies an order of

1 unusual size, frequency anomaly, or orders that

2 substantially deviate from normal pattern orders.

3 And, you know, depending on what kind of system

4 you operate, there's multiple ways of doing that.

5    Q.  Okay.  So when you -- give me some

6 examples of the first criteria, size.

7    A.  Okay.

8    Q.  Just --

9    A.  Size is based on several -- on several

10 different types of systems.  So the easiest to

11 identify is a threshold-based system.  So unusual

12 size is not just it's the largest -- it's the

13 largest that you've ever seen, because unusual

14 size could also encompass a particular dosage unit

15 that doesn't reach threshold, yet is extremely

16 high.

17    So let's take oxycodone 30-milligram as

18 an example, since we talked about that before.

19 Oxycodone 30-milligram was the most abused opioid

20 in the U.S. between probably 2009 and 2014.  It

21 was definitely the most sought after for abuse.

22    If you're a pharmacy and you had a

1 threshold, we'll say, 5,000 tablets and you are

2 using the base drug code for 5- -- oxycodone.

3 Okay?  And you're using that as your threshold and

4 you set your threshold at 5,000 tablets.  You

5 might never breach that threshold.  You might

6 breach that threshold and it becomes an order of

7 interest and you investigate it.  But you might

8 never breach that threshold.

9    But when you look at the orders, that

10 threshold is not -- 80 percent of that threshold

11 is oxycodone 30, well, that's a problem because

12 that's not -- not normal.

13    So you might have a system that doesn't

14 pick up that because it's a threshold-based

15 system.  And when I talk about inflated

16 thresholds, it might not cover that.

17    And that's where these all work together.

18 It might not be covered in the threshold portion,

19 the unusual size, because it hasn't breached their

20 threshold.  So then you have to look at

21 substantially deviating from a normal pattern.

22 And there's no pharmacy that dispenses 90 percent

Page 338

1  or 80 percent oxy 30 over every other oxycodone
2  product.  That's a substantial deviation.
3       So it's not just the size.  You might be
4  perfectly under threshold, but if you're not
5  looking at substantial deviation to determine how
6  that pharmacy operates on that particular base
7  code, you would never pick up that most of their
8  drug is oxy 30.  And that's how it works.
9       So you breach a threshold, it's an order
10  of interest, you investigate it.  You don't breach
11  a threshold but the order anomaly is because
12  there's a particular high-dose opioid that
13  encompasses most of the drug ordered during that
14  period of time, whatever the threshold period is,
15  then you look at substantial deviation, and that
16  is a substantial deviation.
17       And we've seen pharmacies like that,
18  where they might be under threshold, but their
19  substantial deviation using the oxy 30s over other
20  drugs are just -- it's so glaring that you
21  couldn't possibly miss it.
22       Q.  All right.  Thank you for that

Page 339

1  background.
2       You would agree that the DEA leaves that
3  design and implementation of the SOM system to the
4  registrant, right?  I think you've talked about
5  that.
6       A.  It's in the letter.
7       Q.  Yeah.  The DEA does not tell the
8  distributor what system to use to monitor for
9  suspicious orders, correct?
10       A.  No.
11       Q.  That's not correct or you agree?
12       A.  DEA does not tell the registrant how to
13  monitor for suspicious orders.  It's up to them
14  to --
15       Q.  You would agree a system can be more than
16  just a computer software program, right?
17       A.  Well, I agree it has to be.
18       Q.  Okay.
19       A.  Because you have to have due diligence.
20  Just a system kicking out an order means nothing
21  unless somebody is investigating the order.  So
22  there has got to be a human element to any system.

Page 340

1       Q.  Okay.  You agree that -- okay.
2       Would you agree that a system that
3  compares pharmacies against their peers and
4  against all of a chain's pharmacies to identify
5  outliers can be effective for detecting pharmacies
6  with suspicious ordering patterns?
7       A.  Again, if you're doing all three, yes, it
8  can.
9       Q.  All right.  Would you agree that a system
10  that identifies unusual opioid inventory
11  adjustments can be effective for detecting
12  pharmacies at which diversion may be occurring?
13       A.  Explain --
14       MR. MIGLIORI:  Objection to form.
15       Go ahead.
16       THE WITNESS:  I'm sorry.
17       Explain what you mean by that, an
18  inventory adjustment.
19  BY MR. KOHLER:
20       Q.  Well, if you're doing inventory and you
21  don't have everything on the shelves and you've
22  got more than what you're supposed to have or less

Page 341

1  than what you're supposed to have, and so you make
2  an adjustment.
3       A.  Well, that's --
4       MR. MIGLIORI:  Objection to form.
5       THE WITNESS:  Well, that's auditing, and
6  that should be done on a biannual -- I mean, most
7  pharmacies do it very -- regularly do auditing.
8  But yeah, it should be done.  But there's other
9  things -- when you say inventory adjustment, a lot
10  of people mistake -- and we've discussed this
11  before -- mistake doing a SOM to a loss prevention
12  issue.  And in fact, there are companies that have
13  said, oh, well, we do loss -- we have our loss
14  prevention, monitor the amount of drug coming in
15  and the amount of drug going out.  Well, that's --
16  that's great if you're looking for loss, but it
17  has nothing to do with the SOM.
18  BY MR. KOHLER:
19       Q.  Would you agree that a system that
20  identifies an ever-increasing opioid inventory can
21  be effective for detecting pharmacies at which
22  diversion may be occurring?

