# EXHIBIT 19

```
 1                    UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION

 3   IN RE:  NATIONAL PRESCRIPTION *
     OPIATE LITIGATION             *
 4                                 *  MDL NO. 2804
     THIS DOCUMENT RELATES TO      *  CASE NO. 1:17-MD-2804
 5                                 *
     TRACK NINE                    *
 6

 7   **************************************************

 8
                ORAL AND VIDEOTAPED DEPOSITION OF
 9                      DONALD BOWMAN
                        JULY 18, 2023
10
     **************************************************
11           HIGHLY CONFIDENTIAL - SUBJECT TO FUTHER

12                  CONFIDENTIALITY REVIEW

13

14

15              DEPOSITION of DONALD BOWMAN, produced

16   as a witness at the instance of the Plaintiffs, and

17   duly sworn, was taken in the above-styled and

18   numbered cause on the 18th day of July, 2023, from

19   11:05 a.m. to 12:54 p.m., before Christy R. Sievert,

20   CSR, RPR, in and for the State of Texas, reported by

21   machine shorthand, at the offices of Greenberg

22   Traurig, 2200 Ross Avenue, suite 5200, Dallas,

23   Texas, pursuant to the Federal Rules of Civil

24   Procedure and the provisions stated on the record or

25   attached hereto.
```

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4     MR. JAY M. LICHTER
       Baron & Budd, PC
 5     15910 Ventura Boulevard, Suite 1600
       Encino, California  91436
 6     818-839-2333
       jlichter@baronbudd.com
 7

 8   FOR THE DEFENDANT:

 9     MR. PETER S. WAHBY
       Greenberg Traurig, LLP
10     2200 Ross Avenue, Suite 5200
       Dallas, Texas  75201
11     214-665-3600
       peter.wahby@gtlaw.com
12

13   ALSO PRESENT:

14     COLIN COUGHENOUR, Videographer
       CHRIS FOX (Remote)
15     JANICE LEE (Remote)
       GINA VELDMAN (Remote)
16

17

18

19

20

21

22

23

24

25
```

1                       I N D E X
                                              PAGE
2
   Appearances.................................. 2

3  Exhibits.................................... 4

4  Proceedings................................. 5

5  DONALD BOWMAN:

6      Examination by Mr. Lichter................. 6

7  Changes and Signature.................... 89-90

8  Reporter's Certification................. 91-92

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    E X H I B I T S

 2    NUMBER        DESCRIPTION                    PAGE

 3    Exhibit 1     LinkedIn profile                 9

 4    Exhibit 2     E-mail correspondence           33
                    12-15-15, Re: Fw: Rx labor 0232
 5                  ALB-MDLCT9-00367 181182

 6    Exhibit 3     E-mail correspondence           48
                    7-23-18, Re: Fraud
 7                  ALB-MDLCT9-00122497

 8    Exhibit 4     E-mail correspondence           54
                    7-24-19, Re: Possible Fake E-scribe
 9                  Dr. Todd Akins
                    ALB-MDLCT9-00135844 - 135846
10
      Exhibit 5     Spreadsheet                     65
11                  ALB-MDLCT9-00094579

12    Exhibit 6     Summary of Selected Hydrocodone 68
                    and Oxycodone Dispensed by
13                  Albertsons Store 4102 in Dosage
                    Units
14
      Exhibit 7     Summary of Selected Hydrocodone 74
15                  and Oxycodone Dispensed by
                    Albertsons Store 4290 in Dosage
16                  Units

17    Exhibit 8     Summary of Selected Hydrocodone 77
                    and Oxycodone Dispensed by
18                  Albertsons Store 4150 in Dosage
                    Units
19
      Exhibit 9     Prepared at the Direction of    80
20                  Legal Counsel, Store 3914
                    ALB-NM00011005 - 11011
21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                    THE VIDEOGRAPHER:  We are now on the

 3      record.  My name is Colin Coughenour.  I'm a

 4      videographer for Golkow Litigation Services.

 5                    Today's date is July 18, 2023.  The

 6      time is 11:05 a.m.

 7                    This deposition is being held in

 8      Dallas, Texas in the matter of Opioid Litigation

 9      Track 9.

10                    The deponent is Donald Bowman.

11                    Would counsel please identify

12      themselves for the stenographic record.

13                    MR. LICHTER:  Good morning.  Jay

14      Lichter for plaintiff, Tarrant County, Texas.

15                    MR. WAHBY:  Peter Wahby of Greenberg

16      Traurig for the Albertsons defendants.

17                    THE VIDEOGRAPHER:  The court reporter

18      is Christy Sievert, who will now swear in the

19      witness.

20                    DONALD BOWMAN,

21               having been first duly sworn,

22                  testified as follows:

23                       EXAMINATION

24      BY MR. LICHTER:

25          Q.   Good morning, Mr. Bowman.
```

1      A.   Good morning.

2      Q.   Could you please state and spell your name

3  for the record?

4      A.   Donald Bowman, D-o-n-a-l-d B-o-w-m-a-n.

5      Q.   Okay.  And just to go over some basic

6  ground rules of depositions, first, have you had

7  your deposition taken before?

8      A.   No.

9      Q.   Okay.  So I guess I am going to be asking

10  you a series of questions.  While I'm doing that,

11  your counsel sitting to your right may object from

12  time to time.  Just so you know, even if your

13  counsel does object, you are obligated to still

14  respond and answer the question unless your counsel

15  specifically directs you not to answer.  Do you

16  understand that?

17     A.   Yes.

18     Q.   Okay.  We have a court reporter here taking

19  down everything we're saying.  So it's important

20  that we talk slowly so she can do that, and also

21  that we don't talk over each other.  Do you

22  understand that?

23     A.   Yes.

24     Q.   Okay.  And a lot of the questions I ask may

25  call for a "yes" or "no" answer.  Just so you know,

1    responses like "uh-huh" or "huh-uh" are difficult

2    for the reporter to take down.  So to the best you

3    can, I would ask that you avoid doing that.  Is that

4    okay?

5          A.    Yes.

6          Q.    Okay.  Are you taking any medications that

7    may impact your ability to give truthful testimony

8    today?

9          A.    No.

10         Q.    Okay.  Any reasons at all that you may not

11   be able to give truthful testimony sitting here

12   today?

13         A.    No.

14         Q.    Okay.  And throughout the deposition, we

15   will, of course, be taking breaks.  I'll aim to take

16   breaks every hour or so.  But if during the

17   questioning, if you would like to take a break and

18   it's not on the hour, that's fine.  You can -- you

19   can ask that we take a break for however long you

20   need.  I would just ask that we -- if a question is

21   pending, that we finish the response to the

22   question, and then we can go ahead and coordinate

23   the break.  Is that okay?

24         A.    Yes.

25         Q.    Great.

```
 1              Okay.  And you mentioned you have never

 2     had your deposition taken before, correct?

 3          A.   Yes.

 4          Q.   Okay.  And what have you done to prepare

 5     for today's deposition?

 6                    MR. WAHBY:  Objection; form.

 7              You can answer the question, but do not

 8     disclose any information that relates to discussions

 9     we've had.

10          A.   Had a meeting, a Zoom meeting with some

11     attorneys, and then had an in-person meeting with

12     some attorneys.

13     BY MR. LICHTER:

14          Q.   Okay.  So there were two total meetings

15     that you had to prepare?

16          A.   Yes.

17          Q.   Okay.  Do you recall the attorneys that

18     were present for both of those meetings?

19          A.   I believe Peter was present.  The rest, I

20     am -- I don't remember.

21          Q.   Okay.  About how long those meetings

22     lasted?

23          A.   The Zoom -- I would say probably both

24     meetings were four hours-ish.

25          Q.   Okay.  And have you reviewed any documents
```

1    to prepare for today's deposition?

2        A.    Yes.

3        Q.    Okay.  Did you review any documents that

4    were not provided to you by counsel?

5        A.    No.

6               MR. LICHTER:  I'll go ahead and have

7    the first document marked as Exhibit 1.

8               (Exhibit No. 1 marked.)

9    BY MR. LICHTER:

10       Q.    Have you seen this document before?

11       A.    Yes.

12       Q.    And what is it?

13       A.    I believe it's a printed page screen of my

14   LinkedIn profile.

15       Q.    Okay.  And did you prepare the information

16   that's in this document?

17       A.    Yes.

18       Q.    Is the information in here accurate, as far

19   as you know?

20       A.    Generally, yes.  Other than the division

21   pharmacy manager district numbers have changed.

22       Q.    Okay.  I'll represent to you that this is

23   just your experience section of your LinkedIn

24   profile and not the full profile.  Does that appear

25   correct?

1      A.   It appears correct.

2      Q.   Okay.  And this isn't reflected on this

3  document, but your LinkedIn profile indicated you

4  attended Drake University from 1989 to 1994.  Is

5  that correct?

6      A.   Yes.

7      Q.   Okay.  And you received a Bachelor of

8  Pharmacy from that school in 1994; is that correct?

9      A.   A Bachelor of Science in pharmacy.

10     Q.   Okay.  Have you received any other formal

11 education after high school?

12     A.   Besides the Bachelor of Science in

13 pharmacy?

14     Q.   Yes.

15     A.   No.

16     Q.   Okay.  Have you received any other degrees?

17     A.   No.

18     Q.   Do you currently hold any professional

19 licenses or certifications?

20     A.   I have a pharmacist license in the state of

21 Texas, and I have a pharmacist license in the state

22 of Nevada.

23     Q.   Okay.  Do you know when you received your

24 licenses for both of those states?

25     A.   The pharmacy license in Nevada would have

1    been August of 1994.  The pharmacist license in

2    Texas, I believe, was 2005 or 2006.

3        Q.   Okay.  So you're currently a licensed

4    pharmacist in both Texas and Nevada, correct?

5        A.   Yes.

6        Q.   Any other states?

7        A.   No.

8        Q.   Okay.  And looking at the document, pages 1

9    to 2 reflect your work history from 1995 to the

10   present; is that right?

11       A.   Yes.

12       Q.   Okay.  And the top of page 2 indicates you

13   were a pharmacy manager at Sav-On Drugs from '95 to

14   2002 in Las Vegas, correct?

15       A.   Yes.

16       Q.   Okay.  And it says you managed day-to-day

17   pharmacy operations in multiple locations in Las

18   Vegas, Nevada, correct?

19       A.   Yes.

20       Q.   And how many locations did you manage?

21       A.   At one time or meaning cumulative?

22       Q.   I guess cumulative.

23       A.   Cumulative would have been three different

24   locations.

25       Q.   How about at one time?

```
 1        A.    One location.

 2        Q.    And each of those locations were located in

 3   Las Vegas, correct?

 4        A.    Yes.

 5        Q.    Okay.  And it's cut off on this printout,

 6   but it indicates you worked as an operations

 7   specialist at Albertson's/Sav-On Drugs from 1998 to

 8   2002 in Las Vegas.  Does that sound right?

 9        A.    Yes.

10        Q.    Okay.  Was this a promotion from your last

11   position?

12        A.    It was a co-title.  So I would have been

13   managing a pharmacy but then also spending time

14   assisting a division pharmacy manager in the

15   marketplace.  So, yes, I would say yes.

16        Q.    Okay.  Is that why the time frames on

17   the --

18        A.    That's why --

19        Q.    -- two positions overlap?

20        A.    -- they overlap, yes.

21        Q.    Okay.

22        A.    So it's kind of a hybrid role or assistant

23   role, sort of.

24        Q.    Okay.  Did one of the roles take up more of

25   your time than the other?
```

1      A.    They're about equally distributed.

2      Q.    Okay.  And how many stores were you in

3   charge of as an operations specialist?

