# EXHIBIT
# 28

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4       - - - - - - - - - - - x

 5    In Re: NATIONAL PRESCRIPTION    :

 6    OPIATE LITIGATION              :MDL NO. 2804

 7                                   :CASE NO. 1:17-MD-2804

 8    THIS DOCUMENT RELATES TO:      :

 9    "Case Track Nine"             :

10       - - - - - - - - - - - - x

11            HIGHLY CONFIDENTIAL – SUBJECT TO

12            FURTHER CONFIDENTIALITY REVIEW

13               TUESDAY, JULY 25, 2023

14

15    Remote Oral and Videotaped deposition of TIM MILLS

16    conducted at the location of the witness in Ponca

17    City, Arkansas, commencing at 10:03  a.m. CST, on

18    the above date, before Karisa J. Ekenseair,

19    Certified Court Reporter, Registered Merit

20    Reporter, and Notary Public.

21

22            GOLKOW LITIGATION SERVICES

23        877.370.3377 ph | 917.591.5672 fax

24               deps@golkow.com

25
```

```
 1                   A P P E A R A N C E S

 2

 3       ON BEHALF OF THE PLAINTIFFS (VIA ZOOM):

 4            JAY LICHTER, ESQUIRE

 5            BARON & BUDD P.C.

 6            15910 VENTURA BOULEVARD, SUITE 1600

 7            LOS ANGELES, CALIFORNIA 91436

 8            818-839-2333

 9            jlichter@baronbudd.com

10

11       ON BEHALF OF THE DEFENDANT ALBERTSONS (VIA

12    ZOOM):

13            BRETT DORAN, ESQUIRE

14            EMILY MANKOWSKI, ESQUIRE

15            GREENBERG TRAURIG

16            77 WEST WACKER DRIVE, SUITE 3100

17            CHICAGO, ILLINOIS 60601

18            312-456-8400

19            doranb@gtlaw.com

20            mankowskie@gtlaw.com

21

22

23

24

25
```

```
 1

 2        A P P E A R A N C E S   C O N T I N U E D

 3

 4        ON BEHALF OF THE DEFENDANTS KROGER (VIA

 5     ZOOM):

 6             COREY L. PALUMBO, ESQUIRE

 7             BOWLES RICE

 8             600 QUARRIER STREET

 9             CHARLESTON, WEST VIRGINIA 25301

10             304-347-1781

11             cpalumbo@bowlesrice.com

12

13

14        ALSO PRESENT:

15             MICHAEL KAUFFMANN, REMOTE TECHNICIAN

16             ZACH HONE, VIDEOGRAPHER

17

18

19

20

21

22

23

24

25
```

1                 T A B L E   O F   C O N T E N T S

2                                             PAGE

3     STYLE AND NUMBER........................    1

4     APPEARANCES.............................    3

5

6     WITNESS:    TIM MILLS

7     EXAMINATION BY MR. LICHTER............    6

8

9     CERTIFICATE OF REPORTER...............   128

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         EXHIBITS

 2                   (ATTACHED TO TRANSCRIPT)

 3    NUMBER  DESCRIPTION                         PAGE

 4    1       E-MAIL CHAIN, SUBJECT: OUTLINE

 5            OF SUSPICIOUS ORDERING SYSTEM,

 6            BATES NUMBER ALB-NM00014414,

 7            HIGHLY CONFIDENTIAL..............60

 8    2       E-MAIL CHAIN SUBJECT: RE:

 9            PHARMACY SUSPICIOUS QUANTITIES,

10            BATES NUMBER ALB-NM00014412

11            THROUGH 14413, CONFIDENTIAL......91

12    3       PHARMACY SUPPLY CHAIN

13            COMPLIANCE COMMITTEE AGENDA

14            DATED MARCH 18, 2014, BATES

15            NUMBER ALB-NM00001477 THROUGH

16            1482, HIGHLY CONFIDENTIAL -

17            SUBJECT TO PROTECTIVE ORDER......114

18    4       E-MAIL CHAIN, SUBJECT: ENHANCED

19            SOM PILOT **URGENT**, BATES

20            NUMBER ALB-NM00014384 THROUGH

21            14385, CONFIDENTIAL.............121

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2             THE VIDEOGRAPHER:  We are now on the

 3      record.  My name is Zach Hone.  I'm a videographer

 4      for Golkow Litigation Services.

 5             Today's date is July 25, 2023.  The time

 6      is 10:03 a.m.

 7             This remote video deposition is being held

 8      in the matter of In Re: National Prescription

 9      Opiate Litigation.  The deponent is Tim Mills.

10      All parties of this deposition are appearing

11      remotely and have agreed to the witness being

12      sworn in remotely.

13             Due to the nature of remote reporting,

14      please pause briefly before speaking to ensure all

15      parties are heard completely.  Counsels'

16      appearances will be noted on the stenographic

17      record.

18             The court reporter will now swear in the

19      witness.

20                          TIM MILLS

21      of lawful age, being first duly sworn, deposes and

22      says in reply to the questions propounded as

23      follows:

24                         EXAMINATION

25      BY MR. LICHTER:
```

1      Q  Good morning, Mr. Mills.

2      A  Good morning.

3      Q  Would you please state and spell your name

4   for the record?

5      A  Timothy Ross Mills, T-I-M-O-T-H-Y,

6   R-O-S-S, M-I-L-L-S.

7      Q  Okay.  And have you ever had your

8   deposition taken before?

9      A  I'm not positive.  I did have 20-plus

10  years ago a few personal matters, minor personal

11  matters, but I'm not for certain if I was actually

12  deposed.  I did offer some testimony in both cases

13  though.

14     Q  Okay.  Were you a party to either of those

15  cases, or were you giving testimony as a witness?

16     A  I was a witness in one and a party in

17  another.

18     Q  Did either of those cases involve

19  Albertsons?

20     A  No.

21     Q  Did either of those cases involve Safeway?

22     A  No.

23     Q  Okay.  Did either of those cases involve

24  any pharmacies?

25     A  No.

1     Q  Okay.  Okay.  So you may have some

2  experience with this before, but just to give you

3  some basic admonitions for the ground rules for

4  depositions, during the deposition, I'm going to

5  be asking you a series of questions.  From time to

6  time, your counsel Mr. Doran, who I believe is

7  sitting next to you, may object to some of my

8  questions.

9        Just so you know, you are obligated to

10  answer the responses even though Mr. Doran objects

11  unless Mr. Doran specifically instructs you not to

12  answer.

13        Do you understand that?

14     A  Yes.

15     Q  Okay.  And we have a court reporter that's

16  on the Zoom call taking down everything that we

17  are saying.  So it's important to the extent that

18  we can, if we can speak slowly and to the best of

19  our ability not to talk over one another.

20        Does that make sense?

21     A  Yes.

22     Q  Okay.  And also, responses like uh-huh and

23  huh-uh are usually sort of difficult for the court

24  reporter to take down.  So if a question calls for

25  a yes-or-no answer, I would ask that you give a

1  yes-or-no response and avoid the uh-huhs and

2  huh-uhs to the extent you can.

3        Is that okay?

4     A  Yes.

5     Q  Okay.  And have you taken any medications

6  that may impair your ability to give truthful

7  testimony today?

8     A  No.

9     Q  Okay.  Any reason at all why you might not

10  be able to give truthful testimony here today?

11     A  No.

12     Q  Okay.  Okay.  I don't anticipate this

13  deposition will last the entire day, but I do plan

14  to take breaks throughout the deposition.  I

15  usually aim to take a break every hour or so that

16  we've been going.  But if at any time you'd like

17  to take a break for any reason, if you need to get

18  a drink of water, use the restroom, you can go

19  ahead and let me know.

20        I would just ask that we -- we not take a

21  break while a question is pending.  So if I've

22  asked a question, I would ask that we complete the

23  response, and then we can go ahead and break for

24  however long we need.

25        Is that all right with you?

1      A   Yes.

2      Q   Great.  Okay.  And have you done anything

3   to prepare for today's deposition?

4      A   I met with -- with my attorney here

5   yesterday evening and our company -- our in-house

6   company counsel Adwoa briefly.  She was on the

7   call briefly yesterday.  She was -- she was

8   remote.

9      Q   Do you know the last name of Adwoa?

10     A   I do not.

11     Q   Okay.  Do you know how to spell Adwoa?

12     A   I believe it's A-D -- no, I don't.  I'm

13   sorry.

14     Q   Okay.  That's okay.

15         And you said you had two meetings with

16   counsel total?

17     A   I had a meeting last night or late

18   yesterday.

19     Q   So just one meeting then?

20     A   I had a meeting earlier this year to go

21   over what might be coming.

22     Q   Okay.  So then there would be two total

23   meetings; is that right, the one earlier this year

24   and the one the other day?

25     A   I believe so.

1      Q  Okay.  Do you know about how long those

2  meetings lasted?

3      A  Last night -- the first meeting, I do not.

4  It was not a long meeting.

5         The one last night, it was -- I would say,

6  roughly five to six hours.

7      Q  And in either of those meetings, were you

8  shown any documents by counsel?

9      A  I was.

10     Q  Okay.  And other than documents shown by

11  counsel, did you review or look at any documents

12  in preparation for this deposition?

13     A  I'm sorry, I don't understand the

14  question.

15     Q  Sure.  You said that the lawyers showed

16  you some documents; is that right?

17     A  That's correct.

18     Q  Other than the ones that they showed you,

19  did you review any documents to prepare for this

20  deposition?

21     A  Just the ones that I was shown last night.

22     Q  Okay.  So no additional documents?

23     A  No.  No.

24     Q  Okay.  Okay.  Did you attend college?

25     A  I did.

```
 1       Q  And where did you attend college?

 2       A  I believe the name of it -- it was in

 3   Tarrant County.

 4       Q  Okay.

 5       A  It was -- I think that's Tarrant County

 6   College.

 7       Q  Is that a community college?

 8       A  It -- it was at the time.  I don't know if

 9   it still -- it used to be called TCJC.

10       Q  Okay.  And did you graduate?

11       A  I did not.

12       Q  Do you know for what years you attended

13   TCJC?

14       A  I would say late '80s, early '90s.

15       Q  And for how many years were you there?

16       A  I went part-time, so it was -- I

17   would -- I would estimate maybe four years.

18       Q  Is there any reason why you didn't

19   graduate?

20       A  Just family and I ended up at -- just

21   family and work.

22       Q  Were you working toward a specific degree

23   while you were there?

24       A  I was.

25       Q  And what degree was that?
```

1       A  Computer science.

2       Q  Okay.  But you didn't actually receive a

3    degree in computer science, did you?

4       A  No.

5       Q  Okay.  And other than the approximate four

6    years that you spent at TCJC, have you had any

7    other formal education?

8       A  I've had some training courses offered by

9    technical seminars and classes.  I can't -- I

10   can't think of the names of the -- of the

11   institutions.

12      Q  And were those offered from the places

13   that you worked or did you independently attend

14   those seminars?

15      A  A few were independent and a few, they

16   were work-sponsored.

17      Q  Okay.  Were -- were all of those trainings

18   related to computer science in one way or another?

19      A  Yes.

20      Q  And do you currently hold any professional

21   certifications?

22      A  I do not.

23      Q  Okay.  So since leaving TCJC, I guess, in

24   the late '80s or early '90s, do you recall what

25   your first job was after you -- after you left

1    that school?

2        A  I worked for, I believe -- while I was

3    going there, Holiday Inn.

4        Q  Okay.  Do you recall for what years you

5    were working for Holiday Inn?

6        A  It was -- I believe it was five years

7    total.  And it was, I would say, from -- I'm

8    guessing or estimating from '85 to maybe '90.

9        Q  Do you recall what your title was at

10   Holiday Inn?

11       A  I held -- I was promoted several times

12   while I was there, but my ending title was a guest

13   service manager.

14       Q  How about after Holiday Inn, where did you

15   work?

16       A  I worked very briefly at a company called

17   Owens Oil Tools.

18       Q  At Owens Oil, O-I-L?

19       A  Yes, sir.

20       Q  Okay.  And for what years did you work at

21   Owens Oil?

22       A  I -- I am guessing probably -- it was

23   probably six months, and it was in 1991.

24       Q  And what was your job title there?

25       A  I'm not sure.  It was a -- it -- it was a

1   more of an industrial job.  I -- I'm not sure what

2   the title was.

3        Q  Okay.  Can you explain what you mean by an

4   industrial job?  Was it -- were you doing manual

5   labor?

6        A  I was doing manual labor.  I was -- I was

7   working in a pressing room.

8        Q  Okay.  Nothing related to computer science

9   though?

10       A  No.

11       Q  Okay.  How about after Owens Oil, where

12   did you work next?

13       A  That's when I began my career at

14   Albertsons.

15       Q  Okay.  And what year did you start?

16       A  In '91.

17       Q  And what was your -- your first job with

18   Albertsons in 1991?

19       A  It was at the Ft. Worth distribution

20   center.  And are -- are you wanting to know my

21   title when I start -- what it was when I started?

22       Q  Yeah.  Let's start with your title.

23       A  Okay.  It was a report breakdown clerk.

24       Q  And you said you worked at the Ft. Worth

25   distribution center?

1      A  Yes.

2      Q  And what were your general

3   responsibilities as a report breakdown clerk?

4      A  I printed shelf tags for the stores and

5   sorted them and got them ready to be sent out to

6   the stores.  And I also broke down various reports

7   that -- that were printed on the printers and

8   distributed them to the -- to the users in the

9   warehouse.

10     Q  Okay.  And when you say the shelf tags for

11  the stores, are we talking about the actual price

12  tags?

13     A  Yes.

14     Q  On the shelf for a product?

15     A  Yes.

16     Q  Okay.

17     A  Yes.

18     Q  And how long did you serve as the report

19  breakdown clerk?

20     A  I would -- I would -- and this is purely

21  just guessing, I -- probably six months, six to

22  eight months.

23     Q  Okay.  Do you recall what your next

24  position was with Albertsons?

25     A  It was a computer operator.

1      Q  Okay.  Would that have been in about 1992?

2      A  Thereabouts.

3      Q  Okay.  And as a computer operator --

4  operator, did you still work at the Ft. Worth

5  distribution center?

6      A  Yes.

7      Q  And what were your general job

8  responsibilities?

9      A  Monitoring the mainframe system,

10  submitting job streams, processing store orders,

11  and printing reports, and -- and shelf tags.

12      Q  Okay.  Can you explain what you mean a

13  little more by processing store orders?

14      A  We -- absolutely.  We -- stores would send

15  their orders in to the -- to the warehouse

16  electronically, and we would gather those orders

17  and begin the process of -- of we called it

18  billing, where we bill the stores.  It's a process

19  that relieves warehouse inventory and produces the

20  reports needed to select store orders and store

21  invoices --

22      Q  And --

23      A  -- selection labels.

24      Q  Okay.  Got it.  And were you dealing at

25  all with orders from Albertsons' pharmacy at this

1    time?

