# EXHIBIT 32

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4  IN RE: NATIONAL              )
    PRESCRIPTION OPIATE          )
 5  LITIGATION                   )
    This document relates to:    )  MDL No. 2804
 6  Track Eight: Cobb County,    )  Case No. 17-md-2804
    Georgia,                     )
 7  Case No. 1:18-op-45817,      )  Judge Dan Aaron
    COBB COUNTY,                 )  Polster
 8        Plaintiff,             )
                                 )
 9        vs.                    )
                                 )
10  PURDUE PHARMA, L.P., et      )
    al.,                         )
11        Defendants.            )
    _____     )
12  IN RE: NATIONAL              )
    PRESCRIPTION OPIATE          )
13  LITIGATION                   )  MDL No. 2804
                                 )  Case No. 17-md-2804
14  This document relates to:    )
    Track Nine: Tarrant County,  )  Judge Dan Aaron
15  Texas,                       )  Polster
    Case No. 1:18-op-45274       )
16

17      VIDEO RECORDED DEPOSITION OF CRAIG McCANN, PhD

18          Wednesday, May 15, 2024, 10:06 a.m.

19                      Motley Rice
                       401 9th Street NW
20                     Washington, DC

21

22  Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA
    Job Number: MW 6693023
```

Page 2

1    VIDEO RECORDED DEPOSITION OF CRAIG McCANN, PhD,

2  a witness herein, called by Publix and Albertsons,

3  as Track Eight and Track Nine Defendants for

4  examination, taken pursuant to the Federal Rules of

5  Civil Procedure, by and before Marjorie Peters, a

6  Registered Merit Reporter, Certified Realtime

7  Reporter and Notary Public in and for the District

8  of Columbia, at Motley Rice, 401 9th Street NW,

9  Washington, DC, on Wednesday, May 15, 2024, at

10  10:06 a.m.

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

1          A P P E A R A N C E S
2  For CT8 and CT9 Plaintiffs:
3    Page Poerschke, Esquire
        (Appearing via videoconference)
4    LEVIN, PAPANTONIO, RAFFERTY, PROCTOR, BUCHANAN,
        O'BRIEN, BARR & MOUGEY, P.A.
5    316 South Baylen St.
        Pensacola, FL 32502
6    ppoerschke@levinlaw.com
        (205) 401-2373
7
8  For the Plaintiff CT9 Tarrant County:
9    Evan M. Janush, Esquire
        THE LANIER LAW FIRM
10    535 Madison Ave
        New York, NY 10022
11    Evan.Janush@LanierLawFirm.com
        212-421-2800
12
13  For the Defendant Albertsons:
14    Christopher Torres, Esquire
        GREENBERG TRAURIG, P.A.
15    101 East Kennedy Boulevard
        Tampa, FL 33602
16    torresch@gtlaw.com
        813.318.5721
17
18  For the Defendant Publix:
19    William J. Leeder, Esquire
        Deanna Lee, Esquire
20    Barnes & Thornburg, LLP
        171 Monroe Avenue NW
21    Suite 1000
        Grand Rapids, MI 49503
22    William.leeder@btlaw.com
        616-742-3979

Page 4

1          A P P E A R A N C E S
2  ALSO PRESENT:
3  Emmanuel Pezoa, Legal Videographer
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 5

1                I N D E X
2  EXAMINATION                              PAGE
3  CRAIG McCANN, PhD
4    By Mr. Torres                          8
5    By Mr. Leeder                          83
6    By Mr. Torres                          152
7    Acknowledgment of Deponent             171
8    Certificate of Court Reporter          173
9    Errata Sheet                           174
10        I N D E X   O F   E X H I B I T S
11  McCANN EXHIBIT                           PAGE
12  Exhibit 1     McCann Expert Report,      8
13        4.15.2024
14  Exhibit 2     McCann Invoice, 5.13.2024  8
15  Exhibit 3     McCann Expert Report,      90
16        1.24.2024
17  Exhibit 4     Appendix 8.3B Red-Flag     115
18        Analysis Summary on Publix
19        Dispensing Data
20  Exhibit 5     Appendix 6.11 Pharmacy     128
21        Ranking
22

2 (Pages 2 - 5)

Page 6

1       I N D E X   O F   E X H I B I T S

2 McCANN EXHIBIT                          PAGE

3 Exhibit 6       Summary of Publix        130

4               Dispensing Red-Flag

5               Analysis, Cobb County, GA,

6               Nonrecurrent

7 Exhibit 7       Appendix 6.6 Distributor   138

8               Report

9 Exhibit 8       5.13.2024, McCann invoice,  149

10               CT8

11 Exhibit 9      Table 7 - Transactions in   160

12               ARCOS Date - MME per

13               Dosage Unit

14 Exhibit 10     Table 13 - Transactions in   162

15               Tarrant County - MME per

16               Dosage Unit

17 Exhibit 14     Tables 18-71 - Summary of   167

18               McCann Algorithms - MME

19               per Dosage Unit

20

21

22

---

Page 7

1        P R O C E E D I N G S

2             THE VIDEOGRAPHER:  Good morning.  We

3 are going on the record at 10:06 a.m. on May 15,

4 2024.  This is the video-recorded deposition of

5 Craig McCann taken in the matter of In Re: National

6 Prescription Opiate Litigation filed in the US

7 District Court, Northern District of Ohio, Eastern

8 Division, Case Number 1:18-OP-45817.

9             My name is Emmanuel Pezoa from the

10 firm Veritext Legal Solutions.  The court reporter

11 is Marjorie Peters from the firm Veritext Legal

12 Solutions.

13             Will counsel please state their

14 appearances and affiliations for the record.

15             MR. TORRES:  Christopher Torres

16 representing Albertsons.

17             MR. LEEDER:  Bill Leeder and Deanna

18 Lee representing Publix Super Markets.

19             MS. POERSCHKE:  Page Poerschke

20 representing CT8 and CT9 Plaintiffs.

21             MR. JANUSH:  Evan Janush

22 representing CT9 Tarrant County on behalf of the The

---

Page 8

1 Lanier Law Firm.

2             THE VIDEOGRAPHER:  Will the court

3 reporter please swear in the witness.

4             CRAIG McCANN, PhD,

5 having been called as a witness, was legally placed

6 under oath, testified as follows:

7 (McCann Exhibit 1, McCann Expert Report, 4.15.2024,

8 was marked for identification.)

9             EXAMINATION

10 BY MR. TORRES:

11    Q.   Dr. McCann, I handed you Exhibit 1.

12         Is that the expert report that you

13 served in the Track 9 Tarrant County versus Purdue

14 Pharma matter?

15    A.   Yes.

16 (McCann Exhibit 2, McCann Invoice, 5.13.2024, was

17 marked for identification.)

18    Q.   I've also handed you, sir, Exhibit 2,

19 which is a summary of professional services

20 rendered.

21         Does this Exhibit 2 reflect the

22 hours you and your team spent preparing the expert

---

Page 9

1 report marked as Exhibit 1?

2    A.   Yes, at least in the most narrow sense,

3 yes.

4    Q.   What do you mean "in the most narrow

5 sense"?

6    A.   Well, we have been working on the opioid

7 matter now for almost six years, and so there's a

8 lot of content in this expert report that is common

9 to some of the prior expert reports that we created.

10         And so the work that went into

11 developing this expert report, as reflected on the

12 invoice, is the incremental work.  That's what I

13 meant.

14    Q.   Understood.  Thank you.

15         Are these rates discounted, are

16 these fees discounted at all?

17    A.   The only rate that is not a current rate

18 is mine.  Whenever we started this work six years

19 ago, my rate was $475 an hour, and that's continued

20 to be the rate that we've charged for my time.

21         My current time is a little bit more

22 than that.

3 (Pages 6 - 9)

Page 10

1    Q.    Okay.
2          Here, you've got ten hours with an
3  amount of $4,750.  That's $475 an hour.
4          Should you have billed more to this
5  matter?
6    A.    I don't think so.  My current hourly
7  rate is $625 an hour, so that would be another
8  $1500, but because of the multiple clients that we
9  had, we just agreed to keep my rate fixed over the
10 term of the opioid work.
11   Q.    Thank you, sir.
12         Dr. McCann, did you or your team
13 coordinate with Carmen Catizone in connection with
14 the preparation of your expert report?
15   A.    Yes.  I didn't personally, but I believe
16 people on my staff interacted, if not with
17 Mr. Catizone directly, with lawyers handling
18 Mr. Catizone.  And we had worked with him on prior
19 matters, and I'm not sure that there were any
20 changes to what we had been asked to do in prior
21 matters.  To the extent there was, they were
22 communicated through counsel to members of my staff,

Page 11

1  at least that's my understanding.
2    Q.    Did you or your team rely on any facts,
3  data, information or opinions from Mr. Catizone in
4  connection with the preparation of your expert
5  report?
6    A.    Not as I would interpret rely upon.
7          What I mean by that is early on in
8  the sequence of MDL cases, we interacted -- I
9  personally interacted with Mr. Catizone a few times,
10 and as a result of those interactions and the
11 development of a couple of earlier expert reports,
12 Mr. Catizone, through counsel, requested that we do
13 some particular calculations, do some particular
14 analysis of the data.  And we did that then.  We
15 continued to do that in CT9.
16         I don't think that's really relying
17 upon his opinions, but we were asked to do some
18 calculations that I understand would be helpful to
19 him in forming his opinions, we certainly did that.
20   Q.    Thank you.
21         What calculations were those that he
22 asked you to perform?

Page 12

1    A.    There may be others that I'm not
2  thinking about as I sit here, but primarily, it was
3  the application of some rules he specified to the
4  dispensing data, what we may call later in the
5  report red flags on prescriptions.  Those were
6  specified by Mr. Catizone.
7    Q.    Okay.
8          Have those rules to the dispensing
9  data or red flags changed between that time and the
10 report that you provided in CT9?
11         MS. POERSCHKE:  Object to the form.
12   A.    Well, I first interacted with
13 Mr. Catizone four or five years ago, and there
14 were -- there was at least one other pharmacy expert
15 in some other MDL matter, and so I may be confusing
16 a little bit the sequence of requests that we had
17 for identifying prescriptions filled pursuant to
18 particular rules that were specified by Mr. Catizone
19 or others.
20         But my recollection, without lining
21 up the different expert reports that we filed in
22 cases that Mr. Catizone was involved in, is that

Page 13

1  there might have been one or two flagging rules that
2  changed after the first couple of cases, and then
3  more recently, there might have been one or two
4  additional flagging rules that are variants on
5  existing ones, ones that we had applied before.
6          So I guess answer is yes, but I
7  think the changes have been minimal.
8    Q.    Okay.
9          Did you review Mr. Catizone's expert
10 report served in the CT9 case?
11   A.    No.
12   Q.    Okay.
13         Did you or your team coordinate with
14 Katherine Keyes in connection with the preparation
15 of your expert report?
16   A.    I didn't, and I'm not familiar with that
17 name, so I don't know that my staff did, either.
18   Q.    Okay.  Okay.
19         You don't know Katherine Keyes?
20   A.    Correct.
21   Q.    Okay.
22   A.    I may have heard the name, but I'm not

4 (Pages 10 - 13)

Page 14

1  placing it as I sit here.
2      Q.    Did you or your team coordinate with
3  Lacey Keller in connection with the preparation of
4  your expert report?
5      A.    Not to my knowledge.  I didn't, and I'm
6  not aware that my staff did.
7      Q.    Did you or your team coordinate with
8  Anna Lembke in connection with the preparation of
9  your expert report?
10     A.    Same answer.  I'm familiar with the
11  names, but I didn't interact with her, and I'm not
12  aware that my staff did.
13           The staff may have been asked to
14  gather data or provide some analysis, either to
15  Ms. Lembke or Ms. Keller, but I'm not aware of that.
16           Our work on CT9 started
17  two-and-a-half years ago, and I just -- I don't know
18  whether our staff's interacted at any point in time
19  with -- my staff interacted with either of those two
20  individuals.
21     Q.    Is it your impression that information
22  might have gone from you to Lacey Keller, or to

Page 15

1  your -- from your consulting group to Lacey Keller
2  or to Anna Lembke, but not the other way around?
3      A.    Correct.
4      Q.    Okay.
5           Do you know what information your
6  firm would have provided to Lacey Keller?
7      A.    No.
8      Q.    Do you know what information your firm
9  would have provided to Anna Lembke?
10     A.    No.
11     Q.    If I wanted to find that out, how would
12  I find that out?
13     A.    Well, I think you would ask them.
14     Q.    Who is "them"?
15     A.    Ms. Keller and Ms. Lembke.
16     Q.    Okay.
17           I couldn't ask anyone in your
18  office?
19     A.    I don't think so.
20     Q.    Okay.
21           Outside of the Plaintiffs' experts
22  that I just mentioned, did you or your team

Page 16

1  coordinate with anyone outside of SLCG Consulting in
2  connection with the preparation of your expert
3  report?
4      A.    Yes.
5      Q.    Who was that?
6      A.    There may be someone else, but the only
7  people I can think of are people at Levin
8  Papantonio, the law firm.
9      Q.    Mm-hmm.  Mm-hmm.
10     A.    I'm not aware as I sit here that, again,
11  focused on the incremental work that was done in the
12  last two-and-a-half years to create the CT9 report,
13  that we interacted with anybody outside of the firm
14  other than the lawyers and their staff.
15     Q.    Were there any suggestions, requests or
16  directions --
17     A.    I apologize.
18           It was -- I said the Levin
19  Papantonio firm.  We certainly interacted with them,
20  but we also interacted with the people from The
21  Lanier Law Firm, and I don't know if there was
22  anybody else, but it would be at least those two law

Page 17

1  firms.
2      Q.    Who were your contacts at Levin
3  Papantonio?
4      A.    Well, Ms. Poerschke.
5      Q.    Mm-hmm.
6      A.    Peter Mougey.  A coordinator there, Josh
7  Gay.
8           Perhaps a couple of other people
9  that I'm not placing right now, but primarily, those
10  three.
11     Q.    Who would you have coordinated with at
12  The Lanier Law Firm?
13     A.    I'm not 100 percent sure because some of
14  the interaction might have been related to a
15  different case, but over the last two-and-a-half
16  years, most of our interaction has been with a
17  coordinator there whose first name is Sadie, and I
18  apologize to Sadie, but I don't recall her last
19  name.
20     Q.    Were there any suggestions, requests or
21  directions provided to you by either Levin
22  Papantonio or The Lanier Firm in connection with the

5 (Pages 14 - 17)

Page 18

1 preparation of your expert report?
2     A.    I'm sorry.  Could you ask that again,
3 please.
4     Q.    Were there any suggestions, requests or
5 directions provided to you by anyone at Levin
6 Papantonio or The Lanier Law Firm in connection with
7 the preparation of your expert report in the CT9
8 case?
9     A.    Almost certainly all three, suggestions,
10 requests and directions, yes.
11     Q.    What were those?
12     A.    Well, for instance, we were talking
13 about Mr. Catizone earlier, and so I don't believe
14 that during the incremental work on CT9 that we
15 interacted with Mr. Catizone directly.  Perhaps -- I
16 didn't personally.  I don't think my office did.  I
17 think our interactions were through counsel.
18          And so I would interpret those
19 interactions as it relates at least to
20 Mr. Catizone's request for red-flag implementations
21 to be directions.  Something as ministerial as when
22 the reports were due, I would interpret as

Page 19

1 directions.
2          So requests, directions cover a lot
3 of what was done.  Directions, for instance, on who
4 the remaining Defendants were as we got close to the
5 expert report filing.  We were first prepared to
6 file an expert report over, I think, a year earlier,
7 and it was a different set of Defendants, a larger
8 set of Defendants.
9          So, certainly, directions and --
10 directions and requests.  I don't recall any
11 suggestions in the sense of wordsmithing or
12 suggesting that we do something different than what
13 we did, other than the kind of directions and
14 requests that I have tried to provide examples of.
15     Q.    In report Paragraph 13, that's going to
16 be page 5 of your report --
17     A.    Yes.
18     Q.    -- you write that you "...have been
19 asked to report the results of applying certain
20 algorithms to the ARCOS Data and Albertsons'
21 Transactional Data."
22          Who asked you to do that?

Page 20

1     A.    Either the Levin Papantonio law firm or
2 The Lanier Law Firm.  I forget now who we -- I don't
3 know now who we would have received that request
4 from.
5     Q.    Are these the algorithms that you
6 describe as Methods 1 through 7 in your report?
7     A.    Yes.  We refer to those as SOMS,
8 Suspicious Order Monitoring System reports.
9     Q.    Did you formulate those algorithms
10 yourself, or were they provided to you to apply in
11 this case?
12     A.    I apologize.  Let me just amend
13 slightly.
14          I think of them internally as SOMs
15 reports.  We don't in the report anywhere refer to
16 them as SOMs reports, but they're just rules much
17 like the dispensing red-flag rules that we apply to
18 data and report the results.
19          But I'm sorry, to answer your
20 question, they were provided to us long ago in CT1
21 or CT2, certainly by the time we got to the second
22 or third major opioid project by counsel.

Page 21

1     Q.    Okay.
2          So you did not formulate the
3 algorithms, they were -- the SOMs algorithms, they
4 were provided to you by counsel; is that right?
5     A.    Correct.  There might have been --
6          UNIDENTIFIED SPEAKER:  (Zoom audio
7 interference.)
8     Q.    Let me ask the question --
9     A.    There might have -- I'm sorry.  Go
10 ahead.
11     Q.    Let me ask the question again.
12          You did not formulate the SOMs
13 algorithms, they were provided to you by counsel; is
14 that right, sir?
15     A.    Well, they weren't birthed to us fully
16 formed in the sense that there are limits imposed on
17 any calculation you can do, including these
18 calculations based on the data that's available.
19          So there was, five years ago now,
20 some discussion about what data was available from
21 the ARCOS records, for example, the primary source
22 of the calculations, and from discovery outside of

Page 22

1 ARCOS.
2          And so interacting with some of the
3 attorneys at the time, and what I have come to think
4 of as the DEA experts, there was a set of rules
5 developed, Methods 1 through 7 you mentioned a
6 minute ago, and slight variations on those, that
7 were passed on to us at the end of that iterative
8 process as being rules that the DEA experts wanted
9 us to implement.
10     Q.    But you did not formulate these
11 algorithms based on any particular statistical
12 analysis that you wanted to perform; is that fair?
