# EXHIBIT 34

Page 1

```
 1        UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF OHIO
 2              EASTERN DIVISION
 3    IN RE: NATIONAL          :
      PRESCRIPTION OPIATE      :
 4    LITIGATION,              :
                               :
 5    This document relates to: :
      Track 8: Cobb County,    :
 6    Georgia                  :
      Case No. 1:18-op-45817   :
 7                             :
      COBB COUNTY,             :
 8         Plaintiff,          :
                               :
 9         v.                  :
                               :
10    PURDUE PHARMA, L.P., et  :
      al.,                     :
11         Defendant.          :
      ------------------------ :
12
13
14        VIDEOTAPE DEPOSITION OF:
15         KATHERINE KEYES, Ph.D.
16          NEW YORK, NEW YORK
17         TUESDAY, MAY 14, 2024
18
19
20
21
22
23    REPORTED BY:
      SILVIA P. WAGE, CCR, CRR, RPR
24    JOB NO. 6692778
```

Page 2

1
2

MAY 14, 2024

9:11 a.m.

3
4
5 Videotape deposition of KATHERINE
6 KEYES, held at the offices of LIEFF
7 CABRASER HEIMANN & BERNSTEIN, 250
8 Hudson Street, 8th Floor, New York, New
9 York, pursuant to agreement before
10 SILVIA P. WAGE, a Certified Shorthand
11 Reporter, Certified Realtime Reporter,
12 Registered Professional Reporter, and
13 Notary Public for the States of New
14 Jersey, New York and Pennsylvania.
15
16
17
18
19
20
21
22
23
24

Page 3

1 A P P E A R A N C E S :
2
3 LIEFF CABRASER HEIMANN & BERNSTEIN
  Attorneys for Plaintiffs
   250 Hudson Street 8th Floor
4 New York, New York
   (212) 355-9500
  Pdoamaral@lchb.com
  Bcibulke@lchb.com
6 BY: PAULINA do AMARAL, ESQ.
   BY: BRITT CIBULKE, ESQ. (VIA ZOOM)
7
8 LANIER LAW FIRM
   Attorneys for Plaintiffs
9 535 Madison Avenue
   New York, New York 10022
10 (212) 421-2800
   Evan.Janush@LanierLawFirm.com
11 Leila.ayachi@LanierLawFirm.com
   BY: EVAN JANUSH, ESQ.
12 BY: LEILA AYACHI, ESQ.
13
   BARNES THORNBURG LLP
14 Attorneys for Publix Supermarkets
   One North Wacker Drive #4400
15 Chicago, Illinois 60606
   (312) 357-1313
16 Wessig@btlaw.com
   Meredith.white@btlaw.com
17 Mcharchalis@btlaw.com
   Kkapke@btlaw.com
18 BY: WILLIAM ESSIG, ESQ.
   BY: MEREDITH WHITE, ESQ. (VIA ZOOM)
19 BY: MITCHELL CHARCHALIS (VIA ZOOM)
   BY: KARA KAPKE, ESQ. (VIA ZOOM)
20
21 GREENBERG TRAURIG
   Attorneys for Albertsons
22 90 South Seventh Street, Suite 3500,
   Minneapolis, Minnesota 55402
23 (612) 259-9700
   Tom.pack@gtlaw.com
24 BY: TOM PACK, ESQ.

Page 4

1 A P P E A R A N C E S (C O N T.):
2
3 SIMMONS HANLY CONROY LAW FIRM
   Attorneys for Cobb County
   112 Madison Avenue, 7th Floor
4 New York, New York 10016
   (212) 257-8482
5 Ssmokler@simmonsfirm.com
   Jpollock@simmonsfirm.com
6 BY: SANFORD SMOKLER, ESQ. (VIA ZOOM)
   BY: JO ANNA POLLACK, ESQ. (VIA ZOOM)
7
8
9 A L S O P R E S E N T :
10
   COREY WAINAINA, VIDEOGRAPHER
11
12 SADIE TURNER, INTERN (VIA ZOOM)
   LANIER
13
14 SOPHIA PRITCHETT, LAW CLERK (VIA ZOOM)
   SIMONS HANLY CONROY
15
16 BILL HAMMOND (VIA ZOOM)
17
18
19
20
21
22
23
24

Page 5

1 I N D E X
2 PAGE
  WITNESS: KATHERINE KEYES, Ph.D.
3
  EXAMINATION BY MR. ESSIG          9
4 EXAMINATION BY MR. PACK         153
  EXAMINATION BY MR. ESSIG        228
5
6 E X H I B I T S
7 NO.    DESCRIPTION      PAGE
8 Exhibit Keyes 1 Expert Report of  11
           Katherine Keyes,
9          Ph.D., January 24,
           2024
10 Exhibit Keyes 2  five pages of     24
           invoices produced
11          by Dr. Keyes in
           the Cobb County
12          matter
   Exhibit Keyes 2A six additional   53
13          pages of invoices
           produced by Dr.
14          Keyes in the Cobb
           County matter
15          delivered during
           the deposition
16 Exhibit Keyes 3A printout out of   49
           large spreadsheet
17          Figure 7 & 14
   Exhibit Keyes 3B printout of chart 50
18          for Figure 9 &
           Table 1
19 Exhibit Keyes 3C printout of a     50
           spreadsheet for
20          Figure 11 & Table 2
   Exhibit Keyes 3D printout of a     51
21          spreadsheet for
           Figure 13
22 Exhibit Keyes 4 Expert Report of  154
           Katherine Keyes
23          April 15, 2024
24

2 (Pages 2 - 5)

Page 6

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit Keyes 5 | Dr. Katherine Keyes Supplemental Materials Considered | 159 |
| Exhibit Keyes 6 | three pages of invoices produced by Dr. Keyes in the Tarrant matter | 163 |
| Exhibit Keyes 7 | article entitled, "The Changing Face of Heroin Use in the United States a Retrospective Analysis of the Past 50 Years," authored by Cicero, et al. | 195 |
| Exhibit Keyes 8 | article entitled, "Predicting first use of heroin from prescription opioid use subtypes: Insights from the monitoring the future longitudinal Panel," authored by Dash, et al. | 232 |
| Exhibit Keyes 9 | article entitled, "Concordance between controlled substance receipt and post-mortem toxicology in opioid-detected overdose deaths: A statewide analysis," authored by Howell, et al. | 239 |

Page 7

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
Page Line

Request for Production of Documents
Page Line

43  13

45  4

Stipulations
Page Line

Question Marked
Page Line

Reservation
Page Line

Motion to Strike
Page Line

Page 8

1      THE VIDEOGRAPHER:  Good
2  morning, everyone.  We are going
3  on the record at 9:11 a.m. Eastern
4  time on Tuesday, May 14, 2024.
5      Please note that the
6  microphones are sensitive and may
7  pick up whispering and private
8  conversations.  Please mute your
9  phones at this time.
10      This is Media Unit of the
11  video recorded deposition of
12  Katherine Keyes in the matter of
13  In Re:  National Prescription
14  Opiate Litigation.  This was
15  filed in the United States District
16  Court, Northern District of Ohio,
17  Eastern Division.  The Case
18  Number is 1:18-OP-45817.
19      My name is Corey Wainaina
20  representing Veritext Legal
21  Solutions and I am the Videographer.
22      The Court Reporter is
23  Silvia P. Wage, also, from the
24  firm Veritext Legal Solutions.

Page 9

1      I am not authorized to
2  administer an oath.  I am not
3  related to any party in this
4  action.  Nor am I financially
5  interested in the outcome.
6      Please be aware that all
7  appearances and affiliations will
8  be noted on the stenographic record.
9      And will the Court Reporter
10  please swear in the witness.
11      THE STENOGRAPHER:  Doctor,
12  can you raise your right hand.
13  KATHERINE KEYES, Ph.D.,
14    Columbia University, 722 West 168th
15    Street, New York, New York  10032,
16    after having been duly sworn, was
17    examined and testified as follows:
18      THE STENOGRAPHER:  Thank you.
19      You may proceed.
20  EXAMINATION BY MR. ESSIG:
21    Q.    Can you state your name
22  please.
23    A.    Katherine Keyes.
24    Q.    And what is your professional

3 (Pages 6 - 9)

1 title?
2     A.   I am a Professor of
3 epidemiology at the Mailman School of
4 Public Health at Columbia University.
5     Q.   Alright.  Professor Keyes,
6 you understand you're here today to give
7 your deposition with regard to your
8 opinions in the opioid litigation,
9 particularly, in Track 8 and Track 9 in
10 the MDL?  Do you understand that?
11     A.   Yes.
12     Q.   Okay.  And you've given
13 several depositions before in the opioid
14 litigation; is that right?
15     A.   Yes.
16     Q.   And testified at trials?
17     A.   Yes.
18     Q.   Okay.  And because we have a
19 limited amount of time today, I'm going
20 to try to stick to what's new, to the
21 extent possible, which will be related to
22 Cobb County.  In fact, I'm mostly going
23 to be asking you questions about your
24 report for Track 8 related to Cobb

1 County, Georgia, which we've marked for
2 identification as Keyes 1.
3     I'm going to hand you a copy of
4 that.
5         (Deposition Exhibit Keyes 1,
6         Expert Report of Katherine Keyes,
7         Ph.D., January 24, 2024, was
8         marked for identification.)
9         MR. ESSIG:  Does anybody
10     else want a hardcopy?
11         MS. do AMARAL:  Thank you.
12         MR. ESSIG:  I have an extra.
13     Q.   And then after I finish my
14 initial questions, Counsel for Albertsons
15 Mr. Pack, will be asking you questions
16 related to your Track 9 report and then I
17 may have some follow-up questions; is
18 that okay?
19     A.   Yes.
20     Q.   And I understand that you
21 probably know all the ground rules for a
22 deposition, so I'm not going to go over
23 everything.
24     But if for any reason you don't

1 understand a question that I ask today,
2 either cause I'm moving too fast or it
3 just didn't make sense, please let me
4 know and I'll try to rephrase it or ask
5 it differently; is that fair?
6     A.   Fair.
7     Q.   And then, otherwise, if I ask
8 a question and you're able to give me
9 answer, we'll assume you felt you
10 understood the question enough to provide
11 an answer; is that fair?
12     A.   Okay.
13     Q.   Okay, great.  Thank you.
14     Now, you've previously been asked
15 questions in depositions and at trials in
16 opioid litigation.
17     And I want to confirm today so that
18 we can save some time that other than
19 maybe corrections that you made in an
20 errata sheet to a deposition, do you
21 otherwise stand behind the testimony that
22 you've previously given in the opioid
23 litigation?
24         MS. do AMARAL:  Objection.

1     Go ahead.
2     A.   Yes.
3     Q.   Okay.  And all of your expert
4 work in the opioid lawsuits have been on
5 behalf of the governmental entities that
6 are Plaintiffs seeking to recover money
7 from various entities involved in the
8 opioid supply chain; is that right?
9     A.   That's consistent with my
10 understanding.  I -- I produced the
11 expert report, yes.
12     Q.   Okay.  On Page 2 of your
13 report, you state you produced expert
14 reports and provided testimony in opioid
15 litigations as since 2018; is that
16 correct?
17     A.   Yes.
18     Q.   What percentage of your
19 overall professional time, meaning,
20 inclusive of your work at Columbia,
21 anything else that you do professionally,
22 since you began working on the opioid
23 litigation since 2018 has been spent on
24 opioid litigation-related work?

Page 14

1    A.    Within a calendar year or...
2    Q.    Can you give me a broader
3  percentage since 2018?  Is it 5 percent,
4  20 percent?
5    A.    It would really depend,
6  because throughout the year there is long
7  stretches of time where I'm not doing
8  expert work.  There are stretches of
9  times -- you know, if there's a trial, I
10  might be spending more time.
11    So it would be difficult to give a
12  precise percentage.  And it's will
13  changed from year to year.  So there are
14  some years where I would say it's -- my
15  percentage of time would be relatively
16  low.
17    It's hard.  It would be hard to
18  give a precise percentage.
19    Q.    When was the last time you
20  gave a deposition in the opioid
21  litigation?
22    A.    I'm not sure.
23    Q.    When was the last time you
24  testified at trial in the opioid

Page 15

1  litigation?
2    A.    I think the last trial I
3  testified in was in New Mexico in October
4  of 2022, but I would need to double-check
5  that.
6    Q.    Have you been paid by any
7  nongovernmental entities or -- meaning --
8  or not by plaintiff's attorneys either,
9  but physicians groups or patient
10  associations, et cetera, for any work
11  that you've done for the work that you've
12  done over the years related to opioids?
13    A.    Not that I can recall at this
14  time.
15    Q.    Is this your first expert
16  report in your years of working in the
17  opioid litigation where you've offered
18  opinions in the case brought against my
19  client Publix?
20    A.    I'm not -- I'm not 100 percent
21  sure, but you probably have a better
22  understanding than me of that.
23    Throughout the years there have
24  been quite a few defendants that have

Page 16

1  come in and out of various cases.  So I'm
2  not sure.
3    Q.    Okay.  So, as you sit here
4  today, do you have any recollection of
5  ever having testified in a case in the
6  opioid litigation involving Publix?
7    A.    I don't.
8    Q.    Have you ever shopped at a
9  Publix?
10    A.    Yes.
11    Q.    And where, when, how many
12  times?
13    A.    Well, mostly, in Florida.  I
14  don't know that we -- I don't recall any
15  Publix's in New York.  And I've been to
16  Florida several times over the past few
17  years.  I would say I've shopped in
18  Publix, I don't know, 20 times, 30 times.
19    Q.    Have you ever obtained a
20  prescription at a Publix pharmacy?
21    A.    No.
22    Q.    And do you agree that you're
23  not going about be offering any testimony
24  in the trial of this case involving any

Page 17

1  of your personal experiences with Publix?
2    A.    No personal experiences with
3  Publix.  No, I don't plan to.
4    Q.    And similarly or separately
5  -- let me start again.
6    Do you agree that you're not going
7  to be offering any opinions at the trial
8  of this case with regard to specific
9  actions or inactions by Publix or its
10  employees with regard to prescription
11  opioids?
12    A.    I would say that my report
13  provides an overview of pharmacy
14  dispensing and its association with
15  various opioid-related outcomes.  So, to
16  the extent that Publix contributed to
17  those data that I'm reporting on, then I
18  would say that I am testifying about
19  Publix' actions or inactions.
20    Q.    Alright.  Let me try it a
21  different way.
22    You have not reviewed any documents
23  produced by Publix in the opioid
24  litigation in this case in Track 8; is

5 (Pages 14 - 17)

Page 18

1  that correct?
2     A.   I have not reviewed documents
3  produced by Publix.  However, I have
4  reviewed data in which Publix is included
5  in the datasets.
6     Q.   And that would be what kind
7  of "data"?
8     A.   Prescription data in the
9  various databases that I've reviewed and
10  the studies that I've reviewed.
11     Q.   Okay.  And we'll get to that
12  in a minute.
13     But with regard to any actions by
14  any specific say pharmacist at a Publix,
15  other experts may cover those issues, but
16  that's not part of your opinions in this
17  case, correct?
18     A.   I do not have opinions about
19  any specific pharmacists, but I -- my
20  report dots cover the collective
21  dispensing of pharmacists in Publix.
22     Q.   Okay.  And do you know if
23  your report is word searched, the word
24  "Publix" does not appear once?

Page 19

1     A.   That's correct.
2     Q.   The word "opioid" appears 700
3  -- 1736 times.
4     Do you know that?
5     A.   I take your word for it.
6     Q.   Alright.  So let's go to the
7  Track 8 report that you have in front of
8  you.
9     You issued this report on
10  January 24th of 2024; is that right?
11     A.   Yes.
12     Q.   And who -- when were you first
13  contacted to work in the Cobb County case?
14     A.   I don't recall the specific
15  date that I was contacted for CT9.
16     Q.   Okay.  Your invoices -- and
17  we'll get to them in a minute -- show
18  that the first work that you billed for
19  for the Cobb County case was on
20  December 3rd of 2022.
21     Does that seem about right to you?
22     A.   I -- I -- if that's what my
23  invoices reflect, I believe what is on my
24  invoices.

Page 20

1     Q.   Do you recall who first
2  contacted you to work on the Cobb County
3  case?
4     A.   I don't.
5     Q.   And the report that you have
6  in front of you, Keyes Exhibit 1, did you
7  draft that report yourself?
8     A.   Yes.
9     Q.   Did you have any assistance
10  from anyone in preparing the report?
11     A.   Yes.
12     Q.   Who assisted you?
13     A.   Caroline Rutherford.
14     Q.   Who is Caroline Rutherford?
15     A.   She is a data analyst with a
16  Master's degree in data science from
17  Columbia and has worked with me on this
18  -- on these reports for six years.
19     Q.   Does Ms. Rutherford work for
20  you in nonopioid litigation context as
21  well?
22     A.   Yes.
23     Q.   How did you select Ms.
24  Rutherford to be the person to assist you

Page 21

1  for your report in this case?
2     A.   He have worked together for
3  many years at Columbia and she is a very
4  skilled data analyst and so it was a
5  natural fit for the work that I needed
6  help with.
7     Q.   And what kinds of work does
8  she do in helping to prepare the report
9  that you did in this case?
10     A.   She analyzes data and helps
11  me with the figures and charts that are
12  in the report.  She, also, does other
13  research assistant work helping manage
14  references and helping with other kind of
15  logistical aspects of the report.
16     Q.   Is it fair to say that your
17  main generic report, which is the first
18  part of your report in the case, is based
19  largely on your prior Track 7 report with
20  some edits and additions for Track 8?
21     MS. do AMARAL:  Objection,
22     vague.
23     A.   I would say that there's
24  substantial overlap of this report with

Page 22

1    prior reports. But I'm always trying to
2    stay updated with the literature. So
3    there are some -- there are some new
4    science that I've added.
5        Q.   And to try to make it a
6    little easier to handle today, I stapled
7    the first part of the report that
8    contains the report and your Schedule A
9    on Cobb County and then the references
10   and everything else is kind of to the
11   side.
12       I think you've done that already,
13   okay?
14       A.   Yes.
15       Q.   Okay. So -- and, obviously,
16   your Schedule A on Cobb County, that's
17   different from the Schedule A in the
18   Track 7 report about counties in Ohio,
19   right?
20       A.   Yes.
21       Q.   With information about Cobb
22   County, Georgia?
23       A.   Yes.
24       Q.   Are all have of the opinions

Page 23

1    that you intend to offer at the trial of
2    this case contained in your report there
3    in Exhibit A inclusive of Schedule A on
4    Cobb County?
5        A.   Yes, the opinions I currently
6    plan to offer are in the report.
7        Q.   And do you have any current
8    plans to change or update any of the
9    content of your report?
10       A.   Not currently.
11       Q.   Do you recall offhand how
12   many hours you've billed for your work on
13   the Track 8 litigation?
14       A.   It's been a more prolonged
15   period of time. So I'm not sure. I'm
16   sure it's on the invoices.
17       Q.   How much are you charging per
18   hour for your work on this case?
19       A.   Seven hundred dollars.
20       Q.   And that's per hour for any
21   activity, any kind of work you do for the
22   case?
23       A.   Yes.
24       Q.   Including your time spent in

Page 24

1    deposition here?
2        A.   Yes.
3        Q.   Alright. I'm going to hand
4    you what we've marked for identification
5    as Exhibit 2 to your deposition.
6            (Deposition Exhibit Keyes 2,
7        five pages of invoices produced by
8        Dr. Keyes in the Cobb County matter,
9        was marked for identification.)
10       Q.   Can you tell us what Exhibit 2
11   is?
12       A.   These are invoices for CT8,
13   Case Track 8 for both myself and for
14   Caroline Rutherford.
15       Q.   And I'll state these invoices
16   were produced to us yesterday and we put
17   them together in an exhibit.
18       So this is the whole of the
19   invoices that currently exist with regard
20   to your work and Ms. Rutherford's work in
21   Track 8; is that right?
22       A.   I believe so. I haven't gone
23   back to verify it. But if this is what's
24   been produced to you, I assume that it's

Page 25

1    accurate.
2        Q.   Okay. And the most recent
3    invoices here are for you. There is one
4    on the third page dated June 30th of 2023.
5        Do you see that?
6        A.   Yes.
7        Q.   Is that the most recent
8    invoice you've issued in this case?
9        A.   Again, I would have to
10   double-check to be sure but...
11       Q.   Do you have any un-invoiced
12   time, other than today's deposition that
13   you plan to be billing for?
14       A.   Other than time this month,
15   you know, it's monthly but...
16       Q.   What have you done this month
17   with regard to your work in the Track 8
18   litigation?
19       A.   Prepared for this deposition.
20       Q.   What did you do to prepare?
21       A.   I reviewed my report and the
22   materials in the report.
23       Q.   Did you meet with anyone in
24   preparation for the deposition today?

7 (Pages 22 - 25)

Page 26

1   A.   Yes.
2   Q.   Who did you meet with?
3   A.   I met with Paulina and the
4 other lawyers here.
5   Q.   And when was that?
6   A.   Yesterday and last Friday for
7 a couple hours each time.
8   Q.   So that's four more hours
9 you'll be billing for?
10   A.   Yes.  And then over the
11 weekend, I reviewed my report and
12 references and inputs by sheets just to
13 refresh my memory.
14   Q.   So the first invoice, first
15 page here of Exhibit 2, shows time from
16 December 3rd of 2022 and the purpose you
17 have is "report."
18   Do you see that?
19   A.   I do.
20   Q.   Okay.  When you write down
21 "report" on your invoice, what does that
22 mean?
23   A.   That means that I'm working
24 on the report, writing, updating,

Page 27

1 analyzing data.  I'm doing work for -- to
2 produce the materials in the report.
3   Q.   Okay.  So I took the time to
4 use my trusted calculator and try to add
5 up your time.
6   For your part of the invoices, the
7 first three pages here of Exhibit 2, and
8 my math shows that you billed to date
9 25 hours for a total of $16,150.
10   MS. do AMARAL:  Counsel, if
11 I may.  I think that there's an
12 invoice missing, which we will
13 provide to you at a break.
14   MR. ESSIG:  Okay.
15   MS. do AMARAL:  Okay.
16   MR. ESSIG:  Excellent.
17   Q.   So -- and at the beginning of
18 your work in Track 8, it looks like you
19 were billing $550 an hour; is that right
20 on the first page?
21   A.   That's probably correct, yes.
22   Q.   Okay.  And that was time in
23 2022.
24   And then on the second page, your

Page 28

1 next invoice from February of 2023, it
2 looks like you changed your fee at that
3 time to $700 an hour; is that right?
4   A.   That's what it looks to me as
5 well.
6   Q.   And why did you decide to
7 increase your hourly rate in 2023?
8   A.   At that point, I had had more
9 experience and I had, you know, been
10 working on the case for sometime at that
11 point and my understanding is that it's
12 standard for experts to adjust their
13 rates based on experience.
14   Q.   So, based on the three
15 invoices that were produced to us for
16 your time on Track 8, it looks like you
17 spent a total of 25 hours.  Twenty of
18 those hours are listed as "report" on the
19 invoices.  Four of them are listed as
20 "meeting."  And one is for "review
21 materials."
22   Does that seem about right to you?
23   A.   That seems, like, correct
24 based on what has been provided.  And if

Page 29

1 there's any updated materials, then I
2 would adjust my answer to reflect those
3 updated materials as well.
4   Q.   Okay.  And for the entries
5 that say, "meeting," none of those entries
6 reflect or record who you met with; is
7 that right?
8   A.   That's right.
9   Q.   As you sit here today, do you
10 have any recollection as to who you may
11 have met with for any of the four hours
12 of meeting time that you've invoiced to
13 date?
14   A.   Those meetings are listed in
15 the report and they are meetings I had
16 with people in Cobb County to better
17 understand the data that I was -- and the
18 opinions that I was producing in this
19 report to ensure that they reflected what
20 was going on in Cobb County.
21   Q.   And do you recall offhand who
22 those people in Cobb County were that you
23 met with?
24   A.   If I just -- to ensure that I

8 (Pages 26 - 29)

1  state it correctly, I would like to refer
2  to my report.
3      Is that acceptable?
4      Q.   Well, we'll get into the
5  folks in a minute.
6      But just without looking at your
7  report, do you remember who you met with
8  at Cobb County?
9      A.   There was Dr. Gulledge, Missy
10 Owens, several other folks as well.
11     Q.   In addition in Exhibit 2, the
12 last two pages are invoices for Caroline
13 Rutherford's time and she billed 11 and a
14 half hours in 2023 for her work on this
15 case at a rate of $200 an hour.
16     Does that sound about right to you?
17     A.   That sounds about right, yes.
18     Q.   So understanding that we
19 don't have all your invoices yet but that
20 you billed with your time and Ms.
21 Rutherford's time so far $18,450, okay,
22 if you do the math, and adding that to
23 your prior work in the opioid litigation,
24 do you -- can you give us a figure as to

1  how much you've billed to date for your
2  work in the opioid litigation?
3      A.   Across the entire six years?
4      Q.   Correct.
5      A.   I -- I think, it is somewhere
6  around $350,000, $400,000, somewhere in
7  that ballpark.
8      Q.   And I notice that the
9  invoices have the Columbia University
10 Mailman School of Public Health logo on
11 the top, correct?
12     A.   Yes.
13     Q.   Where does the money go that
14 is remitted to you in the case?
15     A.   It goes to me.
16     Q.   Okay.  Did you have to get
17 any kind of approval from anyone at
18 Columbia to use a Columbia letterhead for
19 invoicing related to personal work that
20 you're doing in the opioid litigation?
21     A.   No.
22     Q.   Do you know if there's any
23 sort of guideline that Columbia has for
24 professors who are doing private work in

1  litigation?
2      A.   In terms of what letterhead
3  to use?
4      Q.   Or anything else with regards
5  to using their time professionally in
6  litigation.
7      A.   I don't use Columbia's time
8  professionally in litigation.
9      Q.   So, I guess, I'm confused.
10 You're a full-time professor at
11 Columbia, correct?
12     A.   Yes.
13     Q.   And you work for plaintiffs
14 firms in the opioid litigation on your
15 own time?
16     A.   Correct.
17     Q.   So then why do you use a
18 Columbia logo, as opposed to a Katherine
19 Keyes logo at the time of the invoice?
20     A.   It's just standard.  I have
21 always used the letterhead.  This is the
22 letterhead that I use.
23     Q.   Now, in your report here for
24 Track 8, you have two lists of references

1  for materials that you've cited that
2  you've reviewed.  The first one starts on
3  Page 57 and runs through Page 75.  And
4  then the second list starts at Page 25 of
5  Schedule A and runs through Page 33.
6      And then your Exhibit B also
7  contains a list of materials considered
8  that runs from Page 1 to 140 that
9  contains 2,562 references to articles and
10 other documents.
11     My question for you is, did you
12 prepare all of these lists?
13     A.   I prepare my CV and I reviewed
14 the materials considered list.  I didn't
15 directly assemble the materials considered
16 list, but I reviewed it.
17     Q.   Do you know who prepared the
18 lists then?
19     A.   I don't.
20     Q.   But they were provided to you
21 as part of your work in the litigation?
22     A.   Yes.  There's an ongoing
23 materials considered document that is
24 maintained that I review with each case.

