# EXHIBIT 35

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION
 3     IN RE NATIONAL               )
       PRESCRIPTION OPIATE          )
 4     LITIGATION                   )
                                    )
 5     THIS DOCUMENT RELATES TO:    ) MDL No. 2804
       Track Nine: Tarrant         )
 6     County, Texas               ) Case No. 17-md-2804
                                    )
 7     (Case No.                    ) Judge Dan Aaron Polster
       (1:18-op-45274-DAP)          )
 8                                  )
       TARRANT COUNTY,              )
 9                                  )
         Plaintiff,                 )
10                                  )
           v.                       )
11                                  )
       PURDUE PHARMA L.P.,          )
12     et al.,                      )
                                    )
13       Defendants.                )
14     ********************************************************
15              ORAL AND VIDEOTAPED DEPOSITION OF
16                        G.K. MAENIUS
17       AS 30(B)(6) REPRESENTATIVE FOR TARRANT COUNTY
18                       FEBRUARY 29, 2024
19     ********************************************************
20
21
22
23
24
25
```

Page 2

```
 1    ORAL AND VIDEOTAPED DEPOSITION OF G.K. MAENIUS,
 2  AS 30(B)(6) REPRESENTATIVE FOR TARRANT COUNTY, produced
 3  as a witness at the instance of the Defendants, and duly
 4  sworn, was taken in the above-styled and numbered cause
 5  on the 29th day of February, 2024, from 9:41 a.m. to
 6  7:32 p.m., before Julie C. Brandt, RMR, CRR, and CSR in
 7  and for the State of Texas, reported by machine
 8  shorthand at Veritext Legal Solutions, 300 Throckmorton
 9  Street, Suite 1600, Fort Worth, Texas, pursuant to the
10  Federal Rules of Civil Procedure.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1  ALSO PRESENT:
 2     Mark C. Kratovil - Tarrant Co. Asst. Criminal D.A.
 3     Craig Price - Tarrant Co. Chief, Civil Div. (Zoom)
 4     Sadie Turner - Turner Law Firm
 5     Megan King - Veritext Videographer
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              APPEARANCES
 2
 3  FOR THE PLAINTIFF TARRANT COUNTY:
 4     Evan M. Janush
 5     Leila Ayachi
 6     Alex Abston (via Zoom)
 7     THE LANIER LAW FIRM, PC
 8     10940 W. Sam Houston Pkwy N.
 9     Suite 100
10     Houston, Texas 77064
11     713-659-5200
12     alex.abston@lanierlawfirm.com
13     leila.ayachi@lanierlawfirm.com
14     evan.janush@lanierlawfirm.com
15
16  FOR THE ALBERTSONS DEFENDANTS:
17     Peter S. Wahby
18     Allison Stewart
19     GREENBERG TRAURIG, LLP
20     2200 Ross Avenue
21     Suite 5200
22     Dallas, Texas 75210
23     214-665-3600
24     stewarta@gtlaw.com
25     peter.wahby@gtlaw.com
```

Page 5

```
 1              INDEX
                                    PAGE
 2
    Appearances.......................    3
 3  Proceedings.......................    8
 4  G.K. MAENIUS
       Examination by Mr. Wahby.......    9
 5     Examination by Mr. Janush...... 240
       Further Examination by Mr. Wahby.......... 267
 6     Further Examination by Mr. Janush......... 270
       Further Examination by Mr. Wahby.......... 272
 7     Further Examination by Mr. Janush......... 274
 8  Signature and Changes............ 280
    Reporter's Certificate........... 282
 9
10  DEPOSITION EXHIBITS          IDENTIFIED
11  Exhibit 1   Notice of Deposition    13
12  Exhibit 2   Index of Documents      64
13  Exhibit 3   Sept. 21, 2015 email with      65
                attachments
14     CHAL0001041 - 0001196
15  Exhibit 4   Oct. 24, 2016 email with      73
                attachment
16     ALB-MDLCT9-00001088 - 00001089
17  Exhibit 5   Aug. 2017 email string      74
                ALB-MDLCT9-00002988 - 00002989
18
    Exhibit 6   Handwritten notes       86
19
    Exhibit 7   Challenge of Tarrant County   123
20              Drug Impact Index 2015
                CHAL0000742 - 0000768
21
    Exhibit 8   Tarrant County press release   135
22              "Tarrant County Administrator
                G.K. Maenius Announces
23              Retirement"
24  Exhibit 9   12/12/2018 email with article in  151
                Austin American Statesman
25              TARRANT_00052243 - 00052245
```

2 (Pages 2 - 5)

Page 6

1 Exhibit 10   12/4/2017 email string      169
            TARRANT_00693999 - 00694000
2
  Exhibit 11   Plaintiff Tarrant County's   192
3          Supplemental and Amended
            Allegations to be Added to
4          "Short form for Supplementing
            Complaint and Amending
5          Defendants and Jury Demand"
6 Exhibit 12   3/29/2018 email string and   207
            attachment of Opioids in
7          Tarrant County
            TARRANT_00343779 - 00343781
8
  Exhibit 13   Intelligence Bulletin from   210
9          Texoma HIDTA
            TARRANT_00893103 - 00893105
10
  Exhibit 14   8/2/2019 email and attachments  214
11          TARRANT_00084460 - 00084463
12 Exhibit 15   3/27/2019 email string and   217
            attachment
13          TARRANT_00854340 - 00854342
14 Exhibit 16   Nov. 15, 2021 letter and    219
            attachments
15          CHAL0000256 - 0000264
16 Exhibit 17   Nov. 15, 2022 letter and    223
            attachments
17          CHAL0000265 - 0000274
18 Exhibit 18   8/17/2022 email with attachment  229
            TARRANT_00990454 - 00990456
19
  Exhibit 19   5/24/2021 email TARRANT_00992946  230
20
  Exhibit 20   Nov. 2021 email string excerpt   232
21          TARRANT_00919583
22 Exhibit 21   Texoma HIDTA 2019 Threat    254
            Assessment April 2019
23          TARRANT_00829233 - 00829269
24 Exhibit 22   Challenge of Tarrant County   259
            Drug Impact Index 2007
25          CHAL0000550 - 0000577

Page 7

1 Exhibit 23    Binder Notebook, Tabs 20 - 41   238
2 Exhibit 24    Binder Notebook, Tabs 1 - 19    239
3 Exhibit 25    Second Amended Notice of        239
            Deposition Pursuant to Rule
4          30(B)(6) and Document Requests
            Pursuant to Rules 30(B)(2) and
5          34 to Plaintiff Tarrant County
6 Exhibit 26    Challenge of Tarrant County     270
            Drug Impact Index 2010
7          CHAL0000634 - 0000660
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1         P R O C E E D I N G S
2         THE VIDEOGRAPHER:  We are on the record
3 at 9:41 a.m. on February 29th, 2024.  This is the
4 deposition of G.K. Maenius, in the matter of In Re:
5 National Prescription Opiate Litigation, Tarrant County
6 versus Purdue Pharma LP, et al., filed in the Northern
7 District of Ohio, Eastern Division, Case No. 17-MD-2804.
8 This deposition is being conducted at Veritext Fort
9 Worth, 300 Throckmorton Street, Suite 1600, Fort Worth
10 Texas 76102.
11         My name is Megan King representing Veritext,
12 and I am the videographer.  The court reporter is Julie
13 Brandt from the firm Veritext.
14         At this time, Counsel, please state your
15 appearances for the record.
16         MR. JANUSH:  Hi.  Plaintiff -- on behalf
17 of Plaintiff Tarrant County, Evan Janush of The Lanier
18 Law Firm.  I'm joined by Leila Ayachi and Sadie Turner.
19         MR. KRATOVIL:  I am Mark Kratovil, and
20 I'm with the Tarrant County Criminal District Attorney's
21 Office, Civil Division.
22         MR. WAHBY:  Peter Wahby of Greenberg
23 Traurig for Defendant Albertsons and their related
24 affiliate/pharmacy Defendants, and with me is Allison
25 Stewart.

Page 9

1         THE REPORTER:  Anybody on Zoom?
2         MS. ABSTON:  Alex Abston from The Lanier
3 Law Firm on behalf of Plaintiffs.
4         MR. PRICE:  Craig Price for Tarrant
5 County.
6         G.K. MAENIUS,
7 having been first duly sworn, testified as follows:
8         EXAMINATION
9 BY MR. WAHBY:
10   Q.  Good morning, sir.  As I -- as I said, my name
11 is Peter Wahby, and I represent Albertsons and its
12 related affiliates in this case.  And so I want to thank
13 you, first, for your service to Tarrant County.  I'm a
14 beneficiary of that for all these years.
15   A.  Thank you.
16   Q.  So, thank you for all that good work.
17       And I want to be sure I'm saying your name
18 right.  "Maenius"?
19   A.  Yes, it is.
20   Q.  Okay.  Well, just out of curiosity, what does
21 the G.K. stand for, if I can ask you?
22   A.  Yes, you can.  It stands for Gayle Keith.
23   Q.  Okay.
24   A.  And that's G-A-Y-L-E.
25   Q.  What is your current address?  I only ask

3 (Pages 6 - 9)

Page 10

1 because if we needed to send you a subpoena for some
2 unforeseen reason, we'll probably go through your
3 lawyers, but just in case we needed it.
4     A. It's 4108 Inwood Road. That's with an "I."
5 I-N-W-O-O-D. It's in Fort Worth, Texas, and that's
6 76109.
7     Q. How long have you been at that residence?
8     A. Since a little before 2000.
9     Q. Okay.
10         MR. JANUSH: If I may interrupt just for
11 a moment, and I apologize.
12         Folks are texting me that they can't hear us
13 very well. They can't hear Peter and they couldn't hear
14 me. And I don't think it's --
15         MR. WAHBY: So is that a volume issue
16 or --
17         MR. JANUSH: I don't think it's our mic
18 placement. Your mic is fine.
19         THE VIDEOGRAPHER: Y'all are going
20 through that one.
21         THE WITNESS: Do you need me to move my
22 stuff?
23         MR. WAHBY: I wonder if -- if you wanted
24 to put this -- and then you can just grab it when we get
25 to it. I don't know, whatever y'all want to do.

Page 11

1         MR. JANUSH: This will be fine.
2         MR. WAHBY: Is that better?
3         MR. JANUSH: She said better.
4         MR. WAHBY: Okay.
5     Q. (BY MR. WAHBY) Okay. And have you ever lived
6 outside of Tarrant County?
7     A. Yes, I have.
8     Q. And where was that?
9     A. I came to Tarrant County in -- from San
10 Marcos, Hays County. And prior to that, I used to live
11 in Austin for a little while. And I was born and raised
12 in Blanco County.
13     Q. Have you given a deposition before?
14     A. Yes.
15     Q. How many?
16     A. Probably two or three.
17     Q. Okay. Have you given one recently?
18     A. No.
19     Q. Okay. So if I can just refresh your
20 experience. I'll ask questions. Just give me a minute
21 to get my question out.
22     A. Sure.
23     Q. Think about it and give me the best, most
24 factual answer that you can. It will be important that
25 we don't talk over one another so our court reporter can

Page 12

1 try to get down everything without interference between
2 us speaking.
3     Your lawyer will -- or the County's lawyer,
4 rather, may object from time to time. Unless he tells
5 you to not answer my question, after he stated his
6 objection, please go ahead and answer my question to the
7 best of your ability. Okay?
8     A. Yes.
9     Q. And we can take a break any time you would
10 like. I just ask that if there's a question pending, go
11 ahead and answer the question and then we'll take a
12 break after that.
13     It is not a memory test. So, if you're having
14 a hard time remembering or something, just let me know
15 and I will try to clarify the question; or if you don't
16 understand, I will try to ask a better question. Okay?
17     A. Yes.
18     Q. Now there's not any issue that would impact
19 your ability to testify today as it relates to health or
20 memory or anything like that, correct?
21     A. That's correct. I am 72 years old.
22     Q. That's plenty young, sir, for this effort.
23 Now have you given a 30(b)(6) representative -- a
24 corporate representative deposition before?
25     A. Before this particular case?

Page 13

1     Q. Before this, yes.
2     A. No.
3     Q. Okay. And do you have an understanding that
4 you're here today as Tarrant County, not merely as
5 Mr. G.K. Maenius, correct?
6     A. Yes.
7     Q. Okay. I'm going to go ahead and hand you what
8 is marked as Exhibit No. 1.
9     (Exhibit 1 marked.)
10         MR. WAHBY: There you go.
11         MR. JANUSH: Thank you.
12     Q. (BY MR. WAHBY) Exhibit No. 1 is the Second
13 Amended Notice of Deposition pursuant to Rule 30(b)(6).
14 And you're appearing today pursuant to this deposition
15 notice, correct?
16     A. Yes, sir.
17     Q. And have you seen this Second Amended Notice
18 of Deposition before?
19     A. Yes, I have.
20     Q. And you understand that you are appearing
21 today to address a certain number of topics that are
22 listed in that deposition notice, Exhibit No. 1,
23 correct?
24     A. Yes, sir.
25     Q. In particular, you'll be addressing today with

4 (Pages 10 - 13)

1 your verbal, oral sworn testimony topics 3, 4, 5, 6, 7,
2 8 and 9. Is that your understanding?
3      I'm not trying to evaluate your quick recall
4 of those topics and agreements between counsel, but you
5 do understand that you're here to --
6    A. Yes, I do.
7    Q. -- address a discrete number of topics?
8    A. Yes.
9    Q. And when you look at topics 3, 4, 5, 6, 7, 8
10 and 9, are you prepared to address those topics?
11    A. To the best of my ability, yes.
12    Q. Okay. Now what is your understanding of being
13 a 30(b)(6) designee for Tarrant County today?
14    A. So my understanding is that I am not an expert
15 witness, but I can provide factual information as it
16 relates to how opioids and -- and everything that's
17 included in opioids distribution has impacted Tarrant
18 County and some of the environments that we see in
19 Tarrant County that are -- that may cause opioid
20 addiction or at least diversion of opioid medications.
21    Q. Okay. Let me direct your attention to topic
22 number 3.
23    A. Yes, sir.
24    Q. Topic number 3 states, Tarrant County's
25 knowledge, as a nonexpert, of illicit opioid and

1 prescription opioid sources, supply, division, use or
2 abuse, and addiction in the geographic area of Tarrant
3 County, and the basis for that knowledge. Correct?
4    A. Yes.
5    Q. It goes on to say, This topic is not intended
6 to elicit testimony on the granular details of
7 particular case files or analyses. But to the extent
8 any such case files or analyses form the basis for the
9 County's knowledge on this topic, the witness shall be
10 prepared to identify them. Correct?
11    A. Yes.
12    Q. Do you have any personal knowledge as it
13 relates to topic 3?
14    A. When you say personal knowledge, would you
15 clarify that, please?
16    Q. There's certain knowledge that perhaps you're
17 prepared to present as the representative of the County
18 that perhaps you've learned through your preparation for
19 this deposition. Aside from that knowledge, did you
20 have -- did you acquire knowledge in the course and
21 scope of your duties as county administrator about that
22 particular topic?
23    A. Yes.
24    Q. Okay. And what is that knowledge?
25    MR. JANUSH: Objection, form.

1    Q. (BY MR. WAHBY) You can answer.
2    A. Okay.
3    Q. That will -- Mr. Janush will object from time
4 to time, but you can go ahead and answer.
5    A. Yeah, so -- so over the last 35 years or so
6 that I've been involved with -- with Tarrant County and
7 also prior to that, I spent six years as head of the
8 Fort Worth Crime Commission and worked with different
9 elements of criminal activity and how it impacted the
10 community at large and also the economic impacts of
11 these types of things.
12    What we have found is that this is an
13 evolving story. It started in -- in -- at a time where
14 that -- that prescription drugs were not -- may not have
15 been as regulated as -- as they should have been, that
16 there was ample access to prescription opioids that --
17 and it was caused by various factors, but it -- it
18 morphed into a situation, but it still hasn't gone away
19 necessarily from the core of this, in that opioid drugs,
20 be them that were either distributed by -- by the
21 pharmacies themselves or if it was something that people
22 found in the medicine cabinets that were not their
23 drugs, that it led to excess use, which turned into
24 abuse.
25    And whenever that abuse occurred, there became

1 a tightening of the availability of some of these drugs,
2 that it led to other types of opioid uses and movement
3 from -- from hydrocodone, things such as that, to street
4 related drugs that were opioids, such as heroin and,
5 maybe to a lesser extent, some other street drugs.
6    So we saw this in -- in Tarrant County, and it
7 was interesting how it became progressively worse and --
8 and how it led from one type of drug or one -- you know,
9 one prescription drug to an illicit drug that we found
10 on the street. And so when we saw that -- it wasn't
11 just in the early days, but it began in the early days.
12    We saw that there were indicators that, you
13 know, the drug abuse issue was becoming more and more
14 prevalent. We saw it at the county level through the
15 number of drug arrests that we saw, the number of
16 incarcerations that we had related to either drug cases
17 or individuals who had a drug dependency at the time of
18 this arrest. We saw at -- JPS at that time was the only
19 Level 1 Trauma Center, and it's under the control of the
20 County and the Commissioners Court, and we dealt quite a
21 bit with JPS and the things that they were finding, and
22 the overdoses that they were having to deal with were
23 increasing substantially.
24    So we saw those type of things occurring, and
25 so we also -- you know, there was a decision made, and

Page 18

1 it was -- I think it was a proper decision at the county
2 level, where that we went ahead and we began to put more
3 emphasis on -- on, you know, identifying the problem
4 itself and trying to attempt to find the solutions.
5         And the solution is not just greater
6 enforcement; it's -- it's treatment, rehabilitation,
7 that type of activity, and then make a determination as
8 to what of those factors that we felt that we could --
9 we could implement, either through the government itself
10 or funding from the government to nongovernmental
11 organizations, nonprofits that we partnered with and
12 other entities, you know, the various police
13 departments, social service -- social service agencies
14 and just -- and that's just a few.  There was a lot more
15 that we coordinated with.
16         And -- and so we knew that this issue was
17 growing, simply because of the output of people going
18 through the system, and -- and so our effort was to
19 really do a multi approach -- multilevel approach in
20 really combating this thing.  And you're never going to
21 stop everybody at the front door, and so it was -- it
22 was working with the rehabilitation, working with our
23 court systems.
24         And in some cases, we were having an influx of
25 people that were coming back to the county that, just by

Page 19

1 the nature of where they had been, for example, people
2 that were just getting out of prison, you know, and the
3 difficulties it was to reintegrate with the community,
4 that we detected that there was a substantial problem.
5 And, you know, we -- you know, to someone who hasn't
6 worked in this area, a lot of people simply jumped to,
7 you know, well, the drugs on the street, the heroin and
8 the illicit drugs.
9         But we knew, through our work with DEA and our
10 task forces, we also knew through community programs and
11 surveys that we ran, that really this was a problem that
12 began with prescription drugs that were either abused or
13 diverted from the system, and it led to -- to more
14 substantial use.
15         And the fact that when it got to that point,
16 the costs of actually treating those individuals was
17 substantial, and so there were a tremendous amount of
18 County resources.  We moved to work with federal
19 agencies, the federal government, state government,
20 anyplace that we could to -- to make sure that we could
21 get as much money as we could to focus on, you know, not
22 only the prevention, but the enforcement and then the
23 rehabilitation of individuals dealing with opioids.
24    Q.   As you recount the evolution of what you
25 recall and what you experienced in Tarrant County and

Page 20

1 you refer to the prescription drugs -- prescription
2 opioids, correct?
3    A.   Yes.
4    Q.   -- do you have any personal knowledge -- and
5 we'll come to your 30(b)(6) knowledge.
6         Do you have any personal knowledge connecting
7 that narrative that you've recounted to Albertsons or
8 any of its affiliates specifically?
9    A.   No, I do not.
10   Q.   Okay.  And you referred to the diversion of
11 prescription opioids.
12   A.   Yes.
13   Q.   Do you have any personal knowledge relating to
14 that diversion arising from or relating to Albertsons or
15 any of its affiliates in Tarrant County?
16   A.   So, not specifically Albertsons, but there was
17 a significant diversion of medications, or at least
18 prescriptions of medications, that probably should have
19 been caught at the pharmaceutical level or at the
20 pharmacy level.  And again, the availability of -- of
21 counterfeit drugs at the very beginning was not nearly
22 as substantial as it is now.  So, there's -- there's
23 just a very few ways to get those type of medications,
24 you know.
25   Q.   And to be clear, the availability of

Page 21

1 counterfeit drugs, that's an issue separate from your
2 complaints as it relates to the pharmacy's activities,
3 correct?
4    A.   Yes, to the extent -- to the extent that
5 counterfeit drugs now have become less expensive and --
6 and so -- so it's my understanding that people simply
7 don't start using opioids by buying counterfeit drugs.
8 There has to be an initial source, and they build into
9 that, and finally it becomes a financial issue where
10 that -- if they're hooked on the drugs and they need to
11 get it, they're going to go try to find drugs that are
12 either easily available or at a lower cost, depending on
13 if they can actually afford those drugs.
14   Q.   And as you sit here, you can't identify a
15 pharmacy or a pharmacist -- strike that.
16        You can't identify an Albertsons pharmacy or
17 an Albertsons pharmacist who you believe specifically
18 contributed to this narrative that you've recounted,
19 correct?
20        MR. JANUSH:  Objection, beyond the scope
21 of -- of the notice.
22   Q.   (BY MR. WAHBY)  You can answer.
23   A.   So would you ask the question again?
24   Q.   As you sit here, you can't identify an
25 Albertsons pharmacy or affiliated pharmacy or an

6 (Pages 18 - 21)

Page 22

1  Albertsons pharmacist who contributed to the narrative
2  that you've recounted, correct?
3      A.  Not to my knowledge, and that's really not
4  something that -- that I would have firsthand knowledge
5  on anyway since -- in my position as a county
6  administrator, even as the head of the Crime Commission
7  and some of the things that I was doing with the
8  Governor's Office prior to that, dealing with -- with
9  narcotics and organized crime.
10     The -- I was never into the investigative
11 element of a case, where that I would see the field
12 notes or even read the indictments that would come from,
13 you know, either the US Attorney's Office or the
14 Criminal District Attorney's Office.  So I do not have
15 any detailed information about anything specifically
16 related to Albertsons, and that's the reason why.
17     Q.  Okay.  As you look at topic number 3, who do
18 you believe in Tarrant County would have the most
19 knowledge on this topic?
20     A.  It would probably be the -- the -- our task
21 force leaders.  Our federal DEA would probably have a
22 substantial amount of information, since the DEA is
23 specifically charged with enforcing the Controlled
24 Substance Act of '70.  And in that particular act
25 itself, there are responsibilities that the

Page 23

1  manufacturers, the physicians and also the pharmacies
2  have as it relates to being able to identify a possible
3  red flag issue, and so they would have that.
4      Also, our task forces that we have involving
5  a local, state and federal task force, it's a
6  combination of officers.  Whenever our local task forces
7  come into contact with what is believed as an issue
8  dealing with -- with the dispensing of opioids from --
9  from pharmacies, they tend to hand that off to the DEA
10 and -- however, we do use our people, our officers that
11 are assigned to those task forces to actually -- we use
12 them sometimes as undercover within -- in order to do
13 buys or at least to do surveillance on those pharmacies.
14     Q.  Which task force -- which task forces
15 specifically are you referring to?
16     A.  So we have a HIDTA task force.  We also have a
17 HIT task force.  We have a Tarrant County narcotics task
18 force.  And there may be one more.  I believe those are
19 the three main ones.
20     Of course, those task forces also include not
21 just Tarrant County officers or state officers or
22 federal officers; they're a combination of municipal
23 officers also that contribute manpower to those.  We
24 try to group them together so that -- the sharing of
25 intelligence is critically important.  If they're

Page 24

1  working a particular suspect that may be interested in
2  either one of those task forces, they can share that
3  intelligence.  So those are the three task forces
4  that -- that I am currently aware of.
5      Q.  Okay.  And so you mentioned task forces and
6  the DEA.  Is there any other category of people who you
7  think would be best prepared to address the facts in
8  topic in number 3?
9      A.  Well, yes.  In fact, when you look at the
10 people that are working on the front line of -- of
11 individuals who are suffering from drug abuse, Mental
12 Health Mental Retardation, MHMR -- and they've changed
13 their name.
14     Q.  I think they've changed their name.
15     A.  Yeah, MHMR.
16     And you know, they -- a tremendous amount of
17 their activity is involved in -- in, you know -- it
18 starts, you know, as a mental health issue, but drug
19 abuse is a mental health issue.  And obviously, John
20 Peter Smith Hospital, simply because -- like I said,
21 they are a Level 1 Trauma Center and they deal with a
22 lot of the overdoses that come in.
23     Our jails -- our jails are critically
24 important, because right now we bring in anywhere from
25 100 to 130 or 140 people a day through the back door of

Page 25

1  the jails, and we -- at that time when they come in
2  through the back door, we do several things for them.  I
3  say we; I'm referring to Tarrant County.
4      And one of the things that is that we do a physical
5  health triage, and we also do a mental health triage,
6  and there's questions that are required by state law
7  that we ask inmates that are coming in.  And when I say
8  through the back door, basically what I'm meaning is
9  that's the entry point for people -- for inmates -- or
10 defendants coming into the jail.
11     And so we have a lot of individuals that come
12 in.  They -- you know, they -- they are in a mental
13 state, in a physical state actually, where that they are
14 drug dependent, and -- and it causes a substantial
15 amount of activity in the jail itself because you can't
16 simply let those individuals just go into general
17 population, and you have to make sure that their medical
18 needs are -- are met.
19     So you have a combination of the jail
20 operations.  You have -- the health screening is done
21 by -- by John Peter -- or the Hospital District, JPS.
22 And then the -- a mental health screening is done by
23 MHMR.  So those collaborative efforts also can identify
24 people that -- that are -- that would have knowledge --
25 or those individuals would have knowledge of the people

7 (Pages 22 - 25)

Page 26

1 that are entering our system that have -- that are
2 either currently using drugs to the point that we have
3 to provide immediate medical care to them or that we
4 have to be very careful so that -- that if they are on
5 drugs and they begin to withdraw from those drugs, that
6 we're able to treat them in our facilities.
7    Q.   So are you aware of any written policies or
8 procedures that Tarrant County has as it relates to
9 topic number 3.
10   A.   And you need me to always go back to topic
11 number 3 to make sure --
12   Q.   We're going to move on, but right now we're on
13 topic 3.
14   A.   Right.
15      So, yes.  So others would be the Challenge
16 organization.  And Challenge is a group that -- that
17 they're educational, to a certain extent, that they do
18 most of the educational programs or at least -- at least
19 create them or make sure that they're available.  They
20 are heavily involved in the drug take back program.
21 They do a -- a report -- I think it's an annual report,
22 talking about -- about drug use and the type of drugs
23 and the severity of that.  They team with the DEA to do
24 that.  We also have now contracted with them to also
25 assist in our Family Drug Court, and so they provide

Page 27

1 services to the county in that -- in that effort also.
2      As far as a -- a holistic view, there are
3 different departments that -- and entities that have
4 part of a snapshot piece of that.  They can tell you --
5 for example, the Drug Court itself, Drug Court is
6 located in the Family Law Courts, and it deals with --
7 with people that are pregnant, that -- that have a drug
8 abuse problem, and what they try to do is to make sure
9 that when that baby is born, that baby is clean.  And so
10 we have those type of programs.
11      We have a lot of programs that -- and it's
12 kind of interesting, at least it was for me.  We have
13 programs that are run by our -- our -- some of them are
14 Criminal County Courts, some of them are Criminal County
15 District Courts, where that our judges have gone above
16 and beyond what you would normally -- what I would
17 normally expect as the duties and responsibilities of a
18 judge sitting in a criminal court.
19      And we have things like the Veterans Court.
20 And so they -- the Veterans Court, a lot of the issues
21 that veterans have now are drug related, and so they
22 deal with those, with those cases.  Our goal is -- is
23 not to penalize those individuals, if possible, but
24 to -- to do things that will get them on a more straight
25 path to being clean and productive citizens.

Page 28

1      The District Attorney's Office with our courts
2 also run -- run the D.I.R.E.C.T. Program.  That is a
3 court where that individuals with minor offenses, maybe
4 possessions of some minor street drugs, that we can
5 divert them and make sure they don't enter the criminal
6 justice system.  A lot of those issues deal with drugs,
7 and it may not be necessarily prescription drugs, but it
8 -- if you look at how people use drugs, then what you're
9 going to find is that they have to start somewhere, and
10 it's either with low use medications or marijuana,
11 things like that, and then they progress, and then
12 eventually prescription drugs come into play.
13   Q.   You're -- you're speaking generally about drug
14 abuse in Tarrant County and the programs related,
15 whether it's the Drug Courts or other rehabilitation
16 initiatives to address drug use -- drug abuse generally.
17 Is there anything that you're aware of that relates
18 specifically to prescription drug abuse?
19   A.   Well, if you go to the Challenge reports,
20 you -- you'll see that there -- and I have -- and I can
21 refer back to my notes and some of the documents I have
22 with that.  They talk -- they talk specifically about
23 prescription drugs.  And -- and, you know, hydrocodone
24 is a perfect example, and I can take you to one of their
25 reports that has a chart in it that I will be more than

Page 29

1 happy to make available to you.
2      But still today, and when you look at all the
3 various drugs that are being used, hydrocodone still
4 takes a major, major part of the number of drugs that
5 people -- or the types of drugs that -- that people are
6 using in the -- in the county.  There's probably several
7 more items, but those haven't come to -- you know, I can
8 go back and fill in those as they come.
9    Q.   So as you review topic number 3, what have you
10 done to prepare to testify on topic number 3 on behalf
11 of Tarrant County?
12   A.   So what I've done, I've reviewed a substantial
13 amount of materials.  I have looked at the Challenge
14 reports.  They have to file those reports with the --
15 with the County.  And so in my role as a county
16 administrator, I was the one that received those
17 initially so that I could present -- so that they could
18 be presented to the Commissioners Court and actually
19 made part of a public record.  So it was available to
20 the public to look at.
21      I have reviewed materials that -- that I
22 currently have here, everything from HIDTA reports to
23 reports from Mental Health Mental -- I'm sorry, MHMR.  I
24 have reports from the Medical Examiner's Office that I
25 reviewed, and probably a lot more that -- that -- I've

Page 30

1  seen presentations that were made by Public Health, by
2  UNT Health Science Center, some of their studies.  And
3  so those and -- and a bunch more documents that I have
4  reviewed.  I've talked to several people about, not only
5  the problem itself --
6      Q.  You can go ahead.
7      A.  Okay.
8          -- the problem itself, but some of the things
9  that the County is doing and -- and -- just to refresh
10  my memory, and those are the type of activities that I
11  did to prepare for this.
12      Q.  And who did you talk to?
13      A.  So I talked to Calvin Bond, who is -- who is
14  now the chief deputy of -- for the Sheriff's Department,
15  but Calvin is a retired -- fully retired DEA special
16  agent.  He has been head of our task forces on drugs,
17  someone who has been involved on the DEA side with --
18  with pharmaceutical issues that we're talking about
19  today at the DEA level.  He's been heavily involved in
20  commanding our narcotics groups.  He has always been --
21  first of all, he's a very intelligent man on -- on this
22  topic, but he has always been the person that I have
23  gone to to fully understand some of the issues that --
24  that law enforcement is not only dealing with, but what
25  he is seeing because he is -- as I said, he's someone

Page 31

1  who has worked all of his professional life in narcotic
2  enforcement, but also the intelligence aspect and his
3  opinions and his data that he was able to share with me.
4          I talked with Karen Duncan.  Dr. Duncan is
5  the -- is the executive director, CEO of John Peter
6  Smith -- I'm sorry, Tarrant County Hospital District and
7  about some of the things that they're seeing down in the
8  emergency room and things such as that.
9          I also talked to Helen Giese.  She is our --
10  our director of -- of budget, our budget director, to
11  make sure that I was aware of the types of moneys that
12  the County was expending and other revenue sources that
13  were becoming available to -- for -- to be focused on
14  drug abuse and -- and all the way from enforcement to
15  treatment to prosecution, things such as that.
16      Q.  Anybody else?
17      A.  I don't believe so.
18      Q.  In connection with your meeting with Ms. Giese
19  regarding the budget, what did she tell you about
20  revenue that the County was expending?
21      A.  So when -- when I was the county
22  administrator, one of the things that I wanted to make
23  sure of -- it wasn't necessarily where the revenue was
24  coming from, but that we had adequate revenue and that
25  it was placed in the most effective and efficient

Page 32

1  location to compost what we're trying to do.
2          The -- over my 35 years and -- and prior to
3  even coming with the -- with the Crime Commission, I was
4  in the Governor's Office, and I worked for the Texas
5  Organized Crime Prevention Council.  I was the program
6  director, and it was something where we had 11 organized
7  crime strike forces.  What we did, we provided funding
8  for those strike forces.  So I was familiar with how the
9  State would fund enforcement efforts.  And -- and I
10  cannot remember any single time when we started task
11  forces, that -- that the moneys came all the way from
12  the State.  There was always a requirement that locals
13  put in a match.  A lot of times as the State funding
14  went down, it was expected that the local funding went
15  up.  I say that, in that -- that, when you -- when you
16  ask -- when one asks the question where did the money
17  come from, it's really a combination of -- of non-County
18  revenue and County revenue.
19          Let me give you an example.  We have -- we
20  have a program that we run.  And when I say "we," I'm
21  talking as -- as Tarrant County.  It's called the law
22  Enforcement -- the Law Enforcement Liaison program, and
23  this program is one that -- that is -- we fund positions
24  in MHMR, and their role is -- we train law enforcement
25  to recognize people that may have mental health issues,

Page 33

1  they have drug dependency issues, but then we also
2  operate that program where that there's a 24-hour
3  hotline.  Mental Health actually mans that.  We do
4  ride-alongs.  They -- they do ride-alongs with -- with
5  the police, if requested.
6          And when we began the funding in that, we
7  initially provided a substantial amount of that funding
8  from the Byrne Act, which is a federal act, and it was
9  moneys that came to all of Tarrant County, and not just
10  Tarrant County government, but it was one that where we
11  were able to work with our law enforcement agencies that
12  were also getting some of that funding.  And they would
13  contribute and we would contribute all of ours to help
14  fund the liaison program.
15          Well, what's happened is that as those
16  moneys have gone down and they've limited the amount of
17  money to which jurisdictions can get money from that
18  particular program, the costs have increased.  And so
19  the backfill of those costs that -- in order to keep
20  that -- that -- that program running, which is a very
21  effective program, the County had to supplement that
22  with general revenue funds.
23          And so general revenue funds are basically
24  funds coming from -- from ad valorem taxes.  There is
25  some fees that are included in that, but the vast

9 (Pages 30 - 33)

1 majority of general revenue is money that comes from
2 taxes, and so we use that to backfill. That's just one.
3      There's -- there's numerous other instances
4 where we either fund 100 percent, or we do partial
5 funding, simply to -- to make up that difference as --
6 as either the program needs more assets to -- more
7 revenue to -- to carry out its mission or it's something
8 that the money is diminished from other sources and we
9 have to go ahead and include that in general revenue.
10   Q.   Can you provide testimony as to the amount of
11 County revenue that Tarrant County had to contribute to
12 combat any aspect of opioid abuse in Tarrant County?
13   A.   I don't have a total number. I can tell you
14 in -- that through my experience, it is millions of
15 dollars every year.
16   Q.   So it's your testimony that Tarrant County
17 expends millions of dollars every year to combat opioid
18 abuse in Tarrant County?
19   A.   That's correct.
20   Q.   What percentage of those millions of dollars
21 every year relate to the combating of the abuse of
22 prescription opioids?
23   A.   I don't have a -- I don't have a particular
24 percentage or a totally accurate percentage. When you
25 look at where those moneys have been expended, it takes

1 in a plethora of -- of different type of drugs that are
2 used. A portion of those that are used are prescription
3 drugs.
4      Q.   Can you provide any guidance as to what you
5 believe the percentage of prescription drug abuse for
6 opioids versus general opioid drug abuse is?
7      A.   I can't, no, sir.
8      Q.   So -- so Tarrant County doesn't have a way of
9 allocating or differentiating what you believe is
10 millions of dollars of County money that's spent to
11 combat opioid abuse between prescription drug abuse
12 versus general opioid abuse?
13         MR. JANUSH: Objection.
14   Q.   (BY MR. WAHBY) Is that right?
15         MR. JANUSH: Objection.
16   A.   Okay. Tell me the rules. Can I answer that
17 question or not?
18   Q.   (BY MR. WAHBY) Oh, no, yeah.
19         MR. JANUSH: You can answer.
20   Q.   (BY MR. WAHBY) Unless -- unless -- unless
21 your lawyer says don't answer that, Mr. Maenius, you can
22 answer.
23   A.   Okay. Not a -- not necessarily an exact
24 percentage. They -- I mean, we would have to do some
25 analysis, and we probably could, and that could get us

1 fairly close, but I don't have that information.
2      Q.   Do you know if Tarrant County has ever done
3 that analysis to date?
4         MR. JANUSH: Objection. We're getting
5 into expert matters here.
6      Q.   (BY MR. WAHBY) You -- you can answer.
7      A.   Not to my knowledge.
8      Q.   Okay.
9      A.   Basically, I simply don't know. It's not that
10 I'm saying no. What I'm saying, I just simply don't
11 know.
12   Q.   I understand.
13   A.   Okay.
14   Q.   Now you had testified that the amount of
15 revenue available to the County, as that amount
16 decreases, the County has to fill the void with County
17 revenue, correct?
18   A.   Yes, uh-huh.
19   Q.   And is that because -- strike that.
20      Is your understanding that the amount of
21 revenue provided to the County from other sources, it
22 would decrease in the event there's a determination that
23 the County -- Tarrant County needs it less than perhaps
24 other counties, because the problem isn't as bad as --
25 in Tarrant County as other counties, that's why those

1 grants or those other sources of funding would go down?
2         MR. JANUSH: Objection, form.
3      Q.   (BY MR. WAHBY) Do you understand my question?
4      A.   I think I do. So let me try to answer that,
5 and I'm sure you'll point out that I didn't answer that.
