# EXHIBIT 36

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
    IN RE:  NATIONAL PRESCRIPTION   ) MDL No. 2804
    OPIATE LITIGATION                )
 4                                   )
                                     )
 5  THIS DOCUMENT RELATES TO:        )
    Track Nine: Tarrant County,      ) Case No.: 17-md-2804
 6  Texas                            )
                                     )
 7                                   )
    (Case No. 1: 18-op-45274-DAP)    ) Judge Dan Aaron Polster
 8                                   )
    ----------------------------------------------------------
 9
               ORAL AND VIDEOTAPED DEPOSITION OF
10                      CALVIN C. BOND
                        JULY 7, 2023
11                (REPORTED REMOTELY VIA ZOOM)
    ----------------------------------------------------------
12
13           ORAL AND VIDEOTAPED, VIA ZOOM VIDEOCONFERENCE,
14  DEPOSITION OF CALVIN C. BOND, produced as a witness at
15  the instance of the Defendants and duly sworn, was taken
16  in the above-styled and numbered cause on Friday,
17  July 7, 2023, from 10:02 a.m. to 2:59 p.m., before Kari
18  Behan, CSR, RPR, CRR, a Texas certified machine
19  shorthand reporter, with the witness participating
20  remotely, pursuant to the Federal Rules of Civil
21  Procedure and the provisions stated on the record
22  herein.
23
24
25  Job No. 5946010
```

Page 2

```
 1        A P P E A R A N C E S
 2
   FOR THE PLAINTIFF (REMOTELY):
 3
     ALEX ABSTON, ESQ.
 4      - and -
     SADIE TURNER, ESQ.
 5      - and -
     EVAN M. JANUSH, ESQ.
 6     10940 W. Sam Houston Parkway N.
     Suite 100
 7   Houston, Texas 77064
     (281) 748-7693
 8   alex.abston@lanierlawfirm.com
     sadie.turner@lanierlawfirm.com
 9   evan.janush@lanierlawfirm.com
10
11 FOR THE DEFENDANTS, THE KROGER CO., KROGER LIMITED
   PARTNERSHIP I, KROGER LIMITED PARTNERSHIP II, KROGER
12 TEXAS LP (REMOTELY):
13   GABRIELE WOHL, ESQ.
        - and -
14   ANTHONY "TONY" RYAN, ESQ.
     BOWLES RICE LLP
15   600 Quarrier Street
     Charleston, West Virginia 25301
16   (304) 347-1100
     gwohl@bowlesrice.com
17   anthony.ryan@bowlesrice.com
18
19 FOR THE DEFENDANT, ALBERTSONS (REMOTELY):
20   ALLISON STEWART, ESQ.
     GREENBERG TRAURIG, LLP
21   2200 Ross Avenue
     Suite 5200
22   Dallas, Texas 75201
     (214) 665-3641
23   stewarta@gtlaw.com
24
25
```

Page 3

```
 1 APPEARANCES (CONTINUED):
 2 ALSO PRESENT:
 3   Craig Price, Esq.
        Tarrant County District Attorney's Office
 4
 5 CONCIERGE:
 6   Clint Thomas
 7
   VIDEOGRAPHER:
 8
     David Crenshaw
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          - - -
          I N D E X
 2          - - -
 3 EXAMINATION OF CALVIN C. BOND          PAGE
 4
 5 BY MS. WOHL...................................  8
 6 BY MR. JANUSH.............................147
 7 BY MS. WOHL.............................160
 8 BY MR. JANUSH.............................162
 9 BY MS. WOHL.............................165
10 CHANGES AND SIGNATURE....................169
11 REPORTER'S CERTIFICATION.................171
12          * * *
13        E X H I B I T S
14 EXHIBITS     DESCRIPTION       PAGE
15 Exhibit 1  North Texas HIDTA 2013     58
            Strategy, Texoma_HIDTA_0784
16          through 0804, Highly
            Confidential - Attorneys' Eyes
17          Only
18 Exhibit 2  North Texas HIDTA 2014     64
            Strategy, Texoma_HIDTA_0857
19          through 0875, Highly
            Confidential - Attorneys' Eyes
20          Only
21 Exhibit 3  Texoma HIDTA 2016 Strategy,   67
            Texoma_HIDTA_0152 through
22          0163, Confidential - Subject
            to Protective Order
23
     Exhibit 4  Texoma HIDTA 2016 Threat     70
24          Assessment, Texoma_HIDTA_0254
            through 0305, Confidential -
25          Subject to Protective Order
```

Page 5

```
 1 EXHIBITS (CONTINUED):
 2 Exhibit 5  Texoma HIDTA 2018 Threat     85
            Assessment, Texoma_HIDTA_0347
            through 0386, Confidential -
            Subject to Protective Order
 4
   Exhibit 6  Document entitled "Challenge  94
 5          of Tarrant County, A
            Prescription for Prevention,"
 6          TARRANT_00832587 through
            00832590, Confidential
 7
   Exhibit 7  Combined Narcotics Enforcement  99
 8          Team Workload Measures and
            Projections, TARRANT_00854818
 9          and 00854819, Confidential
10 Exhibit 8  Fort Worth Police Department   103
            Bulletin, Subject: Pharmacy
11          Burglaries - FWPD South
            Division, TARRANT_00850803 and
12          00850804, Confidential
13 Exhibit 9  E-mail, Subject: Re: Narcotics  106
            Complaint - Dark Web,
14          TARRANT_00683964 and 00683965,
            Confidential
15
   Exhibit 10  Analysis of Tarrant County   114
16          Sheriff's Office
            Quarterly/Monthly Intelligence
17          Review in Support of
            Information Requirements for
18          the Dallas Field Division FY
            2019, TARRANT_00814570 through
19          00814574, Confidential
20 Exhibit 11  E-mail, Subject: RE: Inputs   120
            for Appraisals,
21          TARRANT_00683261 through
            00683263, Confidential
22
   Exhibit 12  E-mail, Subject: DAG 71s for  124
23          FW TDS Group, TARRANT_00683183
            and 00683184, Confidential
24
25
```

2 (Pages 2 - 5)

Page 6

1  EXHIBITS (CONTINUED):
2  Exhibit 13  E-mail, Subject: FW: Fentanyl,   129
        TARRANT_00836629 and 00836630,
3        Confidential
4  Exhibit 14  CNET 2018 Activity Report,     136
        TARRANT_00812403
5
   Exhibit 15  Texoma HIDTA 2019 Threat      139
6        Assessment, TARRANT_00829233
        through 00829269, Confidential
7
   Exhibit 16  Info Alert, Counterfeit       143
8        Oxycodone pills containing
        Fentanyl, TARRANT_00850900 and
9        00850901, Confidential
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1                PROCEEDINGS:
2        (Friday, July 7, 2023, 10:02 a.m.)
3        THE VIDEOGRAPHER:  We are on the record.
4  Today's date is July the 7th, 2023.  The time is 10:02.
5  This is the video deposition of Chief Calvin Bond.  This
6  is relative to a case styled In Re: National
7  Prescription Opioid Litigation, Track 9, Tarrant County,
8  Texas.  It's filed in the United States District Court
9  for the Northern District of Ohio, Eastern Division.
10        Counsel, at this time, would you state your
11  appearances for the record, beginning with the taking
12  counsel, and the reporter can then place the witness
13  under oath.
14        MS. WOHL:  Hi, Gabe Wohl from Bowles Rice
15  on behalf of Kroger.
16        MS. STEWART:  This is Allison Stewart for
17  the defendant, Albertsons.
18        MR. JANUSH:  Hi, Evan Janush on behalf of
19  Plaintiff Tarrant County, Lanier Law Firm.
20        MS. ABSTON:  And also Alex Abston on behalf
21  of Lanier Law Firm and the Plaintiff, and we've got
22  Craig Price here as well, from Tarrant County DA's
23  office, and Sadie's on as well.
24        THE COURT REPORTER:  Okay.  Chief Bond,
25  would you please raise your right hand.

Page 8

1        Do you solemnly swear the testimony you're
2  about to give will be the truth, the whole truth, and
3  nothing but the truth, so help you God?
4        THE WITNESS:  I swear.
5        THE COURT REPORTER:  Thank you.  We may
6  proceed.
7              EXAMINATION
8  BY MS. WOHL:
9    Q.  Chief Bond, how are you today?
10   A.  Good morning.  I'm doing good.  How about you?
11   Q.  I'm fine.  Thanks for asking.
12        I want to start off by making sure I'm
13  getting your title right.  Is Chief Bond your preferred
14  -- preferred way to address you?
15   A.  That's fine.  Yes, ma'am.
16   Q.  Perfect, thank you.
17        My name is Gabe Wohl.  I represent Kroger
18  in the opioid litigation.  I'm here in sunny West
19  Virginia at a law firm, and I would like for you to
20  start off by just stating your full name for the record.
21   A.  Calvin C. Bond.
22   Q.  And where do you live, Chief Bond?
23   A.  I live in Argyle, Texas.
24   Q.  And what county is that in?
25   A.  That's in Denton County.

Page 9

1    Q.  How long have you lived in Denton County?
2    A.  Probably eight years.
3    Q.  And how long have you lived in Texas?
4    A.  Probably about 45 years of my life so far back
5  and forth between other locations.
6    Q.  And we'll get into some of the background of
7  where else you've lived in a minute.
8        Is there any reason that you cannot testify
9  truthfully today?
10   A.  No.
11   Q.  Have you ever been deposed or testified in
12  court before?
13   A.  Yes, ma'am.
14   Q.  And, if so, roughly how many times?
15   A.  Just deposed only a few times, probably less
16  than four or five; court, probably 50 -- 50 times at
17  least.
18   Q.  Related to cases you've investigated?
19   A.  Yes, ma'am.
20   Q.  And have you ever been in court testifying or
21  deposed before in connection with prescription drug
22  diversion?
23   A.  Not diversion, no.
24   Q.  What about the opioid crises?
25   A.  The opioids on -- a lot of times, we'd make

3 (Pages 6 - 9)

Page 10

arrests of drug traffickers that would have opioids that we also arrested, so cocaine, heroin, meth, and they would have opioids as well.
Q. Have you ever served as an expert witness?
A. No.
Q. And you've been deposed a couple of times you said. When was the last time you sat for a deposition?
A. It's probably been 20 years ago.
Q. Do you recall any of the -- the general details of the depositions you've had before?
A. One was involving a wrongful arrest, misidentified person, and then others were regarding possibly accidents and things like that. It's been a long time.
Q. Yeah. It's been a while, so I'll go over a couple of the ground rules.
I'll ask you some questions. Your attorney may make objections, and then, typically, you can answer following that unless you're instructed not to. We'll try not to talk over each other. Try to let me finish a question, and I will also try to let you finish an answer. And if we get a little sideways with that, we'll kind of recollect ourselves and try again.
If you don't understand a question that I ask, please let me know. If you need me to repeat

Page 11

something or clarify it, I'll be happy to do so. If not, I'll assume that you understand it, and I'm sure that you've been informed that we're -- we're going to take breaks here. I try to stay on breaks about once an hour. If you need breaks more frequently or if I miss one, you just let me know. But just make sure you answer any pending question before we go on a break. Okay?
A. Yes, ma'am.
Q. Well, let me start out here with, kind of, the main theme of why we're here.
Can you -- give me your understanding of the term "drug diversion."
A. Based on my career, it was when primarily pharmaceutical drugs or any drugs were diverted from a legitimate source and purpose onto what I would call the street for black-market illegal sale.
Q. Now, you said "pharmaceutical drugs." What do you mean by that?
A. Drugs that you would normally receive by a prescription from a doctor, which would be dispensed by a pharmacy.
Q. So are you saying that there -- there is a legal channel for those pharmaceutical drugs, but diversion would be outside of that legal channel?

Page 12

A. That's correct.
Q. Now, give me your understanding of the difference between drugs with a legal channel, you know, pharmaceutical drugs and prescription drugs and illicit drugs.
A. Sure. The illicit drugs that -- that I've dealt with and supervised were investigations targeting methamphetamine, marijuana, cocaine, heroin, MDMA, PCP, things like that, that are illicit drugs.
In a lot of the drugs that we -- investigations that I conducted or supervised were a mixture sometimes of diverted drugs: painkillers, opioids and the meth and heroin and things like that.
Q. And when you say "mixtures," does that mean that both were involved in the investigation or actual chemical mixtures?
A. No, they were -- so we would target, for example, a heroin trafficker, and they would have prescription drugs. When we execute a search warrant or made the arrest, they would have diverted prescription drugs for sale as well.
Q. You're familiar with the term "controlled substances," correct?
A. Yes, ma'am.
Q. And you're familiar with the different

Page 13

schedules of controlled substances, 1 through 4?
A. Yes, ma'am.
Q. And what's -- well, would you agree that prescription opioids are a legitimate medication, in that there's nothing inherently wrong or illegal about prescription medication?
A. As long as it's used under the -- the care and direction of a doctor, yes, ma'am.
Q. Again, along those lines, you would agree that prescription opioids can be legally prescribed?
A. Yes.
MR. JANUSH: Objection.
BY MS. WOHL:
Q. Sorry. What was your answer?
MR. JANUSH: Form.
BY MS. WOHL:
Q. I missed your answer on that, Chief Bond.
A. Okay. Yes, that's correct.
Q. Thank you.
And do you agree that prescription opioids have been approved by the FDA?
A. Yes.
Q. And that pre- -- do you agree that prescribers -- or professionals who are able to prescribe prescription opioids are licensed by the State

Page 14

1 of Texas and by the DEA?
2     A.  That's correct.
3     Q.  Are you aware that DEA sets annual quotas for
4 the manufacture of opioids, chemical precursors, based,
5 in part, on estimated medical need?
6     A.  I'm not too familiar with that.  My career was
7 focused on enforcement of illicit drugs.  So I'm aware
8 that DEA diversion was involved in that, but I don't
9 know the specifics of that.
10     Q.  Chief Bond, how did you prepare for this
11 deposition today?
12     A.  I really -- I've met with the team a few times.
13 They gave me prep on how the deposition would go, and
14 they asked about my background.
15         MR. JANUSH:  Just -- just you can't get
16 into any questions or answers that we asked of you.  You
17 can just say that you met with us, and you can address
18 it very broadly so we that we protect attorney-client
19 privilege.
20 BY MS. WOHL:
21     Q.  Yes.  So let me ask you some follow-up
22 questions that, you know, are not designed to elicit
23 anything that you talked about with your attorneys.
24         But you said you met with the team.  Does
25 that include the two attorneys who are in the room with

Page 15

1 you today?
2     A.  Yes.  This is the first time I've physically
3 met with -- with Alex, but on the video, yes.
4     Q.  Okay.  How many times by video or in person
5 would you say you met with the attorneys?
6     A.  I think I've met via video at least twice and
7 then today in person.
8     Q.  Can you give me an estimate about how long
9 these meetings were?
10     A.  I believe each of the videoconferences was an
11 hour or less each time.
12     Q.  Great.
13         And did you review any documents in
14 preparation for this deposition?
15     A.  I have not.
16     Q.  And have you spoken to anyone other than the
17 attorneys that you mentioned about this deposition?
18     A.  I have not.
19     Q.  Have you reviewed Tarrant County's complaint in
20 this case?
21     A.  Actually, I have not.
22     Q.  Have you reviewed any deposition transcripts
23 that have taken place in this case?
24     A.  I have not.
25     Q.  Are you familiar with the defendants in this

Page 16

1 case?
2     A.  I believe it's Kroger and CVS.
3     Q.  We'll ask you Kroger and Albertsons.  Are you
4 -- do you have prior experience with either Kroger or
5 Albertsons?
6         MR. JANUSH:  Objection, vague.
7         Do you understand the question?  You can
8 answer the question if you understand what "prior
9 experience" means and is referring to.
10         THE WITNESS:  My only experience with
11 either of those is shopping in their grocery stores.
12 BY MS. WOHL:
13     Q.  Are you aware that they, in addition to having
14 grocery stores, operate some pharmacies?
15     A.  I'm aware of that, yes.
16     Q.  Do you have any general idea of why Kroger and
17 Albertsons are being sued by Tarrant County in the
18 opioid litigation?
19     A.  Yes, I believe for the distribution of -- of
20 opioids to their pharmacies and the lack of quality
21 control or oversight on the distribution of the drugs
22 they received.
23     Q.  Are you personally aware of any misconduct by
24 either Kroger or Albertsons in Tarrant County related to
25 prescription opioids?

Page 17

1     A.  I am not.
2     Q.  Where are you testifying from today?
3     A.  Yes, ma'am.  We're testifying from the 7th
4 floor of our main office building in Downtown
5 Fort Worth, 200 Taylor Street.
6     Q.  And do you have any documents or notes or
7 anything else with you?
8     A.  I do not.
9     Q.  Other than the exhibits I sent, I assume?
10     A.  Yes, and I haven't opened it yet.  I don't know
11 what's in here.
12     Q.  Great.  Thank you.
13         Let's go over some of your background.  Can
14 you give me a -- a background of your education?
15     A.  Yes, ma'am.  I went to high school in Hawaii;
16 attended the Air Force Academy in Colorado Springs; and
17 then I have a master's degree from the University of
18 Texas in Arlington here.
19     Q.  Any other degrees or any professional
20 certifications?
21     A.  I've got a lot of training in law enforcement,
22 a lot of training in drug interdiction, conducting
23 conspiracy investigations, money laundering, that type
24 of stuff.
25     Q.  Any accounting background with the

5 (Pages 14 - 17)

Page 18

1 money-laundering stuff?
2     A.  No accounting background, just techniques and
3 procedures for money laundering.
4     Q.  How are you currently employed?
5     A.  Yes, ma'am.  I work as a chief deputy for the
6 Tarrant County Sheriff's Office.
7     Q.  And is the current sheriff of Tarrant County
8 Bill Waybourn?
9     A.  Yes, ma'am.
10     Q.  Do you report -- is he your direct report?
11     A.  He is.
12     Q.  How long have you been in the chief deputy
13 role?
14     A.  In this -- I'm the senior chief deputy now.
15 I've been in this role one year.  I was the chief deputy
16 over criminal investigations, warrant team of
17 trafficking and narcotics for the year prior to that.
18     Q.  Describe your responsibilities in your current
19 position.
20     A.  Yes, ma'am.  I'm in -- I'm basically
21 responsible for the day-to-day operations of the entire
22 agency.
23     Q.  And do any of your responsibilities include
24 finance or budget oversight?
25     A.  Yes.

Page 19

1     Q.  And can you describe some of those
2 responsibilities?  What you do with the budget?
3     A.  Yes, ma'am.  Our practice here is that each of
4 the chiefs prepare an annual budget, a recommended
5 budget, for each of the divisions that they oversee.
6 And then the sheriff and I and our chief of staff review
7 those documents, make decisions, and then work with the
8 county -- Tarrant County budget and the administrator's
9 office on going forward with a recommendation for
10 funding.
11     Q.  Do you know about what the -- the total --
12 adding up the division budgets, what the total operating
13 budget of the sheriff's department is?
14     A.  It's approximately $170 million for the entire
15 agency.
16     Q.  Do you have any knowledge of what the County's
17 operating budget is?
18     A.  I don't know that.
19     Q.  How many officers does the sheriff's department
20 have?
21     A.  We were -- we have about 1500 right now.
22     Q.  And you mentioned different divisions.  How
23 many divisions does the department have?
24     A.  We have quite a few.  So we're responsible for
25 all the jails.  We have five jails in Tarrant County.

Page 20

1 We have criminal investigations, warrants, patrol,
2 crime-scene investigations, human trafficking,
3 narcotics, auto-theft task force.  Those are the main
4 ones.
5     Q.  And do you know the number of how many
6 divisions you have total?
7     A.  I don't off the top of my head, no.
8     Q.  And which divisions are responsible for
9 drug-trafficking investigations?
10     A.  We have a narcotics unit; it's called the
11 Combined Narcotics Enforcement Team.  And they have
12 primary responsibility -- our patrol officers, you know,
13 when they pull somebody over, find drugs oftentimes, and
14 they'll coordinate with our CNET unit to further the
15 investigations on that.
16     Q.  While you have held your current position, has
17 anyone ever reported to you that the sheriff's
18 department has assessed prescription opioid drugs as a
19 threat within Tarrant County?
20     A.  Can you repeat that?  You broke up on the --
21 the first few words.
22     Q.  Sure.
23         While you have held your current position,
24 has anyone reported to you that the sheriff's department
25 has assessed prescription opioid drugs as a threat

Page 21

1 within Tarrant County?
2     A.  Very mu-- -- yes.  Yes.
3     Q.  And can you describe when and the -- the basis
4 for those reports?
5     A.  Right.  Well, all those reports are from me
6 based on my experience on the street.  Before I became
7 the chief deputy, I ran the CNET unit, the narcotics
8 unit, and prior to that was with DEA.  And we've -- you
9 know, prescription drugs here have been a threat since
10 I've been here since 1990 in this area.
11     Q.  I want to work backwards a little bit.  You've
12 mentioned some of your prior positions.
13         So right before you were chief deputy, what
14 was your position -- you were senior chief deputy prior
15 to that?
16     A.  Prior to that, I was the chief deputy over
17 criminal investigations and warrants, and then prior to
18 that, I was the commander of the CNET unit and narcotics
19 unit.
20     Q.  Okay.  And what period of time were you
21 commander for the narcotics unit?
22     A.  From January of 2017 until about two years ago,
23 two-and-a-half years ago.
24     Q.  What were your responsibilities when you were
25 commander of the narcotics unit?

6 (Pages 18 - 21)

Page 22

1    A. To lead our unit and work with other agencies
2 in this area -- local, state, and federal -- to target
3 drug traffickers that affect Tarrant County and try to
4 take the organizations down and put them in the jail.
5    Q. When you were commander of the unit, how many
6 officers were a part of the narcotics unit?
7    A. It varied from about 8 to 10 to as high as 15
8 to 17, probably.
9    Q. And has that number stayed the same or changed?
10       THE WITNESS: Can I do a timeline on this,
11 ask a question?
12       MS. ABSTON: You're going to need to answer
13 -- just you can answer to the best of your ability.
14       THE WITNESS: Okay.
15       Yeah, I'm -- I'm a little concerned about
16 putting out the number of narcotics officers that we
17 currently have assigned to our unit.
18 BY MS. WOHL:
19    Q. I understand.
20       Prior to --
21       MS. ABSTON: Gabe, I don't mean to
22 interrupt you, but can we --
23       MR. JANUSH: Yeah, I'll -- I'll handle
24 this.
25       Yeah. We're -- we're going to just go off

Page 23

1 the record -- off the video record and off the -- the
2 transcription record just to address with Chief Bond
3 parameters in terms of learn -- and discuss privately
4 whether there's a concern that should be maintained
5 confidential. That's all.
6       THE VIDEOGRAPHER: Everybody stand by.
7 We're going off the record at -- we're
8 going off the record at 10:21.
