# EXHIBIT 37

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION
 3      IN RE NATIONAL              )
        PRESCRIPTION OPIATE         )
 4      LITIGATION                  )
                                    ) MDL No. 2804
 5      THIS DOCUMENT RELATES TO:   ) Case No. 17-md-2804
        Track Nine: Tarrant         )
 6      County, Texas               ) Judge Dan Aaron Polster
                                    )
 7      (Case No.                   )
         1:18-op-45274-DAP)         )
 8

 9      ********************************************************
10               ORAL AND VIDEOTAPED DEPOSITION OF
11                          HELEN GIESE
12                         JUNE 23, 2023
13      ********************************************************
14          ORAL AND VIDEOTAPED DEPOSITION OF HELEN GIESE,
15      produced as a witness at the instance of the Defendants,
16      and duly sworn, was taken in the above-styled and
17      numbered cause on the 23rd day of June, 2023, from 10:05
18      a.m. to 5:16 p.m., before Julie C. Brandt, RMR, CRR, and
19      CSR in and for the State of Texas, reported by machine
20      shorthand at Veritext, 300 Throckmorton Street, Suite
21      1600, Fort Worth, Texas, pursuant to the Federal Rules
22      of Civil Procedure.
23

24

25
```

Page 2

```
 1              APPEARANCES
 2
     FOR THE PLAINTIFF TARRANT COUNTY:
 3
     Alex Abston
 4   Leila Ayachi (via Zoom)
     The Lanier Law Firm, PC
 5   10940 W. Sam Houston Pkwy N., Suite 100
     Houston, Texas 77064
 6   713-659-5200
     alex.abston@lanierlawfirm.com
 7   leila.ayachi@lanierlawfirm.com
 8
     FOR THE ALBERTSONS DEFENDANTS:
 9
     Quinn Ford
10   GREENBERG TRAURIG, LLP
     77 West Wacker Drive, Suite 3100
11   Chicago, Illinois 60601
     312-456-8400
12   quinn.ford@gtlaw.com
13
     FOR THE KROGER DEFENDANTS:
14
     Aaron C. Boone (via Zoom)
15   BOWLES RICE LLP
     United Square, Fifth Floor
16   501 Avery Street
     Parkersburg, West Virginia 26101
17   304-420-5501
     aboone@bowlesrice.com
18
19   ALSO PRESENT:
20   Craig Price - Tarrant County Chief, Civil Div.
     Sadie Turner - Turner Law Firm (via Zoom)
21   David Crenshaw - Veritext Videographer
22
23
24
25
```

Page 3

```
 1              INDEX
 2                          PAGE
     Appearances....................................   2
 3   Proceedings....................................   5
 4   HELEN GIESE
     Examination by Mr. Ford..................   6
 5   Examination by Ms. Abston...............  200
     Further Examination by Mr. Ford..........  202
 6   Examination by Mr. Boone................  203
 7   Signature and Changes.......................  212
     Reporter's Certificate.......................  214
 8
 9   DEPOSITION EXHIBITS          IDENTIFIED
10   Exhibit 1    LinkedIn bio           15
11   Exhibit 2    Web pages from Tarrant County   55
                  Budget and Risk Management
12
     Exhibit 3    Tarrant County 2023 approved   67
13                budget
14   Exhibit 4    Supporting detail of 2023      77
                  approved budget
15
     Exhibit 5    email and attachments     117
16                TARRANT_00511669 - 00511809
17   Exhibit 6    Plaintiff Tarrant County's     126
                  Supplemental and Amended
18                Allegations to be Added to
                  "Short Form for Supplementing
19                Complaint and Amending
                  Defendants and Jury Demand"
20
     Exhibit 7    1/28/2021 email and attachments  135
21                TARRANT_00124909 - 00124929
22   Exhibit 8    FY 2014 Grant Listing   137
                  TARRANT_00560438 - 00560446
23
     Exhibit 9    Tarrant County Financial   149
24                Statements for May 2022
25
```

Page 4

```
 1   Exhibit 10   News article "Tarrant County    156
                  accepts more than $2 million
 2                from latest round of opioid
                  settlements
 3
     (Exhibits 11 - 17 were marked but not used.)
 4
     Exhibit 18   FY2011 hierarchy budget letter   184
 5   Exhibit 19   2011 Detailed Approved Budget    185
 6   Exhibit 20   2012 Detailed Approved Budget    185
 7   Exhibit 21   2013 Detailed Approved Budget    186
 8   Exhibit 22   Hierarchy letter for FY2014      186
 9   Exhibit 23   2014 Approved Hierarchy Budget   187
10   Exhibit 24   2014 Detailed Approved Budget    187
11   Exhibit 25   Hierarchy letter for FY2015      188
12   Exhibit 26   2015 Approved Hierarchy Budget   189
13   Exhibit 27   2015 Detailed Approved Budget    189
14   Exhibit 28   Hierarchy letter for FY2016      190
15   Exhibit 29   2016 Approved Hierarchy Budget   190
16   Exhibit 30   2016 Detailed Approved Budget    191
17   Exhibit 31   2017 Approved Hierarchy Budget   191
18   Exhibit 32   2017 Detailed Approved Budget    192
19   Exhibit 33   2018 Approved Hierarchy Budget   192
20   Exhibit 34   2018 Detailed Approved Budget    193
21   Exhibit 35   2019 Approved Hierarchy Budget   193
22   Exhibit 36   2019 Detailed Approved Budget    193
23   Exhibit 37   2020 Approved Hierarchy Budget   194
24   Exhibit 38   2020 Detailed Approved Budget    194
25
```

Page 5

```
 1   Exhibit 39   2021 Approved Hierarchy Budget   195
 2   Exhibit 40   2021 Detailed Approved Budget    195
 3   Exhibit 41   2022 Approved Hierarchy Budget   196
 4   Exhibit 42   2022 Detailed Approved Budget    196
 5   Exhibit 43   Proposed Budget letter FY2023    197
 6   Exhibit 44   2023 Approved Hierarchy Budget   198
 7   Exhibit 45   2023 Detailed Approved Budget    198
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1            P R O C E E D I N G S
2            THE VIDEOGRAPHER:  We're on the record.
3 Today's date is June 23, 2023.  The time is 10:05 a.m.
4       This is the video deposition of Helen Giese
5 relative to a case styled In Re National Prescription
6 Opiate Litigation.  This case is filed in the United
7 States District Court for the Northern District of Ohio,
8 Eastern Division.
9            Counsel, at this time would you state your
10 appearances for the record, and the reporter can then
11 place the witness under oath.
12            MS. ABSTON:  I'm Alex Abston from The
13 Lanier Law Firm, and I'm here on behalf of the
14 plaintiffs.  And we have Sadie and Leila online as well.
15            MR. PRICE:  Craig Price, Tarrant County.
16            MR. FORD:  Quinn Ford on behalf of
17 Albertsons.
18            MR. BOONE:  Good morning, this is Aaron
19 Boone with the law firm of Bowles Rice on behalf of The
20 Kroger Company.
21            HELEN GIESE,
22 having been first duly sworn, testified as follows:
23            EXAMINATION
24 BY MR. FORD:
25   Q.  Good morning, Ms. Giese.

Page 7

1   A.  Good morning.
2   Q.  My name is Quinn Ford.  I'm an attorney with
3 Greenberg Traurig, and I represent Albertsons in this
4 case.
5       Could you please state your full name for the
6 record.
7   A.  Helen Hannah Giese.
8   Q.  And could you please provide your date of
9 birth.
10   A.  5 -- May 21, 1957.
11   Q.  And how about your address?
12   A.  1000 Cowling Road, Sanger, Texas.
13   Q.  I'm from Chicago.  I'm a little unfamiliar.
14 Is that in Tarrant County?
15   A.  No.
16   Q.  No?
17   A.  It's in Denton County.
18   Q.  Denton County, is that next door to Tarrant
19 County?
20   A.  It is.
21   Q.  Okay.  How long have you lived there for?
22   A.  Since 1989.
23   Q.  Okay.  Have you ever given a deposition
24 before?
25   A.  No.

Page 8

1   Q.  Have you ever testified in a court proceeding
2 before?
3   A.  Yes.
4   Q.  What were those or --
5   A.  It was one.
6   Q.  One proceeding?
7   A.  Uh-huh.
8   Q.  What was that?
9   A.  It was a case in the CDA's office on a stolen
10 laptop.
11   Q.  CDA, what is that?
12   A.  Criminal District Attorney, sorry.
13   Q.  Okay.  So you were sort of a fact witness in
14 that case?
15   A.  I worked for the District Attorney.
16   Q.  Gotcha.
17       And you testified like on a witness stand?
18   A.  On the price of the equipment.
19   Q.  Gotcha, okay.
20       So since you haven't given a deposition
21 before, I'm just going to go over some ground rules.
22 The first is breaks.  Everyone says this isn't an
23 endurance test.  So if you ever need a break at any
24 point, I'm happy to accommodate that.  Just let me know.
25 The only thing we ask is that if I've asked a question,

Page 9

1 to answer the question before taking the break.
2   A.  Okay.
3   Q.  Questions and answers, the court reporter
4 Julie will be taking down everything you and I say and
5 anyone else.  It's important to us to get a clean
6 transcript.  So please try to speak clearly and slowly.
7 Please let me finish my question, even if you sort of
8 know where I'm going with it, just get it out so that we
9 have the transcript for it.
10       Also, something I'm very guilty of, please do
11 not try to give answers like uh-huh or huh-uh.  Yes or
12 no is preferable.  It's easier to understand in the
13 transcript.
14       Also, if you don't understand a question,
15 please let me know.  I'm happy to rephrase it, find a
16 better way to say it.  But if you answer the question I
17 ask, I'll assume you understood it.  Is that fair?
18   A.  Yes.
19   Q.  Lastly, your counsel may object or some lawyer
20 in the room may object to a question I ask.  Just to let
21 you know, even if there is an objection, you still have
22 to answer my question unless your counsel directs you
23 not to answer the question.  Do you understand that?
24   A.  I do.
25   Q.  Okay.  Now are you under the influence of any

3 (Pages 6 - 9)

Page 10

1  alcohol or drugs right now?
2      A.  No.
3      Q.  So you haven't taken any, say, prescription
4  drugs that you think would prevent your ability to
5  testify competently today?
6      A.  No.
7      Q.  The court reporter just put you under oath
8  today, and you, you know, promised to testify
9  truthfully.  Will you agree to answer my questions
10  truthfully and to the best of your ability?
11      A.  Yes.
12      Q.  Thank you.
13          So I just want to start with a little bit of
14  background.  Do you know why you're here today?
15      A.  Yes.
16      Q.  Why is that?
17      A.  Opioid settlement case.
18      Q.  So you're aware that Tarrant County has filed
19  a civil lawsuit?
20      A.  Yes.
21      Q.  Do you know what the nature of the lawsuit is?
22      A.  Not extensively.
23      Q.  Can you tell me in your own words what your
24  understanding of the lawsuit is?
25      A.  To -- for the harm that any type of

Page 11

1  prescription drug may have affected Tarrant County.
2      Q.  Gotcha.
3          When you say prescription drug, are you
4  talking about any certain kind of prescription drugs?
5      A.  No, sir.
6      Q.  So it's any sort of prescription drug?
7      A.  My understanding.  You asked my understanding.
8      Q.  Oh, yes.  I appreciate it.
9          So have you had any involvement with this
10  lawsuit before sitting for this deposition today?
11      A.  Have I what?
12      Q.  Had any sort of involvement with this lawsuit.
13      A.  No.
14      Q.  Do you know when it was filed?
15      A.  Maybe in '20 or '21.  No, I don't.  The answer
16  should be no.
17      Q.  If I say March 2018 --
18      A.  No.
19      Q.  -- does that ring any bells?
20      A.  No.
21      Q.  So were you -- I think I know the answer, but
22  were you involved in the decision to bring this lawsuit?
23      A.  No.
24      Q.  Do you know whose decision it would have been?
25      A.  No.

Page 12

1      Q.  To bring this lawsuit?
2          Do you know if it would have been like the
3  Commissioners Court's decision to file this lawsuit?
4          MS. ABSTON:  Objection to form, asked and
5  answered.
6      Q.  (BY MR. FORD)  You can answer.
7      A.  What I know is the Commissioners Court is the
8  one that's required for contractual agreement.  I do not
9  know about lawsuits.
10      Q.  Gotcha.
11          So I just want to be sure.  Has anybody asked
12  you to sort of gather documents that you would have --
13      A.  No.
14      Q.  -- for purposes of this lawsuit?
15      A.  No.
16      Q.  Do you know if anyone in the Budget and Risk
17  Management Department has been asked to gather documents
18  for purposes of this lawsuit?
19      A.  No.
20      Q.  Okay.  Have you had any discussions with
21  anyone regarding your deposition today?
22      A.  Yes.
23      Q.  Who would that be?
24      A.  That would be The Lanier Law Firm.
25      Q.  Okay.

Page 13

1          MS. ABSTON:  And a reminder, I just want
2  to remind you of attorney/client privilege.  If there's
3  anything -- we're not going to discuss the contents of
4  the discussion, but you can talk about who you met with.
5      Q.  (BY MR. FORD)  Yeah, I'm not trying to get
6  into what you talked about.  I might ask, you know, a
7  couple questions about how many times and that sort of
8  thing, but I'm not asking for, you know, specifics.
9          So other than attorneys with The Lanier Law
10  Firm, have you talked to any other lawyers about the
11  deposition today?
12      A.  No.
13      Q.  Have you talked to any other, for example,
14  Tarrant County employees about your deposition today?
15      A.  My staff.
16      Q.  Who on your staff?
17      A.  My assistant director and my administrative
18  assistant so they would know where I am.
19      Q.  Do you mind sharing their names?
20      A.  Robert Cone and Claudia Del Torro.
21      Q.  Is Robert Cone the first assistant, you said.
22      A.  He's the assistant director.
23      Q.  The assistant director.
24          And Ms. Del Torro is?
25      A.  The administrative assistant.

4 (Pages 10 - 13)

Page 14

1    Q.   Administrative assistant.
2         And were the extent of those conversations
3    just where you would be today?
4    A.   Correct.
5    Q.   So how many times did you meet with attorneys
6    from The Lanier Law Firm before today?  Sorry, strike
7    that.  Let me ask that.
8         In preparing for your deposition --
9    A.   Okay.
10   Q.   -- how many times have you met with lawyers
11   from The Lanier Law Firm?
12   A.   Twice.
13   Q.   And when were those meetings?
14   A.   It was either Monday or Tuesday and yesterday.
15   Q.   Do you know about how long you met?
16   A.   Maybe an hour the first time and a couple of
17   hours the second time.
18   Q.   Did you review any documents during those
19   meetings?
20   A.   No.
21   Q.   Did you review any documents in preparation
22   for your deposition today?
23   A.   No, sir.
24   Q.   Did you review anything, any materials I'll
25   say in preparation for your dep today?

Page 15

1    A.   Not in preparation, no.
2    Q.   When you say not in preparation, do you
3    mean --
4    A.   Well, I review budget documents every day.
5    Q.   But not specifically for --
6    A.   Correct.
7    Q.   -- purposes of this dep?
8         Thank you.
9         So I'm assuming you didn't review any expert
10   reports that have been filed in opioids litigation?
11   A.   No.
12   Q.   Okay.  I'm going to go ahead and pull the
13   first exhibit of the day.
14        MR. FORD:  Could you mark this as
15   Exhibit 1.  Sorry, I just have one copy.
16        MS. ABSTON:  And I just want to note for
17   the record that this exhibit does not contain a URL or a
18   date.  So I will allow you to question the witness on
19   it, but we have a standing objection to this line of
20   questioning due to the lack of ability to authenticate
21   the exhibit.
22        MR. FORD:  Okay.
23        (Exhibit 1 marked.)
24   Q.   (BY MR. FORD) So, Ms. Giese, I'll represent
25   to you this is from the LinkedIn website.  I've pulled

Page 16

1    it from the internet.  Does this look familiar to you?
2    A.   I maybe have been linked on LinkedIn once or
3    twice.
4    Q.   But you do have a LinkedIn profile?
5    A.   Apparently I do.
6    Q.   So this says Helen Giese, Business Manager at
7    Tarrant County government.  Is that correct?
8    A.   Uh-huh.
9    Q.   Is that how you refer to your current
10   position?
11   A.   No.
12   Q.   What is your current position?
13   A.   Director of Budget and Risk Management.
14   Q.   Were you ever in the position labeled Business
15   Manager for Tarrant County?
16   A.   I was the Business Manager for the Criminal
17   District Attorney.
18   Q.   And when was that?
19   A.   2011 to 2015.
20   Q.   Okay.  Is it fair to say you haven't updated
21   your LinkedIn since then?
22   A.   Because I don't go on it, that's correct.
23   Q.   Neither do I go on mine.
24        So -- okay, you can put that to the side.
25        So when did you take over your current

Page 17

1    position as director of the Budget and Risk Management
2    Department?
3    A.   December I think it was 2018 or 2019.
4    Q.   And who was the director before you?
5    A.   Debbie Schneider.
6    Q.   And how long was she the director before that?
7    A.   She was with the County for 43 years.
8    Probably 41 -- maybe 41 of those was as the director.
9    Q.   Okay.  I want to take a step back and talk a
10   little bit about your education and your work history
11   before I get into your current position.
12        So where did you attend high school?
13   A.   I graduated high school at James Connally High
14   School in Waco, Texas.
15   Q.   Are you from Waco originally?
16   A.   No.
17   Q.   Where did you grow up?
18   A.   Raymondville, Texas.
19   Q.   Did you attend college?
20   A.   Yes.
21   Q.   Which college?
22   A.   Texas Woman's University.
23   Q.   And what year did you graduate?
24   A.   1997, I think.
25   Q.   And do you remember what your degree was?

5 (Pages 14 - 17)

Page 18

1     A.   Government services.
2     Q.   After you graduated, did you attend any
3 further schooling?
4     A.   No.
5     Q.   So you don't have any, say, master's --
6     A.   No.
7     Q.   -- or a doctorate?
8          Are you a certified public accountant?
9     A.   No.
10     Q.   So other than your undergraduate degree, do
11 you have any sort of professional certifications?
12     A.   No.
13     Q.   Any other professional training?
14     A.   No.
15     Q.   So now I want to move to the work history.
16 Did you have any sort of accounting or budget related
17 jobs while you attended undergrad?
18     A.   I did an internship for the City of Denton.
19     Q.   And what was that internship?
20     A.   So there were two; one was in the economic
21 development department and one was in Keep Denton
22 Beautiful.
23     Q.   Sorry about my ignorance of Texas, but is
24 Denton Texas?
25     A.   Denton, Texas, yes.

Page 19

1     Q.   Where is Denton, Texas?
2     A.   North of -- about 30 miles north of Fort
3 Worth.
4     Q.   Okay.  And what was your first job after you
5 graduated college?
6     A.   City of Corinth.
7     Q.   Is that also in Texas?
8     A.   They're all in Texas.  I've never lived
9 anywhere but Texas.
10     Q.   Okay.  I've never lived anywhere other than
11 Illinois.
12     A.   Great.  That's wonderful.
13     Q.   Where is Corinth, Texas?
14     A.   It is about -- do you know where Lewisville
15 is?  No, okay.  So it is about 10 miles north -- south
16 of Denton.
17     Q.   Okay.  I'm learning.
18     A.   Okay.
19     Q.   Building my mental map.
20     A.   Going towards Dallas.  It's between Dallas and
21 Denton.
22     Q.   Okay.  And what was the position again?
23     A.   That -- I didn't state the position, but it
24 was the HR and budget coordinator.
25     Q.   And can you sort of describe your job

Page 20

1 responsibilities in that role?
2     A.   All personnel actions, whether it be workers'
3 comp, regular inboarding/outboarding employees, medical
4 benefits, payroll, and on the budget side just creating
5 a budget for the City.
6     Q.   Do you remember the years you worked in that
7 position?
8     A.   1998 to 2001.
9     Q.   Okay.  After you left that position, what was
10 your next work position?
11     A.   Upper Trinity Regional Water District.
12     Q.   I'm guessing that's in Texas?
13     A.   That's in Texas.  That's in Lewisville, Texas.
14     Q.   Lewisville, Texas?
15     A.   Uh-huh.
16     Q.   Thank you.
17          What was your title there?
18     A.   Budget Analyst.
19     Q.   And can you describe what that job entailed?
20     A.   Putting together budget documents to -- for
21 the water district.
22     Q.   Would that be like annual budgets?
23     A.   Annual budgets that were also maintained on a
24 monthly basis.
25     Q.   And what years did you work in that position?

Page 21

1     A.   2001 to 2005.
2     Q.   Okay.  After you left that position, what was
3 your next job?
4     A.   Tarrant County.
5     Q.   Tarrant County.  And what was your first
6 position with Tarrant County?
7     A.   Budget analyst.
8     Q.   Budget analyst.
9          Do you remember the years you worked in that
10 role?
11     A.   2005 to 2007.
12     Q.   And can you describe your sort of job
13 responsibilities in that role?
14     A.   Again, just creating budget documents,
15 creating -- putting together -- working in the software
16 and creating the budget document itself.
17     Q.   Did you do it for any particular department?
18     A.   The entire County.
19     Q.   For each budget you would create, would you
20 touch on every department, or would it just sort of be
21 the departments -- sorry, would you touch on -- strike
22 that.
23          For the budgets that you created, would that
24 involve going and touching each department in the
25 County?

Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

Page 22

1    A.   Yes.
2    Q.   So at some point did you take a different
3 position than budget analyst?
4    A.   Promoted to senior budget analyst.
5    Q.   And do you remember what year that would have
6 been?
7    A.   That one from 2007 until I moved to the DA's
8 office in 2011.
9    Q.   Okay.  And as senior budget analyst, what were
10 your job responsibilities?
11    A.   The same responsibilities.
12    Q.   Was there anything in addition to being a
13 budget analyst that you would take on as being a senior
14 budget analyst?
15    A.   No.  It was more interaction with the
16 departments.
17    Q.   Would you oversee budget analysts in that
18 role?
19    A.   So there were only two of us.  Debbie
20 Schneider and Helen Giese.
21    Q.   Okay.
22    A.   So --
23    Q.   Gotcha.  That's two names I know.
24        So you said was it in 2011 you moved?
25    A.   2011 I was promoted to the Budget Business

Page 23

1 Manager in the Criminal District Attorney's Office.
2    Q.   And was that a job that was offered to you?
3    A.   I applied for it.
4    Q.   What made you want to apply for that position?
5    A.   Promotion.
6    Q.   And so, I'm sorry, what department was it
7 with?
8    A.   Criminal District Attorney.
9    Q.   So what was your job responsibilities in that
10 role?
11    A.   To do the business of the District Attorney.
12 Again, it was the processing of personnel,
13 requisitioning all items, overseeing employees' needs.
14 If there was -- needed to be an interaction with the HR
15 Department or one of the business departments, I
16 assisted them with that.
17    Q.   Would your role include putting together a
18 budget proposal for the Criminal District Attorney's
19 Office?
20    A.   Yes, sir.
21    Q.   And would you then submit that to the Budget
22 and Risk Management Department?
23    A.   Yes.  There's no submission.  It just -- you
24 just enter it in.
25    Q.   Yeah, can you explain sort of the process of

Page 24

1 how it works?  Is there -- can you explain the process?
2    A.   There's a software, and it's through web-based
3 and you enter your budget through that, with your
4 justifications and your requests, dollar requests or any
5 new positions or reclasses of positions or capital
6 requests.  And there's a cutoff date, and you're locked
7 out on that date, and whatever you submitted at that
8 time is your submission.
9    Q.   So you better not be late?
10    A.   That's right.
11    Q.   After you submit it, do you then have meetings
12 with the Budget and Risk Management Department?
13    A.   Yes, we would have a meeting with them.
14    Q.   Okay.  I got some more questions about that
15 later, but so after -- did you -- at some point did you
16 leave the position of Business Manager for Criminal
17 District Attorney's Office?
18    A.   Yes.  In 2015, I promoted to the Assistant
19 Director of Budget and Risk Management.
20    Q.   And was the director at that point Debbie
21 Schneider?
22    A.   Correct.
23    Q.   And what were your job responsibilities in
24 that role?
25    A.   A higher level obviously.  Was if the director

Page 25

1 was not around, then my responsibilities would be to do
2 the director's position.  And again, basically the same
3 duties as -- compiling an annual budget, working through
4 that budget throughout the year, and identifying the
5 needs of the departments.
6    Q.   Would you ever present before the
7 Commissioners Court in your role as assistant director?
8    A.   Yes.
9    Q.   What would be the circumstances that would,
10 you know -- I'm blanking on the word.  Strike that.
11        Under what circumstances would you sort of
12 present to the Commissioners Court?
13    A.   During the budget hearing, there is
14 presentation, there's a PowerPoint presentation, some
15 historical data.  I would make that presentation.
16    Q.   Any other circumstances of bringing before the
17 Commissioners Court?
18    A.   No.
19    Q.   Okay.  And was it -- did you leave the
20 position of assistant director and become the director
21 of --
22    A.   Yes.
23    Q.   -- the Budget and Risk Management Department?
24        And I think you said the year, but --
25    A.   I think it's December of 2018.

