# EXHIBIT 38

Page 1

1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION
3    IN RE:  NATIONAL PRESCRIPTION   ) MDL No. 2804
     OPIATE LITIGATION               )
4                                    )
                                     )
5    THIS DOCUMENT RELATES TO:       )
     Track Nine: Tarrant County,     ) Case No.: 17-md-2804
6    Texas                           )
                                     )
7                                    )
     (Case No. 1: 18-op-45274-DAP)   ) Judge Dan Aaron Polster
8                                    )
     ----------------------------------------------------------
9
                  ORAL AND VIDEOTAPED DEPOSITION OF
10                     BILLY EARL WAYBOURN
                         JULY 6, 2023
11                 (REPORTED REMOTELY VIA ZOOM)
     ----------------------------------------------------------
12
13           ORAL AND VIDEOTAPED, VIA ZOOM VIDEOCONFERENCE,
14   DEPOSITION OF BILLY EARL WAYBOURN, produced as a witness
15   at the instance of the Defendants and duly sworn, was
16   taken in the above-styled and numbered cause on
17   Thursday, July 6, 2023, from 10:08 a.m. to 2:08 p.m.,
18   before Kari Behan, CSR, RPR, CRR, a Texas certified
19   machine shorthand reporter, with the witness
20   participating remotely, pursuant to the Federal Rules of
21   Civil Procedure and the provisions stated on the record
22   herein.
23
24
25   Job No. 5945991

Page 2

```
 1        A P P E A R A N C E S
 2
   FOR THE PLAINTIFF (REMOTELY):
 3
      ALEX ABSTON, ESQ.
 4       - and -
      SADIE TURNER, ESQ.
 5    LANIER LAW FIRM, P.C.
      10940 W. Sam Houston Parkway N.
 6    Suite 100
      Houston, Texas 77064
 7    (281) 748-7693
      alex.abston@lanierlawfirm.com
 8    sadie.turner@lanierlawfirm.com
 9
   FOR THE DEFENDANTS, THE KROGER CO., KROGER LIMITED
10 PARTNERSHIP I, KROGER LIMITED PARTNERSHIP II, KROGER
   TEXAS LP (REMOTELY):
11
      AARON BOONE, ESQ.
12       - and -
      ANTHONY "TONY" RYAN, ESQ.
13    BOWLES RICE LLP
      600 Quarrier Street
14    Charleston, West Virginia 25301
      (304) 347-1100
15    aboone@bowlesrice.com
      anthony.ryan@bowlesrice.com
16
17
   FOR THE DEFENDANT, ALBERTSONS (REMOTELY):
18
      ALLISON STEWART, ESQ.
19    GREENBERG TRAURIG, LLP
      2200 Ross Avenue
20    Suite 5200
      Dallas, Texas 75201
21    (214) 665-3641
      stewarta@gtlaw.com
22
23
24
25
```

Page 3

```
 1 APPEARANCES (CONTINUED):
 2 ALSO PRESENT:
 3    Mark Kratovil, Esq.
         Tarrant County District Attorney's Office
 4
 5 CONCIERGE:
 6    Bill Craddock
 7
   VIDEOGRAPHER:
 8
      Tommy Marsh
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1         - - -
       I N D E X
 2         - - -
   EXAMINATION OF BILLY EARL WAYBOURN       PAGE
 3
 4 BY MR. BOONE...............  8
 5 BY MS. STEWART.............115
 6 BY MR. BOONE...............117
 7 CHANGES AND SIGNATURE......121
 8 REPORTER'S CERTIFICATION...123
 9        * * *
10      E X H I B I T S
11 EXHIBITS      DESCRIPTION      PAGE
12 Exhibit 1  Notice of Remote Videotaped    12
             Deposition of Bill Waybourn
13
   Exhibit 2  North Texas HIDTA 2013      48
14           Strategy, June 2012,
             Texoma_HIDTA_0784 to 0804,
15           Highly Confidential -
             Attorneys' Eyes Only
16
   Exhibit 3  North Texas HIDTA 2014      54
17           Strategy, June 2013,
             Texoma_HIDTA_0857 through
18           0875, Highly Confidential -
             Attorneys' Eyes Only
19
   Exhibit 4  Texoma HIDTA 2016 Strategy,    56
20           Texoma_HIDTA_0152 through
             0163, Confidential - Subject
21           to Protective Order
22 Exhibit 5  Texoma HIDTA Threat      59
             Assessment, June 2017,
23           Texoma_HIDTA_0254 through
             0305, Confidential - Subject
24           to Protective Order
25
```

Page 5

```
 1 EXHIBITS (CONTINUED):
 2 Exhibit 6  Texoma HIDTA Threat      64
             Assessment, June 2018,
 3           Texoma_HIDTA_0347 through
             0386, Confidential - Subject
 4           to Protective Order
 5 Exhibit 7  E-mail thread, Subject: FW:    66
             RE: Opiate Overdose Data,
 6           TARRANT_00706329 through
             00706330, Confidential
 7
   Exhibit 8  April 2018 Patrol Standard    68
 8           Operating Procedures,
             TARRANT_00700397 through
 9           00700399, Confidential
10 Exhibit 9  E-mail thread, Subject: Re:    72
             National Pharmaceutical Take
11           Back, TARRANT_00684075 through
             006840798, Confidential
12
   Exhibit 10  2018 NTXCIU Press Release,    75
13            TARRANT_00891662, Confidential
14 Exhibit 11  E-mail from Mike Simons,     82
              TARRANT_00861977
15
   Exhibit 12  E-mail thread, Subject: FW:    85
16            Overdose Initiatives,
              TARRANT_00683582 through
17            00683584, Confidential
18 Exhibit 13  E-mail, Subject: For POTUS    89
              briefing, TARRANT_00697990,
19            Confidential
20 Exhibit 14  E-mail thread, Subject: RE:    93
              Requested Statistics FY2021,
21            TARRANT_00698218 and 00698219,
              Confidential
22
   Exhibit 15  E-mail thread, Subject: FW:    96
23            Stats, TARRANT_00684432
              through 00684434, Confidential
24
25
```

2 (Pages 2 - 5)

Page 6

1 EXHIBITS (CONTINUED):
2 Exhibit 16  APALD Flier, TARRANT_00827551      99
            through 00827553, Confidential
3
  Exhibit 17  E-mail, Subject: BJA Grant      101
4            Award Notice: 2021 Justice and
            Mental Health Collaboration
5            Program Grant to MHMRTC
            (County MOU), TARRANT_00034009
6            and 00034010, Confidential
7 Exhibit 18  Press Release, Re: Fentanyl,     107
            Cocaine and Guns out of
8            criminal hands, dated February
            25, 2022, TARRANT_00855917 and
9            00855918, Confidential
10 Exhibit 19  2019 TCSD Annual Report,        109
            TARRANT_00885303 through
11           00885320, Confidential
12 Exhibit 20  Fiscal Year 2019 Budget        112
            Request, TARRANT_00511670
13           through 00511809, Confidential
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          PROCEEDINGS:
2      (Thursday, July 6, 2023, at 10:08 a.m.)
3      THE VIDEOGRAPHER:  Good morning, everyone.
4 We're going on the record at 10:08 a.m. on July 6, 2023.
5 This is the video-recorded deposition of Sheriff
6 Bill Waybourn in the matter of the National Prescription
7 Opiate Litigation.
8      This deposition is being held via Zoom.  My
9 name is Tommy Marsh representing Veritext; I'm the
10 videographer.  The court reporter is Mrs. Kari Behan,
11 also representing Veritext.  I believe notices have
12 already been -- or appearance of notices have already
13 been made.
14      So, Mrs. Behan, will you swear in the
15 witness, please.
16      THE COURT REPORTER:  Yes.
17      Mr. Waybourn, would you please raise your
18 right hand.
19      THE WITNESS:  (Complied.)
20      THE COURT REPORTER:  Do you solemnly swear
21 the testimony you're about to give will be the truth,
22 the whole truth, and nothing but the truth, so help you
23 God?
24      THE WITNESS:  I do.
25          BILLY EARL WAYBOURN,

Page 8

1 after having been first duly sworn by the
2 above-mentioned Certified Court Reporter, was examined
3 and testified as follows:
4      THE COURT REPORTER:  Thank you.  We may
5 proceed.
6          EXAMINATION
7 BY MR. BOONE:
8    Q.  Good morning, sir.  Would you state your full
9 name for the record, please?
10   A.  Billy Earl Waybourn.
11   Q.  And, sir, my name is Aaron Boone.  I'm an
12 attorney with The Kroger Company.  We are a defendant in
13 a lawsuit that's been filed by Tarrant County.
14      Have you ever appeared for a deposition
15 before?
16   A.  I do not recall having to do this.  If I did
17 it, it was a long, long time ago.
18   Q.  Okay.  So we, of course, are sitting for a
19 deposition.  There is a court reporter that is taking
20 everything that you and I and counsel say today on a
21 record, and you have, of course, been sworn to tell the
22 truth.
23      The court reporter would really appreciate
24 it that we obey a few rules just so that we can ensure
25 we get an accurate transcript.  One of those things that

Page 9

1 she would like for us to do is to not talk over one
2 another.  This means I need to make sure you can get
3 your answer out fully before I ask the next question and
4 that you do your best to make sure I can get my question
5 out fully before you begin answering your question.
6      Are you okay with that?
7    A.  I'm great.
8    Q.  All right.  She would also appreciate that we
9 say "yes" and "no," as opposed to "uh-huhs" and "uh-uhs"
10 or -- or shakes of the head, because, again, that helps
11 capture a more accurate record.
12      Are you okay with that?
13   A.  Very good with that.
14   Q.  So we, of course, are appearing remotely.
15 We're using Zoom technology which allows me to speak
16 with you today.  I'm here in West Virginia, and you're,
17 of course, in Texas; is that correct?
18   A.  That is correct.
19   Q.  All right.  So sometimes we're at the mercy of
20 technology.  So if there ever comes a point, sir, where
21 you can't hear me or maybe you can't see me and that's
22 affecting your ability to -- answer the question,
23 please let me or your counsel know, and we will stop and
24 do what we can to fix the technology issue.
25      Is that fair?

3 (Pages 6 - 9)

Page 10

1  A.  Very fair.
2  Q.  All right.  If at any time you need to take a
3  break, whether it's to stretch your legs or use the
4  restroom or grab a bite to eat, please let me know, and
5  we'll take a break.  My only request is that we complete
6  any pending question before we take that break.
7      Is that fair?
8  A.  That's very fair.
9  Q.  All right.  And I understand that you're seated
10 today with an attorney next to you; is that correct?
11 A.  That's correct.
12 Q.  All right.  Now, at times, she may object or --
13 or place an objection on the record to a question that
14 I've -- that I've asked you.  Let her do that.  But --
15 but, certainly, once she has made her objection, unless
16 she specifically instructs you not to answer, you'll --
17 you'll be permitted to go forth and give the answer to
18 my question.  Okay?
19 A.  Okay.
20 Q.  All right.  So how did you prepare for today's
21 deposition?
22 A.  I met with the attorneys on-site today, and
23 there were a couple other attorneys from -- from that
24 organization.
25 Q.  Okay.  Now, I don't need to know the content of

Page 11

1  your discussions.  But just generally, how many times do
2  you think you met?
3  A.  I believe I recall that we had met a total of
4  three times.
5  Q.  Okay.  And is that in -- three times in recent
6  days or weeks or three times in the last few years?
7  A.  It was twice in the last week or so and then
8  once several -- I believe it was several months ago.
9  Q.  Did you review any documents or materials to
10 prepare for this deposition?
11 A.  No, sir.
12 Q.  Okay.  Now, do you understand that in this
13 lawsuit Tarrant County has sued pharmacies Kroger, as
14 well as Albertsons, alleging that we did certain things
15 with our pharmacies that may have contributed to an
16 opioid crises in your county?  Are you generally aware
17 that that's the nature of the lawsuit?
18 A.  Generally aware, yes, sir.
19 Q.  Okay.  I want to introduce what's been
20 previously marked as Exhibit No. 1, and that is,
21 essentially, the notice of deposition.
22     Sheriff, there are some documents that I
23 provided in hard copies to you and your counsel before
24 today.  They -- those documents have been sealed in
25 envelopes, and so when I identify an exhibit number --

Page 12

1  A.  (Indicating)?
2  Q.  Yes.
3      -- you can open up that folder, and we'll
4  take a look at that.
5      (Off-record discussion.)
6      (Exhibit 1 was marked for identification.)
7      MR. BOONE:  Okay.  The concierge can go
8  ahead and publish this.  This will be Exhibit 1.
9      CONCIERGE:  Hey, Counsel, it looks like
10 it's already in the folder.
11     MR. BOONE:  Okay, great.  Thank you.  So --
12     MS. ABSTON:  Never mind.  I was going to
13 say:  We haven't seen it on our screen yet, but it just
14 came up.
15     MR. BOONE:  Yep, yep.
16 BY MR. BOONE:
17 Q.  So what I'm doing is I'm showing you a version
18 of Exhibit 1 that's on my screen.  It's preset on my
19 screen, so I can be more efficient when going through
20 these exhibits.
21     But, again, Sheriff, this is -- what I've
22 marked as Exhibit No. 1 is entitled "Notice of Remote
23 Videotaped Deposition of Bill Waybourn."
24     And you, sir, are Sheriff Bill Waybourn,
25 correct?

Page 13

1  A.  Correct.  Yes.
2  Q.  All right.  And this indicates that:  The oral
3  videotaped deposition of Bill Waybourn, you, will occur
4  on July 6, 2023, beginning at 10:00 a.m. Central Time.
5      So I would just ask that this -- do you
6  recall seeing this notice by any chance, sir?
7  A.  I did not see it.  I was briefed that it was
8  here, but I didn't -- I did not see it.
9  Q.  Okay.  All right.  So you could put that away
10 now.
11     Sheriff, if I may, I'd like to talk a
12 little bit about you and your career.  First off, where
13 do you live?
14 A.  I live in Tarrant County in the southeast
15 portion of the county in a suburb called Dalworthington
16 Gardens.
17 Q.  I'm sorry.  Where is that?
18 A.  Dalworthington Gardens.
19 Q.  Uh-huh.
20     How long have you lived in Tarrant County?
21 A.  Since 1976.
22 Q.  Nice.
23     And, sir, did you graduate from college?
24 A.  I did.
25 Q.  Where did you graduate from?

4 (Pages 10 - 13)

Page 14

1     A. Dallas Baptist University.
2     Q. Approximately when?
3     A. 1991.
4     Q. Did you obtain a degree there?
5     A. Criminal justice degree, yes, sir.
6     Q. After obtaining your degree from that college,
7  did you obtain any other degrees?
8     A. I did from Trinity Seminary College out of
9  Indiana --
10    Q. Yes.
11    A. -- a master's degree there.
12    Q. Did you ever spend time in ministry?
13    A. Well, lay ministry, I did, in fact, and still
14  do.
15    Q. Great.
16         Is there a particular congregation that you
17  serve?
18    A. I'm sorry?
19    Q. Is there a church or a congregation that you
20  serve now?
21    A. I do not serve. I'm not on any board currently
22  with any churches, but we're involved in fatherless
23  campaigns and orphan campaigns.
24         THE COURT REPORTER: I'm sorry. I'm having
25  a -- I'm having a problem hearing the witness.

