# EXHIBIT 39

Page 1

1                  UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF OHIO

3                        EASTERN DIVISION

4     _____

5     In Re:  National Prescription,   MDL No. 2804

6     Opiate Litigation                Case No. 17-md-2804

7                                      Judge Dan Aaron Polster

8     _____

9

10

11               REMOTE VIDEOTAPED DEPOSITION OF

12                          Mike Simonds

13                     Taken August 15, 2023

14                  Commencing at 10:36 a.m.

15

16

17

18

19

20

21    REPORTED BY:  CHRISTA A. REESER, RPR, CRR, CRC

22

23

24

25

Page 2

1      Remote videotaped deposition of Mike Simonds
2  taken on Tuesday, August 15, 2023, commencing at 10:36
3  a.m., before Christa A. Reeser, Registered
4  Professional Reporter, Certified Realtime Reporter,
5  Certified Realtime Captioner, and Notary Public of and
6  for the State of Minnesota.
7
8                  **********
9
10                 APPEARANCES
11
12 ON BEHALF OF THE PLAINTIFF TARRANT COUNTY:
13      Alex Abston, Esq. (via Zoom)
14      Leila Ayachi, Esq. (via Zoom)
15      THE LANIER LAW FIRM, PC
16      10940 W. Sam Houston Pkwy N., Suite 100
17      Houston, Texas 77064
18      713-659-5200
19      alex.abston@lanierlawfirm.com
20      leila.ayachi@lanierlawfirm.com
21
22
23 (APPEARANCES continued on next page)
24
25

Page 3

1       APPEARANCES (continued)
2
3  ON BEHALF OF THE ALBERTSONS DEFENDANTS:
4       Allison M. Stewart, Esq. (via Zoom)
5       GREENBERG TRAURIG, LLP
6       2200 Ross Avenue, Suite 5200
7       Dallas, Texas 75201
8       214-665-3641
9       stewarta@gtlaw.com
10
11
12 ON BEHALF OF THE KROGER DEFENDANTS:
13      Gregory M. Sudbury, Esq. (via Zoom)
14      QUILLING SELANDER LOWNDS WINSLETT & MOSER
15      2001 Bryant Street, Suite 1800
16      Dallas, Texas 75201
17      214-880-1878
18      gsudbury@qslwm.com
19
20      Anthony Ryan, Esq. (via Zoom)
21      BOWLES RICE, LLP
22      600 Quarrier Street
23      Charleston, West Virginia 25301
24      304-347-1100
25      anthony.ryan@bowlesrice.com

Page 4

1
2  ALSO PRESENT (via Zoom):
3       Megan King, Veritext Videographer
4       Gregg Holderman, Veritext Concierge
5       Sadie Turner, Lanier Law Firm Staff
6       Katie Owens, Tarrant Co. Asst. Criminal D.A.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

                 I N D E X

WITNESS:  Mike Simonds                PAGE
     Examination by Mr. Sudbury............  11


EXHIBITS MARKED                       PAGE
     Exhibit 1 - LinkedIn Profile of Mike   24
          Simonds
     Exhibit 2 - 4/1/2016 Tarrant County    35
          Sheriff's Office Facebook
          Post
     Exhibit 3 - 1/1/2017 Tarrant County    56
          Sheriff's Office Command
          Staff Organizational Chart
     Exhibit 4 - 10/26/2016 E-mail Exchange 57
          Between Mike Simonds,
          David Grantham
     Exhibit 5 - FY 2011 Decision Package    60
          New Positions - Deputy
          Sheriff Effective 11/1/2012
     Exhibit 6 - FY 2011 Decision Package    64
          New Positions - Deputy
          Sheriff Effective 11/1/2015

2 (Pages 2 - 5)

Page 6

1      EXHIBITS (continued)
2
3  EXHIBITS                          PAGE
4      Exhibit 7 - 3/19/2018 Appointment     68
5          Invitation From David
6          Grantham
7      Exhibit 8 - 3/19/2018 Forwarded E-mail   72
8          From David Grantham to
9          Mike Simonds
10     Exhibit 9 - 5/19/2017 E-mail From     77
11         Lance Sumpter
12     Exhibit 10 - Draft Letter RE: ONDCP     79
13         and the HIDTA Program
14     Exhibit 11 - ONDCP and HIDTA Talking     81
15         Points
16     Exhibit 12 - 12/8/2017 Minutes of the     86
17         Texoma HIDTA Executive
18         Board Meeting
19     Exhibit 13 - 2/15/2019 HIDTA Executive     89
20         Board Meeting Agenda
21     Exhibit 14 - 6/27/2019 E-mail From     91
22         Christine Lunger Re:
23         Texoma HIDTA Performance
24         Management Process Reports
25

Page 7

1      EXHIBITS (continued)
2
3  EXHIBITS                          PAGE
4      Exhibit 15 - Texoma HIDTA 2018 Annual     94
5          Report
6      Exhibit 16 - 3/25/2021 Press Release     101
7      Exhibit 17 - Texoma HIDTA 2019 Threat     103
8          Assessment
9      Exhibit 18 - Texoma HIDTA 2021 Threat     109
10         Assessment
11     Exhibit 19 - Tarrant County Sheriff's     118
12         Office Annual Report
13     Exhibit 22 - The Henderson 2019     124
14     Exhibit 24 - 8/24/2018 E-mail From     131
15         Keitha Hallenbeck
16     Exhibit 25 - August 2018 Intelligence     132
17         Briefing
18     Exhibit 26 - 4/12/2019 E-mail From     135
19         SAT News Brief to Mike
20         Simonds
21     Exhibit 27 - 1/14/2022 E-mail From     139
22         Trace McDonald to Calvin
23         Bond
24     Exhibit 28 - CNET 2022 Statistics     144
25

Page 8

1      EXHIBITS (continued)
2
3  EXHIBITS                          PAGE
4      Exhibit 33 - 4/23/2021 SOAR Coalition     159
5          Meeting Minutes
6      Exhibit 34 - 2/25/2022 E-mail From     161
7          Jennifer Gabbert Re: Press
8          Release
9      Exhibit 35 - 2/25/2022 Tarrant County     161
10         Sheriff's Office Press
11         Release
12     Exhibit 36 - 10/16/2018 Forwarded E-mail  163
13         From David Grantham Re:
14         Group Pharmacy Burglaries
15     Exhibit 37 - 5/4/2018 Forwarded E-mail     166
16         From David Grantham Re:
17         Intelligence Bulletin
18     Exhibit 38 - 8/4/2021 Forwarded E-mail     171
19         From David Grantham Re:
20         Aggravated Robberies of
21         Small Pharmacies
22     Exhibit 39 - 8/3/2021 FBI Activity     171
23         Alert
24     Exhibit 40 - 7/14/16 Forwarded E-mail     174
25         From Mike Simonds

Page 9

1      EXHIBITS (continued)
2
3  EXHIBITS                          PAGE
4      Exhibit 41 - 5/24/2021 Forwarded E-mail   179
5          From Mike Simonds Re:
6          Overdose death trends
7          Requested by Sheriff
8      Exhibit 42 - 6/2/2021 E-mail From     186
9          David Grantham
10     Exhibit 43 - 6/28/2021 E-mail From     189
11         Calvin Bond to Katye
12         Travis, Niki Kestenbaum
13     Exhibit 44 - Fentanyl Update CNET     190
14         Investigations
15     Exhibit 45 - 6/8/2017 E-mail Exchange     196
16         Between Elaine Johnson,
17         Brandie Bingham
18     Exhibit 46 - 1/25/2018 Forwarded E-mail   200
19         From Calvin Bond to Jerry
20         Vennum
21     Exhibit 47 - 4/8/2019 PERF Daily Clips     204
22     Exhibit 48 - 12/13/2018 E-mail Exchange   206
23         Between David McClelland,
24         Craig Driskell, Floyd
25         Heckman

3 (Pages 6 - 9)

Page 10

1
2        THE VIDEOGRAPHER: We are on the record at
3  10:36 a.m. on August 15, 2023. This is the deposition
4  of Mike Simonds in the matter of In Re: National
5  Prescription Opiate Litigation filed in the Northern
6  District of Ohio, Eastern Division, Case Number
7  17-MD-2804.
8        This deposition is being conducted remotely.
9  At this time, counsel, please state your appearances,
10 beginning with the noticing attorney.
11       MR. SUDBURY: Yes. Good morning. This is
12 Gregory Sudbury on behalf of the Kroger defendants.
13       MS. ABSTON: I'm Alex Abston from the
14 Lanier Law Firm on behalf of Tarrant County, and we
15 also have Leila and Sadie on as well.
16       MS. STEWART: This is Allison Stewart for
17 Defendants Albertsons.
18       MR. RYAN: This is Tony Ryan with Bowles
19 Rice law firm for the Kroger entities.
20       MS. OWENS: Katie Owens, Assistant
21 Criminal District Attorney with Tarrant County.
22
23            MIKE SIMONDS,
24  duly sworn, was examined and testifies as follows:
25

Page 11

1            EXAMINATION
2  BY MR. SUDBURY:
3    Q. Good morning, Mr. Simonds, my name is Gregory
4  Sudbury, and I'm here today, I represent Kroger as we
5  just talked about before we went on the record there.
6        Do you understand that?
7    A. Yes, sir.
8    Q. Okay. Could you please state your full name
9  for the record?
10   A. It's Michael Eugene Simonds.
11   Q. And are you personally represented by counsel
12 today in connection with this deposition?
13   A. No.
14   Q. And Ms. Owens -- was she -- did she -- did
15 Tarrant County provide -- make Ms. Owens available to
16 you in connection with this deposition today?
17   A. I'm assuming so.
18   Q. Okay. And are you a former employee of Tarrant
19 County; is that correct?
20   A. Yes, sir.
21   Q. Okay. Have you ever been deposed before?
22   A. Yes, sir.
23   Q. Okay. How many times?
24   A. In -- over a 42-year career, you know, I -- ten
25 times.

Page 12

1    Q. Okay. Sounds to me like you're ballparking or
2  maybe guessing a little bit with that answer; is that
3  fair?
4    A. That's absolutely fair.
5    Q. Okay. Well, let's be careful about that.
6  Today there will be times where I may ask you to
7  speculate or guess and then there certainly will be
8  other times -- generally, I do not want you to
9  speculate -- speculate or guess.
10       So let me ask this question, try to drill down.
11 Before today, do you recall approximately when it was
12 you last gave a deposition?
13   A. Three months ago.
14   Q. Okay. And generally, what was the context of
15 that deposition? Why were you being deposed?
16   A. It was a former employee matter.
17   Q. Let me ask this: For the approximately ten
18 depositions you've given before in your 42-year career,
19 have any of them been related or connected in any way
20 to opioids or pharmaceutical opioids?
21   A. No, sir.
22   Q. Okay. All right. Then it sounds to me,
23 particularly with the deposition about three months
24 ago, that you are generally familiar with the ground
25 rules for a deposition; is that fair?

Page 13

1    A. Yes, sir.
2    Q. And where are you currently located?
3    A. My home residence?
4    Q. No -- no, right now, as you sit today, where
5  are you?
6    A. Oh, I'm at the Tarrant County District
7  Attorney's Office in Fort Worth, Texas.
8    Q. And Ms. Owens is present with you, correct?
9    A. That's correct.
10   Q. Anybody else in the room with you?
11   A. No, sir.
12   Q. All right. We will get through this rather
13 quickly, given your familiarity with depositions, but
14 this is not intended to be a marathon. I understand
15 that we got started late. I'm going to do my best not
16 to -- not to try to rush us through to do what we need
17 to do today, but if at any point you need to take a
18 break, please let me know that; is that fair?
19   A. Yes, sir.
20   Q. I will generally try to stop every 60 to 75
21 minutes and do a short break. I'm happy if -- if I
22 blow through that, either you remind me or one of the
23 lawyers can remind me. So let me know.
24       Do you have a general understanding of what the
25 claims are that are being asserted by Tarrant County in

4 (Pages 10 - 13)

Page 14

1  this lawsuit?
2     A.  No, sir.
3     Q.  Okay.  Have you read or reviewed the legal
4  complaint filed by Tarrant County in this matter?
5     A.  No.
6     Q.  Backtrack to a couple more general rules.  You
7  understand you've been sworn in, taken an oath.  This
8  is as though you were testifying in front of a judge or
9  a jury.  Is that your understanding?
10    A.  Yes, sir.
11    Q.  All right.  And this one is really important,
12 because it's going to happen today:  If I ask a
13 question that you do not understand, please let me know
14 that you don't understand my question, otherwise I'm
15 going to assume that you understood the question; is
16 that fair?
17    A.  That's fair.
18    Q.  All right.  And the other thing you are doing
19 an excellent job like a real pro on this, we have a
20 stenographer, she's writing everything down for us,
21 she'll put it in a booklet.  We need to be very
22 careful, particularly in a remote setting, about not
23 speaking over each other.  So mutual courtesy in play
24 here.  Please let me finish my question, even if you
25 know the answer, and I will do my best to not speak

Page 15

1  over you; is that fair?
2     A.  Yes, sir.
3     Q.  All right.  And then one more thing that's
4  really important is that I do need verbal answers, yes
5  or no, whatever the verbal answer may be, instead of a
6  head nod.  I don't get the impression that is going to
7  be a concern with you, but a lot of witnesses just are
8  head nod or shoulder shrug, but we need verbal answers;
9  is that fair?
10    A.  Yes, sir.
11    Q.  All right.  At times today, counsel may object
12 to the form of my question.  That's some legalese to
13 reserve an observation.  Unless you are specifically
14 instructed not to answer my question, you may go ahead
15 and do that even if there's an objection to form; is
16 that fair?
17    A.  Yes, sir.
18    Q.  All right.  And there may be an occasion, I
19 doubt that -- I hope there won't be many -- where I
20 need to object as nonresponsive.  And I'm not picking
21 on you if I need to do that, I'm just -- I'm just doing
22 my job, and perhaps I'll come in and find another way
23 to rephrase -- phrase the question; is that fair?
24    A.  Yes, sir.
25    Q.  Any questions regarding these instructions?

Page 16

1     A.  No, sir.
2     Q.  All right.  Are you currently taking any
3  medications or do you have any medical condition that
4  would impair your ability to recall events or to answer
5  my questions today?
6     A.  No, sir.
7     Q.  All right.  Jumping forward a little bit, sorry
8  I've already jumped around a little bit, but do you
9  have a -- you mentioned that you hadn't read the
10 lawsuit.  Do you have a general understanding of what
11 this case is about?
12    A.  I know it's about opioid addiction.
13    Q.  Okay.  What's the source of your understanding?
14    A.  Basically from having prior conversations with
15 counsel and the notice of the deposition.
16    Q.  Okay.  And let me make clear that I do not want
17 to inquire as to the communications that you have had
18 with counsel.
19       Okay.  So your general understanding is based
20 on the deposition notice itself and communications with
21 counsel; is that fair?
22    A.  Yes, sir.
23    Q.  Anything else that you've done to familiarize
24 yourself at least generally with the context of this
25 lawsuit?

Page 17

1     A.  No, sir.
2     Q.  All right.  Well, then let me tell you this,
3  and this may be new news or it may be old news to you,
4  but that Tarrant County has sued Kroger and other chain
5  pharmacies alleging that the pharmacies contributed to
6  an opioid epidemic causing Tarrant County to lose money
7  through various resources.  That's -- that is the gist
8  of it.
9        Were you aware of that?
10    A.  No, sir.
11       MS. ABSTON:  Objection; form.
12 BY MR. SUDBURY:
13    Q.  All right.  All right, before we get into this,
14 let's see if we can agree on some -- some terms to try
15 to -- to -- to perhaps shorten this up and tighten this
16 up.  So hopefully to make things easier, I've got a
17 list of some terms here that I hope are the similar
18 vernacular that you would use and we can go from there.
19 Can we agree that if I use the term TCSO that I'm
20 referring to the Tarrant County Sheriff's Office; is
21 that fair?
22    A.  Yes, sir.
23    Q.  Okay.  Can we have an understanding that the
24 term CNET, C-N-E-T, refers to the Tarrant -- Tarrant
25 County Sheriff's Office Combined Narcotics Enforcement

5 (Pages 14 - 17)

Page 18

1 Team?
2     A.  Yes, sir.
3     Q.  Okay.  And if I use the term DEA, can we have
4 an understanding that I'm referring to the United
5 States Drug Enforcement Administration; is that fair?
6     A.  Yes, sir.
7     Q.  All right.  And then this one, HIDTA,
8 H-I-D-T-A, which I understand is pronounced HIDTA, is
9 an acronym for High Intensity Drug Trafficking Area.
10 Can we agree on that?
11     A.  Yes, sir.
12     Q.  Okay.  What do you understand the term
13 "opioids" to mean?
14     A.  I understand opioid to be a morphine derivative
15 that comes in different -- under different generic
16 names, often used as a pain killer.
17     Q.  Okay.  And opioids can broadly include what are
18 called illicit opioids such as heroin, fentanyl,
19 cocaine, as well as prescription opioids which are FDA
20 and DEA approved medications manufactured by
21 pharmaceutical companies and legally available with a
22 prescription.  Would you agree with that?
23     A.  Yes, sir.
24     Q.  And it's the dispensing of prescription opioids
25 that my client has been blamed for by Tarrant County.

Page 19

1 Do you generally understand that now?
2         MS. ABSTON:  Objection; form.
3     You can answer, Senior Chief.
4         THE WITNESS:  Can you repeat the question,
5 please?
6         MR. SUDBURY:  Sure.  Fair enough.
7 BY MR. SUDBURY:
8     Q.  It's the dispensing of prescription opioids
9 that my client's been blamed for in this lawsuit by
10 Tarrant County.  Do you understand that as the general
11 matter?
12     A.  Yes, sir.
13     Q.  Okay.  And do you believe that prescription
14 opioids can have legitimate medical uses?
15         MS. ABSTON:  Objection; form.
16         THE WITNESS:  When there's an objection to
17 form, after that's made, then I'm free to answer?
18         MS. ABSTON:  Senior Chief, you can answer
19 unless I tell you otherwise, yes, sir.
20         THE WITNESS:  All right.  Thank you.
21         Yes.
22 BY MR. SUDBURY:
23     Q.  Okay.  And you had mentioned earlier when we
24 were talking about opioids in your definition, I think
25 you said that one of the things it could be used for is

Page 20

1 as a pain killer; is that correct?
2     A.  That's my understanding, my layman's
3 understanding.
4     Q.  Fair enough.
5         And a pain killer could be among the legitimate
6 medical uses for -- for prescription opioids; is that
7 generally your understanding?
8         MS. ABSTON:  Objection; form.
9         THE WITNESS:  Once again, I mean, I -- I'm
10 not a doctor or pharmacist, but, yes, I understand that
11 prescription opioids can be used as a pain killer.
12 BY MR. SUDBURY:
13     Q.  Okay.  And would you agree with me there are
14 quite a few people who suffer from legitimate injuries
15 and pain that seek medical care from a health care
16 provider and are provided prescriptions for opioids
17 upon the -- upon the determination that it's medically
18 necessary.  Would you generally agree with that?
19         MS. ABSTON:  Objection; form.
20         THE WITNESS:  I would generally agree to
21 that.
22 BY MR. SUDBURY:
23     Q.  All right.  Would you agree that a doctor that
24 is examining or treating a patient is in the best
25 position to assess medical necessity for that patient?

Page 21

1         MS. ABSTON:  Objection; form.
2         THE WITNESS:  Generally, I would agree
3 with that.
4 BY MR. SUDBURY:
5     Q.  All right.  And then would you agree when
6 prescribed and used properly that opioids can provide
7 benefits to patients suffering from issues such as
8 acute and chronic pain?
9         MS. ABSTON:  Objection; form.
10         THE WITNESS:  Yes.
11 BY MR. SUDBURY:
12     Q.  Okay.  Without getting into any specifics of
13 what you may have discussed -- I'm going to switch
14 gears here a little bit -- did you meet with anyone to
15 prepare for your deposition today?
16     A.  Okay.  I'm -- you -- the first part of your
17 question was what -- can you say that again, please?
18     Q.  Yeah, I -- I -- I made that too complicated.
19 Thank you.
20         Did you meet with anybody to prepare for your
21 deposition today?
22     A.  I met online with attorneys.
23     Q.  Okay.  Did you meet with any non-lawyers to
24 prepare for your deposition today?
25     A.  No, sir.

6 (Pages 18 - 21)

Page 22

1  Q. Did you go to anybody in Tarrant County and
2  say, hey, I'm being deposed on August 15th, I think
3  it's going to be about subject X, can you provide me
4  some material related to subject X? Anything along
5  those lines?
6  A. No, sir.
7  Q. Approximately how long did you meet with the
8  attorneys to prepare for the deposition?
9  A. Total time?
10  Q. Total time. Yes, sir.
11  A. Maybe two hours.
12  Q. How many times did you meet with the attorneys?
13  A. I believe I had three telephone conversations.
14  Q. Did you review any documents or materials to
15  prepare for your deposition?
16  A. No, sir.
17  Q. All right. Then let's do this, we talked about
18  it before we went on the record, it is my understanding
19  that you have a large envelope with some exhibits that
20  have been delivered and that the attorneys do as well.
21  If you would, please, go ahead and open that envelope.
22      Okay. You've got that complete and the
23  envelope open and the binder in front of you, correct?
24  A. That's correct.
25      MS. ABSTON: Sorry, can ya'll give me one

Page 23

1  minute? I had a little bit of a technical difficulty.
2      MR. SUDBURY: Sure.
3      MS. ABSTON: I'm always afraid I'm going
4  to, on the record, cut my finger open with this thing.
5  Hold on. Sorry guys, hold on.
6      MR. SUDBURY: No problem.
7      MS. ABSTON: Good to go. Thank you.
8  BY MR. SUDBURY:
9  Q. Okay. Mr. Simonds, that binder that you just
10  opened, fingers crossed, I hope that there are
11  numerical tabs in that binder.
12      Do you see that?
13  A. Yes, sir.
14  Q. Could you take a look for me, please, and there
15  should be numerical tabs 1 through 62, six-two. Does
16  that look correct in your binder?
17  A. Yes, sir.
18  Q. All right. Great.
19      I will tell you you're not going to go in
20  numerical order, I am going to jump around, but I will
21  make it as clear as I can which -- which exhibit we're
22  going to talk about. So -- so hang in there with me
23  today, but just know we're not going 1 through 62 in
24  linear fashion.
25      All right. I'd like to get some information

Page 24

1  about your personal background. I think to do so, if
2  you would, please, turn to tab number 1 in the binder.
3  And my question, once you have that open, is that -- is
4  does that appear to be your LinkedIn profile?
5      MS. ABSTON: Counsel, before we -- are --
6  if you intend on marking this deposition, we just want
7  to place an objection on the record that we do not have
8  a URL on this exhibit and don't have a date. I'll
9  go ahead and let you ask questions about it, but we
10  just want to note that we'll object to this line of
11  questioning and this exhibit.
12      You can go ahead.
13  BY MR. SUDBURY:
14  Q. Yeah, you can go ahead and answer the question
15  if you recall it.
16  A. Can you repeat the question, please?
17  Q. Sure.
18      Does tab number 1, does it appear to be your
19  LinkedIn profile?
20  A. Yes, sir.
21  Q. All right. So let's talk about a summary of
22  your postsecondary school education. I see on here
23  you've got Steven F. Austin State University, Criminal
24  Justice/Law Enforcement, September 2003 until December
25  2003; is that correct?

Page 25

1  A. It's --
2  Q. Page -- page number 2.
3  A. Yeah, I'm not sure what -- why that date is on
4  there. I graduated from Steven F. Austin in 1979.
5  Q. Okay. So let me ask this question then. It
6  appears that date is off. For the FBI National Academy
7  215th, is that date, September to December 2003, does
8  that -- is that accurate?
9  A. That would probably be correct.
10  Q. All right. And then for the FBI National
11  Executive Administration, it says January 2015. Is
12  that accurate?
13  A. Yes.
14  Q. All right. And let me go back, just because I
15  was looking at that document. And what year did you --
16  you said you graduated from Steven F. Austin in 1979,
17  correct?
18  A. That's correct.
19  Q. Okay. And did you get a degree from SFA in
20  criminal justice and law enforcement administration?
21  A. Yes, sir.
22  Q. On that -- where it says FBI National Academy
23  215th. What does the 215th mean in there?
24  A. That's the session number for the national
25  academy. That was their 215th session.

7 (Pages 22 - 25)

Page 26

1   Q. All right. And was that a -- the attendance at
2 the FBI National Academy, was that a full-time job,
3 40-hours-a-week type job while you were there?
4   A. Yes, sir.
5   Q. And your attendance was for approximately 16
6 weeks; is that right?
7   A. That's correct.
8   Q. The attendance at the FBI National Academy, was
9 that something you had to be nominated for, applied and
10 accepted into, or -- or did you just enroll? How does
11 that work?
12   A. No, sir, you have to apply and be accepted.
13   Q. And upon completion -- I'm assuming that you
14 did complete the FBI National Academy 215th, correct?
15   A. That's correct.
16   Q. Were you awarded a degree, a certificate, or
17 some form of accreditation? How does that work?
18   A. Yes, sir, there was a certificate, and then
19 there was also the classes were affiliated with the
20 University of Virginia, so I received nine hours of
21 masters work credit from the University of Virginia.
22   Q. And there may have been multiple classes, and I
23 don't need details as to each, but could you just
24 generally describe what the courses, what was offered
25 and the -- the type of education you received at the

Page 27

1 FBI National Academy?
2   A. Classes that -- that -- that I recall, there
3 was a law class, there was a general leadership class,
4 there was a crime scene forensics class, and there was
5 a public information class.
6   Q. Okay. Did you receive any particular
7 education -- strike that, ask an intelligible question,
8 I hope.
9     Did you receive any education or training about
10 narcotics?
11   A. Not specifically, no, sir.
12   Q. Okay. Did you receive any education or
13 training about controlled substances?
14   A. Only through the crime scene portion.
15   Q. Okay. And then what about did you receive any
16 education or specific training during that course about
17 opioids?
18   A. Not specifically, no, sir.
19   Q. All right. And then did -- during that course,
20 did you receive any education or specific training
21 about prescription opioids?
22   A. No, sir.
23   Q. Back to your LinkedIn pro -- LinkedIn profile,
24 the next item down is the FBI National Executive
25 Administration.

Page 28

1     Do you see that?
2   A. Yes, sir.
3   Q. What is that? What was that?
4   A. That is a three-week course that you're
5 nominated for. They accept 50 top -- and when I say
6 "top," I mean large population law enforcement groups
7 and their -- the leaders of those groups into a
8 three-week program. And they're -- you meet for a
9 week, then you're off for a month, then you meet for a
10 week, you're off for a month, and you come back for the
11 final week of -- of the three-week program.
12   Q. Okay. And then for that three-week program,
13 generally speaking, what was the subject matter of the
14 program?
15   A. Executive leadership.
16   Q. Okay. Do you recall in that executive
17 leadership program, did you receive any specific
18 education or training as it related to opioids?
19   A. We received training and collaboration among
20 the -- the group in regard to substance abuse problems,
21 which would include opioids of -- of the employees that
22 -- that we were over.
23   Q. Okay. Let me make sure I follow you there.
24     You're talking about substance abuse for
25 employ -- for employees for whom you were a supervisor,

Page 29

1 things of that nature? Is that what you're talking
2 about?
3   A. Yes. Any of our employees that worked for the
4 agencies that, you know, that we were leaders over.
5 You know, obviously substance abuse problems
6 occasionally occur, and how to deal with that
7 effectively was a topic of discussion.
8   Q. Okay. To paraphrase and make sure I
9 understand, see if you agree with this: The -- the
10 topic that you're describing to me is -- from a
11 leadership perspective is how to identify and perhaps
12 address substance abuse -- abuse issues for your
13 employees; is that fair?
14   A. That's fair.
15   Q. Okay. And do you recall specifically within
16 the context of that substance abuse discussion, was
17 there any training as it related to either opioids or
18 prescription opioids?
19   A. Not specifically.
20   Q. Okay. All right. Let's discuss your work
21 history just very quickly here. Going back to the
22 first page of tab 1 as my cheat sheet here. Your
23 LinkedIn profile indicates that you were with the
24 Arlington Police Department from January 1980 until
25 March of 2001; is that correct?

