# EXHIBIT 40

Page 1

1                   UNITED STATES DISTRICT COURT

                FOR THE NORTHERN DISTRICT OF OHIO

2                       EASTERN DIVISION

3    IN RE:  NATIONAL            )  MDL No. 2804

     PRESCRIPTION OPIATE         )  Case No. 17-md-2804

4    LITIGATION                  )  Judge Dan Aaron Polster

5

6

7    ************************************************************

8              ORAL AND VIDEOTAPED DEPOSITION OF

9                VEERINDER TANEJA, MBBS, MPH

10                     August 30, 2023

11                          Volume 1

12   ************************************************************

13

14

15              ORAL AND VIDEOTAPED DEPOSITION OF VEERINDER

16   TANEJA, MBBS, MPH, produced as a witness at the instance

17   of the Defendant, and duly sworn, was taken in the

18   above-styled and numbered cause on the 30th day of

19   August, 2023, from 10:06 a.m. to 3:55 p.m., via

20   videoconference, before Abigail Guerra, CSR, in and for

21   the State of Texas, reported by machine shorthand, where

22   all attendees appeared via Zoom in their respective

23   locations, pursuant to the Federal Rules of Civil

24   Procedure and the provisions stated on the record or

25   attached hereto.

Page 2

```
 1          A P P E A R A N C E S
 2           (Appearing Remotely)
 3
    FOR THE PLAINTIFF:
 4
    Ms. Leila Ayachi
 5  Ms. Alex Abston
    LANIER LAW FIRM
 6  10940 West Sam Houston Parkway North
    Houston, Texas 77064
 7  Phone: (800) 723-3216
    Email: Leila.Ayachi@LanierLawFirm.com
 8      Alex.abston@LanierLawFirm.com
 9   - and –
10  Mr. Craig M. Price
    TARRANT COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
11  CIVIL DIVISION
    Tim Curry Criminal Justice Center
12  9th Floor
    401 Belknap Street
13  Fort Worth, Texas 76196
    Phone: (817) 884-1400
14  Email: Cprice@tarrantcountytx.gov
15
    FOR THE DEFENDANT KROGER:
16
    Mr. Michael Cardi
17  Mr. Chris Fox
    BOWLES RICE, L.L.P.
18  600 Qarrier Street
    Charleston, West Virginia 25301
19  Phone: (304) 347-1100
    Email: Mcardi@bowlesrice.com
20      Cfox@bowlesrice.com
21  FOR THE DEFENDANT ALBERTSONS:
22  Mr. Peter S. Wahby
    GREENBERG TRAURIG LLP
23  2200 Ross Avenue
    Suite 5200
24  Dallas, Texas 75201
    Phone: (214) 665-3662
25  Email: Peter.Wahby@gtlaw.com
```

Page 3

```
 1          A P P E A R A N C E S (cont'd)
 2           (Appearing Remotely)
 3  ALSO PRESENT:
 4    Mr. Gregg Holderman
      Ms. Megan King, Videographer
 5    Ms. Sadie Turner
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              INDEX
 2
 3  VEERINDER TANEJA, MBBS, MPH
 4    Examination by Mr. Cardi.....................  6
 5    Examination by Ms. Ayachi...................  204
 6    Examination by Mr. Cardi....................  216
 7    Examination by Mr. Wahby....................  221
 8  Signature and Changes..........................  224
 9  Reporter's Certificate.........................  226
10
11
12              EXHIBITS
13  NO.        DESCRIPTION              PAGE
14  Exhibit 1    Email                  121
15            Bates Nos. TARRANT_00265378
16  Exhibit 2    Email                  126
17            Bates Nos. TARRANT_00062906
18  Exhibit 3    Email                  134
19            Bates Nos. TARRANT_00587977
20  Exhibit 4    Email                  135
21            Bates Nos. TARRANT_00578995
22  Exhibit 5    Letter                 145
23            Bates Nos. TARRANT_00567004
24  Exhibit 6    Data Brief Talking Points   150
25            Bates Nos. TARRANT_00084463
```

