# EXHIBIT 42

Page 1

1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
2                         EASTERN DIVISION
3     IN RE NATIONAL              )
      PRESCRIPTION OPIATE         )
4     LITIGATION                  )
                                  ) MDL No. 2804
5     THIS DOCUMENT RELATES TO:   ) Case No. 17-md-2804
      Track Nine: Tarrant        )
6     County, Texas               ) Judge Dan Aaron Polster
                                  )
7     (Case No.                   )
       1:18-op-45274-DAP)         )
8
9     ********************************************************
10              ORAL AND VIDEOTAPED DEPOSITION OF
11                   CHERYL BENNETT-WRIGHT
12                      AUGUST 28, 2023
13    ********************************************************
14        ORAL AND VIDEOTAPED DEPOSITION OF CHERYL
15    BENNETT-WRIGHT, produced as a witness at the instance of
16    the Defendants, and duly sworn, was taken in the
17    above-styled and numbered cause on the 28th day of June,
18    2023, from 10:08 a.m. to 12:31 p.m., before Julie C.
19    Brandt, RMR, CRR, and CSR in and for the State of Texas,
20    reported by machine shorthand at Veritext, 300
21    Throckmorton Street, Suite 1600, Fort Worth, Texas,
22    pursuant to the Federal Rules of Civil Procedure.
23
24
25

Page 2

```
 1              APPEARANCES
 2
    FOR THE PLAINTIFF TARRANT COUNTY:
 3
      Leila Ayachi (via Zoom)
 4    Alex AYACHI (via Zoom)
      The Lanier Law Firm, PC
 5    10940 W. Sam Houston Pkwy N., Suite 100
      Houston, Texas 77064
 6    713-659-5200
      alex.abston@lanierlawfirm.com
 7    leila.ayachi@lanierlawfirm.com
 8
    FOR THE ALBERTSONS DEFENDANTS:
 9
      Quinn Ford
10    GREENBERG TRAURIG, LLP
      77 West Wacker Drive, Suite 3100
11    Chicago, Illinois 60601
      312-456-8400
12    quinn.ford@gtlaw.com
13
    FOR THE KROGER DEFENDANTS:
14
      Kiley Aycock (via Zoom)
15    QUILLING SELANDER LOWNDS WINSLETT & MOSER
      2001 Bryan Street, Suite 1800    |
16    Dallas, Texas 75201
      214-871-2100
17    kaycock@qslwm.com
18
    ALSO PRESENT:
19
      Keith Ogle - Tarrant County Asst. Criminal D.A.
20    Sadie Turner - Turner Law Firm (via Zoom)
      Megan King - Veritext Videographer
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2                          PAGE
    Appearances.....................  2
 3  Proceedings.....................  4
 4  CHERYL BENNETT-WRIGHT
      Examination by Mr. Ford...............  4
 5
    Signature and Changes...........  98
 6  Reporter's Certificate..........  100
 7
    DEPOSITION EXHIBITS          IDENTIFIED
 8
    Exhibit 1    6/9/2016 email string      11
 9        TARRANT_00933890 - 00933891
10  Exhibit 2    LinkedIn bio              16
11  Exhibit 3    8/22/2012 email and attachment  47
          TARRANT_00532693 - 00532694
12
    Exhibit 4    9/29/2021 email string and    50
13        attachments
          TARRANT_00900009 - 00900220
14
    Exhibit 5    7/22/2022 email and attachment  68
15        TARRANT_00912945 - 00912956
16  Exhibit 6    9/18/2018 email and attachment  74
          TARRANT_00947739 - 0094740
17
    Exhibit 7    9/16/2021 email and attachment  79
18        TARRANT_00899703 - 00899704
19  Exhibit 8    3/3/2021 email and attachment  85
          TARRANT_00920917 - 00920938
20
21
22
23
24
25
```

Page 4

```
 1            P R O C E E D I N G S
 2        THE VIDEOGRAPHER:  We're on the record at
 3  10:08 a.m. on August 28, 2023.  This is the deposition
 4  of Cheryl Bennett-Wright, in the matter of In Re
 5  National Prescription Opiate Litigation, filed in the
 6  Northern District of Ohio, Eastern Division, Case No.
 7  17-md-2804.
 8        At this time, Counsel, please state your
 9  appearances for the record.
10        MR. FORD:  Quinn Ford, from Greenberg
11  Traurig appearing on behalf of Albertsons, the
12  Albertsons defendants.
13        MR. OGLE:  Keith Ogle, Assistant Criminal
14  District Attorney for Tarrant County.
15        MS. AYACHI:  My name is Leila Ayachi and
16  I'm representing Tarrant County, and Alex Abston and
17  Sadie Turner are also from The Lanier Law Firm.
18        MS. AYCOCK:  Kiley Aycock, I'm with
19  Quilling Selander, and I'm here for Kroger.
20        CHERYL BENNETT-WRIGHT,
21  having been first duly sworn, testified as follows:
22            EXAMINATION
23  BY MR. FORD:
24    Q.  Good morning.
25    A.  Good morning.
```

Page 5

```
 1    Q.  I'm going to repeat what I said a couple of
 2  moments ago.  My name is Quinn Ford.  I'm an attorney
 3  representing Albertsons in this lawsuit.
 4        Could you please state your name for the
 5  record.
 6    A.  Cheryl Bennett-Wright.
 7    Q.  And would you prefer I refer to you as
 8  Ms. Bennett-Wright or Ms. Wright today during the
 9  deposition?
10    A.  You can say Ms. Bennett-Wright is fine.
11    Q.  Ms. Bennett-Wright, okay.  Thank you.
12        Ms. Bennett-Wright, what is your date of
13  birth?
14    A.  10/4 of '68.
15    Q.  And what is your current address?
16    A.  2423 Campfire Creek Drive, Arlington, Texas.
17    Q.  Is that in Tarrant County?
18    A.  It is.
19    Q.  How long have you lived in Tarrant County for?
20    A.  About 30 years.
21    Q.  Have you ever given a deposition before?
22    A.  I have not.
23    Q.  Have you ever testified in a court proceeding
24  before?
25    A.  I have.
```

2 (Pages 2 - 5)

Page 6

1  Q.  When was that?
2  A.  It was so long ago I don't remember.
3  Q.  Was it one time or multiple times?
4  A.  I would say a couple of times.
5  Q.  Do you remember sort of the setting?  For
6  instance, was it a trial?
7  A.  It was a criminal trial, yes.
8  Q.  Okay.  So I'm just going to go over some basic
9  deposition ground rules today, if that's okay.
10      The first is breaks.  This deposition will
11  likely take at least a couple of hours.  So if at any
12  time you need to take a break, please let me know.  I'm
13  happy to, you know, accommodate you.  The one thing I
14  ask is if a question is pending, if I've asked a
15  question, that you answer the question first and then we
16  can take a break whenever you want.  Is that fair?
17  A.  Yes.
18  Q.  The court reporter here, Julie, will be taking
19  down everything that's said today.  And it's important
20  for everyone to get a clean transcript, so some of the
21  things we usually say is try to speak clearly and
22  slowly.  Also, please let me finish my question before
23  you begin giving your answer.  I know it's easy
24  sometimes to know where I'm going and I might speak
25  slowly, but for the transcript's sake, please let me

Page 7

1  finish the question.
2      Also, you know, a lot of people respond uh-huh
3  or huh-uh for yes or no.  Please respond with a yes or
4  no, because it helps out for the transcript.
5      Also, if you don't understand a question,
6  please let me know.  I'm happy to rephrase it or
7  clarify.  But if you answer a question, I will take that
8  and assume that you understood it.
9      Lastly, your counsel may object to certain
10  questions I ask today.  Just to let you know, even if
11  your counsel objects, you're obligated to provide an
12  answer unless your counsel specifically instructs you
13  not to answer.
14      Do you understand all that?
15  A.  Yes.
16  Q.  Ms. Bennett-Wright, are you under the
17  influence of alcohol or any illegal drugs right now?
18  A.  No.
19  Q.  Have you taken any prescription drugs that you
20  think will prevent you from testifying competently
21  today?
22  A.  No.
23  Q.  Do you have any -- do you currently have any
24  health issues that you think will prevent you from
25  testifying competently today?

Page 8

1  A.  No.
2  Q.  Okay.  Thank you.
3      And the court reporter just put you under
4  oath, and you promised to testify truthfully today.
5  Will you agree to answer my questions truthfully and to
6  the best of your ability?
7  A.  Yes.
8  Q.  Thank you.
9      So I want to talk now a little bit about the
10  background of why we're here.  Do you know why you're
11  here today?
12  A.  Yes.
13  Q.  Can you explain to me why you -- you know, you
14  understand that you're here today?
15  A.  I am here for a deposition on the opioid case.
16  Q.  When you say the opioid case, what are you
17  referring to?
18  A.  An opioid case between pharmacies and Tarrant
19  County.
20  Q.  What do you know about that lawsuit?
21  A.  That's about it.
22  Q.  Do you know any of the claims that Tarrant
23  County is bringing in the lawsuit?
24  A.  I do not.
25  Q.  Do you know if someone asked you describe the

Page 9

1  lawsuit, how would you describe it?
2  A.  An opioid case between Tarrant County and the
3  opioids companies and pharmacies.
4  Q.  Have you ever heard the phrase "opioid
5  epidemic"?
6  A.  I have.
7  Q.  What does that phrase mean to you?
8  A.  Epidemic means it's widespread.  Opioid was a
9  pain killer.
10  Q.  So you just sort of got to my next question.
11  How would you define the term "opioid"?
12  A.  As a pain killer.
13  Q.  Pain killer.
14      Have you ever heard of the term "prescription
15  opioid"?
16  A.  Yes.
17  Q.  What does that term mean to you?
18  A.  A doctor wrote a prescription for it.
19  Q.  Have you ever heard of the term "illegal
20  opioid"?
21  A.  No.
22  Q.  How about illicit opioid?
23  A.  No.
24  Q.  Is it your understanding that -- have you ever
25  heard of fentanyl?

3 (Pages 6 - 9)

1   A.   Yes.
2   Q.   Is it your understanding that fentanyl is an
3   opioid?
4   A.   Yes.
5   Q.   Have you ever heard of heroin?
6   A.   I have.
7   Q.   Is it your understanding that heroin is an
8   opioid?
9   A.   I'm not sure.
10   Q.   Have you ever heard of the term "diversion"
11   used in relation to controlled substances?
12   A.   I'm going to need you to explain what you mean
13   by used in terms of controlled substance.
14   Q.   Okay.  Well, have you ever heard of the term
15   "diversion" before?
16   A.   Yes.
17   Q.   What's your understanding of the term?
18   A.   In the term for me, diversion means that I am
19   diverting someone from legal proceedings to a treatment
20   program or a program that's going to provide them with
21   education.
22   Q.   Gotcha.
23        Have you ever heard of the term "diversion"
24   used in relation to controlled substance like when a
25   controlled substance is diverted?

1   A.   No.
2   Q.   Okay.  I would like to introduce one exhibit
3   that I think might help.  And --
4        MS. AYACHI:  I'm sorry, Counselor, I
5   believe you guys were going to provide me with a link to
6   the exhibits you would be using today.
7        MR. FORD:  Yeah, we said we've got
8   Exhibit Share, so I'm going to publish them as I go.
9        MS. AYACHI:  Got it.
10        MR. FORD:  So I will publish it right
11   now.
12        (Exhibit 1 marked.)
13   Q.   (BY MR. FORD)  I will give you what's -- I'm
14   passing you what will be marked Exhibit 1.
15        MR. FORD:  Bear with me as I --
16   So I have just introduced in Exhibit Share
17   Exhibit 1.  Do you see it there, for people attending
18   remotely?
19        MS. AYACHI:  I do not.  I'm sorry, do you
20   mind if we just go off the record?  I need to get into
21   Exhibit Share.
22        MR. FORD:  Sure.
23        MS. AYACHI:  Thank you.
24        THE VIDEOGRAPHER:  We're off the record
25   at 10:17 a.m.

1        (Break from 10:17 a.m. to 10:20 a.m.)
2        THE VIDEOGRAPHER:  We're back on the
3   record at 10:20 a.m.
4   Q.   (BY MR. FORD)  Okay.  Ms. Bennett-Wright, I
5   have handed you what's been marked as Exhibit 1.  Do you
6   recognize this document?
7   A.   I do.
8   Q.   Is it fair to say it's an email that includes
9   you, an email thread that includes you?
10   A.   It is.
11   Q.   Do you remember this email thread, by chance?
12   A.   No.
13   Q.   A lot of emails.
14        Do you see it's the third email down, and it's
15   an email from you to Leighton Iles.  Am I saying that
16   name right?
17   A.   Yes.
18   Q.   And do you see it begins "The First Offender
19   Drug Program"?
20        Do you see that?
21   A.   Yes.
22   Q.   We'll talk -- I have got some questions about
23   the First Offender Drug Program in a little bit, but it
24   seems like you're saying what offenses make someone
25   eligible for the program.  Is that fair to say?

