# EXHIBIT 43

IN THE UNITED STATES DISTRICT COURT.
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION ) MDL No. 2804

THIS DOCUMENT RELATES TO: Track Nine: Tarrant County, Texas ) Case No.: 17-md-2804

(Case No. 1:18-op-45274-DAP) ) Judge Dan Aaron Polster

---

ORAL AND VIDEOTAPED DEPOSITION OF
FLOYD HECKMAN
AUGUST 24, 2023
(REPORTED REMOTELY VIA ZOOM)

---

ORAL AND VIDEOTAPED, VIA ZOOM VIDEOCONFERENCE, DEPOSITION OF FLOYD HECKMAN, produced as a witness at the instance of the Defendants and duly sworn, was taken in the above-styled and numbered cause on Thursday, August 24, 2023, from 10:01 a.m. to 1:50 p.m., before Kari Behan, CSR, RPR, CRR, a Texas certified machine shorthand reporter, with the witness participating remotely, Fort Worth, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record herein.

Job No. 6055188

APPEARANCES

FOR THE PLAINTIFF (REMOTELY):
ALEX ABSTON, ESQ.
- and -
SADIE TURNER, ESQ.
10940 W. Sam Houston Parkway N.
Suite 100
Houston, Texas 77064
(281) 748-7693
alex.abston@lanierlawfirm.com
sadie.turner@lanierlawfirm.com

FOR THE DEFENDANTS, THE KROGER CO., KROGER LIMITED PARTNERSHIP I, KROGER LIMITED PARTNERSHIP II, KROGER TEXAS LP (REMOTELY):
GABRIELE WOHL, ESQ.
- and -
TONY RYAN, ESQ.
BOWLES RICE LLP
Granville Square
Suite 400
Morgantown, West Virginia 26501
(304) 285-2500
gwohl@bowlesrice.com
tryan@bowlesrice.com

FOR THE DEFENDANT, ALBERTSONS (REMOTELY):
ALLISON STEWART, ESQ.
GREENBERG TRAURIG, LLP
2200 Ross Avenue
Suite 5200
Dallas, Texas 75201
(214) 665-3641
allison.stewart@gtlaw.com

APPEARANCES (CONTINUED):

ALSO PRESENT:
Craig M. Price, Esq.
Tarrant County District Attorney's Office

Kenny Parker, Videographer
Veritext Legal Solutions

Gregg Holderman, Concierge/Technician
Veritext Legal Solutions

\- - -
INDEX
\- - -

EXAMINATION OF FLOYD HECKMAN PAGE

BY MS. WOHL................................ 8
CHANGES AND SIGNATURE.......................137
REPORTER'S CERTIFICATION....................139

* * *

EXHIBITS

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Sheriff's Office - Training Academy Current Chart | 47 |
| Exhibit 2 | E-mail, Subject: RE: Follow up, TARRANT_00862033, Confidential | 49 |
| Exhibit 3 | E-mail, Subject: FW: Ohio cops eye possible fentanyl after 17 overdoses in 1 day, TARRANT_00862326, Confidential | 54 |
| Exhibit 4 | E-mail, Subject: RE: Overdose Inquiry, TARRANT_00706265 through 00706267, Confidential | 59 |
| Exhibit 5 | E-mail, Subject: RE: Overdose Inquiry, TARRANT_00706306 through 00706309, Confidential | 63 |
| Exhibit 6 | E-mail, Subject: CNET Projections, TARRANT_00706310 and 00706311, Confidential | 66 |
| Exhibit 7 | E-mail, Subject: RE: Opiate Overdose Data, TARRANT_00706312 and 00706313, Confidential | 70 |

EXHIBITS (CONTINUED):

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | E-mail, Subject: RE: Opiate OD Data, TARRANT_00683034 and TARRANT_00683035, Confidential | 80 |
| Exhibit 9 | E-mail, Subject: Fwd: RE: Opiate Overdose Data, TARRANT_00706329 and 00706330, Confidential | 83 |
| Exhibit 10 | E-mail, Subject: Re: Re: Opiate/Heroin Overdose Data, TARRANT_00833329 and 00833330, Confidential | 89 |
| Exhibit 11 | Article entitled: The Opioid Epidemic in North Texas, TARRANT_00833331 through 00833382, Confidential | 92 |
| Exhibit 12 | E-mail, Subject: RE: Overdose Statistics, TARRANT_00684006 and 00684007, Confidential | 94 |
| Exhibit 13 | E-mail, Subject: RE: Narcan, TARRANT_00706323 and 00706324, Confidential | 97 |
| Exhibit 14 | E-mail, Subject: FW: Narcan Drug Authorization for Tarrant County Sheriff's Office, TARRANT_00684261 through 00684263, Confidential | 100 |
| Exhibit 15 | E-mail, Subject: RE: Opioid Drugs and Naloxone, TARRANT_00690608 through 00690610, Confidential | 105 |
| Exhibit 16 | E-mail, Subject: RE: RE: RE:Narcan Policy for Sheriff's Office, TARRANT_00683007 through 00683010, Confidential | 108 |

EXHIBITS (CONTINUED):

Exhibit 17 E-mail, Subject: FW: Rough draft of proposed TCSO Policy regarding Naloxone (Narcan), TARRANT_00854759, Confidential 110

Exhibit 18 Tarrant County Sheriff's Office, Standard Operating Procedures, Section Number: 3625, TARRANT_00854760 through 00854762, Confidential 111

Exhibit 19 E-mail, Subject: Narcan Policy for Sheriff's Office, TARRANT_00854797, Confidential 113

Exhibit 20 Tarrant County Sheriff's Office, Standard Operating Procedures, Section Number: 3625, TARRANT_0854798 and 0854799, Confidential 114

Exhibit 21 E-mail, Subject: FW: Narcan, TARRANT_00854909, Confidential 115

Exhibit 22 Purchase Order, TARRANT_00854910, Confidential 117

Exhibit 23 Service Requisition, TARRANT_0085491, Confidential 118

Exhibit 24 E-mail, Subject: FW: Narcan Nasal Spray, TARRANT_00832591, Confidential 120

Exhibit 25 E-mail, Subject: FW: Narcan for Law Enforcement, TARRANT_00706190 and 00706192, Confidential 122

Exhibit 26 E-mail, Subject: RE: Opioid Epidemic, TARRANT_00893307 and 00893308, Confidential 123

Exhibit 27 Service Requisition, TARRANT_00893309, Confidential 126

PROCEEDINGS:

(Thursday, August 24th, 2023, 10:01 a.m.)

THE VIDEOGRAPHER: Good morning. Today is Thursday, August the 24th, 2023. We are on the record at 10:01 a.m. This is the video-recorded deposition of Floyd Heckman in the matter of In Re: National Prescription Opiate Litigation in the United States District Court, Northern District of Ohio, Eastern Division.

My name is Kenny Parker; I'm a certified legal video specialist here on behalf of Veritext Legal Solutions. The court reporter is Kari Behan also present on behalf of Veritext.

At this time, would all counsel please identify themselves and their firm affiliation for the record.

MS. WOHL: Hi, this is Gabe Wohl from Bowles Rice on behalf of Kroger.

MS. STEWART: This is Allison Stewart from Greenberg Traurig on behalf of the Albertsons defendants.

MS. ABSTON: And I'm Alex Abston from the Lanier Law Firm on behalf of Tarrant County, the plaintiffs, and we have Sadie Turner on as well.

MR. PRICE: Craig Price, Tarrant County.

MR. RYAN: Tony Ryan, Bowles Rice, on behalf

of Kroger.

THE VIDEOGRAPHER: Thank you.

Madam Court Reporter, you may proceed.

THE COURT REPORTER: Mr. Heckman, would you please raise your right hand.

THE WITNESS: (Complied.)

THE COURT REPORTER: Do you solemnly swear the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT REPORTER: Thank you.

FLOYD HECKMAN,

after having been first duly sworn by the above-mentioned Certified Court Reporter, was examined and testified as follows:

EXAMINATION

BY MS. WOHL:

Q. Good morning, Captain Heckman. How are you?

A. Good morning. I'm fine.

Q. My name is Gabriele Wohl; I go by Gabe. And I'm here today representing Kroger. I just want to note on the record at the outset that I received your personnel file this morning. It was a couple hundred pages. I didn't get a chance to read it. I am sure there is nothing shocking in there, but I will review it later, and

if there's something in there that we need to ask you about, we may have to open this back up.

But let me start with my questions. First of all, formalities, it is Captain, right?

A. Yes. Yes, my current rank.

Q. Make sure I'm getting that right.

Could you please state your full name for the record?

A. Yeah, Floyd Heckman, Jr.

Q. And are you represented by counsel today?

A. Yes.

Q. And who would that be?

A. I have Craig Price here, and then, I guess Sadie's on the line, and Alex.

Q. And is that counsel provided to you by Tarrant County as an employee of Tarrant County?

A. Yes.

Q. And where are you located at this time?

A. I am in the Tim Curry Justice Center in Fort Worth, Texas.

Q. Other than your attorney, Craig Price, is there anyone else in the room with you?

A. No.

Q. Have you ever been deposed before?

A. No.

Page 10

Q. Well, let me give you some ground rules about depositions that I'm sure you've already heard. But on the record, let me let you know that it's a fact-finding deposition. It's not an inquisition. I want to get whatever information you might be able to provide concerning this litigation.

And you understand that you're under oath to speak the truth, and that's the -- the oath is the same as if you were in a courtroom. Do you agree with that?

A. Yes.

Q. And if I ask a question that is unclear to you or you don't understand, please say so, and I will attempt to rephrase. And we want to make sure that we understand each other; otherwise, I'll presume that you understand my question and are providing a full and truthful response, okay?

A. I understand.

Q. And we've got a stenographer with us today, who is recording everything we say into written form, and it would make it more difficult for the stenographer if we're talking at the same time or interrupting each other. So we'll both do our best to take turns and listen and make sure we're -- we're finishing up before the other person starts, which sometimes makes for an awkward conversation but can help at the end when we're reviewing transcripts, okay?

Page 11

A. Yes.

Q. Likewise, only verbal responses can be recorded, so we'll make sure to answer verbally as opposed to with nodding or hand gestures or jumping out of our seats.

A. Understood.

Q. And at times, your attorney may lodge an objection, like "object to form," and this is some legalese between lawyers. It's kind of a placeholder, and you can still proceed to answer the question unless you're directed by your counsel to not answer. Is that okay?

A. Yes.

Q. I try to take hourly breaks around the hour. If you need a break at a time when I'm not suggesting one, please feel free to do so. All I ask is that, if there's a question pending, you answer it first.

A. Understood.

Q. Do you have any questions regarding the deposition instructions?

A. I do not.

Q. Great.

Are you currently taking any medications or dealing with any other medical condition that could impair your ability for recollection or your ability to understand questions and answer truthfully?

Page 12

A. No.

Q. Do you have an understanding of the claims that Tarrant County is making against Kroger and Albertsons in their lawsuit?

A. I know there -- I've been told there is a lawsuit; I don't know details about it.

Q. And have you read the legal complaint in this litigation?

A. I have not.

Q. When did you first learn of this litigation?

A. I don't know the exact date. I was -- I heard about it from a previous -- my previous narcotic commander, that it -- it -- that there might be a litigation forthcoming, but I was not given any details. And I have -- and then, I guess, fairly recently, I was told that this was going to have to take place, the deposition, and that I would -- was being asked to participate in this.

Q. And when you heard that there may be litigation from your former narcotics commander, do you know about when that was?

A. I -- I -- I don't. It -- it might have been around 2018 maybe.

Q. And can you tell me who that was?

A. Calvin Bond.

Page 13

Q. So I will represent to you that Tarrant County has sued Kroger and Albertsons alleging the pharmacies in their grocery stores contributed to an opioid epidemic causing the County to lose money through various resources.

So opioid litigation in general, I want to make sure that we have -- we know what we're talking about when we use certain terms that we're going to use. So first of all, if I abbreviate Tarrant County Sheriff's Office to TCSO, we'll understand that that means Tarrant County Sheriff's Office. Is that okay?

A. Yes.

Q. And saying the term "CNET" refers to Tarrant County Sheriff's Office Combined Narcotics Enforcement Team --

A. Yes.

Q. -- is that fair?

Do you-all use the term "CNET," or do you use something else for that?

A. We -- we call it CNET.

Q. And if I use the term "DEA," we understand that I'm referring to the United States Drug Enforcement Agency?

A. Understood.

Q. And that "HIDTA" is an acronym for High Intensity

Drug Trafficking Area. Can we agree on that?
A. Yes.
Q. Captain Heckman, what is your -- what do you understand the term "opioids" to mean?
A. Opioids? I understand that to mean synthetic opiates.
Q. And in your understanding, what type of drugs does that include?
A. From my experience, it's generally drugs such as OxyContin, or oxycodone.
Q. So prescription medication?
A. Yes.
Q. It would also include illicit drugs?
A. Yes, such as heroin.
Q. And do you understand that the prescription opioids are FDA- and DEA-approved medications?
A. Yes, that's my understanding.
Q. And prescription opioids are manufactured by pharmaceutical companies and are legally avail- -- available only with a prescription from a healthcare providing -- provider.
Do you understand -- do you have that understanding?
A. Yes.
Q. And prescription opioids can only be obtained by

going to a physician or a provider and receiving a legal prescription from a provider licensed by the DEA to write that prescription and then taken to a pharmacy to have that prescription legally filled.
Is that your understanding?
MS. ABSTON: Objection, form.
You can answer.
THE WITNESS: Okay.
I understand there's legal ways to obtain those drugs, and I understand there's illegal ways to obtain those drugs.
BY MS. WOHL:
Q. And as far as the legal ways to obtain those drugs, what is your understanding of that process?
A. When they're prescribed by a licensed physician or medical care provider.
Q. Prescribed by a medical care provider and then dispensed by a pharmacy?
A. Yes.
Q. And you -- you just mentioned this, that you understand that there are legal, as well as illegal, ways to procure opioids. Can you give me an example of an illegal way to obtain an opioid?
A. Well, most pharmaceutical drugs -- well, I won't say "most." Opiate pharmaceutical drugs are pretty easy

to obtain on the street, and you can buy them just from your local drug dealer, so to speak. So they -- they can be purchased on the street just by somebody you know that has them, either -- sometimes they sell them out of their own prescription bottle, or they obtain them unlawfully, but they -- they -- they can distribute them.
Q. And since we're talking about opioids that also include illicit drugs too, are those also -- any -- let me rephrase that.
Obtain -- there's no legal way to obtain the illicit drugs, right?
MS. ABSTON: Objection, form.
You can answer.
THE WITNESS: The -- in -- in my world, from my perspective, illicit drugs are -- are generally not drugs you can obtain through a prescription.
BY MR. WOHL:
Q. And do you have an understanding that it's the dispensing of prescription opioids that Kroger and Albertsons have been blamed for by Tarrant County in this litigation?
MS. ABSTON: Objection, form.
THE WITNESS: That -- that's what I've gathered. Based on what I've been told about the lawsuit, I just kind of gathered that.

