# EXHIBIT 49

Page 1

1       IN THE UNITED STATES DISTRICT COURT FOR THE
                NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION
3   IN RE NATIONAL PRESCRIPTION )
    OPIATE LITIGATION            )
4                                )  MDL No. 2804
                                 )
5   This Document Relates To:    )  Case No. 17-md-2804
    Track Nine: Tarrant County,  )
6   Texas                        )
                                 )
7   (Case No. 1:18-op-45274-DAP))
    _____)
8
9
10
11           REMOTE VIDEOTAPED DEPOSITION OF
12                DR. ROBERT JOHNSON
13                 AUGUST 9, 2023
14                 10:02 a.m. CDT
15
16
17            Witness Appearing From:
18                Fort Worth, Texas
19
20
21
22
23
24       Conducted Remotely Via Videoconference
25

Page 2

```
 1        R E M O T E   A P P E A R A N C E S
 2 ON BEHALF OF PLAINTIFFS, TARRANT COUNTY:
 3    MS. LEILA AYACHI
      MS. ALEX ABSTON
 4    LANIER LAW FIRM, P.C.
      10940 West Sam Houston Parkway North
 5    Suite 100
      Houston, Texas 77064
 6    (713) 659-5200
      leila.ayachi@lanierlawfirm.com
 7    alex.abston@lanierlawfirm.com
 8 ON BEHALF OF TARRANT COUNTY:
 9    MR. CRAIG PRICE
      ASSISTANT CRIMINAL DISTRICT ATTORNEY
10    TARRANT COUNTY
      401 West Belknap, 9th Floor
11    Fort Worth, Texas 76196
      (817) 884-1233
12    cmprice@tarrantcountytx.gov
13 ON BEHALF OF THE ALBERTSONS DEFENDANTS:
14    MS. ALEXANDRA B. LAGOS
      GREENBERG TRAURIG
15    333 SE 2nd Avenue, Suite 4400
      Miami, Florida 33131
16    (305) 579-0500
      alexandra.lagos@gtlaw.com
17
      ON BEHALF OF THE KROGER DEFENDANTS:
18
      MR. FAZAL A. SHERE
19    MR. JORDAN DYE
      BOWLES RICE
20    600 Quarrier Street
      Charleston, West Virginia 25301
21    (304) 347-1723
      fshere@bowlesrice.com
22    jdye@bowlesrice.com
23 ALSO PRESENT:
24    Ms. Sadie Turner - Lanier Law Firm Paralegal
      Ms. Megan King - Videographer
25    Mr. Gregg Holderman - Veritext Concierge
```

Page 3

```
 1              I N D E X
 2                              Page
 3 Appearances                     2
 4 DR. ROBERT JOHNSON
 5    Examination By Mr. Shere         5
 6    Examination By Ms. Lagos        78
 7 Reporter's Certificate            81
 8           E X H I B I T S
 9 No.     Description              Page
10 Exhibit 1 ................................  7
      Deposition Notice
11
      Exhibit 2 ................................  10
12    Robert Johnson LinkedIn Profile
13 Exhibit 3 ................................  26
      Annual Statistical Reports Webpage Screenshot
14
      Exhibit 4 ................................  28
15    Tarrant County Medical Examiner District
      Annual Report 2020
16
      Exhibit 5 ................................  36
17    Chemistry and Toxicology Laboratory
      Webpage Screenshot
18
      Exhibit 6 ................................  44
19    Article entitled "Fentanyl Deaths Soared in
      Tarrant County Last Year, Analysis Shows"
20
      Exhibit 7 ................................  48
21    Tarrant County Medical Examiner Case Records
      Search
22
      Exhibit 8 ................................  57
23    Tarrant County FY2023 Approved Budget
24 Exhibit 9 ................................  65
      FAA Report entitled "Distribution of Oxycodone
25    in Postmortem Fluids and Tissues"
```

Page 4

```
 1              P R O C E E D I N G S
 2       THE VIDEOGRAPHER:  We are on the record at
 3 10:02 a.m. on August 9th, 2023.  This is the
 4 deposition of Dr. Robert Johnson in the matter of In
 5 Re National Prescription Opiate Litigation filed in
 6 the Northern District of Ohio, Eastern Division,
 7 Case No. 1:18-op-45274-DAP.  This deposition is
 8 being conducted remotely.
 9       At this time, Counsel, please state your
10 appearances and affiliations for the record.
11       MR. SHERE:  Fazal A. Shere, counsel for
12 Kroger.
13       MS. LAGOS:  Alexandra Bach Lagos, counsel
14 for Albertsons.
15       MS. ABSTON:  Alex Abston, counsel for the
16 plaintiffs of Tarrant County along with Leila and
17 Sadie who are also here on behalf of the plaintiffs.
18       MR. PRICE:  Craig Price for Tarrant
19 County.
20       MR. DYE:  Jordan Dye for Kroger.
21       THE REPORTER:  All right.  Dr. Johnson, if
22 you would please raise your right hand, I'll place
23 you under oath.
24       (The witness was sworn by the reporter.)
25 ///
```

Page 5

```
 1         DR. ROBERT JOHNSON,
 2 having been first duly sworn, testified as follows:
 3         E X A M I N A T I O N
 4 BY MR. SHERE:
 5   Q.  Dr. Johnson, good morning.
 6   A.  Yes, sir.  Good morning.
 7   Q.  How are you?
 8   A.  Good.  How are you?
 9   Q.  I'm good.  So let's get started with your
10 deposition.  I know you are on Central Time Zone, so
11 around 1:00 we'll see how things are going.  If you
12 want to take a lunch break, we can talk about it.
13   A.  Okay.
14   Q.  Sounds good to you?
15   A.  Yes.
16   Q.  Sir, could you please state your full name
17 for the record.
18   A.  My name is Robert DeWitt Johnson.
19   Q.  And DeWitt is D-E-W-I-T-T?
20   A.  Yes, sir.
21   Q.  All right.  Sir, is this your first time
22 being deposed?
23   A.  It is not.
24   Q.  Okay.  And in previous depositions, have
25 you testified in your professional capacity or your
```

Page 6

1  personal capacity?
2      A.  Professional.
3      Q.  Okay.  All right.  So I think you're
4  familiar with some of the rules of a deposition, but
5  I'll just go over some ground rules.  One is I'll
6  probably be asking you most of the questions today
7  and other lawyers may also do the same, and it is
8  important that the court reporter captures
9  everything.  So we should do our best to not speak
10  over each other and to give verbal responses to all
11  the questions.  Does that sound good?
12      A.  It does, yes.
13      Q.  All right.  And one of the things we need
14  to be careful is not talk over each other so, again,
15  Karen's job is made as simple as possible.
16      A.  Sounds good, yes.
17      Q.  All right.  And also, you know, we are
18  taking this on Zoom, which some of us have become
19  probably more familiar with than probably taking a
20  live deposition, but if you have any communication
21  issues, please let us know.  And, you know, if I'm
22  asking you to look at a document, let's confirm that
23  you're looking at the right document.
24      We have a concierge today, Mr. Gregg
25  Holderman, who will be putting it up and down on the

Page 7

1  screen, so it'll be a double confirmation, both the
2  hard copy in front of you and the one on the screen.
3  So we'll make sure that all that goes well.
4  Correct?
5      A.  Okay.  Sounds good.
6      Q.  Okay.  One last thing.  If I ask you a
7  question and for any reason you do not understand
8  the question, please let me know and I'll try to
9  rephrase it or ask it again.
10      A.  Okay.
11      Q.  Does that sound fair?
12      A.  It does.
13      Q.  And also, by the same token, if I ask you
14  a question and you answer it, we'll assume that
15  you understood the question and answered
16  appropriately.  Correct?
17      A.  Yes, sir.
18      (Exhibit 1 marked)
19      Q.  Thank you, sir.  So first, let's look at
20  Exhibit 1 which is the second amended notice of
21  remote videotaped deposition of Dr. Robert Johnson.
22  Do you see that as Exhibit 1?
23      A.  I do.
24      MS. ABSTON:  Is Exhibit 1 Tab 1?  Sorry.
25  Just want to clarify that.

Page 8

1      MR. SHERE:  Yes.
2      MS. ABSTON:  Okay.  Great.
3      MR. SHERE:  Yeah.  When I refer to
4  Exhibit 1, it should be the corresponding tab.
5      MS. ABSTON:  Okay.  Thank you.
6      MR. SHERE:  Okay.
7  BY MR. SHERE:
8      Q.  And have you seen this document before,
9  Dr. Johnson?
10      A.  I have, yes, sir.
11      Q.  Okay.  And do you understand that today
12  you are testifying in your personal capacity?
13      A.  Professional capacity, yes.
14      Q.  All right.  Are you familiar with this
15  lawsuit that you're being deposed in today?
16      A.  I am not, no, sir.
17      Q.  Okay.  And when you say you're not
18  familiar with this lawsuit, you don't know what the
19  allegations are?
20      A.  I do not.
21      Q.  Okay.  Do you know that the plaintiff in
22  this case is the municipal government of Tarrant
23  County, Texas?
24      A.  I was told that, yes.
25      Q.  Okay.  Did anyone working on behalf of the

Page 9

1  plaintiff contact you before filing this lawsuit?  I
2  would imagine not, but we need to know.
3      A.  No.  No, sir.
4      Q.  And has anyone from the plaintiff's office
5  spoken to you before your deposition?
6      A.  They have, yes, sir.
7      Q.  And do you recall who spoke to you?
8      A.  Alex on the call today.
9      Q.  All right.  And when Alex spoke to you, do
10  you know who else was on that call?
11      A.  Sadie was as well.
12      Q.  All right.  Did you have any personal
13  counsel present at that meeting?
14      A.  No.
15      Q.  Okay.  So were Alex and Sadie the only two
16  people on the call?
17      A.  To the best of my knowledge.  I don't
18  remember anybody else.
19      Q.  Okay.  And did you review any documents in
20  preparation for your deposition?
21      A.  I did not, no.
22      Q.  Okay.  And did you take any notes as part
23  of the preparation for your deposition?
24      A.  I did not, no.
25      Q.  Okay.  And obviously you don't have any

3 (Pages 6 - 9)

Page 10

1 notes in front of you today, correct?
2    A.  No.  No, sir.
3    Q.  And you don't have any personal counsel
4 present with you sitting to your side in this
5 deposition, correct?
6    A.  No, not my personal counsel, no.
7        (Exhibit 2 marked)
8    Q.  All right.  Okay.  Let's look at
9 Exhibit 2, which is Tab 2.  And Dr. Johnson, just to
10 ease your concerns that the documents are probably
11 more voluminous than they need to be, especially one
12 document, so don't worry about the number of
13 documents.
14    A.  I was a little concerned.  I'm glad you
15 said that.
16    Q.  One of them is like hundreds of pages and
17 we're going to be using maybe one or two pages.
18    MR. SHERE:  All right.  So if you could
19 put that, Gregg, on the screen.
20    Q.  Dr. Johnson, do you recognize this
21 document as your LinkedIn profile?
22    A.  It appears to be, yes.
23    Q.  Your photograph is a little different from
24 you on screen today, but that happens to all of us
25 on LinkedIn, doesn't it?

