# EXHIBIT 52

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
    IN RE:  NATIONAL PRESCRIPTION   ) MDL No. 2804
    OPIATE LITIGATION               )
 4                                  )
                                    )
 5  THIS DOCUMENT RELATES TO:       )
    Track Nine: Tarrant County,     ) Case No.: 17-md-2804
 6  Texas                           )
                                    )
 7                                  )
    (Case No. 1:18-op-45274-DAP)    ) Judge Dan Aaron Polster
 8  -------------------------------------------------------
 9            ORAL AND VIDEOTAPED DEPOSITION OF
                     LUANN PELLETIER
10                    JULY 27, 2023
                (REPORTED REMOTELY VIA ZOOM)
11  -------------------------------------------------------
12
13           ORAL AND VIDEOTAPED, VIA ZOOM VIDEOCONFERENCE,
14  DEPOSITION OF LUANN PELLETIER, produced as a witness at
15  the instance of the Defendants and duly sworn, was taken
16  in the above-styled and numbered cause on Thursday,
17  July 27, 2023, from 9:06 a.m. to 3:39 p.m., before Kari
18  Behan, CSR, RPR, CRR, a Texas certified machine
19  shorthand reporter, with the witness participating
20  remotely, pursuant to the Federal Rules of Civil
21  Procedure and the provisions stated on the record
22  herein.
23
24
25  Job No. 6012001
```

Page 2

```
 1            A P P E A R A N C E S
 2
    FOR THE PLAINTIFF (REMOTELY):
 3
      ALEX ABSTON, ESQ.
 4      - and -
      SADIE TURNER, ESQ.
 5      - and -
      EVAN M. JANUSH, ESQ.
 6      - and -
      LEILA AYACHI, ESQ.
 7    10940 W. Sam Houston Parkway N.
      Suite 100
 8    Houston, Texas 77064
      (281) 748-7693
 9    alex.abston@lanierlawfirm.com
      sadie.turner@lanierlawfirm.com
10    evan.janush@lanierlawfirm.com
      leila.ayachi@lanierlawfirm.com
11
12
    FOR THE DEFENDANTS, THE KROGER CO., KROGER LIMITED
13  PARTNERSHIP I, KROGER LIMITED PARTNERSHIP II, KROGER
    TEXAS LP (REMOTELY):
14
      CHRIS FOX, ESQ.
15    BOWLES RICE LLP
      125 Granville Square
16    Suite 400
      Morgantown, West Virginia 26501
17    (304) 285-2500
      cfox@bowlesrice.com
18
19
    FOR THE DEFENDANT, ALBERTSONS (REMOTELY):
20
      GREGORY FRANKLIN, ESQ.
21    GREENBERG TRAURIG, LLP
      2200 Ross Avenue
22    Suite 5200
      Dallas, Texas 75201
23    (214) 665-3641
      gregory.franklin@gtlaw.com
24
25
```

Page 3

```
 1  APPEARANCES (CONTINUED):
 2  ALSO PRESENT:
 3    Mark C. Kratovil, Esq.
        Tarrant County District Attorney's Office
 4
 5  VIDEOGRAPHER:
 6    Don Harris
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1           - - -
           I N D E X
 2           - - -
 3  EXAMINATION OF LUANNE PELLETIER          PAGE
 4
 5  BY MR. FRANKLIN............................  8
 6  CHANGES AND SIGNATURE......................145
 7  REPORTER'S CERTIFICATION..................147
 8           * * *
 9         E X H I B I T S
10  EXHIBITS        DESCRIPTION           PAGE
11  Exhibit 1  Third Amended Notice of      10
             Deposition of Luann Pelletier
12
    Exhibit 2  Certificate of Achievement,   50
13           Luann Pelletier, Overview of
             Opiate Treatment,
14           TARRANT_00835959
15  Exhibit 3  Drug Test Charts,            68
             TARRANT_00709178
16
    Exhibit 4  E-mail, Subject: RE: Contract  104
17           Monitoring Time,
             TARRANT_00836209 through
18           00836213
19  Exhibit 5  Comprehensive Annual Financial  109
             Report, Fiscal Year Ended
20           August 31, 2012,
             TARRANT_00836214 through
21           00836315
22  Exhibit 6  Single Audit Report, August   111
             31, 2012, TARRANT_00836316
23           through 00836333
24
25
```

Page 5

```
 1  EXHIBITS (CONTINUED):
 2  Exhibit 7  Contract Monitoring Schedule,   113
             Fiscal Year 2011,
 3           TARRANT_00895677, Confidential
 4  Exhibit 8  E-mail, TARRANT_00895676,      114
             Confidential
 5
    Exhibit 9  E-mail, TARRANT_00895617,      128
 6           Confidential
 7  Exhibit 10  Pelletier Notes,             130
             TARRANT_00895618 and 00895619
 8
    Exhibit 11  E-mail, Subject: RE: FY 2016   140
 9           JABG Grant Application
             Commect, TARRANT_00709177,
10           Confidential
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

1       PROCEEDINGS:
2       (Thursday, July 27, 2023, 9:06 a.m.)
3       THE VIDEOGRAPHER:  On the record at
4 9:06 a.m.  My name is Don Harris, representing Veritext.
5 The date is July 27th, 2023.  Please note that this
6 deposition is being conducted virtually.  Quality of
7 recording depends on the quality of camera and Internet
8 connection of participants.  What is seen from the witness
9 and heard on screen is what will be recorded.  Audio and
10 video recording will continue to take place unless all
11 parties agree to go off the record.
12       This is the video-recorded deposition of
13 Luann Pelletier, taken by counsel for the defendant in the
14 matter of National Prescription Opiate Litigation, Track
15 9, Tarrant County, Texas, filed in the United States
16 District Court for the Northern District of Ohio, Eastern
17 Division, Case No. 1:18-0E-45274-DAP. The witness is
18 located in Winder, Georgia.
19       Attorneys, please state your appearance.
20       MR. FRANKLIN:  Good morning.  Gregory
21 Franklin, an attorney at Greenberg Traurig, representing
22 the defendant, Albertsons.
23       MS. AYACHI:  Good morning.  Leila Ayachi,
24 representing Tarrant County from Lanier Law Firm, along
25 with Alex Abston and Sadie Turner from my firm.

1       THE COURT REPORTER:  Okay.  Ms. Pelletier,
2 would you please raise your right hand?
3       THE WITNESS:  (Witness complies.)
4       THE COURT REPORTER:  Do you solemnly swear
5 the testimony --
6       MR. FRANKLIN:  Before we begin, I believe
7 there's another attorney here from Bowles Rice that needs
8 to make an appearance.
9       MR. FOX:  Yes.  Chris Fox from Bowles Rice
10 for Albertson [sic] also.
11       THE COURT REPORTER:  Thank you.
12       MR. KRATOVIL:  And I'm Mark Kratovil.  I'm
13 with the Tarrant County Criminal District Attorney's
14 Office.  We serve as legal counsel for all Tarrant County
15 employees and departments.
16       THE COURT REPORTER:  Okay.  Ma'am, would you
17 please raise your right hand?
18       THE WITNESS:  (Witness complies.)
19       THE COURT REPORTER:  Do you solemnly swear
20 the testimony you're about to give will be the truth, the
21 whole truth, and nothing but the truth, so help you God?
22       THE WITNESS:  I do.
23       THE COURT REPORTER:  Thank you.
24       LUANNE PELLETIER,
25 after having been first duly sworn by the above-mentioned

1 Certified Court Reporter, was examined and testified as
2 follows:
3       EXAMINATION
4 BY MR. FRANKLIN:
5       Q.  Good morning, Ms. Pelletier.
6       A.  Morning.
7       Q.  Could you please state your name for the record?
8       A.  Luann Pelletier.
9       Q.  Again, Ms. Pelletier, my name is Gregory
10 Franklin, and I'm an attorney with Greenberg Traurig, and
11 I represent the Albertson defendants.  Also on the call,
12 we have a colleague of mine, Mr. Chris Fox, and he
13 represents Kroger as a defendant.
14       And as a point of clarification, as we go
15 through the process today, if I refer to "Defendants," I
16 am referring to both Albertsons and Krogers [sic].
17       You understand?
18       A.  I understand.
19       Q.  Awesome.
20       Well, we've noticed your deposition here
21 today because I understand that you used to work for the
22 Tarrant County Juvenile Services.  And it's our
23 understanding that Tarrant County Juvenile Services has
24 been impacted -- allegedly impacted by the opioid
25 challenges in -- in Tarrant County.

1       MR. FRANKLIN:  I'm going to take a second
2 and test out this exhibit share.  All right.  Give it
3 another second.  For some reason, it's not showing up.
4 Let me try it this way.  Okay.  Can everyone in Zoom world
5 see this, what's on the screen?
6       THE WITNESS:  No, I can't.  But would you
7 like for me to access the information through the FedEx
8 box I got of exhibits?
9       MR. FRANKLIN:  This is a different document.
10 What I will be sharing is the notice of deposition.  Maybe
11 it's pulling up now.
12       Can you-all in Zoom land see the exhibit
13 now?
14       THE WITNESS:  I can't see the exhibit.
15       THE VIDEOGRAPHER:  Are you doing share
16 screen, or are you doing exhibit share?
17       MR. FRANKLIN:  Exhibit share.  For some
18 reason, it's not showing up.  Can we go off the record for
19 a second --
20       THE VIDEOGRAPHER:  Sure.
21       MR. FRANKLIN:  -- to get this cleared up?
22       THE VIDEOGRAPHER:  Off the record at
23 9:12 a.m.
24       (Brief recess taken.)
25       THE VIDEOGRAPHER:  On the record at

3 (Pages 6 - 9)

Page 10

1 9:15 a.m.
2 BY MR. FRANKLIN:
3   Q. Thank you, Ms. Pelletier, for your -- your
4 patience.
5       (Exhibit 1 was marked for identification.)
6 BY MR. FRANKLIN:
7   Q. What I have on the screen right now, what's -- I
8 have marked as Exhibit 1, which purports to be the -- the
9 Third Amended Notice of Deposition of Luann Pelletier.
10      Did you receive this notice, Ms. Pelletier?
11  A. Yes.
12  Q. And also, as a point of clarification, do you
13 currently work for Tarrant County Juvenile Services or
14 have you retired?
15  A. I retired on July 31st, 2023.
16  Q. Congratulations.
17  A. Thank you.
18  Q. I'd like to do that sometime soon, but it'll
19 probably be another 30 years from now. We'll see.
20      Okay. So have you been deposed before?
21  A. Have I been what?
22  Q. Been deposed before?
23  A. Oh, gosh. I've been around for a while. So
24 I -- I don't believe so. I've testified in court on
25 several occasions in previous -- through my career, but I

Page 11

1 don't believe I've been deposed.
2   Q. Okay. So this is the general format of how today
3 is going to go. I'll start off with some housekeeping
4 items. And housekeeping items would be, you know, general
5 directions and some of the guardrails that we -- we have
6 throughout the -- the deposition. And then we'll go into
7 your background so I can get a chance to know a little bit
8 more about you. And then we'll discuss your roles with
9 Tarrant County Juvenile Services.
10      That sound fair?
11  A. Absolutely.
12  Q. So, Ms. Pelletier, do you understand that you are
13 under oath?
14  A. Yes.
15  Q. And you also understand that that means you are
16 sworn to tell the truth?
17  A. Yes.
18  Q. Even though that we occupy this structural space
19 that's become very common, but everything that you say
20 today has the full force and effect as if we were in the
21 courtroom before a judge and a jury.
22  A. Yes.
23  Q. Are you prepared to answer my questions today?
24  A. Yes.
25  Q. Is there any reason why I would not have your

Page 12

1 full attention today?
2   A. No.
3   Q. Have you taken any medication that would impact
4 your ability to answer my questions fully and truthfully?
5   A. No.
6   Q. Have you taken any other substances that would
7 impact your ability to respond to my questions truthfully
8 and fully?
9   A. No.
10  Q. Ms. Pelletier, this isn't an endurance program or
11 exercise of endurance. So at any point in time you need
12 to take a break, please let me know. But if I've asked a
13 question, I -- I request that you fully respond to the
14 question, and once you're done answering the question,
15 we'll take a break.
16  A. Okay.
17  Q. And to make it easier for the court reporter to
18 record what you're saying, even as good as she is, I ask
19 for you to give us verbal responses instead of shaking
20 your head yes or no, and just orally give me your
21 response. And in addition to that, allow me to complete
22 my question so the court reporter can get that down, and
23 then we will give a -- a second for you to give your
24 response, and so that the court reporter is able to get
25 a -- a clean record of -- of you and I going back and

Page 13

1 forth.
2       You understand that?
3   A. Yes.
4   Q. And at any point in time, if you don't understand
5 the question, I request that you ask me to repeat it or to
6 clarify that question. If you don't, I'm going to presume
7 that you understood the question, and you are answering
8 the question accurately based on your understanding of my
9 question.
10  A. Okay.
11  Q. Ms. Pelletier, other than the documents that I
12 sent to you, do you have any additional materials or
13 documents in your presence?
14  A. No.
15  Q. What have you done in preparation for this
16 deposition?
17  A. Nothing really. I have spoken to attorneys for
18 this case on a couple of occasions for about 45 minutes to
19 an hour.
20  Q. Who did you speak with?
21  A. With the attorneys for Tarrant County.
22  Q. Which attorneys for Tarrant County?
23  A. Leila -- oh, I don't remember all the names. I'm
24 sorry. I apologize. There was three or four. Sadie
25 coordinated. Let's see. Leila. Oh, I can't believe -- I

4 (Pages 10 - 13)

Page 14

1 can't believe all the names, but it -- it was three or
2 four people.
3     Q. The 45 minutes that you prepared, was that
4 collectively or individually, per --
5     A. Collectively.
6     Q. Did you review any documents in preparation for
7 this deposition?
8     A. No.
9     Q. Have you done any independent research in
10 preparation for this deposition?
11     A. No.
12     Q. You mentioned a second ago that you've testified
13 at trial in the past. Do you recall what type of trial it
14 was.
15     A. It was the -- the most recent would have been as
16 a community services supervisor. I testified in a double
17 murder case in Tarrant County a couple years ago for a
18 case where juveniles were adjudicated for murdering an
19 Uber driver. And my role in that was to -- for the
20 defense was to discuss or let the Court know -- be aware
21 of any kind of community programs that these two juveniles
22 could participate in, in the community should they be left
23 to be supervised in the community.
24         And then before that, when I was a parole
25 officer in Dallas, I had to testify in revocation hearings

Page 15

1 for kids that I supervised out in the community. And
2 those were multiple. I did the -- what is typically one
3 of the roles of your position as a parole officer is to go
4 to court and testify in revocation hearings in those sorts
5 of court proceedings. And that would have been back in
6 the '80s. But I've attended multiple hearings.
7         MS. AYACHI: I'm sorry to interrupt.
8         THE VIDEOGRAPHER: Okay. We need to stop
9 now --
10         MS. AYACHI: Yes. Thank you.
11         THE VIDEOGRAPHER: -- 'cause we've got
12 something going on here with the witness's screen.
13         THE WITNESS: Yes. I've turned pink.
14         THE VIDEOGRAPHER: All right. Off the
15 record at 9:23 a.m.
16         (Brief recess taken.)
17         THE VIDEOGRAPHER: On the record at
18 9:31 a.m.
19 BY MR. FRANKLIN:
20     Q. All right. Ms. Pelletier, do you understand that
21 you are still under oath?
22     A. Yes.
23     Q. Okay. Before we stopped, we were -- you were
24 discussing the times that you have testified in court
25 before. Did you complete your response to that question?

Page 16

1     A. I believe I did. The -- the most recent one was
2 the one I was talking about with the double murder case.
3 That was a couple of years ago. And then, of course, when
4 I was a parole officer, I -- I -- as a part of that role,
5 I had to testify on -- I don't know -- I can't tell you
6 how many occasions -- with the kids that I supervised in
7 the community with revocation hearings.
8         There may have been some more where I've
9 been available, if needed -- oh, I did testify in a case
10 that was related to resources in the community for kids
11 for a kiddo that was on courtesy supervision from Denton
12 County, being supervised in Tarrant County, regarding
13 services that we could provide him in Tarrant County.
14     Q. Have you ever given testimony regarding the
15 illegal sale or manufacture of drugs?
16     A. No.
17     Q. Are you familiar with the allegations made in
18 this litigation?
19     A. Vaguely.
20     Q. The plaintiff in this case, Tarrant County, is
21 alleging that the defendants -- that the defendants'
22 dispensing of opioids has contributed to the opioid crisis
23 in Tarrant County.
24         Are you in agreement with that allegation?
25     A. I don't have a particular opinion about that

Page 17

1 because I don't have enough information to say.
2     Q. That's fair.
3         Were you involved with the decision to bring
4 on this lawsuit?
5     A. No.
6     Q. What other involvement have you had with this
7 lawsuit?
8     A. None.
9     Q. Have you -- have you gathered documents on behalf
10 of this lawsuit?
11     A. None.
12     Q. Do you know who the defendants are in this case?
13     A. I know that you just said you were rep-- there
14 was an Albertsons representative and a Kroger's
15 representative. That is all I know.
16     Q. Have you ever shopped at Albertsons or Kroger's?
17     A. Yes.
18     Q. Which ones -- which -- which? Albertsons?
19     A. Albertsons in Keller, Texas; Kroger's in Keller,
20 Texas.
21     Q. Have you reviewed any discovery requests that
22 were served in this litigation?
23     A. Can you repeat the question, please?
24     Q. Have you reviewed any discovery requests that was
25 served in this litigation?

5 (Pages 14 - 17)

Page 18

1    A. No.
2    Q. Have you review any documents related to the
3 defendants in this case?
4    A. No.
5    Q. Are you aware of any other depositions taken in
6 this case?
7    A. Can you be more specific with your question?
8    Q. Yes.
9        There have been other depositions taken as a
10 part of this case. Are you aware of any other witnesses
11 that have testified on behalf of Tarrant County in this
12 case?
13    A. I believe that another employee of Tarrant County
14 Juvenile Services was also going to be a witness.
15    Q. Could you identify that person?
16    A. Tom Zaback.
17    Q. Did you discuss the case with Tom Zaback?
18    A. No.
19    Q. And when did you speak to Tom Zaback about the
20 deposition in this case?
21        MS. AYACHI: Objection, form.
22 BY MR. FRANKLIN:
23    Q. Let me rephrase the question.
24        Did you speak to Tom Zaback -- strike that
25 question.

Page 19

1        When did you speak to Tom Zaback about the
2 deposition -- deposition that he took in this case?
3    A. I didn't speak to him about the deposition. I
4 think when I first got a letter months ago that I was
5 being called to be a witness, I asked him if he was being
6 called, and I believe -- and he told me then that he was,
7 but that's it. We haven't had any other conversation.
8    Q. Have you reviewed any expert reports in this case
9 to prepare for this deposition?
10    A. No.
11    Q. Have you informed anyone else that you are being
12 deposed in this matter?
13    A. My supervisor.
14    Q. Who was your supervisor?
15    A. Bernice Mack, M-A-C-K.
16    Q. What do you understand an opioid to be?
17    A. I'm sorry. Can you rephrase the question? I
18 didn't hear you.
19    Q. What do you -- give me a second. Let me turn
20 this up.
21    A. Okay.
22        MR. FRANKLIN: Is everyone else having an
23 issue hearing me?
24        THE WITNESS: No, it's just me. I'm old.
25        THE COURT REPORTER: It's fine for the

Page 20

1 court --
2        MR. FOX: I can -- I can hear you.
3        MR. FRANKLIN: Okay.
4        THE COURT REPORTER: Fine for the court
5 reporter.
6        MR. FOX: But -- but my volume is up also
7 too.
8        THE WITNESS: Yes.
9 BY MR. FRANKLIN:
10    Q. I'll ask the question again.
11        What do you understand an opioid to be?
12        MS. AYACHI: Objection to form.
13        You may answer.
14        THE WITNESS: Okay.
15        An opioid is a -- is a form of a pain
16 reliever that's typically used for individuals that -- who
17 have pain, fentanyl, hydrocodone, oxycodone, morphine.
18 It's -- it's mainly for pain medications. It's mainly
19 pain medications.
20 BY MR. FRANKLIN:
21    Q. And what is the basis of your understanding and
22 knowledge of an opioid?
23    A. What is the understanding of my -- or my --
24    Q. What is the -- what is the basis of your
25 understanding?

