# EXHIBIT 53

Page 1

1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION
3    IN RE:  NATIONAL        ) MDL No. 2804
     PRESCRIPTION OPIATE     ) Case No. 17-md-2804
4    LITIGATION              ) Judge Dan Aaron Polster
                             )
5                            )
                             )
6                            )
7

8

9    ************************************************

10        ORAL AND VIDEOTAPED DEPOSITION OF

11                    HENRY REYES

12                  August 17, 2023

13                     Volume 1

14   ************************************************

15

16           ORAL AND VIDEOTAPED DEPOSITION OF HENRY REYES,

17   produced as a witness at the instance of the Defendant,

18   and duly sworn, was taken in the above-styled and

19   numbered cause on the 17th day of August, 2023, from

20   10:05 a.m. to 12:42 p.m., via videoconference, before

21   Abigail Guerra, CSR, in and for the State of Texas,

22   reported by machine shorthand, where all attendees

23   appeared via Zoom in their respective locations,

24   pursuant to the Federal Rules of Civil Procedure and the

25   provisions stated on the record or attached hereto.

Page 2

```
 1          A P P E A R A N C E S
               (Appearing Remotely)
 2
 3 FOR THE PLAINTIFF:
 4 Ms. Leila Ayachi
   Ms. Alex Abston
 5 LANIER LAW FIRM
   10940 West Sam Houston Parkway North
 6 Houston, Texas 77064
   Phone: (800) 723-3216
 7 Email: Leila.ayachi@LanierLawFirm.com
          Alex.abston@LanierLawFirm.com
 8
      - and -
 9
   Mr. Mark C. Kratovil
10 TARRANT COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
   CIVIL DIVISION
11 Tim Curry Criminal Justice Center
   9th Floor
12 401 Belknap Street
   Fort Worth, Texas 76196
13 Phone: (817) 884-1400
   Email: Mckratovil@tarrantcountytx.gov
14
15 FOR THE DEFENDANT KROGER:
16 Ms. Kimberly Harris
   QUILLING SELANDER LOWNDS WINSLETT & MOSER
17 2001 Bryan Street
   Suite 1800
18 Dallas, Texas 75201
   Phone: (214) 880-1808
19 Email: Kharris@qslwm.com
20     - and -
21 Mr. Anthony Ryan
   BOWLES RICE, L.L.P.
22 600 Qarrier Street
   Charleston, West Virginia 25301
23 Phone: (304) 347-1100
   Email: Anthony.ryan@bowlesrice.com
24
25
```

Page 3

```
 1     A P P E A R A N C E S (cont'd)
               (Appearing Remotely)
 2
 3 FOR THE DEFENDANT ALBERTSONS:
 4 Mr. Quinn Ford
   GREENBERG TRAURIG, LLP
 5 77 West Wacker Drive
   Suite 3100
 6 Chicago, Illinois 60601
   Phone: (312) 476-5080
 7 Email: Fordq@gtlaw.com
 8 ALSO PRESENT:
       Ms. Megan King, Videographer
 9     Mr. Gregg Holderman
       Ms. Sadie Turner
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1               INDEX
 2
 3  Appearances.................................    2
 4  HENRY REYES
 5     Examination by Ms. Harris..................    8
 6  Signature and Changes...........................  110
 7  Reporter's Certificate...........................  112
 8
 9               EXHIBITS
10  NO.          DESCRIPTION              PAGE
11  Exhibit 1    LinkedIn Profile          16
12  Exhibit 2    National PREA Auditing and       22
13               Consulting LLC
14  Exhibit 3    Education Profile LinkedIn       27
15  Exhibit 4    Licenses and Certifications      37
16  Exhibit 5    Annual Report             42
17               Bates Nos. TARRANT_00885303
18  Exhibit 6    Health Services Plan       51
19               Bates Nos. TARRANT_00832272
20  Exhibit 7    Email                 55
21               Bates Nos. TARRANT_00832043
22  Exhibit 8    Standard Operating Procedures    56
23               Bates Nos. TARRANT_00832045
24  Exhibit 9    Standard Operating Procedures    60
25               Bates Nos. TARRANT_00832120
```

Page 5

```
 1          EXHIBITS (cont'd)
 2  .................................................
 3  NO.      DESCRIPTION..................... PAGE
 4  Exhibit 10   Comprehensive Annual Report      62
 5          Bates Nos. TARRANT_00831274
 6  Exhibit 11   Email                 68
 7          Bates Nos. TARRANT_00831251
 8  Exhibit 12   Contract               70
 9          Bates Nos. TARRANT_00831255
10  Exhibit 13   Approval of Contract         71
11          Bates Nos. TARRANT_00884532
12  Exhibit 14   Email                 73
13          Bates Nos. TARRANT_00697997
14  Exhibit 15   Email                 74
15          Bates Nos. TARRANT_00710880
16  Exhibit 16   Email                 77
17          Bates Nos. TARRANT_00710885
18  Exhibit 17   Email                 81
19          Bates Nos. TARRANT_00884900
20  Exhibit 18   Letter                82
21          Bates Nos. TARRANT_00884901
22  Exhibit 19   Email                 84
23          Bates Nos. TARRANT_00832126
24  Exhibit 20   John Peter Smith Hospital      84
            Correctional Health
25          Bates Nos. TARRANT_00832128
```

2 (Pages 2 - 5)

Page 6

1         EXHIBITS (cont'd)
2 ...................................................
3 NO.       DESCRIPTION..................... PAGE
4 Exhibit 21   Email              87
5         Bates Nos. TARRANT_00682760
6 Exhibit 22   Email              89
7         Bates Nos. TARRANT_00849525
8 Exhibit 23   Intelligence Review     89
9         Bates Nos. TARRANT_00849526
10 Exhibit 24   Email             92
11         Bates Nos. TARRANT_00863466
12 Exhibit 25   Email             93
13         Bates Nos. TARRANT_00710969
14 Exhibit 26   Email             95
15         Bates Nos. TARRANT_00697938
16 Exhibit 27   Email           100
17         Bates Nos. TARRANT_00710875
18 Exhibit 28   Letter           101
19         Bates Nos. TARRANT_00851245IE
20 Exhibit 29   Email           102
21         Bates Nos. TARRANT_00684299
22 Exhibit 30   Email           103
23         Bates Nos. TARRANT_00710960
24 Exhibit 31   Email           105
25         Bates Nos. 00893307

Page 7

1       THE VIDEOGRAPHER: We're on the record at
2 10:04 a.m. on August 17th, 2023. This is the deposition
3 of Henry Reyes in the matter of In Re: National
4 Prescription Opiate Litigation, filed in the Northern
5 District of Ohio, Eastern Division, case No. 17-MD-2804.
6 This deposition is being conducted remotely.
7       At this time, counsel, please state your
8 appearances for the record beginning with the noticing
9 attorney.
10       MS. HARRIS: This is Kimberly Harris from
11 Quilling Selander on behalf of the Kroger defendants.
12       MR. FORD: Quinn Ford on behalf of the
13 Albertsons.
14       MR. RYAN: Tony Ryan with Bowles Rice firm
15 on behalf of Kroger.
16       MS. AYACHI: And my name is Leila Ayachi,
17 Lanier Law Firm on behalf of Tarrant County, and I'm
18 joined by Alex Abston also from Lanier Law Firm and
19 Sadie Turner.
20       MR. KRATOVIL: I'm Mark Kratovil. I'm with
21 the Tarrant Criminal District Attorneys Office, and we
22 serve as counsel for all Tarrant County departments and
23 employees.
24         HENRY REYES,
25 having been first duly sworn, testified as follows:

Page 8

1       DIRECT EXAMINATION
2 BY MS. HARRIS:
3   Q. Good morning, Mr. Reyes.
4   A. Good morning.
5   Q. My name is -- good morning.
6      My name is Kimberly Harris. And as you
7 heard, I'm here for Kroger today.
8      Would you like me to call you "Mr. Reyes"
9 or "Chief Reyes," or how would you prefer to be
10 addressed?
11   A. No. Henry's fine.
12   Q. Henry, okay.
13   A. Yeah, Henry's fine.
14   Q. Thank you.
15      Now, do you have a notebook of exhibits in
16 front of you right now?
17   A. Yes, there's a box next to me to my left.
18   Q. All right. Yeah, if you can go ahead and open
19 that. We'll be using that in your deposition today.
20      MS. AYACHI: And, counsel, is it okay if I
21 open mine too?
22      MS. HARRIS: Oh, absolutely. Absolutely.
23      MS. AYACHI: That's why I asked.
24      MS. HARRIS: You could just keep it closed.
25 We'll just go one with you.

Page 9

1   A. Okay.
2   Q. (BY MS. HARRIS) All right.
3      MS. HARRIS: Everybody good? Y'all got it
4 open? All right.
5      MS. AYACHI: Yes.
6      MS. HARRIS: Perfect.
7   Q. (BY MS. HARRIS) If you could go ahead and
8 state your full name for the record.
9   A. Henry Reyes.
10   Q. Okay.
11      And you are represented by counsel today?
12 Mr. Kratovil; is that correct?
13   A. Correct.
14   Q. All right.
15      And I'm guessing -- and tell me if I'm
16 incorrect, but he's provided to you by Tarrant County
17 because you're a former employee of Tarrant County; is
18 that right?
19   A. Correct.
20   Q. All right.
21      Have you ever been deposed before?
22   A. Yes.
23   Q. All right.
24      And how many times?
25   A. Twice.

3 (Pages 6 - 9)

1    Q.  Twice.
2         What type of cases were those?  And what
3  was your role?
4    A.  One of them was a personal matter where I was
5  the plaintiff in a federal lawsuit or in a lawsuit.  And
6  the second was, I was a witness for -- in a car
7  accident, so I was deposed as a witness for the
8  accident.
9    Q.  Okay.
10        And neither of those involved prescription
11 opioids or substance abuse?  Any of those things,
12 correct?
13   A.  Correct.
14   Q.  All right.
15        Where are you located right now for this
16 deposition?
17   A.  I'm here at Fort Worth at the district
18 attorney's office.
19   Q.  All right.
20        Is there anybody else in the room with you
21 other than your counsel, if he is in the room with you?
22   A.  No.
23   Q.  All right.
24   A.  Other than with counsel.
25   Q.  All right.  Perfect.

1         You know, and by this deposition here
2  today, basically what I'm here to do is find out what
3  information you might have concerning this opioid
4  litigation.
5         And so do you have an understanding about
6  what claims Tarrant County is making in this lawsuit?
7    A.  No.
8    Q.  All right.
9         And you haven't read the complaint or
10 anything like that?
11   A.  Correct.
12   Q.  All right.
13        And since you've taken your deposition
14 before, you kind of generally know the ground rules I'm
15 betting.  But I'm going to go over them again just so
16 we're on the same page.
17        It's under oath like you're before a judge
18 or a jury.
19        Let me know if you do not understand one of
20 my questions.  Sometimes I tend to talk a little fast,
21 or sometimes Zoom will cut out a little bit.  So let me
22 know, and I will rephrase or reask the question.
23        If you don't let me know, I think I'm just
24 going to presume that you understood; is that okay with
25 you?

1    A.  That's fine.
2    Q.  Perfect.
3         All right.  And I'm sure you remember not
4  to -- I'm going to let you finish your answer your,
5  if you'll let me finish my question, and then we'll both
6  keep the court reporter happy, if that sounds good?
7    A.  Okay.
8    Q.  And if you hear me say "is that a 'yes'?" or
9  "is that a 'no'"? instead of an "uh-uh" or "uh-huh,"
10 please don't take it personal.  I just want to make sure
11 our record is clear.  So when you read back through it,
12 we'll know what your answer meant for sure.
13        At times, you may hear an objection,
14 "objection.  Form."  You can still go ahead and answer.
15        And then also, if you ever need a break,
16 let me know.  I'm not trying to run a marathon here.  So
17 if you need to take time out, let me know.
18        And the only thing that I ask if I just ask
19 a question, if you go ahead and answer that question
20 before we take a break.
21   A.  Okay.
22   Q.  All right.  Perfect.
23        Without getting into any specifics about
24 the conversation, did you meet with anyone prior to your
25 deposition?

1    A.  Yes.
2    Q.  Did you meet with your attorney; is that right?
3    A.  Correct.
4    Q.  All right.
5         How many occasions did y'all meet?
6    A.  Two.
7    Q.  Two occasions.
8         About how long did -- total did y'all meet
9  on...
10   A.  Total about an hour and a half.
11   Q.  Okay.
12        Did you review any documents or other
13 materials in preparation?
14   A.  No.
15   Q.  Okay.
16        Did you speak with anybody else other than
17 your attorney prior to the depo or about the depo?
18   A.  No.
19        Other than to advise my supervisor that I
20 had received the deposition; but, no.
21   Q.  Okay.  Perfect.  I understand.
22        Are you taking any medications, or is there
23 anything that might keep you from answering the
24 questions today or understanding them today or being
25 honest and truthful?

