# EXHIBIT 57

Page 1

1      IN THE UNITED STATES DISTRICT COURT FOR THE
              NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION
3    IN RE NATIONAL PRESCRIPTION )
     OPIATE LITIGATION            )
4                                 )  MDL No. 2804
                                  )
5    This Document Relates To:    )  Case No. 17-md-2804
     Track Nine: Tarrant County, )
6    Texas                        )
                                  )
7    (Case No. 1:18-op-45274-DAP))
     _____)
8
9
10
11          REMOTE VIDEOTAPED DEPOSITION OF
12                 TRACE McDONALD
13                 JUNE 28, 2023
14                 10:01 a.m. CDT
15
16
17          Witness Appearing From:
18               Fort Worth, Texas
19
20
21
22
23
24      Conducted Remotely Via Videoconference
25

## Page 2

```
1      R E M O T E   A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFFS and TARRANT COUNTY:
3      MS. ALEX ABSTON
       LANIER LAW FIRM, P.C.
4      10940 West Sam Houston Parkway North
       Suite 100
5      Houston, Texas 77064
       (713) 659-5200
6      alex.abston@lanierlawfirm.com
7  ON BEHALF OF TARRANT COUNTY SHERIFF'S DEPARTMENT:
8      MR. MARK KRATOVIL
       ASSISTANT CRIMINAL DISTRICT ATTORNEY
9      TARRANT COUNTY
       401 West Belknap
10     9th Floor
       Fort Worth, Texas 76196
11     (817) 884-1233
       mckratovil@tarrantcountytx.gov
12
       ON BEHALF OF THE ALBERTSONS DEFENDANTS:
13
       MS. ALLISON M. STEWART
14     GREENBERG TRAURIG
       2200 Ross Avenue
15     Suite 5200
       Dallas, Texas 75201
16     (214) 665-3600
       stewarta@gtlaw.com
17
       ON BEHALF OF THE KROGER DEFENDANTS:
18
       MS. DIANA LEIGH JACOBS
19     BOWLES RICE
       600 Quarrier Street
20     Charleston, West Virginia 25301
       (304) 347-1723
21     djacobs@bowlesrice.com
22  ALSO PRESENT:
23     Ms. Sadie Turner - Lanier Law Firm Paralegal
24     Mr. Christopher Archie - Videographer
25     Mr. Bob Brasch - Concierge
```

## Page 3

```
1           I N D E X
2                                    Page
3  Appearances                         2
4  TRACE MCDONALD
5    Examination By Ms. Jacobs         7
6  Changes and Signature             123
7  Reporter's Certificate            125
8
9           E X H I B I T S
10 No.   Description              Page
11 Exhibit 1 ..................... 16
     McDonald Personnel File
12   Highly Confidential
13 Exhibit 2 ..................... 51
     North Texas HIDTA 2013 Strategy
14   Texoma_HIDTA_0784-0804
     Highly Confidential - Attorneys' Eyes Only
15
     Exhibit 3 ..................... 58
16   North Texas HIDTA 2014 Strategy
     Texoma_HIDTA_0857-0875
17   Highly Confidential - Attorneys' Eyes Only
18 Exhibit 4 ..................... 61
     Texoma HIDTA 2016 Strategy
19   Texoma_HIDTA_0152-0163
     Confidential - Subject to Protective Order
20
     Exhibit 5 ..................... 64
21   Texoma HIDTA 2017 Threat Assessment
     Texoma_HIDTA_0254-0305
22   Confidential - Subject to Protective Order
23 Exhibit 6 ..................... 68
     Texoma HIDTA 2018 Threat Assessment
24   Texoma_HIDTA_0347-0386
     Confidential - Subject to Protective Order
25
```

## Page 4

```
1           EXHIBITS, CONTINUED
2  No.     Description              Page
3  Exhibit 7 ..................... 71
     Emails re Fentanyl
4    TARRANT_00706065-706066
     Confidential
5
     Exhibit 8 ..................... 76
6    Combined Narcotics Enforcement Team (CNET)
     Briefing, July 2021
7    TARRANT_00836424-836437
     Confidential
8
9    Exhibit 9 ..................... 84
     Document Entitled "Tarrant County Sheriff's
     Office, Criminal Investigation Division,
10   Combined Narcotics Enforcement Team, Not For
     Immediate Release"
11   TARRANT_00813082-813083
     Confidential
12
     Exhibit 10 ..................... 87
13   Emails re Request for Buy Approval
     TARRANT_00706085-706086
14   Confidential
15 Exhibit 11 ..................... 93
     Emails re You're Invited Thursday
16   TARRANT_00706089-706090
     Confidential
17
     Exhibit 12 ..................... 100
18   Combined Narcotics Enforcement Team 2021
     Activity Report
19   TARRANT_00706099-706101
     Confidential
20
     Exhibit 13
21   (Skipped Due to Plaintiffs' Objection)
22
     Exhibit 14
23   (Skipped Due to Plaintiffs' Objection)
24
25
```

## Page 5

```
1           EXHIBITS, CONTINUED
2  No.     Description              Page
3  Exhibit 15 ..................... 110
     Emails re Stats
4    TARRANT_00836621-836623
     Confidential
5
6
7  Reporter's Note:
8    Quotation marks are used for clarity and do
     not necessarily reflect a direct quote.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Good morning, everyone.
3  Current time is 10:01 a.m., June 28th, 2023.  This
4  is Media Unit 1 of the recorded deposition of Trace
5  McDonald, Case No. 18-op-45274.  My name is
6  Christopher Archie representing Veritext and I'm the
7  videographer.  The court reporter is Karen Shelton
8  from the firm Veritext.
9          Counsel and all present will now state
10  their appearances and affiliations for the record
11  beginning with the noticing attorney.
12          MS. JACOBS:  Good morning.  My name is
13  Diana Leigh Jacobs.  I am an attorney at Bowles Rice
14  representing the Kroger defendants.
15          MS. ABSTON:  And I'm Alex Abston.  I'm
16  with the Lanier Law Firm and I'm here on behalf of
17  the plaintiffs and Tarrant County.  And we also have
18  Sadie Turner from the Lanier Law Firm as well.
19          MR. KRATOVIL:  My name is Mark Kratovil.
20  I'm with the Tarrant County Criminal District
21  Attorney's office in the civil division, and we
22  serve as counsel to the Tarrant County Sheriff's
23  Department.
24          MS. STEWART:  And my name is Allison
25  Stewart.  I'm an attorney at Greenberg Traurig

Page 7

1  representing the Albertsons defendants.
2          THE VIDEOGRAPHER:  Madam Court Reporter,
3  you can swear in the witness, and counsel may
4  proceed.
5          THE REPORTER:  And I am reporting this
6  deposition remotely from Fort Worth, Texas, and the
7  witness is also located in Fort Worth, Texas.
8          (The witness was sworn by the reporter.)
9               TRACE MCDONALD,
10  having been first duly sworn, testified as follows:
11          E X A M I N A T I O N
12  BY MS. JACOBS:
13          Q.  Okay.  Good morning.  Do you go by
14  Commander McDonald?
15          A.  I prefer Trace.
16          Q.  Trace.  Okay.  Thank you.  As you heard me
17  say off the record, my name is Diana Jacobs and I
18  represent the Kroger defendants and I will be asking
19  you most of the questions this morning.
20          I -- as you know, we're doing this
21  deposition remotely.  And we have gotten pretty good
22  at doing these over the last couple years this way,
23  but sometimes things do go awry, so be patient.
24          And I will also tell you I have in front
25  of me you on a screen in front of me.  I have a

Page 8

1  second screen with some documents, and then I have
2  papers in front of me.  So if you see me looking
3  around and not always looking at you, that is --
4  that's the reason why.
5          We will take some breaks, but if at any
6  time you need a break when I haven't suggested one,
7  just let me know and we will go ahead and take a
8  break.
9          So, with that, can you introduce yourself
10  with your full name.
11          A.  Yes, ma'am.  My name is Clarence Henry
12  McDonald, III.  I'm more commonly known as Trace
13  because of the "third."
14          Q.  Okay.  And where do you currently live?
15          A.  I live in Bedford, Texas.
16          Q.  And is that in Tarrant County?
17          A.  Yes, ma'am.
18          Q.  And how long have you lived in Tarrant
19  County?
20          A.  Over 13 years.
21          Q.  And how old are you today?
22          A.  54.
23          Q.  Where did you live -- you don't have to
24  give me all the addresses, but before living in
25  Tarrant County, where did you live?

Page 9

1          A.  Prior to coming to Tarrant County, I was a
2  Texas Ranger stationed in Athens, Texas.
3          Q.  Okay.  So is it fair to say you've lived
4  in Tarrant County since about 2010?
5          A.  Yes, ma'am.
6          Q.  All right.  And prior to 2010, had you
7  ever lived in Tarrant County?
8          A.  I did.  I lived in Tarrant County in the
9  early Nineties whenever I worked for the Weatherford
10  Police Department.
11          Q.  All right.  And do you have any plans in
12  the near future to move out of Tarrant County, or
13  are you going to stay put for a while?
14          A.  I'm absolutely staying.
15          Q.  All right.  Now, is there any reason that
16  you cannot testify truthfully today?
17          A.  No.
18          Q.  Have you ever been deposed or testified in
19  court before?
20          A.  I have.  Only one deposition that I can
21  recall.  It was -- I was a state trooper and it was
22  a -- do you want to know the details or just a
23  "yes"?  I'm sorry.
24          Q.  A "yes" you can start with is fine, and
25  then I was going to follow up and ask was that a

3 (Pages 6 - 9)

Page 10

1  civil or a criminal matter.
2      A.  Civil.
3      Q.  Okay.  And just briefly, what was the
4  nature of that?
5      A.  Some guardrail didn't function properly
6  and it was a suit against the manufacturer of the
7  guardrail.
8      Q.  Okay.  And then I assume with your long
9  career in law enforcement, you have probably
10  testified in court before, correct?
11      A.  Yes, ma'am.
12      Q.  How many times, if you know?
13      A.  Dozens, but it's been awhile, believe it
14  or not.
15      Q.  All right.  When, approximately, is the
16  last time you've testified in court?
17      A.  It was a capital murder trial in Central
18  Texas.  I don't remember the date, but I was
19  obviously still a Ranger.
20      Q.  Okay.  Have you ever given any testimony
21  in court in connection with prescription drug
22  diversion?
23      A.  Not that I can recall.
24      Q.  Have you ever been asked to testify as an
25  expert witness?

Page 11

1      A.  No.
2      Q.  Okay.  Well, since you have only done one
3  deposition and it's been awhile since you've
4  testified in court, let me just remind you of a few
5  things and hopefully we'll get through this smoothly
6  here today.
7          As I mentioned, I'll probably be asking
8  you most of the questions today.  You may hear some
9  objections at times.  And unless you are
10  specifically instructed not to answer for some
11  reason, you can still go ahead and answer the
12  question.
13          As you know, we're all in different
14  locations which sometimes makes it a little
15  difficult.  It seems like we're pretty good with no
16  lag time here, but just make sure you wait until I'm
17  done with my question even if you can anticipate
18  what the rest of the question is before you answer
19  so that the court reporter can get everything down.
20          Sometimes I ask questions that may not
21  make sense.  It's not intentional.  But if you don't
22  understand a question for whatever reason or just
23  don't hear it all, just let me know and I will
24  repeat it or rephrase it so we're on the same page.
25          And as I mentioned before, we'll probably

Page 12

1  take breaks approximately every hour or so.  But if
2  at any time you need a break, just let me know and
3  as long as there's not a question pending, I'll be
4  happy to accommodate that.  Okay?
5      A.  Yes, ma'am.
6      Q.  All right.  Are you represented by an
7  attorney today?
8      A.  Yes.
9      Q.  All right.  And can you tell me his name?
10      A.  Mr. Mark.  I'm not going to butcher his
11  last name.
12      Q.  Okay.  I think I heard it earlier and it
13  will be on the record.
14          Have you met with any lawyers in
15  preparation for your deposition today?
16      A.  Yes.
17      Q.  Okay.  And would that be Mark or anyone
18  else?
19          MS. ABSTON:  And, Trace, I'm going to
20  remind you that this is covered by attorney-client
21  privilege, but you can speak to her about some of
22  the questions that she's asking about without giving
23  details of the conversations.  So you can answer.
24      A.  Yes, we met for about an hour last Friday
25  and we met for about an hour this Monday.

Page 13

1      Q.  Okay.  And you say "they."  Who did you
2  meet with?
3      A.  Alex and some other folks that I can't
4  begin to -- I can see her name now.  Sadie and some
5  other folks.
6      Q.  Okay.  So it sounds like you met for two
7  times for approximately a couple hours total?
8      A.  Correct.  Yes, ma'am.
9      Q.  All right.  Did you review any documents
10  in those meetings?
11      A.  No, ma'am.
12      Q.  Have you on your own reviewed any
13  documents to prepare for your deposition today?
14      A.  No, ma'am.
15      Q.  Other than speaking to the lawyers -- and
16  obviously I'm not asking about those
17  conversations -- have you talked to anyone else
18  about your deposition today?
19      A.  My wife.
20      Q.  Okay.  I assume just to tell her you were
21  coming to a deposition?
22      A.  Yes.
23      Q.  So we are here today to talk about -- you
24  are a witness in a case that Tarrant County has
25  filed against Kroger and other pharmacies alleging

4 (Pages 10 - 13)

Page 14

1 that the pharmacies have contributed to the opioid
2 crisis. Have you seen that complaint?
3    A.  I don't recall seeing it.
4    Q.  And have you ever reviewed any deposition
5 transcripts that have previously been taken in this
6 case?
7    A.  No, ma'am.
8    Q.  Okay.  Are you familiar with who the
9 defendants are in this case?
10    A.  Vaguely.  You just -- I knew it was some
11 pharmacies, but I guess you said Kroger and
12 whichever other one you said.
13    Q.  Okay.  But otherwise, you don't have any
14 information about the pleading, the complaint that's
15 been filed in this case.  Is that correct?
16    A.  No, ma'am.  I knew -- I did have some
17 general knowledge that it was going on, you know,
18 for the last year or so or however long it's been,
19 but I have no details.
20    Q.  All right.  And other than the documents
21 that I just asked Alex to open for you, do you have
22 anything with you today to use during your
23 deposition?
24    A.  I do not.
25    Q.  All right.  Okay.  I just want to start,

Page 15

1 I'm going to ask you a little bit, can you tell me
2 about your educational background.
3    A.  Yes, ma'am.  Just obviously high school
4 and two years of college.
5    Q.  Where did you go to college?
6    A.  Weatherford Junior College.
7    Q.  Did you receive any degrees or
8 certifications?
9    A.  No, ma'am.  I got 63 hours and I just
10 needed 60 hours to go to the DPS academy, and that
11 was my goal.
12    Q.  Okay.  And when you say "DPS," what are
13 you referring to?
14    A.  The Texas Department of Public Safety.
15    Q.  So in Texas, the Department of Public
16 Safety requires you to have some college education
17 before entering?  Is that correct?
18    A.  They did -- they did then.  I'm not
19 exactly sure what their requirements are now.
20    Q.  So what -- what year did you -- what years
21 did you attend college?
22    A.  I graduated in '87.  I went to -- I'm
23 having to think this through.  Went to work full
24 time in '92, so somewhere between '87 and '92 I put
25 together the 63 hours.

Page 16

1    Q.  All right.  And then did you immediately
2 thereafter go to the Department of Public Safety's
3 academy?
4    A.  No, ma'am.  I started -- they had a hiring
5 freeze, and so I went to put myself through an
6 academy and went to work for the Weatherford Police
7 Department for approximately four years before going
8 to DPS.
9       MS. JACOBS:  Okay.  And I will let you
10 know that as part of your current employment, I was
11 provided with a personnel file, and it actually has
12 a job application in there that I'm going to kind of
13 use as a guide to walk through your past employment
14 since.
15       So if the concierge and Alex, if you want
16 to give him the notebook if he doesn't have it
17 already there.  It should be Tab 34 in the notebook.
18 So, Alex, it'll be something that came yesterday
19 later.  And we'll go ahead and mark that as
20 Exhibit 1.
21       (Exhibit 1 marked)
22       MS. ABSTON:  Okay.  And we're going to
23 object to marking this as an exhibit as it's not
24 relevant to the current lawsuit and Tarrant County's
25 opioid crisis.  So we'll have a standing objection

Page 17

1 to this line of questioning.
