# EXHIBIT 58

1          IN THE UNITED STATES DISTRICT COURT FOR THE
                   NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION
3     IN RE NATIONAL PRESCRIPTION    §
      OPIATE LITIGATION              §
4                                    §
      THIS DOCUMENT RELATES TO:      §          MDL No. 2804
5                                    §      Case No, 17-md-2804
                                     §
6     Track Nine:                    §   Judge Dan Aaron Polster
      Tarrant County, Texas          §
7     (Case No. 1:18-op-45274-DAP) §
8

9         * * * * * * * * * * * * * * * * * * * * * * * *
               REMOTE VIDEOTAPED ORAL DEPOSITION OF
                        JOHN PAUL BRIGGS
10                       June 7, 2023
11         * * * * * * * * * * * * * * * * * * * * * * * *
12    REMOTE VIDEOTAPED ORAL DEPOSITION OF JOHN PAUL BRIGGS,
13    produced as a witness and duly sworn, was taken in the
14    above-styled and numbered cause on June 7, 2023,
15    from 10:06 a.m. until 2:12 p.m., CDT, at the offices
16    of Veritext Legal Solutions located at 300
17    Throckmorton Street, Suite 1600, Fort Worth, TX
18    76102, with the witness present in person and some
19    attendees appearing remotely before Suzanne
20    Kelly, Certified Shorthand Reporter and Certified
21    Realtime Reporter, reported by stenographic method
22    pursuant to the Federal Rules of Civil Procedure and
23    the provisions stated on the record, if any.
24    Reported by:  Suzanne Kelly, CSR, RDR, CRR
25    Job:  MW 5925735

Page 2

```
 1          APPEARANCES
 2  FOR THE PLAINTIFF:
 3  Alex Abston, Esq.
        -and-
 4  Leila Ayachi, Esq.
    THE LANIER LAW FIRM, P.C.
 5  10940 W. Sam Houston Pkwy N.
    Suite 100
 6  Houston, Texas 77064
    713.659.5200
 7  alex.abston@lanierlawfirm.com
    leila.ayachi@lanierlawfirm.com
 8
 9
    FOR THE ALBERTSONS DEFENDANTS:
10
    Alexandra Bach Lagos, Esq.
11  GREENBERG TRAURIG, L.L.P.
    333 SE 2nd Avenue
12  Suite 4400
    Miami, Florida 33131
13  305.579.0813
    alexandra.lagos@gtlaw.com
14
15  Kristina D. "Kristie" Daniels, Esq.
    GREENBERG TRAURIG, L.L.P.
16  77 West Wacker Drive
    Suite 3100
17  Chicago, Illinois 60601
    312.476.5005
18  danielskr@gtlaw.com
19
20  FOR THE KROGER DEFENDANTS:
21  Kiley Aycock, Esq.
    QUILLING, SELANDER, LOWNDS, WINSLETT & MOSER, P.C.
22  2001 Bryan Street
    Suite 1800
23  Dallas, Texas 75201
    214.880.1809
24  kaycock@qslwm.com
25
```

Page 3

```
 1       APPEARANCES (Continued)
 2
    FOR THE MEDICAL EXAMINER'S OFFICE:
 3
    Mark Kratovil, Esq.
 4  Assistant Criminal District Attorney
    County of Tarrant
 5  401 West Belknap
    9th Floor
 6  Fort Worth, Texas 76196
    817.844.1233
 7
 8
    ALSO PRESENT:
 9
10  Ms. Sadie Turner
    sadie.turner@lanierlawfirm.com
11  (attending remotely via Zoom)
12  Mr. Norm Harris, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              INDEX
 2                              PAGE
 3  Appearances...................................  2
 4  JOHN PAUL BRIGGS
 5     Examination by Ms. Lagos............  7
 6     Examination by Ms. Daniels..........  129
 7
 8  Reporter's Certificate ......................  136
 9  Signature and Changes ......................  139
10         EXHIBITS
11  NO.       DESCRIPTION        PAGE
12
    Exhibit 1   A copy of the 44-page        87
13             Investigator's Report,
               Bates labeled,
14             TARRANT_00708616 through
               TARRANT_00708659
15             Confidential
16  Exhibit 2   A copy of a 45-page          111
17             document entitled,
               "Tarrant County Medical
               Examiner District Annual
18             Report 2021"
19  Exhibit 3   A copy of a two-page         115
20             document, Bates labeled,
               TARRANT_00709343 through
               TARRANT_00709344
21             Confidential
22
23
24
25
```

Page 5

```
 1         INDEX (Continued)
           EXHIBITS (Continued)
 2
    NO.       DESCRIPTION        PAGE
 3
 4  Exhibit 4   A copy of a 138-page         119
               document entitled,
 5             "Medical Examiner's
               Operating Guidelines,"
 6             Bates labeled,
               TARRANT_00894123 through
 7             TARRANT_00894260
               Confidential
 8
    Exhibit 5   A copy of a three-page       129
 9             e-mail, Bates labeled,
               TARRANT_00709204 through
10             TARRANT_00709206
               Confidential
11
    Exhibit 6   A copy of a two-page         133
12             document entitled,
               "Notice of Personnel
13             Action CS-5"
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

1         P R O C E E D I N G S
2         THE VIDEOGRAPHER:  We are going on
3  the record at 10:06 a.m.  My name is Norm Harris
4  representing Veritext.  The date today is June
5  the 7th, 2023.
6         This deposition is being held at
7  the Veritext offices located in Fort Worth,
8  Texas, and is being taken by counsel for the
9  Defendant.
10        The caption of the case is in re:
11 National Prescription Opiate Litigation, filed in
12 the United States District Court for the Northern
13 District Ohio, Eastern Division; Case Number
14 1:18-op-45274-DAP.
15        The name of the witness is John
16 Briggs.
17        Attorneys please state your
18 appearance.  And for those of you online, please
19 state your locations.
20        MS. LAGOS:  Alexandra Bach Lagos,
21 I'm an attorney with Greenberg Traurig, counsel
22 for Albertsons.  And I'm here with Kristie
23 Daniels, and she's also an attorney with
24 Greenberg Traurig, counsel for Albertsons.
25        MS. ABSTON:  And I'm Alex Abston

1  from The Lanier Law Firm on behalf of the
2  Plaintiffs.
3         And we have Leila and Sadie who are
4  on by Zoom, who are also on behalf of the
5  Plaintiffs.
6         MR. KRATOVIL:  I'm Mark Kratovil,
7  I'm with the Civil Division of the Tarrant County
8  Criminal District Attorney's Office.  And we are
9  counsel for the Medical Examiner's Office.
10        MS. AYCOCK:  And Kiley Aycock, I am
11 here for Kroger.  I am in Dallas County, Texas.
12 And I'm with Quillings Selander.
13        THE COURT REPORTER:  If you would
14 please raise your right hand, I'll administer the
15 witness's oath to you.
16        THE WITNESS:  (Complies.)
17        THE COURT REPORTER:  Do you
18 solemnly swear or affirm that the testimony which
19 you give in this case will be the truth, the
20 whole truth, and nothing but the truth, so help
21 you God?
22        THE WITNESS:  I do.
23        THE COURT REPORTER:  Thank you.
24        JOHN PAUL BRIGGS,
25 having sworn to testify the truth, the whole

1  truth, and nothing but the truth testifies on the
2         witness's oath as follows:
3         EXAMINATION
4  BY MS. LAGOS:
5     Q.  Good morning, Mr. Briggs.  We met
6  offline, my name is Alexandra Bach Lagos.  And I
7  am counsel for Albertsons here today.
8         How are you doing today?
9     A.  Just fine, ma'am.
10    Q.  Terrific.  This is your deposition.
11 It's being taken for discovery, trial and all
12 other purposes, offers by law pursuant to Notice
13 in the Federal Rules of Civil Procedure.
14        MS. LAGOS:  Alex, can we agree that
15 all objections except as to the form of the
16 question and responsiveness of the answer shall
17 be reserved until the time of trial, first use of
18 this deposition?
19        MS. ABSTON:  I will just object to
20 form.
21 BY MS. LAGOS:
22    Q.  Okay.  Mr. Briggs, could you please
23 state your full name for the record?
24    A.  John, J-o-h-n.  Paul, P-a-u-l.  Briggs,
25 B-r-i-g-g-s, "S" as in Sam.

1     Q.  Thank you for spelling it out for us.
2         And what's you date of birth?
3     A.  12-22-1968.
4     Q.  What city or town do you reside in?
5     A.  Burleson, B-u-r-l-e-s-o-n, Texas.
6     Q.  Okay.  Can you provide me with your
7  address?
8         You can provide your work address,
9  that's fine.
10    A.  My work address is 200, 2-0-0.  I have
11 to spell it for you.
12    Q.  Okay.
13    A.  Two words, first word, Feliks,
14 F-e-l-i-k-s, as in Sam.
15        Second word, Gwozdz, G-w-o-z-d-z,
16 Fort Worth, Texas 76104.
17    Q.  Mr. Briggs, have you ever sat for a
18 deposition before?
19    A.  Yes, ma'am.
20    Q.  Okay.  Approximately how many?
21    A.  Half dozen.
22    Q.  Okay.  So you're pretty well versed with
23 the process.  When was the last time you sat for
24 depo?
25    A.  Approximately six years ago.

Page 10

1    Q.  Okay.  That's a while back.  So before
2  we begin, I'm just going to go over a few
3  groundrules if that's okay with you.  Most of
4  them are just intended to help the Court Reporter
5  take down everything we say.
6           So as you see here, our Court
7  Reporter is taking down everything that we say,
8  it's being recorded.  We also have a videographer
9  here -- that's here with us today.
10          Because of the Court Reporter
11  here, I just ask that you verbalize your
12  responses and don't nod your head.  Like in --
13  don't nod "yes" or "no."  Instead, just answer
14  audibly.  It makes it a lot easier and it keeps a
15  clean transcript.
16          Likewise, it's difficult for the
17  Court Reporter to take down what we're saying
18  if we're talking over each other.  It's very
19  natural in conversation, natural conversation,
20  that you know where I'm going with a question
21  and you might pop in with an answer.  I just ask
22  that you let me finish my question before you
23  provide your answer so we keep a clean
24  transcript.
25          I'm going to do my best not to

Page 11

1  interrupt you, if you do the same just -- that's
2  again, just let me finish my question.
3           If your attorney raises an
4  objection that's not meant and you have an
5  attorney here today from the D.A.'s Office.
6           That objection is not meant to stop
7  the deposition or my questioning if your attorney
8  objects to a question I pose to you, I just ask
9  that you continue to respond to my question
10  unless your attorney instructs you not to answer.
11  All right?
12    A.  Yes, ma'am.
13    Q.  Okay.  If you need a break, please just
14  let me know.  You're in charge today in terms of
15  timing.  I just want to make sure you are
16  comfortable.  So just let me know when you need
17  a break, we are happy to accommodate you.
18  Okay?
19    A.  Yes, ma'am.
20    Q.  And if you don't understand a question,
21  just let me ask -- just let me know, and I'll
22  repeat or rephrase it and I'll try to do my best
23  to clarify.  All right?
24    A.  Yes, ma'am.
25    Q.  If you answer a question I've asked, I'm

Page 12

1  going to assume that you've understood the
2  question that I'm asking.  Is that fair?
3    A.  Yes, ma'am.
4    Q.  Do you have any questions about my
5  instructions?
6    A.  No, ma'am.
7    Q.  Is there any reason you cannot give
8  accurate and truthful testimony?
9    A.  No, ma'am.
10    Q.  Before your deposition, had you and I
11  ever met or spoken?
12    A.  Not that I can recall.
13    Q.  Do you understand that your testimony
14  today is under oath the same as if you were in
15  Court giving testimony in Court?
16    A.  Yes, ma'am.
17    Q.  Do you in -- intend to testify at the
18  trial of this case?
19          MR. ABSTON:  Objection.  Form.
20          THE WITNESS:  Yes.  If called to do
21  so.
22  BY MS. LAGOS:
23    Q.  Are there any reasons why we can't move
24  forward with your deposition here today?
25    A.  No.

Page 13

1    Q.  Okay.  Before your deposition, did you
2  have any contact with anyone about this
3  deposition?
4    A.  Yes.
5    Q.  Who?
6    A.  Mr. Kratovil and the law firm on the
7  case for the County.
8          MS. ABSTON:  And John, I'm going to
9  remind you that you can answer the questions, but
10  there is attorney/client privilege that covers
11  the content of the discussions.
12  BY MS. LAGOS:
13    Q.  And you said the law firm, do you mean
14  The Lanier Law Firm?
15    A.  I believe that's the name of it.  But
16  I'm not aware of all of their titles or
17  organizations.
18    Q.  All right.  Well, let's take them one by
19  one.
20          When was the first time you spoke
21  to Mr. Kratovil?
22    A.  During the information gathering process
23  on this entire incident.  I believe a year or two
24  ago.
25    Q.  So --

4 (Pages 10 - 13)

Page 14

1    A.  In response to queries.
2    Q.  Okay.  So, the first time that you
3  spoke to Mr. Kratovil, you said was a year or two
4  ago?
5    A.  I don't know, ma'am.
6    Q.  Okay.  How did he first contact you?
7    A.  Telephone.
8    Q.  How many telephone conversations have
9  you had total with Mr. Kratovil?
10    A.  On all topics, or just this topic,
11  ma'am.
12    Q.  On all topics.
13    A.  Hundreds.
14    Q.  You have had hundreds of phone calls
15  with Mr. Kratovil?
16    A.  Yes, ma'am.
17    Q.  So from the first time that you spoke
18  to Mr. Kratovil until today, do you believe that
19  you had approximately how many hours of
20  conversation?
21    A.  I don't know, ma'am.
22    Q.  Do you think about hundreds of hours?
23    A.  Yes, ma'am.
24    Q.  Are most of those conversations that you
25  had with Mr. Kratovil, did they take place by

Page 15

1  phone?
2    A.  Yes, ma'am.
3    Q.  Did you meet Mr. Kratovil in person
4  prior to today?
5    A.  Yes, ma'am.
6    Q.  On how many occasions?
7    A.  Numerous.
8    Q.  When you say "numerous," is it less than
9  10 or is it more than 10?
10    A.  More than 10.
11    Q.  I want to clarify something.
12         During those -- those hundreds of
13  hours of conversations, were all of those
14  conversations about the lawsuit that you're here
15  testifying about today?
16    A.  No, ma'am.
17    Q.  Okay.  So those conversations that
18  you've had with Mr. Kratovil.  Let me change my
19  question.
20         When was the first time that you
21  spoke or met with Mr. Kratovil about this case?
22    A.  Approximately one to two years ago was a
23  phone call.
24    Q.  Okay.  And how many conversations have
25  you had with him about this case?

Page 16

1    A.  Only maybe two or three.
2    Q.  Okay.  And how long were those
3  conversations?
4    A.  Very brief.  Under five minutes.
5    Q.  They were all telephonic?
6    A.  Yes, ma'am.
7    Q.  Okay.  Now, I want to talk about your
8  conversations with the law firm for the
9  Plaintiffs.  All right?
10    A.  Okay.
11    Q.  When was the first time that you were
12  contacted by the law firm for the Plaintiffs in
13  this case?
14    A.  I believe here within the month.
15    Q.  Okay.  So this past month is the first
16  time you spoke with anybody from the Plaintiff's
17  law firm?
18    A.  I believe so.
19    Q.  And who did you speak to?
20    A.  There was a lady named, I believe, Sadie
21  had called in regard --
22    Q.  Is Sadie an attorney?
23    A.  Yes.  I believe it was in regard to
24  setting up this deposition.
25    Q.  And that was a phone call?

Page 17

1    A.  I don't recall, ma'am.
2    Q.  You don't recall if it was a phone call
3  or you don't -- what other communication do you
4  think it could have been?
5    A.  I get lots of e-mails every day and lots
6  of phone calls.
7    Q.  Okay.  So you don't know if they reach
8  out, the initial reach out by Sadie, you can't
9  recall if it was an e-mail or it was a phone
10  call.  Is that fair?
11    A.  Yes, ma'am.
12    Q.  And then the next time that you spoke
13  to -- when was the next time that you spoke to
14  anybody from the Plaintiff?
15    A.  Last week.
16    Q.  Okay.  And who did you speak to last
17  week?
18    A.  Alex.
19    Q.  Was that the first time you've spoken to
20  Alex?
21    A.  I believe so.
22    Q.  Was it a phone call?
23    A.  It was Zoom.
24    Q.  And how was -- how long was that meeting
25  with Alex?

