# EXHIBIT 59

Page 1

1          IN THE UNITED STATES DISTRICT COURT.
           FOR THE NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION
3   IN RE: NATIONAL PRESCRIPTION    ) MDL No. 2804
    OPIATE LITIGATION               )
4                                   )
                                    )
5   THIS DOCUMENT RELATES TO:       )
    Track Nine: Tarrant County,     ) Case No.: 17-md-2804
6   Texas                           )
                                    )
7                                   )
    (Case No. 1:18-op-45274-DAP)    ) Judge Dan Aaron Polster
8
    ---------------------------------------------------------
9
               ORAL AND VIDEOTAPED & VIA ZOOM
10             VIDEOCONFERENCE DEPOSITION OF
                    JENNIFER GILLEY
11                  AUGUST 18, 2023
    ---------------------------------------------------------
12
13          ORAL AND VIDEOTAPED & VIA ZOOM VIDEOCONFERENCE,
14  DEPOSITION OF JENNIFER GILLEY, produced as a witness at
15  the instance of the Defendants and duly sworn, was taken
16  in the above-styled and numbered cause on Friday,
17  August 18, 2023, from 10:05 a.m. to 3:18 p.m., before Kari
18  Behan, CSR, RPR, CRR, a Texas certified machine
19  shorthand reporter, at the offices of Greenberg Traurig,
20  LLP, 2200 Ross Avenue, Suite 5200, Dallas, Texas 75201,
21  pursuant to the Federal Rules of Civil Procedure and the
22  provisions stated on the record
23  herein.
24
25  Job No. 6059372

Page 2

```
 1        A P P E A R A N C E S
 2 FOR THE PLAINTIFF (REMOTELY):
 3    LEILA AYACHI, ESQ.
         - and -
 4    ALEX ABSTON, ESQ.
         - and -
 5    SADIE TURNER, ESQ.
      10940 W. Sam Houston Parkway N.
 6    Suite 100
      Houston, Texas 77064
 7    (281) 748-7693
      alex.abston@lanierlawfirm.com
 8    sadie.turner@lanierlawfirm.com
 9
10 FOR THE DEFENDANTS, THE KROGER CO., KROGER LIMITED
   PARTNERSHIP I, KROGER LIMITED PARTNERSHIP II, KROGER
11 TEXAS LP (REMOTELY):
12    AARON BOONE, ESQ.
      BOWLES RICE LLP
13    Granville Square
      Suite 400
14    Morgantown, West Virginia 26501
      (304) 285-2500
15    aboone@bowlesrice.com
16
17 FOR THE DEFENDANT, ALBERTSONS:
18    GREGORY FRANKLIN, ESQ.
      GREENBERG TRAURIG, LLP
19    2200 Ross Avenue
      Suite 5200
20    Dallas, Texas 75201
      (214) 665-3641
21    gregory.franklin@gtlaw.com
22
23
24
25
```

Page 3

```
 1 APPEARANCES (CONTINUED):
 2 ALSO PRESENT:
 3    Megan King, Videographer
         Veritext Legal Solutions
```

Page 4

```
 1        - - -
          I N D E X
 2        - - -
 3 EXAMINATION OF JENNIFER GILLEY        PAGE
 4
 5 BY MR. FRANKLIN............................ 8
 6 BY MS. AYACHI.............................107
 7 CHANGES AND SIGNATURE.....................109
 8 REPORTER'S CERTIFICATION..................111
 9        * * *
10      E X H I B I T S
11 EXHIBITS        DESCRIPTION        PAGE
12 Exhibit 1  Amended Notice of Deposition    13
              for The Challenge of Tarrant
13            County
14 Exhibit 2  Document titled "Family      49
              Recovery Court - Client Served
15            by Track," CHAL0000850
16 Exhibit 3  Letter dated January 31, 2008,  61
              from G.K. Maenius, CHAL0000107
17            through 0000110
18 Exhibit 4  Agreement, dated January 13,    63
              2009, CHAL0000111 through
19            0000113
20 Exhibit 5  Letter dated February 5, 2010,  64
              from G.K. Maenius, CHAL0000114
21            through 0000117
22 Exhibit 6  Letter dated February 1, 2011,  65
              from G.K. Maenius, CHAL0000118
23            through 0000121
24 Exhibit 7  Agreement dated February 14,    65
              2012, CHAL0000122 through
25            0000124
```

Page 5

```
 1 EXHIBITS (CONTINUED0:
 2 Exhibit 8  Agreement dated March 19,      66
              2013, CHAL0000125 through
 3            0000127
 4 Exhibit 9  Contract for Services,         67
              CHAL0000003 through 0000008
 5
   Exhibit 10 Contract for Services,         74
 6            CHAL0000009 through 0000015
 7 Exhibit 11 Letter dated July 30, 2013,    78
              CHAL0000018 through 0000020
 8
   Exhibit 12 Letter dated November 12,      82
 9            2013, from Wendy Curtis,
              CHAL0000021 through 0000030
10
   Exhibit 13 Contract for Services,         83
11            CHAL0000031 through 000035
12 Exhibit 14 Letter dated July 15, 2015,    84
              CHAL0000036
13
   Exhibit 15 Letter dated July 30, 2016,    84
14            CHAL0000037 and 0000038
15 Exhibit 16 Contract for Services,         86
              CHAL0000045 through 0000050
16
   Exhibit 17 Purchase Order and Contract    87
17            for Services, CHAL0000051
              through 0000075
18
   Exhibit 18 Letter dated July 10, 2020,    88
19            CHAL0000076 and 0000077
20 Exhibit 19 Letter dated November 4, 2020, 89
              CHAL0000086 through 0000091
21
   Exhibit 20 Letter dated July 23, 2021,    90
22            CHAL0000092 through 0000101
23 Exhibit 21 Annual Contract for           91
              Administration of Family Drug
24            Court, CHAL0000102 through
              0000106
25
```

Page 6

1 EXHIBITS CONTINUED:
2 Exhibit 22  Budget Year June 1, 2016 - May    93
        31, 2017, CHAL0001197
3
    Exhibit 23  Budget Year June 1, 2016 - May    93
4        31, 2017, CHAL0001199
5 Exhibit 24  Budget Year June 1, 2018 - May    93
        31, 2019, CHAL0001201
6
    Exhibit 25  Budget Year June 1, 2019 - May    93
7        31, 2020, CHAL0001204
8 Exhibit 26  Budget Year June 1, 2020 - May    93
        31, 2021, CHAL0001205
9
    Exhibit 27  Budget Year June 1, 2021 - May    93
10        31, 2022, CHAL0001207
11 Exhibit 28  Budget Year June 1, 2022 - May    93
        31, 2023, CHAL0001209
12
    Exhibit 29  Document pulled from          103
13        https://challengetc.org/
          naxalone, Frequently Asked
14        Questions
15
16
17
18
19
20
21
22
23
24
25

Page 7

1              PROCEEDINGS:
2         (Friday, August 18, 2023, 10:05 a.m.)
3         THE VIDEOGRAPHER:  We're on the record at
4 10:05 a.m., on August 18th, 2023.  This is the deposition
5 of Jennifer Gilley in the matter of, In Re: National
6 Prescription Opiate Litigation, filed in the Northern
7 District of Ohio, Eastern Division, Case No. 17-MD-2804.
8         At this time, counsel please state your
9 appearances for the record.
10        THE COURT REPORTER:  I think we're going to
11 do them stenographically.
12        Mrs. Gilley, would you please raise your
13 right hand?
14        THE WITNESS:  (Complied.)
15        THE COURT REPORTER:  Do you solemnly swear
16 the testimony you're about to give will be the truth, the
17 whole truth, and nothing but the truth, so help you God?
18        THE WITNESS:  Yes.
19        THE COURT REPORTER:  Thank you.  We may
20 proceed.
21          JENNIFER GILLEY,
22 after having been first duly sworn by the above-mentioned
23 Certified Court Reporter, was examined and testified as
24 follows:
25          EXAMINATION

Page 8

1 BY MR. FRANKLIN:
2    Q.  Give me a second, Mrs. Gilley.  I'm trying to
3 work on this.  Okay.  Now we are ready to get started.
4         Good morning, once again.  Could you please
5 state your name for the record?
6    A.  Jennifer Gilley.
7         THE VIDEOGRAPHER:  Counsel, could you put
8 your microphone on?  Thank you.
9 BY MR. FRANKLIN:
10   Q.  Mrs. Gilley, can you hear me okay?
11   A.  Yes.
12   Q.  Awesome.
13        Mrs. Gilley, my name is Gregory Franklin,
14 and I'm an attorney here at Greenberg Traurig, and I
15 represent the Albertson defendants in this case.
16        Also in Zoom land, I have my colleague,
17 Mr. Aaron Boone, who represents Defendant Kroger's.  Also
18 in Zoom we have counsel for the plaintiff, Tarrant County.
19        I just want to confirm with you this morning
20 that you and the town of Tarrant County are not being
21 represented by counsel?
22   A.  That is correct, yes, sir.
23   Q.  For the purpose of this deposition, when I use
24 the word "Defendants," I am referring to Albertsons as
25 well as Kroger's.  You understand that?

Page 9

1    A.  Yes, sir.
2    Q.  And as a -- an initial matter, because you are
3 not being represented by counsel, the dynamics of the
4 deposition may be a little strange than what you're
5 accustomed to.
6         You may hear -- either counsel may say
7 "form" or "object" to either a question I may pose to you
8 or how you respond, and that's just the way that we object
9 in depositions.  But after counsel states "form" or enter
10 their objection, please feel free to respond to the
11 question.
12        You understand that?
13   A.  No, sir.  I'm so sorry.
14   Q.  Okay.  Okay.  You may hear the word "form" or
15 "objection" throughout this deposition, and that's just
16 the way that counsel records an objection on the record,
17 but that doesn't prohibit you from having to respond to
18 the question.
19        You understand?
20   A.  I'm still required to respond?
21   Q.  Yes.
22   A.  (Witness nods head affirmatively.)
23   Q.  Okay.  And we'll go over some -- some
24 housekeeping matters just to -- so we can have some
25 guidelines for this deposition.

3 (Pages 6 - 9)

Page 10

1    You understand that you were sworn under
2  oath?
3    A.  Yes, sir.
4    Q.  And that means that you are sworn to tell the
5  truth.  You understand that?
6    A.  Yes, sir.
7    Q.  And as great as our court reporter is, she cannot
8  record gestures, head nods, and so what I'll request from
9  you is to give oral responses to the question.
10   A.  Yes, sir.
11   Q.  And as well, we want to avoid speaking over each
12  other.  It's not only difficult for the record, but it's
13  also difficult for the court reporter to get our exchange.
14  And so my request, as a housekeeping matter, is:  After I
15  pose the question, then you will -- I'll give it some
16  time, then I'll allow you to respond, to give your
17  complete answer, and then we'll go on to the next
18  question.
19   A.  Yes, sir.
20   Q.  Is there any reason today that you cannot give me
21  your full attention?
22   A.  No, sir.
23   Q.  Have you taken any medications that may prohibit
24  you from giving full answers -- full and accurate answers
25  this morning?

Page 11

1    A.  No, sir.
2    Q.  This -- a deposition isn't a test of endurance.
3  As a rule of thumb, I like to have breaks after each hour
4  to give the court reporter a break and then give the
5  witness a break.  But at any time if you need to take a
6  break, I request that, after I ask the question, I'll ask
7  for you to respond completely, and then once you are
8  completed with your response, we can take the break.
9    A.  Yes, sir.
10   Q.  At any point in time that you do not understand
11  my question, feel free to ask me to rephrase the question
12  or to repeat the question.  If you do not do so, I will
13  presume that you understood the question and that you are
14  answering the question according to -- how I intended
15  the question to go.
16   A.  Yes, sir.
17   Q.  Now, did you bring any documents with you today?
18   A.  No, sir.
19   Q.  Mrs. Gilley, have you been deposed before?
20   A.  No, sir.
21   Q.  Have you ever given testimony at trial before?
22   A.  No, sir.
23   Q.  So this is a totally new experience for you?
24   A.  It is.
25   Q.  And understanding that this is a new experience,

Page 12

1  feel free to relax.  We're just going to have a
2  conversation.  The things that will be presented today
3  are -- really will be based on the documents that you
4  produced to us back last -- November of last year.
5    So anything that you see today will
6  likely -- introduced by me will not be something that you
7  have not seen before, and the documents have also been
8  shared with all counsel for them to review.  So --
9    A.  Yes, sir.
10   Q.  So there won't be any surprises, and just please
11  relax.  I can see that you're feeling tense.
12    And if you need to take a break, we'll do
13  that at any point in time.  Understood?
14   A.  Thank you.
15   Q.  Okay.  Mrs. Gilley, are you familiar with the
16  allegations in -- that's -- of controversy in this case?
17   A.  No, sir.
18   Q.  I sent you a notice to your e-mail, j-e-n@tc- --
19  ttchallenge --
20   A.  -- tcchallenge.org.
21   Q.  -- .org.
22    Did you receive that notice?
23   A.  To be here today, yes.
24   Q.  I'm going to share with you Exhibit 1, which is
25  the Amended Notice of Deposition for The Challenge of

Page 13

1  Tarrant County.  Please take a look at it.
2    A.  (Witness examines document.)
3    (Exhibit 1 was marked for identification.)
4  BY MR. FRANKLIN:
5    Q.  Is this the notice that you received?
6    A.  Yes, sir, it is.
7    Q.  At a high level, Mrs. Gilley, the allegations
8  that have been alleged against the defendants is that
9  Albertsons and Kroger's are causing an opioid crises or
10  challenge in Tarrant County.
11    Do you have -- my first question is:  Do you
12  agree with that allegation?
13    MS. AYACHI:  Objection, form.
14    THE WITNESS:  I don't feel that I have the
15  ability to answer that question.
16  BY MR. FRANKLIN:
17   Q.  Other than gathering documents for this
18  deposition, have you had any involvement in this lawsuit?
19   A.  No, sir.
20   Q.  Before today, have you spoke to any other
21  attorney regarding this lawsuit?
22   A.  No, sir.
23   Q.  Have you reviewed any documents beyond the ones
24  you produced to me in November of 2022?
25   A.  No, sir.

