# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE:  NATIONAL PRESCRIPTION** | ) | **MDL 2804** |
| **OPIATE LITIGATION** | ) | |
| | ) | **Case No. 1:17-md-2804** |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | **Judge Dan Aaron Polster** |
| | ) | |
| *ALL THIRD PARTY PAYOR ACTIONS* | ) | |

**DECLARATION OF PROFESSOR WILLIAM B. RUBENSTEIN**
**IN RESPONSE TO OBJECTION**

1.      TPP Co-Lead Class Counsel retained me to provide my opinion on the issue of whether the settlement fund is allocated equitably across the class.  A single entity excluded from the class definition has now challenged the equity of that exclusion,[1] and Co-Lead Counsel have asked that I provide the Court my analysis of the concerns raised therein.[2]

*Co-Lead Counsel Have Adequately Represented the Class*

2.      The heart of the objection is straightforward:  the earlier class action complaints on behalf of third-party payors (TPPs) defined the potential plaintiff class in a manner that was more capacious than the class definition proposed for settlement class certification.  Among other changes, the settlement definition explicitly excluded as settlement class members five large,

---

[1] Objection to Third Party Payor Plaintiffs' Motion for Final Approval of Class Action Settlement and for Attorneys' Fees, Expenses, and Service Awards, ECF 5746, at 13 (Nov. 11, 2024) (referencing Rule 23(e)(2)(D)) (hereinafter "Objection").

[2] The issues raised by the Objection are not literally concerns of Rule 23(e)(2)(D)'s ***intra-class*** equity inquiry, as the objection is based on the party's exclusion ***from*** the class, but they are closely related concerns.

atypical TPPs, including the single Objector.  The Objection attributes the change to malfeasance on the part of "Class Counsel"[3] and insists that the Court must accordingly reject both settlement class certification and settlement approval.  The Objection reflects a misunderstanding of fact and law and should be rejected.

3.       As a matter of fact, both Co-Lead Counsel and the Defendants report that the decision to settle without including five large, atypical TPPs in the settlement class definition was based upon the Defendants' refusal to settle in a manner that included these TPPs.  While I have no insider knowledge of why the Defendants refused to enter a settlement that encompassed these large, atypical TPPs, the decision was not based on some illegal prejudice such as race or gender. The Defendants' position arose out of what are quite obviously very complex business relationships among – literally – the largest corporations in the United States.  The settling Defendants are the 9th (McKesson), 10th (Cencora/AmerisourceBergen), and 14th (Cardinal Health) largest corporations in the United States – each with annual revenues exceeding $200 billion – and the single Objector, United HealthCare Services, Inc.is a subsidiary of the 4th largest corporation in the entire country, UnitedHealth Group, Inc., which has annual revenues close to $400 billion.[4]  As the three Defendants distribute close to 100% of pharmaceuticals in the United

---

[3] The Objection uses the phrase "Class Counsel" throughout.  The Settlement uses the phrase "Co-Lead Class Counsel," defining those counsel as Elizabeth J. Cabraser of Lieff Cabraser Heimann & Bernstein, LLP and Paul J. Geller of Robbins Geller Rudman & Dowd LLP. Class Action Settlement Agreement Among Third Party Payors and Settling Distributors, ECF 5614-2, at § I.N (Aug. 30, 2024) (hereinafter "Settlement Agreement").  I am assuming the Objection uses "Class Counsel" to reference these Co-Lead Class Counsel.

[4]     *See List of "Fortune 500" companies*, 50PROS (Sept. 18, 2024), https://www.50pros.com/fortune500  The remaining excluded insurers are similarly enormous: Cigna is 16th largest corporation in the country, Humana 38th, Elevance/Anthem 20th, and Aetna is owned by CVS Health, which is the 6th largest.  *Id.*

States, while the single Objector is the largest health care company in the country, the quantity and quality of the business relationships between and among these enormous entities is clearly quite significant, surely complicated, and largely opaque to outsiders.  For example, the Objector's parent company (UnitedHealth Group) and its PBM (Optum Rx) are co-defendants in MDL 2804 cases and, I am informed, these Distributor Defendants have taken the position that they may have crossclaims against, and/or have specific affirmative defenses involving, those entities.

