# Exhibit A

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF OHIO

3                       EASTERN DIVISION

4

5    _____

6    IN RE:  NATIONAL PRESCRIPTION            MDL NO. 2804

7    OPIATE LITIGATION

8                                    Case No. 17-md-2804

9                                Judge Dan Aaron Polster

10

11   This Document Relates To:

12   City of Rochester v. Purdue

13   Pharma, L.P.

14   No. 19-op-45853 (Track 12)

15   County of Webb, Texas v.

16   Purdue Pharma, L.P.

17   No. 18-op-45175 (Track 15)

18

19        TELEPHONIC STATUS CONFERENCE CALL BEFORE

20               Special Master David Cohen

21                   December 6, 2024

22              Scheduled for 4:30 p.m. EST

23

24   REPORTED BY:  DANA S. ANDERSON-LINNELL

25   Job No.:  7063327

```
                                              Page 2
 1   A P P E A R A N C E S:

 2

 3   ALSTON & BIRD, LLP

 4   Andrew Hatchett, Esquire

 5   Emily C. McGowan, Esquire

 6   Brian D. Boone, Esquire

 7   Bradley D. Harder, Esquire

 8

 9   MOTLEY RICE, LLC

10   Michael E. Elsner, Esquire

11

12   FARRELL & FULLER

13   Paul T. Farrell, Esquire

14

15   NAPOLI SHKOLNIK PLLC (Puerto Rico)

16   Hunter J. Shkolnik, Esquire

17

18   NAPOLI SHKOLNIK PLLC (Ohio)

19   Maria Fleming, Esquire

20

21   NAPOLI SHKOLNIK PLLC (Puerto Rico)

22   Salvatore C. Badala, Esquire

23

24   NAPOLI SHKOLNIK PLLC

25   Frank Gallucci, III, Esquire
```

```
                                                 Page  3

 1   A P P E A R A N C E S  (cont.):

 2

 3   SPANGENBERG, SHIBLEY & LIBER, LLP

 4   Peter H. Weinberger, Esquire

 5

 6   SIMMONS HANLY CONROY

 7   Laura Fitzpatrick, Esquire

 8   Mildred Conroy, Esquire

 9   Jayne Conroy, Esquire

10

11   QUINN, EMANUEL, URQUHART & SULLIVAN

12   Matthew K. Wasserman, Esquire

13   Jonathan Cooper, Esquire

14   Olga Vieira, Esquire

15

16   LEVIN, PAPANTONIO, PROCTOR, BUCHANAN, O'BRIEN, BARR &

17   MOUGEY, P.A.

18   Peter J. Mougey, Esquire

19   Laura Dunning, Esquire

20

21                   (Some participants may not be listed.)

22

23

24

25
```

Page 4

1                SPECIAL MASTER COHEN:  Okay.  Thank
2      you everybody for getting on the phone dealing
3      with the discovery dispute today with regard to
4      plaintiffs' expectation/request for personnel
5      files for three upcoming depositions, three
6      upcoming deponents.  And I'd like to start with
7      just a slightly better understanding of who
8      these deponents are and what they do.  So I did
9      read the emails, but frankly, I'm not sure I
10     understand exactly what they mean.
11               Andrew, do you want to start?
12               MR. HATCHETT:  Yeah.  And this is
13     where the poor court reporter, Dana, is going
14     to feel like we've already misled her, but if
15     we are going to be describing in more detail
16     who these witnesses are and what they
17     [unintelligible] I'm going to ask to introduce
18     a new colleague of mine, Emily McGowan, who I
19     hope is on the line.  And I'm actually going to
20     let her be the one to speak more to that.
21               SPECIAL MASTER COHEN:  Okay.  So let
22     me do it this way, Emily.  The two deponents, I
23     understand, from Optum are going to be
24     ███████████████████████████████  ████

█      ███████████████████████████████

Page 5

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮

4          MS. MCGOWAN:  Yes, Special Master.

5 This is Emily McGowan for Optum Rx from

6 Alston & Bird.  So medical directors may play a

7 number of different roles, but our

8 understanding ▮▮▮▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮▮

12          SPECIAL MASTER COHEN:  Okay.  So

13 that's where I kind of read -- I read that and

14 don't really -- still don't really understand

15 it.  I don't understand.  Why is there a

16 clinical education program?  Who's taking it?

17 Who's taking that program?  Why are they taking

18 the program?  Why is he vetting them?  And I'm

19 sorry to be obtuse, but I'm not sure I

20 understand what the point of it is.

21          MS. MCGOWAN:  Hopefully, I can

22 explain some more.  So there are a number of

23 clinicians who work within the Optum Health

24 organization and have historically worked

25 within that organization over the years, from

1    case managers to nurse practitioners to

2    doctors.  And those individuals may require

3    from time to time additional education or

4    continuing medical education.  ████████

█    ███████████████████████████████████

█    ████████████████████████████████████████

█    █████████████████████████████████████████

█    ████████████████    █████████████████████

█    ████████████████████████████████████████

█    ████████████████

11           SPECIAL MASTER COHEN:  And does this

12   all go to what is on a formulary or whether a

13   drug is going to be approved?  I mean, I'm

14   still trying to understand kind of in a large

15   way what all this has to do with.

16           MS. MCGOWAN:  Right.  So Optum

17   Health is not a pharmacy benefit manager like

18   Optum Rx.  ██████████████████████████████

█    ██████████████████████████    ████████████

█    █████████████████████████████████████████

█    █████████████████████████████████

█    ████████████████████████████████████████

█    █████████████    ████████████████████████

█    ██████████████████████████████████

█    ██████████████████████████████████████

1 ███████████████████████████████████

2 ██  ████████████████████████████

3       SPECIAL MASTER COHEN:  When you say

4 "members of plans that are getting services

5 from Optum Health," you're talking about Joe

6 patient insured?

7       MS. MCGOWAN:  Correct.  So if a plan

8 uses Optum Health, for example, to assist in

9 care management services, then the clinician

10 that works for Optum Health might have, you

11 know, some role, for example, in evaluating

12 like a clinical program for diabetes, for

13 example, to help those members who have

14 diabetes manage their care.  It would be like

15 an add-on program, something like that.

16       SPECIAL MASTER COHEN:  ██████  ██████

17 ████████████████████████████████████████

18 ███████████████████████████████████

19 ████████████████████████████  Can you give

20 me a -- sketch that out?

21       MS. MCGOWAN:  ██████  ██████████████

22 ██████████████████████████  ████████

23 ███████████████████████████████████

24 ██████████████████████████████████

25 ████████████████████████████████

Page 8

1    ███████████████████████████████████

███  █████████████      █████████████████████

███  ███████████████      ████████████████████

███  ██████████████████████████████████████████

███  ████████████████████████████████

6    SPECIAL MASTER COHEN:  Okay.  And

7    before I change subjects -- and I'm going to

8    stick with those two deponents -- Mike Elsner,

9    do you have anything that you would add to my

10   understanding of those individuals and why you

11   need their personnel files and what you're

12   looking for from those files?

