IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| In re: National Prescription Opiate Litigation | Case No. 1:17-md-2804 |
| This Document Relates to: *All Third Party Payor Actions* | MDL Docket No. 2804 |
| | Judge Dan Aaron Polster |

**REPLY TO THIRD PARTY PAYOR PLAINTIFFS' AND SETTLING DISTRIBUTORS' RESPONSES TO UNITED HEALTHCARE SERVICES, INC.'S OBJECTION**

95762301.3

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................................1

ARGUMENT........................................................................................................................2

I.      The present record provides no rational basis upon which the Court can conclude the Proposed Settlement is fair, reasonable, and adequate. .................................................2

II.     The Proposed Settlement's inequitable treatment of United and the Other Excluded Fully Insured Commercial Health Plans is inexcusable and a product of collusion. Discovery into Class Counsel's settlement negotiations with Settling Distributors is warranted. ..................................................................................................8

a.     The Proposed Settlement plainly treats similarly situated class members unequally and threatens to prejudice United. ................................................................................8

b.     The Court should exercise its sound discretion and order discovery into the Settling Parties' settlement communications. ...................................................................12

CONCLUSION...................................................................................................................14

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Allstate Ins. Co. v. Levesque*,
  263 F.R.D. 663 (M.D. Fla. 2010).................................................................................................13

*Bradfield v. Mid-Continent Cas. Co.*,
  15 F. Supp. 3d 1253 (M.D. Fla. 2014).........................................................................................13

*Cf. Wojtas v. Cap. Guardian Tr. Co.*,
  477 F.3d 924, 927-28 (7th Cir. 2007)............................................................................................9

*GAB Bus. Servs., Inc. v. Syndicate*,
  627, 809 F.2d 755 (11th Cir. 1987) .............................................................................................13

*Galloway v. Kan. City Landsmen, LLC*,
  No. 4:11–1020–CV–W–DGK, 2013 WL 3336636 (W.D. Mo. July 2, 2013)...........................5

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983).......................................................................................................................7

*Hollinger Int'l Inc. v. Hollinger Inc.*,
  230 F.R.D. 508 (N.D. Ill. 2005)...................................................................................................13

*In re General Motors Corp. Pick-Up Truck Fuel Tank*,
  55 F.3d 768 (3d. Cir.1995).............................................................................................................2

*In re United Shore Fin. Servs., LLC*,
  No. 17-2290, 2018 WL 2283893 (6th Cir. Jan. 3, 2018) ..............................................................3

*Mars Steel Corp. v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*,
  834 F.2d 677 (7th Cir. 1987) (Posner, J.) .....................................................................................9

*Martin v. Cargill, Inc.*,
  295 F.R.D. 380 (D. Minn. 2013)...............................................................................................3, 5

*New Phoenix Sunrise Corp. v. Comm'r*,
  408 F. App'x 908 (6th Cir. 2010)................................................................................................13

*Rawlings v. Prudential-Bache Properties, Inc.*,
  9 F.3d 513 (6th Cir. 1993) .............................................................................................................7

*Reynolds v. Beneficial Nat. Bank*,
  288 F.3d 277 (7th Cir. 2002) ....................................................................................................3, 4

*Romstadt v. Apple Computer, Inc.*,
    948 F. Supp. 701 (N.D. Ohio 1996) ..................................................................................2

*Rothman v. Gould*,
    52 F.R.D. 494 (S.D.N.Y.1971) .........................................................................................9

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) ............................................................................................3

**Rules**

Fed. R. Civ. P. 23 ..................................................................................................... 1, 8, 14

**Other Authorities**

William Rubenstein, Alba Conte & Herbert B. Newberg,
    *Newberg and Rubenstein on Class Actions*
        § 13:32 (6th ed. 2022) ................................................................................................14
        § 13:51 (6th ed. 2022) ..................................................................................................3
        § 13:56 (6th ed. 2022) ............................................................................................9, 12
        § 13:58 (6th ed. 2022) ..................................................................................................6

