UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br><br>*City of Rochester v. Purdue Pharma, L.P.*, No. 19-op-45853 ("Track 12")<br><br>*City of Ogdensburg v. Purdue Pharma, L.P.*, No. 19-op-45852 ("Track 22") | **MDL No. 2804**<br><br>**Case No. 17-md-2804**<br><br>**Judge Dan Aaron Polster** |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR LEAVE TO SERVE SUPPLEMENTAL DISCOVERY ON OPTUM DEFENDANTS**

Optum's insistence, in its Opposition, to Plaintiffs' Motion for Leave to Serve Supplemental Discovery, that it has produced all requested information concerning its remuneration with respect to opioid sales is belied by its *own admission* that its responses have been limited to a breakdown of monies attributed to "manufacturer rebates" and "administrative fees" alone. Rec. Doc. 5950 at pg. 3; Rec. Doc. 5950, Exh. A. at pgs. 14-15. Plaintiffs' requests, however, have been broader.[1] On September 27, 2024, Plaintiffs

---

[1] On February 6, 2024, Plaintiffs served National Data Requests which requested, in part, "all documents and data . . . *related to Spread or Spread Pricing*. . .relating to Opioids and Cocktail Drugs, including but not limited to all Data showing the amounts paid to You by Plan Sponsors or others for such drugs and the amounts paid by You to pharmacies for such drugs . . ." (emphasis added). *See attached* Exhibit A, "Plaintiffs' National Data Requests" RFP no. 4, pg. 6 (2/6/2024). The PEC first requested information regarding rebates and fees received from manufacturers in December of 2023, broadly seeking production of communications with manufacturers of prescription opioids related to rebates and fees. *See attached* Exhibit B, "Plaintiffs Combined Discovery Requests to Defendant PBMs (1st Set)" DR No. 15, pg. 3 (12/29/2023). Plaintiffs again served prioritized discovery in April of 2024, specifically focused on remuneration from Purdue (footnote continues on next page)

requested "the gross amount (including but not limited to rebates, administrative fees, *service agreement fees, or any other monies or credits*) paid by any manufacturer related to prescription opioids" and asked Optum to "differentiate, to a reasonable degree of certainty, between monies attributed to rebates, administrative fees, *service agreement fees or otherwise*." (emphasis added).[2] Plaintiffs have also separately requested information relating to so-called "spread pricing."[3] Optum has simply ignored these aspects of Plaintiffs' requests.

Rather than address its own failure to provide requested information, Optum goes on the offensive, attacking the merits of Plaintiffs' claims and accusing Plaintiffs of manufacturing a theory that Optum profited from sales of OxyContin and other opioids, a theory for which Optum contends there is no support. But the merits are not at issue

---

Pharma. *See attached* Exhibit C, "Plaintiffs Combined Discovery Requests to Defendant Pharmacy Benefit Managers (2nd Set)" DR No. 2j, 2p, 2q, pgs. 2-3 (4/2/2024). On April 16, 2024, Plaintiffs again served additional discovery requesting pharmacy related documents and communications related to all remuneration, including direct and indirect remuneration. *See attached* Exhibit D, "Plaintiffs' Dispensing and Pharmacy Practice Discovery Requests to Pharmacy Benefit Manager Defendants" RFP No. 11 pg. 8 (4/16/2024).

[2] *See* Optum's "Third Amended Response to Plaintiffs' Questions Regarding Manufacturer Payments Received and Shared" attached as Exhibit A to their Opposition [Rec. Doc. 5950] at pg. 2 wherein Optum specifically states Plaintiffs' request for these materials. Additionally, Plaintiffs' Motion for Leave and accompanying discovery requests sets forth with specificity additional forms of remuneration related to opioids that the PBM defendants have yet to provide information regarding. To be clear, the PEC does not intend to limit in any way their request to only those examples of opioid remuneration but provide such examples as a guide. *See generally* Rec. Doc. 5938 and 5938-1.

[3] Exhibit A, "Plaintiffs' National Data Requests" RFP no. 4, pg. 6 (2/6/2024).

here and Plaintiffs did not manufacture the idea that Optum received substantial revenues from sales of OxyContin and other opioids. Notably, Optum is very careful not to state that it didn't profit from opioid prescriptions, choosing rather to state that "OptumRx did not profit off opioid prescriptions *the way that the PEC has speculated.*" (emphasis added). It appears to be taking the position that the only way that Plaintiffs are entitled to this remuneration discovery is if, without the benefit of the discovery itself, Plaintiffs know exactly how Optum profited off opioids over the years. Rule 26 does not permit this type of games-playing.

