**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION | ) | **CASE NO. 1:17-MD-2804** |
| OPIATE LITIGATION | ) | |
| | ) | **Judge Dan Aaron Polster** |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| *All Cases* | ) | |
| | ) | **ORDER DENYING MOTION FOR** |
| | ) | **RECUSAL** |
| | ) | |

PBM Defendants Optum and ESI move for recusal of the undersigned from this MDL, and

also for disclosure of all *ex parte* communications between the Court and any party or counsel. *See*

docket no. 6060. For the reasons stated below, this motion is **DENIED**.

## I.    Facts.

The seed for the PBMs' recusal motion was planted when the Court ruled, in May of 2024,

that MDL plaintiffs would be given one final opportunity to file motions to amend their complaints,

to add defendants. Many hundreds of governmental subdivision plaintiffs (*e.g.*, cities and counties)

responded by seeking leave to add Optum and ESI as defendants.

In response, Optum began a campaign of filing public records requests with every such

plaintiff. These requests sought any confirmation that the city or county had explicitly authorized its

counsel to add the PBMs as defendants—for example, as shown by minutes of a public hearing. *See,*

*e.g.*, docket no. 5958-2 at 1 (public records request to City of Oviedo, Florida seeking, *inter alia*,

"All documents and other records relating to the City of Oviedo's approval to file any complaint in the Opioid Litigation" and "to amend or supplement its complaint in the Opioid Litigation."). The PBMs have asserted that, absent explicit authorization by the governmental subdivision at a public meeting, any motion to amend to add them as defendants is void. *See* docket no. 5961 at 1 (Optum stating the subdivisions "failed to secure the required authorizations from their clients to join the omnibus motions for leave to amend").

In response to these public records requests, many governmental subdivisions provided to the PBMs videos and minutes of public meetings that had occurred in 2019. During that timeframe, numerous plaintiffs' attorneys were meeting with cities and counties across the country, competing to sign them up as clients in opioid litigation. Pertinent to the PBMs' instant motion are public records supplied by five Florida municipalities recording the representation pitches made in 2019 by attorney Michael Kahn. Mr. Kahn's presentations included dramatic statements about the undersigned and also about Peter Weinberger, who is MDL Plaintiffs Liaison Counsel. The PBMs summarize Mr. Kahn's statements as follows:

> On January 3, 2019, Mr. Kahn spoke to the City of Palm Bay, Florida, on behalf of his consortium of lawyers (including Mr. Weinberger) that the City had retained for opioid litigation. Mr. Kahn told the City that it was well positioned to litigate claims in the MDL because Mr. Weinberger has "total access to the judge" and can communicate "singly" with the Court "on behalf of his clients." A month later, while pitching his consortium's legal services to the City of Oviedo, Florida, Mr. Kahn boasted that Mr. Weinberger "talks to the judge every day." And yet another month later, Mr. Kahn bragged to another prospective client—the City of Fort Pierce, Florida—that Mr. Weinberger was one of three Plaintiffs' lawyers who could "pick up the phone and talk to the judge" as often as "every day."
>
> The statements continued. On June 3, 2019, Mr. Kahn told the City of Deltona, Florida (yet another prospective client), that Mr. Weinberger "is able to pick up the phone literally, and does, every day to talk with the judge about pushing this

litigation along." A week later, when pitching his consortium's legal services to Clay County, Florida, Mr. Kahn said that Mr. Weinberger "is able to talk [to] the judge on a daily basis" and provides Plaintiffs with "inside information."

Mr. Kahn described Mr. Weinberger's communications with the Court as "ex parte," telling his audience that they were "unusual" and of the sort that are "generally disallowed" in litigation. He also told the municipalities that Judge Polster is "a tremendous plaintiff-oriented judge" who is using his "great power and specific intent to try to compel settlement[s] from the defendants" through "enormous pressure."

Docket no. 6060-1 ("Motion") at 3-4 (footnotes and citations omitted).[1]

If true, these statements would certainly be grounds for recusal and cause for alarm. Upon receipt of these public records, the PBMs moved for an order requiring disclosure of all *ex parte* communications between: (i) "any plaintiffs' counsel" (not just Mr. Weinberger), and (ii) "the Court, any Special Masters, or their staff" (not just the undersigned). *See Motion for Disclosure of Ex Parte Communications* at 2 (docket no. 5968). The PBMs did not move for disclosure of *ex parte* communications of ***defense*** counsel, even though the PBMs included quotes from Mr. Kahn showing he believed (and told prospective clients) that certain attorneys for defendants also had "total access"

---

[1]    As the PBMs note, each of Mr. Kahn's statements quoted above were video-recorded and the recordings can be viewed on the internet. *See* Motion at 4 n.1.

to the judge. *Id.* at 2-4.[2]

The Court addressed the motion for disclosure of *ex parte* communications less than 12 hours later, at a previously-scheduled conference. The Court denied the motion, stating it believed Mr. Kahn's remarks were "fundamentally untrue;"[3] but the Court also immediately set an evidentiary hearing and ordered Mr. Kahn to appear in person to testify regarding "the basis for those statements." Tr. at 6 (docket no. 5986) (Feb. 27, 2025); *see also* tr. at 13 ("I shall get to the bottom