86 (Pages 338 - 341)

Page 342

1       MR. MIGLIORI:  Objection to form.
2       THE WITNESS:  Again, you have to explain
3  that.  What are they monitoring exactly?  They're
4  just monitoring the drugs coming into the
5  pharmacy?
6  BY MR. KOHLER:
7       Q.  They're just -- they're ordering -- every
8  30 days they've ordering more than what they did
9  the prior 30 days.
10      A.  And it's being triggered under the SOM?
11      Q.  Yeah.  Is part of a SOM system to detect,
12  you know, a pharmacy making a lot of orders?
13      A.  It can be --
14      MR. MIGLIORI:  Objection to form.
15      Go ahead.
16      THE WITNESS:  It can be if it's being
17  followed up with appropriate due diligence.  Yes.
18  BY MR. KOHLER:
19      Q.  Would you agree that a system that
20  includes review of dispensing trends at a pharmacy
21  and determining whether an ordering threshold
22  should be increased for a pharmacy can be

Page 343

1  effective for detecting pharmacies at which
2  diversion may be occurring?
3       MR. MIGLIORI:  Objection to form.
4       THE WITNESS:  I agree that dispensing
5  data is important during the due diligence
6  process.  So a review of dispensing data and an
7  analysis of dispensing data opens up a whole wide
8  range, broad range of information that you could
9  use to determine if an order is potentially
10  suspicious or suspicious.
11      So yes, I agree with that.
12  BY MR. KOHLER:
13      Q.  If you could turn to page 67 of
14  Exhibit 4.
15      A.  Okay.
16      Q.  First full paragraph, last sentence:  As
17  discussed above, a compliant SOM system should
18  employ analytics, historical data, pharmacy-level
19  dispensing data, and other detailed information
20  from pharmacy personnel to resolve suspicion
21  surrounding a particular order.
22      Did I read that correctly?

Page 344

1       A.  Yes.
2       Q.  Was that ever -- during your time at the
3  DEA, was that ever communicated to registrants,
4  what you said here?
5       A.  I'd have to look at the letters, but I'm
6  pretty sure the letters -- I believe it's in
7  there.  I don't have the letters handy, but I
8  thought they -- that portions of that were in the
9  letter.
10      It was also in the --
11      Q.  Did you --
12      MR. MIGLIORI:  Let him finish.
13      THE WITNESS:  I think it was also in some
14  of the cases that were adjudicated in the
15  administrative courts about what they should be
16  looking for.
17  BY MR. KOHLER:
18      Q.  Other than -- the letters you're
19  referring to are the ones from '06 and '07?
20      A.  Yes.
21      Q.  And you believe that what we just
22  described there was communicated in one of those

Page 345

1  three letters?
2       A.  I'm pretty sure -- it was communicated,
3  yeah.  Plus, when I did the diversion awareness
4  conferences, I talked about it.
5       Q.  Now, the regulations governing SOM has
6  been in place since the early '70s, right?
7       A.  Yes.
8       Q.  And the DEA has never approved a SOM
9  system, correct?
10      A.  That is correct.
11      Q.  And as of today, you've never designed a
12  SOM system, right?
13      A.  No.  I have not designed a...
14      Q.  As of today, you've never been consulted
15  in the design or implementation of a SOM system,
16  correct?
17      A.  No.
18      Q.  Do you have any expertise concerning the
19  technological capabilities of SOM systems between
20  '06 and 2018?
21      A.  When you talk about the technological
22  capabilities, what are we talking about?

87 (Pages 342 - 345)

Page 346

1    Q.  Software, algorithms.
2    A.  No, I'm not a computer guy.
3    Q.  Do you have any expertise concerning the
4 technological limitations of SOM systems between
5 '06 and '18?
6        MR. MIGLIORI:  Objection to form.
7        Go ahead.
8        THE WITNESS:  I wouldn't know that
9 because I don't -- again, I have not been involved
10 in creating a SOM.  So...
11 BY MR. KOHLER:
12    Q.  I'll ask this question.  I suspect I know
13 the answer.
14        Given the advancements in technology,
15 would you agree that a SOM system designed and
16 implemented today could be more effective than one
17 in effect between 2006 and 2019?
18        MR. MIGLIORI:  Objection to form and
19 foundation.
20        Go ahead.
21        THE WITNESS:  I don't know all of the
22 different technical capabilities dating back that

Page 347

1 far, so I couldn't answer that.
2 BY MR. KOHLER:
3    Q.  You know, we talked -- earlier I asked
4 about whether, you know, a SOM system could be
5 more than just a computer software program, that
6 it could be -- involve people, too, right?  And
7 you referenced that, yeah, people need to -- there
8 needs to be a human touch to kind of follow up on
9 what -- but I'm not talking about the due
10 diligence process.  I'm just talking about -- you
11 know, in Publix's case, as a self-distributor,
12 would you agree that its pharmacists and
13 technicians can be part of the SOM system to
14 detect suspicious orders?
15        MR. MIGLIORI:  Objection to form.
16        THE WITNESS:  Well, I don't know how that
17 would be because the pharmacists and the pharmacy
18 technicians are making the orders that are
19 potentially suspicious.
20 BY MR. KOHLER:
21    Q.  Okay.
22    A.  So I don't -- the whole idea is that

Page 348

1 there's got to be a separate unit of people that
2 look at orders and make a determination if that
3 order is a legitimate order or an order that is
4 suspicious and needs to be stopped and reported.
5        So I don't think at the pharmacy level
6 they could tell you -- because they're doing the
7 ordering, so it would be silly for them to order
8 and then say, by the way, this is suspicious.
9    Q.  No, my point is that that person who is
10 doing the order, at Publix, say, the pharmacist
11 who is doing the ordering, based upon their
12 training, their education, and their experience,
13 aren't they part of the SOM system by making a
14 decision about, hey, we've got these scripts that
15 come in, they look suspicious, I'm not placing
16 this order?
17        MR. MIGLIORI:  Objection to form.
18 BY MR. KOHLER:
19    Q.  Aren't -- wouldn't they be kind of part
20 of the SOM system in that case?
21    A.  That would be corresponding
22 responsibility, and that's a separate distinct --

Page 349

1 corresponding responsibility is a check on the
2 doctors.  The distributors' role is a check on the
3 pharmacies.
4        So no, it's separate systems, separate
5 obligations under the law.
6    Q.  Must a SOM system substantially comply
7 with the regs?
8    A.  It's not whether they substantially
9 comply; it's whether the system actually complies
10 with the regs.  It's not substantially comply.
11 That means, well, it might -- if you're only doing
12 one portion of the three requirements, then no.
13 Or two.  You have to do all three.
14    Q.  That wasn't my question.
15    A.  Well, it is, because substantial
16 compliance is that, oh, well, we might not have
17 done this, but we did the other two.  No.
18    Q.  So you would -- does a SOM system have to
19 strictly comply with the regs?
20    A.  Yes.
21        MR. MIGLIORI:  Objection to form.
22        Go ahead.