4      A.    I would -- I assisted with about 15

5   locations.

6      Q.    And those were all in Las Vegas, Nevada, as

7   well?

8      A.    Las Vegas, Nevada or the -- you know,

9   Henderson, Nevada, the Las Vegas metropolitan area.

10  I'm not sure if some of them had different names

11  back then.

12     Q.    Okay.  And those were 15 locations that you

13  assisted with simultaneously?

14     A.    Yes.

15     Q.    And can you summarize your duties as an

16  operations specialist during this time?

17     A.    I would have assisted with inventories.  I

18  would have assisted with touching base with

19  pharmacists about, you know, some of their -- their

20  trainings.  I would have helped with some -- some

21  records.  Basically, just an assistant to what the

22  division pharmacy manager had needs.  A lot of

23  mentoring of -- of pharmacists.

24     Q.    Would you actually conduct training for the

25  pharmacists you oversaw?

1      A.   No.  No.

2      Q.   So how would you have assisted in the

3  training of the pharmacists?

4      A.   I would have, you know, gone and let them

5  ask questions about the management role, less -- let

6  them ask some questions about recordkeeping, let

7  them ask some questions about interviewing.

8  Basically share expertise and share knowledge.  But

9  no formalized training.

10      Q.   Okay.  And how about assisting with

11  inventories, can you break that down a little bit?

12      A.   So pharmacies tend to -- depends on

13  markets, but pharmacies tend to have fiscal

14  inventories generally two times a year, but it could

15  be more or it could be less.  So you would help that

16  pharmacy with an inventory service to come in and do

17  the accounting and counting of the -- of the

18  products in the pharmacy.

19      Q.   That would be the counting of the actual

20  medications on the shelves?

21      A.   Yes.

22      Q.   Back to the document.  It then says you

23  worked as a senior division pharmacy manager at

24  Albertsons in the Dallas-Fort Worth area from 2002

25  to 2003?

1       A.    Yes.   Two-thousand -- to 2005 you mean?

2       Q.    Sorry.   2002 to 2005, yeah.

3       A.    Yes.

4       Q.    And was this another promotion from your

5    last position?

6       A.    Yes.

7       Q.    Did you move to Texas in 2002?

8       A.    Yes.

9       Q.    Why?

10      A.    That's where the position was.

11      Q.    It says you oversaw pharmacy operations at

12   50 Albertsons pharmacy locations in the Dallas

13   metroplex --

14      A.    Yes.

15      Q.    -- is that right?

16      A.    Yes.

17      Q.    It says responsibilities for service,

18   budgeting, inventory, compliance, execution and

19   staffing.   Is that --

20      A.    Yes.

21      Q.    Is that accurate?

22      A.    Yes.

23      Q.    And do you know how many of these store

24   locations were located in Tarrant County?

25      A.    I don't remember.

1      Q.   Were any of them?

2      A.   Yes.

3                MR. WAHBY:  I just want to confirm,

4   that -- all of this that's going on on the Zoom

5   screen, that's a separate recording than this video

6   recording that you're securing, right?  This isn't

7   the same recording?  It's two different recordings?

8                THE VIDEOGRAPHER:  I am capturing

9   everything independently as well as a picture in

10  picture.

11               MR. WAHBY:  Okay.  So we've got the

12  traditional -- what we call the traditional video

13  recording of the witness, and then separately you're

14  recording this video screen that's got these

15  demonstratives kind of developing?  Those are two

16  separate things?

17               THE VIDEOGRAPHER:  Yes, sir.

18               MR. WAHBY:  Okay.  Thanks.

19          Sorry.  Go ahead.

20  BY MR. LICHTER:

21      Q.   So you mentioned you do not recall how many

22  of the stores you oversaw during this time you were

23  located in Tarrant County; is that right?

24      A.   Yes.

25      Q.   Could it be -- do you have any sort of

1  estimate?  Could it be around half or one or two?

2      A.   I -- I could speculate there would be 15 or

3  so.  I'm not sure.

4      Q.   And can you explain what your duties would

5  have been in compliance?

6      A.   My duties in compliance would have been to,

7  on visiting the store, review their recordkeeping,

8  review their signage, their posting of legalized,

9  you know, required documents that need to be posted.

10  Review of their security protocols, making sure that

11  the pharmacy was secure.  That's mainly it.

12      Q.   So would your duties in compliance touch on

13  the actual process of dispensing medications?

14      A.   My duties as -- no.

15      Q.   Okay.  And were you ensuring compliance

16  with federal and state laws, or were you ensuring

17  compliance with Albertsons' own policies and

18  procedures or both?

19           MR. WAHBY:  Objection; form.

20  BY MR. LICHTER:

21      Q.   You can answer.

22      A.   It would have been both.

23      Q.   Okay.  And can you explain your duties in

24  staffing?

25      A.   Staffing would have been to assist with

1    hiring pharmacists for replacement positions.  So if

2    a pharmacist left, we would need to find a new

3    pharmacist at that location.

4         Q.   So would you actually be conducting

5    interviews --

6         A.   Yes.

7         Q.   -- for new hires?

8         A.   Yes.

9         Q.   Did any of your duties in staffing touch

10   on -- well, did it only touch on replacements in new

11   hires, or did it also touch on, you know, staffing

12   levels at stores from a day-to-day standpoint?

13             MR. WAHBY:  Objection; form.

14        A.   There -- no.  My -- it would have been just

15   to replace the pharmacist.

16   BY MR. LICHTER:

17        Q.   Got it.  And who did you report to at this

18   time?

19        A.   At that time, his name was Gerry Bay.

20        Q.   Can you spell his last name?

21        A.   B-a-y.  First name G-e-r-r-y.

22        Q.   Do you remember what his title was?

23        A.   I do not.

24        Q.   Do you know, were there any specific

25   requirements an employee needs to become a division

1  pharmacy manager for Albertsons?

2      A.    Specific requirements, would need to have a

3  pharmacy degree and pharmacy license.

4      Q.    Anything else?

5      A.    No.

6      Q.    And has that always been the case, as far

7  as you know?

8      A.    I don't know.

9      Q.    All right.  Then it says you worked as a

10 district pharmacy supervisor for CVS in the

11 Dallas-Fort Worth area from 2005 to 2007.  Is that

12 right?

13     A.    Yes.

14     Q.    And why did you leave Albertsons for CVS?

15     A.    Albertsons as a corporation had some

16 changes financially in terms of how they were going

17 to align, and they had decided to break the company

18 apart at that time, and I felt at that time that

19 that was an unsure climate.  So I decided to go to a

20 different company.

21     Q.    Did you leave Albertsons on good terms --

22     A.    Yes.

23     Q.    -- in 2005?

24     A.    I felt like I did, yes.

25     Q.    Okay.  And it says you oversaw pharmacy

 1  operations at 34 CVS pharmacy locations in the

 2  Dallas metroplex?

 3      A.   Yes.

 4      Q.   And responsibilities for service,

 5  inventory, compliance, execution and staffing,

 6  correct?

 7      A.   Yes.

 8      Q.   And so your duties for here for CVS were

 9  essentially the same as they were in your prior

10  position at Albertsons?

11      A.   Yes.

12      Q.   Do you recall about how many of those

13  locations were located in Tarrant County?

14      A.   I don't recall.

15      Q.   Do you have an estimate?

16      A.   A guess would be 20, 25.  And I had

17  different -- I had changing districts at one time.

18  So, yeah, it's hard -- hard to pin that down.

19      Q.   You had changing districts.  Were the

20  districts always located in the Dallas-Fort Worth

21  area?

22      A.   Yes.

23      Q.   And why did you stop working for CVS in

24  2007?

25      A.   I felt like CVS's vision for -- for the

1   pharmacies and the pharmacists that I worked with

2   just didn't agree with what I wanted to do, and so I

3   decided to change.

4       Q.    Can you expand on that at all?  What sort

5   of vision did CVS have that -- that you didn't agree

6   with?

7       A.    They just had a lot of work that would come

8   down to the pharmacies from -- from their corporate

9   that I felt many times were book work and work that

10  maybe didn't always help the pharmacists help the

11  patients.

12      Q.    In what sense?

13      A.    A lot of spreadsheet checks, a lot of

14  review of maybe even inventory levels or just --

15  just very nit-picky directives from maybe

16  nonpharmacy individuals wanting information for

17  their jobs that maybe didn't always benefit the

18  patients.

19      Q.    When you say didn't benefit the patients,

20  do you mean it kind of made them extra busy while

21  they were --

22      A.    Absolutely.  Time not spent where they

23  could deal with -- take care of patients.

24      Q.    Okay.  And it says you worked as the vice

25  president of pharmacy operations for QVL Pharmacy

1   Holdings, Inc. --

2       A.   Yes.

3       Q.   -- in Texas and Louisiana?

4       A.   Uh-huh.

5       Q.   That's from 2007 to 2010?

6       A.   Yes.

7       Q.   Is that all correct?

8       A.   Yes.  Yes.

9       Q.   And what kind of company is QVL Pharmacy

10  Holdings, Inc.?

11      A.   It was a -- it was an independent pharmacy

12  chain doing community pharmacy.

13      Q.   How many stores did you oversee in Texas

14  and Louisiana?

15      A.   Thirteen.

16      Q.   How many of those were in Texas?

17      A.   Ten.

18      Q.   Do you know if any of those were in Tarrant

19  County?

20      A.   One.

21      Q.   Do you remember specifically where that

22  location was?

23      A.   Uh-huh.  8th Avenue and Rosedale.

24      Q.   Do you know what city that's in?

25      A.   Fort Worth.

1      Q.   And what were your main duties as the VP of

2  pharmacy operations for QVL at this time?

3      A.   QVL, I was, as the -- as the vice

4  president, basically making sure that the pharmacies

5  operated, had -- had policies and procedures of

6  operation.  I worked with the CEO on some of the

7  discussions around the financing and around the

8  inventory, contracts with our -- with our

9  wholesalers, and then working with our -- just with

10  our pharmacy teams on hiring, on staffing.

11     Q.   And why did you leave QVL in 2010?

12     A.   QVL was an independent pharmacy chain.  I

13  was probably a little closer to understanding the

14  finances of that company, and the finances of that

15  company started to look like it may not last.  And

16  so I decided to take an opportunity and redirect.

17     Q.   Got it.  Okay.  That brings us, I guess, to

18  your position as pharmacy manager at Tom Thumb.

19     A.   Yes.

20     Q.   That's 2010 to 2015, correct?

21     A.   Yes.

22     Q.   Okay.  Was that just at one store?

23     A.   That was in two locations.

24     Q.   Do you remember where they were?

25     A.   Pharmacy manager in Las Colinas in Irving

1    and pharmacy manager in Mansfield.