2        A  I do not recall processing -- I do not

3    believe we had a pharmacy there.  I believe we did

4    at one time, but I did not process, the best that

5    I can recall, pharmacy orders.

6        Q  Okay.  At this time, did your -- was your

7    position serving a specific geographic area or

8    were you computer operator for the entire country

9    of Albertsons stores?

10       A  I believe it was for Texas stores and the

11   Oklahoma stores.  It may have just been Texas.

12   I -- I'm not positive.

13       Q  Okay.

14       A  Certainly Texas.

15       Q  And you said you don't recall whether you

16   were processing pharmacy orders; is that right?

17       A  That's correct.

18       Q  Okay.  Did the Ft. Worth distribution

19   center, did that fill pharmacy orders?

20       A  I -- I do not remember them --

21       Q  Okay.

22       A  I -- I believe at one time they had a

23   pharmacy, but I -- I'm not for certain if while I

24   was there in the early stages of -- of my

25   employment, whether the pharmacy -- pharmacy was

1    still -- still -- they still had it in-house.

2      Q  Okay.  And do you know if the Ft. Worth

3    distribution center is still in operation?

4      A  It -- it was sold a while back.

5      Q  Do you recall about when?

6      A  I -- I want to -- I really can't

7    give -- it would be pure speculating, but I would

8    think it would be somewhere around 2010.

9      Q  You don't have any -- any concrete

10   information you can base -- base on as far as a

11   general estimate of a year that it might have been

12   sold?

13     A  I do not.  I'm sorry.

14     Q  Could have been before 2010; could have

15   been after 2010?  Just no real --

16     A  It -- it could have.

17     Q  Okay.  Is there any reason why 2010 sticks

18   out in your mind?

19     A  No.  Other than it just seems like

20   probably the appropriate amount of time --

21     Q  Okay.

22     A  -- we had a -- we had a -- that warehouse

23   that we operated in there.

24     Q  Okay.  And how about after you were a

25   computer operator in 1992, when was your next

1    position with Albertsons?

2        A  It was as -- I believe they called it an

3    IT -- or a data processing supervisor.

4        Q  I'm sorry, how long were you -- did you

5    serve as a computer operator for?

6        A  I belive, probably from 1992 and I think

7    I'm -- I'm guessing here, it was probably 1998,

8    when I was promoted to a supervisor.

9        Q  Okay.

10       A  It may have been '96 to '98, somewhere

11   around that time frame.

12       Q  Okay.  And just so you know, throughout

13   these questions, I -- I really don't want you

14   to -- to guess or speculate.  I would like, to the

15   best that you can, if you -- if you don't have a

16   precise answer for any of the questions I give

17   you, if you can provide a reasonable estimate of

18   the information based on your experience, based on

19   what you know, that's -- that's what I am shooting

20   for.

21           I really don't want you to guess or

22   speculate.  But if you don't know the answer to

23   something at all, that's a -- you can tell me

24   that, and we can find a way to work through the

25   question.

1          Is that all right?

2     A  Yes.

3     Q  Okay.  Okay.  So you were a data

4  processing supervisor starting in around '96 or

5  '98, right?

6     A  Yes.

7     Q  Okay.  And were you still located at the

8  Ft. Worth distribution center?

9     A  Yes.

10    Q  Okay.  How long did you serve in that

11  role?

12    A  I was promoted from a supervisor to a

13  manager in two -- in 2001.  I'm -- I'm -- again,

14  that's -- that is --

15    Q  That's an estimate?

16    A  That's an estimate.

17    Q  Okay.

18    A  2001.

19    Q  Okay.  And what were your general duties

20  as a data processing supervisor during that time?

21    A  Yes.  The -- I oversaw the -- the

22  operation of the computer room, the operators.  We

23  interviewed applicants, training.  We set up jobs

24  on the mainframe system and provided reports,

25  custom reports for users.

1      Q   And what -- what type of reports are we

2    talking about?

3      A   Basically, like, billing inquiries.

4      Q   Would those have been from billing

5    inquiries related to orders from the stores?

6      A   Yes.

7      Q   And were your duties here still confined

8    to the Texas, Oklahoma stores?

9      A   No.

10     Q   Okay.

11     A   No.   That -- in 2000, I was transferred to

12   the Lancaster distribution center or warehouse in

13   Pennsylvania.   It was in Denver, Pennsylvania.

14     Q   And that was in 2000, you said?

15     A   Yes.

16     Q   So while you were the data processing

17   supervisor at the Ft. Worth distribution center,

18   when you were there at that location, were

19   you -- was your job still confined to the Texas

20   and Oklahoma stores?

21     A   Yes.

22     Q   Okay.   Okay.   And then when you moved to

23   the Lancaster distribution center in Denver,

24   Pennsylvania that -- first of all, why did you

25   move?

1      A  It was a lateral move.  They were

2   opening -- that was a -- a new distribution center

3   and they needed experienced people to -- to go to

4   get it up and running.  We had just merged with

5   Supervalu and it was to -- they made the -- the

6   company made the determination that that warehouse

7   was going to run Albertsons' computer systems.

8          So they were looking for -- for Albertsons

9   employees to train and -- and operate those

10  various systems.

11     Q  So I guess the team in the Lancaster

12  distribution center in Denver, Pennsylvania, that

13  ran the computer system for the entire company of

14  Albertsons as a whole?

15     A  No.  No.  That was just for the stores in

16  Pennsylvania and New Jersey.

17     Q  Oh, okay.

18     A  Maryland, I believe, as well.

19     Q  Okay.  So then when you made this lateral

20  move, did -- did all of your job duties and

21  responsibilities remain the same but for the new

22  geographic area you were serving?

23     A  Yes.

24     Q  Okay.  I think you said in 2001, I guess

25  about a year after the -- the lateral move, you

1    became the manager of data processing?

2        A  Yes.

3        Q  Okay.  Was that in the same location as

4    Pennsylvania?

5        A  Yes.

6        Q  Oh, sorry.  And was that a promotion?

7        A  Sorry, yes, it was.

8        Q  Okay.  Can you explain how your job

9    responsibilities changed in this new role?

10       A  I was responsible for the -- again, it's

11   just responsible for the supervisors, the --

12   the -- the department as a whole.

13       Q  Okay.

14       A  And to make sure everything was, you know,

15   we followed all of the -- the procedures and that

16   employees were adequately trained.  And a lot of

17   my -- my responsibilities as a supervisor, you

18   know, just followed me into the manager position

19   as well.

20       Q  So were you managing and overseeing other

21   IT employees or was there a different group of

22   people you were overseeing?

23       A  It was just the local IT group.

24       Q  Okay.  So when you said that you were

25   involved in training, you were training the local

1    IT group in this distribution center on how to use

2    the computer system; is that fair?

3        A  For -- for my department, yes.

4        Q  And did your department have a specific

5    name?

6        A  I'm -- at various times we've been called

7    data processing, the computer room, IT.

8        Q  And do you know about how long you served

9    as the data processing manager in Pennsylvania?

10       A  I believe four years.

11       Q  Do you know if that distribution center in

12   Pennsylvania is still in operation today?

13       A  It is.

14       Q  Okay.  Does Albertsons still own it?

15       A  It's -- it is an Albertsons distribution

16   center.  It's Albertsons Safeway.

17       Q  And do you know if that distribution

18   center has ever processed orders from pharmacy?

19       A  While I was there, they did not.

20       Q  Okay.  How about at any time?

21       A  Not that I'm aware of.

22       Q  Okay.  So they would just be processing

23   orders from the actual grocery departments of the

24   Albertsons stores?

25       A  Grocery, GM, perishable.

1      Q  Okay.

2      A  HBC, seasonal.

3      Q  You said grocery, GM.

4         What does that mean?

5      A  General merchandise.

6      Q  Okay.  General merchandise, okay.  Okay.

7         So that takes us to about 2005, I believe.

8         Do you know what your next position was?

9      A  That's when I was transferred to the Ponca

10  City warehouse.

11      Q  Were you still the data processing

12  manager, just for the new location?

13      A  Yes.

14      Q  Do you know about how long you served in

15  that role?

16      A  I'm currently serving in that role.

17      Q  Okay.  You're currently the data

18  processing manager in Ponca City?

19      A  Well, we're called the system support

20  manager now.  The titles change names over the

21  years.

22      Q  Is that just a different name for the data

23  processing manager, or are there different duties

24  involved?

25      A  No.  It's -- it's just a different name.

1      Q  Okay.  And does the Ponca City

2  distribution center process orders from Albertsons

3  pharmacy?

4      A  Currently, we do not.

5      Q  Has it ever?

6      A  Yes.

7      Q  Okay.  And who do you report to currently

8  in this position?

9      A  Danny Williams.

10     Q  Do you know Danny's job title?

11     A  He is -- I believe it is the director.

12     Q  Director of data processing?

13     A  No.  He's wear -- supply chain director.

14  That's -- I'm sorry, that's -- in his job title,

15  there is -- he is a director but he oversees the

16  Ponca City warehouse.

17     Q  Okay.  Was that title previously held by

18  Jack Gagnon?

19     A  Yes.

20     Q  Okay.  Do you know when Danny Williams

21  took it over?

22     A  Last year.

23     Q  Okay.  Is Jack Gagnon still with the

24  company?

25     A  No.

1     Q  Do you know why he left?

2     A  He retired.

3     Q  Okay.  And do you currently oversee

4  employees in your current role?

5     A  I do.

6     Q  About how many?

7     A  One supervisor and two computer operators.

8     Q  Do you know their names?

9     A  The supervisor is John Deal (phonetic).

10    Q  Okay.

11    A  And two operators.  One is David Moore and

12  the other is Christopher Casillas.

13    Q  I'll save the court reporter from asking

14  you later how to spell Casillas.

15       Do you know how that's broken down?

16    A  I would have to look it up, but I think

17  it's C-A-S-S-I-S-L-L-A.  I would -- I would have

18  to look that up.  I -- I'm sorry, they -- the name

19  just pops up automatically in e-mails, so --

20    Q  Okay.

21    A  -- I don't have to spell it out.

22    Q  All right.  Okay.  Are you aware that at

23  certain times Albertsons distributed opioids to

24  its pharmacy from the Ponca City distribution

25  center in Oklahoma?

1     A  Yes.

2     Q  Okay.  Are you aware that it distributed

3  opioids from that distribution center in the years

4  2006 to 2008?

5     A  Yes.

6     Q  Are you aware that during the 2006 to 2008

7  time frame, it distributed Schedule III, IV, and V

8  drugs?

9     A  I was not -- to go back, I was not

10  involved with the -- with the pharmacy in

11  those -- from '06 to 2008.  I -- I did not know

12  what type of drugs that we had here at that time.

13     Q  Okay.  When did you first become involved

14  with the pharmacy at the Ponca City distribution

15  center?

16     A  It would have been in 2013.

17     Q  And when we say the pharmacy at the

18  distribution center, are we talking about the

19  department within the distribution center that

20  serves the Albertsons pharmacies?

21     A  Yes.

22     Q  Okay.  And that's -- that's commonly

23  referred to as the pharmacy of the distribution

24  center?

25     A  Yes.

1      Q  Is that fair?

2      A  Yes.

3      Q  And you said you started working in the

4  pharmacy distribution area around 2013?

5      A  Yes.  By -- by helping with my various

6  duties setting up the -- the systems, so to speak,

7  to process pharmacy orders.  From '06 to '08, I

8  had very limited involvement other than knowing we

9  had the pharmacy here and we did do things in and

10  around processing those orders.

11      Q  Okay.  So from the 2006-2008 time frame,

12  you might not have been directly involved in the

13  pharmacy side of the distribution center, but you

14  have a general awareness as to what the pharmacy

15  center was doing; is that fair?

16      A  That's fair, yes.

17      Q  Okay.  Okay.  And so in the 2006 to 2008

18  time frame, I forgot what your response was, were

19  you -- were you aware that it distributed Schedule

20  III, IV, and V drugs in that time frame?

21      A  I did not know specifically the drugs that

22  we -- that we had here, that we were -- that we

23  were supplying our stores.  I knew we had, you

24  know, items.  To us, they're item numbers.

25      Q  Okay.

1      A  And that we process store orders, but as

2      exactly what the items were, I -- I did not know.

3          Q  Okay.  And so as you sit here today, you

4      don't know whether they were distributing Schedule

5      III, IV, and V drugs during that time?

6          A  No.  I don't know specifically.

7          Q  Okay.  I mean, I'm not asking for the

8      specific names of any drugs.  I'm just asking the

9      general, those three scheduled drugs, do you know

10     if Albertsons was distributing during those times?

11         A  I'm sorry, I knew we had pharmacy -- we

12     were supplying our pharmacies, but I did not know

13     what class they were at the time.

14         Q  Do you know currently as you're sitting

15     here today?

16         A  Yes.

17         Q  Okay.  So you currently know that they

18     were distributing Schedule III, IV, and V drugs

19     during 2006 to 2008?

20         A  Yes.

21         Q  Okay.  Are you aware that during that time

22     frame they, Albertsons, the Ponca City

23     distribution center, was not distributing Schedule

24     II drugs?

25         A  I'm sorry, can you repeat that?

```
 1        Q   Sure.   In the 2006 to 2008 time frame, are
 2   you aware that the distribution center was not
 3   distributing Schedule II drugs?
 4        A   They were not?  I'm not positive that --
 5   if we were distributing Schedule IIs or not.
 6        Q   Okay.   Okay.   Are you aware that between
 7   2009 and 2012, Albertsons stopped distributing
 8   drugs from the Ponca City distribution center
 9   altogether?
10        A   Yes.
11        Q   Okay.   Do you know the reason for that?
12        A   No, I do not.
13        Q   Okay.   And are you aware that from 2013 to
14   2016, Albertsons again distributed opioids to its
15   pharmacies from the Ponca City distribution
16   center?
17        A   Yes.
18        Q   Okay.   Do you know why it chose again to
19   start distributing in 2013?
20        A   I -- it was just hearsay that -- that we
21   thought we could do a -- you know, we could
22   service our stores better from -- from this
23   particular warehouse.
24        Q   Okay.   Do you know how -- well, strike
25   that.
```

1    Are you aware that during the 2013 to 2016

2  time frame, the Ponca City distribution center

3  distributed Schedule II, III, IV, and V drugs?

4    A  Yes.

5    Q  Okay.  And do you know why it chose to

6  distribute Schedule II drugs during this time

7  frame when it hadn't before?

8    A  No.

9    Q  Are you aware that in 2016, Albertsons

10  again stopped distributing drugs from the Ponca

11  City distribution center?

12    A  Yes.

13    Q  Do you know why it stopped in 2016?

14    A  No.

15    Q  And have you ever heard the phrase,

16  Suspicious Order Monitoring System, or SOMS?

17    A  Yes.

18    Q  And what do you understand that to mean?

19    MR. DORAN:  Objection.

20    THE WITNESS:  Monitoring the orders coming

21  in from the stores, the quantities.