13     A.    Right.  Well, maybe another way of
14 saying that is we weren't bringing any particular
15 subject matter expertise.  We were explaining to
16 counsel what data was available, what could be done
17 with the data.  After learning what the general
18 methods the DEA experts wanted to be implemented, I
19 don't recall any specific adjustments that needed to
20 be made to their requests for the data to be able to
21 answer whatever requests there are -- they had, but
22 I remember there was some back and forth as we

Page 23

1 mastered the data in the first year, and what could
2 be done with it.
3          So we didn't -- the only subject
4 matter expertise we brought was to the data
5 processing and to the statistical analysis.  We
6 didn't bring any pharmaceutical-specific or
7 DEA-specific expertise.
8     Q.    I understand.  Thank you.
9          What reasons were you given for why
10 you should use these SOMs algorithms Methods 1
11 through 7 described in your report?
12     A.    Well, to the extent I was given reasons,
13 it was really for context.  So I understood a little
14 bit about what we were doing.  We weren't doing the
15 calculations in a complete vacuum, but they weren't
16 reasons necessary to justify the request to me other
17 than the DEA experts requested these calculations,
18 and the lawyers thought the Court would find them
19 useful.
20     Q.    Okay.
21          In report Paragraph 14, you write
22 that you "...have been asked to report the results

Page 24

1 of applying certain red-flag algorithms to the
2 Dispensing Data."
3          Who asked you to do that?
4     A.    Well, same answer.
5          Lawyers from the Levin Papantonio
6 and The Lanier Law Firms.
7     Q.    These red-flag algorithms are the
8 Red-Flag Computations 1 through 14 that you describe
9 in your expert report; is that right?
10     A.    Correct.
11     Q.    Okay.
12          You did not formulate those red-flag
13 algorithms yourself; is that right?
14     A.    Correct.  We discussed that already.
15 These are the red flags that were proposed by
16 Mr. Catizone.
17     Q.    On the next page, report Paragraph 20,
18 and over Carryover, you write, "...Dispensers in
19 Tarrant County received 1.05 billion Dosage Units or
20 18.4 billion MME of opioids.  Given the County's
21 1,896,597 average population during this time --
22 during this same time period, Dispensers received

Page 25

1 enough opioids for every resident in Tarrant County
2 to consume 40 Dosage Units or 693 MME every year
3 from 2006 to 2019."  (As read.)
4          What analysis did you perform to
5 assert that all of these dosage units were consumed?
6     A.    We didn't do any analysis other than to
7 divide the total dosage units and total MME by the
8 average population.
9     Q.    What analysis did you perform to suggest
10 that all of these dosage units were consumed by
11 Tarrant County residents?
12     A.    None.
13     Q.    In report Paragraph 21, you refer to in
14 report Sections VII and VIII "...a nonexhaustive set
15 of algorithms that can be systematically applied to
16 the ARCOS Data."
17          What are the purpose of the
18 algorithms that you applied?
19     A.    Well, that may be for other expert
20 witnesses or for lawyers arguing the results of the
21 algorithms, you know, what purpose they would be put
22 to, but those are the Methods 1 through 7 that we

Page 26

1  talked about earlier, primarily.
2          I have some sense of the purpose of
3  them, but that's really context. It's not expert
4  opinion.
5      Q.    What is that sense?
6      A.    Well, the context I have for those
7  calculations is that they provide information on
8  shipments from dispenser -- from distributors,
9  primarily, to dispensers that might have been
10 identified and investigated further, might have
11 raised a red flag.
12          Now, there's at least seven methods
13 that we implement, and there's a couple of
14 variations on each, and then there's a couple more
15 that we added at some point. So, in total, there's
16 16, 18, 20 different ones.
17          And the reason there are so many
18 different ones is that some courts might find the
19 results of one more illuminating than others. Or a
20 particular witness that would be interpreting these
21 results, a DEA expert, might have a preference for
22 one versus another algorithm in developing an

Page 27

1  opinion about whether there were many shipments that
2  should have been investigated, and weren't. So
3  that's my understanding of the context.
4          My experience with them includes,
5  well, in CT4, testifying before Judge Breyer out in
6  San Francisco, where he suggested a variation on one
7  that we hadn't implemented, and we subsequently
8  implemented it.
9          So, again, it's providing a range of
10 information to the DEA expert and ultimately to the
11 Court in the hopes -- I'm not doing any of this
12 because I think it's futile, because I think it's
13 hopeless, that there's no value to it, although I
14 might in some circumstance, but I think all of these
15 have some information and potentially have some
16 value to the Court.
17     Q.    What were you trying to accomplish with
18 SOMs algorithms Methods 1 through 7, statistically?
19     A.    It's a lot of data, but ultimately, it's
20 just counting. It's just counting. It's arithmetic
21 on a lot of data, arithmetic that the Court itself
22 couldn't do.

Page 28

1          And so my role is to assist with
2  that arithmetic, to apply fairly simple formulas to
3  a lot of data, and report the results to the best of
4  my ability. That's what I was trying to accomplish.
5      Q.    What did you conclude, if anything, from
6  the application of SOMs algorithms Methods 1
7  through 7?
8      A.    Well, I personally, or as an expert
9  witness, don't have any qualitative conclusions
10 about that data. I have -- or those calculations.
11 I have a lot of quantitative conclusions that are
12 embodied in the tables and graphs in the body of the
13 text and in the appendices.
14     Q.    What other SOMs algorithms exist that
15 you did not apply to the ARCOS data?
16     A.    I have no idea.
17     Q.    Okay. Only because you refer to this as
18 a nonexhaustive set of algorithms.
19     A.    Well, as I mentioned, when I was before
20 Judge Breyer, he suggested that instead of looking
21 at a monthly -- cumulative monthly shipments to a
22 pharmacy starting from the beginning of the month,

Page 29

1  he pointed out rightly that that creates kind of an
2  artificial re-setting of the clock, of the counter
3  on the first day of the month every month, and he
4  was more interested in a trailing 30 days' shipments
5  to a pharmacy, and the comparison of that to the
6  maximum six-month monthly shipments over the
7  trailing six months.
8          So that's an example where right
9  before he suggested it, I hadn't thought of it, and
10 no one had suggested it to me. So that whatever we
11 were doing right before that suggestion was
12 nonexhaustive, he had a better idea, in my view.
13          And I'm not -- I have no reason to
14 think that the 18 or 20 different calculations that
15 we implement here couldn't be improved upon by
16 someone else's suggestion.
17     Q.    Were there any other SOMs algorithms
18 that were developed that you did not apply in your
19 expert report?
20     A.    Not that I recall being suggested to me.
21     Q.    In report Paragraph 23, you refer to
22 report Section X for "...a nonexhaustive set of

8 (Pages 26 - 29)

Page 30

1 certain 'flagging' algorithms that can be
2 systematically applied to the Dispensing Data..."
3 (As read.)
4          What are the purpose of these
5 algorithms?
6     A.    Again, I think it's to support other
7 testifying experts, and as I understand it, the
8 results will be used by someone else, perhaps
9 Mr. Catizone, perhaps someone else.  And also be
10 used, perhaps, in argument by attorneys.
11          I don't have any opinion that
12 follows up from just the quantitative results.
13    Q.    What did you conclude from the
14 application of those red-flag algorithms, if
15 anything?
16    A.    Well, similar to our kind of pseudo SOMs
17 algorithms applied to the ARCOS data, I don't have
18 any opinions on the dispensing red flags beyond the
19 quantitative results that are embodied in the tables
20 and charts in the report and in the appendices.
21    Q.    In report Paragraph 27, you write that
22 you "...continue to review documents and gather

Page 31

1 information..."
2          What documents are you reviewing?
3     A.    I'm not aware of any of the documents
4 that I've reviewed since the filing of this expert
5 report.
6     Q.    What information are you gathering?
7     A.    I'm not aware of any information that I
8 have gathered since the filing of this report.
9     Q.    In report Paragraph 57, and that's on
10 page 18, sir --
11    A.    Yes.
12    Q.    -- you write that you supplemented the
13 ARCOS data with drug product potency information
14 from CDC's morphine milligram equivalents, MME,
15 conversion table.
16          How did that supplementation assist
17 in your analysis?
18    A.    Well, the ARCOS data doesn't have MMEs,
19 and some of the experts wanted information across
20 opioid drugs standardized by MME.
21          I also understand that the attorneys
22 found it useful to have some standardized measure of

Page 32

1 opioid shipments or dispensed opioid prescriptions
2 by MME.
3          So, early on, at the very beginning,
4 really, of our work, five years ago -- over five
5 years ago, six years ago, almost, now, I think, we
6 added to the ARCOS data that was eventually -- that
7 was distributed to the MDL and to the States, and
8 then eventually just publicly on our website, a
9 column for MMEs in each ARCOS record.
10    Q.    Is that the end of your answer?
11    A.    I apologize for how long that was.
12          Yes, if you --
13    Q.    That's okay.
14    A.    I think you asked me what the purpose
15 was, and I could have stopped with just saying, you
16 know, counsel told us that that was interesting to
17 them, and it wasn't in the ARCOS data, so we created
18 it.
19    Q.    Okay.
20          I'm only asking because we speak in
21 the same manner.  We pause probably when we
22 shouldn't.

Page 33

1     A.    Yes.  I sometimes have to say that was a
2 pause, not a period.
3     Q.    Okay.
4          Can you explain why drug potency is
5 important to your analysis?
6     A.    No.
7     Q.    Can you explain why MME is important to
8 your analysis?
9     A.    No.
10    Q.    Does it matter in your analysis whether
11 one drug is more potent than another?
12    A.    I'm sorry.  I say "no" to all of those
13 questions because I'm not claiming any subject
14 matter expertise.  Someone else, and maybe
15 ultimately the Court, may well care about drug
16 potency, oxycodone versus hydrocodone, or fentanyl
17 versus buprenorphine.
18          And so I can understand why having
19 some aggregate measure of the amount of opioids that
20 was shipped to a particular pharmacy would be
21 relevant.  I understand that has context, sort of,
22 but it's not part of my expert opinion.  My expert

Page 34

1 opinion is just doing the calculations, and

2 reporting the results.

3    Q.    Do you know which Plaintiffs' experts in

4 the CT9 case are relying on drug product potency or

5 MME?

6    A.    No.  I'm not aware of who the other

7 experts in the CT9 case are, other than I understand

8 that Mr. Catizone is in the case.

9    Q.    In report Paragraph 64 on page 20, the

10 second bullet, you write, "Duplicate transactions

11 were identified and removed if 90 percent or more of

12 a Reporter's transactions in a calendar month

13 appeared more than once."

14        How was that 90 percent figure

15 arrived at?

16    A.    Well, it was developed early on in the

17 first six months that we had the data, because there

18 were obvious errors in the data.  They didn't amount

19 to an enormous percentage of the entire data.  The

20 ARCOS data we got was 450 million records, and there

21 were some errors.  This is one example.

22        And we did our best to -- you know,

Page 35

1 using programming, to identify the errors we -- were

2 a bunch of different things that we dealt with, but

3 one of them was these duplicates.  And a good

4 example, I think, might be there was a distribution

5 center, I think a Cardinal Health distribution

6 center, that for a couple of months, someone

7 entering data had a fat finger or something, and

8 every order was in 13 times, or was in a multiple 13

9 times.  Some of them 13 times, some of them 26

10 times, some of them 39 times.  I don't know how that

11 happened, but you could see in the data this one

12 particular facility, just for a month or two, an

13 enormous spike in shipments.

14    Q.    All right.

15    A.    And so that was, to us, an -- and then

16 after that spike, after these duplicates are not in

17 the ARCOS data, that distribution facility's

18 shipments end up looking the same as they looked

19 before the spike.

20        So with that type of situation,

21 we -- those were obvious duplicates, we just

22 eliminated all but one.

Page 36

1        Now, it does get to be a little bit

2 subjective.  That accounted for most of what we

3 thought were duplicates.  But of the 450 million,

4 there might have been 45 instances, I don't know,

5 where you had a couple of transactions that appeared

6 to be duplicated coming out of a facility to a

7 dispenser.

8        Now, were those really duplicates

9 where someone had a fat finger, or were they clearly

10 situations where -- or were they more likely

11 situations where just a second order was submitted

12 that was identical.  And there's no way 12, 15 years

13 after the fact for us to know which of those is the

14 case.

15        But it turned out that those were

16 very rare, and when we saw something that looked

17 like duplicates, it wasn't that -- like the Cardinal

18 Health example, it wasn't that 10 percent of the

19 transactions showed up 30 times or three times, it

20 was that all the transactions for the month showed

21 up three times.

22        And so the 90 percent was a cutoff

Page 37

1 we used so that we weren't excluding transactions

2 that really were shipments that occurred more than

3 once, but look identical.

4    Q.    Okay.

5        So what did you do to assess the

6 appropriateness of applying that 90 percent figure?

7    A.    I forget now the details of that beyond

8 what I described, which is looking at the data,

9 figuring out where the bulk of what we thought were

10 duplicates were found, and like I said, in most of

11 those cases, it was almost all of the transactions

12 in the month that were duplicated.

13    Q.    Was there any statistical testing that

14 you performed to assess the appropriateness of

15 applying that 90 percent figure?

16    A.    I don't recall.  We were down to really

17 a very tiny number of transactions that we left in

18 the data.  There's -- you have to have some caution,

19 I think, when you take data out.  You know, the data

20 comes from the Government as reflecting transactions

21 that would shift as reported by the registrants.  I

22 think that there's some deference that has to be

10 (Pages 34 - 37)

Page 38

1 given to that data, and you should only take out
2 data that was clearly erroneous.  That's what we
3 tried to do.
4        I don't recall -- there certainly
5 was some analysis of how frequent these different
6 types of occurrences were.  I don't recall exactly
7 what that analysis was as I sit here.
8    Q.   Pages 27 through 31 of your report --
9    A.   Yes.
10    Q.   -- can you confirm that Tables 6
11 through 10 reflect ARCOS data for the whole United
12 States, not including territories.
13    A.   I might have to go back to an earlier
14 table to confirm a number on Table 6 is found in an
15 earlier table.
16    Q.   What table is that, that you're looking
17 for?
18    A.   I'm actually just flipping back to find
19 the earlier tables.
20        So the tables look like they start
21 on -- well, I'd have to go back a little bit
22 further.

Page 39

1        I'm sorry.  Could you ask me the
2 question again, please.
3    Q.   Certainly.
4        Can you confirm that Tables 6
5 through 10 reflect ARCOS data for the whole United
6 States, not including territories.
7    A.   I believe that's correct.  It's not all
8 ARCOS data for every -- all US but the territories
9 because there were some exclusions that got us --
10 besides the corrections that we talked about a few
11 minutes ago, that got us to Table 6.
12        In earlier expert reports, we had
13 another table that broke out the shipments to and
14 from based on buyer business activity.  That's the
15 table I was looking for to contrast the numbers, but
16 I don't see that table here.
17        But it's only ARCOS transactions to
18 dispensers.  We say that in a paragraph that leads
19 into this Table 6.  But I do believe it's all
20 States, and Puerto Rico, and the District of
21 Columbia.
22    Q.   The reason that I'm asking -- because I

Page 40

1 don't -- if you look at Table 9 --
2    A.   Yes.
3    Q.   -- and I'm just comparing dosage units
4 in Table 9 with dosage units in Table 6, in Table 7
5 and in Table 8, which are all the same, and all I
6 see are the 50 US States in Table 9.
7    A.   And the District of Columbia and I think
8 Puerto Rico is in here, but I'm not finding it as I
9 scan.
10    Q.   Okay.  It's nothing personal to me.
11    A.   Well, I have a very soft spot for Puerto
12 Rico, but I don't see it here.
13    Q.   Okay.
14        In Table 6 through 10, you included
15 both dosage unit and MME.
16        Why did you include both of those
17 units of measurement?
18    A.   Because we were asked to.
19    Q.   In report Table 7 on page 28 --
20    A.   I'm sorry.  Let me -- I don't recall
21 specifically being asked to put MME in Table 6 and
22 9, we may well have been, but we had been asked to

Page 41

1 add the MME values to the ARCOS data, and then we
2 were just trying to summarize the ARCOS data in as
3 much detail as we could, in the columns that would
4 fit on one page, and we included MME.
5        I think I would have included it
6 whether we were asked or not, but I imagine we were
7 asked, I just don't recall.
8    Q.   In report Table 7, can you explain the
9 buyer business activity for compound/maint,
10 M-A-I-N-T?
11    A.   No.
12    Q.   Can you explain the buyer business
13 activity for compound/maint/detox?
14    A.   No.
15    Q.   Can you explain the buyer business
16 activity for maint and detox?
17    A.   No.
18    Q.   Can you explain the buyer business
19 activity for maintenance?
20    A.   No.
21    Q.   Can you explain the buyer business
22 activity for practitioner-DW/275?

11 (Pages 38 - 41)

Page 42

1    A.    No.
2    Q.    Can you explain the buyer business
3 activity for practitioner-DW/100?
4    A.    No.
5    Q.    Can you explain the buyer business
6 activity for practitioner-DW/30?
7    A.    No.
8    Q.    Can you explain what the differences are
9 between the pharmacy types, chain pharmacy, retail
10 pharmacy, M/O pharmacy, pharmacy-Fed and central
11 fill pharmacy?
12    A.    No.
13          On all of these I answer no, I don't
14 have any subject matter expertise on how the
15 registrants are identified in the ARCOS data.
16 That's just a data field, the buyer business
17 activity in the ARCOS data, and we've subtotaled
18 these values in the records by those buyer business
19 activities.
20          I can't tell you how the DEA assigns
21 these buyer business activities to one registrant
22 versus another, or whether, in fact, the DEA assigns

Page 43

1 the buyer business activity, or the registrant
2 claims the buyer business activity.
3          I'm just summarizing the data as we
4 find it.
5    Q.    Okay.
6          On pages 32 through 38 of your
7 report --
8    A.    Yes.
9    Q.    -- can you confirm that Tables 11
10 through 17 reflect ARCOS data for Tarrant County,
11 Texas?
12    A.    Yes.
13    Q.    In Tables 11 through 14, you, again, use
14 dosage units and MME.
15          Can you explain why you included
16 both of those unit measurements for those analyses?
17    A.    Well, as with the other tables, because
18 I understood that MME was a useful common
19 denominator for assessing the amount of opioids that
20 were shipped in to a locale, if you took those
21 columns off and just left dosage units, you might
22 not appreciate the relative importance of some

Page 44

1 high-potency drugs versus some low-potency drugs, if
2 you were just counting dosage units.  Both may be
3 relevant, and so we provide both of them, but again,
4 I'm not a subject matter expert, that's just my
5 understanding of the context for including both.