9 (Pages 30 - 33)

1    Q.   And that's provided to you by
2  someone in the plaintiff's firms?
3    A.   Yes.
4    Q.   And then the list of
5  references that I talked about, not the
6  long Exhibit B, but the references inside
7  the report.
8    Do you prepare that list or does
9  someone else prepare the list for you?
10    A.   That I prepare.
11    Q.   Now, do these lists contain
12  everything that you've considered in
13  arriving at your opinions in this case?
14    MS. do AMARAL:  Objection,
15    vague.
16    Go ahead.
17    A.   Generally, yes.  I mean, I'm
18  a practicing epidemiologist.  So I'm
19  reviewing the literature all the time.
20  But the references in the report and the
21  materials considered list represent the,
22  I think, some of the key papers that I
23  relied on.  But I would just state that
24  in the course of my day-to-day work, I'm

1  always taking in additional information.
2    Q.   Okay.  And that reminds me.
3    So -- and we're going to go through
4  your Cobb County report in specifics very
5  soon.  And there is a lot of materials in
6  there that you reviewed and you cite and
7  rely upon in your report.
8    But you only billed one hour for
9  reviewing materials in this case so far.
10    How does that work?
11    A.   So that line item -- you
12  know, when I'm reviewing materials when
13  the invoice says, "report."  That, also,
14  includes reviewing additional materials.
15  But sometimes I spend time only on
16  reviewing materials and not on writing
17  the report itself.
18    So the materials that I reviewed
19  for this case are subsumed in the report
20  line item as well.
21    Q.   Did you make any notes as you
22  were reviewing these materials in your
23  work on the Track 8 report?
24    A.   No.

1    Q.   Why not?
2    A.   All of my work product is
3  reflected in the report.  You know, when
4  I'm reading a paper on my computer, I
5  don't make additional notes.
6    Q.   So you don't have a practice
7  of taking notes while you review
8  complicated epidemiological articles?
9    A.   No.
10    Q.   And Exhibit B to your report,
11  the 2,562 references, were these
12  materials all provided to you by Counsel
13  or did you obtain them independently?
14    A.   Both.
15    Q.   What kinds of materials did
16  you obtain on your own?
17    A.   Articles -- journal articles
18  from the peer reviewed literature, data
19  that is available to me, dashboard
20  material, for example, from the county,
21  publically available data sources.  That
22  would be the majority of what I obtained
23  on my own.
24    Q.   Okay.  Have you talked to any

1  other experts for Cobb County about this
2  case or your opinions?
3    A.   I don't believe so.
4    Q.   Have you performed any
5  academic research specific to Cobb County,
6  Georgia?
7    A.   My academic research includes
8  data that has included Cobb County.  So,
9  in that sense, I've done research that is
10  specific to Cobb County.
11    Q.   Okay.  I understand that you
12  do a lot of research that's national, and
13  national data may include Cobb County
14  data; is that fair?
15    A.   And state level data as well.
16    Q.   Fair enough.
17    A.   And, actually, I do a lot of
18  county level analyses so --
19    Q.   Okay.  Let me ask -- I didn't
20  mean to cut you off.
21    Let me ask it a different way.
22    Have you performed any academic
23  research where you were ever physically
24  present in Cobb County, Georgia?

10 (Pages 34 - 37)

1    A.    Have I performed academic
2 research well in Cobb County?
3    Q.    About Cobb County issues, yes.
4    A.    About Cobb County or -- I'm
5 sorry. I'm not understanding the
6 question.
7    Q.    Sure. Let me back up a
8 minute.
9    Do you know where Cobb County,
10 Georgia is?
11    A.    Yes.
12    Q.    Where is Cobb County, Georgia?
13    A.    What are you -- I'm not...
14    Q.    What part of the state is it
15 located in?
16    A.    It's in the Atlanta area.
17    Q.    Okay. And my question is,
18 putting aside litigation first, for your
19 academic research, have you ever
20 physically gone to Cobb County, Georgia
21 to do any kind of academic research
22 related to Cobb County, Georgia?
23    A.    I have been to Cobb County,
24 Georgia. I have presented academic

1 research in Cobb County, Georgia. That
2 academic research may have included data
3 that included Cobb County.
4    Q.    Have you authored or
5 co-authored peer reviewed or articles
6 specific to Cobb County that contains the
7 word "Cobb County" in the title or in the
8 body of the article?
9    A.    I would have to look through
10 my CV, because I do do research that is
11 county specific. So I'm not sure.
12    Q.    Okay. Other than the
13 meetings that you had with Counsel and
14 the reviewing of documents, did you do
15 anything else to prepare for your
16 deposition today?
17    A.    No.
18    Q.    And have you done any work on
19 the Cobb County case since issuing your
20 report there in 2023 -- sorry, 2024?
21    A.    No.
22    Q.    Okay. Who is Christopher
23 Gulledge?
24    A.    May I refer to my report, so

1 I get his title correct?
2    Q.    If you need to, you know.
3    You don't know who he is without
4 referring to the report?
5    A.    I don't remember his specific
6 title. But I know I put his title in the
7 report. I just don't want to misstate.
8    Q.    Okay. Sure.
9    A.    Okay. So, on Page 6 of the
10 county specific report, I state that he
11 is the Chief Medical Examiner in Cobb
12 County since 2015.
13    Q.    And who is Nick Adams or
14 Nicholas Adams?
15    A.    Also, on page 6 of the
16 report, I specify that he is Chief who is
17 involved in the provision of emergency
18 medical services in Cobb County.
19    Q.    Okay. And who is Melissa
20 Owen?
21    A.    Let me just find the page.
22    On Page 11, I state that she is the
23 Director of the Davis Direction
24 Foundation.

1    Q.    Okay. Do you recall that
2 these three individuals are the only
3 three individuals listed in your report
4 as people that you interviewed who work
5 in Cobb County?
6    A.    Yes.
7    Q.    Did you interview anyone else
8 in Cobb County for your work on this case?
9    A.    No.
10    Q.    Who arranged these interviews
11 for you?
12    A.    Typically, I have a number of
13 requests that I make of the Plaintiffs'
14 Counsel in terms of types of information
15 that I want to verify in the county with
16 county specific professionals. And so,
17 for example, I might say I really want to
18 talk to the Medical Examiner or, you
19 know, someone who is involved in the
20 records.
21    And so then the Plaintiffs' Counsel
22 will then identify who the Medical
23 Examiner is, for example. And that is
24 true for the other interviews as well.

Page 42

1    I, typically, say what category or,
2  you know, job of someone in the county
3  that I want to speak with and then they
4  will identify the appropriate person.
5    Q.   So, with regard to Christopher
6  Gulledge, when did you speak with him?
7    A.   I assume based on the --
8  based on the invoices that I spoke with
9  him probably in sometime between December
10  2022 and June 2023.
11    Q.   And was that on the telephone
12  or by Zoom or in person?
13    A.   I believe that it was by
14  telephone.
15    Q.   Was anyone else on the call
16  with you?
17    A.   Yes.
18    Q.   Who else was on the call?
19    A.   There was several Plaintiffs'
20  Counsel on the call as well and Ms.
21  Rutherford as well.
22    Q.   Okay.  And how long was the
23  call with Christopher Gulledge?
24    A.   I had several conversations

Page 43

1  with Christopher Gulledge and I would say
2  that they probably lasted 30 minutes to
3  an hour.
4    Q.   And did you take any notes
5  from those conversations?
6    A.   Yes.
7    Q.   Handwritten or on the
8  computer?
9    A.   Handwritten.
10    Q.   Where are those notes?
11    A.   I will -- I have them in my
12  notebook and I can produce them.
13    Q.   [REQUEST] I ask that you talk
14  to Counsel afterwards and if you can
15  produce those to us, we would appreciate
16  it.
17    And that goes for any of the
18  interviews that you conducted in --
19  related to Cobb County.
20    A.   Yes.
21    Q.   Okay.  And what did you,
22  generally, discuss with Mr. Gulledge or
23  Dr. Gulledge?
24    A.   I discussed the process of

Page 44

1  death investigations in Cobb County; how
2  suspected drug overdose is investigated;
3  how toxicology and autopsy are performed;
4  and how the death certificates are
5  produced.
6    Q.   Chief Adams, when did you
7  speak with him?
8    A.   In that same time frame
9  between December 2022 and January -- June
10  2023.
11    Q.   So somewhere during the
12  entirety of your work on the case; is
13  that fair to say?
14    A.   Uh-huh, yes.
15    Q.   And how long did you talk to
16  him?
17    A.   I believe, I, also, spoke
18  with him twice and those meetings, also,
19  would be between 30 minutes to an hour.
20    Q.   And was that with Plaintiffs'
21  Attorneys on the phone too?
22    A.   Yes.
23    Q.   And did you take notes?
24    A.   Yes, same.  I, typically, take

Page 45

1  notes during those meetings and in all
2  case the we produced those notes to
3  Counsel.
4    [REQUEST] So we will produce those.
5    Q.   Okay.  And then the last --
6  or the third person you interviewed was
7  Melissa Owen.
8    When did you speak with her?
9    A.   Same, in the time period
10  between December 2022 and June 2023.
11    Q.   Okay.  And that was with
12  Plaintiffs' Attorneys as well on the
13  telephone?
14    A.   It may have been Zoom.  It
15  was either Zoom or telephone.  I think it
16  was Zoom, actually.
17    Q.   And did you take notes from
18  that interview?
19    A.   Yes.
20    Q.   Did you speak with her once
21  or more than once?
22    A.   I believe I spoke with her
23  once.
24    Q.   And you've reviewed her

12 (Pages 42 - 45)

1  deposition in the case, correct?
2      A.  Yes.
3      Q.  Okay.  Do you recall that
4  when Melissa Owen was asked in her
5  August 2023 deposition in this case if
6  Cobb County has a heroin crises, she
7  testified, quote, "mostly, it's fentanyl
8  crisis right now"?
9      Do you agree with her?
10     A.  In my review of the data from
11 Cobb County, I would state that there are
12 several crises in Cobb County related to
13 drug overdose.  Certainly, synthetic
14 opioids including fentanyl are
15 contributing to death in Cobb County,
16 that there are a number of other opioid
17 products that continue to contribute to
18 death in Cobb County as well.
19     Q.  Were you, also, aware that
20 she testified in her deposition that most
21 of the people with drug problems in Cobb
22 County obtain their drugs in Fulton
23 County?
24     A.  I reviewed that in her

1  deposition.
2      Q.  Besides these three people in
3  Cobb County, did you speak to anyone
4  employed by any state governmental agency
5  in George, as part of your work on this
6  report?
7      A.  I don't believe so.
8      Q.  Did you speak with anyone
9  else who is any member of Georgia state
10 boards or commissions related to the
11 issues in this case as part of your work
12 in this report?
13     A.  I did not need to in order to
14 produce the opinions in my report.  So I
15 did not.
16     Q.  Counsel for Cobb County,
17 also, produced to us electronically a
18 spreadsheet of certain calculations of
19 data that were performed related to your
20 report in this case.
21     Do you recall reviewing spreadsheets
22 with calculations specific to Cobb County
23 as part of your work in this case?
24     A.  Yes.  And -- yes.

1      Q.  And the file itself was
2  labeled, "Copy of Track 8 Expert Report
3  Input Calculations 080223."
4      Did you give that file that name or
5  someone else?
6      A.  It was either me or Caroline
7  Rutherford.  We worked collaboratively on
8  those spreadsheets.  And I can't recall
9  who physically named the file, but it was
10 one of the two of us.
11     Q.  Okay.  Does the "080223" in
12 the file name indicate that these
13 calculations were made and the
14 spreadsheets were saved around either
15 August 2nd of 2023 or perhaps if it's
16 European style February 8th of 2023?
17     A.  It would indicate that the
18 document was worked on -- I would imagine
19 it's August of 2023.  But it -- but I'm
20 not sure that that date accurately
21 reflects when it was started or finished.
22     Q.  Okay.  And I would note that
23 in the invoices that we have in Exhibit 2,
24 there's no work shown billed by either

1  you or Ms. Rutherford on that date.
2      A.  We can go back and check what
3  -- if there's anything missing on those
4  dates.
5      MS. do AMARAL:  Counsel, if
6      you'd would like to take a break,
7      we can provide you with a couple
8      of other invoices.
9      MR. ESSIG:  We can take a
10     quick break, if you want to do that.
11     MS. do AMARAL:  Or we can
12     go to whenever you want to --
13     MR. ESSIG:  I'm going to do a
14     couple of things and then maybe
15     we'll take a break; is that alright?
16     MS. do AMARAL:  That's fine.
17     Q.  Alright.  So, because I'm old
18 school, I printed these out.
19     The first sheet received -- they're
20 all going to be Group Exhibit 3, but
21 we're going to give you Keyes 3A.
22     (Deposition Exhibit Keyes 3A,
23     printout out of large spreadsheet
24     Figure 7 & 14, was marked for

13 (Pages 46 - 49)

1    identification.)
2        Q.   And that was labeled on the
3    spreadsheet as being for "Figure 7 and
4    Figure 14."
5        And then I'm going to hand you what
6    we've marked for identification as Keyes
7    3B.
8            (Deposition Exhibit Keyes 3B,
9        printout of chart for Figure 9 &
10       Table 1, was marked for
11       identification.)
12       Q.   And that was marked on the
13   spreadsheet as being for "Figure 9 and
14   Table 1."
15       Next, I'm going to hand you what we
16   marked for identification as Keyes 3C.
17   This is a spreadsheet that was marked on
18   the Excel file as being for "Figure 11
19   and Table 2."
20           (Deposition Exhibit Keyes 3C,
21       printout of a spreadsheet for
22       Figure 11 & Table 2, was marked
23       for identification.)
24       Q.   And last but not least, I'm

1    going to hand you a printout of the
2    fourth spreadsheet that was provided to
3    us in the Excel file that was marked as
4    being for Figure 13.
5            (Deposition Exhibit Keyes 3D,
6        printout of a spreadsheet for
7        Figure 13, was marked for
8        identification.)
9            MS. do AMARAL:  And, Counsel,
10       that's 3D?
11           MR. ESSIG:  3D, yes.
12       Q.   Professor Keyes, is it fair
13   to say that these four spreadsheets that
14   were produced to us represent the whole
15   of the calculations that were performed
16   related to your report in this case?
17           MS. do AMARAL:  Objection.
18       A.   Yes, I believe so.
19       Q.   Okay.  And we'll ask some
20   very specific questions about these as we
21   go along later.
22       But in terms of the inputting of
23   the data here and the calculations that
24   are performed, did you yourself do any of

1    that or were these all done for you by
2    Ms. Rutherford?
3        A.   Both.  It depends.  We work
4    on it collaboratively.  So there might be
5    specific numbers that I entered, specific
6    numbers that she entered.
7        Q.   Okay.
8        A.   But I reviewed all of the
9    work.
10       Q.   Okay.
11           MR. ESSIG:  It's probably a
12       good time for a quick break.
13           MS. do AMARAL:  Okay.
14           THE VIDEOGRAPHER:  We are off
15       the record.  The time is 9:51 a.m.
16           (Recess taken 9:51 to
17       a.m.)
18           THE VIDEOGRAPHER:  We are
19       back on the record.  The time is
20       10:06 a.m.
21       Q.   Professor Keyes, you
22   understand we are back on the record here
23   now?
24       A.   Yes.

1        Q.   And you're under oath.
2        At the break, we were handed
3    additional invoices that we did not get
4    previously.  And I've marked this as
5    Exhibit 2A to your deposition.
6            (Deposition Exhibit Keyes 2A,
7        six additional pages of invoices
8        produced by Dr. Keyes in the Cobb
9        County matter delivered during
10       the deposition, was marked for
11       identification.)
12       Q.   Do you have that in front of
13   you?
14       A.   I do.
15       Q.   Okay.  And do these six pages
16   of invoices from you and Ms. Rutherford
17   reflect the totality combined with
18   Exhibit 2 of the invoices that you've
19   issued in the case thus far?
20       A.   I believe so.
21       Q.   Okay.  With that understanding,
22   it looks like you issued an invoice on
23   September 30th of 2023 -- actually, I
24   have this out of order -- and then

Page 54

1  there's September 1st of 2023 and
2  January 30th of 2024; is that right?
3      A.   Yes.
4      Q.   Okay.  And if you add up the
5  hours that you billed on the invoices,
6  that reflects 21 additional hours of work
7  in Track 8; is that right?
8      A.   I have not done the
9  calculation, but I believe you.
10      Q.   Simple math, I guess, right?
11      A.   Yes.
12      Q.   Okay.  And if you add the 21
13  to the 25, in Exhibit 2A, that would be
14  46 hours of work that you billed for in
15  this case thus far; is that right?
16      A.   Yes.
17      Q.   Okay.  And for these three
18  invoices, all of the time listed as for
19  the report with the exception of 2 half
20  hour meetings on 9/12 and 9/14 of 2023 on
21  the first page and then an hour meeting
22  on the second page that was 8/23/2023.
23      Do you see that?
24      A.   I do.

Page 55

1      Q.   Okay.  So, if we add up the
2  two sets of invoices in Exhibit 2 in
3  exhibit Keyes 2A, it looks like the time
4  you billed reflects 39 hours for report,
5  6 hours for meetings and 1 hour for
6  review of materials.
7      Does that seem about right to you?
8      A.   It seems about right.  I
9  haven't done the math, but I trust you.
10      Q.   Okay.  And then additionally
11  here in Exhibit 2A, we have three more
12  invoices for Ms. Rutherford's time at
13  $200 an hour and she's billed out a total
14  of $1300 in total additionally.
15      Does that seem right to you?
16      A.   That seems about right.
17      Q.   And then if we do the math
18  from your two sets of invoices in Keyes 2
19  and Keyes 2A and for Ms. Rutherford, you
20  get a grand total to date in Track 8 of
21  $34,450.
22      Does that seem about right to you?
23      A.   Again, I haven't done the
24  math, but that seems in the ballpark.

Page 56

1      Q.   Okay.  And so, if you add
2  that 34,450 to the prior amounts that you
3  billed in the opioid litigation, what
4  would be your updated estimate as to how
5  much you billed in the opioid litigation
6  to date?
7      A.   My estimate was inclusive --
8  like, my estimate was inclusive of all
9  the invoices total that I've submitted.
10  So it would be in the same range.
11      Q.   $350,000?
12      A.   I think --
13      MS. do AMARAL:  Objection,
14  misstates her testimony.
15      A.   Yeah, I think it -- I think,
16  it's in the range of between 350 and 400
17  is what I previously stated, so somewhere
18  in that ballpark.
19      Q.   Alright.  In what year, in
20  your opinion, did the opioid epidemic
21  begin in Cobb County?
22      MS. do AMARAL:  Objection,
23  vague.
24      A.   I would like to refer to my

Page 57

1  report to answer that question.
2      So, in my report, what I have
3  produced is the trends in overdose deaths
4  including opioid overdoses deaths in Cobb
5  County beginning in 1999.  And already in
6  that time period, you can see increases
7  in opioid overdose deaths.
8      So, based on the CDC Wonder data,
9  we -- what I can state is that there is
10  evidence of an increase in overdose, at
11  least, in the -- starting in 1999.
12      Q.   And your opinion is
13  extrapolated from national data, such as
14  the CDC Wonder database that you
15  reviewed, correct?
16      A.   The data in Figure 5 that I
17  was just discussing is based on national
18  data and data from Georgia going back to
19  1999 and it includes Cobb County data
20  starting in 2015.
21      Q.   Okay.  Do you know when Cobb
22  County began tracking drug overdose
23  deaths?
24      A.   No.  I mean, they would

15 (Pages 54 - 57)

Page 58

1  assume have been contributing their vital
2  statistics data for many years.
3      Q.   Do you know when Cobb County
4  began attributing drug overdose deaths to
5  use of specific substances?
6          MS. do AMARAL:  Objection,
7      vague.
8      A.   What I have in my report is
9  -- relies on the CDC Wonder Data.  So any
10  process that is involved in Cobb County
11  that is outside of the CDC Wonder Data, I
12  have not reviewed.
13     Q.   Do you know when Christopher
14  Gulledge became the Chief Medical
15  Examiner of Cobb County?
16     A.   I believe I state something
17  about that in the report.
18     Since 2015 is what I have in my
19  report.
20     Q.   Okay.  And you've referred
21  Mr. Gulledge's deposition in this case,
22  correct?
23     A.   Yes.
24     Q.   And you spoke to him on the

Page 59

1  phone, at least, what, two or three
2  times?
3      A.   Something in that ballpark.
4      Q.   Okay.  Do you recall he
5  testified in his August 31st, 2022
6  deposition that there's no way to discern
7  from the data published in the Cobb
8  County Medical Examiner's annual report
9  whether a prescription opioid was part of
10  a multidrug death?
11     A.   Since 2015, which is the data
12  that I included for Cobb County here, I
13  believe, that you can tell that from the
14  CDC Wonder Data.
15     Q.   I asked regarding the Cobb
16  County Medical Examiner's annual reports.
17     A.   I apologize.
18     I have reviewed the Cobb County
19  Medical Examiner's annual report and they
20  do not specify prescription opioid
21  overdose deaths, from my understanding,
22  in the Medical Examiner's report.
23     Q.   And, similarly, do you recall
24  that he testified in his deposition that

Page 60

1  there is no way to discern from the data
2  published in the Cobb County Medical
3  Examiner's annual report whether someone
4  with documented as having died from a
5  prescription drug opioid overdose had
6  either legally or illegally obtained that
7  opioid?
8      A.   That is correct.  That is not
9  in the Cobb County Medical Examiner's
10  annual report.
11     Q.   And you've reviewed the Cobb
12  County Medical Examiner's annual reports
13  from 2015 through 2020, as part of your
14  work in this case; is that correct?
15     A.   Yes.
16     Q.   Okay.  Do you recall that the
17  Cobb County Medical Examiner's annual
18  report for 2015 showed that fentanyl was
19  the most commonly implicated drug in
20  overdose deaths?
21     A.   Do you have the report?  I
22  have -- I reviewed it some time ago.  So
23  I don't recall, specifically, what the
24  2015 report said about fentanyl.

Page 61

1      Q.   Okay.
2      A.   I would be happy to look at
3  it, if you have a copy.
4      Q.   Maybe we'll get that at a
5  break.
6      Similar questions, do you recall
7  that the Cobb County Medical Examiner's
8  annual report for 2016, 2017 and 2020
9  also showed fentanyl was the mostly
10  commonly implicated drug in overdose
11  deaths?
12     A.   I would need to see the
13  annual report, in order to confirm that
14  statement.
15     Q.   Okay.  And do you recall in
16  2018 heroin was the mostly commonly
17  implicated drug in the overdose deaths in
18  the Cobb County Medical Examiner's annual
19  report?
20     A.   Again, I would need to see
21  the report.
22     Q.   Okay, last one.
23     Do you recall that the Cobb County
24  Medical Examiner's annual report for 2019

16 (Pages 58 - 61)

1  showed this methamphetamine was the
2  commonly implicated drug in overdose
3  deaths?
4      A.   I would need to see the
5  report in order to testify about its
6  contents.
7      Q.   Okay.  Based on your review
8  previously of the Cobb County Medical
9  Examiner's annual reports for those
10  years, would you agree that prescription
11  opioids were not found to be the mostly
12  implicated drug in overdose deaths in
13  Cobb County in any of those years we just
14  mentioned?
15          MS. do AMARAL:  Objection,
16  vague.
17      A.   Again, without reviewing the
18  reports, I would not -- if I don't have
19  the reports in front of me, I can't
20  testify what they say.
21      Q.   Okay.  Well, let's turn to
22  your report.  I'd like to start in
23  Schedule A, which is the Cobb County
24  specific section.