6      Q.   No, I won't do that.
7      A.   No, not at all. And let me explain why.
8      First of all, grant funding is -- is something
9 that -- that is appropriated normally at the state level
10 or the federal level. And depending on what congress
11 does or the state legislature does, they may either
12 increase or decrease those appropriations.
13      When I was in the -- in the Criminal Justice
14 Division of the Governor's Office, we -- like I said, I
15 was -- I headed the section dealing with organized
16 crime, which at that time dealt mainly with two things.
17 It dealt with narcotics and drug trafficking and also
18 gambling. And very little effort was placed on gambling
19 enforcement; most of it was -- was narcotics and that.
20      So, it was always the intention -- and a lot
21 of the grant programs that governments get, it's
22 interesting how -- it's -- it's interesting how -- and I
23 fully understand why the funding entities do this. So,
24 they very well will tell you upfront that -- the first
25 year of the program, they may say -- and this is not a

Page 38

1  hypothetical, because there are many programs such as
2  this -- where they'll say the first year of funding is
3  going to be at 100 percent from the -- from the funding
4  sources, either the state or the feds, or the federal
5  government; but they will tell you that the second year
6  it will be an 80/20 split, the third year it will be a
7  60/40, and then the fourth year it will be a 40/60, and
8  then the fifth year it will be a 20/80, and then the
9  sixth year they're expecting you to continue that
10  program.
11       And there's requirements that you -- you
12  obviously have to report back in order to get that type
13  of funding, but to have a diminished amount of -- of
14  state or federal dollars that are coming in does not
15  necessarily mean that the program itself or the problem
16  itself is going away.  It's simply one way that
17  governments that fund local government have a way to,
18  first of all, get local buy-in, and then -- because they
19  don't simply want to give you all the money and then you
20  do what you want to do, and then when they stop the
21  funding, then you stop everything.
22       But also, they want to have a commitment
23  from the local entities that this is a program that's
24  necessary; that it's a program that -- that needs to
25  remain in the community, the county; and that the

Page 39

1  commitment that the locals have to make and ensure that
2  this is a long-term program is one where that, as the
3  federal or state dollars decrease, the local dollars
4  have to increase.
5    Q.  Okay.  So let's go to --
6    A.  If that makes sense.
7    Q.  Yes, sir.
8    A.  Okay.
9    Q.  Thank you.
10       I want to ask you about the individuals that
11  you had just mentioned --
12    A.  Yes, sir.
13    Q.  -- visiting with prior to the deposition.  You
14  mentioned Mr. Bond, Ms. Duncan and Ms. Giese, "Giese."
15    A.  "Giese," uh-huh.
16    Q.  With respect to Mr. Calvin Bond, he was a
17  former DEA agent, special agent, and he's currently the
18  deputy chief --
19    A.  I believe that he's deputy chief.
20    Q.  Either way, he's kind of your go-to person as
21  it relates to the types of issues related to drug abuse
22  in the county.  Is that right?
23    A.  Yes.
24    Q.  And did you ask him to explain to you the
25  differentiation between the abuse of prescription

Page 40

1  opioids in Tarrant County versus drug abuse generally or
2  opioid abuse generally?
3    A.  Yes.
4    Q.  And did you ask him to explain to you drug
5  abuse of prescription opioids as it relates to my client
6  Albertsons or its affiliates?
7    A.  I did not ask him specifically about
8  Albertsons.
9    Q.  Okay.  And -- and what did he tell you as it
10  relates to drug abuse in Tarrant County as it relates to
11  prescription opioids specifically?
12    A.  So his comments were that as people move
13  through the spectrum of drug use, that -- and that the
14  majority of them started using prescription drugs, and
15  it's well documented in some of the reports that I have.
16       And then when it became to the point that --
17  that prescription drugs were not as available as -- as
18  they had been when people first started using them --
19  you know, and it's not as if -- it could very easily
20  have been someone who was prescribed medication and
21  then simply moved past the point where they needed the
22  medication, and it became -- became more addictive,
23  and -- and then whenever those individuals, who no
24  longer either had access to -- to prescription drugs,
25  that -- prescription opioids, that they had to go find

Page 41

1  them some other place.
2       And so -- so it wasn't unusual, in his
3  comments, to find that the next step, initially it would
4  have been to heroin, because it -- heroin is an opioid.
5  It is more -- it's readily available.  The price of
6  heroin compared to price of prescription drugs, heroin
7  is cheaper.  And so -- and so then, you know, then we
8  talked a little bit about fentanyl.
9       And I thought the interesting thing was, was
10  that -- that Tarrant County, Dallas-Fort Worth area has
11  always been a transshipment area for drugs coming in
12  from Mexico.  And what that means is that normally
13  people are in this area that deal -- cartels basically,
14  that -- that they direct where those drugs go, and at
15  one time a long time ago when -- I guess in the mid
16  '80s and -- that was still the case, but now it's not
17  just a transshipment area.  It's an area where it's --
18  basically, it doesn't move anyplace.  It just stays here
19  and is consumed here.
20       Those are the kind of conversations I had with
21  Calvin.
22    Q.  Again, because you and Mr. Bond didn't
23  discuss anything about Albertsons or its affiliates
24  specifically, you're not prepared to provide any
25  testimony as it relates to Albertsons or its affiliates

11 (Pages 38 - 41)

Page 42

1 in connection with the narrative you've described,
2 correct?
3      A.  I did not talk to him specifically about
4 Albertsons.
5      Q.  Right.
6           And so for that reason, you don't have any
7 information as it relates to Albertsons or its
8 affiliates's contributions to the issues that you've
9 just articulated, correct?
10     A.  Well, as it relates to my conversations
11 with -- with Mr. Bond, that's correct.
12     Q.  Okay.  With respect to your discussion with
13 the CEO of the Tarrant County Hospital District --
14     A.  Yes.
15     Q.  -- Ms. Duncan, you're using Tarrant County
16 Hospital District differently than John Peter Smith.
17 That's a different entity?
18     A.  No, it's not.
19     Q.  Okay.  So you're referring -- so you're
20 calling John Peter Smith the Tarrant County Hospital
21 District?
22     A.  Yes.
23     Q.  Okay.  Because John Peter Smith is within the
24 Hospital District?
25     A.  Yes.

Page 43

1      Q.  Okay.  So -- and your discussion with
2 Ms. Duncan was supposed to be broader than the work of
3 John Peter Smith?
4      A.  Yes.
5      Q.  And so was that -- tell me about that
6 discussion as it relates to anything that was said
7 relating to the prescription opioid abuse.
8      A.  So -- so just to make sure -- make -- make
9 sure that we're very clear on this, my conversations
10 with Dr. Duncan has -- has far exceeded the -- the time
11 we were prepping for this deposition.
12          The Hospital District is comprised of --
13 excuse me -- of different elements.  You have John Peter
14 Smith as the -- the main physical hospital.  You also
15 have what I would call hospitals -- they're really
16 clinics, but they're more than clinics.  They're almost
17 a mini hospital that -- that JPS has for -- and they're
18 located in different parts of the county.  And then they
19 have basically walk-in clinics, and they also run
20 programs that -- that deal with -- with a bunch of
21 different health-related issues.
22          And so when I talked with Karen -- I'm sorry,
23 Dr. Duncan, when we talk about these type of things,
24 we're not just saying what's happening down at JPS
25 hospital, but -- because we're seeing things in the

Page 44

1 community.  We've located our clinics in the communities
2 for access.  And so -- and so we talk about addiction.
3 We talk about relationships that Hospital District has
4 with MHMR.  They're partners in a lot of areas.  Mental
5 health is something in which -- which basically ties
6 directly with drug abuse.  So we have those type of
7 things.
8           The one thing that I have spoken with --
9 with Dr. Duncan about is the fact that drop boxes, these
10 are places where -- you know, you may have medication in
11 your -- in your medicine cabinet and -- opioids and
12 other medications, and you don't need them anymore.  And
13 so what do you do with them?  You know, they tell us not
14 to flush them down to commode, which makes sense.
15          And I had some real concerns about the
16 availability of drop boxes and -- because if we go on
17 the basis that one of the -- one of the ways people
18 begin to use opioids, prescription opioids -- and you
19 hear this from a bunch of different people -- they find
20 them in their medicine cabinet, their mom and pop's
21 medicine cabinet.  A lot of times that's because the
22 mom, pop, the person that actually had the script for
23 them, they had the drugs but they didn't need them
24 anymore, so they weren't using them.  And so what do you
25 do with those drugs?

Page 45

1           And -- and so, you know, Dr. Duncan and I had
2 different conversations about, you know, how we go about
3 getting more drop boxes, and that's also one of the
4 things that -- that Challenge did.  I mean, Challenge
5 was -- was a -- on the forefront of getting more and
6 more drop boxes because, you know, my contention was --
7 and I think I'm correct -- is that if you're able to
8 have medication, you don't need it anymore, you don't
9 feel like you want to flush it down the commode because
10 you're told not to, you need to have a place to get rid
11 of that stuff.  And drop boxes, they're something that
12 the DEA has pushed, something that the County has
13 pushed, not only through -- through JPS -- and JPS has
14 drop boxes -- but through the Sheriff's Department and
15 anywhere we can work with.  We work with the
16 universities to do that, TCU, UT Arlington, to establish
17 those -- those type of -- they're not facilities, but
18 those type of containers.
19     Q.  So did you have any discussions with
20 Dr. Duncan about disposal of prescription opioids
21 besides a drop box, expanding drop -- drop box
22 opportunities for people who wanted to appropriately
23 dispose of prescription opioids?
24     A.  The disposal of them?  No, I did not.
25     Q.  Did you have any discussions with her as it

12 (Pages 42 - 45)

1 related to any matters as it related to -- strike that.
2        Did you have any conversations with her
3 relating to the problem of prescription opioids in
4 Tarrant County aside from your drop box discussions?
5 And I'm asking specifically about prescription opioids.
6     A.  So we've generally had those conversations in
7 the past.  It's not something that -- that I call Karen
8 up -- I'm sorry -- Dr. Duncan up to talk with her about
9 as it related to this lawsuit.  It's something that --
10 that we have discussed periodically in the past.  You
11 know, they -- they run pharmaceutical -- they run
12 pharmacies, also, and I wanted to understand, quite
13 frankly, how -- how they filled their prescriptions, you
14 know, where they went to fill them and things such as
15 that.  And -- and so I've had those type of discussions.
16 We've had general discussions in the past, you know,
17 over the years about issues dealing with -- with drug
18 abuse and prescription abuse, not specifically related
19 to Albertsons, but -- but those type of activities
20 within our community.
21     Q.  And as -- in her role as the CEO of the
22 Tarrant County Health Center, have you ever asked her
23 about the practice of -- or the volume of prescribing
24 opioids from either a John Peter Smith pharmacy or a
25 John Peter Smith doctor or any of the doctors who were

1 active at the Texas -- Tarrant County Health Center?
2        MR. JANUSH:  Objection, form.
3        MR. WAHBY:  Is your objection because
4 it's like compound or just confusing or --
5        MR. JANUSH:  Compound, yeah.
6        MR. WAHBY:  Okay.
7     Q.  (BY MR. WAHBY)  Let me ask you that
8 question --
9     A.  Sure.
10     Q.  -- differently.
11     A.  Absolutely.
12     Q.  In your discussions with Dr. Duncan --
13     A.  Yes.
14     Q.  -- have you ever asked her to look into the
15 prescription of opioids from any facility within Tarrant
16 County Health Center?
17     A.  I have not.
18     Q.  Okay.  Have you ever taken an interest in
19 investigating the practice of prescribing opioids
20 from -- by any doctor affiliated or who has privileges
21 at the Tarrant County Health Center?
22     A.  I have not.
23     Q.  Okay.  Have you ever investigated the number
24 of prescriptions for opioids that are fulfilled at a
25 pharmacy located within the Tarrant County Health

1 Center?
2     A.  No.  I -- what I was more interested in was to
3 see if they had established procedures on -- on -- in
4 how they basically guarded against -- not guarded
5 against, that's the wrong term.  How they -- how they
6 managed the distribution and if those were written
7 procedures, and -- and I was told that they did.
8        I will tell you that those conversations with
9 Dr. Duncan were not something that occurred within the
10 last four or five months.  They've occurred over the
11 years that I have known Dr. Duncan.
12     Q.  But those conversations occurred in your
13 capacity as the administrator of this great county,
14 Tarrant County, right?
15     A.  Yes.  And the reason is because when you look
16 at the Hospital District, the hospital district is a
17 separate taxing entity.  Okay?  And a lot of people get
18 confused about this.  But the board of directors -- the
19 board of managers, excuse me, are specifically appointed
20 by the Commissioners Court.  And the budget that -- that
21 the Hospital District passes every year, not only has to
22 pass the board of managers, but it also has to come to
23 the Commissioners Court for approval.
24        Then when we get to the point of -- of
25 collecting Tarrant County taxpayer money that -- that

1 either goes to Tarrant County itself or it goes to the
2 Hospital District, that is a function of the
3 Commissioners Court to pass those tax rates.  And so --
4 so one of the things that I've always done is -- is
5 helped the Hospital District, especially under the last
6 two administrators or CEOs, on helping them fully
7 understand how detailed their budgets have to be.  And I
8 would give them suggestions on, you know, why -- you
9 know, if we're looking at increases here or decreases
10 there, to have justifications for them, because those at
11 one time were -- were detailed discussions that the
12 Commissioners Court had with the board and also with the
13 CEO of the Hospital District so that the Commissioners
14 Court could make, you know, a determination of what that
15 budget needed to be and how much -- how much that tax
16 rate had to be in order to provide funding for that
17 budget.
18     Q.  And so in your role as county administrator is
19 you would work with the leader of the Tarrant County
20 Health Center which, as you've described, includes
21 hospitals and walk-in facilities --
22     A.  Yes.
23     Q.  -- and -- and not quite hospitals, but very
24 high-end healthcare providers --
25     A.  Yes.

13 (Pages 46 - 49)

1    Q.  -- from cancer, to really across the spectrum
2  of healthcare needs for residents of Tarrant County and
3  beyond really.  In those discussions, you wanted to
4  ensure that they were managing the distribution and had
5  written procedures as it relates to the dispensing of --
6  of pharmaceutical medication, including opioids,
7  correct?
8    A.  Yes, and -- but I will -- I'm sorry, I didn't
9  mean to cut you off.
10    Q.  That's correct, right?
11        MR. JANUSH:  Objection, form.
12    A.  So, yes, those discussions, as related to the
13  regs basically, were not detailed discussions.  Those
14  discussions were do you have regulations or policies and
15  procedures?  And -- and, you know, her answer was yes.
16  And I didn't ask, I want to see those.
17    Q.  (BY MR. WAHBY)  I understand.
18    A.  And I take her word for it.
19    Q.  Of course.
20    A.  She's the CEO.
21    Q.  Your job is not to review her policies --
22    A.  Right.
23    Q.  -- and pass judgment.  You're just trying to
24  get comfortable as the county administrator, the -- the
25  most senior unelected official in Tarrant County --

1    A.  Yes.
2    Q.  -- that the Hospital District, which is pretty
3  renowned, has written policies and practices as it
4  relates to the dispensing of medication, correct?
5    A.  That's --
6        MR. JANUSH:  Objection, form.
7    Q.  (BY MR. WAHBY)  Correct?
8    A.  Yes.
9    Q.  And you were satisfied that they did, correct?
10        MR. JANUSH:  Objection, form.
11    A.  I was satisfied that they had policies.
12    Q.  (BY MR. WAHBY)  And that was sufficient for
13  you?
14        MR. JANUSH:  Objection.  Is that a
15  question?
16        MR. WAHBY:  Yes.
17        MR. JANUSH:  Objection, form.
18    A.  Ask your question again.
19    Q.  (BY MR. WAHBY)  And that was sufficient for
20  you, in asking the leader --
21    A.  I just wanted to make sure we had policies and
22  that -- you know, those policies were some that were put
23  together by, you know, my pharmacists, by my upper
24  echelon within the Hospital District, and -- and I was
25  not someone -- they had much more expertise in

1  developing those policies and understanding those
2  policies than I did.
3    Q.  And if Albertsons and its affiliates in
4  Tarrant County have written policies, if it's good
5  enough for the Tarrant County Hospital District, it's
6  good enough for Albertsons and its affiliates, correct?
7    A.  I just don't know how those two compare.  I
8  haven't -- you know, I've seen a document on Albertsons
9  as it relates to some of their -- some of their general
10  practices on pharmacies.  I specifically asked to see if
11  we had a copy of that.  And those policies, at least the
12  document that I saw, was no more than two pages, and one
13  was an introductory type memo and then the policies
14  after that.
15    Q.  And --
16    A.  And they were more -- I don't want to
17  categorize them as policies.  It was more guidance than
18  policies necessarily.
19    Q.  And you're critical of that document that
20  you're referring to related to Albertsons that you're
21  referring to?
22    A.  I don't know if I saw all of the documents
23  that Albertsons provides to its pharmacies.  I know it's
24  a -- it's a big operation, but I wanted to get a flavor
25  as to the overall view of how, not the pharmacists

1  themselves, but -- but that element of -- of within
2  the -- within the Albertsons organization, you know, how
3  serious they took this.  And if they went -- you know,
4  if I would have asked for that document and they would
5  have given -- and I would have received a document that
6  was 50 pages, I would have thought, well, this -- you
7  know, I can read this.  I probably wouldn't understand
8  all of it, probably a majority of it, but I would know
9  that -- that they're on the right trail.  The document
10  that I saw was simply -- it was two pages, and one was
11  really more of an introductory paragraph page.
12    Q.  Can you describe the document that you're
13  referring to?
14    A.  Yes.  May I -- I have that document here.  May
15  I -- may I --
16    Q.  Sure.
17    A.  Okay.  So --
18    Q.  What are you -- can you describe for the court
19  reporter what you're securing?
20    A.  Sure.  I brought material along for this
21  deposition, and it consists of the equivalent of two
22  3-inch binders, and this is material that -- that I
23  either asked for or have reviewed as it relates to the
24  prep for this.
25        MR. JANUSH:  And just for the record, so

Page 54

1 that we're clear, it's the material that we had sent to
2 Allison earlier, I think seven days prior to the
3 deposition, pursuant to the Court order.
4         MR. WAHBY: Thank you.
5         MR. JANUSH: Also, I don't want to take
6 you off your track at all. We've been going for a
7 little over an hour, and I could use a bio break when --
8 when you're able to.
9         MR. WAHBY: Okay. Can we just get
10 through this?
11        MR. JANUSH: 100 percent.
12     Q. (BY MR. WAHBY) So you're -- you're
13 identifying the document, so we're clear on the record,
14 that was provided to you in response to your request to
15 see Albertsons's policies related to the management of
16 prescription opioids. Is that correct?
17     A. So what this -- it's -- it's -- it's
18 controlled substances and diversion prevention for store
19 directors. That's what the subject matter is, and it
20 says controlled -- or CS policy for store directors.
21     Q. And this was provided to you in response to
22 your request to see --
23     A. Yes.
24     Q. -- Albertsons's policies on the distribution
25 of controlled opioids.

Page 55

1     A. Yes.
2     Q. Is that correct?
3     A. Yes, sir.
4     Q. Okay. Can you hand me that document?
5     A. Absolutely.
6     Q. Okay. So for the record, this is document
7 Bates labeled ALB-MDLCT9-00001088 to 89.
8         Were you provided any other document --
9     A. I'm going to give you one more document.
10    Q. Okay. And the second document is Bates
11 labeled ALB-MDLCT9-00002988 to 89.
12        And so in response to the question --
13    A. Yes, sir.
14    Q. -- those are the two documents that you were
15 provided, correct?
16    A. Yes, sir.
17        MR. WAHBY: Yeah, we can go off the
18 record for a short break.
19        THE WITNESS: Thank you.
20        THE VIDEOGRAPHER: We're off the record
21 at 10:48 a.m.
22        (Break from 10:48 a.m. to 11:04 a.m.)
23        THE VIDEOGRAPHER: We are back on the
24 record at 11:04 a.m.
25    Q. (BY MR. WAHBY) Mr. Maenius, you understand

Page 56

1 you're still under oath?
2     A. Yes, sir.
3     Q. Did you -- did you confer with your lawyers
4 about this testimony during the break?
5     A. Somewhat, yes.
6     Q. Okay. What -- did you -- did you discover
7 anything new about your testimony during the break?
8         MR. JANUSH: Objection.
9     A. No.
10    Q. (BY MR. WAHBY) Do you have to amend your
11 testimony in any way?
12    A. No.
13        MR. JANUSH: For the record, I told him
14 he's doing a great job and to keep going.
15        MR. WAHBY: Okay.
16    Q. (BY MR. WAHBY) Isn't it good to have an
17 encourager here?
18    A. He didn't say that.
19    Q. What -- let me direct your attention back to
20 Exhibit 1, topic number 4.
21    A. Okay.
22    Q. If you would review topic number 4. Similar
23 to my question at the outset of your testimony on topic
24 number 3, are you prepared to provide testimony on topic
25 number 4?

Page 57

1     A. Yes.
2     Q. And what did you do to prepare to provide
3 testimony on topic number 4?
4     A. So once again, I reviewed a significant amount
5 of material that -- that's in the binders that I brought
6 today. Also, I -- you know, a lot of the things that --
7 that fall within this particular area are something that
8 I had personal knowledge of simply by being with the
9 County for 35 years, and so I understand, you know,
10 the -- you know, when you talk about the harms caused by
11 illicit opioid and prescription opioid sources.
12        The last 35 years, actually more than that,
13 when I was with the Crime Commission here, we have been
14 seeing -- you know, it's not just a matter of -- of the
15 resources that are necessary to -- to combat drug use,
16 and also to fund those things that -- that are for the
17 treatment of drug abuse and opioid abuse but also the --
18 the general impact that it's had on the community.
19        I have always been someone who has looked at
20 the community as a whole, that if there were areas where
21 that -- because -- and the reason is because there are
22 many different issues that affect how government is run
23 and the services that they provide. And it's -- over
24 those years, I could tell what -- what drug abuse and
25 opioid issues were causing in this county because we had

15 (Pages 54 - 57)

Page 58

1 to address them.
2    Q.   Did you do anything different to prepare for
3 topic 4 than topic 3?
4    A.   No.
5    Q.   Okay.  So the same materials that you reviewed
6 for topic 3 are the same materials you reviewed for
7 topic 4, plus your personal knowledge around topic 4?
8    A.   Yes, sir.
9    Q.   Did you discuss topic 4 with any individuals
10 aside from those you mentioned for topic 3?
11    A.   No.
12    Q.   Well, let me ask you a more simple question.
13 Did you discuss topic 4 with anybody?
14    A.   I discussed it with my attorneys.
15        MR. JANUSH:  Objection to anything
16 regarding attorney/client privilege.
17    Q.   (BY MR. WAHBY)  Did you discuss with anybody
18 besides your attorneys?  I'm referring to topic 4.
19    A.   Yes, I understand.  Not that I can recollect,
20 no.
21    Q.   And the personal knowledge that you acquired
22 over your time as county administrator, as well as on
23 the Crime Commission, about the harm that opioids can
24 cause to a community, do you have any personal knowledge
25 as it relates to the harm that prescription opioids

Page 59

1 specifically cause to a community?
2    A.   So I'm going to go back and talk a little bit
3 about the progression of -- of drug use, and if we go
4 back and look at some of the reports that Challenge has
5 provided and some of the other reports in this document,
6 it's -- even -- even those that are -- that are modern
7 day, there is a clear understanding that drugs of abuse
8 today, hydrocodone is still majority, is the largest
9 type of drug that are used.  And I would be happy to
10 show you the chart where I got that information.
11        Also, just for whatever it's worth, the
12 Challenge reports -- and we talked about this a little
13 bit earlier -- they came to our office, and I had a
14 criminal justice manager that -- that worked directly
15 for me, and their responsibility was to -- was to take
16 information from not only groups like Challenge, but
17 also work with the Sheriff's Department, to work with
18 the FBI as far as the uniform crime reporting aspect,
19 because we -- we literally created documents and reports
20 that talked about a bunch of different things.  But one
21 of those areas that -- that my office produced through
22 my criminal justice manager, one of those topic areas
23 was prescription drugs.  And so, you know, I didn't have
24 direct conversations with some of the sources that --
25 that my manager did, but I did -- I had to approve those

Page 60

1 reports before they went out into the public venue,
2 because they simply came out of my office.
3    Q.   And did those reports relating to prescription
4 drugs cover prescription opioids in particular?
5    A.   Yes, they did.
6    Q.   Okay.  And did any of them refer or relate to
7 Albertsons or any of its -- any of its affiliates in any
8 way?
9    A.   They never used the word "Albertsons."
10        Now I will tell you that -- that when it came
11 to the drop boxes, that -- and I was interested to see
12 if Albertsons was a participant in the drop boxes.  And
13 there are -- there were several instances in reports --
14 and I will be more than happy to show you where those
15 instances are -- where that people were assigned -- and
16 it was through the Challenge process, which we funded,
17 to work with the different pharmacies.  And what we
18 found with Albertsons and the Tom Thumb pharmacies, that
19 they were nonresponsive to our conversations about
20 possibility of establishing drop boxes.  You know, we
21 reached out to them, but they were simply nonresponsive.
22 I would be more than happy to point that out in any of
23 the various reports.
24    Q.   Okay.  Did -- you said that the reports that
25 related to prescription opioid abuse in the county did

Page 61

1 not use the word "Albertsons."  Were they prepared
2 relying on data that involved Albertsons?
3        MR. JANUSH:  Objection.
4    A.   Okay.  So -- so if I can make sure that I
5 clarify something.
6        When we talk about the report -- if you're
7 talking about the report that my criminal justice
8 manager and, you know, that involved outside sources,
9 that involved county-related sources, it was not just
10 one person putting those reports together, it was a
11 combination.  That report or those reports did not
12 mention Albertsons.  The reports that dealt with
13 Challenge did in their annual report because it was --
14 and I agree with -- I agree with Challenge, that it was
15 critically important that we -- we bring the drop boxes,
16 you know, to get them throughout the county as much as
17 possible.  And I was -- one individual was assigned to
18 contact Albertsons to see if they wanted to participate
19 in the drop box program, and at least my review of the
20 documents showed that while they made efforts to contact
21 and get some type of response, there was never a
22 response.
23    Q.   (BY MR. WAHBY)  Okay.  Let's put the drop
24 boxes aside for a moment --
25    A.   Sure.

16 (Pages 58 - 61)

Page 62

1    Q. -- and focus on the reports that you're
2  referring to that you recall your office approving that
3  related to prescription opioid abuse in Tarrant County.
4  Okay?
5    A.  Okay.
6    Q.  Were those reports generated relying on any
7  information that came from Albertsons or related to
8  Albertsons's prescriptions?
9    A.  Not to my knowledge.
10    Q.  And the Challenge reports in connection with
11  the drop boxes --
12    A.  Uh-huh.
13    Q. -- it's your understanding that Albertsons did
14  not respond to a request relating to using drop boxes?
15    A.  Yes, there were at least two instances that I
16  saw in those reports where -- that it was assigned, but
17  basically there was no response from Albertsons.
18    Q.  Okay.  Which document are you referring to?
19    A.  So I'm going to go back into these books here.
20    Q.  Okay.
21    A.  Okay?  And so I am going to use my tab here.
22    Q.  Can you read the note that you're referring to
23  that are handwritten --
24    A.  Sure.  I have basically an index of what's in
25  each of -- each of those tabs.

Page 63

1    Q.  Okay.
2    A.  And -- why I'm referring back to them,
3  because there are 47 different tabs.
4    Q.  I understand.
5    A.  And I'm trying to answer your question as
6  succinctly as possible.
7    Q.  Sure.
8    A.  Okay.
9    Q.  And what is the handwritten note there that
10  you have on the second page of the document you're
11  referring to?
12    A.  This document here?
13    Q.  Uh-huh.
14    A.  This here is simply some of the topics that
15  are found in -- in those different tabs that I thought
16  were of interest.
17    Q.  Okay.  I'm going to give this for you to use.
18  I'm just going to mark this as Exhibit 2 --
19    A.  Sure.
20    Q. -- so we have a record.
21    A.  And by the way --
22    Q.  That's the first page, correct?
23    A.  This is the first page.
24    Q.  Okay.  So these two pages together will --
25  that are entitled "Index of Documents" that reflect 47

Page 64

1  tabs and which have your handwritten notes on them --
2  we'll just -- I'll hand that back to you.
3    A.  Sure.
4    Q.  And we will just refer to that as Exhibit No.
5  2.
6        (Exhibit 2 marked.)
7    A.  Absolutely.  So -- well, let me go ahead and
8  pull some of these because I have one that specifically
9  deals with -- with drop boxes.
10    Q.  (BY MR. WAHBY)  Again, and specifically we're
11  looking for the document that reflects your
12  understanding that Albertsons did not respond to a
13  request relating to drop boxes.
14    A.  That's correct.  You're going to need to give
15  me just a second in order to find that.
16    Q.  Okay.  Maybe we can go off the record while
17  you pull that up.
18        THE VIDEOGRAPHER:  We're off the record
19  at 11:15 a.m.
20        (Break from 11:15 a.m. to 11:22 a.m.)
21        THE VIDEOGRAPHER:  We are back on the
22  record at 11:22 a.m.
23    Q.  (BY MR. WAHBY)  Okay.  Mr. Maenius, you have
24  before you a set of documents produced by Challenge.
25  And they're marked Exhibit 3.

Page 65

1        (Exhibit 3 marked.)
2    Q.  (BY MR. WAHBY)  And they're Bates labeled
3  CHAL0001041 to 1196.
4    A.  Yes, sir.
5    Q.  And this collection of documents from
6  Challenge is what you were referring to as evidence that
7  Albertsons didn't respond to inquiries or an effort to
8  get them involved with the drop box initiative, correct?
9    A.  Okay.  So yes, but just for a correction, I
10  said that these were Challenge documents.  These are
11  all -- these documents were also part of the Fort Worth
12  Safe City Commission or Coalition, which the County was
13  a member of.  If you would look at page 1055, you'll see
14  that at the top of that page, it says Fort Worth Safe
15  City Communities Coalition.  That was a program that
16  Mayor Price put together.
17    Q.  The Fort Worth Safe Communities Coalition --
18    A.  Safe Cities Coalition, yes -- or Safe
19  Communities Coalition, yes, sir.
20    Q.  Okay.  And this is the document that you were
21  referring to?
22    A.  Yes, sir, it is.
23    Q.  And on page 1055, you're specifically
24  referring to the action item person responsible column
25  with the entry next to Amanda R. that says research

17 (Pages 62 - 65)

Page 66

1  contact with Albertsons, correct?
2      A.  That's correct.
3      Q.  Can you explain why that note says,
4  quote, "research contact with Albertsons" means to you
5  that Albertsons was not responsive to the drop box
6  initiative?
7      A.  So -- yes.  So this document illustrates
8  that -- that Amanda R. actually reached out and tried to
9  contact Albertsons.  And what happened was that there
10  was nothing in this document that -- that indicated that
11  Albertsons was responsible -- or responded back, not
12  responsible, but responded back.  And on page 1057, you
13  can see that there was another -- there was another
14  attempt, and it's reflected in the September 8, 2015
15  documents as to she had once again attempted to reach
16  contact with Albertsons.
17      Q.  The -- sorry, go ahead.
18      A.  So -- when I saw this, I asked -- I asked
19  to see if Albertsons had a policy -- first of all, if
20  they do a drop box and -- because I personally believe
21  that the drop box is critically important to -- to
22  basically capture the un -- unused and unwanted
23  medications, opioids and others.  And Albertsons
24  pharmacies are located pretty much throughout the
25  county, and it would be convenient for people who wanted

Page 67

1  to dispose of that to, in fact -- those medications to
2  have that ability.
3      Q.  Mr. Maenius, on -- on page 1055 and on page
4  1057 --
5      A.  Yes, sir.
6      Q.  -- of Exhibit No. 3, there's no reference to
7  her actually contacting Albertsons, correct?
8      A.  That's correct.
9      Q.  All it says is she is going to research
10  contact with Albertsons, correct?
11      A.  Right.  Yes.
12      Q.  And so you can't read this to conclude that
13  she actually called Albertsons or contacted them in any
14  way, correct?
15      A.  No.  But when I did see this -- and I went
16  through the materials on -- on this particular tab, and
17  I found that there was no place in here where it
18  suggested that Albertsons had a drop box or a drop box
19  policy.  And so what I did when I saw that, I -- I asked
20  if I could -- if there was any documents available that
21  would talk about if Albertsons had the drop box or not.
22      Q.  And I want to focus specifically on your
23  understanding that they were not responsive, which I
24  understand you have testified your belief to be based on
25  the fact that Amanda R. has this note where she

Page 68

1  researched contact with Albertsons on two occasions,
2  correct?
3      A.  Right.
4      Q.  But that does not say she actually contacted
5  Albertsons, right?
6      A.  No, it does not say that.
7      Q.  Did you ask Amanda R.?  Do you know who Amanda
8  R. is?
9      A.  No, I don't.
10      Q.  Okay.  So you never asked Amanda R., hey,
11  what's the status with the research?
12      A.  No, I did not.  I did not ask that person
13  about these comments.
14      Q.  So you don't actually know if Amanda R.
15  actually ever contacted Albertsons?
16      A.  No, I don't.
17      Q.  Okay.
18      A.  But what I do know is that when you look at
19  these documents, there are areas where that -- that
20  there is reported back to this group that -- like
21  Walmart and places like that, that they do have drop
22  boxes.  So I didn't see that in here, and that's why I
23  asked is there any documents that shows does Albertsons
24  have a drop box or not, or drop box policy, and I was
25  provide that had.

Page 69

1      Q.  And so your testimony that Albertsons was not
2  responsive to the County was based on those two notes in
3  its entirety, and you acknowledge that those notes don't
4  say she actually contacted Albertsons --
5      A.  Yes.
6          MR. JANUSH:  Objection, misstates
7  testimony.  He said he reviewed documents in these
8  binders and there may be other documents that he
9  reviewed.  So just making sure where it -- it misstates
10  the testimony.
11          MR. WAHBY:  Evan.  Evan, it's "objection,
12  form," that's it.
13          MR. JANUSH:  Objection, form.
14          MR. WAHBY:  Okay.
15          MR. JANUSH:  Misstates testimony.
16          MR. WAHBY:  Hey, no, no.  That's not
17  objection, form, Evan.  It's "objection, form," that's
18  all there is.
19      Q.  (BY MR. WAHBY)  Now --
20      A.  I just want to clarify one thing that you
21  said.  Okay?
22      Q.  Okay.
23      A.  You said "the County."  This was a report that
24  was -- that was not a county government report.  This
25  report here is something that is with the Fort Worth

18 (Pages 66 - 69)

1 Safe Communities Coalition.
2    Q.   Right.  And my point --
3    A.   I just want to clarify that.
4    Q.   I understand.  You're -- this seal reflects at
5 the top of this page where this came from.  It's the
6 Fort Worth Safe Communities --
7    A.   Coalition.
8    Q.   -- Coalition --
9    A.   Yes.
10    Q.   -- collaborative prevention, and it was
11 produced by Challenge, the Challenge entity, correct?
12    A.   I believe that Challenge was a part of that.
13 It was not -- Challenge was a separate organization from
14 this task force, but they were part of this task force,
15 if that makes sense.
16    Q.   Yes.
17       Now going back to topic 4 more generally, you
18 explained that -- let's just take a quick administrative
19 timeout.  Now let's just -- okay.  So you've got
20 Exhibit 3, there, right, in your hands?  We're going to
21 move on.
22    A.   Yes.
23    Q.   I just don't want it to get -- if you'll hand
24 it to me --
25    A.   Sure.

1    Q.   -- because we're going to move on.  Yeah, just
2 put that on there, and I don't want it to get
3 disorganized --
4    A.   Absolutely.
5    Q.   -- and so forth.
6    A.   Absolutely.
7    Q.   The worst thing that can happen today is our
8 exhibits get disorganized.  If you would just --
9    A.   I understand that.
10    Q.   Yeah, because we're going to move on.  So if
11 you would just leave that right here --
12    A.   Sure.
13    Q.   -- and -- and I'll ask you a different
14 question.
15    A.   Okay.  Great.  I may have those -- I don't
16 know if those -- I think those are in order.
17    Q.   Yeah, so if you want to refer back to these,
18 they'll be right in front of you, but we just need to
19 get this set up before we move on here.
20    A.   Okay.  Sure.
21    Q.   I'm going to give you back Exhibit 3, but I
22 want to -- before we move on, during the speaking
23 objection, there was a reference that you believe
24 there's other documents that suggest Albertsons didn't
25 respond to the drop box initiative or other documents

1 that suggested nonresponsiveness from Albertsons.
2       Are there any other documents besides the two
3 that we've discussed with the note regarding research
4 that reflect your understanding of whether Albertsons
5 was responsive about drop boxes?
6    A.   So one of the documents -- and I think I said
7 this previously, is that when I realized that they were
8 not -- you know, that I didn't see anything in there as
9 far as Albertsons actually having a drop box or not.  I
10 asked if they had a drop box policy, and -- and I was
11 provided with a memo from Albertsons, and I don't know
12 if I have given that to you or not.  I believe I have,
13 but I can reference it again.  And it is either under
14 tab 43 or 44.
15    Q.   Again, you're reviewing Exhibit No. 2?
16    A.   Yes, I'm sorry.  This is the index of
17 documents --
18    Q.   Okay.
19    A.   -- just so we can locate those.
20    Q.   And which tab from that index?  If you would
21 read the title of the tab that you're referring to that
22 you believe has that information.
23    A.   So it's either -- it's either one of two.  One
24 is tab number 43 and it's ALB-MDLCT9-00001088 -1089.
25 That is tab number 43.  And tab number 44 -- and as soon

1 as I see those two documents, I can tell you right away,
2 but number 4 ALB-MDLCT9-00002988.
3       MR. JANUSH:  We can turn to the tabs and
4 figure it out, right?
5    Q.   (BY MR. WAHBY)  Yeah, if you would turn to
6 those tabs, as your counsel suggested --
7    A.   Okay.  43 and 44.
8       MR. JANUSH:  Do you want me to grab that
9 for you?