9       (Brief recess taken.)
10      THE VIDEOGRAPHER: We're back on the record
11 at 10:30.
12 BY MS. WOHL:
13    Q. Chief Bond, when you were commander of the
14 narcotics unit, you mentioned a varying number of
15 officers who were dedicated who were part of that
16 division. Of those, were any specifically dedicated to
17 addressing opioids?
18    A. Each officer investigated what we could, you
19 know, find, generate through informants, or arrests. So
20 opioids were one of many of the drug types that we
21 investigated.
22    Q. But nobody was specifically dedicated to a
23 single drug or class of drugs?
24    A. No. Every -- every investigator was required
25 to and trained to investigate every drug type.

Page 24

1    Q. So before you were a commander of the narcotics
2 unit, give me the position you held before that.
3    A. Immediately before, I was hired by Tarrant
4 County. I served as the assistant special agent in
5 charge of DEA that handled Fort Worth, Lubbock,
6 Amarillo, pretty much West Texas.
7    Q. How long were you with the DEA?
8    A. Twenty-seven years total.
9    Q. And did you have different roles during that
10 period with the DEA?
11    A. Yes, ma'am.
12    Q. Can you go through and, beginning with your --
13 your first role there, tell me what the roles were and
14 when you had them?
15    A. Yes, ma'am. In 1990 I was hired by DEA, and I
16 was assigned to the Dallas Field Division. So I was a,
17 what we call, street agent, special agent on the street,
18 and I investigated all direct classes or types, but
19 focused a lot on methamphetamine, and I worked primarily
20 Dallas County, Tarrant County, the DFW area, and
21 sometimes we would go outside of the DFW area, wherever
22 the investigations led us.
23    Q. How long did you serve as a street agent?
24    A. I served in Dallas for six years, and then I
25 was transferred to Lubbock where I served another eight

Page 25

1 or nine years as a street agent in West Texas.
2    Q. So then we're in, you know, 2003-2004.
3       Was that your next role?
4    A. Yes, ma'am. In 2004 I was promoted to group
5 supervisor and transferred back to the Dallas/Fort Worth
6 area as a group supervisor.
7    Q. What was your role as group supervisor?
8    A. So I led several different enforcement groups.
9 During that time, I led a -- what we called a mobile
10 enforcement team that would go all throughout Texas and
11 Oklahoma at the request of local agencies with
12 significant drug issues that they couldn't handle.
13       I was also a group supervisor for the
14 Dallas/Fort Worth airport task force where we focused on
15 interdiction and other cases. And then, about 2008, I
16 recommended to DEA that we change -- we transform that
17 interdiction group to a Heroin Task Force. So that was
18 my third group that I was involved with.
19    Q. When you mentioned you would assist with
20 significant drug issues that -- that they couldn't
21 handle, who did you mean by "they"?
22    A. A lot of times, a very small police department
23 -- or small- to mid-size police departments or sheriffs'
24 departments that didn't have a dedicated narcotics unit
25 that were overwhelmed with drugs and violence normally

7 (Pages 22 - 25)

Page 26

1 would make a formal request to DEA and ask for
2 assistance.  And then I would take a group and deploy a
3 group into that area for 30 days up to, you know, nine
4 months sometimes to do surveillance, make arrests, and
5 then take down organizations.
6     Q.  And then when you recommended that -- the
7 Heroin Task Force be formed, what was the -- the
8 reasoning behind that recommendation?
9     A.  We -- DEA in the North Texas area, like almost
10 all of the areas of the -- of the U.S., was being
11 overwhelmed with prescription drug overdose deaths and
12 heroin deaths, and so a lot of our groups that were not
13 normally working those types of cases were being tasked.
14 And I made a recommendation to my special agent in
15 charge, who recommended to DEA headquarters that we
16 transform the interdiction group, move it back into the
17 field division, and target prescription drug overdose
18 and heroin investigations.  Is that -- and that's what
19 we did.
20     Q.  So was it called the Heroin Task Force?
21     A.  Yes, ma'am.
22     Q.  And the Heroin Task Force targeted both heroin
23 and prescription drugs?
24     A.  Yes, ma'am.  A lot of times, it would start
25 with a pre- -- prescription drug on-the-street

Page 27

1 investigation where a lot of times we would arrest
2 people that were using -- buying oxycodone and -- and
3 hydrocodone and -- and other drugs on the street.  And
4 so we would start with those people a lot of times, and
5 that would lead us into a heroin investigation as well.
6         What we found a lot was, some of the people
7 I personally arrested and debriefed, the teams that I
8 led, we would interview people that either had a serious
9 injury or became addicted to prescription drugs, and
10 their doctor -- the prescribing -- original prescribing
11 doctor would eventually cut them off, and they would
12 then look for other doctors that would continue to
13 prescribe the painkillers for them.
14         Then -- then they would get cut off from
15 that, and then they would go to the street to buy the
16 oxy and everything on the street.  And that became very
17 expensive for them, and unfortunately, then they would
18 trans- -- transition to using heroin.  So we would -- we
19 would -- we would see this quite often, unfortunately.
20     Q.  When you did those investigations and, kind of,
21 confronted with those facts, was there an effort
22 undertaken, typically, to, kind of, trace back the
23 original prescriptions and the -- the original
24 prescribers?
25     A.  Sometimes there was.  I wasn't involved with

Page 28

1 that, because I would pass that to DEA diversion.  But a
2 lot of the people that we were interacting with at that
3 time were buying the prescription drugs on the street
4 already.
5         So sometimes we were able to figure out
6 which doctors they had used, and I would pass that to
7 DEA diversion.  A lot of times, our focus would be on
8 who's providing the -- like, the oxy on the street and
9 then the heroin dealer as well, if that answers your
10 question.
11     Q.  Yeah, I think so.
12         The Combined Narcotics Enforcement
13 Unit [sic] -- I think you referenced that as CNET -- is
14 that the narcotics enforcement unit of which you were a
15 commander?  Is that the same thing?
16     A.  Yes, ma'am.  It's Combined Narcotics
17 Enforcement Team, CNET.
18     Q.  And what are CNET's objectives?
19         MR. JANUSH:  Objection.
20 BY MS. WOHL:
21     Q.  You can answer.
22     A.  Okay.  So when I was hired, I shared my vision
23 with the sheriff to -- to transform the unit or make
24 sure the unit was targeting drug-trafficking
25 organizations that were operating in Tarrant County, and

Page 29

1 our -- and our goal would be to take those down and --
2 and working with local, state, and federal agencies.
3         So we would -- we would -- I would
4 encourage our investigators to concentrate on the
5 highest level of traffickers that we could make
6 purchases from, conduct surveillance on and make --
7 provide successful prosecution.  And so that's what we
8 did with all drug types.
9     Q.  And are you still working with CNET?
10     A.  In my role I supervise CNET right now.  So
11 their commander reports to me.
12     Q.  And just some obvious questions.
13         Is it fair to say that you're not a doctor?
14     A.  I'm not a doctor.
15     Q.  And you're not a pharmacist?
16     A.  No, ma'am.
17     Q.  What about an addiction specialist?
18     A.  I am not.
19     Q.  Or an epidemiologist?
20     A.  I'm not.
21     Q.  In your law enforcement history -- well, let me
22 go back.
23         So prior to the DEA, can you just give me a
24 rundown of what your career was before 1990?
25     A.  Yes, ma'am.  After I graduated the Air Force

8 (Pages 26 - 29)

Page 30

1 Academy, I served as a security police officer in the
2 U.S. and overseas, and then I did that until I joined
3 DEA.
4     Q.  So how much of your law enforcement career has
5 been focused in Tarrant County specifically?
6     A.  Probably the majority of it.  All the time I
7 was assigned in the Dallas/Fort Worth area, I focused on
8 Dallas and Tarrant County, and they overlap greatly.
9         So a lot of times we would target a drug
10 trafficker/heroin trafficker that maybe we were doing
11 surveillance on, making a buy in Dallas, and we would
12 wait while the source went to Tarrant County, paying the
13 drugs wherever the drug trafficker was, and then bring
14 it back.  And we would see the opposite as well.
15        So if we targeted a Tarrant County
16 organization, sometimes we would have to wait for them
17 to go retrieve the drugs from their source in Dallas and
18 bring it back.  So most of my career has been in the
19 Dallas/Fort Worth area, which is Tarrant County.
20     Q.  Even when you weren't specifically in that
21 area, your investigations overlapped with that area?
22     A.  All the time, yes, ma'am.
23     Q.  Understood.
24        Let's talk about substance abuse generally,
25 not specific to opioids.  How long has substance abuse

Page 31

1 been a problem in Tarrant County?
2     A.  Based on my -- my experience, I was assigned
3 here in 1990, and it was a problem at that time.
4     Q.  Starting with around 1990, can you give me,
5 kind of, a timeline of what were, you know, the -- the
6 trends of the biggest substance abuse problems in
7 Tarrant County?
8     A.  Sure.  Methamphetamine has been probably the
9 dominant illegal drug in this area for as long as I know
10 and before I got here as well.  And then we had the
11 prescription drugs linked to heroin, would probably be
12 the number two threat that I -- I spent a lot of my
13 career on.
14        And it was a -- you know, an interesting
15 dynamic going from, you know -- and this is literally
16 arresting, you know, a soccer mom or a coach or an
17 athlete that had an injury and watching the transition
18 from pills, you know, legally prescribed to begin with
19 and then on the street when they became too expensive,
20 then heroin.  So a lot of our heroin investigations had
21 the opioid, the pill component as well with it.
22        So the meth, the heroin/opioids, and the
23 cocaine and marijuana I would -- I would put down as the
24 next tier.  All -- unfortunately, all of those drugs are
25 available in this area and have been since I've been

Page 32

1 here.
2     Q.  And when you say -- when you describe the
3 transition to legal prescription opioids to purchasing
4 pills on the street to heroin, when you start out with
5 that, is it -- is it your understanding that the -- the
6 -- the beginning of that was legal prescriptions for
7 opioids due to an industry -- or an injury?
8     A.  Yes.  And that's based on me actually inter- --
9 arresting and interviewing people or the group that I
10 was doing, based on interviews and their admissions or
11 surveillance that we knew.  So it was either they were
12 injured, you know, surgery, a lingering injury, or
13 somehow they became addicted to the pain pills to begin
14 with.
15        And those were, kind of, the two classes of
16 people that we would see on the street buying, you know,
17 oxy and other things.  And then a lot of them,
18 unfortunately, would make that transition to heroin
19 because it was cheaper than buying the pills on the
20 street.
21     Q.  In your law enforcement career, focusing on
22 Tarrant County, have you seen a change in first-time
23 users of heroin/opioids?
24     A.  Can you -- can you re- -- can you rephrase that
25 one for me?

Page 33

1     Q.  Yeah.  I'm -- I'm wondering if you've seen a
2 change or a transition or a trend from 1990s on in
3 first-time users, in people who are picking up illegal
4 substances for the first time.  Has that -- has the
5 characteristics or the demographic of -- of those people
6 changed?
7     A.  It has somewhat.  In the '90s and early 2000s,
8 we were still dealing with either the -- you know, that
9 had prescription -- that had a prescription because of a
10 real injury, or they became -- getting off pills going
11 to heroin.
12        Now we see, unfortunately, a lot of people
13 that go immediately to the opioid-based pills to get,
14 you know, depressed, get high, and go that way.  So
15 there -- it is a little bit different; it is.
16        Does that answer your question?
17     Q.  Yeah, it does.
18        I'm curious about the people who -- who
19 nowadays are going to -- immediately to the opioid
20 pills.  Would you say that's, kind of, a street-level
21 transaction at this point for first-time users?
22        MR. JANUSH:  Objection to -- you know, no
23 foundation has been established with respect to this
24 witness's knowledge regarding first-time users.
25        To the extent, Senior Chief Bond, you can

9 (Pages 30 - 33)

Page 34

1 answer the question regarding -- in this very
2 generalized fashion regarding first-time users, you may
3 answer, but my objection stands on the record.
4        THE WITNESS:  Yes, sir.
5        I and the people that I -- I've led over my
6 career, a lot times, we're not dealing with first-time
7 users.  These people had already established.  And so
8 it's fairly rare.  I do -- I'm aware of some first-time
9 users that have died because of an overdose, you know,
10 and don't understand the strength of the opioid that
11 they were using.  And I hear that from the families.
12 And they -- you know, whether it's true or not -- you
13 know: My son or daughter, this is the first time they
14 experimented with that or not -- I don't know that.
15 BY MS. WOHL:
16   Q.  Okay.  I'm -- I'm going to move on to some, you
17 know -- you understanding of basic criminal activity.
18        If a citizen of Tarrant County has a
19 prescription opioid medication that they were
20 legitimately prescribed, is it a crime to sell those
21 pills to somebody else?
22   A.  Yes, it is.
23   Q.  If a citizen of Tarrant County has a
24 prescription opioid medication that they were
25 legitimately prescribed, is it a crime for that patient

Page 35

1 to give the pills away?
2        MR. JANUSH:  Objection to the terminology
3 "legitimately prescribed."  What does that mean?
4        MS. STEWART:  Evan, I'm going to interject
5 here.  It's my understanding from the deposition
6 protocol that speaking objections aren't allowed, and so
7 far, that's all there has been.
8        MR. JANUSH:  Well, I object -- I object --
9 I object to the form of the question and to the
10 utilization of terms that you're not providing a
11 definition to this witness to answer.
12        MS. WOHL:  Yeah, Allison's right.  I will
13 object to your continued coaching of the witness.
14 BY MS. WOHL:
15   Q.  Chief Bond, if you can answer my question,
16 please do.
17   A.  All right.  Can -- can you rephrase it for me?
18   Q.  Yeah.
19        If the citizen of Tarrant County has a
20 prescription opioid medication that they were
21 legitimately prescribed, is it a crime to give those
22 pills away?
23   A.  I believe that it is, and a lot of our
24 investigations have started based on, you know, a search
25 warrant where we find those medication bottles that are

Page 36

1 not in the person's name that lives there that's using
2 them, and we start that way.
3   Q.  And that's how a lot of investigations begin?
4   A.  That's how some of them begin, is we'll -- you
5 know, we'd find those pill bottles or the prescriptions,
6 and it's not the person that's living there.
7   Q.  Is it a crime to steal opioid prescription
8 pills from somebody else?
9   A.  I would assume that it is.  I'm not so sure
10 about -- that I understand the exact scenario.
11   Q.  Yeah.  I'm, kind of, covering, you know, more
12 broadly the theft than the -- you know, the previous two
13 questions.
14        But if somebody has a legitimately
15 prescribed opioid medication, is it a crime for somebody
16 to steal that medication?
17   A.  Yes.  Yes, ma'am.
18   Q.  And that would be theft as well as a drug
19 crime, right?
20   A.  Yes, ma'am.
21   Q.  And is it a crime to obtain an opioid
22 prescription medication from a doctor for the purpose of
23 selling it or giving it away?
24   A.  Yes, ma'am.
25   Q.  And that would be -- that would fall under your

Page 37

1 definition of diversion that we talked about earlier,
2 right?
3   A.  Yes, ma'am.
4   Q.  Is it a crime to forge a prescription for
5 controlled substances, like opioid pills?
6   A.  Yes, ma'am.
7   Q.  And is it a crime to present a forged
8 prescription to a pharmacist to be filled?
9   A.  Yes, ma'am.
10   Q.  You agree that -- with me that the federal
11 government licenses companies to manufacture
12 prescription controlled substances, such as opioid
13 medications?
14   A.  Yeah, I can only speak for DEA's part of that,
15 but, yes, as long -- for -- for DEA, yes, ma'am.
16   Q.  And you understand that the federal government
17 licenses companies to then distribute those medications;
18 is that correct?
19   A.  Yes, ma'am.
20   Q.  And you understand that the government licenses
21 entities to dispense, primarily through pharmacies,
22 those prescription medications, correct?
23   A.  Yes, ma'am.
24   Q.  And would you agree with me that it is not a
25 crime for a prescription opioid to pass from the

10 (Pages 34 - 37)

Page 38

1 manufacturer to a distributor and then that distributor
2 to pass it on to a pharmacy?
3            MR. JANUSH:  Objection.
4 BY MS. WOHL:
5    Q.  Sorry.  I missed your answer.
6    A.  I don't think that's -- yes.
7    Q.  You agree that it is not a crime?
8            MR. JANUSH:  Objection.
9            THE WITNESS:  It's not a crime.
10 BY MS. WOHL:
11    Q.  Okay.  And you agree with me that it is not a
12 crime when a pharmacy dispenses the prescription
13 medicine pursuant to a prescription from a licensed
14 medical professional?
15    A.  Yes, ma'am.  That's correct.
16    Q.  So we talked about diversion a little earlier,
17 and I think your -- your definition was, you know,
18 taking us taking something out of a legitimate channel.
19        Is that a -- a good paraphrasing of that
20 definition?
21    A.  Yes, ma'am, diverting it from -- from the
22 legal, you know, process and -- and the intended use of
23 -- of the prescription.
24    Q.  And we walked through the cycle of legal opioid
25 manufacture, distribution, dispensing.

Page 39

1        Would you agree that diversion happens when
2 opioid medication diverts from that cycle that we just
3 walked through?
4    A.  Yes, ma'am.
5    Q.  And in your experience, have you ever learned
6 of or investigated any such diversion within the supply
7 chain from a manufacturer to a distributor to a
8 pharmacy?
9            MR. JANUSH:  Objection.
10            THE WITNESS:  I have not personally been
11 involved in that.  My -- my investigative experience is
12 based on, you know, a doctor and a pharmacy that are
13 diverting illegally, if that answers your question.
14 BY MS. WOHL:
15    Q.  I think so.
16        Let me clarify this.  Have you ever been
17 involved in investigation into a diversion that happens
18 after the opioid pills have been distributed but before
19 they've been dispensed by a pharmacy, like a burglary of
20 a pharmacy?
21    A.  I have not been involved with a burglary of a
22 pharmacy; I've been involved in investigations where,
23 you know, we've actually -- my units and myself have
24 followed people that have been picked up in a homeless
25 shelter and taken to a specific doctor, paid money to go

Page 40

1 to this doctor with a, quote/unquote, ailment, have the
2 doctor provide a prescription.  People get back in the
3 van and go to a specific pharmacy and stand in line at
4 that pharmacy to get the prescription, give the
5 prescriptions back to the person that's driving the van
6 and get paid.  So I've seen that cycle in the
7 Dallas/Fort Worth, Dallas and Tarrant County area.
8    Q.  And when you're talking about those kinds of
9 investigations, which pharmacies are involved in that?
10    A.  I believe they're independent pharmacies, but I
11 don't remember the exact names.
12    Q.  Do you remember if either Kroger or Albertsons
13 was involved in any of those?
14    A.  I -- I don't remember.
15    Q.  Is it possible that they were?
16    A.  It is possible, because we would pass that --
17 you know, the name of the doctor and the pharmacy to DEA
18 diversion, and -- and they would take over from there.
19 So we were doing more of the surveillance and -- and
20 documenting what's going on.
21    Q.  So if there were, would you expect that there
22 would be a DEA investigation into those pharmacies?
23    A.  I would think so, yes, ma'am, but I'm not sure
24 of that.
25    Q.  And you testified that you have never been

Page 41

1 involved in investigation of a burglary of a pharmacy.
2        Have you ever heard of or been made aware
3 of any of those burglaries in Tarrant County?
4    A.  I have.  They're not too common, but I'm aware
5 that they happen sometimes, yes, ma'am.
6    Q.  Have you ever been made aware of or heard of a
7 burglary of a Kroger or a Albertsons pharmacy?
8    A.  I'm not aware of that; I don't recall that.
9    Q.  And if a pharmacy lawfully dispenses opioid
10 medication to a patient and then that patient sells it
11 or it's stolen from that patient, you would agree that
12 that is diversion, correct?
13    A.  Yes, ma'am.
14    Q.  And in that scenario, has the pharmacy
15 committed any crime?
16    A.  I don't think the pharmacy has if they, you
17 know, received a legitimate prescription from a doctor,
18 and then the pharmacy IDs the patient and provides that,
19 you know, to that patient.
20        Is that answering your question?
21    Q.  Yes.  Thank you.
22        Does the sheriff's department investigate
23 criminal dispensing?
24    A.  Can you say that again?  You broke up on the
25 last few words there.

11 (Pages 38 - 41)

Page 42

Q. Yeah.
Does the sheriff's department investigate criminal dispensing, like when an opioid medication leaves the pharmacy and is put into the hands of a patient?
A. No, ma'am. We pass that on to DEA diversion or --
Q. And --
A. I'm sorry.
-- or Texas DPS sometimes.
Q. DEA diversion. And what was the other entity?
A. Texas Department of Public Safety. They have a diversion program as well.
Q. When would you pass information on to the DEA versus Texas DPS?
A. Sometimes it's based on caseload. So having been with DEA, I have contacts that I would, you know, pass that information to them, and they may say, you know: We are overwhelmed. Is there anywhere else? Or they, in turn, may pass it. I may give it to them, or we may give it to them, and they may pass it to DPS.
Q. Is there any records of these criminal dispensing investigations or information that you've passed on to DEA or Texas DPS?
A. I am not -- I'm not sure of that. I know that

Page 43

I've personally made the phone call to pass on. I don't remember the -- you know, the defendant's name or anything, but we would pass it on. And I don't think we prepared any paperwork, because we knew we were immediately going to just call DEA and give that to them.
Q. So the extent of passing on this information would be a phone call to your contacts at DEA or DPS?
A. Yes, ma'am.
Q. And have you ever passed on information about criminal dispensing related to Kroger or Albertsons?
A. I don't remember that. It's been a long time, so I'm not sure.
Q. What's, kind of, the range of years where you would have been doing these referrals to DEA and DPS?
A. When I was D- -- with DEA, my -- my pass-off would be to DEA diversion, so that started in 1990. And then once I came on with the sheriff's office, it would have been passed to -- to DEA tactical diversion squad normally, and that would be starting in 2017.
I don't recall a whole lot of that happening. I know we were asked by DEA, Fort Worth, to conduct surveillance on -- on some of these issues as well. So...
Q. And surveillance of a pharmacy?

Page 44

A. Yes, ma'am.
Q. Which pharmacies would you have conducted surveillance on?
A. I don't remember. They were in the downtown -- they were in the Fort Worth proper area, and I remember just a few of them, because it reminded me of the ones that, in my career, were at 4:00 or 5:00 in the morning, there would be 30 people lined up waiting in the parking lot with an armed guard at the back door of the pharmacy, that type of thing.
Q. Were these mostly independent pharmacies or chain pharmacies?
A. I believe they were mostly independent pharmacies, yes, ma'am.
Q. Do you remember any specific criminal investigations of dispensers in Tarrant County, like any specific instances of these pharmacies that either you assisted in investigation or passed on?