7 (Pages 22 - 25)

Page 26

1 Q. It's December 2018?
2 A. I think.
3 Q. Okay. And you might guess my next question.
4 Can you tell me what your job responsibilities are as
5 the director?
6 A. The oversight of the budget for the entire
7 County and to know the needs of the County to be able to
8 finance them accordingly.
9 Q. Okay. I want to switch topics a little bit
10 now and ask, do you believe there's a substance abuse
11 problem in Tarrant County, Texas?
12         MS. ABSTON: Objection, form.
13 Q. (BY MR. FORD) You can answer.
14 A. I believe there is -- a substance abuse,
15 that's your question? Yes, I believe there's a
16 substance abuse problem.
17 Q. Why do you believe that?
18 A. Because of the requests that come through the
19 budget and while my tenure in the Criminal District
20 Attorney's Office.
21 Q. What about the requests that come through the
22 budget make you -- lead you to believe there's a
23 substance abuse problem in Tarrant County?
24 A. The individual departments present with a
25 justification why they -- why they need every dollar

Page 27

1 that they are requesting, and it's often referred to for
2 different -- for various departments that are
3 specifically working in that field or need for additional
4 dollars to be spent, whether it's on position, supplies
5 or capital, to help offset that need.
6 Q. And when you say offset that need, are you
7 talking about the need to address substance abuse
8 problems in Tarrant County?
9 A. Correct.
10 Q. So you talked about justifications. They
11 submit justifications to the departments for --
12 A. Correct.
13 Q. -- you know, certain items that they want
14 money for?
15 A. Uh-huh.
16 Q. Would those justifications be memorialized in
17 writing anywhere?
18 A. Yes.
19 Q. Would it be part of their budget request that
20 they would submit to your department?
21 A. Correct.
22 Q. That would contain sort of the justifications?
23 A. Uh-huh.
24 Q. So you testified that you believe there's a
25 substance abuse problem in Tarrant County. When do you

Page 28

1 believe that problem began?
2 A. I don't know when the problem -- I don't think
3 I could answer that.
4 Q. Do you know -- could you say whether the
5 problem, in your mind, has increased over the years?
6 A. The costs and the requests have increased. So
7 based on that, I believe there's an increase.
8 Q. Can you sort of give me a timeframe of years
9 of when this increase has occurred?
10         MS. ABSTON: Objection to form.
11 A. So I don't know that I have a timeline that I
12 can say pinpoint directly. It would be speculation, so
13 I don't know that I --
14 Q. (BY MR. FORD) Has it ever -- have the costs
15 in your mind ever gone down and then gone back up? In
16 other words, have they fluctuated over time?
17 A. No. There's not been a decrease in the need.
18 Q. And in no year has there been a decrease in
19 need?
20 A. Not for the reference I'm referencing.
21 Q. And what departments are you referencing or
22 thinking about?
23 A. Several.
24 Q. Do you mind listing them?
25 A. The Medical Examiner's Office, the Domestic

Page 29

1 Relations Department, Juvenile, Public Health, The
2 Criminal District Attorney's Office, the Sheriff's
3 Office, and then by correlation to that, the County
4 Clerk and the District Clerk. Almost every department,
5 but the first ones I referenced drastically.
6 Q. How about the Budget and Risk Management
7 Department?
8 A. So we went from two employees to -- well,
9 there was a total of five in the department, that we now
10 have 14.
11 Q. So from going to five to 14, how many years
12 did that take?
13 A. About six.
14 Q. Were -- you're making me do math. Were the
15 nine people added all in one year, do you remember?
16 A. No, huh-uh.
17 Q. Also one of the departments, you mentioned the
18 Sheriff's Office?
19 A. Uh-huh.
20 Q. Just a question. Is it sort of separated into
21 two divisions?
22 A. The Sheriff's Office?
23 Q. Yeah.
24 A. Sheriff's Department, we recognize them as the
25 confinement area and then the operations side.

8 (Pages 26 - 29)

Page 30

1    Q.  Is the operations side referred to as the
2  constable side?
3    A.  No, that's -- that's totally separate.
4    Q.  Okay.  Is constable the confinement side?
5    A.  No, they're totally separate.  They are
6  elected officials.
7    Q.  Gotcha.
8    A.  Constables are elected officials who have no
9  association with the Sheriff's Department.
10    Q.  But the Sheriff's Office is sort of segmented
11  into two: one being confinement and one being
12  operations?
13    A.  Correct.
14    Q.  Would confinement be operating the jail?
15    A.  Yes.
16    Q.  Would it involve anything else?
17    A.  Huh-uh, jail.
18    Q.  And operations, what would that entail?
19    A.  It can be -- it's patrol, warrants,
20  extradition, narcotics, task force, various task forces
21  they have.
22    Q.  Okay.  So I want to go back to sort of a
23  question from a little while ago, which is you testified
24  that you believe there's a substance abuse problem in
25  Tarrant County, Texas.  My next question is, in your

Page 31

1  mind, what substances would make up that substance abuse
2  problem?
3    A.  That is not something I delve into.
4    Q.  Could you say whether alcohol is part of the
5  problem?
6    A.  I'm sure.
7    Q.  When you say I'm sure --
8    A.  Because it's -- yes.
9    Q.  How about methamphetamine?
10    A.  Yes.
11    Q.  How about cocaine?
12    A.  Yes.
13    Q.  Marijuana?
14    A.  Yes.
15    Q.  If I asked you in your mind what percentage of
16  the substance abuse problem is made up of, say,
17  methamphetamine, what would your answer be?
18        MS. ABSTON:  Objection to form.
19    A.  I have no idea.
20    Q.  (BY MR. FORD)  Do you know what fentanyl is?
21    A.  I don't know what it is.  I know the word.
22    Q.  Do you know what heroin is?
23    A.  I know what it is.  I mean, I don't know what
24  it is.  I know -- yes and no, can I say that?  Because
25  yes I know heroin, but I don't know what it is, what

Page 32

1  it's made up of.
2    Q.  I know what you mean.  I might not try to
3  get -- let you get away with "yes" and "no" to all the
4  questions.
5        So does heroin in your mind make up part of
6  the substance abuse problems in Tarrant County?
7    A.  I'm sure, yes.
8    Q.  Does opioids?
9    A.  Yes.
10    Q.  Now within that, does prescription opioids in
11  your mind make up part of the problem?
12        MS. ABSTON:  Objection to form.
13    Q.  (BY MR. FORD)  Yeah, let me ask a couple more
14  questions.
15        When I say prescription opioids, do you know
16  what I mean?
17    A.  Yes.
18    Q.  How would you define the term "prescription
19  opioids"?
20    A.  Very lamely.  It is a form of narcotics that
21  requires if I go to the pharmacy to get it, I'd have to
22  show my ID, and it's not going to be prescribed forever.
23    Q.  Sort of baked into that, does it need to be
24  prescribed by a doctor?
25    A.  Yes.

Page 33

1    Q.  Do you know what illicit opioids are?
2    A.  Probably not the difference, huh-uh.
3    Q.  Do you know if I said "illegal opioids" --
4    A.  Yes.
5    Q.  -- would that -- what would that mean to you?
6    A.  Not correctly received by a physician.
7    Q.  Great.  We've got to same definition.
8    A.  Okay, good.
9    Q.  So you said opioids are part of the substance
10  abuse problem.
11    A.  Uh-huh.
12    Q.  Do illegal opioids make up part of that
13  substance abuse problem in your mind?
14    A.  I don't know the difference in -- I don't
15  delve into it with the budget process that much to know
16  the difference.
17    Q.  But do you delve into it generally for
18  opioids?
19        MS. ABSTON:  Objection to form.
20    A.  No specific drug is related to my research to
21  determine whether we need to fund that request or not.
22    Q.  (BY MR. FORD)  So have you heard the term
23  "opioid epidemic"?
24    A.  Yes.
25    Q.  Where have you heard that term before?

9 (Pages 30 - 33)

Page 34

1     A.   Within departments, the TV, street -- you
2   know, just in conversation --
3     Q.   On the news?
4     A.   -- generically.
5        I watch very little news, but yes.
6     Q.   Me, too.
7        So when you mentioned you hear it in
8   departments, do any departments come to mind?
9     A.   The Sheriff's Office and the CDA, probably
10   Juvenile and Domestic Relations, Medical Examiner.
11     Q.   When you say Juvenile, do you know the
12   technical name of that department?
13     A.   Juvenile.
14     Q.   Is it just --
15     A.   Juvenile Services and Juvenile Detention.
16     Q.   Okay.
17     A.   But it's just Juvenile.
18     Q.   Gotcha.
19        And CDA, you mentioned that was the Criminal
20   District Attorney's Office?
21     A.   Yes.
22     Q.   And domestic, do you know what the sort of
23   official title would be?
24     A.   Domestic Relations Operations, DRO.
25     Q.   Gotcha.

Page 35

1        Do you believe there's an opioid epidemic in
2   Tarrant County?
3     A.   Based on the information that's been given to
4   me when -- during the budget process, yes.
5     Q.   What information are you thinking of that led
6   you to believe that there's an opioid epidemic in
7   Tarrant County?
8     A.   When a position is requested, they have to
9   give detailed justification.  Or any large capital item
10   they have to give a justification.  And that has -- I
11   have seen those justifications and talked about those
12   justifications, including opioids.
13     Q.   Those justifications, would they come in the
14   form of a report somewhere?
15     A.   They're submitted through the budget process
16   that I talked about earlier.
17     Q.   I understand.
18        So in your mind what has caused this opioid
19   epidemic --
20        MS. ABSTON:  Objection, form.
21     Q.   (BY MR. FORD)  -- in Tarrant County?
22        MS. ABSTON:  Objection to form.
23     A.   I don't think I can -- I'm not qualified to
24   answer that question.
25     Q.   (BY MR. FORD)  I don't care if you're

Page 36

1   qualified.  I'm looking for your -- your understanding
2   of -- in your mind, you testified that you believe there
3   is an opioid epidemic in Tarrant County?
4     A.   Based on the information that's presented to
5   me when I'm reviewing budget documents.
6        MS. ABSTON:  Yeah, and I'm going to
7   object to form as asked and answered.
8     Q.   (BY MR. FORD)  So do you have an opinion of
9   what the causes are of the opioid epidemic in Tarrant
10   County?
11     A.   No.
12     Q.   Do you think that illegal drug dealers played
13   any role in creating the opioid epidemic in Tarrant
14   County?
15        MS. ABSTON:  Objection to form.
16     A.   Again, I don't know that I know where -- I
17   mean, I know there are drug dealers.  I know the
18   Narcotics Unit within the District Attorney's Office
19   worked with them, but I don't know who because I wasn't
20   in that function.  The function I was doing was with
21   numbers.
22     Q.   (BY MR. FORD)  So you have no opinion whether
23   drug dealers have helped cause the opioid epidemic in
24   Tarrant County?
25        MS. ABSTON:  Objection to form.

Page 37

1     A.   Again, I will say that I know that they are a
2   part of when -- when I worked in the Criminal District
3   Attorney's Office, they were a part of that; but to say
4   that they were the only part, I don't know.
5     Q.   That's a good clarification.  I'm not asking
6   about if they're the only part.
7     A.   Okay.
8     Q.   I was asking in your mind, are they part of
9   the cause?
10        MS. ABSTON:  Objection to form.
11     A.   Again, based on the information that I
12   received with numbers, that is a discussion that was --
13   yes, I've been parts of discussions about dealers.
14     Q.   (BY MR. FORD)  So you would agree with --
15   would you agree with the statement that drug dealers
16   have caused, in part, the opioid epidemic in Tarrant
17   County?
18        MS. ABSTON:  Objection to form.
19     A.   I feel like you're putting words in my mouth.
20     Q.   (BY MR. FORD)  I'm not trying to.  I'm trying
21   to understand what you're saying.
22        MS. ABSTON:  I would object to form as
23   asked and answered, once again.
24     Q.   (BY MR. FORD)  Well, I mean, a couple of
25   responses ago you said you were part of discussions and

10 (Pages 34 - 37)

Page 38

1 that drug dealers were part --
2     A.   Part of the discussion, right.
3     Q.   So what do you mean by drug dealers were part
4 of the discussion?
5           MS. ABSTON:  Objection to form.
6     A.   In requests for various supplies, the
7 references were regarding dealers.  I don't think we
8 ever call them drug dealers.  We just call them dealers.
9     Q.   (BY MR. FORD)  Okay.  So you testified you
10 believe there's an opioid epidemic in Tarrant County.
11 Do you believe that opioid manufacturers have played any
12 role in creating that opioid epidemic?
13           MS. ABSTON:  Objection to form.
14     A.   Well, they manufacture them, so yes.
15     Q.   (BY MR. FORD)  Do you believe that doctors who
16 prescribed opioids have played some role in creating the
17 opioid epidemic in Tarrant County?
18     A.   Yes.
19     Q.   Do you believe that opioid distributors have
20 played some role in creating the opioid epidemic in
21 Tarrant County?
22           MS. ABSTON:  Objection to form.
23     A.   Yes.
24     Q.   (BY MR. FORD)  Do you believe there is a
25 methamphetamine epidemic in Tarrant County?

Page 39

1           MS. ABSTON:  Objection to form.
2     A.   Yes.
3     Q.   (BY MR. FORD)  And why do you say that?
4     A.   Again, in the Criminal District Attorney's
5 Office as the Business Manager working with the
6 Narcotics Unit.
7     Q.   Do you think that the methamphetamine epidemic
8 in Tarrant County is a bigger problem than the opioid
9 epidemic problem?
10     A.   I do not know the answer to that.
11           MS. ABSTON:  Objection to form.
12     Q.   I'm sorry, I didn't hear your answer.
13     A.   I don't know the answer to that.
14     Q.   (BY MR. FORD)  Is that because you lack
15 certain information that will allow you to form an
16 opinion on that?
17     A.   The documentations that are presented to me
18 reference drugs.  They don't reference what type of
19 drug.  So conversations that are had reference various
20 issues, and that's why they need some of the supplies.
21     Q.   So in conversations you might hear specific
22 drugs mentioned, but the documents that you're given do
23 not mention specific drugs.  Is that fair?
24     A.   Very seldom do they mention any specific drug.
25 It's a general justification of why they need what they

Page 40

1 need, what they're requesting.
2     Q.   So -- okay.  I didn't mean to overstep.
3        So, you know, in the written document requests
4 that we're talking about, if there was an item that was
5 going to address substance abuse, you know, it could
6 incorporate methamphetamines, it could incorporate
7 opioids or both?
8     A.   Correct.
9     Q.   Do you believe there is an alcohol epidemic in
10 Tarrant County?
11           MS. ABSTON:  Objection to form.
12     A.   Yes.
13     Q.   (BY MR. FORD)  Do you believe there's a
14 marijuana epidemic in Tarrant County?
15           MS. ABSTON:  Objection to form.
16     A.   That is not -- I'm going to say no because
17 that is not part of the conversation.  They don't talk
18 about that that much, so.
19     Q.   (BY MR. FORD)  Gotcha.
20        This is -- again, I'm going to show my
21 ignorance of Texas and Dallas particularly, but Dallas
22 is next door to Fort Worth.  Are they sort of thought of
23 as sister cities?
24     A.   No.
25     Q.   No.  Are they -- are they like rival cities?

Page 41

1     A.   Yes.
2     Q.   Okay.  Do you believe that Dallas County has a
3 problem with prescription opioid abuse?
4           MS. ABSTON:  Objection to form.
5     A.   I have no way -- I have no way of knowing that
6 outside of what's on television, which is -- no, I don't
7 work in Dallas County.
8     Q.   (BY MR. FORD)  So you have no opinion one way
9 or the other?
10     A.   No.
11           MS. ABSTON:  Objection to form.
12     Q.   (BY MR. FORD)  Do you know what the term "OUD"
13 means?
14     A.   No.
15     Q.   If I said opioid use disorder, does that --
16     A.   Oh --
17           MS. ABSTON:  Objection to form.
18     Q.   (BY MR. FORD)  Does that help at all?
19     A.   It tells me what it means.
20     Q.   Do you know what the OUD rate in Tarrant
21 County is?
22           MS. ABSTON:  Objection to form.
23     A.   No.
24     Q.   (BY MR. FORD)  I think you testified earlier
25 that you know the term "fentanyl"?

11 (Pages 38 - 41)

Page 42

1    A.  I know the term, uh-huh.
2    Q.  Do you know that it is a drug?
3    A.  Yes.
4    Q.  Do you know what the fentanyl usage rate in
5  Tarrant County is?
6        MS. ABSTON:  Objection to form.
7    A.  No.
8    Q.  (BY MR. FORD)  Let me just clean up.  It was
9  my fault, I'm sorry.
10       Do you know what I mean when I say usage rate?
11   A.  I'm assuming a percentage -- no, I don't, I
12  guess.  I mean, percentage is what comes to mind.
13   Q.  Yeah, right.  When I use it, I'm referring to
14  what percentage of Tarrant County residents would use
15  that.
16   A.  I don't know the answer to that.
17   Q.  So let me just reask real quick.
18       Do you know what the OUD rate in Tarrant
19  County is?
20       MS. ABSTON:  Objection, form.
21   A.  No.
22   Q.  (BY MR. FORD)  And do you know what the
23  fentanyl usage rate in Tarrant County is?
24   A.  No, sir.
25       MS. ABSTON:  Objection to form.

Page 43

1    Q.  (BY MR. FORD)  I would like to sort of switch
2  gears and go back to the Budget and Risk Management
3  Department.  We've been going a little while.  Do you
4  want to take a break, or do you want to keep going?
5    A.  I'm okay.
6    Q.  Okay.  So I would like to talk to you about
7  sort of the structure of your office --
8    A.  Okay.
9    Q.  -- or your department.  And I might say, you
10  know, in this dep -- I've kind of already done it --
11  Budget and Risk Management Department, or I might refer
12  to it as department, or I might refer to it as your
13  office, but I mean the Budget and Risk Management
14  Department.  Is that fair?
15   A.  Uh-huh.
16   Q.  If I'm talking about another department or
17  office, say the County Auditor's Office, I'll
18  specifically refer to it as the County Auditor's Office.
19       So I wanted to ask you about the sort of
20  structure of your department.  Is there any distinction
21  between the budget side and the risk management side?
22   A.  Yes.
23   Q.  Can you explain that difference to me?
24   A.  I have an assistant director over Budget and
25  Risk Management, and I have an assistant director over

Page 44

1  Risk Management.  So it is distinctly two different
2  departments.
3    Q.  Okay.  I think in the first one, you said you
4  had one assistant over Budget and Risk Management and
5  then one over Risk Management.
6    A.  Uh-huh.
7    Q.  Is that what you said?
8    A.  That's correct.
9    Q.  So that first one, do they sort of touch both
10  or --
11   A.  Yes.
12   Q.  And the second assistant deals only with Risk
13  Management?
14   A.  Correct.
15   Q.  Are there employees in your department below
16  those two positions?
17   A.  Yes.
18   Q.  Are they similarly within one silo or the
19  other?
20   A.  Yes.
21   Q.  Did you say there's 14 --
22   A.  Yes.
23   Q.  -- people?
24       Does that include yourself --
25   A.  Yes.

Page 45

1    Q.  -- in your department?
2        You said that it's grown from what, nine to --
3  or five to 14, correct?
4    A.  Yes.
5    Q.  Can you explain why it's grown, why the need
6  has grown for more employees?
7    A.  One of them was we absorbed a department that
8  was in the HR Department.  So the two employees that
9  were there are under workers' comp.  Originally, they
10  were in HR for a very long period of time, and now
11  they're under the risk -- the assistant director, the
12  risk manager.
13       And then we added a risk analyst under --
14  again, it was a very small department for a very long
15  time, and as the county grew, the need for our
16  department to grow with it, just like every other
17  department.
18   Q.  When you say the county grew, do you mean --
19   A.  Population.
20   Q.  Total population.
21       Okay.  So does your office employ multiple
22  budget analysts?
23   A.  Yes.
24   Q.  And does your office employ risk analysts,
25  too?

12 (Pages 42 - 45)

1    A.   Yes.
2    Q.   Are those distinct positions?
3    A.   Yes.
4    Q.   Does each budget analyst have a sort of
5  distinct area they deal with?
6    A.   I have one budget analyst that has a distinct
7  area.
8    Q.   And what's that?
9    A.   Law enforcement.
10    Q.   Law enforcement.
11        And then you have additional budget analysts?
12    A.   One.
13    Q.   And he or she does everything else?
14    A.   Yes.
15    Q.   Does that person touch law enforcement?
16    A.   Can.  I mean, no one does just one thing.
17  Their primary function -- one of the primary functions
18  would be law enforcement.
19    Q.   And on the risk analyst side, how many risk
20  analysts do you have?
21    A.   Just one.
22    Q.   Do you have a workers' comp. coordinator?
23    A.   Yes.
24    Q.   And that's not -- is that a distinct position
25  from the budget analysts and risk analysts we've

1  discussed?
2    A.   Correct.  Those are the two positions, the
3  workers' comp. coordinator and her assistant.
4    Q.   Is your workers' comp. coordinator Carmello
5  Jones?
6    A.   Yes.
7    Q.   And your assistant directors -- did you have
8  an assistant named Travis Yarbrough?
9    A.   He is.
10    Q.   Oh, he is.  I thought, did you --
11    A.   Robert Cone is the Assistant Director over
12  Budget and Risk Management.  Travis Yarbrough is the
13  Assistant Director over Risk Management.
14    Q.   Okay.  Thank you.
15        And then I also saw on your website, do you
16  have positions associated with the American Rescue Plans
17  Act?
18    A.   Yes.
19    Q.   Can you describe what those positions are?
20    A.   They are data analysts, and their
21  responsibility is the day-to-day requesting and
22  validating items that are requested from the departments
23  and ordering them, making sure that all the
24  documentation for the annual reports are completed so
25  that we can submit our annual report for the feds, to

1  the Treasury.
2    Q.   Did Tarrant County receive funds pursuant to
3  the American Rescue Plans Act?
4    A.   Yes.
5    Q.   Are the positions that we just talked about,
6  are they paid for from the funds?
7    A.   Yes.
8    Q.   That were received --
9    A.   Uh-huh.
10    Q.   -- by the -- if I call it ARPA, is that --
11    A.   ARPA, uh-huh.
12    Q.   ARPA.  So those positions are funded by funds
13  from ARPA?
14    A.   Correct.
15    Q.   Okay.  And all the jobs we've talked about so
16  far, are those incorporated in the 14 total?
17    A.   Yes.
18    Q.   If the money from ARPA ever stops coming, do
19  you know what will happen to those positions that are
20  currently funded by ARPA?
21    A.   They would not be funded and, therefore, they
22  would go away.
23    Q.   So I wanted to ask you about who sort of
24  reports to you.  Is it fair to say everyone in the
25  department reports to you?

1    A.   Yes.
2    Q.   If I say -- ask for your direct reports, does
3  that mean anything?
4    A.   We're such a small department, everybody
5  directly, but I would say Robert and Travis.
6    Q.   And but everyone else if they have questions,
7  they can come directly to you?
8    A.   Yes.
9    Q.   And who do you as director report to?
10    A.   The County Administrator.
11    Q.   And is that -- I am going to butcher his
12  name -- G.K. Maenius?
13    A.   "Maenius," yes.
14    Q.   "Maenius."  It wasn't terrible.
15    A.   No.
16    Q.   And he's been in that position for a long
17  time, right?
18    A.   Yes, sir.
19    Q.   How many years, do you know?
20    A.   30 plus years.
21    Q.   Do you report to anyone else as director?
22    A.   He is my -- I report to him.
23    Q.   So would you say that you also -- that you
24  report to the Commissioners Court?
25    A.   By virtue that G.K. reports to the

13 (Pages 46 - 49)

1  Commissioners.
2  Q.  Do you ever report to the district judges?
3  A.  No.
4  Q.  My understanding is the County Auditor does.
5  Is that your understanding?
6  A.  She's appointed by a board, district judge
7  board.
8  Q.  And do you know who makes up the Commissioners
9  Court?
10  A.  Yes.
11  Q.  Who is that?
12  A.  The Precincts 1 through 4 and the County
13  Judge.
14  Q.  Does the County Judge have a precinct himself?
15  A.  No.
16  Q.  Is Judge Tim O'Hare the current --
17  A.  Yes.
18  Q.  -- County Judge?
19      Do you know what year he was elected?
20  A.  He was elected in '22, took office on January
21  1 of '23.
22  Q.  And do you know who occupied the position
23  before him?
24  A.  Yes.
25  Q.  Who was that?

1  A.  Glen Whitley.
2  Q.  And was he there for a while?
3  A.  He was.
4  Q.  If I said 2006 to 2022, would that sound
5  right?
6  A.  It would sound -- longer as a judge.
7  Q.  Oh, was he a commissioner of a precinct before
8  that?
9  A.  Correct.
10  Q.  So -- never mind, strike that.
11      What is the operating -- do you know what the
12  operating budget is for the Budget and Risk Management
13  Department for this year?
14  A.  No.
15  Q.  I want to --
16  A.  When you say this year, '24 or '23?
17  Q.  Yeah, that's a good question.  Has the budget
18  for 2024 been finalized yet?
19  A.  No.
20  Q.  Do you know when that's going to be finalized?
21  A.  In September.
22  Q.  Are you busy right now with it?
23  A.  Very.
24  Q.  Well, thank you for the time today.  I'll be
25  as brief as I can.

1      For 2023, do you know what your office's --
2  your department's budget is?
3  A.  No, I do not.
4  Q.  I want to ask you about the budget process in
5  a minute, but specifically for your department, do you
6  have to -- you have an annual budget, correct?
7  A.  Correct.
8  Q.  And is that for the fiscal year or calendar
9  year?
10  A.  Fiscal.
11  Q.  Do you submit -- so other departments submit
12  their proposed budgets to you.  Is that fair to say?
13  A.  Uh-huh.
14  Q.  Do you submit your proposed budget?
15  A.  Yes.
16  Q.  Do you submit it to yourself?
17  A.  Yes.
18  Q.  Does -- what's -- is there any sort of review
19  process for that?
20  A.  For Budget and Risk Management's?
21  Commissioners Court does the approval of it.  I do not
22  approve any budget.
23  Q.  So I was just wondering if another department,
24  say County Auditor, would fill the role that you usually
25  fill for --

1  A.  County Administrator.
2  Q.  County -- okay.  County Administrator would do
3  that?
4  A.  G.K. Maenius.
5  Q.  Well, when you develop the budget, the annual
6  budgets, those are also on fiscal years, correct?
7  A.  That's correct.
8  Q.  And your department, you know, formulates the
9  entire budget.  Is that fair to say?
10  A.  That's correct.  When you say -- for the
11  County?
12  Q.  For the County.
13  A.  Yes.
14  Q.  Yes.
15      Does any other department or office within
16  Tarrant County help you with that process of drafting
17  and putting together the entire budget?
18  A.  The auditor's office projects revenues.
19  Q.  Any other department play a role?
20  A.  No.
21  Q.  So in your time with the department, has the
22  total budget for Tarrant County grown larger?
23  A.  Yes.
24  Q.  Do you know if each year it's grown larger?
25  A.  Each year it has, yes.

14 (Pages 50 - 53)

Page 54

1    Q. Can you recall of any time where the annual
2 budget was less than the year before that?
3    A. No.
4    Q. Can you describe what's caused some of the
5 causes of the changes to -- strike that.
6        Can you explain why the budget has grown over
7 the years?
8    A. It's various reasons. Appraised values have
9 gone up. Tax rates have gone down. Requests from
10 departments have increased due to their need. As the
11 departments' requests increase, we're required to have a
12 reserve to maintain a AAA rating, and so that has
13 increased.
14    Q. Would part of it be -- has the population of
15 Tarrant County grown --
16    A. Yes.
17    Q. -- over the years?
18        Would that be also part of the reason why?
19    A. Yes.
20    Q. The budget has grown, that is?
21        Sorry, would that be part of the reason why
22 the budget has grown?
23    A. Yes.
24    Q. So I want to talk a little bit about the roles
25 of your department. Is it fair to say your office is

Page 55

1 responsible for gathering and presenting the
2 information -- gathering and presenting information to
3 the Commissioners Court to help them decide how to
4 expend funds on behalf of Tarrant County?
5    A. Yes.
6    Q. Does your office provide like recommendations
7 on how to spend?
8    A. That's what we do.
9    Q. Okay. I am going to show you another exhibit.
10    MR. FORD: We can take a break if we
11 want. Let's take like a ten-minute break.
12        THE VIDEOGRAPHER: We're going off the
13 record at 11:01.
14        (Break from 11:01 a.m. to 11:13 a.m.)
15        THE VIDEOGRAPHER: We're back on the
16 record at 11:13.
17    Q. (BY MR. FORD) Ms. Giese, okay, so right
18 before the break I was about to mark an exhibit, so I
19 will do that now.
20        (Exhibit 2 marked.)
21    MS. ABSTON: And once again, we'll object
22 to the use of this exhibit as there's no URL and date
23 listed on the exhibit so we could authenticate it.
24    Q. (BY MR. FORD) Okay. Ms. Giese, I've marked
25 as Exhibit 4 -- Exhibit 2, sorry. This is a printout of

Page 56

1 the Budget and Risk Management's website in Tarrant
2 County. Does this look familiar to you? I know the
3 format is different than online, but --
4    A. Yes.
5    Q. I wanted to talk a little bit about what your
6 office does. So do you see, just below that picture of
7 the pen, that paragraph?
8    A. Uh-huh.
9    Q. If you could read it, does that look familiar
10 to you as what's listed on your website?
11    A. Yes.
12    Q. Okay. So do you see in the first line there?
13 And I'll just read it out loud. The Tarrant County
14 Budget and Risk Management Department was created in
15 1989 and is responsible for the development and
16 monitoring of the County budget.
17        Do you see that?
18    A. Uh-huh.
19    Q. Do you agree that your office is responsible
20 for the development and monitoring of the County budget?
21    A. Yes, sir.
22    Q. Okay. And would this refer to the County's
23 annual budget?
24    A. Yes, sir.
25    Q. Would it refer to any other budgets?