Page 15

1         THE WITNESS: I said we've been involved in
2  church-related activities, as far as the fatherless and
3  for orphans and advocates for adoption.
4         THE COURT REPORTER: Okay. Yeah, I had to
5  stop typing because I'm really straining to hear him, so
6  whoever's getting the realtime -- I don't know if we can
7  possibly move him closer.
8         MS. ABSTON: Yeah. Let's go off the record
9  for just a minute, and we can get that figured out.
10  Does that sound okay?
11        THE VIDEOGRAPHER: Absolutely. Time is 18
12  a.m. We are -- sorry -- 10:18 a.m. We are off the
13  record.
14        (Off-record discussion.)
15        THE VIDEOGRAPHER: Time is 10:20 a.m. We
16  are on the record.
17        MR. BOONE: Are we back on? I'm sorry.
18        THE VIDEOGRAPHER: Yes, sir, Mr. Boone, we
19  are on.
20        MR. BOONE: Thank you.
21  BY MR. BOONE:
22    Q. Sir, after -- before the break, we were talking
23  about some of your work with the church, and I was
24  curious if you've ever done any work in -- outside of
25  your role as sheriff or in law enforcement, ever done

Page 16

1  any work with substance abuse or treatment of
2  individuals dealing with substance abuse?
3     A. No, sir, I have not done that.
4     Q. Okay. So I'd like to talk about your career.
5         First, I understand you may have served our
6  country in the military?
7     A. That is correct, U.S. Air Force.
8     Q. Can you tell me about that?
9     A. I was active duty in the United States Air
10  Force from 1978 to 1982, and then I re- -- went to the
11  Air Force Reserves from '91 to '97.
12    Q. Okay. And at some point, you went into law
13  enforcement, correct?
14    A. I did. I did that when I was on active duty in
15  1980.
16    Q. All right. What was your first job in law
17  enforcement?
18    A. I was a reserve officer at Pantego Police
19  Department here in Tarrant County.
20    Q. Is that right?
21    A. Yes, sir.
22    Q. And how long did you server in that role?
23    A. I stayed with Pantego until the following
24  spring of '81 and joined the Dalworthington Gardens
25  Police Department at that point.

Page 17

1     Q. Okay. And I -- I didn't quite hear that last
2  police department. Would you say that again?
3     A. Dalworthington Gardens Police Department in the
4  spring of '81.
5     Q. Okay. And that's in Tarrant County, correct?
6     A. Yes, sir.
7     Q. And how long did you serve with the
8  Dalworthington Spring [sic] department?
9     A. I served there until I retired in September of
10  2015.
11    Q. Okay. So nearly 35 years with that department?
12    A. Yes, sir.
13    Q. Okay. And what are some of the roles that you
14  served in that department?
15    A. I promoted up through the ranks and made
16  lieutenant in '83. And in 1984, the City Council, in
17  the summer of '84, they appointed me chief of police.
18  And then, in 1988, I was appointed chief of public
19  safety, which meant that I directed the fire, the
20  police, emergency medical services, jail dispatch, and
21  emergency management.
22    Q. I see.
23         And did you serve as that role of chief of
24  public safety from 1988 until you retired?
25    A. I did.

5 (Pages 14 - 17)

Page 18

1    Q.  Okay.  So in that role you were in charge not
2  only of the police department, but also, you said, the
3  fire and EMT?
4    A.  Yes, sir.
5    Q.  Okay.  Approximately how many individuals did
6  you have under your supervision when you were serving as
7  chief?
8    A.  At its peak we probably had 55 people.
9    Q.  And forgive me for not being very familiar with
10  that -- that city.
11        But approximately how many citizens are in
12  the Dalworthington Spring area?
13    A.  There's a -- it's -- it's a metropol- --
14  metropolitan suburb of about 3,000.
15    Q.  Okay.  We, of course, are here for a case
16  that's touching on substance abuse, specifically opioid
17  use/opioid misuse, and I'm curious if, in your role as
18  Chief, you've encountered that particular issue as Chief
19  of Dalworthington Springs [sic]?
20    A.  Absolutely.
21        It's Dalworthington Gardens, by the way.
22    Q.  Thank you for the correction.  Okay.
23        So tell me how you encountered that issue
24  when you were with that department.
25    A.  Well, it was -- it was a daily activity where

Page 19

1  officers would arrest people for possession of
2  controlled substance or pharmaceuticals that didn't
3  belong to them.  We often ran EMS calls where people had
4  overdosed or had used too much.  Those things were
5  pretty routine, if you will.
6    Q.  Okay.  And what substances were you -- what
7  illicit substances were you encountering or your workers
8  encountering when they would run those calls?
9    A.  The illicit substance would be probably
10  methamphetamine, which is cocaine, heroin.
11        But we saw everything from acid to
12  marijuana to the generic stuff, the K2 stuff.  We saw
13  all of the -- the whole range of those.
14    Q.  Okay.  And did you notice any trends with
15  respect to the types of substances that you were seeing
16  with that -- with that city?
17    A.  Yeah.  Generally, we did see trends of -- you
18  know, in the early days of methamphetamines, of course.
19  We saw trends of different pills that were popular with
20  the youth or -- or a group from different -- different
21  things like that.  Marijuana was always in the
22  background doing something.  It was, you know, certainly
23  one of the gateways.
24    Q.  Okay.  Now, while you were with Dalworthington,
25  I'm curious if you ever had to investigate any

Page 20

1  pharmacies, such as the retail chain pharmacies like
2  Kroger?
3    A.  We did not investigate them at Dalworthington
4  Gardens.  If we ran across something to that effect, we
5  would always hand that off to our federal partners.
6    Q.  Okay.  Now, you currently serve as the sheriff
7  of Tarrant County; is that correct?
8    A.  Yes.
9    Q.  And my understanding is you took office around
10  2017?
11    A.  January of '17, yes, sir.
12    Q.  Excellent.
13        And how long was -- how long is your term
14  as sheriff?
15    A.  Every four years.
16    Q.  So you have been re-elected once?
17    A.  That is correct.  Yes, sir.
18    Q.  Okay.  And approximately how many employees do
19  you have with the Tarrant County Sheriff's Department?
20    A.  We have 1,700 positions or thereabouts.
21    Q.  Can you -- I know this is a -- a loaded
22  question.  But what are some of the duties of the
23  sheriff department?
24    A.  Well, we have several -- several bureaus --
25    Q.  Yes.

Page 21

1    A.  -- and the substance abuse bureau is going to
2  be our detention bureau, and that's our county jail
3  where we have 5,000 beds with an average daily
4  population of about 4,300.
5        And then we have responsibility for
6  judicial.  And a lot of that is admin, but it's
7  protection of the court, so the court buildings and so
8  forth and so on.
9        And then we get into patrol.  We have
10  regular patrol.  We patrol about 77,000 citizens in the
11  unincorporated area.  And we have a active, robust
12  criminal investigations team.  Then we have a fugitive
13  team that searches out people that hadn't shown up for
14  court and so on and so forth.  Then we have auto-theft
15  task force; we have human-trafficking task force; and we
16  have a narcotics task force; and we also have a
17  game-room task force.
18    Q.  Now, are there other law enforcement units that
19  serve the citizens of Tarrant County, such as a city
20  police department?
21        MS. ABSTON:  Objection, form.
22        You can answer.
23        THE WITNESS:  Yes, sir.
24  BY MR. BOONE:
25    Q.  Okay.  Tell me about those other departments.

6 (Pages 18 - 21)

Page 22

1    A.  There are 41 municipalities in Tarrant County;
2  39 of them have police agencies.  Some of the larger
3  ones are Fort Worth, Arlington.
4    Q.  And is there collaboration among these
5  different departments?
6    A.  Yes, sir.
7    Q.  How so?
8    A.  Well, we have -- we're -- we have -- for
9  instance, our auto-theft task force, our
10  human-trafficking task force, all those task forces have
11  embedded officers from other agencies in them.
12    Q.  Okay.  Do --
13    A.  And --
14    Q.  Are there regular -- no, this is helpful.
15        Are there regular meetings with the
16  leadership of these different agencies?
17    A.  Yes, there -- there are quarterly meetings that
18  we meet on and -- a couple of different quarterly
19  meetings.
20    Q.  Okay.  Now, these other departments, do they
21  have the type of responsibility that the sheriff
22  department has with respects to -- with respect to the
23  jail facilities?
24        MS. ABSTON:  Objection, form.
25        You can answer.

Page 23

1        THE WITNESS:  Not exactly.  They have
2  municipal jails, but they're only holding facilities.
3  Once there's determination of probable cause, the
4  prisoner belongs to the sheriff.
5  BY MR. BOONE:
6    Q.  Okay.  So the sheriff department, among the --
7  let's -- well, let me start over again.
8        In -- in thinking about these different
9  police agencies, the sheriff of Tarrant County certainly
10  has the greatest responsibility for the holding of
11  prisoners?
12    A.  Yes, sir.
13    Q.  All right.  Approximately how much of your
14  police force budget is dedicated to dealing with jail
15  and custody of prisoners?
16    A.  Approximately, probably -- my best guess would
17  be around 65 percent.
18    Q.  Thank you.
19        I'm curious if you have any insight into
20  the budget process.  When I say "budget process," it's
21  the process by which the sheriff department would
22  attempt to get funds for the next fiscal year.
23    A.  I do.
24    Q.  Tell me about that process.
25    A.  What we do per annum -- and we're in the middle

Page 24

1  of that process -- is that our bureau chiefs, they come
2  up with what their needs are as far as equipment and
3  people, and then it's submitted to me, and then I decide
4  if it fits inside the vision, and I either cut it or --
5  or submit it to our budget office downtown who
6  recommends either against it or for it.  And then the
7  final say is the Tarrant County Commissioners Court.
8    Q.  Gotcha.
9        And that's the budget and risk management
10  department or office?
11    A.  Yes, sir.  They -- they are both there
12  together.
13    Q.  Okay.  All right.
14        And so the monies that you seek you present
15  to the budget risk management office; is that fair?
16    A.  Yes, sir.
17    Q.  Okay.  Can you tell me what CNET is?
18    A.  That is our narcotics unit, and that's county
19  narcotics unit.  Forgive me.  I can't remember what all
20  those acronyms mean, but it's our -- it's our narcotics
21  team.
22    Q.  Is it the Combined Narcotics Enforcement Unit?
23    A.  There you go, yes, sir.  That's it.
24    Q.  All right.  Okay.
25        And is that unit comprised entirely of

Page 25

1  members of your sheriff's department, or are there other
2  agencies that fill that department -- fill that unit?
3    A.  Currently, there -- it is us and other
4  agencies.  Yes, sir, there's other agencies.
5    Q.  What other agencies, if you know?
6    A.  Mansfield.  The two that I know is, Mansfield's
7  got a -- got a troop in it, and there's another --
8  Sampson Park has a -- has a officer assigned to them.
9  That's the two that I remember.  There might be a couple
10  more, but I can't remember.
11    Q.  Gotcha.  Okay.
12        Let me -- let me back up just a little bit
13  before we get into CNET.  I -- I -- I want to make sure
14  you've had an opportunity to discuss, kind of, your
15  training that's gone into -- to making you the law
16  enforcement leader that you are today.
17        Did you go through any training, let's say,
18  with the FBI?
19    A.  I'm a graduate of the FBI National Academy,
20  yes, sir.
21    Q.  Can you tell me what that is?
22    A.  That is a ten-week program in Quantico that the
23  FBI teaches to police executives and junior executives
24  all over the country and all over the world, actually --
25    Q.  Okay.

Page 26

1    A. -- is who's there, and it's a broad range of --
2 of courses that are taken.
3    Q. Okay.  Do those courses include training with
4 narcotics?
5    A. There are courses available for that.
6    Q. Do you recall taking courses on narcotics?
7    A. I did not take any courses on narcotics when I
8 was there.
9    Q. Okay.  Is there a particular reason why you
10 didn't?
11    A. When I went through in the early 2000s, it was
12 -- terrorism was the hot button.
13    Q. Which one -- I'm sorry.
14        What was that?
15    A. Terrorism --
16    Q. Terrorism.
17    A. -- was the hot button, and that's where the --
18 most of the courses lie.
19    Q. I -- I see.
20        Was there a particular concern in the
21 Tarrant County region that led you to focus on terrorism
22 in those course choices?
23    A. Well, we felt like that certainly the DFW area
24 was a -- was a high target, a high- -- high-value target
25 to our enemies at that time, as well as domestic

Page 27

1 terrorism, regarding our thoroughfares and -- and the
2 people that were here.
3    Q. In addition to the FBI National Academy, any
4 other training opportunities that you've been able to
5 participate in?
6    A. Yes, sir.  Over my career, I've accumulated
7 probably over 5,000 hours of in-service training of
8 various and sundry things.
9    Q. Okay.  Since serving as -- or since becoming
10 the sheriff of Tarrant County, have you been able to
11 attend any particular training opportunities?
12    A. Few very, but yes.
13    Q. Yeah.  Time is precious, I'm sure.
14    A. Yes, sir.
15    Q. All right.  Okay.  So I want to go back to --
16 to CNET, and the -- the -- kind of the genesis for my
17 question is -- is I'd like to understand, you know, who
18 you, as sheriff of Tarrant County, partner with to help
19 deal with substance abuse issues in Tarrant County.
20        So with that, kind of, being the focus
21 of -- of my question, is it fair to say that CNET is one
22 of those entities that you partner with to -- to help
23 deal with substance abuse issues in Tarrant County?
24    A. Yes, sir, they are.
25    Q. Okay.  Is -- is C- -- and forgive me if I've

Page 28

1 asked this already or if you've answered this already.
2        But is CNET completely consumed by Tarrant
3 County Sheriff Department, or are there other
4 departments that feed into CNET?
5    A. We do have other departments in CNET.  The
6 majority is Tarrant County, but we do have other agency
7 -- agencies involved in it.
8    Q. Okay.  And just -- what are some of the things
9 that CNET does?
10    A. CNET's mission overall is to interrupt
11 mid-level narcotics operations, is what they generally
12 do.  They do do some street work, but a lot of it is
13 mid-level investigations.
14        And they collaborate with all of our
15 federal partners and city partners and state partners in
16 doing so and sometimes collaborate with them on
17 different investigations to -- to complete the task.
18    Q. Do you know how long CNET has been in
19 operation?
20    A. It has been in operation as CNET since 2016,
21 but that narcotics unit has been here since the late
22 '80s.
23    Q. Okay.  So before it became CNET, that narcotics
24 unit was operating but under a different title?
25    A. Yeah, exactly, same thing.

Page 29

1    Q. I gotcha.
2        And -- and back before it was CNET, that
3 narcotics unit was a collaborative unit formed by the
4 sheriff's department and other agencies?
5    A. Yes, sir.
6    Q. Okay.  So in addition -- and talking about now,
7 like the -- the -- the agencies and units that are in
8 play now to deal with substance abuse, in addition to
9 CNET, what other units or entities are out there that
10 are helping in -- in -- in Tarrant County to deal with
11 substance abuse issues?
12    A. From an enforcement standpoint, we have both
13 state agents and federal agents -- agencies involved,
14 and then, obviously, DEA, sometimes FBI --
15    Q. Okay.
16    A. -- you know, people -- ATF occasionally even
17 gets involved, and we also collaborate in involvement
18 with the postal service.  We're also heavily involved
19 with them in regards to delivery of -- of drugs.
20    Q. Okay.  So, of course, DEA, FBI, ATF, the postal
21 service?  Anything --
22    A. Our municipalities -- I'm sorry.
23    Q. But -- yes, sir.
24    A. Our municipalities.  Our municipalities, of
25 course.

8 (Pages 26 - 29)

Page 30

1  Q.  Okay.  So here in West Virginia, we have a lot
2  of task force -- task forces.  Before I became a lawyer
3  here with my firm, I used to work for a judge, and I
4  remember outside the courthouse parking lot, we'd see
5  the task force, kind of, get together before they would
6  do various raids, and these were a task force with this,
7  you know, department and this county department.
8      Are there other task force like that in --
9  in your area that work together to do things?
10  A.  There -- there are federal task force that
11  do -- that we collaborate with, specifically the postal
12  service and DEA.
13  Q.  Okay.  But there's not a -- a Dallas/Fort Worth
14  drug task force that -- that you're aware of?
15  A.  No, sir, not -- not a full metropolitan task
16  force.  We do have an interdiction unit made up of eight
17  different sheriffs.
18  Q.  Okay.  So explain that to me, an interdiction
19  unit.
20  A.  These are -- in our cases that -- we have two
21  canine officers who do highway interdiction, along with
22  the eight other counties surrounding us, not including
23  Dallas, is that -- and we reach as far east as Smith
24  County and as far west as Parker County.
25  Q.  Uh-huh.