8 (Pages 26 - 29)

1    A. Yes, sir.
2    Q. And then it identifies that the jobs that you
3  had there was parole officer, violent crime detective,
4  narcotics detective and homicide sergeant.  And again,
5  is that accurate?
6    A. Those are some of the jobs, yes, sir.
7    Q. All right.  And then in 2001, it -- it has you
8  working for the -- indicates that you worked for
9  Tarrant County.  And I believe that's Tarrant County
10  Sheriff's Office, correct?
11    A. Yes, sir.
12    Q. And you worked for -- during what period of
13  time did you work for the Tarrant County Sheriff's
14  Office?
15    A. I worked from March of 2001 until April of
16  2022.
17    Q. And you retired from the Tarrant -- from TCSO
18  in April of 2022, correct?
19    A. Correct.
20    Q. All right.  And as I understand it, from 2001
21  until 2016, you were the chief over investigations; is
22  that correct?
23    A. Yes, sir.
24    Q. And in 2016, you were promoted to a two-star
25  Executive Chief Deputy; is that correct?

1    A. Yes, sir.
2    Q. And in 2017, you were promoted to a three-star
3  Senior Chief Deputy; is that correct?
4    A. Yes, sir.
5    Q. All right.  I'm chuckling with this one because
6  it -- it may be a longer answer than I want, so I can
7  ask the follow-ups.  But can you provide a brief
8  summary of how TCSO is structured?  In other words,
9  what's the next level underneath the sheriff?
10    A. The next level underneath the sheriff is the
11  three-star chief, which was in my position the last six
12  years I was there.
13    Q. Okay.  All right.  Let's talk about the actual
14  structure of the TCSO itself.  Does it have a Detention
15  Bureau?
16    A. Yes, sir.
17    Q. What does that bureau do?
18    A. It in -- it incarcerates prisoners that have
19  been sentenced or awaiting trial for criminal
20  prosecution.
21    Q. Okay.  Does TCSO have an Operations Bureau?
22    A. Yes, sir.
23    Q. And is that Operations Bureau divided into five
24  major divisions?
25    A. If you can name the divisions, I can say -- I

1  can't recall the -- the -- I'd -- you know, they --
2  they could have restructured by now.
3    Q. Fair enough.
4       We'll -- we'll do it this way:  I'll go through
5  each of the divisions and I'll ask some questions about
6  it.
7    A. Okay.
8    Q. Does TCSO, within the Operations Bureau, does
9  it have a Criminal Investigation Division?
10    A. Yes, sir.
11    Q. And would that Criminal Investigation Division
12  include things such as Crime Scene, Criminal
13  Investigation, Internal Affairs, Narcotics, Sex
14  Offender Registration, Victim Assistance, Warrants, are
15  those the kind of things that would be within the
16  Criminal Investigation Division at TCSO?
17    A. The Warrant Division would not be under that
18  umbrella.  The other ones you mentioned would be.
19    Q. Okay.  All right.  And then another division
20  that I believe is in the Operations Bureau of TCSO is a
21  Patrol Division within the Operations Bureau?
22    A. Yes, sir.
23    Q. Okay.  And the Patrol Division generally
24  handles citizens' calls for assistance in the
25  unincorporated portions of -- of Tarrant County; is

1  that -- is that fair?
2    A. Yes, sir.
3    Q. All right.  And some subparts of what would --
4  what is within the Patrol Division, that's going to
5  include things like your Livestock Estray Enforcement
6  Program, Sheriff's Community -- Community Oriented
7  Policing and Education, Sheriff's Environmental
8  Enforcement Division, your Sheriff's Office Courtesy
9  Patrol, your Reserve Deputy Units and your Sheriff's
10  Posse, things of those nature.  Are those within the
11  Patrol Division?
12    A. Yes, sir.
13    Q. All right.  Another what I believe division or
14  -- or perhaps is better described as department within
15  the Operations Bureau is Professional Development and
16  Training.  Is that within the TCSO Operations Bureau?
17    A. Yes, sir.
18    Q. All right.  And the things that that division
19  does is that things such as training academy and
20  background investigations?
21    A. Yes, sir.
22    Q. All right.  Judicial Services, is that another
23  division within the TCSO Operations Bureau?
24    A. Yes, sir.
25    Q. And does that provide the bailiffs and

9 (Pages 30 - 33)

Page 34

1 generally provide security for county facilities?  Is
2 that what it does?
3     A. Yes, sir, the county facilities and
4 specifically the courts.
5     Q. Okay.  And then the fifth one that I'm -- I
6 mentioned five earlier -- is Communications and
7 Technology.  Is that a division within Operations
8 Bureau at TCSO?
9     A. Yes, sir.
10     Q. All right.  And I think that one probably
11 speaks for itself as far as what it does:  Information
12 Technology, Records Division, things of that nature,
13 correct?
14     A. Yes, sir.
15     Q. All right.  So when you joined Tarrant -- when
16 you joined TCSO in 2001, you were the Chief Deputy of
17 the Criminal Investigations Division that was within
18 the Operations Bureau.  Do I have that right?
19     A. That's correct.
20     Q. All right.  And then you were promoted to the
21 Executive Chief Deputy in 2016, you became head of the
22 entire Operations Bureau at TCSO, correct?
23     A. Correct.
24     Q. All right.  And then in 2017 when you were
25 promoted again to Senior Chief Deputy, at that point

Page 35

1 you were then head of both the Operations Bureau and
2 the Detentions Bureau; is that correct?
3     A. That's correct.
4     Q. All right.
5        Okay.  If you will in the binder in front of
6 you flip to tab number 2, please.
7     A. Yes, sir.
8     Q. You recognize that handsome fellow there?
9        MS. ABSTON:  Counsel, we're going to have
10 to also object to this exhibit as not having a URL or
11 date on it, but I'll let you question about it.
12 BY MR. SUDBURY:
13     Q. Exhibit 2 is a post that we pulled from the
14 Tarrant County Facebook page.  Does this look familiar
15 to you?
16     A. Yes, sir.
17     Q. All right.  And it says in here -- I'll try to
18 point it out to the extent you can point remotely here.
19 But it says -- it identifies that you were promoted to
20 Executive Chief Deputy of the Operations Division to
21 fill the vacancy left when Executive Chief John Ray
22 left to take an Assistant Chief position at Victoria
23 PD.  Is that accurate?
24     A. Yes, sir.
25     Q. And could you describe for us, at least

Page 36

1 generally, what your roles and responsibilities were as
2 the chief over Investigations from 2001 to 2016?
3     A. My responsibility was to oversee the Criminal
4 Investigations Unit, the Warrant Unit, the Crime Scene
5 Unit, Internal Affairs, and I'm missing one -- and
6 Narcotics was -- was in that group.
7     Q. Okay.  And those groups that you just
8 identified, did those groups or departments, I guess as
9 the case may be, did they report directly to you?
10     A. Yes.
11     Q. Okay.  And how did your role change when you
12 were promoted to Executive Chief in 2016?
13     A. Well, at that point in time, I became
14 responsible for all of the operations, everything other
15 than Detention.  And also included, or that came under
16 that responsibility, was a much more active role in the
17 budgeting process for the sheriff's department.
18     Q. Okay.  And then when you were promoted in 2017
19 to the three-star Senior Chief, how did your role
20 change from what you were doing in 2016?
21     A. At that point in time, with a new sheriff, Bill
22 Waybourn, coming into office, I was primarily
23 responsible for implementing his vision for the
24 sheriff's department, for overseeing both the
25 Operations side and the Detention side of the

Page 37

1 organization.
2     Q. Okay.  And you -- you stayed in the capacity of
3 Senior Chief from 2017 until your retirement in April
4 of 2022, correct?
5     A. Yes, sir.
6     Q. So during that time period, from 2017 until
7 your retirement, you were overseeing the Operations and
8 Detention Bureaus of TCSO; is that correct?
9     A. Yes, sir.
10     Q. All right.  So you worked in -- in Tarrant
11 County for a -- a long time, over 20 years, correct?
12     A. Correct.
13     Q. All right.  With your specific work experience
14 in Tarrant County, do you believe you are knowledgeable
15 to speak of the role and impact that opioids in
16 general, and prescription opioids, have had in Tarrant
17 County?
18     A. Yes, sir.
19     Q. Do you have any knowledge regarding the laws
20 and regulations of a pharmacy in filling and dispensing
21 medical prescriptions?
22     A. Very generally.
23     Q. What is that general understanding based on?
24     A. I would not be able to quote you the statutes
25 regarding -- I'm sorry, did someone say something?

10 (Pages 34 - 37)

1    Q. I think we may have had a computer glitch on
2  there, but go ahead.
3    A. Okay. I mean, specifically the statutes, you
4  know, overseeing the distribution of -- of -- of
5  narcotics, I -- you know, I would not be able to speak
6  to that. That would have to come from, you know, the
7  commander over the Narcotics Unit.
8    Q. Okay. Do you have an understanding that chain
9  pharmacies, such as Kroger, that chain pharmacies in
10  Tarrant County do not manufacture the prescription
11  opioids?
12    A. I do not have any understanding of how it's
13  obtained or where it comes from manufacturing-wise.
14    Q. Okay. You just couldn't -- you don't know, you
15  couldn't say one way or the other?
16    A. No, I -- I do not know.
17    Q. Okay. So if I told you that Kroger was not
18  manufacturing the prescription opioids that it was
19  dispensing, would that -- would that be a surprise to
20  you?
21      MS. ABSTON: Objection; form.
22      THE WITNESS: No, sir.
23  BY MR. SUDBURY:
24    Q. Okay. And do you generally have an
25  understanding that chain pharmacies in Tarrant County

1  do not write the prescriptions for opioid medications?
2    A. My assumption is the prescriptions all come
3  from a doctor.
4    Q. And then they get filled at pharmacies such as
5  chain pharmacies, correct?
6      MS. ABSTON: Objection; form.
7      THE WITNESS: Yes, sir.
8  BY MR. SUDBURY:
9    Q. Okay. And along the same lines, it -- you
10  mentioned doctors there. Do you have an understanding
11  that only health care providers that are licensed by
12  the DEA can write prescriptions for opioids?
13      MS. ABSTON: Objection; form.
14      THE WITNESS: That is my understanding.
15  BY MR. SUDBURY:
16    Q. Okay. And we talked about this earlier, but
17  would you generally agree that for many patients, the
18  relief of pain provided by a prescription opioid can be
19  very important to improve their life; would you agree
20  with that?
21      MS. ABSTON: Objection; form.
22      THE WITNESS: Yes, sir.
23  BY MR. SUDBURY:
24    Q. Okay. And would you further agree that a
25  pharmacy can serve critical assistance to a patient by

1  providing the medication that a health care provider
2  has prescribed for that patient, that the pharmacy has
3  important -- important role in that process?
4    A. I mean, they're a portion of the conduit.
5  That's all I can say.
6    Q. Do you have any information that any chain
7  pharmacy located in Tarrant County has been any cause
8  -- any cause of opioid abuse or addiction?
9      MS. ABSTON: Objection; form.
10      THE WITNESS: Not specifically, no, sir.
11  BY MR. SUDBURY:
12    Q. What about generally?
13      MS. ABSTON: Objection --
14      THE WITNESS: I know --
15      MS. ABSTON: You can answer.
16      THE WITNESS: Okay. I know there have
17  been investigations into pharmacies, but specifically
18  which ones or the results of those investigations, I --
19  I wouldn't be able to speak to.
20  BY MR. SUDBURY:
21    Q. Okay. You know there have been investigations
22  in Tarrant County related to pharmacies, correct?
23    A. Correct.
24    Q. And were those investigations specifically
25  related to prescription opioids?

1    A. Yes.
2    Q. Okay. And you cannot identify any of the
3  pharmacies involved in those investigations; is that
4  correct?
5    A. That's correct.
6    Q. Do you know whether Kroger was a pharmacy
7  targeted in any such investigations?
8    A. I do not know.
9    Q. Do you know whether Albertsons was targeted in
10  any such investigation?
11    A. I do not know.
12    Q. Do you know whether any chain pharmacy, that is
13  pharmacies, you know, with more than one location in
14  Tarrant County, were targeted in any such
15  investigations?
16      MS. ABSTON: Objection; form.
17      THE WITNESS: I do not know.
18  BY MR. SUDBURY:
19    Q. Do you know who would know the answers to those
20  questions?
21    A. The Drug Enforcement Administration.
22    Q. Do you know the results of any of those
23  investigations into pharmacies in Tarrant County?
24    A. When you say "results," are you speaking to a
25  criminal conviction, or are you speaking -- well, you

11 (Pages 38 - 41)

Page 42

1 know, can you be more specific?
2    Q.  I -- I can be.  I will try to be.  That was
3 pretty broad, and I intended it broad, but I'll drill
4 it down.
5        Any of these investigations into pharmacies in
6 Tarrant County, do you know if any of them resulted in
7 criminal -- in criminal charges?
8    A.  I believe there was.
9    Q.  Okay.  And what's the basis for that belief?
10    A.  From high-level briefings from DEA task force
11 members.
12    Q.  Do you recall the circumstances of that
13 investigation or what the pharmacy was criminally
14 charged with doing, or the --
15    A.  No, sir.
16    Q.  -- pharmacist, as the case may be?
17        You do not recall?
18    A.  I do not recall.
19    Q.  Do you have an understanding of what the term
20 "division" means as it pertains to the pharmaceutical
21 industry?
22    A.  I'm sorry, repeat that.
23    Q.  Sure.
24        Do you have an understanding of what the term
25 "diversion" means as it pertains to the pharmaceutical

Page 43

1 industry?
2    A.  From a law enforcement perspective, yes.
3    Q.  What does it mean from a law enforcement
4 perspective?
5    A.  Well, a diversion would just be a change of the
6 normal course of -- of -- of distribution in my way of
7 thinking.  And then if it came outside of the -- the
8 legal manner in which it should, then that diversion
9 would be criminally investigated.
10    Q.  Okay.  Do you have -- I think you mentioned
11 when you were promoted to Senior Chief, I think you
12 told me -- well, let me back up so I don't -- I don't
13 characterize your testimony then I don't recall
14 correctly.
15        You were involved -- you mentioned part of your
16 job responsibilities were budgeting as it related to
17 the Tarrant -- to TCSO; is that correct?
18    A.  That's correct.
19    Q.  And when did you tell me you started to get
20 more involved with budgeting?
21    A.  Well, the overall budget and the final product
22 was after I became an Executive Chief and then the
23 Senior Chief.  However, it was my responsibility as a
24 one-star Chief to prepare a budget for those five
25 divisions that I was over from 2001 to 2016.

Page 44

1    Q.  Okay.  So your entire career at TCSO, you had
2 some involvement in budgeting for the sheriff's office;
3 is that fair?
4    A.  That's fair.
5    Q.  Okay.  Do you have any knowledge of any grant
6 applications by Tarrant County or grants awarded to
7 Tarrant County related to opioids?
8    A.  No, sir.
9    Q.  Do you have any knowledge of any grant
10 applications by the TCSO or grant applications awarded
11 to the TCSO related to opioids?
12    A.  Grant applications were usually handled through
13 the county administrator's office, and so I would refer
14 you there.  But specifically do I have knowledge?  No.
15    Q.  All right.  And just to drill down on that, I
16 appreciate the first part of that answer.  But you're
17 -- you're not aware of, you know, hey, either Tarrant
18 County or the TCSO specifically said let's get a grant,
19 you know, for X amount to address these issues with
20 opioids?  You have -- you're not aware of any such
21 grant to Tarrant County or TCSO specifically, correct?
22        MS. ABSTON:  Objection; form, asked and
23 answered.
24        THE WITNESS:  Correct.
25 BY MR. SUDBURY:

Page 45

1    Q.  In your opinion, is there a substance abuse
2 medical crisis in Tarrant County?
3    A.  Yes, sir.
4    Q.  And substance abuse, I think we can agree, can
5 -- comes in a lot of different forms:  Alcohol,
6 marijuana, illegal drugs such as heroin, cocaine,
7 fentanyl, methamphetamine, and then as well in some
8 instances, prescription drugs; would you generally
9 agree with that?
10        MS. ABSTON:  Objection; form.
11        THE WITNESS:  I would agree that those are
12 all forms of abuse in Tarrant County, all those drugs
13 that you mentioned.
14 BY MR. SUDBURY:
15    Q.  All right.  And there could be others as well,
16 right?
17    A.  Yes, sir.
18    Q.  All right.  And do you agree that substance
19 abuse is a medical condition that can require
20 professional treatment and in many instances requires
21 medical care?
22        MS. ABSTON:  Objection; form.
23        THE WITNESS:  Yes, sir.
24 BY MR. SUDBURY:
25    Q.  Have you personally ever been prescribed a

12 (Pages 42 - 45)

Page 46

1 prescription opioid?
2         MS. ABSTON: Objection; we're not going to
3 answer that question, we're not getting into personal
4 HIPAA protected information today. So I'll instruct
5 the witness not to answer that.
6         MR. SUDBURY: Okay.
7 BY MR. SUDBURY:
8     Q. And you're going to follow your counsel's
9 instruction and not answer that question; is that
10 correct?
11    A. That's correct.
12    Q. Have you personally experienced anyone that's
13 been impacted with an addiction to a prescription --
14 prescription opioid?
15        MS. ABSTON: We're also not going to
16 answer that question today about somebody's addiction
17 or private medical information of a family member or a
18 close -- I think your words were -- anyone that's
19 experience -- anyone in general. So we will also
20 instruct the witness not to answer that question as
21 irrelevant.
22 BY MR. SUDBURY:
23    Q. Okay. Are you going to follow your attorney's
24 instruction and not answer that question?
25    A. Yes, sir.

Page 47

1     Q. Do you have any personal experience with
2 Kroger?
3     A. Grocery shopping.
4     Q. So you have grocery shopped at a Krogers
5 before?
6     A. Yes, sir.
7     Q. Have you used the pharmacy at Krogers before?
8         MS. ABSTON: Objection; form. I mean,
9 we're not going to talk about his personal HIPAA
10 protected information about his prescriptions and where
11 he's gotten them filled.
12        MR. SUDBURY: Okay. I think pursuant to
13 the discovery protocol, are you instructing him to
14 answer the question, yes or no?
15        MS. ABSTON: I am -- I don't see how it --
16 you can rephrase this. Are you asking him if he's
17 filled his personal prescriptions at a Kroger Pharmacy?
18        MR. SUDBURY: That's not the question I
19 asked him.
20        MS. ABSTON: I'm asking you to rephrase it
21 or you can tell me what the question is, but I can pull
22 it up on real time.
23        MR. SUDBURY: So I think the way this
24 needs to work under protocol is either the objection to
25 form. Or if you're instructing him not to answer, you

Page 48

1 can instruct -- instruct him to answer, I'll confirm it
2 with him, and we'll move on.
3         MS. ABSTON: Okay. I'm -- I'm seeking
4 clarity on your question to see if I'm going to
5 instruct him not to answer. So . . .
6 BY MR. SUDBURY:
7     Q. Have you ever used -- to your knowledge, have
8 you ever personally used the pharmacy at a Krogers?
9         MS. ABSTON: I would -- I would renew the
10 discussion we just had. Are you talking about him
11 filling prescriptions for himself? Are you talking
12 about picking up prescriptions? We're -- we're going
13 to -- I'm -- I'm going to instruct the witness not to
14 answer about whatever prescriptions he's filled at
15 whatever pharmacy.
16        MR. SUDBURY: I didn't ask about any
17 prescriptions.
18 BY MR. SUDBURY:
19    Q. Have you ever shopped at a pharmacy at Krogers?
20    A. I don't recall.
21    Q. Okay. How has substance use and abuse impacted
22 Tarrant County?
23    A. Boy, that's an incredibly broad question. It's
24 impacted families, it's impacted law enforcement
25 resources, it's impacted the community in general in a

Page 49

1 negative way.
2     Q. Is there a particular substance that you find
3 has been the most -- based on your experience -- has
4 been the most abused in Tarrant County?
5         MS. ABSTON: Objection; form.
6         THE WITNESS: Can you put a time frame on
7 that?
8 BY MR. SUDBURY:
9     Q. Yeah, I'll try to.
10        So let's talk about 2001 to 2016, before your
11 promotion. In that time frame -- I realize that's a
12 wide time period -- was there a particular substance
13 that you found to be the most abused in Tarrant County?
14        MS. ABSTON: Objection; form.
15        THE WITNESS: Trying to quantify what's
16 the most is difficult for me. I'm not trying to be
17 evasive, it's just that drug usage follows different
18 trends in society over years, and what was a huge
19 problem in the 80s may not be as big a problem in the
20 90s or the early 2000s or to 2015 to -- to 2020. So
21 from the time frame that you gave me, I would say
22 probably cocaine for that time frame was probably the
23 largest.
24 BY MR. SUDBURY:
25    Q. Okay. And -- and I do follow what you're

13 (Pages 46 - 49)

Page 50

1 saying there.  So why don't we just approach it this
2 way, because I -- what I -- I want to be specific about
3 Tarrant County.  So for the time period you worked in
4 Tarrant County, from 2001 until 2022, could you take me
5 through the trend line for what you believe to be the
6 most abused drugs during that time period and generally
7 when you think it -- it changed.  And I am saying
8 generally, asking for approximates.  I don't need exact
9 dates when you say this became the most abused.
10    A.  There are threat -- once again, I'm not trying
11 to be evasive.  There are threat assessments that have
12 been done by the DEA that are public information and
13 that are done by the HIDTA that I believe are -- are
14 public information that could much better answer that
15 question than -- than I could.
16        MR. SUDBURY:  Okay.  I'll object as
17 nonresponsive.
18 BY MR. SUDBURY:
19    Q.  But I think what you're telling me is go find
20 other resources to answer that question.  Is that what
21 you're saying?
22    A.  I -- I think that would be the best, yes.
23    Q.  Do you have an opinion whether the majority of
24 substance use and abuse in Tarrant County is related to
25 illegal substances?

Page 51

1        MS. ABSTON:  Objection; form.
2        THE WITNESS:  I would have to refer you to
3 our Narcotics Task Force and the statistics that they
4 could provide you.
5 BY MR. SUDBURY:
6    Q.  So are you unable to answer that question?
7    A.  Yes.
8        MS. ABSTON:  Objection; form.
9        THE WITNESS:  Yes.
10 BY MR. SUDBURY:
11    Q.  Has opioids impacted Tarrant County?
12    A.  Yes, sir.
13    Q.  Have prescription imp -- prescription opioids
14 impacted Tarrant County?
15    A.  Yes, sir.
16    Q.  And you have noticed changes in trends of the
17 substance use throughout the years of your employment
18 at TCSO; is that fair?
19    A.  Yes, sir.
20    Q.  All right.  But you're not able, or perhaps
21 willing, to provide specific as to those trends
22 over the years?  You've referred me elsewhere; is that
23 fair?
24        MS. ABSTON:  Objection; form.
25        THE WITNESS:  I would answer that I could

Page 52

1 speak to trends, I can't speak to percentage.  And I
2 think what I heard you ask was you were asking me to --
3 to give, you know, to quantify, you know, an answer,
4 which I think I would be guessing in that regard, and I
5 don't want to do that.
6 BY MR. SUDBURY:
7    Q.  Let me -- let me go back and reframe then, just
8 ask it this way:  Have you noticed any changes in the
9 trends of substance use throughout the years you were
10 employed by TCSO?
11    A.  Yes, sir.
12    Q.  Okay.  And what have you noticed?  What are
13 those observa -- observations regarding the changes in
14 the trends for substance use?
15    A.  Beginning in probably around 2015, we started
16 noticing a large increase in overdose deaths, and that
17 came from our Patrol Division that normally responds to
18 calls for service and death investigations in the
19 field.  And so that -- that was the trend that -- that
20 I saw a definite increase in.
21    Q.  Okay.  Overdose deaths related to what?  Caused
22 by what?
23    A.  Most of them -- a large percentage of them
24 would be from opioids.
25    Q.  What opioids?

Page 53

1    A.  Prescription pills such as Vicodin,
2 Hydrocodone, OxyContin, heroin.  Those primarily.
3    Q.  If a prescription drug is diverted and then
4 seized, does law enforcement consider that to be an
5 illicit drug?
6    A.  It would be illicit in -- if there wasn't a
7 legitimate -- when you're saying "seized," you're
8 talking about seized from someone who didn't have
9 permission to have it?
10    Q.  Correct.  If it's diverted -- if a prescription
11 opioid is diverted, would law enforcement then consider
12 that to be an illicit drug?
13    A.  When you use the term "law enforcement" -- and
14 once again, I'm not trying to be unresponsive -- how
15 different agencies classify drugs once they're seized,
16 whether they're categorized under legitimate
17 pharmaceuticals or -- or illicit drugs that were
18 manufactured, you know, outside of the normal course,
19 that would -- it just depends on how they're
20 categorized in their statistics.
21    Q.  How did TCSO categorize them in its statistics?
22    A.  I think they actually separated it.  But, once
23 again, I'm going to -- I'm going to refer you to the --
24 to CNET and to the -- their reporting on their
25 seizures and how they classified them.

14 (Pages 50 - 53)

Page 54

1 Q. Okay. I just misunderstood that last part. C
2 -- CNET'S reporting on their what? What did you say?
3 A. On their seizures.
4 Q. Seizures. Got it.
5 Okay. If you would, please, turn to tab 11.
6 MS. ABSTON: Counsel, before we go to this
7 next one, is this a good time to take a break? We've
8 been going for about an hour.
9 MR. SUDBURY: Yes. Thank you for
10 reminding me of that. Let's take a short break, five
11 minutes or so, and --
12 THE VIDEOGRAPHER: All right. We're off
13 the record at 11:37 a.m.
14 (A break was taken at 11:37 a.m.)
15 THE VIDEOGRAPHER: We are back on the
16 record at 11:49 a.m.
17 BY MR. SUDBURY:
18 Q. If you would, please, turn to -- if you don't
19 have it there already -- tab number 11 in the binder,
20 Exhibit 11.
21 A. Okay.
22 Q. It appears to me to be a TCSO Command Staff
23 organization chart. And if you look in the top left,
24 it's short of choppy up there, I think it says
25 effective January 1, 2017. Is that what this document

Page 55

1 appears to be?
2 A. Yes, sir.
3 Q. Okay. And there's a box --
4 GREGG HOLDERMAN: I'm very sorry for the
5 interruption. I just wanted to clarify, is this
6 Exhibit 3?
7 MR. SUDBURY: Exhibit 11. I'm sorry, 1-1,
8 11.
9 GREGG HOLDERMAN: Tab 11. But did you
10 want me to label it Exhibit 3, or would you like me to
11 label it --
12 MR. SUDBURY: Let's go off the record here
13 for a second.
14 GREGG HOLDERMAN: I'm so sorry.
15 MR. SUDBURY: No, that's okay. Very
16 briefly.
17 THE VIDEOGRAPHER: We're off the record at
18 11:50 a.m.
19 (A break was taken at 11:50 a.m.)
20 THE VIDEOGRAPHER: We are back on the
21 record at 11:52 a.m.
22 BY MR. SUDBURY:
23 Q. Okay. Mr. Simonds, let's back up a second
24 here, start over a little bit again.
25 In your binder, tab number 11, which we're

Page 56

1 going to mark as Deposition Exhibit Number 3, do you
2 recognize that document?
3 A. Yes, sir.
4 Q. And what is it?
5 A. It's an organizational chart of the Tarrant
6 County Sheriff's Office.
7 Q. Okay. As of January 1, 2017; is that correct?
8 A. That's -- that's the date on there, yes, sir.
9 Q. All right. And about midway down the page,
10 right-hand side of the page, the box for Commander,
11 Narcotics Unit does not have a name. Was that position
12 then later filled by Calvin Bond?
13 A. Yes, sir.
14 Q. And at some -- at some point in time, was the
15 Narcotics Unit, was it under the jurisdiction of the
16 Tarrant County District Attorney's Office; is that
17 right?
18 A. The task force -- there was a task force under
19 the District Attorney's Office. The sheriff's office
20 always had a -- since I came in 2001 -- always had a
21 standalone Narcotics Unit.
22 Q. Okay. All right. Do you know if that task
23 force then was transferred at some point in time from
24 the District Attorney's Office to the TCSO?
25 A. Yes, sir.