Page 5

```
 1              EXHIBITS (cont'd)
 2
 3  NO.        DESCRIPTION              PAGE
 4  Exhibit 7    Opioids in Tarrant County   154
 5            Bates Nos. TARRANT_00343782
 6  Exhibit 8    Email                  206
 7            Bates Nos. TARRANT_00343779
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1        THE VIDEOGRAPHER:  We're on the record at
2  10:04 a.m. on August 30th, 2023.  This is the deposition
3  of Veerinder Taneja in the matter of In Re:  National
4  Prescription Opiate Litigation, filed in the Northern
5  District of Ohio, Eastern Division, case No. 17-MD-2804.
6  This deposition is being conducted remotely.
7        At this time counsel, please, state your
8  appearances for the record.
9        MS. AYACHI:  Leila Ayachi -- I'm sorry.  Go
10  ahead.
11        MR. CARDI:  I'm sorry, Leila.  Go ahead.
12        MS. AYACHI:  Sorry.
13        Leila Ayachi, Lanier Law Firm, for client
14  Tarrant County, and Sadie Turner is also from Lanier Law
15  Firm.
16        MR. CARDI:  Michael Cardi, Bowles Rice;
17  counsel for the Kroger entities.
18        MR. FOX:  And, also, Chris Fox with Bowles
19  Rice for Kroger.
20        MR. PRICE:  Craig Price for Tarrant County.
21        VEERINDER TANEJA, MBBS, MPH,
22  having been first duly sworn, testified as follows:
23            DIRECT EXAMINATION
24  BY MR. CARDI:
25    Q.  Good -- it is morning.  Good morning,

Page 7

1  Dr. Taneja.  Michael Cardi, Bowles Rice, as stated just
2  a moment prior, counsel for the Kroger entities in this
3  matter.
4        Your voice is a little bit distant sounding
5  to me.  So if I ask you to repeat yourself, maybe that's
6  why, or maybe, yeah.  Any ways want to let you know.
7        Will you, please, state your name, sir?
8    A.  Yes.
9        It's Veerinder Taneja.
10    Q.  Dr. Taneja, where do you presently reside?
11    A.  In Tarrant County in Southlake, Texas.
12    Q.  Southlake, Texas?
13    A.  Yes, sir.
14    Q.  Okay.
15        How long have you resided in Tarrant
16  County?
17    A.  Coming up to almost nine years.
18    Q.  Is that about the time that you began your work
19  at the Public Health Department of Tarrant County?
20    A.  That is correct, yes.
21    Q.  Okay.
22        Sir, have you been deposed before?
23    A.  No.
24    Q.  Okay.
25        Is there any reason health related or

Page 8

1  for due to the use of any prescription drugs or other
2  drugs, you cannot testify accurately and truthfully
3  today?
4    A.  No.
5    Q.  Thank you, sir.
6        It's important throughout the day that we
7  try to let each other finish our questions and answers
8  before we begin.  It's likely that I will break that
9  rule at some point accidentally, but it's important that
10  we try to do our best there.
11        It's also important that responses to
12  questions are verbal in nature, not shakes of the head.
13  That can certainly accompany your answers, but it's
14  important to be verbal as well.
15    A.  Understood.
16    Q.  Thank you, sir.
17        If you don't understand any of my
18  questions, let me know.  If you don't hear me, ask me to
19  repeat myself.  Otherwise, I'm going to assume that
20  you've understood what I have asked, okay?
21    A.  Okay.  Will do.
22    Q.  Going to try to take regular breaks about every
23  hour.  If I forget, I'm sure someone will let me know.
24  Please feel free to let me know yourself.
25        Also, if you need to take a break for any

Page 9

1  reason, just let me know.  Well, hopefully, be able to
2  finish the question presented, and then I'm happy to
3  take a quick break, okay?
4    A.  Okay.
5    Q.  Where are you testifying from today, sir?
6    A.  Fort Worth, Texas.
7    Q.  What offices?
8    A.  It's Public Health location at Mercantile Drive
9  in Fort Worth.
10    Q.  Okay.
11        Are you in your office?
12    A.  Yes, that is correct.
13    Q.  Okay.
14        Is there anyone else in the room with you?
15    A.  Yes.
16        Our DA, Craig Price.  You can see on him
17  the screen, but he's in my office.
18    Q.  Yes, okay.
19        Counsel for Public Health Department?
20    A.  Yes.
21    Q.  Is that accurate?
22    A.  Yes.
23    Q.  Okay.
24    A.  Yes, that is correct.  He's our county civil
25  division chief.

3 (Pages 6 - 9)

1    Q.  You have a couple of binders in close proximity
2 that have been delivered to you?
3    A.  I have one binder.
4    Q.  Okay.
5        Other than that binder, do you have any
6 other documents within viewing distance?
7    A.  Yeah.
8        But it's my office-related, like, notepads
9 and things.  Nothing related to this matter.
10   Q.  Okay.
11       Nothing that you've specifically brought
12 with you or put nearby for purposes of the deposition
13 today?
14   A.  No, sir.
15   Q.  Okay.
16       Do you have any email or -- phone up to
17 receive messages during this deposition?
18   A.  Yeah, emails up.  But if you need me to shut it
19 down, I can.
20   Q.  Well, do you need to have email open for
21 purposes of your -- of your work with --
22   A.  Yeah.
23   Q.  -- the department?
24   A.  Yeah.
25   Q.  Okay.

1    A.  Like I received a phone call just now and
2 emails flying related to that.  That's why I have it up.
3    Q.  Okay.
4        Well, if anything arises in that nature,
5 just let me know.  I gather and assume that you will not
6 be communicating with anyone about this deposition or
7 about my questioning throughout today.
8    A.  Yes, sir.
9    Q.  All right.
10       What did you do to prepare for the
11 deposition today?
12   A.  I'm sorry.  You cut out.  Can you repeat your
13 question?  Because I don't know what's happening with
14 the audio.
15   Q.  Yes, sir.
16       What did you do to prepare for your
17 deposition today?
18   A.  Nothing specific other than a couple of
19 meetings with our attorneys just to make sure we know
20 what depositions are like.
21   Q.  Sure.
22       And what attorneys did you meet with?
23   A.  So a couple of the folks from Lanier Law Firm,
24 Leila Ayachi and Sadie Turner.  And on one of the calls,
25 Mr. Price was present as well.

1    Q.  Was there anyone else present at those meetings
2 other than the counsel you just mentioned?
3    A.  Not that I'm aware of.  I don't believe so.
4    Q.  Were there two meetings in preparation?
5    A.  Two meetings, yes, sir.
6    Q.  Roughly, how long was the first meeting?
7    A.  Half hour.  Maybe 35 minutes.
8    Q.  How about the second meeting?
9    A.  Maybe about an hour.
10   Q.  All right.
11       Did you review any documents in
12 anticipation for --
13   A.  No, sir.
14   Q.  -- of your deposition?
15   A.  (Moving head side to side.)
16   Q.  Have you reviewed any deposition transcripts of
17 depositions taken in this litigation?
18   A.  No, I have not.
19   Q.  At any point.  I wasn't referring to just in
20 preparation.  Just to be clear.
21   A.  No.
22       I mean, this is my first deposition, so I
23 have not ever.
24   Q.  Okay.
25   A.  Yeah.

1    Q.  Have you at any point reviewed the complaint
2 filed in this litigation against the Kroger entities?
3    A.  No, I have not.
4    Q.  All right.
5        Is there anyone else that you spoke with
6 other than counsel in preparation for your deposition
7 today?
8    A.  Not in preparation, but just to inform a couple
9 of people in my chain of command.  So the county
10 administrator.
11       And it just so happened, I was being asked
12 to come see the county judge like right now.  So I told
13 her office that I was doing a deposition, and I can't
14 come right now.  So those are the two parties that are
15 aware.  And then my assistant that helped coordinate the
16 times and all that.
17   Q.  In any of those discussions, did you address
18 anything of substance in relation to the deposition
19 today?
20   A.  No.
21       Other than that I'm being, you know,
22 invited to be deposed.  They didn't ask, and I didn't
23 answer.  I mean, you know, there was no other -- there
24 was no other discussion.  I guess they're aware that
25 there's depositions going on.

4 (Pages 10 - 13)

Page 14

1    Q.  Did you personally prepare any notes,
2  summaries, outlines in preparation for this deposition?
3    A.  No.
4    Q.  Okay.
5        From time to time during the deposition, I
6  may use acronyms, shorthand names for things.  If you
7  don't understand what I'm referring to at any point,
8  please let me know.
9        Is there an acronym for the Public Health
10  Department that is commonly used by you and your
11  department?
12    A.  "TCPH."  It's the acronym for Tarrant County
13  Public Health.
14    Q.  So if I use the acronym TCPH, you will
15  understand that I'm referring to the Tarrant County
16  Health Department, fair?
17    A.  That is correct, yes.
18    Q.  Okay.
19        If I say "this case" or "this litigation,"
20  you understand that I am referring to the lawsuit that
21  Tarrant County has brought against Kroger and others
22  related to prescription opioids?
23    A.  Yes, that is correct.
24    Q.  That's fair?  Okay.
25        If I use the term "prescription opioids"

Page 15

1  today, what is your understanding of my use of that
2  term?
3    A.  So, you know, opioids is a class of drugs that
4  is used for pain management usually morphine; and
5  codeine; and hydrocodone; and a few others like Vicodin;
6  and all that.  So that's kind of first thing that comes
7  to mind when you talk prescription opioids.
8    Q.  Is it fair to say that prescription opioids are
9  pharmaceuticals that can be legally prescribed for a
10  legitimate medical use?
11    A.  Yes.
12    Q.  Okay.
13    A.  That's the original intent.
14    Q.  Sure.
15        What about the word or the term "illicit
16  opioids"?  What's your understanding of that term?
17    A.  Right.
18        So illegal drugs, or street drugs.  You
19  know, a lot of people have -- use heroin, and, now,
20  there's the new synthetic opioid, fentanyl.  So those
21  are a couple of names that come to mind that are
22  illicit, or illegal opioids, that are in use.
23    Q.  I believe you have spoken of a couple
24  differences between prescription opioids and illicit
25  opioids.

Page 16

1        Is there anything else that comes to mind
2  to differentiate the two?
3    A.  Not that I can think of, no.
4    Q.  Okay.
5        What degrees do you hold?
6    A.  Yes.
7        So I have a medical degree from India.
8  It's called MBBS, bachelor's in medicine and bachelor's
9  in surgery.  They follow the old British system, but
10  it's equivalent to an M.D. here.
11        And then, you know, to practice in the
12  U.S., you got to go through the licensing here, which I
13  did not.  And then from the U.S., I hold a master's in
14  public health.  MPH degree.
15    Q.  Where did you get your MBBS?
16    A.  Yes.
17        It's at Kasturba Medical College in India,
18  and the university or the conferring -- -- degree
19  conferring authority is Manipal Academy of Higher
20  Education.
21    Q.  And what year did you obtain that degree?
22    A.  In 2001.
23        And the process is a little different.  So
24  it's a four-and-a-half year of medical school and one
25  year of internship.  So you get licensed as part of that

Page 17

1  degree package, and so everything gets confirmed at the
2  end of the licensing period after the internship.
3  So 2001 was when I got my degree.
4    Q.  And when did you get your master's in public
5  health degree?
6    A.  It was in 2003.
7        So I came to the U.S. in the fall of 2001
8  to get my MPH, and it was a two-year degree program.  So
9  I graduated in 2003.
10    Q.  And what institution did you obtain the degree?
11    A.  Eastern Kentucky University in Richmond,
12  Kentucky.
13    Q.  Have you lived in the United States since 2001?
14    A.  Correct.
15    Q.  You mentioned that you did not go through
16  whatever certification or licensing was required to
17  transfer your medical degree to the United States.
18        Am I saying that correctly?
19    A.  Yes.
20        That is called the United States Medical
21  Licensing Exam, and I stuck in public health and didn't
22  ever go back to do a residency here, or anything like
23  that.  So I did not.
24    Q.  Okay.
25        So you are not presently licensed to

5 (Pages 14 - 17)

Page 18

1  practice medicine in the United States?
2      A.  Correct.
3      Q.  Correct?
4      A.  Yeah, I'm not a practicing physician in the
5  United States.
6      Q.  Have you ever practiced medicine?
7      A.  Other than my internship, that was it.  None
8  other than that.  Because I came straight after that to
9  the U.S. for a master's in public health.
10     Q.  Since your master's in public health degree was
11 conferred in 2003, you worked in the field of public
12 health?
13     A.  Yes.
14         All throughout my career.  In fact, I
15 started my first job in November of 2002 at a local
16 health department as an epidemiologist.
17         So I've been working in public health, even
18 before I graduated because I had a medical background.
19 So I was qualified to start the job.  And so I've been
20 working since 2002 pretty much nonstop.
21     Q.  In 2002, you worked at regional -- as a
22 regional epidemiologist, Madison County Health
23 Department; is that accurate?
24     A.  Yes.
25         That was the health department in Richmond,

Page 19

1  Kentucky where my school was.  Yes, that was my first
2  job in public health.
3      Q.  Okay.
4          And I'm looking at what, I believe, is your
5  LinkedIn profile.  Want to sort of talk through it.
6          How long did you work for the Madison
7  County Health Department?
8      A.  About a year, I believe, or maybe a little bit
9  less than a year.
10     Q.  What were your responsibilities in that role?
11     A.  So I was a regional epidemiologist serving 11
12 counties, and Madison County was the fiscal agent where
13 they received grant funds to hire staff.  The idea was,
14 like, after 9/11 that they wanted to expand local health
15 department capacity to have more epidemiologists.
16 Anthrax letters and things were going around at that
17 time, and they wanted assets in place to investigate
18 those situations.  Make sure if anything -- if an
19 outbreak to occur that they had local people ready to
20 respond.
21         So that was kind of the job to make sure we
22 look at all the disease outbreaks because most health
23 departments did not have epidemiologists at the time.
24 They were only usually at state health departments.
25         And the grant was sent out to make sure

Page 20

1  they build local capacity.  And the first setup was to
2  hire people regionally, and those regionals epis would
3  be housed in a health department, but they would serve
4  multiple neighboring counties around them.
5      Q.  What is the unique role of an epidemiologist
6  within a Public Health Department as opposed to what
7  other employees present?
8      A.  Yeah, the simplest way to explain is
9  epidemiologists are disease outbreak investigators.  We
10 chase after outbreaks.
11     Q.  Outbreaks of any nature?
12     A.  Of any nature.
13         Generally, they end up being disease
14 outbreaks that are the most frequently occurring.  You
15 know, flu outbreak.  COVID was a good example recently.
16         A lot of times, there's food-born related
17 outbreaks.  Somebody goes to a restaurant.  A group of
18 people, five, six people, a party, and they end up all
19 being sick.  Those are common examples.
20         But then there are other things, you know,
21 environmental related.  You know, what we are talking
22 about today, drug related.  Anything that goes out of
23 the ordinary in your community, and it's affecting a lot
24 of people and their health, a lot of those are outbreaks
25 that epidemiologists end up investigating.

Page 21

1          Not all outbreaks are investigated by a
2  local epidemiologists.  Some are investigated at a
3  higher level like at the CDC or the state, along with
4  the local.  But, generally, the most common day-to-day
5  things -- foodborne outbreaks and illnesses outbreaks --
6  are investigated by local epidemiologists.
7      Q.  Is it fair to say that local epidemiologists,
8  at least within public health departments, are only
9  addressing, investigating diseases and illnesses
10 affecting human beings as opposed to animals, or...
11     A.  That is generally true.
12         What is -- again, it's a very large country
13 with a large local flavor.  I am aware of
14 epidemiologists that, you know, sometimes are housed
15 within a health department, but they work with, like,
16 university extensions; and they are more focused on
17 plant or animal outbreaks.
18         Even local health departments a lot of
19 times have veterinarian doctors as their epidemiologists
20 because a lot of animal outbreaks can spill over into
21 humans.  So there is some variation there.
22         But, generally, you're right.  Mostly, we
23 deal with human outbreaks only because Public Health
24 Departments mostly deal with prevention of health issues
25 in humans.

6 (Pages 18 - 21)

Page 22

1     Q. According to your LinkedIn profile, you
2  transition to the state of South Carolina in
3  September of 2003 as a regional epidemiologist; is that
4  accurate?
5     A. Yes.
6        So it was pretty much similar role under
7  Public Health Preparedness. Same concept, regional epi.
8  The only difference was South Carolina is a
9  state-centralized public health system where all the
10  health departments are under the state umbrella. They
11  are state entities.
12       So the hiring entity was the state of South
13  Carolina, but I was placed in a local health department
14  serving about ten counties; and they had formulated
15  under two districts at the time. So four counties in
16  one district and six in the other, but I was a regional
17  epi. Same concept like in Kentucky.
18     Q. Okay.
19       And then Brown County in 2004; is that
20  accurate?
21     A. That is correct.
22       Brown County. That's Green Bay, Wisconsin,
23  yes. And I was there. There were 12 health departments
24  in consortium, sort of the group that I served.
25     Q. Otherwise, did your responsibilities change

Page 23

1  much in Brown --
2     A. No.
3     Q. -- County?
4     A. No. I mean, just with the sign of times going
5  from paper-based outbreak surveillance and other, you
6  know, investigations do more like electronic
7  surveillance because electronic systems were rolling
8  out. So part of the responsibilities were added to
9  train local health department staff and nurses on how to
10  use electronic surveillance systems because it was new
11  for everybody.
12       And epidemiologists, because our job is so
13  involved with databases and investigations, we're sort
14  of the natural choice. Like, y'all, teach everybody to
15  learn all of these new things, but that's it.
16       Otherwise, the core of the job was the
17  same. Disease-outbreak investigations and public health
18  preparedness because that was a grant that was funding
19  all these roles that I had in the beginning. So it was
20  a lot of, you know, involvement in the planning,
21  training, and exercising related to any either national
22  disasters or man-made outbreaks that may lead into, you
23  know, a public health emergency of sorts.
24     Q. During your time in Brown County, do you recall
25  addressing opioid use in your position as an

Page 24

1  epidemiologist in the Public Health Department?
2        MS. AYACHI: Objection to form. Sorry.
3  Objection to form.
4     A. I don't recall. It's been a long time.
5        THE CERTIFIED STENOGRAPHER: This is the
6  court reporter. Was there an objection placed?
7        MS. AYACHI: There was. Can you not hear
8  me?
9        THE CERTIFIED STENOGRAPHER: It was just
10  cross-talk.
11       MS. AYACHI: I'm sorry. I apologize.
12       MR. WAHBY: Let me also say, this is Peter
13  Wahby of Greenberg Taurig, appearing for the Albertsons
14  defendants. I was a few minutes late because the link
15  didn't seem to work, but I see Mr. Cardi went ahead and
16  started. I just want to make sure my appearance is
17  noted for the record.
18       MR. CARDI: Peter, I apologize. We didn't
19  -- we didn't wait for you there.
20     Q. (BY MR. CARDI) During your time in Kentucky as
21  a regional epidemiologist, do you recall addressing
22  opioid use through your work at the Public Health
23  Department?
24     A. No, I don't recall. It's been 20 years or so.
25  Long time.

Page 25

1     Q. Accurate that you transitioned to Tennessee in
2  2010?
3     A. That is correct.
4     Q. And I have on the LinkedIn profile that you
5  were a PHIN coordinator; is that accurate?
6     A. Yes.
7        So the technical term is public health
8  information network, and the software system was
9  National Electronic Disease Surveillance System.
10       So what I mentioned when I was in Brown
11  County, a lot of electronic systems came into play for
12  disease surveillance and investigations and so forth.
13  And because I was good at explaining to people how these
14  things work, I got selected to be the PHIN coordinator
15  or the NEDSS coordinator for the state of Tennessee.
16       Stayed there only about six months. I had
17  applied for multiple jobs like lot of people do when
18  they're looking for opportunities and got an opportunity
19  in Wisconsin in Milwaukee. So I ended up moving back to
20  Wisconsin. Because I had lived in Green Bay for a long
21  time, so kind of felt like home for a while.
22     Q. Sure.
23       These electronic systems that you're
24  referring to, is this the CDC's electronic disease
25  surveillance system?

7 (Pages 22 - 25)

Page 26

1    A. That is correct.
2    Q. Can you explain that to me?
3    A. Yes.
4         It's called the National Electronic Disease
5    Surveillance System, and the idea is that local health
6    departments used to investigate all these things on
7    paper, which took a while, and then the reports were
8    sent to the state, and people would transcribe that, and
9    report that to the CDC.  So by the time all of that data
10   was collected, and national patterns or state patterns
11   were detected, they there's an outbreak in Fort Worth
12   and the same outbreak happening in Dallas and the same
13   outbreak happening in Austin, it was too late to make
14   that connection.  So the idea came that let's do this
15   electronically so close to realtime monitoring of these
16   situations needs to happen.
17        So NEDSS was created.  But as with anything
18   federal, they usually do not mandate that all must use
19   this.  So they created a national framework.
20        Some states chose to use the NEDSS system.
21   Tennessee was one of them.  Texas was also one of them.
22   But then some states like Wisconsin went with
23   third-party solutions that were NEDSS compliant.  So
24   they were able to report data into NEDSS per NEDSS
25   requirement, but the user interface looked a little

Page 27

1    different because they were third-party solutions by
2    private vendors.
3    Q. Is NEDSS a platform to input and share data
4    solely, or does it also offer tools to actually collect
5    the data on a local level?
6    A. It offers tools to collect the data at a local
7    level where you don't have to do the investigation on
8    paper.  You can actually put the data right into the
9    system while you're doing the investigation.
10        And also laboratory reports are connected
11   on the back end.  So somebody goes to a doctor, and they
12   have a disease.  Let's say TB, just an example.
13        A lab report will come into the health
14   department.  Hey, Vinny, this person has TB.  So we can
15   start our investigation right there from calling the
16   doctor's office, looking at the lab report, connecting
17   all the dots, interviewing the person, getting all the
18   information around that situation, and get all that case
19   documentation worked into the system right away.
20   Q. The means to collect data changed over time
21   since your early days of your career in early 2000s to
22   present?
23   A. Yes.
24        Lot more focus on electronic data
25   collection and lot less on paper.  Although, paper is

Page 28

1    still present.  To me, like in most operations, paper is
2    hard to get rid of.
3    Q. At present, the Tarrant County Public Health
4    Department, where does data come from that is collected,
5    reviewed by the Public Health Department?
6    A. Multiple places.
7         But a lot of physician offices and
8    laboratories still fax us stuff, and we've pushed very
9    hard to get them all electronic during COVID because fax
10   was just overwhelming.
11        So a lot has shifted to electronic means of
12   reporting, and it comes in many different ways.  So
13   there's laboratory data that comes in something called
14   electronic lab reports, and we have a NEDSS-compliant
15   system called EpiTrack.  So a lot of that data goes into
16   that system.
17        We also have other surveillance systems set
18   up.  Something called the Syndromic Surveillance System
19   {sic}, NSSP.  It's another CDC platform.  It looks at ER
20   visits and reports related to various situations that
21   people present with.  So that's another early-warning
22   data source, if you will.
23        And those are a couple of things.  So
24   laboratory reporting, physicians reporting through us
25   through faxes.  And then, of course, you know, NSSP

Page 29

1    data.  Those are three main ways that I can think of.
2    I'm sure there's phone calls and other things that
3    happen, but, you know, those are generally how we
4    worked.
5    Q. You say SS data?
6    A. Yes.  Syndromic Surveillance data.
7    Q. Okay.
8    A. It's NSSP.  Syndromic System platform.
9    Q. Okay.
10        These are the three manners of collecting
11   data primarily, I believe, you said presently --
12   A. Correct.
13   Q. -- as of 2023?
14   A. Yes.
15   Q. Have all of these systems for collecting data
16   been in use since you began at Tarrant County Public
17   Health?
18   A. Yes, in various stages of development
19   sometimes.  Because as time progresses, things become
20   more refined.
21        And the other thing that we should mention
22   probably is there's something called QuickBase.  It's --
23   really, it's a low-code database that you can configure
24   to do whatever you want to do.  It's a database tool.
25        And during COVID, a lot of our systems were

Page 30

1 not ready to deal with the volume that was going to be
2 coming in.  So we -- for COVID specific, we did a lot of
3 stuff in QuickBase, and, now, we're sort of phasing
4 everything back into our, you know, TriSano, the
5 NEDDSS-compliant system.
6        But COVID, monkeypox, a couple of those
7 examples were handled in QuickBase because how quickly
8 we could turn things around versus other systems need
9 more like IT help and vendor help to configure them.
10 QuickBase was, like, epidemiologists can go in and
11 create a form, and you can do whatever you need to do.
12    Q.  As the collection of data through physician
13 office faxes, as we've discussed, has it altered or
14 changed over the past ten years?
15    A.  Yes.
16        So it was primarily faxes.  To now, there's
17 some -- a lot of the larger hospital systems are slowly
18 switching to something called e-case reporting.  Not all
19 of them are on board with that.  But I know a couple of
20 large system hospital systems in Tarrant County are
21 doing electronic case reporting, or e-case reporting.
22        Where out of their electronic medical
23 record, we get a report saying, okay, Vinny is in our
24 hospital or under physician care.  Here's what we think
25 is his diagnosis.  And then a lot of times, laboratory

Page 31

1 tests are sent in, and the lab reports come in.  Yep,
2 Vinny tested positive for such-and-such disease.  And
3 those two are connected, and then we, kind of, start
4 working from there.
5        But there's still physician offices,
6 private practices faxing in things that they're required
7 to fax in or send us to -- there's about 80 conditions
8 in Texas that are reportable.  A lot of states have
9 their own list, but generally there are 70, 80
10 physicians that are part of the national surveillance
11 program, if -- disease surveillance program.  And most
12 states adopt those and report those to local health
13 departments and state health departments and then to
14 CDC.
15    Q.  Are any of the 70 to 80 conditions collected
16 through the surveillance program related to opioid use
17 or abuse?
18    A.  So not directly named like that, but there is a
19 sort of a generic term in there that anything that may
20 create an outbreak in your community -- and I'm kind of
21 paraphrasing so we can understand what that means --
22 that must be reported to your health department, whether
23 it's a state or a local.
24        So opioids would fit under that if they
25 create an outbreak.  So, usually, outbreak is in

Page 32

1 simplest terms, something out of the ordinary in your
2 community.  Usually, like, if something doesn't occur in
3 your community and one or two people have it, that's an
4 outbreak.  I mean, that's the simplest way to explain
5 it.
6        And so anything that occurs out of the norm
7 that creates a health impact in the community, that is
8 an outbreak, and it must be reported to a public health
9 department, either state or local.  So they can
10 investigate and see what is happening in terms of health
11 impact.
12        And that's where these opioids and many
13 other out of the ordinary things that are not named
14 items on that list fall under.
15    Q.  Do you recall a reporting through the NSSP
16 surveillance system of outbreak-related opioid use?
17    A.  So not that I can recall, but we are observing
18 trends with, like, ER visits and such related to drug
19 overdoses going up over the last few years.
20    Q.  Who would actually report an outbreak as we've
21 discussed through the surveillance system?  Is it
22 physicians?
23    A.  I'm sorry.  Could you repeat your question?
24 Because my audio cuts out for some reason for a second
25 there.

Page 33

1    Q.  Absolutely.
2        Who would report an outbreak, as we've
3 discussed, through a surveillance system?  Is it just
4 physicians, or is it also public health officials?
5    A.  Yeah.
6        So under state law, anybody who is aware of
7 an outbreak is supposed to report.  And generally, like,
8 you know how state laws are.  They'll give you an
9 example, but not limited to, right?  And so they name
10 people like, you know, school superintendents and
11 physicians, laboratories, infectious control
12 practitioners and so forth; but then it's generic enough
13 that anybody who's aware of an outbreak should report.
14        Do people actually understand and follow
15 that?  That's not always the case.  With many state
16 laws, that's how it happens.  But, generally, the
17 reports come through physicians' offices and also
18 through laboratories.
19        And the lab may not necessarily say, here's
20 an outbreak, but they will send us multiple reports of
21 different diseases; and then we end up connecting the
22 dots.  Hey, this is out of the ordinary.  This is an
23 outbreak.
24        And a lot of times, physicians' offices may
25 notice something.  Hey, we think there's an outbreak

1 going on.  I don't ever see that many kids that are
2 coughing, and, now, I have 20 kids in my office over the
3 last three days that were coughing.  Three of them
4 tested positive for pertussis.  Should I test all of
5 them for pertussis?  Usually, those conversations, they
6 pick up the phone and call and ask our advice and so
7 forth.
8     Q.  Would physician offices report opioid addiction
9 through this system?
10    A.  Generally, they don't.
11        And, again, it's because of a lack of
12 understanding on how the law applies to that.
13    Q.  What about overdoses?
14    A.  So different setups.  A lot of the overdose
15 reporting is happening, I think, to, like, either poison
16 control centers or just, like, through the ambulance
17 systems.  It is not necessarily at least happening in
18 Tarrant County to Tarrant County Public Health.
19        So that's why we have these other systems
20 in place just looking at ER data.  So at least we're
21 aware.  Hey, there's a rising trend in our community,
22 and that indicates a problem.
23        There are other entities in Tarrant County
24 that are more hands-on.  One example would be MHMR of
25 Tarrant County.  And then others would be like Medstar

1 ambulance company.  They get a lot of calls per se.
2 Hey, we have a drug overdose; you need to come.  That
3 kind of stuff.
4     Q.  You mentioned other systems that would result
5 in the reporting of overdoses to public health.
6        What are those systems?
7     A.  So the NSSP Syndromic Surveillance platform.
8 So we can look at ER data and put in some search terms
9 to look at various trends, and it observes patterns and
10 ER visits in the companies that are coming in to
11 determine, hey, that's a valid concern.
12        The original intent was looking at various
13 syndromes, right?  It all started after 9/11.  You know,
14 white powder was going out.  Is it going to create an
15 anthrax that's inhalational?  Or is it going to create
16 an anthrax that's affecting the skin?
17        So that's kind of the basis of all that.
18 So you could look at, like, rash-causing syndromes,
19 respiratory syndromes.  And over the course of the
20 years, systems have been refined to look at various
21 other things -- heat-related injuries, you know, showing
22 up in the ER; opioid related stuff; COVID related stuff;
23 flu surveillance.  A variety of uses.
24    Q.  If there's an overdose that occurs or an
25 individual that has suffered an overdose who enters a

1 position office in Tarrant County, is it always reported
2 into the surveillance system?
3     A.  No.
4     Q.  Is it usually reported into the surveillance
5 system?
6     A.  No, it's not.
7        And, again, when I say the "surveillance
8 system," I'm talking about our NEDSS surveillance
9 system.  And like I said, it's not a named condition on
10 the list; and, thus, a lot of physician offices don't
11 always connect the dots that, hey, if they're seeing
12 something that they feel is an outbreak that they need
13 to report to Public Health.  And it's not unusual for
14 them to think of Public Health as a partner to report
15 such things.
16        So we don't -- we don't receive those
17 reports directly.  But we do have partner entities like
18 Medstar or MHMR where we talk to them, and they say,
19 yeah, this is a growing trend in our community.  And
20 we're observing these calls or getting a lot of calls on
21 going to respond to drug-overdose situations.
22    Q.  Okay.  I apologize.  I'm just trying to
23 understand.
24        I thought you said you are able to get onto
25 the surveillance system -- maybe you didn't say that --

1 but to observe data and trends?
2     A.  Yeah, I did.
3        So that is NSSP Syndromic Surveillance
4 platform, and it looks at ER visits trend.  So
5 that's not a -- you know, it's an early-warning system.
6 Hey, a lot of people showing up with these issues.  And
7 as we've noticed over the years, more and more ER visits
8 happen related to drug overdoses in Tarrant County.
9        And then there's other things like medical
10 examiner conversations.  I was driving by yesterday, and
11 there was a billboard on the highway that drug overdoses
12 deaths are on the rise in Tarrant County.  So it's a lot
13 of -- community conversations also feed into that.
14    Q.  But not every overdose in an ER would be in
15 that system for you all to review and analyze, correct?
16    A.  You know, probably.
17        It should be because it's an ER visit, but
18 I can't say for sure that every one of them gets
19 reported the way it's supposed to.  But if it's an ER
20 visit, we have an ability to look at that data, and --
21 it's not a -- what I would call, like, a definitive
22 answer this is what caused it, but it's syndromic
23 pattern, right?  So people showing up with overdoses are
24 on the rise.  That's kind of the simplest way to explain
25 it, and there's other ways to fine tune the data and

Page 38

1 look at some, you know, what may be causing that. But
2 it's an early-warning system, not a final-answer system.
3    Q. Would the data within the surveillance system
4 differentiate between prescription and illicit opioids?
5    A. I'd have to go ask.
6       I believe so, yes. Because if the
7 physician has made a determination that this was heroin
8 versus this was hydrocodone, I believe we have the
9 ability to parse that. But I have people who are
10 experts on syndromic surveillance who are probably
11 better suited to answer that.
12    Q. Absent a patient being admitted with heroin or
13 prescription opioids on their person, is it typical that
14 physicians in an ER would be able to and would report
15 the form of opioid that is in the system and causing the
16 overdose?
17       MS. AYACHI:  Objection, form.
18    A. I -- yeah, I don't know.  That's an ER
19 physician question.
20    Q. (BY MR. CARDI)  Okay.  All right.
21       Other than the surveillance system, I
22 believe, you mentioned Medstar and MSMR {sic} as sources
23 you all would look to for trends in overdoses; is that