1   A.   That is correct.
2   Q.   Do you see number 10, where it says diversion
3   of controlled substance?
4   A.   I do.
5   Q.   I'm talking about that -- that sort of
6   diversion.  Does this help you understand?  I'm trying
7   to see what you mean when you, you know, use a phrase
8   like that in this context.
9   A.   I still don't know what it means because that
10   is a list that was created by the District Attorney's
11   Office.
12   Q.   Okay.  So if I use the term "diversion" today,
13   I'll be referring to a controlled substance that is
14   taken out of the lawful chain of supply and diverted to
15   be used for illegal means.  Does that make sense to you?
16   A.   It really does not, I'm sorry.
17   Q.   Okay.  What about that explanation doesn't
18   make sense to you?
19   A.   Okay.  So to determine if it was a diversion
20   drug, that would have been something that the District
21   Attorney's Office, they agreed to the offense to come
22   into the program.  Diversion for me would mean the
23   program that they were put into.
24   Q.   Okay.  So I'll clarify when I mean diversion
25   of a controlled substance, but when I'll be using it --

Page 14

1  and I'll make sure to clarify -- I'll mean when a
2  controlled substance is diverted or taken from a lawful
3  use and diverted into an illegal use, like being sold on
4  the black market or used by someone without a
5  prescription.  Is that fair?
6      A.  Yes.
7      Q.  Okay.  All right.  You can put Exhibit 1 to
8  the side.
9          So have you had any involvement in this
10  lawsuit?
11     A.  No.
12          MS. AYACHI:  Objection, form.
13     Q.  (BY MR. FORD)  Do you know -- the lawsuit was
14  filed in 2018; is that right?  Let me restate that.
15         Does it sound right to you that this lawsuit
16  was filed in 2018?
17     A.  I don't know the answer to that.
18     Q.  Were you involved at all in the decision to
19  bring the lawsuit?
20     A.  I was not.
21     Q.  Do you know whose decision it was to bring the
22  lawsuit?
23     A.  I do not.
24          MS. AYACHI:  Objection, form.
25     A.  I do not.

Page 15

1      Q.  (BY MR. FORD)  Did you meet with any attorneys
2  before today's deposition?
3      A.  Yes.
4      Q.  Now I'm not going to ask you about the content
5  of your conversations with them, but which attorneys did
6  you meet before today?
7      A.  Counsel for the county.
8      Q.  Do you know their name?
9      A.  Leila.
10     Q.  Is it from Lanier -- attorneys with Lanier Law
11  Firm?
12     A.  Yes.
13     Q.  Did you meet with any other attorneys?
14     A.  There were other attorneys present.  I don't
15  remember their names.
16     Q.  Do you know if they were with The Lanier Law
17  Firm as well?
18     A.  One was, yes.
19     Q.  Okay.  Other than the attorneys you spoke --
20  or how many times did you meet with the attorneys?
21     A.  Twice.
22     Q.  When were those meetings?
23     A.  One was on Tuesday of last week, and one was
24  Friday of last week.
25     Q.  And other than those meetings, have you talked

Page 16

1  to anyone else about your deposition here today?
2      A.  No.
3      Q.  In preparing for this deposition, did you
4  review any documents?
5      A.  I did not.
6      Q.  Did you review any emails?
7      A.  I did not.
8      Q.  Okay.  I would like to mark Exhibit 2, and I
9  would like to talk to you a little bit about your
10 employment background and education.
11         (Exhibit 2 marked.)
12     Q.  (BY MR. FORD)  And let me -- so I've
13 introduced Exhibit 2 and marked it and given it to you,
14 Ms. Bennett-Wright.  And I've given you what I pulled
15 in, I believe, what is your LinkedIn page.  Is this, in
16 fact, your LinkedIn page?
17     A.  It looks to be the page that I view, yes.
18     Q.  It's a little different when we pull it and
19 print it.
20     A.  Yes.
21     Q.  It says underneath your name Assistant
22 Criminal Courts Administrator.  Is that your current
23 position?
24     A.  It is.
25     Q.  And then I was wondering if you could thumb

Page 17

1  through it real quick, and let me know is there anything
2  on there that is inaccurate or wrong?
3      A.  Everything looks to be correct.
4      Q.  Okay.  Thanks.
5          So for -- under education, it says you
6  attended TCU for a Master of Arts; is that correct?
7      A.  That is correct.
8      Q.  What was the Master of Arts in?  Is there like
9  a specific field or something?
10     A.  It's liberal arts.
11     Q.  Liberal arts, okay.
12         Other than the education listed on here, did
13 you attend any other schooling?
14     A.  I went to Tarrant County junior college, but
15 it would be just for a class or two.
16     Q.  After your time at TCU, did you attend any
17 schooling after that?
18     A.  No.
19     Q.  So -- okay.  Do you have any, you know,
20 professional certifications of any kind?
21     A.  I do.
22     Q.  What are those?
23     A.  I have a certification in mediation.  I also
24 have different certifications that I received associated
25 with my job.  I'm not sure of all the ones that I've

5 (Pages 14 - 17)

Page 18

1 received.
2    Q.   Mediation.  Do you -- are there certain types
3 of, you know, conflicts you would mediate?
4    A.   It's in marital disputes --
5    Q.   Okay.
6    A.   -- where children were involved.
7    Q.   So the other certifications that you mentioned
8 more generally, do any relate to, you know, budget or
9 finance?
10    A.   No, not to my knowledge.
11    Q.   Can you give me an example of just one of the
12 certifications you're thinking about when you said the
13 ones that you've gained during your time working?
14    A.   National Association of Drug Courts, I have
15 been certified in different areas there, as far as for
16 going through classes for substance abuse, going through
17 classes for interviewing and interacting with
18 participants in diversion programs.
19    Q.   Got it.  Thank you.
20        So now I would like to talk a little bit about
21 your work history.  Do you remember what your first you
22 job was after undergrad?
23    A.   After my undergrad, I was a criminal justice
24 analyst.
25    Q.   And was that for Tarrant County?

Page 19

1    A.   Yes.
2    Q.   And I think in your -- is your -- your
3 LinkedIn is accurate, that you would have started that
4 job in November of 1994?
5    A.   Yes.
6    Q.   So what is the job of criminal justice
7 analyst?
8    A.   As a criminal justice analyst, it was my
9 responsibility to look at criminal trends within Tarrant
10 County and provide statistics.
11    Q.   What kind of trends would you look at?
12    A.   It would be based on jail population to see
13 what kind of cases were coming into the jails and where
14 there was a rise or a fall in different areas.
15    Q.   Would that include, you know, looking at
16 charges related to controlled substances?
17    A.   Yes.
18    Q.   So you would analyze trends relating to crimes
19 related to controlled substances?
20    A.   Yes.
21    Q.   So that would be, for example, you know,
22 someone that's in jail for possession of a controlled
23 substance?
24    A.   Yes.
25    Q.   Did you ever look at -- when you analyzed

Page 20

1 controlled substances, did you ever look at opioids
2 specifically?
3    A.   I did not.
4    Q.   Was the analysis, you know -- I am trying to
5 think of how to ask this.  Sorry, strike that.
6        As part of your analysis, would you ever look
7 at whether inmates had substance abuse issues?
8    A.   No.
9    Q.   Okay.  Thank you.
10        And was your role as a criminal justice
11 analyst, was that within the criminal courts
12 administration?
13    A.   No.
14    Q.   What -- was that within Tarrant County?
15    A.   Yes.
16    Q.   What department or administration would the
17 criminal justice analyst be under?
18    A.   It was under the administrator's office.
19    Q.   Okay.  And after you left the role of criminal
20 justice analyst, what did you do next?
21    A.   As criminal justice analyst, the title did not
22 move, but the position moved.  So the position moved to
23 criminal courts, and it was -- in that position I
24 continued to do analyses for the judges, as well as to
25 manage grants.

Page 21

1    Q.   So if I understand you right, it was
2 originally in the administrative department?
3    A.   It was in the administrator's office, and then
4 it moved to criminal courts administration.
5    Q.   Do you remember when that move would have
6 happened?
7    A.   I do not.
8    Q.   Did you eventually leave your role as criminal
9 justice analyst?
10    A.   I did not.
11    Q.   So you're still a criminal justice analyst
12 today?
13    A.   No.
14    Q.   So that's what I'm trying to get at.  So when
15 did you take a different job title?
16    A.   The position -- I was promoted to the
17 assistant criminal courts administrator.
18    Q.   Oh, okay.  Got it.
19        And I think you have that on your LinkedIn.
20 Was this time right, that happened October 2014?
21    A.   It was -- yes.
22    Q.   Okay.  And what are your job duties as
23 assistant criminal courts administrator?
24    A.   I maintain the budgets for 21 different -- for
25 the 21 criminal courts and seven courts under the

6 (Pages 18 - 21)

Page 22

1 criminal courts administration.  I am the administrator
2 for the specialty courts and special programs.  I'm also
3 the liaison for HR issues between the courts and the HR
4 department.
5     Q.  Okay.  That's broadly -- that covers it, the
6 extent of your duties?
7     A.  Yes.
8     Q.  It sounds like a lot.
9     A.  And grant writing.
10     Q.  And grant writing?
11     A.  Yes.
12     Q.  Is the grant writing for all the courts that
13 you touch?
14     A.  No.
15     Q.  No.
16        What courts do you do grant writing for?
17     A.  It's only for the specialty courts.
18     Q.  Gotcha.
19        So for -- you mentioned maintaining budgets
20 for the criminal courts; is that right?
21     A.  Correct.
22     Q.  Can you explain to me a little bit what that
23 job entails?
24     A.  So each year we're required to have a budget.
25 The budget is set for the courts.  I go through and make

Page 23

1 sure that the line items are all covered to make sure
2 the courts expenses are able to be taken care of, make
3 sure that everything that's in there, as far as for
4 education, supplies and any additional needs they may
5 have, such as competency evaluations.  There may be an
6 increase in the cost of competency evaluations from the
7 year before.
8     Q.  Okay.  And so in your role, are you in charge
9 of preparing the proposed budget for the -- sorry, back
10 up.
11        For criminal courts administration, do you
12 ever refer to it as CCA or --
13     A.  I do.
14     Q.  -- or shorthand?
15     A.  CCA.
16     Q.  Save some words.
17        So are you responsible for preparing the
18 proposed budget for the CCA each year?
19     A.  I am.
20     Q.  And that gets submitted using software to the
21 budget and risk management department; is that right?
22     A.  That is correct.
23     Q.  So, you know, we've done depositions in this
24 case of people with the budget and risk management
25 department, like Helen Giese.  And, you know, her

Page 24

1 testimony was that when departments submit proposed
2 budgets, they include justifications for, you know, the
3 line items that they want funded.  Would you agree with
4 that general statement?
5     A.  Yes.
6        MS. AYACHI:  Objection, form.
7     Q.  (BY MR. FORD)  Why do you include -- do you
8 include justifications when you submit your proposed
9 budget?
10     A.  Yes.
11     Q.  Why do you include justifications?
12     A.  It's required by the budget office.
13     Q.  Do you ever remember an instance -- well,
14 yeah, do you ever remember an instance where the budget
15 department, you know, said that you needed to submit a
16 more complete justification in order to get funding?
17     A.  No.
18     Q.  Do you try to be, you know, as descriptive as
19 possible when you put justifications in?
20     A.  I do.
21        MS. AYACHI:  Objection, form.
22     Q.  (BY MR. FORD)  And why do you try to be as
23 descriptive as possible?
24     A.  To save the budget office time.
25     Q.  Okay.  Now I want to switch gears a little bit

Page 25

1 to specifically your experience with Albertsons and
2 Kroger, the two defendants that are represented here
3 today.
4        As I said, I represent Albertsons, and I was
5 wondering have you ever shopped at an Albertsons before?
6     A.  I have.
7     Q.  Have you ever shopped at a Randall's Food and
8 Drug?
9     A.  Yes.
10     Q.  How about United Supermarkets, have you ever
11 shopped at a United Supermarkets?
12     A.  Not to my knowledge.
13     Q.  How about Safeway, have you ever shopped at a
14 Safeway?
15     A.  Yes.
16     Q.  Okay.  So for an Albertsons -- your experience
17 at Albertsons, Randall's Food and Drug or Safeway, can
18 you remember any bad experiences you've had shopping
19 there at those places?
20     A.  No.
21     Q.  Do you remember if, you know, shopping at
22 those locations included using their pharmacies?
23     A.  I don't remember.
24     Q.  Okay.  Now I'm going to ask the same questions
25 about Kroger.