BY MS. WOHL:
Q. Do you believe that prescription opioids can have legitimate medical uses?
A. Yes.
Q. Would you agree that there are many people who suffer from legitimate injury and pain that seek medical care from a provider and are provided prescriptions for opioids upon their provider's determination of medical necessity?
A. Yes.
Q. And would you agree that the doctor who is examining or treating the patient is in the best position to assess medical necessity?
A. Yes.
Q. And I understand that you're not a doctor. But as a layperson, would you agree that, when prescribed and used properly, opioids can provide benefits to patients suffering from acute or chronic pain?
MS. ABSTON: Objection, form.
THE WITNESS: Yes.
BY MS. WOHL:
Q. And without getting into the specifics of what was discussed, did you meet with anyone to prepare for this deposition?
A. I -- I did. I had two meetings that each lasted

an hour and a half to two hours, I -- I believe.
Q. Who did you meet with?
A. The people on this call, Alex, Sadie, and Mr. Craig Price.
Q. Did you discuss the deposition with anyone besides your attorneys?
A. No.
Q. Did you review any documents or any other materials to prepare for this deposition?
A. No.
Q. Captain Heckman, are you from Texas?
A. I am not.
Q. Where are you from?
A. I was actually born in Pennsylvania.
Q. Where in Pennsylvania?
A. Easton.
Q. I'm in Pittsburgh a lot; I don't know Easton.
Where did you grow up?
A. Early childhood until I was about 9 was in Pennsylvania, and then I moved to Texas when I was 10, and I spent some time in the San Antonio area. I spent one year in Indiana in my early teens, and then I moved back to the Fort Worth area in the eighth grade, and I've been here ever since.
Q. Give me a summary of your education following

high school.
A. Civilian education?
Q. Yes.
A. I'm sorry. Or my pro- --
Q. Civilian, and then we'll talk about --
A. Oh, civilian.
Q. -- professional.
A. Okay. Well, I graduated high school, and then I obtained a bachelor's degree in criminal justice and a master's degree in criminal justice.
Q. What school were those degrees from?
A. The -- they were both from Lamar University.
Q. What were the years you attended those schools -- that school?
A. My -- approximately, I -- I finished my master's degree around 2015, and my bachelor's degree was two years prior to that, thereabout, so 2013.
Q. And following -- well, give me your history directly following high school. Were you in the armed forces?
A. I was. I was in the United States Army.
Q. Can you give me that history and what departments and ranks you are?
A. Yes. So I went into the Army in 1986, and I was stationed -- I went to basic training in Fort Sill,

Oklahoma, and then I was stationed in Fulda, West Germany. That was back before the Berlin Wall fell. So -- but I was stationed in Fulda, and my rank was a private the entire time. I was only on active duty for two years, and then I returned, and I had six years of inactive reserve status that I did locally.
Q. Germany, before the Wall fell?
A. I'm sorry?
Q. Were you there when it fell? Were you in West Germany when the Wall fell?
A. I left the year before it actually fell.
Q. Wow, interesting.
What about the FBI National Executive Administration? What is that?
A. I'm not sure. Can you --
Q. You don't have any experience with that? I have a note about the FBI National Executive Administration.
A. I'm sorry.
Q. You don't know anything --
A. I'm not sure what it is.
Q. It's okay. Sorry. Sometimes we go through everybody's files and documents and things pop up, and I've gotta ask you if you know what it is. So if you don't have experience with that, then it must have been a misread or attributed to you, and it was somebody else.

Do you currently have any professional licensures or certifications?
A. Well, yes. I'm a -- I'm a Master Peace Officer in Texas. I also have certification as a -- a TCOLE, which is Texas Commission on Law Enforcement instructor. So I'm a licensed instructor.
I am a firearm's instructor. I have a instructor certification -- correct. I have a -- correct -- I'm sorry. I have a certification as a clandest- -- I'm a certified clandestine lab investigator for illicite drugs, and I'm a clan- -- certified clandestine lab site safety officer.
Q. You don't see as many clan labs as you used to, do you?
A. You -- you don't.
And I'm also an ethics instructor.
Q. Great.
And are all those certifications up to date, to the extent that they need to be?
A. Yes. Yes, they are.
Q. And let's talk about your work history.
First let me ask you: Did you go directly to get your bachelor's degree following leaving the -- the Army?
A. No, not immediately. I -- I attended Kaplan

Page 22

University. I -- I believe I started Kaplan University in the mid-'90s, and I actually got my associate's degree from Kaplan before I went on to my bachelor's. I was on the 20-year plan.

Q. Nothing wrong with that.

So after you got your master's -- well, I don't want to limit you to just post-education, because you might be working during getting your education. But can you give me your work history?

A. Here at the sheriff's office or in law enforcement?

Q. In law enforcement, yeah.

What's -- you know, anything that pertains to your -- your degrees and bachelor's or master's in criminal justice. So if you were working while you were achieving those degrees, that too.

A. I was working the whole time I was going to college.

So I started with the Tarrant County Sheriff's Office in 1988. So just about six or eight weeks after I got out of the Army I started, and I was working in our confinement division. After a couple years, I transferred to the transportation division where I was responsible for transporting prisoners around the Tarrant County area, between our Tarrant County jails, and

Page 23

I would also do -- run inmates on our transportation bus, on our jail bus, back and forth to the penitentiary, things like that. And I -- I did that for a few months, and then I promoted and went to our patrol division.

I did four-and-a-half, approximate, years in patrol, and then I transferred to narcotics as a narcotic investigator, and I spent eight to nine years -- I'm going off memory here. So approximately eight to nine years in narcotics as a narcotic detective.

I was -- I promoted to sergeant when -- and when I left narcotics, I went back to patrol as a -- as a road sergeant. I spent one year as a road sergeant, and I became eligible to promote -- to apply for lieutenant, and I applied for a promotion to lieutenant, and I was promoted to lieutenant in 2005.

Once I was promoted to lieutenant, I was asked to come back to narcotics, and I was assigned to narcotics criminal investigations in crime scene, and I remained there as a lieutenant for about six years. And then I was assigned to our judicial services division in charge of the security of our courthouses in Tarrant County for about a year, and then I was transferred out to patrol as a shift lieutenant on the midnight shift in our patrol division.

I was there approximately three years, and

Page 24

then I was -- received a phone call from one of our chiefs, and I was told that our in-house sheriff's department narcotic unit was going to be merging -- well, actually, let me restate that. I'm sorry. The Tarrant County drug enforcement narcotic unit that was traditionally under the purview of our district attorney was going to be transferred over to the -- under the umbrella of the sheriff's office, and that the county narcotics task force and our in-house sheriff's narcotics task force were going to be merged together, and I was asked to come back and start that, which that's when CNET was created.

So I remained at CNET approximately four years, and then I promoted to captain, and I went to our -- as captain, I was transferred to our training academy, and I was the director of our training. We call it training, research, and professional development. And I was at the academy for about -- I guess it's four-and-a-half years. And approximately two months ago I was transferred to internal affairs. So I'm currently assigned as the captain in internal affairs.

Q. That's a good memory of a lot of changes.

I noted three separate stints as -- in the narcotics department, and then the third one was when CNET was created. Can you give me the approximate years of all

Page 25

three of those? The first one, you said, was about eight to nine years before you were promoted to sergeant?

A. Correct. So my -- my first stint in narcotics was '97, and I left in 2004, I believe. Let me -- I'm going off memory here. It might have been the fall -- I think the first of '97 is -- is when I went to narcotics. And then 2000 -- the fall of 2004 -- I'm sorry -- 2004 -- it was June or July, I believe, in 2004 when I promoted to sergeant and left.

And then I came back in 2005 as a lieutenant, and that lasted until 2010. And then 2010 is when I transferred to our judicial services division. And I -- I'm sorry. I believe 2000 -- the first of 2015, maybe, is when I went back, and that's when we established CNET. So that would have been my third -- third time back in narcotics.

Q. Great. Thank you.

You mentioned the certifications that you have. Any other educational programs or academies where you were awarded a degree or a certificate or some form of accreditation upon completion?

A. Well, I mean, we typically get certificates on the training we attend. I mean, I went to the Institute for Law Enforcement Administration. I -- that was a two-month-long leadership school, and -- and I went to

Veritext Legal Solutions
www.veritext.com 888-391-3376

that, and I believe that was 2015.

Q. When you get certificates for trainings, what kind of trainings are you -- are you given?

A. Well, it is -- it -- it could be anything law-enforcement-related. I mean, I've had numerous courses on investigations; I mean, extensive -- I would say extensive training in narcotics enforcement strategies, surveillance, informant management, undercover operations; again, clandestine lab investigations. Of course, that was a while back, but just other -- other just -- deescalation techniques, dealing with mental health -- people struggling with mental health issues, patrol tactics and strategies.

I was also collaterally assigned to our SWAT team throughout my career on and off several times. And -- and while on SWAT, I -- I attended numerous tactical sources. And I was on SWAT as a -- as an -- as an officer, as a team leader, and as a commander. But that was a collateral duty; it was not a full-time assignment.

Q. Have you ever received any education specific to opioids?

A. I -- I've attended brief training sessions related to opioids. A couple, I would say.

Q. Do you recall when?

A. I -- I don't exactly. They would have been --

they were provided during our Texas Narcotic Officers Association. I was a member of the association. I would go to the annual conferences, and the training would be provided then. I -- I don't recall the exact time frame. It would have been in the 2000 and teens sometime. I don't know exactly.

Q. Do you recall anything about the training, what the focus was?

A. A lot of it was focused around designer drugs and synthetic opioid-type drugs we were seeing on the street, things like -- well -- and also things like ketamine, kratom, I mean, just -- just, kind of, the designer drug that was -- you know, we were seeing in the area, where that was -- D- -- a lab -- generally, a lab person from DEA would -- would put the training on, on two of the classes I attended.

But they would talk about NBOMe and things like, which I wasn't very familiar with. But they would do general, you know, street drugs that we were seeing, general drugs such as, you know, Xanax, OxyContin, hydroco- -- hydrocodone, things like that, that were -- we were seeing on the street. But a lot of it was designer-focused: MDMA, Ecstasy. We would -- we would talk about that.

Q. What's your definition of "designer drugs"?

A. I would -- I would say designer drugs, in my -- in my opinion, are drugs that are generally created, I want to say, by amateurs for the -- the expressed intent of just getting high and feeling good and experiencing hallucinations and things like that.

Q. So not drugs created by a pharmaceutical company that were then diverted?

A. I would not classify those as designer drugs, in my opinion.

Q. Okay. You mentioned some of these training sessions or some part of these training sessions may have included information on some prescription opioids like OxyContin, and then also you said Xanax, I think.

What other specific education do you recall about prescription opioids?

A. I don't think I've had much specifically regarding opiates or prescription drugs, not -- not -- not training solely focused on prescription drugs, other than limited in saying: These are common prescription drugs that we're seeing right now that -- you know, that you need to be aware of that are being, what I call, abused by end drug users.

Q. Do you have any recollection from these DEA presentations about opioids as they relate to pharmacies or investigations into pharmacies?

MS. ABSTON: Objection, form.

THE WITNESS: I have not received that type of training.

BY MS. WOHL:

Q. Can you give me a summary of how the Tarrant County Sheriff's Office is structured? So the next level of organization below the sheriff.

A. As -- as far as our chain of command?

Q. Yeah.

A. Yes.

Q. Well, actually, I'm -- I'm looking here at -- what I'm looking for is the different departments in the sheriff's department.

A. Okay. We just -- on the -- on the high view, we -- we have two main bureaus. So we have our detention bureau, which, of course, is our jails, and we have an operations bureau. And there are multiple units within operations. And, I mean, those include patrol, which has multiple functions under their umbrella.

And we have our criminal investigations division, a warrant division, our judicial services division; we have our training division. Of course, we have different groups within our investigations bureau. So we have crimes against persons, crimes against property, things like that. And we have an intel unit.

Page 30

Q. And the judicial services department, is that also in the operations bureau?

A. It is, yes.

Q. Okay. What about professional development and training?

A. That is -- yes, that is in part of the operations bureau.

Q. With your work experience in Tarrant County, do you believe that you're knowledgeable to speak about the role and the impact that opioids, in general, and also prescription opioids, specifically, have had in Tarrant County?

A. I have had exposure to that, and I could just speak about my limited exposure and experiences.

Q. Do you have any knowledge regarding the laws and regulations of a pharmacy in filling and dispensing a medical prescription?

A. Not intimately. I mean, I -- I understand that a lot of the medication is regulated and that you have to have a prescription, unless it's over the counter.

Q. Can you tell me about your -- the question I just asked about your knowledge about the impact of opioids and prescription opioids, specifically in Tarrant County, give me a sense of your -- your limited experience and exposure to that and -- and what areas you would be knowledgeable

Page 31

to testify about.

A. Could you be a little more specific?

Q. Yeah. When you said you were -- you had some limited exposure to that area, what -- what did you mean by that?

A. So my experience with pharmaceuticals started when I was in patrol. I would make quite a few arrests for people that were in possession of narcotics and -- both illicit narcotics and pharmaceuticals. And I knew that some types of pharmaceuticals at the time, such as hydrocodone and Xanax, were very common on the street, and we knew it was very popular. And then when I transferred into narcotics -- well, let me back up. And also, on the illicit side, heroin, we would -- we were seeing heroin.

I know -- in the mid-'90s when I was in patrol, I know we had incidents in the Dallas-Fort Worth area where, all of a sudden, it was people overdosing on heroin, and it was -- a lot of it was -- at the time, was over in the Plano area, and it was kind of a -- it got on everybody's radar, and we were told in briefing: Hey, there's a big problem with heroin in the area; let's, you know, keep an eye out for that.

And just through -- I -- I remember a lot going on in the news about specifically kids in Plano were using cheese -- a street term of "cheese," which

Page 32

was basically a -- you may be familiar with it -- it's a combination of -- of a Mexican-brown heroin and Tylenol PM or some other type of cold reliever. They would mix it and then ingest that. But the street slang was ter- -- "cheese," and people were overdosing on it.

And so I never encountered cheese on the street in my duties. I do know that, through my patrol career and in -- when I entered -- first became a narcotic investigator, narcotic investigation was my primary responsibility. I -- I had more exposure to both pharmaceuticals being distributed at the street level and also heroin, both brown tar -- I'm sorry -- Mexican-brown heroin and Black Tar heroin.

Q. In the mid-'90s when you -- you became aware of some overdosing on heroin in the Plano area, it -- it sounds like that was sort of a unusual trend or something to take note of that -- that had changed. Is that fair to say?

A. Yes, it definitely made -- got the media's attention and attention of the local politicians in our area.

Q. Do you have an understanding of why, all of a sudden, there was a rise in heroin overdose in the mid-'90s?

A. I don't know for certain. I can tell you,

Page 33

throughout my career, I've interviewed thousands of people, drug suspects and witnesses and drug users, about their experiences. And I know I interviewed several young people -- at the time, I would say, probably 15 to 25 years old -- and I talked to them about their drug usage and their heroin usage, and there were people that were -- I would interview that were -- had a -- that were struggling with heroin issues.

And when I asked them about -- it was very common for me -- I like to get background information on the people I interview, such as: Tell me what your family looks like. Single-parent household? Were your parents supportive? What made you -- you know, what made you get on track to think that experimenting with drugs was a good idea?

And I had several of them tell me that, when they were presented with an opportunity to use heroin, they were told it was Chiva, which is the Mexican word for heroin, and they said they had no idea it was heroin, or they would've never used it. But it was presented to them as Chiva. Other people were doing it, so they joined in.

Q. Wow.

In these interviews that you did in trying to get some background information, especially with the younger kids, were there any other common denominators

Page 34

that you found, anything about background, family life, or anything that you can, kind of, tie together?

A. Well, just -- in my experience, a lot of it just related to whatever peer group they fell into in adolescence, and that, kind of, became their subfamily, so to speak. So if they fell into a group of kids who were hanging around people that were on the meth train or the marijuana train, that -- that's just kind of the direction some of them went.

I -- I -- I do recall, you know, some of the -- I have experience working with human sources as informants, and a lot of what I learned was during these interviews I'm referring to, and -- and my long-term relationships, professional relationships, being in charge of controlling some of the informants I worked with. So I learned a lot from them.

And, you know, I remember back in the late '90s, in an undercover capacity, I got invited to a pharming party. And I had not heard that term before. And it was being held by some local college kids. I didn't go to it, but I had an informant that went to it. But that was the first time I heard the term "pharming"; I didn't know what that was. So I knew that there was pre- -- prescription pill usage -- illicit prescription pill usage was pretty popular.

Page 35

Q. And that's going back to the -- the mid-'90s?

A. I learned about that in the late '90s, early 2000s. When I went to narcotics, that's when I was exposed to that.

Q. Let me steer back to pharmacies.

Do you have an understanding that chain pharmacies in Tarrant County do not manufacture prescription opioid medications?