Page 11

1    A.  I am officially old now, yes.
2    Q.  And I gather from reading this, if you
3 look at the bottom of that page, which of course you
4 are familiar with, is that you have a Ph.D. in
5 analytic chemistry from the University of Oklahoma,
6 correct?
7    A.  Yes, sir.
8    Q.  And by judging by that, you're not an M.D.
9 but a Ph.D., right?
10    A.  That is correct.  I am not a medical
11 doctor.
12    Q.  And are you board certified or licensed in
13 any specialties?
14    A.  I'm board certified by the American Board
15 of Forensic Toxicology, and I'm licensed by the
16 State of Texas to work on forensic casework within
17 the state.
18    Q.  Okay.  Let's first talk about the first
19 entity that you mentioned, the American Board of
20 Forensic Toxicology.  Is that -- did I say that
21 correctly?
22    A.  You did, yes, sir.
23    Q.  And when did you become -- did you say
24 certified or licensed?
25    A.  Certified.  2011.

Page 12

1    Q.  And you have continued to maintain your
2 certification since 2011?
3    A.  Yes, sir.
4    Q.  All right.  Very good.  And what was the
5 second agency you said?
6    A.  The Texas Forensic Science Commission
7 requires all forensic scientists within the state to
8 obtain and then maintain a license to practice.
9    Q.  Okay.  And when did you get certified or
10 licensed by this agency?
11    A.  They started that program I believe it was
12 2018, so that would have been the year that we were
13 all required to obtain the license.
14    Q.  And have you been continually licensed by
15 TFSC, which we'll call the Texas Forensic Science
16 Commission, since 2018?
17    A.  Yes, sir.
18    Q.  Very good.  Dr. Johnson, have you given
19 any presentations on toxicology?
20    A.  Many, many, yes.  As we mentioned earlier,
21 I'm getting old now, so the list is long.
22    Q.  Okay.  Could you give us some random
23 examples of presentations that you may have given on
24 toxicology.
25    A.  Most -- most recently, they've focused on

Page 13

1 standardization within the field.  Before that, it
2 was more analytical in nature, novel methods or ways
3 to detect drugs.  So it really spans the whole gamut
4 of the field.
5    Q.  You just used a term that I'm not familiar
6 with, "standardization in the field."  And I assume
7 you mean the toxicology field.  Could you tell us
8 what you meant by that?
9    A.  I can, yeah.  So there's been a shift over
10 the last seven years or so to perform analyses more
11 consistently laboratory to laboratory around the
12 country.  So we've spent a lot of time and effort
13 writing guidelines and standards to help
14 laboratories obtain a certain expected ability to
15 perform certain analyses.
16    Q.  And have these guidelines been
17 incorporated somewhere?
18    A.  They are published as American national
19 standards.  It's up to the laboratories to actually
20 implement and incorporate them into their casework,
21 but they are -- have a list of about 10 to 12
22 that are published American national standards at
23 this point.
24    Q.  Okay.  And even -- if we were to go
25 looking for them, what would be the easiest way to

4 (Pages 10 - 13)

Page 14

1 find them?  American national standards for
2 toxicology?
3     A.  You can start there.  The easiest way is
4 to Google OSAC, O-S-A-C, Registry.  And then
5 forensic toxicology has a subcommittee within that
6 link.
7     Q.  I see.  So at the start of the deposition,
8 Dr. Johnson, you mentioned that you have given prior
9 depositions in your professional capacity.  So first
10 let me ask you, have you ever given testimony in a
11 deposition regarding controlled substances or
12 opioids?
13     A.  Oh, I'm sure that I have, but it would
14 have been related to the effects of drugs and how
15 they affect human performance.
16     Q.  Okay.  Would that have been specific to
17 opioids or just controlled substances generally?
18     A.  More general.  I don't remember a specific
19 opioid-related case that -- where I was asked in a
20 deposition about the effects.
21     Q.  Okay.  And would this have been a
22 deposition in court or would it also have been part
23 of a trial testimony?
24     A.  It could have been either.  Trial
25 testimony is much more common for us and me

Page 15

1 personally.  I'm in criminal court weekly.  I don't
2 give depositions as often certainly.
3     Q.  Okay.  So let's talk about that a little
4 bit.  So when you appear in court, what are you
5 typically appearing as and for what reason?
6     A.  So when I'm in criminal court, I'm asked
7 to interpret the results of a forensic toxicology
8 report.  So it could be related to the drugs that
9 were found and how those drugs affect human
10 performance.  And any case type is possible from
11 misdemeanor DWI to capital murder.
12     Q.  Okay.  And do you -- have you also
13 appeared in civil trials?
14     A.  I have, yes.
15     Q.  And what was the occasion for your
16 appearance in a civil trial?
17     A.  The exact same purpose, explaining the
18 compounds found on a tox report, what they are, how
19 they affect the body, and then what side effects may
20 be exhibited.
21     Q.  And in these appearances, do you typically
22 testify on behalf of the TCME, or do you also
23 testify as an expert?
24     A.  So in criminal court, we -- I am
25 testifying in support of the results generated by

Page 16

1 the laboratory.  So it's -- it would be in support
2 of TCME and it could be requested by either side,
3 the plaintiff or the defense.
4         In civil court it's been both situations.
5 So a laboratory report from my laboratory is used in
6 a civil trial and I was asked to explain what was
7 found.  I've also been retained outside of our
8 laboratory's work to help explain what was found by
9 a different laboratory.
10     Q.  Okay.  And in that instance, as you
11 pointed out, you were retained as a testifying
12 expert for a particular side?
13     A.  Yes, sir.
14     Q.  And do you recall what side?
15     A.  It's --
16         MS. ABSTON:  Objection, form.
17     A.  It's been both sides.  Sorry.
18     Q.  Both.  And when you say both sides, you
19 mean the plaintiff and the defendants?
20     A.  Yes, sir.
21     Q.  And that would be criminal defendants or
22 civil defendants?
23     A.  Civil.
24     Q.  Okay.  You have not testified as a
25 retained expert in a criminal case, correct?

Page 17

1     A.  No, sir, I have not.
2     Q.  All right.  And also, just to clarify one
3 thing from your earlier testimony, when you said
4 you've given testimony, you have given testimony
5 about controlled substances, but you -- as you sit
6 here today, at least, you don't recall having given
7 any testimony at a deposition or trial about
8 opioids, correct?
9         MS. ABSTON:  Objection, form.
10     A.  There have been opioid-related DWI cases,
11 yes.  So in an instance where an opioid is the drug
12 found in a driving-while-intoxicated case, I am
13 asked to explain the effects of opioids in a case
14 like that.
15     Q.  Wonderful.  And have you ever been
16 retained as an expert at a trial on an issue
17 involving opioids?
18     A.  Not that I can recall, no, sir.
19     Q.  Okay.  Now, according to your profile,
20 you're serving as the chief toxicologist at the
21 Tarrant -- at the TCME, correct?
22     A.  Yes, sir, that is correct.
23     Q.  And you started in this position on April
24 of 2011?
25     A.  Yes, sir.

5 (Pages 14 - 17)

Page 18

1    Q.  And is that still your position today?
2    A.  It is, yes.
3    Q.  Congratulations.  You've held out for a
4  decade, or more than a decade now, 12 years.
5    A.  Yes, sir.  Thank you.
6    Q.  Could you tell us briefly what your duties
7  are as the chief toxicologist for TCME?
8    A.  I can.  I oversee day-to-day operation of
9  two laboratory sections within our office, the
10  forensic toxicology laboratory and then the seized
11  drugs laboratory.
12       For forensic toxicology, I oversee and
13  review all of the data generated by the laboratory,
14  and then I review and sign the final reports from
15  cases that are worked by the laboratory.  I also
16  have to make personnel decisions and things like
17  that too administratively.
18       My role for seized drugs is reviewing
19  cases that are completed by the laboratory and
20  ensuring that they're all done properly before
21  they're released to the customer.
22    Q.  Okay.  Who would the customer be in that
23  case?
24    A.  So it could be a pathologist in a
25  postmortem case.  It could be law enforcement.  It

Page 19

1  could be the -- an attorney from either the
2  plaintiff or the defense.  Those are our typical
3  customers.
4    Q.  Okay.  Now, you mentioned two things, and
5  I just want to confirm that they're actually
6  divisions of TCME.  You mentioned forensic
7  toxicology and seized drugs.  Did I say that
8  correctly?
9    A.  You did, yes, sir.
10    Q.  And are they two separate divisions at
11  TCME?
12    A.  They are two separate laboratory sections
13  on the forensic laboratory services side of the
14  office.
15    Q.  Okay.  And what is your role for the
16  forensic side, the forensic toxicology side?
17    A.  Yes.  For forensic toxicology, I review
18  and sign all of the data generated by the laboratory
19  and then as well as review and sign the final report
20  prior to release to the customer.
21    Q.  Does any report go out without your
22  signature or by someone else's signature?
23    A.  If I'm going to be out of the office for
24  two weeks for some reason, yes, my deputy would sign
25  final reports in that instance.  That doesn't happen

Page 20

1  very often, but that is a possibility.
2    Q.  And who is your deputy?
3    A.  Aria McCall.
4    Q.  Okay.  How do you spell that name?
5    A.  A-R-I-A, M-C-C-A-L-L.
6    Q.  Okay.  Now, let me ask you a question.
7  The toxicology department doesn't make a judgment as
8  to whether a certain substance or a combination of
9  substances is the cause of death, correct?
10    A.  We do not.  That is correct.
11    Q.  Okay.  And correct me if I'm wrong, but
12  the toxicology department's job is to make a
13  determination of what drugs are present and in what
14  amounts, correct?
15    A.  That is our role, yes, sir.
16    Q.  The interpretation as to whether or not
17  the drug caused or contributed to a death would be
18  up to the medical examiner who sent your department
19  a specimen request, correct?
20    A.  Yes, sir, that is correct.
21    Q.  And on that note, does the TCME have
22  regular meetings with the toxicologist where cases
23  are discussed and the toxicologists give input into
24  the meaning of the results?
25    A.  No, we do not have regular meetings.