Page 21

1    A. My work experience and my education.
2    Q. To your knowledge, can opioids have a medically
3 appropriate use?
4    A. Yes.
5    Q. Can you give me -- give me an example of what you
6 understand an illegal opioid to be?
7        MS. AYACHI: Objection, form.
8        THE WITNESS: What did you say Leila?
9        MS. AYACHI: I'm -- I'm objecting to form,
10 but you may answer.
11        THE WITNESS: Okay.
12        An illegal opioid?
13 BY MR. FRANKLIN:
14    Q. That's correct.
15    A. Well, it's my understanding that some of the
16 opioids are -- have been -- and this is just from my
17 reading -- okay? -- have the ability to be laced with
18 other chemicals that are not medically what they're
19 intended to do or make them stronger than they are
20 supposed to be.
21    Q. What did you read to obtain that information?
22    A. Training, reading information as far as opioid
23 addiction and how it affects a person, withdrawals. Those
24 sorts of things that I needed to be aware of as a
25 substance abuse counselor or with my licensure.

Page 22

1    Q. Based on your training, what type of chemicals
2 would opioids be laced with?
3    A. I cannot tell you that because I don't know what
4 persons do to lace medically legal opioids.
5    Q. Let me ask the question slightly different.
6        In the training, it's suggested that opioids
7 may be laced with certain chemicals.  In that training,
8 did they identify what the opioid could be laced with?
9    A. I don't recall.
10    Q. Did the training identify who may be the
11 perpetrators who lace the opioids?
12    A. No.
13        MS. AYACHI:  Objection, form.
14        THE WITNESS:  No.
15 BY MR. FRANKLIN:
16    Q. Is heroin an illegal opioid?
17        MS. AYACHI:  Objection, form.
18        THE WITNESS:  Yes.
19 BY MR. FRANKLIN:
20    Q. Is fentanyl an illegal opioid?
21        MS. AYACHI:  Objection, form.
22        THE WITNESS:  No.
23 BY MR. FRANKLIN:
24    Q. Are you familiar with the phrase "drug
25 diversion"?

Page 23

1    A. From a treatment standpoint, diversion -- drug
2 diversion, for me, may have a different definition than
3 what the term "drug diversion" really is because I kind --
4 have come from a substance abuse background, to some
5 extent, with my training.  When I think about drug
6 diversion, I think about diverting drug use.  Okay?  So it
7 may have a different definition that I'm not aware of.  I
8 am speaking from a treatment standpoint of diverting drug
9 use, a person from using drugs.
10    Q. Is selling an opioid a crime?
11    A. Is selling an opioid a crime?
12        MS. AYACHI:  Objection, form.
13        THE WITNESS:  Selling an opioid is not a
14 crime if it is done -- prescribed by a physician and that
15 is how it's obtained.  If someone, such as me, goes out
16 and sells an opioid, that's a crime.  I'm not a doctor.
17 BY MR. FRANKLIN:
18    Q. Have you ever heard of the phrase "opioid
19 epidemic"?
20        MS. AYACHI:  Objection, form.
21        THE WITNESS:  Yes.
22 BY MR. FRANKLIN:
23    Q. What does the phrase "opioid epidemic" mean to
24 you?
25    A. It means the same thing to me that K2 epidemic

Page 24

1 meant; it means the same thing to me that Ectasy epidemic
2 meant, that it has grown and become a significant issue
3 with our population as a problem.
4    Q. Do you believe that Tarrant County is
5 experiencing an opioid epidemic?
6        MS. AYACHI:  Objection, form.
7        THE WITNESS:  According to what I have read,
8 seen in the media, it has -- it has become.
9 BY MR. FRANKLIN:
10    Q. And can you identify the sources that you've read
11 this about?
12    A. Just --
13        MS. AYACHI:  Objection, form.
14        THE WITNESS:  -- hearing in the media, on
15 the news.  My interest in it in -- in Googling the news
16 leads to see what -- what is going on with the -- you
17 know, with opioids.  Trying to stay abreast of the latest
18 drug issues that are out there, not just opioids, with any
19 kind of drug addiction.
20 BY MR. FRANKLIN:
21    Q. About when did you begin your research on the
22 opioid epidemic?
23        MS. AYACHI:  Objection, form.
24        THE WITNESS:  Well, I'm a licensed chemical
25 dependency counselor, so it's my obligation to stay

Page 25

1 abreast and educated on what the latest drugs are that are
2 out there amongst the population; predominantly, the
3 juvenile population for me because that is the only
4 population that I have worked with that have been
5 court-involved.  And I've only worked with juveniles in a
6 court-involved environment.
7 BY MR. FRANKLIN:
8    Q. When did you start your research or -- or your
9 studies into the opioid epidemic?
10    A. Okay.  Let me rephrase --
11        MS. AYACHI:  Objection, form.
12        THE WITNESS:  -- research or studies.  I'm
13 not a researcher or a statistician or anything like that.
14 I consider it something that I've always -- let me
15 rephrase what -- how I'm saying this.
16        I -- I -- like I said, I'm not a researcher
17 or a statistician; I just read the latest articles I may
18 see on my phone because I feel like I need to be educated
19 on what's going on out there with our juveniles as far as
20 their drug use.  So I haven't done any formal research.
21 That may have been a stronger term than I should have
22 used.
23 BY MR. FRANKLIN:
24    Q. I'll ask the question slightly different.
25    A. Okay.

7 (Pages 22 - 25)

Page 26

1    Q. When did you become more interested in knowing
2 more about the opioid epidemic?
3        MS. AYACHI: Objection, form.
4        THE WITNESS: When I felt like I needed to
5 know that information so that I -- in my position with
6 juvenile services, I could -- I would know: Do we have
7 the services in the community to treat this type of drug
8 addiction appropriately?
9        And so I am always -- or I always try to
10 stay up to date on what the latest information is
11 regarding -- so there's no particular time frame --
12 okay? -- is what I'm saying. When you say, "When did you
13 start your research?" I'm always reading and trying to
14 educate myself on what the latest issues and treatment
15 issues regarding any drug, opioids or anything else.
16 BY MR. FRANKLIN:
17    Q. Do you believe that Tarrant County is -- is
18 experiencing an opioid epidemic?
19        MS. AYACHI: Objection, form, asked and
20 answered.
21        THE WITNESS: I think you asked me this
22 question earlier. Like I said earlier, I can't tell you,
23 without a doubt, that Tarrant County has an opioid
24 epidemic going on. I can just tell you the things I've
25 read that indicate that Tarrant County does have an issue

Page 27

1 with opioids.
2 BY MR. FRANKLIN:
3    Q. Do you believe that Tarrant County has an issue
4 with -- strike the question.
5        Do you believe that residents of Tarrant
6 County have a problem with me- -- methamphetamine abuse?
7        MS. AYACHI: Objection, form.
8        THE WITNESS: Some do.
9 BY MR. FRANKLIN:
10    Q. Do you believe that Tarrant County has residents
11 with problems with marijuana abuse?
12        MS. AYACHI: Objection, form.
13        THE WITNESS: Absolutely.
14 BY MR. FRANKLIN:
15    Q. Do you believe that Tarrant County has a problem
16 with its residents who abuse cocaine?
17        MS. AYACHI: Objection, form.
18        THE WITNESS: Yes.
19 BY MR. FRANKLIN:
20    Q. Do you believe that there is a heroin-abuse issue
21 in Tarrant County?
22        MS. AYACHI: Objection, form.
23        THE WITNESS: A heroin? Ask that question
24 again about heroin.
25 BY MR. FRANKLIN:

Page 28

1    Q. Do you believe residents of Tarrant County have
2 substance abuse issues with heroin?
3        MS. AYACHI: Objection, form.
4        THE WITNESS: I think you would have to
5 contact some different sources in Tarrant County besides
6 me to give you that -- maybe those stats on heroin or any
7 of these drugs.
8 BY MR. FRANKLIN:
9    Q. Earlier in your deposition, you mentioned a drug
10 called K2. What is K2?
11    A. To be quite honest with you, I haven't read as
12 much about K2 more recently, so I don't want to give you
13 the wrong answer.
14    Q. Have you ever spoken to the media on the topic of
15 opioids?
16    A. No.
17        MS. AYACHI: Objection, form.
18        THE WITNESS: No.
19 BY MR. FRANKLIN:
20    Q. Have you given any speeches or presentations
21 regarding the topic of opioids?
22        MS. AYACHI: Objection, form.
23        THE WITNESS: No.
24 BY MR. FRANKLIN:
25    Q. I want to switch gears a little bit to know more

Page 29

1 about your personal background.
2        Where are you from originally?
3    A. Originally, born?
4    Q. Yes.
5    A. Okay. We want to go back that far?
6    Q. Uh-huh.
7    A. I was born in Corsicana, Texas.
8    Q. Did you go to high school in Corsicana?
9    A. I sure did. Go Tigers.
10    Q. When did you graduate from Corsicana High?
11    A. I'm not telling you that. 1980.
12    Q. I would say 1980 was a very good year.
13    A. It was a very good year.
14    Q. Uh-huh. And how long did you live in Corsicana?
15    A. For 18 years.
16    Q. After you graduated from Corsicana High, where
17 did you move to?
18    A. I moved to Huntsville, Texas, where I went to
19 school at Sam Houston State University, their criminal
20 justice department. Go Bearkats.
21    Q. And which years were you at Sam Houston?
22    A. From 1980 to 1983, because I chose to go to
23 summer schools.
24    Q. You graduated quicker than the four years?
25    A. Yes.

8 (Pages 26 - 29)

1     Q.  What was your official degree from Sam Houston?
2     A.  Well, it was in the criminal justice department.
3  But in their department, they have three curriculums of
4  study, and one of them is police science and law
5  enforcement, social rehabilitation for criminal justice --
6  and for some reason, the third one is leaving my mind.
7          But I -- I predominantly was in the
8  rehabilitation piece of the criminal justice department.
9  That's what I got my Bachelor of Science degree in.
10     Q.  After you graduated from Sam Houston, did you
11  pursue any additional education?
12     A.  Not right after Sam Houston.  After I was married
13  and just before I had my daughter, I went back to school
14  at UTA in Arlington towards my master's degree.  Completed
15  about 40-something hours of that up until I had her, and
16  my life changed drastically.  And at that point, I did --
17  I have not gone back for that.
18     Q.  Which years were you at UTA?
19     A.  Oh, geez.  Let's see.  My daughter was born in
20  1990, and I believe I was pregnant with her when I was
21  there or right around that same time.  So I want to say
22  1989 to 1990, something like that, '88 to '89, something
23  like that.
24     Q.  I understand that you did not complete your
25  master's degree.  But under what discipline were you

1  pursuing your degree?
2     A.  It was in their school of social work.
3     Q.  Did you pursue any other degree after your time
4  at UTA?
5     A.  No, I didn't pursue a degree, but I did obtain my
6  licensed chemical dependency counselor certification in
7  Texas.
8     Q.  Which institution provided you with a
9  certification?
10     A.  Hazelden.  It's H-A-Z-E-L-D-E-N.
11     Q.  Which year did you obtain that certification?
12     A.  The original on my licensure, which is No. 3696,
13  had 1992, but I have to go back -- I have to get 60 hours
14  of additional training every two years to relicensure.  So
15  I was -- I was telling one of our attorneys it was
16  interesting because it was just last year when I went
17  through to see how many hours I lacked to recertify in
18  2024.  It said that my licensure began in 1998.
19          But I know that's not -- I don't care either
20  way.  I'm licensed in -- it's years ago, and I've
21  continued to be licensed and continue to do the continuing
22  education for it.  But it was 1992 or 1998, whatever.  One
23  of those dates was my original licensure.
24     Q.  Is Hazelden in Texas?
25     A.  You know, Hazelden, I don't hear much about

1  Hazelden anymore.  It's -- it was a -- it was the, like,
2  premier school for our continuing education,
3  certification, programming for substance abuse counseling
4  at that time, in, like, the 1980 -- like, 19- -- late
5  1980s and 1990s.
6          I don't hear much about Hazelden anymore, so
7  it could have -- someone else could have bought them out,
8  or they may be called a different company now.  But
9  Hazelden was the place to go to get your -- I say "the
10  place to go" to get your -- your original licensure for
11  counseling at that time.  But it was in Dallas.  I went to
12  Dallas.
13          I did continuing education hours there on
14  Saturdays -- or not continuing education -- original
15  certification hours there on Saturdays.  And then I had to
16  do what you would consider, if you know what I'm talking
17  about, an internship type of thing in substance abuse and
18  then go through the testing and all of that with the State
19  of Texas.
20          And I also became a -- an examiner for the
21  State of Texas for licensure.  So, in essence, I would go
22  to Austin maybe two or three times a year and sit on one
23  of the boards that tested potential applicants so that
24  they could obtain their licensure.
25     Q.  I just want to take a step back in the timeline

1  now.
2          You were in Huntsville from 1980 to 1983?
3     A.  Uh-huh.
4     Q.  How long did you stay in Huntsville?
5     A.  I stayed in Huntsville -- okay.  I graduated in
6  August of 1983.  At that point, I left Huntsville -- let
7  me just back up for a second.
8          Before I left Huntsville, I did an
9  undergraduate internship with the Texas Youth Commission.
10  So I moved -- and at -- at that time, the Texas Youth
11  Commission had a facility in Corsicana for residential
12  treatment.  It was their -- their treatment progr- -- I
13  say their treatment program.  It was one of their
14  institutional facilities for emotionally disturbed
15  adolescents.  So that's where I did my undergraduate
16  internship for three months, from, like, May of '83
17  until -- May, June, July -- end of July that year.
18          I moved back to Corsicana.  And at that
19  point, I was -- I had a job application or a couple at CVS
20  and some places like that.  But after I had done my
21  internship at Corsicana, then I was approached about a
22  position coming open with the Texas Youth Commission.  So
23  I stayed in Corsicana at that point and began working with
24  Texas Youth Commission.  I believe it was like April of
25  1984.  Yes, around -- I think it was April of 1984.

9 (Pages 30 - 33)

Page 34

1    I worked at that facility for -- forgive me
2  if my timelines are off a little bit. I'm trying to
3  remember exactly. But I ended up -- after having worked
4  in the institution, I also then transferred and applied
5  for a position in Dallas as a parole officer in Dallas.
6    I became a parole officer in south Dallas
7  and also supervised -- supervised -- managed, supervised,
8  however you want to say it, some group homes in Dallas --
9  I mean, in Ellis County, along with a case -- a parole
10 caseload and an institutional parole caseload.
11    So in answer to your original question, I
12 left Huntsville in '83.
13 Q.  You said that you worked at the Texas Youth
14 Commission in Corsicana. What was your title at the Texas
15 Youth Commission?
16 A.  I was green, straight out of college. I worked
17 in the dorm -- in a dorm with emotionally disturbed male
18 adolescents. That was what I did. I managed just their
19 daily activities, various, you know, paperwork that had to
20 be completed, supervised kids there at the program from --
21 from that particular dorm that I was assigned to. A youth
22 worker, basically.
23 Q.  Then you left there and became a parole officer
24 in -- was it Ellis or Dallas?
25 A.  It was Dallas, but I had a -- a piece -- a

Page 35

1  portion of Dallas County, South Dallas, and then my
2  caseload went out to Du-- Duncanville, Red Oak, DeSoto,
3  and then I also had three group homes that I visited on a
4  weekly basis that were in Ellis County.
5    And those were group homes that were -- that
6  were contracted through the Texas Youth Commission, which
7  is now TJJD, and we -- and did case plans and checked on the
8  kids to make sure they were okay in those programs, that
9  they were getting the services they needed in those
10 programs from the group home -- group home, which was,
11 basically, homes in Ennis. I had one in Ennis, one in
12 Waxahachie, and one or two in Midlothian. So that was
13 Ellis County. But I was housed and officed in Dallas.
14 Q.  Were you employed by Dallas County when you were
15 a parole officer?
16 A.  No. That was a part of the Texas Youth
17 Commission. Texas Youth Commission had -- has offices,
18 parole offices -- about five parole offices throughout the
19 state, maybe even more than that now. But they -- we
20 had -- Dallas had an office; Fort Worth had an -- had an
21 office. Then we subcontracted, like -- with, like, Taylor
22 County in Abilene. We had a Tyler office, which I believe
23 is still there. Things have changed so much with TJJD --
24 or TYC. I -- I couldn't tell you what all is there now,
25 but I worked in Dallas.

Page 36

1    And then from Dallas, I -- this kind of
2  morphed into -- I worked with a lot of kids then in
3  Tarrant County too. So I ended up moving closer to
4  Tarrant County -- or in between Tarrant and Dallas County
5  because I really had developed a relationship with persons
6  in Tarrant County, unfortunately, picking up kids from
7  detention center in Dallas County -- in Tarrant County,
8  and wanted to just work over in the Tarrant County area
9  versus Dallas. I -- I liked Tarrant County. It fit my
10 personality, I should say, better.
11 Q.  Which years were you with the Texas Youth
12 Commission?
13 A.  I was with them on two separate occasions. I was
14 with them through the institutional job and then
15 transferring to Dallas. Let's see. '84 to around -- '84,
16 I want to say, to the latter part of '89. And then after
17 I became pregnant with my daughter, I was approached by
18 someone from Lena Pope Home about being the director of
19 one of their shelters and -- which was also residential,
20 and doing some counseling for them because of my
21 experience with TYC, I think, and working in a residential
22 setting myself.
23    And I also be-- I -- I was interested in
24 working for Lena Pope Home in Fort Worth because I -- I
25 liked their program. I got to know a lot of their staff

Page 37

1  there because we had kids that were TYC kids that Lena
2  Pope Home served. So I got to know a lot of the
3  administration and staff at Lena Pope Home in Fort Worth.
4    So in '89 -- don't -- don't let me get my
5  dates wrong; trying to make sure I have this right -- yes.
6  In '90, I went to work for Lena Pope Home because -- the
7  reason I remember this is 'cause my daughter was born in
8  '90. And I remember wanting to go to work -- get started
9  for work, and my doctor said: I'm not going to release
10 you yet; you had a C-section. So I went to work -- you
11 can't go to work yet. I'm like: I gotta see adults.
12    So I went to work for them in '90, for Lena
13 Pope Home. I had two stints -- okay. This is going to
14 sound crazy, but I had two stints with Lena Pope Home, two
15 work experiences with TYC.
16 Q.  So you went to TYC, for the first time, in 1990?
17 A.  No. I went to TYC the first time in 1984,
18 officially became an employee. I was with them from '84
19 unto -- until the latter part -- or actually 1990,
20 because -- and then in 1990 -- let's see. She was born in
21 July. I started work for Lena Pope in 1990 -- August --
22 probably the end of August or first part of September as
23 their shelter director, and then I did the substance abuse
24 piece.
25    That's where I started my substance abuse

10 (Pages 34 - 37)

Page 38

1 counseling and getting my certification and all that
2 through Hazelden, when I worked for Lena Pope Home in
3 1990.  And then I worked -- so I worked in their drug
4 treatment program that they had at that time, in 1994.
5      Q.  And I misspoke earlier.  I meant to say that you
6 started to work at Lena Pope Home in 1990.
7          How long did you stay there during your
8 first stint?
9      A.  Until someone from TYC approached me about
10 becoming the director of their girls halfway house in
11 Tarrant County.
12      Q.  Do you recall what year that was?
13      A.  Oh, geez. Let's think here.  '94. Don't -- I
14 mean, that is -- that is what my timeline in my mind is
15 saying, '94.
16          MS. AYACHI:  Sorry to step in.  Gregory,
17 I -- I don't want to interrupt your -- your questioning,
18 but it's about an hour now.  Is this a good time for a
19 break?
20          MR. FRANKLIN:  Yeah.  I was going to suggest
21 that after --
22          MS. AYACHI:  Okay.
23          MR. FRANKLIN:  -- she answered the question.
24          MS. AYACHI:  That would be perfect.
25          MR. FRANKLIN:  So --

Page 39

1          MS. AYACHI:  Can we go off the record?
2          THE VIDEOGRAPHER:  Off the record at
3 10:13 a.m.
4          (Brief recess taken.)
5          THE VIDEOGRAPHER:  On the record at
6 10:33 a.m.
7 BY MR. FRANKLIN:
8      Q.  Ms. Pelletier, you understand that you are still
9 under oath?
10      A.  Yes.
11      Q.  Before we went on recess, we were discussing your
12 background, and you testified that you worked from -- you
13 worked at Lena Pope Home from 1990 to 1994.
14          After you -- why did you leave the Lena Pope
15 Home?
16      A.  I believe I -- that was when I became the
17 director of the girls adolescent juvenile justice facility
18 there in Fort Worth, basically a better job opportunity.
19      Q.  Was that back with TYC?
20      A.  Yes.
21      Q.  In your second stint with TYC, how long did you
22 work with them?
23      A.  Well, I worked with them for a total of ten
24 years.  So we can do the math, from '84 to around '90, and
25 then four years on the second stint because -- so I had

Page 40

1 ten years with them, eight years with Lena Pope Home.
2 Anyway, it all adds up to 39, so...
3      Q.  Okay.  Allow me to do --
4      A.  And 19 for Tarrant County.  I'm sorry.
5      Q.  Allow me to do the back-of-the-napkin math here.
6          Did you work with TYC in your second stint
7 again until 1998?
8          MS. AYACHI:  Objection, form.
9          THE WITNESS:  Ask the question again,
10 please.
11 BY MR. FRANKLIN:
12      Q.  When did you leave TYC during your second stint?
13      A.  Let's see.  '98 or '99.  I'm not certain.
14      Q.  Were you the -- were you the director the entire
15 time?
16      A.  Of their shelter, yes -- I mean -- I'm sorry --
17 of their -- their halfway house for adolescent females.
18 I've only worked with juvenile -- in the juvenile justice
19 system.
20      Q.  When you worked at Lena Pope Home in 1990, where
21 did you live?
22      A.  I lived in Trophy Club, Texas, which is right
23 down the street -- or let's say -- down the street -- 5
24 miles from the facility.
25      Q.  How long did you live in Trophy Club?