4 (Pages 10 - 13)

Page 14

1    A.  No.
2    Q.  Perfect.
3         Basically just since you mentioned you
4  don't necessarily know about Tarrant County's claims in
5  this case, just so we have an understanding going
6  forward about my questions, Tarrant County has sued
7  Kroger and other chain pharmacies alleging that the
8  pharmacies contributed to the opioid epidemic causing
9  Tarrant County to lose money through various resources.
10  And so my questions today are going to be based on that
11  scenario a little bit.
12         And excuse me for having to take a drink
13  every once in a while.  They did some construction here,
14  so the dust is coming down in my office, and it's making
15  me cough.  So I'm apologizing in advance for that.
16         Certain terms I'm going to use during this
17  deposition.  I want to make sure we have an agreement as
18  far as the definition of them.
19         What do you understand "opioids" to mean
20  and include?
21    A.  Very basic understanding.  It's just that
22  they're a controlled substance or category-controlled
23  substance.  But in detail, I mean, I wouldn't be able to
24  provide a definition.
25    Q.  And when you're thinking, would it include

Page 15

1  illicit opioids such as heroin, fentanyl, cocaine,
2  things like that along with prescription opioids?
3    A.  Yes.
4    Q.  Just basically the overall --
5    A.  Drugs.
6    Q.  -- all-inclusive controlled substances.
7         All right.  And then prescription opioids,
8  those would be the ones that are FDA, DEA-approved, and
9  legally available with a prescription from a healthcare
10  provider; is that your understanding?
11         MS. AYACHI:  Objection, form.
12    A.  Yes.
13    Q.  (BY MS. HARRIS)  Okay.
14         And part of Tarrant County's claims are
15  with regard to the dispensing of opioids.
16         Do you understand what I'm talking about
17  when I say "the dispensing of opioids"?
18    A.  Yes.
19    Q.  Do you believe that prescription opioids can
20  have a legitimate medical use?
21         MS. AYACHI:  Objection, form.
22    A.  Yes.
23    Q.  (BY MS. HARRIS)  Basically, there are people
24  who have legitimate injuries.  And if a healthcare
25  provider -- if their healthcare provider finds it

Page 16

1  medically necessary to prescribe them, that can be
2  critically helpful to them, correct?
3         MS. AYACHI:  Objection, form.
4    A.  Yes.
5    Q.  (BY MS. HARRIS)  Okay.
6         And the doctor who is treating the patient,
7  he would be in the best position to assess the medical
8  necessity, correct?
9         MS. AYACHI:  Objection, form.
10    A.  Yes.
11    Q.  (BY MS. HARRIS)  Okay.
12         And even -- when prescribed properly,
13  opioids can provide a benefit to someone suffering from
14  acute or chronic pain.
15         MS. AYACHI:  Objection, form.
16    A.  I would assume so.  I'm not a medical
17  professional, so I don't know.
18    Q.  (BY MS. HARRIS)  Totally understand.  Thank
19  you.
20         All right.  We'll go ahead and look to
21  Tab 1 in the notebook first.  I'm going to mark that as
22  Exhibit 1, and that is just a copy of your LinkedIn
23  profile.
24         (Exhibit 1 marked.)
25    A.  Uh-huh.

Page 17

1    Q.  (BY MS. HARRIS)  Does that look like what you
2  remember your LinkedIn profile to look like?
3    A.  Yes.
4    Q.  Perfect.
5         Do you know when the last time was you
6  updated it?  Because I know not everybody updates it
7  regularly.
8    A.  I think it was about several weeks ago when I
9  submitted my retirement or decided to retire.
10    Q.  Oh, when was that when you decided to retire?
11  You said just a couple months ago; is that right?
12    A.  About a month ago.
13    Q.  About a month ago, all right.  That was going
14  to be one of my questions, so...
15         All right.  On Page 2 of Exhibit 1, it
16  looks like the first work experience listed is about
17  past midway down.  It's deputy chief of in-custody
18  detention services with Bexar County office, and it
19  shows a date of November '99 to December of 2016.
20         Was Bexar County Sheriff's Office, were
21  they your first law enforcement job?
22    A.  Yes.
23    Q.  Okay.
24         What position did you enter as in 1999?
25  What was your first position there?

5 (Pages 14 - 17)

Page 18

1    A. I was hired on as a cadet. And then after
2 graduating the academy, was a detention officer.
3    Q. Okay.
4       What is the -- now, what positions -- how
5 do you advance up to where you got to the deputy chief
6 of in-custody detention services? You start off as a
7 cadet. And then what's -- what are the next steps to
8 get where you ultimately were?
9    A. So after cadet, it's a detention officer. And
10 through a promotional process or competitive promotional
11 process, it's corporal; and then sergeant; and then
12 lieutenant. And you can test and promote to captain. I
13 did not. And then the deputy chief position is
14 appointed by the sheriff.
15    Q. Okay.
16       MS. AYACHI: Counsel, I'm sorry to
17 interject. I just want to point out that on this
18 exhibit, there's a white square that's blocking some of
19 information, also, in my printed version. And then,
20 also, I just -- I see that the date has been stamped on
21 this document. I just don't see a URL at the bottom to
22 indicate the website from which it was pulled. But,
23 please, go ahead and continue asking your question.
24       MS. HARRIS: Yeah, I was going to mention
25 that white box. I noticed that last night as well, so I

Page 19

1 apologize for that. I did not realize that until it was
2 too late. But let's see.
3    Q. (BY MS. HARRIS) When did you reach the deputy
4 chief position with Bexar County Sheriff's Office? Do
5 you remember the year?
6    A. I believe it was in June of 2014.
7    Q. And then you held that position through when
8 you left in 2016?
9    A. Correct.
10    Q. All right.
11       Before you started with Bexar County
12 Sheriff Office, did you have any police academy or law
13 enforcement training you attended?
14    A. Before?
15    Q. Correct. Before -- I guess, before 1999.
16    A. No, ma'am.
17    Q. Okay.
18       And when you were a -- corporal, sergeant,
19 lieutenant, all of those -- were you still in detention
20 services?
21    A. Yes, ma'am.
22    Q. Okay.
23       And right underneath that job in your
24 LinkedIn profile, it shows (as read): "Director.
25 Deputy Association of Bexar County from October 2011 to

Page 20

1 July of 2014."
2       What is that position?
3    A. That is a position on the board of directors
4 for the Deputy Sheriff's Association, which is the labor
5 organization that represents the uniform staff in the
6 department.
7    Q. Is that a separate pay position, or is that
8 just part of Bexar County Sheriff's Office?
9    A. It's not a paid position. We run for office.
10 In the department, uniform staff can run for office and
11 are elected by the membership.
12    Q. Okay.
13       What are -- did you have any separate
14 duties with regard to that --
15    A. Yes.
16    Q. -- position?
17    A. Yes.
18    Q. What were those?
19    A. Most of them were contract negotiations under
20 the collective bargaining agreement, contract
21 maintenance, reviewing employe grievances, day-to-day
22 operations of the union at the office, community
23 relations.
24    Q. Okay. Thank you.
25       And it looks like you left Bexar County

Page 21

1 Sheriff's Office in 2016.
2       For what reason did you leave Bexar County
3 Sheriff's Office?
4    A. I was not reappointed to the position of deputy
5 chief by the newly incoming elected sheriff.
6    Q. Okay.
7       And then right above the deputy chief
8 position in your LinkedIn profile, it says (as read):
9 "Partner/auditor of the National PREA Auditing and
10 Consulting from June 2014 to the president {sic}."
11       PREA is Prison Rape Elimination Act; is
12 that correct?
13    A. Correct.
14    Q. All right.
15       Is this associated with the Sheriffs
16 Office, or is this a separate company?
17    A. This is separate.
18    Q. Okay.
19       Is it a personal business?
20    A. Correct.
21    Q. All right.
22       What do you do with the -- with -- as
23 partner/auditor of the National PREA Auditing and
24 Consulting?
25    A. I conduct preaudits for facilities around the

6 (Pages 18 - 21)

Page 22

1 United States.
2    Q.  Actually, if you'll turn to exhibit -- or
3 Tab 2, which I'm going to mark as Exhibit 2, that looks
4 to be the LinkedIn profile for the National PREA
5 Auditing and Consulting, LLC.
6        If you'll take a glance at that and see if
7 you agree that that looks like the LinkedIn profile.
8        (Exhibit 2 marked.)
9    A.  That's correct.
10    Q.  All right.
11        Is the overview, as it's written there, a
12 pretty good explanation?  Would you add anything to it?
13    A.  Correct.
14    Q.  All right.
15        Does the National PREA Auditing and
16 Consulting have any other employees other than yourself?
17    A.  Monica Lugo.
18    Q.  Okay.
19        And what is her role?
20    A.  She's also an auditor and a partner.
21    Q.  And she's been with you since 2014?
22    A.  Correct.
23    Q.  And are y'all still able to do this business,
24 or have you slowed down since you retired?
25    A.  Slowed down significantly.

Page 23

1    Q.  But y'all still do things here and there as far
2 as audits?
3    A.  No.  Actually, we stopped auditing.
4    Q.  Okay.
5        What -- do you just consult now basically?
6    A.  I haven't, but that would be something that I
7 would be open to.
8    Q.  Okay.
9        And the sheriff's offices, Bexar County and
10 Tarrant County, they don't mind you doing this while
11 employed with them, correct?
12    A.  Correct.
13    Q.  All right.
14        For what kind of organizations did you
15 provide auditing services through this LLC?
16    A.  Largely, county jails.
17    Q.  About how many auditing services have you -- I
18 guess, how many times have you provided auditing
19 services to county jails?  Is it quite a few?
20    A.  Probably about -- maybe 10 to 15.
21    Q.  Okay.
22        All over the state of Texas or mainly in
23 Bexar County area?
24    A.  They've been a -- different facilities
25 throughout the United States.

Page 24

1    Q.  Oh, throughout the United States, okay.
2        Have you provided any expert review through
3 this LLC of cases and incidents for purposes of
4 litigation?
5    A.  No.
6    Q.  Okay.
7        Have you provided any expert testimony
8 through this organization -- through this LLC for any
9 organization?
10    A.  No.
11    Q.  All right.  All right.
12        Do y'all draft and review policies for
13 county jails as well as the auditing and consulting?
14    A.  Yes.
15    Q.  Okay.
16        About how many -- do you do that with all
17 of your audits, or is it only -- is it separate from the
18 auditing business?
19    A.  Well, as part of the audit process, there's a
20 review of policies.  But at -- at times, other
21 facilities have asked for, you know, a review of --
22 either a review of policy or a review of the handbook as
23 part of the national preauditing and consulting.
24    Q.  Okay.
25        Well, I'm going to switch back to Exhibit 1

Page 25

1 again -- or Tab 1.
2        And on Page 2 at the top that is partly
3 covered by the box, I'm going to represent to you what I
4 think it says.  That you are -- were chief deputy of
5 housing, assistant jail administrator for Tarrant County
6 Sheriff's Office from August 2017 to present.
7        Does that sound like your correct position?
8    A.  Correct.
9    Q.  Okay.
10        And you retired, you said about a month
11 ago; is that correct?
12    A.  My retirement's officially effective September
13 22nd.
14    Q.  Oh, okay.  Congratulations on retirement.
15        Are there any other law enforcement
16 positions you've held other than these that we've gone
17 through right now?
18    A.  No, ma'am.
19    Q.  All right.
20        And it looks like pretty much all of your
21 law enforcement experience has been in -- in detention
22 services.
23        Would that be accurate?
24    A.  Yes.
25    Q.  Okay.

7 (Pages 22 - 25)

Page 26

1       And have you done anything with regard to
2  crime investigation in law enforcement?
3       A.  What do you mean by "anything"?
4       Q.  I guess -- I guess, other than in your role in
5  detention services, have you done separately any work
6  with Criminal Investigation Division?  Or is that a hard
7  question to answer?  If so, let me know why.
8       A.  It is.  I mean, it is.
9       So I don't understand if you're asking,
10  like, if I worked in a CID or criminal investigation
11  capacity or if I've performed tasks that maybe
12  helped augment an ongoing investigation by the Criminal
13  Investigation Division.
14       Q.  Okay.
15       How about as far as conducting criminal
16  investigations as part of the Criminal Investigation
17  Division?
18       A.  I have not.
19       Q.  Okay.
20       But I understand through your work in
21  detention services, you would have helped criminal
22  investigations within an investigation; is that correct?
23  Is that fair to say?
24       A.  Yes, ma'am.
25       Q.  All right.

Page 27

1       If you could turn to Tab 3, which is --
2  which I am going to mark as Exhibit 3.  It looks like
3  that is your education as listed on LinkedIn.
4       Does that look accurate to you?
5       (Exhibit 3 marked.)
6       A.  Yes.
7       Q.  (BY MS. HARRIS)  All right.  There's a lot.  So
8  we're just going to go through it briefly.
9       MS. AYACHI:  And I'd just like to place an
10  objection again.  The URL is not visible on here and the
11  date is as well as on Exhibit 2.
12       And for any other web pages that you want
13  to have that don't have the URL, I'll just have an
14  standing objection, okay?
15       MS. HARRIS:  Okay.
16       Q.  (BY MS. HARRIS)  What year did you graduate
17  from high school?
18       A.  In 1999.
19       Q.  Okay.
20       At the bottom of the first page, it looks
21  like you first attended Northwest Vista College.
22       Is that in San Antonio?
23       A.  Yes, ma'am.
24       Q.  All right.  From 2006 to 2007.
25       And you got an associate's degree in math;

Page 28

1  is that correct?
2       A.  Correct.
3       Q.  Were you working at the Bexar County Sheriff's
4  Office while going to school?
5       A.  Yes, ma'am.
6       Q.  Did you go, like, nights or weekends or
7  something?
8       A.  Evenings, weekends.
9       Q.  Okay.
10       All right.  Then you went to Columbia
11  Southern University from 2007 to 2009.
12       A.  Correct.
13       Q.  Is that online, or is that -- or did you
14  actually get to go to Alabama?
15       A.  I went online.
16       Q.  All right.
17       And you got a BS in criminal justice
18  administration; is that right?
19       A.  Right.
20       Q.  All right.
21       Then from 2010 to 2012, it looks like you
22  attended Wayland Baptist University.
23       Did you go up to Plainview for that one in
24  my neck of the woods, or did you -- do they have a
25  campus in San Antonio?

Page 29

1       A.  They had a campus in San Antonio and then also
2  an online program.
3       Q.  I did not realize that.  I just knew there was
4  one up in Plainview.  I grew up Muleshoe up in the
5  Panhandle.  So I just knew there was a Wayland in
6  Plainview.  I didn't know they expanded, so good for
7  them.
8       So you got a master in public
9  administration and justice administration; is that
10  correct?
11       A.  Correct.
12       Q.  All right.  All right.
13       And then last, there is Abilene Christian
14  University from 2017 to June 2023.
15       That looks like you were at Tarrant County
16  Sheriff's Office at the time you went to Abilene
17  Christian; is that right?
18       A.  Right.
19       Q.  All right.
20       Did you drive back and forth to Abilene, or
21  do they have an online program as well?
22       A.  They also have an online program.
23       Q.  All right.
24       And it looks like you got your doctorate
25  degree there; is that right?