2       MS. JACOBS:  I understand.  And just to
3 let you know, Alex, we -- I waited yesterday to send
4 this over to you because I was hoping to get the
5 Bates-numbered copy.  So this is not Bates numbered
6 because I don't think we ever got a Bates-numbered
7 copy from your office, so --
8       MS. ABSTON:  Okay.  I think we did, but we
9 can talk about it off the record.
10       MS. JACOBS:  Yeah, that's fine.
11       MS. ABSTON:  I'm trying to find it really
12 quick.  I want to make sure --
13       MS. JACOBS:  Sure.
14       MS. ABSTON:  Exhibit 33, but I want to
15 make sure.  Oh, here we go.  You said Exhibit 34?
16       MS. JACOBS:  Yes.  And Trace and the
17 concierge, if you can scroll -- again, I don't have
18 pages.  It's not Bates numbered.  It's about halfway
19 through maybe, and at the very top it says,
20 "Commander Narcotics Sheriff Contact Information."
21 You can quickly tell it's basically a job
22 application.
23       MS. ABSTON:  Okay.  We'll look through and
24 find it.
25       THE WITNESS:  What's it look like?  Now, I

5 (Pages 14 - 17)

Page 18

1 will apologize. I'm using borrowed readers because
2 I left mine in the truck, so this -- when we break
3 later, I'll go get my own glasses.
4          MS. JACOBS: Okay. We're not there yet.
5 The concierge is still looking for it.
6          THE WITNESS: The new hire checklist, that
7 one?
8          MS. JACOBS: No. Almost there. Okay.
9 There. Concierge, you can stop.
10          MS. ABSTON: I'm going to give it to the
11 witness. I'll represent that this is the part of
12 the document that you're talking about.
13          MS. JACOBS: That's fine.
14          MS. ABSTON: I'll just trade with him real
15 quick. Hold on.
16          THE WITNESS: This is going to be
17 miserable.
18          MS. ABSTON: Do you want to take a break
19 and go get them?
20          THE WITNESS: No, I'll try. I'm going to
21 try. But if it gets --
22          MS. ABSTON: Okay. If it gets too bad
23 with the readers, we might have to take a short
24 break and grab them from the car. Does that sound
25 okay?

Page 19

1          MS. JACOBS: Sure. I think we can
2 probably get through the first section here, and
3 this is really the only exhibit I have for a while,
4 and then we can take a break and he can go grab
5 those.
6          MS. ABSTON: Okay. Great.
7          THE WITNESS: Okay.
8          MS. ABSTON: I think the witness should
9 have that in front of him right now.
10          MS. JACOBS: Okay.
11 BY MS. JACOBS:
12     Q.  All right. Trace, I wanted to just use
13 this. This was really helpful as far as giving us
14 a timeline on your past employment.
15     A.  Okay.
16     Q.  And if you want to look down, I'm just
17 going to start with where it says you worked as
18 police officer from May of '92 to February of '96.
19     A.  Yes, ma'am, uh-huh.
20     Q.  Okay. And I think that's what you just
21 mentioned a moment ago. Is that the job that you
22 went to when DPS had a hiring freeze?
23     A.  Yes.
24     Q.  All right. And looks like you were there
25 for just under four years?

Page 20

1     A.  Yes, ma'am.
2     Q.  All right. The duties say, "Worked
3 routine patrol, answered calls for service,
4 investigated traffic accidents, conducted
5 preliminary investigations, and prepared reports to
6 document those findings."
7          Does that accurately summarize your duties
8 over those four-plus years?
9     A.  Yes.
10     Q.  What county were you working in?
11     A.  Parker.
12     Q.  I'm sorry. What was that?
13     A.  Parker County.
14     Q.  As in a "B"?
15     A.  P-A-R-K-E-R. It's next door to Tarrant
16 County.
17     Q.  Okay. Yes. And forgive me. I've looked
18 at the map, but I live in Columbus, Ohio, so I'm a
19 good ways away from Texas. I'm not familiar with
20 all the counties.
21     A.  Lucky you right now. It's hot.
22     Q.  Yeah. Was any of your work over this
23 period of time devoted to addressing controlled
24 substances?
25     A.  Only if we came across them in a traffic

Page 21

1 stop.
2     Q.  All right. Okay. Next move up there, it
3 looks like trooper, August of '96 to June of 2003.
4 And looks like you had a gap in time after serving
5 as a police officer. Would this be when you went to
6 the academy?
7     A.  Correct.
8     Q.  And how long was that academy?
9     A.  Six months.
10     Q.  Okay. And again, I'm looking at the
11 duties. It says, "Conducted traffic enforcement,
12 investigated traffic accidents, worked criminal
13 interdiction, located, arrested felony and
14 misdemeanor fugitives and offenders. Served as a
15 K-9 narcotics detection trooper and became a DPS K-9
16 instructor."
17          Does that accurately summarize your duties
18 while you worked as a trooper?
19     A.  Yes, ma'am.
20     Q.  All right. And were you assigned to any
21 particular county?
22     A.  Yes, ma'am, the same county, Parker.
23     Q.  Now, it mentions that you worked as a K-9
24 trooper. So did you have a K-9 unit assigned to
25 you?

6 (Pages 18 - 21)

Page 22

1   A.  Yes, ma'am.
2   Q.  And did you have a K-9 assigned to you the
3 entire time that you worked as a trooper?
4   A.  No, ma'am.
5   Q.  How long were you a K-9 officer?
6   A.  I believe I went to K-9 school in '99, and
7 I had a dog until I promoted to narcotics in 2003.
8   Q.  So with a K-9, were you
9 specifically called out to address traffic stops and
10 other situations where narcotics were suspected to
11 be involved?
12   A.  Yes, ma'am.
13   Q.  All right.  And during the course of that
14 work, do you recall any instances where you dealt
15 with prescription opioids?
16   A.  I don't.
17   Q.  It says that you also served as a K-9
18 instructor.  Is that correct?
19   A.  Yes, ma'am.
20   Q.  Okay.  Did that require some separate
21 education?
22   A.  It -- you just go back down and assist
23 putting on the same ten-week school that you go
24 through to train the dogs, to learn how to be a
25 handler yourself.  You go down and actually -- well,

Page 23

1 it's a little longer than that.
2       You go down for about two weeks prior to
3 the school to do some pre-training on the dogs, and
4 then the handlers show up and you go through the
5 ten-week course with the handlers.  You do that a
6 couple of times with seasoned instructors, and then
7 it's your turn to do your own school.  And I
8 promoted before that happened.
9   Q.  Okay.  Was all of your training to be a
10 K-9 instructor and also to be potentially a -- or
11 I'm sorry, to be a K-9 officer and to be a potential
12 K-9 instructor, did that all take place in Texas?
13   A.  Yes, ma'am.
14   Q.  Okay.  And was that at the DPS academy?
15   A.  Yes, ma'am.
16   Q.  Where is that located?
17   A.  Austin.
18   Q.  Austin.  All right.
19       Okay.  Next on your jobs there, it looks
20 like you went to be a sergeant investigator from
21 June of 2003 to May of 2004.  Do you see that?
22   A.  I don't actually see it, but it's true.
23   Q.  Okay.  Maybe on the screen they can put
24 it a little bit --
25   A.  If he makes it big, I can see it up there

Page 24

1 great.
2   Q.  Okay.  I'll let him do that.
3       So while -- I think I heard you a moment
4 ago say that you were -- that you were promoted to
5 this position?
6   A.  Yes, ma'am.
7   Q.  All right.  And it says that -- under
8 "Duties" it says, "Worked as a narcotics
9 investigator for 11 months.  Conducted overt and
10 covert drug investigations which resulted in the
11 seizure of illegal narcotics and the arrest of
12 numerous drug suppliers.  I also conducted numerous
13 diversion of prescription drug investigations."
14       Okay.  So is that an accurate summary of
15 the duties that you performed while you were working
16 as a sergeant investigator?
17   A.  Yes.
18   Q.  Did you have any specialized training for
19 this position?
20   A.  You know, they didn't send me to any --
21 they might have sent me to search and seizure.  I
22 can't remember.  But, no, they knew that I was also
23 on the list to become a Texas Ranger, and so they
24 want -- they weren't going to invest any money in me
25 to send me to any of the fun schools.  So they

Page 25

1 assigned me to do the diversion cases because that's
2 something that most people don't really like to do,
3 but it's a clean investigation and gave me good
4 practice on, you know, interviewing people and
5 things like that.
6   Q.  Okay.  What county or counties were you
7 working in while you were performing this job?
8   A.  So that gets a little more difficult.  So
9 give me a second to explain that.  My duty station
10 was actually Decatur, which is Wise County.  But
11 because I was a rookie, I spent most of my time in
12 Mineral Wells, which is in Palo Pinto County.
13   Q.  Palo Pinnock County?
14   A.  P-A-L-O, and then another word, Pinto,
15 like the bean, P-I-N-T-O.
16   Q.  Okay.
17   A.  But during the course of that time, I
18 worked Parker, Wise, Palo Pinto, and Tarrant.
19   Q.  Okay.  Did you yourself spend any
20 significant amount of time working under cover?
21   A.  Not really.  I mean, I did do some buys
22 and whatnot and some CI buys but not a whole lot.
23 Most of it was doing the pill cases.
24   Q.  When you were working under cover doing
25 buys or CI buys, do you remember what illegal

Page 26

1 narcotics were being targeted?
2   A.  Meth mainly.  That's all I can remember
3 buying.  It's been obviously a long time since I did
4 that job.
5   Q.  All right.  Now, the last sentence on your
6 job duties where it says, "I also conducted numerous
7 diversion of prescription drug investigations," can
8 you tell me about that, please?
9   A.  Yeah, I can remember two of them
10 distinctly.  I did more than two.  One of the cases
11 was actually a friend of mine that was -- I believe
12 he was a Parker County deputy, and he had been
13 involved in some sort of a accident and was injured.
14       And as the course of his treatment, he was
15 subscribed pain pills, hydrocodone, to be specific,
16 and he got addicted to the point that he couldn't
17 get enough and he started doing what they refer to
18 as doctor shopping.  And anyway, I had to end up
19 working the case on him and putting him in jail.
20   Q.  Okay.  How long -- so it looks like that
21 you were a sergeant investigator for about 11
22 months.  How much of your time was involved doing
23 the diversion of prescription drug investigations?
24   A.  Just -- it would be a guess and I don't
25 think I'm supposed to guess.

Page 27

1   Q.  I don't want you to guess, but if you can
2 approximate, I mean, that's fine.
3   A.  60 percent, 70 percent.
4   Q.  Okay.  And you said you specifically
5 recalled another case.  Can you tell me about that
6 one?
7   A.  Yes, ma'am.  It was a -- it was a LVN
8 or -- it was an employee of a doctor's office who
9 had stolen a scrip pad and was writing herself
10 scrips and to obtain pain medication.  There were
11 more, but I would have to go back and pull reports
12 to remember all that.  It's been too long.
13   Q.  Okay.  When you were performing this job,
14 was there ever an occasion where you had any
15 involvement or interaction with a pharmacy or
16 pharmacist?
17   A.  Yes.
18   Q.  When would that be?
19   A.  I don't recall specifically, but part of
20 the way we would do it is we would go into the
21 pharmacy and show them a line-up of the suspects.
22 And I believe -- again, this has been a really long
23 time ago.  I believe we were able to get documents
24 from them showing what all they had prescribed to
25 the patient.

Page 28

1   Q.  Okay.  And when you say they prescribed,
2 you're not talking about the pharmacist, correct?
3 They don't prescribe drugs, right?
4   A.  No, right, dispense, whatever.  I'm sorry.
5 I used the wrong word.
6   Q.  Okay.  And as part of these
7 investigations, was there ever a time where you were
8 tasked with investigating alleged inappropriate
9 activity by a pharmacist or pharmacy?
10   A.  I never -- I don't remember ever working a
11 case on a doctor or a pharmacist.
12   Q.  Okay.  So it sounds like any interaction
13 that you may have had with a pharmacy or pharmacist
14 was purely as part of an investigation and their
15 cooperation with that?
16   A.  Yes.
17   Q.  So I think you mentioned earlier and it
18 looks like you were on the list to be a Texas Ranger
19 and you left this current job when you went to the
20 Texas Rangers, correct?
21   A.  Yes, ma'am.
22   Q.  All right.  And I will confess, I don't
23 know a lot about -- other than what I've seen on TV
24 or Googled on the internet, about the difference
25 between a Texas Ranger versus a trooper.  Can you

Page 29

1 just tell me a little bit about the job of a Texas
2 Ranger?
3   A.  Sure.
4   Q.  Kind of a high-level overview?
5   A.  Yes.  We're just the primary investigators
6 for criminal cases in the DPS.  I mean, we have --
7 we have CID, which works narcotics and auto theft,
8 things like that.  CID -- and they're a big
9 division.  They're like 750 to a thousand guys.
10     There's 162 Rangers for the whole state.
11 Everybody's assigned anywhere from between one and
12 eight counties depending on the population.  And
13 you -- the really primary thing is that we bring all
14 of our assets to bear for small, local agencies that
15 need assistance with murders and officer-involved
16 shootings, robberies, sexual assaults, all those
17 things.
18   Q.  Okay.  How many Texas Rangers did you say
19 there are in the state?
20   A.  When I left, full strength was 162.  It
21 could be more or less now.  I don't even know if
22 they're full.  And that includes all the bosses.
23 That's not just the workers.
24   Q.  Okay.  You said 162 as in one hundred and
25 sixty-two?

8 (Pages 26 - 29)

1  A.  Yes.  Very small number.
2  Q.  I was going to say, that's a very small
3  number for a large state.  I saw somewhere online,
4  tell me if this sounds accurate, it came off the DPS
5  website, that the main mission in modern times for
6  the Texas Rangers has been to investigate major
7  crimes, special investigations such as political
8  corruption, and allegations of law enforcement
9  malfeasance, border security, and assisting local
10  law enforcement in criminal investigations.
11  A.  That's greatly worded, yes.
12  Q.  Okay.  That sounds pretty much what you --
13  like what you just told me, so --
14  A.  But fancier.  I like it.
15  Q.  And your work as a Texas Ranger, I know it
16  spans a number of years.  Was any of that work
17  devoted to addressing controlled substances?
18  A.  I can remember one case whenever I was
19  stationed in Athens.
20  Q.  Okay.  Can you tell me about that?
21  A.  Yes, ma'am.  I got a call from one of the
22  local doctors one day advising me that one of the
23  Athens P.D. detectives, she believed that one of --
24  this is -- again, I don't have it in front of me, so
25  it's not going to be exact.  But long story short,

1  one of the detectives was forging prescriptions for
2  Tussionex, which my understanding -- my recollection
3  of Tussionex is it's a cough syrup that does have
4  codeine in it.
5      And anyway, I was assigned by the district
6  attorney to investigate that case where I went out,
7  talked to various pharmacies.  I tried to remember
8  how I did it in narcotics.  I don't remember if I
9  did it very well or not.  But anyway, he ended up
10  getting indicted and losing his job, unfortunately,
11  because he was a good friend of mine.
12  Q.  Okay.  And is that the same case you
13  mentioned a few minutes ago or different when you
14  talk about --
15  A.  Different case.
16  Q.  Different?  Okay.
17      Okay.  Yeah, I guess the one was when you
18  were a sergeant investigator, you mentioned a
19  deputy, right?
20  A.  Yes.
21  Q.  All right.  And then this was a different
22  situation?
23  A.  Yes, ma'am.
24  Q.  And would your testimony still be the
25  same, that your interaction with any pharmacies or

1  pharmacists was purely as part of your investigation
2  and their cooperation with the same?
3  A.  Yes.
4  Q.  Okay.  Okay.  This document -- you can see
5  it on the screen there.  It says that you were a
6  Texas Ranger from May of 2004 and it says "to
7  present" because that was your job application for
8  your current job.  So when did you leave the Texas
9  Rangers?
10  A.  I retired at the end of May 2021, and my
11  first day on this job was June 1st, 2021.
12  Q.  Okay.  All right.  And so you took a --
13  was that a full retirement then for you?
14  A.  Yes.
15  Q.  While you were working with the Texas
16  Rangers, was -- did any of your responsibilities
17  over that long career include finance, budget
18  oversight?
19  A.  No.
20  Q.  And do you know how many Texas Rangers at
21  the time you were working were assigned to Tarrant
22  County, or are they actually assigned -- you
23  mentioned assignments to counties.
24  A.  Yes.  In Tarrant County, and it's still
25  today, there are two Rangers and a lieutenant

1  assigned in Tarrant County.
2  Q.  And I think I forgot to ask.  What county
3  were you assigned to?