5 (Pages 14 - 17)

1    A.  Approximately 45 minutes.
2    Q.  During that meeting, did Alex show you
3  any documents?
4    A.  No, ma'am.
5    Q.  Did anyone for the Plaintiff's law firm
6  show you any documents prior to your deposition
7  today?
8    A.  No, ma'am.
9    Q.  Okay.  We've now talked about a
10  conversation with Ms. Sadie which you can't
11  recall if it was e-mail or phone.  And we've
12  talked about this Zoom meeting with Alex that
13  lasted approximately 45 minutes.
14         Were there any other meetings with
15  counsel for the Plaintiff prior to your
16  deposition today?
17    A.  Yes, ma'am.
18    Q.  Okay.  What other meeting?
19    A.  Yesterday.
20    Q.  And who did you meet with yesterday?
21    A.  Alex.
22    Q.  And how long was your meeting with
23  Alex?
24    A.  Approximately 30 minutes.  No, I'm
25  sorry.  Approximately an hour.

1    Q.  Was that meeting face to face?
2    A.  No, ma'am.
3    Q.  Was that another Zoom meeting?
4    A.  Yes, ma'am.
5    Q.  And during that Zoom meeting, did Alex
6  show you any documents?
7    A.  No, ma'am.
8    Q.  Okay.  When was the first time that you
9  met Alex face to face?
10    A.  Today walking into the building.
11    Q.  So prior to your deposition today, have
12  you reviewed any documents provided to you by the
13  Plaintiff's law firm?
14    A.  No.
15         MS. LAGOS:  Alex, I was told that
16  there was a personnel file produced prior to this
17  deposition.
18         MS. ABSTON:  I believe we have
19  produced everything we're required to.  But I'm
20  happy to talk with the rest of counsel.
21         Did you receive a personnel file?
22         MS. LAGOS:  I didn't.
23         MS. ABSTON:  I didn't see.  There
24  was just an e-mail yesterday saying that it was
25  going --

1         MS. LAGOS:  We can be off the
2  record for a second.  Just one second.
3         THE VIDEOGRAPHER:  We are going off
4  the record at 10:20 a.m.
5         (Recess taken.)
6         THE VIDEOGRAPHER:  We are going
7  back on the record at 10:23 a.m.
8  BY MS. LAGOS:
9    Q.  All right, Mr. Briggs.  Did you review
10  anything to prepare for today's deposition?
11    A.  No, ma'am.
12    Q.  And when I say "did you review
13  anything," I mean did you review any
14  documents?  Did you review any files, any autopsy
15  reports?
16    A.  No, ma'am.
17    Q.  Okay.  Did you tell review any data at
18  all to prepare for this deposition?
19    A.  No, ma'am.
20    Q.  What did you do to prepare for this
21  deposition?
22    A.  I met with the attorneys who wanted to
23  discuss.
24    Q.  Okay.  And those attorneys are
25  Mr. Kratovil and attorneys from counsel from the

1  Plaintiff's law firm?
2    A.  Yes, ma'am.
3    Q.  Okay.  So the three occasions that you
4  spoke to those attorneys?
5    A.  Mr. Kratovil was not present in the
6  meetings that I had online I believe last two
7  times.  I didn't see him show up on the Zoom
8  meetings.
9    Q.  Okay.  So the only thing that you did to
10  prepare for this deposition, was those meetings
11  that you had with counsel for the Plaintiff's law
12  firm on those three occasions that we spoke
13  about.  Is that correct?
14    A.  Three occasions.
15    Q.  Well, we talked about there was a
16  discussion -- there was a discussion with Sadie
17  about the scheduling possibly?
18    A.  Okay.  Yes, ma'am.
19    Q.  And I know there was a meeting.  Then
20  there was two Zoom meetings with Alex that we
21  spoke about?
22    A.  Yes, ma'am.
23    Q.  Were any other meetings?
24    A.  No, ma'am.
25    Q.  Okay.  So the only thing that you did to

Page 22

1 prepare for this deposition were those two Zoom
2 meetings with Alex. Is that fair?
3    A. Yes, ma'am.
4    Q. Okay. Have you reviewed any -- have you
5 reviewed the Complaint in this case, a copy of
6 the Complaint?
7    A. No, ma'am.
8    Q. Okay. Do you -- when I say "Complaint,"
9 do you understand what I'm referring to?
10    A. The charge cause why we're here?
11    Q. Yes.
12    A. No, ma'am.
13    Q. Okay. So you have never reviewed that?
14    A. No, ma'am.
15    Q. Okay. And have you reviewed any
16 depositions taken in this case?
17    A. No, ma'am.
18    Q. Have you reviewed any summary of this
19 case?
20    A. No, ma'am.
21    Q. I know that you said that all you did to
22 prepare for this deposition was those meetings
23 with Alex, but did you do any research at all,
24 including any online research, to prepare for
25 your depo today?

Page 23

1    A. No, ma'am.
2    Q. Have you spoken to any experts or
3 consultants in this case to prepare for this
4 deposition?
5    A. No, ma'am.
6    Q. Do you have a CV that captures all of
7 your professional experience?
8    A. Yes, ma'am.
9    Q. Okay. I'd ask that you produce a
10 copy of that CV to Alex and hopefully she can
11 forward that along to us. That would be
12 helpful.
13        MS. ABSTON: We can get that over
14 to you.
15        MS. LAGOS: Yeah. That would be
16 great.
17        MS. ABSTON: Okay.
18 BY MS. LAGOS:
19    Q. That CV that you intend to forward to
20 Alex, when was it last updated?
21    A. I believe a few weeks ago after I took a
22 training course.
23    Q. Okay. So you keep it updated pretty
24 regularly. Is that fair?
25    A. Periodically.

Page 24

1    Q. Okay.
2    A. In my line of work, it's not necessarily
3 kept up to date because I'm not an expert
4 witness. I testify as a fact witness. So I
5 don't keep it up to date like experts do.
6    Q. Right. They -- experts have to put in
7 every, you know, all of their testimony and so
8 they keep it up-to-date pretty often. No. I
9 understand that.
10        Since you updated it a few weeks
11 ago it should be pretty updated?
12    A. Yes, ma'am.
13    Q. Okay. Now, I don't have that CV in
14 front of me. So, you know, not -- I know
15 you're not going to go through. You probably
16 haven't memorized it in granular detail but if
17 you can kind of walk me through what it contains,
18 that would just be helpful to me to give you an
19 overview of your professional experience and your
20 background?
21    A. My CV lists my job history, my positions
22 at my different jobs. Some basic tasks or
23 responsibilities from those jobs. It highlights
24 some of my training, my personal accomplishments,
25 service awards.

Page 25

1    Q. Okay. So we'll talk about your job
2 history in a second and your educational
3 background. But why don't you tell me a little
4 bit about your training. What kind of training
5 do you have listed out in the CV?
6    A. I have various sorts of training, either
7 from military background, police background or
8 working as a government employee background.
9    Q. Does any of that training relate
10 specifically to opioids?
11    A. Yes.
12    Q. Okay. What time kind of training?
13    A. Drug enforcement.
14    Q. Okay.
15    A. Death investigations for drugs,
16 overdoses.
17        Identifying of illegal narcotics.
18        Manufacturing of illegal narcotics
19 and the criminal prosecution of -- for illegal
20 narcotics.
21    Q. Okay. And those trainings, who were
22 they offered by?
23    A. Various police academies and law
24 enforcement organizations.
25        In-service training.

7 (Pages 22 - 25)

Page 26

1          University of St. Louis School of
2 Medicine for Medicolegal Death Investigation
3 courses.
4          Various courses, in-service type
5 stuff.
6     Q.  And you also mentioned service awards?
7     A.  Yes, ma'am.
8     Q.  Okay.  And for the service awards, what
9 service awards are listed on there?
10     A.  I am an Eagle Scout in the Boy Scouts of
11 America.
12     Q.  Congratulations.
13     A.  Thank you, ma'am.
14          Officer of the Year at one of the
15 local police departments when I was a police
16 officer.
17          The State of Texas Medal of Valor.
18     Q.  What did you receive that for?
19     A.  I was shot in the line of duty in
20 1997 and sustained a .38 caliber bullet to the
21 chest.
22          The DuPont Kevlar Survivors Award,
23 national award.
24          And I believe there's a few
25 others.

Page 27

1     Q.  Okay.  So, I have the Officer of the
2 Year.
3          The Officer of the Year award, was
4 that award -- was that awarded for just generally
5 acceptable performance throughout -- throughout
6 the year?
7     A.  Yes, ma'am.
8     Q.  Or was that awarded for a specific
9 incident?
10     A.  Throughout the year.
11     Q.  And you were talking about the State of
12 Texas Medal of Valor Award.  And that was for
13 being shot in the line of duty or related to that
14 incident?
15     A.  Yes, ma'am.
16     Q.  Okay.  Can you tell me a little bit
17 about that incident?
18     A.  I was on duty as a police sergeant in
19 the City of Lake Worth, Texas, in 1997, when an
20 intoxicated individual and gang member began
21 shooting up a quinceañera party and shot me once
22 in the chest.
23          I then proceeded to return fire and
24 eventually arrested that individual, myself.
25     Q.  And then you also mentioned the DuPont

Page 28

1 Kevlar Award?
2     A.  Yes, ma'am.
3     Q.  Okay.  And what was that awarded for?
4     A.  That is a national award given by
5 the DuPont Corporation for Kevlar, the bullet
6 resistant vest that police officers wear for
7 surviving a bullet or a shooting.  I was
8 wearing my bullet-proof vest at the time, and my
9 life was saved due to the properties provided by
10 the bullet-proof vest manufactured by the DuPont
11 Corporation.
12     Q.  Understood.  Could you describe your
13 educational background to me, Mr. Briggs?
14     A.  I only have partial college.  I do not
15 have a college degree.
16     Q.  Okay.  Partial college.  Where did you
17 attend college?
18     A.  The local community college here in Fort
19 Worth is called the "Tarrant County College" now,
20 formerly known, "Tarrant County Community
21 College."
22     Q.  When did you attend Tarrant County
23 Community College?
24     A.  In the 1980s, early '90s.
25     Q.  Did you receive any degrees from Tarrant

Page 29

1 County Community College?
2     A.  No, ma'am.
3     Q.  Okay.  So you don't have an AA degree?
4     A.  No, ma'am.
5     Q.  Okay.  Do you have a high school
6 diploma?
7     A.  Yes, ma'am.
8     Q.  And then I think you said -- well, why
9 don't you just go ahead and walk me through your
10 work, your work history.  We've touched on it a
11 little bit, but I just -- kind of
12 chronologically.  If you could walk through that,
13 it would be helpful.
14     A.  Would you like to start from current
15 or from --
16     Q.  That's a great question.  Why don't we
17 start chronological.  So start from the
18 beginning, and kind of work your way forward?
19     A.  Okay.
20     Q.  Thank you.
21     A.  Yes, ma'am.  My CV starts out with me
22 working with the Boy Scouts of America, Longhorn
23 Council, for several years where I taught boys in
24 different aspects of summer camp and leadership
25 and outdoor activities.

Page 30

1    I then progressed on to
2 approximately 1990 beginning work at the Lake
3 Worth Police Department, a suburb of Fort Worth,
4 where I started as a civilian dispatcher, records
5 clerk, reserve officer, patrol officer, canine
6 officer, patrol sergeant, for seven and a half
7 years.
8    Q.  And apologies.  I missed the date when
9 you started.  That was 1990?
10    A.  Yes, ma'am.
11    Q.  So 1990 until 1997?
12    A.  Yes, ma'am.
13    Q.  Thank you.  And then?
14    A.  After leaving Lake Worth, I went to the
15 Kennedale, K-e-n-n-e-d-a-l-e, City Police
16 Department for approximately two and a half
17 years, where I worked as patrol officer
18 investigator on the Drug Task Force, HIDTA,
19 H-I-D-T-A Drug Task Force in Dallas with the DEA
20 and FBI.  And then patrol sergeant.
21    Q.  And that was from about 1997 to 1999?
22    A.  Approximately right up to 2000.
23    Q.  Okay.  Then in 2000?
24    A.  I got out of law enforcement for
25 approximately 10 months.

Page 31

1    I went into computer work,
2 because it paid more money, until a job opened
3 at the Tarrant County Medical Examiner's
4 Office that I had been taking in-service
5 training for and preparing for, for years.  To
6 step into.
7    I was hired at the Tarrant County
8 Medical Examiner's Office on/or about September
9 1, 2001.
10    Q.  And what was your title when you were
11 hired?
12    A.  Investigative clerk.
13    Q.  What were your job responsibilities as
14 an investigative clerk?
15    A.  Taking reports of death, natural deaths
16 from hospitals and hospice organizations and
17 doing non-field-based investigative work.
18    Q.  And non-field-based investigative work
19 means that you worked from the office?
20    A.  Yes, ma'am.
21    Q.  So you say reports of --
22    A.  Death.
23    Q.  Yeah.  What does that mean?  Like you
24 would -- what would you do in your job as the
25 investigative clerk?

Page 32

1    A.  To receive calls from law enforcement,
2 medical facilities, medical personnel, funeral
3 homes, or the general public who were reporting
4 deaths to the Medical Examiner's Office for
5 investigation.
6    Q.  Understood.  So you started as an
7 investigative clerk.  And how long did you serve
8 in that role?
9    A.  Approximately one month.
10    Q.  That was a very short time period?
11    A.  Yes, ma'am.
12    Q.  Okay.  What was your next job?
13    A.  Forensic Death Investigator I.
14    Q.  So after you -- one month, was that a
15 promotion to Forensic Death Investigator?
16    A.  Yes, ma'am.
17    Q.  Okay.  And in your role as Forensic
18 Death Investigator I, could you describe your job
19 duties?
20    A.  I investigated field-related deaths and
21 worked in the field investigating traumatic or
22 suspicious deaths.
23    Q.  And how long did you work in that role
24 as a for Forensic Death Investigator I?
25    A.  Approximately three years.

Page 33

1    Q.  So until about 2004?
2    A.  Approximately.
3    Q.  Okay.  And then in 2004?
4    A.  Approximately that time period, I was
5 promoted to Forensic Death Investigator II, also
6 known as a "Senior Death Investigator."
7    Q.  And what were your job duties as a
8 Senior Death Investigator?
9    A.  The same as before except it also
10 included more complex death investigations.  And
11 increased responsibilities for death
12 investigation scenes.
13    Q.  Can you describe the increased
14 responsibility?
15    A.  Instead of being a regular investigator,
16 I might be a team lead, might be more involved
17 with a mass casualty investigations or planning,
18 assign special projects that involve a complex
19 death investigation, a multi-fatality
20 investigation or the handling of a larger case.
21    Q.  As a Forensic Death Investigator I, did
22 you investigate in the field, did you investigate
23 opioid overdoes cases?
24    A.  Yes.
25    Q.  Do you have any way to tally what

9 (Pages 30 - 33)

Page 34

1 percentage of your, you know, docket or cases
2 involved opioid overdose cases when you were a
3 Forensic Death Investigator I?
4        MS. ABSTON:  Objection to form.
5        THE WITNESS:  Not in front of me,
6 no.
7 BY MS. LAGOS:
8    Q.  And you say, "not front of you, no."
9        Do you have that information
10 somewhere?
11    A.  Not my personal collection.
12    Q.  Okay.  Where would I find it?
13    A.  Our internal computer system.  Search
14 parameters, search screen.
15    Q.  And what kind of information is
16 collected therein that would allow me to identify
17 which percentage of your cases involved, you
18 know, opioid overdose cases?
19    A.  I'm sorry.  Can you restate the
20 question?
21    Q.  Yeah.  How would I -- using -- you said
22 you -- I would -- I would find that information
23 searching your system?
24    A.  Yes, ma'am.  You would have to search by
25 my name, date period, and maybe keyword.

Page 35

1    Q.  Okay.  But sitting here today, you're --
2 you can't tell me what percentage?
3    A.  No, ma'am.
4    Q.  Okay.  And then when the 2004, when you
5 were promoted to Forensic Death Investigator II,
6 did your work in that capacity or your work as
7 Investigator II, did you investigate opioid
8 overdose cases?