4 (Pages 10 - 13)

Page 14

1    Q. Have you reviewed any documents related to the
2 defendants in this case?
3    A. No, sir.
4    Q. Are you aware of any other depositions that have
5 taken place in this case?
6    A. No, sir, only that you shared with me that there
7 were other depositions that were to take place.
8    Q. Have you informed anyone else that you're taking
9 a deposition in this matter?
10    A. Yes, sir, my board of directors.
11    Q. Please expo- -- please explain what you told
12 them.
13    A. That I had received a subpoena to be disposed
14 [sic] regarding the documents that I had delivered to you
15 last November.
16    Q. What we're going to do right now, Mrs. Gilley, is
17 go over your background. Are you from Texas?
18    A. I am.
19    Q. And did you go to high school here?
20    A. I did.
21    Q. Where?
22    A. In Strawn, Texas.
23    Q. I'm geographically challenged. Where is
24 Strong, Texas?
25    A. Strawn, S-T-R-A-W-N, is west of Fort Worth about

Page 15

1 65 miles.
2    Q. What county is that in?
3    A. Palo Pinto.
4    Q. What was the name of your high school?
5    A. Strawn ISD.
6    Q. When did you graduate from Strawn ISD?
7    A. In 1979.
8    Q. Did you pursue higher education after you
9 graduated from Strawn ISD?
10    A. I did.
11    Q. Where did you go to school?
12    A. Tarleton State University.
13    Q. You're a Purple People Eater.
14       What did you study at Tarleton State?
15    A. Science.
16    Q. Any particular discipline within science?
17    A. Biology.
18    Q. What years were you at Tarleton State University?
19    A. I was there four years, so from the time of
20 graduation, and then I completed a master's there after
21 graduating with my undergraduate degree.
22    Q. How long did it take for you to get your -- your
23 master's?
24    A. I'm so sorry. I'd have to do the math, but I
25 believe I worked on it for two to three years.

Page 16

1    Q. So, Mrs. Gilley, if I follow you correctly, you
2 started school at Tarleton in 1979, and you left Tarleton
3 State, that'd be, '84 or '85?
4    A. Approximately. I'm -- I'm sorry; I'm not sure of
5 the exact date.
6    Q. What did you get your master's in?
7    A. Education.
8    Q. Did you pursue any other grad- -- any other
9 education beyond your master's at Tarleton State?
10    A. No, sir.
11    Q. After you left Tarleton State, were you employed
12 by a business, company, et cetera?
13    A. I was employed by the Catholic Diocese of Fort
14 Worth as an educator.
15    Q. What year did you start with the Catholic Diocese
16 of Fort Worth?
17    A. I'm so sorry; I don't have those dates right off
18 the top of my head. It was upon my graduation with my
19 undergraduate degree. So it would be relatively the time
20 period that you previously stated.
21    Q. Well, I want to -- to be clear, the dates that I
22 previously stated was the time period between your
23 beginning your undergrad through your graduate studies.
24 But if I understand you correctly, you started working for
25 the Catholic Diocese after undergrad?

Page 17

1    A. That is a correct statement. I was going to
2 summer school to work on my master's.
3    Q. Would that have been 1983, thereabout?
4    A. Yes, sir, '83, '84.
5    Q. What did you teach for the Catholic Diocese?
6    A. In my first position, I was a instructor of
7 English, and then moving to a different school, I taught
8 science and speech.
9    Q. Within science, did you teach biology, which was
10 the basis of your undergrad degree?
11    A. No -- no, sir. I instructed in the physical
12 sciences.
13    Q. How long did you work for the Catholic Diocese?
14    A. In an effort not to in any way give you incorrect
15 information -- I'm sorry. I don't have that. I would've
16 gladly brought all of these dates with me had I known
17 that -- that this would be asked of me.
18    Q. Mrs. Gilley -- and I'm not asking you for the
19 exact date. But if you can give me an estimate of the
20 year, that will be helpful so I can understand the
21 relative time period for your -- recollection.
22    A. Three years as a classroom teacher, and then I
23 moved into administration.
24    Q. How long were you in administration?
25    A. Mr. Franklin, I'm not sure of the exact number of

5 (Pages 14 - 17)

1 years. That's been quite some time ago.

2    Q. After you left the Catholic Diocese, where were

3 you employed?

4    A. I was employed at AIDS Outreach Center.

5    Q. Why did you leave the Catholic Diocese?

6    A. I wanted a career change.

7    Q. Do you recall what year you started at the AIDS

8 Outreach Center?

9    A. No, sir, I don't. But I'd be happy to provide

10 that date to you.

11    Q. What was your role at the AIDS Outreach Center?

12    A. I was the coordinator of volunteer services.

13    Q. Please explain what you did as the coordinator of

14 volunteer services.

15    A. The clientele of AIDS Outreach Center, our

16 clients were individuals and families who were living with

17 HIV and AIDS. And during that period, I was the

18 supervisor of The Nutrition Center, The Legal Network, The

19 Minority Outreach Program, The Buddy Program.

20    Q. What was The Buddy Program?

21    A. It was the program that provided community care

22 for individuals in the community for other individuals who

23 were living with HIV and AIDS.

24    Q. I just want to take a quick step back. When you

25 worked for the Catholic Diocese, where -- where were you?

1    A. Fort Worth.

2    Q. Is the AIDS Outreach Center also located in

3 Fort Worth?

4    A. It is.

5    Q. Do you currently live in Tarrant County?

6    A. I do.

7    Q. Did you live in any other county between the time

8 you lived in Strawn, Texas, until whenever you were --

9 began your career at the Catholic Diocese?

10    A. I did not.

11    Q. Do you recall when you left the AIDS Outreach

12 Center?

13    A. I was there -- I left there in, to the best of my

14 recollection, 1998 -- wait just a moment, that is -- that

15 would be correct, yes.

16    Q. Why did you leave the AIDS Outreach Center?

17    A. I, again, had the opportunity to become the

18 executive director at Challenge, and so I interviewed for

19 that job.

20    Q. Okay. So you've been at Challenge of Tarrant

21 County since 1998?

22    A. That's correct.

23    Q. And for clarity purposes, I've heard it called

24 Tarrant Challenge, and I've also heard it being called the

25 Challenge of Tarrant County.

1    Which name is correct?

2    A. The registered name of the 501(c)(3) is Tarrant

3 County Challenge, Inc. d/b/a Challenge of Tarrant County.

4    Q. In a few minutes I want to talk more about your

5 role as executive director and the services that the

6 Challenge of Tarrant County provides, but I do have a few

7 more questions regarding your background.

8    Are you a member of any professional

9 organizations?

10    A. Our organization is a member of professional

11 organizations.

12    Q. Could you identify those professional

13 organizations that the Challenge of Tarrant County is a

14 member of?

15    A. Yes, sir. We're a member of Texas Association of

16 Substance Abuse Programs.

17    Q. Before we move on to the next one, tell me more

18 about that organization.

19    A. It's a state-wide organization that's, for all

20 practical purposes, a trade organization.

21    Q. What makes it a trade organization?

22    A. It's composed of members in the -- who deliver

23 services in the field of substance abuse treatment and

24 prevention.

25    Q. Is this, for a lack of better words, a lobbying

1 organization?

2    MS. AYACHI: Objection, form.

3    THE WITNESS: On some occasions, the

4 organization will engage in services -- engage in

5 activities that do educate regarding substance use

6 disorders. I'm not the executive director of that

7 organization, so I can't tell you all the intricacies.

8 BY MR. FRANKLIN:

9    Q. You don't have to tell me verbatim. But what is

10 the mission and purpose of the organization?

11    A. I can look that up and tell you, but I don't have

12 the mission of the organization memorized through its

13 mission statement. I'm not an officer of the

14 organization.

15    Q. Exactly. And that's how I -- that's why I asked

16 the question that way. You don't have to tell me the

17 exact articulated mission. But -- well, let me ask the

18 question a little bit differently. What is the purpose of

19 the organization?

20    A. I -- the organization has many purposes. It

21 depends upon how the organization that is a member chooses

22 to access or engage in those services. There's meetings

23 that take place for education and collaboration.

24    If there are particular issues that are

25 pertinent to the field, that would be something that the

Page 22

1 association would try to educate on.
2    Q. The Texas Association of Substance Abuse
3 Programs, based on what you just articulated is -- they
4 provide education services. My question to you is: Do
5 they provide education services exclusively on substance
6 abuse disorders?
7    A. No. They would also educate on prevention
8 activities as well.
9    Q. Who do they educate?
10    A. Educate members. So if you attend meetings of
11 the association, you could collaborate and gain education.
12    Q. And the organization would not provide education
13 to the general public outside of the members who
14 participate in the organization?
15    A. To the best of my knowledge, that would be
16 correct, yes.
17    Q. Do you recall what year the Challenge of Tarrant
18 County became a member?
19    A. I do not.
20    Q. To your knowledge, has this organization provided
21 education around the opioid challenges in the State of
22 Texas?
23         MS. AYACHI: Objection, form.
24         THE WITNESS: I -- I do not know the
25 answer -- I don't know the answer to that.

Page 23

1 BY MR. FRANKLIN:
2    Q. Where is the organization based?
3    A. The organization's executive director, I would
4 have to look up where she lives. I don't know. Most of
5 the meetings take place in Austin.
6    Q. There isn't a physical location where the Texas
7 Association of Substance Abuse operates out of?
8    A. I am not aware of a specific location. That
9 doesn't mean that one doesn't exist.
10    Q. In addition to the Texas Association of Substance
11 Abuses -- Abuse, what other organizations the Challenge of
12 Tarrant County is a member of?
13    A. We're a member of the -- of CADCA, which is the
14 Community Anti-Drug Coalition of America.
15    Q. Tell me more about that organization.
16    A. It's a very large national organization that
17 is -- has many, many facets to it.
18    Q. Well, what's the purpose of the organization?
19    A. To assist community coalitions that are working
20 in the prevention of substance use disorders in their
21 community.
22    Q. Is this a nonprofit organization?
23    A. It is.
24    Q. Where is it based?
25    A. Bethesda, Maryland, I believe.

Page 24

1    Q. Do they host education- -- educational seminars
2 like The Association of Substance Abuse?
3         MS. AYACHI: Objection, form.
4         THE WITNESS: Much -- much broader, much
5 larger, as a national organization.
6 BY MR. FRANKLIN:
7    Q. Do you have any knowledge of whether CADCA has
8 hosted or presented education on the opioid epidemic in
9 the United States?
10    A. I do not know that.
11    Q. What year did the Challenge of Tarrant County
12 become a member of CADCA?
13    A. I don't know that date off the top of my head.
14    Q. Is it still a member of the organization?
15    A. It is.
16    Q. What other organization is the Challenge of
17 Tarrant County a member of?
18    A. Tarrant County Mental Health Connection.
19    Q. Tell me more about Tarrant County Mental Health
20 Connection.
21    A. Tarrant County Mental Health Connection is a
22 collaboration that works to increase access for mental
23 health disorders in our community.
24    Q. Do they have a -- strike that question.
25         Do you know whether or not the organization

Page 25

1 is involved in addressing substance abuse disorders in
2 Tarrant County?
3    A. Involved to what extent? I -- I'm afraid I don't
4 understand your question.
5         We -- the organization works to create
6 access for a broad array of mental health services.
7    Q. To clarify that question, does the organization
8 specifically provide services to address substance abuse
9 disorders in Tarrant County?
10    A. No, sir.
11    Q. Is it more of a -- an educational organization,
12 or do they provide actual services addressing mental
13 health?
14    A. It is to create community awareness and access to
15 services.
16    Q. Well, when did the Challenge of Tarrant County
17 become a member of the Mental Health Connection?
18    A. I apologize, I do not know that exact date.
19    Q. Is the Challenge of Tarrant County still a member
20 of the organization?
21    A. It is.
22    Q. Is the Challenge of Tarrant County a member of
23 any other professional organization?
24    A. No, sir, we're not.
25    Q. Have you had any training related to

7 (Pages 22 - 25)

Page 26

1 uncontrolled -- controlled substances?
2          MS. AYACHI:  Objection, form.
3          THE WITNESS:  Do you mean, have I
4 participated in seminars that have educated me?
5 BY MR. FRANKLIN:
6      Q.  Yes.
7      A.  Oh, throughout my career, yes.
8      Q.  Are there any that you can identify?
9      A.  None specifically.
10     Q.  Then, generally, what types of things have you
11 learned from those training sessions?
12         MS. AYACHI:  Objection, form.
13 BY MR. FRANKLIN:
14     Q.  Well, let me ask the question more specifically.
15 When you've taken training based on controlled substances,
16 have you learned anything regarding the dispensing of
17 prescription opioids?
18         MS. AYACHI:  Objection, form.
19         THE WITNESS:  I have not specifically had
20 any training around the dispensing of opioids.
21 BY MR. FRANKLIN:
22     Q.  Have you had any training related to the
23 prevention of -- strike that question.
24         Have you been a part of any training that
25 had basic concepts of how to prevent substance abuse in

Page 27

1 the community?
2      A.  Yes, sir.
3      Q.  Do you recall who provided that training?
4      A.  Not specifically, no, sir.
5      Q.  So in the instance that we've just mentioned, how
6 do you engage with obtaining that training?  And let me
7 clarify here.  Is it something that you see as a part of
8 the industry, and you see that it's something of interest
9 to you, or is it a requirement for your role as executive
10 director of the Challenge of Tarrant County?
11     A.  It is not a requirement.
12         MS. AYACHI:  Objection, form.
13 BY MR. FRANKLIN:
14     Q.  In other words, you take the training because
15 it's something of interest to you?
16     A.  Only as it would affect the performance of my
17 duties at the organization.
18     Q.  Have you received any specialized training in
19 medicine?
20     A.  No, sir, I have not.
21     Q.  Have you received any training in pharmacy?
22     A.  No, sir, I have not.
23     Q.  Do you consider yourself an expert on drug
24 diversion?
25         MS. AYACHI:  Objection, form.

Page 28

1          THE WITNESS:  No, sir.
2 BY MR. FRANKLIN:
3      Q.  Do you consider yourself an expert in the area of
4 substance abuse disorders?
5      A.  I wouldn't say that I'm an expert, no.
6      Q.  How would you define a substance abuse disorder?
7      A.  I don't believe I have a textbook definition for
8 substance abuse disorder.  I'm not a clinician.
9      Q.  But what do you believe a substance abuse
10 disorder is?
11     A.  I believe that I would go to the textbook and try
12 to find a definition.  I don't have a definition for it.
13 That is not within the purview of my position.
14     Q.  Do you have any expertise related to opioids?
15     A.  I don't have any expertise other than some of the
16 prevention strategies that we have utilized in our work.
17     Q.  I'll ask this question now, but we'll get more
18 into it as we talk about the function of the Challenge of
19 Tarrant County.
20         But what, specifically, has the Challenge of
21 Tarrant County done to prevent the utilization of opioids?
22         MS. AYACHI:  Objection, form.
23         THE WITNESS:  We have provided community
24 prescription drop boxes for people to take unused or
25 expired prescriptions.  We have educated on the use of

Page 29

1 naloxone in overdose situations.  We've provided
2 community -- we've brought in outside speakers and
3 provided community symposiums.  We have engaged in
4 environmental strategies around community awareness in the
5 prevention of overdose.
6      Q.  And when did the Challenge of Tarrant County
7 implement the community prescription drop boxes?
8      A.  I'm not certain of the exact date.
9      Q.  Has it been within the last five years?
10     A.  To the best of my recollection, yes.
11     Q.  Has it been over five years?
12     A.  Without going back to documents, I wouldn't know
13 the -- the exact answer to that but would be happy to
14 provide that information.
15     Q.  Would the community prescription drop box be used
16 for all prescriptions beyond opioid prescriptions?
17     A.  It could be, because someone can take unused
18 prescriptions and put them into the drop box, but that is
19 mon- -- those prescription drop boxes are in locations --
20 the Drug Enforcement Administration is very specific about
21 where a drop box can be located and then how those
22 prescriptions are transferred to a safe location or
23 destroyed.
24     Q.  Do you have any transparency on what is placed in
25 a drop box that you've implemented?