4.      When the Defendants refused to negotiate a settlement that included these five atypical entities, Co-Lead Counsel faced a dilemma.  The class encompasses roughly 40,000 other TPPs.[5]  Most of these TPPs are small stakeholders.[6]  Absent a class action, they would be without recourse.  The dilemma Co-Lead Counsel faced was whether to pursue relief for the 40,000 small stakeholders or to privilege the complex business relationships – giving rise to unique crossclaims and affirmative defenses –between a handful of atypical TPPs and the Defendants.

5.      Co-Lead Counsel's decision to move ahead does not strike me as motivated by greed, driven by collusion, or in any other way misguided.[7]  Rather, it strikes me as a pragmatic decision serving the interests of a very large class of small claim clients, made in an imperfect situation in this large and complicated MDL.

---

[5] Third Party Payor Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Direction of Notice Under Federal Rule of Civil Procedure 23(e), ECF 5614, at 11 (Aug. 30, 2024).

[6] This Court is aware from the complaints of the actively litigating TPP MDL plaintiffs, including the bellwether plaintiffs (all of whom are included in and support the settlement), that the size and losses of the class members vary.  But when the $300 million settlement is divided among 40,000 entities, the average claim size is $7,500.

[7] The Objector states that carving it out of the class "diluted the entire class's leverage and bargaining power."  Objection at 14.  But the facts support the opposite conclusion – only by agreeing to negotiate without it and the other four non-objecting entities in the class were Counsel able to generate bargaining power for the class.

6.     The applicable legal principles support Co-Lead Counsel's decision.  Rule 23(g) explicitly defines class counsel's duty as being to the class as a whole, not to individual class members.[8]  The Advisory Committee Note on point states:

> [Rule 23(g)(4)] recognizes that the primary responsibility of class counsel, resulting from appointment as class counsel, is to represent the best interests of the class.  The rule thus establishes the obligation of class counsel, an obligation that may be different from the customary obligations of counsel to individual clients.  ___**Appointment as class counsel means that the primary obligation of counsel is to the class rather than to any individual members of it**___.  The class representatives do not have an unfettered right to "fire" class counsel.  In the same vein, the class representatives cannot command class counsel to accept or reject a settlement proposal.  To the contrary, ___**class counsel must determine whether seeking the court's approval of a settlement would be in the best interests of the class as a whole**___.[9]

7.     This language in Rule 23 and in the advisory committee notes grows out of an historic line of cases in which class counsel and the class representative(s) disagreed upon whether to accept a settlement;[10] in those cases, courts ruled that it is class counsel's judgment that is decisive and that even the class representative – standing in as the "client" for absent class members – cannot override class counsel's judgment.  This was true even though class counsel had a specific attorney-client relationship with the class representatives.[11]  If the class

---

[8] Fed. R. Civ. P. 23(g)(4) ("*Duty of Class Counsel*. Class counsel must fairly and adequately represent the interests of the class.").

[9] Fed. R. Civ. P. 23 advisory committee's notes to 2003 amendment (emphasis added).

[10] *See, e.g.*, *Lazy Oil Co. v. Witco Corp.,* 166 F.3d 581 (3d Cir. 1999); *In re Agent Orange Prod. Liab. Litig.,* 800 F.2d 14 (2d Cir. 1986); *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157 (3d Cir. 1984) (Adams, J., concurring).  *See generally* William B. Rubenstein, 6 *Newberg and Rubenstein on Class Actions* § 19:25 (6th ed. 2022 & 2024 Supp.) (hereinafter "*Newberg and Rubenstein on Class Actions*").

[11] *Lazy Oil*, 166 F.3d at 590 ("We therefore hold that, in the class action context, once some class representatives object to a settlement negotiated on their behalf, class counsel may continue to represent the remaining class representatives and the class, as long as the interest of the class in continued representation by experienced counsel is not outweighed by the actual prejudice to the objectors of being opposed by their former counsel.").

representatives have no authority to overrule their own lawyer/class counsel's judgment, *a fortiori*, the atypical interests of a single absent class member surely cannot either.[12]

8.     Based on these facts and this law, it is my opinion that Co-Lead Counsel heeded the command of Rule 23(g) by ensuring that the class as a whole received the significant amount of relief – $300 million – at issue.  Indeed, for Co-Lead Counsel to have walked away from $300 million, and risked a trial, simply to serve the interests of a single, atypical TPP – the fourth largest corporation in the United States – at the expense of 40,000 small stakeholders would have struck me as reckless folly.