13   MR. HATCHETT:  This is Andrew

14   Hatchett.  ███████████████████████████████

███  █████████████    ███████████████████████

███  ████████████      ████████████████████

███  ████████████████      ████████████████████

███  ████████████████████████████  And Emily can

19   provide more color if that's not clear to you,

20   Special Master Cohen, but just want to make

21   sure that you understood the distinction.

22   SPECIAL MASTER COHEN:  Got it.

23   Thank you.

24   MR. ELSNER:  I'm happy to add a few

25   points of color ████████████████████████████

Page 9

1    Before I do, though, I just want to go back to

2    where we were, which is the deposition protocol

3    in the MDL since 2018.

4            SPECIAL MASTER COHEN:  I know where

5    we were.  We'll get to that, Mike.  Just answer

6    my question.

7            MR. ELSNER:  All right.  █████

█    ███████████████████████████was a key

9    opinion leader for Purdue.  ████████

██   ███████████████████████████

██   █████████████████████████████████

██   ██████████████████████████████████

██   ███████████████████████████████

██   █████████████████████████████████

██   ████████████████████████████████ and

16   then I'll get back to why we need them.  ████

██   █████████████████████████████

██   ████████████████████████████████████

██   ████████████████████████████████████

██   ███████████████████████████████

██   ██████████████████████████████████

██   ███████████████████████████

██   ████████████████████████████████

██   ███████████  ████████████████████████

██   ██████████████████████████

Page 10

1　███████████████████████████

█　███████████████████████████

█　████████████████████████████

█　████████████　So she falls more, as we

5　understand it, in a role that would be more

6　familiar to you from sort of a Nicole

7　Harrington world at CVS and those involved in

8　those kinds of programming decisions.

9　　　　　　　SPECIAL MASTER COHEN:  And let me

10　just ask real quick, Mike.  █████████████

█　███████████████████████████

█　███████████████████████████

13　　　　　　　MR. ELSNER:  That's correct.  ████

█　██████████

15　　　　　　　SPECIAL MASTER COHEN:  Okay.  Go

16　ahead.  Yeah.  Okay.  So I think I understand

17　what these two folks did.

18　　　　　　　MS. MCGOWAN:  I'm sorry.  Special

19　Master Cohen, this is Emily McGowan for

20　Optum Rx.  Could I just make a few points of

21　clarification?  Because we do not agree with

22　the statements that Mr. Elsner just made about

23　these two individuals.  So we disagree that

24　████████████  is a key opinion leader for Purdue.

25　That's --

Page 11

```
 1              SPECIAL MASTER COHEN:  I'm sure you

 2     do.

 3              MS. MCGOWAN:  ███████████████████████

       ██████████████████  ████████████████████████

       ██████████████████████████████  ████

       ███████████████████████████████████████████

       ██████████████████████████████████████

       ████████████████████████████████████

       █████████████████████████████████

       ████████████████████████████████████

       ██████████████████████████████████████

       ████████████████  ████████████████████████

13              SPECIAL MASTER COHEN:  Okay.

14              MR. HATCHETT:  █████████████████████

       █████████████████████████████████████

       █████████████████████████

17              SPECIAL MASTER COHEN:  And who is

18     the third deponent?  I've lost track now.

19              MR. WASSERMAN:  This is Matthew

20     Wasserman for Express Scripts.  That would be

21     █████████████████  for Express Scripts.  He's a

22     former employee.  He was the ██████████████

       ██████████████  at Express Scripts from 2006 to 2018.

24     And just to add some more color about what that

25     title actually means and entails, he was
```

Page 12

1          basically the lead of ████████████ and

2          ████████████████ for the company.  So he

3          would interface with different client groups.

4          He would ███████████████████████████

5          ████████████████████ speaking to mostly

6          drug-saving initiatives, other products that

7          Express Scripts was launching.  And, you know,

8          his background search is a Ph.D.

9                    SPECIAL MASTER COHEN:  Okay.  Let me

10         just pull something up.

11                   MS. DUNNING:  Special Master Cohen,

12         this is Laura Dunning for the plaintiffs.  I

13         would also add that ██████████, in addition to

14         being the ███████████████ and serving in

15         some of the roles that Mr. Wasserman just

16         discussed, he also worked in the Office of

17         Clinical Evaluation and Policy, which was

18         directly involved in determining what drugs go

19         on formulary from a clinical perspective.

20                   SPECIAL MASTER COHEN:  All right.

21         So look, I don't need you to -- in fact, you

22         did.  So it was helpful.  I don't need to go

23         over how we got to where we got to, that is to

24         say the history of production of information

25         from personnel files through -- starting with

Page 13

```
 1      Track 1 to today.  And I understand that
 2      plaintiffs essentially thought that the status
 3      quo was every deponent, their personnel file
 4      was produced.  I actually think that's not
 5      exactly where things were left.  I think that
 6      certain documents from a personnel file were
 7      certainly ordered to be produced.  And it may
 8      have turned into a de facto status quo that,
 9      quote, unquote, everyone's personnel file was
10      produced from a former employee or an employee,
11      although that's not exactly where things were
12      left, as far as I was concerned.  But, of
13      course, if the parties, you know, came to an
14      agreement, that's fine.  The trick, though, is
15      that we've got different parties.  And the PBMs
16      are correct that the judge has said:  Look, you
17      know, these are certainly highly persuasive
18      rulings, but they are not automatics.  And so I
19      want to start by reminding the plaintiffs --
20      because I think it's easy to fall into the trap
21      of -- I want to remind the plaintiffs of the
22      fact that, you know, the PBMs have a right to
23      raise issues that they think don't apply.  And
24      you shouldn't simply rely on the status quo
25      every time, especially be -- when I go back and
```

Page 14

1      look at what is recited to me as what the
2      status quo is isn't exactly the same as the
3      plaintiffs' understanding, again, maybe because
4      of agreements or, you know, just the practice
5      that came into being.
6                  Having said all of that, so the
7      descriptions you just gave me make it
8      reasonably clear, but not entirely clear to me,
9      that we're not talking people who were sales --
10     in sales or marketing and might have had their
11     compensation based on, you know, the amount of
12     opioids that were dispensed or the amount of
13     opioids that were sold or anything like that.
14     So those kind of requirements or needs don't
15     appear to me to be what the plaintiffs are
16     after.  They're really more after what I would
17     call more standard things in a file;
18     performance evaluations, compensation and, you
19     know, explanations of whether there are
20     bonuses.  Those bonuses may not be based on
21     opioid sales, but they may still well be
22     relevant, things like that.  Those things, I
23     think, are relevant or certainly discoverable
24     as a general matter.
25                  And so where I'm landing -- and we