**INTRODUCTION**

As Class Counsel's responsive brief confirms, this is a case where members of the plaintiffs' class action bar appear to have prioritized their own pecuniary self-interest over the basic tenets of Rule 23 and class members they purport to represent. After subtracting Class Counsel's requested $60 million in attorneys' fees, the $240 million that remains of the Proposed Settlement represents a trivial sum next to the more than 79,000 class members and two-decades' worth of damages it is meant to compensate. They achieved this result by colluding with the Settling Distributors to reduce the overall settlement *res* in exchange for singling out United HealthCare Services, Inc. ("United") and four other TPPs for inequitable treatment. And they did this in spite of knowing that United and the Other Excluded Fully Insured Commercial Health Plans were core members of the class, whom Class Counsel had purported to represent for more than seven years—until it became "pragmatic" for Class Counsel to no longer do so.

Class Counsel try to justify their conduct with reference to arguments supposedly advanced by the Settling Distributors in the parties' (*confidential*) mediation sessions. Settling Distributors, the Court is told, calculated that United and the Other Excluded Fully Insured Commercial Health Plans would be unlikely to sue on a standalone basis, so Class Counsel was justified in "carving out" the fully insured business of these five class members and accepting a corresponding reduction to the settlement *res*. This line of argument is problematic for at least two reasons. First, it disregards the fundamental rationale of the class action mechanism, which is to render redressable claims that would be unattractive or uneconomical to prosecute on an individual basis. Establishing a precedent that Rule 23 class counsel may ease their glidepath to a negotiated settlement and fee award by acceding to defendant requests to pluck one or two or five specified class members out of a proposed settlement would threaten this basic principle.

Second, this line of argument rests on Class Counsel's selective and self-serving disclosure of some (but obviously not all) communications associated with the confidential mediation. Out of respect for the mediation privilege, United has reluctantly held back on sharing

1

damning information—learned firsthand from the presiding mediator—regarding Class Counsel and Settling Distributors' collusive settlement negotiations. United will continue to respect that privilege absent further direction from the Court, but urges the Court to apply the sword-shield doctrine and order full discovery into the parties' settlement negotiations. Such discovery will make plain not only the scope of the parties' collusion against United and the Other Excluded Fully Insured Commercial Health Plans, but the collateral damage their collusion inflicted on the remaining class members.

That collateral damage is substantial. So substantial, in fact, that Class Counsel seems reticent to provide the type of basic information the Court needs to discharge the fiduciary duty owed to these absent class members at this juncture. Because Class Counsel has failed to provide' sufficient information for the Court to ascribe a ballpark valuation to the settled claims and intelligently appraise the Proposed Settlement's adequacy, and because there are ample indications of collusion, denying Class Counsel's approval motion and supplementing the record via the requested discovery is the soundest path forward.

## ARGUMENT

I. **The present record provides no rational basis upon which the Court can conclude the Proposed Settlement is fair, reasonable, and adequate.**

Class Counsel fail to demonstrate that the Proposed Settlement warrants approval. As the proponents of the settlement, Class Counsel bear the burden of showing that the proposed agreement is fair, reasonable, and adequate. *Romstadt v. Apple Computer, Inc.*, 948 F. Supp. 701, 705 (N.D. Ohio 1996) (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank*, 55 F.3d 768, 785 (3d. Cir.1995)). Far from meeting their burden, Class Counsel offer little if any information that would enable the Court to intelligently appraise the Proposed Settlement—that is, its size relative to the best possible recovery, as well as the likelihood of non-recovery or reduced recovery. As a result of Class Counsel's failure, the Court is unable to discharge its duty "to protect the members of a class in class action litigation from lawyers for the class who may, in derogation of their professional and fiduciary obligations, place their pecuniary self-interest

2

ahead of that of the class." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 279 (7th Cir. 2002).