Moreover, Plaintiffs are not simply speculating that Optum profited from opioid prescriptions and that these profits drove Optum's policies with respect to opioids. Optum's *own documents* show that the rebate payments Optum was to receive under its rebate agreements with Purdue and other manufacturers drove the decisions to delay or deny the implementation of key utilization management controls that would have had a substantial effect on the number of opioid pills dispensed. For example, in April, 2017, OptumRx's Manager of Industry Relations wrote that Optum should delay implementing quantity limits on 80 milligram tablets of OxyContin "so we have time to ensure we can protect rebates."[4] The email continues: "Purdue has a clause built into their agreement that mandates that ALL strengths be unrestricted. So we cannot sacrifice rebates on only the 80mg strength here. We would sacrifice rebates on *all* Oxycontin scripts." *Id.*

---

[4] OPTUMRX_JEFFCO_0000107098. Exhibit E.

Two years later, in *2019* a senior operations manager wrote that "the amount of utilization on Oxycontin and the rebates we collect prevented" Optum from removing OxyContin from its formulary.[5]

> **From:** Vadlamudi,Venkat [venkat.vadlamudi@optum.com]
> **Sent:** 3/1/2019 11:44:05 AM
> **To:** Sabin, Brian [brian.sabin@optum.com]
> **Subject:** RE: Purdue
>
> Brian,
>
> Valid point. We as a company looked into this, but the amount of utilization on Oxycontin and the rebates we collect prevented us from doing it.
>
> But times are different now, if you can look into it and model the scenarios, maybe we can change..
>
> Thank You,
>
> Venkat Vadlamudi
>
> ---
>
> **From:** Sabin, Brian
> **Sent:** Friday, March 01, 2019 8:32 AM
> **To:** Vadlamudi,Venkat
> **Subject:** Purdue
>
> I wanted to run a possible scenario past you....
>
> What do you think, rebate losses be damned, about removing Oxycontin from OptumRx PDLs? We have a branded long-acting oxycodone available on the market. Purdue has looked awful in the news since basically 2008, they basically caused the Opioid epidemic, and we're essentially rewarding their bad behavior.
>
> From a purely PR perspective, I think it would look good on us. But I also know we don't like to announce these types of decisions.
>
> Regards,
> **Brian Sabin**
> Director, Industry Relations | OptumRx
> 17900 Von Karman, Irvine, CA 92614
> Office 949/988-6314
> M/S#CA016-0202
> Brian.Sabin@Optum.com
> www.optumrx.com

---

[5] Other documents confirm the centrality of "rebates" to Optum's formulary and utilization management decisions regarding opioids. *See* OPTUMRX_JEFFCO_0000360074 ("We had a meeting with IR and explained the MEDLIMIT edit to them. Their concern is that with soft and hard rejects, we will be decreasing utilization of rebated products which would be against the rebate contract.") Exhibit F; OPTUMRX_MDL_003934952 ("I know we say it on every deal we review, but we need to retain rebates. This is our position and we need to make it happen. What are we going to do to retain rebates on this deal and all deals?") Exhibit G.

In both instances, the revenue streams at issue were sufficiently large to be driving Optum policy, yet Optum continues to insist that the revenue was trivial or non-existent.

Other evidence confirms that Optum maintains the information about "rebates" and other payments that Plaintiffs have been seeking and that Optum denies it has. For example, Optum's counsel has represented both to the PEC and to the Court on numerous occasions that one of the reasons for the delay in responding to the PEC's remuneration requests is that Optum cannot and does not report rebate information to clients on a drug-by-drug or NDC basis, making it nearly impossible for Optum to calculate the amount or percentage of opioid rebates passed down to clients relative to the amount received from manufacturers.[6]  But it has now become apparent that this claim is false.