---

[2]     Specifically, at a Palm Bay, Florida City Council meeting, Mr. Kahn boasted:

> One of our group members, a man by the name of Peter Weinberger, is one of three plaintiffs lawyers who is in a liaison position with Judge Polster. And what that means, this multidistrict litigation is different than any other litigation or any type of even mass tort litigation because these three plaintiffs lawyers have total access to Judge Polster. **Also the defendants have a liaison team**. But we are privileged in this group to have one of three lawyers in the United States **as a liaison to Judge Polster, which means they have total access to the judge.**

Docket no. 6060-2 at 5 (emphasis added). Similarly, at a City of Deltona, Florida Commission meeting, Mr. Kahn stated:

> Of all of the [plaintiff] litigators in the country—and there's not that many that are working on these cases—there are 20 of them in an executive committee. Of those 20, **there are three individuals who have [a] direct relationship professionally with the judge, that can literally pick up the phone and talk to the judge any day**.
> And as Skip knows, that's called ex parte communications. And it's generally disallowed in any litigation. However, multidistrict litigation is different. And you can have a situation where Peter Weinberger—and his bio is on Page 7—is able to pick up the phone literally, and does, every day to talk with the judge about pushing this litigation along. **Granted, the defendants also have three individuals**, but it's a privilege for this group to have one of the three individuals in the country that is contacting the judge.

Docket no. 6060-5 at 8-9 (emphasis added).

[3]     Thus, PBMs are squarely incorrect when they assert that "no one in a position to deny *ex parte* communications has done so on the record." Motion at 11. *See* also footnote 4, below.

of it directly with Mr. Kahn and see what he has to say."). During the same conference, Mr. Weinberger averred that Mr. Kahn's statements were "not correct."[4]

The PBMs then moved for reconsideration of their motion and added two additional requests: (1) the Court should require Mr. Weinberger to testify under oath at the evidentiary hearing; and (2) a neutral, disinterested judge should preside over the hearing, rather than the undersigned. *See Motion for Reconsideration* at 3 (docket no. 5999). The Court denied this motion as well, noting the entire basis for each of the PBMs' requests was "unsupported hearsay." *Order Regarding Motion for Reconsideration* at 1 (docket no. 6001). The Court explained:

> The PBMs have certainly demonstrated a need to question Mr. Kahn under oath regarding his statements, and the Court has scheduled a hearing to do so on March 12, 2024. But Mr. Kahn's bald, unsworn statements are an insufficient basis to enter the sweeping order the PBMs seek. If Mr. Kahn's testimony demonstrates a basis for questioning any additional witnesses, or to order the production of any documents or

---

[4]     Specifically, Mr. Weinberger stated:

> On the Michael Kahn issue, late last night, as you know, the motion that was filed by PBMs attached the minutes from the City of Deltona, Florida, and the comments [at]tributed to Michael Kahn and another local counsel.
>
> And I just wanted to put on the record that had I been—had I been at the meeting, I wish I was, had I been at the meeting, I would have corrected what—what I consider to be a very clumsy description by Mr. Kahn of the duties and responsibilities of a liaison counsel. It was not and is not correct.
>
> It was not and is not the way in which I or any other liaison counsel associated with this case have conducted themselves. I am very bothered by it. I'm bothered by his comments about you, your Honor. They were inappropriate, so I want you to know that and to put that on the record at this time.
>
> I have not talked to Mike, to Mr. Kahn about this. I believe I met him by Zoom maybe once, and as I said, had I been there and had I known that he was making these statements, I would have corrected them immediately with respect to what went on six years ago.

Tr. at 12-13 (docket no. 5986).

communications, the Court will take appropriate action at that time.

*Id.* at 1-2.

The Court then held the promised hearing, and Mr. Kahn traveled from Melbourne, Florida to Cleveland, Ohio to testify. Mr. Kahn took the witness stand shortly after 1:30 p.m. and answered questions under oath for a total of over two hours: 45 minutes of questioning by the Court, followed by 75 minutes by counsel for the PBMs, followed by 5 minutes by Mr. Weinberger and Mr. Kahn's own counsel, Mr. Alkire.

Because of its central importance, the Court sets forth below a thorough summary of Mr. Kahn's testimony at this hearing, rather than the shorter summaries the parties provide in their briefs.[5]

The Court began the questioning of Mr. Kahn. Mr. Kahn testified he is "generally a trial lawyer," but his activity in this MDL was his "first mass tort case." Tr. at 5 (docket no. 6025). In 2019, because he had "political contacts," he was asked to join a group of attorneys seeking to represent Florida governmental subdivisions in the Opioid MDL. *Id.* at 6. His job was to make presentations to cities and counties, to get "clients." *Id.* at 8.[6]

The Court quickly turned to the matter at hand, asking Mr. Kahn about the statements he made during his initial client presentations:

> [T]he statements that are of concern to the parties in this litigation and to the Court are those in which you told these prospective clients that Plaintiffs' lawyers had the ability and were regularly making *ex parte* communications to the Court. That

---

[5]     The Court has made very minor punctuation changes to some of the transcript quotations in this Order, to improve readability.