88 (Pages 346 - 349)

1      THE WITNESS:  Yes.  And the reason is is
2  because if your SOM system is not complying with
3  the regs, there's a good chance of diversion.
4  BY MR. KOHLER:
5      Q.  Must a distribut- -- a registrant or
6  distributor, must they substantially comply with
7  the regs with respect to their physical security
8  systems?
9      MR. MIGLIORI:  Objection.
10      THE WITNESS:  Again, physical security is
11  one of those things where, you know, you should
12  have full compliance.  Must they?  I don't know
13  exactly -- I know substantial compliance is in
14  there, but I'm not sure that it's part of physical
15  security.
16      I know that when you look at substantial
17  compliance, you're looking at, well, 90 percent of
18  the invoices were done -- or 222 forms were done
19  correctly, there were a few that weren't, and
20  that's why you have a letter of admonition or just
21  a verbal warning to maintain it.
22      So you --

1  BY MR. KOHLER:
2      Q.  My --
3      A.  -- substantially complied, but you didn't
4  have full compliance.
5      Q.  Just to be clear, must a distributor or
6  registrant substantially comply with the physical
7  security requirements under the regs?
8      A.  I don't recall what the measure is under
9  the regs for physical security.
10      Q.  Does the -- when you were at the DEA,
11  does the DEA enforce the Controlled Substances Act
12  to the letter of the law?
13      MR. MIGLIORI:  Objection.  Form.
14  Foundation.
15      THE WITNESS:  Yes.
16      MR. MIGLIORI:  Go ahead.
17  BY MR. KOHLER:
18      Q.  Yes?
19      A.  Yes.  Absolutely.
20      Q.  Okay.  If you could turn to page 49,
21  please.
22      A.  49?

1      Q.  Yeah.  Third full paragraph, second line.
2  You say, The absence of formal operational SOM
3  policies, lack of adequate training and guidance,
4  and limited resources and support prevented
5  suspicious orders from being appropriately
6  identified and reviewed and allowed potentially
7  suspicious orders to be shipped to Publix's
8  pharmacies.
9      Did I read that correct?
10      A.  Yes.
11      Q.  You don't state that suspicious orders
12  were actually sent to Publix's pharmacies, do you?
13  You don't contend that, do you?
14      A.  Well, I think -- in my opinion, there
15  were orders that were sent that I would consider
16  suspicious.
17      But the whole idea behind this sentence
18  is -- so I don't remember what -- the fact is that
19  between 2005 and 2012, you had a system where no
20  one looked at a suspicious order.  PIMS was a
21  machine-generated inventory system that cut
22  everything back --

1      Q.  Mr. Rannazzisi --
2      MR. MIGLIORI:  No, no.  Let him finish.
3      MR. KOHLER:  Well, hold on.  He's not
4  answering my question.
5      MR. MIGLIORI:  Then --
6      MR. KOHLER:  He's filibustering --
7      THE WITNESS:  No, I'm not --
8      MR. KOHLER:  -- and I'm not going to
9  tolerate that.
10      MR. MIGLIORI:  No, no --
11      MR. KOHLER:  The question was simple --
12      MR. MIGLIORI:  Stop.
13      MR. KOHLER:  The question was
14  straightforward.
15      MR. MIGLIORI:  Answer the question the
16  way you want to answer the question,
17  Mr. Rannazzisi.
18      Just because you don't like the answer
19  doesn't --
20      THE WITNESS:  Repeat the question.
21      MR. MIGLIORI:  -- mean it's
22  filibustering.

89 (Pages 350 - 353)

Page 354

1 BY MR. KOHLER:
2     Q. Did you provide a single example in your
3 report where a suspicious order was actually sent
4 to a Publix pharmacy?
5     A. I listed in my report orders that were
6 deemed over threshold, which means they're orders
7 of interest.  And they were basically approved
8 with no due diligence done.
9     Q. Tell me one order --
10     MR. MIGLIORI:  Are you finished?  Are you
11 finished?
12 BY MR. KOHLER:
13     Q. Tell me one order that was sent to a Cobb
14 County Publix pharmacy --
15     MR. MIGLIORI:  I'm asking -- I'm asking
16 my expert a question.  At least let me get an
17 answer.
18     Were you finished with your question
19 [sic].
20     THE WITNESS:  Yes.
21     I'm going to -- so you want an example of
22 an order -- this is an ANDA --

Page 355

1 BY MR. KOHLER:
2     Q. Which page are you referring to?
3     A. Page 60.  This is ANDA requesting --
4     Q. The question was to a Cobb County
5 pharmacy.
6     A. Okay.  Let me look and see what we have
7 for Cobb County.
8     Okay.  Here is oxycodone 10/325s.  They
9 ask for --
10     Q. I'm sorry, which page are you referring
11 to?
12     A. Page 61.
13     Q. Okay.  So in all your analysis, the only
14 three examples you provided for Cobb County were
15 on page 61, correct?
16     A. Well, yeah, I believe so, because that's
17 what was given to me.  I don't know if there were
18 others --
19     Q. Okay.
20     A. -- out there, but that's what --
21     Q. So the only three examples that you can
22 provide that, in your mind, a suspicious order was

Page 356

1 sent to a Cobb County pharmacy were the three that
2 are identified on page 61, correct?
3     MR. MIGLIORI:  Objection.  Asked and
4 answered.
5     THE WITNESS:  Yeah.  But the three that
6 were --
7 BY MR. KOHLER:
8     Q. But you would agree that --
9     MR. MIGLIORI:  But the three that were...
10     Continue.
11     THE WITNESS:  The three examples are
12 pretty serious examples.  I mean --
13 BY MR. KOHLER:
14     Q. Okay.  The question was, do you have an
15 example of where the order was shipped to a
16 Cobb County pharmacy?  You don't know if those
17 orders were shipped to a Cobb County pharmacy, do
18 you?
19     MR. MIGLIORI:  So that wasn't the
20 question, so now --
21     MR. KOHLER:  It was.
22     MR. MIGLIORI:  -- you've got a new