2         Q.    Is Mansfield also in Irving?

3         A.    Mansfield is in Mansfield.

4         Q.    Is that a county?

5         A.    Mansfield, Texas.  City of Mansfield.

6         Q.    What county is that in?

7         A.    I think it's Tarrant.

8         Q.    Okay.

9              MR. WAHBY:  He's from California.

10              THE WITNESS:  Oh, I'm sorry.

11              MR. WAHBY:  Mansfield, Mansfield.

12    That's the quote of the day right there.

13    BY MR. LICHTER:

14         Q.    Was it considered a bit of a demotion to go

15    back to being a pharmacy manager after your other

16    positions?

17         A.    It could have -- it -- I don't -- I didn't

18    feel like it was a demotion.  I felt like at that

19    time I wanted to kind of recharge and step back into

20    the pharmacy role, pharmacist, more hands-on

21    pharmacist role.

22         Q.    So were you doing actual dispensing of

23    medications in your role here?

24         A.    Yes.  Yes.

25         Q.    And those two locations you were working

```
 1   at, were you -- were you working at both locations

 2   simultaneously?

 3       A.   No.  No.

 4       Q.   Which one were you working at first?

 5       A.   First was Las Colinas in Irving.

 6       Q.   Okay.

 7       A.   And that's in Dallas County.

 8       Q.   How long were you there for?

 9       A.   It seems like it was two years.  And then

10   the rest of the time was at Mansfield.

11       Q.   Okay.  Do you know why you moved to

12   Mansfield?

13       A.   Because I lived in Mansfield.  So I had an

14   opportunity to take a role closer to home.  So

15   commute, lowered my commute.

16       Q.   So you worked here until 2015.  That's when

17   Albertsons acquired Tom Thumb pharmacies, correct?

18       A.   I -- I don't remember the actual time that

19   that acquisition occurred.

20       Q.   Okay.  I guess according to your LinkedIn,

21   you started working for Albertsons in 2015.  Right?

22       A.   I -- I don't -- I don't know.  I mean, as a

23   division pharmacy manager?

24       Q.   Your next position.

25       A.   Yes.  Yeah.
```

1      Q.   Okay.  So it's a division pharmacy manager

2   for districts 1 and 6 --

3      A.   Yes.

4      Q.   -- the Albertsons southern division --

5      A.   Yes.

6      Q.   -- from 2015 --

7      A.   Yes.

8      Q.   -- to the present?

9      A.   Yes.

10     Q.   Okay.

11     A.   So yes.

12     Q.   Can you explain what districts 1 and 6 are?

13     A.   At that time, it was just two regional

14   areas in the Dallas-Fort Worth area metroplex.  I

15   honestly don't even remember what those lined out at

16   that time.  I -- I haven't updated the LinkedIn in

17   quite some time.

18     Q.   Okay.  Is this what you mentioned before,

19   where you said the districts --

20     A.   Absolutely.

21     Q.   -- the numbers may not be up to date and

22   accurate?

23     A.   Yes.

24     Q.   Okay.  So they may not -- may no longer be

25   referred to as districts?

1    A.   District 6 is no longer I would have

2  managed.  That's Houston.

3    Q.   Got it.  Okay.

4    A.   And, again, they have realigned.  Stores

5  realign at times in corporations.  So the division

6  alignments from this -- you know, the stores within

7  those divisions have changed.

8    Q.   How many pharmacy locations do you oversee

9  in this position?

10   A.   Thirty-two.

11   Q.   Okay.  Has it consistently been 32?

12   A.   It's consistently been 30 up to 32, yes.

13   Q.   Okay.  Currently it's 32, correct?

14   A.   Yes.

15   Q.   Do you know how many of those locations are

16  in Tarrant County?

17   A.   I believe it's about 26.

18   Q.   And are the duties of this position

19  essentially the same as a senior division pharmacy

20  manager for Albertsons in 2002, 2003?

21   A.   Yes.

22   Q.   Nothing substantively changed?

23   A.   No.

24   Q.   Okay.  And that would be service,

25  budgeting, inventory, compliance, execution and

1   staffing?

2       A.   Yes.

3       Q.   With the -- with regards to staffing, is

4   that something you oversee on a day-to-day basis?

5               MR. WAHBY:  Objection; form.

6       A.   No.  More situational.

7   BY MR. LICHTER:

8       Q.   Can you explain that?

9       A.   If a pharmacist decides to choose another

10  option, go to another employer, leave their

11  position, then that would be something to where I

12  would help hire, interview, promote, you know,

13  depending on candidates that are available.

14      Q.   Got it.

15           Would you -- was part of your position

16  resolving complaints regarding staffing from

17  pharmacists at the stores you oversaw?

18              MR. WAHBY:  Objection; form.

19      A.   No.  There's a standard of -- there's a

20  standard of how many pharmacists will work.  You

21  know, you definitely will always have -- depending

22  on your -- on your hours, but, no, it would have

23  been situational.

24  BY MR. LICHTER:

25      Q.   Would the pharmacy managers of each store

```
 1    typically oversee the day-to-day staffing issues of

 2    those stores?

 3                 MR. WAHBY:  Objection; form.

 4         A.   They -- they would oversee the situational

 5    staffing of their technicians and their ancillary

 6    help in their pharmacy, yes.  They would not oversee

 7    how to staff their location for pharmacists.

 8    BY MR. LICHTER:

 9         Q.   Who oversees that?

10         A.   That's me.  That's what I'm overlooking.

11         Q.   As far as you know, do each of the

12    pharmacies Albertsons owns in Tarrant County follow

13    the same dispensing policies and procedures set by

14    Albertsons?

15         A.   Yes.

16         Q.   Okay.  And are those policies and

17    procedures set nationally by the company, or are

18    they different from region to region?

19                 MR. WAHBY:  Objection; form.

20    BY MR. LICHTER:

21         Q.   If you know.

22         A.   I don't know.

23         Q.   Is it fair to say all of the stores you

24    oversee for Albertsons all follow the same policies

25    and procedures?
```

1       A.   Yes.

2       Q.   And those are set by corporate, correct?

3             MR. WAHBY:  Objection; form.

4       A.   I'm not sure who sets them.

5   BY MR. LICHTER:

6       Q.   Okay.  Do you know which other division

7   pharmacy managers are responsible for the other

8   pharmacy locations in Tarrant County?

9             MR. WAHBY:  Objection; form.

10      A.   I -- I know them.  David Hicks would be.

11  BY MR. LICHTER:

12      Q.   Anyone else?

13      A.   Not that I know of.

14      Q.   And do the different division pharmacy

15  managers often interact with each other?

16      A.   Yes.

17      Q.   And why would they typically interact?

18            MR. WAHBY:  Objection; form.

19      A.   Our interaction would be share -- share

20  ideas, share information, you know, if you have a

21  question about a program or implementation, things

22  like that.  Just clarifications many times.

23  BY MR. LICHTER:

24      Q.   So there weren't any maybe standard set

25  meetings with other district pharmacy managers for

1    discussions, were there?

2              MR. WAHBY:  Objection; form.

3        A.   For the DPM meeting?

4    BY MR. LICHTER:

5        Q.   Yeah.

6        A.   No.

7        Q.   And do pharmacists communicate directly

8    with their DPMs typically, or do they usually

9    communicate through their pharmacy managers?

10             MR. WAHBY:  Objection; form.

11       A.   That varies based on situation and need

12   and. . .

13   BY MR. LICHTER:

14       Q.   Are there typical instances in which

15   pharmacists would communicate directly with you?

16       A.   You know, generally, they would talk to

17   their pharmacy manager for -- I mean, we're talking

18   the staff pharmacists?  Is that what you're meaning?

19       Q.   Yes.

20       A.   Yeah, they would talk to their pharmacy

21   manager.  But if the pharmacy manager is

22   unavailable, they may reach out to me.

23       Q.   And how do they typically communicate with

24   you?

25       A.   They could call me.  They could e-mail me.

1      Q.    Is one used more than the other?

2      A.    Not that I've noticed.

3      Q.    Are you familiar with the Texas State Board

4  of Pharmacy?

5      A.    Yes.

6      Q.    Do they generally oversee pharmacy

7  regulation in the state of Texas?

8      A.    I believe so, but I'm not sure of the exact

9  function of their -- their defined charter.  So I'm

10  not positive what they -- how they define

11  theirselves in that.

12      Q.    Is it okay throughout this deposition if I

13  say BOP, can we understand that to mean Board of

14  Pharmacy?

15      A.    Sure.

16      Q.    And does the Texas BOP ever send anything

17  like notices or alerts to Albertsons regarding

18  certain patients or prescribers?

19            MR. WAHBY:  Objection; form.

20      A.    I haven't -- I haven't seen those.

21  BY MR. LICHTER:

22      Q.    Okay.  Do you -- you don't know if they

23  send those or not?

24      A.    I don't know.

25            MR. LICHTER:  Okay.  I'll go ahead and

1  have the next document marked as Exhibit 2.  For the

2  record, this document is Bates numbered

3  ALB-MDLCT9-00367181.

4         (Exhibit No. 2 marked.)

5  BY MR. LICHTER:

6     Q.  And have you seen this document before?

7     A.  No.  But now I guess I am.  I'm sure I saw

8  it since I sent it as e-mail, but. . .

9     Q.  Okay.  Is this December 15, 2015, e-mail

10  between you and other Albertsons employees?

11     A.  Yes.

12     Q.  Okay.  And the subject line says, "Rx Labor

13  0232," correct?

14     A.  Yes.

15     Q.  And I'll represent to you Store No. 232 is

16  an Albertsons pharmacy located -- well, first, do

17  you know where that pharmacy is located?

18     A.  Yes.

19     Q.  Where is it located?

20     A.  It's in Fort Worth.

21     Q.  Okay.  I'll represent to you the address is

22  3563 Alton Road in Fort Worth.  Does that sound

23  correct?

24     A.  Yes.

25     Q.  Okay.  And that's located in Tarrant

1    County?

2        A.    Yes.

3        Q.    Okay.  We can look at the page marked

4    367182, the second page of the document.  And the

5    bottom e-mail is from the Store 232 pharmacy general

6    e-mail address; is that right?

7        A.    Yes.

8        Q.    Okay.  And it looks like the person who

9    sent it is named Judd; is that right?

10       A.    No.

11       Q.    No?

12       A.    Robynn sent it.

13       Q.    Okay.  Do you know why it says "Judd 232"

14   at the bottom?

15       A.    I'm sorry, we're talking about the back --

16   where are we talking about?

17       Q.    The second page, bottom e-mail.

18       A.    Second page.  I'm sorry.  I was looking on

19   the front page.

20       Q.    Okay.  Second page, bottom e-mail.

21       A.    Okay.  Judd, yes.

22       Q.    Okay.  And this e-mail was sent from the

23   Store 232 pharmacy general e-mail address, correct?

24       A.    Yes.

25       Q.    Okay.  And it was sent from a person named

1   Judd?

2       A.   Correct.

3       Q.   Do you know Judd's last name?

4       A.   Judd, his last name is Connor.

5       Q.   Okay.  And do you know his position with

6   Albertsons at this time?

7       A.   He would have been pharmacy manager.

8       Q.   Okay.  And this e-mail was sent on

9   December 1, 2015, to you, correct?

10      A.   Yes.

11      Q.   Okay.  And Judd writes, "Don, this a.m. I

12  was told I had to cut $100 from this week's payroll

13  and will do unless you tell me otherwise.  I have

14  always been told my allowed tech hours depended on

15  volume.  For the last 90 days, we have filled 10,907

16  prescriptions.  That's 93 days.  That is 820 a week

17  or 82 tech hours.  I am only scheduling 79.  Having

18  to cut just seems wrong.  Judd 0323.  P.S., I wanted

19  to make this all caps but did not.  Thanks for your

20  time."