22  BY MR. LICHTER:

23    Q  Any other understanding what a Suspicious

24  Order Monitoring System might mean?

25    A  Well, monitoring the order quantities

1    for -- for reasonableness.

2      Q  Okay.  Do you recall about when you first

3    learned about suspicious order monitoring in the

4    context of working for Albertsons?

5      A  In 2013.

6      Q  Okay.  And do you recall the context in

7    which you first learned about suspicious order

8    monitoring?

9      A  I was called.  We had a pharmacy

10   compliance meeting here.  And I was in my office

11   and they called me into the meeting and told me

12   that -- that they were needing a -- some type of

13   reporting mechanism for the suspicious -- for the

14   pharmacy items.

15     Q  Do you recall about when that meeting was?

16     A  I do not.

17     Q  But it was sometime in 2013?

18     A  Yes.

19     Q  Okay.  Do you recall who was in that

20   meeting?

21     A  It was some local managers from the Ponca

22   warehouse, Jack Gagnon, David Beck, and there were

23   several people here from Compliance, as well as I

24   believe there was a conference call as well.

25     Q  So this initial meeting we're talking

1    about now, was it an in-person meeting?

2        A  It was an in-person meeting and

3    they -- they also, I believe, had some people

4    joining remotely on the -- on a conference call.

5        Q  Okay.  And so were you tasked at this

6    meeting with setting up the, I think you called it

7    a reporting mechanism for the pharmacy items?

8        A  They -- they asked me if -- if it was

9    possible.

10       Q  Okay.

11       A  To -- to develop something that -- that

12   could be used for -- for that.

13       Q  That could be used for reporting?

14       A  Yes.

15       Q  Okay.  And when we say reporting, what are

16   we reporting things to?

17       A  The local warehouse here, that -- the

18   people who would be overseeing the pharmacy

19   operation as well as I believe pharmacy -- the

20   compliance, pharmacy compliance.

21       Q  Okay.  So I guess where -- I guess you are

22   talking about internal reporting of certain

23   Albertsons orders; is that right?

24       A  Yes.

25       Q  Okay.  Did anybody at Albertsons in this

1    meeting or any other meeting talk to you about

2    reporting certain orders to anyone outside of

3    Albertsons?

4         MR. DORAN:  Objection.

5         THE WITNESS:  No.

6    BY MR. LICHTER:

7      Q  Okay.  So nobody asked you to set up a

8    system that reported certain orders to the DEA; is

9    that fair?

10     A  We had -- we had already things in place

11   for reporting store data to the DEA.

12     Q  Okay.  And what types of data are you

13   talking about there?

14     A  It was billing data.

15     Q  Okay.

16     A  It was in the form of an ARCOS submission.

17     Q  Other than the ARCOS billing data, are you

18   aware of any other mechanisms that were set up to

19   report anything to the DEA?

20         MR. DORAN:  Objection.

21         THE WITNESS:  No.

22   BY MR. LICHTER:

23     Q  Okay.  And you were never asked to set up

24   any sort of mechanism that involved reporting

25   anything to the DEA; is that fair?

1      A   That is correct.

2      Q   Okay.  Okay.  Do you know if Albertsons

3   had a Suspicious Order Monitoring System in place

4   in the 2006 to 2008 time frame?

5          MR. DORAN:  Objection.

6          THE WITNESS:  There was a -- the best of

7   my recollection, there was a -- a system in place

8   but that system was no longer viable in 2013.

9   BY MR. LICHTER:

10     Q   Do you recall why it -- it stopped being

11  viable?

12     A   At the time, I was told that they were

13  looking to -- to monitor items to individual

14  stores by individual item.

15     Q   So this is --

16     A   The store --

17     Q   Okay.  So this is in 2013 where you

18  learned that the prior system was not viable?

19         MR. DORAN:  Objection.

20         THE WITNESS:  Yes.

21  BY MR. LICHTER:

22     Q   Okay.  And it wasn't viable because -- I'm

23  sorry, why was the previous system not viable?

24     A   I was told that the -- the old system, you

25  put max order quantities on items but that

1   was -- that was for a range of stores.  And they

2   wanted it more individual stores, individual

3   items.

4       Q  Do you recall who told you that?

5       A  I do not.

6       Q  Okay.  Would that have been in this 2013

7   meeting where they asked you to develop a system?

8       A  Yes.

9       Q  Okay.  You just don't recall who at the

10  meeting told you that information?

11      A  I do not.

12      Q  Okay.  Okay.  For this 2006 to 2008 time

13  frame, do you know if Albertsons SOMS played any

14  role before an order reached the distribution

15  center?

16          MR. DORAN:  Objection.

17          THE WITNESS:  I do not know.

18  BY MR. LICHTER:

19      Q  Okay.  How about for this same time frame,

20  2008 to 2008, do you know if Albertsons' SOMS

21  played any role in the actual distribution center

22  itself?

23          MR. DORAN:  Objection.

24          THE WITNESS:  My vague understanding is

25  that there was -- there was a process set up on

1    our system for the Ponca City warehouse that would

2    print a report if an item went -- was ordered

3    excessively.

4    BY MR. LICHTER:

5        Q   Okay.  And that process occurred at the

6    actual distribution center?

7        A   To my understanding, it did.

8        Q   Okay.  Do you know whether this step

9    involved identifying suspicious orders?

10       A   That I do not know.

11       Q   Do you know if this step involved any sort

12   of investigations of orders?

13       A   No.  I do not.

14       Q   Okay.  Do you know if this step involved

15   reporting any orders to the DEA?

16       A   I do not.

17       Q   Okay.  Okay.  How about staying in this

18   2006 to 2008 time frame, do you know if

19   Albertsons' SOMS played any roles after orders

20   were selected at the Ponca City warehouse?

21           MR. DORAN:  Objection.

22           THE WITNESS:  I do not.

23   BY MR. LICHTER:

24       Q   Okay.  Okay.  Let's focus now on the 2013

25   to 2016 time frame.

```
 1            Are you familiar with any of the details

 2    as to how Albertsons' SOMS operated in -- in this

 3    2013 to 2016 time frame?

 4            MR. DORAN:  Objection.

 5            THE WITNESS:  Yes.  I am familiar with

 6    pieces of it.

 7    BY MR. LICHTER:

 8       Q  Okay.  How about, let's start with before

 9    a pharmacy order reached the distribution center.

10            Do you know whether Albertsons' SOMS

11    played any role in that time frame?

12            MR. DORAN:  Objection.

13            THE WITNESS:  I'm sorry, can you repeat

14    the question?

15    BY MR. LICHTER:

16       Q  Sure.  I'll ask it another way.

17            For this 2013 to 2016 time frame, do you

18    know if Albertsons' SOMS played any role before a

19    pharmacy order reached the distribution center?

20            MR. DORAN:  Objection.

21            THE WITNESS:  I -- my understanding of

22    that system is that they -- it -- there was -- it

23    had its own order monitoring, and it could adjust

24    store orders before they reached the warehouse.

25    BY MR. LICHTER:
```

1      Q  Okay.  Do you know who would have been

2    involved in this process?

3      A  Pharmacy compliance.

4      Q  Do you know who in pharmacy compliance,

5    any specific names?

6      A  I believe Marc Allgood was the main person

7    that I remember.

8      Q  Anyone else?

9      A  Maybe Bobbie Riley.

10     Q  Do you remember what Marc Allgood's role

11   would have been?

12     A  No.  I do not know.

13     Q  Do you know what Bobbie Riley's role would

14   have been?

15     A  No.

16     Q  Okay.  Do you have any idea who would have

17   created this process for this SOMS process for

18   orders prior to reaching the distribution center?

19     A  No.

20     Q  Okay.  Do you know when -- about when it

21   may have been created?

22     A  No.

23     Q  Do you know if this pre-distribution

24   center step involved identifying suspicious

25   orders?

1           MR. DORAN:  Objection.

2           THE WITNESS:  I'm -- I can't speak to

3      that.  I -- I don't know that system.

4      BY MR. LICHTER:

5           Q  Okay.  Okay.  Then would that mean you

6      don't know whether this step involved reporting

7      suspicious orders to the DEA?

8           A  I do not.

9           Q  Okay.  Did you have any role in Albertsons

10     pre-warehouse SOMS in the 2013 to 2016 time frame?

11          A  Pre-warehouse?

12          Q  Yes.

13          MR. DORAN:  Objection.

14          THE WITNESS:  No.

15     BY MR. LICHTER:

16          Q  Okay.  And you said you think that this

17     pre-warehouse system would adjust store orders

18     before they reached the warehouse; is that right?

19          A  Yes.

20          Q  Okay.  And do you recall how you learned

21     that?

22          A  In -- in I believe the first pharmacy

23     compliance meeting that I was called into.

24          Q  Do you have any idea how store orders were

25     adjusted under this system?

1      A  No.

2      Q  Okay.  And when you say adjusted, do you

3   mean lowered, or do you mean canceled?  Do you

4   mean both?

5         What does adjusted mean?

6      A  That the orders were modified before they

7   reached the warehouse.

8      Q  Okay.  Would that modification, does that

9   mean lowering the order quantity or does it mean

10   something else?

11      A  I -- I mean, I took it as it would lower

12   the quantity.

13      Q  Okay.  Do you have an understanding that

14   this pre-warehouse system was canceling any orders

15   before they reached the warehouse?

16      A  No.

17      Q  Okay.  Okay.  Let's stick with this 2013

18   to 2016 time frame.

19         Do you know if Albertsons' SOMS played any

20   role in the Ponca City warehouse itself?

21         MR. DORAN:  Objection.

22         THE WITNESS:  Yes.

23   BY MR. LICHTER:

24      Q  Can you explain that role?

25      A  A report was -- was created here and sent

1  to various people overseeing the pharmacy

2  operation.

3      Q  Were those warehouse employees?

4      A  It was managers and a pharmacy clerk.

5      Q  When you say managers and a pharmacy

6  clerk, are those people that worked in the

7  warehouse itself?

8      A  Yes.

9      Q  Okay.  Do you know the names of those

10  people?

11      A  Yes.  Jack Gagnon, David Beck, Sandy

12  Evans, Laurie Hooper.  I don't know if all of

13  the -- I mean, we sent it to multiple people.

14  Those are the ones that dealt with it the most.

15      Q  Okay.  And do you know who created this

16  process?

17      A  I did.

18      Q  Do you know when it was created?

19      A  Sometime in 2013.

20      Q  And was it approximately the -- toward the

21  beginning of 2013?  Toward the end of 2013?  Any

22  further estimate you can give me?

23      A  I do not recall when it was in 2013.

24      Q  Okay.  And did this step involve

25  identifying orders as suspicious?

1          MR. DORAN:  Objection.

2          THE WITNESS:  It did.

3    BY MR. LICHTER:

4      Q  And what would constitute a suspicious

5    order under the system?

6          MR. DORAN:  Objection.

7          THE WITNESS:  At the -- the parameters I

8    was giving was anything 20 percent over the

9    store's average order.  The store -- I'm sorry.

10   The store -- the current order -- order quantity

11   would -- was compared against the average store

12   order quantity in 20 -- and anything over

13   20 percent.

14   BY MR. LICHTER:

15     Q  Okay.  So anything -- sorry.

16         So anything over 20 percent of the -- the

17   prior average quantity would be considered

18   suspicious?

19         MR. DORAN:  Objection.

20         THE WITNESS:  Correct.

21   BY MR. LICHTER:

22     Q  Okay.  And were any suspicious orders ever

23   identified in the system?

24         MR. DORAN:  Objection.

25         THE WITNESS:  Yes.

1    BY MR. LICHTER:

2        Q  Do you know about how many?

3        A  No.  I do not.

4        Q  Okay.  Do you know if it would be as an

5    estimate -- do you know if it would be hundreds or

6    orders or thousands of orders or ten orders?

7        A  I would say it was probably I would say

8    probably -- for what time frame?  I'm sorry.

9        Q  Sure.  2013 to 2016.

10       A  I mean, thinking back, it was probably

11   hundreds to thousands.

12       Q  And those would have been pharmacy orders

13   that your Suspicious Order Monitoring System

14   identified as suspicious orders; is that right?

15           MR. DORAN:  Objection.

16           THE WITNESS:  Yes.

17   BY MR. LICHTER:

18       Q  Okay.  And during this time frame, this

19   2013 to 2016 time frame, the Ponca City

20   distribution center, was that distributing drugs

21   to Albertsons' pharmacies across the country?

22       A  Yes.

23       Q  Okay.  Are you aware of any other

24   distribution centers owned by Albertsons in this

25   time frame that distributed drugs to its

1   pharmacies?

2       A  I believe the Chicago warehouse in Chicago

3   was doing that as well.

4       Q  Do you know what that pharmacy is called?

5       A  I believe they called that warehouse the

6   Murdock warehouse.

7       Q  And that was operating between 2013 and

8   2016?

9       A  I'm not positive on that.

10      Q  Okay.  Is the Murdock warehouse still in

11  operation?

12      A  I do not know.

13      Q  Okay.  You never worked in the Murdock

14  warehouse, did you?

15      A  No.

16      Q  Okay.  Okay.  Talking still in this 2013

17  to 2016 time frame, the suspicious order

18  monitoring that played a role in the Ponca City

19  warehouse, do you know if this system involved

20  reporting suspicious orders to the DEA?

21      A  It did not.

22      Q  Okay.  Do you know why it did not?

23      A  It -- it wasn't set up -- it wasn't

24  interfaced with the DEA.

25      Q  Okay.  And you said -- you mentioned that

1    you set up the Suspicious Order Monitoring System

2    that was active within the Ponca City warehouse;

3    is that right?

4        A  Yes.

5            MR. DORAN:  Objection.

6    BY MR. LICHTER:

7        Q  Can you break down what it was that you

8    actually set up?

9        A  I took the files from the billing

10   system --

11       Q  Uh-huh.

12       A  -- and I created a script that validated

13   the order, and it logged -- it kept a history

14   of -- of the stores -- for the -- to arrive at the

15   average, it -- it kept a rolling history of that

16   store and the item that was ordered.  If it

17   breached the 20 percent, it was reported.  It was

18   flagged on the report as a possible suspicious

19   order.

20       Q  And when you say if it breached 20 percent

21   it was reported, we're talking about internally

22   reported to Albertsons' employees?