6    Q.    In Table 15 on page 36 --
7    A.    Yes.
8    Q.    -- you only use MME.
9          Why is that?
10    A.    Well, because it's a summary of some
11 much more voluminous exhibit that you would find in
12 the appendices somewhere that would break out these
13 different labelers by dosage units.  The difficulty
14 with doing that, if you think about the prior table
15 that we just looked at, you have to list all of the
16 drugs that the labeler labels, and the dosage units
17 for each of those drugs.  At least that's how I
18 would go about creating this table, if I wanted to
19 include dosage units, I think.  And so you would end
20 up with a table that would run on for three or four
21 pages.
22          But that data, for instance, the

Page 45

1 dosage units of each drug that SpecGx or Actavis
2 labeled, is in some more voluminous exhibit in the
3 appendices, but for summary purposes, I think this
4 is the way it should be presented.
5    Q.    Okay.
6          You intuited my next question.
7          Where would one find the dosage unit
8 data for Table 15 in your appendices?
9    A.    Oh, I don't know.  There's over 20,000
10 pages of appendices.  We'd have to open them up and
11 look through the -- at least through the table of
12 contents for the various appendices, and -- it would
13 be, certainly, I think, easy to find.
14          There's something called labeler
15 reports, and I believe that's where you would find
16 it, in the labeler reports.
17    Q.    But you believe that data should be in
18 your appendices; is that right?
19    A.    Yes.
20    Q.    Okay.
21    A.    It's certainly -- yes.
22          Well, we know it is.  I apologize

12 (Pages 42 - 45)

1 for going on.  But SpecGx's MME is built up from a
2 set of ARCOS transaction records that include dosage
3 units and MME.  And for purposes of this table, we
4 just subtotaled the MME, but that detailed data is
5 in the appendices and in the data that we provided
6 to you.
7    Q.    Okay.
8          In Tables 16 and 17, you only used
9 dosage units.  Why is that?
10    A.    I don't know.  I don't know why in this
11 particular table, it's dosage units and not MME.
12 There are other tables where we have these
13 distributors by MME.  Why we chose this particular
14 format for Table 16, the summary table in the
15 report, I don't recall as I sit here.
16    Q.    Do you know or recall whether the
17 percentages in Table 16 were ever calculated by you
18 or your team in MMEs instead of dosage units?
19    A.    It was almost definitely.  Again, in the
20 appendices, you would find what we call distributor
21 reports.
22          There are labeler reports,

1 distributor reports and pharmacy reports.  And so
2 there would be something called a distributor
3 report.  And that distributor report goes on for
4 hundreds and hundreds of pages.  And in there, there
5 would be, I'm pretty confident, an MME table, with
6 the percentage allocations.
7    Q.    Okay.
8          Would the calculated base weight in
9 grams for Tables 16 and 17 also be in your report
10 appendices?
11    A.    I believe so.  We have some tables in
12 the appendices that, in the title, will say what's
13 being reported, dosage units, calculated base weight
14 in grams, and MME.  So, oftentimes, you'll will see
15 that trio across different information, each one
16 represented by a separate exhibit, sometimes
17 combined on the same exhibit.
18    Q.    Turning the page to page 38 of your
19 report, sir, Section VII.
20          Can you explain what you mean by the
21 Suspicious Order Monitoring System referenced in
22 this Part 7 of your report.

1    A.    Yes.
2          I understand that, again, just
3 context, that I have for submitting this report, not
4 expert opinion, I -- but I have this understanding
5 that there's something referred to as Suspicious
6 Order Monitoring Systems required of distributors of
7 controlled substances, and they may vary from
8 distributor to distributor, or also to include
9 manufacturers, manufacturer to manufacturer.
10          But the ones that I observed, and it
11 may just be a couple that I observed early on from
12 the discovery, required information that wasn't
13 produced in discovery.  It wasn't available in ARCOS
14 or produced in discovery, and so this goes back to
15 what we were talking about earlier where there's
16 some interaction between the request that a subject
17 matter expert might have and what data is available.
18          So if you're asked to implement a
19 SOMS system, and there's some evidence in the record
20 about a SOMS system, it might be a very complicated
21 system involving a lot of real-time data that's not
22 available in discovery.

1          And so some interaction, what was
2 produced in discovery, what can you create as a --
3 I'll call it a stylized SOMS.  I'm not saying that
4 any one of these methods would be what would be
5 implemented as a SOMS system, but to give you some
6 idea of an approximation of a SOMS system, that's
7 the context I have, not expressing that as a subject
8 matter expert.  That's the context I had for
9 implementing these, turns out, 18 or 20 different
10 variants on a calculation that I understand the
11 lawyers might use in argument or the experts,
12 subject matter experts might use in developing their
13 expert opinion.
14          Yes.
15    Q.    In report Paragraphs 95 through 112, you
16 describe the various algorithms that you computed in
17 your expert report.
18    A.    Yes.
19    Q.    In what system did you run these
20 algorithms?
21    A.    Now, I'm forgetting whether we used
22 statistical software called R, capital R --

13 (Pages 46 - 49)

Page 50

1   Q.   Mm-hmm.
2   A.   -- or we have done some work recently in
3  Python.
4        I think in R -- I think all the code
5  we produced was R.  It could have been done with
6  Python or even programmed in Excel, but I think R
7  was the primary source code.
8   Q.   Do you know if the R data or Python data
9  were produced with the supporting materials in this
10 case?
11  A.   Yes.  I believe it was.  We have
12 produced the code, and the raw data, and the data
13 that gets produced by running the code, I think, in
14 every case.
15  Q.   Okay.
16        Were these SOMS algorithms,
17 Methods 1 through 7 described at Paragraphs 95
18 through 112 of your report, intended to detect
19 suspicious transactions?
20        MS. POERSCHKE:  Object to the form.
21  A.   Not by me.  I told you what the purpose
22 was from my perspective.

Page 51

1   Q.   Did you ever try to define a suspicious
2  transaction?
3   A.   No.
4   Q.   Do you know how a suspicious transaction
5  between a distributor and a dispenser tells anyone
6  anything about an illicit use by a patient?
7   A.   No.
8        MS. POERSCHKE:  Object to the form.
9   Q.   I want to ask you about Method 1,
10 trailing six-month maximum monthly threshold.
11        Do you know how Method 1 was
12 developed?
13  A.   Not beyond what I've already described
14 to you about the development of all of the methods
15 in general.  That explanation would apply to each of
16 them individually, I think.
17  Q.   Was there a hypothesis that you were
18 testing with Method 1?
19  A.   No.
20  Q.   Was there some statistical basis or
21 rationale for your use of Method 1?
22  A.   There's no application of statistics to

Page 52

1  a calculation like this.  It's -- if I were to
2  report to you how many coins I have in my pocket,
3  there's no statistical analysis.  It's a numerical
4  statement of how many coins are in my pocket.
5        Similarly here, there's a criterion
6  that is applied to the data, analogous to count the
7  coins that are in my pocket, and I report the
8  results.  There's no confidence interval or margin
9  of error or statistical analysis.  It's a numerical,
10 arithmetic counting exercise of all of the
11 populations.
12        Statistical analysis applies to
13 situations where you're looking at a sample of data.
14 Here, we're looking at all of the data.  There is no
15 statistical analysis from my perspective.
16  Q.   Are there any scientific, statistical or
17 other technical literature that support your use of
18 Method 1?
19  A.   Well, it's really 5th grade algebra.
20 It's -- there's no statistical analysis that could
21 be applied to the results of applying Method 1, and
22 Method 1 is implementing some subject matter

Page 53

1  expertise developed by other expert witnesses.
2        So there is some basis for the
3  calculations in that expert opinion or argument that
4  counsel may want to make, but there's no statistical
5  analysis.
6        I may not be clear about that, but
7  what I mean by that is if we only had 10 percent of
8  the Albertsons shipment, then we might want to draw
9  some statistical inference from that 10 percent we
10 have to the 100 percent, the universe of Albertsons
11 shipments, but that's not our situation here.  We
12 have 100 percent of Albertsons shipments.
13        So there's no statistical inference.
14 It's just reporting a number.
15  Q.   What I'm asking is whether you are aware
16 of any literature that supports your use of
17 Method 1.
18  A.   No.
19  Q.   Did you rely on any assumptions when
20 applying Method 1?
21  A.   I don't think of them as assumptions.
22 They're instructions or rules, a recipe, if you

14 (Pages 50 - 53)

Page 54

1 will, a set of steps that we implemented.
2          And I don't think of those as
3 assumptions, although you could frame the analysis
4 in terms of assumptions.  I don't think of any of it
5 as -- any of these methods as involving assumptions.
6 They're just implementing a recipe, a set of rules
7 to the data.
8     Q.    Did you perform any test or measures to
9 validate the effectiveness of Method 1?
10    A.    No.
11    Q.    Did you make any effort to measure the
12 effectiveness of Method 1 to detect true suspicious
13 transactions?
14    A.    No.  I think that question and the prior
15 one really is for a subject matter expert.  The
16 calculations that we did, the counting, if you will,
17 the applying the rules is arithmetic.  There's no
18 test that can be applied to that arithmetic, other
19 than, did you do the arithmetic correctly, 2 plus 2
20 and getting 4.
21          But the applicability of these
22 rules, these methods, to detecting suspicious orders

Page 55

1 is for the subject matter expert, I believe.
2     Q.    Did you apply any measures to compare
3 the effectiveness of Method 1 against the other SOMS
4 methods you applied?
5     A.    No.
6     Q.    How was Method 2, trailing six-month
7 maximum monthly fixed after first trigger threshold,
8 developed?
9     A.    Well, like Method 1, it was suggested to
10 us by counsel, I believe, as a result of
11 interactions with DEA expert or experts, and with
12 some perhaps slight iterative discussion of what
13 data was available, but primarily, as with Method 1,
14 as a result of discussions with counsel.
15    Q.    There was no hypothesis you were
16 Method -- you were testing with Method 2; is that
17 right?
18    A.    Right.  Could not be.
19    Q.    Okay.
20          There was no statistical basis or
21 rationale for your use of Method 2; is that right?
22    A.    Correct.  There could not be.

Page 56

1     Q.    You're not aware of any scientific,
2 statistical or other technical literature that
3 supports the use of Method 2; is that right?
4     A.    Right.
5          As I said with Method 1, the
6 arithmetic is at a really very low level, applied to
7 a lot of data.
8          The effectiveness, the applicability
9 of the rule is really for a subject matter expert.
10    Q.    Okay.
11          You did not perform any test or
12 measures to validate the effectiveness of Method 2;
13 is that right?
14    A.    Correct.
15    Q.    How do the measures -- how -- and you
16 did not measure, excuse me, the effectiveness of
17 Method 2 in any way to detect true suspicious
18 transactions; is that right?
19    A.    Yes.
20    Q.    You did not apply any measures for
21 comparing the effectiveness of Method 2 against any
22 of the other SOMS methods you applied; is that

Page 57

1 right?
2     A.    Yes.
3     Q.    Regarding Method 7, trailing six-month
4 maximum monthly threshold on rolling 30-day dosage
5 units, that method was also provided to you by
6 counsel; is that right?
7     A.    No.  I would say that one was provided
8 by Judge Breyer out in San Francisco.  That was the
9 one where I'm on the witness stand, I'm explaining
10 what we did, and he said, well, you know, this
11 alternative, this minor change to what you did,
12 would be more informative.
13          So I think that was his suggestion.
14    Q.    Okay.
15          Is that the only one that was
16 suggested by the Judge?
17    A.    Yes, I think so.  It's the only one that
18 I recall, and it's the only one that we added after
19 I testified in CT4.
20    Q.    Okay.
21          There was no hypothesis that was
22 being tested with Method 7; is that right?

15 (Pages 54 - 57)

Page 58

1   A.   Not by me.
2   Q.   There was no statistical basis or
3   rationale for the use of Method 7; is that right?
4   A.   I don't know.  You will have to ask the
5   subject matter expert.  Again, not by me.  I'm not
6   exercising any statistical subject matter expertise beyond the
7   arithmetic.
8   Q.   I'm -- and you understand what I'm
9   trying to figure out is whether these SOMS methods
10  have any statistical basis or purpose, as opposed to
11  them just counting the numbers.
12  A.   Um --
13  Q.   Do you understand?  I mean, that's what
14  I'm trying to speak with you about.
15  A.   Right.  If you like, I'll just add a
16  little bit.  Thank you for that opening.
17       You know, I would give you the same
18  answers for all 18 or 20 of them, if we go through
19  them --
20  Q.   Right.
21  A.   -- and talk about recurrent versus
22  nonrecurrent.

Page 59

1       These are calculations that I did --
2   Q.   Mm-hmm.
3   A.   -- and I have some understanding of the
4   context --
5   Q.   Mm-hmm.
6   A.   -- but the calculations themselves, once
7   you have the data, I reach into my pocket, and I
8   find I have three coins.  I report to you I have
9   three coins.  There's no statistical analysis of
10  that.  Same thing here.  With the results from each
11  of these, there's no statistical analysis, then, of
12  the results because we have all of the universe.
13       Maybe another way of thinking about
14  that is, like I said, if we had 10 percent of
15  Albertsons shipments instead of all of them, we
16  might want to then, you know, do some statistical
17  inference.  We might say, well, was that 10 percent
18  randomly drawn from your shipments, and was that
19  sample large enough to have a fairly small error
20  band around our estimates, the point estimate from
21  the data, to say what the result would be if we were
22  looking at all of the data.

Page 60

1       That's the purpose of statistical
2   inference, but here, we have all of your data --
3   Q.   Mm-hmm.
4   A.   -- so there's no confidence interval
5   or...
6       Now, ultimately, the subject matter
7   expert who's interpreting this might give you some
8   basis for believing that some range of results would
9   be consistent with his or her experience and
10  expectation, some range of results would be higher,
11  but that's the subject matter expertise.
12       There may be some statistical
13  analysis, there may be some assessment of the
14  reported results, but not by me, other than just
15  reporting the numbers.
16  Q.   Okay.
17       Do you know who the -- you don't
18  know who the subject matter expert is who will be
19  interpreting your data; is that right?
20  A.   Correct.
21  Q.   Okay.
22       I just want to -- I'm going to ask

Page 61

1   the same questions as applied to all of the SOMS
2   methods that you applied based on what we just
3   talked about.
4       So none of these methods were
5   testing a hypothesis that you were aware of?
6   A.   Correct.
7   Q.   Okay.
8       You talked about --
9   A.   I'm sorry.  I'm sorry.
10      Other than in the general context
11  that I understand the results may be used by a
12  subject matter expert to test the question as to
13  whether there was adequate supervision of orders.
14      I'm not testing that.  I don't have
15  the subject matter expertise.
16      So my understanding, my -- the
17  context that I understand is that the data will be
18  used for that purpose, but I'm not doing that.
19  Q.   Okay.
20      So you performed no statistical
21  analysis to test the questions of whether there was
22  adequate supervision of orders; is that right?

16 (Pages 58 - 61)

1    A.    Correct.

2    Q.    Okay.

3          You in no way compared the

4  effectiveness of the SOMS methods to test the

5  question of whether there was adequate supervision

6  of orders; is that right?

7    A.    Correct.

8          MS. POERSCHKE:  Object to the form.

9    Q.    That saved us a lot of time.  Thank you.

10   A.    Thank you.

11   Q.    So I'd like to turn to page 43.

12         THE WITNESS:  When we're at a

13 convenient break --

14         MR. TORRES:  We can stop right now.

15         THE WITNESS:  Can we -- I could use

16 a comfort break.

17         MR. TORRES:  Yes.  I understand.

18         THE VIDEOGRAPHER:  We're now off the

19 record.  The time is 11:25 a.m.

20 (RECESS, 11:25 a.m. -  11:42 a.m.)

21         THE VIDEOGRAPHER:  We are now on the

22 record.  The time is 11:42 a.m.

1  BY MR. TORRES:

2    Q.    Dr. McCann, you are not offering any

3  opinions on the effectiveness of the SOMS methods to

4  test the question of whether there was adequate

5  supervision of orders; is that correct?

6    A.    Correct.

7    Q.    Turning to page 43 of your report, which

8  is, I think, where we broke.

9    A.    Yes.

10   Q.    Can you confirm that Tables 18 through

11 53 are the application of Methods 1 through 7

12 involving transactions between Albertsons

13 distributors and Albertsons pharmacies in Tarrant

14 County.

15   A.    I apologize.  Could you give me that

16 range of tables or pages again, please.

17   Q.    Tables 18 through 53, which is pages 43

18 through 77.

19         If you like, I can ask the question

20 again.

21   A.    No, I've got it.  Thank you.

22   Q.    Okay.

1    A.    Yes.  I believe that's correct.

2    Q.    Okay.

3          The application of Methods 1

4  through 7 in Tables 18 through 53 follow a pattern

5  in which you first calculate Albertsons' total MME

6  and flagged MME for a particular method followed by

7  a calculation of dosage units of flagged

8  transactions under that method; is that accurate?

9    A.    Yes.

10   Q.    What was the purpose of first

11 calculating Albertsons' total MME and flagged MME,

12 and then calculating dosage units of flagged

13 transactions?

14   A.    Well, I don't know that that's the order

15 in which they're calculated.  That's the order in

16 which they're reported.

17         So I agree that that's how they were

18 calculated, that order.  Before, I may not have said

19 that exactly right, but they're presented -- they're

20 both presented because, at some point, counsel, in

21 this or an earlier MDL case, suggested that both

22 would be useful to the Court and to the DEA expert

1  who was developing opinions based on the results of

2  these methods.

3    Q.    On page 61 of your report, this is

4  Table 36 --

5    A.    Yes.

6    Q.    -- Method 6 in Paragraph 131 generated a

7  lower Albertsons' total MME than the other methods

8  you applied.

9          Do you know why that was?

10   A.    Yes.  At least I believe I do.

11         So my Method 6 is discussed up on

12 page 42 and 43.  Method 6 is the daily dosage units

13 threshold method.  There's not a threshold specified

14 in the Cardinal Health document for all of the

15 opioids, so it couldn't be applied to all 14 drugs,

16 and that's why the total MME would be lower.

17   Q.    Okay.

18         So the -- this method is applied to

19 a smaller number of drugs?

20   A.    Correct.

21   Q.    Okay.

22   A.    That's my -- I'd have to confirm that

17 (Pages 62 - 65)

Page 66

1  for you, but that's my understanding.
2  Q.  Thank you.
3  A.  Welcome.
4  Q.  Can you explain what you mean by
5  nonrecurrent and recurrent transactions.
6  A.  Yes.
7  I always hated that labeling just
8  because the terms don't ring in my ear smoothly, but
9  I think it's become used in this litigation to refer
10  to a method that either assesses each shipment anew;
11  that is, applies the rule to each shipment in
12  isolation.