1      Do you have that in front of you?
2      A.   Yes.
3      Q.   Okay.  So, in Paragraph 13 of
4  your report on Page 1 of Schedule A, you
5  wrote in the last sentence of Paragraph
6  13, "There have been and remain
7  tremendously high rates of overdose death
8  and opioid overdose in Cobb County
9  supported by local data and confirmed
10  with local experts."
11      Did I read that correctly?
12      A.   You did.
13      Q.   Is "tremendously high" a
14  descriptor that you've used in your
15  academic writing?
16      A.   I can't say -- I've published
17  400 academic articles.  I'm sure I've
18  used the word "tremendously."
19      Q.   And in the prior sentence you
20  wrote, "Cobb County has been among the
21  top 900 counties out of over 3,000 in the
22  nation with the highest overdose death
23  rates for the last ten out of ten years."
24      Did I read that correctly?

1      A.   Yes.
2      Q.   So almost one-third of the
3  counties in the US had a higher overdose
4  death rate in the last ten years than
5  Cobb County; is that fair to say?
6      That's what you wrote, right?
7      A.   It's in the top 900 counties.
8  So, I think, you are assuming in that
9  calculation that it is No. 900.  But I
10  think we would need to review the
11  placement year to year in order to know
12  what percentage of counties have a higher
13  drug overdose rate by year.
14      Q.   Alright.  Can you quantify
15  with reference to a threshold number or
16  percentage or any way you can quantify it
17  as to when a high rate becomes
18  "tremendously high"?
19      A.   I would say if you look at
20  the trend over time and it's increasing
21  rapidly, that the -- that the word
22  "tremendously" is appropriate.
23      Q.   Is there any consensus in the
24  epidemiology community as to how to make

1  that determination as to when something
2  is becoming "tremendously high" rate?
3      A.   My opinion is that any
4  qualified epidemiologist who read this
5  report would agree that the rate of
6  overdose death is "tremendously high."
7      Q.   At the bottom of this page,
8  in the next section, the sentence that
9  starts right at the end of the Page 1.
10  It says, "these sources," and then we
11  turn to Page 2, "document an exceptionally
12  high burden of harm in this county, well
13  beyond mortality including ongoing
14  morbidity from opioid use."
15      Did I read that correctly?
16      A.   Yes.
17      Q.   Is "exceptionally high" a
18  descriptor that you use in your academic
19  writing?
20      A.   Yes.
21      Q.   And can you quantify with
22  reference to any sort of number or
23  threshold as to when a high rate becomes
24  "exceptionally high"?

17 (Pages 62 - 65)

Page 66

1     A.   Yes, that is a statistical
2  procedure that we use.  It's based on
3  expectation.  So, if something is
4  "exceptionally high," it's beyond that
5  which would be expected, based on a set
6  of averages.
7     Q.   Okay.  And is there a
8  numerical threshold for a rate when
9  something is high and then it becomes
10  "exceptionally high"?
11     A.   Again, it would -- it would
12  be dependent on the expectation that you
13  used for comparison.
14     Q.   Okay.  And is there a
15  consensus in the epidemiology community
16  as to how to make a determination when a
17  rate is "exceptionally high," as opposed
18  to high?
19     A.   Yes.  In statistics, you
20  would set -- you calculate the
21  expectation and when something is above
22  the expected value, then it would be
23  "exceptionally high."
24     Q.   And -- cause I'm confused,

Page 67

1  just let me try it a different way.
2     Does the descriptor "exceptionally
3  high" refer to a larger quantity or rate
4  than the descriptor "tremendously high"?
5     A.   Those are two different
6  words.
7     I'm not understanding the question.
8     Q.   Sure.  I guess, if, you know,
9  there's a high rate of something and then
10  you have an "exceptionally high" rate and
11  a "tremendously high" rate.
12     So which is higher, "exceptionally"
13  or "tremendously"?
14     A.   They both are quite high.
15     Q.   Okay.  Let me go back to your
16  Paragraph 14 on Page 1.  And you refer to
17  -- in Paragraph 14, "the oversupply of
18  prescription opioids that began in the
19  1990s and continues to the present time."
20     Do you see that?  It's in the first
21  sentence at the end.
22     A.   The sentence that starts
23  with, "The increase in fentanyl mortality
24  deaths can be linked to" --

Page 68

1     Q.   No, it's the sentence that --
2  I'm sorry.  Paragraph 14, the sentence
3  starts with, "Data from Georgia."
4     Do you see that?
5     A.   Yes.
6     Q.   And then after the semicolon,
7  you have a phrase -- yeah, we're in the
8  same page, right, same place?
9     A.   I think we're in the same
10  place.
11     Q.   Okay.  Yes, thank you.
12     Can you quantify in any numerical
13  fashion how many opioids or -- were
14  oversupplied in Georgia in that time
15  frame?
16     A.   Yes.  I discuss that in both
17  the -- in the general report in some
18  detail, but there are a number of studies
19  that have estimated oversupply and that
20  would generalize to Georgia and have used
21  Georgia data.
22     Q.   Okay.  And you haven't
23  offered any opinions in your report with
24  regard to specific amounts of opioids

Page 69

1  that you would contend were oversupplied
2  by Publix, correct?
3     A.   I have offered in the report
4  opinions that are specific to Publix in
5  that the data that has been used to
6  generate the opinions includes Publix's
7  data and is generalizable to the region.
8  So I would say my opinions are specific
9  to Publix.
10     Q.   Well, let me ask it a
11  different way.
12     Either in your report or in the data
13  in the spreadsheets that you provided,
14  you haven't done any data analysis
15  specific to Publix's prescription data,
16  as to whether Publix' oversupply of
17  opioids in Cobb, correct, other experts
18  have done that but you haven't?
19     A.   Again, I believe, that the
20  analysis that I've included in this
21  report does include analyses that are
22  specific to Publix prescription data, as
23  they are included in the datasets, as is
24  Cobb County.

18 (Pages 66 - 69)

Page 70

1    So I believe that analysis is
2    included in my opinions.
3        Q.   Okay.  And I understand that
4    you've reviewed generalized mass
5    prescription data in regard to opioid
6    prescribing, right?
7            MS. do AMARAL:  Objection,
8    vague.
9        A.   Yeah, that's -- that's not how
10   I would describe the data that I used.
11       Q.   Okay.  Well you -- let me try
12   it one more time.
13       You haven't reviewed any data
14   provided by Publix specific to this
15   litigation regarding opioid supply as
16   part of your work in this case, correct?
17       A.   Publix supplies data to --
18       Q.   No, no, I'm not asking that
19   way.
20       I'm asking about any data that
21   Publix produced in the litigation with a
22   Publix Bate Stamp.
23       Those kinds of documents, you
24   haven't reviewed those, correct?

Page 71

1        A.   I have not reviewed a document
2    with a Publix Bate Stamp.  However,
3    Publix --
4        Q.   Yes, that's fair.
5        A.   -- contributes data.
6        Q.   Alright.  Do you have any
7    opinions on what percentage of people who
8    have come into contact with opioids in
9    Cobb County have been adversely impacted?
10           MS. do AMARAL:  Objection,
11   vague.
12       A.   Could you specify what you
13   mean "come into contact with opioids"?
14       Q.   Sure.  Well -- and we'll get
15   to in this a little bit.
16       But you offer opinions about -- in
17   your report -- about opioid users,
18   correct?
19       A.   Yes.
20       Q.   And you offer opinions in
21   your report about children and families
22   who may have been impacted by opioids
23   with relation to either parents or family
24   members who have opioid use disorder,

Page 72

1    correct?
2        A.   Yes.
3        Q.   Okay.  And so my question is
4    do you have an overall opinion about what
5    percentage of people who have come into
6    contact with opioids in any fashion in
7    Cobb County who have been adversely
8    impacted?
9            MS. do AMARAL:  Objection,
10   vague.
11       A.   So do you mean -- "come into
12   contact with"?  So anyone who takes any
13   opioid of any kind ever in their life; is
14   that...
15       Q.   You can answer it that way,
16   sure.
17       A.   I guess, I'm asking -- I'd
18   like some more clarification on what you
19   mean by, "come into contact with an
20   opioid," if that's possible.
21       Q.   Okay.  Let me try it this
22   way.
23       Do you have an opinion on what
24   percentage of individuals who were

Page 73

1    prescribed opioids and used opioids in
2    Cobb County who were adversely impacted
3    by their use of opioids?
4            MS. do AMARAL:  Objection,
5    vague.
6        A.   So, in the data that I review
7    and the opinions that I've generated, we
8    -- I specified that there is a dose
9    response relationship between being
10   prescribed an opioid and developing
11   opioid use disorder and other consequences
12   related to opioid use.
13       And the studies that I have cited
14   in that section would provide an estimate
15   for you of the proportion of people in
16   Cobb County who were prescribed an opioid
17   and were adversely impacted.  And we can
18   -- I can pull up some of those studies.
19   I have some specific references that I
20   would pull out in order to generate that
21   estimate.
22       Q.   Okay.  Well, let me back up
23   then.
24       In Paragraph 15 here on Page 1, you

19 (Pages 70 - 73)

1  wrote that, "In 2021, the last year of
2  data available, I estimate the prevalence
3  of opioid use disorder is, approximately,
4  2.0 percent in Cobb County."
5      Did I read that accurately?
6      A.   Yes.
7      Q.   Okay.  So not everyone whose
8  used an opioid in Cobb County has
9  developed opioid use disorder, can we
10  agree on that?
11      A.   That's correct.
12      Q.   Okay.  In fact, a small
13  percentage or, at least, a 2.0 percent of
14  the population in Cobb County has opioid
15  use disorder, based on your calculations,
16  correct?
17      A.   My calculation is that,
18  approximately, 2 percent of the population
19  in that year have opioid use disorder.
20      Q.   Do you know about how many
21  individuals filled opioid prescriptions
22  at Publix from 1999 to 2021?
23      A.   I have not reviewed those
24  data.

1      Q.   Is it your opinion that
2  Publix's opioid prescribing practices and
3  policies injured each and every one of
4  those individuals who filled an opioid
5  prescription at Publix?
6          MS. do AMARAL:  Objection,
7      vague.
8      Q.   If you have an opinion.
9      A.   My opinion is that opioid
10  prescribing contributed to the overall
11  supply of opioids in Cobb County and that
12  that overall supply is causally associated
13  with an increase in opioid-related harm
14  both to the individuals who were exposed
15  to the opioids and their families.  So
16  there's a dose response relationship.
17  The more opioids, the more opioid-related
18  harm and that's my opinion.
19      Q.   Okay.  And that's a general
20  opinion.
21      But my question was specific to
22  Publix.  So -- and if you don't have an
23  opinion, that's fine.
24      But do you have an opinion as to

1  whether Publix's opioid prescribing
2  practice and policies injured each and
3  every one of the individuals who filled
4  an opioid prescription at Publix?
5          MS. do AMARAL:  Objection,
6      vague, calls for a legal conclusion.
7      A.   My opinion is that Publix'
8  opioid prescribing injured the population
9  of Cobb County and the extent to which
10  that injury is prevalent depends on the
11  dose and duration of the prescribing.
12      Q.   Would you agree that many
13  individuals who filled opioid
14  prescriptions at Publix between 1999 and
15  2021 for pain or cancer-related pain or
16  other reasons why they were prescribed an
17  opioid benefitted from Publix's opioid
18  prescribing practices and policies?
19          MS. do AMARAL:  Objection.
20      A.   The epidemiological literature
21  indicates that there is a causal
22  relationship between dose and duration of
23  opioid dispensing and opioid use disorder
24  and other related harms.  So that is a

1  causal relationship that has been
2  established in the literature.  So I
3  would not agree with your statement.
4      Q.   Would you agree that some
5  individuals who filled prescriptions at
6  Publix between 1999 and 2021 for pain or
7  cancer-related pain or other reasons why
8  they were prescribed an opioid benefitted
9  from Publix's opioid prescribing
10  practices and policies?
11          MS. do AMARAL:  Objection,
12      vague.
13      A.   Again, the epidemiological
14  literature that I reviewed in this report
15  details a significant ongoing and
16  pervasive causal relationship between
17  dose and duration of opioid prescribing
18  and opioid related harm.  That is the
19  data and the opinion that I intend to
20  offer.
21      Q.   Okay.  I'm going to move on.
22      In Figure 2 on Page 2 of your
23  report, you have a graph of opioids
24  prescribed in Morphine milligram

20 (Pages 74 - 77)

Page 78

1  equivalents.
2      A.   Yes.
3      Q.   And if you look at the graph,
4  it appears that opioid prescribing peaked
5  in Georgia and in the United States in
6  2010; is that correct?
7      A.   Yes.
8      Q.   What data did you use to
9  generate this graph?
10     A.   I used the data that are
11  referenced in Citation 4.  And if you
12  that have study, we can look at it in
13  more detail.  I believe it's the IQVIA
14  data.
15     Q.   And did you or Ms. Rutherford
16  prepare the figures that are shown in
17  your report?
18     A.   Ms. Rutherford physically
19  produced the figure and I provided the
20  data to generate the figures.  Or, I
21  guess, we collaborated on the data to
22  generate the figures.
23     Q.   Okay.  So then I want to move
24  onto Page 3 and Figure 4.  You've

Page 79

1  provided a map of the data by county for
2  Georgia over drug deaths -- overdose
3  deaths reported to the National Vital
4  Statistic Service from 1999 through 2021,
5  correct?
6      A.   Yes.
7      Q.   And in your discussions to
8  the right of the graph, you noted that,
9  quote, "Cobb County has the 49th highest
10  overdose" rate -- "death rate in the
11  state among the 100 reporting counties."
12     Did I read that correctly?
13     A.   Yes.
14     Q.   Okay.  So, for the years
15  reported in the graph and shown in
16  Figure 4, the majority of counties in
17  Georgia -- or a majority of counties in
18  Georgia had a higher overdose death rate
19  than Cobb County did from 1999 through
20  2021, correct?
21     A.   No.  The 49th is less than
22  the majority, right?  51 counties had
23  lower.
24     Q.   Yeah, you got me there.

Page 80

1      Okay.  So 48 counties had a higher
2  rate, correct?
3      A.   During this time period, yes.
4      Q.   '99 through 2021?
5      A.   Yes.
6      Q.   Okay.
7      A.   And for the counties that are
8  reporting.  That's another caveat I would
9  add to that.
10     Q.   Alright.  So, on the next
11  page, Page 4, you make a reference to
12  your interview with the Cobb County
13  Medical Examiner Dr. Gulledge.  We
14  discussed that a little bit earlier.
15     And he reported to you that prior
16  to 2015, there were different coding
17  practices in Cobb County for overdose
18  deaths, correct?
19     A.   Yes.
20     Q.   Do you recall anything with
21  regard to what those coding practices
22  were and what he told you?
23     A.   My understanding is that many
24  opioid-involved deaths were coded as

Page 81

1  polysubstance death.
2      Q.   And...
3      Would anyone be able to tell if
4  those coding practices led to any kind of
5  undercount of opioid-involved deaths
6  prior to 2015?
7      MS. do AMARAL:  Objection,
8  calls for speculation.
9      A.   My opinion is that the data
10  -- and what I stated in the report is
11  that prior to 2015, the data on specific
12  contributors to overdose -- opioid
13  overdose deaths are likely undercounted.
14     Q.   Okay.  But because we don't
15  have the data, no one can tell for sure
16  whether those coding practices led to
17  undercounting of opioid-related deaths,
18  fair?
19     A.   We don't have the true codes
20  prior to 2015.  Or we don't have more
21  detail, I guess, on the specific
22  contributors to death.  So we don't know
23  exactly how many were undercounted.  But
24  it is likely that there was, at least,

21 (Pages 78 - 81)

1   some undercount.
2       Q.   Alright.  On Page 5 of your
3   report, you wrote near the top of the
4   page that, "Drugs such as alcohol and
5   benzodiazepines interact with opioids to
6   increase the risk of death and these
7   deaths would not have occurred without
8   the presence of opioids."
9       Did I read that correctly?
10      A.   Yes.
11      Q.   Isn't it an opinion that
12  these deaths would not have occurred
13  without the presence of opioids a medical
14  causation opinion?
15          MS. do AMARAL:  Objection,
16      calls for a legal conclusion.
17      A.   No, that's an epidemiological
18  opinion as well.
19      Q.   Okay.  But you're, certainly,
20  aware of deaths caused solely by alcohol
21  use or by benzodiazepine use or by
22  alcohol and benzodiazepine use in
23  combination without opioid use?
24      A.   Those substances can cause

1   death.  When those substances are
2   combined with opioids, it accelerates the
3   probability of a death.
4       Q.   And either way you're not a
5   medical doctor, correct?
6       A.   I am not a medical doctor.  I
7   have included my opinions based on the
8   epidemiological literature.
9       Q.   Okay.  Also, on Page 5 here
10  you state that, quote -- this is in the
11  middle sort of the second paragraph there
12  -- "Sufficient evidence to conclude that
13  prescription opioid use is a cause of
14  heroin and fentanyl use and,
15  approximately, 70 to 80 percent of
16  individuals who use heroin in the last
17  20 years begin with prescription
18  opioids."
19      Did I read that correctly?
20      A.   Yes.
21      Q.   So is it your opinion that 70
22  to 80 percent of individuals in Cobb
23  County who used heroin since 2004 began
24  with prescription opioids -- began their

1   opioid use with prescription opioids?
2       A.   I think that that is a
3   reasonable estimate, yes.
4       Q.   Okay.  Do you have any data
5   on that specific to Cobb County?
6       A.   The data that I have used to
7   form that opinion are based on studies
8   that have included Cobb County data or
9   have included national data including
10  contributions from Cobb County.
11      Q.   Which studies are those?
12      A.   There are a range of studies.
13  The National Study of Drug Use on Health,
14  for example, the IQVIA data and other
15  studies that are based on national and
16  state level data that have included
17  Georgia.
18      Q.   Now, in the sentence I just
19  read you, you opine that this phenomenon
20  has happened in the last 20 years in Cobb
21  County and -- as opposed to 25 years in
22  the United States, which is what you
23  opined on this phenomena on Page 40 in
24  your generic report.

1       Is there a difference between Cobb
2   County and the United States in terms of
3   the duration of this phenomenon?
4       A.   No.
5       Q.   In your Track 8 generic
6   report on Page 40 there, you change the
7   opinion up to 25 years from the 20 years
8   you had in your Track 7 report.
9       Was this a reference to 20 here on
10  Page 5 in Schedule A something that just
11  didn't get updated when you updated the
12  rest of your Schedule A report?
13          MS. do AMARAL:  Objection,
14      asked and answered.
15      A.   Yes.
16      Q.   Okay.  I want to ask some
17  questions about Figure 7 and the
18  calculations that you did to get to it.
19      Do you have that in front of you?
20      A.   I have Figure 7.
21      And do you want me to have one of
22  these spreadsheets?
23      Q.   Yes, I'll direct you in a
24  second.

1     A.   Okay.

2     Q.   What does Figure 7 shows?

3     A.   Figure 7 shows overdose death
4  rates from natural and semi-synthetic
5  opioids from 1999 through 2021.

6     Q.   And where does the data in
7  Figure 7 comes from?

8     A.   The National Vital Statistics
9  System.

10    Q.   Okay.  Let's take a look at
11 the big one, which we've marked as
12 Exhibit 3A.  This the Excel spreadsheet
13 that you produced before the deposition
14 that's labeled Figure 7 and Figure 14.

15    A.   They're not labeled on my
16 spreadsheets so...

17    Q.   Right.  I'm representing to
18 you that 3A, the big one --

19    A.   The big one, okay.

20    Q.   Right.

21    On the spreadsheet that you
22 produced, the tab says this is for Figure
23 7 and for Figure 14.

24    A.   Okay.

1     Q.   Okay.  So, on the left here
2  of the spreadsheet, Lines 3 to 25, those
3  are national calculations that you did --

4     A.   Yes.

5     Q.   -- from 1999 to 2021?

6     A.   Yes.

7     Q.   And Lines 26 to 48 are for
8  Georgia; is that right?

9     A.   Yes.

10    Q.   And Lines 49 to 71 are for
11 Cobb County; is that right?

12    A.   Yes.

13    Q.   Okay.  And did you prepare
14 this spreadsheet or did Ms. Rutherford?

15    A.   We collaborated on it.

16    Q.   And what's the nature of the
17 collaboration?  How does that work?

18    A.   We both work on the document
19 to fill in the numbers and work on the
20 formulas.

21    Q.   Okay.  So, if we go across
22 horizontally, the D and E boxes that you
23 have here represent what?

24    A.   These are the number of

1  deaths that were coded as T40.2, T40.3 or
2  T40.4.

3     Q.   And that's coded that way
4  where?

5     A.   In the National Vital
6  Statistics System.

7     Q.   Okay.  And so you have that
8  data nationally in Lines 3 to 25, correct?

9     A.   Yes.

10    Q.   And then you have it for
11 Georgia in 26 to 48, correct?

12    A.   Yes.

13    Q.   Okay.  And then beginning on
14 Line 49 for Cobb County, we have NA for
15 1999, 2000 and 2001.

16    Do you see that?

17    A.   Yes.

18    Q.   Okay.  And then for some
19 reason, in 2002, you have 11 deaths.

20    Do you know where that data came
21 from?

22    A.   The National Vital Statistics
23 System.

24    Q.   So what does "NA" mean in the

1  boxes for Cobb County?

2     A.   The reporting guidelines for
3  the data are that you don't report on
4  death numbers that are ten or lower.

5     Q.   Okay.  So that would represent
6  that, for example, in 1999 in Cobb
7  County, there were less than ten deaths
8  that were coded related to opioids that
9  had the codes 40.2, 40.3 and 40.4; is
10 that right?

11    A.   Ten or less.

12    Q.   Ten or less?

13    A.   Yeah.

14    Q.   Okay.  Fair enough.

15    And similarly, you have more NAs
16 for 2003, 2005, 2006 and 2007; is that
17 right?

18    A.   Yes.

19    Q.   Okay.  What are the crude
20 rates that are shown in Boxes E and G?
21 What is that calculation?

22    A.   That is the rate of death
23 based on those T codes.  So that's the
24 number of deaths divided by the

23 (Pages 86 - 89)

1 population size.

2 Q. And then in Box H, the header
3 says it's the codes for T42 through T44
4 minus T40.2 and T40.3, deaths that had
5 only T40.4 is a "contributing
6 prescription opioid."

7 Did I read that accurately?

8 A. Yes.

9 Q. Explain that for us. What
10 does that mean?

11 A. So we wanted to isolate the
12 deaths that only had T40.4 out of those
13 three T codes. And I -- to explain more
14 accurately, so many -- so deaths that are
15 coded as T40.2 or T40.3 could also have a
16 T40.4 code. So we wanted to isolate only
17 those deaths that only had the T40.4
18 codes of those three codes.

19 Q. And T40.4 is for a synthetic
20 opioid and it's predominantly fentanyl,
21 correct?

22 A. It is synthetic opioids and
23 fentanyl does contribute to that T code.

24 Q. What calculation did you do

1 to get the data in the "I" boxes?

2 A. The "I" box is the percentage
3 of deaths that were of those three codes
4 that only had T40.4 as their contributing
5 code of those three. So, for example, in
6 Row 3 about 14.6 percent of the 588
7 deaths that had one of those three codes
8 had only T40.4 as the contributing code.

9 Q. So then in 2013 or beginning
10 in 2013 beginning, in Box 17, there is no
11 figure in Box I.

12 Why is that?

13 A. Because we used the percentage
14 of deaths that had T40.4 as their only
15 contributing code as an input calculation
16 for our -- for other analyses that we
17 did. We were interested in the
18 pre-fentanyl epidemic proportion of
19 deaths that -- for which synthetic
20 opioids were killing people.

21 Q. So then even though in 2013,
22 in the national data in Box H at Line 17,
23 there is no 2,090 deaths there and then
24 by 2021 in Line 25 in Box H there is

1 60,957 deaths, correct?

2 A. Yes.

3 Q. But for whatever reason from
4 2013 on you're not calculating the
5 percentage of the opioid deaths that
6 relate to fentanyl use, correct?

7 A. No, there is a reason.

8 MS. do AMARAL: Objection.

9 Q. And what is that reason?

10 A. Because the purpose of Column
11 I is to estimate the proportion of deaths
12 prior to the elicit fentanyl epidemic for
13 which prescription synthetic opioids were
14 killing people in the population.

15 Q. Okay. So then if we look in
16 Box D at Line 16 for 2013 nationally --
17 are you with me?

18 A. Line 16/Column D.

19 Q. Right.

20 So, for that column, you have
21 16,007 deaths, correct?

22 A. Yes.

23 Q. And in Column J now, which is
24 your estimated number of Rx opioid

1 overdose deaths, that also -- for Line 16
2 for 2012 nationally also reads 16,007
3 deaths, correct?

4 A. Yes.

5 Q. Is it your calculation in J
6 that all of those opioid deaths in 2012
7 are related to prescription opioid
8 overdoses?

9 A. Those are the number of
10 deaths that were coded as T40.2, T40.3
11 and T40.4.

12 Q. Okay. So let me go down with
13 you to Line 25.

14 For 2021, in Box D, you've got
15 77,663 deaths listed, correct?

16 A. Yes.

17 Q. But in Box J, for the
18 estimated number of Rx opioid overdose
19 deaths, in that column, you only have
20 18,111, correct?

21 A. That's correct.

22 Q. And that's because so many
23 more deaths -- and we can do the math --
24 are now attributed as fentanyl deaths,

Page 94

1 correct?
2     MS. do AMARAL: Objection,
3   vague.
4     A.   So that is a correction to
5 estimate the number of -- to remove the
6 number of deaths that are likely due to
7 illicitly manufactured fentanyl.
8 Prescription fentanyl is still killing
9 people too. And so that is the estimate
10 of the prescription fentanyl contribution.
11     Q.   Okay.
12     Alright. So now for Cobb County
13 only, you have data in Columns K, L, M
14 and N, correct?
15     A.   Correct.
16     Q.   Why only for Cobb County in
17 those columns?
18     A.   We were interested in -- I
19 was interested in reporting the deaths
20 due to prescription opioids in Cobb
21 County because that's the topic of the
22 report.
23     Q.   Okay. And so where is the
24 data in Columns K through N coming from?