10       THE WITNESS:  No, I've got it.  I've got
11 it.
12    A.   I believe that I've given these to you before,
13 but -- okay.  Okay.  It is tab number 44.
14    Q.   (BY MR. WAHBY)  Can I --
15    A.   Would you like to see it?
16    Q.   Yeah, if you could hand me 43 and 44 in their
17 entirety.
18    A.   That's 44, and this is 43.  And I believe
19 that I've shown you those documents, at least 43 before,
20 so --
21    Q.   Okay.  So we're going to mark tab 43 as
22 Exhibit 4.
23       (Exhibit 4 marked.)
24    Q.   (BY MR. WAHBY)  I am going to hand that back
25 to you.  Actually, sorry.

19 (Pages 70 - 73)

Page 74

1    A.  Did you -- did you read everything you need?
2 Okay?
3    Q.  I am going to hand -- I am going to mark tab
4 44 as Exhibit No. 5 and hand that back to you.
5        (Exhibit 5 marked.)
6    A.  Very good.
7    Q.  (BY MR. WAHBY)  So let's -- so put those over
8 here with your stack, and then -- I don't want you to
9 get your tabs out of order, so if you want to reorganize
10 that, we'll take a second to get that situated and then
11 we'll talk about these two exhibits from tab 43 and 44,
12 Exhibits 4 and 5.
13    A.  Got you.  Okay.  It kind of looks like my desk
14 when I was with the County.  Okay.  I'm sorry.  No. 4
15 and No. 5, okay.
16    Q.  Okay.  So you've testified that Exhibits 4 and
17 5 are evidence in your mind that --
18        MR. JANUSH:  He said either, so I'm just
19 shaking my head.  He said it's either one of these
20 documents.  He didn't say both.  You were using both.
21 It's just --
22        MR. WAHBY:  You know you can speak with
23 body language as well.  That's still a speaking
24 objection.
25    Q.  (BY MR. WAHBY)  Okay.  So you've testified

Page 75

1 that either Exhibit 4 or Exhibit 5, you couldn't recall
2 at the time, but now that you've seen them, do you
3 recall which one you had in mind that reflected a lack
4 of responsiveness from Albertsons as it related to the
5 drop box initiative in the county.  Is that right?
6    A.  Yes.
7    Q.  Which one is it?
8    A.  So it's -- it's tab 5.  I'm sorry, Exhibit 5.
9    Q.  Exhibit 5.  Exhibit 5 --
10    A.  It's tab number 44.
11    Q.  Right.
12        Exhibit 5 is the one that's Bates labeled
13 ending 2988, correct?
14    A.  That's correct.
15    Q.  Okay.  Can you please identify where on
16 Exhibit 5 you believe evidences Albertsons was not
17 responsive about the County's drop box or your drop box
18 initiative?
19    A.  As it related to the documents from the Safe
20 Cities or Safe Communities program, when I saw that
21 there wasn't any response or that there -- in that
22 document it didn't show a response from -- from
23 Albertsons.  So I asked about if there was a policy as
24 related to drop boxes, and so what was provided to me
25 was a document which is Exhibit No. 5.  And I will be

Page 76

1 more than happy to go into that -- that exhibit and talk
2 a little bit about it, if you would like.
3    Q.  To be clear, Exhibit No. 3, which we reviewed
4 from the -- that Challenge group produced, where it's a
5 note from Amanda R. that reflects research for
6 Albertsons contact, correct?
7    A.  That's correct.
8    Q.  It does not say that Albertsons actually was
9 contacted, correct?
10    A.  No.  It was -- it said -- let me get back to
11 it again.
12        Okay.  So what the document says -- and this
13 is Exhibit No. 3, okay.  It basically -- not basically.
14 It says under action items, persons responsible, Amanda
15 R., research contact with Albertsons.  That's all it
16 says on the one document.
17    Q.  That doesn't say that Albertsons actually was
18 contacted, correct?
19    A.  That's correct.  That's correct.
20    Q.  So on what basis do you conclude that
21 Albertsons, in fact, was contacted and then failed to
22 respond?
23    A.  The -- the reason that I say that is because
24 when you review these documents, you will see as other
25 pharmacies were -- or, yeah, pharmacies were contacted,

Page 77

1 it had a delineation in there that -- you know, that
2 they were contacted.  You know, Walmart was, I think,
3 one of them.  They said Walmart has a drop box program.
4        I did not see anything in these documents that
5 stated that there was -- well, there was no response
6 that I could find, that there was any response from
7 Albertsons -- or from Amanda R. as to the success of
8 contacting Albertsons or Albertsons had a drop box
9 program or not.
10    Q.  But there's no note from Amanda R. or anybody
11 that they actually contacted Albertsons?
12    A.  That's correct, I did not see that, no.
13    Q.  Right.  All it says is they're researching
14 contact, correct?
15    A.  That's correct.  Give me just one second.
16        No, I do not see that.  I don't see it.
17    Q.  Okay.  So if we can go back to your testimony
18 regarding Exhibit 5.
19    A.  Yes.
20    Q.  Exhibit 5 you believe reflects Albertsons not
21 having a drop box program?
22    A.  That's correct.
23    Q.  Okay.  What is the basis of that testimony?
24    A.  Well, okay.  So -- so the responses that came
25 from -- this is a memo from Lynette Berggren,

20 (Pages 74 - 77)

Page 78

1 B-e-r-g-g-r-e-n, and she is with -- she is with
2 Albertsons.
3        It says, Well, it's a little bit challenging
4 to explain why compliance with the regulation is
5 difficult for pharmacy when the reality is that we have
6 no experience with it because we have made a business
7 decision not to voluntarily participate.
8        Then it goes on to say -- and they're talking
9 about the disposal of -- of controlled substances
10 regulations, and these are DEA regulations.  It says,
11 Our primary concern with maintaining collection
12 receptacles is that the increased traffic that will
13 result will include those with intentions to misuse the
14 receptacles for disposing -- or, excuse me, depositing
15 unintended items or -- and/or with intent to remove
16 items from the receptacles.  Another concern is the
17 potential for individuals to stalk the receptacles
18 looking for opportunities to snatch and grab items
19 with -- from intended depositors.
20        So what they're saying is before they actually
21 drop the stuff in there, the medications in the drop
22 box, that they will be assaulted and there will be a
23 robbery at that point.
24    Q.   That seems like a legitimate concern, correct?
25        MR. JANUSH:  Objection, form.

Page 79

1    A.   Are you asking my opinion?
2    Q.   (BY MR. WAHBY)  Sure.
3    A.   Okay.  Not --
4    Q.   Sorry, go ahead.
5    A.   No, not necessarily.  I mean, there's --
6 there's pros and cons about doing this, but if, in fact,
7 the -- this pharmacy, this pharmacy company, that -- you
8 know, when you look at pharmacies and some of their
9 responsibilities, especially when it goes to the
10 Controlled Substance Act, there are responsibilities for
11 different players in the pharmaceutical arena.  And --
12 and if one looks at that area dealing with pharmacies,
13 it's pretty clear to me that -- that one of the main --
14 one of the responsibilities of pharmacies, to ensure
15 that medications that -- that are prescribed, that first
16 of all, it is -- it's not overprescribing, that it's not
17 maybe coming from different doctors that may not know
18 that this patient has been doctor shopping.
19        Also, the fact that if the goal is to limit
20 the accessibility to the medications for people -- or
21 the opioids for people who really it's intended to be
22 used for, it's my -- it's my belief that receptacles are
23 critically important to recapture, if that's a good
24 term, those medications that are out there, that are no
25 longer needed and so that they don't fall into -- into

Page 80

1 the hands of people that aren't supposed to have them.
2    Q.   At this particular time it's not mandatory,
3 correct?
4    A.   The drop boxes?
5    Q.   Uh-huh.
6    A.   I don't know the answer to that question.
7    Q.   Okay.  So if somebody -- if a company, if a
8 pharmacy weighs the pros and cons of having a voluntary
9 program, that's a reasonable thing for a pharmacy to do,
10 correct?
11        MR. JANUSH:  Objection, form.
12    A.   Okay.  So -- so that is a decision that that
13 company has to make.
14    Q.   (BY MR. WAHBY)  Do you know if John Peter
15 Smith or any entity within the Tarrant County Hospital
16 District had drop boxes at that timeframe that's
17 reflected in Exhibit No. 4?
18    A.   This is 2017.
19        MR. JANUSH:  Objection, form.
20    A.   This is 2017.  I know today that John Peter
21 Smith has drop boxes.
22    Q.   (BY MR. WAHBY)  As it relates to that
23 timeframe, though, do you know if --
24    A.   I don't -- I don't know exactly when John
25 Peter Smith began their drop box.

Page 81

1    Q.   So let me just get -- let me get the question
2 out.
3    A.   Okay.
4    Q.   And then -- so --
5    A.   Got you.
6    Q.   At the timeframe reflected in Exhibit No. 5 --
7    A.   Yes.
8    Q.   -- you don't know if John Peter Smith or any
9 entity within the Tarrant County Hospital District had
10 drop boxes or receptacles available, correct?
11    A.   Not to my knowledge.
12    Q.   Okay.
13        THE WITNESS:  So in about ten minutes or
14 so, if we could take another break.
15        MR. WAHBY:  Sure.  Are you thinking of a
16 short break or like a lunch break?
17        THE WITNESS:  I'm talking about I have to
18 use the restroom.
19        MR. WAHBY:  Okay.  So we'll -- we will
20 have to figure out what we're going to do about lunch.
21        THE WITNESS:  Not that we have that on
22 the record.
23        MR. WAHBY:  Your counsel calls them bio
24 breaks.  He should have told you that if he was really
25 watching out for you, but --

21 (Pages 78 - 81)

1          MR. JANUSH:  Wow.  I didn't know we're
2 into dings now.  I can give it just as I receive it.
3 Watch out.
4          MR. WAHBY:  Yeah, trust me, I know.
5          MR. JANUSH:  Good.
6     Q.  (BY MR. WAHBY)  Are there any other documents
7 besides the ones we've discussed that relate to your
8 knowledge of topic number 4?
9     A.  So that's a pretty broad question, and -- and
10 there are different documents that I have talking about
11 abuse in Tarrant County.
12    Q.  Let me ask you a better question.
13    A.  Okay.
14    Q.  Are there any documents unique to topic 4 that
15 you -- that you didn't review in connection with
16 preparing for topic 3?
17    A.  No.
18    Q.  Okay.  And you're prepared to testify on
19 behalf of the County on topic 4 today?
20    A.  Yes, sir, I am.
21    Q.  So if I could direct your attention to topic 5
22 listed in Exhibit No. 1.  If you would review that
23 topic.
24    A.  Okay.
25    Q.  Did you do anything to prepare for topic 5

1 different than what you did for topics 3 and 4?
2     A.  No.
3     Q.  Are there any documents that you requested or
4 reviewed in connection with topic 5 that were -- that
5 really kind of distinguished it from topics 3 and 4?
6     A.  So, yes.  So as it relates to topic number 5,
7 the causes of illicit opioid and prescription opioid
8 supply, so -- so some of the documents that I have here
9 are documents that are from various other vendors, other
10 individuals.
11         First of all, I have documents from the
12 Sheriff's Department, their intelligence report.  They
13 have their annual narcotic report.  There are documents
14 that are part of the Challenge documents, but the intro
15 letters that are from -- I think there's four documents,
16 four different years.  Three of those were intro letters
17 that dealt with -- or not dealt with, but were from the
18 special agent in charge of the DEA field office out of
19 Dallas.  And then the fourth one -- I believe there's
20 four -- that was actually from John Parker, who -- who
21 was the US attorney out of Dallas.  So I reviewed those
22 documents also.
23         In almost every document that you're going
24 to -- that I have, you know, it talks about the
25 progressive use of -- of the diversion of legal opioid

1 prescriptions, and then it talks about how that -- and
2 I'm going to use the term "morphed," but graduated to
3 the illegal use.  And also, there are documents that I
4 can show that -- that reflect basically -- and I believe
5 the percentage is 70 percent, that people that are
6 currently -- that they found that are using heroin
7 started by using prescription opioids.  So, they are
8 blended throughout these documents, and I can try to
9 point you to some of those.  I may miss some of those
10 because the documents are somewhat voluminous, and --
11 but I will be more than happy to try to show you those.
12    Q.  Okay.  And to be clear, you're identifying the
13 documents that are all captured within your index of
14 documents at Exhibit 2, correct?
15    A.  Yeah -- they're all part of this
16 index.  Some of these -- some of these tabs may not
17 specifically talk about those particular issues.  I
18 mean, such as the complaint and the -- and the different
19 responses, items 1, 2, and 3, though they may mention
20 those.  But those -- they talk about the Tarrant County
21 Narcotics Unit presentations, the Texoma HIDTA program,
22 you know, the drugs of abuse and CNET, which stands for
23 County Narcotic Enforcement.
24    Q.  I just wanted to clarify that when you
25 identify these documents, as providing the basis for

1 your knowledge on topic 4, you're referring, in part, to
2 the documents --
3     A.  Yes.
4     Q.  -- that are listed in your index of documents
5 at Exhibit 2, correct?
6     A.  Absolutely, yes.
7     Q.  Okay.  And there aren't any other documents,
8 besides those captured in Exhibit 2, in your index, that
9 you are aware of that support your testimony in
10 connection with topic 4?
11    A.  So let me -- before we move on to that
12 question --
13    Q.  I'm sorry, I meant topic 5.
14    A.  Yeah.
15         So what I am looking at, I have notes that I
16 made that are not in any of the 47 tabs.  And it's just
17 my prep notes, basically.  And so there may be something
18 in here.  I would have to review that.  If you would
19 like me to review it, I would be more than happy to
20 right now.
21    Q.  I'm not trying to be invasive, but it is my
22 right --
23    A.  Absolutely.
24    Q.  -- if I could review your notes, that would --
25 that would be great.

22 (Pages 82 - 85)

1    A.  Sure.  Do you want to do that now?
2    Q.  I will do so very quickly.  I know --
3    A.  If you need me to run through any of these --
4    Q.  Well, you know, Ms. Queny would be very proud
5 of your penmanship, because I could never quite pull
6 this off, but, you know, this is very easy to read.
7    A.  Left-handed.
8    Q.  Okay.  Well, you probably see this coming, but
9 I'm going to go ahead -- I'm going to mark this as an
10 exhibit --
11    A.  Sure.
12    Q.  -- because it relates --
13    A.  Absolutely.
14    Q.  -- to your testimony, and then I'll give it
15 right back to you.
16      So I've marked your note pad that you've
17 brought in that has some of your handwritten notes as
18 Exhibit 6.
19      (Exhibit 6 marked.)
20    Q.  (BY MR. WAHBY)  And you can refer to that, to
21 the extent it's helpful for you.
22    A.  Okay.  Very good.
23      MR. WAHBY:  Now with that, let's -- we
24 can go off the record and take a break, and your counsel
25 and I will figure out what our lunch day looks like.  So

1 we can go off the record.
2      THE VIDEOGRAPHER:  All right.  We're off
3 the record at 11:54 a.m.
4      (Break from 11:54 a.m. to 1:09 p.m.)
5      THE VIDEOGRAPHER:  We are back on the
6 record at 1:09 p.m.
7    Q.  (BY MR. WAHBY)  Mr. Maenius, did you review
8 any documents or information during the break that
9 refreshed your recollection about your testimony?
10    A.  Yes, I did.
11    Q.  What did you review?
12    A.  Just the same documents that -- that I have in
13 these binders.
14    Q.  Okay.  Is there any aspect of your testimony
15 that that review has caused you to want to change or
16 modify?
17    A.  Not at this time.
18    Q.  Is there something in particular you were
19 looking to determine or understand better?
20    A.  Not necessarily.  It was just a simple review
21 of the documents.
22    Q.  Let me direct your attention to Exhibit 1,
23 topic 6.
24    A.  Topic 6.
25    Q.  If you would review topic 6, are you prepared

1 to provide testimony on behalf of Tarrant County on
2 topic 6?
3    A.  Yes.  Sure.
4    Q.  And what did you do to prepare for topic 6?
5 Anything different than what you've already testified to
6 for topics 3, 4 and 5?
7    A.  No.
8    Q.  Are there any documents that you believe
9 relate specifically to topic 6?
10    A.  There are several documents that are in
11 these -- in these binders that -- that talk about a lot
12 of the different items that were mentioned in topic 6.
13      So, for example, there are -- there are
14 discussions that were in presentations made by -- by
15 Calvin Bond.  I think there's a slide deck in.
16 There are intro pages that -- that were provided by the
17 Drug Enforcement Administration, the special agent in
18 charge.  Those were intros to reports by Challenge.  And
19 also, there are -- there's a document from the US
20 Attorney out of the Northern District that -- John
21 Parker, and that also was an introductory letter that's
22 part of the Challenge report.
23      When you look at the different reports,
24 especially when you go into the County's, their
25 intelligence report that the Sheriff's Department had

1 made, they talk about illicit drugs and nonopioid drugs
2 in those presentations also.
3      So that type of information is really
4 scattered through a bunch of these documents.  The ones
5 I laid out are not -- is not the totality of those
6 documents, but it talks about those, along with -- with
7 prescription opioids.
8    Q.  Okay.  And specifically, you're referring to
9 Exhibit No. 2 and certain tabs that contain --
10    A.  Yes.
11    Q.  -- documents.  Can you read from Exhibit No. 2
12 which tabs you're referring to specifically with respect
13 to the Calvin Bond documents or the intro pages or the
14 US Attorney documents?
15    A.  Okay.  So -- so the HIDTA reports, that will
16 be tab 6, 7, 8.  Number 9 is drugs of abuse.  So number
17 10 was the Greater Tarrant County drug trends.  You're
18 also going to see on 11 the CNET, which is the County
19 Narcotics Enforcement Task Force.  That's the ones that
20 have a lot of that in it.  The drug assessments that you
21 see in 16 and 17, you'll start seeing the Challenge
22 reports.  Not necessarily 21, but the other reports in
23 the -- and I'll get to those tabs after we go through
24 the first page.
25      We look at -- I think there are some -- there

23 (Pages 86 - 89)

Page 90

1 are some discussions, especially when it gets to cocaine
2 and methamphetamine, that you're going to find in all of
3 those, but also in the Public Health report on 24.
4 You're going to be talking a little bit about it in the
5 item number 28 or tab 28, which is the County's criminal
6 justice community plan. Then you see a lot of -- or
7 some discussion in the Challenge -- Challenge ones.
8 Those are from 29 all the way to 32. I will tell you
9 that in those, though, that the symposium notes are not
10 as detailed as you find in 31 and 32. You'll see a lot
11 of material in the SAID reports. Those are in 34, 35,
12 36, 37 and 38 and 39. You'll -- and let's see. And I
13 think we talked about items 12 and 13. That was a
14 report from Mr. Bond. Those were the threat assessments
15 for 19 and 20.
16 So as I said, all of these have some
17 discussion about -- about illicit drugs and that are --
18 that are nonopioid, but also about opioid drugs, too.
19 Q. Okay. Do you have -- do you have personal
20 knowledge as it relates to topic 6 arising from your
21 time as the county administrator?
22 A. Yes. The -- what we noticed especially --
23 since possession of marijuana is a class B misdemeanor,
24 which is filed in the County Criminal Courts, we've
25 noticed that we -- through my -- through my time as the

Page 91

1 county administrator, I did note that there were
2 increasing numbers of cases that are being filed by the
3 criminal district -- or with the criminal district
4 attorney as it relates to that.
5 Also, discussions and funding issues that I
6 had conversations with with the Sheriff's Department and
7 the District Attorney's Office as far as their task
8 forces and the needs for -- to supply additional
9 individuals to work in those task forces.
10 By the way, the District Attorney's Office
11 also provides prosecutors that are linked to those task
12 forces. Last year, which was -- which was actually the
13 fiscal year that we're in now at the county -- and that
14 fiscal year is October through September -- we funded --
15 upon the request of the Criminal District Attorney, we
16 funded a specific Narcotics Prosecution Unit, and all
17 this was because, not only of the rise of the
18 utilization of -- of illicit drugs, but also the
19 quantity and the severity of those drugs.
20 One other thing is that there's been general
21 discussion with law enforcement about the large
22 number of individuals who have been charged with
23 marijuana. There has been some discussion -- I don't
24 know what the end result of that was -- was to move from
25 a confinement type action against someone who has a

Page 92

1 small quantity of marijuana in their possession, to a
2 cite and release program, where you cite them and
3 they -- and the people that receive the citations are
4 required to -- to appear before either a magistrate or a
5 Court, a County Criminal Court so that -- so that their
6 charges can be adjudicated.
7 So those are the type of things that we've
8 seen. We've also seen a tremendous amount of increase
9 in -- in methamphetamines. It was -- it was something
10 that our task forces talked about. It's something that
11 the intelligence people talked about, was that there was
12 a substantial increase in the amount of methamphetamines
13 that were being cooked either in Tarrant County or in
14 the surrounding counties, which eventually fed into
15 Tarrant County.
16 You know, it's one thing to cook meth, but you
17 have to have someone that's going to utilize that, and
18 since we were -- especially in the southwestern and the
19 western counties that surround us, you know, the users
20 of that tended to be in Tarrant County, simply because
21 that's where the population is. And so we had -- we had
22 that type of discussion.
23 Of course, cocaine -- cocaine is not an
24 opioid. It comes from the cocoa plant. And the
25 utilization of cocaine was -- was substantial. It still

Page 93

1 is. It's something that, it seems like, it becomes a
2 drug of choice for a lot of people. We know that there
3 are -- there are, you know, drug cartels that are based
4 here in Tarrant County, and they traffic a tremendous
5 amount of, not only opioids, but -- but cocaine up from
6 Mexico and from South America.
7 Q. When you referred to the Narcotics Prosecution
8 Unit that Tarrant County funded --
9 A. Yes.
10 Q. -- is their charter to include the abuse of
11 prescription opioids?
12 A. Yes.
13 Q. And when was that unit created?
14 A. Well, it was -- it was created in this past
15 fiscal year. And that fiscal year started -- the one
16 we're in now, that fiscal year started in -- in October
17 1st of '23.
18 Q. And it was -- was there any consideration as
19 it related to problems arising from the use of
20 prescription opioids in connection with forming or
21 funding that group?
22 A. That group was formed to address all levels of
23 drug abuse, illegal drug abuse. Drug abuse and illegal
24 drug -- drug abuse.
25 Q. Do you recall any specific consideration of

24 (Pages 90 - 93)

1 opioid -- prescription opioid abuse?

2    A. I know that when we were having those

3 discussions -- and part of my role as the county

4 administrator along with the budget director, we had

5 significant conversations with -- with the criminal

6 district attorney and the need for the organization

7 because it's an expenditure of funds, and we talked to a

8 certain extent about prescription drugs and either the

9 diversion of those drugs or simply the illegal

10 possession of those drugs.

11    Q. My -- my question goes to the fact that, you

12 know, you're seeing trends in the county, and one

13 response is this Narcotics Unit, but those trends

14 involve the growth and distribution of meth, the

15 widespread, pervasive problems with cocaine, everything

16 from these very serious street drugs to marijuana catch

17 and release. So in that context, how much of a concern

18 over prescription opioids was considered?

19       MR. JANUSH: I just have to make a note

20 for the record that we're on topic 6. That specifically

21 is concerning nonopioid illicit drugs. So when

22 Mr. Maenius testified, he was testifying in response to

23 the nonopioid illicit drug trends. He wasn't saying --

24 testifying to the exclusivity of or nonexistence of

25 other trends.

1       MR. WAHBY: Right, but he also -- he also

2 clarified that he has personal knowledge on that.

3       MR. JANUSH: I just said I'm just making

4 the point that we're on topic 6.

5       MR. WAHBY: Right.

6       MR. JANUSH: And on topic 6, he was

7 testifying to the trends concerning nonopioid illicit

8 drugs without seeking to exclude prescription opioids as

9 a trend. It's just that prescription opioids are

10 excluded from the topic. That's all.

11    Q. (BY MR. WAHBY) Do you recall my question?

12    A. Would you mind repeating your question?

13    Q. The ultimate question was in that context, in

14 light of these trends, how much of a concern was the

15 abuse of prescription opioids considered?

16    A. So in the law enforcement community, it's

17 fairly common -- and we see it in our reports here --

18 that -- that a large percentage of those individuals who

19 use heroin started by abusing prescription drugs,

20 prescription opioids, and I think that, you know,

21 you're looking at a number that's close to 70 percent.

22 And so -- and so we had those type of conversations

23 when -- when we went into the discussion about, you

24 know, do we fund a Prosecution Unit or do we -- or do we

25 just embed more people in the task forces and things

1 such as that.

2     And so prescription drugs and the -- and

3 the -- and the illegal utilization of those drugs or the

4 overutilization of those drugs was part of those

5 discussions. If you're asking -- if you're asking what

6 particular percentage of that -- of those discussions

7 were dealing with prescription opioids, I can't really

8 recall the exact, but they were part of that discussion.

9    Q. Is it fair to say that the discussion

10 primarily related to how to address the use of heroin?

11       MR. JANUSH: Objection.

12    A. No, not necessarily. It was -- the -- the

13 purpose of the Prosecution Unit was to do -- to have a

14 concentrated effort on -- on drug violations, not

15 specifically heroin.

16    Q. (BY MR. WAHBY) Can we direct your attention

17 to topic number 7?

18    A. Yes, sir.

19    Q. If you would review topic number 7, are you

20 prepared to provide testimony on topic number 7?

21    A. Yes, I am.

22    Q. Again, what did you do to prepare to provide

23 testimony on topic 7?

24    A. So what did I do to prepare?

25    Q. Yes.

1    A. I reviewed the documents that I have in here.

2 Also, just in basic memory of what we have -- what I

3 have been experiencing or have experienced for the last

4 35 years. You know, the educational aspect of how we --

5 how we will try to -- to decrease the amount or usage of

6 illegal prescription drugs and non -- nonprescription

7 drugs also.

8    Q. And if I could direct your attention to

9 Exhibit 2, which is the index of the documents that

10 you're referring to having reviewed, which of those

11 documents do you believe relate to topic 7 or informed

12 your testimony as it relates to topic 7?

13    A. Well, there's several of them here, but I

14 would point to those -- those documents that deal with

15 the Challenge reports. And they start on 29, tab number

16 29, and they go all the way through -- I would say they

17 go all the way through 40.

18     One of Challenge's responsibilities was to

19 have drug education, and -- and we funded -- the County

20 funded a substantial portion of -- of drug education

21 programs through Challenge. Also, when you look at some

22 of our courts -- and I will refer you to the Tarrant

23 County Drug Court, which is actually part of -- is run

24 by a District Court out of the Family Law Center or

25 Section. And what this particular court was -- was --

1 the purpose of that was to identify parents that may
2 actually have -- or mothers who may have drug problems
3 or to try to educate them about the impact of those
4 drugs on -- on their babies and to steer them in a way
5 so that -- and provide education and counseling and all
6 of those different things that would hopefully guarantee
7 that when that baby was born, that it was born clean.
8      Also, the Domestic Relations Office, it's not
9 one of these topics here, but when I started this -- I
10 will tell you that there's a lot of knowledge that -- or
11 a lot of areas that I have been involved in.  Domestic
12 Relations basically is -- deals with supervising
13 families that are divorced and taking care of the kids
14 and making sure that -- that the kids are treated
15 properly, that there's no friction in the house, things
16 like that.
17      Drugs have always been a major, major issue
18 that we have had to counsel with our -- with our Tarrant
19 County employees that deal with domestic relations, and
20 we would -- you know, I had very frank conversations
21 about if you become a user or if you continue to be a
22 user of opioids and other narcotics and dangerous drugs,
23 that that would -- that very well could affect your
24 ability to see your child and also to maintain the
25 parent-child relationship.  So those are some of the

1 things we've done.
2      Also, you know, on the education aspect, we
3 talked earlier about things such as Cornerstone, which
4 is -- which was -- which is an entity that we fund that
5 provides counseling to offenders that come directly out
6 of the penitentiary that are coming back into the
7 community.  Educational aspects that we see with MHMR,
8 areas in -- in Public Health, especially Public Health.
9 We do -- what I think is we do a substantial amount of
10 drug utilization education, that hopefully we can divert
11 people from actually using medications.
12      It's kind of interesting, and I will find this
13 document in these files.  There's statistics that's out
14 there that children who have received drug education
15 and, you know, the bad things that can happen to you
16 whenever you use drugs, they have a 50 percent less --
17 not opportunity, but they -- 50 percent less of them are
18 actually moving into the utilization of significant
19 drugs, such as -- you know, you can name -- you can talk
20 about heroin.  You can talk about prescription drugs.
21 You know, we can talk about just a whole bunch of
22 different drugs that they use, and so you can see that
23 that type of public education effort really pays off.
24 You know, it kind of flies under the radar sometimes
25 when you talk about enforcement and things like this,

1 but that type of education is key to why we spend what I
2 think is a significant amount of money in drug
3 education.
4      Q.  Were any of those efforts that you've
5 described, from drug education, to the efforts that
6 MHMR, Domestic Relations Office, Drug Courts, were any
7 of those developed specifically to address the abuse of
8 prescription opioids?
9      A.  I haven't seen all the pamphlets and
10 everything, but I do know that there are educational
11 programs that we -- we run that basically talk about --
12 you know, it would go back to the drop box issue.  You
13 know, what happens if you have medications in your -- in
14 your house and you're not using them anymore?  They're
15 accessible to the younger people.  Well, then that's not
16 a good situation.  Things like that, where there's a
17 significant amount of education.
18      We point people to drop boxes because, you
19 know, a person has to make an independent decision if
20 they still need the medications, you know.  But if they
21 don't need the medication and, you know, let's -- let's
22 not save it for a rainy day, you know.  Let's go ahead
23 and get it to the point that we can return it back or --
24 I use the term "recapture."  That's my -- that's my
25 term.  We can recapture those drugs and really prevent,

1 which is -- which is critically important to these
2 efforts, to prevent the access and then the utilization
3 of prescription drugs because they are prescription
4 drugs because they come from the pharmacies.  And so we
5 do a lot of that.
6      Q.  Okay.  So aside from drop boxes and the
7 recapture effort that you've described, are any of the
8 programs that you've identified specifically related or
9 developed in response to prescription opioids?
10      A.  Well, yes.  I mean -- I mean, when we talk
11 about -- you know, they're not -- they're not limited to
12 the utilization of cocaine or heroin or anything like
13 that, the illicit drugs.  You know, they're -- you know,
14 they're -- they're there because of availability of
15 pills.
16      Now one of the things that we're also looking
17 at -- and it's -- is that the fact that fentanyl is --
18 you know, fentanyl -- you can find fentanyl in legal
19 opioids, but at the same time, the fentanyl epidemic and
20 the toxicity of fentanyl is something that, you know,
21 there's a major push to talk about -- about medicine
22 that you believe is just prescription medicine that you
23 think you're going to take.
24      And, of course, you know, there's -- there's
25 some documentation in here that talks about -- about

26 (Pages 98 - 101)

1  parents and children believe that if the child or they
2  take prescription opioids, that that's safer than taking
3  illicit opioids, like heroin, and that's not -- that is
4  not true.  You know, that's a belief that we -- we try
5  to make sure everyone understands that -- that opioids
6  are opioids.
7       Q.   Okay.  So which are the programs you've
8  identified, from drug education to Drug Courts to
9  Domestic Relations Office, which of those initiatives or
10  efforts were in response to prescription opioid abuse?
11      A.   Well, I don't think that you can just
12  simply -- I don't think that we said, okay, we're --
13  we're targeting this one, just to -- just to pills,
14  because I think -- I think rather than a rifle shot, we
15  tend to want to do more of a shotgun type approach where
16  that we can hit multifaceted because -- and we can go
17  and look at some charts.
18          There is opioids, legitimate opioids, that
19  have been either diverted from the system or have been
20  taken from the system in one way or the other and -- and
21  put into the utilization of those opioids that -- that
22  are not prescribed by physicians, or they may be
23  prescribed but not at that dosage, that it builds this
24  chain of how you move from -- from certain levels of
25  drugs, then it morphs into a higher level, and then you

1  have to ask the question why -- you know, why do a lot
2  of people use heroin?
3          Heroin is used because it's an opioid.
4  Hydrocodone is an opioid.  It's a lot cheaper to get a
5  fix of heroin than it is to get a couple of tabs of
6  hydrocodone.  And it becomes availability, and
7  availability has decreased to a certain extent.  But it
8  also depends on pricing.  And I thought it was very
9  interesting that -- that to get the same level or even a
10  higher level of usage, it's cheaper to use heroin than
11  it is to use prescription drugs.
12      Q.   Do you have an understanding of what diversion
13  is?
14      A.   So my understanding of diversion is when you
15  take a legitimate substance -- as it relates to this
16  topic, if you take a legitimate substance, be it an
17  opioid, and you divert that away from its intended
18  purpose or create a situation where it's abused because
19  the person has gotten too many, didn't need it.
20  Diversion is -- consists of a lot of different things.
21  You can have a robbery of pharmacies where they steal
22  the drugs, and you can have situations where they may --
23  you know, someone may steal a script pad.  It may be
24  something where someone goes into the medicine cabinet
25  and -- and takes those -- those drugs and either

1  utilizes for themselves when it's not for them or
2  actually takes them out and sells them also.
3       Q.   Okay.  And with that understanding of
4  diversion, the steps Tarrant County took to prevent
5  diversion include the drug education efforts, the Drug
6  Courts, the Domestic Relations Office and initiatives by
7  MHMR.  Is that correct?
8       A.   And the -- and the educational programs that
9  Challenge has -- has initiated.  Like I said, we have
10  always been part of the Challenge environment, either
11  sitting on that board -- our chief epidemiologist tends
12  to sit on the Challenge board, chief epidemiologist
13  from -- from the Public Health Department.  So -- so we
14  have -- we have those -- those particular areas that --
15  that apply to the questions that you're asking.
16      Q.   Right.  And you agree with me that those
17  efforts that you've identified, from drug education to
18  the Drug Courts to the Domestic Relations Office to MHMR
19  initiatives to the educational programs you've
20  described, those are steps to address drug abuse in
21  Tarrant County widely, not specifically tailored to
22  confronting prescription opioids, correct?
23          MR. JANUSH:  Objection, form.
24      A.   So prescription opioids are a part of but are
25  not the totality on all the drug use and abuse.

1       Q.   (BY MR. WAHBY)  And of the totality, do you
2  have any understanding as to what percentage of that
3  problem the County is attempting to address?  What
4  percentage does prescription opioid abuse amount to?
5       A.   I don't have -- I don't have an answer for you
6  as far as the specific percentage.
7       Q.   Okay.  Now let me direct your attention to --
8  well, before we move on.
9          And you don't have any understanding or any
10  information as it relates to Albertsons or its
11  affiliates and pharmacists contributing or not
12  contributing specifically to the drug issues that these
13  programs that you've identified are attempting to
14  address, correct?
15      A.   That's correct.
16      Q.   Okay.  Let me direct your attention to topic
17  number 8.
18      A.   Okay.
19      Q.   Are you prepared to provide testimony on topic
20  number 8?
21      A.   Yes, sir, I am.
22      Q.   And what did you do to prepare for topic
23  number 8?
24      A.   So I -- of course, I have the materials
25  that -- that we've spoken of previously.  Plus, I spoke

27 (Pages 102 - 105)

1 with Calvin Bond as it relates to efforts of our
2 narcotic task forces in how they deal with -- with the
3 diversion of -- of legitimate opioids into an illegal
4 use. So it was that, plus my own recollection of a lot
5 of things that the County has done, the material that we
6 have in the binders here, and also my conversation with
7 Calvin Bond.
8     I believe we mentioned earlier that Mr. Bond
9 is -- or Chief Bond is -- is a retired DEA agent. I
10 believe he is in a supervisory role, that he has
11 commanded our narcotics task forces, and his
12 responsibilities within the Sheriff's Department deal
13 with our narcotic task forces and enforcement.
14     Q.  Okay.  So you spoke to Deputy Chief Bond?
15     A.  Yeah.
16     Q.  And you identified some documents that has
17 informed your testimony on topic 8.  Is that right?
18     A.  That's correct.
19     Q.  Have you spoken with anybody else to prepare
20 for topic 8?
21     A.  No.
22     Q.  Okay.  And which documents do you believe
23 speak to topic 8?
24     A.  So if you look at --
25     Q.  And you're referencing Exhibit No. 1?

1     A.  Yes, I'm sorry.  Exhibit No. 2.
2     Q.  Yeah, right, Exhibit 2.
3     A.  So once again, the documents I'm talking about
4 are the Challenge reports that you find all the way
5 starting from 28 and 29, all the way down to -- to 31 --
6 39, excuse me.  Especially those letters and -- that we
7 see from the DEA and the US Attorney's Office or the US
8 Attorney.  I'm also talking about the threat assessments
9 that Chief Bond had put together.  These are 12 and 13.
10 I'm also talking about item number 18, which is the
11 opioid presentation.
12     And there's a couple more.  The intelligence
13 report, which is item number 14.  The national drug
14 threat assessment, you'll see those in 16 and 17.  And
15 there's probably some more in here, but I believe those
16 are the major ones.  So also number 28, the criminal
17 justice plan.  While that plan was one that talked about
18 a bunch of different aspects of the criminal justice
19 system, it does talk specifically in -- in that plan
20 about prescription drugs and narcotics in general.
21     Q.  What steps did Tarrant County take to address
22 an oversupply of prescription opioids?
23     A.  So -- so several things.  First of all, the
24 educational aspect was critically important, and we
25 continued to fund Challenge of Tarrant County to do

1 that.
2     Also, our narcotics task forces, it was not --
3 they came up on times whenever we had -- when we
4 believed that there was -- was a diversion, if you will,
5 from -- from a legitimate use of manufactured opioids,
6 pills, and into -- into the illegal market.  So we did
7 those type of things.