A. You would have to ask DEA on that, because I -- I don't remember any of those. I know that we assisted them with surveillance, like I said, but I don't remember the names.
Q. Have you ever testified in court in prosecutions that were related to criminal dispensing?
A. I'm not 100 percent sure on that. I may have

Page 45

testified regarding, perhaps, heroin trafficking where I've relayed the information to you earlier this morning about how the investigation may have started, like people buying the -- the opioids on the street, but I don't recall that exactly. But that may have happened.
Q. So I -- I think your testimony is that, when you suspected criminal dispensing, a lot of times you would refer -- make referrals to the DEA or DPS, and I know you're not -- you don't recollect every pharmacy that was the subject of those referrals.
But is it -- is it fair to say that you have never investigated one of Kroger's or Albertsons' pharmacies in Tarrant County for improper dispensing?
A. That's correct; I've never done that.
Q. Okay. What about doctors and prescribers? Have you investigated doctors or other prescribers who were prescribing opioids illegitimately?
A. I personally did not. I have directed investigators that have worked -- that I'm responsible for to go into doctors' offices in an undercover capacity for doctors that were prescribing illegally.
Q. And how often were you aware of these types of investigations?
A. These investigations were fairly common, but it was rare that I -- my group would be asked to assist on

Page 46

1 that. Diversion was doing a lot of that. Sometimes
2 diversion would ask for me to provide undercover
3 officers to go into a doctor's office to do this.
4    Q. Have you ever been made aware of an
5 investigation or been part of an investigation where you
6 sent undercover officers to pharmacies?
7    A. I don't recall that, no.
8    Q. Have you ever worked with pharmacies in
9 cooperation with investigations into prescribers?
10    A. I have not personally, no.
11    Q. Have any pharmacies, to your knowledge, ever
12 reached out to you or your division to report suspicions
13 of diversion?
14    A. Yes. And if I ever received those, I would
15 refer them to diversion, but, yes, I'm involved in a few
16 of those. I don't know it turned out; I just, you know,
17 made the contact for them.
18    Q. Do you recall if any of Kroger or Albertsons'
19 pharmacies have ever reached out with that information?
20    A. I don't recall that, no, ma'am.
21    Q. Do you have experience with pill mills?
22    A. Yes, ma'am.
23    Q. Can you explain your experience with pill
24 mills?
25    A. Can you be more specific on that, exactly what

Page 47

1 you're talking about with regards to pill mills?
2 Because it means many different things to me.
3    Q. All right. Let's start out with the meaning.
4 What is a pill mill?
5    A. We would use that as a -- a pharmacy that's --
6 that's illegally diverting, and the story I shared about
7 watching the -- the van of homeless people, you know,
8 being taken to a pharmacy like that, where they would
9 get back in the van and then provide the driver of the
10 van with all the pills that they had just received from
11 the -- from the pharmacist and get paid for the
12 services. So that was common for us like that.
13    Q. And am I right that this is included in your
14 estimation that most of these were independent
15 pharmacies?
16    A. Yes, ma'am. That's what I recall.
17    Q. And is it your -- any recollection of whether
18 these pharmacies had an affiliation or were working with
19 a prescriber or prescribers?
20    A. I'm not sure of that.
21    Q. Would you characterize any of the defendants',
22 Kroger or Albertsons, pharmacies as pill mills?
23    A. I really -- I don't know on that. I can't
24 answer that question, because I don't know the
25 relationship they had with independent pharmacies.

Page 48

1    Q. Assuming that Kroger pharmacies are simply
2 Kroger pharmacies, and same with Albertsons, would you
3 consider any of those branded pharmacies pill mills?
4        MR. JANUSH:  Objection.
5        THE WITNESS:  Like I shared, I've never
6 been involved in an investigation that I recall that
7 targeted Kroger and -- and all that, if that's what
8 you're asking.
9 BY MS. WOHL:
10    Q. Was there -- in your estimation and your time
11 in law enforcement in Tarrant County, was there, kind
12 of, a height of pill-mill activity at any point?
13    A. When I was with DEA, it was the mid-'90s
14 through 2007, 2008, and 2009. I left the -- the
15 metroplex area to go to Washington, D.C. for another
16 assignment, and so I was removed from that.
17        And then I -- I've come back and seen, you
18 know, the same thing when I got back here in Tarrant
19 County, if that answers your question. So I've seen
20 this as a -- a critical issue since I've been
21 assigned since 1990.
22    Q. So the number of pill mills operating hasn't
23 changed?
24    A. I think it's probably increased over my career.
25 And we've also done investigations where the traffickers

Page 49

1 have a pill press or tabulating machine that they --
2 they obtained on the black market as well and are --
3 -- are, you know, producing this as well.
4    Q. And that's different from opioid medication
5 that comes from a legitimate distributor, though, right?
6    A. It's different, yes. We would call those pill
7 mills sometimes as well.
8    Q. Okay. So the terminology might be the same
9 even if it's counterfeit?
10    A. Correct.
11    Q. Tell me about your assignment in D.C. that you
12 just mentioned.
13    A. Yes, ma'am. So I was assigned to our office
14 that -- that supported DEA operations in Europe and
15 Afghanistan, and I was sent to Afghanistan. I went back
16 and forth between D.C. and Afghanistan for three years
17 targeting heroin traffickers, because that's where most
18 of them are in the world, and then -- trying to assist
19 the Afghan government and European and military with
20 dealing with the heroin trafficking over there.
21    Q. What three years were those?
22    A. From 2009 to 2012.
23    Q. Has it been a focus in the sheriff's department
24 to investigate and shut down these pill mills?
25    A. It would be if we're aware of it. I would

13 (Pages 46 - 49)

Page 50

1  normally -- we would normally, when I was commander,
2  immediately, like I told you earlier, call a DEA
3  diversion normally or a DPS and pass that intel on.
4      Q.  If you were made aware of, during an
5  investigation, that there was a -- what you would call a
6  pill-mill operation, would it have been your response to
7  then make those calls to DEA or DPS to refer that?
8      A.  Yes, ma'am.
9      Q.  In your experience, have you seen these pill
10  mills being shut down over the last, you know, 10,
11  15 years?
12      A.  Yes, ma'am.  I was involved in a few of those,
13  but a lot of them I -- I was not, where they would
14  eventually obtain the -- the search warrants and arrest
15  warrants and -- and, a lot of time, take these down.
16  Sometimes the dispensers were -- and the pharmacists
17  were out of state, so we would pass leads over to other
18  offices.  Florida comes to mind.  There were a lot of
19  online pharmacies that we were dealing with in Florida
20  that were impacting us here in the Dallas/Fort Worth
21  area.
22      Q.  What about prescribers over your career?  Have
23  you seen an increase in, kind of, a crackdown on
24  prescribers who were overprescribing opioid medication?
25      A.  I have.  As you know better than I, it's very

Page 51

1  hard to -- to -- to prosecute some of these prescribers,
2  the pharmacists and doctors, because of their discretion
3  as a professional.  So it's hard, but yes.
4      Q.  And in -- in your estimation, have any of these
5  efforts to, you know, eliminate pill mills and
6  prescribers had an impact on the market or supply of
7  prescription opioid medication?
8      A.  Unfortunately, not -- not a lot that I see,
9  because the drugs are still available on the street.
10      Q.  You mentioned earlier, kind of, a -- a
11  trajectory of, you know, addiction starting with a legal
12  prescription, a legitimate prescription, and one of the
13  things you mentioned was that, then, you know, turning
14  to the streets, the pills become too expensive.
15          Explain that to me a little bit.  Why would
16  the -- why would they be changing in price or becoming
17  too expensive on the street?
18      A.  Yes, ma'am.  In my experience, a lot of the
19  people that I debrief or arrested, you know, they spent
20  usually six months to a year with their doctor, the
21  original doctor, and then we would -- they would --
22  "shop" is the word that we use -- shop doctors to find
23  additional doctors that would continue prescribing the
24  painkillers.
25          When they got shut down, then they would go

Page 52

1  on the street.  So the prescriptions that they were
2  paying were very cheap.  Now, the pills on the street,
3  when I was dealing with this, were maybe $30 apiece for
4  oxy.  So now, a lot of times, the females -- and not
5  just females, but I'd interview a lot of females.  A lot
6  of the defendants had an addiction of four -- four or
7  five, six, eight, ten, pills a day.  So the math adds up
8  greatly, very fast.  They start stealing.  You know,
9  they -- a lot of times, they lose their job, if they
10  have a job, because they're not on time.  They're --
11  they're calling off a lot.  And that's why they go to
12  heroin; heroin is much cheaper.  It's a terrible cycle.
13      Q.  Have you ever been made aware of an illicit
14  opioid drug fentanyl in the jurisdictions where you've
15  worked in Texas?
16      A.  Yes, ma'am.
17      Q.  And have you been made aware that there is a
18  threat from illicit fentanyl that had been manufactured
19  in China or Mexico?
20      A.  Yes, ma'am.
21      Q.  And you're aware that pharmacies do not
22  distribute or dispense illicit fentanyl?
23      A.  Right.  I know they dispense fentanyl patches,
24  but I don't think they describe -- or prescribe the
25  actual pills of fentanyl, if that's what you're asking.

Page 53

1      Q.  Do you have any information that any pharmacy
2  in the State of Texas has been the cause of opioid abuse
3  or addiction?
4      A.  I don't have any information in that regard,
5  no.
6      Q.  Do you have experience with HIDTA, High
7  Intensity Drug Trafficking Agency, in the State of
8  Texas?
9      A.  Yes, ma'am.
10      Q.  And did that include the Texoma division of
11  HIDTA?
12      A.  It does, among others.
13      Q.  What were your experiences with HIDTA?
14      A.  They were a resource -- great resource for us
15  at DEA, and they've been a great resource for us with
16  Tarrant County as well.
17          I would actually -- when I was the
18  assistant special agent in charge, I would have one or
19  two of -- of the groups that I was responsible for
20  actually housed in HIDTA, and they would conduct, you
21  know, multiple types of investigations in North Texas
22  and Oklahoma, primarily.
23      Q.  And what is your understanding of what HIDTA
24  does?
25      A.  They come along -- they're supposed to come

14 (Pages 50 - 53)

1 along -- you know, the -- the local, the state, and
2 federal agencies that are combatting drug traffic in
3 their -- in their area that's been designated as a,
4 quote/unquote, high -- high-trafficking area by ONDCP in
5 Washington, D.C., and they provide resources.  They also
6 serve as a deconfliction center for us.  So I'm a
7 supporter of HIDTA's mission and -- and been involved
8 with it for many years.
9     Q.  Is there a HIDTA section of the sheriff's
10 department?
11     A.  We have somebody assigned to one of the groups
12 that's housed -- or works out of HIDTA, yes, ma'am.
13 Actually, we have two.
14     Q.  So two people from the sheriff's department are
15 -- are embedded with HIDTA?
16     A.  They're task force officers, yes, ma'am.
17     Q.  Okay.  Are they narcotics division officers?
18     A.  Actually, we did have somebody that was
19 narcotics with Homeland Security.  That role
20 transitioned to human trafficking last year.  And then
21 we have another officer/investigator that's assigned to
22 the postal service task force, and they primarily are
23 dealing with narcotics being moved through the U.S. mail
24 system.
25     Q.  Back to the -- the officers that are embedded

1 in HIDTA -- as a task force, right; is that what you
2 said?
3     A.  They're task force officers, yes, ma'am.
4     Q.  -- what kind of work do -- do they do?
5         MR. JANUSH:  Objection.
6         In this regard, Senior Chief Bond, I'm
7 going to instruct you to answer only what you can
8 appropriately disclose.
9         THE WITNESS:  Understood.
10        MR. JANUSH:  So if you can -- if you can
11 generally describe, but nothing as to methodologies, et
12 cetera.
13        THE WITNESS:  I understand.
14 So broadly speaking --
15        MR. JANUSH:  And -- and -- and definitely
16 no names.
17        THE WITNESS:  All right.
18        MR. JANUSH:  Thank you.
19        THE WITNESS:  Our investigators assigned to
20 the postal task force, they do interdictions and -- or
21 investigations involving, you know, fraud, abuse, theft,
22 and drug trafficking that -- that is involved with --
23 with the U.S. Postal Service.  A lot of their effort
24 ends up being narcotics-focused investigations in
25 Tarrant County, in Dallas County, North Texas, and even

1 the Oklahoma area.
2 BY MS. WOHL:
3     Q.  What about the task force officers embedded
4 with HIDTA?
5     A.  So HIDTA is the umbrella agency, if you will.
6 So our -- our task force officers that's assigned to the
7 postal service is housed at HIDTA, which is in
8 Las Colinas for the Texoma HIDTA.
9         Our investigator that's assigned to
10 Homeland Security investigations, he is housed at HIDTA
11 in another enforcement group.  So HIDTA is pretty much
12 -- is the umbrella agency, if you will, to try to
13 encourage coordination and joint operations among the
14 different agencies that participate.
15     Q.  Okay.  Thank you for that explanation.
16         What about the -- the task force officer
17 with Homeland Security?  What are the -- the general
18 duties of that officer?
19     A.  Yes, ma'am.  Initially, we placed him in there
20 as a -- as a narcotics investigator, and that person,
21 that role, has transformed into doing human trafficking
22 now.  We don't have enough resources to -- to put as
23 many officers as -- as I would like and the sheriff
24 would like in these task forces.  So it became -- we
25 already have somebody -- we have a task force officer at

1 DEA here in Fort Worth; we have one at postal; and we
2 have -- have one at HSI.  So we already have somebody
3 involved in narcotics investigations.
4         The postal investigator's involved
5 primarily in narcotics investigations, and human
6 trafficking is a huge -- unfortunately, a huge threat
7 for this area besides the drugs.  So the sheriff made
8 the decision that he would prefer that this person work
9 out of the human-trafficking group for human -- for
10 Homeland Security, if I didn't confuse you on that.
11     Q.  I got it.  I think I got it.
12         Are you familiar with the HIDTA annual
13 reports?
14     A.  I am.
15     Q.  Do you review them pretty regularly or yearly?
16     A.  I receive them every year, but to be honest, I
17 don't always read them all page to page.  Yes, ma'am.
18     Q.  Are you aware with the HIDTA -- are you aware
19 of the HIDTA Threat Assessments?
20     A.  I am.
21     Q.  And what about their Annual Strategy Reports?
22     A.  I'm familiar with that, yes, ma'am.
23     Q.  Okay.
24         MS. WOHL:  Why don't we take a quick break,
25 if we could go off the record.

15 (Pages 54 - 57)

1	THE VIDEOGRAPHER:  Everybody stand by.
2	We're going off the record at 11:14.
3	(Brief recess taken.)
4	THE VIDEOGRAPHER:  We're back on the record
5 at 11:26.
6 BY MS. WOHL:
7	Q.  Chief Bond, do you mind picking up that binder
8 that I sent you-all yesterday --
9	A.  Okay.
10	Q.  -- and turning to Tab 2.
11	MS. WOHL:  And, then, Clint, that will be
12 our first exhibit.
13	MS. ABSTON:  Hey, Gabe -- sorry -- the
14 binder ring came undone.  I'm going to just put these
15 back in there before so the Chief can flip through it.
16 One second.
17	CONCIERGE:  Counsel, will you be starting
18 with this as Exhibit 1?
19	MS. WOHL:  Yes, please.
20	CONCIERGE:  Okay.
21	MS. WOHL:  Thank you.
22	(Exhibit 1 was marked for identification.)
23 BY MS. WOHL:
24	Q.  Are you there?
25	A.  Yes, ma'am.

1	Q.  Okay.  Give it a second for the tech to bring
2 it up.
3	Are you able to see the screen?
4	A.  Yes, ma'am.
5	Q.  All right.  We talked a second ago about the
6 HIDTA Annual Strategy Reports.
7	Does this look familiar?
8	A.  The format of it does, yes, ma'am.
9	Q.  And would you recognize this or assume this to
10 be the 2013 HIDTA Strategy Report?
11	A.  I would, but I -- I -- I'd like some time to
12 review it, if possible.
13	Q.  Well, if you don't mind, let me ask a question
14 about a specific part of it, and then if you need to
15 review the context, that would be fine.
16	If you could turn to the third page, it
17 ends in 786 on the bottom right, and there's a section
18 there labeled "Threat Assessment."  And I'm just going
19 to read a sentence out of that, which is:
20 Methamphetamine, marijuana -- sorry; I'm going to go
21 back up.
22	The most notable threat-related reports
23 include the continued use of Dallas/Fort Worth Metroplex
24 as a command and control center for international
25 drug-trafficking networks that receive --

1	MR. JANUSH:  Forgive me, Gabe.  I just have
2 a question.  Did the witness -- I'm -- I'm looking at
3 the realtime.
4	Did the witness say that the witness wanted
5 more time to review the document?
6	THE WITNESS:  Yes, I -- I'd like more time.
7	MR. JANUSH:  Okay.  I -- I believe we have
8 to permit the witness to get more time to review the
9 document before you jump into the next question.
10	MS. WOHL:  Well, I'm fine with that, but
11 there isn't a question pending, so the review may be
12 aided by the question I'm about to ask.
13	MR. JANUSH:  Sir -- sir, do you need more
14 time to review this document?
15	THE WITNESS:  Yes, I would like to review
16 the document before a question is asked, yes.
17	MS. WOHL:  Okay.
18	THE WITNESS:  (Witness examines document.)
19	(Off-record discussion.)
20	MS. ABSTON:  Okay.  I think we're good.
21 BY MS. WOHL:
22	Q.  Okay.  Are you looking at the paragraph with
23 the subheading "Threat Assessment"?
24	A.  Yes, ma'am.
25	Q.  All right.  I'm going to read a sentence out of

1 that, and that sentence is:  The most notable
2 threat-related reports include the continued use of the
3 Dallas/Fort Worth Metroplex (DFW) as a command and
4 control center for international drug-trafficking
5 networks that receive drug loads originating within
6 Mexico.
7	Chief Bond, is this statement consistent
8 with your memory in your experience as a law enforcement
9 officer in 2013?
10	MR. JANUSH:  Objection.
11	THE WITNESS:  Okay.  It is consistent.
12 This is an annual threat assessment, so it's going to
13 change every year.  But, yes, ma'am, this looks like
14 it's -- it's the one from that period.
15 BY MS. WOHL:
16	Q.  Do you remember, as of 2013 and throughout your
17 term as law enforcement in Texas, that the geography and
18 the border with Mexico played a significant role in the
19 drug threat?
20	A.  Yes, ma'am, it does -- did, and it does.
21	Q.  How so?
22	A.  The car- -- the Mexican drug cartels, you know,
23 when I was a younger agent, the -- the -- the cartel
24 operations were more removed.  I remember doing
25 heroin-operated deals where phone calls were made to

16 (Pages 58 - 61)

Page 62

1 decision-makers either in Mexico or on the South -- in
2 South Texas for permission to release a drug, buy a
3 drug, things like that.  And over the years, the cartel
4 has just made so much money in the area that they have
5 moved leadership into this area, if that answers your
6 question.
7    Q.  That does.  Thank you.
8        If you'll turn the page to the page ending
9 787.
10    A.  I'm ready.
11    Q.  Okay.  Let me find the sentence I'm going to
12 read, so I can tell you which paragraph it's in.
13        So that first incomplete paragraph up
14 there, kind of, midway through, there's a sentence that
15 begins:  Methamphetamine....
16        And it says:  Methamphetamine, marijuana,
17 and heroin have been reported by NT HIDTA partner
18 agencies as the most significant drug threats in the
19 North Texas HIDTA AOR.
20        Let me ask you first what "AOR" stands for?
21    A.  Area of operations.
22    Q.  And is this statement consistent with your
23 memory in your experience as a law enforcement officer
24 in 2013?
25    A.  Yes, ma'am.

Page 63

1    Q.  Can you turn to the page ending in 790?
2    A.  I'm ready.
3    Q.  In the subheading "Performance Management
4 Process (PMP)," I'll read that paragraph:  ONDCP uses
5 the PMP as an evaluative and managerial tool that allows
6 them to assess the performance of each HIDTA and the
7 overall performance of the HIDTA program.
8        Is this statement consistent with your
9 memory in your experience in law enforcement in 2013?
10    A.  Yes, ma'am.
11    Q.  What is PMP data?
12    A.  I am not sure exactly what PMP data is.  I
13 know, as a supervisor who had units there, kind of, the
14 return on investment.  The ROI is a better way to look
15 at it, I believe, on the man-hours, the money, that is
16 spent in regards to drug users' arrests being made,
17 successful prosecutions and all that.  So that -- that's
18 what I equate to that.
19    Q.  Are you aware of another database, a PMP
20 database, that keeps track of all the controlled
21 substance prescriptions?
22    A.  I'm aware that database exists; I don't
23 remember the -- name of it, though.
24    Q.  Do you have any experience with that database?
25    A.  No, ma'am, I don't.

Page 64

1    Q.  Does -- do you know of anybody in your
2 department that does?
3    A.  That would have been handled, as far as I know,
4 from the DEA diversion side of it.
5    Q.  If we can turn to Tab 3, this will be our
6 second exhibit.
7    A.  Can you give me a few more minutes to review
8 this one as well?
9    Q.  Yes, sir.
10    A.  Thank you.
11        (Witness examines document.)
12        (Exhibit 2 was marked for identification.)
13        THE WITNESS:  Okay.  I'm ready.
14 BY MS. WOHL:
15    Q.  Okay.  Can you turn to the page ending in 863?
16    A.  Okay.
17    Q.  There's a subheading there, "Outlook," and I
18 want to point you to a couple of passages in that.
19        The first is the second sentence:  DEA
20 Dallas has reported anticipating higher than previously
21 reported levels of MDMA in the region the past two
22 years.  However, other law enforcement entities in the
23 area reports availability as stable during the same time
24 frame.
25        Is this statement consistent with your

Page 65

1 memory and your experience as law enforcement in 2014?
2        MR. JANUSH:  Objection.
3        THE WITNESS:  Yes, ma'am, it does.  I'm
4 familiar with some of the MDMA investigations that were
5 going on at that time, yes, ma'am.
6 BY MS. WOHL:
7    Q.  Were those investigations out of the sheriff's
8 department?
9    A.  Not that I'm aware of.  I think it was
10 DEA-focused.
11    Q.  And then the last sentence there:  Regional
12 marijuana production is expected rise; particularly,
13 outdoor grows, in the latter half of the year based on
14 demand for higher potency product yielded by United
15 States cultivation and competitive pricing of the U.S.
16 product when compared to the lower potency marijuana of
17 Mexico origin.
18        Is this statement consistent with your
19 memory and your experience as a law enforcement officer
20 in 2014?
21    A.  It is.
22    Q.  If you could -- you know, a second ago we were
23 talking about a 2013 Threat Assessment, the -- the
24 geography and border with Mexico, and you talked about
25 the cartels.