Page 57

1    A. So all of the budgets are annual, but there's
2 an operating budget and there's special purpose budgets.
3    Q. Are those the only two budgets that are
4 created by your office?
5    A. Well, special purpose budgets is -- consists
6 of about 89 different funds, but --
7    Q. That's a lot.
8    A. Uh-huh.
9    Q. Is that -- the special purposes budget, is
10 there one annual report created each year?
11    A. Correct, presented to Commissioners Court.
12    Q. Gotcha.
13        They cover all 89 special --
14    A. Uh-huh, yes, sir.
15    Q. Have the special purpose budgets grown over
16 time?
17    A. Yes.
18    Q. So there haven't always been 89?
19    A. Correct.
20    Q. Okay. I got a couple of questions about that
21 a little later, but first, you know, we've touched on
22 this, but I just want to ask directly. So how does your
23 department develop the annual budget?
24    A. The departments submit their request. We have
25 budget review meetings to discuss with each department,

15 (Pages 54 - 57)

1 for them to explain further what their request is, fact
2 finding mission.  And then we start compiling the data
3 in the month of June and July for recommendation and
4 those that are not recommended and then balance them to
5 the revenues.
6    Q.  Okay.  And I think you might have mentioned it
7 before, does each department submit their proposed
8 budget using software?
9    A.  Yes.
10    Q.  Do you know, does that software have a name or
11 a program name?
12    A.  BW, Business Warehouse.
13    Q.  And can you describe the form of their
14 submission?  Is it, say, an Excel spreadsheet?
15    A.  Oh, no.  It is PDFs, and they are submitting
16 their line by line expenses, their requests for new
17 positions, their request to reclass existing positions,
18 request for capital items, and they're all in various --
19 each one of those that I just talked about is in a
20 separate area for them to enter their submission.
21    Q.  What do you mean by in a separate area?
22    A.  So their ongoing operating costs are in one
23 application, then new positions are in another
24 application, reclasses are in another --
25    Q.  Gotcha.

1    A.  -- constables in another.
2    Q.  And were these documents, are they all
3 separate documents?
4    A.  Yes, they create different documents.
5    Q.  Do these -- do all of the documents contain
6 the sort of justification blurbs that we've talked
7 about?
8    A.  So everything they request must have a
9 justification, so yes.
10    Q.  And justification, would that just be like an
11 explanation of why they need that specific line item?
12    A.  Uh-huh.
13    Q.  You mentioned -- I can't read my own
14 handwriting -- reclassifying positions.  That would be
15 part of a budget proposal?
16    A.  Correct.
17    Q.  Can you explain what that means?
18    A.  That just means a person that is doing -- a
19 person in a position is working outside of their job
20 description, and it's presented to a job evaluation
21 committee for them to determine if the position needs to
22 be reclassed from one grade to another.
23    Q.  Does that affect the level of pay they
24 receive?
25    A.  Yes.

1    Q.  Does that affect what fund their payment might
2 come from?
3    A.  No.
4    Q.  So the various departments submit their
5 budget, and then you said there's budget meetings with
6 your department?
7    A.  Budget review meetings, yes.
8    Q.  Budget review.
9        And would it be the department that submitted
10 the proposal and your department?
11    A.  And other departments, yes.
12    Q.  Oh, so there's multiple departments?
13    A.  So the Commissioners always have a
14 representative in these meetings so that they can come
15 back to them and explain what was transpired in those
16 meetings.
17    Q.  Do you meet one on one with each department?
18    A.  Yes.
19    Q.  So in those meetings, it would be the
20 department that's requesting the budget, your department
21 and a representative from the Commissioners Court?
22    A.  And the County Administrators, yes.
23    Q.  Anyone else?
24    A.  No.
25    Q.  Can you describe what happens in those

1 meetings?
2    A.  We discuss their request, whether it -- any
3 anomalies, anything that they've added from the year
4 before, you know, why did they need this, positions.
5 They explain why.  During a legislative year, they
6 explain how that is affecting their department, and just
7 what their added needs are from the previous year.
8    Q.  Do you know how many -- are there multiple
9 meetings with each department?
10    A.  No.  Each department we meet with, outside of
11 the IT department, we meet one time.
12    Q.  And hash out everything?
13    A.  Well, nothing is completely hashed out.  I
14 always reserve the right to contact them and have
15 further discussions.
16    Q.  Does that usually happen?
17    A.  Yes.
18    Q.  And is it your call, your department's --
19 strike that.
20        Does your department have the final say on
21 what items each department gets to roll into a proposed
22 budget that you then put before the Commissioners Court?
23    A.  Correct.  We do the recommendations.
24    Q.  You mentioned at some point in process, I
25 think it was after the budget review meetings, that

16 (Pages 58 - 61)

1 there was a fact-finding portion of the process.
2    A.  The budget review meetings are fact-finding.
3    Q.  Okay.  So that's all sort of one?
4    A.  It's verified.
5    Q.  I think I know what you mean, but what do you
6 mean by fact-finding?
7    A.  You know, their justification may have been
8 vague, and we need more explanation to be able to make
9 an educated decision on whether it should be recommended
10 or not recommended.
11    Q.  And then there was one other step.  You
12 mentioned in the process something about data.
13    A.  Data?
14    Q.  I think it was after the fact-finding.  Oh,
15 that you gathered --
16    A.  Correct.  During the budget review meetings,
17 they may have entered in something correctly.  In the
18 legislative year, they're -- the legislation has not
19 completed, so there may be more information.  And their
20 final submission is on April 1st -- I mean, excuse me,
21 the last day of April, and we start on May 1.  We start
22 reviewing on May 1.  So things can change just in that
23 little bit of time, and that's the fact-finding.  And
24 any data that they want to change, we then change it for
25 them and then do the recommendations in the month of

1 July.
2    Q.  Generally speaking, is it a -- is it a fun
3 process?
4    A.  Oh, I think it's -- yes.
5    Q.  Is it a contentious process?
6    A.  Yes.
7    Q.  Do you have to say no a lot?
8    A.  Yes.
9    Q.  So how long is the process after that April --
10 the last day of April submittal to when you have a
11 budget that you're ready to propose to the Commissioners
12 Court?
13    A.  So what was the first of your question?
14    Q.  How long of a length of time is it between
15 when each department submits their proposed budget?
16    A.  So we have our budget hearing in August, the
17 first -- tentatively the first two weeks in August, and
18 then the budget has to be approved with a lot -- there's
19 a lot of required dates along the way, but it has to be
20 approved within the first two weeks of September.
21    Q.  Okay.  And that -- the meeting is in August?
22    A.  The budget hearing.
23    Q.  Budget hearing?
24    A.  Uh-huh.
25    Q.  Is that before the Commissioners Court?

1    A.  Yes.
2    Q.  And that's when your department brings -- is
3 it termed a proposed budget at that point?
4    A.  Uh-huh.
5    Q.  And that includes everything for every
6 department?
7    A.  Our proposal.  It includes all of our
8 proposal.
9    Q.  So other than the proposed budget, are there
10 any sort of documents created that are submitted to the
11 Commissioners Court as part of the budget hearing
12 process?
13    A.  So we -- we create a PowerPoint.  Is that what
14 you're referencing?
15    Q.  Sure.
16    A.  So we just create a PowerPoint showing a
17 summary of revenues, expenditures, what drastically
18 changed, new positions and reserves.
19    Q.  And how would you describe the budget hearing
20 process?
21    A.  Not every department agrees with our proposal,
22 and that's what a budget hearing is for, is for them to
23 be able to stand before Commissioners Court and request
24 to be added what we did not put in there.
25    Q.  So is it fair to say it's sort of like a mini

1 quasi appeal process?
2    A.  Correct.
3    Q.  And do the Commissioners Court -- well, strike
4 that.
5       Independent of departments requesting
6 additional items to what's in the proposed budget, does
7 the Commissioners Court, you know, ask any questions
8 they might have about the proposed budget to your
9 department?
10    A.  During the budget hearing?  Historically, no,
11 not during the budget hearing.
12    Q.  Is there another time that the Commissioners
13 Court would ask you questions about the proposed budget?
14    A.  There are various meetings during -- during
15 Commissioners Court where decisions are made on
16 structure, merit, market, increases for personnel or
17 what our retirement rate would be, what our rate would
18 be for retirees.
19       MS. ABSTON:  And I'm going to remind you
20 we're not going to answer anything about closed
21 Commissioners Court, or anything that pertains to that
22 we're not going to be speaking to that today.
23       MR. FORD:  Sure.
24    Q.  (BY MR. FORD)  The meetings you just
25 mentioned, though, I missed it.  Was that part of the

17 (Pages 62 - 65)

Page 66

1 budget hearing process?
2     A.   No, they're in open Commissioners Courts prior
3 to the budget hearing.
4     Q.   And is that -- can that happen at any time
5 during the year?
6     A.   Month of July.
7     Q.   So is it sort of part of the overall budget
8 process?
9     A.   Yes.
10     Q.   And at the end of the budget hearings, does
11 Commissioners Court vote to approve the budget or
12 not?
13     A.   So individually every department that's
14 presented, they vote to approve and it goes on record;
15 but there is a final approval that happens in September
16 for an overall budget, including the tax rate.
17     Q.   And is that vote taken by the Commissioners --
18     A.   Yes.
19     Q.   -- Court?
20     A.   Yes.
21     Q.   After that vote, is the budget finalized and
22 all done?
23     A.   That day.
24     Q.   Okay.  Do you know -- do you make the final
25 approved budgets -- well, let me back up.

Page 67

1       Do you have a term for what the final budget
2 is called?
3     A.   Approved budget.
4     Q.   Approved budget?
5     A.   Uh-huh.
6     Q.   Do you make the approved budgets publicly
7 available?
8     A.   Yes.
9     Q.   How do you make them publicly available?
10     A.   On the website.
11     Q.   Do you know offhand what years are available
12 on the website?
13     A.   I don't know when it goes back to, but it
14 should be several years.  I know at least the last five
15 are on there.
16     Q.   If I said 2011 through 2023, does that
17 sound --
18     A.   Sounds reasonable.
19     Q.   -- reasonable?
20       Okay.  I want to mark another exhibit.  You
21 can put -- I am going to come back to 2, but you can put
22 it to the side for now.
23       MR. FORD:  This is a big one.
24       (Exhibit 3 marked.)
25       MR. FORD:  Here you go.

Page 68

1     Q.   (BY MR. FORD)  I just handed you what's been
2 marked as Exhibit 3, and I will represent to you I
3 pulled this down from Tarrant County's website.  Do you
4 know what this document is?
5     A.   Yes.  It's the approved budget.
6     Q.   And is this -- strike that.
7       And it's the approved budget for what year?
8     A.   FY '23.
9     Q.   Is that the most current budget?
10     A.   Yes, sir.
11     Q.   And if you'll look at the first page, it says
12 prepared by Tarrant County Budget and Risk Management.
13 Is that correct?
14     A.   Yes, sir.
15     Q.   Okay.  I just want to talk about a couple of
16 things here.  If you could flip to page 29.
17     A.   Okay.  So -- okay.
18     Q.   What were you thinking right there?
19     A.   This is not the document that is approved by
20 Commissioners Court.  This is the GFOA budget, which
21 takes the information from the approved budget, but it's
22 the same information.
23     Q.   Does the budget that's approved by
24 Commissioners Court have a different name?
25     A.   No, they're both the approved budget.

Page 69

1     Q.   So they both have this --
2     A.   Uh-huh.
3     Q.   -- this title on it?
4     A.   Yes.
5     Q.   So the document that's approved by
6 Commissioners Court, is that contained on the website?
7     A.   Yes.  I mean, it's the same information.  It's
8 the same numbers.  It's the same information.  GFOA
9 requires a story behind it.
10     Q.   Okay.  So would this document contain
11 everything that's in the document, the final -- or the
12 approved budget?
13     A.   The numbers, yes.
14     Q.   Okay.  So I guess I'll ask the questions
15 about -- are you at page 29?
16     A.   Yes, sir.
17     Q.   Is this the sort of budget overview for the
18 year?
19     A.   This is a budget in brief, yes.
20     Q.   So it says total budget, $904,702,681.  What
21 is that figure?
22     A.   That's the operating budget.
23     Q.   For fiscal year 2023?
24     A.   Correct.
25     Q.   What makes up that figure?  Well, strike that.

18 (Pages 66 - 69)

Page 70

1    Is that figure made up of total revenue and
2 cash carry forward?
3    A.  So this budget, some of the cash carry forward
4 would be in here and some would not.
5    Q.  Okay.
6    A.  There would be an expenditure moving the money
7 from here to a special purpose budget to cover capital
8 items.
9    Q.  Can you say that one more time?  I'm sorry.
10 Or can you read it --
11    A.  There would be an operating transfer from the
12 operating budget to a special purpose budget that
13 included some of the cash.  An expenditure would be in
14 here, but it would be for capital items that would be in
15 the special purpose budget.
16    Q.  Okay.  If you flip to the next page, do you
17 see that 198 figure?
18    A.  198, uh-huh.
19    Q.  Can you explain what that is?
20    A.  That is cash carry forward.
21    Q.  And what is cash carry forward?
22    A.  Cash is money that is left over from the
23 previous year.
24    Q.  So that's what was unspent in the 2022 fiscal
25 year budget --

Page 71

1    A.  Correct.
2    Q.  -- that then was rolled over to this year?  Or
3 can you explain carry forward to a layman who is not --
4    A.  Cash is only used in the operating budget to
5 cover reserves.  So the reserves is -- we don't use the
6 reserves, so there's always cash left over from the
7 reserves.  So we fund from year to year the reserves
8 with the cash that was originally establishing that.
9    Q.  Okay.
10    A.  The remainder of it is moved over into capital
11 and capital -- nondebt capital and capital improvement.
12    Q.  Do you know what portion would be moved into
13 that second category?
14    A.  I believe that the -- I don't know the exact
15 dollar amount.  It -- 70 million plus was for the
16 reserves.  The remainder went over to the cash carry
17 forward.
18    Q.  Do you know --
19    A.  Not to capital.  Sorry.
20    Q.  Sorry.  I didn't mean to talk -- I cut you
21 off.
22    Do you know how -- how do you arrive at the
23 amount that goes into the reserves?
24    A.  It is a required 10 percent recommended by the
25 governing body that oversees the accounting division for

Page 72

1 all government entities, GASB, that you have at least a
2 16.7 percent reserve for your operating budget,
3 approximately three months.
4    Q.  Okay.  Looking at these pretty big numbers,
5 the total budget is almost a billion dollars.  Would you
6 say the finances of Tarrant County are healthy right
7 now?
8    MS. ABSTON:  Objection to form.
9    A.  I would say that if you look at the '23
10 budget, there is cash that has been left over that is
11 larger than there was in previous years.
12    Q.  (BY MR. FORD)  Do you have an explanation as
13 to why it's larger than in previous years?
14    A.  Yes.
15    Q.  Do you mind sharing it with me?
16    A.  We have -- COVID-19 shut down courts, and
17 operations did not go as normal.  And when operations
18 don't go as normal, expenditures don't happen as they
19 did in previous years.  In addition to that, we received
20 direct allocations for CARES and for ARPA.  So that
21 offset -- that was -- we were able to utilize those
22 funds for some of our operations that qualified.
23    Q.  Do you know that the cash carry forward will
24 be for fiscal year 2024?
25    A.  I do not know that.  It will be less.

Page 73

1    Q.  So with that explanation, I guess I just
2 don't -- I will reask my question because I don't think
3 I got an answer to it, which is would you describe
4 Tarrant County finances today as healthy?
5    MS. ABSTON:  Objection to form.
6    A.  So "healthy" is a term I probably wouldn't use
7 in the financial world, but there is more requests for
8 expenditures than there is revenue.
9    Q.  So is there a cash carry forward -- I'm
10 sorry -- for this year, there is more requests for
11 expenditures than revenue?
12    A.  Would you restate your question?
13    MR. FORD:  Do you mind reading back
14 Ms. Giese's answer?
15    (Requested testimony read.)
16    Q.  (BY MR. FORD)  Right now there is?
17    A.  We do not have a final revenue, but there will
18 be more requests than revenue.  There historically is
19 more requests than revenue.  I do not use cash to
20 balance the budget.
21    Q.  What do you mean by you do not use cash to
22 balance the budget?
23    A.  It is not financially sound to use cash left
24 over from a previous year, because it fluctuates from
25 year to year, to budget -- to balance a budget.  That's

19 (Pages 70 - 73)

1 why we use it for one-time expenses over in the capital
2 funds. It's moved out of operating budget over into the
3 nondebt capital and the capital improvement plan.
4    Q.  Are those examples of special purpose budgets?
5    A.  Yes, sir.
6    Q.  Okay. Could you flip to page 9, please.
7    A.  9?
8    Q.  9, yes. And I think it goes from 9 to -- I
9 think it's 14 pages. It goes from 9 to page 22.
10   A.  Uh-huh.
11   Q.  Do you recognize this?
12   A.  It is the letter that is presented to explain
13 the overall expenditures from G.K. Maenius.
14   Q.  Did you have any role in creating the
15 substance of this?
16   A.  Yes, sir.
17   Q.  And in some years does the letter come from
18 you?
19   A.  No. Not this letter, no.
20   Q.  In 2022, do you recall if the letter came from
21 you?
22   A.  Not this letter. There is a letter that comes
23 from me, and there's a letter that comes from G.K.
24 Maenius. This letter always comes from the County
25 Administrator.

1    Q.  Thanks for clarifying.
2        What's the letter that comes from you? Is
3 there a specific title for it?
4    A.  It is a much condensed version of this letter
5 just giving a summary of what is in that current budget.
6 This gives summaries from previous years and a few
7 more -- a little bit more information.
8    Q.  Is this called -- I just saw the term
9 somewhere. Is this called the budget transmittal
10 letter? Does that term mean anything to you?
11   A.  So that may be the formal name. That is not a
12 name that we use within the budget office.
13   Q.  Okay. I think you might have already said it.
14 I'm sorry I forgot. How do you refer to this letter
15 from G.K. Maenius?
16   A.  County Administrator's letter.
17   Q.  County Administrator's letter?
18   A.  Uh-huh.
19   Q.  How do you refer to the letter that you send?
20   A.  Director of Budget and Risk Management letter.
21   Q.  Okay. And what involvement did you have in
22 this letter?
23   A.  The numbers.
24   Q.  So do you see where it says appraised property
25 values and tax rates?

1    A.  On what page are you?
2    Q.  Page 9, sorry. In bold.
3    A.  Oh, yes.
4    Q.  So I'll give you a minute, but I just wanted
5 to ask you about the first couple of paragraphs there.
6 Is it fair to say that, you know, these paragraphs sort
7 of give a summary of the state of the Tarrant County
8 economy?
9        MS. ABSTON: Objection to form.
10   A.  It addresses what drove us to present a
11 budget, recommend the budget that we did.
12   Q.  (BY MR. FORD) In a letter like this, is it
13 fair to say this would highlight any potential
14 challenges to the County's --
15   A.  Yes.
16   Q.  Is that part of the purpose of a letter like
17 this?
18   A.  Is what --
19       MS. ABSTON: Objection.
20   Q.  (BY MR. FORD) I'll withdraw it. Sorry.
21       So one example of a potential challenge would
22 be the COVID-19 pandemic. Is that fair to say?
23   A.  Yes.
24   Q.  I'll give you a minute, but do you know if
25 this letter mentions costs arising from the opioid

1 epidemic anywhere?
2    A.  I do not --
3        MS. ABSTON: Objection to form.
4    A.  I do not believe it does. I don't know. I
5 don't think.
6    Q.  (BY MR. FORD) I can give you a minute if you
7 want to look it over.
8    A.  I do not see anyplace where it says it
9 references that.
10   Q.  Costs arising from the opioid epidemic?
11   A.  No.
12       MS. ABSTON: Objection, form.
13   Q.  (BY MR. FORD) You can put this to the side
14 for now. There's another exhibit I wanted to show you.
15 Budget documents are big.
16       (Exhibit 4 marked.)
17       MR. FORD: Is this 4?
18       THE REPORTER: Yes.
19   Q.  (BY MR. FORD) I'm showing you what's marked
20 as Exhibit 4. I'll represent to you I also pulled this
21 from the County's website. Does this look familiar to
22 you?
23   A.  Yes.
24   Q.  Can you explain what this document is?
25   A.  This is the supporting detail, line item by

20 (Pages 74 - 77)

1 line item, on the approved budget that's submitted to
2 Commissioners Court for approval.
3    Q.  Is this the document you're referring to that
4 is the approved budget that's -- you know, goes before
5 the Commissioners Court?  That was poorly phrased.
6        Earlier -- strike that.
7        Earlier you referred to -- earlier when
8 looking at Exhibit 4, you said this was not the document
9 that is the approved budget from the Commissioners
10 Court.
11    A.  The information in it is approved by
12 Commissioners Court.  This is not what's presented to
13 them.  This is created after the approval of the budget.
14    Q.  But it has all the information that's in the
15 budget?
16    A.  Correct.
17    Q.  Is Exhibit -- is the next exhibit that's in
18 front of you right now, is this the one that's put
19 before the Commissioners Court?
20    A.  So this is the detailed budget, and the
21 Commissioners Court official approval is not the
22 detailed budget.
23    Q.  Okay.
24    A.  They approve the data, but this is not the one
25 that goes on file as the approved budget.

1    Q.  I figured that was going to be the answer, but
2 can you explain what this document is?
3    A.  The -- it's line item by line item what the
4 request is from the departments by GL account number for
5 the -- this is -- a similar document is presented during
6 the budget hearing line item by line item for approval,
7 and then this is the approved version of that.
8    Q.  And why do you make it publicly available?
9    A.  Transparency.
10    Q.  You want Tarrant County residents to know
11 exactly what's in their budget?
12    A.  Correct.
13    Q.  Is that the same reason you publish --
14    A.  This is the very first time we've ever done
15 this budget.  So, yes, this is -- because these are just
16 numbers and do not tell a story of any kind, and this a
17 citizen could open up and read what's going on.
18    Q.  Gotcha.
19        And for the record, I was just referring to
20 the exhibit prior to this one, which is Exhibit 3.
21        Okay.  Turning back to the current exhibit --
22    A.  Uh-huh.
23    Q.  -- I've got just a couple of questions.  Could
24 you turn to the page that's marked 2 on the bottom?  Do
25 you see at the top left it reads, 2023 approved budget

1 summary recap?
2    A.  Yes.
3    Q.  Can you describe what information is contained
4 on this page?
5    A.  The total of that cost center's request that's
6 being -- approved request.
7    Q.  So I wanted to ask you about the budget/risk
8 management row.  Do you see that?  It's fifth from the
9 top.
10    A.  Uh-huh.
11    Q.  Does that relate to your department?
12    A.  Yes.
13    Q.  The column next to it, it's titled Center.
14 What does that mean?
15    A.  That's the number, numerical number of the
16 cost center to look it up within our SAP -- within our
17 financial software.
18    Q.  Is your financial software called SAP?
19    A.  SAP, uh-huh.
20    Q.  So then there's a bunch of columns.  One is
21 2021 Expenditures.  Does that cover expenditures in
22 fiscal year --
23    A.  So 2020 are the actual expenditures that
24 happened.
25    Q.  In that 2021 column?

1    A.  Uh-huh.
2    Q.  And what's represented in the next column?
3    A.  At '22, what was the appropriated.  It could
4 be the budget -- the original budget request or any
5 appropriation adjustments that happen throughout the
6 course of the year.
7    Q.  When you talk about appropriation adjustments,
8 would that relate to special purpose budgets?
9    A.  No, no.  During the course of a -- a budget
10 document is a fluid document.  It changes the day after
11 it's created.  So it begins to change the day after
12 it's created, so it would be the -- if there were any
13 appropriation adjustments submitted to Commissioners
14 Court for approval, at the time that we printed this
15 document on 9/6, it would be reflected in that number.
16    Q.  I understand.  The next column 2022
17 year-to-date -- YTD, does that stand for year-to-date?
18    A.  Yes.
19    Q.  What does that column represent?
20    A.  It represents the actual expenses that
21 happened.
22    Q.  And the next column over?
23    A.  Is the request.
24    Q.  For fiscal year 2023?
25    A.  Uh-huh.

Page 82

1    Q.  That's what your department was requesting for
2  a budget?
3    A.  Uh-huh.
4    Q.  And the next column over --
5    A.  It's what the Commissioners approved.
6    Q.  Okay.  And then the final column is --
7    A.  The difference.
8    Q.  Between the approved amounts?
9    A.  Between '22 and '23.  The title says '22 and
10  '23 comparison.
11    Q.  The '22, would that respond to the
12  appropriated column?
13    A.  Yes.
14    Q.  Okay.  So my question is it looks like you
15  were approved for more than you requested?
16    A.  That is correct.
17    Q.  Why is that the case?
18    A.  We added another position then.
19    Q.  So did that happen while the budget proposal
20  process was happening?
21    A.  Yes.
22    Q.  Do you know what -- remember what position
23  that was?
24    A.  It was the -- if you look over, it should be
25  on the detailed budget.  It should tell you.

Page 83

1    Q.  They're front and back, but it's not --
2    A.  Oh.
3    A.  It's upside down.  It's not the best --
4    A.  So under budget risk management, you'll see
5  what was done.
6    Q.  Do you mind sharing the page on there?
7    A.  Absolutely.  It was the Workers' Comp.
8  Department that was originally in the HR Department that
9  moved over to the Budget and Risk Management.
10    Q.  Gotcha.
11      So is it typical for there to be a larger
12  approved amount than a requested amount?
13      MS. ABSTON:  Objection to form.
14    A.  Yes, it is.  Not typical, but it is not
15  unusual.  That's what the budget hearings are for.  So
16  the budget hearing is my -- the budget office's
17  recommendation, but the department has the -- that is
18  their time to be able to come to Commissioners Court and
19  say I believe the budget office got it wrong, this is
20  why we need these additional dollars, and the
21  Commissioners make that decision of what happens then.
22    Q.  (BY MR. FORD)  Okay.  So the amount of
23  difference, 567,907, do you see that --
24    A.  Uh-huh.
25    Q.  -- on page 2?