Page 31

1  A.  And we -- we have an agreement where we send
2  deputies to them if they have a hotspot, or they send
3  them to us, those kind of things.
4  Q.  So that sounds like on an add needed --
5  as-needed basis?
6  A.  Yes.  It's -- it does have mission orientation
7  to it where they will -- they will get together at times
8  and just explore if a particular thoroughfare is being
9  used.
10  Q.  Okay.  I want to turn our attention to
11  prescription opioids for a little bit.
12      You -- it's fair to say that you -- you
13  understand that it is a crime to present a forged
14  prescription to a pharmacist to be filled, correct?
15  A.  Oh, absolutely.
16  Q.  Okay.  And it's a crime to even forge a
17  prescription for a controlled substance and -- and
18  present it to a pharmacist, correct?
19  A.  Yes, sir.
20  Q.  All right.  And is it fair to say it's a crime
21  to obtain an opioid prescription medication from a
22  doctor for the purpose of selling that prescription,
23  giving it away, correct?
24  A.  Yes, sir.
25  Q.  All right.  Now, you also understand that the

Page 32

1  federal government does license manufacturers of opioids
2  to manufacture opioids for patient care, correct?
3  A.  Yes, sir.
4  Q.  All right.  And you're aware that the federal
5  government does authorize pharmacies to dispense these
6  medications from licensed prescribers, correct?
7  A.  Yes, sir.
8  Q.  All right.  But we're here today to talk
9  about -- or one of the things we're here to talk about
10  is diversion of -- of controlled substance.  And I'm
11  curious if you can help define for me what diversion is
12  in that context.
13  A.  Well, the only diversion that we do here is
14  that we have a mental health diversion program instead
15  of coming to jail.  That's what we do.
16  Q.  Sure.
17      And -- and you are using the word
18  "diversion" correctly.  It's -- it's a -- it's a
19  different type of diversion.  In my mind, you're
20  describing the diversion that you might provide to a
21  person needing different services.
22      The diversion that I'm speaking of is when
23  a pharmaceutical is diverted to an inappropriate use,
24  right?  So if I were to take a medication because it
25  were prescribed to me, but I would give that to someone

Page 33

1  that it wasn't prescribed to, that would be diversion.
2      Have you heard of it used in that concept
3  before?
4      MS. ABSTON:  Objection, form.
5      You can answer.
6  BY MR. BOONE:
7  Q.  Yeah.  Go ahead.
8  A.  I've never heard it in quite that type of form.
9  Of course, we've seen that happen, but --
10  Q.  Sure.
11  A.  -- absolutely not described that way.
12  Q.  Okay.  I'm curious if -- in your capacity as
13  sheriff department, have you investigated individuals
14  that were accused of taking medications and selling them
15  on the open market?
16  A.  Yes, sir.
17  Q.  Okay.  Have you ever had the opportunity or
18  ever had the need to investigate Kroger Pharmacy for
19  inappropriately dispensing medications?
20  A.  Personally not aware of an investigation of
21  Kroger.
22  Q.  Okay.  Is that true for any retail pharmacy?
23  A.  That is true.
24      MS. ABSTON:  Objection, form.
25      You can answer.

9 (Pages 30 - 33)

Page 34

1    THE WITNESS:  That is true.
2  BY MR. BOONE:
3    Q.  All right.  Now, it is fair to say you're not a
4  physician, correct?
5    A.  That -- that's correct.
6    Q.  And you're also not a pharmacist, correct?
7    A.  Correct.
8    Q.  All right.  You're not here to give any
9  opinions about what the appropriate dispensing practices
10  should be for a pharmacy, correct?
11    A.  That's correct.
12    Q.  I'm curious though, if you've ever had the
13  opportunity to work with a pharmacy or pharmacist in the
14  investigation of a crime?
15    A.  We -- I haven't directly.  Our teams have.
16  With the -- we have a specific pharmacy -- we have a
17  pharmacy in our jail that we work with --
18    Q.  Okay.
19    A.  -- regularly.
20    Q.  I'm sorry.  I -- I didn't mean to interrupt
21  you.
22       You were saying you have a pharmacy in your
23  jail?
24    A.  We have a pharmacy in our jail that we work
25  with every day when people try to, as you said, divert

Page 35

1  things.
2    Q.  Okay.  Does that pharmacy in your jail dispense
3  controlled substances?
4    A.  I don't think so.  I'd have to double-check.
5    Q.  Okay.  All right.
6       And are there pharmacists -- I presume
7  there are pharmacists that work that pharmacy?
8    A.  Yes, sir.
9    Q.  Okay.  And the patients for that pharmacy would
10  be the inmates and individuals in custody?
11    A.  That is correct.
12    Q.  Okay.  Do you know how long the sheriff
13  department has had a pharmacy as part of its jail
14  facilities?
15    A.  I believe it's been there for the last six
16  years.
17    Q.  Okay.  And -- and where is that pharmacy
18  located?  What -- what -- within what facility is that
19  pharmacy located?
20    A.  It's located in our correction facility, our --
21  our Tarrant County correction facility.
22    Q.  How big is the Tarrant County correction
23  facility?
24    A.  Well, the total -- the total group is, is that
25  it houses -- that facility houses over 1,600 prisoners,

Page 36

1  and it's connected to another facility that houses
2  another 400 and a third facility connected to it to --
3  for another 400.
4    Q.  Okay.  So I -- I wrote down 1,600.  It's
5  connected to another 400-unit, which is connected to
6  another 400-unit, correct?
7    A.  That is correct.
8    Q.  All right.  So my math, it's 2,400 prisoners,
9  approximately?
10    A.  Right there.  But it serves the entire
11  population.  We have another 1,600 prisoners in a whole
12  different facility, and they serve that population also.
13    Q.  Okay.  So we're talking around 4,000 -- a
14  population of 4,000?
15    A.  Yes, sir.
16    Q.  Okay.  And are these prisoners -- and forget --
17  if -- this speaks to my ignorance here.
18       But are these prisoners that are awaiting
19  to be tried, or are these prisoners that have been
20  convicted and are serving out a sentence?
21    A.  Majority waiting to be tried, but some serving
22  sentences, and some waiting to go to prison.
23    Q.  Okay.  So these are individuals that could be
24  there anywhere for a day to, what, a year?
25    A.  Or three.

Page 37

1    Q.  Okay.  So it's important to make sure these
2  inmates are provided any medical care that they should
3  be provided during their time in your custody, correct?
4    A.  Yes.
5    Q.  And that's why we have a pharm- -- you have a
6  pharmacy to ensure appropriate patient care?
7    A.  That is correct.
8    Q.  All right.  As the head of the sheriff's
9  department, as the sheriff, do you meet with or
10  coordinate with anyone regarding the pharmacy practices?
11    A.  No, sir, I do not.  I -- that -- that is
12  delegated to our jail chiefs.
13    Q.  Okay.  So who are your jail chiefs?
14    A.  That would be -- Charles Eckert is our -- our
15  executive chief over there.  He'd be running the jail.
16  He has two other chiefs that report to him, Henry Reyes
17  and Glen Richardson.
18    Q.  Forgive me, sir.  I wrote down Charles Eckert.
19       Who was the other person?
20    A.  Chief Henry Reyes --
21    Q.  Okay.
22    A.  -- and Chief Glen Richardson.
23    Q.  All right.  Do you know if the pharmacies
24  provide buprenorphine or -- let me just stop there.
25       Do you know if the -- if your pharmacies

10 (Pages 34 - 37)

1 dispense buprenorphine?

2     A. Not familiar with that all.

3     Q. Okay. Do you know if your pharmacies prescribe

4 medications that, among the various treatment, can

5 provide for withdrawal symptoms from opioid use?

6     MS. ABSTON: Objection, form.

7     You can answer.

8     THE WITNESS: They do treat opioid

9 withdrawal. What drugs they use, I am not familiar

10 with.

11 BY MR. BOONE:

12     Q. Thank you for that.

13     Are you aware of the types of services that

14 the corrections facility -- your jail facility provides

15 with respect to individuals who may have substance abuse

16 issues?

17     A. The agencies that we have to assist with manage

18 our mental health folks. We also have Narcotics

19 Anonymous in the jail that meet there on a regular

20 basis, and then, of course, John Peter Smith Hospital

21 staff that is there from a medical end of it. That

22 would be the agencies. And we allow --

23     Q. Sir -- yes, sir.

24     A. And we allow lay -- lay ministry in to do

25 counsel.

1     Q. Excellent.

2     Okay. So I wrote down a mental health

3 agency; I wrote down Narcotics Anonymous; I wrote down

4 you have a hospital staff and -- and lay ministries.

5     As far as the mental health agency, is that

6 mental health agency a subset of the sheriff department,

7 or is that agency from outside of a sheriff department

8 that comes in and provides services?

9     A. They are described as outside services that

10 come in. They're under our control, but they are a

11 Tarrant County mental health agency.

12     Q. Would you, by any chance, know what department

13 would be over the mental health agency that comes in and

14 services the -- the jail?

15     A. They are their own entity.

16     Q. Okay.

17     A. And they -- yes, sir.

18     Q. As far as the types of services that this

19 agency provides to the inmate population, can you

20 describe the type of services that it would provide?

21     A. The full range of mental health issues from

22 psychotic to counseling on different issues. They also

23 have the ability to write -- you know, the psychiatrists

24 over there, they can write prescriptions. They can do

25 all those type of things.

1     Q. Understood.

2     THE WITNESS: There we go.

3     MS. ABSTON: Sorry. We had a little bit of

4 technical difficulties. Hold on one second.

5     I think we've gotten it taken care of. You

6 can continue.

7     THE WITNESS: Did -- did we lose audio?

8 Are we good?

9     MR. BOONE: Yep, I can hear you fine. Can

10 you hear me?

11     THE WITNESS: Yes, sir.

12     MS. ABSTON: Got it. We're good.

13     MR. BOONE: All right. Thank you.

14 BY MR. BOONE:

15     Q. So I'm thinking back to the fact that, I

16 believe, you testified you became the sheriff in 2017,

17 January 2017, and if I remember your testimony correctly

18 about the pharmacy in the corrections facility, was

19 the -- let me -- let me step back.

20     Was the pharmacy already in the jail system

21 before you became sheriff, or is that something you

22 initiated when you became sheriff?

23     A. Yeah. For clarification, it -- it was here

24 when I got here --

25     Q. Thank you. Okay.

1     A. -- that program, they could've approved it with

2 machinery and that kind of thing. But, yes, it's -- it

3 was here.

4     Q. Great.

5     I'm -- I want to get to some of the things

6 that -- that you were able to do and improve when you

7 came to your position as sheriff. I was going to save

8 that for later, but let me go ahead and -- and -- and

9 cover that now.

10     I -- I understand when you took over as

11 sheriff, you took over because you felt you could have

12 provided some improvements to the sheriff department; is

13 that fair?

14     A. That's fair, yes, sir.

15     Q. Okay. What were some of the things that you

16 did to improve the sheriff's department when you took

17 over?

18     A. Well, one of the things is, is that we did --

19 as far as the jail was concerned, we opened that up to

20 more lay ministry that could come in and more

21 counseling. We also created several reentry programs

22 that -- that we're very proud of, and they're doing well

23 in, the people that go through it. And they're from

24 faith-based to financial to -- to how to survive in the

25 world, all those type of things. And we're excited

Page 42

1 about the expansion of it, but we're very excited about
2 the success of it.
3         We created it in the jail specifically a
4 veterans' program where we had vets in the jail that
5 could -- we found that it -- if we put those guys
6 together, that they fed off of each other for good, and
7 that has been an incredibly successful program where
8 those people have gone back and become great
9 contributing citizens.  And we're starting to arrive on
10 that three- and four-year mark, which the criminal
11 justice people look at.
12         Over on operations side, we created a
13 human-trafficking unit; we created an intelligence
14 bureau; we created a game-room unit to go after those,
15 and -- and we also went back after DWI task force.
16 That's a few of the things that we've done.  And a
17 combined SWAT team.
18     Q.  I think I read somewhere that you were very
19 cognizant of your requirements under the law to be the
20 one to transport criminals or something along those
21 lines, and -- and that led to, really, an increase in
22 that responsibility.
23         Do -- do you know what I'm talking about?
24 And if so, can you help me out here?
25     A.  I think --

Page 43

1         MS. ABSTON:  Objection -- objection, form.
2         You can answer.
3 BY MR. BOONE:
4     Q.  It's okay.  Go ahead.  Go ahead.
5     A.  It's -- when we got here -- you know, I had
6 been a police chief in the county for 30 years prior to
7 that -- we were the only county in Texas where we would
8 not receive prisoners until a case -- criminal case was
9 filed with the district attorney and approved, and that
10 put a undue burden on cities where the law was clear
11 that, once probable cause was found to confine somebody,
12 that prisoner belonged to the sheriff.
13         So what we did is we went back and obeyed
14 the law, if I may say that --
15     Q.  Uh-huh.
16     A.  -- and -- and we said that we're going to take
17 prisoners when we're supposed to and take that burden
18 off the cities -- the cities, and that's what we've
19 done.
20     Q.  I see.
21     A.  And so I think we just we reorganize and make
22 sure we get them.  And we visit these communities all
23 the time.  We have a pick-up program where we go by and
24 pick up their prisoners and bring them to jail within
25 24 hours.

Page 44

1     Q.  I see.
2         And so when we talk about your budget and
3 resources being almost 60-something percent earmarked
4 for the housing of prisoners, it's, in part, because of
5 this program; is that correct?
6         MS. ABSTON:  Objection, form.
7         THE WITNESS:  Yes.
8         MR. BOONE:  Okay.  I'm getting ready to
9 start a different topic altogether.  Do you want to take
10 a short break?
11         THE WITNESS:  That would be great.
12         MS. ABSTON:  Yes, that works great.  Maybe
13 a ten-minute break?
14         MR. BOONE:  That'd be great.
15         MS. ABSTON:  Okay.
16         THE VIDEOGRAPHER:  All right.  Time is
17 10:58 a.m.  We are off the record.
18         (Brief recess taken.)
19         THE VIDEOGRAPHER:  Time is 11:15 a.m.  We
20 are on the record.
21 BY MR. BOONE:
22     Q.  Sheriff, have you been able to take a short
23 break?
24     A.  I have.  Thank you.
25     Q.  Okay.  Are you ready to resume?

Page 45

1     A.  I am, sir.
2     Q.  Now, during our last session, we talked about
3 your prior history and current history as a law
4 enforcement officer.
5         If my notes are correct, you started
6 serving as the chief of the Dalworthington Gardens in
7 1988, correct?
8     A.  Chief of public safety in '88, yes, sir.
9     Q.  Correct.
10         Chief of public safety in 1988, which had
11 visibility both as the department chief of police, as
12 well as the EMT department and the fire department for
13 that city, correct?
14     A.  That is correct.
15     Q.  Okay.  So you were in a leadership position
16 with that city in 1988 forward, correct?
17     A.  Yes, sir.
18     Q.  And then, in 2017, you became the sheriff of
19 Tarrant County, correct?
20     A.  Yes, sir.
21     Q.  So is it fair to say that, in those roles,
22 you've had visibility into the illicit drug problem
23 affecting Tarrant County?
24     A.  Yes, sir.
25     Q.  All right.  I want to talk to you about a group

12 (Pages 42 - 45)

Page 46

1 or an agency called the High Intensity Drug Trafficking
2 Agency [sic].
3        Are you familiar with that?
4    A. I am familiar with HIDTA.
5    Q. Okay. So if I refer to it as HIDTA during this
6 question, you'll know what I'm speaking about, correct?
7    A. Correct.
8    Q. All right. What is HIDTA?
9    A. Well, HIDTA is a conglomerate of -- of agencies
10 that -- that work together to deconflict narcotics
11 operations. We have a chair at the table of that
12 organization, and it's represented by our Senior Chief
13 Calvin Bond.
14    Q. I'm sorry. Say that again, please. You have a
15 --
16    A. We have a chair at the policy table --
17    Q. Uh-huh.
18    A. -- and it -- it is represented by our Senior
19 Chief Calvin Bond.
20    Q. And that's -- oh, a senior chief with your
21 department -- the department of Tar- -- Tarrant County?
22    A. Yes, sir.
23    Q. Okay. Is -- what are some of the things that
24 HIDTA does?
25    A. Well, to be quite honest with you, I -- I -- I

Page 47

1 don't keep up with a lot of what they do, other than I
2 know they deconflict. If an agency is working a case,
3 they can call HIDTA and say: This is who we're looking
4 at. This is what we're looking at. Is there anybody
5 else working this so we don't overlap or run in -- or
6 for safety problems?
7        They also have investigators in -- in there
8 that they -- in -- from all -- several other agencies
9 that are also working cases that they will work all over
10 the metroplex and all over North Texas.
11    Q. Okay.
12    A. That -- that's what our HIDTA does.
13    Q. Is it fair to say they seek to address
14 drug-trafficking threats within the State of Texas?
15    A. That's very well put.
16    Q. All right. And are you aware of HIDTA
17 authoring reports on, perhaps, a yearly basis to, kind
18 of, capture what HIDTA is seeing in the State of Texas
19 with respect to those threats?
20    A. You know, I think that they do issue reports.
21 Quite frankly, I have not reviewed one anytime soon.
22    Q. Okay. What I'd like to do is go through some
23 of these reports, because these reports do give
24 snapshots of what HIDTA is seeing. I'm curious if -- if
25 what they are seeing is consistent with what you have