Page 57

1 Q. When did that occur?
2 A. Approximately 2017.
3 Q. Do you know why it occurred?
4 A. No, sir.
5 Q. All right. If you would then -- and this is
6 where I mentioned earlier we're going to jump around
7 some. If you will turn to tab 48, four-eight, which
8 we'll mark as Deposition Exhibit Number 4.
9 MS. ABSTON: And, Gregory, as I said off
10 the record a second ago, on these exhibits, we will be
11 reviewing them to ensure that we don't have any
12 proprietary or sensitive information about ongoing
13 investigations or plans or undercover officers. So if
14 you'll just give us a moment to review. If we have any
15 questions, we might need to go off the record. But I
16 just want to give you a heads up.
17 MR. SUDBURY: Sure. And, Alex, if I'm
18 waiting on a cue from you, let me know when I can
19 proceed.
20 MS. ABSTON: Okay. Senior Chief, have you
21 been able to look over it? Do you have any -- are we
22 good to go?
23 THE WITNESS: Yes.
24 MS. ABSTON: Okay. I think we're also
25 good to go, Gregory. Thank you.

15 (Pages 54 - 57)

Page 58

BY MR. SUDBURY:

1 BY MR. SUDBURY:
2     Q.  All right.  This is an e-mail written by you to
3 David See in October of 2016, subject matter Narcotics
4 commander.
5         Do you see that?
6     A.  Yes, sir.
7     Q.  Do you agree that what I just paraphrased as
8 describing it, that that's accurate?
9     A.  Yes, sir.
10    Q.  Do you recall writing this e-mail?
11    A.  No, sir.
12    Q.  Okay.  Do you have any reason to believe that
13 you did not write or send this e-mail?
14    A.  No, sir.
15    Q.  All right.  You just -- as we sit here seven
16 years later don't have specific recollection of sending
17 this e-mail; is that -- is that what you're telling me?
18    A.  That's correct.
19    Q.  I get it.
20        All right.  In this e-mail, it looks like you
21 wrote, "The executive board met today and voted to make
22 an initial job offer to another candidate."
23        Do you see that?
24    A.  Yes, sir.
25    Q.  Why was this position of Narcotic Commander,

Page 59

1 why did -- why was it being filled?
2     A.  Because at that point in time, the Tarrant
3 County Sheriff's Office was moving from the standalone
4 Narcotics Unit to combining it with personnel from the
5 Tarrant County Narcotics Task Force, which had
6 previously been under the Tarrant County District
7 Attorney's Office.
8     Q.  Okay.  And in that e-mail you reference the
9 executive board.  What -- what executive board, do you
10 recall?  What were you referring to?
11    A.  I don't specifically remember the formation of
12 that board and who sat on it.
13    Q.  Okay.  But do you know -- I mean, was that
14 executive board, was it for TCSO?  Was it for the
15 County?  Do you know?
16    A.  I don't remember the composition of the board
17 that reviewed applications for this position.
18    Q.  Okay.  Let -- let me -- let me back up and see
19 if I can get us back on the same page.  I think -- I
20 think you and I are -- you're answering a different
21 question and I'm asking another one.
22    A.  Okay.
23    Q.  The board itself, the executive board, was the
24 executive board on behalf of which -- which department
25 or entity, if you recall?  Not the composition.  Who

Page 60

1 was the executive board for what?
2     A.  Okay.  The -- there would have been an
3 executive board in place from the -- the existing
4 Tarrant County Narcotics Task Force that had previously
5 been under the Tarrant County District Attorney's
6 Office.
7     Q.  Okay.  Got it.
8         And then this position that is referenced in
9 this e-mail about Narcotics Commander, I think you told
10 me earlier that was ultimately filled by Calvin Bond;
11 is that fair?
12    A.  Yes, sir.
13    Q.  All right.  Let's now go to tab number 9, back
14 to the single digits here, tab number 9, which I will
15 plan to mark as Exhibit 5 once you get there and
16 Allison confirms we're good to go to discuss it.  I'm
17 sorry, Alex -- Alex, not Allison.  I apologize.
18        MS. ABSTON:  No problem.  Give me one sec.
19        Senior Chief, have you looked over it?
20        THE WITNESS:  Yes, I have.
21        MS. ABSTON:  Okay.  I think we're -- I
22 think we're good to go.
23 BY MR. SUDBURY:
24    Q.  Okay.  Does this appear to be a job posting,
25 and it looks like it's got sort of top left there

Page 61

1 effective date 11/1/2012 for a new Deputy Sheriff
2 position to serve as a Task Force Officer for the DEA
3 Task Force in Fort Worth.  Is that what this appears to
4 be?
5     A.  No, it's not a job posting.
6     Q.  Okay.  What is it then?
7     A.  It is a budget document submitted for
8 recommendation to the County Administrator's Office.
9     Q.  Okay.  Budget document posted by whom?
10    A.  I would have approved it.  It would have been
11 researched and submitted by whoever was acting as the
12 commander at that point in time.
13    Q.  Okay.  So the gist of it -- and -- and I
14 understand your distinction saying it's not a job
15 posting, it's a -- it's a -- a budget document.  But
16 TCSO was looking for somebody to fill this position; is
17 that fair?
18    A.  The sheriff's -- when you say "TCSO" -- yes.
19 I'm sorry.  Yes, sir, that's correct.  And I -- and I
20 see now the effective date being 2012, and so I'm
21 not -- I'm trying not to get that confused with the
22 transition period of the -- of the task force.
23    Q.  Okay.  It says in here -- if I can put my
24 finger on it -- it says, "The DEA has approached the
25 Sheriff's Office and requested our participation once

16 (Pages 58 - 61)

Page 62

1 again in the task force."
2     Do you see that?
3  A. Yes, sir, I do.
4  Q. Any idea -- this document top left has FY 2011.
5 Do you know why it has that indication up there?
6  A. I'm not sure where you retrieved this document
7 from. I know that working copies a lot of times are --
8 well, anyway, no, I -- I -- I can't speak to the date
9 that's -- that's up there or why it's there.
10  Q. Okay. To finish the thought I think you were
11 going with that, just so I understand, if there may be a
12 fiscal year or some earlier information that may be a
13 working copy, is it your belief that perhaps this
14 document was not -- not in final form. Is that what
15 you were suggesting there?
16  A. It's possible.
17  Q. All right. The DE -- the DEA Task Force
18 referenced in here, is that HIDTA?
19  A. No, sir.
20  Q. Okay. What task force then is it referencing?
21  A. The DEA has a office in Fort Worth, one of
22 their -- that is overseen by resident agent. They had
23 a state and local task force affiliated with that
24 office.
25  Q. Okay. Do you know why the DEA was requesting

Page 63

1 that TCSO participate in this task force?
2  A. They are always looking for assistance from
3 state and locals.
4  Q. They -- so in your experience, it's your
5 testimony that DEA is always looking for assistance
6 from state and local law enforcement; is that -- that
7 fair?
8  A. That's correct.
9  Q. All right. So you're not aware of any specific
10 reasons as it relates to this document why the DEA
11 would say we need somebody for this task force
12 specifically; is that -- is that correct?
13  A. I can't recall what the specific initiatives
14 were at that time frame.
15  Q. Do you know if this position, as described in
16 this budget document, was -- to be assigned to the DEA
17 Task Force was full-time? Let me ask a better
18 question.
19     The role to be fulfilled here, was the DEA Task
20 Force looking for somebody from TCSO on a full-time
21 basis?
22  A. It's my understanding, yes.
23  Q. Was this position filled?
24  A. I don't recall.
25  Q. And based on your lack of recollection about

Page 64

1 whether it was filled, is it also safe to assume you do
2 not recall the name or identity of anybody who would
3 have filled this position; is that fair?
4  A. That's fair.
5  Q. All right. Let's now turn to tab number 10
6 that will be marked as Exhibit Number 6 and give you a
7 chance to look at that.
8     MS. ABSTON: I think we're okay, if Senior
9 Chief is, about asking about this document.
10     THE WITNESS: Yes, sir, I'm -- I believe
11 I'm fine with this.
12 BY MR. SUDBURY:
13  Q. Okay. This document that is now Deposition
14 Exhibit Number 6, first of all -- we'll let him pull it
15 up here -- looks to be very similar to Exhibit Number
16 5, correct?
17  A. Yes, sir.
18  Q. In fact, I think it may -- may, perhaps, be
19 substantively -- substantively the same, except for the
20 effective date on Exhibit 5 it was 11/1/2012, and then
21 in this document it is 11/1/2015.
22     Do you see that?
23  A. Yes, sir.
24  Q. Do you know, is this the same position that's
25 being discussed in Exhibit 5, or is this -- is this an

Page 65

1 additional position, if you know?
2  A. This would have been, to my recollection, the
3 same position, because -- the same position.
4  Q. Okay. Do you recall then was the position
5 filled before this and then somebody left so then
6 they're saying we need to fill the same position again?
7 Do you recall?
8  A. It would not have been because someone left,
9 because that would not have to go through the budgetary
10 process of the County if it was already a budgeted
11 position.
12  Q. Okay. So let me break that down to make sure
13 I'm following you there. I think I get it. It's not a
14 new -- well, I'm not sure that I do quite follow it.
15 If -- if -- if there's a budgeted position and somebody
16 leaves, then TCSO does not need to do a new budget item
17 for -- for that job, because it already exists, you
18 just need to go find a replacement; is that -- while
19 perhaps sloppy in the way I described it, is that
20 correct?
21  A. That's correct.
22  Q. Okay. So if there's a budget request such as
23 this, it's because there is either a new position or
24 some additional position that needs to be filled,
25 right?

17 (Pages 62 - 65)

Page 66

1    A. Correct.
2    Q. All right.  But did I follow you correctly?  In
3  comparison of Exhibit 5 and Exhibit 6, I thought you
4  said that this is not -- this would not be a new
5  position, that those -- these are budget items for the
6  same position.  Did I follow you correctly?
7    A. I'm sorry, I'm -- I lost you on that.  You'll
8  have to -- let's try that again.
9    Q. I think I lost myself on that, so thank you.
10      Let me just try to -- try to keep it simple.
11  The positions referenced in Exhibit 5 and 6, is that
12  for the same position for the same job?
13    A. Okay.  I'm -- when you're referencing back to 5
14  and 6, are -- are those the -- I'm getting lost on the
15  tabs and the exhibits.  And so are you referring to --
16    Q. Fair enough.
17    A. -- tab 5?
18    Q. Fair enough.  That is confusing because you're
19  looking at the tabs and not the exhibit numbers.  I'm
20  looking at tab number 9 and comparing it to tab number
21  10.
22    A. Oh, okay.
23    Q. And -- and here's my question.  I -- we -- we
24  approached this two different ways.  Here's -- here's
25  what I'm getting at, let me just ask the ultimate

Page 67

1  question:  Is tab number 10, is that the request for an
2  additional position, an additional person, or is it a
3  replacement for what was being looked for in tab 9?
4    A. It -- it could be either.  And I will explain
5  it, if -- if I may.  During -- we have people assigned
6  to different task forces in different locations.  One
7  may be at HIDTA working for a DEA group out of HIDTA.
8  It could be possible that one's assigned to a DEA Task
9  Force of the office out of Fort Worth.  And so without
10  going back and reviewing the specific organizational
11  chart for those -- I mean, the -- the active who's in
12  what position number where within the agency of Tarrant
13  County, I couldn't say exactly what positions these are
14  referencing, other than they're asking for additional
15  staffing or additional budget money for that budget
16  year for a new position.
17    Q. Okay.  And for tab number 10 here, which is
18  Deposition Exhibit Number 6, it's got that same thing
19  that we looked at earlier, that FY 2011 in the top left
20  corner.
21      Do you see that?
22    A. Yes, sir, I do.
23    Q. Do you know why it has that?
24    A. Once again, I'm -- I can only assume that --
25  well, no, I don't know why.

Page 68

1    Q. Okay.  Do you know whether the position
2  described in tab 10, Deposition Exhibit 6, whether that
3  position was filled?  And if so, by whom?
4    A. No, sir.
5    Q. Okay.  We are now going to turn to tab number
6  43 in the binder, four-three, which absent any concerns
7  on ya'll's end will become Exhibit Number 7.  Please
8  let us know when you've had a chance to look at tab 43.
9    A. Okay.  I'm ready.
10    Q. All right.
11      MR. SUDBURY:  Alex, we're good to go?
12      MS. ABSTON:  Yeah, let's go ahead and go.
13  Yeah.
14  BY MR. SUDBURY:
15    Q. Okay.  This appears to be an e-mail dated March
16  19, 2018 from David Grantham to a number of recipients,
17  including yourself; is that fair?
18    A. Yes, sir.
19    Q. And the subject line is Meeting with USARMY --
20  and the poor court reporter here -- but it's NG and
21  then TXARNG/DEA.  Did I get that correct?
22    A. That -- that's what I see also.
23    Q. Okay.  Do you recall receiving this e-mail?
24    A. No, sir.
25    Q. Do you have any reason to believe that you did

Page 69

1  not receive this e-mail?
2    A. No, sir.
3    Q. That e-mail address, it's -- I've seen it --
4  we've seen it now a couple times, was that your e-mail
5  address at Tarrant County, that being at
6  mesimonds@tarrantcounty.com?
7    A. Yes, sir.
8    Q. And -- and that TXARNG, is that reference to
9  the Texas Army National Guard?
10    A. It very well may be.
11    Q. Okay.  Do you know what support -- if you look
12  at this, it says the "Meeting to discuss TXARNG through
13  DEA providing a narcotics analyst to support TCSO
14  operations."
15      First of all, that last sentence, did I read
16  that correctly?
17    A. Yes, sir.
18    Q. All right.  What support was TXARNG going to
19  provide?
20    A. Analytical support.
21    Q. Did TCSO request that support?
22    A. Yes, sir.
23    Q. Do you know whether that support was provided?
24    A. Yes, sir.
25    Q. Do you know why that analytical support was

18 (Pages 66 - 69)

Page 70

1 requested?
2  A. Specifically, I'd refer you to David Grantham
3 for that.
4  Q. Okay. He may have more information about it,
5 but -- but, sitting here today, are you able to answer
6 that question as to why the support was requested?
7  A. Other than for analytical support of their
8 mission, no, sir.
9  Q. And -- and when you say -- I think I generally
10 understand, but -- but help me in this context. When
11 you say "analytical support," what do you mean by that?
12  A. It can take a number of different forms. It
13 could be assistance to investigators working a specific
14 case, it could be threat assessments. So it can take
15 various forms.
16  Q. Data collection? Would that be another example
17 of a form it could take?
18  A. It could be, yes, sir.
19  Q. Okay. Do you recall then -- setting aside --
20 well, you can look at whatever you want to in this, at
21 least with respect to the binder, but do you recall
22 somebody from the Texas Army National Guard coming in
23 to provide that analytical support? Do you have any
24 independent recollection of that occurring?
25  A. Yes, sir, I do.

Page 71

1  Q. Okay. What do you recall about that? Do you
2 know the name of the individual or individuals that
3 provided that support?
4  A. I don't recall their names.
5  Q. Do you know if it was one or more than one
6 person?
7  A. Do you have a time frame?
8  Q. I don't in mind, but that's a fair question.
9    So this e-mail was in 2018. Let's talk
10 about -- let's talk about the 28 time -- '18 time
11 period. In -- in that year, do you know, was
12 analytical support provided by the Army National Guard?
13 And, if so, do you know who provided it?
14  A. I believe the initial support provided was
15 one -- excuse me -- was one individual. I don't
16 remember any names.
17  Q. Okay. And -- and I -- I think I'm
18 understanding from your comment back to me about asking
19 for dates that that may have changed over time, so let
20 me just try to ask the question this way: This one
21 individual that provided analytical support, did -- did
22 that stay consistent from 2018 until your retirement in
23 2022, or did that change?
24  A. It changed.
25  Q. How so?

Page 72

1  A. The Texas Army National Guard would routinely
2 rotate people through the office, and they would have
3 to leave for special assignments and then come back.
4 So whatever assistance they were able to provide us was
5 appreciated. But consistency in that assistance is --
6 consistency is not a word I would use.
7  Q. Understood.
8    So the person provided -- if I follow you
9 correctly -- may have changed, it sounds like -- it
10 sounds like, with some frequency; is that fair?
11  A. Yes.
12  Q. All right. Let's turn to tab number 44 in the
13 binder, which will now be Exhibit Number 8. And,
14 Chief, let me know when you've had a chance to review
15 that document and let us know if you have any concerns
16 before we start discussing that.
17   MS. ABSTON: Hey, Gregory, do you mind if
18 we go off the record for a minute?
19   MR. SUDBURY: No, that's fine. We can go
20 off.
21   THE VIDEOGRAPHER: We are off the record
22 at 12:20 p.m.
23   (A break was taken at 12:20 p.m.)
24   THE VIDEOGRAPHER: We are back on the
25 record at 12:32 p.m.

Page 73

1   MS. ABSTON: Okay. Thanks everyone for
2 your patience. I'm going to go ahead and allow you,
3 Gregory, to ask questions about tab 44 which I think
4 we're marking as Exhibit 8. But we would like to
5 reserve the right to -- while we confirm if this
6 includes an undercover officer or anything sensitive,
7 we're going to allow you to question on the contents of
8 the material of the document, but we want to reserve
9 the right to claw this back and reissue it with a
10 redaction taking off any names that may need to be kept
11 private. So -- and I've asked for this to be pulled
12 off the screen for the time being until we confirm it.
13 I know it was previously shown. But, Gregory, we're
14 going to allow you to ask questions about it.
15   MR. SUDBURY: Okay. Thank you. And
16 that's fine with me that it's not on the screen.
17 BY MR. SUDBURY:
18  Q. So, Chief Simonds, Exhibit Number 8 there, page
19 number 2 of that document -- and by the way, as we get
20 into some of these documents, in an effort to avoid
21 some of the confusion, you'll -- you'll see bottom
22 right it says 44.0002. We -- we tried to basically put
23 a page number on these, so that 2 is a reference to
24 page number 2.
25   Do you see that?

19 (Pages 70 - 73)

Page 74

1   A. Yes, sir.
2   Q. Okay. That may be helpful down the line with
3 some of the -- the lengthier documents we have.
4       MS. ABSTON: I'm sorry, I do not see
5 that -- is that alarming -- on mine. I just have the
6 Bates number in the bottom right corner. It may have
7 just been cut off on my copies.
8       MR. SUDBURY: It may have been.
9       MS. ABSTON: Okay. I'll -- I'll just
10 trust your word on it. We'll go -- we can go forward.
11      MR. SUDBURY: Okay. All right.
12 BY MR. SUDBURY:
13   Q. The -- so I want to start on -- on page number
14 2 of that with the bottom e-mail and work
15 chronologically forward from there. The bottom e-mail
16 is -- appears to be sent by Major Travis Urbanek -- if
17 I'm close to getting that correct in pronunciations --
18 North Region Commander for the Texas National Guard
19 Counterdrug Task Force, to David Grantham.
20      Do you see that?
21   A. Yes, sir.
22   Q. And I'm sorry if I asked this earlier, but who
23 is David Grantham?
24   A. David Grantham is the intelligence director for
25 the Tarrant County sheriff's Department. Or was at

Page 75

1 that time.
2   Q. Okay. And then if you go up from there,
3 Mr. Grantham eventually forwards this e-mail string to
4 you; is that correct? If you'll turn to page 1 of tab
5 44.
6   A. Yes, sir.
7   Q. All right. Do you recall receiving this
8 e-mail?
9   A. I don't recall.
10   Q. Okay. Go back to the second page -- sorry to
11 flip around on this -- but Major Urbanek wrote to David
12 Grantham in that first paragraph, it says, "I met
13 earlier this week with Mr. Scott Douglas at the DEA
14 Dallas field office, and he discussed having us partner
15 a collection analysts with the TCSO intel team."
16      Do you -- do you see that?
17   A. Yes, sir.
18   Q. Okay. And did I read that correctly?
19   A. Yes, sir.
20   Q. All right. Do you recall when that request for
21 TXARNG to provide a collection analyst to the TCO --
22 TCSO was made to the DEA?
23   A. No, sir, I don't.
24   Q. Do you know why the DEA made that request?
25   A. Why the DEA made that request?

Page 76

1   Q. Yeah, why -- let -- let me back up then if I
2 misstated that. Why this request was made?
3   A. The Tarrant County Sheriff's Office Intel
4 Division was seeking at that point in time different
5 options to -- to gain assistance for their mission.
6 And so that's why a request for an analyst would have
7 been made.
8   Q. And what about -- you reference at that time
9 period it was seeking assistance for its mission,
10 including an analyst. Was there anything specific
11 about that time period where it was seeking this
12 analyst, or are you just being more general it was
13 always looking for help?
14   A. During this time period, the forensic analysis
15 of suspects' telephones was becoming more and more
16 prevalent. And being able to analyze the data farmed
17 off of those devices was critical to operations, but
18 it's very time consuming and very labor intensive. And
19 so I -- I specifically remember that being one of the
20 needs.
21   Q. Okay. Technology was changing and so TCSO
22 needed -- needed to be in a position to, as best it
23 could, to -- to -- to match or understand and evaluate
24 the changing technology; is that a fair -- fair
25 summary, if I'm following you?

Page 77

1   A. You could say that, yes, sir.
2   Q. All right. Was this partnership -- this
3 proposed partnering up together, was it ever
4 actually -- did it occur, do you know?
5   A. I don't recall.
6   Q. All right. Now we're going to go to tab number
7 20, two-zero, absent any concerns on ya'll's end will
8 be Deposition Exhibit Number 9. So tab 20. And if you
9 will let me know, Chief Simonds when you've had a
10 chance to review, and Alex, if you have any concerns we
11 need to discuss.
12      MS. ABSTON: Okay, thanks, if you could
13 just give us just a minute.
14      MR. SUDBURY: Sure.
15      MS. ABSTON: And just for clarity, you're
16 just seeking to -- I know it's mentioning some
17 attachments on here. You're not looking to the
18 attachments, you're just talking about this one e-mail
19 alone?
20      MR. SUDBURY: I am talking about this one
21 e-mail alone. The -- 
22      MS. ABSTON: Okay.
23      MR. SUDBURY: -- attachment actually is --
24 they are -- they are the next numbered tab, so we are
25 --

20 (Pages 74 - 77)

<table>
<tr><td colspan="2" align="right">Page 78</td></tr>
</table>

Page 78

1 　　　MS. ABSTON:  Okay.
2 　　　MR. SUDBURY:  -- going to talk about them.
3 If you want to do this wholistically, or perhaps more
4 efficiently, go ahead and look at 21 and 22 as well.
5 　　　MS. ABSTON:  Okay.
6 　　　MR. SUDBURY:  And --
7 　　　MS. ABSTON:  Yeah.
8 　　　MR. SUDBURY:  -- why don't -- why don't we
9 all do that.  To be clear on the record, Chief Simonds,
10 go ahead and take a look at tabs number 20, 21 and 22,
11 because those are the attachments referenced in the
12 e-mail.
13 　　　MS. ABSTON:  Okay.  Perfect.  Would you
14 mind giving -- let's go off the record, we'll just
15 knock it out real quick.
16 　　　MR. SUDBURY:  Sure.
17 　　　THE VIDEOGRAPHER:  We are off the record
18 at 12:40 p.m.
19 　　　(A break was taken at 12:40 p.m.)
20 　　　THE VIDEOGRAPHER:  We are back on the
21 record at 12:44 p.m.
22 BY MR. SUDBURY:
23 　　　Q.  Okay.  Chief Simonds, I got the green light off
24 the record there to proceed with my questions related
25 to the next three exhibits, so let's get into it.

Page 79

1 　　　Tab number 20, Deposition Exhibit Number 9
2 appears to be an e-mail from a Lance Sumpter,
3 S-u-m-p-t-e-r, it looks like to numerous people in the
4 law enforcement field, including yourself.  Is that a
5 fair description of this e-mail?
6 　　　A.  Yes, sir.
7 　　　Q.  And he's forwarding draft letters about and
8 ONDCP, the Office of Drug Control Policy, and HIDTA to
9 send out to congresspersons and senators to request
10 continued support for both ONDCP and HIDTA.  Is that --
11 is that also a fair description of this?
12 　　　A.  That's what it appears, yes, sir.
13 　　　Q.  Do you recall receiving this e-mail?
14 　　　A.  I don't recall.
15 　　　Q.  All right.  But no reason to believe that you
16 didn't receive this e-mail since it includes your
17 e-mail address at Tarrant County?
18 　　　A.  That's correct.
19 　　　Q.  Okay.  All right.  And then the next one, tab
20 number 21, which would be Deposition Exhibit Number 10
21 and is one of the attachments, I believe, to this
22 e-mail, is that your understanding that this is a draft
23 letter to senators of Congress that Mr. Sumpter had
24 forwarded with that e-mail?  Does that look right?
25 　　　A.  Yes, sir.