24 accurate?
25    A. It's MHMR, My Health My Resource.  They're the

Page 39

1 mental health and substance abuse provider entity.
2       In simplest terms, Texas is kind of unique
3 where physical health is dealt by with health
4 department.  Mental health is under another
5 quasi-governmental entity.  They're kind of like a
6 health department, but they primarily deal with mental
7 health and substance abuse issues.
8       And so MHMR is the entity in Tarrant County
9 and in many other counties in -- in Texas, and they are
10 the lead on mental health and substance abuse issues.
11    Q. And they collect data on opioid abuse?
12    A. I don't know the details, but I believe they
13 do.
14    Q. And do they collect data on opioid overdoses?
15    A. I don't know.  That's an MHMR question.
16    Q. What about Medstar?  What is --
17    A. Medstar, I know that they collect data on drug
18 overdose cause and any other details that they find.
19       Because I know there's been conversations
20 about receiving that data.  I can't recall if we're
21 actively receiving it or not, but we did have this with
22 them back in 2018, '19 to set up a way to receive their
23 data so we can start looking at some of the details.
24    Q. Any other sources, to your knowledge, of data
25 related to opioid use or abuse that the Public Health

Page 40

1 Department has access to?
2    A. Yes.
3       So medical examiner data.  We -- we have
4 conversations with the medical examiner in Tarrant
5 County, and then we have access to reporting systems.
6 So it's not like primary data like raw information
7 coming in.
8       But CDC Wonder is a CDC tool public facing.
9 Our health department staff use that all the time
10 because it gives you state-level and local-level
11 breakdowns on various data sources that CDC collects
12 from.  A lot of that is from hospital systems and
13 surveys and other things that they've done.
14       And, also, DHS, the Texas Department of
15 Health Services has a website similar to that where you
16 can go look at your county and see what's happening on
17 various health issues including opioids.  So they
18 collect some of that data as well through various
19 surveys.
20       And then -- and, again, talking about
21 surveys, we do have a survey we do every three to
22 five years.  It's called Youth Risk Behavior Survey.
23 And I don't know for sure if there's a question about
24 opioids, but there's question about substance use,
25 alcohol, tobacco, illicit drugs.  I'm sure they ask some

Page 41

1 details, but I don't know for sure if it goes into,
2 like, defining opioids.  It might just name, hey, do you
3 use heroin or other illicit drugs or anything like that?
4 So it does look at youth risk behavior.
5       So those are some of the data sources that
6 the Health Department typically uses.
7    Q. On the youth risk behavior survey, does the
8 Health Department conduct any other surveys with any
9 regularity?
10    A. So the Health Department contracts out for the
11 youth risk behavior survey and so does the state of
12 Texas.  So we collate from both.
13       And then we also do a community-health
14 needs assessment, again, about every five years or so.
15 And a lot of that is looking at a variety of data
16 sources like the ones that I mentioned.  So collecting
17 sort of data from those, and then add in the community
18 stakeholder meetings and conversations.
19       You know, not everything comes to the
20 Health Department.  So we talk to a lot of partners to
21 figure out what is happening in the community that we
22 may not have firsthand information on.
23       And it's a pretty standardized process.  A
24 lot of Health Departments do this across the country.
25 You know, the hospital systems do this.  They're

11 (Pages 38 - 41)

Page 42

1 required by their accrediting bodies.  And that's how we
2 keep a pulse on what is happening in our communities in
3 terms of what's impacting health.
4     Q.  Do you know if the medical examiner data breaks
5 down opioids into prescription versus illicit opioids?
6     A.  I don't have firsthand knowledge because I
7 don't deal with that every day.
8         Generally, I would think yes.  Because
9 their job is to determine what caused the death, but
10 that's a medical examiner question.  So I would defer
11 you to them.
12    Q.  What about CDC Wonder?  Does the data as
13 presented in that system differentiate between
14 prescription and illicit?
15    A.  I'll be honest, I haven't looked at that data
16 set in quite a while.
17        So when I was an epidemiologist, I used to
18 access that pretty frequently.  Last ten years, I've
19 been in administration.  So I know that staff use it,
20 but I don't necessarily pull that data up on my own.
21        So they -- they generate the reports and
22 usually I'm good with that.  So I haven't accessed it
23 recently to, kind of, give you firsthand knowledge of
24 what they've added or deleted from their data sets.
25    Q.  What positions within the Tarrant County Health

Page 43

1 Department would access that data and be more familiar
2 with that data?
3     A.  Absolutely.
4         So our biostatistician.  Her name's Micky
5 Moerbe.  She accesses that on a pretty, regular basis
6 because a lot of our reports cite CDC Wonder as our
7 source, and she is usually the author of those.
8         There's other staff across the department.
9 A lot of them are epidemiologists, or in our infomatics
10 division that may access it.  But the one person that
11 does it on a regular basis would be our biostatistician
12 Micky Moerbe.
13    Q.  Okay.
14         Can you think of anyone else that comes to
15 mind that would frequently deal with this data?
16    A.  Epidemiologists mostly.
17         And it depends on what they're working on.
18 Because if they're working just a disease outbreak,
19 they're probably not going to look at that.  But if
20 their jobs entails other things -- because I have
21 epidemiologists here that are focused on other things
22 other than common disease outbreaks.  So they may have
23 injury prevention roles, and this is where some of that
24 will fall under.  They might be looking at like, you
25 know, traffic accidents and helmet-related injuries, but

Page 44

1 also drug abuse-related injuries or heat-related
2 injuries, and that's where they'll be accessing some of
3 that.  Some of those databases that deal with those
4 things like CDC Wonder.
5     Q.  During your time as an epidemiologist in Brown
6 County, do you recall addressing any issues related to
7 opioid use or abuse?
8     A.  Not that I recall.
9         I know the topic's been circulating for
10 quite a while.  So was I ever in any conversations with
11 any Health Departments about this?  Probably.  But not
12 that I can recall.  It's been a long time.
13    Q.  Okay.
14         You moved to the city of Milwaukee in 2010;
15 is that accurate?
16    A.  That is correct.
17    Q.  You served as an epidemiologist to the city of
18 Milwaukee?
19    A.  That is correct.
20         I was one of two or three, I believe.
21 Large city.  So they had more resources.
22    Q.  Did your responsibilities change between city
23 of Milwaukee and Brown County?
24    A.  A little bit.  It was still an epidemiologist
25 job, but the focus was very much on electronic disease

Page 45

1 data warehousing.  So sort of the back end.
2         A lot of health departments collected a lot
3 of data, and the larger health departments collected a
4 lot more data.  And then they couldn't find the
5 resources to get reports made out of that data, how to
6 make sense out of all of that.  So the job was to create
7 a health data warehouse and create a lot of reports.
8     Q.  Do you recall any initiatives related to opioid
9 use or abuse during that time?
10    A.  No, I don't recall at that time.
11         But, again, I was very focused on sort of
12 the backend data and working with IT on how to build
13 infrastructure to get reports out.  I wasn't necessarily
14 working on topics.
15         A couple of topics do come to mind.  Like
16 there was a clinic that deals with -- dealt with FTDs,
17 and they had a heavy no-show rate.  So I got asked to
18 look at a quality-improvement project looking at the
19 backend data, presenting to the team, hey, here's what
20 your data is.  And then they had to come up with methods
21 to improve the show rates.
22         But not that I can recall anything related
23 to any particular topics or related to opioids because
24 it was very focused on building the
25 infrastructure-technology aspect working with IT versus

12 (Pages 42 - 45)

1 the actual topical Public Health stuff.

2    Q.  You transitioned to your role of deputy health

3 officer in Wayne County, Michigan in 7/11; is that

4 accurate?

5    A.  That is correct.

6    Q.  Did your responsibilities change in that role?

7    A.  Yes.

8       So went into administration, and it was

9 pretty much overseeing the entire Health Department's

10 operations.  It just so happened that the health

11 director who recruited me ended up moving to Detroit.

12       So Wayne County is the county for Detroit,

13 and Detroit had their health department and Wayne County

14 had their health department.  So we served everything in

15 Wayne County except Detroit, and she got recruited into

16 Detroit.  So there was a vacancy.

17       So I was, kind of, the acting director.  We

18 were under a Health and Human Services.  So the chief of

19 operations sort of stepped in as the -- as the main guy,

20 and I was, kind of, like the day-to-day guy.

21       You know, that's how it goes a lot times in

22 government.  They don't get to always get to show their

23 positions fast.  So we kind of split responsibilities,

24 you know.

25    Q.  Do you recall any specific initiatives or

1 concerns related to opioid use or abuse during your time

2 as deputy health officer at Wayne County, Michigan?

3    A.  Not specifically.  But the topic was making

4 circulation at the time.

5       Also -- but in the Wayne County, a lot of

6 Middle Eastern communities settled in Dearborn, and so

7 their main issues were related to hookah use, smoking.

8 So a lot of smoking-related discussions I do remember,

9 but not necessarily opioids.  Other than just general

10 awareness and public health that there is a rising trend

11 across the country, things that could happen in your

12 community also.

13       And by that time, it was starting to

14 become, you know, more in the public health circle, hey,

15 this is an upcoming issue that we need to be aware of.

16    Q.  2011 to 2014, what was becoming more aware in

17 public health circles?

18    A.  That opioids use was on the rise.  And, also,

19 that a lot of that was starting as prescription drug

20 abuse, and, again, this was sort of anecdotal in public

21 health circles.  Listening to physicians, going to

22 different meetings, and learning about -- again, the

23 role of deputy director exposed me to a lot of

24 higher-level discussions in public health and in

25 government that allowed me to understand what are other

1 health issues coming.

2       As an epidemiologist, you're focused on

3 your job, right?  But as a deputy director and director,

4 you're looking at the big picture of what else may be

5 coming.  So you try to have early understanding of what

6 is happening in your community.  So I did recall around

7 that time that this was a topic that was sort of

8 starting to come up on the radar in various public

9 health circles.

10    Q.  During this time frame, 2011 to 2014, what was

11 the early understanding as to the cause of this rise in

12 opioid use?

13    A.  So one of the things that we understood at the

14 time was that people were starting to abuse prescription

15 opioids, and various examples could come to -- you know,

16 in meetings they were being discussed that, you know,

17 people would find leftover medications in a cabinet and

18 then get hooked onto it after consuming those and things

19 like that.

20       And so those conversations I do remember.

21 Well, that's a -- that's a bad thing, right?  I mean,

22 you know -- so I remember those conversations had

23 started around that time, but nothing specifically that

24 I was involved in in Wayne County.  Just general public

25 health knowledge from attending national conferences and

1 national meetings and being exposed to topics other than

2 what I was exposed in epidemiology, focused on disease

3 outbreaks.  This was more administration-level stuff

4 that I was getting into.

5    Q.  Other than the conversations that you had and

6 can recall and anecdotal stories, do you recall any

7 efforts to drill down and collect data as to the cause

8 of this rise during that time period?

9    A.  I do not.

10       But, again, with many places, we were a

11 Public Health division of Wayne County Health and Human

12 Services, and they had a mental health division that was

13 a very large department, if you will.  And, eventually,

14 I think they spun off into Wayne County Mental Health

15 Authority because they were so large.  I believe that

16 entity was, again, heavily involved in the substance

17 abuse world.

18       And I also recall as the deputy health

19 director, who is, kind of, the acting director there,

20 being sent to some meetings.  And I'm trying to remember

21 the name of the organization, but the organization had a

22 lot of SAMHSA funding related to substance use.  Like I

23 said, I recall from attending those meetings that people

24 who dealt with it every day because that's what their

25 entity was doing was -- they were starting to raise a

13 (Pages 46 - 49)

Page 50

1  lot of noise about, hey, this is an upcoming trend.
2  Health departments need to know.  Mental Health
3  Authority needs to know, and we all need to come
4  together and start addressing this before this becomes a
5  real problem in our community.
6          So it wasn't that, you know, -- because the
7  Health Department is not the lead on this, that's why
8  we're, kind of, on the tail end, but there were other
9  entities that very entrenched because that's their, sort
10  of, proper role.  They deal with substance abuse.
11      Q.  You mentioned theft as an early understanding
12  of a cause in the form of theft from medicine cabinet
13  and by family member.
14          Is that what you're referring to?
15      A.  Yeah, that's one example.
16          I mean, that's kind of -- I mean, you know,
17  my memory is not that super accurate --
18      Q.  Sure.
19      A.  -- from, like, ten years ago.  But, generally,
20  that was the theme that I can recall, and that has come
21  up many times over the years.  But I do remember going
22  to these meetings.  I mean, in my head, I can visualize
23  the building that I entered, and the room I sat in; but
24  I can't remember the name of the organization that put
25  the meeting together.

Page 51

1          But I was, sort of, the designated Health
2  Department representative onto that committee, to attend
3  those meetings, and there were the mental health people
4  there.  And this -- I don't know if it was a
5  collaborative or some other sort of group, but they were
6  primarily people that dealt with substance abuse and
7  mental health issues.  And Public Health was invited to
8  be a part of that discussion.  Because, again, once
9  things start to impact a lot more people, it becomes a
10  Public Health issue.
11      Q.  Is your understanding as to the cause for a
12  rise in opioid use, a change from then to now?
13      A.  I'm not sure I understand your question.  Can
14  you repeat that?
15      Q.  Yeah.
16          We were discussing the early understanding
17  during the 2011 to 2014 time period of what was
18  perceived by Wayne County as a rise in opioid use.  And
19  there was a discussion of prescription opioids, theft
20  from medicine cabinets as -- as what the community was
21  seeing as a cause.
22      A.  Right.
23      Q.  Has that understanding changed, as you sit here
24  today, in 2023?
25      A.  Yes.  A little bit.

Page 52

1          So what I'm starting to see more -- and,
2  again, this is all, sort of, anecdotal either listening
3  to partners in meetings or just observing trends that we
4  see in different reports and media stories and all that.
5  There has been a lot more add-on burden now related to
6  synthetic opioid like fentanyl.
7          But I believe for several years -- and I
8  would venture to say for the first few years that I was
9  aware of this topic, it was primarily discussion around
10  prescription opioids.  But over the last four or
11  five years maybe, synthetic opioids have burst out to
12  the scene and have been part of the conversation.
13      Q.  Fair to say, synthetic opioids are more of a
14  problem presently for Tarrant County than prescription
15  opioids?
16          MS. AYACHI:  Objection, form.
17      A.  I don't know.  I don't know.  I don't have data
18  to support one way or the other.
19      Q.  (BY MR. CARDI)  So what -- what supports your
20  belief, as you sit here today, that synthetic is used
21  and what you're hearing more about it, at least?  That's
22  what you said?
23      A.  Yes.
24          So I'm hearing in different meetings from
25  law enforcement partners and so forth that this has

Page 53

1  become a new and major, emerging issues.  And, also, I'm
2  hearing the same kind of conversation from other health
3  departments and different national meetings and
4  conferences that I attend that as if it was not bad
5  enough to have prescription opioids to be a problem, now
6  we are facing synthetic opioids bursting onto the scene
7  illegally adding to the problem.
8      Q.  You began as public health director of Tarrant
9  County Health Department in 2014; is that accurate?
10      A.  That is correct.
11      Q.  And you are presently the director of Public
12  Health in Tarrant County?
13      A.  Yes, that is correct.
14      Q.  Have your responsibilities changed over the
15  past ten years?
16      A.  No.  Just flavor de jure, right?  {Phonetic.}
17  You know, COVID came, and that was kind of unusual; but,
18  no, it's the same.  The main job is to be the
19  administrator over the Health Department to oversee the
20  daily operations.
21      Q.  Has the structure of the Health Department
22  changed over the past ten years?
23      A.  A little bit.
24          Just sort of internal reorganization as we
25  added more staff.  But nothing that -- you know, it's

14 (Pages 50 - 53)

Page 54

1 not a substantive change that we suddenly are doing a
2 lot more different things or anything like that.  It's
3 just we added more people.  They have some more
4 specialties.  So we kind of reorganized to make sure
5 they're a better fit.  That's all.
6     Q.  What positions have been added over the past
7 ten years?
8     A.  So COVID added a lot of stuff, a lot of
9 positions; but primary focus was adding a lot more
10 epidemiologists, a lot of infomatics people.
11         Usually -- they kind of grew out of
12 epidemiology.  So, like, how I was an epidemiologist,
13 but I, kind of, got sucked into electronic data systems
14 and working with IT on back end, the data collection,
15 making sure everything worked smoothly.  That discipline
16 grew out over the last couple decades into public
17 health infomatics.  So now we have a whole infomatics
18 division.
19         And then we added a call center.  Public
20 Health never had that, but now we have people that
21 actually take phone calls to -- in a centralized way to
22 answer a lot of general questions.  Used to be, people
23 would just call and get right to the program or get
24 right to the clinic.  Now, we have a call center that
25 actually, sort of, Level 1 customer support.  They

Page 55

1 answer frequently asked questions.  And then if it gets
2 complicated, then they go back to the program because
3 that way the programs have more time to actually deal
4 with their job versus just answering phone calls.
5         And then we added some clinic staff for
6 vaccination purposes and testing purposes.  And we added
7 some health educators who go out into the community and
8 talk about vaccines and all those type of things or
9 other public health issues.
10         So a lot of that is COVID-funding driven,
11 increases in capacity that we are currently slowing
12 dwindling down as COVID recedes.
13     Q.  Has the staff expansion of the past ten years
14 been driven in any way by substance abuse?
15     A.  No.
16         And not for the -- lack of perceived
17 need by us.  We have been trying to add.  Public Health,
18 unfortunately, is very driven by grant funding.
19         So just to give you a perspective, we got
20 about $135 million of total budget.  Majority of that is
21 various grant funds over 50 to 55 different grants that
22 come with stipulations on what you're supposed to do.
23 And local money is only about 12, $13 million, so about
24 10 percent of our funding.  So there's not a funding
25 source currently that is big enough.

Page 56

1         We had, like, one tiny grant from New York
2 City Health Department that mentions opioids and, yes,
3 start to work on your syndromic surveillance system to
4 start looking at trends in your opioid data.  But other
5 than that, we have not been successful in getting direct
6 funding to add capacity to study opioid issues or add
7 staff related to opioid issues.  A lot of SAMHSA
8 funding, being the structure in Texas, goes to entities
9 like MHMR.  So we don't end up getting moneys to add
10 capacity unfortunately.
11     Q.  You said 10 percent of the budget comes from
12 local sources; is that accurate?
13     A.  That is correct, yes.
14     Q.  And how do you define local?
15     A.  So in most communities, they would call it
16 general fund.  But in Tarrant County, we have a unique
17 structure.  Public Health Department does not get
18 general fund at all.
19         Many years ago -- we have a public health
20 hospital or like a hospital district.  It's the county
21 organization, but they have their own taxing authority
22 on the tax line.  So Hospital District gets some tax
23 dollars and a lot of other revenue that they generate
24 through various grants and billing insurances and
25 Medicaid and Medicare and so forth.  And we're just one

Page 57

1 cost center on the Hospital District funding.  So,
2 essentially, we've got a mix of revenue.  That doesn't
3 necessarily mean you've got local money or not.
4         But we get our money from Hospital
5 District.  But that is equivalent to what you would
6 assume is local dollars.  Like if we were to get direct
7 money from the county as general fund, they would
8 probably give us similar amounts, right?  So it's kind
9 of a roundabout way, okay, you're going to fund Public
10 Health.
11         So it's kind of -- some countries in Texas
12 have that where they get their moneys from the Hospital
13 District because the county create {sic}.  Hey, this is
14 the health district, and y'all figure out how to split
15 the pot.
16     Q.  So local sources of funds, you're speaking of
17 county funds?
18     A.  Yes.
19         Hospital Districts funds.  So I don't get
20 any direct moneys from the county.  I get the local
21 contribution is Hospital District funds.  Hospital
22 District is a county entity authorized by the county,
23 and they're given the authority to put a tax line on the
24 local property taxes.
25         So do I get some?  Probably.  But it's hard

15 (Pages 54 - 57)

Page 58

1 to say because taxes make a small portion, probably
2 one-third of their revenue.
3     Q.  Okay.  I think I understand.
4          So 10 percent of the Public Health budget
5 comes through hospital districts.
6     A.  Hospital districts.
7     Q.  -- which --
8     A.  Yeah.
9     Q.  -- and those districts are funded from multiple
10 sources including county funds.  And so some, maybe
11 small portion of that 10 percent, is -- is -- flows from
12 the county through the districts to Public Health; is
13 that...
14     A.  Sort of.  It doesn't necessarily flow from the
15 county because the district is a taxing authority of its
16 own.
17     Q.  Sure.
18     A.  So, yes, it's authorized by the county.  So,
19 essentially, the county says, yes, you can put a tax
20 line on the tax bill; and that's your tax source, if you
21 will.  The revenue source.  But it's authorized by the
22 county.  So, yes.
23          THE CERTIFIED STENOGRAPHER:  Counsel, this
24 is the court reporter.  When you get to a stopping
25 point, I'd like to take a break, please.

Page 59

1          MR. CARDI:  We can take a break now.
2          THE CERTIFIED STENOGRAPHER:  Thank you.
3          THE VIDEOGRAPHER:  We're off the record at
4 11:13 a.m.
5          (A break was taken from 11:13 a.m. to
6          11:30 a.m.)
7          THE VIDEOGRAPHER:  We are back on the
8 record at 11:31 a.m.
9     Q.  (BY MR. CARDI)  Dr. Taneja, how would you
10 describe the mission of Tarrant County Public Health
11 Department?
12     A.  Sure.
13          So our mission is to really safeguard our
14 community health and sort of improve the health in our
15 community through leadership and health strategy.
16     Q.  Okay.
17          What are your responsibilities as a
18 director?
19     A.  Generally, oversight of day-to-day operations.
20 Majority of that is what I would call administration.
21 Dealing with budgets, HR issues, hiring and the firing
22 of people, you know, all those kind of boring things
23 that administrators deal with.
24          But, also, being from a medical background
25 and also being from an epidemiology background, I am the

Page 60

1 spokesperson for the department also when there are
2 large outbreak-related matters or Public Health emergent
3 issues.
4          So good examples {sic} would be COVID.  I
5 was sort of the spokesperson.  Were there other people
6 from the department who talked to the media and the
7 public?  Absolutely.  But I was kind of the face
8 plastered all over the TV and media and all that.
9          But that's happening frequently.  Ebola,
10 Zika.  Large county, lots of things happen.
11     Q.  Understood.
12          You mentioned that there's been an increase
13 in staff for the past ten years.
14          Well, what is the present dedicated staff
15 member to Tarrant County Public Health?
16     A.  About 537 filled positions the last I checked
17 two or three weeks ago.
18     Q.  Do you recall roughly what the number was when
19 you began about ten years ago?
20     A.  Yeah.  About 330-ish.
21          In general terms, I'll tell you, Public
22 Health Departments and county government here in Tarrant
23 County is very conservative in hiring.  So pre-COVID, I
24 think over the course of maybe five, six years, we might
25 have added maybe 10, 12 positions.  We were about 340,

Page 61

1 350 strong depending on what was going on.
2          And then during COVID, there was a lot of
3 surge in capacity because the need was so great and a
4 lot of different kinds of funding was coming into
5 actually hire staff to deal with the issue.  So we were
6 able to almost, not quite double, but expand capacity
7 significantly.
8          (Simultaneous cross-talk ensues.)
9     Q.  (BY MR. CARDI)  During the COVID period?
10     A.  Yeah.  It's mostly COVID related, yes.
11     Q.  I believe you said that the budget is roughly
12 150 million?
13     A.  135-ish.
14     Q.  35?
15     A.  Yeah.  Uh-huh.
16     Q.  Has it similarly grown over the past ten years
17 and particularly during COVID?
18     A.  Yes.
19          I think when I first joined, it was
20 probably right around 50 million.  I mean, I don't have
21 the exact, but it was -- it was not very big.
22          And then pre-COVID, we were in the 70
23 million range.  I think maybe 72 million.  And then it
24 almost, not quite doubled, but close to during COVID due
25 to various grant funds that came in.

16 (Pages 58 - 61)

Page 62

1   Q. Has the percentage of the budget funded from
2 local sources shifted during the past ten years?
3   A. No.
4       Generally, that has remained pretty stable.
5 This year, we did not get a year-over-year increase;
6 but, generally, it's about a 3 percent increase year
7 over year.  Adds to about, maybe 250 to $300,000 because
8 the 3 percent is usually, like, on salary expenses, not
9 the entire budget.  So not a very significant increase
10 year over year, and that's been the trend pretty
11 consistently over the last ten years.
12   Q. The budget has grown significantly.  And as I
13 gather, that's largely due to -- to grant sources
14 outside of local government.
15       Has the local government funding then
16 similarly increased if it's remained at ten percent?
17 I'm just trying to understand.
18   A. So it has not increased.
19   Q. Okay.
20   A. The only year-over-year increase has been about
21 3 percent on salary expenses that are funded by that
22 local pot of money.
23       So, like I said, every year ballpark 250 to
24 $300,000 increase on the local budget.  From a
25 percentage basis relative to our entire budget, it has

Page 63

1 actually shrunk because we have a lot more grant funds,
2 a bigger budget.  So the local dollars look smaller.
3   Q. I understand.
4       And local dollars, just to confirm, is
5 about ten percent?
6   A. Right now, yes.
7       Because they're about 13-ish million --
8 little bit maybe.  Somewhere in that range.  It's not
9 exact but about 13 million.
10   Q. And the rest of the budget is it entirely
11 grant?
12   A. No.
13       Grants make up majority of the budget, but
14 some revenues are generated through health department
15 billing for clinical services, and some fees we collect
16 for environmental health; restaurant inspections; some
17 fines that are levied on people that let their
18 apartments expire and things like that.  An occasional,
19 you know, few thousand here and there; some donations.
20 You know, somebody who likes to donate some money.  Hey,
21 help do this good thing in your community.  Here's some
22 donation.
23       So it's a mix of a lot of things, but
24 generally majority of it is grant funds from various
25 sources.  Most of them are passthrough funds through the

Page 64

1 state government, Department of State Health Services
2 receives moneys from the CDC, and they pass it onto
3 local departments in the state.
4       But, lately, some have been direct funding
5 opportunities from the federal government.  And then
6 other than grants, there are some other programs that
7 are revenue reimbursement.  There are cost-reimbursement
8 programs from beyond the scope, you know.  One you might
9 find interesting is 340B drug reimbursement program but
10 it's for us related to TB is HIV is STD medications.
11   Q. Roughly 1 percent of the budget is funded from
12 the grant sources?
13   A. I would venture to say almost 80 percent.  They
14 make the majority of our budget.
15   Q. And that percentage has increased since COVID
16 -- during and since COVID?
17   A. Yes.
18   Q. Okay.
19   A. It significantly increased during COVID time
20 frame.
21   Q. Are certain grants geared towards research
22 specifically?
23   A. Not for us.
24       A lot of the research grants are more to
25 like academic institutions or hospitals that are tied to

Page 65

1 academic institutions and so forth.  Generally, the
2 health departments don't have a research component and
3 we participate.  Sometimes there's opportunities.  But I
4 don't recall anything recently where we've gotten a
5 research grant at all.
6   Q. Stimulus grants?  Are those received by Tarrant
7 County Public Health?
8   A. So not by the health department directly but,
9 for example, CARES funding came and then the ARPA
10 funding came.  And then, again, I don't know how you
11 define stimulus payments, but general public understands
12 these were stimulus payments.  So that's my
13 understanding.
14       But we did get some money from the county
15 from CARES funds and some ARPA funds to do some of the
16 work we were doing related to COVID and just building
17 capacity in the department.  And those were -- I would
18 venture to say there were stimulus payments, but I don't
19 know what your definition is.
20   Q. Does the Public Health Department -- has it
21 ever received grants specific to addressing substance
22 abuse?
23   A. So the one grant I can recall is the New York
24 City Health Department gave us some passthrough funding,
25 a couple hundred thousand dollars.  And I don't exactly

17 (Pages 62 - 65)

Page 66

1 recall the time frame 2019, maybe early 2020.
2 And we -- we had actually applied for a
3 grant to the CDC and didn't succeed. And New York
4 City -- we were in conversation with a large group of
5 health departments, and they said, well, we can give you
6 some extra money we have. Get your work started on
7 observing trends in the data in your ERs.
8 And so we got the moneys. And then COVID
9 hit. And it kind of sat to the aside for a little bit
10 until we were able to sort of use that to support our
11 syndromic surveillance data and looking at some of that
12 data. But that's the only one I recall specifically
13 related to either substance abuse or opioids.
14 Other than that, like I explained earlier,
15 there's other entities in Tarrant County that are lead,
16 and a lot of the funding that come from SAMHSA ends up
17 in the pots related to MHMR and other related substance
18 abuse entities in Tarrant County.
19 Q. Was the one grant you can recall was a one-off
20 in early 2020?
21 A. Correct.
22 Q. And I believe you said it was -- it was applied
23 to the SS analysis?
24 (Simultaneous cross-talk ensues.)
25 A. Yeah, the NSSP platform.

Page 67

1 I mean, the grant had other thing that we
2 were supposed to get started, but then COVID really took
3 away our capacity to do other things. So like I said,
4 it kind of sat in a pot for a while without being
5 utilized.
6 And as COVID start to do recede, we started
7 to use the funds to support our Syndromic Surveillance
8 System and started building the data queries and
9 algorithms to start looking at what's happening with
10 opioids in our ERs and so forth -- with drug overdoses
11 in general, I think.
12 Q. (BY MR. CARDI) How did the fund support -- the
13 syndromic surveillance program? Is it man hours we're
14 speaking of? Is it software?
15 A. I'd have to go look, but I believe we paid for
16 a software contract or part of that. I think they were
17 switching from being a software that's supported by our
18 IT on their infrastructure to a third-party company that
19 was going to take it into the Cloud or things like that.
20 Again, this is just going off of memory. So I'm not
21 being 100 percent accurate on this. But I think we paid
22 for part of that contract through those funds so that it
23 could remain a viable system.
24 Q. Okay.
25 When you mentioned other initiatives that

Page 68

1 were derailed with COVID -- or by COVID, do you recall
2 what those initiatives were?
3 A. So we were pretty aggressively pursuing a grant
4 opportunity with the CDC regarding studying opioids and
5 putting prevention strategies into our community because
6 we were starting to see a growing trend in Tarrant
7 County through various sources that we discussed
8 earlier, and we did not succeed. And, you know, there's
9 a lot of back and forth between us between CDC. And we
10 disagreed; they disagreed on a lot of things.
11 So our thought was to pursue other
12 opportunities. So we did succeed with New York City.
13 We were trying to -- some other health department-style
14 coalitions to secure funding because others did succeed
15 in getting funding. And then COVID came, and we sort of
16 put the efforts on back burner.
17 And, now, just recently, a grant
18 opportunity just opened again with the CDC. So we've
19 applied again to start getting some funding so we can
20 start looking at this more in detail, and we're waiting
21 on results back whether we will get the moneys or not.
22 Q. Do you recall any of the specific reasons that
23 the Public Health Department did not get that CDC grant?
24 A. Yes.
25 So CDC kind of put out -- what they call a

Page 69

1 NOFO, notice of funding opportunity, and they had kind
2 of named some areas in the country they believed were
3 right for prevention-related work for opioids. Because
4 they were seeing a rising trend of opioid-related issues
5 in those communities. And Tarrant County was named as
6 one of them.
7 And IN just conversations, we knew that we
8 were there. But when we presented our data, they said,
9 oops, we made an error in calculation.
10 And it kind of goes back to, oh, looking at
11 Fort Worth as a city and their data, and then later
12 realizing that the Health Department actually serves the
13 entire county, and the jurisdiction's bigger.
14 And the data somewhat sometimes gets
15 diluted because not every issue is evenly distributed in
16 every corner of the county. Larger cities due tend to
17 have large problems. So they kind of misunderstand the
18 data, I believe.
19 And they looked at Fort Worth data, and the
20 rates were high. But when they looked at us as a county
21 health department and recalculated as a county, they
22 were like, yeah, you don't qualify. And we argued that
23 Fort Worth is part of the county, and there's a problem;
24 let us get the money, get the work started to prevent