7 (Pages 22 - 25)

Page 26

1    Have you ever shopped at a Kroger before?
2    A.  I have.
3    Q.  Would you say that you've had any bad
4  experiences at Kroger?
5    A.  No.
6    Q.  And do you remember if when you shopped there
7  it included using their pharmacy?
8    A.  It did.
9    Q.  Okay.  Thank you.
10    So, you know, we've talked a little bit about
11  what opioids are.  I just wanted to be clear.  Are you
12  licensed to prescribe opioids?
13    A.  No.
14    Q.  Are you licensed to dispense opioids?
15    A.  No.
16    Q.  Do you have any training or education relating
17  to how to properly prescribe opioids?
18    A.  No.
19    Q.  Are you aware generally that a healthcare
20  provider licensed by the DEA can write a prescription
21  for opioids?
22    A.  Yes.
23    Q.  Do you believe that prescription opioids can
24  provide a medical benefit when prescribed to patients
25  for legitimate medical reasons?

Page 27

1    MS. AYACHI:  Objection, form.
2    Q.  (BY MR. FORD)  You can answer.
3    A.  I'm not sure.
4    Q.  Why aren't you sure?
5    A.  I wasn't sure what all you said.
6    Q.  I'll repeat the question.
7    Do you believe that, you know, prescription
8  opioids can provide a medical benefit when they're
9  prescribed to patients for legitimate medical reasons?
10    A.  Yes.
11    MS. AYACHI:  Objection, form.
12    A.  Yes.
13    Q.  (BY MR. FORD)  Thank you.
14    Do you believe that there's a substance abuse
15  problem in Tarrant County?
16    A.  I'm not -- I don't know.
17    Q.  Do you believe -- do you believe there's an
18  alcohol abuse problem in Tarrant County?
19    A.  Can you define problem?
20    Q.  I was wondering if, you know, your
21  understanding how you understand that question, if you
22  would say there is an alcohol abuse problem in Tarrant
23  County?
24    A.  Yes.
25    Q.  Do you think that the alcohol abuse problem in

Page 28

1  Tarrant County rises to the level of a crisis?
2    A.  No.
3    MS. AYACHI:  Objection, form.
4    A.  No.
5    Q.  (BY MR. FORD)  How about methamphetamine,
6  would you say that there's a methamphetamine abuse
7  problem in Tarrant County?
8    A.  Yes.
9    Q.  Would you say that the methamphetamine abuse
10  problem rises to the level of a cries?
11    A.  Yes.
12    MS. AYACHI:  Objection, form.
13    Q.  (BY MR. FORD)  How about marijuana, do you
14  think there's a marijuana abuse problem in Tarrant
15  County?
16    A.  I'm not sure.
17    Q.  How about cocaine, is there a cocaine abuse
18  problem in Tarrant County?
19    A.  Abuse, yes.
20    Q.  Would that rise to the level of crisis?
21    MS. AYACHI:  Objection, form.
22    A.  I'm not sure.
23    Q.  (BY MR. FORD)  And opioids, do you think
24  there's an opioid abuse problem in Tarrant County?
25    A.  Yes.

Page 29

1    Q.  In your opinion, does the opioid abuse problem
2  involve both prescription opioids and illegal opioids?
3    A.  Yes.
4    Q.  Do you think there's a problem with
5  specifically prescription opioid abuse in Tarrant
6  County?
7    A.  I'm not sure.
8    Q.  Do you think the opioid abuse problem in
9  Tarrant County rises to the level of a crisis?
10    MS. AYACHI:  Objection, form.
11    A.  Yes.
12    Q.  (BY MR. FORD)  So we talked about, you know,
13  the phrase "opioid epidemic."  Would you also describe
14  the opioid abuse problem in Tarrant County as an opioid
15  epidemic?
16    A.  I'm not sure.
17    Q.  Have you ever heard of the term "opioid use
18  disorder"?
19    A.  No.
20    Q.  Or OUD?
21    A.  Yes.
22    Q.  What does OUD mean to you?  I ask you because
23  I might, you know, use the term later on, so wondering
24  if we'll be talking about the same thing.
25    A.  It would -- may have just been something that

Page 30

1  was mentioned in a training.
2      Q.  Do you understand that to be like an opioid
3  use problem that an individual would have?
4      A.  Yes.
5      Q.  Do you know what the OUD rate in Tarrant
6  County is?
7      A.  I do not.
8      Q.  Have you yourself ever personally been
9  prescribed opioids?
10         MS. AYACHI:  Objection, form.
11     A.  Yes.
12     Q.  (BY MR. FORD)  You personally?
13         MS. AYACHI:  Objection.  This is HIPAA
14  protected information.  She doesn't have to answer
15  personal prescriptions she's received.
16         MR. FORD:  It's a little hard to hear
17  you.  What did you say?
18         MS. AYACHI:  I said objection on the
19  grounds it's HIPAA protected.  She doesn't need to
20  reveal anything about any sort of medical reason why she
21  might have been prescribed prescription opioids.
22         MR. FORD:  Are you directing her not to
23  answer?
24         MS. AYACHI:  I am inviting her not to
25  answer if she does not wish to.

Page 31

1          MR. FORD:  Inviting her not to answer?  I
2  am just trying to get clear on your objection, just
3  respectfully, because, you know, I've heard this come up
4  before.  And I'm, you know, a little confused on what
5  provisions of HIPAA would prevent me from asking the
6  question, so --
7          MS. AYACHI:  Ms. Bennett-Wright, if you
8  feel comfortable to answer this question, you can answer
9  the question.
10     A.  Yes.
11     Q.  (BY MR. FORD)  Did you have any issues or
12  problems, you know, with the opioids that you were
13  prescribed using -- to use?
14     A.  No.
15     Q.  Thank you.
16         Now I want to switch gears back to the CCA.
17  Can you describe to me generally what the CCA is?
18     A.  Criminal courts administration, CCA for short,
19  is responsible for taking care of the administrative
20  needs of the criminal courts.
21     Q.  And so would that sort of include when you
22  were describing your job duties, would the CCA play
23  those roles of maintaining the budgets for the criminal
24  courts and also administering specialty courts and
25  everything else you mentioned?  Is that sort of the role

Page 32

1  of the CCA?
2      A.  Yes.
3      Q.  I saw on -- I wanted to save some paper so I
4  didn't print out the website, but I saw on your website,
5  you know, a description of the CCA on Tarrant County's
6  website, saying that the CCA, you know, has -- there's a
7  criminal courts administrator; is that correct?
8      A.  Correct.
9      Q.  And what is his or her name?
10     A.  Greg Shugart.
11     Q.  And how long has Mr. Shugart been in that
12  role?
13     A.  I think 13 years.
14     Q.  During your time have there been other
15  criminal courts administrators?
16     A.  Yes.
17     Q.  Who was before Mr. Shugart?
18     A.  Clete McAlister.
19     Q.  And on your website it says -- or on Tarrant
20  County's CCA website, it says that the administrator,
21  quote, serves as the chief of staff for several judicial
22  support departments.
23         Do you agree with that statement?
24     A.  Yes.
25     Q.  I was just wondering the phrase "chief of

Page 33

1  staff," can you sort of describe, you know, what that
2  means?
3      A.  Chief of staff means that we're responsible
4  for time sheets.  We're responsible for FMLA, overtime,
5  vacation time, schedules, making sure that payroll is
6  accurate for each employee involved in the department.
7      Q.  And the criminal courts administrator, is that
8  an appointed position?
9      A.  No.
10     Q.  How does -- how did Mr. Shugart get the job?
11     A.  He was hired.
12         MS. AYACHI:  Objection, form.
13     Q.  (BY MR. FORD)  Who was he hired by?
14     A.  The criminal court judges.
15     Q.  Okay.  And that's separate from the
16  commissioner court?
17     A.  That is correct.
18     Q.  Okay.  You know, being from out of town, my
19  referring to the commissioners court as judges threw me
20  off, so I'm a little confused by that.
21         Do you know is Mr. Shugart hired for, you
22  know, any set period of time?
23     A.  No.
24     Q.  And who does Mr. Shugart report to?
25     A.  The 21 criminal court judges.

9 (Pages 30 - 33)

1    Q.   Does he have any duty to report to the
2   commissioners court?
3    A.   Define report.
4    Q.   I guess I'll ask two questions.  If the
5   commissioners court wants Mr. Shugart to do something,
6   can they, you know, order him to do something?
7    A.   They cannot.
8    Q.   Does Mr. Shugart, you know, on behalf of the
9   CCA ever provide, you know, information about CCA
10  operations to the commissioners court?
11   A.   He does.
12       MS. AYACHI:  Objection, form.
13   Q.   (BY MR. FORD)  I think you mentioned the term
14  "specialty courts."
15   A.   Yes.
16   Q.   I was wondering, you know, could you define
17  what you mean by specialty courts?
18   A.   A specialty court is usually a program that is
19  supervised by a criminal court judge, and it's also a
20  court that is tied -- it's linked to treatment versus
21  the regular criminal justice pathway.
22   Q.   So are specialty courts required by Texas
23  statute?
24   A.   Some of them are.
25   Q.   Does Tarrant County have any specialty courts

1   that are not required by statute?
2    A.   Yes.
3    Q.   I feel like -- not "feel like."  I've seen in,
4   you know, some documents a reference specialty programs.
5   I was wondering, are specialty programs, is that kind of
6   interchangeable with specialty courts or are they
7   different?
8    A.   I would say it's different.
9    Q.   That was a bad question on my part, but I was
10  wondering can you explain to me what the differences
11  would be between a specialty program and a specialty
12  court?
13   A.   A specialty court is a nationally recognized
14  program.  A specialty program may not be a program that
15  is required by the state, nor is it recognized by a
16  national program.
17   Q.   So do you have any specialty courts that are
18  not required by statute?
19   A.   No.
20   Q.   So anything that's not required by statute,
21  would you -- would it be fair to refer to that as a
22  specialty program?
23   A.   Yes.
24   Q.   I know this is -- this might be a memory test,
25  but do you mind listing, to the best of your ability,

1   the specialty courts that Tarrant County has?
2    A.   The D.I.R.E.C.T. Program, which is supervised
3   by probation.
4        The Veterans Treatment Court.
5        The Public Safety Employees Treatment Court.
6        And the Mental Health Diversion Court.
7    Q.   When was the Public Safety Employee Treatment
8   Court established, do you know?
9    A.   About three years ago.
10   Q.   It's pretty recent?
11   A.   Yes.
12   Q.   I've seen, you know, in the documents -- well,
13  I have a couple of questions about the D.I.R.E.C.T.
14  Program.  You said that it's supervised by parole; is
15  that right?
16   A.   Probation.
17   Q.   Probation, sorry.
18   A.   Community supervision, to be correct.
19   Q.   Community Supervision and Corrections
20  department?
21   A.   Yes.
22   Q.   So does the CCA, you know, administer that
23  program?  I was a little confused as to what the -- you
24  know, who governs the D.I.R.E.C.T. Program.
25   A.   Currently CSCD.

1        MS. AYACHI:  Objection, form.
2    A.   CSCD.
3    Q.   (BY MR. FORD)  So what role does the CCA play
4   in the D.I.R.E.C.T. Program?
5    A.   None.
6    Q.   And how long has that been the case?
7    A.   I'd say about ten years.
8    Q.   Okay.  And then I saw, you know, on the
9   website in documents some names of other programs.  I
10  was wondering if I could list them off and just ask you
11  what they are technically.
12       So the Felony Alcohol Intervention Program, do
13  you know what that is?
14   A.   Yes.
15   Q.   Is that a specialty program?
16   A.   Yes.
17   Q.   Is that administered by the CCA?
18   A.   It is not.
19   Q.   Who does that?
20   A.   CSCD.
21   Q.   How about -- do you understand when I use the
22  acronym RISE?
23   A.   Yes.
24   Q.   Is that a specialty program?
25   A.   It is.

10 (Pages 34 - 37)

1    Q.   Is that administered by the CCA?
2    A.   No.
3    Q.   Is it administered by CSCD?
4    A.   Yes.
5    Q.   How about the Youth Offender Divisional
6 Alternative, do you know what that is?
7    A.   YODA.
8    Q.   YODA?
9    A.   Yes.
10   Q.   Is there someone that's a Star Wars fan?
11   A.   I think the judge was.
12   Q.   I noticed that.  I am too.
13        So the Youth Offender Diversion Alternative,
14 is that a specialty program?
15   A.   Yes.
16   Q.   And does -- who administers that?
17   A.   CCA.
18   Q.   How about the Domestic Violence Diversion
19 Program, is that a specialty program?
20   A.   Yes.
21   Q.   Who administers that?
22   A.   CCA.
23   Q.   And the First Offender Drug Program, would
24 that be a specialty program?
25   A.   Yes.