A. Correct. I understand that.

Q. And do you have an understanding that chain pharmacies in Tarrant County do not write prescription for opioid medications?

A. Yes.

Q. And we've touched on this before, but so it's all in one place: Do you have an understanding that only healthcare providers licensed by the DEA can write prescriptions for opioids?

A. Yes.

Q. Would you agree -- would you agree that a pharmacy can serve as critical assistance to a patient in the -- providing medication that a healthcare -- healthcare provider has prescribed?

MS. ABSTON: Objection, form.

THE WITNESS: Yes, because my understanding, that's the only way to get it dispensed to the patient.

Page 36

So I -- I'd think that'd be a pretty critical role.

BY MS. WOHL:

Q. Do you have any information that Kroger or Albertsons, or any chain pharmacy in Tarrant County, has been a cause of opioid abuse, overdose, or addiction in Tarrant County?

A. No.

Q. Do you have any knowledge of grant applications by Tarrant County or grants awarded to Tarrant County related to opioids?

A. No.

Q. In your opinion, is there a substance abuse crises in Tarrant County?

A. Yes, there is.

Q. And substance abuse, as we just discussed, comes in many forms. You would agree that includes alcohol, marijuana, illegal drugs, like heroin, fentanyl, methamphetamine, and also, in some instances, prescription opioids as well. Would you agree with that?

A. Yes.

Q. And I won't limit it to prescription opioids, but prescription drugs?

A. Yes.

MS. ABSTON: Objection, form.

BY MS. WOHL:

Page 37

Q. Do you agree that substance abuse is a medical condition that requires professional treatment and, in many instances, medical care?

MS. ABSTON: Objection, form.

THE WITNESS: I don't know that I would define substance abuse as that; I would -- I would align that with addiction or preliminary addictions.

BY MS. WOHL:

Q. Have you ever been prescribed a prescription opioid?

MS. ABSTON: Objection, form.

We're not going to discuss private HIPAA-protected information, so I'm going to instruct the witness not to answer.

BY MS. WOHL:

Q. Have you personally experienced anyone, whether it be a family member, friend, acquaintance, that has been impacted with an addiction to prescription opioids?

MS. ABSTON: I'm going to instruct the witness not to answer once again, and object to form, because we're not going to discuss family members' private HIPAA-protected information today.

MS. WOHL: I'm trying to get some personal experience from the witness. If you instruct him not to answer...

BY MS. WOHL:
Q. Do you have any personal experience with Kroger or Albertsons?
A. I -- I do.
Q. In what way?
A. I -- shopping. I -- I have not used either of their pharmacies, but just grocery shopping.
Q. Let's go back to substance abuse in Tarrant County.
Is there a particular substance that you find to be most abused, in your experience?
MS. ABSTON: Objection, form.
THE WITNESS: I -- I wouldn't say "most abused." I think -- my experience has been our investigations have taken us in -- in different routes. Sometimes we would stumble upon a drug-trafficking organization that specialized in meth or cocaine or heroin or -- or something like that. So it's been my experience that a lot of those substances are problems in Tarrant County. And I believe their availability, from what I've seen over my career, has greatly increased in -- based on my experience in narcotics.
BY MS. WOHL:
Q. When you say the "availability has greatly increased," what substances are you referring to?

A. I would say anything from prescription pills that are in demand to high-grade marijuana, methamphetamine, heroin, Ecstasy, cocaine.
It -- it seems that -- if I can elaborate just a second. From my earlier experiences in narcotics to when I came back a few years later, I noticed that the availability and ease of purchasing these drugs on the street was -- it got a lot easier to obtain them, and the prices dropped significantly in our -- in our area.
Q. And give me a -- a general timeline of that, when you say your early experience till now.
A. For instance, when I was -- in -- as a narcotic investigator in the late '90s, if -- that was back when it was amphetamine and methamphetamine you could purchase. Methamphetamine was -- when it first came to prominence, in my experience, in Tarrant County, it -- it would cost about $1,500 an ounce. And, I mean, just, for instance, today you can go by an ounce for 3 or $400.
Q. Do you have a sense of when this changed?
A. I -- I think it increased when the federal government began relating -- I'm sorry -- regulating prescription -- I'm sorry -- precursor chemicals that were commonly used in manufacturing methamphetamine domestically. And when that became very difficult for our local drug manufacturers to -- to have the little meth

labs around town, our meth lab production shut down quite a bit, and it's my experience -- and this is based on interviews I've had with drug traffickers in Tarrant -- that have come to Tarrant County that we've apprehended and interviewed, that that opened the floodgates for the cartels in Mexico to fill that void, because a lot of people were manufacturing meth and distributing it domestically. And when we shut that down, because we controlled all the pseudoephedrine and other precursor chemicals, that -- the Mexican cartels filled the void with their methamphetamine they were bringing across the border.
THE COURT REPORTER: I'm sorry. This is getting just a little fast, the terminology. So if we can slow down just a little bit.
THE WITNESS: Yeah, of course.
MS. WOHL: Thank you for letting us know. We'll be careful about that.
BY MS. WOHL:
Q. Do you have an opinion as to, right now, whether the majority of substance use and abuse in Tarrant County is related to illegal substances?
MS. ABSTON: Objection, form.
THE WITNESS: I really can't speculate on that.

BY MS. WOHL:
Q. Do you find that there is a lot of substance abuse related to alcohol?
A. Yes.
Q. In your opinion, have opioids impacted Tarrant County?
A. Yes.
Q. In what way?
A. I've -- in the course of my professional duties, I've met and interviewed a few people who became addicted to opiates, prescription opiates, and I've interviewed people who we've caught either with prescription opiates, or we've caught with heroin and in the course of talking to them. I know some of the people we've arrested for heroin possession, when -- when I would interview them and they'd, kind of, take me on their journey -- journey through their drug-use history, that -- I know some of them told me that their addiction started with a pharmaceutical.
And we -- we kind of have this term that we say: Pharmaceuticals, they're cleaner, if you're familiar with that, than heroin. And -- but I've -- I know from experience, and I'll just -- if I can relay one story to you. One of my human sources, an informant that I had -- and I worked with him for years -- he was a -- he had his

own business. I mean, he -- he was well-known locally in Tarrant County in the -- in the drug trade. And so he -- he -- I actually arrested him for possession of narcotics, and he was turned and -- and became a human source for me and was assisting us with investigations.

So I got to talk with him quite a bit, and he became addicted to op- -- opiates following a knee injury that he sustained. And I noticed, following his injury -- and I saw quickly how his life spiralled, and he lost his business and his -- you know, alienated his daughter from him and wound up in jail more -- more -- multiple times after that. And so that -- that's just one incident that I recall that has that nexus.

Q. Do you recall from that story or other interviews you've conducted whether the prescription was filled at a chain pharmacy or a pill mill?

MS. ABSTON: Objection, form.

THE WITNESS: I do not know.

BY MS. WOHL:

Q. Do you have any knowledge of whether the original prescription was a legitimate prescription or if it was a -- an illegal prescription that was filled?

MS. ABSTON: Objection, form.

THE WITNESS: I do not.

BY MS. WOHL:

Q. And aside from that story, any other anecdotes or interviews with people where you do have that information of whether the prescription -- an addiction stemmed from a prescription of opioids and whether that prescription was legitimate or illegal?

MS. ABSTON: Objection, form.

THE WITNESS: Well, I -- I do recall in the '90s doing several interviews with people, and, you know, they're -- a lot of -- oftentimes they were currently confined in the Tarrant County jail, and they were, you know, trying to provide information to get leniency on their pending cases. And, of course, back then, my -- my primary focus for drug enforcement in Tarrant County was methamphetamine, heroin, marijuana, Ecstasy, cocaine, things like that. I -- my focus and -- and -- and the focus of our narcotic unit was not prescription drugs.

But oftentimes I would interview people; they would say: Hey, I know a doctor you can go to, and I can get you anything you want. You just go in there and tell them your back hurts.

And -- and there was this -- in fact, there was a couple -- they -- the street term that I was told was "Dr. Next". They would all call them: I can get you a Dr. Next, which means they had patients going through their office so fast, they would just say: Next, next,

next. And -- and -- but at the time, they were giving me this intel, saying: Well, I know these doctors where you can just go there and get anything you want, and -- but due to my current duties and responsibilities, I was redirecting that down -- I didn't follow up on that. I was -- I was more interested in the other types of drugs that I described.

Q. When they were talking about the doctors' offices where you could get anything you want, did you have a sense whether they were talking about getting a prescription for anything they want, or were they actually able to obtain the -- the pills at the office?

A. The prescription.

Q. And did you ever get a sense from talking to them about where they would fill those prescriptions?

A. I did not.

Q. In your experience, aside from just talking to those people, did you ever come across independent pharmacies that filled opioid prescriptions or were connected to one of these doctors that prescribed a lot of opioid prescriptions?

A. No.

MS. ABSTON: Objection, form.

BY MS. WOHL:

Q. Have you noticed any changes in the trends of

substance use throughout your years of employment at Tarrant County Sheriff's Office?

A. Can you be a little more specific?

Q. I mean, you kind of gave me the trajectory of the meth problem, which was real helpful. So you had a lot of clan labs, and then, I think, you -- there was more regulation about the precursor chemicals, and then that kind of opened the market for the cartels.

A timeline like that or any changes you've noticed like that but with other substances?

MS. ABSTON: Objection, form.

THE WITNESS: Well, I -- I think based on my first eight -- approximately eight years in narcotics and then leaving for a year and -- and coming back, and then just -- I've had those periodic gaps where I was not assigned to narcotics. When I would come back, I -- I just -- especially my last time in CNET, I just -- it was very apparent to me that drugs were much more readily available.

And I -- just through interviews that I've had with -- and -- and I've -- I've maintained contact with a -- a -- a select number of people that have worked for me previously, and informants, and that's just -- FYI, that's a -- kind of a mentoring relationship. I would just call them and check on them, make sure they're

Page 46

staying out of trouble. And we would just kind of talk drug trends in -- in Tarrant County, and -- and several of them told me that just the availability and the price was -- I mean -- and just to kind of put things in perspective: So when I was in narcotics eight or ten years ago, it was -- if -- if you wanted to buy a pound of hard drugs, like cocaine, heroin, or meth, you really had to have a good connection. I mean -- and people weren't going to sell you large quantities like that unless you either had a great introduction or they knew you somehow or you established a rapport with them.

When I returned to narcotics in the late teens in CNET, that -- you -- you could just make a phone call and just any -- people were, like, tripping over each other trying to sell you large quantities of drugs, and it was a real eye-opener for me. I mean, that was -- I -- I couldn't believe how many -- what the street -- what I was -- they call them "up-and-comers" in the -- in the drug trade. Up-and-comers were just -- I mean, it -- it's not uncommon for somebody now to get a pound of drugs and just give it to somebody and say: Hey, just go sell it and give me the money later. I mean, it's just much more readily available, in my opinion.

Q. Any opinions on how that came to be, why that is?

A. I -- I think there's just a lot more drugs in our

Page 47

society. I -- I noticed just through my interviews when I would come back -- when I was in CNET this last time, and when I was -- in the late teen -- or -- I'm sorry -- the early teens, the -- when I was interviewing drug traffickers and -- and they would tell me how: Hey, Tarrant County has shifted; it's now a money hub.

I mean, historically, I've always been told through my interviews, interviewing suspects, that Tarrant County was a drug hub; Dallas was a drug hub, but Dallas was a primary financial hub for U.S. currency going south. And -- and it reversed, and they were -- they were -- many more of the drug traffickers were coming over and using Tarrant County as major drug hubs and major currency hubs.

So I just felt like Tarrant County was just being utilized a lot more by drug-trafficking organizations. And that -- that was based on my interviews with people in the street.

Q. Let's go a couple more minutes, and then I'll take a break. I'll get through one or two exhibits.

If you want to pick up that binder that I sent you and turn to Tab 1, which will be Exhibit 1.

(Exhibit 1 was marked for identification.)

THE WITNESS: Yes, I have it.

BY MS. WOHL:

Q. This appears to be a Training Academy

Page 48

organization chart, and there's two pages to this, Proposed Effective November 17th, 2021, and then, I guess, this is the current.

Does this -- does this look accurate?

A. It was -- it looked accurate in 2021. It's not 100 percent accurate today. There's been some personnel adjustments.

Q. Okay.

MS. ABSTON: And just for the record, I just want to note this doesn't have any Bates -- my copy doesn't have any Bates number on it or any sort of URL in any way.

MS. WOHL: Noted.

BY MS. WOHL:

Q. You are identified as a Captain reporting to Craig Driskell on this chart. Is that -- is that still accurate as we sit here today?

A. Yes. However, Chief Driskell and I are no longer part of the training academy. We are now both over internal affairs.

Q. What is his title?

A. He is a -- a chief deputy.

Q. And when you were transferred to the narcotics unit the third time, that was when it had merged and -- and became under Tarrant County Sheriff's Office, right?

Page 49

A. Yes.

Q. Okay. And who was the head of narcotic -- the narcotics unit right before you were there?

A. That would have been just the sheriff's narcotic unit, and that was Lieutenant Kevin Turner.

Q. And then after it was merged, you were the head of it, or was somebody else?

A. Well, I was the one that was actually there and -- and merged the two units.

Q. Okay. And once it was merged, that's when it became known as CNET, right?

A. Yes.

(Exhibit 2 was marked for identification.)

BY MS. WOHL:

Q. Let's go to Tab 2. And this will be our Exhibit 2, and the Bates number is TARRANT_00862033.

A. I have it.

Q. Okay. And looking at the second e-mail from the top from Calvin Bond -- and he was the Chief Deputy of Criminal Investigations and Warrants at the time in 2022; is that right?

A. He was -- I believe during this time -- oh, yes. Oh, I'm sorry. He was. He was the chief deputy. You're correct.

Q. And as chief deputy, did he have a -- did he have

a supervisory role in CNET?
A. At that time -- so he was our first -- if -- if I may, when CNET was started, we didn't have a budget to hire a, quote, commander, so I was assigned as the interim commander. And then Calvin Bond was hired as our first commander. And then when he transferred, he changed roles to chief deputy, and that's when they put another commander out at CNET. And I believe Chief Bond, at the time, was -- the -- the new commander at CNET reported directly to him.
Q. Thank you.
And who was Mike Simonds at this time?
A. Mike Simonds was our senior chief, so he would have been the chief directly under Sheriff Waybourn.
Q. Okay. And was he Chief Deputy Bond's -- I don't know if I'm saying that right -- immediate supervisor at the time?
A. Correct.
Q. So in this e-mail Bonds [sic] writes to Mr. Simonds: Sir, I forgot to tell you the law firm handling the opioid litigation would like to speak to Captain Floyd Heckman as well. I thought he would be the best person to discuss CNET activities before I was hired.
Did I read that correctly?
A. Yes.

Q. Do you know why Deputy Bonds thought you were the best person to discuss CNET activities before he was hired?
A. Do I know why?
Q. Yes.
A. I'm sorry, I didn't hear. Is that what you're asking?
Q. Do you know why? Yes.
A. Oh. Chief Bond told me he felt it would be helpful just because I have been here for a while, and just my historical knowledge might -- might help.
Q. Did he talk to you about this -- this e-mail?
MS. ABSTON: Objection, form.
THE WITNESS: No, not specifically.
BY MS. WOHL:
Q. Did he talk to you about the possibility of bringing you up as somebody who would be a good person to talk to about CNET?
MS. ABSTON: Objection, form.
THE WITNESS: He -- he just mentioned that -- that there was possible litigation and that he thought I would be a good person to talk to.
MS. WOHL: It's been about an hour. Let's take a break, maybe about five minutes. Is that okay? Go off the record.