Page 21

1    Q.  You just give your results and they
2  analyze it or read it?
3    A.  Yes, sir, that is correct.  We submit the
4  results to the individual pathologist, and what they
5  do with them after that is outside of our purview.
6    Q.  Okay.  So you don't have regular meetings,
7  but let me ask you this.  Have you ever had a
8  medical examiner change his or her opinion on the
9  cause of death after discussing the results with you
10  or any other toxicologist?
11    A.  Not to my knowledge, no.
12    Q.  Okay.  So while the results of the
13  toxicology are certainly important, it's the medical
14  examiner whose job it is to interpret it, correct?
15    A.  That is correct, yes, sir.  They have the
16  whole -- all of the pieces of the puzzle, and
17  toxicology may just be one small piece.
18    Q.  And if you could tell us, indulge us, what
19  exactly are all the pieces of the puzzle besides the
20  toxicology portion?
21    A.  Oh, well, I will probably miss some, but
22  there are the investigation records that they
23  receive for a case.  They have the physiological
24  findings from the autopsy itself which only they
25  know.  They have any past medical history from

6 (Pages 18 - 21)

Page 22

1 outside of the office that they may have access to.
2 There's histology, laboratory testing that they
3 would have access to.  So all of those would be
4 individual pieces -- and I, again, may have missed
5 one -- that complete the picture.
6     Q.   That's a very good list, Dr. Johnson.
7 Thank you.  But at the same time, the toxicologist
8 has an important role to play.  You would agree,
9 right?
10    A.   We can, yes.  Depending on case type, we
11 may have an important role.
12    Q.   I mean, just to name a few things, you
13 guys are toxicologists who runs the test, who makes
14 sure it's calibrated correctly and there are good
15 quality controls in place, and you get defensible,
16 scientifically valid results that you can give to
17 the medical examiner, right?
18    A.   We do.
19        MS. ABSTON:  Objection, form.
20    A.   I'm sorry.  We do take care of all of
21 those things within the laboratory to ensure that
22 our results are accurate and done in an appropriate
23 way.
24    Q.   Okay.  My next question might be a little
25 broad, and I'm admitting that, but you seem to be

Page 23

1 very knowledgeable so I'm going to ask you.
2        Do you have any opinion about the
3 reliability or the validity of certain tests that
4 are run on postmortem blood?
5     A.   I would, yes.
6     Q.   Give -- tell us.  Tell us what your --
7        MS. ABSTON:  Objection, form.
8     A.   Well, just in general, we -- we know from
9 our quality assurance and quality control program
10 that the results generated by the laboratory are
11 accurate, so what is in the blood or tissue
12 specimen, the amount or the identification of a
13 substance is accurate in every case.
14        The interpretation of those results in a
15 postmortem case is where there is a gray area.  So
16 the results generated by the lab are accurate and
17 precise.  What someone does with those results
18 outside of the laboratory is -- can vary depending
19 on the individual.
20    Q.   Okay.  Now, is there such a thing as a
21 National Association of Medical Examiners or NAME?
22    A.   There is, yes.
23    Q.   And do they publish standards for
24 performing forensic autopsies?
25    A.   I believe so, yes.

Page 24

1     Q.   Okay.  Do you know what's entailed in
2 those standards?
3     A.   I do not, no.
4     Q.   Okay.  And do you know if it is important
5 to specify the anatomical location for where the
6 sample was taken?
7     A.   It is important.  Then that goes to the
8 interpretation side.  So when you're trying to
9 utilize the results generated by the laboratory,
10 sample site is -- can be important.
11    Q.   Okay.  And is this important because
12 femoral or leg blood from a peripheral compartment
13 may have a different drug or alcohol concentration
14 than the cardiac blood from the central compartment?
15    A.   It can, yes, sir.
16    Q.   Now, in the many years that you have
17 practiced, have you ever come to a conclusion the
18 level of opioids found in a decedent was a lethal or
19 toxic level?
20    A.   No.  That would be -- that all happens on
21 the pathology side.  We do generate those numbers,
22 but we don't come to that conclusion, no.
23    Q.   Now, does TCME serve just Tarrant County
24 or also some neighboring counties?
25    A.   We have neighboring counties.  So we're a

Page 25

1 medical examiner's district and there are four
2 counties within the district, Tarrant, Parker,
3 Denton, and Johnson counties.
4     Q.   Thank you.  Now, again, going back to your
5 experience on your LinkedIn page, it says that you
6 were a research chemist for the Federal Aviation
7 Administration.  Do you see that?
8     A.   Yes, sir.
9     Q.   Okay.  And what did that job entail?
10    A.   So it's very -- it was very similar to
11 what I currently do.  The only difference was the
12 decedents in those cases were all pilots, so
13 individuals that had died in aviation accidents.
14 The testing procedures and protocols were very
15 similar to what I do currently.  Just the customer
16 base was different.
17    Q.   Okay.  And just looking at the dates, it
18 looked like you started a job even before you
19 finished your Ph.D. at the University of Oklahoma?
20    A.   I did, yes, sir.  I worked at the FAA
21 while finishing my degree, and the federal
22 government was very generous to allow me to do that,
23 so I'm grateful.
24    Q.   Sometimes you have to thank the federal
25 government.

7 (Pages 22 - 25)

Page 26

1    A.  Every now and then, yes.
2    Q.  Every now and then.  All right.  Sounds
3  good.
4        And how did you end up leaving that job
5  and going to the Tarrant County medical examiner's
6  office?
7    A.  So one of the drawbacks of the federal
8  government is no one ever leaves.  So if I was ever
9  going to move up in my career, the only option was
10  to go somewhere else.  All the people that I worked
11  with 12 years ago there are still there.  So I never
12  would have advanced.  And Tarrant County had an
13  opening for a chief toxicologist when my predecessor
14  retired, so I jumped at the opportunity.
15    Q.  Okay.  I hope you didn't give up too
16  sizable a federal pension.
17    A.  No, it was okay.
18    Q.  All right.  Let's now look at -- actually,
19  before we look at that, let me just ask you a
20  question.  You're familiar with the TCME's
21  organizational structure, correct?
22    A.  Yes, sir.
23        (Exhibit 3 marked)
24    Q.  All right.  So let's look at Exhibit 3.
25  And as you look at it, let me first tell you why

Page 27

1  there are two pages in the beginning.
2        If you see, we took a snapshot of the
3  statistics -- statistical annual reports and we
4  couldn't get all that on the first page.  I'm not a
5  technical person, but I think the second one is
6  landscape or whatever.  So if you look at the second
7  page --
8        MS. ABSTON:  Before we move on, make sure
9  he has it out, but we're going to object to the use
10  of the screenshot as it cuts off part of the page
11  and it doesn't have a URL to it, but I'm going to
12  allow you to ask him questions about it.
13        MR. SHERE:  Thank you, Alex.
14    Q.  So let's move on to the next page which
15  is, I guess, the landscape version.  And do you
16  see -- do you see this page now, Dr. Johnson?
17    A.  I do, yes, sir.
18    Q.  Okay.  Now, looking at this page, it looks
19  like -- well, before we ask that, let me ask you
20  this.
21        Are you familiar with the contents of
22  these reports, the annual statistical reports?
23    A.  In general, yes.  I'm asked annually to
24  provide some toxicology statistics for the report.
25  I'm not involved in putting together the report for

Page 28

1  the office.  So just in general terms, yes.
2    Q.  Thank you, sir.  And if you look at this
3  page, the one that we are looking at right now, it
4  appears that 2021 is the most recent report
5  available to download.  Do you see that?
6    A.  It appears from this view, yes.
7    Q.  As you sit here today, do you know if
8  there is a 2022 report?
9    A.  I do not know, no.
10    Q.  Okay.  Do you know if that report is in
11  the works?
12    A.  I also don't know.
13        (Exhibit 4 marked)
14    Q.  Okay.  All right.  Let's move on to the
15  Exhibit 4 which is the annual report for 2020.  Do
16  you see that now?
17    A.  I do, yes, sir.
18        MR. SHERE:  And if you could put that,
19  Gregg, on the screen, just the first page.
20        CONCIERGE:  It's loading.  Bear with me
21  for a moment, please.
22        MR. SHERE:  No problem.
23    Q.  And since you are looking at it,
24  Dr. Johnson, in front of you, are you familiar with
25  this particular report?

Page 29

1    A.  I was asked to provide some information
2  for toxicology specifically.  I don't know if I've
3  ever seen any of the rest of it, no.
4    Q.  Okay.  And do you recall providing any
5  information relating to toxicology for this report?
6    A.  I do, yes.
7    Q.  Did you draft something or did you just
8  provide the data?
9    A.  Just the data.
10        MR. SHERE:  Okay.  Now, this is where it
11  gets a little confusing.  Gregg, you have to help
12  us.  Keep going down, and I think it's page 28 on
13  this.  You will see an organizational chart.  I
14  think it's page 28.  Let's get there.
15        MS. ABSTON:  Hold on.
16        MR. SHERE:  There you go.  You're getting
17  close.  Let's see.  No, that doesn't look right.
18  Yeah, that -- keep going up a little.  There is a
19  photograph of a building and then it is the page
20  after that.  Yeah, this is the page.  Wonderful.
21  Great job, Gregg.
22    Q.  All right.  Now, are you seeing this in
23  front of you?  And Dr. Johnson, have you found it in
24  your materials as well?
25    A.  I have, both, yes.

8 (Pages 26 - 29)

1    Q.  Wonderful.  Now, do you agree that what
2 you're seeing right now is the Tarrant County
3 medical examiner's office and forensic laboratories
4 organizational chart?
5    A.  From 2020, yes, sir.
6    Q.  All right.  Yeah, that may have changed
7 now, and it probably has.  Okay.  Now, if you'll
8 look toward the far right on the fourth level, your
9 name shows up as chief toxicologist, Robert Johnson,
10 Ph.D.  Do you see that?
11    A.  I do, yes, sir.
12    Q.  And do you see that there are 12 employees
13 listed under your name including senior
14 toxicologist, toxicologist, senior forensic chemist,
15 and forensic chemist?
16    A.  Yes, sir.
17    Q.  And if you would take just a quick look,
18 and we don't have to get into too much detail, but
19 do you think these people are all still working
20 there?
21    A.  They are not, no.
22    Q.  Okay.  But at this time in 2020 when this
23 organizational chart was made, you were responsible
24 for managing and overseeing the work of each of the
25 individuals listed alongside yours, correct?