Page 41

1      A.  Close to ten years.
2      Q.  So you moved from Trophy Club in 2000?
3      A.  Let's see.  No.  I moved to Trophy Club when I
4 got married in '87 or '87.  And then approximately -- I'd
5 say approximately ten years later, I moved into Keller,
6 which is down the street, north Fort Worth.
7          In -- let me go back -- 1987 or '88, I moved
8 to Trophy Club with my husband.  Let's see -- 1990,
9 1994 -- I moved into Keller around 1990 -- or close --
10 close to 1997, when I became a single, divorced parent.
11      Q.  Did you commute from Trophy Club to UTA whenever
12 you were getting your master's there?
13      A.  I can't --
14          THE WITNESS:  Is Leila trying to talk to me?
15          MS. AYACHI:  I'm waiting --
16          THE WITNESS:  Yeah.  You were muted.  Now
17 you're muted again.
18          MS. AYACHI:  No, no.  I'm sorry.
19          THE WITNESS:  Were you trying to talk to me?
20          MS. AYACHI:  No, no, no.  Go ahead and
21 answer.
22          THE WITNESS:  Okay.  I'm sorry.
23 What was your --
24          MS. AYACHI:  My apologies.
25          THE WITNESS:  That's okay.

11 (Pages 38 - 41)

1    What was your question, Greg -- Gregory?

2 BY MR. FRANKLIN:

3    Q.  Did you commute from Trophy Club to UTA when you

4 were getting your master's?

5    A.  Yes.

6    Q.  After you left TYC in 1998 or '99, who did you

7 work for after that?

8    A.  That was my second time that I went to work for

9 Lena Pope Home, for four more years -- or until 2004 or --

10 yeah, 2004, I started with Tarrant County Juvenile

11 Services.

12    Q.  What was your role at Lena Pope Home when you

13 started again in 2000?

14    A.  I became one of their supervisors in their

15 community corrections programs.

16    Q.  What were your responsibilities in that role?

17    A.  I supervised the supervisors that managed their

18 Family Preservation contracts with various agencies in the

19 community.

20    Q.  Can you explain, what is a Family Preservation

21 contract?

22    A.  That contract goes into homes of juveniles whose

23 family -- the family functioning is a challenge, a lot of

24 issues going on in the homes, identified what the issues

25 were, identified what the -- what curriculums needed to be

1 used to work with families in their homes.  It was

2 predominantly an in-home -- in-home services.

3    Q.  You testified that you started working for

4 Tarrant County Juvenile Services in 2004?

5    A.  Yes.

6    Q.  What was your first role with Tarrant County

7 Juvenile Services?

8    A.  I worked in their drug court program.

9    Q.  What was your official title?

10    A.  Drug court -- I was a probation -- certified

11 probation officer, but at that time, I believe I was -- I

12 was hired in on a grant project with MHMR for kids that

13 were going from juvenile services to one of the local MHMR

14 residential drug treatment programs.  My title, I believe,

15 was some drug court liaison or -- don't quote me on that.

16 It was something drug court related, the title was, but I

17 don't remember exactly.

18    Q.  How long did you have that role within the drug

19 court?

20    A.  Well, let's see.  I was with the county 19 years.

21 I was in that role for four.

22    Q.  Until 2008; is that fair?

23    A.  That's ballpark.

24    Q.  And I'll ask more questions about your time in

25 the drug court later.

1    But for now, after you left your role in the

2 drug court, which role did you transition to?

3    A.  My current -- what my role was, until I retired,

4 for 15 years.  It was -- I supervised a community -- so

5 not all of our contracts, but our larger contracts with

6 juvenile services for -- for programs in the community,

7 programs that we contracted with.

8    Q.  You mentioned that you were lucky to retire June

9 of this year?

10    A.  Yes.  It will be -- you know, it's kind of weird,

11 but it will be as of July 31st.  I had a lot of vacation

12 hours I had to -- so I think that was my official date

13 is --

14    Q.  Did -- did you live in Keller from your entire

15 time at -- working for Tarrant County Juvenile Services?

16    A.  Yes.  I lived there for -- yeah, the whole time.

17 I -- I lived right there in north Fort Worth, on the line,

18 so north Fort Worth, Fort Worth, and Keller.

19    Q.  And as I mentioned, we'll discuss your time in

20 Tarrant County more in depth in a little bit.

21    In your professional career, have you been a

22 part of any professional organizations?

23    MS. AYACHI:  Objection, form.

24    THE WITNESS:  Professional organizations.

25 Be more specific, if you would.

1 BY MR. FRANKLIN:

2    Q.  Well, let me ask the question slightly different.

3    Were you a member of any organizations

4 during your employment with Tarrant County?

5    MS. AYACHI:  Objection, form.

6    THE WITNESS:  What do you define as an

7 organization?

8 BY MR. FRANKLIN:

9    Q.  A group of people who have a mission -- well,

10 scratch that.

11    Let me give -- let me give an example.  Like

12 the North Central Texas Council of Governments would be

13 considered an organization.  Were you a member of the

14 North Texas -- North Central Texas Council of Governments?

15    A.  I served on the evaluation committee for North

16 Texas Council of Governments.  I served as -- on the

17 advisory council for Workforce Solutions.  I served on the

18 advisory committee for YouthBuild USA.  There were various

19 others, but I can't recall all of them in the 19 years.

20    THE WITNESS:  And I've turned pink again

21 like Barbie.

22    THE VIDEOGRAPHER:  Yes, you have.

23    Want to go off the record and fix this?

24    MS. AYACHI:  Yes, please.

25    THE VIDEOGRAPHER:  All right.  Off the

1 record at 10:48 a.m.

2      (Brief recess taken.)

3      THE VIDEOGRAPHER:  On the record at

4 10:50 a.m.

5 BY MR. FRANKLIN:

6     Q.  Ms. Pelletier, do you understand that you are

7 still under oath?

8     A.  Yes.

9     Q.  Tell me about the work that you did on the

10 evaluation committee for the North Central Texas Council

11 of Governments?

12     A.  North Texas Council of Governments.

13      I was a part of a team of probably 50

14 members from across North Texas who were assigned to grade

15 grant proposals for various grants for various things in

16 Tarrant County.  Everything -- or Tarrant County and

17 surrounding -- a part of that consortium, or however you

18 want to say it, that collaboration of counties who applied

19 for grant funds and scored grants.  They ranged -- I mean,

20 it was various things that we graded, different grant --

21 different types of grants that were applied for.

22     Q.  On the committee, did you grade any grants that

23 were used to address controlled substances issues in the

24 region?

25     MS. AYACHI:  Objection, form.

1     THE WITNESS:  Let me think.  In this last

2 grant round, no.

3 BY MR. FRANKLIN:

4     Q.  You said in the last round.  What do you mean by

5 that?

6     A.  Well, it happened every year, and I've been on

7 that committee for two years.  So we just finished a round

8 of grant proposal gradings in, I want to say, April, and I

9 don't believe any of those grants were related to drug

10 issues or anything like that.

11     The previous round, I ca- -- I don't even

12 remember, 'cause there are a lot of grants you grade in

13 that period of time.  You're assigned a certain amount.

14     Q.  Let's discuss your time on the Workforce --

15 Workforce Solutions advisory council.

16     What were your responsibilities on the

17 advisory council?

18     A.  Very little.  I was just a member of that

19 committee to represent Tarrant County Juvenile Services.

20 It was only related to juveniles.

21     Q.  Did it have a nexus related to controlled

22 substances?

23     A.  No.

24     Q.  What about on your advisory committee role for

25 YouthBuild USA?

1     A.  No.

2     Q.  Can you remember any other committees that you

3 served on in your professional career?

4     A.  I know there were more.  I just can't recall all

5 the names.

6     Q.  You've had an admirable career working with the

7 youth.  What drove you to pursue that line of career?

8     A.  I don't know, honestly.  Personal observations,

9 personal experience with family, friends who went the

10 wrong direction in life.

11     Q.  Any family members that suffer from substance

12 abuse issues?

13     MS. AYACHI:  Objection.

14     THE WITNESS:  I had a first cousin my same

15 age, yes.

16 BY MR. FRANKLIN:

17     Q.  I know that you officially retired from Tarrant

18 County, and you are currently residing in Winder, Georgia.

19     A.  Hold on.  "Winder," Georgia.

20     THE WITNESS:  Let me do my flip phone thing

21 here 'cause I'm pink.  Am I pink on y'all's screen?

22     MR. FRANKLIN:  Yes, you are.

23     MS. AYACHI:  Yes.

24     Don, maybe we should go off the record

25 again.

1     THE VIDEOGRAPHER:  Off the record at

2 10:56 a.m.

3     (Brief recess taken.)

4     THE VIDEOGRAPHER:  On the record at

5 10:58 a.m.

6 BY MR. FRANKLIN:

7     Q.  Ms. Pelletier, do you understand that you are

8 still under oath?

9     A.  Yes.

10     Q.  Okay.  Have you had any training related to drugs

11 or controlled substances?

12     MS. AYACHI:  Objection, form.

13     THE WITNESS:  Ask the question, if you

14 would, a little more specifically.

15 BY MR. FRANKLIN:

16     Q.  Have you had any training where you learned more

17 about drugs and controlled substances?

18     A.  I've had training for my LCDC licensure, so I've

19 had various trainings that had to do with drugs, yes.

20     Q.  What other licenses do you have?

21     A.  None.

22     Q.  Have you ever had any training specifically

23 related to opioids?

24     A.  Yes, but I don't recall the dates.  It's been

25 months ago.

13 (Pages 46 - 49)

Page 50

1  Q. I'm going to share with you Exhibit 2, Bates
2  Number 0 -- well, TARRANT_00835959. It should have been a
3  part of your packet that you received.
4      A. Section 2? Is that what you said?
5  Q. The Bates number is 00835959.
6      MS. AYACHI: Which -- which tab number is
7  that?
8      THE WITNESS: That's the tab I'm looking
9  for.
10     MR. FRANKLIN: I'm not sure about the tab
11 because I -- I didn't send it, but maybe -- what this
12 is -- it's a certificate of achievement for the overview
13 of opioid treatment.
14     THE WITNESS: Tell me the number, page
15 number again.
16 BY MR. FRANKLIN:
17     Q. It is 00835959. Let's see if I can get this
18 thing to share.
19     A. 'Cause I'm not seeing that in my tab.
20     THE WITNESS: If someone sees it before I
21 do, please let me know. I'm not seeing it.
22     MR. KRATOVIL: Looks like it may be Tab 16.
23     THE WITNESS: Tab 16?
24     Yes, I see that.
25     (Exhibit 2 was marked for identification.)

Page 51

1  BY MR. FRANKLIN:
2      Q. I'm marking that as Exhibit 2.
3      A. I believe you may be missing one, if you were
4  collecting these, because this would have been in my
5  first -- I mean, my last research. So I've had another
6  one of these since 2020.
7      Q. Who is the issuing body that provided the -- the
8  certificate?
9      A. It's Dawn-Elise Snipes with allceus.com. It's
10 online.
11     Q. Tell me about the -- the course here that's
12 been -- where you received this certificate.
13     MS. AYACHI: Objection, vague.
14 BY MR. FRANKLIN:
15     Q. What did you learn during this course?
16     A. It was just an overview of the treatment
17 of -- for opioids.
18     Q. And what type of treatments did you learn about?
19     A. Oh, geez. I don't remember all of it. It -- it
20 was just -- let me think on this, what it was about. It
21 discussed various opioids. I want to say it talked
22 about -- they -- it was a -- it was online. Had to do a
23 lot of things online during COVID. I can't recall all of
24 the subjects that were discussed in that training, but
25 there -- I've had another one since then.

Page 52

1      And this is a training I recall. And -- and
2  I recall that -- and the last one I believe I had was --
3  was to become more familiar with the opioid issues. In
4  the 60 hours of training I have to get every two years, I
5  could pick three different subjects, and this is one of them
6  that I picked.
7      Q. And to my original question, do you remember any
8  opioid treatments that was discussed in the course?
9      A. No, I don't remember at this time.
10     Q. Do you know of any opioid treatments?
11     A. No, not that have been successful.
12     Q. In addition to the coursework that you took on
13 July 19th, 2020, that's represented in the certificate,
14 what other courses have you taken related to opioids?
15     MS. AYACHI: Objection, form.
16     THE WITNESS: I don't recall all of them.
17 They keep those.
18 BY MR. FRANKLIN:
19     Q. Well, when was the earliest course that you took
20 regarding opioids?
21     MS. AYACHI: Objection, form.
22     THE WITNESS: This one was July of 2020. I
23 believe I took another one in July -- oh, not July --
24 let's see. This -- we're in July now of 2023. Somewhere
25 between January and -- I think now I've had another --

Page 53

1  took another course on -- just an overall general,
2  educational, four-hour, online course on opioids.
3  BY MR. FRANKLIN:
4      Q. Do you remember the specific subject that was
5  taught during that session?
6      A. I think I said this earlier. I don't recall.
7      Q. Have you had any specialized training in
8  medicine?
9      A. No.
10     Q. Have you had any specialized training in
11 pharmacy?
12     A. No.
13     Q. Have you attended any conferences whereby the
14 topics included addressing the opioid crisis?
15     A. No.
16     Q. Have you heard of the organization Challenge of
17 Tarrant County?
18     A. Tarrant Challenge?
19     Q. Tarrant Challenge?
20     A. Is that the organization you're referring to?
21     Q. Yes. I've heard it called both. It's -- it's
22 one and the same, so --
23     A. Yes.
24     Q. -- yes, Tarrant --
25     Have you attended any trainings delivered by

14 (Pages 50 - 53)

1 Tarrant Challenge regarding substance abuse issues in
2 Tarrant County?
3        MS. AYACHI:  Objection, form.
4        THE WITNESS:  I've only attended one
5 training that Tarrant Challenge did, and it was years ago.
6 And I would say that answer would be no.
7 BY MR. FRANKLIN:
8    Q.  Do you remember what the subject of the training
9 was?
10    A.  No.
11    Q.  Okay.  I want to go back into your time when you
12 started with Tarrant County Juvenile Services.
13        You testified that you started with Tarrant
14 County Juvenile Services in 2004 within the drug court.
15 What was your specific role and responsibilities in the
16 drug court?
17    A.  When I came into the drug --
18        MS. AYACHI:  Objection, form.
19        Go ahead.
20 BY MR. FRANKLIN:
21    Q.  You may --
22    A.  When I came into the drug court -- I think I said
23 this earlier -- I came in as a part of a grant project
24 that was going on.  The person who was in that position
25 left for some reason, and I -- it was -- it was a

1 grant-like liaison.  I worked with sending kids -- or not
2 sending kids -- coordinating the kids that went over to
3 the youth campus with MHMR who participated in this grant.
4        It's been so long ago; I cannot remember all
5 the specifics of that grant.  I just know I did that for
6 most of that time that I was in the drug court program.  I
7 was a liaison person between kids that were sent from
8 juvenile services to that MHMR residential program for
9 service -- I'm sorry -- for residential and outpatient
10 treatment services.
11    Q.  Was your role funded by the grant?
12        MS. AYACHI:  Objection, form.
13        THE WITNESS:  You know, I don't know exactly
14 how much of my salary was funded by the grant.
15 BY MR. FRANKLIN:
16    Q.  Was any of your salary funded by the grant?
17    A.  I'm sure it was, but I'm -- like I said, I don't
18 know.  That would be something you would need to ask
19 county administrators because I don't know.
20    Q.  From your time in the drug court, between 2004
21 and 2008, was it all a part of this grant that brought you
22 to Tarrant County?
23    A.  Yes.
24        MS. AYACHI:  Objection, form.
25        THE WITNESS:  Yes.