8 (Pages 26 - 29)

Page 30

1    A. I'm on my dissertation, so I'm working on my
2  dissertation now.
3    Q. Was the sheriff's office able to help you out
4  with any of your education and degrees?
5        MS. AYACHI:  Objection, form.
6    Q. (BY MS. HARRIS) As providing any scholarships?
7  Payments anything like that?
8    A. Tarrant County Sheriff's office.
9    Q. Or Bexar County for the others in -- the other
10  schools.
11    A. Tarrant County, no; Bexar County, yes.
12    Q. Okay.
13        Did you receive any other -- I know there
14  are licenses and certifications but any other college or
15  formal education that is not listed here?
16    A. My peace officer license that I -- that I did
17  through the San Antonio Law Enforcement Academy.
18    Q. Okay.
19        When was that?
20    A. Oh, wow.  2002.
21    Q. And then if you'll -- let's see.  I guess, at
22  the bottom of the first page, it says (as read):  "You
23  attended a jail administration management and operations
24  training program at Sam Houston State University in
25  2014."  It says that was a week-long program.

Page 31

1        Did Bexar County send you to that program?
2    A. Yes, ma'am.
3    Q. Did any of this training concern substance
4  abuse or drug abuse?
5        MS. AYACHI:  Objection, form.
6    A. Can you explain the question or expand on it?
7    Q. (BY MS. HARRIS)  Did any of this training
8  concern opioids?
9    A. Not that I can recall.
10    Q. Okay.
11        It says -- then it looks like you
12  participated in a team audit of the Los Angeles County
13  Jail System for the National Institute of Corrections,
14  and that's from 2015 to 2016.
15        What was that?
16    A. The National Institute of Corrections, or NIC,
17  gathered a team of county jail professionals from around
18  the nation.  And we went to conduct a security audit of
19  the Los Angeles County Jail System where we audited
20  their practices, their facility.
21        I believe we reviewed some of their
22  policies and then conducted an out brief to the
23  director, I believe.  Her name's Terri McDonald.  I
24  don't know if she's still in the position anymore.
25    Q. Were you selected to go with -- to be on this

Page 32

1  team audit?
2    A. Yes.
3    Q. Who selected you for this?
4    A. I believe it was either NIC or the jail
5  administrator from Bexar County at the time.
6    Q. Okay.
7        How many people were on the team?
8    A. Total on the team -- oh, wow.  Somewhere in the
9  neighborhood of maybe 20, 25.
10    Q. Oh, quite a few people.
11    A. Right.
12    Q. Okay.
13        Was there a presentation -- it looks like
14  there was a presentation there.  "High Liability Inmates
15  at Large Jail Network" -- at Large Jail Network."
16        Is that part of the team, or is that
17  something different?
18    A. That was a -- that was a separate program.
19    Q. Were you a presenter on that one?
20    A. Correct.
21    Q. All right.
22        What is a high-liability inmate?
23    A. So for purposes of this presentation, a
24  high-liability inmate was -- was basically our inmates
25  who require a higher level of care, maybe a higher level

Page 33

1  of observation or whose presence in the jail represents
2  an increased risk for either self-harm or experiencing
3  any type of medical and mental health emergency.
4    Q. Did any of that presentation concern substance
5  abuse or opioids?
6    A. Yes.
7    Q. To what extent?
8    A. We discussed -- or I discussed the housing of
9  inmates who are under detox protocols.
10    Q. What did you discuss about them?  Was there
11  something that's particular -- that's an issue?
12        MS. AYACHI:  Objection, form.
13    A. Basically, just the practice of housing them
14  together and kind of working with medical and mental
15  health to identify their locations and -- their housing
16  locations.  And in a nutshell, the presentation was on
17  housing -- housing of inmates to basically get maximum
18  use of your available beds in the jail.
19    Q. (BY MS. HARRIS) If you'll turn the page, it
20  looks like the next attendance is the National Jail
21  Leadership Command Academy at Sam Houston State
22  University in 2018.
23        How long was that academy, if you remember?
24    A. I believe it was a week.
25    Q. Was that one while you were at Tarrant County

9 (Pages 30 - 33)

1 Sheriff's Office?

2    A. Yes, ma'am.

3    Q. All right.

4       Did they send you to that, or was that

5 something you wanted to do on your own?

6    A. I applied, was selected, and the department

7 sent me.

8    Q. Okay. Great.

9       Did any of that program discuss opioids?

10    A. Not that I can recall.

11    Q. All right.

12       All right. Do you remember if it discussed

13 substance abuse in general?

14    A. No, ma'am, I don't recall.

15    Q. Okay. All right.

16       The next one on the list is the FBI

17 National Academy in 2020, and it looks like that was a

18 ten-week program.

19       How did you come to attend that one?

20    A. I applied to the National Academy, was

21 selected, and was sent by Tarrant County.

22    Q. Did you get some kind of a degree or

23 certificate or some other kind of accreditation for

24 completing?

25    A. It's a certificate with graduate hours, but not

1 enough to equate to a master's degree. So it's a

2 certificate.

3    Q. Okay.

4       What kind of education did you get at that

5 academy?

6       MS. AYACHI: Objection, form.

7    Q. (BY MS. HARRIS) What topics did you discuss

8 there?

9    A. Oh, I'm sorry.

10       Largely, it was leadership. So there were

11 leadership topics, mental health wellness for staff,

12 physical wellness, current trends, policing Internet.

13 They talked about different policing practices from

14 around the world. Basically introducing us to different

15 cultures from police departments around the world.

16    Q. Did you receive any -- oh, I'm so sorry. I

17 didn't mean to interrupt you.

18    A. Media relations, communication, public

19 speaking.

20    Q. Did you receive any education about narcotics?

21    A. Not that I can recall.

22    Q. Any education there about opioids or

23 prescription opioids?

24    A. No, ma'am.

25    Q. Do you remember receiving any education there

1 about controlled substances in general?

2    A. No, ma'am.

3    Q. All right.

4       It looks like the last one is the National

5 Institute for Jail Operations Elite Program Corrections

6 Administration in February 2022.

7       What was that program?

8    A. That is a leadership development program that's

9 put on by the National Institute for Jail Operations.

10 It was their first program -- their first time running

11 the program -- their elite program, and it covers topics

12 related to leadership and -- for jail leaders, jail

13 professionals.

14    Q. In that program, did you receive any education

15 about opioids?

16    A. No, ma'am.

17    Q. All right.

18       Do you recall in that program if you

19 received any education about controlled substances in

20 general?

21    A. No, ma'am.

22    Q. And if you'll turn to exhibit -- or Tab 4,

23 which I'm going to mark as Exhibit 4. It looks like

24 there is a list of licenses and certifications.

25       Do those look correct to you? And are

1 there any you would add?

2       (Exhibit 4 marked.)

3    A. The list is correct.

4    Q. (BY MS. HARRIS) Okay.

5       For these licenses and certifications,

6 generally, like for the first one, National Certified

7 Corrections Executive, what did you -- what were you

8 required to do to get this certification?

9    A. You first have to apply for the -- you have to

10 apply to the organization to demonstrate either specific

11 years in a position at a certain rank or a certain

12 level, and then you have to complete a specified number

13 of hours of training and submit them to the organization

14 for review. And for this specific certification, they

15 make the determination whether you would qualify for the

16 certification or not.

17       Excuse me. For others, they may review

18 everything submitted and determine whether you're

19 eligible to sit for an examination, an initial

20 examination for certification.

21    Q. And for the ACA auditor, is that a licensing,

22 I'm guessing?

23    A. I guess it's more -- it's more of -- yeah, it's

24 a license. That makes sense.

25    Q. What were you required to do for that license?

10 (Pages 34 - 37)

1    A.  Submit an application to American Correctional
2  Association to demonstrate years of experience in both
3  the -- in both in corrections and as an auditor or
4  auditing experience.
5    Q.  Okay.
6        What about for the Certified Corrections
7  Executive?  For that certification, what were you
8  required to do?
9    A.  Submit an application demonstrating years of
10  experience in a specific position at a specific rank,
11  submit training, and then sit for examination.
12    Q.  Same question for Advanced Police Instructor.
13    A.  The Advanced Police Instructor, it's the second
14  part of an instructor certification.  The first part is
15  your Basic Instructor Certification through TCOLE, the
16  Texas Commission on Law Enforcement.  And you have to
17  complete the Basic Instructor course.
18        And then after holding certification as an
19  instructor for, I believe it's -- I believe it's three
20  years, then you can apply to become -- to be certified
21  as an advanced instructor and then complete an --
22  additional coursework for the Advanced Police Instructor
23  Certification.
24    Q.  All right.
25        So the next one, the Certified Corrections

1  Executive, is that similar to the first one, the
2  National Corrections Executive?
3    A.  Correct.  It's a repeat.
4    Q.  All right.
5        What about for Certified Jail Manager?
6  What were you required to do for that?
7    A.  For the Certified Jail Manager, once again,
8  submitting application, on this one, it's to the
9  American Jail Association, demonstrating years of
10  experience in a specific position at a certain rank.
11  And then submit a proof of training for a specified
12  number of hours.  I don't recall the number of hours.
13        And then, I believe, for the Certified Jail
14  Manager, or CJM, you also have to set for an examination
15  for your initial certification.
16    Q.  For the next one, what is a Fusion Liaison
17  officer?
18    A.  Fusion Liaison was a -- was a duty with the
19  Southwest Texas Fusion Center that I held in and
20  training completed when I was -- I believe I was a
21  sergeant at the time that dealt with specifically gang
22  intelligence.
23    Q.  What about the next one?  Master Jailer's
24  Certification?  What did you have to do to get that
25  certification?

1    A.  So Master Jailer Certification is the -- if you
2  will, the highest level of jail certification that you
3  can receive through the Texas Commission on Law
4  Enforcement as a jailer.  You have to first be certified
5  as a basic jailer; and then three years' of experience,
6  and training points, education, and completing certain
7  courses that TCOLE outlines.  You can achieve the
8  different levels.  It's basic, intermediate, advanced,
9  and then master.
10    Q.  And, similarly, the Master Peace Officer
11  license.
12        Is that somewhat similar?
13    A.  Correct.
14    Q.  Okay.
15        And then the last one, the PREA Auditor for
16  jails and prisons.
17        What did you need to do to get that
18  license?
19    A.  To be certified as a preauditor, I attended the
20  preauditor training in South Carolina.  And I can't
21  remember if it was one week or two weeks.  It was in --
22  wow -- 2014.
23        Attended a program there that was put on
24  through, I believe, the Department of Justice.  And then
25  at the end of the program, you have to sit for an

1  examination that's graded by a panel.  And then they
2  notify you whether you pass or failed.
3    Q.  Now, I'm going to switch topics now a little
4  bit.
5        If you can, explain to me a little bit how
6  the Tarrant County Sheriff's Office is structured.
7        What is the next level below the sheriff?
8  And then kind of go down a little bit if it's possible.
9    A.  Okay.
10    Q.  Uh-huh.
11    A.  Below the sheriff is the senior chief deputy,
12  who's generally designated by wearing three stars on his
13  collar.
14    Q.  Okay.
15    A.  Under him or beside him, depending on how it's
16  set up, is the chief of staff, who in this agency, is
17  designated by wearing two stars.
18        On the detention side, you have the
19  executive chief deputy, who serves as the jail
20  administrator.  He's designated by wearing two stars.
21        And under him, you have two assistant jail
22  administrations, who also hold the rank of deputy, but
23  are designated by wearing one stars.
24        On the operations side, or the law
25  enforcement side, you'll have chief deputies overseeing

11 (Pages 38 - 41)

1 different divisions of the department.  For example,
2 we'll have a chief deputy over patrol, who's a one star;
3 a chief deputy over judicial services, or the
4 courthouse, is the two star; chief deputy over CID,
5 who's a one star.  A chief deputy over -- what else do
6 we have?  Inmate services, which is like jail
7 programming and deals with the volunteers; and then a
8 chief deputy over our intel section.
9        Without looking at an organizational chart,
10 it's kind of hard to picture, but...
11   Q.  Well -- and I think I have one.  Let me reach
12 in and look at it real quick.
13        Switch to Exhibit 5, or Tab 5, which I'm
14 going to mark as Exhibit 5.  And I think -- the last
15 page of that exhibit, it has names, but not really what
16 their position is or what their area of focus is, if
17 that helps.
18        (Exhibit 5 marked.)
19   A.  Okay.
20   Q.  (BY MS. HARRIS)  So Senior Chief Mike Simonds,
21 what was his area of focus?
22   A.  He -- I mean, he provided direction and
23 guidance essentially for all divisions in the sheriff's
24 office from the jail to the operation site.
25   Q.  You have the chief of staff.

1        Then Executive Chief Craig Driskell.
2        What was his title?
3   A.  At this -- he was a chief deputy.  So at --
4 during this -- when this photo {sic}, he was over
5 training.  Training judicial, which is the courts.  And,
6 I believe -- and then that's it.  Those two areas from
7 what I can recall.
8   Q.  Anyone -- let's just flip back to the first or
9 the second page of this exhibit.  And I'll tell you, I
10 think, this is a 2018 -- or the third page, sorry -- of
11 this tab.
12        It's talking about 2018 stats in Sheriff
13 Waybourn's article on Page 3.  So I think this is either
14 a 2018 or 2019 report, if that helps.
15   A.  Okay.
16   Q.  All right.  Sorry.  Getting back to the last
17 page.
18        Executive Chief Randy Cundiff.  What was
19 his title or area of focus?
20   A.  At this time, he was a jail administrator.
21   Q.  Chief Roy Kurban?
22   A.  He was in charge of inmate services.
23   Q.  And Chief Steven Sparks?
24   A.  He was in charge of internal affairs and IT.
25   Q.  And Chief Vennum.  Jerry Vennum?