4  A.  Initially -- well, I don't know when you
5  want to talk about.  Initially I was out in
6  Plainview.  I had four counties.  I don't remember
7  all the names of them.  That's in the Panhandle.  I
8  was there for six months before I went to Athens,
9  which is Henderson County.  And then because of a
10  job change for my wife, we came to the Fort Worth
11  area in 2010.
12  Q.  Okay.  So any of your work, were you ever
13  assigned to Tarrant County while you were a Texas
14  Ranger?
15  A.  Yes, for about 10, 12 years.
16  Q.  Okay.  So from 2010 on?
17  A.  I think so, yes.
18  Q.  I won't hold you to the exact date.  But
19  if it was 10 to 12 years, somewhere in there, 2010,
20  2011, somewhere in there?
21  A.  Yeah, around 2- -- I can't remember if it
22  was December, January, but it was 2010, 2011.  And I
23  was stationed in Fort Worth until I retired.
24  Technically the duty station is Hurst, but nobody
25  knows where Hurst is, so we just say Fort Worth.

9 (Pages 30 - 33)

1    Q.  All right.  Okay.  The -- while you were a
2  Texas Ranger, other than that one case that you
3  mentioned, were you -- were you ever party to any --
4  or I'm sorry.  "Party" is a bad word.  Let me start
5  over.
6       Were you ever aware of any reports of
7  prescription opioid drugs as a threat within the
8  Tarrant County area?
9    A.  That would have been CID's job, so no,
10  ma'am.
11    Q.  All right.
12    A.  They don't work murders and we don't work
13  narcotics, generally.
14    Q.  Okay.  So based on what you've told me
15  about your job duties and what we have reviewed that
16  DPS reports the job duties of a Texas Ranger are,
17  generally speaking, Texas Rangers would not have had
18  anything to do with narcotics or prescription opioid
19  drugs, correct?
20    A.  Correct.  And the only reason I was
21  involved in the one in Henderson County is because
22  he was a police officer, which kind of falls into
23  the public corruption --
24    Q.  Okay.
25    A.  -- duty.

1    Q.  During your long tenure as a Texas Ranger,
2  were you ever disciplined on the job?
3    A.  No, ma'am.
4    Q.  Okay.  That takes us to your current job.
5  And you can -- I think we're done with that exhibit.
6    A.  Would it be in order if I put it back like
7  that?
8    Q.  You can just set it aside.  All right.
9  It's my understanding that you are currently the
10  commander of the Tarrant County Sheriff's Office's
11  narcotics unit.  Did I get that right?
12    A.  Yes, that's generically what it's called.
13  Technically it's the Combined Narcotics Enforcement
14  Team.
15    Q.  And you said that you started at the
16  Tarrant County Sheriff's Office in June of 2021,
17  correct?
18    A.  That's correct.
19    Q.  All right.  And did you hire in at the
20  position that I just stated, or did you start with a
21  different position?
22    A.  No, ma'am.  I hired in at this position.
23    Q.  So you've held -- and do you currently
24  still hold -- you've hold -- sorry.  Start over.
25       You've had the same job since you started

1  in June of 2021 --
2    A.  Yes.
3    Q.  -- till today, June of 2023?
4    A.  Correct.
5    Q.  And who do you report to?
6    A.  Calvin Bond.
7    Q.  What is his job title?
8    A.  Senior chief of Tarrant County Sheriff's
9  Office.
10    Q.  And who would he report to?
11    A.  The sheriff.
12    Q.  What's his name?
13    A.  Bill Waybourn.
14    Q.  And are your sheriffs there elected or
15  appointed or --
16    A.  Elected.
17    Q.  If you know, how long has Sheriff Waybourn
18  been in office?
19    A.  I believe he took office in 2017.
20    Q.  Can you just give me a very high-level
21  overview of your job responsibilities today.
22    A.  Yes, ma'am.  I just oversee the office and
23  supervise.  Really and truly, I only have one direct
24  report which is a lieutenant.  Under him is a
25  sergeant, and then we have seven investigators and

1  two K-9s.  I got to make -- this is about to shut
2  down.  There we go.
3       Technically, I believe this job was
4  designed to liaison between local chiefs of police
5  and the command staff at the sheriff's office to go
6  out and recruit task force officers for my unit.
7  And unfortunately, because of just the personnel
8  issues with all local agencies around here, it's --
9  I'm unable to recruit anybody.  So I've just kind of
10  become an assistant to the investigators at this
11  point and still a liaison between them and the
12  sheriff.
13    Q.  Okay.  So my understanding based on what
14  you just said and based on some personal experiences
15  that I have had in my past that I understand that
16  this is a drug enforcement net- -- or network team
17  basically that originates out of the sheriff's
18  office but pulls from other departments?  Is that
19  correct?
20       MS. ABSTON:  Objection to form.
21       You can answer.
22    A.  Yes, ma'am.  We currently only have one
23  TFO from Mansfield P.D., but we are set up to have
24  TFOs from multiple agencies.  It's just everybody's
25  shorthanded and they can't get us personnel at this

Page 38

1  time.
2      Q.  Okay.  When you say "TFO," what does that
3  mean?
4      A.  Task force officer.
5      Q.  Okay.  And by the way, my personal
6  experience is I used to be a prosecutor a long time
7  ago, so I have some familiarity with this setup.
8          So did you tell me that you currently
9  supervise one lieutenant?  Was that correct?
10     A.  You can say I supervise the group, but in
11  truth, there's a commander, lieutenant, sergeant,
12  investigators, K-9 handlers, and admins.  They --
13  the sergeant does the bulk of the supervising, and
14  then there's the lieutenant buffer and then there's
15  me.
16         So I have the ultimate say-so, but as long
17  as they're doing their job right, there's really not
18  a lot to do.  I just make sure the bills are paid,
19  they have the equipment they need, and that sort of
20  thing.
21     Q.  Okay.  So other than the one officer you
22  said is from, I believe, Mansfield?  Was that right?
23     A.  Yes.
24     Q.  Are all the other officers, the
25  lieutenant, the sergeant, the investigators, the

Page 39

1  K-9s, are they all from the Tarrant County Sheriff's
2  Department?
3      A.  They are.
4      Q.  And as part of your job, do any of your
5  responsibilities include finance, budget oversight?
6      A.  Vaguely.  We have a business manager,
7  thank goodness, who does most of that for me.  I do
8  have to make some decisions on moving money from
9  here and there, but we have a very tiny budget and
10  it varies from year to year.  It's really weird.
11  But anyway, so you could say yes, I do have
12  something to do with budget, but very little.
13     Q.  Okay.  And so, for example, the TFO
14  assigned from Mansfield, what county is Mansfield
15  in?
16     A.  Several, but a lot of it's in Tarrant, but
17  they're also in Johnson and Ellis.
18     Q.  Okay.  So that TFO and any other TFO who
19  may come from another department, their salaries and
20  things are paid by their respective department.  Is
21  that correct?
22     A.  That's correct.
23     Q.  Do you have any knowledge of Tarrant
24  County's overall operating budget?
25     A.  No, ma'am.

Page 40

1      Q.  Do you have any knowledge of the portion
2  of that budget that is assigned to your office or
3  department?
4      A.  I can tell you how much it was last year.
5  It was 500,000.
6      Q.  And is that 500,000, does that pay the
7  sher- -- I'm sorry, the Tarrant County Sheriff's
8  Office employees, or are they paid out of a
9  different budget?
10     A.  They're paid out of a different budget,
11  but that wouldn't even come close to covering
12  salaries.  That's just for paying for, you know,
13  equipment, rent, cars, gas, electricity, those sorts
14  of things.
15     Q.  Okay.  That's what I assumed, but I wanted
16  to make sure.
17         How many, if you know, officers are there
18  in total in the Tarrant County Sheriff's Department?
19     A.  I know approximately.  I don't know an
20  exact number.
21     Q.  That's fine.
22     A.  A little over 400 commissioned officers is
23  my understanding.  And that's -- that's in -- that's
24  actual what we call gun toters.  And I think there's
25  maybe close to a thousand detention officers.

Page 41

1      Q.  And detention officers, what are their job
2  duties?
3      A.  They work in the jail.
4      Q.  And as you call them, the gun toters,
5  those would be more the traditional officer out on
6  the road in a cruiser or working in CID or any of
7  those other things, correct?
8      A.  Yes.  We have a warrants division.  Or
9  actually our largest division is courts because we
10  have multiple officers assigned to every court and
11  this is a huge county.  So I think they've got like
12  120 guys just over there.  Patrol's smaller than
13  that because, you know, actually Tarrant County --
14  I'll wait for you to ask a question.  I'm getting
15  too broad.  Sorry.
16     Q.  No, that's fine.  I appreciate it because
17  I am trying to understand how the -- how the
18  department works.  So I was going to ask you, and I
19  think you started to tell me, about the different
20  departments.  And I think you said detention,
21  warrants, courts.  And I -- are the personnel that
22  are on the road, are they called road?
23     A.  Patrol.
24     Q.  Okay.  What else?  Anything else?
25     A.  There's -- there's game room units.

11 (Pages 38 - 41)

1 There's -- I don't -- I can't think of what they
2 call them right now.  I think they call them "seed"
3 maybe.  I don't know.  There's a unit that covers
4 livestock.  There's lots of small units.
5     Q.  Okay.  Is there a detective division?
6     A.  Yes, CID.
7     Q.  All right.  And when you said "game," are
8 you talking about like wild game or video gaming,
9 gambling?
10     A.  The illegal gambling rooms.  We call
11 them -- we call them game rooms here.
12     Q.  All right.  Okay.  So just in summary, we
13 have the unit that you work for, CNET, detention,
14 warrants, court, patrol, game rooms, seed, CID.
15 Anything else you can think of?
16     A.  Yeah, you just jogged my memory.  Human
17 trafficking.  I should know that.  They moved out
18 into my office.
19     Q.  Okay.  What are the objectives of -- I'm
20 just going to call it CNET from here on out.  Is
21 that okay?
22     A.  Sure.
23     Q.  Okay.  What are the objectives of CNET?
24     A.  Just to identify, disrupt, and dismantle
25 drug organizations, drug trafficking organizations.

1     Q.  So the past pretty much exactly two years
2 that you've been in that, your current position, has
3 anyone ever reported to you that the organization
4 has determined that prescription opioid drugs are a
5 threat within Tarrant County?
6     A.  Prescription opioids.  No, I don't recall
7 ever that being the case.
8     Q.  And while you've been on this job, have
9 you ever been disciplined while on the job?
10     MS. ABSTON:  Objection to form.  We've
11 discussed for not -- that's not relevant and we'll
12 have a standing objection to any sort of
13 disciplinary matters as they're not relevant to this
14 lawsuit.
15     Q.  You can answer yes or no.
16     A.  Yes.
17     Q.  And I will just tell you I'm not going to
18 ask you about this, but I did see one reference to a
19 situation in your personnel file.  Anything else or
20 just the one thing?
21     A.  The one thing.
22     Q.  All right.  All right.  I want to go
23 through just a handful of general questions, and
24 then we can take a break if you'd like and you can
25 go retrieve your glasses if that's all right.

1     A.  Absolutely.  If you're going to have me
2 reading documents, I need them.
3     Q.  Yeah, no more documents right now, so
4 that's why I thought we could just get through this
5 quickly.  So I just want to ask you some real basic
6 questions here.
7         If a citizen of Tarrant County has a
8 prescription opioid medication that they were
9 legitimately prescribed, is it a crime to sell those
10 pills to someone else?
11     MS. ABSTON:  Objection to form.
12     A.  Yes.
13     Q.  And if a citizen of Tarrant County has a
14 prescription opioid medication that they were
15 legitimately prescribed, is it a crime to give those
16 pills away?
17     A.  Yes.
18     Q.  And is it a crime to steal opioid
19 prescription pills from someone else?
20     A.  Yes.
21     Q.  Is it a crime to obtain an opioid
22 prescription medication from a doctor for the
23 purpose of selling or giving it away?
24     A.  Yes.
25     Q.  Is it a crime to forge a prescription for

1 a controlled substance?
2     A.  Yes.
3     Q.  Is it a crime to present a forged
4 prescription to a pharmacist to be filled?
5     A.  Yes.
6     Q.  Okay.  Do you agree that prescription
7 opioids can be legally prescribed?
8     A.  Sure.
9     Q.  And you understand that prescription
10 opioids are approved by the FDA?
11     A.  I would assume so.
12     MS. ABSTON:  Objection to form.
13     Q.  You understand that prescribers are
14 licensed by the state of Texas and the DEA?
15     A.  Yes.
16     Q.  Are you aware that the DEA sets annual
17 quotas for the manufacture of opioids' chemical
18 precursors based, on part, on an estimated medical
19 need?
20     MS. ABSTON:  Objection to form.
21     A.  No, ma'am, I'm not aware of that.
22     Q.  You're aware that opioids, prescription
23 opioids can help people suffering from pain?
24     A.  Yes.
25     Q.  And do you agree that it is not a crime

12 (Pages 42 - 45)

1 for a prescription opioid to pass from the
2 manufacturer to a distributor and for that
3 distributor to pass it on to a pharmacy?
4     MS. ABSTON: Objection to form.
5     A. Can you say that again, please? It all
6 sounds right, but you're -- you went long.
7     Q. I understand. Would you agree that it is
8 not a crime for a prescription opioid to pass from
9 the manufacturer to a distributor and then for that
10 distributor to pass it on to a pharmacy?
11     MS. ABSTON: Objection to form.
12     A. It sounds legal to me.
13     Q. Okay. And do you agree that it is not a
14 crime when a pharmacy dispenses the prescription
15 medicine pursuant to a prescription from a licensed
16 medical professional?
17     A. Sounds legal to me.
18     Q. And you don't believe that doctors in your
19 community are engaging in wrongdoing when they
20 prescribe opioids to patients for legitimate medical
21 purposes, do you?
22     MS. ABSTON: Objection to form.
23     A. I think that there are some pain
24 management clinics that are shady. I don't have any
25 specific examples, but anytime I see a pain

1 management clinic, I -- it just -- that goes back to
2 my experience back when I was in DPS narcotics.
3 Those were the people that were writing all those
4 prescriptions back then. So I -- there probably are
5 some of those people that aren't following the rules
6 exactly.
7     Q. Okay. But if a doctor prescribes
8 prescription opioids for a legitimate medical
9 purpose, you would agree that that is okay, correct?
10     MS. ABSTON: Objection to form. Asked and
11 answered.
12     A. Sounds legal, yes.
13     Q. All right. What is your understanding of
14 the term "diversion"?
15     A. Diversion, I believe, is whenever -- just
16 basically it's used in law enforcement as a generic
17 term for basically obtaining and selling,
18 distributing legally-manufactured pharmaceuticals to
19 other people. You know, the legal definition may
20 mean something else, but like my recollection from
21 my DPS days is diversion is if -- if you -- whether
22 you forged a scrip or you were doctor shopping and
23 got more of them and you were hoarding them to sell
24 and share and whatnot, I would consider that
25 diversion. But I don't know the legal definition.

1     Q. I understand. Have you ever investigated
2 the diversion of a medication after it has been
3 lawfully dispensed by the pharmacy?
4     MS. ABSTON: Objection to form.
5     A. I can't remember if that one girl was
6 selling them or not. I know the other guy
7 specifically was taking a huge amount of them a day
8 himself. So I don't -- I don't think so.
9     Q. Okay. All right. And the fact that a
10 pharmacy may fill many prescriptions, that doesn't
11 mean that it is engaging in diversion, correct?
12     MS. ABSTON: Objection to form.
13     A. Using your wording, I would say that's not
14 illegal.
15     Q. And would you agree that just because a
16 doctor prescribes a large amount of prescriptions,
17 that on its own doesn't necessarily mean the doctor
18 has engaged in illegal activity?
19     MS. ABSTON: Objection to form.
20     A. Yes.
21     Q. You understand that pharmacies in the
22 state of Texas do not manufacture prescription
23 opioid medications, correct?
24     MS. ABSTON: Objection to form.
25     A. I don't guess I really knew that because

1 there's some compounding pharmacies around me. I
2 don't know exactly what all they compound, so --
3     Q. You understand that pharmacies in the
4 state of Texas do not write prescriptions for
5 illegal opioids, correct?
6     MS. ABSTON: Objection to form.
7     A. When you say "illegal opioids," what do
8 you mean?
9     Q. Well, how would you describe illegal or
10 illicit opioids?
11     MS. ABSTON: Objection to form.
12     A. Heroin, fentanyl, things like that.
13     Q. Okay.
14     A. And so I would say, no, they don't write
15 prescriptions for that because they shouldn't have
16 that.
17     Q. All right. I think I -- I think I asked
18 that question incorrectly.