9    A.  Yes, ma'am.
10    Q.  And again sitting here today, you can't
11 tell me what percentage of the cases that you
12 worked on as a Senior Invest -- as an
13 Investigator II involved opioid overdose cases.
14 Is that correct?
15        MS. ABSTON:  Objection.  Form.
16        THE WITNESS:  That is correct,
17 ma'am.  I cannot.
18 BY MS. LAGOS:
19    Q.  And how long did you work as a Forensic
20 Death Investigator II?
21    A.  Until approximately 2010.
22    Q.  So from 2004 to -- to 2010.  And then in
23 2010?
24    A.  I was promoted to Supervisory
25 Investigator also known as "Deputy Chief

Page 36

1 Investigator."
2    Q.  And what were your duties in that role?
3    A.  Very little field work and more
4 supervisory work.
5    Q.  Okay.  So starting in 2010, you started
6 going out to the investigative scenes less often.
7 Is that fair?
8    A.  Yes, ma'am.
9    Q.  Okay.  Would you say that you rarely
10 went out to an investigative scene from 2010
11 forward?
12        MS. ABSTON:  Objection to form.
13        THE WITNESS:  Yes, ma'am.
14 BY MS. LAGOS:
15    Q.  Okay.  From 2010 until today, can you
16 give me an approximation of the number of death
17 scenes that you've -- that you have been to in
18 your -- in your work as an investigator?
19        MS. ABSTON:  Objection.  Form.
20        THE WITNESS:  Approximately less
21 than 50.
22 BY MS. LAGOS:
23    Q.  All right.  So we talked about your
24 promotion to Deputy Chief Investigator, and that
25 was in 2010.  Right?

Page 37

1    A.  Yes, ma'am.
2    Q.  Okay.  And you said it was less field
3 work, more supervisory, more supervisory work.
4        Who were you supervising?
5    A.  The remaining field investigators and
6 investigative clerks.
7    Q.  And approximately, how many people was
8 that?
9    A.  At that time, it was approximately 12.
10    Q.  At some point, did that number change?
11    A.  Yes, ma'am.  In the last few years, it
12 has changed.
13    Q.  How has it changed?
14    A.  I've secured new staffing positions.
15    Q.  Approximately how many new staffing
16 positions did you secure?
17    A.  In my department, we have had five new
18 positions created in approximately the last four
19 or five years.
20    Q.  Okay.  So you're currently supervising a
21 group of approximately 17?
22    A.  Eighteen.
23    Q.  Okay.  Eighteen.  So from 2010, you were
24 promoted to the Deputy Chief Investigator and is
25 that your -- is that your role?  Are you

10 (Pages 34 - 37)

Page 38
1 currently in that role today?
2     A. No, ma'am.
3     Q. Okay. When were you promoted to Chief?
4     A. I believe January of 2021.
5     Q. Okay. So from 2010 to January of 2021.
6 Okay.
7     A. I believe that's correct. I was
8 promoted to Chief Forensic Death Investigator of
9 the Tarrant County Medical Examiner's Office and
10 District.
11    Q. And you were promoted in of 2021? And
12 that is a role you currently serve in today.
13 Correct? Forensic Death Investigator?
14    A. Yes, ma'am.
15    Q. Can you describe to me your duties as
16 the Chief Forensic Death Investigator in Tarrant
17 County?
18    A. I supervise my Department of Tarrant
19 County staff, recommend budget items, I submit
20 purchase orders for budgetary items.
21        I approve timesheets, discipline
22 staff, hire staff.
23        I then also supervise indirectly
24 staff in the Denton, Parker, and Johnson Field
25 offices.

Page 39
1     Q. Denton, Parker and Johnson Counties, do
2 all of those counties, are they covered -- are
3 they within the jurisdiction of the Tarrant
4 County Examiner's Office?
5     A. The Tarrant County Medical Examiner's
6 Office District.
7     Q. District. Okay. And that district
8 includes those counties I just mentioned. Is
9 that fair?
10    A. Yes.
11    Q. And who do you report to in the office,
12 if anyone?
13    A. The chain of command, I report to the
14 Administrator, Tracye, T-r-a-c-y-e, last name
15 Sisco. S-i-s-c-o.
16    Q. And what is Tracy's title?
17    A. Administrator. I believe it may have
18 been changed. They're working on changing it or
19 something but last I heard it was Administrator.
20    Q. I know you said your CV contains your
21 certifications listed there.
22        Are there any certifications that
23 you can recall today -- are there any specifics?
24 Well, let me rephrase my question.
25        Approximately how many

Page 40
1 additional -- how many certifications do you
2 have?
3     A. Approximately active, two.
4     Q. Okay. What the certifications?
5     A. I currently have a Master's Peace
6 Officer License in the State of Texas from the
7 Texas Commission on Law Enforcement.
8     Q. A Master's Peace Officer license?
9     A. Yes, ma'am.
10    Q. All right. And what is a Master Peace
11 Officer?
12    A. It is the highest license available in
13 the State of Texas for a police officer.
14    Q. Did you have to attend a course to
15 receive that license?
16    A. It is a combination of tenure and
17 in-service training or educational hours.
18    Q. Okay. And you said two certifications.
19 What is the other one?
20    A. I am currently diplomatic in the
21 American Board of Medicolegal Death
22 Investigation, also only in as ABMDI. And I am a
23 diplomatic in the Board certification for death
24 investigation.
25    Q. And when did you receive that

Page 41
1 certification?
2     A. I do not recall the exact date. It's --
3 I believe it's early 2000.
4     Q. And did you take any certification
5 course to receive that certification?
6     A. Yes.
7     Q. And where did you take that
8 certification course?
9     A. Is the University of St. Louis School of
10 Medicine, St. Louis, Missouri.
11    Q. How long was the course?
12    A. I have been to it twice. It was 40
13 hours each week.
14    Q. Have you ever had any licenses
15 suspended?
16    A. No.
17    Q. Have you ever been reprimanded, punished
18 or sanctioned in anyway professionally?
19        MS. ABSTON: Objection. Form.
20        THE WITNESS: Can you repeat the
21 question?
22 BY MS. LAGOS:
23    Q. Yes. Have you ever been professionally
24 reprimanded or sanctioned?
25    A. Yes.

11 (Pages 38 - 41)

Page 42

1    Q. On how many occasions?
2    A. Approximately five.
3    Q. Was that during your work as a police
4 officer or during work as a -- for the Medical
5 Examiner's Office?
6       MS. ABSTON:  Objection to form.
7       THE WITNESS:  My work as a police
8 officer.
9 BY MS. LAGOS:
10   Q. For any of those reprimands, were you
11 ever put on leave or the subject of any
12 investigation or additional follow-up?
13      MS. ABSTON:  Objection to form.
14      THE WITNESS:  No, ma'am.
15 BY MS. LAGOS:
16   Q. Have you ever been investigated by a
17 Board?
18      MS. ABSTON:  Objection to form.
19      THE WITNESS:  No, ma'am.
20 BY MS. LAGOS:
21   Q. Are you on faculty for any school?
22   A. No, ma'am.
23   Q. Are you a member of any professional
24 societies or organizations?
25   A. No, ma'am.

Page 43

1    Q. Mr. Briggs, you are not a pathologist.
2 Correct?
3    A. That is correct.
4    Q. Have you ever practiced Psychology or
5 Psychiatry?
6    A. No, ma'am.
7    Q. Do you hold yourself out as a mental
8 health professional or psychiatrist?
9    A. No, ma'am.
10   Q. Have you ever diagnosed or treated an
11 addiction or substance use disorder?
12   A. No, ma'am.
13   Q. Do you consider yourself to be an expert
14 in addiction?
15      MS. ABSTON:  Objection to form.
16      THE WITNESS:  No, ma'am.
17 BY MS. LAGOS:
18   Q. Are you an economist?
19      MS. ABSTON:  Objection to form.
20      THE WITNESS:  No, ma'am.
21 BY MS. LAGOS:
22   Q. Are you an epidemiologist?
23      MS. ABSTON:  Objection to form.
24      THE WITNESS:  No, ma'am.
25 BY MS. LAGOS:

Page 44

1    Q. Do you have any expertise in marketing
2 or advertising?
3       MS. ABSTON:  Objection to form.
4       THE WITNESS:  No, ma'am.
5 BY MS. LAGOS:
6    Q. Some of the Defendants in this case --
7 the Defendants in this case are pharmacies.
8       Have you ever worked as a
9 pharmacist?
10      MS. ABSTON:  Objection to form.
11      THE WITNESS:  No, ma'am.
12 BY MS. LAGOS:
13   Q. Do you have any expertise in pharmacy
14 practices?
15   A. No, ma'am.
16   Q. Do you have any expertise in the
17 standard of care for pharmacy dispensing?
18      MS. ABSTON:  Objection to form.
19      THE WITNESS:  No, ma'am.
20 BY MS. LAGOS:
21   Q. Do you agree you're not an expert in the
22 practice of pharmacy?
23   A. Yes, ma'am.
24   Q. Are you an expert in the processes for
25 manufacturing pharmaceutical medications?

Page 45

1       MS. ABSTON:  Objection. Form.
2       THE WITNESS:  No, ma'am.
3 BY MS. LAGOS:
4    Q. Have you ever worked for the FDA or the
5 CDC?
6    A. No, ma'am.
7    Q. Are you an expert in the process for the
8 approval and labeling of medications?
9    A. No, ma'am.
10   Q. Are you an expert in DEA regulations
11 with respect to controlled substances?
12   A. No, ma'am.
13   Q. Are you an expert in pain management or
14 the diagnosis and treatment of pain?
15   A. No, ma'am.
16   Q. Do you have any training or expertise in
17 the area of treating pain?
18   A. No, ma'am.
19   Q. Have you ever written any peer --
20 professional literature that was published in a
21 peer-reviewed publication?
22   A. No, ma'am.
23   Q. Have you ever been published or put any
24 articles online or blogged about any of your
25 professional employment?

12 (Pages 42 - 45)

1     MS. ABSTON:  Objection to form.
2     THE WITNESS:  No.
3  BY MS. LAGOS:
4     Q.  Have you written anything about opioids
5  or overdose -- overdose deaths related to
6  opioids?
7     A.  Written?
8     Q.  Written anything.  Written a blog --
9  okay.  I have to clarify that.  That's a poor
10  question.  Thank you for -- thank you for making
11  me clarify that.
12     Have you ever published any
13  literature on opioids or opiate overdose deaths?
14     A.  No, ma'am.
15     Q.  Have you ever given a presentation or
16  taught any classes about opioid overdose deaths?
17     A.  Specifically targeted at opioids?  Is
18  that your question?
19     Q.  No.  My question is:  Have you ever
20  given any presentation or taught any classes that
21  even included topics, the topic of opioid
22  overdose deaths?
23     MS. ABSTON:  Objection.  Form.
24     THE WITNESS:  Yes.
25  BY MS. LAGOS:

1     Q.  Okay.  When did you give -- when and
2  where did you give that presentation?
3     A.  I have given several death investigation
4  presentations over the years.
5     Q.  Okay.
6     A.  I cannot recall dates and locations.
7     Q.  Okay.  So, the presentations you're
8  referring to are presentations on the topic of
9  death investigations.  Is that fair?
10     A.  Yes.
11     Q.  Okay.  And who would you -- who would be
12  the audience for those presentations?
13     A.  Law enforcement investigators, crime
14  scene officers, civic groups, college classes.
15     Q.  And did you address the topic of opioids
16  within that presentation?
17     A.  Yes.
18     Q.  Okay.  That was a topic you discussed in
19  the presentations.  Is that fair?
20     A.  Yes.
21     Q.  And can you just generally summarize
22  what you have said specifically about opioids in
23  those presentations?
24     MS. ABSTON:  Objection.  Form.
25     THE WITNESS:  Evidence to look for

1  at a scene.  Indicating factors that the scene
2  may suggest an overdose.
3     Things that investigators key in on
4  to help their investigation.
5     Or signs, changes, possibly found
6  on a body that may indicate an overdose may be
7  involved.
8  BY MS. LAGOS:
9     Q.  Okay.  I'm going to take those one by
10  one.
11     The first topic that you mentioned
12  was evidence to look for at a scene suggestive of
13  an overdose?
14     A.  Yes.
15     Q.  Okay.  Can you -- still focusing on what
16  you would have said in the presentation.  I just
17  dropped my -- sorry.  My videographer is going to
18  get mad at me here.  I will clip that back on.
19     And, again, I know we don't have
20  the presentation here today and I know you don't
21  have the slides before you, if you use slides.
22     Did you use slides?
23     A.  Yes.
24     Q.  Okay.  Do you think you still have those
25  slides?  Do you have those slides in your

1  possession?
2     A.  In presentations, yes.
3     Q.  Okay.  But the sitting here today, kind
4  of talking about -- focusing on that topic, the
5  evidence to look for a scene suggestive of -- of
6  overdose, can you summarize for me what you would
7  have said in the presentation to your audience
8  about that?
9     MS. ABSTON:  Objection.  Objection
10  to form.
11     THE WITNESS:  Things to look for
12  that would indicate a possible overdose to
13  include foil, needles, baggies, bottles to
14  include prescription bottles.
15     Paraphernalia used in consuming,
16  smoking, or injecting any type of illegal or
17  legal narcotics.
18  BY MS. LAGOS:
19     Q.  My handwriting is terrible here, and I'm
20  having trouble reading what I wrote in Number 2.
21  But we were talking about in the presentations,
22  the topics that you would have discussed, where
23  you would have discussed opioids in the context
24  of the presentations.  And I wrote down things
25  investigators believe are key in those

13 (Pages 46 - 49)

Page 50

1 investigations?
2        MS. ABSTON:  Objection to form.
3        THE WITNESS:  Interviews, paperwork
4 found at scenes.
5        Medication or medical records.
6        All information or evidence that
7 would be found at the scene to assist in an
8 investigation.
9 BY MS. LAGOS:
10   Q. And then Number 3 was signs of changes
11 on the body?
12        MS. ABSTON:  Objection.  Form.
13        THE WITNESS:  Yes, ma'am.  There
14 are certain things we look for on the body
15 involving possible overdose, either needle, track
16 marks that are obvious, persons dying with the
17 paraphernalia still attached to them in their
18 arm.
19 BY MS. LAGOS:
20   Q. Meaning the needle?
21        MS. ABSTON:  Objection.  Form.
22        THE WITNESS:  Yes, ma'am.  And then
23 foam comes on a person's mouth or nose that are
24 sometimes present.
25 BY MS. LAGOS:

Page 51

1   Q. Mr. Briggs, you're not a Medical Doctor.
2 Correct?
3   A. That is correct.
4        MS. LAGOS:  I think we have been
5 going a little bit.  I'm going to try to take
6 breaks every hour on the hour.  Have we been
7 going about an hour yet?  This would be a good
8 place to take a break.
9        Okay.  So let's go ahead and take a
10 quick restroom break and then we can come back.
11 Thank you.
12        THE WITNESS:  Okay.
13        THE VIDEOGRAPHER:  We are going off
14 the record at 11:03 a.m.
15        (Recess taken.)
16        THE VIDEOGRAPHER:  We are going
17 back on the record at 11:13 a.m.
18 BY MS. LAGOS:
19   Q. Earlier in this deposition, Mr. Briggs,
20 we spoke about -- you said you have been deposed
21 previously.  I think you said about six
22 occasions?
23   A. Yes, ma'am.
24   Q. Okay.  Have you ever testified at trial
25 before?

Page 52

1   A. Yes, ma'am.
2   Q. Okay.  How many times?
3   A. Numerous.
4   Q. More than 10?
5   A. Yes.
6   Q. Has your testimony in the courtroom been
7 related to your experience in the Medical --
8 Medical Examiner's Office?
9   A. Yes.
10   Q. Okay.  And did you also testify at
11 trials as a -- as a police officer?
12   A. Yes.
13   Q. Have you ever testified at a trial other
14 than in your capacity as a police officer or as
15 presenting the findings -- describing your report
16 in the Medical Examiner case?
17   A. I'm sorry?
18   Q. Yes.  That was a bad question.
19        Have you ever testified at trial in
20 a case that didn't involve -- let me strike the
21 question.
22        Have you ever testified in a civil
23 case?  Meaning a non-criminal case, or in a
24 non-criminal case?
25   A. No, ma'am.

Page 53

1   Q. Okay.  Do you have an understanding as
2 to the kind of claims and issues in this lawsuit
3 that you're sitting for deposition today?
4   A. No, ma'am.
5   Q. Okay.  So you don't have any
6 understanding of what this specific case is
7 about?
8   A. No, ma'am.
9   Q. When did you first learn about this
10 lawsuit?