8 (Pages 26 - 29)

Page 30

1   A.  No, sir, I don't -- I don't know what is placed
2 in those drop boxes.  They're located in hospitals,
3 clinics, police departments.
4   Q.  Do you have a drop box located at the Challenge
5 of Tarrant County location?
6   A.  No, sir, we would not be an appropriate location.
7 We would not be allowed to have a prescription drop box.
8   Q.  Was -- the extent of the implementation of the
9 drop boxes, was it just Tarrant County -- the Challenge of
10 Tarrant County providing awareness of the existence and
11 the locations of the drop boxes?
12   A.  Purchase, payment for purchase, delivery, and
13 community awareness regarding the locations.
14   Q.  You mentioned that you've -- the organization has
15 educated on the use of naloxone in overdose situations.
16 Did you provide that education in a seminar?
17     MS. AYACHI:  Objection, form.
18     THE WITNESS:  That information would be
19 provided in individual trainings for groups of
20 individuals.
21 BY MR. FRANKLIN:
22   Q.  Please explain that a little bit further when you
23 say it would be provided to groups of individuals.
24   A.  School resource officers, school nurses.
25   Q.  Would you provide educational material, such as

Page 31

1 brochures, fly- -- flyers, et cetera?
2   A.  No, sir, that is not in that format.
3   Q.  Then when we talk about educating the groups,
4 this would be an oral education?
5   A.  That would, sir.
6   Q.  Does the Challenge of Tarrant County purchase
7 naloxone -- naloxone?
8   A.  The brand name is naloxone.
9   Q.  Naloxone?
10   A.  No, sir, we do not purchase it.
11   Q.  You -- do you maintain it at the Challenge of
12 Tarrant County office?
13   A.  We do not.  Individuals can have naloxone.  We've
14 worked to facilitate that that be provided to schools,
15 college campuses, in the event that someone would need to
16 be resuscitated utilizing that.
17   Q.  But the Challenge of Tarrant County would not
18 distribute naloxone to any entities or persons?
19   A.  Well, in the -- yes, if we were able to obtain it
20 and could provide it free of charge, yes.
21   Q.  Has the Tarrant -- has the Challenge of Tarrant
22 County done so historically?
23     MS. AYACHI:  Objection, form.
24     THE WITNESS:  We have provided naloxone to
25 school districts in order for them to have it available,

Page 32

1 but we did not purchase it.  There have been many programs
2 through the State that have provided that historically
3 free of charge.
4 BY MR. FRANKLIN:
5   Q.  When did the Challenge of Tarrant County begin
6 distributing naloxone to school districts?
7   A.  Well, it was only in the last legislative session
8 where that became possible to do with school districts.
9   Q.  Are you referring to the 2021 legislative session
10 or the 2023 legislative session?
11   A.  I believe it was in the most recent one.
12   Q.  Then if I understand correctly, the Challenge of
13 Tarrant County has only recently began to distribute
14 naloxone to Tarrant County school districts?
15   A.  That is correct.
16   Q.  Do you know about how many have been distributed?
17   A.  No, sir, I don't.
18   Q.  And you also mentioned that you-all provided --
19 that you brought in outside speakers and provided the
20 community with symposiums regarding -- regarding opioids.
21   A.  Yes, sir.  I provided all of those conference
22 brochures to you in documents that were delivered to you
23 in November.
24   Q.  And did you speak at any of the symposiums or
25 conferences?

Page 33

1   A.  Only in the capacity of welcoming our guests.
2   Q.  Do you recall any specific topics that was
3 discussed at the seminars and conferences?
4   A.  No, sir, I don't.
5   Q.  Which years did the Challenge of Tarrant County
6 host the seminars and conferences?
7   A.  I'm sorry; I don't know the exact dates.  But,
8 again, the conference brochures are in the items that were
9 provided to you in November.
10   Q.  Would you say that you've hosted these
11 conferences within the last five years?
12   A.  Yes.
13   Q.  Anything -- strike that.
14     Have you hosted any of these conferences
15 prior to 2018?
16   A.  I would prefer to have the documents checked for
17 the exact dates.
18   Q.  Do you recall why the organization decided it was
19 important to host these conferences?
20     MS. AYACHI:  Objection, form.
21     THE WITNESS:  The opioid crises has been a
22 part of the national dialogue, and as part of our mission,
23 we would work to educate the community on growing trends.
24     MR. FRANKLIN:  Mrs. Gilley, we are at the
25 top of the hour.  Is everybody ready for a five-minute

9 (Pages 30 - 33)

Page 34

1 break?

2          MS. AYACHI:  Yeah, that's fine.

3          MR. FRANKLIN:  Okay.  Let's do that.

4          THE VIDEOGRAPHER:  All right.  We're off the

5 record at 11:00 a.m.

6          (Brief recess taken.)

7          THE VIDEOGRAPHER:  We're back on the record

8 at 11:10 a.m.

9 BY MR. FRANKLIN:

10     Q.  Now, Mrs. Gilley, you understand that you are

11 still under oath?

12     A.  Yes, sir.

13     Q.  I may go back to your background in a little bit,

14 but I would like to go more towards your current position

15 at the Challenge of Tarrant County.

16          If I understood you correctly, you started

17 with the Challenge of Tarrant County in 1998?

18     A.  That is correct.

19     Q.  How long has the Challenge of Tarrant County been

20 in existence?

21     A.  1984.

22     Q.  Do you know who the prior executive director was

23 before you filled the role?

24     A.  I do.  I'm not at the moment recalling her

25 name -- ah, Julie Stephens.

Page 35

1     Q.  Please describe your role as the executive

2 director for Tarrant Challenge.

3     A.  My role is the supervision of staff.  I'm

4 responsible for the budget, responsible for fundraising

5 through grants and local initiatives.  I report to the

6 board of directors, responsible for audits, recordkeeping,

7 responsible to funders for deliverables.

8     Q.  What type of programs and initiatives does the

9 Challenge of Tarrant County offer?

10     A.  Challenge has five community coalition projects

11 for the State of Texas through the Health and Human

12 Services Commission.  We have a federal drug-free

13 community support grant.  We are the administrator of the

14 services provided for the Tarrant County Recovery Court.

15          I don't believe I've left out anything.

16 We -- part of the mission of the coalition is community

17 education and awareness.

18     Q.  When you discussed your role and responsibilities

19 as executive director, you mentioned local initiatives.

20          Are you referring to the role as the

21 administrator of the Court, to be a part of that, or were

22 you referring to something different?

23     A.  Would you repeat the question, please?

24     Q.  Yes.

25          In your earlier response regarding your

Page 36

1 roles and responsibilities as the executive director, you

2 said that you are responsible for local initiatives.

3          Could you define to me what you are

4 referring -- you were referring to as local initiatives?

5     A.  For example, at one time we had United Way

6 funding to do community education in schools.  That would

7 be a local initiative.  The State funds us to provide

8 these five community coalition projects.  Those are local

9 initiatives.

10     Q.  Do all of the projects involve or have a nexus of

11 addressing substance abuse issues?

12     A.  Yes.  We have had, over the course of the last

13 year, a funding source through the State that was funded

14 through federal COVID relief dollars that specifically

15 focused on community health and wellness in underserved

16 communities disproportionately impacted by the COVID

17 epidemic.

18     Q.  What is the mission of Tarrant Challenge?

19     A.  The mission of Challenge is to educate the

20 community, mobilize resources, promote collaboration, all

21 around substance use disorder prevention, intervention,

22 and treatment services.

23     Q.  Although I know this may vary, how many people

24 are on staff in support of Challenge?

25     A.  At this time, we have ten full-time paid staff,

Page 37

1 and that includes myself.

2     Q.  We can go one by one.  But who do you have on

3 staff at Challenge?

4     A.  Do you mean position-wise?

5     Q.  Name and position.

6     A.  We have John Haynes, who is our chief operations

7 officer.  We have the five community coalition project

8 directors.

9          You want me to give you the name of each

10 one?

11     Q.  Yes, please.

12     A.  Catherine Neil, Michelle Gonzalez, Claudia

13 Perkins, Erica Castillo, and McKenzie Martinez.

14          The program director for our drug-free

15 community support grant is Abby Hancock.  The supervisor

16 over our prevention services is -- am I allowed to look?

17 It's Melissa -- I'm trying to think of Melissa's last

18 name -- Melissa McCarthy.  And the last person is

19 Joanna Letz, who is one of the directors in our Family

20 Recovery Court.

21     Q.  Please describe the roles of Ms. Neil,

22 Ms. Gonzalez, Ms. Perkins, Ms. Castillo, and Ms. Martinez,

23 as the commun-- -- community coalition directors?

24     A.  They are located -- three of them are located on

25 college campuses: UTA, TCU, and Weatherford College.  The

10 (Pages 34 - 37)

1 other two individuals work with high school and middle
2 schools, one in the northeast quadrant and one in the
3 northwest quadrant.
4          Their role is to develop the community
5 coalitions in those particular areas and to implement
6 environmental strategies designed to reduce substance use
7 disorders, underage binge drinking, and prescription drug
8 abuse.  And the parameters of those coalitions are defined
9 by the State of Texas through the Texas Health and Human
10 Services Department.
11     Q.  Are their roles funded by the Texas Health and
12 Human Services Department?
13     A.  Yes, sir.
14     Q.  Can you give me an example of how a director
15 would implement the aforementioned environmental strategy
16 designed to reduce substance use disorders?
17     A.  It might be through designing a social media
18 campaign that would be featured at sporting events.  It
19 might be through engaging community members to be part of
20 one of the Drug Enforcement Administration Drug Take Back
21 events.  It might be through tabling events, just
22 educating about underage drinking, binge drinking, and the
23 potential consequences.
24          Does that answer your question?
25     Q.  Yes.

1          Are -- are these programs designed
2 generically to address substance abuse for all drugs and
3 alcohol?
4     A.  Yes.
5          MS. AYACHI:  Object to form.
6 BY MR. FRANKLIN:
7     Q.  You mentioned that you have a -- that
8 Abby Hancock is the program director for the drug-free
9 community support grant.
10          Who provides the drug-free community support
11 grant?
12     A.  That program was initially funded by the
13 Substance Abuse and Mental Health Services Administration
14 through the federal government, but it was transferred to
15 the CDC, Center for Disease Control and Prevention, two
16 years ago.
17     Q.  And what, specifically -- what services
18 specifically does Ms. Hancock provide as the drug-free
19 community support grant director?
20     A.  That similar process of environmental strategies
21 and community education, and it focused specifically on
22 the City of Arlington working with the school districts.
23     Q.  So Ms. Hancock's role is pretty similar to
24 Ms. Castillo and Ms. Martinez's?
25     A.  Yes, sir.

1     Q.  It's just that they're getting paid from
2 different buckets?
3     A.  They are funded through different grant sources.
4     Q.  Tell me more about Ms. McCarthy's role as the
5 supervisor over prevention services.
6     A.  She is the direct supervisor that works with four
7 of our community coalitions to help them implement the
8 strategies outlined in their contracts and does the
9 reporting of measures to the State and -- and assists with
10 the federal as well.
11     Q.  Can you clarify what you mean by "contracts"?
12 And let me be more specific.  Who are the parties to the
13 contracts in which you refer?
14     A.  The State provides contracts to providers.  There
15 is a competitive grant procurement process that takes
16 place every four to five years for all services in the
17 State of Texas.  And during that procurement process, they
18 select organizations to provide the entire array of
19 prevention, intervention, and treatment services in the
20 State of Texas.  I wouldn't be able to tell you the number
21 of organizations they contract with, but it's several, to
22 say the least.
23          That contract outlines the amount of funding
24 for the programs that we are charged with delivering.  It
25 is the same with our federal contract.  These are

1 competitive grants.
2     Q.  It sounds like the Challenge of Tarrant County
3 has done well to get to the competition to receive these
4 grants.
5          MS. AYACHI:  Objection, form.
6 BY MR. FRANKLIN:
7     Q.  The last person you mentioned -- no.  The
8 next-to-last person you mentioned -- no.  The last person
9 you mentioned was Joanne Letz?
10     A.  Joanna Letz, yes, sir.
11     Q.  And she is the director for the recovery court?
12     A.  Coordinator is her title.
13     Q.  Coordinator of the recovery court?
14     A.  Yes, sir.
15     Q.  I know that this may vary.  But how long have you
16 had a staff of ten persons?
17     A.  For the last five years.
18     Q.  Prior to 2018, about how many people did you have
19 on staff?
20          MS. AYACHI:  Objection, form.
21          THE WITNESS:  I'm trying to think of how
22 many programs we had at that time.
23          To the best of my recollection, we had
24 seven.
25 BY MR. FRANKLIN:

11 (Pages 38 - 41)

Page 42

1    Q.  Does the increase in staff reflect the increase
2  of initiatives that are executed by the Challenge?
3          MS. AYACHI:  Objection, form.
4  BY MR. FRANKLIN:
5    Q.  I'll ask the question a little differently.
6    A.  Thank you.
7    Q.  Did you increase staff because you had additional
8  initiatives that the Challenge wanted to execute?
9    A.  Yes, sir.
10          MS. AYACHI:  Objection, form.
11  BY MR. FRANKLIN:
12    Q.  I now want to discuss the Family Recovery Court
13  program.  And to your knowledge, when did the Family
14  Recovery Court program start?
15    A.  I cannot tell you the exact date.
16    Q.  Did the program exist prior to you starting the
17  executive director role?
18    A.  No, sir.
19    Q.  Was it within the last ten years?
20    A.  I am not good at recalling exact dates, as I've
21  exhibited this morning, but I am happy to provide you with
22  the exact date on which the project began.
23    Q.  How did the Challenge of Tarrant County get
24  involved with the Family Recovery Court?
25    A.  Tarrant County has long had many diversion

Page 43

1  courts, and one of our family court judges began to
2  realize that, quite often, a parent would have a child
3  removed by Child Protective Services as a result of an
4  existing substance use disorder which made them incapable
5  of caring for that child.
6          And there was a reoccurring pattern, and we,
7  as a community, realized that the outcomes for children
8  that are placed in the foster care system are not good
9  and that if we could help parents get into treatment and
10  recovery and be able to have their children return to
11  them, that the outcomes for those children would be much
12  better than those children entering the foster care system
13  and, many times, aging out of foster care.
14          We wrote to foundations locally, met with
15  them, and secured the initial funding for the project
16  which provides case-management services and referral to
17  treatment at no cost to the parents.  And then we work
18  very closely with Child Protective Services to ultimately
19  renight- -- reunite those children in a safe and healthy
20  home with their parents.
21          I'm not sure I've answered your question.
22    Q.  Yes.
23          Based on what you've said -- and correct me
24  if I'm wrong -- the Family Recovery Court is a
25  diversionary program?