*The Class Definition Does Not Bar Class Certification or Settlement Approval*

9.     The Objection alleges that the class definition itself somehow forecloses class certification and/or settlement approval.  Again, this reflects a misunderstanding of fact and law.

10.    As to the definition itself, three observations are in order.  *First,* there is no one right way to define TPPs in the American health care system.  Setting aside the five-company exclusion about which the Objector (alone) complains, the class definition reflects the complexities of the American health care system.  Thus, the first paragraph of the class definition has a clear definition, with two subparts; amplifies that definition with a "for clarity" phrase identifying certain classes of payors with more specificity; and then attaches a non-exhaustive list of the payors

---

[12] Because class counsel's obligations are to the class as a whole, not to individual class members, the Objection's allegation that these Co-Lead Class Counsel have a conflict of interest in purporting to represent the Objector here, while suing the Objector in another part of the MDL, Objection at 17-18, is also belied by both fact and law.  Factually, Co-Lead Class Counsel agreed to the Defendants' insistence on excluding the Objector from the settlement class, so they do not now purport to represent the Objector.  Regardless, the ABA Model Rules of Professional Conduct, in defining conflicts of interest in Rule 1.7, explicitly state that absent class members are ordinarily not considered "clients" for conflicts purposes.  ABA Model Rules of Prof'l Conduct R. 1.7 cmt. [25]; *see also* Ohio Rules of Prof'l Conduct R. 1.7 cmt. [12] (same).

to which it refers.  There follow two full paragraphs of the class definition that list, as many class definitions do, groups of excluded parties, here done with remarkable specificity.  It is worth noting that not a single one of these ***many*** excluded entities object to the class definition except the single Objector.  This is remarkable as this class action is not the type that could yield a simple, straightforward class definition like "all purchasers of the security between dates x and y."

11.     *Second,* the Objection's argument that the class definition is not ascertainable is wrong.  Membership in the class is easily ascertained; indeed, the class definition even clearly specifies the identities of the five excluded, atypical TPPs.  Co-Lead Counsel inform me that the settlement claims administrator retained in this case (A.B. Data, Ltd.) regularly works with TPP classes, including in the recently resolved TPP class settlement with McKinsey & Company (before Judge Breyer) and has encountered no problems identifying the class members and providing notice to them, nor will the definition in any way impede the clarity of administering class member claims.

12.     *Third,* the true thrust of the Objection's argument is that the class definition is arbitrary.  As just noted, the definition is complex, but that does not render it arbitrary:  it would be arbitrary if, say, every 15th TPP on a list were randomly excluded and/or every TPP with a name beginning with "N" were excluded.  Here, the exclusion of the five large, atypical TPPs is based on specific facts about their unique relationships with the settling Defendants, including possible crossclaims and affirmative defenses those Defendants believe they may have.  The definition is therefore not *"arbitrary"* in any usual sense of that term.

6

13.     In fact, the Objection effectively concedes that the class definition could exclude certain would-be class members,[13] in that it ticks through several such possible bases – geography, big-ness, PBM affiliation, etc.[14]  That concession is telling, in that for all intents and purposes the challenged part of the definition **_is_** truly aimed at big-ness, excluding five enormous, atypical TPPs. The fact that it is a rough proxy that may not capture that group ("enormous TPPs") perfectly,[15] does not damn the effort.  It remains true that each of the five excluded insurers are so large that they atypically have individualized relationships with the Defendants, generating the Defendants' clearly different interests as to settling with those five in particular – perhaps attributable to crossclaims and affirmative defenses.

14.     The Objection itself demonstrates that the exclusion is based on bigness in asserting that its "counsel" were not invited to play an "active role" in the mediation.[16]  Absent class members do not have individualized counsel, and absent class members are not invited to play an "active role" in mediation sessions between class counsel and defendants.  The Objection's lament perfectly captures how atypical it would be as a class member, so much so that it desired to – and imagined itself having some entitlement to – participate individually in the litigation, not as an absent class member.