Page 15

```
 1        can talk about the contours of this.  And both
 2        of you can argue that I got it wrong to some
 3        extent and maybe I'll reconsider.  But where
 4        I -- my tentative ruling, where I'm landing is
 5        that is for employees and former employees the
 6        kind of documents that are listed in what has
 7        been referred to as page 3 of the Lanier letter
 8        have to be produced three days before the
 9        deposition.  And those are, first of all, not
10        only opioid related, as was made clear in an
11        email and was made clear by the Court in that
12        email, I mentioned that I talked to Judge
13        Polster about it, and also are things that can
14        be redacted to the extent necessary.  And I'm
15        not talking about for relevance.  There will be
16        no redaction for relevance.  There will be
17        redaction, though, of Social Security numbers,
18        things like that.  The protective order is
19        going to apply to those.  So that addresses the
20        privacy concerns.
21                  And, you know, the documents listed
22        in the -- in that letter, those bullet points
23        include things like performance evaluations,
24        commendations, salary history, job
25        descriptions, things like that.  And this goes
```

Page 16

1        both ways, right?  So this doesn't apply only

2        to the defendants' employees and former

3        employees.  It applies to the plaintiffs'

4        employees and former employees.

5                    So that's where I'm landing.  And

6        now if somebody wants to jump up and down and

7        tell me I got it wrong and why, I'll listen to

8        that.

9                    MR. HATCHETT:  Special Master Cohen,

10       this is Andrew Hatchett.  And I'll start.  And

11       I'm not going to be jumping, but we do believe

12       you got it wrong.  And so here's why.  I will

13       give at least, you know, two reasons.  So

14       one -- and this is a point that we, you know,

15       made in our email to Mr. Elsner and in our

16       email exchanges that have also copied you.  One

17       starting threshold problem is the lack of a

18       document request seeking this information.  And

19       so before this morning I didn't know that for

20       sure.  When I saw the transcript from the

21       hearing that Mr. Elsner attached yesterday, it

22       looked to me like there had been a document

23       request asking for personnel file information

24       in other tracks, but I did not know it for

25       sure.  I'm now looking at it because the prior

Page 17

1    briefing has been provided to us.  And so I'm
2    looking at a document request from plaintiffs
3    to the defendants, and it asks for things like,
4    A, all reviews, evaluations or assessments of
5    the witness' job performance related
6    specifically to opioid marketing and sales.
7    That's A.  And it goes down.  But there's an
8    Express document request for this information.
9    In the pharmacy track, I understand that there
10   was also a document request for this
11   information.  That document request was served
12   because the defendants and other track, as I
13   understand it, said:  We don't have to produce
14   this information absent a document request
15   because that's, in fact, what the Federal Rules
16   require.  They require document requests before
17   you have to produce documents.
18                The PEC and the plaintiffs, of
19   course, have done this through many tracks.
20   They did not serve a document request on us
21   seeking this information.  It does not exist.
22   And so as a threshold matter I think that that
23   is a failure on their part.  Whether it's an
24   inadvertent mishap and they missed it, they did
25   not serve a document request.  And so, you

Page 18

```
 1        know, it's our position that we shouldn't have
 2        to produce documents without a document request
 3        asking for the information.
 4                  The second --
 5                  SPECIAL MASTER COHEN:  Andrew,
 6        please remember your second point.  I don't
 7        want you to forget it.  But I do want to take
 8        them point by point.  So let me interrupt you
 9        and ask, I guess, Mike, to respond to that.
10                  MR. ELSNER:  Absolutely.  Michael
11        Elsner, again, for the PEC.  There was, as
12        Andrew stated, an initial 30(b)(2) document
13        request for certain records in Track 1.  Once
14        the protocol had been ordered and agreed to and
15        then ordered by yourself, there were no other
16        document requests ever issued in any subsequent
17        track for any personnel file because it was
18        understood that the deposition protocol
19        required the production of personnel files.
20        And let me be clear.  We were not seeking
21        complete personnel files beyond what you had
22        previously ordered in -- and in the bullets
23        that you described on page 3 of Mr. Lanier's
24        letter.  Those are the exact types of
25        information that we were seeking here.  We
```

1     weren't seeking anything beyond that because

2     that's what the protocol calls for.  If the

3     protocol called for something else, we would

4     have asked for amendments to that if we felt

5     like we needed additional information.

6                    MR. HATCHETT:  This is Andrew

7     Hatchett.  That protocol is something that I

8     literally had not seen until yesterday.  So

9     I -- if it's an email that didn't copy any

10    party, didn't copy the PBM defendants, we

11    weren't party to that stage of the process.  Of

12    course there is an order that's on the docket.

13    I think that's 1162, 1163 --

14                    SPECIAL MASTER COHEN:  1163.

15                    MR. HATCHETT:  -- [unintelligible].

16    But that would not apply to any of these

17    witnesses because none of these are sales,

18    marketing people that were compensated based on

19    the sales and distribution of opioids.  And so

20    I don't know how Mr. Elsner could believe that

21    we were -- had reached some understanding or

22    agreement to apply to some, quote, unquote,

23    protocol that was not even available to us.

24                    SPECIAL MASTER COHEN:  I understand.

25    Do you want to go ahead and hit on your second

Page 20

1     point?

2                 MR. HATCHETT:  The second point I

3     would make is that it was also very clear from

4     the record that is now becoming available to us

5     is that there was an extensive effort as these

6     issues arose in different tracks for the

7     plaintiffs to make a showing, which is what the

8     law requires, as to the need for certain

9     categories and information from personnel files

10    for certain types of witnesses.  And so it

11    appears that it started with the manufacturer

12    defendants and related to people who were

13    involved in the sales and marketing of opioids.

14    And so there was a focus on compensation and

15    bonus information related to sales and

16    marketing of opioids.

17                 As it went on to Track 3, as you

18    look at the Lanier letter and email, there was

19    a discussion about how there was a concern that

20    the dispensing pharmacies had engaged in

21    compensating or providing a bonus structure

22    that incentivized dispensing pharmacists to

23    push out more volume of prescriptions because

24    they received a bonus or pay based on the

25    volume of dispenses.  And so in each case there

Page 21

1    was an attempt to come to the Courts and

2    explain specifically for certain categories of

3    witnesses why it is that their compensation or

4    their bonus information would be relevant to

5    the claims and issues in the case.  And that

6    was done.  For these witnesses -- ███████████

     ███████████████████████████     █████████████

     █████████████████████████████████████████████

     ████████   █████████████████████████████████

     █████████████████████████████████████████████

     ████████████       There's been no attempt to

12   explain why ████ compensation and bonus

13   information is relevant to anything, let alone

14   whether or not ███ was disciplined because he

15   stole someone's parking spot or wore, you know,

16   something wrong on casual Friday.  So there's

17   all kinds of things, of course, that are in

18   employee files, but there's been no attempt to

19   explain why that information is going to be

20   relevant to the claims or issues that would

21   relate to whatever they may be pursuing ████████

     ██████████████████

23                  █████████████████████████████████

     ████████████████████████████████████

     ████████   ██████████████████████████████████

Page 22

1        ████████████████████████████        But

2        the law, I think, doesn't just say:  Oh,

3        because Mr. Lanier sent an email three years

4        ago that identified some bullets in an email

5        where they had explained to the Court why it

6        was that that information would be relevant to

7        the dispensing pharmacists and the witnesses in

8        those case.  They need to actually come in and

9        explain why it is that this information is

10       going to be relevant to these witnesses.