"[C]ourts have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Id*. "When analyzing a proposed settlement, the Court should begin by quantifying the net expected value of continued litigation to the class, and then estimate the range of possible outcomes and ascribe a probability to each point on the range." *Martin v. Cargill, Inc.*, 295 F.R.D. 380, 384 (D. Minn. 2013) (citing *Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006) (cleaned up). While a high degree of precision need not be achieved, the court must "insist that the parties present *evidence* that would enable possible outcomes to be estimated, so that it can at least come up with a ballpark valuation." *Id*. (emphasis in original) (cleaned up).

Class Counsel have presented no such evidence here. Instead, they fall back on generic platitudes and straw-manning. The relief they negotiated is "substantial," they tell the Court, while the risks of litigation are "very real" and "[a]ny settlement requires compromise."[1] They advance a puzzling argument that United is somehow insisting that "no settlement short of several billion dollars would be sufficient to compensate the Class for its damages." *Id*. Where they got that idea is anyone's guess, but to be clear United's position is not that "several billion dollars" are required. Rather, United is advancing the unremarkable proposition that Class Counsel owes it to the Court (and the class) to provide the same basic level of information that *all* settlement proponents are required to provide when seeking approval: evidence sufficient to enable possible outcomes to be estimated, so that a ballpark valuation can be ascribed to the settled claims and the settlement's adequacy can be intelligently appraised by the Court.

What is the ballpark valuation of TPP class claims as pled—*i.e.*, inclusive of United and the Other Excluded Fully Insured Commercial Health Plans? What is the ballpark valuation of the TPP class claims as settled—*i.e.*, exclusive of United and the Other Excluded Fully Insured

---

[1] ECF 5802 at 19.

3

Commercial Health Plans? By how much exactly did Class Counsel agree to reduce their settlement demand in exchange for excluding United and the Other Excluded Fully Insured Commercial Health Plans' fully insured commercial lines of business? How can the Court be sure that Class Counsel's math adds up? If "exercise[ing] the highest degree of vigilance in scrutinizing proposed settlements of class actions" means anything, surely it means securing answers to questions such as these. *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 279 (7th Cir. 2002). Class Counsel's reluctance to provide the basic information required to do so is troubling.

This should not be controversial. Class Counsel's own declarant, Professor William B. Rubenstein, would appear to support the same in his famous treatise. "The value of the settlement to the settling plaintiffs is the most important factor in the court's decision to approve or disapprove a settlement." 4 Newberg and Rubenstein on Class Actions § 13:51 (6th ed.). "The primary way a court determines whether the settlement's value is sufficient is by (1) making a rough estimate of what the class would have received had it prevailed at trial (or at other endpoints) and then (2) discounting that value by the risks that the class would face in securing that outcome." *Id*. "[T]he court must at least satisfy itself that the class settlement is within the 'ballpark' of reasonableness." *Id*.

The few hard numbers that are available to the Court suggest that the Proposed Settlement is nowhere close to the "ballpark of reasonableness." Class Counsel's own expert calculates that a TPP incurs $19,118 in added annual medical treatment costs for each member diagnosed with opioid-use disorder (OUD).[2] More than 2.1 million TPP members were diagnosed with OUD *in 2016 alone*.[3] $19,118 multiplied by 2.1 million yields an annual cost of more than $40 billion. The class period in this case spans *more than two decades*. Multiplying $40 billion across the decades-long class period, Class Counsel's own figures imply a maximum possible recovery of several hundred billion dollars. Yet after subtracting Class Counsel's $60 million in requested fees, the remaining $240 million for which they propose to settle the case is

---

[2] ECF 5614-7, Rosenthal Report at 9.
[3] *See* ECF 5746 at 3, fn 7.

4

enough to compensate the class for just a fraction of a percent of the damages they sustained *in a single year* as a result of the opioid epidemic.