In a "Q&A" prepared for potential clients, Optum posed the question it expected potential clients to ask: "Will you provide NDC level rebate reporting? Drug level reporting?" The answer Optum wrote for itself is: "Yes, that is a standard accounting report we provide."  The answer continues: "We will generate rebate reports at the product level but can provide customized rebate reporting at the NDC-9 level upon request."[7]  Optum's continued refusal to provide Plaintiffs the information Optum told its clients was part of its "standard accounting report" underscores the need for the supplemental discovery Plaintiffs are seeking.

---

[6] *See generally* Exhibit H 10/9/2024 Discovery Conference Transcript at pgs. 19-23 and Exhibit I 10/30/2024 Discovery Conference Transcript at pgs. 14-15, 33.

[7] Optum-MNAG-0000054473. *See* Exhibit J.

Finally, Optum attempts to deflect and distract the Court by suggesting that "OptumRx did not have a presence in New York when Rochester's and Ogdensburg's alleged harms began" pointing to the timing of Optum's rebate agreements with Purdue, only one of several opioid manufacturers.[8] Shockingly, Optum's counsel touts the troubling fact that it was *six years after* the widely known 2003 GAO Report on Oxycontin Abuse and Misuse was released and *two years after* Purdue Pharma pled guilty to felony charges related to the overpromotion and fraudulent marketing of Oxycontin, paid a $635 million fine, and three of its executives were charged criminally and sentenced to three years of probation, only narrowly avoiding prison time, that Optum made the decision to **add** Oxycontin to its standard formulary option in 2009, during the height of the epidemic. Perhaps this was a decision intended to grow what counsel referred to as Optum's then "infinitesimal PBM market share." The truth is that Optum did in fact grow to be one of the top three PBMs in the country, and as early as 2017, two years before

---

[8] Optum also points to the purportedly small number of opioid prescriptions Optum's Home Delivery Pharmacy dispensed between 2010 and 2019 in the City of Rochester and City of Ogdensburg. This is a merits argument that simply has nothing to do with whether Optum has satisfied its discovery obligations with respect to remuneration it received on the pharmacy benefit management side of its business. Moreover, it ignores the fact that just last year, Optum agreed to pay $20 million dollars to resolve allegations that between April 2013 - April 2015 it improperly filled opioid prescriptions in violations of the Controlled Substances Act. Specifically, the DEA alleged that Optum "filled certain opioid prescriptions in combinations with other drugs such as benzodiazepines and muscle relaxants, commonly referred to as "trinity prescriptions" and that its mail order pharmacy ignored "red flags" indicating that the prescriptions may not have been intended for legitimate medical use and could lead to abuse or diversion of highly addictive and powerful opioids." See Exhibit K. During its investigation, the government alleged that "OptumRx received numerous trinity prescriptions that raised red flags but filled those prescriptions without always resolving the red flags." Id.

Optum's own employees were questioning the morality of continuing to reward Purdue for its bad behavior, Optum's pharmacy benefit business represented 53.8 million lives.[9]

But all of this is beside the point. If Optum believes that Plaintiffs' claims lack merit, it can move for summary judgment at the appropriate time. The purpose of discovery is for the parties to disclose evidence. Rather than provide the information Plaintiffs are seeking, Optum cherry-picks from the information in its possession to make a one-sided case that it has behaved properly. The purpose of Plaintiffs' requests is to test those assertions. Given that Optum admits that it has limited its responses to only two categories of revenue ("manufacturer rebates" and "administrative fees") and given that Optum's own documents demonstrate both that the information Plaintiffs seek exists and that it is significant, this Court should grant Plaintiffs' request for supplemental discovery and require Optum, at last, to disclose the full extent of its remuneration from OxyContin and other opioids.

Dated: February 25, 2025

Respectfully submitted,

Jayne Conroy
Laura S. Fitzpatrick
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
jconroy@simmonsfirm.com
lfitzpatrick@simmonsfirm.com

---

[9] Exhibit L Optum-MNAG-0000032639 at pg. 75.

Joseph F. Rice
Michael Elsner
MOTLEY RICE
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
jrice@motleyrice.com
melsner@motleyrice.com

Paul T. Farrell Jr., Esq.
FARRELL & FULLER
270 Munoz Rivera Ave., Suite 201
San Juan, PR 00918
(304) 654-8281

*Plaintiffs' Co-Lead Counsel*

*/s/ Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
pweinberger@spanlaw.com

*Plaintiffs' Liaison Counsel*