[6]     *See also id.* at 24, 26 (Mr. Kahn confirming it was his job only to obtain and sign up clients; he did not know if his clients later participated in settlements or still had claims against any remaining defendants).

would be me and/or my staff.

So let's start with those. So did—those statements have been recorded, and you admit you are the one who made the statements. I would like you to explain those statements and provide the basis for those statements.

*Id.* at 10. Mr. Kahn's response was as follows:

[T]he first thing I wanted to say is that I misspoke in the clear sense of the word about "regularly"—I am just going to take the one you just said, "regularly making *ex parte* communications."

I did not use that—I used it in a colloquial term. I can define for the Court why I used it and what I meant.

I am an experienced lawyer and 47 years in, and I should have used another word. I should have described it differently. **I don't know of any *ex parte* communications. * * ***

I know of no—I know Peter Weinberger. I just met your Honor and know the other lawyers in the group, and **I know of no *ex parte* communications that were made**, and this is my own belief system.

I know that [my co-counsel] group would never make *ex parte* communications. I know your Honor wouldn't, just .... By instinct I know it, just by the character of knowing Peter Weinberger in the times I have met him I know it, and by reputation of both of you, I know it, **and I don't have any evidence of any *ex parte* communications.**

**So it was a dumb statement to make**. It was an inartful statement, and to borrow Peter's very gracious way of describing it in the transcript, and he graciously calls it "clumsy." And it was certainly that.

I can describe what I meant by it, but it was not meant as a term of art. **It was meant in its colloquial sense in trying to describe [to] lay people and some lawyers, Peter's role**, which as liaison counsel, which as I was reviewing the booklet [that my group gave to prospective clients]—and then I will stop—in the executive statement in our booklet, it actually perfectly describes his role as liaison counsel, period.

And it was—I misspoke. It was an inartful way of describing it, and after 47 years of an unblemished career, I can't apologize enough for it to all parties.

*Id.* at 11-12 (emphasis added).

When the Court sought further explanation, Mr. Kahn testified that: (1) he understood MDL Plaintiffs and MDL Defendants each had three liaison counsel, Mr. Weinberger being one of them, *id.* at 14, 15; (2) any one of these six liaison counsel could arrange a meeting with the Court without all of the hundreds of other client lawyers attending, *id.* at 16; and (3) all of these other client lawyers "were the people who the words '*ex parte*' applied to because they would have a right to be there. And that's why I defined it in the way that I did for your Honor. It may be wrong." *Id.* at 16-17.

The Court confirmed with Mr. Kahn that his "colloquial" use of the term *ex parte* was most certainly wrong, and what he meant was not what he said.[7]

The Court then asked Mr. Kahn to explain his other statements to prospective clients that the

---

[7]     Specifically, the Court responded to Mr. Kahn as follows:

> Q. Well, you understand in legal parlance, legal ethics, "*ex parte*" doesn't mean only some of the people on one side are meeting with the Court, and so it is *ex parte* as to the rest of the people on that side. It means that only one side to a dispute is meeting privately or speaking privately to the Court.
> A. I understand.
> Q. Do you agree that's the common sense definition of that term?
> A. That—I do, your Honor. I understand what the Court is saying to me. * * * I was just trying to go explain as best I could what I meant, but I understand the Court.
> Q. All right. So you were saying correctly in an MDL you don't have a hundred or 200 or 300 lawyers meeting with the Court every time something comes up. Each side has a small number of lawyers who are tasked with working out logistics and administrative details. And you have a small group from the Plaintiffs and a small group from the Defendants, and they meet with the Court regularly?
> A. That's what I was—the best way I can put it to the Court today, that's exactly what I meant to say.
> Q. All right. You appreciate that that is not how—if you ask a third-year law student what does an *ex parte* communication with the Court mean, I don't think he would come up with the definition you just gave.
> A. I agree, Judge.

*Id.* at 16-18.

undersigned "is a Plaintiff-oriented Judge who is pushing all the Defendants to settle and is using my great power and specific intent to try to compel settlements from Defendants." *Id.* at 18. Mr. Kahn responded he "shouldn't have used the words 'Plaintiff-oriented.'" *Id.* But when he made those statements, he knew that the Court: (1) had denied defendants' motion to dismiss, and (2) was encouraging settlement. *Id.* at 18-19. Mr. Kahn continued:

> I should have used another word than "Plaintiff-oriented," but it was based upon the fact that your Honor was encouraging settlement. And obviously, settlement means payment of money or usually means payment of money from Defendants to Plaintiffs, and * * * what I did, your Honor, I said, I juxtaposed this with what was going in state court.
>
> * * * [In my client presentations] I said, unlike the state case that was brought—because, as your Honor knows better than I, there were many states as well as federal cases—unlike the state cases that were brought, and I use the word "languishing," or I am using it now, languishing in state court with pending motions to dismiss, your Honor was encouraging settlement.
>
> And so I felt that that meant something, but what it didn't mean is to misconvey a situation that you were always going to rule for the Plaintiffs or something like that. I should have used another word.