Page 357

1 question.
2     THE WITNESS:  The request was
3 submitted -- I have no reason to believe that
4 these were not submitted --
5 BY MR. KOHLER:
6     Q. No, no, that wasn't my question.
7     A. Well --
8     Q. My question was --
9     MR. MIGLIORI:  You don't get to stop him
10 when you don't like the answer if he's still
11 talking.
12     MR. KOHLER:  He's not answering --
13     MR. MIGLIORI:  Just be kind --
14     MR. KOHLER:  He's not answering the
15 question.
16     MR. MIGLIORI:  I'll give you an extra
17 three minutes if you feel that he's filibustering
18 for three minutes.
19     MR. KOHLER:  Well, whatever.  I'll take
20 it.  Thank you.
21     MR. MIGLIORI:  Okay?  I'll keep the clock
22 for the filibuster.

90 (Pages 354 - 357)

1     MR. KOHLER:  Thank you.

2     MR. MIGLIORI:  Just be courteous.

3     THE WITNESS:  Based on the documents I

4 read, I had no reason to believe that those were

5 not sent.  Do I know for sure if they were sent?

6 No.  But the documents --

7 BY MR. KOHLER:

8     Q.  You --

9     A.  -- didn't really offer a really good

10 description of what exactly happened.

11    Q.  In your first example, you were

12 incredulous about the explanation for the need of

13 the order, but you note there was no document that

14 reflected an adjudication of this request, meaning

15 you don't know if it was sent or not, right?

16    A.  That's correct.  On that one.  Yes.

17    Q.  And the same for the next one, right?

18 There was no document provided that reflected an

19 adjudication of this request, correct?

20    A.  That's correct.

21    Q.  And the same for the third one.  There

22 was no document provided that reflected an

1 adjudication of this request, correct?

2     So again, my original question --

3     MR. MIGLIORI:  Did you answer the third

4 one?  I didn't hear it.

5     MR. KOHLER:  I'm sorry.

6     THE WITNESS:  I'm reading -- I'm reading

7 the document.

8     Okay.  So yes, there was no -- but then,

9 again -- I'm just trying to -- 2015 time frame.

10 You were -- at that point in time, they were

11 operating under the enhanced PIMS, so you were

12 actually using a threshold, and those were bounced

13 for the threshold.  It wasn't just the PIMS where

14 there was an MOQ.  It was operating under the

15 enhanced PIMS where there's a threshold.

16    So I don't know, but they definitely

17 bounced off the threshold.

18 BY MR. KOHLER:

19    Q.  Okay.

20    A.  So...

21    Q.  So going back to my original question,

22 with the benefit of looking at page 60 and 61.

1     The question was, can you provide me a

2 single example of Publix shipping a suspicious

3 order to a Cobb County pharmacy?

4     You can't do that, can you?

5     A.  Based on the documents I received, what I

6 can tell you is these were in there, and I -- I

7 don't know whether they were sent or not.

8     Q.  Okay.  Thank you.

9     Let's go to -- back to page 49,

10 Mr. Rannazzisi.

11    A.  Page 49?

12    Q.  Yes, sir.

13    A.  Okay.

14    Q.  Final sentence of the final paragraph.

15 It says, As discussed later in this report, PIMS

16 was quantity/volume based, functioned as nothing

17 more than an inventory control system, could be

18 easily circumvented, and failed to identify orders

19 that were of unusual size or frequency or deviated

20 substantially from a normal pattern.

21    Did I read that correctly?

22    A.  Yes.

1     Q.  Go on to page 50, final paragraph.  It

2 looks like it's the third sentence.  It says, If

3 the pharmacist is not vigilant -- do you see that?

4     A.  Yes.

5     Q.  -- when performing this required process

6 and instead continues to fill prescriptions with

7 red flags, more drug seekers will come to the

8 pharmacy seeking to have illegitimate

9 prescriptions filled.

10    Can you provide me a single example in

11 which that happened at any Cobb County Publix

12 pharmacy?

13    A.  In Cobb County?

14    Q.  Yes, sir.

15    A.  No, but it is -- that is consistent with

16 all the other diversion cases that I've done and

17 been involved with, that once the pharmacist does

18 not do corresponding responsibility appropriately,

19 he's going to have an increase in foot traffic

20 with prescriptions.  It's just -- it's a natural

21 occurrence.

22    Q.  But again, I'm asking for a specific

91 (Pages 358 - 361)

Page 362

1 example of that actually happening in Cobb County.
2     You can't give that to me with respect to
3 Publix, can you?
4     A. I can't give it to you, but I think that
5 was addressed in Catizone's report.
6     Q. If you could go to page 51. We'll start
7 at the bottom there.
8     A. Okay.
9     Q. The PIMS SMQ process could be easily
10 circumvented.
11     Do you see that?
12     A. Yes.
13     Q. And then you go on to explain how it
14 could be circumvented, correct?
15     A. Yes.
16     Q. And the question is, can you provide me a
17 single -- an example where this actually -- this
18 circumvision [sic] happened in a Publix
19 Cobb County pharmacy?
20     A. Again, my role was to review the SOM
21 system and show where the holes in the system
22 were, if there were any. And in this case, that's

Page 363

1 a major hole.
2     And no, I can't tell you if that
3 happened. But when the SOM system is based on a
4 particular item or NDC, you could always go around
5 it because there's always another item with a
6 different item number or different NDC that's the
7 same dose and strength in drug class of that
8 particular -- so it happens. We've seen it
9 happen.
10     Q. You've seen it happen, but you can't
11 provide me a single time in Cobb County -- a
12 Publix Cobb County pharmacy in which this example
13 you give on 51 and 52 happened, correct?
14     MR. MIGLIORI: Objection. Foundation.
15     THE WITNESS: Again, I've never seen
16 dispensing data from Cobb County, so I couldn't
17 tell you. Or ordering data.
18 BY MR. KOHLER:
19     Q. Your report doesn't identify a suspicious
20 order from a Cobb County Publix pharmacy, does it?
21     A. Not from a Cobb County pharmacy, no.
22     Q. Your report doesn't provide an actual