21           Did I read that correctly?

22      A.   Yes.

23      Q.   And what are technicians responsible for

24  doing at Albertsons pharmacies?

25      A.   Technicians would be an ancillary helper

1    for the pharmacists.  So they could assist with

2    things like typing prescriptions.  They can assist

3    with things like contacting the insurance companies

4    around claims.  They can assist with cashier work.

5    They can assist with inventory in terms of, you

6    know, putting inventory up onto the shelves.  They

7    can assist with filling prescriptions that have to

8    eventually be checked by the pharmacist.  Answering

9    phone calls.

10        Q.    Do they assist with filling and dispensing

11   opioid prescriptions?

12        A.    Yes.  That's not -- that's not every

13   location, but that's the comfort level of the

14   pharmacist.  Some pharmacists want to have -- they

15   do it themselves.  But, yes, they can do that, yes.

16        Q.    Do some techs actually fill the opioid

17   prescriptions?

18        A.    Yes.

19              MR. WAHBY:  Objection; form.

20   BY MR. LICHTER:

21        Q.    Here when Judd says he was told to cut a

22   hundred dollars from this week's payroll, who would

23   have given that instruction?

24        A.    Store director.

25        Q.    And where in the -- the chain of command is

1    the store director located?

2        A.   The store director is responsible for the

3    operations for the entire facility.  The pharmacy is

4    a department within that -- within those four walls.

5    But the store director has an ultimate financial

6    obligation to the store.

7        Q.   Are store directors in charge of multiple

8    stores at a time?

9        A.   No, one store.

10       Q.   I guess in the pecking order, are you above

11   the store director for any of the locations you

12   oversee?

13       A.   They -- store directors do not report to

14   me.

15       Q.   Okay.  So what does it mean here when Judd

16   says he needed to cut $100 from the week's payroll?

17               MR. WAHBY:  Objection; form.

18   BY MR. LICHTER:

19       Q.   Do you know what that means?

20       A.   I'm not sure what Judd was told in that

21   case.

22       Q.   Irrespective of what he was actually told,

23   do you know what it means to cut $100 from payroll?

24               MR. WAHBY:  Objection; form.

25       A.   I -- I would guess she had asked him maybe

1  to schedule less hours in his pharmacy, but I

2  couldn't be sure.

3  BY MR. LICHTER:

4      Q.   Do you know why something like that would

5  be requested of a pharmacy manager?

6            MR. WAHBY:  Objection; form.

7      A.   I -- unsure other than the -- that store

8  director has a -- has a number that they are trying

9  to make around the total performance of the store.

10 BY MR. LICHTER:

11     Q.   When you say "the total performance," do

12 you mean the revenue that the -- that the store is

13 seeing?

14     A.   Overall financial performance, yes.

15     Q.   Based on the e-mail, he basically says he

16 is already scheduling 79 tech hours even though his

17 pharmacy should have 82 tech hours.  Does that seem

18 accurate?

19     A.   Is that accurate what he said?

20     Q.   Is that accurate that that's a summary of

21 what he is saying, what he is telling you in this

22 e-mail?

23     A.   That --

24            MR. WAHBY:  Objection; form.

25     A.   -- seems to be what he typed, yes.

 1   BY MR. LICHTER:

 2       Q.   And his opinion here is that reducing that

 3   number of tech hours even further, "just seems

 4   wrong," correct?

 5       A.   That's what he said, yes.

 6       Q.   Do you agree with that opinion?

 7            MR. WAHBY:  Objection; form.

 8       A.   I don't have all the facts to understand

 9   what his motivations were on that.

10   BY MR. LICHTER:

11       Q.   Do you agree with the general proposition

12   that a pharmacy that should have 82 tech hours but

13   is only scheduling 79 tech hours should not reduce

14   the tech hours any further?

15            MR. WAHBY:  Objection; form.

16       A.   Again, I have no idea where he's basing his

17   82 based on.

18   BY MR. LICHTER:

19       Q.   I'm just asking you as a generality, not

20   specifically what his -- what he's basing that on.

21            MR. WAHBY:  Objection; form.

22       A.   Again, I guess I'm not sure what your

23   generality -- what are you generally asking?

24   BY MR. LICHTER:

25       Q.   If a pharmacy requires or should have 82

1    tech hours scheduled at any given time but it's only

2    scheduling 79, do you think that reducing that

3    number even further is problematic?

4                    MR. WAHBY:  Objection; form.

5        A.   Again, I don't know what the -- when you

6    say "should," I'm not sure what "should" means in

7    that case.

8    BY MR. LICHTER:

9        Q.   And this complaint that Judd is sending

10   you, is this something that -- is this a common

11   complaint you may receive as a district pharmacy

12   manager?

13                   MR. WAHBY:  Objection; form.

14       A.   It's not a common complaint.  Those are

15   discussions that pharmacies have with -- with their

16   team members and their stores all the time around

17   managing their -- their workload.

18                   MR. WAHBY:  Do you want another water?

19                   THE WITNESS:  Yeah, if you've got one.

20   They're kind of little.  Don't get too hydrated.

21   BY MR. LICHTER:

22       Q.   Okay.  At the top of the page here you

23   respond to the e-mail on December 2, 2015, correct?

24       A.   Yes.

25       Q.   Okay.  And you write, "Judd, unfortunately,

1   we do not have the pure ten hours/100 script rule

2   anymore.  The labor model has been pared back and

3   individualized based on location, factoring in

4   volume and pay rates."

5         Did I read that right?

6   A.   Yes.

7   Q.   What was the ten hours/100 script rule?

8   A.   That was a rule that Albertsons had at one

9   point in terms of their staffing model.

10  Q.   And what was it?  What was the rule?

11  A.   Every -- every hundred scripts, they earned

12  ten hours of technician.  That was a rule that they

13  had.  Or a -- rule, I guess that's the wrong way to

14  say it.  That was the policy or the guidance.

15  Probably a better way -- word to say is guidance.

16  Q.   So would Albertsons look back on how many

17  prescriptions a store was filling, and then based on

18  that number, it would determine for -- for every 100

19  scripts, out of those filled, that store would be

20  allotted ten tech hours?

21  A.   Yeah, as a -- as a model, yes.

22  Q.   Okay.  And that would be ten tech hours per

23  day?  Per week?

24  A.   Per week.  And 100 scripts per week.  100

25  scripts per week as well.

1      Q.   Do you know when that policy ended?

2      A.   I do not.

3      Q.   Do you have any sort of general ballpark?

4           MR. WAHBY:  Objection; form.

5      A.   I don't, because I wasn't in a management

6  role with Albertsons at that time when that was

7  changed, as far as I know.

8  BY MR. LICHTER:

9      Q.   Do you have any sort of estimate as to when

10  that policy may have ended?

11          MR. WAHBY:  Objection; form.

12     A.   I don't know.

13  BY MR. LICHTER:

14     Q.   And what do you mean when you write, "The

15  labor model has been pared back"?  Can you explain

16  that?

17     A.   As far as I know, the labor model, it -- it

18  had been realigned to better match volumes of

19  stores.  Some stores may have gotten more labor,

20  some stores -- or more in the model, and some stores

21  may have had less in the model.

22     Q.   So even though your phrasing here is that

23  the model has been pared back, that means some

24  stores could actually have been --

25     A.   Pared --

1      Q.   -- receiving more?

2      A.   Pared back based on where Judd was at.  So

3   Judd's level of scripts, it had been pared back.

4   Some stores that were busier may have been given an

5   expanded amount.  Or if they had a drive-thru, they

6   may have been given more for that feature.

7      Q.   Okay.  And I think you're touching on this

8   now, but how is the labor model individualized to

9   factor in volume and pay rates?

10     A.   It's -- it's a guidance around

11  prescriptions sold per week.

12     Q.   Looking at the middle of the same paragraph

13  that we're reading, it says, "That being said. . ."

14  Do you see that?

15     A.   "That being said," yes.

16     Q.   "That being said, cutting dollars isn't

17  what we need to do.  We need to look at hours worked

18  and make sure we factor those correctly.  So if we

19  have a technician making less per hour, giving them

20  more hours than a higher paid technician will help."

21          Did I read that correctly?

22     A.   Yes.

23     Q.   So your suggestion here is to schedule

24  lower paid technicians more than higher paid

25  technicians; is that right?

1              MR. WAHBY:  Objection; form.

2      A.   I'm giving him an option that there may be

3  a way to have the same amount of hours with less

4  dollars spent.

5  BY MR. LICHTER:

6      Q.   Right.  And that option is to schedule

7  lower paid technicians more frequently than higher

8  paid technicians, correct?

9              MR. WAHBY:  Objection; form.

10     A.   You -- that was something that you could --

11  you could schedule some technicians that make a

12  lower wage to make out your hours, yes.

13  BY MR. LICHTER:

14     Q.   Okay.  I understand that you can do that.

15  I'm just trying to confirm that that's the advice

16  you're giving him?

17     A.   Yes.

18     Q.   Okay.  And was that suggestion made with

19  the goal of saving Albertsons money?

20     A.   That suggestion was the goal that Judd

21  could find more hours of people to help him in the

22  pharmacy.

23     Q.   For less money, correct?

24     A.   For overall --

25              MR. WAHBY:  Objection; form.

```
 1      A.   For overall spending, trying to -- trying

 2 to maximize, yes.

 3 BY MR. LICHTER:

 4      Q.   Okay.  And can you give any estimate as to

 5 Albertsons' pay scale for techs at its pharmacies?

 6      A.   Currently?

 7      Q.   Yes.

 8      A.   To pay scale?  Pharmacy --

 9           MR. WAHBY:  Objection; form.

10           Sorry.  Go ahead.

11      A.   Pharmacy technicians are scaled depending

12 on experience and time.  It would go from 15.50 to

13 $20.25.

14 BY MR. LICHTER:

15      Q.   And higher paid technicians would typically

16 be technicians with more experience than lower paid

17 technicians; is that correct?

18      A.   Yes.

19      Q.   So I guess based on your e-mail here, then,

20 to Judd, is the advice to schedule more technicians

21 with less experience so Albertsons could meet its

22 goal of saving $100 per week?

23           MR. WAHBY:  Objection; form.

24      A.   The goal was for him to look at his total

25 spend and make sure he maximized the hours that he
```

1   could spend and using the personnel he had

2   available.  If he had technicians that made less per

3   hour but were still qualified to do the job, that

4   may give him more hours if his store director is

5   looking at a total dollar spend, yes.

6   BY MR. LICHTER:

7       Q.   Right.  And he says in his e-mail that he

8   had to cut $100 off of his payroll, right?

9       A.   Yes.

10      Q.   Okay.  And your advice is to schedule the

11  lower paid technicians or the lower experienced

12  technicians so he can meet that $100 savings,

13  correct?