23       A  Yes.

24       Q  Okay.  Okay.  Did -- did the system have

25   any other components?

```
 1          MR. DORAN:  Objection.

 2          THE WITNESS:  As to what --

 3     BY MR. LICHTER:

 4       Q  As to what you set up.

 5       A  That was the basic reporting.

 6       Q  Okay.  And this was essentially a

 7     spreadsheet that you set up; is that right?

 8       A  It -- it turned -- the -- the process

 9     created a CSV file that we then imported into

10     Excel and e-mailed the -- the parties needing that

11     here.

12       Q  Okay.  And when we say the parties, that

13     would be Jack Gagnon, David Beck, Sandy Evans, and

14     Laurie Hooper?

15       A  Yes.

16       Q  And would they receive an updated version

17     of the spreadsheet every day?

18       A  Yes.

19       Q  Okay.  And do you know what they were

20     supposed to do with the spreadsheet after they

21     received it every day?

22       A  I was -- I knew that they would take that

23     spreadsheet to call stores.

24       Q  Do you know if anything else happened

25     after they were given the spreadsheet?
```

1      A  No.

2      Q  Okay.  No, you don't know; or no, nothing

3   else happened?

4      A  No, I don't know.

5      Q  Okay.  And did the spreadsheet that you

6   set up for this warehouse process, did that stay

7   consistent from the 2013 to 2016 time period?

8          MR. DORAN:  Object -- objection.

9          THE WITNESS:  Consistent as to the --

10  BY MR. LICHTER:

11     Q  Were any changes made to the process or to

12  the spreadsheet that you made?

13     A  Yes.

14     Q  Okay.  And do you recall what the first

15  change was to the process?

16     A  I do not.

17     Q  Okay.  Do you recall what any of the

18  changes were to the process?

19     A  At various -- at various times, I -- I was

20  asked to -- to add columns.  It was a tool for the

21  end -- you know, for management, for the end user.

22          So from time to time they would ask if I

23  could add a column, a specific data field, and I

24  tried to -- to accommodate those -- those

25  requests.

1      Q  Do you recall what any of these new

2  columns consisted of, what type of information

3  they held?

4      A  One of them was an out-of-stock field.

5      Q  Anything else you can recall?

6      A  Basically -- there was another version of

7  the program, of the -- the reporting program

8  that -- that instead of going off bottles ordered,

9  my vague understanding, and it's been a long time,

10  but we had a -- we had two versions of this

11  program for a time that was running parallel.  And

12  one of them, I believe it went off pills per

13  bottle.

14      Q  Any other differences you can recall

15  between those two programs that ran in parallel?

16      A  No.

17      Q  Do you know why there were two programs

18  running in parallel?

19      A  It was changes -- changes were requested

20  that -- that if we could -- I was asked if we

21  could create another version of it that -- and the

22  best of my recollection, it was instead of

23  reviewing just bottles, but the number of pills

24  per -- per bottle.

25      Q  Do you recall if that 20 percent over

1    average threshold changed between the two systems?

2        A  I don't recall if that -- it changed from

3    20 percent.

4        Q  You don't recall if it changed from

5    20 percent?

6        A  I don't -- I do not recall if it changed.

7        Q  Okay.  And so do you know about how long

8    these two programs were running simultaneously?

9        A  I do not.

10       Q  Do you know if it was the entire duration

11   of the 2013 to 2016 time frame?

12       A  The -- both of them did not run the

13   entire -- both of them ran the entire time until

14   we closed pharmacy.  However, the modified version

15   was introduced later.  I do not know when that

16   was.

17       Q  So if I have this right, beginning in 2013

18   with the SOMS system you created for the

19   warehouse, that was running by itself for a period

20   of time.  And then at some point prior to 2016, a

21   new modified version was running simultaneously

22   with that system?

23           MR. DORAN:  Objection.

24           THE WITNESS:  Correct.

25   BY MR. LICHTER:

1       Q   Okay.  And you don't recall when that

2   second program began -- you don't recall the year

3   that second program began running simultaneously?

4       A   I do not know.

5       Q   Okay.  Do you recall if that second

6   program was ever actually implemented at any

7   point?

8       A   Ever implemented as to?

9       Q   Did it replace the original program that

10  you created at any point?

11          MR. DORAN:  Objection.

12          THE WITNESS:  I do not -- we -- no.

13  BY MR. LICHTER:

14      Q   No.  It did not, or you don't know?

15      A   I don't know.

16      Q   Okay.  Was that second version being run

17  simultaneously as sort of a test or pilot program?

18      A   It was briefly.  And we -- we continued to

19  send throughout, until we closed the pharmacy,

20  sending both versions of that -- of that report to

21  the warehouse.

22      Q   Okay.  And did that modified program also

23  identify suspicious orders?

24          MR. DORAN:  Objection.

25          THE WITNESS:  It did.

```
1    BY MR. LICHTER:
2        Q   Okay.  So there would have been two
3    reports simultaneously that identified suspicious
4    orders for the Ponca City warehouse?
5        A   Yes.
6        Q   Okay.  Would they have identified the same
7    orders as suspicious or would they have identified
8    different orders as suspicious?
9            MR. DORAN:  Objection.
10           THE WITNESS:  Can you restate that
11   question?
12   BY MR. LICHTER:
13       Q   Sure.  So there's two programs
14   simultaneously running that are meant to identify
15   suspicious orders, correct?
16       A   Yes.
17       Q   Did they identify identical orders as
18   suspicious, or did they identify different orders
19   as suspicious?
20           MR. DORAN:  Objection.
21           THE WITNESS:  They would have -- well, one
22   was reporting in bottles and one, to the best of
23   my recollection, was reporting by the number
24   of -- of pills.  So --
25   BY MR. LICHTER:
```

1      Q  Okay.

2      A  -- there could have been some variances.

3      Q  Okay.  And this second modified system, I

4  believe you said the first system identified

5  anywhere from hundreds to thousands of orders as

6  suspicious.

7         Did this second modified system also

8  identify hundreds to thousands of orders as

9  suspicious?

10         MR. DORAN:  Objection.

11         THE WITNESS:  I -- I do not know.

12  BY MR. LICHTER:

13      Q  Okay.  Okay.  But you created the second

14  modified system, correct?

15         MR. DORAN:  Objection.

16         THE WITNESS:  Yes.

17  BY MR. LICHTER:

18      Q  Okay.  Okay.  For this 2013 to 2016 time

19  frame, do you know if Albertsons' SOMS played any

20  role after orders were selected at the Ponca City

21  warehouse?

22         MR. DORAN:  Objection.

23         THE WITNESS:  Could you restate that?

24  I -- I don't --

25  BY MR. LICHTER:

1      Q  Sure.

2      A  -- understand the question.

3      Q  So we talked about whether or not the SOMS

4   played a role before orders reach the warehouse.

5         Do you recall that?

6      A  Yes.

7      Q  And we talked about whether the SOMS

8   played a role at the warehouse itself.

9         Do you remember that?

10     A  Yes.

11     Q  Okay.  So for 2013, I'm asking if you know

12  whether Albertsons' SOMS played any role after an

13  order was actually selected at the warehouse?

14        MR. DORAN:  Objection.

15        THE WITNESS:  No.

16  BY MR. LICHTER:

17     Q  No, you don't know; or no, it did not play

18  a role?

19     A  No, I don't know.

20     Q  Okay.

21        MR. DORAN:  Jay, we've been going a little

22  over an hour.  I don't mean to cut you off, just

23  when we get to a natural stopping place.

24        MR. LICHTER:  Sure.  This -- this might be

25  a good point.  Just give me one second.  Okay.

1    Just maybe two or three additional questions and

2    then we can break.

3           Is that all right?

4           MR. DORAN:  Yeah.  That's fine.

5    BY MR. LICHTER:

6       Q  Okay.  So this 2013 to 2016 time frame

7    regarding Albertsons' SOMS after an order was

8    selected at the warehouse, does that mean

9    you -- you played no role in creating any sort of

10   system that would identify orders after orders

11   were actually selected?

12      A  Correct.

13      Q  Okay.  And during this 2013 -- well,

14   strike that.

15          Do you know if there was any mechanism

16   Albertsons had in place to report orders

17   identified as suspicious after those orders

18   were -- were selected at the warehouse?

19          MR. DORAN:  Objection.

20          THE WITNESS:  No.

21   BY MR. LICHTER:

22      Q  No, you don't know?

23      A  No.  I do not know.

24      Q  Okay.  And I guess by that same token, you

25   don't know if there was any mechanism in place

1    that identified orders as suspicious after they

2    were selected at the warehouse; is that right?

3        A  I do not know.

4        Q  Okay.  Okay.  Do you know whether --

5    whether orders at the Ponca City warehouse were

6    selected and shipped the same day they were

7    received?

8        A  They were selected the following day.

9        Q  Okay.  So an order would come in and reach

10   the warehouse.  And I guess within 24 hours, it

11   would be selected and shipped out?

12       A  Correct.

13       Q  Okay.

14          MR. LICHTER:  Okay.  We can stop here.

15   Would a ten-minute break be okay with everyone?

16          MR. DORAN:  Sure.  That works.

17          THE VIDEOGRAPHER:  Off record.  Time is

18   11:17.

19              (Whereupon a break was had.)

20          THE VIDEOGRAPHER:  Back on record.  Time

21   is 11:37.

22   BY MR. LICHTER:

23       Q  All right.  Welcome back, Mr. Mills.

24       A  Thank you.

25       Q  All right.  You have mentioned that in the

1    2013 to 2016 time frame, there was a system that

2    adjusted store orders before they reached the

3    warehouse.

4         Do you recall that?

5    A  Yes.

6    Q  Okay.  Did you create that system?

7    A  No.

8    Q  Okay.  Do you know who created that

9    system?

10   A  No.

11   Q  Okay.  Have you ever seen any evidence

12   that that system existed in the 2013 to 2016 time

13   frame?

14        MR. DORAN:  Objection.

15        THE WITNESS:  No.

16   BY MR. LICHTER:

17   Q  Okay.  Do you know if that system was an

18   automated system?

19        MR. DORAN:  Objection.

20        THE WITNESS:  I do not know.

21   BY MR. LICHTER:

22   Q  Okay.  Do you know any other details or

23   information about that system at all?

24   A  No, I do not.

25   Q  Okay.  Okay.  Do you know -- if that

1    system was functioning, do you know why you would

2    have been called to create a separate system that

3    identified suspicious orders?

4        A  Well, I was told that -- that we needed a

5    report to report on possible suspicious order

6    quantities --

7        Q  Okay.

8        A  -- here at the local warehouse.

9        Q  Okay.  All right.  You can turn to Tab 1

10   in your exhibit binder.

11           MR. LICHTER:  And we could introduce this

12   document as Exhibit 1.

13       (Exhibit Number 1 marked for identification.)

14           MR. LICHTER:  And for the record, this

15   document is Bates numbered ALB-NM00014414.

16   BY MR. LICHTER:

17       Q  Do you have that document in front of you?

18       A  I do.

19       Q  Okay.  Have you seen this document before?

20       A  I have.

21       Q  Okay.  When's the last time you saw it?

22       A  Yesterday.

23       Q  Okay.  Is this an e-mail you sent to Jack

24   Gagnon on November 13th, 2013?

25       A  Yes.

1    Q  Okay.  And can you remind us who Jack

2  Gagnon is?

3    A  He was the general manager of the

4  warehouse.

5    Q  Okay.  And why were you sending this

6  e-mail to him?

7    A  So what I -- what I did was take input

8  from the pharmacy compliance team to build a

9  report, and I was letting him know this is how

10  the -- this is how the -- the program was going to

11  work based on -- on the parameters that I

12  received.

13    Q  Okay.  So when you sent this e-mail on

14  November 13th, 2013, was this system that you

15  describe in this e-mail, was that already

16  implemented and in place or was it still sort of

17  being created?

18    A  That, I am uncertain of.

19    Q  Okay.

20    A  We -- that I am -- I mean, it looks like

21  a -- I'm not sure of the date that -- that we

22  started creating the report.

23    Q  Okay.  You don't recall if you were

24  sending him this e-mail as sort of an update on

25  what you were working on as opposed to what was

1    actually up and running?

2       A  I'm uncertain of that.  I mean, it --

3    obviously, it's for a meeting that he's having on

4    the 21st, but as far as whether this was in

5    complete operation at the time, I -- I do not know

6    that.

7       Q  Okay.  And looking at the e-mail, you

8    write, it says, Below I outlined our suspicious

9    order system for the meeting on the 21st.  Let me

10   know if you see anything that needs further

11   clarification.

12         Do you see that?

13      A  I do.

14      Q  Okay.  Can you explain the nature of the

15   meeting that you reference here?

16      A  I believe he had a -- a meeting with the

17   compliance team.

18      Q  Okay.  Did you attend that meeting?

19      A  I -- I don't know if I attended

20   this -- this particular meeting.  I -- I never

21   attended a pharmacy compliance meeting in its

22   entirety.  There were just times that I was called

23   up and asked if I could add something to the

24   report or -- or something of that nature.

25      Q  Okay.  So did you understand this meeting

1    that -- that took place on the 21st, would that

2    have been a pharmacy compliance meeting?

3          MR. DORAN:  Objection.

4          THE WITNESS:  It -- it -- I can't speak to

5    that.

6    BY MR. LICHTER:

7      Q  Okay.  Do you know who would have attended

8    this meeting on the 21st?

9      A  If it was pharmacy compliance, it would

10   have been the managers overseeing warehouse

11   operation here and the compliance team.

12     Q  Anyone else?

13     A  Not that I'm aware of.

14     Q  Okay.  And it looks like you divided your

15   outline of Albertsons' SOMS into three sections;

16   is that right?

17         MR. DORAN:  Objection.

18         THE WITNESS:  Yes.  But again, this is not

19   a system.  This is a reporting piece of -- of our

20   day-to-day operation.  It was not a system.

21   BY MR. LICHTER:

22     Q  It's not a system.  Okay.  Can we --

23   sorry.

24     A  It's -- it's a single report.

25     Q  Okay.  Can we -- can we zoom out of

1    document here and see the document here in full.

2    I just want to re-read what you wrote at the

3    beginning of the e-mail.

4         It says, Below I outlined our suspicious

5    order system.

6         Do you see that?

7    A  Yes.

8    Q  So are you saying that what you outlined

9    was not actually a system?

10    A  It -- it was more of a report than an

11    entire system.

12    Q  Okay.  Why would you have referred it to

13    as the system here in your e-mail?

14    A  That's just the terminology we use.

15    Q  Okay.

16    A  Anything related to IT is --

17    Q  Okay.  We can look at the first section

18    that you identified as basic operation.

19         Do you see that?

20    A  Yes.

21    Q  Okay.  And the first bullet point says,

22    program is executed after each RX billing.

23         Do you see that?

24    A  I do.

25    Q  Can you explain what that means?

1      A  Yes.  So our operation staff here, the

2    computer operators, we would receive store orders.

3    These were digital orders.  It -- what we saw on

4    our end was store -- the internal item number, the

5    store order quantity, and I think a confirmation

6    number.  We then took those -- these digital

7    orders and ran them through a series of programs

8    that produced the various selection labels and

9    documents for the warehouse to -- to do their job.

10          Part of that system was -- or part of

11   those programs and -- was a -- the billing

12   programs, was to relieve warehouse inventory, so

13   we always kept a perpetual inventory of our

14   system.