13  And in the alternative, a rule that
14  flags or identifies any order when a previous
15  shipment had been flagged under that rule.
16  And so the interpretation, there's a
17  couple of different interpretations of that, but
18  from my perspective of doing the calculations,
19  that's the difference.
20  With the -- with nonrecurrent, you
21  flag a shipment, and then looking at the next
22  shipment, unless it triggers the same rule, it's not

Page 67

1  flagged.  So you could have a flagged shipment, and
2  then ten shipments that are not flagged, and then
3  another shipment.
4  But with the recurrent one, once a
5  shipment is flagged, all subsequent shipments are
6  flagged.
7  Q.  Okay.
8  Tables 18 through 37 are your
9  analysis of nonrecurrent flagged transactions; is
10  that right?
11  A.  Yes.
12  Q.  Tables 38 through 53 are your analyses
13  of recurrent flagged transactions; is that right?
14  A.  Correct.
15  Q.  For recurrent flagged transaction report
16  Tables 38 and 39, you refer to Method 1(2).
17  What is the meaning or significance
18  of the (2)?
19  A.  Well, I think it's that if you apply
20  this recurrent rule, you get the same result for
21  Method 1 or Method 2, recurrent.  And the reason is
22  with Method 2, you're fixing the threshold of

Page 68

1  which -- against which you're comparing this month's
2  shipments to the prior six-month maximum, but once
3  you hit that threshold, that threshold is fixed
4  thereafter.
5  It -- for Method 2, to flag a
6  shipment, Method 1 also has to have flagged it.  The
7  difference is whether you allow the threshold that
8  you're comparing subsequent shipments to to change
9  over time, or do you fix them.  Method 2 fixes them.
10  So if you're looking at shipments
11  from one distributor to one pharmacy, and you hit
12  under Method 2 -- the first time you hit under
13  Method 2, you've also hit under Method 1.  So with
14  the recurrent measure, you're flagging all
15  subsequent shipments from that distributor to that
16  pharmacy, whether you're looking at Method 1 or
17  Method 2, so you get exactly the same results.
18  In the nonrecurrent version, you get
19  different results, but in the recurrent version, you
20  get exactly the same results.
21  Q.  Thank you.
22  A.  I didn't explain that very well, but

Page 69

1  that's what's going on there.
2  Q.  I think I understand what you're -- what
3  you described.
4  I have the -- a similar question
5  regarding Table 40.  It's on page 64.
6  So for recurrent flagged
7  transactions in report Table 40, you refer to
8  Method 2b(7).
9  What is the meaning or significance
10  of (7)?
11  A.  Well, it's the same issue.  Maybe really
12  should be specified as -- I think the way it's --
13  that subheading is written is okay, but...
14  So Method 2b is trailing six-month
15  maximum monthly fixed after first triggered
16  threshold on a 30-day rolling basis.  So that's
17  Judge Breyer's modification to what had been
18  Method 2.
19  So Method 2 was looking at the
20  cumulative shipments from the beginning of the
21  month.  So, today, whatever day we're on here, the
22  15th of the month, on the 15th of the month,

18 (Pages 66 - 69)

1 Method 2 is looking at shipments just from May 1st
2 to May 15th. Judge Breyer would say, you should
3 look at April 17th to May 15th, and Method 2b makes
4 that qualification.
5          But same as with Method 1 and 2, I
6 think once you hit Method 7 flag, you're also
7 hitting a Method 2b flag, with the very same
8 shipment.
9          And so if the rules are applied with
10 a recurrent assumption, and they first flag the same
11 prescription, everything afterwards is going to be
12 the same under both methods as well.
13          There is a difference between 2b and
14 7, if you're not applying them on a recurrent basis,
15 and it's because the trailing six-month maximum is
16 not fixed when you first hit it under Method 2, and
17 is fixed under Method 2 -- I'm sorry, not fixed
18 under 7, but is fixed under 2b.
19    Q.    Okay. So let me try to simplify.
20    A.    Sorry that wasn't very well-explained.
21    Q.    No, that's okay.
22          So, in other words, the computations

1 for Method 2b and Method 7 for recurrent
2 transactions would generate the same results?
3    A.    Correct.
4    Q.    Okay.
5          Did you investigate whether there
6 was any statistical relationship, or any
7 relationship at all, between the nonrecurrent
8 flagged transactions and the recurrent flagged
9 transactions that you were calculating?
10    A.    Not beyond the results that we report,
11 the counting, the numerical results that are
12 reported.
13    Q.    You were just computing the algorithms,
14 and that's it?
15    A.    Correct.
16    Q.    Okay.
17          Do any of the flagged transactions
18 in report Tables 18 through 53 demonstrate that
19 there was any illicit opioid use by chain pharmacy
20 patients?
21    A.    No.
22    Q.    Can we turn to page 78 of your report,

1 sir.
2    A.    I'm sorry. My answer there might have
3 been a little bit strong in the sense that, not
4 being a subject matter expert, I don't draw that
5 conclusion from the data.
6    Q.    I understand.
7    A.    Yes.
8    Q.    Okay.
9          Can you confirm that Tables 54
10 through 71 in Section VIII of your report are the
11 application of Methods 1 through 7 involving
12 transactions between all distributors and Albertsons
13 pharmacies in Tarrant County?
14    A.    Yes.
15    Q.    In Tables 54 through 71, you only
16 represent the calculation of dosage units of flagged
17 transactions under Method 7 -- 1 through 7; is that
18 right?
19    A.    Yes. Three of them have an A and a B,
20 but they're numbered 1 through 7, yes.
21    Q.    Can you explain why you didn't reflect a
22 computation or calculation of Albertsons' total MME

1 and flagged MME for the methods you applied in
2 Section VIII of your report.
3    A.    I don't recall why we chose to summarize
4 the detailed exhibits that span 10,000 pages or more
5 in the appendices with these particular tables.
6          I believe that you would find the
7 results expressed in MME in the appendices, but some
8 judgment was made as to what was necessary to tell
9 the story in a narrative since, here, we could have
10 expanded the 150 pages another 50 pages, and
11 included more, but this was what we thought told the
12 story.
13    Q.    Okay.
14          Yeah, and all I'm asking is was
15 there a reason that you left out dosage units and
16 flagged transactions. I'm not saying that -- I'm
17 not suggesting that it wasn't computations you
18 performed, just asking whether there was a reason
19 you left it out of this section of your report.
20          MS. POERSCHKE: Object to the form.
21    A.    I think it was just a space issue, but I
22 don't even know that I consciously thought about

Page 74

1 that.
2         I -- and some of these reports are
3 150 or 200 pages of text, and 20,000 pages of
4 appendices, and which summaries, which tabulations
5 you think are most effective at explaining what
6 calculations we did is a matter of taste, and I
7 don't recall exactly why I decided to present it
8 this way.
9         You see this same basic presentation
10 going back reports over the last three or four
11 years, and I just don't recall what exactly the
12 tradeoffs were that I considered at the time.
13  Q.    Thank you.
14         Tables 54 through 63 are your
15 analysis of nonrecurrent transactions; is that
16 right?
17  A.    Yes.
18  Q.    Tables 64 through 71 are your analysis
19 of recurrent transactions; is that right?
20  A.    Yes.
21  Q.    For recurrent flagged transaction in
22 Table 64, you refer to Method 1(2).

Page 75

1         Is the meaning or significance of
2 the (2) the same as what you previously explained?
3  A.    Yeah, you get exactly the same table if
4 you apply Method 1 on a recurrent basis as if you
5 apply Method 2 on a recurrent basis.
6  Q.    Okay.
7         In Table 65, same thing with respect
8 to Method 2 being Method 7, you compute the same
9 results?
10  A.    Correct.
11  Q.    Did you investigate whether there was
12 any statistical or other relationship between the
13 nonrecurrent flagged transactions and the recurrent
14 flagged transactions that were computed and
15 reflected in Section VIII of your report?
16  A.    Not beyond reporting the results.  I'm
17 not -- it's not clear to me what -- what additional
18 statistical analysis could be done other than to --
19 yes, other than what I just said.
20         You could see that the recurrent
21 flagging method flags more than the nonrecurrent
22 method and, you know, you could express those in

Page 76

1 absolute values, as I do.  You could express the
2 difference between them.  You could report a
3 percentage difference.
4         There's, you know, different ways of
5 presenting the data, but they're all just very
6 trivial manipulations of the two numbers that I
7 report, the recurrent number and the nonrecurrent
8 number.
9  Q.    Do any of the flagged transactions in
10 Section VIII of your report demonstrate that there
11 was illicit opioid use by chain pharmacy patients?
12  A.    Not to me.  They may spell something to
13 someone else, but to me, not being a subject matter
14 expert, beyond the arithmetic, it's just arithmetic.
15  Q.    Can we turn to Paragraph 172, which is
16 page 93.
17  A.    Yes.
18  Q.    Okay.
19         Here, at the bottom of
20 Paragraph 172, you conclude that "...Albertsons
21 prescription data before 2014 is not reliable."
22         Is the basis for that conclusion

Page 77

1 explained in footnote 37 and Figure 2 of your
2 report?
3  A.    Yes.  I'm sure there's more to it than
4 just that, but -- more than just what's stated in
5 the footnote, but visually, you can see from
6 Figure 2, we created this figure for -- must be now
7 50 instances where you've got a chain pharmacy
8 serving as a distributor and as a dispenser, and we
9 compare the dispensing data -- I think of it as the
10 opioids going out the front door over the pharmacy
11 counter, and out the front door, with what ARCOS
12 tells us about the opioids being delivered to the
13 loading dock at the back.
14         And other than inventory variations,
15 those numbers should match up, and they do in
16 virtually every -- every time in ten different
17 jurisdictions, and in total, on average, four or
18 five distributors, so 50 times, we look at this
19 graph, the red line and the blue line line up, makes
20 sense, right.
21         But in this case, it doesn't, and it
22 looks like the reason it doesn't is we don't have

20 (Pages 74 - 77)

1 dispensing data for hydrocodone for big swaths of

2 time.

3    Q.    Okay.

4          Were there any other reasons not

5 described in this page, page 93 of your report, that

6 cause you to conclude that Albertsons prescription

7 data before 2014 was not reliable?

8    A.    I think Albertsons is the one with a lot

9 of missing data fields, so I forget the details on

10 that now, but maybe patient zip code missing or

11 prescriber DEA number or NPI number.

12          So the Albertsons dispensing data,

13 my recollection is, was missing a lot of data.

14 Either the records were entirely missing, like

15 what's reflected in Figure 2, or the fields for the

16 records that were produced, a lot of the fields

17 weren't populated.

18          Another example would be most of the

19 dispensing data we receive has a filled quantity --

20 a written quantity and a filled quantity, and we use

21 those fields sometimes to identify refills, and for

22 a very large fraction, maybe a majority of the

1 prescriptions, the Albertsons data didn't include a

2 written quantity.

3          So there's just more issues with the

4 Albertsons prescription data than with Publix or

5 with the other distributors we've dealt with in the

6 past.

7    Q.    Turning to page 96 of your report, sir.

8    A.    Yes.

9    Q.    Do the red-flag computations in

10 Tables 74 through 76 rely in any way on algorithm

11 Methods 1 through 7?

12    A.    No.

13    Q.    All right.

14          They're entirely independent

15 computations; is that right?

16    A.    Correct.

17    Q.    Okay.

18          Did you perform any analysis to

19 determine whether there was any relationship between

20 the red-flag computations and your SOMS

21 computations?

22    A.    No.

1    Q.    In Table 76, you excluded initial

2 prescriptions in red-flag computations 3, 4, 5, 7

3 and 13.

4          Can you explain why you did that.

5    A.    Yes.

6          If you look at -- for instance,

7 Flag 3 is explained on page 94 as being "Patient was

8 dispensed opioid prescriptions with overlapping days

9 of supply that were written by two or more

10 prescribers."

11          There might be some scenario that I

12 can't imagine as I sit here, but -- why this would

13 not be true, but in every example I can think of

14 where that Flag 3 would be triggered, there would be

15 one prescription presented, and then sometime later,

16 a day, a week, three weeks later, a second

17 prescription would be submitted and filled for

18 overlapping days of supply by two or more

19 prescribers.

20          And some pharmacy experts have

21 wanted to see all of the prescriptions that were

22 part of the pair or triple that flagged the --

1 tripped the flag, and to me, that makes a lot of

2 sense, again, not the subject matter expert, but if

3 I submit a prescription today and then go in on

4 Friday with another prescription, and the pharmacist

5 looks at that second prescription, and says, well,

6 Craig was just in here three days ago and filled a

7 one-week supply, so there's an overlapping days of

8 supply, I need to evaluate both of these

9 prescriptions, I -- you know, to me, that makes

10 sense.

11          But then others would interpret that

12 data and say, but the first prescription couldn't

13 have been stopped because the second prescription

14 hadn't been presented yet.  You might be able to

15 stop the second prescription.

16          And so it depends on your

17 interpretation of these flagging methods.  Are

18 they -- are there -- is the purpose to identify sets

19 of prescriptions that raise concerns, or is it to

20 identify only prescriptions that could have been

21 stopped before it went out the door.

22          And so some pharmacy experts have

21 (Pages 78 - 81)

Page 82

1 preferred one interpretation versus the other, or
2 wanted to see the results of both interpretations,
3 that's why for 3, 4, 5, 7 and 13, it's done both
4 ways.
5     Q.    Okay.
6           MR. TORRES:  Can we go off the
7 record for five minute, please.  Do you mind?
8           THE WITNESS:  Not at all.
9           MR. TORRES:  Thank you.
10          THE VIDEOGRAPHER:  We're now off the
11 record.  The time is 12:11 p.m.
12 (RECESS, 12:11 p.m. - 12:17 p.m.)
13          THE VIDEOGRAPHER:  We are now on the
14 record.  The time is 12:17 p.m.
15 BY MR. TORRES:
16    Q.    Okay.  Dr. McCann, did anyone ask you
17 whether there were -- did you review the Texas
18 Professional Responsibility of Pharmacists Rule
19 Section 291.29 in connection with your red-flag
20 analysis?
21    A.    No.
22          MR. TORRES:  Thank you.

Page 83

1           EXAMINATION
2 BY MR. LEEDER:
3     Q.    Good morning, Dr. McCann.
4     A.    Good morning.
5     Q.    My name is Bill Leeder, and I represent
6 Publix Super Markets.
7           Is this your first expert report in
8 your years of work in the opioid litigation where
9 you have offered opinions in a case brought against
10 Publix?
11    A.    I don't know.  I don't think so, but I
12 don't know for sure.
13          We've certainly had Publix data
14 before.  Whether Publix settled out of a case before
15 I filed an expert report or not, I'm not sure.  I
16 don't recall.
17    Q.    Have you ever shopped at a Publix?
18    A.    Yes.
19    Q.    Where?
20    A.    In Florida, I think.  Maybe in North or
21 South Carolina, I'm not sure, but in Florida, for
22 sure.

Page 84

1     Q.    Do you recall where the store was?
2     A.    No.
3     Q.    Okay.
4           Do you recall approximately when
5 that occurred?
6     A.    No.
7     Q.    Do you know how many times you shopped
8 at a Publix in --
9     A.    Oh, fewer than ten times.  Maybe three
10 or four times.  I don't spend -- I don't live in
11 Florida or spend a lot of time in Florida, but I
12 have occasionally pulled off the side of the road
13 and picked up a sandwich or a coffee at a Publix.
14    Q.    Okay.
15          Have you ever obtained a
16 prescription at a Publix pharmacy?
17    A.    No.
18    Q.    Okay.
19          Just to be clear, it's a little bit
20 confusing because you're being asked questions by
21 two different lawyers, but the questions I'm going
22 to ask you pertain to what in the MDL is referred to

Page 85

1 as Track 8, which is a case bought by the Plaintiff
2 of Cobb County, Georgia, against Publix and, at
3 least initially, other pharmacies.
4     A.    Yes.
5     Q.    So if I make a reference to Track 8, you
6 will understand that that's the case I'm referring
7 to?
8     A.    Yes.
9     Q.    Okay.
10          As an opening matter, just to build
11 off of the testimony that you've already given here
12 today and previously, if I asked you the same
13 questions about the process and the methods for
14 preparing your report that Mr. Torres has already
15 asked you, would your answers be the same for the
16 Track 8 report as they were for the Track 9 report?
17    A.    Yes.
18    Q.    Were there any calculations that you
19 were asked to run but did not include in your
20 Track 8 report?
21    A.    Excuse me.  Not that I'm aware of.
22    Q.    Okay.

22 (Pages 82 - 85)

Page 86

1      Are you aware of that ever happening
2 in any of the previous MDL cases in which you've
3 served as an expert?
4      A.   No.  I don't think so.  At least not
5 where the calculations were being done specific to a
6 case.
7           So, early on, we were developing the
8 data and doing calculations and reporting to the
9 Court about the general development of the ARCOS --
10 processing and supplementation of the ARCOS data,
11 and distributing it to cities and states and
12 counties.
13          So there were certainly calculations
14 that we did prior to CT1 report being filed that
15 probably didn't make it into the CT1 report or
16 subsequent reports, but nothing we were ever asked
17 to do, I don't think, for a report, not that I'm
18 aware of anyway, where we then didn't include that
19 in some form, in an appendix or in the data files.
20      Q.   Certainly, you didn't do it for the
21 Track 8 report; correct?
22      A.   Yes.

Page 87

1      Q.   Okay.
2           In your earlier testimony, you
3 mentioned some discussions with DEA experts related
4 to the development of the SOMS algorithms.
5           Specifically, who were you
6 referencing when you made that reference?
7      A.   Oh, my gosh.  My name recall is so poor.
8           So, early on, we -- when we first
9 got the ARCOS data, I met two or three DEA experts,
10 Jim Geldof's name comes to mind.  He has since
11 passed away, but -- because there was a famous
12 musician named Geldof.  But he wasn't -- and he was
13 served as an expert in one or two cases, but there
14 was another person, who I met several times and
15 appeared in a number of the cases, and I'm not
16 placing his name right now.
17      Q.   I'm not trying to play gotcha here, but
18 was it James Rafalski?
19      A.   That's it.  Yes.
20      Q.   Okay.
21           Was he the primary source for these
22 algorithms, specifically the SOMS algorithms?

Page 88

1      A.   Well, not directly to me.  So I received
2 the suggestions and had interactions with -- mostly
3 with the lawyers, but Mr. Rafalski, I understand,
4 was the DEA expert working with the lawyers to
5 develop the rules that they wanted us to apply.