Page 95

1     A.   They are outputs of the other
2 columns in the spreadsheet, as well as
3 outside estimates that we used
4 adjustments.
5     Q.   When you say, "outside
6 estimates that you used for adjustments,"
7 what does that mean?
8     A.   So, for example, in Column N,
9 the deaths due to nonprescription opioids
10 that are attributable to prescription
11 opioids, we use why a peer reviewed
12 method from an academic publication.
13     Q.   So that's your Larney
14 calculation; is that right?
15     A.   No, that's a different --
16     Q.   Okay. Well, we'll get to
17 that later.
18     A.   -- thing altogether.
19     Q.   Okay. Then I'm confused.
20 I'm jumping ahead.
21     Alright. So I didn't think I heard
22 in that answer the source of the data
23 from Columns X through N.
24     A.   K through N.

Page 96

1     MS. do AMARAL: "K."
2     Q.   I'm sorry, K through N.
3     A.   The sources of the data
4 transaction are the National Vital
5 Statistics System and outside estimates
6 that we use for adjustment.
7     Q.   Okay. So there's no Cobb
8 County Medical Examiner annual report
9 data contained in K through N; is that
10 fair?
11     A.   The data are drawn from the
12 National Vital Statistics System, which
13 are consistent with the Cobb County
14 Medical Examiner report in magnitude and
15 trend.
16     Q.   Okay. So, just a few more
17 questions here.
18     So Line 49, 1999 Cobb County, all
19 of these columns about death related to
20 opioids from K through N are "NA,"
21 meaning, they were ten or fewer recorded;
22 is that right?
23     A.   Yes.
24     Q.   Okay. So, then in Line 54 --

Page 97

1 I think it's 54 -- yeah, 54, for 2004,
2 for some reason now you have 14 deaths in
3 K, 11 deaths in L, 3 deaths in M and 2
4 deaths in N.
5     Do you see that?
6     A.   Yes.
7     Q.   Do you know how you got
8 specific death numbers for 2004 that are
9 at ten or under?
10     A.   Because they're based on
11 estimates that we did.
12     Q.   Okay.
13     Alright. So then I want to direct
14 your attention to the last number here
15 for 2021 in Line 71.
16     Do you have that in front of you?
17     A.   Yes.
18     Q.   Okay. So you're showing 129
19 deaths due to opioids recorded in Cobb
20 County in Line -- in Column K; is that
21 right?
22     A.   That's correct.
23     Q.   Fifty-six of those are listed
24 in L as deaths due directly to Rx

25 (Pages 94 - 97)

Page 98

1    opioids; is that right?
2        A.    Yes.
3        Q.    And who was making that
4    determination?
5        A.    That is based on what T codes
6    are listed on the death certificate.  So
7    it comes from the Medical Examiner's
8    office.
9        Q.    Okay.  And then in Column M,
10   it says, "deaths to nonprescription
11   opioids," and there's 73.
12       Do you see that?
13       A.    Yes.
14       Q.    And, again, who is making
15   that determination that those deaths were
16   due to nonprescription opioids?
17       A.    Again, it's based on the T
18   codes that are listed on the death
19   certificate.
20       Q.    And then in Column N, you
21   have 39 down for -- in Column N it's
22   described as "death due to non-Rx opioids
23   attributable to Rx opioids."
24       A.    Yes.

Page 99

1        Q.    What does that mean?
2        A.    That is based on the peer
3    reviewed method that I spoke about
4    earlier.  It's a Cerda study that is
5    cited in the report.
6        Q.    Okay.  So that's a
7    calculation or is it an estimation that
8    you've made?
9        A.    That is an estimation that
10   I've made.
11       Q.    And that's not a number
12   that's directly attributable to the death
13   certificate data from Cobb County; is
14   that fair to say?
15       A.    Well, it is in some sense
16   because everything is based on the T
17   codes.  So it uses the T code information
18   and then makes adjustments based on the
19   peer reviewed literature.
20       Q.    Okay.  And then you've
21   adjusted that up because you believe that
22   the certain nonprescription opioid deaths
23   should be attributable to Rx or
24   prescription opioids, right?

Page 100

1        A.    Well, it's not a belief.  I'm
2    relying on academic literature to make
3    that determination based on my expertise.
4        Q.    Okay.  Oh, yeah, last question
5    on this, I think.
6        In Row O here, you're making -- you
7    providing what's called an "Estimated
8    Crude Rate of Rx opioid overdose deaths."
9        Do you see that?
10       A.    Yes.
11       Q.    And how was that rate
12   calculated?
13       A.    That is based on the number
14   of deaths that are attributable -- that I
15   estimate are attributable to prescription
16   opioids divided by the population size.
17       Q.    Based on your calculations
18   with your technique that you've described
19   earlier?
20       A.    Which "technique"?
21       Q.    Forget it.  I'll move on.
22       A.    Okay.
23       Q.    Okay.  And so the -- forget
24   it.  I think I'm done with that exhibit.

Page 101

1        Okay.  So, on Page 6 of your Cobb
2    County report, there's some notes, a
3    paragraph about your discussion with
4    Christopher Gulledge at the bottom of the
5    page.
6        Do you see that?
7        A.    Yes.
8        Q.    Okay.  And the second to the
9    last sentence you wrote, "In 2020, the
10   year with more acute accidental drug or
11   alcohol deaths than seen in 2015 to 2019,
12   fentanyl was determined to be present in
13   49 percent of these deaths with
14   prescription opioids present in
15   25 percent."
16       Did I read that correctly?
17       A.    Yes.
18       Q.    Did Dr. Gulledge have any
19   further discussion with you about how
20   he's seen fewer accidental drug deaths
21   related to prescription opioids compared
22   to fentanyl in recent years?
23       MS. do AMARAL:  Objection.
24       A.    I don't recall sitting here

26 (Pages 98 - 101)

1  today a discussion with Dr. Gulledge on
2  that specific topic.  However, I've
3  analyzed the data on that topic so can
4  speak to it based on the data if you'd
5  like me to.
6     Q.   Alright.  I'm going to keep
7  moving here in the interest of time.
8     On Page 7, you begin a discussion
9  about Neonatal Abstinence Syndrome in
10  Cobb County.
11     A.   Yes.
12     Q.   And there's a Figure 9 that
13  includes a rate of Neonatal Abstinence
14  Syndrome; is that right?
15     A.   Rate per 1,000 hospital
16  births, yes.
17     Q.   Okay.  And in the
18  spreadsheets that were provided to us, we
19  received a one-page spreadsheet that
20  we've marked as Exhibit 3B that, I guess,
21  relates to calculations for Figure 9; is
22  that right?
23     A.   Yes.
24     Q.   And if you look back at the

1  figure itself, Figure 9, it shows that
2  the rate of Neonatal Abstinence Syndrome
3  in Georgia is well-below the national
4  rate, correct?
5     MS. do AMARAL:  Objection,
6    vague.
7     A.   It -- the rate in Georgia is
8  lower in -- than the national.  But I
9  wouldn't say it's, "well-below."  I think
10  it's just lower.
11     Q.   Alright.  And on Page 8 of
12  your report, in Table 1, you provided us
13  a number of estimated NAS births in Cobb
14  County.
15     Do you see that?
16     A.   I do.
17     Q.   Okay.  And those estimates
18  were based on the calculations that are
19  shown here in Exhibit 3B; is that right?
20     A.   Yes.
21     Q.   Okay.  And so, for example,
22  on Table 1 and also in 3B, the number of
23  estimated births with NAS in 2014 was 28
24  in Cobb County and then again the same

1  number of births with Neonatal Abstinence
2  Syndrome was also shown as 28; is that
3  right, in 2021?
4     A.   In 2014, the estimated number
5  of NAS births is 28 and then in 2021, it
6  is, also, 28.
7     Q.   Okay.  And do you know how
8  much larger the population of Cobb County
9  was in 2021 compared to 2014?
10     A.   Well, it's the number of live
11  births that matter for the calculation of
12  NAS, which I've listed in the column on
13  the left.
14     Q.   And the rate that you're
15  referring to is that the column in 3B
16  that's listed "rate"?  Is that the rate
17  of live births?
18     A.   This is the number of live
19  births.
20     Oh, and then there's the rate.
21  There's the number of live births, the
22  NAS births and then the rate.
23     Q.   Okay, right.
24     So, in 2014, is it -- your chart

1  here in Exhibit 3B showing the rate of
2  live births was 2.866 in Cobb County?
3     A.   2.866 per a thousand live
4  births.
5     Q.   Okay.  And then in 2021 the
6  rate is up to 3.151 in Cobb County; is
7  that right?
8     A.   Per a thousand live births,
9  right.
10     Q.   So the rate of live birth is
11  higher in Cobb County in 2021?
12     A.   No, there's a higher number
13  of live birth in 2014 than in 2021.
14  There is a higher number and so, if the
15  denominator is going down but the
16  numerator is staying the same, then the
17  rate goes up.
18     Q.   Okay.  So --
19     A.   There is a higher rate,
20  because there's fewer numbers of live
21  births.
22     Q.   Okay.  Fair enough.
23     And -- alright.  I think we're done
24  with 3B?

27 (Pages 102 - 105)

Page 106

1     MR. ESSIG:  Is this a good
2  time for a break?
3     MS. do AMARAL:  Sure.
4     MR. ESSIG:  Okay.  Let's
5  take a break.
6     THE VIDEOGRAPHER:  We are
7  off the record.  The time is 11:01.
8     (Recess taken 11:01 to
9  11:12 a.m.)
10    THE VIDEOGRAPHER:  We are
11  now back on the record.  The time
12  is 11:12 a.m.
13    Q.   Okay.  Page 10 of your
14  report, in the paragraph on "opioid
15  supply," you assert that, ARCOS data
16  recorded over 3 billions prescription
17  opioids supplied to Georgia from 2006 to
18  2014.  Enough for 34 pills each year for
19  each resident.
20    Did I read that accurately?
21    A.   You paraphrased it accurately.
22    Q.   Yes, right.  I'm sorry.  If I
23  had read it, I would have said
24  "correctly," but I said "accurately."

Page 107

1     Okay.  But we agree those are the
2  numbers you provided there, correct?
3     A.   Yes.
4     Q.   How did you calculate those
5  totals for Georgia?
6     A.   We used the publically
7  available ARCOS data management system
8  and calculated the total number of
9  prescription opioids by year from 2006 to
10  2014 and then divided that by the
11  population size.
12    Q.   Okay.  And were those
13  calculations done on a spreadsheet?
14    A.   I think we just did them
15  using a calculator.
16    Q.   Do you know if those
17  calculations were saved at all?
18    A.   My calculator doesn't have a
19  save function.
20    Q.   Okay.  Because I don't think
21  that those calculations were produced to
22  us at all in the spreadsheets that we
23  received.
24    So did you preserve any of those

Page 108

1  calculations either here for Georgia or
2  for Cobb County?
3     A.   No.  Again, I just -- I used
4  a calculator.  So I didn't preserve the
5  numbers.
6     Q.   So you just calculated it on
7  hand and then typed it into the report
8  and there was no handwritten or
9  spreadsheet calculation provided?
10    A.   Correct.
11    Q.   So, and for Cobb County, you
12  note that for the same time frame, there
13  were enough for 27 pills per year for
14  every resident from 2006 to 2014; is that
15  right?
16    A.   34 pills, wasn't it?
17    Q.   No, I'm sorry.
18    Georgia we just talked about, that
19  was 34.
20    A.   Oh, I'm sorry.
21    Q.   And the then last sentence
22  here you wrote --
23    A.   I see.
24    Q.   -- In Cobb County, ARCOS data

Page 109

1  recorded 170,495,052 prescription opioid
2  pills supplied enough for 27 pills per
3  year for every resident.
4     Did I read that accurately?
5     A.   Yes.
6     Q.   Okay.  So the Cobb County
7  average for pills per resident in your
8  calculations from 2006 to 2014 is,
9  actually, lower per resident than the
10  state calculation, correct?
11    A.   Yes, the state is 34.  The
12  Cobb County is 27.
13    Q.   We are in agreement, okay.
14    Okay.  Time for some more number
15  crunching.
16    On Page 11 of your report, you
17  discuss how you estimated the number of
18  individuals with opioid use disorder,
19  which you've abbreviated OUD, in Cobb
20  County, correct?
21    A.   Yes.
22    Q.   And the calculations behind
23  these estimates were provided to us in a
24  spreadsheet in the Excel file that was

1 labeled as Figure 11 and Table 2 and this
2 is what is Exhibit 3C in front of you.
3     Do you have that?
4     A.   Yes.
5     Q.   Okay.  And, actually, I
6 think, maybe this was a typo.
7     But the figure for this data is,
8 actually, on Page 14 and it's actually
9 Figure 12; is that right?
10     A.   Oh, did we label the tab
11 incorrectly?
12     Q.   It looks like the tab was
13 labeled for Figure 11.
14     But it's -- but would you agree
15 that these calculations in Exhibit 3C are
16 shown, at least, in part on Figure 12?
17     A.   Yes.  I apologize.
18     Q.   Okay, no problem.
19     Okay.  So but looking at
20 Exhibit 3C, the spreadsheet, what is your
21 first assumption that you stated?
22     A.   Assumption 1 is the death
23 rate among OUD cases is, approximately,
24 equivalent to meta-analysis.

1     Q.   Okay.  And when you refer to
2 the "meta-analysis," what are you
3 referring to?
4     A.   That is the Larney paper that
5 we discussed earlier.
6     Q.   Okay.  And your report here
7 beginning on Page 12, actually, discusses
8 how you've used the Larney meta-analysis
9 in your multiplier method; is that right?
10     A.   Beginning on Page 12, yes.
11     Q.   Yes.
12     A.   It begins on Page 11 but
13 maybe -- okay, 11/12, in that area.
14     Q.   You're right.  You're right.
15 A little bit on 11 and then into 12.
16     Okay.  And you've done a similar
17 multiplier method to calculate OUD rates
18 in earlier cases in the litigation,
19 correct?
20     A.   Yes.
21     Q.   This is the not the first
22 time you've used Larney?
23     A.   No.
24     Q.   Okay.  So I want to try to be

1 brief and work my way through it without
2 repeating stuff.
3     So, on the spreadsheet, you're
4 using a mortality rate of what's shown as
5 0.0052, which is what -- 0.52 death rate
6 per hundred person years; is that right?
7     A.   Yes.
8     Q.   Okay.  And the 2019 Larney
9 meta-analysis reviewed a 124 studies for
10 mortality rates of individuals using
11 opioids extra medically; is that correct?
12     A.   Not exactly.  So the title of
13 the paper says, "Used Opioids Extra
14 Medically," but I took an extra step of
15 reviewing the underlying data that was
16 used to produce the meta-analysis to
17 ensure that the death rate that I was
18 using was generalizable to people with
19 opioid use disorder.
20     Q.   Okay.  Is it fair to say then
21 that none of the 124 studies including
22 the Larney meta-analysis is focused on
23 mortality rates of individuals using
24 opioids as prescribed with medical

1 supervision?
2     A.   That's not fair to say.
3     Q.   Okay.  How many of the 124
4 Larney studies were -- strike that.
5     How many of the 124 studies in the
6 Larney meta-analysis were conducted
7 within the United States?
8     A.   If you have the supplement to
9 the Larney paper -- I assume you have it
10 in your files.  I can tell you exactly.
11 There's -- I think, it's Supplementary
12 Figure 720.  That -- I would like to
13 refer to that, to answer the question
14 accurately.
15     Q.   Okay.  Well, in the interest
16 of time, I'll represent to you that --
17 and you testified to this before -- that
18 six of the studies in the Larney
19 meta-analysis were conducted in the
20 United States, okay?
21     And you reference the United States
22 studies in the middle of the second
23 paragraph here on Page 12.
24     Do you see that?

29 (Pages 110 - 113)

1     MS. do AMARAL:  Counsel, do
2  you have that the Larney study so
3  she can take a look at it?
4     MR. ESSIG:  I do.  But I don't
5  think I'm going to have anymore
6  questions that will get into
7  that.  But if we need to, we'll
8  get there.
9     MS. do AMARAL:  Okay.
10     And which of her testimony
11  are you referring to past testimony?
12     MR. ESSIG:  Certainly, the
13  Michigan Attorney General
14  litigation.
15     Q.   Alright.  Professor Keyes,
16  are you with me?
17     A.   Uh-huh.
18     Q.   So, on Page 12, you noted
19  that in the United States studies in
20  Larney, the range of overdose death rates
21  was comparable to the overall rate
22  ranging from 0.21 per 100 person years to
23  0.61 to a hundred person years.
24     Did I read that correctly?

1     A.   Yes.
2     Q.   Okay.  Do you recall if
3  you've ever done your own statistical
4  analysis of the power of each of the six
5  United States articles either individually
6  or combined?
7     A.   Can you say what you mean by
8  "power"?
9     Q.   Well, in terms of -- let me
10  ask it a different way.
11     In terms of selecting either any
12  particular one of these studies or the
13  studies together for the death rate that
14  you're going to use in your calculations,
15  did you look at the statistical power of
16  any of the six studies?
17     MS. do AMARAL:  Objection,
18  vague.
19     A.   That would not be an
20  epidemiologically appropriate analysis to
21  do.
22     Q.   Why not?
23     A.   Because a meta-analysis
24  derives its appropriateness based on the

1  combination of a range of studies.
2     Q.   Okay.  Did you pool the six
3  studies from the US to get an overdose
4  death rate for those six studies?
5     A.   I did sensitivity analyses
6  and you can see in my peer reviewed
7  publication on this multiplier method to
8  review those sensitivity analyses in more
9  detail where we restricted to the US
10  numbers.  However, pooling the six
11  studies would not be appropriate.
12     Q.   Okay.  So you're using here
13  the overall .52 per hundred years --
14  person years overdose death rate from
15  Larney as a whole, correct?
16     A.   Yes.
17     Q.   Okay.  Despite the fact that
18  the majority of the subjects in that
19  meta-analysis were not in the United
20  States?
21     A.   That has no bearing on the
22  validity of the .52 estimate in Larney.
23  So, no, I --
24     Q.   Okay.  And then --

1     A.   The appropriate analysis is
2  the .52 per hundred thousand.
3     Q.   Okay.  And then you go on to
4  discuss at the bottom of Page 12 that
5  your estimate involves applying a
6  correction to the estimate in Larney
7  because those studies were published,
8  quote, "before the outbreak of
9  fentanyl-induced death"; is that correct?
10     A.   Correct.
11     Q.   And so, in exhibit -- excuse
12  me -- 3C, what is your second assumption?
13     A.   The death rate when fentanyl
14  -- the death rate when fentanyl exposed
15  is, approximately, three times the
16  non-fentanyl death rate based on existing
17  literature.
18     Q.   And what is the literature
19  that you used to decide that the death
20  rate should be three times higher?
21     A.   I used data from the Centers
22  for Disease Control, as well as literature
23  from the National Vital Statistics
24  System.

Page 118

1  Q.  So I want to look at your
2  calculations on Page 13.  And the first
3  full paragraph you write, "In Cobb County
4  the number of fatal overdoses in 2021,
5  the most recent year of available data,
6  is 174 and an estimated 59 percent of
7  those deaths are attributable to
8  synthetic opioids."
9  Did I read that correctly?
10  A.  Yes.
11  Q.  And that 59 percent would
12  include fentanyl-related deaths, correct?
13  A.  59 percent would include but
14  are not limited to fentanyl-associated
15  deaths.
16  Q.  And, as we saw back in
17  Exhibit 3A, the Medical Examiner in 2021
18  in Cobb County found that the majority of
19  these deaths were not attributable to
20  prescription opioids, correct?
21  MS. do AMARAL:  Objection,
22  vague.
23  A.  I have not -- that's based on
24  the deposition testimony?

Page 119

1  Q.  And based on 3A.
2  A.  Sorry.  I guess I'm not
3  understanding the question.
4  As we saw -- I'm sorry.  I don't
5  mean to repeat the question.
6  In 2021, in Cobb County, the
7  Medical Examiner found -- and you're
8  basing that on his deposition, right.
9  Q.  No.  And, also, the numbers
10  provided in Exhibit 3A for 2021.
11  A.  Oh, okay.
12  So for 2021, in Cobb, there were
13  129 total opioid deaths.
14  And I'm sorry.  If you would just
15  remind me what cell you're looking at for
16  the majority of these deaths are not
17  attributable to prescription opioids?
18  Q.  Sure.  So, in Cell L/Line 719,
19  the deaths due directly to prescription
20  opioids are 56, correct?
21  A.  That's -- so you would need
22  to sum Columns L and Column N.  So
23  there's 56 directly attributable.
24  Thirty-nine deaths due to nonprescription

Page 120

1  opioids that are attributable to
2  prescription opioids.
3  Q.  So your calculation is
4  different from my question.
5  My question is the 56 in Box L is
6  the Medical Examiner's determination that
7  the deaths were due directly to
8  prescription opioids, correct?
9  A.  No.  Those are -- the 56
10  deaths are those that are coded with a T
11  code, as described in Columns D through
12  G.
13  Q.  But by the Medical Examiner?
14  A.  The Medical Examiner makes a
15  determination of the substances that
16  contributed to the death.
17  Q.  Right.  And that's what is
18  shown in Box L/Line 71, correct?
19  MS. do AMARAL:  Objection,
20  calls for speculation.
21  A.  Box L counts several T codes
22  that are provided in the spreadsheet.
23  Q.  Okay.
24  Alright.  I want to go back to 3C

Page 121

1  and your report here on Page 13.
2  So your sentence on Page 13 is
3  that, "I estimate that there are,
4  approximately, 15,349 individuals who
5  have OUD in Cobb County."
6  Did I read that accurately?
7  A.  Yes.
8  Q.  Okay.  And so, if we look at
9  Exhibit 3C -- and you changed it up on us
10  here.  So the horizontal is now the
11  years.
12  And so box -- or Column Y, do you
13  see that?
14  A.  Column Y, I see that.
15  Q.  That's data for 2021, correct?
16  A.  That's correct.
17  Q.  Okay.  And so, if we go down
18  to Line 29 for Cobb County and that
19  appears to be a row for OUD population;
20  is that right?
21  A.  Yes.
22  Q.  Okay.  And so, if we go to
23  Line 29/Column Y, what does that box say?
24  A.  Line 29/Column Y says 15,349.

31 (Pages 118 - 121)

1    Q.   Okay.  And that's the same
2  number you have in your report, correct?
3    A.   Correct.
4    Q.   Okay.  So take us through
5  your calculation here that gets you to
6  this figure in Line 29/Column Y.
7    A.   Okay.  So the first number
8  that is important is in Row 10/Column Y.
9  That is the total number of drug overdose
10  deaths in Cobb, based on the CDC WONDER
11  Data.
12    That number, the first -- to
13  describe it in words, the first thing we
14  do is divide that by the overdose rate in
15  the OUD population from Larney, which is
16  .0052.
17    However, we make some corrections
18  to that number, because we know that the
19  death rate among the OUD population is
20  higher in a fentanyl-exposed population
21  than in a non-fentanyl-exposed population.
22    Well, there's two numbers that you
23  need to make that correction.  One is
24  what portion of the OUD population is

1  fentanyl exposed.
2    And the second number you need is
3  how much higher is their death rate
4  compared to .0052.  So we estimate those
5  two numbers using additional data.
6    First, we estimate the proportion
7  of the OUD population that is fentanyl
8  exposed by calculating the proportion of
9  total deaths in that year are for which
10  there was a T40.4 code.
11    And that you will find in column --
12  or in Row 17, Column Y/Row 17.
13    In Cobb, we find that 59 percent of
14  the deaths involved T40.4.
15    So we estimate 59 percent of the
16  population exposed to fentanyl.
17    Then we need, okay, how much higher
18  is the death rate in the fentanyl-exposed
19  population than in the not
20  fentanyl-exposed population.  And that's
21  where we bring in that 0.0156.
22    So then the denominator of the
23  total prevalence estimate is a weighted
24  combination of 0.0052 and 0.0156.  And

1  it's weighted by the proportion of the
2  population that's fentanyl exposed.
3    And so, if you can just imagine
4  that you take 00.52 times 0.41 plus
5  0.0156 times 0.0 -- 0.59, that's the
6  denominator.  You divide the total number
7  of drug overdoses by that and you get
8  15,349.
9    Q.   Okay.  And after you did
10  that, you applied the Larney Confidence
11  Interval to that number, right?
12    You talk about that in your
13  discussion on Page 13?
14    A.   Yes.
15    Q.   And so, by doing that, you
16  wrote that a plausible range number of
17  individuals that have OUD as 13,528 to
18  17,351.
19    Did I read that correctly?
20    A.   Yes.
21    Q.   And that calculation with the
22  confidence interval on Page 13, is that
23  reflected anywhere here on Exhibit 3C?
24  Because I didn't see it.