8     Also, as part of the concern that we have and
9 had -- had and have is that the movement of the cartels,
10 especially in the areas of opioids that are in pill
11 form.  And I'm talking about even hydrocodone.  I'm
12 talking about sometimes heroin, other types of narcotics
13 that we see.  That was something critically important
14 simply because the cartels now are using pill stamp
15 machines and they're making their own pills.
16     Q.  Did you believe that -- when you were working
17 as the county administrator, that any of the pharmacy
18 defendants were culpable for an oversupply of
19 prescription opioids in Tarrant County?
20     A.  I didn't have any information on that.
21     Q.  And so at the time you were the county
22 administrator, you did not then believe that Albertsons
23 or any of its affiliates had a role in the oversupply of
24 prescription opioids in Tarrant County?
25     MR. JANUSH:  Objection.

1     Q.  (BY MR. WAHBY)  You can answer.
2     A.  So -- so I knew that the pharmacies were
3 involved.  I didn't know exactly which pharmacies were
4 involved.
5     Q.  Did you do anything to find out?
6     A.  I talked with our task force people, and --
7 but really that type of enforcement, the majority of it
8 is something that is done by the Drug Enforcement
9 Administration, the DEA, and they have specialized units
10 that -- that focus on that.
11     It's critically important to know, at least in
12 my opinion, that when you go to the Controlled Substance
13 Act and -- because that's -- that's -- there's a lot of
14 different narcotic laws on the federal level, but that's
15 the crux of the movement from the old drug narcotics
16 and dangerous drugs to the Drug Enforcement Administration.
17 That happened in 1970.  And the Controlled Substance
18 Act was something that really beefed up some
19 responsibilities, not only for DEA, but also for the
20 pharmaceutical manufacturing companies, to the doctors,
21 but also to the pharmacies themselves, and they talked
22 about responsibilities  that -- that they had.
23     And it wasn't just a responsibility, but it
24 was a red flag issue.  Whenever you had a suspicion
25 that a particular opioid was being overprescribed, that

28 (Pages 106 - 109)

1 it might look like there was doctor shopping or if
2 there was any issue where the pharmacist was hesitant
3 to actually go ahead and fill a prescription but filled
4 it anyway or didn't fill it, that there was a
5 responsibility by the pharmacy to report that red flag
6 incident to DEA.
7        And the reason I say that is because that
8 really put the responsibility directly on DEA to -- to
9 do a lot of the enforcement as it relates to
10 pharmaceutical opioids.  And at the same time, that's
11 one reason why we have consistently teamed with and made
12 part of our task forces and they have made us part of
13 their task forces, that -- that they go after major
14 drugs, and pharmaceuticals is one of them also.
15    Q.  Okay.  I want to focus on your testimony that
16 you talked with the task force people regarding the
17 pharmacies that may have been involved with the
18 overprescription or oversupply of opioids.  Who did you
19 speak with at the task force in connection with
20 determining if pharmacies were involved with the
21 oversupply?
22    A.  Calvin Bond.
23    Q.  Okay.  And when was that?
24    A.  I talked to him -- I talked to him several
25 different times.  The last time I talked to him was

1 yesterday afternoon.
2    Q.  Okay.  And did you ever talk to him when you
3 were the county administrator?
4    A.  Oh, yes.
5    Q.  Okay.  And what -- please recount for us the
6 discussion you had with Calvin Bond when you were trying
7 to understand the role of the pharmacies in the
8 oversupply of prescription opioids.
9    A.  Those discussions were -- were part of a much
10 larger discussion, and the reason that we had those
11 discussions was because I have -- I have knowledge from
12 other -- other positions that I've held prior to coming
13 to the County, but I've always been interested in
14 exactly, you know, how we're utilizing our task forces
15 and is this something where that -- are they interested
16 in going after 2, 4, 6 ounces of marijuana, or are
17 they -- where are they targeting?
18    Q.  When were the discussions that you're
19 referring to?
20    A.  Oh, they -- those discussions, gosh, they've
21 been going on for years.
22    Q.  I want specifically as relates to pharmacies
23 that prescribed -- or that filled prescriptions for the
24 prescribed opioids.  When were those discussions
25 specifically?

1    A.  They were -- they -- that type of discussion
2 was part of a more general discussion that -- that,
3 gosh, I had with our narcotics people either every year
4 or every few years.  I read their reports mainly, and if
5 anything jumped out at me, then I would give them a call
6 and -- because they tended to do an annual report, or at
7 least a justification, as to why they needed funding,
8 additional manpower, additional resources besides
9 manpower to operate their task forces efficiently, and
10 so that's where I gained knowledge.  And I talked to --
11 I would talk to Calvin and his team.  I talked to others
12 in the County that I knew were in -- were in the task
13 forces, not as much as I talked to Calvin, and -- simply
14 because Calvin had -- has -- had and has a much greater
15 overview of all the different moving parts of those task
16 forces.
17    Q.  And when did you first -- did you form a
18 belief that pharmacies in their fulfilling of
19 prescriptions contributed to an oversupply of opioids in
20 Tarrant County?
21    A.  Well, when you look at the charts -- and
22 you'll find those -- I believe you'll find them in -- in
23 the Challenge reports, and I can go back and look.  I
24 know there's one specifically in here.  And remember
25 that during the time these reports were being written

1 and submitted, I was having -- I was having an insight
2 into those reports, simply because, first of all,
3 they're public documents.
4        Second of all, I had a criminal justice
5 manager in my office that had responsibilities for --
6 for looking at all criminal type activities.  And the
7 one thing that I noticed, and there's a really good
8 chart in here talking about, even of all the drugs that
9 are being used today, hydrocodone is still 30 to
10 40 percent of the usage, and hydrocodone is something
11 that, you know, it's an opioid.  It comes from
12 pharmacies --
13    Q.  Did --
14        MR. JANUSH:  Wait, wait, wait.  He was
15 still finishing.  Let him finish his response.
16        Keep going.
17    A.  And so, you know, that -- that -- to me,
18 hydrocodone is not something that, at least I'm not
19 aware of, that is -- that is something that is brought
20 into the country or grown here, something like -- like
21 heroin, something like that.  That's a pharmaceutical
22 drug.
23    Q.  (BY MR. WAHBY)  This is a yes or no question.
24        Did you form a belief that pharmacies in their
25 fulfilling prescriptions contributed to an oversupply of

Page 114

1 opioids in Tarrant County?
2    A.  To a certain extent, yes.
3    Q.  Okay.  When did you -- when, the date,
4 generally did you form that belief?
5    A.  Well, I can't tell you the exact date.  I
6 mean --
7    Q.  Generally.
8    A.  It's been -- it's been several -- it's been
9 years because I deal in this stuff.  I deal in reports
10 and -- I don't deal in drugs, but I deal in reports.
11 And because of my role as the administrator, you know, I
12 was the one who had to recommend to the Commissioners
13 Court, who is the funding entity, what we should fund
14 and what we shouldn't fund and why --
15    Q.  Did you -- sorry, go ahead.
16    A.  No, I'm sorry.
17    Q.  Did you form a belief that Albertsons in
18 particular in their fulfilling of prescriptions or any
19 of their affiliates contributed to an oversupply of
20 opioids in Tarrant County?
21        MR. JANUSH:  Objection.
22    A.  I never thought of it specifically as
23 Albertsons.
24    Q.  (BY MR. WAHBY)  Okay.  And aside --
25    A.  It was pharmacies in general.

Page 115

1    Q.  Okay.  Aside from the note that we've reviewed
2 together that Amanda R. entered --
3    A.  Yes.
4    Q.  -- where she researched contacting Albertsons,
5 did you ever request that anybody contact a pharmacy in
6 Tarrant County to get to the bottom of what you believed
7 was their role in contributing to an oversupply of
8 opioids?
9        MR. JANUSH:  Objection.
10    A.  I did not, and the reason I didn't is because
11 that's an enforcement process.  And the Sheriff's
12 Department and the city police, DEA, state narcotics,
13 you know, that's their job to do.  I didn't go out and
14 do any special investigations on my own.
15    Q.  (BY MR. WAHBY)  I'm not -- aside from a
16 special investigation on your own, did you do
17 anything -- once you formed the belief that pharmacies
18 in Tarrant County were contributing in your mind to the
19 oversupply of opioids in this county, did you do
20 anything at all to get to the bottom of what you
21 believed to be contributing to the oversupply of
22 opioids?
23    A.  So -- so in a roundabout way, yes.  I have
24 always been a huge proponent of drop -- drop boxes.  Now
25 drop boxes are those where that if they're available and

Page 116

1 they're visible whenever you go see your pharmacist,
2 that the possibility of -- if you have excess
3 medications and you want to dispose of them, that
4 they're there.
5        That doesn't answer the question I think you
6 may be asking as it relates to specific diversion at --
7 at the pharmacy level if we're Albertsons; however, we
8 talk about the availability of drugs and prescription
9 drugs.  And so I personally believe that drop boxes play
10 a role, now not a significant role, but they do play a
11 role in taking those type of medications off the street.
12    Q.  Okay.  So as the senior-most unelected
13 official in Tarrant County, you came to a conclusion
14 long ago that pharmacies were contributing to the
15 oversupply of prescription opioids in Tarrant County,
16 and you did nothing except for promote drop boxes.  Is
17 that correct?
18        MR. JANUSH:  Objection.
19    A.  I helped fund -- helped recommend funding for
20 task forces and increased law enforcement to combat it.
21    Q.  (BY MR. WAHBY)  Did you ever reach out to
22 Dr. Karen --
23    A.  Duncan.
24    Q.  -- Duncan when you came to this realization
25 to ensure that the facilities and prescribers and

Page 117

1 pharmacies at the Tarrant County Health Center were not
2 contributing to the oversupply of prescription opioids?
3    A.  No, I did not.
4    Q.  But you talked to her regularly, correct?
5    A.  I do talk to Karen -- Dr. Duncan much more
6 regularly when I was the county administrator than I do
7 now.
8    Q.  Of course.  And when you're the county
9 administrator and you came to this realization, why
10 didn't you ever reach out to her during your regular
11 discussions to share this concern?
12    A.  Oh, I believe that -- that Dr. Duncan
13 understood my concern, at least about the drop boxes.  I
14 was first exposed to a drop box going to a TCU event and
15 there was a drop box, and I had never heard of a drop
16 box.  That was probably eight or ten years ago.
17    Q.  Do you believe that the Tarrant County Health
18 Center and John Peter Smith and the pharmacies at those
19 locations should pay a pro rata share to the extent they
20 prescribed prescription opioids during the time at issue
21 in this lawsuit?
22        MR. JANUSH:  Objection.
23    A.  So my goal is not to determine who should pay
24 what.  Okay.  And my goal and I believe the County's
25 goal is to try to figure out ways that we can stop the

30 (Pages 114 - 117)

Page 118

1 access and the -- I don't want to say diversion, but
2 the -- the overprescribing of opioid medications, plus
3 all of those other things that cause people in Tarrant
4 County to step up and morph into a more -- or the
5 utilization of more hard drugs, heroin, fentanyl, things
6 like that, because, quite frankly, we spend a lot of
7 money on not only enforcement, but also in treatment for
8 those individuals.  And, you know, we talk about
9 treatment, but there's a lot of people that -- or
10 there's people in Tarrant County that because of their
11 utilization, they died, you know.  We tried to prevent
12 something like that.
13         THE WITNESS:  If we're about to move on,
14 whenever you feel -- whenever you feel there's a good
15 point to break, just let me know if we could take five
16 minutes.
17         MR. WAHBY:  I think we can take five
18 minutes now if you would like.
19         THE WITNESS:  Thanks.
20         THE VIDEOGRAPHER:  We're off the record
21 at 1:59 p.m.
22         (Break from 1:59 p.m. to 2:09 p.m.)
23         THE VIDEOGRAPHER:  We are back on the
24 record at 2:09 p.m.
25     Q.  (BY MR. WAHBY)  So Mr. Maenius, before we went

Page 119

1 on a break, you testified that the County has spent a
2 lot of money on, not only enforcement, but also in
3 treatment for those individuals, correct?
4     A.  That's correct.
5     Q.  Does the County have any ability or testimony
6 to offer as it relates to how much specifically it spent
7 on enforcement or treatment to address prescription
8 opioid abuse?
9         MR. JANUSH:  Objection.
10     A.  Sorry, ask the question one more time.  I want
11 to make sure that I answer you correctly.
12     Q.  (BY MR. WAHBY)  Does the County have any
13 ability or testimony to offer as it relates to how much
14 specifically it spent on enforcement or treatment to
15 address prescription opioid abuse?
16     A.  If you're talking specifically to -- to opioid
17 prescriptions and not the entire narcotics spectrum, I
18 don't -- I do not believe that that particular item is
19 broken out in all the different funding -- programs that
20 we fund or the projects that we fund.
21     Q.  Turn to topic number 9.  Let me direct your
22 attention to topic 9 --
23     A.  Yes, sir.
24     Q.  -- on Exhibit 1, I believe.  If you would
25 review topic 9, please.

Page 120

1     A.  Okay.  Yes.
2     Q.  Are you prepared to offer testimony on behalf
3 of the County on topic 9?
4     A.  Yes, sir, I am.
5     Q.  Okay.  And what did you do to provide -- to
6 prepare for that testimony?
7     A.  So, first of all, once again, I've looked at
8 the material that's -- that's in the binders.  I also
9 talked with Chief Bond, as far as enforcement techniques
10 and actions that we have as it relates to illicit --
11 illicit opioids and things such as that.
12         Plus, we continue not only to fund the task
13 forces, we continue to fund the various courts.  Our
14 education programs that we have with Challenge is
15 significant and -- and other type of activities like
16 that.  There's a significant amount of money that is
17 budgeted for not only enforcement but also treatment
18 and education as it relates to not just -- not just
19 prescription opioids, but as far as topic 9 is
20 concerned, the illicit opium -- opioid issue in Tarrant
21 County.
22     Q.  Okay.  Are there any documents that you
23 reviewed that you believe informed your testimony for
24 topic 9 in particular?
25     A.  Yes.

Page 121

1     Q.  Which documents are those?
2     A.  So I want to -- if you don't mind, I will show
3 you, and I think it's -- I think it addresses this
4 particular issue pretty well.
5         Part of the Challenge programs also have an
6 introductory letter, and we've spoken about that
7 previously, from -- from the special agent in charge of
8 the DEA in Dallas, but also the one that -- that dealt
9 with John Parker, who is the -- or was the US Attorney
10 for this district of Texas.  And -- and I think it's
11 pretty telling, if you would, if you let me use that
12 word.  Let me find it real quick.  I think it's right
13 here.
14     Q.  What tab are you referring to?
15     A.  So I am talking about -- let me get my deal
16 out of the way here.  If you'll just give me one second,
17 I will get to it.
18     Q.  While you look for that, I want to clarify
19 your prior testimony.
20     A.  Sure, absolutely.  I found it.
21     Q.  You explained that the particular item
22 relating to prescription opioids is not broken out in
23 all the different funding programs.  That's your prior
24 testimony.  Do you recall that?
25     A.  Yes.  You were asking me if we had

31 (Pages 118 - 121)

1  specifically broken out the cost of enforcing
2  prescription opioids.
3      Q.   Correct.
4          My question -- so the County does not have and
5  cannot offer testimony or evidence that relates to its
6  costs for the enforcement or treatment of prescription
7  opioid abuse specifically, correct?
8          MR. JANUSH:  Objection.
9      A.   Those numbers are embedded in our costs for
10 not only the task forces but for medical costs and other
11 treatment costs that we do.
12     Q.   (BY MR. WAHBY)  So the answer is the County
13 cannot provide the cost specifically for --
14     A.   It's not -- I have not seen it broken down.
15     Q.   Okay.  If could I just finish the question.
16         So the County does not have testimony or
17 evidence as it relates specifically to the enforcement
18 or treatment for prescription opioid abuse specifically,
19 correct?
20     A.   I don't believe that that document or that
21 information is specifically broken out, no.
22     Q.   Okay.  So now if we can go to the document
23 that you're identifying in connection with your
24 preparation for --
25     A.   Yeah, I'm sorry.

1      Q.   -- topic 9, what tab are you referring to?
2      A.   So I'm in tab 39.
3          So when we talk about -- when we talk about
4  illicit opioids, it's important that -- that we also, at
5  least in my opinion, that we talk about fentanyl.
6      Q.   I'm going to interrupt you, and I apologize
7  for doing so.  Let's go ahead -- if you could take that
8  out, and let's mark it as an exhibit.
9      A.   Sure.
10     Q.   And that way --
11     A.   This is a letter -- this is an intro letter
12 from, like I said, John Parker.
13         MR. JANUSH:  Can you take the entire --
14         MR. WAHBY:  Yeah, take the whole tab out.
15         MR. JANUSH:  Down to the remainder.
16         MR. WAHBY:  There you go.
17         MR. JANUSH:  Here, this is -- well, he
18 has it.
19         THE WITNESS:  Here you go.
20         MR. WAHBY:  Thanks.  Can you hand me --
21     Q.   (BY MR. WAHBY)  I am going to mark this as
22 Exhibit No. 7.
23         (Exhibit 7 marked.)
24     Q.   (BY MR. WAHBY)  And Exhibit No. 7 is Bates
25 labeled CHAL0000742 to 768, and this is a document that

1  you -- if you want to go ahead and close your binder, I
2  don't want you to get disorganized.
3      A.   Sure.
4      Q.   That's a document you identified in response
5  to my question about what helped you prepare for topic
6  number 9, right?
7      A.   Yes.
8      Q.   Okay.  And what is it about this Exhibit No. 7
9  that you would like to specifically identify?
10     A.   Well, first of all, it talks about the spike
11 of deaths of fentanyl.
12     Q.   What page are you on?
13     A.   I am on page 0744.
14     Q.   Okay.
15     A.   And so -- and so, first of all, it basically
16 states that -- that -- you know, they talk about a
17 synthetic opioid, but they're talking about fentanyl, 40
18 times stronger than heroin.  And that is in
19 paragraph one, two, three, four.
20         It also makes a statement that -- in the next
21 paragraph, that the US accounts for only 5 percent of
22 the world's population, but we consume 80 percent of the
23 world's opioid supply and 99 percent of its hydrocodone,
24 according to the NIDA.
25         Then I know we were talking about illicit,

1  but -- and when we talk about heroin in the third
2  paragraph from the bottom, in fact, 80 percent of heroin
3  users start abusing prescription drugs first or
4  prescription pills first.
5      Q.   Okay.  Do you see there in the -- toward the
6  middle of the page it says, For our part, my office --
7  referring to US Attorney John Parker -- will continue
8  working with our local, state and federal partners to
9  vigorously prosecute gangs, cartels and other drug
10 trafficking organizations who put these drugs on the
11 street.  Do you see that?  It's in the middle of the
12 page.
13     A.   Okay.
14     Q.   I can show you if it's easier.
15     A.   Yes, please.
16     Q.   My question goes to this question right here.
17 It starts right here.
18     A.   Okay.  This is the split paragraph.
19         MR. JANUSH:  And I'm going to -- I'm
20 going to ask that you read the entire document.  Take
21 your time and read the entire document.
22     A.   Okay.  I have read this.
23     Q.   (BY MR. WAHBY)  Okay.  So does anything about
24 this letter inform you as to what's happening in Tarrant
25 County specifically?

32 (Pages 122 - 125)

Page 126

1    A.  Well, yes.  So when we talk about, you know,
2  gangs, drug cartels, the fact that we're a major
3  transshipment area, major user area, those type of
4  activities simply don't stop at the county line.  I
5  mean, it's -- it just simply doesn't.  And so -- so
6  everything that -- or the majority of the things that
7  Mr. Parker is referencing here, our -- our groups, our
8  enforcement groups face the same type of situation and
9  enforcement activities.  We prosecute gangs.  We go
10  after the cartels.  In fact, some of the killings that
11  are in the cartels that -- that have occurred and other
12  drug trafficking organizations, you know, that's why we
13  have -- quite frankly, that's why we have these
14  multiagency task forces, so that it's not -- we can see
15  them not only at the local level, but maybe at the state
16  level, but quite frankly more importantly, at the
17  national level also.
18    Q.  Okay.  Does anything about Exhibit No. 7
19  inform you as to any activity occurring at an Albertsons
20  or an affiliated pharmacy?
21    A.  No, it does not.
22    Q.  Okay.  Let's just take a step back.
23    A.  Yes, sir.
24    Q.  And I want to ask you generally about what
25  you did to prepare for the deposition, but I don't want

Page 127

1  to get into any discussions or anything that your
2  counsel informed you about.  I don't want privileged
3  information.  I just want to know --
4    A.  Okay.
5    Q.  -- about your preparation for today's
6  appearance.  Okay?
7    A.  Okay.
8    Q.  So what did you do to prepare for today's
9  deposition?  I've asked you about that in pieces as it
10  relates to the specific topics --
11    A.  Sure.
12    Q.  -- but I would like to know what did you do to
13  prepare for your deposition today?
14    A.  So, first of all, I reviewed the material that
15  I asked for and that I received also extensively.
16    Q.  Okay.  Did -- did the information in those
17  binders, was that generated all based on your request?
18  Did you say -- did you have a list of everything that
19  you needed to inform yourself to refresh your
20  recollection?
21    MR. JANUSH:  This gets into
22  attorney/client privileged discussions.
23    MR. WAHBY:  I'm just kind of wondering
24  how he got -- how he got this set of binders.  Did he
25  create this setup?  Is this a creation of his, or is

Page 128

1  this not a creation of his?
2    MR. JANUSH:  This gets into
3  attorney/client privileged communications.
4    Q.  (BY MR. WAHBY)  Okay.  So how many times did
5  you meet with your lawyers?
6    A.  I met with the attorneys on five different
7  occasions, and -- and -- and I also met with the
8  attorneys yesterday, and I met with them this morning.
9    Q.  And how long on average did you meet with
10  them?
11    A.  On the first five, they tended to be about two
12  hours.  I think one session might have gone to about
13  three hours, yesterday was right under two hours, and
14  this morning was an hour.
15    Q.  Are you being paid for your time to appear as
16  a witness?
17    A.  No, I am not.
18    Q.  Okay.  Are you collecting retirement from
19  Tarrant County?
20    A.  Yes, I am.
21    Q.  And that's as part of the normal course of the
22  benefits that the County provides for your service?
23    A.  Right.  And it's -- so -- so technically, my
24  retirement doesn't come from Tarrant County; it comes
25  from the Texas County and District Retirement

Page 129

1  Association, TCDRS -- or System.  And the County and I
2  contributed to that -- to that retirement program as a
3  percentage of my salary.  And once -- once I have
4  separated -- once I separated from the County, then my
5  retirement, my checks, all come -- or my deposits all
6  come from TCDRS and not Tarrant County.
7    Q.  Are you going to get -- would you get any
8  percentage of a recovery that the County secures in this
9  case --
10    A.  Not --
11    Q.  -- to compensate for your time?
12    A.  Not at all.
13    Q.  Okay.  And so you're not receiving -- aside
14  from maybe reimbursement for your expenses, you're not
15  receiving any kind of compensation to appear or act on
16  behalf of the County in this case?
17    A.  I am getting zero compensation, even
18  reimbursement.  I am not getting any reimbursement for
19  anything as it relates to this case.
20    Q.  Are you working as a witness in other cases?
21    A.  No.
22    Q.  Okay.  So when you say as it relates to this
23  case, I mean, you have other ways, other forms of
24  income, but just nothing related to this proceeding or
25  the law firm that's representing the County?

33 (Pages 126 - 129)

1  A. That's correct.

2  Q. Okay. You're just doing this as a former

3  county administrator and as a citizen of Tarrant County?

4  A. Quite frankly, I spent 35 years with the

5  County. When we first began this process, I was a

6  county administrator, and -- and I felt an obligation to

7  an employer that, quite frankly, treated me very

8  respectfully.

9  MR. JANUSH: I have a polite addendum

10  that I think you should know, that if you'll allow me to

11  just let you know on the record.

12  Mr. Maenius was formally appointed, since he

13  had retired, by the County Commissioners Court to be

14  the 30(b)(6) witness, like a -- I don't know if it's a

15  proclamation, but there was a formal vote and hearing,

16  you know, something very specific that appointed him.

17  Just wanted to make sure you knew that.

18  MR. WAHBY: I guess I'm not surprised

19  that they needed something very --

20  MR. JANUSH: Formal.

21  MR. WAHBY: -- formal and official.

22  Q. (BY MR. WAHBY) But that happened at the

23  County Commissioners Court --

24  A. That's correct.

25  Q. -- and so that's how they designated you?

1  A. So there would be total clarity as to my role.

2  Q. Uh-huh. Was there anybody -- were there any

3  nonlawyers present in your meetings with counsel in

4  preparation for your testimony?

5  A. No.

6  Q. Okay. Which lawyers were there?

7  A. So it is the four lawyers that you see here,

8  plus the chief of the Civil Division of the District

9  Attorney's Office, Criminal District Attorney's Office.

10  MR. JANUSH: One more polite

11  interjection. While she is an exceptional lawyer who is

12  not a J.D., Sadie is our --

13  MR. WAHBY: We all know who --

14  MR. JANUSH: -- legal administrative

15  assistant.

16  MR. WAHBY: We all know.

17  MR. JANUSH: I just to make it clear.

18  MR. WAHBY: You didn't need to. We all

19  know. We all know.

20  MR. JANUSH: All right.

21  THE WITNESS: Well, congratulations.

22  MR. WAHBY: Yeah. It's actually a

23  demotion; he doesn't even realize it.

24  Q. (BY MR. WAHBY) So then -- so it's just the

25  four people here, and then I think that the person

1  you're talking to might be on the line?

2  A. He may very well.

3  Q. Okay. And -- and you referred to three people

4  who you talked about, Dr. Duncan, Chief --

5  A. Bond.

6  Q. -- Bond and --

7  A. Helen Giese.

8  Q. -- Helen Giese. Those are the three other

9  people you talked to to prepare for your deposition?

10  A. Yes.

11  Q. Okay. Do you have anybody else?

12  A. No, sir.

13  Q. Did you review anybody's deposition testimony

14  in advance of your appearance here today?

15  A. I -- I read the intro part to the -- to the

16  deposition of Vinny Taneja, who was our Public Health

17  Director.

18  Q. And why did you read that?

19  A. I wanted to see how -- you know, basically

20  how -- how these things started. I've been in different

21  depositions, and quite frankly, they're -- they start

22  differently.

23  So I wanted to familiarize on -- on how a

24  meeting like this would start and how it would move

25  forward. I did not read -- I did not read a substantial

1  part. I didn't even read a third of it, because once I

2  understood how the process was working -- it's been a

3  long time since I've been in depositions, and so that

4  was the only reason I did that.

5  Q. But you've been in three depositions, you

6  think?

7  A. I think so, yeah.

8  Q. And what were -- what was the general nature

9  of those cases?

10  A. So -- so it was -- it dealt with personnel

11  issues with the County on one involving an elected

12  official and one of that person's employees.

13  There was one additional one that I believe

14  that I participated in when I first got -- when I first

15  began working for the County. I really don't know

16  exactly what that deposition -- and it was work related,

17  and it was some issue that was -- that was -- oh, I know

18  what it was. It was another -- it was a deposition that

19  dealt with -- with an employee issue of not something

20  that I dealt -- not something that was within my --

21  within my control at the County, but it was more

22  deposition where it was a factual deposition talking

23  about personnel issues, how we handled those type of

24  things.

25  Q. Okay. And have you ever been a party to

34 (Pages 130 - 133)

Page 134

1 litigation?
2    A.  I've never been --
3    Q.  Like, have you ever sued anybody?  Has anybody
4 ever sued you?
5    A.  No, they have not.
6    Q.  Okay.  Have you ever filed bankruptcy?
7    A.  No, sir.
8    Q.  Have you ever had a family member impacted by
9 opioid abuse?
10    A.  I believe that -- and this dealt with my
11 mother-in-law, and this was something that -- not here
12 in this part of the state, and she was bedridden, and
13 she was receiving a substantial amount of hydrocodone.
14 And -- and I believe -- this is my speculation, okay?
15    Q.  If it's speculation, we don't need to bother.
16    A.  Okay.  Then no.
17    Q.  Do you have any -- did that experience form --
18 cause you to form any opinions about hydrocodone?
19    A.  I knew it was a potent medication because of
20 her illness and -- but as far as being -- being some
21 type of medication that should not be prescribed, no.
22    Q.  Okay.  So despite that, you still then and now
23 believe there is a legitimate medical use for these
24 opioids in the right circumstances?
25    A.  Yes, I do.

Page 135

1    Q.  Anything else as it relates to a personal
2 connection or exposure to prescription opioids?
3    A.  No, not to my knowledge.
4    Q.  The -- you were employed with Tarrant County
5 for 35 years?
6    A.  Yes.
7    Q.  Let me show you what's been -- what we'll mark
8 as Exhibit No. 8.
9       (Exhibit 8 marked.)
10    MR. WAHBY:  Thanks.
11    MR. JANUSH:  Thank you.
12    A.  Okay.
13    Q.  (BY MR. WAHBY)  So Exhibit 8 is a retirement
14 announcement --
15    A.  Yes.
16    Q.  -- for you in connection with the announcement
17 of your retirement, correct?
18    A.  That's correct.
19    Q.  You're the longest serving county
20 administrator in Texas and the only one in Tarrant
21 County history.  Is that right?
22    A.  That's correct.
23    Q.  And so was there not a role for county
24 administrator prior to your assuming that job in 1988?
25    A.  You had to bring in the fact that it was 1988,

Page 136

1 right?
2    Q.  I was here, too, you know.
3    A.  So we're all familiar with city managers and
4 the role city managers play.  Back in that period, back
5 in 1988 and 1987, counties were growing.  And while
6 they didn't have the authority that -- that cities have,
7 as far as land use regulations and things like that,
8 taxing -- some types of taxing issues, they did have
9 responsibilities that impacted our community, not only
10 in the incorporated areas, but also in the
11 unincorporated areas.
12       There was a move that began back there -- and,
13 actually, it started -- it started in Dallas County --
14 where there was -- the workload in the county became
15 such that -- that when you look at the structure of
16 county government, the -- there's a -- we have 69
17 different elected officials here, but there's no one
18 elected official that has overall charge.  In fact, the
19 authority of the County for contracting, for approval of
20 budgets, for setting tax rates and a multitude of other
21 things, falls under the auspices of the Commissioners
22 Court.  And -- and the County Judge is the presiding
23 officer, but when it comes to the vote of the Court,
24 that position is just simply one of five positions.
25       But what was happening was that county

Page 137

1 governments were becoming more and more complex, and --
2 and there was a belief and a need for someone to be
3 operating the day-to-day functions, supervising the
4 day-to-day functions of county government because the
5 Commissioners Court could only issue directives when
6 they were in session.  They couldn't do that when
7 they're not in session.
8       And so at that time Tarrant County met once a
9 week, their Commissioners Court, and when they came
10 together as a body, they were -- they were all powerful.
11 I mean, they were substantial.  But once that court was
12 adjourned, then what happened was that body -- that body
13 was -- that body didn't have -- they couldn't do things
14 because they had to be in session in order to do those
15 things.
16       So that's why they decided to begin the
17 process of looking for a county administrator, someone
18 who is appointed by the Court, who worked directly for
19 the Court, had certain things, certain directives of
20 what the Court wanted that position to do.  You know, I
21 had come up from Austin.  I was in the Governor's
22 Office, and then I came to head the Crime Commission.
23 And I wanted -- my -- my whole career path was in the
24 public sector, and when this position came open, I
25 applied for it and was very fortunate to receive it.

35 (Pages 134 - 137)

Page 138

1    Q.   So you joined the County in 1988 as the
2 county administrator.  What year did you -- you
3 graduated from -- at the time it was called Southwest
4 Texas State?
5    A.   Southwest Texas State, yes.
6    Q.   What year did you graduate out of Southwest
7 Texas State?
8    A.   So I graduated twice.  I graduated in 1973,
9 and then I went directly into graduate school, and then
10 I got married, and I had -- it took me two more years to
11 write both my theses to graduate.
12    Q.   So --
13    A.   '77 is when I graduated with my MPA.
14    Q.   So you graduated with your undergraduate
15 degree in accounting?
16    A.   No.  It was actually --
17    Q.   Okay.
18    A.   My undergraduate degree was in law
19 enforcement, not even criminal justice.  On my degree,
20 it's a Bachelor's of Science in Law Enforcement.
21    Q.   Okay.  And then in '77, you got a Master's in
22 Public Administration?
23    A.   That's correct.
24    Q.   Also from Southwest Texas State?
25    A.   That's correct.

Page 139

1    Q.   They call it Texas State now?
2    A.   Yes, they do.
3    Q.   And you left San Marcos and you went to Austin
4 after that?
5    A.   I went to work in Austin.  I continued to live
6 right outside of San Marcos.  But yes, I went into the
7 Governor's Office in 19 -- either 1977 or 1978.
8    Q.   Who was the governor at that time?  Was that
9 Bill Clements?
10    A.   Clements was the governor that I went to --
11 no, I'm sorry.  Briscoe was the governor that I went to
12 work for initially, and then I was one of several that
13 made the transition when Governor Clements came into
14 office.
15    Q.   And you stayed with Governor Clements?
16    A.   I stayed with Governor Clements until December
17 of '81, and I was recruited to come to Fort Worth to
18 head the Crime Commission -- the Fort Worth Crime
19 Commission at that time.
20    Q.   And what did you do in Governor Clements's
21 office from '77 -- '78 to '81?
22    A.   So when I was -- Clements was -- Clements
23 actually went into office in '79.  So when I was with
24 Briscoe's office, I initially went into the Governor's
25 Office as a program coordinator for the Texas Organized

Page 140

1 Crime Prevention Council.  That was a -- that was an
2 executive order created agency, and our job was to
3 create and fund, through the Criminal Justice Division,
4 organized crime units across the state and be a planning
5 entity for organized crime activity -- not for, but for
6 the prevention of organized crime activities in the
7 state.
8    Q.   And so that was the job with Governors Briscoe
9 and Clements?
10    A.   So what happened -- yes.  So what happened
11 when -- when Governor Clements came in, there were a
12 number of individuals in the organization that were --
13 their employment was no longer needed or wanted, and so
14 I made the transition, and I became the program director
15 at that time.
16    Q.   And you worked for him until '81.  Then you
17 came to Fort Worth to join the Fort Worth Crime
18 Commission?
19    A.   Yeah, I came to work for the Crime Commission
20 on January 1, 1982.
21    Q.   '82?
22    A.   Yes, sir.
23    Q.   And then you were there from '82 to '88?
24    A.   Six years, that's correct.
25    Q.   And you joined the County in --

Page 141

1    A.   January 1, '88.
2    Q.   January 1, '88.
3         So what do you think of the lawsuit Tarrant
4 County has filed against Albertsons and its related
5 affiliates?
6         MR. JANUSH:  Objection.
7    A.   Well, as far as I'm concerned, it's not about
8 the money.  It's -- it's an effort to see, to try to
9 diminish the impact of -- of illicit drugs, the full
10 entire system that creates situations where that they
11 become stepping stones to -- to the use of even more
12 powerful drugs.  And the fact that we have such -- we
13 really have such a strong effort and a cost that we
14 spend every year relating to -- relating to people who
15 are addicted, to we -- our task force that we fund to
16 enforce the law and things such as that.
17    Q.   (BY MR. WAHBY)  Is there anything that
18 Albertsons, Tom Thumb, any of its affiliates, Market
19 Street, anything they've done that you could identify
20 and that you have a complaint with?
21         MR. JANUSH:  Objection, beyond the scope
22 of this witness and certainly beyond the scope of this
23 deposition notice.
24    Q.   (BY MR. WAHBY)  You can answer.
25         MR. JANUSH:  I'm going to maintain my

36 (Pages 138 - 141)

Page 142

1 objection. I'm going to move to strike the question and
2 the answer.
3            MR. WAHBY: Okay.
4    Q.  (BY MR. WAHBY) You can answer.
5    A.  I can answer?
6    Q.  Uh-huh.
7    A.  I don't have any personal knowledge.
8    Q.  Were you involved with the decision to file
9 the lawsuit when you were with the County?
10   A.  No.
11   Q.  Were you involved in any discussions to file
12 the lawsuit when you were with the County?
13   A.  So -- okay. I'm going to have to ask counsel
14 on this. There were -- when we began to go in to
15 consider this, those discussions were -- were held in
16 closed session.
17   Q.  Okay. Well, if you think it's --
18           MR. JANUSH: Those are privileged
19 discussions.
20   Q.  (BY MR. WAHBY) If you think it's -- if you
21 think it's a privileged discussion in closed session,
22 then you don't -- then he's going to invoke the
23 privilege. That's what he's saying, you don't have to
24 answer that.
25   A.  Okay. So I'm not going to answer that

Page 143

1 question.
2    Q.  Okay. Aside from that closed session meeting,
3 did you have any other involvement or were you party to
4 any discussions relating to the filing of this lawsuit?
5    A.  I sit in on closed sessions, and the other
6 action that I had was to prepare the agendas for the
7 Commissioners Court, to execute or to have the
8 Commissioners Court formally vote to join this lawsuit.
9    Q.  Do you believe there is a substance abuse
10 problem in Tarrant County?
11   A.  Yes.
12   Q.  Why do you believe that?
13   A.  I believe that because of all of the different
14 programs that we have been funding and continue to fund,
15 and quite frankly, probably there's more need out there
16 than resources to address, not only drug abuse, but drug
17 overdose deaths. And we see it in our hospitals. We
18 see it in our jails. We see it in the Medical
19 Examiner's Office. We see it in Child Protective
20 Services. We see it in -- in Domestic Relations. We
21 see it in Cornerstone, which is our -- which are those
22 individuals coming back from the penitentiary. We see
23 it in a number of different programs. So, you know, the
24 material that I've seen, the individuals who I've seen
25 with drug problems leads me to believe that there

Page 144

1 definitely is a drug abuse problem.
2    Q.  You believe it rises to the level of crisis?
3    A.  Yes.
4    Q.  How would you define that level of crisis?
5    A.  Something that is difficult, if not almost
6 impossible, to control and that is getting larger than
7 it's getting -- than it's being diminished.