17 (Pages 62 - 65)

Page 66

1 Primarily, what -- what drugs are being
2 imported through the cartels, if there is any one drug
3 over the other?
4 A. What time frame are you talking about?
5 Q. The 2013-'14 time frame.
6 A. Okay. During that time frame, it would have
7 been methamphetamine, always number one for this region,
8 then probably heroin, and then cocaine and marijuana. A
9 lot of the cocaine went to other regions as well, so we
10 saw a lot of the marijuana coming here. So the heroin
11 and meth were the primary.
12 Q. And since 2013 did that change?
13 A. Since 2013, is that your question?
14 Q. Yeah, yeah. That's, kind of, the 2013-'14 time
15 period. Did that change going forward?
16 MR. JANUSH: Objection, form.
17 THE WITNESS: That's changed a lot. Do you
18 want to talk about now compared to then or what time
19 frame specifically?
20 BY MS. WOHL:
21 Q. Yeah, that would be great. If you can, kind
22 of, talk about the -- the since 2013-'14 area -- time
23 frame.
24 A. Yep. So still meth, not so much marijuana
25 anymore. A lot of the marijuana, fortunately, the

Page 67

1 higher-quality and potency marijuana, is grown in this
2 region or California or Colorado instead of Mexico. And
3 fentanyl is -- is coming in, and cocaine is coming in
4 today, so...
5 Q. Can you turn to Tab 4 in your binder?
6 A. Can you give me another minute here?
7 Q. Yes, sir.
8 MS. STEWART: While he is looking at that
9 Gabe, can you tell me the -- I didn't see the cover page
10 of Exhibit 2. I know it was 2013.
11 MS. WOHL: Yeah. Let me gave you the Bates
12 number. It's Texoma_HIDTA_0857. That was the 2014.
13 2013 was Exhibit 1.
14 MS. STEWART: Okay. Thank you.
15 CONCIERGE: Counsel -- I'm sorry -- that
16 kind of threw me off a little bit. This is Tab 4 we're
17 going to, right?
18 MS. WOHL: Yes, Exhibit 3.
19 CONCIERGE: Thank you.
20 (Exhibit 3 was marked for identification.)
21 THE WITNESS: (Witness examines document.)
22 I'm ready.
23 BY MS. WOHL:
24 Q. Okay. If you could turn to the page ending in
25 154, there's a subheading there, "Executive Summary."

Page 68

1 Do you see that?
2 A. Yes, ma'am.
3 Q. I'm going to read a couple of sentence --
4 sentences from there starting with the second paragraph:
5 The overall drug-trafficking threat to the Texoma HIDTA
6 region remains stable. Law enforcement intelligence
7 data clearly indicates methamphetamine poses the most
8 significant drug threat to the region as North Texas and
9 Oklahoma are flooded with cheap, high-purity
10 methamphetamine produced in Mexico. Prescription drugs,
11 heroin, synthetic cannabinoids -- cannabinoids,
12 cocaine/crack cocaine, and marijuana also pose a
13 significant threat to communities throughout the Texoma
14 HIDTA region.
15 Is this statement consistent with your
16 memory and your experience as a law enforcement officer
17 in 2016?
18 MR. JANUSH: Objection.
19 THE WITNESS: Yes -- yes, ma'am, it is.
20 BY MS. WOHL:
21 Q. Which prescription drugs referenced in here
22 posed a significant threat to the Dallas community?
23 A. From my recollection, it's going to be the --
24 you know, the painkillers, the opioid-based drugs, that
25 led to the heroin. That cycle is still continuing at

Page 69

1 that time.
2 Does that answer your question?
3 BY MS. WOHL:
4 Q. It does. Thank you.
5 Can you turn to page 160 in this document?
6 A. Okay.
7 Q. The first sentence under that table there says:
8 Pharmaceuticals are noted as the number two threat
9 within our region.
10 Is this statement consistent with your
11 memory and your experience as a law enforcement officer in
12 2016?
13 A. It -- yes, ma'am, it is.
14 Q. And this is a similar question that may have
15 the same answer. But which pharmaceuticals posed a
16 threat to the Dallas community in 2016?
17 A. It was the -- the opioid-based pain pills that
18 -- that we're talking about here.
19 Q. And when you say "opioid-based pain pills," are
20 you including in that description both legitimately
21 manufactured and counterfeit opioid pain pills?
22 A. Yes, ma'am.
23 Q. Let's go to Tab 5 in the binder, and this will
24 be Exhibit 4.
25 A. Can you give me another minute?

18 (Pages 66 - 69)

Page 70

1   Q. Yep.
2   A. (Witness examines document.)
3       (Exhibit 4 was marked for identification.)
4       THE WITNESS: Okay. I'm ready.
5   BY MS. WOHL:
6   Q. All right. I'm going to read page 257 under
7   "Executive Summary." I'm going to direct your attention
8   to that paragraph.
9   A. I'm ready.
10  Q. The second half of that paragraph says:
11  Prescription drugs, heroin, synthetic cannabinoids,
12  cocaine/crack cocaine, and marijuana, also all pose a
13  significant threat to communities throughout the Texoma
14  HIDTA region. In particular, increased flow of cocaine
15  into the region and signs of increasing distribution of
16  synthetic opioids, such as fentanyl and fentanyl-laced
17  drugs, are the most significant emerging trends facing
18  the region.
19      Is this statement consistent with your
20  memory and your experience as a law enforcement officer
21  in 2017?
22  A. It is. This is the time frame where we were
23  encountering fentanyl, and to me, it was a logical jump
24  from the -- the prescription pain pills that were on the
25  street. Two, the fentanyl by the Mexican cartels

Page 71

1   capitalized on that demand. And so that's when -- about
2   when -- actually, the year before is when I started
3   encountering fentanyl investigations and people started
4   talking about it. So to me, it was a logical transition
5   from the -- from the painkillers to the fentanyl. And,
6   unfortunately, the cartels seized that opportunity and
7   making a lot of money on it.
8   Q. So when we're talking about synthetic opioids
9   here, you mean fentanyl and fentanyl-laced drugs?
10  A. Yes, ma'am, I do.
11  Q. And that does not include prescription opioids,
12  correct?
13      MR. JANUSH: Objection.
14      THE WITNESS: Right. I'm talking about the
15  fentanyl that is here in pill form/tablet form/powder
16  form that's been illegally, you know, produced outside
17  of the -- the normal supply chain.
18  BY MS. WOHL:
19  Q. Thank you.
20      Can you turn to page 272 of this document?
21  A. Can you give me just a minute on this page?
22  Q. Yep.
23  A. (Witness examines document.)
24      Okay. I'm ready.
25      MS. WOHL: Clint, could you go to the page

Page 72

1   that ends in 272, please?
2       THE WITNESS: Yes, ma'am. I'm on that --
3   on that page.
4   BY MS. WOHL:
5   Q. Oh, great. Thank you.
6       All right. I'm going to look at the second
7   paragraph under the subheading "Pharmaceuticals" and
8   read that first sentence, which is: Pharmaceutical
9   diversion is often erroneously viewed as white-collar
10  drug crime because of the misperception that its
11  violators consist largely of professionals such as
12  physicians, pharmacists, and clinics.
13      Would you agree with that statement?
14  A. I don't know that I agree with -- I never
15  thought of it in that way. To answer your question, I
16  -- I'm not -- yeah, I -- I don't think of it that way.
17  Q. Can you explain what you mean by that?
18  A. Right. Because my interactions, as we've
19  talked about earlier this morning, you know, at this --
20  on the pills on the street is, I'm dealing with addicts
21  and violent criminals and heroin dealers that have
22  started that way. And that's my view going on.
23      So if I was, you know, DEA diversion, I'd
24  probably have that mindset, but I don't know.
25  Q. So there may be a misperception here, but it's

Page 73

1   not one that you've encountered?
2   A. Right.
3   Q. Okay. Thank you.
4       The next sentence there says: However, the
5   pill-mill operation is a thinly veiled organization --
6   oh -- thinly veiled organized criminal enterprise that
7   increasingly results in the street-level distribution of
8   powerful controlled substances by the same violent
9   criminal organizations that distribute crack cocaine,
10  heroin, methamphetamine, and other controlled
11  substances.
12      Does this line up with your experience and
13  understanding with -- of pill mills, particularly in the
14  2017 era?
15      MR. JANUSH: Objection.
16      THE WITNESS: I think this is a pretty
17  accurate summary. The -- as -- as we've been talking
18  about, this is what we saw not only, you know, the --
19  the prescribed drugs hitting the street, becoming too
20  expensive, and then interaction with the -- the existing
21  criminal drug-traffic organizations that are involved,
22  especially in the heroin.
23      And if I can just clarify one thing I said
24  a little bit earlier this morning on -- you asked me if
25  a doctor prescribes a -- a drug and a pharmacist

Page 74

1 dispenses that, is that legal, I think, were the words
2 that you used.  I need to go back, because I -- I gave
3 you an example of me sending undercover officers in
4 there.  But we had doctors that were not examining their
5 patients and were getting paid under the table, and then
6 the -- they would go to that pharmacist that's not
7 doing -- you know, know your customer, is this a
8 legitimate prescription, and things like that.  So I
9 just wanted to correct the record on that.  So...
10 BY MS. WOHL:
11     Q.  I appreciate that.  Let me dig into that a
12 little bit.
13         So you had undercover officers going to
14 prescribers who were not actually seeing the patient; is
15 that right?
16     A.  You -- we had undercover officers that would go
17 to a doctor and the doctor either would not examine
18 them, not even meet with them, ask them what kind of
19 drug they would like.  Those are the examples that I can
20 remember; they were not doing a proper exam and
21 assessment of -- of what's wrong and what should be
22 prescribed to them.  That -- that's correct, if that
23 answers your question.
24     Q.  Yeah.
25         So in this scenario, you had undercover

Page 75

1 officers go into these prescribers, and, you know, that
2 would go on, and they would come out with a prescription
3 despite having not, you know, gone through a legitimate
4 examination?
5     A.  That's correct.
6     Q.  And then just a second ago when you were
7 clarifying, you said they would then take that
8 prescription to a pharmacy.  Is that the next step in
9 the investigation with the undercover officer?
10     A.  Yes, it -- it would be.
11     Q.  Okay.  And I think we talked about this before,
12 but in terms of these investigations that you recall
13 where you've got an undercover officer picking up a
14 prescription taking it to a pharmacy, these pharmacies
15 that you're talking about, that were part of this, were
16 independent pharmacies?
17     A.  I -- I believe that they were.  It could have
18 been chain, but I don't recall that.  So I don't want to
19 rule that out.  But I believe they were independent, so
20 that's the best recollection.
21     Q.  Do you have any recollection of any of these
22 pharmacies ever being a Kroger or an Albertsons'
23 pharmacy?
24     A.  I do not, but I'm not saying that they couldn't
25 have those ties, and I wasn't aware of them.  Yes,

Page 76

1 ma'am.
2     Q.  Okay.  If there ever were a connection or -- or
3 a -- a role in the investigation as to Kroger or
4 Albertsons, how would that be documented?
5     A.  That would be handled by DEA diversion.  So
6 even -- even the times that I was asked to provide
7 undercover officers, you know, the undercover officer
8 would write his report or her report based on the
9 interaction with the doctor and the pharmacist, and then
10 that would be sent to DEA diversion because that was
11 their case; it wasn't our case --
12     Q.  And so the records --
13     A.  -- if that answers your question.
14     Q.  Sorry.  Go ahead.
15     A.  I was going to say:  That -- that's how every
16 one, the ones that either I was personally involved with
17 or I directed a unit to be doing, that -- that's how it
18 normally happened.
19     Q.  So if there are any records that exist to show
20 that Kroger or Albertsons was a subject or involved in
21 any way in one of these undercover investigations into
22 dispensing and prescribing, those records would be with
23 the DEA and not with the sheriff's department?
24     A.  That's correct, or with Texas DPS.  Yes, ma'am.
25     Q.  Texas DPS.  Okay.  Thank you.

Page 77

1         Can you turn to page -- the next page, 273.
2     A.  Okay.
3     Q.  In that first paragraph, one of the last --
4 maybe second-to-last sentence says:  A number of
5 agencies in the DFW area have encountered criminal
6 organizations engaged in armed robberies of pharmacies
7 where criminals have stolen opioid prescription drugs,
8 including hydrocodone, promethazine cough syrup, and
9 alprazolam.
10         Is this statement consistent with your
11 memory and your experience as a law enforcement officer
12 in 2017?
13     A.  It is.  I heard of groups doing this.  I was
14 never involved in this --
15         THE WITNESS:  Do we need to do something
16 with the screen?
17         MS. ABSTON:  Oh.
18         THE WITNESS:  Sorry about that.
19         MS. ABSTON:  Sorry.  We're having technical
20 difficulties.
21         THE WITNESS:  So I heard that this was
22 going on, but I -- either myself or the units I was in
23 charge of weren't involved in this.
24 BY MS. WOHL:
25     Q.  Were any of the divisions of the sheriff's

20 (Pages 74 - 77)

1  department involved in this?
2  A. Not that I'm aware of.  I'm not saying it's --
3  it's poss- -- not possible, but not that I'm aware of.
4  Q. If they were, would there be records of the
5  sheriff's department about these burglaries?
6  A. There could -- if it's a burglary in our
7  patrol, we may have records on that patrol division.
8  And then once I was informed of it or CNET was informed
9  of it, we would make that referral to DEA or DPS if it
10  involved a pharmacy or a doctor.
11  Q. Okay.  And when -- your understanding here of
12  the sentence when it says:  Criminals have stolen opioid
13  prescription drugs, I mean, that means they were, you
14  know, stolen; they were not dispensed by pharmacists in
15  this scenario, correct?
16  A. I believe in this scenario they're talking
17  about groups that are actually breaking and entering
18  into pharmacies, is my understanding.
19  Q. Will you turn to page 275?
20  A. Okay.
21  Q. This page gets into the synthetic drugs a
22  little bit more, and starts out:  Synthetic drugs,
23  especially synthetic cannabinoids and increasingly
24  synthetic opioids, are an existing and persistent drug
25  threat in the Texoma HIDTA.

1  And I'll just read the next -- skip a
2  sentence and read the next one:  Because of the wide
3  variety of chemicals and substances used in synthetic
4  drugs and the often inconsistent and untested methods
5  used to produce the finished product, a significant
6  threat of overdose or serious physical and psychological
7  damage exists with synthetic drug use due to the ease at
8  which a bad batch of the drugs can be created.
9  Are these statements consistent with your
10  memory and your experience as a law enforcement officer
11  in 2017?
12  MR. JANUSH:  Objection.
13  THE WITNESS:  They are.
14  I -- I personally get involved in execution
15  of search warrants where traffickers were manufacturing
16  these substances, the synthetic cannabinoids and all
17  that, and there was no quality control when they were
18  mixing, you know, different types of drugs into this
19  with cut and all that.  So it was very common to have
20  bad batches where there's no quality control.
21  BY MS. WOHL:
22  Q. This includes -- you know, this is illegal
23  drugs, like fentanyl, right?
24  A. And -- and I've been in some where there
25  were -- I believe there were prescription drugs that

1  were crushed and placed in there as well.  It was
2  whatever the -- the dealer could get his hands on to
3  make a batch, if that answers your question.
4  Q. It does.
5  Let me ask you this:  Do you recall when
6  the department or agents started regularly testing for
7  fentanyl?
8  A. Probably in -- based on my experience alone, I
9  had the responsibility for the Lubbock office when I sat
10  in Fort Worth with DEA, and we had a -- our first
11  fentanyl lab in Lubbock in 2016, I believe, where they
12  were manufacturing.  They were receiving the powder and
13  then putting it in pill or capsule form.
14  So at that time, the law enforcement was
15  afraid of touching or handling fentanyl, which were
16  unknown to them.  And so that's when my memory of the
17  starting of fentanyl begins.
18  Q. If you could turn to page 277 for me.
19  A. Okay.
20  Q. Under "Synthetic Opioids," the second or third
21  sentence in that paragraph says:  There are two main
22  sources for synthetic opioids in the region, known
23  DTOs, who are increasingly trafficking bulk fentanyl
24  alongside other drugs like cocaine, methamphetamine, and
25  heroin, and independent DTOs who obtained the drug from

1  sources in China and other countries through
2  negotiations and purchases over the Dark Web and other
3  Internet sources.
4  Is this statement consistent with your
5  memory and your experience as a law enforcement officer
6  in 2017?
7  MR. JANUSH:  Objection.
8  THE WITNESS:  It is.  And the next
9  paragraph, I believe, is talking about the fentanyl in
10  the Lubbock area that we're encountering.  Yes, ma'am,
11  that's correct.
12  BY MS. WOHL:
13  Q. Yeah.
14  And that lines up with your memory of when
15  that first lab was, I believe, in 2016?
16  A. (No audible response.)
17  Q. So in other words, these synthetic opioids, you
18  agree, were a rising threat in the DFW area, and the
19  synthetic opioids, as we discussed, were not from --
20  coming from pharmacies; is that right?
21  MR. JANUSH:  Objection.
22  THE WITNESS:  Right.  I can't say if they
23  were coming from pharmacies; I know the cases I was
24  involved with were Mexico and China, as it indicates
25  here.

21 (Pages 78 - 81)

1 BY MS. WOHL:
2    Q. Okay. But you -- so let me go back to that.
3        You can't say whether they were coming from
4 pharmacies?
5    A. That's correct. I've been in some of these
6 situations where there are pills there, like I think we
7 talked about earlier, and how they got there, I have
8 no -- I have no idea. So there would be pills along
9 with fentanyl, marijuana, and heroin, and all that. So
10 it was -- it was very common to encounter that.
11    Q. So I think I remember this from earlier.
12        When you execute a search warrant and
13 you're picking up some illegal, illicit substances,
14 there also may be some legitimately manufactured opioid
15 medication. Is that what you're saying?
16    A. Yes, ma'am, there could be.
17        And -- and a lot of the higher-scale ones,
18 there were no pill bottles, if you understand what I'm
19 saying. There was no evidence. It was just whatever
20 they could get their hands on, and they were mixing it
21 together, and there were pills there.
22    Q. In those instances where pills were found with
23 a bunch of other illicit substances, were you aware
24 whether those were legitimate pharmaceuticals or those
25 were synthetic opioids that we're talking about?

1    A. I don't know the answer to that. I don't --
2 I'm not aware.
3    Q. When pills are found during an investigation,
4 are there tests run to determine whether or not these
5 are legitimate medications, you know, at some point
6 before diversion or counterfeit pills, synthetic opioids
7 from a pill press?
8    A. It's both. If there's evidence that it may
9 have been prescribed, such as a pill bottle or
10 prescriptions that we seize, we'll -- like I said, we'll
11 pass that on to diversion or DPS. A lot of times the
12 pills are just there, and we have no way of knowing that
13 an- -- that an- -- what their source is, if that answers
14 your question.
15    Q. It does a little bit, but let me clarify.
16        If you -- if the pills are just kind of
17 there in bulk and you can't immediately tell or collect
18 evidence that they're from a legitimate prescription or
19 a prescription somewhere down the line, you can still
20 test those, right, and that would give you some idea of
21 whether these were, you know, manufactured from a
22 illegitimate source?
23    A. We can. Based on my experience, a lot of times
24 there's thousands of pills and other drugs there, so we
25 have to just make our best guess on that. And some --

1 as I shared earlier this morning, I've been involved in
2 operations where they have pill presses and tabulating
3 machines on-site with the trademark guise and all that.
4 So even if they look like they're legitimate, they may
5 not be.
6        So does that answer your question?
7    Q. Yeah, I think I understand.
8        So when you get into these investigations
9 and collect, kind of, these bulk pills that look
10 legitimate, it's not -- it may not be worth your
11 resources to then go find -- you know, test every pill
12 to figure out whether it was manufactured legitimately
13 or counterfeit, a synthetic?
14    A. If we have evidence of, you know, a
15 prescription bottle or the prescription there, we'll
16 follow through on that. Normally a referral, but, yes,
17 ma'am, that's right.
18    Q. How often in your estimation, you know, maybe a
19 percentage, do you -- do you come across evidence of
20 prescription pill bottles?
21    A. That's hard to answer. Some of the
22 smaller-level deals that I've been involved with, there
23 -- there usually are prescription bottles involved. The
24 larger ones that are being discussed in these documents,
25 there usually is no evidence of that that we could find

1 of their source.
2    Q. Thank you.
3        Can we turn to Tab 6? And this, I think,
4 is Exhibit 5.
5    A. Can you give me another minute on this?
6    Q. Yes.
7        (Exhibit 5 was marked for identification.)
8        THE WITNESS: (Witness examines document.)
9        Okay. I'm ready.
10 BY MS. WOHL:
11    Q. Can you turn to page 359 of this document?
12    A. 359?
13    Q. Yes.
14        And I'll -- I'll go back to -- you know,
15 and ask you: Is this is the 2018 Threat Assessment from
16 Texoma HIDTA? That's what it says on the first page.
17    A. Can you give me a minute to look at this page
18 before we start?
19    Q. Yes.
20    A. (Witness examines document.)
21        Okay. I'm ready.
22    Q. All right. So under the subheading
23 "Fentanyl/Other Synthetic Opioids," it starts out: Over
24 the past year, law enforcement has encountered fentanyl,
25 fentanyl analogues, carfentanil, and other synthetic

Page 86

1 opioids throughout North Texas, the Texas Panhandle, and
2 Oklahoma.
3          Is that statement consistent with your
4 memory and experience as an officer in 2018?
5          MR. JANUSH:  Objection.
6          THE WITNESS:  Yes, ma'am, it is.
7 BY MS. WOHL:
8     Q.  It goes on to say:  On the whole, illicitly
9 produced and/or diverted fentanyl has been encountered
10 less frequently than in several other regions of the
11 country, with the majority of law enforcement agencies
12 responding to the National Drug Threat Assessment Survey
13 reporting fentanyl availability as moderate, low, or not
14 available.
15          Is that consistent with your memory and
16 your experience as a law enforcement officer in 2018?
17     A.  It is, and this is based on, when we started
18 hearing about fentanyl-related deaths, a lot of that was
19 Northeast, West Virginia, Chicago, places like that.
20     Q.  And the bullet under this heading says:
21 Multiple instances of seized counterfeit
22 oxycodone/hydrocodone tablets found to contain fentanyl
23 or fentanyl analogues have occurred in Texas and
24 Oklahoma over the last several years.  As both Texas and
25 Oklahoma have a significant demand for prescription

Page 87

1 opioid analgesics, it is not surprising that some
2 organizations or individual traffickers have sought to
3 capitalize on the demands for prescription opioids
4 through the production and/or distribution of
5 counterfeit pills.
6          Is this consistent with your memory and
7 experience as a law enforcement officer in 2018?
8     A.  It is, and this is what I was describing
9 earlier as the -- kind of, the natural transition from
10 this to the cartels being involved with the fentanyl to
11 capitalizing on -- on the prescription opioids as a way
12 to make great pro- -- profits, which they have, yes.