Page 84

1      Was that just because of the introduction of
2  additional positions?
3    A.  So it's the two positions -- well --
4      MS. ABSTON:  Sorry, could we clarify what
5  page we're looking at here?
6      MR. FORD:  Yes.  I'm looking at page 2
7  that reflects the line items for the Budget and Risk
8  Management Office.
9    A.  I do not know if there's any.  Off the top of
10  my head --
11    Q.  (BY MR. FORD)  Right.
12    A.  -- I cannot determine.  Whatever expenses
13  correlated to the workers' compensation department
14  coming from their office over to our office, it would
15  have been all of their salaries and any other function
16  they did.
17      So, again, it was in -- it was not decided
18  until August that the Workers' Comp. Department would
19  come over to the Budget and Risk Management Department.
20    Q.  Gotcha.
21    A.  So it would be expenses correlated to workers'
22  comp. coming over to us.
23    Q.  Okay.  Okay, you can set that to the side.
24  Thank you.
25      THE WITNESS:  I didn't put it back in

Page 85

1  order.  So what's the first page?
2      MR. FORD:  I was trying to save some
3  trees with front and back printing.
4      THE WITNESS:  I like that idea.
5    Q.  (BY MR. FORD)  Okay.  We've touched on this
6  earlier, but I just had a couple more questions about
7  the special purpose budget.
8    A.  Uh-huh.
9    Q.  So did you say there's 89 special purpose
10  budgets?
11    A.  Uh-huh.
12    Q.  And between -- are the special purpose budgets
13  and then the annual budget, does that make up the
14  totality of the budgets that your department creates?
15    A.  Correct.
16    Q.  So what prompts your department to create a
17  special purpose budget?
18    A.  If the legislative session changed any of the
19  fees through the state that the various departments
20  could collect, or the way that they could collect it,
21  or ARPA.  Any -- any other funding source that came in
22  that was not tax -- that could not be commingled with
23  tax dollars, it's a special purpose, there is a fee set
24  aside that it can only be used for these items, and
25  that -- we separate that out.

22 (Pages 82 - 85)

Page 86

1    Q.  Does Tarrant County receive funding from
2  grants?
3    A.  Yes.
4    Q.  Can any grant be commingled with the funds
5  from the general budget?
6    A.  So there are two components, grant match and
7  operating subsidy.
8    Q.  What's an operating subsidy?
9    A.  If the grant is -- the project costs X and the
10  grant only gave you Y, the difference in those would be
11  operating subsidy to run the program.
12    Q.  And would that money come out of Tarrant
13  County's pocket?
14    A.  Correct.
15    Q.  So can grants -- would that Tarrant County
16  money be commingled into the general?
17    A.  Not the grant money.
18    Q.  Right.
19    A.  The operating subsidy part of it.
20    Q.  Gotcha.
21    A.  And it's not commingled; it is part of the
22  grant.
23    Q.  I'm unsophisticated, I apologize.
24      So other than --
25      MR. BOONE:  Quinn, can we get to a

Page 87

1  stopping point and take a break?
2      MR. FORD:  Sure.  You know what?  Yeah,
3  I've got -- yeah, now is a good time.
4      MS. ABSTON:  Do we want to take -- do you
5  want to go off the record?
6      THE VIDEOGRAPHER:  Everybody stand by.
7  We're going off the record at 11:58.
8      (Break from 11:58 a.m. to 12:52 p.m.)
9      THE VIDEOGRAPHER:  We're back on the
10  record at 12:52.
11    Q.  (BY MR. FORD)  Good afternoon and welcome
12  back.  I was wondering -- I'm going to ask you a
13  question about Exhibit 4, what I believe is Exhibit 4,
14  which is the -- well, actually it might be Exhibit 2,
15  sorry.  It's this, the printout from the Tarrant County
16  website.  Do you still have that?
17    A.  Uh-huh.
18    Q.  Is that Exhibit 2?
19    A.  Yes, sir.
20    Q.  Okay.  Thank you.
21      Okay.  Looking back at Exhibit 2, we talked
22  about that first line of responsible -- that your
23  department is responsible for the development and
24  monitoring of the County budget.  I was just wondering.
25  Do you see that second part, monitoring the County

Page 88

1  budget?
2    A.  Uh-huh.
3    Q.  Do you agree that that's a role of your
4  office, of your department?
5    A.  Yes, sir.
6    Q.  Can you describe what that is?  In relation to
7  creating the budget, what would monitoring the budget
8  be?
9    A.  Like I said earlier, the budget is a fluid
10  document.  It's never static.  The day that it's
11  approved, it then becomes old data and appropriation
12  adjustments are done throughout the course of the year,
13  presented to Commissioners Court for movement of money
14  between funding sources, and we are looking to see if
15  expenses that are happening are expenses that can happen
16  within the County and as they requested.  So we're
17  monitoring it all year long.
18    Q.  You know, I was wondering.  After the fiscal
19  year is done, there's no more adjustments to the budget,
20  right?  Let me rephrase that.
21      So I'm just -- when does a -- when does a
22  fiscal year budget stop being a living document?
23    A.  Probably about ten months after the end of the
24  fiscal year.
25    Q.  Okay.  So when it stops being a living

Page 89

1  document and is sort of set in stone, is that document,
2  you know -- is that contained in a single document?  If
3  I wanted to say -- strike that.
4      If I wanted to look at, you know, what the
5  actual budget was for, say, fiscal year 2018, is there a
6  document that reflects, you know, the final budget?
7    A.  The only way that you would be able to --
8  yeah, through the annual comprehensive report that the
9  auditors do.  They also do it -- they present it three
10  different ways, and one of them is budgetary basis.  So
11  that's why it's a living document for ten months, until
12  they close out the year, and expenses are still coming
13  in, invoices are still coming in throughout the course
14  of many months after the -- after October 1 that are
15  charged back to that document.  So when the auditor --
16  we do in the front; the auditors do on the back.
17    Q.  Got it.
18      And do you know what the -- is that -- does
19  that document have a title, the auditor's document?
20    A.  ACFR, annual comprehensive financial report.
21    Q.  And do you know if those are publicly
22  available?
23    A.  Yes.
24    Q.  Do you know where they're publicly available?
25    A.  You can see them under the auditors, or you

23 (Pages 86 - 89)

Page 90

1 can also click on them under the budget.
2    Q.  Okay.  And would that document reflect
3 everything that was spent by Tarrant County?
4    A.  The final expenditures.
5    Q.  For a given year?
6    A.  Correct.
7    Q.  Fiscal year?
8    A.  Uh-huh.
9    Q.  Okay.  I wanted to ask about the next line of
10 Exhibit 2, and I will read it.  The department serves
11 the Commissioners Court by providing recommendations to
12 facilitate operational efficiency within the various
13 County departments.
14        Do you see that line?
15    A.  Uh-huh.
16    Q.  Do you agree with the statement that your
17 department serves the Commissioners Court by providing
18 recommendations to facilitate operational efficiency
19 within various County departments?
20    A.  Yes.
21    Q.  Can you explain the sort of recommendations
22 you provide to the Commissioners Court?
23    A.  Throughout the course -- after a budget is
24 approved, departments have a new need, and it will --
25 there's very seldom a need that is not -- needs to be --

Page 91

1 that doesn't need to be financially supported.  So we do
2 the same during the year that we do during the
3 appropriation of the budget, is analyze to see what is
4 the need and what is the fiscal capability of us funding
5 that.
6    Q.  So is that part of the process that you're
7 just explaining about how, you know, after there's a
8 final budget, it's this process of things that come up
9 and you analyze it and decide if it's something that
10 should be approved?
11    A.  We make a recommendation.
12    Q.  To the Commissioners Court?
13    A.  Correct.
14    Q.  Every time you do that, is there a sort of
15 document that's submitted to the Commissioners Court?
16    A.  It is not always in Commissioners Court.
17    Q.  Where else would it be?
18    A.  It could be a Commissioner or the County Judge
19 or the County Administrator calling me into their office
20 and discussing their view, wanting to hear what the
21 fiscal -- fiscally what could happen to the budget, the
22 dollars amount that we have if they move forward with
23 any one item.
24    Q.  You know, every time you make one -- every
25 time your department makes one of these recommendations,

Page 92

1 is it necessarily memorialized somewhere in a report?
2    A.  Most likely, it will be in the budget that is
3 after that, because my recommendation is always to wait
4 to move forward with anything that happens, any request
5 that happens throughout the year to the budget process,
6 so that it is documented.
7    Q.  So your recommendation is your -- sorry.  Your
8 sort of default recommendation is to wait until the next
9 year budget process?
10    A.  Well, it's a twofold recommendation.  Either I
11 have a recommendation or an opinion on the item, or --
12 and if I don't, either way, I still always recommend
13 that we wait instead of bringing them one by one to the
14 Commissioners Court for approval, that it waits until
15 the budget process.  That doesn't always happen, but
16 that's always my recommendation.
17    Q.  Is there any way you can ballpark for me how
18 many times you make recommendations to the Commissioners
19 Court in a given year?
20        MS. ABSTON:  Objection to form.
21    A.  I don't --
22    Q.  (BY MR. FORD)  I guess I'm trying to see just
23 how often it is that your department would, you know,
24 analyze a request by another department for an
25 additional thing that's not covered by the annual

Page 93

1 budget, how often that would occur in a year.
2    A.  Weekly.
3    Q.  Okay.
4    A.  I don't know how many.
5    Q.  Right.
6    A.  But it's -- there is an appropriation
7 adjustment on the Commissioners Court every Tuesday they
8 meet.  So somewhere along the line, there's been a
9 conversation to determine whether that's needed or not
10 needed and how it's going to fiscally impact.
11    Q.  Are there multiple every week or --
12    A.  It's a list.
13    Q.  Okay.  Does that list have a name for the --
14    A.  Appropriation adjustments.
15    Q.  That's what the document would be titled?
16    A.  Yes, sir.
17    Q.  Okay.  Looking back at that line on Exhibit 2,
18 you know, your department provides recommendations,
19 quote, "to facilitate operational efficiency within
20 various County departments," closed quote.
21        I was just wondering what your understanding
22 of that phrase "operational efficiency" would be.
23    A.  So that can go to someone requesting a mobile
24 phone, to someone requesting several million dollars to
25 move forward with a project that was just recognized.

24 (Pages 90 - 93)

1 And operation efficiencies, our job is to make sure the
2 departments are financially able to do -- based on
3 revenue available, to do at least the minimum of what
4 they need to be doing, at the very minimum.
5 　　But everything is driven by revenue. So a
6 budget is balanced. Anything that happens after that,
7 you've got to take it away from somebody. There's no
8 additional money in the operational budget that could be
9 just readily available to do all of the different types
10 of requests that the departments have throughout the
11 year.
12 　　Q. Okay. Would that concept of operational
13 efficiency, I mean, when you're analyzing that, would it
14 include, you know, looking at whether the request is --
15 includes something that's wasteful, would be wasteful
16 spending?
17 　　MS. ABSTON: Objection to form.
18 　　A. So I don't -- wasteful spending? Any
19 department that requests anything from me believes that
20 their department needs that to function. It is my job
21 to determine if there is an efficient way to facilitate
22 their request within our financial means.
23 　　Q. So the requests that come to you, do you ever
24 find there's fat on them, so to speak?
25 　　MS. ABSTON: Objection to form.

1 　　A. A department requests a budget based on
2 what-ifs. It has not happened yet; it is going to
3 happen. And rising costs -- departments are extremely
4 familiar with rising costs and rising needs, and the --
5 and they will put in there an anticipated cost or they
6 will put in an item that we discuss because, well,
7 you're not doing this, well, the plan is to do this.
8 And there's what's called key performance indicators,
9 and within their key performance indicators, they need
10 to tell me that that's their objective to be doing the
11 next year.
12 　　Q. (BY MR. FORD) How often is it that a
13 department says they need something that will likely not
14 come to fruition?
15 　　A. I don't know what the percentage would be, but
16 obviously with cash left over, something doesn't come to
17 fruition; but it usually is not because it was a cost
18 that was completely unneeded, it's because maybe a
19 higher priority happened. Again, you know, tomorrow
20 there may be a totally different major objective that
21 was unknown yesterday, and everybody has to scramble and
22 meet that need. And if something gets left on the table
23 and it gets left on the table repeatedly, we may have
24 that conversation; but if it gets left on the table just
25 one year, the experience that I have is that that

1 objective wasn't able to be met because of other
2 pressing issues.
3 　　Q. I guess -- so take, for instance, the
4 Sheriff's Office.
5 　　A. Okay.
6 　　Q. Can you think of any categories of requests
7 that they make that, in your view, would be unnecessary?
8 　　MS. ABSTON: Objection to form.
9 　　A. I don't know that I would consider it
10 unnecessary. I may ask if another funding source could
11 be used to fund it.
12 　　Q. (BY MR. FORD) Yeah, in your years dealing
13 with the Sheriff's Office budget proposals, are there
14 any requests that the Sheriff's Office has made maybe
15 multiple years that you look at as operationally
16 inefficient? Is that a better way to ask it?
17 　　A. So, again -- give me a moment. If there is --
18 law enforcement is a complete unknown. So, you know, if
19 they ask me for cell phones, I'm going to ask can you
20 use a mobile phone allowance? If I see a different way
21 that accomplishes their same objective but is less -- it
22 costs less for the County or less manpower, then that's
23 going to be my recommendation.
24 　　Did that answer your question, because I'm not
25 sure if I did?

1 　　Q. It does.
2 　　A. Okay.
3 　　Q. Thank you.
4 　　Does the -- do 100 percent of your
5 recommendations get accepted?
6 　　A. Do -- again, that's the budget hearing, and
7 departments frequently do not believe that we have made
8 the best decision on a recommendation and requests from
9 the Commissioners Court for additional funding for an
10 item -- request the item that I did not recommend to be
11 recommended -- approved by the Commissioners Court, but
12 if that happens, there's a finite amount of money.
13 　　Q. But in some instances the Commissioners Court
14 does -- does, you know, go with the department and not
15 your recommendation. Is that fair to say?
16 　　A. That's correct, but I have to take it from
17 someplace else.
18 　　Q. Okay.
19 　　A. It's a finite amount of money, so some place
20 else loses for some place else to gain.
21 　　Q. Is it your job -- if the Commissioners Court
22 says we want to actually give this to them despite your
23 recommendation, is it then your job to go find the money
24 elsewhere and make a new proposal?
25 　　A. Correct, after the budget hearing, between the

1 budget hearing and the approved budget.
2    Q.   Okay.  I want to look at another line on
3 Exhibit 2, and it is the third full sentence.  The
4 programs -- quote, "The programs of each County
5 department are reviewed annually," end quote.
6        Do you agree with that sentence?
7    A.   Yes.
8    Q.   Is that something your department does?
9    A.   Yes.
10    Q.   Does your department review each County
11 program as part of the annual budget process that we've
12 been discussing?
13    A.   So if it's a program that's been continuing
14 for years, the only review is, you know, has it expanded
15 or is there an additional need for that?  But on new
16 programs, yes, we would look into very closely.
17    Q.   If there is a program that has no change from
18 one year to the next, do you do any sort of analysis of
19 that?  Or do you review that that year if there is no
20 change?
21    A.   So we look at every single line item, and we
22 look within each one of those line items what makes it
23 up.  If consistently they bought X and they've -- they
24 have requested X and they've bought X, the only thing is
25 if the price went up, but that particular item won't be

1 reviewed.  It would be expansion of programs that would
2 get a more in-depth analysis to be done to it.
3    Q.   Or new programs?
4    A.   Yeah, uh-huh.
5    Q.   So when there is an expansion of a program or
6 a proposed expansion of a program, what sort of analysis
7 would your office do?
8    A.   Well, it depends on the program obviously, but
9 we would determine if other counties are doing it.  If
10 it's an issue that is specifically to our county, then
11 we would talk to various departments.  I would
12 communicate with the County Administrator.  I would
13 communicate with the Commissioners Court to -- and this
14 would only be -- on small items, we're going to make the
15 decision on our own, but bigger items would be, you
16 know, is everybody in agreement that this is an issue,
17 and then we would vet out the costs for it and -- again
18 then, based on limited resources, how much of that could
19 we do in any given year, or could we spread it out over
20 a few years?
21    Q.   So when you do that work, do you have any sort
22 of uniform criteria that gets applied to the analysis?
23    A.   Because -- you know, the very first thing
24 we're going to look at is the restriction of revenue.
25 The next is going to be -- depending on the cost of the

1 program or project.  The next is going to be -- because
2 everything is different, every department within our
3 County is different, the only thing that I would look
4 at, you know, across the board would be I mentioned
5 phones before.  You know, it would be phones or
6 something like that that everybody uses.  But outside of
7 that, every department is very unique in the services
8 that they -- the way they serve the County and what they
9 do.  So to have a template to say that they all had to
10 meet some criteria of it would be an injustice to the
11 department.  So, no, I wouldn't have a template, but
12 we're always going to look in and see, you know, talk
13 more about what it is, why it is and what the need is.
14    Q.   And when you, you know, review each program,
15 is that review documented somewhere?  Could I go to a
16 document and say this is where your department reviewed
17 this program?
18    A.   No.  It would be an internal working document
19 that we either did protected cost or some type of
20 analysis on how -- you know, what's the benefit to the
21 County?  And that is not documented on any website or in
22 any documentation on a budget.  Even if it is during the
23 budget cycle, those are still our internal working
24 documents that don't get published.
25    Q.   But the documentation does exist; it's just

1 internally within your department?
2    A.   Probably for -- yes.
3    Q.   Are there any sort of types of documents that
4 are kind of only created when you're reviewing these
5 program?
6    A.   Spreadsheets.
7    Q.   Spreadsheets.  Just Excel spreadsheets?
8    A.   I love Excel.
9    Q.   I wish I loved Excel.
10    A.   You could be a budget analyst.
11    Q.   You would fire me very quickly.
12        Okay.  Okay.  So the next thing I want to do
13 is go to the next page of Exhibit 2.  And do you see,
14 once you're there, it's the second -- it's the second
15 paragraph that begins "the risk management
16 responsibilities."
17        Do you see that?
18    A.   Uh-huh.
19    Q.   I'm going to read the first sentence of that.
20 The risk management responsibilities include the
21 oversight of the County's self-insurance programs.
22        Do you see that?
23    A.   Yes, sir.
24    Q.   Do you agree that's something your department
25 is responsible for?

26 (Pages 98 - 101)

Page 102

1    A.   Yes, sir.
2    Q.   So would this responsibility cover employee
3 health insurance?
4    A.   No.
5    Q.   Would it cover workers' compensation?
6    A.   Yes.
7    Q.   So why wouldn't it cover employee health
8 insurance for employees of Tarrant County?
9    A.   Because that is the function of the HR
10 Department.
11    Q.   So your department does not touch health
12 insurance plans at all?
13    A.   So the Assistant Director of Risk Management
14 and myself are on the board to review and make decisions
15 on the cost. The Assistant Director of Risk Management
16 is on the PEBC board, which is a group of cities and
17 counties that make decisions on what the plan is going
18 to be, but we do not implement the policy. We do not
19 implement -- we have no day-to-day function with the
20 implementation of the employee healthcare.
21    Q.   But you are on the board, you said?
22    A.   I'm on the committee that determines the cost.
23 Travis Yarbrough, the Assistant Director of Risk
24 Management, is on the board.
25    Q.   And what's the name of the committee that

Page 103

1 you're on?
2    A.   I don't know that it has an official name. It
3 is just the rate setting committee, is what we always
4 reference it to, the rate setting committee.
5    Q.   And is that under the umbrella of HR?
6    A.   HR makes the presentations. There are, you
7 know -- the County -- I don't know who is on that board
8 now because we have a new majority of Commissioners
9 Court, but historically it's been one Commissioner and
10 the County Judge, along with the Audit Department, the
11 County Administration, HR and Budget.
12    Q.   Okay. Apologies, I'm just trying to get this
13 right in my mind. What you just said, does that refer
14 to the board or the committee?
15    A.   That's the committee.
16    Q.   Committee.
17    A.   The PEBC board is made up of multiple
18 entities.
19    Q.   Does PEBC stand for Public Employee Benefits
20 Cooperative?
21    A.   Yes.
22    Q.   Do you know how many government entities that
23 covers?
24    A.   No.
25    Q.   You said cities and counties?

Page 104

1    A.   Uh-huh.
2    Q.   Is it sort of geographical? Is it --
3    A.   It's in our region.
4    Q.   Okay. And is the committee under the PEBC
5 board?
6    A.   No, no.
7    Q.   Okay. The committee is within sort of Tarrant
8 County?
9    A.   Tarrant County determining how we set our
10 rates.
11    Q.   So in your role on that committee, do you do
12 any oversight regarding insurance claims that get
13 submitted?
14    A.   No.
15    Q.   So you wouldn't have any knowledge of, you
16 know, insurance claims for prescriptions --
17    A.   No, sir.
18    Q.   -- that are paid for through the insurance
19 programs?
20    A.   I would not. Intentionally, it is not -- no
21 one on that committee can discuss those types of -- we
22 have an actuarial company that comes in. We discuss
23 with them. I know how many people -- or I know claims
24 that have been above our -- I can't remember the name of
25 what it's called right now, but if it's above -- we're

Page 105

1 self-insured. At one point, we have a third-party
2 vendor that will take it on when we hit, I think it is
3 750,000 per claim.
4    Q.   Okay. Do you know who the vendor is?
5    A.   No.
6    Q.   Why -- is it intentional that you don't know
7 this information?
8    A.   The vendor or -- the vendor I just can't
9 remember the name. It's intentional that I don't know
10 the other information because that's HIPAA protected.
11    Q.   Okay. So is there anyone within Tarrant
12 County that would be responsible for analyzing, you
13 know, whether claims get paid that are submitted through
14 your insurance plan?
15    A.   So that's PEBC.
16    Q.   Okay.
17    A.   PEBC. There is a -- that is actually a group
18 of employees that are paid by all of the participants,
19 and they're the ones who do that.
20    Q.   Okay. When you say a group of employees, are
21 you referring to the board?
22    A.   No. I'm referring to the actual PEBC
23 department that is -- that works for the board.
24    Q.   Gotcha.
25    A.   The board hires them. All the information is

27 (Pages 102 - 105)

Page 106

1 presented to the board.
2   Q.  Do you know, are they sort of a stand-alone
3 entity?  Are they within some --
4   A.  Stand-alone.
5   Q.  Stand-alone.
6       And so would the PEBC, would they be the ones
7 that are reviewing, you know, medical or claims that are
8 made by participants in Tarrant County's health
9 insurance plan?
10   A.  Every claim?
11   Q.  Just any -- if there are claims reviewed,
12 would they be the ones doing it?
13   A.  Only if there was a nonpayment.  I mean, if it
14 didn't meet the criteria, if the -- you're getting a
15 little bit out of my expertise, so I am uncomfortable
16 answering some of these questions.
17   Q.  I'm also outside my own expertise.
18       My main question here is, if there are -- is
19 it your understanding that Tarrant County's health
20 insurance plan would cover when an employee needs to buy
21 a prescription, medication?
22   A.  Based on the formulary.  If it's under the
23 formulary plan, yes.
24   Q.  So my question is, one of the allegations in
25 this case is that -- I'll represent to you is that, you

Page 107

1 know, prescriptions for opioid medications were filled
2 that were not medically necessary.  My question is for
3 prescriptions filled under a health insurance plan for
4 Tarrant County employees, who or what entity would
5 review those claims for prescription -- for prescription
6 opioids?
7       MS. ABSTON:  Objection to form.
8   Q.  (BY MR. FORD)  If you know.
9   A.  So again, PEBC and our insurance -- even
10 though we are self-insured for that, it's United Health
11 Insurance.
12   Q.  Okay.  Do you know whether the PEBC has any
13 preferred pharmacy for filling prescriptions?
14   A.  I don't know the answer to that.
15   Q.  If I said CVS is the preferred pharmacy, would
16 that --
17   A.  It may be, but personally I know that I --
18 where I go, I'm not restricted.  So I don't know the
19 answer.
20       MS. ABSTON:  And objection to form.
21       MR. FORD:  Okay.  We are now done looking
22 at Exhibit 2.
23       MR. BOONE:  Can we take a short break?
24       MR. FORD:  Sure.  If that's all right
25 with --

Page 108

1       MS. ABSTON:  Yeah, that's fine.
2       THE VIDEOGRAPHER:  Are you okay with
3 that?
4       MS. ABSTON:  Yes, it's okay.
5       THE VIDEOGRAPHER:  We're going off the
6 record at 1:22.
7       (Break from 1:22 p.m. to 1:33 p.m.)
8       THE VIDEOGRAPHER:  We're back on the
9 record at 1:33.
10   Q.  (BY MR. FORD)  Okay.  So do you remember
11 earlier we were talking about your role on a committee
12 related to PEBC -- or setting rate for insurance?
13   A.  For the County.
14   Q.  For the County.
15       When we were talking about that, I believe you
16 testified that sometimes you have actuarials analyze, is
17 it, medical claims data?
18   A.  Just the overall cost of our claims.
19   Q.  Is that a third-party actuary?
20   A.  Yes.
21   Q.  Do you know what the name of it is?
22   A.  I think now it's Gallagher.  It changed names.
23   Q.  Changed names.
24       Do you know what the past name was?
25   A.  I don't remember.

Page 109

1   Q.  Okay.  Do you know how often they would
2 analyze the data?
3   A.  Annually.
4   Q.  Annually?
5   A.  Uh-huh.
6   Q.  Would they create a report for the committee?
7   A.  They would create a report for the risk
8 manager and the HR director.  Risk manager, its new
9 title is Assistant Director of Risk Management.
10   Q.  Okay.
11   A.  If I reference him as risk manager, it's the
12 same position.
13   Q.  Good to know.
14       And that data, did you say that's only for
15 workers' comp. data or workers' comp. claims, or is
16 that --
17   A.  No, that would -- so I thought you were
18 asking the rate setting.  We don't set rates for
19 workers' comp.
20   Q.  Okay.
21   A.  We only set rates for the medical benefits for
22 the employees in the County.
23   Q.  Gotcha.
24       And so that's the medical claims data that the
25 actuaries would be looking at?

28 (Pages 106 - 109)

Page 110

1     A.  Correct.
2     Q.  We did -- I think you did mention that your
3   department does handle -- is responsible for the
4   workers' compensation plan of Tarrant County?
5     A.  That started this year, yes.
6     Q.  That started this year?
7     A.  Correct.
8     Q.  Do you know who was responsible for it before?
9     A.  HR.
10    Q.  HR.
11        So now that you've taken over, is your
12  department responsible for analyzing, you know, claims
13  that are made on the workers' compensation plan?
14    A.  The workers' comp. coordinator and the
15  Assistant Director of Risk Management would communicate
16  with that, about that.  I mean, it has to meet the
17  actual criteria.  There is -- I am not involved in that,
18  nor do I believe I should be involved in that.
19    Q.  Do you know whether your workers' comp.
20  coordinator would have any role in reviewing, you know,
21  prescriptions that are paid through the workers'
22  compensation plan?
23    A.  I mean, all -- a third party actually makes
24  the payments for that.  No, I don't remember the name of
25  that either.