Page 48

1 seen in -- in your role as a law enforcement officer.
2 Okay?
3    A. Okay.
4    Q. So, first, let's look at Exhibit No. 2. If you
5 pull up that envelope, please.
6    A. (Witness complies.)
7        MR. BOONE: If the concierge would go ahead
8 make that Exhibit 2, go ahead and publish that.
9        MS. ABSTON: Aaron, can you give us some
10 time to look through the full exhibit so we don't have
11 to verify any ongoing investigations, if we can just
12 look through it for a moment.
13        MR. BOONE: Okay.
14        CONCIERGE: And, Counsel, that's been
15 introduced.
16        MR. BOONE: Thank you.
17        (Exhibit 2 was marked for identification.)
18        MR. BOONE: Counsel, is it going to be the
19 case that in any of these HIDTA reports, the Sheriff is
20 going to need to review them to make sure there's no
21 ongoing investigations mentioned?
22        MS. ABSTON: Yes. We're going -- we're
23 going to need to check any documents you put in front of
24 him just to verify if there's any ongoing investigations
25 or anything that we're -- we're not going to speak about

Page 49

1 today.
2        MR. BOONE: Oh, okay. All right.
3        My apologies. I -- I wasn't aware on the
4 front end that we would need to do that, and I -- I
5 don't mean to take up his time or your time.
6        I've got one, two, three, four, five --
7 five of those reports that I want to discuss. If you'd
8 like, we can open them all up and go off record and let
9 him take a look --
10        MS. ABSTON: Yes.
11        MR. BOONE: -- and then come back on
12 record.
13        MS. ABSTON: I think that'd be a great
14 idea. Do you want to tell me which exhibits they're
15 going to be or what envelopes?
16        (Simultaneously speaking.)
17        MR. BOONE: Yes.
18        MS. ABSTON: Okay. Go ahead.
19        MR. BOONE: It'll be Envelopes 2, 3, 4, 5,
20 and 6.
21        MS. ABSTON: Okay, great.
22        Give us just a moment, and we'll look at
23 those.
24        MR. BOONE: Let's go off record.
25        THE VIDEOGRAPHER: All right. Time is

13 (Pages 46 - 49)

1 11:22 a.m., and we are off the record.

2          (Brief recess taken.)

3          THE VIDEOGRAPHER:  Time is 11:28 a.m.  We

4 are on the record.

5 BY MR. BOONE:

6    Q.  All right.  Sheriff Waybourn, during the break,

7 you had an opportunity to review several reports from

8 HIDTA.  Did you have a chance to skim through those

9 reports?

10   A.  I did, indeed, yes, sir.

11   Q.  Okay.  Now, of the reports that I have provided

12 to you and your counsel for potential questioning today,

13 are there any concerns that those reports mention

14 ongoing investigations?

15   A.  I have no concerns at this point.

16   Q.  Great.

17          So we can proceed?

18   A.  Yes, sir.

19   Q.  Thank you.

20          Let's look now at Exhibit 2.

21          MR. BOONE:  Concierge, you can go ahead and

22 publish that.

23          CONCIERGE:  (Complied.)

24 BY MR. BOONE:

25   Q.  So if you would take a look at the first page

1 of Exhibit 2, can you read what that first page says?

2    A.  We are talking about the cover sheet, "North

3 Texas HIDTA 2013 Strategy"?

4    Q.  Correct.

5          All right.  Now, I'm going to present to

6 you on the screen in front of you the document that's

7 also printed in hard copy.  So whatever is more

8 comfortable for you to review, feel free to do that.

9          Now, we mentioned a moment ago that HIDTA

10 is the High Intensity Drug Trafficking Agency, correct?

11   A.  Correct.

12   Q.  All right.  Now, this report is noted as being

13 prepared in June of 2012.  Do you see that on the first

14 page?

15   A.  Yes, sir.

16   Q.  And it's entitled "For the 2013 Strategy"; is

17 that correct?

18   A.  That is correct.

19   Q.  All right.  I'm going to direct your attention

20 to the first page, and under the section entitled

21 "Threat Assessment," I've highlighted a sentence in the

22 middle of this paragraph, and this sentence reads as

23 follows:  The most notable threat-related reports

24 include the continued use of the Dallas/Fort Worth

25 Metroplex as a command and control center for

1 international drug trafficking networks that receive

2 drug loads originating within Mexico.

3          Did I read that correctly?

4    A.  You did.

5    Q.  All right.  Is this statement consistent with

6 your memory of the state of narcotics --

7    A.  Yes.

8    Q.  -- in 2013?

9    A.  Yes, sir.

10   Q.  All right.  Perhaps you could elaborate for the

11 record what is meant by "drug trafficking networks that

12 originate within Mexico."

13   A.  I believe they are specifically referring to

14 the drug cartels, bridge cartels of Mexico, that bring

15 drugs into the United States.

16   Q.  Okay.  And what is a cartel?

17   A.  Cartel is an organized criminal organization in

18 Mexico that generally has a specific territory in which

19 they operate.

20   Q.  Okay.  And the -- the Mexican drug cartels are

21 smuggling in illegal narcotics into the United States;

22 is that correct?

23   A.  Yes, sir.

24          MS. ABSTON:  Objection, form.

25 BY MR. BOONE:

1    Q.  Are the Mexican drug cartels smuggling in

2 heroin?

3    A.  Yes, sir.

4    Q.  And is it your opinion that heroin can lead to

5 addiction?

6    A.  Yes, sir.

7    Q.  I'm going to turn now to page 2.  This is,

8 again, still under that "Threat Assessment" category,

9 but on page 2, I've highlighted a sentence at the top.

10          It reads:  Methamphetamine, marijuana, and

11 heroin have been reported by NT HIDTA Partner Agencies

12 as the most significant drug threats in the NT HIDTA

13 AOR.

14          Question:  Is that statement consistent

15 with your memory an experience as a law enforcement

16 officer in 2013?

17          MS. ABSTON:  Objection, form.

18          You can go ahead.

19          THE WITNESS:  Yes, sir.

20 BY MR. BOONE:

21   Q.  Okay.  In this report, it talks about

22 Performance Management Process, PMP.  Do you have any

23 familiarity with HIDTA's use of the Performance

24 Management Process?

25   A.  I have no -- no memory of that, no idea.

Page 54

1   Q. Okay. That's fine. Okay.
2       All right. So now I'm going to have you
3 turn to the next page of this report on page 3.
4       Okay. Now, at the very beginning of the
5 first full paragraph on this page, we see a sentence
6 that states: Diverted Pharmaceuticals are another
7 growing threat -- threat, perhaps second only to
8 methamphetamine. Common diversion methods for all
9 controlled substances include prescription forgeries,
10 Internet pharmacies, doctor shopping, pharmacy thefts,
11 registrants using or selling controlled substances,
12 theft or misuse of prescriptions, and illegal smuggling
13 from foreign countries.
14       Did I read that correctly?
15   A. You did.
16   Q. Okay. Is this consistent with your
17 recollection from 2013?
18   A. Yes, sir.
19   Q. You can put Exhibit 2 away.
20       And let's pull out Exhibit 3, please.
21       MR. BOONE: Concierge, if you can publish
22 Exhibit 3.
23       CONCIERGE: (Complied.)
24       (Exhibit 3 was marked for identification.)
25 BY MR. BOONE:

Page 55

1   Q. All right. Can you read to me what the first
2 page of Exhibit 3 says?
3   A. "North Texas HIDTA 2014 Strategy."
4   Q. Okay. And this appears to have been authored
5 or produced in June of 2013, correct?
6   A. Correct.
7   Q. All right. I want to direct your attention to
8 page 5. And right above this section entitled "Outlook"
9 is a paragraph whose last sentence reads as follows:
10 Methamphetamine, marijuana, and heroin are reported as
11 the most significant drug threats in the region.
12       Is that consistent with your recollection
13 of this time frame?
14       MS. ABSTON: Objection, form.
15       You can answer. You can answer.
16       THE WITNESS: Yes.
17 BY MR. BOONE:
18   Q. Thank you.
19       Now, this says here: Mexican/Hispanic DTOs
20 and Caucasian DTOs are reported as the most significant
21 trafficking threats in the region.
22       What is a DTO?
23   A. I am not familiar with that term.
24   Q. Okay. Thank you.
25       All right. Let's go to Exhibit 4, please.

Page 56

1       (Exhibit 4 was marked for identification.)
2 BY MR. BOONE:
3   Q. All right. And the first page has the seal of
4 the High Intensity Drug Trafficking Area, correct?
5   A. Yes, sir.
6   Q. Now, I see here it's called the Texoma HIDTA?
7   A. Yes, sir.
8   Q. Is -- what is the Texoma HIDTA?
9   A. That -- that's our North Texas HIDTA --
10   Q. Okay.
11   A. -- that's here in North Texas.
12   Q. So it's the same entity that produced the
13 report that we read just a moment ago, correct?
14   A. That is correct.
15   Q. All right. And this is entitled the "2016
16 Strategy," correct?
17   A. That is correct.
18   Q. All right. So if you could turn to page 3,
19 under the Executive Summary, the second paragraph, the
20 first sentence reads as follows: The overall drug
21 trafficking threat to the Texoma HIDTA region remains
22 stable. Law enforcement and intelligence data clearly
23 indicates methamphetamine poses the most significant
24 drug threat to the region as North Texas and Oklahoma
25 are flooded with cheap, high-purity methamphetamine

Page 57

1 produced in Mexico.
2       Is that sentence consistent with your
3 recollection of this time frame, 2015?
4       MS. ABSTON: Objection, form.
5       THE WITNESS: Yes.
6 BY MR. BOONE:
7   Q. Now, it goes on to say that: Prescription
8 drugs, heroin, synthetic cannabinoids, cocaine/crack
9 cocaine, and marijuana also pose a significant threat to
10 communities throughout the Texoma HIDTA region.
11       Do you know specifically which prescription
12 drugs are referenced here?
13   A. The ones that I would be familiar with that I
14 recall would be -- be your painkiller-type drugs, and
15 that -- they're narcotics.
16   Q. Gotcha.
17       Now, are the Mexican cartels pressing --
18 let me ask you: What is pressing of a pill?
19   A. Well, today, as we know it, is that that's
20 where they take their own chemicals, a lot of fentanyl
21 in this issue, and they have pill presses, and they want
22 to make them look like pharmaceutical drugs. And they
23 do have that technology, and they are used.
24   Q. Okay. So the types of prescription -- sorry.
25       The types of drugs that are pressed include

15 (Pages 54 - 57)

Page 58

1 drugs that look like pharmaceutical prescription drugs,
2 correct?
3      A.  Yes.
4      Q.  All right.  I'd like for you to go to page --
5 okay.  Let's go to page 6 of this report.  And towards
6 the bottom of this page, we see a figure entitled "Major
7 Drugs Trafficked in the Texoma HIDTA AOR."
8           Do you see that?
9      A.  What page are you on again?
10      Q.  I'm on page 6.
11      A.  Of -- is that Exhibit 4?
12           MS. ABSTON:  What's the -- yeah.  Do you
13 have a Bates number, maybe, Aaron?
14           MR. BOONE:  Yes, Bates 259 --
15           MS. ABSTON:  Okay.  Hold on.  Wait -- our
16 -- our Exhibit 4 only goes to page 163.
17           MR. BOONE:  Oh, I'm sorry.  I'm on the
18 2017.
19           THE WITNESS:  Oh, I see.
20           (Simultaneously speaking.)
21           MR. BOONE:  Yeah.  So let's pull out
22 Exhibit 5, please.
23           THE WITNESS:  Okay.
24           MR. BOONE:  So if we can publish Exhibit 5,
25 sir.

Page 59

1           CONCIERGE:  (Complied.)
2           THE WITNESS:  Okay.  I'm there.
3           (Exhibit 5 was marked for identification.)
4 BY MR. BOONE:
5      Q.  Okay.  So on Exhibit 5 -- and, again, we'll go
6 to Bates Number Texoma_HIDTA_259; it's page 6 of this
7 report.
8           And, again, this report is dated 2016 HIDTA
9 Strategy [sic].  Do you see the table entitled "Major
10 Drugs Trafficked in the Texoma HIDTA"?
11      A.  Yes, sir.
12      Q.  Okay.  Could you read the six drugs identified
13 there?
14      A.  Yes, sir.  One is methamphetamine; two is
15 heroin; three, controlled pharmaceutical drugs; four,
16 synthetic cannabinoids or opioids; number five is
17 cocaine/crack cocaine; and number six is cannabis.
18      Q.  All right.  So if we scroll down to the section
19 that talks about pharmaceuticals, we find that that
20 section is found on page 19, which is Texoma_HIDTA_0272.
21           Can you go there, please?
22      A.  Yes, sir.
23      Q.  Page 19.
24      A.  We're there.
25      Q.  All right.  The second paragraph under the

Page 60

1 section "Pharmaceuticals" -- well, let me -- let me step
2 back.
3           Number 3, "Pharmaceuticals," it states:
4 The diversion of pharmaceutical drugs continues to be a
5 significant drug threat to the Texoma HIDTA region.
6           Did I read that correctly?
7      A.  Yes, sir.
8      Q.  Okay.  Now, the second paragraph states:
9 Pharmaceutical diversion is often erroneously viewed as
10 white-collar drug crime because of the misperception
11 that its violators consists largely of professionals,
12 such as physicians, pharmacists, and clinics.
13           Did I read that correctly?
14      A.  You did.
15      Q.  Okay.  It goes on to read:  However, the
16 pill-mill operation is a thinly veiled organized
17 criminal enterprise that increasingly results in the
18 street-level distribution of powerful controlled
19 substances by the same violent criminal organizations
20 that distribute crack cocaine, heroin, methamphetamine,
21 other controlled substances.
22           Are you familiar with a pill mill?
23      A.  I've -- I've heard the term, yes, sir.
24      Q.  Okay.  What is your understanding of what a
25 pill mill is?

Page 61

1      A.  That is where someone is -- is literally making
2 drugs and -- and trying to sell them, making -- looking
3 -- pharmaceutical drugs and those type things or --
4      Q.  Now --
5      A.  -- covertly or illegally.
6      Q.  Go ahead.
7      A.  Covertly or illegally.
8      Q.  Okay.  Is it fair to say that retail pharmacies
9 are not part of this pill-mill concept that you're
10 speaking to?
11           MS. ABSTON:  Objection, form.
12           You can answer.
13 BY MR. BOONE:
14      Q.  You can answer.
15      A.  Yes.
16      Q.  Is that correct?
17      A.  Yes.  In my limited knowledge of that, yes.
18      Q.  Retail pharmacies are not included in the
19 concept of pill mill, correct?
20           MS. ABSTON:  Objection, form.
21           THE WITNESS:  That is my understanding.
22 BY MR. BOONE:
23      Q.  Okay.  All right.  We are now on page 24.
24           Are you there at 24?
25      A.  Yes, sir, we're here.

16 (Pages 58 - 61)

Page 62

1   Q.  Okay.  There's a section entitled "Synthetic
2  Opioids."
3        Do you see that?
4   A.  I do.
5   Q.  Generally speaking, what is your understanding
6  of synthetic opioids?
7   A.  It is -- as put in the analysis, that would be,
8  like, fentanyl or a type -- type of drug that imitates
9  opioids.
10   Q.  Gotcha.
11        And these are not substances that are
12  dispensed by retail pharmacies, such as Kroger, correct?
13   A.  I have no --
14        MS. ABSTON:  Objection, form.
15        You can answer.
16        THE WITNESS:  I have no idea.
17  BY MR. BOONE:
18   Q.  Okay.  So let me ask you -- let's read here:
19  There are two main sources for synthetic opioids in the
20  region, Mexican DTOs who are increasingly trafficking
21  bulk fentanyl alongside other drugs like cocaine,
22  methamphetamine, heroin, and independent DTOs who obtain
23  the drug from sources in China and other countries
24  through negotiations and purchases over the Dark Web and
25  Internet sources.