Page 80

1 　　　Q.  All right.  And then in the -- yeah, let's get
2 this one up on the screen so we can look at some
3 language in it.
4 　　　In the first paragraph, third sentence there,
5 starting with "Toxic drugs," it says, "Toxic drugs,
6 such as methamphetamines, synthetics, hallucinogens and
7 cocaine can only be mitigated through a national
8 strategy."
9 　　　Did I read that correctly?
10 　　　A.  I'm sorry, I'm -- where -- where did you find
11 that?
12 　　　Q.  Yeah, if -- first paragraph, third sentence,
13 starting with "Toxic drugs."
14 　　　A.  You're on page 22?
15 　　　Q.  Page 21.
16 　　　A.  Oh.  Whoops.
17 　　　Yes, sir.  I found that, and it does read the
18 way you stated.
19 　　　Q.  Okay.  And the letter does not reference --
20 certainly that sentence doesn't, and -- and I'll tell
21 you, having looked at the -- letter, it doesn't
22 reference prescription opioids; is that correct?
23 　　　A.  Not that specific sentence, no.
24 　　　Q.  Okay.  Well, the rest of it, do you -- I -- I
25 don't -- not -- not intended as a gotcha whatsoever.  I

Page 81

1 don't see prescription opioids referenced anywhere in
2 this -- this letter.  Am I just missing it somewhere?
3 　　　A.  I -- I would think so.  I think in the
4 following sentence where it says, "We are currently in
5 the grips of a burgeoning opioid/heroin crisis," the
6 opioid would certainly be the -- the prescription form
7 of the opioid would certainly be included in that.
8 　　　Q.  Okay.  Why do you say that, that the
9 prescription form would certainly be included in that?
10 　　　A.  Simply because of my experience in dealing with
11 law enforcement executives and I -- you know, over the
12 last 42 years, in my experience in law enforcement,
13 when you refer to an opioid problem, it would be any
14 derivative or form thereof.
15 　　　Q.  Okay.  Let's then look at tab number 22, which
16 I think will be Deposition Number 11.  And this is also
17 an attachment to Mr. Sumpter's e-mail.  This is the
18 ONDCP and HIDTA Talking Points.  Can we agree on that?
19 　　　A.  Yes, sir.
20 　　　Q.  And in that first paragraph -- hold on, let's
21 let -- let's get this one up here.  I'm going to slow
22 down so Gregg can do that.
23 　　　Okay.  In that first paragraph at the top, the
24 second sentence here, it says, "The HIDTA Program has
25 proven to be cost-effective, highly productive and

Page 82

1 demonstrates a significant return on investment."
2      Did I read that correctly?
3 A. Yes, sir.
4 Q. Do you agree with that statement?
5 A. I do.
6 Q. Did HIDTA generate more revenue through seizure
7 of currency than its expenditures?
8 A. I have no idea.
9 Q. Do you know who would know that?
10 A. ONDCP.
11 Q. Do you know specifically who at ONDCP would
12 have that information?
13 A. No.
14 Q. All right.  Staying on that document, let me
15 count them up here, the sixth bullet point -- and these
16 are -- these are the noteworthy highlights, one, two,
17 three, four, yeah, the sixth one says -- do you see
18 where it states that it has seized more than $547
19 million in illegally gained cash from drug trafficking
20 and money laundering organizations?
21 A. Yes, I see that.
22 Q. And then the next bullet point says, "The
23 illegally-gained cash and other assets along with the
24 wholesale value of the drugs seized equates to return
25 of investment of $75.34 for every $1.00 of HIDTA

Page 83

1 funding in 2016."
2      Did I read that correctly?
3 A. Yes, sir.
4 Q. Do you know if that information was accurate?
5 A. The numbers are -- I'm assuming are accurate.
6 How you're applying those numbers are probably up for
7 discussion.
8 Q. Okay.
9 A. And the reason I say that, just because
10 something is seized doesn't mean it's been awarded.  I
11 mean, we -- we might seize a million dollars off of a
12 mule transporting cash back from the United States to
13 Mexico, but throughout the seizure proceedings
14 afterwards, you know, that money may be awarded back to
15 the individual, it may be awarded to an attorney, it
16 may be -- you know, you just never know.  So seizure
17 and award -- and awards are two completely different
18 things.
19 Q. Okay.  And that bullet point doesn't use the
20 term "award."  Is that what you're getting at?
21 A. That's correct.
22 Q. It referenced a return on investment, correct?
23 A. Yes, sir.  You had brought up the point earlier
24 about whether it was cost effect -- I say "you."  The
25 document brought up the point about it being cost

Page 84

1 effective, so I was just drawing the -- the parallel
2 that it's not a one-to-one of seizure against baseline
3 of operating cost.
4 Q. All right.  The second bullet point, moving up
5 there -- we started in the sixth and looked at the
6 seventh.  Let's go up to number 2.  It says, "Removing
7 117 tons of cocaine, 28 tons of methamphetamine, 5.2
8 tons of heroin and 1 ton of prescription narcotics from
9 our communities."
10      Did I read that correctly?
11 A. Yes, sir.
12 Q. And then this is in reference -- those numbers
13 appear to be talking about nationwide.  Would you agree
14 with that?
15 A. That's my understanding.
16 Q. Do you have any idea why it says prescription
17 narcotics as opposed to prescription opioids?
18 A. I have no idea.
19 Q. According to the DEA, are medical narcotics
20 considered controlled substances under the Controlled
21 Substance Act?
22      MS. ABSTON:  Objection; form.
23      THE WITNESS:  I'd have you ask the DEA on
24 that.
25 BY MR. SUDBURY:

Page 85

1 Q. Okay.  You don't know?
2 A. I don't know.
3 Q. Do you know whether controlled substances under
4 the Controlled Substance Act include more than just
5 opioids, things such as Ritalin, Xanax, Valium,
6 Adderall, barbiturates, steroids, do you know whether
7 those are included in prescription -- well, whether
8 those type of items are concluded -- included as
9 controlled substances under the Controlled Substance
10 Act?
11      MS. ABSTON:  Objection; form.
12      THE WITNESS:  I would say -- I -- I can't
13 speak to the drugs that you just named without
14 referring to the Controlled Substance Act.  I do know
15 there are more drugs in the Controlled Substance Act
16 than just opioids.
17 BY MR. SUDBURY:
18 Q. Okay.  All right.  Moving down on that page,
19 under -- under the heading ONDCP and HIDTA Relationship
20 Critical to Success, I think it's one, two, three --
21 fifth line down, it says, "ONDCP has the important
22 responsibility to establish priorities and object --
23 objectives for the nation's drug policy.  The goals
24 include reducing illicit drug use, trafficking,
25 drug-related crime and violence, and drug-related

22 (Pages 82 - 85)

1 health consequences."
2     Did I read that correctly?
3   A. Yes, sir.
4   Q. Do you know if at that time ONDCP had any goals
5 that were related to prescription opioids?
6   A. I do not know.
7   Q. Okay. All right. Let's go, please, if you'll
8 turn to tab number 45. And I will let you look at
9 that, and Alex as well, and tell me when we have the
10 green light to proceed.
11   A. Okay.
12     MS. ABSTON: Yeah, give me one second.
13   Okay. I think we're good.
14     MR. SUDBURY: Okay. Thank you.
15 BY MR. SUDBURY:
16   Q. Chief Simonds, this document, tab number 45,
17 now Deposition Exhibit Number 12, we'll get it up on
18 the screen here, but it is a Texoma HIDTA Executive
19 Board Meeting Minutes from December 8, 2017. Does look
20 like I've described that fairly?
21   A. Yes, sir. Yes, sir.
22   Q. All right. And then flip to the second page --
23 please turn to the second page, about three quarters of
24 the way down. It says, "There was a motion by Tim
25 Gallagher for Mike Simonds to serve as 2018 Vice Chair

1 on the Texoma HIDTA Executive Board."
2     Did I read that correctly?
3   A. Yes, sir.
4   Q. And did you serve in that capacity as the
5 Texoma HIDTA Executive Board Vice Chair in 2018?
6   A. Yes, sir.
7   Q. What year did you first serve on the HIDTA
8 Executive Board?
9   A. 2021. No, sorry, 2001.
10   Q. 2001. Okay.
11   A. Yes.
12   Q. All right. So were you on -- and let me be
13 explicit on this, I want to make sure we're on the same
14 page. Did you serve on the Texoma HIDTA Executive
15 Board for the entirety of your time when you were
16 employed at TCSO, that is from 2001 until April of
17 2022?
18   A. That is my recollection, yes, sir.
19   Q. Okay. What were your roles and duties as an
20 Executive Board member? And if they changed over time,
21 could you give me a general description of how they may
22 have changed as an Executive Board member of HIDTA?
23   A. The Executive Board would review policy and
24 procedures of the HIDTA. They would have input into
25 salary structures of full-time HIDTA employees, they

1 would provide guidance and input and sometimes staff
2 hiring boards for new employees. Those were some of
3 the responsibilities.
4   Q. Do you recall -- excuse me, if I can speak
5 here. Sorry.
6     Do you recall how frequently the Executive
7 Board met?
8   A. We met once a month for the -- for the majority
9 of the time I was on the board.
10   Q. And then the last year you were a member of the
11 Executive Board was through your retirement in April of
12 2022; is that correct?
13   A. That's correct. I was still a member of the
14 board; however, approximately six months to a year
15 prior to my retirement, I asked Calvin Bond to start
16 attending, primarily because I knew my retirement was
17 upcoming and I wanted a smooth transition.
18   Q. Okay. So -- so prior to your retirement,
19 approximately six months to a year in advance, you
20 asked Calvin Bond to start attending to make that
21 transition smoother; is that fair?
22   A. Yes, sir.
23   Q. And then when you retired, at that point you're
24 -- you're no longer on the Executive Board for HIDTA;
25 is that correct?

1   A. That's correct.
2   Q. All right. Okay. Sorry to jump around, but I
3 did warn everybody, even though it's not perfect here.
4 We're going to go back to tab number 7 in the binder.
5 And I really -- you all do what you need to do to take
6 a look at this, I'll tell you I've got one question
7 related to it, but . . .
8     MS. ABSTON: Yeah, just let me check one
9 name really quick.
10     MR. SUDBURY: Sure.
11     MS. ABSTON: Okay. I think we're good to
12 go. Thank you. Thanks, Gregory.
13 BY MR. SUDBURY:
14   Q. Okay. So tab number 7, which will be
15 Deposition Exhibit Number 13, this document in the
16 Opening Remarks and in the line for Old Business, it
17 identifies you, correct, and says "Tarrant County SO,
18 Chair."
19     Did I read that correctly?
20   A. Yes, sir.
21   Q. So if I follow the chronology in the documents,
22 if I follow correctly, in 2019 you were the HIDTA
23 Executive Board Chair; is that correct?
24   A. Yes, sir.
25   Q. So let me just ask this question: What period

23 (Pages 86 - 89)

Page 90

1 of time were you the HIDTA Executive Board Chair?
2     A.  During the calendar year of 2019.
3     Q.  Okay.  For one year then, correct?
4     A.  One year.  Yes, sir.
5     Q.  All right.  Got it.
6         Now please turn to tab number 23.  And let me
7 know when you have had a -- when you have had a chance
8 to look at that document, and we'll also wait for Alex
9 to let us know if there's --
10        MS. ABSTON:  Gregory, do you intend on
11 looking at the attachments to this one as well?
12        MR. SUDBURY:  For this one, we -- yes, it
13 is the following tab.
14        MS. ABSTON:  Okay.  You want me to look at
15 those?
16        MR. SUDBURY:  Yep, let's do those
17 collectively.
18        MS. ABSTON:  Okay.
19        MR. SUDBURY:  So 23 and 24.
20        MS. ABSTON:  Okay.  Okay.  Do you mind
21 letting us go off the record real quick?
22        MR. SUDBURY:  No, that's fine.
23        MS. ABSTON:  Okay.
24        THE VIDEOGRAPHER:  We are off the record
25 at 1:04 p.m.

Page 91

1         (A break was taken at 1:04 p.m.)
2         THE VIDEOGRAPHER:  We are back on the
3 record at 1:06 p.m.
4 BY MR. SUDBURY:
5     Q.  Okay.  Chief Simonds, I've -- I had you looking
6 at tab number 23, which will be Deposition Exhibit
7 Number 14.  And it appears to me that this is an e-mail
8 from a Ms. Lunger, L-u-n-g-e-r.  He's got an e-mail
9 address at the Texoma HIDTA dated June 27, 2019 to a
10 whole bunch of people, including yourself, transmitting
11 the 2018 Texoma HIDTA Annual Report and Final Threat
12 Assessment for 2019 as separate documents is my
13 understanding of this.
14        Do you recall receiving this e-mail?
15     A.  I don't recall receiving it, but it looks
16 familiar.
17     Q.  All right.  And in 2018, we looked at, you were
18 the Vice Chair of the Texoma HIDTA Executive Board, and
19 then you were the Chair of Texoma HIDTA in 2019,
20 correct?
21     A.  Yes, sir.
22     Q.  Did you have any role in drafting -- and it
23 looks like they're two separate documents.  Did you
24 have any role in drafting either the 2018 Annual Report
25 or the 2019 Final Threat Assessment?

Page 92

1     A.  Not in drafting, no, sir.
2     Q.  What about in reviewing those drafts after
3 somebody else prepared them?  Did you have any
4 involvement in that?
5     A.  They would have been sent to me for review.  I
6 don't specifically remember reviewing them, but that
7 would have been the normal course.
8     Q.  Okay.  Well then let me ask just this kind of
9 broad question.  Did you have any role?  And if you
10 did, could you explain to us what that role would have
11 been in preparing either the 2018 Annual Report or the
12 2019 Final Threat Assessment?
13     A.  Not in preparing, no, sir.
14     Q.  Okay.  All right.  And then when you say
15 review -- let me ask this:  For these particular
16 documents, did you -- do you recall reviewing and
17 making any changes or recommendations as far as items
18 that should be changed in the documents?
19     A.  No, sir, I don't recall requesting any changes.
20     Q.  Okay.  And -- and back to review again, I --
21 we'll move on, I don't mean to harp on it, but I just
22 need to understand what your role is.  When you say you
23 were reviewing it, was it a review to I'm just
24 interested, I want to -- I want to read it and review
25 the materials or reviewing it with a critical eye

Page 93

1 towards, you know, yes, I think this information is
2 accurate or we should reframe this, or -- when you say
3 "review," without being too long about this, but what
4 exactly were you doing in that review?
5     A.  No, I -- I would have reviewed it as -- as
6 being on the Executive Board and being the Vice Chair
7 for the calendar year that these stats were probably
8 collected and then being disseminated during the year I
9 was the Executive Chair, you know, or the Chair.  I
10 would have reviewed it, and if there was anything in
11 there that I felt was inaccurate or needed to be
12 changed, hopefully I would have caught that and brought
13 it to their attention.
14     Q.  Okay.  Do you recall specifically for these two
15 documents, the 2018 Annual -- Annual Report or the 2019
16 Final Threat Assessment, bring to the attention
17 anything that you thought was inaccurate or needed to
18 be changed?
19        MS. ABSTON:  Objection --
20        THE WITNESS:  I don't recall that.
21        MS. ABSTON:  -- to form.
22        THE WITNESS:  Oh, sorry.  I don't recall
23 that.
24 BY MR. SUDBURY:
25     Q.  Okay.  For -- let me ask this because you had a

24 (Pages 90 - 93)

Page 94

1 long time with Texas HIDTA.  For any of those -- and I
2 realize -- well, I don't -- I take that back.  But at
3 any point for any annual reports or any annual threat
4 assessments, do you -- do you specifically recall in
5 that process you just explained where you reviewed it,
6 found something you thought was inaccurate and then ask
7 there to be further research or changed in the report?
8      A. I don't recall ever finding anything that I
9 felt like was inaccurate.  I do believe there were one
10 or two occasions where I may have asked for something
11 to be clarified and/or emphasized.
12      Q. Got it.  Okay.  Then let's turn to tab -- the
13 next tab, 24, which is the 2018 Annual Report
14 referenced in the e-mail.  This will be Deposition
15 Exhibit Number 15.  And Chief Simonds, I'm going to go
16 to page 8.  Hopefully on your version of this, if you
17 look down in the bottom right, it says 24.0008, or the
18 Bates number 829210.
19      A. Okay.
20      Q. Yeah, you got it there, Gregg, thank you, up on
21 the screen we have it as well.
22      The -- the -- the middle paragraph starting
23 with the "Texoma HIDTA assesses" -- do you see that on
24 page 8?
25      A. Yes, sir.

Page 95

1      Q. It's the second sentence I want to -- I want to
2 go to.  It says, "The combination of rising prices for
3 diverted opiate -- opiate pharmaceuticals along with
4 larger and more profitable shipments of heroin by
5 Mexican DTOs, suggest heroin trafficking and
6 distribution will remain a persistent drug threat in
7 the Texoma HIDTA region."
8      Did I read that accurately?
9      A. Yes, sir.
10      Q. So by 2018, was HIDTA seeing that diverted
11 pharmaceuticals were being priced out of the market by
12 other illicit drugs?
13      MS. ABSTON: Objection; form.
14      THE WITNESS:  I'm re-reading that.
15 BY MR. SUDBURY:
16      Q. Sure.  And I don't want to interrupt you, but
17 let me know if I need to repeat the question if that
18 helps.
19      A. Yes, please restate the question.
20      Q. Right.  So by 2018, when this annual report was
21 written, was HIDTA seeing that diverted pharmaceuticals
22 were being priced out of the market by other illicit
23 drugs?
24      A. I don't -- I don't see the conclusion that
25 they're being priced out of the market.  I think the

Page 96

1 conclusion is that we're going to continue to have a --
2 a heroin problem based upon all the facts and
3 circumstances surrounding that addiction issue.
4      Q. Okay.  And the facts and circumstances
5 surrounding it is that the sentence is referencing
6 there's a combination of issues.  And -- and let's just
7 make sure we agree on the structure what the sentence
8 is saying.  "The combination of rising prices for
9 diverted opiate -- opiate pharmaceuticals." Correct?
10 That's part one of the sentence.  You agree with that?
11      MS. ABSTON: Objection; form.
12      THE WITNESS: Yeah, I -- I agree that's
13 what it says.
14 BY MR. SUDBURY:
15      Q. Okay.  And then second part, breaking the
16 sentence down -- "along with larger and more profitable
17 shipments of heroin by Mexican DTOs suggest heroin
18 trafficking and distribution will remain a persistent
19 threat in the Texoma HIDTA region."
20      So you got two things going on there.  It's
21 saying higher prices for diverted opiate -- opiate, and
22 then larger and more profitable shipments of heroin
23 from Mexico.  And combining those two suggest heroin
24 trafficking and distribution will be a persistent drug
25 threat.  Are we on the same page?

Page 97

1      MS. ABSTON:  Objection; form.
2      THE WITNESS:  Is there a question there?
3 I -- I'm -- I'm sorry, I mean, I -- you're reading it,
4 and I agree that you're reading it correctly.  I'm just
5 not sure how you want me -- what you want me to respond
6 to, other than you're reading it correctly.
7 BY MR. SUDBURY:
8      Q. Well, I think you told me earlier that there
9 are factors and other thing -- well, do you have an
10 understanding of what a pill mill is?
11      A. From -- you define your understanding of the
12 pill mill and I'll tell you if it's mine.
13      Q. Chief Simonds, I -- I -- that's not the way
14 that it gets -- gets to -- gets to work.  Well, what is
15 your definition of a pill mill?
16      A. Well, it can actually be two different things.
17      Q. Sure.
18      A. You can have the reference of a pill mill being
19 possibly a -- a doctor or a pharmacist that is
20 illegally or -- or -- or unethically prescribing a
21 certain drug and that can be referred to on the
22 street is that that person is nothing more than a pill
23 mill.  Or you could have the physical pill mill where
24 powders are actually pilled up into a hard pill and
25 then are marked that often look like legitimate

25 (Pages 94 - 97)

1 pharmaceuticals.  So there's two different definitions
2 in my brain.
3    Q.  Got it.  Thank you for that.
4        Would you characterize a chain pharmacy like
5 Kroger as a pill mill under either definition that you
6 just gave?
7        MS. ABSTON:  Objection; form.
8        THE WITNESS:  I don't have the knowledge
9 to -- to answer that question.  I -- I don't know of
10 any investigative -- I -- I don't have the knowledge to
11 answer that question.
12 BY MR. SUDBURY:
13    Q.  Right.  You don't know if Kroger was
14 investigated in Tarrant County on the basis being that
15 there was a suspicion that Kroger was a pill mill; is
16 that fair?  You don't know.
17        MS. ABSTON:  Objection; form.
18        THE WITNESS:  I don't have the knowledge
19 to answer that question.
20 BY MR. SUDBURY:
21    Q.  And I'm sorry if I asked this earlier, but do
22 you know who would have that information?
23    A.  I'm assuming the DEA.
24    Q.  Okay.  All right.  Another role -- Texoma
25 HIDTA, one of the roles that it played was a

1 deconfliction with other agencies; is that correct?
2    A.  Yes, sir.
3    Q.  And -- and just so I -- I understand we're on
4 the same page, what is deconfliction?
5    A.  The deconfliction area of the risk center for
6 HIDTA provides a very critical role in that let's say
7 the Arlington Police Department is conducting an
8 investigation and they get a search warrant for a
9 particular location, they would call the HIDTA Risk,
10 which the -- and they deconflict that address.  And
11 then anybody that is -- has an ongoing investigation at
12 a particular location or address within this region
13 should notify the HIDTA Risk so we don't inadvertently
14 have two investigations or two search warrants being
15 conducted simultaneously and the risk of having a -- a
16 blue on blue -- or a police officer on police officer
17 situation.
18    Q.  Okay.  So -- all right.  I think I got you.  De
19 -- de -- deconfliction is -- it's a mechanism by which
20 all the agencies know what the other agencies are doing
21 so that you don't disrupt or interfere with other
22 investigations or activities; is that -- am I getting
23 it?
24    A.  Yes.  Only to the extent that there is an
25 investigation at that location, not what is being

1 investigated, you know, or any of the details of the
2 investigation at all.
3    Q.  Okay.  So it's location specific then, right?
4    A.  Correct.  Location and/or it could potentially
5 be a person.
6    Q.  All right.  Are you familiar with an
7 investigation conducted in 2020 by the DEA Dallas field
8 divisions Fort Worth office and the DEA's Forth Worth
9 Tactical Diversion Squad, and I think there were other
10 agencies, that was known as Operation Wasted Daze?  Are
11 you familiar with it?
12    A.  No, sir, I'm not.
13    Q.  Okay.  Let's take a look then.  Let's turn to
14 tab 60 on this one, six-zero.  And I know that you need
15 to look at it, and I know, Alex, you need to do your
16 job.  I will say just -- this is a -- a press release,
17 so I hope there's not anything in there that you're
18 concerned about, but -- but take -- take a look,
19 please.
20        MS. ABSTON:  Okay, I'm going to trust you
21 it's a press release because I'm not seeing the URL or
22 the date on it.  So -- and it may just be my copies,
23 but we're going to object to the use of this exhibit
24 just because there's -- there's no way to verify or
25 authenticate where it came from.  But I'll allow you to

1 question the witness about it if it is a press release
2 pulled down from the Internet.
3 BY MR. SUDBURY:
4    Q.  And I don't mean to push you along here, Chief
5 Simonds, but is that -- do you recognize that document,
6 if you've had a chance to look at it?
7    A.  No, I've -- I do not recognize the document.
8    Q.  Do you know whether you've seen this press
9 release before today?
10    A.  I don't ever recall seeing this press release.
11    Q.  And this will be Deposition Exhibit Number 16.
12 Do you see on the -- on the first page of the document,
13 you may need to scroll down there just a little bit on
14 our screen shot there, it references five pharmacists
15 that were convicted in this scheme.
16        Do you see that on the first page?
17    A.  I see a sentence that starts with "He and five
18 co-conspirators."
19    Q.  Yes.  And then it says pharmacists and then it
20 identifies names.  Do you follow me there?
21    A.  Yes, sir.
22    Q.  Okay.  And then I'm going to have you, if you
23 would, please -- let me -- let me ask the question:
24 Are you familiar with any of -- of the pharmacies that
25 these people are associated with?  And those pharmacies

26 (Pages 98 - 101)

Page 102

1 are -- are you familiar with the pharmacy called
2 Calvary?
3     A. No, sir.
4     Q. Are you familiar with the pharmacy called
5 Remcare, R-e-m-c-a-r-e?
6     A. No, sir.
7     Q. How about a pharmacy called Beco, B-e-c-o, are
8 you familiar with that?
9     A. No, sir.
10     Q. How about a pharmacy called Brandy,
11 B-r-a-n-d-y, are you familiar with that pharmacy?
12     A. No, sir.
13     Q. And then finally, Ethel's Pharmacy, E-t-h-e-l,
14 are you familiar with that pharmacy?
15     A. No, sir.
16     Q. Okay. So you're not familiar with them, so you
17 -- you've got no basis to -- to determine whether they
18 would be independent pharmacies or chain pharmacies; is
19 that a fair assessment?
20     A. That's correct.
21     Q. Do you recall -- I know you indicated you
22 haven't looked at it before, and I acknowledge it's
23 somewhat lengthy. But this press release, do you know
24 if TCSO had any involvement in -- in the material
25 addressed in this press release?

Page 103

1     A. No, I -- I do not know.
2     Q. All right. Again, sorry to bounce around, but
3 we're going to go back to tab number 25. Or not go
4 back to, we're going to look at tab number 25 now.
5     A. Okay. And after this --
6     Q. Yes, sir.
7     A. -- I'm going to need to take a break.
8     Q. Why don't we -- do you want to wait until after
9 this exhibit or do you want to take a break right now?
10     A. I mean, I -- is this going to take more than
11 five minutes?
12     Q. I hope not.
13     A. Okay. Well then we can -- we can go forward if
14 that will help.
15     Q. Okay. Let's get through this exhibit and then
16 we'll talk about that. Thank you for letting me --
17 letting me know on that.
18         First of all, let me do what we need to do
19 here. Tab number 25, which will be Exhibit Number 17,
20 Mr. Simonds, I'll ask you if you recognize the
21 document. And, Alex, let me know if you need a moment
22 to look at -- look at this document. Let me know if
23 you have any concerns.
24         MS. ABSTON: Okay. I think we're good on
25 this one at least, but I'll let Senior Chief look over

Page 104

1 it.
2         THE WITNESS: I'm good.
3 BY MR. SUDBURY:
4     Q. Okay. This document is identified in the first
5 page as a Texas HIDTA 2019 Threat -- Threat Assessment
6 from April of 2019. Agree with me?
7     A. Yes, sir.
8     Q. And during the time this report was prepared,
9 you were Chair of the Texoma HIDTA Executive Board,
10 right?
11     A. During 2019, yes, sir.
12     Q. All right. Let's go to page 18. I hope yours
13 is marked as such. For those that may not be, it's
14 Bates label 829250. There we go on the screen. And
15 I'm looking at the section called Pharm -- or
16 identified as Pharmaceuticals.
17         Do you see that?
18     A. Yes, sir.
19     Q. About half way through that second paragraph,
20 it says, "Pharmaceutical diversion occurs in a variety
21 of forms, but a common operation is the 'pill mill'
22 model. These operations generally involve multiple
23 co-conspirators, to include individuals associated with
24 medical clinics and pharmacies, as well as
25 drivers/recruiters. Other diversion methods include

Page 105

1 doctor shopping, fraudulent prescriptions, pharmacy
2 theft, employee pilferage, robberies, night break-ins,
3 online pharmacies, and/or 'dark web' drug
4 marketplaces."
5         Did I read that correctly?
6     A. Yes, sir.
7     Q. So the Exhibit 16, or tab 60, with the
8 Operation Wasted Daze, based on what you saw from that
9 press release with co-conspiring medical clinics and
10 pharmacies, was -- was that what -- what would be
11 identified kind of a classic pill mill as it's
12 described in this document?
13         MS. ABSTON: Objection; form.
14         THE WITNESS: I -- I think you could draw
15 that conclusion, yes, sir.
16 BY MR. SUDBURY:
17     Q. Okay. And this -- what you said in here,
18 again, this -- you -- you gave two -- two definitions
19 of pill mill, but -- but this -- this is -- definitely
20 fits one of the definition -- definitions you gave me
21 earlier, correct?
22     A. Yes, sir.
23     Q. All right. All right, final paragraph of that
24 page, let's move on here. Rather than me read it --
25 well, let's -- let's see here, make sure we're on the

27 (Pages 102 - 105)

Page 106

1 same page. "Pharmaceutical diversion is often
2 erroneously reviewed as a 'white collar drug crime,'"
3 and then it goes on from there.
4     Do you see that paragraph that I'm talking
5 about?
6   A. Yes, that last paragraph.
7   Q. Yeah. Do you agree with the statements made in
8 that paragraph?
9     MS. ABSTON: Objection; form.
10     THE WITNESS: You'll have to give me a
11 minute to read the paragraph.
12 BY MR. SUDBURY:
13   Q. Sure. I understand.
14   A. Okay. I've -- I've read the paragraph and I --
15 yes, I generally agree with what it says.
16   Q. Okay. I know I've asked you about the
17 pharmacies broadly. I don't think I've asked this
18 question. Bear with me if you believe I have. But are
19 you aware of any Kroger pharmacist being investigated
20 by TCSO?
21   A. No, sir.
22   Q. Okay. Are you aware of any Kroger pharmacist
23 being investigated by the Texoma HIDTA Task Force?
24     MS. ABSTON: Objection; form.
25     THE WITNESS: No, sir, but I wouldn't have

Page 107

1 been briefed at that level anyway.
2 BY MR. SUDBURY:
3   Q. What -- what do you -- what do you mean by
4 that? Can you explain to me you wouldn't have been
5 briefed at that level? If a particular pharmacist was
6 being investigated, you would not receive that
7 briefing, is that what you're saying?
8   A. That's correct.
9   Q. Who would have that information on behalf of
10 Texoma HIDTA Task Force, that information being whether
11 particular pharmacists were investigated?
12   A. That would be the initiative commanders.
13 There's multiple initiatives at the Texoma HIDTA. And
14 whoever was responsible for that area of enforcement
15 would have that information.
16   Q. And when you say "area of enforcement," is that
17 topic specific, narcotic specific, location specific?
18 What's an area of enforcement?
19   A. That's a shifting target, you know, based upon
20 the needs at -- that are presented at the time. You
21 will have initiatives such as the money laundering
22 initiative, which will be heavily laden with IRS
23 investigators. But then again, you're going to have
24 violent crime groups, you're going to have different
25 groups investigating different areas of crime and

Page 108

1 illegal activity based upon the need at the time.
2   Q. Okay. Are you aware of any area enforcement or
3 specific group within Texoma HIDTA that investigated
4 prescription opioids?
5     MS. ABSTON: Objection; form.
6     THE WITNESS: I would say yes, I know
7 there was. I couldn't tell you who was over that
8 particular -- or -- or where it folded into the overall
9 product.
10 BY MR. SUDBURY:
11   Q. Do you know when that occurred?
12     MS. ABSTON: Objection; form.
13     THE WITNESS: I would say pharmaceutical
14 diversion and -- was always a part of the mission of
15 the HIDTA from when I began until when I ended.
16 BY MR. SUDBURY:
17   Q. Okay. And -- and what I'm getting at is I
18 think, if I followed your testimony, you're saying that
19 the -- the initiative commanders that you can change
20 the focus in areas, and you gave me some examples of
21 such. Do you recall any specific focus on
22 pharmaceutical diversion within Texoma HIDTA? And if
23 you do, do you know when that occurred?
24     MS. ABSTON: Objection; form.
25     THE WITNESS: Once again, I would say it

Page 109

1 occurred the entire time I was on the board.
2 BY MR. SUDBURY:
3   Q. Okay. Are you aware of any Kroger -- I asked
4 earlier about pharmacists. So are you aware of any
5 Kroger pharmacy being investigated by the Texoma HIDTA
6 Task Force?
7   A. Not specifically, no, sir.
8   Q. All right.
9     MR. SUDBURY: I'm at a good point to take
10 a break, so why don't we go off the record here,
11 please.
12     THE VIDEOGRAPHER: We're off the record at
13 1:33 p.m.
14     (A break was taken at 1:33 p.m.)
15     THE VIDEOGRAPHER: We are back on the
16 record at 2:05 p.m.
17 BY MR. SUDBURY:
18   Q. Chief Simonds, Texoma HIDTA does not receive
19 funding from Tarrant County; is that correct?
20   A. That's correct.
21   Q. If you will turn -- I forgot if we had done
22 this before we took our quick lunch break there, but we
23 were going to go to tab 12, which I think is going to
24 be Exhibit 18. I don't think we'd gotten there before
25 we took a break. So please turn to tab 12, Exhibit 18.