25 it. And they disagreed.

18 (Pages 66 - 69)

Page 70

1      And we were not the only one.  Harris
2  County, which is Houston area -- Houston has a health
3  department.  They got funding.  Harris County did not.
4      San Antonio/Bexar County Health department
5  -- that's the county health department.  They were in
6  the same boat.
7      So there were very many upset health
8  departments because they were invited in the
9  opportunity, and then told, no.  Sorry.  We
10  miscalculated, and you're not qualified.
11      So, now, in the second round of funding, we
12  are, we believe, qualified because the rates have grown.
13  We have data to show and all that; and we're waiting to
14  see if they agree.
15  Q.  Okay.
16      You mentioned prevention strategies and
17  maybe research initiatives that you all were hoping to
18  fund with the CDC grant.  It was not awarded.
19      Do you have any further details on what
20  those strategies were and plans were?
21  A.  So no research initiatives as far as I can
22  recall.
23  Q.  Okay.
24  A.  But prevention strategies -- I mean, generally
25  -- and, again, I don't recall the specifics because it's

Page 71

1  been more than three to four years.  But mostly it
2  starts with public education.  Raising the awareness
3  about the issue, talking to various stakeholders to see
4  what they're doing, and how the Health Department can
5  educate the public.
6      One of the things that has happened in many
7  communities is Narcan became available, and it -- you
8  know, came through various routes.  Like in our
9  community, the sheriff's department carries it; the
10  Medstar, the ambulance company carries it; and a few
11  other different police departments carry it.
12      But there's not been a
13  health-department-concerted effort to raise the
14  awareness about Narcan use and how people can use it
15  and, you know, where you can go get it because we did
16  not have the moneys to put towards that effort.
17      I'll give you other health department
18  examples.  Boston, I think, for example, was very
19  focused.  The health department was the lead in Narcan
20  distribution and getting that adopted in the community.
21      The health director there -- they have a
22  different staff.  Their health officer, she's an M.D.,
23  and she wrote a citywide prescription for Narcan.  So
24  that anybody that ends up in an opioid-overdose
25  situation can get Narcan.

Page 72

1      And this is before laws came into effect
2  where you could just go get it from a pharmaceutical.
3  So this was three or four years ago.
4      So a variety of different things could be
5  done by health departments if we were given the funding
6  and the opportunity to do so.
7  Q.  Are these same initiatives the basis for the
8  present requests to CDC for funds?
9  A.  No.
10      Because a lot of those things are changed,
11  right?  So, like I mentioned, there's some state laws
12  that came into effect and other laws where Narcan is now
13  easily available at pharmacies.  So, I mean, strategies
14  would change.
15      Once we get the funding, maybe we don't
16  need to write an order for everybody to get one, but we
17  may raise more public awareness, you know.  Do more
18  educational campaigns on how to properly use it, when to
19  properly use it.  And if it doesn't work, how to reach
20  help, how to connect to existing resources in the
21  community.
22      And there's a -- and, again, staff would
23  have more detail.  This is just kind of scratching the
24  service on how prevention strategies are usually
25  crafted.  But, again, the goal is to prevent the problem

Page 73

1  from happening.  So that's, you know, early prevention,
2  primary prevention.
3      And the other aspect would be more
4  detailed.  Like after somebody's hooked onto, you know,
5  any substances, how do we get them, you know, early
6  diagnosed and into care so they can get over their
7  addiction?  Those are usually what I would call
8  secondary strategies and so forth.  We're getting them
9  into early treatment and addiction care, working with
10  other community partner agencies.  And health
11  departments usually do very well in connecting people to
12  care.
13  Q.  What was the prior CDC grant applied for?
14  A.  I believe the round came out in 2019-ish.
15  Again, I'm just going by memory, but ballpark in that
16  time frame.
17  Q.  And so if I'm understanding you correctly, the
18  intended use at that time was for prevention strategies,
19  and you recall --
20      (Simultaneous cross-talk ensues.)
21  Q.  (BY MR. CARDI)  And you recall it being -- your
22  examples were education and Narcan education.
23      Is there anything else specifically you can
24  recall as being an intended use?
25  A.  I can't recall.

19 (Pages 70 - 73)

Page 74

1     But, I mean, like I said, I'm not always
2  the expert writing these grant opportunities.  I have
3  staff that are very entrenched, and they study the
4  subject and what's being done by other health
5  departments.  So I'm sure they have a lot more detail
6  that they probably presented in the grant opportunity or
7  had in our strategy playbook on if we get the grant what
8  are we going to do with it?  Usually they require you to
9  commit a work plan.  But, you know, we did not succeed.
10  So, now, if we do succeed, the strategies are probably
11  going to be different looking at the current situation.
12     Q.  Who, during the round three years ago, would
13  have been that person knowledgeable of the intended use
14  of the funds within the health department?
15     A.  Yeah, so, I mean, one person comes to mind is
16  my associate director, Dr. Tal Holmes -- Talmage Holmes.
17  I believe he was the primary author of the grant packet,
18  and he's still the primary author of the submission that
19  we just did three or four months ago.  I can't recall
20  exactly, but this year in 2023.  And we're waiting on
21  hearing back from CDC.
22     Q.  So Talmage Holmes would be the individual
23  knowledgeable of the intended use of the present target
24  funds?
25     A.  Yes.

Page 75

1     Q.  You spoke -- to your knowledge, the present
2  request would be for also prevention strategies and what
3  you called secondary strategies.
4        Any further detail that you can provide?  I
5  understand that Talmage Holmes may be person to speak
6  with.  But anything else that you are aware of?
7     A.  Yeah, I mean, the two main things even before
8  prevention is actually surveillance of the data, right?
9  Collecting more data and understanding what the
10  situation is in our community, where is it happening,
11  you know.  It's probably not evenly distributed
12  everywhere in the county.  Just like with any other
13  disease, it's never, ever evenly distributed.  There's
14  pockets that are heavy, and there's pockets that are
15  light.
16        So collecting all of that data, putting
17  that all into sort of an understanding situational
18  awareness, and then drafting strategies on what will
19  work well in this part of the county and how do we do a
20  prevention strategy -- we won't be alone.  It will
21  probably include medical examiner and law enforcement
22  and MHMR, all of the substance abuse and mental health
23  players in the community that already do the work in
24  this arena.  We would just be another prevention angle.
25        Because a lot of times, law enforcement's

Page 76

1  going to come in from a law enforcement angle.  They
2  want to make sure that any illicit drug use is being
3  curbed, the networks of distribution are being stopped,
4  and so forth, right?  They don't necessarily delve into
5  the health impacts and how to people prevent people from
6  getting hooked on.  So we'll come in with a prevention
7  angle.
8        Same thing, you know, substance abuse
9  providers and mental health entities are approaching it
10  from that angle.  A lot of times getting people into
11  addiction care and treatment, not necessarily
12  prevention.  So we'll come in with a prevention angle.
13     Q.  Right.
14        How would the dollars be actually
15  implemented?  Would it be likely manpower if you know?
16  Or -- or what?
17     A.  I don't recall the exact work plan details.
18  But probably, you know, because usually these are not
19  very big amounts of the dollars.  We might hire like one
20  staff.  An example would be an epidemiologist focused on
21  studying the data and collecting the data, and maybe an
22  infomatics person visualizing everything.
23        And the rest of that would probably be
24  implemented into programming with community partners.
25  So getting prevention messages out, getting educational

Page 77

1  materials made and campaigns made and raising awareness,
2  and then using existing resources.  Because we have
3  health educators and other staff that can be trained to
4  do the work, but a lot of time money is spent in
5  developing the material that goes into it.
6        So it depends on how big of a dollar amount
7  we get.  But as I recall when we were submitting the
8  package, it wasn't very staff heavy.  It was more like
9  let's put the money out into the community, do the
10  actual work.
11        But I believe there were going to be either
12  one or two people, if we succeed, that are going to be
13  dedicated to the grant.
14     Q.  One or two people including an epidemiologist
15  that would be focusing on prevention data, supporting
16  prevention strategies in relation to substance abuse.
17        Is that what we're speaking of?
18     A.  Correct.
19     Q.  And is it tied to substance abuse generally or
20  opioid abuse specifically?
21     A.  I don't recall.
22        I believe it was opioid focused, but I'm
23  sure we will be looking at poly substances because the
24  data sets come together a lot of times.  So I'm sure
25  they'll be collecting more than just opioid-related

20 (Pages 74 - 77)

Page 78

1 data, but I can't be 100 percent certain what was put
2 into the work plan.  Been a while.
3    Q.  Sure.
4       When was the work plan submitted?
5    A.  Memory doesn't support me but three, four
6 months ago.  Three months, something like that.  Because
7 I know the grant opportunity came this year, and there
8 was a lot of activity within the department --
9 collecting information, putting it into package, and
10 submitting it to the CDC.  Tal Holmes was the primary
11 author, and, of course, he worked with different staff
12 to pull different pieces together.  He might have more
13 accurate time line on when it was submitted but three
14 months ago roughly.
15    Q.  Are there any at present positions within
16 Tarrant County Public Health focused on substance abuse?
17    A.  Not specifically.
18       But -- excuse me.  For example, Micky
19 Moerbe, our biostatistician, does get requests from time
20 to time from Tal or other people who maybe going to a
21 meeting or, you know, going to a conference and the
22 opioid topic's coming up; and they want to understand
23 about it.
24       Or the community may have a university
25 partner or some organization may have sent the request

Page 79

1 saying, Hey, can you look at a county-wide what's
2 happening with this data?  So she probably has pulled
3 some reports.  Hold on one second, please.  Sorry.
4       And then I am not certain, but I know that
5 the injury-prevention epidemiologist -- we did show her
6 a couple of opportunities related to opioids and
7 substance abuse.  I think her attraction to opioid
8 prevention has been more like related to heat injuries
9 and traffic accidents and gun violence and all those
10 type of things.
11       So sometimes people don't always, you know,
12 get attracted to the topic.  Yeah, "this is part of the
13 job, but that's not my favorite kind of" thing.  So I
14 haven't seen a lot of reports at least coming out of
15 her, but I can't be certain because she does report to
16 the biostatistician Micky Moerbe.  So I'm sure they're
17 working together.  I just haven't seen -- out of her
18 email, it comes from Micky Moerbe and things like that.
19 So I always assume, it's Micky and her team working on
20 it.
21    Q.  So as I understand it, at present, there are
22 not any staff positions that -- who's primary focus is
23 substance abuse or abused.
24       What about during the past ten years?  Can
25 you recall any position being -- having that primary

Page 80

1 focused?
2    A.  No.
3       And, again, simple reason, we've never had
4 funding for it.  And, like I said, the structure here is
5 MHMR are the lead entities, and then there's other
6 entities like Medstar, the ambulance company.  And I
7 don't know if they get any funding or not, but they're
8 just kind of sucked in because they get calls.  So we've
9 never received any money to resources to work this, and
10 that's why we haven't been able to.
11    Q.  Well, okay.
12       You're also saying that it's -- there are
13 other departments, I believe, who focus on that in a
14 more primary way; is that accurate?
15    A.  That's right.
16       And they're -- they're a quasi-governmental
17 entity.  They're not necessarily a county operation, but
18 MHMR, My Health My Resource, they're authorized under
19 state law, and they're a pretty decent-sized department,
20 if you will, an organization.
21       And whenever we talk about opioid substance
22 abuse, mental health issues -- because a lot of that
23 gets combined in the same umbrella -- they are usually
24 the lead entity, but there's other entities.  Like
25 there's Cook Children's Hospital that deals with mostly

Page 81

1 children.  They're a children's hospital.  But they have
2 an adverse childhood events task force.
3       And in those conversation, I've also heard
4 about drug use and opioids and early childhood trauma
5 and how that drives people into addiction.  So, I mean,
6 it's -- it's a widespread topic in many, many, many
7 circles, and everybody is trying to work on that.  Some
8 more than the others.
9    Q.  Given Public Health's mission and its broad
10 mission, is it fair to say that Public Health would
11 never strive to be a leader within the community in
12 addressing these issues?
13       MS. AYACHI:  Objection, form.
14    A.  So -- yeah, it depends on the community.  Let
15 me give you an example.  So New York City, for example,
16 it's the Department of Health and Mental Hygiene.  Long
17 term from long time ago.  And they have the mental
18 health umbrella under the health department.  They're a
19 very large entity; and that's how the structure was; and
20 that's how they're retained.
21       Wayne County, example, they were under
22 Health and Human Services.  So public health, mental
23 health work together, and then mental health spun off
24 into a large mental health authority; and the substance
25 abuse umbrella kind of moved over.

21 (Pages 78 - 81)

Page 82

1        In Tarrant County, the health department is
2  very focused on physical health.  Funding is very
3  focused on physical health.  Mental health substance
4  abuse resources exist in the community.
5        And under our essential functions in public
6  health, we step in if there's nobody else doing the work
7  in the community.  That's just how public health is
8  everywhere.  But if there is other people, we assure
9  that they can do the work.  We tie together the
10  resources.  We bring them to the table.  If there's
11  partners, nonprofit organizations, governmental
12  entities, law enforcement, school district -- they're
13  doing their things, but they're not working together.  A
14  lot of times we bring them together.  So we're the
15  coordinator of efforts, not necessarily the doer of
16  effort.  So that's where we see our role.
17        Even if we get grant opportunities, most
18  people ask us for data.  So we would look at
19  surveillance; pass the information; gather it from
20  medical examiner, law enforcement, ambulance companies.
21  Put it all together in a composite picture.  Here's
22  what's happening in the community.  Here's where the
23  resources are.  How can we work together to solve this?
24        And the prevention part will be the
25  strategies that we might share.  Here is our idea.  What

Page 83

1  do you think?  Is it going to work?  How do we make this
2  work?
3        So that's how I see the role, not
4  necessarily as a lead entity, but more like a glue that
5  brings everybody together.
6     Q.  (BY MR. CARDI)  So increasing funding would
7  serve that function as -- as coordinating the efforts of
8  others as the primary doers and increasing surveillance?
9     A.  That's right, yes.
10     Q.  Okay.  Okay.
11        We spoke of staff dedicated to substance
12  use and abuse.
13        What about any programs or initiatives
14  managed by Public Health?  Are there presently any
15  focused on substance use and abuse?
16     A.  No.  Not that I can recall.
17        I mean, there might be some handouts or
18  materials that we might distribute here and there.  Like
19  Narcan when it came out, I'm sure we got packets of
20  information from different organizations.  Hey, help
21  spread the word.  But nothing that I can specifically
22  recall that hit my radar that this is something we're
23  doing very specifically to address this issue.
24     Q.  And same answer looking back over the past ten
25  years?

Page 84

1     A.  That is correct, yes.
2        Again, and it's all driven by lack of
3  funding and the structure.  We're not usually the first
4  entity that people think of.  Money goes the other way.
5     Q.  Right.
6        You're not the first entity that people
7  think of, but, also as you've said, that's not Public
8  health-specific role, correct?
9     A.  Not here in Tarrant County.  That is correct.
10     Q.  Okay.
11        Is there an overall organizational
12  structure of Public Health?
13     A.  Yes, we have an org chart.  It's on our
14  website.  Or if you need it, I'm sure we can submit that
15  to y'all.
16     Q.  How many individuals report to you?
17     A.  Direct reports, about eight or nine.  And then
18  indirect, obviously, the entire department, 537.
19     Q.  Direct reports, can we go down their positions
20  to the extent you can --
21     A.  Sure.
22     Q.  -- recall the eight or nine?
23     A.  Sure.  Absolutely.
24        So I have my medical director and local
25  health authority, Dr. Catherine Colquitt.  So if you

Page 85

1  were to, kind of, think about hospital terms, a lot of
2  people watch TV, and they understand that and
3  organizations.  So I'm the CEO of the organization.
4        She's the chief medical officer, right?  So
5  any medical orders that are written are under her
6  signature and under her authority.  So the clinical
7  operations operate under her authority.  I'm the
8  administrative boss, if you will.  And she's the medical
9  boss, if you will.
10        And then I have the deputy director, right?
11  So that's Angie Hagy.  So she's my deputy director that
12  helps me oversee the operation.
13        And then I have five, currently, associate
14  directors.  Dr. Tal Holmes is one.  He's over
15  disease-control area that is mostly epidemiology and
16  laboratory function.
17        Then I have Catherine Andler.  She's over
18  all our backend office like fiscal finance, grants, and
19  contracts.  So all the buildings, facilities, all that
20  fun stuff.
21        Then I have Sabrina Vidaurri.  So she's
22  another associate director.  She's over what we call
23  Health Protection and Response, but mostly it's
24  environmental health -- restaurant inspections, food
25  trucks, swimming pools, all those type of things.  Also,

22 (Pages 82 - 85)

1  preparedness efforts -- planning related to, you know,
2  any manmade or natural disasters including large
3  outbreaks.
4          And then I have Dr. J'Vonnah Maryman.
5  She's over our family health services.  So that's all of
6  our maternal, child health-style programs.  Anything
7  that touches moms and babies like the WIC program or
8  nurse-family partnership.  That's home-visiting program.
9  So there's many of those.
10          And then Dr. Gary Kesling, who's over our
11 clinical operation.  So he works very closely with
12 Dr. Colquitt.  So Dr. Colquitt's the medical director
13 and also a clinician.  So she's a doctor in one of our
14 clinics.
15          But he's sort of the administrative
16 overhead guy.  Like, you know, I'm not always there to
17 deal with all the managers and all those issues in the
18 clinics, and he's the person who day to day makes sure
19 that the clinics run smoothly, which one's
20 opening/closing due to staffing issue, or they have an
21 event, or somebody needs to take time off, and they're
22 in the management team, so they go to Dr. Kesling.
23          So it's kind of a layered structure like in
24 any large organization, but the associate directors help
25 manage the middle and front management; and I'm at the

1  -- sort of the executive level, if you will, with
2  Dr. Colquitt and Angie Hagy.
3      Q.  And who do you report to?
4      A.  To the county administrator, Mr. G.K. Maenius.
5      Q.  Okay.
6          Is substance abuse one of the primary
7  concerns of Public Health Department?
8      A.  It's a growing concern.  Not primary.  A lot of
9  things that we are dealing with are related to chronic
10 diseases right now -- obesity, diabetes.
11          In our community health needs assessment,
12 mental health, which is a big umbrella, includes
13 substance abuse -- has come up to a top priority even
14 ahead of chronic diseases.  So I wouldn't say that
15 substance abuse was, like, the number one priority, but
16 it's in that umbrella that's risen to the top.
17          But mental health is a sort of a broad
18 subject.  So -- and we're not the only ones seeing it.
19 The Hospital District is doing their own needs
20 assessment, and they've had some done in the past.  And
21 mental health capacity, substance abuse issues, they've
22 all been brought up in the past as needs.
23          But in our case, mental health, as a broad
24 topic, came up number one; and chronic disease is number
25 two.  And there's a couple more, but those are really

1  the top two.
2      Q.  Has mental health always been a top-related
3  concern?
4      A.  Yeah, I don't recall exactly.  I think those
5  change.
6          But I will tell you generally, you know,
7  when we do needs assessment, mental health is not absent
8  by any means.  It's always been in, like, major
9  concerns, but I don't know if they've been top one, two,
10 three.  I mean, I don't remember from previous years to
11 now.
12          But the recent assessment that is not yet
13 fully done -- but just looking at the trends, it has
14 been rising up to the top that -- and no secret.  A lot
15 of people have been talking about mental health after
16 COVID.  So it is not surprised {sic} that everybody is
17 kind of stressed out and dealing with issues.
18      Q.  Okay.
19          Is it fair to say the substance abuse is --
20 has not been identified by the county as one of the
21 primary causes for the increase in mental health needs?
22          MS. AYACHI:  Objection, form.
23      A.  Not that I can -- yeah, not that I can tell you
24 right now because I haven't looked at the final data;
25 but, again, that's just -- reports are pending.

1      Q.  (BY MR. CARDI)  I mean, as you sit here today,
2  what do you believe is the primary cause in the increase
3  of mental health needs in Tarrant County?
4      A.  I couldn't tell you accurately.  I'd have to
5  look at the data.
6          But just being in public health, I can tell
7  you that mental health issues have been in -- on an
8  increasing trend over the last few years, and it's not
9  an unusual trend.  I mean, we're seeing that all across
10 the country.
11          I've always heard -- and, again, I don't
12 have data to show or support that, but it makes logical
13 sense that COVID was a big stressor all across the world
14 including in our community.  And that has increased to
15 people getting isolated, losing access to community, and
16 just stresses of life have increased over the last few
17 years that's added to mental health pressures.
18          I also just learned being in different
19 circles, there's anecdotal conversations that I am privy
20 to that it has also increased substance abuse because
21 people were home isolated.  They found medicine; took
22 it.  But, again, I don't have any concrete data today
23 that I can share with you that supports that, but it's
24 buzz in the community and in our public health circles.
25      Q.  Anecdotally, mental health has been viewed as a

23 (Pages 86 - 89)

Page 90

1 potential cause of increased substance abuse; is that
2 what you're saying?
3     A. I don't know that one is -- I don't know how to
4 characterize that. I really don't.
5         I mean, whether mental health issues are
6 the cause of substance abuse increase or substance abuse
7 causing mental health issues? I don't know. It can go
8 either way. And a lot of resources would have to be
9 spent to, kind of, understand.
10        But I think they're tied. We usually see
11 people with addiction -- alcoholism, tobacco use, you
12 know, prescription drug use, illicit drug use -- it's a
13 continuum. Like one can be a gateway to the others.
14 And a lot of times, there are triggers for mental health
15 issues. And a lot of times, people with mental health
16 issues end up falling to addiction. So it's, kind of, a
17 two-way street there.
18    Q. Fair to say, it's, as a matter of human nature,
19 mental health and a decrease in mental health has always
20 turned human beings to abusive substances, whether it's
21 alcohol, tobacco, meth, opioids, whatever -- whatever is
22 out there; is that fair?
23        MS. AYACHI: Objection, form.
24    A. Yeah, I can't speculate on that unfortunately.
25    Q. (BY MR. CARDI) You don't have an opinion on

Page 91

1 that, Doctor?
2    A. I don't.
3    Q. Okay.
4    A. I don't. I mean, like I said, it goes both
5 ways.
6    Q. Right.
7        But speaking of that direction, being those
8 with mental health problems turning to substances
9 whether opioids, methamphetamines, alcohol -- you can't
10 speak to whether or not, there's a connection and there
11 always has been?
12        MS. AYACHI: Objection, form.
13    A. (No response.)
14    Q. (BY MR. CARDI) Doctor?
15    A. Like I said, it goes both way.
16    Q. So you would agree that it has always gone that
17 way? Mental health leading to abusing --
18    A. What I'm --
19        (Simultaneous cross-talk ensues.)
20    Q. (BY MR. CARDI) -- substances?
21    A. Yeah, what I'm saying is, one, I don't have
22 data to accurately answer that. I'm sure there's been
23 research done. I'm not a mental health or substance
24 abuse expert. So, first, I would defer you to them for
25 that opinion.

Page 92

1        But, secondly, what I know just being in
2 the health world 20-plus years, it goes both ways. It's
3 not that one is the cause of the other, or the other is
4 the cause of -- I mean, I've kind of learn that both can
5 lead to each other. They usually work hand in hand,
6 right?
7        And let me give you an alternate example.
8 Totally different. So HIV disease in itself can happen
9 on its own. Syphilis is a disease in itself can happen
10 on it's own. What we observe is a lot of times, they
11 both happen together. And one can lead to the other
12 happening faster, sooner, at a higher pace in
13 individuals; and they end up with both.
14        Same thing, a lot of diseases work
15 together. So addictions can lead to mental health
16 issues. Mental health issues can lead to addiction
17 issues. I am not the expert to say the main driver of
18 one or the other. You're asking the wrong person
19 unfortunately.
20    Q. Well, I wasn't asking which ones -- which
21 direction is the main driver of the other. I was just
22 asking if you agreed that there always has been a
23 connection between mental health an substance abuse no
24 matter the substance, any substance that can be abused.
25 That was my question, doctor.

Page 93

1        And you don't have an opinion?
2    A. I've given you my answer.
3    Q. Okay.
4    A. I've given you my answer. My opinion has not
5 changed.
6    Q. Who maintains the Tarrant County website --
7 Tarrant County Public Health website?
8    A. Yeah, so the technical aspects are maintained
9 by the county IT department.
10        Content comes from the Health Department
11 staff. Different programs. And we have layers of
12 mechanisms.
13        We have a public information office, and
14 they look at grammar and presentation and pictures and
15 make sure it's accurately posting on the website. But
16 the subject matter comes from our staff. And, usually,
17 that's, you know, paraphrased and copied from other
18 resources like the CDC and DSHS.
19        But, usually, it's not a lot of time a
20 whole lot of original content on its own because the
21 message is supposed to be unified, right? We're all
22 working on the same things. So we might have a
23 different flare, and maybe, you know, put up a more
24 relevant topic in front of the public in our community.
25 But, generally, we're not usually the original content

24 (Pages 90 - 93)

1 authors.  It's borrowed from public sector locations
2 like CDC and the Department of State Health Services.
3     Q.  How often is the content updated?
4     A.  We're supposed to keep it fairly updated, but
5 it's -- it's an ongoing process, and we ebb and flow.
6         Like when COVID came, a lot of the focus
7 was shifted on keeping COVID content updated pretty much
8 day to day.  But that also meant that a lot of other
9 content went stale.
10        But, now, there's been concerted efforts
11 trying to get everybody back on board and looking at
12 their program information.  As staff kind of settled
13 back into their normal operations and starting -- we're
14 starting to update the website again on a -- on a more
15 frequent basis.
16        I know that my deputy director and our PIO
17 has monthly meetings set up with different groups within
18 the department who go over the website and its content,
19 and they're working on cutting out things that are
20 old or outdated; photos that look dated, if you will;
21 and bringing new content; or, at least, have a fresh
22 look that it's been reviewed and updated and so forth.
23     Q.  There is a page titled, "Current Concerns"
24 under Public Health.
25        What is the purpose of that page and the

1 content?
2         (Simultaneous cross-talk ensues.)
3     A.  Yeah, so the idea is to give people a quick
4 landing page to see what are the top, emerging health
5 issues in Tarrant County.  So lot of that was, like,
6 driven by COVID.  People wanted to know like where do I
7 go to find what are the top, major issues that the
8 Health Department's dealing with or our community is
9 dealing with?  Like COVID, monkeypox, West Nile came,
10 things like that.  Other topics come and go and it's --
11 that's what it is.
12    Q.  (BY MR. CARDI)  There's my screen there.
13    A.  Yeah.
14    Q.  Are you able to see it?
15    A.  Yeah.
16    Q.  Is this the Tarrant County Public Health
17 "Current Concerns" page?
18    A.  That is correct, yes.
19    Q.  And the items listed are (as read):  "Avoid
20 heat injuries, director's blog entry, rolling through
21 August, be AQI aware of West Nile virus, testing for
22 sexually transmitted infections, and COVID-19 and its
23 variants"; is that accurate?
24    A.  Yes.
25    Q.  And it looks like it was last modified

1 August 22, 2023?
2     A.  Yes, that is correct.
3     Q.  Is this page updated, changed on any planned
4 schedule; or is it just as the concerns shift?
5     A.  Yeah, usually as the concerns shift.
6         And just for context, a lot of this is also
7 driven by, sort of, media inquiries and topics that
8 they're asking.  So we put those current concerns in an
9 easy-to-find page sort of to reduce phone calls and
10 repeatedly similar questions.  Because then they kind of
11 get mad.  Like, hey, drop everything; do an interview.
12 And we're, like, no.  Just go here.  Pick your
13 information.  Run your story.
14        So just to give you context, so on our
15 health needs assessment are going to methodically, sort
16 of, determined health needs of the community versus
17 these current concerns are more topical things that
18 we're getting called about either from the public or
19 from the media, and it's just for easy access.  And are
20 they issues that are emerging in the community?  Like
21 heat.  We had 100-plus degree days for several days in a
22 row.  So, yeah, is heat injury, you know, a current
23 concern?  Absolutely it is.  Does it rise to the top of
24 the pile of what's impacting Tarrant County?  No.
25        Same thing I mentioned.  What is the big

1 health concern that's on top of my mind?  Chronic
2 diseases.
3         You don't see that here because nobody's
4 asking about it.  Nobody cares about it and -- but we
5 know working in the community, looking at the data, that
6 is a primary driver of health issues.  So people are
7 getting obese.  They're getting diabetes.  They're
8 getting heart disease.
9         Once that data is ready to publish, we'll
10 probably have a discussion saying, hey, should we put
11 this on?  Then we'll look at analytics.  Hey, is anybody
12 even looking at it?  If they're not, take it off.  We'll
13 keep working in the public health circles and in the
14 health circles with the hospitals and so forth.
15        But a lot of this page is driven by what we
16 get frequently asked questions from the public through
17 our call center and through the media.
18    Q.  The topics are presented here, and it says (as
19 read):  "The listing below touches on immediate and
20 growing health concerns we see in Tarrant County."
21        Did I read that accurately?
22    A.  Yeah.
23    Q.  And when you say (as read):  "We see," you're
24 referring to public health?  And by public health seeing
25 these topics, you're saying it's coming through phone

1  calls, not really from data?

2      A.  Yeah, some of that is through data.

3          I mean, of course, we do injury -- or heat
4  surveillance, and we do, you know, West Nile, and
5  vector-borne disease surveillance.  But a lot of these
6  topics are seasonal also.  Every year in the summertime,
7  you're going to see a heat injury topic come up as a
8  current concern.  West Nile come up as a current
9  concern, you know.

10          And there's years that are sort of light in
11  West Nile, and years that are really heavy.  But you're
12  probably going to see this topic come back because it's
13  a media-darling topic.  You get calls incessantly about
14  this topic.

15          So where we sort of, again, rest our our
16  head on is what is the actual health issue by times and
17  by community and community partners supported by data
18  and all of that.  Usually comes in a five-year cycle
19  through something called the Community Health
20  Assessment.  I explained that to you earlier; that we do
21  some data gathering and surveys and look at all the
22  health indicators.  So it's very methodical.

23          And then we listen to community partners in
24  listening sessions.  We then post that on the website
25  for the public to make a comment like if they agree on

1  what we're seeing.

2          And, usually, that creates prioritization.
3  That's where mental health was coming up as number one;
4  chronic disease as number two.  That is what is called
5  Community Health Assessment.

6          And then later we work various community
7  partners to create something called a Community Health
8  Improvement Plan.  How do we come together as a
9  community and address these issues?

10          And there's a disconnect between this page
11  and what is actually the real heavy-hitter health
12  issues.  Because, again, this page is more, you know,
13  people call like, hey, you know, I heard there's West
14  Nile.  Where can I go?  Oh, go to our current pages.
15  You'll find it.  You know, there's a director's blog,
16  you know.

17          It's -- it's there, but it's there for a
18  purpose to solve the problem of constantly getting phone
19  calls while you're in meetings and trying to answer
20  one-off questions from media and the public.  And there
21  it is.  Go here.  And usually that satisfies them.

22          But more scientific, accurate approach and
23  really looking at holistic health of the community,
24  that's on our Community Health Assessment done on almost
25  a five-year basis.

1      Q.  When is the last public health -- community
2  health -- I'm sorry.  Say it again.  Community Public
3  Health Assessment?

4      A.  Yes.

5          So a published one was, I think, back in
6  2015.  And the next one was supposed to be done in 2020,
7  and then COVID came.  So we started the assessment in
8  '22, and then we're almost done.

9          I think it's going through sort of the
10  final iterations of getting approved, and I think
11  there's going to be a public comment period on that.  So
12  hopefully here in the next month or so, we'll publish
13  the next iteration.  It will be a 2022 version but
14  published in '23.  And, again, a lot of these indicators
15  are, like, on a five-year cycle.

16          And the five-year cycle comes from our