1    Q.   So it's not a specialty court?
2    A.   Correct.
3    Q.   And that's administered by the CCA?
4    A.   Correct.
5    Q.   And you said the Mental Health Diversion
6 Program is administered by the CCA?
7    A.   Yes.
8    Q.   And that is a specialty court?
9    A.   Yes.
10   Q.   Okay.  And I just have a few more.
11        The Substance Abuse Felony Punishment Facility
12 Re-Entry Court, do you know what that is?
13   A.   Yes.
14   Q.   Is that a drug court?
15   A.   No.
16   Q.   Is that a specialty program?
17   A.   It's a CSCD program.
18   Q.   Okay.  Does CCA have any role in that?
19   A.   No.
20   Q.   I listed YODA twice.
21        This is the other Star Wars one, Other
22 Behavior Intervention Program, have you heard of that?
23   A.   Yes.  It no longer exists.
24   Q.   No longer exists.
25        Does Other Behavior Intervention Assault

1 Nonfamily exist?
2    A.   No.
3    Q.   When did -- were those distinct programs?
4    A.   The distinction between those and the YODA
5 program was they were -- they could have been
6 nonintimate partners.
7    Q.   Got it.
8        Do you know when the OBI or OBI 1 program
9 ended?
10   A.   About two years ago.
11   Q.   Do you know why?
12   A.   They stopped receiving referrals in the
13 program.
14   Q.   Got it.
15        So we, you know, just went through specialty
16 courts and specialty programs, and there was a number
17 that are administered by CSCD.  And I can go through
18 them if you want, but I was wondering for the ones that
19 are administered by CSCD, does CCA play any role in
20 those programs?
21   A.   No.
22   Q.   Okay.  Does CCA administer or participate in
23 any programs that are aimed specifically at addressing
24 opioid abuse?
25   A.   Specifically, no.

1    Q.   Does the CCA administer any programs that are
2 aimed specifically at addressing substance abuse more
3 generally?
4    A.   Yes.
5    Q.   What would those programs be?
6    A.   The Veterans Court, the Public Safety
7 Treatment Program, the Mental Health Court Program and
8 FODP.
9    Q.   What is the Public Safety Treatment Program?
10   A.   The Public Safety Employees Treatment
11 Program --
12   Q.   Oh, sorry.  I didn't mean to cut you off.
13   A.   The Public Safety Employees Treatment Program
14 is a program that is dedicated to public service
15 workers.
16   Q.   Got it.
17        So in what ways are these programs aimed at
18 addressing substance abuse?
19   A.   At the --
20        MS. AYACHI:  Objection, form.
21   Q.   (BY MR. FORD)  You know, can you answer on a
22 general level?
23   A.   Based on the assessment when they come into
24 the program, we follow the assessment if there's any
25 information that says that they may need to go to

11 (Pages 38 - 41)

Page 42

1 treatment.
2     Q.  So for the programs you mentioned -- actually,
3 you know, strike that.
4         I want to ask a slightly different question,
5 which is do you believe the CCA administers any programs
6 that have been impacted by opioid abuse in Tarrant
7 County?
8         MS. AYACHI:  Objection, form.
9     A.  I didn't understand your question.
10     Q.  (BY MR. FORD)  So I just asked you if there
11 was any programs that are aimed specifically at opioid
12 abuse, and you answered no, not specifically.
13         I was wondering -- I was trying to get at, you
14 know, whether the issue of opioid abuse in Tarrant
15 County, if that's had impact on any of the programs
16 we've been talking about?
17         MS. AYACHI:  Objection, form.
18     Q.  (BY MR. FORD)  Specifically the Veterans
19 Court, the Public Safety Employees Program, Mental
20 Health Program or the FODP.
21     A.  I'm not sure.
22     Q.  So I just wanted to take a little bit of time
23 to talk about -- a little bit more about the Veterans
24 Treatment Court and then the Mental Health Diversion
25 Program, the FODP and D.I.R.E.C.T., those four programs.

Page 43

1 I am happy to get into it now.  We've been going for a
2 little bit.  Are you fine to keep going or would you
3 like a break?
4     A.  I'm fine.
5     Q.  Okay.  So now I would like to talk about the
6 Veterans Treatment Court.  I think it's in the name, but
7 can you describe a little bit who is served by the
8 Veterans Treatment Court?
9     A.  Veterans.  It's 100 percent for veterans.
10     Q.  Is that, you know, US military veterans, or is
11 it broader than that?
12     A.  It's US military.
13     Q.  And generally speaking, can you describe what
14 services the Veterans Treatment Court provides?
15     A.  The services they provide -- because it is a
16 treatment court, once a person is put into the program,
17 there's an assessment that is done to determine what
18 their needs are.  If their needs are substance abuse, we
19 have to go at substance abuse first.  If there are
20 medical needs, we get in touch with the VA to take care
21 of their medical needs.  If it's housing, we look at
22 different agencies that can help them with housing.  We
23 look at providing them with educational needs and
24 employment.
25     Q.  When you say medical needs, the way you

Page 44

1 phrased it, does that not include substance abuse
2 issues?
3     A.  It could be a traumatic brain injury.
4     Q.  Got it.
5         And can you explain to me how the Veterans
6 Treatment Court is funded?
7     A.  Veterans Court is funded through Texas
8 Veterans Commission, the Office of the Governor through
9 the State of Texas, and also through general funds from
10 the county.
11     Q.  Do you know what portion of funds come from
12 Tarrant County?
13     A.  Not without looking at my information, sorry.
14     Q.  Oh, no.
15         What -- you know, what information would you
16 look at to figure out the answer?
17     A.  I would have to look at my budgets.
18     Q.  So would the annual budget be the place you
19 would look?
20     A.  No.
21     Q.  What sort of document would you look at?
22     A.  I would actually look at my annual expenses
23 and look at what it costs us to run the program and what
24 was spent on where.
25     Q.  Is that report, does that make -- does that --

Page 45

1 did those expenditures make its way into the Tarrant
2 County budget anywhere --
3     A.  No.
4     Q.  -- to get reported?
5         Does the amount of funds that Tarrant County
6 spends specifically change year to year?
7     A.  Yes.
8     Q.  And why is that?
9     A.  Salaries.
10     Q.  What are Tarrant County funds used for for the
11 Veteran Treatment Court?
12     A.  For salaries for the staff.
13     Q.  Do they pay for anything else?
14     A.  No.
15     Q.  Are salaries ever covered by other sources,
16 like grant money?
17     A.  Some of the people in the program are paid by
18 salary and some are paid by grant funds.
19     Q.  Do you know how many people are on salary in
20 the Veteran Treatment Court?
21     A.  Two.
22     Q.  Currently, do you know if Tarrant County is
23 paying their salary?
24     A.  Yes.
25     Q.  In addition to their work on Veteran Treatment

12 (Pages 42 - 45)

Page 46

1 Court, do those two staff members do anything else?
2      A.   They also work with Public Safety Employees
3 Treatment Court.
4      Q.   Is there ever a situation where funds expended
5 by Tarrant County are, you know, later reimbursed by a
6 grant?
7      A.   All of our grants are reimbursement grants.
8 So when we are expensing items, such as the treatment
9 that we're paying for to providers, Tarrant County first
10 pays the expense.  After the invoices have come in,
11 Tarrant County takes care of the invoice.  We then have
12 to wait for the commissioners court to write the checks,
13 sign the checks.  The vendor cashes the checks.  The
14 checks go back through the bank.  And then we can ask
15 for reimbursement from the grants.
16      Q.   Okay.  And that's how every grant you have
17 operates --
18      A.   Yes.
19      Q.   -- that process?
20      A.   Yes.
21      Q.   I want to show you a couple, two documents,
22 that I had questions about.
23           MR. FORD:  I would like to introduce --
24 what are we on, 3?
25           THE REPORTER:  Yes.

Page 47

1           MR. FORD:  Exhibit 3.
2           (Exhibit 3 marked.)
3      Q.   (BY MR. FORD)  Ms. Bennett-Wright, I am going
4 to pass you this document.
5      A.   Yes.
6      Q.   And then bear with me as I -- actually, can I
7 get that back?
8      A.   Sorry.
9      Q.   I gave you my highlighted copy.  Sorry about
10 that.
11           MR. FORD:  There you go.  And I'm
12 introducing the exhibit now.  I am going to publish it.
13      I published what's been marked as Exhibit 3.
14      Q.   (BY MR. FORD)  Ms. Bennett-Wright, do you
15 recognize this email as coming from you?
16      A.   As coming from me, yes.
17      Q.   And there's an attachment to this email which
18 is on the backside.  Do you recognize what this type of
19 document is?
20      A.   Yes.
21      Q.   How would you describe what this is?
22      A.   It's a court communication for commissioners
23 court.
24      Q.   Okay.  And does this cover a few different
25 specialty courts?

Page 48

1      A.   Yes, from 2012.
2      Q.   From 2012.
3           And I just had a couple questions on the
4 fiscal impact section.  Do you see that at the bottom?
5      A.   Yes.
6      Q.   Do you see county -- the language "county
7 funds utilized for interim funding will be reimbursed by
8 these grants"?
9      A.   Yes.
10      Q.   So I've seen some -- well, let me back up.
11           Does a document like this need to be submitted
12 to the commissioners court before grant funding can be
13 accepted?
14      A.   No.  Do you want me to explain why?
15      Q.   Yes, please.
16      A.   Interim funding means that the grant has not
17 been approved by the time that the grant ended.  So if
18 we had a grant in 2011 -- 2011, the grant would have
19 expired, but the 2012 grant had not come in.  We had a
20 preliminary approval from the state, but it had not
21 funded; and until those funds actually come into the
22 county, we cannot use them.  We cannot expense against
23 them.  So the county will provide interim funding, which
24 is -- this is for 60 days, meaning that they would pay
25 the salaries of our employees and any treatment dollars

Page 49

1 for the 60 days.
2      Q.   And the idea would be once the grant money was
3 secured, then it would be -- then the county would be
4 reimbursed for the funds it spent?
5      A.   Yes, if it was in the line items of the grant.
6      Q.   Okay.  So do you see it's the background
7 section, paragraph two?  I am going to read.  The
8 diversion programs are presently funded by the
9 Governor's Criminal Justice Diversion.
10           Do you see that?
11      A.   Yes.
12      Q.   I was wondering, does that mean that the --
13 these programs are completely funded by the --
14      A.   No.
15      Q.   No?
16           Would -- back then would Tarrant County still
17 pay for, say, salaries or --
18      A.   Yes.
19      Q.   Okay.  Maybe I can save an exhibit.  I've seen
20 documents like this where under the fiscal impact it
21 says there is no fiscal impact to Tarrant County.  Are
22 you familiar with that kind of language that would be in
23 a document like this?
24      A.   Yes.
25      Q.   When that language is used, what does that

13 (Pages 46 - 49)

1 mean?

2    A.  It means that no funds -- the county will not

3 have to cover any of the costs such as the line items in

4 that grant.

5    Q.  But there's still the process where the county

6 technically pays for it first and then is reimbursed?

7    A.  Correct.

8    Q.  Okay.  You can set that to the side.  I am

9 finished with that.

10       I would like to show you another exhibit that

11 talks a little bit about Veterans Treatment Court.  I am

12 going to mark this as Exhibit 4.

13       (Exhibit 4 marked.)

14    Q.  (BY MR. FORD)  Here you go.

15       MR. FORD:  And I will introduce it now.

16 Bear with me for a second.  I have introduced on Exhibit

17 Share Exhibit 4.

18    Q.  (BY MR. FORD)  Ms. Bennett-Wright, I just had

19 a couple of questions about the attachment to this, but

20 do you remember receiving this email?

21    A.  No.

22    Q.  Do you have any -- looking at, you know, who

23 it's from, and it looks like you're cc'd, right?

24    A.  Correct.

25    Q.  And this contains a number of some

1 attachments.  I have included one in the exhibit, which

2 is the Veterans Treatment Court Policy and Procedure

3 Manual.

4       Do you see that?

5    A.  Yes.

6    Q.  Are you familiar with this document?

7    A.  Vaguely.

8    Q.  Okay.  I had a couple questions about it.  The

9 first is, if you turn to page 3, and do you see in the

10 first paragraph under introduction and overview it says,

11 A "drug court" and then goes on?

12    A.  Yes.

13    Q.  I can't remember if you answered this.  Is the

14 Veterans Treatment Court referred to as a drug court?

15    A.  Yes.

16    Q.  So is the term a "specialty court" and a "drug

17 court" interchangeable?

18    A.  Yes.

19    Q.  And a little bit further down the page in the

20 paragraph, third paragraph starting "In 2009," do you

21 see that?