THE WITNESS: Of course.
THE VIDEOGRAPHER: It's 11:04 a.m. We are off the record.
(Brief recess taken.)
THE VIDEOGRAPHER: The time is 11:13 a.m. We are on the record.
BY MS. WOHL:
Q. Welcome back.
Captain Heckman, let me follow up on a couple of questions that you answered earlier. The first is, you told me a couple of times that you've talked to inmates and CIs about their experience with prescription opioids and heroin. And, specifically, I'm talking about the stories about the -- the Dr. Next stories where you could go to a doctor and just get anything you wanted.
Do you recall that?
A. Yes.
Q. Did you -- did you mention that you passed that information along to somebody else?
A. It was passed on to DEA.
Q. How do you pass information on to DEA in those circumstances?
A. Generally, people I know that -- that work in the DEA office here in Fort Worth; I would just call them and -- and pass it on.

Q. Just an informal call?
A. Yes, generally.
Q. And the other question I want to follow up on and make sure I understand is, we were talking earlier about the evolution of Tarrant County and drug trafficking and the availability of drugs, and you -- you mentioned -- what term you used -- that Tarrant County had been a money hub.
Can you explain what you meant by that?
A. Sure. So in -- in some of the interviews that -- that I -- I did when -- when I would talk to people in drug trafficking, I would ask them, you know: What is the general route if -- when you bring it over the border? Where -- where do you get in -- in the link, so to speak? Some of them may, you know, go to El Paso and Del Rio, and they would get the drugs there. Some of them would pick the drugs up here and take them to Dallas.
But what I meant by "money hub" is when drug traffickers -- once the drugs are sold somewhere in the country -- and if you can just envision the United States, drugs typically flow north and eastward, generally from the border up into the Northeast or the North or the Northwest. And once the transactions are made, the cash usually flows in the opposite direction. So the cash will be flowing back towards our Southwest border until it can

Page 54

be -- their intent is to smuggle it over the border.
And there's - there's select regions in the United States that drug-trafficking organizations will use as, quote, money hubs. And that's where the money will -- the money -- for instance, money from, you know, say a few states in the Northeast will -- will come southwards towards the border. And a money hub might be Tarrant County. And a lot of money, currency, would come into Tarrant County, where somebody is assigned from that drug-trafficking organization to oversee that money and ensure that it gets packaged. And whatever smuggling method they want to use to take it back across the southern border, a lot of that money will be -- congregate here until it can be prepackaged, put in whatever smuggling vessel or device they're going to use, and then they attempt to bring it back over to the southern border. So it's --
Q. Thank you for clarifying --
A. -- essentially like a staging location for currency going south.
Q. Understood. Thank you.
If you can turn to Tab 3. This will be our Exhibit 3. Bates number is 00862326.
A. Okay. I have it.
(Exhibit 3 was marked for identification.)

Page 55

BY MS. WOHL:
Q. So this is e-mail dated July 14th, 2016, from Mike Simonds to you and several others.
Do you recall this e-mail?
A. I -- well, I have to read it.
Q. Sure.
A. I don't recall it just by glancing at it.
(Witness examines document.)
I don't recall this e-mail; I recall the context.
Q. And in 2016, at this time, can you give me the positions of both you and Mike Simonds?
A. Yes. I was a lieutenant assigned to CNET, and Mike Simonds was our executive chief deputy at the time, so it was the number two position in our agency directly under the sheriff.
Q. Who is Don Harris, who's also included in this e-mail?
A. At this time, there were two lieutenants assigned to CNET because we had two separate enforcement units, and Lieutenant Harris was the -- basically my peer. He was a group supervisor, and I was also a group supervisor.
Q. What about Michael Floyd, who's included here too?
A. He worked for the Medical Examiner's Office.

Page 56

Q. And Eric Martinez?
A. I am not sure where he was at this time. I'm -- I'm not sure why he was on this e-mail.
Q. And what about Timothy Canas -- Canas?
A. Tim Canas was -- at -- I believe at this time he was the CIB chief, a criminal investigations chief. When -- and -- and, forgive me, I'm -- I'm not sure -- I believe when this e-mail was created, I'm -- I'm not -- I don't think -- I don't know if Calvin Bond was hired yet by Tarrant County, because I don't see his name on here.
Okay. Well, if I may, now that I -- I'm reading the e-mail a little more, at the time, Mike Ford and Eric Martinez were field supervisors. And I think, based on the context of the e-mail, Chief Simonds is basically saying: Hey, we want to be aware of any possible overdoses that may be linked to heroin, and that the sheriff and the upper command staff want to know about that.
Q. Did you have an understanding of why Chief Simonds was issuing this directive?
A. I -- I know at some point when I was at CNET, Sheriff Waybourn -- I was contacted by Sheriff Waybourn, and -- and I believe it was Chief Simonds, and they started asking me about overdose deaths that we were seeing, or if I had very much information about that,

Page 57

both -- general overdose cases as well as overdose cases related to fentanyl. And that was the first time I was approached about it.
And they asked me -- at some point I was asked where they might be able to get the information, because the sheriff was wanting more information. And I suggested they contact the Medical Examiner's Office and -- and speak with them, because they do toxicology, and they would have a better perspective and maybe more details regarding deaths related -- or overdoses related to heroin and fentanyl.
And in addition to nonfatal overdoses, I suggested they reach out to MedStar, which was a large ambulatory service here in Tarrant County, and -- and see what their statistics were for how many overdoses they were called out on.
Q. And who did you say started asking you about overdose cases and fentanyl when you were in CNET?
A. I don't remember who called me initially, but someone called me -- it might have -- it was probably either Mike Simonds or Tim Canas, and they were saying -- they told me the sheriff wanted the information.
Q. Do you have a sense of why the sheriff wanted that information?
A. I don't know.

Q. Chief Simonds writes in here that: Any overdose cases that may be linked to heroin need to be forwarded up the chain of command.

Do you know what they meant by "chain of command"?

A. For instance, if you're a patrol sergeant or a patrol lieutenant and you get called to an emergency scene that may involve possible heroin overdoses, at the end of the shift, any significant cases, generally there's an e-mail generated and sent to our command staff. So any -- any chiefs at the chief level, all the way up to the sheriff, are generally notified of major incidents. And it looks like he's wanting to include overdoses that may have a heroin nexus in those notifications to our command staff.

Q. Are you in that chain of command?

A. Not at that time, no.

Q. And do you know -- you know, that was a good explanation of the chain of command. Do you know if that's where these reports went?

MS. ABSTON: Objection, form.

THE WITNESS: I'm not sure. I -- I couldn't tell you if -- I mean, how many communications they received related to this topic, I mean, I wouldn't know.

BY MS. WOHL:

Q. Do you know whether there was a person responsible to collect and compile these reports?

A. I do not know that.

Q. And do you know if they were entered into any sort of database or other form of tracking?

A. I don't.

Q. Let's go to Exhibit -- or Tab 4, which will be Exhibit 4, Bates number 00706265.

(Exhibit 4 was marked for identification.)

THE WITNESS: Okay.

BY MS. WOHL:

Q. So this is an e-mail chain, and the last one in here is an e-mail from you to Michael Floyd, if you could take a look at that.

And my first question will be: Do you recall this e-mail? So take the time you need to review it.

A. (Witness examines document.)

Yeah. I recall the context of this e-mail.

Q. So you wrote to, I want to say, Mr. Floyd, but did -- what was his title at the time?

A. I believe at the time he was the -- the chief over the death investigators at the Tarrant County Medical Examiner's Office.

Q. So you wrote to Chief Floyd: I am trying to find

basic data on drug overdose deaths in our area. Do you have access to find the number of deaths attributed to drug overdose or suspected drug overdose in North Texas over the last two years? I'm doing a drug threat analysis for our county and am trying to see if our OD's from opiates, prescriptions, et cetera, are on the rise, falling, or remaining the same.

Did I read that correctly?

A. Yes.

Q. What did you mean by "drug threat analysis" here?

A. The sheriff had asked -- well, let me rephrase that.

So I was told, and I -- and I did get a phone call from the sheriff asking about overdose deaths. I believe most of my -- the limited conversations I had were with either Chief Simonds, Chief Canas or Commander Bond, but they were -- I was basically -- when they called and asked if I had any details on statistics for overdose deaths and I recommended that somebody speak to the Medical Examiner's Office or to our ambulatory service, as I mentioned earlier, I just told them I would do it. And so I was just trying to get some basic statistics that I could forward to my -- my chain of command, since they were asking for it.

Q. And did you have any sense, or were you told,

that the purpose of this analysis had anything to do with litigation?

A. No, that was never mentioned.

Q. Was it your understanding that Chief Floyd was keeping that heroin, fentanyl overdose data as per Chief Simonds' directives seven months earlier?

A. No. So Chief Floyd's role would be completely separate from the sheriff's office. I -- I just knew Michael Floyd just as a professional colleague, and I -- I knew he knew -- if I needed to get something from the Medical Examiner's Office, he could point me to -- probably give me a point of contact pretty quickly. And it was just a guess that, you know, if I called the ME's office -- and I know the ME's office conducts autopsies for not only Tarrant County but surrounding counties. And I knew that that would possibly be a good way to get a snapshot of drug overdose deaths in the North Texas area, and so I called him -- not that he would have direct access to that information, but I asked him who I should talk to, and then that's when he put me in touch with someone else.

Q. Yep. And that was my next question. So on -- if you go back to the first page. On February 28, 2017, he refers you to the Tarrant County Chief of Forensic Toxicology Robert Johnson, I believe, and then copies

Page 62

Dr. Johnson in his e-mail; is that right?
A. Yes.
Q. And then about a week later, Dr. Johnson e-mails you and states: According to my numbers, in 2015 we had 195 deaths due to overdose, accidental or intentional, and in 2016, we had 262, a pretty dramatic increase.
Did I read that accurately?
A. Yes.
Q. And then he says: What I don't have access to is the number of cases that were autopsied during those years, so I can't give you a percentage of cases that were ODs. Right?
A. Yes.
Q. And you used that term "ODs" earlier, and then in parentheses wrote: Opiates, prescription, et cetera.
So is it your understanding that he was using it in the same way talking about the specific drugs?
A. Correct, yes.
Q. Okay. And your response is: This data was what I needed.
And what about this data was what you needed in this instance?
A. It just gave me a -- because I was asked to find out -- try to get some general numbers on overdose deaths in Tarrant County, and -- and this was helpful based on

Page 63

what they've seen. It was just -- it was just a couple numbers that I could go back to my boss and say: This is what the Medical Examiner's Office is seeing currently.
Q. Were you asked to get numbers on overdoses generally, or were you also asked to get, if you could, numbers on the breakdown of the types of overdoses, the types of drugs involved?
MS. ABSTON: Objection, form.
THE WITNESS: I know overdoses were mentioned, and I know fentanyl was mentioned.
BY MS. WOHL:
Q. Can you turn to Exhibit -- Tab 5, Exhibit 5? This is Bates Number 00706306.
(Exhibit 5 was marked for identification.)
THE WITNESS: 308, 309 -- wait a minute. Oh, 306. Yes, I've got that.
BY MS. WOHL:
Q. And this looks like a continuation of the e-mail that we just looked at. But on the bottom of page 1, you've got an e-mail to Dr. Johnson. If you could review that and let me know when you're done.
A. (Witness examines document.)
Yes, I'm familiar with it.
Q. Do you recall this e-mail?
A. I do.

Page 64

Q. So this is a couple weeks after your last communication that we just looked at. You wrote: I was off last week and just saw you had Dr. David deGregorio -- David Gregorio presented information this morning on Tarrant County opioid overdoses from 2015 to present. As I mentioned in previous e-mails, I am collecting stats for staffing purposes and trying to project future workload measures for the Tarrant County narcotics unit. I would have been very interested to hear Dr. Gregorio present his numbers, trends, et cetera. Will he be giving future presentations? And if not, would it be possible for me to reach out to him to see if he would share his raw data with me?
Did I read that correctly?
A. Yes.
Q. What did you mean here by "collecting stats for staffing purposes and projecting workload measures"?
A. So -- and I -- I don't remember which chief I was talking with, but I know right about this time is when fentanyl and overdose deaths related -- that were tied in with opiates was kind of getting on the radar of our command staff. And I know we had seen an increase in it, just in the community, based on our investigations.
And I was asked at some point to -- do you have enough help? We -- we're hearing that this is a

Page 65

crises, it's getting on -- you know, just my -- my perspective was it was getting on the radar of local political leaders, and so the sheriff was asking -- they were asking me, on behalf of the sheriff: Do we have enough staffing? Do we need more staffing? Try to -- try to see what's going on out there and, kind of, see if -- things are on an increase and we need to, you know, increase staffing, increase resources.
Q. Was this a different inquiry than the one before that was just about overdose numbers?
A. No. I mean, it was -- it was the same general context, just trying to establish data on overdoses related to Tarrant County and -- and the surrounding areas.
Q. Did you end up getting in touch or talking to Dr. Gregorio?
A. I did, uh-huh.
Q. And what was the nature of those conversations?
A. I -- I don't recall entirely. I told him what my intention was, and I'd heard that he had done a presentation and had done some research in this area, and he said he'd be happy to share his PowerPoint with me, and he sent me his PowerPoint.
Q. And I think I've got that in the notebook somewhere that we'll get to you.

Page 66

But did you use that PowerPoint, rely on it, send it to anybody?
A. Yes. So I -- I pulled some of the numbers off there that I presented to my command staff. I believe I sent that PowerPoint to Calvin Bond, maybe -- maybe Chief Simonds. I sent it to a couple people in my chain of command at their request.
Q. We may get to that a little bit later.
Let's turn to Tab 6, which will be Exhibit 6. This is Bates Number 00706310, and it's an e-mail from you to Calvin Bond dated March 24, 2017, with a subject: CNET projections. And take a second to review, and let me know when you're ready.
A. (Witness examines document.)
(Exhibit 6 was marked for identification.)
THE WITNESS: Okay.
BY MS. WOHL:
Q. Do you remember this e-mail?
A. Well, it's coming back to me now that I'm reading it, yes.
Q. It looks like Commander Bond sent you a draft of e-mail that he intended to Kandice, sending her drug stats she requested, and he asked you to review the draft.
Does that appear correct?
A. Yes.