1    A.  Yes, sir, that is correct.
2    Q.  What are the primary duties and
3 responsibilities of the senior toxicologist and
4 toxicologist under your direction?
5    A.  So they are the people within the
6 laboratory that are responsible for generating the
7 data that is eventually associated with each case
8 that we -- that we work.
9    Q.  Okay.  And what about the forensic
10 chemist?
11    A.  That is the seized drugs laboratory
12 section.  So different laboratory.  And they analyze
13 solid dose drug samples that are typically submitted
14 from law enforcement agencies that are collected at
15 the scene of a crime.
16    Q.  Now, as you mentioned, some of the people
17 referenced as working under you are no longer there,
18 correct?
19    A.  That's correct.
20    Q.  Do you know if this organizational chart
21 has also changed in its format, not the people
22 involved but just the format, since 2020, if you
23 know?
24    A.  Our -- our section has not changed in its
25 format.  I think the basic structure is similar

1 today as it was in 2020.
2    Q.  Now, on this chart, the big kahuna, the
3 big boss sitting at the top is the chief medical
4 examiner who in this case was Dr. Nizam Peerwani,
5 correct?
6    A.  Yes, sir, that is correct.
7    Q.  Now, Dr. Nizam Peerwani is no longer the
8 CME, correct?
9    A.  He is not, no, sir.
10    Q.  Do you know if he resigned?
11    MS. ABSTON:  Objection, form.
12    A.  I don't know.  I was -- thought he
13 retired.
14    Q.  Do you have any reasons or understanding
15 of his leaving TCME?
16    A.  No.  No, sir.
17    MS. ABSTON:  Objection, form.
18    THE WITNESS:  Sorry, Alex.
19    A.  I don't.
20    Q.  How was your working relationship with
21 Dr. Peerwani?
22    A.  Well, I didn't have direct contact very
23 often.  He was way above my pay grade and oversaw an
24 extremely large number of people.  I would answer
25 questions if he ever had any, but he didn't perform

1 a lot of autopsies towards the end of his career, so
2 we didn't have much contact.
3    Q.  Okay.  And in your opinion, was
4 Dr. Peerwani a competent medical examiner?
5    MS. ABSTON:  Objection, form.
6    A.  Yes.
7    Q.  And you personally don't have any issues
8 or problems with Dr. Peerwani, correct?
9    A.  No, sir, I don't.
10    Q.  Okay.  All right.  So who is the current
11 chief medical examiner?
12    A.  Dr. Kendall Crowns.
13    Q.  And how long has Dr. Kendall Crowns served
14 as the CME of TCME?
15    A.  Oh, he's been there -- I would say he's
16 been there a little over a year now.  I don't know
17 his exact hire date, but it's somewhere around a
18 year ago.
19    Q.  And how is your working relationship with
20 Dr. Crowns?
21    A.  Excellent.  He's more involved within the
22 office, so we do see him much more often than we saw
23 Dr. Peerwani.
24    Q.  And does Dr. Crowns perform autopsies and
25 sign death certifications also?

Page 34

1    A.  He does, yes, sir.
2    Q.  And also performs other administrative
3 duties, correct?
4    A.  Many.  I cannot imagine.
5    Q.  And judging from your testimony a few
6 minutes ago, I imagine that you consider Dr. Crowns
7 a competent medical examiner?
8    A.  Yes, sir, I do.
9    Q.  Okay.  And you certainly have had no
10 issues or problems with Dr. Crowns, correct?
11         MS. ABSTON:  Objection, form.
12    A.  I have not, no, sir.
13    Q.  Okay.  Now, at any time did you ever
14 report directly to the chief medical examiner?
15    A.  No, I have not.
16    Q.  Okay.  Now, if you look at this chart
17 again, to your left, to the left of Dr. Peerwani
18 there is a Dr. Mark Krouse listed as the deputy
19 medical examiner.  Do you see that?
20    A.  Yes, sir.
21    Q.  Are you familiar with Dr. Mark Krouse?
22    A.  I am, yes.
23    Q.  And is Dr. Mark Krouse currently the
24 deputy medical examiner?
25    A.  He is not with the office any more or

Page 35

1 either.
2    Q.  Okay.  And do you know why Dr. Krouse left
3 the office?
4         MS. ABSTON:  Objection, form.
5    A.  I do not, no, sir.
6    Q.  Was his job terminated, if you know?
7    A.  I don't know the --
8         MS. ABSTON:  Objection, form.
9    A.  No, I don't know the correct terminology,
10 no, sir.
11    Q.  And do you know if he was -- Dr. Krouse
12 was asked to leave the CME's office due to his
13 performance, abilities, or conduct?
14         MS. ABSTON:  Objection, form.
15    A.  I do not know, no, sir.
16    Q.  So as you sit here today, just for
17 clarification, you don't know the circumstances
18 involving Dr. Krouse's leaving the deputy medical
19 examiner's position, correct?
20    A.  That is --
21         MS. ABSTON:  Objection, form.
22    A.  That is correct, yes, sir.
23    Q.  Okay.  And who is the current deputy
24 medical examiner?
25    A.  Dr. Tasha Greenberg.

Page 36

1    Q.  Okay.  And she has held the office since
2 when?
3    A.  She started with the office not long after
4 me, so I would guess 11 years or so.
5    Q.  Okay.  But how long has she been the
6 deputy medical examiner?
7    A.  Oh, okay.  Sorry.  I misunderstood your
8 question.  She obtained that position not long after
9 Dr. Crowns was hired.  I don't know the exact date.
10    Q.  Actually, as you correctly point out, she
11 is listed there below Dr. Crowns as the deputy ME,
12 right?
13    A.  Yes, she's been a deputy medical examiner
14 for 11 or so years at this point.  She's now the
15 deputy chief medical examiner, so the deputy chief
16 to Dr. Crowns.
17    Q.  I got it.  I got it.  Okay.  All right.
18 Thank you, sir.  As I said, some of these documents
19 look voluminous, but we're not going to spend too
20 much time on it.  So let's move on to Exhibit 5, the
21 first page of Exhibit 5.
22         (Exhibit 5 marked)
23         MS. ABSTON:  We're going to object to
24 the -- I mean, we're just going to note for the
25 record that this exhibit printed out for us is

Page 37

1 semi-cropped off.  I don't know if this is an issue
2 for Dr. Johnson as well.  And it also says that
3 there's supposed to be two pages and I only have
4 one, so --
5         MR. SHERE:  Oh, okay.  Actually I only
6 have one here too, so it says 1 of 2 but we're just
7 going to talk about the first page.  But that's
8 fine.  Your objection is noted.
9         We'll wait for Gregg to bring it up.
10    Q.  All right.  Now, as chief toxicologist,
11 Dr. Johnson, you lead the TCME's chemistry and
12 toxicology laboratory, correct?
13    A.  Yes, sir, that is correct.
14    Q.  Okay.  So looking at this exhibit, I want
15 you to look at the third sentence under "Forensic
16 Toxicology."
17         MR. SHERE:  And Gregg, you'll have to go
18 to that.  Yeah.  If you would enlarge it, the third
19 sentence that begins with, let's see, "The
20 toxicology laboratory provides."  There you go.
21    Q.  So I'm going to read the third sentence in
22 the record, Dr. Johnson.  "The toxicology laboratory
23 provides drug testing to assist medical examiners in
24 determining the cause and manner of death by
25 isolating, identifying and determining the

Page 38

1  concentration of compounds in a collected specimen."
2       Did I read that correctly?
3    A.  You did, yes, sir.
4    Q.  So walk us through the process a little
5  bit, Dr. Johnson.  Is -- how exactly does a
6  toxicology laboratory assist the medical examiner's
7  death investigation?  What comes first?
8    A.  In our process what comes first, or do you
9  mean --
10   Q.  Yes.
11   A.  -- within the office what comes first?
12   Q.  Actually, excellent point.  Let's address
13  both.
14   A.  So let's start with the office because
15  that's the broader -- the broader answer.
16       So in a postmortem case, someone passes
17  away, they're transported to our office.  A
18  pathologist determines if an autopsy is required and
19  then what type of autopsy is needed for the case.
20  They may or may not request various laboratory
21  services for that case, including histology,
22  toxicology, or others depending on the case type.
23       If they request toxicology testing for
24  their case, we receive samples that were collected
25  at the autopsy.  Those are provided to us from the

Page 39

1  evidence department within the office, and then we
2  start our testing service within the laboratory.
3    Q.  I see.  Now, does the medical examiner's
4  office reach out to you or someone else at the
5  toxicology laboratory for assistance with every
6  death the TCME investigates?
7    A.  No, they do not.
8    Q.  Okay.  Do they pick and choose?
9    A.  They decide based on -- actually I don't
10  know how they decide, but they do choose when they
11  want to request tox testing.  We only know on the
12  cases that they do make that request.
13   Q.  And does your office provide toxicology
14  analyses for other agencies or any other party
15  besides TCME?
16   A.  We do, yes.  So we also do a significant
17  amount of testing on living people, and that could
18  be related to driving while intoxicated cases, could
19  be related to drug-facilitated crimes or sexual
20  assault cases.  We do re-test work for defense
21  attorneys who have had a sample tested at a
22  different laboratory.  So it's about 50/50 for us
23  between postmortem and antemortem testing.
24   Q.  Okay.  That's good to know.  Okay.  Now --
25  and Gregg has this exhibit placed perfectly, so we

Page 40

1  don't -- you don't have to do anything, Gregg.
2       Now let's look at the first and second
3  sentences under the "Forensic Chemistry" handling
4  and which reads as follows.  And again, I'm going to
5  read it into the record.
6       "Forensic chemists analyze substances
7  submitted by pathologists and other agencies.  Drug
8  types received commonly range from clandestine
9  chemical substances to therapeutic or prescribed
10  medications."  Do you see that?
11   A.  Yes, sir.
12   Q.  Is that an accurate statement?
13   A.  It is, yes.
14   Q.  Now, the next sentence states, "Cocaine,
15  heroin, and methamphetamine, all drugs of abuse,
16  represent the most common products received for
17  chemical assay."  Do you see that?
18   A.  I do, yes.
19   Q.  And do you agree with that statement?
20   A.  I don't know statistically if that's
21  accurate today.  I'm sure it was accurate when that
22  sentence was generated.  Drug trends change over
23  time though.  So there have certainly been times
24  when cocaine or heroin or methamphetamine were the
25  most common submissions though.

Page 41

1    Q.  And do you know as you sit here today, if
2  we were to put it in the context of 2023,
3  August 9th, would it change to what --
4       MS. ABSTON:  Objection, form.
5    A.  Currently our most common submission is
6  methamphetamine, which is sent to us or submitted to
7  us from law enforcement.
8    Q.  Does cocaine and heroin remain in the mix
9  though today?
10   A.  They do.
11       MS. ABSTON:  Objection, form.
12   A.  Yes, sir, they do.
13   Q.  All right.  Okay.  So what is a chemical
14  assay?  First of all, am I pronouncing it correct?
15  Is it assay or assay?
16   A.  Assay, yes.  So --
17   Q.  What is a chemical assay?
18   A.  It's a test to determine the identity of a
19  substance.
20   Q.  Okay.  Now, whether it be methamphetamine
21  or whether it be cocaine or heroin, these are all
22  illicit substances to your knowledge, correct?
23       MS. ABSTON:  Objection, form.
24   A.  Yes, sir.
25   Q.  They're not available for sale at

11 (Pages 38 - 41)

1 pharmacies, correct?
2      MS. ABSTON:  Objection, form.
3   A.  They are not, that's correct.
4   Q.  And do you have any opinion as you sit
5 here today as to why the most common substances
6 received for analysis by your office are illicit
7 substances and not prescribed medications?
8      MS. ABSTON:  Objection, form.
9   A.  No.  We only test the things that are
10 submitted to us from the customer, so I don't know
11 what they're confiscating prior to that submission.
12   Q.  So you said that methamphetamine is
13 probably the thing you see the most today.  Do you
14 know what would be the second most common today?
15      MS. ABSTON:  Objection, form.
16   A.  Currently the second most common is
17 fentanyl.
18   Q.  Okay.  And the third most common?
19   A.  Either heroin --
20      MS. ABSTON:  Objection, form.
21   A.  Heroin or cocaine.  They're about equal.
22   Q.  Now, you mentioned fentanyl.  Fentanyl, is
23 it your understanding that fentanyl is a prescribed
24 medication?
25      MS. ABSTON:  Objection, form.