1 BY MR. FRANKLIN:
2    Q.  What is the age range of the juveniles who
3 participate in the drug court program?
4    A.  I believe -- you know, drug court has changed
5 now.  It's totally different.  I -- I -- I believe they
6 served 10-year-olds to 17, but we may have started at 12.
7 I can't recall.
8    Q.  Do you recall, on average, how many juveniles
9 participated in the drug court program?
10        MS. AYACHI:  Objection, form.
11        THE WITNESS:  How many --
12 BY MR. FRANKLIN:
13    Q.  Let -- and let me specify there, to be more
14 clear, on an annual basis.
15    A.  Let me do some addition.  I -- I think we had
16 four or five officers, and I think -- in the drug court
17 program that worked with families.  I think they had
18 caseloads.
19        Geez.  I -- on an annual basis, I can't tell
20 you how many.  I mean, I would not even know.  I -- I
21 know -- I think they carried a -- a fairly smaller
22 caseload, but I believe there were 4 or 5 officers at that
23 time with maybe 15 to 20 clients.  And those numbers, of
24 course, turned over every, like, 4 to 6 months.  So you
25 can do the addition.  I -- I couldn't tell you exact --

1 exactly how many kids per year that program was serving
2 off the top of my head.
3    Q.  Did the officers report to you?
4    A.  No.  I had no supervisory duties with that
5 position, the position that I served under the drug court
6 program.
7    Q.  Who did you report to during your time in the
8 drug court program?
9    A.  John Haynes.
10    Q.  Did John Haynes still work for the drug program
11 after you retired?
12    A.  No.  John Haynes works for Texas Tarrant
13 Challenge and has since he left the county.
14    Q.  Do you remember what year he left the county?
15    A.  No, I don't recall what year it was.
16    Q.  To the extent that you can remember, can you walk
17 me through the process on how a juvenile is selected for
18 the drug court?
19    A.  It's probably more appropriate to ask Tom Zaback
20 that question.  I can tell you what I can remember from
21 that program.
22    Q.  Yes.  What do you remember from the program?
23    A.  Okay.
24        MS. AYACHI:  Objection, form.
25        THE WITNESS:  Those kiddos or juveniles who

15 (Pages 54 - 57)

Page 58

1 were court-involved who would be typically, at that time,
2 brought in for possession of marijuana under 2 ounces in a
3 drug-free zone, the school district or local police
4 departments would refer those cases to us. Those kiddos
5 would come in with their parent or guardian, would be
6 given the option -- would be actually assessed and would
7 be given the option of whether they wanted to participate
8 in the drug court program or not.
9         If they said they would fully participate in
10 the curriculum and the programming of the drug court
11 program and complete the program, which I think
12 was -- about that time was about six months, if they
13 completed that program, then their possession of a
14 controlled substan- -- a drug-free zone case was dropped,
15 and their record was expunged. And that was the
16 motivation for some of those kids and their families to
17 participate in the drug court program.
18         The drug court program was a very intense
19 program. So it had to have full participation from the
20 family and the youth in order to meet the criteria for
21 that program, be able to par- -- to participate in it
22 successfully. At the end of the six months or the end of
23 that -- that program, they went back before the judge.
24 The -- the probation officer gave a progress report to
25 say: Susie or Johnnie participated; the family totally

Page 59

1 participated; they've done well; they've been clean on all
2 their drug screens; they've participated in all of our
3 outpatient services, various services they may be selected
4 to participate in. We recommend that they be --
5 they're -- they're -- they complete successfully with the
6 Court's acknowledgement and their record be expunged.
7 BY MR. FRANKLIN:
8    Q. You used the example of marijuana possession.
9        Was the criteria for admittance into the
10 drug program limited to marijuana?
11       MS. AYACHI: Objection, form.
12       THE WITNESS: I don't recall. That would be
13 a better question for the drug court supervisor at that
14 time.
15 BY MR. FRANKLIN:
16    Q. Do you have any knowledge whether participants
17 from the drug court program had other substance abuse
18 issues besides marijuana?
19       MS. AYACHI: Objection, form.
20       THE WITNESS: I think that's a trick
21 question. You just asked me the same question twice. I
22 don't know. Tom Zaback would probably be a better person
23 to ask that question.
24 BY MR. FRANKLIN:
25    Q. And the reason why I asked the question slightly

Page 60

1 different is because it's my understanding that, as the --
2 the liaison in the drug court, that you have some
3 interaction with the juvenile to place them into a program
4 that would serve their needs.
5    A. I'm saying I don't recall from 2004 if the net,
6 so to speak, of criteria for kids was more than possession
7 of marijuana under 2 ounces in a drug-free zone. I don't
8 recall the other offenses that they may have been able to
9 have, but their drug offense is what got their referral.
10 That drug offense is what brought them in to be considered
11 for the drug court program.
12    Q. Did you have any transparency into the drug
13 offense allegedly committed by the juvenile?
14       MS. AYACHI: Objection, form.
15       THE WITNESS: Can you be more specific about
16 what you're asking?
17 BY MR. FRANKLIN:
18    Q. I'll break the question down.
19        At any point in time when you were a liaison
20 in the drug court, were you aware of any drug offenses
21 committed by the participants that you served?
22    A. Well, I was a part of the grant project on kids
23 that went to residential treatment or outpatient at the
24 local mental health facility there. I didn't have as much
25 oversight on, like, what their other -- what their

Page 61

1 offenses were or whatever. I'm -- I'm a little confused
2 by the question because my role in drug court, I worked in
3 the drug court program, but I was hired in on the grant
4 project for kids that went over to the local mental health
5 facility for treatment.
6        I did not have a caseload. I didn't know as
7 much about their different offenses that they may have had
8 in addition to a drug offense. I'm a little confused.
9    Q. And -- and that's a fair response. But I -- I
10 want to be clear that you had no transparency into the
11 drug offense that the kids that you served may have
12 committed.
13    A. No --
14       MS. AYACHI: Objection, form.
15       THE WITNESS: -- transparency into the
16 offense that the kid committed? Is that what you're
17 asking?
18 BY MR. FRANKLIN:
19    Q. Yes.
20        So if -- if a -- a kid came in and was
21 directed to a, you know, mental health -- the mental
22 health facility for treatment, what I'm understanding from
23 you, you would not have known what type of drug offense
24 the juvenile committed to be directed to the mental health
25 facility for treatment?

16 (Pages 58 - 61)

Page 62

1    A.  I mean, I would -- I could see their paperwork
2  that had -- they committed, you know, possession of
3  marijuana in a drug-free zone.  I would -- I could see
4  that.
5         My thing was they were -- they got accepted
6  into the drug court program.  Then it was my
7  responsibility to work with MHMR to see that that youth
8  got the services they needed from the mental health
9  facility that we worked with and from other providers that
10  we worked with, with the drug court program.
11    Q.  It's my understanding --
12    A.  Yes, I guess I -- I did see, you know, some of
13  their offenses.  But I can't tell you any additional
14  offenses -- I don't remember -- that we had in 2004
15  related to.  They were mainly the possession charge I'm
16  talking about.
17    Q.  During your time in the role that we're
18  discussing right now, do you recall any of the juveniles
19  entering into the mental health facility for treatment
20  that abused opioids?
21       MS. AYACHI:  Objection, form.
22       THE WITNESS:  At that time, I don't recall
23  any.
24  BY MR. FRANKLIN:
25    Q.  Do you have any knowledge of whether they are

Page 63

1  admitted into the program today?
2    A.  For opioid?
3       MS. AYACHI:  Objection, form.
4  BY MR. FRANKLIN:
5    Q.  Yes.
6    A.  For opioid abuse?
7    Q.  Yes.
8    A.  Ask me the question again.
9    Q.  Are you aware of whether participants in the
10  mental health facility for treatment accept juveniles who
11  have abused or were in possession of opioids?
12       MS. AYACHI:  Objection, form.
13       THE WITNESS:  They would take those kids.
14  If they needed the treatment, it would depend on their
15  level of dependency and addiction, because opioid
16  withdrawal is a serious issue and, in some cases, may need
17  medical intervention that in some programs may not be
18  equipped to provide, but they would accept those kids.
19  BY MR. FRANKLIN:
20    Q.  You testified earlier, as a part of the intake
21  process into the drug program, that the juvenile was
22  assessed.  Who performed the assessment?
23    A.  Drug court is subcont- -- are contracted with
24  some clinicians from MHMR and from Lena Pope Home.
25  From -- there were two or three programs that had

Page 64

1  contracts with Tarrant County Juvenile Services who had
2  their clinicians come in and do an assessment packet on
3  each -- each individual with the family and the kiddo to
4  determine their level of use, their lev- -- and their need
5  for treatment at what level.
6    Q.  Do you recall the criteria that was used to refer
7  a juvenile to MH- -- MHMR versus Lena Pope Home?
8       MS. AYACHI:  Objection, form.
9       THE WITNESS:  No, I don't remember.  I'm
10  sorry.
11  BY MR. FRANKLIN:
12    Q.  What is the general profile of a juvenile
13  participant who is admitted to MHMR?
14       MS. AYACHI:  Objection, form.
15       THE WITNESS:  The typical profile?  Are you
16  talking about MHMR or MHMR drug treatment?  'Cause MHMR is
17  a humongous organization with various types of treatment.
18  And I've only worked with juveniles, so I could only speak
19  to juveniles.  What -- what -- how specifically are you --
20  what are -- what are you asking me?  That's a broad
21  question.
22  BY MR. FRANKLIN:
23    Q.  Well, let me deconstruct that question, and let
24  me ask a subsequent question so I can get a better
25  understanding of what services that MHMR provides.

Page 65

1         It sounds like what you're telling me is
2  that MHMR had a specific program for drug treatment.
3    A.  Uh-huh.  Yes.  They still do.
4    Q.  How would you describe the type of participant
5  who is referred to the MHMR drug program?
6    A.  Marijuana is usually -- is -- is -- I'm just
7  telling you from my experience with -- with that program
8  and with kids that we sent there were -- typically had
9  repeated dirty or positive UAs for marijuana.  On some
10  occasions, predominantly marijuana, habitual addicted
11  juveniles' marijuana use.
12         Some -- some UAs positive for oxycodone and
13  hydrocodone, that sort of thing, but predominantly, they
14  were -- I'm not saying that's all they would take, but
15  that was mostly what I saw was marijuana addiction.  But
16  in those UAs and that -- those assessments, they -- there
17  was some sprinklings of cocaine.
18    Q.  I'll ask a similar question for Lena Pope Home.
19  And the question is:  How would you describe the juvenile
20  who is referred to Lena Pope Home?
21    A.  Lena Pope Home is predominantly a family
22  preservation type of program.  So they go into the homes.
23  And if there is substance abuse issues, they are equipped
24  too because they -- they have licensed clinicians who
25  evaluate the family, evaluate any drug use that's going on

17 (Pages 62 - 65)

1 with the youth and with the family in the home, determine,
2 you know, what kind of services the family needs, do they
3 need to continue to work with the family along with
4 outpatient on substance abuse issues with kids. They
5 could do in-home-type services like that too. But they
6 predominantly addressed family-functioning challenges that
7 were going on.
8    Q. Did Lena Pope Home have any inpatient services?
9    A. No. They did at one time, the substance abuse
10 program, but it's been closed for a long time. But, no,
11 they don't do any inpatient now.
12    Q. Do you recall when the inpatient services
13 concluded for Lena Pope Home?
14    A. I don't recall.
15    Q. Did they have inpatient services during your
16 stints working for Lena Pope Home?
17    A. When I worked in their drug treatment program,
18 which, I think, we talked about earlier.
19    Q. During the time the inpatient services were
20 available, what type of juveniles -- strike that question.
21      During your stint with Lena Pope Home, what
22 type of juveniles would qualify for the inpatient services
23 that Lena home provided?
24    A. In the '90s when I worked for their drug
25 treatment program, that's the time you're talking about,

1 right?
2    Q. Yes.
3    A. Okay. You know, the times change, and the youth
4 changes, and the degree changes of addiction with our
5 juveniles. If I recall, for sure marijuana was a given in
6 most cases. We had kids that were using LSD, acid, you
7 name it. And they had to be -- have a pretty extensive
8 drug use in order to get into that program because that
9 was a -- a program that was hugely funded through the
10 State. So they had to meet certain criteria in order to
11 get into that program. That program was very intense, and
12 it was six months, which is very rare.
13    Q. To the extent that you have knowledge, when did
14 Lena Pope Home begin to receive juveniles who abused
15 opioids?
16      MS. AYACHI: Objection, form.
17      THE WITNESS: That program accepted kids
18 that used everything. It was very intense. I cannot even
19 begin to tell you. I cannot recall.
20 BY MR. FRANKLIN:
21    Q. And can you recall the proportion of --
22 categorized by drug of the -- strike that question.
23      Do you recall, by category of drug abused by
24 the participants used, that were admitted into the Lena
25 Pope Home program?

1      MS. AYACHI: Objection, form.
2 BY MR. FRANKLIN:
3    Q. For example, was it 80 percent marijuana,
4 5 percent cocaine, 3 percent opioid, and can -- are you --
5 do you have the ability to -- to break down -- break it
6 down in percentages?
7    A. No.
8    Q. Do you know, at the time, whether Lena Pope Home
9 could have -- would have had that information to break it
10 down in those percentages?
11    A. I don't recall if they kept statistics on that --
12 those numbers or not. I'm sure there were some probably
13 because it was a -- it -- it was a -- a huge budgeted
14 program through the State. The State refunded them, so
15 I'm sure they presented some sort of statistics, but I
16 don't have knowledge of what -- how to break that down for
17 you. I know it was -- a lot of those participants were
18 polysubstance users, meaning more than marijuana.
19      (Exhibit 3 was marked for identification.)
20 BY MR. FRANKLIN:
21    Q. I want to share with you Exhibit 3, which may be
22 in your Tab 14, Bates Number TARRANT_00709178.
23    A. I don't know where that is in my tab.
24      MS. AYACHI: Luann, I think it's Tab 14.
25      THE WITNESS: Tab 14? Okay.

1 BY MR. FRANKLIN:
2    Q. This document was produced as a part of your
3 custodial files.
4    A. Okay.
5    Q. I'll give you a second to take a look at it. And
6 when you're done, can you tell me whether you remember
7 this document?
8    A. That would be an easy no.
9      MS. AYACHI: Sorry. Gregory, are you going
10 to put it up on the screen as well?
11      THE WITNESS: This is the drug offenses 1998
12 to 2005? Is that what you're saying?
13 BY MR. FRANKLIN:
14    Q. Yes. Give me one moment. For whatever reason,
15 it would not allow me to share this exhibit again. You
16 know what, I will do it this way.
17      MS. AYACHI: Here you go.
18      MR. FRANKLIN: Okay. Can you-all see that?
19      MS. AYACHI: Yes.
20      MR. FRANKLIN: All right.
21 BY MR. FRANKLIN:
22    Q. Yeah. So here on Exhibit 3, I want you to take
23 note here at the very bottom.
24    A. Okay.
25    Q. I know that you said that you do not recall this

18 (Pages 66 - 69)

1 document.

2    A. Well, I didn't go to work for the county until

3 2004. So this is from 1998 to 2005. Just noting that.

4    Q. And based on these -- this day, this document was

5 presumed to have been created at least in 2005, maybe

6 later. Would you agree with that?

7    A. I would suppose.

8    Q. So I want to point your attention to the bottom

9 portion of this exhibit, and it details the drug testing

10 for 2005.

11       Do you see that?

12    A. Yes.

13    Q. And you mentioned earlier that many of the

14 juveniles that came through the drug program were poly- --

15    A. No, that wasn't the drug court program; that was

16 the Lena Pope Home residential program.

17    Q. Thanks for that clarification.

18       Do you have any insight on the proportion of

19 substance abuse users who used certain drugs that came --

20 strike that question. We'll just use this exhibit.

21       Looking at the bottom portion of this

22 exhibit, it details the percent of juveniles who were

23 detained and the tests that they took and the positivity

24 rates.

25       MS. AYACHI:  I'm going to object to this

1 exhibit. There's no indication that juveniles are the

2 population described here. Unless you have a cover e-mail

3 or other explanatory document to supplement this, I'm

4 going to object on the basis of foundation.

5 BY MR. FRANKLIN:

6    Q. With that understanding -- and we'll come back to

7 the -- the cover e-mail to this later. So let -- let's

8 set aside to whether or not these were juvenile

9 participants in the drug program.

10       Looking at the positivity rates identified

11 at the bottom of Exhibit 3, is this consistent to what

12 your experience was when you worked for the drug program?

13       MS. AYACHI:  Objection, lacks foundation.

14       THE WITNESS:  I cannot say. I will say that

15 when I worked for the drug court program, most of the

16 participants were for possession of marijuana in a drug --

17 under 2 ounces in a drug-free zone. I don't know where

18 this document -- this is 2005; we're in 2023. Is that

19 18 years?

20 BY MR. FRANKLIN:

21    Q. More or less.

22    A. Okay. That's a long time. I -- I don't -- there

23 are so many documents like this that I've looked at and

24 been a part of; I could not tell you, in all honestly.

25    Q. Did -- did the drug court drug test the juvenile

1 participants?

2    A. Yes.

3    Q. Were you involved in either administering or

4 managing the drug tests taken by -- well, taken for the

5 juvenile par- -- participants?

6       MS. AYACHI:  Objection, form.

7       THE WITNESS:  I don't recall administering

8 any -- any UAs to kids. Maybe occasionally, if we didn't

9 have a female available in the drug court program, they

10 would ask me to go in with the juvenile to make sure they

11 didn't contaminate the specimen. But it -- that -- that

12 was on a rare occasion did I ask to get -- to do --

13 conduct the UA actually with the kid.

14 BY MR. FRANKLIN:

15    Q. Which -- which team within your department was

16 responsible for administering the drug tests?

17    A. Well, the drug -- the -- the drug court, it was a

18 given. They were tested weekly. Those kids were seen

19 weekly and tested weekly.

20       In the general population of juvenile

21 services, that was up to the individual probation officer

22 and their supervisor and what was going on with the kid as

23 to when they would drug test their kid they had on

24 supervision. I have no knowledge of what their drug -- no

25 knowledge -- I don't remember what their drug cri- --

1 testing criteria was at that time in 2005.

2    Q. Did you have any transparency in the overall test

3 results of the juvenile participants in the drug program?

4    A. You keep saying "overall transparency" question.

5 Can you say that differently so that I can understand

6 exactly what you're asking me? I know what transparency

7 means. But is there a different way that you can word

8 that?

9    Q. I'll simply say:  Did you see any of the results

10 of the drug tests on the juvenile participants?

11    A. Oh, okay. I don't recall actually visually

12 seeing, you know, their actually -- their actual drug

13 screens. I would see -- I could -- I could see where they

14 were documented in the system.

15    Q. What system were they documented in?

16    A. I believe at that time -- I don't remember the

17 system they had at that time. It's been a long time ago.

18 Now they had the JCMS system, so you can look at drug

19 screens there and how that -- what the results were. But

20 I don't remember what their -- what the program was that

21 they used for the county at that time 'cause we switched

22 over to JCMS many years ago.

23    Q. What was the name of the prior system?

24    A. I don't remember what the name of the pri- -- of

25 the system was. That's -- that's the -- what I was

Page 74

1 saying. But you could look and see, you know, what the
2 results were of the -- of a youth's drug screen.
3     Q. Do you recall ever seeing an overall -- strike
4 the question.
5         Do you ever recall seeing an annual report
6 of test results, drug test results, administered in
7 juvenile services?
8     A. I'm sure I did. I just cannot recall when. I
9 just cannot recall when. We -- we had so many different
10 annual reports and statistics that were collected. I
11 would --
12     Q. Do you remember --
13     A. -- not be telling the truth if I said I didn't,
14 because I probably did. I just don't -- I don't recall
15 all that.
16     Q. Do you remember who would have produced that
17 report?
18     A. It would have been our research statistics de- --
19 department who draws that information out of the case
20 management system.
21     Q. In your role in the drug court, would -- would
22 you have used the drug test results to provide guidance on
23 where to refer the juvenile?
24         MS. AYACHI: Objection, form.
25         THE WITNESS: I wouldn't use just the drug

Page 75

1 screen report. We would -- I would use more than the drug
2 screen report because we had those facilities that did
3 those assessments. But the drug screens are a very
4 important part of that program. So if I could see on a
5 drug screen in -- in the six weeks' period of time or a
6 six -- two-month period of time the kid's testing positive
7 for marijuana or cocaine or whatever consistently, we got
8 an issue here.
9 BY MR. FRANKLIN:
10     Q. Who provides you with the drug screen report?
11     A. Well, typically, those were done -- they're --
12 they do them a little differently now. They ha- --
13 because now they have the hair follicle test and the
14 nailbed test. At that time, it was specifically a urine
15 test, and I believe those were sent off to Labcorp. And
16 the results of those tests were given to the POs by
17 Labcorp or whatever lab we are using at that time. I
18 don't -- I don't have a clue.
19         But that -- let me just specify that those
20 were only sent off to Labcorp. Or -- or more extensive
21 testing of those specimens, what they did was a dip test,
22 which you guys are probably familiar with, where, you
23 know, they urinate in the cup, and then there's a dip test
24 that you dip down in the urine for -- to do the drug
25 screen to -- and the lines will come back a certain way if

Page 76

1 they're positive for certain drugs.
2         And that -- I believe those were, like, a
3 seven- or a nine-panel that were done that tested for
4 marijuana, cocaine, I think -- I think opiates. There may
5 have been over-the-counter -- hydroco- -- I don't
6 remember. It was -- it was several different drugs that
7 they tested for that would come back on the panel. Like,
8 you could walk out of the restroom with the kid, do the
9 dip, and it was kind of, like, a -- I hate to say it this
10 way -- a pregnancy test. You know, it would -- the lines
11 would show up whatever drug they tested positive for.
12         But if there was some question about the
13 validity of it or we felt like the kid somehow manipulated
14 the drug screens, which they could do, in very creative
15 ways I might add, then we would send those to Labcorp or
16 whatever lab we were using. On occasion, I -- I mean, I
17 would see those. I -- that wasn't my primary
18 responsibility, but...
19     Q. Do you have any insight, for your time in the
20 drug court, how many drug tests were administered on an
21 annual basis?
22     A. Drug court kids were done once a week, never
23 missed, as far as I know. Geez. The numbers add up so
24 quickly. I -- I couldn't tell you. I mean, if -- if you
25 had 20 kids on your caseload and you tested 20 of them, so

Page 77

1 that's 80 times one person's caseload times five, 400 -- I
2 mean, thousands -- you know, in the thousands of drug
3 screens that were done in drug court program.
4     Q. Do you recall how much the drug tests cost?
5     A. I have no idea. That would be better suited to
6 ask budget. I know it's not cheap.
7         MR. FRANKLIN: I know we are getting pretty
8 close to the lunchtime, and I recognize that you are on
9 East Coast time, which puts us pretty close to 1 o'clock.
10 Would you-all like to take a -- a lunch break?
11         MS. AYACHI: Yeah. Can we go off the
12 record?
13         MR. FRANKLIN: Let's go off the record.
14         THE VIDEOGRAPHER: Off the record at
15 11:53 a.m.
16         (Lunch break taken.)
17         THE VIDEOGRAPHER: On the record at
18 12:54 p.m.
19 BY MR. FRANKLIN:
20     Q. Ms. Pelletier, do you understand that you are
21 still under oath?
22     A. Yes.
23     Q. All right. Prior to our lunch break, we had some
24 discussions around the drug court service providers. We
25 talked about MHMR, and we talked a little bit about Lena

20 (Pages 74 - 77)

1 Pope Home.

2        Were there any other service providers to

3 the drug court?