1   A.  He was in charge of CID.
2   Q.  Chief Tim Canas?
3   A.  He was in charge of patrol operation.
4   Q.  And then there's Chief Charles Eckert?
5   A.  He was another -- he was the second jail
6 administrator at the time.
7   Q.  And at this time, were you still -- were you
8 chief deputy of housing assistant jail administration;
9 is that correct?
10   A.  Correct.
11        Just -- just to clarify, Chief Eckert, he
12 was one of the other assistant jail administrators in
13 the jail, but he was in charge of our support services
14 in the jail.
15   Q.  And so for this, both you and Chief Eckert
16 would report to Executive Chief Cundiff, is that -- am I
17 reading that correctly?
18   A.  Correct.
19   Q.  And then Chief Cundiff reports to Senior Chief
20 Mike Simonds?
21   A.  Correct.
22   Q.  All right.
23        With your specific work experience and
24 Tarrant County, in particular, do you believe you are
25 knowledgeable to speak of the role and maybe the impact

1 of opioids in general and prescription opioids, the
2 effect that they have had in Tarrant County?
3   A.  Hold on.  The -- I want to make sure that I
4 don't close anything out that I'm not supposed to.  The
5 --
6   Q.  Okay.
7   A.  -- message popped up on the computer screen.
8   Q.  Oh.
9   A.  Can you repeat --
10   Q.  Yeah, I'll restate.
11   A.  Can you repeat the question?
12   Q.  Yeah.
13        With your specific experience in Tarrant
14 County, do you believe you are knowledgeable to speak to
15 the role and the impact opioids in general and
16 prescription opioids, specifically, the effect they have
17 had in Tarrant County?
18        MS. AYACHI:  Objection, form.
19   A.  In Tarrant -- no.  Not in Tarrant County.
20   Q.  (BY MS. HARRIS)  Do you have -- excuse me --
21 any knowledge regarding the laws and regulations of a
22 pharmacy in filling and dispensing a medical
23 prescription?
24        MS. AYACHI:  Objection, form.
25   A.  No.

12 (Pages 42 - 45)

Page 46

1  Q.  (BY MS. HARRIS)  Do you have any understanding
2  that chain pharmacies in Tarrant County do not
3  manufacture prescription opioid medications?
4        MS. AYACHI:  Objection, form.
5     A.  No.
6     Q.  (BY MS. HARRIS)  Do you have an understanding
7  that chain pharmacies in Tarrant County do not write
8  prescriptions for opioid medications?
9        MS. AYACHI:  Objection, form.
10    A.  No.
11    Q.  (BY MS. HARRIS)  Do you have any understanding
12 that only healthcare providers licensed by the DEA can
13 write prescriptions for opioids?
14       MS. AYACHI:  Objection, form.
15    A.  No.
16    Q.  (BY MS. HARRIS)  Okay.
17       Do you have any information that any chain
18 pharmacy in Tarrant County has been the cause of any
19 opioid abuse or addiction?
20       MS. AYACHI:  Objection, form.
21    A.  No.
22    Q.  (BY MS. HARRIS)  And I think -- I don't think
23 we've discussed this, but do you have -- have you heard
24 of the term "diversion" as it relates to opioids?
25    A.  Can you define it?

Page 47

1     Q.  Yeah, that's what I was going to say.
2        Do you have an understanding about what the
3  word "diversion" means as it relates to opioids?
4     A.  No.
5     Q.  Okay.
6        Do you have any knowledge of any grant
7  applications by Tarrant County or grants awarded to
8  Tarrant County related to opioids?
9     A.  No.
10       MS. AYACHI:  Objection, form.
11    Q.  (BY MS. HARRIS)  All right.
12       In your opinion, is there a substance abuse
13 medical crisis in Tarrant County?
14       MS. AYACHI:  Objection, form.
15    A.  From the information that I've received from
16 other command staff members and minus any, yes, there is
17 a problem.
18    Q.  (BY MS. HARRIS)  In what kind of forms do you
19 see a problem?  Is it alcohol?  Marijuana?  Illegal
20 drugs?  Fentanyl?  What do you think is the main problem
21 in Tarrant County?
22       MS. AYACHI:  Objection, form.
23    A.  I don't know if I'd be able to identify
24 anything as a main problem in Tarrant County in the
25 community just because that would fall under like the

Page 48

1  operations and CID, and that's not something I generally
2  track.  All the information that I track or any
3  incidents I track are in the jail.
4     Q.  (BY MS. HARRIS)  And with regard to the
5  detention services, what causes you the most problems, I
6  guess, with related to substance abuse?
7        MS. AYACHI:  Objection, form.
8     A.  It's the introduction of substances into the
9  jail from outside through different means.
10    Q.  (BY MS. HARRIS)  What are the main substances
11 that are snuck in, I guess, without a better way to say
12 it?
13    A.  What we suspect is fentanyl, but we just -- we
14 just suspect that anything coming in could contain or
15 might be fentanyl.  But until they run lab tests, we
16 don't know definitively what it is.
17    Q.  Do you believe Tarrant County has an opioid
18 crisis?
19       MS. AYACHI:  Objection, form.
20    A.  I don't know.
21    Q.  (BY MS. HARRIS)  Have you ever been prescribed
22 a prescription opioid?
23       MS. AYACHI:  I'm going to object and
24 instruct the witness not to answer on the grounds of
25 HIPAA-protected information.

Page 49

1        MS. HARRIS:  Okay.
2     Q.  (BY MS. HARRIS)  Have you personally
3  experienced anyone be it a family, friend, acquaintance
4  that has been impacted by an addiction to a prescription
5  opioid?
6        MS. AYACHI:  Objection, form.
7     A.  No.
8     Q.  (BY MS. HARRIS)  Okay.
9     A.  Not that I know of.
10    Q.  Okay.
11       Have you ever been Kroger to grocery shop?
12    A.  Ever in my life?
13    Q.  Ever in your life, have you been to Kroger to
14 grocery shop that you recall?
15    A.  I'm sure when I was a kid.  Once.  Maybe twice.
16    Q.  Do you go there to get your prescriptions
17 filled at all?
18    A.  No, ma'am.
19    Q.  Have you had any experiences good or bad at
20 Kroger that you remember?
21    A.  No, ma'am.
22    Q.  Do you have an opinion about how substance
23 abuse has impacted Tarrant County?
24    A.  Sure.  Yeah, yes.
25    Q.  What is your opinion?  What do you think?

13 (Pages 46 - 49)

Page 50

1  A.  Well, I think with all substance abuse, I think
2 it can break up families, and it leads to individuals
3 engaging in other criminal activity either to obtain the
4 substances or to support their habit.
5  Q.  Do you have a particular substance that you
6 find to be most abused?
7  MS. AYACHI:  Objection, form.
8  A.  No.
9  Q.  (BY MS. HARRIS)  Do you have an opinion
10 about --
11  A.  Excuse me.
12  A.  Oh.
13  A.  I'm sorry.
14  Q.  Bless you.
15  Q.  Can you repeat the question?
16  Q.  Sure.
17  Do you have an opinion whether the majority
18 of substance use and abuse is related to illegal
19 substances?
20  A.  No, I don't have an opinion on that neither.
21  Q.  Have you noticed any changes in the trends of
22 substance use through the -- through your years at
23 Tarrant County Sheriff's Office?
24  A.  No.
25  But I started Tarrant County in 2017.  So I

Page 51

1 don't have two decades of experience here to see -- to
2 see the changes, if any.
3  Q.  Okay.
4  If a prescription opioid is diverted and
5 seized, do you and law enforcement consider that to be
6 an illicit drug?
7  MS. AYACHI:  Objection, form.
8  A.  I don't know.  I don't know how the CID section
9 or portion of the investigation, how that works, and
10 what their criteria is.
11  Q.  (BY MS. HARRIS)  Okay.  All right.
12  Let's look at Tab 6, which I'll mark as
13 Exhibit 6.  This document is entitled, Tarrant County
14 Sheriff's Department Health Services Plan, and it looks
15 like it's date-stamped March 7th, 2022.
16  Is this a document you remember seeing?
17  (Exhibit 6 marked.)
18  A.  Yes.
19  Q.  (BY MS. HARRIS)  In general, can you tell me
20 what it is?
21  A.  I believe this is the health services plan
22 that's submitted to the Texas Commission on Jail
23 Standards outlining the medical and, I believe, mental
24 health services; and treatment that's submitted --
25 outlined -- the treatment that's provided or services

Page 52

1 that are provided to inmates.  I believe this is
2 submitted to, like I said, Texas Commission on Jail
3 Standards.
4  Q.  All right.
5  I'm looking at the first two sentences of
6 the first paragraph on the first page under Health
7 Services, and it reads (as read):  "Medical and dental
8 services shall be provided to the Tarrant County jail
9 units by the Tarrant County Hospital District."
10  Do you know -- what is the Tarrant County
11 Hospital District?  Do you have an understanding?
12  A.  I believe it's JPS.  The JPS Hospital.
13  Q.  That was going to be my next question.
14  Do you understand that to be the same as
15 JPS Health Network, JPS Hospital?
16  A.  Yes.
17  Q.  And, correct me if I'm wrong, but it looks like
18 the Tarrant County Hospital District, JPS, provides
19 health services to Tarrant County families; is that your
20 understanding?
21  A.  Yes.
22  Q.  Or Tarrant County Hospital District.
23  And it looks like, if you read on -- if you
24 read that sentence (as read):  "Medical and dental
25 services shall be provided for the Tarrant County jail

Page 53

1 units by the Tarrant County Hospital District."  And
2 then if you, kind of, jump down three or four lines, it
3 says (as read):  "In conjunction with the Tarrant County
4 Mental Health Mental Retardation"?
5  A.  Yes.
6  Q.  People commonly refer to that as "MHMR,"; is
7 that right?
8  A.  Correct.
9  Q.  And I think several years ago, MHMR changed
10 their name from Mental Health Mental Retardation to My
11 Health My Resources?
12  A.  That's correct.
13  Q.  Do you know -- okay.  That's correct, okay.
14  Do you know how the Tarrant County Hospital
15 District and the Tarrant County MHMR coordinate their
16 services to provide medical care in the Tarrant County
17 jail units?
18  MS. AYACHI:  Objection, form.
19  A.  Can you repeat the question?
20  Q.  (BY MS. HARRIS)  Sure.
21  Do you know how -- do you know how the
22 Tarrant County Hospital District and the Tarrant County
23 MHMR coordinate their services to provide medical care
24 in the Tarrant County jail units?
25  MS. AYACHI:  Objection, form.

14 (Pages 50 - 53)

Page 54

1    A.  Yes.
2    Q.  (BY MS. HARRIS)  Okay.
3         Who does what?  How does it work?
4    A.  So JPS, or the medical provider in the jail,
5  which I'll refer to as "JPS," has directors, if you
6  will, executive directors, medical directors.  And MHMR
7  also has a director.
8         And they communicate with each other on
9  either specific cases or on situations that might
10 require a procedural change or an operational change.
11 And I believe they meet jointly -- not just them, but
12 other MHMR or JPS employees -- meet at least once a week
13 to discuss either specific cases or just medical mental
14 health services in general.
15   Q.  In that first paragraph, right above the line
16 that says, "in conjunction with mental health and mental
17 retardation," it says -- it refers to "inmates who
18 are" -- "who are determined to have mental help
19 conditions."
20        When it says "mental health conditions," do
21 you know if that includes substance use or abuse, or is
22 that separate?
23        MS. AYACHI:  Objection, form.
24   A.  To my understanding, it -- to my understanding,
25 I believe it does include substance abuse.  They would

Page 55

1  fall under the mental health umbrella.
2    Q.  (BY MS. HARRIS)  All right.
3         If you will turn to Tab 7, which is Exhibit
4  -- which I'll mark as Exhibit 7.  This looks like an
5  email from Jerry Rucker to you dated August 26, 2020,
6  regarding clarification on records request.
7         Do you recall this email?
8         (Exhibit 7 marked.)
9    A.  No, I don't remember this.
10   Q.  (BY MS. HARRIS)  Is that your email address?
11 Is that listed correctly on the email?
12   A.  That was -- correct.  That was my email at the
13 time.
14   Q.  You don't have any reason to think you didn't
15 get this?  You just don't remember it; is that correct?
16   A.  Correct.
17   Q.  Now, who is Jerry Rucker?
18   A.  Jerry Rucker was the records supervisor at the
19 time.  He's since retired.
20   Q.  Okay.
21        Do you remember who Lyndee Higgs is?
22   A.  Not off the top of my head.  No, I don't
23 remember.
24   Q.  So you probably don't have any recollection as
25 to why she was requesting records?

Page 56

1    A.  Correct.
2    Q.  All right.
3         If you will turn to Tab 8, which is
4  Exhibit 8 -- which I'll mark as Exhibit 8.  This is the
5  Tarrant County Sheriff's Department Confinement Bureau
6  Housing Division Standards Operating Procedures 908:
7  Medical and Healthcare Service, 0001:  Medical Service.
8         This is the document that was attached.
9  I'll represent to you this was the document that was
10 attached to that Exhibit 7 email from Jerry Rucker?
11        (Exhibit 8 marked.)
12   A.  Okay.
13   Q.  Do you recognize these as the standard
14 operating procedures in effect at the time of the email
15 in 2020 -- August 2020?  Sorry.
16        MS. AYACHI:  Apologies.  I just want to
17 make sure you have the opportunity to fully review the
18 entire document just to familiarize yourself, okay?
19        MS. HARRIS:  Absolutely.
20   Q.  (BY MS. HARRIS)  Take all the time you need.
21   A.  Thank you.  Yes.
22   Q.  All right.
23        If you will turn to Page 3 of this exhibit.
24 It's Section 1.2, Correctional Health Department.
25   A.  Okay.