19     You understand that pharmacies in the
20 state of Texas do not dispense illegal opioids such
21 as heroin, fentanyl, et cetera?
22     A. Yes.
23     MS. JACOBS: All right. This might be a
24 good time for you to go get your glasses.
25     THE WITNESS: Okay.

13 (Pages 46 - 49)

Page 50

1    MS. ABSTON: Okay. Do you want to take
2 how long, like a 15-minute break, 10-minute break?
3    THE WITNESS: It'll be a minute because
4 it's a block away.
5    MS. ABSTON: Okay. Then we'll do -- how
6 about 15-minute break? Does that sound okay?
7    MS. JACOBS: That's fine. And could the
8 concierge put myself and Allison and Tony in a
9 breakout room?
10    CONCIERGE: Yes. One second.
11    THE VIDEOGRAPHER: Okay. Current time is
12 10:56 a.m. We're now off the record.
13    (Recess from 10:56 to 11:16)
14    THE VIDEOGRAPHER: Current time is
15 11:16 a.m. We're now back on the record.
16 BY MS. JACOBS:
17    Q. Okay. We are back after a short break,
18 and I -- were you able to retrieve your glasses?
19    A. Yes, ma'am.
20    Q. Great. Just to close out some of the
21 stuff, general job duties with CNET, I neglected to
22 ask you, while you've been at CNET for the past two
23 years, has any of that job been devoted to
24 addressing prescription opioids?
25    A. Specifically to -- not really, no. No.

Page 51

1    MS. JACOBS: Okay. All right. Bob, if
2 you could pull up what should be Tab 28, and we can
3 mark that as Exhibit 2.
4    (Exhibit 2 marked)
5    Q. Okay. And Trace, if you see in the bottom
6 corner, these documents now have what we call in our
7 legal world Bates numbers. And I'm not going to
8 read you the whole long number, but if you can
9 just -- first of all, when I do refer to a number,
10 that will be your guide to flip to the correct page,
11 but for now --
12    MS. ABSTON: Diana, for the record, I'm
13 not seeing Bates numbers on these. We just want to
14 make a standing objection that I think the Bates
15 numbers may have been cut off of these documents,
16 so -- I can show you on the screen if that helps,
17 but it looks like there may have been a scaling
18 issue with printing.
19    So we'll have a standing objection to the
20 use of these documents, and please make sure you put
21 on the record the Bates number of the document that
22 you are trying to refer to.
23    MS. JACOBS: Yeah, okay. I apologize. I
24 personally did not lay eyes on it before it went
25 out, so -- but I can see the Bates number is on the

Page 52

1 screen.
2    Q. So anyways, let me just ask you a few
3 general questions before we get into that document
4 anyway.
5    Do you personally have any experience with
6 HIDTA, which is the High Intensity Drug Trafficking
7 Agency in the state of Texas?
8    A. I have been to that office and I met with
9 one of their folks yesterday, but that's about the
10 end of it.
11    Q. Okay. So over your career, was yesterday
12 the first time you've met with them?
13    A. No. I've been out to the HIDTA office
14 with my boss once or twice. We participate in one
15 of their programs and have for the last couple of
16 months.
17    Q. Okay. What program is that?
18    A. The OD mapping program. We -- the Tarrant
19 County Sheriff's Office has joined that group. I am
20 the administrator for the county, and so now I'm
21 tracking all of the ODs that the Tarrant County
22 Sheriff's Office is involved with.
23    Q. And when you say "OD," are you referring
24 to overdose?
25    A. Yes.

Page 53

1    Q. What is your understanding of what HIDTA
2 does?
3    A. They house and fund a lot of other law
4 enforcement units. Obviously it stands for High
5 Intensity Drug Trafficking Area, and I think their
6 focus is helping the communities of -- obviously
7 there's the North Texas HIDTA. I'm not familiar
8 with how many different HIDTAs there are, but they
9 have fed, state, and local officers out there and
10 they assist and conduct narcotics investigations and
11 probably other things. I don't know.
12    Q. What relationship does the Tarrant County
13 Sheriff's Department have with HIDTA?
14    A. I don't know exactly other than we are a
15 part of the group. And my boss, Calvin Bond, is one
16 of the -- I don't know what his title is. I think
17 board member might be correct. But he would -- he
18 would definitely be the better person to question
19 about HIDTA.
20    Q. So does CNET work at all with -- directly
21 with HIDTA?
22    A. Very little. We can call. Our meeting
23 yesterday was about them helping us with some
24 training and things like that. They have offered
25 some analytical support. But on a daily basis, no,

14 (Pages 50 - 53)

Page 54

1 we do not. Well, let me back up. We do use them
2 for deconfliction. On any cases that we work, if we
3 come up with a phone number or an address or
4 whatever of a potential target, we run it. We do a
5 deconfliction through HIDTA to make sure that we
6 don't interfere with somebody else's investigation.
7    Q.  And I saw that term "deconfliction" appear
8 in a couple documents. Can you just tell me what
9 that means?
10    A.  It's just that our investigator or
11 somebody helping that investigator will call HIDTA
12 and give them an address or a phone number, maybe
13 even a license plate, I don't know, and they will
14 run it through their databases to see if there's
15 another investigator out there that is working on
16 that same target. It helps prevent blue-on-blue
17 incidents and would help prevent us from interfering
18 with someone else's ongoing investigation.
19    Q.  Okay. And are you -- so it's my
20 understanding based on -- I'm looking at the
21 document that we've just now marked as Exhibit 2.
22 Just looking at the cover page where it says "North
23 Texas HIDTA," that leads me to believe there are
24 different divisions of HIDTA throughout Texas?
25    A.  I know that's true, but I don't know any

Page 55

1 of the other ones.
2    Q.  Okay. Is the North Texas division the one
3 that you would have contact with?
4    A.  Yes.
5    Q.  Okay. If you can flip to what would be in
6 the bottom corner 0786. So that's just going to be
7 a couple pages in on your hard copy document. And
8 if you can go to the paragraph that says "Threat
9 Assessment."
10    A.  Yes.
11       MS. JACOBS:  And Bob will put that up on
12 the screen. And, Bob, if you can go to where it
13 starts with the sentence, "The most notable threat."
14 It's about midway through the paragraph.
15    Q.  And that says, "The most notable
16 threat-related reports include the continued use of
17 the Dallas/Fort Worth metroplex as a command and
18 control center for international drug trafficking
19 networks that receive drug loads originating within
20 Mexico."
21       This document is dated 2013. Is that
22 statement consistent with your memory as a law
23 enforcement officer in 2013?
24    A.  I believe it's still true today.
25    Q.  Okay. So is it fair to state that the

Page 56

1 geography and the border with Mexico played, at
2 least at this time and it sounds like you're saying
3 still today, a role in the drug threat in Tarrant
4 County, Texas?
5    A.  Yes.
6    Q.  Now, Bob, if you could go to page 787
7 which should be, Trace, the very next page. And it
8 will say -- I'm sorry. I'm trying to find it on the
9 page now. I lost it. Give me a second.
10       Okay. It's about halfway through the top
11 of the first paragraph. It starts with the sentence
12 "Methamphetamine." And it says, "Methamphetamine,
13 marijuana, and heroin have been reported by NT HIDTA
14 partner agencies as the most significant drug
15 threats in the NT HIDTA AOR."
16       First of all, can you -- is NT HIDTA, is
17 that referring to North Texas HIDTA?
18    A.  I believe it is.
19    Q.  And what does AOR mean?
20    A.  Area of operations or area of
21 responsibility maybe.
22    Q.  Is this statement that we just read and
23 that's highlighted on the screen, is that consistent
24 with your memory and your experience as a law
25 enforcement officer in 2013?

Page 57

1    A.  Not in 2013 because I wasn't doing this in
2 2013.
3    Q.  Okay. I just mean generally as a law
4 enforcement officer if you had any knowledge if
5 that's accurate.
6       MS. ABSTON:  Objection to form.
7    A.  If you want to talk to me about the last
8 couple years, I'm happy to do that, but I can't
9 really speak to 2013.
10    Q.  Well, were you a law enforcement officer
11 in 2013?
12    A.  Yes, who did not work narcotics.
13    Q.  Okay. All right. If you want to go to
14 the very next page, 790. And at the very bottom it
15 talks about performance management process, PMP.
16       Can you tell me, do you know what is PMP
17 data?
18       MS. ABSTON:  One second. Let me make sure
19 he can find it.
20    A.  I haven't found it yet. I'm sorry.
21    Q.  Sorry.
22    A.  I thought you said the very --
23       MS. ABSTON:  The bottom of page 5. Okay.
24 I think we've located it.
25    A.  Okay. I'm here.

15 (Pages 54 - 57)

Page 58

1    Q.  Okay.  If you just want to take a second.
2  I'm not going to read all that to you.  You can look
3  at that paragraph, tell me when you're done.
4    A.  Just the one with "PMP"?
5    Q.  Yes.
6    A.  Okay.
7        MS. ABSTON:  And can I ask if that
8  paragraph continues onto the next page?  Because if
9  so, he's also allowed to look at that.
10       MS. JACOBS:  Right.  It does not.
11   A.  Okay.  I've read it.
12   Q.  Okay.  Do you know what PMP data is?
13   A.  No, ma'am.
14   Q.  All right.  So are you able to tell me
15 what this paragraph means at all?
16   A.  No, ma'am.
17       MS. JACOBS:  Okay.  You can put that
18 document aside.  And, Bob, if you can go to what's
19 marked as Tab 29.  And we can mark that as
20 Exhibit 3, please.
21       (Exhibit 3 marked)
22       MS. ABSTON:  Just for the record, this
23 document also does not have Bates numbers, so we'll
24 have a standing objection to this line of
25 questioning regarding this document.  And please

Page 59

1  state the Bates number that you're referring to on
2  the record.
3        MS. JACOBS:  Okay.  They have pulled up
4  this document, and the Bates number is
5  Texoma_HIDTA_0857.  That's the cover page of the
6  document.  And it's titled "North Texas HIDTA 2014
7  Strategy."
8        Bob, if you can flip to page 0863.
9        MS. ABSTON:  Do you have a page number in
10 the document?
11       MS. JACOBS:  Yeah.  I was just going to
12 say, these actually have their own individual page
13 numbers, so it looks like it's page 5.
14       MS. ABSTON:  Okay.
15   Q.  Trace, if you could just review the
16 section that is under "Outlook."
17   A.  Yes, ma'am.
18   Q.  Let me know when you've read that.
19       MS. ABSTON:  While he's reading, I'm going
20 to change his Zoom screen so he can see you, Diana.
21       MS. JACOBS:  Okay.
22       MS. ABSTON:  And before he answers, was
23 the highlighting part of this document, or was that
24 something that y'all added, just to confirm?
25       MS. JACOBS:  We had added.

Page 60

1        MS. ABSTON:  Okay.  So going forward we're
2  also going to object to the use of exhibits that are
3  pre-highlighted before we walk through them with the
4  witness, so -- can y'all hear me okay?
5        MS. JACOBS:  Yes.
6        MS. ABSTON:  Okay.
7    A.  I've read it.
8    Q.  Okay.  Trace, I just was going to read to
9  you the second sentence and ask you -- it says, "DEA
10 Dallas has reported anticipating higher than
11 previously reported levels of MDMA in the region the
12 past two years.  However, other law enforcement
13 entities in the area reports availability as stable
14 during this time frame."
15       What is MDMA?
16   A.  It's -- I can't remember the chemical
17 name, but it's ecstasy.
18   Q.  Okay.  And based on -- I understand you
19 weren't in your current job, but based on your
20 experience in law enforcement in 2014, is that
21 statement consistent with your memory at that time
22 period?
23   A.  I'm going to say the same answer as last
24 time.  In 2014 I was not in narcotics, and I have no
25 idea what they were doing at that time.  I have no

Page 61

1  reason to disbelieve these reports, but I can't
2  speak to my personal knowledge of them.
3    Q.  Okay.  And at the bottom it talks about
4  the regional marijuana production is expected to
5  rise.  And do you have any information regarded --
6  regarding the regional marijuana production back in
7  2014?
8    A.  No, ma'am.
9        MS. JACOBS:  All right.  Okay.  You can
10 put that document aside.  And if you will flip to
11 Tab 30, and we'll mark that as Exhibit 4.
12       (Exhibit 4 marked)
13       MS. JACOBS:  And that Bates number is
14 Texoma_HIDTA_0152.
15       MS. ABSTON:  Okay.  We're going to once
16 again object to the use of this exhibit and the line
17 of questioning that follows as there's no Bates
18 numbers that reflect this.  And also, the document
19 appears to have attorney-added highlighting to it,
20 including on the physical copy in front of the
21 witness.  So we just want to state that objection.
22       MS. JACOBS:  Can you just tell me, Alex,
23 does it look like in printing the bottom was cut off
24 or what?
25       MS. ABSTON:  It does.  It looks like when

16 (Pages 58 - 61)

Page 62

1 it was scale printed that it was not -- I'll show
2 you.  Like, for example, this is the bottom of my
3 document.  Like it wasn't properly scaled when it
4 was printed.
5      MS. JACOBS:  Okay.
6      MS. ABSTON:  So it cut off the bottom.
7 And then it did not print in color, but we can see
8 the residual highlighting.
9      MS. JACOBS:  I'm just trying to understand
10 so it doesn't happen again.  That's all.  Okay.
11 Thank you.
12   Q.  Okay.  If you can go -- it'll just be a
13 couple pages in -- to page 0154.  And it looks like
14 it's page 3 on the actual document.
15   A.  Yes, ma'am.
16   Q.  All right.  Okay.  And in the second
17 paragraph, it says, "Law enforcement and
18 intelligence data clearly indicates methamphat-" --
19 sorry -- "methamphetamine poses the most significant
20 drug threat to the region as North Texas and
21 Oklahoma are flooded with cheap, high purity
22 methamphetamine produced in Mexico."
23      Do you -- in your experience in law
24 enforcement in 2016, do you recall that to be the
25 case?

Page 63

1   A.  I do not.
2   Q.  And when you say you do not, is that just
3 based on your prior statement that you were not in
4 narcotics at that time?
5   A.  Yes, ma'am.  And I'm not trying to be
6 rude.  I'm just being completely honest with you.
7   Q.  I understand.  But you don't -- I just
8 want to understand that you're not necessarily
9 disagreeing with that statement, you're just telling
10 me you don't have knowledge?
11   A.  Absolutely.
12   Q.  Okay.  And then when it also talks a
13 little further down, it says, "Prescription drugs,
14 heroin, synthetic cannabinoids, cocaine, crack cocaine,
15 and marijuana also all pose a significant threat to
16 communities throughout the Texoma HIDTA region."
17      Same question.  Your experience in law
18 enforcement in 2016, would you agree with that
19 statement?
20   A.  I would say that I do not know.
21   Q.  All right.  This mentions prescription
22 drugs.  At this time period in 2016, do you have any
23 information as to what prescription drugs posed a
24 threat to the DFW area?
25      MS. ABSTON:  Objection to form.  Asked and

Page 64

1 answered.
2   A.  No, ma'am.
3   Q.  Okay.  You can put that document aside.
4 And --
5      THE WITNESS:  Am I supposed to keep giving
6 it to you?
7      MS. ABSTON:  Yeah, I can help you find it.
8      MS. JACOBS:  Okay.  We will go to Tab 31,
9 Exhibit 5.  We'll mark that as Exhibit 5.  I'm
10 sorry.
11      (Exhibit 5 marked)
12      MS. ABSTON:  Tab 31?  Okay.  We're going
13 to also object to the use of this document.  There's
14 no Bates numbers on this document.  And from our
15 review, it includes attorney-created highlighting
16 possibly, so --
17   Q.  Okay.  If you go to -- first of all, have
18 you seen a document like this before labeled "Threat
19 Assessment"?
20   A.  I have seen -- I believe I've seen an
21 email in the last couple of years that -- I know --
22 I know for sure that they've sent questionnaires
23 asking, you know, for data to do one of these, or I
24 believe that's what it was going to be used for, but
25 I don't know for sure that I've seen the document.

Page 65

1   Q.  I understand you weren't at CNET at the
2 time, but in your current position at CNET, do you
3 receive these threat assessments from HIDTA?
4   A.  We do receive them.  I can't -- I'm not
5 sure if I get them from Calvin who sends them down
6 to me or if I get them directly from HIDTA.
7   Q.  Do you receive any other publications from
8 HIDTA on a regular basis?
9   A.  Not that I can recall, no.
10   Q.  Okay.  If you will go to page 257.  It's
11 just going to be a few pages in.  It looks like it
12 is page 4 on your document.