11   A. Approximately a year and a half or so
12 ago.
13   Q. Was that when Sadie reached out to you?
14   A. No, ma'am.
15   Q. Okay.  How did you learn about this
16 lawsuit?
17   A. Mr. Kratovil called me.
18   Q. And has Mr. Kratovil ever provided you
19 with any documents?
20   A. No, ma'am.
21   Q. And you understand you are deposed as a
22 fact witness for your work in Tarrant County?
23   A. Yes, ma'am.
24   Q. Have you ever been asked to serve as an
25 expert witness in any area for purposes of this

14 (Pages 50 - 53)

Page 54

1 case?
2     A. No, ma'am.
3     Q. Have you been hired by any of the
4 parties in this case?
5     A. No, ma'am.
6     Q. Are you being compensated for your
7 testimony today?
8     A. No, ma'am.
9         Correction.  Are you meaning in
10 extra pay or as in my standard hourly rate as a
11 salaried employee?
12     Q. Are you receiving your standard hour --
13 hourly rate as a salaried employee for your
14 testimony today?
15     A. Yes, ma'am.
16     Q. Are you receiving any additional
17 compensation?
18     A. No, ma'am.
19     Q. Are you aware that there are several
20 pharmacies sued in this case including Albertsons
21 and Kroger?
22     A. No, ma'am.
23     Q. Do you have any idea why any of the
24 pharmacies were sued in this case?
25     A. No, ma'am.

Page 55

1     Q. Can you personally point to any specific
2 conduct by Albertsons or Kroger related to
3 opioids that caused harm to Tarrant County?
4     A. No, ma'am.
5     Q. Are you here to help the County win at
6 trial?
7         MS. ABSTON: Objection.  Form.
8         THE WITNESS: No, ma'am.
9 BY MS. LAGOS:
10     Q. Why are you here testifying today?
11     A. I don't know.  I have been waiting --
12 waiting for somebody to reach out to me and tell
13 me why I'm here.
14     Q. Do you believe the Medical Examiner's
15 Office is underfunded?
16     A. In my opinion?
17     Q. Yes.
18     A. Yes, ma'am.
19     Q. And why do you believe it's underfunded?
20     A. I believe that we don't have sufficient
21 staff to cover the volume of death calls and
22 tasks that are associated with our office
23 responsibilities.
24     Q. So if you received additional funding
25 for -- or monies for the office, how would you

Page 56

1 use those additional monies?
2         MS. ABSTON: Objection to form.
3         THE WITNESS: Well, I would lean
4 more towards my department in funding my
5 department, of course, by adding additional
6 staff.
7         But there are other departments
8 that need additional staff, also.
9 BY MS. LAGOS:
10     Q. And how many additional staff do you
11 believe are needed in your department?
12     A. At this present time?
13     Q. Yes.
14     A. I believe I need four additional
15 investigators.
16     Q. You started at the Medical Examiner's
17 Office in 2001.  Correct?
18     A. Yes, ma'am.
19     Q. Okay.  Do you believe it's been
20 underfunded?
21         And now, you're still working there
22 in 2021?  So you've been there about 20 years.
23 Is that fair?
24     A. I have been there approximately 21 and a
25 half years.  Almost 22.

Page 57

1     Q. Okay.  Twenty-one and a half years.
2         The entire time that you have been
3 in the office, do you believe it's been
4 underfunded the entire time you've been with the
5 office?
6     A. Yes, ma'am.
7     Q. I'll represent to you that this lawsuit
8 relates to prescription opioids.  When we talk
9 about opioids, do you have -- you have an
10 understanding of what an opioid is.  Is that
11 fair?
12         MS. ABSTON: Objection to form.
13 BY MS. LAGOS:
14     Q. Okay.  Let me ask a better question.
15         When we talk about opioids, do you
16 have an understanding of what an opioid is?
17     A. Yes.  But in my line of work that should
18 be clarified as to types and illegal, legal,
19 because of my law enforcement background and our
20 death investigation practices.
21     Q. And some of the -- in terms of legal
22 opioids, legal opioids include prescription
23 medication.  Correct?
24     A. For legal?
25     Q. Yes.

15 (Pages 54 - 57)

Page 58

1    A.  Yes.
2    Q.  Do you know the names of any
3 prescription opioid medications?
4    A.  Yes.
5    Q.  What are they?
6    A.  Hydrocodone.
7        OxyContin.
8        We see morphine tablets or
9 methadone liquids.
10   Q.  An opioid can also include illicit
11 non-prescription drugs like heroin.  Right?
12   A.  Yes.
13   Q.  As a supervisory investigator -- let me
14 parse this out.  Hold on one second.
15       As an investigator with the ME's
16 office, your job responsibilities have included
17 going to death scenes and collecting evidence
18 from a body.  Correct?
19   A.  Yes.
20   Q.  Did your job responsibilities include
21 reviewing any of the evidence collected from the
22 different -- did it include reviewing all of the
23 evidence collected from the death scene?
24   A.  Yes.
25   Q.  Do your responsibilities also include

Page 59

1 reviewing investigative reports?
2    A.  Yes.
3    Q.  And does it include drafting
4 investigative reports?
5    A.  Yes.
6    Q.  After the evidence is collected at the
7 death scene, what happens with it?
8    A.  Evidence is properly packaged, sealed,
9 inventoried, logged into the computer system for
10 a -- a chain of custody and then secured in an
11 evidence locker pending transfer to the evidence
12 custodian, laboratories, or to the law
13 enforcement agency that has jurisdiction over the
14 case.
15   Q.  Is the evidence also provided to the
16 Medical Examiner?
17   A.  Yes.
18   Q.  In your experience investigating death
19 scenes, did you ever arrive at a scene to find
20 that law enforcement had already removed evidence
21 so there was nothing for you to collect?
22       MS. ABSTON:  Objection.  Form.
23       THE WITNESS:  Yes.
24 BY MS. LAGOS:
25   Q.  Did that happen on many occasions?

Page 60

1        MS. ABSTON:  Object to form.
2        THE WITNESS:  Yes.
3 BY MS. LAGOS:
4    Q.  Okay.  So can you just walk me through
5 it?  Because I'm just not -- I'm not that
6 familiar with your line of work.
7        So is it -- is it -- would it often
8 be about that the police officers would get to a
9 scene first, and they would collect all of the
10 evidence at the scene and store it, you know, at
11 their facility and then you would get there later
12 as the death investigator?
13   A.  Yes.
14   Q.  Are there any kinds of evidence that for
15 forensic investigators do not collect as a matter
16 of policy?
17   A.  Dangerous, explosive, flammable items at
18 times, large bulky items.  Items the Police
19 Department want to maintain custody of or to send
20 to their own laboratories for testing.
21   Q.  And do investigators collect illegal
22 drugs at a scene?
23   A.  Rare --
24       MS. ABSTON:  Objection.  Form.
25       THE WITNESS:  Rarely for a death

Page 61

1 investigator at the Tarrant County Medical
2 Examiner's Office to collect illegal narcotics.
3 BY MS. LAGOS:
4    Q.  Okay.  Who -- who will collect them at
5 the death scene?
6    A.  Most of the time, the law enforcement
7 investigating agency but not all of the time.
8    Q.  Okay.  So there are some occasions
9 where -- where your department will collect
10 illegal drugs at a scene?
11   A.  Yes.
12       MS. ABSTON:  Objection to form.
13 BY MS. LAGOS:
14   Q.  Is the protocol that the law enforcement
15 will typically collect the drugs at the scene?
16   A.  Typically, yes.
17   Q.  Okay.  Under what circumstances will
18 someone from your department collect the drugs at
19 the scene?
20   A.  The patrol officer did not notify a
21 crime scene or a homicide detective and is
22 reluctant to collect it, themselves.
23       The law enforcement officer has
24 left the scene prior to our arrival, or the
25 illegal narcotics or prescription narcotics were

16 (Pages 58 - 61)

Page 62

1 found on the decedent's person and were removed
2 by my staff prior to examination by the doctor.
3      Q.  What about prescription narcotics if
4 they're found at the scene?  Who collects those?
5      A.  It depends on the circumstances, and if
6 it's related to the death or not.
7      Q.  Can you describe to me what the policies
8 are for collecting the prescription narcotics at
9 the scene?  When to collect versus when not to
10 collect?
11          Kind of just give me an overview.
12      A.  Yes.  We do not currently collect
13 medications from a crime scene.  Unless it's
14 directly related to the death based upon
15 information or evidence we find at the scene.
16          We had too much stored and it's too
17 bulky to store and handle and an issue for
18 storage.  It is easier to photograph, transcribe
19 into our reports, document those counts for pill
20 bottles.
21          Not all deaths that we investigate
22 are necessarily drug-related.  So they might be
23 photographed but not documented thoroughly as it
24 may not relate to the death by obvious
25 circumstances.

Page 63

1      Q.  In your experience, if an investigator
2 observes drug paraphernalia at a -- at a death
3 scene, is it documented?
4          MS. ABSTON:  Objection to form.
5          THE WITNESS:  Yes.
6 BY MS. LAGOS:
7      Q.  And how is it documented?
8      A.  By photograph and in narrative writing.
9      Q.  The investigators -- and when I say the
10 term "investigators," I mean the investigators
11 that -- in your department.  That's what I'm
12 referring to.
13          Do investigators look for evidence
14 of prescription medication at the scene of
15 suspected drug overdoses?
16          MS. ABSTON:  Objection.  Form.
17          THE WITNESS:  Yes.
18 BY MS. LAGOS:
19      Q.  Are there any specific types of evidence
20 investigators are looking for if it's a suspected
21 overdose?
22      A.  Yes.
23      Q.  Can you describe that to me?
24      A.  Paraphernalia, pill bottles, baggies,
25 typical evidence related to drug use either legal

Page 64

1 or illegal.
2      Q.  If the Medical Examiner's Office collect
3 a bottle of prescription medication at the scene,
4 does the office ever do any type of additional
5 investigation of either the prescriber or of the
6 pharmacy associated with those prescriptions?
7          MS. ABSTON:  Objection to form.
8          THE WITNESS:  Only in possibly
9 using the prescriber information to request
10 medical records.  The purpose of what -- of that
11 is to establish a medical history that can assist
12 the doctor during their examination.
13 BY MS. LAGOS:
14      Q.  To your knowledge, has the Medical
15 Examiner's Office ever contacted a pharmacy for
16 purposes of investigating the dispensing done by
17 that pharmacy?
18          MS. ABSTON:  Objection to form.
19          THE WITNESS:  No.
20 BY MS. LAGOS:
21      Q.  Are there chain of custody requirements
22 for items found at death scene?
23      A.  Yes.
24      Q.  Can you describe those requirements?
25      A.  When taking in items of evidence, the

Page 65

1 items are packaged, date and time noted,
2 transported back to the office, inventoried,
3 chain of custody's written in paper form as well
4 as in the computer.
5          The item is then packaged, sealed,
6 and locked in a secure evidence locker pending
7 transfer to evidence custodian or appropriate
8 laboratories for inspection or testing.
9      Q.  And are those chain of custody
10 requirements documented somewhere within some
11 kind of policies for the Medical Examiner's
12 Office?
13      A.  Yes.
14      Q.  I have a document here I don't mark it
15 now, but I have a document here.  I may use is it
16 later but I just want to show you, this is the
17 Medical Examiner's operating guidelines for the
18 Tarrant County Medical Examiner.
19          Would the chain of custody
20 requirements be found in here?
21      A.  Unknown.
22      Q.  Okay.
23      A.  That's the manual for the doctors.
24      Q.  Okay.  So for the pathologists?
25      A.  Yes.

17 (Pages 62 - 65)

Page 66

1    Q.  Do investigators conduct an examination
2 of the body at the scene?
3    A.  A basic external investigation or
4 viewing of a decedent is conducted at the scene
5 if we respond.
6        MS. ABSTON:  I just want to note
7 on the record that the witness didn't have the
8 ability to observe the exhibit and it wasn't
9 marked.  So, for the record, we object to that
10 line of questioning.
11        MS. LAGOS:  Okay.
12 BY MS. LAGOS:
13    Q.  Do investigators sometimes interview
14 witnesses or family members at the scene?
15    A.  Yes.
16    Q.  When law enforcement is at the scene, do
17 law forensic investigators need the approval of
18 law enforcement to interview people?
19    A.  No.
20    Q.  And ultimately, an investigator drafts a
21 final report that goes into the case file.  Is
22 that correct?
23    A.  Yes.
24    Q.  And to the extent that an investigator
25 would learn something significant during the

Page 67

1 investigation by talking to people at the scene,
2 is it your understanding that they would include
3 that information in the final report?
4    A.  Yes.
5    Q.  In your experience, if you learned
6 something you thought was significant from
7 talking with people at the death scene, was it
8 your practice to include all that information in
9 the investigative report in whatever form it was
10 at the time?
11    A.  Yes.
12    Q.  Have you ever personally tracked what
13 the office or you identified as drug-related
14 deaths in Tarrant County?
15        MS. ABSTON:  Objection to form.
16        THE WITNESS:  I'm sorry.  Restate.
17 BY MS. LAGOS:
18    Q.  Yeah.  Have you ever tracked what you
19 identified as drug-related deaths in Tarrant
20 County?
21        MS. ABSTON:  Objection.  Form.
22 BY MS. LAGOS:
23    Q.  Have you ever personally tracked that
24 information?
25        MS. ABSTON:  Objection.  Form.

Page 68

1        THE WITNESS:  Tracked as in what?
2 BY MS. LAGOS:
3    Q.  Kept statistics or numerical values for
4 it.
5    A.  I have, yes.
6    Q.  Okay.  How did you do that?
7    A.  I have directed my staff on a recent
8 investigation to track number and location in
9 case details.
10    Q.  And you said you did that on a recent
11 occasion?
12    A.  Yes.
13    Q.  Okay.  When did you do that?
14    A.  Approximately three months ago.
15    Q.  And prior to that time, that was
16 information tracked?
17    A.  No.
18    Q.  Why did you ask your office to start
19 tracking that information?
20    A.  We had sudden spike in possible K2
21 synthetic marijuana deaths over a weekend
22 involving approximately six deaths to an area.
23        And we tracked it to determine a
24 pattern to give to the Police Department for them
25 to investigate.

Page 69

1    Q.  Have you ever tracked that information
2 on any other occasion?
3        MS. ABSTON:  Objection.  Form.
4        THE WITNESS:  No.
5 BY MS. LAGOS:
6    Q.  And is it going to be the practice and
7 policy of the office to track that information
8 going forward, or was it for a specific
9 incidents?
10        MS. ABSTON:  Objection.  Form.
11        THE WITNESS:  This was for a
12 specific incident.
13 BY MS. LAGOS:
14    Q.  Okay.  A specific incident related to K2
15 marijuana death?
16    A.  Yes.
17    Q.  What is K2 marijuana?
18    A.  Synthetic marijuana.  "K2" is a street
19 or -- or sales name for a fad that went over a
20 few years, for synthetic marijuana.
21    Q.  I want to just cover some basics about
22 the Medical Examiner's Office with you.
23        So generally speaking, the Medical
24 Examiner's task is to determine a manner and
25 cause of death for certain individuals who died

18 (Pages 66 - 69)

Page 70

1 within the jurisdiction of the office.  Is that
2 correct?
3         MS. ABSTON:  Objection.  Form.
4         THE WITNESS:  Yes, ma'am.
5 BY MS. LAGOS:
6     Q.  And the cause of death, that's the
7 Medical Examiner's medical diagnosis about what
8 caused the death.  Is that correct?
9     A.  Yes, ma'am.
10     Q.  And the manner of death, what does that
11 mean?
12     A.  The manner of death is the circumstances
13 outlined by the State of Texas as being
14 homicide/suicide accident, natural or
15 undetermined.
16     Q.  Now, not every individual who dies in
17 Tarrant County falls within the jurisdiction of
18 the Office of the Medical Examiner.  Is that
19 correct?
20     A.  That is correct.
21     Q.  What type of cases trigger the Office of
22 the Medical Examiner's jurisdiction?
23     A.  Based upon Texas Code of Criminal
24 Procedure 49.25, the law specifically states that
25 certain deaths fall within our jurisdiction to

Page 71

1 include traumatic deaths, suicides, accidents,
2 suspicious deaths, deaths unattended by a doctor
3 outside of a facility, children under six years
4 of age.