Page 44

1    A.  It is.  It is a civil court, unlike some
2  diversion courts that are criminal in nature.
3    Q.  Who did you engage with within Tarrant County to
4  implement the Family Recovery Court program?
5          MS. AYACHI:  Objection, form.
6          THE WITNESS:  Do you mind rephrasing,
7  please?  I'm not sure I understand your question.
8  BY MR. FRANKLIN:
9    Q.  If I understood your testimony earlier, the
10  Challenge of Tarrant County developed this program.
11          Did you introduce this program to a
12  particular department within Tarrant County?
13    A.  We did not.  We were working with the judges who
14  deal with the Child Protective Services removal cases in
15  Tarrant County.
16    Q.  And do you remember the judge's name?
17    A.  Judge Ellen.  I'm certain that the -- the last
18  name will come to me.
19    Q.  That's fine.
20          And once the Family Recovery Court program
21  was implemented, did you report to Judge Ellen?
22    A.  Yes.
23    Q.  Although -- I know it's been several years.  But
24  what other judges have you worked with since Judge Ellen?
25    A.  I don't work with this program on a daily basis,

Page 45

1  and so my function is not daily interaction with the
2  Court.  Those particular judges resided in the 323rd, and
3  that -- that court has since moved from the 323rd to an
4  alternate court downtown.
5    Q.  Do you know the name of the court?
6    A.  I don't know the number, but I can obtain that
7  information for you.
8    Q.  You did discuss this briefly, but it would help
9  my understanding if you take me through the intake process
10  of someone who comes to the Family Recovery Court, from
11  the time that they were assessed and referred to your
12  program.
13    A.  If -- there are different tracks within the
14  Family Recovery Court:  some parents needing intensive
15  residential services, some parents needing an inter- --
16  intermediary program perhaps with outpatient services, and
17  some just needing very minimal service.
18          In some -- in the cases of those individuals
19  the children have not been removed, if an individual is
20  referred to the Family Recovery Court, either by the
21  attorney, whoever is assigned to that individual, would
22  request an assessment, that would be provided to determine
23  if they were eligible for the program.
24          There are a lot of things that impact that.
25  I'm sure you're familiar with ASFA.  It has to be possible

12 (Pages 42 - 45)

1 during the time period available since the case was filed.
2 There's only a certain period of time, as you know, when a
3 return can take place.  If that individual were assessed
4 to be eligible for the recovery court, then they would be
5 directed to what is referred to as the OSAR, Outreach,
6 Screening, Assessment, and Referral, another organization
7 in Tarrant County funded by the State of Texas.  They
8 would be assessed to determine the level of care that they
9 needed.
10        We would be working with CPS, because it's
11 very important that, while mother, father, or both, are in
12 treatment, that they're still able to have visitation with
13 their children.  So we would be working on that.
14        After the individual leaves treatment, it is
15 very often that they are homeless and without housing.  So
16 the case managers, who we subcontract for with another
17 organization, would be working to find them housing,
18 either at Salvation Army, Union Gospel Mission, one of the
19 recovery support housing programs in town.
20        We would be working to help them with --
21 sometimes individuals don't have birth certificates or
22 Social Security cards, et cetera.  The case managers would
23 be working on them to help them obtain whatever documents
24 they might need.  We would be helping them address the
25 case-management staff through the other organization.  If

1 they needed other medical services, we would be working to
2 help them enroll in Medicaid in order that they could get
3 those services.
4        They would go through whatever treatment
5 program had been deemed appropriate.  Those are, again,
6 paid for by the State.  As part of that procurement
7 process, we talked about Challenge doesn't do treatment,
8 but other organizations in our community do.
9        They would be meeting with their care team.
10 They would be meeting with the judge on a regular basis to
11 talk about their progress, to see if there were any
12 special needs that weren't being met and how we could work
13 as a team to meet those needs.  And CPS would be a part of
14 this entire process, because the ultimate goal is that
15 these children be reunited with their parents.
16 Q.  I do have some follow-up questions based on what
17 you just testified to.
18        Who performs the initial assessment to
19 determine whether someone with a substance abuse issue
20 qualifies for the Family Recovery Court?
21 A.  That would most likely be Joanna.  The only
22 requirement is that -- that would exclude someone from the
23 program would be certain acts of domestic violence or
24 other type of -- of violent behavior.  There's no
25 financial cost to the individual for entering the Family

1 Recovery Court.  So that's --
2 Q.  Then the -- the Family Recovery Court intakes
3 persons with substance abuse issues regardless of the
4 substance that person may be addicted to?
5 A.  Absolutely, yes.
6 Q.  Do you have to be a Tarrant County resident to
7 qualify?
8 A.  Yes, sir.
9 Q.  In this program does the Challenge of Tarrant
10 County provide services or assistance to juveniles?
11 A.  The -- they would not -- the only situation I can
12 imagine is if one of the children that had been removed
13 had some special -- I can't imagine what the need would
14 even be.  Because we would link them with another -- if
15 they didn't have clothing or if they didn't have school
16 supplies, they would be linked with someone in our
17 community who could assist with that.  If they were put in
18 a relative placement and perhaps the -- the placement
19 couldn't afford to provide that, we would link them with
20 another community resource that could provide that child
21 with whatever that particular need was.
22        If there was -- CPS, at that point, is going
23 to be really on top of if that child needed special
24 counseling or needed trauma therapy or anything of that
25 nature.  CPS is responsible for the children.

1 Q.  We are about midway through August of 2023.
2        How many participants have come through the
3 Family Recovery Court this year?
4 A.  I have no idea.  I'm sorry; I don't.  I'm not
5 responsible for reporting that.  I would've been happy to
6 have provided that information had I known.
7        (Exhibit 2 was marked for identification.)
8 BY MR. FRANKLIN:
9 Q.  At this time I'm going to share with you
10 Exhibit 2, Bates Number CHAL0000850, which appears to be
11 the Family Recovery Court, Client Served By Track.
12        This was provided in your production.  I'll
13 just give you a moment to take a look at it.
14 A.  (Witness examines document.)
15 Q.  Do you remember?
16 A.  I do.  I can tell you that, at this point, the
17 numbers are higher.
18 Q.  Do you have an explanation of why the numbers are
19 higher now?
20 A.  No, I don't.  We've just served more clients this
21 year.
22 Q.  This report dates back to 2011 through 2022.
23        Did the Family Recovery Court exist prior to
24 2011?
25 A.  No, sir.

13 (Pages 46 - 49)

Page 50

1    Q.  And based on this -- on Exhibit 2, there appears
2  to be a ramp-up by track.  And let me clarify that.
3          The dates in which there appears to be
4  participants varied by year.  Is this based on the
5  available data, or did these particular tracks only exist
6  in the years in which they have numbers?
7    A.  They only existed during the years in which the
8  numbers are there.
9    Q.  Did you have any input into the development of
10 the tracks identified on here:  Intensive Support Track,
11 Recovery Support Track, and Early Intervention Track?
12         MS. AYACHI:  Objection, form.
13         THE WITNESS:  I'm sorry.  I don't understand
14 your question.
15 BY MR. FRANKLIN:
16   Q.  Did you help develop the Intensive Support Track
17 for the Family Recovery Court?
18   A.  Tarrant County Challenge helped develop the
19 tracks for the Family Recovery Court.
20   Q.  Who within the Challenge of Tarrant County would
21 have designed and developed the tracks?
22   A.  It would've been myself and different staff --
23   Q.  So in 20--
24   A.  -- in collaboration with the judge, who, of
25 course, is ultimately responsible for everything in the

Page 51

1  court.
2    Q.  Then who helped you to design the intensity --
3  Intensive Support Track in 2011?
4    A.  These tracks are simply -- as I mentioned
5  earlier, our goal is certainly early intervention, because
6  we want to save children and parents the trauma of
7  separation, of removal.  And so our goal is ultimately to
8  intervene as early as possible with the family so that a
9  child removal ultimately doesn't have to take place.
10         I -- I'm not sure that there's anything
11 particularly magic.  If you look at recovery courts around
12 the country, you'll see similar designs.
13   Q.  Well, let me ask you the question this way:
14 The -- the separation of the tracks in 2016, and again in
15 2020, was this a evolution of your understanding of the
16 needs of the participants?
17         MS. AYACHI:  Objection, form.
18         THE WITNESS:  No.  I -- I think it was --
19 our desire as it -- is to intervene earlier, but in this
20 case, you have to start at a level, and the individuals in
21 the intensive track were the ones most in need of those
22 services at that moment.  And then when we had the ability
23 to expand to less-intensive cases, we did.  I -- I
24 don't --
25 BY MR. FRANKLIN:

Page 52

1    Q.  That answers the question.
2    A.  Okay.
3    Q.  So from 2011 to 2022, there's an increase in the
4  overall numbers of persons who have participated in the
5  Family Recovery Court.
6          Do you have an explanation of why the
7  numbers increased over that period of time?
8    A.  The numbers increased as a result of having
9  additional tracks -- does that -- additional types of
10 tracks.
11   Q.  Okay.  So it was based on your ability to
12 accommodate more, rather than some underlying phenomenon
13 to increase the numbers across the board?
14   A.  Yeah -- yes, I'm not -- I'm trying to make sure I
15 understand your question, but I'm not sure I do.  I'm just
16 not --
17   Q.  Let me --
18   A.  Please don't think I'm dense.
19   Q.  -- ask the question this way:  So in 2022, the
20 amount of participants were 36 that came through the
21 family recovery drug court -- that number's pretty
22 accurate?
23   A.  Yes.
24   Q.  -- compared to 16 in 2011.
25         Was the need the same in 2011 as in 2022?

Page 53

1  The need for the services is what I'm referring to.
2          MS. AYACHI:  Objection, form.
3          THE WITNESS:  I'm not capable of answering
4  that question.
5  BY MR. FRANKLIN:
6    Q.  Okay.  We'll come back to that question.  I'll
7  think of a better way to ask the question to where you can
8  understand it.
9    A.  Okay.
10   Q.  From these numbers that you see here, are you
11 able to determine how many of the participants who have
12 come through the program suffered from addiction to
13 prescription opioids?
14         MS. AYACHI:  Objection, form.
15         THE WITNESS:  That information would exist
16 but only through client direct report through the
17 assessment.  When the -- when the initial screening is
18 done and then when the state-funded OSAR for our region
19 were to do the full assessment, they would normally, in
20 the course of that process, determine the client's drug
21 use, type, through report.
22 BY MR. FRANKLIN:
23   Q.  Would -- Joanne, since she's the person who does
24 the initial assessment, would she know that answer?
25   A.  No.  She would ultimately know after it was --

14 (Pages 50 - 53)

Page 54

1  the assessment was returned and the client entered the
2  program, if the client entered the program.
3       Q.  The Family Recovery Court serves persons with
4  addictions to a variety of substances.
5       A.  That is correct.
6       Q.  So would it be a correct assumption that, if at
7  all, someone had an addiction to prescription opioids,
8  that it would be a number less than 36 for 2022?
9            MS. AYACHI:  Objection, form.
10           THE WITNESS:  I don't know the answer to
11  that question.  It would require complete speculation on
12  my part.  I don't know the drug of use by any of these
13  clients, and I would -- I wouldn't speculate.
14  BY MR. FRANKLIN:
15       Q.  Has there been any indication that all of the
16  persons who come in through the Family Recovery Court have
17  come in with addictions to prescription opioids?
18       A.  Not that I'm aware.
19           MS. AYACHI:  Objection, form.
20  BY MR. FRANKLIN:
21       Q.  And it's your testimony that no one at the
22  Challenge of Tarrant County would know that information?
23       A.  Not -- it would require us to go back and pull
24  the individual assessments on each of these clients to
25  determine the report -- the self-report of that client as

Page 55

1  to their drug use.
2       Q.  Okay.
3           MR. FRANKLIN:  We are just a little bit
4  beyond the top of the hour, and I promised a lunch break.
5  And so if you-all are ready, we can go off record and take
6  a quick lunch.  Does 45 minutes work for everyone?
7           THE VIDEOGRAPHER:  We're off the record at
8  12:04 a.m.
9           (Brief recess taken.)
10          THE VIDEOGRAPHER:  We are back on the record
11  at 12:51 p.m.
12  BY MR. FRANKLIN:
13       Q.  Mrs. Gilley, you understand that you are still
14  under oath?
15       A.  Yes, sir.
16       Q.  Before we went on break, we were discussing the
17  Family Recovery Court, and we'll continue to discuss that
18  on the other side of lunch.
19           So is the Challenge of Tarrant County
20  responsible for drug testing for the Family Recovery
21  Court?
22       A.  We are.
23       Q.  Who within the Challenge of Tarrant County
24  administers the drug tests?
25       A.  That is subcontracted.  The case managers are

Page 56

1  both female, and so they would do the drug testing on the
2  ladies, and then we contract with two gentlemen who are --
3  who do the drug testing for the gentlemen in the program.
4       Q.  You subcontract out this particular part of the
5  services.  Who is the subcontractor?
6       A.  Lena Pope Home, Inc.
7       Q.  In addition to the drug-testing services, are
8  there any other services that Lena Pope Home provides to
9  Challenge?
10       A.  They provide the case-management services, and
11  the testing would just be something that the two female
12  case managers do in the course of business.
13       Q.  Explain to me the duties of a case manager.
14       A.  A case manager would make sure that someone is
15  making their appointments; attending their treatment
16  services; attending court, if court is part of that
17  particular obligation for the week; meeting with other
18  services that have been identified to meet the needs of
19  that client; housing; education.
20       Q.  When did Challenge first engage Lena Pope to use
21  their services?
22       A.  2011.
23       Q.  How much does the Challenge of Tarrant County pay
24  Lena Pope Homes [sic] for its subcontracted services?
25       A.  I would have to go back to the budget for the

Page 57

1  program to tell you that information.  It's not something
2  I would retain on the top of my head.
3       Q.  As an estimate, is it over $100,000?
4       A.  I'd prefer not to guess at what it is, but I'd be
5  happy to provide you the correct information.
6       Q.  Who purchases the drug kits?
7       A.  They are purchased through a grant that we have
8  through the Office of the Governor.  It's a -- it's a --
9  it's a grant that goes with specialty courts, if you're
10  able to get one of them.
11       Q.  Have you seen one of these kits before?
12       A.  I have.
13       Q.  I've -- I've heard of drug-testing kits before,
14  and I know that they differ.
15           But for the drug-testing kits that Challenge
16  of Tarrant County use, does it test all controlled
17  substances?
18       A.  I do not know the answer to that.  I'm happy to
19  obtain that information for you.
20       Q.  Does it test more than one controlled substance?
21       A.  Yes.
22       Q.  Do you ever send the test to any third parties,
23  such as labs, for results?
24       A.  If CPS requests a hair-strand analysis, that
25  would be conducted by an outside laboratory and would be

15 (Pages 54 - 57)

Page 58

1 paid for by Child Protective Services.
2   Q.  Are -- the drug-testing kits that the Challenge
3 of Tarrant County primarily use, are they the urine
4 analysis drug kits?
5   A.  Yes, sir.
6   Q.  After the drug test is performed, does the
7 Challenge of Tarrant County receive those results?
8   A.  Yes.
9   Q.  And what do you do with the results after you
10 receive the results?
11   A.  If the client were found to have a positive for a
12 substance, then CPS would be notified, and the care team
13 would work with the client to determine:  Do they need a
14 higher level of care?  What could be done to help them in
15 their recovery process?  What could be done to prevent a
16 reoccurrence?
17   Q.  So it's not like the Challenge of Tarrant County
18 would abandon that participant; it would just transition
19 or find additional care to adjust the need?
20   A.  Yes.  The judge would also be notified, of
21 course, but we would indeed work to determine what could
22 be done to more effectively assist that client in their
23 recovery.
24   Q.  Does the Challenge of Tarrant County maintain and
25 archive the test results?