15.     The Objection cherry-picks some language from a few class action cases to suggest that the class definition is _legally_ arbitrary.  There is very little caselaw on the topic of arbitrary

---

[13] Indeed, the final class definition excludes "consumers," although the initial class definition did not, a fact about which Objection registers no complaint.

[14] Objection at 11.

[15] _See id._ ("Centene and HCSC, for example, are 'big' too—each has larger overall enrollment than Humana—yet they have not been excluded from the Settlement Class.").

[16] _Id._ at 16.

class definitions, and what there is provides no support for the proposition that the court must reject certification of, and a $300 million settlement for, a class consisting of at least 40,000 members, based on the objection of one excluded party. The Objection primarily relies on a single sentence in the *Manual for Complex Litigation (Fourth)*[17] stating that a class "definition [that] fails to include a substantial number of persons with claims similar to those of the class members . . . [may be] questionable."[18] The *Manual* expresses its concerns as to the exclusion of "a ***substantial*** number of persons," [19] which is the opposite of this situation, so it is inapposite. Moreover, the *Manual* itself cites no case law in support of that proposition, and the passage has rarely been cited, and even more rarely applied, in reported case law in the ensuing two decades. Four of the six cases upon which the Objection relies all address a distinct concern – the problem of drawing geographic boundaries in groundwater contamination and toxic waste cases; a fifth case is about an attempt to limit the class definition to evade the diversity requirements of the Class Action Fairness Act; and the final case is about the complexities of structuring a RICO class of hospitals concerning Medicare practices. In these cases, class certification was generally challenged by the defendant, and none of the cases address anything close to the present situation.

16.     In fact, the cases most analogous to this situation – all of which support Co-Lead Counsel's actions – are those in which courts have rejected intervention (for objection purposes) by parties written out of class definitions in the course of a case. In the sprawling Holocaust Victim

---

[17] The Objection relies on one other note in the *Manual*, Objection at 13 (citing *Manual for Complex Litigation (Fourth)* § 21.61 n.965), but that note is about the inequity that arises when class counsel pay off objectors and hence has nothing to do with the present situation.

[18] *Manual for Complex Litigation (Fourth)* § 21.222 (2004), cited in Objection at 10.

[19] *Id.* (emphasis added).

Assets Litigation against the Swiss banks,[20] for example, the initial complaints spoke broadly of crimes against humanity, while the final settlement class encompassed "those who were or were believed to be 'Jewish, Romani, Jehovah's Witness, homosexual, or physically or mentally disabled or handicapped.'"[21]  A group of ethnic Polish citizens objected "to the certification of a narrower settlement class than the one described in the original complaints,"[22] seeking to have "Polish" added to the list above after "Jewish."[23]  They sought to intervene to lodge their objections, but the Court denied their motion.[24]  In affirming, the Second Circuit held that "***the broad language of a complaint in a class action lawsuit does not vest in putative class members a right to be part of the class ultimately certified by the District Court***."[25]  Moreover, the Court insisted that the excluded parties had suffered no legal prejudice (for intervention purposes) even though they alleged they would face "tremendous obstacles in bringing their own lawsuit."[26]

17.  Courts reached the same conclusion as classes narrowed during the course of litigation in a sprawling action against Google for copyright infringement[27] and in an infamous

---

[20] The case returned roughly $1.3 billion to more than 450,000 Holocaust victims and their heirs throughout all of the United States and more than 80 other nations.  For an accounting, see Holocaust Victim Assets Litigation (Swiss Bank), https://www.swissbankclaims.com/.

[21] *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 193 (2d Cir. 2000).

[22] *Id.*

[23] *Id.* at 194.

[24] *Id.* at 194-95.

[25] *Id.* at 202 (emphasis added).

[26] *In re Holocaust Victim Assets Litig.*, 225 F.3d at 199.