11       That's, I believe, what the law requires, and I

12       don't think they've even attempted to do it.

13       They are just asking you to rotely subject us

14       to the same requirements that were subjected to

15       the retail pharmacies without making a showing

16       and without ever serving us a document request.

17       And we believe that that's improper.

18                SPECIAL MASTER COHEN:  Andrew, do

19       you know if the PBMs served a document request

20       upon plaintiff or plaintiffs for the same kind

21       of documents?

22                MR. HATCHETT:  I don't believe we

23       served a document request for personnel files,

24       but we haven't demanded them.

25                SPECIAL MASTER DAVID COHEN:  Okay.

Page 23

1           MR. WASSERMAN:  This is Matthew

2     Wasserman for Express Scripts.  We had also not

3     demanded personnel files.

4           SPECIAL MASTER COHEN:  Mike?

5           MR. ELSNER:  Yes.  So if we just go

6     through the points of -- that were previously

7     part of the protocol, the first part of the

8     protocol is background information and CVs.  I

9     don't think anyone has ever argued that

10    background information and curriculum vitaes is

11    information that is somehow protected or

12    somehow information that shouldn't be shared.

13    And for employees like ███████████████

14    that have been with the company for ██ years,

15    those records are incredibly important.  They

16    provide detailed information as to what entity

17    they were performing work for over what period

18    of time, what programs they were evaluating

19    over what period of time.  ███████████

██    ███████████████████████████

██    █████████████████████████████

██    ██████████████████████████████

23    The employee personnel file contains that kind

24    of in real-time information about what roles██

25    was performing for what entity over what period

Page 24

1    of time.  And it's incredibly important.  And

2    it's been ordered, produced in multiple MDLs

3    precisely because that type of information is

4    information you can't otherwise obtain from CVs

5    or LinkedIn results.  And often witness' memory

6    of what happened and what entity they were

7    performing work for over ███ years is faulty.

8    And so this information provides critical

9    information.

10                The review information, which is the

11   second point list of bullets, performance

12   review information proved incredibly helpful in

13   all of the prior tracks of the litigation and

14   will prove entirely helpful here because it

15   provides on an annual basis specific

16   information about what that particular employee

17   was working on.  For ████████  situation,

18   ████████████████████████████████

██   ████████████████, how is it related to

20   opioids, ███████████████████████

██   ███████████████████████████████

██   ████████████████████████████████████

██   ████████████████████  And I can tell

24   you by example from the CVS case, you know,

25   we've obtained this type of information from

Page 25

1    Tom Davis, who is an executive vice president.

2    We obtained this information from people all

3    along the chain.  And the plaintiffs produced

4    this information from sheriffs to coroners to

5    all types of employees.  And in the CVS example

6    we learned only through the production of

7    personnel files that there was specific

8    programming that they had developed related to

9    the diversion of opioids that was not otherwise

10   discussed in any other document that had been

11   provided to us.  And we learned that CVS had

12   actually developed an internal program using

13   the exact red flags plaintiffs had developed

14   and tried to implement it and that was

15   otherwise not available.  So that type of

16   information and performance reviews is

17   incredibly important.  And it's just as

18   important if no work had been done.  ██████

     ██   ███████████████████████████████████████

     ██   ███████████████████████████████████████

     ██   ████████████████████████████████████

     ██   █████████████████████████████████████████

     ██   ████████████████████████

24              As it relates to compensation,

25   compensation affects bias, of course.  And I

Page 26

1     don't know if there was any kind of incentive
2     programming for ███████████████████
      █████████████████████████████████████
      █████████████████████████████████████
      █████████████████████              I don't know if
6     ███████████  maintains stock interests and other
7     interests within the company that might impact
8     the scope of ███ testimony.  We found that with
9     critical witnesses like Tom Davis, Nicole
10    Harrington, among others, that type of
11    information can only be revealed often
12    accurately through the production in a
13    personnel file.  And this is consistent with
14    what's been done with every type of witness in
15    the case, even for witnesses from the
16    plaintiffs, which you acknowledged at the time
17    that they probably had no role with respect to
18    opioids.  And yet we provided that information
19    and we would do so here.
20              SPECIAL MASTER COHEN:  Right.  So
21    look, I am bothered by -- a little bit, not a
22    lot, just a little bit, by the lack of a formal
23    request, but I think it's easily explained by
24    the history of this MDL and the understandable
25    understanding on the part of plaintiffs that

Page 27

```
 1     the requirement was already in place and that
 2     they didn't need to ask for it.  Again, I
 3     remind plaintiffs that they need to be careful
 4     about that, that that's an assumption that
 5     isn't necessarily valid because we have
 6     different defendants.  And as they know and I
 7     know, those defendants are entitled to point
 8     out that they are different and different
 9     circumstances adhere.
10               Having said that, I remain of the
11     opinion that this kind of information in
12     personnel files is not only discoverable but
13     relevant and needs to be produced.  And I'm
14     also not real happy that this is done on a
15     short time frame, but, again, I understand why.
16     It's because of the background.  And so we're
17     only talking about three deponents, and I know
18     they're coming up next week, but I think
19     there's time.  And so I'm ordering that the
20     bullet points on Lanier page 3, those sorts of
21     documents, not with reference to opioids, in
22     other words, not restricted by if they're
23     talking about opioids, as was mentioned in
24     email, have to be produced.  And, again, that
25     is something the plaintiffs also have to
```

Page 28

```
 1     produce even though defendants haven't asked
 2     for it formally either.  Okay?
 3                 MR. WASSERMAN:  This is Matthew
 4     Wasserman for Express Scripts.  If I could just
 5     push back a little bit on the timing and the
 6     idea that we all knew that this was coming.  I
 7     will just say for Express Scripts we received
 8     an email two days ago asking --
 9                 SPECIAL MASTER COHEN:  No, I --
10                 MR. WASSERMAN:  -- where the
11     production --
12                 SPECIAL MASTER COHEN:  Yeah, I
13     didn't say that you knew it was coming.  I'm
14     saying that even though it's only a few days, I
15     think there's time to get it out, to get those
16     documents produced.  Look, we're starting to
17     enter now into our core discovery.  And, you
18     know, there are going to be -- I know I'm going
19     to get calls the day of and even during
20     depositions for documents and other rulings.
21     And that's just how it's going to go.  We've
22     all been here before.  I understand that it's
23     tight.  I'm saying you can get it done.
24                 MR. WASSERMAN:  This is Matthew
25     Wasserman again.  If I could just ask for one
```

Page 29

1     point of clarification.  On page 3, the

2     bullets, it says at the top there's no

3     obligation to create a personnel file.  So am I

4     right that if these materials don't exist

5     already, that the PBM defendants and none of

6     the parties are under an obligation to create

7     this information?