The probability of ever realizing the maximum theoretical recovery may be low indeed, but Class Counsel must provide more than generic platitudes before the Court can conclude that settling this case for a fraction of a fraction of one percent of the class's damages represents an adequate outcome.

> Plaintiff's explanation why the Court should approve the Amended Settlement is little more than a discussion of the risks inherent in prosecuting almost any class action. There is always a chance that a court might not certify a class, that the jury might find plaintiffs have not met their burden of proof, or that an appellate court might overturn a verdict. The question is, what is the chance that one or more of these events will happen in this case? Plaintiff's explanation is unpersuasive because it is so generic it could be used to justify a wide range of possible settlements here. *The Plaintiff should place in the record an estimate of the class members' claims so that the Court can demonstrate it has a rational basis to approve the Amended Settlement, particularly since Plaintiff proposes to settle the class members' claims so early in the litigation.*

*Martin v. Cargill,* 295 F.R.D. 380, 385 (D. Minn. 2013) (quoting *Galloway v. Kan. City Landsmen, LLC*, No. 4:11–1020–CV–W–DGK, 2013 WL 3336636, at *4–6 (W.D.Mo. July 2, 2013)) (emphasis in original). In this case Class Counsel have given the Court nothing more than a recital of the risks inherent in prosecuting any class action. It is generic and could be used to try to justify seemingly any settlement Class Counsel presented to the Court. It is therefore insufficient.

Class Counsel also bizarrely tout the $21 billion in relief they helped secure from Settling Distributors on behalf of a *different* class in this MDL.[4] But more than anything, that highlights the inadequacy of the Proposed Settlement before the Court here, reinforces the specter of potential conflicts, and underscores the need to subject *this* Proposed Settlement to the highest level of scrutiny. From these same Settling Distributors, Class Counsel helped secure a settlement for a *different* set of clients that is *70 times* larger than the Proposed Settlement they

---

[4] ECF 5802 at 22.

5

secured for the TPP Class here. What accounts for this discrepancy, and how does it speak to the adequacy or inadequacy of the Proposed Settlement? Are the TPP Settlement Class members' damages 70 times smaller? Are their claims 70 times weaker? If Class Counsel had confidence that the answers to these questions weighed in favor of approving the Proposed Settlement, they would presumably offer up such information to the Court voluntarily. Their reluctance to do so warrants scrutiny.

Unable or unwilling to explain how the Proposed Settlement can possibly be adequate in light of these metrics, Class Counsel instead argue that the "very low exclusion rate and the singular objection are persuasive evidence that TPP Settlement Class members favor the proposed settlement."[5] As no less an authority than Newberg and Rubenstein confirm, this argument is fatuous, and the small exclusion rate "is likely just apathy":

> [M]ost class members have too little at stake to bother objecting, so the fact that they have not done so says little about the merits of the settlement. Moreover, a low objection rate could be ascribed to a poor notice program. Additionally, in small and cohesive classes, class members aware that one class member has objected may sit back and let the class member carry their objection, meaning the low number of objections is not indicative of widespread support. If the class contains particularly significant class members—*e.g.*, institutional investors with large stakes in securities cases—who do not object, those class members' acquiescence may be more meaningful.
>
> As with objections, in theory a large number of opt-outs weighs against approval because it illustrates that a non-negligible number of class members believe they would be better off pursuing individual claims than accepting the terms of the settlement. However, again, one would not expect significant opt-outs from small claims class suits, and indeed the opt-out rate in most class actions is well below 1% of the class. . . .

Newberg and Rubenstein at § 13:58. Simply put, "[g]iven the ambiguity of the quantitative signals emanating from the number of objectors or opt-outs, this factor does little work in relieving a court of its ultimate responsibility to analyze independently the actual merits of the settlement." *Id*.

---

[5] *Id*. at 2.