*Id.* at 19-20.

When the Court asked Mr. Kahn whether he had "specific knowledge that I was misusing my great power?", he replied: "Absolutely, not, Judge." *Id.* at 20-21. Asked whether "any of the lawyers in your group or any of the lawyers in the PEC [Plaintiffs Executive Committee] . . . — did any of them say that I was using my power and intent to try to compel settlements from Defendants? Did you get this from someone else?", Mr. Kahn replied: "No, your Honor. The best they said was that you were encouraging settlement." *Id.* at 21.

The Court then invited counsel for the PBMs to examine Mr. Kahn. The principal points of new information that the PBMs' counsel elicited were the following:

9

- Mr. Kahn "misspoke" ***repeatedly***, stating numerous times to different prospective clients in public meetings that Mr. Weinberger had *ex parte* communications with the Court and that the Court was plaintiff-oriented. *Id.* at 70.

- Nobody who was with Mr. Kahn when he made his statements during his 2019 client presentations corrected him. *Id.* at 58-59. No member of the MDL Plaintiffs Executive Committee ("PEC") ever corrected him either, although Mr. Kahn did not believe any PEC member (including Mr. Weinberger) knew he made those statements. *Id.* at 59-60.

- Mr. Kahn has not contacted any of this clients to tell them he "misspoke" when he made his 2019 statements. *Id.* at 66.

- Mr. Kahn told one prospective client (Palm Bay City) ***in 2019*** that he had "really gotten to know the members of [his attorney consortium] group," including Mr. Weinberger. In contrast, Mr. Kahn testified at the hearing on March 12, 2025 that he had actually spoken with Mr. Weinberger only twice before this matter arose—once during a group teleconference and once at a "very short" multi-person meeting, both in 2019. *Id.* at 49-50; *see also id.* at 79-81 (confirming this under questioning by Mr. Weinberger).

Counsel for PBMs also engaged in colloquies with Mr. Kahn that underscored some of his responses to the Court's own earlier questions. For example, Mr. Kahn confirmed his entire role for his consortium was to obtain clients; and that when doing so, he laid it on thick:

> Q. And you are in pitch mode, here [during your client presentation]. You want to win the work.
> A. Excuse me?
> Q. You are in pitch mode, you want to win the work, correct?
> A. That was my job.

*Id.* at 44-45; *see also id.* at 66 ("once I obtained them, again, that was the end of my job").

> Q. Okay. You wanted your pitches to stand out. Is that fair to say?
> A. Yes.
> Q. You wanted your pitches to be the best, correct?
> A. That's true.

*Id.* at 74.

Mr. Kahn also expanded on his incorrect understanding of *ex parte* communications:

10

Q. And what you are talking about is Mr. Weinberger getting inside information from the Court, correct?

* * *

A. No. I was not talking about that. I was talking about the privileged position of having on our team one of three Plaintiffs' members or Plaintiffs' liaison counsel.

There was also three defense liaison counsel, and as I was trying to describe to the Court in the meetings that were held amongst the three or one or how-so-many-ever of the defense liaison would meet with the Plaintiffs' liaison and the Court, we could get information quickly.

But only so much as Peter was permitted to tell us, meaning that there were things that just because of his position he might not be able to tell us things that the Court didn't want anybody to know, and so he was in a very privileged position.

So whatever he could tell us, it was our privilege to have a person who was one of three people in the country representing the Plaintiffs, and there is three representing the Defendants. They would be equally privileged to have that sort of an individual in their group.

*Id.* at 52-53.

Finally, Mr. Weinberger asked a few questions of Mr. Kahn, as did Mr. Kahn's own attorney, Mr. Alkire. The most salient portions are set forth here:

BY MR. WEINBERGER:

Q. Now, at no time did you ever hear from me, Mr. Kahn, that I was able to call the Judge everyday and have an *ex parte* conversation with him, correct?

A. That's correct.

* * *

Q. Before making any of these presentations, did you ever inform me personally that you were going to make the presentations to any of these prospective clients?

A. No.

Q. After you made the presentations to any of these prospective clients, did you ever inform me about those presentations?

A. No.

Q. Up until the time that the motion was filed that brought us to today, did you ever inform me that you made these comments that are at issue today to any of

11

these prospective clients?

      A. No.

*Id.* at 81-82.

      BY MR. ALKIRE:

      Q. Mr. Kahn, are you aware of any specific *ex parte* communications between any Plaintiffs' counsel and the Court, Special Masters, or their staff?

      A. No.

      Q. Mr. Kahn, did you ever participate in any *ex parte* communications with the Court, Special Masters, or their staff?

      A. No.

      Q. Lastly, are you aware of any individuals who participated in *ex parte* communications with the Court, Special Masters, or their staff?

      A. No.

*Id.* at 82-83.