Page 364

1 example of Publix filling or shipping a suspicious
2 order from a Cobb County Publix pharmacy that it
3 shouldn't have filled or shipped, does it?
4     A. No, because Publix never filed any
5 suspicious orders until 2018.
6     Q. Your report doesn't provide an actual
7 example of a Cobb County Publix pharmacist
8 dispensing opioids he or she should not have
9 dispensed, does it?
10     MR. MIGLIORI: Objection to foundation.
11 Wrong expert.
12     Go ahead.
13     THE WITNESS: Could you ask the question
14 again.
15 BY MR. KOHLER:
16     Q. Your report doesn't provide an actual
17 example of a Cobb County Publix pharmacist
18 dispensing opioids he or she should not have
19 dispensed, does it?
20     MR. MIGLIORI: Same objection.
21     THE WITNESS: No, that wasn't my role.
22

Page 365

1 BY MR. KOHLER:
2     Q. Your report doesn't provide an example of
3 somebody in Cobb County receiving opioid
4 medication from a Cobb County Publix pharmacist
5 that he or she should not have received, does it?
6     MR. MIGLIORI: Same objection.
7     THE WITNESS: Again, that's not my role.
8 BY MR. KOHLER:
9     Q. I understand it's not your role, but your
10 report doesn't --
11     A. No.
12     Q. All right. Your report doesn't provide
13 an example of somebody in Cobb County receiving
14 opioid medication from a Cobb County Publix
15 pharmacist that he or she should not have received
16 and becoming addicted to opioids, does it?
17     MR. MIGLIORI: Objection. Same
18 objection. Foundation.
19     THE WITNESS: No.
20 BY MR. KOHLER:
21     Q. Your report doesn't provide an example of
22 somebody in Cobb County receiving opioid

92 (Pages 362 - 365)

1 medication from a Cobb County Publix pharmacist
2 that he or she should not have received and
3 overdosing on the opioid medication, does it?
4    MR. MIGLIORI: Objection to foundation.
5    THE WITNESS: No.
6 BY MR. KOHLER:
7    Q. Your report doesn't provide an example of
8 somebody in Cobb County receiving opioid
9 medication from a Cobb County Publix pharmacist
10 that he or she should not have received and dying
11 from taking the opioid medication, does it?
12    MR. MIGLIORI: Same objection.
13    THE WITNESS: No.
14 BY MR. KOHLER:
15    Q. Your report doesn't provide an example of
16 somebody in Cobb County receiving opioid
17 medication from a Cobb County Publix pharmacist
18 they should not have received and Cobb County
19 having to incur any cost in treating the person
20 who received the opioid medication, does it?
21    MR. MIGLIORI: Same objection.
22    THE WITNESS: No. My report centered on

1 SOMs.
2 BY MR. KOHLER:
3    Q. Okay. During the time period of your
4 report -- so that would be 2006 to '19 or '20?
5    A. '20.
6    Q. Okay.
7    A. Because I mentioned OI, OrderInsite.
8    Q. Do you remember when that went into
9 effect?
10    A. '20. It started in -- actually, it was
11 two years after they said that the other one
12 wasn't working. So probably '19, I guess.
13    Q. Okay. During the time period of your
14 report --
15    A. Uh-huh.
16    Q. -- what was Publix's percentage of
17 distribution of opioids compared to the national
18 average?
19    A. I don't know.
20    Q. What was Publix's -- during the time
21 period of your report, what was Publix's
22 percentage of distribution of opioids compared to

1 the State of Georgia average?
2    MR. MIGLIORI: Objection to foundation.
3    THE WITNESS: I don't know.
4 BY MR. KOHLER:
5    Q. During the time period of your report,
6 what was Publix's percentage of distribution of
7 opioids compared to the Cobb County average?
8    MR. MIGLIORI: Same objection.
9    THE WITNESS: That, I don't know.
10 BY MR. KOHLER:
11    Q. What was Publix's percentage of
12 dispensing of opioids compared to the national
13 average during the time period of your report?
14    MR. MIGLIORI: Objection to foundation.
15    THE WITNESS: Again, I don't know.
16 BY MR. KOHLER:
17    Q. What was Publix's percentage of
18 dispensing of opioids compared to the State of
19 Georgia average during the time period of your
20 report?
21    MR. MIGLIORI: Objection. Foundation.
22    THE WITNESS: I don't know.

1 BY MR. KOHLER:
2    Q. And what was Publix's percentage of
3 dispensing of opioids compared to the Cobb County
4 average during the time period of your report?
5    MR. MIGLIORI: Objection. Foundation.
6    THE WITNESS: I don't know.
7 BY MR. KOHLER:
8    Q. You mentioned Mr. Catizone, correct?
9    A. Yes.
10    Q. Is he Dr. or goes by Mr.? Is he --
11    A. I believe he's got the title of doctor.
12    Q. Okay. In your report, similar to the one
13 that Albertsons' counsel pointed out earlier, you
14 referenced on page 77 that you reviewed
15 Dr. Catizone's report, correct?
16    A. Yes, I did.
17    Q. And similar to the language you used in
18 Albertsons -- in Albertsons' report, you said, I
19 reviewed a draft of the expert report of Carmen
20 Catizone.
21    Do you see that there?
22    A. Yes.