14           MR. WAHBY:  Objection; form.

15      A.   Helping him to get to the number that he

16  and his store director are trying to get to, yes.

17  BY MR. LICHTER:

18      Q.   Right.  Which is $100 savings from each

19  week's payroll, according --

20      A.   Is what --

21      Q.   -- to his e-mail?

22      A.   Is what he had been asked to do, yes.

23      Q.   Okay.  We can look at the first page on

24  this document, 367181, and the top e-mail here is

25  from you to Julie Spier.

1       A.   Yes.

2       Q.   It's dated December 15, 2015.  Do you see

3   that?

4       A.   Yes.

5       Q.   And who is Julie Spier?

6       A.   Julie Spier is the director of pharmacy

7   operations for -- at -- at this time she would have

8   been for the Houston division and the Southern

9   division.  She's now of just the Southern division.

10  There's no Houston division anymore.

11      Q.   In the e-mail you write, "Julie, this is

12  one of the stores that seems a bit narrow around

13  labor.  Store filling around 700-plus scripts week.

14  Minus out the RPH dollars, 5,040, and the store

15  would have less than $90 a week for technician

16  help."

17           Did I read that correctly?

18      A.   Yes.

19      Q.   And what does RPH stand for?

20      A.   Pharmacist.

21      Q.   And when you say the budget would leave $90

22  a week for technician help, does that mean after the

23  pharmacist is paid --

24      A.   Yes.

25      Q.   -- Albertsons' spending goal would only

```
 1   leave $90 a week to pay technician?

 2        A.   Based on that -- on that budget, yes.

 3        Q.   Do you recall how this issue was ultimately

 4   resolved?

 5        A.   I don't.

 6             MR. LICHTER:  We're at about one hour.

 7   Is everybody okay to take a ten-minute break?

 8             THE WITNESS:  Yes.

 9             MR. WAHBY:  Sure.

10             MR. LICHTER:  We'll go off the record.

11             THE VIDEOGRAPHER:  The time is

12   11:56 a.m., and we are off the record.

13             (Break taken, 11:56 a.m. to 12:07 p.m.)

14             THE VIDEOGRAPHER:  The time is

15   12:07 p.m., and we are on the record.

16             MR. LICHTER:  Welcome back,

17   Mr. Bowman.

18        I'll go ahead and have the next document

19   marked as Exhibit 3.  For the record, this document

20   is Bates numbered ALB-MDLCT9-00122497.

21             (Exhibit No. 3 marked.)

22   BY MR. LICHTER:

23        Q.   And have you seen this document before?

24        A.   No, but yes.  I mean, obviously, it was an

25   e-mail to me.  So at some point I did see it, yes.
```

1      Q.   Okay.  And is this a July 23, 2018, e-mail

2   you received from a pharmacist at Albertsons Store

3   No. 4163?

4      A.   Yes.

5      Q.   Do you know where Store 4163 is located?

6      A.   Yes.

7      Q.   Where is that located?

8      A.   It is in Arlington, Texas.

9      Q.   Okay.  I think the address is 5950 South

10  Cooper Street.  Does that sound right?

11     A.   Yes.

12     Q.   Okay.  And that's located in Tarrant

13  County, correct?

14     A.   Yes.

15     Q.   Okay.  Do you know the name of the person

16  that sent this e-mail to you?

17     A.   No.

18     Q.   Do you know that person's job title?

19     A.   No.

20     Q.   Is it presumably from a pharmacist or a

21  pharmacy manager at this location?

22          MR. WAHBY:  Objection; form.

23     A.   It's from the pharmacy general e-mail

24  account.  So that could be anybody working in the

25  pharmacy.

1    BY MR. LICHTER:

2        Q.    Who typically uses that e-mail account?

3        A.    All the individuals working in the

4    pharmacy.

5        Q.    Techs?

6        A.    Can, yes.

7        Q.    Okay.  The e-mail says, "Hey Don, I just

8    got a confirmation today on a fraud prescription,

9    oxycodone, 30 milligrams.  Patient is ███████

10   ████████████████, for oxycodone, 30 milligrams.

11   He's going around Arlington/DFW.  Dr. Gregory Skie

12   had a script pad stolen.  Just FYI."

13           Did I read that correctly?

14       A.    Yes.

15       Q.    Do you recall if you or anyone else at

16   Albertsons took any action in response to receiving

17   this e-mail?

18       A.    I do not recall.

19       Q.    Would you typically take action in response

20   to receiving an e-mail like this?

21       A.    I would generally forward some form of this

22   to the pharmacies near that location.

23       Q.    You don't recall if you did that here?

24       A.    I do not.

25       Q.    Would you typically forward that to the --

1    the store pharmacy general e-mail addresses?

2         A.   Yes.

3         Q.   Okay.  Do you know who typically sees those

4    e-mails?

5                   MR. WAHBY:  Objection; form.

6         A.   Anybody working in the pharmacy could see

7    those.

8    BY MR. LICHTER:

9         Q.   Is there any sort of directive for

10   everybody working in the pharmacy to look at and

11   review e-mails received at that e-mail address?

12        A.   There's a directive that the expectation is

13   the pharmacists working that day should check their

14   e-mail, yes.

15        Q.   So all pharmacists working in a day are --

16        A.   Expected to.

17        Q.   -- expected to check this general e-mail

18   address?

19        A.   Yes.

20        Q.   Okay.  Techs aren't expected to check it?

21        A.   No.

22        Q.   Are the pharmacy managers expected to check

23   it?

24        A.   They're pharmacists, so yes.

25        Q.   Do you know if this patient, █████

1      ███████, was put on any sort of do-not-fill list?

2      A.   No.

3                MR. WAHBY:  Objection; form.

4                THE WITNESS:  Sorry.

5      A.   No.

6  BY MR. LICHTER:

7      Q.   No, you don't know, or, no, he was not?

8      A.   I don't know.

9      Q.   Okay.  Did Albertsons keep any sort

10  do-not-fill list for certain patients?

11     A.   No.

12     Q.   Do you know if this patient was flagged in

13  any way for Albertsons' pharmacists?

14               MR. WAHBY:  Objection; form.

15     A.   I don't know.

16  BY MR. LICHTER:

17     Q.   Would -- after receiving an e-mail like

18  this, would a patient like this typically be flagged

19  by Albertsons in any way?

20               MR. WAHBY:  Objection; form.

21     A.   Not -- no specific way.  Some -- a

22  pharmacist may have seen this and made it, but I

23  don't know.

24  BY MR. LICHTER:

25     Q.   Okay.  So you're not aware of any system or

1   procedure Albertsons had to -- to circulate the

2   names of maybe potential problematic patients; is

3   that fair to say?

4              MR. WAHBY:  Objection; form.

5       A.   I'm not aware of any, no.

6   BY MR. LICHTER:

7       Q.   Okay.  Do you know if Albertsons had the

8   capabilities to flag patients along those lines?

9              MR. WAHBY:  Objection; form.

10      A.   I'm not aware of that, no.

11  BY MR. LICHTER:

12      Q.   Do you know if this patient was ever

13  referred to law enforcement?

14      A.   I do not know.

15      Q.   Have you ever referred a patient to law

16  enforcement?

17      A.   As a pharmacist, yes.

18      Q.   Okay.  How about as a district pharmacy

19  manager?

20      A.   No.

21      Q.   Do you know if any sort -- if Albertsons

22  put out any sort of alert regarding prescriptions

23  purporting to be written by Gregory Skie?

24      A.   I'm not aware of any, no.

25      Q.   Okay.  Is that something Albertsons would

1    typically have done in this situation?

2              MR. WAHBY:  Objection; form.

3         A.   No.

4    BY MR. LICHTER:

5         Q.   Do you know if this e-mail was submitted up

6    to corporate for any further actions to be taken?

7         A.   I do not know.

8              MR. LICHTER:  Set this one aside.

9    I'll hand you the next document marked as Exhibit 4.

10   For the record, this is Bates numbered

11   ALB-MDLCT9-00135844.

12             (Exhibit No. 4 marked.)

13   BY MR. LICHTER:

14        Q.   Have you seen this document before?

15        A.   Yes.

16        Q.   When's the last time you saw it?

17        A.   2019.

18        Q.   Okay.  Is this a July 24, 2019, e-mail

19   string between you and other Albertsons employees?

20        A.   Yes.

21        Q.   Let's go down to the last page, Bates

22   number 135845.  Sorry, the second to the last page.

23        A.   Okay.

24        Q.   Not the last page.

25             Let's look at the e-mail from Store 3312

1    to you, Don Bowman, on April 22, 2019.  Do you see

2    that?

3         A.   Yes.

4         Q.   Okay.  Towards the bottom of the page, the

5    e-mail says, "Hi Don, we have received a possible

6    fake e-scribe under a Dr. Todd Akins," and it gives

7    his DEA number, "twice over the past three days.

8    One for an oxycodone, 30 milligram, 96, and a second

9    for an oxycodone, 30 milligram, 120, for the same

10   patient.  The address on the e-scribe is from the

11   Baylor Scott & White Hospital on 1400 8th Avenue.

12   We called them, and they state this doctor is not

13   one of their physicians and this patient has not

14   been seen by them.  If you search the doctor, he

15   actually shows as an anesthesiologist out of

16   Houston.  The PT does not have any history of taking

17   this med in the PMP.  Of course, I cannot get in

18   touch with the doctor to 100 percent confirm it is

19   fake, but this has red flags all over it.  I just

20   want to report this as I am not aware of seeing a

21   fraudulent e-scribe with an altered address on it

22   previously.  Thanks, Glenda."

23           Did I read that correctly?

24        A.   Yes.

25        Q.   Okay.  Are you aware that Albertsons Store

1    3312 is a Tom Thumb located in Tarrant County?

2        A.    Yes.

3        Q.    Okay.  Are you aware that it's located at

4    2400 West 7th Street in Fort Worth?

5        A.    Yes.

6        Q.    Okay.  Do you know Glenda's full name?

7        A.    Glenda, her last name was Hart, H-a-r-t.

8        Q.    Do you know her job title at this time?

9        A.    Pharmacy manager.

10       Q.    Okay.  And it looks like the very next day

11   you forward that e-mail to Charlie Painter, Mark

12   Allgood and Julie Spier on August 23, 2019.  Is that

13   right?

14       A.    Yes.

15       Q.    And in that e-mail you say, "I feel like we

16   have already dealt with this possible phony M.D. in

17   the Fort Worth area.  Can we find out?"

18             Did I read that right?

19       A.    Yes.

20       Q.    Do you recall whether you or anyone else at

21   Albertsons actually dealt with this phony prescriber

22   before Glenda's e-mail?