15          Those -- I picked up on the report after

16   inventory had been adjusted and the warehouse

17   selection documents were created.  My report would

18   then read that data in and -- and flag

19   possible -- based on the parameters that I was

20   given by pharmacy compliance, would flag possible

21   orders to be reviewed.

22      Q  And when you say my report, are we talking

23   about the -- the spreadsheet you created that went

24   to the -- the warehouse personnel?

25      A  Yes.  All of this was a spreadsheet.

1      Q  Okay.  And so when you say the program is

2    executed after each prescription billing, does

3    that mean once a prescription order was billed, it

4    would enter into your spreadsheet?

5      A  We did everything in batch.  So we

6    would -- all of the stores would send their orders

7    at once.  Then we would take that and -- and

8    produce that Excel spreadsheet after we had run

9    through all of the steps to build the stores.

10          The reason why I -- I mention here that

11    it's executed after each RX billing is if we were

12    to -- a store were to have an issue and they

13    weren't able to transmit their order on time or

14    there was an issue on their side and they -- they

15    cannot get the order to us, we would then have to

16    send an addendum out of that spreadsheet after we

17    processed that late order.

18      Q  Okay.

19      A  So I'm just --

20      Q  Sorry, go ahead.

21      A  I'm mainly outlining here that, you know,

22    that this needs to run every time we have a

23    pharmacy billing for whatever we're doing, whether

24    if it's, you know, 300 stores or, you know, we're

25    going back and picking up one store.

1      Q  Okay.  So the stores would all submit

2   their orders to the warehouse.  You guys would

3   process those billing numbers.  And then from

4   there, you would input the ordering information

5   into the -- the program which is the spreadsheet;

6   is that right?

7      A  Yes.  It -- it would -- it was a file that

8   was inputted into a -- a script that would produce

9   the Excel text for the text, the CSV file.

10     Q  Okay.  And that's what you mean by the

11  program is executed, that information being --

12  being ported over into the spreadsheet?

13     A  Yes.

14     Q  Okay.  And that was done once a day?

15     A  After every pharmacy billing.

16     Q  Did that occur once a day?

17     A  Yes.  Most -- generally, yes.

18     Q  Okay.

19     A  I believe there was a few days a week we

20  did not process pharmacy orders.

21     Q  Okay.  Okay.  And looking at the third

22  bullet down under basic operation, you write, If

23  store has sufficient order history, 11 previous

24  orders, current order quantity is compared to the

25  minimum 11/max 20-week average.

1          Do you see that?

2      A  I do.

3      Q  Okay.  And does this process occur prior

4  to an order reaching the Ponca City distribution

5  center for fulfillment?

6      A  No.

7      Q  No.  When does it occur?

8      A  It happens on bullet proof -- bullet point

9  number one after the pharmacy billing.

10      Q  Okay.  Does -- do the actual warehouse

11  employees see the order before -- before they see

12  the spreadsheet?

13      A  The order wasn't selected until the

14  following day.

15      Q  Okay.

16      A  And we notified the -- all the parties

17  that were involved to -- to review the spreadsheet

18  that -- the day prior.

19      Q  Okay.  And this -- this process of

20  comparing the orders to the -- the prior minimum

21  11/maximum 20-week average, is that a fully

22  automated process or is someone using discretion

23  to apply the formula?

24      A  It was an automated process.

25      Q  Okay.  Okay.  And this comparison is

1    identified in the spreadsheet?

2        A  It was called out in the spreadsheet.

3    Yes.

4        Q  Okay.  Can you explain the reference to

5    minimum 11/max 20 here?

6        A  I can.  Yes, I can.  The 11, the way I was

7    asked to -- to -- to flag these orders is that we

8    needed 11 that -- to the best of my knowledge,

9    I'm -- let me think about this.

10        The -- the first 11 orders would be

11    flagged as like a new ND -- maybe not new NDC, no

12    set order average.  On the 12th order that the

13    store sends is when we started to compare the

14    current store order quantity against the average

15    plus 20 percent.

16        Q  Okay.  And then --

17        A  And then we --

18        Q  Sorry.  Go ahead.

19        MR. DORAN:  Finish your answer.

20        THE WITNESS:  And we did that for --

21    for -- up until the 20 -- not that -- that 20-week

22    average, that may be a 20-order average.  I'm not

23    for certain how that -- how that worked.

24    BY MR. LICHTER:

25        Q  Okay.  So you're not sure if the program

1    you created was comparing new orders to -- to the

2    prior weeks or to the prior order numbers?

3        A  Well, it was to the -- the average, but

4    in -- on this e-mail it says 20-week average, and

5    I don't know if that is 20 -- the last 20 orders

6    or if that was the last 20 weeks.

7        Q  Okay.

8        A  I -- I can't remember what internally,

9    what it was -- whether it was comparing against

10   20 weeks or 20 orders.

11       Q  Do you know who decided if it was compared

12   against the 11 or the 20 -- the 11 weeks or the 20

13   orders?

14       A  I took all of my direction from pharmacy

15   compliance.

16       Q  Okay.  So someone in pharmacy compliance

17   determined that previous order metric?

18       A  I would -- I would -- I would guess.  Yes.

19       Q  Okay.  You don't know who that was?

20       A  No.  I do not.

21       Q  Was there a specific person from pharmacy

22   compliance that you were taking most of all of

23   your direction from for this project?

24       A  I -- I spoke to Bobbie Riley, to Scott

25   Johnson, and then, of course, I got -- took

1   direction from my manager here, Jack Gagnon, if he

2   relayed something to me.  I was not part of

3   pharmacy compliance group.  I just -- I just

4   basically tried to accommodate whatever they

5   requested.

6       Q  So no one ever told you how they reached

7   that management 11/max 20 metric?

8       A  No.

9       Q  Okay.  And when we're talking about an

10  order here for the spreadsheet, are we talking

11  about a specific amount of a specific drug --

12  drug, like Oxy 30 milligrams?

13      A  It would have been by -- by drug, yes.

14      Q  Okay.  Okay.  What would happen if an

15  order did not have the sufficient order history of

16  the minimum 11 previous orders?

17      A  I believe it would flag that order as

18  no -- no set average for store.

19      Q  Do you know what would happen to those

20  orders?

21      A  I do not.

22      Q  Okay.  Do you know if those orders were

23  considered suspicious by the spreadsheet?

24      A  I do not.

25          MR. DORAN:  Objection.

1    BY MR. LICHTER:

2        Q  Do you know if those orders were

3    considered suspicious by anybody?

4        A  I do not.  I -- I was just following the

5    parameters that I was given.

6        Q  Okay.  And the same bullet point here, it

7    goes on.  The order record is reported if current

8    order quantity is greater than the order average

9    plus 20 percent.

10           Do you see that?

11       A  I do.

12       Q  And is this reporting a fully automated

13   process as well or is there someone using

14   discretion here on that?

15       A  It is automated.

16       Q  Okay.  And again, this would be -- when it

17   says it would be reported, we're talking about

18   internal Albertsons' reporting, not to anybody

19   outside of Albertsons; is that right?

20       A  I believe the context of the e-mail,

21   meaning it was reported, it was flagged on the

22   spreadsheet as such -- as you see in the types of

23   exceptions reported.

24       Q  Okay.  So when you're talking here about

25   being reported, we're talking about being flagged

1    in the spreadsheet?

2        A  Yes.

3        Q  Okay.  Do you know if this, the threshold

4    mentioned here, the order average plus 20 percent,

5    do you know if that ever changed?

6        A  It's -- I do not know.

7        Q  Okay.  Would you have been aware if it did

8    change?

9        A  Yes.

10       Q  Okay.  But you don't recall it changing

11   ever?

12       A  I do not recall it changing.

13       Q  Okay.  And if an order exceeded the

14   average plus 20 percent, would that order be

15   canceled?

16       A  I -- that was not part of my knowledge.

17       Q  So you don't know?

18       A  I do not know.

19       Q  Okay.  So you also don't know if that

20   order would be fulfilled or cut or anything?

21       A  No.  I do not know.

22       Q  Okay.  Do you know if those orders were

23   investigated?

24       A  I do not.

25       Q  Okay.  And if an order exceeded the

1    average plus 20 percent, was that considered a

2    suspicious order?

3         MR. DORAN:  Objection.

4         THE WITNESS:  It was just flagged as an

5    entry that may need to be looked -- looked at.

6    BY MR. LICHTER:

7    Q  Okay.  And the next bullet here says, an

8    internal history file is maintained that includes

9    all suspicious order quantities from every

10   execution of the program; is that right?

11   A  I see that, yes.

12   Q  Okay.  And this is an e-mail that you

13   wrote, correct?

14   A  Correct.

15   Q  Okay.  What is a suspicious order

16   quantity?

17   A  Those -- a -- a suspicious order quantity

18   is something that we may need to -- to look at

19   more thoroughly.

20   Q  Okay.  Were only orders that exceeded the

21   threshold considered suspicious?

22        MR. DORAN:  Objection.

23        THE WITNESS:  I'm -- I'm sorry, restate

24   the question.

25   BY MR. LICHTER:

1      Q  Sure.  Your -- your program here flagged

2    suspicious order quantities, correct?

3            MR. DORAN:  Objection.

4            THE WITNESS:  It flags possible suspicious

5    orders.  Yes.

6    BY MR. LICHTER:

7      Q  Well, you -- you refer to them here in

8    this e-mail as suspicious order quantities, right?

9      A  Yes.  That was the terminology we used.

10     Q  Okay.  Other than the reason of exceeding

11   the 20 percent, the average plus 20 percent, was

12   there any reason why an order would be considered

13   a suspicious order quantity?

14     A  That, I do not know.

15     Q  Okay.  And this internal file that is

16   maintained that you mention here in this bullet

17   point, do you know how that file is maintained?

18   Is it -- is it electronic or hard copy?

19     A  I vaguely remember this -- this piece of

20   it.  I believe what the -- what the program did

21   was for every time a store exceeded the 20 percent

22   parameter, it would -- it would -- it would log

23   it.  That's the best of my -- my recollection

24   about the -- what that bullet point is.

25     Q  So it would log it in the location outside

1    of this spreadsheet that we're talking about?

2       A  It -- yes.

3       Q  Okay.  And would it log it in an

4    electronic file or a hard copy file?

5       A  It would have been electronic.

6       Q  Okay.  And this would have been in -- an

7    automated logging process?

8       A  Correct.

9       Q  Okay.  Do you know who would have

10   maintained that file?

11      A  It -- it was an automated process.

12      Q  Well, you said it was logged into an

13   electronic file, correct?

14      A  Yes.

15      Q  Was there somebody that maintained that or

16   had access to that file?

17      A  There was several people who had access to

18   it.

19      Q  Did you know who they were?

20      A  David Beck and Sandy Evans.

21      Q  Do you know why this separate electronic

22   file was -- was kept?

23      A  It was -- it was -- again, to the best of

24   my knowledge, it was simply a lot of the history

25   of when this -- this process -- this program ran.

1    Q  I get that it was a log of the history,

2  but do you know why this separate file for these

3  orders was kept?

4    A  I do not.

5    Q  Okay.  Do you know how long those files

6  were kept for?

7    A  I -- I do not.

8    Q  Okay.  Do you know if they still -- if any

9  of those files still exist today?

10    A  Not 100 percent sure.

11    Q  Do you have a belief one way or the other?

12    A  They may still exist.

13    Q  Okay.  And so you believe that orders were

14  actually added to this internal history file?

15    A  I -- I'm sorry, repeat that.

16    Q  Sure.  Do you believe that orders were

17  actually added to this internal history file, this

18  automatic logging file?

19    A  Yes.  And again, I just want to clarify:

20  This was a summary of what happened every time we

21  ran this after a pharmacy billing.  It was

22  basically this is what the script did.

23    Q  Right.  And this was a summary of all of

24  the orders that exceeded this 20 percent average

25  threshold; is that right?

1      A  I -- that, I do not know.

2      Q  Okay.  Well, according to the bullet

3  point, it says an internal history file is

4  maintained that includes all suspicious order

5  quantities for every execution of the program?

6      A  Yes.

7      Q  So based on what we're looking at here,

8  does that mean that this electronic file would

9  include a listed summary of every single

10  suspicious order quantity that was identified by

11  the program?

12      A  It does call that out, but I do not know

13  if it also -- if it was every item that passed

14  through.

15      Q  What do you mean by that?

16      A  Well, the -- the program would take that

17  billing data and did it, logged every single item

18  whether it was needed to be placed on the -- on

19  the spreadsheet or not.  I know I -- obviously,

20  it's -- from this bullet point, it's -- it's doing

21  items that it's deemed possible suspicious, but

22  it's -- there may be other items in there as well.

23  That's all I'm trying to -- to say.

24      Q  So you're saying that this automated

25  process could have logged and filed all of the

1    suspicious order quantities and some other

2    potential orders; is that what you're saying?

3        A   Correct.

4        Q   Okay.  You just don't know what those

5    other orders might be?

6        A   That -- that's correct.

7        Q   Okay.  We can look at the next bullet

8    here.  It says, There is a menu that can be

9    accessed that displays the last 20 order

10   quantities for a store and NDC.  Includes total

11   number of times an NDC was ordered and total

12   number of times the order quantity exceeded the

13   average quantity.

14       Do you see that?

15       A   I do.

16       Q   Okay.  And this is an -- is this an

17   electronic dropdown in the spreadsheet that we've

18   been talking about?

19       A   No.  That is menu driven.

20       Q   Can you explain what that means?

21       A   It was -- I allowed David and some of the

22   pharmacy people here at the -- at the warehouse,

23   Sandy, there may have been a few others, they

24   could key in the -- our internal item number and

25   they could see -- and a store number, and they

1    could see the times that the -- an item was --

2    was -- breached the set 20 percent, is the way I

3    understand it.

4        Q  So this was a -- this was kind of a quick

5    and easy way someone can see how many times an

6    order was excessive?

7        A  Yes.

8        Q  Okay.  And everyone who had access to this

9    spreadsheet would also have access to this menu to

10   see that information?

11       A  I do not know that.  I am not 100 percent

12   positive.  I know the main people did.  Yes.

13       Q  Okay.  And those people would have been

14   David Beck, Jack Gagnon, Laurie Hooper, and Sandy

15   Evans?

16       A  I don't know Jack had access to this.

17       Q  Okay.  But the other people I named would

18   have access to this?

19       A  They should have.

20       Q  Okay.  Then the last bullet point in this

21   section says, Currently, we are processing all

22   Schedule II through V items through the suspicious

23   order system.

24           Do you see that?

25       A  I do.

1      Q  Okay.  Do you know what a Form 222 in the

2  context of pharmacy orders to the distribution

3  center?

4      A  Yes.

5      Q  Are you aware that -- well, first, what is

6  a Form 222?

7      A  It is the manual way that the -- the

8  stores would send -- they would mail their

9  Schedule II items to us for processing.

10     Q  Okay.  And that was -- that was submitted

11 to the distribution center by the pharmacies,

12 correct?