6           And I participated in two or three,
7 maybe four Zoom calls with Mr. Rafalski where we
8 discussed the methods and the results in specific
9 cases.  Most of those conversations were four and
10 five years ago, but that's -- that was the
11 origination of these methodologies.
12      Q.   Do you know if Mr. Rafalski has been
13 named as an expert in this case?
14      A.   I don't know.  No.
15      Q.   Have you spoken to anybody else -- any
16 other DEA expert specific to your work in Track 8?
17      A.   I haven't.  I don't know whether someone
18 in my office, my staff may have, but I know that I
19 did not.
20      Q.   How would we confirm whether you've
21 had -- whether your staff has had any conversations
22 with any DEA expert regarding the SOMS methods?

Page 89

1      A.   Well, I could ask my staff.
2      Q.   Does the name Joseph Rannazzisi ring any
3 bells?
4      A.   Yes.
5      Q.   Okay.
6           Have you had any conversations with
7 Mr. Rannazzisi?
8      A.   I haven't.  Mr. Rannazzisi has requested
9 information, calculations from my office, and I'm
10 not sure whether those were in direct communication
11 with my office or through counsel that
12 Mr. Rannazzisi is working with.
13          Now that you mention his name, his
14 name came up in the last few days, just in
15 discussions in my office, so it may well be that
16 he's involved in CT8 and/or CT9.  I don't know that.
17 That wasn't something that I focused on.
18      Q.   Okay.
19           Dr. McCann, I'm going to show you
20 what we're going to mark --
21      A.   Thank you.
22      Q.   -- as McCann Number 3.  So this is a

23 (Pages 86 - 89)

Page 90

1 copy of your expert report that you prepared for the
2 Track 8 case.
3 (McCann Exhibit 3, McCann Expert Report, 1.24.2024,
4 was marked for identification.)
5    Q.    I want to start at page 45, and
6 Paragraph 104.
7          You note that you "...implemented
8 various approaches to identify transactions meeting
9 specified criteria using nonpublic ARCOS Data from
10 2006 to 2019, supplemented by Defendants'
11 Transactional Data..."  (As read.)
12          That's consistent with the approach
13 you've taken previously?
14    A.    Yes.
15    Q.    Okay.
16          Now, these various approaches are --
17 that you are referencing are the distributor SOMS
18 methods that are described in Paragraphs 105 to 122
19 of your report; correct?
20    A.    Yes.
21    Q.    The -- your basis for relying on those
22 SOMS methods is that they were provided to you by

Page 91

1 Plaintiffs' counsel and the DEA expert?
2    A.    Yeah.  I wouldn't say I relied on them,
3 but I implemented them.
4          So we took these recipes, if you
5 will, for adding up data, and applied them and
6 reported the results.
7    Q.    I want to have you look initially at
8 Method 3.
9    A.    Yes.
10    Q.    You understand that Method 3 is twice
11 trailing 12-month average pharmacy dosage units;
12 correct?
13    A.    Yes.
14    Q.    Okay.
15          In Paragraph 113, you state,
16 "...transactions that cause the number of Dosage
17 Units shipped by a Distributor Defendant to a
18 pharmacy in a calendar month to exceed twice the
19 trailing 12-month average Dosage Units to retail and
20 chain pharmacies served by the Distributor
21 Defendant"; correct?
22    A.    Yes.

Page 92

1    Q.    Then in Paragraph 114, you state that,
2 "If the national average of opioid shipments keeps
3 increasing, the threshold will increase."
4    A.    Correct.
5    Q.    My question to you is:  If the method is
6 based on the number of dosage units shipped to a
7 Distributor Defendant, and whatever historical data
8 is available related to that -- those shipments,
9 what impact does the national average of opioid
10 shipments have on calculating the threshold under
11 that method?
12    A.    Oh, maybe the wording there is a little
13 bit confusing, but when Paragraph 114 refers to the
14 national average, it's referring to the average
15 dosage units shipped by the Distributor Defendant to
16 retail and chain pharmacies across the country.
17          It's not taking into account the
18 average shipment by all distributors to all
19 pharmacies, or something like that.
20          So it's really referring to the same
21 threshold that's referred to in Paragraph 13 (sic),
22 and it's just making the point that if you're during

Page 93

1 a period where the overall shipments by the
2 distributor to the pharmacies it serves is
3 increasing over time, this national -- this average
4 to those pharmacies that the distributor ships will
5 be increasing over time.  You're pulling the
6 12-month window with you as you go through time.
7          If shipments are generally
8 increasing from the distributor to the pharmacies it
9 serves, this threshold, two times whatever that
10 average shipment to a pharmacy is, will be
11 increasing.
12          That's why there's a 3b.  3b just
13 says, once you trigger Flag 3, instead of allowing
14 the threshold to continue to increase, we fixed the
15 threshold at whatever twice the average shipments to
16 pharmacies across the country were by that
17 distributor.
18    Q.    But the method is still based on
19 shipments to an individual pharmacy as opposed to a
20 calculated average across all pharmacies served by a
21 distributor; correct?
22    A.    Well, there's a bit of both, right,

24 (Pages 90 - 93)

Page 94

1 because you're comparing the shipments to a
2 particular pharmacy with the shipments from the
3 distributor to all of the pharmacies that they
4 serve.
5        So they may serve 115 pharmacies,
6 take the average of the shipments to those 115
7 pharmacies, and compare twice that number to what is
8 being shipped to this individual pharmacy.
9        That's -- I'm still not saying
10 it very clearly, but that's the idea.
11    Q.    But the average has been based on what
12 the distributor is doing as opposed to what the --
13 who the distributor is shipping to as opposed to
14 what the pharmacy is ordering; correct?
15    A.    Yes.  So it is evaluating an individual
16 pharmacy, an individual pharmacy's orders to date
17 during the month, and the issue is what sort of
18 benchmark, what threshold do you use when you're
19 assessing the particular individual pharmacy's
20 shipments.  And the first couple of examples we
21 looked at were that pharmacy's own receipts over the
22 prior six months.

Page 95

1        And this one is saying, well,
2 instead of looking at that individual pharmacy's
3 recent history, let's look at the recent history of
4 pharmacies on average that the distributor is
5 servicing.  That's the transition from 1 and 2 to
6 now 3.
7    Q.    Okay.
8        You made similar -- you used similar
9 language in -- with respect to -- I'm sorry,
10 Method -- the next method, three times trailing
11 12-month average pharmacy dosage units, where you
12 reference in Paragraph 118, again, the national
13 average of opioid shipments.
14        Your responses would be the same if
15 I asked you the same line of questions about --
16    A.    Yes.
17    Q.    The numbered -- the SOMS methods
18 identified in Paragraph 105 to 122 of your report,
19 are they identical to the SOMS methods that you
20 implemented in your Track 7 report?
21    A.    I don't recall that.  We'd have to pull
22 out the Track 7 report, and compare them.  Very

Page 96

1 likely, but I don't know from memory.
2    Q.    Oh, but if it's -- if you are
3 referencing the same number of methods, the
4 methodology, the algorithm didn't change; is that
5 fair?
6    A.    Right.  I don't think that there was any
7 renumbering of them or anything, or any change in
8 how we implemented them.
9    Q.    Okay.
10    A.    That really has not been for several
11 years now.
12    Q.    You are not offering an opinion as to
13 whether any of these methods is the appropriate way
14 to identify suspicious orders?
15    A.    Correct.
16    Q.    Okay.
17        You are not offering an opinion as
18 to whether a flagged order is suspicious?
19    A.    Correct.
20    Q.    Similarly, you're not offering an
21 opinion on whether a flagged order should be
22 shipped?

Page 97

1    A.    Correct.
2    Q.    Okay.
3        In doing the work to build up to
4 preparing your report, did you review any of the
5 Publix SOMS systems that were in place between 2006
6 and 2019?
7    A.    No.
8    Q.    Do you know whether any of the ten
9 flagging methods replicate any of the SOMS systems
10 used by Publix between 2006 and 2019?
11    A.    No.
12    Q.    Okay.
13        Do you know whether any of the
14 flagging methods have ever been approved by the DEA?
15    A.    No.
16    Q.    Do any of the flagging methods account
17 for the medical needs of prescription opioids in
18 Cobb County?
19    A.    No.
20    Q.    Do any of the flagging methods account
21 for an increase in overall grocery store business or
22 pharmacy customers for a specific store?

25 (Pages 94 - 97)

Page 98

1    A.    No.  I don't think so.
2    Q.    How would these algorithms account for
3  the opening of a new store?
4          Put another way, since you have a --
5  since the -- there is always a look-back aspect to
6  this, if you have a store that's never ordered
7  anything, how does that -- how is that accounted for
8  in these SOMS algorithms, if you know?
9    A.    Well, there's no exclusion or
10  modification to the SOMS and to these flagging
11  methodologies that we implement in that fact
12  pattern, although the results will be a little bit
13  different, right, you're less likely to subsequently
14  flag under some of the rules, and are more likely to
15  flag under some of the others than if this was a
16  store that had been in existence for some time.
17         So, for instance, the daily limits
18  or the monthly limits, Methods 5 and 6, are more
19  likely to be flagged as a new store gets stocked up,
20  but if a new store is getting stocked up, it's
21  creating a high threshold in the trailing six-month
22  calculations, and so you're less likely to flag that

Page 99

1  store's shipments under Methods 1 and 2.
2          So the interpretation of the results
3  are a little different in the fact pattern you've
4  described, and that probably is something that
5  someone evaluating the results of the flagging
6  methods would take into account.  I'm not a subject
7  matter expert, but it seems to me that they would.
8          There's no change to the
9  calculations because of that fact pattern, just a --
10  maybe a change in the interpretation of the results.
11    Q.    Does your analysis distinguish between
12  opioids shipped to a Publix store in an
13  unincorporated territory in Cobb County as opposed
14  to an incorporated city?
15    A.    Not that I'm aware of.
16    Q.    Your report marked as Exhibit and your
17  website group pharmacy information by county.  What
18  is your -- what's the source of making that
19  grouping?  What's the source of that information; is
20  it ARCOS?
21    A.    Well, there were two sources.
22          One is ARCOS.  ARCOS identifies the

Page 100

1  county, and then your dispensing data identifies
2  counties.
3          And there's, I think, at least one
4  pharmacy where there's some fight over whether it's
5  in Cobb County or not, and that shows up in our
6  analysis of the sampled prescriptions.
7          Based on the ARCOS data, I forget
8  which way it goes, but we ended up creating a tool
9  for 391 prescriptions instead of 400 prescriptions
10  because nine of the sampled 400 prescriptions were
11  filled at a pharmacy which I think ARCOS says is
12  Cobb County and which Publix says is not Cobb
13  County, or the other way, I forget which way it
14  goes.
15    Q.    Was that an issue that you flagged
16  initially, or is that -- to deal with in your
17  report, or is that something that was brought to
18  you?
19    A.    I don't recall.
20    Q.    Okay.
21          Your report, in page 9 through 12, I
22  just want to make sure, you indicate that the county

Page 101

1  information, the ARCOS records, is appended by the
2  DEA in the transaction records submitted by Publix.
3          Does that sound right to you?
4    A.    I'm sorry, could you give me that page
5  number.
6    Q.    Yeah.  Page 9 through 12.  And it's
7  really on 9 and 10 is what we're focusing on.
8    A.    Yes.
9    Q.    On page 12, you also note that --
10  Paragraph 42, that some DEA numbers have more than
11  one address.
12          Did you find any instances of that
13  with the Publix stores at issue in this case?
14    A.    I don't recall.
15    Q.    Going back to page 5 at Paragraph 11,
16  you state that you were tasked with validating the
17  ARCOS data; correct?
18    A.    Correct.
19    Q.    What did you do to validate the county
20  information associated with each transaction?
21    A.    I don't recall, but I believe we -- I
22  just don't -- I don't recall.  There was --

26 (Pages 98 - 101)

Page 102

1    Q.   That's okay.  If you don't recall,
2 that's fine.
3    A.   Okay.
4    Q.   If -- were you provided a store list for
5 the Publix stores at issue in this case?
6    A.   Well, I believe so.  We have received
7 store lists for other chain pharmacies.  It's
8 reflected in the dispensing data that we receive.
9 Typically, a store number, and -- so separate from
10 the DEA number that the pharmacy would have, we
11 would have a store number in the data, typically.
12 I'm not picturing it specifically with Publix, but I
13 believe we would.
14         And then, of course, from the ARCOS
15 data, we have a list of Publix pharmacies.
16   Q.   So the store specific -- I'll cut to the
17 chase.
18         The store that we're talking about
19 here is Store Number 541, which is located at
20 6300 Powers Ferry Road in Sandy Springs, Georgia.
21         As we sit here today, do you have
22 any reason to doubt that that store is actually

Page 103

1 located in Fulton County as opposed to Cobb County?
2    A.   No, I don't.  I understand that -- just
3 the general context -- as a result of the general
4 context, I understand that there was some
5 disagreement between the ARCOS data identified
6 county and the Publix dispensing data identified
7 county.
8    Q.   But regardless, you didn't do anything
9 to verify where those stores were located?
10   A.   I did -- my office did a Google search
11 of the address, and found that there was some
12 dispute about which county, or that which county it
13 was in had changed.
14   Q.   Okay.
15        I want to shift gears just a little
16 bit and bring your attention to page 4 of your
17 report.
18        And AI want -- most of these
19 questions are going to relate to Section X of your
20 report, which largely -- which deals with red-flag
21 computations on the Publix dispensing data.
22        Now, you calculated the number of

Page 104

1 red-flag prescriptions that you found in the Publix
2 dispensing data; correct?
3    A.   Yes.
4    Q.   Okay.
5         Can you tell me specifically what
6 data sources you used to create a unified set of
7 Publix dispensing data.
8         I direct your attention to
9 Subparagraph 10o on page 4, that's specifically what
10 I'm talking about.
11        Does that look familiar to you?
12   A.   Yes.
13        I don't recall how these four
14 Bates-stamped documents were collectively
15 transmitting the Publix dispensing data to us, but
16 those are the ones that are identified in
17 Subparagraph (o).
18   Q.   Did you understand that the data was
19 from multiple platforms?
20   A.   I don't recall that, but that appears to
21 be what the naming convention implies.
22   Q.   Okay.

Page 105

1         Specifically, that there was data
2 from eRx and from PDX?
3         Did you have an understanding of
4 when and how the Publix stores in Georgia
5 transitioned from PDX to eRx?
6    A.   Not as I sit here.  If I did when this
7 data first arrived, and we started work on it, I
8 have since forgotten.
9    Q.   Okay.
10        Did you do anything to account for
11 the possibility of duplicate prescriptions in the
12 various eRx and PDX datasets that you considered
13 according to page 4 of your report?
14   A.   Yes, but I don't recall what -- we
15 certainly didn't intentionally leave in duplicate
16 prescriptions.
17   Q.   Did you take any steps to account for
18 the differences in the various fields between the
19 eRx dataset and the PDX datasets?
20   A.   I'm sorry.  Could you ask that question
21 again, please.
22   Q.   Did you take any steps to account for

27 (Pages 102 - 105)

Page 106

1 differences in the various data fields that were
2 present in the eRx and the PDX datasets?
3     A.    Well, certainly, there would be -- if
4 there were fields missing in one dataset for one set
5 of -- for some subset of prescriptions, and those
6 field values were used in our flagging algorithms,
7 well, the flagging algorithms wouldn't identify some
8 prescriptions unless that data was available in some
9 other form.
10         I don't recall the Publix data being
11 the same problem that the Albertsons data was.  I --
12 my understands is that the Publix dispensing data
13 was pretty good.
14     Q.    To be clear, I don't want to retread old
15 ground, but you didn't come up with any -- you
16 didn't come up with a criteria to identify red-flag
17 prescription; correct?
18     A.    Correct.
19     Q.    You took those criteria from someone
20 else and applied them to the Publix data?
21     A.    Correct.
22     Q.    Do you have any opinion on whether any

Page 107

1 of the 14 flags are the correct way to identify
2 prescriptions of controlled substances?
3     A.    No.
4     Q.    Do you know whether any of the red-flag
5 prescriptions identified in your analysis of Publix
6 data were diverted?
7     A.    No.
8     Q.    Do you know whether any of the red-flag
9 prescriptions were illegitimate?
10     A.    No.
11     Q.    Other than the red flags described --
12 the 14 red flags described in your report, did you
13 run any other red-flag analyses on the Publix
14 dispensing data?
15     A.    Not that I'm aware of.
16     Q.    I want to direct your attention to
17 page 111 of your report.  Specifically, I want to
18 look at Table 80.
19     A.    Yes.
20     Q.    This is the result of the Publix
21 nonrecurrent flagged opioid prescription and
22 analysis that you conducted; correct?

Page 108

1     A.    Yes.
2     Q.    You conclude that 305,069 out of 669,828
3 opioid prescriptions dispensed by Publix stores in
4 Cobb County had at least one red flag?
5     A.    Correct.
6     Q.    That amounts to 45-and-a-half percent?
7     A.    Yes.
8     Q.    So that means that 364,759 prescriptions
9 did not hit on a single nonrecurrent flag; is that
10 right?
11     A.    Yes.
12     Q.    In other words, more than half of the
13 opioid prescriptions did not trigger any of the 14
14 red flags?
15     A.    Correct.
16     Q.    Are you going to offer any opinions
17 regarding the amount of opioids that Publix should
18 have supplied in Cobb County?
19     A.    No.
20     Q.    Are you going to offer any opinions
21 regarding the amount of opioids that Publix should
22 have dispensed in Cobb County?

Page 109

1     A.    No.
2     Q.    Are you going to offer any opinion about
3 whether any of the prescriptions in the Publix data
4 that you flagged should have not been dispensed?
5     A.    No.
6     Q.    Are you going to offer any opinions
7 about whether any of the prescriptions in the Publix
8 data that you analyzed caused injury to anyone?
9     A.    No.
10     Q.    I have a few questions about specific
11 red flags, so...
12         Okay.  If you turn to page 108 of
13 your report, you -- that's where you identify the 14
14 red flags.  Can you turn there for me.
15     A.    Yes.
16     Q.    Okay.  Great.
17         Looking at Red Flag 1 and 2, 1 --
18 Red Flag 1 is an opioid was dispensed to a patient
19 who traveled more than 25 miles to visit the
20 pharmacy.  Distance here is calculated from the
21 center of the patient's zip code to the center of
22 the pharmacy zip code; correct?

28 (Pages 106 - 109)

Page 110

1     A.    I apologize.  Which red flag?
2     Q.    Red Flag 1.
3     A.    Yes.  That's correct.
4     Q.    Okay.
5           Red Flag Number 2 is similar, but
6   it's basically using the same calculus to address
7   the distance traveled to see the prescriber;
8   correct?