1    A.   No, we just did that with a
2  calculator.
3    Q.   Okay.  Did you just calculate
4  it and write it directly into the report?
5    A.   Yeah.
6    Q.   You didn't write it out or
7  keep any of the papers for that
8  calculation?
9    A.   No.
10    Q.   Okay.  Alright.
11    Okay.  And so your next sentence --
12  can you read it for us?
13    A.   "There is an estimated
14  762,944 people in Cobb County.  Thus this
15  estimate indicates that the prevalence of
16  OUD in Cobb County is, approximately,
17  2.02 percent."
18    Q.   Okay.  And so is this simple
19  math of the 15,349 into this 777,062,944?
20    A.   Yes.
21    Q.   Okay.
22    A.   Performed with a calculator.
23    Q.   Okay.
24    A.   Actually, that is on the

1 spreadsheet.  It's Line 24 -- oh, no,
2 Line 32 on the spreadsheet.
3     Q.  Got it.  Thank you.
4     Okay, great.  I think that's it for
5 3C.
6     In the next section of your report
7 that begins on Page 13 here is
8 calculations about the number of
9 individuals with opioid use disorder
10 across time.
11    And you do that for the US Georgia
12 and Cobb County, correct?
13    A.  Yes.
14    Q.  And in the second sentence
15 you state, "By way of summary, I use the
16 death rate among individuals of OUD from
17 the most recent meta-analysis of cohort
18 studies in order to anchor my estimation
19 to the best available literature."
20    Did I read that correctly?
21    A.  Yes.
22    Q.  Okay.  And, again, when you
23 are referring to the "meta-analysis,"
24 you're using the Larney analysis again?

1     A.  Yes.
2     Q.  Okay.  And then in a couple
3 sentences down you wrote, "Specifically,
4 for each year, I estimated that proportion
5 of overdose deaths in which synthetic
6 opioids were listed as a contributing
7 cause.  I then weighed each year for the
8 higher death rate from synthetic opioids
9 that would be expected."
10    Did I read that correctly?
11    A.  Yes.
12    Q.  Alright.  What data did you
13 rely upon to make your estimate of the
14 proportion of overdose deaths in which
15 "synthetic opioids were listed as a
16 contributing cause"?
17    A.  The National Vital Statistics
18 System.
19    Q.  Okay.  And then how did you
20 weight -- it says "weigh."
21    Should that be weigh each year or
22 weight each year?
23    A.  "Weighted."
24    Q.  Okay.  How did you weight

1 each year?
2     A.  So that's what I was talking
3 about before.  You take the denominator
4 of the total calculation.  It's the
5 0.0052 times the proportion of deaths for
6 which synthetic opioids were not
7 involved.
8     So, in 2021, that was 41 plus
9 0.0156 times the proportion of deaths for
10 which synthetic opioids were involved.
11 So that's the "weight."
12    So, if you can -- I think another
13 simple way to think about is, like,
14 before, you know, the -- before the
15 increase in fentanyl in the US
16 population, most of the deaths are not
17 T40.4 coded.
18    So the weight is going to be close
19 to one for 0.0052 and close to 0 for
20 0.0156.  As the proportion of overdose
21 deaths that have a T40.4 code increases,
22 those weights are then going to shift.
23    And so, for Cobb County by 2021,
24 59 percent of the population is excessed

1 to the higher death rate and 41 percent
2 of the population is exposed to the lower
3 death rate.  And that's how the weight
4 works in theory, you know, in words.
5     Q.  Okay.
6     Alright.  So you used this method
7 of estimation to calculate the estimated
8 number of individuals with opioid use
9 disorder in the US, Georgia and Cobb
10 County across time, right?
11    A.  Yes.
12    Q.  Okay.  And Figure 14, which
13 is on Page 15 but starting on the bottom
14 of Page 14 you wrote that, "Figure 14
15 below provides the distribution of my
16 estimate of OUD cases in Cobb County
17 stratified by those that I estimate are
18 directly attributable to prescription
19 opioids (opioid use disorder due to
20 prescription opioids), and indirectly
21 attributable to prescription opioids."
22 I'm going to stop there, because it goes
23 on a little bit.
24    But this is calculations that were

1    done for this on Exhibit 3D; is that
2    right?
3        A.    That's right.
4        Q.    Okay.  And, actually, again,
5    the tab for this Excel file that was
6    produced to us was labeled as Figure 13,
7    but these calculations are actually for
8    Figure 14, right?
9        A.    Yes.  I apologize.
10       Q.    Okay.
11       Okay.  And so, if we look at Cobb
12   County here, which starts on Line 6 and
13   intersects first with Column K for 2015 --
14   do you see that?
15       A.    Yes.
16       Q.    That's where the first year
17   where you get actual numbers, correct?
18       A.    Yes.  Well, there's numbers
19   in prior years, but that's the first year
20   where we estimate the numbers that are in
21   Figure 14.
22       Q.    Okay.  And why did you not
23   start doing these calculations until 2015
24   for Cobb?

1        A.    Because the data that we
2    relied on for our estimation of direct
3    and indirect attribution were suppressed
4    for previous years, that "NA."
5        Q.    And is that -- "suppressed"
6    in which database?
7        A.    He used the National Survey
8    of Drug Use and Health.
9        Q.    And do you, also, understand
10   from Christopher Gulledge's testimony
11   that Cobb County didn't have this kind of
12   data on attribution for types of opioids
13   found in a death case prior to 2015?
14       A.    This does not use death
15   cases.  This is not -- these data do not
16   rely on death at all.
17       Q.    Okay.  So it's not related to
18   Gulledge's data?
19       A.    Correct.
20       Q.    Okay.  So it was just not
21   available to you, other than in an "NA"
22   form?
23       A.    Right.
24       Q.    Alright.  And the NSDUH data,

1    did it have publically available county
2    data for you to use?
3        A.    No, we used the rates from
4    Georgia, based on the -- the RDAS, which
5    is the -- I'm not remembering right now
6    what "RDAS" stands for.  But it's
7    analytic software that anyone can use.
8    It's publically available to analyze
9    state specific data.  The county specific
10   data for NSDUH is more restrictive.
11       Q.    Okay.  So clarify for us.
12   For example, in Rows 6 and 7 about Cobb
13   County HUD cases, Cobb HUD cases -- do
14   you see that?
15       A.    Yes, I see that.
16       Q.    Is that database data or is
17   that estimated data from Georgia
18   information?
19       A.    That is estimated data from
20   Georgia information.
21       Q.    Okay.  And you believe and
22   you've testified about this before that
23   the NSDUH data you think that undercounts
24   OUD, correct?

1        A.    Yes, the NSDUH data
2    undercounts OUD, which is why we only
3    used ratios, not the actual underlying
4    OUD estimates from the NSDUH data for
5    exactly that reason.
6        Q.    Okay.  So, in Page 15 your
7    discussion here, is that you used a
8    multiplier of 4.49 derived from what you
9    describe as overlapping 2015 data from
10   Massachusetts state level NSDUH data and
11   from a capture/recapture study in
12   Massachusetts by Baracos of OUD
13   prevalence, correct?
14       A.    No, those are two different
15   sections of the -- two different -- they
16   don't overlap at all, those calculations.
17       Q.    Okay.
18       A.    So the Baracos study, that
19   4 percent, was used as a sensitivity
20   analysis on the multiplier method for the
21   OUD prevalence estimation.
22       But what is on Figure 14 did not
23   use that 4 percent multiplier.  Rather we
24   used the ratio based on the Georgia RDAS

1    data of the total OUD cases for which
2    there was prescription opioids use
3    listed.  So we don't use Baracos for
4    Figure 14 at all.
5        Q.    Okay, fair enough.
6        And when you -- alright.
7        So, when you look at Figure 14 --
8    and that's at the top of Page 17.
9        Do you have that in front of you?
10       A.    Yes.
11       Q.    Okay.  So is it fair to say
12   -- strike that.
13       When you look at Figure 14, the OUD
14   prevalence has decreased since 2017 in
15   Cobb County, correct?
16       A.    The number of cases in 2018
17   -- the point estimate for the number of
18   cases in 2018 is lower than the point
19   estimate for the number of cases in 2017.
20   That's how I would read that.
21       Q.    Okay.  And it's hard to see.
22   But isn't it fair to say that the number
23   of cases in 2019 is, also, lower than the
24   data in 2018?

1        A.    Yeah.  And this -- you can
2    look at Table 2, to get those exact
3    numbers.
4        But, yes, there's about 400 fewer.
5    The point estimate is about 400 fewer for
6    2019 than for 2018.
7        Q.    Okay.  I think I'm done with
8    3B.
9        Okay.  I'm trying to -- moving fast
10   here.
11       Page 17 of your Cobb report, you
12   attempt to estimate the burden of harm
13   for families and children in Cobb County
14   from OUD, correct?
15       A.    Yes.
16       Q.    And you started with your
17   calculation that you had made previously
18   of individuals with OUD in Cobb County in
19   2021 of 15,349 and you attempt here to
20   estimate how many of those individuals
21   may be parents, correct?
22       A.    Yes.
23       Q.    And your discussion says that
24   you looked at census data that 64 percent

1    of individuals in Cobb County are between
2    18 and 64.  And, for purposes of this
3    calculation, you assumed that each of
4    those individuals is the parent of, at
5    least, one child; is that right?
6        A.    What I state in the report is
7    that it's a reasonable range for
8    individuals parenting dependence.
9        Q.    Did you make any effort to
10   look for any census data or otherwise
11   that indicates how many people in Cobb
12   County between the ages of 18 and 64 are
13   actually the parents of, at least, one
14   child?
15       A.    I relied on the census data
16   that I included in this report only.
17       Q.    Based on your assumption that
18   64 percent of individuals in Cobb County
19   are parents and you multiplied that by
20   the 15,349 individuals that you estimated
21   with OUD in Cobb County, you calculated
22   that -- you cite on Page 17 that,
23   approximately, 9,823 children in Cobb
24   County are potentially exposed to

1    parental opioid use during development;
2    is that correct?
3        A.    Yes.
4        Q.    Alright.  And then, also, in
5    this section of your report, you offer
6    some opinions about how many of those
7    estimated 9823 children may have various
8    psychiatric and mental health disorders
9    as a result of parental opioid use.
10       A.    Yes.
11       Q.    Okay.  And you cited to two
12   articles that references 90 and 91 that
13   provide nationwide prevalence rates for
14   mental disorders and learning
15   disabilities in support of your opinion
16   here that, quote, "children who
17   experienced parental substance abuse have
18   rates of disorder that are 2 to 3 times
19   higher than other children," unquote; is
20   that right?
21       A.    Yes.
22       Q.    Alright.  When was the last
23   time that you reviewed these two
24   articles, the 2010 Mara Kangas article

1  and the 2007 Alterac (phonetic) article?
2     A.   Probably within the last six
3  months to a year.
4     Q.   Okay.  Do you recall anywhere
5  in either of those two articles that they
6  express or say that children who
7  experience parental substance use have
8  rates of disorder that are two to three
9  times higher than other children?
10    A.   I would need to look at the
11  article again.
12    Q.   Okay.  Do you have any other
13  sources for this estimate of children who
14  experience parental substance abuse being
15  -- having rates of disorder that are 2 or
16  3 times higher than other children?
17    A.   That is the source that I
18  used in this paragraph.  There's other
19  literature that would corroborate that as
20  well.
21    Q.   Did you do any research with
22  -- related to these disorders and
23  learning disabilities for any data
24  specific to Cobb County either contained

1  in reports or other data from the Cobb
2  County Department of Health, for example?
3     A.   Similar to other topics that
4  we've talked about, I relied on data that
5  included Georgia and Cobb County in those
6  -- in their estimates.
7     Q.   I was asking any -- did you
8  review anything that is data that is,
9  specifically, generated as to Cobb
10  County, not --
11    A.   Those data -- right.
12    But the data from Cobb County was,
13  specifically, generated from Cobb County
14  for those studies.
15    Q.   Alright.  Beginning on
16  Page 19, you try to calculate for us how
17  many heroin and opioid deaths in Cobb
18  County are directly and indirectly
19  attributable to prescription opioid use.
20    Do you see that?
21    A.   Yes.
22    Q.   And I think we talked about
23  this before, but just so we're on the
24  same page...

1     A   directly attributable death to
2  opioid use would be determined by the
3  Medical Examiner's office, correct?
4        MS. do AMARAL:  Objection,
5     calls for speculation, vague.
6     A.   I used the T codes that were
7  on the death certificates for direct
8  attribution.
9     Q.   Right.  And those codes would
10  be provided by a Medical Examiner office,
11  correct?
12       MS. do AMARAL:  Same
13    objection.
14    Q.   At least, in Cobb County.
15    A.   The Medical Examiner provides
16  the underlying contributing causes of
17  death.
18    Q.   And so directly attributable
19  to prescription opioid use would be a
20  death where prescription opioid use is
21  listed or coded as a cause of death?
22    A.   That's right.
23    Q.   And do you know if that
24  includes deaths where prescription opioid

1  use is listed as a significant condition
2  contributing to the death but not a cause
3  of death?
4        MS. do AMARAL:  Objection,
5     vague, calls for speculation.
6     A.   I believe we just used the T
7  codes that were contributing causes of
8  death.
9     Q.   What is your definition for a
10  death indirectly attributable to
11  prescription opioids, in the context of a
12  Medical Examiner report?
13    A.   So, in the context of this
14  report, which is what I can speak to,
15  indirectly attributable were deaths where
16  prescription opioids were not listed as a
17  contributing cause of death but the death
18  remains attributable based on the
19  estimate of the transition to heroin and
20  illicit opioid use that started with
21  prescription opioids.
22    Q.   So that's an estimate based
23  on what?
24    A.   That is the estimate that's

1  based on the method -- the peer reviewed
2  method by Cerda.
3      Q.   Okay.  In the third paragraph
4  on this page that begins with "first," in
5  this discussion you state you're using,
6  quote, "'the most conservative approach'
7  to determine the lower bound of proportion
8  of OUD and opioid death indirectly
9  attributable to prescription opioids."
10     Why do you believe you were using
11 "the most conservative approach"?
12     A.   Because the NSDUH data
13 underestimates OUD.
14     Q.   In your discussion on Page 20,
15 you stated that you average the rates
16 between 2006 and 2014 to calculate the,
17 quote, "a minimum of 53.4 percent of
18 opioid use disorders cases and deaths in
19 Cobb County are indirectly attributable
20 to prescription opioids in those years."
21     Did I read that correctly?
22     A.   Yes.
23     Q.   But at the end of this
24 paragraph, you opine that the, quote,

1  "true proportion," unquote, would be
2  closer to three-quarters.
3      A.   Yes.
4      Q.   What is the basis for that
5  opinion?
6      A.   That is based on the section
7  of the general report on trends that the
8  increase risk of heroin and other opioid
9  use based on starting with prescription
10 opioids.
11     Q.   So, in Figure 15 here, you're
12 attempting to include what you described
13 as all of the deaths attributable to
14 opioids overall directly attributable to
15 prescription opioids and indirectly
16 attributable to prescription opioids as
17 well?
18     A.   Correct.
19     Q.   And, if you look in 2021, the
20 deaths that you've got as both directly
21 and indirectly attributable to
22 prescription opioids, those don't equal
23 all of the overdose deaths shown in the
24 black line in 2021?

1      A.   Right.
2      Q.   Because many of those deaths
3  are fentanyl-related deaths, correct?
4      A.   Well, some fentanyl deaths
5  are prescription opioid overdose deaths.
6  The delta between the summation of the
7  orange and blue lines would be deaths for
8  which there's no estimated history of any
9  prescription opioid use.  Many of the
10 illicit fentanyl deaths would still be
11 attributable to prescription opioids, if
12 those individuals started their opioid
13 using trajectory with a prescription
14 opioid.  So the deaths that are not
15 included are those with no history of any
16 prescription opioid use.
17     Q.   Okay.  So, on pages --
18 starting with the bottom of Page 20,
19 you've got a new section in your Track 8
20 report here compared to Track 7 about the
21 "emergence of fentanyl as a cause of
22 opioid overdose death in the United
23 States."
24     Why did you decide to add this in

1  your Track 8 report?
2      A.   Based on the accumulating
3  epidemiological literature that fentanyl
4  and other synthetic opioids were
5  contributing to the increases in overdose
6  death.
7      Q.   Okay.  Is it fair to say that
8  while you do provide data in Figure 16 on
9  opioid overdose deaths in Georgia from
10 1999 through 2021 that's from the CDC
11 WONDER database, you don't have a
12 separate line breaking out any Cobb
13 County specific data in this figure?
14     A.   That's right.  Figure 16 is
15 just based on Georgia data.
16     Q.   One of your opinions in this
17 section is that, quote, "The available
18 evidence indicates that almost all people
19 who use fentanyl are those with a history
20 of heroin or prescription opioid use."
21     Is that your opinion today?
22     A.   I'm sorry.  Can you point me
23 to where that is in the report?  I just
24 want to see the context.

37 (Pages 142 - 145)

Page 146

1    Q.   Sure.
2    Of course, that's the one line I
3 didn't highlight.
4    A.   I'm looking for it, too.
5    Q.   Here we go.
6    A.   Oh, I found it.
7    Q.   On Page 22, in the top
8 paragraph about halfway down, "Thus
9 available evidence indicates that almost
10 all people who use fentanyl are those
11 with a history of heroin or prescription
12 opioid use."
13    Did I read that correctly?
14    A.   Yes.
15    Q.   Is that your opinion today?
16    A.   Based on the data that I have
17 reviewed, yes.
18    Q.   Would you agree that more
19 recent medical literature is reporting
20 that more and more fentanyl users have an
21 initiated their opioid use with fentanyl?
22    A.   I would need to see the data
23 to confirm that.
24    Q.   Okay.  The final section of

Page 147

1 your Cobb County report here in Schedule
2 A begins at the bottom of Page 22.  It
3 discusses stimulant death trends in the
4 United States and the contribution of
5 opioids.
6    This is also a new section here in
7 your Track 8 report?
8    A.   Yes.
9    Q.   Why did you add this section?
10    A.   Again, based on the
11 accumulating literature that's stimulant
12 deaths are also increasing in the United
13 States.
14    Q.   Did anyone ask you to add
15 these sections to your report?
16    A.   I felt that it was an
17 important update to the literature.
18 There is a lot of discussion in the peer
19 reviewed literature.  So I felt that it
20 was important to include the updated data
21 specific to stimulants.  And it had come
22 up quite a bit, the extent to which
23 increases in overdose deaths were
24 stimulant related.

Page 148

1    Q.   And, again, Figure 17 you're
2 providing data with regard to the number
3 of cocaine or psycho-stimulant overdose
4 deaths involving opioids in Georgia by
5 opioid category based on data sourced
6 from the CDC WONDER database, correct?
7    A.   That's right.
8    Q.   And Figure 17 does not break
9 out or depict any Cobb County specific
10 data in a line or otherwise, correct?
11    A.   That's correct.  This is for
12 Georgia overall.
13    Q.   Alright.  I'm going to do a
14 little stuff and then we'll take a lunch
15 break and we're going to turn it over to
16 Mr. Pack and I might have some
17 questions after that but...
18    Is it correct to say you're not
19 going to be offering any opinions at the
20 trial of this case related to Publix's
21 market share and dispensing prescription
22 opioids in Cobb County compared to all
23 other the other pharmacies and grocery
24 stores with pharmacies in Cobb County?

Page 149

1    A.   I have not looked at Publix'
2 market share.  So my opinions on Publix
3 relate to the overall contribution to the
4 opioid epidemic.  But I have not analyzed
5 data with respect to its market share
6 compared to other pharmacies and grocery
7 stores.
8       MR. ESSIG:  Okay.  I think
9 this is a good time for a lunch
10 break.
11       THE VIDEOGRAPHER:  We are off
12 the record.  The time is 12:00 p.m.
13       (Lunch recess taken 12:00 to
14 12:41 p.m.)
15       THE VIDEOGRAPHER:  We are back
16 on the record.  The time is
17 p.m.
18    Q.   Professor Keyes, I hope you
19 had a nice lunch.
20    A.   Yes.
21    Q.   And we're back on the record
22 and you're still under oath.
23    I just have a couple more for now
24 and then I'll turn it over to Mr. Pack.

38 (Pages 146 - 149)

Page 150

1     You've offered a few opinions in
2  your report about oversupply of opioids.
3     A.   Yes.
4     Q.   Okay.  And just a couple of
5  specific questions.
6     Have you calculated the amount of
7  opioids in Cobb County that you believed
8  were oversupplied between 1999 and 2021?
9     A.   I have reviewed the
10  epidemiological literature, which provides
11  quantitative estimates of oversupply and
12  I have confirmed that those data include
13  national and Cobb specific data.  So that
14  I believe that those results generalize
15  to Cobb County.
16     Q.   Okay.  But, in terms of
17  crunching numbers on a spreadsheet like
18  you did for some of your other
19  calculations and estimations in this
20  case, have you done that with regard to
21  the amount of opioids in Cobb County
22  between 1999 and 2021 that you believe
23  were oversupplied?
24        (Stenographer clarification.)

Page 151

1        MR. ESSIG:  Oversupplied.
2        MS. do AMARAL:  Objection,
3     vague.
4        Go ahead.
5     A.   The analysis that I've done
6  is to review the existing literature and
7  provide quantitative bounds based on the
8  literature that is available, which does
9  involve crunching numbers and other
10  calculations that are detailed in the
11  generic section of my report.
12     Q.   But you haven't provided to
13  us in a spreadsheet or otherwise any
14  specific calculations that you made with
15  regard to opioid oversupply in Cobb
16  County, fair to say?
17     A.   I don't have numbers on a
18  spreadsheet that have been produced for
19  that calculation.
20     Q.   Okay.  And one more similar
21  question.
22     Have you performed any spreadsheet
23  calculations with regard to attempting to
24  calculate a level of opioid supply in

Page 152

1  Cobb County from 1999 to 2021 that you
2  would estimate would have resulted in a
3  lower rate of OUD and opioid overdose
4  death?
5        MS. do AMARAL:  Objection,
6     vague.
7     A.   Similarly, I have reviewed the
8  epidemiological and medical literature on
9  that topic and ensured that it included
10  data from the relevant jurisdiction.
11  Those studies included many spreadsheets
12  and I reviewed that literature and my
13  opinions are based on the peer reviewed
14  literature that's available.
15     Q.   Okay.  And then, similarly,
16  same similar question.
17     Have you then performed any
18  spreadsheet calculations that you could
19  have provided to us today with regard to
20  the level of opioid supply in Cobb County
21  that you would estimate or opine would
22  result in lower rates of OUD and opioid
23  overdose deaths?
24        MS. do AMARAL:  Objection,

Page 153

1     vague.
2     A.   My opinions with respect to
3  the level of opioid supply in Cobb County
4  that would result in lower OUD and
5  overdose deaths are contained in the
6  report.
7     I have not produced my own
8  spreadsheet to the -- with this report,
9  rather I have relied on the existing
10  medical literature to provide that
11  estimate.
12     Q.   Thank you, Professor Keyes.
13  I don't think I have any questions now.
14  I may have at the end, if there's time.
15  But thank you for your patience.
16  EXAMINATION BY MR. PACK:
17     Q.   Good afternoon, Dr. Keyes.
18  My name is Tom Pack.  I am from the
19  Greenberg Traurig firm and I represent
20  Albertsons in this matter.
21     Does that make sense?
22     A.   Yes.
23     Q.   And I understand that you've
24  been deposed a number of times.  We

39 (Pages 150 - 153)

1   talked about that earlier.
2      But like Mr. Essig, the one
3   instruction I will reiterate is if I'm
4   unclear about anything, can you ask me to
5   rephrase it?
6      A.   Yes.
7      Q.   And if I ask -- if you
8   answer, I'm going to assume that you
9   understood it.  So that's a really
10  important instruction.
11     Does that make sense?
12     A.   Yes.
13     Q.   And I have a marked for the
14  record as Exhibit 4 your expert report in
15  Track 9.
16     (Deposition Exhibit Keyes
17     4, Expert Report of Katherine
18     Keyes April 15, 2024, was marked
19     for identification.)
20     Q.   Can you take a brief look and
21  verify that that is your complete expert
22  report in this matter?
23     A.   It looks to be my complete
24  report.  If there's any section missing,

1   we can address as we go along.
2      Q.   And, as of today, does this
3   report reflect all of the opinions that
4   you've formed in this case?
5      A.   As of today, these are my
6   opinions, yes.
7      Q.   And since the date of your
8   report, have there been any changes to
9   any of your opinions?
10     A.   No.
11     Q.   And sitting here today do you
12  intend to offer any opinions at the trial
13  of this case that have not been disclosed
14  in your report?
15     A.   Not sitting here today, no.
16     Q.   Okay.  On Page 99, I think,
17  it's sort of the second section.  It's
18  sort about 250 pages in, there is an
19  extensive "Materials Considered" list.
20     A.   Yes.
21     MS. do AMARAL:  Counsel,
22     you're referring to Exhibit C?
23     A.   Exhibit B.
24     MS. do AMARAL:  Exhibit B?

1      MR. PACK:  I guess there's
2   is not an exhibit slip sheet
3   right there, but it's titled, "Bate
4   Stamped Documents," up at the
5   top.
6      A.   Oh.
7      MS. do AMARAL:  Oh, yes.
8      A.   I'm in the wrong section.
9      MS. do AMARAL:  So, on the
10  Exhibit 4 document that you've
11  handed over, Counsel --
12     A.   Oh, I see.
13     MS. do AMARAL:  -- Exhibit B
14  is the whole materials considered
15  list.
16     And then I think you're
17  referring to -- there is a page
18  number where it starts Bates numbers
19  -- Bate stamped documents.
20     MR. PACK:  Uh-huh.
21     MS. do AMARAL:  That's 99;
22  is that what you're referring to?
23     MR. PACK:  Yes.
24     MS. do AMARAL:  Okay.