8    Q.  Do you believe there's a problem in Tarrant
9 County as it relates to alcohol?
10   A.  Yes. Yes.
11   Q.  Do you believe there's a problem in Tarrant
12 County with the abuse of methamphetamines?
13   A.  Yes.
14   Q.  Do you believe there is a problem with the
15 abuse in Tarrant County of marijuana?
16   A.  There's a tremendous amount of usage of
17 marijuana in Tarrant County.
18   Q.  And do you believe it rises -- the abuse rises
19 to a level of crisis?
20           MR. JANUSH: Objection.
21   A.  I don't know the answer to that question.
22   Q.  (BY MR. WAHBY) Okay. How about cocaine? Do
23 you believe that there is a crisis of -- a cocaine abuse
24 crisis in Tarrant County?
25           MR. JANUSH: Objection.

Page 145

1    A.  I know that cocaine is extremely prevalent and
2 available in Tarrant County.
3    Q.  (BY MR. WAHBY) Do you believe that the abuse
4 of cocaine rises to the level of a crisis in Tarrant
5 County?
6            MR. JANUSH: Objection.
7    A.  Yes. You're asking for my personal belief,
8 right?
9    Q.  (BY MR. WAHBY) Your personal belief -- do you
10 have a belief in your capacity as the Tarrant County
11 witness?
12           MR. JANUSH: No, I'm actually not going
13 to let you answer that. That's so far afield from the
14 deposition notice. We're off topic. And if you want to
15 push it, we'll just pause, stay on the record and call
16 Special Master Cohen, or you can enumerate which topic
17 this falls under.
18   Q.  (BY MR. WAHBY) Do you have a -- in your role
19 as the county administrator for -- since 1988, do you
20 have a belief as to whether there is a heroin problem
21 and abuse in Tarrant County?
22   A.  Yes.
23   Q.  And that rises to the level of a crisis?
24   A.  I believe there is, yes.
25   Q.  How about fentanyl? Same question for

37 (Pages 142 - 145)

Page 146

1  fentanyl.
2      A.  Oh, absolutely.
3      Q.  What substances are most often abused in
4  Tarrant County?
5          MR. JANUSH:  Objection.
6      A.  I don't know if I can answer that.  If you're
7  asking for a personal opinion, that's one thing.  Asking
8  for -- for a different opinion, well, then that's
9  something else.  I think fentanyl is -- fentanyl is
10  killing more people than -- than -- and it's simply
11  because the people don't know what's in their drugs that
12  they're using and the quantity that they're consuming.
13  Heroin is an extremely bad problem, simply because it is
14  so -- so much available and the price of heroin compared
15  to a lot of other opioids is a lot less.
16      Q.  Do you believe -- do you agree that there are
17  many factors that could drive a person to use heroin?
18          MR. JANUSH:  Objection.
19      A.  I think there's several factors that -- yes.
20      Q.  (BY MR. WAHBY) Do you believe that there
21  could be -- there are situations where somebody would
22  use heroin without previously trying a prescription
23  opioid?
24          MR. JANUSH:  Objection.
25      A.  Possibly, but the data that I've seen is that

Page 147

1  when we talk with heroin users, the majority of them
2  start with using some type of prescription pills.
3      Q.  (BY MR. WAHBY)  With prescription opioids?
4      A.  Hydrocodone, yeah.  Yes, sir.
5      Q.  And when you say when we talk with them, are
6  you a party to that, or are you referring to --
7      A.  I am not a party to those conversations;
8  however, I've seen the reports whenever they do surveys
9  of users.
10      Q.  So it's your belief that a prescription opioid
11  is the gateway to using heroin?  Is that your belief?
12      A.  I believe that over 50 percent -- according to
13  the documentation, that over 50 percent of -- actually,
14  it's a higher percentage than that -- of people that use
15  heroin started with -- with an opioid pill, a
16  pharmaceutical opioid.
17      Q.  And you're familiar with the term "opioid
18  epidemic," correct?
19      A.  Yes.
20      Q.  What's that phrase mean to you?
21      A.  That -- that the -- that the unlawful
22  utilization of opioids or opioids that have been abused,
23  even though they may be prescription opioids, have
24  gotten to the point where that the utilization of that
25  type of pain reliever compared to the general population

Page 148

1  is higher in this country than any other country.
2      Q.  Do you believe there is an opioid epidemic in
3  Tarrant County?
4      A.  I think there's significant usage.  There's
5  significant deaths, and I guess the question becomes how
6  many people have to die before it becomes an epidemic,
7  you know?
8      Q.  Well, you know, that -- I think that is a real
9  question.  When you're trying to say is this a problem,
10  is this a crisis, is this an epidemic in the sense that
11  these are -- these are graduated levels of how serious
12  and widespread a problem is.  So any one death is
13  tragic, but before we say that there's an opioid
14  epidemic, then I think that there's a -- there's a
15  question about that, and that's why I'm asking you, in
16  your mind and over your 35 years, would you say that
17  there's an opioid epidemic in Tarrant County?
18          MR. JANUSH:  Objection and move to strike
19  the monologue at line 1:34:20 to 1:35:03.
20      Q.  (BY MR. WAHBY)  You can answer.
21      A.  I think that there's an opioid epidemic that
22  we're witnessing, and I think it's been brought to the
23  forefront with -- with the fentanyl, and fentanyl is an
24  opioid.  So yeah, is there an opioid epidemic?  Yes.
25      Q.  In your own words, what would you say is the

Page 149

1  causes?  What are the causes of that epidemic?
2          MR. JANUSH:  Objection.
3      Q.  (BY MR. WAHBY)  You can answer.
4          MR. JANUSH:  I mean, not really because
5  you're here as a 30(b)(6) on the enumerated topics and
6  not here --
7          MR. WAHBY:  He also has personal
8  knowledge, so.  He was the county administrator for
9  35 years.
10          MR. JANUSH:  If you can answer that
11  without speculation as to the causes of the epidemic,
12  please go -- go forward and do so.
13      Q.  (BY MR. WAHBY)  In your 35 years as the
14  senior-most unelected official in this county --
15      A.  Yes, sir.
16      Q.  -- what's your opinion of the causes of the
17  genesis of the opioid epidemic in this county?
18      A.  The -- some of the societal issues that we've
19  seen.  The pandemic was a good example.  Before then,
20  the rise of social media where there was not interaction
21  between humans anymore except through an electronic
22  device.  I think that -- that the ease of -- of the
23  ability to access originally drugs that may have been
24  prescribed or found in the medicine cabinet or maybe
25  even the marijuana that people were smoking, but now to

38 (Pages 146 - 149)

Page 150

1 the ease and availability of opioids, street opioids and
2 other opioids.
3     Q.  Do you have any sense of the degree to which
4 you would blame prescription opioids?
5     A.  Through the material that I've seen and the
6 charts that I've seen and documentation from people that
7 I would consider experts -- that would be people from
8 Drug Enforcement Administration and -- and other law
9 enforcement and community groups -- that when -- when
10 over 50 percent of people that currently use heroin or
11 have used heroin, their path to heroin went through
12 prescription opioids, then yes, there is -- there is a
13 correlation.
14     Q.   You would agree that opioids are not the
15 state's biggest drug problem or drug crisis, correct?
16          MR. JANUSH:  Objection, form.
17     A.  Ask your question one more time.
18     Q.  (BY MR. WAHBY)  You would agree that opioids
19 are not the state's biggest drug problem or drug crisis?
20          MR. JANUSH:  Objection, form.
21     A.  Oh, I do believe they are.
22     Q.  (BY MR. WAHBY)  You believe they are?
23     A.  Especially when you consider heroin and -- and
24 fentanyl.
25     Q.  I'm going to hand you what's been marked as

Page 151

1 Exhibit 9.
2          (Exhibit 9 marked.)
3     Q.  (BY MR. WAHBY)  If I could direct your
4 attention to Exhibit 9 --
5     A.  Okay.
6     Q.  -- this is an email from Ms. Helen Giese.
7 That's one of the people that you spoke with, correct?
8     A.  Yes.
9     Q.  She was the director of Tarrant County Budget
10 and Risk Management.  And it's dated December 12th,
11 2018, correct?
12     A.  Yes, it is.
13     Q.  And it's a report from the -- from Austin, the
14 Texas House, correct?
15     A.  Yes.  This is -- this is a newspaper article
16 out of the Austin American-Statesman.
17     Q.  Well, take a moment and just review that
18 exhibit.
19     A.  Sure.
20     Q.  I want to ask you a few questions about it.
21     A.  Sure.
22     Q.  I really just want to ask you about the first
23 three paragraphs.
24     A.  Give me half a second.
25     Q.  Sure.

Page 152

1     A.  Okay.  I have read the first three paragraphs.
2     Q.  Okay.  So you see there that there's an
3 extensive report referred to in the second paragraph?
4     A.  Yes.
5     Q.  An 108-age report from the House Select
6 Committee on Opioids and Substance Abuse found -- also
7 found that methamphetamine was the state's biggest
8 problem --
9     A.  Uh-huh.
10     Q.  -- saying it should be labeled a Texas crisis.
11 Do you see that?
12     A.  Yes, I do.
13     Q.  Do you agree that that was true in Tarrant
14 County at that same time?
15     A.  So we're talking about a time period of 2016
16 to 2018.  This article is -- it's updated on 2018.
17     Q.  That's right, we're going back in time as it
18 relates to my question.  I'm not talking about the
19 current.  I'm just really focused on the report and the
20 timeframe it meant to capture.
21     A.  Was the consumption of methamphetamine in
22 Tarrant County a major issue back in that period?  Yes,
23 it was.
24     Q.  Okay.  And specifically it was considered the
25 state's biggest problem.  Would you agree that it was

Page 153

1 Tarrant County's biggest problem similarly at that time?
2          MR. JANUSH:  Objection.
3     A.  I can't say if it was the biggest problem.
4     Q.  (BY MR. WAHBY)  Okay.  The next paragraph, the
5 first line says more people died from methamphetamine
6 use in Texas in 2016 than from opioids.  Do you recall
7 that being true in Tarrant County?
8     A.  I don't have any information on that.
9     Q.  Okay.  Do you know what "OUD" means, what that
10 acronym stands for?
11     A.  OUD?  Over utilization of drugs.
12     Q.  How about opioid use disorder, have you ever
13 heard that reference?
14     A.  Yes, I have.
15     Q.  Do you recall what was the context of hearing
16 that?
17     A.  Well, it's contained in -- in various
18 documents in these folders.  So, you know -- so ask --
19 I'm sorry, ask your question one more time.  I want to
20 make sure I answer it correctly.
21     Q.  I was asking simply if -- simply the context
22 of which you saw that reference to OUD, or opioid use
23 disorder.
24     A.  So I saw that -- I saw that in -- in the
25 documents, and I can go through and point out the ones.

39 (Pages 150 - 153)

Page 154

1  In fact, I can pull it up, if you want me to, in the
2  documents where they talked about -- about those.
3          That term has been something that has been
4  used since -- since probably, you know, within the mid
5  twenty teens.  Probably maybe earlier.  I know it was
6  used in '15 and '16.  There's one document in here that,
7  the President's Commission on Drug Abuse, their report
8  talks about it.
9          As I said, I was not involved in drug
10  enforcement at that time.  I was in an administrative
11  role here with the County.  So I found that sometimes
12  whenever we find new acronyms, they -- it's just a
13  relabeling of an issue that might have been addressed
14  previously.
15      Q.  Have you ever heard the term "OUD," or opioid
16  use disorder, rate as a measurement?
17      A.  I will have to go back and look at one of the
18  documents that I have in -- in my book, because there
19  was a report in there -- and I don't know if it was an
20  OUD analysis, but it talked about the number of -- it
21  ranked Tarrant County with the other big six counties in
22  Texas.  And I think our ranking was -- was 5.5, but
23  before I can answer that completely, I'll need to go
24  back and look at that document.
25      Q.  Okay.  So do you -- do you have an

Page 155

1  understanding as to whether or how Tarrant County's OUD
2  rate measured up against the state rate or the national
3  rate?
4      A.  I don't have that information.
5      Q.  Okay.  We've talked about fentanyl.  Do you
6  know what the fentanyl usage rate has been in Tarrant
7  County?
8      A.  If there's -- if there's fentanyl -- I'm
9  sorry, are you asking if fentanyl was present in Tarrant
10  County or --
11      Q.  I'm asking do you know what the usage rate is
12  of fentanyl in Tarrant County?
13      A.  I do not.
14      Q.  And do you know -- do you know what that rate
15  is statewide?
16      A.  I haven't researched that, no.
17      Q.  Okay.  So you don't know if the fentanyl usage
18  rate is higher or lower in Tarrant County versus the
19  Texas rate?
20      A.  I don't know that for sure, no.
21      Q.  Well, when you say you don't know for sure,
22  that piques my interest, is that you know it like
23  possibly in some general way.  Do you have any knowledge
24  about that?
25          MR. JANUSH:  Objection.

Page 156

1          And only answer if you're not speculating.
2      A.  I'm not going to answer that question.
3      Q.  (BY MR. WAHBY)  Because you don't know?
4      A.  Yeah.  I don't want to speculate.
5      Q.  Now when you were the county administrator,
6  did you personally do any work relating to the
7  prevention of opioid use or abuse in Tarrant County?
8      A.  Only to the extent that -- that I worked with
9  different funding sources in order to try to provide
10  resources through the County to either do educational or
11  treatment programs.
12      Q.  So when you say resources through the County,
13  was your role basically try to ensure that they had
14  their proverbial ducks in a row in connection with their
15  submission to the Commissioners Court, or was it more
16  than that and that you were an advocate of some sort
17  trying to get them more money in some way?
18      A.  So -- so the way the budgeting process works
19  at the County, not only County departments but NGOs,
20  nongovernment organizations, that the County funds, they
21  submit their budgets to the budget office, and I have my
22  staff work with the budget office to go through all of
23  those documents and to see if -- if there was what we
24  believed justification to recommend to the Commissioners
25  Court to fund every -- at least -- I can't remember of

Page 157

1  any instance where the -- the staff -- and those staff
2  work for me and, therefore, it came up to me -- that we
3  would not make a recommendation or state our position on
4  a funding request one way or the other.
5          So we were -- we were involved in the analysis
6  of the request, how it fit within the existing
7  revenues that we had to expend, and then we would make
8  our recommendations to the Commissioners Court.
9  Obviously, the court is -- is independent.  You know,
10  they -- they utilized our recommendations, but they
11  didn't -- they didn't necessarily -- they were not
12  forced to have to approve our recommendations because
13  they're the decision-making body for the County.
14      Q.  Do you specifically recall being involved in
15  any funding request that related to addressing opioid
16  abuse in Tarrant County?
17      A.  Yes, and additional resources for the task
18  forces, the additional funding that was approved by the
19  Court as it related to the Narcotics Prosecution Unit of
20  the Criminal District Attorney's Office, funding that
21  dealt with the amount of moneys that we gave to
22  Challenge and the expansion of the role of Challenge as
23  we -- as we went forward.  And especially at one time
24  Challenge didn't have a responsibility in the Family
25  Drug Court, and now they help operate that system for

40 (Pages 154 - 157)

Page 158

1  us.  We -- we do contractual relations with them.
2       The County has a -- a diversion center, mainly
3  dealt -- built around diverting people with mental
4  health-related issues from the county jail.  A lot of
5  those individuals have drug related issues, and that all
6  goes back to the issue of that correlation between drug
7  abuse and mental health.  And so we also -- also made
8  recommendations to the Hospital District, which they
9  incorporated in their budget request to the Court.
10      So we've been involved in a substantial amount
11  of analysis, of requests, and the determination, if it
12  made sense and if there was what -- we were convinced
13  there was a need for those additional resources.  So,
14  yes, that's what we did.
15      Q.  Now when you -- I want to cover two different
16  job roles you had.  When you were at the Governor's
17  Office, your title was Group Vice President of
18  Governmental Affairs For the Fort Worth Chamber of
19  Commerce Executive Director.  Is that right?
20      A.  Yes.  Yes.
21      Q.  Executive Director of Fort Worth Crime
22  Commission and Program Director of Texas Organized Crime
23  Prevention Council.  That's a mouthful.  Is that all one
24  job?
25      A.  No.

Page 159

1      Q.  Okay.  So those were different jobs you had?
2      A.  So -- so the Organized Crime Prevention
3  Council was a -- was that executive order agency that
4  was formed in the Governor's Office.  I moved from that
5  to -- to the Crime Commission.  The Crime Commission was
6  part of the Fort Worth Chamber, and that move was made
7  January 1, 1982.  And because of my work in the
8  Governor's Office and several different governors, as
9  the chamber went through some -- went through some
10  reorganization, they wanted me to also take on the
11  additional role of Group Vice President For Governmental
12  Affairs.
13      Q.  Okay.  And in any of those roles, Vice
14  President of Governmental Affairs, Executive Director of
15  Fort Worth Crime Commission, Program Director of Texas
16  Organized Crime Prevention Council --
17      A.  Yeah.
18      Q.  -- and your role in the Citizens Crime
19  Commission, in any of those roles did you work to
20  address prescription opioid abuse?
21          MR. JANUSH:  Objection, form.
22      A.  Yes.  So when I was with the Organized Crime
23  Council, as I said previously, there were two areas that
24  we were heavily involved in.  One was -- one was
25  gambling, which was not a big element of that.  But it

Page 160

1  was drug trafficking, and that made up the substantial
2  portion of all of those task forces.
3      So we worked with our task forces.  A lot of
4  it was illegal narcotics coming up from the border, but
5  there was also -- I know that they did some work with --
6  with diversion of prescription pills.
7      Q.  (BY MR. WAHBY)  Did you have any involvement
8  with that?
9      A.  Only to the extent that that type of activity
10  I considered whenever we put together their funding
11  request from the State.  And so -- but as far as an
12  enforcement action, no, I did not.
13      Q.  I want to ask you a few of questions about
14  your personal experience, personal knowledge about
15  Albertsons and its affiliates who are defendants in this
16  case.  Okay?
17      A.  Sure.
18      Q.  Have you ever shopped at an Albertsons?
19      A.  I shop at both Albertsons and Tom Thumb.
20      Q.  Okay.  Have you ever had -- have you ever had
21  a bad experience at an Albertsons or a Tom Thumb?
22          MR. JANUSH:  Objection.
23      A.  No.
24      Q.  (BY MR. WAHBY)  Have you ever used an
25  Albertsons or a Tom Thumb pharmacy?

Page 161

1          MR. JANUSH:  Objection.
2      A.  Yes.
3      Q.  (BY MR. WAHBY)  Okay.  How long have you --
4  how long have you used an Albertsons or a Tom Thumb
5  pharmacy?
6      A.  Numerous years.  I have a Tom Thumb store down
7  the street from me.
8      Q.  And is that -- is that your primary grocery
9  store?
10      A.  Yes.
11      Q.  Is that your primary pharmacy?
12      A.  Mine, yes.
13      Q.  Do you have a spouse who uses a different
14  pharmacy?
15      A.  She uses Tom Thumb, and she also uses CVS.
16      Q.  Okay.  Have you or your wife ever had any
17  problem or issue in connection with your using a Tom
18  Thumb pharmacy?
19          MR. JANUSH:  Objection.
20      A.  No.
21      Q.  (BY MR. WAHBY)  Okay.  No complaints about
22  your -- either your shopping at a Tom Thumb or an
23  Albertsons or your use of their pharmacy?
24      A.  No.
25      Q.  How long would you say that there's been an

41 (Pages 158 - 161)

1 illicit opioid use crisis in Tarrant County?

2       MR. JANUSH: We're talking about illicit,

3 not licit?

4       MR. WAHBY: Correct.

5       MR. JANUSH: Okay.

6   A. I don't know how many years. It's been

7 numerous years.

8   Q. (BY MR. WAHBY) Do you have a sense of how

9 long you believe there's been an illicit opioid abuse

10 crisis in Tarrant County?

11   A. So we have been -- in my role as the county

12 administrator, we have been funding programs to --

13 dealing with -- with drugs pretty much for at least 20,

14 25 years. I can't say specifically. I will have to go

15 back and look at 25 years's or 35 years's worth of data.

16   Q. Okay. So you're referring to funding programs

17 dealing with drugs for 20 or 25 years. About how long

18 do you believe there's been an illicit opioid crisis in

19 this county relating to illicit opioids specifically?

20   A. Illicit?

21   Q. Yes.

22   A. Well, I know that there has been -- what I do

23 know is that there has been a significant amount of

24 heroin consumption in this county since at least 1988

25 and probably actually before then simply when I was with

1 the Crime Commission. I worked with the police

2 departments, and that was an issue here. You didn't

3 have a lot of methamphetamine here at that time, but

4 heroin was -- was readily available and -- and so, you

5 know, there's -- it's been here a long time.

6   Q. So you believe it started in 1988?

7   A. Well, now when you say -- I don't know when

8 exactly it started, but if you ask me when I thought

9 that -- when I became aware of it, probably in '88,

10 maybe a little bit before '88.

11   Q. Okay. And when -- when do you believe

12 prescription opioids became a problem in Tarrant County?

13   A. I don't know. I don't know the answer to

14 that.

15   Q. Do you have any sense of how long you believe

16 it's been going on?

17   A. I don't know exactly how long it's been going

18 on.

19   Q. Okay. You don't know -- do you know generally

20 how long you think it's been going on?

21   A. So -- so it -- I know that -- I know that it's

22 been going on for a certain amount of time, and you

23 asked is that five years. I knew it was before the

24 COVID pandemic got here, which was '18, '19, '20.

25   Q. '20.

1   A. Yeah.

2   And so before then, there was -- there was

3 abuse of -- of prescription pills.

4   Q. By prescription pills, you mean prescription

5 opioids?

6   A. Yes.

7   Q. Okay. And so do you have -- so you believe it

8 started before 2020?

9   A. Yes.

10   Q. Okay. Do you have a sense of how long before

11 2020 you believe prescription opioids have been abused

12 in Tarrant County?

13   A. No, I don't -- I don't know the answer to

14 that.

15   Q. And why do you believe that it began before

16 2020?

17   A. So -- so several reasons. I know that

18 various articles that appeared in the papers and some

19 intelligence reports, we saw that -- that there was --

20 there was more situations, at least that came to the

21 public eye, of -- of pill factories basically, you know,

22 and where that they would make busts. And they're still

23 making them today, not necessarily in Tarrant County,

24 but in Texas. Where you have -- I don't want to call it

25 an organized crime ring, but in a way it is because you

1 have violators that are doctors and -- and pharmacists

2 and -- pharmacists and pharmacies that -- that still

3 divert these drugs from its intended use.

4   Q. Where -- where in Tarrant County do you

5 believe, if anywhere, there is a prescription opioid

6 crisis?

7   A. Oh, I think it's -- I think it's countywide,

8 quite frankly. There may be -- there may be areas that

9 we have been told about more than some areas, but I

10 don't think there's any one place -- any one location in

11 Tarrant County where -- where this is not a major

12 problem.

13   Q. So you don't believe that it's more pronounced

14 in Arlington versus, you know, Mansfield, for example?

15       MR. JANUSH: Objection.

16   Q. (BY MR. WAHBY) I mean, there's no

17 differentiating the different parts of the county as to

18 where this problem might be more pronounced in your

19 mind?

20   A. I can't say.

21   Q. Are you aware of any pharmacy in Tarrant

22 County that you believed contributed to an oversupply of

23 prescription opioids in Tarrant County?

24       MR. JANUSH: Objection.

25   A. I personally don't have any knowledge on that

42 (Pages 162 - 165)

Page 166

1 issue.
2    Q.  (BY MR. WAHBY)  So you can't identify a single
3 pharmacy that contributed to the oversupply of
4 prescription opioids in Tarrant County?
5         MR. JANUSH:  Objection.
6    A.  I know that by talking to Chief Bond, that
7 there are those in Tarrant County.  I just simply didn't
8 ask him where they're located.
9    Q.  (BY MR. WAHBY)  Okay.  Aside from where
10 they're located, do you know their identity?
11         MR. JANUSH:  Objection.
12    A.  No, I do not.
13    Q.  (BY MR. WAHBY)  Does Tarrant County have data
14 on the number of residents addicted to prescription
15 opioids?
16    A.  There's several -- there is -- the totality of
17 numbers?  No, simply because self-reporting is not
18 something that most people do.  And while we -- we can
19 monitor what's happening at the Medical Examiner's
20 Office and the SSD that the Public Health uses through
21 their -- their -- their programs of surveillance,
22 syndromic surveillance, you know, there's some there,
23 but are those numbers -- are those numbers complete?
24 No, they're not.
25    Q.  Okay.

Page 167

1         MR. JANUSH:  I just have to pause and ask
2 for a break.  We've been going for well over an hour
3 now.
4         MR. WAHBY:  Okay.  We'll go off the
5 record.
6         THE WITNESS:  Sure.
7         THE VIDEOGRAPHER:  We're off the record
8 at 3:19 p.m.
9         (Break from 3:19 p.m. to 3:34 p.m.)
10         THE VIDEOGRAPHER:  We are back on the
11 record at 3:34 p.m.
12    Q.  (BY MR. WAHBY)  Before we took a break, we had
13 been discussing, you and I, the -- whether Tarrant
14 County has data on the number of residents addicted to
15 prescription opioids.
16    A.  Yes.
17    Q.  I want -- similarly, does Tarrant County have
18 data on the number of residents addicted to illicit
19 opioids?
20    A.  I don't believe that the data that they have
21 is complete data, and because there's not -- there's not
22 a way that you can -- you can track people that may be
23 addicted to those type of drugs, and they're not forced
24 to report to the -- either the County or the State or
25 the federal government.

Page 168

1    Q.  What data do you believe they have that's
2 incomplete?
3    A.  Well, I know that -- that -- that there is
4 some data that the Public Health Department has, through
5 some of the reportings that we have from emergency
6 rooms, also from some doctors that report, but that's
7 the extent of the -- of what I know.
8    Q.  Of the three entities you identified, the
9 public -- some Public Health data, ER departments,
10 doctors who may report, do you know how that
11 information, assuming that it's collected, is
12 maintained?
13    A.  I know that -- that that data that's collected
14 by the Public Health Department is -- it's maintained by
15 the department itself.  When it comes to -- to the
16 Medical Examiner's Office, they can tell you how many
17 overdose deaths that they've had.  They can't tell you
18 the sequencing of -- of how they got to that particular
19 type of drug.  Of course, you know, from the very
20 beginning, the -- whole issue of licit prescriptions
21 has been the stepping stone to harder drugs.  So, you
22 know, when you talk about how long that's been in
23 Tarrant County, it's been here for numerous years.
24    Q.  Okay.  So we were talking about the illicit
25 and prescription addictions.  I want to ask about

Page 169

1 prescription and illicit deaths.  Do you know if the
2 County maintains data for the number of deaths caused by
3 illicit opioids?
4    A.  The only thing that I know is the Medical
5 Examiner -- that person is brought to the Medical
6 Examiner's Office to do a toxicology screen, and -- and
7 if there's records for the cause of death, it would be
8 maintained by the Medical Examiner's Office.  That
9 doesn't mean that that information is not shared or
10 isn't compiled in a larger pool of data, but as far as I
11 know personally, I know the Medical Examiner's Office
12 probably keeps those records.
13    Q.  Okay.  Do you know if the County maintains
14 data for the number of deaths caused by prescription
15 opioids?
16    A.  I don't know the answer to that question.
17    Q.  Can you get from your notebook the document at
18 tab 27?  We're going to mark it as an exhibit.
19    A.  Tab 47?
20    Q.  27.
21    A.  27.  Yes, I can.
22    Q.  I just want to make sure that this is the
23 correct -- yes.
24         (Exhibit 10 marked.)
25    Q.  (BY MR. WAHBY)  So I am going to mark

43 (Pages 166 - 169)

1 Exhibit 10 and hand back to you --
2        THE VIDEOGRAPHER:  Your microphone.
3        MR. WAHBY:  Oh, yeah.
4        If you would raise that up, your microphone
5 there.
6    Q.  (BY MR. WAHBY)  I am handing you what's been
7 marked as Exhibit 10.
8    A.  Thank you.
9    Q.  And it's Bates labeled TARRANT_00693999 to
10 4000.  If you would take a moment and review that
11 document.
12    A.  Sure.  Okay.
13    Q.  Have you seen this document before?
14    A.  Yes, I have.
15    Q.  Have you seen it prior to preparing for your
16 deposition today?
17    A.  No, I have not.
18    Q.  Do you know Chris Heartsill?
19    A.  I don't know him personally.
20    Q.  Do you know who he is?
21    A.  All I know is that he worked for the ME's
22 Office.
23    Q.  Okay.  And this Exhibit No. 10 involves
24 initially an email from Mr. Chris Heartsill from the
25 Tarrant County Medical Examiner's Office to Billy

1 O'Dell, copying himself Chris Heartsill, and Ronald
2 Singer, and the subject is opioid-related deaths.
3 Correct?
4    A.  That's correct.
5    Q.  Are you familiar with the role of a quality
6 manager within the Tarrant County Medical Examiner's
7 Office?
8    A.  I don't know specifically what they do, but we
9 have them.
10    Q.  Have you ever spoken to Mr. Heartsill?
11    A.  Not to my knowledge.
12    Q.  Okay.  He explains at the bottom of the first
13 page, the opioid epidemic as it is -- as it is described
14 is a complicated problem that is entangled between
15 legitimate therapeutic use (prescriptions), abuse of
16 prescriptions, diversion of prescriptions to the street,
17 use of illicit drugs, and import of very potent drugs
18 from overseas.  Do you see that?
19    A.  Yes, I do.
20    Q.  Do you agree with that?  Strike that.
21    Do you agree with that as a summary of the
22 opioid epidemic?
23        MR. JANUSH:  Objection.
24    A.  Generally, yes.
25    Q.  (BY MR. WAHBY)  Is there an aspect of it that

1 you disagree with?
2    A.  I'll have to do a little more research on it,
3 but it seems to cover a lot of the different opioids
4 that make up this epidemic, and it talks about different
5 ways as to how they could be obtained, you know, through
6 regular prescriptions, abuse of prescriptions, diversion
7 of prescription drugs to the street, use of illicit
8 drugs, and things such as that.
9    Q.  He goes on to say that in many cases the
10 imported and far more potent fentanyl analogs are being
11 included in counterfeit pills that mimic legitimate --
12 the legitimate prescriptions.  Do you see that?
13    A.  Yes, I do.
14    Q.  This has led to the death of many drug abusers
15 when these counterfeit pills are purchased on the
16 street, correct?
17    A.  That's what it says, yes, sir.
18    Q.  Okay.  Do you agree that there's a difference
19 between a -- a counterfeit pill containing fentanyl and
20 a legitimate prescription secured from a pharmacy?
21    A.  Yes.
22    Q.  He says Texas has not been the epicenter of
23 this problem.  Do you see that?
24    A.  Yes, I do.
25    Q.  Then he's comparing it to issues with states

1 like West Virginia, Ohio, New Hampshire and Kentucky,
2 correct?
3    A.  Yes.
4    Q.  Do you agree that Texas has not been the
5 epicenter of the opioid epidemic?
6    A.  So I don't have enough knowledge to -- to make
7 that statement.  You know, I've read issues dealing with
8 West Virginia and Kentucky.  I'm not so sure about Ohio
9 and north -- or, I'm sorry, New Hampshire.
10    Q.  Okay.  But as you sit here, you can't speak to
11 whether or not the abuse has been worse in Texas or --
12 versus these other states that are referenced in this
13 exhibit, correct?
14    A.  That's correct.
15    Q.  Okay.  And you can't speak to whether the
16 abuse has been worse in Tarrant County than other parts
17 of the state, correct?
18    A.  That's correct.
19    Q.  Okay.  He goes on to talk about the testing
20 process, and he says the testing process and toxicology
21 laboratory for TCME -- that's the Tarrant County Medical
22 Examiner?
23    A.  Uh-huh.
24    Q.  Correct?
25    A.  Yes, it is.

44 (Pages 170 - 173)

1  Q.  -- does not take into account the cause or
2  manner of death, the legitimacy of the source of drugs
3  or the prescription status of the user, correct?
4  A.  That's what it says, yes.
5  Q.  So if somebody dies and an opioid is detected
6  in their system, his point is the medical examiner can't
7  provide guidance as to whether that death was from a
8  prescription opioid that was rightly obtained, an
9  illicit opioid, or other classes or categories that
10  contribute to this problem, correct?  That's what he's
11  saying here?
12  A.  Yeah, that's correct.
13  Q.  He goes on in the next paragraph, While there
14  are certainly costs in operating the laboratory, the
15  toxicology testing process does not result in charges
16  for Tarrant County directly or the affiliated Tarrant
17  County Medical Examiner, medical examiner system.
18  A.  Yes.
19  Q.  All right.  So the point is if somebody dies
20  as a result of an opioid overdose and the Medical
21  Examiner has to deal with that, his point is that
22  doesn't result -- the Medical Examiner's process of
23  dealing with that death, there isn't a resulting charge
24  or cost to the County for that effort by the Medical
25  Examiner, correct?

1  A.  So let's talk a little bit about how the
2  Medical Examiner, what he's saying here.
3  First of all, understand that the Medical
4  Examiner's Office is comprised of the ME's Office and
5  the County lab, and they're combined and they're under
6  the auspices of the Medical Examiner.  Tarrant County
7  through its ad valorem taxes pays for that operation.
8  Okay?  So we --
9  Q.  When you say that operation --
10  A.  The personnel, the testing equipment, the
11  facilities, the -- the supplies that they need to do
12  that, Tarrant County pays for all of that through the
13  normal budget process.
14  Q.  The Medical Examiner's Office, just having an
15  office?
16  A.  Yes.  And -- and, for example, Chris Heartsill
17  is an employee of Tarrant County, and Tarrant County
18  pays his salary.  The people that do the testing are
19  Tarrant County employees, and they are paid for by
20  Tarrant County.  So what he is saying here -- and --
21  and by the way, there are three other counties that
22  comprise -- along with Tarrant, that comprise the
23  Medical Examiner's district.  That's what he's talking
24  about when he says system.
25  So there is a fee that is charged to each one

1  of those counties to help offset the cost of operating
2  the Medical Examiner's Office and the lab.  So what he's
3  saying here is that above and beyond those -- that
4  revenue that's coming in from Tarrant County and the
5  three other counties, that there is not an additional
6  charge on top of that to Tarrant County, or he says the
7  system, which he's talking about the three other
8  counties.
9  So what's happening here is that -- I'll give
10  you an example.  Let's say that Fort Worth Police
11  Department sends the County some substance that they
12  want to have analyzed.  It could be -- it could be just
13  a liquid.  It could be anything.  So we run toxicology,
14  and we do various drug screens, and we charge Fort Worth
15  for that service.  If the Sheriff's Department or the
16  District Attorney's Office has a chemical that they want
17  us to -- that they want the lab to analyze, there's not
18  an additional charge that is made to Tarrant County for
19  either the sheriff or the DA, simply because we are the
20  ones who pay for all of the operations to begin with,
21  and part of those operations is for the Medical
22  Examiner's Office to -- to do those tests.  So that's
23  what -- that's what this sentence means.
24  Q.  Okay.  The point that he's -- the last --
25  second to last sentence, unfortunately, we will not be

1  able to provide even an estimate of the cost to Tarrant
2  County related to the opioid epidemic.  Do you see that?
3  A.  Yeah.  Second to -- yeah.
4  Q.  Okay.  So the point is -- because there's many
5  reasons that they're doing a toxicology report in the
6  Medical Examiner's Office, the point is they can't --
7  they don't have the ability to apportion some amount --
8  a particular report to the opioid epidemic differently
9  than they would apportion it to, for example, a cocaine
10  overdose.  His point is simply there's so many different
11  factors, that we can't provide an estimate of the cost
12  to Tarrant County related to the opioid epidemic.
13  Correct?
14  A.  So I disagree with that statement to a certain
15  extent.
16  First of all, the Medical Examiner's Office
17  has not historically attempted to divide those costs
18  between different type of causes of death.  I mean,
19  when you do an autopsy for someone who has expired,
20  regardless of how that person died, you know, you're
21  going to do that autopsy and it's going to be paid for.
22  If it's in the district, it will be paid for the fees
23  that they have already paid into the general fees that
24  are under contract with the County.  They have never
25  collected that type of data specifically for toxicology

Page 178

1 issues related to opioids.
2     It's my belief that what he is saying, you
3 know, we just don't have that -- that broken down.  And,
4 you know, we don't -- we don't do time in motion
5 studies for our -- our toxicologists and our lab workers
6 or anyone.  We -- we know that it's going to cost -- we
7 anticipate it's going to cost X number of dollars to
8 operate the ME's Office and the lab, and we -- we -- the
9 way we determine how that's going to be is cases, like
10 with the Medical Examiner's Office with assistant
11 medical examiners, not the chief medical examiner, but
12 one of the doctors that do -- one of -- I think we have
13 about eight or nine now.  NAME, which is the National
14 Association of Medical Examiners, they basically say you
15 should not do more than X number of autopsies per person
16 every year.  So we watch the number of autopsies that
17 come in, and if we get to a point where that we're
18 getting more off -- more bodies that need to be
19 autopsied, then we may have to supplement that by giving
20 them another -- another ME.
21     The same way with the laboratory.  There's --
22 you know, we can do certain things, and we buy equipment
23 that expedites some of the analysis.  Toxicology is one
24 that takes a while to do because there's a test and then
25 there's a retest on -- to make sure that it's accurate,

Page 179

1 and so -- but it's never broken down by case types
2 because the case type is not something that -- that
3 you're looking for, as far as why that person died.
4 What you're doing is you're examining the body fluids,
5 toxicology, and -- and you're determining what is in
6 that system.  Now they can determine to what extent, you
7 know, the high potency of a -- of a drug, but that --
8 they're not going to necessarily make the assumption
9 that that's the reason that person died.