13     Q.  And these organizations that they're talking
14 about here or the -- the drugs they're talking about
15 here is the synthetic opioids that are the rising
16 concern being referenced but are not coming from
17 pharmacies, as far as you know?
18          MR. JANUSH:  Objection, mischaracterizes
19 testimony.
20          THE WITNESS:  Yeah.  I'm not sure -- I'm
21 not sure of the source on all that.  I know I dealt with
22 some that came from Mexico and China at this point.  I
23 can't exclude pharmacies.
24 BY MS. WOHL:
25     Q.  Okay.  But specifically the -- what's

Page 88

1 referenced here is:  Counterfeit oxycodone/hydrocodone
2 tablets found to contain fentanyl or fentanyl analogues.
3          Is it your understanding that the
4 counterfeit pills are being produced illegally as
5 opposed to coming from pharmacies?
6     A.  I can't -- I don't know the -- it's possible
7 they're coming from pharmacies, but the ones that I had
8 dealt with probably, our investigations led by law, came
9 from Mexico.
10     Q.  Do these issues with counterfeit pills still
11 exist today?
12     A.  Can you say that again -- your question again?
13 I'm sorry.
14     Q.  Do the issues and concerns with counterfeit
15 pills still exist today?
16     A.  They do.
17     Q.  Can you turn to the following page, 360?
18     A.  Okay.
19     Q.  And the third bullet down on that page states:
20 In April 2017, law enforcement seized a clandestine
21 U-47700 synthetic opioid laboratory in Tarrant County.
22 The lab operator had purchased the synthetic drug from
23 China and mixed it with binding agents obtained from
24 Canada in order to produce counterfeit pills.
25          Do you recall the seizure?

Page 89

1     A.  I do.
2     Q.  Who conducted the seizure?
3     A.  DEA con- -- conducted the seizure.  We assisted
4 them, but it was a DEA case.
5     Q.  Well, what assistance did your department
6 provide?
7     A.  I believe we provided surveillance and then
8 conducting arrests, whenever asked, to help on that.
9     Q.  Do you recall how much was seized?
10     A.  I don't remember, no, ma'am.
11     Q.  Do you recall if multiple types of drugs were
12 seized?
13     A.  I don't recall that either.  I'm sorry.
14     Q.  That's okay.
15          Do you have knowledge of similar seizures
16 occurring involving synthetic drugs from China?
17     A.  I do.  The -- the lab that I had spoke about a
18 few minutes ago in Lubbock, we traced those precursor
19 chemicals to China.  But now it's more and more Mexico,
20 where China is providing the precursor chemicals to
21 Mexico.
22     Q.  So the lab in Lubbock, which started around
23 2016, are you recalling a specific incidence where
24 fentanyl was traced to China, or was it more of a -- a
25 generality in that time period?

23 (Pages 86 - 89)

Page 90

1    A. It's both. We had a lot of intelligence and
2 information that China was -- people in the U.S. -- drug
3 traffickers in the U.S. were actually obtaining the raw
4 materials or the precursors from China through the Dark
5 Web and through the postal service as well at that time,
6 yes.
7    Q. And now you would say it's more Mexico?
8    A. It's more Mexico in that regard because China
9 is -- is diverting the -- the precursor chemicals
10 directly to Mexico. I'm not saying it's not coming in
11 from China in the same way, but most of it is through
12 Mexico.
13    Q. Understood.
14       Do you have knowledge of seizures that were
15 similar to this April 2017 seizure in terms of involving
16 finding agents obtained from Canada?
17    A. I've been involved with domestic agents that
18 have -- have binding agents, but I'm not sure of the
19 sources of the binding agents. I don't know.
20    Q. What are binding agents?
21    A. To -- in my understanding -- and like you said,
22 I'm not a pharmacist -- to hold the -- you know, the
23 illegal -- the controlled substance together, to bind it
24 together, so it could be made into a pill or a tablet.
25    Q. Are -- so binding agents may not necessarily be

Page 91

1 illegal on their own, but they're mixed with the illegal
2 substance?
3    A. That's correct.
4    Q. Can you turn to page 362 of this document?
5    A. Can you give me another -- just a minute?
6    Q. Yes.
7    A. (Witness examines document.)
8       Okay. I'm ready.
9    Q. Okay. The second full paragraph there that
10 begins "Law enforcement...," about two-thirds of the way
11 down, I'm going to read a sentence that begins -- or
12 that goes like this: In 2017, law enforcement
13 intelligence identified shipments of tramadol,
14 hydrocodone, carisprodal, alprazolam, and other CPDs
15 from Thailand, China, Canada, and Europe. Though the
16 Texoma HIDTA does not have a committed diversion
17 initiative, redacted, including pharmaceutical
18 precursors and synthetic opioids from sources based in
19 China and other countries around the world.
20       I know there's a redacted line in there.
21 But is this statement consistent with your memory and
22 your experience as a law enforcement officer in the
23 2017-2018 time period?
24    MR. JANUSH: Objection.
25    THE WITNESS: I -- I'm aware of intel that

Page 92

1 mentions some of these countries. Some of these
2 countries are -- I'm not aware of. That -- that's my
3 best answer on that. So some of them I agree with, yes,
4 ma'am, or know about.
5 BY MS. WOHL:
6    Q. Were you aware that Texoma HIDTA did not have a
7 committed diversion initiative?
8    A. I am, because our practice was to divert --
9 immediately move the -- or divert those investigations
10 to DEA diversion or DPS.
11    Q. Can you turn to page 365?
12    A. Can you give me a minute?
13    Q. Yep.
14    A. (Witness examines document.)
15       Okay. I'm ready.
16    Q. Under the subheading "Marijuana," the first
17 sentence says: Marijuana remains the most abundant and
18 accessible illicit drug throughout the Texoma HIDTA AOR
19 (Texas and Oklahoma).
20       Is this statement consistent with your
21 memory and your experience as a law enforcement officer
22 in 2018?
23    A. It is. I would -- I would just say that -- I
24 understand that a lot of the agencies that are reporting
25 that make these assessments up are small agencies. So

Page 93

1 this is the most common drug encountered, like, for
2 patrol, for a small agency or smaller county. You know,
3 the initiatives, the investigations, that HIDTA are
4 usually focused on are on a higher level, but marijuana
5 is -- is -- was very common, yes, ma'am.
6    Q. Within your agency was this true, or was it
7 meth at this time?
8    A. Within DEA, it's rare that we conducted
9 marijuana investigations. U.S. Attorney's Office,
10 unless they were unique circumstances, you had to have,
11 like, a 2,000-pound threshold. So unless I had an
12 18-wheeler or a marijuana dealer that murdered some
13 people, we couldn't usually get prosecution -- federal
14 prosecution for it.
15    Q. What about the sheriff's department?
16    A. The sheriff's -- we will -- there needs to be a
17 significant amount. Usually, like I said earlier, the
18 marijuana traffickers that we're targeting now, when we
19 execute the search warrant, we're finding multiple drugs
20 in there; we're finding firearms, the THC cartridges.
21 So it's easier to prosecute now in that regard.
22    Q. In 2018, within the Tarrant County Sheriff's
23 Department, was marijuana the most abundant and
24 accessible illicit drug you-all were finding in
25 investigations, or, I think, earlier you mentioned meth

24 (Pages 90 - 93)

1 has always been number one?
2     A.  Marijuana is usually the easiest drug to come
3 by, especially at the street level.  So a lot of our
4 investigations may have started with a marijuana user
5 that would cooperate, or we would arrest him, and like I
6 said, he would have other drugs available -- or other
7 drugs.
8     Q.  Can you turn to Tab 7 of your binder?  And this
9 will be Exhibit 6.
10     A.  Can you give me just a second with this?
11     Q.  Yes.
12     A.  (Witness examines document.)
13         (Exhibit 6 was marked for identification.)
14         THE WITNESS:  Okay.  I'm ready.  Bringing
15 back memories.
16 BY MS. WOHL:
17     Q.  Well, that's my first question.  Do you
18 recognize this document?
19     A.  I do, yes, ma'am.
20     Q.  And can you tell me what this is?
21     A.  This is just a brief outline on what each of
22 the guest speakers was going to discuss during their
23 respective presentations.
24     Q.  And it's about a presentation on HHS's Five
25 Point Strategy to Combat the Opioid Crises; is that

1 right?
2     A.  I believe so.
3     Q.  And you see your name on the list of names here
4 as speakers?
5     A.  Yes.
6     Q.  And did you, indeed, speak at this event?
7     A.  I believe that I did, yes, ma'am.
8     Q.  Was this an in-person event?
9     A.  I think it was.  I've done some videoconference
10 events like this, but I think this was in person.
11     Q.  It looks like it was pre-COVID, so makes it
12 more likely in person, right?
13     A.  I think so.
14     Q.  And I -- I see the date kind of small on the
15 left-hand side there is August 20th -- 9th, 2019.
16         Does that sound right about when this was?
17     A.  Yes, ma'am.
18     Q.  Do you know where it took place?
19     A.  At the Hurst Convention Center.
20     Q.  Can you turn to page 2589 of this document?
21     A.  Okay.
22     Q.  So under your section here, it's got, you know,
23 a couple of learning objectives about strategies and
24 techniques.
25         Do you recall about how long your

1 presentation was?
2     A.  It was probably no more than 10 or 15 minutes,
3 and then probably questions afterwards.  That's how they
4 normally were set up.  I'm not 100 percent on the time,
5 but that's probably what it was.
6     Q.  Do you recall if you used or distributed any
7 materials in connection with this presentation?
8     A.  I don't specifically recall, but I normally
9 would not have any handouts when I -- when I spoke
10 publicly.
11     Q.  Okay.  You -- in the learning objections, it
12 says:  Attendees will understand the strategies and
13 techniques utilized by CNET, which are producing
14 consistent and effective results in addressing the
15 illegal use of opioids in Tarrant County.
16         What illegal uses of opioids were you
17 presenting on here?
18     A.  So I didn't -- I don't remember writing that
19 statement.  The host probably did or the organizer of
20 the event.  And I don't have my notes from that.
21         I would normally talk about the -- the --
22 the current threat that we're seeing with prescriptions,
23 and fentanyl is probably what I would talk about, and
24 talked generally about some of the arrests that we've
25 made, the types of people that we're arresting, you

1 know, students, people with jobs.  I would talk about
2 the fact that, on search warrants that we execute and
3 arrests that we make, it's -- they're probably drug
4 dealers; that if they wanted, you know, oxy, we -- we
5 hit the house, they would have oxy; they'd have
6 marijuana; they'd have meth; they'd have heroin.  That's
7 what I would normally speak about.
8     Q.  And when you just said that you would normally
9 speak about the current threat of prescription drugs and
10 fentanyl, can you be more specific about the -- what the
11 current threat of prescription drugs and fentanyl in
12 this, kind of, 2019 time frame was?
13     A.  Right.
14         It was -- the threat that we were dealing
15 with was the -- the prescription pain pills that were
16 available on the street, on the black market, and that
17 normally, like I said earlier, tied into a heroin
18 trafficker, and then this is also the time that we're
19 starting to see fentanyl being added to these
20 prescription pills on the street.  And I would talk
21 about the danger of not understanding or not knowing,
22 you know, the quality or the percentage of the opioid
23 that was in there versus the fentanyl, if that's clear.
24     Q.  Yeah.  Thank you.
25         And I understand you -- you may not have

25 (Pages 94 - 97)

Page 98

1 written out these learning objectives yourself.  But do
2 you have any recollection or is it likely your
3 presentation touched on the strategies and text --
4 techniques utilized by CNET?
5     A.  No.  I would have been very, very general in
6 all this.  That's why I know I didn't write this.
7     Q.  Do you know if you gave this presentation
8 alone?
9     A.  Normally, I would be alone with the other guest
10 speakers, of course.  But I would be the only one from
11 my department there, yes, ma'am.
12     Q.  Okay.
13         MS. WOHL:  We've been going about another
14 hour.  Can we go off the record?
15         THE VIDEOGRAPHER:  Everybody stand by.
16         We're going off the record at 12:25.
17         (Brief recess taken.)
18         (Lunch break taken.)
19         THE VIDEOGRAPHER:  We're back on the record
20 at 12:53.
21 BY MS. WOHL:
22     Q.  Welcome back, Chief Bond.
23     A.  Thank you.
24     Q.  I'll ask you to turn to Tab 8 of our notebook,
25 and that will be Exhibit 7.

Page 99

1     A.  Can I review this just a second?
2     Q.  Yes.
3     A.  (Witness examines document.)
4         (Exhibit 7 was marked for identification.)
5         THE WITNESS:  Okay.  I'm ready.
6 BY MS. WOHL:
7     Q.  Do you recognize this document?
8     A.  Yes, ma'am.
9     Q.  What is it?
10     A.  It's a workload measure that we prepare to help
11 with our budget planning.
12     Q.  Who prepares this?
13     A.  Our unit prepares this document.  I'm
14 responsible for it, when I was the commander, and then I
15 would send it to my chief to use in budget planning.
16     Q.  Are these still prepared every year?
17     A.  Yes, they are.
18     Q.  And what's the purpose of tracking these
19 measures and making projections?
20     A.  The biggest purpose is workload measures for us
21 to see, kind of, the caseload the investigators have and
22 the results of their work for the prior year and -- and
23 to also -- we can use it some- -- sometimes to spot
24 trends that are coming.
25     Q.  Next to the label "FY 2015," there's a

Page 100

1 parenthetical of NICU.
2         What does "NICU" stand for?
3     A.  That is the unit that was led by the District
4 Attorney's Office at that time before I -- before I
5 became a commander for CNET.  I'm not sure exactly what
6 the initials are.
7     Q.  Is it essentially tracking the same division
8 here; they were just called different things?
9     A.  That's correct.
10     Q.  Okay.  And next to 2017, it says "YTD."  Is it
11 your understanding that this was prepared sometime in
12 2017?
13     A.  Yes, ma'am.
14     Q.  Do you know, based on experience, when this
15 would have been prepared in the year?
16     A.  Probably a couple months -- oh, probably April
17 time frame, so that we can have time for the budget
18 planning.
19     Q.  When did the budget planning take place?
20     A.  It would take place during the summer,
21 primarily on input that we needed from the different
22 components of our -- of our agency.
23     Q.  And when would the -- the final budget be, I
24 guess, finalized?
25     A.  It would be in -- October 1 would be the new

Page 101

1 budget start, so we're in -- we're currently, you know,
2 doing that kind of stuff right now.
3     Q.  Okay.  On the second page of this document, the
4 third sentence there says -- sorry -- CNET -- actually,
5 the second sentence; it's just obscured by the hole
6 punched in mine.
7         It says:  CNET seizures of prescription
8 drugs increased in several categories by over
9 600 percent in 2016.  CNET is also beginning to see an
10 increase in counterfeit pharmaceuticals, such as
11 alprazolam.
12         What prescription drugs is this referring
13 to?
14     A.  To the best of my recollection, it would be the
15 opioid painkillers primarily, primarily OxyContin or
16 oxycodone, some Xanax more than likely, and then the
17 alprazolam.
18     Q.  And when prescription drugs is used in this
19 conduct -- context, does it also encompass those
20 counterfeit pills that we have talked about?
21         MR. JANUSH:  Objection.
22         THE WITNESS:  More than likely it would,
23 yes, ma'am.
24 BY MS. WOHL:
25     Q.  And so you mentioned Xanax.  So it's not

26 (Pages 98 - 101)

Page 102

1  limited to opioids, correct?
2      A.  It is not.  But a lot of times we would seize
3  opioids on the street.  They would also be trafficking
4  Xanax to take the edge off, the users, from the -- from
5  the opioids.
6      Q.  On the first page here, going back to these
7  categories of workload measures, is there any one
8  standalone category for opioids?
9      A.  I've got the hole punch in the middle of the
10  page, too.  I think that is heroin.
11      Q.  I think you're right about that.
12      A.  Okay.  So it would be the Rx, and then the D.U.
13  for dosage units.
14      Q.  Okay.  In the Rx (D.U.) line, I see 2389 under
15  FY 2015.
16          Does that mean that's the number of pills
17  that were seized in 2015?
18      A.  Yes, ma'am.
19      Q.  And then that increases to 15,000 the following
20  year?
21      A.  That's correct.
22      Q.  Okay.  And, again, that would include -- or
23  would that include the counterfeit prescription
24  medication that was seized as well?
25      A.  I believe it would be a mix of both.

Page 103

1      Q.  Okay.  And just to -- to be clear here, in that
2  sentence that we read on the second page, alprazolam is
3  not an opioid, right?
4      A.  That's correct.
5      Q.  Let's turn to Tab 9, or Exhibit 8.
6      A.  Can you give me just a minute to review?
7      Q.  Yep.
8      A.  (Witness examines document.)
9          (Exhibit 8 was marked for identification.)
10          THE WITNESS:  Okay.
11  BY MS. WOHL:
12      Q.  Do you recognize this document?
13      A.  I don't recognize this specific document; I've
14  seen similar doc- -- documents during my career, yes,
15  ma'am.
16      Q.  Do you recall the Fort Worth Police Department
17  reporting on pharmacy burglaries that were happening in
18  the Fort Worth area?
19      A.  I think I mentioned earlier I knew that some of
20  these were taking place, but I really didn't know the
21  details of them.
22      Q.  The first sentence says there were "four
23  commercial burglaries at local pharmacies (mom & pop
24  style, no national chains).
25          In your experience -- and we've talked

Page 104

1  about this a little bit.  But have those styles --
2  these, quote, mom-and-pop-style pharmacies been more
3  susceptible or vulnerable to burglaries than chains?
4      A.  I don't -- I -- I really can't say on that.
5  I'm not sure.
6      Q.  Okay.  And under here where it says "Targeted
7  Property:  Prescription medications to include
8  controlled substances (opioids)," were you aware of
9  pharmacies being burglarized specifically for opioids?
10      A.  Yeah.  Well, I should say I -- I was aware that
11  pharmacies were being burglarized.  I would -- I'm
12  assuming that they would go after opioids, but I don't
13  have specific details on that.
14      Q.  When did you become aware of pharmacies being
15  burglarized for opioids -- or being burglarized?
16      A.  This has happened throughout our -- my entire
17  career where I've heard about it.  Haven't really been
18  involved in -- in these investigations.  You know, I
19  know when I've been with Tarrant County, I've heard that
20  there's been some that has been burglarized as well.
21      Q.  Can you estimate a number of times you've heard
22  about these?
23      A.  Not with DEA.  With CNET, probably two or three
24  times I've been aware of, like, in a four- or five-year
25  period.  Not that often, but it does happen, I know.

Page 105

1      Q.  And what would that four- or five-year period?
2  Was that the, like, 2015 to '19?
3      A.  2016 through, probably, 2020, that time frame.
4      Q.  Okay.  And were all of these, to your
5  knowledge, these independent mom-and-pop-style
6  pharmacies?
7      A.  I don't recall; I'm not sure.
8      Q.  Do you -- are -- are you aware of any
9  burglaries of controlled substances from any chain
10  pharmacies in your experience in Tarrant County?
11      A.  I think, like I said, I'm aware of burglaries,
12  but I can't -- I'm not sure who -- was it a chain or
13  independent, I'm not sure of that.
14      Q.  Who would have that information?
15      A.  It would be DEA that would have it or, in this
16  case, Fort Worth PD.
17      Q.  Okay.  Do you know if the sheriff's department
18  was taking any specific efforts to address the pharmacy
19  burglary issue in that 2016-2020 time period?
20      A.  We -- our assistance would have been towards
21  DEA, trying to -- to provide surveillance support for
22  them as they do the diversion-type investigations.  That
23  would have been our -- our -- our contributing on
24  that -- contribution on that.
25      Q.  Okay.  Would you say cooperation with DEA when

27 (Pages 102 - 105)

Page 106

1 it was -- it was asked of you as opposed to taking
2 initiative?
3     A.  Well, if we -- sometimes, you know, we would
4 get the intelligence and pass that DEA about a person
5 that was distributing, like, opioids on the street, and
6 we would pass that to them, and then if they asked us to
7 help, then we would help them on that, surveillance and
8 things like that.
9     Q.  Understood.
10        Can you turn to Tab 10 for me?  This will
11 be Exhibit 9.
12     A.  Can you give me second on this one?
13     Q.  Yes.
14     A.  (Witness examines document.)
15        (Exhibit 9 was marked for identification.)
16        THE WITNESS:  Okay.
17 BY MS. WOHL:
18     Q.  Do you remember this communication?
19     A.  I do.
20     Q.  Again, it's to and from your e-mail address; is
21 that right?
22     A.  Yes, ma'am.
23     Q.  Starting with the first e-mail at the bottom of
24 the first page from Brian Lord, on November 6th, 2018,
25 let me ask you first:  Who is Brian Lord?

Page 107

1     A.  To be honest with you, I'm not really sure.
2 I'm assuming he may be associated with Tarleton State
3 for possibly -- well, I don't know.  I just don't know.
4 I don't recall.
5     Q.  If you look on the content of the e-mail on the
6 second page, can you tell me what it is he is conveying
7 to you in this e-mail?
8     A.  Yes.  He's providing intel on drug -- suspected
9 drug traffickers operating in our area that are
10 utilizing the dark web.
11     Q.  And at the end, he says:  Hopefully, he will be
12 able to find something off of this.  Let me know if he
13 needs anything else.
14        Do you know the "he" that Brian is
15 referring to?
16     A.  I believe that this is reference to
17 Dr. Christopher Copeland, who's a professor at Tarleton
18 State University here in Fort Worth, and he was
19 assisting us and other law enforcement agencies on
20 dark-web investigations.
21     Q.  How is he assisting with that?
22     A.  He operated a dark-web portal for us and other
23 agencies, and we tried to look for suspects or
24 description of -- of pills and drugs and that kind of
25 stuff on the dark web.

Page 108

1     Q.  So you would give him some information to
2 search for you, and he would use his portal to uncover
3 things?
4     A.  Yes.  From my memory, a lot of times we would
5 provide him intel on a suspected trafficker that we were
6 looking at and ask him to see if -- if he could identify
7 or find any dark-web activity related to drug dealing.
8 That would be, kind of, the -- the most common process.
9     Q.  How did this relationship come about?
10     A.  We had a -- a grant -- we entered into a
11 federal grant at Tarleton State, probably 2016 or '17,
12 and one of the capabilities or assets they were able to
13 bring to us was the use -- access training and use of
14 the dark web on some of our investigations.
15     Q.  Interesting.
16        So was this, kind of, the -- the typical
17 set of information that was given to him for -- for an
18 investigation?