Page 111

1     Q.  But third party?
2     A.  Again, just took it over in October and
3   there's been other things pressing, but they would --
4   the third party makes the payment.  If there's -- but
5   the process always is the employee comes through us,
6   works through us, asks their questions through the
7   workers' comp. coordinator.
8     Q.  So I was wondering if there's, you know, an
9   objection to a claim that's being made pursuant to the
10  plan, say, you know, there's someone that's saying that
11  this claim is not proper --
12    A.  That would be the third party.  That's their
13  responsibility.
14    Q.  Do they then submit it to your department to
15  review their findings?
16    A.  Their findings to the Assistant Director of
17  Risk Management.
18    Q.  Do you know, does that come in the form of a
19  report?
20    A.  I don't know what it would come.  We receive a
21  monthly report of payments that have been made, and it's
22  just a very long, lengthy document of just names and
23  payments, not what they're for or anything like that.
24    Q.  Do you know if it would include, you know --
25  would it include detail of this was for prescription?

Page 112

1     A.  Not on that report, no.  It's just the name
2   and total amount paid.
3     Q.  Do you know if that data is captured anywhere?
4     A.  I'm sure it is someplace.
5     Q.  Have you ever seen a report like that?
6     A.  No.
7     Q.  Okay.  So I wanted to switch gears a little
8   bit now and just cover a little something.  Just to be
9   clear, are you licensed to prescribe opioids?
10    A.  No.
11    Q.  Are you licensed to dispense opioids?
12        MS. ABSTON:  Objection to form.
13    A.  No.
14    Q.  (BY MR. FORD)  Do you have any training or
15  education relating to how to properly prescribe opioids?
16    A.  No.
17    Q.  Do you have any training or education relating
18  to how to properly dispense opioids?
19        MS. ABSTON:  Objection to form.
20    A.  No.
21    Q.  (BY MR. FORD)  I should have asked this
22  earlier.  Do you have any personal experience with
23  opioids?
24        MS. ABSTON:  I'm going to object.  We're
25  not going to talk about personal experience today.

Page 113

1        I am going to instruct you not to answer.
2        That's private HIPAA protected information, so
3   we will not be speaking about that today.
4        MR. FORD:  I'm not asking her to disclose
5   records.
6        MS. ABSTON:  These are her health
7   experiences.
8        MR. FORD:  What under HIPAA prevents her
9   from voluntarily talking about whether --
10       MS. ABSTON:  About if she has any
11  personal health or medical issues?
12       MR. FORD:  Or has family members or
13  anything like that.
14       MS. ABSTON:  We're not going to discuss
15  that today.
16       MR. FORD:  You're directing her not to
17  answer?
18       MS. ABSTON:  I'm directing her not --
19  that she is not required to disclose HIPAA information
20  protected for herself or family members, and it's not
21  relevant to this lawsuit.
22       MR. FORD:  It could be relevant for a
23  number of reasons, but you're directing her not to
24  answer?
25       MS. ABSTON:  We're not going to get into

29 (Pages 110 - 113)

1 protected HIPAA information today.

2 Q. (BY MR. FORD) Do you have any personal

3 experience with anyone who has consumed illicit opioids?

4 MS. ABSTON: Objection to form.

5 A. No.

6 Q. (BY MR. FORD) So in your time with the Budget

7 and Risk Management Department, has your department done

8 any work specifically in preventing opioid abuse in

9 Tarrant County?

10 MS. ABSTON: Objection to form.

11 A. It may be -- maybe indirectly.  I do not know.

12 Q. (BY MR. FORD) Can you think of any ways your

13 department would have done it indirectly?

14 A. Done it indirectly?  Yes.

15 So ask the question again to make sure that

16 I'm going to answer this correctly.

17 Q. Sure.

18 In your time with the Budget and Risk

19 Management Department, has your department done any work

20 specifically aimed at preventing opioid abuse in Tarrant

21 County?

22 A. So yes.  Within, again, the departments that I

23 referenced earlier, there are various requests that come

24 through that specifically are related to some type of

25 drug issue.

1 Q. When you say drug issue, are you talking

2 about, you know, any drug?

3 A. I am -- we don't discuss what the drug is,

4 what the -- we just know when their discussion is

5 happening, they are referencing drug abuse, drug issues

6 and other things that are associated with that.

7 Q. Okay.  So these requests you're talking about,

8 can you say one way or another whether they relate

9 specifically to opioid?

10 A. No, I cannot.

11 Q. They might relate to another drug, say

12 methamphetamine?

13 A. And it might relate to opioids.

14 Q. You don't know either way?

15 MS. ABSTON: Objection to form.

16 A. So it would be a list of drugs that -- again,

17 we don't discuss what the drug is, but it also doesn't

18 say specifically this one and not this one.  So it would

19 be for any problem that is arising.

20 Q. (BY MR. FORD) And when you say a list of

21 drugs -- you just said list of drugs.  You don't mean

22 literally a list --

23 A. I mean literally it does not have a list.

24 Q. Right.

25 A. There's literally no list that says yes list,

1 no list or all yeses or all nos.  There's no -- there's

2 nothing that I have that directs me in that direction.

3 Q. Got it.

4 Has the Budget and Risk Management Department

5 done any analysis of the costs incurred by the County as

6 a result of opioid abuse in Tarrant County?

7 A. So not specifically just opioids?

8 Q. Has your department conducted any analysis of

9 the costs incurred by the County as a result of general

10 substance abuse?

11 A. When we're analyzing departments that request

12 positions or equipment or software that would have

13 anything to do with that, yes.

14 Q. And is that -- is there any sort of

15 independent analysis?  Strike that.

16 So I understand you might look at requests

17 that relate to substance abuse issues when you're

18 analyzing a department's request for funding, but does

19 your department -- has your department conducted an

20 analysis specifically of the costs incurred by the

21 County as a result of substance abuse in Tarrant County?

22 A. Repeat it again.

23 Q. I understand that you might look at requests

24 that relate to substance abuse issues when you're

25 analyzing a department's request for funding as part of,

1 say, the budget process, but has your department

2 conducted an analysis specifically to determine the

3 costs incurred by the County as a result of substance

4 abuse in Tarrant County?

5 A. No.

6 Q. Okay.  I have got another exhibit.

7 MR. FORD: What number are we up to?

8 THE REPORTER: 5.

9 MR. FORD: 5.

10 (Exhibit 5 marked.)

11 MR. FORD: Here you go.

12 MS. ABSTON: Thank you.

13 Q. (BY MR. FORD) Okay.  I have handed you an

14 email with its corresponding attachment as Exhibit 5,

15 and this is an email and attachment that's been produced

16 in this case.  Do you see at the top of the document the

17 from line?

18 A. Uh-huh.

19 Q. Does this appear to be an email that you sent?

20 A. Yes.

21 Q. And what date did you send it on?

22 A. 5/4/2018.

23 Q. And the subject line is fiscal year 2019, May

24 9, 2018 budget review meetings.  Is that right?

25 A. Correct.

Page 118

1    Q.  Do you have any independent recollection of
2 sending this email?
3    A.  I mean, I send these out regularly, so yes and
4 no.  This was not -- this was as the assistant director.
5    Q.  Gotcha.
6        So if you could flip to page 2, which is the
7 beginning of the attachment, can you describe for me
8 what this attachment is?
9    A.  So this is the request -- the department's
10 request.
11    Q.  The attachment's name is Budget Review
12 Meetings and, you know, I can give you a few minutes to
13 flip through it, but that's what I thought it was, the
14 department's budget request.  It looks like it --
15    A.  It is the request.
16    Q.  Right.  It looks like it involves multiple
17 departments.  Flipping through it, does that -- does
18 that sound right?
19    A.  Yes, because I sent it to the people who would
20 be attending the meeting.  So it's going to the
21 Commissioners.  It's going to the Commissioners'
22 precinct administrators.  It's going to the County
23 Judge.  It's going to the County Administrator and
24 Debbie Schneider, the director at the time, and Michele
25 Heckman, who was one of the analysts.  And it is what we

Page 119

1 send to them.  And it may be just for the week.  I don't
2 know what the timeframe is on this, but it's the budget
3 review documentation so that they can have it to review
4 to come to the meeting and listen to the budget review
5 meetings.
6    Q.  Okay.
7    A.  And it looks like it's not the entire
8 department.  It goes -- because we meet according to the
9 department's availability.
10    Q.  So I was wondering, flipping through the
11 attachment --
12    A.  Uh-huh.
13    Q.  -- you know, it's got a heading for Public
14 Health.
15    A.  Uh-huh.
16    Q.  I think the Sheriff's Department.
17    A.  Uh-huh.
18    Q.  SO is what I assume is the Sheriff's Office.
19 Is that right?
20    A.  Yes, uh-huh.
21    Q.  Do you know, looking through this, would this
22 cover every department that submitted a budget request?
23    A.  I don't know what this -- so it does not say
24 on here what timeframe, but please find the May 9th
25 budget review meetings attached.  So these are the

Page 120

1 departments that we were seeing on May 9.
2    Q.  Gotcha.
3    A.  And we can't see every department in one day.
4 We take the entire month.
5    Q.  Okay.  Yeah, I was just trying to understand
6 what's in the attachment.
7    A.  So it would be whoever we scheduled for that
8 day.  So Public Health, we scheduled to see Public
9 Health.  And usually it's just -- the Sheriff's Office
10 usually takes the entire afternoon and -- that is a
11 correct statement.  So we saw Public Health in the
12 morning, and then after lunch we saw the Sheriff's
13 Office.
14    Q.  Okay.
15    A.  And we probably visited with them
16 approximately three to four hours.
17    Q.  Great.
18        So if you could turn to page 2, the first page
19 of the attachment.
20    A.  Uh-huh.
21    Q.  I just have a question about one of the
22 columns.  Do you see the column labeled Dec Pack?
23    A.  Decision package.
24    Q.  Decision package.  Yeah, my question is what
25 does that mean?

Page 121

1    A.  That's if a new position is requested.
2    Q.  Oh, okay.  So if that column is blank for all
3 the Public Health pages, does that mean there's no new
4 position that's currently being requested?
5    A.  Well, it could or it could not mean that.
6 Salaries are not on the -- I'm looking.  Salaries are
7 not on the -- this report.  So the answer to that is no.
8 Oh, and there's also Resource Connection.  I missed
9 that.  Resource Connection is in here.
10    Q.  What is Resource Connection?
11    A.  It is a -- it is a facility within Tarrant
12 County that was an old campus, and we now -- programs
13 that serve various organizations.  WIC is out there.
14 There are various -- Veteran's Services is out there.
15 There's various locations that rent the building that
16 are out there serving the public.
17    Q.  Okay.
18    A.  And it looks like there was no new positions
19 for Public Health.
20    Q.  Could you flip to the page that's marked 7 on
21 the bottom.
22    A.  Yes.
23    Q.  Do you see at the bottom it says "objectives"
24 in bold?
25    A.  Uh-huh.

31 (Pages 118 - 121)

Page 122

1    Q.  What would this section cover?
2    A.  What I referenced earlier.  They're going
3  to tell us what their plan is for the future.  This
4  information is what I was referencing about key
5  performance indicators, objectives and accomplishments
6  or objectives and then accomplishments.  So this tells a
7  story and information for us to make a decision, an
8  informed decision on what to recommend and not
9  recommend.
10    Q.  Gotcha.
11        Could you flip to page 13?
12    A.  Uh-huh.
13    Q.  Do you see the column labeled Justifications
14  Calculations?
15    A.  Uh-huh.
16    Q.  Is that what you were telling me about
17  earlier, where a department would explain each line item
18  and give a justification for its request?
19    A.  Correct.
20    Q.  So I know it's a lengthy document, and I
21  will -- if you want to review the whole thing, I will
22  certainly let you, I won't stop you.  But I will
23  represent to you that the term "opioid," the phrase
24  "opioid abuse," nothing like that appears in this
25  document.  Would that be consistent with your testimony

Page 123

1  that, you know, when departments submitted budget
2  requests, they wouldn't do so at the level of detail to
3  isolate issues that are arising specifically due to
4  opioid abuse?
5    A.  It would most likely be a more general term.
6    Q.  So looking at this document, would anybody be
7  able to say -- point to a line item and say this is
8  needed because of opioid abuse in Tarrant County
9  specifically?
10    A.  So, no, not based on this justification.
11    Q.  So sort of on your last answer, there is two
12  instances in this document where substance abuse is
13  mentioned.  I want to direct you to one.  One is in, I
14  believe, the accomplishments section where they say this
15  thing, but on page 81, if you turn to it, they mention
16  the same facility.  Let me know when you're there.
17    A.  81.
18    Q.  Okay.  Towards the bottom, under that bold
19  housing-inmate transported to SA -- SAPF, do you see
20  that?
21    A.  Uh-huh.
22    Q.  Under that, it says Substance Abuse Punishment
23  Facility.  And this is one of two times it's mentioned.
24  Do you know what this is, the Substance Abuse Punishment
25  Facility?

Page 124

1    A.  I do not know what this specific one is, no.
2    Q.  Do you know what any one is?
3    A.  So my belief is it would have been with John
4  Peter Smith Hospital, but I don't know that positively
5  because -- I don't know that positively in 2018.
6    Q.  Do you know generally what a substance abuse
7  felony punishment facility is?
8    A.  I do not know what this one is, no.
9    Q.  And in looking at a line item like this, is it
10  fair to say that it's not possible to say if any portion
11  of this program relates to opioid abuse issues?
12    A.  I think looking at this line item, it's some
13  type of substance abuse, and I wouldn't know which one
14  it was.
15    Q.  So you wouldn't be able to say what portion --
16    A.  Huh-uh.
17    Q.  -- would correspond to opioid abuse?
18    A.  No.
19    Q.  Okay.  If a document like this doesn't contain
20  the detail to show, you know, what requested funding
21  would go to specifically opioid abuse, do you know of
22  any document that would show that?
23    A.  I do not have any document that would go into
24  that granular detail.
25    Q.  So the annual budget would not?

Page 125

1    A.  No.  The only place you're going to see
2  justifications are here in this documentation.
3    Q.  Okay.  Let me just tic it off, as lawyers like
4  to do.  So the annual budget wouldn't have that
5  information?
6    A.  The annual budget would not have the granular
7  information that you're requesting, you're speaking of.
8    Q.  And the annual budget rollup wouldn't have
9  that information either?
10    A.  No, it's just numbers.
11    Q.  Thanks for indulging me on that.  I think we
12  covered that.
13        Just briefly, we discussed previously the role
14  of your department is to review County programs.  Do you
15  remember that?
16    A.  Uh-huh.
17    Q.  Has your office reviewed any programs that
18  relate to addressing opioid abuse in Tarrant County?
19    A.  So I don't have any granular information.  I
20  wouldn't know -- it would be a discussion of substance
21  abuse or related to any impairment related to that.
22    Q.  So similar to the testimony you've given -- I
23  don't want to belabor the point.  I will try to not to
24  belabor the point.
25        Similar to the testimony you've given, to the

32 (Pages 122 - 125)

Page 126

1 extent your department analyzes County programs that
2 relate to substance abuse, your department doesn't do
3 the sort of granular analysis to say this portion of the
4 program relates to opioid abuse specifically.  Is that
5 fair to say?
6     A.  That's fair to say.
7     Q.  Okay.  Next exhibit I've got, it is another
8 big one.
9         (Exhibit 6 marked.)
10    Q.  (BY MR. FORD)  Is it 6?  Okay.  Julie just
11 passed you what has been marked as Exhibit 6.
12        MS. ABSTON:  Thank you.
13        MR. FORD:  No problem.
14    Q.  (BY MR. FORD)  And do you recognize that
15 document?
16    A.  No.  The front page I received to tell me when
17 to be here, and this part I've seen because it told me
18 when to be here or something like that.
19    Q.  The caption?
20    A.  Yes.
21    Q.  Was that on top of your amended notice for
22 deposition?
23    A.  Yes.
24    Q.  Does that sound right?
25    A.  Yes.

Page 127

1     Q.  So I'll represent to you this is the -- well,
2 a portion of the complaint, the operative portion of the
3 complaint that Tarrant County has filed in this case.
4 Is it true you've not seen this document --
5     A.  No.
6     Q.  -- before today?
7     A.  Yes, it is true I have not seen this document.
8     Q.  So could you flip to paragraph 719, please?
9     A.  Is paragraph 719, is that what it says at --
10    Q.  Yes, it will be the number before the
11 paragraph.  So, no, not the page number.
12    A.  Okay.  You're going to have to give me better
13 direction.
14    Q.  Okay.  I apologize.  I'll find the page
15 number.  It is --
16        MS. ABSTON:  216.
17    A.  216?
18    Q.  (BY MR. FORD)  Yeah.  So do you see in
19 paragraph 719 -- I will read the sentence.  As a direct
20 and proximate result of the pharmacy defendants'
21 tortious conduct and the public nuisance created by the
22 pharmacy defendants, plaintiff has incurred and will
23 continue to incur, excessive costs to treat the opioid
24 epidemic in its county including, but not limited to,
25 increased cost of police, emergency, health,

Page 128

1 prosecution, corrections, rehabilitation and other
2 services.
3         Did I read that correctly?
4     A.  Yes, sir.
5     Q.  Do you agree with this statement?
6     A.  I do.
7         MS. ABSTON:  Objection to form.
8     A.  I do.
9     Q.  (BY MR. FORD)  On what basis do you agree?
10    A.  Because, again, with the requests that come
11 through the department for a request for increased
12 supplies, demands.  While opioids are not specifically
13 requested, it's substance abuse, drug crisis, and it is
14 implied that we all know the big list that I kept
15 referring to, but it's never anywhere written down.  The
16 ME's office, the requests that they have.  When the
17 increase happened, when they started asking for huge
18 increases -- and it was during COVID-19.  And I asked,
19 is that specifically related to COVID-19?  And he said,
20 no, the deaths have not increased because of COVID-19;
21 the deaths have increased because of overdoses and
22 suicides.
23    Q.  So in that instance when they say overdoses,
24 it's possible it's overdoses caused by drugs other than
25 opioids.  Is that correct?

Page 129

1     A.  Or opioids.
2     Q.  But it could be --
3     A.  Could be, or opioids.
4     Q.  Right.  Or --
5     A.  My knowledge, it could be any of them.
6     Q.  Right.
7         Can you go to paragraph 722, which is on the
8 next page, 217?  Do you see that?
9     A.  Yes.
10    Q.  It says plaintiff has incurred expenditures
11 for special programs over and above plaintiff's ordinary
12 public services.
13        Did I read that right?
14    A.  Uh-huh.
15    Q.  Do you agree with that sentence?
16    A.  Well, I don't know what programs it's
17 referencing.  I wasn't part of -- I didn't put this
18 together, so I don't know what that's referencing.
19    Q.  That was going to be my next question.  What
20 would be your understanding of what special programs
21 means?
22        MS. ABSTON:  Objection to form.
23    A.  I would assume programs in the Narcotics Unit,
24 programs in MHMR.  That would be an assumption on my
25 part, but, again, I don't know because I don't know what

33 (Pages 126 - 129)

Page 130

1  was behind that sentence.
2     Q.  (BY MR. FORD)  You just mentioned programs in
3  the Narcotics Unit.
4     A.  Uh-huh.
5     Q.  Now would it be -- do you know that any -- do
6  you know of any increase in expenditures for programs in
7  the Narcotics -- Narcotics Unit that are due
8  specifically to opioid abuse in Tarrant County?
9     A.  I do not know of any specific drug.
10    Q.  Would the same be true of the example of MHMR?
11    A.  Correct.
12    Q.  And can you -- do you know what MHMR stands
13 for?
14    A.  My health, my resources.
15    Q.  I was wondering, do you know did Tarrant
16 County dollars get spent or fund MHMR?
17    A.  Yes.
18    Q.  Does it provide all of its budget?
19    A.  So certain programs are solely supported
20 financially by Tarrant County funding.
21    Q.  Do you know if those programs relate to
22 substance abuse, any of those programs?
23    A.  What I know is that's part of it.  Not
24 specifically, but part of it.
25    Q.  Do you know -- I was wondering is MHMR sort of

Page 131

1  a quasi government agency, or is it a quasi government
2  agency?
3     A.  I look at it as a nonprofit, so I don't know.
4  I mean, it's grant -- mostly grant funded and supported
5  by other entities, so.
6     Q.  Yeah, I was wondering because I was wondering
7  its affiliation with Tarrant County government.
8        MS. ABSTON:  Objection to form.
9     A.  Affiliation.  I mean, that's -- we contract
10 with them to do various programs in the county.
11    Q.  (BY MR. FORD)  And you said most of its
12 funding is through grants?
13    A.  I know a large portion of it is.  I don't work
14 for MHMR, but I know a large portion is grant funded.
15    Q.  Okay.  If you go back to paragraph 718, it's
16 on the page before, towards the top, and I will read a
17 portion of it.  Do you see where it says the pharmacy
18 defendants -- additionally, the pharmacy defendants
19 should compensate Tarrant County for the funds it has
20 expended and continues to expend for medical insurance
21 claims for opioids that were not medically valid.
22       Do you see that?
23    A.  Uh-huh.
24    Q.  Is it correct that your department would not
25 have information related to that assertion because it's

Page 132

1  not your department's responsibility to oversee medical
2  insurance claims?
3        MS. ABSTON:  Objection to form.
4     A.  We would not have the employee's medical
5  insurance, but as I stated earlier, there's probably --
6  for the workers' comp., there is some report.  I just
7  don't look at it.
8     Q.  (BY MR. FORD)  So as to the workers' comp.
9  portion, do you agree with the assertion that Tarrant
10 County has spent funds on prescription opioids via the
11 workers' compensation plan that were not medically
12 valid?
13       MS. ABSTON:  Objection to form.
14    A.  I wouldn't have -- I am sure there has been
15 money spent on pharmaceuticals.  I don't know whether
16 they're valid or not valid.  And, again, workers' comp.
17 just came into my department October 1.
18    Q.  (BY MR. FORD)  Okay.  Okay.  I'm finished with
19 that exhibit.  You can set it to the side, please.
20       So I think you spoke earlier -- I think you
21 testified earlier that a certain amount of funding for
22 Tarrant County services comes from grants?
23    A.  Yes.
24    Q.  Do you know what portion of the Tarrant County
25 services are paid for with money from grants?

Page 133

1     A.  I don't know a percentage.
2     Q.  Would your department be tasked with tracking
3  that?
4     A.  No.
5     Q.  Do you know what department would be?
6     A.  Auditors.  And let me back up.  I don't know
7  that anybody's tasked with tracking what the percentage
8  is.
9     Q.  Thank you.
10       Is any department in Tarrant County tasked
11 with tracking what grants are received --
12    A.  Oh, no, that is in my department.
13    Q.  Okay.  Do you track how they're spent, how the
14 money is spent?
15    A.  That would be the auditors.  I'm on the front
16 end; the auditor is on the back end.
17    Q.  Is there any sort of document that your
18 department creates that, you know, shows all the grants
19 that are received by Tarrant County in a given year?
20    A.  The auditors create that report.  We receive
21 it; the auditors create it.
22    Q.  Would that be the single audit report?
23    A.  No.  No, this is just a report that shows what
24 every grant is, what the grant number is, what the name
25 is, what a brief description is, what the dollar amount

34 (Pages 130 - 133)

Page 134

1 is, where it came from, whether it's state, federal or
2 local.
3   Q.   Okay.  Do you know what I mean when I refer to
4 the single audit report?
5   A.   Yes.
6   Q.   Have you heard about that?
7   A.   Uh-huh.
8   Q.   Do you know whether that report reflects all
9 the grants that have been received in a fiscal year?
10   A.   I don't know if they're listed by name.
11 That's done by the auditor's office.
12   Q.   Do you know what the Texas Conference of Urban
13 Counties is?
14   A.   TAC, yes.
15   Q.   Do you know what is --
16   A.   Wait, Texas Office of Urban Counties?
17   Q.   Texas Conference of Urban Counties.
18   A.   I'm assuming TAC.  I am going to make an
19 assumption there, so no, maybe not.
20   Q.   I've got an exhibit.  Let me show it to you,
21 and maybe --
22   A.   Texas Association of Counties is -- that's
23 TAC.
24   Q.   Okay.  This is at least labeled differently.
25 Let me show it to you.  I am going to label what's

Page 135

1 marked as Exhibit 7.
2        (Exhibit 7 marked.)
3   Q.   (BY MR. FORD)  So I've given you an email and
4 an attachment.  Do you see in the to line, do you see
5 your name?
6   A.   Uh-huh.
7   Q.   And this is dated January 28, 2021, correct?
8   A.   Uh-huh.
9   Q.   Do you see that it's from Russell Schaffner?
10   A.   "Schaffner."
11   Q.   "Schaffner."  Who is Russell Schaffner?
12   A.   Yes, I do know who Russell Schaffner is.
13   Q.   Who is he?
14   A.   He's the Assistant County Administrator that
15 is the legislative liaison.
16   Q.   Okay.  So the attachment -- do you remember
17 this email and attachment?
18   A.   Well, I don't remember this email.  He sends
19 hundreds of these emails out during the legislative
20 session --
21   Q.   Gotcha.
22   A.   -- and prior to, so -- yes.
23   Q.   Looking at the attachment --
24   A.   CUC, yes.  Now that I see it in writing, it's
25 the CUC, Conference of Urban Counties.