Page 63

1        Now, is this statement consistent with your
2  memory and experience as a law enforcement officer in
3  around 2- -- 2017?
4        MS. ABSTON:  Objection, form.
5        THE WITNESS:  It is my memory, yes.
6  BY MR. BOONE:
7   Q.  Okay.  If you can go to page 13, please.
8        And that should be Bates Number HIDTA_359;
9  is that correct?
10   A.  Wait a minute.  No, it's not in mine.  Is this
11  -- are we still in Exhibit --
12   Q.  Hold on one second.
13        MS. ABSTON:  Yeah, I think we might -- are
14  you talking --
15        THE WITNESS:  -- 5?
16        MS. ABSTON:  Oh, no.  I think you may be
17  talking about Exhibit -- potentially Exhibit 6, Aaron.
18  Is that --
19        MR. BOONE:  Yes.  Thank you.
20        Okay.  So we're now at Exhibit 6.  If you
21  want to pull that out, please.
22        THE WITNESS:  Yes, sir.
23        MR. BOONE:  And you can publish that one,
24  Concierge.
25        CONCIERGE:  (Complied.)

Page 64

1        (Exhibit 6 was marked for identification.)
2        MS. ABSTON:  And just to clarify, Defense
3  Exhibit 5 is the 2017 Threat Assessment?
4        MR. BOONE:  That is correct.
5        MS. ABSTON:  Thank you.
6  BY MR. BOONE:
7   Q.  And the 2016 -- sorry.  Exhibit No. 6 is the
8  2018 HIDTA Threat Assessment.
9        Do you see page 1, Sheriff?
10   A.  Yes, sir.
11   Q.  Okay.  All right.  And, again, that first page
12  for Exhibit 6 is the Texoma HIDTA 2018 Threat
13  Assessment, correct?
14   A.  Yes, sir.
15   Q.  All right.  If you would turn to page 13 of
16  Exhibit 6.
17   A.  Yes, sir.
18   Q.  Under the section "Fentanyl/Other Synthetic
19  Opioids":  Over the past year, law enforcement has
20  encountered fentanyl, fentanyl analogs, carfentanil, and
21  other synthetic opioids throughout Texas.  On the whole,
22  illicitly produced and/or diverted fentanyl has been
23  encountered less frequently than in several other
24  regions of the country, with the majority of law
25  enforcement agencies responding to the National Drug

Page 65

1  Threat Assessment Survey reporting that fentanyl
2  availability as moderate, low, or not available.
3  However, nearly half of the agencies identified fentanyl
4  distribution as increasing.
5        Is that consistent with your memory and
6  experience as a law enforcement officer around
7  2017-2018?
8   A.  Yes, sir.
9   Q.  And you can put that one away.
10        Okay.  If you would, let's pull Exhibit 6
11  back out.  There's one more question.
12        Okay.  And, again, this is Exhibit 6, the
13  2018 HIDTA Threat Assessment.  Under page 15 --
14   A.  Yes, sir.
15   Q.  -- under the section "Pharmaceuticals," it
16  reads:  The diversion of pharmaceutical drugs continues
17  to be a significant threat to the Texoma HIDTA region.
18        Did I read that sentence correctly?
19   A.  Yes, sir.
20   Q.  Okay.  Now, the next paragraph down, under the
21  highlighted sentence, it reads:  Pharmaceutical
22  diversion occurs in a variety of forms, but the most
23  common operation is the "pill-mill" model.
24        Did I read that correctly?
25   A.  Yes, sir.

17 (Pages 62 - 65)

Page 66

1    Q. Okay. If you would, pull out Exhibit 7,
2 please.
3        (Exhibit 7 was marked for identification.)
4 BY MR. BOONE:
5    Q. Okay. Do you recognize this document?
6    A. I recognize it's a -- it's an e-mail to me
7 dated back in '17.
8    Q. Okay. This document appears to be from an
9 individual named Floyd Heckman, Jr.?
10    A. Yes, sir.
11    Q. Do you know who Floyd is?
12    A. He is. He's with us. At the time, he was a
13 lieutenant in CNET.
14    Q. Okay. What was his role and responsibility
15 with CNET?
16    A. He was an operational lieutenant and a working
17 lieutenant in CNET.
18    Q. Okay. And was he employed by your sheriff
19 department?
20    A. Yes, sir.
21    Q. Okay. Was he involved in the gathering of data
22 and information used by the department?
23    A. Yes, sir.
24    Q. Okay. If we look at this document -- okay.
25 I'll share my screen.

Page 67

1        MR. BOONE: And, again, this is Exhibit 7.
2 So, Concierge, you can go ahead and publish that one.
3        CONCIERGE: (Complied.)
4 BY MR. BOONE:
5    Q. This, I believe, is the second page of that
6 document. It's the page that says: On May 9th, 2017,
7 at 12:09 p.m., Floyd Heckman wrote -- it says: Sheriff,
8 this is a summary of overdose data from the Tarrant
9 County Medical Examiner's Office for 2015 and 2016. The
10 sentence reads, "In 2015," it reads: There were 141
11 drug overdose deaths caused by or related to opioid use.
12 66 deaths (47 percent) related to heroin use.
13        What was your understanding when you
14 received this as to what the phrase "related to opioids"
15 -- "opioid use" meant?
16    A. That we just simply had the -- these people
17 were users of op- -- opioids in general.
18    Q. Okay. Is there any way to discern where that
19 opioid substance was obtained from?
20    A. I don't have those cases in front of me so I
21 could look it up.
22    Q. Okay. Now, in number -- this next sentence, it
23 says: In 2016, there were 173 drug overdoses caused by
24 or related to opioid use, a 22.7 increase.
25        Did I read that correctly?

Page 68

1    A. Yes.
2    Q. And the next sentence says: In 2016, 11 deaths
3 were related to U47700, the fentanyl analog.
4        Let me pause there. What is that U47700?
5    A. I have no idea.
6    Q. Okay. Now, anywhere in these data points does
7 it say how much or what percentage these overdose deaths
8 were related to prescription opioids?
9    A. I see no -- no focal points on there.
10    Q. Thank you. You can put that one away.
11        If you would bring out Exhibit 8, please.
12        (Exhibit 8 was marked for identification.)
13 BY MR. BOONE:
14    Q. All right, sir. Do you have Exhibit 8 in front
15 of you?
16    A. I do.
17    Q. Okay. Can you tell me what this is?
18    A. This looks like a -- a standard operating pro-
19 -- standard operating procedure -- blah, I'm sorry --
20 procedure that we issued back in 2018.
21    Q. All right. And this is your signature at the
22 top, sir?
23    A. It is.
24    Q. Okay. And these are procedures and protocols
25 that your employees, your deputies, are supposed to

Page 69

1 follow, correct?
2    A. That is correct.
3    Q. All right. Now, the first paragraph, paragraph
4 identified as A, states: Tarrant County deputies will
5 be provided with Narcan (naloxone) nasal spray to
6 provide emergency treatment in cases of opioid overdose
7 in the field caused either through intentional
8 consumption or accidental exposure.
9        Now, prior to this policy coming into
10 effect, was there any policy -- any written policy for
11 your department -- was there any written policy with
12 respect to the use of naloxone?
13        MS. ABSTON: Objection, form.
14        THE WITNESS: No.
15 BY MR. BOONE:
16    Q. Okay. Do you know what the practice was prior
17 to this policy being authorized by you?
18    A. We had a -- our JPS Hospital staff in the jail
19 had Narcan available to them, and our tactical medic had
20 Narcan available to him under the direction of the
21 Fort Worth medical director.
22    Q. Okay. Now, were these individuals only using
23 Narcan if it was an accidental exposure, as opposed to
24 an intentional consumption?
25        MS. ABSTON: Objection, form.

18 (Pages 66 - 69)

Page 70

1      THE WITNESS:  I -- I believe it'd be used
2  for either/or.
3  BY MR. BOONE:
4      Q.  Thank you.
5          So that was the practice before this
6  policy, correct?  Is that correct?
7      A.  Yes.
8      Q.  Was this written policy essentially codifying
9  in writing what the practice was at the time?
10     A.  Yes, it was.  The intent was, is that we saw
11  more when [inaudible] -- so we broadened it to make sure
12  that everybody had it.
13     Q.  Okay.  When you said make sure every- --
14         THE COURT REPORTER:  I'm sorry.  I didn't
15  -- I'm sorry.  I didn't get his answer.  He's starting
16  to speak a little lower now.  I need him to speak up.
17         Can you repeat your answer?
18         THE WITNESS:  Oh, I apologize.
19         We wrote the policy with the intent because
20  we were using Narcan -- we were distributing
21  prolifically in our operation troop by patrol to make
22  sure they had it on hand, and so the policy came into
23  play.
24  BY MR. BOONE:
25     Q.  Were there individuals that did not have

Page 71

1  naloxone on hand?
2          MS. ABSTON:  Objection, form.
3          THE WITNESS:  Did not -- they did not have
4  it prior to -- probably 2018, I'm sure, is when we
5  started making sure every patrol officers had it on
6  hand.
7  BY MR. BOONE:
8      Q.  Gotcha.
9          Okay.  So before 2018, your deputies didn't
10  necessarily have naloxone on hand with them when they
11  went out to a call; is that correct?
12     A.  That is correct.
13     Q.  All right.  Perhaps, the EMTs would have
14  naloxone when they responded to a call prior to 2018,
15  correct?
16     A.  Oh, yes.  Yes, absolutely.
17     Q.  But after this policy was instituted by you,
18  sir, your deputies would also have naloxone on hand to
19  utilize, if necessary, correct?
20     A.  That is correct.
21     Q.  What is your understanding as far as the
22  efficacy of naloxone in treating individuals who have a
23  -- a potential overdose episode?
24         MS. ABSTON:  Objection, form.
25         THE WITNESS:  It's my understanding that --

Page 72

1  that if you believe you have an overdose on hand, you
2  administer the Narcan a couple of times, and you'll have
3  success.
4  BY MR. BOONE:
5      Q.  Okay.  Now, what substances does naloxone abate
6  or assist with?
7      A.  Opioids.
8      Q.  All right.  Any particular types of opioids?
9      A.  I believe it covers the gamut.
10     Q.  Thank you.
11         Does your department track when it
12  administers Narcan in the field?
13     A.  We do.  It's -- it's probably indicated in an
14  incident report or something to that effect.  It's not a
15  formal report, but -- but we track it.
16     Q.  Okay.  Okay.  Let's look at Exhibit 9, please.
17         (Exhibit 9 was marked for identification.)
18  BY MR. BOONE:
19     Q.  Okay.  Do you have Exhibit 9 in front of you,
20  sir?
21     A.  I do, sir.
22     Q.  All right.  And these are a series of e-mails
23  that have been stapled together, correct?
24     A.  Yes, sir.
25     Q.  All right.  If you could turn to the e-mail

Page 73

1  that is dated Wednesday, January 13th, from the Dallas
2  Diversion Outreach.  I will share my screen as well.
3      A.  Okay.
4      Q.  All right.  This e-mail is from the Dallas
5  Diversion Outreach.
6          Let me ask you:  What is that?
7      A.  I apologize.  I do not remember that group.
8      Q.  That's okay.
9          This paragraph at the beginning reads:
10  Good morning -- by the way, this is to you,
11  Bill Waybourn, correct?
12     A.  That is correct, yes, sir.
13     Q.  All right.  And it's been copied to Calvin Bond
14  also with the sheriff department?
15     A.  That is correct.
16     Q.  Okay.  And this paragraph reads:  Good morning.
17  You are being notified as your departments are either
18  former participants or interested agencies in the
19  National Drug Take Back Initiatives.
20         Can you tell me what the "National Drug
21  Take Back Initiative" is?
22     A.  What I know about it, it is a program started
23  many years ago that a couple of times a year they
24  emphasize that if you have pharmaceuticals in your
25  house; that is, particularly narcotics, is that we set

19 (Pages 70 - 73)

Page 74

1 up drop-off stations where they can securely drop that
2 prescription off where we can dispose of it
3 appropriately.
4     Q. Gotcha.
5        And does Tarrant County Sheriff's
6 Department participate in this program?
7     A. We do.
8     Q. Is this a one-day event?  Is this an event you
9 have regularly?
10    A. My memory serves me is that we do it a couple
11 of times a year, but, you know, I defer to Calvin Bond.
12 He would be able to answer that in more detail.
13    Q. Understood.  Thank you.
14       Do you know if there are particular drugs
15 that are collected, or are certain drugs not permitted
16 to be provided?
17    A. I know of none not permitted, but I do not know
18 the list that we're looking for.  I know it's opioids in
19 general, but I don't know which ones.
20    Q. Thank you.
21       And do you know what happens with the drugs
22 once they've been collected?
23    A. Again, I defer to Calvin on this, but it is --
24 I believe they're going to -- they're going to be
25 destroyed in -- in a proper manner.

Page 75

1     Q. Okay.  Thank you.  You can put that one away.
2        All right.  Let's pull out Exhibit 10,
3 please.  Okay.  Tell me when you're ready.
4     A. Almost.  Okay.
5     Q. Okay.
6        MR. BOONE:  So you can publish Exhibit 10,
7 Concierge.
8        CONCIERGE:  (Complied.)
9        (Exhibit 10 was marked for identification.)
10 BY MR. BOONE:
11    Q. All right.  And Exhibit 10 is entitled "Press
12 Release North Texas Sheriffs' Criminal Interdiction
13 Unit"; is that correct?
14    A. That is correct.
15    Q. Okay.  Can you tell me what the North Texas
16 Sheriffs' Criminal Interdiction Unit unit is, please?
17    A. Yes, sir.  This is several county sheriffs that
18 have come together to partner to do the interdiction
19 units that I'd spoken of earlier.
20    Q. Okay.  And does this group still meet?
21    A. Yes, sir.
22    Q. Okay.  Do you recall what departments or --
23 well, I -- let me step back.
24       I see here at the very beginning, it reads:
25 In Sheriff -- in December 2017, Collin County Sheriff,

Page 76

1 Grayson County Sheriff, Hunt County Sheriff, Parker
2 County Sheriff, Rockwall County Sheriff, Tarrant County
3 Sheriff, and Wise County Sheriff came together to
4 formulate this plan; is that correct?
5     A. That is correct.
6     Q. All right.  Does this group author any reports
7 as to what this group is able to achieve?
8     A. There is, from time to time, a -- a report or
9 e-mail of reports that come out.
10    Q. Understood.
11       And does this unit work together to stop
12 the flow of narcotics, illegal substances?
13    A. Yes, sir.
14    Q. Okay.  I'm looking here lower on the page, it
15 reads:  This unit became operational on December 18,
16 2017, and the results of their efforts to date have been
17 nothing short of incredible.  In the first quarter of
18 operations, this unit has seized $60,000 of hidden U.S.
19 currency, 1,479 pounds of marijuana --
20       Did I read that correctly?
21    A. Yes, sir.
22    Q. Okay.
23       -- 5 pounds of cocaine, 61 pounds of meth,
24 9 pounds of heroin, half a pound of fentanyl, 13 pounds
25 of THC products, 8 stolen vehicles, 4 automatic weapons,

Page 77

1 and made 57 arrests.
2        That's just in the first quarter of your
3 operations; is that right?
4     A. That is correct.
5     Q. This appears to be very successful to me.
6 Would you classify this as successful?
7     A. Yes, sir, it's been very successful.
8     Q. And has this group continued to experience the
9 same or similar types of successes?
10    A. They have.
11    Q. Okay.  Now, I notice in this report of items
12 that were seized, I don't see anywhere the mention of
13 prescription opioids; is that correct?
14    A. Yes, sir.
15    Q. Okay.  Sitting here today, are you aware of
16 this North Texas Criminal -- Criminal -- sorry.
17       Are you aware of the North Texas Sheriffs'
18 Criminal Interdiction Unit recovering prescription
19 opioids?
20       MS. ABSTON:  Objection, form.
21       THE WITNESS:  Not in my memory.  I'd have
22 to review those reports.
23 BY MR. BOONE:
24    Q. Thank you.
25       You can put that one away, please.