28 (Pages 106 - 109)

1 And I'll just read the -- I'll just read the title and
2 let you all do what you need to do.  Texoma HIDTA 2021
3 Threat Assessment.  And let me know if you've had a
4 chance to familiarize yourself with this document.
5 And, Alex, if ya'll -- there are any concerns on
6 ya'll's end.
7         MS. ABSTON:  Okay.  Let me give it a look.
8         MR. SUDBURY:  Sure.
9         MS. ABSTON:  I think that we'll -- we're
10 going to be good with this one if Senior Chief is.
11        THE WITNESS:  I'm fine.
12 BY MR. SUDBURY:
13   Q.   This is -- as I read the title, just to try to
14 move this along here, but this is the Texoma HIDTA 2021
15 Threat Assessment dated June of 2021; is that accurate?
16   A.   Yes, sir.
17   Q.   And do you recall having reviewed this report
18 previously?
19   A.   I don't specifically recall, but I know I
20 did --
21   Q.   Okay.
22   A.   -- as part of my duties.
23   Q.   Sure.
24        All right.  Let's go to page 4 of this
25 document, the Bates label will be 813686.  And I'm

1 going to look at the first paragraph underneath
2 Executive Summary.  It says, "The overall drug
3 trafficking threat to the Texoma HIDTA region remains
4 stable."
5        Did I read that correctly?
6   A.   Yes, sir.
7   Q.   And then, "Law enforcement and intelligence
8 data continue to indicate that methamphetamine
9 continues to pose the most significant drug threat to
10 the region as north Texas, the Texas Panhandle and
11 Oklahoma are flooded with cheap, high purity
12 methamphetamine produced in Mexico."
13        Did I read that --
14   A.   Yes, sir.
15   Q.   All right.  And then it goes on to talk about
16 heroin, marijuana, cocaine and fentanyl also posing
17 significant threats.  I -- I did not read that word for
18 word, but I'm paraphrasing.
19        Do you see that?
20   A.   Yes, sir, I did.
21        MS. ABSTON:  Objection; form.
22 BY MR. SUDBURY:
23   Q.   Okay.  The statements in this paragraph
24 underneath the Executive Summary, do you believe that
25 they were accurate at the time they were written?

1   A.   Yes, sir.
2   Q.   And let me just ask you about the second
3 sentence where it says, "continue to -- to indicate
4 that methamphetamine continues to pose that most
5 significant drug threat to the region."  How long had
6 methamphetamine, prior to this, posed the most
7 significant drug threat to the region, do you know?
8        MS. ABSTON:  Object -- objection; form.
9        THE WITNESS:  I would -- I wouldn't know
10 an answer to that question without reviewing the threat
11 assessments and the statistics for each year.
12 BY MR. SUDBURY:
13   Q.   Okay.  So let me break that down so I
14 understand.  If we want to -- to recreate, understand
15 what you need to look at, the threat assessments, would
16 you look at this document just from years prior, the
17 threat assessment in prior years?
18   A.   Yes, sir, that would be one way to -- to
19 ascertain that information.
20   Q.   Okay.  And then what data would you look at to
21 ascertain that information?
22   A.   Well, you would have to look at the amount of
23 seizures that occurred, the number of arrests that
24 occurred, and things of that nature to determine, you
25 know, what is your biggest problem.

1   Q.   Okay.  And to get that information, seizures
2 and arrest data, is there a particular document that,
3 you know, oh, it's called the ABC document, or this is
4 what I would need to look at?
5   A.   You could go to the Uniform Crime Report
6 potentially.  All law enforcement agencies are supposed
7 to report various crimes through what, when I left was
8 still the Uniform Crime Report.  I think they've
9 actually gone to a different reporting system now.  But
10 that would be one way to look at it.  If you're talking
11 about nationally, that -- that would be the way to look
12 at it.  If you're looking at it locally, then the only
13 way to do that would almost be to go to each and every
14 agency and get that information and -- and review it
15 independently.
16   Q.   Okay.  All right.  Let's turn, on that
17 document, to page 17, Bates label 813699.  And there's
18 a heading there for Pharmaceuticals and Controlled
19 Prescription Drugs.  And I'm going to have you just
20 please read the first paragraph there.  I won't read it
21 out loud here.  Starting with, "The diversion."
22        Do you see that?
23   A.   Yes, sir, I do.
24        I've read it.
25   Q.   Okay.  The last sentence there, "The pill mills

29 (Pages 110 - 113)

Page 114

1  are generally conspiracies involving doctors, medical
2  clinics, pharmacies and street-level drug organizations
3  involved in systematic drug diversion."
4       That's one variation of the pill mill that you
5  described to me earlier, correct?
6       MS. ABSTON: Objection; form.
7       THE WITNESS: That's correct.
8  BY MR. SUDBURY:
9    Q. Okay. And do you agree with this assessment
10 from Texas HIDTA, at least that first paragraph there?
11      MS. ABSTON: Objection; form.
12      THE WITNESS: Yes, sir.
13 BY MR. SUDBURY:
14   Q. Okay. Let's turn, please, to tab number 8 in
15 the document -- in the binder, I'm sorry.
16      MR. RYAN: Can we go off the record for a
17 second and can defendants go in a breakout room real
18 quick?
19      MR. SUDBURY: Fine with me. Thank you.
20      THE VIDEOGRAPHER: We're off the record at
21 2:12 p.m.
22      (A break was taken at 2:12 p.m.)
23      THE VIDEOGRAPHER: We are back on the
24 record at 2:24 p.m.
25 BY MR. SUDBURY:

Page 115

1    Q. I asked you a number of questions I know before
2  we took our lunch break that were related to TCSO's
3  investigations of either pharmacies or pharmacists in
4  Tarrant County. And I believe what you told me is that
5  for additional information regarding the identification
6  of any pharmacy or pharmacist investigate --
7  investigated in Tarrant County, if any, that I would
8  need to go speak with the DEA; is that correct?
9       MS. ABSTON: Objection; form.
10      THE WITNESS: That's where I would begin.
11 BY MR. SUDBURY:
12   Q. Okay. And the reason for that -- what I didn't
13 ask you and I want to ask you now: Is the reason
14 you're suggesting go to the DEA is because if TCSO
15 became aware of some concern with a pharmacy or
16 pharmacist that may be -- may -- may need further
17 investigation, the TCSO would refer that to the DEA; is
18 that correct?
19      MS. ABSTON: Objection; form.
20      THE WITNESS: That would be the reason why
21 we embedded an investigator in the -- is how is so we
22 would have direct access for assistance in those
23 matters and to assist in those investigative processes.
24 BY MR. SUDBURY:
25   Q. Okay. Again, I think we can generally agree

Page 116

1  the DEA has specialized information, skill set,
2  technology, et cetera, to address drug-related
3  investigations; fair enough?
4       MS. ABSTON: Objection; form.
5       THE WITNESS: Yes, sir.
6  BY MR. SUDBURY:
7    Q. All right. So essentially, what would have
8  happened is if TCSO became aware of a concern in
9  Tarrant County with a pharmacy or a pharmacist, in
10 layman's terms here, Chief Simons, that issue would
11 have been kicked from the TCO -- TCSO to the DEA to --
12 to effectively take it from there; is that fair?
13      MS. ABSTON: Objection; form.
14      THE WITNESS: And not completely, sir, no,
15 sir. What we would have done with that allegation or
16 investigation, we would see if that would be an
17 investigation that the DEA and/or the Diversion Task
18 Force, basically the same thing, would they be willing
19 to take on that investigation. If -- if it didn't meet
20 their parameters, either in scope or for whatever
21 reason, then, you know, then we would do the best we
22 could with the resources we had to -- to do that within
23 our own task force.
24 BY MR. SUDBURY:
25   Q. Okay. I follow you.

Page 117

1       Then are you aware of any investigations in
2  Tarrant County involving pharmacies or pharmacists
3  where it stayed with TCSO's task force? In other
4  words, where the DEA, the Diversion or its task force,
5  said, no, we're not going to take that on, but -- but
6  you all keep it and run with it if you -- if you would
7  like to? Are you aware of any such situations?
8       MS. ABSTON: Objection; form.
9       THE WITNESS: I am almost positive that it
10 occurred on numerous occasions, but I couldn't speak
11 specifically to any in -- specific investigation.
12 BY MR. SUDBURY:
13   Q. Okay. When you say "almost positively," can
14 you just explain to me the basis for why you -- why you
15 believe almost positively that occurred?
16   A. Because it's not an uncommon situation to have
17 those allegations made, either from a citizen, or from
18 a victim, or through the -- trying to investigate a
19 death investigation that might lead to suspicion of the
20 drugs coming from, you know, a bad doctor or, you know,
21 a bad pharmacist. And so we would be making those
22 inquiries, and it -- it would just not be a hundred
23 percent sure by any stretch of imagination that all of
24 those requests would be adopted by the DEA.
25   Q. Okay. Let's go to tab 39 of the binder,

30 (Pages 114 - 117)

Page 118

1 please.
2       MS. ABSTON: Can I just clarify, did we
3 ever mark tab 8 as an exhibit or did we set that aside?
4       MR. SUDBURY: No, we did not. We're going
5 to set --
6       MS. ABSTON: Okay.
7       MR. SUDBURY: -- that aside.
8       MS. ABSTON: Okay.
9       MR. SUDBURY: So this will be -- thank you
10 for reminding me of that. This will be Exhibit 19 now
11 barring any issues here.
12      MS. ABSTON: Okay. So tab 39. Okay.
13      GREGG HOLDERMAN: Confirming: Tab 39?
14      MR. SUDBURY: Correct. Exhibit 19 now.
15      GREGG HOLDERMAN: Thank you.
16      MR. SUDBURY: Or about to be Exhibit 19.
17 BY MR. SUDBURY:
18      Q. Chief Simonds, I'll represent to you that is a
19 Tarrant County Sheriff's Office Annual Report if you
20 look at the first page.
21      A. Yes, sir.
22      Q. And I'll pause a moment here to let -- if
23 you'll let me know if you or Alex have any concerns
24 about this document.
25      MS. ABSTON: I don't have any concerns

Page 119

1 about it.
2       MR. SUDBURY: Okay.
3       MS. ABSTON: -- if Chief does.
4 BY MR. SUDBURY:
5       Q. And let's mark this as Exhibit 19. It -- it
6 represents an annual report. I actually think it's the
7 annual report for 2017, 2018. Somewhere in here it's
8 got that information.
9       Have you seen this document before?
10      A. Yes, sir.
11      Q. If you'll turn to -- hopefully yours is
12 marked -- page 17, bottom right corner. If it's not,
13 its Bates label 885319.
14      A. I'm there.
15      Q. All right. In the middle of the page, yep,
16 there we got D -- DEA Task Force.
17      Do you see that?
18      A. Yes, sir.
19      Q. Under the first paragraph it says, "Due to the
20 incredible increase in opioid addiction, including
21 pharmaceutical drug abuse, the Tarrant County Sheriff's
22 Office has partnered with the Federal Drug Enforcement
23 Administration on their Tactical Diversion Squad."
24      Did I read that accurately?
25      A. Yes, sir.

Page 120

1       Q. Do you know when that partnership was formed?
2       A. I believe it was in 2017.
3       Q. Okay.
4       A. 2016, 2017.
5       Q. Do you know -- could you explain the nature of
6 the partnership between TCSO and the DEA Tactical
7 Diversion Squad?
8       A. Yes, sir. In either late 26 -- well, in either
9 2016 or 2017, I went to an intelligence conference in
10 New York City with the NYPD. During the course of that
11 conference, there were various breakout sessions. One
12 of the sessions was in regards to opioid addiction and
13 pharmaceutical drug abuse. And it enlightened me as to
14 the double digit increases that were being seen in
15 overdoses resulting in death from opioids throughout
16 the country. As I came back and met with Sheriff
17 Waybourn, we discussed that and realized that
18 potentially the best way to attack that in Tarrant
19 County was to partner with the Drug Enforcement
20 Administration and to embed one of our officers within
21 their workgroup.
22      Q. Okay. So would -- as part of this partnership,
23 would TCSO turn over any suspected diversion to the DEA
24 Tactical Diversion Squad for investigation?
25      A. As I explained previously, that would always be

Page 121

1 an option. Sometimes it would work that way, other
2 times we would, you know, need to do it inhouse.
3       Q. Okay. And -- and to your knowledge then, did
4 TCSO forward any findings of suspected diversion by a
5 pharmacy over to the DEA Tactical Diversion Squad?
6       MS. ABSTON: Objection; form.
7       THE WITNESS: I don't have any specifics
8 on that. I'm sure the Narcotics Task Force, and -- and
9 at that time Calvin Bond, there would be records to
10 indicate those referrals.
11 BY MR. SUDBURY:
12      Q. Okay. And then very similar question but
13 specific to Kroger: To your knowledge, did TCSO
14 forward any findings of suspected diversion by a Kroger
15 pharmacy over to the DEA Tactical Diversion Squad?
16      MS. ABSTON: Objection; form.
17      THE WITNESS: I would have the same
18 answer, that we would have to review the statistics.
19 BY MR. SUDBURY:
20      Q. Okay. Let's go to tab 16, please, one-six.
21 And this one will be Deposition Exhibit Number 20, but
22 I'll give you a minute to read this e-mail and Alex to
23 read it as well. And I believe that exhibit -- the
24 next one will be the attachment to this e-mail.
25      MS. ABSTON: Okay. So 17?

Page 122

1          MR. SUDBURY:  Yes, tab 16 and 17 to be
2  reviewed together.
3          MS. ABSTON:  Yeah, let's go off the record
4  if you'll give us a minute.
5          MR. SUDBURY:  Sure.
6          MS. ABSTON:  Thank you.
7          THE VIDEOGRAPHER:  We are off the record
8  at 2:35 p.m.
9          (A break was taken at 2:35 p.m.)
10         THE VIDEOGRAPHER:  We are back on the
11 record at 2:41 p.m.
12         MS. ABSTON:  Okay.  Thank you for your
13 patience.  As we reviewed tab 16 and tab 17, which is
14 the attachment, we're going to not allow questions or
15 answers to be asked about these documents, and we're
16 going to reserve the right to claw them back as it
17 might contain sensitive law enforcement information or
18 possibly require authorization from the DEA before
19 answering questions or disclosing this document in any
20 way.  So we reserve our rights to potentially claw this
21 back, and we're happy to answer more questions after
22 the deposition after we're able to gain more
23 information about it, but we don't want to impede the
24 deposition from going forward.  So we would just
25 instruct the witness not to answer, and we're not going

Page 123

1  to answer questions on these two documents today.
2  BY MR. SUDBURY:
3          Q.  Okay.  So, Chief Simons, you've heard what
4  Tarrant County's counsel has said, and -- and you go --
5  are you going to follow those instructions and you
6  would not answer questions related to tabs 16 and 17 if
7  I were to ask them of you; is that correct?
8          A.  That's correct.
9          Q.  Okay.  All right.  Then please turn to tab 61,
10 six-one.
11         MR. SUDBURY:  And, Alex, take a quick look
12 at this one.  This is a community publication, so I
13 don't think there will be any issues.  The reason I
14 asked you to look at this one pretty quickly is, Gregg,
15 I need -- the copy I've got, the background color makes
16 my copy almost illegible.  I think we need it up on the
17 screen for any of us to read it.
18         MS. ABSTON:  Yeah, I just -- the only
19 thing I'm -- I'm seeing here is I don't see a URL or an
20 origin of this, so -- but you said it was a -- it was
21 something that was -- I'm sorry, I'm going to have to
22 look at the realtime -- a community publication?
23         MR. SUDBURY:  I can describe it to you.
24 It's a TCSO Summer 2019 Community Publication.  Why
25 don't we -- I can assure you there's nothing that ya'll

Page 124

1  are concerned about in the document.  Why don't we have
2  Gregg pop it up on the screen and see if it's even
3  legible for all of us.
4          MS. ABSTON:  Yeah, that's -- I don't think
5  we have -- if this was some sort of public document, I
6  don't think we have a problem with it.
7          MR. SUDBURY:  There we go.
8  BY MR. SUDBURY:
9          Q.  Chief Simons, looking at the computer screen
10 in front of you there that we're all straining here to
11 do, do you recall having seen this particular document
12 before?
13         A.  No, sir, I -- I don't ever recall seeing this.
14         Q.  Okay.  Would you have any role -- first of all,
15 let's just look at the title.  It's called The
16 Henderson, Summer 2019, A Tariff -- sorry, getting
17 later in the day for me -- a Tarrant County Sheriff's
18 Office Community Publication.
19         Do you see that?
20         A.  Yes, sir, I do.
21         Q.  Would you have had any role in providing the
22 information that's contained in the document?
23         A.  Well, I -- I don't recognize the document, and
24 I certain -- I haven't read the contents, so I wouldn't
25 know what's in the contents.

Page 125

1          Q.  Okay.  Well, it's real short, so let -- let's
2  scroll down here.
3          MR. SUDBURY:  Gregg, if you could scroll
4  down in the document a little bit, let -- let Chief
5  Simons take a look at this here.
6          MS. ABSTON:  Chief Simons, do you have a
7  hard copy in front of you?
8          THE WITNESS:  I -- it's not legible.
9          MS. ABSTON:  Oh, okay.  Mine is really
10 big.  I didn't know if maybe he had that version in
11 front of him.
12         THE WITNESS:  No.
13         MS. ABSTON:  You don't.  Oh, then I got a
14 special one.  I got a really long one.  Okay, sorry,
15 continue.
16         MR. SUDBURY:  Let -- let's do this, let's
17 do this.  Let me ask this question -- Gregg, if you
18 keep scrolling down, I think it's towards the bottom of
19 this page underneath -- here we go.
20 BY MR. SUDBURY:
21         Q.  Divisional Updates -- Updates, CNET.
22         Do you see that, Chief Simons?
23         A.  Yes, I do.
24         Q.  Okay.  The second sentence of that first
25 paragraph there at the top says, "CNET has achieved

32 (Pages 122 - 125)

Page 126

1 amazing success this year by conducting a total of 31
2 seizures. The most prominent drug seized for the month
3 of July was heroin, meth, and cocaine, resulting in
4 1356.52 grams of illegal narcotics confiscated."
5     First of all, did I just read -- did I read
6 that correctly?
7     A. Yes, sir.
8     Q. All right. And this is a publication from
9 summer of 2019; is that consistent with your
10 recollection of CNET's success up to the year in 2019
11 and the types of drugs it was successfully seizing?
12         MS. ABSTON: Objection; form.
13         THE WITNESS: I don't know where this
14 information was -- I'm just not familiar with this
15 publication.
16 BY MR. SUDBURY:
17     Q. Okay. I gotcha.
18     And then you'll see to the left there, our left
19 as we look at it, that chart, that it's got -- got
20 drugs identified there. You're not saying that's
21 inaccurate or untruthful, you just don't know because
22 you're not sure the source of this publication; is that
23 right?
24     A. That's correct.
25     Q. Okay. Gregg, you can go ahead and pull that

Page 127

1 one down.
2     And, Chief Simonds, if you'll turn to tab 35.
3         MS. ABSTON: Just to clarify really quick,
4 were we marking that as Exhibit 21 or Exhibit 20?
5         MR. SUDBURY: I may regret this later on,
6 but why don't we skip the 201 and introduce, and why
7 don't we just -- why don't we make -- make it 22.
8         MS. ABSTON: Okay. No, I think that's a
9 great idea.
10         MR. SUDBURY: So the last one was Exhibit
11 22, The Henderson.
12 BY MR. SUDBURY:
13     Q. All right. Let's go to tab 35, please, Chief
14 Simonds.
15     A. Okay.
16     Q. And I'll let you, obviously an opportunity to
17 review it, and Alex as well. And let me know if you
18 all have any concerns with this one.
19         GREGG HOLDERMAN: Mr. Sudbury?
20         MR. SUDBURY: Yes.
21         GREGG HOLDERMAN: I believe -- I'll have
22 to reintroduce the last document, that's not a problem.
23 I'll reintroduce it as 21 though, correct? And this
24 current document will be 22?
25         MR. SUDBURY: So I think we're going to

Page 128

1 skip. We have the two exhibits that I wanted to
2 introduce. Let me look at my notes real quick.
3         MS. ABSTON: Yeah, no, you're right. We
4 were going to mark -- we were considering marking tab
5 16 as Exhibit 20 and tab 17 as Exhibit 21, but in order
6 to prevent confusion from reading the record, we're
7 going to just skip to 22, right?
8         MR. SUDBURY: Correct. That was my plan.
9         GREGG HOLDERMAN: Okay.
10         MR. SUDBURY: Yep.
11         GREGG HOLDERMAN: That's my fault, I
12 apologize.
13         MS. ABSTON: Hold on, we're looking over
14 this exhibit, but I just want to -- do you mind putting
15 us in a breakout room for a second? I'm sorry to be so
16 disjointed. But can we go off the record?
17         MR. SUDBURY: You got to do what you got
18 to do.
19         THE VIDEOGRAPHER: We're off the record at
20 2:48 p.m.
21     (A break was taken at 2:48 p.m.)
22         THE VIDEOGRAPHER: We are back on the
23 record at 2:55 p.m.
24         MS. ABSTON: Okay. After further review
25 on tab 35, I think it's -- yeah, 35, which is

Page 129

1 TARRANT_00852515, we're going to -- I'm going to
2 instruct the witness not to answer any questions about
3 this, and we're going to reserve our right to claw back
4 this document due to potentially having law enforcement
5 sensitive methodology with on -- on it and us needing
6 to make some redactions. So in order to do that, we
7 would instruct the witness not to answer.
8 BY MR. SUDBURY:
9     Q. Okay. And, Chief Simonds, having heard those
10 instructions from Tarrant County's attorney, number
11 one, are you going to follow those instructions and any
12 questions I related to the -- I would have asked
13 related to the document to be Exhibit Number 23, you
14 will decline to answer those questions; is that
15 correct?
16     A. That's correct.
17     Q. All right. Then just for the record, again,
18 this would have been Exhibit Number 23, which I've
19 identified for purposes of just as a placeholder. And
20 then we will -- we'll move on from that.
21     All right. The next document, Chief Simonds,
22 I'd like for you to look at, is under tab number 54.
23 And let me make sure we can do this collectively,
24 because it is an e-mail -- yes, it is an e-mail and
25 then followed by an attachment. So if you all would

33 (Pages 126 - 129)

Page 130

1 like to look at tab 54 and 55.
2      MS. ABSTON: Okay. We'll look at it now.
3      GREGG HOLDERMAN: And these will be
4 Exhibits 24 and 25.
5      MR. SUDBURY: Correct. That's the plan.
6      GREGG HOLDERMAN: Okay.
7      MR. SUDBURY: Mr. Simonds?
8      THE WITNESS: Yes.
9      MR. SUDBURY: You might want to mute
10 yourself there if you need to speak with counsel there.
11      THE WITNESS: No, that's fine.
12      MR. SUDBURY: Okay.
13      MS. OWENS: You're fine.
14      MS. ABSTON: Senior Chief, do you need to
15 talk about something? Sorry, I was looking at this.
16      THE WITNESS: No, I'm fine.
17      MS. ABSTON: Okay. I'm going to look at
18 it, too.
19      MS. OWENS: This page is hard to --
20      THE WITNESS: Some of it's hard to read.
21      MS. ABSTON: Okay, yep.
22      THE WITNESS: And if I'm having trouble,
23 I'll just let you know. That was it.
24      MS. ABSTON: Okay. Great.
25      Okay. Let me look over it real quick,

Page 131

1 continuing.
2      Okay. I think we're okay with it if Senior
3 Chief is okay with it. I think he might still be
4 looking through it. Senior Chief, are you okay with
5 it?
6      THE WITNESS: I am.
7      MS. ABSTON: Okay.
8      MR. SUDBURY: Okay. Great.
9      All right. Ms. Reeser, are we back on? I'm
10 not sure we ever left.
11      COURT REPORTER: Yes, we're still on the
12 record.
13      MR. SUDBURY: Okay.
14 BY MR. SUDBURY:
15      Q. All right. Exhibit -- Deposition Exhibit
16 Number 24 is an -- appears to be an e-mail from Keitha
17 Hallenbeck to you and Calvin Bond dated August 24,
18 2018. Would you agree with that?
19      A. Yes, sir.
20      Q. And it's transmitting some Intel Briefing,
21 which is the next exhibit, tab 55, which will be
22 Exhibit Number 25.
23      First of all, who's Keitha Hallenbeck?
24      A. Keitha Hallenbeck's an employee of the Tarrant
25 County Sheriff's Office. And please keep in mind that

Page 132

1 that could have changed within the last 15 months.
2 When I left, she was an employee of the Tarrant County
3 Sheriff's Department. During the time that this e-mail
4 was sent, she was a lieutenant over in the Tarrant
5 County CNET program.
6      Q. Okay. And looking at this e-mail, her e-mail
7 to you says, "Here it is!"
8      This just suggests that she's sending some
9 information that you had requested. Do you have any
10 recollection of what you requested and why you would
11 have requested it?
12      A. No, sir.
13      Q. Okay. Well, to the extent it helps refresh
14 your recollection, the Intelligence Briefing from
15 August 2018 was attached to this e-mail, and that's
16 Exhibit Number 25. Do you recognize that document?
17      A. No, sir.
18      Q. Okay. This Intelligence Briefing date -- that
19 has August 20, 2018 on the first page, is that -- maybe
20 not this particular document, but this format, is an
21 Intelligence Briefing like this something that
22 regularly was produced or created by TCSO?
23      A. There was not a -- a monthly or regular
24 Intelligence Briefing that I received in this format,
25 but that doesn't mean that it wasn't created. It --

Page 133

1 there could have been a number of reasons why I ask
2 for, you know, the -- the current structure or the
3 current participation of groups or other agencies
4 involved that Keitha would have just produced this
5 document and sent it to me.
6      Q. Okay. So if I follow you, there could have
7 been any number of reasons why you wanted this
8 information, but sitting here today, you don't recall
9 specifically why you were asking Lieutenant Hallenbeck
10 for this information; is that fair?
11      A. That's fair.
12      Q. And -- and do you know when you received this
13 information, your e-mail says, "Please print it." Do
14 you know if you shared this information or just
15 generally what you did with this information?
16      A. No, sir. Because I don't know why I requested
17 it at this time.
18      Q. All right. Let's look, hopefully relatively
19 quickly, at some of the information and data in here.
20 For Exhibit 25, which is tab 55, if you'll turn to the
21 fifth page, hopefully bottom right corner. There we
22 go. That appears to be a summary of the drugs seized
23 by CNET for the time periods indicated, January 1, 2017
24 through December of 31, 2017 and then Jan -- I'm sorry,
25 January 1, 2018 until July 1, 2018. Would you agree

34 (Pages 130 - 133)

Page 134

1 I'm -- I'm looking at that correctly, that's what it's
2 intended to reflect?
3     A. That's what it appears to reflect, yes.
4     Q. Okay. And that's consistent with the timing of
5 the e-mail, if we flip back to Exhibit Number 24, with
6 when this is -- this e-mail being sent August 24, 2018,
7 you would only have this information or data available
8 through July of 2018; fair enough?
9     A. Yes, sir.
10     Q. All right. And pharmaceutical seizures are
11 distinguished in this table, correct?
12     A. Yes, sir.
13     Q. And it does not report -- it doesn't report
14 hydro -- any Hydrocodone or Oxycodone being seized by
15 CNET in these time periods; am I reading it correctly?
16     A. I don't see that reflected either.
17     Q. Okay. All right. Let's set that aside, or
18 whatever the proper terminology is given we're working
19 in a binder, and go to tab 4 -- 40, four-zero, please.
20     A. I want to elaborate on that last answer.
21     Q. You -- you may, but let me get back to the
22 document in case I need to have any follow-up, so --
23 okay. Go ahead.
24     A. Well, just so there's no misunderstanding,
25 these types of statistics would have been for the

Page 135

1 Narcotics Task Force only. That does not mean that
2 other drugs and other quantities may or may not have
3 been seized by Patrol or the Warrant Division or -- or
4 someone else from TCSO. So it -- it's a snapshot of
5 this investigative group.
6     Q. Okay. And when you say "this investigative
7 group," you are talking about CNET, correct?
8     A. Yes, sir.
9     Q. Okay. I follow you. Understand.
10     A. Okay.
11     Q. All right. Tab 40, please. And I don't
12 believe there are going to be any concerns on ya'll's
13 end with this one, but I'll -- I'll stop predicting and
14 -- and you all let me know. Please take a look at tab
15 40.
16     MS. ABSTON: No, I believe we're fine with
17 this one if Senior Chief is.
18     MR. SUDBURY: Which this will be Exhibit
19 Number 26, Chief Simonds.
20 BY MR. SUDBURY:
21     Q. Does this appear to be an e-mail from SAT,
22 S-A-T, News Briefs to you dated April 12, 2019?
23     A. Yes, sir.
24     Q. Do you recall receiving this e-mail?
25     A. No, sir, I don't.