17  accreditation requirements.  Hospitals have JCO
18  requirements.  They do it every three years.

19          So we did participate in the one with the
20  Hospital District in 2000, I think.  So they had one.  I
21  know they got delayed.  They're doing theirs also now.
22  And we're finding similar things.  And they're not
23  necessarily, you know, heat and West Nile because these
24  are very topicular {sic} blips risks on the radar.
25  Health assessments look at what is driving the health

1  problems in your community versus what are topics of the
2  day.  So a little bit different.

3      Q.  What -- and I understand that it's a draft
4  report that's in review, but do you have a knowledge as
5  to what the focus areas are and the upcoming community
6  Public Health Assessment?

7      A.  Yeah.

8          And I don't recall all four.  But I know
9  there were four parties that were identified or major
10  health issues.  Number one was mental health; and number
11  two was chronic, but I  recall -- a block on the other
12  two.  But, again, because it's in draft and some of the
13  prioritization changes when we finish the listening
14  sessions and community comments.  So I was like, okay,
15  let that all settle, and then I'll, you know, "read it
16  once it's ready" kind of thing, so...

17      Q.  Mental health priority is not specific to
18  substance use, correct?

19      A.  Not that I can recall, but I'm sure it makes up
20  a component of that mental health issue.  Because,
21  again, just knowing what we know, it is part of that,
22  but it's mental health broadly.

23          And then -- oh, and then the other thing, I
24  think, the -- and, now, I remember the other two.  One
25  was related to Medicare costs being high.  And then the

Page 102

1 last one, I believe -- and I don't remember the order of
2 the last two -- was related to primary care doctor
3 access.  So even though there's primary care doctors,
4 they're not evenly distributed, and there's delays in
5 accessing care.  So those were the four -- mental
6 health, chronic diseases, primary care access, and
7 Medicare costs.
8     Q.  Do you recall what the priorities were in 2015
9 Community Public Health Assessment?
10    A.  I don't, but the assessment is on our website.
11 So if you're on the website, I'm sure we can do a quick
12 search and find it.  Or just do a Google search, and it
13 will bring up the PDF.
14        But I think one of the ones was related to
15 education.  Because at the time, it was being observed
16 that a lot of our high school graduations were not
17 happening.  You know, some kids were -- or quite a lot
18 of kids were dropping out and not completing high
19 school.
20        And I'm sure -- memory fades, but there
21 were -- chronic diseases were always there, and I'm sure
22 there were other issues.  But we can do a quick search,
23 and it's on the website.
24    Q.  Do you recall substance use or abuse ever being
25 on the Current Concerns page?

Page 103

1     A.  No, I don't.  And, again, because it's never
2 been our main area of expertise as the health
3 department, so we don't put that out.
4     Q.  But if many in the community have been calling
5 asking questions, would that be the type of topic that
6 would be on this Current Concerns page?
7     A.  Yes.
8        If we were to start getting calls a lot on
9 substance abuse issues and where is the data and how do
10 we access this data, we would put that topic on the
11 page.  And the article or the details below the topic,
12 when you click on it, would have access to any reports
13 that we might have pulled together from different data
14 sources, maybe a data brief that's been done on
15 overdoses and substance abuse.  And I'm sure we've done
16 some of that.  It's probably on our website somewhere.
17        So we would collate all of that information
18 in an easy-to-find way.  Because the website is big, and
19 not everybody knows how to navigate.
20        So when they call the call center, usually
21 you have a clerk answering the phone, and they're not
22 knowledgeable of the topics either.  So they know to
23 send the public to the Current Concerns page, and then
24 they look together with the person on the phone, and
25 that's how mostly we answer the questions.

Page 104

1     Q.  You --
2        MR. CARDI:  Yes.
3        THE CERTIFIED STENOGRAPHER:  Counsel, this
4 is court reporter.  Is now another good time for a
5 break?
6        MR. CARDI:  Yes, ma'am, that's fine.
7        THE CERTIFIED STENOGRAPHER:  Thank you.
8        THE VIDEOGRAPHER:  All right.  We're off
9 the record at 12:29 p.m.
10       (A break was taken from 12:30 p.m. to
11       12:44 p.m.)
12       THE VIDEOGRAPHER:  We are back on the
13 record at 12:44 p.m.
14    Q.  (BY MR. CARDI)  Dr. Taneja, do you hold
15 yourself out to your peers as an expert in pain
16 medicine?
17    A.  No.
18    Q.  Do you hold yourself out to your peers as an
19 expert in addiction?
20    A.  No.
21    Q.  Have you received any training in pharmacy or
22 pharmaceutical practices?
23    A.  Other than, like, my medical school stuff
24 learning about drugs and medicine, nothing specific
25 related to, like, pharmacy; but I'm familiar with the

Page 105

1 drug classes and so forth.
2     Q.  Okay.
3        You understand that pharmacists cannot
4 prescribe medications, correct?
5     A.  Correct.
6        And there's some nuances there; but, yes,
7 yes.  I mean, some law have allowed them to prescribe
8 like Paxlovid, for example, for COVID and things like
9 that.  But, yes, generally they cannot prescribe
10 medicine, yes.
11    Q.  Pharmacists cannot prescribe opioid
12 medications, correct?
13    A.  Not fully aware.
14       I know they can dispense Narcan, but I'm
15 not sure of the mechanism on how they can -- but,
16 generally, yes, they are not typically the people that I
17 would think would prescribe meds to the public.  They
18 just fulfill the doctor's orders.
19    Q.  Do you know anything about how pharmacists are
20 regulated?
21    A.  State Pharmacy Board, I believe.
22    Q.  But you're not an expert on how pharmacists are
23 --
24       (Simultaneous cross-talk ensues.)
25    A.  No.

27 (Pages 102 - 105)

Page 106

1    Q. (BY MR. CARDI)  Correct?
2    A.  Not at all.
3    Q.  And do you have any knowledge about pharmacists
4    training -- the training the pharmacists receive to
5    become trained pharmacists
6    A.  Just a little bit.  Just being in the health
7    field.
8         I'm not an expert by any means, but I know
9    they go to pharmacy school, and a lot of them have a
10   Pharm.D.  degree.  When they actually become a full
11   pharmacist, they have their little practice internship,
12   if you will, and all those types of things.
13        But it's just outside view not -- I'm not
14   in the pharmacy world, so I have no firsthand knowledge.
15   Q.  Do you have any firsthand or specific knowledge
16   about the licensing requirements for pharmacists?
17   A.  No, I don't.
18   Q.  Do you know under what circumstances a
19   pharmacist should or should not fulfill a prescription?
20   A.  I mean, doctor's orders.  If there's a
21   prescription and they have it.  But, again, this is
22   outside view.
23        I don't know if there's other criteria
24   where they cannot fill.  I mean, if there's a
25   contraindication that they become aware of.  I mean,

Page 107

1    that's just common sense, right?
2         I mean, doctor said, give this person
3    penicillin and the person says, I'm allergic.  Well,
4    don't fill it, right?
5    Q.  Sure.
6    A.  Yeah.
7    Q.  Any other, I guess, lay knowledge on the
8    contraindications, which would lead a pharmacist to not
9    fill a prescription?
10   A.  Talking about the opioid topic, I mean, if
11   they're aware that this person's addicted, well, they
12   shouldn't, right?  But, again, that's just, kind of, a
13   lay-knowledge answer.
14   Q.  Do you have any knowledge of how a pharmacist
15   would know or would not know a patient is addicted?
16   A.  You know -- and, again, this is, kind of, very,
17   you know, layman, kind of, conversation, speculative, so
18   to speak.  But, generally, my experience with
19   pharmacists have been that they get to know their
20   customer.  Like my pharmacist knows me and my family by
21   first name, and she remembers and she trains her staff,
22   hey, if Vinny comes in, here's all the meds.  Here's
23   questions that you need to ask him, and here's things
24   that he's already answered.  Don't bother him.  So, I
25   mean, it becomes integral.  Just like primary care doc,

Page 108

1    they're a part of care.
2         But if I go to a different pharmacy, that
3    relationship takes a while to establish.  So I would
4    assume that if I was repeatedly coming in to pick up
5    medications that are, you know, habit forming, they
6    would probably delve a little bit deeper into, hey, why
7    do you need all of this stuff all the time?  What's
8    going on?  I mean, they ask you.  They say, hey.  Like I
9    went up and picked some medication.  Oh, you got this?
10   Yes, I did, you know...
11   Q.  Are you speaking of -- of just the visual
12   examination by the pharmacist of patients coming in,
13   coupled with just the back and forth --
14   A.  Yes.
15   Q.  -- "get to know you" knowledge?
16   A.  That's right.
17        Yeah, I mean, and that's how I've
18   experienced pharmacists, but I'm sure there's, you know,
19   different handling in different areas.  But,
20   fortunately, the people that I've worked with usually
21   get to know me and my family, and that's just how --
22   it's been a pretty decent experience.
23   Q.  And in your experience in being prescribed and
24   obtaining prescriptions from pharmacists, fair to say,
25   that pharmacists do not examine your need for

Page 109

1    prescription the same way the physicians do, correct?
2    A.  No, no.
3         They usually go over the instructions on
4    the prescription.  And are you taking other medications
5    that may interact with this?  They do ask about
6    allergies and, you know, previous reactions.  Have you
7    had any problems?  Have you used this medication in the
8    past?
9         And so they go through some health history
10   with you, but not to the level that a physician would.
11   Because a physician's aware about your health condition,
12   and they usually are the ones that diagnosed it or got
13   into your care if you already had a preexisting
14   condition and things like that.
15        But the pharmacist is more dealing, from my
16   experience, with here's medication your doctor
17   prescribed.  Do you know how to properly use it?  Here's
18   things to watch for.  And take it with food, without
19   food; or, you know, you might nausea; you might get
20   metallic taste in your mouth, whatever.  Don't drive.
21   It may make you sleepy.  All that kind of stuff, you
22   know.
23   Q.  As director of the Tarrant County Public Health
24   Department, do you believe there is presently a heroin
25   crisis or epidemic in Tarrant County?

28 (Pages 106 - 109)

1     A.  I don't have any data to support that.

2          But anecdotal I know fentanyl has been
3  making the news in Tarrant County quite a bit.  In fact,
4  I mentioned there was a billboard on the highway the
5  other day that I saw.  Fentanyl-related deaths, you
6  know, on the rise in Tarrant County.  Let's work
7  together to address this.  So I did see that.

8     Q.  Other than, you know, a billboard on the
9  highway, you don't recall having reviewed, I mean, data
10 that your department has access to regarding the
11 increase or decrease in the general existence of heroin
12 and fentanyl-related overdoses?

13    A.  So there is data.  And my health department did
14 put out a data brief.  And it's been a while.  So I
15 don't necessarily recall exactly the details.  But I
16 know fentanyl-related deaths were mentioned.

17         And some of that data comes from medical
18 examiners.  Some comes from like CDC Wonder.  And I
19 think the data brief is more focused on overdose deaths
20 in general, and it goes a little bit into, you know,
21 what kind of substances are involved.

22         But it's been a while since I've reviewed
23 that.  And it was just whenever the biostatistician was
24 putting that out that I looked at it.  But nothing
25 specifically that I can recall.

1     Q.  Given your recollection on the numbers, is it
2  fair to say that it's not a specific concern of yours as
3  director of the Tarrant County Public Health Department?

4     A.  It's a growing concern.

5          But, like I said, COVID was a major
6  priority for many health departments and many health
7  directors.  And a lot of these other things, even though
8  we know -- it's kind of a -- sorry for the analogy --
9  but it's kind of like a slow-moving train wreck.  You
10 know, health -- things that really impact health are
11 usually slow moving -- chronic diseases, substance abuse
12 issues, violence issues.  You know, trends that are
13 moving your community's health outcome.

14         And then there are topics that just explode
15 onto the scene.  COVID came, or there's a West Nile
16 heavy season or -- so they pick up a lot of time and
17 resources and attention because they're very immediate
18 topics.  And sometimes it takes your energy away.

19         And we know that these things are on a
20 trend.  STDs are on a rise, right?  You know, syphilis
21 is on a rise, and it's been on a rise for years.  And
22 are there efforts going on to curb that?  Absolutely.
23 But is it, like, on an everyday top of mind that I got
24 to solve this syphilis problem today?  No.  COVID
25 happened.  Let's deal with that today, right?

1          So we're also people.  We know things that
2  are driving health outcomes, but then there's what we
3  say, immediate let's put out this fire because we can do
4  something about that, and the other things are going to
5  take a while.

6     Q.  You been speaking about heroin and fentanyl,
7  which are illicit opioids at least typically as you see
8  them, correct?

9     A.  Yes, yes.  That is correct.

10    Q.  What forms the basis of your opinion that it is
11 a growing concern of illicit opioids?

12    A.  A couple of things I mentioned.  We did see
13 some data brief that my department put out, there were
14 some, I guess, analysis from medical examiner data that
15 there were, you know, illicit drug-related deaths that
16 were increasing part of that Community Health
17 Assessment.

18         Also, I believe there's a component in
19 there, and there's a mental health priority area that --
20 and, again, I'm paraphrasing what my staff have told me
21 that overdose deaths have increased almost by double.
22 And, again, this is very generic since 2019.

23    Q.  You said '19?

24    A.  Yeah.

25         Because I remember this from a meeting that

1  I attended a few days ago.  And -- and it's, just kind
2  of, a one-blitz conversation because it was a
3  conversation between two different parties.  I was kind
4  of listening in on the conversation.  And so -- and,
5  again, I'm kind of waiting for the report to be
6  finalized.  So I look at the data and all those type of
7  things.

8          But, again, it didn't surprise me.  It's,
9  like, yeah, I mean, that's what I'm hearing in other
10 circles also.  And I had just seen that billboard.  So
11 it was, like, yeah, this makes sense that our data is
12 showing what I'm seeing on the billboard, what community
13 partner organizations are talking about.

14         And, again, there are people in the
15 department that are experts that do this on a very
16 methodical, scientific basis.  At administration level,
17 you kind of get the end product like, okay, here's the
18 key issue that's happening, and let's get together, make
19 decisions, drive the resources to address that.

20    Q.  Your recollection is that the data you have
21 seen recently indicates that that overdose deaths have
22 doubled since '19.

23         Is that overdoses by -- from all substances
24 and all combination of substances?

25    A.  I -- you know, again, I'm recalling from a

29 (Pages 110 - 113)

Page 114

1 meeting that I listened in to. So staff will have more
2 accurate details on that, but I believe they mentioned
3 overdose deaths from highly substances including
4 fentanyl. Fentanyl -- fentanyl was brought up as an
5 example.
6    Q. Okay.
7        Do you believe that alcohol abuse is a
8 growing concern?
9    A. I don't have any recollection of any data that
10 I've recently seen, but it hasn't hit my radar.
11        I know that like generally what we know is,
12 you know, alcohol, tobacco use, all those type of
13 things, they ebb and flow. For example, tobacco use is
14 on a decline, and the e-cigarette use was on an
15 increase, right?
16        I mean, but I haven't recently seen any
17 data particularly for Tarrant County on alcohol use, but
18 I'm sure my team has it. Because the staff who work in
19 this area that -- the biostatistician, for example, they
20 can pull out data briefs that they've done for any
21 requests that may have come out from an academic
22 institution or a community partner organization. I just
23 haven't recently seen it.
24    Q. Do you have any reason to believe that
25 methamphetamine use or abuse is a growing concern?

Page 115

1    A. I -- yes. I did hear that. But lately the
2 conversation has been more about fentanyl. But over the
3 course of maybe {sic} last three years or so,
4 methamphetamines was a topic of discussion.
5        But, again, I was very focused on COVID.
6 So it was like, yeah, I hear you, but y'all work on it.
7 Let me figure out the COVID issues. So my life was
8 consumed by COVID even though there were other issues at
9 play that staff are working on. I was just like, yeah,
10 you guys do your thing and let me -- let me let me worry
11 about this immediate fire that's consumed all of us, you
12 know.
13    Q. Do you believe prescription opioid use is a
14 growing concern in Tarrant County?
15    A. So I don't have recent data, but I know that
16 somewhere -- and, again, memory fades me. I'll give you
17 a broad time frame. 2016 through '19. And the reason I
18 say that is there's different times, we've tried to
19 write for grants and look at data from different angles.
20 Somewhere in that time frame, I do remember a report
21 that detailed, and I think it came from -- I forget the
22 data set. It's the state pharmacy data set, PDMP
23 something-something. I can't remember.
24        And we had looked at state trend versus
25 Tarrant County trend. And it was a sudden acceleration

Page 116

1 from 2016 to '19 on prescription -- prescriptions being
2 written for opioids where it was very strikingly strong
3 increase in prescriptions being written for opioids.
4        And at some point, I think, later, the
5 trend was starting to decline. But I just, kind of,
6 remember a graph out of a report, and it was very
7 striking at the time. And I don't even remember the
8 exact time frame, but I believe the report was somewhere
9 around the 2019 time frame when we were looking at that
10 CDC grant submission.
11        And around the same time that, I think, I
12 mentioned to you we were talking to Medstar, the
13 ambulance company. And from there, we learned about the
14 state pharmacy database, and I think we got access to it
15 somehow and built that report to include in our
16 justification for the grant.
17        But that's all I recall on that topic. But
18 it was very a striking, sudden sharp increase in opioid
19 prescriptions all across Tarrant County.
20    Q. So I believe you're saying that you recall at
21 some point, prescription opioid use being a growing
22 concern, but not presently?
23    A. The reason is I don't have present data.
24        Last three years have been a COVID-related
25 blur. I mean, that's the honest truth.

Page 117

1        So even though the department has probably
2 -- you know, my staff has been working on reports and
3 data and putting up stuff, it's not like always
4 registering in my head because I've been so busy with
5 the major topic of the century which is COVID right now.
6        Now, we're starting to kind of ease into
7 other things. So we're focusing back on our Community
8 Health Needs Assessment. You know, looking at what
9 topics are coming out of there. We're doing strategic
10 planning on, you know, how we're going to, kind of, move
11 the department forward and the Community Health
12 Improvement Plan will be built. So things are starting
13 to get back to normal where more attention will be given
14 to these topics.
15        But last three years, I can't accurately
16 tell you that I've looked at more recent data. But
17 before that, the picture is very clear in my head
18 because I saw that, and that was kind of a, wow, stop
19 and look at this because this was, you know, quite
20 striking. And then after that, everything's been a blur
21 because of COVID because it's long days and COVID only.
22    Q. If there was similarly striking data in the
23 past three years, do you believe your direct reports
24 would have brought that to your attention?
25    A. Probably yes.

30 (Pages 114 - 117)

1      But they were -- very honest, they were all
2  very sucked into COVID also.  So even if there were
3  other things on their radar, sometimes they just didn't
4  have the time to get the conversation happening about
5  these other things.  I mean, that's -- nobody will
6  understand other than Public Health people.  It might
7  sound like superfluous, but we lived and breathed 24/7
8  and more if there was more, and there was no room for
9  anything else.  There really was not.
10  Q.  Is it fair to say you don't have sufficient
11  information to determine that there is presently an
12  opioid crisis or epidemic in Tarrant County?
13  A.  I don't have accurate data to talk to you about
14  today.  I mean, I can go ask the staff or you are
15  welcome to go ask the staff, and I'm sure we'll pull up
16  what's current and available to us.
17      I don't know that the trajectory that we
18  were on -- I don't know that anything's changed.  I
19  mean, something's changed.  That's good news.  But the
20  trajectory was like this, very sharply upwards on
21  prescription opioids use.
22      And then later, again, some of the stuff
23  that I'm telling you is anecdotal.  That graph I
24  remember in the data, and then other things that I
25  heard.

1      Methamphetamine use was there because we're
2  the county, and there's unincorporated areas in the
3  county.  And I kept hearing, oh, there's, you know, meth
4  use over there and this and that.  And, you know, I
5  heard from physicians, yeah, that's on the increase,
6  okay.  We're observing that.
7      And then lately, all of the conversation
8  has shifted in local and national public health circles
9  to fentanyl.  So I'm not sure if that means prescription
10  opioids are on the decline.  If they are, that's great.
11  But I don't have data to accurately say that that's the
12  case.
13  Q.  The term "crisis" and the term "epidemic"
14  indicates a serious issue, fair?
15  A.  Yes.
16  Q.  Do you believe COVID was a crisis and -- or an
17  epidemic?
18  A.  Yes.
19  Q.  And that was the focus of your attention for
20  {sic} couple of years?  That fair?
21  A.  Yeah, since 2020.  So we're going on about
22  three years almost.
23  Q.  And still is?
24  A.  It still is, yeah.
25      I mean, it still takes up a lot of my time

1  to deal with issues related to COVID.  Even internal
2  like department operations, right?  A lot of HR and
3  financing issues as COVID funding is declining, and
4  we're having to terminate staff positions and all of
5  that.  And there was a lot of rapid hiring.  And, now,
6  that the dust has settled, hey, these are not the most
7  productive people sometimes.  So finding ways to, kind
8  of, lighten that load.  So a lot of that, you know, what
9  we call the back-end fallout of COVID is still, you
10  know, keeping us busy.
11      And then we had monkeypox in the middle
12  and, you know, many other things.  So there we go.  Life
13  is busy.
14  Q.  (BY MR. CARDI)  Okay.
15      All right.  Let's -- you have a binder --
16  A.  Yes, sir.
17  Q.  -- nearby?
18  A.  Uh-huh.
19  Q.  You can go ahead and open that up.
20  A.  Yes.
21  Q.  Have you opened the binder, Doctor?
22  A.  Yes, sir, I have.  I'm on Exhibit 1.
23  Q.  Okay.
24      If you would turn to Tab 2, please?
25  A.  Okay.

1      MR. CARDI:  Greg, you can publish Tab 2 and
2  mark it as Exhibit 1.
3      MR HOLDERMANN:  (Witness complies.)
4      (Exhibit 1 marked.)
5  Q.  (BY MR. CARDI)  Do you have any recollection of
6  this email from February 21st, 2018?
7  A.  Recollection?  No.  But I'm reading it now,
8  and, obviously, we -- we've had this conversation.
9      So --
10  Q.  The subject line is --
11  A.  -- I think this is -- this is --
12  Q.  Go ahead.
13  A.  -- what lead to that data deal that I was
14  telling you about from the pharmacy board.  So this is
15  for the starting point of that discussion.
16  Q.  Starting point of what discussion?
17  A.  The -- the data that I mentioned that we
18  received from the pharmacy board that eventually led to
19  me -- or my staff presenting me that graph.  You know, I
20  might not have necessarily read this particular email
21  because it was Tal Holmes, my associate director, and
22  from our chief epidemiologist, and a couple of folks.
23  Myself was copied, cc'd.
24      But do I recall.  There was a meeting, I
25  believe.  And I believe it was at the Medstar office,

31 (Pages 118 - 121)

Page 122

1 and they talked about the -- the drug prescription drug
2 monitoring program.  And then we requested the data from
3 the pharmacy board.  And then later, I believe, we got
4 the data, and then my team was able to pull out that
5 graph after analyzing the data that prescription drug
6 use was on a meteoric rise in Tarrant County.
7     Q.  So there's -- Denton is mentioned there in the
8 first sentence and an opioid overdose project.
9         Do you have any recollection of what that
10 was?
11     A.  I don't.  But Denton is a neighboring county,
12 just north of Tarrant County.  So they're a little bit
13 smaller.  We're about 2 million people.  They're about a
14 million people.  Dallas County is to our east.  So, you
15 know, we kind of form the metroplex area counties, if
16 you will.  So there's a big metro area.
17     Q.  But you don't have any specifics about Denton's
18 opioid overdose project?
19     A.  I don't.
20     Q.  The --
21     A.  I'm sure I've probably heard of it before.  I
22 just don't recall the details because it's been a while.
23     Q.  Do you recall whether Tarrant County had a
24 similar opioid overdose project in this time frame?
25     A.  No, we didn't.

Page 123

1         I believe what we were trying to do, from
2 looking at this email, is gather our data sources and
3 things that I've mentioned to you.  That NSSP Syndromic
4 Surveillance platform, we can look at chief complaint
5 data and discharge diagnoses.  So then we can build a
6 query for opioids overdoses using some CDC analytics
7 algorithms, if you will.
8         Then we were also talking about getting
9 prescription data from the drug monitoring program at
10 the pharmacy board.
11         And then medical examiner data I've talked
12 about a few times, that those were some of the data
13 sources that we would then use to create a grant
14 application.  If we get the money, then we would then go
15 further into programming.
16     Q.  So it was Denton at this time also seeking to
17 apply for this same grant?
18     A.  I don't know.
19         Just my guess would be that they probably
20 were not qualified at the time.  Because if our numbers
21 were small for CDC, Denton's were probably smaller, but
22 that's just a guess.
23     Q.  And it appears to me -- and correct me -- or if
24 you disagree, let me know -- there's a discussion with
25 Denton about the various data sources that each county

Page 124

1 has access to and trying to achieve comparable results
2 or at least --
3     A.  Well --
4     Q.  -- methods to measure --
5     A.  Yeah.
6     Q.  -- opioids overdose within your counties; is
7 that fair?
8     A.  Correct.
9         And the other piece is that Tarrant County
10 sort of is the host entity for NSSP, and we serve a
11 49-county region through the NSSP platform.  So if
12 Denton needs access to ER data for opioids overdoses, my
13 team would have to build the query, filtered by Denton
14 County.  So they can see their.  We can see our data.
15         So Bill Stevens, or William Stevens, was
16 infomatics manager at the time, and that's why I think
17 he was being included on the conversation.  So that his
18 people, who are the techie people, can build that query
19 if need be.
20     Q.  But it looks like there was a request or
21 discussion of a request for prescription data from a
22 Texas prescription drug monitoring program; is that
23 fair?
24     A.  That's correct.
25         I think that's the data we received later

Page 125

1 and less through the generation of that graph that I
2 talked about that showed a very sharp increase from like
3 2006 to 2019 time frame in Tarrant County related to
4 opioid preparations being used and being prescribed in
5 Tarrant County.  It was a very striking graph.
6         If you give access to all these reports,
7 probably have it somewhere.
8     Q.  Tarrant County does not have continuous access
9 to prescription job monitoring data?  It has to make a
10 specific request?
11     A.  That is correct.  I don't believe we have
12 continuous access to that data set.
13     Q.  Today you don't, just like in 2018?
14     A.  I don't believe so, no.  Because if there was,
15 I probably would have received a more updated report.
16 And I think -- now, that I connect the dots, that's
17 probably the reason why all my team got busy with COVID
18 and did not request another update because usually
19 getting data from the state is a long, drawn-out
20 process.  So they may not have had the time bandwidth,
21 if you will, to get another updated data set.
22     Q.  There's also a discussion here of the medical
23 examiner pulling death from opioid information out of
24 their data.
25         So there's not a process in place for the

32 (Pages 122 - 125)

1 medical examiner to continually supply data to Public
2 Health Department?
3        A. I -- it's kind of a mixed bag.  General answer
4 is no because we don't have direct access to their
5 database where we can get continuous accessed
6 information.
7            What they do is they post a lot of death
8 reports and summary related to that and causes on their
9 website.  And that's where Micky Moerbe, our
10 biostatistician, draws most of her data from.  And
11 that's our first source of information.
12           And if there is anything specific that we
13 need to get details from, there are county departments
14 that we reach out, and they run a specific query for us.
15 And we then get the updated information.
16           So is there a mechanism?  Yes.  But is it
17 like automated live, realtime where, you know, we can go
18 in any time?  No, it's not.  I mean, it's sort of
19 by-request basis or whatever is publicly available.
20       Q. All right.
21           If you can turn to Tab 3?
22           MR. CARDI:  And, Greg, if you can publish
23 Tab 3 and mark it as Exhibit 2.
24           MR HOLDERMANN:  (Complies.)
25           (Exhibit 2 marked.)

1       Q. (BY MR. CARDI)  Do you recall this email,
2 Doctor?
3       A. Yeah, I believe so.
4       Q. What is the Tarrant County opioid report?
5       A. That, I don't specifically recall, but could be
6 one of the data briefs that we did back then.
7           Because I -- my team, Micky Moerbe and her
8 team, does put out data briefs from different topics
9 that they find in this assessment data, if you will.
10 And they try like almost every month or every couple of
11 months to go to a different topic, pull out the data,
12 make a meaningful report.
13           So that whoever needs it -- a lot of
14 university partners need it, academic institutions or
15 even community organizations, they want to look at
16 because they have programming going on, or they're
17 applying for grants, and they need county-level data.
18 So they look at those reports.  It could be referring to
19 that.
20           Or it could be something that we pulled
21 from the Syndromic Surveillance System to create a
22 specific report for something.  But I don't exactly
23 recall what this specific one is.  It's one of those
24 two, I think.
25       Q. This email chain from April of 2018, subject is

1 "Emergency Departments Opioid Case Data" seems to be a
2 discussion following a request -- a FOIA request for
3 information on -- on opioid cases; is that fair?
4       A. As I recall, yeah.
5       Q. Do you have the second page there?
6       A. Yeah, I do.  That's right.
7           I believe DSHS received a FOIA request
8 related to pulling out opioid-related data from the
9 Syndromic Surveillance platform because they have the
10 same platform also, and their PIO was sending heads up
11 to different programs that had access to that data set
12 that you may also receive a FOIA request.  And they just
13 wanted to make sure that we do not release patient-level
14 data because that would be a HIPAA violation.
15           So that's, kind of, the gist of the
16 conversation.  Hey, heads up.  Make sure you don't
17 release.  Because the request was very detailed.  Don't
18 release data elements that may make you violate HIPAA.
19       Q. Who is William Stevens?
20       A. He is retired now, but he was our infomatics
21 manager.  I think he retired, like, late 2018.
22           And somewhere after that, Rasneet Kumar --
23 and I don't know if you was -- she's in your email
24 or whatever -- but she's been the infomatics manager
25 ever since.

1       Q. William Stevens follows up with a Talmadge
2 Holmes, middle of the first page here, and says (as
3 read):  "The cat is out of the bag now about our NSSP
4 participation."
5           What is -- is he referring to there, if you
6 know?
7       A. So -- so the request came from a reporter, I
8 believe, that reached out to DSHS because they found out
9 that DSHS has a Syndromic Surveillance platform where
10 they can run a query and look at statewide
11 opioid-related visits like the email states; that they
12 can look at chief complaints and final diagnoses before
13 the patient is either admitted or discharged from the
14 ER.  And they were reaching out to the state that we
15 need access to all these details because opioids was a
16 hot topic around the time and a lot of national coverage
17 and all that.
18           Somewhere in that conversation, I guess,
19 somehow they found out that Tarrant County maintains
20 access to 49 counties in North Texas.  And that's what
21 the heads up was from Carrie Bradford at the state that,
22 hey, you might also get a follow-up data request, and
23 they also sent a heads up to Houston because they
24 maintained another subset of the southeastern portion of
25 the state.

33 (Pages 126 - 129)

1    So they were -- kind of a long history.  We
2 were sort of the frontrunners of this system.  They
3 didn't have it.  Then Houston joined.  But we covered
4 North Texas.  They covered Southeast Texas.  There was a
5 big gap.
6         Eventually, the State of Texas joined in,
7 and they were trying to take it over as a whole.  We're
8 like, no, we've been working on it for many years.  So
9 they kind covered the rest of the state, and we were
10 sort of data sharing to create a composite state
11 picture.
12        So they were giving a heads up that y'all
13 may get similar data requests.  So that's what he means
14 "cats out of the bag" that we also have access to this
15 system.  So a follow-up media whatever may come our way
16 also.
17    Q.  And William Stevens also notes that some level
18 of concern about the ability to provide reports because
19 there's "so few opioid-related cases."
20    A.  Yes.
21    Q.  Yeah.
22    A.  So at the time without really, like, fine
23 tuning the data, the big concern always remains.  And,
24 again, if you're familiar with HIPAA law, we're supposed
25 to not release a lot of information.  And if the numbers

1 are few, it is easy to sort of identify a person.  So
2 the general rule of thumb without looking at the data is
3 that, hey, if there's not a whole a lot of data, then
4 don't even talk about it because it's going to
5 potentially get down a path where we're really -- and
6 they say we're going to have to talk to the DA's office
7 and make sure we don't release anything that violates
8 HIPAA.
9    Q.  Do --
10        (Simultaneous cross-talk ensues.)
11    Q.  (BY MR. CARDI)  Today, do you recall then the
12 numbers of opioid-related overdoses as of April 2018
13 roughly?
14    A.  Yeah, and I don't.
15        And I would sort of -- you know, here I'll
16 make an opinion that he was making an -- sort of an
17 educated guess just looking at the system, but the query
18 I don't think was set up at that time.  They were
19 talking about setting the query up.  So just looking
20 into the system, he was probably not seeing a lot of
21 data flow.
22        And the media FOIA request was going to be
23 media, like, hey, what do you have?  And his concern