22    A.  Yes.

23    Q.  The second sentence says, On, January 1, 2010,

24 Tarrant County created the Tarrant County Veterans Court

25 Diversion Program.

1    A.  Yes.

2    Q.  Does that sound right to you, that the Veteran

3 Treatment Court has been around since 2010?

4    A.  Yes.

5    Q.  If you turn to page 4, do you see the section

6 named C, Methods For Achieving Goals?

7    A.  Yes.

8    Q.  And under Goal 1, it's called reduce drug use

9 and related criminal activity.

10       Do you see that label?

11    A.  Yes.

12    Q.  So that first bullet, only bullet says,

13 Mandate intensive substance abuse treatment and close

14 judicial supervision and mentoring of all participants.

15       Do you see that language?

16    A.  Yes.

17    Q.  Do you know what is entailed in the intensive

18 substance abuse treatment that's provided by the

19 Veterans Treatment Court?

20    A.  It would be the amount of drug testing, as

21 well as they would be required to go to an education

22 program; and they would also, if their assessment said

23 that they needed treatment, they would go to a substance

24 abuse treatment program.

25    Q.  Okay.  Do you know -- well, strike that.

1       Do you know who would provide those services

2 you just mentioned?  We can take them in turn.  Do you

3 know is there one particular vendor who provides the

4 treatment if needed?

5    A.  There's multiple vendors.

6    Q.  Okay.  Can you just give me an example of one?

7    A.  Dr. Jessica Batts.

8    Q.  Gotcha.

9       How about the drug testing, is there -- are

10 there multiple vendors who handle that?

11    A.  There's one vendor.

12    Q.  And does that -- does that vendor handle all

13 drug -- or drug testing for all specialty programs or

14 specialty courts operated by Tarrant County?

15    A.  Yes.

16    Q.  And the educational program you mentioned, do

17 you know is there one vendor who would do that?

18    A.  No, there's multiple vendors.

19    Q.  Can you give me just one example?

20    A.  MHMR of Tarrant County.

21    Q.  Okay.  Does MHMR, would they provide any of

22 the treatment that you mentioned?

23    A.  Yes.

24    Q.  So we could take the three in turn, too.  Do

25 you know how the drug testing in the program is paid

Page 54

1 for?
2    A.   The drug testing is paid through grant funds,
3 and when grant funds run out, we receive money from the
4 county, as well as participant payments.
5    Q.   Participant payments, when you say that, are
6 you referring to the fees they pay to be part of the
7 program?
8    A.   Yes.
9    Q.   So -- so on top of fees and grants, sometimes
10 there's still costs that need to be covered and the
11 county would pay for those?
12    A.   Yes.
13    Q.   Do you know how -- how often that happens in a
14 given year?
15    A.   In the past couple of years, it's been
16 annually.
17    Q.   Annually.
18         Can you ballpark the amount of money Tarrant
19 County has had to spend to cover that cost?
20    A.   Some years they put in up to 75,000.
21    Q.   And, you know, is that a trend that's going
22 up, the amount of money that Tarrant County has to cover
23 for drug testing?
24    A.   That trend has been increasing, yes.
25    Q.   Do you know why?

Page 55

1    A.   The grants are tending to be reduced.
2    Q.   Do you know why that is?
3    A.   Grants are designed to be seed money, and the
4 longer -- they don't want you to have grants forever, so
5 the grant providers usually will taper off the amount
6 that they provide, so that if there's other counties
7 that are applying for the grants, other agencies that
8 are applying for grants, that they can bring on new
9 programs as well.
10    Q.   Is there any possibility that Tarrant County
11 will be able to find other grant providers to cover the
12 costs that's, you know, eroding from the grants that you
13 have had?
14    A.   It's --
15         MS. AYACHI:  Objection, form.
16    Q.   (BY MR. FORD)  You can answer.
17    A.   We have continued to look for other grants,
18 but it's been difficult to find funding for the
19 specialty courts.
20    Q.   Do you know why that -- or is there an
21 explanation as to why that is?
22    A.   Usually they're looking for like enhancement
23 programs, programs that are doing something with --
24 maybe it's a tribal program.  It's just we don't meet
25 all of the qualifications that they've looking for.

Page 56

1    Q.   I did see that term "enhancement" in
2 documents.  I wasn't sure what that meant.  What does it
3 mean when -- you know, when a program, you know, is an
4 enhancement program?
5    A.   An enhancement program means that they maybe
6 taking care of co-occurring behaviors, such as the
7 person is experiencing substance abuse as well as
8 trauma.
9    Q.   So I thought Veterans Court treats more than
10 just substance abuse, though, doesn't it?
11    A.   It does.
12    Q.   So why wouldn't that be an enhancement
13 program?
14    A.   Because Veterans Court started out doing those
15 things.  To enhance it would mean that we have added
16 that as a part of that program.  It started out treating
17 multiple things.
18    Q.   Got it.  Okay.
19         So for the substance abuse treatment that we
20 just discussed, does CCA or anyone track, you know, what
21 particular substances participants in the program have a
22 problem with?
23    A.   No.
24    Q.   Can sometimes it be multiple -- strike that.
25         Can a participant sometimes have struggled

Page 57

1 with multiple substances?
2    A.   Yes.
3    Q.   And do you see, going back to the exhibit, the
4 language "close judicial supervision and mentoring of
5 all participants."  I was wondering what is the
6 mentoring of all participants, what does that mean?
7    A.   So the mentoring -- do you want the close
8 supervision first, or the --
9         So close supervision means that they meet with
10 the judge.  They meet face to face in a court that's set
11 up just for them.  It's a docket that is just for the
12 specialty court.  The judge presides over that program.
13 They talk to them individually.  They talk to them as a
14 group.  Then the mentoring may be graduates.  Graduates
15 who have graduated the program come back, and they're
16 wanting to help people that are coming into the program
17 be successful.
18    Q.   Got it.
19         Are those mentors, are they paid?
20    A.   Not by Tarrant County.
21    Q.   And the judge on the -- are there multiple
22 judges on the Veterans Treatment Court or just one?
23    A.   There's two.
24    Q.   Two.
25         Do they receive a salary for their work on

15 (Pages 54 - 57)

Page 58

1  Veterans Treatment Court?
2      A.  No, it's within their salary, same salary.
3      Q.  So if they weren't on the Veteran Treatment
4  Court, they would be receiving the same salary?
5      A.  They would be receiving the same salary.
6      Q.  Is that how it is for each specialty court?
7      A.  Yes.
8      Q.  And specialty program?
9      A.  Yes.
10     Q.  I saw on page 6, if you turn there, under
11  Roman numeral III, and then A, it says, Team Members and
12  Roles.  The first one says, The Judge.
13         Do you see that?
14     A.  Yes.
15     Q.  I was wondering, do you know how a judge ends
16  up on, you know, a drug court or a specialty court?
17     A.  They usually volunteer because it's extra work
18  for the same pay.
19     Q.  I have seen some emails to that effect of
20  judges saying that, but --
21         Okay.  Are they ever appointed if no one
22  raises their hand?
23     A.  No.
24     Q.  And then the next page, page 7, do you see
25  under B it says Eligibility?  Do you see that towards

Page 59

1  the bottom of the page?
2      A.  Yes.
3      Q.  And then further down under 1 it says to be
4  eligible for the Tarrant County Veterans Treatment Court
5  and then has some language.
6         Do you see that?
7      A.  Yes.
8      Q.  In reading this paragraph -- and if you need a
9  minute, I will definitely give it to you.
10         It looks like that if a veteran comes and has
11  only substance abuse, would they be eligible for the
12  program?
13     A.  Yes.
14     Q.  But not every participant in the Veterans
15  Treatment Court has a substance abuse problem?
16     A.  All of -- 90 percent of our veterans have
17  substance abuse problems.  The other 10 percent we're
18  looking at people with traumatic brain injuries.
19     Q.  Got it.
20         And do you have any idea of what -- idea what
21  portion -- never mind, you just answered that.
22         Is there -- do you keep track of, in any form,
23  the participants that do have a substance abuse problem?
24     A.  I personally do not, no.
25     Q.  Do you know of any, you know, document or

Page 60

1  analysis that would keep track of, you know, how many
2  participants have substance abuse problems?
3      A.  The program managers may have that.  I don't
4  have that.
5      Q.  Do you know if, you know, to the extent they
6  do have that information, whether it gets specific
7  enough to say what substances the participant has a
8  problem with?
9      A.  I do not know.
10     Q.  And can you say generally whether opioid abuse
11  in Tarrant County has impacted the veterans treatment
12  council?
13     A.  State your question again.
14         MS. AYACHI:  Objection, form.
15     Q.  (BY MR. FORD)  Can you say whether opioid
16  abuse in Tarrant County has impacted the veterans
17  treatment council?
18         MS. AYACHI:  Objection, form.
19     A.  I'm not sure.
20     Q.  (BY MR. FORD)  You're not sure because you
21  don't know or because you don't understand -- because I
22  asked a bad question?
23     A.  No, I don't think it was a bad question.  I
24  can't say that it was opioids that is the specific
25  substance, because when someone is referred to substance

Page 61

1  abuse counseling, it's usually multiple substances that
2  they're using.
3      Q.  Got it.  Thanks.
4         Now I want to switch gears to the Mental
5  Health Division -- Diversion Program.  Are you still
6  good, or do you want to take a break?
7      A.  I'm good.
8      Q.  Okay.  So for the Mental Health Diversion
9  Program, how would you describe -- do you know, you
10  know, who is eligible to participate in the program?
11     A.  It's based on the criteria that the District
12  Attorney's Office sets up.
13     Q.  Do you know if -- if an applicant has a
14  problem with substance abuse, if that on its own is
15  enough to qualify for the Mental Health Diversion
16  Program?
17     A.  Not if they do not have a mental health
18  diagnosis.
19     Q.  Can you explain to me how the Mental Health
20  Diversion Program is funded?
21     A.  The Mental Health Diversion Program is funded
22  through county funds and a grant from the state.
23     Q.  And the county funds that are used for the
24  program, are they dedicated to a specific thing or
25  things?

16 (Pages 58 - 61)

Page 62

1  A.  Yes.
2  Q.  What are county funds used for in relation to
3  operating the Mental Health Diversion Program?
4  A.  Salaries and positions.
5  Q.  Do you know how many positions there are in
6  the Mental Health Diversion Program currently?
7  A.  There's two positions, and actually that
8  budget also includes treatment because the governor's
9  office reduced the budget so low.
10  Q.  When did that happen?
11  A.  Probably about five years ago.
12  Q.  Do you know what portion of treatment is
13  funded by Tarrant County?
14  A.  100 percent of the treatment is provided for
15  in the mental health court by Tarrant County.
16  Q.  Tarrant County funds 100 percent of the
17  treatment that's provided?
18  A.  Yes.
19  Q.  Can you describe the treatment that's provided
20  through the Mental Health Diversion Program?
21  A.  It will be mental health, behavioral health
22  or -- and/or substance abuse.
23  Q.  Regarding substance abuse, do you know what
24  sort of treatment is provided?
25  A.  Substance abuse treatment with a private

Page 63

1  vendor and also substance abuse education.
2  Q.  So are those two services the same as the
3  services that are provided for -- through the Veterans
4  Treatment Court for substance abuse issues?
5  A.  Yes, but on a different scale.
6  Q.  On a grander scale or a lesser scale?
7  A.  Probably on a lesser scale, because the number
8  one objective is to get the person stabilized so that
9  they can then go through the behavioral health
10  treatment.
11  Q.  Got it.
12  And is it right that -- is MHMR a vendor for
13  the substance abuse treatment that's provided through
14  the Mental Health Diversion Program?
15  A.  Yes.
16  Q.  Do you know if MHMR provides all substance
17  abuse treatment?
18  A.  They do not.
19  Q.  You have other vendors --
20  A.  Yes.
21  Q.  -- that the county uses?
22  Do you know how many other vendors?
23  A.  We provide one, two -- maybe three other
24  vendors, and then there's also participants that use
25  private vendors.

Page 64

1  Q.  Do you have any idea what portion of
2  participants in the Mental Health Diversion Program have
3  substance abuse issues?
4  A.  I'll say probably about 80, 85 percent.
5  Q.  Do you know if that number is tracked
6  anywhere, like in any kind of document?
7  A.  I do not know.
8  Q.  And, you know, for that 80 percent, do you
9  know if you have any data showing specifically which
10  substances the participant is struggling with?
11  A.  I'm not sure.
12  Q.  Do you know if -- if you had that question, is
13  there someone at CCA that you would ask for the answer?
14  A.  If the state were to ask me, I would have to
15  rely on the program managers, and they would rely on the
16  drug test.
17  Q.  When you say the drug test, the results of
18  drug tests taken by participants?
19  A.  Yes.
20  Q.  Is that drug test taken at the beginning of
21  when they -- you know, is there -- strike that.
22  So when you say they would rely on the drug
23  tests, the data would be -- if a drug test tests
24  positive for an opiate, then that participant has a
25  substance abuse problem with opioids?