Page 67

Q. Who is Kandice?
A. I don't recall.
Q. Do you have any knowledge of why somebody might be requesting this information from Commander Bond?
A. I -- I don't. And, again, I don't -- the name looks familiar, I'm just not familiar with who Kandice is.
Q. That's okay.
Commander Bond wrote: We have several e-mails and calls --
A. Where is this?
Q. This is -- sorry. If you go down, one, two -- three paragraphs, and it's the third sentence starting: We have several e-mails and calls to Medical Examiner's Office on the drug overdose deaths so far this year. As soon as they respond, I will get that info to you.
Do you see that?
A. Yes, I do.
Q. So it sounds like this is a lot of requests for the same data that we've seen in the last couple of exhibits in the e-mails to Michael Floyd and Dr. Johnson requesting overdose data.
Do you have any knowledge of whether this is a separate request or part of the same request that we've been looking at?
A. It -- it looks like the -- in addition to the

Page 68

overdose deaths that I had received stats on, they were asking for more specifics on -- more specific drugs, such as THC, hashish and designer drugs.
Q. And looks like Commander Bond provided those drug stats on those specific drugs you just mentioned.
A. I think -- you know, I don't recall. By the looks of this, I -- if I recall, I got those stats and sent them to Calvin, Calvin Bond.
Q. Okay.
A. Oh, I -- well, let me -- let me look again. You know what? I'm just -- I'm just not sure if he generated these stats or it was me.
Q. That's okay. We'll say it could have been either one of you.
It looks the way e-mail is set up is that you added notes at the bottom, and then under Commander Bond's signature, there's a couple paragraphs there that -- those may be the -- the notes that you added, if you're able to tell? And let me know.
A. It -- it would make sense that -- that those came from me, because generally that's something I would be tasked with.
Q. Okay. Commander Bond goes on to write -- and it's that paragraph that starts out: Please... The second sentence says: Based on my experience and the

Page 69

direction and workload of our unit, I would predict that the amount of methamphetamine and heroin seized will increase as well this year. I would expect a 20 to 50 percent increase for both.
With your experience on CNET, is that a statement that you can say you either came up with or you agree with?
A. I -- I would agree with that.
Q. And if those paragraphs at the bottom are what you added, the notes you added, based on your discussions with the forensic analysts at Tarrant County Medical Examiner's Offices, the Tarrant County Medical Examiner's Office was seeing more than 50 percent increase in THC edible cases, a large increase in hash oil, increases in fentanyl, and a steady increase of NBOMe submissions; is that right?
A. Yes. That's what it says.
Q. And does that information generally sound right for the time that we're in here?
MS. ABSTON: Objection, form.
THE WITNESS: Well, I would -- I would rely on it if -- if that's what they sent, based on the information that they have.
BY MS. WOHL:
Q. Okay. But in your experience in March of 2017,

Page 70

none of that sounds wrong to you, right, in terms of the increases in edible THC and NBOMe cases?
MS. ABSTON: Objection, form.
THE WITNESS: I did not have any experience with NBOMe investigations during my tenure there, but I know there was a significant increase in THC seizures.
BY MS. WOHL:
Q. What were NBOMes?
A. I'm sorry?
Q. What are NBOMes? What does that mean?
A. You know what? I've received training on that. It's been a long, so I -- I wouldn't be able to comment on that.
Q. Is it an illicit substance?
MS. ABSTON: Objection, form.
THE WITNESS: If memory serves, it's a -- it's a designer drug. But short of that, I don't recall any specifics about it.
Q. Okay. Can you turn to Tab 7? And this will be Exhibit 7, Bates Number 00706312.
(Exhibit 7 was marked for identification.)
BY MS. WOHL:
Q. And this is a string of e-mails between you and David Gregorio from March 30th, 2017, through April 12th, 2017. And this is the same Dr. Gregorio that we were

Page 71

talking about earlier, right?
A. Yes.
Q. Is he a medical doctor, that you know of?
A. I -- I believe so. I -- I -- it was my understanding that he had put -- gathered data for his presentation while he was doing a -- a stint of service at the Medical Examiner's Office. I don't know if he had obtained his Ph.D. at that point or not; I don't remember.
Q. At the bottom of the e-mail string, you first wrote to Dr. Gregorio on March 30, 2017: I am looking for specific data on how many opiate overdoses Tarrant County had the last couple of years and if there are any overdose projections for the near future.
Do you see that?
A. Yes.
Q. So this is a little bit more specific than the request for information that we've seen in the previous e-mails.
Do you recall when you were asked to obtain information on -- specific to opiate overdoses?
A. It would have been right around this same time.
Q. And were those connected to the requests that you were receiving from the sheriff?
A. Yes.
Q. Did the sheriff make a specific request to you to

Page 72

look at opiate overdoses?
A. Yes, that was part of the conversation.
Q. Part of which conversation?
A. Well, I was -- during several conversations that -- with my bosses about overdose deaths, specifically fentanyl and opiates, were eventually mentioned.
Q. Do you have an understanding of why fentanyl and opiates were -- were -- information on those were sought?
MS. ABSTON: Objection, form.
THE WITNESS: From my understanding, it was because we were seeing a big increase in those in our communities.
BY MS. WOHL:
Q. And then on April 11, 2017, Dr. Gregorio writes back: I was given the task of putting together a lot of data from the TCME cases from 2015-2016. As such, there are thousands of cases, so I've gotten through probably 5/8 to 3/4's of 2015 only. That is what the attached PP file encompasses. My research begins on Slide 32.
Do you see that?
A. I do, yes.
Q. And then on the next three paragraphs on that second page, we see the -- he's providing the 2015-2016 overdose numbers as given to him by Dr. Johnson.
Does that look right?

Page 73

A. Yes.
Q. And it states that: In 2015, there were 141 drug overdose deaths caused by or related to opioid use.
Do you see that?
A. Yes.
Q. And 66 of those were related to heroin use; is that right?
A. Yes, that's what it says.
Q. Do you have any information or knowledge of what the other overdose deaths were related to?
A. I -- I wouldn't -- I wouldn't be able to comment on that.
Q. And then, in 2016, there were 173 drug overdose deaths caused or related to opioid use, which is an increase, and 62 were related to heroin use.
Do you see that?
A. Yes.
Q. And this includes the statistic that 11 were related to the fentanyl analog, which is when TCME began testing for it; is that right?
A. Yes.
Q. So is it possible that, prior to 2016, there were opioid overdose deaths attributable to or related to heroin, but the medical examiners weren't testing for fentanyl -- I'm sorry -- related to fentanyl, but they

Page 74

weren't testing for fentanyl so it would just fall under the non-heroin overdose?

MS. ABSTON: Objection, form.

THE COURT REPORTER: Yeah. Could you slow down a little bit?

MS. WOHL: Yeah. I'm sorry. And that was inartful.

THE COURT REPORTER: Thank you.

BY MS. WOHL:

Q. And my -- my question is: So in 2016, if they started testing for fentanyl, it's possible that in 2015 some of those overdose deaths could have been related to fentanyl, but since they weren't testing for fentanyl, we don't know?

MS. ABSTON: Objection, form.

THE WITNESS: I was told by the Medical Examiner's Office that because we were seeing such a huge increase in fentanyl analog, basically homemade -- homemade fentanyl pills, in our area, that the ME's office found it -- that it's important for them to start testing for that, both for toxicology results so we can -- so as we submit a drug exhibit, for example, to the ME, so they can test for in-house and tell us what it is, without having to send to a -- an associate lab. And also, it was relayed to me that, that way, they could also test for it

Page 75

during their in-house toxicology during their autopsy investigations.

BY MS. WOHL:

Q. When he uses the terminology here "drug overdose deaths caused by or related to opioid use," what do you understand the "related to opioid use" to be?

MS. ABSTON: Objection, form.

THE WITNESS: Generally, on -- my understanding is somebody may pass away, for instance, and they do an autopsy and there's other contributing causes to the death; however, during toxicology, it is shown that there were levels, detectable levels of opiates in their system, it -- it could be listed as a contributing factor but not necessarily the primary cause, if that makes sense.

BY MS. WOHL:

Q. And then at the top of the e-mail, if you go back to the first page of that exhibit, you say that: This information is very interesting and useful to my project.

And just to clarify, your project at that time was this broad inquiry about overdose and opiate overdose, including fentanyl, from the sheriff; is that right?

MS. ABSTON: Objection, form.

THE WITNESS: That's correct.

Page 76

BY MS. WOHL:

Q. Did it encompass anything else, other than what I mentioned?

A. I know we were tracking, but we were seeing a definite increase in seizures of prescription -- let me rephrase that.

We were seeing an increase in seizures of tablets and syn- -- so, basically, pharmaceutical grade regulated pills versus -- and also pills that were made by clandestine labs, we were seeing an increase in that. So I wanted to start tracking that as well.

Q. And was that part of the directive, or was that your own initiative based on what you were seeing?

MS. ABSTON: Objection, form.

THE WITNESS: It was one of the things I was asked about. And when I talked the Medical Examiner's Office and they told me what they were seeing, it just started really getting on my radar. And I knew from being a -- my assignment out at CNET, that I had some investigators that were falling into these groups that were investigating that were engaging in distribution of, basically, homemade pharmaceuticals.

BY MS. WOHL:

Q. Tell me a little bit more about that. What are the groups who were engaging in that?

Page 77

A. Well, we had detectives --

MS. ABSTON: Objection, form.

THE WITNESS: I'm sorry.

MS. ABSTON: Go ahead. You can answer.

THE WITNESS: Okay. Thank you.

We had detectives that just through the normal course of their investigations -- I know, one in particular, that received information about some people that were selling designer drugs, if you will, that kind of had the fentanyl analog, and I don't know at the time if they were manufacturing them themselves or just trafficking them, but these would be pills that were fentanyl analogs, much like the U-47000, and not pharmaceutical grade, if that makes sense.

BY MS. WOHL:

Q. You may have to dumb it down a little more for me.

So when you say "not pharmaceutical grade," what do you mean by that?

MS. ABSTON: Objection, form.

THE WITNESS: We have -- so you have your -- what I consider pharmaceutical grade is things -- is tablets that are -- pills or tablets that are manufactured by a reputable pharmaceutical company. You -- you have people in the illicit drug trade that are buying these

Page 78

precursor chemicals, and they are using these precursor chemicals here domestically with no over- -- professional oversight, and they're making these in clandestine labs.
BY MS. WOHL:
Q. With pill presses?
A. Yes. Ultimately, they all -- most of the -- most of our formed and shaped pills would come from some -- a pill press somewhere.
Q. Are these pills that are made in the clandestine laboratories as opposed to a pharmaceutical company distinguishable in -- in physical appearance from the pills that do come from the pharmaceutical companies?
A. I have seen both. I have seen pills that are not -- have no stamps or markings or scores, and then I've also seen tablets that are designed and made and imprinted to look like a legitimate medication that was made by a pharm- -- a former pharmaceutical company, if that makes sense.
Q. It does.
And are they distinguishable chemically? Can a laboratory distinguish between the ones made by a pharmaceutical company and the ones made in a clan lab with a pill press?
MS. ABSTON: Objection, form.
THE WITNESS: I -- I can't say that they can

Page 79

do that every time; however, I know that when you're making these drugs clandestinely, you don't carry -- you don't care about the percentage of the active ingredient in your pills. And what I mean by that is -- the analogy I use is: If you take a cup of flour, white flour and put it in a bowl, and then you take two tablespoons of red paprika and you mix it up in the same bowl, you're going to have white flour and red paprika. However, when you spoon that out and you're putting it into your dies to stamp your pills, some teaspoons are going to have a little more paprika in it than the others.
And -- and I think -- it's my understanding that that is why these overdoses occurs. Because I can buy five clandestine pills from somebody, but they don't all have the exact same amount of active ingredient. So I can --
Q. That makes sense.
A. And whereas you're buying -- you know, you're buying a -- for instance, you're buying a OxyContin from your pharmacy, and they're all colored the same way, scored the same way, and they generally all have either 5, 10, 15, 20 milligrams of active ingredient in there, so to speak, and -- so it's much more regulated and controlled.
Q. So that might be one way a lab could tell the difference between a pharmaceutical company-made pill and

Page 80

a -- an illicitly made pill?
A. Yes, because --
MS. ABSTON: Objection, form.
THE WITNESS: It -- it's possible. Because if we seize -- say we seize ten pills off of somebody on a street arrest and send them to the lab and the lab comes back that the pills have different levels of precursor, that -- that could be indicative of a clandestine lab, that it was manufactured clandestinely.
BY MS. WOHL:
Q. In an investigation when you get that kind of information that it is -- there's possibly a clandestine laboratory involved in manufacturing the pills, what's the follow-up that you do in terms of an investigation?
MS. ABSTON: Objection, form.
THE WITNESS: My recommendation would be to go to the investigator and talk to the source of those pills and, with great intention, try to pursue the -- up the food chain, so to speak, of where the pills came from. Our -- our goal is always to get to the manufacture if we can and find that pill press.
BY MS. WOHL:
Q. Turn to Tab 8, which will be our Exhibit 8. This is 683034.
(Exhibit 8 was marked for identification.)

Page 81

THE WITNESS: Yes, I have it.
BY MS. WOHL:
Q. Great.
The bottom e-mail is from you to Calvin Bond dated April 12th, 2017, with the subject: Opiate and OD Data.
Do you see that?
A. Yes.
Q. And this looks like it was on the same day as your e-mail to Dr. Gregorio when you told him that the information he gave you was interesting and useful for the project, that same April 12th; is that right?
A. Yes.
Q. So it looks like you may be passing on the information that you got from Dr. Gregorio to Commander Bond. Is that your understanding?
A. Yes, I think that's accurate.
Q. And then Commander Bond forwards your e-mail to Kandice Boutte and wrote: These stats fall in line with what we're seeing on the street. Prescription drugs, heroin, and fentanyl use and overdoses are on the rise and I believe will continue to rise for the next few years.
Do you see that?
A. I do.
Q. Now having seen her last name, Kandice S. Boutte,

Page 82

any recollection of who that is?
A. Yes. I -- I didn't know her at the time, but -- but she does work for Tarrant County.
Q. Do you know what she does?
A. The last time I -- I spoke with her, I believe she was assigned to our county administrator's office.
Q. And do you have any sense of what her duties are or her position?
A. I -- I don't.
Q. And he says in there: The stats fall in line with what we're seeing on the streets in terms of prescription drugs, heroin, fentanyl use, and overdoses.
But just to be clear, in the information that Dr. Gregorio sent, there wasn't any information on prescription drugs; is that right?
MS. ABSTON: Objection, form.
THE WITNESS: I -- I would have to go back and look at his PowerPoint again to be sure.
BY MS. WOHL:
Q. Okay. Let's go to -- we're going to skip around a little bit -- Tab 13 now. This is going to be our Exhibit 9. This is 00 --
CONCIERGE: I'm sorry. Could you give me the tab again, please?
MS. WOHL: Yes, 13.

Page 83

CONCIERGE: Thank you.
MS. WOHL: And the Bates number is 00706329.
(Exhibit 9 was marked for identification.)
THE WITNESS: I have that.
BY MS. WOHL:
Q. Great.
The bottom e-mail on this is from you to Sheriff Waybourn dated May 9th, 2017.
Do you see that?
A. Yes -- I'm sorry. What date did you have?
Q. May 9th, '20 --
A. Yes, at the bottom. I see that.
Q. Do you recall sending this e-mail?
A. I'll have to read it. If you can just give me a second.
Q. Yes, of course.
A. (Witness examines document.)
Yes, I recall this e-mail.
Q. And do you know why you were sending this information to Sheriff Waybourn?
A. Somebody -- well, it would have been for -- the sheriff was requesting just projections on what we were anticipating and what we were seeing in our investigative efforts in -- on the street level.
Q. And in the next e-mail, Sheriff Waybourn asks

Page 84

you: Do you have info on the trend this year?
Do you see that?
A. Yes.
Q. Do you know what he was -- he meant by that question?
A. It looks like he's referring to projections as far as prescription medication and users of fentanyl-related deaths. I think it's in line with what I had been asked up to that point, as far as opioids and opiates.
Q. And then if you look at your response, you say: Based on what we have seen over the last few months, I expect that we will see more prescription medication abusers transitioning to heroin because the high is much cheaper.
What did you mean by "prescription medication abusers"?
MS. ABSTON: Objection, form.
THE WITNESS: Based on -- at that time, we had seen a -- in my opinion and what we were seizing is heroin was much more prevalent in our area than what I had been exposed to previously. And the -- I noticed the price had come down. And some of the people that we were arresting for distributing heroin, during our interviews with them -- and, also, we would con- -- for instance, we

Page 85

would conduct surveillance on a -- on a house suspected of distributing heroin, and we might see a vehicle show up, stay a short time. We developed probable cause, stopped them, and subsequently, they were in possession of heroin. So we debriefed them, attempt to get their intel -- intelligence related to what happened, and we were hearing that -- and -- and I also learned this in the course of some of my interviews with heroin suspects, is a lot of the -- we were seeing a trend -- I was seeing a trend, based on my conversations and interviews, that there were people that were, at some point, legitimately prescribed a prescription painkiller or opiate and, at some point, developed a level of addiction. And they, at some point, in struggling with this addiction, had switched to heroin.
And my understanding of it is the heroin is -- or the -- the opioids -- the prescription opiates are cleaner, so people will often transition -- because sometimes it's hard to -- to get prescription pills if you don't have a prescription or know somebody that has them, but it's a lot easier, if you know the right people, just to get heroin.
And once -- some people in extreme cases, when your addiction really gets out of control, you just -- you built up a tolerance pretty quickly of

Page 86

prescription painkillers, so in order to, they say, chase the high, it is useful for them to switch to heroin. They find it beneficial to them to switch to heroin, because it's less expensive, and it -- it helps them fulfill their -- the needs of their addiction.