1   A.  Can be, yes.
2   Q.  Is it also your understanding that there
3 is another fentanyl that is an illicit substance?
4   A.  Well, it's the same fentanyl.  It just
5 comes from a different source, yes.
6   Q.  Okay.  And as you sit here today, do you
7 know the fentanyl that you-all analyze, is that the
8 licit fentanyl or the illicit fentanyl?
9      MS. ABSTON:  Objection, form.
10   A.  We -- it would be the illicit or the
11 clandestine fentanyl that is by far the most common
12 submission.
13   Q.  If you were to assign percentages,
14 Dr. Johnson, would you -- can you assign a
15 percentage to illicit fentanyl versus licit
16 fentanyls in what you analyze?
17      MS. ABSTON:  Objection, form.
18   A.  No, it would just be a wild guess, so I
19 would hate to do that on the record.
20   Q.  But your testimony as you sit here today
21 is the vast majority of those are illicit fentanyls,
22 correct?
23      MS. ABSTON:  Objection, form.
24 Mischaracterizes testimony.
25

1   Q.  You can answer.
2   A.  Okay.  Yes.
3   Q.  They are -- the vast majority is illicit
4 fentanyl, correct?
5      MS. ABSTON:  Objection, form.
6   A.  Yes.
7      (Exhibit 6 marked)
8      MR. SHERE:  All right.  Let's move on to
9 Exhibit 6, the first page, Gregg.  Thank you, Gregg.
10 If you could put the full -- yeah.
11   Q.  So this is an article from CBS News,
12 correct?
13   A.  It appears to be, yes.
14   Q.  Okay.  And if you look at the top, it
15 says, "Fentanyl Deaths Soared in Tarrant County Last
16 Year, Analysis Shows," correct?
17   A.  It does.
18   Q.  Okay.  And the article was published on
19 December 22nd, 2021, right?
20   A.  Yes, it looks like it.
21   Q.  Okay.  This seems to validate your earlier
22 statement that fentanyl has been a very prominent
23 drug in your analyses, correct?
24   A.  It has been, yes.
25   Q.  All right.  Let's look at the first

1 paragraph.
2      MR. SHERE:  And if you would go down,
3 Gregg, just a little bit.  Yeah.  And it begins with
4 "Despite receiving."  Yeah, there you go.  If you
5 would enlarge it just a little bit more.  Yeah.
6 It's on that -- yeah, right there.  Okay.  Yeah, we
7 can see it.  All right.
8   Q.  So I'm again going to read this first
9 paragraph.  It says, "Despite receiving new
10 attention in 2021 from families of victims, law
11 enforcement and drug awareness organizations, county
12 records showed as many as 123 deaths connected to
13 fentanyl through November.  That was nearly a
14 30 percent increase over 2020."
15      Do you see that language, Dr. Johnson?
16   A.  I do, yes, sir.
17   Q.  And do you agree with that language in the
18 article?
19      MS. ABSTON:  Objection, form.
20   A.  I don't have any way to know whether
21 that's accurate or not.  I don't know how many
22 deaths were attributed to fentanyl from our office
23 or where they got those numbers.
24   Q.  That's a fair statement.  But as you sit
25 here today, do you have any reason to actively doubt

Page 46

1 those numbers that are stated in the article?
2        MS. ABSTON:  Objection, form.
3     A.  No, I personally don't have any reason to
4 doubt it, no.
5     Q.  Okay.  And do you know if your office was
6 approached by CBS News for any data relating to this
7 article?
8     A.  I don't know, no, sir.
9     Q.  So the language they use -- and again,
10 this is not a technical document, it's a news
11 article -- it uses the term "connected," if you can
12 see, "123 deaths connected to fentanyl," correct?
13     A.  It does say that, yes.
14     Q.  Okay.  So let me ask you this.  I know
15 that the article says "connected to fentanyl," but
16 in your experience as the chief toxicologist for the
17 TCME reporting to the medical examiner's office, did
18 you see a rise in the number of instances where
19 fentanyl was at least present in the toxicology
20 report during the time period in this article, which
21 is 2020 and 2021?
22        MS. ABSTON:  Objection, form.
23     A.  Yes, we -- we had fentanyl on more
24 toxicology reports in this time frame than we did in
25 the years prior to this, yes, sir.

Page 47

1     Q.  Thank you, sir.  And has that continued to
2 the very present, if you know?
3        MS. ABSTON:  Objection, form.
4     A.  We continue to report numerous fentanyl
5 positives, yes.
6        MR. SHERE:  Okay.  All right.  Gregg,
7 let's move on to page 2 of this document.  And if
8 you would go to the fifth paragraph that begins with
9 "The Drug Enforcement Administration."  Right there,
10 yeah.  Do you see it?
11     Q.  Okay.  I'm going to read this, and it says
12 as follows.  "The Drug Enforcement Administration
13 increased seizures of the drug this year, in the
14 form of fake pills, often coming into Texas over the
15 Mexico border.  It took in more than 11,000 pounds,
16 more than double the two previous years combined."
17     Do you see that language, Dr. Johnson?
18     A.  I do, yes, sir.
19     Q.  And as you sit here today, do you have any
20 reason to doubt the veracity or authenticity of the
21 language I just read to you?
22        MS. ABSTON:  Objection, form.
23     A.  No, I don't have any reason to doubt it.
24     Q.  So first, one of the contentions made here
25 is that it's coming into Texas over the Mexican

Page 48

1 border.  Do you see that?
2     A.  I do.
3     Q.  Do you have any reason to doubt that
4 contention?
5        MS. ABSTON:  Objection, form.
6     A.  I do not because I don't know.
7     Q.  Also, it references a term "fake pills."
8 Do you know -- do you have any idea what they meant
9 by "fake pills"?
10     A.  Counterfeit pills that are made to look
11 like something that is legitimate, yes.
12     Q.  Okay.  As a toxicologist, when you find
13 the presence of fentanyl in a decedent's system, are
14 you able to define or estimate or connect whether
15 the fentanyl came from a manufacturer or from a
16 illegitimate source like a fake pill?
17     A.  No, we are not.  Fentanyl is fentanyl
18 regardless of the source.
19     Q.  Thank you, sir.  Now -- okay.  Let's move
20 on.  Let's move on to Exhibit 7.
21        (Exhibit 7 marked)
22        MR. SHERE:  And that's fine, Gregg.  We
23 can focus on the top portion for the beginning.
24     Q.  So were you aware that the TCME website
25 allows anyone to search through the medical

Page 49

1 examiner's case records for roughly the past 20
2 years?
3     A.  No, I actually wasn't aware of that until
4 I saw your exhibit.
5     Q.  All right.  So this is a screenshot of the
6 page from the TCME website where we searched the
7 medical examiner's office case records for all four
8 counties the TCME services that you mentioned
9 earlier from January 1, 2020, to December 31, 2020,
10 where the manner of death is listed as "accident."
11 Do you see us doing that at the top?
12     A.  Yes, that's what it appears to be, yes.
13     Q.  Do you see the date range and "manner of
14 death" field near the top of the page?
15     A.  I do.
16     Q.  Okay.  All right.  Do you have any reason
17 to believe that this data from the TCME's website is
18 accurate?
19     A.  No, I don't know who enters the data and I
20 don't know where the data comes from, so I really
21 wouldn't know.
22     Q.  So you wouldn't know one way either
23 whether it's accurate or inaccurate, correct?
24     A.  Correct.
25     Q.  But given that it is from the TCME's, you

13 (Pages 46 - 49)

1 would assume, for the most part, that it is
2 accurate, correct?
3       MS. ABSTON:  Objection, form.
4       A.  No, I would make no assumptions.  Again, I
5 have no idea who enters this or where the data comes
6 from.
7       Q.  That's a fair statement.  Dr. Johnson, I
8 just don't want to compliment you for no reason, but
9 you're a very good witness.  Anyway, all right.
10 Okay.
11       So would you agree that most deaths
12 investigated by the medical examiner where he or she
13 finds that the cause of death was a drug overdose
14 would be classified as accident in the "manner of
15 death" field?
16       MS. ABSTON:  Objection, form.
17       A.  I don't know, no, sir.
18       Q.  Can you think of other categories that
19 could be listed in the "manner of death" field?
20       MS. ABSTON:  Objection, form.
21       A.  I know of other categories that are
22 possible, yes.
23       Q.  And what would those possible categories
24 be?
25       MS. ABSTON:  Objection, form.

1       A.  To my knowledge, suicide is a category,
2 homicide is a category, and probably natural, but I
3 don't know what they call those.  Would be some sort
4 of category related to a natural death.
5       Q.  Okay.  So here's an interesting.  If you
6 look at the top under, you know, where it says
7 "manner of death, accident," right, at the top?
8       A.  It does, yes, sir.
9       Q.  Okay.  But if you go five downs line (sic)
10 in this -- in this document from the top, there's a
11 cause of death listed which in this case was blunt
12 force trauma, injuries.  Do you see that?
13       A.  Not yet, but I'm looking.  Oh, yes, I do,
14 yes, sir.
15       Q.  Yeah, one, two, three, four, five, six.
16 Do you see that?
17       A.  Yes.
18       Q.  Okay.  As you sit here today, you know, in
19 your -- in your extensive professional opinion, is
20 there a difference between manner of death and cause
21 of death?
22       MS. ABSTON:  Objection, form.
23       A.  I don't know.  That would be a question
24 for a pathologist.
25       MR. SHERE:  Okay.  Okay.  Let's move on to

1 the next page.  Thank you, Gregg.  And stay at the
2 top of the page.
3       Q.  This is some event that took place at 5126
4 Goodman Avenue.  Do you see that the cause of death
5 is listed as, "Acute mixed drug intoxication
6 (cocaine, heroin, and methamphetamine)"?  Do you see
7 that?
8       A.  I do, yes, sir.
9       MS. ABSTON:  Objection, form.
10       Q.  So in a case like this where the cause of
11 death is due to multiple substances, do you know how
12 the medical examiner typically draws the conclusion
13 based on the toxicology report of exactly what
14 caused the death?
15       MS. ABSTON:  Objection, form.
16       A.  I do not, no.
17       Q.  Would it typically be listed in this
18 format, "Acute mixed drug intoxication (cocaine,
19 heroin, and methamphetamine)"?
20       MS. ABSTON:  Objection, form.
21       A.  I don't know if that's typical or if that
22 varies by pathologist.  No, I don't.
23       Q.  Okay.  Now, if you look at the next page
24 and cause of death, and it's one, two, three, four,
25 five, six, seven, eight, nine, ten, eleven,