4      A.  Yes.  I believe they had San- -- Santa Fe

5 Counseling Services, which also provided in-home

6 counseling services.

7      Q.  Okay.  How did their services differ than Lena

8 Pope Home?

9      A.  Santa Fe tended to have four or five different

10 curriculums that they used.  Family preservation with Lena

11 Pope Home had one curriculum they used, which was family

12 preservation curriculum.  They called it FFT, Functioning

13 Family Therapy.

14        Santa Fe Youth Services, I worked with them

15 for -- before I ever worked for the county, 'cause they

16 did some contract work for me at the girls' program with

17 TYC doing some substance abuse counseling.  They had about

18 five curriculums that they used, depending on how they

19 assessed the family and what curriculum worked best for

20 the family.

21        But Santa Fe went into the homes also.  They

22 were in-home services.  And they did some things that were

23 family-oriented counseling that were more brief that

24 weren't extended out as long a period of time.  Just they

25 had a different array.  They kind of had a buffet of types

1 of curriculums that they used that their counselors were

2 trained in.

3        So it depended on, you know, what the issues

4 were, whether drug court decided that Lena Pope Home was

5 the best provider or Family Preservation.  They were both

6 equally excellent programs.

7      Q.  Did the judge determine which program the

8 juvenile would enter into?

9      A.  They took into account -- highly took into

10 account what the drug court assessments and personnel or

11 staff for that department recommended.  The judges usually

12 went along with what was recommended by drug court as to

13 what program they needed.

14      Q.  Did Santa Fe have any specific programs

15 addressing opioid substance abuse?

16      A.  They have specific programs addressing substance

17 abuse.  There may be opioid addition -- addictions that

18 are involved.  There may be marijuana.  There could be a

19 realm.  But -- but keep in mind, you have to determine:

20 Is this a kiddo that needs to be in residential, or is

21 this a kid who can stay in the home, and they can do those

22 in-home outpatient services in the home?

23      Q.  Did Santa Fe offer any inpatient care?

24      A.  No.  Inpatient care is so extremely expensive,

25 and we need inpatient -- listen to me, "we."

1        We need residential.  Residential programs

2 are hard to find that our families can access, that the

3 county can afford to pay for, because your basic detention

4 facility is a -- is a lot per night, per kid with -- if

5 you didn't put any treatment involved.

6        When you start talking about residential--

7 'cause I worked residential, and I had a residential

8 program with TYC.  It's extremely expensive to treat drug

9 addiction, very expensive.

10      Q.  Do you mean --

11      A.  I mean, the average Joe Blow with good insurance

12 cannot afford what residential costs.

13      Q.  Would the expenses to enter into an inpatient

14 care treatment facility be borne on the family, or would

15 it be paid by Tarrant County?

16      A.  I would tell you --

17        MS. AYACHI:  Objection, form.

18        THE WITNESS:  I'm sorry?

19        MS. AYACHI:  Objection, form.

20        But you can answer.

21        THE WITNESS:  I would tell you that, from my

22 experience, whether it was with TYC, any- -- anyplace I

23 worked, residential of any kind, a lot of our families had

24 Medicaid; they didn't have private insurance.  And even if

25 you had private insurance -- occasionally, occasionally,

1 we would come across a family that had private insurance.

2        Well, guess what?  You may have private

3 insurance, but your co-pay may be $100 a day.  Well, I

4 don't know that many people who even make good salaries

5 can afford to pay $100 a day co-pay.  That's with good

6 insurance for any kind of extensive inpatient treatment.

7        So, consequently, you know, it's back on the

8 taxpayers of Tarrant County or whatever county in Texas,

9 because a lot of our families qualified for Medicaid.

10 Unfortunately, Medicaid doesn't have a great reputation

11 for some of their plans providing what's needed for our

12 drug treatment prob- -- problem.

13 BY MR. FRANKLIN:

14      Q.  Were there any grant opportunities to fund

15 inpatient service care for the juveniles?

16      A.  You know, in recent days and recent years, I can

17 say in probably the last five to ten years, grant

18 opportunities for juvenile justice clients or juveniles or

19 adolescents in general, grant-wise, the fun- -- funding

20 source, for some reason -- I have no clue -- has reduced

21 the amount of money being allocated for juvenile services

22 in the grant process.

23        Now, I don't know how that's going to

24 be -- okay.  The grant process through Texas, through the

25 governor's grant, which are the ones I worked with, I

Page 82

1 don't -- I don't recall any of them being for residential.
2 It was more outpatient, which concerns me, you know, with
3 whatever might be going on with --
4      Q.  Okay.  So that --
5      A.  -- with the juveniles at this point.  Because
6 when I first started in drug treatment, drug treatment was
7 paid through Medicaid through the State.  They would pay
8 for six months of treatment.  Well, even at that time, in
9 the '90s, to treat cocaine addiction was about 12 to
10 18 months, and we only had money for 6 months.  I'm going
11 off on a ledge.
12          But anyway, it's -- we don't have the -- the
13 kinds of funds that we need to treat the kind of
14 addictions that are going on.
15      Q.  Okay.  So let's dive deeper into the grants.
16          You just mentioned that, at least in part,
17 service providers may be funded by the State?
18      A.  A percentage, not all of it.  Okay?
19          I don't know what MHMR is getting now from
20 the State for their residential program from the
21 State-funded perspective of it.  They could tell you that.
22 But in order to keep -- in order to keep quality,
23 informed, educated staff for a residential program -- I
24 can tell you this from experience -- okay? -- you gotta
25 pay them.  And you cannot pay them minimum wage, or you're

Page 83

1 going to get minimum-wage results.
2      Q.  During your time working as liaison for the drug
3 court, what percentage of State funding went into H --
4 MHMR?
5          MS. AYACHI:  Objection, form.
6          THE WITNESS:  When I first started working
7 in drug court and with MHMR residential program, Tarrant
8 County didn't pay MHMR a dime for residential services.
9 Okay?  They were totally State-funded.
10          We had a bird in our hand.  Okay?  We had a
11 blessing because Tarrant County was lucky, because we just
12 happened to be one of those counties who had an MHMR
13 residential facility for juveniles.  Not every county has
14 that in Texas.  We weren't paying for any of that.
15          But what I discovered, my experience, was
16 that there was difficulty, I think -- there was
17 difficulty -- you know, you have to have quality staff who
18 are trained, those sorts of things.  You don't pay for
19 that on minimum-wage salary.  I'm just using it as an
20 example.  So after about five years of doing what I was
21 doing, I said:  Hey, you know, if we want them to retain
22 the kind of staff that we need for them to be working with
23 our specialized populations, why don't we look at
24 subsidizing them, some of that money they lose?  So we
25 began paying them a supplemental fund -- okay? -- per day,

Page 84

1 per kid, which was nothing, but it helped.
2          But contract-wise, when I was working in
3 drug court and for four or five years, we didn't pay them
4 anything.  They got all their funding through the State.
5 BY MR. FRANKLIN:
6      Q.  What year did that change?
7      A.  Wow.  Somebody asked me that like three or four
8 months ago in some conversation 'cause they didn't realize
9 that.  And I'm like:  Yeah.
10          I want to say -- this is 2023.  I went in
11 there in 2000 -- let's see -- '8, '9, '10, '11.  I want to
12 say about maybe 2015 or '16.  You would have to ask the
13 budget people on that because I don't remember what
14 year -- the very first year we started paying them a
15 supplemental fund for our kids in residential.  Before
16 that, they were getting strictly State funding or Medicaid
17 funding or both, and it still could hardly pay the bills.
18      Q.  What percent -- after 2015, what percent funding
19 came from the State to MHMR?
20      A.  I have --
21          MS. AYACHI:  Objection, form.
22          THE WITNESS:  -- no idea.
23 BY MR. FRANKLIN:
24      Q.  Do --
25      A.  I have no idea.

Page 85

1      Q.  Do you recall how much, annually, you
2 supplemented the service providers to --
3      A.  When we started?
4      Q.  After 2015.
5      A.  $40 a day per kid, which is beans.  That's beans.
6 I paid that to board my dog.
7      Q.  Collectively, how much was that on an annual
8 basis paid as a supplement?
9          MS. AYACHI:  Objection, form.
10          THE WITNESS:  Our contract started out at
11 $150,000 a year, and we overspent that at that time.  And
12 so we basically just had to say:  After this month, we
13 have no more money, so everything will have to be -- any
14 kid we send you -- you know, they could refuse them if
15 they wanted to because of the money, but they didn't.
16 They didn't refuse our kids because they saw the need, and
17 we had a good partnership with them.
18          So they lost out on money from us because we
19 did not have the money to -- you know, so we managed to
20 increase the budget from 150 to 167 a year.  But then
21 COVID hit, which turned everything upsidedown, which
22 their -- their population dwindled down to about 4 to 8
23 kids there for months and months, because of COVID.
24 BY MR. FRANKLIN:
25      Q.  So of the 167,000 paid to MHMR annually, how much

22 (Pages 82 - 85)

1  of that was supplemented by Tarrant County?
2      MS. AYACHI:  Objection, form.
3      THE WITNESS:  Well, I don't know the --
4  exactly the total amount they received from the State or
5  from Medicaid for each one of our kids.  All I can tell
6  you is that we paid them $40 a day per kid.  So the rest
7  of that -- I don't know, you know, how much they're
8  getting now from the State and from Medicaid on our kids.
9  BY MR. FRANKLIN:
10     Q.  Did the drug court continue to pay the $40 per
11  kid from 2015 through the time you retired?
12     MS. AYACHI:  Objection, form.
13     THE WITNESS:  Yes.  We -- we still pay $40 a
14  day.  But the -- the thing is, is that -- well, there's no
15  thing is.  It's -- we -- yeah, $40 a day.
16  BY MR. FRANKLIN:
17     Q.  And you said during COVID, the amount of
18  participants were around 8?
19     A.  Or less at times because we couldn't -- they
20  couldn't bring kids in because they were coming in from
21  out of the community and giving other kids COVID.  So they
22  had to set up a different situation, a separate living
23  situation inside the building, where they had to set up a
24  section of kids that were coming from the community.  They
25  had to put them in an isolated area of the building for X

1  amount of days and test them, like, twice before they
2  could move them into the general population.
3      Well, I mean, they had staff to protect;
4  they had -- you know, the whole COVID situation made it
5  very difficult for them to do groups or anything like
6  that.
7      Q.  Did the numbers ever increase from 8 after COVID?
8      A.  I would say -- yes.  Let me say that the last
9  bill I reconciled was the first part of July.  They had
10  about 8 kids at that -- 8, 9 kids that they served that
11  previous month.  They're still not back up -- well, they
12  may be today; I don't know.  But they still have not
13  gotten back up to the 16 -- 16 that we have on our
14  contract.
15     Q.  And to clarify, we are only talking about
16  juveniles participating in the inpatient care?
17     A.  Yes.
18     Q.  About how many juvenile participants are in the
19  outpatient care?
20     MS. AYACHI:  Objection, form.
21     THE WITNESS:  From juvenile services, I
22  would say probably -- they have three locations -- let's
23  see -- Dallas -- I mean -- I'm sorry -- Fort Worth,
24  Euless, Arlington.  I would say probably 45 to 50
25  outpatient kids at any one time.

1  BY MR. FRANKLIN:
2      Q.  Are the service --
3      A.  That are actively -- actively participating.
4      Q.  Are the services provided for these 50 juveniles
5  funded by grant funding or Tarrant County?
6      A.  State funding.
7      Q.  And generically, when you say "state funding,"
8  are you including Medicaid or --
9      A.  Yes.
10     Q.  Yes?
11     Okay.  It's Medicaid plus grants from the
12  State?
13     A.  Well, when you say "grant funding," I'm thinking
14  specifically of grant money we applied for.  Okay?  Within
15  the budget process, the way Kimberly Dixon does it, who is
16  our finance person, who is the person you may need to talk
17  to about this because I don't want to tell you something
18  that's not accurate, because there is some ways that --
19  that the State categorizes their grant funding.  They
20  could say:  You're getting this money out of grant C or
21  something, or whatever.
22     They may define grant money differently than
23  I'm thinking about.  I'm thinking grant money like grant
24  money that Luann, you know, helped the county apply for,
25  but it's State money.  All the outpatient that we use is

1  State funded through Medicaid.
2      Q.  We've been speaking specifically about MHMR.
3      What about Lena Pope Homes [sic]?  Is the
4  services provided by Lena Pope Homes funded by the State?
5      A.  We have --
6      MS. AYACHI:  Objection, form.
7      THE WITNESS:  -- contracts with Lena Pope
8  Home in Santa Fe.
9  BY MR. FRANKLIN:
10     Q.  Focusing on Lena Pope Homes, how are those
11  contracts funded?
12     A.  We have a contract with Lena Pope Home for family
13  preservation for $265,000 a year.  Santa Fe is 200 and --
14  well, it increased this year, but it's typically 250,000,
15  and we had to add $62,500 to that this past year.
16     Q.  Are these funded by the State or by Tarrant
17  County?
18     A.  Tarrant County.
19     Q.  Do you know whether or not Tarrant County
20  received funds from the State to pay the contracts for
21  Lena Pope Home?
22     A.  I'm not totally for sure.
23     Q.  Is it possible?
24     A.  Yeah, I guess it's possible.  I mean, I -- I --
25  the streaming funds are a budget process, which is not my

23 (Pages 86 - 89)

Page 90

1 expertise.  As -- as far as that's concerned, you would
2 need to talk to budget administration.
3      Q.  Would Kimberly Dixon know that?
4      A.  Yeah, I believe so.  Kimberly Dixon may not be
5 aware of how MHMR is funded for drug treatment, though.  I
6 mean, she knows that we have our residential funding
7 there, because she helps, you know, manage that on a
8 monthly basis, as -- as of -- I reconcile the bills; I
9 send them to her; they process them for payment.
10      I don't think she could tell you what I'm
11 telling you as far as other ways that MHMR is funded as
12 far as drug treatment goes.  She probably couldn't.  But
13 she could tell you all the other streaming funds as far as
14 subsidies or other services in general is what I'm saying,
15 I guess.
16      Q.  The service provider Santa Fe is contracted for
17 over $200,000 to provide services to Tarrant County?
18      A.  Uh-huh.
19      Q.  Is it --
20      A.  Juvenile services.
21      Q.  Say that again.
22      A.  Juvenile services.
23      Q.  And Tarrant County pays Santa Fe directly for the
24 services to Santa Fe?
25      MS. AYACHI:  Objection, form.

Page 91

1      THE WITNESS:  They send us their invoice for
2 the kids that they serve, the families that they serve.
3 We reconcile those invoices; we send them for processing
4 to downto-- downtown.  Yes.  I'm thinking out loud.
5 BY MR. FRANKLIN:
6      Q.  But you don't -- like with Lena Pope Homes, you
7 don't know whether Tarrant County is paying Santa Fe
8 through state funds rather than Tarrant County general
9 funds?
10      A.  My understanding is Tarrant County funds, but I
11 can't -- I can't swear on that.  That's something you
12 would need to double-check with the powers that be.
13      Q.  Were there any other service providers in
14 addition to MHMR, Santa Fe, and Lena Pope Homes?
15      A.  Any other service providers or any service
16 providers for substance abuse that I managed?
17      Q.  Let's -- to simplify it, let's focus on the
18 substance abuse.
19      A.  Okay.
20      Q.  Were there any service providers providing
21 services to Tarrant County specifically for substance
22 abuse?
23      A.  For substance abuse or substance abuse -- for
24 instance, Family Preservation could also address substance
25 abuse, but they didn't really do, like, intense treatment

Page 92

1 regarding -- they were more family preservation.  That
2 could have been a part of the problem, but it wasn't the
3 main problem.  Okay?
4      Lena Pope Home, Santa Fe, MHMR.  I'm
5 thinking if there's another one that we paid for.  I mean,
6 if you wanted to count the money that is spent on UAs/drug
7 screens, that's there.  And I don't know who those drug
8 screen -- who those companies are now that they use 'cause
9 I -- I wasn't really a part of that in my last 15 years,
10 anything related to substance abuse.  I believe that's it.
11 I may have left out one, but I believe that's pretty much
12 it.  The lab costs that may be, you know, involved with
13 the drug screens.
14      Q.  Do you know how much that was on a annual basis?
15      A.  What -- how much --
16      MS. AYACHI:  Objection, form.
17      THE WITNESS:  -- what was on an annual
18 basis?
19 BY MR. FRANKLIN:
20      Q.  How much the drug testing costs were?
21      A.  No, I don't.  I know it's not cheap, but I don't
22 know -- and -- and they're doing other kinds of drug
23 screens now in -- in the department with the hair follicle
24 test and the nailbed test, and those are expensive.
25 That's why we try not to have to do those.  But -- and --

Page 93

1 and they have been court-ordered frequently.
2      Q.  What -- what is the basis of your knowledge that
3 the drug tests were not cheap?
4      A.  Well, let's see.  I'm trying to remember what
5 they were when I was in drug court, per test.  I don't
6 know.  I really don't know, except that I -- I can
7 remember in my mind, in the past -- and this was a drug
8 court time -- thinking:  Wow.  And we test a lot of kids
9 in drug court.  I don't know.  You can look it up, or you
10 could find it from the county records for juvenile
11 services, or you can call downtown and ask.
12      Q.  I -- I briefly want to talk about the drug kits
13 themselves.
14      A.  Uh-huh.
15      Q.  Are you familiar with the drug kits?
16      A.  You know, I don't know the kind of drug kits
17 they're using now.  I think they're still doing the
18 nine-panel, like, dip test.  I'm pretty sure they're still
19 doing the dip test.  I'm -- I'm almost certain they are,
20 because I've sat in court hearings and a kid has just been
21 tested with a dip test when they were detained the night
22 before.  Okay?  So I know they're still doing those.
23      I know the POs are still having kids come
24 in, and they're doing a drug screen dip test kind of
25 thing.  But, you know, sometimes those come out

24 (Pages 90 - 93)

Page 94

1 inconclusive, so they have to go with the lab route, which
2 is more expensive.
3           They're now doing the nailbed test and the
4 hair follicle test.  And I can recall a very brief
5 conversation with the administrator for our intake unit
6 and us having a very brief discussion about those tests,
7 and there was made mention of those being expensive.
8      Q.  Do you know how many tests, drug tests, are
9 inside of one kit?
10          MS. AYACHI:  Objection, form.
11          THE WITNESS:  Have you ever seen one?
12 BY MR. FRANKLIN:
13      Q.  No.  But please describe how --
14      A.  Okay.  They come in a little packet about like
15 this (indicating), a little plastic, rip off the top.
16 They tinkle in a cup.  You dip it like you do a pregnancy
17 test, dip it down in there.  You pull it up.  And lines
18 come across solid for whatever te-- -- whatever the kid
19 tests positive for.  That -- they're very simple.  You can
20 buy them at the drugstore.  But I don't know how much each
21 one of them costs is what I'm saying.
22      Q.  Yes.  I do understand that some test kits may
23 have multiple tests inside of the kit.
24      A.  Uh-huh.  It's one panel -- it's one panel, and it
25 tests for all the different drugs.