Page 57

1    Q.  And it reads (as read):  "The department of the
2  Tarrant County Hospital District designated for the
3  provision of required medical care for inmates in the
4  Tarrant County jail units."
5         It looks like the Tarrant County Hospital
6  District provides health services to Tarrant County and
7  the Correctional Health Department is a specific
8  department within the Tarrant County Hospital District
9  that provides health services to the Tarrant County jail
10 units; is my understanding correct on that?
11   A.  It appears correct.
12        We don't use the term or never used the
13 term "Correctional Health Department."  Everything was
14 just referred to just as JPS, but it appears that the
15 Correctional Health Department is, if you will, a
16 division of the Tarrant County Hospital District.
17   Q.  Okay.
18        Y'all didn't get that specific?
19   A.  Correct.
20   Q.  All right.  Makes sense.  All right.
21        And then if you'll turn to the next page in
22 Section 3.2 or -- Standard Operating Procedure 3.2, and
23 it says (as read):  "Individuals" -- Evaluate at Medical
24 Screening.  It says (as read):  "Individuals accepted
25 into the jail shall during the booking process be

15 (Pages 54 - 57)

1 escorted to medical screening where correctional help
2 personnel shall evaluate the individual's health status
3 to determine medical/mental health needs."
4     Who are the correction medical help
5 personnel?  Do you know?
6     A.  Yes.
7         That would be Tarrant County staff, Tarrant
8 County officers.
9     Q.  Not the JPS folks?
10     A.  It could be.  But it's generally the uniform
11 staff who are doing the intake process.
12     Q.  Are they employees of the Tarrant County
13 Sheriff's Office, or is that a contracted service?
14     A.  Who is "they"?
15     Q.  The correctional health personnel.
16     A.  Correctional health personnel, that's the
17 contracted services through JPS.
18     Q.  Okay.
19         So the correctional health personnel, the
20 JPS folks, will be the ones to evaluate the health
21 status; is that correct?
22     A.  Correct.
23     Q.  Okay.
24         All right.  At the bottom of Page 4,
25 carrying over to the top of Page 5 under 3.7, it is

1 Methadone Management.  It says (as read): "Dispensing
2 of methadone shall be administered under the supervision
3 of the Correctional Health Department."
4         And the Correctional Health Department, I
5 believe, was that the JPS folks?
6     A.  Correct.
7     Q.  Okay.
8         Do you have an understanding about what
9 methadone is used for?
10     A.  Yes.
11     Q.  For the treatment of opioid addiction; is that
12 correct?
13     A.  Correct.
14     Q.  So it appears that for the Correctional Health
15 Department to administer methadone, there needed to have
16 been an assessment of addiction at the time; is that a
17 correct understanding?
18         MS. AYACHI:  Objection, form.
19     A.  Correct.
20     Q.  (BY MS. HARRIS)  Okay.
21         Are you good to take a quick break, or you
22 want to keep going?
23     A.  We -- keep going.
24     Q.  Okay.  All right.
25         THE CERTIFIED STENOGRAPHER:  This is the

1 court reporter.
2         MS. HARRIS:  Do you need to take a break?
3         THE CERTIFIED STENOGRAPHER:  Yes, please.
4         MS. HARRIS:  Okay.
5         THE VIDEOGRAPHER:  We're off the record at
6 11:09.
7         (A break was taken from 11:09 a.m. to
8         11:20 a.m.)
9         THE VIDEOGRAPHER:  We are back on the
10 record at 11:20 a.m.
11     Q.  (BY MS. HARRIS)  All right.
12         If you could turn to Tab 9, which I'm going
13 to mark as Exhibit 9.  This was another document
14 attached to Mr. Rucker's email in Exhibit 7.  And this
15 is one entitled, Tarrant County Sheriff's Department
16 Confinement Bureau Housing Division Standard Operating
17 Procedures 908:  Medical & Healthcare Services, 003:
18 Mental Health Services.
19         Does this look familiar to you as something
20 you would have seen as a standard operating procedure?
21         (Exhibit 9 marked.)
22     A.  Yes.
23     Q.  (BY MS. HARRIS)  If you will turn to Page 2 and
24 No. 3.2:  Local MHMR Inmate.
25         What does local MHMR inmate mean?

1     A.  I believe for the purposes of this policy it
2 means an individual who has received some sort of mental
3 health services.
4     Q.  Do you know if there is a separate standard
5 operating procedure that discusses evaluation or
6 assessment for substance abuse?
7     A.  That's administered by Tarrant County or by JPS
8 or MHMR?
9     Q.  Any one of the three?
10     A.  I don't know what MHMR or JPS administers or
11 what screening or what documents they complete as part
12 of the screening process.
13         For Tarrant County, I believe, part of the
14 intake process that's completed by TCSO, Tarrant County
15 staff, may ask about an individual's history of mental
16 health treatment, mental health issues, or drug abuse.
17 And, I believe, that's done during the booking/intake
18 process.
19     Q.  Then would they be referred to JPS for
20 assessment or evaluation?
21     A.  Correct.
22     Q.  Okay.
23         You know if there was a contract between
24 the Tarrant County Sheriff's Office and MHMR for the
25 services provided in the Tarrant County jail units?

1    A. For my understanding, there has been since I
2 been here.
3    Q. There has been, yes?
4    A. Yes.  I'm sorry.
5    Q. As deputy chief of detention services, did you
6 have any kind of role in approving or reviewing that
7 contract?
8    A. Yes.
9    Q. All right.
10        If you will turn to Tab 10, which I'll mark
11 as Exhibit 10.  This looks the MHMR of Tarrant County
12 Comprehensive Annual Financial Report Yearend ending in
13 August 2020.
14        Is this something that looks familiar to
15 you that you may have seen at some point?  And if it
16 helps, I can point you to Page 12 --
17        (Exhibit 10 marked.)
18    A. Yeah.
19    Q. (BY MS. HARRIS) -- where you are listed as a
20 member of the board of trustees.
21    A. That's what I was going to say.  I believe I
22 would have seen this as a member of the board or been
23 forwarded this as a member of the board.  But,
24 specifically, I don't recall.
25    Q. Do all the members of the board including

1 yourself review these, or do y'all have a specific
2 person who reviews it and let's everybody else know
3 what's in it?  How does that work?
4    A. Correct.  This would be --
5        MS. AYACHI:  Objection, form.
6        THE WITNESS:  I'm sorry.
7    A. This would be reviewed either by MHMR's legal
8 or their executive leadership team, and then it would be
9 forwarded to the board of trustees.
10    Q. (BY MS. HARRIS)  Do y'all discuss this in any
11 of your meetings and go over it in detail?
12    A. I don't recall.  I believe they opened it up
13 for discussion, but I don't recall.
14    Q. You don't remember any long meetings discussing
15 this in detail?
16    A. Correct.
17    Q. Okay.
18        How long have you been a member of the
19 board of trustees for MHMR of Tarrant County?
20    A. I believe -- I think I was put on the board --
21 it may have been in 2020 or 2019.  It's more of an
22 honorary position that I was asked to fill.  I think
23 2019 or 2020.  I don't recall the exact year.
24    Q. Did Tarrant County Sheriff's Office ask you to
25 sit as a board member?

1    A. Yes.
2    Q. Okay.  All right.
3        Are you still a member of the board?
4    A. I think technically, yes.  But, I mean, after I
5 retire, they'll fill it with someone else.
6    Q. All right.
7        If you'll turn to Page 7 of this exhibit.
8 And I'll give you a second to review the sections that
9 goes onto the next page, Page 8.  That's Factors
10 Affecting Financial Condition.
11        Because then I have a couple of questions
12 about that.  Then I'll let you review it first.
13    A. Okay.  Page 7, okay.  Go ahead.
14    Q. I didn't see any discussion -- and you can
15 point it to me if you saw it -- about opioids in this
16 section of Factors Affecting Financial Condition; is
17 that correct?
18    A. It appears so.
19    Q. It appears that there's mention of opioids in
20 that?
21    A. Correct.
22    Q. All right.
23        And then two pages after that is an
24 organizational chart.  It begins on Page 10.
25        With regard to that organizational chart,

1 can you -- is it easy for you -- or I don't know if
2 you're able to or not point to the person or position
3 that would oversee the services provided to the Tarrant
4 County jail units?
5    A. It's -- point to it or just --
6    Q. Can you tell me?  Sorry.
7    A. Ramey Heddings.  He's at the bottom, if I'm
8 looking at the same one.
9    Q. Oh, chief of behavioral health services?
10    A. Correct.
11    Q. All right.
12        On the next to the last line.
13    A. Uh-huh.
14    Q. Are there five facilities within the Tarrant
15 County jail; is that correct?
16    A. Correct.
17    Q. All right.
18        Do you know if MHMR contracted for each
19 facility separately, or was it one contract for all of
20 them?
21        MS. AYACHI:  Objection, form.
22    A. It's one contract.
23    Q. (BY MS. HARRIS)  Okay.
24        Are you familiar enough with this report to
25 show me where I can locate the amount of revenue MHMR

17 (Pages 62 - 65)

Page 66

1 received from the services provided to the Tarrant
2 County jail units?
3      A. No.
4      Q. Okay.
5           Is the MHMR contract to provide services to
6 Tarrant County jail units a yearly contract, or what is
7 the length, if you recall?
8      A. I don't recall.
9      Q. Okay.
10          Do you recall if MHMR ever attributed any
11 contractual increase due to the increase cost and
12 services as a result of opioids?
13          MS. AYACHI:  Objection, form.
14     A. Not specific to opioids, no.
15     Q. (BY MS. HARRIS)  Do you know where MHMR
16 receives its funding?
17     A. I understand it's taxpayer funded; but,
18 specifically, no, I don't know.
19     Q. Okay.
20          Do you know if this funding changed in any
21 manner due to opioids?
22     A. No.  No, I don't know.  Sorry.
23     Q. You don't know.  That's why I was fixing to
24 correct, and say you don't know, correct?
25          Is there a person who might know this

Page 67

1 information on this organizational chart?
2      A. I'm sure there is.  I wouldn't be able to
3 direct you to.
4      Q. Okay.
5      A. It could be the CFO or the CEO, but I wouldn't
6 be able to direct you to the specific individual.
7      Q. In this same exhibit, if you'll turn to the end
8 of Page 84, and that is Bates No. 831357.
9           All right.  This is a table of MHMR
10 expenses.  Expenditure by Activity for the Last Ten
11 Years.
12          Do you have that in front of you?
13     A. Yes.
14     Q. All right.
15          And it looks like on the left-most column,
16 it has Behavioral Health, Mental Health Adult.  And it
17 looks like -- and tell me if I'm reading this correctly,
18 but ever since 2012, it looks like the expenses have
19 risen through 2020.
20          Does that look correct to you?
21          MS. AYACHI:  Objection, form.
22     A. Assuming these are dollars because there's no
23 dollar sign, yes, the number has increased.
24     Q. (BY MS. HARRIS)  All right.
25          And the same with -- if you'll look to the

Page 68

1 middle, Early Childhood Services.  It looks like every
2 year since 2012, there has been an increase.
3           Does that look -- am I reading that
4 correctly?
5      A. Correct.
6      Q. And then if you'll look for one -- over to the
7 left, Behavioral Health Substance Youth Disorders.  It
8 looks like 2016 to 2020 -- there was a decrease from
9 2016 to 2020.
10          Am I reading that correctly?
11     A. Correct.
12     Q. All right.  All right.
13          Let's turn to Tab 11, which I'm going to
14 mark as Exhibit 11.  This is an email from Jennifer
15 Gabbert.
16          Who is Jennifer Gabbert?
17          (Exhibit 11 marked.)
18     A. She is the sheriff's office chief of staff.
19     Q. (BY MS. HARRIS)  To you and Charles Eckert.
20          Do you remember -- I'll give you a second
21 to look at this email.
22          Do you remember this email?
23     A. Yes.
24     Q. Okay.
25          If you'll look at the second page, there is

Page 69

1 a September 8th -- here at the very bottom,
2 September 8th email from you -- September 8, 2021, email
3 from you to Charles Eckert and Mike Simonds.
4           And Mike Simonds was the executive chief
5 deputy; is that right?
6      A. He was the senior chief deputy.
7      Q. Senior chief deputy.
8           And in that second paragraph, you say (as
9 read):  "Chief Eckert implemented a weekly report that
10 MHMR sends to us and is very helpful in getting a
11 snapshot of what is going on from a MHMR perspective in
12 the jail.  I think including this as a requirement in
13 the agreement would be helpful."
14          What kind of information did that weekly
15 report provide?
16     A. Where are you looking at?
17     Q. Oh, I'm sorry.  It is on the second -- on the
18 third page.  Your email starts at the bottom of the
19 second page and goes to the top of the third.
20     A. I found it.
21     Q. It starts with Chief Eckert.
22     A. Can you repeat the question?
23     Q. Sure.
24          After reading that paragraph that starts
25 with Chief Eckert, it talks about a MHMR weekly report.

18 (Pages 66 - 69)

Page 70

1     What kind of information did that report
2  contain that was helpful?
3     A.  From what I recall, it was the total number
4  of -- it was a snapshot of, like, total number of MHMR
5  referrals, of those how many were seen, within how many
6  hours they were seen, the longest -- the number of hours
7  that have elapsed for pending requests.  I believe
8  that -- it just contained, sort of, performance
9  measures, if you will, on a weekly basis so that we
10  could make sure that people were being seen in a timely
11  manner.
12     Q.  Okay.  All right.
13     If you will then turn to Tab 12, which I
14  marked as Exhibit 12.  This states that (as read):  "It
15  is fiscal year 2022 contract between Tarrant County and
16  MHMR of Tarrant County for Behavior Health Intellectual
17  Disability Services for Inmates at the Tarrant County
18  Jail."
19     Are you familiar with this contract?
20     (Exhibit 12 marked.)
21     A.  I've seen it before.  I think this was the
22  contract that I was responding to in the previous email.
23     Q.  (BY MS. HARRIS)  Okay.
24     A.  But I don't recall.  I mean, these all look the
25  same.

Page 71

1     Q.  Totally understand.
2     And then Paragraph 3, the third whereas
3  paragraph.  It says (as read):  "Tarrant County received
4  5,691,167.63 for fiscal year 2022 from the Tarrant
5  County Hospital District for provisions of this
6  service."
7     Does that look correct to you?  Did I read
8  that correctly?
9     A.  Correct.
10     Q.  Do you know if these services would include
11  substance abuse?
12     A.  Can you explain what you mean by -- like
13  substance abuse treatment?  Screening?
14     Q.  Treatment, correct.
15     A.  I believe so.
16     Q.  All right.
17     If you will turn to Tab 13, which I'll mark
18  as Exhibit 13.  It's another contract.  But the very
19  first page, it says (as read):  "Commissioners Court
20  Communication.  Approval of a Contract Between Tarrant
21  County and MHMR of Tarrant County for mental health
22  services for inmates in the Tarrant County system."  And
23  this one's fiscal year 2020.
24     (Exhibit 13 marked.)
25     A.  Correct.