13   A.  I'm here.
14   Q.  Okay.  And under "Executive Summary," it
15 states, "Prescription drugs, heroin, synthetic
16 cannabinoids, cocaine, crack cocaine, and marijuana
17 also all pose a significant threat to communities
18 throughout the Texoma HIDTA region.  In particular,
19 increased flow of cocaine into the region and signs
20 of increasing distribution of synthetic opioids such
21 as fentanyl and fentanyl-laced drugs are the most
22 significant emerging trends facing the region."
23      Based on your experience as a law
24 enforcement officer in 2017, does this accurately
25 reflect what was going on?

17 (Pages 62 - 65)

Page 66

1     A.  I'm unsure.
2     Q.  Okay.  Do you agree that synthetic opioids
3  were the emerging trends?
4        MS. ABSTON:  Objection to form.
5     A.  I'm sorry.  Are you speaking to now or
6  2017?
7     Q.  2017.  I'm sorry.
8     A.  I can't say through my work experience,
9  but I do believe that's when I started hearing about
10  it on the news.
11     Q.  Okay.
12     A.  Somewhere around there.
13     Q.  And synthetic opioids, those do not
14  include prescription opioids, correct?
15     A.  Correct.
16        MS. ABSTON:  Objection to form.
17     Q.  Okay.  If you will move to -- let's see
18  here -- page 275, which will be -- sorry, I'm trying
19  to find the page number for you -- page 22 for you.
20        Okay.  And the section that talks about
21  synthetic drugs.  It says, "Synthetic drugs,
22  especially synthetic cannabinoids and increasingly
23  synthetic opioids, are an existing and persistent
24  drug threat in the Texoma HIDTA."
25        Is that statement consistent with your

Page 67

1  experience in law enforcement in 2017?
2        MS. ABSTON:  I want to make sure the
3  witness is able to see the full -- you found it?
4        THE WITNESS:  I think I'm there, uh-huh.
5        MS. ABSTON:  Okay.
6     A.  I'm going to give you the same answer.  I
7  don't know about what was going on in 2017.
8     Q.  And again, synthetic drugs refer to
9  illegal drugs, correct?
10        MS. ABSTON:  Objection to form.
11     A.  I believe so, yes.
12     Q.  Okay.  If you can move, please, to page
13  277 which should be page 24 for you.  And under
14  "Synthetic Opioids," it states about midway through
15  the paragraph, "There are two main sources for
16  synthetic opioids in the region: Mexican DTOs who
17  are increasingly trafficking bulk fentanyl,
18  alongside other drugs like cocaine, methamphetamine
19  and heroine, and independent DTOs who obtain the
20  drugs from sources in China and other countries
21  through negotiations and purchases over the dark web
22  and over internet sources."
23        Can you tell me what a DTO is?
24     A.  Drug trafficking organization.
25     Q.  Okay.  And is this statement consistent

Page 68

1  with your law enforcement experience in 2017?
2     A.  Not in 2017, no, ma'am.
3     Q.  Why do you say that?
4     A.  Because I wasn't working narcotics in
5  2017.
6     Q.  Okay.  You can put that document aside.
7        MS. ABSTON:  Before we put that document
8  aside, can you read to me the Bates number on the
9  first page of the document you're referring to?  I
10  don't think we got that on the record.
11        MS. JACOBS:  Sure.  Let me back up here.
12  I lost it.  Texoma_HIDTA_0254.
13        MS. ABSTON:  Thank you.
14        MS. JACOBS:  Okay.  If you can go to
15  Tab 32, which we will mark as Exhibit 6.
16        (Exhibit 6 marked)
17        MS. ABSTON:  Okay.  We're going to once
18  again object to the use of this exhibit and the line
19  of questioning that follows as there's no Bates
20  numbers and it includes attorney-created
21  highlighting on the back of it.
22     Q.  Okay.  And this -- this document is Bates
23  numbered Texoma_HIDTA_0347.  And this appears to be
24  a 2018 threat assessment, so similar to the document
25  we just looked at.

Page 69

1        And if you will go to Bates number page
2  359, and I will give you the page number here.  Just
3  a second.  Page 13.  Under "Fentanyl and Other
4  Synthetic Opioids," it states, "Over the past year,
5  law enforcement has encountered fentanyl, fentanyl
6  analogues, carfentanil, and other synthetic opioids
7  throughout North Texas, the Texas Panhandle, and
8  Oklahoma."
9        Based on your experience in law
10  enforcement in 2018, is this accurate?
11     A.  I'm going to say again, I'm sorry, I don't
12  know.
13     Q.  And then the bullet-pointed paragraph
14  below, it says, "Multiple instances of seized
15  counterfeit oxycodone/hydrocodone tablets found to
16  contain fentanyl or fentanyl analogues have occurred
17  in Texas and Oklahoma over the last several years."
18        You would agree that those are illicitly
19  and illegally-produced opioids, correct?
20        MS. ABSTON:  Objection to form.
21     A.  By definition, yes, I believe they would
22  be.
23     Q.  And I understand that you were not working
24  in the job that you are currently in in -- I guess
25  this is in 2018, but the statements that are listed

18 (Pages 66 - 69)

Page 70

1 here, are those still accurate as we sit here today?
2      MS. ABSTON: Objection to form.
3      A.  Yes.  If you put 2023 on here, I don't
4 think much has changed.
5      Q.  Okay.  If you can flip to page 365.  I
6 will tell you that is on the document page 19.  And
7 under the section "Marijuana," it states, "Marijuana
8 remains the most abundant and accessible illicit
9 drug throughout the Texoma HIDTA AOR," which is in
10 parentheses "Texas and Oklahoma," close parentheses.
11      Based on your experience in law
12 enforcement in 2018, was that statement accurate as
13 of 2018?
14      A.  I do not know.  And I haven't found that
15 in here.  Were you on --
16      Q.  I'm sorry.
17      A.  -- page 16?
18      Q.  Page 19.
19      A.  19.  Sorry.
20      MS. ABSTON:  Okay.  So we're going to
21 object to that line of questioning before the
22 witness can locate it on the document.
23      A.  Okay.  I'm there.
24      MS. ABSTON:  Can you repeat your question
25 for the witness?

Page 71

1      MS. JACOBS:  Sure.  Court Reporter, can
2 you just read that back?
3      THE REPORTER:  "Under the section
4 'Marijuana,' it states, 'Marijuana remains the most
5 abundant and accessible illicit drug throughout the
6 Texoma HIDTA AOR,' which is in parentheses 'Texas
7 and Oklahoma,' close parentheses.
8      "Based on your experience in law
9 enforcement in 2018, was that statement accurate as
10 of 2018?"
11      A.  I don't know about 2018.  I'm sorry.
12      Q.  Okay.  Is this statement still true today?
13      MS. ABSTON:  Objection to form.
14      A.  I would have to look at our current CNET
15 stats to tell you more accurately, but -- so I'll
16 say I don't know.
17      Q.  Okay.  You can put that document aside.
18 All right.  Let me -- you should be able to go to
19 your notebook, would be Tab 1.  And I'll have that
20 marked as Exhibit 7.
21      (Exhibit 7 marked)
22      MS. ABSTON:  Hold on.  Let us get there
23 for a moment.
24      MS. JACOBS:  Sure.  And if you can check
25 and let me know, Alex if the Bates numbers appear on

Page 72

1 the bottom of those.
2      MS. ABSTON:  Yeah, actually I think we do
3 have the Bates numbers on those.  Just give us one
4 minute.  Okay?  Okay.
5      MS. JACOBS:  Are you guys there?
6      MS. ABSTON:  Yes.
7      MS. JACOBS:  Sorry.
8      Q.  Okay.  Trace, if you can go to the bottom.
9 Unfortunately, with emails we have to always start
10 at the bottom and read up.  So if you can look at
11 the bottom, that appears to be the original email
12 from -- is it Raul or Raul?
13      A.  Raul.
14      Q.  Raul Rodriguez copying you on June 25,
15 2021.  Who is Raul?
16      A.  He -- at that point in time, he was the
17 sergeant in CNET.  He has since been transferred to
18 human trafficking.
19      Q.  Okay.  And do you know why this email was
20 sent?
21      A.  Generally, I believe that the chief likes
22 to report to the sheriff -- sheriff just likes to
23 know these numbers.
24      Q.  When you say "these numbers," what numbers
25 are you referring to?

Page 73

1      A.  Fentanyl overdose deaths in Tarrant
2 County.
3      Q.  All right.  And is this something that --
4 do these emails -- are these emails still produced
5 to report the fentanyl overdose deaths?
6      A.  We haven't done it yet.  Since we've got a
7 new sergeant that doesn't necessarily have the -- we
8 have a new medical examiner.  I don't know.  Things
9 have changed since this was produced, and I would
10 just say I'm not sure that it's still a work in
11 progress or not.
12      Q.  Okay.  I will direct your attention to the
13 first paragraph, and it says, "Chief Bond, Attached
14 are the overdose deaths in Tarrant County from
15 January 2018 through March of 2021.  As you may be
16 aware, we are at the mercy of the medical examiners
17 who complete reports on overdose deaths.  The
18 statistical information I am provided can be precise
19 or vague; some reported overdose deaths state 'mixed
20 drug toxicity' while others state the same followed
21 by actual drug names/types.  For the purposes of
22 reporting on fentanyl overdose deaths, I have only
23 counted overdose deaths in which fentanyl was
24 specifically named, whether as the sole drug or as a
25 cocktail of two or more drugs.  The data examined

19 (Pages 70 - 73)

Page 74

1 was staggering."
2     So this mentions that sometimes drugs can
3 be mixed, but it's my understanding that this is
4 data on fentanyl. Is that correct?
5     A.   That's what they asked for, yes.
6     Q.   Okay.  And they are not asking and not
7 reporting on data on prescription opioids, correct?
8     MS. ABSTON:  Objection, form.
9     A.   Fentanyl is what the sheriff is mostly
10 interested in.
11     Q.   Okay.  And if you look down to the second
12 paragraph, I promise you I'm not going to read all
13 of this, but we just want to put some of it on the
14 record.  It starts, "What the unit is encountering,
15 I believe, explains the uptick in overdose deaths
16 involving fentanyl.  Fentanyl is being sold and
17 passed off as a legitimate prescribed medication,
18 namely oxycodone hydrochloride 30-milligram pills,
19 commonly referred amongst law enforcement as 'blue
20 M30s.'  What makes these counterfeit oxycodone pills
21 so dangerous is the fentanyl content of each pill is
22 not precise due to the pills being manufactured in
23 clandestine lab settings."
24     Do you see that statement?
25     A.   I do.

Page 75

1     Q.   And do you agree with that statement?
2     A.   Yes.
3     Q.   And in the time that you've been at CNET,
4 what has your experience been with fentanyl being
5 made into counterfeit medication?
6     A.   Really just what he said.  I mean, we
7 encounter blue M30s on a regular basis during search
8 warrant executions.
9     Q.   So what are exactly blue M30s?
10     A.   You just read the definition of what it
11 is.  It's a counterfeit oxycodone.
12     Q.   And are these counterfeit oxycodones made
13 in what I've seen in other documents, I'm not sure
14 if it was in yours or others, as -- are they made in
15 what's called pill presses?
16     MS. ABSTON:  Objection to form.
17     A.   That is my understanding.
18     Q.   Okay.  Okay.  If you can flip to the next
19 page, please.  And starting -- actually, I'm sorry,
20 it's starting on -- it's starting on the page
21 before, the last four sentence -- four words.  My
22 apologies.
23     At the very bottom, it says, "I believe
24 the pills" -- and then you can go to the next page
25 -- "are being sold to patrons as 'safer'

Page 76

1 alternatives than the harder drugs such as cocaine,
2 methamphetamine, and heroin due to their disguised
3 nature of prescribed oxycodone."
4     And then it goes on to say that -- sorry.
5 I just lost my place.  What is your understanding
6 with regards to that statement that they're being
7 sold as a safer alternative?
8     A.   Obviously that's Sergeant Rodriguez's
9 opinion, since he said "I believe."  I wouldn't
10 disagree with him, although I have not personally
11 interviewed anybody who has said that to me.
12     Q.   Okay.  You can put that document aside.
13 And we will go to Tab 8. I'm sorry. Tab 35. I'm
14 sorry. Exhibit 8. I got my numbers wrong here.
15     (Exhibit 8 marked)
16     MS. ABSTON:  Give us one second.
17     MS. JACOBS:  Yeah.
18     THE WITNESS:  Yeah, I don't think I have
19 that here.
20     MS. ABSTON:  Here we go.  One second.
21 Okay.  Hold on one second.  We're also going to
22 object to the use of this document and the line of
23 questioning that follows as there's no Bates numbers
24 present on it, so -- or page numbers for that
25 matter.  I'm not sure about if there's any

Page 77

1 highlighting added, but we would object if there is
2 as well.  Could you please read the Bates on the
3 record of the document that you're referring to?
4     MS. JACOBS:  Sure.  This is
5 Tarrant_00836424.  And, Bob, can you confirm that
6 was correct?  I was reading it off the screen
7 myself.
8     Q.   Okay.  Trace, do you recognize this
9 document?
10     A.   I've seen this one or one very similar to
11 it, but we have a PowerPoint that we use over and
12 over for different things, so I'm not sure this is
13 the exact one I've seen.
14     Q.   Okay.  What is it?
15     A.   It's -- well, it's a -- I think it's a
16 briefing to the commissioners court, I believe.
17     Q.   And when you say "commissioners of court,"
18 what does that mean?
19     A.   That's the county commissioners who
20 basically run the county.  There's a number of them
21 that the sheriff meets with, and they show them
22 about the various activities within the department.
23     Q.   All right.  And this one appears to be
24 dated July of 2021.  So at this point, you would
25 have been on the job for a month or so, correct?

20 (Pages 74 - 77)

1     A.  A seasoned veteran, yes.

2     Q.  All right.  Do you know who would have

3  prepared this document?

4     A.  Probably Sergeant Rodriguez.  But I'm not

5  a hundred percent on that.

6     Q.  Is that -- I apologize.  Is that Raul who

7  we just spoke of?

8     A.  Yes, ma'am.

9     Q.  Okay.  You would have been new on the job.

10  Were you tasked with helping prepare this in any

11  way?

12     A.  No.  I mean, I asked him to do it, I'm

13  sure.  I don't recall that specifically, but that's

14  kind of how -- how that was working.

15     Q.  Now, I see, as I said, it's dated

16  July 2021.  Do you have any information as to how

17  often this kind of document was prepared?

18     A.  I believe once a year.  I think we've done

19  it a couple of times now.

20     Q.  Is there any significance of doing it in

21  July?

22     A.  Budget times, I believe, because right

23  now -- July is specifically whenever the sheriff's

24  office is starting to go to the commissioners and

25  try to get budget approval and all that.  But I

1  don't recall exactly why we did it in July.

2         The other reason it could have been done

3  is we do a similar document whenever we -- and

4  again, that's why -- I don't know why this one was

5  done, but we -- anytime we have a group of cadets

6  graduating the academy and going to start patrol,

7  CNET goes out and does a couple-hour presentation to

8  the recruits to let them know what we do and teach

9  them a little bit about drug enforcement and calling

10  us for help when they need to.

11         So this could have been a briefing.  Just

12  based on its titling, it probably was, but it also

13  could have been done for the cadets.  I don't know.

14         MS. JACOBS:  Okay.  If you will flip, Bob,

15  to page 6430.  And, Trace, it'll be about six pages

16  in, I guess, five or six pages.  And, Bob, if you

17  can expand that middle section with the numbers

18  there.

19         MS. ABSTON:  Hold on.  We're going to try

20  to locate that page.  Okay.  We found it.

21     Q.  Great.  So this looks like to me,

22  and I don't know -- can you tell me, is this a

23  summary of the contraband that CNET would have

24  seized over a period of time?

25     A.  Probably --

1         MS. ABSTON:  Objection to form.

2         THE WITNESS:  Sorry.

3         MS. ABSTON:  You can answer.

4     A.  Probably year to date would be my guess

5  just based on the amount.

6     Q.  Okay.  And when you say year to date, are

7  we talking year as in calendar year, January to July

8  of 2021?

9     A.  Yes, ma'am.

10     Q.  Okay.  And it looks to me that

11  methamphetamine was by far the most seized drug in

12  terms of weight, correct?

13     A.  Well, yes.

14     Q.  And when it refers to counterfeit pills,

15  do you know what it is referencing in particular?