5     Q.  Are natural deaths within the
6 jurisdiction of the Medical Examiner's Office?
7     A.  At times, yes.
8     Q.  And the categories you just described,
9 meaning sudden, unexpected, I think you said
10 "violent."
11         Are those causes of death, or would
12 those be manners of death?
13     A.  Manners of death.
14     Q.  And within these large buckets of the
15 various manners of death, is it the pathologist
16 that determines the immediate cause of death?
17         MS. ABSTON:  Object to form.
18         THE WITNESS:  Yes.
19 BY MS. LAGOS:
20     Q.  And in terms of what standards would be
21 in how the Medical Examiner ultimately
22 adjudicates the cause and manner of death, those
23 types of decisions and methods, those are
24 questions I should speak to Medical Examiner
25 about and not you.  Is that fair?

Page 72

1         MS. ABSTON:  Objection to form.
2         THE WITNESS:  Yes.
3 BY MS. LAGOS:
4     Q.  Are all cases involving drug overdoses
5 sent for autopsy?
6         MS. ABSTON:  Objection.  Form.
7         THE WITNESS:  They are supposed to
8 be sent for examination.  But does not
9 necessarily include an autopsy.
10 BY MS. LAGOS:
11     Q.  Okay.  Can you explain to me the
12 difference between the two?
13         MS. ABSTON:  Objection to form.
14         THE WITNESS:  An examination is
15 performed by the doctor.
16         An autopsy is an invasive
17 examination and further description or
18 information on that pathologist, Medical
19 Examiner, is the one who conducts that.  Not
20 myself.
21     Q.  Okay.  So all cases involving drug
22 overdoses are either sent for examination or
23 autopsy.  Is that fair?
24         MS. ABSTON:  Objection.  Form.
25         THE WITNESS:  Yes.

Page 73

1 BY MS. LAGOS:
2     Q.  Okay.  Is the Medical Examiner who
3 determines whether an autopsy will be performed
4 or not?
5     A.  Yes.
6     Q.  Do the investigators in the Medical
7 Examiner's Office conduct an investigation of the
8 death scene for each case the Medical Examiner's
9 Office assumes jurisdiction over?
10     A.  I'm sorry.  Say it again.
11     Q.  Sure.  Do the investigators in the
12 Medical Examiner's Office conduct an
13 investigation of the death scene for each case
14 that the office assumes jurisdiction over?
15     A.  No.
16     Q.  Okay.  Why not?
17         MS. ABSTON:  Objection to form.
18         THE WITNESS:  Due to manpower
19 shortage other cases working case volume, we are
20 unable to respond to every scene.  We must
21 triage, we must prioritize different types of
22 scenes.
23 BY MS. LAGOS:
24     Q.  Okay.  And if your office doesn't go to
25 investigate the scene, who is sent to investigate

19 (Pages 70 - 73)

Page 74

1 the scene?
2     A. The law enforcement agency.  Or the
3 medical facility where the person may have died
4 at.
5     Q. In the circumstances where there is a
6 suspected drug overdose, are you aware of any
7 times the Medical Examiner's Office has assumed
8 jurisdiction but an investigator did not go to
9 the death essentially?
10     A. Yes.
11     Q. So you had -- I think you referred to it
12 as a triage, triaging due to, you know, shortage
13 of manpower.  Is that fair?
14     A. Yes.
15     Q. Okay.  So kind of in the hierarchy of
16 triage, can you can walk me through what would
17 be, you know, a critical scene to send
18 investigators to versus a less critical scene to
19 send investigators to?
20         MS. ABSTON: Objection.  Form.
21         THE WITNESS:  The most important
22 one to send an investigator to is a homicide,
23 outright detectives, law enforcement,
24 investigating an active homicide investigation.
25         The next level that would take

Page 75

1 precedence, would be something in the roadway
2 that is obstructing highways in the streets such
3 as any type of car wrecks.
4         And then down from there would be
5 other cases where significant evidence is present
6 that needs to be photographed, looked at,
7 documented, or something on a body that needs to
8 be handled and moved by my staff, the
9 investigators, and not law enforcement.
10     Q. Okay.  And where would drug overdoses
11 fall in, in terms of the triage?
12     A. Into the category of evidence present at
13 a scene that needs to be photographed or
14 documented or removed from a decedent.
15         The lowest tier would be the 1
16 scenes that have no evidence present, nothing
17 that we have to remove from a body or that we
18 have to catalogue and inventory the scene.
19     Q. Understood.
20         Can you just give me an overview of
21 the kind of lifecycle of a case at the Medical
22 Examiner's Office, and I'm just going to kind of
23 give you some parameters.
24         So I want you to assume it's a case
25 within the jurisdiction of the Medical Examiner's

Page 76

1 Office and let's assume that it's a suspected
2 accidental drug overdose.
3         A call comes in and the office is
4 notified about this potential case.  What happens
5 next?  Can you kind of walk me through it?
6         MS. ABSTON:  Objection to form.
7         THE WITNESS:  The first thing that
8 happens is we get a phone call typically from the
9 Police Dispatch Communications Center that a
10 death investigator is needed on a scene for a
11 death investigation.
12         The first thing we do is verify the
13 detectives and crime scene officers have been
14 notified to respond to the scene, or do we need
15 to wait for them to be en route and arrive on the
16 scene?
17         And we try to coordinate our
18 arrival together so that we cannot do duplication
19 of work.
20         After that is -- the timeline is
21 set up so that we can arrange to be there
22 together if at all possible.
23         We then drive to the scene across
24 the county.  Scene response may be anywhere from
25 minutes to hours, depending on traffic and

Page 77

1 location within the county.
2         Once arriving at the scene, we
3 begin processing the scene, interviewing,
4 photographing, conducting an investigation in
5 tandem with the law enforcement agency if they
6 are present.
7         We coordinate with the crime scene
8 officer in the identification, photography,
9 preservation and collection of evidence at a
10 scene.
11         And then we coordinate with a
12 detective the identification of witnesses,
13 victims, family, next of kin in conducting
14 interviews.
15         Then we begin processing the body
16 at the scene and we begin taking photographs of
17 the body, documenting wounds, injuries,
18 indicators on the body that may assist the
19 examining physician in determining the cause and
20 manner of death.
21         We notified the transport company
22 that is subcontracted to our agency to respond
23 who then shows up at the scene and assists in
24 putting the body in a body bag.
25         We then seal the body bag with an

20 (Pages 74 - 77)

Page 78

1  evidence seal, and the body is sent up to the
2  Medical Examiner's Office morgue pending
3  examination.
4       The death investigator then
5  finishes up any interviews with families or
6  witnesses, returns to the office where extensive
7  paperwork is either typed or research is done for
8  medical history, medical records, medical
9  treatment plans that have been given to the
10 doctor to assist in them determining a medical
11 history of the decedent or we request police
12 reports and any documents the doctor needs to
13 assist in their case investigation.
14      All paperwork is then forwarded to
15 the doctor within eight hours of the field
16 investigation and available to the doctor the
17 next morning when the examination is conducted by
18 the doctor typically at our office within a day,
19 maybe two or three, depending on how the case
20 volume was going.
21      The field investigator's job is
22 done unless the doctor needs further follow-up
23 investigation such as medical records, additional
24 witness statements or something.
25      The investigator's involvement

Page 79

1  typically ends at that time.
2  BY MS. LAGOS:
3      Q.  Understood.  That was a very helpful
4  overview.
5      Does the investigator draft an
6  investigative report?
7      A.  Yes.
8      Q.  Okay.  So at the conclusion of all of
9  that, then the investigator drafts an
10 investigative report?
11     A.  Yes.
12     Q.  Okay.  And then that becomes part of the
13 scene for that case.  Is that fair?
14     A.  Yes.
15         MS. LAGOS:  I think -- I don't
16 know.  Did I say "scene"?
17         THE COURT REPORTER:  That's what I
18 heard.
19         MS. LAGOS:  I meant to say "part of
20 the file for that case."
21 BY MS. LAGOS:
22     Q.  How does the ME's office determine
23 whether or not to perform an autopsy?
24     A.  That is out of my purview.  It's not my
25 job to determine that.

Page 80

1      Q.  And that's determined by the Medical
2  Examiner, you said earlier?
3         MS. ABSTON:  Objection to the form.
4         THE WITNESS:  Yes, ma'am.
5  BY MS. LAGOS:
6      Q.  And for suspected drug overdose cases,
7  is it required that an autopsy be performed?
8      A.  I don't know.
9      Q.  In cases where the autopsies -- where
10 autopsies are performed, then does -- do the
11 pathologists complete autopsy reports?
12         MS. ABSTON:  Objection.  Form.
13         THE WITNESS:  As far as I know,
14 yes.
15 BY MS. LAGOS:
16     Q.  And do you know what types of
17 information are contained within those autopsy
18 reports?
19     A.  I do not type those reports and cannot
20 speak to that.
21     Q.  And in your role as an investigator, do
22 you ever have the opportunity to review autopsy
23 reports?
24     A.  Yes.
25     Q.  Okay.  Kind of under what circumstances

Page 81

1  would that occur where you would be reviewing the
2  autopsy report?
3      A.  When a case may be re-visited or a
4  detective calls up for a -- to review a case,
5  typically involving old cases.
6      Q.  Okay.  So you have had the
7  opportunity -- the occasion to review autopsy
8  reports, but it's not typically part of your --
9  of your role and duties.  Is that fair?
10     A.  Yes.
11     Q.  And on those occasions where you have
12 had the opportunity to review autopsy reports,
13 have you ever seen a pharmacy identified therein?
14     A.  No.
15     Q.  A few moments ago, we were speaking
16 about the process for the investigation of the
17 death scene.
18         When an investigator is evaluating
19 the death scene, is one of the steps in the
20 evaluation to figure out what evidence or
21 materials may be with or around the body that
22 should be documented?
23     A.  Yes.
24     Q.  Do investigators take notes during death
25 scene investigations?

21 (Pages 78 - 81)

1    A.  Yes.
2    Q.  And where do those notes go?
3    A.  They are transcribed into our computer
4  reports.
5    Q.  So does that mean that they become --
6  ultimately there's an investigator report but is
7  there an appendix of that containing all of the
8  individual notes?
9    A.  Our policy is that handwritten notes if
10  they are transcribed completely in to the report,
11  the handwritten notes may be discarded.
12    Q.  An investigator is at a scene to
13  investigate a suspected drug overdose.  Is there
14  anything specific that an investigator would do
15  for that type of death as opposed to another kind
16  of death in the investigation process?
17    A.  Yes.
18    Q.  Can you describe to me what they would
19  do a little bit differently in a death scene
20  involving a drug overdose?
21    A.  We would search more for medications or
22  narcotics, not just prescription or illegal but,
23  also, over-the-counter.
24    Q.  So I am investigator, let's say the drug
25  overdose occurs in a residence.  The investigator

1  will look through the residence for evidence of
2  medications?
3    A.  Yes.
4    Q.  And then document all the medications
5  found?
6    A.  Yes.
7    Q.  And said we said earlier, we discussed
8  earlier, the investigators don't always collect
9  all of those medications.  Correct?
10    A.  Yes.
11    Q.  Because it becomes a -- excessively
12  bulky.  Is that right?
13    A.  Yes.
14    Q.  But those medications that are found at
15  the scene by the investigator, are they mentioned
16  or inventoried in the report?
17    A.  Yes, when applicable.
18    Q.  And how do you determine what's
19  applicable and what's not applicable?
20    A.  If the scene suggests that drugs or
21  narcotics were involved in the death, they would
22  be documented in the computer system.
23        If the scene is suggestive of not
24  having anything to do with narcotics or drugs,
25  they may not be investigated or may not be

1  documented in the report.
2    Q.  So taking it, for example, a drug
3  overdose case that occurs in a residence, in a
4  case like that, would all of the medication in
5  the home be including over-the-counter, would
6  that be inventoried and documented within the
7  investigative report?
8        MS. ABSTON:  Objection to form.
9        THE WITNESS:  Some of it, yes.
10  Some over-the-counter or some prescription
11  medications may not be typical of an overdose.
12  BY MS. LAGOS:
13    Q.  So those groups of medications, those
14  would not necessarily be documented and included
15  in the report.  Is that fair?
16    A.  Yes.
17    Q.  When prescription medications are found
18  at the scene and documented, how are they
19  documented?
20    A.  In photographs and in writing in the
21  computer report.
22    Q.  Does the form where it's documented
23  contain any line for identifying the pharmacy or
24  the doctor?
25    A.  Yes.

1    Q.  Is there a separate line for the
2  pharmacy?
3    A.  Yes.
4    Q.  And that then becomes part of the file?
5    A.  Yes.
6    Q.  Are the investigators supposed to label
7  the -- sorry.  Strike.
8        Is the investigator supposed to
9  also photograph the label of the prescription
10  medications found at the scene?
11    A.  Yes.
12    Q.  And in your experience during your time
13  at the Medical Examiner's Office, investigators
14  have collected or photographed prescription
15  medications at a death scene if the investigator
16  thought it would be pertinent to the cause of
17  death determination.  Is that correct?
18        MS. ABSTON:  Objection.  Form.
19        THE WITNESS:  Yes.
20  BY MS. LAGOS:
21    Q.  Do you know how the Medical Examiner
22  determines whether or not a decedent's
23  medications were being taken in accordance with
24  the prescription rate.  Right?
25        MS. ABSTON:  Objection.  Form.

22 (Pages 82 - 85)

Page 86

1      THE WITNESS:  Yes.
2  BY MS. LAGOS:
3      Q.  How do they make that determination?
4      MS. ABSTON:  Objection.  Form.
5      THE WITNESS:  By reading the label
6  and making a count of the remaining pills in the
7  pill bottle as an indicator that the count may be
8  off and may be pertinent to the case.
9  BY MS. LAGOS:
10      Q.  What type of information would an
11  investigator provide to a Medical Examiner, if
12  any, to be able to determine -- so the Medical
13  Examiner could determine whether the prescription
14  medications were being taken appropriately by the
15  decedent?
16      A.  As --
17      MS. ABSTON:  Objection.  Form.
18      THE WITNESS:  As appropriate, the
19  investigator may make note in the report that the
20  count appears off.
21  BY MS. LAGOS:
22      Q.  Is anything else other than the pill
23  count methodology?
24      A.  Interviews with the family, witnesses,
25  text messages on the phone call, physical

Page 87

1  evidence found at the scene.
2      Q.  I will mark this.
3      (Deposition Exhibit Number 1 is
4  marked.)
5  BY MS. LAGOS:
6      Q.  I'm going to hand you what I have marked
7  as "Exhibit 1."
8      MS. LAGOS:  Here you go, Counselor.
9      MS. ABSTON:  Thank you.
10  BY MS. LAGOS:
11      Q.  It's Bates labeled "TARRANT_00708616."
12      Can you just take it apart and flip
13  through and take a look at the document front of
14  you?
15      A.  Yes, ma'am.
16      Q.  All right.  In terms of Exhibit 1,
17  applying your review of Exhibit 1, if you turn to
18  Page 2 of the exhibit, it states "Investigators
19  Report."  Correct?
20      A.  Yes.
21      Q.  Okay.  Is this document representative
22  of a typical investigator's report that an
23  investigator would prepare following a death
24  scene investigation?
25      A.  Yes.

Page 88

1      Q.  During your time at the office, has
2  there been a metric or target in terms of case
3  turnaround time in terms of how long it should
4  take to get a case processed by the office?
5      A.  Involving?  Can you clarify?
6      Q.  Sure.
7      A.  My staff?
8      Q.  No.  Involving just the office
9  generally, a case turnaround time.
10      MS. ABSTON:  Object to form.
11      THE WITNESS:  I'm aware at one time
12  there were requirements for accreditation
13  requirements but I'm not familiar with that
14  because that does not apply to the death
15  investigator section.
16  BY MS. LAGOS:
17      Q.  Okay.  And in terms of this investigator
18  report, what's the turnaround time for -- for
19  those, if any?
20      A.  Investigator reports are required to be
21  to the doctors the very next morning that the
22  examinations are being conducted.
23      Under state law and Code of
24  Criminal Procedure, investigative reports used in
25  an inquest should be to the doctor within eight

Page 89

1  hours of the investigation.
2      Q.  And looking through the report in front
3  of you, can you point to me where the
4  investigator's notes would be captured?
5      A.  The page that starts "investigative
6  report" with the -- what appears to be the
7  narrative page, I believe it will be one, two,
8  three, Page 4.