Page 59

1   A.  It would -- it would be a part of the CPS record.
2   Q.  Would the Challenge of Tarrant County have access
3 to those records?
4   A.  I do not know the answer to that, but I'm happy
5 to get that information and provide it to you.
6   Q.  In addition to Lena Pope Homes, does the
7 Challenge of Tarrant County receive services from other
8 subcontractors?
9   A.  No, sir, not other than the two individual male
10 drug testers that I identified earlier.
11   Q.  We talked a little bit earlier -- or you
12 testified a little bit earlier about the Intensive
13 Recovery Track --
14   A.  Yes, sir.
15   Q.  -- and that there is a residential component to
16 it?
17   A.  Yes, sir.
18   Q.  Who provides the residential care for the
19 participants?
20   A.  We -- the primary provider for residential
21 services in Tarrant County that's funded by the State is
22 our local mental health authority, MHMR of Tarrant County.
23 It is not -- because clients can receive residential
24 services anywhere in the State, it wouldn't -- there have
25 been occasions where we have used Nexus Recovery Center

Page 60

1 here in Dallas, which has a -- a component for women.
2   Q.  But, again, those services would be pro- -- would
3 be funded by the State?
4   A.  Yes, sir.
5   Q.  What other services does the Challenge of Tarrant
6 County provide Tarrant County in addition to the
7 administration of a Family Recovery Court?
8   A.  I'm not sure I understand your question.  All of
9 the programs I outlined for you this morning take place in
10 Tarrant County.
11   Q.  Okay.  Well, let me ask the question a little
12 differently with context.
13        You mentioned that you pro- -- the Challenge
14 of Tarrant County provides educational services, as well
15 as administer the Family Recovery Court?
16   A.  (No response.)
17   Q.  When you provide the education services, is that
18 under the Family Recovery Court, or is that something
19 different?
20   A.  It's through our state contracts with the
21 Department of State Health Services --
22   Q.  Okay.
23   A.  -- as well as through the DFC grant that I
24 described this morning.
25   Q.  Okay.  So the only service that you really

Page 61

1 provide to Tarrant County as a entity is the
2 administration of the Family Recovery Court?
3   A.  That is correct.
4        MS. AYACHI:  Objection, form.
5 BY MR. FRANKLIN:
6   Q.  I'd like to spend some time going over the
7 documents that you produced, and many of the documents
8 were contracts.  So I'd ask for you to be patient with me
9 as we go through it, because I know there were several.
10        (Exhibit 3 was marked for identification.)
11 BY MR. FRANKLIN:
12   Q.  I'm going to share with you Exhibit 3, Bates
13 number ending in 107, ending in -- the final page ending
14 in 110.
15        Again, Mrs. Gilley, this is --
16   A.  This is a -- this is what is referred to as a
17 public assistance contract, and what this is for is
18 generalized community planning, needs assessments,
19 generalized community education, but it's a small -- it is
20 just a very small portion of our budget.  This is a --
21 but, yes, that's exactly what this is.
22   Q.  On page 3 with Bates number ending in 110, is
23 that your signature as the Officer and Authorized Agent?
24   A.  It is indeed.
25   Q.  And to summarize the content, if I understand

16 (Pages 58 - 61)

Page 62

1  what you're explaining correctly, this contract for
2  $30,000 is for, essentially, consulting services?
3      A.  No.
4      Q.  Okay.
5          MS. AYACHI:  Objection, form.
6  BY MR. FRANKLIN:
7      Q.  What is it -- please explain what -- the services
8  that are contracted under this agreement.
9      A.  This agreement is for us to do community
10 education, planning, looking at what the overall needs in
11 a given area might be.  We've done large community needs
12 assessments before, which would have certainly been
13 included in the documents that I provided you.  But if you
14 look at our overall budget -- well, you have my overall
15 budget.
16     Q.  And we'll get into that a little later.
17         Was this the first contract of its kind back
18 in 2008?
19     A.  No.  That was within the parameters of the
20 subpoena that you sent to me, the time frame that you had
21 within it in terms of the documents that I was to provide
22 you.
23     Q.  Who is G.K. Maenius?
24     A.  That is the county administrator.
25     Q.  And he is the person that you engage for

Page 63

1  executing the contracts; is that a correct statement?
2      A.  Well, I believe he prepares all -- I mean, he's
3  the county administrator.  I don't know all that
4  Mr. Maenius does, but I'm guessing that preparations of
5  contracts fall under the purview of his department.
6      Q.  To the extent that you know, it was his
7  department that created this contract?
8      A.  I don't know that.
9          MS. AYACHI:  Objection, form.
10         (Exhibit 4 was marked for identification.)
11 BY MR. FRANKLIN:
12     Q.  Okay.  Now, I'm going to share with you Exhibit
13 No. 4, Bates Number CHAL0000111 through Bates number
14 ending in 113.
15         You can take a second to look at it, if
16 needed.
17     A.  No, it's -- it's the same as I described before.
18     Q.  It's the same contract just extended from 2008 to
19 2009?
20     A.  No.  It is an annual sum of money that's given,
21 an annual contract.  It is not a -- are you -- I'm not
22 understanding your question.
23     Q.  Yeah.  So here, if I'm interpreting this
24 correctly, on the first page of the exhibit, it's for
25 services rendered beginning October the 1st, 2008, through

Page 64

1  September 30th, 2009.  I'm pointing your attention to the
2  bottom of the page, Section 2, last paragraph.
3      A.  Yes.
4      Q.  So my question was:  It was for the year -- for
5  the entire year, September the 1st, 2008, through
6  September the 30th, 2009?
7      A.  It is.
8      Q.  And the amount increased from 30,000 to 50,000?
9      A.  Yes.
10     Q.  And it's pointing your attention to the last
11 page, 113.  Can you confirm that is your signature?
12     A.  Yes.
13     Q.  You can set that one to the side -- Exhibit 4 to
14 the side.
15         (Exhibit 5 was marked for identification.)
16 BY MR. FRANKLIN:
17     Q.  And now I will show you Exhibit 5, Bates Number
18 CHAL0000114 ending in -- Bates number ending in 117.
19 Again, you can take a look at it, if it -- if you need to
20 refresh your memory.
21         Are these for the same services that were
22 identified in Exhibit 4?
23     A.  Yes.
24     Q.  And, again, confirming on the last page of the
25 exhibit that this is your signature?

Page 65

1      A.  It is.
2          (Exhibit 6 was marked for identification.)
3  BY MR. FRANKLIN:
4      Q.  Now showing you Exhibit 6, Bates Number
5  CHAL0000118, ending in -- the final page of the exhibit --
6  Bates number ending in 121.
7          You may take a look at it.
8      A.  (Witness examines document.)
9      Q.  Is this the same basic contract as what was
10 identified in both Exhibits 4 and 5, outside of -- the
11 operative dates for the year for services rendered October
12 the 1st, 2010, through September 30th, 2011?
13     A.  Yes.
14         MS. AYACHI:  Objection, form.
15 BY MR. FRANKLIN:
16     Q.  Then please confirm that on the final page of
17 this exhibit, Bates number ending in 121, that that's your
18 signature under Officer and Authorized Agent.
19     A.  It is.
20         (Exhibit 7 was marked for identification.)
21 BY MR. FRANKLIN:
22     Q.  I'll share with you now Exhibit 7, Bates
23 CHAL0000122; the last page of exhibit -- Bates number
24 ending in 124.
25         Is this your signature on Bates number

17 (Pages 62 - 65)

1 ending in 124 under -- above Officer and Authorized Agent?

2    A.  It is.

3    Q.  Is this agreement consistent with what was

4 introduced as Exhibits 4, 5, and 6?

5    A.  It is.

6    Q.  Okay.  Now I'll share with you Plaintiff's

7 Exhibit 8 -- not Plaintiff's Exhibit, just Exhibit 8 -- my

8 apologies --

9         (Exhibit 8 was marked for identification.)

10 BY MR. FRANKLIN:

11    Q.  -- with Bates number ending in CHAL0000125

12 terminating with Bates Number 127.

13        Now, this appears to be a similar agreement.

14 But could you confirm that this agreement is consistent to

15 the agreements that were introduced as Exhibits 4, 5, 6,

16 and 7?

17        MS. AYACHI:  Objection, form.

18        THE WITNESS:  (Witness examines document.)

19 It is.

20 BY MR. FRANKLIN:

21    Q.  Were there any additional services provided in

22 this agreement that were not provided in the agreements

23 identified in Exhibits 4, 5, 6, or 7?

24    A.  No.

25    Q.  And can you confirm that it's your signature on

1 the final page of the exhibit, Bates number ending in 127,

2 as the authorized agent?

3    A.  It is.

4    Q.  And this agreement covers the period from October

5 the 1st, 2012, through September 30th, 2013; is that

6 correct?

7    A.  It is.

8    Q.  I'll share with you now Exhibit 9, Bates Number

9 CHAL0000003.  Exhibit concluding with Bates number ending

10 in 007.

11        (Exhibit 9 was marked for identification.)

12 BY MR. FRANKLIN:

13    Q.  I want to take a few minutes to discuss what

14 appears to be another Contract for Services.

15    A.  This is -- this is the Family Recovery Court.

16    Q.  Okay.

17    A.  At that time, it was referred to as the Family

18 Drug Court.

19    Q.  And 2011 was the first year that the Challenge of

20 Tarrant County provided service to Tarrant County for the

21 Family Recovery Court; is that accurate?

22    A.  Yes, it is.

23    Q.  Can you confirm that this is your signature on

24 page 5 with Bates number ending in 007?

25    A.  (Witness examines document.)

1    Q.  I'll give you a moment to get there.

2    A.  It is my signature.

3    Q.  Okay.  Here under the Scope of Services appear to

4 be different than what was mentioned in the prior

5 exhibits, Exhibits 4 through 8.  I want to step through

6 the Contract for Services so you can explain to me what

7 the service entails, and we can start from Section 1 --

8 1.2.

9        It says:  The provider will provide a

10 full-time FDC supervisor to perform all duties outlined in

11 the roles and responsibilities in Section 4 -- or

12 Section 6 of Attachment A.

13        At this time, who was the full-time FDC

14 supervisor?

15    A.  I would have to go back to my records to tell you

16 that.

17    Q.  Well, what would be the duties performed by an

18 FDC supervisor?

19        MS. AYACHI:  Objection, form.

20        THE WITNESS:  Among those duties would be

21 meeting with the team that's working with the client,

22 working with the case managers, being present at

23 supervision hearings with the judge, communicating with

24 Child Protective Services --

25 BY MR. FRANKLIN:

1    Q.  When you --

2    A.  -- providing case notes.

3    Q.  When you said "meeting with the team," are you

4 referring to only the case managers, the judge, and the

5 CPS representative?

6    A.  The team, usually for an intensive client, would

7 consist of those individuals, and it would not be unusual

8 to have a CASA worker as well.

9    Q.  And CASA is an acronym for which organization?

10    A.  Child Advocates -- they're appointed by the

11 Court.  They're a national --

12    Q.  Understood.  I know many people are familiar with

13 CASA as CASA, but just for the record --

14    A.  Yes.  I'm sorry.  I don't know the --

15    Q.  And that's fine.

16    A.  -- Child Advocate Service...

17        I'm sorry.

18    Q.  At this time, who funded the salary for the

19 full-time FDC supervisor?

20    A.  A portion of it would have been funded through

21 this contract.

22    Q.  Who would have funded the other portion?

23    A.  It -- I would have to go back and check

24 specifically, but it could have been another funding

25 source.  It could have been a -- a grant from another

18 (Pages 66 - 69)

Page 70

1  source.  It could have been a governor's office funding a
2  small portion.  It could have been a CJD.  I don't -- I
3  don't recall, but it would have funded a portion of --
4  would have been funded from this contract.
5      Q.  If I interpret this contract correctly, it began
6  in 2011.  Would the funding proportions be the same today
7  as it was in 2011 with a half portion through the contract
8  and another portion funded through another source?
9          MS. AYACHI:  Objection, form.
10         THE WITNESS:  I do not know the answer to
11  that without checking the specific budget figures.
12  BY MR. FRANKLIN:
13     Q.  I want to quickly point your attention to the
14  second page of the exhibit, Bates ending in 004.
15         Under Section 2 for the term, it says:  This
16  contract begins in May -- on May 10th, 2011.  It concludes
17  on September 30th, 2011.
18         Is that a Scrivener error, or did this
19  contract only last through the summer of 2011?
20         MS. AYACHI:  Objection, form.
21         THE WITNESS:  We'd have to go back and check
22  as to why that date has that start -- why this contract
23  has that start date.
24  BY MR. FRANKLIN:
25     Q.  But if I interpret this Section 2 correctly, the

Page 71

1  contract came with three renewal -- renewal options for an
2  additional 12 months -- for an additional 12-month period
3  each?
4      A.  That's correct.
5      Q.  And, generally, these contracts are for a year?
6      A.  That is correct, with options of renewal.
7      Q.  I want to point your attention back to the first
8  page of Exhibit 9, Section 1.3.  Here it says:  The
9  provider will provide one full-time intensive case manager
10  and one part-time existing intensive case manager
11  position.
12         Here, is this referring to the resources
13  that you use at -- use from Lena Pope Home?
14     A.  That is correct.
15     Q.  You've already identified earlier what services
16  that they provide, so we won't go back through that here.
17         On Section 1.4, it says:  The provider will
18  provide fiscal administration of all funds utilized in the
19  operation of FDC, including fiscal oversight of all
20  contracts with subcontractors.
21         Is it the Challenge of Tarrant County that
22  establishes the budget for the Family Recovery Court?
23         MS. AYACHI:  Objection, form.
24         THE WITNESS:  The Family Recovery Court
25  budget is a part of our overall agency budget.