[27] *Authors Guild v. Google, Inc.*, No. 05-cv-8136 (DC), 2009 WL 3617732, at 3–*4 (S.D.N.Y. Nov. 4, 2009) (rejecting intervention by group of graphic artists who objected when class definition in complaint had narrowed from all works to only texts, thus excluding "pictoral works," and rejecting the argument "that class counsel acted in bad faith in the way they defined the class because there are legitimate reasons for limiting the class to holders of textual copyrights").

strip search case against the New York City Corrections department.[28]  These expansive, MDL-like cases, where large class structures adapt as litigation progresses, have far more in common with this situation than any of the random cases from which the Objection cherry picks language – and all support the conclusion that "plaintiffs and their counsel cannot be accused of retrenching on any obligation"[29] when adapting class definitions to litigation realities.  While these precedents arise out of attempts by excluded parties to *intervene*, they are directly on point because the proper procedural path for this Objector, too, would have been intervention, given that non-class members are generally not permitted to file objections.[30]

*The Objector's Interests Have Not Been Prejudiced*

18.     Had the Objector sought intervention, it would have had to demonstrate impairment of its interests.[31]  But Co-Lead Class Counsel's actions have not prejudiced the interests of this large, atypical TPP.  The Objection's implications that the settlement "strips [the Objector] of a legal claim or cause of action,"[32] and that Co-Lead Counsel decided to "preclude [the Objector] from recovering . . . damages . . ."[33]  are both inaccurate.  As a non-class member, the Objector's

---

[28] *McBean v. City of New York*, 228 F.R.D. 487, 496-97 (S.D.N.Y. 2005) (rejecting challenge to class counsel adequacy for narrowing the original class definition of all detainees "to exclude misdemeanor arrestees charged with weapons or narcotics-related offenses . . . in exchange for settlement," stating, "[t]his argument would have weight if there were no conceivable justification for plaintiffs' decision to narrow the class aside from desiring a quick and easy settlement.  But defendants are clearly entitled to argue that individuals charged with narcotics or weapons-related offenses are differently situated than other misdemeanor arrestees.").

[29] *Id.* at 497.

[30] *Newberg and Rubenstein on Class Actions* § 13:22 & n.5 ("Courts regularly find that nonclass members have no standing to object to a proposed settlement. . . .").

[31] Fed. R. Civ. P. 24.

[32] Objection at 6 (quoting *Rahman v. Vilsack*, 673 F. Supp. 2d 15, 19 (D.D.C. 2009)).

[33] *Id.*

claims against the Defendant remain unfettered by a final judgment in the class action.  The Objector falls back to arguing that it will face "other prejudice" – not preclusion – because it will now have to file its own case and litigate "from scratch."[34]  That is misleading.  *First,* the Objection notes that its counsel have been involved throughout the MDL, so they are fully versed on the relevant issues and are not starting "from scratch."  *Second,* the litigation materials produced in this class action are available to the Objector at no cost to it, upon payment by Objector's counsel of a small participation/common benefit fee.  *Third,* the Objection alleges that the Objector's damages are large – far greater than the return achieved by the class[35]– hence it has every incentive to litigate on its own.  *Fourth,* the Objector is a sophisticated class action litigant:  it regularly opts out of antitrust classes, hires its own counsel, and litigates alongside class counsel, sharing costs and work with them.  There is nothing wrong with that:  class members have every right to decide when to stay in or opt out of classes that encompass them.  It is simply to point out that pursuing its interests through individualized litigation is a situation familiar to the Objector.  In short, if a small group of elderly, foreign, Holocaust survivors suffered no legal prejudice by exclusion from that monumental settlement of historic proportion, it would be difficult to conclude that the fourth largest corporation in the United States has suffered legal prejudice given the facts enumerated above.

* * *

---

[34] *Id.* at 7.

[35] *Id.* at 18-21.

19. I have testified that:

- Co-Lead Counsel met their obligations under Rule 23(g) to pursue the best interests of the class when they went ahead with settlement negotiations that excluded five large, atypical TPPs.  It would have been far more problematic for them to abandon 40,000 small clients so as to serve the interests of a handful of large, atypical corporations.

- The class definition complies with the requirements of Rule 23 and no issue raised by the Objection bars either class certification or settlement approval.

- Co-Lead Counsel's decisions caused no legal prejudice to the Objector:  its cause of action remains fully intact; its counsel have been part of this MDL from its inception; it has full access to all of the litigation materials produced to this point at small cost; it alleges that its damages are large, so it has the capacity and incentive to litigate alone; and it is a large corporation that regularly opts out of class actions to pursue individual litigation, so it is fully versed in how to proceed alone.

December 9, 2024

_____

William B. Rubenstein