8              SPECIAL MASTER COHEN:  That is true.

9              MR. WASSERMAN:  Okay.  Thank you.

10           MR. HATCHETT:  So this is Andrew

11    Hatchett for the Optum defendants.  I mean, as

12    I sit here today, I don't know how -- I mean,

13    it's obviously 5:00 on a Friday.  I don't know

14    what it means.  I think the deposition is

15    Tuesday.  So I don't know what it will look

16    like for us to access ██████ personnel

17    file.  I don't know what's in it.  ███████

██    ████████████████████████ But

19    that could be ███ years of performance reviews.

20    But the order that you're making is that we're

21    not allowed to review those to assess whether

22    or not any of his reviews related to

23    opioid-related issues, but that we have to

24    produce all performance reviews that he ever

25    received during ████████ tenure at the

Page 30

```
 1          company, and that's true for all employees?
 2                    SPECIAL MASTER COHEN:  Correct.
 3                    MR. HATCHETT:  I don't know if his
 4          personnel file has pay stubs for ▪ years.  I'm
 5          just trying to -- without having seen a
 6          personnel file, I don't know what this may
 7          entail.  But would that mean, like, we would
 8          need to produce ▪ years of pay stubs if those
 9          are in the personnel file?  Is there any sort
10          of a limitation that might --
11                    SPECIAL MASTER COHEN:  Well, I don't
12          know how to answer that, Andrew, because I
13          don't know what's there.  It seems unlikely to
14          me, having looked at personnel files for other
15          folks, that there are ▪ years of pay stubs in
16          anybody's personnel file.  I just don't think
17          that's very likely.  However, I take your
18          point.  You know, you can come back to me and
19          say:  Look, this kind of document here is just
20          absolutely out of bounds.  We know what your
21          ruling is, but you didn't have this in mind,
22          right?  I don't have time to do an in-camera
23          inspection of the whole thing, but I'm not
24          being implacable.  If you come back and say:
25          These are documents that we think we shouldn't
```

Page 31

1       have to produce, I'm willing to listen.  And I

2       can do that ex parte.  When I say "ex parte," I

3       mean review documents in camera that you don't

4       think should be produced.

5                   MR. WASSERMAN:  Special Master

6       Cohen, this is Matthew Wasserman again.  Sorry

7       to ask another question about the bullets, but

8       we are just seeing them for the first time

9       today.  Unless I'm missing it, there's nothing

10      in these bullets that address compensation.

11      And so am I right to conclude that compensation

12      is not what the plaintiffs are requesting here?

13      They're requesting these three bullets, the CV,

14      the list of positions and then the performance

15      reviews?

16                  MS. FITZPATRICK:  This is Laura

17      Fitzpatrick.  To be clear, we are requesting

18      compensation information.  And that exact sort

19      of information was produced in previous tracks

20      for employees that we deposed to be very clear.

21                  SPECIAL MASTER COHEN:  Compensation

22      and bonuses is actually the first -- if you

23      look at page 1 of the letter, is the first

24      topic.  So, I mean, I think that was actually

25      the first thing that was being discussed and

Page 32

1          was included in the original protocol.  And the
2          bullet points on page 3 are kind of "and
3          alsos."  The short answer, Mr. Wasserman, is
4          yes, compensation information has to be
5          produced.
6                    MR. WASSERMAN:  As I read the
7          compensation discussion on page 1, it was
8          compensation for pharmacists, whether bonuses
9          were tied to an incentive to fill quickly.
10                   SPECIAL MASTER COHEN:  Compensation
11         has to be produced both ways.  It's not as
12         though a deponent isn't going to be asked that
13         question.
14                   MR. WASSERMAN:  And no, I
15         understand.  I guess from our perspective it's
16         simply a matter of getting these documents
17         collected, reviewed and produced in the next
18         two days.  And so any type of limiter certainly
19         helps us get it out the door faster.
20                   SPECIAL MASTER COHEN:  Understood.
21         Compensation has to be produced.
22                   MR. HATCHETT:  This is Andrew
23         Hatchett for the Optum defendants.  Looking --
24         again, I'm also reading these letters and stuff
25         for the first time this morning.  And it looked

Page 33

```
 1     to me like there was parts of the earlier
 2     orders that discuss redacting bank, Social
 3     Security-type information, which may appear on
 4     compensation related documents, so...
 5               SPECIAL MASTER COHEN:  It just -- if
 6     what you're complaining about, Andrew, is the
 7     capacity of counsel to produce these documents
 8     and redact things that need to be redacted in
 9     time, it sounds like that's what you're
10     concerned about, I get it.
11               MR. HATCHETT:  [Unintelligible]
12     collecting them first [unintelligible] --
13               SPECIAL MASTER COHEN:  Yeah.
14               MR. HATCHETT:  -- got to know when
15     that can be done at this point.
16               SPECIAL MASTER COHEN:  Yeah, that's
17     fair.  So look, I am going to say that you can
18     produce this one day before the deposition.
19     Normally it would be three.  But the reason
20     that we're here is partly plaintiffs' fault,
21     that they assumed that you already knew that
22     you had to do this, and that wasn't entirely
23     fair.  So to help you, I'm going to tell you
24     that at least for the -- when are the
25     depositions?  Are there two next week?
```

Page 34

1              MR. HATCHETT:  Our first is Tuesday.
2    Today would be three days before the
3    deposition.  One day before the deposition is
4    Monday.  I don't even know if I can get the
5    documents until Monday.
6              SPECIAL MASTER COHEN:  Yeah.  I
7    mean, that's the problem.  That's really the
8    problem.
9              MR. HATCHETT:  At this point in time
10   I am not sure that it would be feasible for us
11   to collect, review and produce this information
12   even one day before the deposition if it's a
13   Tuesday deposition next week.
14              SPECIAL MASTER COHEN:  Right.  █████
█████  ████████████████
16              MR. HATCHETT:  [Unintelligible]
17   close of business on Friday.
18              ████████████████████████████████████
19              SPECIAL MASTER COHEN:  I understand.
20   Hold on a minute.  ███████ is next Tuesday,
21   right?
22              MR. HATCHETT:  ██████is not until
23   January.
24              SPECIAL MASTER COHEN:  Okay.  So ████
25   is not an issue.  And who -- what about --