6

Ascribing little explanatory value to the low exclusion rate is particularly apt given the profile of this case. According to Class Counsel, most of the class members here are "small,"[6] consisting of self-funded healthcare plans and therefore (to quote Newberg and Rubenstein again) "have little incentive to invest either time or money in responding to a class notice." Newberg, *id*. The notice program in this case may have been poor, particularly given that a number of class members sought leave to opt-out after the deadline, or in the alternative to object to the adequacy of the notice provided.[7] The opt-out procedures were also, by design, unusually onerous, requiring a sworn and notarized filing on an individual-TPP by individual-TPP basis (thus precluding third-party administrators form opting out plans they administer on a consolidated basis). Moreover, United represents a particularly significant class member, akin to an institutional investor in a securities case, whose refusal to acquiesce is especially meaningful. And it would not be unreasonable to suppose that other class members may disfavor the Proposed Settlement but find themselves content to sit back and let United carry the burden of objecting.

Class Counsel have negotiated a settlement that: (1) will result in a recovery of less than $700 for the average self-funded healthcare plan —a sum which is a fraction of the incremental expense it takes to cover a single OUD patient in a single year, and which hardly makes it worthwhile to fill out the onerous claim form requiring twenty years of data; (2) is 70 times smaller than a recent settlement Class Counsel negotiated with these same Settling Distributors on behalf of a different class; and (3) is a fraction of a fraction of one percent of total class damages as calculated by Class Counsel's own expert. In exchange, Class Counsel requests to be paid "only" $60 million.[8] Citing the Supreme Court, the Sixth Circuit Court of Appeals has noted that "the most critical factor in determining a reasonable fee is the result achieved by counsel." *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 517 (6th Cir. 1993) (citing

---

[6] ECF 5802 at 3.
[7] *See* ECF 5824.
[8] ECF 5802 at 17.

*Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983)). While a $60 million fee may not, under some circumstances, be unreasonable, it certainly demands a rigorous examination of the supposedly "substantial" result achieved.

    **II.**    **The Proposed Settlement's inequitable treatment of United and the Other Excluded Fully Insured Commercial Health Plans is inexcusable and a product of collusion. Discovery into Class Counsel's settlement negotiations with Settling Distributors is warranted.**

Class Counsel offer no rational explanation for their inequitable treatment of United and the Other Excluded Fully Insured Commercial Health Plans. Nor do they cite to a single case where anything similar has occurred. Their inability to do so is not surprising. The entire purpose of the Rule 23 class action mechanism is to render redressable claims that may be unattractive or uneconomical to prosecute on an individual basis. That purpose would be destroyed if class lawyers and defendants were allowed to hand-select certain class members they deem unlikely to prosecute their claims on an individual basis and restrict such class members from fully participating in a settlement class, as proposed here.

Class Counsel's responsive brief leaves little doubt what transpired here. They simply found it expedient to treat five class members differently, precluding them from recovering on behalf of their fully insured lines of business (but tellingly not their other lines of business). Class Counsel offer a few arguments to excuse their unprecedented derogation of their Rule 23 duties, but none of them are persuasive. And in trying to do so, they and the Settling Distributors resort to disclosing confidential mediation communications and open the door to full discovery regarding the parties' settlement discussions.

    **a.**    **The Proposed Settlement plainly treats similarly situated class members unequally and threatens to prejudice United.**

At the time of the mediation, not one of the many class actions pending in this MDL excluded a subset of TPPs; they uniformly included "all payors." At some point during the mediation process, Class Counsel abandoned their duties to the entire class and agreed to a settlement that carved out a single line of business for five specific payors: the fully insured

8

commercial business of United, Humana, Aetna, Cigna and Elevance.

Class Counsel and Settling Distributors try to argue that there is something special about United and the four Other Excluded Fully Insured Health Plans that justifies their disparate treatment, but their arguments are nonsense. Newberg and Rubenstein provide a better guide as to what happened: "A distribution of relief that favors some class members at the expense of others may be a red flag that class counsel have sold out some of the class members at the expense of others, or for their own benefit." Newberg §13:56.