After Mr. Kahn stepped down from the witness stand, the Court concluded the hearing. Counsel for the PBMs asked "to have Mr. Weinberger on the stand for a complete record," but the Court overruled this request, stating: "There is no reason to put Mr. Weinberger on the stand because no one has put in any evidence that Mr. Weinberger made any of these statements, knew of them in advance, or for that matter knew of them afterward. So the request is denied." *Id.* at 83.

Three days after the hearing, the Court issued an Order concluding "it must impose a significant sanction upon Mr. Kahn, as his repeated 2019 statements, ***made without any factual basis***, improperly cast aspersions upon the integrity of the Court, Mr. Weinberger, and the entire process of the MDL." *Order Regarding Attorney Michael Kahn* at 3 (docket no. 6028) (emphasis

added).[8] The Court fined Mr. Kahn $100,000, which is a small fraction of the $1.8 million in Opioid MDL contingent fees he has received to date. Mr. Kahn did not contest the sanction and paid it on April 11, 2025.

## II. Applicable Law.

The PBMs cite 28 U.S.C. §§ 455(a) and 455(b)(1) and argue that, in light of the facts set forth above, each section requires this Court to recuse itself.

Section 455(a) states that a federal judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." This language focuses not on whether the judge has any actual prejudice, but on appearances: disqualification may be necessary "even though no actual partiality exists," because "justice must satisfy the appearance of justice." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860, 864 (1988). The test is an objective one, "ask[ing] what a reasonable person **knowing all the relevant facts** would think about the impartiality of the judge." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 7482137 at *1 (6th Cir. Oct. 10, 2019) (quoting *Roberts v. Bailar*, 625 F.2d 125, 129 (6th Cir. 1980) (emphasis added)). "[R]ecusal is required when a reasonable person would harbor doubts about the judge's impartiality." *In re Aetna Cas. & Sur. Co.*, 919 F.2d 1136, 1143 (6th Cir. 1990). A judge's "introspective estimate of his own ability impartially to hear a case" is not the test. *Bailar*, 625 F.2d at 129.

Section 455(b)(1) moves away from appearances and focuses on actual partiality or

---

[8]      The Court also observed that it appeared Mr. Kahn had violated Rule 4-7.13(a)(3) of the Rules Regulating The Florida Bar, which states: "A lawyer may not engage in deceptive or inherently misleading advertising. . . . An advertisement is deceptive or inherently misleading if it . . . implies the existence of a material **nonexistent** fact." *Id.* at 3 n.2 (emphasis added).

knowledge. The statute states a federal judge "shall" disqualify himself "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). When a party challenges the judge's personal bias or prejudice, "the question is whether a reasonable person would be ***convinced*** the judge was biased." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisc., Inc.*, 991 F.2d 1249, 1255 (7th Cir. 1993) (emphasis added).

## III.    Analysis.

The PBMs are unsatisfied with the result of the Court's hearing with Mr. Kahn and with the Court's rulings on their motions for disclosure of *ex parte* communications. The PBMs argue that, at the hearing, "[n]either Mr. Weinberger nor anyone else submitted evidence contradicting Mr. Kahn's [2019] statements, so Mr. Kahn's statements stand unrebutted." Motion at 1. But this assertion purposefully ignores virtually everything Mr. Kahn, himself, said at the hearing.

While ***under oath***, Mr. Kahn repeatedly and consistently stated he did not know of any *ex parte* communications between any attorney and the Court. Although Mr. Kahn did repeatedly state during client pitches ***in 2019*** (***not under oath***) that Plaintiffs' Liaison Counsel engaged in *ex parte* communications, he explained ***in 2025*** (***under oath***) what he meant when he said that—that is: (1) both Plaintiffs' and Defendants' Liaison Counsel could appear and converse with the Court without all of the other clients' counsel present; and (2) because his consortium included one of the six MDL Liaison Counsel, his clients would benefit. The PBMs adduced at the hearing ***no*** non-hearsay evidence of ***actual*** *ex parte* communications—as that term is properly understood—between ***any*** attorney and the Court, the Special Masters, or their staff. Similarly, the PBMs adduced at the hearing

14

*no* non-hearsay evidence that *any* attorney told Mr. Kahn the undersigned had the "power and specific intent" to pressure and compel defendants to settle.

Moreover, as this Court stated on the record immediately after receiving the PBMs' original motion for disclosure, Mr. Kahn's statements were and are "fundamentally untrue." Tr. at 6 (docket no. 5986). Regardless of the evidence adduced at the hearing, this Court again reaffirms it has never engaged in *ex parte* communications with Mr. Weinberger or any other attorney, except during the early, smaller settlement conferences to which all parties gave prior consent.[9] Similarly, all of the later, global settlements were facilitated by an outside mediator or by the Special Master or his staff, with the prior consent of all mediating parties. In the more than seven years of this MDL, no attorney or party has alleged the Court compelled them to settle, or even tried to do so.