1    Q.  So which draft of his expert report did
2  you review?
3    A.  It says draft, but I reviewed the report
4  that they did -- he did for Cobb County.
5    Q.  So it was his final signed report?
6    A.  Yes.
7    Q.  I believe part of that report identifies
8  certain red flags that must be resolved before the
9  pharmacist dispenses an opioid medication; is that
10 right?
11   A.  Yes.
12   Q.  Did you independently review the red flag
13 data that Dr. Catizone relies on?
14   A.  No.
15   Q.  Do you intend to offer any opinions in
16 this case about red flags?
17   A.  Just what's in my report.
18   Q.  Okay.  Are you familiar with the DEA
19 pharmacist's manual?
20   A.  Yes.
21   Q.  And can you briefly tell me what that is?
22   A.  The pharmacist's manual basically is

1  provided to pharmacists so they understand what
2  their legal obligations are, what rules,
3  regulations, and laws they're required to comply
4  with under the Controlled Substances Act, the
5  implementing regulations.  And it's used part and
6  parcel with the state regulations.
7    Q.  Were you at all involved in the
8  preparation or editing or review or approval of
9  that manual?
10   A.  I think I signed one of those manuals.
11 Yes.
12   Q.  And how -- how often was that updated
13 during your tenure at the -- as head of diversion
14 control?
15   A.  I don't remember exactly.  I think it was
16 updated two or three times.
17   Q.  And did you provide any input -- I know
18 you said you signed it, but did you actually
19 provide substantive input --
20   A.  Oh, I read the manual, yeah.
21   Q.  I'm sorry?
22   A.  I've read the manual.

1    Q.  Did you author any of the content or have
2  any -- did you ask that anything be included in
3  that?  Were you part of that process?
4    A.  That goes through a review committee, and
5  the decisions are final based on what the review
6  committee does.
7    Q.  Were you on that review committee?
8    A.  No.
9    Q.  Was there -- at any point in time, had
10 you read that pharmacist's manual and made some
11 recommendations of things that should be included
12 in there with respect to SOM systems?
13   A.  That would, again, review committee, and
14 if I'm not mistaken, the Department of Justice
15 would look at it, too.
16     I never -- I read the manual to ensure
17 that everything was correct.  I read it as a
18 pharmacist.
19     And so -- but the manual goes through the
20 review committee, so I don't know exactly what
21 corrections were made.  They didn't make
22 corrections that I had issues with, so -- or I

1  wouldn't have signed it.
2    Q.  If you could turn to page 18, please.
3    A.  18?
4    Q.  Yes, sir.
5      Last sentence of the last paragraph.
6    A.  Yes.
7    Q.  It says, My summary of each defendant's
8  programs highlights deficiencies I found during my
9  review.  However, the emphasis on one or more
10 deficiencies is not intended to be exhaustive of
11 the deficiencies found.
12     Did I read that correctly?
13   A.  Yes.
14   Q.  Were there any other deficiencies that
15 you found that are not in this report?
16   A.  The reason I put that in there is because
17 there are documents that might have fleshed out
18 some things, but there were no documents available
19 that discuss it.
20   Q.  So all the deficiencies that you can
21 comment on are in the four corners of this report?
22   A.  Well, there's -- yeah, and there's quite

Page 374

1 a few.  So...
2      Q.  Okay.  If you can go to page 55, please.
3 Do you see where it says, "Reporting suspicious
4 orders"?
5      A.  Yes.
6      Q.  Final sentence:  The files should be
7 retained for all customers indefinitely and should
8 be accessible to all employees who perform due
9 diligence.
10      Did I read that correctly?
11      A.  That is correct.
12      Q.  And to be clear, you believe a suspicious
13 order from, say -- do you know where store number
14 33 is in Cobb County?
15      A.  No.
16      Q.  All right.  It's over in East Cobb off of
17 Sandy Plains and Shallowford Road.
18      A.  Okay.
19      Q.  Is it your testimony that a suspicious
20 order from store number 33 in East Cobb in 1995
21 should still be maintained today, nearly 30 years
22 later?

Page 375

1      A.  I don't know if Publix was doing
2 suspicious orders back in 1995.  However, what I
3 do know is that the a due diligence file should
4 have a historical perspective of all of their
5 orders, whether deemed suspicious or not.  And the
6 reason is is because that establishes a foundation
7 for due diligence.
8      Q.  So to be clear, any due diligence that
9 was done with respect to an order from store
10 number 33 nearly 30 years ago, Publix should still
11 have, in your opinion?
12      MR. MIGLIORI:  Objection.  Asked and
13 answered.
14      THE WITNESS:  Yeah, I don't see why they
15 wouldn't if they're performing due diligence
16 appropriately.
17 BY MR. KOHLER:
18      Q.  Assuming this store is around in the next
19 30 years, do you think it should still have due
20 diligence files from the mid-'90s?
21      A.  I think that the company should make a
22 determination of how extensive they want their due

Page 376

1 diligence files to be.  But as we've said before,
2 the due diligence files don't take up a massive
3 amount of paperwork.  In fact, a historical
4 perspective of the orders that were deemed
5 suspicious and the reason they were deemed
6 suspicious should take up very little space on any
7 type of drive.  But it pays off dearly because if
8 that store is showing a pattern again, you want to
9 know why it was suspicious back in 1995 and if it
10 follows -- if the orders that are now being deemed
11 suspicious follow that same pattern they did in
12 1995.  It's a basis of foundation that's
13 necessary.
14      Q.  So as long as store number 33 is
15 operating, any due diligence stuff related to
16 store 33 should be held, as you say, indefinitely?
17      A.  That's up to the company but --
18      Q.  No, that's what you said, right?
19      MR. MIGLIORI:  No, no --
20      THE WITNESS:  -- in my opinion --
21      MR. MIGLIORI:  That's not what he said.
22      THE WITNESS:  In my opinion, yes, it

Page 377

1 should be.
2 BY MR. KOHLER:
3      Q.  If you could turn to page 63, please.  Do
4 you see the second paragraph under the "due
5 diligence" header?
6      A.  Yes.
7      Q.  You reference a compliance team memo from
8 November 10th of 2015, correct?
9      A.  Yes.
10      Q.  Did that involve pharmacies located in
11 Cobb County?
12      A.  That, I don't remember.
13      Q.  All right.  If you go to page 64.  The
14 second full paragraph that starts with "Note that
15 period 2."
16      A.  Yeah.
17      Q.  You reference a fourth -- a 2015
18 fourth-quarter compliance memo.
19      Do you see that?
20      A.  Yes.
21      Q.  Did that deal with pharmacies located in
22 Cobb County?