23       A.    I don't remember.  Meaning, I -- at the

24   time, I felt like this was a -- something that had

25   come up.  The issue on this one was -- I guess the

```
 1   key part of this was it was called an e-scribe,

 2   meaning the prescription was electronically sent to

 3   us.  So that was where -- my question is I -- I had

 4   thought that there was an electronically prescribed

 5   issue with this doctor in the past.

 6        Q.   Okay.  Previously, would an issue with this

 7   doctor have come to your attention by a pharmacist

 8   e-mailing you?

 9        A.   Similar, yes.

10        Q.   Okay.  Do you recall --

11        A.   Or it could have been -- it could have been

12   a meeting when I was in the store.

13        Q.   Okay.  Do you recall how the issue was

14   dealt with previously?

15        A.   No.  That's -- no.

16        Q.   And who is Charlie Painter?

17        A.   Charlie Painter, he was the -- or is the --

18   I'm not positive what his title is now --

19   director -- director -- he basically worked for our

20   pharmacy professional services department in our

21   corporate offices.

22        Q.   Why did you include him on this e-mail?

23        A.   Because it was an electronically sent

24   prescription that was fraudulent.

25        Q.   Okay.  And why would that come within his
```

1    purview?

2        A.    Because as professional services, I was

3    trying to get some insight to how someone -- you

4    know, this is, what, 2019.  So 2019, electronic

5    prescribing of controlled substances was fairly new.

6    It wasn't brand new, but it was pretty new.  So I

7    was including Charlie and Mark Allgood, who is

8    our -- one of our IT guys to say how are we

9    seeing -- how are we seeing electronic -- because I

10   was kind of like, well, electronic prescriptions

11   should be pretty secure.  So how -- how is someone

12   getting this information?  So that was my question.

13       Q.    Charlie Painter was considered the IT guy?

14       A.    Mark Allgood would be the IT guy.

15       Q.    Do you remember what Mark Allgood's

16   position was at this time?

17       A.    Head of pharmacy IT, but I don't know the

18   exact title.

19       Q.    And Julie Spier, we discussed before.

20       A.    Correct.

21       Q.    Do you remember what her position was at

22   this time in 2019?

23       A.    Director of pharmacy operations.

24       Q.    Okay.  Did Charlie Painter, Mark Allgood or

25   Julie Spier ever respond to this e-mail you sent

1  them?

2      A.   I don't remember their response.  I guess

3  Mark did respond.

4      Q.   Let's look above that.

5      A.   Yes.

6      Q.   The e-mail above that is three months later

7  on July 24, 2019.  Do you see that?

8      A.   Yes.

9      Q.   And you, again, write to Charlie Painter,

10  Mark Allgood and Julie Spier to say, "All, this

11  continues to be an issue.  Now occurring in Austin

12  as well as DFW area.  Got the message below from an

13  Austin Randalls."

14          Did I read that correctly?

15      A.   Yes.

16      Q.   Okay.  I'm going to read what that message

17  says, so bear with me.

18          The message says, "Hey Don, Deb over at

19  People's called to give us a heads up that they got

20  some fraudulent e-prescriptions for oxycodone and

21  some other cheap antibiotics that didn't make sense,

22  i.e., 30 days of amoxicillin, et cetera.  Apparently

23  there's a mole in a legit doctor's office sending

24  out e-prescriptions for fake patients under

25  Dr. Akins' name.  She called the doctor who is an

1  anesthesiologist out of Houston who is not set up

2  for e-prescriptions and doesn't prescribe anything

3  stronger than Tylenol 3 and reported that his info

4  was compromised about two years ago.  If you call

5  the number listed on the prescription, it basically

6  puts you through to a simple automated line that

7  routes you to a cell phone.  Deb ran the PDMP and

8  saw that some Randalls had filled their stuff.  So

9  she wanted me to spread the word."

10        Did I read that okay?

11    A.   Yes.

12    Q.   Okay.  Who is Deb over at -- over at

13  People's?

14    A.   I have -- People's is a pharmacy chain in

15  Austin.  So I don't know who Deb is.  I assume she

16  works at People's.

17    Q.   People's was -- at this time was not owned

18  by Albertsons, correct?

19    A.   It is not owned by Albertsons, right.

20    Q.   And what does it mean for a doctor's

21  information to be compromised?

22            MR. WAHBY:  Objection; form.

23    A.   I don't know exactly.  In this case, I'm

24  guessing his electronic prescribing account was

25  compromised, but I don't know the IT term of what

1    that would have been.

2    BY MR. LICHTER:

3        Q.    Okay.  Just to try to summarize this e-mail

4    here, is it correct that another pharmacist named

5    Deb, I think over at the People's pharmacy chain,

6    received some sketchy prescriptions from this

7    Dr. Akins, called his office and found out his

8    information had been compromised two months before

9    she ever called?  Does that sound right?

10                MR. WAHBY:  Objection; form.

11       A.    If that's how it reads, yes.

12   BY MR. LICHTER:

13       Q.    Okay.  Do you have a different

14   understanding as to how that reads?

15                MR. WAHBY:  Objection; form.

16       A.    No.

17   BY MR. LICHTER:

18       Q.    Okay.  Do you know if this was the first

19   time you learned that Dr. Akins' information had

20   been compromised?

21       A.    I guess I'm confused.  Are you talking

22   about the Deb e-mail or the e-mail we talked about

23   earlier on this page?

24       Q.    The Deb e-mail.

25                MR. WAHBY:  Objection; form.

 1      A.   I would say I knew about it further back in

 2  April based on the e-mail below.

 3  BY MR. LICHTER:

 4      Q.   You knew about it back in April.  And then

 5  in your e-mail you mentioned sometime prior to

 6  April 2019 you knew about it, correct?

 7      A.   At some point.

 8      Q.   Okay.  You don't remember if that was also

 9  in 2019?

10      A.   I don't remember.

11      Q.   Could that have been prior to 2019?

12          MR. WAHBY:  Objection; form.

13      A.   I don't remember.

14  BY MR. LICHTER:

15      Q.   Okay.  Back on the first page.  The same

16  day, on July 24, 2019, Mark Allgood responds to your

17  e-mail to say, "Don, I am going to need the

18  prescriber being used and his correct information.

19  I see it's a Todd Akins that is an anesthesiologist

20  from Houston.  We'll need to contact them, validate

21  that there is and has been a compromise of his

22  information.  Then we can go through the proper

23  channels to have his information inactivated."

24          Did I read that correctly?

25      A.   Yes.

1      Q.   Do you know why it took Mark Allgood three

2    months to respond to your concerns about fraudulent

3    prescriptions from Dr. Akins?

4      A.   I don't know why it took him that long.

5      Q.   Okay.  Was that a typical response time for

6    these sorts of issues?

7              MR. WAHBY:  Objection; form.

8    BY MR. LICHTER:

9      Q.   In your experience.

10     A.   There wasn't this many of these, so I

11   wouldn't know.

12     Q.   And during that three-month period before

13   he responded, did Albertsons send out an alert to

14   Albertsons' pharmacists on Dr. Akins or any of the

15   patients presenting prescriptions from him, if you

16   know?

17     A.   I don't remember.

18             MR. WAHBY:  Objection; form.

19     A.   I don't know.

20   BY MR. LICHTER:

21     Q.   Is that something Albertsons would

22   typically do?

23             MR. WAHBY:  Objection; form.

24     A.   I -- we did not typically do that, no.

25   BY MR. LICHTER:

1    Q.   Then in the last paragraph of Mark

2  Allgood's e-mail, he says, "Then please open a case

3  with ERx Network via e-mail to begin the process of

4  investigation of this prescriber activity and

5  potentially shut the prescriber off the network.

6  Surescripts/ERx Network decision."

7         Do you see that?

8    A.   Yes.

9    Q.   Can you explain this process of opening a

10  case with the ERx Network to investigate a

11  prescriber?

12    A.   No.  I don't -- I don't know how -- what

13  that means.

14    Q.   You don't know anything about that?

15    A.   No.

16    Q.   You don't have any information on what

17  those investigations may entail?

18    A.   No.

19         MR. WAHBY:  Objection; form.

20    A.   No.

21  BY MR. LICHTER:

22    Q.   Do you know if Albertsons maintains any

23  sort of central list of doctors that have been

24  investigated?

25    A.   I don't know.

1      Q.   Do you know what it means to shut the

2   prescriber off the network?

3      A.   I do not know.

4      Q.   Do you know if there's a list of

5   prescribers that have been shut off?

6      A.   I do not know.

7      Q.   Do you know what the results of this

8   investigation found?

9      A.   No.

10      Q.   Do you know why Mark Allgood didn't order

11   an investigation when he was first e-mailed about

12   this doctor back in April?

13           MR. WAHBY:  Objection; form.

14      A.   I do not know.

15           MR. LICHTER:  Okay.  We can set this

16   one aside.  I'll have the next document marked

17   Exhibit 5.  For the record, this document is Bates

18   numbered ALB-MDLCT9-00094579.

19           (Exhibit No. 5 marked.)

20   BY MR. LICHTER:

21      Q.   I'll represent to you this is an extract

22   from a March 4, 2021, Excel sheet Albertsons

23   produced in this litigation at the Bates number I

24   just read.  And I'll also represent that I

25   highlighted some of the store numbers in the

1   right-hand column.

2           Do you see that?

3       A.   Yes.

4       Q.   Okay.  And this appears to be a list of 32

5   Albertsons pharmacies for which you serve as a

6   division pharmacy manager as of March 2021.  Does

7   that seem correct?

8       A.   Yes.

9       Q.   And the highlighted stores are the ones I

10  believe are located in Tarrant County, Texas.

11      A.   Yes.

12      Q.   That appears accurate?

13      A.   Yes.  I think I said 26 earlier in this,

14  but it looks like it's 25.

15      Q.   Okay.  In looking at this chart, do you see

16  anything here that might appear inaccurate at all?

17              MR. WAHBY:  Objection; form.

18      A.   I don't see anything.

19  BY MR. LICHTER:

20      Q.   As far as you know, does this chart reflect

21  your current assignments?

22      A.   Yes.

23      Q.   Have you seen -- have you overseen the same

24  stores for the entire time you've served as a

25  division pharmacy manager for Albertsons?

```
1        A.   No.

2        Q.   Do you know which ones have changed?

3        A.   No.  Yes.  I'll say it this way, I had -- I

4   at one time had a district in Austin.  That was for

5   about two and a half years.  And then, again, stores

6   have changed in alignments, so it's hard to pin down

7   exactly all those changes.

8        Q.   When you say "alignments," what do you mean

9   by that?

10       A.   Districts.  So stores could get

11  redistricted.

12       Q.   Okay.  How many stores did you oversee in

13  Austin?

14       A.   Fourteen, I believe.

15       Q.   Okay.  I would like to talk about just, I

16  think, three stores that are on this list here:

17  Store 4102, 4290, and 4150.

18       A.   Okay.

19       Q.   Do we agree that those are stores that you

20  oversee?

21       A.   Yes.

22       Q.   And those stores are located in Tarrant

23  County?

24       A.   Yes.

25       Q.   Okay.
```

1      A.   Yeah, 4290.  Did you say 4290?

2      Q.   Yes.

3      A.   I guess that's Azle.  So that's still

4  Tarrant County.  It's close.

5                MR. LICHTER:  Set this one aside and

6  have the next document marked as Exhibit 6.

7                (Exhibit No. 6 marked.)

8  BY MR. LICHTER:

9      Q.   You haven't seen this document before, have

10  you?

11      A.   No.

12      Q.   Okay.  I'll represent to you this is a --

13  this chart we're looking at is a summary of the

14  opioid dispensing data Albertson -- sorry --

15  Albertsons produced for Store 4102 in dosage units

16  created by Dr. Craig McCann in this litigation.