13     A  Yes.

14     Q  Okay.  And that was submitted by filling

15 out a printed paper, a hard copy document,

16 correct?

17     A  Yeah.  I think it was a -- it was a

18 carbonless form from the DEA.

19     Q  But it was a physical paper; it wasn't

20 like an e-mail that was being sent, correct?

21     A  Correct.

22     Q  And the paper would be printed out and

23 mailed in an envelope to the distribution center,

24 correct?

25     A  The way I understand it, yes.

1      Q  Okay.  Were you -- were you aware

2  that -- that Albertsons' pharmacies were mailing

3  their Schedule II orders via these hard copy 222

4  forms directly to the Ponca City distribution

5  center?

6          MR. DORAN:  Objection.

7          THE WITNESS:  I was aware of it.

8  BY MR. LICHTER:

9      Q  Okay.  Are you aware that some pharmacies

10  were using this method right until Albertsons

11  stopped distributing in 2016?

12          MR. DORAN:  Objection.

13          THE WITNESS:  That, I do not know.

14  BY MR. LICHTER:

15      Q  So this system that's being described

16  here, would this system have processed those hard

17  copy orders?

18      A  Again, this is -- when we speak of the

19  system, it is the report, the Excel report.  Those

20  orders were -- to the best of my knowledge, were

21  keyed in and, yes, they would have gone through

22  the reporting process to -- on the Excel

23  spreadsheet.

24      Q  So all of the hard copy 222 forms that the

25  distribution center would receive every day,

1    someone would manually key in the information from

2    each of those forms into the spreadsheet?

3        A   No.   They were keyed into our -- our

4    database.

5        Q   Okay.

6        A   And the billing process would pull those

7    orders in and run them through the -- the same

8    process as the stores sent orders in the first

9    bullet point.

10       Q   Do you know who was responsible for keying

11   in the information from the hard copy form?

12       A   There were numerous people.  Sandy Evans

13   is the one I can think of the most that had the

14   most contact with those.

15       Q   Okay.  Other -- other than the bullet

16   points listed here in the basic operation section

17   of your item, are you aware of any other

18   components of Albertsons' SOMS from 2013 to 2016

19   that are not listed here?

20           MR. DORAN:  Objection.

21           THE WITNESS:  I cannot think of any.

22   BY MR. LICHTER:

23       Q   We can look at the second section you

24   discuss here called the type of exceptions

25   reported.

1          Do you see that?

2     A   Yes.

3     Q   Okay.  Can you explain what this means?

4     A   The best that I can recall how this system

5   worked, if a store ordered a -- an NDC for the

6   first time, it was -- it was flagged on the

7   spreadsheet as new NDC ordered.  The -- the next

8   one order quantity -- order quantity greater than

9   20 percent of store average would be if -- if an

10  item came in for a store that -- that exceeded the

11  parameter on bullet point number 3 under the basic

12  operation.

13    Q   If I can -- if I can cut you off for just

14  a second, we'll go through each of the -- the

15  bullet points here one by one.

16    A   Okay.

17    Q   I just want to know generally when you

18  write type of exceptions reported, what that means

19  generally.

20    A   It means --

21    Q   What is an exception, I guess is the

22  question.

23    A   An exception is just something that's

24  outside of -- of -- of the parameters that we set

25  for reviewing orders.

1        Q  Okay.  So --

2        A  Possibly --

3        Q  So if an exception applied, that means

4     that that order would appear in the spreadsheet;

5     is that fair?

6        A  Yes.

7        Q  Okay.  And when we say type of exceptions

8     reported, again, we're talking about internally

9     reported among Albertsons' employees, correct?

10       A  Yes.

11       Q  Okay.  And these are reported by being

12    identified within the spreadsheet, correct?

13       A  Yes.

14       Q  Okay.  And do you know if anyone was

15    assigned to review the -- the exceptions that

16    appeared in the spreadsheet?

17       A  Yes.

18       Q  And who -- who was that?

19       A  That would have been David Beck, Sandy

20    Evans, and in Sandy's absence, I believe Laurie

21    Hooper.

22       Q  And were they supposed to review every

23    single entry in the spreadsheet that was an

24    exception, or were they just supposed to review

25    certain exceptions that appeared in the

1      spreadsheet?

2           MR. DORAN:  Objection.

3           THE WITNESS:  That, I do not know.

4      BY MR. LICHTER:

5        Q  Okay.  Do you know what the purpose of

6      their review was?

7        A  That, I do not know.

8        Q  Okay.  Okay.  We can go through the

9      different exceptions that are listed here.  And

10     the first one says when a new NDC is ordered.

11          Can you explain what that means?

12       A  Okay.  I'm -- I'm vaguely -- I'm thinking

13     that it's probably the first several times the

14     store ordered either -- it was the first time or,

15     you know, I -- I don't recall if we had a set

16     limit on how many times we would flag that entry

17     on the spreadsheet as an NDC, a new -- new NDC

18     order.  But most certainly, I -- I'm sure we -- at

19     least the first time a store ordered a new NDC, we

20     would -- we would flag that on the spreadsheet.

21       Q  Okay.  And NDC is essentially a code given

22     to a particular drug; is that right?

23       A  Yes.

24       Q  Okay.  So if that was the pharmacy's first

25     time ordering a particular NDC from the warehouse,

1    that would be flagged as an exception included in

2    the report, correct?

3        A   Correct.

4        Q   The second one, second bullet here, when a

5    current order quantity is greater than order

6    average plus 20 percent, this exception, I believe

7    we've been talking about this at some length.

8            But any time an order exceeded the prior

9    average of those orders plus 20 percent, that

10   would be an exception and included on this list;

11   is that correct?

12       A   It would be flagged on the -- on the list,

13   yes.

14       Q   And then in --in capital letters and bold

15   at the end of each of these bullet points, for the

16   one we're looking at here it says, order QTY

17   greater than 20 percent of store AVG, is that how

18   the information in this bullet point was

19   designated in the spreadsheet?

20       A   Yes.

21       Q   Okay.  Next bullet says insufficient order

22   history to build order average, parentheses, 11

23   prior orders.

24           Does that mean an order would be flagged

25   if there were not 11 prior orders by which to

1   build an average?

2       A  Correct.

3       Q  Okay.  Next bullet point, when an item is

4   subbed to a new NDC.  I take it there were

5   instances where certain drugs changed

6   their -- their identifying code or NDC and that

7   was flagged here in the spreadsheet as well?

8       A  Yes.  There were very -- various reasons

9   that someone could go into our -- they could

10  substitute an item being ordered to another item.

11      Q  Okay.  The next bullet point says when an

12  item is subbed to a new NDC and the subbing item

13  had insufficient history for order average.  I

14  think that's self-explanatory based on what we've

15  just been discussing.

16      A  Yes.

17      Q  Okay.  And then when an item is subbed to

18  a new NDC and the current order is greater than

19  the subbing item's average order.

20          So all -- all of these, I guess, these

21  bullet points that we just went through under type

22  of expectations reported, are these all of the

23  reasons why an opioid order would appear on the

24  spreadsheet?

25      A  To my understanding, yes.

1       Q  Okay.  Are there any other reasons an

2   order could appear that aren't listed here?

3       A  Not that I am aware of.

4       Q  Okay.  And the third section here in this

5   e-mail is special processing of NDC substitutions.

6          Do you see that?

7       A  Yes.

8       Q  And can you explain generally what that

9   means?

10      A  Please allow me just a minute to read it.

11      Q  Sure.

12      A  I believe what I'm -- what I'm trying to

13  convey here is just a little deeper so that they

14  understand how this reporting structure is -- is

15  working on the last two bullet points, how the

16  program is -- is working on that data in case

17  there's any questions that they may have.  It's

18  the process that the program is -- is -- you know,

19  what it's doing internally to -- to flag

20  these -- the substituted NDCs.

21      Q  Okay.  And again, at the top of the

22  e-mail, you say that you're providing the outline

23  of the suspicious order system for Jack Gagnon's

24  meeting.

25          Do you see that?

1      A  I do.

2      Q  So all of the type of exceptions reported

3   in that -- that middle section of your e-mail, are

4   all of those orders that wind up on the

5   spreadsheet considered suspicious orders?

6          MR. DORAN:  Objection.

7          THE WITNESS:  I do not believe so.  Can

8   you restate the question?  I'm sorry.

9   BY MR. LICHTER:

10     Q  Sure.  Are -- are all of the orders that

11  appear in the spreadsheet considered suspicious

12  orders?

13         MR. DORAN:  Objection.

14         THE WITNESS:  These are items that fall

15  outside of -- of the parameters that I was given

16  for the reporting and that may need further

17  investigation.

18  BY MR. LICHTER:

19     Q  So I understand that.  So if this is a

20  suspicious order system that you're -- you're

21  outlining here, are those orders suspicious orders

22  that appear in -- in the spreadsheet system?

23         MR. DORAN:  Objection.

24         THE WITNESS:  I -- I can't make that

25  determination.

1    BY MR. LICHTER:

2        Q  You weren't told one way or the other?

3        A  No.  I was told to produce this report.

4    I -- I personally don't know what is -- you know,

5    when we send it off to other departments, what is

6    going to be considered a suspicious order and what

7    is not.

8        Q  Okay.

9        A  These are just the -- when I say

10   exceptions, these are things that fall outside of

11   the normal processing.

12       Q  And this process that you created, this

13   didn't reject or reduce any orders in any way, did

14   it?

15       A  No.

16       Q  Okay.  Okay.  You can turn to the second

17   tab in the binder and we can have this marked as

18   Exhibit 2.

19     (Exhibit Number 2 marked for identification.)

20        MR. LICHTER:  For the record, and this is

21   Bates numbered ALB-NM00014412.

22   BY MR. LICHTER:

23       Q  And Mr. Mills, have you seen this document

24   before?

25       A  I have.

```
 1        Q  And when's the last time you saw it?

 2        A  Yesterday evening.

 3        Q  Is this a February 25, 2014, e-mail chain

 4   between you and Scott Jardine?

 5        A  Yes.

 6        Q  And who is Scott Jardine?

 7        A  He was part of the pharmacy compliance

 8   group.

 9        Q  Okay.  Do you recall what his title was at

10   this time?

11        A  I'm sorry, I -- yeah.  He was part

12   of -- I'm thinking of Scott Johnson.

13            Scott Jardine was, I think, a VP, but I

14   believe it was part of the pharmacy compliance

15   group as well.

16        Q  Do you know what he would have been a VP

17   of?

18        A  I do -- it may have been distribution.

19        Q  Okay.  Toward the bottom of this page,

20   toward the bottom of the first page of the

21   document is an e-mail from Scott Jardine to Jack

22   Gagnon, and Lynette Berggren with a cc to Brian

23   Rood and Rick Bunnell.

24            Do you see that?

25        A  I do.
```

1     Q  And that e-mail was sent on February 23rd,

2  2014, correct?

3     A  Yes.

4     Q  Okay.  And it looks like Scott forwards

5  you that e-mail on February 25th, 2014, correct?

6     A  Yes.

7     Q  Okay.  I think we've already talked about

8  Jack Gagnon and his role in the warehouse.

9        Who is Lynette Berggren?

10     A  I believe she was part of the pharmacy

11  compliance group.

12     Q  You don't remember her title at this time?

13     A  I do not.

14     Q  How about Brian Rood, do you recall what

15  his title was at this time?

16     A  I believe he was vice -- VP of

17  distribution.

18     Q  Rick Bunnell?

19     A  I believe he was the same.

20     Q  Okay.  Do you know if Brian Rood and Rick

21  Bunnell still work for Albertsons?

22     A  I believe they have both retired.

23     Q  Okay.  Does Scott Jardine still work for

24  Albertsons?

25     A  I believe he is retired.  I'm -- I'm not

1    positive.

2        Q  Okay.  So is Scott Jardine senior to

3    everyone else on this e-mail chain, or does he

4    hold the same position as Mr. Rood and

5    Mr. Bunnell?

6        A  I'm not -- I'm not -- I do not know that.

7        Q  Okay.  So in the e-mail at the bottom of

8    the first page, Scott writes, Jack, I had a

9    productive session with Lynette on Friday

10   afternoon and gave Rick and Brian an update on

11   this also.  Observations are that the report is

12   way too big and not practical to review.  It needs

13   to be right-sized to provide meaningful

14   information that can be acted on.

15       Do you see that?

16       A  I do.

17       Q  Okay.  Is this the spreadsheet report that

18   we discussed in the previous exhibit?

19       A  Yes.

20       Q  Okay.  Do you know how long the -- that

21   report was being used prior to February 23rd,

22   2014?

23       A  I do not.

24       Q  Okay.  Based on this e-mail, do you know

25   what Mr. Jardine means when he says that the

1    spreadsheet is too big and needs to be

2    right-sized?

3        A  Very vaguely, what I remember around this

4    e-mail is that they were looking at maybe

5    condensing down some of the entries to just to

6    what may really need to be items that need to be

7    investigated or -- yeah.

8        Q  You said items condensed down to items

9    that need to be investigated?

10       A  Well, further reviewed.

11       Q  Okay.  So in -- in its form before this

12   e-mail was written, does that mean that the -- all

13   of the entries in the spreadsheet were not being

14   reviewed or investigated?

15       A  I --

16           MR. DORAN:  Objection.

17           THE WITNESS:  I -- I do not know that.

18   BY MR. LICHTER:

19       Q  Okay.  Okay.  When he says the -- the

20   report is too big and needs to be right-sized,

21   does that mean that there would be fewer entries

22   in the report?

23           MR. DORAN:  Objection.

24           THE WITNESS:  That's the way I interpreted

25   it.

```
 1    BY MR. LICHTER:

 2        Q   Okay.  Do you know what would cause the

 3    report to be too big?

 4        A   No.  I do not.

 5        Q   He then writes, Here is what I think we

 6    need to do as a next-steps process.

 7            And then he lists out 12 different

 8    numbered steps.

 9            Do you see that on this page, on the

10    second page?

11        A   I do.

12        Q   Okay.  And let's start with the -- the

13    first section one here.

14            He says create a new report that is

15    meaningful and meets the test of compliance with

16    DEA regulations.

17            Do you see that?

18        A   I do.

19        Q   Okay.  Do you know what is meant here by

20    create a new report that is meaningful?

21            MR. DORAN:  Objection.

22            THE WITNESS:  I can only speculate that

23    he's referring to the -- the -- going to

24    a -- a -- the number of pills as opposed to the

25    number of bottles.  I'm not real sure -- I -- in
```

1    by further reducing the number of -- possibly

2    reducing the number of entries on the -- on the

3    Excel spreadsheet.

4    BY MR. LICHTER:

5        Q  Did you know if a new report ever got

6    created?

7        A  That was the report that ran in parallel

8    with -- for some time up until the close of

9    pharmacy.

10       Q  Okay.  You don't recall when that second

11   report was first run?