9     A.    Correct.
10    Q.    Okay.
11          Do either one of these red flags
12  account for the specialty of the doctor writing the
13  prescription?
14    A.    No.
15    Q.    Okay.
16          You know, for example, it would be
17  reasonable for a patient to travel more than 25
18  miles to see their oncologist; correct?
19    A.    I don't know.
20    Q.    Okay.
21          You indicate here that you
22  calculated from the center of the patient's zip code

Page 111

1   to the center of the pharmacy zip code; correct?
2     A.    Yes.
3     Q.    With respect to Red Flag 2, you do the
4   same calculation, but from the center of the
5   patient's zip code to the center of the prescriber
6   zip code.
7           Now, you have the pharmacy
8   addresses; correct?
9     A.    Correct.
10    Q.    You have the prescriber addresses;
11  correct?
12    A.    Correct.
13    Q.    Is there any reason you wouldn't use
14  those actual addresses to calculate the distance
15  traveled; wouldn't that be a more efficient way
16  of -- or a more accurate way, rather, of calculating
17  those distances?
18    A.    Definitely not.  The most efficient way
19  to do it is the way we did it, because if you think
20  about it, you've got however many zip codes there
21  are in the country, and the geographic center of
22  those zip codes is a set of coordinates that are

Page 112

1   available, and then it's -- I don't know how to do
2   it, but people in my office can use software to
3   identify the distance between the center of any two
4   zip codes.
5           And so that -- there's a limited
6   number of combinations of zip codes, pairs of zip
7   codes, and so a fairly simple matter to look up
8   these distances between centers of two zip codes.
9           Quite another matter to calculate
10  the distance between the center of a zip code and
11  any one of tens or hundreds of thousands of possible
12  addresses within a zip code.  So that could have
13  been done --
14    Q.    But we're talking just about Cobb County
15  here.  I mean, you have the address information at
16  least for two -- for the prescriber and for the
17  pharmacy, and at a minimum, even if you still use
18  the central address, you could still calculate more
19  accurately using those addresses; correct?
20    A.    I'd have to think through that, but with
21  some work, at least conceptually, I think that's
22  right, yes.

Page 113

1     Q.    Okay.
2           I want to jump to the end of your
3   list and look at Red Flag 14.
4           Red Flag 14 is simply a patient was
5   dispensed an opioid and paid in cash.
6           How do you define "paid in cash"
7   under this red flag?
8     A.    Yeah, it just means that they didn't use
9   insurance.  I don't know.  The pharmacy experts
10  refer to either insurance or paid in cash, but, you
11  know, you might have used a credit card.
12    Q.    Okay.
13          Did you have that -- do you know if
14  you have that -- how that information was provided
15  to you in the Publix dispensing data?
16    A.    I don't recall, but in all of the
17  dispensing data that I can recall reviewing, there
18  was a field that didn't say cash/not cash, it said
19  insurance/not insurance.
20          So I think the field identifies
21  whether it was insurance -- or I think even the
22  dispensing data refers to the alternatives as

29 (Pages 110 - 113)

Page 114

1 insurance or cash, but I think the cash alternative
2 encompasses your Visa card.
3    Q.   Okay.
4         Would it also encompass, then -- do
5 you know what a prescription discount card is?
6    A.   Yes.
7    Q.   Okay.
8         So would it encompass that?
9    A.   I would think so.
10   Q.   So, basically, it's meant to encompass
11 any payment that's not insurance?
12   A.   Well, even with a prescription discount
13 card, you're still paying something.  So that
14 payment is not being paid by an insurance company.
15   Q.   I asked that poorly.
16        As opposed to saying paid in cash,
17 what that really means is not insurance?
18   A.   Correct.
19   Q.   Okay.
20   A.   At least that's how I interpret the data
21 that we receive from the dispensers.
22   Q.   Does this red flag take into account the

Page 115

1 percentage of Cobb County residents that are
2 insured?
3    A.   No.
4    Q.   Okay.
5         Does it take into account the
6 percentage of Publix customers that are insured?
7    A.   No.
8    Q.   So if you were to do a calculation of
9 the number of prescriptions, you don't know how it
10 would compare to either of those categories, either
11 Cobb County at large or Publix County -- Publix
12 customers, excuse me?
13   A.   Correct.
14   Q.   Do you know what percentage of nonopioid
15 prescriptions at Publix were also paid, well, not
16 with insurance?
17   A.   No.
18 (McCann Exhibit 4, Appendix 8.3B Red-Flag Analysis
19 Summary on Publix Dispensing Data, was marked for
20 identification.)
21   Q.   I'm going to hand you what I'm going to
22 mark -- oh, here.

Page 116

1    A.   Thank you.
2    Q.   Okay.  I have marked what is Exhibit 4.
3 This is Appendix 8.3B to your report.
4         You recognize that?
5    A.   Yes.
6    Q.   Based on your -- okay.
7         Would you agree that your current
8 red-flag analysis flags twice as many prescriptions
9 as the nonrecurrent method; correct?
10   A.   Yeah.  I don't know about the precise
11 ratio, but that sounds right to me.
12   Q.   I think if you look at the first page,
13 it's 45-and-a-half for the nonrecurrent and
14 91 percent, so I think it's pretty straightforward.
15   A.   Yeah.  I'm sorry.  I don't see the
16 91 percent, but I'm assuming that's right, yes.
17   Q.   Yeah.
18        If you look at the page that starts
19 with the recurrent analysis, it shows you the
20 91 percent.
21   A.   Okay.
22   Q.   Based on your expertise, is the method

Page 117

1 that flags 91 percent of all prescriptions actually
2 helpful in any meaningful way?
3    A.   Yes.
4         MS. POERSCHKE:  Object to the form.
5         THE WITNESS:  I apologize.
6    A.   Yes.
7    Q.   Do you believe that's effective?
8    A.   Yes.
9    Q.   How so?
10   A.   Well, so I'm not a subject matter
11 expert, as I've been saying all day, but there is --
12 from a data perspective, there's a natural
13 interpretation of the 91 percent number.  It's that
14 91 percent of the prescriptions filled by Publix
15 pharmacies were filled after a prescription was
16 flagged by one of these 14 methods.  So the
17 prescription subsequently written by a doctor, if
18 it's a doctor flag, or filled by a patient, if it's
19 a patient flag, are flagged.
20        So the way I interpret that
21 91 percent is it tells you -- or imagine a scale
22 with the prescriptions that might have been

1 stopped -- might have been stopped if action were
2 taken on the first flagged prescription written by
3 that doctor or filled by that patient.
4          So 91 percent does sound like a very
5 high number, but it's an important number.  If the
6 same calculation resulted in a 5 percent, well,
7 you'd say, 95 percent of these prescriptions would
8 have been filled, at least 95 percent, according to
9 the data, before the first prescription was flagged,
10 and so only 5 percent were filled after those first
11 flagged prescriptions.  It doesn't seem like very
12 much in that hypothetical could have been stopped.
13          The 91 percent number makes it seem
14 like an awful lot of prescriptions could have been
15 stopped.
16          So this sort of -- this number
17 telling you how much was filled after versus before
18 the first prescription would have been flagged by
19 that -- for that patient or written by that doctor,
20 I think that that does have an important
21 interpretation.
22     Q.    Okay.

1          For your recurrent analysis, if a
2 prescription was flagged by any of the red-flag
3 methods, all subsequent prescriptions dispensed to
4 the same patient and/or written by the same doctor
5 are also flagged; correct?
6     A.    Close.
7          All prescriptions to the same
8 patient if it is a patient-centric flag were
9 flagged, all prescriptions written by the same
10 doctor were subsequently flagged if it's a
11 doctor-centric flag.
12          And I think the flags, we were
13 looking at them earlier, the flags are denoted with
14 a P or a D, and so the recurrent feature is applied
15 either patient or doctor, depending on how they're
16 marked.
17     Q.    Okay.
18          But it's -- the code that you use
19 for the recurrent Flags 2, 6, 8, 10 and 11 assign
20 the recurrent variable of value of 1 if the patient
21 has ever had the flag or the prescriber has ever had
22 the flag; correct?

1     A.    Correct.
2     Q.    Okay.
3          So doesn't this mean that a patient
4 without any nonrecurrent red flags could have a
5 recurrent red flag for 2, 6, 8, 10 or 11 simply
6 because they have the same prescriber as another
7 patient who was previously flagged?
8     A.    Well, it's not the patients that being
9 flagged there.  It's the prescription written by the
10 doctor.
11          So that patient, if it's flagged
12 because of the doctor, not because of the patient,
13 subsequent prescriptions filled by the same patient
14 written by a different doctor are not flagged.
15 You're flagging the doctor's prescriptions from that
16 point forward.
17          And in fact, even in that initial
18 flag, you're flagging the doctor's prescription, not
19 the patient's prescription, in my perspective.
20     Q.    Do you know whether there are any
21 patients in your flagging analysis data that have a
22 recurrent red-flag value of 1 for Red Flag 2, 6, 8,

1 10 or 11, but do not have any nonrecurrent flags?
2     A.    Almost definitely.  I don't know that
3 for a fact, I didn't look at that, but I would be
4 surprised if that's not the case.
5     Q.    Okay.
6          Do you know how many patients had
7 zero red flags under either the nonrecurrent or
8 recurrent analysis?
9     A.    Not as I sit here.
10     Q.    Okay.
11          But you didn't look at it?
12     A.    Not that I recall.
13     Q.    Do you know how many patients had zero
14 nonrecurrent flags, but at had at least one
15 recurrent red flag?
16     A.    I don't think that you're identifying
17 the prescription right because in that fact pattern,
18 it would be the doctor's prescription that is being
19 flagged.  It's not being flagged because of anything
20 to do with the patient.
21          Each prescription is connected to
22 both a patient and a doctor, but it's not the --

Page 122

1  it's not really the patient's identity or attributes
2  in any way that's causing that prescription to be
3  flagged in your example, it's the doctor, and --
4      Q.    But it's showing up in the patient's
5  data, and the question was simply, do you know how
6  many patients had zero nonrecurrent flags, but had
7  at least one recurrent flag, and that's a yes or no
8  question.
9      A.    I said no.
10     Q.    Okay.  All right.
11         MR. LEEDER:  Could we -- is it okay
12  if we take a short break?
13         THE WITNESS:  Please.
14         MR. LEEDER:  Okay.
15         THE VIDEOGRAPHER:  Please stand by.
16         We are now off the record.
17         MS. POERSCHKE:  How much time do we
18  have on the record?
19         THE VIDEOGRAPHER:  2 hours,
20  36 minutes.
21         MR. LEEDER:  54 minutes.  Oh, left?
22  54 left.

Page 123

1         THE VIDEOGRAPHER:  We're now off the
2  record.  The time is 1:05 p.m.
3  (RECESS, 1:05 p.m. - 1:18 p.m.)
4         THE VIDEOGRAPHER:  We are now on the
5  record.  The time is 1:18 p.m.
6  BY MR. LEEDER:
7      Q.    Dr. McCann, let's go back to your --
8  we'll come back to Exhibit 4, but let's go back to
9  the report for a moment.
10        Paragraph 20 on page 7 summarizes
11  the volume of prescription opioids received by
12  "Dispensers in Cobb County" between 2006 and 2019.
13        You note in the opening part of the
14  paragraph that you prepared summary statistic for
15  subsets of the process ARCOS data covering Cobb
16  County.
17        What do you mean by "subsets"?
18     A.    I'm sorry.  Could you give me the page
19  number.
20     Q.    It's at page 7, Paragraph 20.
21     A.    Well, by a "subset," I mean I'm not
22  using all of the ARCOS data.

Page 124

1         So, for instance, it doesn't include
2  shipments from manufacturers to distributors, or
3  manufacturers to dispensers.  That's what I mean.
4      Q.    Okay.
5         It doesn't mean that you are using a
6  subset of the Cobb County data specifically;
7  correct?
8      A.    Ah...
9      Q.    You're not modifying the Cobb County
10  data that's referenced in this paragraph in any way,
11  shape or form, other than what's being shipped to
12  dispensers in Cobb County; is that fair?
13     A.    Correct.
14     Q.    Okay.
15        To be clear, you are not offering an
16  opinion as to whether that -- the volume reflected
17  in Paragraph 20 is appropriate or lawful?
18     A.    Correct.
19     Q.    You note here that "...Dispensers in
20  Cobb County received 329.8 million Dosage Units,"
21  and that, "Given the County's 714,564 average
22  population during this time period," that that

Page 125

1  amounts to a 754 MMEs for every Cobb County resident
2  from 2006 to 2019; correct?
3      A.    Yes.
4      Q.    Okay.
5         In your report, you also calculated
6  those figures on a national and state level;
7  correct?
8      A.    Yes.  I believe so.
9      Q.    Let me direct your attention to page 31.
10        So in Paragraph 82, you've
11  calculated the annual MME per capita for each state
12  between 2006 and 2019; correct?
13     A.    Yes.
14     Q.    Okay.
15        By that metric, if you look at
16  Georgia, it was --
17     A.    Yes.
18     Q.    -- ranked 35th with an annual average of
19  885.9 MMEs per resident; true?
20     A.    Correct.
21     Q.    When you compare that to what you've
22  compared to Cobb County, you would agree with me

32 (Pages 122 - 125)

Page 126

1 that the Cobb County average is below the Georgia
2 average MME; correct?
3    A.   Correct.
4    Q.   Do you recall if you calculated the
5 average MME for any other county in Georgia?
6    A.   I don't recall whether I did or not.
7 Probably.  It's probably in the data and in the
8 appendices that were provided, but I don't know with
9 certainty.
10   Q.   Going back to page 7 of your report,
11 in -- is it fair to say that the summary provided in
12 Paragraph 20 does not distinguish between the volume
13 of prescription opioids dispensed by Publix and all
14 others dispensers in Cobb County?
15   A.   Correct.  Yes.
16   Q.   Do the summary statistics in
17 Paragraph 20 include hospitals?
18   A.   Yes.
19   Q.   Do the summary statistics in
20 Paragraph 20 include long-term care facilities?
21   A.   Yes.
22   Q.   Do they also include closed-door

Page 127

1 pharmacies?
2    A.   Yes.
3    Q.   Are there any dispensers excluded from
4 the statistics in Paragraph 20?
5    A.   Not the way we've defined dispensers
6 anyway.
7    Q.   Okay.
8         How do you define dispensers?
9    A.   Well, there was a list that we identify
10 in a footnote somewhere here of the buyer business
11 activities that we interpreted to be involved in
12 providing drugs for consumption as opposed to --
13 domestic consumption as opposed to, for instance,
14 research or destruction or export.
15        And so there's a list of around 40
16 buyer business activities that we think involved,
17 like the examples that you just gave, the
18 closed-door pharmacy or the long-term care facility
19 or retailer chain pharmacy, where the drugs are
20 being passed on to individuals to consume.
21        So that's how we defined a
22 dispenser.

Page 128

1    Q.   Okay.
2         Turning your --
3 (Clarification requested by the Realtime
4 Stenographer.)
5    A.   A dispenser.
6 (McCann Exhibit 5, Appendix 6.11 Pharmacy Ranking,
7 was marked for identification.)
8    Q.   I want to turn your attention back to
9 what we have marked as Exhibit 4.  It's
10 Appendix 6.11.
11   A.   Yes.
12   Q.   It's entitled Pharmacy Ranking.  This --
13 I just want to be clear, this particular appendix
14 ranks all the pharmacies -- retail or chain
15 pharmacies in Cobb County by total MME; correct?
16   A.   I'm sorry.  Which page within --
17   Q.   It's -- if you look at the -- if you
18 just turn to the second page.  No, you're -- I think
19 I've got -- oh, you know what, he's got the wrong
20 one.  My apologies on that.
21   A.   Thank you.
22        Yes.

Page 129

1    Q.   Okay.
2         Is my description accurate?
3    A.   I'm sorry.  Would you give it to me
4 again, please.
5    Q.   Sure.
6         So this is ranking of all retail and
7 chain pharmacies in Cobb County by total MME between
8 2006 and 2019; correct?
9    A.   Correct.
10   Q.   As part of your work in this case, were
11 you asked to run any of your flagging methods
12 against any pharmacies besides Publix?
13   A.   Well, at some point during the
14 litigation, there were other pharmacies involved,
15 including Kroger, which settled out right at the
16 time I was filing the expert report.  So the answer
17 is certainly, yes.  Even in what was produced in
18 this case, there's analysis of Kroger prescriptions.
19   Q.   You beat me to the punch to a certain
20 degree.
21        You, early on in this case, did a --
22 there used to be additional Defendants in this case;

33 (Pages 126 - 129)

Page 130

1 correct?

2     A.   Correct.  Correct.

3 (McCann Exhibit 6, Summary of Publix Dispensing

4 Red-Flag Analysis, Cobb County, GA, Nonrecurrent,

5 was marked for identification.)

6     Q.   I'm going to show you what I'm -- I'm

7 marking this as Group Exhibit 6.  These are the

8 summaries that you prepared for CVS, Walmart,

9 Walgreens, Kroger and Publix in December of 2022,

10 and Rite Aid, I believe.

11     A.   Okay.

12     Q.   Do you still stand by those analyses?

13     A.   Well, I don't know that anything has

14 changed since 2022 when these were first created.  I

15 know that our report was finalized and submitted

16 January of 2024, and other than Publix and Kroger,

17 these are not in there, so I don't know whether I

18 stand by them or not.

19     Q.   Okay.

20          But you admit that you prepared

21 them?

22     A.   Yes.

Page 131

1     Q.   Okay.

2          Did you run -- were you -- did you

3 run any of your flagging methods, and I mean this --

4 I should probably break this up.

5          Did -- if you look at the listing in

6 Appendix 6.11, there are -- the top five pharmacies

7 are, by your designation, all retail pharmacies;

8 correct?

9     A.   Yes.

10     Q.   Did you -- were you asked to run your

11 red-flag analysis against Lacey's Marietta Pharmacy?

12     A.   I'm sorry.  Let me just clarify my prior

13 answer.

14          It's really the type that you

15 identified Lacey's as -- with an R, as being a

16 retail pharmacy.  That's the ARCOS classification of

17 that pharmacy.

18          But I also understand that according

19 to NPI, the other source of whether something is a

20 retail or a chain pharmacy, it's probably identified

21 as a retail pharmacy.

22          But the answer to your question is,

Page 132

1 no, I did not.

2     Q.   Okay.

3     A.   Not that I'm aware of, anyway.

4     Q.   Some question for Carter's Pharmacy,

5 number 2 on the list, 280 --

6     A.   Same answer.  I did not.

7     Q.   Okay.

8     A.   Or at least not that I'm aware of.

9     Q.   Okay.

10          Would your answer be the same --

11 whether -- excluding Publix and the pharmacies that

12 I just identified in your earlier red-flag

13 summaries, would it be fair to say that you didn't

14 conduct a red-flag analysis of any pharmacy other

15 than the ones that we've already discussed?