1      Q.   With the exception of the
2   supplemental materials, which we will
3   discuss briefly, did those constitute all
4   the documents you considered at the time
5   of your report?
6      A.   The documents that I
7   considered at the time include these Bate
8   stamped documents, as well as the other
9   materials considered and all the sources
10  that are listed in my reference section
11  of both sections of the report.
12     Q.   And does that universe of
13  documents constitute all the documents
14  you considered at the time of your
15  report?
16     A.   I would only add to that that
17  as an epidemiologist, I am constantly
18  reviewing literature.  And so I have also
19  a general knowledge base that is
20  accumulating.  But the references that
21  are in -- that are listed here constitute
22  the sources that I relied upon
23  principally in forming my opinions.
24     Q.   Are you aware of any specific

1  materials that are missing from this
2  list?
3      A.   There is -- when I was
4  reviewing in preparation for this, there
5  is a study that I talk about in the gen
6  report that I neglected to put on the
7  reference list.  So I just want to --
8  that was just a typo on my part.  But I
9  wanted to raise it.
10     Q.   And do you recall which study
11 that was?
12     A.   The first author is Dash,
13 D-A-S-H.
14     Q.   Okay.
15     A.   It should have been, I think,
16 reference 224 around there and it just --
17 I like left off of a note.
18     Q.   Anything else come to mind?
19     A.   No.
20     Q.   And then I'm going to mark as
21 Exhibit 5 a "Supplemental Materials
22 Considered" list that was received
23 yesterday.
24         (Deposition Exhibit Keyes

1      5, Dr. Katherine Keyes Supplemental
2      Materials Considered, was marked
3      for identification.)
4      A.   And, I guess, I should add
5  that sitting here today, I, also, relied
6  on the supplemental materials considered.
7  I thought that was included in this.
8      Q.   Yes.
9      A.   I apologize.
10     Q.   And in your report and in the
11 "Supplemental Materials Considered" list,
12 which was produced yesterday, no document
13 that produced by any Defendant including
14 Albertsons appears, correct?
15     A.   I don't know who produced
16 what document, to be completely honest
17 with you.  But the Bates Stamped
18 documents do not have Albertsons listed
19 on them.
20     Q.   Do you recall reviewing any
21 documents that were produced by
22 Albertsons in this matter?
23     A.   I have reviewed data that
24 includes Albertsons specific data.  So,

1  to the extent that Albertsons produced
2  those data to the databases that I
3  reviewed, I would say those were
4  Albertsons produced material.
5      Q.   I apologize.  "Produced" in
6  this is little bit term of art here.  It
7  means produced in the discovery of this
8  litigation.
9          So, with that context, do you
10 recall reviewing any documents produced
11 by Albertsons in this case?
12         MS. do AMARAL:  Objection,
13         calls for a legal conclusion and
14         seeks privilege.
15     A.   Again, I -- to be honest,
16 with you, I don't know exactly who
17 produced what documents.  So, I guess my
18 most accurate answer is, I don't know.
19     Q.   But, again, all the documents
20 that you considered apart from your
21 general epidemiological knowledge and the
22 Dash Study that you just mentioned are
23 included in this report in the
24 "Supplemental Materials Considered" list,

1  correct?
2      A.   Yes.
3      Q.   Great.
4          And in terms of who prepared the
5  "Supplemental Materials" list, is your
6  testimony as to Track 9 the same as it
7  was to Track 8, in terms of what you
8  provided -- what you stated for Mr.
9  Essig?
10     A.   Yes.
11     Q.   And, in general, I'm going to
12 try to streamline things by asking more
13 or less if you can just confirm that what
14 you said as to Track 8 applies to Track
15 9.  So please expect a fair bit of that,
16 but, also, let me know if there's
17 anything that's different.
18         Does that make sense?
19     A.   Yes.
20     Q.   And then you also provided
21 testimony as to the compilation of your
22 list of references in Track 8.
23         Does that apply to Track 9 as well?
24     A.   Yes.

41 (Pages 158 - 161)

Page 162

1    Q.   Okay.  And I suspect we might
2   discuss a little bit more down regarding
3   the experts you considered in Tarrant
4   County with respect to notes you might
5   have.
6       But, as in Track 8, you don't have
7   any general notes underlying your report
8   in the Track 9 matter?
9       A.   The notes that I have pertain
10  to my meetings with the folks that I
11  named in the report and those are the
12  only notes that I took.
13      Q.   Okay.  And do you have any
14  issue producing those to us?
15      A.   No.
16      Q.   Great.
17      And have you spoken to any other
18  experts for Tarrant County regarding your
19  opinions or this case?
20      MS. do AMARAL:  Objection,
21      vague, calls for a legal conclusion.
22      A.   I don't believe so.
23      Q.   And, with regard to the
24  "Supplemental Materials Considered" list,

Page 163

1   Exhibit 5, did you review these documents
2   since your April 15, 2024 report in this
3   matter, or did you have access to them
4   prior to that date?
5       A.   This is Exhibit 5, right?
6       Q.   Yes.
7       A.   I reviewed them after my
8   report was submitted.
9       Q.   And have your review of these
10  supplemental materials considered changed
11  any of your opinions in any way?
12      A.   No, they corroborated the
13  opinions that I produced in the report.
14      Q.   I'm going mark as Exhibit 6
15  your invoices in this matter that were
16  produced to us including the invoices of
17  Ms. Rutherford.
18      (Deposition Exhibit Keyes 6,
19      three pages of invoices produced
20      by Dr. Keyes in the Tarrant matter,
21      was marked for identification.)
22      THE WITNESS:  Thank you.
23      Q.   And with regard to Track 9,
24  do you and Ms. Rutherford follow the same

Page 164

1   billing practices in Track 9, as you
2   followed in Track 8, in terms of what you
3   mean by when you write "report" or
4   "meeting"?
5       A.   Yes.
6       Q.   And I want to walk through
7   these briefly.
8       So the September 1st, 2023 invoice
9   reflects six hours of work in Track 9?
10      A.   Yes.
11      Q.   And that's -- is that when
12  you began writing your report in this
13  matter?
14      A.   I believe so.
15      Q.   Okay.  Are you aware of any
16  work that you did on Track 9 prior to
17  August 6, 2023?
18      A.   Sitting here today I don't
19  remember any work prior.
20      Q.   And turning to the next page,
21  September 1st, 2023 Caroline Rutherford
22  invoice, when did Ms. Rutherford start
23  billing Plaintiffs for her time?
24      A.   On Track 9?

Page 165

1       Q.   Generally.  I don't think I
2   remember seeing any invoices for her
3   prior to the Track 8/Track 9 matter.
4       A.   Yes, she's been working with
5   my since Case Track 1.
6       Q.   And she's been billing
7   separately that whole time?
8       A.   Yes.
9       Q.   Okay.  And do you recall
10  whether her rate has increased during
11  that time period?
12      A.   Yes, it has.
13      Q.   Do you recall what her rate
14  had been at the beginning of the Track 1
15  case, for example?
16      A.   I don't recall.
17      Q.   Okay.  And do her billings go
18  to her or to Columbia?
19      A.   They go to her.
20      Q.   And then moving on there's a
21  March 30th, 2024 invoice reflecting March
22  time.
23      Do you see that?
24      A.   Yes.

42 (Pages 162 - 165)

Page 166

```
 1      Q.   First of all, do you recall
 2  doing any work on Track 9 between
 3  August 9, 2023 and March 26, 2024?
 4      A.   I don't recall.  And if I
 5  didn't submit an invoice, I would say
 6  there's a low likelihood that I did.
 7      Q.   And what I'm getting at is I
 8  know that there were invoices perhaps
 9  missing in the other case and I just want
10  to make sure that I'm covering all the
11  basis that there is not an invoice
12  missing here?
13      A.   We can double-check.
14      Q.   Yes.
15      A.   I'm not sure.
16      Q.   And so, on this March 30th,
17  2024 invoice, there are two half hour
18  meetings noted.
19      Do you recall who those were with?
20      A.   Those are listed in my report.
21      Q.   Is that Dr. Johnson and Dr.
22  Zemrus?
23      A.   Yes.
24      Q.   Okay.
```

Page 167

```
 1          MS. do AMARAL:  Counsel, can I
 2  just clarify one thing?
 3          It looks like there are two
 4  invoices listed as March 30th.
 5  Just -- so, to clarify, one of
 6  them lists March dates and the
 7  other one lists April dates.  So,
 8  I think, that was just a typo.
 9      A.   Couple typos there.
10          MR. PACK:  You saved me a
11  couple of questions there.  Thank
12  you.
13          MS. do AMARAL:  Happy to help.
14      Q.   And how did those individuals
15  -- how were those individuals identified
16  to you?
17      A.   Similar to Case Track 8,
18  typically, when I'm writing a report, I
19  outline additional information that would
20  help me form my opinions or corroborate
21  additional data sources.
22      So, for example, I, typically, ask
23  to speak to the Medical Examiner and
24  other folks in the county who might have
```

Page 168

```
 1  particular expertise in how the data are
 2  assembled and how the validity of the
 3  data can be confirmed.  And then the
 4  Plaintiffs Counsel will identify the
 5  appropriate person based on what I have
 6  requested.
 7      Q.   And do you recall if these
 8  meetings were on Zoom or on the telephone
 9  or in person?
10      A.   They were on Zoom.
11      Q.   Okay.  And was anyone else on
12  these calls with you?
13      A.   Yes.
14      Q.   Who else was on the calls
15  with you?
16      A.   Paulina and other Plaintiffs'
17  Counsel and Caroline Rutherford as well.
18      Q.   Anyone else on those calls?
19      A.   I don't think so.
20      Q.   And other than Dr. Johnson
21  and Dr. Zemrus, did you speak to anyone
22  else in Tarrant County, who is affiliated
23  with Tarrant County?
24      A.   Not -- not that I can remember
```

Page 169

```
 1  today.
 2      Q.   Is there anyone else you
 3  asked to speak with or any topic area
 4  that you asked to have covered that was
 5  not covered?
 6      A.   No.
 7      Q.   And this reflects seven hours
 8  of report writing time and one hour of
 9  meeting time, correct?
10      A.   Yes.
11      Q.   And turning to the next page,
12  we just discussed this.  This is a
13  March 30th invoice, but it's for April
14  time.
15      And this invoice reflects two --
16  well, one meeting and then one meeting
17  report entry.
18      And do you recall who the April 8th
19  meeting was with?
20      A.   I don't.
21      Q.   Do you recall meeting with
22  anyone in Tarrant County in April of
23  2024?
24      A.   I'm sure there were meetings
```

43 (Pages 166 - 169)

1  that included Tarrant County people. I
2  just don't remember exactly who I was
3  meeting with on that particular day.
4      Q.  Okay.  Do you know if you met
5  with Dr. Johnson or Dr. Zemrus more than
6  once?
7      A.  Yes.
8      Q.  How many times did you meet
9  with each person?
10     A.  Dr. Johnson, I believe, I met
11 with twice.
12     And Dr. Zemrus, I believe, I met
13 with once.
14     Q.  Okay.  So we have three
15 meeting entries standing alone, which
16 would cover two meetings with Dr. Johnson
17 and one with Dr. Zemrus.
18     Do you recall what the other meeting
19 entry on April 12th was or whether it was
20 a different person you met with on
21 April 8th?
22     A.  It could have been a meeting
23 with the lawyers.
24     Q.  But sitting here today, you

1  don't remember speaking with anyone in
2  particular at Tarrant County apart from
3  Dr. Johnson and Dr. Zemrus?
4      A.  That's right.
5      Q.  And this invoice reflects
6  11 hours of either report time or mixed
7  meeting and report time; is that correct?
8      MS. do AMARAL:  Objection;
9          Eleven and a half.
10     A.  Eleven and a half, yeah.
11     Q.  Oh, I was separating out,
12 though, meeting alone entry, excuse me.
13     A.  Ah, okay.
14     Yes, 11 report or meeting/report
15 time .5 meeting time.
16     Q.  And adding all of this up, for
17 total pre-report time, I have 25.5 hours
18 or $17,850 in billings just for you.
19 Does that sound right?
20     A.  It sounds about right.
21     Q.  And earlier you testified
22 that you received I want to say between
23 350 and $400,000 in total in the opioid
24 litigation.

1      Was this number included in that
2  calculation?
3      A.  Yes.
4      Q.  Okay.  And do you know about
5  how much time in Track 9 you've billed
6  since April 15th?
7      A.  I haven't prepared an invoice
8  for this month.
9      Q.  And I'm going to endeavor not
10 to cover ground already tread in this and
11 many other prior depositions, but there
12 are just some things I need to confirm as
13 to this case and jurisdiction.  So please
14 bear with me.
15     And the first one is when I refer
16 to "Albertsons," Albertsons has multiple
17 brands.  And so I am going to use that
18 term to refer to the brands Albertsons,
19 Safeway, Bonds, Jewel-Osco, Shaw's, Acme,
20 Tom Thumb, Randalls, United Supermarkets,
21 Pavilions, Star Market, Haggen, Carrs,
22 King Food Markets and Balducci's Food
23 Lovers Market.
24     That's a long list.  If at anytime

1  you're confused about what I'm referring
2  to, can you ask me?
3      A.  Yes.
4      Q.  But thinking through that
5  list, do you recall ever shopping at one
6  of those brands?
7      A.  To be honest with you, as you
8  were going through the list, I don't
9  recall sitting ever shopping at any of
10 those; maybe Safeway.  But it would not
11 be -- it would be a rare event, in any
12 case.
13     Q.  Not memorable it sounds like?
14     A.  No.
15     Q.  And do you know if you ever
16 obtain a prescription at one of those
17 brands?
18     A.  No, definitely not.
19     Q.  And so, in looking through
20 your report, you don't reference any
21 personal experience with Albertsons or
22 one of that long list of brands.
23     So is it fair to say that you don't
24 intend to offer testimony stemming from

44 (Pages 170 - 173)

Page 174

1 your personal experience with Albertsons
2 as defined?
3     A. Correct.
4     Q. And would you agree that your
5 Track 9 expert report does not list any
6 single pharmacy defendant by name?
7     A. The report includes data that
8 was produced by the Pharmacy Defendants
9 and so the data that is in the report is
10 germane to Albertsons and Publix. But I
11 don't use the word "Albertsons" in the
12 report.
13     Q. And is that because the data
14 you're talking about -- I mean, you're
15 only looking at an aggregate form, as to
16 pharmacies generally, or do you ever pull
17 up information regarding specific
18 pharmacy brands or chains of pharmacies?
19     A. The data that I'm reviewing,
20 for the most part, does combine different
21 data sources from different pharmacies.
22 There are several studies that have
23 separated out specific pharmacy brands
24 that I believe are cited in the health

Page 175

1 economic section. But I don't think
2 Albertsons was one of those chains.
3     Q. And do you know if any of
4 that data would be specific to Tarrant
5 County at all?
6     A. It is specific to Tarrant
7 County in that there is Tarrant County
8 data in the databases.
9     Q. But do you know if those
10 studies that you reference break down the
11 data by county such that you can go pull
12 information regarding any particular
13 pharmacy chain in Tarrant County?
14     A. You, certainly, could using,
15 for example, the ARCOS publically
16 available data find data that are
17 specific to Tarrant County. And that is
18 -- ARCOS data are cited in this report.
19 And there are a number of different
20 analyses that provide county level data
21 and association.
22     Q. But prior to writing your
23 report, had you done so?
24     A. Done?

Page 176

1     Q. In the sense that had you
2 gone and reviewed the data you referenced
3 by pharmacy brand and done any independent
4 analysis by brand?
5     A. The data that I have reviewed
6 in the report analyze a broad range of
7 pharmacy brands aside from the several
8 that I mentioned that reference specific
9 pharmacy brands. And I have not
10 independently analyzed any specific
11 pharmacy brand.
12     Q. And would you agree that
13 while your report discloses some
14 opinions, which relate to pharmacies,
15 generally, that your report discloses no
16 opinions regarding any specific pharmacy
17 or chain of pharmacies?
18     A. I would say that my opinions
19 are specific to the Pharmacy Defendants
20 in this case because of the data that I
21 reviewed that includes data that are
22 specific to these Defendants.
23     Q. But looking at the writing of
24 your report, again, there's no mention of

Page 177

1 any one specific pharmacy, correct?
2     MS. do AMARAL: Objection,
3    asked and answered.
4     A. I think, yeah, I would have
5 the same answer in that, I believe, some
6 of the studies do report on specific
7 pharmacies and there are specific
8 pharmacies that are contributing to data
9 that I reviewed. But the word
10 "Albertsons" does not appear in my
11 report.
12     Q. And have you conducted
13 analyses of data in connection with this
14 report that differ, for example, between
15 independent pharmacies and retail chain
16 pharmacies, any analysis comparing the
17 two?
18     MS. do AMARAL: Objection,
19    vague.
20     A. I believe that some of the
21 papers that I have cited in this report,
22 specifically, in the pharmacy shopping
23 section do provide some level of detail
24 to retial versus independent pharmacies.

45 (Pages 174 - 177)

Page 178

1  And I was just reviewing it.  So I think
2  there are several that make that
3  distinction in the results that they have
4  posted.
5      Q.   But apart from those studies
6  have you done any analysis comparing
7  independent pharmacies and retial chain
8  pharmacies?
9          MS. do AMARAL:  Objection,
10     vague.
11     A.   The analysis that I've done
12  is of the scientific literature.
13     Q.   And, specifically, that listed
14  in your report, which you just referenced?
15     A.   Yes.
16     Q.   And before we get to your
17  opinions in Track 9, the data underlying
18  the Tarrant County report seems to have
19  been calculated in a very similar manner
20  to your Cobb County report; is that a
21  fair statement?
22     A.   Yes.
23     Q.   Likewise, your methodology
24  for calculating your opinion regarding

Page 179

1  the impact of opioids on Tarrant County,
2  that methodology seems to be really
3  similar to the methodology used in Cobb
4  County; is that fair?
5          MS. do AMARAL:  Objection,
6     vague.
7     A.   In general, yes.  There is
8  some differences in terms of the numbers.
9  For example, you know what years were
10  suppressed in the counties and things
11  like that.  So there are some differences
12  in how we approached each of the counties
13  based on the available data.  However, the
14  methodology -- the general methodology
15  that I used is consistent between the two
16  counties.
17     Q.   And so, for example, when you
18  were talking about the Larney calculations
19  and the sources of certain data, if those
20  are referenced in both Track 8 and Track
21  9, is it fair to say your analysis in
22  both cases was similar?
23          MS. do AMARAL:  Objection,
24     vague.

Page 180

1     A.   My approach to the analysis
2  was similar and the methodology was
3  similar.  Again, different issues arise.
4      And the other thing that I would
5  add to it is that I -- in short, in each
6  report that I compare and corroborate the
7  evidence that is provided.  And so there
8  were some differences in terms of the
9  available data between the two counties
10  of what data sources were available,
11  local data sources for corroboration and,
12  also, differences in the people that I
13  interviewed, obviously, to confirm.
14     So I would say there were notable
15  differences in the execution of the
16  methods.  But the overall approach of
17  using the Larney analysis, using
18  confirmatory data sets to corroborate the
19  numbers that I have, that general
20  methodology is consistent.
21     Q.   And those differences would
22  be reflected in your written report in
23  Track 9, correct?
24     A.   Yes.

Page 181

1     Q.   Okay.  And I'm generally
2  trying to avoid having to go through all
3  those spreadsheets and make you say,
4  yeah, that's the same as Cobb.
5     Does that make sense?
6     A.   Yeah, but we can -- I'm fine
7  with that.
8     Q.   I do want to ask a couple of
9  questions about the spreadsheet, which,
10  hopefully, will not involve me taking
11  them all out and going through them line
12  by line.
13     There was a spreadsheet produced to
14  us last week titled, "Track 9 Expert
15  Report Input Calculations 07/18/23."
16     Do you know if you created that
17  spreadsheet?
18     A.   Either myself or Caroline
19  Rutherford created the spreadsheet.
20     Q.   And you testified that in
21  Track 8 that you worked collaboratively
22  with Ms. Rutherford on, basically, all of
23  the calculations in the spreadsheets; is
24  that a fair statement?

46 (Pages 178 - 181)

Page 182

1    A.    Yes.
2    Q.    Okay.  And is that, also,
3  true in Track 9?
4    A.    Yes.
5    Q.    And do you know if you
6  conducted the data analysis on the
7  spreadsheet in July of 2023, which is
8  sort of what's indicated by the date
9  07/18/23?
10       MS. do AMARAL:  Objection,
11    vague, misstates the document.
12    A.    I'm not sure when the
13  spreadsheet was created or when we
14  conducted the analysis.  We may have
15  worked on it on that day.  I'm not sure.
16    Q.    I'm asking just because I
17  don't believe we have any invoices from
18  that day and I'm trying to figure out if
19  we're missing anything.
20       And, in terms of the -- well, I
21  think, we already have that covered.
22       I'm going to ask you to turn to
23  your Track 9 specific report, Schedule A.
24    A.    (The witness complies.)

Page 183

1    Q.    Are you there?
2    A.    Yup.
3    Q.    So Opinion 12 -- first of
4  all, does, Opinion 12 reflect data for
5  all of Texas or is there anything that's
6  specific to Tarrant County?
7    A.    I believe that Tarrant County
8  is included in the Texas data.
9    Q.    But this reflects data from
10  all of Texas and the numbers don't,
11  specifically, reflect only Tarrant
12  County, correct?
13    A.    Correct.
14    Q.    From the national data that's
15  referenced in the second sentence, do you
16  know if you're able to get to Tarrant
17  County specific data from that national
18  data?
19    A.    We would have to look at the
20  source.  If we pull it out, I can tell
21  you if they -- if it's possible to pull
22  out the specific Tarrant County number.
23    Q.    Sitting here today do you
24  recall whether or not you looked for

Page 184

1  Tarrant County data and performed that
2  analysis and then didn't include it in
3  your report?
4    A.    The analyses that I've done
5  are all included in the report.
6    Q.    And moving onto Opinion 13,
7  I'm trying to, again, not cover ground
8  that's exactly been trot here.
9       When you write, "confirm with local
10  experts," does that include or does that
11  refer to Dr. Johnson and Dr. Zemrus?
12    A.    Yes.
13    Q.    Anyone else?
14    A.    No.
15    Q.    And then moving onto Opinion
16  14, the first sentence reads, "Data from
17  Texas indicates that fentanyl mortality
18  began increasing after 2013 with
19  especially rapid increases after 2015.
20  The increase in fentanyl mortality deaths
21  can largely be attributed to the
22  oversupply of prescription opioids that
23  began in the 1990s and continues to the
24  present time."

Page 185

1  Did I read that correctly?
2    A.    Yes.
3    Q.    And here as well, we're
4  referring to data for all of Texas, which
5  will include Tarrant County, but is not
6  exclusively related to Tarrant County,
7  correct?
8    A.    I have included data specific
9  to Tarrant County for fentanyl overdose
10  deaths in the figures that are provided
11  in Schedule A.  So I would say I am
12  including Tarrant-specific data in that
13  opinion.
14    Q.    And you use the term
15  "oversupply."
16       Do you have any opinion regarding
17  whether prior to the increase in
18  prescribing in the late 1990s the supply
19  was appropriate to address legitimate
20  prescribing needs?
21       MS. do AMARAL:  Objection,
22    vague.
23    A.    In the literature that I
24  reviewed in the section on oversupply in

47 (Pages 182 - 185)

1  the general report, I think, the consensus
2  based on the scientific literature is
3  that the difference in the early 1990s
4  supply and the late 1990s and 2000 supply
5  reflects oversupply.
6      But there has not been, to my
7  knowledge, an analysis of whether the
8  pre-1990s level was -- the extent to
9  which that was also an oversupply.  But
10  we do know that the difference in the
11  1990s and 2000s largely reflected
12  oversupply.
13      Q.   And so, as to the time period
14  prior to the late 1990s referenced in
15  your report, you have no -- you don't
16  intend to offer any opinion regarding the
17  appropriateness of the level of opioid
18  supplied at that time --
19          MS. do AMARAL:  Objection,
20  vague.
21      Q.   -- is that fair?
22      A.   What I have cited in the
23  report would not allow a conclusion -- or
24  I would have to review it again in order

1  to know whether any studies have
2  specifically examined the pre-1990s level
3  of opioid prescribing.  It's possible
4  that that is contained in the references
5  that I have included.  And so, if I were
6  asked that opinion, that is an analysis
7  that I could do, but it's not currently
8  in the report.
9      Q.   Okay.  Skipping to the last
10  sentence of this report -- sorry, of this
11  Opinion 14, that reads, "Evidence
12  indicates that nonmedical opioid use
13  through diversion has the strongest
14  associations with transitions from
15  prescription opioids to heroin use and
16  thus associations with fentanyl exposed."
17      Did I read that right?
18      A.   Yes.
19      Q.   Can you explain what you mean
20  by "and thus associations with fentanyl
21  exposed"?
22      A.   Yes.  As I detail in the
23  report, the scientific evidence indicates
24  that the majority of fentanyl use is

1  preceded by heroin use in the United
2  States.  And so the same pathway from
3  prescription opioid use to other illicit
4  opioid use that would include illicitly
5  manufactured fentanyl would be a
6  generalizable pathway.
7      Q.   And is that more or less what
8  you discuss on Pages 4 and 5 of this
9  report?
10      And what, I mean, more specifically,
11  is a discussion at the top of Page 5 that
12  there is sufficient evidence to conclude
13  that prescription opioid use is a cause
14  of heroin and fentanyl use and,
15  approximately, 70 to 80 percent of
16  individuals who use heroin in the last
17  20 years began -- begin with prescription
18  opioids?
19      A.   That is one section in which
20  the transition from prescription opioids
21  to heroin use and fentanyl use is
22  discussed.  But it's discussed in much
23  more detail in other sections of the
24  report.