10    Q.  Do you agree with the quality manager in the
11 Tarrant County Medical Examiner's Office that the
12 Tarrant County Medical Examiner will not be able to
13 provide even an estimate on the cost to Tarrant County
14 related to the opioid epidemic?
15    A.  Yeah, because they don't -- they don't capture
16 that cost as a -- as a stand-alone cost.
17    Q.  So you agree with Mr. Heartsill's
18 conclusion --
19       MR. JANUSH:  Objection.
20    Q.  (BY MR. WAHBY) -- that, quote, unfortunately,
21 we will not be able to provide even an estimate on the
22 cost to Tarrant County related to the opioid epidemic,
23 end quote.  Do you agree with what he is saying as the
24 quality manager of the Tarrant County Medical Examiner's
25 Office?

Page 180

1    A.  So I'm agreeing to that to the extent that
2 they don't capture those costs individually, and those
3 costs are mixed in with all the other costs that it
4 takes to run the Medical Examiner's Office.
5    Q.  Just to have an office.  To your point, your
6 testimony is that if you have more cases, then you have
7 to allocate more resources, but they're not looking as
8 to why you have more cases.  They just know that last
9 year -- or two years ago, you did 100 cases and last
10 year you did 120 cases and maybe this year you're going
11 to do more, so you have to allocate more money.  That's
12 what you're saying.  So they have to -- the -- the --
13 the estimate -- they do know the estimate in that
14 regard.  Is that your testimony?
15       MR. JANUSH:  Objection, because I think
16 we're in the field of expert testimony in terms of what
17 experts do in these cases.
18       MR. WAHBY:  Okay.  Strike that.
19    Q.  (BY MR. WAHBY)  Let me ask you a different
20 question.  You believe the costs could go up if the case
21 number goes up?  That's what you've testified to?
22    A.  What I testified to is that if -- the costs
23 could go up if we get to a point where the amount of
24 resources that we have consumes all of its capacity and
25 there is a need for additional resources to do

Page 181

1 additional work.
2    Q.  Okay.  And that can happen because your
3 population is growing, correct?
4       MR. JANUSH:  Objection.
5    A.  Yeah.
6    Q.  (BY MR. WAHBY)  In fact, it can happen for a
7 lot of reasons unrelated to an opioid epidemic, correct?
8    A.  It could.  And --
9    Q.  And Tarrant --
10    A.  And at the same time, it -- it could be caused
11 by that.
12    Q.  Right.  Well, you can't say one way or the
13 other what's causing it, correct?  That's fair?
14       MR. JANUSH:  Objection.
15    A.  Oh, I think that -- no, I think that you can
16 analyze trends, but as far as what's causing some of
17 those increases, I could go ask the Medical Examiner
18 to -- to make them go back through their records and
19 make a determination of all the deaths that you've
20 worked, how many of those had some type of opioid in
21 their system and, you know, the level of opioid and --
22 and why they may have it in their system.
23       You can have opioids in your system and die.
24 If you have a legitimate -- a good example, if you have
25 a legitimate prescription and you're taking drugs, I

46 (Pages 178 - 181)

1 mean, the prescription, you have those opioids in your
2 system, but -- and you may die for some reason.  You may
3 have a heart attack.
4     Q.   (BY MR. WAHBY)  Okay.  Do you know if the
5 costs to run, maintain and have a Medical Examiner's
6 Office in Tarrant County, do you know if that has gone
7 up or down over the last ten years?
8     A.   It's gone up.
9     Q.   Okay.  Are you prepared today to testify as to
10 why it's gone up?
11     A.   To a certain extent, yes.
12     Q.   Why do you believe that is?
13     A.   Because we have changed the -- the method that
14 we operate our Medical Examiner's Office, that at one
15 time we were contracting with -- with an individual
16 through his PA, and he was providing the doctors and --
17 and those doctors were not County employees.  They were
18 County -- they employees of his PA, and so they could
19 work -- they could work on other cases not associated,
20 private autopsies, that type of deal.  And so that --
21 that doctor was at the point that -- and we had some
22 issues down at the Medical Examiner's Office.
23        So -- so, actually, it was people like me who
24 said now is a good time to change that model.  And so
25 the way we changed that model was -- was we said, okay,

1 everybody that works, including the MEs -- and when I
2 say MEs, those are the docs that do -- it's not just the
3 chief ME; it's all the docs that -- that do the -- they
4 all will be -- everyone will be a County employee.
5        And -- and so we also said you cannot do
6 private work, unless it's after hours and things like
7 that and not in our facilities, but you have to maintain
8 that level of autopsies below the mandated named top
9 mark.  And so what happened is that we began to hire
10 doctors, and I believe that we have seven or eight --
11 seven or eight MEs down there now.  And because we're
12 not allowing them to do private work, then what happens
13 is that we have to -- you know, we buy that entire doc,
14 and those -- those prices go anywhere from 250 to
15 $300,000 a doctor.
16     Q.   Right.  And so to the extent you -- the County
17 has made a change in philosophy on how to staff or
18 manage the Medical Examiner's Office, that's unrelated
19 to the opioid epidemic or the number of cases,
20 population growth, correct?
21     A.   Well, the question that you asked is has --
22 has expenses for the ME's Office increased and why.
23     Q.   Right.  And -- and so to the extent -- all
24 right.  Withdraw the question.
25        And you're referring to Dr. Peerwani?

1     A.   I know Dr. Peerwani.
2     Q.   But he was the issue that you're referring to
3 in the Medical Examiner's Office?
4     A.   He was -- he was the chief medical examiner.
5 He had other physicians that were working for him, for
6 his PA, and so -- but I know who Dr. Peerwani is.
7     Q.   And that -- his -- the challenges in
8 connection with how he was operating the Medical
9 Examiner's Office, that's what prompted the change?
10     A.   He was at a point where that -- Dr. Peerwani
11 was at a point where that he wanted to retire, and we
12 were not going to -- we've had -- at the county level
13 for a large number of years, we have had this discussion
14 if the medical -- chief medical examiner and those
15 physicians should be county employees or can we contract
16 for those?  And these were discussions that we had with
17 the Criminal District Attorney's Office.  People began
18 to -- or not began, but they questioned can you do that.
19 In legal rulings from our DA's Office, they said yes,
20 you can.  But with Dr. Peerwani leaving the County or
21 leaving the ME's Office, we thought this would be a
22 great time to -- to basically change how we are
23 structured at the ME's Office.
24     Q.   Are you aware of any allegations relating to
25 his leadership of the Medical Examiner's Office?

1     A.   Oh, there were allegations.  I don't -- I
2 don't know if they were founded allegations.  I mean,
3 you know, the whole question -- part of the question
4 delved on he's not a county employee, can you contract
5 for the medical examiner position, or does it have to be
6 a county employee?
7     Q.   Okay.  Thank you for your answer as to why you
8 believe or why the cost of the Medical Examiner's Office
9 has gone up, and you provided an explanation of
10 basically a staffing decision.  You have no evidence or
11 testimony that the cost of the Medical Examiner's Office
12 has gone up as a result of the use of opioids in Tarrant
13 County?
14        MR. JANUSH:  Objection, form.
15     Q.   (BY MR. WAHBY)  Correct?
16        MR. JANUSH:  Objection.
17     A.   I am not -- I am not personally -- do not know
18 why those costs have gone the way they have except for
19 the staffing issue.  I have never -- not to my knowledge
20 was I ever -- ever told that the reason we need, you
21 know, more personnel, more revenue -- more resources is
22 simply to -- to -- you know, because of more opioid
23 deaths coming in.
24     Q.   (BY MR. WAHBY)  Do you know if -- do you know
25 if Tarrant County has prosecuted people for crimes

47 (Pages 182 - 185)

Page 186

1 related to prescription opioid use?
2    A.  I don't have any information on that.
3    Q.  Do you know if Tarrant County has investigated
4 any pharmacies or pharmacists for crimes related to
5 diversion of prescription opioids?
6        MR. JANUSH:  Objection.
7    A.  So in my conversations with Chief Bond, we
8 have -- we have had comments or intelligence that --
9 that that was a problem here, and whenever we have those
10 type of reports, we refer them to the DEA because
11 they're the primary investigative unit on cases such as
12 this.  However, we do -- as I think I mentioned earlier
13 today, we do use our personnel sometimes as -- either
14 for surveillance and other activities, but it's under
15 the guidance of the task force, and DEA is the one who
16 works that simply because they have a specialized unit
17 that does that.
18    Q.  (BY MR. WAHBY)  So do you have any information
19 relating to Tarrant County investigating or prosecuting
20 any pharmacies or pharmacists for crimes related to the
21 diversion of prescription opioids?
22    A.  I believe that -- as I said, I believe that
23 they were sent back up to the DEA, and those
24 prosecutions would be by the US Attorney's Office.
25    Q.  I guess, are you thinking of something in

Page 187

1 particular, or do you just -- are you testifying that
2 you generally believe that's how it would be done?
3    A.  I'm talking about the conversations that I had
4 with Chief Bond and -- and -- because I asked him that
5 question specifically, you know, if you do those type of
6 investigations, and he says we do -- whenever we are
7 notified of those, that they report -- they -- they hand
8 that off to DEA, because -- and I'll go back to it --
9 the Controlled Substances Act.  That is -- that is the
10 purview of DEA since that's a federal act.  And, you
11 know, the -- the abuses by -- by the manufacturers and
12 the doctors and the pharmacies fall well within the
13 jurisdictional responsibility of DEA.
14    Q.  And did you ask Chief Bond about any
15 investigation of any Tom Thumb or Albertsons pharmacy or
16 pharmacists?
17    A.  Not specifically -- not specifically of Tom
18 Thumb or Albertsons.
19    Q.  Did you ask him about any --
20    A.  No.
21    Q.  -- any pharmacy in particular?
22    A.  No, I did not.
23    Q.  So you can't identify a pharmacy or a
24 pharmacist who is either -- who was investigated in
25 connection with any prescription opioids?

Page 188

1    A.  No, I cannot.
2    Q.  Do you know if Tarrant County has collected
3 any data regarding the diversion of prescription
4 opioids?
5    A.  I don't know if they have or not.
6    Q.  Do you know if Tarrant County has prosecuted
7 any doctors for crimes related to prescribing
8 prescription opioids?
9    A.  I don't know that they've prosecuted anyone or
10 not.
11    Q.  What's your under -- what's your expectation
12 as to how Tarrant County will seek to redress any issues
13 in the county relating to filling prescriptions for
14 opioids at pharmacies in Tarrant County?
15        MR. JANUSH:  Objection.  Give me a
16 second.  I don't really understand this question.
17        Do you?  Here.
18        MR. WAHBY:  Is that -- I'm having a hard
19 time.  Are you saying "objection, form"?  Are we just --
20        MR. JANUSH:  I can't even --
21        MR. WAHBY:  So, like, it would be
22 "objection, form."  I can't really tell.
23        MR. JANUSH:  I -- I'm going to -- this is
24 the most unintelligible question of the day, so --
25        MR. WAHBY:  So -- so what we do when --

Page 189

1 in like a lawsuit, like deposition, we say "objection,
2 form."  Is that what you're saying?  So just say it.
3        MR. JANUSH:  I'm going to say -- you know
4 what?  Here is the issue.  It's objection, form.
5        MR. WAHBY:  Okay.
6        MR. JANUSH:  It's objection, beyond the
7 scope of this witness.
8        MR. WAHBY:  Okay.
9        MR. JANUSH:  You're asking a -- a
10 30(b)(6) witness --
11        MR. WAHBY:  Okay.  That's a speaking
12 objection now.  I'm going to go with the question.
13        MR. JANUSH:  And I'm going to put it on
14 the record because I'm willing to go to the Court on
15 this.
16        MR. WAHBY:  Go to the Court.  Get it over
17 with.
18        MR. JANUSH:  You're asking --
19        MR. WAHBY:  Be quiet so I can ask the
20 question.
21        MR. JANUSH:  Don't be rude and dogmatic.
22        MR. WAHBY:  Okay.
23        MR. JANUSH:  Maintain integrity and
24 class --
25        MR. WAHBY:  Okay.

48 (Pages 186 - 189)

Page 190

1    MR. JANUSH: -- please.
2    MR. WAHBY: "Objection, form" is what you
3 say.
4    MR. JANUSH: I've been polite to you.
5    MR. WAHBY: "Objection, form."
6    MR. JANUSH: I've been polite to you.
7 Maintain integrity and class.
8    MR. WAHBY: I am.  I am being patient --
9    MR. JANUSH: You're asking --
10    MR. WAHBY: All you say is "objection,
11 form."  That's all you say.
12    MR. JANUSH: You're asking a fact
13 witness, who is also a 30(b)(6), what his expectation is
14 as to how Tarrant County will seek to redress any issues
15 in the county relating to filling prescriptions.
16    MR. WAHBY: So is it "objection, form"?
17 Is that what you're saying?
18    MR. JANUSH: It's so far beyond --
19    MR. WAHBY: Okay.
20    MR. JANUSH: -- "objection, form," I
21 don't even know where to begin.
22    MR. WAHBY: Great.
23    Q.  (BY MR. WAHBY) Now my question for you, sir,
24 is what -- as the representative for Tarrant County,
25 what is your expectation, your hope, for what Tarrant

Page 191

1 County will recover, how will they seek recovery in this
2 litigation for the prescription and the fulfillment of
3 opioids in Tarrant County?
4    MR. JANUSH: Objection.  Move to strike.
5    A.  I don't want to get into an argument between
6 you guys, but I really don't quite understand the
7 question.
8    Q.  (BY MR. WAHBY) Okay.  Let me try to ask a
9 more clear question.
10    A.  Okay.  Thank you.
11    Q.  Do you have a -- do you have any -- what do
12 you hope comes out of this lawsuit for Tarrant County as
13 it relates to solving the opioid crisis in Tarrant
14 County?
15    MR. JANUSH: Objection, form.
16    A.  Well, I hope that one thing that comes out of
17 this is that the pharmacies will be much more diligent
18 in the dispersement of -- of licit opioids, that -- that
19 they hold true to what the Controlled Substance Act
20 requires them to do; even if they don't issue a
21 prescription because of some concern that they have,
22 that they report this to the DEA; and that those
23 policies and procedures were tightened up so we can --
24 we can decrease substantially the amount of opioids that
25 are -- that are being prescribed and -- and whenever

Page 192

1 they're not medically necessary and also in the amount
2 and the quantity and, I guess, the quality of those --
3 those drugs so that they serve the purpose of which
4 they're intended to serve.  And what I mean by quality
5 of the drug, what I'm saying is that it's the -- the
6 legal dosage.  That's what I mean by that.
7    Q.  (BY MR. WAHBY) I am going to hand you what's
8 been marked as Exhibit 11.
9    (Exhibit 11 marked.)
10    Q.  (BY MR. WAHBY) Exhibit 11 is "Plaintiff
11 Tarrant County's Supplemental and Amended Allegations to
12 be added to Short Form for Supplementing Complaint and
13 Amending Defendants and Jury Demand."  Do you see that?
14    A.  Yes, sir, I do.
15    Q.  Have you seen this before?
16    A.  I believe I do have a copy of that in my
17 binder.
18    Q.  Okay.  Let me direct your attention to
19 paragraph 429.
20    A.  429?
21    Q.  Yes.  It's on page 120.
22    A.  Got it.  I have it.
23    Q.  Do you see there it says, The volume of
24 opioids Albertsons brought into and dispensed in the
25 county was so high as to raise a red flag that not all

Page 193

1 the prescriptions being ordered could not be for
2 legitimate medical uses.  Do you see that?
3    A.  I see that.
4    Q.  Okay.  Do you have any facts to support that
5 statement?
6    MR. JANUSH: Objection.
7    A.  I personally do not.
8    Q.  (BY MR. WAHBY) Okay.  On the next page, at
9 paragraph 433 --
10    A.  Yes.
11    Q.  -- it says -- the second sentence there says,
12 Upon information and belief, these drugs were diverted
13 from these other states to Texas.  Upon information and
14 belief, Albertsons failed to take meaningful action to
15 stop this diversion despite its knowledge of it, and it
16 contributed substantially to the opioid epidemic in the
17 County and in Texas.  Do you see that?
18    A.  Yes, I do see that.
19    Q.  Do you have any facts to support that
20 allegation?
21    MR. JANUSH: Objection.
22    A.  No, I do not.
23    Q.  (BY MR. WAHBY) Okay.  The next paragraph,
24 434, it says, In the county -- referring to Tarrant
25 County -- Albertsons violated the standard of care for a

49 (Pages 190 - 193)

Page 194

1  distributor and dispenser by failing to control the
2  supply chain, prevent diversion, report suspicious
3  orders and halt shipments of opioids in quantities it
4  knew or should have known could not be justified and
5  signaled potential diversion.  Do you see that?
6      A.  Yes, I do.
7      Q.  Do you have any facts to support that
8  paragraph?
9          MR. JANUSH:  Objection.
10     A.  No, I do not.
11     Q.  (BY MR. WAHBY)  Okay.  On paragraph 436 it
12  says, Given the volume and pattern of opioids
13  distributed in Texas and in the County, Albertsons was
14  or should have been aware that opioids were being over
15  supplied into the state and should have detected,
16  reported and rejected suspicious orders.  Do you have
17  any facts to support those allegations?
18         MR. JANUSH:  Objection.
19     A.  No, I do not.
20     Q.  (BY MR. WAHBY)  438 says, Given Albertsons's
21  retail pharmacy operations, in addition to its role as a
22  whole sale distributor, Albertsons knew or reasonably
23  should have known that the disproportionate flow of
24  opioids into Texas and the County, and the operation of
25  pill mills that generated opioid prescriptions that, by

Page 195

1  their quality or nature, were red flags for, if not
2  direct evidence of, diversion.  Do you see that?
3      A.  Yes, I do.
4          MR. JANUSH:  Objection.
5      Q.  (BY MR. WAHBY)  Okay.  Do you have any
6  evidence in support of those allegations?
7          MR. JANUSH:  Objection.
8      A.  No, I do not.
9      Q.  (BY MR. WAHBY)  On the next page at paragraph
10  441 it says, As a dispenser of prescription opioids,
11  Albertsons had visibility into dispensing-level data at
12  all of its pharmacies, and Albertsons knew or should
13  have known that it was dispensing an excessive volume of
14  pills in Texas and around the country.  Do you see that?
15     A.  "Around the County"?
16     Q.  I'm sorry, around the County.
17     A.  Yes, I do see that.
18     Q.  Do you have any evidence or facts to support
19  that allegation?
20     A.  No, I do not.
21     Q.  Okay.  442, Upon information and belief,
22  Albertsons, by virtue of the dispensing data available
23  to it, had actual knowledge of indicia of diversion,
24  such as (1) individuals traveling long distances to fill
25  prescriptions; (2) prescriptions for drug "cocktails"

Page 196

1  known for their abuse potential, such as oxycodone and
2  Xanax; (3) individuals arriving together with identical
3  or nearly identical prescriptions; (4) high percentage
4  of cash purchases; and (5) doctors prescribing outside
5  the scope of their usual practice or geographic region.
6  However, Albertsons ignored these obvious red flags.  Do
7  you see that?
8          MR. JANUSH:  Objection.
9      A.  Yes, I do.
10     Q.  (BY MR. WAHBY)  Okay.  Do you have any facts
11  to support those allegations?
12         MR. JANUSH:  Objection.
13     A.  No, I do not.
14     Q.  (BY MR. WAHBY)  If you would review paragraphs
15  444 to 453 relating to Albertsons and its affiliates, do
16  you have any facts or evidence to support any of those
17  allegations?
18     A.  I'll need to read them first.
19         Okay.  That was through 453?
20     Q.  Yes, sir.  Do you have any facts to support
21  any of the allegations from paragraph 444 to 453?
22     A.  No, I do not.
23     Q.  Is Tarrant County aware of who the major
24  manufacturers are or were of prescription opioids?
25         MR. JANUSH:  Objection.

Page 197

1      A.  I don't know if they were or not.  I mean, I
2  know that -- that we were aware of some of the Big
3  Pharma.  I don't know we were aware of all of the Big
4  Pharma.  And I was never involved in that particular
5  aspect of -- of what the County knew or did not know.
6      Q.  (BY MR. WAHBY)  Did --
7          MR. JANUSH:  I'll just stipulate for the
8  record that Tarrant County in the previous iteration of
9  this same lawsuit sued those manufacturers and already
10  settled with those manufacturers.  I don't know if you
11  know the history, that this is now only the pharmacy
12  track, but they absolutely knew who they were.  They got
13  paid.
14     Q.  (BY MR. WAHBY)  Are you aware of the fifth
15  vital sign?
16     A.  I'm sorry?
17     Q.  Are you aware of the fifth vital sign?
18     A.  The fifth vital sign?
19         MR. JANUSH:  Objection.
20     A.  The fifth vital sign is the measurement of
21  pain.
22     Q.  (BY MR. WAHBY)  And where did you hear that
23  term?
24     A.  It's in one of these documents.
25     Q.  Were you familiar with it before preparing for

50 (Pages 194 - 197)

Page 198

1 your deposition?
2     A.  No, I was not.
3     Q.  Does Tarrant County believe that doctors
4 overprescribed opioid prescriptions at any point?
5         MR. JANUSH:  Objection.
6     A.  If you're asking me about specific doctors as
7 far as naming those doctors, I don't have any names of
8 doctors if that's -- that's what your point is.
9     Q.  (BY MR. WAHBY)  No, my question is does
10 Tarrant County believe that doctors overprescribed
11 opioid prescription -- opioids at any point?
12        MR. JANUSH:  Objection.
13        I'm going to pause now and ask a question and
14 make an objection.  You're asking does Tarrant County
15 believe, but you've concluded the fact -- the 30(b)(6)
16 portion of the topics.  Now you're into the fact topics.
17 You've moved on --
18        MR. WAHBY:  No, I -- I -- that's not
19 how --
20        MR. JANUSH:  So what topic is this?  What
21 topic in the 30(b)(6) gets you to this question about
22 Tarrant County and what Tarrant County believes?
23        MR. WAHBY:  Okay.  Well, I can ask him in
24 his personal --
25        MR. JANUSH:  No.

Page 199

1         MR. WAHBY:  I can ask for his personal
2 knowledge based on his 35 years.
3         MR. JANUSH:  That's a different question.
4         MR. WAHBY:  Okay.
5         MR. JANUSH:  That's not objectionable.
6 That's a different question.
7     Q.  (BY MR. WAHBY)  In your role as the county
8 administrator for 35 years, do you believe that doctors
9 overprescribed opioids?
10     A.  Are you asking for my personal belief?
11     Q.  Yes.
12     A.  I believe that there's been overprescription
13 of opioid drugs in Tarrant County.
14     Q.  Okay.  And does Tarrant County believe that
15 doctors have overprescribed opioids in Tarrant County?
16     A.  So are you asking if Tarrant County
17 believes --
18     Q.  Yes.
19     A.  -- or if I believe personally?
20     Q.  Yes, Tarrant County.
21     A.  I don't know the answer to that question.
22     Q.  Okay.  Does Tarrant County have an
23 understanding of what it would mean to overprescribe?
24     A.  Yes.
25     Q.  And what is that understanding?

Page 200

1     A.  It's that overprescribing is whenever -- in my
2 opinion, what overprescribing means is that -- that
3 medicine or opioids have been prescribed and they have
4 surpassed their -- their purpose for use of those drugs,
5 and there are still prescriptions available to -- to
6 obtain the drugs.
7     Q.  Is it -- is it Tarrant County's contention
8 that Albertsons should refuse to fill a legitimate
9 prescription?
10     A.  No.
11     Q.  Does Tarrant County have a belief as to
12 whether Albertsons or its affiliates caused and
13 oversupply in Tarrant County?
14     A.  So I want to go back and -- and comment on
15 that last question, if I might.
16     Q.  Can you answer the question I just asked you?
17     A.  Yes, if you don't mind repeating it.
18     Q.  I don't.
19        Does Tarrant County have a belief as to
20 whether Albertsons or its affiliates caused an
21 oversupply of opioids in Tarrant County?
22        MR. JANUSH:  Objection.
23     A.  I don't have an answer to that question.
24     Q.  (BY MR. WAHBY)  Okay.
25     A.  I would like to go back to the previous

Page 201

1 question, if you would ask that -- that question again
2 to me.
3     Q.  The one that related to doctors?
4     A.  The one should -- should a pharmacy fill a
5 prescription --
6     Q.  Okay.
7     A.  -- that's written by a doctor.
8     Q.  Okay.  Do you want me to reask the question?
9     A.  Please.
10     Q.  Okay.  Is it Tarrant County's contention that
11 Albertsons should refuse to fill a legitimate
12 prescription?  Your answer was no.
13     A.  Okay.  So I want to correct that.
14        If, in fact -- if, in fact, a prescription is
15 written and there may be multiple prescriptions that are
16 written by different doctors, then I believe that
17 Albertsons has a responsibility not to do that because
18 it is an overprescription and -- because you're filling
19 two scripts; and that with the Controlled Substance Act,
20 they have a responsibility of reporting that to the DEA.
21     Q.  And you're not aware of that ever happening,
22 correct?
23     A.  Not to my knowledge.
24     Q.  Are you familiar with the term "red flag" in
25 the context of a prescription for opioids?

51 (Pages 198 - 201)

Page 202

```
 1    A.  Yes.  To a certain extent, yes.
 2    Q.  Okay.  What is that -- what's your
 3  understanding of that term?
 4    A.  So what my understanding is as it relates to
 5  pharmacies, that if there is a situation where a person
 6  comes in or maybe several people come in and -- let's
 7  use one person, and they have prescriptions from several
 8  different doctors that -- that require the filling of
 9  the same medication and they have -- then a red flag
10  then is that there is a reason to believe that the
11  pharmacy -- the pharmacist should question if he or she
12  should actually fill that prescription.  And it's my
13  understanding they have an obligation, even if they
14  don't fill the prescription or if they do fill the
15  prescription, they have an obligation to notify the DEA.
16         It could be other issues also, such as, you
17  know, the -- you may have two or three people walk in
18  that -- that have the same prescription written from
19  the same script pad, similar handwriting.  Anything
20  that would make a pharmacist question the legitimacy of
21  the -- of filling that prescription, that to me is a red
22  flag, and that red flag is an issue where they have an
23  obligation to report that to the DEA.
24    Q.  If you -- if Tarrant County doesn't know if
25  Albertsons and its affiliates contributed to an
```

Page 203

```
 1  oversupply of prescriptions in Tarrant County, then why
 2  did you sue Albertsons and its affiliates?
 3         MR. JANUSH:  Objection.
 4    A.  So --
 5         MR. JANUSH:  The witness already -- I'm
 6  going to say this.  The witness already testified that
 7  he didn't play a role in suing.
 8         MR. WAHBY:  You're violating the rules.
 9         MR. JANUSH:  You're asking a question of
10  why a witness --
11         MR. WAHBY:  You're violating the rules
12  right now.  How is that okay with you?
13         MR. JANUSH:  What you have done is so
14  inappropriate.
15         MR. WAHBY:  You are violating the rules.
16  The rules for this proceeding are very clear, and you
17  just don't care because you're so passionate about what
18  you want to say right now.  It is so simple.  We all
19  agreed to a set of rules.  Adhere to that.
20         MR. JANUSH:  We also agreed to a witness
21  deposition that was within the scope, and what you're
22  asking is attorney questions.
23         MR. WAHBY:  What I am asking him -- I am
24  not asking attorney questions.
25         MR. JANUSH:  You absolutely are.
```

Page 204

```
 1         MR. WAHBY:  I'm not asking an attorney
 2  question at all.  If you --
 3         MR. JANUSH:  He already told you earlier
 4  in the day that he did not --
 5         MR. WAHBY:  All you have to do is say
 6  "objection, form" --
 7         MR. JANUSH:  -- play a role in the
 8  litigation.
 9         MR. WAHBY:  -- and what you want to do is
10  preserved.
11         THE REPORTER:  Excuse me.
12         MR. WAHBY:  So why you're doing this is a
13  total mystery.  Let him answer the question, and then
14  you can take it up afterwards if you think this is so
15  out of bounds.  That's how this works, as you very well
16  know.
17         MR. JANUSH:  And I may.
18    Q.  (BY MR. WAHBY)  Go ahead.
19    A.  Please ask the question again.
20    Q.  If Tarrant County doesn't know if Albertsons
21  and its affiliates contributed to an oversupply of
22  prescriptions -- prescription of opioids in Tarrant
23  County, then why did you sue Albertsons and its
24  affiliates?
25    A.  So the fact that I may not know that may not
```

Page 205

```
 1  mean that the County doesn't know that because --
 2  because the County has been involved in this lawsuit.
 3  There's been investigations by external parties with our
 4  attorneys and activities like that.  If you're asking me
 5  if -- if I don't know if they -- if Albertsons violated
 6  the law or violated the Controlled Substance Act, why
 7  are we suing, I don't know if Albertsons has violated
 8  the Controlled Substances Act or not.
 9    Q.  Okay.  And so is it your testimony that
10  somebody else decided to sue Albertsons, and so you
11  can't answer the question?
12    A.  No, the -- the people that made the decision
13  to sue Albertsons is the Commissioners Court.
14    Q.  Okay.  And on behalf of Tarrant County, you
15  can't articulate today why they sued Albertsons if
16  Tarrant County doesn't know if Albertsons contributed to
17  an oversupply of prescription opioids in Tarrant County?
18         MR. JANUSH:  Objection.
19    Q.  (BY MR. WAHBY)  Is that correct?
20         MR. JANUSH:  Objection.  Move to strike.
21    A.  So if you ask me if I know if Albertsons
22  has -- has overprescribed, I don't know the answer to
23  that.  I have no knowledge of that.
24         If the County as a whole going through this
25  process has had conversations and believes that -- that
```

52 (Pages 202 - 205)

Page 206

1 Albertsons played a part in that -- and I don't know if
2 they do or not, but I know that the Commissioners Court
3 made its decision after -- and here we go into closed
4 session issues again, and so I don't know how much -- I
5 don't want to talk about anything that happened in
6 closed session.  But upon their deliberation, they
7 believe  that -- that Tarrant County is a legitimate
8 partner in this lawsuit.
9        And please understand when we talk about
10 closed session, we're talking about attorney/client
11 privilege in closed session.
12        THE WITNESS:  If we are getting close to
13 a point that -- I may need five minutes.
14        MR. WAHBY:  Okay.  That's fine.  We can
15 go off the record.  You want five minutes right now?
16        THE WITNESS:  Yes, if that's okay with
17 you.
18        MR. WAHBY:  Okay.  That's fine.  We can
19 go off the record.
20        THE VIDEOGRAPHER:  We're off the record
21 at 4:35 p.m.
22        (Break from 4:35 p.m. to 4:50 p.m.)
23        THE VIDEOGRAPHER:  We are back on the
24 record at 4:50 p.m.
25    Q.  (BY MR. WAHBY)  Mr. Maenius, you're still

Page 207

1 under oath just as you were before.
2    A.  Yes, sir.
3    Q.  Did you confer over your testimony during the
4 break?
5    A.  I'm sorry?
6    Q.  Did you confer over your testimony or any
7 documents over the break?
8    A.  No.
9    Q.  Can we go into your binder, sir, and grab tab
10 24?  And then we'll mark that as Exhibit 12, if you
11 would hand it to me.
12        (Exhibit 12 marked.)
13    Q.  (BY MR. WAHBY)  Okay.  I am going to hand you
14 what's been marked as Exhibit 12, and that's Bates
15 labeled Tarrant 00343779 -- well, it looks like only the
16 first page is Bates labeled.  Well, no, to Tarrant
17 00343781, and then -- and then there's nine pages that
18 are attached, pages -- pages 1 to 9.  That's the way
19 your copy of Exhibit 12 appears, correct?
20    A.  Yes.
21    Q.  Now had you seen Exhibit 12 prior to your
22 preparation for today?
23    A.  Not to my knowledge.
24    Q.  Okay.  And it appears to be an email exchange
25 involving Vinny Taneja and Alma Espinoza at the top,

Page 208

1 correct?
2    A.  That's correct.
3    Q.  But it originates on the second page with an
4 exchange between Micky M. Moerbe and Talmage Holmes
5 dated March 29, 2018, correct?
6    A.  That's correct.
7    Q.  Do you know Micky Moerbe?
8    A.  I know who she is.  I don't know her
9 personally.
10    Q.  Okay.  Her signature block says she's a
11 biostatistician in the Division of Epidemiology & Health
12 Information at the Tarrant County Public Health Office,
13 correct?
14    A.  Yes.
15    Q.  And she is providing what she has called in
16 her email, results from the data we received from
17 Medical Examiner's Office are presented on pages 2 and
18 3, correct?
19    A.  Where are you looking?
20    Q.  I'm on the back of this front page.  Let's get
21 that stapled together or something so it's -- so it
22 stays in order, that Exhibit 12.  If you hand me Exhibit
23 12, let's just put that back together.  It will just be
24 easier for you if we don't these lose pages flying
25 around.  Okay.

Page 209

1    A.  Thank you.
2    Q.  Yes, sir.
3        Yeah, so on the second page ending 80 --
4    A.  Yes.
5    Q.  That appears to be the original transmittal
6 email from Ms. Moerbe, and she says she's attaching,
7 quote, "Results from the data we received from Medical
8 Examiner's Office are presented on pages 2 and 3,"
9 correct?
10    A.  Let me see if I can find that.
11    Q.  It's right there in the first -- the top
12 paragraph.
13    A.  Okay.  Yes, I see it.
14    Q.  She sent it to Talmage Holmes, and then
15 Talmage Holmes appears to forward it to Vinny Taneja,
16 correct?
17    A.  Yes.
18    Q.  And Talmage Holmes says, Attached is the TC
19 Opioid report from Micky along with her explanation
20 regarding pending data.  Is that correct?
21    A.  Correct.
22    Q.  And who is Vinny Taneja?
23    A.  Vinny Taneja was the Director of Public
24 Health.
25    Q.  Okay.  And Exhibit -- Exhibit 12 attaches a

53 (Pages 206 - 209)

Page 210

1 report on "Opioids in Tarrant County"?
2    A.   Yes.
3    Q.   That's nine pages, correct?
4    A.   Yes.  Yes, it is.
5    Q.   Now on the first page of that attachment, page
6 number one, the third bullet point, it says, The
7 mortality rate for Tarrant County was the lowest among
8 the five most populous counties in Texas and was
9 significantly lower than the opioid-related mortality
10 rate of Travis County, correct?
11    A.   That's correct.
12    Q.   So in your mind, would that indicate to
13 Tarrant County that the opioid-related deaths were --
14 were better in Tarrant County or less impactful than
15 these other parts of the state?
16    A.   According to this information, it was -- it
17 was the -- it was lower than the five major counties.
18    Q.   Okay.
19    A.   I'm sorry, the four other major counties.
20        (Exhibit 13 marked.)
21    Q.   (BY MR. WAHBY)  Handing you what's been marked
22 as Exhibit 13.  We can put Exhibit 12 away.  You can put
23 it right there.  I'm going to hand you what's been
24 marked as Exhibit 13.  Are you familiar with Exhibit 13?
25    A.   I don't immediately recognize it.

Page 211

1    Q.   Okay.  Because earlier in your testimony, you
2 had referred to HIDTA reports.
3    A.   Yes.
4    Q.   Do you recall that?
5    A.   Yes, I do.
6    Q.   And is -- Exhibit 13 is an Intelligence
7 Bulletin from Texoma HIDTA Regional Intelligence Support
8 Center, correct?
9    A.   Yes.
10    Q.   Okay.  So you don't recognize this as a
11 document that you reviewed in connection with --
12    A.   So I may need to go back into my documents to
13 see if that was one of those that I -- I looked at.
14 Offhand I don't know, but I'll be more than happy to go
15 ahead and look through those.
16    Q.   Well, let's get through this exhibit and
17 then --
18    A.   Okay.
19    Q.   -- we can go from there.
20        Now you're familiar with HIDTA, correct?
21    A.   Yes, I am.
22    Q.   And in your role as the county administrator,
23 did you interface with HIDTA?
24    A.   Only to the extent that we provided funding
25 for our officers, both in the District Attorney's Office

Page 212

1 and also the Sheriff's Department, to be members of
2 HIDTA.  We approved certain contracts, I believe, with
3 HIDTA, but just as a reimbursement contract as it
4 related to maybe overtime.
5    Q.   Okay.  And if you look in the second to the
6 bottom paragraph --
7    A.   Okay.
8    Q.   -- in the second to last sentence it says,
9 Current intelligence suggests the source locations for
10 the diverted and clandestinely produced fentanyl are
11 primarily China-based chemical suppliers and clandestine
12 laboratories in Mexico, correct?
13    A.   I see this.
14    Q.   Right.  That's not coming from pharmacies and
15 grocery stores in Tarrant County, right?
16    A.   That's what this report says.
17    Q.   Now if you go to the last page --
18    A.   Yes.
19    Q.   -- in the box it says, This document is a
20 joint intelligence bulletin produced by Texoma High
21 Intensity Drug Trafficking Area Regional Intelligence
22 Support Group and DEA Dallas Field Division Intelligence
23 Program, correct?
24    A.   Yes, it does.
25    Q.   So is it your understanding that drug

Page 213

1 enforcement, as you've referred to it, is primarily in
2 this area a federal responsibility, not the
3 responsibility of Tarrant County?
4    A.   You said drug enforcement?
5    Q.   Correct.
6    A.   No, I did not say that.
7    Q.   Okay.  So how would you describe the
8 difference between the County responsibility versus the
9 federal responsibility?
10    A.   Well, county and state, they enforce state
11 laws, and the federal agencies enforce federal laws.
12    Q.   And you agree that in connection with the
13 diversion or misuse of prescription opioids, that's
14 primarily the responsibility of the federal government
15 to investigate and regulate?
16    A.   What -- what I had mentioned previously was
17 that whenever we come upon a case that involves
18 potential illegal activity at -- either at the doctor
19 level, the medical doctor level, the prescriber level or
20 at the dispensing level, which is the pharmacies, that
21 at least our -- our task forces tend to hand those cases
22 over to DEA because they have a specialized unit within
23 DEA that works that type of offense.
24    Q.   Once those cases are handed over to the DEA,
25 does the involvement of the County stop?