19        MR. JANUSH:  Objection, form.
20        THE WITNESS:  This -- I'd say it's not
21 typical.  Normally, we didn't deal with suspects.  A lot
22 of times we dealt with descriptions of illegal drugs
23 that we were -- we were buying, or arresting, from
24 people we're seizing on the street.  So a lot of times
25 we would provide him a -- a photograph or the trade name

Page 109

1 or -- and see if he could identify people that were
2 operating in Tarrant County that were, you know, buying
3 from the same sources and -- and look for commonalities,
4 that type of stuff.
5 BY MS. WOHL:
6     Q.  And when you gave him information, what -- what
7 did he produce to you after looking through -- for
8 information on the dark web?
9     A.  It -- it would vary.  Sometimes he would be
10 able to confirm that maybe a drug that we've identified
11 that was being trafficked here is being trafficked by
12 several people in this area and other parts of the U.S.
13 or the world.  Sometimes we could figure out where, you
14 know, the -- the source of supply, what area of the
15 country that they were shipping from, if you will,
16 things like that.
17     Q.  And then what would you do once you had that
18 information?
19     A.  If it -- if it supplemented our investigations,
20 you know, we could look for other suspects or, kind of,
21 identify suspects we knew that were involved with this
22 group; for example, look at their phone records,
23 things like -- normal investigative steps that we would
24 then take.
25     Q.  Were all the investigations done in this matter

28 (Pages 106 - 109)

1 related to narcotics?

2    A. I believe so. From -- from CNET's point of

3 view, he may have assisted human trafficking and our

4 intel unit, but I'm not sure of that. It's possible.

5    Q. Do you know how much the grant was?

6    A. I don't -- I don't remember that; no, I don't.

7 It lasted for several years, but I'm not sure of the

8 price or the -- the amount.

9    Q. Are you still operating under this grant?

10    A. I don't think that we are, but we have -- one

11 of the -- the good things for the grant for us was this

12 relationship we could maintain with, specifically, him

13 for help with the dark web.

14    Q. So the grant may not still be operating, but

15 you still reach out to him with information?

16    A. Yeah. And I have not personally reached out to

17 him for a while. I'm assuming that CNET does, but I

18 don't know that for sure. And I do believe the grant's

19 expired, if that's your other question, yes.

20    Q. Do you know about how many investigations or

21 instances where you've reached out to him for further

22 investigation to dark -- the dark web have led to

23 Tarrant County arrests and seizures?

24    A. I don't know the answer to that, because some

25 of the things that he was able to help us identify with,

1 I got promoted and left at that time. So I'm not sure

2 on the follow-up on some of the investigations.

3    Q. In your experience, it was a significant tool

4 for you-all to supplement investigations with?

5    A. Very much so.

6    Q. So in the descriptions of what Brian is

7 forwarding along, he is describing three people --

8 supplier, dealer, and spouse -- and he describes the

9 supplier as "obtains fentanyl from the dark web because

10 cousin turns it into pills."

11    So, kind of, going backwards, we've been

12 talking about the dark web. Can you tell me what the

13 dark web is?

14    A. Right. It's kind of the -- it's kind of the

15 bottom of the iceberg of -- of Internet communications,

16 and it's very large, probably 70 percent, that people

17 without the right access and software cannot engage in.

18 And all the currency -- all the transactions were

19 conducted with a virtual currency, and so it's hard for

20 us as law enforcement to operate in that environment

21 sometimes because of that.

22    And one of the issues we had that he

23 identified for us is that the -- a lot of those websites

24 on the dark web stay up for a few days, or a month or

25 two, and then they get shut down, or they get -- they're

1 afraid, and they shut operations. So it's a frustrating

2 experience to deal with it.

3    Q. So to get involved with the dark web and

4 actually facilitate transactions require some level of

5 technical sophistication; it's not just available to

6 anybody?

7    A. Pretty much so. We control it with our -- with

8 an RA2. We have one terminal here, and it's restricted

9 access to it.

10    Q. And is it designed so that all of the

11 transactions are -- and communications on the dark web

12 are anonymous?

13    A. That's their hope, yes.

14    Q. Do you have any experience with criminal

15 activity involving the illegal purchase of opioids on

16 the dark web?

17    A. Not -- not -- no, I do not.

18    Q. And this document -- this e-mail says the

19 supplier's address is in Fort Worth; is that right?

20    A. Give me just a second on that.

21    (Witness examines document.) Yes.

22    Q. And Brian describes the dealer as selling

23 fentanyl caps for Xanax and cash. Pills are stored in

24 Tylenol pill bottles and resealed in box and packaging.

25    Do you have experience with criminals who

1 sell fentanyl in exchange for other drugs?

2    A. I -- I would say that it would not surprise me

3 that they -- that they barter with that, but I don't

4 have any direct experience on that.

5    Q. And this also says the dealer's address is in

6 Fort Worth as well; is that right?

7    A. Where are you seeing that, if I can ask?

8    Q. Sorry. I'm looking now. Nope. I see a Texas

9 driver's license, but I don't see Fort Worth on there.

10 My mistake.

11    A. Okay. I think the supplier is the one that has

12 that address associated with them.

13    Q. Okay. And you say at some point you got

14 promoted, so you weren't aware of the outcome of some of

15 these investigations.

16    But do you recall the outcome -- or what

17 the next steps were with this one, if there's any

18 information that Dr. Copeland -- or professor Copeland

19 was able to give you?

20    A. I -- I'm not aware of this. I'm sorry; I don't

21 know on that.

22    Q. Okay. Your response to him includes the

23 statement: As you may be aware, most of the fentanyl

24 comes in from China in powder form to the U.S.

25    And, now, this was in 2018. So that was

29 (Pages 110 - 113)

Page 114

1 your experience at that time in 2018; is that right?
2     A. That's right, China first and then Mexico
3 later.
4     Q. Okay. All right. Can you turn to the next
5 Tab 11. This will be our Exhibit 10.
6     A. Can you give me a minute on this?
7     Q. Yep.
8     A. (Witness examines document.)
9         (Exhibit 10 was marked for identification.)
10        THE WITNESS: Okay. I think I've read it.
11 BY MS. WOHL:
12    Q. Do you recognize this document?
13    A. Actually, I do not recognize this document.
14    Q. Do you recognize the format of it or as -- you
15 know, the subject of something that you knew was
16 prepared?
17    A. I knew that this information was provided. I
18 believe it was provided to DEA by our intel unit, and
19 that -- and that's what I -- I'm good with that, but I
20 don't recognize the format of it.
21    Q. Okay. So this information that's contained
22 herein would have been provided possibly to the DEA.
23        Would you also have been provided a copy of
24 the information?
25    A. I don't recall receiving this one. I've seen

Page 115

1 other ones similar to this, but I don't recall this one.
2     Q. Okay. Do you know what this kind of analysis
3 is intended to be used for?
4     A. I think when I was with DEA and -- and reviewed
5 information like this, to me, it's: What are the
6 current treat -- threats that we're seeing, and what are
7 the threats? So that's what I would try to glean from
8 information intelligence like this.
9     Q. And what kind of information and data goes into
10 making these -- this analysis?
11    A. I think this is prepared by DEA intel, so I'm
12 not -- I can't speak to a lot of what their goals and
13 everything are. This report is dealing, it looks like,
14 primarily from interviews that our intel group conducted
15 with prisoners in our jails in Tarrant County.
16    Q. So when you say "our intel group," do you mean
17 the sheriff's department?
18    A. Yes, ma'am, Tarrant County Sheriff's Office.
19    Q. Okay. What division would be conducting those
20 interviews?
21    A. Well, our intelligence division would provide
22 the information, and we provide it to multiple agencies,
23 not just DEA.
24    Q. At the bottom of that first page there, under
25 "Summary," it says: With respect to the first quarter

Page 116

1 to the fourth quarter of Fiscal Year 2019, a total of 56
2 SIRS reports were written.
3         Can you tell me what SIRS reports are?
4     A. I'm not exactly sure what it stands for; it's a
5 type of intelligence report. I'm not sure of what
6 exactly it stands for.
7     Q. Under the "Methodology" par- -- paragraph, it
8 says: Significant intelligence reports. But that -- do
9 you -- if that terminology rings a bell and you know
10 what exactly that would include, that -- that's my
11 question.
12    A. Yes, ma'am, that's correct.
13    Q. Okay. And are you familiar with the
14 terminology, the PIR ICP tags?
15    A. I've heard that before. I'm not sure -- I
16 don't recall what it stands for exactly.
17    Q. Okay. The "C" in the paragraph above PIR is
18 Priority Collection Requirements, but I'm not sure that
19 -- oh, yeah, Intelligence Collection Plan.
20        Okay. So I take it you didn't write this?
21    A. I did not write that.
22        MR. JANUSH: Objection.
23 BY MS. WOHL:
24    Q. This says here that -- "PIR 3 -
25 Heroin/Fentanyl," the units here are eight. Do you know

Page 117

1 what that's measuring?
2     A. Since these are intel reports, I'm assuming
3 that eight times an inmate provided information or
4 intelligence in that -- in that category.
5     Q. And that --
6     A. I may be wrong on that, but that's what I think
7 it is.
8     Q. I understand. Thank you.
9         And that category, heroin and fentanyl, you
10 would not expect to include prescription opioids; is
11 that fair?
12    A. That's -- that's a little hard for me to answer
13 in regards to the fake -- you know, the pills that we
14 see here now with fentanyl in them, because they're
15 designed to look like pharmaceutical pills. So that's
16 hard. I -- I don't know the answer on that one.
17    Q. I understand.
18        On the next page there with respect to
19 2019, that next table says that there are two for
20 "Fentanyl Synthetics."
21        And that, kind of, your same answer with
22 respect to whether this would include prescription
23 pharmaceuticals that it's unclear, because there's the
24 counterfeit pills?
25    A. That's correct.

30 (Pages 114 - 117)

Page 118

1  Q. Okay. But there isn't a separate category here
2 for prescription opioids, correct?
3  A. I don't know. I'm looking.
4  No. I see a pharmaceutical diversion on
5 the first page, but I don't see anything else like that.
6  Q. What would the pharmaceutical diversion mean?
7  A. I'm assuming -- and -- that that would be an
8 inmate that talked about a pharmaceutical diversion,
9 diverting prescription drugs illegally on its street.
10  Q. Okay.
11  A. That would be my assumption only on that.
12  Q. Okay. And the figure for that is zero on that,
13 right?
14  A. Yes, ma'am.
15  Q. Okay. Going to the third page of this document
16 ending in 572 --
17  A. Okay.
18  Q. -- that chart at the top of the page, what does
19 this chart reflect, if you know?
20  A. Give me just a second to look at that.
21  Q. Uh-huh.
22  A. (Witness examines document.)
23  So I believe that this would be Dallas's --
24 Dallas DEA's prior intelligence, kind of, categories or
25 requirements that they define for themselves each year

Page 119

1 independently. So Tarrant County would have nothing to
2 do with this. So that would be their -- their threat
3 assessment, I guess, or their trends, and that -- and
4 how they rank-ordered them and how they came up with it,
5 I -- I don't know any of that.
6  Q. Okay. So none of this would have to do with
7 Tarrant County?
8  A. I -- I don't believe so.
9  Q. That line there about pharmaceutical diversion,
10 it's a little bit different than the one we saw on the
11 other pages. It's pharmaceutical and precursor
12 diversion. Can you tell me -- do you know what that
13 means?
14  A. I -- I would only be speculating on this,
15 because I've never participated in a report like this or
16 prepared it.
17  MR. JANUSH: And -- and I'm going encourage
18 my witness to not speculate or guess if you don't know
19 the answer.
20 BY MS. WOHL:
21  Q. The first sentence of the assessment there:
22 From this chart of PIRs, the analysis reflects that the
23 bulk of the collected intelligence can be associated
24 with domestic cartels and gangs in the Tarrant County
25 and surrounding area with a second-most reference to

Page 120

1 Mexican DTOs operating within the Tarrant County and
2 surrounding area. The most prevalent drug in the Dallas
3 division is methamphetamine, and the most associated
4 trafficker of this meth is usually Mexicans and/or a
5 link to Mexico for the drugs.
6  Do you agree with those statements?
7  A. I agree with the statements, but I -- like I
8 said, I've never -- I have not prepared this report,
9 so...
10  Q. I understand.
11  But you would not -- you would agree
12 that -- well, strike that.
13  Let's go to the next Tab 12. It's
14 Exhibit 11.
15  A. Give me just a second here.
16  (Witness examines document.)
17  (Exhibit 11 was marked for identification.)
18  THE WITNESS: Yeah, I'm -- I recognize this
19 e-mail, but I'm concerned because there's a lot of
20 sensitive information and activities that are detailed
21 in here.
22 BY MS. WOHL:
23  Q. Well, we certainly have no intention of
24 compromising any sensitive information of ongoing
25 investigations.

Page 121

1  Let me ask you some questions about this,
2 and then if we --
3  MR. JANUSH: Yeah. You know, just to --
4 for the record, this is the same issue that arose
5 yesterday with respect to at least one document where
6 certain folks were named. We're going to need to claw
7 back this document and replace it with redacted --
8 redactions for certain names in here. We won't alter
9 the substance of this document, but we do need to
10 protect the names of these individuals.
11  MS. WOHL: Can we go off the record for a
12 second?
13  MR. JANUSH: We can.
14  THE VIDEOGRAPHER: Everybody stand by.
15 We're going off the record at 1:27.
16  (Brief recess taken.)
17  THE VIDEOGRAPHER: We're back on the record
18 at 1:30.
19 BY MS. WOHL:
20  Q. Okay. Chief Bond, I've got you looking at
21 Exhibit 11 that we're going to bring up here,
22 because there's some information that needs to be
23 redacted.
24  But let me ask you first -- you have asked
25 some of the recipients of your e-mail for details of

31 (Pages 118 - 121)

1 accomplishments, and if you can tell me, generally, why
2 you were asking for this information.  That -- that's my
3 question.
4    A.  Yes, ma'am.
5        One, so I can brief the sheriff on what our
6 officers -- our task force officers are doing, right?
7 And the other one is to -- to help me prepare their --
8 their appraisals and just to understand, you know:  How
9 active are they?  Are they contributing the right way?
10 Things like that.
11   Q.  And this document references an abbreviation
12 here that stands for Title -- or T3.
13        Can you tell me what "T3" means?
14   A.  It does.  It's a -- it's a communication
15 intercept, wire intercept.
16   Q.  And the investigation that's referenced in this
17 document, is that ongoing?
18   A.  I don't know if it's still ongoing or not.  I
19 don't think it is, but I don't know.
20   Q.  Okay.  How can we find out that information?
21   A.  I can find that out for you.  Let Evan know if
22 you want me to do it that way.
23   Q.  Okay.  Can you -- are you able to tell me
24 whether any of Kroger's or Albertsons' pharmacies are
25 involved?

1    A.  I have no idea on that.
2    Q.  Okay.  Can you tell me what pill press machines
3 are?
4    A.  Yep.  That's what we were discussing earlier
5 this morning.  A lot of the traffickers have acquired,
6 illegally, the -- the tabulating machines and the
7 pill-press machines with the dyes and -- and all that.
8 So that's what they're referring to.
9        MR. JANUSH:  And that's about all I'm going
10 to permit regarding pill-press machines.
11       MS. WOHL:  Well, I do have a couple other
12 questions that, I think, are outside the boundaries
13 of this document but --
14       MR. JANUSH:  All right.  Why don't you ask
15 them, and -- and we'll make a -- a determination with --
16 with Craig as Tarrant County's attorney.
17 BY MS. WOHL:
18   Q.  And I think this is something you've alluded to
19 in our past conversations.  But in recent years, have
20 you seen an increase in the use of these pill-press
21 machines?
22   A.  I would say, in recent years, I -- I can't
23 answer that.  I don't know based on my role at CNET.
24 When I was at DEA, we saw a general increase of them
25 when I was with DEA.

1    Q.  Do you know where they come from?
2    A.  I do not.
3    Q.  And is it fair to say that when pill-press
4 machines are being used, they're not being used
5 coinciding with prescription opioids that are coming
6 from a manufacturer to a distributor to a pharmacy; it's
7 used to make counterfeit pills?
8    A.  I -- I don't know the answer to that.  Based on
9 my experience, I have seen a mixture, like I said
10 earlier, of pills and powder and all that.  Where the
11 pills came from, I don't know.  So I can't answer that
12 question.
13   Q.  But in terms of what's being produced from the
14 pill-press machine, is that simply counterfeit pills?
15   A.  Yes, ma'am.
16   Q.  Okay.  Let's move off this document and go to
17 Tab 13.
18       MR. JANUSH:  And just for the record, 13
19 has a redaction to be made regarding a specific named
20 individual, same individual, one of the two that are --
21 that was listed in the prior document.
22       MS. WOHL:  Noted.  Okay.  This will be
23 Exhibit 12.
24       (Exhibit 12 was marked for identification.)
25       CONCIERGE:  Counsel, without redaction, do

1 you still want me to pull up -- pull it up on the screen
2 or not?
3        MR. JANUSH:  I'd rather not, just because
4 that name shouldn't be displayed further.
5        CONCIERGE:  Counsel, both of you agree?
6        MS. WOHL:  Yes, that's fine.
7        CONCIERGE:  Okay.
8        THE WITNESS:  (Witness examines document.)
9        Okay.  I'm ready on that one.
10 BY MS. WOHL:
11   Q.  Okay.  Do you recognize this communication?
12   A.  I do.
13   Q.  And can you tell me what the DEA Fort Worth
14 Tactical Diversion Squad is?
15   A.  Yes, ma'am.  That's -- DEA has an office in
16 Fort Worth with regular enforcement groups that target
17 the meth and the cocaine and heroin.  They also have a
18 unit that's called the Tactical Diversion Squad that
19 focuses on doctors and prescribers/pharmacists that --
20 that are suspected of diverting material -- or illegal
21 drugs.
22   Q.  So -- sorry.  Say that to me again.  It's got,
23 kind of, two -- two facets of the diversion squad:  One
24 is targeting heroin and meth; and other is targeting
25 doctors, pharmacies, and what else?

Page 126

1    A. No. So the office -- the Fort Worth office and
2  the Dallas office, for example, have a number of -- of,
3  what I would call, a -- a normal enforcement group that
4  are targeting traffickers of heroin, meth, cocaine,
5  things like that. They also have -- not every off- --
6  DEA office, but some of them have a group, a squad,
7  that's -- that's focused only on tactical -- on
8  diversion of pharmaceutical drugs, and that's what this
9  is. It's called a Tactical Diversion Squad.
10    Q. Okay. So the Tactical Diversion Squad is the
11  one targeting doctors, prescribers, pharmacies?
12    A. Yes, ma'am.
13    Q. Would you in- -- would you include anyone else
14  in that list of targets?
15    A. If we encountered somebody that has a -- a
16  tabulating machine or pill press, things like that, then
17  they would be involved in that as well.
18    Q. Okay. So you've got, kind of, a mix of
19  legitimately manufactured opioid pills and the
20  counterfeit pills being produced, kind of, in -- within
21  -- under the umbrella of the tactical squad?
22    A. That's correct.
23    Q. Do you know when this was started?
24    A. It would be a guess on my part. It's been a
25  while.

Page 127

1    Q. Like, 1990s or later?
2    A. Probably mid-1990s, but I'm not sure.
3    Q. I won't hold you to it.
4       And was the purpose always to target the
5  doctors, pharmacies, prescribers, and those producing
6  counterfeit pills?
7    A. As far as I know, yes.
8    Q. There's a reference to a DEA case in here. Do
9  you have any knowledge of whether this DEA case is
10  ongoing?
11    A. I don't know. I would --
12    Q. Do you have any -- go ahead.
13    A. I would assume not since this is a -- a -- kind
14  of, a go-by press release that was prepared for the
15  agencies that helped DEA to release.
16    Q. Do you know anything about this investigation
17  that's referenced here?
18    A. I would say general, high-level speaking, yes,
19  but not the details.
20    Q. What's your high-level understanding of it?
21    A. That they targeted -- my understanding is that
22  they targeted street prescription drugs, which led, kind
23  of, up the chain to this, which is normal, which led to
24  the tabulating machines, I think, like that. It's
25  common.

Page 128

1    Q. Okay. And when you use the term "street
2  prescription drugs," what do you mean by that?
3    A. Oxy and things like that available on the
4  street illegally.
5    Q. Okay. So not coming from a pharmacy but
6  already diverted and on the street?
7    A. Don't know the answer to that. They're just on
8  the street for purchase.
9    Q. Okay. I understand. I think we're saying the
10  same thing.
11       But -- and that would include OxyContin and
12  prescription opioid medication that was legitimately
13  manufactured by a licensed manufacturer, as well as
14  counterfeit pills that were produced from a pill press
15  or similar operation?
16    A. It could. Some of the cases I've been on were
17  just the -- the opioids that were diverted, sold
18  illegally on the street. And later on, we see a mix of
19  that with the fentanyl, the counterfeit pills.
20    Q. Okay. So the first part of that was: Early on
21  you would see opioid pills that were diverted, and that
22  means they have, at some point, came from a distributor
23  or came from a pharmacy?
24    A. Yes, ma'am.
25    Q. And in any of those were you able to trace them

Page 129

1  back to the pharmacy that the pills came from?
2    A. As I said earlier, I don't recall any -- I know
3  that we passed those leads to DEA/TDS for -- Texas DPS,
4  and I'm not sure how successful they were on that.
5    Q. Okay. So that would fall under that same line
6  of questioning that we talked about earlier.
7       If there were any records supporting that
8  any of these illegally diverted prescription opioid
9  pills came from a Kroger or an Albertsons pharmacy,
10  those records would not be in your office; that
11  investigation would not have been by your department?
12    A. That's correct.
13    Q. Okay. Turn to Tab 14, please.
14    A. Give me just a minute on this too.
15    Q. Yeah. This will be Exhibit 13.
16       (Exhibit 13 was marked for identification.)
17       MS. WOHL: And this one should be okay to
18  display on screen.
19       THE WITNESS: (Witness examines document.)
20       Okay. I'm ready.
21  BY MS. WOHL:
22    Q. Okay. This first e-mail -- well, let me ask
23  you first: Do you recognize this communication --
24    A. Yes.
25    Q. -- any part of it?

33 (Pages 126 - 129)

1      The first e-mail is from Raul Rodriguez to
2  you on June 25th, 2021.  Can you tell me who
3  Raul Rodriguez is?
4      A.  Yes, ma'am.  He was one of the supervisors that
5  worked for me in CNET.
6      Q.  And who did he supervise, generally?
7      A.  He would supervise our investigators and task
8  force officers that were assigned to our group, his
9  group.
10      Q.  How many groups were in the CNET?
11      A.  There's supposed to be two.  So there's really
12  one because of manpower issues.
13      Q.  Okay.  So at the time, he was over one group,
14  and then he reported to you; is that the hierarchy?