Page 136

1   Q.   What is the CUC?
2   A.   That is an organization that facilitates
3 information amongst all counties.  I have not ever been
4 to a CUC meeting, and it's not a part of anything that I
5 would do.
6   Q.   Okay.  One question about this document on
7 page 6.  On the lower right-hand corner is the page
8 number.
9   A.   Uh-huh.
10   Q.   Do you know if this document is Mr. Schaffner
11 sending around as items that Tarrant County might be
12 interested in?  Is that sort of the point of this?
13   A.   Items of interest to counties, yes.  CUC --
14 that's CUC's somewhat responsibility to assist counties.
15   Q.   Okay.  Do you see the last box on page 6?
16   A.   Uh-huh.
17   Q.   Under program name, it says grants for County
18 jail medication-assisted treatment for opioid and
19 alcohol dependence.
20        Do you see that?
21   A.   Uh-huh.
22   Q.   Do you know, would this have been a grant that
23 Tarrant County could potentially have applied for?
24   A.   I don't know that this is grant information.
25 I mean, it says grants for County, but I don't know it's

Page 137

1 something that we would have applied for.  I don't know.
2 This was in '21?
3   Q.   I think so.
4   A.   Uh-huh.
5   Q.   So do you know what the next column over is?
6 Do you know what that amount would be?
7   A.   I'm assuming that's the dollar amount that's
8 available.
9   Q.   Okay.
10   A.   For all -- I would assume it's the dollar
11 amount available across the state.
12   Q.   Okay.  Yeah, do you know -- but you don't know
13 one way or the other whether Tarrant County ultimately
14 applied for this grant?
15   A.   No.  I would have to look and see if --
16        MS. ABSTON:  Objection, form.
17   A.   I would have to look and see if it was on our
18 list.
19   Q.   (BY MR. FORD)  Okay, just wondering.  You can
20 set it to the side.
21        I have another exhibit, and this is Exhibit 8.
22        (Exhibit 8 marked.)
23        MR. FORD:  Thank you.
24   Q.   (BY MR. FORD)  I have handed you -- well,
25 Julie has handed you a document that has been produced

35 (Pages 134 - 137)

1 in this case, and it's labeled fiscal year 2014 grant
2 listing.
3      Do you see that?
4   A.  Uh-huh.
5   Q.  Would this be the document you're referring
6 to, or was there --
7   A.  Uh-huh.  It's a condensed version of the list
8 I was referencing.
9   Q.  Okay.  So this would be an example of a
10 condensed list that would go around for a given year?
11   A.  Uh-huh.
12   Q.  Let's see.  Looking through this report or
13 this list, would you be able to tell me if any of these
14 grants related to addressing opioid abuse in Tarrant
15 County?
16   A.  I could tell you those that are related to --
17 this is from 2014, but I could tell you those that are
18 related to substance abuse or substance -- some type of
19 drug.
20   Q.  Sure, yes, if you wouldn't mind.
21   A.  Taking out --
22      MS. ABSTON:  While she looks, I just want
23 to note for the record that this starts on page 22.  So
24 I don't know if this isn't the full exhibit or the full
25 family of the exhibit or just a portion of it, but I'll

1 let you ask questions about it, but just for the record
2 we need to look into that.
3      MR. FORD:  Right.  Yeah, it is a
4 stand-alone document.
5      MS. ABSTON:  Okay.
6      MR. FORD:  I can say that.
7   A.  So S.W.I.F.T. could be.  CJAD S.W.I.F.T., that
8 is in the DWI Court.  The next one, Treatment
9 Alternatives to Incarceration Program.  The Day
10 Treatment Substance Abuse, which are obvious.  Some of
11 the Mentally Impaired could be.  Family Drug Court,
12 Veteran's Court could be.  CJD Substance Abuse Felony
13 Punishment Facilities.  Medical Examiner's Forensic
14 Laboratory could have some.  That's all housing.
15 Housing all could have some association.  DIRECT Court.
16 DIRECT Court MHMR TC, DIRECT Court or DIRECT Court in
17 kind.  The no refusal.  Again, we don't have that one
18 now, but in 2014 we did.  And I know some are in the
19 TJJD, which is Juvenile, but I don't know -- I wouldn't
20 be able to point out exactly which one.  And then it's
21 the Narcotics DEA Overtime and the STOP.  And CSCD Bond
22 Supervision could be.  I mean, that's a vast array of
23 all kinds.
24   Q.  (BY MR. FORD)  Okay.  Thank you.
25      You said -- did you say this is an abbreviated

1 version of the document?
2   A.  Well, it takes out the dollar amount -- what I
3 referenced earlier was this report, but expanded, that
4 has the dates -- which that does have the date, but it
5 has the dollar amount and whether it's state, fed or
6 local funding, and that's not on here.
7   Q.  When you say local funding, what -- what would
8 that source be?
9   A.  So it could be between nonprofits or various
10 donations to the County for some type of use.
11   Q.  And when you say state, it would be money from
12 the State of Texas, grant money from the State of Texas?
13   A.  Correct, and it could be a pass-through.  It
14 could be fed money that's passed through the state.
15   Q.  Okay.
16   A.  Or just state money alone.
17   Q.  All right.  Thank you.
18      MR. FORD:  I'm fine to keep going.  I'm
19 going to switch into a new subject, the second-to-last
20 subject area.  So I don't know if you want to take a
21 break or keep going.  I'm fine doing either one.
22      THE WITNESS:  Does the guy online need to
23 take a break?
24      MR. FORD:  Aaron, are you awake?
25      MS. ABSTON:  It's up to you, Helen.

1      THE WITNESS:  Sure, let's take a break.
2      MR. BOONE:  Yes.  Yes, a break would be
3 great, thank you.
4      THE VIDEOGRAPHER:  We're going off the
5 record at 2:21.
6      (Break from 2:21 p.m. to 2:36 p.m.)
7      THE VIDEOGRAPHER:  We're back on the
8 record at 2:36.
9   Q.  (BY MR. FORD)  So I have one question from --
10 relating to your testimony before, which was did you say
11 you joined the Budget Department in 2005, Tarrant
12 County?
13   A.  In Tarrant County budget, yes.
14   Q.  And then for a gap -- or for 2011 to 2015, you
15 were with the Criminal District Attorney's Office.  Is
16 that right?
17   A.  Uh-huh.
18   Q.  When you were with the Criminal District
19 Attorney's Office, did you have visibility into the
20 budget?
21   A.  I did the DA's budget.
22   Q.  Do you remember if you would have reviewed the
23 entire budget during that time or had access to it?
24   A.  We would have had meetings with all of the
25 chiefs and discussed all of their requests for me to --

36 (Pages 138 - 141)

Page 142

1 and a decision would be made what would be put in the
2 budget and what would not be put in the budget.
3     Q.   Okay.  And so you testified today that the
4 budget documents and budget proposal documents that we
5 reviewed didn't have the level of granular detail to say
6 specifically if a requested item related to opioids --
7 issues relating to opioid abuse specifically.  Is that
8 fair to say?
9     A.   Uh-huh.
10    Q.   Would that be true for your entire time in
11 Tarrant County, 2005 to the present?
12    A.   Written down, it would be true.
13 Conversations, again, would be more granular.
14    Q.   All right.  Thank you.
15         All right.  So now to the second-to-last area.
16 Do you know what the Opioid Abatement Fund Council is?
17    A.   No.
18    Q.   Do you have any knowledge of any state level
19 entity that's dedicated to creating an opioid abatement
20 fund for the state of Texas?
21    A.   No.
22    Q.   Are you aware of any efforts from Texas state
23 government to provide funds to abate opioid abuse across
24 the state?
25    A.   Outside of what we're doing right now?  I

Page 143

1 mean, I don't -- no.  No, I don't know.
2     Q.   So you testified that you don't know what the
3 Opioid Abatement Fund Council is, correct?
4     A.   I don't think I do.
5         MS. ABSTON:  Objection to form.
6     Q.   (BY MR. FORD)  So you wouldn't know any of the
7 members of the council?
8         MS. ABSTON:  Objection to form.
9     A.   No.
10    Q.   (BY MR. FORD)  Do you know a man by the name
11 of Pedro Fernandez?  Dr. Pedro Fernandez?
12    A.   No.
13        MS. ABSTON:  Objection to form.
14    Q.   (BY MR. FORD)  Do you know if the State of
15 Texas has received any money from settlements pursuant
16 to opioid lawsuits?
17    A.   The State of Texas?  No.  That may be an
18 incorrect answer.
19    Q.   Do you want me to reask it or --
20    A.   Yeah.
21    Q.   Do you know if the State of Texas has received
22 any money from any settlements pursuant to opioid
23 lawsuits?
24    A.   So then I would ask a question of you.  Is
25 that -- would the state disburse to entities and

Page 144

1 counties?
2     Q.   That's three questions now from me, but --
3     A.   I know that the County has received funding
4 for settlements.  I don't know -- I'm not exactly sure
5 where they came from at this particular time.
6     Q.   Do you know whether it came from the State of
7 Texas government?
8     A.   I'm going to say I'm not sure --
9         MS. ABSTON:  Objection, form.
10    A.   -- where it came --
11    Q.   (BY MR. FORD)  All right.  I wasn't sure if
12 you didn't know what entity within the state government
13 or what entity regardless.
14    A.   It is a very initial -- in my budget process,
15 it is very -- it's at the very beginning of it.  So I am
16 not looking into it any further, but there is money that
17 I know they have created a fund for and put money into
18 it.  So I don't know if it's from that or not, so I feel
19 that if I say no, I may be inaccurately answering that.
20    Q.   I appreciate that.  Thank you.
21        So do you know how much money Tarrant County
22 has received pursuant to settlements from opioid
23 lawsuits so far?
24    A.   I know at one -- when I created -- originally
25 created, there was about -- I think it was either

Page 145

1 $300,000 or $500,000.  I'm not positive.  Again, it's at
2 the initial -- just the beginning stage of us looking at
3 it.
4     Q.   Do you know -- so you said you created a fund
5 for it?
6     A.   Uh-huh.
7     Q.   Would that be a special purpose fund?
8     A.   Uh-huh.
9     Q.   I'm learning a little bit.
10    A.   Good.
11    Q.   Can you describe what that special fund is?
12    A.   It is -- it's opioid settlement, and it is an
13 undesignated, meaning there is no plan for it at this
14 time until we -- until I understand what the
15 restrictions are on the funding.
16    Q.   Do you know who would impose restrictions on
17 the funding?
18    A.   Whoever gave the money.
19    Q.   Do you know if the Commissioners Court, could
20 they impose additional or could they impose restrictions
21 on the money?
22    A.   Only within the restrictions.  If there are
23 any -- if it is restrictive funds, all they could do
24 then is within those guidelines.
25    Q.   If they are -- assuming they are unrestricted

37 (Pages 142 - 145)

Page 146

1 funds --
2    A.  Assuming they are --
3    Q.  Unrestricted.
4    A.  Unrestricted, okay.
5    Q.  Could the Commissioners Court say we only want
6 these funds to be spent in these certain ways?
7    A.  Yes.
8    Q.  Do you know how many times Tarrant County so
9 far has received money pursuant to settlements?
10    A.  No.  That would be on the auditor's side and
11 only when I go and look and see if there's any revenue
12 that's received out there that's not been recognized
13 would I then do something with it.  And that's not --
14 that's not a regular thing.  Again, I would only go look
15 maybe once or twice a year.
16    Q.  What would prompt you to look at it?  Anything
17 in particular?
18    A.  To see if I needed to just update towards the
19 end of the year.  We budget very conservatively in our
20 special purpose budgets, and if there's any additional
21 revenue that I need to add to the departments for them
22 to be able to finish out the year, then I would do that.
23    Q.  What do you mean when you say you budget very
24 conservatively?
25    A.  We're not going to state more revenue.  In

Page 147

1 most cases in special purpose budgets, it would be only
2 the actual cash that's there.  And in some cases when we
3 know historically what fees have been collected, then we
4 would be very conservative and we would budget low and
5 then look at it later in the year to see if we needed to
6 do anything to it.
7    Q.  Got it.
8      So if you were expecting more money to flow
9 in, you know, six months from now when you say you
10 budget conservatively, would you wait to actually
11 receive that money to, you know, do anything with that
12 money or assign it?
13    A.  In most -- in most of the special purpose
14 budgets, we're going to make sure that the cash has come
15 in.
16    Q.  The special purpose budget that's for opioid
17 settlements --
18    A.  Uh-huh.
19    Q.  -- is there any other funding source for that
20 budget other than opioid settlements?
21    A.  No.
22    Q.  So it wouldn't be like some grants that's --
23    A.  No.
24    Q.  Okay.  Do you know what the process is for
25 determining how that money gets spent in the special

Page 148

1 purpose budget for opioid settlements?
2    A.  I have not received -- there has been general
3 conversation about unrestricted versus restrictive,
4 and -- but I have no written -- I have received no
5 written documentation of what it can or cannot be spent
6 on, what the restrictions or unrestricted is.  And until
7 I have that would I start having conversations with
8 various departments that potentially would be the users
9 of that funding to see how they wanted to spend it and
10 then submit it to Commissioners Court for
11 recommendations -- for their approval.
12    Q.  Got it.
13      You said you have some conversations.  Would
14 that be with -- do you know who those would be with?
15    A.  Just various people that say, Helen, do you
16 know what that could be spent on?  Could we spend it on
17 this?  Could we spend it on that?  County Administration
18 Department, Public Health, you know, how can we spend
19 this, what are restrictions on this funding?  And I
20 don't know the answer to that.
21    Q.  Do you recall any informal request of a
22 department saying, hey, we would like to spend it on
23 this, can we do that?
24    A.  No.  Nobody tells me those types of things
25 until --

Page 149

1    Q.  Until budget time?
2    A.  Well, until -- no, not budget time.  Until --
3 when I tell them, no, I'm not going to discuss it,
4 they're not going to discuss it with me anymore.
5    Q.  Got it.
6    A.  Except the Commissioners.
7    Q.  Right.
8    A.  I'll be real clear about that.
9    Q.  They'll talk about it whether or not you want
10 to?
11    A.  Well, I am not going to tell them I'm not
12 going to discuss it.
13    Q.  Have they --
14    A.  No.
15    Q.  Have any of them said --
16    A.  No.
17    Q.  Okay.  I would like to show you one exhibit,
18 and I think this will be Exhibit 9.
19      MR. FORD:  Is that right?
20      THE REPORTER:  Yes.
21      (Exhibit 9 marked.)
22    Q.  (BY MR. FORD)  Okay.  Here you go.
23      MR. FORD:  Here you go.
24      MS. ABSTON:  Thank you.
25    Q.  (BY MR. FORD)  So I've just passed you what's

38 (Pages 146 - 149)

Page 150

1 been marked as Exhibit 9. I'll represent to you -- or
2 does this look familiar to you at all?
3     A.  I do know that it's the monthly financial
4 statement from the auditor's office.
5     Q.  Do you know whether this is available
6 publicly?
7     A.  I believe so.
8     Q.  Would it be on the Tarrant County's website?
9     A.  Under the auditor's department.
10    Q.  I'll represent to you that's where I pulled it
11 from --
12    A.  Okay.
13    Q.  -- is from that website.
14        Do you know what the purpose of this document
15 would be?
16    A.  In general, just to say what the financial
17 stability of the County is in that given month, what
18 we've spent money on for that given month.
19    Q.  Can --
20    A.  Or up to that month maybe.
21    Q.  Okay.  And I would like you to flip to page
22 60, where it says 60 on the bottom.  Do you see the very
23 bottom there?
24    A.  Uh-huh.
25    Q.  Do you know what this page reflect?

Page 151

1     A.  It's the special purpose budgets, and that's
2 the one that I was referencing, the opioid settlement.
3     Q.  Okay.  Do you see on the left most column fund
4 number?
5     A.  Uh-huh, T85.
6     Q.  What is that?
7     A.  It's just a number.  It is -- for financial
8 software, you have to give it an identifying number, and
9 so the fund is T85.
10    Q.  Got it.
11    A.  Or T8500.
12    Q.  Do you see two columns over where it says
13 actual revenue?
14    A.  Uh-huh.
15    Q.  Does that reflect --
16    A.  Yes.
17    Q.  -- the actual money that's flowed in?
18    A.  (Witness nods head.)
19    Q.  $510,506, does that sound right to you?
20    A.  That does sound -- seeing it in front of my
21 face, yes, that does sound correct, and that's what the
22 budget has on it, or close to anyway.
23    Q.  And then -- okay.  So the next column over,
24 budgeted revenue?
25    A.  Uh-huh.

Page 152

1     Q.  Is that blank for the reason you were telling
2 me, that it --
3     A.  It's blank because on May 31 I did not have a
4 budget for it, but as of 9 -- 10/1 of '22, I had a
5 budget for it.  That was the beginning of our fiscal
6 year.
7     Q.  Got it.
8        When you say you have a budget for it, do you
9 mean that you know how it's going to be spent?
10    A.  No.  It's in undesignated, still to be
11 determined, until I find out whether it's restrictive or
12 unrestrictive.
13    Q.  Got it.
14        Do you have any idea of when that
15 determination will be made?
16    A.  Sure.  When someone really wants to spend the
17 money, they'll make sure I have that documentation.
18    Q.  Do you expect it will be by the time next
19 year -- or fiscal year 2024 budget comes out?
20        MS. ABSTON:  Objection to form.
21    A.  I don't know the answer to that.
22    Q.  (BY MR. FORD)  Do you see the column to the
23 rightmost that says percent collected?
24    A.  Uh-huh.
25    Q.  What does it mean when it says over

Page 153

1 100 percent.
2     A.  I don't know the answer to that.
3     Q.  Okay.
4     A.  I don't know how you collect over 100 percent.
5     Q.  Me neither, but I'm not a budget person.
6     A.  Well, you know, budget people are not
7 auditors.  They're not accountants.
8     Q.  That's a good --
9     A.  So --
10    Q.  It's all Latin to me.  That's all for this
11 document.
12    A.  Okay.
13    Q.  And then could I ask you to go back?  Did you
14 have Exhibit 5 in front of you?  Or it's not Exhibit 5.
15 I think it's the fiscal year 2023 approved budget.
16    A.  Which one, the GFOA or the one we present to
17 Commissioners Court?  So it's either going to be 4 or 3.
18    Q.  It's 3.
19    A.  Okay.
20    Q.  Could you please flip to page 45 for me.  So
21 do you see at the top it says funds subject to
22 appropriation?
23    A.  Yes, sir.
24    Q.  Oh, thanks.
25    A.  I didn't mean to shake.

39 (Pages 150 - 153)

1   Q.  I got sloppy.
2       And if you flip to 49, a couple of pages later
3   within this section, do you see the miscellaneous
4   other --
5   A.  Uh-huh.
6   Q.  -- at the bottom of the page?
7   A.  Uh-huh.
8   Q.  Do you see opioid epidemic fund?
9   A.  Uh-huh.
10  Q.  I just wondered, does this mean -- is this
11  within the umbrella of, you know, funds subject to
12  appropriation listed on 45?
13  A.  Right.  Correct.
14  Q.  Will this fund, is it the intention that any
15  other money you get pursuant to settlements will be
16  placed in the same -- in this fund?
17  A.  Correct.
18  Q.  And then I've got one -- on page 71, if you
19  flip to that for me, please.  Do you see about midway
20  through the page it also says miscellaneous other?
21  A.  Uh-huh.
22  Q.  And it says opioid epidemic fund?
23  A.  Uh-huh.
24  Q.  On the rightmost column, it lists 521,816.
25  A.  Uh-huh.

1   Q.  And if you flip a page, a couple of pages back
2   to the column header, the column header is FY '23
3   budgeted revenues.
4   A.  Uh-huh.
5   Q.  I was just wondering that 521 figure, 521,816,
6   do you know why that's different than --
7   A.  Could be if it allows to have interest earned
8   on it.
9   Q.  Okay.  And this would come months after the
10  auditor report we just looked at?
11  A.  Yes.
12  Q.  So that would be interest that's actually
13  accrued on that amount?
14  A.  Could potentially be.  I don't know that
15  exactly.
16  Q.  Okay.  Okay, thanks.  We can put that to the
17  side.
18      So other than -- oh, I'm sorry.
19      Other than the 500,000 and change amount that
20  we just assessed, are you aware of Tarrant County
21  receiving any additional money pursuant to opioid
22  settlement after that amount came in?
23  A.  We may have received it, but I have not
24  budgeted for it.
25  Q.  Gotcha.

1       I've got one more -- another exhibit that I
2   think might relate to that that I wanted to show you.  I
3   am going to hand you Exhibit 10.
4       (Exhibit 10 marked.)
5       MR. FORD:  Here you go.
6       MS. ABSTON:  Thank you.
7   Q.  (BY MR. FORD)  Making sure I didn't put my
8   initials on there.  I thought I might have given you my
9   copy.
10      So looking at the headline -- I will represent
11  to you this is just a news article I found online, and
12  it's pretty recent.  It's from March 2023.  And the
13  headline is Tarrant County accepts more than 2 million
14  from latest round of opioid settlements.
15      Do you see that?
16  A.  I do.
17  Q.  Does that ring --
18  A.  No, but I'm going to go check when I get back
19  to the office.
20  Q.  So you don't have any --
21  A.  No.
22  Q.  -- knowledge of this yet?
23  A.  Huh-uh.
24  Q.  For that 500 and change amount of settlement
25  offer that we previously talked about --

1   A.  Uh-huh.
2   Q.  -- do you have any knowledge of what
3   settlement -- what lawsuit that settlement money came
4   from?
5   A.  No.  It would probably be in the backup
6   documentation.  I just have not taken the time to read
7   it.
8   Q.  Assuming Tarrant County has received this
9   $2 million, will it go into the same special purpose
10  budget fund?
11  A.  Yes, sir.
12  Q.  I think there is one other question I wanted
13  to ask.  So if you flip to the second page of the
14  article and if you look at the last full paragraph on
15  the page -- well, sorry, the second-to-last that
16  begins -- if you could read the three paragraphs
17  starting at "The state got 1.17 billion."
18      Do you see that?
19      MS. ABSTON:  Are you asking her to just
20  read it aloud or read it to herself?
21      MR. FORD:  No.  Yeah, sorry.
22      MS. ABSTON:  That's okay.
23  Q.  (BY MR. FORD)  Could you read those three
24  pages?
25  A.  You want me to read aloud?  I'm not in school.

40 (Pages 154 - 157)

1 You read it aloud.  I was reading it.
2     Q.  Yeah, do you mind just reading just those
3 three paragraphs?  The first one being "The state got
4 1.17" --
5     A.  The state got --
6     Q.  Not out loud, not out loud.
7         MS. ABSTON:  I'm going to object.
8     Q.  (BY MR. FORD)  Just to yourself.
9     A.  Okay.  I've done that.
10     Q.  Okay.  So my question is this.  That second
11 paragraph says the settlement agreement in the case
12 states that 85 percent of the settlement money must go
13 towards opioid remediation.
14     Do you see that?
15     A.  Uh-huh.
16     Q.  But then in the next paragraph, it says the
17 $2 million pool for Tarrant County doesn't come with
18 those restrictions.
19     Is it fair to say you don't have any direct
20 knowledge about this?
21     A.  That is correct.
22     Q.  In the second paragraph that says -- you know,
23 states that 85 percent of the settlement money must go
24 towards opioid remediation --
25     A.  Uh-huh.

1     Q.  -- would that be an example of one of the
2 restrictions that you were testifying about earlier that
3 would restrict the ability -- or Tarrant County's
4 ability on what it could spend the money on?
5     A.  Correct.
6     Q.  Okay.  Thank you.  That's all I've got with
7 that one.
8     A.  Until you ask a question, I am going to
9 continue to read.
10     Q.  Okay.  Yeah, you'll have some questions when
11 you get back to the office.  Okay.
12     A.  I am going to reprimand my husband for not
13 letting me hear about this bit of news that he heard.
14     Q.  He's reading about submarines too much?
15     A.  Yes.
16     Q.  So do you know what the Challenge of Tarrant
17 County is?
18     A.  That's a broad statement.  The Challenge of
19 Tarrant County?
20     Q.  Do you know what -- if I say the organization
21 Challenge of Tarrant County, do you know what I'm
22 referring to?
23     A.  I know what I perceive as our challenges, but
24 I don't know what you're referencing as the "Challenge."
25     Q.  I'm referring to a specific organization named

1 Challenge?
2     A.  Oh, Challenge.
3     Q.  Yeah.
4     A.  Oh.  Yes, I do know what Challenge is.
5     Q.  Can you describe what it is?
6     A.  So it is a nonprofit organization that assists
7 with the Family Drug Court and various other projects
8 and programs throughout the County.
9     Q.  Do you know where Challenge get its funding
10 from?
11     A.  They're grant funded, and the County pays them
12 also.  We have contracts with them.
13     Q.  Did you say it's a nonprofit?
14     A.  I believe so.
15     Q.  So is it similar to MHMR where it's not a sort
16 of direct department or entity within Tarrant County?
17     A.  No, it has no affiliation with Tarrant County.
18 We contract with them.
19     Q.  Do you know what portion of its budget is
20 currently made up of Tarrant County funds?
21     A.  No.
22     Q.  Is that something that your department looks
23 at every year?
24     A.  That would be -- no, we would not look to see
25 what percentage we funded them.

1     Q.  Do you know what -- was there any entity in
2 Tarrant County that would look at that, what money
3 Tarrant County is sending to Challenge?
4     A.  Okay.  So I am understanding your question to
5 be one way, and what you just said now is different from
6 what I was understanding your question to be.
7     Q.  Let me -- let me reask it.
8     So is it your understanding that part of
9 Challenge's budget comes from Tarrant County --
10     A.  Yes.
11     Q.  -- government?
12     Is your department tasked with, you know,
13 keeping track of what portion of funds go from Tarrant
14 County to Challenge?
15     A.  Yes.
16     Q.  Do you know where that would be covered?
17     A.  Under the special purpose budgets in various
18 -- various different funds.
19     Q.  Would it -- would it all be under special
20 purpose budgets?
21     A.  No, there would be one line under.  I think
22 they're also under public assistance.
23     Q.  And that's in the general fund --
24     A.  Yes.
25     Q.  -- that's covered in an annual budget --

41 (Pages 158 - 161)

Page 162

```
 1    A.  Uh-huh.
 2    Q.  -- that we've discussed today?
 3        Does Challenge -- do you know if Challenge of
 4  Tarrant County provides any program relating to
 5  substance abuse?
 6    A.  Yes.
 7    Q.  Do you know what sort of programs it provides?
 8    A.  The one that I am familiar with is the Family
 9  Drug Court.
10    Q.  Can you describe that a little bit?
11    A.  The last time I was there and -- was probably
12  15 years ago, but I do know that the -- there are
13  representatives, counselors, social workers -- I am not
14  sure which ones they are -- actually work with families
15  in the Family Court, Judge Riek's court exactly, for
16  those that have some type of issues with custody of
17  their children that are related to drug issues.
18    Q.  Similar to the other questions I've asked
19  today, is there any sort of delineation for those types
20  of services that would show what portion go to cases
21  involving opioid abuse specifically?
22    A.  Not what I do.
23    Q.  Does your department make a recommendation for
24  how much funding Tarrant County should provide in a
25  given year to Challenge?
```

Page 163

```
 1    A.  So they present to us their funding need, and
 2  they have in the past lost funding sources, and we have
 3  made up the difference within our County to maintain at
 4  least the minimum of what they've been doing.
 5    Q.  Do you know -- are you thinking of a specific
 6  year when that's happened?
 7    A.  2022.  I believe 2023 they got a portion of
 8  some of their funding that they lost back, but we had to
 9  increase our funding source for them.
10    Q.  Was 2022, was it due to a grant running out or
11  something --
12    A.  State.
13    Q.  -- like that?
14        State grant?
15    A.  Uh-huh.  I don't know about running out, but
16  they just did not budget them to the level they had
17  historically budgeted them.
18    Q.  Do you know the funding that Tarrant County
19  provides to Challenge?
20    A.  I don't know the dollar amount.
21    Q.  Do you know what the source of the funds is
22  that Tarrant County provides?  For example, do you take
23  grant money you receive and pass it through to
24  Challenge?
25    A.  No.  It is -- some of the -- in the special
```

Page 164

```
 1  purpose budgets, it's fees that are collected -- a
 2  consolidated fee that is collected by the County Clerk
 3  or the District Clerk for cases that is put into that
 4  fund.  In addition, some of it is general fund tax
 5  dollar money that we've had.  That was what we had to
 6  use because the funding source from the fees was not
 7  enough to supplement the additional money that were
 8  needed.
 9    Q.  When you say it comes from cases, fees
10  collected on cases from the County Clerk and --
11    A.  And District Clerk.
12    Q.  -- District Clerk, what cases do you mean?
13    A.  I would have to be looking --
14    Q.  Lawsuits?
15    A.  Excuse me?
16    Q.  Sorry.  Is it like lawsuits, like filing fees
17  associated with lawsuits that get filed or --
18    A.  No, it would be criminal charges --
19    Q.  Okay.
20    A.  -- on -- you're referencing civil lawsuits.  I
21  mean, it wouldn't be through that.  It would be through
22  criminal cases that -- there are various fees.  There is
23  a consolidated fee that the state allows to be collected
24  per case, and the state designates where it can go.
25  That ebbs and flows.  I mean, it's up and down.  So the
```

Page 165

```
 1  funding source was not enough to cover the loss of the
 2  state grant, so we had to implement with taxpayer
 3  dollars to cover the cost, the additional cost that was
 4  needed.
 5    Q.  Okay.
 6    A.  Revenue that was needed.
 7    Q.  Would the fees come from defendants, the ones
 8  that were --
 9    A.  Cases, yes, where the fees are, yes.
10    Q.  Okay.  Other than 2022, are you thinking of --
11  is there any other years you can think of that Tarrant
12  County has had to pick up the slack for grant money?
13    A.  Yes.  The contract with them increased -- was
14  required because of the dollar amount that we pay them.
15  And I don't know the exact dollar amount, but it's above
16  $200,000.  It could be much more than that.  But what
17  I'm referencing right now is a contract that we had to
18  go out for bid on by purchasing regulations; and when it
19  came back, what we had been paying, it was over $100,000
20  more than what we had paid -- the contract came back
21  $100,000 more than our previous cost, in addition to the
22  loss of revenue from the state.
23    Q.  Okay.
24        MR. FORD:  You know, I've got very few
25  questions left.  Could I just get five minutes to look
```

42 (Pages 162 - 165)

1 over my notes and make sure I'm not missing anything and
2 then wrap it up?
3         MS. ABSTON: So like 3:20, 3:15?
4         MR. FORD: That would be great.
5         MS. ABSTON: Yeah.
6         THE VIDEOGRAPHER: We're going off the
7 record at 3:08.
8         (Break from 3:08 p.m. to 3:32 p.m.)
9         THE VIDEOGRAPHER: We're back on the
10 record at 3:32 p.m.
11     Q.  (BY MR. FORD) So we've talked a little bit
12 about, you know, how your department handles requests
13 for budget items from various department. Can you think
14 of any time that a department asked for money for
15 something related to substance abuse in Tarrant County
16 that ultimately couldn't be provided to them?
17     A.  So I always ask a department -- yes. I
18 always ask a department to prioritize what they need,
19 and then we're looking at it prior to knowing what the
20 revenues are going to be. So at the very end when
21 revenues are -- we have the projected revenues, we have
22 the certified tax roll and we know what our revenues are
23 and it's something that we thought we could fund that we
24 couldn't, then we'll sit down at the table and try to
25 find out if we can figure out another funding source.