20 (Pages 74 - 77)

Page 78

1      Let's go to Exhibit 11.
2      MR. BOONE: Actually, let me -- let me
3 pause for a second.
4      Counsel, I had promised that we would go
5 for about an hour, then we would stop and have a lunch
6 break. I don't -- I still think we should stop and take
7 a break. I don't think we're going to be too much
8 longer beyond that. But would now be a good time to
9 stop?
10      THE WITNESS: Yes, sir.
11      MS. ABSTON: I think that works great.
12 Thank you, Aaron.
13      MR. BOONE: Okay.
14      Sheriff, is it okay to pause for a little
15 bit?
16      THE WITNESS: Absolutely.
17      MR. BOONE: All right.
18      THE VIDEOGRAPHER: Okay. Time is 12:11
19 p.m. We are off the record.
20      (Lunch break taken.)
21      THE VIDEOGRAPHER: Time is 12:47 p.m. We
22 are on the record.
23 BY MR. BOONE:
24      Q. Good afternoon, Sheriff. Did you have a chance
25 to take a break?

Page 79

1      A. I did indeed. Thank you.
2      Q. Did you have lunch?
3      A. I did. It was very good.
4      Q. Good.
5      Ready to proceed?
6      A. Yes, sir.
7      Q. Okay. Earlier, you were answering questions
8 about some of the services that the jail facilities were
9 providing to its population, specifically some health
10 services -- specifically, mental health services.
11      Is that organization called My Health My
12 Resources of Tarrant County?
13      A. That -- that would be it.
14      Q. Okay, great.
15      And in the HIDTA reports, we were talking
16 about information speaking about DTOs, and I just want
17 to share my screen so we can quickly refresh your
18 recollection.
19      Okay. So, for example, this is Exhibit 4,
20 I believe, on page 3, which is Texoma_154. At --
21 looking here at this paragraph that talks about DTO is
22 defined as drug-trafficking organizations.
23      Does that refresh your recollection as to
24 what DTOs mean?
25      A. It does. I don't see that acronym very often

Page 80

1 at all, but yes.
2      Q. Understood.
3      Now, you have no reason to believe that
4 retail pharmacies, such as Kroger and Albertsons, are
5 included within the construct of drug-trafficking
6 organizations, do you?
7      A. No.
8      Q. Okay. I'm curious, if -- if -- do you have an
9 opinion as to whether there is a substance abuse problem
10 in Tarrant County?
11      A. I -- I believe there is very much a substance
12 abuse problem in Tarrant County, and I believe it's on
13 the rise.
14      Q. Okay. And why do you say that, sir?
15      A. Well, our jail population is rising, and in
16 that, we -- we see that about 80 percent of them that
17 come through are motivated by some type of controlled
18 substance.
19      Q. Okay. Do you have an opinion as to which
20 substances are the most prevalent?
21      A. We're seeing fentanyl, methamphetamine, and
22 heroin --
23      Q. Uh-huh.
24      A. -- from the illicit side.
25      Q. Do you believe this rises to the level of a

Page 81

1 crises or an epidemic?
2      A. I would use the word "crises" and "epidemic,"
3 as I discuss it, yes.
4      Q. Okay. Do you have an opinion as to what
5 retail, if any, retail pharmacies have played in any
6 crises?
7      A. I -- I would not. I would not, not that I know
8 of.
9      Q. I believe we left off --
10      MR. BOONE: And just for the record, just
11 -- just to kind of catch us up. Thus far, I have
12 identified and produced while questioning Exhibits 1, 2,
13 3, 4, 5, 6, 7, 8, 9, 10. I believe it's 10, and I do
14 want those made part of the transcript.
15 BY MR. BOONE:
16      Q. If you would, pull out Exhibit 11, please.
17      (Off-record discussion.)
18      MS. ABSTON: Nope, we didn't open 11 yet.
19 Yeah.
20      THE WITNESS: Or for 10?
21      MS. ABSTON: Oh, we did; we did 10.
22      THE WITNESS: Oh, we did? Okay.
23      MS. ABSTON: Yes, we did 10.
24      You've got 11 right there.
25      THE WITNESS: Oh, sorry. I'll put my

21 (Pages 78 - 81)

Page 82

1  glasses on.
2          MS. ABSTON:  No, you're all good.
3          (Off-record discussion.)
4          (Exhibit 11 was marked for identification.)
5  BY MR. BOONE:
6      Q.  Okay.  Do you have Exhibit 11 pulled out?
7      A.  Yes, sir.  Yes, sir.
8      Q.  Okay.  I have this as Tarrant County -- excuse
9  me -- the Bates number is TARRANT_00861977.  This
10 appears to be an e-mail from Mike Simons to
11 Bill Waybourn.
12          Who is Mike Simons?
13     A.  At the time, Mike was our senior chief.  He has
14 since retired.
15     Q.  I see.
16          Who is XXXX XXXX?
17     A.  He is a deputy sheriff that is on assignment on
18 the DEA task force.
19     Q.  Okay.  In this e-mail it mentions a Deborah
20 Carrillo.  Who is Deborah?
21     A.  Just referring to the memo itself, at the time
22 she was assistant special agent in charge here in
23 Fort Worth in the DEA.
24     Q.  Okay.  So in this e-mail that Deborah has
25 written to you, dated March 23rd, 2020, she writes:

Page 83

1  Good morning, Sheriff Waybourn and Sheriff Purdue.  I
2  wanted to start your weeks off with something good that
3  has nothing to do with COVID-19.  Below is a short
4  synopsis of a case that TFO XXXX XXXX and TFO XXXX XXXX
5  lead the charge on.
6          What is TFO?
7      A.  Task force officer.
8      Q.  Okay.  And what task force is this referring?
9      A.  It's a DEA task force here in the greater
10 Tarrant County area.
11     Q.  Okay.  And who is on the task force?  What --
12 what entities comprise this task force?
13     A.  Well, I don't know all the agencies there.
14 Obviously, the two that he identified, XXXX is with
15 Tarrant County Sheriff's Office, and XXXX at the time
16 was with North -- North Richland Hills Police
17 Department.
18     Q.  Okay.  So I'm going to share my screen.  The
19 second paragraph in this e-mail by Ms. Carrillo reads:
20 Initial information was derived from DEA headquarters
21 import/export section regarding the delivery of a
22 16,000-per-hour encapsulating machine valued at $10,000
23 to a nondescript warehouse in the Dallas/Fort Worth
24 area.
25          Did I read that correctly?

Page 84

1      A.  Yes, sir.
2      Q.  Okay.  What is an encapsulating machine?
3      A.  As I recall, that's -- that's going to be your
4  pill machine.
5      Q.  Okay.  These are machines that press substances
6  into pills that can be passed off and sold on the
7  illicit market as drugs, correct?
8      A.  That is correct.
9      Q.  Ahh, here we go.
10          At the top of the next page, it says:  At
11 the residence, 38 firearms were seized along with
12 2 kilograms of methamphetamine, counterfeit Adderall
13 tablets, about $20,000 in currency.
14          And on the prior page, it talks about the
15 Fort Worth TDS.  What is the TDS?
16     A.  I'm not familiar with that acronym.  I
17 apologize.
18     Q.  Okay.
19     A.  But it's going to -- it's going to be law
20 enforcement because they execute search warrants, but
21 I'm not sure what TDS stands for.
22     Q.  Thank you.
23          Question:  Do you know if the drugs that
24 are seized are tested to determine what substances they
25 are?

Page 85

1      A.  Yes.
2      Q.  Okay.  That's generally the practice in these
3  seizures?
4      A.  Absolutely.
5      Q.  Okay.  Let's look at Exhibit 12, please.
6          MS. ABSTON:  And, Aaron, if you'll give us
7  a moment, we can look through this one and make sure
8  there's nothing we need to go off the record about.
9  Just give us a second.
10         MR. BOONE:  Uh-huh.
11         MS. ABSTON:  Good to go?
12         THE WITNESS:  I'm good to go also.
13         MS. ABSTON:  Okay.  We're good to go,
14 Aaron.
15         MR. BOONE:  Thank you.
16         (Exhibit 12 was marked for identification.)
17 BY MR. BOONE:
18     Q.  So do you have Exhibit 12 in front of you?
19     A.  I do, sir.
20     Q.  Okay.  If you would turn to the page that
21 begins with an e-mail -- let me rephrase.
22          Would you turn to the e-mail that contains
23 e-mail from Matt Zavadsky dated Septem- -- dated
24 April 23rd, 2021?
25          I'm sharing my screen right now, if you'd

22 (Pages 82 - 85)

Page 86

1 like to see.  At the bottom, it has a Bates Number
2 TARRANT_00683583.
3        Okay.  This e-mail is from Matt Zavadsky
4 dated April 23rd, 2021, and you are included among the
5 individuals who received this e-mail.  The subject is
6 "Overdose Initiatives."  And this e-mail begins:  Hi,
7 TORRI team.  That's capital T-O-R-R-I.
8        Do you know what TORRI is?
9    A.  I apologize.  I cannot recall what TORRI is.  I
10 probably knew it at the time from conversations, but I
11 don't remember.
12    Q.  Okay.  If you can't recall what those
13 acronym -- what the acronym stands for, do you know
14 what, generally, this entity is?
15    A.  There was a -- what they wanted to do is to try
16 to create a -- a mapping process where overdoses are
17 occurring to see where the hot areas were, if you will,
18 of ODs.  That was -- that was their general of what was
19 happening.
20    Q.  Gotcha.
21        And do you know if this entity is still in
22 existence?
23    A.  I believe it is.  I believe it's still there
24 and trying to improve.
25    Q.  Okay.  Do you know if your law enforcement

Page 87

1 agency has been able to use the information generated by
2 TORRI?
3    A.  I believe that we have -- we -- we were aware
4 of it.  I don't know that it's been directly related to
5 any investigations, but we've -- we've seen different
6 things happen on -- on that mapping.
7    Q.  Gotcha.
8        And in this e-mail he writes:  As mentioned
9 during the meeting today, here are the two initiatives
10 mentioned.  Number 1, the DEA/HIDTA areas program, ODMAP
11 program, reached out to MedStar about data sharing.
12        What is the ODMAP?  Is this the mapping
13 that you were mentioning?
14    A.  Right, the overdose map.
15    Q.  Gotcha.
16        And is this, like, an online database that
17 law enforcement can access to see where trends are
18 occurring in overdose deaths?
19    A.  I believe that to be the goal; I just don't
20 know it's been completely resolved.
21    Q.  Understood.
22        And Number 2:  We have been invited to
23 participate in a live stream event, quote, over the
24 overdoses, jointly sponsored by the DEA and Challenge of
25 Tarrant County.

Page 88

1        What is "Challenge of Tarrant County"?
2    A.  Again, I don't know what that is.  I don't know
3 --
4    Q.  Okay.
5    A.  -- what that resulted from.
6    Q.  Gotcha.
7        This mentions MedStar.  Do you know what
8 MedStar is?
9    A.  MedStar is our ambulance company.
10    Q.  Ahh, okay.
11        Now, does the sheriff department have
12 administrative oversight over MedStar?
13    A.  No, we do not.
14    Q.  Okay.  Does Tarrant County have any EMT
15 services that are county-owned and not contracted to a
16 private?
17    A.  No.  No, we don't.  Yeah, no.
18    Q.  All of your EMT services are contracted through
19 a private entity?
20    A.  Right.  And -- now, we have outlying agencies
21 that are -- fire district agencies that have their own
22 ambulance services in some of our unincorporated areas.
23 So it's not all MedStar.  There's two or three different
24 ambulance services.
25    Q.  Okay.  So this live stream event that's

Page 89

1 mentioned here "Over the Overdoses," do -- do you recall
2 attending that live stream event?
3    A.  I do not.
4    Q.  Do you believe you attended it?
5    A.  I -- I don't think I did.  I don't -- I believe
6 I would remember that.
7    Q.  Okay.  Another e-mail here is from Kimberly
8 Harris.  Who is Kimberly Harris?
9    A.  I believe she is an administrative person with
10 Arlington PD, but I'm not completely sure.
11    Q.  Okay.  Are you familiar with Brad Pearce or
12 Trevor Clenney?
13    A.  Quite frankly, I've heard the names, but in
14 regards to this, I would say that, again, Senior --
15 Senior Chief Calvin Bond be able to probably better
16 answer that.
17    Q.  Understood, okay.
18        Let's look at Exhibit 13, please.
19        (Exhibit 13 was marked for identification.)
20        MS. ABSTON:  Can we go off the record for a
21 moment, Aaron, to review this?
22        MR. BOONE:  Yes.
23        MS. ABSTON:  Thank you.
24        THE VIDEOGRAPHER:  Okay.  Time is 1:05 p.m.
25 We are off the record.

23 (Pages 86 - 89)

Page 90

1    (Brief recess taken.)
2         THE VIDEOGRAPHER:  Time is 1:09 p.m.  We
3  are on the record.
4  BY MR. BOONE:
5    Q.  Sheriff, do you have Exhibit 13 in front of
6  you?
7    A.  I do, sir.
8    Q.  Okay.  And do you recognize this document?
9    A.  I do.
10   Q.  What is this document?
11   A.  This was some talking points that I was given
12 by our director of Intel in regards to a briefing I was
13 conducting before Governor Abbott and President Trump.
14   Q.  Okay.  And was this a briefing that you
15 delivered to President Trump?
16   A.  It was.
17   Q.  Okay.  What was the occasion that you were
18 providing this briefing?
19   A.  Governor Abbott asked me to be a briefer in
20 this situation in regards to the impact of fentanyl in
21 Tarrant County.
22   Q.  Understood.
23        Were there other individuals, law
24 enforcement other -- individuals or officials that were
25 providing briefings to the President at this time?

Page 91

1    A.  Yeah.  There's -- there was one other sheriff
2  doing a briefing also.
3    Q.  Okay.  All right.  And does this e-mail here
4  capture the talking points that you were prepared to
5  share with the President?
6    A.  It does.
7    Q.  Okay.  I'm going to publish this here.
8         All right.  Did you have this in front of
9  you when -- or did you read this to the President or --
10   A.  No.  I -- it became a very narrow briefing, and
11 so I wasn't able to state all these talking points.  I
12 was prepared to, but it became a lot more narrow.
13   Q.  Understood.
14        Do you recall what, specifically, you did
15 relay to President Trump?
16   A.  The things that we wanted to make clear as
17 to -- is, one, that there are cartel decision-makers in
18 North Texas and Tarrant County.  Fentanyl was coming
19 across the border in great numbers, and China was
20 delivering that fentanyl to Mexico, and the cartels were
21 with them, collaborating with Chinese and Venezuelans,
22 in order to get that north of the border.
23        That was the essence of the -- of the
24 statements, and people in Tarrant County were dying
25 because of overdoses of fentanyl.

Page 92

1    Q.  Gotcha.
2         So -- so these were deaths and overdoses in
3  large part because of foreign actors that were pushing
4  these substances into your region?
5    A.  Correct.
6         MS. ABSTON:  Objection, form.
7  BY MR. BOONE:
8    Q.  Okay.  And that's what you wanted to convey to
9  President Trump, correct?
10   A.  That is correct.
11   Q.  All right.  In this talking point here, third
12 one down:  Tarrant County is a prime location for
13 Mexican cartels who take advantage of the elaborate
14 highway system to quickly and efficiently deliver
15 narcotics across the United States.
16        I take it you agree with that statement,
17 correct?
18   A.  I do, indeed.
19   Q.  The next statement that I have here highlighted
20 reads:  Fentanyl, once only a drug sold by a handfill
21 of -- handful of dealers is currently flooding the
22 Dallas/Fort Worth area in both jail -- in both pill and
23 powder form.
24        Is that correct?
25   A.  That is correct.

Page 93

1    Q.  And is that still the case today?
2    A.  It is slowing down a little bit, but it's
3  still -- there's still a plethora of dope out there.
4    Q.  Gotcha.
5         It reads next:  Low-level dealers have
6  access to large quantities of fentanyl powder.  They
7  have turned to making their own pills and "cutting" - or
8  mixing - the fentanyl powder with our drugs, especially
9  heroin, to increase potency and make more money.
10        Did I read that correctly?
11   A.  Yes, sir.
12   Q.  The fentanyl powder that's mentioned here,
13 where is that coming from?
14   A.  Mexico.
15        MS. ABSTON:  Objection, form.
16 BY MR. BOONE:
17   Q.  Okay.  Thank you for sharing it with me.
18        Let's look at Exhibit 14, please.
19        (Exhibit 14 was marked for identification.)
20        MR. BOONE:  And, Counsel, do you need to
21 take a look at this first?
22        MS. ABSTON:  Yes, if you don't mind.  We'll
23 just review it quickly.  I believe once Sheriff looks
24 through it, we might be good to talk about this one.
25        MR. BOONE:  Okay.