Page 136

1     Q. And you don't have any reason though -- that is
2 your e-mail address -- no reason to believe you didn't
3 receive it, you just don't recall right now; fair
4 enough?
5     A. That's fair.
6     Q. SAT -- and used in this context, I think what
7 it means is the Sheriff's Association of -- of Texas;
8 is that correct?
9     A. That's my understanding. That's how I would
10 view it.
11     Q. Okay. If you'll flip to the second page of the
12 document. Perfect. Right there on the screen or in
13 your binder, either way, it's got the heading "Tarrant
14 County sheriff explains cartel strategy to 'overwhelm'
15 border patrol's resources amid crisis."
16     Do you see that?
17     A. Yes, sir.
18     Q. All right. And this story, while not the
19 entirety of the story, I will acknowledge that, but it
20 does have a quote from Sheriff Way -- Waybourn as
21 saying Tarrant County has seen a big uptick in
22 methamphetamine and heroin seizures since October, and
23 drug seizures have picked up since 2019 and spiked
24 tremendously in the past six months.
25     Do you see that?

Page 137

1     A. I saw the first part --
2     MS. ABSTON: Objection; form.
3     MR. SUDBURY: Yeah, I -- I may have
4 paraphrased a -- a reading there.
5 BY MR. SUDBURY:
6     Q. Let -- let me do this: Sheriff Waybourn is
7 saying that "drug seizures have picked up since 2016
8 and spiked tremendously in the past six months as
9 groups of 100 or more people began showing up at the
10 border."
11     Do you see that?
12     A. Yes, sir.
13     Q. I think I may have said 2019 in the question
14 previously. I'm not sure exactly what the issue was,
15 but I think that was the problem there.
16     Okay. Well, let me ask -- let me just ask you
17 this question: This statement, do you disagree -- and
18 it's got a quoted picture of Sheriff Waybourn -- do you
19 disagree with anything in that -- in that statement?
20     A. No.
21     MS. ABSTON: Objection; form.
22     MR. SUDBURY: Okay.
23     THE WITNESS: No, sir.
24 BY MR. SUDBURY:
25     Q. And so it would be true then that Tarrant

35 (Pages 134 - 137)

Page 138

1  County was seeing a big uptick in methamphetamine and
2  heroin seizures since October -- this is in April -- so
3  over -- basically over the prior six months.  That's
4  the point that's tried to be conveyed there; is that
5  fair?
6      MS. ABSTON:  Objection; form.
7      THE WITNESS:  That may, in my opinion,
8  sir, be an overreach.  Oftentimes when the sheriff
9  speaks, especially in these situations, he very well
10  may be talking about Texas in general or the nation in
11  general.  He -- he doesn't necessarily say Tarrant
12  County in this.  So I -- I don't know what specific
13  area he was referring to.
14  BY MR. SUDBURY:
15     Q.  Okay.  Fair enough.
16         Sheriff Waybourn is the sheriff of Tarrant
17  County, correct?
18     A.  Yes, sir.
19     Q.  Has he been the sheriff of any other counties
20  in -- in Texas, to your knowledge?
21         MS. ABSTON:  Objection; form.
22         THE WITNESS:  No, sir.
23  BY MR. SUDBURY:
24     Q.  Okay.  I'd like to direct your attention,
25  please, to tab 26.  And we can look at tab 26.  If you

Page 139

1  all would, please, look at tabs 26 and 27 collectively
2  for purposes of what we need to do next.  It's an
3  e-mail and an attachment to the e-mail.
4         MS. ABSTON:  Okay.  I know with this --
5  let's go off record for a minute.  I can keep this
6  quick if you send me to a breakout room really quick.
7  I just need to check the date.
8         THE VIDEOGRAPHER:  We're off the record at
9  3:10 p.m.
10        (A break was taken at 3:10 p.m.)
11        THE VIDEOGRAPHER:  We are back on the
12  record at 3:16 p.m.
13  BY MR. SUDBURY:
14     Q.  Okay.  Before our short little break there, I
15  was asking you to look at what has been marked as
16  Deposition Exhibit Number 27, it happens to be tab
17  number 26.  It starts with an e-mail from -- and let me
18  just ask this question:  Is it Trace or -- or Tracy
19  McDonald?  How -- how do you say the first name?
20     A.  Trace.
21     Q.  Trace.
22         All right.  Trace McDonald to Calvin Bond dated
23  January 14, 2022.
24         Do you see that on the first page there?
25     A.  Yes, sir.

Page 140

1      Q.  And then he references, if you look at that,
2  what he's forwarding, stats for the annual report.  Do
3  you see that in the first sentence?
4      A.  Yes, sir.
5      Q.  And then the last sentence he says, "I only
6  included the major drugs rather than clouding up the
7  document with all the smaller obscure drugs without
8  significant weight."
9         Did I read that correctly?
10     A.  Yes, sir.
11     Q.  And as of this date that this was sent, January
12  14, 2022, Trace McDonald was commander of CNET,
13  correct?
14     A.  Correct.
15     Q.  And Calvin Bond was the chief deputy of the
16  Warrants and Investigations Divisions; is that right?
17     A.  That's correct.
18     Q.  And Calvin Bond, at that time, reported
19  directly to you; is that right?
20     A.  That's correct.
21     Q.  Do you know, can you tell from this, was
22  McDonald providing Bond with CNET stats?
23     A.  Yes.  That's what it says, yes.
24     Q.  Okay.  All right.  That's what I thought.
25         And -- and then the annual report, what annual

Page 141

1  report is he referring to, do you know?  When he
2  says "stats for the annual report," what's he talking
3  about?
4      A.  Sheriff Waybourn always wanted a annual report
5  produced that was just a brief synopsis of each work
6  group.
7      Q.  Okay.  Do you know if that annual report that
8  Sheriff Waybourn wanted, if it was its -- was it
9  published?  What -- what was done with the annual
10  report?
11         MS. ABSTON:  Objection; form.
12         THE WITNESS:  I would say the -- what
13  Sheriff Waybourn wanted and what we were able to
14  provide for him was actually not the same thing.  And
15  through a variety of reasons, the report -- whether it
16  be COVID, whether it be other crises and emergencies,
17  lack of staffing, whatever you may want to say,
18  sometimes those reports were completed and sometimes
19  they weren't, and sometimes it was in a
20  less-than-finished product.
21  BY MR. SUDBURY:
22     Q.  Okay.  I asked a compound question, so I
23  probably had it coming.  But you answered several
24  different questions there, so let me break this down
25  into smaller parts.

36 (Pages 138 - 141)

Page 142

1 Could you explain, at least generally, what
2 your understanding was of what -- what Sheriff Waybourn
3 wanted in these annual reports on a high level?
4    A.  What he wanted in the annual reports were
5 statistics and summaries of accomplishments that the
6 sheriff's office and the different investigative units
7 as well as the Detention Bureau were part of and
8 achieved during that preceding year.
9    Q.  Okay.  And then you said what he was provided
10 was something different than what he had envisioned or
11 -- or wanted.  Could you just explain to me at a high
12 level, was the information -- well, let me just ask the
13 question: How is it different from what he wanted?
14    A.  Well, usually --
15       MS. ABSTON:  Objection; form.
16       THE WITNESS:  I'm sorry.
17       MS. ABSTON:  That's okay.
18       THE WITNESS:  Mostly in regard to finished
19 product, not in regard to substance.  Sheriff Waybourn
20 would have really preferred a very nice, professional
21 publication that was bound in some way.  Due to time
22 constraints, due to COVID, due to staffing and any
23 number of other issues, that was not always able to be
24 provided.
25 BY MR. SUDBURY:

Page 143

1    Q.  Okay.  Were -- let me break that down again.
2 I'm not picking on you, I just want to make sure I
3 fully understand.
4       The -- the desire for the nice, professional
5 publication, to your knowledge, did TCO -- TCSO, and
6 specifically under Sheriff Waybourn because this is
7 what he wanted -- was that ever produced by the TCSO?
8    A.  There may have been one or two years that it
9 came to that format, or to that finished product.  I --
10 I don't recall specifically though.
11    Q.  Do you know what years that would have been
12 for?  Covered?
13    A.  No, sir.  I'd just be guessing.
14    Q.  What about just the information?  Even if it
15 was less than a finished product, do you know
16 internally did the TCSO keep the information somewhere?
17 You know, this is not exactly what Sheriff Waybourn
18 wants, but this is the information we've got, the best
19 we can do given our resource limitations, and -- and so
20 here it is.  Was that information retained, do you
21 know?
22       MS. ABSTON:  Objection; form.
23       THE WITNESS:  There were always adequate
24 statistics and -- and -- and evidence or examples
25 retained of the different operating divisions within

Page 144

1 the sheriff's department.  The only question was is
2 extracting that and when putting it into a final
3 product.
4 BY MR. SUDBURY:
5    Q.  Understood.
6       The underlying data is there somewhere, it's
7 just an issue of extracting it and putting it into the
8 final product that Sheriff Waybourn desired; is that a
9 fair summary?
10    A.  Yes, sir.
11    Q.  Okay.  All right, let's go to the next tab,
12 which is going to be Deposition Number 28, tab 27, if
13 that's not confusing enough.  This is the attachment to
14 the e-mail from McDonald.  And would you agree with me
15 that this is a summary of CNET's 2022 statistics?  And
16 it includes list of seizures for currency,
17 methamphetamine, cocaine, heroin, marijuana, fentanyl,
18 and then some other items, firearms, vehicles?
19    A.  Yes, sir.
20    Q.  Okay.  Do you recall seeing these statistics
21 back in 2022?
22    A.  I don't remember seeing -- viewing this
23 document.
24    Q.  Do you have -- do you know if these statistics
25 are accurate?

Page 145

1       MS. ABSTON:  Objection; form.
2       THE WITNESS:  The only reason I know that
3 these even came -- I don't know where these came from.
4 There's -- it's not -- there's not a e-mail from and to
5 or who would have compiled these statistics.  So that
6 -- that's -- it's hard for me to speak to their
7 accuracy when I don't know where they came from.
8 BY MR. SUDBURY:
9    Q.  Okay.  But let -- let's look at this.  I mean,
10 I -- based on your recollection, let's just use cocaine
11 as the example here.  It says cocaine HCL 3.63
12 kilograms.  I mean, do you have any independent
13 recollection of, no, that number is wrong because I
14 remember that year, it was 17.2 kilograms?
15       MS. ABSTON:  Objection; form.
16       THE WITNESS:  And, I'm sorry, the question
17 again?
18 BY MR. SUDBURY:
19    Q.  Yeah, it was a poor question, but let me try to
20 frame it this way:  If I'm understanding you, you're
21 not sure the source of the -- of these statistics --
22 you're not sure where the data came from that was
23 compiled into the statistics in Exhibit Number 28,
24 correct?
25    A.  That's correct.

37 (Pages 142 - 145)

Page 146

1    Q. And therefore, you have no independent ability
2 to verify the accuracy of this data, sitting here right
3 now; is that correct?
4    A. That's correct.
5    Q. But do you have any reason to believe, based on
6 your knowledge and recollection, that there is
7 information that is in here that is inaccurate?
8        MS. ABSTON: Objection; form.
9        THE WITNESS: No, sir.
10 BY MR. SUDBURY:
11   Q. Okay. And are all drugs that are seized by
12 CNET, are they sent to a lab for analysis and
13 confirmation of the substance?
14   A. Not all drugs, no, sir.
15   Q. Why not all drugs? What are examples of drugs
16 that wouldn't be sent to the lab for testing?
17       MS. ABSTON: Objection; form.
18       THE WITNESS: It wouldn't be a case of
19 which drugs are not sent, it would be a case of which
20 case is either not prosecutable and so you don't want
21 to spend the money on analysis, or, you know, analysis
22 for the sake of analysis is just not cost effective to
23 the taxpayers of -- of Tarrant County.
24 BY MR. SUDBURY:
25   Q. Okay. So it's not just by the drug, it's

Page 147

1 --it's also by the circumstances; fair enough?
2        MS. ABSTON: Objection; form.
3        THE WITNESS: Yes, sir. It's almost
4 exclusively based upon the totality of the
5 circumstances.
6 BY MR. SUDBURY:
7    Q. Is there any degree of confidence in the
8 identification of the narcotics that's involved in
9 that? In other words, if somebody seizes as part of an
10 investigation a prescription bottle and it contains
11 what looks like Hydrocodone, is it possible, oh, we
12 don't need to test it then because I'm confident it --
13 that this is what it purports to be based on -- on what
14 I'm looking at? Is that -- could that be part of the
15 totality of circumstances?
16       MS. ABSTON: Objection; form.
17       THE WITNESS: Only if there was no
18 prosecutable case.
19 BY MR. SUDBURY:
20   Q. Okay. All right. Back to Exhibit 28, the
21 statistics there. What we do not see on here, it
22 doesn't list prescription opioids; would you agree with
23 that?
24       MS. ABSTON: Objection; form.
25       THE WITNESS: I agree.

Page 148

1 BY MR. SUDBURY:
2    Q. All right. And then reading that in
3 connection, you know, where -- where -- I shouldn't say
4 you know.
5        Reading that in connection with the e-mail
6 where Mr. McDonald indicates, "I only included the
7 major drugs rather -- rather than clouding up the
8 document with all the smaller obscure drugs without
9 significant weight," I mean, does that suggest to you
10 that he's saying I'm not putting prescription opioids
11 on here because they're one of the smaller obscure
12 drugs?
13       MS. ABSTON: Objection; form.
14       THE WITNESS: I would say no.
15 BY MR. SUDBURY:
16   Q. Why is that?
17   A. Because it may not be -- you know, once again,
18 where the seizure is coming from is going to greatly
19 reflect it -- reflect it in the statistics. And so --
20 I mean, there would most certainly, in my opinion, be
21 seizures done by Patrol on a weekly basis that would
22 include pharmaceutical drugs, but they're not reflected
23 in that document you were referring to.
24   Q. Because they're not included within CNET; is
25 that what you're telling me?

Page 149

1    A. That's correct.
2    Q. And so if Commander McDonald had a list
3 somewhere or additional statistics with what he thought
4 were the smaller obscure drugs, would we need to ask
5 Commander McDonald to identify what those drugs would
6 be? That's who we would need to talk to about that?
7        MS. ABSTON: Objection; form.
8        THE WITNESS: Yes, sir.
9 BY MR. SUDBURY:
10   Q. In other words, Chief Simonds, you're not
11 aware -- well, let -- let me just strike that, move on
12 from that.
13       Has Tarrant County seen a substantial presence
14 of counterfeit pills?
15   A. Yes, sir.
16       MS. ABSTON: Objection; form.
17       THE WITNESS: I got to slow down.
18       Yes, sir.
19 BY MR. SUDBURY:
20   Q. Okay. And counterfeit pills, by definition,
21 those are illicit drugs that are manufactured to look
22 like legal prescription drugs, but they're -- but
23 they're not. Is that -- do we have a fair
24 understanding of what we're talking about with
25 counterfeit pills?

38 (Pages 146 - 149)

1 A. That would -- that would be my understanding
2 and -- and definition also.
3 Q. Based on your experience, why would a drug
4 dealer go to the trouble to make counterfeit pills?
5 A. To make the individuals believe that they were
6 safe.
7 Q. Okay. So to fool the buying public to think
8 they're getting some legitimate prescription drug
9 that's safer when in fact they're -- they're not; is
10 that the gist of it?
11 A. That -- that would be one -- that would be my
12 explanation. You know, obviously I can't speak for the
13 drug dealer that's doing it.
14 Q. I appreciate that. I didn't mean to laugh at
15 that, but I -- I -- I understand you -- you cannot
16 speak for them on that.
17 But basically, we agree, it -- it's to fool the
18 buying public?
19 MS. ABSTON: Objection; form.
20 BY MR. SUDBURY:
21 Q. You nodded, I just couldn't hear an answer. Is
22 that a yes?
23 A. No, I mean, I think that's part of it. I think
24 it would also be you, know, to potentially fool law
25 enforcement --

1 Q. Okay.
2 A. -- depending on the form and the location, you
3 know, that it was observed.
4 Q. Got it.
5 All right. Let's move on to tab number 33,
6 please.
7 MR. SUDBURY: And I think -- I'm trying to
8 look at my notes to make sense of this, but I think,
9 Alex, that 33 and 34 --
10 MS. ABSTON: Okay.
11 MR. SUDBURY: -- if you want to look at
12 those together --
13 MS. ABSTON: Yeah, can you throw us in a
14 breakout room real quick? Let me just check this
15 quick.
16 THE VIDEOGRAPHER: We're off the record at
17 3:32 p.m.
18 (A break was taken at 3:32 p.m.)
19 THE VIDEOGRAPHER: We are back on the
20 record at 3:38 p.m.
21 MS. ABSTON: After further review, we're
22 going to need to move on to the next exhibit because
23 tab 33 and tab 34 contain sensitive law enforcement
24 information about ongoing methodologies or -- or
25 sensitive law enforcement information in general. So

1 we're going to reserve the right to claw back this
2 document and review it. Thank you.
3 MR. SUDBURY: Okay. And so just to
4 clarify, the position is that I cannot ask Chief
5 Simonds questions related to what I was going to
6 introduce as Exhibit 29 and 30 at this time, and you've
7 instructed him not to answer; is that correct?
8 MS. ABSTON: That is correct, due to the
9 proprietary informing that we're not authorized to
10 discuss.
11 MR. SUDBURY:
12 Q. All right. And, Chief Simonds, you would
13 follow Tarrant County's counsel's instructions, and to
14 the extent I asked you any questions about Exhibits 29
15 and 30, you would not answer those questions, correct?
16 A. Correct.
17 Q. All right. And just -- I probably should have
18 done this previously, we can talk about this after the
19 fact after we're off the record, so don't take your
20 time. But just for identification of those, let me
21 just do this real quick here before I forget about it.
22 Tab 33, the initial Bates label 850898. And then tab
23 34, which would have been Deposition Exhibit Number 30,
24 is 850900, just so we have a point of reference down
25 the line.

1 Okay. Well, then let's move on. If you could
2 please turn to tab 14, one-four.
3 MR. SUDBURY: And let's do these together,
4 Alex, as I look at them. Let's do tab 14 and 15
5 together for purposes of any review you need to have on
6 it. That -- that's one of the attachments referenced
7 in -- in this e-mail.
8 MS. ABSTON: Okay. Are we going to look
9 at the other ones, or no?
10 MR. SUDBURY: That's -- that's it.
11 MS. ABSTON: Okay.
12 MR. SUDBURY: Yeah, that's it. So just
13 look at tab 14 and 15 together.
14 MS. ABSTON: Okay. Thanks. Give me just
15 a second.
16 Senior chief, what do you think about this one?
17 THE WITNESS: Well, I mean, this is, you
18 know, from the Texas Fusion Center, this is just
19 another analytical group that's taking a look at
20 seizures and then summarizing them for the benefit of
21 law enforcement in the area.
22 MS. ABSTON: Okay.
23 THE WITNESS: It does specifically, you
24 know, talk about how certain things are being smuggled
25 in and meth -- you know, in, 5-gallon buckets of paint

Page 154

1  and, you know, and different things like that, but --
2        MS. ABSTON:  Okay.  So since we're on the
3  record, let's take a moment and go off the record real
4  quick.
5        Give us five seconds, please, thank you.
6        THE WITNESS:  Sorry, I forgot we --
7        MS. ABSTON:  It's okay.  It's all good.
8  It's fine.
9        THE VIDEOGRAPHER:  We're off the record at
10  3:43 p.m.
11        (A break was taken at 3:43 p.m.)
12        THE VIDEOGRAPHER:  We are back on the
13  record at 3:51 p.m.
14        MS. ABSTON:  After further review of tab
15  14 and tab 15, which I think were going to be marked as
16  Exhibit 35 and Exhibit 36, we would ask that these just
17  be placeholder exhibits as we have concerns about the
18  metrics and methodology that law enforcement employs
19  and that is contained within these two documents, and
20  we reserve the right to issue a clawback for potential
21  redactions to conceal ongoing law enforce -- law
22  enforcement efforts.  And so we will not be discussing
23  any of that as it could impair DEA, DPS or Tarrant
24  County operations that are currently ongoing or release
25  private methodologies.

Page 155

1        MR. SUDBURY:  Okay.  And to be clear, if I
2  asked any questions of Chief Simonds on these
3  documents, you would instruct him not to answer the
4  questions; is that correct?
5        MS. ABSTON:  Yes.  Until we feel
6  comfortable speaking with someone who can -- can, you
7  know, further verify these documents or if this is
8  ongoing or -- or these methodologies, we -- we would
9  instruct the witness not to answer.
10        MR. SUDBURY:  Okay.  And to be clear --
11  again, I'm not trying -- we're -- we've done this
12  multiple times -- that's not something you're able to
13  do right now, so any questions --
14        MS. ABSTON:  Correct.
15        MR. SUDBURY:  -- I asked him right now,
16  you would instruct him not to answer, correct.
17        MS. ABSTON:  That's correct.  And we're
18  happy to circle back with you after the deposition and
19  if we receive more clarity, but we can't contact the
20  DPA -- the DEA, DPS and Tarrant County at this moment
21  to verify that we are able to discuss this.
22        MR. SUDBURY:  And to clarify, I think
23  these were the documents I was going to introduce as
24  Exhibits 31 and 32, not 35 and 36.
25        MS. ABSTON:  Oh, I'm sorry.

Page 156

1        MR. SUDBURY:  31 would be the document
2  Bates labeled 8144420, and 32 would be the document
3  beginning with the Bates label 814422.
4  BY MR. SUDBURY:
5        Q.  Chief Simonds, having heard all that exciting
6  lawyer talk, are you going to follow the attorney's
7  instructions and if I asked you any questions related
8  to what I propose as Deposition Exhibit Number 31 and
9  32, would you follow those instructions and refuse to
10  answer my questions?
11        A.  Yes, sir.
12        Q.  I will ask this question, and I don't intend
13  this as a gotcha because I'm not sure you knew we were
14  on the record, but I'll let whoever wants to do
15  whatever respond accordingly if they don't want you
16  answering.  What is the Texas Fusion Center?  What is
17  it?
18        A.  It's an analytical group comprised of different
19  law enforcement entities.  It's almost like it's an --
20  it's an analytical group much like an investigative
21  task force, except they just deal in analytics of
22  crime.
23        Q.  Okay.  Is -- see if I can figure out how to
24  frame this.  Was -- was -- do you have to be a member
25  of the Texas Fusion Center?  How do you become part of

Page 157

1  it?
2        A.  No, I mean, I -- I don't know how they're
3  funded or where their funding comes from.  For --
4  usually a particular county will host them and then
5  other counties or agencies will assign individuals or
6  analysts -- not necessarily peace officers, but they
7  could -- could be analysts to that facility for
8  staffing.  And they're a support group for law
9  enforcement.
10        Q.  Okay.  Did TCSO work with that support group,
11  the Texan -- Texas Fusion Center?  Is that something
12  that occurred between TCSO and Texas Fusion Center?
13        A.  Yes.
14        Q.  Do you know during what period of times there
15  was that coordination?
16        A.  The Fusion Center model has morphed over the
17  last, I would say, 10 to 15 years.  And so I think it
18  was originally known as the Collin County Fusion
19  Center.  And now this is -- you know, it's taken on
20  different names, and it's actually even physically
21  changed locations.  So we have been -- we've -- Tarrant
22  County's been affiliated with them to some extent over
23  the last 10 to 15 years.
24        Q.  Okay.  Do you know where the Texas Fusion
25  Center is -- is physically located now?  Or let me ask

40 (Pages 154 - 157)

Page 158

1  this question:  As of the time of your retirement, do
2  you know where it was located?
3      A.  I believe they had moved it somewhere to the
4  Mid-Cities.  I -- I can't say, no, sir.
5      Q.  All right.  And then just so I understand in --
6  in my own mind what -- what -- if I'm hearing you
7  correctly, Texas Fusion Center is similar to a joint
8  task force but with a focus on analytics; is that a
9  fair statement?
10      A.  Yes, sir.
11      Q.  All right.  Are you familiar with the SOAR,
12  S-O-A-R Coalition?  I think it stands for Stand Out --
13  Stand Out Act Responsibility.  Are you familiar with
14  it?
15      A.  No, sir.
16      Q.  Okay.  So you're not familiar with it, you
17  couldn't tell me what the SOAR Coalition does then; is
18  that fair?
19      A.  That's fair.
20      Q.  All right.  Let's look -- this will go pretty
21  quickly then I think -- tab 13.  Do you see that, it
22  says SOAR Coalition Meeting Minutes.
23      A.  Yes, sir.
24      Q.  From Friday, April 23, 2021.  Do you see that
25  at the top of the page?

Page 159

1      A.  Yes, sir.
2      Q.  Are you -- I -- I don't know if this refreshes
3  your recollection or does anything, but -- but with
4  this -- with SOAR, does this trigger anything where you
5  remember, oh, yes, I know what this group does, or
6  anything?
7      A.  Not off the top of my head, no, sir.
8      Q.  All right.  Okay.  Let's look then and -- and
9  just see if you agree or disagree on page 2 of that
10  document.  And this will be deposition Exhibit Number
11  33.
12      And to back up a second, just the gist of this,
13  from reading this, it appears to me that SOAR is a
14  community coalition that's doing educational outreach.
15  I'll just -- I'll just put that into the record.  You
16  don't have to agree or disagree with me.
17      But let's go to the -- to the next page at the
18  top of that, page -- page number 2.  All right.  At the
19  top there, Over the Overdoses Webinar.
20      Do you see that?
21      A.  Yes.
22      MS. ABSTON:  Objection; form.
23  BY MR. SUDBURY:
24      Q.  Do you agree with the SOAR Coalition statement
25  that in 2021 Tarrant County was experiencing a rise of

Page 160

1  overdoses due to counterfeit Percocet and Xanax pills
2  laced with fentanyl?
3      MS. ABSTON:  Objection; form.
4      THE WITNESS:  I cannot speak to what was
5  causing the overdose as far as what was laced or what
6  wasn't laced.  All I know was that I do agree that
7  there was a rise in overdoses.
8  BY MR. SUDBURY:
9      Q.  Okay.  And -- and that rise in overdoses, this
10  -- this issue of people -- or -- and here specifically
11  it's talking about youth purchasing thinking they're
12  one thing and then them being laced with fentanyl; is
13  that something that, based on your experience, you've
14  seen in Tarrant County?
15      A.  Yes.
16      MS. ABSTON:  Objection; form.
17  BY MR. SUDBURY:
18      Q.  Okay.
19      A.  Yes, sir.
20      Q.  Okay.  Let's move on then to tab number 41.
21  We've got an e-mail, this one attaches a press release,
22  so I'll let ya'll do what you need to do, but I will
23  mention the e-mail is referencing a press release.  So
24  I hope there's nothing in there that ya'll are
25  concerned about.

Page 161

1      MS. ABSTON:  Are you going to talk about
2  the attachment press release?
3      MR. SUDBURY:  I am.  You can look at them
4  together, tab 41 and 42, please.
5      MS. ABSTON:  Okay.  I think we're fine
6  with this if Senior Chief is.
7      THE WITNESS:  Yes.
8  BY MR. SUDBURY:
9      Q.  Okay.  Tab number 41, which we're going to make
10  Deposition Exhibit Number 34, that is an e-mail -- does
11  it appear to be an e-mail from the Chief of Staff for
12  the Tarrant County Sheriff's Office to a number of
13  people, including yourself, that says, "See attached
14  press release"?  Is that a fair description of what
15  Exhibit Number 34 slash tab 41 is?
16      A.  Yes, sir.
17      Q.  Okay.  And then the attachment, tab number 42
18  and Exhibit Number 35, we'll look at the first page of
19  that.
20      A.  Yes, sir.
21      Q.  Okay.  The -- the M30 pills that is referenced
22  in that first page, those are counterfeit pills that
23  it's referring to, correct, where it says "(fentanyl)"?
24      A.  That's my understanding, yes, sir.
25      Q.  Okay.  Is there another form of diversion of

41 (Pages 158 - 161)

Page 162

pharmaceutical drugs by robbery or burglary of pharmacies?
MS. ABSTON: Objection; form.
THE WITNESS: That certainly occurs.
BY MR. SUDBURY:
Q. And in your experience, did that occur in Tarrant County?
A. From my experience, I would have to say occasionally. To what extent or specific robbery or burglary, I could not speak to.
Q. All right. So you're trying to get ahead of my next question here; you've figured this out late in the day.
Are you aware of any specific burglaries or robberies that impacted any Kroger pharmacies in Tarrant County?
A. No, sir.
Q. Are you aware of any -- let's see if I can use some terms that will make sense -- any -- any -- any significant outbreaks or, you know, periods of time where that was really a hot-button issue in Tarrant County where pharmacies were being broken into?
MS. ABSTON: Objection; form.
THE WITNESS: I couldn't identify any specific time.