24 was, like, we can't share this because it's going to be
25 potentially identifiable.

1    Q.  Because he didn't have that many cases in the
2 data sources to report, correct?
3    A.  Correct.  Correct.
4        And it's because, again, the query was not
5 set up.  But once you set up the query, you probably
6 find more data.  This is just what flows into the system
7 on its own without actually asking the system to find,
8 hey, what is the chief complaint that relates to
9 opioids?  What is the final diagnosis that relates to
10 opioids?  Run an accurate analysis.
11    Q.  Why do you believe a query had not been set up
12 yet?
13    A.  Because I believe that got set up -- because
14 this is a time when CDC was giving the algorithm or
15 talking about sharing the algorithm.  I believe we
16 actually set up the query once we got the money from New
17 York City, and that happened '20.
18        So, again, my time lines are a little
19 rusty, but I believe that's the time we set up the query
20 accurately and started getting some more information.
21 But then information was there, but we had turned our
22 attention to COVID.  So a lot happened.
23    Q.  And when was that again, the money received
24 from New York?
25    A.  Late 2019, early 2020.  Something like that.

1    Q.  And when do you recall seeing this drastic
2 spike in cases?
3    A.  Okay.
4        So that's a different data set, not from
5 this query.  That's the pharmacy board data set.  And I
6 believe they had requested it somewhere in 2018.
7        If I am accurately recalling, which I'm not
8 100 percent certain, somewhere in preparation for this
9 grant opportunity, we had -- and, again, a lot of times
10 these things are alerted several months ahead, like,
11 hey, CDC is working on this big package and be ready and
12 get your data ready and get your coalition if you need
13 to be participating in who's going to do the work and
14 all that.  So somewhere along the way from this point
15 onto like the time we submitted the grant in maybe 2019,
16 I did see that report because the pharmacy board data
17 arrived, and that report was derived out of the pharmacy
18 board data.  I'm sure there's other components in there,
19 but that graph that I keep talking about was derived
20 from the pharmacy board data.
21    Q.  Doctor, can you flip to Tab 4, please?
22        MR. CARDI:  And, Greg, if you would mark
23 Tab 4 as Exhibit 3.  I'm going to screw up this
24 numbering at some point.  I'm confident.
25        MR. HOLDERMAN:  (Complies.)

34 (Pages 130 - 133)

Page 134

1           (Exhibit 3 marked.)
2      A.  Yep.
3      Q.  (BY MR. CARDI)  Is this the CDC grant that you
4  were speaking of earlier?
5      A.  Yes.
6      Q.  Okay.
7           And this email -- the latest in the email
8  string, February 11, 2019, subject line:  "Opioid
9  Overdose Funding Opportunities."  Talmadge states that
10  (as read):  "We're not eligible since we didn't register
11  at least 395 drug overdose deaths 2017"; is that
12  correct?
13      A.  That is correct, yes.
14      Q.  And -- and what data would this number be
15  generated from?
16      A.  I don't recall, but two data sources do come to
17  mind.  Primarily it would be the CDC Wonder because
18  that's our composite data set.  We may have added local
19  data from, like, DSHS because they have state-level data
20  or some data from medical examiner because not every one
21  of those overdose deaths becomes a medical examiner
22  case.  So their data is also not complete.  But I'm not
23  pretty sure the primary data source was CDC Wonder.
24      Q.  When you're talking about not having
25  established a query yet as of April 2018, in relation to

Page 135

1  the last exhibit, this query was in what system of data?
2      A.  So it was in the NSSP platform, and it's not
3  related to what you're talking about now.  These are
4  drug overdose deaths.  NSSP platform looks at chief
5  complaint coming into the ER and discharge diagnosis,
6  whether the person is being admitted to the hospital or
7  discharged to home care.  So at that point, the person
8  is usually alive; but, you know, the death data comes
9  from other data sources after a long time.
10      Q.  But an -- an overdose being the cause of
11  someone's admission would be within NSSP, correct?
12      A.  Correct.  Yes.
13      Q.  All right.
14           And CDC Wonder -- would the board of
15  pharmacy data be included in the CDC Wonder system?
16      A.  I don't know.  I don't believe so.  Yeah, I
17  really don't think it does, but I'm not 100 percent
18  certain.
19      Q.  If we go to Tab 5, Doctor.
20           MR. CARDI:  Greg, this is going to be
21  marked as Exhibit 4.
22           (Exhibit 4 marked.)
23           MR. HOLDERMAN:  (Complies.)
24      Q.  (BY MR. CARDI)  Doctor, do you recall what is
25  now marked as Exhibit 4, an email dated April 30, 2019,

Page 136

1  subject line:  "Data Regarding Opioid"?
2      A.  Yes, I do.  You know, now, that I'm reading
3  this, yes, this is coming back because this was all that
4  discussion we were having around the time.
5           And go ahead and ask your question because
6  I have a point that I want to kind of clarify also.
7      Q.  Go ahead.
8      A.  Well, I was going to say this exactly shows you
9  the challenges we have, right?  So even the
10  biostatistician is saying that medical examiner data is
11  not a complete, accurate representation of what's
12  happening for many reasons.  One, you know, a lot of
13  times they report data regardless of the county of
14  residence, and that's all we have until we ask for a
15  specific query, right?  So this post on the website,
16  hey, so-and-so person died, and here's the cause of
17  death and usually it's for the next of kin and so forth.
18           But we preview that website and query that
19  data on our own without bothering them unless
20  specifically is needed.  But also not every overdose
21  death is recorded with the medical examiner because not
22  every one of them qualifies.  Sometimes they're just
23  dead in the ER, died in the hospital, and doctor made a
24  ruling; and that's fine enough.  They don't need to be a
25  medical examiner case unless there are suspicious

Page 137

1  circumstances around the death.
2           So that just kind of shows you the
3  challenges and goes back to why we need funding in
4  Public Health to do accurate surveillance of where the
5  real problems are, to cover the data gaps, and fully
6  understand the deep impact of those deaths in our
7  community.  Because there's changes everywhere.
8           You can see the struggle trying to piece
9  together different data pieces to show a composite
10  picture to the CDC.  Hey, we have a need in our
11  community.
12      Q.  Does any department presently within Tarrant
13  County have that ability to piece together the data
14  sources and provide an accurate reflection of opioid
15  abuse cases in Tarrant County?
16      A.  I don't know for sure, but I mean it would
17  probably fall on the health department.  That's just how
18  usually things go.
19           If we were given the funding and the
20  marching orders to go put this together, I think our
21  team can.  It's just that we've never had the resources
22  to do it.  That's been the challenge, and we've tried a
23  few times to get the resources.
24      Q.  Does MHMR aggregate that data?
25      A.  I don't know.  I'm sure they do to certain

35 (Pages 134 - 137)

1 level {sic} because I'm sure my teams worked with them.

2       And in this email, you'll see that they're

3 trying to get some data from us because they're very

4 focused on getting people into addiction treatment and

5 dealing with that immediate health crisis versus big

6 picture because, again, that falls on health departments

7 usually.

8     Q.  Do you believe that if you wanted to right now

9 you could get an accurate number of opioid-related

10 overdoses in Tarrant County and, let's say, for 2022?

11     A.  No.  I could get you somewhere close, but it's

12 not going to be 100 percent accurate.

13       I mean, it would be representative of what

14 is happening in Tarrant County.  And the limitations

15 related to that are disparate data sources.  No one

16 entity particularly funded to collate and create a

17 composite picture.

18       And that's the gap that the health

19 department's been trying to address, trying really hard

20 to get funding to do that because of the challenge that

21 we see.  We see a growing need.  We see trends.  We're

22 in a very unfortunate spot where we can't get the

23 intention and the resources to actually pull it all

24 together.  The glue concept that I explained earlier, we

25 see our need to do that.

1     Q.  So let's -- let's speak of opioid-related

2 deaths.  Those would -- the data on opioid-related

3 deaths could be obtained from medical examiner, and then

4 it could be obtained from hospitals and cases that are

5 not otherwise reported to medical examiner.

6     A.  Yes.

7     Q.  If you have those two sources, would that get

8 you pretty close?

9     A.  That would get you pretty close.

10       And then I know that DSHS does -- because

11 they have -- they're the state.  They have more

12 authority on reporting requirements, and they're a very

13 large entity.  Like we're very focused on public health.

14 State has Health and Human Services Commission that has

15 regulatory authority on hospitals and nursing homes and

16 many other entities.

17       And part of that is DSHS.  So they have a

18 regulatory arm that deals with hospitals.  So they can

19 force a lot of data that comes to them.  They can force

20 laboratories to share a lot of data to come to them.

21 They can require HMRs to report a lot of data.  We don't

22 have any requirement authority, if you will.

23       So -- and getting data back in a composite

24 way from the state is also a challenge.  They're just

25 kind of big and data sources come at different --

1 different angles.  They have pharmacy board data.

2       So the concept is that can we get this

3 done?  Yes.  But it's going to take a very methodical,

4 thought-out approach with funding and resources to pull

5 it all together.  In absence of that, just like you

6 said, a good -- it gives you a good idea of what's

7 happening in the community looking at that data from the

8 medical examiner and from the hospital.

9     Q.  Does DSHS have hospital and ME data in Tarrant

10 County?

11     A.  I don't know.

12       But can they get it?  Absolutely, they can.

13 I just don't know that they do.

14       Somewhere in this email chain, you'll find

15 a very frustrating email that at the time DSHS declined

16 to participate in the grant application because they

17 didn't feel they had the resources, and the priorities

18 were different at the time for them.  So it is what it

19 is.

20     Q.  Can you agree that DSHS is best situated to be

21 the entity that aggregates this data since they have the

22 power to obtain it from hospitals?

23     A.  Yeah.

24       I mean, it's kind of a long, drawn-out

25 answer there.  But the short is, if they -- same like

1 us.  If they have the funding and the priorities set for

2 them, they can do it because they are a state entity,

3 and that gives them a lot more authority to work on

4 that.  And if they get into any issues, they can work

5 with legislative folks at the state to create law that's

6 smooth out the way.

7       For example, COVID happened, and they were

8 not getting laboratory data.  Only what is required is

9 positive case reporting, and people wanted to look at

10 the whole picture -- how many positives, how many

11 negatives.  They talked to the governor.  The governor

12 issued an executive order, made all the laboratories

13 report to the state all the tests -- positive, negative,

14 otherwise, repeat tests, everything.

15       So can it be done?  Yes.  Does it need a

16 lot of moving parts?  Absolutely.

17     Q.  So it sounds like DSHS has the authority but

18 maybe not the funding?

19     A.  Yeah.

20     Q.  Isn't it accurate that Tarrant County, even if

21 they had all the funding in the world, would not have

22 the authority?

23     A.  Yeah, we wouldn't have necessarily the

24 authority.  But at the local level, a lot of times,

25 that's what health departments are known for.  We are

36 (Pages 138 - 141)

Page 142

1  very collaborative and usually are successful in
2  bringing a lot of partners to the table.
3          And that's -- from just experience in
4  public health, we do serve as that glue.  That's what
5  health departments do almost everywhere.  We tend to get
6  people to the table.  Here's the issue.  Here's what we
7  can provide in terms of data or here's the gaps.
8  Everybody give us your data.  We'll bring you back a
9  composite report, and then let's all look at it all
10 together.  Where is the problem in our community?  What
11 do we need to do to resolve it?  Most of the time we're
12 fairly successful.
13      Q.  Hospitals provide that data and say
14 opioid-related deaths to Tarrant County Public Health?
15      A.  Currently, they don't.
16          And the reason is, they have a little
17 crutch, right?  So it's not required.  But then they're
18 like, if you really need to go look at our ER data,
19 you've got access to Syndromic Surveillance.  Go take a
20 look in there.
21          But if we were to get funding, get
22 everybody on board saying we're doing an opioid overdose
23 project -- like you've heard the term within county and
24 all that -- I'm sure there will be, you know,
25 participation.  Is it going to be 100 percent by every

Page 143

1  hospital system?  I don't know until we try that out.
2  But, generally, we bet good participation.
3      Q.  I don't do this work obviously.  I'm just
4  having some trouble understanding what the funding is
5  needed for.  If hospitals frequently participate with
6  Public Health initiatives, isn't it simply a matter of
7  Public Health asking hospitals to provide data?
8      A.  Yeah, it's not that simple.
9          Everybody is resource constrained.  So when
10 funding is there, usually that comes with letters of
11 support and commitment towards the project.  Who are
12 going to be your participating partners?
13          A lot of times, you know, we'll hire staff,
14 and we'll give them probably some recipient moneys to
15 dedicate some staff time towards pulling some specific
16 reports or creating connections between data systems.
17 It goes through legal review of data sharing.
18          All those -- so a lot of time and effort
19 and spent, and that's what the moneys are for to cover
20 those costs.  It's to pave the way for those things.  In
21 an ideal world, yeah, all of this should be interflowing
22 with each other.  You know, everybody working together.
23 That's now how it works in real life unfortunately.
24      Q.  I mean, to your knowledge, do most hospitals
25 keep and aggregate this data?  I mean, I would think --

Page 144

1  and I'm just a layperson -- that hospitals have a system
2  that says we've had this many overdose -- opioid
3  overdoses this year?
4      A.  I don't know.
5          I would presume they do.  I mean, they have
6  EMR systems, which electronic medical records; and
7  that's the reason why a lot of push went on for Public
8  Health to electronic surveillance and hospitals to go
9  electronic so that these reports could be run on a
10 timely basis, but requirements for sharing were kind of
11 weak.
12      Q.  Right.
13          And that's why I'm circling back to the
14 authority.  That's a component that Tarrant County
15 wouldn't have, only DSHS even if Tarrant County did have
16 the funding?
17      A.  Yeah.
18      Q.  Okay.
19          MR. CARDI:  What are we on here?  Tab 5?  I
20 believe Exhibit 4?
21          MS. AYACHI:  Yes.
22      Q.  (BY MR. CARDI)  Doctor, if you would move to
23 Tab 10.
24      A.  Okay.
25      Q.  Please.

Page 145

1          MR. CARDI:  Greg, if you would publish
2  Tab 10, and mark it as Exhibit 5.
3          MR. HOLDERMAN:  (Complies.)
4          (Exhibit 5 marked.)
5      Q.  (BY MR. CARDI)  Doctor, this appears to be a
6  letter to the National Center for Injury Prevention and
7  Control written by yourself and Glen Whitley; is that
8  accurate?
9      A.  Correct.
10     Q.  Do you know what this letter concerns?
11     A.  Yes.
12         So this is the letter of intent to apply
13 for that grant that I was talking about earlier that we
14 applied to the CDC.  It appears that we were identified
15 as eligible communities.  And later when we submitted
16 our application.  And you saw some of those email
17 frustrations there saying, we're not qualified because
18 we didn't hit a certain number of deaths in 2017 while
19 the grant is in 2019, right?  So this is the grant that
20 we had applied for and did not succeed.  And, now, we've
21 applied for {sic} again and waiting to hear back.
22     Q.  The last sentence of the description paragraph
23 states (as read):  "The opioid overdose problem will
24 require solutions that combine sensible prescribing,
25 addressing social determinants of health,

Page 146

1  decriminalizing evidence-based interventions including
2  medications and treatments, and treatment of
3  comorbidity."
4         Did I read that correctly?
5     A. Yes.
6     Q. So which of those efforts would Tarrant County
7  have played a direct role in?
8     A. So multiple of those.
9         But, again, we wouldn't be doing this
10  alone. As you saw, there were participating
11  organizations at the time that identified Challenge of
12  Tarrant County, which I completely forgot mention to at
13  all. It's a nonprofit that deals with substance
14  abuse-related issues.
15        The sheriff's department because they were
16  actively involved in, like, Narcan, you know, carrying
17  Narcan in their medical, like, kit, if you will. So
18  they were kind of showing leadership in that area.
19        MHMR of Tarrant County obviously. The JPS
20  Health Network is the county-funded hospital system that
21  I mentioned. The health district, if you will, hospital
22  district.
23        And they end up with a lot of people
24  showing up in their ER. Because a lot of times, they're
25  a public charge. They don't have insurance. They've

Page 147

1  got drug overdose happening, and it ends up in the JPS
2  ER.
3        So those are the participating
4  organizations.
5        But I could certainly see, to answer your
6  question, Public Health, working with many partners on
7  educating the providers about sensible prescribing
8  because we had generated that report out of the state
9  pharmacy board data. I don't think anybody had known or
10  seen that -- that it was such a striking increase of
11  opioid prescriptions in Tarrant County.
12        To show that visually to medical
13  prescribers and pain clinics and others would be a
14  talking point that we need to be judicious about this
15  because people can get hooked on -- and we would bring
16  other entities that have firsthand knowledge on how that
17  is working and impacting the community.
18        Then we would also -- working on social
19  determinants, I mean, that's what the health departments
20  do anyways, but it brings a lot of different sectors in
21  to fix like issues that impact health. Whether somebody
22  doesn't have a good job or doesn't have health insurance
23  or hasn't completed their education or lives in a
24  crime-ridden zone, and that's why they don't go out or
25  exercise or take care of their health. I mean, a lot of

Page 148

1  those issues intertwine and impact one's ability to
2  achieve health. I mean, it's a big topic, but it's one
3  of those things that almost everybody agrees that it
4  leads to bad health outcomes, and we all need to be
5  working methodically to resolve those issues.
6        We would pull in the sheriff's office,
7  probably our DA's office probably, and many other
8  community entities looking at, you know,
9  decriminalization of things that can be like create
10  community diversion programs, things like that. And
11  some of that stuff, I think, is already set up in all
12  those.
13        And other evidence-based interventions, for
14  example, like Narcan and a few other things. And that
15  would be working with different medical groups, pharmacy
16  groups, and all those type of things to reduce deaths.
17        And then treatment of comorbidities. I
18  mean, that's generally mental health issues, other
19  health issues that may lead to poor health outcomes.
20  Let's say you have heart disease, and you have diabetes
21  and blood pressure, and now you're also addicted to
22  medication. You're likely to have the worse outcome
23  than somebody young and healthy who's addicted because
24  that's the one issue they're dealing with versus five
25  health issues. So getting people to take care of their

Page 149

1  health in general is always a good strategy in
2  prevention.
3        So we would be involved in every one of
4  those to different levels, not the lead on everything,
5  but in -- in certain components.
6     Q. Education and collaboration data gathering,
7  that's the role that you would have envisioned? I mean,
8  that's a vast simplification potentially; but is that
9  fair?
10     A. Yes, that is fair. I mean, that's what I
11  mentioned to you earlier too.
12     Q. Sure.
13     A. If you boiled it down, we would gather better
14  data to show a composite picture of what's happening in
15  the community. Then thing bring everybody together.
16  Here's what we think will work. What do you think will
17  work? And then we kind of resolve that together.
18        Because not everything's under our purview.
19  You know, law enforcement's not under our purview, but
20  we can talk to them. Say, hey, not everybody needs to
21  be thrown in jail. Let's figure out a way how to better
22  manage this. You know, do we get them into -- right
23  into an addiction treatment center instead of throwing
24  them in jail first? I mean, you know, that kind of
25  stuff.

38 (Pages 146 - 149)

Page 150

1   Q.  Okay.
2       Can you turn to Tab 14, please?
3       MR. CARDI:  Greg, we can mark this as
4   Exhibit 6.
5   A.  Sure.
6       MR. CARDI:  Correct?
7       MR. HOLDERMAN:  (Complies.)
8       (Exhibit 6 marked.)
9       MS. AYACHI:  Sorry to interrupt you,
10  Michael.  Just asking if the prior exhibit and this
11  exhibits that you're marking now, if they have parent
12  emails that were attached to them?
13      MR. CARDI:  I believe that they all did and
14  are present in the exhibits, I believe.
15      MS. AYACHI:  Okay.
16      Just to the extent that they do not include
17  the parent email, I'm not going to instruct the witness
18  not to answer, but I just want to make that noted on the
19  -- on the record, okay?
20      MR. CARDI:  That's fine.  And we can even
21  supplement them if we find that to be the case after we
22  close out the deposition.
23      MS. AYACHI:  That sounds good.
24      MR. CARDI:  I have no reason to think that
25  they're not included, but certainly we can.

Page 151

1   Q.  (BY MR. CARDI)  Doctor, looking at Exhibit 6,
2   what is this document?
3   A.  So, I believe, this is usually -- and, again,
4   because the context is missing, usually these talking
5   points accompany data briefs that my team -- Micky
6   Moerbe's team may be putting out on our website.  So
7   when we put out data briefs, a lot of times we get
8   out-of-the-blue media calls, and, you know, I've
9   approved though data briefs like, let's say, a month ago
10  and we went through the approval process, got posted.
11  And out of the blue, the PIO's getting a call.  Hey,
12  Vinny, they want a comment on this issue.  I'm like,
13  hey, what are we talking about because it's been a month
14  or more?
15      So they usually have these talking points.
16  So we pull it out into the email saying, hey, sure.
17  Let's review what we put out in the data brief.  What
18  are some anticipated questions and what are the talking
19  points that we may have to talk to the media about?
20  Q.  Do you know what data would have established
21  these numbers set forth in the data brief talking points
22  we're looking at?
23  A.  I don't know.  That's the honest answer.
24  Q.  Is this the data from -- I guess, to paint in a
25  paragraph, it says in 13 to 17 and also references a

Page 152

1   figure from 2008 to 2017, Paragraph 2; is that accurate?
2   A.  Yeah, looking at the paragraph there, yes,
3   that's what it says.
4   Q.  It says under Paragraph 1 that (as read):
5   "Tarrant County had the lowest overdose mortality rate
6   and is significantly lower in the" -- "in U.S. and
7   Bexar, Dallas, and Travis Counties."
8       Has that always been the case?  Do you have
9   any knowledge?
10  A.  I don't.
11      Yeah, this is data that Micky and team
12  probably pulled out from one -- CDC Wonder or some of
13  the other systems that we use and compared it to other
14  large counties in Texas.
15  Q.  If you go to Paragraph 3, it discusses the --
16  it discusses overdose death, and it places unspecified
17  drugs as 40 percent.
18      Am I reading that correctly?
19  A.  Yes.
20  Q.  Heroin is 23 percent; psychostimulant with
21  abuse potential as 20 percent; 15 percent, other
22  opioids; natural and semisynthetic; and then 14 percent,
23  cocaine?
24  A.  Correct.
25  Q.  Do you know if those -- if that breakdown

Page 153

1   remains somewhat similar after 2017?
2   A.  I don't.
3       I would have to have Micky run a similar
4   comparative report for recent data.
5   Q.  You spoke of -- of heroin and fentanyl being a
6   growing concern presently.
7       And at least according to this data, heroin
8   was top five drug overdose deaths from '13 to '17.
9       So is it -- is it continuing to increase?
10  A.  So just to be correct, I didn't mention heroin
11  because I didn't have the data handy.  I did say that
12  anecdotally I'm hearing more about fentanyl now in
13  Tarrant County and public health circles and the state
14  and nationally.  So that's where I was deriving my
15  understanding from.  You asked me about heroin, and I
16  was like I don't have any public data that I can recall.
17  Q.  Yeah.
18  A.  I'm sure it's an issue.  I didn't -- I didn't
19  have any opinion on heroin.
20      So, fentanyl, yes.  I think that's the
21  current darling topic unfortunately, so...
22  Q.  I appreciate that clarification.  I recalled my
23  initial question being "is there a heroin crisis or
24  epidemic in Tarrant County?"  and I thought you said,
25  "Well, I don't really have the data, but I do believe

39 (Pages 150 - 153)

Page 154

1 it's a growing concern." And you said the same thing
2 with fentanyl.
3       Am I wrong about either one of those
4 points? I think we're saying the same thing.
5    A. I think we're saying the same thing.
6    Q. Okay. Just confirming.
7    A. Yeah.
8    Q. If you would turn to Tab 16.
9       MR. CARDI:  And, Greg, if you would mark it
10 as says Exhibit 7.
11    A. That's the graph.
12       MR. HOLDERMAN:  (Complies.)
13       (Exhibit 7 marked.)
14    Q. (BY MR. CARDI)  So what are we looking at here
15 on the first page --
16       (Simultaneous cross-talk ensues.)
17    A. -- this one --
18    Q. (BY MR. CARDI)  -- of Exhibit 6?
19    A. I know. So this one -- the first one is an
20 opioid-related deaths among Tarrant County residents
21 from 2000 to 2016. And so that one that -- that's the
22 whole report that I think I was mentioning to you. And
23 somewhere down the road, there's graphs that I mentioned
24 from the pharmacy data that shows increases in
25 prescription drug use.

Page 155

1       But this one talks about opioid deaths.
2 And I think as we dived or looked into the data in a
3 little bit more in detail, Austin -- now, that I'm
4 looking at it, comes to mind that had a pretty huge
5 increase in overdose deaths, and that was driving Texas
6 rate pretty high, while Tarrant County was somewhat
7 doing okay. It wasn't like, you know, flat, but it was
8 trending gently upwards, an ebb and flow every year.
9    Q. So Figure 1 is opioid-related deaths among
10 Tarrant County residents, and it -- it is the solid line
11 that's mainly staying below five deaths per hundred
12 thousand.
13       Am I reading that correctly?
14    A. That is correct, yes.
15    Q. So, generally, following the Texas rates, which
16 is the dotted line?
17    A. Yes.
18    Q. More of a zigzag pattern?
19    A. Yes.
20    Q. And opioid, for purposes of this figure,
21 includes opioid -- opium, heroin, other opioids,
22 methadone, other synthetic narcotics, and other
23 nonspecified narcotics listed as the contributing cause
24 of death; is that correct?
25    A. Yes.

Page 156

1    Q. Okay.
2       So National Center --
3    A. 45 --
4    Q. Yes. Sorry. Go ahead.
5    A. 45 percent of overdose deaths in Tarrant County
6 involved an opioid.
7    Q. 45 percent? Where are you looking now?
8    A. That second bullet point --
9    Q. Go down --
10    A. -- in 2016 --
11    Q. Okay.
12    A. -- 45 percent of drug overdoses deaths in
13 Tarrant County involved in opioid.
14    Q. And that would be likely an opioid including
15 opium, heroin, methadone, other synthetic, all of those,
16 correct?
17    A. That's safe to assume, yes.
18    Q. The Natural Center for Health Statistics, is
19 that of the data sources a more full and reliable data
20 source?
21    A. Yes.
22       It's part of the CDC, and that's where I
23 think the CDC Wonder platform resides because they --
24 CDC is made up of multiple health centers, and this
25 is -- like in the health department here, I have the

Page 157

1 infomatics division. Just like I was trying to work and
2 create a health data warehouse in Milwaukee. Same
3 concept. There at the national level, they have an
4 entire center dedicated to collating the entire nation's
5 data and put out health information in various reports.
6 But that's what they're -- they're experts on health
7 data.
8    Q. The mortality rate for opioid-related deaths in
9 Tarrant County was 4.8 deaths per 100,000 in 2016.
10 There were 97 of them in Tarrant County in 2016.
11       Am I reading that correctly?
12    A. Correct.
13       The qualifier that's what we knew at the
14 time because not everything is easily accessible, but
15 that's what we were able to gather.
16    Q. You don't know what data was omitted or what
17 data sources were omitted from National Center of Health
18 Statistics at this time, do you?
19    A. I don't, but that's certified data. So fair to
20 assume that that is -- that is what the national and
21 state entities all will agree that that's what the
22 future was.
23       Because that data is multiple layers of
24 approval through local, state, federal authorities
25 before it's certified. And usually that's why they're a

40 (Pages 154 - 157)

Page 158

1 little behind.  On -- I think this one is created in
2 like 2019, and we have data only until 2016 because they
3 go through several levels of accuracy checks and
4 certifications; and that is official data.
5     Q.  Figure 2 deals with opioid deaths among Tarrant
6 County residents reported by the medical examiner's
7 office per month.
8        Is that -- am I reading that correctly?
9     A.  Yes.
10    Q.  And from 2015 to 2018, it looks like an
11 increase.  I wouldn't say a drastic increase.
12        Would you agree?
13    A.  '15 to -- you're looking at the Figure 2?
14    Q.  Yes.
15    A.  And you're saying from what year to what year?
16    Q.  2015, it's 72; and then 86 in '16; and then 92
17 in 2017; and, I guess, 11 at the beginning of 2018.
18        Am I reading that correctly?
19    A.  Yes.
20        But raw numbers, I wouldn't venture to
21 guess whether that is significant or not because that's
22 where the biostatistician comes in and does all our
23 analysis if it's significant or not in terms of
24 statistical significance.
25    Q.  Sure.  And I'm not trying to say any number is

Page 159

1 significant or insignificant.  I'm more speaking of this
2 drastic spike that you were speaking of earlier.
3        This is not it?
4     A.  No, this was not it, no.
5     Q.  Okay.
6        MS. AYACHI:  Michael, I'm sorry to
7 interrupt you.  For this document, I see that there is a
8 parent email that does provide some context.  I don't
9 know if you want to take a moment and, like, just pull
10 it up and present it digitally, but it does provide
11 context to the completion of some of these figures.  So
12 I would...
13        MR. CARDI:  Parent email in which
14 individuals discuss data?
15        MS. AYACHI:  Yes.
16        MR. CARDI:  If you'd like to -- to present
17 that and go through it with Dr. Taneja, certainly able
18 to.  I don't see the need to.  We're just talking about
19 data here.  That would be my thought on it.
20        MS. AYACHI:  You're welcome to do what you
21 want.  So I'll take to the use of this without the
22 parent email giving context.  Just putting that on
23 record.
24        MR. CARDI:  I'm not really clear on the
25 basis of the objection.  This is data reported by

Page 160

1 sources that we're discussing.  I'm not sure how an
2 email discussing data somehow affects the reliability of
3 the data.
4        MS. AYACHI:  I mean, I can tell you or ask
5 him about it myself.  But I'm looking at the parent
6 email, and it shows that some of the numbers are not --
7 are pending.  So that indicates to me that some of these
8 may not be final numbers.
9        MR. CARDI:  We can look at it on a break.
10        Do you have a number?
11        MS. AYACHI:  Sure.
12        MR. CARDI:  Bates number?
13        MS. AYACHI:  Yeah, the Bates says
14 TARRANT_00343779.
15        MR. CARDI:  Okay.
16    Q.  (BY MR. CARDI)  We are on Figure 3, I believe,
17 Doctor.  "Percentage of Opioid Deaths Among Tarrant
18 County Residents Reported by the ME's Office."  This is
19 just presenting that same data potentially?  The
20 demographics?
21    A.  If I may, just a point of clarification?
22    Q.  Yeah.
23    A.  Because I mentioned to you on Graph 1 --
24    Q.  Uh-huh.
25    A.  -- what comes from National Center for Health

Page 161

1 Statistics is certified accurate, final data.  A lot of
2 these other graphs in the report -- and you will notice
3 that somewhere either in the report or in the emails,
4 repeated comments that this provisional data may be
5 subject to change as data finalizes.
6        Because at the local level, a lot of things
7 change really fast.  But by the time it goes through
8 certification for most of the state to the CDC, it gets
9 accurately represented.  It's a couple {sic} three years
10 before the data is considered final and stable.
11        So some of the other graphs are very
12 fluctuating because it was pulled from raw data.  Hey,
13 what do we have today?  Show us that, so we have some
14 idea of the trend.
15    Q.  And you're speaking of medical examiner data?
16    A.  Well, medical examiner data and even some of
17 our other data reports.
18        And, again, it varies by system.  And,
19 usually, they're very good about putting an asterisk
20 where they believe the data is provisional.  But some of
21 this stuff is very fluctuating because it's pulled off
22 of a website.  And without, you know, going into exact
23 details, maybe it's the medical examiner signing off on
24 this, blah, blah, blah.  All of that.  So just be
25 mindful.

41 (Pages 158 - 161)

Page 162

1    And then the -- the reason I kind of got
2  hung up on the differences between the years, the
3  numbers may look 72 versus 86 versus 92.  You and me
4  might look at it as no big deal, but when they do
5  statistical analysis, it may be statistically
6  significant from year to year based on population and
7  other criteria.
8    But, again, that's beyond my understanding.
9  I let the biostatistician tell me.  She's the expert.
10  And a lot of times in those emails, she'll note whether
11  there is significantly statistical difference or not.
12    Q.  Where does it say here that data is provisional
13  and not final?
14    A.  It may be in the email.
15    But a lot of times I know just from working
16  with the biostatistician, they'll put an asterisk
17  somewhere if the data is provisional.
18    But since this was an internal report, they
19  may have gone through all that checks and balances.
20  Because as you can understand, this is a confidential,
21  internal report.  So it was kind of a raw report to us
22  saying, hey, here is what we have.  Now, tell me what
23  you need to package for the grant application, and then
24  we'll make it look pretty -- actual do full analysis,
25  color graphs, all the little provisions that they need

Page 163

1  to put on.  Do it in the right way.
2    Q.  Other than your counsel's testimony on this
3  subject of the email, do you have any specific
4  recollection of the time this report was generated it
5  was based on provisional data?
6    MS. AYACHI:  Objection, form.
7    A.  Yeah.
8    Actually in some of the previous exhibits
9  that we saw in emails and whatnot, I did notice those
10  comments and asterisks.  So --
11    Q.  (BY MR. CARDI)  Why aren't those comments here
12  in this report?
13    A.  I don't see them, but it may be in the email,
14  you know.