Page 65

1  A.  It would require --
2  MS. AYACHI:  Objection, form.
3  A.  It would require random testing.
4  Q.  (BY MR. FORD)  So other than the drug testing
5  results, is there any source of information that you can
6  think of that would show which participants in the
7  Mental Health Diversion Program struggle specifically
8  with opioid abuse?
9  A.  Self-reporting.
10  Q.  Are there -- is there regular self-reporting
11  in the program?
12  A.  Yes.
13  Q.  What kind of document is created from
14  self-reporting?
15  A.  The chronological notes are kept into the case
16  manager's case management system, and then it's
17  addressed in court.
18  Q.  Can you say whether -- sort of the same
19  question -- whether opioid abuse in Tarrant County has
20  impacted the Mental Health Diversion Program?
21  A.  Yes.
22  Q.  And why do you say yes?
23  A.  For the Mental Health Court, a lot of times
24  they're taking meds to feel better.  And it doesn't
25  matter whose medication it is, it doesn't matter where

17 (Pages 62 - 65)

1 they got the medication from; they're just trying to
2 cope with all of the different behavioral health
3 problems that they're having.
4      Q.   I understand your answer, but I was just
5 wondering, so how would you say that opioid abuse has
6 impacted MHDP, the Mental Health Diversion Program?
7      A.   MHDP goes to the ER in the hospitals a lot
8 more than any other population that we have, so it's
9 easier to get their medical information.
10      Q.   So because you have more medical information,
11 you can see that opioid abuse is a problem to many
12 participants?
13      A.   It has impacted the program, yes.
14      Q.   And have you seen that impact increase over
15 time?
16      A.   I wouldn't say increase.
17      Q.   Okay.  I'm going to switch gears to the First
18 Offender Drug Program.  Are you still good to keep going
19 or do you want a break?
20      A.   I am good.
21      Q.   So can you describe for me what the First
22 Offender Drug Program is?
23      A.   The First Offender Drug Program was a program
24 created by the criminal court judges and the District
25 Attorney's Office and Sheriff's Department, and the

1 design of the program is for people who are facing their
2 first arrest involving controlled substances.  And they
3 pretty much go in, they tell the judge this is not who I
4 am, this is not what I do, this will never happen again.
5 We call them self-correctors.  They are then placed on
6 an open plea and put into the First Offender Drug
7 Program.
8      Q.   Got it.
9          I was going to ask what a "self-corrector"
10 was.  I wasn't sure what that -- can you explain what
11 that term means?
12      A.   Self-corrector means I do not need any type of
13 assistance, I do not need any hand holding, I can take
14 care of this, this mistake will never be made again.
15      Q.   And do you know when the First Offender Drug
16 Program -- do you call it FODP?
17      A.   FODP.
18      Q.   Do you know when FODP was created?
19      A.   I don't remember the date.
20      Q.   Was it within the past decade?
21      A.   Yes.
22      Q.   Did FODP replace any other program?
23      A.   No.
24      Q.   I was seeing some documents that suggested it
25 might have replaced the D.I.R.E.C.T. Diversion Program.

1 Is that incorrect to say that?
2      A.   That would be incorrect.
3      Q.   Does the D.I.R.E.C.T. Diversion Program still
4 exist?
5      A.   That is the D.I.R.E.C.T. Program.  It's no
6 longer a diversion program because now the cases are
7 postadjudicated.  Diversion simply meant that they were
8 preadjudicated.
9      Q.   So is there no role in D.I.R.E.C.T. for
10 preadjudication anymore?
11      A.   That is correct.
12      Q.   And did that change in 2012?
13      A.   I think so.
14      Q.   So, let me see.  Hold on.
15          Do you know what the eligibility requirements
16 are to take part in FODP?
17      A.   Not without looking at the documents.
18      Q.   Documents.  Well, I've got one for you.
19          Okay.  Let me -- I will introduce this.  We
20 skipped a couple of big ones.  So I will mark --
21          MR. FORD:  Is this Exhibit 5?
22      Q.   (BY MR. FORD)  We'll mark what's -- I will
23 pass you what's been marked as Exhibit 5.
24          (Exhibit 5 marked.)
25      Q.   (BY MR. FORD)  Here you go.

1          MR. FORD:  And I will publish it on
2 Exhibit Share now.  Okay.  I have introduced Exhibit 5
3 in Exhibit Share.
4      Q.   (BY MR. FORD)  And, Ms. Bennett-Wright, I
5 would like to ask you about the attachment to this.  Do
6 you see the cover email, do you see that it's from you?
7      A.   Yes.
8      Q.   Do you have any reason to doubt that you sent
9 this email?
10      A.   No.
11      Q.   Okay.  And it looks like the attachment is an
12 FODP information booklet?
13      A.   Yes.
14      Q.   Do you recognize this document?
15      A.   I do.
16      Q.   Okay.  So can I direct you to page 10?  Or,
17 sorry, page 3.  Do you see on the top it says list of
18 eligible offenses?
19          Do you see that?
20      A.   Yes.
21      Q.   And I think we've already actually covered
22 this list today.
23      A.   Uh-huh.
24      Q.   Do you see number 10 says diversion of a
25 controlled substance?

Page 70

1    A.  I do.
2    Q.  Do you know whether that would include
3  diversion of an opioid?
4    A.  I'm not sure.  That would have been the
5  District Attorney's call.
6    Q.  Gotcha.
7       Yeah, and you said the District Attorney set
8  the eligibility; is that correct?
9    A.  Yes.
10   Q.  Do you know how they determine who is
11  eligible?
12   A.  They set the offenses.  I don't know how they
13  determine that.
14   Q.  Got it.
15      And could you flip back to page 2, please.  Do
16  you see towards the bottom it says Program Cost in bold?
17   A.  Yes.
18   Q.  And then it lists, you know, amounts for
19  felony and misdemeanor.
20      Do you see that?
21   A.  Yes.
22   Q.  Are these the cost of the fees for a
23  participant to take part in the program?
24   A.  Yes.
25   Q.  And so felony, it says $550; is that right?

Page 71

1    A.  Yes.
2    Q.  Do you know if that's currently the price?
3    A.  That is.
4    Q.  And then next to it, it lists, you know,
5  some -- some services, I guess, or treatments.
6    A.  Correct.
7    Q.  Is that what is covered under the program?
8    A.  Yes.
9    Q.  Does that 550 cover the entirety of the
10  services there?
11   A.  Yes.
12   Q.  Is it the same thing for the misdemeanor?
13   A.  Yes.
14   Q.  So is there any portion of the FODP that is
15  covered by something other than fees?  Sorry, let me
16  rephrase that.  I misread it.
17      Are there any costs associated with the FODP
18  that is covered by something other than the fees the
19  participants pay?
20   A.  Yes.
21   Q.  What would that be?
22   A.  Salaries.
23   Q.  Salaries, is there anything other than
24  salaries?
25   A.  No.

Page 72

1    Q.  And does Tarrant County pay for the salaries?
2    A.  Yes.
3    Q.  Are any portion of the salaries covered by
4  grants?
5    A.  No.
6    Q.  How many salaries are part of the FODP
7  program?
8    A.  Two.
9    Q.  Are those case managers?
10   A.  It's a case manager and an administrative
11  assistant.
12   Q.  Have those always -- have those salaries for
13  those positions always been paid for by the county?
14   A.  Yes.
15   Q.  So back to, I guess, the participants of the
16  program.
17   A.  Uh-huh.
18   Q.  Do you know of any way that the program tracks
19  what particular substance a participant is struggling
20  with -- or strike that.
21      Is there any way that the program tracks, you
22  know, what substance was involved in the offense that
23  led to the participant joining the program?
24   A.  We don't track the substance that the person
25  came in the program with.  There's a baseline drug test,

Page 73

1  and if it's -- say it's -- then there's time for that
2  baseline drug test to clear out of their system.  If the
3  drug shows up again, they're removed from the program.
4    Q.  How about if a different drug shows up in a
5  test, would that also lead them to get kicked out of the
6  program?
7    A.  If they have a prescription for the drug, they
8  can continue the program; if they do not, they're
9  removed from the program.
10   Q.  If a participant has a prescription for
11  opioids, is that permitted in the program?
12   A.  If they have a prescription, yes.
13   Q.  So in the program, is the only way that
14  tracking is done -- sorry, strike that.
15      In the FODP, is drug testing the only way that
16  tracks what controlled substances -- what substances are
17  used by participants?  Do you want me to reask that?
18      MS. AYACHI:  Objection, form.
19   Q.  (BY MR. FORD)  In the FODP, is drug testing
20  the only way that tracks what substances are used by the
21  participants?
22   A.  Yes.
23   Q.  Okay.  I got another exhibit.
24      MR. FORD:  Is this Exhibit 6?
25      THE REPORTER:  Yes.

19 (Pages 70 - 73)

1          (Exhibit 6 marked.)
2      Q.   (BY MR. FORD)  I am marking what's going to be
3  Exhibit 6.  Here you go.
4      A.   Thank you.
5          MR. FORD:  Now I will publish it real
6  quick.
7          Okay.  My computer is about to die.  I picked
8  a bad plug.  There we go.
9          So I just introduced in Exhibit Share what's
10  been marked as Exhibit 6.
11      Q.   (BY MR. FORD)  Ms. Bennett-Wright, do you see
12  that the first page is an email that looks like it's --
13  the top portion is sent to you; is that right?
14      A.   That is correct.
15      Q.   Do you have any reason to believe you didn't
16  receive this email?
17      A.   No.
18      Q.   And it looks like -- I wanted to ask you about
19  the attachments, and it looks like the attachments,
20  they're labeled FODP stat tracking for two fiscal years.
21      A.   Yes.
22      Q.   Yeah, does that look right to you in looking
23  at these numbers or the attachments?
24      A.   Yes.
25      Q.   Okay.  So on that first page -- they're Excel

1  spreadsheets, so there's no like numbering on them, but
2  the first page is titled "Monthly Statistical Report"
3  for fiscal year 2017.
4      A.   Yes.
5      Q.   Are you there?
6      A.   Yes.
7      Q.   I just wanted to look at -- or ask you about
8  some of these columns.
9          Do you know what's meant by the submissions
10  column, that first column?
11      A.   Submissions means that there was an
12  application submitted to the District Attorney's Office
13  for participation.
14      Q.   And is there a column that reflects how many
15  people were actually admitted to the program?
16      A.   Yes.
17      Q.   Is that the column that's labeled admitted?
18      A.   Yes.
19      Q.   And then the last two columns, the
20  second-to-last column says deposited program fees.  Do
21  you know what this column indicates?
22      A.   Yes.
23      Q.   What does it -- what does it show?
24      A.   That's the amount that was deposited for that
25  month.

1      Q.   And that's through fees that are paid by
2  participants?
3      A.   Yes.
4      Q.   And that -- that next column over, what does
5  that show?
6      A.   That would be for anyone that was entering
7  into the program.
8      Q.   So I'm --
9      A.   So the deposit amount of program fees would be
10  what we actually -- because we didn't begin with zero.
11  Where it says beginning of the month, that would have
12  been the number of people in the program --
13      Q.   Okay.
14      A.   -- currently in the program.  And fees are not
15  required to be paid for all at once.  Some people are
16  paying fees through the entire time that they're in the
17  program.
18          The last column would be what is -- what has
19  been assessed as the new amount to be added for new
20  applicants that have been admitted.  So the 42 would be
21  for the second column, and the 127 is for the deposited
22  column.
23      Q.   Okay.  Got it.
24          Okay.  And then if you flip over two pages to
25  the page that's titled "Relapse Pattern," do you see

1  that?
2      A.   Yes.
3      Q.   Do you see in -- so can you tell me what this
4  page depicts -- not "depicts."  Can you tell me what
5  sort of information is contained in this page?
6      A.   It's a review of what the UAs and hair tests
7  have reported.
8      Q.   And what's a UA?
9      A.   A drug urinalysis.
10      Q.   So that second box down that's titled
11  "Positive Drug Test," do you see that?
12      A.   Yes.
13      Q.   Then there's categories of substances below
14  that.  Do you see that?
15      A.   Yes.
16      Q.   Are those the different categories they're
17  tested for?
18      A.   Yes.
19      Q.   Do you see the one that says opiates?
20      A.   I do.
21      Q.   So I was wondering if a participant comes in
22  and their test shows positive for opioids and, say,
23  meth, would -- would that test show up in each category?
24      A.   Yes.
25      Q.   So one test could be accounting for, you know,

20 (Pages 74 - 77)

1 multiple categories here?