Q. The last two sentences of your response, you say: I anticipate we will have both more overdoses and more nonfatal fentanyl overdoses thanks to Narcan being administered to victims. The Medical Examiner's Office told me they expect to see an increase in opiate-related deaths in the future.

Do you see that?

A. Yes.

Q. And when you say you anticipate you'll have more overdoses, was that because of the increase in fentanyl or something else?

MS. ABSTON: Objection, form.

THE WITNESS: Based on what I was seeing, heroin was coming into our areas a lot more. There was a high demand for prescription painkillers. And also, I was seeing a trend where we would -- I mean, historically, 10 or 15 years prior to this, when we would target a drug -- a drug dealer and we would arrest them, you know, maybe they were a meth dealer; maybe they were a cocaine dealer or a marijuana dealer, and we start -- we -- there's just

Page 87

been this huge outburst of poly drug dealers.

And what I mean by "poly drug dealers" is, they see the profit margin for getting involved in these counterfeit fentanyl pills and the heroin that's -- that's been de- -- in demand. So, historically, where somebody might just deal meth or might deal cocaine, now they're -- what I mean by poly drug dealers is when you raid their house, they have several types of narcotics in their possession because they know there's a market for.

And my experience has been, historically, prior to this time, people generally stuck with one or two general drugs or -- or a -- a -- a family of drugs, if you will. We've always had our people that dealt traditionally in marijuana or Ecstasy or meth or cocaine, but it just seemed like you -- we were arresting more and more people who had multiple types and multiple quantities of drugs in their possession.

Q. So you're seeing more of a -- a crossover -- you know, I would -- I would interpret that as, you know, you've got the opiate family, and then meth would be another big one. So were you seeing some kind of crossover between those two categories of drugs?

MS. ABSTON: Objection, form.

THE WITNESS: Yeah, I -- I think whatever the -- whatever they could sell, they were getting their

Page 88

hands on. And -- and from my previous experience, that was uncommon. And just, like I mentioned, the -- the ease -- the availability and ease of getting larger quantities of heroin, it -- it was just so much -- it -- it just seemed so much easier during -- during this time.

And also, we did catch people -- we -- we did arrest some people that had fairly large quantities of heroin on them, and when we would -- well, let me back up just a minute, if I may.

During our surveillance on some of our heroin distributors, we were seeing -- it was -- it was an observation by our investigators that they would comment -- we were seeing, like, newer, late-model vehicles. People that tend to be white, tend to be better dressed -- I don't want to say only white -- but tend to look like they come from a different neighborhood than the one we might have been sitting in. And when we arrested these drug dealers and -- and found them in possession of this quantity of heroin, and we debriefed them, it just -- for example, one of these drug dealers told us that their -- their favorite client was a rich white woman, because she always paid cash. And another one would call them soccer moms, that: Hey, I don't have to deal with tweakers anymore; I've got soccer moms that are -- that are -- that are in demand and that want -- want my

Page 89

product. And those were his -- they were telling me those were their predominately -- their predominant preference of customer.

Q. In the -- the very top e-mail, it looks like you sent this e-mail to yourself back in August, 2017.

Any recollection of why?

A. You know, the -- at some point in our e-mail system here in Tarrant County, when I would send an e-mail, it automatically went to me. I don't think that was intentional for any reason.

Q. Let's go back where it's to Tab 9, and this will be our Exhibit 10.

(Exhibit 10 was marked for identification.)

BY MS. WOHL:

Q. The Bates number on Tab 9 is 00833329.

A. I have it.

Q. So the bottom e-mail is sent by you to Sheriff Waybourn and Calvin Bond on August 2nd, 2017. And it's pretty identical to the e-mail that we just looked at that was sent to Sheriff Waybourn on May 2017, with the addition of two sentences in the first paragraph. And also you're forwarding a PowerPoint presentation.

Do you see that?

A. I do, yes.

Q. Do you know why you were sending Sheriff Waybourn

Page 90

the same information that you sent him a few months earlier?
MS. ABSTON: Objection, form.
THE WITNESS: I'm sorry. That I sent the sheriff?
BY MS. WOHL:
Q. Yes.
A. The only reason I would resend it is if it was requested again.
Q. And do you have any recollection of whether it was requested again?
A. I -- I don't, but I -- I mean, I don't -- I wouldn't have intentionally sent it -- sent them the same information for no reason.
Q. The second-to-last paragraph that you added to the -- the May 2017 e-mail reads: As I told you earlier, we are seeing an increase in counterfeit pharmaceuticals being made and distributed in Tarrant County. We have seen both counterfeit hydrocodone and Xanax that contained the U-47700 fentanyl analog in our area.
Do you see that?
A. Yes.
Q. Do you know if this was new information since May 2017 that you added?
A. I'm sorry. I'm trying to find the date of that.

Page 91

Was that August 2nd?
Q. Yeah. So this is an August 2nd e-mail that relays the same information that was in the May 2017 e-mail, with the addition of that -- that sentence I just read.
MS. ABSTON: Objection, form.
THE WITNESS: I'm sorry. So just for clarification, could you restate your question, please?
BY MS. WOHL:
Q. Yes.
So that paragraph that starts: As I told you earlier, that's the addition to this e-mail of the information that -- it was sent in May.
Do you know whether that was new information in August of 2017?
A. I don't --
MS. ABSTON: Objection, form.
THE WITNESS: I don't know for sure.
BY MS. WOHL:
Q. Okay. And then if you go to the first page of that exhibit, you forwarded the e-mail to Garland Payne with the comment: This is what I -- I lost my place -- this is what I sent the sheriff, reference data and stats on heroin/opiates.
Do you see that?

Page 92

A. Yes.
Q. Who is Garland Payne?
A. He was one of our lieutenants.
Q. Why did you forward this e-mail and presentation to him?
A. It looks like he called me and was inquiring about the information that I had obtained from the Medical Examiner's Office, so I shared it with him.
Q. Do you know why he wanted it?
A. I believe, at this time, he was assigned out at North Texas HIDTA, and it may have been part of his duties out there that he was trying to get it -- get that information.
Q. Okay. Can you turn to Tab 10? This will be Exhibit 11.
(Exhibit 11 was marked for identification.)
BY MS. WOHL:
Q. And this is Bates Number 00833331. See that?
MS. ABSTON: Counsel, we've been going for about an hour. After this one, do you anticipate we may be taking a lunch break?
MS. WOHL: Yes. That is fine with me. Let's -- I don't have a lot of questions on this exhibit --
MS. ABSTON: Okay.

Page 93

MS. WOHL: -- so let's get back to this in a second.
BY MS. WOHL:
Q. Okay. I'm not going to go through this 50-page presentation, other than to ask you if this is the presentation that you -- you believe you sent to Sheriff Waybourn and Lieutenant Payne?
Do you recognize that?
A. Yes.
Q. And the author of this presentation is David Gregorio, the medical student that you were previously communicating with to obtain the overdose data; is that right?
A. Yes.
Q. And is this the PowerPoint presentation that he sent you during his communications with you?
A. Yes, that looks like it.
Q. And you mentioned earlier that you know you've sent it to a couple people, which we've seen. Do you know whether it was presented to a group or relied upon beyond which you used it for in sending to people?
MS. ABSTON: Objection, form.
THE WITNESS: I -- I don't know if anybody used this specific PowerPoint for a presentation.
BY MS. WOHL:

Page 94

Q. Okay.
MS. WOHL: Let's go off the record.
THE VIDEOGRAPHER: The time is 12:14 p.m. We are off the record.
(Lunch break taken.)
THE VIDEOGRAPHER: The time is 12:33 p.m. We are on the record.
BY MS. WOHL:
Q. Welcome back. I know that was a short lunch break. Hopefully, you got what you needed, but we'll be done that much quicker.
Can you turn to Tab 12, please? This will be our Exhibit 12.
(Exhibit 12 was marked for identification.)
THE WITNESS: Okay.
BY MS. WOHL:
Q. So this is an e-mail August of 2018, and I don't see that you're included in this, but the bottom e-mail was sent by David McClelland to Lieutenant Keith Hallenbeck -- Keitha Hallenbeck, Calvin Bond, and Mike Simonds requesting overdose statistics for 2016, '17, and currently in 2018.
Do you see that?
A. Yes.
Q. And David McClelland was Tarrant County Sheriff's

Page 95

Office Chief of Staff; is that right?
A. Correct.
Q. Who is Keitha Hallenbeck?
A. So she's a lieutenant with -- with our agency. And at the time this e-mail was generated, I -- I had left CNET at the time. Prior to leaving CNET, there was a change. Lieutenant Don Harris left CNET and Lieutenant Hallenbeck came into CNET to replace him. And so just prior to this e-mail, she and I would have been the two group supervisors at CNET.
Q. And do you know why David McClelland would have been asking Lieutenant Hallenbeck for these statistics?
MS. ABSTON: Objection, form.
THE WITNESS: I -- I -- I couldn't -- I don't know.
BY MS. WOHL:
Q. Do you have any knowledge of the budget presentation that he's speaking about in this e-mail?
MS. ABSTON: Objection, form.
THE WITNESS: I'd have to look over this.
(Witness examines document.)
I'm sorry. What -- what were you asking in a -- in a context of budgeting?
BY MS. WOHL:
Q. I asked if you knew what he meant by "budget

Page 96

presentation," his reference in that e-mail?
MS. ABSTON: Objection, form.
THE WITNESS: I can't say specifically, but it's not uncommon during the year when we're preparing our budgets or -- generally, every department has to give a presentation to our governing body. It's not uncommon to give drug presentations of current drug trends to a governing body at the county. And it looks like that's why this information might have been requested.
BY MS. WOHL:
Q. And then Calvin Bond responds to David McClelland and states: Below is overdose data that Captain Heckman and I put together last year in order to get approval for our personnel to carry Narcan.
Do you see that at the top of the exhibit?
MS. ABSTON: Objection, form.
THE WITNESS: Yes, I do.
BY MS. WOHL:
Q. And is that your recollection of how this information was used, to get approval for personnel to carry Narcan?
MS. ABSTON: Objection, form.
THE WITNESS: I don't recall that, but just gathering what I'm reading here in the context of this e-mail, I -- I do recall when Narcan was first coming on

Page 97

our radar and we were first trying to get Narcan for narcotics and for our field officers as well. We -- we can often have a pretty cumbersome purchasing process, and there were a lot of phone calls and discussions, and there was a lot of people involved in the decision of whether we needed to buy Narcan for our officers and our -- you know, to serve the community. So it -- it looks like that's kind of what they were referencing in this e-mail.
BY MS. WOHL:
Q. And we'll look at some more communications about the Narcan purchase later.
Let's turn to Tab 14. And this is our Exhibit 13, Bates Number 00706323.
A. Sorry. I'm trying to find that here. Give me -- okay.
(Exhibit 13 was marked for identification.)
THE WITNESS: Okay. I think I have it.
BY MS. WOHL:
Q. Okay. So the bottom e-mail is an e-mail dated May 17th, 2017, sent to you -- sent from you to John -- sorry.
This is -- the bottom e-mail is May 10th, 2017, sent by you to John Briggs with a subject: Narcan.
Do you see that?
A. Yes.

Q. And based on the e-mail above with his signature, John Briggs appears to be the Deputy Chief Forensic Death Investigator for the Tarrant County Medical Examiner's Office; is that correct?
A. Yes.
Q. Do you remember this e-mail communication?
A. I'd have to read over it.
(Witness examines document.)
Yes, I remember this.
Q. And it looks like Mr. Briggs, in the e-mail after your first one, refers you to the Medical Examiner's Office Quality Assurance and Safety Director, Chris Heartsill.
Do you see that?
A. Yes.
Q. And then Mr. Briggs states to Chris Heartsill, who is copied on that e-mail: But you are the supervisor of the supervisor of the Sheriff's Department narcotics unit.
Was that your role in May 2017?
A. Yes.
Q. Okay. And do you know what Mr. Briggs means by his comment that -- the last phrase in that sentence: Sends us a lot of business for the drug lab?
MS. ABSTON: Objection, form.

THE WITNESS: It looks like he's just referring that our unit sends a lot of drug exhibits to them for drug analysis.
BY MS. WOHL:
Q. And would that be drugs confiscated or seized by Tarrant County Sheriff's officers?
A. Correct.
MS. ABSTON: Objection, form.
BY MS. WOHL:
Q. And would that also include prescription medication that was seized in an investigation?
MS. ABSTON: Objection, form.
THE WITNESS: Yes. It would include any type of drug, whether it's made in a pharmacy or it's an illicit clandestine-manufactured drug that we had seized pursuant to an investigation, and we needed a drug analysis for the purpose of criminal prosecution.
BY MS. WOHL:
Q. Do you recall whether May 2017 was about the time that you began looking into purchasing Narcan for the sheriff's office?
A. Yeah, that time frame is accurate.
Q. And were you personally assigned to the task of arranging for the purchase and supply of Narcan for the sheriff's office?

A. I don't -- I don't recall if I was tasked with doing it for the whole department or just CNET, but evidently that was a task given to me to find out what we have to do to buy it.
Q. But you don't recall who might have given you that task or directive?
A. I don't. It would've -- it would've come from one of my chiefs, so either Commander Bond, at the time, most likely, or it could have been Chief Simonds, but Commander Bond would have had knowledge of that.
Q. Okay. Let's go to Tab 18. This will be our next exhibit. I think it's Exhibit 14.
(Exhibit 14 was marked for identification.)
BY MS. WOHL:
Q. Bates number is 00684261.
A. Yes, I have that.
Q. Okay. Looking at the bottom e-mail, this is an e-mail from Commander Bond dated August 23rd, 2017, to Alma Espinosa.
You see that?
A. Yes.
Q. Who is Alma Espinosa?
A. I am not sure. I see her Tarrant County e-mail, but I'm not sure.
Q. And the last paragraph in Commander Bond's e-mail

reads: Our initial order will be for 75 units. Each unit has two doses of the nasal Narcan. This will be enough to issue to all of our patrol deputies, CID and narcotics investigators, all of which are most likely to come in contact with fentanyl.
Do you see that?
A. Again, I'm sorry. I don't see where you're seeing that. Is that in the document on the screen?
MS. ABSTON: It's ending in Bates 62; is that right, Gabe?
MS. WOHL: Yes, that's right. So it's the second page of this.
THE WITNESS: 62. Okay. I'm sorry.
BY MS. WOHL:
Q. That's okay. That sentence that starts out: Our initial order...
A. I see that, yes.
Q. Okay. Is it your recollection that the first Narcan purchased for Tarrant County Sheriff's Office was in August 2017?
A. I don't recall when it came in, but it would have been around that time frame.
Q. And Commander Bond specifically states in this e-mail that its use is for TCSO personnel that will come into contact with fentanyl, doesn't he?