1 twelve -- about 15 lines down, you look at the cause
2 of death and it says -- let me see where it is.  It
3 says, "Complications of mixed drug intoxication."
4 Do you see that?
5       A.  I do, yes, sir.
6       Q.  Okay.  Do you know the difference between
7 acute mixed drug intoxication versus complications
8 of mixed drug intoxication?
9       A.  No, I don't.
10       Q.  Okay.  Now, you mentioned earlier that if
11 you are present at work, you sign every toxicology
12 report that goes to the medical examiner's office,
13 correct?
14       A.  Yes, sir, that is correct.
15       Q.  Okay.  And would you say it's more common
16 than not to see presence of multiple substances as
17 the medical examiner's referenced in this example we
18 looked at?
19       MS. ABSTON:  Objection, form.
20       A.  Do you mean on our toxicology reports?
21       Q.  Yes.
22       A.  Yes, we more often than not see a -- it's
23 more common to have a case with more than one
24 positive compound, yes.
25       Q.  Okay.  And as a toxicologist, can you

14 (Pages 50 - 53)

Page 54

1 offer an opinion as to the concentration of
2 particular substances like heroin or cocaine in the
3 mixed drug interaction?
4    A. No.
5       MS. ABSTON: Objection, form.
6    A. So toxicologists can help the pathologist
7 understand what those individual substances can do
8 to a person, but related to a specific
9 concentration, no, no one has that information.
10      MR. SHERE: Dr. Johnson, we have been
11 going for an hour. Do you want to take a
12 five-minute break just to freshen up, if you need?
13      MS. ABSTON: Yeah, let's go ahead and take
14 a break. That's perfect.
15      MR. SHERE: All right. Good. So let's go
16 off the record, and we'll see you in five minutes.
17      Thank you, sir.
18      THE VIDEOGRAPHER: We're off the record at
19 11:04 a.m.
20         (Recess from 11:04 to 11:16)
21      THE VIDEOGRAPHER: We are back on the
22 record at 11:16 a.m.
23      MR. SHERE: Thank you, guys. Sorry, just
24 finishing up on a little candy bar.
25 ///

Page 55

1 BY MR. SHERE:
2    Q. Okay. Just one follow-up question,
3 Dr. Johnson. You mentioned just a few minutes ago
4 that you believe that methamphetamine is the most
5 common drug on toxicology reports generated by your
6 lab, correct?
7    A. No.
8       MS. ABSTON: Objection, form.
9    Q. Go ahead.
10   A. During that portion of questioning, we
11 were talking about the seized drugs lab and the
12 solid dose substances that were submitted to the --
13 to our drug chemistry or seized drugs laboratory.
14   Q. Okay. And in that, methamphetamine
15 was the most common?
16      MS. ABSTON: Objection, form.
17   A. Currently, in solid dose form, that's our
18 most frequent submission, yes.
19   Q. Okay. And this was followed by illicit
20 fentanyl, correct?
21      MS. ABSTON: Objection, form.
22   A. Fentanyl, yes, is probably number two.
23 Then it gets a little bit grayer after that.
24   Q. Okay. So let me ask you this. How common
25 is it for you today to see toxicology reports with

Page 56

1 positive results for prescription opioids like
2 oxycodone or hydrocodone?
3       MS. ABSTON: Objection, form.
4    A. Very common.
5    Q. When you say "very common," it happens all
6 the time?
7    A. Yes, sir, it does.
8    Q. And has the instances of positive tests of
9 prescription opioids increased or decreased over
10 time, in your opinion?
11   A. As far as oxycodone is concerned, it's
12 remained constant. We see a tremendous number of
13 tramadol cases. I don't have any specific numbers,
14 but those two specifically have not really changed
15 over time.
16   Q. Okay. And if you compare positive results
17 for prescription opioids versus illicit substances
18 like heroin, methamphetamine, or illicit fentanyl,
19 which do you think happens more?
20      MS. ABSTON: Objection, form.
21   A. Well, on the tox side from a blood
22 specimen, we don't know the source of any compound.
23 So we see hydrocodone and tramadol and fentanyl most
24 often. I don't know the source of any of those
25 three.

Page 57

1    Q. Okay. Would you tend to find hydrocodone
2 more or fentanyl more?
3    A. They're pretty close to even at this
4 point.
5    Q. Okay. Now, Dr. Johnson, given your
6 leadership position with TCME, are you involved at
7 all with the drafting of the TCME budget?
8    A. I am not, no, sir.
9    Q. Okay. You have no responsibilities or
10 connection with the budget, budgetary process?
11   A. I request funds for my laboratory
12 sections. Those requests go through two layers
13 above me, and then at that level they're submitted
14 to the county. So I do make annual requests for
15 three different categories of funding. What happens
16 with those requests depends on a lot of steps above
17 me.
18      (Exhibit 8 marked)
19   Q. Okay. Let's look at Exhibit 8 now. And I
20 promise you, Dr. Johnson, this is one of those
21 exhibits where it's a lot more voluminous than we're
22 going to get into. We'll wait for Gregg to put
23 it -- the first picture on the screen.
24      CONCIERGE: It may take a moment to load.
25 Please be patient.

15 (Pages 54 - 57)

1    MR. SHERE: Sure. Thank you, sir.
2    Q. All right. If you'll look at this
3 exhibit, Dr. Johnson, do you see that this is the
4 2023 approved budget of the Tarrant County medical
5 examiner's office?
6    A. Yes, sir, I do.
7    Q. And it's prepared by the Tarrant County
8 budget and risk management department, correct?
9    A. That appears to be the case, yes.
10    Q. And it is dated September 13, 2022,
11 correct?
12    A. Yes, sir.
13    MR. SHERE: All right. Okay. Gregg, this
14 is where you're going to earn your keep today.
15 Let's go to page 185 of this document. And the
16 heading will be "Medical Examiner." Oh, you're very
17 close to it, yeah. There you go. Wonderful. Great
18 job. Okay. Okay.
19    MS. ABSTON: Dr. Johnson, have you found
20 it?
21    THE WITNESS: I have, yes, ma'am.
22    MS. ABSTON: Okay.
23    Q. Very good. Okay. This -- the page that
24 you're seeing, page 185, is the medical examiner --
25 let's see. This is the Tarrant County medical

1 examiner's section of the budget, correct?
2    A. It does appear to be, yes, sir.
3    Q. Okay. And if you go to the bottom of this
4 first page, you'll see a title called "Recent
5 Accomplishments." Do you see that?
6    A. I do.
7    Q. Now, if you go to the next page, you will
8 see -- and now let me tell you exactly where you'll
9 see that. It's three bullet points from the bottom.
10 "Transition medical examiners to full-time Tarrant
11 County employees." Do you see that?
12    A. I do, yes.
13    Q. Okay. First of all, do you agree with
14 that bullet point?
15    MS. ABSTON: Objection, form.
16    A. I don't know. So I don't -- I assume
17 they're talking about the pathologists maybe. That
18 really didn't have anything to do with my
19 laboratory.
20    Q. That's -- and that's perfectly fair.
21    But my question to you is, do you know if
22 Tarrant County medical examiners were not full-time
23 employees at any point?
24    MS. ABSTON: Objection, form.
25    A. To my knowledge, they were contract

1 employees prior to -- I guess prior to this
2 announcement in the budget.
3    Q. Okay. And do you know at what time did
4 the Tarrant County medical examiners referenced here
5 became full-time employees?
6    A. I don't, no, sir.
7    Q. Okay. Probably around the time that this
8 report came out?
9    MS. ABSTON: Objection, form.
10    A. That is a possibility, or it could have
11 happened before that. I really don't know.
12    Q. Okay. Looking further down, you see a
13 section called "Division Objectives" on the same
14 page?
15    A. Yes, sir.
16    Q. Okay. Now, if you look at the next page,
17 which is -- okay. Right there at the top, let's
18 see. The first objective listed is, "To perform all
19 forensic laboratory testing as part of a formal
20 inquest including identification of the decedent,
21 histology, toxicology, and specialized chemistry."
22    Did I read that correctly?
23    A. You did, yes.
24    Q. Do you have any reason to doubt that
25 bullet point?

1    A. No, I have no reason to doubt it.
2    Q. Okay. And let me ask you this. As chief
3 toxicologist, are you the person primarily
4 responsible for ensuring that this objective is met?
5    A. No. So I would be 25 percent of this
6 objective.
7    Q. Wonderful. Who would be 75 percent?
8    A. Oh, the histologist, the laboratory that
9 they send specialized chemistries to, and then the
10 pathologist who is really in charge of the whole
11 bullet.
12    Q. Okay. And I know we've all watched crime
13 dramas on TV, but what exactly is a formal inquest?
14    A. That is a very fancy phrase for an
15 autopsy.
16    Q. Okay. So that is basically an autopsy.
17    A. Yes, sir.
18    Q. And do you think that as far as your
19 understanding goes that the lab has met this
20 objective to perform all forensic laboratory testing
21 as part of a formal inquest?
22    A. On the -- specifically related to
23 toxicology, yes. When requested, we -- we are
24 comprehensive in nature and we are looking for
25 anything and everything that may be there.

Page 62

1    Q.  Very good.  And are you aware of anytime
2 the laboratory did not meet this objective?
3    A.  Not toxicology, no.
4    Q.  Okay.  For the rest you don't know?
5    A.  That's correct.  I would not have any
6 knowledge about the other three segments.
7    Q.  All right.  Okay.  Now I want to draw your
8 attention --
9       MR. SHERE:  And Gregg, you don't have to
10 mess with the document.  It's perfect the way it is.
11    Q.  The "Key Performance Indicators," do you
12 see that at the -- more at the bottom of the page?
13    A.  I do, yes, sir.
14    Q.  So looking at that, it looks like the
15 number of toxicology cases in 2021 were 4,903, and
16 the estimated number of toxicology cases for 2022
17 and 2023 are 5,000 and 5,200, correct?
18    A.  Yes, sir.
19    Q.  As chief toxicologist, did you provide
20 this data to the medical examiner's office?
21    A.  I did not, no.  That would have been the
22 technical administrative director putting these
23 numbers together.
24    Q.  Okay.  But the chart indicates that the
25 number of toxicology cases are projected to increase

Page 63

1 in 2022 and 2023, correct?
2    A.  Yes, sir, that is correct.
3    Q.  And since your tenure with TCME which goes
4 back, as we discussed earlier, for 12 years, did you
5 ever feel the laboratory did not have the personnel
6 or resources to handle the number of cases it was
7 assigned?
8    A.  Yes, sir.  That is currently accurate and
9 has been for about five years now.
10    Q.  Okay.  So let's begin with that.  Was it
11 not accurate more than five years ago?
12    A.  No, we were -- we had sufficient staff
13 when I started to complete all testing in every case
14 without any real concern.  Our caseload has nearly
15 doubled in those 12 years, and our number of staff
16 has only increased by one, I think.  So we're --
17 we're way behind where we should be as far as
18 staffing is concerned.
19    Q.  Okay.  So ideally, how much would you like
20 to see your staffing increase by?
21    A.  If we added five additional toxicologists,
22 we would be right around the average for
23 laboratories around the country that do the number
24 of cases that we work.
25    Q.  Thank you, sir.  Now, you said you weren't

Page 64

1 involved in the budgetary process -- but anyway,
2 skip that.  Let's move on to page 188, which is the
3 next page.
4       MR. SHERE:  Thank you, Gregg.
5    Q.  Okay.  All right.  So first, near the top
6 of the page it says that the total approved budget
7 for 2023 was $16,050,129, correct?
8    A.  Yes, sir, that's what it says.
9    Q.  And it looks like the budget went up by
10 about 10 percent over the previous year, 2022,
11 correct?
12    A.  Yes, sir.
13    Q.  Also, if you look at the chart, it appears
14 that 85 percent of total budget is for personal
15 costs, correct?
16    A.  That's what it says, yes.
17    Q.  The next largest budget category is
18 "Other" at 8.92 percent, correct?
19    A.  Yes.
20    Q.  As you sit here today, do you have any
21 idea what would be included in that category?
22    A.  I do not.  I was wondering that myself as
23 I looked at the pie chart.
24    Q.  Okay.  So as you sit here today, you have
25 no idea what that "Other" category is?