Page 95

1      Q.  Okay.  So there's -- for each kit, there's only
2 one test inside of each kit?
3      A.  Yes.  That's the way it was the last one that I
4 looked at.  Today, last month, five months ago, they could
5 be doing a totally different one for their testing.  Those
6 are the ones that I recall doing.
7      Q.  What impact has the opioid epidemic had on the
8 drug court?
9          MS. AYACHI:  Objection, form.
10         THE WITNESS:  Drug court really doesn't
11 exist anymore.  Drug court is -- has been reconstructed,
12 so to speak.  That program has become more of the
13 diversionary piece of our unit, of our juvenile services.
14 So drug court has -- those officers have kind of become --
15 there's only, like, three of them now, I think, and
16 they -- they're in more of the diversion unit of juvenile
17 services now.  Drug court is no longer drug court anymore,
18 unfortunately.
19 BY MR. FRANKLIN:
20      Q.  We may limit your response to the time that you
21 were employed in the drug court.
22      A.  Okay.  What was the question?
23      Q.  What impact, if any, did the opioid epidemic in
24 Tarrant County impact the drug court?
25      A.  At the time I was in drug court, probably very

Page 96

1 little because the primary offenses were -- as I said
2 earlier, were possession of marijuana under 2 ounces in a
3 drug-free zone.
4      Q.  And can you estimate, by percentage, of the cases
5 that came through that were related to opioids?
6      A.  In 2004 and '5 and '6 and '7 and '8?
7      Q.  Yes.
8      A.  Probably 10 percent.  But that was 18 years ago.
9 We're in 2023.
10     Q.  And the 10 percent would be based on
11 the -- strike the question.
12         Would the 10 percent be based on the
13 offenses committed by the juvenile?
14     A.  Well, the primary method --
15         MS. AYACHI:  Objection, form.
16         THE WITNESS:  -- at that ti-- -- the primary
17 offense at that time was under 2 ounces in a drug-free
18 zone, possession.  Okay?  If we saw a kid come through
19 there and somehow they drifted in and had opioid
20 addiction, they had more than a drug court could handle.
21 BY MR. FRANKLIN:
22     Q.  What would be --
23     A.  For example, I'm telling you, if a kid came in,
24 in 2004 and '5 and '6 and '7 and '8, when I was in there,
25 and they tested positive regularly or even semi-regularly

Page 97

1 or once a month for opioids, they were being past a
2 drug court program.  They were going to be considered more
3 for residential or intensive outpatient, because the
4 opioid piece is very significant.
5      Q.  Then, if I understand you correctly, the
6 10 percent number comes from the testing that occurred
7 after a juvenile was admitted into the drug court?
8      A.  It could come from the testing.  It could come
9 from the assessment that was done with the kid and the
10 family.  The family could report, you know: I know he's
11 using something else because he's "duh," you know, coming
12 in acting crazy, blah, blah, blah.  For whatever reason.
13 There may be some other reason.  It wasn't just drug tests
14 that would tell us.  There was other things going on.
15         If we saw a kid who came in and -- and
16 tested positive for opioids and cocaine and several
17 things, we -- they probably weren't going to be found
18 appropriate for drug court.  They needed much more intense
19 treatment.
20         Drug court was a beginning type of program.
21 It was a program that we tried to catch them on the front
22 end.  That was -- and divert them out of the system.
23 That's the reason, if they participated and participated
24 successfully, their record was expunged.  You don't get
25 your record expunged from juvenile services real easy.  So

25 (Pages 94 - 97)

Page 98

1 it was an intense program that you had, you know, to
2 participate in.
3    Q.  Then the 10 percent that you are referencing
4 would not participate in the drug court program but would
5 be diverted to MHMR since they were the only inpatient
6 care service provider?
7    A.  Well, we're not trying to determine --
8        MS. AYACHI:  Objection, misstates the
9 testimony.
10       THE WITNESS:  I'm sorry, Leila.  What did
11 you say?
12       MS. AYACHI:  I was objecting, misstates the
13 testimony.  But you can clarify as to your understanding
14 of the question or ask him to restate the question.
15       THE WITNESS:  Can you restate the question,
16 please?
17 BY MR. FRANKLIN:
18    Q.  The 10 percent that have come through the drug
19 court system where you mentioned tested positive
20 for -- for opioids, would that entire population be
21 referred to MHMR because MHMR had the inpatient care
22 system?
23       MS. AYACHI:  Objection, form.
24       THE WITNESS:  If they were male, it was a
25 strong possibility, but MHMR, for juveniles, doesn't serve

Page 99

1 females.
2 BY MR. FRANKLIN:
3    Q.  Where would opioid substance abusers, talking
4 about juveniles, be directed to if not MHMR?
5    A.  They would be direct -- sometimes we would try to
6 utilize Phoenix House in Dallas because they always got --
7 they also got State funding.  We tried to divert to any
8 program that had State funding because our kids didn't
9 have insurance.  And if they didn't go to drug treatment
10 through our placement unit, we had to dig and claw and try
11 to find a program -- another program that was state funded
12 that would take the kiddo:  Phoenix House.  At that time,
13 there was Nexus house in Dallas for females; there was The
14 Right Step in Euless at one time, which is no longer
15 taking adolescents.
16       We had three -- three or four basic places,
17 but a lot of those were only insurance.  Some of them
18 would take State funding.  Some of them wouldn't take
19 certain kinds of Medicaid.  A lot of them did not want to
20 take the Medi- -- Medicaid Amerigroup.  Their explanation
21 to me was it was hard to get paid.  So the whole insurance
22 thing is a whole nother ball of wax, so don't get me
23 started.
24    Q.  After you transitioned from your liaison role in
25 the drug court, what was your new title?

Page 100

1    A.  Supervisor over community resources unit.
2    Q.  Tell me more about that role.
3    A.  Okay.  I managed the -- the Family Preservation
4 contracts, the MHMR, the -- our advo- -- TCAP program,
5 Tarrant County Ad- -- Advocacy Program, which is a
6 $600,000 budget that we provide advocates for our kids
7 that qualify.  I did the grant work at one time,
8 collaborated/partnerships with other agencies in -- in
9 the county that provided other services besides substance
10 abuse.
11       Substance abuse, in my last 15 years, really
12 was one piece of it.  It -- it branched out to some of our
13 community programs, in general, in trying to find
14 community programs that would serve our kids; vetting
15 programs that could potentially serve our programs:  How
16 much do their programs cost; are their programs legit; am
17 I going to read about them on the news tomorrow, which was
18 not something Luann Pelletier wanted to be a part of;
19 putting out fires; listening to people gritch and moan
20 'cause they don't get what they want; budgets.
21    Q.  Did you establish the budgets for the contracts
22 for the service providers?
23    A.  I didn't establish them.  I was a big part of
24 them, a big part of the input into how much money we
25 really needed to -- to serve our kids, what kind of

Page 101

1 programming we really needed, because times change just
2 like addictions -- or addictions.  But certain drugs, you
3 know, become a bigger issue.
4       I did a little bit of everything in the
5 community.  Wor- -- trying to work with providers and
6 create partnerships and relationships with people in
7 Tarrant County that would serve our kids, who -- who were
8 nonprofits, who weren't about money and those sorts of
9 things.
10    Q.  Help me understand the structure of the
11 supervisor community resource unit?
12       MS. AYACHI:  Objection, form.
13 BY MR. FRANKLIN:
14    Q.  And I'm saying that --
15    A.  Ask your question again.
16    Q.  Well, let me ask it differently.
17       Who did you report to in your role as a
18 supervisor of the community resource unit?
19    A.  I reported -- when I left, I reported to the
20 deputy assistant director of probation services.  I had
21 several supervisors over the years.
22       At one time, I reported to the assistant
23 director of the department of juvenile services.  I don't
24 know.  It's been restructured several times.  You know how
25 structuring goes.

26 (Pages 98 - 101)

Page 102

1    Q. So what's -- and the community resource unit,
2 this fell under the umbrella of probation services?
3    A. Yes, because we provided services to kids that
4 were on probation.
5    Q. Understood.
6       For the contracts that you managed for
7 community -- for the community resource unit, did that
8 differ than the contracts that were used in the drug
9 court?
10      MS. AYACHI: Objection, form.
11      Is there a time frame or a time for this?
12      THE WITNESS: It was expanded. Because drug
13 court was drug court. That was one direction. When I
14 went into the community resource thing, I still did our
15 MHMR coordination/liaison-type work with MHMR for our
16 substance abuse program, but I also did it for our other
17 programs, our family preservation programs, our advocacy
18 programs, those kinds, you know.
19 BY MR. FRANKLIN:
20    Q. So you --
21    A. Well, with YouthBuild, I sent kids to -- referred
22 kids to YouthBuild for vocational training. Whatever a
23 kid and a family needed, I tried to find it.
24 BY MR. FRANKLIN:
25    Q. So did you manage the contracts for those service

Page 103

1 providers across juvenile services?
2      MS. AYACHI: Objection, form.
3      THE WITNESS: Across juvenile services?
4 BY MR. FRANKLIN:
5    Q. For example -- well, I'll allow you to tell me.
6      Did the community resource unit coexist with
7 the drug court?
8    A. At that time, I believe it did, but the role was
9 a little more narrow. That person, at that time, didn't
10 do any of the substance abuse piece. They primarily did
11 Family Preservation and TCAP. It expanded after I moved
12 into that. And I think one reason it may -- well, I'm not
13 even going to think. I don't know.
14    Q. Do you know whether or not Tarrant County
15 Juvenile Services had multiple contracts with the same
16 service provider?
17    A. Multiple contracts with the same -- same service
18 provider?
19      MS. AYACHI: Objection, form.
20      THE WITNESS: I think juvenile services -- I
21 think JJAP, their alternate school program, may have a
22 contract with Lena Pope Home for their behavioral
23 interventionists in their schools. I'm trying to think --
24 which I don't manage that piece. Santa Fe, I think, at
25 one time provided behavioral interventionists to our JJAP.

Page 104

1 I don't know if they still do. I want to say -- I don't
2 know about multiple, but some of them may have had one or
3 two.
4 BY MR. FRANKLIN:
5    Q. Did you manage all of the service provider
6 contracts that involved substance abuse services?
7      MS. AYACHI: Objection, form.
8      THE WITNESS: We didn't have very many, so,
9 yeah, except for drug screens and -- drug screens.
10 BY MR. FRANKLIN:
11    Q. Did you have anyone to report to you when you
12 were the supervisor of community resource?
13    A. I had one person. We were a two-person company.
14    Q. Who was that other person?
15    A. Lori Hooper. So we stayed very busy.
16    Q. Did she work with you for the entire 15 years?
17    A. Yes. She's been there 29.
18    Q. Wow. That's impressive.
19      What was your work e-mail address when you
20 worked for Tarrant County?
21    A. Lpelletier@tarrantcounty.com.
22    Q. I'm going to share with you Exhibit 4. And this
23 would be likely Tab 1 of your notebook. And I'll see if I
24 can get this shared on the screen.
25      (Exhibit 4 was marked for identification.)

Page 105

1      MS. AYACHI: And, Gregory, do you have the
2 Bates for that?
3      MR. FRANKLIN: Yes.
4 BY MR. FRANKLIN:
5    Q. And Bates number starts with Tarrant County
6 00836209 through Bates number ending in 213.
7    A. Uh-huh. Okay. Then I'm on the wrong -- what's
8 the number again?
9      MS. AYACHI: It should be on Tab 1, Luann.
10      THE WITNESS: Okay. Well, I am in the right
11 tab for this. And this was 2013.
12      MR. FRANKLIN: Okay. Can everyone see my
13 screen?
14      MS. AYACHI: Yes.
15 BY MR. FRANKLIN:
16    Q. Okay. I'll give you a second to look through
17 Exhibit 4.
18    A. (Witness examines document.)
19      MS. AYACHI: And, Luann, feel free to read
20 the complete document at -- at your own pace. Okay?
21      THE WITNESS: You want me to read them?
22      MS. AYACHI: Familiarize yourself.
23 You -- you can --
24      THE WITNESS: Yeah.
25      MS. AYACHI: -- feel free to look over it.

27 (Pages 102 - 105)

Page 106

1      THE WITNESS:  Yeah.
2      (Off-record discussion.)
3  BY MR. FRANKLIN:
4      Q.  And, Ms. Pelletier, just let me know whenever
5  you're done.
6      A.  I'm pretty much done.  I think I know what this
7  is.
8      Q.  And do you recall this e-mail?
9      A.  That would be a no, 'cause it's ten years ago,
10 but I can probably explain to you what the conversion was
11 about.
12     Q.  Yes.  But before we do that, can you tell me who
13 Roxanne Potter is?
14     A.  Roxanne Potter, according to the e-mail, was the
15 account manager at mhmrtc.org.
16     Q.  And what about -- who is Julie M. Laughlin?
17     A.  Julie Laughlin was a brief program director, a
18 brief program director at MHMR residential.
19     Q.  Who is Margie K. Blake?
20     A.  Margie K. Blake was -- I haven't heard from
21 Margie in a long time, so she might have retired.  She was
22 also in the accounting department at MHMR, in their main
23 office on Hulen.
24     Q.  Who is Floyd L. Tennison?
25     A.  I have no clue.

Page 107

1      Q.  Is --
2      A.  Probably one of her bosses, one of Margie's
3  bosses at that time.
4      Q.  Now, can you explain to me what's going on in
5  this e-mail?
6      A.  What's going on in this e-mail, I believe, would
7  be the monitoring reports that would have to be conducted
8  on our contracts.  And I was letting them know what
9  information that I needed to follow up on that I would be
10 needing to look at to see for their monitoring through the
11 year, that I needed to do twice a year.  So -- because a
12 lot of that information, some of it I could pull from the
13 State monitoring paperwork that -- 'cause the Sta- -- the
14 State monitored them.  And so I could pull a lot of their
15 information from the State monitoring.
16     But I believe this is where I was asking
17 for -- where it says -- for instance, on February 5th,
18 Tuesday, 2013, where it says:  Luann, here is Karen's
19 license.  Is there anything else you need from me for your
20 records?
21     I would send them a letter that said, you
22 know:  I'm going to be coming out on X day, and I'm going
23 to be doing a monitoring report.  I will be asking for
24 five kids' records.  I didn't give them the name of the
25 kids because I didn't want them to know the names of the

Page 108

1  kids because then they could prepare.  Right?
2      Okay.  So I would need to be looking at
3  their li- -- the licenses of the kid -- of the counselors
4  there to make sure their lic- -- they were current.
5  You'll see on that next page, where it says Bev, who was
6  one of the program director -- assistant program directors
7  there, Beverly Ozanne, where it says:  If you'll give me
8  your renewal license for your LCDC, I'll scan it and send
9  it to Luann.
10     She's communicating to people that we need
11 to get this stuff to me, being Luann.  There were
12 several -- a lot of questions, you know, that were asked
13 on the -- on the audits.  It was just based on monitoring
14 reports that I was getting ready to have to do.
15     Q.  Now I'm going to share with you two attachments
16 that were a part of this e-mail.  And for your
17 convenience, these would be Tabs 2 and 3.
18     A.  Okay.  Tab 2.
19     Q.  And I will share the Bates number in a second.
20     A.  Tab 2.
21     Q.  The first one I'll show you is Exhibit 5, which
22 purports to be an MHMR Tarrant County comprehensive annual
23 financial report.
24     A.  Uh-huh.
25     Q.  Bates number starting with TARRANT_00836214, and

Page 109

1  it ends with Bates number ending in 315.
2      (Exhibit 5 was marked for identification.)
3  BY MR. FRANKLIN:
4      Q.  In your monitoring of these contracts, how would
5  you use -- what information would you look for in the
6  financial report?
7      A.  Okay.  If you looked at the MHMR -- let's see.  I
8  got that.  Let me -- I'll show you what I would look at.
9      My primary -- if you go to a few pages --
10 move it a few pages forward, you'll see a Certificate of
11 Achievement for Excellence in Financial Reporting.
12     Q.  Which page and which Bates number?
13     A.  00836226.
14     Q.  Okay.
15     A.  I'm looking to see what the State found on their
16 last annual financial reporting, 'cause this would be
17 their auditors that came in from the State who dug through
18 all of their stuff.  Okay?  I did everything from look at
19 what the State gave them to how many smoke detectors they
20 had.
21     Q.  So you would only be looking for financial
22 discrepancies?
23     A.  No.
24     MS. AYACHI:  Objection, form.
25     THE WITNESS:  That -- that was a part of the

28 (Pages 106 - 109)

Page 110

1 auditing piece, was to look at if there was any issues
2 that were noted in their auditing report that looked
3 off -- okay? -- to see what the -- what the State
4 reported.
5 BY MR. FRANKLIN:
6    Q.  What is some --
7    A.  No.  You know, I didn't keep up with all their
8 num- -- numbers across the board because MHMR is a
9 humongous organization.  So I had them send me a -- that
10 report.  You'll see that they have their independent
11 auditor's report in there.  These are all forms that I
12 would keep so that we had this information.
13    Q.  What decisions would you make if something looked
14 off?
15       MS. AYACHI:  Objection, form.
16       THE WITNESS:  Asking questions.
17 BY MR. FRANKLIN:
18    Q.  Do you recall a situation where you received a
19 financial report and something looked off and then you
20 subsequently took action?
21       MS. AYACHI:  Objection, form.
22       THE WITNESS:  I don't recall one, but that
23 wasn't -- you know, that was just one part of the
24 monitoring report, so -- but I don't recall one.
25

Page 111

1 BY MR. FRANKLIN:
2    Q.  I'll share with you the second attachment, which
3 would be Tab 3 of your folder.  Exhibit 6 is what I'm
4 marking this as, and it begins with TARRANT_00836316 --
5    A.  Okay.  16.  Okay.
6    Q.  -- and it concludes with TARRANT_00836333.
7    A.  Okay.
8       (Exhibit 6 was marked for identification.)
9 BY MR. FRANKLIN:
10    Q.  How did you use this document in your evaluation
11 for the monitoring process?
12    A.  What are you asking me now?  How did I use this
13 information -- are you asking me about a certain piece of
14 this information or --
15    Q.  No, just --
16    A.  -- a photograph or --
17    Q.  I'm just generally asking the question, because
18 this was attached to the documents that were sent over to
19 you for the monitoring process.
20       And my question is:  How would you use this
21 document in your contract monitoring process?
22       MS. AYACHI:  Objection, form.
23       THE WITNESS:  If there's anything noted, I
24 would look at it and see that anything noted was corrected
25 with the State's auditing system.  This piece on the last

Page 112

1 page about, Section 4, "Summary Schedule for Prior Audit
2 Findings, Allowable Activities, ARRA - Homelessness
3 Prevention Rapid Housing Program," I don't really have a
4 clue about that because I don't -- didn't deal with any
5 kind of rapid homelessness prevention issues.
6 BY MR. FRANKLIN:
7    Q.  So to tie up Exhibit 6, you only looked for this
8 document to see if something looked, quote/unquote, off?
9    A.  I looked to see if they had any findings related
10 to the care and custody and treatment of our kids.
11    Q.  In your experience, have you identified any
12 findings that were violative of the care of the -- the
13 kids provided?
14    A.  In this book?
15    Q.  This book or any other document while you served
16 in this role.
17       MS. AYACHI:  Objection, form.
18       THE WITNESS:  Anytime there was anything
19 that was off or came up at this facility, I was
20 responsible to look into it and to report it to my
21 supervisor or my director and make sure that the proper
22 procedures were taken to address any concerns related to
23 anything that applied to the services provided to our
24 kids, whether it be anything in residential, outpatient,
25 whatever.