Page 72

1     Q.  (BY MS. HARRIS)  And then is this a contract
2  you would have seen at some point?
3     A.  At some point, I'm sure I would have seen it.
4     Q.  And the third paragraph -- third whereas.
5  Shows the county received 3,867,601 for fiscal year
6  2020.
7     A.  Correct.
8     Q.  Do you know where Tarrant County Hospital
9  District gets the funds to pay this amount?
10     A.  No.
11     Q.  Okay.
12     And is it correct that the services
13  provided by MHMR are paid for by the Tarrant County
14  Hospital District and not the county itself; is that
15  correct?
16     MS. AYACHI:  Objection, form.
17     A.  Can you repeat that?
18     Q.  (BY MS. HARRIS)  Are the services provided by
19  MHMR paid for by the Tarrant County Hospital District
20  and not the county?
21     A.  I don't know.
22     Q.  Okay.
23     If you'll turn to Page 7.  This contract,
24  and it's 7 of 9, but it's 13.008 at the bottom of my
25  page.

Page 73

1     A.  Okay.  Okay.
2     Q.  And it says the Exhibit B, and it's Duties of
3  MHMR PC.  And on the very first No. 1, the very first
4  sentence, it says (as read):  "Provide mental health
5  service as defined Texas Health and Safety Code, Title 7
6  571.003.
7     So whatever services they are supposed to
8  provide, it looks like it's the services outlined in
9  that chapter of the Texas Health and Safety Code; is
10  that a correct understanding?
11     MS. AYACHI:  Objection, form.
12     A.  Yes.
13     Q.  (BY MS. HARRIS)  Okay.  All right.
14     Turn to Exhibit 14 -- or Tab 14, which I'm
15  going to mark as Exhibit 14.  And it's an email from
16  Charles Eckert to Sheriff Waybourn, and it includes you.
17     Do you remember this email?
18     (Exhibit 14 marked.)
19     A.  No.
20     Q.  (BY MS. HARRIS)  Do you have any reason to
21  believe you wouldn't have received it?  It's just that
22  you don't remember it?
23     A.  Correct.
24     Q.  Okay.
25     When it says -- in the very first paragraph

19 (Pages 70 - 73)

Page 74

1 -- and Chief Eckert says (as read): "I met with Paul
2 today." It's in the second line.
3          Who would be Paul be?
4     A. Paul Celestin, he was the -- I believe his
5 title was executive director for Correctional Health.
6 He was a JPS employee. He's since retired.
7     Q. Okay.
8          So did JPS provide all of the screening and
9 treatment for substance abuse in the Tarrant County jail
10 units? And I'll repeat that.
11          Did JPS provide all of the screening and
12 treatment for substance abuse in the Tarrant County jail
13 units?
14     A. I believe JPS did it jointly with MHMR.
15     Q. Okay. All right.
16          Let's turn to Exhibit 15 -- or Tab 15,
17 which I'll mark as Exhibit 15. It's an email from Paul
18 Celestin to you and Glen Richardson regarding Narcan,
19 and it's dated 5/26/2021.
20          Do you recall this email? I'll give you a
21 chance to look at it.
22          (Exhibit 15 marked.)
23     A. Yes.
24     Q. (BY MS. HARRIS) In the bottom email, Paul
25 writes and asks -- it looks like in the second line,

Page 75

1 midway down (as read): "Can TCJ can provide" -- or
2 wait. "TCJ can provide Narcan kits to high-risk
3 individuals at the time of release. We would like to
4 know if TCJ can provide Narcan kits to high-risk
5 individuals at the time of release."
6          TCJ. Is that Tarrant County jail?
7     A. Correct.
8     Q. Okay.
9          Do you have an understanding of what
10 Mr. Celestin meant by "high-risk individuals"?
11     A. I'm sorry. I'm reading the email real quick.
12     Q. Uh-huh.
13     A. Yeah, I believe high-risk individuals in Paul
14 Celestin's email here is individuals who either have a
15 history of opioid use or have, I guess, a history of
16 opioid overdose. That's what he's defining as a high
17 risk -- or that's the term. That's what he's referring
18 to when he says high-risk individuals.
19     Q. Do you know what if -- what, if anything,
20 prompted him to send this email in 2021?
21          MS. AYACHI: Objection, form.
22     A. I don't know.
23     Q. (BY MS. HARRIS) You didn't know; is that
24 correct?
25     A. Yeah, I don't recall what specifically -- but

Page 76

1 there was a specific incident or something that happened
2 that prompted him to send this.
3     Q. All right.
4          It looks like you then sent this request to
5 Charles Eckert -- Chief Eckert.
6          And who is Glen Richardson?
7     A. So it appears that this email took place at a
8 time when we had a change in leadership in the jail. So
9 at -- so Charles Eckert now would have been promoted
10 from the -- from one of the assistant jail
11 administrators to the executive -- I mean to the
12 executive chief deputy to the jail administrator. And
13 Glen Richardson would have been the second jail
14 administrator -- assistant jail administrator. I'm
15 sorry.
16     Q. Would they have been the ones to answer Paul's
17 question and talk to him? Is that why you forwarded it
18 to them?
19     A. Not Glen. Glen was included more of an FYI.
20     Q. Uh-huh.
21     A. Charles Eckert would be the one who would
22 approve something like this, an initiative like this.
23     Q. Okay.
24          Let's look at Tab 16, which I'll mark as
25 Exhibit 16. And it looks like it's the continuation of

Page 77

1 the email chain regarding Narcan, and it's May 26, 2021.
2 And I'll give you a second to review this.
3          (Exhibit 16 marked.)
4     A. Okay.
5     Q. (BY MS. HARRIS) On the second page in this
6 string email, your email -- and you ask Paul (as read):
7 "Who will provide the Narcan?" And if you turn back, he
8 says (as read): "JPS will provide the Narcan" on
9 Page 1. And then it looks like Chief Eckert then
10 responds, (as read): "Here recently it seems we were
11 asked to buy Narcan so JPS could have it on hand in case
12 overdoses occurred. Is the current status that we
13 bought for JPS and JPS is going to give for free as
14 inmates leave custody. Am I missing something?"
15          Was he missing something, or was that the
16 case?
17          MS. AYACHI: Objection, form.
18     A. I think he was missing something. I think he
19 was -- his understanding was that if we moved forward
20 with the initiative that Paul was recommending of
21 providing Narcan to inmates upon release that the Narcan
22 provided would be from the supply that the sheriff's
23 office was purchasing and providing to JPS for use and
24 emergencies within the facility.
25     Q. (BY MS. HARRIS) You don't have a lot of

20 (Pages 74 - 77)

1 overdoses occurring in the jail facility?

2     A. Can you define "a lot"?

3     Q. I was going to say was it a weekly? Monthly?

4 Yearly? Daily? How often did -- were there overdoses

5 in the jail -- Tarrant County jail?

6     A. I mean, I wouldn't be able to give you, you

7 know, a rate of frequency, but we have had overdoses in

8 the jail.

9     Q. Okay.

10        Is there any particular substance that you

11 were seeing overdoses related to?

12        MS. AYACHI:  Objection, form.

13     A. There is substances that we suspect, which is

14 why we started carrying Narcan.  We suspect it was

15 fentanyl.  But until they go out for testing or we

16 actually receive medical information that confirms the

17 substance, we don't know.  We -- the Tarrant County

18 Sheriff's Office won't know specifically what somebody

19 overdosed on.

20     Q. (BY MS. HARRIS)  Do you recall ever seeing any

21 overdoses related to prescription opioids in the Tarrant

22 County jail?

23        MS. AYACHI:  Objection, form.

24     A. I don't -- no, I don't recall.  Not that it's

25 never happened.  I just don't know.

1     Q. (BY MS. HARRIS)  You know if JPS asked Tarrant

2 County Sheriff's Office to purchase the Narcan?

3     A. I don't remember if they -- if they

4 specifically asked us to purchase it.

5     Q. But then Tarrant County actually purchased

6 it -- Tarrant County Sheriff's Office?  I'm sorry.

7     A. Yeah.  Correct.

8        I'll say I don't know if we purchased it or

9 how it was provided.  I just know through the channels

10 established here, it was requested, and it appeared in

11 my office.  So I don't know who paid for it and how it

12 was acquired, if you will.

13     Q. Understand.

14        All right.  Then I'm looking at the top

15 email from Paul, and it says (as read):  "JPS has

16 received the Right Time Right Treatment grant to

17 increase access of buprenorphine to patients with opioid

18 use disorder in Tarrant County."

19        Do you see where I'm reading?

20     A. Yes.

21     Q. All right.

22        Do you know whether the Right Time Right

23 Treatment grant JPS received was for the use of

24 buprenorphine in Tarrant County and not specific to

25 Tarrant County inmates?

1     A. I don't know.

2     Q. You don't know.

3        But that's not the same thing as Narcan,

4 correct?  Buprenorphine?

5     A. I don't know.

6        Buprenorphine -- I mean, I've heard both

7 terms Narcan and bupnorphine, but I wouldn't be able to

8 tell you if they're the same thing or not.

9     Q. Okay.

10        And Narcan is used to reverse the effects

11 of opioids after an overdose; is that correct?

12     A. That's my understanding.  Correct.

13     Q. And it's talking about -- in that second

14 paragraph of that same email about an initiative Sheriff

15 Waybourn had been pushing for the past two years.

16        Do you know what initiative they were

17 discussing?

18     A. From the context of the email, it appears, it's

19 that Right Time Right Treatment.  Oh, I'm sorry.

20        It appears that it's making Narcan

21 available to inmates with opioid addiction.  I'm just

22 getting that from the context of the email.

23     Q. Understand.

24        Do you have any knowledge on why Sheriff

25 Waybourn may have been pushing this initiative?

1     A. I do not.

2     Q. Okay.

3        All right.  Let's turn to Tab 17, which I'm

4 going to mark as Exhibit 17.

5        And this is an email from Paul to yourself.

6 Paul Celestin.  Sorry.  Tab 19.  Sorry.  I'm having to

7 back up.

8        Turn to Tab 19 that I'm going to mark as

9 Exhibit 17.  Sorry.  I skipped around on myself.

10 Tab 19, which I'm marking as Exhibit 17.

11        And it's an email from Paul Celestin to you

12 and Michael Gravitt.

13        And who is Michael Gravitt?

14        (Exhibit 17 marked.)

15     A. Michael Gravitt was a captain with the

16 sheriff's office in the jail, and he's since retired.  I

17 think he retired in 2019 maybe.

18     Q. (BY MS. HARRIS)  And it's also to Chief

19 Cundiff.

20        And it looks like this email was in

21 December 13th, 2019, which is about a year and a half

22 prior to the other email we just looked at.

23        Do you remember this email?

24     A. No.

25     Q. Okay.

21 (Pages 78 - 81)

Page 82

1     You're not saying you didn't get it; you're
2  just saying you don't remember it; is that correct?
3     A.  Correct.
4     Q.  All right.
5        And if you'll look at Tab 18, which I'll
6  mark as Exhibit -- no.  Sorry.  Not Tab 18.  Tab 20.
7  Tab 20, which I'm going to mark as Exhibit 18.  The is
8  the attachment to that email.  Tab 20, which I'm marking
9  as Exhibit 18.
10        And I'll give you a chance to look at that
11  attachment.
12        (Exhibit 18 marked.)
13     A.  So 20 is the attachment for 19, correct?
14     Q.  (BY MS. HARRIS)  Correct.
15     A.  Okay.  Okay.
16     Q.  All right.
17        And it looks like on December 12, 2019,
18  it's a -- JPS is announcing that (as read):  "Effective
19  today, December 12, 2019, JPS Correctional Health will
20  be utilizing Narcan nasal spray at the Tarrant County
21  jail as needed when we have patients presenting with
22  opioid overdose symptoms."
23        When he's discussing patients presenting
24  with opioid overdose systems -- symptoms, do you have an
25  understanding about who he's referring to?  Is it intake

Page 83

1  or is it inmates?
2     A.  It's inmates regardless of where they're at in
3  the system or the process of jail.
4     Q.  Okay.
5        So this would have been inmates that
6  overdosed while in jail?
7     A.  Yes.
8     Q.  Okay.
9        Was that a problem in 2019 for them to
10  implement this system?
11        MS. AYACHI:  Objection, form.
12     A.  Was -- was the overdose a problem?  Is that
13  what you're asking?
14     Q.  (BY MS. HARRIS)  Right.  Yes.
15        Inmates overdosing in jail.  Was that a
16  problem for them to implement this system?
17     A.  Yes.
18     Q.  Okay.
19        Now, let's flip back to Tab 17, which I'm
20  going to mark as Exhibit 19.  And it's an email from
21  Emily Pedigo to yourself and others.  And it's
22  transmitting a JPS correctional Health PowerPoint
23  presentation in September 27, 2018.
24        Do you recall this email?
25        And if you want to go ahead and look at the

Page 84

1  next tab, Exhibit 18, which I'll mark as Exhibit 20,
2  that is the PowerPoint presentation attached to that
3  email.
4        (Exhibit 19 marked.)
5     A.  I don't recall this specific email.
6     Q.  (BY MS. HARRIS)  Do you recall the PowerPoint
7  presentation under Tab 18 that went with it by chance?
8     A.  I believe this was a presentation that Pedigo,
9  who was a captain at that time, gave as part of a
10  program that she was in.
11     Q.  Do you recall what kind of program she would
12  have been IN to prepare this?
13     A.  It was -- if I'm correct, it was the Tarrant
14  County Leadership Development Program.
15     Q.  All right.
16        If you'll look at the fifth page of the
17  PowerPoint on Exhibit 20, Tab 18.  It's kind of hard to
18  read, but it has Tarrant County jail.  And it says, five
19  jails.
20        And are those the five jails listed there
21  when it says bed capacity?  It looks like there's five
22  bullet points.
23        Are those the five jails?
24        (Exhibit 20 marked.)
25     A.  Correct.

Page 85

1     Q.  (BY MS. HARRIS)  All right.
2        Did JPS provide medical service for all of
3  those facilities?
4     A.  Yes.
5     Q.  Okay.
6        And on Page 13 of that same exhibit, I have
7  John Peter Smith Correctional Health.  And it says (as
8  read):  "JPSH has provided correctional healthcare since
9  1995 to Tarrant County Sheriff's Office."
10        Is that your understanding as well; that
11  they've been there for that long?
12     A.  Yes.
13     Q.  Okay.
14        And it says, the annual budget is
15  13,464,114.
16        Was this amount paid by Tarrant County
17  Sheriff's Office to JPS, or was this simply the budget
18  for services provided to Tarrant County Sheriff's
19  Office?
20        MS. AYACHI:  Objection, form.
21        THE WITNESS:  I'm sorry.
22     A.  I don't know.
23     Q.  (BY MS. HARRIS)  Do you have any idea or any
24  understanding where JPS obtained the funding for this
25  budget?