16     A.  I do not.

17     Q.  Okay.  And do you know what that num- --

18  I assume -- well, it says at the top the number is

19  weight, so that would be 16 pounds of counterfeit

20  pills.  Is that correct?

21     A.  That would be odd for them to do pills in

22  pounds.  It could be, but generally that's grams and

23  kilograms.  So I don't know -- I didn't put this

24  together, so I can't tell you.

25     Q.  Okay.  Yeah, that's what I wasn't sure,

1  some of this, whether it was all weight or if it

2  had -- had different amounts listed there.

3         So -- but just to be clear, counterfeit

4  pills would not include drugs that were dispensed

5  from pharmacies.

6         MS. ABSTON:  Objection, form.

7     A.  Correct.

8     Q.  And there are no pharmaceutical drugs

9  listed on this list, are there?

10         MS. ABSTON:  Objection to form.

11     A.  No, ma'am.

12     Q.  Okay.  If you can go just a couple pages

13  further, there are a couple of charts.  Right there,

14  Bob.  You can stop there.  The document at the top

15  says "Meth and Fentanyl Seizure Trends," and the

16  Bates number is -- at the bottom is

17  Tarrant_00836432.  Sorry.  Okay.

18         So, Trace, I'm just going to ask, can you

19  tell what these charts are showing or is this a --

20     A.  I have no idea what this was supposed to

21  show.

22     Q.  Okay.

23     A.  I can't make heads or tails of it.

24     Q.  Okay.  All right.  Me neither.  But

25  whatever it is, it's tracking obviously

Page 82

1 methamphetamine and fentanyl, correct?
2     A.  Yes, ma'am.
3     Q.  All right.  If you can go just a couple
4 more pages further.  There.  You can stop there,
5 Bob.  The graph is "Overdose Deaths in Tarrant
6 County."  The Bates number is Tarrant_00836434.
7         And is this reflecting overdose deaths
8 from looks like January of 2018 to April of 2021?
9     A.  That's what it appears.
10     Q.  All right.  Is there any way on here to
11 distinguish between what is marked as
12 fentanyl-related deaths versus other overdose
13 deaths?
14     A.  It might have been if it was in color.
15 I can't tell.  Obviously this is in black and white
16 and it looks like at the bottom there's a --
17 possibly a color for fentanyl-related deaths and
18 another -- I'm not sure.  I can't -- just the way it
19 is here, I can't tell.
20     Q.  Sorry.  That was a bad question anyway.
21 So it appears to be, if you look, there's a color.
22 And I understand it's black and white.  It's kind of
23 darker gray and lighter gray on here.  It references
24 fentanyl-related deaths as one color and possibly
25 another color as overdose deaths, correct?

Page 83

1     A.  Yes.
2     Q.  And my question is, are you able to tell
3 me -- obviously fentanyl deaths are given their own
4 color, and overdose deaths are given a separate
5 color.  Do you know what the other overdose deaths
6 includes?
7     A.  I do not.
8     Q.  Okay.  If you will just go a couple more
9 pages further to 6436.  Right there, Bob.  The Bates
10 number is Tarrant_00836436.  And this has a picture,
11 "Lethal dose of fentanyl and M30s."
12         And it also mentions carfentanil.  What is
13 that?
14     A.  I can't remember the exact definition, but
15 I think it's for like an elephant tranquil- -- I
16 can't remember.  I know it's more powerful than
17 regular fentanyl.  That's all I can tell you right
18 now.
19     Q.  Okay.  Do you know why CNET was making
20 this comparison, put together this slide here?
21     A.  That was taken from the DEA website
22 directly.  I've seen that on the DEA's web page.
23     Q.  And in terms of --
24     A.  I think it -- I'm sorry.
25     Q.  I'm sorry.  Go ahead.

Page 84

1     A.  I think it was just to give the viewer or
2 audience a perspective on how little of the drug it
3 takes to kill you.
4     Q.  Okay.  Is it fair to state that fentanyl
5 is more lethal than heroin?
6     A.  I'm not a doctor.  I'm not a hundred
7 percent sure.
8     Q.  All right.  In any event, this slide does
9 not talk about prescription opioids, correct?
10     A.  No, it does not.
11     Q.  And is that because in 2021 drugs such as
12 these illegal drugs were the problem in Tarrant
13 County?
14         MS. ABSTON:  Objection to form.
15     A.  They were definitely the target of our
16 group and remain a target of our group.
17     Q.  Okay.  You can put that document aside.
18 And we can go to Tab 7.  That will be in your
19 notebook.  And we'll mark that as Exhibit 9.
20         (Exhibit 9 marked)
21     Q.  Just tell me when you're there.
22     A.  I'm there.
23     Q.  Okay.  Do you recognize this?
24     A.  I can't really tell what the photo is.
25 I'm sure just based on the date that I was aware of

Page 85

1 this investigation, but I -- you know, it kind of
2 blends in with a whole lot of other ones.
3     Q.  Okay.  This document, it looks like it's
4 some sort of internal update or release because it
5 says "Not for immediate release."  So do you know
6 who this would have been distributed to?
7     A.  I would assume Chief Bond.
8     Q.  All right.  And this references -- again,
9 we've got more acronyms here.  On the second line it
10 talks about this being an OCDETF investigation.  Do
11 you know what that is?
12     A.  I haven't studied that in a minute.  It
13 seems like it's organized crime -- I don't remember
14 what it means, but it's generally a federal
15 investigation that we assist with.
16     Q.  Okay.  And this references that it took
17 place, at least the surveillance took place in west
18 Tarrant County, correct?
19     A.  It doesn't really say that.  It just says
20 it happened on west -- oh, I guess it does say that
21 up there.  Yes, it does.
22     Q.  Okay.  And so you were employed at CNET at
23 this time.  Do you recall if you were personally
24 involved in this investigation?
25     A.  I don't.

22 (Pages 82 - 85)

Page 86

1    Q.   And in the course of your position at
2  CNET, you would -- would you have gone out on an
3  investigation like this personally, or is that
4  something that the other officers would do?
5    A.   The other guys would handle that,
6  normally.  And back then, we were staffed a little
7  better than we are now, and so they had plenty of
8  help probably.
9    Q.   Okay.  And it looks like it was a traffic
10  stop which yielded seizure of the following
11  contraband, and there's a bullet point list of stuff
12  there.  It includes, among other things, heroin,
13  fentanyl, and then also MDMA.  And I apologize if I
14  already asked you.  I can't recall.  What are MDMA
15  capsules?
16    A.   Ecstasy.  Again --
17    Q.   That's right.
18    A.   -- I can't remember the chemical name.
19    Q.   I thought we'd already talked about that.
20  All right.
21        In any event, there is no mention of
22  prescription opioids on this list, correct?
23        MS. ABSTON:  Objection to form.
24    A.   Correct.
25    Q.   And in the course of your time at CNET, is

Page 87

1  this sort of typical of a seizure that might take
2  place by your officers or the OCDETF?
3        MS. ABSTON:  Objection to form.
4    A.   I can't speak to the OCDETF part of it,
5  but yes, this is a pretty common size seizure for my
6  unit.
7    Q.   Okay.
8    A.   Although not typically traffic stops.
9  They're more typically search warrants of
10  residences.
11    Q.   All right.  Okay.  You can put that
12  document aside, and would ask that you go to Tab 2
13  in the notebook which we will mark as Exhibit 10.
14        (Exhibit 10 marked)
15    Q.   And for the record, it's Tarrant_00706085.
16  Again, this is an email, so you may have to look
17  from the bottom up.  Actually the second page up.
18  If you just want to take a look and tell me if you
19  recognize this.
20    A.   Yes, it does look familiar.
21    Q.   Okay.  Just have a number of questions
22  here.  Who is -- is it Jorge Ramirez?
23    A.   George (phonetic).
24    Q.   Jorge.  Okay.  Who is Jorge?
25    A.   He was a TFO from Mansfield.  He has since

Page 88

1  went back to full-time Mansfield work and we have
2  him replaced.
3    Q.   Okay.  And then this document, and I'm on
4  the second page, the original email, there are a
5  number of terms I want to just ask you about.
6  "Deconflicted," we already talked about that, I
7  believe.
8    A.   I want to make sure I'm looking at the
9  right place.
10        MS. ABSTON:  Hold on a second.  Let's make
11  sure we get to the right page.
12        MS. JACOBS:  Sure.
13        MS. ABSTON:  The second page, let's see,
14  of the document maybe?
15        MS. JACOBS:  Yeah, just where it says the
16  email from Jorge to Trace.
17        MS. ABSTON:  Okay.  And it ends -- Bates
18  number ends in 86?
19        MS. ABSTON:  Yes.
20    A.   Okay.  I'm there.
21    Q.   Okay.  Just starting at the top of the
22  email, I just am going to ask you about some terms
23  just to make sure I understand what I'm actually
24  reading here.
25        The first one we -- I was going to ask you

Page 89

1  about was "deconflicted," but I think we've already
2  covered that.  But can you just tell me in terms of
3  this email here what that refers to, make sure we're
4  on the same page?
5    A.   Exact same thing.  Just whenever our guys
6  call HIDTA and enter in whether it's an address, a
7  phone number, license plate, or a name to see if
8  another agency is working that target.
9    Q.   Okay.  And when you say "target," that's
10  the alleged criminal, whoever you're looking at?
11    A.   It could just be a target address.  Could
12  be a target vehicle or whatever.  It could be a
13  target phone number.
14    Q.   Okay.  In this situation looks like it
15  says on a target "Sanchez."  Fair to assume that's a
16  person?
17    A.   Sounds like a person, yes.
18    Q.   All right.  "DPS TAG unit," what is that?
19    A.   Texas anti-gang.  And it's a --
20    Q.   Anti-gang?
21    A.   Gang, yes, ma'am.
22    Q.   Okay.  And "Dallas Intelligence Unit,"
23  what is that?
24    A.   I'm not exactly sure, to be honest.  I
25  remember interacting with this group one time.  I

23 (Pages 86 - 89)

Page 90

1 don't -- we don't work with Dallas hardly ever, so
2 I'm assuming it's just an intel group, but they may
3 work narcotics. I don't know.
4    Q. All right. And then "Tango Blast" in
5 Dallas, what is that?
6    A. That's a criminal street gang.
7    Q. All right. Okay. And reading this email,
8 it looks like some details are provided, setting up
9 a planned buy between a target and a source. Is
10 that accurate?
11    A. I haven't read this whole thing. Do you
12 want me to read the whole thing real quick?
13    Q. Sure. Go ahead. Take your time. Sorry.
14    A. (Witness complies.)
15       Okay.
16       MR. KRATOVIL: Briefly, I'm going to
17 interject for just a second to note that if this
18 relates to an ongoing operation, we would like to
19 object to any line of questioning related to this.
20       MS. JACOBS: Okay.
21       THE WITNESS: I believe it's closed.
22       MR. KRATOVIL: Okay. Fair enough.
23    Q. And, Trace, while you're at it, you might
24 as well flip back to the first page which is
25 actually the two emails that follow, and they are

Page 91

1 very short. You can look at those real quick.
2    A. Okay.
3    Q. Okay. Now, this scenario that you've just
4 read here, is this typical of the types of emails or
5 requests that you may get from your officers
6 regarding planned buys?
7    A. No.
8    Q. Okay. And how is this not typical?
9    A. Because the only reason this all occurred
10 was because the amounts we were going to possibly
11 have to pay for the dope. So anything, you know,
12 significant, over, say, $5,000 -- I think
13 technically policy does say 7, but I was brand-new
14 to the job. And so that was just giving Chief Bond
15 the information and making sure he was good with us
16 possibly spending that kind of money on dope.
17 But --
18    Q. Okay.
19    A. -- at that time our imprest fund was not
20 nearly as large as it is today.
21    Q. I'm sorry. What was that last sentence?
22 Your what wasn't as large?
23    A. We didn't have as much imprest fund money
24 back then. So a $7,000 purchase would have been
25 significant out of our fund.

Page 92

1    Q. Okay. And that's the fund -- you said
2 imprest fund. Is that the moneys that you have
3 available to conduct buys like this?
4    A. Yes, ma'am.
5    Q. All right. And so it sounds like you say
6 it's atypical in the sense of the dollar amount.
7 But are you, as part of your position, asked to
8 approve buys such as this, whether it's for a
9 thousand dollars or $3,000, whatever, as part of
10 your job?
11    A. Yes, but it's not done through email.
12 It's done through ops -- well, there normally would
13 be an operational plan sent, and that's how it's
14 normally done, not in a, you know, memo type. You
15 know, there's a lot of details on here that that
16 just doesn't happen very often.
17    Q. Okay. And this looks like this planned
18 buy, this deal, deals with methamphetamine from
19 Mexico. Is that correct?
20    A. Yes.
21    Q. And is this what you would consider a
22 large amount?
23    A. Mid, mid-sized, not really that large.
24 5 kilos isn't -- I mean, we wouldn't turn it away,
25 but that's -- we want bigger than that.

Page 93

1    Q. All right. Do you remember over the
2 course of your two-plus years now at CNET, have you
3 ever approved any organized buys regarding diverted
4 prescription opioids?
5    A. No.
6    Q. Okay. You can put that document aside and
7 just flip to Tab 3. And we will make that
8 Exhibit 11, please.
9       (Exhibit 11 marked)
10    Q. And if you just want to go ahead and take
11 a look at that.
12    A. (Witness complies.)
13       Okay.
14    Q. Okay. And this is dated November 9th and
15 10th, 2021, because there's a couple of emails here.
16 It looks like this is talking about a potential
17 press release regarding some confiscated narcotics.
18 And this doesn't refer to the planned buy we just
19 spoke of, does it?
20    A. Kind of. My recollection is that all that
21 you read about ended up turning into the
22 192-kilogram seizure you're reading about in this
23 one.
24    Q. Okay. So they could be related. All
25 right.

24 (Pages 90 - 93)

Page 94

1    And if you go to approximately the middle
2 of the page, and maybe Bob can blow it up for us, it
3 says, "These operations" -- "These operations
4 resulted in the seizure of approximately
5 451 kilograms of crystal methamphetamine and
6 192 kilograms of liquid methamphetamine or a total
7 of 1,414 pounds.  The street value of the narcotics
8 that were seized is approximately," looks like,
9 "$16 million."
10    Would you consider this to be a large
11 amount of methamphetamine?
12    A.  Absolutely.
13    Q.  Okay.  And there were no diverted
14 prescription opioids seized, correct?
15    A.  Not that I recall.
16    MS. JACOBS:  All right.  You can put that
17 document aside.  And we've been going for about an
18 hour again.  If you want to take a quick break, and
19 we can go off the record and talk about how we want
20 to proceed.
21    MS. ABSTON:  Yeah, let's do that.
22    THE VIDEOGRAPHER:  Okay.  Current time is
23 12:20 p.m.  We're now off the record.
24    (Recess from 12:20 to 12:40)
25    THE VIDEOGRAPHER:  Current time is

Page 95

1 12:40 p.m.  We're now back on the record.
2 BY MS. JACOBS:
3    Q.  All right.  Trace, do you have any
4 understanding of what the mission of CNET is?
5    A.  I can't quote to you exactly what it says
6 in policy, but it's basically just to identify,
7 disrupt, and dismantle drug trafficking
8 organizations, to assist patrol and other Tarrant
9 County agencies with the investigation of narcotics.
10    Q.  Do you know when CNET started?
11    A.  So you can get -- you'll get two answers
12 for that.  It existed under other names supposedly
13 since the 1980s.  Prior to being put under the
14 sheriff's office, it actually was ran under the
15 Tarrant County DA's office.  And it was still under
16 Dee Anders- -- now, this is all more or less
17 hearsay, right?  I've heard all this.  I wasn't here
18 during that time.  But before Sheriff Waybourn took
19 office, the DA's office, Sharon Wilson, didn't want
20 to be over the task force anymore and so it was
21 transferred, if you will, to the sheriff's office
22 and it was renamed CNET and formed sometime before
23 2017.  I don't know the exact date.
24    Q.  Okay.  Was there any break in period of
25 time of its existence no matter what name it was

Page 96

1 known under, or has it always been in existence
2 since the Eighties?
3    MS. ABSTON:  Objection to form.
4    A.  I'm not sure.
5    Q.  Okay.  But it's your understanding that it
6 has been functioning as CNET since about 2017?
7    A.  Yes, ma'am.
8    Q.  And since that time -- we talked just a
9 little bit earlier about the budget, but let me just
10 ask you generally if you know.  Does CNET receive
11 any grants?