9      Q.  Is that -- does it say "8621" at the
10  bottom, the Bates?  The Bates numbers in the
11  corner down here.
12      A.  It starts at 8619.
13      Q.  Okay.
14      A.  I think you went too far.
15      Q.  Yeah.
16      A.  Okay.
17      Q.  8619.  Okay.
18      A.  That page.  The next page.  This is
19  duplicated.  8621 is duplicate.
20      Q.  Yes.  I see that.
21      A.  Continue on to 8623.  8623 is what we
22  call "addendums" or additions for follow-up notes
23  and investigations.
24      So those pages would be my
25  narrative for my investigative staff and their

1  notes.
2     Q.  So all of the investigator's notes would
3  be captured in both the main report and then any
4  addendums attached thereto.  Is that correct?
5     A.  Yes.
6     Q.  Okay.  And after the investigator report
7  is completed, can you tell me what happens to the
8  document?
9        I know that it's provided to the
10  Medical Examiner.  Is that correct?
11     A.  Yes.
12     Q.  Okay.  And then does it also go into --
13  do you have to also put it into your system and
14  make sure that it's filed, or can you tell me how
15  it's preserved?
16     A.  Yes.  After typing it into the computer
17  system and we make -- we print out hard copies,
18  the hardcopies are put into Tyvek envelopes that
19  are then made available to the doctors the very
20  next morning prior to their examination.
21        They are then physically handed off
22  to the examining physician that is assigned the
23  case, and it leaves my -- my custody, control,
24  for the investigators.
25        The physical hardcopy report and

1  any associated documents that we have obtained
2  are all handed to the doctor in that case folder.
3     Q.  And then, do you know what the doctor
4  does with it after reviewing the document?
5     A.  It becomes their custody for them to add
6  anything to and use in their investigation.
7     Q.  And then their notes are then added into
8  the document?
9     A.  I can't speak to their --
10     Q.  Okay.
11     A.  -- actions and what they do.
12     Q.  Because this file, it looks like it has
13  a cover page here.  Right?  And says, "MI
14  documents, investigative report, investigator
15  narrative, cause of death report over here."
16        Do you see that there?
17     A.  Yes, ma'am.
18     Q.  Okay.
19     A.  This page is a Records Department
20  checklist of what may be included with that
21  specific case.
22     Q.  Understood.  So your department doesn't
23  figure -- doesn't fill out this, the front page?
24     A.  No, ma'am.
25     Q.  Is that fair?  Okay.  All of the

1  documents are kind of collected and then it
2  becomes part of the file.  And then the Records
3  Department completes this top page?
4     A.  Yes.
5     Q.  Is that fair?  Okay.
6        Are you responsible for the
7  protocols to insure the accuracy reliability of
8  investigative reports?
9     A.  Yes.
10     Q.  Are those protocols memorialized in
11  writing?
12     A.  Yes.
13     Q.  And where are they kept?
14     A.  The Tarrant County Medical Examiner's
15  Qualtrax reporting system.
16     Q.  What is Qualtrax?
17     A.  Qualtrax, Q-u-a-l-t-r-a-x, is an SOP
18  management software the county uses for housing
19  our SOPs for each department.
20     Q.  But those protocols are captured in the
21  SOPs for the Investigator Department --
22  Investigative Department.  Is that -- is that
23  correct?
24     A.  Yes.
25     Q.  Okay.  Do you agree standards are

1  necessary to ensure the accuracy and reliability
2  of investigative reports?
3     A.  Yes.
4     Q.  Other than the SOPs you just described
5  to me, is there any other place where those
6  standards would -- would be memorialized?
7     A.  Old hard copies, modern only in the
8  Qualtrax.  Depends on what timeframe you're
9  looking at.
10     Q.  Does the office ever conduct internal
11  audits pertaining to the investigative reports?
12     A.  No, ma'am.
13     Q.  So there's no auditing system to ensure
14  the accuracy of investigative reports.  Is that
15  correct?
16     A.  Not at this present time, no, ma'am.
17     Q.  When the Office of the Medical Examiner
18  finishes its investigation of cases, the officer
19  files the official cause and manner of death.
20  Correct?
21     A.  Yes.
22     Q.  And that official certified cause and
23  manner of death represents the Office of the
24  Medical Examiner's best medical judgement as to
25  the cause and manner of death.  Correct?

24 (Pages 90 - 93)

Page 94

1    A.  Yes.
2    Q.  Sometimes it's very challenging to
3  determine the cause of death.  Correct?
4         MS. ABSTON:  Objection to form.
5         THE WITNESS:  I would not know.  I
6  don't determine cause and manner of death.
7  BY MS. LAGOS:
8    Q.  Do you agree that a key function of -- a
9  key function of the Office of the Medical
10  Examiner is to maintain accurate mortality data?
11         MS. ABSTON:  Objection.  Form.
12         THE WITNESS:  Yes.
13  BY MS. LAGOS:
14    Q.  Do you play any role in maintaining that
15  data?
16    A.  No.
17    Q.  Maintaining accurate mortality data
18  serves a public health function for the State.
19         Do you agree?
20    A.  Yes.
21    Q.  And the postmortem setting, is there a
22  test that can be performed to diagnose an
23  addiction?
24         MS. ABSTON:  Objection.  Form.
25         THE WITNESS:  I am not a doctor and

Page 95

1  aware of anything.
2  BY MS. LAGOS:
3    Q.  Okay.  When the Office of the Medical
4  Examiner is working on a drug overdose
5  investigation, does the Office of the Medical
6  Examiner try to answer the question of whether
7  that individual had a substance use disorder or
8  addiction to any particular drug while they were
9  alive?
10         MS. ABSTON:  Objection.  Form.
11         THE WITNESS:  I'm not aware of any.
12  BY MS. LAGOS:
13    Q.  When the Office of the Medical Examiner
14  is working on a drug overdose investigation, does
15  the office ever try to set out to try to recreate
16  that individual's substance use history while
17  they were alive?
18         MS. ABSTON:  Objection to form.
19         THE WITNESS:  At times if needed,
20  yes.
21  BY MS. LAGOS:
22    Q.  Under what circumstances?
23         MS. ABSTON:  Objection.  Form.
24         THE WITNESS:  When an examining
25  physician determines they need to find out how

Page 96

1  long a decedent has been prescribed a medication
2  and at what quantities and daily use values as it
3  pertains to their toxicology results for
4  tolerance levels.
5  BY MS. LAGOS:
6    Q.  Fair to day you have never seen a report
7  or document in the Medical Examiner's Office that
8  said that any pharmacy caused the death of any
9  individual.  Is that accurate?
10    A.  Yes.
11    Q.  Have you ever offered an official
12  opinion regarding prescribing practices or
13  prescribing levels in Tarrant County?
14         MS. ABSTON:  Objection.  Form.
15         THE WITNESS:  No.
16  BY MS. LAGOS:
17    Q.  In your role with the Medical Examiner's
18  Office, have you ever taken a position whether
19  opioids, whether prescription -- wait.  Let me
20  rephrase that.
21         In your role at the Medical
22  Examiner's Office, have you ever taken a position
23  on whether prescription opioids should be banned?
24    A.  No.
25         MS. ABSTON:  Objection.  Form.

Page 97

1  BY MS. LAGOS:
2    Q.  If I have questions about the medical
3  standards of care for the prescribing of opioids,
4  are those questions that you're able to answer,
5  or do you agree that's outside the scope of your
6  knowledge as an investigator?
7    A.  That is outside of the scope of my role.
8    Q.  During the course of time at the Medical
9  Examiner's Office, have you ever been responsible
10  for identifying whether there was a crisis or an
11  epidemic with respect to drug overdoses?
12    A.  Yes.
13    Q.  Under what circumstances?
14    A.  As previously stated, the recent K2
15  synthetic marijuana.
16    Q.  Any other -- on any other occasion that
17  you can recall?  We spoke employ the K2.
18         Was there -- were you asked to make
19  a determination on any other occasion?
20    A.  No, ma'am.
21    Q.  In your role at the Medical Examiner's
22  Office, did you ever receive any information from
23  a prescription drug monitoring program?
24    A.  Yes.
25    Q.  Does the Medical Examiner's Office

25 (Pages 94 - 97)

Page 98

1 utilize any prescription drug monitoring programs
2 in connection with its overdose cases?
3      A.  Yes.
4      Q.  Do you recall when they started
5 utilizing those programs?
6      A.  Only in the last five years,
7 approximately.  And it has only become standard
8 use in approximately the last year.
9      Q.  So they started using the program about
10 five years ago?
11      A.  Yes.
12      Q.  You said it's become standard use in the
13 last year?
14      A.  Yes.
15      Q.  Okay.  Can you describe to me how the
16 office uses those program?
17      A.  Yes, ma'am.  The original purpose for
18 using it was so that we could locate doctors and
19 we could then find medical records for -- to
20 determine prescribed medical history.
21           But more importantly, their
22 diagnosed medical history as it relates to an
23 autopsy or examination by the doctor.
24           We do not look at it for opioid
25 levels.  We're looking at it more for identifying

Page 99

1 doctors and prescribing physicians.  So that we
2 can then get treatment records from those.
3           In recent years, however, we have
4 begun utilizing it to determine if the patient is
5 obtaining prescriptions from multiple locations
6 and if it appears that the decedent is
7 pill-seeking or getting large quantities of
8 medication.
9      Q.  Okay.  And you said that you have been
10 using it for that purpose in recent years?
11      A.  Yes.
12      Q.  Okay.  When?  When you say "recent
13 years," what timeframe?
14      A.  Within the last year.
15      Q.  Okay.  So it's --
16      A.  We've had it for about five years and it
17 was used for that purpose.  We have increased the
18 use of it.
19           The Medical Examiner's Office was
20 not originally granted access to it.  It was
21 difficult to get access to it.  And at five years
22 ago only, I believe, two of us had access to
23 it.  And it was just the procedures and the way
24 it was set up in the state of Texas.
25      Q.  Okay.  So we'll just walk through that a

Page 100

1 second.
2           So prior to five years ago, your
3 office didn't have any access to the -- to the
4 program?
5      A.  Yes.
6      Q.  Okay.  Then five years ago, your office
7 was granted access to the program?  But it was
8 used very minimally just to find medical records
9 information?
10      A.  Yes.
11      Q.  Is that fair?  Okay.
12           And it was not used to assess
13 whether the decedent had been pill shopping.  Is
14 that fair?
15           MS. ABSTON:  Objection.  Form.
16           THE WITNESS:  Yes.  Yes.
17 BY MS. LAGOS:
18      Q.  And then you said one year ago, you
19 began to use that program a little bit
20 differently?
21      A.  Yes.
22      Q.  Okay.  And why did you change the way
23 you used the program?  Why did the office change
24 the way it uses the program?
25      A.  The Tarrant County Medical Examiner's

Page 101

1 Office changed the Chief Medical Examiner for the
2 office and administrative procedures or processes
3 changed.
4           The new chief Medical Examiner was
5 told about the program, and he encouraged us to
6 use it more actively.
7      Q.  Is there a protocol at the office that
8 governs when the prescription drug monitoring
9 program needs to be searched in a particular
10 case?
11      A.  No.
12      Q.  Do you know what percentage of drug
13 overdose cases the Office of the Medical Examiner
14 runs a PDMP search of?
15      A.  No.
16      Q.  Are you able estimate whether it's more
17 or less than 50 percent of the cases?
18           MS. ABSTON:  Objection.  Form.
19           THE WITNESS:  I do not know.
20 BY MS. LAGOS:
21      Q.  Is the PDMP search recorded in the case
22 file?
23      A.  Sometimes.
24      Q.  When is it included versus not included?
25           MS. ABSTON:  Objection to form.

26 (Pages 98 - 101)

1        THE WITNESS:  When data was found
2 that may assist in the case investigation.
3 BY MS. LAGOS:
4     Q.  Have you or anyone in the office ever
5 searched to see who was the manufacturer of any
6 pharmaceutical medication involved in a case?
7     A.  No.
8     Q.  During the course of your death
9 investigations, did you ever evaluate
10 prescriptions to determine whether they were
11 written for a legitimate medical purpose?
12        MS. ABSTON:  Objection.  Form.
13        THE WITNESS:  No.
14 BY MS. LAGOS:
15     Q.  Did you ever look at a prescription --
16 did you ever look at any prescriptions that were
17 reflected in a PDMP search to determine whether
18 the pharmacist properly dispensed those
19 prescription?
20        MS. ABSTON:  Objection.  Form.
21        THE WITNESS:  No.
22 BY MS. LAGOS:
23     Q.  So based on your experience and tenure
24 at the office, is it accurate to say that you
25 don't have any information about whether any

1 particular prescription was appropriate,
2 prescribed or filled?
3     A.  Yes.
4     Q.  Has the Office of the Medical Examiner
5 ever come to the conclusion that a pharmacist was
6 engaged in conduct that contributed to an
7 overdose death is that something that the Office
8 of the Medical Examiner would report to the
9 relevant authorities?
10        MS. ABSTON:  Objection to form.
11        THE WITNESS:  Yes.
12 BY MS. LAGOS:
13     Q.  If the Office of the Medical Examiner
14 came to the conclusion that a prescriber was
15 engaged in misconduct that contributed to an
16 overdose death, is that something that the Office
17 of the Medical Examiner would report to the
18 authorities?
19     A.  Yes.
20     Q.  To your knowledge, has the Office of the
21 Medical Examiner ever reported a Texas doctor or
22 other prescriber to law enforcement for
23 improperly prescribing medications?
24     A.  I can't recall a specific doctor.  I do
25 know we have had conversations with authorities.

1 "Authorities" being DEA Diversion Unit.
2     Q.  And would those conversations be
3 memorialized in the files of the Medical
4 Examiner's Office?
5     A.  Yes.
6     Q.  And what happened with any of those
7 particular investigations?  Those would be
8 questions for the law enforcement agency.  Is
9 that fair?
10        MS. ABSTON:  Objection.  Form.
11        THE WITNESS:  Yes.
12 BY MS. LAGOS:
13     Q.  In circumstances where that has
14 occurred, once that report is made, the Office of
15 the Medical Examiner defers to the law
16 enforcement agency in terms of the investigation
17 and prosecution.  Correct?
18     A.  Yes.
19     Q.  Has the Office of the Medical Examiner
20 ever reported a Texas pharmacist to the relevant
21 authorities for improperly dispensing drugs?
22     A.  Not that I'm aware of.
23     Q.  Have you ever had any responsibilities
24 for the budget at the Office of the Medical
25 Examiner's Office?

1     A.  Yes.
2     Q.  Can you describe your role in the budget
3 process?
4     A.  I recommend budgetary items and
5 requests, purchase budgetary items involving my
6 department.
7     Q.  Can you -- is the budget process an
8 annual process, or is it quarterly?
9     A.  Annual.
10     Q.  Have you ever made a basic budget
11 request tied to drug overdose cases?
12     A.  No.
13     Q.  Is the Office of the Medical Examiner
14 able to identify any costs that it incurred
15 either in dollars or resources specifically as a
16 result of prescriptions opioids?
17     A.  I would not know that answer.
18     Q.  With respect to your department, are you
19 able to identify any costs that your department
20 incurred either in dollars or resources
21 specifically as a result of prescription opioids?
22     A.  Not at this time.
23     Q.  Fair to say you don't break down your
24 budget or costs that way?
25        MS. ABSTON:  Objection to form.

27 (Pages 102 - 105)

Page 106

1       THE WITNESS:  Yes.
2  BY MS. LAGOS:
3       Q.  Does the Office of Medical Examiner
4  track or break down it's budget expenditures
5  based on cases attributable to any particular
6  substance?
7       A.  I don't know.
8       Q.  Can you identify any costs that your
9  department has incurred either in dollars or
10 resources specifically caused by opioids?
11      A.  Not at this time.  I would need time to
12 prepare or research any such document or request.
13      Q.  And if you were to research any such
14 requests, how would you go about doing that?
15      A.  I would have to identify statistical
16 numbers involved using the computer system.
17          I would have to then determine what
18 supplies would be used for packaging or
19 preserving evidence and manpower staffing hours
20 and any other supplies needed that involved my
21 department.  That is nothing I track or have
22 available.
23          MS. LAGOS:  I think we have been
24 going about another hour.  Let's take another
25 10-minute break, if that works.

Page 107

1          MS. ABSTON:  Do you want to go
2  ahead and break for lunch?