Page 72

1  BY MR. FRANKLIN:
2      Q.  Can you explain to me, in better detail, of what
3  the provision of 1.4 is requiring the Challenge of Tarrant
4  County to execute?
5      A.  It's stating that we would construct and execute
6  the contract with Lena Pope, and that if there were any
7  other grants that were received from the Substance Abuse
8  and Mental Health Services Administration or from some
9  other funding entity, that we would provide the oversight
10  for those if we received those grants.
11     Q.  Moving to Section 1.5, it states:  The provider
12  will provide grant writing and fund development for the
13  continuation and expansion of FDC.
14         Who -- as a part of this contract, which
15  entities did -- or does the Challenge of Tarrant County
16  solicit for grants and additional funding in support of
17  the federal -- of the Family Drug Court?
18         MS. AYACHI:  Objection, form.
19         THE WITNESS:  We have, in the past, made
20  grant requests to various organizations, federal and
21  state.
22  BY MR. FRANKLIN:
23     Q.  Can you identify any of those?
24     A.  We've written SAMHSA grants; we've worked
25  collaboratively on OJJDP grants; we've -- there's any

Page 73

1  number of sources.  Those are two that come to mind
2  readily.
3      Q.  Who on your staff would be responsible for
4  drafting the -- the grant proposals or the -- or
5  performing the fund development?
6      A.  Well, I would have a -- the major role in that.
7      Q.  Anyone else from your team?
8      A.  Our school operations officer would have some hand
9  in that as well.
10     Q.  You identified John Haynes --
11     A.  That's correct.
12     Q.  -- as your -- the chief operation officer?
13         Was he the chief operation officer at the
14  time this contract was executed?
15     A.  He was.
16     Q.  Moving on to Section 1.6, it says:  The provider
17  will collect, maintain, and store drug-testing samples
18  from all program participants?
19     A.  I think that should be -- well, that's saying
20  that we're going to provide the oversight.  We wouldn't be
21  storing samples.  We -- we might be storing the supplies,
22  but we wouldn't be storing samples of anything.
23     Q.  I'm moving to the next pages, Bates ending in
24  004, Section 1.7 of the contract:  The provider will
25  provide monthly and annual statistical collection and

19 (Pages 70 - 73)

Page 74

1 program evaluation including outcomes in evaluations of
2 associated services.
3         What type of deliverables specifically do
4 you provide Tarrant County in support or -- in support of
5 Section 1.7?
6     A. Well, the -- the two items that are referred to
7 there would most likely be:  How many clients were served,
8 how many family members were served, how many children
9 were in the program, the clients that successfully
10 completed the program, the number of reunifications that
11 took place.
12     Q. The information that you just mentioned, these
13 reports, would you provide those to the judge of the
14 court, or is there someone else within Tarrant County you
15 would provide this information to?
16     A. We would provide it to the judge; we would
17 provide it to any funder of -- that was giving serv- --
18 that was giving funds to the Family Recovery Court.  But
19 it's -- if we made a request to United Way for something,
20 we would include such data to show the success of the
21 program.
22     Q. Now, I would like to direct -- share with you
23 Exhibit 10, Bates Number CHAL0000009 and concluding with
24 Bates terminating in 015.
25         (Exhibit 10 was marked for identification.)

Page 75

1 BY MR. FRANKLIN:
2     Q. And this appears to be another Contract for
3 Services.  Does this contract differ to the -- to the one
4 we just talked about, Exhibit 9?
5     A. Yes, it does.
6     Q. How does it differ?
7     A. It differs by the funding source utilized in
8 payment.
9     Q. Who was the funding source in Exhibit 10?
10     A. This is -- I don't know.  It is -- it is for the
11 same program.  It is -- it looks to have come out of a
12 different funding source.
13     Q. Were the services provided the same under this
14 contract as in Exhibit 9?
15     A. I believe that if you look at No. 1, the scope of
16 services are listed.
17     Q. Yes.  And it doesn't have the same amount of
18 detail as the prior contract, but we can go through it
19 just to be sure.
20         Under Section 1.2:  Supervision of Family
21 Drug Court supervisor -- in this contract, would the
22 services rendered by the Family Drug Court supervisor be
23 the same as what was identified in Exhibit 9?
24     A. Yes.
25     Q. Where within the scope of services could I -- I

Page 76

1 find the services provided by the case managers?
2     A. The services provided by the case managers would
3 be delineated in the contract to Lena Pope.
4     Q. Is that here in this particular contract on --
5     A. No, sir.  That would be a contract from Challenge
6 of Tarrant County.
7     Q. I want to make sure I understand you.  So the
8 case managers' services would not be included in the
9 contract identified in Exhibit 10?
10     A. The case managers -- according to this particular
11 contract, case management was not paid out of this
12 contract.  It is -- only the 1.1 through 1.6 would have
13 been services provided out of this contract.
14     Q. The 1.3, the Consultation to Judges, is the same
15 as it was in the contract in Exhibit 9?
16     A. Yes, sir.
17     Q. 1.4, Grant Writing, is that the same as well?
18     A. Yes, sir.
19     Q. 1.5, Drug Testing, is that the same?
20     A. Yes, sir.
21     Q. And 1.6, the Evaluation Reporting to Funders, is
22 the same?
23     A. Yes, sir.
24     Q. And this contract ran from September the 1st,
25 2012, through August 31st, 2013?

Page 77

1     A. Yes, sir.
2     Q. I want to point your attention to page 5 of the
3 exhibit, Bates number ending in 013, Section 24.
4     A. Would you please say that again?
5     Q. Page 5.
6     A. Thank you.
7     Q. I want to point your -- direct your attention to
8 Section 24.  24.1, it says:  The provider is hereby
9 notified that state funds may be used in whole or in part
10 to pay for services provided under terms of this contract
11 and are subject to termination without penalty -- without
12 penalty, either in whole or in part, if funds are not
13 available or not appropriated by the Texas legislature.
14         Having read that, does that refresh your
15 memory on where these funds may have come from in support
16 of the contract?
17     A. I believe that this must have been an Office of
18 the Governor's grant.
19     Q. I'd like to point your attention to page 7, Bates
20 number ending in 015.
21         Can you confirm that it's your signature
22 under the Tarrant County Challenge, Inc.?
23     A. It is.
24     Q. Okay.  And the total amount paid under this
25 contract to Tarrant County Challenge was $10,261?

20 (Pages 74 - 77)

Page 78

1    A. It was.
2    Q. You may place that exhibit to the side.
3    A. (Complied.)
4        (Exhibit 11 was marked for identification.)
5  BY MR. FRANKLIN:
6    Q. Sharing with you Exhibit 11, Bates ending in --
7  well, Bates CHAL0000018, and the exhibit concludes in
8  Bates number ending in 028.
9        I can't recall exactly which exhibit it was,
10 but we talked about the -- the options to renew the
11 contract for the administration of the Tarrant County
12 Family Drug Court.
13       Is Exhibit 11 an example of that renewal?
14       MS. AYACHI:  Objection, form.
15       THE WITNESS:  (Witness examines document.)
16       It is -- the -- the page 1 is a copy of our
17 willingness to continue.  Are we looking at the same page?
18 BY MR. FRANKLIN:
19   Q. Yes, we are.
20       In terms of the renewal process, Tarrant
21 County will send you the renewal option, and you would
22 execute it, identifying yes or no, whether you want to
23 move forward for -- for the remainder of the renewal
24 period?
25   A. Yes, annually.

Page 79

1    Q. Okay.  So you would execute this on an annual
2  basis during the renewal period?
3    A. That is correct.
4    Q. And this is your signature on the first page of
5  Exhibit 11?
6    A. It is.
7    Q. I want to direct your attention to the second
8  page of the exhibit, Bates number ending in 020, which
9  purports to be a purchase order.  I do have a couple
10 questions about this exhibit, Mrs. Gilley.
11       If you look to the middle of the page, it
12 says:  Please deliver to Juvenile Services, Juvenile
13 Justice Center.  Do you see that?
14   A. I do.
15   Q. Do you know why this purchase order would be
16 delivered to Juvenile Services?
17   A. It would be delivered there, because at this
18 time, the 323rd court was housed at Kimbo Road, which is
19 also the Office of Juvenile Services.
20   Q. Okay.  So it's just Juvenile Services in name,
21 but the actual court itself supported adults?
22   A. In --
23       MS. AYACHI:  Objection, form.
24       THE WITNESS:  In this case, the Court dealt
25 with all Child Protective Services' cases at that time.

Page 80

1  BY MR. FRANKLIN:
2    Q. Okay.  I understand.
3        And also on the same page, it indicates that
4  the contract value is $177,768; is that correct?
5    A. Yes, sir.
6    Q. And these are funds that are paid directly from
7  Tarrant County to the Challenge of Tarrant County?
8    A. That is correct.
9    Q. Do you have any knowledge of whether the money
10 that was paid to the Challenge of Tarrant County pursuant
11 to this agreement came from a -- a grant by the State of
12 Texas or a federal grant?
13   A. It would be impossible --
14       MS. AYACHI:  Objection, form.
15       THE WITNESS:  -- for me to answer that.
16 BY MR. FRANKLIN:
17   Q. Okay.  Mrs. Gilley, I need your assistance to
18 help me understand.  As a part of this exhibit on Bates
19 number ending in 022, this appears to be similar to the
20 contract that was identified in Exhibit 10; is that
21 accurate?
22   A. Will you please restate your question?
23       MS. AYACHI:  Counsel, is this a new exhibit?
24       MR. FRANKLIN:  It's all a part of the same
25 exhibit.  It's -- I believe so.

Page 81

1        MS. AYACHI:  I've seen it as separate ones.
2        MR. FRANKLIN:  So the exhibit that I'm
3  referring to is from -- starts with Bates number ending 18
4  and concluding in 30.
5        MS. AYACHI:  I have -- I'm sorry to
6  interrupt you.  I have exhibits -- I have a document
7  ending in 21 as a separate document from the one beginning
8  with 18.
9        MR. FRANKLIN:  Okay.  Let's correct that.
10 BY MR. FRANKLIN:
11   Q. What -- your Exhibit 11 ends in what number?
12   A. 30.
13       MS. AYACHI:  Let's see.  So you said
14 Exhibit 11 ends in 18, correct?  That's what I have.
15       MR. FRANKLIN:  It starts at 18 and ends
16 in -- so what you may need to do -- can we go off record
17 for a second?
18       THE VIDEOGRAPHER:  We're off the record at
19 1:53 p.m.
20       (Brief recess taken.)
21       THE VIDEOGRAPHER:  We -- we are back on the
22 record at 2:00 p.m.
23 BY MR. FRANKLIN:
24   Q. All right.  I want to make a change to the
25 record.  Exhibit 11 begins with Bates CHAL0000018, and it

21 (Pages 78 - 81)

Page 82

1 concludes with Bates number ending in 020.
2          (Exhibit 12 was marked for identification.)
3 BY MR. FRANKLIN:
4     Q.  Exhibit 12 will be Bates beginning with
5 CHAL0000021 and concluding with Bates number that
6 terminates in 028.  Now, before that short break -- my
7 apologies -- that ends in CHAL0000030.
8          And before the break, we were just going
9 over the contracts that the Challenge of Tarrant County
10 has engaged with Tarrant County.  Now, looking at
11 Exhibit 12, the first page is a letter from Ms. Curtis,
12 Wendy Curtis, to -- to Mrs. Gilley, and this appears to be
13 another executed contract for the Family Drug Court.
14          Mrs. Gilley, starting with Bates number that
15 ends in 22, on the second page, is this similar to the
16 contract that we discussed in Exhibit 9?
17          MS. AYACHI:  Objection, form.
18          THE WITNESS:  It looks to me to be similar
19 to Exhibit 10.
20 BY MR. FRANKLIN:
21     Q.  Okay.  So this is the contract that is funded by
22 a different source than the contracts that we mentioned
23 before?
24          MS. AYACHI:  Objection, form.
25 BY MR. FRANKLIN:

Page 83

1     Q.  Is -- is this the contract that you mentioned
2 that may be funded by the Office of the Governor?
3     A.  It is possible.  I do not know.
4     Q.  Okay.  Can you confirm that it's your signature
5 on page 7 of 7, Bates ending in 028?
6     A.  Yes, it is.
7          (Exhibit 13 was marked for identification.)
8 BY MR. FRANKLIN:
9     Q.  Now, let's move to Exhibit 13, Bates -- Bates
10 beginning in CHAL0000031 and concluding in Bates that
11 terminates in 035.
12          Mrs. Gilley, can you confirm that this is
13 your signature on page 5 of 5, Bates number terminating in
14 035?
15     A.  Yes, it is.
16     Q.  And for the record, can you tell me what this
17 contract is for?
18     A.  It is for the services delineated under 1, Scope
19 of Services, 1.1 through 1.11, with Tarrant County for the
20 Family Drug Court.
21     Q.  And referencing the final page of this exhibit,
22 it states that:  Certification of funds available for the
23 amount of $196,441.08.
24          Was this the amount paid to the Challenge of
25 Tarrant County under this contract?