Page 35

```
 1      sorry.  I can't remember names.  The third
 2      deponent, when is that?
 3                  MR. WASSERMAN:  That's okay.  This
 4      is Matthew Wasserman.  ██████████  is Wednesday.
 5      So we're in the same position as Optum where,
 6      you know, he worked at the company for decades.
 7      It's just going to be almost unfeasible, if not
 8      not feasible.
 9                  SPECIAL MASTER COHEN:  Right.  You
10      know, Mike, you're going to have to make a
11      choice.  Because I think it is asking way too
12      much to not only produce these documents when
13      they have no idea they were going to have to
14      but do it in such a rush.  And so you're going
15      to have to move the depos, you know, at least
16      seven days or go without them.  It's up to you.
17      Obviously that's the scheduling issue.  I don't
18      know what to do about it except say that that's
19      only fair.  If you want them, you're going to
20      have to move the depos.
21                  MR. ELSNER:  Special Master Cohen,
22      this is Michael Elsner from Motley Rice for the
23      PEC.  Let me just say, with respect to Optum,
24      these materials were requested in an email in
25      the middle of November.  The fact that we're
```

Page 36

```
1     arguing this today and the fact that an
2     objection was only raised two days ago, I don't
3     think should excuse them from producing these
4     materials rapidly.  I take your point as to
5     timing.  I'm happy to discuss that with my
6     team.  But if we decide to forgo the deposition
7     at this point in time waiting for the personnel
8     file and delaying it, we still want the --
9     that's one issue that we'll deal with.  If we
10    decide to go forward without it, then we still
11    want the production of the personnel file.  And
12    I think with respect to ████████, we should be
13    permitted to reopen that deposition and
14    question ███ as to it when it's produced if it
15    can't be produced --
16              SPECIAL MASTER COHEN:  That's my
17    point.  We're not going to reopen the
18    deposition for these documents, so you have to
19    make the choice.  They do have to be produced,
20    right?  So you can choose to do the deposition
21    without the documents and then get them, or you
22    can choose to move the deposition by at least
23    seven days, and the documents have to be
24    produced in time then for that deposition.
25              Now, let me understand something.  I
```

Page 37

1    do remember now having read something about

2    what you just said, which is that the documents

3    were requested in November, and to this point

4    that hadn't been brought back up.  Tell me what

5    that means.  The documents had been requested

6    in November, certainly not formally, correct?

7              MR. ELSNER:  We served the notice of

8    the deposition.  And then after we served the

9    notice of the deposition, I sent an email to

10   counsel for Optum, and I said:  Please produce

11   the personnel files ██████████████████

     ██████████████████████  And I believe that

13   was November 13th.  I never received a response

14   to that email.  And when I hadn't received a

15   response to that email, I sent a follow-up

16   email, I believe, earlier this week or last

17   week, and then I only got an objection to that

18   follow-up email on Wednesday of this week.  I

19   immediately brought it to your attention as

20   soon as I knew that we had an issue.  But I

21   didn't think we had an issue at all.  I was

22   fully expecting the production of the personnel

23   file 72 hours in advance.

24             MR. WASSERMAN:  Special Master

25   Cohen, Matthew Wasserman for Express Scripts.

Page 38

1    I just want to make clear that is not true for
2    Express Scripts.  We only first received the
3    request for personnel files two days ago.
4                    MR. MOUGEY:  This is Peter Mougey.
5    I've kind of sat quietly listening to this back
6    and forth.  And I'm a little confused at the
7    position, and regardless of the timing, whether
8    it was November or -- that these orders and
9    this process have been in place for years.  And
10   I don't --
11                   SPECIAL MASTER COHEN:  I don't know
12   if you just got on the call, Peter, but we've
13   already addressed that.  It's simply not true
14   that these orders, A, for every former employee
15   or employee, for every defendant, for every
16   deponent and for every plaintiff, that their
17   personnel files will get produced.  It's less
18   than that.  And as Judge Polster has explained,
19   even though there might be highly persuasive --
20   even though those rulings might be highly
21   persuasive, the PBMs are different.  They're
22   different defendants.  They have rights to
23   raise different arguments.  And the plaintiffs
24   cannot assume that everything applies every
25   time.  I don't think anybody is assuming.  The

```
 1      question then -- that begs the question is
 2      are -- whichever orders or whatever protocol
 3      the defendants believe don't apply to them, I
 4      think they need to speak up and say:  We're not
 5      going to follow this protocol.  We're not going
 6      to follow this order.  This doesn't apply to us
 7      for X.  It's -- this is going to be an awfully
 8      arduous process if everything that we put
 9      together in this litigation over the last seven
10      years, which we'll call it the architecture or
11      the infrastructure with all the prior orders,
12      if the defendants believe that this doesn't
13      apply to them.  The oneness should be on the
14      defendants to pipe up and say something.  I
15      just -- I don't -- I mean, otherwise we're --
16      re -- what's the point of the MDL?  I mean,
17      this is the rule of the case.
18                      MS. FITZPATRICK:  Special Master
19      Cohen?
20                      SPECIAL MASTER COHEN:  Hold on.
21                      MR. HATCHETT:  Andrew Hatchett --
22                      SPECIAL MASTER COHEN:  Wait a
23      minute.  Wait a minute, please.  Peter, I agree
24      with you except that there was nothing except
25      Docket Number 1183 to give the defendants, the
```

Page 40

1        PBM defendants, any notice.

2                Now, what could have happened and

3        what I suggest should happen in the future is

4        that on November 13th when Mike says:  Hey, we

5        expect you to follow the protocol and produce

6        personnel files, here's the protocol and here's

7        where we're getting this from.  Maybe you did,

8        Mike.  I don't know.  Look, I'm not going --

9        this isn't going to be relitigated every time.

10       I assure you that that is not true.  But this

11       is the first time it has come up, and I'm

12       trying to make clear that it's not an automatic

13       that you guys -- both sides.  It's not going to

14       be plaintiffs' burden only.  It's not going to

15       be defendants' burden only.  Both sides need to

16       communicate better.  If you want something and

17       you think that the reason you get it is because

18       of, quote, unquote, the architecture of the

19       MDL, then point to something and do it early

20       and bring it to me.  Where are we landing?

21       Pretty much the same place.

22                MS. FITZPATRICK:  Special Master

23       Cohen --

24                SPECIAL MASTER COHEN:  You have to

25       give everybody a fair chance.

```
                                              Page 41

 1              Go ahead, Laura.

 2              MS. FITZPATRICK:  I apologize.  I

 3     didn't mean to interrupt.

 4              Special Master Cohen, this is Laura

 5     Fitzpatrick, and only for the sake of the

 6     record -- and I apologize that I don't have a

 7     specific date to give you, but you will recall,

 8     and defendants will be reminded that very early

 9     on in this litigation at the beginning of this

10     calendar year, we -- when -- I believe it may

11     have been our very first discovery conference

12     with you, it was over the issue of

13     organizational charts and the PEC's position

14     that in particular the Optum defendants had

15     failed to produce organizational charts.  And

16     one of the things that we specifically

17     requested was the production of personnel files

18     in hopes to, you know, reverse engineer or

19     reverse construct the organizational structure

20     of the company.  And in that very conference we

21     discussed exactly the fact that in prior tracks

22     and historically defendants have had to produce

23     personnel files for the deponents for the

24     individuals that we noticed for deposition.

25     And my memory -- and forgive me, I don't have
```

1    the transcript right in front of me, but it is

2    transcribed -- is that we -- you're -- not only

3    did you deny our request for that, but you

4    specifically said that that issue would be --

5    we would deal with that issue when the time

6    came for these depositions.  And so I just want

7    to be really clear that this is not -- for the

8    defendants to in any way insinuate that this is

9    the very first time that they have been put on

10   notice that we would be requesting personnel

11   files for individuals to be deposed in this

12   litigation is just not factually correct.