Contrary to Class Counsel's protestations, United and the Other Excluded Fully Insured Commercial Health Plans are not "atypical" class members in any meaningful sense. They paid for "(i) opioid prescription drugs manufactured, marketed, sold, distributed, or dispensed by any of the Defendants and/or Opioid Supply Chain Members for purposes other than resale, and/or (ii) paid or incurred costs for treatment related to the misuse, addiction, and/or overdose of opioid drugs, on behalf of individual beneficiaries, insureds, and/or members, during the time period from January 1, 1996 to the date of entry of the Preliminary Approval Order" just like any other class member. Similarly, rewriting the class definition to their exclusion at the eleventh hour undoubtedly threatens United and the Other Excluded Fully Insured Commercial Health Plans with prejudice—most starkly, as to the numerous state-law claims that Class Counsel had asserted on their behalf and to which *American Pipe* tolling does not apply. *Cf. Wojtas v. Cap. Guardian Tr. Co.*, 477 F.3d 924, 927–28 (7th Cir. 2007) (a party "suffer[s] plain legal prejudice" when statute-of-limitations defense added or subtracted). *See also Rothman v. Gould*, 52 F.R.D. 494, 496 (S.D.N.Y.1971) ("The very bringing of a class action . . . may deter the institution of suits by members of the ostensible class. The passage of time may impair or defeat the rights of others thus deflected from acting for themselves."); *Mars Steel Corp. v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 834 F.2d 677, 680–81 (7th Cir. 1987) (Posner, J.) ("Moreover, the delay may make opting out of the class action less feasible than if members of the class had received prompt notice, not because the statute of limitations will have run (the filing of the suit will have stopped it from running) but because evidence may be growing stale.").

9

Despite the question-begging and unsubstantiated opprobrium the Settling Parties direct at OptumRx, PBM affiliation cannot explain the exclusion of these five insurers. The class definition expressly provides that "entities that own an interest, including a controlling interest, in a PBM, are not excluded from the Class."[9] Moreover, several large class members that were *not* singled out for disparate treatment also own PBMs: Kaiser Permanente owns its own in-house PBM,[10] while several Blue Cross plans have an ownership interest in Prime Therapeutics, the fourth largest PBM in the country.[11] Neither Class Counsel nor Settling Distributors even attempt to address this obvious inconsistency in their responsive briefs.

Instead, they merely contend that United is situated differently than the TPPs included in the Settlement Class because United's subsidiary OptumRx is a defendant in a small fraction of MDL cases in which plaintiffs assert claims against PBMs. But the claims against the PBMs are meritless. PBMs are different from the manufacturers, distributors, and retail pharmacies that have been defendants in the bulk of opioid cases in the MDL. PBMs do not manufacture, market, prescribe, or distribute opioids; they are not part of the closed system of distribution that the U.S. Drug Enforcement Administration established to regulate controlled substances like prescription opioids. OptumRx provides administrative services to clients, which include employer health plans, unions, government plans, and other third-party payors. United and its affiliates and subsidiaries have borne tremendous financial costs because of the opioid crisis.

The Declaration of Professor Rubenstein[12] also does nothing for Class Counsel. Professor Rubenstein's declaration disingenuously contradicts his own treatise and most of it is speculative and question-begging, a product only of information Class Counsel chose to "inform" him about. Professor Rubenstein admits that he has "no insider knowledge" as to the parties' negotiations or Settling Distributors' position, but he doesn't let that stop him from opining that "Defendants'

---

[9] Preliminary Approval Order, ECF No. 5616 at 4.
[10] https://www.mmitnetwork.com/aishealth/spotlight-on-market-access/mmit-payer-portrait-kaiser-permanente/.
[11] https://www.primetherapeutics.com/w/prime/magellan-rx-s-advocate-elevates-specialty-pharmacy-experience-simplifies-health-care-journey
[12] ECF 5802-1.