The circumstances presented here are thus entirely distinguishable from every other case the PBMs cite for the proposition that the Court should recuse. In each of those cases, as summarized below, there was undisputed evidence that an unconsented *ex parte* communication **had** occurred, and was acknowledged by the judge. The differences between the circumstances in those cases and this one are stark:

- *ControlSoft, Inc. v. Dow Chem. Co.*, 2024 WL 5400258 (N.D. Ohio July 18, 2024) (Polster, J.): The undersigned recused after plaintiff's counsel unilaterally sent to the Court a settlement position statement without the consent of defendant. This Court concluded "the letter was an improper and unsolicited extrajudicial communication to the Court," leading to a situation where "a reasonable and disinterested observer might question the Court's impartiality on future rulings in this case." *Id.* at *3. This Court granted a motion to recuse even though it was "by no means a situation where recusal is mandatory." *Id.*

---

[9] The PBMs insist the part about settlement conferences being consented to is not true; the Court addresses this issue below.

- *In re Kensington Int'l, Ltd.*, 368 F.3d 289 (3rd Cir. 2004): In an asbestos case, the district court appointed two neutral advisors and received *ex parte* communications from them. However, the two advisors also "had a duty to act as zealous advocates for the future asbestos claimants" in a related bankruptcy case. *Id.* at 304, 305. This required recusal because there exists "an almost irrebutable presumption that a judge is 'tainted' and must be disqualified where, as here, he surrounds himself with individuals who may not be truly disinterested." *Id.* at 308.

- *In re Sch. Asbestos Litig.*, 977 F.2d 764 (3rd Cir. 1992): The district court attended a conference sponsored by plaintiffs, "his expenses were largely defrayed by the conference sponsors," and "thirteen of the eighteen expert witnesses the plaintiffs were intending to call [at trial] gave presentations [at the conference]." *Id.* at 782. The judge's recusal was required because a "reasonable person might suspect that Judge Kelly's plaintiff-subsidized attendance at the 'preview' of the plaintiffs' case would have predisposed him toward the plaintiffs' position." *Id.*

- *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996): "[T]he district judge appointed a panel of three experts to investigate the state's institutions and programs," and "the panel began to meet in private with the judge." *Id.* at 257. "[A]t least one meeting had covered the merits of the case." *Id.* at 258. Recusal was thus required because a "thoughtful observer aware of all the facts . . . would conclude that [the judge's] preview of evidence by a panel of experts who had become partisans carries an unacceptable potential for compromising impartiality." *Id.* at 259-60.

In every one of these cases, it was ***undisputed*** that the judge ***did*** receive *ex parte* communications—the judge in each case acknowledged this. Here, the entire basis for the PBMs' recusal motion were Mr. Kahn's 2019 hearsay assertions, which he testified under oath were ***misrepresentations***: he knew of and knows of ***no ex parte*** communications. And the Court personally reaffirms there is and was no basis for Mr. Kahn's 2019 statements.

In light of this evidence, the foundation for the PBMs' motion crumbles. Nonetheless, the PBMs try to cobble together alternative grounds. Their faulty logic proceeds as follows:

1.   In late 2022, plaintiffs' attorney Joanne Cicala sent a document to Special Master Cohen, and

not to the PBMs. The Court found this occurred due to "a misunderstanding," and "[i]mmediately after bringing it to the Court's attention, it was cured—Cicala sent the communication to defendants." *Order Denying Motion to Vacate* at 3 (docket no. 5015). The Court also wrote: "Th[is] "*ex parte* communication . . . was a singular, aberrant incident. There has not been, nor will there be, any further, substantive *ex parte* communications from either side." *Id.* The PBMs have known about this incident for over two years, and never moved for recusal or any other relief.

2.      Ignoring the Court's statement that the Cicala memo incident was "singular" and "aberrant," and brushing aside the fact it occurred over two years ago, the PBMs now assert misleadingly that the Court's declaration in 2023 that there will not be any "***further***" *ex parte* communications must mean there had been ***some***. *Reply* at 2, 4 (docket no. 6120). The PBMs contend the Cicala episode revitalizes Mr. Kahn's statements as true—even though he made the statements in 2019, while the single Cicala memo example did not involve Mr. Weinberger and it occurred in 2022.

3.      The PBMs also observe the Court engaged in *ex parte* **settlement** communications with plaintiffs and certain other defendants (not the PBMs), ***with the consent of the participating parties***, until March 2, 2020, when the participating defendants withdrew their prior consent. *See Notice Regarding Ex Parte Communications* (docket no. 3200).[10] The PBMs assert this shows the Court has a "penchant for *ex parte* settlement discussions," *Reply* at 2 (docket no. 6120), and further observe those discussions were not consented to by ***all*** parties—that is, the PBMs did not consent to the Court's settlement dialogue with the PEC and Distributors. But the PBMs never complained before 2025 that they had not consented to these *ex parte* communications, including when the Distributors publicly withdrew their consent. Still, the PBMs again assert this history of ***consensual*** *ex parte* communications shows Mr. Kahn's

---

[10]     In response to the defendants' withdrawal of their consent to *ex parte* settlement discussions, the plaintiffs argued that, "after more than two years of consenting to, and participating in, '*ex parte*' and other communications with the Special Masters and the Court—these defendants have waived any right to withdraw their prior consent." *Plaintiffs' Response to Notice by Certain Defendants Regarding Ex Parte Communications* at 1 (docket no. 3203). The Court found no waiver and honored the defendants' withdrawal. Up to that point, of course, the Court's *ex parte* communications with the parties were allowed. *See* Code of Conduct for U.S. Judges Canon 3, §A(4)(d) ("A judge may: . . . with the consent of the parties, confer separately with the parties and their counsel in an effort to mediate or settle pending matters.").