95 (Pages 374 - 377)

Page 378

1    A. I just need to read that paragraph.
2    Q. Yeah, go ahead.
3    A. It doesn't say if it was in Cobb County
4 or not.
5    Q. What did the DEA do with suspicious order
6 reports concerning pharmacies in Cobb County
7 between 2005 and '15?
8    A. I'm not allowed to discuss that. That's
9 one of the things -- it's called investigative
10 process, and they won't allow me to discuss that.
11 I haven't talked about that in any of the
12 depositions.
13    Q. Is that because of Touhy stuff or
14 something else?
15    A. It's called Touhy. It's called
16 investigative process, and they won't let me talk
17 about investigative process.
18    Q. If Publix had an effective SOM system
19 that complied with the acts and regulations, would
20 that have stopped the diversion of all opioids in
21 Cobb County?
22       MR. MIGLIORI: Objection. Foundation.

Page 379

1 Vague.
2       THE WITNESS: Would it stop the
3 diversion? I don't know if it would stop the
4 diversion, but it would definitely put a -- you
5 know, taking your portion of the diversion and
6 decreasing the amount of diversion if they had a
7 SOM program that worked.
8 BY MR. KOHLER:
9    Q. And what percentage of diverted opioids
10 would it have stopped?
11       MR. MIGLIORI: Objection. Form.
12 Foundation.
13       THE WITNESS: That, I couldn't tell.
14       MR. MIGLIORI: Improper hypothetical.
15 BY MR. KOHLER:
16    Q. You would agree that the purpose of the
17 SOM system is to prevent the diversion of
18 controlled substances, including opioids, correct?
19    A. The purpose of the SOM system is to
20 identify suspicious orders so to prevent
21 diversion. Yes.
22    Q. And that diversion primarily occurs at

Page 380

1 the pharmacy level, correct?
2    A. I would say, yes, it does occur at the
3 pharmacy level.
4    Q. Part of what you reviewed in preparing
5 your report was the complaint that was filed
6 against Publix; is that fair?
7    A. Yes.
8    Q. You understand that one of the theory of
9 recovery against Publix is that it's a public
10 nuisance in Cobb County.
11       Do you understand that?
12    A. That's correct.
13    Q. What's the public nuisance in
14 Cobb County?
15    A. The public nuisance --
16       MR. MIGLIORI: Objection to form. Legal
17 conclusion.
18       Go ahead.
19       THE WITNESS: The public nuisance is
20 allowing -- because there is no SOM, without the
21 SOM, you open the door to large-scale diversion,
22 potential large-scale diversion. And not

Page 381

1 operating with a SOM is a contributing factor, a
2 substantial contributing factor, in diversion.
3 BY MR. KOHLER:
4    Q. So what is the public nuisance in
5 Cobb County?
6    A. Well, if you're not operating a SOM and
7 the drugs are leaving your pharmacies that are
8 distributed downstream from your distributors and
9 they're getting into the hands of people who are
10 not supposed to have them because they're
11 operating with prescriptions that are not for a
12 legitimate medical purpose, people get harmed.
13 That's the nuisance. When people get harmed, when
14 people become addicted, people die. That becomes
15 a serious issue, and that is a nuisance.
16    Q. So you would agree that addiction is a
17 harm caused by diversion of opioids in
18 Cobb County?
19    A. Not only addiction --
20       MR. MIGLIORI: Objection. Go ahead.
21       THE WITNESS: It's not just addiction.
22 Overdose and death. We're not dealing with car

96 (Pages 378 - 381)

Page 382

1 parts here.  One drug -- one drug taken in an
2 inappropriate manner could kill you.  One dosage
3 unit.  And that's what we have to realize.  It's
4 not a question of -- it's not a question of
5 multiple, multiple drugs.  One dosage, one pill,
6 could hurt you.
7 BY MR. KOHLER:
8     Q.  Can you -- can you go to page 10 of your
9 report?
10    A.  Yes.
11    Q.  You say here under -- do you see where it
12 says, Responsibility of registrants?
13    A.  Yes.
14    Q.  The United States has been in an opioid
15 crisis for more than two decades, and attention is
16 rightfully focused on how the healthcare delivery
17 system will do its part to abate the addiction,
18 overdose, and deaths that have suffered [sic].
19        What do you mean by abate in that
20 context?
21    A.  Stop.  Slow down.
22    Q.  In your report, do you cite to any study

Page 383

1 or analysis about how much a bonus would need to
2 be to impact a pharmacist's clinical judgment?
3     A.  I'm sorry.  Are you asking me if --
4     Q.  Yeah.
5     A.  -- there's somewhere in here that says
6 this amount of bonus will alter the clinical
7 judgment of a pharmacist?
8     Q.  Yes.
9     A.  I don't know.  I guess it depends on the
10 pharmacist and what they're doing.
11    Q.  Are you aware of any such studies?
12    A.  No, but I don't think there would be
13 studies because every person has got their -- I
14 guess their own level of need.
15    Q.  Financial need?
16    A.  Yeah.
17    Q.  And when you retired from the DEA, you
18 weren't in a position not to continue working,
19 correct?
20    A.  No, I had to work.
21    Q.  You had to put your kids through college?
22    A.  Yes, sir.

Page 384

1     MR. KOHLER:  All right.  Don, may I take
2 a break, look at my notes, talk to Kara?
3     MR. MIGLIORI:  Yes.
4     VIDEO TECHNICIAN:  The time is 4:30 p.m.
5 We're off the record.
6     (A recess was taken.)
7     VIDEO TECHNICIAN:  The time is 4:40 p.m.
8 This begins unit number 7.  We're on the record.
9     MR. KOHLER:  Mr. Rannazzisi, thank you
10 for your time today.
11    THE WITNESS:  Thank you.
12    MR. KOHLER:  I am done today.  Keep it
13 open, subject to some questions I had with respect
14 to that State of Ohio expert report that you gave.
15    I may never see you again.  I may have to
16 redepose you on that.
17    THE WITNESS:  That's --
18    MR. KOHLER:  We'll just play it by ear.
19 But for now, I'm going to suspend the deposition.
20 Okay?
21    THE WITNESS:  Thank you very much.
22    MR. KOHLER:  Thank you for your time.