17                MR. WAHBY:  Which we object to the use

18  of this document as an exhibit because it's not

19  Bates labeled and don't know where it came from.

20                MR. LICHTER:  That's fine.

21  BY MR. LICHTER:

22      Q.   And a dosage unit is essentially a pill; is

23  that correct?

24      A.   Yes.

25      Q.   Okay.  And the top here indicates

1    Albertsons Store 4102 is located at 1021 North

2    Saginaw Boulevard in Saginaw, Texas.  Does that

3    sound right?

4         A.   Yes.

5         Q.   Okay.  And Saginaw is located in Tarrant

6    County?

7         A.   Yes.

8         Q.   And you oversee Store 4102 currently?

9         A.   Yes.

10        Q.   Okay.  Do you have any idea what the

11   population of Saginaw, Texas is?

12        A.   No.

13        Q.   Okay.  I'll represent to you according to

14   the U.S. Census Bureau, the population of Saginaw,

15   Texas was 24,011 people in 2021.  So approximately

16   24,000 people.  Do you have any reason to dispute

17   that?

18             MR. WAHBY:  Objection; move to strike.

19   BY MR. LICHTER:

20        Q.   You can answer.

21        A.   I have no idea.

22        Q.   Okay.  It's fine.

23             And first it looks like for every year

24   since 2006 on this chart, with the exception of

25   2011, Albertsons Store 4102 dispensed more opioid

1  pills into Saginaw than the actual number of people

2  that live there.  Does that look right?

3              MR. WAHBY:  Objection; form.

4     A.  Yes.

5  BY MR. LICHTER:

6     Q.  Okay.  Does that seem reasonable to you on

7  its face?

8              MR. WAHBY:  Objection; form.

9     A.  Does what seem reasonable to me?

10  BY MR. LICHTER:

11     Q.  Does dispensing more pills into Saginaw

12  than the amount of people that live there seem

13  reasonable?

14              MR. WAHBY:  Objection; form, assumes

15  facts not in evidence.

16     A.  Without knowing the demographics in terms

17  of the scripts that were written, in terms of the

18  quantities, the directions, there's a lot of

19  variables to make that a difficult guess.

20  BY MR. LICHTER:

21     Q.  Okay.  And you don't have those variables,

22  correct?

23     A.  Absolutely not.

24     Q.  You don't have the demographic information?

25     A.  I don't have the -- all the script

1    information.

2       Q.   Okay.

3       A.   I don't have any of that.

4       Q.   Do you know why there's no data here for

5    the year 2011?

6       A.   No.

7       Q.   Do you know if this store stopped

8    dispensing drugs that year?

9       A.   I don't know.

10      Q.   Okay.  If one of the stores you oversaw

11   stopped dispensing drugs for a year, is that

12   something that you would be aware of?

13             MR. WAHBY:  Objection; form.

14      A.   Yes.

15   BY MR. LICHTER:

16      Q.   Okay.  And looking at the year 2014 on this

17   chart, it indicates Albertsons Store 4102 dispensed

18   203,250 dosage units into Saginaw.  Do you see that?

19      A.   Yes.

20      Q.   Okay.  And, again, in a city of about 24 --

21   sorry -- 24,000 people, that comes out to over 8

22   pills that year for every man, woman and child in

23   Saginaw.  Does that number seem reasonable to you?

24             MR. WAHBY:  Objection; form.

25      A.   Without knowing how they were prescribed

 1   and who they were prescribed for, I have no idea.

 2   BY MR. LICHTER:

 3       Q.   Okay.  And over on the bottom left of the

 4   chart it indicates Albertsons Store 4102 dispensed a

 5   grand total of 2,120,553 opioid dosage units into

 6   Saginaw from 2006 to 2021.  Do you see that?

 7       A.   Yes.

 8       Q.   Okay.  And, again, in a city of about

 9   24,000 people, that comes out to over 88 pills per

10   person in Saginaw.  Does that seem reasonable to

11   you?

12               MR. WAHBY:  Objection; form.

13       A.   Again, without knowing all the

14   information. . .

15   BY MR. LICHTER:

16       Q.   Okay.  Based on these numbers we're looking

17   at, do you think maybe -- maybe this Albertsons

18   location was filling more opioid prescriptions than

19   it should have been?

20               MR. WAHBY:  Objection; form.

21       A.   I couldn't say that.

22   BY MR. LICHTER:

23       Q.   Okay.  And did Albertsons ever provide you

24   with any data so you could determine whether Store

25   4102's opioid dispensing was reasonable?

1              MR. WAHBY:  Objection; form.

2      A.   No.

3  BY MR. LICHTER:

4      Q.   If it did provide you that sort of

5  information on demographics and dispensing trends,

6  stuff like that, would that information be helpful

7  for you in your job?

8              MR. WAHBY:  Objection; form.

9      A.   No.

10  BY MR. LICHTER:

11      Q.   Why wouldn't that be helpful for you?

12              MR. WAHBY:  Objection; form.

13      A.   I'm not the person filling the

14  prescriptions and giving them to the patients.

15  BY MR. LICHTER:

16      Q.   But you oversee these pharmacies, right?

17      A.   Yes.

18      Q.   Does Albertsons provide you that sort of

19  information for any of the stores you oversee?

20      A.   No.

21              MR. WAHBY:  Objection to form to that

22  last question.

23              THE WITNESS:  Sorry.

24              MR. LICHTER:  Set this one aside.

25              I'll have the next document marked

 1    Exhibit 7.

 2                (Exhibit No. 7 marked.)

 3    BY MR. LICHTER:

 4        Q.    Okay.  I'll represent to you that this

 5    chart we're looking at is a summary of the opioid

 6    dispensing data that Albertsons produced for Store

 7    4290 and dosage units created by Dr. Craig McCann in

 8    this litigation.

 9            And, again, a dosage unit is essentially

10    just a pill, correct?

11        A.    Yes.

12                MR. WAHBY:  Object.  We object to the

13    use of this exhibit.  It's not Bates labelled and

14    have no idea where it came from.

15    BY MR. LICHTER:

16        Q.    Okay.  And the top here indicates Store

17    4290 is located at 480 Northwest Parkway in Azle,

18    Texas; is that right?

19        A.    Azle.

20        Q.    Azle?

21        A.    Yes.

22        Q.    Excuse me.

23        A.    It's okay.

24        Q.    I'm from California.

25        A.    I get you.

1      Q.   Azle is in Tarrant County, correct?

2      A.   Yes.

3      Q.   Okay.  And you oversee Store 4290?

4      A.   Yes.

5      Q.   Okay.  Do you have any idea what the

6  population of Azle, Texas is?

7      A.   No.

8      Q.   Okay.  I'll represent to you according to

9  the U.S. Census Bureau, the population of Azle,

10  Texas was 13,518 people in 2021.  So that's about

11  14,000 people.

12              MR. WAHBY:  Objection; form, move to

13  strike.

14  BY MR. LICHTER:

15      Q.   And, again, it looks for every year since

16  2006 on this chart, with the exception of 2010 to

17  2011, Albertsons Store 4290 dispensed more opioid

18  pills into Azle than the actual number of people who

19  live there.  Do you see that?

20              MR. WAHBY:  Objection; form, assumes

21  facts not in evidence.

22      A.   Yes.

23  BY MR. LICHTER:

24      Q.   Okay.  And, again, you don't have any of

25  the demographic or dispensing information to

1    determine if that level of dispensing is reasonable

2    in this area; is that right?

3        A.    Correct.

4        Q.    Okay.  Looking at the year 2014, on this

5    chart, indicates Albertsons Store 4290 dispensed

6    194,539 dosage units into Azle.  Do you see that?

7        A.    Yes.

8        Q.    And in a city of about 14,000 people, that

9    comes out to almost 14 pills that year for every

10   man, woman and child in Azle.  Again, you don't --

11   Albertsons never provided you any information to

12   determine if that number would be reasonable; is

13   that right?

14               MR. WAHBY:  Objection; form.  Object

15   to the sidebar.

16       A.    Correct.

17   BY MR. LICHTER:

18       Q.    Okay.  And over on the bottom left, it

19   indicates Store 4290 dispensed a grand total of

20   2,204,889 opioid dosage units into Azle between 2006

21   and 2021.  Do you see that?

22       A.    Yes.

23       Q.    Okay.  And in a city of about 14,000

24   people, that comes out to approximately 157 pills

25   over that time for every person in Azle.

1                    MR. WAHBY:  Objection; form.  Object

2    to the sidebar.  Move to strike.

3    BY MR. LICHTER:

4        Q.   And, again, you don't have any demographic

5    dispensing information to determine whether or not

6    that's reasonable, correct?

7        A.   Correct.

8                    MR. LICHTER:  Okay.  Set this one

9    aside.

10            I'll have the next document marked as

11   Exhibit 8.  Just one more of these charts.

12                    (Exhibit No. 8 marked.)

13   BY MR. LICHTER:

14       Q.   I'll represent to you that Exhibit 8 here

15   is a summary of the opioid dispensing data

16   Albertsons produced for Store 4150 in dosage units

17   created by Dr. Craig McCann in this litigation.

18            The top here indicates Store 4150 is

19   located at 6308 Lake Worth Boulevard in Lake Worth,

20   Texas.  Does that sound correct?

21       A.   Yes.

22       Q.   Okay.  And Lake Worth is in Tarrant County,

23   correct?

24       A.   Yes.

25       Q.   Okay.  And you oversee Store 4150, correct?

1      A.   Yes.

2      Q.   Okay.  And do you have any idea what the

3   population of Lake Worth, Texas is?

4      A.   No.

5      Q.   Okay.  I'll represent to you that according

6   to the U.S. Census Bureau, the population of Lake

7   Worth, Texas was 4,674 people in 2021.  So about

8   5,000 people.

9           MR. WAHBY:  Objection form.  Object to

10   the sidebar.  Move to strike.  And I object to the

11   use of this exhibit as it's not Bates labeled.

12   BY MR. LICHTER:

13      Q.   First, like the other charts we just looked

14   at, for every year since 2006, with the exception of

15   2010 and 2011, it looks like Albertsons Store 4150

16   dispensed more opioid pills into Lake Worth than the

17   actual number of people that live there, correct?

18           MR. WAHBY:  Objection; form.

19      A.   Yes.

20   BY MR. LICHTER:

21      Q.   Again, you don't know why there's any data

22   missing here from the years 2010 and 2011?

23      A.   No.

24      Q.   Looking at the year 2012 on this chart,

25   Store 4150 dispensed 194,346 dosage units into Lake

1    Worth.  Do you see that?

2        A.   Yes.

3        Q.   Okay.  In a city of about 5,000 people,

4    that comes out to almost 39 pills that year for

5    every man, woman and child in Lake Worth.

6             MR. WAHBY:  Objection to the form.

7    Object to the sidebar.

8    BY MR. LICHTER:

9        Q.   Okay.  And, again, you don't have any data

10   or demographic information to determine whether or

11   not that's a reasonable amount to dispense into Lake

12   Worth, correct?

13       A.   Correct.

14       Q.   Okay.  In the bottom left, it indicates

15   Albertsons Store 4150 dispensed a grand total of

16   1,905,832 opioid dosage units into Lake Worth

17   between 2006 and 2011.  Do you see that?