12       A  No, I do not.

13       Q  Okay.  Do you recall if that new report

14   had fewer entries than the previous report?

15       A  I do not.

16       Q  Okay.  Did you create that second report?

17       A  Yes.

18       Q  Okay.  Other than maybe counting pills as

19   opposed to bottles, do you know -- was there any

20   other way that that second report was different

21   than the -- the first report?

22       A  Not -- not -- not off the top of my head,

23   I cannot think of anything.

24       Q  Okay.  Do you know if Albertsons ever took

25   any steps to ensure the new report would meet the

1   test of compliance with DEA regulations that

2   Mr. Jardine mentions here?

3          MR. DORAN:  Objection.

4          THE WITNESS:  I do not know.

5   BY MR. LICHTER:

6      Q  Okay.  Do you know what this -- the test

7   of compliance refers to?

8      A  Would be the parameters that -- that

9   compliance or -- I would interpret that as

10  the -- what we have put together as a company that

11  complies with DEA regulations.

12     Q  And there aren't any -- is there a

13  specific test or steps that you're aware of that

14  Albertsons took to pursue that?

15         MR. DORAN:  Objection.

16         THE WITNESS:  I do not know.

17  BY MR. LICHTER:

18     Q  We can look at section 3.  He writes, The

19  no set average per store should be modified and

20  shortened to fewer orders to minimize how many

21  stores hit this category.  Would suggest four, but

22  we will need to test this and see what the right

23  number is to support a quality result.

24         Do you see that?

25     A  I do.

1      Q  And when he says no set average per store,

2   that was one of the exception reasons that we

3   talked about in the last document, correct?

4      A  Yes.  Okay.

5      Q  And that means that that's a store that

6   ordered a certain amount of opioids, did not have,

7   I think it was 11 prior orders, by which

8   Albertsons can calculate an average; is that

9   right?

10     A  That's what he's indicating, it -- how I

11  would take it in this -- in this e-mail.

12     Q  Okay.  Do you know how those would be

13  shortened to fewer orders?

14         MR. DORAN:  Objection.

15         THE WITNESS:  I -- I don't remember what

16  we did, if anything, to -- to accomplish that.

17  BY MR. LICHTER:

18     Q  Okay.  Would lowering the amount of orders

19  that -- that were flagged for no set average per

20  store, would that -- would that make that data

21  inaccurate within your spreadsheet?

22     A  I'm sorry, what's the question again?

23     Q  Would lowering that number of no set

24  average per store in some way, would that make the

25  data in your spreadsheet inaccurate?

1          MR. DORAN:  Objection.

2          THE WITNESS:  It -- it would change its

3     reporting behavior.

4     BY MR. LICHTER:

5        Q  But you don't remember if -- if anything

6     was done to accomplish that?

7        A  I -- I don't remember specifically if this

8     was done to accomplish that.  No.

9        Q  Okay.  When he says he would suggest four,

10    do you know what that's referring to?

11       A  I -- I don't know what -- what he's

12    meaning by this.  I don't know what he means by

13    the right number.

14       Q  Okay.  As far as the prior average in your

15    spreadsheets, the average was based on, I think,

16    11 previous orders; is that right?

17       A  Correct.

18       Q  Okay.  And here where he says would

19    suggest four, does that mean that he's -- he's

20    suggesting that the average should be based on the

21    prior four orders as opposed to the prior 11

22    orders?

23          MR. DORAN:  Objection.

24          THE WITNESS:  I -- let me read the -- the

25    bullet point more thoroughly.

1    BY MR. LICHTER:

2         Q   Sure.

3         A   That's what I -- that's what I would

4    interpret this as -- as meaning.

5         Q   Okay.  And he says, We will need the test

6    this and see what the right number is to support a

7    quality result.

8             You don't recall if there ever was any

9    testing to -- to verify that?

10        A   I do not recall anything around that,

11   doing that.

12        Q   So you don't know if any changes were

13   implemented to address this bullet point?

14            MR. DORAN:  Objection.

15            THE WITNESS:  There may have been changes

16   to -- to address shortening the report.  I do not

17   know specifically what was done.  And I do not

18   remember doing anything with the -- the limit,

19   changing it from 11 to -- to 4, or actually it

20   was -- yeah, 11 to 4.  I -- I do not recall doing

21   that at all.

22   BY MR. LICHTER:

23        Q   Okay.  Look at number five on this same

24   list here.  Says, The 20 percent guidance seems to

25   be an industry norm, but is this a correct

1    approach to all of the drugs that are required to

2    be looked at?  Could we have a higher guideline

3    than 20 percent on the higher classification

4    drugs?  If this is reasonable, it would, again,

5    cause the report to be smaller and easier to take

6    action on the outstanding items.

7         Do you see that?

8    A  I do.

9    Q  Okay.  And the 20 percent guideline that's

10   referenced here, that's the average plus

11   20 percent threshold that we've been discussing?

12   A  Yes.

13   Q  Okay.  Do you have any information on

14   whether that 20 percent guideline is the industry

15   norm?

16   A  I do not.

17   Q  Okay.  Do you know how that 20 percent

18   guideline was developed?

19   A  I -- I do not.

20   Q  And do you know how that 20 percent

21   guideline was -- was chosen within Albertsons?

22   A  I do not.

23   Q  Okay.

24   A  That was the number I was just given.

25   Q  Okay.  When he suggests raising the

1    guideline on the higher classification of drugs,

2    is he referring to Schedule II drugs?  Would that

3    be the higher classification referenced here?

4         MR. DORAN:  Objection.  And Jay I know

5    that earlier you did caution about not asking him

6    to speculate.  And I do think a lot of these

7    questions are kind of asking him to do just that,

8    but...

9    BY MR. LICHTER:

10    Q  And Mr. Mills, to be clear, I'm asking in

11    the context of -- of this e-mail that we're

12    looking at here and the context of your

13    communications with Albertsons' employees and the

14    context of your -- your job duties and

15    responsibilities, I want to know what you

16    understood some of this information to mean.  I'm

17    definitely not asking you -- to guess or

18    speculate.

19         Is that -- do we understand that?

20    A  Yes.

21    Q  Okay.  So in this e-mail that was

22    forwarded to you, when Mr. Jardine says he

23    suggests raising the guideline on the higher

24    classification drugs, did you understand the

25    higher classification drugs to mean a higher

1    schedule of drugs?

2        A  I'm not sure if he's referring to Schedule

3    III through V here or not, or whether he means

4    it's a Schedule II as being higher.

5        Q  Okay.

6        A  We had --

7        Q  Are you confident we're referring -- or

8    the e-mail here is referring to the scheduling of

9    certain drugs?

10            MR. DORAN:  Objection.

11            THE WITNESS:  Yes.

12   BY MR. LICHTER:

13       Q  Okay.  And if you raise the guideline on

14   those, like -- like he's suggesting here, that

15   would result in fewer higher classification drug

16   orders making it onto the spreadsheet; is that

17   right?

18       A  If you -- if you raise the -- the

19   guideline, it would definitely reduce the number

20   of entries.

21       Q  Okay.

22       A  You know, regardless of, you know,

23   whatever he's mentioning here, yes.

24       Q  Right.  And then that would result in

25   fewer higher classification drug orders being

1    reviewed by the warehouse, right, if they weren't

2    on the spreadsheet in the first place?

3          MR. DORAN:  Objection.

4          THE WITNESS:  That's the way I would

5    interpret it.  Yes.

6    BY MR. LICHTER:

7      Q  Okay.  Do you know if his suggestion to

8    raise the guideline beyond 20 percent, do you know

9    if that was ever implemented?

10     A  That, I do not recall.

11     Q  Okay.  We can look at the second page of

12   this document.  And in the list, we're looking at

13   number seven.

14         And here he writes, Do we focus on bottles

15   over or on percentage with regards to follow-up,

16   and what will be the threshold for when we believe

17   a call needs to be made?  This will need to be

18   reduced to writing, and whatever we decide is

19   correct will need to be addressed every time with

20   necessary documentation kept on file to support

21   that we did, in fact, address the potential

22   problem with the right person at the store or

23   retail management.

24         Do you see that?

25     A  I do.

1      Q   Okay.  When he says do we focus on bottles

2   over or on percentage with regards to follow-up,

3   do you know what that's referring to?

4      A   I -- I would -- I would -- I would guess

5   that this is a -- that this is --

6      Q   Again, I'm not asking you to guess.

7      A   Well, I would --

8      Q   Based on the context of this e-mail and

9   your role and duties working for --

10     A   Both --

11     Q   -- Albertsons --

12     A   -- both -- both columns are outlined

13  within that Excel spreadsheet.  So I would take it

14  from that he was wanting to focus on a percentage

15  over the 20 percent of -- over the bottles.

16     Q   And how was that different than what was

17  already in place?

18     A   There was no changes needed for -- for --

19  if that's what they wanted to do, they could do

20  that with the data that was provided.

21     Q   When he says this will need to be reduced

22  to writing, do you know what that means?

23     A   No, I do not.

24     Q   Did you know if there was a written

25  standard in place at this time for this process?

1      A  No, I do not.

2      Q  Do you know if any of the processes or

3   policies changed as a result of this suggestion?

4      A  No, I do not.

5      Q  Okay.  We can look at number eight on the

6   same document.

7         And he says, How do we take into account

8   areas where we are seeing significant sales

9   increases?  For example, you have to believe the

10  pharmacies at Jewel are seeing the same type of

11  increases that the stores are.  How can this be

12  addressed so that the stores' orders do not hit

13  the suspicious quantity list just because they are

14  naturally doing more business?

15        Do you see that?

16     A  I do.

17     Q  Is Jewel a pharmacy banner that Albertsons

18  owned at this time?

19     A  Yes.

20     Q  Okay.  And prior to this e-mail, do you

21  know if the SOMS process took into consideration

22  increased pharmacy business?

23     A  That, I do not know.

24     Q  Did the spreadsheet you create identify or

25  take into consideration increased pharmacy

1    business?

2        A  No.

3        Q  Okay.  Do you know if any -- any of the

4    policy or process changed as a result of this

5    suggestion here?

6        A  I do not.

7        Q  And look at number ten.  Says, Processes

8    that are compliant with DEA regulations will need

9    to be put in place for order quantities that are

10   determined to be suspicious.

11          Do you see that?

12       A  I do.

13       Q  Okay.  Do you know what he means by

14   processes that are compliant with the DEA

15   regulations will need to be put in place here?

16          MR. DORAN:  Objection.

17          THE WITNESS:  I mean, it would just be

18   speculating on -- on something we do here at the

19   warehouse.  But no, I was not part of that -- of

20   that process.

21   BY MR. LICHTER:

22       Q  Okay.  And he -- when he's saying that

23   processes that are compliant with DEA regulations

24   will need to be put in place, he's saying that in

25   an e-mail dated February 23rd, 2014, correct?

```
 1        A  Yes.

 2        Q  Okay.  Do you know if this was ever done?

 3        A  I -- that, I do not know.

 4        Q  Okay.  You weren't given any specific

 5   directions to create a new program based on this

 6   suggestion here; is that right?

 7            MR. DORAN:  Objection.

 8            THE WITNESS:  No.  I'm -- I -- I don't

 9   know if it was based on this suggestion.

10   BY MR. LICHTER:

11        Q  Okay.  So you -- you can't recall making

12   any changes to the spreadsheet or the process as a

13   result of this suggestion in number ten; is that

14   right?

15            MR. DORAN:  Objection.

16            THE WITNESS:  No.  I -- I do not recall.

17   BY MR. LICHTER:

18        Q  Okay.  After that sentence he says, Jim

19   indicated on call that we had -- that you have the

20   authority to hold or cut a shipment based on a

21   store not being available to be contacted timely

22   to comment on a suspicious order.  How do you do

23   this and remain compliant?  Should a store's

24   entire order be held and shipped on the next

25   available air shipment once the suspicious issue
```

1    is addressed?

2         Do you see that?

3    A  I do.

4    Q  Okay.  Do you know whether the

5    distribution center was cutting and shipping

6    orders if they were not able to contact the

7    pharmacy?

8    A  I do not.

9    Q  You do not know?

10   A  I do not know.

11   Q  Okay.  Do you know if -- if the

12   spreadsheets or any policies were changed as a

13   result of this suggestion here?

14   A  No.  I do not know.

15   Q  Okay.  We can look at the first full

16   paragraph after number one there.  He says, We

17   need to get this modified and put into place

18   quickly.  I believe Lynette in legal, as well as

19   Jim, the retail division leadership team, need to

20   be involved in the quantity to call on and

21   potentially hold orders on decision.

22        Do you see that?

23   A  I do.

24   Q  Okay.  When he says need to be involved in

25   the quantity to call on, do you know what that

1   refers to?

2       A   This would be anything that's deemed a

3   possible suspicious order.

4       Q   Those would be the orders that would be

5   called on?

6           MR. DORAN:  Objection.

7           THE WITNESS:  I -- I believe so.

8   BY MR. LICHTER:

9       Q   Okay.  I mean, when he says called on,

10  does that mean a call made by the distribution

11  center to the pharmacy placing the order?

12          MR. DORAN:  Objection.

13          THE WITNESS:  That's the way I interpret

14  the -- the sentence.

15  BY MR. LICHTER:

16      Q   Okay.  Were you ever involved in these

17  areas?

18      A   No.

19      Q   Okay.  This sort of information never

20  entered into your process for creating or changing

21  the spreadsheet; is that right?

22          MR. DORAN:  Objection.

23          THE WITNESS:  No.

24  BY MR. LICHTER:

25      Q   No, that's not right?

1       A  Well, no.  Not that -- not what I recall.

2   I --

3       Q  Okay.  So you don't recall this

4   information ever entering your process for

5   creating or changing the spreadsheet, correct?

6       A  There were -- I don't know if -- if any of

7   these were specifically implemented to change the

8   report.  No, I don't.

9       Q  Okay.  And so other than creating the new

10  system that -- that counted pills as opposed to

11  bottles, can you recall any changes you made to

12  the Suspicious Order Monitoring System in response

13  to this e-mail?

14      A  There were -- the reports were -- I

15  have -- I was asked to make changes from time to

16  time on how it reported.  Those specific changes,

17  I -- I do not recall what actually was made.  No.

18      Q  Okay.  I'm asking specifically in response

19  to this e-mail, as opposed to changes that were

20  requested from time to time.

21          Do you recall any other changes you made

22  as a response to this e-mail?

23          MR. DORAN:  Objection.

24          THE WITNESS:  The only thing I can think

25  of is the -- the addition of the -- of the other

1    report that was running in parallel.

2    BY MR. LICHTER:

3      Q  Okay.  And that other report that was

4    running in parallel, the only difference that you

5    can recall in that report is the change from

6    counting bottles from -- or counting pills to

7    bottles, correct?

8      A  Okay.  That's -- that's the -- what I

9    understand about it.  Yes.

10     Q  Okay.  Okay.

11        MR. LICHTER:  We've been going for about

12   another hour.  We want to take another ten-minute

13   break?