16     A.   Right.  Well, I didn't get dispensing

17 data from any of them.  It's only Defendants in the

18 case that produced dispensing data, so I couldn't

19 have.  I wasn't asked to, but I couldn't have

20 anyway.

21     Q.   As a follow-up to that, you didn't run

22 any of the SOMS methods against the orders that were

Page 133

1 shipped to any of these pharmacies?

2     A.   I think that's very likely the case.  I

3 guess the big three distributors, or the

4 distributors were not in this case at any point in

5 time.  If they were, then we would have run a

6 distributor SOMS to those independent pharmacies,

7 but we -- I don't believe we did.

8          I don't know that with certainty,

9 but I don't believe so.

10     Q.   Plaintiffs didn't ask you to run any of

11 that analysis, correct, to the extent you were able

12 to?

13     A.   Right.  I'm not aware that they did.

14     Q.   Are you offering an opinion on whether

15 any manufacturer, distributor or pharmacy

16 oversupplied opioids in Cobb County or elsewhere in

17 the country?

18     A.   No.

19     Q.   Are you offering an opinion on whether

20 any manufacturer, distributor or pharmacy caused an

21 opioid crisis in Cobb County or elsewhere in the

22 country?

34 (Pages 130 - 133)

Page 134

1    A.    No.
2    Q.    Have you undertaken any analysis for the
3  Plaintiffs in Track 8 to determine whether any --
4  sorry.
5  (Clarification requested by the Realtime
6  Stenographer.)
7    Q.    For the Plaintiffs in Track 8 to
8  determine whether any flagged order or prescription
9  caused the Plaintiff harm?
10    A.    No.
11    Q.    Did you do any work to determine the
12  percentage of opioid prescriptions compared to all
13  prescriptions for the Publix stores in Cobb County?
14    A.    No.
15    Q.    Okay.  Were you ever given Publix C2
16  poll reports?
17    A.    Not that I'm aware.
18    Q.    Okay.
19          Have you done any work to compare
20  the results of your red-flag analysis or your SOMS
21  flagging analysis to the work that you've done in
22  any other jurisdiction?

Page 135

1    A.    No.
2    Q.    That would include cases in the MDL and
3  state court cases?
4    A.    Yes.
5    Q.    Okay.
6          Do you know the extent to which
7  opioid orders shipped or received by non-Defendant
8  pharmacies contributed to the opioid crisis?
9    A.    No.
10    Q.    Your flagging analysis is presented in
11  the aggregate, not at the store level; is that
12  correct?
13    A.    Well, in the summary tables that are in
14  the narrative portion of the report, yes, but there
15  is -- high level of detail is available in the
16  appendices.
17    Q.    Okay.
18          Did you do any analysis to determine
19  whether your flagged orders are in any way connected
20  to your flagged prescriptions?
21    A.    No.
22    Q.    Do you provide a market share analysis

Page 136

1  in your Track 8 report?
2    A.    Yes.
3    Q.    Let me direct your attention to
4  page 121.
5    A.    Yes.
6    Q.    You note you reported the market share
7  of Distributor Defendants and Chain Pharmacy
8  Defendants in Cobb County; correct?
9    A.    Yes.
10    Q.    Okay.
11          Now, turning to page 44,
12  specifically, Table 19...
13    A.    Yes.
14    Q.    Okay.  Is this intended to show the
15  distributor market share by dosage unit in Cobb
16  County from 2006 to 2019?
17    A.    Yes.
18    Q.    Okay.
19          Does this include shipments to any
20  dispensers other than chain and retail pharmacies in
21  Cobb County?
22    A.    No.

Page 137

1    Q.    So you exclude closed-door pharmacies?
2    A.    Correct.
3    Q.    Long-term care facilities?
4    A.    Correct.
5    Q.    Clinics?
6    A.    Correct.
7    Q.    Hospitals?
8    A.    Yes.
9    Q.    Okay.
10          So this is only really intended to
11  reflect a distributor market share based on chain
12  and retail -- shipments to chain and retail
13  pharmacies alone; correct?
14    A.    Correct.
15    Q.    Did you at any point calculate a market
16  share that doesn't include -- excuse me, that doesn't
17  exclude other dispensers in Cobb County?
18    A.    I don't recall.  We may have -- we may
19  have done a market share calculation using both the
20  ARCOS definition and the NPI definition of retail
21  and chain pharmacy, but I don't recall that we did a
22  distributor market share -- no, that's not right.

35 (Pages 134 - 137)

Page 138

1 We would have done a distributor market share at
2 least in the detailed appendices.
3    Q.   I'm not trying to play -- I just wanted
4 to test your recollection, but is that the report
5 that you're referencing?
6    A.   Yeah.  I mentioned earlier, maybe in
7 questioning from Mr. Torres, we have reports that I
8 think of as manufacturer reports or labeler reports,
9 distributor reports and pharmacy reports.  The
10 high-level distributor report gives you market
11 shares to any user, I believe, in the ARCOS data.
12    Q.   Okay.
13    A.   I'm sorry.  That's not right.
14       To all dispensers in the ARCOS data,
15 but not limited to just retail and chain pharmacies
16 like the table in the report we were just looking at
17 does.
18    Q.   Okay.
19 (McCann Exhibit 7, Appendix 6.6 Distributor Report,
20 was marked for identification.)
21    Q.   So I've just handed you what I have
22 marked as Exhibit 7.  This is Appendix 6.6 to your

Page 139

1 report.
2       Is this the distributor market share
3 analysis that you were just referencing?
4    A.   Yes.
5    Q.   Okay.
6       If I draw your attention, the first
7 page of the actual table or chart shows 14 opioid
8 drugs market share by company in Cobb County,
9 Georgia, and that shows a Publix Super Market market
10 share of 5.35 percent; is that correct?
11    A.   Yes.
12    Q.   Now, when you compare that to what's --
13 I just want to make sure I understand what we're
14 looking at.
15       When you compare that to what's in
16 Table 19, that's a lower market share than 6.4;
17 correct?
18    A.   Yes.
19    Q.   So when you include everyone that was
20 dispensing opioids, it's a natural occurrence that
21 you include everybody that's dispensing opioids in
22 Cobb County, that that's the most appropriate way to

Page 140

1 calculate a market share, isn't it, for the entire
2 county?
3       MS. POERSCHKE:  Object to the form.
4    A.   Yeah.  I don't think that's right.  I
5 don't --
6    Q.   You don't think it's appropriate to
7 include everyone?
8    A.   Well, as we do here, but if the issue
9 is -- and this is something perhaps for the subject
10 matter expert, but if the issue is diversion, and
11 diversion is more likely to occur at retail
12 pharmacies as opposed to an assisted-living
13 facility, then the market share for retail and chain
14 pharmacies is more relevant.
15       I have reported the results both
16 ways, but I can see some reason why the market share
17 with dispensers -- of dispensers that have a
18 storefront being a relevant metric, but that's for a
19 subject matter expert to discuss with you.
20    Q.   Now, did you also calculate market share
21 by MME?
22    A.   I believe so.

Page 141

1    Q.   Okay.
2       If that -- would it be reasonable to
3 say that if the market share went down, the
4 dosage-unit-to-MME comparison, that that would
5 indicate that Publix was dispensing -- or excuse me,
6 distributing lower strength opioids?
7    A.   Yes.
8    Q.   Okay.
9       I want to take your attention to --
10 so, now, I want to look at Table 20.  Again, that's
11 on page 44.
12    A.   Yes.
13    Q.   Now, Table 20, you're also trying to
14 calculate a market share as well; correct?
15    A.   Yes.
16    Q.   What is this intended to reflect?
17       This is just dispensing market
18 share; correct?
19    A.   Well, it's not dispensing, but it should
20 be highly correlated, right.  It's the receipts at
21 the loading dock, at the back of the pharmacy,
22 whatever distributor delivered the product.

36 (Pages 138 - 141)

Page 142

1    Q.    So is that why the number increases
2  because you're including shipments to Publix
3  pharmacies from other distributors besides the
4  Publix warehouse?
5    A.    Well, it's that and that -- that
6  Publix -- one way to think about it, I guess, is
7  that Publix self-distributed less than the other
8  chain pharmacies on average; CVS, Walgreens, Kroger.
9  They may have been more involved as a distributor
10 than Publix was, as a function of how much they
11 dispensed.
12   Q.    Just want to clarify a couple of things.
13          In this case, you are not offering
14 an opinion that any manufacturer, distributor or
15 pharmacy created the opioid crisis; correct?
16   A.    Correct.
17   Q.    Contributed to the opioid crisis?
18   A.    Correct.
19   Q.    Maintained the opioid crisis?
20   A.    Correct.
21   Q.    Was a substantial factor of the opioid
22 crisis?

Page 143

1    A.    Correct.
2    Q.    Was a significant interference with
3  public health and safety?
4    A.    Correct.
5    Q.    Okay.
6          All right.  I want to direct your
7  attention to page 116 of your report.
8          Paragraph 196, you say, "...I
9  created a spreadsheet (hereafter 'Prescription
10 Summary') that contains the Dispensing Data for the
11 Selected Sample Prescriptions in Cobb County"; is
12 that right?
13   A.    Yes.
14   Q.    You refer to those as -- you define them
15 as a prescription summary; right?
16   A.    Yes.
17   Q.    I could not locate in any appendix or
18 attachment any index or -- excuse me, let me start
19 over.
20          I could not locate any appendix or
21 attachment titled Prescription Summary.
22          Do you believe there is one with

Page 144

1  that title?
2    A.    Not necessarily.  I'm just using -- I'm
3  defining that term because I refer to it later in
4  this document.
5    Q.    Okay.
6          The one thing I did find was
7  Appendix 10B, which was titled Pharmacy Notes,
8  Tools, Publix.
9          Is that likely to be it?
10   A.    Yes.
11   Q.    Okay.
12          In creating that spreadsheet, you
13 link the prescription images to the prescription
14 samples; correct?
15   A.    Yes.
16   Q.    Did you review the images for any
17 information?
18   A.    I don't think so.  I think it was --
19 they were just linked based on a key, an ID number
20 that Publix gave us in the metadata telling us to
21 attach these images to these sample prescriptions.
22 I believe that's all we did.

Page 145

1    Q.    So you didn't extract any information
2  from them, either?
3    A.    Not that I recall.  I think that we just
4  created hyperlinks in the Excel file so that someone
5  could click on the hyperlink and see the scanned
6  document.
7    Q.    Okay.
8          Looking at -- let me turn your
9  attention to Section XII of your report, the
10 discussion on random sampling and its confidence
11 interval on page 118.
12          You were asked to provide an
13 illustration of the method that could be used;
14 correct?
15   A.    Correct.
16   Q.    You are not offering an opinion about
17 the percentage of prescriptions that did or did not
18 have adequate due diligence, are you?
19   A.    I am not.
20   Q.    Okay.
21          We touched on this earlier.  In
22 Paragraph 201, you reference a random sample of 400

37 (Pages 142 - 145)

Page 146

1 and 391 observations, and I think the 400 is a
2 reference to Kroger.
3          The reference to 391 observations is
4 because you removed nine observations that were tied
5 to the Store 541 that we discussed earlier; is that
6 correct?
7     A.    I'm not sure if we removed them or
8 Publix removed them.
9     Q.    Okay.
10    A.    We sampled some prescriptions, and we
11 received back data, I think, on 391 from Publix, and
12 then when we investigated, the nine missing were all
13 from one store, and we understand that that store,
14 what county it was in was in dispute, and maybe it
15 changed at some point in time.  And so I think that
16 explains why we have 391 instead of 400 --
17    Q.    Okay.
18    A.    -- for Publix.
19    Q.    In Paragraph 205, you say -- you write,
20 "For example, if 380 (or 95 percent) of the 400
21 prescriptions in an annual sample have inadequate
22 due diligence based on the Pharmacist Expert's

Page 147

1 review, than at a 95 percent confidence level, the
2 likelihood of inadequate due diligence (or failure
3 to document due diligence) on flagged prescriptions
4 is at least 92.36 percent."
5          Did I read that correctly?
6     A.    Yes.
7     Q.    Okay.
8          Why do you say that it was an annual
9 sample; is it your understanding that these notes
10 only came from a one-year period?
11    A.    No.  I think that that's just drafting.
12    Q.    You believe that's an error?
13    A.    I believe it's a drafting error.  Let me
14 just read it.  I don't think the word "annual"
15 belongs in there.
16          Yeah.  I think it's just the word
17 "annual."  I'm not sure.  There's a similar sentence
18 in another paragraph, and it's not there.  The word
19 "annual," I just think that it's -- I think it's a
20 drafting error that I didn't pick up.
21    Q.    So your understanding is that the
22 production of this data did span a period of time,

Page 148

1 it wasn't limited to a single year; correct?
2     A.    Oh, definitely.
3     Q.    Okay.
4     A.    Yes.  Yes.  No, we didn't get 400 or 391
5 prescriptions each year.  We got it for the entirety
6 of the period.
7     Q.    Okay.
8          You have had any -- have you had any
9 discussions with anyone about the number of the 391
10 sample prescriptions that had -- whether they had
11 adequate or inadequate due diligence?
12    A.    No.
13    Q.    Okay.
14          You reference in Paragraph 205 a
15 pharmacist expert.
16          What does that mean to you,
17 "pharmacist expert"?
18    A.    Well, it's the subject matter expert
19 being proffered by the Plaintiff in this case.
20    Q.    In this instance, do you believe that to
21 be Mr. Catizone?
22    A.    That's my understanding.

Page 149

1     Q.    Okay.
2          MR. LEEDER:  Do you mind if we take
3 quick break?  Okay.
4          THE VIDEOGRAPHER:  Please stand by.
5          We are now off the record.  The time
6 is 1:48 p.m.
7 (RECESS, 1:48 p.m. - 1:55 p.m.)
8          THE VIDEOGRAPHER:  We are now on the
9 record.  The time is 1:55 p.m.
10 (McCann Exhibit 8, 5.13.2024, McCann invoice, CT8,
11 was marked for identification.)
12 BY MR. LEEDER:
13    Q.    Dr. McCann, thanks for your patience.
14 I'm going to show you what I have marked as
15 Exhibit 8.
16    A.    Thank you.
17    Q.    This is a copy of your invoices for
18 professional services for the Track 8 case; is that
19 right?
20    A.    Yes.
21    Q.    Okay.
22          Does this reflect all of the work

38 (Pages 146 - 149)

Page 150

1  that was done specific for the preparation and
2  drafting of the Track 8 report?
3     A.    Excuse me.
4           Yes.
5     Q.    Okay.  I'll excuse you.
6           Other than the amounts reflected in
7  this report, how much has your firm made for the
8  work that you've done in the opioid MDL generally?
9     A.    I don't know.
10    Q.    This is -- this two-page document is the
11  sum total of your invoices?
12    A.    Yes.
13    Q.    Okay.
14    A.    For this case, yes.
15    Q.    Okay.
16          All right.  I just want to close the
17  loop on one more issue.
18          I've touched on some of these
19  previously, and I don't mean to belabor the point,
20  but I want to make sure I covered them all.
21          I want to confirm that you are not
22  an expert generally in opioids; correct?

Page 151

1     A.    Correct.
2     Q.    Pharmacy practice?
3     A.    Correct.
4     Q.    Distribution of opioids?
5     A.    Correct.
6     Q.    Dispensing of controlled substances?
7     A.    Correct.
8     Q.    The applicable laws and regulations
9  relating to the distribution of controlled
10 substances?
11    A.    Correct.
12    Q.    Diversion of controlled substances?
13    A.    Correct.
14    Q.    Drug abuse or addiction?
15    A.    Correct.
16    Q.    Suspicious order monitoring?
17    A.    Correct.
18    Q.    What -- and you are also not an expert
19 in what the Federal or Georgia authorities consider
20 a red flag in the context of an opioid prescription?
21    A.    Correct.
22    Q.    Okay.

Page 152

1           MR. LEEDER:  I believe that I am
2  done for the day, but we have a little bit of time
3  left, and I'm going to give it to my co-counsel.
4           So thank you for your time.
5           THE WITNESS:  Thank you.
6           MR. TORRES:  Let's go off.
7           THE VIDEOGRAPHER:  We're now off the
8  record.  The time is 1:57 p.m.
9  (RECESS, 1:57 p.m. - 2:04 p.m.)
10          THE VIDEOGRAPHER:  We're now on the
11 record.  The time is 2:04 p.m.
12          MR. TORRES:  Thank you.
13          RE-EXAMINATION
14 BY MR. TORRES:
15    Q.    Christopher Torres again for Albertsons.
16          Dr. McCann, did Joseph Rannazzisi
17 provide any facts, data or information to you or
18 your team in connection with the preparation of your
19 expert report in the CT9 matter?
20    A.    I'm not sure.  He may have asked us to
21 produce particular reports which we included in the
22 appendices, but I don't know that for a fact.

Page 153

1     Q.    Is this something that you just don't
2  remember; is that what you're saying to me?
3     A.    Well, in some cases, he's asked us to --
4  through counsel, primarily, I think, to produce some
5  summaries of activity at particular pharmacies --
6     Q.    Mm-hmm.
7     A.    -- and sometimes of particular drugs.
8  And I believe we produced similar exhibits in this
9  case.  I don't know whether they came as a -- that
10 they were produced as a result of our request for
11 Mr. Rannazzisi or not.
12    Q.    Do you know what particular drugs he
13 asked you to consider in connection with your report
14 in the CT9 matter?
15    A.    Well, we considered all 14 drugs, but he
16 asked -- he may have asked for some summaries of
17 shipments, or -- yeah, shipments of a particular
18 drug and drug strength, I just don't -- I don't
19 recall.
20          I recall seeing such exhibits, and
21 I'm not even sure as I sit here whether it was CT8
22 or CT9 where I saw them, or both, and they look like

39 (Pages 150 - 153)

Page 154

1 exhibits that Mr. Rannazzisi had requested before
2 through counsel, and so he may have requested them
3 here as well, I just don't know.
4    Q.   Okay.
5         Going back to the red-flag
6 computations in Section X of your expert report, our
7 Exhibit Number 1, I just have a couple of quick
8 questions on that.  Page 94, if you want to go to
9 it.
10   A.   Yes.
11   Q.   You did not offer any opinions on the
12 effectiveness of the red-flag algorithms in your
13 report to test the question of whether there was
14 adequate supervision of orders; is that right?
15   A.   I'm sorry.  94, now we're talking about
16 the dispensing red flags?