1      Q.   In the main report, correct?
2      A.   And in the case specific
3  report.  I think there's other references
4  throughout to that transition.
5      Q.   I want to ask a lot -- a fair
6  bit of questions about this 70 to
7  80 percent figure.  And, first of all, I
8  kind of want to figure out what you mean
9  by that.
10      So this references "70 to
11  80 percent of individuals who use heroin
12  in the last 20 years begin with
13  prescription opioids."
14      When you say, "the last 20 years"
15  there, what do you mean?  Do you mean
16  going back from today 20 years?
17          MS. do AMARAL:  Objection,
18  misstates testimony, the document
19  speaks for itself and it's vague.
20      A.   Yes, I would just reiterate
21  what is written on the page.  Heroin use
22  in the last 20 years began with
23  prescription opioids.  And the date of
24  the report is 2004 -- 2024.

48 (Pages 186 - 189)

1    Q.   And I want to cross-reference
2  back to Page 40 of your general report,
3  which discusses this in some more detail.
4    And we're looking at the second --
5  sorry, the third paragraph on Page 40,
6  which starts with, "Numerous studies show
7  that, approximately, 70 to 80 percent of
8  individuals who used heroin in the last
9  25 years started their opioid use with
10  prescription opioids."
11    Are you there?
12    A.   Yes.
13    Q.   And so here we're talking
14  about 25 years.
15    So we're talking about 1999 to the
16  present?
17    A.   Yes.
18    Q.   And then you go on to list a
19  few studies from which you take this
20  information.
21    The Cicero study, the Lankenau
22  study, the Pollini study and the
23  Mateu-Gelabert study; is that correct?
24    A.   And there are -- 1, 2, 3, 4,

1  5 -- at least, five on the first paragraph
2  of the next page and then two more in the
3  paragraph after that.  And, I mean, the
4  section goes on for like -- 1, 2, 3, 4 --
5  five pages after that paragraph but in
6  that paragraph, yes --
7    Q.   Well --
8    A.   -- with the addition of the
9  five that are on the page.
10    Q.   And I'm interested in the
11  next page, in the sense that you mention
12  this is Veliz study, which is more
13  recent.
14    And I guess I'm not understanding
15  how that Veliz study supports the
16  proposition that 70 to 80 percent of
17  individuals who used heroin in the last
18  25 years started their opioid use with
19  prescription opioids.
20    A.   Can we pull the study out?
21    Q.   Well, I guess, what I sort of
22  want to do -- you describe it here.
23    So, based on the description of
24  your report, are you able to explain how

1  it supports the 70 to 80 percent figure?
2    A.   This particular sentence
3  isn't relevant to that figure.
4    Q.   Okay.  And which "particular
5  sentence" are you referring to?
6    A.   I guess, the Veliz, et al,
7  2022 found in a national sample of
8  individuals followed longitudinally for
9  more than 30 years that "7.5 percent of
10  individuals who used prescription opioids
11  non-medically, also, reported heroin used
12  by age 50."
13    Q.   I think I'm not in the same
14  spot you are.
15    A.   Oh, I apologize.
16    Q.   I'm Page 41 about four lines
17  in.  And that's my fault.  I should have
18  been clearer.
19    A.   Okay.  So Veliz, et al., 2022
20  analyzed data from 26,569 individuals who
21  started longitudinal follow-up at age 18
22  between 1976 and 1986 and were followed
23  from age 18 to age 50.  Among those in
24  the cohort who started using heroin

1  between age 18 and 50, 70.3 percent,
2  also, reported nonmedical prescription
3  opioid use.
4    Q.   And, I guess, I'm trying to
5  figure out how that bolsters the idea
6  that 70 to 80 percent of individuals who
7  used heroin in the last 25 years started
8  their opioid use with prescription opioids
9  or started their heroin opioid use with
10  prescription opioids.
11    MS. do AMARAL:  Objection,
12  misstates the report.
13    A.   I think maybe what's confusing
14  is -- are you -- is it the 1976 to 1986
15  is longer than 25 years ago?
16    Q.   Well, I'm trying to,
17  basically, figure out the --
18    A.   Cause I can --
19    Q.   The data sources that,
20  basically, underlie this first sentence
21  on -- that I reference on Page 40, "The
22  numerous studies show that, approximately,
23  70 to 80 percent of individuals who used
24  heroin in the last 25 years started their

49 (Pages 190 - 193)

1 opioid use with prescription opioids."

2    A.    Right.  So these people

3 started to be followed between 76 and 86,

4 but they were followed for decades after

5 that.

6    Q.    Yes.

7    A.    So you can calculate the

8 proportion of people who started with

9 prescription opioids in the last 25 years,

10 because they were followed longitudinally

11 for many decades after they were

12 enrolled.  They were enrolled in -- does

13 that make sense?

14    Q.    Yes.

15    And, I guess, I'm trying to get the

16 connection between -- basically, the idea

17 here is that most people in the last

18 25 years who used heroin started with

19 prescription opioids; is that your

20 opinion?

21    A.    My opinion is that numerous

22 studies showed that, approximately, 70 to

23 80 percent of individuals who used heroin

24 in the last 25 years started their opioid

1 use with prescription opioids.

2    Q.    And so you would include the

3 Veliz study as bolstering that?

4    A.    Yes.

5    Q.    I want to ask a few questions

6 about the Cicero study, in particular.

7    MR. PACK:  Can I ask how much

8 time we've been on the record?

9    THE VIDEOGRAPHER:  3:09.

10    MR. PACK:  Which Exhibit

11 are we up to?

12    THE STENOGRAPHER:  Exhibit

13 6?

14    No, Exhibit 7.

15    (Deposition Exhibit Keyes 7,

16 article entitled, "The Changing

17 Face of Heroin Use in the United

18 States a Retrospective Analysis

19 of the Past 50 Years," authored

20 by Cicero, et al., was marked for

21 identification.)

22    Q.    And you reference this study

23 as "the most extensive report."

24    What did you mean by that?

1    MS. do AMARAL:  Objection,

2 vague.

3    A.    Can you point me to where

4 that's written?

5    Q.    It's the second sentence of

6 the last paragraph on Page 40.

7    A.    Okay.  Cicero, et al., 2014

8 demonstrated that among those who

9 initiated opioids in the '60s and the

10 '80s, less than one-third.

11    I don't see that phrase here.

12    Am I missing it.

13    Q.    It's the second sentence.

14 "The most extensive report is from

15 Cicero."

16    A.    Oh, I see.  I'm so sorry.

17    That is, I think, based on the

18 combination of sample size and the time

19 span.

20    Q.    Okay.  And looking at these

21 other studies, would you agree that

22 Lankenau, Pollini and Mateu-Gelabert all

23 are for substantially smaller sample

24 sizes?

1    A.    Lankenau is 50 individuals,

2 which is smaller than 2,797.  Pollini is

3 12, which is smaller than 2,797, and

4 Mateu-Gelabert is 46, which is smaller.

5    I would just, again, like to state

6 that there's five more studies cited on

7 the next page, too.

8    Q.    And looking at the data, the

9 analysis, the "Method" section, second

10 column of Page 822, these -- The Skip

11 data, which is by far the most numerous

12 set of data in this report, were analyzed

13 through the third quarter of 2013,

14 correct?  Do you see that?

15    A.    Okay.  The Skip data were

16 analyzed from the third quarter 2010 to

17 the third quarter of 2013, yes.

18    And the Rapid Interview was during

19 the fourth quarter of 2013.

20    Q.    And so all of the data

21 underlying this article, which you said

22 is the most extensive report, is, at

23 least, ten years old; is that correct?

24    A.    Yes, that's why I cited about

Page 198

1  ten more studies in just that paragraph
2  but then went on for another five pages,
3  because it's the totality of all those
4  studies together that provide the
5  evidence underlying the opinion.
6      Q.   But Pollini and Lankenau
7  necessarily by their dates of publication
8  must involve older data, correct?
9      A.   Yes.  And Veliz 2022, it
10  provides newer data.  You know, that's
11  why you kind of -- you really need to
12  look at all of the studies together.
13  Because I tried to fill in the different
14  windows of time across that entire time
15  span, such that any one study might be
16  covering a smaller sliver than the
17  totality of the evidence.
18      Q.   And, at least, in one place
19  in your report -- and I apologize that
20  we're moving around, but it's the nature
21  of --
22      A.   That's okay.
23      Q.   -- of a general report and
24  then a specific report.

Page 199

1      (Continuing.) Page 18 of your
2  specific report --
3      A.   (The witness complies.)
4      Q.   -- do you see where about
5  midway of the page you say, "Given that
6  an estimated 70 to 80 percent of those
7  initiating heroin began with prescription
8  opioids and that would indicate that
9  996,930 new heroin initiates transitioned
10  from N.M.U.P.O. to heroin during that
11  time period."  Do you see that?
12      A.   Yes.
13      Q.   And you consistently
14  reference "70 to 80 percent."
15      Do you know what number 996,930
16  represents as a percentage of 1,254,000?
17      A.   I can't do that math in my
18  head.
19      Do we have a calculator here?
20      Q.   I crunched it.  It's 80.
21      I mean, I guess, what I want to
22  know is why did you pick 80, when you
23  consistently use a range of 70 to 80?
24      A.   I think that that is a

Page 200

1  reasonable estimate from that range.
2      Q.   To estimate the top of the
3  range?
4      A.   Yeah.
5      Q.   And what is that based on?
6      A.   What is what based on?
7      Q.   Your decision to just use the
8  top of the range rather than any other
9  point in the range?
10      A.   That's a standard practice in
11  epidemiological literature that you
12  provide a range and provide an estimate
13  somewhere in that range.
14      Q.   So anywhere in the range is
15  fair game?
16      A.   It would depend on what
17  purpose the estimate is used for, in the
18  epidemiological literature.
19      Q.   Well, how about here, this
20  number?
21      A.   I think that's an estimate of
22  the number of new heroin initiates.  I
23  think that that's a fair estimate based
24  on the range that I provided.

Page 201

1      Q.   Would 70 percent, also, be a
2  fair estimate?
3      A.   It would depend on the
4  purpose that one was using the 7/8
5  percent for.
6      Q.   Well, I guess, if you just
7  replace this 996,930 number with one that
8  reflects 70 percent, would that still be
9  a fair opinion to hold?
10      A.   In this case, yes, because
11  the 1,254 [sic] is itself a minimum and
12  an under estimate.  And so, I think, in
13  that case, given that the other number is
14  so conservative, it's likely that using
15  an upper bound of the range would provide
16  -- well, I would just say that the using
17  the lower bond of the range would provide
18  a number that would be too conservative.
19  So this would be standard epidemiological
20  practice based on that.
21      Q.   And...
22      So you're, essentially, saying that
23  because the 12 -- 1,254 -- sorry,
24  1,254,000 is a conservative number,

51 (Pages 198 - 201)

1   you're allowed to just go to the top end
2   of the range when you have an estimate?
3       A.   That's not what I said.
4           MS. do AMARAL:  Yeah -- I'm
5   sorry.
6           Objection, misstates the
7   testimony.
8       Q.   I'm trying to understand that.
9   Can you -- can you say that again
10  then?
11      A.   What I said was that I used
12  standard epidemiological techniques for
13  reporting on estimates from ranges of
14  data.  And in this circumstance, because
15  the estimates from Figure 1 of Muhuri,
16  there was a minimum of 1,254,000 new
17  heroin initiates during that period and
18  then we know that the NSDUH data to be
19  underestimate, it would be a standard
20  epidemiological practice when selecting
21  something from the range to choose
22  something that's on the upper end of the
23  range to try to provide some correction
24  for the under estimation of the

1   underlying input.
2       Q.   And so, if you scrubbed out
3   the No. 996,930 and put in 877,800, which
4   is 70 percent, in your view, would that
5   be an inappropriate number?
6           MS. do AMARAL:  Objection,
7   asked and answered and vague.
8       A.   Again, it would be -- depend
9   on what you're using that number for.
10      Q.   Well, I mean, it's used for
11  the purpose of given in the sentence.
12          MS. do AMARAL:  Same
13  objection.
14      A.   I've described what a
15  standard epidemiological approach would
16  be.  And that's what I used.
17      Q.   Are you aware of any studies
18  indicating difference in whether a heroin
19  user initiates the prescription opioids
20  or not based on race or ethnicity?
21      A.   I don't think I understand
22  the question.
23      Q.   So you say 70 to 80 percent
24  of heroin users initiate with prescription

1   opioids, correct?
2       A.   Yes.
3       Q.   And I'm asking if you know if
4   that number or have you seen any studies
5   that indicate that that number varies
6   depending on a heroin user's race or
7   ethnicity?
8       A.   I believe Figure 3 of the
9   Cicero study stratifies by race and
10  ethnicity, correct?
11      Q.   And what is your
12  interpretation of Figure 3 of the Cicero
13  study?
14      A.   For white respondents, the
15  percentage of heroin users who start with
16  prescription opioids -- wait, no, this is
17  -- let me just...
18          Let's go to the "Results" section.
19          Figure 3, heroin users who started
20  their opioid use in the 60s were
21  primarily men.
22          And there was a dominance of white
23  users in 2010.
24          So, I guess, no, that's not -- I

1   apologize.  That's not relevant to the
2   question that you asked.
3           I would need to go through the
4   other -- I only have this one in front of
5   me.  So I would need to go through the
6   studies again to see if there are racial
7   differences in those percentages.
8       Q.   Do you recall -- oh, sorry.
9           Sitting here today do you recall
10  any, in particular, that might have that
11  analysis?
12      A.   I'm sure there have been.  I
13  would need to go through the studies
14  again.
15      Q.   But looking at Figure 1 and
16  comparing it to Figure 3, do you see a
17  correlation in the sense that as the
18  decades go on, the -- in Figure 1, the
19  instance of a user's first choice of drug
20  being a prescription opioid goes up and
21  as the years go on, in Figure 3, the
22  racial distribution of heroin users gets
23  more white?
24          Are both of those things true?

Page 206

1    MS. do AMARAL:  Objection,
2  vague.
3    A.   In Figure 1, what we see is
4  that the proportion of heroin dependent
5  people who starts with prescription
6  opioids increases across time.
7    In Figure 3, what we see is that
8  the distribution of heroin dependent
9  people who are white versus nonwhite,
10 also, changes across time.  So that more
11 of the heroin dependent sample is white
12 in the 2010s.
13    But it does not show that the
14 proportion of people who start with
15 prescription opioids has a racial
16 difference.
17    Q.   And that goes back to the
18 testimony that you gave that you would
19 need to check the studies to see if that
20 exists?
21    A.   Yes.
22    Q.   One follow-up point on
23 Figure 1.
24    Would you agree that the number who

Page 207

1  initiated with a prescription opioid went
2  down from the 2000s to the 2010s?
3    A.   I don't know whether the
4  authors statistically tested whether
5  that's a statistically significant
6  change.
7    But the 2010 point estimate is
8  slightly lower than the 2000 point
9  estimate.
10   Q.   And it went from about
11 74 percent to about 65 percent, roughly
12 speaking, if we can read these graphs
13 correctly?
14   A.   I -- I don't know what the
15 point estimate is from this graph, but it
16 is between 60 and 70.
17   Q.   And did you analyze the
18 demographic breakdown of Tarrant County,
19 Texas by race and ethnicity at all, in
20 connection with your report here?
21   A.   I have not.
22   Q.   Moving back to your opinion
23 section in Tarrant County.
24    MR. PACK:  And what time

Page 208

1  are we at?
2    THE VIDEOGRAPHER:  3:24.
3    MR. ESSIG:  We've been going
4  for like an hour.
5    Do you guys want to take a
6  quick break or...
7    MR. PACK:  Yeah, that would
8  be fine.
9    MR. ESSIG:  Let's take a
10 break.
11    THE VIDEOGRAPHER:  We are off
12 the record.  The time is 1:41 p.m.
13    (Recess taken 1:41 to
14 p.m.)
15    THE VIDEOGRAPHER:  We are
16 back on the record.  The time is
17 1:53 p.m.
18   Q.   Dr. Keyes, do you understand
19 you're still under oath?
20   A.   Yes.
21   Q.   I am going to ask a couple of
22 questions generally about how demographics
23 work in your field.
24    If a study reports results on one

Page 209

1  study population that reflects one set of
2  demographics and the population of, for
3  example, Tarrant County, Texas differed
4  significantly from that study population,
5  could that affect your analysis?
6    MS. do AMARAL:  Objection,
7  vague.
8    A.   It would really depend on the
9  analysis, that I couldn't answer that as
10 a blanket statement.
11   Q.   So, for example, if the Cicero
12 study differed significantly, for example,
13 from Tarrant County, for example, because
14 Cicero's percentage of Latinos was six
15 times less than Tarrant County's and
16 Cicero's percentage of African Americans
17 represented in the study was half of
18 Tarrant County's, would that affect your
19 analysis?
20   A.   In the question you're asking
21 is one about interaction.  So the
22 question, I think, is whether there is
23 sufficient data to conclude that the
24 relationship between prescription opioid

53 (Pages 206 - 209)

1    use and later heroin use, for example,
2    differs by race.  If it did, then two
3    places with very different racial
4    compositions, that would affect your
5    analysis.
6         However, in this matter, if you
7    look at the studies that are cited in
8    that section, I have confirmed that the
9    relationship between prescription opioid
10   use and later illicit opioid use is
11   generalizable across races.
12        So, for this particular question,
13   I'm not worried about the fact that
14   Tarrant County is a different racial
15   distribution than what is in the Cicero
16   study.
17        Q.   And what did you do to
18   confirm that -- sorry, I'm not -- I just
19   need to look at your answer to get to my
20   question.
21        What did you do to confirm that the
22   relationship between "prescription opioid
23   use and later illicit opioid use is
24   generalizable across races"?

1         A.   The way we do that
2    epidemiologically is by evaluating a body
3    of literature with diverse sample
4    compositions and recruitment strategies.
5         Q.   And you believe that the
6    studies you cited in this section of your
7    report represents a diverse sample
8    composition and recruitment strategy, it
9    represents that?
10        MS. do AMARAL:  Objection,
11   vague, compound.
12        Q.   Sorry, I can ask the
13   question.
14        And you believe that the studies
15   you cited in your report on Pages 40 and
16   41 represent a body of literature with
17   diverse sample compositions and
18   recruitment strategies?
19        A.   This section goes to Page 45
20   and so I would say, if you examine the
21   studies from Page 40 to Page 45, yes, you
22   will find studies with a range of
23   different sample compositions and
24   recruitment strategies.

1         Q.   Can we go back to Page 37
2    here.  I'm trying to limit our
3    pingponging from specific to general from
4    specific to general --
5         A.   It's okay.
6         Q.   -- given that we've done a
7    fair bit of that.
8         The paragraph beginning at the
9    bottom of Page 37 that begins with,
10   "Evidence indicates that prescription
11   opioid-related deaths, specifically,
12   those not involving other opioids had
13   declined in complement with the decline
14   in prescription opioids sales and
15   distribution in recent years."
16        Do you see that section?
17        A.   I do.
18        Q.   This section appears to be
19   new in this report.
20        Does that sound right to you?
21        A.   Yes.
22        Q.   And why was it included?
23        A.   Because I had analyzed the
24   vital statistics data on deaths over time

1    and it's a relevant it data point.  You
2    know, if there is a causal relationship
3    between prescription opioid use and
4    death, as prescriptions have declined,
5    you know, you saw an increase in deaths
6    when prescriptions increased.
7         So I wanted to know whether the
8    data were, also, consistent with a
9    decline in deaths as prescriptions
10   decreased, as that is part of the
11   Bradford Hill criteria I used.  So I
12   thought it was a relevant analysis to
13   include.
14        Q.   And this is a general opinion
15   it's not specific to Tarrant County?
16        A.   Tarrant County deaths are
17   included in the analysis that I did.
18        Q.   But it, also, is generalizable
19   across the country in terms of that being
20   your opinion?
21        A.   There are other counties that
22   are included in that estimate as well as
23   Tarrant County.
24        Q.   But this isn't in the section

54 (Pages 210 - 213)

1   of your report that doesn't, specifically,
2   relate to Tarrant County, correct?
3       It's not your case specific
4   opinion, I guess, is what I'm trying to
5   get at.
6       A.   This is not part of Schedule
7   A; however, I do believe that this
8   section is specific to Tarrant County in
9   that Tarrant County data are included in
10  the section.
11      Q.   Alright.  Now, I want to go
12  back to your Tarrant County report.
13      And, specifically, Opinion 15,
14  which reads, "In 2021, the last year of
15  data available, I estimate that for
16  prevalence of opioid use disorder is,
17  approximately, 2.1 percent in Tarrant
18  County."
19      Did I read that right?
20      A.   Yes.
21      Q.   And without waiving any
22  objection to the length of this
23  deposition, we -- I do think we've saved
24  a bit of time in that you testified that

1   the inputs into the spreadsheet, the
2   Track 9 spreadsheet, and the analysis
3   with some variation are the same as in
4   the Track 8 matter.  But I did have a few
5   specific questions about Track 9.
6       MS. do AMARAL:  Counsel, I'm
7       sorry.  We had an agreement about
8       the length of the deposition.
9       Are you saying that that's
10      not the case, that you are reserving
11      objections?
12      MR. PACK:  I will say I
13      can't speak to the agreement that
14      was reached.
15      MS. do AMARAL:  Well, I'll
16      put a note on the record that
17      parties agreed to the length of
18      this deposition at four hours.  So
19      there shouldn't be any objections
20      pending with regard to the length
21      of the deposition.
22      MR. JANUSH:  And I'm going
23      to put on the record as Counsel
24      for Track 9 that at no point was

1   there ever an objection to the
2   agreement.  In fact, on behalf of
3   all Counsel, Meredith Thornburg
4   White addressed in an e-mail that
5   there is an agreement as to all
6   of the times that have been reached.
7       Q.   So, as to the data in Opinion
8   15, you note that 2021 is the last year
9   of data available, correct?
10      A.   Yes.
11      Q.   And this report is dated
12  April 15, 2024, correct?
13      A.   Yes.
14      Q.   Did you look after the time
15  you began drafting -- or you drafted this
16  section of your report to see if 2022
17  data had been released yet?
18      A.   They had not been released at
19  the time that this report was submitted.
20      Q.   And I want to ask a few
21  questions about your figures specific to
22  Tarrant County.
23      So Figure 3 on Page 3, let me know
24  when you're there.

1       A.   I am there.
2       Q.   Would you agree that the --
3   well, first of all, the lines -- the dots
4   represent data points and the lines
5   represent moving averages; is that fair?
6       A.   Yes.
7       Q.   Would you agree that the
8   moving average for both Texas and Tarrant
9   County is significantly lower than the
10  moving average for the United States as a
11  whole, in terms of overdose death rates?
12      A.   No.
13      MS. do AMARAL:  Objection,
14      vague.
15      Q.   And why do you disagree with
16  that?
17      A.   For many of the years --
18  first of all, for many of the years,
19  there's indistinguishable rates between
20  Texas and the overall nation.  And then
21  for the most recent years, statistical
22  significance is a specific test that's
23  done on race and that was not performed
24  here.  So I could not conclude that they

1  are significantly different.
2      Q.  Well, what is the -- for
3  2021, the last year of analysis you did,
4  what is the national moving average, even
5  roughly speaking, if you have to be rough
6  because of the size of the graph?
7      A.  Yeah, I don't -- I don't
8  know, specifically, because I don't have
9  the underlying spreadsheet.
10     Q.  Would you agree that it looks
11  to be halfway between 20 and 30?
12         MS. do AMARAL:  Objection.
13     A.  In 2021?
14     Q.  Yes.
15     A.  I'm sorry, for the nation or
16  for Texas?
17     Q.  For the nation.
18     A.  No, I would not agree.
19     Q.  Why not?
20     A.  Because the dot looks to be
21  above 30.
22     Q.  No, I said "the moving
23  average."
24     A.  Oh, I'm sorry.  I thought you

1  meant the dot.
2      Yes, "the moving average" is
3  between 20 and 30.
4      Q.  And, likewise, the moving
5  average for Texas and Tarrant County in
6  2021, those are pretty close, correct?
7         MS. do AMARAL:  Objection,
8      vague.
9      A.  Say the question again.
10     Q.  The moving averages for Texas
11  in Tarrant County are pretty close in
12  number in 2021, correct?
13         MS. do AMARAL:  Objection,
14      vague.
15     A.  Again, I have not
16  statistically tested the difference.  So
17  I can't -- I think -- we don't have
18  enough information to answer the
19  question.
20     Q.  But the numbers, though, the
21  numbers on your chart, for 2021, the
22  moving average for Tarrant County is
23  south of 15, correct, lower than 15?
24     A.  The moving average is lower

1  than 15.
2         MS. do AMARAL:  Counsel, to
3      the extent that you want to address
4      more questions in this figure, I
5      suggest that we look at the input
6      calculation.
7      Q.  I'm going to move onto
8  Figure 5.
9      And these lines, also, represent
10  moving averages and the dots represent
11  data points; is that correct?
12     A.  That is correct.
13     Q.  And for overdose death rates
14  on opioids, would you agree that the
15  moving average nationally in 2021 is
16  somewhere between 17 and a half and 20?
17         MS. do AMARAL:  Objection,
18      vague.
19     A.  I would be able to conclude
20  that it's between 15 and 20.
21     Q.  You don't see this creeping
22  over that 17 and a half line?
23         MS. do AMARAL:  Objection,
24      asked and answered.