54 (Pages 210 - 213)

Page 214

1   A.  No, it does not, not necessarily.
2   Q.  It just depends on the case?
3   A.  It depends on the case and the need for
4  manpower to do continued investigations.  For example,
5  you may -- you may work surveillance.  We may be working
6  surveillance to see who comes and goes from some of the
7  pharmacies.  In some instances, I've been told that --
8  that if there's a necessity to go in and do a buy,
9  basically, that in some instances our -- our enforcement
10  personnel are used in that capacity, but normally it's
11  under the direction of the DEA.
12       (Exhibit 14 marked.)
13   Q.  (BY MR. WAHBY) I am going to hand you -- you
14  can put that aside.  I am going to hand you what's been
15  marked as Maenius 14.  Do you recognize Exhibit 14?
16   A.  I don't -- I can't recall.  I'll have to go
17  back and look to see if that's part of the documents
18  that I have in my binder, so.
19   Q.  Okay.  At the top it says, For TCPH Internal
20  Use Only, Not for External Distribution.  That's the
21  Tarrant County Public Health?
22   A.  That's correct.
23   Q.  Okay.  And the document is titled "Data Brief
24  Talking Points, Overdose Deaths," correct?
25   A.  Yes.

Page 215

1   Q.  And then based on this document produced by
2  Tarrant County, it says in the first bullet point under
3  number 1, that Tarrant County had the lowest overdose
4  mortality rate, and it was significantly lower than the
5  US and Bexar, Dallas and Travis Counties, correct?
6   A.  That's what it says, yes.
7   Q.  In point 3, it says that among Tarrant County
8  overdose -- overdose deaths from '13 to '17, 23 percent
9  involved heroin and 20 percent involved psychostimulants
10  with abuse potential, correct?
11       MR. JANUSH:  Objection.
12   Q.  (BY MR. WAHBY) Is that right?
13   A.  That's what the document says.
14   Q.  Okay.  And neither of those categories, heroin
15  or psychostimulants with abuse potential, are the type
16  of narcotics secured from a pharmacy pursuant to
17  prescription, correct?
18   A.  I'll --
19       MR. JANUSH:  Objection.
20   A.  I'll need to -- I'll need to ask what
21  psychostimulants, what type of drugs we're talking
22  about.  I don't have a clear understanding of that
23  particular term.
24   Q.  (BY MR. WAHBY) Okay.  Do you have an
25  understanding of what Tarrant County does with this

Page 216

1  data?
2       MR. JANUSH:  I have a question just to
3  perfect the record.  Is this the full document, or it --
4  the document references pictures on page 1 at paragraph
5  3, the second bullet in black, so I just want to make
6  sure this isn't a piecemeal portion of the document.
7       MS. STEWART:  I will have to check, and
8  I'll have to pull it up.
9       MR. WAHBY:  Okay.
10       MS. STEWART:  I will look right now.
11   Q.  (BY MR. WAHBY) Do you have an understanding
12  as to what Tarrant County does with this data that's
13  referenced at Exhibit 14?
14   A.  So one of the responsibilities of the Tarrant
15  County Public Health Department is epidemiology, and
16  epidemiology deals in an area where it's the detection
17  of diseases or even the outbreak of diseases, so a lot
18  of their activities deal with statistical analysis.  And
19  while I'm making somewhat of an assumption, I'm assuming
20  that this is part of their efforts as it relates to, you
21  know, examining overdose deaths, overdose deaths in
22  Tarrant County.
23       MR. JANUSH:  And I'm going to object to
24  questioning on a document that's missing multiple pages,
25  including the parent email that this was attached to and

Page 217

1  the chart that is referenced in the document where it
2  says pictures on page 1.  Giving the witness an
3  incomplete document is a problem.
4       MS. STEWART:  To clarify, are you
5  objecting that all entire families have to be -- you
6  have to include an entire family?
7       MR. JANUSH:  You are supposed to include
8  the parent email that gives context to the document.
9       MS. STEWART:  It is yes or no.
10       MR. JANUSH:  I am giving you an answer.
11       You are supposed to include the parent email,
12  and you are supposed to include the totality of a
13  document when you question a witness, not just the
14  portion you want to question the witness on.
15       I move to strike all questions concerning
16  Exhibit 14 on this basis.
17       (Exhibit 15 marked.)
18   Q.  (BY MR. WAHBY) I'm handing you what's been
19  marked Exhibit 15.  Exhibit 15 is an email exchange
20  beginning with David Grantham to Calvin Bond dated March
21  27, 2019, correct?
22       And then Mr. Bond or Deputy Chief Bond
23  responds to Mr. Grantham, correct?
24   A.  Yes.
25   Q.  Now who is David Grantham?  Actually, strike

55 (Pages 214 - 217)

Page 218

1 that.
2         David Grantham, it says in the signature
3 block, is the Director of Intelligence for Tarrant
4 County Sheriff's Office, correct?
5     A.  I don't know if he's still in that position,
6 but he was.
7     Q.  Okay.  And did you work with him when he
8 was -- Dr. Grantham when he was in that position?
9     A.  I met him one time just as an introductory
10 meeting, but no -- no not substantive meetings.
11    Q.  And he's providing to Chief Bond information
12 relating to narcotic trends in Tarrant County, correct?
13    A.  So did you have a question?
14    Q.  I did.  I was confirming it's your
15 understanding he's providing to Chief Bond information
16 relating to the narcotic trends in Tarrant County at
17 this time, correct?
18    A.  That's what this document suggests, yes.
19    Q.  And based on the information provided by
20 Dr. Grantham, he makes three conclusions there on the
21 last page of that exhibit, and they are: cocaine is
22 making a come back in Tarrant County, heroin may be
23 arguably the most widespread, and fentanyl remains the
24 deadliness of the narcotics.  I've summarized his three
25 main points there, correct?

Page 219

1     A.  That's correct.
2     Q.  As of March 27, 2019, he doesn't make any
3 mention of prescription opioids, correct?
4         MR. JANUSH:  Objection.
5     A.  Not in this document.
6     Q.  (BY MR. WAHBY)  On the second page of that
7 exhibit, he's referring to the role of Mexican cartels
8 moving makers and infiltrating Tarrant County as a
9 development, correct?
10    A.  Yes.
11    Q.  Okay.  He makes no reference here to
12 pharmacies in Tarrant County having a role, correct?
13        MR. JANUSH:  Objection.
14    A.  Not -- not in this document.
15        (Exhibit 16 marked.)
16    Q.  (BY MR. WAHBY)  Okay.  Handing you what's been
17 marked as Exhibit 16.  Now you've made a number of
18 allusions earlier in your testimony to Challenge of
19 Tarrant County, right?
20    A.  Yes.
21    Q.  And this is a document from Challenge of
22 Tarrant County, correct?
23    A.  That's correct.
24    Q.  Okay.  And they're a Tarrant County -- well, I
25 was going to say a nonprofit.  How would you describe

Page 220

1 Challenge of Tarrant County?
2     A.  Yeah, they're a non -- nongovernmental
3 organization.  They're nonprofit.
4     Q.  Okay.  So Challenge of Tarrant County is a
5 local nongovernmental organization that's dedicated to
6 confronting substance abuse, correct?
7     A.  Uh-huh.
8     Q.  They're not only focused on confronting
9 opioids, right?
10    A.  Sorry, ask that question again.
11    Q.  They're not only focused on dealing with
12 opioids; they're attempting to address all challenges
13 relating to a wide range of substance abuse?
14    A.  That's correct.
15    Q.  This is a letter sent to you by Ms. Jennifer
16 Gilley, the executive director, dated November 15, 2021,
17 right?
18    A.  Yes.
19    Q.  And she says that on behalf of the board of
20 directors, we're very grateful for the financial support
21 of Tarrant County, right?
22    A.  Right.
23    Q.  And -- and that's because Tarrant County has a
24 role in helping fund Challenge of Tarrant County?
25    A.  Yes.

Page 221

1     Q.  Okay.  What percentage of their funding comes
2 from the County?
3     A.  It changes over the various years, but if
4 you're talking about this document -- okay.  So it looks
5 like the County contributes $50,750.  That is for
6 October -- for November '20 through October '21.
7     Q.  That's the lion's share of their funding.  Am
8 I reading this P&L correctly there at page 264?  Is the
9 lion's share of their funding coming from the -- from
10 Tarrant County?
11    A.  I can't answer that question now, because I
12 know they receive other types of funding and I believe
13 that I've seen this document in -- in here.  One of the
14 things that we're required -- the County requires some
15 of the nonprofits is that, you know, we provide funding
16 on the annual basis, but they basically have to report
17 to us the utilization of those moneys, either quarterly
18 or an annual report.
19    Q.  Is that what she's doing in this letter
20 because she includes a number of different programs that
21 relate to advocacy, recovery?  You know, work with --
22    A.  I would -- it looks as if that's what this
23 document is.
24    Q.  Now some of their initiatives are at the
25 university level, some are at the ISD level, some are

56 (Pages 218 - 221)

Page 222

1 directly with citizens groups.  So can you kind of
2 describe in your own understanding what -- what -- how
3 do they work in the community?  In other words, you
4 provide -- Tarrant County provides some level of
5 funding, and then what do they turn around and do?
6    A.  So they serve as basically an oversight --
7 "oversight" may be too broad of a term.  But a
8 coordinating entity that coordinates with different --
9 different agencies and programs in the county to make
10 sure that -- that they are moving all in the same
11 direction.  It looks like what I'm seeing here is that
12 they are describing the different programs that are --
13 that are out in the county.  I don't believe that they
14 actually fund these programs.  I believe that some of
15 these programs are funded by other -- other revenue.
16    Q.  Did you ever consider increasing the funding
17 to Challenge of Tarrant County to address prescription
18 opioid abuse?
19    A.  So what we did with Challenge -- and they run
20 the Family Court programs or the Drug Court programs --
21 we have increased their funding, and we did that in this
22 year because they're taking over a lot of the
23 responsibilities as relates to what -- what that Family
24 Law Court does with individuals that have -- that --
25 that have opioid addictions or drug addictions and they

Page 223

1 very well could be pregnant.  And so, I think we
2 mentioned it several times today, that our goal is to --
3 is to try to ensure that that baby when it's born is --
4 is a healthy baby.
5    Q.  And -- but that initiative, as laudable as it
6 is, is unrelated to prescription opioids in the
7 community; it's to address a broad issue that could
8 impact a pregnant mother?
9       MR. JANUSH:  Objection.
10    A.  Well, it's -- so it -- it could very well be
11 the misuse of opioids and depending what the drug of
12 choice is.
13    Q.  (BY MR. WAHBY)  Right.  So that could be, but
14 it could be any number of maladies that a pregnant
15 mother is trying to navigate during her pregnancy.  But
16 the question is that program was not initiated to
17 address opioid prescription abuse?
18       MR. JANUSH:  Objection, form.
19    A.  It was -- it was created to address
20 individuals who had a drug problem, so -- so that's
21 why -- and, you know, that's why we call it the Drug
22 Court.
23    Q.  (BY MR. WAHBY)  Right.
24       (Sotto voce discussion.)
25       (Exhibit 17 marked.)

Page 224

1    Q.  (BY MR. WAHBY)  I'm going to hand you what's
2 been marked as Exhibit 17.
3    A.  Thank you.
4    Q.  Okay.  Exhibit 17, a very similar letter from
5 Ms. Gilley to you.  It's one year later.
6    A.  2017?
7    Q.  Exhibit 17 --
8    A.  Oh, I'm sorry.
9    Q.  -- is a letter --
10    A.  Yeah.
11    Q.  -- dated November 15, 2022 --
12    A.  That's correct.
13    Q.  -- from Ms. Gilley to you.  And it's the same
14 type of update that we reviewed at Exhibit 16.  The
15 government grant amount has gone down.
16    A.  Okay.  Yes.  Very slightly, but it has, yes.
17    Q.  Right.  It's gone down from $50,750, which it
18 was in the prior year, to, as reflected in this exhibit,
19 $49,844.93, correct?
20    A.  Yeah, about 900 bucks.
21    Q.  Okay.  So do you know why it was reduced?
22    A.  I'm speculating to a certain extent, but this
23 is probably the budget that they have submitted to us,
24 and -- and so it's under the $50,000 threshold for
25 bidding projects, and so I believe that they came in

Page 225

1 with a budget that was below that, and this was the
2 amount that they requested.  I cannot recall any time
3 that we did not fund the amount that -- that Challenge
4 had asked for.
5       I would like to point out one thing, though,
6 because it relates to the question that you asked
7 before.  If you look on -- on page 265, so you read --
8 it says, Please find enclosed the financial and
9 programmatic reports for the general assistance funds
10 provided by Challenge of Tarrant County.
11       So when you see the term "general assistance
12 funds," that's a category within our budget that we
13 provide general assistance to -- to a variety of
14 different nonprofits.  And so when we talk about the
15 Drug Court, the Drug Court would not necessarily fall
16 within the category of general assistance funds.  It
17 would be -- it would be something that would be detailed
18 under a different title.
19    Q.  Okay.  What would that title be?
20    A.  Probably the Drug Court.  It's -- I mean, this
21 is just a general category here so -- so -- and I
22 believe that -- I believe, yeah, it's probably under
23 the -- the Tarrant County Drug Court program.
24    Q.  And you said that Challenge of Tarrant County
25 was responsible for running the Drug Court program.

57 (Pages 222 - 225)

Page 226

1    A.  Yeah.
2    Q.  What does that mean?
3    A.  It's working with -- with those individuals
4  that are assigned to -- to -- to be counseled, to try to
5  help them -- to get them treatment to help them get off
6  drugs so that -- so that the baby hopefully will be
7  healthy.
8        It could mean other things, too.  I mean, It
9  could be parenting skills, those things that -- that
10  would end result with a healthy baby.
11    Q.  Okay.
12        (Sotto voce discussion.)
13    Q.  (BY MR. WAHBY)  Then let's fix Exhibit 14.
14  Can you hand me Exhibit 14?
15        Okay.  I was asking you questions about
16  Exhibit 14.
17        MR. JANUSH:  May I please have that
18  stapler too?  Thanks.
19    Q.  (BY MR. WAHBY)  I will give that back to you.
20  My questions were focused on the last page, which was
21  attached to a transmittal email from Micky Moerbe to
22  Russell Wilson and others, dated August 2nd, 2019.  The
23  subject is Action Needed, Overdoses Data Brief.
24  Correct?
25    A.  Yes.

Page 227

1    Q.  Okay.  She says, Also attached is the Talking
2  Points document -- as an aside, I'll say that was the
3  document that I was asking you about previously.
4    A.  Okay.
5    Q.  And she refers to the Talking Points document
6  to help answer potential questions leadership may
7  receive regarding the results provided in the data
8  brief.  If you have other questions that you feel need
9  to be addressed in the Talking Points, please let me
10  know and we will add them.  Correct?
11    A.  Yes.
12    Q.  Okay.  Do you have an understanding of what
13  she's referring to with respect to potential questions
14  leadership may receive?
15        In other words, my question for you is do you
16  know if she's trying to brief a group of people?  Is
17  this in connection with some press release that they may
18  be having to answer questions?  Do you have any
19  understanding?
20    A.  No, I do not.  You know, this is an internal
21  document that -- and I don't know exactly what Public
22  Health was going to use this for.  They could have made
23  this public to the -- or made this document public, or
24  it was just -- it could possibly be something where that
25  they wanted to make sure that if anybody saw this

Page 228

1  document and had questions, then -- then they would have
2  some answers to either questions that they believed
3  would be asked or -- or at least provide the person who
4  is -- who is being asked the questions with some -- with
5  some additional information.
6    Q.  Okay.  And then on the second page, you recall
7  I asked you about heroin and psychostimulants?
8    A.  Yes.
9    Q.  Okay.  And you asked for a definition of
10  psychostimulants.  There in the box, you see
11  "psychostimulants with abuse potential."  And that
12  appears to be defined as methamphetamine, MDMA
13  'ecstasy,' and ADHD medications, correct?
14    A.  Yes.
15    Q.  And to be clear, the mortality overdose deaths
16  when you compare the counties on page 2, they're lowest
17  in Tarrant County and then these other large counties
18  referenced, as well as Texas as a whole, as well as
19  compared to the US as a whole, correct?
20    A.  That's correct.
21    Q.  Mr. Maenius, do you have an interest in who
22  wins this litigation?
23    A.  Do I have an interest on who wins this
24  litigation?
25        MR. JANUSH:  Objection.

Page 229

1    Q.  (BY MR. WAHBY)  Do you have a preference as to
2  who wins this litigation?
3    A.  Yes.  If we were at the point where we thought
4  that there was cause of action, then I would hope that
5  Tarrant County would win this litigation.
6    Q.  I am going to hand you what's been marked as
7  Exhibit 18.
8        (Exhibit 18 marked.)
9        MR. WAHBY:  Let me ask him a question
10  about that.  We only have two copies.
11        MR. JANUSH:  Do you need time?
12        MR. WAHBY:  Just take a look.
13        (Sotto voce discussion.)
14        MR. JANUSH:  Do you need it?
15        MR. WAHBY:  Yeah.
16    Q.  (BY MR. WAHBY)  Mr. Maenius, you got an email
17  from the National Association of Counties introducing
18  NACo's Opioid Solutions Center.  Correct?
19    A.  Yes.
20    Q.  And did you ever rely on NACo's Opioid
21  Solutions Center or access their information in any way?
22    A.  First of all, I don't remember receiving this,
23  though apparently I did receive it.  In a situation like
24  this, what I would have done with this document is
25  forward it to my Public Health director and let them do

58 (Pages 226 - 229)

Page 230

1 an analysis of this.  And so to my knowledge when I was
2 with the County, I don't know if Public Health actually
3 accessed the center.  I know that we were talking
4 internally, not with the Commissioners Court, but we
5 were going to receive -- because we had received some
6 moneys from -- from the -- the opioid lawsuit of how we
7 might spend that money, and the consensus was that
8 obviously we needed to -- to spend that money as it
9 relates to treatment and recovery and secondary to
10 enforcement.
11    I will tell you, though, that there's no
12 formal document that states that.  That is just simply
13 conversations that we had with interested department
14 heads and because -- because -- because we had just had
15 begun to receive some funding.  We may have received
16 some before but had not spent this, but if there was
17 going to be additional funds, we wanted to be sure it
18 was used for the purpose that it was intended to.
19       (Exhibit 19 marked.)
20    Q.  (BY MR. WAHBY) Okay.  Handing you what's been
21 marked Exhibit 19, Exhibit 19 is an email from
22 Mr. Russell Schaffner?
23    A.  "Schaffner."
24    Q.  "Schaffner."  Dated May 24th, '21 to you at
25 3:31 a.m.

Page 231

1    A.  Yes.
2    Q.  And he says -- it's to you and others.  He's
3 referring to the opioid lawsuit bill.  In the second
4 paragraph he says, This amendment allows up to 5 million
5 a year from the State's 15 percent off the top to be
6 allocated to opioid-related civil legal costs (i.e.,
7 slush fund for Texas Access to Justice Foundation
8 expended by the Supreme Court).
9       Do you have an understanding as to what that's
10 referring to?
11    A.  First of all, I don't know if there is an
12 amendment, that that amendment was actually passed.  So
13 as the final paragraph says, you know, we're trying to
14 keep the bill clean.
15       So what my recollection is on this -- and not
16 necessarily this specific email, but -- but there were
17 funds that the State was going to collect that didn't
18 come directly to counties and that there was a proposal
19 in the legislature during this time that -- that would
20 begin to shape how that money would be -- would be
21 distributed, either to State agencies or to -- to local
22 governments.  And it says the amendment allows up to
23 $5 million a year of the State's 15 percent off the top
24 to be allocated to opioid-related civil legal costs,
25 which is a fund for Texas Access to Justice Foundation

Page 232

1 expended by the Supreme Court.
2       So -- so what this says is that what this
3 amendment would have done would have, if it passed -- I
4 don't know if it passed or not -- would provide the
5 Texas Supreme Court with a fund to -- for the Texas
6 Access to Justice Foundation.  I do not know what that
7 foundation is.
8    Q.  Okay.  You can put that -- that's in your pile
9 there.
10    A.  Thank you.
11    Q.  Let me hand you what's been marked as
12 Exhibit 20.
13       (Exhibit 20 marked.)
14       MR. JANUSH:  Thanks.
15       MR. WAHBY:  Uh-huh.
16    Q.  (BY MR. WAHBY)  And Exhibit -- okay.
17 Exhibit 20 is a series of emails involving Brandon
18 Eggins and Cheryl Bennett-Wright.
19    A.  Okay.
20    Q.  The subject is Opioid Usage and Opioid Impact
21 to Tarrant County.  Okay.  And who is -- who is --
22    A.  Just I want to make a note, first, before we
23 start if you're going to be asking me questions on this.
24 Some of these --
25       MR. JANUSH:  I need to make an objection

Page 233

1 and seek to claw back this document as attorney/client
2 privilege.  This is from the Chief of the Civil --
3 former Chief of the Civil Division investigating who is
4 appropriate to provide information for this lawsuit and
5 writing to other folks within the law department,
6 courts, health department.
7       I am going to also ask that Tarrant County,
8 through you join, in this objection.  Why don't you take
9 a look at this.
10       MR. WAHBY:  So my questions go to the
11 exchange between Brandon Eggins and Cheryl
12 Bennett-Wright.
13       MR. JANUSH:  Yeah, but you wouldn't have
14 the entire document.
15       MR. KRATOVIL:  So certainly beginning on
16 Bates label ending in 584 through 588, those are all
17 communications that involve the Civil Division in the
18 Criminal District Attorney's Office and with individuals
19 we are in an attorney/client relationship with as
20 Tarrant County employees.
21       MR. WAHBY:  Okay.  My questions are only
22 on the first page 83 -- 583.
23       (Sotto voce discussion.)
24       MR. WAHBY:  Do you want me to pull this
25 off?

59 (Pages 230 - 233)

1        MR. JANUSH:  I think so.  I appreciate
2  your courtesies in this regard.
3        MR. WAHBY:  Okay.  So it's this, it's
4  this and this.
5        MR. JANUSH:  I grabbed just the first
6  page, so we're good.
7        MR. WAHBY:  Okay.  Can I have -- let us
8  have your set, and then we'll --
9        MR. JANUSH:  We're going to have to make
10 a copy of just the first page.
11       MR. KRATOVIL:  Let me take one more look
12 at that.
13       MR. JANUSH:  You should.
14       MR. WAHBY:  We're still on the record,
15 but we're good on that clawback?  You're going to claw
16 back those pages, and then I can ask questions on the
17 first page?
18       MR. JANUSH:  Yeah.  And then we'll
19 replace the exhibit with just the one-page exhibit.
20       MR. WAHBY:  We already took his exhibit.
21       MR. JANUSH:  Is it double-sided like
22 mine, though?
23       MR. WAHBY:  Yes, and that's why we took
24 it.  We took it.
25       MR. JANUSH:  What do you mean "we took

1  it"?
2        MR. WAHBY:  Allison is taking it to go
3  make a copy.
4        MR. JANUSH:  Right, right, right.
5        MR. WAHBY:  Yeah.  Let's just go off the
6  record.
7        THE VIDEOGRAPHER:  We're off the record
8  at 5:44 p.m.
9        (Break from 5:44 p.m. to 6:29 p.m.)
10       THE VIDEOGRAPHER:  We are back on the
11 record at 6:29 p.m.
12  Q.  (BY MR. WAHBY)  So Mr. Maenius, if I could
13 direct your attention to Exhibit 20.
14  A.  Yes, sir.
15  Q.  It's an email exchange between Cheryl Bennett
16 and Brandon Eggins dated November 22nd, 2021, until
17 November 23rd, 2021, correct?
18  A.  That's correct.
19  Q.  Okay.  And Ms. Bennett-Wright is asking for,
20 and I quote, "I need numbers on opioid cases in the past
21 five years.  This would only be cases in our programs
22 that we know opioids effected the reason they were in
23 one of our programs."  Correct?
24  A.  Yes.
25  Q.  Who is Ms. Cheryl Bennett-Wright?

1  A.  She works for criminal court administration,
2  and she is the -- she is is -- she's one of their senior
3  staffers in that organization.
4  Q.  And Mr. Eggins responds and says, That may be
5  a difficult task for FODP.
6        And that stands for First Offender Drug
7  Program, correct?
8  A.  Yes.
9  Q.  And he goes on to say, Majority of the felony
10 cases have pos c/s, but can't indicate the defendants
11 that had a specific opioid addiction unless I count all
12 the removals that had a positive drug/hair test of a
13 controlled substance or if they indicated something in
14 their application.  I read that correctly?
15 A.  Yes.
16 Q.  So the First Offender Drug Program in the
17 criminal courts are not tracking court cases to
18 determine which are related to opioid or opioid
19 addiction, correct?
20       MR. JANUSH:  Objection, form.
21 A.  That's correct.  It does point out, though,
22 that the majority of the felony cases have possession of
23 a controlled substance.  That's what CS stands for.
24 Q.  (BY MR. WAHBY)  Right.  But he goes on to say
25 he can't indicate defendants that had a specific opioid

1  addiction, correct?
2  A.  That's correct, yes, sir.
3  Q.  Okay.  So do you know how they resolved this
4  inability to identify opioid addiction cases within the
5  body of controlled substance cases?
6  A.  No, I do not.
7  Q.  Do you know if they ever were able to identify
8  that subset of opioid prescription drug case -- or
9  criminal cases?
10 A.  I do not.
11 Q.  Okay.  One last request actually.
12 A.  Yes, sir.
13 Q.  And I would like to -- the two binders that
14 you brought into the --
15 A.  Yes.
16 Q.  -- deposition room, they had referenced a
17 number of the documents in there.
18       MR. WAHBY:  I would like to mark --
19 you've already noted numbers on your upcoming exhibits,
20 Counsel.  Is that right?  Because I'm trying to -- I
21 want to mark both of these binders as exhibits, not
22 every document, but I would say Exhibit 21 and 22.  But
23 I think you have a numbering system going for your
24 exhibits, so I want to figure out which numbers we're
25 going to use for these two notebooks.

60 (Pages 234 - 237)

1    MR. JANUSH: I like it. I have 21 and
2 22, so you're going to do 23 and 24.
3    (Sotto voce discussion.)
4    MR. JANUSH: 23, 24 and 25 because
5 there's the complaint, I believe -- or additional
6 documents. In other words, it's almost as if there's
7 three binders, not two.
8    MR. WAHBY: Okay. So we're going to put
9 this back here. And then you're done looking, so if you
10 could go ahead and close this binder --
11    THE WITNESS: I may have to refer to it.
12    MR. JANUSH: Yeah, yeah. Do you mean
13 close it just for purposes of stickering it?
14    MR. WAHBY: Yeah, just so we can get this
15 thing marked.
16    MR. JANUSH: Okay.
17    MR. WAHBY: Okay. So we're going to make
18 this one 23, okay.
19    THE WITNESS: Uh-huh.
20    (Exhibit 23 marked.)
21    MR. WAHBY: We're going to make this one
22 over here, the second one, 24.
23    Q. (BY MR. WAHBY) And these are the binders that
24 you brought with you that you reviewed in connection
25 with preparing for your deposition?

1    A. That's correct.
2    (Exhibit 24 marked.)
3    Q. (BY MR. WAHBY) That's 24.
4    MR. WAHBY: And then that as well?
5    MR. JANUSH: Yeah, that's 25.
6    (Exhibit 25 marked.)
7    THE WITNESS: So does that mean that I
8 leave all of these here?
9    MR. JANUSH: Yes.
10    MR. WAHBY: Yes. So they're going --
11 they're going to belong to our lovely court reporter
12 now.
13    MR. JANUSH: That's correct.
14    MR. WAHBY: So you don't have to carry
15 them home. That's the good news.
16    Q. (BY MR. WAHBY) And -- and just to be clear,
17 we've reviewed some documents together, and you have now
18 three items we've marked, and that captures everything
19 that you've reviewed in connection with preparing for
20 your deposition today. Is that right?
21    A. Every document, yes.
22    Q. Okay, every document. And we talked about the
23 conversations that you had, correct?
24    A. Yes, uh-huh.
25    Q. So besides -- Okay. And we discussed your

1 conversations, and now we've marked all of the documents
2 that you've brought with you. Is there anything else
3 you reviewed in connection with preparing to come today
4 and provide your testimony?
5    A. No.
6    Q. Was there anything else you did to prepare and
7 come today to provide your testimony that we haven't
8 already discussed?
9    A. No.
10    MR. WAHBY: Okay. I pass the witness.
11 Thank you, sir.
12    THE WITNESS: Thank you.
13    MR. JANUSH: Let me know when you're
14 ready.
15    THE WITNESS: I'm trying to turn my phone
16 off.
17    MR. JANUSH: Oh, okay.
18    THE WITNESS: All right. I am ready.
19    EXAMINATION
20 BY MR. JANUSH:
21    Q. Mr. Maenius --
22    A. Yes, sir.
23    Q. -- thank you for all of your time today. I'm
24 going to try to be as brief as I can.
25    In your role as a designated 30(b)(6)

1 corporate witness, have you had access to all of
2 Albertsons's prescription opioid pharmaceutical drug
3 dispensing data that Albertsons produced in this case to
4 the plaintiff?
5    A. No.
6    Q. Did any of the topics in the deposition notice
7 that you received give you an expectation that you were
8 supposed to have somehow requested or gained access to
9 and formed an opinion about the volume of Albertsons's
10 prescription opioid drug dispensing data?
11    MR. WAHBY: Objection, form and leading.
12    A. No.
13    Q. (BY MR. JANUSH) Did you have any expectation
14 that you would be questioned specifically on
15 Albertsons's opioid prescription dispensing statistics?
16    A. No, I did not.
17    Q. Did you sit in on any of the many doctor
18 depositions in which Albertsons's attorneys subpoenaed
19 opioid prescribers in Tarrant County --
20    MR. WAHBY: Objection.
21    Q. (BY MR. JANUSH) -- and questioned doctors
22 regarding their prescribing history?
23    MR. WAHBY: Objection, form.
24    A. Absolutely not.
25    Q. (BY MR. JANUSH) Did you read any of the

61 (Pages 238 - 241)

1 transcripts where doctors subpoenaed by Albertsons

2 testified about whether or not Albertsons's pharmacists

3 called them to discuss questionable opioid

4 prescriptions?

5    A.  No.

6        MR. WAHBY:  Objection, form and leading.

7        THE WITNESS:  Sorry.

8        MR. WAHBY:  I get the same chance.

9        THE WITNESS:  Okay.

10       MR. WAHBY:  So just give me a second.

11   Q.  (BY MR. JANUSH)  Have you ever heard the term

12 "corresponding responsibility"?

13   A.  Yes.

14   Q.  Are you aware that pharmacies have a duty to

15 verify the medical legitimacy of opioid prescriptions

16 before dispensing them?

17   A.  Yes.

18       MR. WAHBY:  Objection, form and leading.

19   A.  Yes.

20       MR. JANUSH:  You can only say "objection,

21 form."  You can't see "leading."

22       MR. WAHBY:  Technically, I can say

23 "leading."  Can I say --

24       MS. STEWART:  You have to say "leading"

25 to preserve a leading objection.

1        MR. WAHBY:  Yeah, I can say "leading."

2        MS. STEWART:  That's my understanding.

3        MR. WAHBY:  Unless there's protocol

4 saying I can't say "leading."

5    Q.  (BY MR. JANUSH)  Are you aware that fulfilling

6 the duty, this corresponding responsibility, requires

7 pharmacies to resolve red flags associated with a

8 prescription before dispensing it?

9    A.  Yes.

10       MR. WAHBY:  Objection, form and leading.

11   A.  Yes.

12   Q.  (BY MR. JANUSH)  Sir, do you have any

13 knowledge about whether red flags are established

14 warning signs used by pharmacists that raise questions

15 about a legitimate -- the legitimacy of a prescription?

16       MR. WAHBY:  Objection, form and leading.

17   A.  Would you ask that question one more time?

18   Q.  (BY MR. JANUSH)  Do you have knowledge

19 regarding that red flags are well established warning

20 signs used by pharmacists that raise questions about the

21 legitimacy of a prescription?

22       MR. WAHBY:  Objection, leading.

23   A.  Yes.

24   Q.  (BY MR. JANUSH)  In this case I'm going to

25 represent to you that Albertsons produced their

1 dispensing data to Plaintiff Tarrant County and that

2 plaintiffs have advised Albertsons that 35,956

3 prescriptions flagged because a patient was dispensed

4 opioids with overlapping days of supply written by two

5 or more prescribers at the same time.  Do you understand

6 what I'm addressing?

7        MR. WAHBY:  Objection to the sidebar and

8 leading.

9    Q.  (BY MR. JANUSH)  Do you understand what I'm

10 addressing, sir?

11   A.  Yes.

12   Q.  Okay.  Did you ever have an opportunity before

13 this deposition to review the 35,956 red flag

14 prescriptions concerning patients dispensed opioid

15 prescriptions with overlapping days of supply written by

16 two or more prescribers?

17       MR. WAHBY:  Objection, form and leading.

18       Go ahead.

19   A.  No, I did not.

20   Q.  (BY MR. JANUSH)  Okay.  I'm going to represent

21 to you in this case that plaintiffs have advised

22 Albertsons through the discovery process that they

23 believe -- that Plaintiff Tarrant County believes

24 Albertsons's pharmacists dispensed 29,343 prescriptions

25 that flagged for red flag computation 5 that a patient

1 was dispensed an opioid, a benzodiazepine and a muscle

2 relaxer on the same day and all prescriptions were

3 written by the same prescriber.  Do you understand what

4 I'm addressing?

5    A.  Yes.

6    Q.  Did you have access as part of your role as a

7 corporate witness to 30 -- to the -- excuse me -- 29,343

8 prescription data demonstrating -- allegedly

9 demonstrating that a patient was dispensed an opioid, a

10 benzodiazepine and a muscle relaxer for overlapping days

11 of supply?

12       MR. WAHBY:  Objection, form and leading.

13   A.  No, I did not.

14       MR. JANUSH:  And by the way, asking

15 whether someone had access, a yes or no question, is

16 just really foundational.  It's not leading.

17       MR. WAHBY:  It is foundational, but are

18 you asking --

19       MR. JANUSH:  We'll just stop there.  Just

20 making a comment on the record.

21       MR. WAHBY:  Okay.

22   Q.  (BY MR. JANUSH)  Red flag computation number

23 7, in this case plaintiffs have -- Plaintiff Tarrant

24 County advised Albertsons that plaintiff believes

25 Albertsons's pharmacists dispensed 152,904 prescriptions

62 (Pages 242 - 245)

Page 246

1 where a patient was dispensed an opioid and a
2 benzodiazepine within 30 days of one another. Did you
3 have access to the 152,904 prescriptions from Albertsons
4 that I'm speaking of?
5    A. No.
6       MR. WAHBY: Objection, form and leading.
7    A. Absolutely not.
8    Q. (BY MR. JANUSH) Okay. In this case plaintiff
9 has advised Albertsons that 27,350 prescriptions
10 dispensed by Albertsons's pharmacists were red flagged,
11 or should have been, because a patient was dispensed an
12 opioid and a benzodiazepine on the same day and both
13 prescriptions were written by the same prescriber. Did
14 you have access to that data?
15       MR. WAHBY: Objection, form and leading.
16    A. No, I did not.
17    Q. (BY MR. JANUSH) In this case plaintiff
18 represented to Albertsons that 45,938 prescriptions hit
19 a red flag, called red flag number 10, because a patient
20 was dispensed an opioid prescription over 200 MME per
21 day on or before December 31, 2018, or over 90 MMEs per
22 day after December 31, 2018. Did you have access to
23 those prescriptions to assess Albertsons's culpability
24 in this case?
25       MR. WAHBY: Objection, form and leading.

Page 247

1    A. No, I did not.
2    Q. (BY MR. JANUSH) And I'm going to jump forward
3 to red flag number 13. In this case plaintiff has
4 addressed with Albertsons and produced in discovery
5 their position that Albertsons's pharmacists dispensed
6 119,250 opioid prescriptions where a patient was
7 dispensed more than 210 days of opioid supply of all
8 opioids in a 180-day period. Did you have access to any
9 of that data --
10       MR. WAHBY: Objection, form and leading.
11    Q. (BY MR. JANUSH) -- before testifying today?
12    A. No, I did not.
13    Q. Sir, as between you and others, such as
14 Tarrant County's attorneys and Tarrant County's experts,
15 who is in the best position to review Albertsons's
16 prescription opioid data and determine Albertsons's
17 potential culpability in this case?
18    A. It would be our attorneys that would have --
19 would be the ones that should be doing that.
20    Q. Would you ever think that you, as a former
21 county manager, would be deemed a person responsible to
22 review Albertsons's dispensing data of opioids to
23 determine Albertsons's role in contributing to the
24 opioid crisis in Tarrant County?
25       MR. WAHBY: Objection, form, leading.

Page 248

1    A. No.
2    Q. (BY MR. JANUSH) And why is that?
3    A. Well, first of all, in the -- first of all,
4 I'm not an attorney and I was not part of the original
5 development of this and that's -- that is outside my
6 scope of expertise.
7    Q. Can you pull up Exhibit 13 from your --
8    A. Yes.
9    Q. -- pile of exhibits? It should be in here for
10 you.
11    A. Okay. I'm almost there. Okay. Yes, I have
12 13.
13    Q. And this -- is Exhibit 13 an intelligence
14 bulletin from Texoma HIDTA Regional Intelligent Support
15 Center dated September 2016?
16    A. Yes.
17    Q. Is this one of the documents that Mr. Wahby
18 presented to you during his examination?
19    A. Yes.
20    Q. And what -- what is the significance of a
21 Texoma bulletin as compared with a HIDTA annual report,
22 for example?
23       MR. WAHBY: Objection, form and leading.
24    Q. (BY MR. JANUSH) Let me ask it differently.
25       Is there a difference between a Texoma

Page 249

1 bulletin and a HIDTA annual report?