15      A.  Yes, ma'am.  And we had a -- a lieutenant
16  involved as well.  So he technically reported to her,
17  and then they -- she reported to me.
18      Q.  Okay.  And there's some information that
19  Raul Rodriguez provides to you.  Did you -- do you
20  recall asking him to provide this information?
21      A.  I do.
22      Q.  And why did you ask for this info?
23      A.  I needed to brief the sheriff on the -- the --
24  you know, the -- trends in the threats that we see
25  here, and then I would use some of this information --

1  the information that I could if I spoke publicly about
2  the -- the growing drug threat, kind of, the trends that
3  we're seeing.
4      Q.  Does your overdose data always come from the
5  medical examiner's office?
6      A.  In Tarrant County it does, yes.
7      Q.  And the statistical information here -- the
8  mixed drug toxicity, does that mean that there were a
9  mixture of drugs in the system?
10      A.  It does.
11      Q.  And when that's the case, are you able to tell
12  which drug caused the overdose?
13      A.  Sometimes the medical examiner is, and
14  sometimes they're not, and that's why he is referring to
15  the -- the, quote/unquote, drug cocktail.  And that's
16  the result that we get back from the medical examiner
17  when there's multiple drugs in this person's system, and
18  they may not be able to attribute the death to one
19  specific drug.
20      Q.  Okay.  So this data here on fentanyl is -- the
21  statistics include fentanyl overdoses even if fentanyl
22  was just one drug in a mixture of drugs?
23      A.  That's correct.
24      Q.  Okay.  And he's not giving you data here on
25  prescription opioids; is that right?

1      A.  I don't believe so, no.
2      Q.  The paragraph that starts out:  What the unit
3  is encountering..., I'm going to read the second
4  sentence there:  Fentanyl is being sold and passed off
5  as a legitimate prescribed medication; namely, oxycodone
6  hydrochloride 30mg pills (commonly referred to as "blue
7  M30's."  What makes these counterfeit oxycodone pills so
8  dangerous is the fentanyl content of each pill is not
9  precise due to the pills being manufactured in
10  clandestine lab settings.
11      Do you agree with this statement?
12      A.  I do.
13      Q.  And we've talked a little bit about counterfeit
14  medication.  But, specifically, can you hone in on your
15  experience with fentanyl being made into counterfeit
16  medication?
17      A.  Yes.  So it's transitioned over time a little
18  bit.  Initially, in my experience, a lot of the
19  traffickers were actually selling the illegally diverted
20  oxycodone on the street, and then they would start
21  adding -- kind of, cutting some of the oxy -- oxy with
22  the fentanyl, right, and then having to re- --
23  retabulate or reformulate that.
24      So earlier on, it was a mixture of diverted
25  and the counterfeit with fentanyl in it.  And it's kind

1  of going back and forth during my career, and the -- the
2  key point was that there -- there's no quality control,
3  and you don't know how strong each pill is.  So
4  that's -- that's the main thing.
5      Q.  Have you encountered these clan labs in Tarrant
6  County?
7      A.  I --
8      MR. JANUSH:  Objection.
9      THE WITNESS:  I'm sorry.
10      I personally have not.  My units, when we
11  were assisting DEA, have encountered them.
12  BY MS. WOHL:
13      Q.  So there are some that are in the United
14  States, in your experience, rather than all of them in
15  Mexico?
16      A.  Yes.  The -- the first one that I encountered,
17  as I told you, was in Lubbock.
18      Q.  Okay.  On the next page in that document ending
19  630, there's a statement towards the end that says:  I
20  believe the pills are being sold to patrons as safer
21  alternatives than the harder drugs, such as cocaine,
22  methamphetamine, and heroin, due to their disguised
23  nature of prescribed oxycodone.  The common street slang
24  the investigators are coming across during their
25  interviews and investigations are the pills being sold

34 (Pages 130 - 133)

Page 134

1 and promoted as "percs," otherwise known as Percocet
2 (oxycodone and acetaminophen tablets) which have
3 recently been popularized by rap culture.
4      Do you agree with this statement?
5   A. I do, yes.
6   Q. And is that consistent with your experience in
7 terms of how these pills are marketed and promoted?
8   A. It is. And like we have talked about earlier
9 this morning, unfortunately, you know, some of the
10 people on the street believe, if it looks like a
11 prescription drug, it's safer for them instead of using,
12 you know, an illegal drug like heroin or -- or meth.
13      So in my opinion, based on my career, the
14 cartels have recognized that, and that's why they're,
15 you know, using -- using this right now as M30s, because
16 of that -- how it started.
17   Q. We've talked a little bit about the use of
18 undercover officers in narcotics investigations.
19      Do you also utilize controlled buys as a --
20 a tactic for an investigation?
21   A. We do.
22   Q. Have you ever used somebody -- a CI or somebody
23 in a controlled-buy scenario to attempt to get an opioid
24 medication from a pharmacy to try to -- well, I'll leave
25 it there -- to send somebody to a pharmacy to pick up an

Page 135

1 opioid medication?
2   A. Not that I can recall. As we talked earlier,
3 we've gone in for doctors, but I don't -- I don't
4 remember if we have targeted a pharmacy directly, if
5 that's what you're asking.
6   Q. Yeah.
7   A. Okay. Let me ask you to turn to Tab 16, and
8 this will be our Exhibit 14 -- 13 or 14 -- yeah, 14.
9      THE COURT REPORTER: Ms. Wohl, is there any
10 way we can take a two-minute restroom break while he's
11 looking at the document?
12      MS. WOHL: Yes, absolutely. It has been
13 about that time.
14      Yeah, go ahead and look at this. We'll
15 take a break.
16      THE COURT REPORTER: I appreciate it.
17 Thank you.
18      MS. WOHL: Sure.
19      THE VIDEOGRAPHER: We're going off the
20 record at 1:50.
21      (Brief recess taken.)
22      THE VIDEOGRAPHER: We're back on the record
23 at 2 o'clock.
24 BY MS. WOHL:
25   Q. Chief Bond, you'll be happy to know I don't

Page 136

1 have a whole lot left. We'll power through the rest of
2 this.
3      We left off looking at Tab 16, which is our
4 Exhibit 14.
5      (Exhibit 14 was marked for identification.)
6 BY MS. WOHL:
7   Q. Do you recognize this document?
8   A. Yes, ma'am.
9   Q. What is it?
10   A. This is our -- basically, the activity report
11 for our unit broken down by quarter.
12   Q. Who prepares this document?
13   A. All of our investigators will provide the data
14 information to -- to our, like, administrative
15 assistants, and then they would prepare -- or be
16 reviewed by our supervisors.
17   Q. And this is for 2018. If you could go down to
18 the line that says "Narcotic Search Warrants," and
19 you've got a couple of numbers for each quarter there.
20 You see that?
21   A. Yes, ma'am.
22   Q. Do you recall either in 2018, or ever, as part
23 of an investigation, serving a search warrant on a
24 pharmacy?
25   A. I don't -- I don't recall that. Now, DEA may

Page 137

1 have done that with the assistance of our personnel, and
2 I'm not aware of it.
3   Q. Sure. Thank you.
4      And there's a line here on the second page,
5 the "Clandestine Labs" line, and it's a bunch of zeros
6 for 2018.
7      My question is: Does that refer to
8 methamphetamine laboratories, pill-press laboratories,
9 or both?
10   A. It would refer to both.
11   Q. Okay. And the numbers here are zero for each
12 of the first three quarters at least.
13      Is that pretty usual for that time period,
14 not a lot of clandestine laboratory seizures?
15   A. That's correct. If we had intel on one, we
16 would normally refer it to DEA.
17   Q. Was there a time when clandestine laboratories
18 were a bigger part of your cases and investigations?
19   A. Most definitely, especially with DEA, yes.
20   Q. And was that mostly, you know, with respect to
21 methamphetamine?
22   A. Yes, ma'am.
23   Q. And same question with respect to the line that
24 says, "Canine Activity." Ever had any reason to engage
25 a canine officer at a pharmacy in regards to a narcotics

35 (Pages 134 - 137)

1 investigation?
2    A.  Not that I can recall.  The -- the -- the
3 canine officers may have assisted with arrests and
4 search warrants with DEA at a pharmacy, but I'm not --
5 not aware.
6    Q.  When you go down another couple of pages -- and
7 I apologize; this isn't Bates-stamped because it was an
8 Excel spreadsheet, so the name of the file is a Bates
9 number.  And let me go ahead and read that into the
10 record.  It's TARRANT_00812403.
11        And if you go to the fourth page of this
12 document, it's got a list of pharmaceuticals, and
13 there's not a lot of activity of these cells under
14 pharmaceuticals.
15        Is -- is that because that -- there weren't
16 seizures of these drugs during those quarters?
17    A.  It is.  And -- and if we had -- like I said
18 before, if we had information about that, we would
19 normally refer to -- to DEA Tactical Diversion Squad.
20    Q.  So seizures of pharmaceuticals may have been
21 incidental to drug busts that you were doing, but if it
22 was an investigation specific to counterfeit or
23 prescription drugs, that's something you would have
24 referred?
25    A.  Yes.

1    Q.  Let's turn to Tab 19, please.  This will be our
2 Exhibit 15.
3    A.  Give me a second here.
4        (Exhibit 15 was marked for identification.)
5        THE WITNESS:  (Witness examines document.)
6        Okay.  I'm ready.
7 BY MS. WOHL:
8    Q.  All right.  Do you recognize this as another
9 HIDTA Threat Assessment for the year 2019?
10    A.  Yes, ma'am.
11    Q.  All right.  If you could go to the page that
12 ends in 241, the section is titled "Drug Threats."
13    A.  Okay.
14    Q.  So this is generally talking about a continued
15 threat of methamphetamine, and methamphetamine still
16 being the number one threat.
17        Is that -- you know, you said it a couple
18 times it has been and still is the number one threat,
19 but I'm just making sure you agree with -- with that.
20 I'll give you a specific sentence so you're not just
21 guessing what it says:  Consistently -- law enforcement
22 agencies across Texoma HIDTA Area of Responsibility
23 consistently identify methamphetamine as the greatest
24 drug threat in their communities.
25        Does that hold true in your experience with

1 the areas you were involved in?
2    A.  At that time, yes.  And then heroin and
3 controlled pharmaceutical drugs would be number two.  So
4 I agree -- I agree with how it's laid out for that time
5 frame, yes, ma'am.
6    Q.  Okay.  And then, again, when you say heroin and
7 controlled substances, pharmaceuticals, is number two,
8 you're including in that those counterfeit pills that
9 are -- are being made to look like pharmaceuticals,
10 right?
11        MR. JANUSH:  Objection.
12        THE WITNESS:  Give me just a second.  I
13 think at this time most of what we're dealing with are
14 actual diverted pharmaceutical pills on the street.
15        This is -- what year is this again?
16 BY MS. WOHL:
17    Q.  This is April 2019.  That's what it says on the
18 beginning of the first page.
19    A.  Okay.  I would say it's -- it's definitely a
20 combination, but probably predominantly the street --
21 the diverted oxy pills and things like that.
22    Q.  Okay.  So when you say diverted oxy pills on
23 the street, are you referencing pills that were
24 manufactured from a licensed manufacturer yet diverted
25 from that -- that chain that we talked about at the

1 beginning?
2    A.  Yeah.  I'm talking about drugs that would've --
3 yes, would have come through the normal manur- --
4 manufacturing process prescribed through a pharmacy and
5 then illegally diverted on the street.  That's what I'm
6 referring to.
7    Q.  Okay.  Will you turn to the page ending in 250?
8    A.  Okay.
9    Q.  There's a paragraph -- the second paragraph
10 under "Pharmaceuticals," starts out:  Outside of the
11 threat from Mexican DTOs, diversion of controlled
12 pharmaceutical drugs from the medical and pharmacy
13 environment, as well as the sale of synthetic drugs from
14 retail establishments, pose a significant public health
15 and public safety threat in the region.
16        Is that consistent with your understanding
17 from your experience as law enforcement at this time?
18    A.  Yep.  So they're mixing two things here, taking
19 the Mexico DTO out, but the diversion of controlled
20 pharmaceuticals we're talking about on the illegal --
21 like, oxy on the street.
22    Q.  Okay.
23    A.  And then when that sets, instead of drugs here,
24 they're more than likely talking about K-2, the
25 synthetic cannabinoids.

36 (Pages 138 - 141)

1    Q.  Okay.  And are you saying that based on the
2  context of the -- the time that this was written and
3  what you were seeing at that time?
4    A.  Yes, ma'am.
5    Q.  Okay.  A couple sentences down, there's a
6  sentence that says:  Pharmaceutical diversion occurs in
7  a variety of forms, but a common operation is the
8  pill-mill model.
9        In this context, what is the pill-mill
10  model, if you're able to tell me?
11    A.  Yes, ma'am.
12        And this is from, you know, my experience
13  assisting conducting surveillance.  It would be where a
14  pharmacy is identified that's illegally diverting, you
15  know, the prescription drugs, primarily the opioids, out
16  onto the street.  And so that's examples I provided this
17  morning of people, 30, 40 people, lined up at 4:00 in
18  the morning at the back door of the pharmacy and having
19  an armed guard standing there.  That's not normal.  So
20  that's what -- in my mind, that's -- when they say "pill
21  mills," that's -- that's a good example of that that I
22  encounter.
23    Q.  Okay.  And then, in your experience with these
24  types of pill mills, they were, I think you testified,
25  primarily independent pharmacies?

1    A.  That I'm aware.  And they may be linked to
2  national chains, but I'm not -- I'm not sure on that.
3    Q.  Okay.  Are you familiar with a task force
4  operation called "Operation Wasted Days"?
5    A.  I am not, no.
6    Q.  Never heard of that?
7    A.  No.
8    Q.  Can you turn to Tab 28?  This will be --
9    A.  Give me a minute on this one.
10        (Witness examines document.)
11        Okay.  I'm ready.
12        (Exhibit 16 was marked for identification.)
13  BY MS. WOHL:
14    Q.  Do you recognize this bulletin?
15    A.  I've never seen this bulletin at all.
16    Q.  Do you recall the seizure that it's discussing?
17    A.  No, ma'am, I don't.
18    Q.  I don't have any more questions to ask about
19  that document.
20        Let me ask you:  In your experience in the
21  sheriff's department in Tarrant County, what programs or
22  services do you think are currently working to help
23  abate the opioid crises?
24    A.  Besides education through the different
25  nonprofits that -- that do that, the take --

1  Operation Take Back, that you take back, is -- is very
2  effective.  And I say that based on what I've seen and
3  then comments that I've received from citizens that are
4  participating and from law enforcement agencies that are
5  participating as well.  And I was able to get that
6  started in Tarrant County a year or two after I -- I
7  came over from DEA, so it's been very effective for us.
8    Q.  Have you seen some success in Tarrant County
9  with the Operation Take Back that you initiated?
10    A.  Yes.
11    Q.  And has that program increased over the years,
12  increased visibility, increased success?
13    A.  Yes, ma'am.
14    Q.  Is there anything else that's -- you've got
15  education and the take-back programs.  Anything else
16  that's currently working?
17    A.  I would say those are the primary.  The
18  education is the harder piece that we have to continue
19  to stay on, but that would be it.
20    Q.  And is there anything that, you know, is not
21  currently in place that would help to abate the opioid
22  crises?  What do you think is needed here?
23    A.  The greatest help for me would be able to have
24  more narcotics investigators in our agency that I could
25  dedicate to this.  We have so many cases that come in

1  that we don't have the manpower to -- to address them
2  all, and I'm not -- and I'm not the only agency that
3  feels that way.  We're all overwhelmed with this.
4    Q.  During your time at the DEA, did any of your
5  investigations -- were any of your investigations
6  dedicated to investigating pharmacies?
7    A.  You said investigating pharmacies?
8    Q.  Yes.
9    A.  As I described earlier this morning, several of
10  the ones that we started with, the -- the street
11  OxyContin -- the illegal diverted OxyContin on the
12  street led to heroin, and then I would refer the -- if
13  we had information on a pharmacy that was involved, we
14  would refer back -- that to TDS, and then that -- I was
15  done at that point.
16    Q.  Okay.  So never, in any of your law enforcement
17  roles, have you been -- other than assisting in
18  surveillance as needed by the DEA, but -- you have not
19  been the investigator as to a pharmacy dispensing opioid
20  medication?
21    A.  I have not.
22    Q.  Okay.  Have you overseen any investigations
23  into pharmacies?
24    A.  I've over-- overseen the investigations that
25  may lead to a pharmacy, but then we would -- we would

37 (Pages 142 - 145)

Page 146

1  pass that on.  And then I've overseen investigations
2  that provide surveillance support, arrest support, going
3  through trash, you know, everything to help another
4  agency that is targeting a pharmacy, such as DEA or DPS.
5      Q.  The investigations that you started on the
6  street that may lead to investigations of the pharmacies
7  that you've been referred, do you then get notice or
8  knowledge of where that investigation goes, or is that
9  completely out of your hands at that point?
10     A.  It's out of my hands, and if I didn't -- if I
11  wasn't overwhelmed with the next case coming, I would
12  probably pay more attention to it, but I move on, and
13  our group moves on.
14         MS. WOHL:  Well, if you don't mind, let me
15  take a two-minute break and go through and see if
16  there's anything -- exhibits that I've missed.  And
17  let's go off the record, and we'll come back on in a
18  second.
19         MR. JANUSH:  I -- well, let's go off the
20  record, then I'll talk with you.
21         THE VIDEOGRAPHER:  We are going off the
22  record at 2:15.
23         (Brief recess taken.)
24         THE VIDEOGRAPHER:  We're back on the record
25  at 2:28.

Page 147

1         MS. WOHL:  Chief Bond, as I expected, I do
2  not have any further questions.
3         MR. JANUSH:  Anyone else before I begin?
4         MS. STEWART:  This is Allison Stewart of
5  Greenberg Traurig for Albertsons.  I do not have any
6  questions at this time.
7             EXAMINATION
8  BY MR. JANUSH:
9      Q.  Good afternoon, Chief Bond.  How are you today?
10     A.  Doing good.  Thank you.
11     Q.  Chief Bond, during deposition examination by
12  counsel for Kroger, you were asked quite a bit about
13  illicit counterfeit drugs; is that right?
14     A.  Yes, sir.
15     Q.  From your experience working as a employee of
16  the Drug Enforcement Agency, the DEA, through the
17  present date, sitting here today as senior chief of
18  Tarrant County, do you have any firsthand opinion as to
19  whether legally manufactured prescription opioid drugs
20  has contributed to an opioid crises in Tarrant County?
21     A.  I do, and I -- I believe it's contributed
22  nationwide, and I say that from firsthand experience
23  arresting and/or debriefing or being involved in
24  debriefings of people that we have -- we have arrested
25  that were addicted to prescribed drugs from a doctor.

Page 148

1  And a lot of times they would move from doctor to doctor
2  and became addicted, mainly on opioid painkillers, and
3  then they would go onto the street, as I've described a
4  couple times this morning, in search of the drugs -- the
5  opioid drugs that have been illegally diverted on the
6  street to purchase.  And then that became too expensive,
7  or becomes too expensive, and then they move on to
8  illicit drugs on the street such as heroin.
9         So I've seen this played over countless
10  times throughout my entire career, and I believe that
11  it's a direct result.  And as I -- I've shared stories
12  of sending undercover officers in with doctors that are,
13  you know, enabling these people to get these
14  prescriptions for the pain -- the painkillers and
15  continue on until the doctors shut them down.
16         So I've seen it played again and again, and
17  in many of the cases, we were buying and arresting
18  people that were using diverted opioid painkillers or
19  pills that came from pharmacies on the street, and we
20  see that transition all the time to -- heroin,
21  unfortunately, is the primary one for that.  So I've
22  seen it played out.  I think it's a direct impact, and I
23  think it has led to the introduction of fentanyl here in
24  the United States because the Mexican cartel has
25  recognized our dependence, our -- our addictions to the

Page 149

1  opioid painkillers, and I think that's -- that's how
2  it's happened.
3      Q.  Do you have a -- any understanding of what the
4  term "doctor shopping" means?
5      A.  I do.  Based on my experience and what I have
6  seen is, when somebody -- a lot of times it's from an
7  injury or maybe it not be from an injury -- they go to
8  their primary doctor to receive that initial
9  prescription, painkillers, opioids, and a lot of times
10  their primary doctor, after a certain period of time,
11  would stop prescribing those -- those opioids to them.
12         And then they would -- they would look for
13  other doctors.  And first it starts in the -- their
14  town; then it expands out to their region.  I have even
15  arrested people that have gone out of state, because
16  they could find a doctor that would prescribe opioids on
17  -- on a person that shouldn't be getting the opioids,
18  because they're healed from the injury and everything.
19         So the doctors are either not examining
20  them properly.  As I shared earlier this morning, even
21  the doctors are asking:  What type of drug would you
22  like?  We've seen the full spectrum on that.
23     Q.  Counsel for Kroger went over a number of Texoma
24  HIDTA Threat Assessment annual documents with you.  Do
25  you remember that?

38 (Pages 146 - 149)

Page 150

1   A.  Yes, sir.
2   Q.  And in the course of going over each of those
3   documents, counsel for Kroger addressed the
4   cartel-related illicit drugs that have been observed by
5   the HIDTA enforcement task force.
6       Do you -- do you recall that?
7   A.  Yes, sir.
8   Q.  There wasn't that much of an emphasis made by
9   counsel for Kroger, however, to address the diversion of
10  otherwise legal pharmaceutical drugs, was there?
11      MS. WOHL:  Objection to form.
12      THE WITNESS:  No, there wasn't.
13  BY MR. JANUSH:
14  Q.  And -- and so I'm going to have you turn to
15  Tab 5, Senior Chief Bond, which has been marked as
16  Exhibit 4.  And, more specifically, I'm going to ask
17  that you turn to page 19, which is Bates number ending
18  in 0272.
19  A.  Okay.
20  Q.  And -- and there we see a Section 3,
21  "Pharmaceuticals."
22      Do you see that section?
23  A.  Yes, sir.
24  Q.  And I'm going to read the first sentence into
25  the record, quote:  The diversion of pharmaceutical

Page 151

1   drugs continues to be a significant drug threat to the
2   Texoma HIDTA region.
3       Did I read that correctly, sir?
4   A.  Yes, sir.
5   Q.  Was this shown to you by counsel for Kroger
6   when asking you questions about this document?
7   A.  I -- I don't believe that -- that was
8   specifically, no.
9   Q.  And, in fact, the second paragraph, was the
10  second paragraph pointed out and -- and read with you
11  during counsel for Kroger's questioning?
12  A.  She did mention the white-collar direct crime
13  and ask my -- if that's a term that -- or -- that I use
14  or think about that.  But the rest of the paragraph was
15  not discussed, that I remember.