1     Q.  Can you think of any examples, particularly as
2 you sit here today, about, you know, requests from a
3 department for money related to a substance abuse issue
4 that ultimately couldn't be funded?
5     A.  So MHMR. The -- through the probate courts,
6 there was a request or there was a concern that MHMR was
7 losing a grant. And the grant was for an alternative --
8 what's it called? AOT, alternative outside treatment,
9 and it had been very successful in assisting various
10 patients, clients -- I don't know what they're called
11 when they're actually going to a court, but when they
12 were -- didn't need to be in court, they needed some
13 type of treatment help one on one, it's a very expensive
14 type of treatment. And so we put our heads together.
15 We worked around it. We talked to several different
16 departments. We talked to MHMR. And we finally found a
17 funding source for them, but that funding source will
18 only last until 2026, 2024 or 2026, and then we'll have
19 to figure out another funding source. It's one on one.
20 The social worker actually goes to the person's home,
21 assists them in learning how to reestablish themselves
22 in society, go to the grocery store, go to the doctor,
23 go to the doctors' appointments as needed, pharmacy,
24 whatever it is they need to do on a daily basis, that's
25 what the social worker is helping them to do.

1     Q.  And that's -- what you just said, is that sort
2 of a description of the AOT program?
3     A.  That is the AOT program, yes.
4     Q.  So -- just so I understand what you just
5 described, is that an example of a program that couldn't
6 be provided because the funding wasn't there or might
7 not be when this particular funding source runs out?
8     A.  That funding source ran out.
9     Q.  Okay.
10     A.  The probate judges were bringing it up during
11 a budget review meeting, asking how we could fund that,
12 what could we do, could they add it to their budget, was
13 there anything that we could do. We didn't have the
14 funding for that. That happened -- maybe this is the
15 second year it's been in. Maybe this is the second
16 year, yes. And we were able to identify outside grant
17 sources to cover that for a period of time. Those
18 funding sources will go away, and then we'll have to
19 figure out how to do it again.
20     Q.  Do you remember what the gap of time was where
21 the service wasn't being offered?
22     A.  I do not know when MHMR lost the grant.
23     Q.  So other than that example, can you think of
24 any others?
25     A.  Where I said no? The -- you know, there's a

1 lot of them, but the Family Courts, the Domestic
2 Relations Operation. So one of their components is they
3 have workers that go into -- social workers go into
4 the home to determine whether the child is -- you know,
5 what parent it should be with. They do home case
6 studies. And they repeatedly ask for personnel,
7 additional personnel because their client, their base
8 has grown. And we've just tried to work with ARPA funds
9 and temporaries to -- temporary positions to assist with
10 that.
11         In addition with DRO, Domestic Relations,
12 there's also supervised visitation for parents, and that
13 supervised visitation has increased dramatically. And
14 that request for positions has come up. We've been able
15 to offset that cost in the past with jury donations, but
16 jury donations, because it's being split in so many
17 different directions now, it's not enough to cover the
18 cost of all of the additional temporary people that come
19 in on Saturdays to do this supervised visitation. So
20 we've had to find funding elsewhere for that and not
21 within County funds. Either through -- just creative
22 funding sources so that we can get it done. And all of
23 that, while not solely related to any type of --
24 specifically to drug, it is part of it. That is
25 consistently the conversations that we have.

Page 170

1    Q.   Okay.  You just anticipated my follow-up.  The
2  program that you just described, does that have a
3  particular name, the Domestic Relations program you just
4  described?
5    A.   It's the -- the program is supervised
6  visitation.
7    Q.   Okay.
8    A.   I mean, it is a function of one of the
9  departments in DRO.  And, like I say, we've been
10 historically able to fund it through jury donations, but
11 not any -- there's not enough funding anymore for that.
12   Q.   Okay.  And I think you just touched on it, but
13 is it fair to say that it's not a requirement of that
14 program that there must be a substance abuse issue
15 present --
16   A.   No.
17   Q.   -- in the circumstance?
18       Okay, but it can involve substance abuse?
19   A.   It does involve substance abuse.  That's why
20 there's supervised visitation, because that has been the
21 discussion of why they can't go to that parent's home.
22   Q.   And consistent with some other testimony
23 you've provided today, would it be fair to say that when
24 you talk about substance abuse issues, there's no clear
25 delineation as to what substance abuse issue is present?

Page 171

1    A.   (Witness shakes head.)
2    Q.   Do you mind saying no verbally?
3    A.   Sorry.  No, there is no specific drug.
4    Q.   Okay.
5        MR. BOONE:  Let me ask the videographer,
6  if I could.  It looks like the image has turned a
7  different color.  Is that just lighting, or is there any
8  particular issue that we're seeing?
9        THE VIDEOGRAPHER:  You're right it's
10 lighting, and I was trying to change it and I think I
11 might have made matters worse.
12       THE WITNESS:  Do I look better?  Because
13 if I look better, let's leave it alone.
14       MR. BOONE:  You look marvelous.  I just
15 wanted to make sure the video --
16       THE VIDEOGRAPHER:  It looks better on my
17 end.  How about yours?
18       MR. BOONE:  It's -- it's good.  It's
19 good.  I just wanted to make sure there wasn't an issue
20 with the recording process, so I'm fine.
21       THE VIDEOGRAPHER:  Thank you.
22       MS. ABSTON:  Should we go off the record
23 to save Julie some typing?
24       MR. FORD:  Good call.
25       THE VIDEOGRAPHER:  Go ahead, Counsel,

Page 172

1  continue.
2        MS. ABSTON:  Okay.
3        MR. FORD:  No, can we go off the record?
4        MS. ABSTON:  For like five minutes?
5        MR. FORD:  Yeah.
6        MS. ABSTON:  Okay, cool.
7        MR. FORD:  Appreciate it.  Thank you very
8  much.
9        THE VIDEOGRAPHER:  We're going off the
10 record at 3:41.
11       (Break from 3:41 p.m. to 3:43 p.m.)
12       THE VIDEOGRAPHER:  We're back on the
13 record at 3:43 p.m.
14   Q.   (BY MR. FORD)  Okay.  Home stretch here.
15       Switching topics, do you want to see Tarrant
16 County win this lawsuit?
17       MS. ABSTON:  Objection to form.
18   A.   I want what's best.
19   Q.   (BY MR. FORD)  In your mind, what is best?
20   A.   Funding for projects and programs that assist
21 the citizens of Tarrant County.
22   Q.   Do you intend to testify at trial in this
23 case?
24   A.   I don't have any --
25       MS. ABSTON:  Objection to form.

Page 173

1    A.   I don't have any idea.
2    Q.   (BY MR. FORD)  Do you intend to -- well,
3  strike that.
4        Do you think winning this case will help the
5  Budget and Risk Management Department in any way?
6        MS. ABSTON:  Objection to form.
7    A.   Okay.  So Budget and Risk Management
8  receives -- there's nothing to benefit Budget and Risk
9  Management.  The benefit is for Tarrant County.
10   Q.   (BY MR. FORD)  If Tarrant County were to win
11 this lawsuit, would you expect that any funds from an
12 award in this case would flow directly to your
13 department?
14       MS. ABSTON:  Objection to form.
15   A.   To my department to fund my department, no.
16   Q.   (BY MR. FORD)  Do you know what diversion
17 means when I talk about it in the context of controlled
18 substances?
19   A.   Because immediately what came to mind is
20 diversion, diverting someone from some place to another.
21 So maybe not.
22   Q.   Do you know what it means if a prescription
23 opioid is diverted?
24       MS. ABSTON:  Objection to form.
25   A.   No.

44 (Pages 170 - 173)

1    Q.  (BY MR. FORD)  Are you aware of any Albertsons
2  pharmacist dispensing a prescription for an opioid
3  medication that the pharmacist knew would be diverted in
4  the black market?
5        MS. ABSTON:  Objection to form.
6    A.  No, but now I know what diversion means.
7    Q.  (BY MR. FORD)  So if I reask the question,
8  would your answer remain the same?
9        MS. ABSTON:  Objection to form.
10    A.  Yes.
11    Q.  (BY MR. FORD)  Are you aware of any Kroger
12  pharmacist dispensing a prescription for an opioid
13  medication the pharmacist knew would be diverted into
14  the black market?
15        MS. ABSTON:  Objection to form.
16    A.  No.
17    Q.  (BY MR. FORD)  Are you aware of any Albertsons
18  pharmacist dispensing a prescription for an opioid
19  medication that the pharmacist knew was not for a
20  legitimate medical purpose?
21        MS. ABSTON:  Objection, form.
22    A.  No.
23    Q.  (BY MR. FORD)  Same question for Kroger.  Are
24  you aware of any Kroger pharmacist dispensing a
25  prescription for an opioid medication that the

1  pharmacist knew was not for a legitimate medical
2  purpose?
3        MS. ABSTON:  Objection, form.
4    A.  No.
5    Q.  (BY MR. FORD)  Okay.  I got the budget docs.
6  I am going to show you a series of documents, starting
7  with this one, that I'm going to mark as Exhibit 11.
8        (Exhibit 11 marked.)
9        MR. FORD:  There you go.
10    Q.  (BY MR. FORD)  Okay.  I have passed you a
11  document marked Exhibit 11.  Do you recognize this
12  document at all?
13    A.  I do.
14    Q.  Can you tell me what it is?
15    A.  It is the -- this is the approved budget for
16  FY 2011.
17    Q.  And do you know if that's publicly available?
18    A.  I know that it has been put on the web.  I do
19  not know when IT determines that a document needs to be
20  pulled from the web due to space, due to us having too
21  many documents on our specific website.
22    Q.  If I told you that I pulled that from Tarrant
23  County's website today, would you have any reason to
24  doubt me?
25    A.  No.

1    Q.  Okay.  Thank you.  You can put that to the
2  side, please.
3        (Exhibit 12 marked.)
4    Q.  (BY MR. FORD)  I am going to pass you what's
5  been marked as Exhibit 12.  Do you recognize that
6  document?
7    A.  Uh-huh.
8    Q.  Can you tell me what it is?
9    A.  It's the FY 2012 approved budget.
10    Q.  And if I told you that I pulled that document
11  from Tarrant County's website today, would you have any
12  reason to doubt me?
13    A.  It would make perfect sense.
14    Q.  Okay.  Thank you.  You can put that to the
15  side.
16
17        MR. FORD:  Thank you.
18    Q.  (BY MR. FORD)  I am going to pass you what's
19  been marked Exhibit 13.
20        (Exhibit 13 marked.)
21    Q.  (BY MR. FORD)  Do you recognize that -- oh,
22  sorry.  Do you recognize that document?
23    A.  It is the 2013 approved budget.
24    Q.  And if I told you I pulled that from the
25  County's website today, would you have any reason to

1  doubt that?
2    A.  No, sir.
3    Q.  Okay.  Thank you.
4        I am going to pass you was it been marked as
5  Exhibit 14.
6        (Exhibit 14 marked.)
7    Q.  (BY MR. FORD)  Do you recognize that document?
8    A.  Yes, sir.
9    Q.  Can you tell me what the?
10    A.  It is the FY 2014 approved budget.
11    Q.  Okay.  And if I told you that I pulled that
12  from the Tarrant County website today, would you have
13  any reason to doubt that?
14    A.  No, sir.
15    Q.  Okay.  Thank you.  Okay.  We're getting there.
16        (Exhibit 15 marked.)
17    Q.  (BY MR. FORD)  I am going to pass you what's
18  been marked as Exhibit 15.
19        MS. ABSTON:  Thank you.
20    Q.  (BY MR. FORD)  Do you recognize that document?
21    A.  It is the FY 2015 approved budget.
22    Q.  Okay.  And do you know if that's publicly
23  available on Tarrant County's website?
24    A.  Yes, sir.
25    Q.  Thank you.

45 (Pages 174 - 177)

1    The second box.
2         (Exhibit 16 marked.)
3    Q.  (BY MR. FORD)  I'm going to pass you what's
4  been marked as Exhibit 16.
5         MS. ABSTON:  Thank you.
6    Q.  (BY MR. FORD)  Do you recognize that exhibit?
7    A.  Yes.
8    Q.  Can you me what it is, please?
9    A.  The FY '26 (sic) approved budget.
10   Q.  Did you say 2016 approved budget?
11   A.  Yes, 2016.
12   Q.  Sorry, I think I misheard you.
13      Is that -- do you know if that's available
14 online on Tarrant County's website?
15   A.  Yes, sir, I believe so.
16   Q.  Thank you.
17      (Exhibit 17 marked.)
18   Q.  (BY MR. FORD)  I am going to now pass you
19 what's been marked as Exhibit 17.
20   A.  Sorry.
21   Q.  Take your time.  Did you have something you
22 want to say about that?
23   A.  No, I just needed to look at front to back on
24 one of these because I had not.
25      Okay.  So if I said you had two different

1  documents in here --
2    Q.  Do you know what those two document would be?
3      And for the record we're referring to
4  Exhibit 16, correct?
5    A.  Yes, sir.  And it may be -- I would like to
6  take a moment to look.  Yes, you have two documents in
7  here.
8    Q.  Do you know what the two documents are?
9    A.  Yes.
10   Q.  Can you tell me what they are?
11   A.  Yes.  This document is -- the FY 2016
12 budget -- and it may be the same for the rest of them,
13 but I would like to know that.  This is what is the
14 official document that the Commissioners approve.  It's
15 called the hierarchy budget.  And it is not line item by
16 line item; it is group by group.  This is the detailed
17 supporting document which is just that, a supporting
18 document while it is presented to Commissioners Court.
19 This is the actual adoption.  This is just to support
20 this document.
21   Q.  Is the support document, is that sometimes
22 referred to as a rollup?
23   A.  It is the detailed budget.
24   Q.  The detailed budget.
25   A.  The rollup budget is the report that's in the

1  SAP software.
2    Q.  Okay.  Gotcha.  Okay.
3    A.  And it may have in some cases -- you handed
4  me -- somewhere in here is one of them, just a detailed
5  budget, but these are two separate documents.
6    Q.  Okay.
7         MR. BOONE:  Counsel, are there Bates
8  numbers at the bottom of those pages such that the
9  witness could identify page number to page number?
10        MR. FORD:  No, there are none.  We tried.
11        MS. ABSTON:  We can go --
12        MR. BOONE:  Okay.
13        MS. ABSTON:  Do we want to go off the
14 record and discuss where these came from or try to sort
15 it out?
16        MR. FORD:  I can answer Aaron, yeah,
17 clarify Aaron's point.
18      If you're all right with that, Aaron?
19        MR. BOONE:  Why don't we go off record?
20        MR. FORD:  All right.
21        THE VIDEOGRAPHER:  We're going off the
22 record at 3:56.
23        (Break from 3:56 p.m. to 4:14 p.m.)
24        THE VIDEOGRAPHER:  We're back on the
25 record at 4:14 p.m.

1         MS. ABSTON:  Okay.  Helen, I want you to
2  kind of walk us through what we just talked about off
3  the record.  Will you do that for us?
4         THE WITNESS:  Yes.
5         MS. ABSTON:  Okay.  Thank you.
6    A.  So starting with FY 2011, the document that I
7  have here is the detailed approved budget, and the
8  letter attached to it is for the hierarchy budget.  Yes.
9  So that's 2011, FY 2011.
10      Keep on?
11   Q.  (BY MR. FORD)  So do we want to mark the
12 letter right now?
13   A.  Okay.
14   Q.  Let's separate those and mark the letter.  So
15 for the detailed budget, is that the -- was the first
16 document you said?
17   A.  This is the detailed budget.
18   Q.  Let's keep that as Exhibit 11.
19   A.  Well, the letter is 11.
20   Q.  Okay.  All right.  Then we'll switch it.
21      So we've marked as Exhibit 11 the letter that
22 you just referred to.  And how did you refer to this
23 letter again?
24   A.  That is the hierarchy letter.
25   Q.  Hierarchy letter, okay.

46 (Pages 178 - 181)

1        So I'm going to mark as Exhibit 24 -- no, this
2  is -- I think we're going start --
3        MS. ABSTON:  Do you want to just start
4  whatever the next --
5        MR. FORD:  24.  Are we doing 24?
6        MS. ABSTON:  It's up to you, because we
7  kind of already marked these.
8        MR. FORD:  Yeah.
9        MS. ABSTON:  Do you want to start on 24
10 for the -- what is that?  We're talking about the
11 detailed budget.
12        THE WITNESS:  So I don't know what you're
13 meaning by starting with 24, but the last one we have is
14 17.
15        MS. ABSTON:  Yeah, you're fine.  We're
16 just talking exhibit numbers --
17        THE WITNESS:  Okay.
18        MS. ABSTON:  -- for just a second.
19        MR. FORD:  Let's just go in line because
20 it's screwed up already.
21        MS. ABSTON:  Yeah, that's okay.  Just
22 tell us whatever you want to mark it.
23        MR. FORD:  Okay.  So I am going to mark
24 as Exhibit 18 --
25        MS. ABSTON:  Okay.

1        MR. FORD:  -- what I believe you just
2  told me is --
3     Q.  (BY MR. FORD) Can you tell me what this
4  document is?
5     A.  This is the detail budget.  That's the
6  supporting document for the hierarchy budget which the
7  Commissioners Court approve.
8     Q.  And is that for fiscal year 2011?
9     A.  It is for fiscal year 2011.
10    Q.  And is that document available online?
11    A.  Yes, it is.
12    Q.  Okay.  Now going back to Exhibit 12.
13    A.  12.
14    Q.  Can you tell me what's in that, what that
15 document is?
16        MR. BOONE:  Could we go off the record?
17        MS. ABSTON:  Sure.
18        THE VIDEOGRAPHER:  We're going off the
19 record at 4:16.
20        (Break from 4:16 p.m. to 4:50 p.m.)
21        THE VIDEOGRAPHER:  We're back on the
22 record at 4:50 p.m.
23        MS. ABSTON:  I think that, Helen, while
24 we were on the break -- and then I'm going to hand it
25 over to you, Quinn -- we clarified some stuff that Helen

1  noticed about the exhibits.  And so I believe, Quinn,
2  correct me if I'm wrong, but we are going to disregard
3  what has previously been marked as Exhibits 11 through
4  Exhibit --
5        MR. FORD:  18?
6        MS. ABSTON:  -- 18.  Well, we will have a
7  new Exhibit 18, so.
8        MR. BOONE:  Right.
9        MS. ABSTON:  Yeah.  Okay.  So we're going
10 to walk through these.  Clearly, I think -- I'm going to
11 hand it over to Quinn, and then at the end we're going
12 to clarify the new markings of the exhibits.  Does that
13 sound good?
14        Okay.  Go ahead, Quinn.
15        MR. FORD:  This will be quick, hopefully.
16 Thank you.
17        (Exhibit 18 marked.)
18    Q.  (BY MR. FORD) Yeah, so Exhibits 11 through 17
19 are going to be disregarded.
20        So I believe the first exhibit you have in
21 front of you is Exhibit 18.  Is that correct?
22    A.  That's correct.
23    Q.  Do you know what that exhibit is?
24    A.  It is the letter for the FY 2011 hierarchy
25 budget.

1     Q.  And do you know if that document is publicly
2  available on Tarrant County's website?
3     A.  Yes.
4        (Exhibit 19 marked.)
5     Q.  (BY MR. FORD) Okay.  Now looking at
6  Exhibit 19, is that the exhibit you have in front of
7  you?
8     A.  Yes, sir.
9     Q.  Can you tell me what that document is?
10    A.  This is the FY 2011 detail approved budget.
11    Q.  Okay.  And is that document available publicly
12 online?
13    A.  Yes, it is.
14        (Exhibit 20 marked.)
15    Q.  (BY MR. FORD)  Do you have Exhibit No. 20 in
16 front of you now?
17    A.  Yes, I do.
18    Q.  Do you know what that document is?
19    A.  Yes, I do.
20    Q.  Can you tell me what it is?
21    A.  It is the FY 2012 detail approved budget.
22    Q.  Okay.  And do you know if that document is
23 publicly available on Tarrant County's website?
24    A.  Yes, it is.
25    Q.  Thank you.

Page 186

1          (Exhibit 21 marked.)
2     Q.   (BY MR. FORD)  Do you have Exhibit 21 in front
3  of you?
4     A.   Yes, I do.
5     Q.   Do you recognize that document?
6     A.   Yes, I do.
7     Q.   Can you tell me what it is, please?
8     A.   It is the FY 2012 approved budget, detailed
9  approved budget.
10    Q.   The FY 2012 approved budget?
11    A.   2013, excuse me.  2013, sorry.  I'm sorry.
12    Q.   So Exhibit 21 is FY 2013 detailed approved
13  budget.  Is that correct?
14    A.   Correct.
15    Q.   And that document is available on Tarrant
16  County's website publicly available.  Is that correct?
17    A.   That is correct.
18    Q.   Okay.  Thank you.
19          (Exhibit 22 marked.)
20    Q.   (BY MR. FORD)  Are you on Exhibit 22 now?  Is
21  that in front of you?
22    A.   Yes, it is.  Now there's an issue.  Yes, it is
23  in front of me.
24    Q.   Do you know what that document is?
25    A.   That is the letter for the hierarchy budget.

Page 187

1     Q.   Okay.  Do you know if that document is
2  publicly available --
3     A.   Yes, it is.
4     Q.   -- on Tarrant County's website?
5     A.   Yes, it is.
6     Q.   Okay.
7          (Exhibit 23 marked.)
8     Q.   (BY MR. FORD)  Can you go to Exhibit No. 23?
9  Have you seen that document before?
10    A.   Yes.
11    Q.   Can you tell me what it is?
12    A.   It is the FY 2014 hierarchy budget, approved
13  hierarchy budget.
14    Q.   Thank you.
15          And that's publicly available on Tarrant
16  County's website?
17    A.   Yes, it is.
18    Q.   Thank you.
19          (Exhibit 24 marked.)
20    Q.   (BY MR. FORD)  Exhibit No. 24, do you have
21  that in front of you?
22    A.   Yes, I do.
23    Q.   Do you recognize that document?
24    A.   Yes, I do.
25    Q.   Can you tell me what it is, please?

Page 188

1     A.   It is the FY 2014 detailed approved budget.
2     Q.   And do you know if that document is publicly
3  available on Tarrant County's website?
4     A.   Yes, it is.
5     Q.   Thank you.
6          (Exhibit 25 marked.)
7     Q.   (BY MR. FORD)  I believe Exhibit No. 25, is
8  that in front of you right now?
9     A.   Yes.
10    Q.   Do you recognize that document?
11    A.   Yes.
12    Q.   Can you tell me what that is, please?
13    A.   The FY '25 (sic) hierarchy approved budget
14  letter.
15    Q.   And is that letter --
16          MS. ABSTON:  Do you mean 2015?
17    A.   What did I say?  Yes, 2015.
18    Q.   (BY MR. FORD)  Okay.
19    A.   I saw FY 2015.
20          MS. ABSTON:  We've got a lot of numbers
21  going.
22    A.   Document 25 is FY 2015 approved hierarchy
23  letter.
24    Q.   (BY MR. FORD)  Okay.  And do you know if that
25  hierarchy letter is publicly available on Tarrant

Page 189

1  County's website?
2     A.   Yes, it is.
3     Q.   Okay.  Thank you.
4          (Exhibit 26 marked.)
5     Q.   (BY MR. FORD)  Exhibit 26, do you have that in
6  front of you?
7     A.   Yes, sir.
8     Q.   Do you recognize that document?
9     A.   Yes, sir.
10    Q.   Can you tell me what it is, please?
11    A.   It is the FY 2015 hierarchy approved budget.
12    Q.   Okay.  Do you know if that document is
13  publicly available on Tarrant County's website?
14    A.   Yes, it is.
15          (Exhibit 27 marked.)
16    Q.   (BY MR. FORD)  Do you have Exhibit 27 in front
17  of you?
18    A.   Yes, sir.
19    Q.   Do you recognize that document?
20    A.   Yes, sir.
21    Q.   Can you tell me what it is, please?
22    A.   It is the FY 2015 detailed approved budget.
23    Q.   Do you know if that document is publicly
24  available on Tarrant County's website?
25    A.   Yes, it is.