24 (Pages 90 - 93)

Page 94

1          THE WITNESS:  (Witness examines document.)
2          MS. ABSTON:  Okay, Aaron.  I think we're
3  good.
4          MR. BOONE:  Thank you.
5  BY MR. BOONE:
6     Q.  So now we're looking at Exhibit 14.  Do you
7  have Exhibit 14 in front of you, Sheriff?
8     A.  I do, sir.
9     Q.  Okay.  Can you tell me what this is?
10    A.  This is a -- a e-mail exchange between myself
11  and Sheriff Jim Skinner at Collin County.
12    Q.  And who is -- oh, I'm sorry.
13         Sheriff Skinner with Collin County; is that
14  correct?
15    A.  That is correct.
16    Q.  Okay.  Now, I see here in this e-mail section
17  that I'm showing on the screen; it's an e-mail from
18  Tully Yount dated June 28, 2021.
19         Do you know who Tully Yount is?
20    A.  Yes, sir.  He'd be the commander over the
21  interdiction units of the -- of the next sheriffs.
22    Q.  Okay.  Now, the subject of this e-mail states:
23  Requested Statistics Fiscal Year 2021.
24         Did I read that correctly?
25    A.  Yes, sir.

Page 95

1     Q.  And it goes on to say:  Sheriff, the here --
2  here is the attached statistics for 2021.  Please let me
3  know if you need anything else.
4          Is it your understanding that these are
5  statistics for the contraband that was seized during
6  2021 by this entity?
7     A.  Yes, sir.
8     Q.  And I'm reading here, we see:
9  Methamphetamines, 257.09 pounds; cocaine, 50 pounds;
10  marijuana, 397.75 pounds; heroin, 16.8 pounds; THC
11  products, 10.0 pounds; counterfeit pills, 16 pounds.
12         Did I read that correctly?
13    A.  I believe you did.
14    Q.  And by "counterfeit pills," these would be
15  pills illegally manufactured by drug dealers?
16    A.  That's what I'm --
17         MS. ABSTON:  Objection, form.
18         Go ahead.
19  BY MR. BOONE:
20    Q.  Go ahead.
21    A.  That -- I believe so, yes.
22    Q.  Okay.  Let's go to Exhibit 15 -- let me -- let
23  me step back for a second.
24         Now, in that list that you just read, none
25  of those items seized were prescription opioids,

Page 96

1  non-counterfeit prescription opioids, correct?
2          MS. ABSTON:  Objection, form.
3          THE WITNESS:  I -- I don't quite understand
4  your question, Aaron.
5  BY MR. BOONE:
6     Q.  Right.
7          Of the list of items that were seized, none
8  of those items were prescription opioids?
9          MS. ABSTON:  Objection, form.
10         THE WITNESS:  They didn't list them that
11  way, so I -- but I'm not sure.
12  BY MR. BOONE:
13    Q.  Okay.  All right.  Let's go through Exhibit 15.
14         (Exhibit 15 was marked for identification.)
15         MR. BOONE:  You want to take a look at
16  this, Counsel?
17         MS. ABSTON:  Yes, please.  Thank you,
18  Aaron.
19         THE WITNESS:  (Witness examines document.)
20         MS. ABSTON:  I think we're okay to talk
21  about this one, Aaron.
22         MR. BOONE:  Great.  Thank you.
23  BY MR. BOONE:
24    Q.  And we're looking at Exhibit 15.  Do you
25  recognize this, sir?

Page 97

1     A.  I do.  I vaguely remember this, yes, sir.
2     Q.  Okay.  And Calvin Bond is with your office,
3  correct?
4     A.  That is correct, sir.
5     Q.  Who is Katye Travis?
6     A.  She is my administrative assistant.
7     Q.  Gotcha.
8          And reading this, it states:  Katye, your
9  summary below is correct on the number of
10  fentanyl-related deaths.  I would suggest using this
11  regarding prices.  As the supply of fentanyl powder and
12  counterfeit pills has increased in Tarrant County over
13  the last year, prices have dropped.
14         Do you agree with that statement?
15    A.  Yes, sir.
16    Q.  Why have prices for these counterfeit -- sorry.
17         Why have these prices dropped?
18    A.  It is my belief because of the incredible
19  amount of drugs that are here.  It's that -- it's just
20  the supply is huge.
21    Q.  I see.
22         And, again, this is the supply of
23  counterfeit pills, fentanyl powder, et cetera, correct?
24    A.  Yes.  So --
25    Q.  Let me rephrase that.

25 (Pages 94 - 97)

Page 98

1          This is the -- sorry.
2          The increase in supply is related to the
3  increase of fentanyl powder and counterfeit pills,
4  correct?
5     A.  Yes, sir.
6     Q.  All right.  This next statement, it says:  In
7  2020, counterfeit M30 Percocet pill costs approximately
8  $20 per pill.  Today these illegal pills can be
9  purchased between 8 to $12.
10         Did I read that correctly?
11    A.  You did.
12    Q.  Is that a correct statement even today?
13    A.  I believe it is very close, yes, sir.
14    Q.  Okay.  And what does M30 refer to in this
15 Percocet pill phrase?
16    A.  M- -- the M30 pill, which is a pharmaceutical
17 narcotic, is often used by the cartel to disguise their
18 fentanyl pills to look like regular pharmaceuticals.
19    Q.  I see.
20         And so when we say "counterfeit M30
21 Percocet pills," we're talking about pills that are
22 created and brought to the country by the cartels?
23    A.  Yes, sir.
24         MS. ABSTON:  Objection, form.
25         THE WITNESS:  Yes, sir.

Page 99

1  BY MR. BOONE:
2     Q.  Thank you.
3         Okay.  And let's go to number --
4  Exhibit 16, please.
5         (Exhibit 16 was marked for identification.)
6  BY MR. BOONE:
7     Q.  And once you've got the document open, let me
8  know.
9         MS. ABSTON:  Okay.  I think we've got it
10 open.
11        MR. BOONE:  Okay.
12 BY MR. BOONE:
13    Q.  Sheriff, the beginning of this -- well, first
14 off, do you recognize this document?
15    A.  I do.
16    Q.  Okay.  What is this document?
17    A.  This is just a flier saying that myself and
18 a -- a mother who lost a child to fentanyl overdose was
19 going to speak at -- I believe it was the Catholic
20 parish.
21    Q.  Okay.  And do you often speak to those
22 constituents or individuals in the region?
23    A.  I do, sir.
24    Q.  Okay.  And do you recall this particular
25 event -- speaking at this event?

Page 100

1     A.  I do, yes, sir.
2     Q.  Okay.  This flier continues on the next page.
3  It says:  In 2021 Tarrant County has experienced a large
4  increase in fatal overdoses of fentanyl.  The most
5  affected group is the 16-to-24 years age bracket.
6          It goes on at the very end:  In all of
7  2019, only nine fentanyl deaths were recorded by the
8  Tarrant County Medical Examiner.  In 2020 they recorded
9  97 deaths of fentanyl overdose and 72 COVID-19 deaths.
10 In 2021 we've had 78 fentanyl overdose deaths compared
11 to 59 COVID -- COVID-19 deaths through August 18, 2021.
12         Did I read that correctly?
13    A.  Yes, sir.
14    Q.  Now, do you agree with this statement at the
15 top that talks about Tarrant County experiencing a large
16 increase in fatal overdoses in fentanyl?
17    A.  Yes, sir.
18    Q.  Okay.  Why do you attribute -- why do you say
19 the most affected group is the 16-to-24 year age
20 bracket?
21         MS. ABSTON:  Objection, form.
22         THE WITNESS:  Those statistics were just
23 delivered to me by either the ME's office or public
24 counselor.  I can't remember.
25 BY MR. BOONE:

Page 101

1     Q.  So you don't have an opinion as to why this
2  particular age bracket may or may not be the most
3  affected age group?
4     A.  I -- I do not.  I know that our youth,
5  unfortunately, are able to get their hands on fentanyl a
6  lot easier than other drugs sometimes.
7     Q.  I see.
8          Do you know who Stephanie Hellstern is?
9     A.  Yes.  She is the mother that spoke that evening
10 that lost a child to fentanyl overdose.
11    Q.  Okay.  Do you know how her child came to
12 possess the drug that took his life?
13         MS. ABSTON:  Objection, form.
14         THE WITNESS:  I -- secondhand, the story
15 is, is that he bought what he thought was a
16 pharmaceutical drug from a fellow, and he took it, and
17 he didn't live very long.
18 BY MR. BOONE:
19    Q.  Okay.  What is the Association of People
20 Against Lethal Drugs?
21    A.  I -- I believe this -- this was a group that
22 Stephanie was trying to start.  I don't know that it
23 ever fully got off the ground.
24    Q.  Okay.  Let's go to Exhibit 17, please.
25         (Exhibit 17 was marked for identification.)

26 (Pages 98 - 101)

Page 102

1 BY MR. BOONE:
2     Q.  Do you recall -- first off, are you -- do you
3 have Exhibit 17 in front of you?
4     A.  I do, sir.
5     Q.  Okay.  Do you recognize this?
6     A.  I do not recall this.
7     Q.  Okay.  It is an e-mail that is from Michael
8 Laughlin to several individuals, including you, dated
9 December 17th, 2021.
10         Do you know who Michael Laughlin is?
11     A.  He, at one time, worked for the county
12 administrator, and he was to assist in criminal justice
13 matters across the county.
14     Q.  The subject of this document reads "BGA" --
15 "BJA Grant Award Notice."
16         Do you know what that -- do you know what
17 the BJA Grant is?
18     A.  I -- that's the Bureau of Justice, but I -- I
19 am not -- I'm not familiar with this grant.
20     Q.  Okay.  Does your organization apply for grant
21 monies?
22     A.  Does the sheriff's office?
23     Q.  Yes, sir.
24     A.  Yes, sir.
25     Q.  Okay.  Has the sheriff's department been

Page 103

1 successful in being awarded grants?
2     A.  We have.
3     Q.  Okay.  What types of grants have you been
4 successful in obtaining?
5     A.  We have -- the two big ones are, we have an
6 auto-theft grant for a task force, and we have a
7 human-trafficking grant for human trafficking.
8     Q.  Okay.  As far as the auto theft, do you know
9 the approximate value?
10     A.  The current value that we just signed off on
11 is, I think, around 14 million.
12     Q.  Okay.  And the purpose and use for those grant
13 funds are what?
14     A.  To fund auto-theft investigators and -- and
15 their resources.
16     Q.  Is this a national grant?
17     A.  It's out of our Governor's Office.
18     Q.  With respect to the human-trafficking grant,
19 how much is that grant?
20     A.  It's a little over a million dollars.
21     Q.  So 14 million to recover cars, but only 1
22 million to recover people, huh?
23     A.  There you go, yeah.
24         MS. ABSTON:  Objection, form.
25 BY MR. BOONE:

Page 104

1     Q.  So do either of these grant funds touch on
2 substance abuse treatment services?
3     A.  No, sir.
4     Q.  Do either of these grants help deal with
5 substance abuse problems?
6         MS. ABSTON:  Objection, form.
7         THE WITNESS:  Indirectly?
8 BY MR. BOONE:
9     Q.  Yes, uh-huh.
10     A.  Indirectly, human trafficking and those
11 involved in auto theft, often there are drugs in the
12 mix.
13     Q.  Understood.  Okay.
14         Has your department ever applied for grant
15 monies specifically designed to address substance abuse
16 treatment or illicit-drug interdiction?
17     A.  I cannot remember any grants that are that
18 specific.
19     Q.  Okay.  My question was, I think:  Did you apply
20 for anything along those lines?  And I think your answer
21 was:  I don't recall there being any.
22         Are you saying you didn't -- you don't
23 recall applying for any, or there are none out there
24 that are even available?
25         MS. ABSTON:  Objection, form.

Page 105

1         The witness said:  I cannot remember any
2 grants that are that specific, is what the realtime's
3 reflecting.  So...
4         MR. BOONE:  Okay.  And I have realtime in
5 front of me, but thank you for that.
6 BY MR. BOONE:
7     Q.  So -- so, Sheriff, again, I'm just trying to
8 know what have you attempted to recover from grant funds
9 to help with substance abuse?
10     A.  I have no recollection of us being involved in
11 those.
12     Q.  Being involved in this?
13     A.  Is that -- you asked if we applied?  I'm sorry.
14     Q.  Applied, yes.  Applied.
15     A.  I don't believe -- I don't have in my memory
16 the specific grant that was specific to recovery or --
17 or rehabilitation.
18     Q.  Okay.  Have you applied for grant funds for new
19 equipment for your law enforcement officers?
20     A.  Yes.  Yes, sir.
21     Q.  What kind of equipment?
22     A.  Well, we've had software, and we've had --
23 there's software, and there's some equipment.  And I
24 believe it was in the area of less than lethal or, you
25 know, also, possibly, I believe, maybe drone operations,

27 (Pages 102 - 105)

Page 106

1 and I don't -- I don't recall anything else.
2    Q.  All right.  And were you successful in
3 acquiring grants to help fund those equipments?
4    A.  We have been successful in some of the
5 equipment grants.  I don't -- I don't know which ones to
6 be specific.
7    Q.  Sure.
8        And does some of that equipment help with
9 drug interdiction?
10   A.  Directly and indirectly --
11       MS. ABSTON:  Objection, form.
12       Go ahead.
13       THE WITNESS:  Directly and indirectly, it
14 does.
15 BY MR. BOONE:
16   Q.  Thank you.  Okay.
17       Do you -- does -- do you keep record of
18 grant monies that your department has received?
19   A.  Oh, absolutely.  We -- we manage those grants,
20 and there's some documentation somewhere of what
21 happened to all that.
22   Q.  Sure.
23       Do you know if -- if grant funds that are
24 received by a county agency like yourself, the sheriff
25 department, is that kept track of by the county auditor,

Page 107

1 if you know?
2    A.  As a general rule, the auditor will be
3 involved.
4    Q.  Gotcha.
5        Okay.  Let's look at Exhibit 18, please.
6        (Exhibit 18 was marked for identification.)
7 BY MR. BOONE:
8    Q.  And do you have Exhibit 18 in front of you?
9    A.  I do, sir.
10   Q.  Can you tell me what this is, please?
11   A.  This is a press release that -- from February
12 of '22.
13   Q.  I see.
14       And this is from the Sheriff of Tarrant
15 County, Texas.  It's from your department, correct?
16   A.  That is correct.
17   Q.  All right.  And it says:  The Tarrant County
18 Sheriff's Office Combined Narcotics Enforcement Team and
19 the Tarrant County Special Weapons and Tactics Team take
20 more drugs and guns out of the hands of criminals in our
21 community.
22       It goes on to say:  CNET Investigators
23 found more than 587 grams of M30 pills (fentanyl),
24 114 grams of cocaine, 100 and -- 1,344 grams of
25 marijuana, over 500 grams of unknown orange pills, and

Page 108

1 $87,000 in cash.
2        Did I read that correctly?
3    A.  You did.
4    Q.  All right.  And this next page appears to be a
5 photograph.  Does this depict the items that were
6 seized?
7    A.  Yes, sir, it does.
8    Q.  Okay.  Now, were any pharmaceuticals recovered
9 here that were not illegally manufactured?
10   A.  I have no idea what the unknown orange pills
11 were.  That would be the only one suspect.
12   Q.  Gotcha.
13       Are they typically tested to determine what
14 the substances are?
15   A.  They will be tested sometimes before court.  At
16 some point before court, they'll be tested.
17   Q.  Gotcha.
18       You know, in the seizures that we have read
19 during this deposition today, all of the pills, but for
20 this unknown orange pill, had been illegally
21 manufactured pills, correct?
22       MS. ABSTON:  Objection, form.
23       THE WITNESS:  I would believe that to be
24 correct.
25 BY MR. BOONE:

Page 109

1    Q.  During your time as sheriff of Tarrant County,
2 have all the pills that have been seized been illegally
3 manufactured pills?
4        MS. ABSTON:  Objection, form.
5        THE WITNESS:  I do not have those stats in
6 front of me.  I don't know.
7 BY MR. BOONE:
8    Q.  Do you know where those tests might be?
9    A.  Well, we hope that our narcotics unit may have
10 some annual stats on that.  So Commander McDonald or
11 Senior -- Senior Chief Calvin Bond might be able to
12 answer that.
13   Q.  You said Trace McDonald?
14   A.  Yes.
15   Q.  Okay.  Thank you.
16       Let's go to Exhibit 19, please.
17       (Exhibit 19 was marked for identification.)
18 BY MR. BOONE:
19   Q.  And do you have Exhibit 19 in front of you?
20   A.  I do, sir.
21   Q.  Can you tell me what this is, please?
22   A.  This is an annual report that we constructed of
23 the sheriff's office activity.
24   Q.  Understood.
25       And this is prepared by your office?