Page 163

BY MR. SUDBURY:
Q. Do you know if I were to track that information down where we would need to go for that kind of information?
A. Each and every law enforcement agency in Tarrant County.
Q. Okay. All right.
Let's go to tab 30 then, move on, three-zero. This one's stand alone, just -- just the e-mail itself.
A. Okay.
Q. Do you recall --
MS. ABSTON: Oh, hold on. Sorry, go ahead. Are we looking at what -- I'm so sorry, can we say one more time, we're looking at tab --
MR. SUDBURY: Thirty.
MS. ABSTON: Yeah, give me one second, just finishing. Yeah, I think we're fine. Thank you.
BY MR. SUDBURY:
Q. Okay. Tab 30, now Deposition Exhibit Number 35, is an e-mail from David Grantham dated 10/16/18. And -- and the subject matter of this, it ties together, is related to information on pharmacy burglaries -- burglaries. Do you recall receiving this e-mail?
A. I -- I don't recall.

Page 164

GREGG HOLDERMAN: Counsel, if I may, I believe this is Exhibit 36.
MR. SUDBURY: Okay. Thank you.
BY MR. SUDBURY:
Q. If you will look at the second page, the e-mail forwarded from John Cook near the bottom of the page. It says, "Since 09/15, there have been 4 Pharmacy burglaries in the Fort Worth area that match the MO," then it goes on from there.
Do you see that?
A. Yes, sir.
Q. Any -- does that help in any way refresh your recollection as far as the frequency of pharmacy burglaries in -- in the -- in Tarrant County in this time period around 2018?
MS. ABSTON: Objection; form.
THE WITNESS: I mean, it certainly helps refresh my memory, yes.
BY MR. SUDBURY:
Q. Okay. Chief Simonds, this is really what I'm going for, to the extent you recall. If the answer is you don't know, then that's your answer. But were there -- were there any specific time periods or recollection that you have where we were really seeing a lot of these, you know, kind of organized, or

Page 165

unorganized, just pharmacy break-ins and this issue was really bad, or just sort of generally they occur on occasion but -- but no specific recollection of -- of burglary operations?
MS. ABSTON: Objection; form.
BY MR. SUDBURY:
Q. That was a terrible question. Let me -- let me start over again, please.
Based on your experience and employment at the TCSO, are there any periods of time where you have recollection of there being burglaries and robberies of pharmacies?
A. Yes.
Q. Were there any occasions where that was more problematic, in other words, the frequency, what was stolen, et cetera, any periods of time where that was a bigger issue in Tarrant County than other times?
A. Yes.
MS. ABSTON: Objection; form.
BY MR. SUDBURY:
Q. Okay. When was that?
A. They're cyclical, like much crime is. And so I would not be able to -- I just know that throughout time there are periods where different types of offenses, specifically this type of offense, would

Page 166

1  occur in rashes, and then there would be a lull, and
2  then there would be another rash.
3      Q.  All right.  Rash is the term I've been trying
4  to get to for my last five questions.  So those rashes.
5          The -- the cyclical nature, are you able to tie
6  that related to burglary or theft of -- of pharmacies?
7  Are you able to tie those timing of those rashes of
8  cyclical nature to any external events?
9          MS. ABSTON:  Objection; form.
10         THE WITNESS:  No.
11 BY MR. SUDBURY:
12     Q.  All right.  Let's move on to tab number 3.  Let
13 me do something here before we even -- yeah, ya'll take
14 a look at tab number 3, please.
15         MR. SUDBURY:  And, Alex, there are no
16 attachments.
17         MS. ABSTON:  I was just looking at that.
18 Okay.  Thank you.  Hold on one second.
19         Okay.  I think we're okay, since we don't have
20 the attachments, if Senior Chief feels like it's okay.
21         THE WITNESS:  Yes, ma'am.
22 BY MR. SUDBURY:
23     Q.  Okay.  Tab 3 we've marked as Exhibit Number 37.
24 Again, we've got another e-mail from David Grantham
25 dated -- this one's dated May 4, 2018 to yourself and

Page 167

1  others forwarding an FBI/DEA Intelligence Bulletin
2  related to violent -- Violent Street Gangs Almost
3  Certainly Fueling Opioid Crisis Through Prescription
4  Fraud and Pharmacy Burglaries.
5          Do you see that document?  It's got a link to
6  it in it, but we're not going to -- that -- that's just
7  the title of it near the bottom of the page.
8          Do you see that?
9      A.  Yes, sir.
10     Q.  Do you recall receiving that e-mail?
11     A.  Don't recall.
12     Q.  No reason to dispute it though because your
13 e-mail address is on there, correct?
14     A.  Correct.
15     Q.  All right.  This type of criminal activity
16 that's described in here, at least by the -- the
17 headline, for lack of a better term, Violent Street
18 Gangs Fueling Opioid Crisis Through Prescription Fraud
19 and Pharmacy Burglaries, did you see that type of
20 activity in Tarrant County?
21     A.  Yes, sir.
22     Q.  And -- and would drugs stolen from pharmacy
23 burglary, would that be another type of diversion?
24     A.  Yes, sir.
25     Q.  And would drugs obtained by prescription fraud,

Page 168

1  would that also be consider -- considered diversion?
2      A.  In my opinion, yes, sir.
3      Q.  Okay.  Let's go to tab 58, please, five-eight.
4          MS. ABSTON:  Is tab 58 is standalone
5  document?
6          MR. SUDBURY:  It is.  This is one that's
7  kind of the inverse to what we see, and I actually
8  don't have, at least in my notebook right now, the --
9  an e-mail related to it.
10         MS. ABSTON:  Okay.  Can we go off the
11 record for a minute?
12         MR. SUDBURY:  Sure.
13         THE VIDEOGRAPHER:  We're off the record at
14 4:11 p.m.
15         (A break was taken at 4:11 p.m.)
16         THE VIDEOGRAPHER:  We are back on the
17 record at 4:18 p.m.
18         MS. ABSTON:  Gregory, we've reviewed this
19 document, and we'll allow you to ask questions about
20 it.  But just for the record, this document is not
21 produced in a full family, and we've not thoroughly
22 reviewed all of the other exhibits that have been
23 introduced today to see if it's a full family, meaning
24 that we have the original e-mail and all attachments.
25 So we would continue to ask that both Kroger and

Page 169

1  Albertsons comply with normal discovery protocol and --
2  and normal exhibit marking procedures of providing the
3  original e-mail with any subsequent attachments.
4          MS. STEWART:  Sorry, are you -- are you
5  citing an order or are you citing something else for
6  that?
7          MS. ABSTON:  We -- we just can't
8  authenticate documents, and we're going to have to keep
9  going off the record to try to figure out where these
10 documents are coming from or if they're coming from,
11 you know, sensitive --
12         MR. SUDBURY:  Wait a second, wait a
13 second.  None of the stuff going off the record today
14 is related to authentication of any of the records.
15 This is the first and only time authentication -- I may
16 not even ask him to authenticate.
17         MS. ABSTON:  I'll clarify what I said.
18 You -- we have found a document here -- I'll isolate it
19 to this -- just this incident if you like.  We have
20 found a document here that has an original e-mail that
21 goes with it that has not been provided with us today,
22 so we had to go back through, and that takes time.  So
23 initially, we thought it was a sensitive information,
24 so that's why we went off the record.  But if we find
25 that there is not full families produced, I -- I've

43 (Pages 166 - 169)

1 talked about this before in other Kroger and Albertsons
2 depositions, we would like the full families to be
3 produced so we have proper authentication and we don't
4 have to go through this whole procedure to see where
5 these documents are coming from.
6      MR. SUDBURY:  Okay.  You would like to
7 have the full families produced.  Is that request
8 pursuant to a court order or is there a rule --
9      MS. ABSTON:  I've -- I've yet to be in
10 some of these depositions that -- I'm happy to get
11 other people on the phone to continue this
12 conversation, but I -- I -- other than a handful of
13 depositions I've been on with Kroger and Albertsons,
14 most of the other times I've seen full families
15 produced, so . . .
16      MR. RYAN:  Are we talking about tab 58
17 here?
18      MR. SUDBURY:  Yes.
19      MR. RYAN:  Okay.  Well, tab 57 is the
20 transmittal e-mail.
21      MS. ABSTON:  Okay.  That's what I asked
22 originally before we went off the record.
23      MR. RYAN:  Okay.  Well, we just weren't --
24 if you want to, we'll introduce that.
25      MS. ABSTON:  It's -- okay.  Thank you.

1 That's just all I ask.
2      MR. SUDBURY:  Okay.  Then let's back up a
3 second here.
4 BY MR. SUDBURY:
5      Q.  Chief, let's look at tab number 57, which I'm
6 going to go back -- back up here, and I'm going to make
7 it Exhibit Number 38.  Do you recall -- all right.
8 This is an e-mail from David Grantham to -- to the team
9 regarding aggravated robberies of fall -- small
10 pharmacies.
11      Do you see that?
12      A.  Yes, sir.
13      Q.  Do you know whether you received this e-mail?
14      A.  It would have just been an FYI from the intel
15 director to me.
16      Q.  Okay.  All right.  Then the exhibit, which
17 we're going to mark now as Exhibit Number 39, which is
18 tab 58, is this the FBI Activity Alert that
19 Mr. Grantham circulated with that e-mail?
20      A.  I'm not sure how to connect the e-mail with
21 the -- with the FBI document.  Am I missing something
22 there?
23      Q.  No.  I could refer you to the Bates labels, the
24 consecutive pagination of them.
25      Let me ask you this.

1      A.  Okay.
2      Q.  Exhibit Number 39, do you recall seeing that
3 document before today?
4      A.  And, I'm sorry, is 39 the e-mail or the
5 document itself?
6      Q.  Tab number 58.  I'm sorry.  I forget you're --
7      A.  That's okay.
8      Q.  -- you're just --
9      A.  Yeah, I don't specifically remember seeing
10 this.  I don't recall.
11      Q.  Okay.  This report -- this -- the alert reports
12 of five aggravated robber -- robberies of small
13 pharmacies in Fort Worth and Keller between May 4, 2021
14 and July 12, 2021.
15      Would you agree that that is a fair general
16 summary of this document?
17      A.  Yes, sir.
18      Q.  All right.  And it also said -- the alert
19 states that the prescription drug -- drugs taken
20 included Hydrocodone and oxycodone.
21      Do you see that?
22      A.  Yes, sir.  Not exclusively, but it does say
23 those two drugs.
24      Q.  Yeah, fair enough.  Yep.
25      And in connection with this alert at least, not

1 only was this criminal activity putting diverted
2 pharmaceutical drugs on the street, but it's also in
3 and of itself just a very violent and dangerous crime.
4      Would you agree with that?
5      MS. ABSTON:  Objection; form.
6      THE WITNESS:  Yes, sir.  From reviewing
7 the document, it seems to be a type of takeover
8 robberies.
9 BY MR. SUDBURY:
10      Q.  Right.  And so this type of takeover robbery,
11 is it fair then to ex -- well, let me -- forget
12 expectations.  Did -- did this get prioritized?  Was
13 this high on the list of TCSO's list as far as crimes
14 during this relevant time period, August of 2021?
15      MS. ABSTON:  Objection; form.
16      THE WITNESS:  No, sir.
17 BY MR. SUDBURY:
18      Q.  Okay.  So this alert itself would not have
19 moved this type of crime up as a priority for TCSO; is
20 that what you're telling me?
21      A.  I'm telling you from --
22      MS. ABSTON:  Object to form.
23      THE WITNESS:  I'm telling you from this
24 document, from the locations of the robberies, they
25 would not have been in a jurisdiction that we would

Page 174

1  have investigated.
2  BY MR. SUDBURY:
3  Q.  Okay.  What jurisdiction would they have been
4  in?
5  A.  It looks like Keller and Fort Worth, from what
6  I'm viewing.
7  Q.  All right.  Let's go to tab number 31, please.
8  If you would, please, go to tab number 31.
9  MS. ABSTON:  Gregory, do you have an
10  intent to look at the attachment on this document as
11  well?
12  MR. SUDBURY:  No.
13  MS. ABSTON:  Okay.  We'll just note for
14  the record that the attachment is not being produced
15  with this e-mail, but you can go ahead and ask
16  questions about it.
17  MR. SUDBURY:  Do you know that there is an
18  attachment?
19  MS. ABSTON:  It says, "Attachments: Ohio
20  cops eye possible fentanyl after 17 overdoses in day
21  1," and there's a period and it says "docx," but . . .
22  BY MR. SUDBURY:
23  Q.  Okay.  Chief Simonds, this is an e-mail from
24  you to some in your command staff dated July 14, 2016
25  in response to a reported cases of fentanyl in Ohio.

Page 175

1  Would you agree that's a fair high-level summary of
2  this e-mail exchange?
3  A.  Yes, sir.
4  Q.  And that it says -- and this is your words, I
5  believe -- "Any overdose that may be linked to heroin
6  needs to be forwarded up the chain of command.  Let's
7  make sure the analysis at the ME's Office includes a
8  check for fentanyl.  I do not know of fentanyl showing
9  up in the metroplex or North Texas however when it does
10  we need to be aggressive."
11  Did I read that correctly?
12  A.  Yes, sir.
13  Q.  All right.  So a fair -- do you recall writing
14  that?
15  A.  Yes, sir.
16  Q.  Okay.  If fentanyl -- what I'm trying to
17  understand, based on your -- your words here, if
18  fentanyl was not showing up yet in Tarrant County as of
19  2016, why -- why were you alerting your command staff
20  as you did at this time?
21  MS. ABSTON:  Objection; form.
22  THE WITNESS:  I'm sure it would have
23  related back to the attachment that is not there.
24  Around that time is when fentanyl was entering the
25  scene in law enforcement and in the United States, and

Page 176

1  there was extreme caution that was being recommended
2  for street officers especially who would normally
3  handle, or could normally handle different types of
4  narcotics possibly without the use of gloves or not
5  being as concerned with airborne particles.  And it was
6  being demonstrated around the country that police
7  officers were being injured from that type of exposure.
8  So it was critical that we be aggressive if we see that
9  coming back on any lab analysis and that we provide our
10  officers with the proper safety equipment to do their
11  job.
12  BY MR. SUDBURY:
13  Q.  Okay.  So was it your understanding with this
14  directive that TCSO would start tracking -- number one,
15  it would track fentanyl overdoses; is that part of what
16  you wanted to occur here?
17  A.  Well, any -- really, any overdose needed to be
18  tracked and for the reason thereof whenever a -- a
19  death occurs, especially an overdose death, most of the
20  time there's no external trauma to the body.  So when
21  it goes to the medical examiner's office and they do
22  their exam, they're going to come back with a pending
23  analysis, which is going to be basically their heart
24  stopped and we don't know why, and -- pending
25  toxicology.  And so then you have to wait four to six

Page 177

1  weeks for toxicology to come back.  So it was critical
2  that we track those, not only at the time of death and
3  the notification of the next of kin, but that we track
4  the results of that toxicology so we know what we're
5  dealing with and that it's not just going unnoticed.
6  Q.  Okay.  And then this directive instruction in
7  here, was it ever formalized into TCSO policy or
8  procedure, what you just explained?  Was it ever
9  formalized into policy or procedure?
10  A.  I'm not sure.
11  Q.  Well, then let me ask you this:  What you're
12  suggesting here in this e-mail in July of 2016 and the
13  -- and the process you explain for why that's
14  important, at the time of your retirement in April of
15  2022, was that -- was that being done by TCSO, this
16  tracking being done?
17  A.  It's my understanding that it was.
18  Q.  Okay.  And what do you base that understanding
19  on?
20  A.  This e-mail.
21  Q.  Okay.  But -- and just to be clear, I -- I -- I
22  -- I -- I think I know your answer, I think I'm going
23  to like your answer, which is to say you asked that it
24  be done in July 2016 and so you expected it to be done
25  going forward; is that -- is that what you're telling

45 (Pages 174 - 177)

Page 178

1 me?

2     A.  Yes, sir.

3     Q.  All right.  Was there any -- let me ask this

4 question then:  Was there any type of reporting form or

5 -- or documentation that was ever provided to you

6 indicating this directive was being carried out?  Have

7 you seen any such documentation?

8     A.  Yes, sir.

9     Q.  Could you describe it for me, at least

10 generally?

11     A.  I believe in one of the documents that we

12 previously reviewed today on narcotics statistics that

13 it had overdoses on there.

14     Q.  Okay.  Let's go to tab 32, please.

15         MS. STEWART:  Real quick, Greg, I don't

16 know if that one got marked.  I think we're on 40, but

17 . . .

18         MR. SUDBURY:  That would have been 40,

19 according to my notes.  So let's mark tab number 31 as

20 Deposition Exhibit Number 40.  If somebody tells me I'm

21 off with my numbering, I've made --

22         MS. STEWART:  Oh, okay, I see it.  Sorry.

23         MR. SUDBURY:  -- other mistakes, but I

24 think that's right, four-zero.

25         MS. STEWART:  Thanks.

Page 179

1 BY MR. SUDBURY:

2     Q.  All right.  So tab number 32, which will be

3 Deposition Exhibit Number 41 barring objection to its

4 introduction.

5         Chief, do you recognize that e-mail?

6         MS. ABSTON:  First, Senior Chief, are you

7 comfortable with -- after reviewing the e-mail with us

8 discussing this, or do you have any concerns where we

9 would need to go off the record?

10         THE WITNESS:  Yeah, can we go off the

11 record for just a minute?

12         MS. ABSTON:  Yes.  Let's --

13         MR. SUDBURY:  Sure.

14         THE VIDEOGRAPHER:  We're off the record at

15 4:34 p.m.

16         (A break was taken at 4:34 p.m.)

17         THE VIDEOGRAPHER:  We are back on the

18 record at 4:40 p.m.

19         MS. ABSTON:  Okay.  We've reviewed this

20 document, and -- and we can proceed forward with asking

21 questions about it.  But if we're going to get into the

22 attachments, we'd just like to know now because this is

23 a single e-mail that has two attachments listed on it,

24 but we were not given the full family, so . . .

25         GREGG HOLDERMAN:  Mr. Sudbury, you're

Page 180

1 muted.

2         THE WITNESS:  Oh, I'm muted?

3         MS. ABSTON:  No, Chief -- Senior Chief,

4 you're good.

5         THE WITNESS:  Okay.

6         MR. SUDBURY:  I'm the one that was muted.

7 Sorry.  I just asked a great question.

8 BY MR. SUDBURY:

9     Q.  For Exhibit Number 41, is this an e-mail from

10 Calvin Bond to you dated May 24, 2021 regarding the

11 sheriff's request for fentanyl overdose information?

12     A.  Yes, sir.

13     Q.  Okay.  Do you recall receiving this e-mail?

14     A.  Not specifically, no, sir.

15     Q.  But no reason to dispute that it was -- was

16 sent to you, correct?

17     A.  That's correct.

18     Q.  And if -- if we look at this, it says -- Bond's

19 writing to you at the top of the page, "FYI The Sheriff

20 asked for information on this issue this morning.  This

21 is what I sent him."

22         Do -- did I read that correctly?

23     A.  Yes, sir.

24     Q.  Do you know what information the sheriff was

25 asking for?

Page 181

1         MS. ABSTON:  Objection; form.

2         THE WITNESS:  No, sir.

3 BY MR. SUDBURY:

4     Q.  Do you know why the sheriff was asking for

5 information?

6         MS. ABSTON:  Objection; form.

7         THE WITNESS:  No, sir.

8 BY MR. SUDBURY:

9     Q.  All right.  And then if we read down the

10 next -- further in this e-mail string between Calvin

11 and -- I don't know how to pronounce it, but Katye or

12 Katye, K-a-t-y-e, Travis.

13         Do you see that?

14     A.  Yes, sir.  It's Katye.

15     Q.  Katye.  Okay.  Keep it simple.

16         All right.  Katye Davis.  She works for Tarrant

17 County; is that correct?

18     A.  Yes, sir.

19     Q.  All right.  Between Calvin and Katye, it

20 suggests that the sheriff was asking for fentanyl

21 overdose death trends.

22         Would you agree that's a fair reading of -- of

23 what that e-mail is about?

24         MS. ABSTON:  Objection; form.

25         THE WITNESS:  Fentanyl is referenced

46 (Pages 178 - 181)

Page 182

1 under, you know, the National Institute of Health
2 annual fentanyl-involved deaths by jurisdiction. Up
3 above that, the sentence above that is just referring
4 to overdose death statistics in general, it looks like
5 to me.
6 BY MR. SUDBURY:
7   Q.  Okay.  So you don't read this to mean that
8 these trends, these statistics, are related solely to
9 fentanyl overdose?  You think it's inclusive of all
10 overdose?
11     MS. ABSTON:  Objection; form.
12     THE WITNESS:  Yeah, I would go back to the
13 subject line on -- you know, from Calvin to Katye that
14 says "Overdose death trends requested by Sheriff."  To
15 me, that's just generic overdoses.
16 BY MR. SUDBURY:
17   Q.  Okay.  All right.  And I'm not -- if you know,
18 you know, if you don't, you don't, but the rest of this
19 e-mail, it appears, you know, focused on fentanyl.
20     All right.  So you -- do you know one way or
21 the other whether the trend information in here is for
22 all overdose regardless of the cause or simply for
23 fentanyl overdoses?  Do you know one way or the other?
24     MS. ABSTON:  Objection; form.
25     THE WITNESS:  No, sir.

Page 183

1 BY MR. SUDBURY:
2   Q.  Okay.  And then do you see where Calvin wrote
3 to Katye, "It is very hard (impossible) to get any
4 recent overdose death stats and data"?
5     Do you see that?
6   A.  Yes, I do see that.
7   Q.  Do you agree with him?  Is it very hard to get
8 recent -- at that time, May of 2021 -- recent overdose
9 death stats and data?  Or do you know?
10     MS. ABSTON:  Objection; form.
11     THE WITNESS:  There are several reasons
12 why it may be difficult.
13 BY MR. SUDBURY:
14   Q.  What are those reasons?
15   A.  One may be the timeliness of the toxicology
16 reports.  One may be the timeliness of entering the
17 data from the medical examiner's office once the
18 toxicology reports are available into their website.
19 Those -- those are the -- you know, the types of
20 communication issues that you can have with a medical
21 examiner's office.
22   Q.  Okay.  So you've identified some issues that --
23 that I think we could -- that would fit in the category
24 of kind of lag time issues, just delayed information
25 from getting from one place to another place; is that

Page 184

1 fair?
2     MS. ABSTON:  Objection; form.
3     THE WITNESS:  That's part of it.  And then
4 you can also have cases that full toxicology, you know,
5 was never done.  So I'm not sure when Calvin is saying
6 they're difficult or -- you know, to obtain accurate
7 stats.  In a perfect world, you can have accurate
8 stats.  In -- in our world, not so much a lot of times.
9 BY MR. SUDBURY:
10   Q.  Okay.  Within this e-mail, the 2019, 2020, and
11 it's got bolded Projected four -- over 400 percent
12 increase," is that -- is that consistent with your
13 recollection of what was going on at that time?
14   A.  There was a dramatic increase.  I -- I -- I
15 cannot put a number to it, but I would feel comfortable
16 in saying a dramatic increase.
17   Q.  All right.  And that timeline sounds right to
18 you as far as when that dramatic increase incur --
19 incurred -- occurred?
20     MS. ABSTON:  Objection; form.
21     THE WITNESS:  Yes, sir.
22 BY MR. SUDBURY:
23   Q.  All right.  And that dramatic increase, the
24 primary driver in that dramatic increase was fentanyl;
25 is that correct?

Page 185

1     MS. ABSTON:  Objection; form.
2     THE WITNESS:  I would not make that -- I
3 -- I can't speak to that.
4 BY MR. SUDBURY:
5   Q.  Okay.  Is it your opinion that something other
6 than fentanyl was the driver in that dramatic increase?
7   A.  I don't --
8     MS. ABSTON:  Objection; form.
9     THE WITNESS:  I don't have the data to be
10 able to delineate which drug specifically was causing
11 the overdose deaths.
12 BY MR. SUDBURY:
13   Q.  Do you know who would have that information, if
14 it is available?
15   A.  Tarrant County Medical Examiner's Office.
16   Q.  Do you know, in connection with this e-mail --
17 and we've looked at your prior directive from I think
18 it was five years earlier, from 2016, in an earlier
19 exhibit.  Do you know why -- why Chief Bond wasn't just
20 grabbing that information that you had previously
21 requested be tracked for the TCSO for fentanyl overdose
22 death?
23     MS. ABSTON:  Objection; form.
24     THE WITNESS:  Once again, I do not know
25 the specific question that was -- the sheriff was

47 (Pages 182 - 185)

1 asking. And the sheriff may have been inferring for a
2 broader reach than just what we had in our files.
3 BY MR. SUDBURY:
4    Q. Okay. Chief Bond also cites -- he's got some
5 DEA background information in here that DEA Fort Worth
6 is reporting a significant increase in fentanyl
7 traffickers operating in Tarrant County.
8      Do you see that? Middle of the page.
9    A. Yes, sir.
10   Q. And would you agree with that assessment as of
11 May 2021, that there was an increase in the large-scale
12 fentanyl traffickers operating in Tarrant County?
13   A. I can only take his word for what's written
14 there. I wouldn't have the subject matter expertise to
15 make that assessment.
16   Q. Okay. Move on to tab 59, please. And tab
17 number 59, which will be Deposition Exhibit Number 42,
18 is an e-mail from David Grantham June 2, 2021 to you
19 and a whole host of others, subject line:  "Yesterday's
20 meeting - Please Read."
21      Do you see that?
22   A. I'm sorry, I was scanning down. Direct me back
23 to where you wanted me to review.
24   Q. Sure. Just -- just this document itself.
25 Would you agree it's an e-mail from David Grantham June

1 -- dated June 2, 2021. You're a recipient of this
2 e-mail. Fair enough?
3    A. Yes, sir.
4    Q. Do you recall receiving this particular e-mail?
5    A. I may have a -- a -- a -- a recollection of
6 receiving this one.
7    Q. Okay. Why -- why is that? Why does this one
8 stand out to you?
9    A. Because Richard Almendarez -- excuse me -- had
10 been assigned to the North Texas HIDTA for a number of
11 years as an intel analyst. And prior to that, he had
12 been the gang coordinator in the Detention Bureau. He
13 had specific areas of expertise in gangs and narcotics
14 identification, and we were pleased to have him back
15 inhouse.
16   Q. All right. So this was a good news e-mail, and
17 that's why it stuck out, that's why you remember it, at
18 least in part; fair enough?
19   A. Yes, sir.
20   Q. All right. The next paragraph after that, it's
21 paragraph number 3, but it starts with the word
22 "second."  It says, "Second, fentanyl is a major
23 problem and getting worse."
24      Do you see that?
25   A. Yes, sir.

1    Q. And then it talks about how "They're arriving
2 mostly in pill form, blue and green, with M3 -- 30 on
3 it or M on one side and 30 on the other. They mimic
4 the look of pain pills, so one source said they are
5 called 'perks' or 'Percocet' on the streets. Please
6 keep eyes and ears open and share any info you can."
7      Did I read that correctly?
8    A. Yes, sir.
9    Q. All right. And these M30s or the -- well, I'll
10 just leave it that. These M30 pills that -- that were
11 being described, those are the -- those are counterfeit
12 pills, correct?
13   A. That's my understanding, yes, sir.
14   Q. Yeah. And sorry if I asked you this and you
15 already answered it, just getting late in the day for
16 -- for both of us. But fentanyl -- you would agree
17 with the statement that fentanyl -- as of June 2, 2021,
18 fentanyl is a major problem and was getting worse; is
19 that correct?
20   A. Yes, sir.
21   Q. All right. Okay. Tab 18 now, please.
22      MS. ABSTON: Hold on. Can we go off the
23 record really quick? I want to check one thing before
24 we move on from this exhibit. Just to make sure.
25      MR. SUDBURY: Sure.