15    But I know that we don't get certified data
16  from the medical examiner because we're just off brought
17  it up from their website.  That's usually what we do.
18    Do we ever ask for an actual raw report
19  from their system?  Again, raw reports shared between
20  departments are usually provisional.
21    In fact, on our website, a lot of times
22  we'll put out data because people get real upset.  Well,
23  why are you holding this data when you know there is
24  this happening in the community?  Okay.  Well, we'll put
25  it out provisionally, but stuff happens.

Page 164

1    I mean, I'll tell you during COVID and in
2  many things, we said, hey, there's a case of COVID here
3  or a death of COVID here.  Turns out, it wasn't even a
4  Tarrant County resident once everything was all settled
5  in.  Then the people got mad.  Oh, you lied to us.  No,
6  we didn't.  It's provisional data.  It takes a while to
7  figure everything out, you know.
8    Q.  So your recollection is that some of the data
9  in Exhibit 6 here may have been provisional at the time,
10  but not the National Center for Health Statistics
11  data --
12    A.  Yes.
13    Q.  -- that's here?
14    A.  Because that is finalized data.
15    That's why it's like three years behind.
16  Frustration source for a lot of us, but that is deemed
17  to be the nationally certified accurate data.  They
18  don't change after it's posted.
19    Q.  What does Figure 5 show?
20    A.  Figure 5, okay.  So that was the graph, I
21  think, I was talking about.
22    Prescription drug use.  And if you want to
23  look at -- and it's hard to see on a black and white,
24  but it was a pretty sharp increase going --
25    Q.  This is -- Figure 5 is Opioid Prescription

Page 165

1  Rates Per Hundred Persons, isn't it?
2    A.  Yeah.  That, I believe, yes.
3    And, again, I had my time frames wrong.
4  This one is 2006 to '16.  So there you go.  Recollection
5  error.
6    But, yeah, there was a pretty sharp
7  increase in prescription, you know, dispensed per
8  hundred residents.  That was kind of following the
9  national trend here in Tarrant County, and it's hard to
10  see the black and white lines; but I believe this same
11  thing happened in Tarrant County.
12    Q.  One prescription is going down here between
13  2012 and 2016?
14    A.  Yeah, I think that was the recollection error
15  that I had.  I thought the graph showed 2016 to '19, but
16  it showed 2006 to '16.  And then towards the end, it was
17  tapering off.
18    Q.  And so we're not talking about a drastic spike?
19  We're talking about a drastic decrease in opioid
20  prescription rates?
21    MS. AYACHI:  Objection, form.
22    A.  No.
23    Yeah, the later half, but you're missing
24  the point.  In 2016, it was almost a ten-year period.
25  In 2006 through '12, you can see it was a sharp

42 (Pages 162 - 165)

Page 166

1 increase.
2        And, remember, the recollection I had about
3 when I was in Detroit, Wayne County from '11 to 2014. A
4 lot of buzz was happening in those circles. Hey,
5 prescription drug use is on the increase, and it's
6 causing issues in our communities and health departments
7 need to be participating and all that. This gives you
8 context on why that conversation was happening around
9 that time because we were at the peak of that problem.
10 Q. (BY MR. CARDI) 2012?
11 A. Yes.
12 Q. Okay.
13        So isn't it true that it drops much more
14 sharply between 2012 and '16 than it increases
15 between 2006 to 2012?
16 A. I don't know about the slant, but it does
17 appear that way on the graph. Yes, you are correct.
18 Q. Is there anything in this figure that indicates
19 any problem with opioid prescription?
20 A. Yes.
21        MS. AYACHI: Objection, form.
22 A. The six-year increase trend that got us into
23 trouble nationwide.
24 Q. (BY MR. CARDI) What in this data says that?
25 A. Sharp increase in opioid use. Like suddenly

Page 167

1 people decided they all have pain for six years. You
2 tell me.
3 Q. Okay.
4        Well, we spoke of physicians earlier
5 examining patients and determining legitimate medical
6 purpose for a prescription.
7        So unless they didn't, I'm just not sure
8 how this data standing by itself shows anything other
9 than an increase in prescription rates.
10        Can you help me understand?
11 A. Yeah.
12        This one, again, is giving context to the
13 conversation that there was -- exactly what the graph
14 is. There was an increase in prescription rates from
15 2006 to '12. '12 appears to be the peak on the graph,
16 and then there was a decline, right?
17        And I don't have any more data after 2016
18 to show is it continuing to decline? Has it leveled
19 off? All of that.
20        But all of the conversation we had -- hey,
21 when did you first hear that prescriptions were an
22 issue? Told you in the 2011 to '14 time frame. Before
23 that, was there conversation? Probably. But I was not
24 high enough in the chain to be involved in a lot of
25 those conversations. I was given my job. Do your job

Page 168

1 and you're done. As I became the deputy director and
2 the acting director there, I got involved in a lot more
3 conversations because I had to over and present the
4 department, and it was around the peak time that you're
5 seeing on the graph. So that gives you context to all
6 of that conversation we had.
7        You're not only looking at Texas and, you
8 know, local Tarrant County and Harris County data and
9 all that. You're looking at U.S. data. There was an
10 increase nationwide from 2006 to '12.
11        And I don't have data going any further
12 back. Maybe it was a sharper increase when you -- when
13 you look at the bigger time frame. But it seems like
14 2012 was the peak, and it was declining in years.
15 Q. Do you have any data on the causes in the
16 increase in opioid prescription rates as presented by
17 Figure 5, 2006 to '12?
18 A. Yeah, I don't have that today.
19        But, again, just anecdotal and being
20 involved in a lot of conversations and many different
21 circles -- public health circles, medical circles,
22 there's other nonprofit law enforcement, all of that --
23 the big buzz around that time has been it's been
24 dispensed pretty frequently, repeated quantities, and
25 all the issues. People are getting hooked onto it.

Page 169

1 That was sort of the summary that I remember from a lot
2 of conversations.
3 Q. And are you -- are you referring to a physician
4 who practices that are prescribing at a high rate
5 illegally without determination of legitimate medical
6 needs? So just pill mills?
7 A. I have no way to know that.
8        MS. AYACHI: Objection, form.
9 A. So other -- yeah.
10 Q. (BY MR. CARDI) All right.
11        So you don't have any specific data or
12 further explanation as to of any cause for an increase
13 in prescription rates?
14 A. No, but I can give you another anecdotal
15 example. Personal example. And I don't recall exactly
16 the time frame. But had some dental work done. I think
17 I was in Michigan. It was in '11 to '14.
18        I think on the right side. And they -- the
19 dentist prescribed the opioid, I think, and I don't know
20 -- hydrocodone maybe. I can't remember.
21        And so I got my ten pills, and I took a
22 couple and didn't really care for them or whatever. And
23 then almost seven or eight days later, I got an
24 automated reminder from the pharmacy, hey, your
25 prescription's ready to pick up.

43 (Pages 166 - 169)

1         Not knowing because I had other meds, I
2 just went through the driveway, picked up my
3 prescription, came home.  Here's another ten pills.
4 Like why did I pick this up and pay money for it?  I
5 don't need this.
6         But, you know, that's just how things
7 happen, you know.  I mean, I coming back from work.  I
8 get an automated call.  Okay.  Sure.  I'll do the
9 drive-through, talking to family on the phone, not even
10 paying attention, and came home with more opioids than I
11 ever needed.  So there you go, but that was the time
12 frame.
13     Q.  So you were prescribed an opioid in this case
14 by a dentist, you said?
15     A.  I believe so, yeah.
16     Q.  All right.
17         And do you believe that that opioid was
18 illegally or improperly prescribed?
19         MS. AYACHI:  Objection, form.
20     A.  No.  I had dental work done.  I mean, they did
21 the right thing.
22         I'm just saying that there were other
23 factors involved like automated reminder calls and
24 automatic refilling of a prescription around that time.
25 Hopefully, that practice has subsided.

1         And, you know, I was in the drive-through.
2 They just give me meds, and I go home and open the pack;
3 and I'm like, oh, I have eight pills left from ten days
4 ago, and I have ten more pills.  What am I going to do
5 with this, you know?
6         And I'm smart enough.  I took it to like a
7 drug reselection program and dumped it in the container,
8 but most people just stick it in their medicine cabinet.
9 And then, you know, that's where I have heard hundreds
10 of stories.  I'm sure you have too.  Kids got into it.
11 Teenagers got into it.  Grandparents got into it by
12 accident.  You know, it's just how it is.
13     Q.  (BY MR. CARDI)  If it was refilled, isn't it
14 likely at that time that you had a prescription that
15 contemplated a refill?
16         MS. AYACHI:  Objection, form.
17     A.  Yeah.  I mean, it authorized a refill.
18         But, you know, it was automatic called to
19 me.  And, you know, it was, hey, your prescription's
20 ready.  Come pick it up, and I'm just kind of
21 reselecting from an incident that I remember.  It's been
22 a long time, but I'm just kind of giving you some
23 anecdotal examples of what was happening around that
24 time and why this kept coming up on the radar for a lot
25 of people.  Just giving you context of that conversation

1 we had earlier.  How come you knew about this in
2 Michigan and what was your involvement and all that?
3         And this data somewhat, you know, shows
4 what was happening in the background.  More
5 prescriptions being written, dispatched, and so forth.
6     Q.  (BY MR. CARDI)  With respect to your anecdotal
7 example, do you believe that the dentist did something
8 improper or illegal?
9     A.  No.
10     Q.  Or is it the pharmacy did something improper or
11 illegal?
12     A.  I don't know that it was illegal, but I think
13 they should have made more of an effort to talk to me as
14 a person versus an automated system.  Here's -- your
15 prescription's ready.
16         Because I got sucked into it.  I'll be
17 honest.  You know, life's busy.  I got a reminder call.
18 I think I was on the way home, or I got a
19 text message, "your prescription's ready for pick up."
20 And I went and picked it up in drive-through.  Was busy,
21 didn't talk to them.  Like, yeah, yeah, yeah, here's my
22 card.  Give me my drugs, and I'm gone.  Because I have
23 other meds, and it was there.
24         So that's just one example.  I'm sure
25 others -- so, you know, I don't know how you

1 characterize that, but it could have been done better.
2 Do you really need this?  It's a controlled substance.
3 Are you still using it?  Maybe some added questions
4 would have been nice, I guess.
5     Q.  And you believe that you did not authorize that
6 refill prior to picking it up?
7     A.  Well, yeah.
8         I mean, so this is where kind of get
9 legally.  Yeah, I authorized the refill.  I paid for it
10 and all that.
11         But, you know, whether that connection
12 between that pharmacy tech dispensing a med and, you
13 know, the automated system, hey, your prescription's
14 ready.  Press yes if you're coming to pick it up today.
15 Sure.  You know, it was, kind of, all sort of auto
16 authorized, if you will, without real augmented
17 intervention that what am I picking up today and is it
18 really needed?  And that's just, you know, one example
19 of many that you'll probably find.
20         I legally authorized it?  Absolutely.  I
21 paid for it.  I mean, you know...
22     Q.  So the problem in your hypothetical is that
23 there was the use of some sort of automated system and
24 not a phone call to actively discuss whether or not you
25 want refills?  Is that what you're saying?

44 (Pages 170 - 173)

Page 174

1    A.  Yeah.
2         Well -- and, really, some medications you
3    get regular refills on because that's what your
4    prescription is, and that's what your health condition
5    is.  And some medicines like this that are highly
6    addictive and controlled substances for a reason, there
7    probably should be more of a discussion between the
8    pharmacist and the patient or the person picking up.
9    Hey, are you still experiencing pain?  You still need to
10   use this?  Here's some things to watch for.  Blah, blah,
11   blah.
12        Hopefully, that has improved.  I haven't
13   had to use them ever since, I don't think.  So,
14   hopefully, that changed.
15        Q.  I'm confused in this hypothetical of why you're
16   placing some level of blame on the pharmacy and not the
17   physician for authorizing refills without having that
18   personal conversation as to whether you need it.
19        Is it not a physician that should be making
20   that determination of need?
21        A.  Absolutely.
22        I mean, a lot of times, you know, again,
23   this time frame shows the trend where prescriptions were
24   loosely being given with multiple refills.  My hope is
25   that they've curved that down because you're starting to

Page 175

1    see on that data that automated refills are not being
2    written.  Hopefully, that's the declining trend that
3    you're seeing, and the doctors are being more careful in
4    prescribing.
5         But at the same time -- and, again, I'm not
6    necessarily placing blame.  I'm just giving you context
7    of what was happening at the time when we were seeing
8    this increased trend over this six-year course that you
9    see on the chart.  Doctors were loosely prescribing, and
10   pharmacies were automatically refilling.  Here's your
11   next prescription.  Hopefully, that has stopped.
12        Because I don't get any more automated
13   calls.  I get a text message from time to time.  It's
14   time to refill your prescription.  Go authorize and I
15   do.
16        And, now, they put a name of the medication
17   that I'm getting refilled in the text messages.  I don't
18   recall if that was done at the time or not, but, you
19   know, here we are.
20        Q.  We discussed earlier that physicians prescribe
21   opioid medications in pharmacies now, correct?
22        A.  Yeah.  Absolutely.
23        Q.  And the data in Figure 5 is prescription rates.
24   It's not dispensing rates; is that fair?
25        A.  So rate is number of retail opioid

Page 176

1    prescriptions dispensed per hundred residents.  I mean,
2    you don't get it dispensed without both parties, the
3    doctor and the pharmacy working together.
4         Q.  Uh-huh.
5         A.  So it is prescription dispensed per 100
6    residents.
7         Q.  So why is it that you quickly answered
8    physician did not do anything improper, but you're a
9    little bit unsure about --
10        (Simultaneous cross-talk ensues.)
11        A.  I didn't say that.  I said both parties are --
12        (Simultaneous cross-talk ensues.)
13        Q.  (BY MR. CARDI)  I thought you did.
14        A.  No, I didn't say that.
15        I told the dentist was probably very
16   loosely writing multiple refills allowed or X times two
17   or X times three or whatever, you know.
18        So I don't have the prescription handy to
19   go look at it or anything.  But I'm just saying if it
20   got done that way, I mean, both parties were probably
21   not being super careful.
22        Q.  (BY MR. CARDI)  A dentist that determines the
23   need of the description and the pharmacist that
24   dispenses it?
25        A.  That's right.

Page 177

1         THE CERTIFIED STENOGRAPHER:  Counsel, this
2    is the court reporter.  I'd like to take a break at the
3    next stopping point.
4         MR. CARDI:  Okay.  We can go off the
5    record.
6         THE CERTIFIED STENOGRAPHER:  Thank you.
7         THE VIDEOGRAPHER:  We're off the record at
8    2:20.
9         (A break was taken from 2:20 p.m. to
10        2:40 p.m.)
11        THE VIDEOGRAPHER:  We are back on the
12   record at 2:40 p.m.
13        Q.  (BY MR. CARDI)  Doctor, do you agree that over
14   the past ten years since you've been the director of
15   Tarrant County Public County Health, the vast majority
16   of doctors prescribe prescription medications
17   inappropriately?
18        MS. AYACHI:  Objection, form.
19        A.  I don't know that.
20        Q.  (BY MR. CARDI)  Do you have any reason to
21   believe that is not true?
22        A.  Just general observations and the trends in
23   data that -- and just that -- you know, again, this is
24   completely -- I won't even bother.  Like I have no way
25   to know whether it's accurate or not.

45 (Pages 174 - 177)

Page 178

1    But I did see a lot of pain clinics pop up.
2 Now, are they for good use?  Probably.  But are they
3 potentially feeding into the problem we have?  Probably.
4 But no way to know one way or another.
5    Q.  Do you believe any of the doctors in Tarrant
6 County at any point were part of pain clinics?
7    A.  No, I don't know.
8    Q.  Sure.
9    A.  I mean, doctors are with various specialties.
10 So I'm sure there's some that specialize in pain
11 medicine and others in others.  So, I mean, it's just a
12 mix.
13    Q.  So you don't have an opinion as to whether or
14 not the vast majority of doctors prescribe opioid
15 medications inappropriately?
16    A.  No, I don't.
17    And coming from the medical profession, I
18 would like to presume -- just out of the goodness of my
19 heart, I would like to presume that most people want to
20 do right by their patient.  You know, that much I would
21 agree, you know.
22    Are there practices that are improved over
23 time?  Yeah.  We should be doing that.  That happens.
24 I'm sure that has happened with the medical profession
25 also.

Page 179

1    Are there other influences that make your
2 decision-making?  You know, a lot of times things are
3 automated.  Hey, this is a great thing.  Let's do it
4 this way.  Sure.  Let's try it.  Then they realize it
5 wasn't that great.  We shouldn't be doing that.
6    So, you know, I think just being from the
7 healthcare field in general, it's an ebb and flow.  It's
8 not a very -- people like to treat medicine as exact
9 science.  It's a lot of art a lot of times.
10    Q.  Do you agree the vast majority of pharmacists
11 in Tarrant County dispense medications appropriately and
12 have done so for the past ten years?
13    MS. AYACHI:  Objection, form.
14    A.  I have no way to know that.
15    Q.  (BY MR. CARDI)  Do you think it's possible that
16 the vast majority of pharmacies in Tarrant County
17 dispense inappropriately?
18    A.  I have no way to know that.
19    But same thing, you know, all of these
20 folks, again, I consider, you know, comrades in the
21 healthcare profession, peers and all that.  We all go
22 through our trainings and education and all of that.
23 And one of the key tenets is do no harm, and, hopefully,
24 they're all following that.
25    Q.  Ultimately, you just don't know because you

Page 180

1 don't have data on all of the physicians or all the
2 pharmacists in the Tarrant County and all of their
3 actions; is that what you're saying?
4    A.  Yeah, I don't -- I don't have the data.
5    What I do have is the one graph that you
6 saw.  That shows that there was a long, sustained
7 increase.  And, of course, if we had more data before
8 and after, we could see what the full picture is like.
9 Are we back down to somewhat normal levels?  But
10 that 2006 to 2012 time frame seems like a heavy increase
11 of prescription drugs being written and dispensed in
12 Tarrant County.
13    And I don't have the color graph, but my
14 guess would be Tarrant County because that's what I
15 remember.  Tarrant County would be the top in those
16 lines because that's what was striking.  But, again,
17 let's look at the color graph, and see if that's what I
18 really recall correctly or not.
19    (Simultaneous cross-talk ensues.)
20    A.  I'm sorry?
21    Q.  (BY MR. CARDI)  Are you referring to Figure 5
22 of Exhibit 6?
23    A.  Yes, yes.
24    Q.  "Opioid Prescription Rates Per 100 Persons"?
25    A.  Correct, yes.

Page 181

1    Q.  And you agree that Figure 5 does not show that
2 any pharmacy or pharmacist did anything improper,
3 correct?
4    A.  Not a particular named pharmacy.
5    I mean, this is very collated prescription
6 data.  So a doctor wrote a prescription.  A pharmacy
7 filled a prescription.
8    Q.  Right.
9    A.  It doesn't name a pharmacy per se.  This is...
10    Q.  Right.
11    So you agree that Figure 5 does not show
12 that any pharmacy or pharmacist did anything wrong at
13 any time?
14    MS. AYACHI:  Objection, form.
15    A.  Yeah, it's very hard to make any other than
16 that the prescription -- what the graph shows is
17 prescription drug use was increasing very sharply
18 from 2006 to '12.  '12 seems to be the peak time, and
19 then we saw a decline.
20    The other thing I recall is that I believe
21 Tarrant County was the top line above other large
22 counties, state of Texas, U.S. data, but that's my
23 recollection and, you know, I've had some errors.  So
24 I'm hoping we can look at the colored graph and see if I
25 recollect correctly or not, but that's what I recall

46 (Pages 178 - 181)

Page 182

1 from -- the last time I looked at it was 2019. So
2 you've got to give me a little bit of break there not
3 recollecting things correctly, but ---
4 Q. (BY MR. CARDI) That's fine, Doctor.
5 (Simultaneous cross-talk ensues.)
6 Q. (BY MR. CARDI) I'm just trying to confirm that
7 you do not believe Figure 5 shows that any pharmacists
8 or pharmacy did anything improper.
9 It just shows opioid prescription rates
10 increased from 2006 to roughly 2012; is that fair?
11 A. It shows opioid prescriptions were being
12 dispensed at a high rate from 2006 to '16 -- or 2006 to
13 '12, an increasing trend.
14 Q. And it does not show that any pharmacy or
15 pharmacist did anything wrong, correct?
16 MS. AYACHI: Objection, form.
17 A. I don't have any way to know that.
18 How would you know from a graph? That's a
19 very -- that's a leap of faith? Like how would I know
20 that? Would you know that? I don't know that.
21 Q. (BY MR. CARDI) No, I'm saying what it does not
22 show. Figure 5 doesn't show how many dogs were killed
23 in 2006, right? It also does not show that any pharmacy
24 or pharmacist did anything wrong.
25 MS. AYACHI: Objection, form.

Page 183

1 A. So -- so here's the thing.
2 Q. (BY MR. CARDI) Standing alone is all I'm
3 talking about.
4 (Simultaneous cross-talk ensues.)
5 A. So it doesn't show any data that -- what it
6 shows is there was a mechanism that prescriptions were
7 being written and filled. And who were the two parties
8 involved? Doctors and the pharmacies. So that much it
9 shows that doctors and pharmacies were prescribing more
10 opioids and filling more opioid prescription from 2006
11 to '12.
12 I can't tell you whether they did it right,
13 whether they did it wrong. I mean, that's something
14 y'all can determine by other investigations. This graph
15 doesn't get into any of that detail. It just shows that
16 more prescriptions were being written and being filled,
17 and the two parties involved to make that happen are
18 doctors and the pharmacies. Whether they did it right
19 or wrong is not the intent of the graph.
20 Q. (BY MR. CARDI) And that was my question.
21 Thank you.
22 Now, you said that it shows that they
23 were -- you used the words "at a high rate," I believe.
24 What about Figure 5 shows that it was at
25 any high rate?

Page 184

1 A. So, again, the peak of the graph is in 2012.
2 And, again, the -- the context is all the other
3 conversations that I mentioned. Every circle that I,
4 you know, visited in health care or in public health
5 circles, substance abuse circles, the conversations
6 around those times were opioid use is on the increase,
7 prescription drug use.
8 And, you know, again, these are
9 recollections from conversations that there are people
10 finding these prescriptions sitting in drawers and
11 cabinets. And we need to have more tighter controls
12 around how these are being prescribed and have more drug
13 reflection programs so they're not falling into
14 unintended hands, but it's leading to an increase of
15 opioid use and abuse in our community.
16 So that's kind of the conversation, and
17 this graph does lend context to that conversation.
18 Q. Based on your anecdotal recollections of this
19 conversation?
20 A. Yeah.
21 Q. Standing alone, Figure 5 does not show that --
22 or establish that 2012 that was improperly or too high
23 of a rate, correct? It just shows it was higher
24 in 2006; is that fair?
25 A. I have no way to show or tell you whether it

Page 185

1 was proper or improper. But it does show that the use
2 was high. Prescriptions were being written and filled
3 at a high rate.
4 Q. And Figure 5 does not show that it was -- in
5 2012, they were being prescribed at a higher rate than
6 desirable or good for society? It just shows higher in
7 2012 than 2006, fair?
8 MS. AYACHI: Objection, form.
9 Q. (BY MR. CARDI) Fair?
10 A. Need to understand that from the graph.
11 Q. All right. Thank you.
12 Do you agree the vast majority of patients
13 who use prescription opioids pursuant to a valid
14 prescription do not --
15 A. I'm sorry. Say that -- say that again.
16 Q. Do you agree that the vast majority of patients
17 who used prescription opioids pursuant to a valid
18 prescription do not eventually subsequently use heroin?
19 MS. AYACHI: Objection, form.
20 A. And I have no data to show you one way or the
21 other. But like I mentioned before, many of the
22 addictive substances -- this is kind of 101 on
23 addiction, right -- cigarettes, alcohol, medications
24 that are addictive; illicit drug that are addictive --
25 are all gateway to addiction. That's just how it works.

47 (Pages 182 - 185)

Page 186

1      A lot of times, you have no way to know.
2  You might take a couple -- three pills because you had a
3  dental procedure done, and then your brain activated.  I
4  want more.  I want more.  I want more.  There's no way
5  to control that.
6          You know, I don't know what else to explain
7  that, but it can be a gateway to other drug use, whether
8  it's prescription drug use.  Or then if you can't find
9  them, then you go onto the illegal market to find the
10  fix.  You know, all of that can happen, and it does
11  happen.  But it's just there's no way to explain other
12  than this -- this is how addiction works.
13      Q. (BY MR. CARDI)  Yeah, it can -- no, I -- one
14  can lead to the other you're saying.
15          And my question was, do you believe the
16  vast majority of patients who use prescription opioids
17  without a prescription eventually use heroin?
18          MS. AYACHI:  Objection, form.
19      A. I don't have data on that.
20      Q. (BY MR. CARDI)  Do you think it's possible a
21  vast majority of those prescribed who take opioids use
22  heroin?
23          MS. AYACHI:  Objection, form.
24      A. I don't have data on that.
25      Q. (BY MR. CARDI)  Well, it's one or the other.

Page 187

1  So if you don't agree with the first, I imagine you
2  agree with the latter?  You think that's not an unfair
3  characterization of the two questions I just presented?
4          MS. AYACHI:  Objection, form.
5      A. I don't know how else to answer.  I don't have
6  any -- any information to accurately answer your
7  question.
8      Q. (BY MR. CARDI)  Okay.
9          So you believe it is possible then that a
10  vast majority of patients who use prescription opioid
11  assumed without prescription subsequently use heroin is
12  what you're saying?  You're saying that's possible?
13      A. I -- I don't have data to show one way or the
14  other about -- you might want to, like, try an expert in
15  the field that deals with prescription meds and
16  addiction who might have more firsthand data because
17  they deal with it every day.  I don't have anything
18  handy to tell you one way or the other.
19          Is it plausible?  Sure.  Why not?
20  Absolutely.
21          I mean, they are gateways to addiction.
22  Sure.  Can happen, but I have no way to know that.
23      Q. Are you familiar with the term "suspicious
24  order" as it relates to the distribution of prescription
25  medications?

Page 188

1      A. Suspicious order?  No, I'm not.  Well, what --
2  you might have to explain that to me.  I'm not familiar
3  with the term.
4      Q. The term "suspicious order" as it relates to
5  distribution of prescription medications.  You're not
6  familiar with it?
7      A. I am not.
8      Q. Being that you're familiar with it, is it fair
9  to say that you are not aware of any suspicious orders
10  that were shipped by Kroger or Albertsons' pharmacies
11  into Tarrant County?
12      A. I am not aware.
13      Q. Are you familiar with, or have you reviewed any
14  of -- of Kroger's policies or procedures relating to
15  dispensing of prescription opioids?
16      A. No, I am not.
17      Q. Are you familiar with, or have you reviewed any
18  of Albertsons' policies or procedures relating to the
19  dispensing of prescription opioids?
20      A. No, I am not.
21      Q. Are you familiar with Kroger's training related
22  to dispensing of prescription opioids?
23      A. No.
24      Q. Are you familiar with Albertsons' training
25  related to the dispensing of prescription opioids?

Page 189

1      A. No.
2      Q. Do you agree that prescribing a large amount of
3  prescriptions on its own does not necessarily mean
4  there's any illicit activity, or improper, or illegal
5  activity?
6          MS. AYACHI:  Objection, form.
7      A. Yeah, it's hard to know.  You know, there's no
8  way to know that without analyzing what happened
9  afterwards.
10      Q. (BY MR. CARDI)  So the fact that a specific
11  doctor writes a lot of prescriptions, standing alone
12  does not mean there's any diversion going on?  There are
13  other factors --
14      A. I have no way to know that.  I have no way to
15  know that.
16      Q. I didn't mean to interrupt you, Doctor.  I
17  apologize.
18          We spoke of pill mills earlier.  What's
19  your understanding of a pill mill?
20      A. I'm not -- I mean, I've heard the term.  I
21  don't know what you mean by it.  I mean, I'm not super
22  familiar.
23          I have my guess.  The guess would be a
24  clinic that's writing prescriptions freely, I mean, you
25  know, very loosely.  That's -- that's my understanding

48 (Pages 186 - 189)

Page 190

1 from just being around in the community.
2        But if you have a different definition,
3 feel free to let me know.
4    Q. Sure. That's roughly my understanding.
5 Physicians that are writing prescriptions without
6 examining and determining a legitimate medical need that
7 the patient has.
8        Do you have any knowledge of the existence
9 of pill mills under that definition within Tarrant
10 County over the past ten years?
11    A. I am not aware.
12        But I'm sure there's other entities like
13 law enforcement or others who might have had complaints,
14 but not -- not to the health department.
15    Q. You don't have any anecdotal recollections of
16 learning of a -- of a law enforcement bust of a pill
17 mill or anything?
18    A. Oh, I'm sure a lot of those things hit the
19 news, but I don't have a recollection.
20        But, like I said earlier -- and it was
21 related to methamphetamines -- but, you know, we did
22 hear for a couple -- three years some buzz about
23 methamphetamine use, and, I guess, networks of
24 distribution in unincorporated areas of the county, but
25 it seems to have subsided.

Page 191

1        The conversation has shifted more towards
2 fentanyl. That's anecdotal. I mean, what's 100 percent
3 accurate? I mean, law enforcement may know more than --
4 than we ever will.
5    Q. Were you aware in the past ten years of any
6 concerns with residents of Tarrant County doctor
7 shopping? Meaning going around to different medical
8 offices within or without Tarrant County to try to find
9 someone to fill it?
10    A. Yeah.
11        So, again, that is, you know, conversations
12 I've heard on -- when they can't get their prescription
13 filled, they'll, you know -- this was kind of a common
14 discussion -- that they are going from doctor to doctor,
15 and we need to make sure prescription data is flowing
16 from EMRs from one clinician office to the other. So
17 they're not filling a prescription for someone who's
18 doctor hopping.
19        So those are some of the prevention
20 strategies that we would be discussing or had discussion
21 that if we had all the resources, here's how to mitigate
22 some of that. But it's not something that's on my radar
23 recently, but it was when we were more actively pursuing
24 it.
25    Q. Do you believe that Tarrant County Public

Page 192

1 Health has any authority when it comes to sharing of --
2 of a patient seeking filling of an opioid -- or I'm
3 sorry -- the prescription of an opioid?
4        MS. AYACHI:  Objection, form.
5    A. No. Yeah, we don't have the authority to share
6 patient information without a due cause. And,
7 generally, due cause is to present an outbreak. So,
8 kind of, a loaded area there.
9        Can there be methods devised to share
10 information? Eventually, on a limited basis. You know,
11 mostly the identified basis to show trends, yes.
12        But not to an individual level like, oh,
13 Vinny, is a pill shopper. I don't think that's --
14 that's going to the case that the health department does
15 that. But we might facilitate, under existing laws,
16 sharing of patient prescription and medical record data
17 between clinical practices.
18        The technology exists, but a lot of the
19 medical practices and doctors don't implement it
20 correctly and don't always use it. That's where the
21 education and the Health Department acting as the glue
22 comes in. Hey, why don't we put some resources, connect
23 these systems, so they talk to each other? And you get
24 a person who's saying I need medication; you can quickly
25 pull all their history before you write a prescription.

Page 193

1    Q. (BY MR. CARDI)  Are you referring to PDMP data?
2    A. I -- I was not. I was talking about actual
3 medical records data from different clinical practices,
4 but it would be nice to have that data also added in.
5 But that's a long, drawn-out processes, and you're going
6 to have to connect with a state data system.
7        Can it be done? We do that with
8 immunization registry. Lot of immunization data comes
9 back from the state realtime to medical record charts
10 because that's the way connectivity has been
11 established.
12        Can that be done with the pharmacy data?
13 Absolutely. You just need time and resources.
14        But what I was mentioning was medical
15 charts and prescription histories being shared between
16 clinicians because it is currently allowable under the
17 law, and the technology exists. It's just not -- people
18 are not implementing it because it's cumbersome; and
19 they're like, yeah, it's fine. We're practicing the way
20 we're practicing.
21        But the technology is there. You can -- on
22 a click of a button, as long as the patient is
23 authorizing it, request all of their medical records
24 from their previous physicians no matter where they've
25 been and get all that data into their system. Not

49 (Pages 190 - 193)

Page 194

1 flawless, but it's a start.
2    Q.  You're not suggesting that -- that anything
3 that Tarrant County Public Health could do with
4 sufficient funding would address doctor shopping
5 problems specifically, correct?
6    A.  No.
7    Q.  Okay.  I just wanted to make clear.
8    A.  Yeah, no.
9       I mean, our method is going to be like
10 you're mentioning.  Obviously, you've been involved in
11 these conversations.  So -- so have we and a lot of
12 other community partners.
13       So we would all bring them all together.
14 How do we resolve this?  And one of the easier ways
15 seems to be enable existing technology to talk to each
16 other.  Because it's there.  And it's allowed.
17       The only ingredient that's needed is
18 different hospital and medical offices willing to invest
19 in that technology to talk to each other, training their
20 staff on how to electronically request that data while
21 the patient is there as patient authorization, right?
22       So if the patient authorizes, all of that
23 data can flow in pretty much instantaneously.  And when
24 the patient is being seen by the doctor and go through
25 their medical and history and all that, the doctor can

Page 195

1 see, hey, this person's been prescribed, you know,
2 opioids for a long time.  Why are they asking again?
3 And then approach it differently versus, oh, I hurt my
4 back, and I need meds.
5       Okay.  So there's one added tool that can
6 be available.  That's what I was, kind of, talking
7 about.
8    Q.  You don't believe that every physician with a
9 DEA license authorized to prescribe opioids has access
10 to data on a particular patients opioid prescription