2    A.  Yes.  There's seven -- the test is a

3 seven-panel test.

4    Q.  Got it.

5       So I guess I don't need to ask that question

6 now, but on the first page, the cover email, if I could

7 ask one more question.

8       The person that responded is Alexander D. Rae.

9 Do you know who that is?

10    A.  I do.

11    Q.  And do you see the message from the person

12 says, I don't have any for 14 or 15?

13    A.  Yes.

14    Q.  And that's referring to that person doesn't

15 have any end-of-year reports for fiscal year 2014 or

16 2015; is that right?

17    A.  Yes.

18    Q.  Do you know why that is?

19    A.  Why they don't have the stats?

20    Q.  I was wondering if it's because that the

21 program didn't record it in those years or, you know, if

22 it's some other reason.

23    A.  I'm going to say that it was probably because

24 the program that -- whoever was in the position during

25 those times didn't record the information.

1    Q.  Got it.

2       Okay.  And then there's -- I've got to

3 introduce one more exhibit to ask one more question.  So

4 I'm going to mark Exhibit 7 and pass it to you.

5       (Exhibit 7 marked.)

6       MR. FORD:  Here you go.

7       MR. OGLE:  Thanks.

8       MR. FORD:  This isn't stapled.  Sorry

9 about that.  And I am introducing it on Exhibit Share

10 now.

11       Okay.  I have introduced now in Exhibit Share

12 what's been marked Exhibit 7.

13    Q.  (BY MR. FORD)  Ms. Bennett-Wright, do you see

14 the cover email?

15    A.  I do.

16    Q.  It includes you on it?

17    A.  Yes.

18    Q.  And the attachment I want to ask you about, it

19 looks like it's the FODP stats for August 2021.

20       Do you see that?

21    A.  Yes.

22    Q.  So if you flip to the attachment, it's going

23 to be the third page to that, yeah -- yes, the third

24 page that says Monthly Statistical Report.

25       Do you see that?

1    A.  Yes.

2    Q.  Is this the same report that we looked at for

3 fiscal years 2016 and 2017?

4    A.  Yes.

5    Q.  Now do you see the number of submissions in

6 the first column, the total 185?  It's kind of blurry.

7    A.  Oh, yes, at the -- at the bottom, I see it.

8    Q.  And then -- so that's the number of people

9 that applied to be in the program that year; is that

10 right?

11    A.  Correct.

12    Q.  And then the admitted column a few over, do

13 you see it says 125?

14    A.  I do.

15    Q.  And that's the total people that took part in

16 the program?

17    A.  Yes.

18    Q.  Okay.  I'll represent to you this is the last

19 year that I could find with a complete year of stats.

20 There was one for 2022, but it was partial.  But my

21 question is this.  I noticed -- and you might have to

22 look back at the last exhibit, but that the number of

23 participants have gone down pretty significantly, both

24 in terms of people that submitted an application to be

25 part of the program and the people that were admitted.

1    A.  Yes.

2    Q.  I was just wondering if there was an

3 explanation for that level of decrease?

4    A.  The applications that are approved for the

5 program are dependent on the District Attorney's Office.

6 During 2020 through probably 2021, end of 2022, the

7 District Attorney's Office was changing the assistant

8 district attorneys that were being placed over the

9 program to approve applications.  So it's a matter of

10 them learning what they were looking for, as far as for

11 putting people in the program, and also they kept

12 changing.

13       So the more changes there were, the less

14 applications would come in.  Because you would have

15 90 days to actually apply for the program from the time

16 of the case being filed, a lot of people were running

17 out of time.

18       Also, that was during the time of COVID.

19 And with COVID, the operations in the court changed

20 significantly.  So attorneys may not have been appointed

21 within the 90 days, and they may not have -- once they

22 got the case to the District Attorney's Office, it may

23 not have been approved within that time span.

24    Q.  Gotcha.

25       So, like I said, I found a partial reporting

Page 82

1 for 2022 that still seemed to be a little down, and I
2 don't know what it is in 2023.  Do you have any
3 knowledge of whether submissions are going up this year?
4     A.   Submissions are going up this year.  I don't
5 think there -- another thing that changed between 2017
6 and 2021 is the laws for THC.  So marijuana cases now
7 have a different track that they can take.  They don't
8 have to go through the -- through this particular
9 program.
10    Q.   What's the different track they can take?
11    A.   Some of them can do a memo with the District
12 Attorney's Office, and the memo requires that they stay
13 clean for 90 days and their case may be dismissed, which
14 is a lot easier than our program for 180 days.
15    Q.   But even not with standing that change, the
16 submissions are going up this year?
17    A.   The submissions are going up since COVID, yes.
18    Q.   Do you know why that is?
19    A.   I would say with full operations in the court,
20 the defense attorneys are able to get appointed to the
21 cases; and once they're appointed, they're able to file
22 the application with the District Attorney's Office
23 before the 90 days runs out.
24    Q.   Do you know if this sort of report is being
25 generated for, you know, a full one for 2022 and will be

Page 83

1 generated for 2023?
2     A.   The reports probably have not been generated
3 for 2022 and 2023, because we also have an electronic
4 case management system, so they wouldn't come through in
5 Excel.
6     Q.   Okay.  When you say in Excel, what do you
7 mean?
8     A.   They wouldn't be in an Excel report.
9     Q.   Oh.  So there's another way that the CCA is
10 tracking it?
11    A.   Yes.
12    Q.   And what's that system?
13    A.   It's CSS.  It's Court Software Solutions, and
14 we track our information inside of an electronic system.
15    Q.   So do you know when that was implemented?
16    A.   2010.  No, 2020, I'm sorry.
17    Q.   2020, okay.  Was it October 2020?
18    A.   Yes.
19    Q.   I know this is -- you might not -- well, do
20 you have any idea -- let me restart that question one
21 more time.
22        So looking at the fiscal year 2017 for the
23 FODP statistical report, you know, submissions are 681
24 and the admissions are 484.  Do you have any idea
25 whether, you know, the numbers are the same this year or

Page 84

1 similar this year?
2     A.   They are never going to look like that again.
3     Q.   Why is that?
4     A.   The laws have changed, and the laws have
5 changed -- again, the majority of the cases would have
6 been misdemeanor cases, and misdemeanor cases are now
7 handled a different way through the state of Texas
8 statutes.
9     Q.   Got it.
10       THE VIDEOGRAPHER:  Counsel, I need to
11 start a new media unit.  Can we go off the record?
12       MR. FORD:  Sure.
13       THE VIDEOGRAPHER:  We're off the record
14 at 11:55 a.m.
15       (Break from 11:55 a.m. to 12:08 p.m.)
16       THE VIDEOGRAPHER:  We are back on the
17 record at 12:08 p.m.
18    Q.   (BY MR. FORD)  Okay.  Ms. Bennett-Wright, so
19 now I want to talk about the D.I.R.E.C.T. Program.
20    A.   Okay.
21    Q.   So you said that currently CCA has no role in
22 the D.I.R.E.C.T. Program; is that right?
23    A.   That is correct.
24    Q.   So CCA doesn't administer anything regarding
25 the D.I.R.E.C.T. Program; that's all under CSCD?

Page 85

1     A.   That is correct.
2     Q.   Does CSCD have any role in applying for,
3 obtaining or handling grants that fund the D.I.R.E.C.T.
4 Program?
5     A.   No.
6     Q.   And I think I asked you this, but did CCA ever
7 administer the D.I.R.E.C.T. Program?
8     A.   Yes.
9     Q.   And is it generally referred to as the
10 D.I.R.E.C.T. Drug Court?
11    A.   Right.
12    Q.   Okay.  So I was wondering if I could ask you
13 just a couple questions about it.  So I saw -- I will
14 introduce this exhibit now to help ask these questions.
15       MR. FORD:  Am I on 8?
16       THE REPORTER:  Yes.
17       MR. FORD:  Thank you.
18       (Exhibit 8 marked.)
19    Q.   (BY MR. FORD)  Okay.  I am going to pass you
20 what I've marked as Exhibit 8.  Here you go.
21       MR. FORD:  And I am introducing it on
22 Exhibit Share now.  Okay.
23    Q.   (BY MR. FORD)  All right.  Ms. Bennett-Wright,
24 do you see on the first page of this it contains an
25 email?

22 (Pages 82 - 85)

Page 86

1    A.  Yes.
2    Q.  And it looks like it's from you to a David
3  Hagerman; is that right?
4    A.  Judge David Hagerman.
5    Q.  Judge Hagerman.
6        And I wanted to ask you, do you see the
7  attachment specialty courts and it's a PowerPoint?
8    A.  Yes.
9    Q.  Do you recognize this PowerPoint?
10    A.  Yes.
11    Q.  Did you put this together?
12    A.  Originally, yes.
13    Q.  Okay.  Do you know what sort of the purpose of
14  this PowerPoint was?
15    A.  When new judges volunteered for the program,
16  Judge Hagerman was taking over the program.  I sent it
17  to Judge Hagerman so if he wanted to go and speak about
18  the program in front of other people.
19    Q.  Got it.
20        So I wanted to show you this because it seemed
21  like it summarized some details about the D.I.R.E.C.T.
22  Program that I saw pop up other places.  So if you could
23  turn to -- at the bottom of the page, it's called a
24  Bates label and it ends in 923.  It's like the fifth or
25  sixth page.  Do you see that at the bottom it says

Page 87

1  D.I.R.E.C T.?
2    A.  Yes.
3    Q.  So do you see it says the D.I.R.E.C.T. Court
4  was established in 1994?
5    A.  Yes.
6    Q.  Is that your understanding?
7    A.  Yes.
8    Q.  And do you see where it says, Goal: To provide
9  an alternative to incarceration for nonviolent, criminal
10  offenders with a history of substance abuse?
11    A.  Yes.
12    Q.  Do you know -- would you agree with that
13  statement, that's the goal of the D.I.R.E.C.T. Drug
14  Court Program?
15    A.  Yes.
16    Q.  If you could flip to the next page.  This page
17  and the next page after that, you know, it talks about
18  something I've seen in the documents, which is the
19  D.I.R.E.C T. Program's treatment of low risk/low need
20  people versus high risk/high need people.
21        Do you have any -- can you explain to me what
22  that distinction is all about in the D.I.R.E.C T.
23  Program?
24    A.  The risk --
25        MS. AYACHI:  Objection, form.

Page 88

1    A.  The risk was determined by an assessment.  Low
2  risk/low needs meaning that their needs were low and
3  their risks were low.  Needs may be their personal
4  needs.  Do they have housing?  Do they have education?
5  If they had housing and education and employment, then
6  their needs would be low.  Low risk means that they do
7  not have an extensive criminal history.
8    Q.  (BY MR. FORD)  Okay.  And, you know, when high
9  risk/high need is used in the program, can you explain,
10  you know, basically what that is, what that would be?
11    A.  Basically it's the opposite of the low
12  risk/low needs.  Those are -- their risk level is going
13  to be higher because the assessment is going to show a
14  longer criminal history.  Also, their needs are going to
15  be higher because they may not have housing, they may
16  not have education, they may not be employed.
17    Q.  Okay.  And are these sort of the two
18  categories that the D.I.R.E.C T. Program deals with, low
19  risk/low need and high risk/high need?
20    A.  2012, the modifications was actually when we
21  were handing it off to CSCD.  So at that time, that may
22  have been what they were handling.  I don't know what
23  they're doing today.
24    Q.  Okay.  So the fact that this is -- do you know
25  did this PowerPoint, was it created in 2012 then?