A. Yeah. So this -- this would have been consistent with the time frame when I first started tracking down how we would buy -- where we could purchase Narcan from.
Q. Is that your recollection of the purpose of the acquisition here, to issue to officers who are most likely to come in contact with fentanyl?
MS. ABSTON: Objection, form.
THE WITNESS: Yes. I know the early discussions about the Narcan purchase were both for providing aid to our first responders who may come in contact with it, as well as if we encountered a citizen that -- that may need a Narcan dose.
BY MS. WOHL:
Q. So in this message from Commander Bond, he's talking about officers that come in contact with fentanyl. So Narcan would not need to be administered to an officer for exposure to prescription opioids, would it?
MS. ABSTON: Objection, form.
THE WITNESS: No, not generally.
BY MS. WOHL:
Q. In looking at the second e-mail from the top from Calvin Bond to Jerry Vennum -- so that's the first page of this exhibit -- and Keitha Hallenbeck, Lieutenant Hallenbeck dated January 25th, 2018, Commander Bond wrote in the third sentence in paragraph 1:

I was asked by Chief Simonds to get Narcan for the SO.
Do you see that?
A. Yes.
Q. And "SO" is sheriff's office, correct?
A. That's correct.
Q. And then in the second paragraph on about that third line, he wrote: I relied on Captain Heckman regarding the brand and dosage we should purchase.
Do you see that?
A. Yes.
Q. And then further down: The purpose of Narcan is primarily for use on fellow officers when they are exposed.
Do you see that?
A. Yes.
Q. Do you agree that that's the primary purpose of the Narcan?
MS. ABSTON: Objection, form.
THE WITNESS: Yes, I agree that's the primary reason that Tarrant County was purchasing it.
BY MS. WOHL:
Q. For use on fellow officers when they are exposed specifically to fentanyl, right?
MS. ABSTON: Objection, form.
THE WITNESS: Yes. Using fentanyl is a

broad term, like a fentanyl analog or something like that, yes.
BY MS. WOHL:
Q. Thank you.
Do you know if Narcan has ever been used at Tarrant County Sheriff's Office for exposure by an officer or first responder?
MS. ABSTON: Objection, form.
THE WITNESS: Not to my knowledge.
BY MS. WOHL:
Q. Does the sheriff's office have any data concerning when Narcan has been used and the type of drug it was used for?
A. I do not know.
Q. Is there anybody who would know that?
A. Our chief deputy, Tim Canas, might know that. He -- he's the chief over patrol, which is primarily field operations.
Q. And the use of Narcan on a victim, as opposed to for officer exposure, would include many other applications aside from just prescription opioid overdose; is that right?
MS. ABSTON: Objection, form.
THE WITNESS: Yes. I mean, they -- I mean, you -- a -- a person can overdose from -- have an opiate

overdose whether it's from a prescription medication or from an illicit drug, yes.
BY MS. WOHL:
Q. Turn to Tab 30. This will be Exhibit 15. Tab 30, the Bates number ends in 00690608.
(Exhibit 15 was marked for identification.)
THE WITNESS: Okay. I have that.
BY MS. WOHL:
Q. Okay. This is a series of e-mails between you and Chris Heartsill from May 2017 to June 2017 with the subject: Opioid drugs and Naloxone.
Does that appear correct?
A. Yes.
Q. And, again, Mr. Heartsill's title is the Equality Manager of Tarrant County Medical Examiner's Office, correct?
A. Yes.
THE COURT REPORTER: Excuse me, guys. Can you hear me? This is the court reporter.
MS. WOHL: Yes.
THE COURT REPORTER: For some reason my Internet keeps dropping. Can we take a five-minute break so I can reconnect?
MS. WOHL: Yes, of course.
THE COURT REPORTER: I apologize. I just --

you'll see on the realtime, I just keep dropping.

THE VIDEOGRAPHER: 12:50 p.m. We are off the record.

(Brief recess taken.)

THE VIDEOGRAPHER: The time is 12:58 p.m. We are on the record.

BY MS. WOHL:

Q. Captain Heckman, are you still on Tab 30 with me?

A. Yes.

Q. So we just identified this e-mail as a conversation between you and Chris Heartsill, and the -- what was your understanding of Mr. Heartsill's role as quality manager?

A. You know, I can't speculate on that. There's many facets of the Medical Examiner's Office, and I don't know what section -- if he's over all the whole -- the whole department, the whole office, or just maybe over the lab, so I can't speculate.

Q. The bottom e-mail forwarded by Mr. Heartsill discusses the DEA warning regarding exposure to fentanyl.

Do you see that?

A. Yes.

Q. And then on June 16th, 2017, you wrote back, and you responded: That's good stuff. Thank you. We came across some more U-47700 yesterday, and have a lead on the

local lab that has the pill presses. This stuff is getting pretty common.

Do you see that?

A. Yes.

Q. And the U-47700 is the fentanyl analog; is that right?

A. Yes.

Q. How do you say that? Is there a shorthand for the letter and numbers?

A. You know, some people just call them U-47 pills. We -- that's just how we generally refer to them.

Q. And on June 19, 2017, Mr. Heartsill responds: Yes, we see this in many death cases, and it is making appearances all across the nation.

Do you see that?

A. Yes.

Q. And was it your understanding that Mr. Heartsill was referring to this fentanyl analog?

MS. ABSTON: Objection, form.

THE WITNESS: That's what it looks like.

BY MS. WOHL:

Q. Let's turn to Tab 21.

A. I'm sorry. 21?

Q. Yeah, 21. This will be Exhibit 16, I believe. The Bates number is 683007.

(Exhibit 16 was marked for identification.)

THE WITNESS: Okay. I have that.

BY MS. WOHL:

Q. Okay. So if you go to the bottom e-mail, towards the end of the exhibit, this was an e-mail dated October 5th, 2017, sent by Commander Bond to Catherine Colquitt, and some others, and you were copied on that e-mail.

Do you see that?

A. I'm sorry. You said October 5th is the date of the e-mail?

Q. Yes. The e-mail from Calvin Bond to Catherine Colquitt and some others.

MS. ABSTON: Do you know the last few Bates numbers on that one?

MS. WOHL: Yep. 3010.

MS. ABSTON: Okay.

THE WITNESS: Okay. I have it now, yes.

BY MS. WOHL:

Q. Okay. Catherine Colquitt was the medical director at Tarrant County Public Health; is that right?

A. I -- I know she worked there. I wasn't -- I don't recall what her role was at that time.

Q. And Commander Bond sent this e-mail, because when you first began looking into purchasing Narcan around

May 2017, one of the things that you learned is that Tarrant County Sheriff's Office had to implement a Narcan policy; is that correct?

MS. ABSTON: Objection, form.

THE WITNESS: Yes. I do know that was something that was brought up.

BY MS. WOHL:

Q. And at least one of the reasons that Narcan was not purchased for several months after the conversation about purchasing Narcan first began was because a Narcan policy had to be drafted and approved, and officers had to be trained on the storage, use, and reporting of the nasal Narcan; is that right?

MS. ABSTON: Objection, form.

THE WITNESS: Yes. There were several things that needed to be in place -- I remember being told several things needed to be in place before we were authorized to purchase Narcan and issue it to our officers.

BY MS. WOHL:

Q. Was there anything in addition to the policy and the training?

A. I -- I -- not that I recall. I do recall those two specific things. I don't recall anything else.

Q. Can you turn to Tab 19 of your binder? This will

Page 110

be our Exhibit 18 -- no, our Exhibit 17. The Bates number is 854759.

(Exhibit 17 was marked for identification.)

THE WITNESS: Yes. I have it.

BY MS. WOHL:

Q. Now, this is an e-mail dated August 25th, 2017, from Commander Bond to Mike Simonds and Tim Canas, with the subject: Rough draft of proposed TCSO policy regarding naloxone (Narcan).

Do you see that?

A. Yes.

Q. And then Commander Bond forwarded that e-mail to you and some others.

Do you see that?

A. Yes.

Q. And Commander Bonds wrote in his e-mail to Simons and Canas: Gentlemen, in our effort to purchase and distribute naloxone to our personnel, I have had to seek the approval and sponsorship of the Tarrant County Public Health Medical Director, Dr. Catherine Colquitt, and her board. They will -- they are willing to be the sponsoring medical authority to authorize us to purchase these critical drugs.

Do you see that?

A. Yes.

Page 111

Q. And then in the next paragraph, Commander Bonds goes to: Before she will approve our request, she has asked to see the TCSO's policy on the use of the drug. Obviously, we don't have one.

Did I read that correctly?

A. Yes.

Q. And then he goes on to explain that a policy has been drafted and he is forwarding that for their review, right?

A. Yes.

Q. So let's go one tab over to Tab 20. This will be Exhibit 18, Bates Number 854760.

(Exhibit 18 was marked for identification.)

THE WITNESS: Okay, I have.

BY MS. WOHL:

Q. This appears to be the draft Narcan policy that was attached to Commander Bond's e-mail.

Does that sound right?

A. Yes.

Q. And I want to point out a couple of sections of the draft policy. In three portions -- the draft policy states in three portions that: The use and deployment of Narcan are documented -- are to be documented. And there's one in D5 that ensures pertinent details are documented, E2 reporting, and H2 is the other one I saw,

Page 112

another documentation requirement.

Do you see those?

A. I do.

Q. And I think you answered this, but I want to make sure now that you're looking at the policy: Do you know where these reports are maintained?

A. I do --

MS. ABSTON: Objection, form.

THE WITNESS: I -- I do not. They -- I'm not aware of a central database that records this. If it's required in our policy, then the officers would be required to document it, at a minimum, in their incident report or within their call notes when they're on a call.

BY MS. WOHL:

Q. And do you know if their reports distinguish between the type of use, whether it's overdose versus exposure?

A. I don't know.

Q. But in your experience, you're not aware of Narcan ever being administered due to exposure; is that right?

MS. ABSTON: Objection, form.

THE WITNESS: Yes, I have no knowledge if one of our officers have had to have Nar- -- Nar- -- Narcan administered to them.

Page 113

BY MS. WOHL:

Q. And do you know whether the reporting -- or the reports identify the suspected overdose drug?

MS. ABSTON: Objection, form.

THE WITNESS: I -- I don't know. I -- I think it would be -- the average officer probably wouldn't have any knowledge of -- if they did encounter an exposure or a suspected exposure, they wouldn't have any firsthand knowledge of what the exposure was to unless they were there and perhaps an officer was, you know, handling a suspected evid- -- a piece of evidence that may be fentanyl-related and -- and exposure occurred that required first aid.

BY MS. WOHL:

Q. Let's turn to Tab 22, and this will be our Exhibit 19.

(Exhibit 19 was marked for identification.)

BY MS. WOHL:

Q. Bates Number 854797.

A. I have that.

Q. Okay. This is an e-mail from Commander Bond dated October 5th, 2017, to Dr. Colquitt and others, including you, forwarding the approved TCSO policy on Narcan.

Does that appear correct?

Page 114

A. Yes.
Q. And Commander Bonds wrote: As you can imagine, we would like to get this ordered and issued to our personnel ASAP.
Do you see that?
A. Yes.
Q. So as of October 5th, 2017, Narcan had yet to be purchased and issued to Tarrant County Sheriff's Office; is that right?
MS. ABSTON: Objection, form.
THE WITNESS: That's what I would gather based on this e-mail.
BY MS. WOHL:
Q. Let's turn to the next tab, Tab 23. And this is Exhibit 20 --
A. Okay.
Q. -- Bates Number --
A. I have it.
Q. -- sorry -- Bates Number 854798.
(Exhibit 20 was marked for identification.)
THE WITNESS: Yes.
BY MS. WOHL:
Q. Just to make sure we have everything, does this appear to be the approved TCSO Narcan policy?
A. Yes.

Page 115

Q. Do you agree that the reporting requirements that were present in the draft policy are still there in D5, E2, and at H2?
MS. ABSTON: Objection, form.
THE WITNESS: Yes, I see that.
BY MS. WOHL:
Q. Let's turn to Tab 27. This is our Exhibit 21, and the Bates number is 854909.
(Exhibit 21 was marked for identification.)
THE WITNESS: Yes, I have that.
BY MS. WOHL:
Q. This is a May 22nd, 2019, e-mail from Calvin Bond to Scott Grazer. And the bottom e-mail looks like Commander Bond is writing to Scott Grazer to order more Narcan.
Do you see that?
A. Yes.
MS. ABSTON: Objection, form.
THE WITNESS: I -- I do see that.
BY MS. WOHL:
Q. And Commander Bond -- well, let me ask you first: Do you know who Scott Grazer is?
A. I do. He's -- he's the director of our accounting department.
Q. That makes sense. If you want to purchase

Page 116

something, you'd talk to him, right?
A. Yes. He's very helpful.
Q. And Commander Bond says in his e-mail to Mr. Grazer -- let me find it -- attached are the first Narcan requisitions and a quote from TC purchasing.
Do you see that?
A. Yes.
Q. So are you able to discern from this e-mail, or do you know independently, is Commander Bond making the second purchase of Narcan following the initial purchase in 2017?
MS. ABSTON: Objection, form.
THE WITNESS: I -- I wouldn't know.
BY MS. WOHL:
Q. You don't know if there was an intervening purchase between those years?
MS. ABSTON: Objection, form.
THE WITNESS: I don't know for sure. I -- I -- it would make -- I -- I think we had it prior to this date, but I -- I don't know for sure.
BY MS. WOHL:
Q. When you say you think you had it prior to this date, does that mean you think you had already ordered a second round of Narcan prior to this date, or you still had some from the first purchase?

Page 117

MS. ABSTON: Objection, form.
THE WITNESS: You know what? I'm not sure. Because the date of this e-mail, I was definitely out at our training center, and I know some people in the department had Narcan prior to this, and I don't know if that was purchased through formal channels or how they obtained it.
BY MS. WOHL:
Q. Okay. Let's turn to Tab 28. And this is Exhibit 22, Bates Number 854910.
(Exhibit 22 was marked for identification.)
THE WITNESS: Yes, I have it.
BY MS. WOHL:
Q. So this is the purchase order that was attached to Commander Bond's e-mail to Mr. Grazer for -- that he says is the first Narcan acquisition.
Does that appear correct?
MS. ABSTON: Objection, form.
THE WITNESS: Take a look at the dates here.
Well, I -- I do remember seeing a requisition in the past -- I don't recall the date -- for 70 -- a 75 quantity of Narcan.
BY MS. WOHL:
Q. But does it -- this purchase order coincide with your recollection when Tarrant County Sheriff's Office

made its first Narcan purchase after the policy was in place, the October 2017 time frame?
MS. ABSTON: Objection, form.
THE WITNESS: Yes. That would make sense.
BY MS. WOHL:
Q. And I think you mentioned you did not have an independent memory of the quantity or the dose, but it looks like the purchase was for 75 units of Narcan, 4 milligrams.
Would you agree with that?
MS. ABSTON: Objection, form.
THE WITNESS: Yes. Now that I see this, I do remember there being a requisition for 75 doses -- or 75 Narcan boxes, or however you want to ex- -- whatever you want to call it. Sorry.
BY MS. WOHL:
Q. Now having seen this, do you have any other recollection about other purchases of Narcan following the October 2017 date?
A. I -- I -- I don't, because it was soon after this that I transferred to the training academy.
Q. Let's go to Tab 29. This is our Exhibit 23, and the Bates number is 854911.
(Exhibit 23 was marked for identification.)
THE WITNESS: Yes.

BY MS. WOHL:
Q. Okay. So does this appear to be the requisition for the first Narcan purchase that was also attached to Commander Bond's e-mail to Mr. Grazer?
A. Yes, this is --
MS. ABSTON: Objection, form.
THE WITNESS: Yes, this is the document that I think made me remember the 75 doses we ordered.
BY MS. WOHL:
Q. Okay. And your name is on this as the requestor. Is that a formality, or do you recall making this request?
A. No, I -- I would have made the request if my name was on it.
Q. Okay. And, again, the date requested, August 28, 2017; date needed, September 15, 2017. The purchase order in the previous exhibit was in October 2017.
Does this all match your recollection of the very first purchase by your office of Narcan?
MS. ABSTON: Objection, form.
THE WITNESS: Yes. That would be consistent with the flow of -- for our first discussions about Narcan and then reaching out to the health department and medical examiner just trying to track down how previous Tarrant County offices have purchased Narcan. So this -- this would have been in line with that time frame, yes.