Page 65

1    A.  I don't, no, sir.
2    Q.  Okay.  And I know you're not very involved
3 in the budgetary process, but do you know if the
4 TCME or the chemistry and toxicology laboratory
5 specifically receives funding outside the funding it
6 receives from the county?
7    A.  No.  Our budget for supplies and
8 consumables and capital equipment and education and
9 training all comes from the county.
10    Q.  Thank you, sir.  Now, in addition to your
11 work with the TCME as chief toxicologist, you have
12 authored or coauthored publications related to the
13 field of toxicology, correct?
14    A.  I have, yes, sir.
15       MR. SHERE:  Okay.  So let's look at
16 Exhibit 9 which is the last exhibit, folks.  Gregg,
17 your work, at least for me, is almost done.
18       (Exhibit 9 marked)
19    Q.  Okay.  And I see by the date on this, this
20 is when you were with the federal government,
21 correct?
22    A.  Yes, sir, it was.
23    Q.  Specifically the Federal Aviation
24 Administration, correct?
25    A.  Yes.

17 (Pages 62 - 65)

1  Q.  Okay.  And was this report sponsored by
2 the FAA?
3  A.  It was, yes, sir.
4  Q.  Okay.  Do you remember, broadly speaking,
5 what this report is about?  I know it's 13 years
6 old, but --
7  A.  I do in general terms, yes.
8  Q.  And what was it generally about?
9  A.  So it's kind of a unique situation to an
10 aviation accident because when a plane crashes into
11 the ground at high speed, there's often not a wide
12 selection of tissues available for testing.  So we
13 didn't get blood very often like we do currently at
14 the medical examiner's office.
15       So the question that was frequently asked
16 is, if you obtain a concentration of a drug in a
17 tissue, can you relate that in any way to what the
18 blood concentration may have been at the time of
19 death.  So we did a lot of distribution studies for
20 various types of compounds to determine if you could
21 estimate a blood concentration from a tissue
22 concentration from the laboratory.
23  Q.  I see.  Thank you.  And your recollection
24 is impeccable.  Okay.  So I see three other names
25 listed under the title.  There's Sabra Botch, Arvind

1 Chaturvedi, and Russell Lewis, correct?
2  A.  Yes, sir.
3  Q.  Did they also coauthor this report?
4  A.  They did, yes.
5  Q.  And were you the lead drafter of this
6 report?
7  A.  I was not.  That was Sabra.
8  Q.  Sabra.  And you were number two on the
9 list, right?
10  A.  Yes, sir.
11       MR. SHERE:  All right.  Okay.  Let's turn
12 to page 3 of this report.  Right there.  Thank you,
13 sir.  Thank you, Gregg.
14  Q.  Okay.  The second sentence in the
15 "Introduction" section, okay, it states, "The
16 postmortem distribution of oxycodone has not been
17 fully characterized, particularly at sublethal
18 levels."  Okay?  Do you see that?
19  A.  I do.
20  Q.  Okay.  Now, oxycodone, of course, is a
21 prescription opioid, correct?
22  A.  It is.
23  Q.  All right.  Okay.  So when it's talking
24 about postmortem distribution of oxycodone, is that
25 referring to the concentration of oxycodone in the

1 decedent's body?
2  A.  It is, in various fluids and tissues from
3 the body, yes.
4  Q.  Okay.  And were there any specific
5 concerns relating accurately measuring the
6 distribution of oxycodone or any other substance in
7 the decedent's body that this report was supposed to
8 address?
9  A.  Yes.  It was specifically meant to address
10 the question of can you estimate a blood
11 concentration from a tissue concentration when
12 there's no blood available for testing.  So that was
13 the goal.  We didn't believe that was possible, but
14 we wanted to make sure that we were accurate, so we
15 began this study.
16  Q.  And the sentence that I read out to you
17 today, the second sentence from the introduction, is
18 that still true today?
19  A.  There are a few publications that have
20 done -- have looked at the distribution of oxycodone
21 and other drugs in fluids and tissues.  So I don't
22 know that we were the first, and we certainly
23 haven't been the last over the last 13 years.  But
24 at the time, there weren't many to look at or
25 reference.

1  Q.  Thank you, sir.  And Dr. Johnson, do you
2 know if there was something particular about
3 oxycodone, either from a forensic chemistry or
4 toxicological standpoint, that made it difficult to
5 measure the postmortem distribution of that drug?
6  A.  No, nothing specific to oxycodone.  We did
7 encounter it frequently, so the question was
8 consistent from investigators, but we certainly did
9 the same work on other drugs.  It wasn't specific to
10 oxycodone.
11  Q.  Okay.  Now, you went to work for the TCME
12 a year after this was published, correct?
13  A.  I did, yes, April of 2011.
14  Q.  Okay.  And do you know if during your
15 tenure with TCME, did any other toxicologist you
16 worked with or you yourself express concerns about
17 whether the lab could accurately measure the
18 distribution of oxycodone in postmortem toxicology
19 reports?
20       MS. ABSTON:  Objection, form.
21  A.  No.  Completely different question at the
22 medical examiner's office than at the FAA because of
23 the specimens available for testing.  We very
24 frequently have blood available for testing at the
25 ME's office, where it was not very common dealing

Page 70

1 with plane crashes.
2    Q.  And the reason for that is self-evident,
3 that in one case it's an airplane crash, the other
4 is a decedent who's --
5    A.  Yes, sir, that is correct.
6    Q.  All right.  Okay.  And then on the same
7 page under "Conclusion," which is at the bottom of
8 the page, it says that, "The blood concentrations
9 found indicate that the oxycodone in these cases
10 ranged from therapeutic to above therapeutic, but
11 all were below lethal levels."  Do you see that?
12    A.  I do.
13    Q.  And of course that statement is accurate,
14 correct?
15    A.  I don't remember the -- all the
16 concentrations specifically, but I hope so.
17    Q.  Okay.  And the next line says that,
18 "Tissue/fluid to blood distribution coefficients
19 were found to have large coefficients of variation
20 (ranging from 26 to 188 (sic) percent), thereby
21 rendering them unreliable for estimating a blood
22 oxycodone concentration from a tissue value when no
23 blood is available for analysis."
24    Do you see that?
25    A.  I do, yes.

Page 71

1    Q.  And do you have any reason to doubt that
2 statement?
3    A.  No.  That was the hypothesis going in.  We
4 just needed data to show that we were right when we
5 told people that you cannot do that.
6    Q.  Now, again, as we discussed, this report
7 is about 13 years ago, but do you know of any
8 advances in technology that makes a more accurate
9 analysis of the concentration of oxycodone in body
10 tissue possible today?
11    A.  No.  There are certainly different
12 instrumentation platforms available to do that
13 testing, but the accuracy of the test has not
14 changed over these number of years.
15    Q.  All right.  We can put away the exhibits
16 now.  I just have a few more questions to ask you.
17    By the way, Dr. Johnson, are you familiar
18 with an employee at the TCME's office named Lisa
19 Garcia Nunez, a records manager at TCME?
20    A.  I was going to say that I believe she's
21 the records custodian, yes.
22    Q.  Okay.  Did you ever have the opportunity
23 to work with Mr. Nunez?
24    A.  Ms., and no.
25    Q.  Okay.  And as you sit here today, you

Page 72

1 wouldn't know what her responsibilities were as the
2 records manager, correct?
3    A.  That's correct, I do not know.
4    Q.  Now, Ms. Nunez recently gave a deposition
5 that was undertaken by Albertsons' counsel, who is
6 also present here.  And we don't have the transcript
7 or the report, but I'm going to ask you to assume
8 some questions I'm going to ask you and just see
9 what you think about it.
10    Ms. Nunez says -- and I want you to assume
11 that this is true -- that in her role with TCME she
12 codes the medical examiner cases with manner and
13 cause of death.
14    Do you recall if we discussed manner and
15 cause of death for --
16    MS. ABSTON:  I'm going to -- I'm going to
17 object here to a lot of different aspects of this
18 line of questioning, but are you asking the witness
19 about another witness's deposition without showing
20 any sort of testimony and asking for him to give an
21 opinion about that, about your summary of her
22 testimony?
23    MR. SHERE:  Ms. Abston, that was my plan.
24    MS. ABSTON:  Okay.  Because I don't -- I'm
25 going to have a problem with that, but unless you

Page 73

1 have the transcript in front of you and you want to
2 ask him.  I would still have a problem with that too
3 because he's already established that he doesn't do
4 any work with this person, so --
5    MR. SHERE:  Actually, I'll tell you what.
6 I'll let you have the argument on that.  I'll move
7 on.
8    MS. ABSTON:  Okay.  Thank you.
9    MR. SHERE:  Her testimony speaks for
10 itself.  All right.  Okay.
11    Q.  Now, Dr. Johnson, as a Ph.D. in analytic
12 chemistry, do you have an understanding of the term
13 "epidemic"?
14    A.  Not -- that had nothing to do with my
15 education or training, no.  As a layperson, I think
16 I know what an epidemic is.
17    Q.  Okay.  And what is your understanding of
18 what is an epidemic?
19    A.  Some sort of crisis related to an issue
20 that's -- I don't know how to phrase it, but it's
21 bigger than -- it's not random or rare.  It's more
22 constant and consistent than that.
23    Q.  Okay.  And are epidemics typically related
24 to a communicable disease?
25    MS. ABSTON:  Objection, form.