Page 113

1 BY MR. FRANKLIN:
2    Q.  Okay.  So if you found a negative finding in this
3 report, then you would escalate it through your chain of
4 command to have it addressed?
5    A.  Yes.
6       MS. AYACHI:  Objection, form.
7       Gregory, how do you feel about taking
8 another short break?  We've been going an hour now.
9       MR. FRANKLIN:  Yes, we can take another
10 break.  We can go off the record.
11       THE VIDEOGRAPHER:  Off the record at
12 2:05 p.m.
13       (Brief recess taken.)
14       THE VIDEOGRAPHER:  On the record at
15 2:25 p.m.
16 BY MR. FRANKLIN:
17    Q.  Welcome back, Ms. Pelletier.  Do you understand
18 that you are still under oath?
19    A.  Yes.
20    Q.  Now I want to direct your attention to what will
21 be Exhibit 7, but in your folder, Tab 24, which purports
22 to be a Contract Monitoring Schedule, Bates Number
23 TARRANT_00895677, and I'll share.
24       (Exhibit 7 was marked for identification.)
25 BY MR. FRANKLIN:

29 (Pages 110 - 113)

Page 114

1    Q.  Ms. Pelletier, are you there?
2    A.  Yes.
3    Q.  Okay.  So, Ms. Pelletier, this document was
4  produced as a part of your custodial files.
5    A.  Uh-huh.
6    Q.  And I have a few questions about the programs
7  that are identified on your Contract Monitoring Schedule.
8    A.  Uh-huh.
9    Q.  This dates back to 2011, and there are -- one,
10  two, three, four, five -- six contracts that are
11  identified for your program area.
12        Do you see that?
13    A.  Uh-huh.
14    Q.  And can --
15        MS. AYACHI:  Objection, lack of foundation
16  on this document.  If there's a cover letter, perhaps you
17  can show that as well.
18        MR. FRANKLIN:  Certainly.
19  BY MR. FRANKLIN:
20    Q.  Ms. Pelletier, I'd like to direct your attention
21  to Tab 23.
22    A.  Okay.
23    Q.  And this will be Exhibit 8, Bates Stamp
24  TARRANT_00895676.
25        (Exhibit 8 was marked for identification.)

Page 115

1  BY MR. FRANKLIN:
2    Q.  And I'll submit to you -- represent to you that
3  Exhibit 7 was attached to this e-mail.  Take a second to
4  look at the cover e-mail.
5    A.  (Witness reviews document.)
6        From Richard Gonzalez?
7    Q.  Yes.
8        Is this your e-mail?
9    A.  Yes.
10    Q.  Who is Richard Gonzalez?
11    A.  He was our finance coordinator for the juvenile
12  services at that -- at that time.
13    Q.  And do you recall the reason why you forwarded
14  Mr. Gonzalez Exhibit 7?
15    A.  Exhibit 7 is the one that has Contract Monitoring
16  Schedule.
17    Q.  That's correct.
18    A.  Probably because I was asked or he was asked or
19  someone was asked to identify how many times a year each
20  grant-funding resource had to be monitored.  And those are
21  some notes that I put on there from General Fund 4E,
22  General Fund, Grant A, Grant Y, Grant C, TCAP General
23  Fund.  And those are just some of my cheat sheet notes
24  I -- I kept.
25    Q.  And you're referencing the notes that you placed

Page 116

1  on Exhibit 7?
2    A.  Yes.
3    Q.  Okay.  So now I want to walk through the
4  organizations that are identified under the name of
5  contract.
6    A.  Uh-huh.
7    Q.  Starting with BHIPS.
8    A.  Uh-huh.
9    Q.  What does BHIPS stand for?
10    A.  Behavioral Health Integrated Program Services,
11  and it is a detention -- or not detention -- substance
12  abuse assessments that we had a contract with to have
13  those done in detention, and that was the name of the
14  assessments at that time that we paid for.
15    Q.  How -- do you recall how much the contract was
16  for?
17    A.  It was for $24,000 a year.
18    Q.  And what about the next one -- I'm looking down
19  the list -- Cassata?
20    A.  Cassata was an alternative school program in
21  Fort Worth through the Catholic Diocese.
22    Q.  Did the organization have any substance abuse
23  treatment as a part of the services they provided?
24    A.  No.
25    Q.  What about -- what does CBD stand for here?

Page 117

1    A.  CBD was part of our -- and still is a part of our
2  Tarrant County advocate program, and it provides daily
3  monitoring.  It's a contract that we have with youth
4  alternative programs that does daily monitoring of kids in
5  their home, as opposed to placing them in detention and
6  spending over $250 a day on a kid in detention, who if
7  they can stay in their home and be monitored by advocates
8  in the community.
9    Q.  And would this organization serve juveniles who
10  have committed offenses in addition to drug-related
11  offenses?
12    A.  Yes.
13    Q.  Do you recall what percentage of the juveniles
14  that were a participant in this program had substance
15  abuse offenses?
16        MS. AYACHI:  Objection, form.
17        THE WITNESS:  Had substance abuse offenses
18  or substance use?
19  BY MR. FRANKLIN:
20    Q.  Substance use.
21    A.  At least 50 percent.
22    Q.  Do you recall what the primary drugs used were
23  for the juveniles who participated in this program?
24    A.  In CBD at that time?
25    Q.  Yes.

30 (Pages 114 - 117)

Page 118

1    A.  In 2011, marijuana.
2    Q.  Do you know what would have ranked second behind
3  marijuana?
4    A.  No.  If it were last year, I could probably tell
5  you, but it's been 12, so I can't.
6    Q.  What was last year?
7    A.  Behind marijuana?
8    Q.  Yes.
9    A.  It probably would be -- let me take that back.  I
10  don't know.
11    Q.  And according to this document, CBD was funded
12  through the general fund?
13    A.  Yes.
14    Q.  Was it solely funded through the general fund?
15    A.  I believe so.  If this is GF, it's general fund.
16    Q.  And below that -- and I know we've discussed Lena
17  Pope Home, Family Preservation a few times today -- it
18  looks like there are three categories of funding.  I see
19  GF for general funding.
20        Do you recall what Grant A and Grant W are
21  that's identified under -- as a funding source?
22        MS. AYACHI:  Objection, form.
23        THE WITNESS:  Not for 2011, I can't tell
24  you.
25  BY MR. FRANKLIN:

Page 119

1    Q.  And would you have generally identified as
2  Grant A and Grant Y?
3    A.  I cannot tell you.  Those are all administered,
4  and -- and Grant Y may not even exist anymore.  Grant A, I
5  don't know -- the grant lingo has changed over the years.
6  Kim Dixon could probably -- could tell you that, and I
7  don't know if she could since it was 2011.
8    Q.  If I understand you correctly, year over year,
9  Grant A, Grant Y could mean different grants?
10        MS. AYACHI:  Objection, form.
11        THE WITNESS:  No, that's not what I'm
12  telling you.  What I'm telling you is I don't know at this
13  point.
14  BY MR. FRANKLIN:
15    Q.  Are you able to identify whether the grant came
16  from the State or federally?
17    A.  I don't know.
18    Q.  Moving to Santa Fe FIT Project.  Is there any
19  reason you have project circled here?
20    A.  I believe the reason we had that on project at
21  this point is because, during this time, I had a
22  discussion with the program director because their
23  referrals were down, and I knew that they needed -- we
24  needed to utilize that program to the extent of
25  their -- their strengths.  And their strengths were --

Page 120

1  are -- were historically in drug treatment from the
2  inception of that program.  Because I worked with that
3  program director for -- previous to Tarrant County
4  Juvenile Services.  We go back probably 30 years.
5        I knew that we needed the substance abuse
6  services for our kids, and we needed them badly.  And we
7  weren't giving this program the referrals that they
8  needing -- needed.  We weren't casting our net out far
9  enough to serve kids that we needed to be serving in
10  Tarrant County in a bad, bad way.  And if you don't use
11  your money, you lose it.
12        So she and I had a discussion.  I said:
13  Hey, how about this, we have kids coming out of drug
14  treatment programs in residential right now who are
15  relapsing on a daily basis because they're not going to
16  outpatient, and no one can understand why they're not
17  going to outpatient services.  Well, let's find out why
18  they're not going to outpatient services.  The reason
19  they're not going to outpatient services when they come
20  home from residential is 'cause they have no
21  transportation or there are so many kids in their
22  family -- our programs didn't provide child care for other
23  kids for siblings.
24        But these kids were relapsing on a daily
25  basis, Gregory, and these kids needed after-care services.

Page 121

1  If you go to residential drug treatment and you're in that
2  bad of straights and you don't go to after care, I can
3  tell you 98 percent of the time you're going to relapse,
4  'cause relapse is part of re-- -- recovery.
5        So what we decided to do, because their
6  roots were in substance abuse treatment -- that's where
7  they started their program was in sub-- -- substance abuse.
8  That was their strength.  So I said:  Let's do something.
9  Let's create -- and we're going to do this on a -- on a
10  six-month trial basis.  So we called it "Project."  Okay?
11  So we didn't commit ourselves to anything.  We're going to
12  test the waters here.
13        Let's call it Families in Transition, and
14  let's see about you guys taking some of these kids
15  directly out of drug treatment who don't have
16  transportation and taking your outpatient treatment
17  services into their home so that they -- the families
18  don't have to get out and drive these kids to outpatient
19  at 5:30 in the afternoon, which was ridiculous, to try to
20  get them to treatment services.  It made no sense.  I
21  wouldn't do it.  I barely got my kid to soccer practice.
22  You know what I'm saying?
23    Q.  Uh-huh.
24    A.  I mean, they didn't have enough baby seats in the
25  cars for some of these kids.  Some of them didn't have

31 (Pages 118 - 121)

1 cars; they didn't have gas; they didn't have any of that.
2 Let's take those treatment services to where they're
3 needed, in the home.  You can do it in the living room.
4 You can do it on the back porch.  I don't care where you
5 do it.  Just provide it.  Okay?  And we called it Families
6 in Transition.  It did the trick.
7    Q.  Educate --
8    A.  What we were able to do is they implemented their
9 substance abuse outpatient curriculum in the home with the
10 kid when they came home from treatment.  That's why we
11 called it Project.
12    Q.  Educate me on the referral process.  Who -- what
13 was the source of the referrals?
14    A.  The source of the referral was from our placement
15 unit.  If we had a kid that was placed in -- wherever for
16 substance abuse treatment, out of the county or in the
17 county or where -- out of the county, mainly, in those
18 cases -- then when they got close to coming out of
19 treatment, say 30 days before they were coming out of
20 residential and going to go back into their homes, they
21 would refer the kid to me.
22       I would look at their information, forward
23 that information to Santa Fe, to the FIT Program -- FIT
24 Project at the time, but it's the FIT Program now.  And
25 they would have that kid set up to start their services

1 when they got out of treatment.  So we didn't have this
2 big lag time.  'Cause when you let lag time go, addiction
3 gets worse.  And that's what was happening.
4       So that's how we cast our net out far- --
5 farther to try to get these kids, that had been
6 residential, the services they needed quicker when they
7 got back to their house.  Because, to be honest with you,
8 a lot of their parents used.  This was a family affair.
9 This is a family affair.
10    Q.  And according to the schedule, the FIT Project
11 was funded by a grant?
12    A.  I don't know where the county found the money.
13 It says Grant C, so part of it might have been
14 Gra- -- Grant C.  It looks like all of it came
15 out -- came -- came out of Grant C in 2011.
16    Q.  Did that check --
17    A.  And I don't know if you're aware of it, but, you
18 know, the State cuts grant money -- they cut two of the
19 programs that I was -- near and dear to my heart that had
20 80 and 90 percent success rates, and they cut them.
21    Q.  After 2011, did Tarrant County supplement the FIT
22 Project financially?
23    A.  The FIT Project -- the Fit Program still exists
24 today.  It's probably the most popular, and it has the
25 highest success rate in our serv- -- in our juvenile

1 department, and we need more money.
2    Q.  Is it still funded completely by the State?
3    A.  I have no clue who's funding it at this point.
4    Q.  Did Tarrant County ever fund it?
5    A.  I believe so.  I know that we're on a tight
6 shoestring budget with it even though we've increased it
7 and had to put it back out and ask for more money.
8    Q.  Do you know how much, on an annual basis, Tarrant
9 County supplements this program?
10    A.  I don't.  That would be a Kim Dixon answer.
11    Q.  On an annual basis, how many juveniles does the
12 FIT Project serve?
13    A.  Oh, geez, Louise.  I have so many of
14 these -- these numbers going through my head.  I'm trying
15 to remember how many they served last year.
16       I would say close to 200.  Let me take that
17 back.  I may -- I -- I think -- I don't want to mix them
18 up with somebody else.  I don't -- I'm going to say I -- I
19 don't know for sure, because I -- I -- I don't want to mix
20 them up with one of our other numbers.  Not as many as we
21 need, I know that.
22    Q.  Did the FIT Project get impacted by COVID?
23    A.  Not really, because they -- they did some really
24 creative things with their virtual.  They didn't like
25 virtual.  They didn't care for doing the pro- -- the

1 program virtually, but they did okay with it with --
2 during the -- during the COVID time.  But they -- they
3 didn't care for the COVID model, the virtual model.
4       They were -- they much more preferred, you
5 know, being in -- meeting the family and being with the
6 family individually.  And for a long time, they did a lot
7 of their visits outside on the porch, in the backyard.
8 They did whatever they could.  Which all of our
9 inpatient -- all in of our -- all of our in-home
10 patient -- outpatient programs did that kind of thing
11 where they would do them outside and that sort of stuff.
12    Q.  If I'm understanding your response correctly,
13 during COVID, there wasn't a material impact in terms of
14 juvenile participation in the FIT Project?
15    A.  Not really.  It was more -- it was more
16 difficult, but I don't -- I don't recall there being a
17 huge impact except for just -- you know, just the
18 cumbersome issues of:  Did a -- did a youth have a
19 computer?  Did they know how to use it?
20       Everybody thinks, you know:  Oh, well, get
21 on virtually.  You know, no.  Some people are like me;
22 they don't do that all the time.  Well, I did during
23 COVID.  But anyway, that -- that program continues to do
24 very, very well.
25    Q.  I know you mentioned TCAP earlier.  But based on

32 (Pages 122 - 125)

1  your testimony a few minutes ago, it sounded like there
2  was some overlap between TCAP and CBD.  Is --
3      A.  TCAP provides CBD.  TCAP has an advocacy program
4  and a community-based detention program.  They have two
5  separate contracts with us:  One of them is their
6  mentoring program, and the other is the CBD program.
7  They're two totally different programs.  One of them is a
8  surveillance kind of program; the other one is a mentoring
9  program.
10     Q.  I understand.
11         For the mentoring program, TCAP, how much
12  was the contract for?
13     A.  For the mentoring program?
14     Q.  Yes.
15         MS. AYACHI:  Objection, form.
16         THE WITNESS:  I'm sorry, Leila.
17         MS. AYACHI:  Objection, form.
18         You can answer.
19         THE WITNESS:  600,000.
20  BY MR. FRANKLIN:
21     Q.  How much?
22     A.  600,000.  Now you're going to ask me why didn't
23  we use that -- half of that 600,000 for treatment, right?
24  Is that the next question?
25     Q.  Yes.  'Cause 600,000 sounds like an incredible

1  amount of money.
2      A.  Okay.  Well, you come to Tarrant County, and you
3  drive around, and you look at all the issues we have going
4  on with gun violence, people killing people on the street
5  on a daily basis now, and you walk through these
6  neighborhoods, you see what's going on, and you see how
7  much mentoring needs to be done and what it costs to
8  keep a good, honest, quality mentor who does this on the
9  side -- it's not their main job -- you'll see why it's
10  600,000 and how many hours a week it takes to keep our
11  kids from getting killed.  You would be shocked.
12     Q.  How many mentors are part of this program?
13     A.  I would say they have probably 15, 20, maybe.
14  And they take high-risk, high-need kids.  We're talking
15  gang affiliations, gun -- weapons offenses, drug offenses.
16  They take the very difficult, difficult,
17  high-crime-neighborhood-area kids, who may have drug use,
18  who may not have drug use, but most have had or are
19  having.
20     Q.  The -- what is the average pay to the mentors?
21         MS. AYACHI:  Objection, form.
22         THE WITNESS:  I don't know what --
23         I'm sorry, Leila.
24         MS. AYACHI:  You may answer.  Go ahead.
25         THE WITNESS:  Okay.

1          I'm not sure right now what -- we just
2  signed a new contract with a new unit or a new -- new
3  agency that had not started yet when I left.  I believe we
4  were paying them 37.78 an hour from our perspective.  I
5  don't know what they were paying the individual mentor
6  'cause I didn't see their paychecks.
7          But I would venture to say they were
8  probably, and hopefully, paying their mentors at least 20
9  bucks an hour.  I don't know that.  I -- that is just
10  something I would throw out there, 'cause you don't want a
11  gang member being an advocate, maybe a past one, but
12  not...
13  BY MR. FRANKLIN:
14     Q.  Do you recall when this program started?
15  Specifically talking about TCAP.
16     A.  About 30 years ago with the county.  In fact, I
17  think we were at our 30-year mark this year, their
18  anniversary with us.
19     Q.  We can set Exhibit 7 to the side.
20         (Exhibit 9 was marked for identification.)
21  BY MR. FRANKLIN:
22     Q.  Now I'm going to show you Exhibit 9, which would
23  be Tab 6 for you, Bates Number TARRANT_00895617.
24         I want you to take a second to review this
25  e-mail.  Let me know when you're done.