22 (Pages 82 - 85)

Page 86

1    A.  No.
2    Q.  All right.
3         Let's flip to Page 17 of this same exhibit.
4  It says (as read):  "What services are provided?"  And
5  it doesn't look like they list substance abuse as a
6  treatment for substance abuse as a treatment service
7  provided; is that correct?
8    A.  It's correct.  Yeah, substance abuse is not
9  listed here.
10    Q.  Okay.
11         And let's flip to Page 19 of this same
12  exhibit.  Two over.
13    A.  You said page --
14    Q.  Yes.  It is -- on mine, it has 18.0019.  And at
15  the top, it says "What services are provided"?
16    A.  All right.  I'm there.
17    Q.  All right.
18         And it's talking about inpatient services,
19  and it does not list treatment for substance abuse there
20  either.  It doesn't look like.
21         Am I seeing that correctly?
22    A.  Correct.
23    Q.  All right.
24         Now, let's flip another couple of pages to
25  21.  And the top of it says Medications at the very top.

Page 87

1  And I don't know if you have an understanding, but it
2  doesn't look like the list has any medications for the
3  treatment of substance abuse to me.
4         But if you see something on there that you
5  think is for the treatment of substance abuse, in your
6  understanding, let me know.
7    A.  So my understanding, methadone would be
8  medication for -- to treat substance abuse.
9    Q.  Okay.
10         Let's turn to Tab 21, which I'll mark as
11  Exhibit 21.  It's an email from David Grantham.
12         And who is David Grantham again?
13         (Exhibit 21 marked.)
14    A.  At the time of this email, he was the director
15  of intelligence.
16    Q.  (BY MS. HARRIS)  All right.
17         And it's regarding DEA, FBI intelligence
18  bulletin.  (As read):  "Violent street gangs almost
19  certainly fueling opioid crisis through prescription
20  fraud and pharmacy burglaries."
21         I'll give you a chance to review this email
22  to see if you remember it.
23    A.  I don't specifically remember the email.
24    Q.  No reason to believe you didn't receive it,
25  though, correct?

Page 88

1    A.  Correct.
2    Q.  And we may have touched on this before, but do
3  you have an understanding what the term "diversion"
4  means in the context of prescription medications?
5    A.  No.
6    Q.  Okay.
7         Would you have any understanding whether
8  drugs stolen during through a pharmacy burglary would be
9  considered diverted?
10         MS. AYACHI:  Objection, form.
11    A.  If you could define diversion or diverted in
12  terms of, you know, of prescription medication or drugs,
13  I think I'd be able to better answer that.
14    Q.  (BY MS. HARRIS)  Well, that's what I was kind
15  of wondering.
16    A.  Yeah.
17    Q.  If you had any, kind of, usage of term within
18  the area of pharmacy burglary and prescription fraud?
19  If you had any use of the term?
20    A.  No.  It means something totally different in
21  the terms of jails.
22    Q.  Okay.
23         What does it mean in terms of jail?
24    A.  In terms of jail, diversions refers to
25  alternative to incarceration.  So somebody who's

Page 89

1  arrested, we would divert them by sending them to some
2  sort of community program or a diversion program, a
3  sobriety center.  Something to keep them out of jail to
4  reduce jail population.  That's what diversion means in
5  the jail world.
6    Q.  Okay.
7         So you haven't ever used it in the context
8  of --
9    A.  Correct.
10    Q.  -- medications?  Okay.
11    A.  Correct.
12    Q.  All right.  Let's flip to Tab 22, Exhibit --
13  which I'll mark as Exhibit 22.
14         This is an email to the Sheriff's
15  Collection Team forwarding the June 2021 Intelligence
16  Review, and then the attachment is in Tab 23, which I'll
17  mark it as Exhibit 23.
18         (Exhibit 22 marked.)
19         (Exhibit 23 marked.)
20    A.  Okay.
21    Q.  (BY MS. HARRIS)  Do you recall this email and
22  attachment?
23    A.  Not specifically.
24    Q.  Okay.
25         No reason to think you didn't receive it,

23 (Pages 86 - 89)

Page 90

1 though, correct?
2  A. Correct. Sorry.
3  Q. Uh-huh.
4       Let's turn to the attachment in tab --
5 Exhibit 23, and let's flip to the fifth page of that
6 exhibit. And then on the very paragraph, it says (as
7 read): "As of June 2021, it was said that the
8 Mid-Cities area -- Euless, Bedford, Hurst -- is flooded
9 with fentanyl pills and powder that are coming from
10 plugs in Fort Worth and Dallas."
11       What are plugs?
12  A. Plugs would be individuals who sell drugs.
13 Drug dealers or drug suppliers.
14  Q. To your knowledge, was this statement accurate?
15  A. I don't know. This was prepared by the
16 Intelligence Division. So I didn't do any background,
17 any investigation, or any work on this.
18  Q. You don't have any reason to think this
19 statement's not accurate, I guess, is a good way to say
20 it?
21  A. Correct.
22  Q. All right.
23       Then the first sentence at the next
24 paragraph, it says (as read): "Local dealers have also
25 turned to pill pressers in hopes of being able to

Page 91

1 capitalize on the availability of powder, although many
2 have yet to perfect the process."
3       Do you know what a pill press is?
4  A. Yes.
5  Q. What is that?
6  A. So the device that is used, from my
7 understanding, to turn a powder substance into a pill by
8 compressing it.
9  Q. Do you know why dealers would turn to pill
10 presses?
11  A. I mean, I could only speculate. I don't know
12 why dealers do what they do.
13  Q. Does anybody really?
14  A. No.
15  Q. In part -- could it be because they're trying
16 to manufacture counterfeit pills, in part?
17  MS. AYACHI: Objection, form.
18  A. It could be.
19  Q. (BY MS. HARRIS) All right.
20       Do you have any reason to think that this
21 is statement is not accurate?
22  A. No.
23  Q. Okay.
24       . All right. Then the first sentence of
25 the third paragraph, it says (as read): "It was set

Page 92

1 that the number of heroin users continues to rise as
2 well because dealers are cutting it with powder
3 fentanyl."
4       Do you have any reason to believe that this
5 statement is not accurate?
6  A. No.
7  Q. Okay. All right.
8       Let's flip to Tab 26, which I will mark as
9 Exhibit 24.
10       You're listed as a recipient on this email
11 somewhere in that email chain. It's from David
12 Grantham, and it's on June 2, 2021. And the subject is
13 Yesterday's Meeting.
14       And I'll give you a second to review the
15 email.
16       (Exhibit 24 marked.)
17  A. Okay.
18  Q. (BY MS. HARRIS) On these -- it looks like the
19 third paragraph where it says (as read): "Second
20 fentanyl is a major problem and getting worse. They are
21 arriving mostly in pill form, blue and green on M30 on
22 it or M one side and 30 on the other."
23       Do you have any understanding on why these
24 pills may have been made with M30 or M on one side and
25 30 on the other?

Page 93

1  A. No. Not specifically.
2  Q. Okay.
3       Anything generally?
4  A. I think they're stamping them to make them look
5 like -- they're stamping street drugs to make them look
6 like legitimate pills, I guess.
7  Q. No reason to think that this statement was not
8 accurate, correct?
9  A. Correct.
10  Q. Let's turn back to Tab 24, which I'll mark as
11 Exhibit 25. And the bottom email or -- I guess, the
12 middle email is from you to David McClelland in
13 March 26, 2018, and I'll give you a chance to review it.
14       (Exhibit 25 marked.)
15  A. Okay.
16  Q. (BY MS. HARRIS) All right.
17       David McClellan was the chief of staff at
18 the time, correct?
19  A. Correct.
20  Q. All right.
21       What is the JMS Project?
22  A. JMS Project is a jail management system
23 project. It was a project that the county undertook to
24 develop its own homemade jail management solution as
25 opposed to buying one off the shelf.

24 (Pages 90 - 93)

Page 94

1  Q.  All right.
2      Why would the Securus Elevate Summit be a
3  good -- great R&D opportunity?
4      A.  During the jail management system project, we
5  were creating -- or the county was creating a jail
6  management system from the ground up.  So I recommended
7  going to this summit just to get information on things
8  like -- if you look at the next page it talks about
9  human trafficking, opioid crisis, future of corrections,
10  so on, so forth.  Anything that's tied to data.
11      So my recommendation was based on if we
12  could collect data from individuals that are booked into
13  the facility that maybe relates to some of this stuff or
14  some of these topics, then we could use that in the
15  future for, you know, initiating programs or, you know,
16  directing our resources and initiatives and, you know,
17  know where to focus our time and attention to.
18      Q.  Okay.
19      Let's flip to Tab 28, Exhibit -- which will
20  be Exhibit 26.  And it is an email from Chief Eckert to
21  yourself regarding possession of narcotics in law and
22  evidence, February 12, 2017, and it's the very bottom
23  email.
24      Do you recall -- I'll give you a second to
25  review it.  Just let me know if you recall it.

Page 95

1      (Exhibit 26 marked.)
2      A.  Okay.
3      Q.  (BY MS. HARRIS)  Okay.
4      Do you recall this email?
5      A.  Not specifically.
6      Q.  No reason to think you didn't get it, though,
7  correct?
8      A.  Correct.
9      Q.  All right.
10      And it looks like Chief Eckert was
11  informing that a female inmate was found in possession
12  of a suspected methamphetamine and marijuana.
13      In your experience, how does an inmate get
14  drugs into a jail facility?
15      MS. AYACHI:  Objection, form.
16      A.  There's several ways.  One of the ways is, they
17  can smuggle it in either on their person or in their
18  person.  So that when they're booked, they would have
19  the contraband, if you will, on them prior to arrest and
20  prior to being booked.  And then when they're booked,
21  it's brought into the facility.
22      Another method is having it sent in by
23  friends or family using the mail system.  And then it
24  could be introduced into the facility either through
25  contractor, employees and delivered to the inmate.

Page 96

1      Q.  (BY MS. HARRIS)  Was that very common to find
2  -- I guess, on average during this timeframe in 2017, if
3  you remember, was it common to find an inmate in
4  possession of drugs?
5      A.  So I started the sheriff's office in August of
6  2017.
7      Q.  Uh-huh.
8      A.  So for -- from time to time that I -- from when
9  I started -- the time to 2017 when I was here, yes, it
10  was a problem.  Finding inmates not just with drugs, but
11  contraband in general.
12      Q.  What were the most common drugs found in
13  possession of inmates?
14      MS. AYACHI:  Objection, form.
15      A.  Pills.  Prescription -- what we call
16  prescription pills, but we don't know if they were
17  prescribed to them -- but pills and other paper and
18  other items that were -- what we believed were either
19  sprayed with or soaked in some sort of substance.
20      Q.  (BY MS. HARRIS)  Do you recall what kind of
21  pills in general?
22      A.  I mean, what they tested for, I don't know.  I
23  can just tell you how they were described in many of the
24  reports and notifications that were sent.
25      During that time, I think we were seeing

Page 97

1  pills that were described as blue pills with the M30
2  marking on them, and then other unknown white substances
3  is how it's defined or how it's described.  And I
4  believe we also saw some marijuana, or a substance
5  believed to be marijuana.
6      Q.  Do you personally recall ever finding an inmate
7  in possession of opioids?
8      A.  Can you repeat the question?
9      Q.  Yeah.
10      Do you ever recall finding an inmate in
11  possession of opioids?
12      A.  Personally, no.  But the search is not
13  something that I would have performed in my capacity.
14      Now, our staff conducting the actual
15  searches would.  If they found a substance, then they
16  would turn it over to the medical department for
17  identification or turn it over to narcotics or to CID
18  for identification.  I would not have gotten the
19  information -- the final determination of what the
20  substance found was officially identified as.
21      Q.  Okay.
22      And I think earlier and -- correct me if
23  I'm wrong -- earlier you testified that your specific
24  work experience in Tarrant County, you didn't believe it
25  made you knowledgeable to speak to the role of opioids

25 (Pages 94 - 97)

Page 98

1 in Tarrant County specifically.
2        Do you think your knowledge -- that your
3 experience makes you knowledge able as to the detention
4 center and the effect opioids have had?
5        MS. AYACHI:  Objection, form.
6    A.  Yes.
7    Q.  (BY MS. HARRIS)  Okay.
8        What effect would you say in your
9 experience the impact opioids have had in the Tarrant
10 County jail system?
11    A.  So I think the -- just -- we'll just call it
12 the "drug problem."  It's effect on the jail has been
13 that there is -- obviously, we have an increase in -- or
14 we see a prevalence of overdoses, of inmates hoarding
15 medication for use either to abuse it or even to try to
16 attempt suicide or to use it as currency or to sell it
17 in the jail.
18        Also there's an -- with an increase in the
19 number of individuals who are on detox protocols.  It's
20 requiring a higher level of more frequent observation
21 checks.  So there's an impact on staffing and the use of
22 our available housing.
23        Also with the -- with the number of inmates
24 who are falling under these detox protocols, there's an
25 increased demand on the need for medical and mental

Page 99

1 health professionals within the jail.
2    Q.  And when you're --
3    A.  Sorry.
4    Q.  I'm sorry.  I apologize for interrupting you.
5    A.  And the contraband issues also has a huge
6 impact on the safety and security concerns we have
7 because we have to try to, you know, stop the
8 introduction of contraband into the facility, and so
9 we've had to, you know, implement other safety and
10 security measures and programs such as, you know,
11 changes in how we do inmate mail.
12    Q.  And thank you for that.
13        And as you've been discussing the impact,
14 you're including in what has caused the impact?  Things
15 like fentanyl, heroin, cocaine, as well as pills?
16 You're including everything that has contributed to that
17 impact; is that correct?
18    A.  That's correct.
19    Q.  All right.
20        Let's turn to Tab 29, and I'll mark that
21 Exhibit 27.  And I will direct your attention to the
22 bottom email.  And it's December 19, 2017, where you
23 wrote (as read):  "Captain Pilkington advised that a
24 search of an inmate in response to an anonymous kite was
25 conducted and black tar heroin was found.  The substance

Page 100

1 tested positive.  CID has been notified.  The inmate has
2 been in jail for 30 days."
3        Do you recall this email?
4        (Exhibit 27 marked.)
5    A.  No.
6    Q.  (BY MS. HARRIS)  All right.
7        No reason to think you didn't get it
8 though, correct?
9    A.  Correct.
10    Q.  What is a kite?
11    A.  A kite is a written communication that inmates
12 have access to -- to communicate -- a written system
13 that can either be -- let's see in 2017 -- it can either
14 be a physical, written letter or done through electronic
15 means, but it's a term.  That's why they put it in
16 quotes.  It's a term that's used to describe how inmates
17 will communicate with staff or other areas of the
18 sheriff's office.
19    Q.  All right.
20        And since -- you mentioned the inmate had
21 been in jail for 30 days.  So it's more likely than not
22 that he took possession of the black tar heroin after
23 being in jail; is that correct?
24        MS. AYACHI:  Objection, form.
25    A.  Correct.