12    A.  We don't.
13    Q.  So --
14    A.  I don't know if they have in the past, but
15 we certainly have not in the last several years.
16    Q.  Okay.  So since you've been there for --
17 since 2021, you have not received any grants,
18 correct?
19    A.  No, ma'am.
20    Q.  Has CNET applied for any grants since you
21 have been there?
22    A.  No.
23    Q.  And I know you told me earlier about the
24 makeup of CNET in terms of you, the lieutenant,
25 et cetera.  How many total employees including

Page 97

1 administration does CNET currently have?
2    A.  I was thinking about this.  I want to say
3 14, but if you'll let -- can I work it out in my
4 head right here with you?
5    Q.  Yeah, that's fine.
6    A.  So there's me, the lieutenant, the
7 sergeant.  I've got -- of course, we're not full.
8 We have one vacancy.  But currently, right this
9 moment, we have three investigators.  We have one
10 vacancy.  We have -- so I'm going to go ahead and
11 count that vacancy.  Two K-9 handlers, two assigned
12 to federal task forces, and two admins.  So I think
13 that's 14.  I wasn't -- I don't have enough fingers.
14    Q.  Okay.  And when you say there's a vacancy,
15 what kind of a vacancy is that?
16    A.  I have an investigator opening that I
17 haven't been able to fill since I've been there.
18 We've been running with three instead of four.
19 Well, and I say that.  I do have an investigator
20 that he is an investigator, but he really just does
21 asset forfeiture, but he would be -- he would count
22 as an investigator.  So that would be the five there
23 at the office, two out at the fed task forces, if we
24 were full.
25    Q.  Okay.  So that investigator that's vacant,

25 (Pages 94 - 97)

Page 98

1 would that be somebody from the Tarrant County
2 Sheriff's Department, or would that be one of the
3 TFOs?
4     A.  No, that's somebody that works for the
5 sheriff's office.  And I'm not including the
6 Mansfield guy.  That would be, you know, in addition
7 to.
8     Q.  Okay.  That was going to be my next
9 question.  So what you've just laid out are the
10 individuals that are funded by Tarrant County
11 Sheriff's Office.  Is that correct?
12     A.  Yes, ma'am.
13     Q.  Okay.  So -- and then right now you
14 currently have the one TFO?
15     A.  Yes, ma'am.
16     Q.  All right.  Since you've been there in the
17 past two years, what is the highest number of TFOs
18 you've had?
19     A.  One and a half, sadly.
20     Q.  Okay.
21     A.  We had a part-timer from River Oaks, and
22 then we've -- Mansfield has always been a good
23 partner for us.
24     Q.  Okay.  Do you know how many they had at
25 their highest number before you were part of CNET?

Page 99

1     MS. ABSTON:  Objection, form.
2     A.  It would be a guess, but I'm going to say
3 around five.
4     Q.  Okay.  Ideally, the way I understand -- or
5 let me start over.  The way I understand CNET works,
6 there are opportunities for a TFO to come from the
7 various departments in your area.  So ideally, how
8 many officer -- how many TFOs would you have working
9 at CNET?
10     A.  I would like to fill every desk in the
11 office.  So right now, because human trafficking has
12 moved in, I've got room for five and I would love to
13 have five.
14     Q.  Okay.  And obviously some departments are
15 not participating in CNET right now.  Do you have
16 any understanding why they are not participating?
17     A.  They -- all -- I've met with the majority
18 of the police chiefs in Tarrant County, and most
19 have said that whenever they get their staffing to a
20 certain percentage, they would love to participate.
21     Q.  Okay.  Now, at the Tarrant County
22 Sheriff's Office, outside of CNET, I know we went
23 through all the different divisions at the sheriff's
24 department.  Are there any other departments that
25 are dedicated to handling narcotics?

Page 100

1     A.  No.
2     Q.  Okay.
3     A.  And I will add this.  Patrol obviously
4 initiates a lot of cases for us.  Like they get a
5 traffic stop, they get drugs in the car, the person
6 wants to work, CNET gets involved.  So, you know, in
7 that way, yes, but not a dedicated narcotics unit.
8 We are the unit for that.
9     Q.  Okay.  All right.  Next, if you can go
10 back to your notebook, and I will refer you to,
11 please, Tab 4.  And I believe that will be
12 Exhibit 12.
13         (Exhibit 12 marked)
14     Q.  Are you there?
15     A.  Yes, ma'am.
16     Q.  Okay.  Do you recognize this?
17     A.  I do.
18     Q.  What is it?
19     A.  It's just our monthly and quarterly
20 activity report, stat sheet.
21     Q.  Okay.  And so is this something that
22 CNET -- at first glance it looks like maybe
23 something that you prepare quarterly, but you
24 mentioned monthly.  How often is this prepared?
25     A.  It's done every month.

Page 101

1     Q.  Okay.  Is there anywhere on here that I
2 can see if this is a monthly report, or is this a
3 summary of the monthly reports made quarterly?
4     A.  I don't know -- so whenever I ask for --
5 I ask for this every month so that whenever I go to
6 the staff meeting on the first Wednesday of the
7 month, I ask for this document from my admin.  And
8 it will show -- it's a different form of this.  I
9 don't know actually that I've seen it in this exact
10 form, but I think that all the data is the same.
11 This is just a true quarterly one.
12     Q.  Okay.  Is there any way by looking at this
13 to tell how far this goes, is this -- which quarter
14 this goes through?
15     A.  It appears, based on there's no data for
16 the fourth quarter, so just through the end of
17 the -- I don't know when this was printed.  I have
18 no idea.  So in this form, I can't tell you.
19     Q.  Okay.  Because I would agree with you that
20 on the first page, it looks like there's no data for
21 the fourth quarter.  And on the second page, it
22 looks like there's no data for the fourth quarter.
23 But then when you go to the third page, it looks
24 like there is a little bit of -- a couple cells
25 filled in with some data for the fourth quarter.

26 (Pages 98 - 101)

Page 102

1      Do you see that?
2      A.  I do, and I'm not sure why.  I didn't
3  prepare this.
4      Q.  Okay.  I understand.  But based on what
5  you do see, does it look like this is at least
6  current -- or not current, but at least goes through
7  the third quarter?
8      A.  I would say that's accurate.
9      Q.  Okay.  Now, I'm going to -- if you can
10  flip back to the first page of it again.  And where
11  it says -- the first section at the top, it's
12  headered -- the heading is "Participating Agencies
13  and Personnel."
14      A.  Yes.
15      Q.  You see that?
16      A.  Uh-huh.
17      Q.  Okay.  And there is a section that says
18  "TCSO Investigators," and it lists five.  And would
19  that be the individuals that we just spoke of that
20  are employees of the sheriff's office?
21      A.  Yes.
22      Q.  Okay.  And obviously the same with the
23  K-9s.  And then I see at the bottom where it's the
24  Mansfield investigator is noted.  But then at the
25  top, there's a section that says "TCDA

Page 103

1  Investigators."  And there's a zero there, but what
2  does that refer to?
3      A.  Tarrant County DA's office.  And they --
4  prior to my being in the office or in the unit,
5  there used to be -- and I don't recall his name, but
6  there was an individual who worked over there with
7  us doing the same thing as my guy who does the asset
8  forfeiture stuff.  And he retired, and the other guy
9  was hired prior to my arrival.
10      Q.  Okay.  So if we add up at the top here
11  participating agencies and personnel.  And just --
12  I'm just trying to understand what this means.  So
13  let's just look at the first quarter for now.  It
14  looks like there are five TCSO investigators, two
15  K-9s, and the one Mansfield investigator, so for a
16  total of eight.  Correct?
17      A.  That appears to be what it's saying, but I
18  don't know of a time that we've ever had six since
19  I've been there.
20      Q.  Okay.
21      A.  Unless she's counting the fed guys, which
22  I don't know, to be honest, if she -- I don't think
23  she normally counts them.
24      Q.  Okay.
25      A.  I would love to have six though.

Page 104

1      Q.  All right.  Well, we'll work with what we
2  have here now that shows the number eight that I
3  just reflected to you.
4      If you go down to the second section of
5  the chart, it says "Narcotic Investigators
6  Activity."  And if you look where it says "Full-time
7  Investigators" -- and again, I'm just looking at
8  first quarter just so I can understand the chart.
9      A.  Okay.
10      Q.  It says eight.  So is that eight, is that
11  referring to the total of investigators from above?
12      A.  Let's see.  Five, six, seven -- yeah,
13  she's counting K-9s and everything in that.
14      Q.  Okay.  And then looking at "New Cases
15  Assigned," it says for the first quarter 69, for the
16  second quarter 45, for the third quarter 74.  And
17  that would be exactly what it says, cases that you
18  guys were assigned and worked on during that
19  quarter?
20      A.  Correct.
21      Q.  And understanding the way the criminal
22  justice system works, where it goes down below and
23  it says "Cases Closed," first quarter it says 87 --
24  I think that says 87, yeah -- and second quarter 63,
25  third quarter 62, obviously you might handle a case

Page 105

1  in a quarter that isn't closed till a later quarter,
2  and that's why those numbers are different, correct?
3      A.  That would be correct.
4      Q.  All right.  Okay.  If you can go to the
5  last page on the same document.
6      A.  Ending in 101?
7      Q.  Yes.  And I'm sorry.  It starts on the
8  bottom of page 100.  The heading starts below, on
9  the bottom of page 100.  It says, "Commonly Abused
10  Pharmaceuticals."  And then go to the next page.
11      A.  Yes, ma'am.
12      Q.  Okay.  Are you able to tell me which of
13  these are opioids?
14      A.  Well, I think -- you know, I don't know
15  all of --
16      MS. ABSTON:  Wait.  Objection to form.
17      Go ahead.
18      A.  I can take a guess.  I mean, some I
19  absolutely know.  Some I don't.  You know,
20  alprazolam, I think that's an opioid.  All -- I
21  think all the "pams" are.  Hydrocodone for sure.
22  Tramadol is not.  Lorazepam, I think, is.  Oxycodone
23  is.  Codeine I'm pretty sure is.  That's my guesses
24  at it.  And I didn't look up the chemical makeup of
25  any of these, so I don't know.  I would not say that

27 (Pages 102 - 105)

1 pharmaceutical things are my expertise by any means.
2    Q.  Okay.  And it looks like, if you flip back
3 to the page before, it looks like just in terms of
4 dollar amounts and amounts seized, it looks like
5 you're dealing with more, again, of the marijuana
6 and -- sorry, I can't read -- and fentanyl.  Is that
7 correct?
8        MS. ABSTON:  Objection to form.
9    A.  There is definitely more marijuana.
10 Fentanyl still is a pretty low amount compared to
11 the other drugs.
12    Q.  Okay.  And I missed at the top, of course,
13 methamphetamine and cocaine and heroin, correct?
14    A.  Yes.
15    Q.  Okay.  Okay.  You can put that document
16 aside.  And just to finish that off, you don't need
17 to get the document back out, but are those activity
18 reports still something that are prepared then in
19 your office that you use?
20    A.  Yes, ma'am.
21    Q.  All right.
22    A.  And I look at them a lot closer now
23 because I do the briefings at the monthly staff
24 meeting.
25    Q.  Okay.  Okay.  If you will go to looks like

1 Tab 10, and we'll mark that as Exhibit 13.
2        (Exhibit 13 marked)
3    Q.  And do you recognize this document?
4    A.  Not --
5        MS. ABSTON:  Take your time and look
6 through the whole document.
7    A.  Yeah, not yet.  I'm sorry.
8    Q.  That's fine.
9    A.  (Witness reviews document.)
10        MS. ABSTON:  Can we go off the record for
11 a moment?
12        MS. JACOBS:  Yes.
13        MS. ABSTON:  Thank you.
14        THE VIDEOGRAPHER:  Current time is
15 12:58 p.m.  We're off the record.
16        (Off record from 12:58 to 1:05)
17        THE VIDEOGRAPHER:  Current time is
18 1:05 p.m.  We're now back on the record.
19 BY MS. JACOBS:
20    Q.  Okay, Commander, after that short break
21 let's move on for now to another document.  And if
22 you could just flip to Tab 6 in the notebook, and it
23 will be marked as Exhibit 14.
24        (Exhibit 14 marked)
25    Q.  And do you recognize this?

1    A.  I do.
2    Q.  Okay.  What is it?
3    A.  This is the note, kind of notes, if you
4 will, that I type up on a monthly basis to go talk
5 to the command staff about what we did.  And I get
6 this information directly from the stat sheet which
7 you've already seen.
8    Q.  Okay.  And command staff, who is that?
9    A.  All the chiefs and captains and directors.
10    Q.  The -- when you say chiefs, captains, and
11 directors, are you meaning in the county or just the
12 sheriff's --
13    A.  Tarrant County Sheriff's Office.
14    Q.  Okay.
15    A.  Command staff.  They -- the commands --
16 the chiefs, one stars, two stars, three stars, and
17 the sheriff meet every Wednesday.  The first
18 Wednesday of every month the commanders, directors,
19 and captains are required to attend as well.
20    Q.  Okay.  So on the first Wednesday of every
21 month, you would attend that meeting and take with
22 you a report like this?  Is that correct?
23    A.  Yes.  And it's not -- I don't -- I don't
24 generally give it away.  It's just for me to be able
25 to read to the group.

1    Q.  Okay.  And are the numbers on the left
2 side, for example, "2-5," is that a date?
3    A.  Yes, which I don't even do that anymore.
4 I've started to just do totals.  All I'll do is say
5 during this month we seized X amounts of these
6 drugs, this much money, this many arrests, open
7 cases.  I don't -- I don't know why.  I just kind of
8 morphed away from doing it like this.
9    Q.  Okay.  And I will direct your attention
10 down to the one that says "2-11."  And it says, "UC
11 buy/walk Soria of 1000 M30s and 4 hydrocodone
12 (Soria).  CI buy/walk (Cooke) 1 ounce of cocaine."
13    A.  Yes.
14    Q.  Do you see that?  Can you tell me what
15 that all means?
16    A.  It means that Investigator Soria, which I
17 don't think we're supposed to be talking names --
18        MS. ABSTON:  Do we want to go off the
19 record for a moment?
20    A.  He's leaving the unit, so if y'all are --
21 and the other guy's already gone.  So you tell me.
22        MS. ABSTON:  Let's just take a five-minute
23 break really quick just to confirm.
24        MS. JACOBS:  Okay.
25        THE VIDEOGRAPHER:  Current time is

Page 110

1  1:08 p.m.  We're off the record.
2        (Recess from 1:08 to 1:13)
3      THE VIDEOGRAPHER:  Current time is
4  1:13 p.m.  We're now back on the record.
5      MS. ABSTON:  Okay.  So as to Defense
6  Exhibit 13 and Defense Exhibit 14, both of those
7  pertain to ongoing law enforcement endeavors and
8  ongoing law enforcement measures, so we reserve the
9  right to issue a clawback and we will not be
10  discussing any of those exhibits today.
11      MS. JACOBS:  Okay.  And, Alex, I
12  understand.  Thank you for getting back to us so
13  quickly on that and confirming, and we'll just
14  reserve all objections and potential questioning
15  later if it becomes necessary.
16      MS. ABSTON:  Thank you.
17  BY MS. JACOBS:
18    Q.  Okay.  Let me just take a look here and
19  get organized.  Okay.  I don't think we're going to
20  have any problems with the next couple here, but
21  let's take a look.  Tab 14.  And if you could just
22  when you get there, we'll mark this as Exhibit 15.
23        (Exhibit 15 marked)
24    Q.  And actually, while you look, if you could
25  go ahead and look at Tabs 14, 15, and 16.  And

Page 111

1  they're each just a couple documents.  And tell me
2  after you look at them if they all go together, go
3  with that email actually.
4      MS. ABSTON:  Okay.  I just want to put on
5  record, I believe that Tab 16 doesn't have a Bates
6  number on it.
7      MS. JACOBS:  Correct.  That's the way we
8  received it, and that's why I wanted -- if he could
9  tell by looking at Tab 14, 15, if it looks like 16
10  goes with that email.
11      MS. ABSTON:  Thank you.
12    A.  This is weird.  So you got that, a blank
13  page, and then -- okay.  So --
14      MS. ABSTON:  Just to clarify, Diana,
15  you're meaning he's trying to detect if these were
16  attached to the document that you're referring to in
17  Tab 14?
18      MS. JACOBS:  Yeah.  Just to be clear,
19  Tab 14 is an email that it looks like was authored
20  by Trace McDonald.  And Tab 15 is a Bates number
21  that follows in succession Tab 14.  So it's probably
22  likely that one goes with it.