3          MS. LAGOS:  We can.  That's fine.
4          MS. ABSTON:  Okay.
5          MS. LAGOS:  Let's do that.  I mean,
6  if you want to.
7          THE VIDEOGRAPHER:  We're going off
8  the record at 12:30 p.m.
9          (Luncheon recess.)
10         THE VIDEOGRAPHER:  We are going
11 back on the record at 1:28 p.m.
12 BY MS. LAGOS:
13      Q.  All right.  Mr. Briggs, did you have a
14 good lunch?
15      A.  Yes, ma'am.
16      Q.  Okay.  Did you have lunch with any of
17 the attorneys that are here today on your behalf
18 at the deposition?
19      A.  Yes.
20      Q.  Okay.  Who did you have lunch with?
21      A.  Mark Kratovil with the Tarrant County
22 District Attorney's Office.
23      Q.  And during the lunch, did you discuss
24 this case?
25      A.  No, ma'am.

Page 108

1       Q.  All right.  During the course of your
2  education and training, Mr. Briggs, were you
3  taught anything about the abuse of -- abuse
4  potential of medications?
5       A.  Not that I recall.
6       Q.  In your role as the Tarrant County
7  Medical Examiner's Office, has it ever been your
8  job to identify and of make announcements or
9  whether there's a public health crisis?
10      A.  No.  Not prior to Dr. Crowns coming into
11 office and taking over administration.
12          In the last year, he has been more
13 proactive for that and encourages me to come
14 forward if we see a problem.
15      Q.  Okay.  And since -- since that time
16 where he has come in, have you made any
17 announcements on whether there is a public health
18 crisis?
19      A.  Yes.
20      Q.  And how many announcements did you make?
21      A.  One.
22      Q.  Okay.  Was that announcement relating to
23 that K2 marijuana crisis?
24      A.  Yes.
25      Q.  Did that K2 marijuana event, did that

Page 109

1  involve opioids?
2       A.  No.
3       Q.  What was causing the deaths in that K2
4  marijuana crisis in your opinion?
5       A.  In my opinion, it was the manufacturer
6  of the synthetic chemicals on it.
7       Q.  Have you ever been responsible for
8  declaring on behalf of the county whether there
9  is a public health crisis?
10      A.  Am I responsible?
11      Q.  Have you ever been?
12      A.  Yes.
13      Q.  On how many occasions have you been
14 responsible for declaring whether there is a
15 public health crisis?
16      A.  I have not declared a public health
17 crisis.  I have issued a media release involving
18 heat-related deaths in Tarrant County last
19 summer.
20      Q.  And heat related deaths, you mean deaths
21 caused by extreme -- extreme heat.  Is that fair?
22      A.  Yes.
23      Q.  So we have now talked about the K2
24 marijuana crisis and the extreme heat death
25 crisis.

28 (Pages 106 - 109)

1      Have you ever declared any
2  public -- any other public health crisis?
3      A. I do not declare health crises at all in
4  my job description. CI issues media releases or
5  coordinate the research on the latest K2 thing.
6  No, ma'am.
7      Q. Okay. Thank you.
8      Have you ever been -- we talked
9  about the heat-related deaths on the K2
10  marijuana. Have you ever been in the declaration
11  of any other health crises?
12      A. No.
13      Q. Do you have a personal view as to
14  whether there is a significant problem related to
15  opioid overdoses in Tarrant County?
16      A. No.
17      Q. The Office of the Medical Examiner
18  prepares an annual report. Correct?
19      A. Yes.
20      Q. Have you ever had any role in preparing
21  the annual reports?
22      A. No.
23      Q. Have you ever had any responsibilities
24  related to the reporting -- to reporting
25  statistics about drug-related deaths in Tarrant

1  County that are -- well, strike that question.
2      Have you ever had any
3  responsibilities relating to any of the
4  statistics that are reported within those annual
5  reports?
6      A. Yes.
7      Q. Can you describe your responsibilities?
8      A. The specifics -- specifically defined in
9  the Death Investigation section that are provided
10  to the administrator when she creates a report.
11      I think there is approximately
12  three stats or things that she lists in our area.
13      Q. Okay. I'm going to pull out one of
14  the -- I will try to put out one of the more
15  recent ones. Maybe you can show me that section?
16      MS. LAGOS: Can I get another
17  exhibit sticker? I'm going to do 2? Yeah.
18      (Deposition Exhibit Number 2 is
19  marked.)
20  BY MS. LAGOS:
21      Q. I am now handing you Exhibit 2 which is
22  the Tarrant County Medical Examiner District
23  Annual Report for 2021.
24      MS. LAGOS: There you go.
25      MS. ABSTON: Thank you.

1      MS. LAGOS: Yeah. Of course.
2  BY MS. LAGOS:
3      Q. And if you could just direct me to the
4  section --
5      A. Uh-huh.
6      Q. -- where you would have some
7  responsibility?
8      A. Page 27.
9      Q. Okay.
10      A. The stats at the bottom of that page
11  come from me.
12      Q. All right. So at the bottom of Page 27,
13  for the record, it says, "Forensic Death
14  Investigations."
15      And one of the categories is
16  Service Requests.
17      The other one is Protocol and
18  Property Letters.
19      The other one is Body Releases.
20      And the last one is Property
21  Releases.
22      So, the information contained
23  within this chart, there are the statistics that
24  comes from your department. Is that fair?
25      A. Yes, ma'am.

1      Q. Okay. And your department doesn't have
2  any responsibility for any of the other
3  statistics contained in the report. Correct?
4      A. No, ma'am.
5      Q. I think that question came out a little
6  funny so I'll just read it back to you.
7      Is it fair to say that your
8  department isn't responsible for any of the other
9  statistics referenced in the report?
10      A. Yes.
11      Q. Does the Medical Examiner's Office have
12  a data set that has the information where they
13  could tell us of the number of deaths in 2022
14  that were drug overdose deaths, how many of those
15  involved any kind of opioid?
16      A. Yes.
17      Q. Okay. Where would that information be
18  captured?
19      A. In Crypt, our computer system. The name
20  of the computer program is Crypt, C-r-y-p-t.
21      Q. And has that information been contained
22  in Crypt since you started at the Medical
23  Examiner's Office?
24      A. Yes, ma'am.
25      Q. And how would you search for that

29 (Pages 110 - 113)

Page 114

1 information within Crypt?
2    A. I would go to the search screen. I can
3 search by date period, I can search by manner of
4 death and I can search by cause of death keyword.
5       Based upon that, I would use
6 keyword search for any number of important
7 phrases or words needed to meet the parameters.
8       Outside of that, the only other way
9 would be an offline search through IT.
10    Q. And what do you mean an offline search
11 through IT?
12    A. Programmers would have to -- our
13 computer system is not search friendly and
14 doesn't have a lot of search fields. They would
15 have to search through any other fields other
16 than that.
17       If you were requesting different
18 types of fields, they would have to be through an
19 IT offline search.
20    Q. Would the Medical Examiner's Office know
21 how many cases they've dealt with a drug overdose
22 deaths where the decedent had a prescription for
23 opioids written in their name?
24    A. Not that I'm aware of.
25    Q. Currently, how would you assess the

Page 115

1 quality of the Tarrant County Medical Examiner's
2 Office?
3    A. Good.
4    Q. Has that answer changed during the
5 tenure of your career, or has it maintained that
6 level throughout your career?
7      MS. ABSTON: Objection to form.
8      THE WITNESS: It has been that
9 level.
10 BY MS. LAGOS:
11    Q. I'm sorry. I didn't hear you. You said
12 it has been that level?
13    A. It has been that level.
14    MS. LAGOS: I will mark another
15 document. Could I have another exhibit sticker?
16      Thank you.
17      (Deposition Exhibit Number 3 is
18 marked.)
19 BY MS. LAGOS:
20    Q. I'm handing you what's been marked as
21 "Exhibit 3," it's TARRANT_00709343 is the Bates.
22      Can you take a look at that?
23    A. Yes, ma'am.
24    Q. Does this document look familiar to you?
25    A. Yes, ma'am.

Page 116

1    Q. Okay. This is a document summarizing a
2 sting operation at the ME office. Right?
3    A. Yes, ma'am.
4      MS. ABSTON: Objection. Form.
5      THE WITNESS: Yes, ma'am.
6 BY MS. LAGOS:
7    Q. Why don't you describe what the document
8 is to me.
9    A. It is -- it is my personal notes
10 involving an internal investigation into
11 suspected theft of medications from our
12 prescription holding and storage area by an
13 employee.
14    Q. And the purpose of the operation was to
15 determine if the employee was stealing
16 medications collected at the scene?
17    A. Yes.
18      MS. ABSTON: Objection to form.
19 BY MS. LAGOS:
20    Q. Okay. This operation involved two
21 bottles of hydrocodone?
22    A. Yes.
23    Q. And hydrocodone is an opiate medication.
24 Correct?
25    A. Yes.

Page 117

1    Q. Can you describe the operation?
2    A. We suspected that medication bottles had
3 been collected at a crime scene and brought to
4 our office for storage and that we believed that
5 during the storage process, someone had entered
6 the storage packaging containers and removed
7 pills from them. We suspected we had an
8 internal theft and set up an operation to
9 determine if that was true.
10      These are my notes for that
11 investigation.
12    Q. And at the conclusion of the operation,
13 it was your notes that -- it was your conclusion
14 that four pills were indeed missing from one of
15 the bottles. Right?
16    A. I believe that's true.
17    Q. And who was the suspect in the
18 investigation?
19    A. A former employee named James Greenwell.
20 He is noted in the report as "Jim." I believe
21 his formal name is "James."
22    Q. And was Mr. Greenwell an employee of the
23 Medical Examiner's Office?
24    A. Yes.
25    Q. What kind of employee?

30 (Pages 114 - 117)

1    A.  He was a Forensic Death Investigator I.
2    Q.  Is he still with the office?
3    A.  No.
4    Q.  Was he terminated after this operation?
5    A.  I do not know.  I was not the Chief
6  Investigator at the time.
7         I do not know if he was terminated
8  or if he resigned, but he no longer worked with
9  us after this operation.
10    Q.  Was this the only operation of its kind
11  that you engaged in, or did you engage in other
12  operations similar to this?
13    A.  This was the only one I did.  I don't
14  know of any other ones outside of this.
15    Q.  Okay.  Even though you didn't engage in
16  any others, are you aware of any others that took
17  place?
18    A.  No.
19    Q.  All right.  I'm going to mark the
20  Medical Examiner's Operating Guidelines, dated
21  July 1, 2019.
22         MS. LAGOS:  Can I put a sticker on
23  this?  I only have two copies of this.
24         MS. ABSTON:  Okay.
25         MS. LAGOS:  If you want to look on.

1         MS. ABSTON:  Given the length of
2  the document, you can take your time reviewing
3  it.
4         THE WITNESS:  Okay.
5         (Deposition Exhibit Number 4 is
6  marked.)
7  BY MS. LAGOS:
8    Q.  This one is marked "TARRANT_00894123,"
9  for Bates.  It's entitled, "Medical Examiner's
10  Operating Guidelines, Effective July 1, 2019."
11         If you turn to TARRANT_00894140, so
12  look for 4140 on the bottom of the Bates there.
13  If you turn to that page.
14    A.  140.
15    Q.  Yeah.
16    A.  My page starts with "duty doctor."
17    Q.  Yeah.  Actually it's the next page.
18  Sorry.  It's the section titled, "Sudden
19  Unexplained Deaths in Infancy."  If you turn to
20  Page 145.  It's -- That section is titled "Scope
21  of the Investigation" kind of at the bottom of
22  the page.
23    A.  Okay.
24    Q.  It says, "Standard documentation of
25  death scene should include at a minimum the

1  following."
2         And then if you turn to that next
3  page, it says, under Number 4 -- there's many
4  things mentioned but under 4, it says, "The
5  presence of prescriptions and over-the-counter
6  medications."
7         Do you see that?
8    A.  Yes, ma'am.
9    Q.  Okay.  Is -- is there a similar protocol
10  for death scenes not involving sudden un --
11  unexplained deaths in infancy?
12    A.  I'm sorry?
13    Q.  Is this -- yeah.  Is this the same
14  protocol for any deaths not inviting -- involving
15  the sudden unexplained deaths in infancy?
16    A.  No.  That is standard for --
17    Q.  Okay.  So this is standard protocol?
18    A.  Yes.
19    Q.  Okay.  So standard protocol for all
20  death scene investigations to photograph the
21  presence of prescriptions and over-the-counter
22  medications.  Is that fair?
23    A.  Yes, ma'am.
24    Q.  Okay.  Considering the tenure of your
25  time with the office, were you familiar with

1  Dr. Nizam Peerwani?
2    A.  Yes, ma'am.
3    Q.  Okay.  Who is Dr. Peerwani?
4    A.  Dr. Peerwani was the Chief Medical
5  Examiner for the Tarrant County Medical
6  Examiner's Office and District.  He was employed
7  by the County for approximately 42 years.
8    Q.  And when -- Dr. Peerwani is no longer
9  with the office.  Correct?
10    A.  That is correct.  He recently retired
11  approximately a year and a half ago.
12    Q.  Do you know who Dr. Marc Krouse is?
13    A.  Yes, ma'am.
14    Q.  Who is Dr. Marc Krouse?
15    A.  Dr. Krouse was the Deputy Chief Medical
16  Examiner under Dr. Peerwani during his tenure.
17    Q.  And is Mister -- is Dr. Krouse with the
18  office?
19    A.  No.
20    Q.  When did he leave the office?
21    A.  Approximately three years ago.
22    Q.  Are you aware of the reasons for -- for
23  Dr. Krouse -- what is your understanding of the
24  reason for Dr. Krouse's departure from the
25  office?

31 (Pages 118 - 121)

1     A.  His issues involving an autopsy of a
2  homicide suspect and problems with his report.
3     Q.  And what happened?
4         MS. ABSTON:  Objection.  Form.
5         THE WITNESS:  Dr. Peerwani
6  conducted a review of the report and then the
7  examination done by Dr. Krouse and found errors
8  in the report and procedures that Dr. Krouse had
9  done.
10 BY MS. LAGOS:
11    Q.  And can you describe those errors?
12        MS. ABSTON:  Objection to form.
13        THE WITNESS:  As best I can recall,
14 it was errors in regards to not looking at an
15 X-ray, not documenting a wound accurately.
16        And then several clerical errors in
17 regards to medical records.
18 BY MS. LAGOS:
19    Q.  As a result of those errors, did
20 Dr. Peerwani suspend Dr. Krouse?
21        MS. ABSTON:  Objection.  Form.
22        THE WITNESS:  Yes, ma'am.
23 BY MS. LAGOS:
24    Q.  And then, ultimately, Dr. Peerwani
25 decided -- decided to conduct some additional

1  audits of Dr. Krouse's homicide cases.  Correct?
2         MS. ABSTON:  Objection.  Form.
3         THE WITNESS:  It is my
4  understanding, yes.
5  BY MS. LAGOS:
6     Q.  The -- during those additional audits
7  which numbered approximately 40 additional
8  audits, Dr. Peerwani found numerous mistakes were
9  made.  Is that fair?
10        MS. ABSTON:  Objection.
11        THE WITNESS:  I am not involved in
12 any --
13        MS. ABSTON:  Objection.  Form.
14        THE WITNESS:  I was not involved in
15 any aspect of those cases, reviews, audits or
16 anything.
17 BY MS. LAGOS:
18    Q.  Okay.  But you were aware that
19 Dr. Peerwani conducted some additional audits of
20 Dr. Krouse's cases.  Correct?
21        MS. ABSTON:  Objection to form.
22        THE WITNESS:  Yes.
23 BY MS. LAGOS:
24    Q.  And tell me what your understanding of
25 what those additional audits revealed.

1         MS. ABSTON:  Objection.  Form.
2         THE WITNESS:  What I read in the
3  newspapers, it was not discussed with me
4  directly, but it involved what is public record
5  as clerical errors or documentation errors with
6  examinations and calling into question
7  Dr. Krouse's capabilities.
8  BY MS. LAGOS:
9     Q.  And at some point after those additional
10 audits, the Dallas County District Attorney's
11 Office actually began an investigation into
12 Dr. Krouse.  Correct?
13        MS. ABSTON:  Objection to form.
14        THE WITNESS:  I do not know
15 officially.  I heard that they had been consulted
16 in the media, but I don't know if that actually
17 took place or what was done.
18 BY MS. LAGOS:
19    Q.  And ultimately, Dr. Krouse was put on
20 administrative leave.  Correct?