Page 84

1     A.  Yes, it was.
2     Q.  You may put Exhibit 13 to the side.
3     A.  (Complied.)
4          (Exhibit 14 was marked for identification.)
5 BY MR. FRANKLIN:
6     Q.  Now, I will show you Exhibit 14, with Bates
7 number beginning with CHAL0000036.
8          Can you explain to me what this exhibit is?
9     A.  This is from the County asking if we wished to
10 continue the contract.
11     Q.  For which period -- or for which date range, to
12 be more specific?
13     A.  It is referencing a contract that was initially
14 issued on October 1, 2014, through September 30th of 2015,
15 and asking for -- if we wished to renew the contract for
16 the period October 1 of 2015 through September the 30th --
17 excuse me -- October 1, 2015, through September the 30th
18 of 2016.
19     Q.  Is that your signature --
20     A.  It is.
21     Q.  -- on the front page?
22          (Exhibit 15 was marked for identification.)
23 BY MR. FRANKLIN:
24     Q.  Now I'm sharing with you Exhibit 15, with Bates
25 Number CHAL0000037, and concluding with Bates number

Page 85

1 ending in 038.
2          Can you please explain to me what Exhibit 15
3 is?
4     A.  Exhibit 15 is the same in scope as the previous
5 Exhibit 14 with a request -- if we will continue to
6 deliver administrative services to the Family Drug Court
7 for the period October 1, 2016, through September the 30th
8 of 2017.
9          MS. AYACHI:  Counsel, I'm -- I'm sorry to
10 interrupt.  This is one where I have three pages to this
11 exhibit.  So the Bates begins -- sorry.  The first page
12 ends in 037, but I have three pages so that this document
13 ends in 039.
14          MR. FRANKLIN:  What exhibit does that one
15 conclude in?
16          MS. AYACHI:  According to the docu- -- the
17 digital copy I'm looking at right now, it ends in 039, and
18 you indicated that it ends in 038.
19          MR. FRANKLIN:  Well, I'm not going to use
20 what's going on in 039, only through 38.
21          Are you going to object to this exhibit?
22          MS. AYACHI:  No.  I'm looking at it.  I can
23 see that the date is 2012 in that last page, so it
24 probably arrived to us in this format.  I won't object to
25 the use of this exhibit as you have it.

22 (Pages 82 - 85)

Page 86

1       MR. FRANKLIN:  Okay.
2  BY MR. FRANKLIN:
3       Q.  Yes.  So, please -- I want to point your
4  attention to the page that ends in 38.
5           Notice that there are two line items for
6  charges on this document.  What is the difference between
7  the two items that are being charged?
8       A.  (Witness examines document.)
9           I do not know why this purchase order was
10  split in this fashion.
11      Q.  Okay.
12          (Exhibit 16 was marked for identification.)
13  BY MR. FRANKLIN:
14      Q.  So we'll move to Exhibit 16, Bates Number
15  CHAL0000045, and concluding with Bates number terminating
16  in 050.
17      A.  (Witness examines document.)
18      Q.  Ayren, is this a Contract for Services for the
19  Family Recovery Court?
20      A.  Yes, sir.
21      Q.  Let me point your attention to page 5 of 6, Bates
22  number ending 049.
23          Is this your signature on this page?
24      A.  It is.
25      Q.  And on Bates number ending in 050, it says:  The

Page 87

1  certification of funds available for the amount of
2  $205,932.00.
3           Is that the amount that Tarrant County paid
4  the Challenge of Tarrant County?
5       A.  It is.
6       Q.  Okay.
7           (Exhibit 17 was marked for identification.)
8  BY MR. FRANKLIN:
9       Q.  Now I'll point your attention to Exhibit 17,
10  Bates number beginning with CHAL0000051.
11          You can take your time to review the
12  document.
13      A.  (Witness examines document.)
14      Q.  Can you explain what this document is?
15      A.  The first page is a purchase order for services
16  to administer the Family Recovery Court, which at that
17  time was referred to as Tarrant County Family Drug Court.
18          Page 0000052 through 58 appears to be the
19  con- -- excuse me -- 57 appears to be the contract with
20  the County for those -- for that purchase order.
21          The next page, 0000058, appears to be the
22  agreement between Challenge and Lena Pope for
23  case-management services.  The next page, 0000059, appears
24  to be the consent agenda where the funds were approved by
25  the Commissioner's Court.

Page 88

1           And the next pages appear to be a duplicate
2  copy of the contract.
3           0000066 seem -- appears to be the request
4  for -- made by the County to Challenge regarding extending
5  the contract through September 30th of 2020.  0000067
6  appears to be a request for a copy of the single audit
7  from Texas Health and Human Services.  68 appears to be a
8  duplicate for the request to extend the contract.  This
9  appears to be yet another copy of the contract.
10      Q.  Going back to the first page of the exhibit, it
11  says:  The total value of it -- of the contract was
12  $205,932.
13          Was this the amount that Tarrant County paid
14  to the Challenge of Tarrant County?
15      A.  It is.
16          (Exhibit 18 was marked for identification.)
17  BY MR. FRANKLIN:
18      Q.  All right.  Moving to Exhibit 18, which begins in
19  Bates number CHAL0000076 through Bates number terminating
20  in 085, what is this document?
21      A.  It is the document from Tarrant County requesting
22  if Tarrant County Challenge will accept an extension of
23  the contract for the period October 1, 2020, through
24  September 30th, 2021.  It is followed by the 1295 po- --
25  form on page 77.  78 is a purchase order for those

Page 89

1  services.  The next page is a duplicate of the page before
2  it, and it is followed page 80 through 84 -- 85 -- excuse
3  me -- is the executed contract for those services.
4       Q.  Okay.  On the first page of the exhibit, is that
5  your signature?
6       A.  It is.
7       Q.  And did Tarrant County pay the amount of $205,932
8  as identified on Exhibit ending in 078?
9       A.  They did.
10      Q.  Okay.
11          (Exhibit 19 was marked for identification.)
12  BY MR. FRANKLIN:
13      Q.  Now introducing Exhibit 19, with Bates number
14  starting with CHAL0000086 and concluding with Bates
15  terminating in 091.
16          What is this document?
17      A.  This document is a contract from Tarrant County
18  in the amount of $50,000 delineated in Exhibit A for the
19  purchase of $5,000 of testing supplies, $35,000 for a .5
20  FTE case manager, and $10,000 for professional services
21  contract for the Family Recovery Court.
22      Q.  So, Mrs. Gilley, in this instance, Tarrant County
23  paid for the purchase of the test kits?
24      A.  They bought $5,000 -- they paid for $5,000 in
25  drug-testing supplies.

23 (Pages 86 - 89)

Page 90

1    Q.  Under the other contracts, did they purchase any
2  drug kits in support of the drug court?
3    A.  We would have to go back and look at each of
4  those contracts individually, but if so, it would be
5  delineated in the contract.
6    Q.  Would that be standard practice for Tarrant
7  County to purchase the test -- the testing kits for the
8  Challenge of Tarrant County?
9    A.  This was a particular grant that was written and
10  included those supplies.
11    Q.  So the money that was used to fund the testing
12  kits were from a grant but not directly from Tarrant
13  County?
14    A.  Yes, they were.  They were -- the community
15  development department was issued a grant in this amount
16  for a Family Recovery Court.
17    Q.  Understood.
18        (Exhibit 20 was marked for identification.)
19  BY MR. FRANKLIN:
20    Q.  Okay.  Now I will show you Exhibit 20, beginning
21  in CHAL0000092 and concluding in Bates number ending in
22  101.
23        Take a look at that and tell me what that
24  document is.
25    A.  This is a con- -- well, this is accepting -- this

Page 91

1  is stating that we will accept the contract for delivering
2  administration of the Family Drug Court for the period
3  October 1, 2021, through September 30th of 2022.  The next
4  page is an exhibit 1295.  The next page is a purchase
5  order in the amount of $205,932.
6    Q.  Let me stop you right there.
7        Did Tarrant County remit the $205,932 in
8  support of the contract?
9    A.  Yes, we did receive that amount.
10    Q.  And on page 100 of this document -- well, Bates
11  number ending in 100, is that your signature?
12    A.  It is, sir.
13    Q.  Okay.  And we can put Exhibit 20 to the side.
14    A.  (Complied.)
15        (Exhibit 21 was marked for identification.)
16  BY MR. FRANKLIN:
17    Q.  Now I will show you Exhibit 21 beginning with
18  Bates Number CHAL0000102 and ending in Bates terminating
19  in 106.
20        Is this a contract between Tarrant County
21  and the Challenge of Tarrant County in support of the
22  Family Drug Court?
23    A.  Yes, it is.
24    Q.  Is this your signature on page -- that terminates
25  Bates number ending in 106?

Page 92

1    A.  It is.
2    Q.  Also looking at that page, it shows that -- the
3  certification of funds for the amount of $322,308.  Is
4  that the amount that Tarrant County paid to the Challenge
5  of Tarrant County?
6    A.  Yes.
7    Q.  Okay.  I believe those are all of the contracts
8  that I wanted to go over.
9        In your earlier testimony, you mentioned
10  that you are responsible for the budget for the Challenge
11  of Tarrant County; is that correct?
12    A.  That is correct, sir.
13    Q.  Now I'm going to share with you a series of
14  exhibits, and these will be Exhibits 22, 23, 24.
15        MR. BOONE:  Hey, Greg, could we get to a
16  stopping point?
17        MR. FRANKLIN:  Yes.  Let's take a break
18  right now.  Everybody --
19        THE VIDEOGRAPHER:  All right.  We're off the
20  record at 2:31 p.m.
21        (Brief recess taken.)
22        THE VIDEOGRAPHER:  We are back on the record
23  at 2:41 p.m.
24  BY MR. FRANKLIN:
25    Q.  Now, Mrs. Gilley, do you understand that you are

Page 93

1  still under oath?
2    A.  Yes, sir.
3    Q.  What I'm now going to share with you are a series
4  of exhibits that purport to be the budget for the
5  Challenge of Tarrant County.  Sequentially, it's
6  Exhibits 22 through Exhibit 28.
7        (Technical interruption.)
8        (Exhibits 22 through 28 was marked for
9  identification.)
10  BY MR. FRANKLIN:
11    Q.  These are the budgets that you produced as a part
12  of your production back in November of 2022.
13        And Exhibit 22 is -- coincides with Bates
14  Number CHAL0001197.  Do you see Exhibit 22?
15    A.  I do.
16    Q.  Is -- now, please explain to me what this exhibit
17  reflects.
18    A.  There was a request in the subpoena document from
19  you that I delineate our budget and its funding sources
20  and purpose of funds.
21    Q.  Okay.  So looking at these different sources --
22  and correct me if I misstate anything here -- there are
23  two line items where Tarrant County provides funds to the
24  Challenge of Tarrant County?
25    A.  That is correct.

24 (Pages 90 - 93)

Page 94

Q. And it's $50,000 for the substance abuse education?
A. And planning, community assessment, needs assessments, but the -- but the bulk of it is community education.
Q. And these services were outlined in one of the prior exhibits that we discussed today?
A. Yes, sir.
Q. And then, here, the second one is for $198,987 for the administration of the Family Recovery Court?
A. That is correct.
Q. Did you have any figures that predates 2016?
A. I have those figures. They were not requested in the scope of the subpoena.
Q. For the line items in which Tarrant County is the source of funding, is there any way to delineate how much of those funds were allocated in the service of persons with opioid addictions?
MS. AYACHI: Objection, form.
THE WITNESS: I do not think so. Just sitting here with you right now, I don't believe that that is something that would be -- would be possible to delineate with any relative accuracy.
BY MR. FRANKLIN:
Q. Would it be a accurate assumption that for the

Page 95

administration of the Family Recovery Court that the entire amount funded did not go in support of persons with opioid addictions?
MS. AYACHI: Objection, form.
THE WITNESS: I have no way of answering that question for you. It -- I would have to literally look at the record of every client and what they listed as their substance of choice.
BY MR. FRANKLIN:
Q. Well, let me ask the question a different way, then. What substance abuse disorders are supported through the services of the Family Drug Court?
A. In Texas -- this is anecdotally. I'm not looking at the records, but I would suggest to you that opioids/methamphetamine would be the top two.
Q. Would it include alcohol?
A. We would not exclude a client whose only drug of choice was alcohol, but it would be very unlikely to see that individual, and that is because the precipitating factors would be a CPS removal.
Q. Would persons coming through the Family Recovery Court have addictions to marijuana?
MS. AYACHI: Objection, form.
THE WITNESS: I cannot answer that question for you without reviewing every client record.

Page 96

BY MR. FRANKLIN:
Q. Is there any indication that no other substance abuse disorder is addressed in -- or supported in the Family Recovery Court?
A. No.
MS. AYACHI: Objection, form.
BY MR. FRANKLIN:
Q. But you could give us that information if -- if requested?
MS. AYACHI: Objection, form.
THE WITNESS: It could be done. It would be very onerous to go back and review every client record. But, yes, in point of fact, it could be obtained.
BY MR. FRANKLIN:
Q. So for 2022 there were 36 persons that have come through the Family Drug Court. Would the Family Recovery Court coordinator have drug-testing information on the 36 persons who have participated in the drug court in 2022?
MS. AYACHI: Objection, form.
THE WITNESS: That would exist, yes.
BY MR. FRANKLIN:
Q. Would the information exist for 2021?
A. Yes. The information exists; I did not say that the information did not exist.
Q. So to clarify, it would be onerous to provide the

Page 97

information on the 36 individuals for -- for 2022?
A. Exact- -- no. It would be onerous to go back through every case file and determine if the client reported opioids as a drug of choice.
Q. So it's also possible that none of them have abused opioids?
A. No, that --
MS. AYACHI: Objection, form.
THE WITNESS: -- that is not possible, because I know that we have grants that have paid for medication-assisted therapy.
BY MR. FRANKLIN:
Q. Please explain that.
A. That is -- the client is either receiving methadone or some other form of medication-assisted therapy to assist them in their recovery from an opioid addiction.
Q. Could methadone be used for persons with heroin addictions?
A. I'm not a clinician; I can't answer that question for you.
Q. So what purposes can -- to the extent that you have knowledge, that methadone could be used for?
MS. AYACHI: Objection, form.
THE WITNESS: I'm not a clinician. I simply

Page 98

1 know that we have clients who have received
2 medication-assisted therapy, and I -- I wouldn't be able
3 to tell you, without looking at each client, what that
4 treatment was used for. But to say that we haven't had
5 any clients that did not have an addiction to an opioid
6 wouldn't seem realistic.
7 BY MR. FRANKLIN:
8     Q. But to your earlier testimony, you could not say,
9 with any certainty, that 100 percent of the -- the persons
10 who have come in through the Family Drug Court were
11 addicted to opioids?
12     A. I cannot.
13        MS. AYACHI: Objection, form.
14        THE WITNESS: I would have to go back. I'm
15 telling you that, anecdotally, I know that clients have
16 received medication-assisted therapy and that, typically,
17 that is a service that is provided for some type of an
18 opiate addiction. Now, what opiate, I could not tell you
19 without going back and researching every client.
20 BY MR. FRANKLIN:
21     Q. Would you consider heroin an opioid -- opiate?
22     A. Yes.
23     Q. Would you consider fentanyl an opiate?
24     A. Yes.
25     Q. So you're saying it's possible that the methadone

Page 99

1 treatment that you refer to was used to assist someone
2 with a heroin addiction?
3     A. I'm --
4        MS. AYACHI: Objection, form.
5        THE WITNESS: I am not comfortable answering
6 that question without doing the research to back it up.
7 BY MR. FRANKLIN:
8     Q. We'll move on.
9        Let's go to Exhibit 20 -- were we on 23?
10 Yeah, Exhibit 23, Bates CHAL0001199.
11        Again, here, it shows that Tarrant County
12 spent $50,000 for substance abuse education, and $198,987
13 for the administration of the Family Recovery Court.
14     A. Mr. Franklin, what exhibit are you on?
15     Q. Exhibit 23.
16     A. Thank you.
17     Q. Did I represent that correctly?
18     A. You did. I had inadvertently turned two pages at
19 once.
20     Q. And just to get through the rest of these
21 exhibits, Exhibits 24, 25, 26, and 27, Bates numbers
22 ending in 1201 for Exhibit 24, Bates ending in 1204 for
23 Exhibit 25, Bates number ending in 1205 for Exhibit 26,
24 and Bates number 1207 for Exhibit 27, and Bates 1209
25 through 1210 for Exhibit 28.