13              Thank you.

14              SPECIAL MASTER COHEN:  I do remember

15   that conversation.  And if the plaintiffs want

16   to conclude that I've given the PBMs an unfair

17   break, then you can conclude that.  But what

18   the break is is a little bit more time to do

19   what has always been required.  That's where

20   we're landing.  Giving the PBMs a little more

21   time, because I think it's not unreasonable for

22   them to have not known that this was going to

23   be required.  And I get that different people

24   can conclude differently on that.  That's where

25   I'm landing.

Page 43

```
 1            MR. FARRELL:  David, this is Paul
 2    Farrell on behalf of the PEC.  We are not going
 3    to proceed without the personnel files.  So I
 4    think that puts us back to the drawing board of
 5    picking new dates.  And we ask for the PBM
 6    defendants to very quickly come up with
 7    alternative dates with the idea that we're
 8    not -- this isn't a 30-day bump.  We're going
 9    to ask they that produce the personnel files in
10    seven days and then schedule the depositions
11    very soon thereafter.
12            SPECIAL MASTER COHEN:  Yeah.  I
13    agree the two deponents who were scheduled for
14    this week, the PBMs need to contact them as
15    soon as possible, explain to them that
16    rescheduling is happening because of me and
17    that they need to pick the next
18    soon-as-possible date.
19            MR. BOONE:  Special Master Cohen,
20    this is Brian Boone for Optum Rx.  ████████████

      ███████████████████████████████████████

      ████████████████████████████████████████████

      █████████████████████████████████

24            SPECIAL MASTER COHEN:  ███████████

      ███████████████████████████████████
```

Page 44

1          MR. BOONE:  ███████████████████

   ██████   ██████████████████

3          MS. MCGOWAN:  ██████████████

   ████

   █████████████████████████████

   ███████████████████████████████

   ███████████████████████████████

   ████████████████████

9          SPECIAL MASTER COHEN:  Well, I want

10    you to try and get it done either the 13th or

11    the 16th ███████████████████████

   █████████████████████████████████

   ████████████████  That should give

14    you time to get the documents out and get the

15    depo done.

16          MR. MOUGEY:  This is Peter Mougey.

17    Just let us know then if it's the 13th or the

18    16th for ESI, and that will be -- we'll make

19    that work.

20          MR. BOONE:  Special Master Cohen,

21    this is Brian Boone again for Optum Rx.  ██████

   ██████████████████████  I also need to check

23    with my client because we may want to appeal

24    your ruling today that is, of course, going to

25    affect the timing of all of this too.

Page 45

1           MR. COOPER:  And Special Master

2       Cohen, this is Jonathan Cooper for the Express

3       Scripts defendants.  We will discuss with

4       ████████████  his availability.  I think I heard

5       Mr. Mougey say it needs to be either the 13th

6       or 16th.  I just don't know sitting here today

7       what his availability is.  So we'll check with

8       him and follow up as soon as we can.

9           SPECIAL MASTER COHEN:  ████████████

██  ████████████████████████████████████████████

██  ████████████████████████████

12          MR. MOUGEY:  This is Peter Mougey.

13      What I said was the 13th or 16th would work or

14      any day on the week of the 16th.  I believe

15      that's Monday.  So the week of the 16th.

16      Right?  ████████████████████████████████████

██  ████████████████████████  No, I'm sorry.  I'm

18      talking about ESI.  Oh, yeah.  This is Peter

19      Mougey.  Right.  And if we can do it on the

20      13th, that's the in-law Christmas, and I'll

21      send everybody on the ESI team a thank you note

22      so I can miss that.

23          MR. COOPER:  I'll tell you,

24      Mr. Mougey, it won't be the 13th because Quinn

25      Emanuel has its partner meeting on

Page 46

1     December 13th.  So I don't think we'll be able

2     to do a deposition then, but we will check with

3     ████████████  about his availability and follow up

4     as soon as we can.

5                 SPECIAL MASTER COHEN:  Okay.  We

6     have one other issue that I want to address

7     quickly, and that is production of documents.

8     And --

9                 MR. HATCHETT:  Special Master Cohen,

10    this is Andrew Hatchett.  I can clarify

11    something on that that may make this a lot

12    easier.

13                 SPECIAL MASTER COHEN:  Go ahead.

14                 MR. HATCHETT:  Mr. Elsner's response

15    in the email is actually not getting at the

16    issue that we were raising.  So we are not

17    asking them to identify any document that may

18    be produced by another party that is going to

19    be used at a deposition.  This is an issue that

20    came up in the context of the Jefferson County

21    discovery.  And in that case the PBMs didn't

22    have access to all the documents that had been

23    produced in the MDL [unintelligible] documents

24    that were used in the depositions in Jefferson

25    County that we simply didn't have access to.

Page 47

```
 1              Now, Mr. Elsner's email seems to
 2      suggest that we won't have that sort of issue
 3      in this litigation because every document that
 4      they will be using during a deposition will be
 5      a document that has been produced into the MDL
 6      under DR-22.  If that is the case, then this
 7      may be a moot issue.  But all we are asking is
 8      that if they are going to use any document that
 9      has been not been formally reproduced into this
10      MDL under DR-22 for whatever reason that they
11      may have gained access to through cases outside
12      the MDL, through investigations or otherwise,
13      that they should have to provide us copies of
14      those documents in advance of the deposition.
15      That's just preventing, you know,
16      non-Bates-stamped documents, documents that are
17      not otherwise publicly available or accessible
18      to us.  That is all we are asking for.
19              MR. ELSNER:  Well, this is Michael
20      Elsner.  I misunderstood, I suppose, what Optum
21      was requesting.  But what they're requesting to
22      me seems completely out of line.  Any -- we can
23      depose and impeach a witness with any document
24      that we choose.  I thought his concern was is
25      that there may be documents produced by parties
```

Page 48

1    that they didn't have access to.  And I was

2    clarifying that the concern that they had in

3    Jefferson County wouldn't exist here because

4    they have access to all the MDL documents and

5    all documents from state cases.  But if he's

6    suggesting that there are somehow third-party

7    documents that we want to use to impeach the

8    witness with that we have to produce in

9    advance, that's completely inconsistent with

10   the Federal Rules and the practice of this MDL.