10

position arose out of what are quite obviously very complex business relationships among – literally – the largest corporations in the United States."[13] Professor Rubenstein goes on to assert that the "quantity and quality of the business relationships between and among these enormous entities is clearly quite significant, surely complicated, and largely opaque to outsiders."[14] Somewhere between paragraphs 3 and 13, Professor Rubenstein inexplicably becomes *certain* that "the exclusion of the five large, atypical TPPs is based on specific facts about their unique relationships with the settling Defendants, including possible crossclaims and affirmative defenses those Defendants believe they may have."[15] One paragraph later, he clarifies (?) that "the exclusion is based on bigness."[16]

      Bizarrely, Professor Rubenstein also opines that the settlement class definition cannot be "arbitrary" because it does not, *e.g.*, exclude "every 15th TPP on a list . . . and/or every TPP with a name beginning with 'N'. . .". In securing his opinions to the effect that "the settlement-class definition is not arbitrary" and "the exclusion is based on bigness," one wonders whether Class Counsel did Professor Rubenstein the courtesy of informing him that United and the Other Excluded Fully Insured Commercial Health Plans are not in fact the five biggest TPP class-members. Or that multiple other large TPP class-members, with presumably their own "very complex business relationships" with Defendants, own PBMs yet were not singled out for disparate treatment. Or that some of the five excluded insurers are affiliated with PBMs against whom no opioid-related claims have been filed.

      Professor Rubenstein's "bigness" theory is also belied by the facts.  The fully insured commercial business of the five excluded insurers represents a *mere seven percent of the overall TPP market*.  And not excluded is the Medicare and Managed Medicaid business of those five insurers which, of course, is equally "big."  There is simply no rational explanation for singling out these five class members and restricting them, and only them, from fully participating in a

---

[13] *Id*. at 2.
[14] *Id*.
[15] *Id.*
[16] *Id*.

11

class settlement across all of their lines of business.[17]

Again, as the Newberg and Rubenstein treatise clearly states, the differential treatment built into the Proposed Settlement "is a warning that the settlement deserves greater judicial scrutiny." Newberg and Rubenstein on Class Actions § 13:56. Indeed, this type of "differential treatment is the sign of an unfair settlement . . ." *Id*. The inference that the settlement is unfair can be rebutted, but only "by evidence that the class members should be treated differently because they are situated differently." *Id*. Speculation regarding potential cross-claims or "complex business relationships" or "bigness" is not enough. "[T]he fact that compensation would be more difficult for some class members than others does not by itself justify differential treatment if both groups have the same claims." *Id*. Accordingly, "courts reject settlements where part of the class receives relief and another significant part receives no relief . . ." *Id*.

The only way for the Court to cut through the question-begging and tendentious nonsense—and to properly exercise its role as a fiduciary of the class—is to order discovery into the parties' settlement negotiations. The parties should not object on the grounds of mediation or settlement privilege, given that they themselves have put the contents of these communications directly at issue.

> **b. The Court should exercise its sound discretion and order discovery into the Settling Parties' settlement communications.**

Class Counsel and Settling Distributors attempt to undercut United's objection by selectively invoking positions supposedly taken by Settling Distributors during the settlement process. *See, e.g.*, ECF 5803 at 2-3 ("Settling Distributors have been clear throughout the settlement process that the proposed Settlement would exclude United . . . . Throughout the mediation process between Settling Distributors and now-Interim Settlement Class Counsel that began in February 2024, Settling Distributors made clear that they would only engage in settlement discussions with those TPPs that are now members of the Settlement Class, and

---

[17] The Settling Distributors merely note that Medicare and Managed Medicaid plans "are typically subject to extensive regulation." They fail, however, to explain how that is in any way relevant to the strength or weakness of the claims held by the excluded insurers for their fully insured commercial plans.