2019 statements—that ***improper ex parte*** communications occurred regularly—are plausible.

Boiled down, the PBMs point to communications about which the PBMs have known for years as evidence supposedly consistent with Mr. Kahn's 2019 statements. But no defendant, including the PBMs, contemporaneously argued those communications required recusal. If the Cicala memo incident was improper, then it was improper two years ago—but the PBMs did not move for recusal then. And if the Court's *ex parte* communications with parties during settlement talks were improper, then they were improper five years ago—but the PBMs did not move for recusal then. The PBMs' recent discovery of Mr. Kahn's statements does not now convert those earlier circumstances into grounds for disqualification.

In sum, the PBMs' subsequent discovery of Mr. Kahn's unsupported misrepresentations, which he retracted under oath, does not combine with anything else the PBMs have long known about to suggest the Court's impartiality might reasonably be questioned, nor to show the Court has a personal bias or prejudice. The picture the PBMs attempt to draw with their connect-the-distant-dots logic is shapeless.

The PBMs also insist the Court's entire approach to their discovery of Mr. Kahn's statements creates an appearance of impartiality. Specifically, the Court: (1) did not immediately give credence to Mr. Kahn's 2019 statements; (2) denied without prejudice the PBMs' request to place Mr. Weinberger under oath, stating it would consider that possibility only after Mr. Kahn was questioned; (3) similarly denied the PBMs' request to immediately order disclosure of all *ex parte* communications, stating it would consider that possibility only after Mr. Kahn was questioned; (4) denied the PBMs' request to have a disinterested judge preside over the hearing with Mr. Kahn; and (5) itself led off the questioning of Mr. Kahn. The PBMs assert this course of action, pursued after

denying all of the PBMs' procedural requests, raises "serious questions about the impartiality of the process." Motion at 11.

But the process was thorough and fair. Mr. Kahn was questioned for a total of two hours, more than half of which was by counsel for PBMs. The PBMs point to no unfair question by the Court, no unreasonable ruling on an objection, no hint that a different, "disinterested judge" would have done a better job. And Mr. Kahn was resolute in his sworn testimony that Mr. Weinberger never said he or anyone else on the PEC engaged in any private communications with the Court; that Mr. Weinberger never said the Court pressured any defendant to settle; and that he, Kahn, knew of no *ex parte* communications, and had no basis to believe any had occurred. Mr. Kahn repeatedly explained what he meant by his 2019 statements and he did not change his testimony when the PBMs questioned him. The Court is firmly convinced, and believes any fair and reasonable observer would conclude, that the evidence adduced at the hearing proved a simple fact: during his 2019 client pitches, Mr. Kahn engaged in exaggeration and puffery that crossed the line into misrepresentation and falsehood. If Mr. Kahn breached the rules of ethics with his statements, his actions comprised and revealed only deceptive advertising, not any actual *ex parte* communication or other inappropriate action by the Court.

The PBMs insist the Court **had** to order disclosure of all *ex parte* communications, given what Mr. Kahn said. But it cannot be true that, just because a person accuses the Court of engaging in improper *ex parte* communications, the Court must then immediately order disclosure and require counsel to testify. These unusual and exceptional measures would only be appropriate if the accuser is put under oath and the accusation is tested and found colorable. Here, when the Court did put the accuser to the test and allowed the PBMs to question him, the accuser disavowed the accusation

19

entirely. As reaffirmed earlier, this result is wholly consistent with this Court's own knowledge.

The PBMs also insist Mr. Kahn was not credible and even the Court found him untrustworthy. *See* reply at 3 ("Mr. Kahn's testimony was riddled with contradictions as he tried to reinterpret his repeated representations to his clients, reinterpretations that the Court agreed were unbelievable and lacking any credibility."). The PBMs' comprehension of the Court's assessment is incorrect. During the entirety of Mr. Kahn's testimony, the Court was extremely attentive to his demeanor, word choice, body language, and so on. The Court believes (and concludes any reasonable observer would believe) that Mr. Kahn "came clean" and confessed he had exaggerated and misrepresented in 2019—but he did not accept full responsibility for having done so.[11] Mr. Kahn was especially credible when he admitted his statements went beyond being "inartful," they were "dumb." Tr. at 12 (docket no. 6025).

Having reached this conclusion, the Court fined Mr. Kahn $100,000 for having repeatedly made statements in 2019, "***without any factual basis***, [that] improperly cast aspersions upon the integrity of the Court, Mr. Weinberger, and the entire process of the MDL." *Order Regarding Attorney Michael Kahn* at 3 (docket no. 6028) (emphasis added). That is the Court's final judgment. If the PBMs disagree with that conclusion, they can appeal that judgment. The PBMs are effectively stating the Court should not have sanctioned Mr. Kahn at all, because he only repeated what Mr. Weinberger told him. Even if the Sixth Circuit agrees, no objective, reasonable person ***knowing all the relevant facts*** would conclude the process the Court used or the judgment it reached is the result of bias or prejudice, or that the Court does not appear impartial.