Page 385

1     MR. GIBBONS:  I have no more questions
2 except for the one area that we had a disagreement
3 in.  I may or may not see the wisdom of placing an
4 objection there.
5     And subject to that reservation, I have
6 no further questions either.
7     MR. MIGLIORI:  Just so I'm clear, was
8 this on the question of the hypothetical?  Was it
9 that exchange?
10    MR. GIBBONS:  I keep forgetting what we
11 argued about.
12    MR. MIGLIORI:  I think we argued about
13 whether your hypothetical was something he was
14 answering because he wouldn't answer any
15 hypothetical.
16    MR. GIBBONS:  Yeah, okay.  Whatever that
17 colloquy was, I am going to have to review it --
18    MR. MIGLIORI:  We're good.
19    MR. GIBBONS:  -- and see who's got the
20 better argument there.
21    MR. MIGLIORI:  I only have one little
22 quick question.

97 (Pages 382 - 385)

Page 386

1      EXAMINATION BY COUNSEL FOR THE WITNESS

2  BY MR. MIGLIORI:

3      Q.  You've been asked a lot of questions

4  today about prescriptions out the door of

5  pharmacies.

6          Do you recall those questions?

7      A.  Yes.

8      Q.  Irrespective of whether it was in

9  Cobb County or Tarrant County -- do you remember

10  those questions?

11      A.  Yes.

12      Q.  Were you asked to analyze individual

13  prescriptions out the door of a pharmacy?

14      A.  No, sir.

15      MR. MIGLIORI:  That's all I have.

16      MR. KOHLER:  Thank you.

17      MR. GIBBONS:  Nothing further.

18      VIDEO TECHNICIAN:  The time is 4:41 p.m.

19  We're off the record.

20      (Whereupon at 4:41 p.m., the videotaped

21      deposition of Joseph Rannazzisi was

22      concluded.)

Page 387

1      CERTIFICATE OF NOTARY PUBLIC

2      I, CHRISTINA S. HOTSKO, the officer before

3  whom the foregoing deposition was taken, do hereby

4  certify that the witness whose testimony appears in

5  the foregoing deposition was duly sworn by me; that

6  the testimony of said witness was taken by me in

7  stenotype and thereafter reduced to typewriting under

8  my direction; that said statement is a true record of

9  the proceedings; that I am neither counsel for,

10  related to, nor employed by any of the parties to the

11  action in which this statement was taken; and,

12  further, that I am not a relative or employee of any

13  counsel or attorney employed by the parties hereto,

14  nor financially or otherwise interested in the

15  outcome of this action.

16

17

18      CHRISTINA S. HOTSKO

19      Notary Public in and for the

20      District of Columbia

21  My commission expires:

22  1 January 2027

Page 388

1          Veritext Legal Solutions
          1100 Superior Ave
2            Suite 1820
          Cleveland, Ohio 44114
3          Phone: 216-523-1313

4  June 5, 2024

5  To: DONALD A. MIGLIORI

6  Case Name: National Prescription Opiate Litigation - Track 8 (Cobb
  County) v.

7
  Veritext Reference Number: 6693127

8
  Witness:  Joseph T. Rannazzisi       Deposition Date:  5/30/2024

9
  Dear Sir/Madam:

10
  Enclosed please find a deposition transcript.  Please have the witness

11
  review the transcript and note any changes or corrections on the

12
  included errata sheet, indicating the page, line number, change, and

13
  the reason for the change.  Have the witness' signature notarized and

14
  forward the completed page(s) back to us at the Production address

15  shown

16  above, or email to production-midwest@veritext.com.

17  If the errata is not returned within thirty days of your receipt of

18  this letter, the reading and signing will be deemed waived.

19  Sincerely,

20  Production Department

21

22  NO NOTARY REQUIRED IN CA

Page 389

1      DEPOSITION REVIEW
      CERTIFICATION OF WITNESS

2
      ASSIGNMENT REFERENCE NO: 6693127

3      CASE NAME: National Prescription Opiate Litigation - Track 8
  (Cobb County) v.
      DATE OF DEPOSITION: 5/30/2024

4      WITNESS' NAME: Joseph T. Rannazzisi
      In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of

6  my testimony or it has been read to me.

7      I have made no changes to the testimony
  as transcribed by the court reporter.

8

9  Date        Joseph T. Rannazzisi

10      Sworn to and subscribed before me, a
  Notary Public in and for the State and County,

11  the referenced witness did personally appear
  and acknowledge that:

12
      They have read the transcript;

13      They signed the foregoing Sworn
          Statement; and

14      Their execution of this Statement is of
          their free act and deed.

15
  I have affixed my name and official seal

16
  this _____ day of_____, 20____.

17
      Notary Public

18
      Commission Expiration Date

19

20

21

22

23

24

25

98 (Pages 386 - 389)

Page 390

1    DEPOSITION REVIEW
     CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 6693127
3       CASE NAME: National Prescription Opiate Litigation - Track 8
   (Cobb County) v.
     DATE OF DEPOSITION: 5/30/2024
4    WITNESS' NAME: Joseph T. Rannazzisi
5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7       I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9       I request that these changes be entered
   as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
   that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
   Date          Joseph T. Rannazzisi
14
        Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
   the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18      in the appended Errata Sheet;
        They signed the foregoing Sworn
19      Statement; and
        Their execution of this Statement is of
20      their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of_____, 20____.
23  _____
        Notary Public
24
25  _____
        Commission Expiration Date

Page 391

1       ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2       ASSIGNMENT NO: 6693127
3   PAGE/LINE(S) /       CHANGE        /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____      _____
20  Date          Joseph T. Rannazzisi
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
        Notary Public
24
25  _____
        Commission Expiration Date

99 (Pages 390 - 391)