18       A.   Yes.

19       Q.   Okay.  And, again, Lake Worth, with about

20   5,000 people, that comes out to about 381 pills per

21   person during that time.  And, again, you have no --

22   no data to help you determine whether or not that

23   number might be reasonable, correct?

24       A.   Correct.

25             MR. WAHBY:  Objection; form.

1      A.   Correct.

2  BY MR. LICHTER:

3      Q.   Based on these numbers that we're looking

4  at, do you think someone at Albertsons should have

5  been in charge of monitoring opioid dispensing

6  numbers like this to make sure things weren't

7  getting out of hand in Tarrant County?

8            MR. WAHBY:  Objection; form.

9      A.   No.

10  BY MR. LICHTER:

11      Q.   No, you don't think someone should have

12  been monitoring?

13            MR. WAHBY:  Objection; form.

14      A.   No.

15            MR. LICHTER:  Set this one aside.

16          I'll have the next document marked

17  Exhibit 9.  For the record, this document is Bates

18  numbered ALB-NM00011005.

19            (Exhibit No. 9 marked.)

20  BY MR. LICHTER:

21      Q.   Have you seen this document before?

22      A.   No.

23      Q.   I'll represent to you this document is an

24  internal Albertsons report dated January 24, 2020,

25  that discusses the controlled substance dispensing

1    of Albertsons Pharmacy 3914 located in Silver City,

2    New Mexico.  Have you seen this report before?

3        A.    No.

4        Q.    I would like us to kind of take a look at a

5    few different parts of this report together,

6    starting at the bottom of the first page.  It

7    identifies some prescription fill data for this

8    store as far as weekly prescriptions filled, what

9    percent are Schedule IIs compared to the company

10   average.  Do you see that?

11       A.    Yes.

12       Q.    Okay.  And below that it identifies the

13   number of stores in the state of New Mexico at 29,

14   and it identifies IQVIA controlled substance

15   dispensing ratings on -- and on the following page

16   includes a chart of how this store is rated using

17   the IQVIA data.  Do you see that?

18       A.    Okay.  Yes.

19       Q.    Do you know what IQVIA -- excuse me.  Do

20   you know what IQVIA controlled substance dispensing

21   ratings are?

22       A.    No.

23       Q.    Okay.  Have you ever seen a chart like this

24   before for any of the stores you oversee?

25       A.    No.

1      Q.    Okay.  Have you ever heard of IQVIA?

2      A.    No.

3      Q.    Okay.  Below that chart, it indicates -- it

4  says, "A review of all prescriptions dispensed from

5  10/19/19 to 1/20/2020 was performed and details

6  provided below."

7          Do you see that?

8      A.    Yes.

9      Q.    Okay.  It then gives a section on overall

10 insights for that store based on its review of the

11 prescriptions dispensed.  Do you see that?

12     A.    Yes.

13     Q.    Okay.  And below that is a section titled

14 "Patients," which appears to identify specific

15 information for what looks like a few dozen

16 Albertsons patients at this store.  Do you see that?

17     A.    Yes.

18     Q.    Okay.  And flipping past the "Patient"

19 section, this is on the fourth page of the document,

20 there's a section titled "Prescribers."  Do you see

21 that?

22     A.    Okay.  Yeah.

23     Q.    And this appears to discuss top prescribers

24 by volume for CS prescriptions.  Do you see that?

25     A.    Yes.

1      Q.   And it gives IQVIA ratings for each of the

2    prescribers broken down by different controlled

3    substance drugs.  Do you see that on the following

4    page?

5              MR. WAHBY:  Objection; form.

6      A.   Yes.

7    BY MR. LICHTER:

8      Q.   Okay.  And following that section is a

9    section titled "Geography."  Do you see that?

10     A.   Yes.

11     Q.   And that appears to discuss the Silver City

12   population and surrounding areas as it relates to

13   controlled substance dispensing at this store.  Do

14   you see that?

15     A.   Yes.

16     Q.   Okay.  It also includes a graphic map of

17   the state of New Mexico and locates Silver City

18   within there.  Do you see that?

19     A.   Yes.

20     Q.   The following page, the last page of the

21   document, is a section titled "Store Action Plan."

22   This apparently identifies a plan of action for the

23   store to follow based on the above dispensing

24   review.  Do you see that?

25     A.   Yes.

1      Q.   Have you ever seen a dispensing report like

2   this for any of the stores you oversee in Tarrant

3   County?

4      A.   I don't remember seeing one for a Tarrant

5   County store, no.

6      Q.   Have you ever seen a dispensing report like

7   this for any of the stores you oversee?

8      A.   I don't remember that I saw this.

9      Q.   Okay.  So you don't recall seeing a report

10  like this for the stores we just looked at the

11  following charts -- or -- yeah, the following charts

12  from Saginaw, Azle and -- sorry, Azle, and Lake

13  Worth; is that right?

14             MR. WAHBY:  Objection; form.

15     A.   I don't remember seeing it for those.

16  BY MR. LICHTER:

17     Q.   Okay.  Has Albertsons ever provided you any

18  information like what we've seen in this report for

19  any of the stores you oversee in Tarrant?

20     A.   Not that I remember.

21     Q.   Okay.  Do you know if Albertsons provides

22  any of this information that we're looking at

23  directly to its pharmacists?

24     A.   I don't know.

25     Q.   Okay.  So as far as you know, no

1    information to you or to the pharmacists you oversee

2    regarding certain prescribers at the stores you

3    oversee?

4                   MR. WAHBY:  Objection; form.

5        A.   Not -- not that I know.

6    BY MR. LICHTER:

7        Q.   Okay.  Same response as far as providing

8    information on dispensing trends of certain

9    patients?

10                  MR. WAHBY:  Objection; form.

11       A.   Right.

12   BY MR. LICHTER:

13       Q.   Okay.  Were you ever given information from

14   Albertsons on dispensing trends for the store as a

15   whole?

16                  MR. WAHBY:  Objection; form.

17       A.   Not that I remember.

18   BY MR. LICHTER:

19       Q.   And no analytic information from IQVIA data

20   or anything like that?

21       A.   Not that I remember.

22                  MR. WAHBY:  Objection; form.

23       A.   Not that I remember.

24   BY MR. LICHTER:

25       Q.   Okay.  No information from Albertsons on

1   how the geography of your stores should or shouldn't

2   impact opioid dispensing?

3                    MR. WAHBY:  Objection; form.

4       A.  No.

5   BY MR. LICHTER:

6       Q.  If you had some of this information, do you

7   think it would put you in a better position to

8   prevent diversion at the stores you oversee?

9                    MR. WAHBY:  Objection; form.

10      A.  Diversion?

11  BY MR. LICHTER:

12      Q.  Prescription opioid pills leaving the

13  legitimate chain of purchase and going into the

14  illicit channels.

15                   MR. WAHBY:  Objection; form.

16      A.  I don't know.

17  BY MR. LICHTER:

18      Q.  Okay.  Do you know how pharmacists' bonuses

19  are calculated in Tarrant County?

20      A.  In -- in Albertsons/Tom Thumb?

21      Q.  In Albertsons' pharmacies in Tarrant

22  County, yes.

23      A.  How are they -- yes.

24      Q.  Can you explain how they are calculated?

25      A.  The pharmacist -- pharmacy manager is bonus

1    eligible.  The pharmacy manager bonus is based on

2    the store's performance, the entire store's

3    performance.

4        Q.    Would that include the dispensing volume of

5    the pharmacy?

6        A.    No.  It will -- it was based on if the

7    stores makes a -- makes their projected number on

8    sales and makes their projected number on earnings.

9        Q.    So would the sales and earnings number

10   include prescription drugs?

11       A.    Prescriptions filled in the -- in the

12   store --

13       Q.    Right.

14       A.    -- do contribute to the sales of the store,

15   yes.

16       Q.    Okay.  So the higher the volume of

17   prescription drugs dispensed, the higher the overall

18   earnings of the store would be, correct?

19              MR. WAHBY:  Objection; form.

20       A.    Yes.

21   BY MR. LICHTER:

22       Q.    Okay.  Do you know if controlled

23   substances, or opioids in particular, were ever

24   excluded from that bonus calculation?

25       A.    No.

1      Q.   You don't know or they haven't been?

2      A.   Not that I know, that they have ever been

3    excluded from that.

4      Q.   At a corporate level, do you know if

5    Albertsons has any corporate monitoring programs for

6    Tarrant County regarding problematic doctors?

7      A.   I don't know.

8      Q.   Okay.  What about for problematic patients?

9      A.   I don't know.

10      Q.   What about for red flag prescriptions?

11      A.   I don't know.

12      Q.   What about for -- well, strike that.

13            MR. LICHTER:  I believe that's all the

14    questions I have for now.  We can -- yeah, I'm fine

15    to pass the witness to you if you would like --

16            MR. WAHBY:  Great.

17            MR. LICHTER:  -- to ask further

18    questions.

19            MR. WAHBY:  We'll reserve our

20    questions until the time of trial.

21            THE VIDEOGRAPHER:  The time is

22    12:54 p.m., and we are off the record.

23            (Deposition concluded at 12:54 p.m.)

24

25

1                    CHANGES AND SIGNATURE

2    DONALD BOWMAN  JULY 18, 2023

3    Reason Codes: (1) to clarify the record; (2) to

4    conform to the facts; (3) to correct a transcription

5    error; (4) other (please explain).

6    PAGE    LINE            CHANGE              REASON

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

```
 1                        SIGNATURE

 2

 3              I, DONALD BOWMAN, have read the

 4    foregoing deposition, or have had it read to me, and

 5    hereby affix my signature that same is true and

 6    correct, except as noted above.

 7

 8                          _____

 9                        DONALD BOWMAN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION

 3   IN RE:  NATIONAL PRESCRIPTION *
     OPIATE LITIGATION              *
 4                                  *  MDL NO. 2804
     THIS DOCUMENT RELATES TO       *  CASE NO. 1:17-MD-2804
 5                                  *
     TRACK NINE                     *
 6
                     REPORTER'S CERTIFICATION
 7               DEPOSITION OF DONALD BOWMAN
                       JULY 18, 2023
 8

 9            I, CHRISTY R. SIEVERT, CSR, RPR, in

10   and for the State of Texas, hereby certify to the

11   following:

12            That the witness, DONALD BOWMAN, was duly

13   sworn by the officer and that the transcript of the

14   oral deposition is a true record of the testimony

15   given by the witness;

16            I further certify that the signature of

17   the deponent was requested by the deponent or a

18   party and is to be returned within 30 days from date

19   of receipt of the transcript.  If returned, the

20   attached Changes and Signature Page contains any

21   changes and the reasons therefor;

22            I further certify that I am neither

23   counsel for, related to, nor employed by any of the

24   parties or attorneys in the action in which this

25   proceeding was taken, and further that I am not
```

1   financially or otherwise interested in the outcome

2   of the action.

3          Subscribed and sworn to on this the 4th

4   day of August, 2023.

5

6

7          _____

8                          CHRISTY R. SIEVERT, CSR, RPR
                           Texas CSR 8172
9                          Expiration Date:  4-30-2025

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25