14        MR. DORAN:  Jay, we're -- I'm wondering if

15   we want to do a short lunch break.  I mean, I

16   guess it depends if you think you have, you know,

17   another, you know, fairly significant amount.

18   However, you think about it, we might want to just

19   break for a short lunch --

20        MR. LICHTER:  No --

21        MR. DORAN:  If you -- maybe you got a half

22   hour or so, then we can break for shorter.

23        MR. LICHTER:  I do not have a -- a

24   significant amount more to get through.  I think

25   if we take a ten-minute break, that should give us

```
 1    a -- we won't be held over from lunch for too

 2    long, if that's okay with everyone.

 3          MR. DORAN:  Yeah.  Let me -- I think

 4    that's fine.

 5          THE REPORTER:  Do we want to go off the

 6    record?

 7          MR. DORAN:  Yeah.  Let's go off the

 8    record.  Yeah.

 9          THE VIDEOGRAPHER:  Going off record.  Time

10    is 12:51.

11             (Whereupon a break was had.)

12          THE VIDEOGRAPHER:  Back on the record.

13    Time is 1:06.

14    BY MR. LICHTER:

15       Q  Okay.  Okay.  Mr. Mills, you can flip to

16    Tab 3 in your exhibit binder.

17       A  Okay.

18          MR. LICHTER:  I'm going to have this

19    marked as Exhibit 3.  And for the record, this

20    document is Bates number ALB-NM00001477.  Let me

21    know when you're ready.

22       (Exhibit Number 3 marked for identification.)

23          THE WITNESS:  I'm ready.

24    BY MR. LICHTER:

25       Q  Have you seen this document before?
```

1        MR. DORAN:  You can flip through it

2    because you're just looking at the first page.

3        THE WITNESS:  I'm sorry.

4        MR. DORAN:  If you want to quickly flip

5    through it just to make sure you've seen it.

6        THE WITNESS:  Okay.

7        MR. DORAN:  Sorry, Jay.

8        MR. LICHTER:  That's okay.

9        THE WITNESS:  I've seen documents like

10   this.  I'm -- I'm not sure if it's this exact one.

11   BY MR. LICHTER:

12       Q  Okay.  Does this -- well, are you finished

13   flipping through it?

14       A  Yes.

15       Q  Okay.  Does this appear to be a

16   March 18th, 2014, agenda for Albertsons' pharmacy

17   supply chain committee?

18       A  Yes.

19       Q  Okay.  Did you attend this meeting?

20       A  No.

21       Q  Okay.  I think you mentioned that

22   there -- you have attended meetings, not in their

23   entirety, but you've been called in some of these

24   meetings to -- to give input; is that correct?

25       A  Mainly to receive input.

```
 1         Q  To receive input.  Okay.

 2            Do you recall whether or not --

 3         A  That was most --

 4         Q  I'm sorry?

 5         A  That was most of it.

 6         Q  Do you recall whether you were either

 7     called to give or receive input for this meeting?

 8         A  No.  Unless I'm listed in here somewhere.

 9         Q  I don't believe you're listed.  I'm just

10     asking for your -- for your recollection.

11         A  I -- I don't recall attending any part of

12     this meeting.

13         Q  Okay.  This is the agenda for the pharmacy

14     supply chain compliance committee.

15            Do you know what that committee does?

16         A  They met, I believe, here at the warehouse

17     and discussed compliance issues is -- and I guess

18     what we were doing in our day-to-day operation.

19         Q  Okay.  You were no -- you were never a

20     member of this committee, were you?

21         A  No.  I was not.

22         Q  Okay.  Do you know how often the committee

23     meets or met?  Excuse me.

24         A  I believe it was once a month.

25         Q  Okay.  And was it your understanding that
```

1    this committee had a role in overseeing

2    Albertsons' suspicious ordering process?

3        A  I believe the committee oversaw a lot more

4    than probably just the -- the reporting process.

5    But I think that was part of it.  Yes.

6        Q  Okay.  We can look at page -- it's marked

7    at the bottom as 1479.  I think it's the third

8    page of the document.  Let me know when you're

9    there.

10       A  Okay.  I'm there.

11       Q  At the bottom of the document, it says

12   Topic 5, review suspicious order monitoring

13   process.

14          Do you see that?

15       A  Yes.

16       Q  And on the following page at Bates number

17   1480, the Topic 5 section -- or excuse me, the

18   Topic 5 notes section at the last paragraph in

19   that section, it says, Jim indicates that the

20   business will be implementing a max pick process

21   within the next couple of weeks.

22          Do you see that?

23       A  I do.

24       Q  Are you familiar with this max pick

25   process?

1      A  I've heard the terminology.  That -- that

2  is it.

3      Q  Okay.  You don't -- do you know what it

4  refers to?

5      A  I would -- I would estimate that

6  it's -- it's -- it's an order cut-off limit.

7  That's the way I interpret the max pick quantity.

8      Q  Okay.  Did this max pick process relate in

9  any way to the -- the spreadsheet report that

10  we've been talking about throughout this

11  deposition?

12     A  No.  Did not.

13     Q  Okay.  Was this max pick process something

14  you understood to occur among the warehouse

15  employees?

16     A  I'm not for certain if the max pick is pre

17  the warehouse receiving the orders or something

18  that was done after.

19     Q  Okay.  Do you know how -- how this max

20  pick process was different than what was already

21  in place on March 18th, 2014?

22     A  No.  I do not.

23        MR. DORAN:  Objection, sorry.  Objection.

24  BY MR. LICHTER:

25     Q  That paragraph continues.  It says, There

1    was discussion around the report and ways that it

2    needs to be improved.

3         Do you see that?

4    A  Yes.

5    Q  Okay.  I'm going to -- when it refers to

6    that report, do you understand this to mean the

7    spreadsheet that we've been discussing throughout

8    the deposition?

9         MR. DORAN:  Objection.

10        THE WITNESS:  I -- I really do not know

11   what they're referring to here.  There was no max

12   pick on the spreadsheet that we sent out.

13   BY MR. LICHTER:

14   Q  Okay.  Are you aware of any discussions

15   among the supplier -- or the pharmacy supply chain

16   committee regarding ways that your spreadsheet

17   report needed to be improved?

18   A  With the exception of a few e-mails

19   that -- about adding a column or -- and the -- the

20   number 2 exhibit that we were just on, no, I do

21   not.

22   Q  Okay.  It then says, Bobbie indicates that

23   they will get a group back together to look at the

24   process to include Bobbie, Scott, Nikki, Jack,

25   David, Ray, and Tim.

1        Do you see that?

2        A  I do.

3        Q  Do you know if you -- if you were the Tim

4    that's referenced here?

5        A  I do not remember getting together

6    with -- with this group of people or anything that

7    had to do with a max pick or -- or the -- or the

8    spreadsheet that -- that we supplied.

9        Q  Do you know of any other Tim that works at

10   Albertsons that may have been involved in this

11   instead of you?

12       A  There was a Tim Fitzgerald that worked for

13   the company.  I don't know when he left.

14       Q  Okay.  Was -- was Tim Fitzgerald ever on

15   the pharmacy supply chain compliance committee?

16       A  Not that I'm aware of.  No.

17       Q  Did you have any reason to believe that

18   the Tim referenced here is the Tim Fitzgerald

19   rather than yourself?

20       A  No.

21       Q  Okay.  But you don't recall meeting with

22   this list of people to -- to look back at the

23   process, do you?

24       A  No, I do not.

25       Q  Okay.  And the last sentence of this

1    section says, Jim wants to investigate whether we

2    have a process to look comprehensively at what is

3    being ordered in total from all sources.

4          Do you see that?

5          A  I do.

6          Q  Do you know who the Jim is that's

7    referenced here?

8          A  I -- no, I don't.

9          Q  Okay.  Do you know what this concern is

10   referring to in this sentence?

11         A  No, I don't.

12         Q  Okay.  And this process to look

13   comprehensively at what is being ordered in total

14   from all sources, do you know if that was ever

15   developed by Albertsons?

16         A  I do not know.

17         Q  Were you ever asked to develop any sort of

18   process or system to look comprehensively at what

19   was being ordered in total from all sources?

20         MR. DORAN:  Objection.

21         THE WITNESS:  No.

22         MR. LICHTER:  Okay.  We can flip to Tab 4

23   of the binder and have this document marked as

24   Exhibit 4.

25     (Exhibit Number 4 marked for identification.)

1          MR. LICHTER:  For the record, this

2    document is Bates numbered ALB-NM00014384.

3    BY MR. LICHTER:

4          Q  Okay.  Have you seen this document before?

5          A  Yes.

6          Q  Okay.  When's the last time you saw it?

7          A  Last night.

8          Q  Okay.  Is this an e-mail you received from

9    Scott Johnson on November 31st, 2014, with an

10   attachment?

11         A  October 31st, yeah.

12         Q  Okay.  And who is Scott Johnson?

13         A  Scott Johnson was part of pharmacy

14   compliance.

15         Q  Do you remember what his title was at this

16   time?

17         A  I -- I do not.

18         Q  And in the e-mail Scott writes, Tim, based

19   on our call yesterday we have decided to proceed

20   to the next step by enhancing the SOMS pilot.

21         Do you see that?

22         A  I do.

23         Q  And the SOMS pilot that's referenced here,

24   is that the second spreadsheet process we've been

25   discussing throughout this deposition?

1        A  Yes.

2        Q  Okay.  That was called the SOM pilot?

3        A  I believe they referred to the second

4    report as SOM, yes.

5        Q  Okay.  Did SOM stand for Suspicious Order

6    Monitoring?

7        A  Yes.

8        Q  Okay.  And that was a pilot program at

9    this time?

10       A  I'm sure what we were doing, we were

11   sending -- we were sending test versions or the

12   output to all of those involved to -- to review

13   the -- the spreadsheets.

14       Q  Okay.  And at this time in October of

15   2014, given that it's still referred to as a pilot

16   here, does that mean it was still in its test

17   stages?

18       A  That's the way I would take that.

19       Q  Okay.  And was that SOM pilot ever removed

20   from a testing pilot stage into an active,

21   implemented stage?

22          MR. DORAN:  Objection.

23          THE WITNESS:  We did send that.  As he

24   mentions in the next sentence, we -- we did send

25   that, the report, from -- from the SOM pilot along

1    with the -- the original spreadsheet from 2013,

2    yes.

3    BY MR. LICHTER:

4        Q  I guess my question is more whether the

5    SOM pilot ever moved from a pilot testing phase to

6    an active implementation phase.

7        A  To the best of my knowledge, it did in the

8    in fact that we were -- we sent that to the

9    warehouse personnel to use as well.

10       Q  Okay.  Do you recall when it moved from

11   test pilot phase to active implemented phase?

12       A  No, I do not.

13       Q  Okay.  Would it have been around this time

14   at the end of 2014?

15       A  Yes.  I would -- I would -- I would

16   estimate that -- that to be true.

17       Q  Okay.  And I think you mentioned this

18   before, but that SOM pilot program, the difference

19   between that program and the original program that

20   you created was the counting of pills as opposed

21   to bottles, correct?

22       A  I believe that's the case.

23       Q  Okay.  Continuing the e-mail, Scott

24   writes, We will ask you to turn on the new process

25   and run it in parallel with the current process.

1    We want to capture the data for both components to

2    assess.

3         Do you see that?

4    A  I do.

5    Q  Okay.  So is it your belief then that the

6    SOM pilot was turned on as far as its testing

7    phase in or around October 2014?

8    A  Yes.

9    Q  Okay.  And where he says we want to

10   capture the data for both components to assess, do

11   you have any idea what the results of that

12   assessment were?

13   A  I do not.

14   Q  Okay.

15        MR. LICHTER:  I don't have any further

16   questions.

17        MR. DORAN:  I don't have any questions

18   either, so I think we're --

19        MR. LICHTER:  Okay.  Great.  Just -- just

20   to put on the record, I know we have not yet

21   received the personnel file of Mr. Mills.  So I

22   just want to explain that we are holding the

23   deposition open pending receipt and review of the

24   personnel file to potentially call Mr. Mills back

25   to ask him additional questions related to that

1    file.

2        MR. DORAN:  Okay.  I would say

3    that -- that Mr. Mills does is not have the

4    primary responsibility of compliance, sales, or

5    marketing.  So the MDL order did not require the

6    production of the personnel file.

7        MR. LICHTER:  Okay.

8        MR. DORAN:  So we can have further

9    discussion if you like after.

10        MR. LICHTER:  We can talk about that off

11    the record, but that's it for me.  I don't think

12    there's any other counsel on Zoom to check in

13    with, so I guess we can go off the record.

14        MR. PALUMBO:  This is Corey --

15        THE VIDEOGRAPHER:  Okay.  Going off the

16    record --

17        MR. PALUMBO:  This is --

18        THE VIDEOGRAPHER:  -- time is 1:21.

19        MR. PALUMBO:  -- Corey Palumbo.  I

20    represent Kroger.  I'm on Zoom, but I don't have

21    any questions.

22        MR. LICHTER:  Sorry about that Corey.

23        MR. PALUMBO:  No worries.  Okay.

24        MR. LICHTER:  All right.  Thank you,

25    everyone.

1          THE REPORTER:  Mr. Mills, I'm sorry --

2   did -- I need to get transcript orders.

3          MR. DORAN:  Yeah.  That was my fault.

4          THE REPORTER:  That's okay.  I think -- I

5   need to get transcript orders.

6          MR. DORAN:  Yeah.  I mean, we can do -- I

7   never know what our normal request is.  We do

8   not -- I do not need a rough.

9          THE REPORTER:  Okay.

10         MR. DORAN:  So I mean, whatever we

11  normally -- this doesn't need to be expedited,

12  rough -- so I --

13         THE REPORTER:  Okay.

14         Just regular turnaround on the transcript?

15         MR. DORAN:  Just regular turnaround would

16  be fine.

17         THE REPORTER:  And Mr. Palumbo, would you

18  like to order the transcript?

19         MR. PALUMBO:  Yeah.  I would like a

20  transcript too.  I'm not necessarily sure what we

21  would normally do either for Kroger, but I think

22  just a regular transcript is fine.

23     (Whereupon the proceedings were concluded at

24                 1:23 p.m. CST)

25

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2         I, Karisa Ekenseair, the officer before

3    whom the foregoing deposition was taken, do hereby

4    certify that the foregoing transcript is a true

5    and correct record of the testimony given; that

6    said testimony was taken by me stenographically

7    and thereafter reduced to typewriting under my

8    direction; that reading and signing was not

9    requested; and that I am neither counsel for,

10   related to, nor employed by any of the parties to

11   this case and have no interest, financial or

12   otherwise, in its outcome.

13        IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 8th day of

15   August, 2023.

16

17

18

19        Karisa Ekenseair, CCR, RMR  LS #1802

20        Oklahoma Certified Shorthand Reporter

21

22

23

24

25