17   Q.   Yes.
18   A.   I'm sorry.  Did you mean to connect that
19 with the shipments, the orders from pharmacies?
20   Q.   No.
21        All I'm asking is whether you're
22 offering any opinion on the effectiveness of the

Page 155

1 red-flag algorithms in your report to test the
2 question of whether there was adequate supervision
3 of orders.
4    A.   Well, it's the "orders" term that I'm
5 getting confused by.
6         Do you mean adequate supervision of
7 prescriptions being filled?
8    Q.   Yes.
9    A.   Yes.  Yes.
10        No, I did not.
11   Q.   Okay.  Yes, you mean no?
12   A.   Ah...
13   Q.   I'll ask the question one more time --
14   A.   All right.
15   Q.   -- just so we can have it clear for the
16 record.
17        You did not offer any opinions on
18 the effectiveness of red-flag algorithms in your
19 report to test the question of whether there was
20 adequate supervision of dispensing; is that right?
21   A.   Correct.
22   Q.   Okay.

Page 156

1         You are not offering any opinions on
2 whether the red-flag analyses in your report can
3 detect suspicious dispensing transactions; is that
4 right?
5    A.   Correct.
6    Q.   Okay.
7         Did anyone tell you whether there
8 were any Texas laws or regulations regarding red
9 flags for Texas pharmacists?
10   A.   No.
11   Q.   In report Section XI on page 99 --
12   A.   Yes.
13   Q.   -- you describe 400 selected sample
14 prescriptions.
15        Did you perform any analysis to
16 determine whether a sample size of 400 prescriptions
17 is large enough to be adequately representative of
18 the population of flagged opioid prescriptions?
19   A.   Yes.
20   Q.   What was that analysis?
21   A.   Oh, I forget the precise details, but
22 back early on, there was a fair bit of back and

Page 157

1 forth with Special Master Cohen through the lawyers
2 about how large a sample was required.  And the way
3 a lawyer might pose that question would be how large
4 does a random sample have to be to be statistically
5 reliable?
6         That's not the way a statistician
7 thinks of the issue, because the correct way, I
8 think, to frame the question is:  How large a margin
9 of error is there around your point estimate for
10 different sample sizes?  And roughly speaking, a
11 sample size of 400 will have half the error --
12 standard error as the sample of 100.  It roughly
13 declines with the square root of the size.
14        And so, in some contexts, you might
15 need to have the uncertainty around a point estimate
16 down almost to zero, in which case, you would want a
17 really big sample, but in some cases, a range of
18 uncertainty maybe at the 95 percent confidence level
19 of plus or minus 10 percent would be adequate, or
20 plus or minus 5 percent would be adequate.
21        So what we did was we provided to
22 the Court, through counsel, that range, 95 percent

1 range of uncertainty around a point estimate for
2 different sample sizes, 100, 200, 400, 800, 1600.
3 And so that's just sort of arithmetic.
4          And the Court and the attorneys
5 agreed on a sample size of 400. So we provided kind
6 of the trade-offs, and someone else made the
7 judgment about how large the sample size was
8 adequate.
9          And then applying the same basic
10 methodology, we report on what the range of
11 uncertainty is at the 95 percent confidence level
12 around point estimates for a sample size of 400, and
13 that's what ends up in the appendix or in the --
14 yeah, in the appendix, but that same basic
15 information was provided to the Court at different
16 sample sizes, 100, 200, 800, 1600, and the Court
17 chose 400.
18     Q.    Did you have any involvement with the
19 sample selection?
20     A.    Yes. I believe we randomly selected
21 from the flagged prescriptions.
22     Q.    Okay.

1     A.    I'm sorry.
2          It's -- it may have been Special
3 Master Cohen who effectively chose because you've
4 got a random number generator that requires what
5 they call a seed, and I believe that seed was --
6 (Clarification requested by the Realtime
7 Stenographer.)
8     A.    Yes.
9          A value that kind of keys the
10 generation of the random numbers and, really,
11 anybody could have provided it. My daughter could
12 have provided it. It's just starting the random
13 number generation. I think that was provided by the
14 Court.
15          So we had some role, but we weren't
16 the sole entity involved.
17     Q.    Okay.
18          Can you turn, sir, to Table 7 of
19 your report, which is page 28.
20     A.    Yes.
21     Q.    Regarding the data in Table 7, did you
22 analyze MME per dosage unit by business activity --

1 by buy -- excuse me -- by buyer business activity?
2     A.    So that seems to be what's here.
3          What is it? Maybe I didn't
4 understand your question. Could you ask again,
5 please.
6     Q.    Absolutely.
7          Regarding the data in report
8 Table 7, did you analyze MME per dosage unit by
9 buyer business activity?
10     A.    No, but it seems trivial, right. The
11 two columns that you need are here, and you would
12 just divide the MME column by the Dosage Units
13 column for each buyer business activity.
14          We didn't do -- calculate that
15 ratio, but it seems like it's here.
16     Q.    Okay.
17 (McCann Exhibit 9, Table 7 - Transactions in ARCOS
18 Date - MME per Dosage Unit, was marked for
19 identification.)
20     Q.    I'm going to hand you what I have marked
21 as Exhibit 9, and this was a chart I created.
22     A.    Thank you.

1     Q.    I did exactly what you just suggested I
2 could do, which was divide MME by dosage units to
3 come up with an MME per dosage unit.
4          Did you ever advise Plaintiffs'
5 counsel in any cases to pursue any buyer businesses
6 with higher MMEs per dosage unit than the chain
7 pharmacies?
8     A.    I didn't advise the Plaintiffs to pursue
9 any buyer business activity one way or the other.
10     Q.    Have you ever had a conversation with
11 any other expert in this case regarding MME per
12 dosage units as -- in connection with the buyer
13 business activities?
14     A.    No.
15     Q.    Earlier, I think, with Mr. Leeder, when
16 you were talking, he asked whether a higher MME per
17 dosage unit would mean that the drugs were higher
18 strength.
19          Do you remember that?
20     A.    Yes.
21     Q.    Okay.
22          You believed that to be the case,

41 (Pages 158 - 161)

1 that a dosage unit with a higher MME is a higher

2 strength drug?

3    A.    Yes.  I am not expressing that as an

4 expert, a subject matter expert, but that's my

5 general understanding.  That's the context of these

6 calculations, I believe.

7    Q.    Okay.

8         Can we turn to your report, Table 13

9 on page 34.

10        Regarding the data in report

11 Table 13, did you analyze MME per dosage unit by

12 buyer business activity?

13    A.    No.

14 (McCann Exhibit 10, Table 13 - Transactions in

15 Tarrant County - MME per Dosage Unit, was marked for

16 identification.)

17    Q.    I'm going to hand you charts that I

18 created, Exhibit 10.

19    A.    Thank you.

20    Q.    Of course.

21        MS. POERSCHKE:  Is there a way you

22 can show those?

1        MR. TORRES:  Yes, I can.  I'll put

2 it here.  I have an extra copy.

3        Can you see that, Page?

4        MS. POERSCHKE:  Yes.  Thank you.

5        MR. TORRES:  Okay.  Of course.

6 BY MR. TORRES:

7    Q.    Dr. McCann, did you ever advise

8 Plaintiffs' counsel in the Tarrant County case to

9 pursue any buyer businesses with higher MMEs per

10 dosage units --

11    A.    No.

12    Q.    -- than the chain pharmacies?

13    A.    No.  I think you're not interpreting

14 this data correctly, but I guess the answer to your

15 question is no.

16    Q.    Okay.

17        Why am I misinterpreting these data?

18    A.    Well, look at Exhibit 10 that you've

19 just shown me.  The MLP-Ambulance Service column bar

20 is the ratio of, in Table 13, the MME, which is

21 2,951,440, divided by 300.  I guess that's how you

22 described your calculation.

1        Well, there aren't dosage units for

2 some opioids, or some formulations, so it could just

3 mean that that particular buyer business activity is

4 buying opioids that don't include dosage units.

5        And so you have a high MME, but it's

6 really an issue with the data.  The data doesn't

7 include a dosage unit number.

8        So both with your Exhibit 9 and

9 Exhibit 10, what you might be picking up here is

10 buyer business activities that are receiving a

11 particular formulation of opioids, not that they're

12 receiving higher strength opioids.

13    Q.    Did you perform any analysis by dividing

14 calculated base weight in grams by dosage units?

15    A.    I would have the same problem, has

16 exactly the same problem that I've just identified

17 for you with the MME, because the problem is the

18 missing dosage units for some of the formulations.

19    Q.    Including in calculated base weights in

20 grams?

21    A.    No.  The numerator in both of these

22 ratios, MME and calculated base weight in grams per

1 dosage unit, is available.

2        The problem is that the denominator,

3 the dosage units, is not available for some

4 formulations.

5        And so these very high bars that you

6 are showing, I believe, reflect not particularly

7 strong opioids, but that their formulations don't

8 include dosage units in the ARCOS data.

9    Q.    Is your Table 13 incomplete in any way?

10    A.    I don't think so.  You could have added

11 the column that you're suggesting now, this ratio.

12 I -- as I said, I don't think that that's right.

13        I haven't thought about it until you

14 raised it, and we're talking about it now, but

15 that's really what is driving these -- I believe,

16 I'd have to go back and look at it, but these much

17 higher bars that you have for three or four tiny

18 buyer business activities in Exhibit 9 and 10 are

19 coming from the fact that there aren't dosage units

20 in the shipments to those buyer business activities

21 in the ARCOS data, I believe.  I don't know that for

22 certain, but feel very strongly that that's the

Page 166

1 case.

2   Q.   Did you analyze why MME per dosage unit

3 for Tarrant County chain pharmacies was lower than

4 MME per dosage unit for national chain pharmacies?

5   A.   No.

6   Q.   Does the fact that MME per dosage unit

7 for Tarrant County chain pharmacies are lower than

8 MME per dosage unit for national chain pharmacies

9 cause you to rethink any of the opinions in your

10 report?

11   A.   No.

12   Q.   Did you compare Tarrant County's average

13 annual MME per capita against average annual MME per

14 capita for all other Texas counties?

15   A.   I don't recall that in the report, but

16 we do have some reports, and they may be in the

17 appendices, that show -- I think we called them

18 state reports, but I'm not 100 percent sure of that.

19       It's certainly available on our

20 website where you can see the MME per capita by

21 county within each state.  I feel pretty certain

22 that that is something that we have produced

Page 167

1 publicly, and I believe would be in the appendices

2 in -- that we submitted in this case.

3   Q.   Did you perform any analysis to assess

4 whether Tarrant County was an outlier relative to

5 other Texas counties in average annual MME per

6 capita?

7   A.   No.

8   Q.   Why not?

9       MS. POERSCHKE:  Can we get a time

10 check.

11       THE VIDEOGRAPHER:  3:28.  3 hours,

12 28 minutes.

13       MR. TORRES:  Okay.

14 (McCann Exhibit 14, Tables 18-71 - Summary of McCann

15 Algorithms - MME per Dosage Unit, was marked for

16 identification.)

17 BY MR. TORRES:

18   Q.   I'm going to hand you what I have marked

19 as Exhibit 14.

20       Dr. McCann, do you know -- did you

21 analyze MME per dosage unit for any of the

22 algorithms you computed in your report Tables 18

Page 168

1 through 71?

2   A.   I don't believe so.  Not that I recall.

3   Q.   Can you explain why MME per dosage unit

4 is higher for all nonflagged transactions than it is

5 for flagged transactions in your report Tables 18

6 through 53.

7   A.   Well, I don't know that that's the case,

8 but I haven't investigated it, if it is.

9   Q.   Is -- did you ever analyze that?

10   A.   What you said doesn't seem to be true,

11 so based on this demonstrative you've put in front

12 me, but in any case, I haven't done it.

13   Q.   You don't think it's true?

14   A.   Well, as I read this -- maybe I

15 misunderstood your question.

16       I thought you were saying that the

17 MME per dosage unit is high -- always higher for the

18 not-flagged than for the flagged.  And that's not

19 true.  Some of these methods have taller blue bars

20 than black bars.  Some of them have taller black

21 bars than blue bars.  I'm not -- if -- maybe I'm not

22 understanding this demonstrative, I have never seen

Page 169

1 it before, but it doesn't seem consistent with the

2 context of your question.

3   Q.   Well, let me re-ask the question because

4 I think something got lost in translation.

5       I asked:  Do you have any idea why

6 the MME per dosage unit is higher for all nonflagged

7 transactions than it is for flagged transactions in

8 your report Tables 18 through 53?  Those are the

9 distributor recurrent and distributor nonrecurrent

10 transactions.

11   A.   Oh, I see.

12       No.

13   Q.   Can you explain how a lower MME per

14 dosage unit for flagged transactions demonstrates

15 that those transactions are suspicious?

16   A.   I didn't identify them with the flagging

17 methods based on that, so it doesn't seem to be --

18   Q.   Is there --

19   A.   -- a question that addresses the

20 opinions that I gave or the calculations that I did.

21   Q.   Is there a statistical explanation for

22 the fact that MME per dosage unit is higher for all

43 (Pages 166 - 169)

Page 170

1  nonflagged transactions than it is for flagged
2  transactions in report Tables 18 through 53?
3      A.    I don't know.  There may be.  It's not
4  an observation that I had made before or thought
5  about.
6      Q.    Looking at the chain recurrent and chain
7  nonrecurrent in the chart, for the chain pharmacy
8  SOMS, those are the areas where I identified a few
9  in the red boxes that you correctly point out the
10  blue line is taller than the -- excuse me, the gray
11  line is taller than the blue line.
12          Can you explain why MME per dosage
13  unit is higher for nonflagged transactions than it
14  is for flagged transactions for 12 of the 18 chain
15  pharmacy SOMS methods in report Section VIII?
16      A.    No.  Well, not as I sit here, anyway.
17  It's not an observation that I made before I ever
18  thought of it.
19      Q.    Okay.
20          It's not something that you
21  analyzed?
22      A.    Correct.

Page 171

1      Q.    Okay.
2          MR. TORRES:  I think our time is up.
3          MS. POERSCHKE:  And I think -- go
4  ahead.
5          MR. TORRES:  I think we're done
6  here, Page.  I want to be respectful of the time
7  that we agreed to.
8          MS. POERSCHKE:  Thanks.
9          THE VIDEOGRAPHER:  All right.
10  Please stand by.
11          We are off the record at 2:26 p.m.,
12  and this concludes today's testimony given by Craig
13  McCann.
14  (CONCLUDED, 2:26 p.m.)
15
16
17
18
19
20
21
22

Page 172

1          CERTIFICATE OF COURT REPORTER
2      I, Marjorie Peters, Fellow of the Academy of
3  Reporting, Registered Merit Reporter, Certified
4  Realtime Reporter, Realtime Systems Administrator,
5  and Notary Public in the District of Columbia,
6  before whom the foregoing deposition was taken, do
7  hereby certify that the witness was placed under
8  oath according to the law; that the foregoing
9  transcript is a true and correct record of the
10  testimony given; that said testimony was taken by me
11  stenographically and thereafter reduced to
12  typewriting under my direction, and that I am
13  neither counsel for, related to, nor employed by any
14  of the parties to this case and have no interest,
15  financial or otherwise, in its outcome.
16      I further certify that signature was
17  not waived by the witness.
18      IN WITNESS WHEREOF, I have hereunto set my
19                                  2024.
20
21
    Marjorie Peters, FAPR, RMR, CRR, RSA
22  My commission expires October 31, 2024.

Page 173

1              Veritext Legal Solutions
                  1100 Superior Ave
2                    Suite 1820
                  Cleveland, Ohio 44114
3                Phone: 216-523-1313
4  May 30th, 2024
5  To: Sadie Turner
6  Case Name: National Prescription Opiate Litigation - Track 8 (Cobb
   County) v. Purdue Pharma, L.P. Et Al
7
   Veritext Reference Number: 6693023
8
   Witness:  Craig McCann , PhD      Deposition Date:  5/15/2024
9
   Dear Sir/Madam:
10
   Enclosed please find a deposition transcript.  Please have the witness
11
   review the transcript and note any changes or corrections on the
12
   included errata sheet, indicating the page, line number, change, and
13
   the reason for the change.  Have the witness' signature notarized and
14
   forward the completed page(s) back to us at the Production address
15  shown
16  above, or email to production-midwest@veritext.com.
17  If the errata is not returned within thirty days of your receipt of
18  this letter, the reading and signing will be deemed waived.
19  Sincerely,
20  Production Department
21
22  NO NOTARY REQUIRED IN CA

44 (Pages 170 - 173)

Page 174

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 6693023
 3        CASE NAME: National Prescription Opiate Litigation - Track 8
       (Cobb County) v. Purdue Pharma, L.P. Et Al
          DATE OF DEPOSITION: 5/15/2024
 4        WITNESS' NAME: Craig McCann, PhD
 5        In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
 6     my testimony or it has been read to me.
 7        I have made no changes to the testimony
       as transcribed by the court reporter.
 8
       _____
 9     Date         Craig McCann , PhD
10        Sworn to and subscribed before me, a
       Notary Public in and for the State and County,
11     the referenced witness did personally appear
       and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
          Statement; and
14        Their execution of this Statement is of
          their free act and deed.
15
          I have affixed my name and official seal
16
       this _____ day of_____, 20____.
17
18        _____
          Notary Public
19
          _____
          Commission Expiration Date
20
21
22
23
24
25
```

Page 176

```
 1        ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
 2        ASSIGNMENT NO: 6693023
 3     PAGE/LINE(S) /      CHANGE      /REASON
 4     _____
 5     _____
 6     _____
 7     _____
 8     _____
 9     _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     Date         Craig McCann , PhD
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23
          _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

Page 175

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 6693023
 3        CASE NAME: National Prescription Opiate Litigation - Track 8
       (Cobb County) v. Purdue Pharma, L.P. Et Al
          DATE OF DEPOSITION: 5/15/2024
 4        WITNESS' NAME: Craig McCann, PhD
 5        In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
 6     my testimony or it has been read to me.
 7        I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
 8     well as the reason(s) for the change(s).
 9        I request that these changes be entered
       as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11     as this Certificate, and request and authorize
       that both be appended to the transcript of my
12     testimony and be incorporated therein.
13
       Date         Craig McCann , PhD
14
          Sworn to and subscribed before me, a
15     Notary Public in and for the State and County,
       the referenced witness did personally appear
16     and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22     this _____ day of_____, 20____.
23
          _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

Veritext Legal Solutions