1      Counsel, if you want to
2      discuss the input data, you should
3      put it before the witness.
4      A.  Because the Y axis is not
5  marked, I would -- what I can state
6  without looking at the input calculation
7  is that it's between 15 and 20.
8      Q.  And as to Tarrant County,
9  it's between 5 and 10?
10         MS. do AMARAL:  Same
11      objection.
12     A.  The moving average for
13  Tarrant County --
14     Q.  For 2021.
15     A.  -- for 2021 looks to be
16  between 5 and 10.
17         MR. PACK:  What is our timing?
18         THE VIDEOGRAPHER:  3:37.
19     Q.  And then moving onto Figure 7,
20  this is the same analysis with regard to
21  moving averages and data points, correct,
22  in terms of what the lines and dots mean?
23     A.  In terms of what the lines
24  and dots mean, the line is a moving

56 (Pages 218 - 221)

Page 222

1  average. The dot is a data point.
2    Q.   And so, for 2021, the moving
3  average for national overdose death rates
4  and prescription opioids is between --
5  well, I think, it's clearly between 5 and
6  6, but you might say it's between 4 and
7  6.
8        MS. do AMARAL: Objection,
9    vague.
10   Q.   Would you agree that it's
11 between 5 and 6?
12       MS. do AMARAL: Same
13   objection.
14   A.   I think what we can conclude
15 from the figure the way it's presented is
16 that it's between 4 and 6.
17   Q.   And then for Tarrant County,
18 2021 moving average less than two,
19 correct?
20       MS. do AMARAL: Objection,
21   vague.
22   A.   I would need to see the input
23 calculation, but it's very close to the
24 two line.

Page 223

1        MR. PACK: Let's take a brief
2    break.
3        THE VIDEOGRAPHER: We are off
4    the record. The time is 2:08 p.m.
5        (Recess taken 2:08 to
6    p.m.)
7        THE VIDEOGRAPHER: We are
8    back on the record. The time is
9    2:11 p.m.
10   Q.   Dr. Keyes, are you aware
11 you're still under oath?
12   A.   Yes.
13   Q.   Can you turn to Page 22 of
14 your case specific report?
15   A.   Yes.
16   Q.   So I want to ask about the
17 sort of second paragraph of the section,
18 "stimulant death trends in the United
19 States and the contribution of opioids."
20   A.   Okay.
21   Q.   Beginning with, "Nonfatal
22 overdose from stimulants is also
23 increasing across the United States,
24 although available evidence indicates

Page 224

1  that it's largely concomitant with opioid
2  use."
3    Did I read that right?
4    A.   Yes.
5    Q.   And so what do you mean in
6  this sentence by "opioid use,"
7  specifically?
8        (Stenographer clarification.)
9        MR. PACK: Specifically.
10   A.   I provide more detail in the
11 remaining paragraph. But, I mean, that,
12 for example, cocaine-related nonfatal
13 overdoses have increased but only where
14 an opioid was present. So cocaine-related
15 nonfatal overdose actually declined when
16 an opioid was not present.
17   And there are other examples in
18 that paragraph that provide evidence for
19 the statement that the increase in
20 stimulant overdose is really -- is very
21 connected to the opioid epidemic.
22   Q.   And when you say, "presence
23 of an opioid," where does that data come
24 from in death cases?

Page 225

1    A.   Well, in this paragraph,
2  we're talking about nonfatal. So it's
3  not coming from death cases.
4    But there's other sections in the
5  report where we do include death cases.
6    Q.   And do you know how the
7  information that an opioid was present
8  comes to be? Do you know where that data
9  comes from?
10   And I'm not trying to hide the
11 ball.
12   Does it come from toxicology
13 screens, do you know?
14   A.   For the H. Cup data or for
15 the --
16       MS. do AMARAL: Objection.
17   Q.   For the H. Cup data.
18   A.   For the H. Cup data, it's
19 based on hospital codes.
20   Q.   And do you know where those
21 -- how those are calculated?
22   A.   It -- there's a range of
23 information that clinicians use to make a
24 determination of the presence of a

57 (Pages 222 - 225)

Page 226

1  specific substance.
2      Q.   And this is national data,
3  correct?
4          MS. do AMARAL:  Objection --
5      A.   This is --
6          MS. do AMARAL:  -- calls for
7      privileged testimony.
8          Go ahead.
9      A.   This is nationwide emergency
10  department sample data.
11     Q.   Okay.  And are you aware of
12  reports of significant increases in
13  contamination of cocaine and
14  methamphetamine with fentanyl?
15     A.   I am aware of data from, for
16  example, drug seizure sources that have
17  indicated that among drug seized, there
18  is more fentanyl in cocaine and
19  methamphetamine, for example.
20     Q.   Did you consider that data in
21  forming your opinions in this case?
22     A.   Yes.
23     Q.   Did you cite any of those
24  studies in your -- in the report at all --

Page 227

1      A.   Yes.
2      Q.   -- that reflects contamination
3  of cocaine and methamphetamine with
4  fentanyl?
5          MS. do AMARAL:  Objection.
6          You can answer, if you can.
7      A.   Yes.
8      Q.   Do you recall any offhand?
9      A.   There are a number of reports
10  that are cited throughout the references,
11  the materials considered and the
12  supplemental materials considered list
13  that provide information on fentanyl
14  contamination.
15     Q.   In cocaine and methamphetamine?
16     A.   Yes.
17         MR. PACK:  I'm going to turn
18     it over to Mr. Essig.  Although I
19     might have some follow-up
20     questions, to the extent he has
21     any time left.
22         MR. ESSIG:  Okay.  Can you
23     hear me down here okay?
24         THE WITNESS:  Yes.

Page 228

1          MR. ESSIG:  Okay, great.
2  EXAMINATION BY MR. ESSIG:
3      Q.   Professor Keyes, I have some
4  followup here.  I think my first couple
5  here might be yes or no questions.
6      Your report does not contain any
7  opinion with a numerical calculation of
8  how many opioids were oversupplied in
9  Cobb County from 1999 to 2021, yes or no?
10     A.   I would say it's not exactly
11  a yes or no question because the general
12  report contains information on numerical
13  calculations of opioid oversupply that
14  are specific to Cobb County.
15     But I did not provide a spreadsheet
16  with my own calculation.  I relied on the
17  literature.
18     Q.   Okay.  So I'd like you then
19  to direct me to the section of your Cobb
20  County report that contains an opinion
21  with a numerical calculation of how many
22  opioids were oversupplied in Cobb County
23  from 1999 to 2021.
24     A.   So the general section of my

Page 229

1  report providers an overview of the
2  epidemiological literature that has
3  provided evidence underlying my opinion
4  that there was oversupply.
5      It is not in -- I did not do a
6  specific calculation for Schedule A.  I
7  relied on the epidemiological literature
8  to support the opinion I'm offering.
9      Q.   Okay.  And I understand that
10  you have a general opinion about
11  oversupply of opioids.  And I think you
12  just gave me the answer.
13     But there's no numerical calculation
14  where you sat down and said, this number
15  of opioids by MME or a number of
16  prescriptions were oversupplied to Cobb
17  County from 1999 to 2021, correct?
18  That's not in the report?
19     A.   What is in the report is an
20  analysis of the epidemiological
21  literature that provide those numerical
22  ranges.
23     Q.   Well, I understand --
24     A.   But it is not in Schedule A

58 (Pages 226 - 229)

Page 230

1    and did I not produce a spreadsheet.
2        Q.    And you didn't do a specific
3    calculation or give a specific number in
4    your report, correct --
5             MS. do AMARAL:  Objection.
6        Q.    -- for Cobb County?
7        A.    I did do a specific analysis.
8        Q.    I didn't ask you specific
9    analysis; very simple yes or no.
10       Is there a number in your report of
11   the number of opioids that you believe
12   were oversupplied in Cobb County between
13   1999 and 2021?
14            MS. do AMARAL:  Objection,
15       asked and answered and vague.
16       Q.    Is there a number?
17            MS. do AMARAL:  Same
18       objection.
19       A.    In my general report, I
20   provide an analysis of the epidemiological
21   literature that provides numerical
22   estimates of oversupply and that is what
23   I used to form my opinion.  And that
24   contains data that is specific to Cobb

Page 231

1    County.
2        Q.    But a number itself is not
3    supplied in Schedule A, yes or no?
4             MS. do AMARAL:  Same
5        objection.
6        A.    Because I did the analysis in
7    the general report, I did not need to
8    include any specific numbers in Schedule
9    A to form my opinion.
10       Q.    Professor Keyes, you are an
11   associate editor, I believe, with the
12   Journal of Drug and Alcohol Dependence;
13   is that right?
14       A.    Yes.
15       Q.    And what is your role there
16   as an Assistant Editor?
17       A.    I evaluate studies that have
18   been submitted by scientists and I judge
19   their appropriateness for peer review and
20   their appropriateness for the scope of
21   the journal.
22       Q.    So do you have a role in
23   approving which manuscripts get published
24   in that journal?

Page 232

1        A.    Yes.
2        Q.    Okay.  So, in your general
3    report, you cite a few articles that were
4    published in that journal.  And I wanted
5    to ask you a couple of questions about
6    them.  That means I need a sticker or
7    two.
8             MR. ESSIG:  What number are
9        we on number-wise?
10            Eight.
11            (Deposition Exhibit Keyes 8,
12       article entitled, "Predicting
13       first use of heroin from
14       prescription opioid use subtypes:
15       Insights fro the Monitoring the
16       Future longitudinal panel,"
17       authored by Dash, et al, was
18       marked for identification.)
19       Q.    Alright.  I'd like to hand
20   you what we've marked as Keyes 8 to your
21   deposition.
22       This is the 2024 Dash report that I
23   think you mentioned before.
24       Do you recall this article?

Page 233

1        A.    Yes, I do.
2        Q.    And did you have any role in
3    reviewing or selecting this paper for
4    publication?
5        A.    No.
6        Q.    How many associate editors
7    are there of Drug and Alcohol Dependence?
8        A.    I'm not sure.
9        Q.    Handful, dozens?  Do you have
10   any idea?
11       A.    It's publically available on
12   the website.  If I were to make a
13   ballpark guess, I would say probably 15.
14   But I could be -- there's a margin of
15   error there.
16       Q.    And are articles for review
17   assigned, you know, based on particular
18   areas of interest or randomly?  Or how
19   does that work in terms of what articles
20   you get to look at?
21       A.    The associate editors each
22   have content errors that they cover.
23       Q.    What are your "content areas"?
24       A.    I would need to look on the

59 (Pages 230 - 233)

Page 234

1  website with -- I'm not sure exactly
2  what's listed on the website, in terms of
3  my content areas.
4      Q.   Are opioid-related articles
5  part of your content areas?
6      A.   I don't know that my content
7  area specified opioid-related articles.
8  Epidemiology is the -- would be a content
9  area that I cover.
10     Q.   So the Dash article is in
11 front of you.  It's a 2024 article in a
12 Drug and Alcohol Dependence.  It's
13 titled, "Predicting first use of heroin
14 from prescription opioid use subtypes:
15 Insights from the monitoring the future
16 longitudinal panel."  And the lead author
17 is a Genevieve F. Dash.
18     Do you see that?
19     A.   I do.
20     Q.   Are you familiar with Dr.
21 Dash?
22     A.   I'm not.
23     Q.   You cite this article on
24 Page 42 of your general Track 8 report?

Page 235

1      A.   Yes.
2      Q.   Okay.  And I wanted to discuss
3  a couple of items here.
4      The abstract to the article begins
5  with, "Only a small proportion of
6  individuals who initiate nonmedical use
7  of prescription opioids (NUPO) transition
8  to heroin, suggesting that more nuanced
9  aspects of NUPO may be better indicators
10 of risk for escalating opioid use
11 trajectories."
12     Did I read that correctly?
13     A.   Yes.
14     Q.   Okay.  And your discussion on
15 Page 42 in the generic section of your
16 report in Track 8 -- and I'm not going to
17 read the whole paragraph, but I think the
18 last line here maybe this is your
19 takeaway.  You wrote, "Thus strong and
20 significant associations with subsequent
21 heroin use are found in the majority of
22 student responders who use opioid
23 nonmedical."
24     Did I read that accurately?

Page 236

1      A.   Yes.
2      Q.   Okay.  And -- but, in their
3  abstract, the authorized -- the authors
4  summarized their conclusion in the
5  conclusion section of the abstract to say
6  in the first line, "NUPO does not
7  uniformly or uniquely increase risk for
8  heroin initiation."
9      Do you see that?
10     A.   I see that --
11         MS. do AMARAL:  Objection,
12 vague.
13     A.   I see that that is what is
14 written.
15     Q.   Okay.  Do you agree or
16 disagree with that sentence?
17     A.   I think my analysis of their
18 paper -- and if you look at their
19 results, what they show is strong and
20 significant associations with subsequent
21 heroin use in the majority of student
22 respondents who used opioids nonmedically
23 in their paper.
24     Q.   And you didn't report on

Page 237

1  their finding that nonmedical users of
2  prescription opioids with the highest
3  rate of later heroin initiation have also
4  the highest rates of other illegal drug
5  use, correct?
6      A.   I'm sorry.  I don't understand
7  the question.
8      Q.   Okay.  You gave us your read
9  of the Dash article.  And I'm just trying
10 to make the point that in your discussion
11 on Page 42 of the article, there's a
12 section of the article -- well, they
13 report on their findings that "nonmedical
14 users of prescription opioids with the
15 highest rate of later heroin initiation
16 are those who have the highest rates of
17 other illegal drug use."
18     Do you recall that from the Dash
19 articles?
20     A.   That's one of the many
21 findings from the Dash article, but it
22 was not particularly relevant to the
23 comparison I was making.
24     Q.   Okay.  And do you recall --

60 (Pages 234 - 237)

Page 238

1  and we can find it here -- that Dash and
2  her co-authors concluded that for those
3  users, quote, "It is likely more
4  reflective of a general propensity for
5  drug use and the course of addiction that
6  substantiation that NUPO acts as a
7  gateway to heroin use."
8      Do you see that?
9      A.   That was not a finding from
10  their analysis.
11      That is a conclusion that they
12  drew, based on their interpretation of
13  the data.  I would not agree with that
14  interpretation of the data.
15      Q.   And why not?
16      A.   Because much like every other
17  study that I cite in this section, they
18  find that there is strong and significant
19  associations with subsequent heroin use
20  found in the majority of student
21  respondents who used opioids not
22  medically.  I think this article is very
23  consistent with the epidemiological
24  literature showing that one of the

Page 239

1  biggest risk risks for use of heroin is
2  prior exposure to prescription opioids.
3      Q.   Okay.  Thank you.
4      MR. ESSIG:  How much more
5  time?
6      THE VIDEOGRAPHER:  3:55.
7      MR. ESSIG:  Five minutes.
8      Q.   Dr. Keyes, I'd like to hand
9  you what we've marked as Exhibit Keyes 9
10  to your deposition.
11      (Deposition Exhibit Keyes
12      9, article entitled, "Concordance
13      between controlled substance
14      receipt and post-mortem toxicology
15      in opioid-detected overdose
16      deaths:  A statewide analysis,"
17      authored by Howell, et al., was
18      marked for identification.)
19      Q.   This is another article from
20  the Journal of Drug and Alcohol
21  Dependence.  This one is from 2023
22  called, "Concordance between controlled
23  substance receipt and postmortem
24  toxicology opioid detected overdose

Page 240

1  death:  Statewide analysis," and the lead
2  author is Benjamin Howell.
3      And this is cited on Page 70 of
4  your generic report.  It's referenced at
5  241.
6      Were you involved in editing or
7  selecting or approving this article for
8  publication in the Drug and Alcohol
9  Dependence?
10      A.   No.
11      I'm sorry, Page 70?
12      Q.   I'm sorry.  That's not the
13  right page.
14      MS. do AMARAL:  It is if
15      you're referring to the references.
16      A.   Oh, the reference is 241 on
17  Page 17.
18      (INAUDIBLE DUE TO CROSS-TALK.)
19      MR. ESSIG:  Okay.
20      A.   I just want to see where it's
21  discussed in the report before -- 241 is
22  the...
23      Q.   Yes.
24      MS. do AMARAL:  Yes.

Page 241

1      A.   Hold on.  241, okay.
2      (The witness writes on the
3  exhibit.)
4      MS. do AMARAL:  And you see
5  it on Page 45?
6      THE WITNESS:  Yes, I've got
7  it.
8      Q.   Page 44 and 45.
9      A.   Yes.
10      Q.   Are you personally familiar
11  with Dr. Howell or any of the other
12  co-authors of this piece?
13      A.   No, none of them sound
14  familiar to me.
15      Q.   Okay.  And you cited this
16  article in support of your assertion that
17  prior prescription opioid use among those
18  who die of overdose remain substantial
19  and significant, correct?
20      A.   It is cited with the
21  statement that the percentage of
22  decedents with purported medically
23  prescribed opioids from the range of one
24  month to two years prior to death is,

1  approximately, 25 to 55 percent.
2      Q.    And you -- strike that.
3      The authors here in the abstract,
4  they discuss that this -- they examine
5  data from 1,412 opioid detected overdose
6  deaths in Connecticut from May of 2016
7  through December of 2017.
8      Do you see that?
9      A.   I do.
10     Q.    And they found that
11 36 percent of the subjects had received
12 an opioid prescription in the 90 days
13 prior to their deaths.
14     A.    Well, 47 percent received
15 opioid or benzodiazepine.  30 percent
16 received opioid, yes.
17     Q.    36 percent received an opioid,
18 correct?
19     A.    Yes.
20     Q.    Okay.  And...
21     Let me get the right cite for you
22 here.
23     But they found that 84.5 percent of
24 the deaths in this group were determined

1  to be fentanyl or heroin involved.
2  That's on Page 3 in "Results" in the
3  second paragraph.  The sentence that
4  begins, "Based on toxicology results from
5  OCME investigations were all opioid
6  detected overdose deaths.  Of 1,983,
7  84.5 percent were fentanyl or heroin
8  involved.
9      Do you see that?
10     A.    And 42 percent involved a
11 pharmaceutical opioid.
12     Q.    That's only 42 percent were
13 found to have a pharmaceutical opioid
14 detected in their system after death; is
15 that right?
16     A.    Yes.
17     Q.    Okay.  Then on Page 7...
18 actually, strike that.
19     Okay.  Alright.  Your generic
20 report Pages 50 through 54, these are two
21 new sections that you, also, had added in
22 this Track 8 on fentanyl and stimulants;
23 is that right?  They were not in Track 7?
24     A.    Correct.

1      Q.    And why did you decide to add
2  these new sections on fentanyl and
3  stimulants to your generic report in
4  Track 8?
5          MS. do AMARAL:  Objection,
6      asked and answered.
7          Go ahead.
8      A.    As I stated before, because
9  we know that fentanyl deaths have been
10 increasing and there is a lot of
11 discussion about the role of fentanyl
12 deaths in the opioid epidemic.  So I
13 thought that the availability over time
14 of new epidemiological research warranted
15 a special section or a new section.
16     Q.    And in fact on Page 51, your
17 discussion notes that fentanyl has become
18 a preferred product for users now in the
19 current wave of the opioid crisis
20 correct?
21         MS. do AMARAL:  Objection,
22     asked and answered.
23     A.    Can you point me to where
24 that is?

1      The preferred products?
2      Q.    So you cite a study from
3  Baltimore, Maryland from November 17th,
4  individuals for fentanyl.
5      And then if you go down to the --
6      A.    I think, I found the
7  sentence, and it's among people who use
8  opioids over time.  There has been an
9  increase in the preference for fentanyl
10 given the strength.
11     Q.    There Is an increasing
12 preference for fentanyl among opioid drug
13 users, correct?
14     A.    That's not what's written.
15         MS. do AMARAL:  Objection.
16     A.    What's written is, "As
17 fentanyl became more familiar to people
18 who use opioids, there was an increase in
19 the proportion of opioid users who
20 intentionally fentanyl as a preferred
21 product," not the preferred product.
22         MS. do AMARAL:  Counsel, I
23     believe you are out of time.
24         MR. ESSIG:  How much time

Page 246

1    is left?
2         THE VIDEOGRAPHER:  4:02.
3         MS. do AMARAL:  You're out
4    of time.
5         MR. ESSIG:  Alright.
6    Q.   Professor Keyes, I appreciate
7    your time today.
8         MR. ESSIG:  And, Counsel, I
9    appreciate your time.
10        Just for the record, because
11   we -- and I'm not reopening
12   anything here.  But because we
13   didn't get the notes of her
14   interviews, we have Dr. Gulledge
15   and Miss Owens and Chief --
16        THE STENOGRAPHER:  Adams.
17        MR. ESSIG:  I'm forgetting his
18   name.
19   A.   Adams.
20   Q.   "Adams," thank you.
21        MR. ESSIG:  You know, I know
22   you're going to produce those to
23   us.  I don't anticipate necessarily
24   that they would cause us to want

Page 247

1    to make a request to you for extra
2    time, but we can meet and confer
3    on the record after we receive
4    those documents.
5         MR. PACK:  And that would
6    be the same for Tarrant County as
7    well.
8         MS. do AMARAL:  Understood.
9         We're going to go off the
10   record for just a moment and
11   we're not going to close out the
12   deposition just yet.
13        Just give us one moment.
14        THE VIDEOGRAPHER:  Okay.  We
15   are off the record.  The time is
16   2:34 p.m.
17        (Recess taken 2:34 to
18   p.m.)
19        THE VIDEOGRAPHER:  We are
20   back on the record.  The time is
21   2:39 p.m.
22        MS. do AMARAL:  Thank you,
23   Counsel.
24        We have no problem producing

Page 248

1    the notes from Dr. Keyes.
2         We just simply wanted to
3    note that the parties have agreed
4    to four-hour combined deposition
5    for Dr. Keyes.
6         Defendants have expended
7    their time and the deposition is
8    closed.
9         Thank you.
10        MR. ESSIG:  And, for the
11   record, we understand your position.
12        I don't know that we agree
13   with it with regard to materials
14   that we could not have asked her
15   about today that weren't produced
16   to us.
17        So, when we get the notes, we
18   will happily meet and confer with
19   you as to whether any additional
20   time will be requested or not.
21        But subject to that, I
22   understand that we have concluded
23   for today.
24        MS. do AMARAL:  And to the

Page 249

1    extent that you could have requested
2    those documents in advance, it
3    would be our position that there
4    wouldn't be additional time.  But
5    we can meet and confer, as you
6    suggest.
7         MR. ESSIG:  Fair enough.
8         MS. do AMARAL:  Okay.
9         MR. ESSIG:  Alright.
10        THE VIDEOGRAPHER:  We are
11   off the record.  The time is
12   p.m.  This concludes today's
13   testimony.
14        Thank you everyone.  And
15   take care.
16        (Time noted 2:40 p.m.)
17
18
19
20
21
22
23
24

63 (Pages 246 - 249)

Page 250

CERTIFICATE OF REPORTER

1    I, SILVIA P. WAGE, CSR, CRR, RPR,
2  herby certify that the witness in the
3  foregoing deposition was by me duly sworn
4  to tell the whole truth, nothing but the
5  truth; said deposition was taken down in
6  shorthand by me, a disinterested person,
7  at the time and place therein stated.  The
8  testimony of said witness was thereafter
9  reduced to typewriting by computer under
10  my direction and supervision.  Before
11  completion of the deposition, review of
12  the transcript [X] was [ ] was not
13  requested.  If requested, any changes
14  made by the deponent (and provided to
15  the reporter) during the period allowed
16  are appended hereto.
17    I further certify that I am not of
18  counsel or attorney for either or any
19  of the parties to the said deposition,
20  [illegible] in the event
21  [illegible] am not
22  [illegible] ies thereto.
23                                 May 29, 2024

---

Page 251

                Veritext Legal Solutions
                     1100 Superior Ave
                         Suite 1820
                   Cleveland, Ohio 44114
                   Phone: 216-523-1313

May 29, 2024

To: PAULINA do AMARAL

Case Name: National Prescription Opiate Litigation - Track 8 (Cobb
County) v.
Veritext Reference Number: 6692778
Witness:  Katherine Keyes, Ph.D.     Deposition Date:  5/14/2024

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness
review the transcript and note any changes or corrections on the
included errata sheet, indicating the page, line number, change, and
the reason for the change.  Have the witness' signature notarized and
forward the completed page(s) back to us at the Production address
shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of
this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

---

Page 252

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 6692778
CASE NAME: National Prescription Opiate Litigation - Track 8
(Cobb County) v.
DATE OF DEPOSITION: 5/14/2024
WITNESS' NAME: Katherine Keyes, Ph.D.
    In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
    I have made no changes to the testimony
as transcribed by the court reporter.

_____        _____
Date            Katherine Keyes, Ph.D.
    Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

    They have read the transcript;
    They signed the foregoing Sworn
    Statement; and
    Their execution of this Statement is of
    their free act and deed.

    I have affixed my name and official seal

this _____ day of_____, 20____.

            _____
            Notary Public

            _____
            Commission Expiration Date

---

Page 253

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 6692778
CASE NAME: National Prescription Opiate Litigation - Track 8
(Cobb County) v.
DATE OF DEPOSITION: 5/14/2024
WITNESS' NAME: Katherine Keyes, Ph.D.
    In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
    I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s).
    I request that these changes be entered
as part of the record of my testimony.

    I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.

_____        _____
Date            Katherine Keyes, Ph.D.

    Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
    They have read the transcript;
    They have listed all of their corrections
        in the appended Errata Sheet;
    They signed the foregoing Sworn
        Statement; and
    Their execution of this Statement is of
        their free act and deed.
    I have affixed my name and official seal
this _____ day of_____, 20____.

            _____
            Notary Public

            _____
            Commission Expiration Date

64 (Pages 250 - 253)

Page 254

```
1              ERRATA SHEET
            VERITEXT LEGAL SOLUTIONS MIDWEST
2              ASSIGNMENT NO: 6692778
3   PAGE/LINE(S) /      CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19

    _____    _____
20  Date           Katherine Keyes, Ph.D.
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
        Notary Public
24
    _____
25  Commission Expiration Date
```