2    A. Yes, there is.
3    Q. What's the difference?
4    A. Bulletins themselves tend to focus on one
5 particular area, and annual reports are a much more
6 comprehensive document that includes various other
7 elements that are of interest to reporting by Texoma
8 HIDTA.
9    Q. And so what's the title at the top in bold of
10 this particular bulletin?
11    A. "Presence of Counterfeit Hydrocodone Tablets
12 containing Fentanyl in the Texoma HIDTA Region."
13    Q. Would you expect, sir, that there would be any
14 reference to licit or legal prescription opioid drugs in
15 a HIDTA bulletin concerning the presence of counterfeit
16 hydrocodone tablets?
17    A. No, I would not.
18    Q. Do you recall that Mr. Wahby asked you about,
19 you know, where in the document is it addressing, and
20 I'm paraphrasing, but addressing prescription opioids?
21       MR. WAHBY: Objection, form.
22    Q. (BY MR. JANUSH) In other words, Mr. Wahby
23 presented this to you and said this is not addressing
24 prescription opioids in this bulletin, right?
25    A. That's correct.

63 (Pages 246 - 249)

1          MR. WAHBY:  Objection, form.

2     A.   That's correct.

3     Q.   (BY MR. JANUSH)  Does that surprise you in any

4 way?

5     A.   No.  It's a bulletin that deals strictly

6 with -- deals with the presence of counterfeit

7 hydrocodone tablets containing fentanyl.

8     Q.   Are there better HIDTA documents that do

9 address the notion of prescription opioids being a

10 problem in the Texoma jurisdiction?

11          MR. WAHBY:  Objection, form and leading.

12     A.   So documents such as their annual reports

13 would have that type of information.

14     Q.   (BY MR. JANUSH)  Okay.  All right.  Now I am

15 going to have you pull up Exhibit 14 that's right in

16 front of you.

17          Mr. Maenius, Exhibit 14 is a cover email with

18 a Tarrant County Public Health Data Brief and Data Brief

19 Talking Points that was presented to you by Mr. Wahby

20 earlier today.  Is that right?

21     A.   That's correct.

22     Q.   Okay.  And specifically, if you turn to the

23 Data Brief Talking Points at the last page, do you

24 recall Mr. Wahby questioned you very specifically about

25 number 3 where it states, Among Tarrant County overdose

1 deaths from 2013 through 2017, 23 percent involved

2 heroin and 20 percent involved psychostimulants with

3 abuse potential?  Do you remember that?

4     A.   That's correct, yes.

5     Q.   And do you remember that Mr. Wahby also said

6 that prescription opioids isn't addressed in those

7 figures.  Is that right?

8          MR. WAHBY:  Objection, form.

9     A.   Yes.

10     Q.   (BY MR. JANUSH)  Okay.

11          MR. WAHBY:  And leading.

12     Q.   (BY MR. JANUSH)  Mr. Maenius, did Mr. Wahby at

13 any point in time point you to the second to last bullet

14 which reads (15%) T40.2 other opioids (natural and

15 semisynthetic opioids, such as morphine, codeine,

16 oxycodone and hydrocodone) were responsible for overdose

17 deaths from 2013 to 2017?  Did he address that with you

18 within this document?

19          MR. WAHBY:  Objection, form and leading.

20     A.   No, he did not.

21     Q.   (BY MR. JANUSH)  He only addressed with you

22 the -- the heroin deaths and the psychostimulant deaths.

23 Is that right?

24     A.   That's correct.

25     Q.   Incidentally, do you have an independent

1 understanding of whether morphine, codeine, oxycodone

2 and hydrocodone are prescription opioid products?

3     A.   Yes, they are.

4     Q.   Let's turn to Exhibit 15, the next one.  Do

5 you recall that Mr. Wahby presented you with this email

6 exchange between Calvin Bond or Chief Bond and David

7 Grantham, who is the Director of Intelligence of Tarrant

8 County Sheriff's Office as of March 27, 2019?

9     A.   Yes.

10     Q.   And do you recall that in questioning you on

11 this email Mr. Wahby addressed the notion that there's

12 no mention of prescription opioids in this email

13 correspondence addressing the intelligence estimate?

14          MR. WAHBY:  Objection, form.

15     A.   Yes.

16     Q.   (BY MR. JANUSH)  Mr. Maenius, is it surprising

17 in any way to you that the Director of Intelligence was

18 addressing drug cartels in this document?

19     A.   No, it was not surprising to me at all.

20     Q.   Why was it not surprising to you that the

21 Director of Intelligence was addressing drug cartels?

22     A.   Because they are some of the culprits that are

23 involved in drug trafficking in this area.  Also, the

24 document itself talks about -- about the positioning of

25 the Dallas-Fort Worth area as it relates to independent

1 control by cartels as drugs come into the state and then

2 are used as a transshipment point to other parts of the

3 country.

4     Q.   Now I want to focus your attention very

5 specifically on what a Director of Intelligence for the

6 Tarrant County Sheriff's Office would do and, by

7 contrast, would not do?  Are you with me?

8     A.   Yes.

9     Q.   Okay.  Would the Director of Intelligence for

10 the Tarrant County Sheriff's Office have data at his

11 fingertips concerning Albertsons's opioid prescription

12 dispensing data?

13          MR. WAHBY:  Objection, form and leading.

14     A.   No, he would not.

15     Q.   (BY MR. JANUSH)  And so, sir, would you ever

16 expect someone like David Grantham, the Director of

17 Intelligence for the Tarrant County Sheriff's Office, to

18 be addressing the dispensing practices of pharmacies

19 such as Albertsons?

20          MR. WAHBY:  Objection, form and leading.

21     A.   No, I would not.

22     Q.   (BY MR. JANUSH)  Would Albertsons's opioid

23 dispensing practices be outside or within the

24 jurisdiction of David Grantham, Director of

25 Intelligence, Tarrant County Sheriff's Office?

64 (Pages 250 - 253)

Page 254

1          MR. WAHBY:  Objection, form.
2     A.  Would you ask that question one more time?
3     Q.  (BY MR. JANUSH)  Would it be within or outside
4  of the jurisdiction of David Grantham as Director of
5  Intelligence to be assessing Albertsons's prescription
6  dispensing of opioids?
7          MR. WAHBY:  Objection, form.
8     A.  Yes, it would be outside of his
9  responsibilities.
10    Q.  (BY MR. JANUSH)  Thank you, sir.
11         Now we're going to move on to tab 7, and tab 7
12  has been marked as Exhibit 21.
13         (Exhibit 21 marked.)
14    A.  You said Exhibit 21.
15    Q.  (BY MR. JANUSH)  Yes, sir.  Tab 7 in the
16  binder will be easier for you, I think.
17    A.  Okay.  Great.
18         THE WITNESS:  It's going to be in this
19  binder right here.
20         MR. WAHBY:  So --
21         MR. JANUSH:  If you recall, because he
22  had marked it, I wanted it clean.  I've marked it for
23  you, and you'll hand it to the court reporter when done.
24         THE WITNESS:  Okay.
25         MR. WAHBY:  Okay.  But I guess that's

Page 255

1  going with the court reporter as well because it's in
2  his binder?
3          MR. JANUSH:  It is, but it's going as
4  part of a different exhibit since you numbered this as
5  Exhibit 24 --
6          MR. WAHBY:  Okay.
7          MR. JANUSH:  -- or 23.
8          MR. WAHBY:  Okay.  Well, we'll just focus
9  on this being Exhibit 21.  And you're questioning him on
10  Exhibit 21?
11         MR. JANUSH:  Yes and no.  Fair enough.
12  Fair enough.
13         MR. WAHBY:  If you refer him in all the
14  testimony that he's about to give is going to keep
15  referring to tab 7, the record is going to get totally
16  messed up.
17         MR. JANUSH:  No, no, I agree.  I was only
18  asking him to return to it.  I've referred to it --
19         MR. WAHBY:  Okay.
20         MR. JANUSH:  -- as Exhibit 21.
21         MR. WAHBY:  Okay.
22         MR. JANUSH:  I've marked it.  I think I
23  said now we're going to move on to tab 7, and tab 7 has
24  been marked as Exhibit 21.
25         MR. WAHBY:  Okay.

Page 256

1     Q.  (BY MR. JANUSH)  Okay.  Sir, looking at the
2  cover sheet of this document, do you know what a Texoma
3  HIDTA 2019 Threat Assessment is?
4     A.  Yes, I do.
5     Q.  What is a -- a 2019 threat assessment?
6     A.  It's basically a report from -- from the
7  HIDTA -- Texoma HIDTA, where they determine the
8  different types of narcotic and -- and licit drugs and
9  illicit drugs, and -- and they talk about in detail some
10  of the things that they have found, and they want to
11  make sure that -- that there's an understanding that
12  those different types of -- of drugs are -- are
13  something that -- that people are aware of in the task
14  force arena that could -- could increase the -- increase
15  the trafficking of these type of drugs.
16    Q.  Now just for a moment, before we get into this
17  document, I want to address your view of whether
18  Exhibit 21, a 2019 Threat Assessment, is in any way
19  similar to a Texoma bulletin that was marked by
20  Mr. Wahby as Exhibit 13.
21         MR. WAHBY:  Objection to form and
22  leading.
23    A.  So the threat assessment itself is a much more
24  detailed document.  While the bulletin may -- may talk
25  somewhat of some of the elements of the threat

Page 257

1  assessment, it is not comprehensive.  The -- the threat
2  assessment itself is a much more comprehensive document.
3     Q.  (BY MR. JANUSH)  If you wanted to investigate
4  or review whether prescription opioids was noticed by
5  HIDTA as a significant concern, would you look at an
6  annual document like the 2019 Threat Assessment or a
7  three page bulletin?
8          MR. WAHBY:  Objection, form.
9     A.  I would look for as -- I would look at the
10  threat assessment rather than just simply the bulletin.
11    Q.  (BY MR. JANUSH)  Okay.  Sir, and on this
12  threat assessment, working from Exhibit 21, I'm going to
13  ask that you turn to the page ending in 29250.
14    A.  Yes, sir.
15    Q.  Are you there?
16    A.  Yes, I am.
17    Q.  Okay.  Do you see in the middle of the page
18  Pharmaceuticals?
19    A.  Yes.
20    Q.  Okay.  Now I'm going to read.  The diversion
21  of pharmaceutical drugs continues to be a significant
22  drug threat to the Texoma HIDTA region.  Hydrocodone,
23  oxycodone, alprazolam, steroids and codeine with
24  promethazine continue to be the dominant diverted
25  controlled substances within the AOR.  Did I read that

65 (Pages 254 - 257)

Page 258

1 correctly?
2    A.  You did.
3    Q.  Now I'm forgetting what AOR stands for.  Do
4 you have an independent understanding of what AOR stands
5 for?
6    A.  I do not.
7    Q.  Is it area of responsibility?
8    A.  Yes, it is.
9    Q.  Okay.  Now let's go to the second paragraph
10 beginning with the words, Outside of the threat from
11 Mexican DTOs, diversion of controlled pharmaceutical
12 drugs from the medical and pharmacy environment, as well
13 as the sale of synthetic drugs from retail
14 establishments, pose a significant public health and
15 public safety threat in the region.  Did I read that
16 correctly?
17    A.  Yes, you did.
18    Q.  Sir, is this speaking about street illicit
19 drugs, or is this speaking about pharmaceutical
20 prescription opioids?
21          MR. WAHBY:  Objection, leading.
22    A.  It says it's controlled pharmaceutical drugs.
23    Q.  (BY MR. JANUSH)  Stated differently -- I will
24 ask it differently.  What is this paragraph addressing?
25 Same question asked differently since I got a leading

Page 259

1 objection.
2    A.  It's talking about the diversion of
3 controlled pharmaceutical drugs by -- by the medical and
4 pharmacy -- from the medical and -- I'm sorry.  Let's
5 try this again.  It's from the medical and pharmacy
6 environment.
7    Q.  Okay.  I will put that away.
8        (Exhibit 22 marked.)
9    Q.  (BY MR. JANUSH)  Now I have marked what is
10 your tab 34 as Exhibit 22.  So I believe it is in
11 another binder.
12    A.  Uh-huh.  Yes, it is.  Did you say tab 34?
13    Q.  I did, sir.
14    A.  Okay.  Okay.
15    Q.  Incidentally, earlier today when Mr. Wahby
16 questioned you at a point in time about the opioid
17 crisis, at one point you answered that licit drugs serve
18 as the stepping stone to street drugs.  Do you remember
19 that?
20    A.  Yes, I do.
21    Q.  Did you mean to say that -- sorry, you
22 addressed that illicit drugs, not licit -- strike that.
23 I have to clear this up because this got muddied.
24        Earlier today you had addressed that illicit
25 drugs were a stepping stone to street drugs.  Did you

Page 260

1 mean to say that illicit, illegal drugs were a stepping
2 stone to illicit illegal drugs?
3    A.  No, I misspoke.  Instead of illicit, I meant
4 licit drugs.
5    Q.  Okay.  You also were asked questions
6 concerning when prescription opioids became a -- a
7 crisis in your mindset in Tarrant County.  Do you
8 remember that?
9    A.  Yes, I do.
10    Q.  And you couldn't or didn't specify a specific
11 date, but you did address that it was certainly -- it
12 was before COVID.  Do you remember testifying in that
13 regard?
14    A.  Yes.
15          MR. WAHBY:  Objection, form.
16    Q.  (BY MR. JANUSH)  What is this document that
17 I've marked as Exhibit 23?
18          MR. WAHBY:  22.
19          MR. JANUSH:  Oh 22, excuse me.
20    Q.  (BY MR. JANUSH)  Exhibit 22, what is this
21 document?
22    A.  So this is a report from -- it's a Drug Impact
23 Index that was produced by Tarrant County Challenge.
24    Q.  Okay.  What's the date of this document?
25    A.  2007.

Page 261

1    Q.  And when you turn to the first page, can you
2 look at the Tarrant County Challenge, Inc. Board of
3 Directors from 2007 to 2008 and just review that for a
4 moment?  Let me know when you're done.
5    A.  Yes.
6    Q.  Do any of these names -- are any of these
7 names familiar to you?
8    A.  Several of them are, yes.
9    Q.  Who stands out as being familiar to you?
10    A.  Two individuals.  First of all, the president
11 Lyn Willis.  Lyn Willis was a deputy director of our
12 Juvenile Probation Department and -- but the one that
13 stands out the most is Bobby R. Jones, a veterinarian
14 doctor and Master's of Public Health, Dr. Jones was our
15 chief epidemiologist for the Public Health Department at
16 the time.
17    Q.  So you viewed Dr. Jones to have been a
18 respected chief epidemiologist in the Health Department?
19    A.  Yes, absolutely.
20    Q.  And when we turn the page to the page -- it
21 should be your third page.  It's Challenge or
22 CHAL0000553.  Do you see that?
23    A.  Yes.
24    Q.  Okay.  And I'm going to read from the middle
25 of the second paragraph.  According to Monitoring the

66 (Pages 258 - 261)

1 Future Survey 2001 to 2006, the past-month usage of
2 illicit drugs by teenagers has decreased approximately
3 23 percent in the past five years; however, prescription
4 opioid abuse has remained high. The Partnership for a
5 Drug Free America reports more than a third of teens
6 (40 percent) and parents (37 percent) think teen abuse
7 of prescription painkillers is safer than abuse of
8 illicit street drugs. The Partnership also reports that
9 teen abuse of prescription and over-the-counter
10 medicines has become en trenched in teen culture.
11 Nearly one in five teens (4.5 million American teens)
12 report abusing prescription medications to get high
13 while one in ten teens (2.4 million) report abusing
14 cough medicine to get high. Research shows that kids
15 who learn about the risks of drugs at home are up to
16 50 percent less likely than their peers to use drugs,
17 yet fewer than a third of teens, just 31 percent, say
18 they are getting that message from their parents. Did I
19 read that correctly?
20     A.  Yes, you did.
21     Q.  Sir, is there any significance about this
22 document and this statement to you?
23     A.  So -- well, yes. First of all, it tells us
24 that while some of the numbers are coming down,
25 prescription opioid abuse has remained high.

1     It talks about a third of the teens that
2 believe, and 37 percent of parents believe -- and we've
3 mentioned this before in the presentation today -- think
4 that abuse of prescription painkillers is safer than
5 illicit drugs -- street drugs, which is not a correct
6 statement. I mean, they are just as dangerous, if not
7 more dangerous.
8     And -- that then it also talks about the fact
9 that education is critically important, something else
10 that we've talked about today, where -- that 50 percent
11 of -- of kids are less likely than their peers to use
12 drugs if they receive some type of discussion or
13 education from their parents.
14     Q.  Okay. Let's move forward to page 2. It's
15 CHAL0000557, and it has at the top Indicator 2. Let me
16 know when you get there.
17     A.  I'm here.
18     Q.  Okay. And do you see the heading at the top
19 of the two bar charts that say -- that reads Juvenile
20 Arrests for Drug Possession, Tarrant County?
21     A.  Yes, I do.
22     Q.  This isn't talking -- is this talking about
23 national statistics or Tarrant County statistics?
24     MR. WAHBY:  Objection, form and leading.
25     A.  Tarrant County.

1     Q.  (BY MR. JANUSH)  Okay. And when you look at
2 the note at the bottom it says, The numbers reported
3 here reflect arrests of individuals 17 years of age and
4 under. Synthetic narcotics are prescription drugs which
5 contain opium derivatives. The non-narcotics category
6 includes prescription drugs which are not opium based,
7 inhalants, and all other illicit drugs which do not fall
8 into the categories marijuana or opium/cocaine. Do you
9 see that?
10     A.  Yes, I do.
11     Q.  And when we look at numbers of arrests at the
12 top bar chart for 1993, the light gray is -- is for
13 opium and cocaine on the -- on the left. Is that right?
14     A.  Are you referring to 1999?
15     Q.  1999. You know what?  I can't even read these
16 colors, so I'm going to move on from that.
17     Let me ask you this. Taken together when you
18 review this document, what does this document, if
19 anything, tell you about whether there was an opioid
20 issue in Tarrant County in years before 2018?
21     MR. WAHBY:  Objection, form and leading.
22     A.  Well, it shows that there is an opium/opioid
23 issue in Tarrant County just simply by looking at the
24 bar charts.
25     Q.  (BY MR. JANUSH)  And just generally --

1     A.  And this -- by the way, this -- this data goes
2 back to 1999.
3     Q.  Okay. This data reflects 1999 to 2006, right?
4     A.  That's correct.
5     Q.  And -- and to be clear, this is only
6 addressing juvenile arrests, right?
7     A.  That's correct.
8     Q.  So is this data capturing all of the opioid
9 abuse in Tarrant County by juveniles where a juvenile is
10 not caught?
11     A.  No.
12     MR. WAHBY:  Objection, form and leading.
13     THE WITNESS:  Sorry.
14     Q.  (BY MR. JANUSH)  How about adults?  Does
15 this -- does this document capture adult abuse of
16 opioids in Tarrant County?
17     MR. WAHBY:  Objection, form and leading.
18     A.  No, it does not.
19     Q.  (BY MR. JANUSH)  Actually, I apologize. It
20 doesn't there. It does at indicator 10 and 11, I
21 believe, so let me steer you to page ending in 565 and
22 566.
23     A.  Okay.
24     Q.  And so here we see indicators for abuse of
25 various drugs or possession of various drugs where there

67 (Pages 262 - 265)

Page 266

1 are arrests.  Is that right?
2     A.  That's correct.
3     Q.  Okay.  And, again, do arrest statistics tell
4 this complete story concerning opioid abuse in Tarrant
5 County?
6         MR. WAHBY:  Objection, leading.
7     A.  No, it does not.
8         MR. WAHBY:  And form.
9     Q.  (BY MR. JANUSH)  Let's move on to indicator 12
10 at page 12.  Actually, this -- I'm going to move to
11 indicator 13 at page 13 ending in 568.
12     A.  Okay.
13     Q.  And here we see -- the title is "Primary Drug
14 at Time of Adult Admission to DSHS Funded Facilities
15 2006."  Do you see that?
16     A.  Yes.
17     Q.  And it looks like the 800 admissions at 18
18 percent matches the color coding for opiates.  Do you
19 see that?
20     A.  Yes.
21     Q.  Okay.  What, if anything, is the significance
22 of this 18 percent related to opiates as it concerns
23 adult admission to DSHS funded facilities in 2006?
24         MR. WAHBY:  Objection, form.
25     A.  So what it means is that -- and we're talking

Page 267

1 about admissions into, you know, the Department of State
2 Health -- or Health Services.  And what it shows is that
3 about 18 percent of the individuals that were admitted
4 into these facilities had, you know, an opioid addiction
5 and it was the primary drug of abuse.
6     Q.  (BY MR. JANUSH)  Fair to say that the opioid
7 crisis in Tarrant County began earlier than 2018,
8 preCOVID?
9     A.  Oh, yes.
10         MR. WAHBY:  Objection, form and leading.
11     Q.  (BY MR. JANUSH)  What's your answer?
12     A.  Yes, absolutely.
13     Q.  Let me ask it differently.  When in your --
14 when do you believe or how early do you believe the
15 opioid crisis, the prescription opioid crisis began in
16 Tarrant County?
17     A.  When you look at -- I'm sorry.
18         MR. WAHBY:  Go ahead.
19         THE WITNESS:  Okay.
20     A.  So when you look at -- at the data that is on
21 this chart, at least by 1999.
22         MR. JANUSH:  Mr. Maenius, thank you for
23 your time.  I have no further questions at this moment.
24         FURTHER EXAMINATION
25 BY MR. WAHBY:

Page 268

1     Q.  Just a few questions, sir.
2     A.  Yes, sir.
3     Q.  If we can go back to the first page of the
4 exhibit you were just looking at.
5     A.  Yes, sir.
6     Q.  Actually, not the first page, the page that
7 ends in 553.
8     A.  Yes, sir.
9     Q.  And the paragraph that Mr. Janush read to you,
10 beginning "According to Monitoring the Future Survey."
11 Do you see that section?
12     A.  Yes, sir.
13     Q.  Now the sentence beginning "The Partnership
14 for a Drug Free America," that's referring to an opinion
15 survey, correct?  That's not actually referring to
16 statistics that reflect addiction, right?
17     A.  I do not know exactly what -- I don't know the
18 answer to that question.
19     Q.  Well, Partnership for a Drug Free America
20 reports that more than a third of teens (40 percent) and
21 parents (37 percent) think teen abuse of prescription
22 painkillers is safer than abuse of illicit street drugs.
23 That's an opinion survey?
24     A.  It is.
25     Q.  So that's not to be meant or that should not

Page 269

1 be interpreted to reflect actual addiction data, right?
2 This is what people think, correct?
3     A.  That's correct.
4     Q.  Now it goes on, The Partnership also reports
5 that teen abuse of prescription and over-the-counter
6 medicines has become entrenched in teen culture.  Nearly
7 one in five teens (4.5 million American teens) report
8 abusing prescription medications to get high, while one
9 in ten teens (2.4 million) report abusing cough medicine
10 to get high, correct?
11     A.  That's what it says, yes.
12     Q.  Based on reading this, you can't extrapolate
13 or connect that to the experience in Tarrant County, can
14 you?
15     A.  Well, if one makes the assumption that Tarrant
16 County is similar to what's happening nationwide, well,
17 then these would -- these should correspond, except you
18 have to look at the percentages; one in five, which is
19 20 percent or one in -- one in ten, which is 10 percent.
20     Q.  Are you prepared to testify under oath that
21 the Tarrant County experience is reflective of what's
22 referred to here, or do you not know?
23     A.  I do not know.
24         MR. WAHBY:  Okay.  No further questions.
25 Thank you, sir.

68 (Pages 266 - 269)

1     THE WITNESS:  You're welcome.
2     (Exhibit 26 marked.)
3         FURTHER EXAMINATION
4  BY MR. JANUSH:
5     Q.  Mr. Maenius, I am going to hand you what's
6  been marked as Exhibit 26.  It's a Tarrant County Drug
7  Impact Index from 2010.
8     A.  Okay.
9     Q.  And this document is similar to the one we
10  were just working with at Exhibit 22 that was from 2007.
11  Is that right?
12     A.  That's correct.
13     Q.  Okay.  You can work off -- yes, you can work
14  off your tab document, if it's easier, or the formal
15  exhibit, but I'm going to direct your attention --
16         THE WITNESS:  It's tab 36.
17         MR. WAHBY:  Oh, Okay.  Thank you, sir.
18     Q.  (BY MR. JANUSH)  I am going to direct your
19  attention to, right at the outset if you flip it open to
20  one page, Challenge 0000636.  Are you with me?
21     A.  Yes.
22     Q.  Okay.  And here I'm going to direct your
23  attention to the second paragraph, middle of the page;
24  and in the middle of that paragraph, the sentence
25  beginning, "However, with prescription drugs, the trend

1  is alarming."  Do you see that?
2     A.  Yes, I do.
3     Q.  And let me continue reading.  Just this month,
4  the TEDS (Treatment Episode Data Set) report indicates a
5  fourfold increase in the abuse of pain relievers among
6  Americans 12 years or older between 1998 and 2008.
7  Moreover, the nonmedical use of prescription pain
8  medicine has become the second most prevalent type of
9  illicit drug use, after marijuana.  DEA has aggressively
10  targeted the diversion of licit pharmaceuticals to the
11  illicit market in order to stem and reverse this trend.
12  Did I read that correctly?
13     A.  Yes, you did.
14     Q.  Is this addressing survey reporting, or is
15  treatment episode dataset something more than a survey?
16         MR. WAHBY:  Objection to form and
17  leading.
18     A.  It's more than a survey.
19     Q.  (BY MR. JANUSH)  And so when the treatment
20  episode dataset is reporting a fourfold increase in the
21  abuse of prescription pain relievers among Americans 12
22  or older between 1998 and 2008, what, if any,
23  significance does this have for you?
24         MR. WAHBY:  Objection, leading.
25     A.  Well, it means that -- it means that there's

1  been a four time increase in the number of abuse of pain
2  relievers in Americans and, you know, we're talking
3  about an age where you start at 12 years of age.  So to
4  me, that's significant because now all at once we -- we
5  have at least data that shows that younger users and
6  abusers are utilizing, you know, pain relievers.  And as
7  we talked about today and there's various chart that
8  show this and documents that show this, that the use of
9  licit pain relievers, opioids, is something where that
10  is normally the first drug used before movement is
11  toward heroin.
12         MR. JANUSH:  Thank you, Mr. Maenius.  I
13  have no further questions.
14         MR. WAHBY:  Sorry.  Just a few quick
15  questions.
16         THE WITNESS:  Sure, absolutely.
17         MR. WAHBY:  You're a real prizefighter, I
18  tell you.
19         FURTHER EXAMINATION
20  BY MR. WAHBY:
21     Q.  Let me ask you.  In 2009 in all of Tarrant
22  County, how many teenagers lived here, the whole county?
23     A.  I don't have that data readily at hand.
24     Q.  How many live there -- live here now?
25     A.  I don't have that data readily at hand.

1     Q.  So this exhibit that your counsel had you
2  review, that's national information.  That doesn't
3  reflect what's going on in Tarrant County.  Isn't that
4  right?
5     A.  I can't answer that because I just -- I don't
6  have enough data here.
7     Q.  You -- you know that this letter he directed
8  you to at Exhibit 26 does not -- is not referring to
9  900,000 teenagers in Tarrant County, nor is it referring
10  to statistics and drug abuse and the diversion of
11  illicit drugs in Tarrant County in this time.  This is a
12  national perspective provided about the what the DEA is
13  doing nationally.  Isn't that right?
14     A.  That's correct.
15     Q.  Okay.  So one cannot take Exhibit 26 and the
16  letter that was read to you and use that as a precise
17  reflection as to what's happening in Tarrant County, can
18  they?
19     A.  Not a precise issue of what's happening in
20  Tarrant County, but it does show what's happening
21  nationwide and -- and -- so that's what's happening
22  nationwide.
23     Q.  And just because something is happening
24  nationwide, that doesn't necessarily mean that that is
25  indicative of what is happening in this great county of

69 (Pages 270 - 273)

1 Tarrant County.  Isn't that right?

2     A.  That's correct, but Tarrant County is not an

3 outlier as it relates to the rest of the country.  And

4 so we follow various patterns that we see on a national

5 level in all particular areas.  But -- but in taking

6 this statement, it does not indicate specifically those

7 issues that are occurring in Tarrant County.

8     Q.  Let me make it easy for you.

9     A.  Thank you.

10     Q.  These are numbers that you're looking at in

11 Exhibit 26 of macro level provided by the DEA, and as

12 you sit here, you don't have any facts to connect those

13 numbers of Exhibit 26 to what is specifically happening

14 at that time in Tarrant County, correct?

15     A.  That's correct.

16         MR. JANUSH:  Are you done?  Sorry.

17         MR. WAHBY:  No further questions.

18         FURTHER EXAMINATION

19 BY MR. JANUSH:

20     Q.  All right.  So I have to just correct that --

21 that testimony.  I only worked with the preamble

22 paragraph addressing the national statistics; however,

23 the document is a Tarrant County document, isn't it?

24     A.  Yes, it is.

25         MR. WAHBY:  Hold on.

1         MR. JANUSH:  Let me ask --

2         THE WITNESS:  I'm sorry.

3         MR. JANUSH:  Objection, form and

4 objection, Leading.

5     Q.  (BY MR. JANUSH)  Look at the front cover page

6 of this document.  What does it say?

7     A.  Tarrant County Drug Impact Index.

8     Q.  Okay.  2010, correct?

9     A.  Yes.

10     Q.  All right.  And the statement on the front

11 insert at Challenge 636, Roman numeral little i, is like

12 the 2007 earlier document addressing a statement from

13 the Drug Enforcement Administration, Dallas Field

14 Division, right?

15         MR. WAHBY:  I genuinely have no idea

16 where you are.

17         MR. JANUSH:  Little i.

18         MR. WAHBY:  Oh, oh.  The front page.

19         MR. JANUSH:  Challenge 636.

20         MR. WAHBY:  Got it, sorry.

21     Q.  (BY MR. JANUSH)  Do you see at the bottom of

22 the page, it says James L. Capra, Special Agent in

23 Charge, Drug Enforcement Administration, Dallas Field

24 Division.  Do you see that at the bottom?

25     A.  Oh, I see.  Were you asking me?

1     Q.  I am.

2     A.  Yes.  I'm sorry, I thought you were talking to

3 opposing counsel.

4     Q.  All right.  Stick with me.  I know it's

5 getting late, but I only have a couple more questions.

6         And so this page, just this page, is

7 addressing a national perspective?

8     A.  Sure.

9     Q.  Correct?

10     A.  Yes.

11     Q.  However, when you get to the table of

12 contents, everything else that follows concerns Tarrant

13 County and the State of Texas.  True or false?

14     A.  That's correct.

15     Q.  Okay.  So let's flip forward, as an example,

16 to --

17         MR. WAHBY:  That was "objection, form" to

18 the last question.  That's the definition of a leading

19 question.

20     Q.  (BY MR. JANUSH)  Indicator 13, let's go to

21 page 13.  Primary Drug at Time of Adult Admission to

22 DSHS Funded Facilities 2009.  And in the box map key or

23 chart key, you see at the top opioids -- opiates

24 1,159/23%.  Do you see that, 1,159 --

25     A.  Yes, I do.

1     Q.  Is that 1,159 primary drug being opiates at

2 the time of an adult admission to a Department of State

3 Health Services funded facility in 2009?

4     A.  Yes, it is.  That's what it represents, yes.

5     Q.  And so according to this chart, is this

6 23 percent or 1159 primary opioid drug admissions for

7 adults in 2009 relating to the United States or to

8 Tarrant County?

9         MR. WAHBY:  Objection, form and leading.

10     Q.  (BY MR. JANUSH)  Or excuse me.  To the United

11 States or to Texas?

12     A.  Texas.

13     Q.  And when we go back a page to Indicator 12,

14 how many adult admissions to Tarrant County DSHS funded

15 treatment programs existed in year 2000 at the top of

16 that chart?

17     A.  2,224.

18     Q.  And how many in 2001?

19     A.  2,326.

20     Q.  How many in 2002?

21     A.  3,038.

22     Q.  How many in 2003?

23     A.  3,261.

24     Q.  How many in 2004?

25     A.  3,999.

Page 278

1    Q.  How many in 2005?
2    A.  4,608.
3    Q.  How many in 2006?
4    A.  4,374.
5    Q.  How many in 2007?
6    A.  4,565.
7    Q.  And how many in 2008?
8    A.  4,760.
9    Q.  And how many in 2009?
10    A.  4,960.
11    Q.  Okay.  And to be fair, this is just addressing
12  adult admissions to Tarrant County concerning Department
13  of State Health Services funded treatment programs,
14  right?
15    A.  That's correct.
16    Q.  And so this may be encompassing all different
17  reasons -- drug reasons why someone is seeking help at a
18  State funded treatment program, right?
19    A.  That's correct.
20    Q.  But it's Tarrant County data.  True?
21    A.  That's true.  Yes, that's correct.
22        MR. JANUSH:  Okay.  Mr. Maenius, the day
23  has run long, and I'm going to thank you for your time.
24        THE WITNESS:  You're welcome.
25        MR. WAHBY:  No further questions, thank

Page 279

1  you.
2        THE WITNESS:  Thank you.
3        THE VIDEOGRAPHER:  All right.  We're off
4  the record at 7:32 p.m., and that concludes today's
5  testimony.
6        (Proceedings ended at 7:32 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 280

1        REPORTER'S CERTIFICATE
2        The undersigned Certified Shorthand Reporter
3  licensed in the State of Texas does hereby certify:
4        I am authorized to administer oaths or
5  affirmations, and prior to being examined, the witness
6  was duly administered an oath by me.
7        I am not a relative or employee or attorney or
8  counsel of any of the parties, nor am I a relative or
9  employee of such attorney or counsel, nor am I
10  financially interested in the outcome of this action.
11        I am the deposition officer who
12  stenographically recorded the testimony in the foregoing
13  deposition, and the foregoing transcript is a true
14  record of the testimony given by the witness.
15        Before completion of the deposition, review of
16  the transcript [X] was [ ] was not requested.  If
17  requested, any changes made by the deponent (and
18  provided to the reporter) during the period allowed are
19  appended hereto.
20        In witness whereof, I have subscribed my name
21  this 12th day of March, 2024.
22
23        *Julie C. Brandt*
24        Julie C. Brandt, CSR, RMR, CRR
25        TX CSR No. 4018, Exp. 10/31/25

Page 281

1        Veritext Legal Solutions
          1100 Superior Ave
2          Suite 1820
          Cleveland, Ohio 44114
3          Phone: 216-523-1313
4
   March 12, 2024
5
   To: Sadie Turner, Esq.
6
   Case Name: National Prescription Opiate Litigation -
7          Track 9 (Tarrant County)
8  Veritext Reference Number: 6461315
9  Witness:  G.K. Maenius, 30(B)(6)    Deposition Date:  2/29/2024
10
   Dear Sir/Madam:
11
12  Enclosed please find a deposition transcript.  Please have the witness
13  review the transcript and note any changes or corrections on the
14  included errata sheet, indicating the page, line number, change, and
15  the reason for the change.  Have the witness' signature notarized and
16  forward the completed page(s) back to us at the Production address
   shown
17
   above, or email to production-midwest@veritext.com.
18
19  If the errata is not returned within thirty days of your receipt of
20  this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24
25  NO NOTARY REQUIRED IN CA

71 (Pages 278 - 281)

Page 282

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
          ASSIGNMENT REFERENCE NO: 6461315
 3        CASE NAME: National Prescription Opiate Litigation -
              Track 9 (Tarrant County)
          DATE OF DEPOSITION: 2/29/2024
 4        WITNESS' NAME: G.K. Maenius, 30(B)(6)
 5        In accordance with the Rules of Civil
          Procedure, I have read the entire transcript of
 6        my testimony or it has been read to me.
 7        I have made no changes to the testimony
          as transcribed by the court reporter.
 8        _____
 9    Date           G.K. Maenius, 30(B)(6)
10        Sworn to and subscribed before me, a
          Notary Public in and for the State and County,
11    the referenced witness did personally appear
          and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
              Statement; and
14        Their execution of this Statement is of
              their free act and deed.
15
          I have affixed my name and official seal
16
      this _____ day of_____, 20____.
17
                  _____
18            Notary Public
19                _____
          Commission Expiration Date
20
21
22
23
24
25
```

Page 283

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
          ASSIGNMENT REFERENCE NO: 6461315
 3        CASE NAME: National Prescription Opiate Litigation -
              Track 9 (Tarrant County)
          DATE OF DEPOSITION: 2/29/2024
 4        WITNESS' NAME: G.K. Maenius, 30(B)(6)
 5        In accordance with the Rules of Civil
          Procedure, I have read the entire transcript of
 6        my testimony or it has been read to me.
 7        I have listed my changes on the attached
          Errata Sheet, listing page and line numbers as
 8    well as the reason(s) for the change(s).
 9        I request that these changes be entered
          as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
          that both be appended to the transcript of my
12    testimony and be incorporated therein.
13        _____
      Date           G.K. Maenius, 30(B)(6)
14
          Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
          the referenced witness did personally appear
16    and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18            in the appended Errata Sheet;
          They signed the foregoing Sworn
19            Statement; and
          Their execution of this Statement is of
20            their free act and deed.
21        I have affixed my name and official seal
22    this _____ day of_____, 20____.
23        _____
              Notary Public
24
                  _____
25            Commission Expiration Date
```

Page 284

```
 1        ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
 2        ASSIGNMENT NO: 6461315
 3    PAGE/LINE(S) /      CHANGE      /REASON
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19
          _____    _____
20    Date           G.K. Maenius, 30(B)(6)
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23
              _____
              Notary Public
24
              _____
25            Commission Expiration Date
```

72 (Pages 282 - 284)