16  Q.  Okay.  So let's go to the sixth sentence down
17  -- sixth line down, beginning with the -- the language:
18  Law enforcement throughout the Texoma HIDTA AOR continue
19  to see instances where controlled pharmaceutical drugs
20  are distributed on the street alongside traditional
21  illicit drugs and, in fact, are used as a stepping stone
22  by street dealers to eat -- lead users down the path to
23  heroin addiction.
24      Did I read that correctly?
25  A.  Yes, sir; that's true.

Page 152

1   Q.  And so, earlier, you -- you addressed, from
2   your firsthand personal experience working as a DEA
3   employee through the present date, having seen people
4   who were first introduced to legal controlled
5   prescription opioids and who went down a path where they
6   end up using illicit, or street, drugs; did you not?
7   A.  I did, specifically heroin; many stories of
8   that.
9   Q.  Okay.  And here we have -- here, is it the case
10  that HIDTA is, in fact, addressing exactly what you
11  testified to seeing firsthand as being something that
12  the HIDTA task force has observed?
13  A.  It is.
14  Q.  Okay.  And let's talk about the words
15  "controlled pharmaceutical drugs."
16      When HIDTA is publishing in its annual 2017
17  Threat Assessment that law enforcement throughout the
18  Texoma HIDTA AOR continue to see instances where
19  controlled pharmaceutical drugs are distributed on the
20  street alongside traditional illicit drugs, what is
21  being referred to here when HIDTA speaks to "controlled
22  pharmaceutical drugs"?
23  A.  They're speaking the same thing I've been
24  speaking to, the -- the opioids that are, you know,
25  prescribed by a doctor to a pharmacy and then, from the

Page 153

1   pharmacy, illegally put on the street by many different
2   ways, but -- so it is a prescribed opioid that is being
3   used to sell on the street.
4   Q.  So to be clear, is HIDTA limiting its threat
5   assessment to only the illicit counterfeit
6   pharmaceutical drugs?
7   A.  No, they are not.
8   Q.  HIDTA -- instead, is HIDTA expressly including
9   legal -- otherwise legal controlled pharmaceutical drugs
10  in its analysis as a significant threat and, in fact, a
11  stepping down to illicit street drugs?
12  A.  That's correct, and they described it in what
13  you read.
14  Q.  Okay.  Similarly, Senior Chief Bond, I'm going
15  to ask you to turn to Tab 6, which is Exhibit 7.
16      And here, too, we have another Texoma HIDTA
17  2000-- and this one is a 2018 Threat Assessment.  So
18  now we're a year forward; is that right?
19  A.  Yes, sir.
20  Q.  And I'm going to ask you to turn to page 15,
21  which is Bates-stamped Texoma_HIDTA_0361.
22  A.  Okay.
23  Q.  And, again, I'm going to focus on the
24  "Pharmaceutical" section.
25      Here, too, this is a section counsel for

39 (Pages 150 - 153)

Page 154

1 Kroger chose to not question you on; is that right?
2        MS. WOHL:  Object to the form.
3        THE WITNESS:  That's correct.
4 BY MR. JANUSH:
5    Q.  And, again, I'm going to read the first
6 sentence of the section:  The diversion of
7 pharmaceutical drugs continues to be a significant drug
8 threat to the Texoma HIDTA region.
9        Reading further:  Hydrocodone, oxycodone,
10 alprazolam, and codeine with promethazine continue to be
11 the main diverted controlled substances within the AOR.
12        Senior Chief Bond, when -- when HIDTA is
13 speaking to the diversion of pharmaceutical drugs, what
14 does that mean?
15    A.  That's the -- the drugs that are manufactured
16 legally for a doctor to prescribe to a patient which
17 come out of the pharmacy that have been illegally
18 diverted onto the street.
19    Q.  And, earlier, in -- in the examination
20 conducted by counsel for Kroger, Counsel, very
21 specifically and repeatedly, addressed with you the
22 Mexican drug cartels in dealing with illicit street
23 drugs, true?
24    A.  Yes, sir.
25    Q.  Okay.  And if we go to the second paragraph of

Page 155

1 this "Pharmaceutical" section, I'd like for you to read
2 the whole first sentence of that second paragraph into
3 the record.
4    A.  All right.  (As read):  Outside of the threat
5 -- the threat from Mexican drug-trafficking
6 organizations, diversion of controlled pharmaceutical
7 drugs from the medical and pharmacy environment, as well
8 as the sale of synthetic drugs from retail
9 establishments, pose a significant public health and
10 public safety threat in the region.
11    Q.  Thank you, Senior Chief Bond.
12        So what is -- is this sentence declaring
13 that, beyond the threat of the Mexican drug cartels or
14 drug-trafficking organizations, the diversion of
15 controlled; i.e., legal pharmaceutical drugs, from the
16 medical and pharmacy environment is posing a public
17 health and public safety threat in the region?  Is that
18 what this is saying?
19    A.  Exactly, yes.
20    Q.  And do you agree with that threat assessment?
21    A.  I do.
22    Q.  If we move forward to Tab 19, which was
23 Exhibit 15 -- which is Exhibit 15, we find ourselves at
24 the 2019 Threat Assessment for Texoma HIDTA; is that
25 right?

Page 156

1    A.  Yes, sir.
2    Q.  And, again, so that I'm not just using
3 acronyms, H-I-D-T-A, or HIDTA, stands for the High
4 Intensity Drug Trafficking Area; is that right?
5    A.  Yes, sir.
6    Q.  And -- and if we have you turn to the page
7 Bates-numbered ending with 829250, does that page also
8 address a section on pharmaceuticals?
9    A.  Yes, sir.
10    Q.  And this section, similarly, as with the other
11 threat assessments, addresses that the diversion of
12 pharmaceutical drugs continues to be a significant drug
13 threat to the Texoma HIDTA region, true?
14    A.  Yes, sir.
15    Q.  And, again, we are talking about the
16 diversion -- or HIDTA's talking about the diversion of
17 hydrocodone, oxycodone, alprazolam.  Now we have:  The
18 addition of steroids and codeine with promethazine
19 continue to be the dominant diverted controlled
20 substances within the AOR.
21        Did I read that correctly?
22    A.  Yes, sir.
23    Q.  And here, too, again, 2019, in the second
24 paragraph, we have this language:  Outside of the threat
25 from Mexican drug-trafficking organizations, diversion

Page 157

1 of controlled pharmaceutical drugs from the medical and
2 pharmacy environment, as well as the sale of synthetic
3 drugs from retail establishments, pose a significant
4 public health and public safety threat in the region.
5        Did I read that correctly?
6    A.  Yes, sir.
7    Q.  Do you agree with that statement?
8    A.  I do.
9    Q.  The next sentence:  Though often lacking the
10 stigma of more, quote, hard-core, quote, drugs, these
11 controlled substances are every bit as destructive as
12 other drugs and negatively affect the quality of life
13 and safety of the communities throughout the Texoma
14 HIDTA.
15        Did I read that correctly?
16    A.  Yes, and I agree with that statement too.
17    Q.  Well, that was what was going to be my next
18 question, so I won't need to ask it.  I appreciate that.
19        With respect to the very next sentence:
20 Pharmaceutical diversion occurs in a variety of forms,
21 but a common operation is the pill-mill model.  These
22 operations generally involve mul- -- multiple
23 coconspirators to include individuals associated with
24 medical clinics and pharmacies, as well as drivers and
25 recruiters.

40 (Pages 154 - 157)

Page 158

1    Now, Senior Chief Bond, you -- you
2  testified today, very specifically, about knowledge of
3  this, quote, pill-mill model, right?
4    A. Yes, sir.
5    Q. You've seen pill mills that have been cracked
6  down on due to diverting otherwise legal controlled
7  prescription opioid drugs in an inappropriate way,
8  correct?
9    A. Yes, sir.
10   Q. But the examples don't just begin and end with
11 pill mills; HIDTA, thereafter, addresses, quote:  Other
12 diversion methods include doctor shopping, fraudulent
13 prescriptions, pharmacy theft, employee pilferage,
14 robberies, night break-ins, online pharmacies, and/or
15 Dark Web drug marketplaces.
16       Did I read that sentence correctly?
17   A. Yes, sir.
18   Q. Except, when -- when counsel for Kroger
19 questioned you, counsel really focused on -- a lot on
20 these burg- -- burglaries or robberies, the break-ins,
21 in addressing how -- how drugs might be diverted from a
22 pharmacy to the street; is -- is that true?
23   A. Yes, sir.
24   Q. Do you recall counsel addressing the subject
25 that otherwise legal controlled pharmaceutical opioid

Page 159

1  drugs can be diverted and are seen as a diversion threat
2  by HIDTA with respect to -- with respect to doctor
3  shopping as an example?
4    A. No.  I -- I provided those examples, but, yes,
5  they didn't ask about that.
6    Q. How about fraudulent prescriptions?  Did -- did
7  counsel for Kroger raise for you the question of whether
8  HIDTA has determined, in multiple threat assessments,
9  the -- the notion that fraudulent prescriptions are
10 contributing to the opioid threat assessment?
11   A. No, sir.
12   Q. As -- as you sit here today, do you have an
13 opinion, one way or the other, as to whether, at present
14 day, there still remains an opioid crises within Tarrant
15 County?
16   A. There does remain that crises here and across
17 the U.S.
18       MR. JANUSH:  Senior Chief Bond, I -- I
19 don't have any further questions for you, and I thank
20 you for your time today.
21       THE WITNESS:  Yes, sir.
22       MS. WOHL:  I do have a couple of follow-up
23 questions before we end here today, Chief Bond.
24       THE WITNESS:  Yes, ma'am.
25       FURTHER EXAMINATION

Page 160

1  BY MS. WOHL:
2    Q. While we're on that Tab 19, Exhibit 15, let me
3  go to that sentence that Plaintiff's counsel just read
4  to you, that last sentence there about other diversion
5  methods, including doctor shopping, fraudulent
6  prescriptions, pharmacy theft, employee pilferage,
7  robberies, night break-ins, online pharmacies, and/or
8  Dark Web drug marketplaces.
9        Did I read that correctly?
10   A. Yes, ma'am.
11   Q. What information do you have that any Kroger or
12 Albertsons' pharmacies are involved with any of these
13 methods of diversion?
14   A. I -- I don't know whether they're involved or
15 not.  I don't know the names of the pharmacies or -- or
16 manufacturers.
17   Q. Chief Bond, do you plan to testify at trial?
18   A. Of course, if needed.
19   Q. Do you plan to offer any expert opinions in
20 this case?
21   A. I'm not sure I understand the question on that.
22   Q. Have you been asked to provide any expert
23 opinions in this case as an expert witness, as opposed
24 to in your experience?
25   A. I have not.

Page 161

1    Q. One of the first questions that Plaintiff's
2  counsel asked you was about seizing legally manufactured
3  drugs or -- or legally manufactured drugs on the
4  streets, finding those diverted, and seizing legally
5  manufactured drugs for people who were -- who were not
6  prescribed those pills; is that right?  You have
7  experience in that?
8    A. I do, yes.  And then I have experience
9  arresting people that have doctor shopped and they're --
10 you know, are receiving them, I believe, illegally
11 because the doctor didn't perform his or her duty on --
12 on the patient.  So...
13   Q. So two different types of -- of diversion.
14 You've got, you know, a prescription that somebody
15 wasn't prescribed, and you're, kind of, finding that and
16 seizing it, and then a prescription that somebody was
17 prescribed, but you believe the prescription was
18 illegal; is that right?
19   A. Yes.
20   Q. What role did chain pharmacies have in this
21 kind of diversion?
22   A. I don't know.
23       MS. WOHL:  I don't have any further
24 questions.
25       FURTHER EXAMINATION

41 (Pages 158 - 161)

Page 162

1  BY MR. JANUSH:
2      Q.  Senior Chief Bond, you weren't asked to review
3  any documents in this case concerning Defendant Kroger
4  and Defendant Albertsons' systems and methods to address
5  how to fulfill the pharmacist's corresponding
6  responsibility, true?
7      A.  That's true; I haven't reviewed anything.
8      Q.  Okay.  Do you understand, as someone who -- who
9  has been employed within the DEA, what it means for a
10  pharmacist to have corresponding responsibilities when
11  filling a drug, just generally?
12     A.  Yes.
13         MS. WOHL:  Objection, form.
14  BY MR. JANUSH:
15     Q.  You have -- you do have such an understanding?
16     A.  I have a very basic understanding of that, yes.
17     Q.  Okay.  Does fulfilling a -- a -- a pharmacist's
18  corresponding responsibility, might that include looking
19  for -- looking out for purported patients or patients
20  who have -- who appear to be engaging in doctor
21  shopping?
22     A.  It does.
23     Q.  Does fulfilling a -- a -- pharmacists'
24  corresponding responsibilities include looking at
25  whether a doctor is writing duplicative or overlapping

Page 163

1  opioid prescriptions?  Do you have any knowledge about
2  that; in other words, where a doctor is just
3  freewheeling and writing prescriptions for multiple
4  opioids for the same patients?  Is -- is that something
5  that you'd expect a red flag to be raised by a
6  pharmacist?
7      A.  Yes.
8      Q.  And in this case, you -- you don't know, as you
9  sit here today, one way or the other, again, how Kroger
10  and Albertsons, generally as a national practice and
11  more specifically in Tarrant County, carried out, or
12  failed to carry out, the pharmacists' corresponding
13  responsibilities, right?  You have no way of knowing,
14  right?
15     A.  I do not know.
16     Q.  Okay.  But it would -- would it be a good thing
17  or a bad thing if there were no policies in place that
18  were required to be universally followed to spot
19  red-flag opioid prescriptions?
20         MS. WOHL:  Objection.
21  BY MR. JANUSH:
22     Q.  Would -- would that be good or bad?
23         MS. WOHL:  Objection.
24         THE WITNESS:  That would be very good.
25  BY MR. JANUSH:

Page 164

1      Q.  It'd be -- it'd be very good if there was no --
2  no structure in place, or would it be very bad if there
3  was no structure in place for pharmacists to spot
4  red-flag opioid prescriptions?
5      A.  It would be bad --
6          MS. WOHL:  Objection.
7          THE WITNESS:  It would be bad if there was
8  no structure in place; it would be good if there was a
9  policy that required that.
10  BY MR. JANUSH:
11     Q.  And -- and would it be good if there was -- is
12  it good enough to just have a policy, or must you also
13  follow that policy?
14     A.  It needs to be followed and enforced.
15     Q.  Okay.  Then questions concerning the topic of
16  suspicious order monitoring.
17         Do -- do you have any understanding, first
18  of all as a threshold question, whether -- you know,
19  what it means for a company to have a suspicious
20  order-monitoring policy in place when ordering opioid
21  drugs?
22     A.  I've heard the term before, but I don't
23  understand it.
24     Q.  Okay.  Fair enough.
25         Again, when you've been asked a bunch of

Page 165

1  questions today whether or not you have heard of
2  Albertsons or -- or Kroger being involved in -- being
3  the subject of a, quote, pill-mill investigation, you
4  were asked that question just as a threshold matter; is
5  that right?  Were you asked that question?
6      A.  Yes, sir, I was.
7      Q.  Okay.  And fair to say that you just don't
8  have -- you just haven't been exposed to documents and
9  evidence addressing, one way or the other, how Kroger
10  and Albertsons carried out their respective obligations
11  concerning a pharmacist's corresponding responsibility?
12     A.  That's correct.
13         MS. STEWART:  Objection, form.
14  BY MR. JANUSH:
15     Q.  Senior Chief Bond, were you ever exposed to any
16  information through this date to address how Kroger and
17  Albertsons carried out their corresponding
18  responsibilities as pharmacies and pharmacists when
19  doling out prescription opioid drugs?
20         MS. WOHL:  Objection.
21         THE WITNESS:  No, I haven't.
22         MR. JANUSH:  Okay.  Thank you, Senior Chief
23  Bond.  I have no further questions.
24         FURTHER EXAMINATION
25  BY MS. WOHL:

42 (Pages 162 - 165)

Page 166

1    Q. Senior Chief Bond, Plaintiff's counsel asked
2 you if you had seen any documents relating to Kroger or
3 Albertsons' systems or procedures.  And the answer was
4 "no," correct?
5    A. That's correct.
6    Q. And, in fact, you haven't seen any documents,
7 reviewed any documents, relating to Albertons or Krogers
8 at all, right?
9    A. That's correct.
10    Q. Can you think of a single document in -- in the
11 DEA or in the sheriff's department that so much as
12 references Kroger or Albertsons in any respect, an
13 investigation or anything else?
14    A. Not that I'm aware of.  And I know we don't
15 have any such documents in Tarrant County.  I can't
16 speak for DEA as a whole.
17    Q. Do you have opinions about what a red flag is
18 when it comes to filling prescription opioids?
19    A. I do have opinions based on -- on what I've
20 seen during the investigation.  Is that what you're
21 asking?
22    Q. Yeah.
23        Do you -- do your opinions relate to how a
24 pharmacist should do his or her job?
25    A. I have opinions that the cases that I've been

Page 167

1 involved with were multiple overlapping prescriptions of
2 high amounts of -- of opioids that are -- are being
3 prescribed regularly from the same doctor, and to me,
4 that should be a red flag to the pharmacist to call the
5 doctor and figure out what's going on.
6    Q. Okay.  You talked about policies and procedures
7 with respect to systems in identifying red flags, I
8 believe.
9        If you were to review policies and
10 procedures from these pharmacies, would you be able to
11 form an informed opinion about whether these were
12 appropriate or not?
13    A. I probably would not, no.
14    Q. You mentioned a red flag of, kind of,
15 high-dosage overlapping opioids.
16        Do you have opinions about what steps need
17 to be taken or when that creates a red flag and when it
18 doesn't?
19    A. I don't.  I would just think it would be a red
20 flag for the pharmacist to communicate with the doctor,
21 is all that I'm saying.
22        MS. WOHL:  I don't have any further
23 questions.
24        MR. JANUSH:  Thank you, Senior Chief Bond.
25 That concludes your testimony for today, and we

Page 168

1 appreciate your time.
2        THE WITNESS:  Of course.  Thank you.
3        THE VIDEOGRAPHER:  Everybody stand by.
4        We're going off the record at 2:59.
5        (Deposition concluded at 2:59 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 169

1
          IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF OHIO
                  EASTERN DIVISION
3
   IN RE:  NATIONAL PRESCRIPTION  ) MDL No. 2804
4  OPIATE LITIGATION          )
                              )
5                             )
   THIS DOCUMENT RELATES TO:     )
6  Track Nine: Tarrant County,   ) Case No.: 17-md-2804
   Texas                       )
7                             )
                              )
8  (Case No. 1: 18-op-45274-DAP)  ) Judge Dan Aaron Polster
                              )
9 ----------------------------------------
10        REPORTER'S CERTIFICATION
          ORAL AND VIDEOTAPED DEPOSITION OF
11              CALVIN C. BOND
              FRIDAY, JULY 7, 2023
12            (REPORTED REMOTELY)
13    I, Kari J. Behan, CSR, RPR, CRR, and in and for the
   State of Texas, do hereby certify that the facts as
14 stated by me in the caption hereto are true;
       That there came before me the aforementioned named
15 person, who was by me duly sworn to testify the truth
   concerning the matters in controversy in this cause;
16    And that the examination was reduced to writing by
   computer transcription under my supervision; that the
17 deposition is a true record of the testimony given by
   the witness.
18    I further certify that I am neither attorney or
   counsel for, nor related to or employed by, any of the
19 parties to the action in which this deposition is taken,
   and further that I am not a relative or employee of any
20 attorney or counsel employed by the parties hereto, or
   financially interested in the action.
21    Given under my hand and seal of office on this 4th
   day of August 2023.
22
23
       _____, RPR, CRR
24     Texas CSR NO. 8564;
       Expiration Date: 7-31-2024
25

43 (Pages 166 - 169)

**Page 170**

```
1              Veritext Legal Solutions
                   1100 Superior Ave
2                      Suite 1820
                 Cleveland, Ohio 44114
3               Phone: 216-523-1313
4
      August 4, 2023
5
      To: EVAN M. JANUSH
6
      Case Name: National Prescription Opiate Litigation - Track 9 (Tarrant
7     County) v.
8     Veritext Reference Number: 5946010
9     Witness:  Calvin C. Bond      Deposition Date:  7/7/2023
10
      Dear Sir/Madam:
11
12    Enclosed please find a deposition transcript.  Please have the witness
13    review the transcript and note any changes or corrections on the
14    included errata sheet, indicating the page, line number, change, and
15    the reason for the change.  Have the witness' signature notarized and
16    forward the completed page(s) back to us at the Production address
      shown
17
      above, or email to production-midwest@veritext.com.
18
19    If the errata is not returned within thirty days of your receipt of
20    this letter, the reading and signing will be deemed waived.
21
      Sincerely,
22
      Production Department
23
24
25    NO NOTARY REQUIRED IN CA
```

**Page 171**

```
1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
3     ASSIGNMENT REFERENCE NO: 5946010
      CASE NAME: National Prescription Opiate Litigation - Track 9
      (Tarrant County) v.
      DATE OF DEPOSITION: 7/7/2023
4     WITNESS' NAME: Calvin C. Bond
5     In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
6     my testimony or it has been read to me.
7     I have made no changes to the testimony
      as transcribed by the court reporter.
8
      _____
9     Date           Calvin C. Bond
10    Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11    the referenced witness did personally appear
      and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
      Statement; and
14    Their execution of this Statement is of
      their free act and deed.
15
      I have affixed my name and official seal
16
      this _____ day of_____, 20____.
17
      _____
18    Notary Public
19
      _____
      Commission Expiration Date
20
21
22
23
24
25
```

**Page 172**

```
1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
3     ASSIGNMENT REFERENCE NO: 5946010
      CASE NAME: National Prescription Opiate Litigation - Track 9
      (Tarrant County) v.
      DATE OF DEPOSITION: 7/7/2023
4     WITNESS' NAME: Calvin C. Bond
5     In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
6     my testimony or it has been read to me.
7     I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
8     well as the reason(s) for the change(s).
9     I request that these changes be entered
      as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
      that both be appended to the transcript of my
12    testimony and be incorporated therein.
13    _____
      Date           Calvin C. Bond
14
      Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
      the referenced witness did personally appear
16    and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18    in the appended Errata Sheet;
      They signed the foregoing Sworn
19    Statement; and
      Their execution of this Statement is of
20    their free act and deed.
21    I have affixed my name and official seal
22    this _____ day of_____, 20____.
23
      _____
24    Notary Public
25    _____
      Commission Expiration Date
```

**Page 173**

```
1     ERRATA SHEET
      VERITEXT LEGAL SOLUTIONS MIDWEST
2     ASSIGNMENT NO: 5946010
3     PAGE/LINE(S) /        CHANGE        /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    Date           Calvin C. Bond
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23
      _____
      Notary Public
24
      _____
25    Commission Expiration Date
```