48 (Pages 186 - 189)

Page 190

1   Q.  Thank you.
2       (Exhibit 28 marked.)
3   Q.  (BY MR. FORD)  Do you have Exhibit 28 in front
4   of you?
5   A.  Yes.
6   Q.  Do you recognize that document?
7   A.  Yes.
8   Q.  Can you tell me what that document is?
9   A.  It is the FY 2016 approved hierarchy budget
10  letter.
11  Q.  Okay.  Is that document publicly available on
12  Tarrant County's website?
13  A.  Yes, it is.
14  Q.  Thank you.
15      (Exhibit 29 marked.)
16  Q.  (BY MR. FORD)  Do you have Exhibit 29 in front
17  of you?
18  A.  Yes, sir.
19  Q.  Do you recognize that document?
20  A.  Yes, sir.
21  Q.  Can you tell me what that is, please?
22  A.  It is the FY 2016 approved hierarchy budget.
23  Q.  Do you know if that document is publicly
24  available on Tarrant County's website?
25  A.  Yes, sir.

Page 191

1   Q.  Thank you.
2       (Exhibit 30 marked.)
3   Q.  (BY MR. FORD)  Do you have Exhibit 30 in front
4   of you?
5   A.  Yes, sir.
6   Q.  Do you recognize that document?
7   A.  Yes, sir.
8   Q.  Can you please tell me what it is?
9   A.  It is the FY 2016 detailed approved budget.
10  Q.  Do you know if that document is publicly
11  available on Tarrant County's website?
12  A.  Yes, it is.
13  Q.  Okay.  Thank you.
14      (Exhibit 31 marked.)
15  Q.  (BY MR. FORD)  Exhibit No. 31, do you have
16  that in front of you?
17  A.  Yes, sir.
18  Q.  Do you recognize that document?
19  A.  Yes, sir.
20  Q.  Can you tell me what it is, please?
21  A.  It is the FY 2017 approved hierarchy budget.
22  Q.  Do you know if that document is publicly
23  available on Tarrant County's website?
24  A.  Yes, sir.
25  Q.  Thank you.

Page 192

1       (Exhibit 32 marked.)
2   Q.  (BY MR. FORD)  Do you have Exhibit No. 32 in
3   front of you?
4   A.  Yes.  Yes, sir.
5   Q.  Do you recognize that document?
6   A.  Yes, sir.
7   Q.  Can you tell me what the, please?
8   A.  It is the FY 2017 detailed approved budget.
9   Q.  And is that document publicly available on
10  Tarrant County's website?
11  A.  Yes, it is.
12  Q.  Thank you.
13      (Exhibit 33 marked.)
14  Q.  (BY MR. FORD)  Do you have Exhibit No. 33 in
15  front of you?
16  A.  Yes, sir.
17  Q.  Do you recognize that document?
18  A.  Yes, sir.
19  Q.  Can you please tell me what it is?
20  A.  It is the FY 2018 hierarchy budget, approved
21  hierarchy budget.
22  Q.  And do you know if that document is publicly
23  available on Tarrant County's website?
24  A.  Yes, sir.
25  Q.  Okay.  Thank you.

Page 193

1       (Exhibit 34 marked.)
2   Q.  (BY MR. FORD)  Do you have Exhibit No. 34 in
3   front of you?
4   A.  Yes, sir.
5   Q.  Do you recognize that document?
6   A.  Yes, sir.
7   Q.  Can you tell me what it is, please?
8   A.  It is the FY 2018 detailed approved budget.
9   Q.  Do you know if that document is publicly
10  available on Tarrant County's website?
11  A.  Yes, it is.
12  Q.  Thank you.
13      (Exhibit 35 marked.)
14  Q.  (BY MR. FORD)  Last stack.
15  A.  Okay.
16  Q.  Do you have Exhibit No. 35 in front of you?
17  A.  Yes, sir.
18  Q.  Do you recognize that document?
19  A.  Yes, sir.  It is the FY 2019 hierarchy
20  approved budget.
21  Q.  Thank you.
22      Do you know if that document is publicly
23  available on Tarrant County's website?
24  A.  Yes, sir.
25      (Exhibit 36 marked.)

49 (Pages 190 - 193)

Page 194

1    Q.  (BY MR. FORD)  Do you have Exhibit No. 36 in
2  front of you?
3    A.  Yes, sir.
4    Q.  Do you recognize that document?
5    A.  Yes, sir.
6    Q.  Can you tell me what that is, please?
7    A.  It is the FY 2019 detailed approved budget.
8    Q.  And do you know if that document is publicly
9  available on Tarrant County's website?
10    A.  Yes, sir.
11    Q.  Thank you.
12        (Exhibit 37 marked.)
13    Q.  (BY MR. FORD)  Do you have Exhibit No. 37 in
14  front of you?
15    A.  Yes, sir.
16    Q.  Do you recognize that document?
17    A.  Yes, sir.
18    Q.  Can you tell me what it is, please?
19    A.  It is the FY 2020 approved hierarchy budget.
20    Q.  And do you know if that document is publicly
21  available on Tarrant County's website?
22    A.  Yes, sir.
23    Q.  Thank you.
24        (Exhibit 38 marked.)
25    Q.  (BY MR. FORD)  Do you have Exhibit No. 38 in

Page 195

1  front of you?
2    A.  Yes, sir.
3    Q.  Do you recognize that document?
4    A.  Yes, sir.
5    Q.  Can you please tell me what that is?
6    A.  It is the FY 2020 detail -- approved detail
7  budget.  2020, did I say 2020?  FY --
8    Q.  You did.
9    A.  -- 2020 approved detail budget.
10    Q.  Okay.  And is that document publicly available
11  on Tarrant County's website?
12    A.  Yes, it is.
13        (Exhibit 39 marked.)
14    Q.  (BY MR. FORD)  Do you have Exhibit No. 39 in
15  front of you?
16    A.  Yes, sir.
17    Q.  Do you recognize that document?
18    A.  Yes, sir.
19    Q.  Can you identify it for me?
20    A.  It's the FY 2021 hierarchy approved budget.
21    Q.  And do you know if that document is publicly
22  available on Tarrant County's website?
23    A.  Yes, sir.
24        (Exhibit 40 marked.)
25    Q.  (BY MR. FORD)  Do you have Exhibit No. 40 in

Page 196

1  front of you?
2    A.  Yes, sir.
3    Q.  Do you recognize that document?
4    A.  Yes, sir.
5    Q.  Can you tell me what it is, please?
6    A.  It is the FY 2021 approved detail budget.
7    Q.  And do you know if that document is publicly
8  available on Tarrant County's website?
9    A.  Yes, sir.
10    Q.  Thank you.
11        (Exhibit 41 marked.)
12    Q.  (BY MR. FORD)  Do you have document -- or do
13  you have Exhibit No. 41 in front of you?
14    A.  Yes, sir.
15    Q.  Can you please tell me -- or do you recognize
16  that document?
17    A.  Yes, sir.
18    Q.  Can you please tell me what it is?
19    A.  It is the FY '22 approved hierarchy budget.
20    Q.  And do you know if that document is publicly
21  available on Tarrant County's website?
22    A.  Yes, sir.
23        (Exhibit 42 marked.)
24    Q.  (BY MR. FORD)  Do you have document number --
25  sorry, do you have Exhibit No. 42 in front of you?

Page 197

1    A.  Yes, sir.
2    Q.  Do you recognize that document?
3    A.  Yes, sir.
4    Q.  Can you tell me what it is, please?
5    A.  It is the FY '22 approved detail budget.
6    Q.  And do you know if that document is publicly
7  available on Tarrant County's website?
8    A.  Yes, sir, it is.
9    Q.  Thank you.
10        (Exhibit 43 marked.)
11    Q.  (BY MR. FORD)  Do you have Exhibit No. 43 in
12  front of you?
13    A.  Yes, sir.
14    Q.  Do you recognize that document?
15    A.  Hold on.  Yes, sir.  Yes, sir.
16    Q.  Can you identify it for me, please?
17    A.  This is the letter from the County
18  Administrator for the proposed budget.
19    Q.  Proposed budget, okay.  And is that -- do you
20  know for what fiscal year it is?
21    A.  Oh, I'm sorry.  Yes, it is fiscal year 2023.
22    Q.  And is that document publicly available on
23  your website?
24    A.  Yes, sir.
25    Q.  Okay.

50 (Pages 194 - 197)

Page 198

1          (Exhibit 44 marked.)
2      Q.  (BY MR. FORD)  Do you have Exhibit No. 44 in
3  front of you?
4      A.  Yes, sir.
5      Q.  Do you recognize that document?
6      A.  Yes, sir.
7      Q.  Can you identify it for me, please?
8      A.  This is the FY 2023 approved hierarchy budget.
9      Q.  And is that document available on Tarrant
10  County's website?
11     A.  Yes, sir.
12     Q.  Thank you.
13          (Exhibit 45 marked.)
14     Q.  (BY MR. FORD)  And do you have Exhibit No. 45
15  in front of you?
16     A.  Yes, sir.
17     Q.  Do you recognize that document?
18     A.  Yes, sir.
19     Q.  Can you identify it for me, please?
20     A.  It is if FY 2023 approved detail budget.
21     Q.  And do you know if that document is available
22  on Tarrant County's website?
23     A.  Yes, sir.
24     Q.  Okay.  Thank you very much.
25          MS. ABSTON:  I just have one clarifying

Page 199

1  redirect or question to ask Ms. Helen, okay, and then
2  we'll wrap up unless, Aaron, do you have anything from
3  Kroger before --
4          MR. BOONE:  No, but I did want to confirm
5  my understanding as to Exhibit 22 and 23.
6          MS. ABSTON:  Okay.
7          MR. BOONE:  Exhibit 22, could you put
8  that in front of you.
9          MS. ABSTON:  I've got it on real-time.
10          MR. BOONE:  If you want to clarify it.  I
11  understand 22 is the letter for the approved hierarchy
12  budget.  And then -- well --
13          MS. ABSTON:  We can mark through it at
14  the end unless you want to go through them all now.  Do
15  you want to do that?
16          MR. BOONE:  For 21, was that the letter?
17  Was there a letter with that detailed budget or just the
18  detailed budget?
19          MS. ABSTON:  It was just the detail
20  budget.  The letter is included within in the detail
21  budget prior to 2014, I believe.
22          MR. BOONE:  That was my understanding.
23  Okay.
24          MS. ABSTON:  Perfect, yeah.
25          MR. BOONE:  And Exhibit 22 -- Exhibit 22

Page 200

1  is a stand-alone letter?
2          MS. ABSTON:  It is.  I believe we
3  discovered, all of us working together, that there was
4  a -- that there were letters that started being
5  separated that year, but we're -- I am happy to go off
6  the record and we can wrap it up and clarify, but I
7  believe that's the time when the letters started being
8  separated, or one of the letters.
9          MR. BOONE:  Okay.  You can --
10          MR. FORD:  Does that jibe with your
11  memory?
12          MR. BOONE:  I'm good.
13          THE WITNESS:  Yes.
14          MS. ABSTON:  Okay.  We can clarify it,
15  but can I ask one -- can I have her explain one thing
16  with the exhibits, and then we can -- or ask her a
17  follow-up question, and then we can, attorneys, walk
18  through the exhibits and let Ms. Helen go?  Does that
19  sound like a plan?
20          MR. FORD:  Absolutely.
21          MS. ABSTON:  Okay.
22          EXAMINATION
23  BY MS. ABSTON:
24     Q.  First off, thank you for your time.  We're
25  going to get you out of here, but I want to make sure

Page 201

1  it's clear on the record.
2      Will you tell me the difference between what
3  is the approved budget for Tarrant County and what is
4  the supporting detail, also known as the rollup budget
5  for Tarrant County?  What are the differences between
6  these two documents, Exhibit 44 and Exhibit 45?
7      A.  Exhibit 44 is the hierarchy, which is what is
8  submitted to Commissioners Court for official approval,
9  and it is by category.  It's by personnel, materials and
10  supplies, court costs, travel.  There's -- there is one
11  called other.  And this is the way the Commissioners
12  Court approves it, and this is what goes on file in the
13  County Clerk's record.
14      This Exhibit 45 is the detailed line item by
15  GL account number of every single line item and the
16  request for that expense associated with it or that
17  budget associated with it.
18          MS. ABSTON:  Okay.
19          MR. FORD:  I have -- if I could ask one
20  more question.
21          MS. ABSTON:  Yes.
22          MR. FORD:  We marked another exhibit, I
23  think it was 3 or 4.  You said it was slightly different
24  than the hierarchy budget, if we could just go back to
25  it and you could explain since you just explained these.

51 (Pages 198 - 201)

1 Do you have the marked exhibit in front of you?

2          MS. ABSTON:  They're going to be over

3 there.  We're going to need to grab Julie's copy.

4          FURTHER EXAMINATION

5 BY MR. FORD:

6     Q.  I'm showing you what's been marked as

7 Exhibit 3 earlier today.

8     A.  Uh-huh.

9     Q.  Can you explain again just for the record what

10 that document is?

11     A.  This is the GFOA budget award documentation.

12 It is not submitted to Commissioners Court in this

13 manner.  It is done after the budget is approved, and

14 then we put a narrative to the numbers and post it on

15 our website so that any constituent can pick this up and

16 have a better understanding of what the documentation --

17 what the numbers represent.

18     Q.  Does it contain all the information that's in

19 the hierarchy budget that's been marked as Exhibit 45 --

20 sorry, that's been marked as Exhibit 44?

21     A.  It contains -- yes, it contains all that data.

22     Q.  Okay.

23          MR. FORD:  Thank you.  That's all I

24 wanted to clarify.

25          THE WITNESS:  Okay.

1          MS. ABSTON:  Okay.  I don't think we have

2 any more questions.  And we can stay on the record and

3 clear up some exhibits, but I just want to thank

4 Ms. Helen Giese for her time today and her service to

5 the County in her many, many years.

6          MR. BOONE:  I'm sorry.

7          MS. ABSTON:  Do you have any?

8          MR. BOONE:  I do.  I'm sorry, just real

9 quick.

10          EXAMINATION

11 BY MR. BOONE:

12     Q.  If you would put Exhibit 44 in front of you

13 and Exhibit 45 in front of you.  Okay.  Exhibit 44, per

14 my notes, is the approved hierarchy budget for fiscal

15 year 2023.  Is that correct?

16     A.  Yes, sir.

17     Q.  Okay.  Exhibit 45, per my notes and your

18 testimony, is the approved detail budget for fiscal year

19 2023.  Is that correct?

20     A.  That is correct.

21     Q.  Okay.  Now I just wanted to confirm that when

22 you talk about Exhibit 45 being a detail budget, we use

23 the word "approved" to describe that detail budget

24 because that is the detail for the budget that was

25 approved by the commission, correct?

1          MS. ABSTON:  Objection to form.

2     You can answer.

3     Q.  (BY MR. BOONE)  The court.

4     A.  Yes.

5     Q.  Okay.  All right.  So --

6          MR. BOONE:  Okay.  That's all I have.

7 Thank you.

8          MS. ABSTON:  Okay.  I just want to thank

9 you again, Ms. Helen, for your time.  We really

10 appreciate it.  And that's all we have for today.  We're

11 going to stay on the record and clear up some exhibits,

12 but you're free to go.

13          MR. FORD:  I would also like to say thank

14 you so much for your time.  Thank you for your patience

15 with that last bit.  I really appreciate it.

16          THE WITNESS:  Absolutely.  Yes, sir.

17          MR. FORD:  And have fun with your

18 grandson.

19          THE WITNESS:  I am going to have fun with

20 him.

21          MS. ABSTON:  Okay.  We're going to get

22 back down -- so let's walk through the exhibits that

23 have been marked just to make sure that it's clear for

24 Julie and for the record.

25          MR. BOONE:  I'm going to share my screen.

1          MS. ABSTON:  That's great.  How about,

2 Aaron, why don't you just walk through them?  Why don't

3 you just read off your screen and what you have.

4          MR. BOONE:  Okay.

5          MS. ABSTON:  Just so we have a written

6 record of it that's clarified.

7          MR. BOONE:  Exhibit 18, fiscal year 2011

8 is a letter.  Is that correct?

9          MS. ABSTON:  Yes.

10          MR. BOONE:  Exhibit 19, fiscal year 2011,

11 is the approved detail budget.

12          MS. ABSTON:  I am going to get these out

13 of the box again.  Say that one more time, please.

14          MR. BOONE:  Exhibit 19.

15          MS. ABSTON:  Yes.

16          MR. BOONE:  2011.  It's the approved

17 detail budget?

18          MS. ABSTON:  Yes.

19          MR. BOONE:  Exhibit 20, fiscal year 2012,

20 that is the approved detail budget?

21          MS. ABSTON:  It just says approved

22 budget, but yes.  Whatever -- whatever Helen has

23 testified to, yes.

24          MR. BOONE:  Thank you.  Exhibit No. 21,

25 it's fiscal year 2013, and this would be approved detail

52 (Pages 202 - 205)

Page 206

1 budget?
2        MS. ABSTON:  Yes.
3        MR. BOONE:  Exhibit 22, fiscal year 2014,
4 it is a letter?
5        MS. ABSTON:  Yes.
6        MR. BOONE:  Exhibit 23, fiscal year 2014,
7 it is the approved detail budget?
8        MS. ABSTON:  It is the approved budget,
9 and Exhibit 24 is for the supporting detail for approved
10 rollup budget for fiscal year 2014.
11        MR. BOONE:  Thank you.  See, I have it
12 highlighted because that was a question I had.
13        MS. ABSTON:  Okay.
14        MR. BOONE:  So to repeat for clarity,
15 Exhibit 23, fiscal year 2014, it is -- well, is it
16 approved hierarchy budget --
17        MS. ABSTON:  Yes.
18        MR. BOONE:  -- or just approved budget?
19        MS. ABSTON:  She was -- Helen has
20 referred to the approved budget synonymous as hierarchy
21 budget, from what I understand, unless the record
22 reflects otherwise.
23        MR. BOONE:  That's my understanding as
24 well.  Thank you.
25        Exhibit 24, fiscal 2014, it is the approved

Page 207

1 detail for the budget?
2        MS. ABSTON:  Yeah, also known as
3 supporting detail or rollup budget; but, yes, it is
4 approved.
5        MR. BOONE:  Exhibit 25, fiscal year 2015,
6 approved -- well, it's the letter for the approved
7 budget?
8        MS. ABSTON:  Yes.
9        MR. BOONE:  Exhibit 26, fiscal year 2015,
10 it is the approved hierarchy budget?
11        MS. ABSTON:  Yes.
12        MR. BOONE:  Exhibit 27, fiscal year 2015,
13 it is the approved detail budget?
14        MS. ABSTON:  Yes.
15        MR. BOONE:  Exhibit 28, fiscal 2016, it
16 is the letter for the approved budget?
17        MS. ABSTON:  Yes.
18        MR. BOONE:  Exhibit 29, fiscal year 2016,
19 the approved hierarchy budget?
20        MS. ABSTON:  Yes.
21        MR. BOONE:  Exhibit 30, fiscal year 2016,
22 the approved detail budget?
23        MS. ABSTON:  Yes.
24        MR. BOONE:  Exhibit 15 -- sorry.
25 Exhibit 31, fiscal year 2017, approved hierarchy budget?

Page 208

1        MS. ABSTON:  Yes.
2        MR. BOONE:  Exhibit 31, fiscal year 2017,
3 approved hierarchy budget?
4        MS. ABSTON:  Hold on.  I'm sorry.  Say
5 that -- let's go back, I'm sorry.  Let's start with
6 Exhibit 30 one more time.
7        Exhibit 30 is 2016 supporting detail for
8 approved rollup budget.  So the detail budget for fiscal
9 year 2016, that's Exhibit 30.  That's what you have,
10 right?
11        MR. BOONE:  Correct.
12        MS. ABSTON:  Okay.  I'm sorry.  Go on.
13 Start with 31, if you don't mind.
14        MR. BOONE:  Exhibit 31, fiscal year 2017,
15 approved hierarchy budget?
16        MS. ABSTON:  Correct.
17        MR. BOONE:  Exhibit 32, fiscal year 2017,
18 the approved detail budget?
19        MS. ABSTON:  Yes.
20        MR. BOONE:  Exhibit 33, fiscal year 2018,
21 approved hierarchy budget?
22        MS. ABSTON:  Yes.
23        MR. BOONE:  Exhibit 34, fiscal year 2018,
24 approved detail budget?
25        MS. ABSTON:  Yes.

Page 209

1        MR. BOONE:  Exhibit 35, fiscal year 2019,
2 approved hierarchy budget?
3        MS. ABSTON:  Yes.
4        MR. BOONE:  Exhibit 36, fiscal year 2019,
5 approved detail budget?
6        MS. ABSTON:  Yes.
7        MR. BOONE:  Exhibit 37, fiscal year 2020,
8 approved hierarchy budget?
9        MS. ABSTON:  Yes.
10        MR. BOONE:  Exhibit 38, fiscal year 2020,
11 approved detail budget?
12        MS. ABSTON:  Yes.
13        MR. BOONE:  Exhibit 39, fiscal year 2021,
14 approved hierarchy budget?
15        MS. ABSTON:  Yes.
16        MR. BOONE:  Exhibit 40, fiscal year 2021,
17 approved detail budget?
18        MS. ABSTON:  Yes.
19        MR. BOONE:  Exhibit 41, fiscal year 2022,
20 approved hierarchy budget?
21        MS. ABSTON:  Yes.
22        MR. BOONE:  Exhibit 42, fiscal year 2022,
23 approved detail budget?
24        MS. ABSTON:  Yes.
25        MR. BOONE:  Okay.  Exhibit 43, fiscal

53 (Pages 206 - 209)

Page 210

1  year 2023, it is a letter?
2      MS. ABSTON:  Yes.
3      MR. BOONE:  Exhibit 44, fiscal year 2023,
4  the approved hierarchy budget?
5      MS. ABSTON:  Yes.
6      MR. BOONE:  Exhibit 45, fiscal year 2023,
7  the approved detail budget?
8      MS. ABSTON:  Yes.
9      Okay.  I think we've clarified the exhibits.
10  I want to make one statement on the record.
11      I've met both of you for the first time today,
12  but we continue to have problems with both Albertsons'
13  and Kroger's exhibits, either not being provided on time
14  where it's causing us to cancel depositions or exhibits
15  being provided to the witness that don't have a URL or
16  date.  We've been amenable thus far in about two weeks
17  of depositions.  We will not be going forward if this
18  continues to happen.  We will get the Special Master
19  involved.  We've been patient.  If this like happens
20  again, where we have combined exhibits and we have to
21  waste the witness' time, we will seek to have a
22  discussion about that.  Do I make myself clear?
23      MR. FORD:  On website exhibits, what kind
24  of form do you want?
25      MS. ABSTON:  So I need to be able to

Page 211

1  authenticate that it was pulled down from a website.
2  She authenticated the budgets.  I don't need a URL on
3  those or a date, but you -- half of them you did.  It's
4  not just a "you" issue.  This has happened before.  So I
5  need a date and a URL to be able to authenticate the
6  exhibit unless somebody lays proper authentication.
7  Otherwise, I'm going to object to the use of the
8  exhibits and have a standing objection.
9      MR. FORD:  Got it.
10      MS. ABSTON:  Okay?
11      Okay.  I think that's it from me unless y'all
12  have anything else to add.
13      MR. FORD:  No.
14      MS. ABSTON:  Okay.  Thank you.
15      THE VIDEOGRAPHER:  We're going off the
16  record at 5:16.
17      (Proceedings ended at 5:16 p.m.)
18
19
20
21
22
23
24
25

Page 212

1      REPORTER'S CERTIFICATE
2      The undersigned Certified Shorthand Reporter
3  licensed in the State of Texas does hereby certify:
4      I am authorized to administer oaths or
5  affirmations, and prior to being examined, the witness
6  was duly administered an oath by me.
7      I am not a relative or employee or attorney or
8  counsel of any of the parties, nor am I a relative or
9  employee of such attorney or counsel, nor am I
10  financially interested in the outcome of this action.
11      I am the deposition officer who
12  stenographically recorded the testimony in the foregoing
13  deposition, and the foregoing transcript is a true
14  record of the testimony given by the witness.
15      Before completion of the deposition, review of
16  the transcript [X] was [ ] was not requested.  If
17  requested, any changes made by the deponent (and
18  provided to the reporter) during the period allowed are
19  appended hereto.
20      In witness whereof, I have subscribed my name
21  this 10th day of July, 2023.
22
23      *Julie C. Brandt*
24      Julie C. Brandt, CSR, RMR, CRR
25      TX CSR No. 4018, Exp. 10/31/23

Page 213

1          Veritext Legal Solutions
            1100 Superior Ave
2              Suite 1820
            Cleveland, Ohio 44114
3          Phone: 216-523-1313
4
July 10, 2023
5
To: Alex Abston
6
Case Name: National Prescription Opiate Litigation - Track 9 (Tarrant
7  County) v.
8  Veritext Reference Number: 5971348
9  Witness:  Helen Giese      Deposition Date:  6/23/2023
10
Dear Sir/Madam:
11
12  Enclosed please find a deposition transcript.  Please have the witness
13  review the transcript and note any changes or corrections on the
14  included errata sheet, indicating the page, line number, change, and
15  the reason for the change.  Have the witness' signature notarized and
16  forward the completed page(s) back to us at the Production address
    shown
17
above, or email to production-midwest@veritext.com.
18
19  If the errata is not returned within thirty days of your receipt of
20  this letter, the reading and signing will be deemed waived.
21
Sincerely,
22
Production Department
23
24
25  NO NOTARY REQUIRED IN CA

54 (Pages 210 - 213)

Page 214

```
1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 5971348
3       CASE NAME: National Prescription Opiate Litigation - Track 9
    (Tarrant County) v.
        DATE OF DEPOSITION: 6/23/2023
4       WITNESS' NAME: Helen Giese
5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7       I have made no changes to the testimony
    as transcribed by the court reporter.
8
    _____
9   Date          Helen Giese
10      Sworn and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
            Statement; and
14      Their execution of this Statement is of
            their free act and deed.
15
        I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
18      _____
19      Notary Public

        _____
20      Commission Expiration Date
21
22
23
24
25
```

Page 216

```
1           ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2       ASSIGNMENT NO: 5971348
3   PAGE/LINE(S) /        CHANGE        /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____   _____
20  Date          Helen Giese
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23
        _____
        Notary Public
24
        _____
25      Commission Expiration Date
```

Page 215

```
1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 5971348
3       CASE NAME: National Prescription Opiate Litigation - Track 9
    (Tarrant County) v.
        DATE OF DEPOSITION: 6/23/2023
4       WITNESS' NAME: Helen Giese
5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7       I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9       I request that these changes be entered
    as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13
    _____   _____
    Date          Helen Giese
14
        Sworn and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18          in the appended Errata Sheet;
        They signed the foregoing Sworn
19          Statement; and
        Their execution of this Statement is of
20          their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of_____, 20____.
23
        _____
24      Notary Public

        _____
25      Commission Expiration Date
```

Veritext Legal Solutions