28 (Pages 106 - 109)

Page 110

1  A. It is.
2  Q. Okay. The very first page, the -- well, let's
3  say it's Page No. 3. I'm going to share my screen so
4  you can see.
5      You discuss, on January 1st, you had the
6  honor of being sworn in as the 39th Sheriff of Tarrant
7  County. You state that: It was not until I had
8  officially been sworn in that I could truly see where
9  the operations of the Tarrant County Sheriff's Office
10  stood. It states: There were policies that needed to
11  be repealed or amended.
12      Can you explain to me what those policies
13  that needed appealed -- repealed or amended were?
14  A. The first policy was, is that the previous
15  administration had on our fugitive team a no-pursuit
16  policy; meaning that if you knocked on the door of a
17  murder suspect and he ran out the back door and he got
18  in his car and drove off, they weren't allowed to
19  pursue. We changed something like that on day one in
20  order to chase those people down.
21      Some of the others on amendments were --
22  for instance, some of the weapons that could be carried
23  was a very conservative list, and I wanted it to be more
24  broad where people felt more comfortable with the --
25  their sidearms and -- and other weaponry. Those --

Page 111

1  we -- in the jail, our jailers weren't allowed to carry
2  handcuffs or less-than-lethal spray. We -- we amended
3  the policy immediately so that they could begin to carry
4  handcuffs and spray for their own protection. Those are
5  a few things that we immediately changed.
6  Q. Understood.
7      Were any policies changed with respect to
8  the practices and procedures related to seizure of drugs
9  and narcotics?
10  A. I don't remember on the seizure aspect of it.
11  We changed the mission of CNET to deal with more
12  mid-level drug activity.
13  Q. And here on the second page, page 4, this
14  touches on the topic that I addressed earlier on. It
15  reads: For the past 40 years, it was the accepted
16  practice in Tarrant County that TCSO would not accept
17  city prisoners into our county jail until a case had
18  been officially accepted by the Tarrant County Criminal
19  District Attorney's Office; is that correct?
20  A. That is correct.
21  Q. Right.
22      But you changed that policy so that you do
23  accept those prisoners and do take custody of them?
24  MS. ABSTON: Objection, form.
25  THE WITNESS: We -- we did.

Page 112

1  BY MR. BOONE:
2  Q. Okay. And that, of course, has increased the
3  percentage of your budget that has to go towards taking
4  care of prisoners and ensuring their safety, correct?
5  A. Had a unnoticeable change in our budget to take
6  care of prisoners. We -- we were -- we were still able
7  to do that with the budget we had.
8  Q. Right.
9      And if you could take a look at Exhibit 20,
10  please.
11      (Exhibit 20 was marked for identification.)
12  BY MR. BOONE:
13  Q. And could you tell me what this is?
14  A. It appears to be the budget requests for Public
15  Health.
16  Q. Okay. All right. Now, is the sheriff
17  department budget included in the Public Health section,
18  or is it separate?
19  A. I believe it's separate.
20  Q. Okay.
21  A. We -- I think these would be two different
22  budgets.
23  Q. Yeah, I think so too.
24      Let me ask you: Do you know if your budget
25  format looks similar to the Public Health format?

Page 113

1  A. Similar. Similar.
2  Q. Similarly?
3  A. Yeah. Thank you.
4  Q. Sure.
5      Okay. All right. That's all I have for
6  this one. Thank you.
7  MR. BOONE: Okay. Counsel, I think I'd
8  like to go off record.
9  MS. ABSTON: Okay.
10  THE VIDEOGRAPHER: All right. Time is 1:42
11  p.m. We are off the record.
12      (Brief recess taken.)
13  THE VIDEOGRAPHER: Time is 1:57 p.m. We
14  are on the record.
15  BY MR. BOONE:
16  Q. Sheriff, just a few more questions, if I may.
17      Earlier, I talked with you about the
18  existence, if at all, of a substance abuse problem or
19  crises in Tarrant County, and I asked you, quote: Do
20  you have any opinion as to which substances are
21  prevalent? And you answered: We are seeing fentanyl,
22  methamphetamine, and heroin.
23      And I was curious if there are any other
24  substances that you're seeing --
25  MS. ABSTON: Objection --

29 (Pages 110 - 113)

Page 114

1 BY MR. BOONE:
2   Q. -- or per -- per the crises?
3       MS. ABSTON: Objection, form.
4       THE WITNESS: Is -- I couldn't specifically
5 name them.  If they were here, we -- we -- I know we
6 have K2 problems; we've had those.  And I think we have
7 the whole bailiwick of them.  But, generally, right now,
8 you know, fentanyl's gotten our attention clearly,
9 because it's one pill, and you're -- you're dead.  So
10 that's -- that's the one to get your attention.
11 BY MR. BOONE:
12   Q. Understood.
13       Now, have you been asked to provide any
14 expert opinions in this lawsuit?
15   A. I don't think I've been requested by anyone, to
16 be quite honest.
17   Q. Now, is it fair to say you have no opinion as
18 to how retail pharmacies have contributed, if at all, to
19 any opioid crises?
20       MS. ABSTON: Objection, form.
21       THE WITNESS: I have no opinion.
22 BY MR. BOONE:
23   Q. Okay.  In many of the questions and answers
24 that we have shared today with respect to the specific
25 drug interdiction, you've -- HIDTA, et cetera -- have

Page 115

1 talked about some of the illicit-drug trafficking that's
2 been going through Tarrant County, correct?
3   A. Correct.
4   Q. Is it fair to say the vast majority of the law
5 enforcement resources for your department is being
6 earmarked and dedicated to the illicit-drug trafficking?
7       MS. ABSTON: Objection, form.
8       THE WITNESS: I would agree with that
9 statement, that the majority does go after that.
10 BY MR. BOONE:
11   Q. Okay.  Okay.
12   A. Not all.  I'm sorry.
13   Q. Not all of them?
14   A. No, not all of them.
15       MR. BOONE: Sheriff, those are all the
16 questions I have for now.  I -- thank you very much for
17 your time.  I may have questions if other counsel have
18 any follow-ups.  Okay?
19       THE WITNESS: Thank you.
20           EXAMINATION
21 BY MS. STEWART:
22   Q. Sheriff, my name is Allison Stewart.  We met
23 just before we went on the record to start this morning,
24 but to remind you, I'm an attorney at Greenberg Traurig,
25 and I'm representing the Albertsons as a defendant in

Page 116

1 this case, and I have just a couple questions for you.
2 I don't want to re- -- re-cover what Mr. Boone has
3 already covered.
4       So I understand Mr. Boone just asked you a
5 question about opinions.  But my question for you is:
6 Do you have any information that would indicate that any
7 retail pharmacies, including Kroger and Albertsons, were
8 participating inappropriately in any diversion of
9 prescription opioids?
10       MS. ABSTON: Objection, form.
11       THE WITNESS: I don't recall any briefings
12 that involved those two.
13 BY MS. STEWART:
14   Q. Okay.  Do you have any information to provide
15 where a retail pharmacist or pharmacy perpetrated some
16 wrongdoing when it comes to the dispensing of
17 prescription opioids?
18       MS. ABSTON: Objection, form.
19       THE WITNESS: I have none.
20       MS. STEWART: Those are my only questions
21 for you.  Thank you.
22       THE WITNESS: Okay.  Before we close out the
23 deposition today, could we go off the record very
24 quickly?
25       MR. BOONE: I do have follow-up questions.

Page 117

1       MS. ABSTON: Oh, sorry.  Go ahead.  Sorry.
2       FURTHER EXAMINATION
3 BY MR. BOONE:
4   Q. Thank you, Sheriff.  And I appreciate you
5 answering Ms. Stewart's questions.
6       And I believe one of your responses to the
7 question of whether you had any information that would
8 indicate any retail pharmacies were participating
9 inappropriately in diversion of prescription opioids,
10 you answered: I don't recall any briefings that
11 involved those two.
12       Are you aware of other retail pharmacies?
13       MS. ABSTON: Objection, form.
14       THE WITNESS: I am not.
15 BY MR. BOONE:
16   Q. Okay.
17       MR. BOONE: That's all I have.
18       MS. ABSTON: Okay.  Before we close out,
19 can we go off the record really quick?
20       THE VIDEOGRAPHER: Okay.  Time is 2:02 p.m.
21 We are off the record.
22       (Brief recess taken.)
23       THE VIDEOGRAPHER: Time is 2:05 p.m.  We
24 are on the record.
25       MS. ABSTON: Okay.  Thank you.

30 (Pages 114 - 117)

Page 118

1    Before we close out today, we would like to
2 make a statement about what has been marked as Exhibit
3 No. 11. The Bates number reads TARRANT_00861977. We
4 would like to claw back this document for the limited
5 purpose of redacting the names of law enforcement
6 officers engaged in sensitive or undercover operations,
7 and that should not have been disclosed. We will be
8 replacing the document with an overlay production, and
9 we ask that any copies of the originally produced
10 document be destroyed.
11    We're asking for the defendants' agreement
12 in not only this, but also that the names of any of
13 those officers be struck from the record and redacted
14 from the record. So we are happy to provide the
15 defendants and the court reporter with redacted versions
16 of the exhibits, and we'll be circulating an e-mail
17 request that contains this information as well.
18    MR. BOONE: Counsel, we have no objection
19 to that. Off record, you gave a little bit more detail
20 as to why it is protected, and so given that
21 information, we agree.
22    The only caveat is, there has been a
23 videotape made of this deposition, and I have shared my
24 screen from time to time, and it is possible that the
25 name was shown on my screen, and so I would just ask

Page 119

1 that the burden on getting with the videographer and
2 making sure that does not appear inappropriately, that
3 that burden rests with Plaintiff, with your office, and
4 that you'll make sure that's taken care of prior to its
5 use at trial, if --
6    MS. ABSTON: Absolutely.
7    MR. BOONE: -- it goes that way. Okay.
8    MS. ABSTON: And thank you, Aaron. Yes,
9 absolutely.
10    Okay. And we want to close with this:
11 Thank you for your time today, Sheriff. Thank you for
12 all your -- all that you do for Tarrant County, and we
13 know that this is a significant portion of your day, and
14 we just really appreciate it. And thank you for all
15 that you do.
16    Thank you, everyone.
17    THE VIDEOGRAPHER: Mrs. Behan, do you have
18 anything for the record?
19    THE COURT REPORTER: If anyone would like a
20 copy of the transcript, you can let me know that now.
21    MR. BOONE: I would.
22    MS. ABSTON: Yes, and I think that Sadie
23 from our office is going to be reaching out about the
24 transcript as well.
25    MR. BOONE: Sheriff, pleasure meeting with

Page 120

1 you. Thank you for answering my questions and spending
2 some time with me. Best of luck to you.
3    THE WITNESS: Thank you, Aaron. It was
4 good -- thank you. And Allison, also.
5    THE VIDEOGRAPHER: All right. Well, this
6 concludes today's deposition. Time is 2:08 p.m. We are
7 off the record.
8    (Deposition concluded at 2:08 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 121

1    IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF OHIO
2         EASTERN DIVISION
3 IN RE: NATIONAL PRESCRIPTION ) MDL No. 2804
   OPIATE LITIGATION         )
4                           )
5 THIS DOCUMENT RELATES TO:    )
   Track Nine: Tarrant County,  ) Case No.: 17-md-2804
6 Texas                      )
                            )
7                           )
   (Case No. 1: 18-op-45274-DAP)  ) Judge Dan Aaron Polster
8 --------------------------------)
9
       REPORTER'S CERTIFICATION
10   ORAL AND VIDEOTAPED DEPOSITION OF
        BILLY EARL WAYBOURN
11      THURSDAY, JULY 6, 2023
12   I, Kari J. Behan, CSR, RPR, CRR, and in and for the
   State of Texas, do hereby certify that the facts as
13 stated by me in the caption hereto are true;
     That there came before me the aforementioned named
14 person, who was by me duly sworn to testify the truth
   concerning the matters in controversy in this cause;
15   And that the examination was reduced to writing by
   computer transcription under my supervision; that the
16 deposition is a true record of the testimony given by
   the witness.
17   I further certify that I am neither attorney or
   counsel for, nor related to or employed by, any of the
18 parties to the action in which this deposition is taken,
   and further that I am not a relative or employee of any
19 attorney or counsel employed by the parties hereto, or
   financially interested in the action.
20   Given under my hand and seal of office on this 27th
   day of July, 2023.
21
22   _____, RPR, CRR
23   Texas CSR NO. 8564;
   Expiration Date: 7-31-2024
24   VERITEXT LEGAL SOLUTIONS
   Firm Registration No. 571
25   Telephone (800) 336-4000

Page 122

1        Veritext Legal Solutions
             1100 Superior Ave
2           Suite 1820
          Cleveland, Ohio 44114
3       Phone: 216-523-1313
4
   July 28, 2023
5
   To: ALEX ABSTON
6
   Case Name: National Prescription Opiate Litigation - Track 9 (Tarrant
7   County) v.
8   Veritext Reference Number: 5945991
9   Witness:  Bill Earl Waybourn    Deposition Date:  7/6/2023
10
   Dear Sir/Madam:
11
12  Enclosed please find a deposition transcript.  Please have the witness
13  review the transcript and note any changes or corrections on the
14  included errata sheet, indicating the page, line number, change, and
15  the reason for the change.  Have the witness' signature notarized and
16  forward the completed page(s) back to us at the Production address shown
17
   above, or email to production-midwest@veritext.com.
18
19  If the errata is not returned within thirty days of your receipt of
20  this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Page 123

1      DEPOSITION REVIEW
      CERTIFICATION OF WITNESS
2
3   ASSIGNMENT REFERENCE NO: 5945991
   CASE NAME: National Prescription Opiate Litigation - Track 9
   (Tarrant County) v.
   DATE OF DEPOSITION: 7/6/2023
4   WITNESS' NAME: Bill Earl Waybourn
5   In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7   I have made no changes to the testimony
   as transcribed by the court reporter.
8   _____
9   Date      Bill Earl Waybourn
10  Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
   They have read the transcript;
13  They signed the foregoing Sworn
      Statement; and
14  Their execution of this Statement is of
      their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18   _____
19   Notary Public
   _____
20   Commission Expiration Date
21
22
23
24
25

Page 124

1      DEPOSITION REVIEW
      CERTIFICATION OF WITNESS
2
3   ASSIGNMENT REFERENCE NO: 5945991
   CASE NAME: National Prescription Opiate Litigation - Track 9
   (Tarrant County) v.
   DATE OF DEPOSITION: 7/6/2023
4   WITNESS' NAME: Bill Earl Waybourn
5   In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7   I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9   I request that these changes be entered
   as part of the record of my testimony.
10
   I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
   that both be appended to the transcript of my
12  testimony and be incorporated therein.
13   _____
   Date      Bill Earl Waybourn
14
   Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
16  and acknowledge that:
17   They have read the transcript;
18   They have listed all of their corrections
     in the appended Errata Sheet;
   They signed the foregoing Sworn
19     Statement; and
   Their execution of this Statement is of
20     their free act and deed.
21  I have affixed my name and official seal
22  this _____ day of_____, 20____.
23   _____
   Notary Public
24   _____
25   Commission Expiration Date

Page 125

1      ERRATA SHEET
     VERITEXT LEGAL SOLUTIONS MIDWEST
2      ASSIGNMENT NO: 5945991
3  PAGE/LINE(S) /    CHANGE    /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
   _____
20 Date      Bill Earl Waybourn
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23 _____
   Notary Public
24
25 _____
   Commission Expiration Date

32 (Pages 122 - 125)