1      MS. ABSTON:  Thank you.
2      THE VIDEOGRAPHER:  We're off the record at
3 4:53 p.m.
4      (A break was taken at 4:53 p.m.)
5      THE VIDEOGRAPHER:  We are back on the
6 record at 4:57 p.m.
7 BY MR. SUDBURY:
8    Q. Okay. Chief Simonds, I would like for you to
9 please look at tabs 18 and 19. These can be looked at
10 together. It's -- it's an e-mail with an attachment.
11 And they're going to be, for purposes of the
12 deposition, Exhibit Number 43 and Exhibit Number 44.
13 But let's -- let's start with the -- the book you've
14 got in front of you. Behind tab 18, do you see that
15 cover e-mail, is that an e-mail from Calvin Bond to
16 Katye Travis dated June 28, 2021 that you were cc'd on
17 forwarding an attachment called Fentanyl Update for
18 Sheriff June 28, 2021; is that correct?
19   A. Yes, I see that.
20   Q. Do you recall receiving this e-mail?
21   A. No, sir.
22   Q. Okay. But you don't have any reason to believe
23 that you did not receive it and that was your e-mail
24 address at the time, correct?
25   A. That's correct.

48 (Pages 186 - 189)

1  Q. All right.  Do you know why the sheriff, in
2  connection with this e-mail, was requesting information
3  related to fentanyl?
4  A. No, sir.
5  Q. And also at tab 19, for your purposes,
6  Deposition Exhibit Number 44, is this the -- the
7  attachment, I'll tell you consecutive page numbers, you
8  can look at the bottom for the Bates label -- that's
9  the attachment referenced in Chief Bond's e-mail; is
10  that correct?
11  A. Yeah.  So your question is, is this the
12  attachment --
13  Q. Yes, sir.
14  A. -- associated with -- I -- I assume so.
15  Q. Yeah, I -- okay.  Fair enough.
16  This report then that's tab 19, do you
17  recall -- do you remember reading this report?
18  A. I don't recall.
19  Q. Okay.  The first paragraph -- I'm not going to
20  read the whole thing out loud here into the record, but
21  if you would please take a look at that.  We can kind
22  of read along together to ourselves.
23  Have you had a chance to read that paragraph?
24  A. Yes, sir.
25  Q. All right.  First thing -- point it makes in

1  here is that there's an uptick in overdose deaths
2  involving fentanyl in the North Texas area.  And that
3  North Texas area is referenced here, that would include
4  Tarrant County; is that fair?
5  MS. ABSTON: Object to form.
6  THE WITNESS: Yes, sir.
7  BY MR. SUDBURY:
8  Q. And then the other thing that it's addressing
9  is this counterfeit issue we talked about where
10  fentanyl is being sold and passed off as something
11  legitimate pharmaceutical grade when it's really not.
12  Is that sort of a fair summary of what -- what the next
13  sentence talks about?
14  MS. ABSTON: Objection; form.
15  THE WITNESS: Yes, sir.
16  BY MR. SUDBURY:
17  Q. So this specifically references fentanyl being
18  sold on the street as counterfeit oxycodone, correct?
19  Am I following --
20  MS. ABSTON: Objection --
21  BY MR. SUDBURY:
22  Q. -- correctly?
23  MS. ABSTON: Objection; form.
24  THE WITNESS: I -- I can't draw that
25  conclusion from there, but I -- yeah, I can only read

1  what's, you know -- what's -- what's there.
2  BY MR. SUDBURY:
3  Q. Okay.  Fair enough.
4  So the document speaks for itself.  But were
5  you seeing, based on, you know, boots on the -- I
6  shouldn't say it that way.
7  Based on your experience in June of 2021, were
8  you aware that there was a situation, including in
9  Tarrant County, where Oxycodone pills were being
10  counterfeited and laced with fentanyl?
11  A. Yes, sir.
12  Q. All right.  In the next paragraph of this
13  document, it -- it talks about search warrants and
14  conducted knock-and-talk investigations related to
15  seizure of -- and it specifically says "counterfeit
16  Oxycodone pills."
17  Do you see that in the first sentence of
18  paragraph 2?
19  MS. ABSTON: Objection; form.
20  THE WITNESS: Yes, sir, I see it.
21  BY MR. SUDBURY:
22  Q. And then it even quantifies that.  The last
23  part of that, it says -- it's talking about November
24  knock and talk, but it says approximately 48 pills
25  containing fentanyl were recovered.

1  Do you see that?
2  MS. ABSTON: Objection; form.  I think it
3  says 480 pills.
4  MR. SUDBURY: Yeah, what did I say, 408?
5  MS. ABSTON: You said 48.
6  MR. SUDBURY: 480.  Sorry.
7  MS. ABSTON: It's all good.
8  THE WITNESS: Yes, I see that.
9  BY MR. SUDBURY:
10  Q. Okay.  What's a knock-and-talk investigation?
11  What does that mean?
12  A. That -- that means that we have had information
13  come to us from a source that there is narcotics
14  trafficking going on at a particular location or
15  suspicious activity that may indicate narcotics
16  activity at a specific location.  Usually, there is a
17  preliminary investigation done by investigators on the
18  location, on the residence, on the address itself to
19  see if there's any historical information that could
20  lead to the investigation in a more covert manner.  If
21  they hit a dead end in regards to that type of -- of
22  information, they may just do that, they may go out and
23  knock and talk to whoever answers the door, tell them
24  what they have -- what information they have and -- and
25  do an investigation that way.

49 (Pages 190 - 193)

Page 194

1    Q.  Okay.  In an effort to move us ahead here,
2  rather than go through each paragraph of this document,
3  tab 19, I mean, is it fair to say -- I mean, we can sit
4  here and look at it, but this is -- we've got -- I
5  mean, it is what the title says, a Fentanyl Update CNET
6  Investigations.  This is CNET doing an update as of
7  June 2021 regarding fentanyl; is that fair enough?
8        MS. ABSTON:  Objection; form.
9        THE WITNESS:  The last sentence refers
10  from 2019 to 2020, not 2021.  So I -- I'm assuming
11  that's the time period that it's referring to.
12  BY MR. SUDBURY:
13    Q.  Okay.  Well I -- the document says what it
14  says, we don't need to -- that may be the last date
15  available for that statistic, but the document itself
16  is referencing events that occurred in 20 -- in 2021.
17        But -- but let me just ask this question:  I
18  mean, we looked at this document, it's a page and --
19  it's a page and an eighth, whatever, with the next
20  line.  Is there anything in here that you believe is
21  inaccurate or you just disagree with?
22        MS. ABSTON:  Senior Chief, have you had
23  the ability to review the entire document, including
24  the back?
25        I want to make sure that he has the opportunity

Page 195

1  to review the document in full.
2        THE WITNESS:  Yeah, I'm -- there's a few
3  paragraphs I'm going to read again.
4  BY MR. SUDBURY:
5    Q.  Sure.  Take your time.
6    A.  Okay.  Repeat your question one more time,
7  please.
8    Q.  Sure.  My question is really is there anything
9  in here that you believe is inaccurate?
10    A.  Not that I can see.
11    Q.  The last sentence on the first page says, "Of
12  those 178 deaths, 72 have involved Fentanyl being in
13  the victim's body."
14        So at least according to this documentation,
15  there was some ability, if you're looking at overdose
16  deaths, to determine whether fentanyl was involved,
17  according to the document, correct?
18        MS. ABSTON:  Objection; form.
19        THE WITNESS:  Yeah, obviously he had some
20  ability to obtain this information or it wouldn't be
21  there.
22  BY MR. SUDBURY:
23    Q.  Okay.  Let's go to tab 47, please.
24    A.  Okay.
25    Q.  Okay.  Let's start -- this one let's start with

Page 196

1  the bottom and work our way up.  We don't need to look
2  at page 2, that's just signature block that carried
3  over.  But the bottom of the first page.  And again,
4  this is tab 47, which is now going to be Deposition
5  Exhibit Number 45.  That e-mail from Brandie Bingham to
6  Elaine Johnson on June 8, 2017, you're cc'd on that
7  e-mail and the subject is Narcan Nasal Spray.
8        Do you follow me and do you agree with that?
9    A.  Yes.
10    Q.  All right.  And Elaine -- first of all, who --
11  who's -- who is Brandie Bingham?
12    A.  Okay.  She is evidently a senior buyer for the
13  Tarrant County Purchasing Department.
14    Q.  All right.  So page 2 did become relevant to
15  get that information.
16        But, all right, who is Elaine Johnson?
17    A.  She is another senior buyer for the Tarrant
18  County Purchasing Office.
19    Q.  All right.  So two senior buyers for the
20  Tarrant County Purchasing Office are e-mailing each
21  other and copying you; is that what's going on here?
22    A.  Yes, sir.
23    Q.  And Elaine's repeating -- reporting to -- I'm
24  sorry, Brandie is reporting to Elaine, "I received a
25  call from Senior Chief Simonds with the SO today

Page 197

1  regarding the purchase of Narcan Nasal Spray for all
2  first responders.  The medication is an antidote to
3  opioids that the officers could administer to
4  themselves should they come into contact with opioids
5  or for a person that they are providing assistance to."
6        Did I read that correctly?
7    A.  Yes, sir.
8    Q.  Okay.  And the administration of Narcan to the
9  officers would be for exposure to fentanyl, correct?
10    A.  Yes.  For one -- for an overdose situation.
11    Q.  Okay.  Well, let me ask this:  I mean,
12  Narcan -- Narcan would not be administered to an
13  officer or first responder for exposure to prescription
14  opioids, correct?
15    A.  They might --
16        MS. ABSTON:  Object to form.
17        THE WITNESS:  Sorry.
18  BY MR. SUDBURY:
19    Q.  I couldn't hear your answer.
20    A.  They might be.
21    Q.  What are the circumstances under which Narcan
22  might be administered -- and I'm asking specifically as
23  to an officer or first responder -- for a prescription
24  opioid overdose?
25    A.  If the individual was unresponsive and in

50 (Pages 194 - 197)

Page 198

1  cardiac arrest, you would go ahead and administer the
2  Narcan whether or not you knew specifically what was
3  causing the potential overdose.
4      Q.  Okay.  So I guess we're talking about -- maybe
5  approaching this from two different ways.  I'm -- if
6  you had an officer -- I mean, if you had this terrible
7  circumstance where you had an officer or a first
8  responder that was unresponsive, you're saying there
9  could be a circumstance where you would give that
10  officer or first responder Narcan; is that what you're
11  saying?
12     A.  Yes, sir.
13     Q.  The primary use for Narcan is related to
14  fentanyl exposure or overdose; is that your
15  understanding?
16        MS. ABSTON:  Objection; form.
17        THE WITNESS:  It was my understanding that
18  the Narcan was for any opioid and/or fentanyl overdose
19  to be administered to help save a life.
20  BY MR. SUDBURY:
21     Q.  And could you tell me what the basis of the
22  under -- of that understanding is?
23     A.  Once again, I thought it was effectively used
24  in regards to heroin overdoses and not just a fentanyl
25  overdose.

Page 199

1      Q.  Okay.  So based on prior experience with Narcan
2  related to heroin you thought it was effective; is that
3  right?
4      A.  That's -- that's just my understanding.
5      Q.  Okay.  And I'm not -- just trying to get the
6  basis of the understanding.  Is it I went to a training
7  session and I was told this, I talked to a doctor, or
8  just your -- your -- your experience, if -- if you're
9  able to tell me, if you know?
10     A.  No, it's --
11        MS. ABSTON:  Objection; form.
12        THE WITNESS:  That was -- as I sit here
13  today, that was my understanding.
14  BY MR. SUDBURY:
15     Q.  Okay.  And you're not able to tell me the basis
16  for that understanding, as we sit here today; is that
17  fair?
18        MS. ABSTON:  Objection; form.
19        THE WITNESS:  I believe I've answered that
20  question, have I not, sir?
21        MS. ABSTON:  I would agree.  Objection;
22  form, asked and answered.
23        MR. SUDBURY:  I don't have a question.
24  He's -- you -- you objected to your own witness's
25  question.

Page 200

1        MS. ABSTON:  No, I --
2  BY MR. SUDBURY:
3      Q.  Moving on, tab -- tab number 5 --
4        MS. ABSTON:  -- made my objection --
5        MR. SUDBURY:  -- tab number 5 --
6        MS. ABSTON:  -- and that's why I objected.
7  BY MR. SUDBURY:
8      Q.  -- I'm moving on.
9        Will you please look at tab number 5?  Let me
10  know when you're there, please.  Thank you.
11     A.  I'm -- I'm there now.
12     Q.  Great.
13        Looking at the second e-mail from the top from
14  Calvin Bond to Jerry Vennum.  Do you know who Jerry
15  Vennum is?
16     A.  Yes, sir.
17     Q.  All right.  Who -- who is Jerry Vennum?
18     A.  Jerry Vennum is a retired chief of the Tarrant
19  County Sheriff's Office.
20     Q.  All right.  And Bond is -- if you'll look at
21  the first paragraph there, I think it's the third
22  sentence.  And this is going to be Exhibit Number 46 to
23  the deposition.  It says, "I was asked by Chief Simonds
24  to get Narcan for the SO."
25        Do you see that?

Page 201

1      A.  Yes, sir.  I see it.
2      Q.  And did you make that request to Chief Bond?
3      A.  Yes, sir.
4      Q.  Okay.  Next paragraph, about five lines down,
5  "The purpose of the Narcan is primarily for use on
6  fellow officers when they are exposed."
7        Do you see that?
8      A.  Yes, sir.
9      Q.  All right.  And do you -- do you know if the
10  exposure he's talking about here is exposure to
11  fentanyl?
12        MS. ABSTON:  Objection; form.
13        THE WITNESS:  I don't know what he's
14  referring to.
15  BY MR. SUDBURY:
16     Q.  If you'll turn to the next page of that
17  document, let's continue looking at the e-mail string,
18  page 2.  There's an e-mail from Calvin Bond to Alma
19  Espinoza.
20        Do you see that?
21     A.  Yes, sir.
22     Q.  If you look at the last sentence there before
23  the thank you, this is Chief Bond, "This will be enough
24  to issue to all of our Patrol Deputies, CID and
25  Narcotics Investigators, all of whom are most likely to

51 (Pages 198 - 201)

Page 202

1 come in contact with fentanyl."
2      Do you see that?
3   A.  Yes, sir, I do.
4   Q.  And did I read that correctly?
5   A.  Yes, sir.
6   Q.  And do you think that helps provide some
7 context for the rest of this e-mail string as far as
8 what the Narcan -- Narcan was intended for?
9      MS. ABSTON:  Objection; form.
10      THE WITNESS:  It does provide clarity, but
11 not exclusivity.
12 BY MR. SUDBURY:
13   Q.  Fair enough.
14      But it doesn't say -- I mean, it doesn't say --
15 in the e-mail string, it doesn't say, prescription
16 opioids.  Or he's not saying, all of which are most
17 likely to come in contact with prescription fentanyl or
18 prescription opioids, by way of example.  It doesn't
19 say that, correct?
20      MS. ABSTON:  Objection; form.
21      THE WITNESS:  I didn't see that, no, sir.
22 BY MR. SUDBURY:
23   Q.  All right.  Okay.  Turn to tab 37, please.  I
24 will give you hope on this, we are -- we are nearing
25 the end, so hang in there with me for just a couple

Page 203

1 more.
2      COURT REPORTER:  Can we go off the record
3 for just a minute?
4      MR. SUDBURY:  Sure.  Who's make -- who I
5 just didn't see who --
6      MS. ABSTON:  It's --
7      COURT REPORTER:  The court reporter.
8      MS. ABSTON:  -- Katie on behalf of
9 plaintiffs.  Or who is it?
10      MR. SUDBURY:  Yeah.
11      MS. ABSTON:  Or is it Christa?  Okay.
12      THE VIDEOGRAPHER:  We're off the record at
13 5:19 p.m.
14      (A break was taken at 5:19 p.m.)
15      THE VIDEOGRAPHER:  We are back on the
16 record at 5:28 p.m.
17 BY MR. SUDBURY:
18   Q.  Chief Simonds, are you aware of any wrongdoing
19 by Kroger or Albertsons or any of their pharmacies or
20 pharmacists in Tarrant County?
21      MS. ABSTON:  Objection; form.
22      THE WITNESS:  No, sir.
23 BY MR. SUDBURY:
24   Q.  Are you able to quantify the alleged resources
25 of Tarrant County that it has used to address

Page 204

1 prescription opioid abuse?
2      MS. ABSTON:  Objection; form.
3      THE WITNESS:  Question -- I mean, to what
4 detail?
5 BY MR. SUDBURY:
6   Q.  To any detail.  Can you quantify it -- I'm
7 asking quantify, number, dollars and cents.  Are you
8 able to quantify the resources that Tarrant -- Tarrant
9 County has used to address prescription opioid abuse
10 within Tarrant County?
11      MS. ABSTON:  Objection; form.
12      THE WITNESS:  Not split off from the
13 entire investigative budget.
14 BY MR. SUDBURY:
15   Q.  Do you plan to testify at the trial in this
16 matter?
17   A.  I have no idea.
18   Q.  All right.  Tab 37.  We'll try to do this very
19 quickly, please.  It will be Deposition Exhibit Number
20 47.  Do you know John Ray?
21   A.  Yes, sir.
22   Q.  And he succeeded you, correct?
23   A.  Correct.
24   Q.  PERF.  If you look at that document, PERF is an
25 acronym for Police Executive Research Forum, correct?

Page 205

1   A.  Yes, sir.
2   Q.  If you look at the top of page 3 of that
3 document, it's discussing a New York Times editorial --
4 Editorial: Fear, loathing and fentanyl exposure.
5      Do you see that?  Page 3.
6   A.  Yes, sir.
7   Q.  Further down, it says, "In 2017, the nation's
8 two leading toxicology societies published a joint
9 statement explaining that for emergency medical
10 workers, the risk of accidental opioid exposure is
11 extremely low."
12      Do you see that?
13   A.  Yes, sir.
14   Q.  Were you aware of those published statements?
15   A.  No, sir.
16      MS. ABSTON:  Objection; form.
17 BY MR. SUDBURY:
18   Q.  Did -- did this information change any
19 perception at the TCSO that Narcan was primarily
20 purchased for the protection of its personnel?
21      MS. ABSTON:  Objection; form.
22      THE WITNESS:  As far as I know, this
23 document had no bearing on anything regarding the TCSO.
24 BY MR. SUDBURY:
25   Q.  Okay.  Does TSCO [sic.] maintain any data

52 (Pages 202 - 205)

Page 206

1 concerning when Narcan has been used and -- and what --
2 why it was used?
3      A. Any time Narcan would have been dispensed, it
4 would have been a matter of the officer's report.
5      Q. Would be included in the officer's report,
6 right?
7      A. Yes, sir.
8      Q. All right.  Let's look at tab number 38, and I
9 will go as expeditiously as I possibly can.  It will be
10 Exhibit Number 48.
11      MS. ABSTON:  Okay.  We're just going to
12 make an objection on the record that there's an
13 attachment here that's not in -- with the exhibit -- or
14 what the document as marked, so we just want to make
15 that objection on the record.  Or as produced to us,
16 rather.
17 BY MR. SUDBURY:
18      Q. The bottom e-mail in this document is a David
19 McClelland to you and others dated 12/31/2018, correct?
20      A. Yes, sir.
21      Q. And the recipients are the TSCO [sic.] command
22 staff, correct?
23      A. Yes, sir.
24      Q. Do you recall receiving this e-mail?
25      A. No, sir.

Page 207

1      Q. All right.  The second page, reading from the
2 bottom up, it's talking about asking "everyone to get
3 together numbers for their respective departments so we
4 could give to the civil attorneys.  I believe they're
5 asking for any hard costs, i.e. Narcan or detox in the
6 jail.  Will you all please get that to me by tomorrow
7 morning?"
8      Do you see that?
9      A. I see that.
10      Q. And he's specific that the civil attorneys are
11 looking for the hard cost, correct?
12      MS. ABSTON:  Objection; form.
13      THE WITNESS:  He says he's going to supply
14 it to the civil attorneys.
15 BY MR. SUDBURY:
16      Q. Right.
17      Do you know if he's saying that's specifically
18 what the civil attorneys are looking for, or he was
19 just using this as an example, do you know?
20      MS. ABSTON:  Objection; form.
21      THE WITNESS:  I do not know.
22 BY MR. SUDBURY:
23      Q. Do you know if these civil attorneys were for
24 the prescription opioid litigation?
25      MS. ABSTON:  Objection; form.

Page 208

1      THE WITNESS:  I have no idea.
2 BY MR. SUDBURY:
3      Q. And detox services in the jail are offered for
4 many other substances other than prescription opioids,
5 correct?
6      MS. ABSTON:  Objection; form.
7      THE WITNESS:  That is my understanding.
8 BY MR. SUDBURY:
9      Q. So wouldn't you agree those hard costs, at
10 least in the abstract without any further information
11 and specification of the drug at issue, it doesn't
12 really tell you whether those hard costs are related to
13 prescription opioids; would you agree with that?
14      MS. ABSTON:  Objection; form.
15      THE WITNESS:  I see where he says, I ask
16 everyone to get their -- any numbers together.  I'm not
17 sure what numbers he's referring to.
18 BY MR. SUDBURY:
19      Q. Okay.  And all I'm just saying is in the
20 abstract, without some more information -- well, I
21 think I got the answer to the question.
22      You're -- you're not sure what number he's
23 referring to, correct, for hard costs?
24      MS. ABSTON:  Objection -- objection; form.
25      THE WITNESS:  Yes.

Page 209

1 BY MR. SUDBURY:
2      Q. Methamphetamine, since you've been with the
3 TCSO, has always been highway trafficked in Tarrant
4 County; is that correct?
5      MS. ABSTON:  Objection; form.
6      THE WITNESS:  It has always been a
7 substance of abuse.
8 BY MR. SUDBURY:
9      Q. Right.
10      Would you consider methamphetamine to be the --
11 the -- the greatest threat among the substance of abuse
12 to Tarrant County?
13      MS. ABSTON:  Objection; form.
14      THE WITNESS:  You would have to define
15 "threat."
16 BY MR. SUDBURY:
17      Q. Well, let me ask this:  Methamphetamine drug
18 trafficking is often associated with violent
19 activities; would you agree with that?
20      MS. ABSTON:  Objection; form.
21      THE WITNESS:  Not necessarily any more
22 than any other drug.
23      MR. SUDBURY:  Okay.  All right, I will
24 pass the witness.
25      MS. STEWART:  This is Allison Stewart for

53 (Pages 206 - 209)

Page 210

1  the Albertsons defendants.  I just sent a message to
2  the chat asking Ms. King, or whoever has -- has track
3  of it, how long we've been on the record today.  Is it
4  possible I can get that information?
5       THE VIDEOGRAPHER:  Yes, give me just a
6  second.
7       MS. STEWART:  I'm concerned we're about to
8  lose our court reporter, so -- and I just -- I -- it
9  doesn't feel right to be able to just not -- really not
10 have the opportunity to ask questions.  So, counsel, we
11 could talk off the record about it.  But from what I
12 understood from her just now, she needs to leave right
13 now.
14      MS. ABSTON:  I'm fine putting on the
15 record how much time we've -- has -- has gone by today
16 or how much time we have left.
17      MS. STEWART:  Okay.
18      THE VIDEOGRAPHER:  This is the
19 videographer speaking.  We've been on for 4 hours, 49
20 minutes.
21      MS. STEWART:  Okay.  And so by my count
22 today, we've been going for about seven and a half
23 hours.  So that means we've been off the record for a
24 little less than three total today, right?  Does
25 everybody agree with that?

Page 211

1       MR. SUDBURY:  Feels about right.
2       MS. STEWART:  Okay.  I'm not -- frankly,
3  I'm not really sure how to end this, because, Madam
4  Court Reporter, are -- are we -- are we proceeding, or
5  . . .
6       MS. ABSTON:  I'm also really not sure how
7  to end this, before she even responds, because if -- if
8  -- are you proposing that you reopen this deposition so
9  that you can continue it?  Is that what you're
10 advocating for?  Because I would say you'd have to
11 motion to the Court.  We're going to have to talk to
12 the rest of our team about that.
13      MS. STEWART:  I mean, that -- Alex, that's
14 kind of the position I'm in.  I -- that's what I'm sort
15 of wondering.  I've never had to deal with this issue
16 before, so . . .
17      MS. ABSTON:  Do we want to talk about it
18 off line or is there anything else that we want on the
19 record before we can -- we could let Christa --
20      MS. STEWART:  Well, I mean, let -- let me
21 just say this:  We do not -- Albertsons does not have
22 any questions at this time; however, we preserve -- we
23 reserve our right to request that we reopen this
24 deposition or that we have an opportunity to ask
25 questions later on.

Page 212

1       MR. SUDBURY:  And then while we're on --
2  on the record, Tony, do you have the list of exhibits
3  that they objected to and didn't let us introduce?  Can
4  we just recap that so we --
5       MS. ABSTON:  I'm happy to send that after
6  the fact if it -- if Christa has to go, but, yeah, we
7  can do that now.
8       MR. RYAN:  Okay, real quickly, counsel for
9  Tarrant County has objected to seven documents under
10 the guise of being relating to either ongoing
11 investigations or sensitive law enforcement
12 information, proprietary information, amongst others.
13 And those documents are as follows:  Exhibit 20, and
14 that's TARRANT_00814568-69; Exhibit 21,
15 TARRANT_00814570-74; Exhibit 23, TARRANT_00852515-21;
16 Exhibit 29, TARRANT_00850898-99; Exhibit 30,
17 TARRANT_00850900-01; Exhibit 31, TARRANT_00814420-21;
18 and Exhibit 32, TARRANT_00814422-31.
19      Counsel has indicated they're clawing these
20 documents back either for redaction or for some other
21 assertion of privilege or what other basis.  And
22 accordingly, we reserve the right upon resolution of
23 the plaintiffs' basis for withholding these documents
24 or portions of these documents to -- to reopen this
25 deposition and ask Mr. Simonds concerning these

Page 213

1  documents.
2       MS. ABSTON:  Okay.  Sorry.  I'm not -- no,
3  I don't know who's speaking because it's Zoom, but I
4  just want to clarify, we didn't -- we will be
5  reevaluating those documents, we have to speak further
6  with other parties to confirm if they were able to be
7  produced.  But we -- some of the -- the comments that
8  you just said and the -- and the -- trying to keep time
9  short right now to allow Christa to leave.  We can
10 discuss this off line, but I clarified the reasons for
11 each of those documents on the record at the time they
12 were discussed.  So we would have a standing objection
13 to a reservation to reopen this deposition.
14      But I think other than that, I want to thank
15 Senior Chief Simonds for all of his time today.
16 Plaintiffs don't have any questions.  And, Senior
17 Chief, I want to thank you for your service to the
18 County and thank you for appearing here today.
19      THE WITNESS:  Thank you.
20      THE VIDEOGRAPHER:  All right.  We are off
21 the record at 5:41 p.m.
22
23      (The deposition was concluded at 5:41 p.m.)
24
25

54 (Pages 210 - 213)

Page 214

1           REPORTER'S CERTIFICATE
2
3  STATE OF MINNESOTA     )
                          ) ss.
4  COUNTY OF CLAY         )
5       I hereby certify that I reported the remote,
   videotaped deposition of Mike Simonds on Tuesday,
6  August 15, 2023, and that the witness was by me first
   duly sworn to tell the whole truth;
7
       That the testimony was transcribed by me and is
8  a true record of the testimony of the witness;
9       That the cost of the original has been charged
   to the party who noticed the deposition, and that all
10 parties who ordered copies have been charged at the
   same rate for such copies;
11
       That I am not a relative or employee or
12 attorney or counsel of any of the parties, or a
   relative or employee of such attorney or counsel;
13
       That I am not financially interested in the
14 action and have no contract with the parties,
   attorneys, or persons with an interest in the action
15 that affects or has a substantial tendency to affect
   my impartiality;
16
       That the right to read and sign the deposition
17 by the witness was not reserved.
18
       WITNESS MY HAND AND SEAL THIS 1st day of
19 September. 2023.
20
21
22
23     _____
       Christa A. Reese, RPR, CRR, CRC
       Notary Public, Clay County, Minnesota
24     My commission expires January 31, 2027
25



55 (Page 214)