11 history?
12    A.  I don't know for certain; but, you know, just
13 knowing medical records and data, it is still a very
14 disjointed system.
15       That's what was being tried, you know, when
16 we were going from paper medical records to electronic
17 medical records.  The concept was the patient's medical
18 chart is a complete record, and it goes with the patient
19 no matter what physician they visit, what hospital they
20 visit across the country.  That is still not a reality
21 even though the technology exists.  It is not an
22 interconnected world on health medical record data.
23    Q.  Do you know whether or not physicians are
24 required to input information on the purchase of
25 controlled substances like opioid medications into a

Page 196

1 database?
2    A.  I believe so.
3       And that's just because -- and, again, it's
4 a controlled substance.  They have to -- and I recall
5 some things from just, like, personal experiences that
6 they don't always like -- are able to, like,
7 e-prescribe.  They have to sign something; report
8 something.
9       I'm not fully familiar with the process,
10 but it's more than like, oh, here's your allergy pill.
11 I mean, you know?  It's a little bit more involved in
12 that.  And they are more -- there are more requirements
13 around prescribing a controlled substance.
14    Q.  Right.
15       Are you aware of any instance of a Kroger
16 pharmacy or pharmacist improperly filling a prescription
17 for opioids?
18    A.  No, I am not aware.
19    Q.  Are you aware of any instance of a Kroger
20 pharmacy or pharmacist knowingly allowing the diversion
21 of prescription opioids?
22    A.  No, I'm not aware.
23    Q.  Are you aware of any instance of an Albertsons'
24 pharmacy or pharmacist improperly filling prescription
25 for opioids?

Page 197

1    A.  No, I'm not aware.
2    Q.  Are you aware of any instance of an Albertsons'
3 pharmacy or pharmacist knowingly allowing the diversion
4 of prescription opioids?
5    A.  No.
6    Q.  Are you aware of any instance of a Kroger
7 pharmacy or pharmacist knowingly allowing -- I already
8 read that question.
9       Are you aware of any instance of a Kroger
10 pharmacy or pharmacist -- of any other pharmacy or
11 pharmacist improperly filling a prescription for
12 opioids?
13    A.  Not that I can give you any, like, real
14 accurate data on.  I'm not aware.
15       I'm not in that regulatory authority with
16 the pharmacies, so I have no way to know whether they're
17 doing it right or wrong.  I mean, I'm just another
18 person.
19       Like, hey, you know pharmacy's there.
20 They're doing their job.  Hopefully, they're doing it
21 right.  I mean, that's just how it is, you know.  I'm
22 not in that circle to know whether it's being done right
23 or wrong.
24    Q.  Even anecdotally, I mean, have you heard of a
25 specific instance of any pharmacy or pharmacist within

50 (Pages 194 - 197)

Page 198

1 Tarrant County improperly filling prescription for
2 opioids?
3      A. I have not.
4          But, again, the conversation we had about
5 my experience, was it legally done?  Did it authorize
6 it?  Were there opportunities for improvement so that
7 things are not loosely prescribed and dispensed?  I
8 think that's a good example where there's opportunities
9 for improvement.
10          But I wouldn't -- that's why I was saying I
11 wasn't blaming the doctor or the pharmacy in that
12 example.  I just saying it was just the system was kind
13 of set up fairly messed up.
14      Q. And you acknowledge that you authorized the
15 sale of that and the receipt and the filling of that
16 prescription?
17      A. Yes.
18          (Simultaneous cross-talk ensues.)
19      Q. (BY MR. CARDI) Go ahead, sir.
20      A. I said, I fell into that trap.  You know, life
21 being busy.  You got an automated call.  Yeah, I need my
22 prescription.  Sure.  Fill it up.  Because there's more
23 than one prescription, so went in.  Picked up.  Didn't
24 care what I picked up.  And go home.  Surprise.  Stuff
25 that you don't need.

Page 199

1      Q. And you don't believe that the -- that the
2 dentist or the pharmacy or pharmacist was trying to trap
3 you in that scenario, do you?
4          MS. AYACHI:  Objection, form.
5      A. I have no way to know that.
6          Is there -- is there a system that was set
7 up that could have been improved?  That's all I can tell
8 you.  That knowing now what all has happened, right, and
9 just hearing that there may have been other parties
10 involved that were pushing that this is a comfortable
11 way to do things, maybe there was.  I don't know.
12          But my personal experience and my personal
13 opinion on that is, was there a better way to do it.  I
14 mean, my first reaction was, I paid money for something
15 that I don't need, and I can't take it back.  Hey,
16 return.  Like it's not like just buying groceries from
17 Walmart or whatever.  Hey, take it back.  I accidentally
18 bought it.
19          It's a medicine.  They dispensed it.
20 They're not going to take it back and refund your money,
21 right?
22          So all the opportunity I had was lock it in
23 my cabinet or, you know, put it in a drug reselection
24 program, which I'm smart enough to do that.  But most
25 people don't know, and they don't really have the

Page 200

1 education to do so.  And they just put it in the
2 cabinet.  Hey, maybe for later use.
3          So there was opportunity for improvement.
4 I wasted my time and money to go pick up a prescription
5 that I didn't need.  So my frustration at the time was
6 that.
7          Later, because I'm in public health and
8 realizing what's happening with our community as a whole
9 -- too many prescriptions being written and being
10 filled, and, again, connecting the dots.  Maybe it was
11 happening like that -- there was probably some things
12 that could have been done differently and done right
13 versus what was -- what was happening.
14      Q. (BY MR. CARDI) Do you agree that -- that
15 national/international medical community beliefs and
16 understanding as to the appropriate use of opioids has
17 changed over the past 10, 15 years?
18          MS. AYACHI:  Objection, form.
19      A. I'm not in the -- practicing, you know,
20 physician anymore.  So, I mean, I can only anecdotally
21 tell you that there is a lot more conversations
22 happening.  I don't know that they've changed.  That's
23 why I keep saying I hope it has changed.  You know, I'm
24 starting to see some trends in the data that we saw on
25 the graph.  And, hopefully, is leveling off to a more

Page 201

1 reasonable use.
2          We saw that with antibiotics.  So it's not
3 anything that, you know, seems to be different.
4 Antibiotics were pushed very heavily, and then we
5 realized that's not the thing to do.
6          And, now, you go ask the doctor for an
7 antibiotic, and they try to talk you out of it.  And you
8 go home sick and cursing the doctor.  I needed that
9 antibiotic, but they usually don't give it to you.  It's
10 gone the other way.
11      Q. (BY MR. CARDI) You don't recall in the past 10
12 to 15 years the majority of those medical professionals
13 believing in a more liberal use of opioids to treat
14 different levels of pain?
15          MS. AYACHI:  Objection, form.
16      A. I was -- yeah, I'm not -- I'm not in the
17 practice of medicine, so I'm privy to those circles and
18 those conversations.  I've heard what you might have
19 heard on TV and other -- just other -- just being in
20 other circles.  Same thing that it was being very
21 liberally used, but I am not directly privy to the
22 practice side of medicine.
23          THE CERTIFIED STENOGRAPHER:  This is the
24 court reporter.  Can we go off the record for just one
25 moment, please?

51 (Pages 198 - 201)

Page 202

1  MR. CARDI:  Yes, ma'am.
2  THE CERTIFIED STENOGRAPHER:  Thank you.
3  THE VIDEOGRAPHER:  We are off the record at
4  3:12 p.m.
5  (A break was taken from 3:12 p.m. to
6  3:16 p.m.)
7  THE VIDEOGRAPHER:  We're back on the record
8  at 3:16 p.m.
9  Q.  (BY MR. CARDI)  Doctor, are you aware of any
10  wrongful act by Kroger or one of its pharmacies in
11  Tarrant County relating to prescription of opioids?
12  A.  No.
13  Q.  I'm sorry?
14  A.  No, I'm not.
15  Q.  Are you aware of any wrongful act by Albertsons
16  or one of its pharmacists in Tarrant County related to
17  prescription opioids?
18  A.  No, I'm not.
19  Q.  The anecdote we were discussing regarding the
20  dentist prescription, when did that occur?
21  A.  I don't exactly recall the date, but I was in
22  Michigan 2011 to '14.  And somewhere in that time frame,
23  I got a dental procedure done on the right side, lower
24  jaw.  So somewhere -- venture to say 2012.
25  And the pharmacy, I do remember actually

Page 203

1  was CVS Pharmacy.  So it wasn't Kroger and Albertsons',
2  but it was a pharmacy.
3  And I, since then, put a note in my phone
4  and carried over -- because it's in my Google profile --
5  automated pharmacy reminder.  So when the call comes, I
6  know what am I looking at.  Oh, pay attention.  Don't
7  just say yes blindly.
8  Q.  So you get a call, you know who's calling you
9  and what they want?
10  A.  Yeah.
11  Because -- because a lot of times, it just
12  comes, and the number just shows up and you don't know
13  what it is.  You listen.  You're busy.  You're like
14  yeah, yeah, okay, fine.  So I know I have a note in
15  there that it's an automated reminder, and I better pay
16  attention.
17  Because I didn't -- my big thing was I
18  didn't want to pay for something that I can't return and
19  don't need it.  So just being careful about my, you
20  know, dollar use.
21  Q.  Have you -- have you ever been called by a
22  Kroger or Albertsons' pharmacy that has not identified
23  themselves in their purpose in seeking to refill or
24  secure permission to refill a prescription?
25  A.  No.

Page 204

1  MS. AYACHI:  Objection, form.
2  Q.  (BY MR. CARDI)  Okay.  Okay.
3  MR. CARDI:  I have no further questions at
4  this time.  I'll turn it over to -- I don't know if
5  Peter has anything or not.
6  MR. WAHBY:  No questions at this time.
7  Thank you.
8  MS. AYACHI:  Can we just take a quick
9  five-minute break?
10  MR. CARDI:  Yeah.
11  MS. AYACHI:  Sure.
12  THE VIDEOGRAPHER:  Okay.  We're off the
13  record at 3:19 p.m.
14  (A break was taken from 3:19 p.m. to
15  3:29 p.m.)
16  THE VIDEOGRAPHER:  We're back on the record
17  at 3:29 p.m.
18  FURTHER EXAMINATION
19  BY MS. AYACHI:
20  Q.  Dr. Taneja, I have just a few questions for
21  you.
22  A.  Sure.
23  MS. AYACHI:  Greg, I added an exhibit into
24  the shared folder.  Would you be able to put that on the
25  screen for me?

Page 205

1  MR. HOLDERMAN:  I'm sorry.  Did you put it
2  in the exhibit share -- in your exhibit share private
3  folder?
4  MS. AYACHI:  Yes.
5  MR. HOLDERMAN:  I don't have access to
6  that.  I didn't realize.  Give me one second here.
7  MS. AYACHI:  Sure.
8  MR. CARDI:  This probably is not the
9  easiest way, but, Leila, you could send it to me, and I
10  could put it in mine; and he could do it.  I can't
11  imagine that's the easiest way, though.  I'm just
12  offering.
13  MR. HOLDERMAN:  That honestly may be the
14  fastest way.  I'd have to --
15  MR. CARDI:  Okay.
16  MR. HOLDERMAN:  -- make a request to the
17  exhibit share --
18  MS. AYACHI:  Yeah, whatever's easiest.
19  Okay.  Michael, go ahead and give me your
20  email address, please.
21  MR. CARDI:  M, Cardi, C-A-R-D-I
22  @bowlesrice.com.  B-O-W-L-E-S.
23  MS. AYACHI:  All right.  Sent.
24  MR. CARDI:  It should be in there, Gregg.
25  MR. HOLDERMAN:  Okay.  I see it listed as

52 (Pages 202 - 205)

1 "Exhibit 7"; is that correct?
2      MS. AYACHI:  That's how I named it.  You
3 can change the name.  I'm not sure.  However you need
4 to.
5      MR. HOLDERMAN:  Oh, okay.  Just to clarify
6 for the record, Exhibit 8 has been introduced.
7      (Exhibit 8 marked.)
8   Q.  (BY MS. AYACHI)  Doctor, will you open your
9 binder to Exhibit 7, Tab 16?
10   A.  Exhibit 7?
11   Q.  Yes.  Tab 16 in your binder.
12   A.  Oh, okay.  Tab 16, yes.
13   Q.  And then --
14      MS. AYACHI:  Sorry, Gregg.  I do -- I do
15 actually want for you to pull up the Exhibit 8 so that
16 we can just make sure that these are the same documents.
17      MR. HOLDERMAN:  (Complies.)
18      MS. AYACHI:  Thank you.
19      And, please, scroll down about four pages,
20 I think.
21   Q.  (BY MS. AYACHI)  So, Doctor, I will represent
22 to you that this is the same document that you see at
23 Tab 16, but a color version of it.
24   A.  Yeah.
25   Q.  And attached to this is a parent -- the parent

1 email that accompanies this.
2      Were you provided the parent email when you
3 were asked about this exhibit earlier?
4   A.  I -- I don't have that in my binder, the parent
5 email.  I do have the same document in a black and white
6 -- black-and-white version.  This one's the colored
7 version of that.
8   Q.  And let us know if you want Greg to scroll at
9 all, but initially I'll just direct you to the parent
10 email.
11      MS. AYACHI:  So if we can go back to the
12 beginning.  Okay.  So -- sorry.  Scroll down to the
13 second page.  My apologies.
14      MR. HOLDERMAN:  (Complies.)
15   Q.  (BY MS. AYACHI)  So this -- this document,
16 Tarrant_00343779, is the parent email to the original
17 Exhibit 7.
18      Doctor, would it have been helpful for you
19 to have this parent email while giving your testimony
20 earlier?
21      MR. CARDI:  Objection, form.
22   A.  Yes.
23      MS. AYACHI:  Please, go ahead.
24      MR. CARDI:  Go ahead.
25   Q.  (BY MS. AYACHI)  And I invite you just to read,

1 you know, see the exchanges going on.
2      Can you explain to us why this would have
3 been helpful for you to have?
4   A.  Right.
5      So I would draw your attention to the
6 second paragraph.  It talks about (as read):  "Please
7 note the results of the Texas State Board of Pharmacy
8 are still pending.  These data will allow us to describe
9 the persons receiving the prescriptions by gender, city,
10 zip code, number of pills prescribed, number of refills
11 available.  We're waiting on some verbal clarification
12 from the State Board of Pharmacy; and, therefore, do not
13 have an estimate of those results or when they may be
14 available.  With over 3 million prescriptions filled by
15 a licensed pharmacists located in Tarrant County per
16 year, it is understandable, you're going to take time to
17 clean that data and have all of that analyzed to have
18 some meaningful results."
19      But it would lend more context to the
20 trends that we were seeing from these national and state
21 data sets to have, you know, that data.  And this would
22 help me recollect what I was saying, and maybe give you
23 more accurate interpretation of what we're looking at in
24 the graph.
25      Just for context, this is the first time

1 I'm looking at it since 2018, right?  So a lot goes on.
2 Oh, yeah, I remember that graph.  But as you all saw, I
3 kind of remembered the time frame wrong and, you know,
4 wasn't very accurate, but it's seven years ago.  So
5 these type of things do help jog that memory because,
6 you know, it makes it more accurate.
7   Q.  Does this parent email help inform or -- or
8 does it cause you to want to clarify or add to any of
9 your prior testimony with regard to any of the figures
10 that you saw in the original Exhibit 7?
11      So feel free to --
12   A.  Yeah.
13   Q.  -- to look through the binder and refer to any
14 of the figures that were discussed earlier and provide
15 any clarifications that you see that you might want to
16 add.
17   A.  Yeah.
18      So one thing is that I would probably, you
19 know, want to go, you know, later maybe look and see if
20 there was more details available or whatever.  But for
21 today, I want to go back to look at Figure 5.  Because
22 what I recollect was that Tarrant County was on top.
23 And, hopefully, I'm still recollecting it correctly.
24 Yes, it does appear to be the case.  The red line.
25      So, again, context on why opioid

Page 210

1  prescriptions were a hot topic in Tarrant County.  And
2  even though I will concede that I remembered the time
3  frame wrong and 2012 to '16 shows a downward decline
4  nationally, Tarrant County, state of Texas, and many
5  locations, the point that I was trying to make was 2006
6  to '12, we were in an uptrend.  And if you would note,
7  Tarrant County was on top of everybody else -- Harris
8  County, Dallas County, Travis County, State of Texas.
9  U.S. data that has the hotspot West Virginia part of the
10  data, we beat out everybody in prescribing more opioids
11  and dispensing more opioids.  That's all this shows.
12  But we can extrapolate that.  That led, you know, to a
13  situation in Tarrant County that caused more
14  opioid-related addiction and more issues.
15          Because we saw some of the aftermath of all
16  of that.  And as a result, there we are discussing that.
17  So that's -- that's one thing that was missing because
18  it was not a colored chart that we were looking at.  But
19  I remember that Tarrant County was in trouble looking at
20  this data.  So there we are on that one.
21          If we can go to the next page.  I know we
22  didn't cover some of those, but I think there's some
23  useful information there.  And some of that is data from
24  other sources.
25          So -- and, again, it's hard to sort of just

Page 211

1  look at the report and say what may be causing that.
2  But look at the first draft, No. 6.  From 2000 all the
3  way to 2014/'15 time frame, it was a steady increase in
4  opioid exposure calls to Texas Poison Control Center for
5  Tarrant County residents.  So not every data set is
6  going to exactly match up, but they fill in the gaps of
7  what was happening in our community.
8          So prescription charts are showing 2006.
9  '12 was the peak, and then there was a decline; but we
10  don't have before and after.  This one goes a little bit
11  beyond that, and Poison Control calls usually are
12  overdose related.  You're seeing a steady increase from
13  all the way 2000, all the way into 2015/'16 time frame.
14  So beyond what we saw.
15          Corroborating that is Figure 7 --
16  Q.  I'm sorry, Doctor.  Let me just --
17  A.  -- which is broken down --
18  Q.  I just want to clarify.  Figure 6, is that the
19  one entitled "Number of Opioid Exposures Reported to the
20  Texas Poison Center Network Among Tarrant County
21  Residents 2000 to 2017"?
22  A.  That is correct.
23  Q.  Okay.  Please continue.
24  A.  And then on No. 7, again, it is broken down by
25  type of opioid substance being used, legal or illegal;

Page 212

1  and you can see some trend there.  But the big-picture
2  trend that I wanted to point out:  More data gives you a
3  better picture.  Even though on the prescription front,
4  we may have seen, hey, there was a decline.  This is not
5  really true on why the poison -- you know, the Poison
6  Center data was showing what was happening in the
7  community.
8          So we're seeing an increasing trend all the
9  way into 2015, 2016, and then a little bit of a decline
10  in '17.  But the point here is, all those prescriptions
11  got written.  And, again, anecdotally what we heard was
12  people locked them away in their kitchen cabinet,
13  bathroom cabinet later to be found by teenagers, adults,
14  children.
15          It lends itself to somewhat of a bad
16  conversation.  Yeah, Poison Center Control calls
17  continued on.  Despite the decline in prescription being
18  written and dispensed, we were still on an uptrend
19  because there was so much leftover medicine sitting in
20  our community.
21          And, again, this is -- you know, I can't
22  just draw that conclusion from the graph, but it does
23  lend itself to the story that we keep hearing in public
24  health and medical circles; and that's what happened.
25  It does paint that picture when you look at it with that

Page 213

1  context in mind.  So there is some value to looking at
2  more of this data there.
3          And then I think a final, maybe couple of,
4  charts I want to show.  On the next page, there's one
5  line.  The second bullet point that I would like to read
6  before the chart.  Go back up.
7          MR. HOLDERMAN:  (Complies.)
8  A.  (As read):  "The drug tramadol had the greatest
9  increase in reports among Tarrant County residents with
10  almost 800-percent increase from 11 reported exposures
11  in 2000 to 97 reported exposures in 2017."  And just
12  being in the public health prevention world, reports are
13  the tip of the iceberg.  So if we saw an 800 increase in
14  -- 800 percent increase in reports, you can just imagine
15  how much got unreported.
16          And the graph there talks about Tarrant
17  County residents that had intentional exposures.
18  Meaning, they sought out by purposeful action these
19  opioids, and then later had overdoses and adverse
20  reactions and things like that.
21          So there's more context to this.  The story
22  didn't end that, oh, in 2012 prescriptions peaked, and
23  then they declined.  The damage continued on in our
24  community for years until 2017 almost.
25          And I'm hoping that it continued the

54 (Pages 210 - 213)

Page 214

1 downward trend.  I just don't know what the rest of the
2 picture is.  So that's No. 8.
3          And then just lending itself to some
4 discussion about where Public Health Department could
5 have been useful in strategies, No. 9.  So this is where
6 it's useful to collect data and look at that, right?  So
7 a lot of the opioid-exposure situations got reported to
8 Poison Control Center.  And they found that a majority
9 of those situations, naloxone was not recommended, was
10 not used, things like that.  And that's a learning
11 opportunity for all of us from a prevention standpoint,
12 from a public health standpoint.
13          So this is just an example to show what
14 public health would be able to bring to the table when
15 given all the resources, the dollars, and the
16 investments in preventing this situation from becoming a
17 bigger crisis than it already has been.
18          That's kind of what I wanted to show.
19          Other charts are -- No. 12 might be of
20 interest to, y'all.  Related to e-data.  Because we
21 talked about it.  And it's, I think, the latest time
22 frame that we had in this report.
23          So if we want to go to Page 8, Figure 12.
24 So it is a time frame, I think, from 2017 to early 2018.
25 Continuing to show a disease surveillance trend in the

Page 215

1 ERs opioid-related visits on the increase.  And this is,
2 like, early part where we weren't even like fine tuning
3 our algorithm or investing a lot of effort in trying to
4 study all of that.
5          So this was just kind of an indicator, oh,
6 there's a problem.  We should invest more into this.
7 This is -- you know, just the starting of everybody,
8 kind of, really starting to kind of pay attention that
9 we have problems in our community that needs to be
10 addressed.
11          So color charts and those emails do lend a
12 lot of context to the story that we've all heard in
13 public health and other circles; that there is a real
14 problem in our community, and something needs to be done
15 about it.
16          It's up to y'all and others to determine,
17 you know, parties responsible and how the mechanisms
18 work and all of that.  My job here is tell you that the
19 problem was real, and there were two factors, liberal
20 prescription/liberal dispensing.
21          And, later, what you saw was the aftermath
22 that we can show in the data.
23      Q.  That's all the questions I have for you,
24 Doctor.
25          MS. AYACHI:  Pass the witness.

Page 216

1          FURTHER EXAMINATION
2 BY MR. CARDI:
3      Q.  Doctor, if I recall your testimony correctly,
4 prior to the introduction of Exhibit 7 in color, you had
5 testified it was your recollection that Figure 5 showed
6 Bexar on top, right?
7      A.  I thought Travis was on top, but that's --
8 that's what I thought at the time.
9          But I was kind of taken aback when I looked
10 at the chart that I recollected wrong.  I thought we
11 were ending in an incline, but we were ending in a
12 decline.  So I was kind of not sure of my own
13 recollection.  One that I was like maybe Travis was on
14 top.  I don't know.
15          But in the back of my head, I thought
16 Tarrant was on top, and that was right.  And I did try
17 to correct that a couple of times later that maybe, I
18 think, on the black-and-white chart, it's Tarrant County
19 on top.
20      Q.  Is Exhibit 7 and Exhibit 8 is a color copy of
21 Exhibit 7?  Is it the final draft of the report?
22      A.  I'm not sure if it's the final draft, but it's
23 -- it's the same exact copy that I'm looking at on the
24 black-and-white version.  Same Bates number, same draft,
25 same everything.

Page 217

1      Q.  Well, beginning Exhibit 8, speaks (as read):
2 "Awaiting for variable clarifications," indicating that
3 it's not a final draft potentially; is that fair?
4      A.  Yeah.
5          And, again, that's why I said when we
6 started talking now is that I would have probably liked
7 to go back and see if there is a revised version, or did
8 we not find other data to revise any further?  But this
9 seemed to be a draft that they found in my email, I
10 guess.
11      Q.  And as you sit here today, you don't know what
12 the final draft presented, whether or not the numbered
13 change?
14      A.  Yeah, I don't -- I don't recall any
15 other because it's been a long time.  I don't know that
16 the numbers would have changed very much.
17          What may have been added was the state
18 pharmacy board data because I do recall a whole another
19 draft, but it could have been getting confused.
20      Q.  So I believe your testimony walking through
21 these figures is that there was an increase in
22 prescriptions shown by Figure 5.  That, coupled with
23 your anecdotal recollection of pills being left in
24 cabinets and then stolen by others, coupled with the
25 later increase in calls to the poison center and such,

55 (Pages 214 - 217)

Page 218

1 creates a connection between what you called liberal
2 prescription and liberal dispensing and present problems
3 with opioids; is that fair?
4        MS. AYACHI:  Objection, form.
5    A.  Not present.  But to the point it was showing
6 the chart all the way up to 2016, '17.
7        Because, like I said, last three years have
8 been a blur.  And my ear has been more to COVID than to
9 opioids.  Still, what's filtering in is, hey, fentanyl
10 has burst onto the scene as a major problem.  It was
11 not.  If you look at one of the charts, No. 8, I believe
12 -- or No. 7.  Fentanyl was there but, it wasn't a big
13 deal.  But, now, what I expect if we pull up recent
14 data, we would probably see a lot more than that.  But,
15 again, I don't have any data beyond 2017 in front of me
16 to tell you what the current situation is.
17        What I was trying to say is that even
18 though on this chart No. 5, Figure No. 5, it does appear
19 that we peaked in prescriptions in dispensing in 2012,
20 issue in our community continued on three or four years
21 later and a continued increase in overdoses and calls to
22 the poison center probably corroborate that with Medstar
23 and getting ambulance calls and law enforcement getting
24 calls and all that.  But one would venture to say, it
25 was because the story was being true was true.  That a

Page 219

1 lot of extra medicine got left over in cabinets and fell
2 into unintended hands.  But then there's data to show
3 that they were intentionally being sought out.
4        So it became a cycle where people either
5 themselves got hooked or others got hooked and then
6 sought out intentional exposure to opioids.
7    Q.  (BY MS. AYACHI)  Throughout today, you've
8 refused to speculate based on data not being present in
9 front of you and based on potentially a lack of
10 perceived qualifications.  I'm trying to confirm.  Are
11 you now saying that these figures lead you to the
12 conclusion that an increase in prescriptions during this
13 time frame led to resulting increase overdose on
14 prescription and illicit opioids?  Have you come to that
15 conclusion based off this data?
16        MS. AYACHI:  Objection, form.
17    A.  No, no.  Not at all.
18        You know, all I'm trying to say is when I
19 hear those stories that too many prescriptions were in
20 our community available to people and a lot of that fell
21 into other hands where it was not intended to go to, and
22 then I look at this data, it does makes sense.  The
23 story does sound recently found true.  But it doesn't
24 conclusively prove any of that.
25        So, I mean, I'm very clear.  I'm just

Page 220

1 saying that prescriptions went on a rise and then went
2 on a decline.  It just shows just that.
3        Later, we see poison control calls went up
4 related to prescription meds even though there were less
5 prescriptions being prescribed.  So what that tells me
6 is that potentially -- that story was true that there
7 was a lot left over in our community because we were
8 beating out everybody else on prescriptions.
9        So are there other explanations possible?
10 Sure.  But I've heard it too many times, and then I look
11 at the data, and I was, like that sounds like a logical
12 explanation.
13    Q.  (BY MR. CARDI)  But you don't feel comfortable
14 on any level speculating as to whether or not the vast
15 majority of patients who used prescription opioids
16 pursuant to a valid prescription and used as directed by
17 a doctor subsequently used heroin?
18        MS. AYACHI:  Objection, form.
19    A.  I have no way to know any of that.
20    Q.  (BY MR. CARDI)  Okay.
21        In light of the colored figure present in
22 Exhibit 8, are you aware of any instance of Kroger
23 pharmacy or pharmacists improperly filling a
24 prescription for opioids?
25    A.  No.

Page 221

1    Q.  In light of witnessing Exhibit 8 in color, are
2 you aware of any instance of a Kroger pharmacy or
3 pharmacist knowingly allowing the diversion of
4 prescription opioids?
5    A.  No.
6    Q.  In light of the colored copy present in
7 Exhibit 8, are you aware of any instance of an
8 Albertsons' pharmacy or pharmacist improperly filling a
9 prescription for opioids?
10    A.  No.
11    Q.  In light of the color copy present in
12 Exhibit 8, are you aware of any instance of an
13 Albertsons' pharmacy or pharmacists knowingly allowing
14 the diversion of prescription opioids?
15    A.  No.
16    Q.  All right.
17        MR. CARDI:  I have no further questions.
18        FURTHER EXAMINATION
19 BY MR. WAHBY:
20    Q.  Yes, sir, this is Peter Wahby.  I'm
21 representing Albertsons in connection with the case
22 you've appeared on -- appeared for today.  Just a couple
23 of questions.
24        You referred to liberal dispensing.
25        Do you recall that?

56 (Pages 218 - 221)

Page 222

1    A.  Yes.
2    Q.  Do you have any evidence that Albertsons or an
3  Albertsons' affiliated pharmacy or pharmacists engaged
4  in any liberal dispensing practices?
5    A.  No, I'm not aware.
6    Q.  Do you have any evidence that any Kroger or
7  Kroger-affiliated pharmacy or pharmacist engaged in any
8  liberal dispensing practices?
9    A.  I am not aware.
10    Q.  Okay.
11        MR. WAHBY:  No further questions.  Thank
12  you, doctor.
13        MS. AYACHI:  And I don't have any other
14  questions.
15        Thank you so much, Dr. Taneja.  I really
16  appreciate your time, and we hope you can get to the
17  county judge before the end of the day.
18        THE WITNESS:  We'll find out.  Thank you so
19  much.
20        THE VIDEOGRAPHER:  We're off the record at
21  3:55 p.m.
22        THE REPORTER:  Just for the attorneys, real
23  quick housekeeping.  Since this is Federal, do you have
24  any other stipulations you want to add to the record?
25        MR. CARDI:  I don't believe so.  None from

Page 223

1  my end.
2        MS. AYACHI:  None from my end either.
3        (Proceedings concluded at 3:55 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 224

1        UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
2              EASTERN DIVISION
3  IN RE:  NATIONAL        ) MDL No. 2804
   PRESCRIPTION OPIATE    ) Case No. 17-md-2804
4  LITIGATION             ) Judge Dan Aaron Polster
                          )
5                         )
                          )
                          )
6                         )
7
       REPORTER'S CERTIFICATION
8  DEPOSITION OF VEERINDER TANEJA, MBBS, MPH
            August 30, 2023
9
10        That the deposition transcript was delivered
11  to Mr. Michael Cardi.
12        That a copy of this certificate was served on
13  all parties and/or the witness shown herein on
14  _____
15        I further certify that pursuant to FRCP
16  Rule 30(f)(1) that the signature of the deponent:
17  _____ was requested by the deponent or a party
18  before the completion of the deposition and that
19  signature is to be before any notary public and returned
20  within 30 days from date of receipt of the transcript.
21        If returned, the attached Changes and
22  Signature Page contains any changes and the reasons
23  therefore:
24  _____ was not requested by the deponent or a
25  party before the completion of the deposition.

Page 225

1        I certify that I am neither counsel for,
2  related to, nor employed by any of the parties or
3  attorneys in the action in which this proceeding was
4  taken, and further that I am not financially or
5  otherwise interested in the outcome of the action.
6        Certified to by me this
7  18th day of September, 2023.
8
9
10
11
12
      ABIGAIL GUERRA, Texas CSR 9059
13  Expiration Date:  02/28/24
      VERITEXT LEGAL SOLUTIONS
14  Firm Registration No. 571
      300 Throckmorton Street
15  Suite 1600
      Fort Worth, Texas 76102
16  Phone:  (817) 336-3042
17
18
19
20
21
22
23
24
25

57 (Pages 222 - 225)

**Page 226**

1    Veritext Legal Solutions
          1100 Superior Ave
2            Suite 1820
         Cleveland, Ohio 44114
3        Phone: 216-523-1313
4
     September 18, 2023
5
     To: Sadie Turner, Esq.
6
     Case Name: National Prescription Opiate Litigation -
7        Track 9 (Tarrant County)
8    Veritext Reference Number: 6055208
9    Witness:  Veerinder Taneja, MBBS, MPH   Deposition Date:  8/30/2023
10
     Dear Sir/Madam:
11
12   Enclosed please find a deposition transcript.  Please have the witness
13   review the transcript and note any changes or corrections on the
14   included errata sheet, indicating the page, line number, change, and
15   the reason for the change.  Have the witness' signature notarized and
16   forward the completed page(s) back to us at the Production address shown
17
     above, or email to production-midwest@veritext.com.
18
19   If the errata is not returned within thirty days of your receipt of
20   this letter, the reading and signing will be deemed waived.
21
     Sincerely,
22
     Production Department
23
24
25   NO NOTARY REQUIRED IN CA

**Page 227**

1            DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 6055208
3    CASE NAME: National Prescription Opiate Litigation -
         Track 9 (Tarrant County)
     DATE OF DEPOSITION: 8/30/2023
4    WITNESS' NAME: Veerinder Taneja, MBBS, MPH
5    In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7    I have made no changes to the testimony
     as transcribed by the court reporter.
8
9    _____    _____
     Date            Veerinder Taneja, MBBS, MPH
10   Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
     They have read the transcript;
13   They signed the foregoing Sworn
         Statement; and
14   Their execution of this Statement is of
         their free act and deed.
15
     I have affixed my name and official seal
16
     this _____ day of_____, 20_____ .
17
18   _____
     Notary Public
19
     _____
     Commission Expiration Date
20
21
22
23
24
25

**Page 228**

1            DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 6055208
3    CASE NAME: National Prescription Opiate Litigation -
         Track 9 (Tarrant County)
     DATE OF DEPOSITION: 8/30/2023
4    WITNESS' NAME: Veerinder Taneja, MBBS, MPH
5    In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7    I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9    I request that these changes be entered
     as part of the record of my testimony.
10
     I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____    _____
     Date            Veerinder Taneja, MBBS, MPH
14
     Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17   They have read the transcript;
     They have listed all of their corrections
18      in the appended Errata Sheet;
     They signed the foregoing Sworn
19      Statement; and
     Their execution of this Statement is of
20      their free act and deed.
21   I have affixed my name and official seal
22   this _____ day of_____, 20_____ .
23
     _____
     Notary Public
24
     _____
25   Commission Expiration Date

**Page 229**

1            ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 6055208
3    PAGE/LINE(S) /        CHANGE        /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   Date            Veerinder Taneja, MBBS, MPH
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23
     _____
     Notary Public
24
     _____
25   Commission Expiration Date

58 (Pages 226 - 229)