Page 89

1    A.  It was created before -- yes, it would have
2  been after 2012.
3    Q.  Got it.
4        So this might not reflect how the D.I.R.E.C.T.
5  Program is today?
6    A.  That is correct.  It would be the decision of
7  CSCD.
8    Q.  Okay.  Is it your understanding that today to
9  be eligible for the D.I.R.E.C T. Program, do you know --
10  let me rephrase that.
11        Do you know how a participant is eligible to
12  be part of the D.I.R.E.C T. Program today?
13    A.  I know they have to have an extensive
14  substance abuse history.
15    Q.  Does it sound right if -- to say that they
16  might qualify if either their offense is substance
17  related or if the circumstances around their offense,
18  you know, suggests they have a substance abuse problem?
19    A.  Yes.
20    Q.  Do you know if alcohol qualifies as a
21  substance for purposes of a D.I.R.E.C T. Program?
22    A.  I don't know.
23    Q.  And similar to the -- you know, the questions
24  I asked you about the other programs, do you know if
25  Tarrant County tracks what controlled substance is at

23 (Pages 86 - 89)

Page 90

1 issue?  Let me reask that.
2       Do you know if Tarrant County tracks what sort
3 of substance is at issue for each participant in the
4 D.I.R.E.C T. Program?
5    A.  I do not know.
6    Q.  If you look back at the exhibit at page --
7 let's go first with page 925, the postadjudication
8 program.  Do you see the second paragraph?  The print is
9 pretty small but it begins "The treatment plan."
10      Do you see that?
11   A.  Yes.
12   Q.  So this paragraph contains some, you know,
13 details of what the treatment plan provided through the
14 D.I.R.E.C T. Program would include.  Do you know if
15 anything listed in this program is still being provided
16 by the D.I.R.E.C T. Program today?
17   A.  I do not know.
18   Q.  Would someone at CSCD --
19   A.  Yes.
20   Q.  -- know that?
21      The third paragraph lists -- you know,
22 describes where the funding for the D.I.R.E.C.T. Program
23 comes from.
24   A.  Uh-huh.
25   Q.  Do you have any knowledge about where the

Page 91

1 funding for the D.I.R.E.C T. Program comes from today?
2    A.  I do not.
3    Q.  Would someone from CSCD know that?
4    A.  Yes.
5    Q.  You know, and the page before that talks about
6 the preadjudication.  If I asked you the same questions,
7 would your answers be the same?
8    A.  For today?
9         MS. AYACHI:  Objection, form.
10   Q.  (BY MR. FORD)  Let me ask this.  For the
11 D.I.R.E.C.T. Program as a whole, do you have any
12 knowledge about where the funding for the D.I.R.E.C T.
13 Program comes from today?
14   A.  I do not.
15   Q.  And do you know what treatment options are
16 provided through the D.I.R.E.C T. Program today?
17   A.  I do not.
18   Q.  Okay.  So can you say whether opioid abuse in
19 Tarrant County has impacted the D.I.R.E.C T. Program?
20   A.  During which period?
21   Q.  Based on your knowledge, can you say whether
22 opioid abuse in Tarrant County has had an impact on the
23 D.I.R.E.C T. Drug Court, you know, based on what you
24 know?
25   A.  Based on what I know --

Page 92

1         MS. AYACHI:  Objection, form.
2    A.  Based on what I know in 1994, the D.I.R.E.C.T.
3 Drug Court Program was created because of the numerous
4 cases that were coming through the courts.  I don't
5 specifically know what substance was being directed at.
6    Q.  (BY MR. FORD)  Do you know whether any
7 substance -- whether it ever included opioids?
8    A.  It included every drug.
9    Q.  So you don't have any knowledge whether one --
10 one drug, you know, would impact the services needed or
11 the -- provided by the D.I.R.E.C.T. program versus
12 another drug?
13   A.  That is correct.
14   Q.  Okay.  You can set aside that document.
15      I just wanted to ask a question generally
16 about grants.  Can you say, generally speaking, how much
17 of the costs associated with the specialty courts we've
18 talked here today -- about today, how much are paid
19 through grant money?
20   A.  Properly operated, I would say one of the --
21 one of the courts that is properly operated is the
22 Veterans Court because it gets most of the funding that
23 it needs, and it operates at about $500,000.  With the
24 waiting list that we have, I could double that in size
25 if we received more money.

Page 93

1      Most of the programs I would say are running
2 between $250,000 per program.  Such as the Mental Health
3 Court, we're receiving about $100,000 from that in grant
4 funds and the rest is coming from the county.
5    Q.  Okay.  So those portions, can you say
6 generally, or maybe for each court, what percentage of
7 that is the overall cost of the program?
8    A.  I would say probably about 50 percent of that
9 is for the cost of the program --
10   Q.  Okay.
11   A.  -- and 50 percent would be in treatment.
12   Q.  Are you aware that Tarrant County has
13 received -- are you aware if Tarrant County has received
14 any money as a result of settlements from opioid
15 lawsuits?
16   A.  One of my employees mentioned that they
17 received money from a lawsuit.
18   Q.  Do you know how much money?
19   A.  I think it was around 2 million.
20   Q.  Do you know if that amount is the only amount
21 of money that Tarrant County has received so far from
22 settlements related to opioid lawsuits?
23   A.  I don't know.
24   Q.  Do you know how Tarrant County plans to use
25 the money it's obtained from settlements relating to

24 (Pages 90 - 93)

Page 94

1 opioid lawsuits?

2    A.  No.

3    Q.  Do you know if the CCA plans to request that

4 any money obtained through settlements relating to

5 opioids lawsuits be given to CCA to be used for, you

6 know, costs it might have?

7    A.  No.

8         MS. AYACHI:  Objection, form.

9    Q.  (BY MR. FORD)  Do you know what the Opioid

10 Abatement Fund Council is?

11    A.  I do not.

12    Q.  We're on the home stretch.

13        Do you want Tarrant County to win this

14 lawsuit?

15        MS. AYACHI:  Objection, form.

16    Q.  (BY MR. FORD)  You can answer.

17    A.  Does winning mean that the citizens that come

18 through the justice system gets treatment?  If that is

19 the case, yes, I want Tarrant County to win to be able

20 to provide treatment for our citizens that get in

21 trouble because of drugs.

22    Q.  Do you intend to testify at trial in this

23 case?

24    A.  If I'm subpoenaed.

25    Q.  Would a win at trial, do you think it would

Page 95

1 help the CCA in any way?

2    A.  Not to my knowledge.

3    Q.  If Tarrant County were to receive money, you

4 know, from this case, either from a jury verdict award

5 or a settlement amount, would you expect the CCA to be

6 given any portion of that settlement money?

7    A.  No.

8         MS. AYACHI:  Objection, form.

9    Q.  (BY MR. FORD)  Okay.  You know, we talked a

10 little bit about the word "diversion" today.

11    A.  Uh-huh, yes.

12    Q.  Do you remember how I was using it in terms

13 of, you know, relating to controlled substances?

14    A.  Yes.

15    Q.  Are you aware of any Albertsons pharmacists

16 dispensing a prescription for an opioid medication that

17 the pharmacist knew would be used for something illegal?

18    A.  I'm not aware.

19    Q.  Are you aware of any Kroger pharmacist

20 dispensing a description for an opioid medication that

21 the pharmacist knew would be used for something illegal?

22    A.  I am not aware of that.

23    Q.  Are you aware of any Albertsons pharmacist

24 dispensing an opioid that the pharmacist knew was

25 medically unnecessary?

Page 96

1    A.  No.

2         MS. AYACHI:  Objection, form.

3    Q.  (BY MR. FORD)  Are you aware of any Kroger

4 pharmacist dispensing a prescription for an opioid

5 medication that the pharmacist knew was medically

6 unnecessary?

7    A.  I am not aware of that.

8         MS. AYACHI:  Objection, form.

9         MR. FORD:  You know, that's -- I think

10 that's it.  Can I take a three-minute break --

11        THE WITNESS:  Sure.

12        MR. FORD:  -- just to look it over real

13 quick?

14        THE WITNESS:  Yes.

15        THE VIDEOGRAPHER:  All right.  We're off

16 the record at 12:25 p.m.

17        (Break from 12:25 p.m. to 12:29 p.m.)

18        THE VIDEOGRAPHER:  We are back on the

19 record at 12:30 p.m.

20        MR. FORD:  Ms. Bennett-Wright, I've got

21 nothing else.  I want to say thank you for your time

22 today and enjoy your vacation.  I'm sorry it started out

23 this way, and I will pass it on to counsel for Kroger if

24 she has any questions.

25        MS. AYCOCK:  I'm not going to have any

Page 97

1 questions today.  Thank you.

2         MS. AYACHI:  On behalf of Tarrant County,

3 we deeply appreciate the work you've done, the time

4 you've spent.  We hope you have a great vacation.

5 Again, sorry you had to start off this way.

6         THE WITNESS:  Thank you.

7         THE VIDEOGRAPHER:  All right.  We're off

8 the record at 12:31 p.m.

9         (Proceedings ended at 12:31 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

25 (Pages 94 - 97)

Page 98

1         REPORTER'S CERTIFICATE

2       The undersigned Certified Shorthand Reporter

3 licensed in the State of Texas does hereby certify:

4       I am authorized to administer oaths or

5 affirmations, and prior to being examined, the witness

6 was duly administered an oath by me.

7       I am not a relative or employee or attorney or

8 counsel of any of the parties, nor am I a relative or

9 employee of such attorney or counsel, nor am I

10 financially interested in the outcome of this action.

11       I am the deposition officer who

12 stenographically recorded the testimony in the foregoing

13 deposition, and the foregoing transcript is a true

14 record of the testimony given by the witness.

15       Before completion of the deposition, review of

16 the transcript [X] was [ ] was not requested.  If

17 requested, any changes made by the deponent (and

18 provided to the reporter) during the period allowed are

19 appended hereto.

20       In witness whereof, I have subscribed my name

21 this 8th day of September, 2023.

22

23       *Julie C. Brandt*

24       Julie C. Brandt, CSR, RMR, CRR

25       TX CSR No. 4018, Exp. 10/31/23

---

Page 99

1       Veritext Legal Solutions

        1100 Superior Ave

2         Suite 1820

        Cleveland, Ohio 44114

3       Phone: 216-523-1313

4

September 8, 2023

5

To: Sadie Turner

6

Case Name: National Prescription Opiate Litigation - Track 9 (Tarrant

7 County) v.

8 Veritext Reference Number: 6059392

9 Witness:  Cheryl Bennett-Wright     Deposition Date:  8/28/2023

10

Dear Sir/Madam:

11

12 Enclosed please find a deposition transcript.  Please have the witness

13 review the transcript and note any changes or corrections on the

14 included errata sheet, indicating the page, line number, change, and

15 the reason for the change.  Have the witness' signature notarized and

16 forward the completed page(s) back to us at the Production address shown

17

above, or email to production-midwest@veritext.com.

18

19 If the errata is not returned within thirty days of your receipt of

20 this letter, the reading and signing will be deemed waived.

21

Sincerely,

22

Production Department

23

24

25 NO NOTARY REQUIRED IN CA

---

Page 100

1      DEPOSITION REVIEW

     CERTIFICATION OF WITNESS

2

3     ASSIGNMENT REFERENCE NO: 6059392

    CASE NAME: National Prescription Opiate Litigation - Track 9

(Tarrant County) v.

    DATE OF DEPOSITION: 8/28/2023

4     WITNESS' NAME: Cheryl Bennett-Wright

5     In accordance with the Rules of Civil

    Procedure, I have read the entire transcript of

6 my testimony or it has been read to me.

7     I have made no changes to the testimony

    as transcribed by the court reporter.

8

9 Date      Cheryl Bennett-Wright

10     Sworn to and subscribed before me, a

    Notary Public in and for the State and County,

11 the referenced witness did personally appear

    and acknowledge that:

12

    They have read the transcript;

13     They signed the foregoing Sworn

      Statement; and

14     Their execution of this Statement is of

      their free act and deed.

15

    I have affixed my name and official seal

16

this _____ day of _____, 20_____.

17

    _____

18     Notary Public

19     _____

    Commission Expiration Date

20

21

22

23

24

25

---

Page 101

1      DEPOSITION REVIEW

     CERTIFICATION OF WITNESS

2

3     ASSIGNMENT REFERENCE NO: 6059392

    CASE NAME: National Prescription Opiate Litigation - Track 9

(Tarrant County) v.

    DATE OF DEPOSITION: 8/28/2023

4     WITNESS' NAME: Cheryl Bennett-Wright

5     In accordance with the Rules of Civil

    Procedure, I have read the entire transcript of

6 my testimony or it has been read to me.

7     I have listed my changes on the attached

    Errata Sheet, listing page and line numbers as

8 well as the reason(s) for the change(s).

9     I request that these changes be entered

    as part of the record of my testimony.

10

11     I have executed the Errata Sheet, as well

    as this Certificate, and request and authorize

    that both be appended to the transcript of my

12 testimony and be incorporated therein.

13     _____

    Date      Cheryl Bennett-Wright

14

    Sworn to and subscribed before me, a

15     Notary Public in and for the State and County,

    the referenced witness did personally appear

16 and acknowledge that:

17     They have read the transcript;

    They have listed all of their corrections

18       in the appended Errata Sheet;

    They signed the foregoing Sworn

19       Statement; and

    Their execution of this Statement is of

20       their free act and deed.

21     I have affixed my name and official seal

22 this _____ day of _____, 20_____.

23     _____

    Notary Public

24     _____

25     Commission Expiration Date

---

26 (Pages 98 - 101)

```
                                                    Page 102
1            ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2           ASSIGNMENT NO: 6059392
3   PAGE/LINE(S) /      CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____   _____
20  Date         Cheryl Bennett-Wright
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
           Notary Public
24
    _____
25  Commission Expiration Date
```

Veritext Legal Solutions
www.veritext.com                    888-391-3376