BY MS. WOHL:
Q. And the total cost on this was $5,625.
Do you see that?
A. Yes.
Q. And in the bottom left box, it states that: The justification is Narcan is needed to provide critical first aid to officers who experience an overdose from fentanyl exposure.
Do you see that?
A. Yes.
Q. Does that -- that match everything that we've talked about in terms of what the primary purpose of carrying Narcan was, fentanyl exposure to officers?
A. Yes.
MS. ABSTON: Objection, form.
BY MS. WOHL:
Q. All right. What was your answer to that?
A. Yes.
Q. Let's go to Tab 26. And this will be Exhibit 24, Bates Number 832591.
(Exhibit 24 was marked for identification.)
THE WITNESS: I have it.
BY MS. WOHL:
Q. Okay. This is an e-mail sent to you and Craig Driskell on April 16th, 2019, by Chad Krueger with the

subject: Narcan nasal spray.
Do you see that?
A. Yes.
Q. And Mr. Krueger is forwarding an e-mail that he received on October 16th, 2018, regarding a Texas federal grant to supply first responders with Narcan nasal spray.
Does that look right?
A. Yes.
Q. Do you recall receiving this e-mail?
A. I do not.
Q. Do you recall anything about the Texas grant that's referenced?
A. I do remember that -- that the agency received some Narcan, a pretty large order of Narcan that was distributed throughout our departments to different units. I couldn't tell you the exact quantities or -- or where it came from. I -- I do recall them mentioning that the agency got free Narcan from somebody.
Q. Do you know when that was?
A. I -- I don't remem- -- I don't recall.
Q. Would it have been after 2018?
MS. ABSTON: Objection, form.
THE WITNESS: Most likely, because I believe I was already at the training center when that happened.
BY MS. WOHL:

Q. And certainly after 2017; otherwise, you-all wouldn't have been trying to get your hands on Narcan, right?
MS. ABSTON: Objection, form.
THE WITNESS: Correct.
BY MS. WOHL:
Q. Who is Chad Krueger?
A. He worked with me at the Tarrant County Training Center. He was our training coordinator.
Q. And you mentioned that you're aware that the agency received a large quantity of Narcan for free. But just to close the loop: You don't know whether that was pursuant to this grant that's referenced?
A. That's correct.
MS. ABSTON: Objection, form.
BY MS. WOHL:
Q. Let's turn to Tab 17. This is our Exhibit 25, Bates Number 706190.
(Exhibit 25 was marked for identification.)
THE WITNESS: Yes, I have that.
BY MS. WOHL:
Q. Okay. The bottom e-mail is an August 17, 2020, e-mail with the subject: Narcan for law enforcement. It's a forward. And it discusses a statewide naloxone distribution project that allows entities to apply for

free Narcan through the State of Texas.
Do you see that?
MS. ABSTON: Objection, form.
THE WITNESS: I'm -- I'm sorry. Where in the document are you referring to?
BY MS. WOHL:
Q. The last page. It looks like it was forwarded to a lot of people, but then the content of the forward was about: Free Narcan to Texas entities.
A. Okay. Yes, I see that.
Q. Do you recall receiving this e-mail?
A. I don't.
Q. And do you know if the quantities of free Narcan that the sheriff's office got was pursuant to this program that's referenced in the e-mail?
MS. ABSTON: Objection, form.
THE WITNESS: I do not know that.
BY MS. WOHL:
Q. Let's go to Tab 24. And this is our Exhibit 26, Bates Number 893307.
(Exhibit 26 was marked for identification.)
THE WITNESS: I have it.
BY MS. WOHL:
Q. So the bottom e-mail in this chain is dated December 13th, 2018, and it was sent by Tarrant County

Sheriff's Officer Chief of Staff David McClelland to a list of recipients. And you're not on this recipient list of that e-mail, but eventually the e-mail is forwarded to your attention above.
Do you see that?
A. Yeah, I -- I see the e-mail you're referencing on the screen.
Q. And there's an e-mail forwarding this to you from Craig Driskell asking: Do either of you have any expenses related to the opioid epidemic?
Do you see that question?
A. Yes.
Q. Now, did you have an understanding at this point in 2018 that this inquiry in the opioid epidemic was pertaining to the civil litigation about the impact of prescription opioids?
MS. ABSTON: Objection, form.
THE WITNESS: No, I -- I didn't make that connection, or I don't know if -- if that was the purpose behind the e-mail.
BY MS. WOHL:
Q. You're included in the top two e-mails, and those concern attempting to get some hard cost data for Narcan.
Do you see those questions or inquiries?
A. Yes.

Q. And Craig Driskell is looking to you for costs for the purchase of Narcan kits to provide to McClelland to, in turn, to provide to the civil attorneys as expenses related to the opioid epidemic. And that's on the last page of the exhibit, the McClelland e-mail.
Do you see that?
A. Yes.
MS. ABSTON: Objection, form.
THE WITNESS: Yes, I do see that.
BY MS. WOHL:
Q. And as we said earlier, the opioid epidemic within the context of the opioid litigation concerns the impact of prescription opioids; is that right?
MS. ABSTON: Objection, form.
THE WITNESS: Yes.
BY MS. WOHL:
Q. And are you aware whether or not the costs for Narcan kits were ever tracked to the type of opioid that they were to be used for?
A. No.
Q. Do you have an opinion whether the hard costs for the kits that were ordered can be directly attributed to the impact of prescription opioids?
MS. ABSTON: Objection, form.
THE WITNESS: I -- I -- I wouldn't be able

Page 126

to say that specifically, because when we're talking about acquiring Narcan for use in a medical intervention, I mean, if you overdose on an opiate, it -- it's not going to distinguish whether that's a clandestine-created opiate element or something that was, you know, legitimately purchased from a pharmacy.

BY MS. WOHL:

Q. Let's go to Tab 25. That's where we were, isn't it -- hold on. No, Tab 25. We were on 24. This is our Exhibit 27, and it's Bates Number 893309.

(Exhibit 27 was marked for identification.)

THE WITNESS: Yes, I have that.

BY MS. WOHL:

Q. And we've seen this. Just to close the loop: This is the original requisition for Narcan that you sent to Driskell and McClelland as part of that response for Narcan acquisition costs; is that right?

MS. ABSTON: Objection, form.

THE WITNESS: Yes.

BY MS. WOHL:

Q. And at the time of the e-mail that's in Tab 24, December 13th, 2018, the sheriff's office had not made an additional purchase for Narcan; is that correct?

MS. ABSTON: Objection, form.

THE WITNESS: Not to my knowledge.

Page 127

BY MS. WOHL:

Q. And you also state to McClelland and Driskell that there has been no training costs associated with Narcan; is that right?

MS. ABSTON: Objection, form.

THE WITNESS: Yes, as far as I knew, from -- from my experience with dealing with Narcan in our agency, that's correct. We did receive some training, but I arranged to have the training done for free to some of our officers.

BY MS. WOHL:

Q. Who was the training with?

A. It was with a -- I'd have to look -- it was with Dalworthington Gardens Police Department. It was one of their medics who -- who do medical training for first responders, police and fire.

Q. Was this an ongoing training, or was this just before the first purchase of Narcan?

MS. ABSTON: Objection, form.

THE WITNESS: At -- at the time, it was just a one-time training. So when I was in CNET, I was trying to make sure that all our officers had current tactical and tactical medic training, not -- not a certification, just training for basic things, like tourniquet application, chest seals, packing wounds, things like

Page 128

that. And I had meetings with local police chiefs. I was trying to get them interested in sending one of their officers to join our task force as a task force officer.

And some of the agencies, Dalworthington, for example, when I spoke with their chief, I was -- I was requesting that they assign an officer over to our task force. He told me they didn't have an officer who could respond -- who -- who he could assign over there because they were short-staffed.

And generally, when I would talk with a police chief and they would tell me they couldn't send anybody, I -- I still freely offered our CNET resources to assist them with their community drug enforcement efforts. And in exchange, I would kind of say to them: Well, hey, is there anything you can do to help us out?

And then I realized that they were -- their department has -- is a public safety department, so they're trained in law enforcement and fire, and I asked if his agency -- he asked me if he can ever help us, to let us know. And I said: Would you be willing to do a tactical first aid class for our task force officers, and they agreed and that took place at their agency.

BY MS. WOHL:

Q. And that included Narcan training as well as some other first aid?

Page 129

A. That was part of it, correct.

Q. Had there been any --

(Simultaneously speaking.)

A. But it was free.

Q. Have there been additional trainings that included Narcan training?

MS. ABSTON: Objection, form.

THE WITNESS: We -- we have, as a -- the -- now that I was assigned after the training academy, I know the importance of tactical medic training, so I tried to implement that into our training curriculum and offer that to our officers as often as possible. We have a -- we had an officer at the time -- he's no longer there, it's a new officer -- but we have an officer that's embedded with the Fort Worth Police Department Tactual Medic Unit. And so he's our tactical medic, so -- and that's kind of a joint partnership.

But they often would come to our training academy -- well, let me -- let me rephrase that. I would re- -- often request that they come to our training academy and put on this type of tourniquet, first-aid, CPR, AED, Narcan training for our officers. They didn't always come. They were generally busy. But they -- they have come on occasion and provided that training free of -- free of charge to our officers.

BY MS. WOHL:
Q. We can close the exhibit binder for now.
Captain Heckman, do you have an understanding of what a pill mill is?
A. From an investigative standpoint, a pill mill is -- is basically a clandestine pill-manufacturing operation, and they generally have some type of pill press or pill stamp or -- or die, as they call it, and it's a clandestine pill-manufacturing operation.
Q. You know, through other witnesses, I've heard that term also apply to one-stop-shop doctor or pharmacy organizations where people get prescription opioids.
Is that not a term that you would use for that situation?
MS. ABSTON: Objection, form.
THE WITNESS: I have not used it in that context. I could see where someone might refer to it in that way.
BY MS. WOHL:
Q. Have you ever heard of independent pharmacies being called a pill mill?
A. So just for clarification, when you're talking about independent pharmacies, is this pharmacies that are -- that do not have chain pharmacies, that have multiple locations, or just --

Q. That's correct. The smaller community pharmacies that you see in the news a little bit more often about getting shut down, I guess.
MS. ABSTON: Objection, form.
THE WITNESS: I don't recall -- I don't remember referencing such a pharmacy as a pill mill.
BY MS. WOHL:
Q. In your experience, have you ever investigated a pharmacy as part of a narcotics diversion investigation?
A. I have not.
Q. In your experience in CNET and narcotics unit, is it possible for a prescription opioid to be legitimate and legally dispensed and then diverted after it was dispensed legally?
A. Yes.
Q. In your law enforcement experience, have you heard of other diversion methods, including fraudulent prescriptions, pharmacy theft, employee theft, robberies?
MS. ABSTON: Objection, form.
THE WITNESS: Yes, I've heard of that.
BY MS. WOHL:
Q. And what about the dark web drug marketplace, have you done any investigations that include that?
MS. ABSTON: Objection, form.
THE WITNESS: I have not been associated

with any investigations directly involving the dark web.
BY MS. WOHL:
Q. Have you heard of it or heard of investigations being done involving the dark web and drug -- drug diversion specifically?
A. Yes.
Q. Are you aware of any Kroger or Albertsons pharmacy being investigated by Tarrant County Sheriff's Office for anything?
MS. ABSTON: Objection, form.
THE WITNESS: No.
BY MS. WOHL:
Q. Are you aware of any Kroger or Albertsons pharmacist being investigated by the Tarrant County Sheriff's Office for anything?
MS. ABSTON: Objection, form.
THE WITNESS: No.
BY MS. WOHL:
Q. Are you aware of any Kroger or Albertsons pharmacy being investigated by the Texoma HIDTA task force?
MS. ABSTON: Objection, form.
THE WITNESS: No.
BY MS. WOHL:
Q. Are you aware of Kroger or Albertsons pharmacist

being investigated by the Texoma HIDTA task force?
MS. ABSTON: Objection, form.
THE WITNESS: No.
BY MS. WOHL:
Q. Is there a substance currently that you would consider to be the greatest threat to Tarrant County?
MS. ABSTON: Objection, form.
THE WITNESS: You know, I've been out of the narcotic game for about five years, so I -- I couldn't speculate on that currently. All I would know is what I've heard in the news.
BY MS. WOHL:
Q. Do you have any opinions as to whether Kroger or Albertsons are responsible for opioid overdose, addiction, or abuse in Tarrant County?
MS. ABSTON: Objection, form.
THE WITNESS: No.
BY MS. WOHL:
Q. Have you been involved in or been aware of any investigations of diverted prescription opioids where the prescription opioids were dispensed originally from a Kroger or an Albertsons pharmacy?
A. No.
MS. WOHL: Can we go off the record and take a break?

MS. ABSTON: Uh-huh.

THE VIDEOGRAPHER: Time is 1:32 p.m. We are off the record.

(Brief recess taken.)

THE VIDEOGRAPHER: The time is 1:45 p.m. We are on the record.

BY MS. WOHL:

Q. Captain Heckman, I have one more question for you, and that is: Are you planning to testify at the trial of this case?

MS. ABSTON: Objection, form.

THE WITNESS: I have not been asked that or told that.

MS. WOHL: No further questions. I will reserve my right to reopen the deposition pending review of the personnel file that was produced this morning.

MS. ABSTON: Before I address that. Does Albertsons have any questions?

MS. STEWART: Albertsons does not have any questions at this time.

MS. ABSTON: Okay. So I'll -- I'll note for the record that we're willing to keep the witness -- it's 1:45 p.m. and we're willing to keep the witness as long as necessary in order to allow the defendants to review the personnel file, and they've chosen or stated that they

would be unable to review the personnel file and -- and address it today, so -- we've had -- I think there's multiple hours before we could conclude, but I just wanted to note that for the record. So for any comments about reopening the deposition, there appears to be some time left end of day and the court reporter appears to be available.

And also, I just want to thank you Captain for you service to Tarrant County, and we appreciate your time today. Let me -- let me go off record for one more minute and I'll be right back.

If that sounded good with everyone.

THE VIDEOGRAPHER: The time -- the time is 1:47 p.m. We are off the record.

(Brief recess taken.)

THE VIDEOGRAPHER: The time is 1:50 p.m. We are on the record.

MS. ABSTON: Okay. The plaintiffs have no questions. And once again, we want to thank you, Captain, for your time today and for your service to Tarrant County.

THE WITNESS: Of course. I appreciate you saying that.

THE VIDEOGRAPHER: Anyone else?

(No responses.)

THE VIDEOGRAPHER: Okay. The time is 1:50 p.m. We are off the record.

(Deposition concluded at 1:50 p.m.)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION ) MDL No. 2804

THIS DOCUMENT RELATES TO: Track Nine: Tarrant County, Texas ) Case No.: 17-md-2804

(Case No. 1:18-op-45274-DAP) ) Judge Dan Aaron Polster

REPORTER'S CERTIFICATION
ORAL & VIDEOTAPED DEPOSITION OF
FLOYD HECKMAN
THURSDAY, AUGUST 24, 2023
(REPORTED REMOTELY VIA ZOOM)

I, Kari J. Behan, CSR, RPR, CRR, in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true;

That there came before me the aforementioned named person, who was by me duly sworn to testify the truth concerning the matters in controversy in this cause;

And that the examination was reduced to writing by computer transcription under my supervision; that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

Given under my hand and seal of office on this 8th day of September, 2023.

Kari J. Behan

KARI J. BEHAN, CSR, CCR, RPR, CRR
Texas CSR NO. 8564;
Expiration Date: 7-31-2024
VERITEXT LEGAL SOLUTIONS
Firm Registration No. 571
Telephone: (800) 336-4000

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

September 13, 2023

To: Sadie Turner, Esq.

Case Name: National Prescription Opiate Litigation - Track 9 (Tarrant County)

Veritext Reference Number: 6055188

Witness: Floyd Heckman Deposition Date: 8/24/2023

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 6055188
CASE NAME: National Prescription Opiate Litigation - Track 9 (Tarrant County)
DATE OF DEPOSITION: 8/24/2023
WITNESS' NAME: Floyd Heckman

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_____________ ____________________
Date Floyd Heckman

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of___________________, 20____.

________________________________
Notary Public

________________________________
Commission Expiration Date

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 6055188
CASE NAME: National Prescription Opiate Litigation - Track 9 (Tarrant County)
DATE OF DEPOSITION: 8/24/2023
WITNESS' NAME: Floyd Heckman

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____________ ____________________
Date Floyd Heckman

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of___________________, 20____.

________________________________
Notary Public

________________________________
Commission Expiration Date

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 6055188

PAGE/LINE(S) / CHANGE /REASON

____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________

_______________ ________________________
Date Floyd Heckman

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________

DAY OF ________________________, 20______ .

___________________________________
Notary Public

___________________________________
Commission Expiration Date