19 (Pages 70 - 73)

Page 74

1    A.  I don't know.
2    Q.  All right.  Now, as you sit here today, do
3  you believe that Tarrant County is currently
4  experiencing an opioid epidemic?
5        MS. ABSTON:  Objection, form.
6    A.  Again, I don't know.  That's outside of
7  what I -- what I do.
8    Q.  So as you sit here today or if you're
9  asked to testify at trial, you will have no opinions
10 on whether Tarrant County is currently experiencing
11 an opioid epidemic, correct?
12       MS. ABSTON:  Objection, form.
13   A.  That is correct.  I would defer to some
14 sort of epidemiologist or public health expert.
15   Q.  All right.  Very good.  And as I said
16 earlier, you're a very careful and very good
17 witness, so let's just roll with that.  Okay.  So
18 let me ask you a slightly broader question.
19       Do you believe that Tarrant County, Texas,
20 is currently or has ever experienced an opioid
21 crisis?
22   A.  Again, I would answer the same way and
23 simply say I don't know.  I, first of all, don't
24 know the difference between crisis and epidemic, so
25 at the base of the question, I'm unfamiliar.

Page 75

1    Q.  Excellent.  And given your answer, is it
2  fair to say that as you sit here today or if you are
3  asked to testify at trial, you will not offer any
4  opinions on whether Tarrant County is currently or
5  has ever experienced an opioid crisis, correct?
6        MS. ABSTON:  Objection, form.
7    A.  That would be -- that is how I would
8  answer the question, correct.
9    Q.  All right.  Next question.  As you sit
10 here today, do you believe that pharmacies are in
11 any way responsible for the opioid crisis or opioid
12 epidemic in Tarrant County?
13       MS. ABSTON:  Objection, form.
14   A.  I don't know.
15   Q.  Okay.  So as you sit here today, you have
16 no knowledge as to whether pharmacies are
17 responsible for any opioid-related problem in
18 Tarrant County, correct?
19   A.  That is correct.  I don't know.
20   Q.  Okay.  And again, if you were asked to
21 testify at trial, you will not offer any opinions on
22 whether a pharmacy is responsible for any opioid
23 problem in Tarrant County, Texas, correct?
24       MS. ABSTON:  Objection, form.
25   A.  Yes, sir.

Page 76

1    Q.  Okay.  Now, do you know that Kroger and
2  Albertsons are two pharmacies that have been named
3  in this lawsuit by Tarrant County?
4    A.  No.  I'm trying to remember reading
5  through the deposition notice, and I don't remember
6  seeing those names.
7    Q.  Okay, which is fine, which is perfectly
8  fine.  So as you sit here today, again, because you
9  clarified at the very beginning of your deposition,
10 you don't know what the allegations made in this
11 case are or the allegations specifically against
12 Kroger and Albertsons, correct?
13   A.  Correct.
14   Q.  Okay.  Have you ever personally shopped at
15 a Kroger?
16   A.  I'm sure I have.  I would not be able to
17 tell you how many times or when, but I bet I've been
18 in a Kroger at some point, yes, sir.
19   Q.  And what about Albertsons?
20   A.  I don't know about Albertsons.  We have a
21 Kroger much closer to our house than we have an
22 Albertsons.
23   Q.  Okay.  And do you have any opinions about
24 Kroger?
25   A.  I do not.

Page 77

1    Q.  All right.  Have you ever had a
2  prescription filled at a Kroger or a Albertsons?
3        MS. ABSTON:  Objection, form.  We're not
4  going to get into talking about HIPAA-protected,
5  personal health information here.  So I'm going to
6  object to this entire line of questioning and we're
7  not answering questions about personal,
8  HIPAA-protected health information.
9    Q.  Okay.  So, you know, we discussed the role
10 of pharmacies in any opioid-related problem in
11 Tarrant County, and you said that as you sit here
12 today you have no opinions about that fact and you
13 would not offer any opinion at trial, correct?
14       MS. ABSTON:  Objection, form.
15   A.  Correct, that's what I said.
16   Q.  And the same would apply if anyone asked
17 you any questions about Kroger or Albertsons and
18 their role in the opioid problem in Tarrant County,
19 that question at trial, you would have no opinions,
20 correct?
21       MS. ABSTON:  Objection, form.
22   A.  That is correct.
23   Q.  And has anyone at the medical examiner's
24 office told you that an opioid dispensed by Kroger
25 or Albertsons was a cause of death in Tarrant

20 (Pages 74 - 77)

Page 78

1 County, Texas?
2        MS. ABSTON:  Objection, form.
3     A.  No.
4        MR. SHERE:  Dr. Johnson, I really thank
5 you for your time and attention and the detail with
6 which you answered these questions.  I have no
7 further questions at this point.  I would now pass
8 it on to Alexandra for Albertsons and then to Alex,
9 but my job at the moment is done.  And again, I
10 thank you, sir.
11        THE WITNESS:  I thank you.
12        E X A M I N A T I O N
13 BY MS. LAGOS:
14     Q.  Dr. Johnson, it's nice to meet you.  I'm
15 Alexandra Lagos, counsel for Albertsons.
16        Moments ago in your deposition, you
17 testified that you have no opinions about Kroger.
18 I just want to confirm, you also have no -- do you
19 agree that you have no opinions -- let me rephrase
20 this question.  Do you have any opinions about
21 Albertsons?
22        MS. ABSTON:  Objection, form.
23     A.  No, ma'am, I do not.
24        MS. LAGOS:  Okay.  I don't think I have
25 any further questions for you at this time,

Page 79

1 Dr. Johnson.  Thank you very much for your time.  I
2 will now pass the witness to plaintiff.
3        MS. ABSTON:  Okay.  Do y'all mind giving
4 us five minutes?
5        MS. LAGOS:  Absolutely.
6        MR. SHERE:  No, no problem at all.
7        MS. LAGOS:  Take five minutes, go off
8 record and take a break.  Thanks.
9        THE VIDEOGRAPHER:  We're off the record at
10 11:45 a.m.
11        (Recess from 11:45 to 11:51)
12        THE VIDEOGRAPHER:  We're back on the
13 record at 11:51 a.m.
14        MS. ABSTON:  Okay.  And plaintiffs will
15 not have any questions today or any redirect, but
16 Dr. Johnson, we want to thank you not only for your
17 time today but for your service to Tarrant County
18 and all the citizens of Tarrant County and the
19 community.  We really appreciate you and we wish you
20 the best.
21        THE WITNESS:  Thank you, guys.
22        MR. SHERE:  Same from us too.
23        Hey, Karen, do you have our typical
24 request from Kroger?
25        THE VIDEOGRAPHER:  One moment.  We're off

Page 80

1 the record at 11:52 a.m.
2
3        (Deposition concluded at 11:52 a.m. CDT)
4              -oOo-
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 81

1     IN THE UNITED STATES DISTRICT COURT FOR THE
       NORTHERN DISTRICT OF OHIO
2            EASTERN DIVISION
3 IN RE NATIONAL PRESCRIPTION )
   OPIATE LITIGATION          )
4                             )  MDL No. 2804
                              )
5 This Document Relates To:  )  Case No. 17-md-2804
   Track Nine: Tarrant County, )
6 Texas                       )
                              )
7 (Case No. 1:18-op-45274-DAP))
   _____)
8
       REPORTER'S CERTIFICATE
9 REMOTE VIDEOTAPED DEPOSITION OF
       DR. ROBERT JOHNSON
10        AUGUST 9, 2023
11     I, KAREN L. SHELTON, a Certified Shorthand
12 Reporter in and for the State of Texas, hereby
13 certify to the following:
14     That the witness, DR. ROBERT JOHNSON, was
15 duly sworn by the officer and that the transcript of
16 the oral deposition is a true record of the
17 testimony given by the witness;
18     I further certify that pursuant to FRCP
19 Rule 30(e) that the signature by the deponent:
20     ___ was requested by the deponent or a
21 party before the completion of the deposition and is
22 to be returned within 30 days from date of receipt
23 of the transcript.  If returned, the attached Errata
24 contains any changes and the reasons therefor;
25     _X_ was not requested by the deponent or a

21 (Pages 78 - 81)

Page 82

1 party before the completion of the deposition.
2      I further certify that I am neither
3 counsel for, related to, nor employed by any of the
4 parties or attorneys in the action in which this
5 proceeding was taken, and further that I am not
6 financially or otherwise interested in the outcome
7 of the action.
8
9      Certified to me this 15th day of
10 August, 2023.
11
12
13
14      _Karen L. Shelton_
     Karen L. Shelton, CSR, RDR, CRR
15      TX CSR 7050 Exp: 10/31/23
     Veritext Legal Solutions
16      Firm No. 571
     300 Throckmorton Street
17      Suite 1600
     Fort Worth, Texas 76102
18      (817) 336-3042  (800) 336-4000
19
20
21
22
23
24
25

Page 83

1      Veritext Legal Solutions
     1100 Superior Ave
2      Suite 1820
     Cleveland, Ohio 44114
3      Phone: 216-523-1313
4
   August 22, 2023
5
   To: ALEX ABSTON
6
   Case Name: National Prescription Opiate Litigation - Track 9 (Tarrant
7 County) v.
8 Veritext Reference Number: 6024054
9 Witness: Dr. Robert Johnson     Deposition Date: 8/9/2023
10
   Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript. Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change. Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
shown
17
   above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 84

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

1
2
3    ASSIGNMENT REFERENCE NO: 6024054
   CASE NAME: National Prescription Opiate Litigation - Track 9
(Tarrant County) v.
   DATE OF DEPOSITION: 8/9/2023
4    WITNESS' NAME: Dr. Robert Johnson
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7    I have made no changes to the testimony
   as transcribed by the court reporter.
8
9 Date     Dr. Robert Johnson
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
   They have read the transcript;
13    They signed the foregoing Sworn
     Statement; and
14    Their execution of this Statement is of
     their free act and deed.
15
   I have affixed my name and official seal
16
this _____ day of _____, 20____.
17
   _____
18    Notary Public
19    _____
   Commission Expiration Date
20
21
22
23
24
25

Page 85

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

1
2
3    ASSIGNMENT REFERENCE NO: 6024054
   CASE NAME: National Prescription Opiate Litigation - Track 9
(Tarrant County) v.
   DATE OF DEPOSITION: 8/9/2023
4    WITNESS' NAME: Dr. Robert Johnson
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7    I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8 well as the reason(s) for the change(s).
9    I request that these changes be entered
   as part of the record of my testimony.
10
   I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13
Date     Dr. Robert Johnson
14
   Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
   They have listed all of their corrections
18      in the appended Errata Sheet;
   They signed the foregoing Sworn
19      Statement; and
   Their execution of this Statement is of
20      their free act and deed.
21    I have affixed my name and official seal
22 this _____ day of _____, 20____.
23    _____
   Notary Public
24    _____
25    Commission Expiration Date

22 (Pages 82 - 85)

Page 86

1          ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2          ASSIGNMENT NO: 6024054
3   PAGE/LINE(S) /      CHANGE        /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____   _____
20  Date          Dr. Robert Johnson
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23      _____
        Notary Public
24
        _____
25      Commission Expiration Date