1      A.  (Witness examines document.)
2          Okay.
3      Q.  Do you remember this e-mail?
4      A.  That would be a no.  But if I could see the
5  questions, including the e-mail discussing substance abuse
6  treatment, I jotted down some notes regarding -- and I
7  don't see any of the notes, so I don't -- can't tell you
8  what I said.
9      Q.  I will share that with you --
10     A.  Okay.
11     Q.  -- in a second.
12     A.  Okay.  Cool.
13     Q.  Who is Deborah Butler that you sent the --
14     A.  She was the former deputy executive director of
15  specialized services.  She was my supervisor for a brief
16  period of time before she retired.
17     Q.  Who is Ron Lewis?
18     A.  He is the assistant director of the department.
19     Q.  Okay.  For a second, I want you to set aside
20  Exhibit 9, and we'll discuss the content of Exhibit 9
21  along with the document that was attached to Exhibit 9.
22     A.  Okay.  Great.
23     Q.  And this would be Tab 7 for you.
24     A.  Okay.  Okay.
25     Q.  So -- forgive the pause.  It's taking a while for

33 (Pages 126 - 129)

Page 130

1 this thing to load.
2         (Exhibit 10 was marked for identification.)
3 BY MR. FRANKLIN:
4     Q. So introducing as Exhibit 10, Bates Number
5 TARRANT_00895618.
6     A. (Witness reviews document.)
7     Q. Now that you have the full context of the e-mail
8 and the attached notes, can you explain to me the -- the
9 content of the e-mail?
10    A. I believe -- I'll -- I'll -- I'll try to -- I'm
11 trying to remember everything in my mind, and I'm going to
12 try to make this short and sweet.
13        I think the number one that I was talking
14 about -- all the -- all this relates to things that I
15 wanted to see improved in Tarrant County regarding
16 providing substance abuse treatment to our kids.  And I
17 had related to Debbie that Tarrant -- Recovery Resource --
18 Recovery Resource is not MHMR.  Recovery Resource is an
19 education program.  Okay?  It's for kids that have used
20 once or twice or three times in their lives.  It's not
21 MHMR services.
22        Recovery Resource, what I was saying was
23 it -- it -- that it concerned me that they only did one
24 group per week, and it was education only.  It did not
25 delve into treatment issues.  It was not outpatient; it

Page 131

1 was not residential.  It was education.  Which I'm all
2 about education, but our kids needed much -- the majority
3 of our kids needed much more than substance abuse
4 education.  That was number one.
5     Q. Before you move on, on Exhibit 10, what does OP
6 stand for?
7     A. Outpatient.
8     Q. You may proceed.
9     A. Okay.  So I was talking about Recovery Resource
10 is all great and whatever, but it was education.  It
11 wasn't "treatment" treatment, so to speak, outpatient or
12 residential.  I was talking about how MHMR provides
13 services.  They provided services in Arlington.  They
14 provided outpatient in Euless and in Fort Worth.  However,
15 they didn't go farther enough into our northwest region
16 where it was hard for people to drive all the way in --
17 you know, into services to the other two programs.  That
18 was one of my need/concerns right there.
19        Number two, I was talking about -- you know,
20 'cause kids' work schedules, parents' work schedules,
21 those sorts of things.
22        Inpatient substance abuse utilizes MHMR,
23 which we've talked about all afternoon.  They do have
24 State funding serving all of the -- however we utilized;
25 Phoenix House, which I talked about; and there was one in

Page 132

1 Austin.  But we only had TYC Nexus, I talked about
2 earlier.  Same barrier for family treatment meetings.
3 They -- families couldn't go all the way to Dallas for
4 that.  Okay?  I'm sorry.  They just couldn't do it.
5         Let's see.  The next thing was --
6 I'm basically -- to sum it up, I'm giving her my brief
7 concerns about what we needed more of for juvenile
8 services for treatment purposes, which are still needed.
9     Q. Okay.  In Exhibit 9, you specifically identify
10 that this pertains to opioids in all types of SA
11 treatment.  Which I'm assuming SA stands for substance
12 abuse?
13    A. Substance abuse treatment.
14    Q. Do you recall why you identified opioids
15 separately?
16    A. I believe because in 2018 is around the time that
17 I started looking at the opioid issue a little closer.
18 Because, like I said this morning, I have to keep abreast
19 of what the upcoming -- you know, what's starting to
20 transpire, and I tried to stay ahead of the curve.
21    Q. Then -- and based upon that testimony, it wasn't
22 driven by the volume of juveniles going through the system
23 that were abusing opioids?
24        MS. AYACHI:  Objection, form.
25        THE WITNESS:  Why do you wait till the

Page 133

1 problem's a problem?
2 BY MR. FRANKLIN:
3     Q. So at this time, it was not a problem, in 2018?
4     A. No.  But why do you wait till it's a problem?
5     Q. I'm asking the questions, and --
6     A. I'm just saying.
7     Q. And I -- I think that's admirable to be --
8     A. I mean, I'm --
9     Q. -- proactive --
10    A. What I'm saying to you is:  Ethically, as a part
11 of a licensed counselor, I need to be on top of what the
12 next issues are going to be for our kids.
13    Q. Understood.
14    A. Why don't I get on the other side of the 8 ball?
15    Q. Understood.
16        But as of 2018, the problem had not
17 manifested yet, but you were being proactive and seeking
18 ways to treat those who may have substance abuse issues --
19 opioid substance abuse issues?
20    A. 'Cause I felt like it was coming.
21        MS. AYACHI:  Objection, form.
22        THE WITNESS:  I felt like it was coming.
23 BY MR. FRANKLIN:
24    Q. Uh-huh.
25    A. And where are we?  I mean...

34 (Pages 130 - 133)

Page 134

1    Q.  In your testimony today, we discussed a few
2  grants that were provided by the State.
3         Do you recall any other grants that Texas
4  juvenile services may have received from the State?
5         MS. AYACHI:  Objection, form.
6         THE WITNESS:  Grants from -- we received two
7  COG grants from the State of Texas that I worked on for
8  six or seven years, the First Offender Program -- First
9  Offender Program, and we worked on a sibling mentoring
10  grant.  And -- well, one of the main ones is we worked on
11  a truancy prevention grant that we got from the State with
12  the -- with the city -- Fort Worth, Arlington ISD.
13         Mind you, the First Offender Program had a
14  92 percent success rate over probably 15 years.  The AISD
15  truancy grant had a 90 percent success rate over about
16  five years, and the State cut both of the funding.  About
17  five years ago, those totally got cut.  And that Arlington
18  ISD program served over 250 kids a year.  The First
19  Offender Program, when it started, was serving about 200,
20  and it got cut.
21         So two of our most successful programs got
22  funding cut (snaps fingers) overnight.  And, mind you,
23  Arlington ISD, this got -- this got cut two weeks before
24  school started.  So all these people they hired to go into
25  that program suddenly found out they had no job.  So that

Page 135

1  shows you how quick the money goes, like that, overnight.
2  And you get to be the lucky person, Luann, that gets to
3  call administrators at Arlington ISD and go:  Guess what,
4  you're going to be getting a letter from our director next
5  week.
6  BY MR. FRANKLIN:
7    Q.  How much --
8    A.  I know I'm venting with that.  I'm just saying
9  how quickly money gets cut.
10    Q.  Believe me, I understand the passion.  I do.
11         For the First Offender Program, how much was
12  the grant, annually, before it was terminated?
13    A.  Oh, wow.  I'm trying to remember the fir-- how
14  much the -- I -- I want to say it was -- the -- we had to
15  cut it every single year because they allowed us less and
16  less money to apply for.  And we applied for as much as we
17  could, believe me.  I think that last year was like 80,000
18  or something like that.  But when I first started doing
19  it, it was like 200,000.
20         But, luckily, we had a great partnership
21  with Arlington ISD and Fort Worth -- I mean, Arlington
22  Police Department and Fort Worth Police Department, and
23  they gave their monies that were going to be allocated to
24  them to us at juvenile services, partly because they
25  didn't want to manage it, to be honest with you, but

Page 136

1  whatever.  We take what we get.
2    Q.  How much -- scratch that question.
3         I want to understand more about the First
4  Offender Program.
5    A.  First offenders are not your opioid kids -- I can
6  tell you that -- or -- or heavy drug users.  Their drug
7  use, they're going to be experimental.
8    Q.  Now, could that include someone who's just
9  experimenting with opioids for the first time?
10    A.  I'm not saying it never happened, but it's not
11  likely.  It -- I'm sure we had kids in the First Offender
12  Program who had used opioids at one time -- or -- I'm not
13  saying -- but I'm saying experimentally.  I'm not saying
14  there weren't any.  But that was not what it was designed
15  for.  Those were not substance abuse kids; those were more
16  of your low-level offenses.
17    Q.  In your role as supervisor of community
18  resources, you testified that you had budget-related
19  responsibilities.
20         Did I recall that correctly?
21    A.  Yes, to an extent.
22    Q.  Has anyone asked you to calculate your
23  department's expenses related to initiatives addressing
24  the opioid epidemic in Tarrant County?
25    A.  Asked me to calculate our expenses related to

Page 137

1  opioid --
2    Q.  To initiatives addressing --
3    A.  No one's ever asked me to calculate that.
4    Q.  How much was the -- the annual budget for the
5  community resource unit?
6         MS. AYACHI:  Objection, form.
7         THE WITNESS:  The annual budget?  Are you
8  talking about salaries?
9  BY MR. FRANKLIN:
10    Q.  To the extent that you know --
11    A.  What are you talking about, because --
12    Q.  No.  Let me clarify.  And to the extent that you
13  can answer the question, I would like for you to identify
14  where you have the knowledge of the budget.
15         But the question that I'm asking for is
16  fully loaded.  It's the operating budget, which would be
17  salaries and expenses, plus the expenditures that you have
18  toward, you know, contracting the -- the service providers
19  that we were talking about earlier.
20    A.  I mean, I can tell you the service provider
21  contract numbers, but I don't know between Lori and I
22  those -- that expense.  That would be something you would
23  need to get from Kim Dixon or our administrators downtown.
24    Q.  What's the annual budget for the contracts with
25  the community resource units service providers?

35 (Pages 134 - 137)

1          MS. AYACHI:  Objection, form.
2          THE WITNESS:  YAP was 600,000.  CBD was
3  60,000.  Lena Pope Home was 265,000.  Santa Fe was
4  250,000; we had to add $62,500 to that to make that budget
5  this year.  Cassata, we don't have any longer.  I'm
6  leaving a couple out.  Okay.  FFT, YAP, CBD, Santa Fe.
7  The campus is 167,000.  Our BHIPS assessments was, I
8  believe, 37,500.
9  BY MR. FRANKLIN:
10    Q.  Let me stop you there.  What is "the campus"?
11    A.  That's the residential treatment through MHMR.
12    Q.  Okay.  You may proceed.
13    A.  I said the BHIPS, 37,500, didn't I?
14    Q.  Yes.
15    A.  37,500.  And then the one before that,
16  what -- what did I say with that?  Which one was that?
17    Q.  That was the campus at 167,000.
18    A.  167,000.
19          Let's see.  600, 6 -- 60,000.  Which we
20  increased, this year, our CBD to 87,000 because we started
21  running out of money, which was not easy to get, believe
22  me.
23          Let's see.  250, 265, 600, 37,500, and 167.
24  I think that's it.
25    Q.  Ms. Pelletier, are you referencing any notes?

1    A.  Nope.
2    Q.  Okay.
3    A.  I'm referencing the notes on this page that's
4  going down, scrolling.  No --
5    Q.  Have you --
6    A.  -- okay.  I'm referencing -- okay.
7    Q.  Have you relied on any notes today in your
8  testimony?
9    A.  No.  What notes would I rely on?
10    Q.  Ms. Pelletier, that's a question for yourself.  I
11  don't know.
12    A.  Okay.  Just wondering.
13    Q.  Have you heard of the JABG grant?
14    A.  The JABG grant?  JABG grant?
15    Q.  That's correct.
16    A.  Yes, but I don't -- it may have changed now.
17    Q.  What was the grant whenever you recall it?
18    A.  I don't remember.  The JABG grant?
19          You may have to tell me 'cause I don't
20  remember.  I remember the JABG grant, but I don't remember
21  what JABG -- juvenile alternatives -- I don't know.  I
22  can't remember.
23    Q.  Let me direct your attention to Tab 13.
24    A.  Okay.
25    Q.  And I'll bring it up for --

1    A.  Oh, okay.
2    Q.  Why didn't it work?  My apologies.  For some
3  reason, it doesn't look like it marked.
4    A.  I -- I see it.
5    Q.  There we go.
6          (Exhibit 11 was marked for identification.)
7  BY MR. FRANKLIN:
8    Q.  So I'm introducing Exhibit 11, Bates --
9  identified as TARRANT_00709177.
10          Now that you've had a second to --
11    A.  Uh-huh.
12    Q.  -- take a look at this e-mail, is this an e-mail
13  chain between you and Linda P. Brooke?
14    A.  Uh-huh.  She was the assistant director at that
15  time.
16          I recall this.  The First Offender Program,
17  if you'll see where it says we already sent the FOP court
18  communi-- communiqué, our assistant at the department
19  would send information to Debbie Fillmore downtown, who
20  was our grant administrator for the county at that time.
21  She's retired now -- this was part of the -- this was the
22  drug court grant, but they used to call it the JABG grant
23  for some reason.  It was a State term.
24    Q.  Do you remember how much that grant was for?
25    A.  Wow.  When we first started, I think we applied

1  for, like, 200 and -- don't -- I mean, here's -- here's
2  another one of those things where I can't remember
3  exactly.  But in the very beginning, it was, I believe,
4  over $200,000.  And that dwindled down to about a hundred
5  near the end of it.
6          But I think when I first started with it, it
7  was about 200, between 200 and -- some- -- something like
8  that.  But that was the drug court grant.  I can't
9  remember why it was called the JABG grant.  It was called
10  JABG, and I didn't even know what it stood for, and I -- I
11  was just doing it.
12    Q.  I know that the drug court doesn't exist in the
13  way that it did whenever you were a liaison for the -- the
14  division.
15          But do you know whether the JABG grant
16  continued through the termination of the drug court?
17    A.  No.  Drug court continued, I think, for a few
18  more years after we stopped getting the grant.
19    Q.  What year did you stop getting the -- the grant?
20    A.  Wow.  Let me think about it.  I don't remember
21  the year that drug court -- let's see.  This is 2023.  I
22  would say we stopped getting that grant probably
23  2000 -- this is 2015 right here.  I want to say we
24  probably -- we stopped getting that grant somewhere
25  between 2016-2018.

Page 142

1    Q.  Do you have any knowledge of an instance where
2  Albertsons inappropriately dispensed a prescription
3  opioid?
4        MS. AYACHI:  Objection, form.
5        THE WITNESS:  Do I have any knowledge of
6  that?
7  BY MR. FRANKLIN:
8    Q.  Yes.
9    A.  No, sir.
10   Q.  And do you have any knowledge of an instance
11 where Kroger's inappropriately dispensed an opioid?
12       MS. AYACHI:  Objection, form.
13       THE WITNESS:  No.
14       MR. FRANKLIN:  Let's take another
15 five-minute break.  Does that work for everyone?
16       THE WITNESS:  Works for me.
17       MR. FRANKLIN:  Let's go off record.
18       THE VIDEOGRAPHER:  Off the record at
19 3:25 p.m.
20       (Brief recess taken.)
21       THE VIDEOGRAPHER:  On the record at
22 3:25 p.m. -- I mean, 3:35 p.m.
23       MR. FRANKLIN:  I want to thank you so much
24 for your time, Ms. Pelletier.  I know it's -- it's been a
25 long day.

Page 143

1        At this time, I will pass the -- the
2  witness.
3        THE WITNESS:  Thank you.
4        MR. FRANKLIN:  Do you have any follow-up
5  questions, Leila?
6        MS. AYACHI:  Oh, I'm sorry.  Did the other
7  defense counsel want to ask her any questions?
8        MR. FOX:  No.  I -- I'm fine.  Thank you.
9        MS. AYACHI:  Okay.  Then we will go -- can
10 we just have just a minute to discuss?
11       MR. FOX:  Sure.
12       MR. FRANKLIN:  Sure.
13       MS. AYACHI:  All right.  We're going to go
14 back into --
15       THE VIDEOGRAPHER:  Off the record at
16 3:36 p.m.
17       (Brief recess taken.)
18       THE VIDEOGRAPHER:  On the record at
19 3:38 p.m.
20       MS. AYACHI:  Ms. Pelletier, we very much
21 appreciate your time today.  Plaintiff's counsel does not
22 have any questions for you.  We thank you for all the
23 incredible work you've done for Tarrant County over the
24 years and continue to do, and we -- yeah, we just wanted
25 to say thank you.

Page 144

1        THE WITNESS:  You're welcome.
2        MR. FRANKLIN:  Likewise.
3        THE WITNESS:  Thank you, Mr. Franklin.
4        MR. FOX:  Yes.
5        MR. FRANKLIN:  Send me some of that Georgia
6  peach tea whenever you get a chance.
7        (Off-record discussion.)
8        THE VIDEOGRAPHER:  Are we done?  Off the
9  record at 3:39 p.m.
10       (Deposition concluded at 3:39 p.m.)

Page 145

1
2        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
                EASTERN DIVISION
3
   IN RE:  NATIONAL PRESCRIPTION  ) MDL No. 2804
4  OPIATE LITIGATION            )
                                 )
5                                )
   THIS DOCUMENT RELATES TO:     )
6  Track Nine: Tarrant County,   ) Case No.: 17-md-2804
   Texas                        )
7                                )
                                 )
8  (Case No. 1:18-op-45274-DAP)  ) Judge Dan Aaron Polster
9        REPORTER'S CERTIFICATION
         ORAL AND VIDEOTAPED DEPOSITION OF
10            LUANN PELLETIER
         THURSDAY, JULY 27, 2023
11         (REPORTED REMOTELY)
12    I, Kari J. Behan, CSR, RPR, CRR, and in and for the
   State of Texas, do hereby certify that the facts as stated
13 by me in the caption hereto are true;
         That there came before me the aforementioned named
14 person, who was by me duly sworn to testify the truth
   concerning the matters in controversy in this cause;
15       And that the examination was reduced to writing by
   computer transcription under my supervision; that the
16 deposition is a true record of the testimony given by the
   witness.
17    I further certify that I am neither attorney or
   counsel for, nor related to or employed by, any of the
18 parties to the action in which this deposition is taken,
   and further that I am not a relative or employee of any
19 attorney or counsel employed by the parties hereto, or
   financially interested in the action.
20    Given under my hand and seal of office on August 16,
   2023.
21
22    _____ RPR, CRR
23    Texas CSR NO. 8564;
      Expiration Date: 7-31-2024
24    VERITEXT LEGAL SOLUTIONS
      Firm Registration No. 571
25    Telephone (800) 336-4000

37 (Pages 142 - 145)

Page 146

1            Veritext Legal Solutions
                         1100 Superior Ave
2                     Suite 1820
                Cleveland, Ohio 44114
3              Phone: 216-523-1313
4

5    August 17, 2023

    To: LEILA AYACHI
6

    Case Name: National Prescription Opiate Litigation - Track 9 (Tarrant
7   County) v.
8   Veritext Reference Number: 6012001
9   Witness:  Luann Pelletier      Deposition Date:  7/27/2023
10

    Dear Sir/Madam:
11

12  Enclosed please find a deposition transcript.  Please have the witness
13  review the transcript and note any changes or corrections on the
14  included errata sheet, indicating the page, line number, change, and
15  the reason for the change.  Have the witness' signature notarized and
16  forward the completed page(s) back to us at the Production address
     shown
17

    above, or email to production-midwest@veritext.com.
18

19  If the errata is not returned within thirty days of your receipt of
20  this letter, the reading and signing will be deemed waived.
21

    Sincerely,
22

    Production Department
23

24

25  NO NOTARY REQUIRED IN CA

---

Page 147

1        DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2

      ASSIGNMENT REFERENCE NO: 6012001
3      CASE NAME: National Prescription Opiate Litigation - Track 9
   (Tarrant County) v.
   DATE OF DEPOSITION: 7/27/2023
4    WITNESS' NAME: Luann Pelletier
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7    I have made no changes to the testimony
   as transcribed by the court reporter.
8

9   Date        Luann Pelletier
10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
     They have read the transcript;
13    They signed the foregoing Sworn
     Statement; and
14    Their execution of this Statement is of
     their free act and deed.
15
    I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17

18     Notary Public
19
     Commission Expiration Date
20
21
22
23
24
25

---

Page 148

1        DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2

      ASSIGNMENT REFERENCE NO: 6012001
3      CASE NAME: National Prescription Opiate Litigation - Track 9
   (Tarrant County) v.
   DATE OF DEPOSITION: 7/27/2023
4    WITNESS' NAME: Luann Pelletier
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7    I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9    I request that these changes be entered
   as part of the record of my testimony.
10

11    I have executed the Errata Sheet, as well
   as this Certificate, and request and authorize
12  that both be appended to the transcript of my
   testimony and be incorporated therein.
13   _____
   Date        Luann Pelletier
14
    Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
   the referenced witness did personally appear
16  and acknowledge that:
17    They have read the transcript;
     They have listed all of their corrections
18     in the appended Errata Sheet;
    They signed the foregoing Sworn
19     Statement; and
    Their execution of this Statement is of
20     their free act and deed.
21    I have affixed my name and official seal
22  this _____ day of_____, 20____.
23  _____
     Notary Public
24
25     Commission Expiration Date

---

Page 149

1       ERRATA SHEET
      VERITEXT LEGAL SOLUTIONS MIDWEST
2      ASSIGNMENT NO: 6012001
3  PAGE/LINE(S) /      CHANGE     /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 Date        Luann Pelletier
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23 _____
     Notary Public
24
25     Commission Expiration Date

38 (Pages 146 - 149)