Page 101

1    Q.  (BY MS. HARRIS)  All right.
2        Let's turn to Tab 30, which I will mark as
3 Exhibit 28.  And it's a memo from David Grantham, and
4 it's regarding (as read):  "Contraband at Green Bay.
5 Possible officers in involved, January 28, 2018.  And
6 I'll give you a chance to look at this.
7        Do you recall this memo?
8        (Exhibit 28 marked.)
9    A.  Not specifically.
10    Q.  (BY MS. HARRIS)  No reason to think you didn't
11 receive it, though, correct?
12    A.  Correct.
13    Q.  Looking at the second paragraph, third line is
14 talking about that (as read):  "Noel manages the
15 trustees and uses that position."
16        What does "trustees" mean in that context?
17    A.  A trustees is a term that's used by some of the
18 employees here to refer to inmates who have either
19 duties, job assignment in the jail.
20    Q.  Do you have any knowledge on whether these
21 allegations were investigated or the results of the
22 investigation?
23        MS. AYACHI:  Objection, form.
24    A.  I don't recall.  Something like this would have
25 been forwarded to our CID or even internal affairs.  I

26 (Pages 98 - 101)

Page 102

1 don't recall a specific outcome of an investigation
2 relating to this -- these specific allegations.
3      Q.  (BY MS. HARRIS)  Let's turn back to Tab 27,
4 which will be Exhibit 29.  And I'll start off with the
5 bottom email, but I'll give you a second to review it.
6           (Exhibit 29 marked.)
7      A.  Okay.
8      Q.  (BY MS. HARRIS)  In your email on January 29th
9 at the bottom of Page 1, January 29, 2018, you cc'd Raul
10 Banasco.
11           Who is Raul?
12      A.  At the time, Raul Banasco was the executive
13 chief deputy of the jail.  He was the jail
14 administrator.
15      Q.  Okay.
16           And this is concerning the back tar heroin
17 we just discussed in Tab 29.
18           Do you recall anything about the facts of
19 this incident?
20      A.  Not specifically.
21      Q.  Okay.
22           Do you recall if IAD was ever brought in?
23      A.  I don't recall.  The individual that I sent
24 this to was the commander over narcotics.  I sent it to
25 CID.  That's Chief Vennum, and then, I guess, he looped

Page 103

1 in Calvin Bond, who at the time was the commander over
2 narcotics.
3      Q.  Let's turn to Tab 25, which I'll mark as
4 Exhibit 30.
5           And do you recall this email?
6           (Exhibit 30 marked.)
7      A.  No.
8      Q.  (BY MS. HARRIS)  Okay.
9           Any reason to think you didn't receive it?
10      A.  No.
11      Q.  All right.
12           If you'll turn to Page 2 of that exhibit.
13 There's an email from you to Brandi Brazil.  And I
14 believe she was the JPS Correctional Health project
15 manager; is that your recollection?
16      A.  I think so.  Project manager/business manager.
17 Something like that.
18      Q.  And it's dated December 11, 2018.  And it looks
19 like you were asking (as read):  "If JPS kept any stats
20 on the number of inmates who were placed under detox
21 protocol at intake."  And it says you've been asked what
22 the opioid impact has been on jail.
23           Do you know who asked you for that
24 information?
25      A.  I believe it was a sheriff.

Page 104

1      Q.  Okay.
2           Was -- this information request, was it
3 related to the opioid litigation?  Do you recall?
4      A.  I don't recall.  He just asked a question, and
5 I got with medical on it.
6      Q.  And the detox protocol that could have been
7 from anything from fentanyl to heroin to any kind of
8 opioid, correct?
9      A.  Correct.  It could even include alcohol.
10      Q.  Includes everything.  Alcohol, correct, yes.
11           And was it your understanding that JPS did
12 not track those detox numbers specifically at that
13 point?
14      A.  Yes, I believe that was Brandi's responsibility
15 to track the numbers.
16      Q.  Do you know if they tracked those numbers now?
17      A.  I don't know.
18      Q.  All right.
19           And then on Page 1 of that tab, there -- in
20 the middle, there's an email from you to Chief Cundiff.
21 It says you reached out to JPS and Classification.
22           Who is Classification?
23      A.  So Classification is a section within the jail
24 on what's called the support side, the support division,
25 of the jail that basically manages inmate records and

Page 105

1 oversees all of the intake.  It's part of -- if you
2 will, they're like an arm of booking.  They assist with
3 the intake screening of all inmates and determine inmate
4 housing.
5      Q.  Do you know if there's ever any follow up on
6 this one from anyone?  Did anyone ever follow up with
7 you on any of this --
8      A.  Not that I can recall.
9      Q.  -- on tracking the number of inmates on detox?
10      A.  Not that I can recall.  I think it ended there.
11 I checked for the information.  Nobody tracked or
12 provided it, and that's what I related to Cundiff.
13      Q.  All right.
14           Let's look at Tab 31, which I'll mark as
15 Exhibit 31.  It's an email from David McClelland, the
16 chief of staff, to yourself and Brandi Brazil.  It's
17 dated December 18, 2018.
18           You recall this email?
19           (Exhibit 31 marked.)
20      A.  No.
21      Q.  (BY MS. HARRIS)  Okay.
22           Any reason to believe you didn't receive
23 it?
24      A.  No.
25      Q.  All right.

27 (Pages 102 - 105)

1  And it looks like Chief McClelland asked
2  people (as read):  "To get numbers so we could give them
3  to the civil attorneys.  They're asking for hard costs
4  of Narcan or detox in the jail."
5  And I'm looking at it, also it goes to
6  Craig Driskell.  Who is Craig Driskell?
7  A.  Craig Driskell is one of the executive chief
8  deputies.  He is currently over Judicial and Internal
9  Affairs.
10  Q.  And are most of the recipients -- or all of the
11  recipients on this list chief deputies and up?
12  A.  You're talking about --
13  Q.  Yeah, I'm sorry.  The bottom email from Chief
14  McClelland on December 13, 2018.  It's the bottom of the
15  first page.
16  A.  That's correct, yes.
17  Q.  Do you know whether the costs for Narcan kits
18  were ever tracked to the type of opioid used?
19  A.  I don't know.
20  Q.  Okay.
21  Do you have an understanding as to Tarrant
22  County Sheriff's Office, their initial purpose in
23  purchasing Narcan -- one of their primary purposes in
24  initially purchasing Narcan, do you understand what
25  their -- let me scratch that.  That is a horrible

1  question.
2  Do you have any understanding as to Tarrant
3  County Sheriff's Office's primary purchase in initially
4  purchasing Narcan for its officers?
5  A.  No.
6  Q.  All right.
7  And earlier I asked you if you had ever
8  been to a Kroger.  And I forgot to ask you if you'd ever
9  been to an Albertsons or ever gotten a prescription
10  filled at Albertsons?
11  A.  No, I have not.  Well, I'm sure I've been to an
12  Albertsons at sometime in my life, but I've never gotten
13  a prescription fill.
14  Q.  So no experiences good or bad with Albertsons
15  or Albertsons' pharmacies?
16  A.  Correct.
17  MS. HARRIS:  All right.  If we can take a
18  break.  I am almost finished.
19  THE VIDEOGRAPHER:  All right.  We're off
20  the record at 12:30 p.m.
21  (A break was taken from 12:30 p.m. to
22  12:40 p.m.)
23  THE VIDEOGRAPHER:  We are back on the
24  record at 12:40 p.m.
25  Q.  (BY MS. HARRIS)  Mr. Reyes, I just want to

1  thank you for your time.
2  MS. HARRIS:  And pass the witness.
3  THE WITNESS:  Thank you.
4  MS. AYACHI:  Quinn, did you have any
5  questions for him?
6  MR. FORD:  No.  Nothing for Albertsons.
7  Thank you, Mr. Reyes.
8  THE WITNESS:  Thank you.
9  MS. AYACHI:  Anthony, do you have any
10  questions.
11  MR. RYAN:  No.  Nothing.  I'm with Kroger.
12  MS. AYACHI:  My apologies, okay.
13  In that case, you know, we thank you very
14  much for your time.  I don't have any questions for you.
15  So we really appreciate the service to the county, and
16  we wish you the best of luck in your retirement and hope
17  that you find absolutely wonderful and fulfilling work
18  ongoing.  So thank you for your time today.
19  THE WITNESS:  Thank you.
20  THE VIDEOGRAPHER:  All right.  We're off
21  the record at 12:41 p.m.
22  THE CERTIFIED STENOGRAPHER:  Just quick
23  housekeeping.  Since this is federal, I have to ask.
24  Are there any stipulations the parties want to add to
25  the record?

1  MS. HARRIS:  I don't have any.
2  MS. AYACHI:  None from us.
3  MR. FORD:  None from Albertsons.
4  (Proceedings concluded at 12:41 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 110

1        UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF OHIO
2              EASTERN DIVISION
3  IN RE: NATIONAL      ) MDL No. 2804
   PRESCRIPTION OPIATE   ) Case No. 17-md-2804
4  LITIGATION      ) Judge Dan Aaron Polster
                )
5               )
                )
6               )
7
8
9      REPORTER'S CERTIFICATION
       DEPOSITION OF HENRY REYES
          August 17, 2023
10
11     That the deposition transcript was delivered
12 to Ms. Kimberly Harris.
13     That a copy of this certificate was served on
14 all parties and/or the witness shown herein on
15 _____.
16     I further certify that pursuant to FRCP
17 Rule 30(f)(1) that the signature of the deponent:
18    ____ was requested by the deponent or a party
19 before the completion of the deposition and that
20 signature is to be before any notary public and returned
21 within 30 days from date of receipt of the transcript.
22     If returned, the attached Changes and
23 Signature Page contains any changes and the reasons
24 therefore:
25    ____ was not requested by the deponent or a

Page 111

1 party before the completion of the deposition.
2     I certify that I am neither counsel for,
3 related to, nor employed by any of the parties or
4 attorneys in the action in which this proceeding was
5 taken, and further that I am not financially or
6 otherwise interested in the outcome of the action.
7     Certified to by me this 1st day of September,
8 2023.
9
10
11
12
13
    ABIGAIL GUERRA, Texas CSR 9059
14    Expiration Date: 02/28/24
    VERITEXT LEGAL SOLUTIONS
15    Firm Registration No. 571
    300 Throckmorton Street
16    Suite 1600
    Fort Worth, Texas 76102
17    Phone: (817) 336-3042
18
19
20
21
22
23
24
25

Page 112

         Veritext Legal Solutions
1           1100 Superior Ave
            Suite 1820
2          Cleveland, Ohio 44114
        Phone: 216-523-1313
3
4
  September 1, 2023
5
  To: Ms. Turner
6
  Case Name: National Prescription Opiate Litigation - Track 9 (Tarrant
7 County) v.
8  Veritext Reference Number: 6055171
9  Witness: Henry Reyes    Deposition Date: 8/17/2023
10
  Dear Sir/Madam:
11
12  Enclosed please find a deposition transcript. Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change. Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
  shown
17
  above, or email to production-midwest@veritext.com.
18
19  If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
  Sincerely,
22
  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Page 113

1      DEPOSITION REVIEW
     CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 6055171
3    CASE NAME: National Prescription Opiate Litigation - Track 9
  (Tarrant County) v.
    DATE OF DEPOSITION: 8/17/2023
4    WITNESS' NAME: Henry Reyes
5    In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7    I have made no changes to the testimony
  as transcribed by the court reporter.
8
  _____
9 Date    Henry Reyes
10    Sworn to and subscribed before me, a
  Notary Public in and for the State and County,
11 the referenced witness did personally appear
  and acknowledge that:
12
    They have read the transcript;
13    They signed the foregoing Sworn
    Statement; and
14    Their execution of this Statement is of
    their free act and deed.
15
  I have affixed my name and official seal
16
  this _____ day of_____, 20____.
17
18  _____
  Notary Public
19
  _____
  Commission Expiration Date
20
21
22
23
24
25

29 (Pages 110 - 113)

Page 114

```
1          DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
          ASSIGNMENT REFERENCE NO: 6055171
3          CASE NAME: National Prescription Opiate Litigation - Track 9
  (Tarrant County) v.
          DATE OF DEPOSITION: 8/17/2023
4          WITNESS' NAME: Henry Reyes
5          In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7          I have listed my changes on the attached
  Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9          I request that these changes be entered
  as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
  that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
   Date           Henry Reyes
14
          Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
  the referenced witness did personally appear
16  and acknowledge that:
17          They have read the transcript;
          They have listed all of their corrections
18              in the appended Errata Sheet;
          They signed the foregoing Sworn
19              Statement; and
          Their execution of this Statement is of
20              their free act and deed.
21          I have affixed my name and official seal
22  this _____ day of_____, 20____.
23
              _____
              Notary Public
24
25          Commission Expiration Date
```

Page 115

```
1              ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2              ASSIGNMENT NO: 6055171
3  PAGE/LINE(S) /        CHANGE        /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
   _____        _____
20  Date           Henry Reyes
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23
              _____
              Notary Public
24
25          _____
              Commission Expiration Date
```

30 (Pages 114 - 115)