23        And then Tab 16, this is the way we
24  received it, with no Bates number.  And I just want
25  to know if he can tell, since he authored the email,

Page 112

1  if both Tab 15 and 16 go with Tab 14.
2    A.  The --
3      MS. ABSTON:  Do you want to pull them out?
4  We can get them out.
5    A.  No, I've looked at them pretty good.  The
6  only -- the only thing that makes me -- so it was
7  sent -- sent on the 22nd.  I don't think this is
8  right because it would have been 2020 -- this is --
9      MS. ABSTON:  Is that the name of one of
10  these attachments maybe?
11      THE WITNESS:  Maybe.
12      MS. ABSTON:  Maybe, because that says 2022
13  though.  You're right.
14    A.  So if this one -- if this email was sent
15  in January 2022, it would have to be talking about
16  2021 stats.  So -- and this overdose report just has
17  the first, second, and third quarter.
18        So maybe that's a typo on my part that
19  should have been 2021 on the top.  I find it hard
20  that I would have done that.  But if it was sent
21  with this email -- oh, I bet I know why I did it,
22  because it was already 2022 even though it was
23  talking about 2021.  So I bet that -- so I'm going
24  to say yes, it does belong there.  It just actually
25  for some knuckleheaded reason I put 2022 instead of

Page 113

1  2021 on the title.
2    Q.  Okay.  I understand.  All right.  If you
3  go back to the first -- the email, sorry, which was
4  Tab 14, and look down at the bottom.  You say,
5  "Chief, Please see attached stats for the annual
6  report."  And then you go on to say, "Also, I
7  included the major drugs rather than clouding up the
8  document with all the smaller obscure drugs without
9  significant weight."  Do you see that?
10    A.  I do.
11    Q.  Okay.  All right.  Now, if we go to
12  Tab 15, I think you've already said that you
13  prepared this, correct?
14    A.  Yes.
15    Q.  Okay.  All right.  And looks like there
16  were a total of 240 cases.  And for purposes of this
17  question, we'll assume that this is referring to
18  2021, correct?
19    A.  Yes, ma'am.
20    Q.  All right.  There's no mention on here of
21  any prescription opioids being seized.  Is that
22  correct?
23    A.  Yes, by design.
24    Q.  Okay.  Can you explain that?
25    A.  Like I said in the email to the chief,

29 (Pages 110 - 113)

Page 114

1 it's just such a small amount of those drugs that
2 it's not worth mentioning, in my opinion.
3    Q.   Okay.  And again, assuming this document
4 is referring to 2021 statistics, it looks like the
5 main drugs were, again, methamphetamine, marijuana,
6 fentanyl, heroin, cocaine.  Is that correct?
7    A.   Yes, ma'am.
8    Q.   Okay.  You can put that document aside.
9       Now, Tab -- I'm sorry.  Go back to the
10 Tab 16, the graph, the overdose deaths in Tarrant
11 County.  This one is -- this one should be in color?
12    A.   This one is -- yes, ma'am, it is in color.
13       MS. JACOBS:  Okay.  Maybe if Bob could put
14 that up on the screen for my benefit because the one
15 in my notebook's really small, so -- thank you.
16    Q.   Okay.  Is this something that you would
17 have prepared, or did somebody else prepare this?
18    A.   Sergeant Rodriguez would have prepared
19 this with information that he got from the medical
20 examiner's office.  I should probably clarify
21 something if you'd give me a moment.
22    Q.   Yes.
23    A.   Okay.  So whenever you see this, the
24 overdose deaths in Tarrant County, keep in mind that
25 the Tarrant County Sheriff's Office, while we have

Page 115

1 countywide jurisdiction, our law enforcement
2 response is mostly limited to the unincorporated
3 areas of Tarrant County, which, to be honest, are
4 really small.  We have a small area up in the
5 northern Tarrant County, small area in southern
6 Tarrant County.  And then, you know, of course
7 there's everything in the middle which is your
8 Arlington, your Fort Worth, the mid-cities, all
9 those.
10       So whenever you see this report, this data
11 came from the Tarrant County ME's office which is
12 going to include ODs from all these other
13 jurisdictions that we had no investigative part in.
14 I just wanted to make that clear to you.  So even
15 though there might have been, you know, 24 OD deaths
16 in third quarter 2021, that by no means means that
17 the Tarrant County Sheriff's Office was involved in
18 any of them.
19    Q.   Okay.
20    A.   That make sense?
21    Q.   Yes, it does.  So this, though, is a
22 fair -- to the extent you know, this is an accurate
23 representation of data that comes from the ME's
24 office of the total overdose deaths in Tarrant
25 County, which might include the ones -- which should

Page 116

1 include the ones that the sheriff's office took part
2 in but also includes all others, correct?
3       MS. ABSTON:  Objection, form.
4       You can answer.
5    A.   Yes.
6    Q.   Okay.  And again, we have fentanyl
7 highlighted on here, correct?
8    A.   Yes, ma'am.
9    Q.   As its own category.  And then the
10 other -- the blue is just labeled "OD Deaths."
11       And do you know what that includes?
12    A.   I don't.
13    Q.   Okay.  Okay.  Now you can put that aside.
14 Thank you.
15       CONCIERGE:  Were we marking 15 and 16,
16 Tab 15 and 16?
17       MS. JACOBS:  You can mark those with
18 whatever the exhibit was that we said, Exhibit --
19       CONCIERGE:  14A and -- it's 14A and B.
20       MS. JACOBS:  I'm sorry.  Was it a -- yeah,
21 my exhibits got messed up because we skipped one
22 there.  So should be -- was it Exhibit 14 would be
23 Tabs 14, 15, and 16 collectively?
24       CONCIERGE:  Sorry.  Yeah, Tab 14 was
25 Exhibit 15, what I have.

Page 117

1       MS. ABSTON:  Yeah, because even though you
2 marked Exhibit 13 and Exhibit 14, but we're going to
3 take those off the record at the end.
4       MS. JACOBS:  Okay.
5       MS. ABSTON:  So when you say the Tab 14 is
6 now Exhibit 15, Tab 15 is Exhibit 16, and Tab 16 is
7 Exhibit 17?  Is that right?
8       MS. JACOBS:  Well, since he has confirmed
9 that those should all go together, I would like them
10 to just be one exhibit.
11       MS. ABSTON:  Okay.  That's fine.  So all
12 of them are going to be marked as Exhibit 15?
13       MS. JACOBS:  Yes.
14    Q.   Okay.  I do not have a document to show
15 you about this.  I just want to ask you if you are
16 familiar with a pill mill investigation and
17 prosecution known as Operation Wasted Daze, as in
18 D-A-Z-E.
19    A.   I'm not -- that doesn't ring a bell to me.
20    Q.   Okay.  All right.  I have some just
21 general questions, and I think for now we're done
22 with documents.  Commander, over your long career in
23 law enforcement, do you ever recall participating in
24 a law enforcement action relating to a pharmacy or
25 pharmacist?

30 (Pages 114 - 117)

1    A.  Are you finished?

2    Q.  Yes, sir.

3    A.  I don't guess I necessarily under- -- I
4 mean, as we've spoken earlier, yes, I have talked to
5 pharmacists on the investigations back in 2003.

6    Q.  Right.  But other as talking to a pharmacy
7 or pharmacist as what I'm just going to phrase for
8 our purposes as a cooperating entity or witness in
9 your investigation, have you ever participated in
10 any law enforcement action which would relate to or
11 maybe target a pharmacy or pharmacist?

12       MS. ABSTON:  Objection to form.

13    A.  I don't recall one, no.

14    Q.  Okay.  And along the same lines, over your
15 long career in law enforcement, do you ever recall
16 you or anyone that you worked with responding to
17 investigate a pharmacy or pharmacist for any
18 wrongdoing relative to the dispensing of
19 prescription medications?

20       MS. ABSTON:  Objection, form.

21    A.  I don't recall any.

22    Q.  And again, other than a couple instances
23 where you talked to a pharmacy or pharmacist as a --
24 as part of an investigation into something else, do
25 you have any information to offer relative to any

1 investigation or any law enforcement response in any
2 aspect with regards to a pharmacy or pharmacist?

3    A.  Not that I can recall.

4    Q.  And as we sit here today, you don't have
5 any information to indicate that any pharmacy that's
6 a defendant in this case was involved in
7 participating in any kind of diversion?

8    A.  I don't.

9    Q.  Do you ever recall a time when an
10 operation or effort was proposed by CNET or the
11 Tarrant County Sheriff's Office relative to
12 prescription opioids?

13    A.  Prescript- --

14       MS. ABSTON:  Objection to form.

15    A.  No, I don't recall any -- ever targeting
16 those in my last two years.

17    Q.  Okay.  Do you have any information to
18 provide as we sit here today whether Tarrant County
19 has faced a prescription opioid medication problem?

20    A.  Could you say that one more time?

21    Q.  Sure.  As we're sitting here today, do you
22 have any information to provide in this case as to
23 whether Tarrant County has faced a prescription
24 opioid medication problem?

25    A.  I have no personal information, no, ma'am.

1    Q.  Do you have any information to provide in
2 this case relative to any effect of prescription
3 opioids on Tarrant County's citizens or the county's
4 budget?

5    A.  I guess I'm getting tired.  Can you say
6 that one more time?

7    Q.  Sure.

8    A.  I'm trying to hear every word you're
9 saying, and I'm having to close my eyes to do it.

10    Q.  We're getting close to the end, so I
11 understand.

12       Do you have any information to provide in
13 this case relative to any effect of prescription
14 opioids on Tarrant County's citizens or the county's
15 budget?

16    A.  I don't.

17       MS. JACOBS:  All right.  Alex, if we could
18 just take maybe ten minutes, and we can probably
19 wrap up shortly after that.

20       MS. ABSTON:  Yes, sounds good.

21       MS. JACOBS:  Thank you.

22       THE VIDEOGRAPHER:  Current time is
23 1:28 p.m.  We're off the record.

24          (Recess from 1:28 to 1:35)

25       THE VIDEOGRAPHER:  Current time is

1 1:35 p.m.  We're now back on the record.

2 BY MS. JACOBS:

3    Q.  Commander, I certainly appreciate your
4 time today, and I think I just have a couple more
5 questions just to wrap up here.

6       Do you have any knowledge at all of the
7 county's allegations against the pharmacies in this
8 case?

9    A.  No, ma'am.

10    Q.  And do you have any knowledge as to
11 whether the county's allegations against the
12 pharmacies in this case are accurate?

13    A.  I do not.

14       MS. JACOBS:  All right.  I do not have any
15 other questions right now.  I will reserve my right
16 to ask other questions depending on whether anyone
17 else has questions.

18       MS. STEWART:  This is Allison Stewart, and
19 I do not have any other questions at this time.

20       THE WITNESS:  Allison, bless your heart.

21       MS. STEWART:  Diana asked all the good
22 questions.

23       MS. ABSTON:  Okay.  I don't think that the
24 plaintiffs have any further questions today other
25 than we've put our objections on the record about

31 (Pages 118 - 121)

Page 122

1 some of the exhibits.  And thank you for giving us
2 time to check on some of those ongoing
3 investigations and being amenable for us to take a
4 moment to check on those, unless Mark has anything.
5      Mark, do you have anything?
6      MR. KRATOVIL:  I do not.
7      MS. ABSTON:  Okay.  So we just want to
8 thank you so much today for your time, and we
9 appreciate it, and your service to Tarrant County.
10      THE WITNESS:  Absolutely.
11      MS. ABSTON:  And we'll reserve everything
12 else for reading and signing.
13      MS. JACOBS:  Thank you, Commander.
14      THE WITNESS:  Thank you.  Y'all have a
15 good rest of your day.
16      MS. ABSTON:  Thank you.  You too.
17      THE VIDEOGRAPHER:  Current is time
18 1:37 p.m.  We're off the record.
19
20      (Deposition concluded at 1:37 p.m. CDT)
21           -oOo-
22
23
24
25

Page 123

1    IN THE UNITED STATES DISTRICT COURT FOR THE
          NORTHERN DISTRICT OF OHIO
2             EASTERN DIVISION
3 IN RE NATIONAL PRESCRIPTION )
   OPIATE LITIGATION          )
4                             )  MDL No. 2804
5 This Document Relates To:  )  Case No. 17-md-2804
   Track Nine: Tarrant County, )
6 Texas                )
                        )
7 (Case No. 1:18-op-45274-DAP))
   _____)
8
        REPORTER'S CERTIFICATE
9   REMOTE VIDEOTAPED DEPOSITION OF
          TRACE McDONALD
10          JUNE 28, 2023
11      I, KAREN L. SHELTON, a Certified Shorthand
12 Reporter in and for the State of Texas, hereby
13 certify to the following:
14      That the witness, TRACE McDONALD, was duly
15 sworn by the officer and that the transcript of the
16 oral deposition is a true record of the testimony
17 given by the witness;
18      I further certify that pursuant to FRCP
19 Rule 30(e) that the signature by the deponent:
20      _X_ was requested by the deponent or a
21 party before the completion of the deposition and is
22 to be returned within 30 days from date of receipt
23 of the transcript.  If returned, the attached Errata
24 contains any changes and the reasons therefor;
25      ___ was not requested by the deponent or a

Page 124

1 party before the completion of the deposition.
2      I further certify that I am neither
3 counsel for, related to, nor employed by any of the
4 parties in or counsel to this action, nor am I
5 financially or otherwise interested in the outcome
6 of this action.
7      Certified to by me this 12th day of July,
8 2023.
9
10
11      Karen L. Shelton, CSR, RDR, CRR
12      TX CSR 7050 Exp: 10/31/23
        Veritext Legal Solutions
13      Firm No. 571
        300 Throckmorton Street
14      Suite 1600
        Fort Worth, Texas 76102
15      (817) 336-3042  (800) 336-4000
16
17
18
19
20
21
22
23
24
25

Page 125

1      Veritext Legal Solutions
          1100 Superior Ave
2          Suite 1820
          Cleveland, Ohio 44114
3      Phone: 216-523-1313
4
   July 14, 2023
5
   To: ALEX ABSTON
6
   Case Name: National Prescription Opiate Litigation - Track 9 (Tarrant
7 County) v.
8 Veritext Reference Number: 5989037
9 Witness: Trace McDonald      Deposition Date:  6/28/2023
10
   Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript.  Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change.  Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
   shown
17
   above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24
25 NO NOTARY REQUIRED IN CA

32 (Pages 122 - 125)

Page 126

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 5989037
3        CASE NAME: National Prescription Opiate Litigation - Track 9
         (Tarrant County) v.
         DATE OF DEPOSITION: 6/28/2023
4        WITNESS' NAME: Trace McDonald
5        In accordance with the Rules of Civil
         Procedure, I have read the entire transcript of
6        my testimony or it has been read to me.
7        I have made no changes to the testimony
         as transcribed by the court reporter.
8        _____
9    Date            Trace McDonald
10       Sworn to and subscribed before me, a
         Notary Public in and for the State and County,
11       the referenced witness did personally appear
         and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
             Statement; and
14       Their execution of this Statement is of
             their free act and deed.
15
         I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17                        _____
18       Notary Public
19                        _____
         Commission Expiration Date
20
21
22
23
24
25
```

Page 127

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 5989037
3        CASE NAME: National Prescription Opiate Litigation - Track 9
         (Tarrant County) v.
         DATE OF DEPOSITION: 6/28/2023
4        WITNESS' NAME: Trace McDonald
5        In accordance with the Rules of Civil
         Procedure, I have read the entire transcript of
6        my testimony or it has been read to me.
7        I have listed my changes on the attached
         Errata Sheet, listing page and line numbers as
8        well as the reason(s) for the change(s).
9        I request that these changes be entered
         as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11       as this Certificate, and request and authorize
         that both be appended to the transcript of my
12       testimony and be incorporated therein.
13       _____
     Date            Trace McDonald
14
         Sworn to and subscribed before me, a
15       Notary Public in and for the State and County,
         the referenced witness did personally appear
16       and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18           in the appended Errata Sheet;
         They signed the foregoing Sworn
19           Statement; and
         Their execution of this Statement is of
20           their free act and deed.
21       I have affixed my name and official seal
22   this _____ day of_____, 20____.
23                        _____
         Notary Public
24                        _____
         Commission Expiration Date
25
```

Page 128

```
1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 5989037
3    PAGE/LINE(S) /      CHANGE       /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
     _____   _____
20   Date            Trace McDonald
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23
         Notary Public
24
         _____
25   Commission Expiration Date
```

Veritext Legal Solutions

www.veritext.com                                                      888-391-3376