21        MS. ABSTON:  Objection to form.
22        THE WITNESS:  Yes.
23 BY MS. LAGOS:
24    Q.  And then shortly thereafter Dr. Peerwani
25 himself, notified county leaders that he intended

1  to retire.  Correct?
2         MS. ABSTON:  Objection.  Form.
3         THE WITNESS:  Somewhere after that,
4  yes, ma'am.
5  BY MS. LAGOS:
6     Q.  Well, I believe Krouse -- Dr. Krouse was
7  put on administrative leave in March 25 of 2021.
8         And then in April, on April 1st of
9  2021, Dr. Peerwani notified county leaders that
10 he intend to retire.
11        MS. ABSTON:  Objection to form.
12        Is that a question?
13 BY MS. LAGOS:
14    Q.  Is that your -- is that consistent with
15 your recollection of the timeline?
16    A.  I do not recall the date on it, ma'am.
17 I know that Dr. Krouse was put out first on
18 leave.  And then Dr. Peerwani retired after that.
19    Q.  And in April of 2021, a judge actually
20 found that Dr. Peerwani had provided false and
21 misleading testimony against a man who was
22 sentenced to death and was on death row.
23 Correct?
24        MS. ABSTON:  Objection to form.
25        THE WITNESS:  I have no information

32 (Pages 122 - 125)

1 to that, ma'am.
2 BY MS. LAGOS:
3     Q.  Did you hear anything about that?
4     A.  I read the news, yes, ma'am.
5     Q.  When -- did you see that in the
6 newspaper?
7     A.  Yes, ma'am.
8     Q.  Did you speak about it with any of your
9 colleagues at the Medical Examiner's Office?
10        MS. ABSTON:  Objection to form.
11        THE WITNESS:  No, ma'am.
12 BY MS. LAGOS:
13     Q.  When was your new Medical Examiner
14 appointed?
15     A.  Approximately a year and a half ago.
16     Q.  What is their name?
17     A.  The new Chief Medical Examiner is
18 Dr. Kendall, K-e-n-d-a-l-l, last name Crowns,
19 C-r-o-w-n-s, M.D.
20     Q.  Under Dr. Crowns' leadership, have there
21 been any changes within your department at the
22 Medical Examiner's Office?
23     A.  Yes, ma'am.
24     Q.  Can you describe to me some of those
25 changes?

1     A.  Procedures involving evidence handling,
2 body handling, report writing.
3     Q.  Anything else?
4     A.  Not that I recall at this time.
5     Q.  And how have the procedures regarding
6 evidence handling changed under Dr. Crowns'
7 leadership?
8     A.  It involves the tagging of bodies, the
9 sealing of body bags, the preservation of
10 evidence on the bodies not removing property or
11 evidence from the bodies in the field for fear of
12 contaminating the body prior to the doctor
13 conducting an examination.
14        So, now we leave everything in
15 place as much as possible, seal it in a body bag,
16 put a body bag seal on it and leave it for the
17 examining doctor to -- to inspect in place,
18 document and review and they will then turn it
19 over to us.
20     Q.  And then you also mentioned some changes
21 with respect to report writing?
22        MS. ABSTON:  Objection.  Form.
23        THE WITNESS:  Yes, ma'am.  Yes,
24 ma'am.
25        We implemented some better

1 templates involving different types of deaths.
2 You would see it in our narrative for a -- a
3 structured, Q & A better for answering questions
4 involving certain types of deaths such as a motor
5 vehicle death.
6 BY MS. LAGOS:
7     Q.  Have any of the -- strike that.
8        Do any of the changes relate
9 specifically to opioid overdose death
10 investigations?
11     A.  No, ma'am.
12        MS. LAGOS:  I think I am done with
13 my questions at this point in time.  I'm going to
14 turn it over to Ms. Daniels to ask a few
15 questions.
16        MS. DANIELS:  Where did you leave
17 off?  Exhibit 4.  Right?
18        MS. LAGOS:  Exhibit 4.
19        THE VIDEOGRAPHER:  Good with that.
20        MS. DANIELS:  That's fine.
21        MS. ABSTON:  And just to clarify,
22 Ms. Daniels, you are also with Albertsons.
23 Right?
24        MS. DANIELS:  Yes.
25        MR. BARRETT:  I will give this to

1 the Court Reporter to mark "Exhibit 5," or I can
2 mark it.
3        (Deposition Exhibit Number 5 is
4 marked.)
5           EXAMINATION
6 BY MS. DANIELS:
7     Q.  So what you have as "Exhibit 5," it's a
8 document ending in '92014.
9        Do you recognize this e-mail as an
10 e-mail that you sent in May of 2021?
11     A.  Yes, ma'am.
12     Q.  And in this e-mail you were sending some
13 instruction to FBI staff so that would be the
14 Forensic Death Investigator on staff.  Correct?
15     A.  Yes.
16     Q.  So in the e-mail, you are instructing
17 the staff to watch out for counterfeit
18 medications that are being found -- that were
19 found to have fentanyl in them.
20        What is your understanding of what
21 a counterfeit medication is?
22        MS. ABSTON:  Objection.  Form.
23        THE WITNESS:  A counterfeit
24 medication would be one not produced by a
25 legitimate pharmaceutical company and sold

Page 130

1  legitimately through a prescription service or
2  pharmacy.  One that is sold on a street level by
3  dealers and not packaged properly.
4  BY MS. DANIELS:
5      Q.  So these counterfeit medications, they
6  wouldn't be any sort of medication that would
7  have come from a Defendant pharmacy in this case?
8          MS. ABSTON: Objection to form.
9          THE WITNESS:  Not that I'm aware
10  of.
11  BY MS. DANIELS:
12      Q.  Is there a problem with counterfeit
13  medications that -- that contains fentanyl in
14  Tarrant County?
15      A.  Yes, ma'am.
16      Q.  Have you noticed that it's becoming more
17  widespread in recent years through these
18  investigations?
19      A.  Yes, ma'am.
20      Q.  When these counterfeit medications are
21  found on the scene, what -- what is done with
22  that?  Are they sent off for testing?
23          MS. ABSTON: Objection.  Form.
24          THE WITNESS:  That is not the death
25  investigator's job to -- to send stuff off for

Page 131

1  testing.
2          We either photograph and document
3  in the report and ask the Police Department to
4  seize them as evidence or if they don't seize it,
5  we may seize it as evidence, and we would put it
6  into evidence for the doctors to view or future
7  testing if needed or transfer back to the law
8  enforcement agency.
9  BY MS. DANIELS:
10      Q.  So in the investigation report, the
11  investigators would note whether they suspect
12  these to be counterfeit medications?
13          MS. ABSTON: Objection.  Form.
14          THE WITNESS:  Sometimes it might
15  say that.  Most of the time, it's just merely an
16  observation that they are found, not a conclusion
17  drawn as to whether or not they are, in fact,
18  counterfeit or not.  They're merely documenting
19  the presence of them.
20  BY MS. DANIELS:
21      Q.  When did the investigators start
22  documenting the presence of counterfeit
23  medications in fentanyl, that also may contain
24  fentanyl?
25      A.  At some time in the last two years,

Page 132

1  whenever the deaths starting becoming so
2  numerous, when it became an every day thing that
3  we were seeing, that it became to the point that
4  everybody knew common knowledge, and blue N30
5  found on a scene outside of proper packaging
6  laying on the ground or in a piece of foil as
7  this picture demonstrates, is probably a
8  street-related counterfeit pill.
9          MS. DANIELS:  I don't think I have
10  any further questions.
11  BY MS. DANIELS:
12      Q.  When it is documented based on the
13  investigation scene, will there be notes on -- in
14  the investigator's report or in the notes that
15  they that they take that they suspect, is there a
16  specific location that is suspected counterfeit
17  or fentanyl?
18          MS. ABSTON: Objection. Form.
19          THE WITNESS:  There will be a note
20  that they were observed or found on scene and a
21  note on the disposition on whether or not we had
22  to take it or the law enforcement had to take it.
23  BY MS. DANIELS:
24      Q.  But are there any notes to the point of
25  suspecting that they are counterfeit or contain

Page 133

1  fentanyl for the reasons that were briefly
2  mentioned earlier about being on the foil,
3  outside of the usual packaging?
4          MS. ABSTON: Objection to form.
5          THE WITNESS:  No field testing is
6  done by my staff at all to determine the presence
7  or absence of fentanyl or any type of opioids in
8  it.  And my staff cannot testify as to whether or
9  not it is, in fact, a counterfeit item or not.
10          It appears to us at the time, that
11  it may be a counterfeit item, but we do no
12  testing in the field for anything like that.
13          MS. DANIELS:  Thank you.  I have no
14  further questions.
15          MS. LAGOS:  I would just like to
16  attach Mr. Briggs' personnel file as "Exhibit 6."
17  We will just mark it as "Exhibit 6" to the
18  deposition.
19          (Deposition Exhibit Number 6 is
20  marked.)
21          MS. LAGOS:  I don't have any
22  questions about it.
23          MS. ABSTON:  Okay.  Yeah.
24          MS. LAGOS:  I'm handing this to
25  Court Reporter.  This is -- I think it's actually

34 (Pages 130 - 133)

Page 134

1 a duplicate, so.
2          MS. ABSTON:  Okay.  There are
3 multiple copies probably.
4          MS. LAGOS:  Yeah.
5          MS. ABSTON:  Okay.  Okay.  You can
6 give me one.
7          MS. LAGOS:  I'm not sure if the
8 other Defendants have any questions.  We're done
9 with our questioning.
10          Any other questions?
11          Kiley, any questions from you?
12          MS. AYCOCK:  I don't think -- I
13 don't think I'm going to have any today.
14          MS. ABSTON:  Do you mind if we take
15 a five-minute break?
16          MS. LAGOS:  Absolutely.  Yeah.
17          MS. ABSTON:  So we can wrap up.
18          THE VIDEOGRAPHER:  We're going off
19 the record at 2:03 p.m.
20          (Recess taken.)
21          THE VIDEOGRAPHER:  We are going
22 back on the record at 2:12 p.m.
23          MS. ABSTON:  Okay.  Plaintiffs
24 don't have any questions.
25          I just want to thank you for your

Page 135

1 time today, Mr. Briggs.  And thank you for coming
2 out.
3          MS. LAGOS:  Thank you, Mr. Briggs.
4 Very nice to meet you.
5          THE VIDEOGRAPHER:  We are going off
6 the record at 2:12 p.m.
7          (Deposition concluded at 2:12 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 136

1          IN THE UNITED STATES DISTRICT COURT FOR THE
                    NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION
3 IN RE NATIONAL PRESCRIPTION  §
   OPIATE LITIGATION            §
4                                §
   THIS DOCUMENT RELATES TO:     §      MDL No. 2804
5                                §      Case No, 17-md-2804
                                 §
6 Track Nine:                    §  Judge Dan Aaron Polster
   Tarrant County, Texas         §
7 (Case No. 1:18-op-45274-DAP) §
8          DEPOSITION OF JOHN PAUL BRIGGS
                       June 7, 2023
9
          I, Suzanne Kelly, RDR, CRR, in and for the State
10 of Texas hereby certify to the following:
11        That the witness, JOHN PAUL BRIGGS, was duly
   sworn by the officer and that the transcript of the
12 videotaped oral deposition is a true record of the
   testimony given by the witness;
13
          That the deposition transcript was submitted on
14 the _____ day of _____, 2023, to the witness for
   examination, signature and return to Suzanne Kelly by
15 the _____ day of _____, 2023;
16        That the amount of time used by each party at the
   deposition is as follows:
17
          Ms. Lagos:  Two hours and 46 minutes used;
18
          That pursuant to the information given to the
19 deposition officer in the time said testimony was
   taken, the following includes counsel for all parties
20 of record:
21
22
23
24
25

Page 137

1 Alex Abston, Esq.
        -and-
2 Leila Ayachi, Esq.
   THE LANIER LAW FIRM, P.C.
3 10940 W. Sam Houston Pkwy N.
   Suite 100
4 Houston, Texas 77064
   713.659.5200
5 alex.abston@lanierlawfirm.com
   leila.ayachi@lanierlawfirm.com
6
   Alexandra Bach Lagos, Esq.
7 GREENBERG TRAURIG, L.L.P.
   333 SE 2nd Avenue
8 Suite 4400
   Miami, Florida 33131
9 305.579.0813
   alexandra.lagos@gtlaw.com
10
   Kristina D. "Kristie" Daniels, Esq.
11 GREENBERG TRAURIG, L.L.P.
   77 West Wacker Drive
12 Suite 3100
   Chicago, Illinois 60601
13 312.476.5005
   danielskr@gtlaw.com
14
   Kiley Aycock, Esq.
15 QUILLING, SELANDER, LOWNDS, WINSLETT & MOSER, P.C.
   2001 Bryan Street
16 Suite 1800
   Dallas, Texas 75201
17 214.880.1809
   kaycock@qslwm.com
18
   Mark Kratovil, Esq.
19 Assistant Criminal District Attorney
   County of Tarrant
20 401 West Belknap
   9th Floor
21 Fort Worth, Texas 76196
   817.844.1233
22
23
24
25

35 (Pages 134 - 137)

Page 138

1    I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
2    attorneys in the action in which this proceeding was
taken, and further that I am not financially or
3    otherwise interested in the outcome of the action.
4    In witness whereof, I have this date subscribed my
name of
5
6
7    _____
     Suzanne Kelly
8    Certified Shorthand Reporter
     Certificate Number:  1260
9    Expiration Date:  11/30/2023
     Registered Diplomate Reporter
10   Certified Realtime Reporter
     Realtime Systems Analyst
11   Certificate of Merit Reporter
     Certified Livenote Reporter
12   VERITEXT LEGAL SOLUTIONS
     Firm Registration No. 571
13   300 Throckmorton Street
     Suite 1600
14   Fort Worth, Texas 76102
     817.336.3042 1.800.336.4000
15
16
17
18
19
20
21
22
23
24
25

Page 139

1         Veritext Legal Solutions
          1100 Superior Ave
2         Suite 1820
          Cleveland, Ohio 44114
3         Phone: 216-523-1313
4
     June 20, 2023
5
     To: Sadie Turner, Esq.
6
     Case Name: National Prescription Opiate Litigation - Track 9 (Tarrant
7    County) v.
8    Veritext Reference Number: 5925735
9    Witness:  John Paul Briggs       Deposition Date:  6/7/2023
10
     Dear Sir/Madam:
11
12   Enclosed please find a deposition transcript.  Please have the witness
13   review the transcript and note any changes or corrections on the
14   included errata sheet, indicating the page, line number, change, and
15   the reason for the change.  Have the witness' signature notarized and
16   forward the completed page(s) back to us at the Production address
     shown
17
     above, or email to production-midwest@veritext.com.
18
19   If the errata is not returned within thirty days of your receipt of
20   this letter, the reading and signing will be deemed waived.
21
     Sincerely,
22
     Production Department
23
24
25   NO NOTARY REQUIRED IN CA

Page 140

1         DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 5925735
3         CASE NAME: National Prescription Opiate Litigation - Track 9
     (Tarrant County) v.
          DATE OF DEPOSITION: 6/7/2023
4         WITNESS' NAME: John Paul Briggs
5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7         I have made no changes to the testimony
     as transcribed by the court reporter.
8    _____
9    Date         John Paul Briggs
10        Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
          Statement; and
14        Their execution of this Statement is of
          their free act and deed.
15
          I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17        _____
18        Notary Public
19        _____
          Commission Expiration Date
20
21
22
23
24
25

Page 141

1         DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 5925735
3         CASE NAME: National Prescription Opiate Litigation - Track 9
     (Tarrant County) v.
          DATE OF DEPOSITION: 6/7/2023
4         WITNESS' NAME: John Paul Briggs
5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7         I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9         I request that these changes be entered
     as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____
     Date         John Paul Briggs
14
          Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
18        They have listed all of their corrections
          in the appended Errata Sheet;
19        They signed the foregoing Sworn
          Statement; and
20        Their execution of this Statement is of
          their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20____.
23        _____
24        Notary Public
25        _____
          Commission Expiration Date

36 (Pages 138 - 141)

Page 142

1          ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2            ASSIGNMENT NO: 5925735
3    PAGE/LINE(S) /      CHANGE      /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____    _____
20   Date         John Paul Briggs
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
        Notary Public
24
     _____
25   Commission Expiration Date

Veritext Legal Solutions
www.veritext.com                                    888-391-3376