Page 100

1        Could you take a look at those three [sic]
2 exhibits and confirm that the amounts represented to --
3 from the funding source of Tarrant County was used to pay
4 the Challenge of Tarrant County?
5     A. Yes. We received funds from Tarrant County
6 during all of those years you mentioned.
7     Q. For the administration of the Family Recovery
8 Court, are those funds used in support of wages and
9 salaries or any other initiatives?
10     A. They are -- the entire budget of the
11 administration of the Family Recovery Court is not in
12 salaries.
13     Q. How would you prorate those dollars in accordance
14 with expenses?
15     A. I would have --
16        MS. AYACHI: Objection, form.
17        THE WITNESS: I'm not sure I understand your
18 question, but I would have to go back to every cost center
19 for that particular funding source and allocate it
20 according to our cost centers.
21 BY MR. FRANKLIN:
22     Q. Have there been any of these funds, to your
23 knowledge, that have been used exclusively in support of
24 persons with opioid addiction?
25        MS. AYACHI: Objection, form.

Page 101

1        THE WITNESS: Would you repeat that, please?
2 BY MR. FRANKLIN:
3     Q. So the funds identified in Exhibits 22
4 through 28, specifically for the -- for the funds used for
5 the administration of the Family Recovery Court, were
6 there any funds allocated to any specific initiative,
7 program, or product in support of persons with opioid
8 addiction?
9        MS. AYACHI: Objection, form.
10        THE WITNESS: Yes, there would be if the
11 individuals served during that funding cycle had opioids
12 as a drug of choice.
13 BY MR. FRANKLIN:
14     Q. So it would be a function of the person being
15 served -- person being served addiction -- let me say that
16 a little differently.
17        It all depends on whether a person was
18 addicted to opioids that you can say that X amount of
19 funds was dedicated to that person?
20        MS. AYACHI: Objection, form.
21        THE WITNESS: Yes, that is correct. And it
22 would be difficult to delineate that because the only
23 thing that -- the only way you could do that would be to
24 take each client and allocate the same amount of resources
25 to them, which -- as an example, in a classroom, one child

26 (Pages 98 - 101)

1 may require more than another child requires. And so I
2 can't say to you that the only reasonable way to do this
3 would be to take it and literally say that everybody
4 needed the same thing. And then you would divide it
5 somehow by the number of people with --
6 BY MR. FRANKLIN:
7     Q. Would the cost of purchasing methadone be
8 included in any of these figures?
9     A. No, it would not. That was purchased through a
10 grant through the Substance Abuse and Mental Health
11 Services Administration.
12     Q. Would any residential services in support of
13 someone addicted to opioids be included in that number?
14     MS. AYACHI: Objection, form.
15     THE WITNESS: No. It -- not the -- not
16 these funds, no, it would not. Because the clients'
17 treatment services -- treatment services are paid for by
18 the Department of State Health Services.
19 BY MR. FRANKLIN:
20     Q. Okay. So the treatment services are excluded
21 from -- or the amount for the treatment services are
22 excluded from the dollars identified under the
23 administration of Family Recovery Court?
24     A. That is correct.
25     Q. For the participants who come in through the

1 Family Recovery Court, is there a -- a way for the
2 Challenge of Tarrant County to identify the source of
3 drugs -- or source of opioids that the person may have
4 taken?
5     A. No.
6     MS. AYACHI: Objection, form.
7 BY MR. FRANKLIN:
8     Q. Have you ever heard of any allegations that would
9 suggest that anyone who have participated in the Family
10 Recovery Court have received prescription opioids from one
11 of the defendants?
12     A. I do not know.
13     Q. I'm going to show you Exhibit 29, which is a pull
14 from your website, https://challengetc.org/naxalone.
15     MR. FRANKLIN: And for the purposes and
16 benefit of Leila, this would have been the document named
17 T9 Challenge: Image from website of counterfeit pills.
18     MS. AYACHI: Perfect. Thank you. Got it.
19     (Exhibit 29 was marked for identification.)
20 BY MR. FRANKLIN:
21     Q. Mrs. Gilley, I pulled this from your -- your
22 website. I'll give you a few seconds to see if it's
23 familiar to you.
24     A. Yes, it is.
25     Q. And here it says: Three of these pills are

1 counterfeit and laced with a fatal dose of fentanyl, and
2 it also says: The Drug Enforcement Administration has
3 estimated that three out of five tablets, such as Vicodin,
4 OxyContin, and Xanax, which were not purchased from a
5 pharmacy, are fake and laced with deadly levels of
6 fentanyl.
7     My question for you -- so only to the extent
8 that you have knowledge -- are you able to make any
9 distinction between a counterfeit synthetic opioid versus
10 a legitimately prescribed opioid?
11     MS. AYACHI: Objection, form.
12     THE WITNESS: I am not.
13 BY MR. FRANKLIN:
14     Q. Do you have any reason to disagree with what I
15 stated that the Drug Enforcement Administration has
16 estimated that three out of five tablets, such as Vicodin,
17 OxyContin, and Xanax, which were not purchased from a
18 pharmacy, are fake and laced with deadly levels of
19 fentanyl?
20     A. I do not disagree.
21     Q. Outside of the information that is being
22 presented on the website, have you heard of any issues
23 supporting that counterfeit opioids are a problem in
24 Tarrant County?
25     MS. AYACHI: Objection, form.

1     THE WITNESS: I would have to go back and
2 research the number of overdoses that -- I couldn't answer
3 that question for you at this very moment. Not that it's
4 not a reasonable question; I just don't have that
5 information.
6 BY MR. FRANKLIN:
7     Q. If the Challenge of Tarrant County had to design
8 a program specifically to address the opioid challenge of
9 Tarrant County, what would that look like?
10     MS. AYACHI: Objection, form.
11     THE WITNESS: It would look like -- it would
12 have certain elements to it, certainly. One element would
13 be that people are keenly aware of the potential addictive
14 nature of opioids. Number two, it would certainly be
15 educating them about safe disposal, not flushing unused
16 medications down the toilet where it goes into the water
17 supply, but disposing of them in a way that they can be
18 safely disposed of. It would be educating the community
19 about a number of ways in which medications could be taken
20 or used in a household. It would be teaching people how
21 to safely deal with someone who is having an overdose in
22 such a way that it was able to -- that they were able to
23 potentially save that individual's life, and it would
24 include ways in which the public could assist that
25 individual in finding medical care, short-term, and then

27 (Pages 102 - 105)

Page 106

1 care for the potential addiction that they might be
2 dealing with.  It would also teach young people to be very
3 careful about what they take, just an effort to make us
4 all more aware and have the ability to assist those who
5 are in a crises.
6 BY MR. FRANKLIN:
7     Q.  What would be the staff requirement to design and
8 implement what you just mentioned?
9     A.  You would want someone who was a certified
10 prevention specialist who, hopefully, had experience in
11 health and human services, who knew best practices in
12 community education or public health.  I would say
13 probably the best product would be created by a
14 collaboration of individuals, public health, community
15 education, clinicians.
16     Q.  So you would include other resources outside of
17 personnel with the Challenge of Tarrant County?
18     A.  Yes.
19     Q.  How many staff persons would you dedicate to such
20 efforts?
21         MS. AYACHI:  Objection, form.
22         THE WITNESS:  I would need to know more
23 about the scope of the endeavor.  Are you -- are you
24 providing -- that is not a one presentation that you just
25 identified.  When our staff are going to train parents in

Page 107

1 a school district or when they are going to train officers
2 or school nurses or the neighborhood association, those
3 are all very different presentations that are designed to
4 meet the needs of a specific audience.
5         MR. FRANKLIN:  Now, let's go off record for
6 a few minutes.  I just want to take a look at my notes.
7         THE VIDEOGRAPHER:  We are off the record at
8 3:12 p.m.
9         (Brief recess taken.)
10         THE VIDEOGRAPHER:  We are back on the record
11 at 3:17 p.m.
12         MR. FRANKLIN:  Okay.  Mrs. Gilley, I really
13 appreciate your -- your time today.  At this moment, I
14 have no further questions for you, and I'll pass it over
15 to counsel -- Plaintiffs' counsel, if you have any
16 additional questions for Mrs. Gilley.
17         MS. AYACHI:  Mrs. Gilley, I do not have any
18 other questions, but just the one.
19         CROSS-EXAMINATION
20 BY MS. AYACHI:
21     Q.  Is there any reason why you would not be able to
22 testify if you were called to trial in this action?
23     A.  I don't have any physical reasons why I wouldn't
24 be able to testify.  I guess the answer is:  No, I would
25 not have any reason not to testify.

Page 108

1     Q.  Okay.
2         MS. AYACHI:  That's all I wanted to ask you.
3         Thank you so much for your time today.  We
4 really appreciate it and the work that you do for Tarrant
5 County.  We hope you have a wonderful weekend.
6         THE WITNESS:  Thank you very much.  I hope
7 you do as well.
8         MR. FRANKLIN:  And thank you so much.
9         MS. AYACHI:  Thank you, ma'am.
10         MR. FRANKLIN:  We can go off the record.
11         THE VIDEOGRAPHER:  All right.  We are off
12 record at 3:18 p.m.
13         (Deposition concluded at 3:18 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 109

1     IN THE UNITED STATES DISTRICT COURT.
      FOR THE NORTHERN DISTRICT OF OHIO
2         EASTERN DIVISION
3 IN RE: NATIONAL PRESCRIPTION     ) MDL No. 2804
   OPIATE LITIGATION             )
4                                 )
5 THIS DOCUMENT RELATES TO:       )
   Track Nine: Tarrant County,     ) Case No.: 17-md-2804
6 Texas                           )
7                                 )
   (Case No. 1:18-op-45274-DAP)    ) Judge Dan Aaron Polster
8
9         REPORTER'S CERTIFICATION
       ORAL & VIDEOTAPED & VIA ZOOM VIDEOCONFERENCE
10         DEPOSITION OF
         JENNIFER GILLEY
11       FRIDAY, AUGUST 18, 2023
12     I, Kari J. Behan, CSR, RPR, CRR, and in and for the
    State of Texas, do hereby certify that the facts as stated
13 by me in the caption hereto are true;
       That there came before me the aforementioned named
14 person, who was by me duly sworn to testify the truth
    concerning the matters in controversy in this cause;
15     And that the examination was reduced to writing by
    computer transcription under my supervision; that the
16 deposition is a true record of the testimony given by the
    witness.
17     I further certify that I am neither attorney or
    counsel for, nor related to or employed by, any of the
18 parties to the action in which this deposition is taken,
    and further that I am not a relative or employee of any
19 attorney or counsel employed by the parties hereto, or
    financially interested in the action.
20     Given under my hand and seal of office on this 11thd
    day of September, 2023.
21
22     _____
       Kari J. Behan, CSR, RPR, CRR
23     Texas CSR NO. 8564;
       Expiration Date: 7-31-2024
24     VERITEXT LEGAL SOLUTIONS
       Firm Registration No. 571
25     Telephone:  (800) 336-4000

28 (Pages 106 - 109)

Page 110

1           Veritext Legal Solutions
2              1100 Superior Ave
                 Suite 1820
3             Cleveland, Ohio 44114
           Phone: 216-523-1313
4

September 11, 2023
5
To: Sadie Turner
6
Case Name: National Prescription Opiate Litigation - Track 9 (Tarrant
7 County) v.
8 Veritext Reference Number: 6059372
9 Witness:  Jennifer Gilley     Deposition Date:  8/18/2023
10
Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript.  Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change.  Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address shown
17
above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
Sincerely,
22
Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 111

1      DEPOSITION REVIEW
     CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 6059372
3     CASE NAME: National Prescription Opiate Litigation - Track 9
(Tarrant County) v.
    DATE OF DEPOSITION: 8/18/2023
4     WITNESS' NAME: Jennifer Gilley
5     In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7     I have made no changes to the testimony
    as transcribed by the court reporter.
8
   _____
9 Date     Jennifer Gilley
10     Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11 the referenced witness did personally appear
    and acknowledge that:
12
    They have read the transcript;
13     They signed the foregoing Sworn
      Statement; and
14     Their execution of this Statement is of
     their free act and deed.
15
    I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18      Notary Public
19
     Commission Expiration Date
20
21
22
23
24
25

Page 112

1      DEPOSITION REVIEW
     CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 6059372
3     CASE NAME: National Prescription Opiate Litigation - Track 9
(Tarrant County) v.
    DATE OF DEPOSITION: 8/18/2023
4     WITNESS' NAME: Jennifer Gilley
5     In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7     I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8 well as the reason(s) for the change(s).
9     I request that these changes be entered
    as part of the record of my testimony.
10
    I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12    testimony and be incorporated therein.
13  _____
   Date     Jennifer Gilley
14
    Sworn to and subscribed before me, a
15     Notary Public in and for the State and County,
    the referenced witness did personally appear
16 and acknowledge that:
17     They have read the transcript;
18     They have listed all of their corrections
     in the appended Errata Sheet;
    They signed the foregoing Sworn
19      Statement; and
    Their execution of this Statement is of
20      their free act and deed.
21     I have affixed my name and official seal
22 this _____ day of_____, 20____.
23
     Notary Public
24
25      Commission Expiration Date

Page 113

1      ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS MIDWEST
2      ASSIGNMENT NO: 6059372
3 PAGE/LINE(S) /     CHANGE    /REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 Date     Jennifer Gilley
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23
     Notary Public
24
25      Commission Expiration Date

29 (Pages 110 - 113)