11            SPECIAL MASTER COHEN:  Yeah.  I

12   mean, I agree with both of you, that most of

13   these documents are going to have been produced

14   directly or through DR-22, but also that -- I

15   mean, certainly you can come in with a document

16   that you come across, maybe it's tomorrow's

17   Wall Street Journal, and mark it as an exhibit

18   during the deposition, and it doesn't have to

19   have been disclosed beforehand.  So it sounds

20   like I don't need to rule here.

21            MR. HATCHETT:  Yeah.  So that would

22   be obviously a public document.  I'm talking

23   about documents that had been produced to the

24   PEC that they had gained access to through

25   other litigation from nonparties.  So we're not

Page 49

```
 1        asking for them to identify any new source or
 2        something public that they may use to impeach
 3        the witness.  But if they are nonpublic
 4        documents that are -- that they had gained
 5        access to through litigation or investigations
 6        that have not been produced or made accessible
 7        to the PBMs through DR-22, those documents
 8        should be provided to us.
 9                  SPECIAL MASTER COHEN:  Well, I'm
10        going to assume that's a null set or that I'm
11        going to have to deal with it when it comes up.
12        As to your concerns about, you know, those
13        documents not being what they purport to be or
14        things like that, of course, even that can be
15        dealt with after the fact, you know, as
16        authenticity or completeness.  So I'm not
17        sensing that I need really to make a ruling
18        here.  If something comes up, we'll deal with
19        it.
20                  MR. HATCHETT:  Understood.
21                  SPECIAL MASTER COHEN:  Okay.  That's
22        all I have on my list of things to chat about.
23                  Does anybody else have anything else
24        they want to raise?
25                  MR. MOUGEY:  This is Peter Mougey.
```

Page 50

```
 1        Just for purposes of clarity, today is Friday.
 2        I'm -- can we set -- is Tuesday a reasonable
 3        time to get a date for the following week for
 4        at least ESI?  And I understand that we're
 5        checking on the 13th and 16th for Optum.
 6                   SPECIAL MASTER COHEN:  Can we figure
 7        out --
 8                   MR. WASSERMAN:  I think -- this is
 9        Matthew Wasserman.  I mean, we will contact
10        ██████████    as soon as we can, but it is Friday
11        evening.  I mean, he might need more than one
12        day to get back to us, but -- I mean, we will
13        commit to getting in touch with him and getting
14        availability from him as quickly as possible,
15        but I can't promise it will be done in one day.
16                   MR. MOUGEY:  I -- Special Master
17        Cohen, I think my calculator -- calendar looks
18        like -- today is Friday, and I thought it said
19        Tuesday, which to me is four days and.  You
20        know, the day that we have cell phones and can
21        reach, send texts and emails, that seems pretty
22        reasonable.  I just felt that Tuesday would be
23        nice to be able to plan for the following week
24        with moving people and documents and things
25        around.  So I think that's a reasonable time,
```

Page 51

1 Special Master Cohen, to get a heads-up of what

2 we're looking at.  I mean, quite frankly, I

3 don't want to retread old ground, but this

4 should be plenty of time to get the documents.

5    SPECIAL MASTER COHEN:  Look, I take

6 the defendants at their word that they will

7 reach out to the deponents as soon as we hang

8 up via text, email or phone call and explain

9 circumstances and ask them as soon as they can,

10 preferably on that phone call, when a

11 replacement date can occur and report back to

12 the plaintiffs as soon as possible.  I agree it

13 should all be able to happen before Tuesday.

14    MR. HATCHETT:  Special Master Cohen,

15 this is Andrew Hatchett for the Optum

16 defendants.  At this time, and we'll

17 obviously -- if we can make contact with people

18 immediately after this teleconference, we will

19 do so.  As I indicated earlier, I just don't

20 know how quickly we can obtain, review, redact

21 and produce the personnel file.  As Brian

22 indicated, we're going to talk to our client

23 about whether we need to object and otherwise.

24 But if we're able to make an assessment, you

25 know, before midday on Sunday, we'll notify the

Page 52

1        plaintiffs too.  If for whatever reason we
2        don't object and we're able to produce the
3        information and we can move forward right now,
4        that seems unlikely, but that is obviously
5        still something that is in the cards,
6        ████████████████████████████████████
         ████████████████████████████████████
8                    SPECIAL MASTER COHEN:  All right.
9        And as far as -- if you decide that you want to
10       object, that needs to happen by Monday at 5:00.
11       And I simply note that, as I stated in the
12       email where I'm discussing the Lanier letter, I
13       had had conversations with the Court about all
14       of that, and that's -- so those bottom lines
15       were reached.  That ruling was reached in
16       consultation with the Court.  But that, you
17       know, is just -- I'm just highlighting that.
18       You can do whatever you need to do.
19                   MR. HATCHETT:  Understood.  Thank
20       you.
21                   MR. ELSNER:  This is Michael Elsner.
22       Just for your benefit, trial witnesses were
23       also required to have their personnel file
24       produced in advance of trial.  So the Court
25       reconsidered all of these issues at the eve of

1 the CT7 trial and reaffirmed them again.

2     SPECIAL MASTER COHEN:  Yeah.

3 Actually, Mike, if you could send that out to

4 the extent that's documented, it would be

5 helpful to me and the defendants, I think, and

6 the Court.

7     MR. ELSNER:  Yeah.  I don't know

8 that it was issued by a formal order by Judge

9 Polster, but I think it was -- I'll see what --

10 how that was documented at the time.  But I

11 know that arguments were made in that regard.

12 I know ultimately an agreement was reached, but

13 I believe it was in a conference with you or

14 with Judge Polster.

15     SPECIAL MASTER COHEN:  Yeah, I

16 remember it's true.  I just don't know where

17 it's documented, if it is.

18     Okay, everybody, have a good

19 weekend.  Thank you all.  I appreciate it.  And

20 that's it.

21     (Proceedings concluded at 5:39 p.m.)

22     ***************

23

24

25

Page 54

1                    REPORTER'S CERTIFICATE
2

    STATE OF MINNESOTA    )
3                         ) ss.
    COUNTY OF HENNEPIN    )

4
5          I hereby certify that I reported the
    foregoing teleconference proceedings on Friday,
6   December 6, 2024, from Maple Grove, Minnesota,
7          That the proceedings were transcribed by me
    and is a true record of the proceedings;

8
           That the cost of the original has been
9   charged to the party who hired Veritext, and that
    all parties who ordered copies have been charged at
10  the same rate for such copies;
11         That I am not a relative or employee or
    attorney or counsel of any of the parties, or a
12  relative or employee of such attorney or counsel;
13         That I am not financially interested in the
    action and have no contract with the parties,
14  attorneys, or persons with an interest in the
    action that affects or has a substantial tendency
15  to affect my impartiality;
16
17
           WITNESS MY HAND AND SEAL THIS 7th day of
18  December, 2024.
19
20
21
22  *Dana Anderson*
23
24  Dana S. Anderson-Linnell
    Notary Public, Hennepin County, MN
25  My commission expires 1/31/2025