12

Settling Distributors negotiated with Interim Settlement Class Counsel on that basis alone."); ECF 5802 at 16 ("[W]hile Class Counsel intended to secure the most complete resolution possible, Settling Distributors would not negotiate a settlement and full release for the Excluded Insurers' primary commercial business for the reasons noted above regarding potential cross-claims and defenses. . . . The decision to exclude was solely the result of Settling Distributors' insistence.").

By invoking this defense, the Settling Parties have put the subject matter of their settlement communications at issue, making its disclosure appropriate. "Under the sword and shield doctrine, a party who raises a claim that will necessarily require proof by way of a privileged communication cannot insist that the communication is privileged." *Allstate Ins. Co. v. Levesque*, 263 F.R.D. 663, 667 (M.D. Fla. 2010) (citing *GAB Bus. Servs., Inc. v. Syndicate*, 627, 809 F.2d 755, 762 (11th Cir. 1987)). Courts have applied the sword and shield doctrine to preclude the assertion of the mediation privilege. *Bradfield v. Mid-Continent Cas. Co.*, 15 F. Supp. 3d 1253, 1257 (M.D. Fla. 2014); *see also New Phoenix Sunrise Corp. v. Comm'r*, 408 F. App'x 908, 919 (6th Cir. 2010) ("[L]itigants cannot hide behind the privilege if they are relying upon privileged communications to make their case."); *Hollinger Int'l Inc. v. Hollinger Inc.*, 230 F.R.D. 508, 518 (N.D. Ill. 2005) (the sword-shield doctrine is "rooted in fairness"); *In re United Shore Fin. Servs., LLC*, No. 17-2290, 2018 WL 2283893, at *2 (6th Cir. Jan. 3, 2018) ("privilege may be implicitly waived when defendant asserts a claim that in fairness requires examination of the protected communications.").

Having put their settlement communications regarding United and the Other Excluded Fully Insured Commercial Health Plans at issue, and given the deleterious impact of their alleged collusion to both Excluded Insurers and the remainder of the Settlement Class, fairness requires a complete discovery record pertaining to the parties' settlement negotiations. Accordingly, United respectfully asks that the Court grant the concurrently filed Motion for Leave to Take Discovery, with such discovery to consist of: (1) production by Class Counsel, Settling Defendants, and the Mediator as to all documents related to the proposed settlement, the parties' settlement

13

communications, and the mediation; and (2) the right for Objectors to take up to two factual depositions related to the mediation and associated settlement communications. To quote the Newberg and Rubenstein treatise a final time:

> The propriety of the settlement negotiations is a factor in the approval process—Rule 23 requires a court reviewing a settlement to consider whether "the proposal was negotiated at arm's length"—a fact that cuts against the convention for confidentiality. . . . The fact that the court is required to consider collusion, coupled with these factual submissions opining on its absence, arguably opens the door to more discovery of that process. . . . Courts should consider giving objectors the opportunity to do that in more than collusive-based situations if the court plans on relying upon these submissions in reaching the factual conclusion that the negotiations were arms-length in its final judgment.

Newberg and Rubenstein at § 13:32.

## CONCLUSION

For the foregoing reasons, and as further explained in United's underlying objection, the Proposed Settlement should be rejected and the requested discovery should be ordered.

Dated: January 10, 2025

Respectfully submitted,

*/ s/ Thomas C. Mahlum*
Thomas C. Mahlum
Eric P. Barstad
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone:  (612) 349-8500
TMahlum@RobinsKaplan.com
EBarstad@RobinsKaplan.com

*Attorneys for United HealthCare Services, Inc.*

## CERTIFICATE OF SERVICE

    I hereby certify that on January 10, 2025, a copy of the foregoing was served on all counsel of record by filing the same with the Court's CM/ECF System.

                                                         */s/ Thomas C. Mahlum*
                                                         Thomas C. Mahlum