---

[11]     *See* tr. at 76-78 (Mr. Kahn stating he thought his statements, as explained, did not mislead his clients and that he did not regret anything, except the trouble he caused Mr. Weinberger and the Court).

The Court's analysis of the PBMs' motion could end here, but the Court adds two more points.

***First***: The PBMs are apparently seeking the Court's recusal from the entire MDL, not just the cases where they are defendants. This is in contrast to their earlier, failed motion to disqualify Special Master Cohen only from "all pending and future proceedings ***that involve [PBMs]***." *In re: OptumRx, Inc.*, case no. 23-3882, *Order Denying Mandamus Petition* at 1 (6th Cir. Nov. 14, 2023) (MDL docket no. 5238) (emphasis added). If the PBMs' motion for disqualification had any merit, it is likely at least ***one*** of the scores of other manufacturer, distributor, and pharmacy defendants who ***continue to litigate*** in this MDL would join the PBMs' motion. Indeed, the claims against the PBMs were not being actively litigated in 2019 when Mr. Kahn made his statements, but the claims against the other defendants were—so these other defendants would have far more reason to be concerned, if there was any valid basis for recusal. Yet no other defendant joined the PBMs' motion.

***Second***: The test for recusal under §455(a) "asks what a reasonable person ***knowing all the relevant facts*** would think about the impartiality of the judge." *Bailar*, 625 F.2d at 129. Thus, a reasonable person might look to the "relevant fact" of how the Court has actually treated the party bringing the accusation of bias, especially right before that party levied the accusation. Here, the docket shows the Court's Order closest in time to the PBMs' recusal motion was its *Order Regarding Optum's Objection to Discovery Ruling 14, Part 34* (docket no. 6031), issued two weeks before the PBMs filed the instant motion. That *Order* reveals that: (1) Optum objected to Special Master Cohen's overruling of its privilege claims; and (2) the Court agreed with the Special Master that Optum "never provided the Special Master with sufficient information or context about the documents" to undertake the review Optum wanted. *Id.* at 1. Although Optum did provide to the

Court, with its objection, "some additional factual context missing from its presentation to the Special Master," the Court noted this was too late:

> For many years, it has been the practice of the MDL Court not to consider "new evidence, case law, or legal theories [submitted] to the Court" in an objection to a discovery ruling that have not first been presented to the Special Master for his consideration. *See* docket no. 1349 at 2; *see* also docket no. 5053 at 3–4 (providing a detailed procedural history of the long-standing practice). Based on this established practice, the Court should disregard Optum's new details and rule only upon the facts and arguments Optum provided to the Special Master.

*Id.* at 3.

Accordingly, the Court sustained the Special Master's Ruling—but did so without prejudice, and then **allowed Optum to "present new evidence to Special Master Cohen**." *Id.* at 4 (emphasis added). The Court noted this would be "the last time the Court will give any party a second opportunity to support an overruled privilege claim with new evidence not first submitted to the Special Master." *Id.* Essentially, the Court broke its own, long-standing rule and gave Optum a second chance to prove its documents were privileged. *Compare Order Regarding Kroger's Objection to DR 14-32* at 3-4 (docket no. 5053) (refusing to consider new evidence offered by defendant Kroger and overruling its objection to the Special Master's Ruling).

If there is any bias shown here, it was in favor of Optum, not against it.

## IV.    Conclusion.

The entire basis for all of the requests contained in the PBMs' motion for recusal is the collection of statements made by Mr. Kahn in 2019. Once put under oath, Mr. Kahn retracted those statements and testified that, contrary to what he said in 2019, he had no basis for his assertions that

this Court engaged in any *ex parte* communications with Mr. Weinberger or any other attorney, and had no basis for his assertions that the Court intended to compel defendants to settle. The Court concluded Mr. Kahn's 2019 statements were all misrepresentations and extreme puffery, made for the purpose of securing clients, and Mr. Kahn did not contest this Court's Order directing him to pay a $100,000 fine as a result.

Ultimately, then, the PBMs point to no credible or admissible evidence that this Court engaged in any unconsented *ex parte* communication with anyone; and the Court reaffirms it did not.

"Motions to recuse under 28 U.S.C. § 455(a) must rest on the kind of objective facts that a reasonable person would use to evaluate whether an appearance of impropriety had been created, ***not on . . . unsubstantiated allegations***." *United States v. Martorano*, 866 F.2d 62, 68 (3rd Cir. 1989) (emphasis added). Here, the PBMs allegations are all unsubstantiated. Accordingly, the PBMs' motion for disqualification and for disclosure of *ex parte* communications is denied.

**IT IS SO ORDERED.**

/s/ *Dan Aaron Polster*
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

**Dated:** April 29, 2025

23