# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| In re National Prescription Opiate Litigation | MDL No. 2804 |
| THIS DOCUMENT RELATES TO: | Case No. 17-md-2804-DAP |
| Case Track 22: *City of Ogdensburg v. Purdue Pharma, L.P.,* No. 1:19-op-45852 | Judge Dan Aaron Polster |
| | (Jury Trial Demanded) |

## ANSWER BY DEFENDANTS EXPRESS SCRIPTS, INC., AND ESI MAIL PHARMACY SERVICE, INC.

Defendants Express Scripts, Inc. (**Express Scripts**), and ESI Mail Pharmacy Service, Inc. (**ESI Mail Pharmacy**) (together, the **Express Scripts Entities**), hereby file this answer in accordance with Federal Rule of Civil Procedure 15(a)(1)(A) to answer the Supplemental Amended Complaint (**SAC**) (Ogdensburg Dkt. No. 123-1) of Plaintiff City of Ogdensburg (the **City**) as follows:[1]

## INTRODUCTION

1.      Express Scripts is a leading pharmacy benefit manager. Its mission is to help its clients—employers, labor unions, government agencies, and health plans—provide their plan members with access to safe and effective medications at affordable prices.

2.      Contrary to the City's allegations, Express Scripts did not cause a prescription opioid epidemic and did not collude with Purdue or other prescription opioid manufacturers to increase the supply of prescription opioids. And the City's assertions that Express Scripts took no actions as new information came to light about prescription opioids is belied by the facts. As Judge Polster concluded over five years ago (MDL Dkt. No. 1848 at 1–2):

> As part of their nationwide offerings available to all commercial clients, each PBM Defendant [including Express Scripts] offers programs or utilization-management criteria to its clients that are intended to help combat opioid abuse and addiction, and to encourage safe prescribing practices in alignment with the CDC Guideline. . . . These limitations, adopted voluntarily at various times by each PBM Defendant, are a contribution to our national effort to help address risks related to opioid abuse.

> The Court deeply appreciates the actions taken by the PBM Defendants to offer these limitations to their clients and appreciates Plaintiffs' willingness to discuss the issues with the Court. The Court

---

[1] Pursuant to the Track 22 Case Management Order, the Express Scripts Entities answer only the allegations in the SAC. *See* ECF No. 5834 at D.3. The Express Scripts Entities do not admit any allegations in the City's Original Complaint dated June 7, 2019 (Ogdensburg Dkt. No. 2) (**OC**, together with the SAC, **Complaints**), and reserve the right to respond or otherwise object to the allegations contained in the OC. *See id.* at D.4.

understands that the PBM Defendants do not manufacture, market, or prescribe opioid medications. It also understands that plan sponsors decide whether to adopt the programs that the PBM Defendants offer. The Court encourages plan sponsors—as part of their own efforts to combat opioid abuse—to consider and adopt for their members, where appropriate, the opioid programs that the PBM Defendants offer.

3. For decades, Express Scripts has properly performed its role, including by publishing information to raise awareness about prescription opioids and by offering its clients clinically sound formularies and utilization management options with respect to prescription opioids. In 2003, for instance, Express Scripts made a presentation to plan sponsors at its annual client conference on the value of implementing a prior authorization policy on OxyContin. Purdue was livid. Yet Express Scripts offered that same prior authorization policy to its clients—which Express Scripts would not have done if (as the City falsely alleges) Express Scripts were colluding with Purdue to promote OxyContin use. Through steps like this—and many more Express Scripts has taken over the past two decades, including its award-winning Advanced Opioid Management program—Express Scripts appropriately responded to the risks posed by prescription opioids as they became known over time.

### The Role of a PBM

4. A PBM's role, however, is limited. Express Scripts does not manufacture, market, distribute, dispense, prescribe, sell, or ever come into possession of prescription opioids or any other medications. Unlike manufacturers, distributors, and pharmacies, PBMs are outside the closed system established by the Controlled Substances Act (**CSA**) and regulated by the U.S. Drug Enforcement Administration (**DEA**) for disseminating prescription opioids and other controlled substances. Unlike doctors, PBMs do not diagnose or examine patients and do not prescribe medications. And unlike retail pharmacies, PBMs never see the patient or person picking up the medication and rarely know why they were prescribed it. Instead, the PBM only electronically

"sees" that the patient has a valid prescription and "adjudicates" whether that prescription is covered by the patient's health plan.

5.      What PBMs do is help their clients administer prescription-drug benefits for their members. Express Scripts does not control those benefits. Express Scripts implements the various plan designs set by its clients, who control the parameters of the prescription drug coverage offered. Client choice is central to Express Scripts' business. Express Scripts offers options to assist its clients with management of prescription-drug benefits, but it is up to plan sponsors to choose what benefits to provide their plan beneficiaries and how to manage those benefits. Plan sponsors choose which medications their plans will cover (*i.e.*, which medications are on formulary), under what circumstances (*i.e.*, what utilization management and clinical programs, if any, are in place), and what the members' cost-share will be for any given prescription (*i.e.*, flat copay, coinsurance, deductible, etc.).

### *Opioids Are Clinically Necessary for Formularies*

6.      Despite the City's rhetoric in its complaint, prescription opioids are clinically necessary on a formulary. The U.S. Food & Drug Administration (**FDA**) has approved prescription opioids as safe and effective medications for the treatment of pain—and they remain so approved today. For many individuals suffering pain, prescription opioids are the best therapeutic option currently available on the market. That is why federal laws, such as Medicare Part D and the Affordable Care Act, require prescription opioids to be included on formularies for plans governed by those laws. It is also presumably why the State of New York includes prescription opioids on its Medicaid formulary. Indeed, every formulary Express Scripts is aware of—whether developed by PBMs, plan sponsors, or government officials—includes prescription opioids.

7.      Consistent with these broadly accepted and government-mandated medical standards, the standard formularies that Express Scripts offers to its clients include prescription

opioids because the independent doctors and pharmacists on its National Pharmacy and Therapeutics Committee (**P&T Committee**) determined, based purely on clinical considerations, that it is appropriate to include prescription opioids. Three principles guide formulary development at Express Scripts: (1) clinical appropriateness of the drug, not cost, is the foremost consideration; (2) the prescribing physician always makes the final decision regarding an individual patient's medications; and (3) Express Scripts develops clinically sound formularies based on evaluations of independent physicians. The primary decisionmaker in formulary development at Express Scripts is the P&T Committee, which is composed of independent, actively practicing physicians and pharmacists who are not employed by Express Scripts. The P&T Committee makes its formulary decisions from a purely clinical perspective. It does not have access to, nor does it consider, any information regarding manufacturer rebates. And it does not use price, in any way, in making formulary placement decisions. Instead, the P&T Committee focuses solely on what medications are clinically appropriate for a formulary.

### Express Scripts Has Long Offered Its Clients Utilization Management and Clinical Tools to Restrict Prescription Opioids

8.      Although prescription opioids belong on a formulary, Express Scripts clients can implement utilization management tools and clinical tools to restrict the utilization of prescription opioids where clinically appropriate. For over two decades, Express Scripts offered its clients various standard utilization management tools for prescription opioids. Those offerings, which have evolved over time as the understanding of prescription opioids has evolved, include quantity limits, step edits, prior authorizations, and drug utilization review. For example, starting in the 1990s, Express Scripts offered its clients an Addictive Substance program, which would notify prescribers when patients exhibited potential signs of opioid abuse. In 2002, even before the FDA warned Purdue about mis-marketing the safety profile of OxyContin, Express Scripts began

offering its clients a prior authorization policy that would require strict clinical criteria to be met—such as a cancer diagnosis—before OxyContin could be authorized beyond an initial quantity limit.

9.      Clients can also develop their own custom restrictions on prescription opioids. For example, Express Scripts worked with its client Blue Cross Blue Shield of Massachusetts to implement a custom program for prescription opioids, including custom utilization management rules, that took effect in July 2012. A 2016 study by the Centers for Disease Control and Prevention (**CDC**) found "a 6%–9% annual decline in the percentage of members on short-acting and long-acting opioid prescriptions and in opioid prescribing rates after implementation" of the program.[2]

10.     In addition to the tools already mentioned, Express Scripts also established numerous other programs that addressed the risks posed by prescription opioids. For example, since the 1990s, Express Scripts has offered its clients concurrent drug utilization review (**CDUR**), which sends dispensing pharmacists real-time alerts of safety concerns with a medication. Alerts for prescription opioids include adverse drug-drug interactions, high dosage, maximum quantity per day, opiate naïve,[3] and therapy duplication. Of course, it is ultimately up to a patient's doctor and pharmacist what medication is prescribed and dispensed. Express Scripts can and does flag for the pharmacist any benefit claim that exceeds plan limits or that triggers CDUR alerts. But pharmacists can override PBM warnings, and even when the PBM rejects coverage, retail pharmacists can still fill a prescription if the patient pays in cash.

11.     As yet another example, Express Scripts has long operated a fraud, waste, and abuse program (**FWA**). FWA uses analytics to monitor and, when appropriate, to investigate pharmacies

---

[2] *See* Macarena C. García et al., *Declines in Opioid Prescribing After a Private Insurer Policy Change—Massachusetts, 2011–2015*, 65 Morbidity & Mortality Wkly. Rep. 1125, 1127 (Oct. 21, 2016), https://www.cdc.gov/mmwr/volumes/65/wr/pdfs/mm6541a1.pdf.

[3] "Opiate naïve" generally means someone who has not used, or filled a prescription for, opioids within a certain period of time.

to detect potentially improper dispensing, fraudulent billing, or "pill-mills." Clients may also choose to enroll in an enhanced fraud, waste, and abuse program (**eFWA**), which uses analytics to monitor prescribers and members for abnormal utilization or prescribing patterns, and to take steps to prevent patients from doctor-shopping, such as by allowing clients to "lock" members into a single pharmacist and/or physician. Express Scripts also offers RationalMed, a retroactive drug utilization review program that evaluates medical, pharmacy, and laboratory data to detect critical patient health and safety issues, which are then addressed through timely notification to physicians, pharmacies, patients, and case managers.

12.     Despite this decades-long record, the City erroneously claims that it was only ***after*** the opioid crisis reached its peak, and ***after*** the U.S. Senate and state governments allegedly began to investigate the Express Scripts Entities' alleged role, that the Express Scripts Entities launched tools to restrict prescription opioid utilization. That is demonstrably false.

13.     In 2017, Express Scripts combined many of its opioid-related offerings into a one-stop program, Advanced Opioid Management (**AOM**).[4] AOM was the first solution of its kind offered by a PBM to try to influence behavior at every touchpoint—at the doctor's office, the pharmacy, and with the patient. The three-pronged approach includes holistic initiatives such as utilization management tools, case management services, and data analytics to identify and intervene in cases of potential opioid misuse. With more than 17.4 million members enrolled by 2019, clients using Express Scripts' AOM program have seen significant outcomes. The Pharmacy Benefit Management Institute recognized the success of Express Scripts' AOM program with the Excellence Award for Opioid Management Strategies in both 2018 and 2020.

---

[4] *See* Evernorth Health Services, *Advanced Opioid Management*, https://www.evernorth.com/our-solutions/advanced-opioid-management.

### *Rebates Are Not a Cause of the Alleged Opioid Epidemic*

14.     Rebates are not the problem that the City misrepresents them to be, let alone a cause of the alleged opioid epidemic. As part of its mission to make prescription medications more affordable for plan members, Express Scripts negotiates with pharmaceutical manufacturers for rebates on branded prescription medications to lower the net cost of medications included on its clients' formularies.[5] The value of rebates to make brand medications more affordable is widely recognized. Indeed, many plan sponsors contract directly with manufacturers (including opioid manufacturers) for rebates. Moreover, the federal government and all fifty states—including the State of New York—receive manufacturer rebates under the Medicaid Drug Rebate Program. Most plan sponsors prefer to have their PBMs handle rebate negotiations. That way, instead of hundreds of thousands of health plans individually negotiating rebates with manufacturers, PBMs can wield their aggregate purchasing power to negotiate greater rebates than the health plans could negotiate individually.

15.     Under Express Scripts' rebate agreements, manufacturers pay rebates to Express Scripts, and Express Scripts then shares the rebates with its clients. In 2022, Express Scripts shared with its clients over 95% of the rebates it received. Plan sponsors can then use those rebates to lower premiums, expand benefits, or otherwise make medications more affordable for plan participants. Each client determines what percentage of rebates it wants passed through from Express Scripts and how much (if any) it wants the PBM to retain as payment for services. Many clients elect to receive 100% of rebates. Others opt for less than 100%, in exchange for not paying fees to Express Scripts for its services, or in exchange for other benefits.

---

[5] *See* Evernorth Health Services, *The Reality of Rebates*, https://www.evernorth.com/esfacts/key-topics/the-reality-of-rebates.

16.     Rebate agreements simply provide that *if* a health plan puts a certain medication on its formulary, there will be rebates *if* the medication is prescribed and purchased by a plan member in accordance with the conditions set by the manufacturer. Contrary to the City's claims, Express Scripts does not control how or when a doctor prescribes a rebate-eligible medication, and Express Scripts never requires that rebate-eligible medications be included on clients' formularies. In fact, 99% of all generic drugs are included on Express Scripts' standard formularies, and generic drugs typically are not rebated. As courts have recognized, a PBM rebate agreement with a manufacturer "does not require the PBM or health plan to make specific formulary decisions. Instead, only if and when a coverage option is selected by a PBM's client (the health plan) is the manufacturer obligated to provide the agreed-upon level of price concessions. This preserves flexibility for a PBM's client to, for example, receive the rebate for covering a drug that is otherwise excluded on the PBM's national formulary." *In re EpiPen*, 44 F. 4th 959, 965, 967–68 (10th Cir. 2022).

17.     Moreover, over 94% of opioid medications prescribed and dispensed are generic medications, which do not receive any rebates. Contrary to the City's allegations that rebates drive formulary placement, generic medications receive the most preferred placement on the formularies administered by Express Scripts. This is because generic medications are more affordable and reduce overall health care costs for plan sponsors and their members.

### *Spread Pricing Is Not a Cause of the Alleged Opioid Epidemic*

18.     The City similarly misrepresents the role of spread pricing.[6] How clients pay for prescription medications is yet another customizable option Express Scripts offers to its clients. Some clients choose a traditional pricing model known as spread pricing. Under this model,

---

[6]     *See* Evernorth Health Services, *The Skinny on Spread Pricing*, https://www.evernorth.com/esfacts/key-topics/skinny-on-spread-pricings.

Express Scripts and the client agree to a guaranteed discount for prescriptions. If Express Scripts cannot negotiate with pharmacies for a better discount, then Express Scripts is on the hook for any losses. This means that clients are protected from uncertainty around prescription costs. Other clients choose a pass-through model. Under this model, the client agrees to pay the prescription rates that Express Scripts pays to pharmacies. Contrary to the City's claims, spread pricing is never a factor in Express Scripts' formulary development and never the basis for Express Scripts to encourage the use of a particular drug.

### *ESI Mail Pharmacy is Not a Cause of the Alleged Opioid Epidemic*

19.     Separate from Express Scripts the PBM is ESI Mail Pharmacy. ESI Mail Pharmacy is a mail order pharmacy that delivers prescription medications to the homes of individuals who require those medications on a long-term basis. Doctors send a prescription to the ESI Mail Pharmacy electronically or by fax, and pharmacists then fill the prescription as written and send the medication to the patient using a delivery service like UPS or FedEx.

20.     The City wrongly alleges that ESI Mail Pharmacy played a substantial role in the supply of prescription opioids dispensed in the City of Ogdensburg. In fact, less than 0.1% of the prescription opioids dispensed in Ogdensburg from 2009–2019 came from ESI Mail Pharmacy. ESI Mail Pharmacy dispensed just 74 prescriptions in the City of Ogdensburg over that 11-year period.

21.     ESI Mail Pharmacy works proactively to ensure that opioid prescriptions end up in the right hands and for the right reasons. Opioid prescriptions are processed by specially trained pharmacists who closely review each prescription to ensure validity. Before the ESI Mail Pharmacy dispenses prescription opioids, it reviews "red flag" warnings that are triggered according to state-specific and federal regulations. No prescription can be sent for delivery until the pharmacist reviews and "clears" each of these red flags.

22.    Opioid prescriptions dispensed by ESI Mail Pharmacy are processed by specially trained pharmacists who closely review each prescription to ensure validity. ESI Mail Pharmacy has developed Standard Operating Procedures (**SOPs**) that govern the dispensing of prescription opioids. ESI Mail Pharmacy regularly updates these SOPs, which are aligned with federal and state laws and regulations. ESI Mail Pharmacy provides extensive training to its pharmacists on the SOPs. The SOPs require pharmacists to (among other things) inquire about a patient's history where the patient is prescribed a combination of medications identified by the DEA as indicating potential abuse or diversion or where an opioid therapy contains a certain amount of morphine milligram equivalents (**MME**). ESI Mail Pharmacy pharmacists also receive training on identifying "red flag" warnings, such as quantity alterations. ESI Mail Pharmacy pharmacists review and resolve all red flags before dispensing any prescription opioids. ESI Mail Pharmacy's compliance staff performs regular audits to assess whether pharmacists have adequately counseled patients, supervised pharmacy technicians, inspected prescriptions before dispensing, and logged controlled substances, among other metrics.

### *The Real Causes of Any Prescription Opioid Public Nuisance*

23.    The City, like many cities and counties across the United States, suffers from a substance abuse crisis well beyond any alleged prescription opioid misuse or abuse. The City's alleged damages are instead attributable to this wider substance abuse crisis, which results from drug overdose and drug poisoning from illicit drugs such as cocaine, heroin, crack, marijuana, carfentanil, methamphetamine, and synthetic (non-pharmaceutical) opioids; illegally obtained substances such as fentanyl and its analogs, benzodiazepines, and morphine; and alcohol abuse. As a PBM, Express Scripts does not offer formulary products or adjudicate claims for illicit drugs or alcohol on behalf of health plan sponsors. Separately, as a mail order pharmacy, ESI Mail Pharmacy does not dispense illicit drugs or alcohol. ESI Mail Pharmacy does not control the

distribution of drugs that may have been illegally obtained from friends, family, drug dealers, and pill mills.

24.     The cause of any prescription opioid public nuisance in the City of Ogdensburg is not the Express Scripts Entities but rather government agencies that were slow to act in the face of widespread opioid abuse, manufacturers that misled doctors and the public about the risks of prescription opioids, doctors that overprescribed opioids, and criminal distributors, pill mills, and drug traffickers that inundated the City with opioids, including illicit opioids such as heroin and fentanyl.

### Government Agencies

25.     First, prescription opioid use has spread because state and federal governments, along with the medical community, encouraged the use of prescription opioids to treat chronic and severe pain. When the medical community recommended in the 1990s that pain be considered the "fifth vital sign" and to treat pain like other significant symptoms, state medical boards and state legislatures promoted more permissive use of prescription opioids outside of cancer or end-of-life care. In 2001, 21 health organizations and the DEA issued a joint statement saying that undertreatment of pain is a serious problem in the United States and that for many patients, prescription opioids are the most effective way to treat their pain and often the only treatment option that provides significant relief. In line with this directive, from 2003 to 2013, the DEA, which sets an annual production quota for each prescription opioid in the United States, raised the production quotas for prescription opioids by significant amounts. In conjunction with these rising quotas, the sale of prescription opioids increased by 300% from roughly 1999 to its peak in 2010.

### Prescription Opioid Manufacturers

26.     Second, prescription opioid manufacturers, in particular Purdue, took advantage of changing medical standards to misleadingly market and sell prescription opioids. The City's

Supplemental Amended Complaint acknowledges Purdue's reckless disregard for safety. Purdue introduced OxyContin in the mid-1990s and began a campaign to fraudulently portray it as safe and effective for a variety of conditions while downplaying the risks of addiction or abuse. For example, in 1995, when the FDA approved OxyContin, Purdue had conducted no clinical studies on how addictive or prone to abuse the drug might be. Nevertheless, Purdue requested a package insert announcing that the drug "is believed to reduce the abuse liability," which the FDA approved. Purdue's false marketing led to the FDA issuing a series of warning letters about OxyContin to Purdue. The first of these, in 2003, claimed that Purdue's "journal advertisements are misleading because they make prominent claims of effectiveness for pain relief, but omit from the body of the advertisements crucial facts related to the serious, potentially fatal safety risks associated with the use of OxyContin, the potential for OxyContin to be abused, and the limitations on its appropriate indicated use."

27.     The FDA also criticized Purdue for "promoting OxyContin for a much broader range of patients with pain than are appropriate for the drug" and concluded that Purdue's advertising was "especially egregious and alarming in its potential impact on the public health." These rebukes, however, did not stop Purdue from actively pushing OxyContin to a wider market. Over the next decade, Purdue would compile a database of thousands of OxyContin prescribers, not to alert law enforcement or to ensure safer prescribing practices, but rather to target the "highest prescribers for opioids across the country" and increase sales. Ultimately, Purdue pleaded guilty to federal charges of criminal misbranding with respect to OxyContin and paid a $635 million fine among other sanctions.

28.     Far from working on behalf of the manufacturers, as the City alleges, Express Scripts *did* alert its clients of concerns regarding the rising trends in opioid prescriptions. Express

Scripts consistently discussed publicly the risks of prescription opioids and has aligned its formularies, utilization management tools, and clinical programs with guidance from CMS, the CDC, and the FDA and with clinical best practices, all of which have evolved over time and continue to evolve today.

### Distributors

29.     Third, distributors did not comply with legal obligations to report suspicious orders of prescription opioids. One such distributor was Rochester Drug Co-Operative (**RDC**). RDC was headquartered and operated just 200 miles from the City, in Rochester, New York, for one hundred and fifteen years, from 1905 until 2020. In 2020, RDC filed for bankruptcy due to its criminal exposure related to controlled substances distribution. RDC lacked a functional system to comply with its legal obligations to report suspicious orders and repeatedly shipped to known pill mills. When questioned by DEA agents in 2017, the RDC's CEO acknowledged that there was no program in place to notify the DEA of suspicious orders. That same CEO, Laurence F. Doud III, is serving a jail sentence for his role in the crisis.

### Doctors

30.     Fourth, prescription medications cannot be dispensed at licensed pharmacies without doctors' prescriptions. While most doctors sought to follow the standard of care in treating pain, the standard evolved over the years as the risks of opioid abuse have become better understood. In retrospect, it appears that some doctors—following the standard of care at the time—may have prescribed opioid medications too frequently or at quantities that were too large. It should be noted, however, that the most problematic prescriptions came from unscrupulous doctors who did not follow any standards. Some doctors disregarded patient safety. Instead, they chased profits, including lucrative speaking and consulting fees from opioid manufacturers. In

many instances, doctors received bigger bonuses in exchange for writing additional opioid prescriptions.

31.     Unlike doctors, Express Scripts does not receive critical information to determine the medical appropriateness of a prescription. Doctors physically examine patients, discuss their medical history, and apply their medical expertise to determine the best course of treatment. Doctors can ask a patient about the patient's symptoms and how long the patient has had these symptoms. Doctors can order tests, such as blood tests, x-rays, and MRIs, to determine a patient's individual needs.

32.     In contrast, when a patient comes to a retail pharmacy with a prescription for opioids, Express Scripts sees only that the prescription is written by a licensed doctor. Specifically, at the retail level, Express Scripts' computers see an electronic "claim" submitted by a pharmacy for "adjudication"—*i.e.*, to determine whether a particular prescription is covered by the patient's insurance; what the copay, if any, is that the pharmacy must collect from the patient; and what the pharmacy is going to be reimbursed for filling the prescription. This adjudication happens electronically and is near instantaneous. It happens millions of times a day at pharmacies all over this country and is an invaluable part of getting patients the medicines they need safely and effectively.

33.     Equally important is what Express Scripts does not see and does not know. Express Scripts does not know if the person has just been diagnosed with cancer and undergone surgery to remove a tumor. It is ultimately up to the doctor to decide which medications to prescribe, and Express Scripts does not know why the doctor prescribed the medication, only that the patient has a valid prescription that they have presented at a pharmacy to fill. It is unreasonable and contrary to accepted medical practice for the City to suggest that Express Scripts knows what is better for

a patient than the doctor examining them and that Express Scripts should interfere in the doctor-patient relationship.

34. The vast majority of prescription opioids dispensed in the City came from ordinary retail pharmacies, including Kinney Drugs, Wal-Mart, Kimro's Medicine Place, Rite Aid, Walgreens, and Price Chopper Pharmacy. ESI Mail Pharmacy, by contrast, dispensed *less than 0.1%* of all prescription opioids in the City during 2009–2019. The City has alleged that the Express Scripts Entities contributed to the opioid crisis by ignoring certain "red flags" in adjudicating prescription opioid claims and in filling opioid prescriptions. The Express Scripts Entities dispute the City's red flag theory as an invalid and misleading methodology. But to the extent it has any validity, it applies with even more force to the actual pharmacies on the ground in Ogdensburg, such as Kinney Drugs, Wal-Mart, Kimro's Medicine Place, Rite Aid, Walgreens, Price Chopper Pharmacy, and others, who dispensed the vast majority of prescription opioids.

### Criminal Actors

35. Finally, the opioid crisis has been driven in large part by criminal activity rather than legitimate opioid prescriptions. For decades, drug dealers in New York have preyed upon individuals suffering from substance use disorder. These drug dealers used fraud and theft to divert opioid medications for illicit use, while also selling illegal street drugs such as heroin, methamphetamine, and cocaine. As the medical community and the government placed greater restrictions on opioid medications, drug dealers continued selling illegal drugs such as counterfeit pills and heroin. In fact, even as opioid prescriptions fell after 2012, overdoses increased due to the rise in exceedingly dangerous illicit drugs manufactured and sold by drug dealers and criminal cartels. Recent data suggests that over 90% of opioid-related deaths in the state of New York involve illegal fentanyl.

36.     Express Scripts, in contrast, saw only a small fraction of the prescription opioids dispensed—those dispensed through retail pharmacies, pursuant to a prescription, and covered by insurance. These types of valid and legitimate prescription fills for prescription opioids—as opposed to the pill mills and other aspects of illicit trade—are simply not what caused the alleged opioid epidemic.

\*       \*       \*

37.     In summary, any public nuisance created by a prescription opioid crisis in the City was not caused by the Express Scripts Entities. The Express Scripts Entities have fully complied with their legal obligations and taken proactive steps for decades to prevent the misuse and abuse of prescription opioids. The City is not entitled to any of the relief it seeks from the Express Scripts Entities in this lawsuit, and judgment should be entered for the Express Scripts Entities.

## SPECIFIC RESPONSES TO THE CITY'S SUPPLEMENTAL AND AMENDED ALLEGATIONS TO THE VERIFIED COMPLAINT

## I.    INTRODUCTION[7]

1–2.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

3.    Denied, except that the Express Scripts contracts with various types of entities to provide PBM services, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

4.    Paragraph 4 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 4 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

5.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

6.    Denied, except that the Express Scripts Entities admit that the quoted language appears in the document cited in footnote 4, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

7.    Denied, except that the Express Scripts Entities admit that the quoted language appears in the document cited in footnote 5, and that the Express Scripts Entities lack knowledge

---

[7] This Answer includes the headings in the SAC solely by way of reference. To the extent these headings contain any allegations to which the Express Scripts Entities must respond, the Express Scripts Entities deny each allegation.

or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

8.      With respect to the first sentence of paragraph 8, the Express Scripts Entities admit that PBMs provide services to prescription drug benefit plans sponsored by health insurers, self-insured employers, and state and federal government agencies. The remainder of paragraph 8 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

9.      Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

10.      The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the second through sixth sentences of paragraph 10, except that formularies are lists of drugs covered by a pharmacy benefit plan. The first and last sentences are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

11.      Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the second sentence of paragraph 11, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

12.      The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 12. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 12.

13.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13, except that all interests in the Express Scripts Entities are held by The Cigna Group, a publicly traded company.

14–16. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

17.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 17, except that the Express Scripts Entities admit that Purdue Pharma introduced OxyContin in 1996. The Express Scripts Entities also admit that Purdue Pharma pleaded guilty to misbranding of OxyContin in 2007.

18.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 18.

19.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 19.

20–22. The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of these specific allegations. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 20–22, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

23.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 23.

24.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 24.

25.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 25.

26.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 26.

27.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 27.

28.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 28.

29–30. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 29–30.

31.     Denied, except that the Express Scripts Entities admit that prescription opioids can be addictive for some individuals. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

32–36. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

37.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 37 and refer to the source of the quoted language for its contents.

38–39. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

40.     The Express Scripts Entities admit that Purdue pleaded guilty to misbranding OxyContin in 2007, agreed to pay a $635 million fine, and entered into a Corporate Integrity Agreement. The remainder of paragraph 40 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

41–43. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

44.     Denied, except that the Express Scripts Entities admit that prescription opioids are regulated as controlled substances, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

45.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 45.

46.     The first sentence of paragraph 46 is admitted. The remainder of paragraph 46 asserts legal conclusions that do not require a response. To the extent a response is required, the remainder of paragraph 46 is denied, except that the Express Scripts Entities lack knowledge or

information sufficient to form a belief about the truth of the allegations concerning other Defendants.

47–50. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

51–52. Denied.

53.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

54.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 54. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 54.

55–58. The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, Express Scripts Entities deny the allegations in paragraphs 55–58.

59–71. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 59–71. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 59–71.

72.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 72.

73–80. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 73–80. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 73–80.

81–82. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

83–84. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 83–84. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 83–84.

85–88. Paragraphs 85–88 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 85–88 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

89–92. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

## II. JURISDICTION AND VENUE

93–96. Paragraphs 93–96 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 93–96 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

## III. PARTIES

### A. Plaintiff.

97–100. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 97–100.

101–102. Paragraphs 101–102 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 101–102 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

103.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

**B.    Defendants.**

**1.    The Express Scripts Defendants.**

104–106.    The allegations in paragraphs 106–108 are directed at Evernorth Health, Inc. (formerly known as Express Scripts Holding Company), which was dismissed on April 30, 2025, *see* Ogdensburg Dkt. No. 135, so no response is required. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 104–106, except that Evernorth Health, Inc., is a Delaware corporation.

107.    Admitted.

108.    Paragraph 108 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 108 is denied.

109.    Denied, except that Express Scripts provides PBM services.

110–112.    The allegations in paragraphs 110–112 are directed at Express Scripts Administrators LLC, which was dismissed on April 30, 2025, *see* Ogdensburg Dkt. No. 135, so no response is required. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 110–112, except that Express Scripts Administrators, LLC, is a Delaware corporation registered to do business in New York.

113–114.    The allegations in paragraphs 113–114 are directed at Medco Health Solutions, Inc., which was dismissed on April 30, 2025, *see* Ogdensburg Dkt. No. 135, so no response is required. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 113–114, except that Medco Health Solutions, Inc., is a Delaware corporation registered to do business in New York.

115–116.    The allegations in paragraphs 115–116 are directed at ESI Mail Order Processing, Inc., which was dismissed on April 30, 2025, *see* Ogdensburg Dkt. No. 135, so no response is required. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 115–116, except that ESI Mail Order Processing, Inc., is a Delaware corporation.

117.    Denied, except that ESI Mail Pharmacy Service, Inc., is a Delaware corporation.

118.    Admitted.

119.    Paragraph 119 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 119 is denied, except that ESI Mail Pharmacy Service, Inc., operates in New York.

120–123.    The allegations in paragraphs 120–123 are directed at Express Scripts Pharmacy, Inc., which was dismissed on April 30, 2025, *see* Ogdensburg Dkt. No. 135, so no response is required. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 120–123, except that Express Scripts Pharmacy, Inc., is a Delaware corporation registered to do business in New York.

124.    Paragraph 124 does not make any allegations and therefore does not require a response. To the extent the City purports to refer to Express Scripts Pharmacy, Inc., as "Express Scripts Mail Order Pharmacy," the Express Scripts Entities note that the claims against Express Scripts Pharmacy, Inc., were dismissed on April 30, 2025, *see* Ogdensburg Dkt. No. 135, so the Express Scripts Entities treat the references to "Express Scripts Mail Order Pharmacy" in the SAC as referring only to ESI Mail Pharmacy Service, Inc.

125–126.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 125–126.

127–128.    The allegations in paragraphs 127–128 are directed at Express Scripts Specialty Distribution Services, Inc., which was dismissed on April 30, 2025, *see* Ogdensburg Dkt. No. 135, so no response is required. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 127–128, except that Express Scripts Specialty Distribution Services, Inc., is a Delaware corporation.

129.    Paragraph 129 does not make any allegations and therefore does not require a response. To the extent the City purports to refer to Evernorth Health, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., Express Scripts Pharmacy, Inc., and/or Express Scripts Specialty Distribution Services., Inc., as "Express Scripts" or "ESI," the Express Scripts Entities note that the claims against those entities were dismissed on April 30, 2025, *see* Ogdensburg Dkt. No. 135, so the Express Scripts Entities treat the references to "Express Scripts" or "ESI" in the SAC as referring only to Express Scripts, Inc., and ESI Mail Pharmacy Service, Inc.

130.    Denied.

131.    Denied, except that the Express Scripts Entities admit that on December 20, 2018, Cigna acquired Express Scripts.

132.    Denied, except that the Express Scripts Entities admit that on April 2, 2012, Express Scripts consummated a merger with Medco Health Solutions, Inc., and that both became wholly-owned subsidiaries of Express Scripts Holding Company.

133–134.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 133–134.

135.    Denied.

136.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 136.

137.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of paragraph 137. To the extent a response is required, the Express Scripts Entities deny the allegations in the first sentence of paragraph 137. The second sentence is denied.

138.     Denied, except that the Express Scripts Entities admit that Express Scripts develops formulary offerings, such as the National Preferred Formulary, which its clients can choose to accept, reject, or modify.

139–140.       Denied.

**2.     The Optum Defendants.**

141–200.       The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 141–200.

## IV.     THE ROLE OF PBMS IN PRESCRIPTION DRUG TRANSACTIONS

### A.     PBMs Operate on All Sides of Prescription Drug Transactions.

201.     Express Scripts admits that it provides PBM services to its clients, which include various entities from different business sectors and the government. Express Scripts admits that it offers its clients formulary and utilization management products (including retrospective drug utilization review products) that its clients can accept, reject, or customize. Express Scripts admits that it receives limited data from pharmacies as part of adjudicating prescription claims following its clients' benefit designs. The remainder of paragraph 201 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other PBMs.

202.    Denied, except that Express Scripts contracts with certain drug manufacturers, certain pharmacies, and certain third-party payors, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other PBMs.

203.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other PBMs and other Defendants.

204.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 204. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 204.

205–206.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

**B.    PBMs Use Their Formularies as Leverage to Negotiate with Drug Manufacturers.**

207.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 207. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 207, except that a formulary is a list of medications that an insurer or health plan covers.

208.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 208. To the extent a response is required, the Express Scripts Entities deny the allegations in the second sentence of paragraph 208. The remainder of paragraph 208 is denied.

209.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

210.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 210. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 210.

211–212.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

213.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 213. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 213.

214–215.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other PBMs.

216.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other PBMs and other Defendants.

217.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

218.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 218. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 218.

219–221.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

222.     Denied, except that some manufacturers pay Express Scripts administrative fees for certain administrative services it provides, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

223.     The Express Scripts Entities object to paragraph 223 because the document in footnote 57 is misquoted. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 223.

224.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

225.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other PBMs.

226.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 226.

1.     **Express Scripts' Formularies.**

227.     Denied, except that Express Scripts utilizes the Therapeutic Assessment Committee, P&T Committee, and the Value Assessment Committee to develop formularies.

228.     Admitted.

229–230.     Denied.

2.     **Optum's Formularies.**

231–235.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 231–235.

**C.     PBMs' Drug UM Programs.**

236.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other PBMs and other Defendants.

237–241.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

242.     Denied, except that Express Scripts admits that it offers an Advanced Opioid Management program, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

**D.     PBMs Contract with Pharmacies.**

243.     Express Scripts admits that it contracts with retail pharmacies where health plan members can fill their prescriptions. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other PBMs and other Defendants.

244.     Denied.

245.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 245.

246.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 246. To the extent a response is required, the

Express Scripts Entities deny the allegations in paragraph 246, except that both customers and PBMs pay pharmacies for some prescriptions.

247.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

248.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 248, except that Express Scripts offers its clients drug utilization review.

249.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 249.

## V.    THE PBM DEFENDANTS' ROLE IN CAUSING THE OPIOID CRISIS

### A.    The PBM Defendants and the Opioid Manufacturers Colluded to Ensure Virtually Unfettered Access to Opioids.

#### 1.    The PBM Defendants Negotiated with the Opioid Manufacturers to Give Opioids Favorable Placement on National Formularies in Exchange for Rebates and Other Fees.

250.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

251.    The first sentence of paragraph 251 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants. With respect to the second sentence of paragraph 251, the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in this sentence. To the extent a response is required, the Express Scripts Entities deny the allegations in the second sentence of paragraph 251.

252–253.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 252–253. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 252–253.

254.     With respect to the first two sentences of paragraph 254, the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in these sentences. To the extent a response is required, the Express Scripts Entities deny the allegations in the first two sentences of paragraph 254. The third sentence of paragraph 254 is denied.

255.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 255.

256–262.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 256–262. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 256–262.

263.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

264.     Denied.

265.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 265.

266.     Denied.

267.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

268.     Denied, except that the Express Scripts Entities admit that Express Scripts negotiates with certain pharmaceutical drug manufacturers for rebates and administrative fees that

its clients can use to lower their costs, and it develops formulary offerings that its clients can accept, reject, or modify, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph concerning other Defendants.

269–276.   Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

277.   The Express Scripts Entities object to paragraph 277 because the document in footnote 78 is misquoted. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 277 and refer to the source of the quoted language for its contents.

278.   Denied.

279.   The Express Scripts Entities object to paragraph 279 because the document in footnote 80 is misquoted and the source of the quoted language in the fourth sentence is not identified, and the Express Scripts Entities are thus without knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 279 and refer to the sources of the quoted language for their contents.

280.   The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 280 and refer to the source of the quoted language for its contents.

281.   Denied.

282–286.   The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 282–286.

287.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 287.

288–289.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

### 2.    The PBM Defendants and the Opioid Manufacturers Used Parity to Limit the Use of Utilization Management Measures for Opioids.

290–293.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

294.    The Express Scripts Entities object to paragraph 294 because the document in footnote 85 is misquoted. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 294, including that the Express Scripts Entities have "standard rebate agreements," and refers to the source of the quoted language for its contents.

295.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 295.

296.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 296 and refer to the sources of the quoted language for its contents.

297–298.    Denied.

299–303.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 299–303.

304.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

305.    Denied, except that the quoted language appears in the documents cited in footnotes 94 and 95.

306.    Paragraph 306 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 306 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

### 3.    The PBM Defendants Misrepresented that They Were Using Their Formularies to Promote Safe Use and Appropriate Prescribing of Opioids.

307.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

308.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 308 and refer to the sources of the quoted language for its contents.

309.    Denied, except that the Express Scripts Entities admit that the quoted language appears in a letter dated September 4, 2013, from David Dederichs, Senior Director of Government Affairs at Express Scripts, Inc., to the Pennsylvania House of Representatives Committee on Health. The Express Scripts Entities refer to the document cited in footnote 96 for its contents.

310.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 310.

311.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express

Scripts Entities deny the allegations in paragraph 311 and refer to the source of the quoted language for its contents.

312.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

**B.      During the Early Years of the Epidemic, the PBM Defendants Conspired with the Opioid Manufacturers to Expand the Opioid Market and Increase Opioid Utilization.**

313.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

314–315.       Denied.

316.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 316 and refer to the source of the quoted language for its contents.

317.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 317. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 317.

318.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 318.

319.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

**C.** **For Two Decades after the PBM Defendants Knew the Opioid Epidemic Was Occurring, the PBM Defendants Continued to Conspire with the Opioid Manufacturers in the Deceptive Marketing of Opioids.**

320. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 320. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 320.

321. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

322. Denied, except that Express Scripts Specialty Distribution Service contracted with certain pharmaceutical drug manufacturers to administer all or part of their Patient Assistance Programs.

323–324. Denied.

325–327. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

**1.** **The PBM Defendants Disseminated the Opioid Manufacturers' Deceptive Propaganda.**

328. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

329. The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 329.

330. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 330. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 330.

331.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 331.

332–333.    Denied.

334.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 334. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 334.

335.    Denied.

336.    The Express Scripts Entities object to paragraph 336 because the document in footnote 108 is misquoted. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 336 and refer to the source of the quoted language for its contents.

337.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 337. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 337.

338.    Denied.

339.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 339.

340–343.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 340–343.

344.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 344.

345–346.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 345–346.

347.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 347.

348–349.    Denied.

350–351.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 350–351.

>    **2.    The PBM Defendants' Affiliated Entities Provided Research, Data, and Consulting to the Opioid Manufacturers to Expand the Opioid Market.**

352.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

353.    Denied.

354–375.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 354–375.

376.    Denied, except that the quoted language appears in the document cited in footnote 140, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph concerning other Defendants.

**D.    The PBM Defendants Had Access to Real-Time Data Regarding Drug Utilization Which Gave Them a Unique Vantage Point into the Opioid Epidemic**

377.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

1. **The PBM Defendants track every prescription claim they process across all the health plans they service which provided them with uniquely granular and comprehensive data.**

378. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

379. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

380–382. Denied.

383–387. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 383–387.

388. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

389. The first sentence of paragraph 389 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in the remainder of paragraph 389. To the extent a response is required, the Express Scripts Entities deny the allegations in the remainder of paragraph 389.

390. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

2. **The PBM Defendants had knowledge about the opioid epidemic and about abuse and diversion.**

391–393. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 391–393. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 391–393.

394. Denied, except that the chart in paragraph 394 appears in the document cited in footnote 150.

395. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 395.

396–397. Denied, except that the Express Scripts Entities admit that prescription opioids can be addictive for some individuals and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

398–399. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

400. The Express Scripts Entities object to paragraph 400 because the document in footnote 154 is misquoted. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 400 and refer to the source of the quoted language for its contents.

401. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

402–403. Denied.

404. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 404, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

405. Denied, except that the image in paragraph 405 appears in the document cited in footnote 161.

406.    Denied, except that the quoted language and image in paragraph 406 appear in the document cited in footnote 162.

407.    Denied, except that the quoted language and image in paragraph 407 appear in the document cited in footnote 163.

408.    The Express Scripts Entities object to paragraph 408 because the document in footnote 164 is misquoted. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 408 and refer to the sources of the quoted language for their contents.

409.    The Express Scripts Entities object to paragraph 409 because the document in footnote 166 is misquoted. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 409 and refer to the sources of the quoted language for their contents.

410.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

411.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 411 and refer to the source of the image for its contents.

412.    Denied, except that the quoted language in paragraph 412 appears in the documents cited in footnotes 168 and 169.

413.    Denied, except that the quoted language in paragraph 413 appears in the documents cited in footnotes 170, 171, and 172.

414.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 414. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 414.

415.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

### 3.    The PBM Defendants Failed to Timely Undertake Actions to Address the Opioid Epidemic that They Helped Create.

416.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

417–419.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 417–419.

### a.    The PBM Defendants chose not to use their claims data and their formulary and UM offerings to address overprescribing, abuse, and diversion.

420–421.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

422.    Denied.

423.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 423 and refer to the source of the quoted language for its contents.

424.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 424. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 424 and refer to the source of the quoted language for its contents.

425.    Denied, except that the quoted language in paragraph 425 appears in the document cited in footnote 181.

426.    Denied.

427.    The Express Scripts Entities object to paragraph 427 because the document in footnote 185 is misquoted. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 427 and refer to the source of the quoted language for its contents.

428.    Denied.

429–430.    The Express Scripts Entities object to paragraphs 429–430 because the document in footnote 186–187 is misquoted. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 429–430 and refer to the source of the quoted language for its contents.

431.    Denied.

432.    The Express Scripts Entities object to paragraph 432 because the document in footnote 188 is misquoted. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 432 and refer to the source of the quoted language for its contents.

433.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 433.

434.    The Express Scripts Entities object to paragraph 434 because the document in footnote 189 is misquoted. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 434 and refer to the source of the quoted language for its contents.

435–437.    Denied.

438.    Denied, except that the quoted language in paragraph 438 appears in the document cited in footnote 190.

439. The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 439.

440. Denied.

441–445. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 441–445.

446. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

447–449. The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 447–449.

450. Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

451. The first sentence of paragraph 451 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in the remainder of paragraph 451.

452–454. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 452–454.

455. The Express Scripts Entities object to paragraph 455 because the document in footnote 206 is misquoted. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 455 and refer to the source of the quoted language for its contents.

456.    Denied, except that the quoted language in paragraph 456 appears in the documents cited in footnotes 207, 208, and 209.

457–458.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

459.    Denied, except that the Express Scripts Entities admit that the quoted language appears in the testimony of Snezana Mahon (who was at the time the Vice President of Clinical Product Development of Express Scripts) in February 2018 before the Senate Committee on Health, Education, Labor and Pensions.

460–466.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 460–466.

467.    Denied, except that the quoted language in paragraph 467 appears in the documents cited in footnotes 217 and 218, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

      **b.**      **The PBM Defendants chose not to use their "Drug Utilization Review" tools to address overprescribing, abuse and diversion**

468.    Denied, except that Express Scripts admits that it offers retrospective and concurrent drug utilization review programs for its clients (RDUR and CDUR), and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

469.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 469.

470–471.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

472.    Denied, except that the quoted language in paragraph 472 appears in the document cited in footnotes 219 and 220.

473.    The Express Scripts lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 473.

474–477.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 474–477.

      c.    **The PBM Defendants failed to use their vast stores of data, their formulary and UM offerings, and their DURs to provide effective controls against diversion and/or to prevent the diversion and abuse of opioids**

478.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

479–480.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 479–480.

481.    Denied, except that the Express Scripts Entities admit that Express Scripts, Inc., provides PBM services and that ESI Mail Pharmacy Service, Inc., provides mail order pharmacy services.

**E.   Two Decades After They Knew Opioids Were Causing a Public Health Crisis, Express Scripts and Optum Finally Implemented Protocols to Address the Opioid Epidemic.**

482.   Denied, except that Express Scripts admits that it offers an Advanced Opioid Management program, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

483.   Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

484.   Denied, except that the quoted language in paragraph 484 appears in the document cited in footnote 225, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

485.   The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 485 and refer to the source of the image for its contents.

486.   Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

487.   Denied, except that Express Scripts launched its Advanced Opioid Management program on September 1, 2017.

488.   Denied.

489.   The Express Scripts Entities object to paragraph 489 because the document in footnote 227 is misquoted. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 489 and refer to the source of the quoted language for its contents.

490–491.     Denied.

492.    Express Scripts admits that by 2020 more than 17.4 million members enrolled in Express Scripts' Advanced Opioid Management program.

493–496.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 493–496.

497.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the second sentence of paragraph 497, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

498.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

**F.     Even After Implementing its Opioid Risk Management Program, Optum Continued Promoting Uncontrolled Opioid Sales Through Its Cash Card and Discount Card Businesses.**

499–504.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 499–504.

**VI.    AS MAIL ORDER PHARMACIES, EXPRESS SCRIPTS AND OPTUM DISPENSED OPIOIDS IN VIOLATION OF THE CONTROLLED SUBSTANCES ACT**

**A.     The Applicable Statutes.**

505–506.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 505–506. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 505–506.

507.    Paragraph 507 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 507 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

1.    **The Controlled Substances Act.**

508–516.    Paragraphs 508–516 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 508–516 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

517.    With respect to the first sentence of paragraph 517, ESI Mail Pharmacy admits that its mail order pharmacy is registered with the DEA. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in this sentence concerning other Defendants. The second sentence of paragraph 517 asserts legal conclusions that do not require a response. To the extent a response is required, the second sentence of paragraph 517 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

518.    The first sentence is denied, except that Express Scripts Pharmacy, Inc., and ESI Mail Pharmacy Service, Inc., are registered with the DEA. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 518.

519–525.    Paragraphs 519–525 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 519–525 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

526–531.    Paragraphs 526–531 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 526–531 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

2. **Pharmacies Are Obligated Not to Fill Prescriptions Until All Red Flags Are Resolved.**

532–535.    Paragraphs 532–535 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 532–535 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

3. **The CSA Applies to All Persons Who Dispense Controlled Substances.**

536–539.    Paragraphs 536–539 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 536–539 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

540.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

B. **Defendants Violated the Controlled Substances Act.**

541.    Paragraph 541 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 541 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

542.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 542. To the extent a response is required, the allegations in paragraph 542 are denied.

543–546.    Paragraphs 543–546 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 543–546 are denied, except that the Express

Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

547–548.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

549.    The first sentence of paragraph 549 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in the remainder of paragraph 549. To the extent a response is required, the allegations in the remainder of paragraph 549 are denied.

550–555.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

556–561.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 556–561.

562.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

563.    Denied, except that the Express Scripts Entities refer to the document cited in footnote 287 for its contents.

564.    Denied, except that ESI Mail Pharmacy developed a Controlled Substances Security Compliance Plan in or around 2012.

565. Denied, except that Express Scripts Specialty Distribution Service contracted with certain pharmaceutical drug manufacturers to administer all or part of their Patient Assistance Programs.

566–568. Denied.

569. Denied, except that the quoted language appears in the document cited in footnote 288.

570. Denied, except that Medco entered a settlement agreement with the United States concerning Medco's mail order pharmacies in 2006.

571. The first sentence of paragraph 571 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in the remainder of paragraph 571. To the extent a response is required, the allegations in the remainder of paragraph 571 are denied.

572. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 572. To the extent a response is required, the allegations in paragraph 572 are denied.

573–574. The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 573–574.

575–576. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 575–576.

577–578. Paragraphs 577–578 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 577–578 are denied, except that the Express

Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

579–581.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

## VII.    EXPRESS SCRIPTS AND OPTUM CONTRIBUTED TO THE PUBLIC HEALTH CRISIS IN PLAINTIFF'S COMMUNITY

582.    Paragraph 582 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 582 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

583.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 583, except that the Express Scripts Entities admit that prescription opioids can be addictive for some individuals.

584–585.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 584–585. To the extent a response is required, the allegations in paragraphs 584–585 are denied.

586–588.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

589.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 589. To the extent a response is required, the allegations in paragraph 589 are denied.

## VIII.   FACTS PERTAINING TO THE FORMULARY & UM ENTERPRISE

590–593.      Paragraphs 590–593 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 590–593 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

594.     Denied, except that the Express Scripts Entities admit that prescription opioids can be addictive for some individuals, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

595.     Paragraph 595 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 595 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

596.     Denied, except that the Express Scripts Entities admit that they are committed to the health and safety of their customers, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

597.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

598.     Paragraph 598 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 598 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

599–604.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

**A.     Formation of the Formulary & UM Enterprise.**

605.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

606.     Paragraph 606 asserts a legal conclusion that does not require a response. To the extent a response is required, paragraph 606 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

607.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

608.     Denied, except that the Express Scripts Entities admit that Express Scripts negotiates with certain pharmaceutical drug manufacturers for rebates and administrative fees that its clients can use to lower their costs, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

609.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

610.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other PBMs and other Defendants.

611–612.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

613–614.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 613–614. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 613–614.

615.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

616.    Denied, except that the Express Scripts is a member of the Pharmaceutical Care Management Association (**PCMA**) and Express Scripts President Adam Kautzner, Pharm.D., is a PCMA board member, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

617.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 617.

618.    The first sentence of paragraph 618 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants. With respect to the second and third sentences of paragraph 618, the Express Scripts Entities admit that former Express Scripts President Amy Bricker was formerly the Chair of the PCMA Board of Directors. With respect to the fourth sentence of paragraph 618, the Express Scripts Entities admit that the PCMA appointed Mr. Kautzner as Chair of the PCMA Board of Directors on February 3, 2023.

619.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 619.

620.    Denied, except that the Express Scripts Entities admit that representatives of Express Scripts attend some PCMA conferences, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

621–622.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 621–622.

623.    Denied, except that the Express Scripts Entities admit that representatives of Express Scripts attended some PCMA conferences and met with other representatives in the healthcare industry, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

624.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 624.

625–626.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

627.    The first, second, and third sentences of paragraph 627 are denied, except that the Express Scripts Entities admit that representatives of Express Scripts attended some PCMA events and met with other representatives in the healthcare industry, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other PBMs and other Defendants. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in the remainder of paragraph 627.

628–629.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 628–629.

630–631.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraphs 630–631.

632.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

633.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 633.

634.     The first and second sentences of paragraph 634 are denied, except that the Express Scripts Entities admit that representatives of Express Scripts attended some PCMA events and met with other representatives in the healthcare industry, and that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants. The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in the third sentence of paragraph 634.

635.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

**B.     The Common Purpose and Fraudulent Scheme of the Formulary &
UM Enterprise.**

636–637.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

638–644.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 638–644, except that certain opioid manufacturers, including Purdue, expanded the opioid market through misrepresentations and fraud.

645.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in the first and second sentences of paragraph 645, except that certain opioid manufacturers, including Purdue, expanded the opioid market through misrepresentations and fraud. The third and fourth sentences of paragraph 645 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

646–648.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 646–648, except that certain opioid manufacturers, including Purdue, expanded the opioid market through misrepresentations and fraud.

649–650.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

651.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other PBMs and other Defendants.

652.     The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 652. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 652.

653–654.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

655.     The Express Scripts Entities object to paragraph 655 because the document in footnote 320 is misquoted. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 655 and refer to the source of the quoted language for its contents. Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

656.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 656.

657.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 657.

658.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 658.

659.     Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

660.     The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 660.

661.    The Express Scripts Entities lack knowledge or information sufficient to form a belief as to the truth of this specific allegation. To the extent a response is required, the Express Scripts Entities deny the allegations in paragraph 661.

662.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

663–664.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 663–664.

665.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

666–668.    The Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraphs 666–668.

669.    Denied.

670.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

671.    Paragraph 671 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 671 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

672.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

**C.    Conduct and Participation of the Formulary & UM Enterprise Through a Pattern of Racketeering Activity.**

673–674.    Paragraphs 673–674 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 673–674 are denied, except that the Express

Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

675–679.      Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

680.    Paragraph 680 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 680 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

681–682.      Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

683–684.      Paragraphs 683–684 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 683–684 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

685–686.      Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

687–689.      Paragraphs 688–689 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 687–689 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

## IX.    PLAINTIFF'S CLAIMS ARE TIMELY

690.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

691–692.    Paragraphs 691–692 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 691–692 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

693.    Paragraph 693 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 693 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

694–700.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

701.    Paragraph 701 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 701 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

702.    Paragraph 702 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 702 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

703–704.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

## X.    DEFENDANTS ENTERED INTO AND ENGAGED IN A CIVIL CONSPIRACY

705–706.    Paragraphs 705–706 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 705–706 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

707.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

708.    Paragraph 708 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 708 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

709.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

710.    Paragraph 710 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 710 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

711.    Denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

712.    Paragraph 712 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 712 is denied, except that the Express Scripts Entities lack

knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

713.    Paragraph 713 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 713 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

714.    Paragraph 714 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 714 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

## XI.    SUCCESSOR LIABILITY

715.    Paragraph 715 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 715 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

## XII.    ALTER EGO LIABILITY

716.    Paragraph 716 asserts legal conclusions that do not require a response. To the extent a response is required, paragraph 716 is denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

## XIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF—CREATION OF A PUBLIC NUISANCE
### (Brought by Plaintiff against All Defendants)

717–781.        Paragraphs 717–781 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 717–781 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

### SECOND CLAIM FOR RELIEF—VIOLATION OF FEDERAL CIVIL RICO, 18
### U.S.C. 1961, *ET SEQ.*; 1964(c)
### (Brought by Plaintiff against All Defendants)

782–815.        Paragraphs 782–815 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 782–815 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

### THIRD CLAIM FOR RELIEF—NEGLIGENCE AND GROSS NEGLIGENCE
### (Brought by Plaintiff against All Defendants)

816–838.        Paragraphs 816–838 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 816–838 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

### FOURTH CLAIM FOR RELIEF—DECEPTIVE ACTS AND PRACTICES:
### NEW YORK GENERAL BUSINESS LAW §349
### (Brought by Plaintiff against All Defendants)

839–850.        Paragraphs 839–850 assert legal conclusions that do not require a response. To the extent a response is required, paragraphs 839–850 are denied, except that the Express Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the allegations concerning other Defendants.

## FIFTH CLAIM FOR RELIEF—FALSE ADVERTISING:
## NEW YORK GENERAL BUSINESS LAW §350
## (Brought by Plaintiff against All Defendants)

851–861.        Paragraphs 851–861 assert legal conclusions that do not require a response.

To the extent a response is required, paragraphs 851–861 are denied, except that the Express

Scripts Entities lack knowledge or information sufficient to form a belief about the truth of the

allegations concerning other Defendants.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden of proof that it would not otherwise bear, the Express Scripts

Entities assert the following affirmative and other defenses to the allegations and claims in

Plaintiff's Complaints. The Express Scripts Entities deny wrongdoing or liability of any kind; no

defense constitutes an admission that the Express Scripts Entities are liable to the City, that the

City has been or will be injured or damaged, or that the City is entitled to relief from the Express

Scripts Entities.

## FIRST DEFENSE

1.        The City's claims are barred or limited by the applicable statutes of limitations:

a.        The City's negligence, N.Y. Gen. Bus. Law §§ 349–50, and public nuisance

claims are subject to a three-year limitations period. NY CPLR §§ 214,

214-c. However, the alleged wrongful acts underpinning these claims

occurred more than three years before the City filed suit on June 7, 2019.

*See generally* NY CPLR § 214. To the extent the City claims the value of

certain properties within the City decreased because of the alleged opioid

crisis, the City discovered, or with the exercise of reasonable diligence

should have discovered, any alleged injury underpinning this claim more

than three years before the filing of this suit on June 7, 2019. *See* NY CPLR § 214-c; SAC ¶¶ 326, 459, 463, 655, 656, 689, 763.

b.  Additionally, the City's RICO claim is subject to a four-year limitations period. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 152 (1987). However, the City knew, or with the exercise of reasonable diligence should have known, facts sufficient to trigger this claim more than four years before the City filed suit on June 7, 2019.

e.  The City's own allegations confirm that all of its claims are time-barred. *See, e.g.*, SAC ¶¶ 17, 18, 29, 30, 32, 33, 38, 41, 50, 62, 263, 274, 275, 282, 284, 285, 288, 289, 299, 301, 308, 328, 340, 350, 351, 354, 356–360, 383, 398, 403, 417, 443, 577, 610.

## SECOND DEFENSE

2.  The City's claims are barred or limited by the equitable doctrine of laches. Based on the City's own allegations and ongoing discovery responses, its alleged injuries began in the late 1990s. *See, e.g.*, SAC ¶¶ 32, 33, 57, 252, 253, 289, 328, 391, 583. Yet, the City waited decades to sue the Express Scripts Entities. The City's unreasonable delay in filing suit has prejudiced the Express Scripts Entities and therefore the suit is barred by laches.

## THIRD DEFENSE

3.  The City's claims are barred or limited by the equitable doctrines of estoppel, unclean hands, and *in pari delicto*.

a.  The City's delay and failure to engage in protective measures bar its claims under the equitable doctrines of estoppel, unclean hands, and *in pari delicto*. The City claims its injuries began in the late 1990s, *see, e.g.*, SAC ¶¶ 32, 33, 57, 252, 253, 289, 328, 391, 583, but failed to take adequate reasonable

measures to address opioid abuse, rejected proposed programs aimed at reducing opioid utilization, and failed to effectively enforce the law and prosecute violations thereof.

b. Those equitable doctrines also bar the City from arguing that the placement of prescription opioids on a formulary somehow contributed to its injuries. Health-plan sponsors—including the City—chose and/or controlled formularies that included prescription opioids.

**FOURTH DEFENSE**

4. The City's claims are barred or limited because the City lacks standing. The City lacks a concrete, particularized injury. The City's alleged injuries are not fairly traceable to the Express Scripts Entities. And the City's alleged injuries are not judicially redressable.

**FIFTH DEFENSE**

5. The City's claims are barred or limited because they intrude on and overlap with claims that the State of New York pressed in a separate litigation. In August 2018, the State of New York brought a *parens patriae* action asserting substantially similar claims on behalf of both the State and its citizens and political subdivisions. *See State of New York, ex rel. Letitia James v. Purdue Pharma, L.P., et al.*, Index No. 400016/2018 (Sup. Ct. Suffolk Cnty).

**SIXTH DEFENSE**

6. The City's claims are barred or limited by the political-question and separation-of-powers doctrines. The City's claims are non-justiciable because they would require the Court to make non-legal policy-based determinations about prescription opioids that are the province of the legislative and executive branches. Furthermore, there is no reliable judicial method for adjudicating the relief the City seeks, including for abatement of the alleged nuisance.

## SEVENTH DEFENSE

7.     The City's claims are barred or limited by the First Amendment to the United States Constitution and Article I, Section 8 of the New York State Constitution. The City's claims implicate the First Amendment and the New York State Constitution because the City attempts to impose liability based on the Express Scripts Entities' speech regarding prescription medications, including prescription opioids. *See, e.g.*, SAC ¶¶ 321, 325–339, 344–349, 352–353, 595, 602, 609–650, 675–685, 721–722, 731–732, 736, 755, 779. Further, the City impermissibly seeks to impose a prior restraint on the Express Scripts Entities future speech through injunctive relief. *See, e.g.*, SAC ¶¶ 771, 815.

## EIGHTH DEFENSE

8.     The City's claims are barred or limited because they are preempted by the Medicare Act, 42 U.S.C. §§ 1395 *et seq.* and the Medicaid Act, 42 U.S.C. §§ 1396 *et seq.*:

   a.     Under the Medicare Act, "the standards established under this part shall supersede any State law or regulation . . . with respect to [Part D prescription drug] plans which are offered by [Part D sponsors] under this part." 42 U.S.C. § 1395w–26(b)(3); *see also* 42 C.F.R. § 422.402 (2005) (same). When implementing the Medicare Act, the Centers for Medicare & Medicaid Services (**CMS**) established standards governing Part D formularies. *See, e.g.*, 42 C.F.R. § 423.120(b)(2)(ii)–(iv). Those federal standards preempt the City's claims that relate to Medicare plans, Medicare Part D formularies, or other aspects of Medicare.

   b.     Under the Medicaid Act, state laws and regulations are preempted to the extent there is a conflict between state and federal law. Federal law provides the basis for regulations, guidance, and policy related to pharmacy benefits

and manufacturer requirements under Medicaid. *See, e.g.*, Medicaid Drug Policy—Laws, Regulations, and Federal Register Notices, https://www.medicaid.gov/medicaid/prescription-drugs/medicaid-drug-policy-laws-regulations-and-federal-register-notices/index.html.

c. The City's claims implicate Medicare Part D and Medicaid plans, Medicare Part D and Medicaid formularies, Medicare Part D standards, and Medicaid drug policy. *See, e.g.*, SAC ¶¶ 351, 424, 425, 427, 446–457. The City's claims are preempted because they attempt to impose liability in conflict with Medicare Part D standards and Medicaid policy, including by seeking to impose liability based on the placement of prescription drugs on Medicare Part D formularies approved by CMS and on Medicaid formularies.

**NINTH DEFENSE**

9.     The City's claims are barred or limited because they are preempted by the Employee Retirement Income Security Act (**ERISA**). 29 U.S.C. § 1144.

a. ERISA preempts "any and all State laws" that "relate to [an] employee benefit plan." 29 U.S.C. § 1144(a); 29 U.S.C. § 1002(1). The U.S. Supreme Court has identified "two categories of state laws that ERISA pre-empts." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016).

b. ERISA preempts the City's claims because they relate to employer-sponsored health plans and because they seek to force ERISA plans to adopt different prescription drug benefits for prescription opioids and other medications. *See, e.g.*, SAC ¶¶ 8, 193, 201, 273, 282–84, 330, 337, 412, 570, 613, 726.

**TENTH DEFENSE**

10.     The City's claims are barred or limited because they are preempted by the Patient
Protection and Affordable Care Act (**ACA**). *See, e.g.*, 42 U.S.C. § 18000 *et seq.*, 42 U.S.C.
§ 300gg.

a.     The ACA requires that all insurance plans offered to individuals and small
groups must include an "essential health benefits package." *Schmitt v.
Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 949 (9th Cir.
2020), quoting 42 U.S.C. § 300gg-6(a); *see also* 45 C.F.R. § 147.150(a).

b.     The U.S. Department of Health and Human Services has issued a series of
regulations specifying the requirements for "essential health benefits." *See*
45 C.F.R. § 156.100 *et seq.* These regulations require each state to select a
benchmark plan that covers a minimum set of essential health benefits
(**EHB benchmark plan**). *See id.* §§ 156.100, 156.110, 156.115, 156.122.
Those regulations state that a "health plan does not provide essential health
benefits unless it . . . covers at least the greater of: (i) one drug in every
United State Pharmacopeia (USP) category and class; or (ii) the same
number of prescription drugs in each category and class as the EHB-
benchmark plan[.]" *Id.* § 156.122(a).

c.     New York's EHB benchmark plan contains multiple long-acting and short-
acting opioid medications. As a result, every individual or small group plan
administered by Express Scripts in New York is required to cover at least as
many prescription opioids in each category and class as New York's EHB
benchmark plan.

75

d. The City seeks to impose liability on Express Scripts based on the placement of prescription opioids on formularies. *See, e.g.*, SAC ¶¶ 10, 11, 274, 276, 279, 281, 288, 289, 307, 636, 676–679, 722, 731, 771, 815, 843. The ACA preempts the City's claims because the City seeks to impose liability based on actions required by the ACA and its implementing regulations.

### ELEVENTH DEFENSE

11. The City's claims are barred or limited because they are preempted by TRICARE.

a. The TRICARE program, administered by the Department of Defense (**DoD**), provides medical and dental care for military members and their families. 10 U.S.C. § 1071. The DoD is required by law to enter into contracts to provide healthcare services to TRICARE members. *See* 10 U.S.C. § 1073a. The DoD is also statutorily required to establish an "effective, efficient, integrated pharmacy benefits program" for TRICARE. 10 U.S.C. § 1074g. DoD established "a uniform formulary" that encompasses "the complete range of therapeutic classes." 10 U.S.C. § 1074g(a)(1)–(2).

b. To satisfy these statutory mandates, DOD contracted with Express Scripts to provide pharmacy benefits and to administer the TRICARE Home Delivery/Mail Order Pharmacy (**TMOP**) for members of TRICARE across the country, including in New York. The TRICARE statute expressly preempts any state law claims that relate to TRICARE contracts. 10 U.S.C. § 1103(a); 32 C.F.R. § 199.21(o)(2).

c.      The contract between the Express Scripts Entities and the DoD, as well as the relevant related statutes and regulations, establish specific standards for the administration of TRICARE pharmacy benefit management and mail order pharmacy services. The Express Scripts Entities adhere to those standards in performing services under the contract. State law claims, such as those here, that attempt to dictate or alter the terms of this arrangement would interfere with nationally uniform TRICARE plan administration and therefore are expressly preempted.

### TWELFTH DEFENSE

12.     The City's claims are barred or limited because they are preempted by the Federal Employee Health Benefits Act (**FEHBA**). 5 U.S.C. § 8901, *et seq.*

a.      FEHBA "authorize[s] the Office of Personnel Management (**OPM**) to contract with private carriers for federal employees' health insurance." *Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. 87, 90 (2017). FEHBA's express preemption clause provides that the terms of a contract entered into under FEHBA "relate[d] to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans." 5 U.S.C. § 8902(m)(1).

b.      OPM's contracts with insurance carriers for health benefit plans authorized by FEHBA establish specific standards for PBM arrangements. State law claims, such as those here, that attempt to dictate the terms of such arrangements would interfere with nationally uniform FEHBA plan

administration and are expressly preempted. *See, e.g.*, SAC ¶¶ 8 , 201, 330, 337, 412, 571, 613, 726. As one such provider, the Express Scripts Entities are subject to OPM's requirements, oversight, and control in administering and supporting FEHBA plans, including specific regulations OPM established to govern PBM providers, *see* 48 C.F.R. §§ 1602.170-16(a), 1604.7201(a), 1652.204-74(a), 1652.204-70, and 1652.246-70, and specific guidelines OPM issued to govern pharmacy benefits, including guidelines on formulary management, utilization management, and prescription opioids, among other topics. *See, e.g.*, FEHB Program Carrier Letter 2019-10, https://www.opm.gov/healthcare-insurance/healthcare/carriers/2019/2019-10.pdf. The formularies used by a PBM are also subject to OPM reporting requirements. *See* Federal Employees Health Benefits Program Standard Contract for Experience-Rated Health Maintenance Organization Carriers (2019) ("Standard Contract") at 1-17, § 1.28(a)(5), https://www.opm.gov/healthcare-insurance/healthcare/carriers/experience-rated.doc; archived April 2, 2022, at the Wayback Machine, https://web.archive.org/web/20220402190458/http://www.opm.gov/health care-insurance/healthcare/carriers/experience-rated.doc.

### THIRTEENTH DEFENSE

13.     The City's claims are barred or limited because they are preempted by the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 355(b)(1), (d), (j)(2)(A)(v), (j)(4)(G), and its implementing regulations, 21 C.F.R. §§ 314.94(a)(8), 314.127(a)(7). The Express Scripts Entities have no authority to alter the labels of prescription opioids, which are designed by the manufacturers and

approved by the FDA. In addition, the Express Scripts Entities were entitled to reasonably rely on the FDA's determinations, including, among others, (a) that there was "no physiological or pharmacological basis upon which to differentiate the treatment of chronic pain in a cancer setting or patient from the treatment of chronic pain in the absence of cancer"; and (b) "to specify or recommend a maximum daily dose or duration for any opioid." *See* FDA Response to Petition by Physicians for Responsible Opioid Prescribing (**PROP**), Sept. 10, 2013, http://www.supportprop.org/wp-content/uploads/2014/12/FDA_CDER_Response_to_Physicians_for_Responsible_Opioid_Prescribing_Partial_Petition_Approval_and_Denial.pdf.

## FOURTEENTH DEFENSE

14.    The City's claims are barred or limited by the learned-intermediary doctrine. The Express Scripts Entities do not examine patients, diagnose patients, nor write opioid prescriptions. Here, various physicians' decisions to prescribe opioids based on clinical assessments of medical appropriateness and necessity sever any link between the Express Scripts Entities' alleged conduct and the City's alleged injuries. Further, the prescribers themselves had independent knowledge of the benefits and risks of prescription opioids, and any alleged act or omission by the Express Scripts Entities are not the but-for or proximate cause of any patient's alleged injury. *See, e.g.*, SAC ¶ 417. Nowhere does the City allege that any physician chose to prescribe opioids that the physician believed were not medically appropriate because the medications appeared on a particular formulary (or were less expensive than alternative medications).

## FIFTEENTH DEFENSE

15.    The City's claims are barred or limited by the sophisticated user doctrine. Because of their training and expertise, prescribers who prescribed opioid medications knew or should have known of the potential risks. Moreover, the City had personnel trained in benefit management and

79

also hired brokers and third-party administrators to help manage the City's health plans. Under the sophisticated user doctrine, the Express Scripts Entities had no duty to warn the City of the risks and complications of which members of the medical community and/or other trained professionals knew or should have known.

## SIXTEENTH DEFENSE

16.    The City's claims are barred or limited by Dillon's Rule. Under Dillon's Rule, without legislative authorization, local governments cannot recover in tort costs for providing emergency and public services. The City seeks to recover its alleged increased costs for medical care, law enforcement, and other public services in response to a long-standing social condition. The City also asserts that those alleged costs were or will be incurred as part of the abatement of a claimed public nuisance. For example, the City seeks injuries for "the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarcerations, treating opioid-dependent newborns in neonatal intensive care units, burying the dead, and placing thousands of children in foster care placement, among others." *See* SAC ¶ 81; *see also id.* ¶¶ 766, 771, 811. The New York General Assembly has not authorized the City to sue to recover those costs, so Dillon's Rule bars the City's claims.

## SEVENTEENTH DEFENSE

17.    The City's claims are barred or limited by the municipal-cost-recovery rule (otherwise known as the free-public-services doctrine). Under the municipal-cost-recovery rule, a political subdivision cannot recover its costs for responding to an alleged tortfeasor's conduct— including for police and emergency response services. The City seeks to recover costs associated with municipal services that the City is duty-bound to provide, including "increased costs of police, emergency, health, prosecution, corrections, rehabilitation, and other services." *See* SAC ¶ 766;

*see also id.* ¶¶ 81, 771, 811. The New York General Assembly has not authorized the City to recover for municipal costs through a tort action.

## EIGHTEENTH DEFENSE

18.     The City's claims are barred or limited by the economic-loss doctrine. The economic-loss doctrine "prohibits recovery in tort for purely economic losses" and is intended to "maintain the fundamental distinction between tort law and contract law." 1 Minzer, et. al., INJURIES IN TORT ACTIONS § 1.02 (Matthew Bender 1986). The economic-loss doctrine bars the City's claims because the City seeks economic injuries for emergency, social, medical, and police services. *See, e.g.*, SAC ¶¶ 81, 766, 771, 811.

## NINETEENTH DEFENSE

19.     The City's claims are barred or limited by the voluntary-payment doctrine. The City seeks to recover injuries for voluntary payments made without contractual or other legal obligation.

## TWENTIETH DEFENSE

20.     The City's claims are barred or limited by the Due Process Clauses of the U.S. and New York Constitutions. Imposing liability for a local government's police expenditures under the guise of "abatement" injuries, *see, e.g.*, SAC ¶¶ 81, 766, 771, 811, violates due process because there was no prior legal notice that these costs could be recovered in a tort action, nor was there prior notice or opportunity for the Express Scripts Entities to abate the alleged nuisance.

## TWENTY-FIRST DEFENSE

21.     The City's claims are barred or limited inasmuch as they violate the Ex Post Facto clauses of the U.S. and New York Constitutions.

### TWENTY-SECOND DEFENSE

22.     The City's claims are barred or limited by the derivative-injury rule and the remoteness doctrine. The City cannot recover payments that it allegedly made on behalf of its residents to reimburse any expenses for health care, pharmaceutical care, and/or other public services. *See, e.g.*, SAC ¶¶ 81, 766, 771, 811. Moreover, the City does not have a cognizable property or commercial interest either in the public monies that it expends for legally required public services or in the public services themselves.

### TWENTY-THIRD DEFENSE

23.     The City's claims are barred or limited due to the City's failure to exercise reasonable care and diligence to avoid loss and mitigate injuries. Among other things, the City failed to timely implement programs targeted at reducing opioid utilization, failed to notify the Express Scripts Entities that their practices were allegedly contributing to a public nuisance, and delayed for years in bringing a lawsuit.

### TWENTY-FOURTH DEFENSE

24.     The City's claims are barred or limited by the doctrines of contributory or comparative negligence and comparative fault. NY CPLR § 1411. The City, by its own negligence or conduct, contributed directly and proximately to any alleged injuries or public nuisance, including but not limited to through the following ways:

> a.     Despite alleged concerns over opioid abuse and misuse, the City failed to implement programs targeted at reducing opioid abuse or misuse, including for its own employees under the health care plan the City sponsored.

> b.     Despite the fact that various states and counties had already acted, the City failed to notify the Express Scripts Entities or any other PBMs or

pharmacies that any of their practices were allegedly contributing to an alleged injury to the City and delayed for years in bringing a lawsuit.

c.      Despite knowledge of Purdue's guilty plea in 2007 for criminal conspiracy and improper marketing of OxyContin, the City failed to act to curb the oversupply of prescription opioids in the City.

d.      Despite knowledge of the utilization rate of prescription opioids within the City's own sponsored health plan, the City failed to act to limit the use of prescription opioids.

e.      Despite the availability of public information about the addictive nature of prescription opioids, including Express Scripts' 2014 "A Nation in Pain" publication, the City failed to act to limit the supply, distribution, prescribing, or dispensing of prescription opioids.

f.      These are illustrative examples only. Discovery or other facts may demonstrate other bases for the City's culpability.

## TWENTY-FIFTH DEFENSE

25.     Any verdict or judgment that the City might recover must be reduced under NY CPLR § 1402 by amounts that the City has or will receive as indemnification for any past or future claims for economic loss.

## TWENTY-SIXTH DEFENSE

26.     Any monetary relief claimed by the City must be reduced by the amount of funding received, or to be received, for healthcare and other services from the federal government or other non-City sources.

### TWENTY-SEVENTH DEFENSE

27.     Any monetary relief claimed by the City must be reduced to the extent that the City is seeking relief for alleged injuries or expenses related to the same user(s) of the subject drugs, or injuries recovered or recoverable by other actual or potential plaintiffs.

### TWENTY-EIGHTH DEFENSE

28.     The City's claims are barred or limited by NY CPLR § 1411 because responsibility for 50% or more of the City's alleged injuries lies with the City itself and/or with third parties over whom the Express Scripts Entities have no control.

### TWENTY-NINTH DEFENSE

29.     The City's claims for punitive or exemplary injuries or other civil penalties are barred or limited by applicable laws. Alternatively, the City's claims for those injuries are unconstitutional insofar as they violate the due process protections afforded by the U.S. Constitution, the excessive fines cause of the Eighth Amendment of the U.S. Constitution; the Full Faith and Credit Clause of the U.S. Constitution; and Article I, Section 6 of the New York Constitution.

### THIRTIETH DEFENSE

30.     The City's claims are barred or limited because its claims do not arise from the same transaction or occurrences as its claims against other defendants, as required for joinder of parties. In the alternative, the City's claims are barred or limited because the City failed to join all necessary and indispensable parties, including drug manufacturers, health care providers, prescribers, patients, and other third parties who the City alleges engaged in the unauthorized or illicit prescription, dispensing, diversion, marketing, or use of prescription opioid products. *See* NY CPLR § 1001. For example, the Complaints include allegations about unnamed physicians, pill mill operators, and drug dealers, but those physicians, entities, and individuals are not named

as defendants. *See, e.g.*, SAC ¶¶ 420, 476, 582 (discussing overutilization), ¶ 749 (discussing the "black market" and availability of heroin and synthetic opioids); ¶ 811(i) (discussing street-level drug dealers).

### THIRTY-FIRST DEFENSE

31.     The City's claims are barred or limited by the doctrines of waiver and ratification. Inasmuch as the City alleges that including prescription opioids on formularies contributed to its injuries, the City included prescription opioids on its own formularies.

### THIRTY-SECOND DEFENSE

32.     The City's claims fail to state a claim upon which relief can be granted.

### THIRTY-THIRD DEFENSE

33.     The City's claims are barred or limited inasmuch as the prescription medications in question were misused, modified, altered, or changed from the condition in which they were sold.

### THIRTY-FOURTH DEFENSE

34.     The City's claims for equitable relief are barred or limited because it has adequate remedies at law.

### THIRTY-FIFTH DEFENSE

35.     The City's claims are barred or limited to the extent that the Express Scripts Entities are entitled to a credit or setoff for any and all sums the City has received in the way of any and all settlements or from any other entity to abate the alleged nuisance, including if the City settled with one or more tortfeasors, then the Express Scripts Entities are entitled to a monetary offset against the amount of any verdict or judgment that the City may recover against them pursuant to New York Gen. Oblig. L. § 15-108; specifically, the verdict or judgment must be reduced by the highest of the amount stipulated in the release, the consideration paid for the release, or the settling tortfeasor's equitable share of the injuries as found by the jury or trier of fact.

## THIRTY-SIXTH DEFENSE

36.     The City's claims are barred or limited because New York law requires apportionment of liability on Plaintiff's claims based on fault. The Express Scripts Entities are entitled to apportion fault to the following entities, including but not limited to:

a.  CVS Health, which operates CVS Caremark (**Caremark**), a major PBM that manages prescription drug benefits for numerous health plans and persons in the City. To the extent the Express Scripts Entities can be held liable on plaintiffs' theories, they apply with equal force to Caremark. *See* OC ¶¶ 252–260.

b.  Opioid manufacturers who improperly marketed and sold prescription opioids must also bear an equitable share of fault.

c.  Endo International PLC (**Endo**) is a generics and specialty branded pharmaceutical manufacturer. Endo and several of its affiliates, including Endo Health Solutions Inc. (**EHSI**), filed for bankruptcy in 2022. In February 2024, EHSI agreed to resolve criminal and civil investigations related to the company's sales and marketing of the opioid drug Opana ER with INTAC (**Opana ER**). Under the criminal resolution, EHSI agreed to plead guilty to violating the Federal Food, Drug and Cosmetic Act by introducing misbranded drugs into interstate commerce, pay a criminal fine of $1.086 billion, and pay an additional $450 million in criminal forfeiture. Under the civil resolution, EHSI agreed to pay $475.6 million to resolve its liability under the False Claims Act. Over 1.9 million opioid units manufactured by Endo were sold into the City during 2006–2019. *See* OC ¶¶ 74, 81–83, 167, 526, 533, 543, 800–890; *see also* SAC ¶¶ 57, 90, 345.

d.  Insys Therapeutics (**Insys**) was a predominantly generics-focused pharmaceutical manufacturer that also made Subsys, a sublingual liquid form of fentanyl. Insys

filed for bankruptcy in 2019. The following year, Insys's founder and former Chairman of the Board, John Kapoor, was sentenced to 66 months in prison for orchestrating a scheme to bribe practitioners to prescribe Subsys. According to the City, Insys played a substantial role in the City's alleged opioid crisis. *See* OC ¶¶ 1013–1035; *see also* SAC ¶ 57.

e.  Mallinckrodt Pharmaceuticals (**Mallinckrodt**) is a generics and specialty branded pharmaceutical manufacturer. Mallinckrodt filed for bankruptcy in 2020 and agreed to pay $1.7 billion to settle approximately 3,000 lawsuits alleging it used deceptive marketing tactics to boost opioid sales. Over 6.9 million opioid units manufactured by Mallinckrodt and its subsidiaries were sold into the City during 2006–2019. *See* OC ¶¶ 168–170; *see also* SAC ¶ 57.

f.  Purdue Pharma (**Purdue**), a pharmaceutical manufacturer, introduced OxyContin in the mid-1990s and began a campaign to fraudulently portray it as safe and effective for a variety of conditions, including chronic pain calling for long-term use. Purdue's false marketing led to the FDA issuing a series of warning letters about OxyContin to Purdue in the early-2000s. Ultimately, Purdue pled guilty to misbranding OxyContin in 2007, agreed to pay a $635 million fine, and entered into a Corporate Integrity Agreement. Over 1.5 million opioid units manufactured by Purdue were sold into the City during 2006–2019. *See* OC ¶¶ 533, 689–695, 941–1012; *see also* SAC ¶¶ 17, 57, 90, 252–253.

g.  Hikma Pharmaceuticals (**Hikma**) is a generics pharmaceutical manufacturer. In February 2024, Hikma agreed to pay up to $115 million in cash and $35 million in donations of Hikma's naloxone, an opioid antagonist used to reverse the effects of

opioid overdose, to resolve the majority of opioid related cases brought against the company by U.S. states, their subdivisions, and tribal nations. Over 790,000 opioid units manufactured by Hikma were sold into the City during 2006–2019. *See* OC ¶ 173.

h. Allergan/Watson/Actavis (**Allergan**) is a branded pharmaceuticals manufacturer that formerly made generics as well. Allergan agreed to pay $2.37 billion to resolve more than 2,500 opioid-related lawsuits brought by states, local governments, and tribes alleging that Allergan deceptively marketed prescription opioids by downplaying the risk of addiction, overstating their benefits, and encouraging doctors to treat patients showing signs of addiction by prescribing them more opioids, as well as failing to maintain effective controls to prevent diversion of prescription opioids. Over 3 million opioid units manufactured by Allergan were sold into the City during 2006–2019. *See* OC ¶¶ 84–85, 533, 539, 541, 543, 699–726.

i. Janssen Pharmaceuticals, Inc. (**Janssen**), is a subsidiary of Johnson & Johnson and a manufacturer of generic and branded pharmaceuticals. Janssen and Johnson & Johnson have agreed to pay billions of dollars, including a $5 billion nationwide settlement, to settle certain lawsuits based on the companies' role in the opioid crisis. Over 400,000 opioid units manufactured by Janssen and Johnson & Johnson were sold into the City during 2006–2019. *See* OC ¶¶ 77–80, 533, 541, 543, 891–940; *see also* SAC ¶¶ 57, 90.

j. Teva Pharmaceuticals and its subsidiary, Cephalon, Inc. (together, **Teva**), is a pharmaceutical manufacturer focusing primarily on generic drugs. Teva settled

with all fifty states, agreeing to pay over $4.25 billion, for litigation stemming from its role in the opioid crisis. Over 230,000 opioid units manufactured by Teva were sold into the City during 2006–2019. *See* OC ¶¶ 69–76, 181, 203, 533, 571, 727–799; *see also* SAC ¶¶ 57, 90, 289 n.84.

k.  Amneal Pharmaceuticals, Inc. (**Amneal**), is a generics and specialty pharmaceutical manufacturer. Amneal agreed to pay $272.5 million to settle approximately 900 lawsuits brought by state, local and Native American jurisdictions claiming that the company fueled the opioid crisis by failing to act on suspicious opioid orders. Over 1.1 million opioid units manufactured by Amneal were sold into the City during 2006–2019. *See* OC ¶ 174.

l.  Assertio Therapeutics, Inc. (formerly and f/k/a Depomed, Inc.) (**Depomed**), is a branded pharmaceutical manufacturer. Doctors have settled claims brought by the Justice Department asserting that they prescribed Depomed's primary opioid, Nucynta, to Medicare beneficiaries in exchange, at least in part, for receiving paid speaking and consulting work from Depomed. According to the City, Depomed played a substantial role in the City's alleged opioid crisis. Over 45,000 opioid units manufactured by Depomed were sold into the City during 2006-2019. *See* OC ¶ 80 n.32.

m.  Mylan Pharmaceuticals (**Mylan**) was a generic and specialty pharmaceuticals manufacturer that merged with a Pfizer Inc. entity, the Upjohn Company, to form Viatris Inc. in 2020. Mylan has settled certain opioid lawsuits and has been the subject of subpoenas, including one from the Department of Justice, regarding the

manufacture, marketing, and sale of prescription opioids. Over 87,000 opioid units manufactured by Mylan were sold into the City during 2006–2019. *See* OC ¶ 171.

n. Sandoz, Inc. (**Sandoz**), is a generic pharmaceuticals manufacturer. In 2023, Sandoz agreed to pay almost $100 million to settle various lawsuits stemming from Sandoz's role in the opioid crisis. Over 18,000 opioid units manufactured by Sandoz were sold into the City during 2006–2019. *See* OC ¶ 172.

o. Distributors who sold prescription opioids to retailers also played a role. Distributors contributed to Plaintiff's alleged harm by failing to prevent diversion, detect pill mills, and prevent an alleged oversupply of prescription opioids in the City.

p. Rochester Drug Cooperative, Inc. (**RDC**), lacked a functional system to report suspicious orders and repeatedly shipped to known pill mills. Due to its criminal exposure, RDC shut down operations and its former CEO is serving a 27-month prison sentence for conspiring to unlawfully distribute controlled substances and defraud the DEA. RDC distributed over 6,000 opioid units into the City. *See* OC ¶¶ 144–148.

q. McKesson, Inc. (**McKesson**), partners with pharmacies, hospitals, and medical practices to distribute prescription drugs, including prescription opioids sold and shipped into the City without the appropriate controls. In 2022, McKesson agreed to pay $7.4 billion to settle claims related to prescription opioids. McKesson distributed over 8 million opioid units into the City. *See* OC ¶¶ 88–94, 138–143, 1117–1120, 1141.

r.   AmerisourceBergen Drug, Inc. (**AmerisourceBergen**), distributed prescription medication to health systems, community practices, independent pharmacies, and alternative care settings. In 2022, AmerisourceBergen agreed to pay $6.1 billion to settle claims related to prescription opioids. AmerisourceBergen distributed over 450,000 million opioid units into the City. *See* OC ¶¶ 100–116, 1123, 1141.

s.   Cardinal Health, Inc. (**Cardinal**), distributed prescription opioids to the City, thereby contributing to the alleged oversupply of prescription opioids. In 2022, Cardinal agreed to pay $6 billion to settle claims related to prescription opioids. Cardinal distributed over 3.2 million opioid units into the City. *See* OC ¶¶ 95–99, 132–137, 208–210, 241, 1121–1122, 1137, 1141.

t.   Retail pharmacies and hospitals who dispensed prescription opioids in-person to patients must also be considered. These pharmacies include, but are not limited to:

   i.   Kimro Inc., d/b/a Kimro's Medicine Place, a pharmacy operating in the City, which purchased over 3 million opioid units during 2006–2019.

   ii.   Kinney Drugs, Inc., a pharmacy operating in the City, which purchased over 8 million opioid units through its parent company KPH Healthcare Services, Inc., during 2006–2019.

   iii.   The Golum Corporation, d/b/a Price Chopper Pharmacy, a pharmacy operating in the City, which purchased over 256,000 opioid units during 2006–2019.

   iv.   Walmart Inc. (**Wal-Mart**), which operates a pharmacy in the City, dispensed a substantial amount of prescription opioids. In 2022,

Wal-Mart settled claims related to prescription opioids for $3.1 billion. Wal-Mart pharmacies purchased over 2.8 million opioid units in the City during 2006–2019. *See* OC ¶¶ 235, 386–443, 471–474.

v.   Walgreens Pharmacy (**Walgreens**), which previously operated at least 2 retail pharmacies in the City, dispensed a substantial amount of prescription opioids. In 2023, Walgreens settled claims related to prescription opioids for $5.7 billion. Walgreens pharmacies purchased over 1.2 million opioid units in the City during 2006–2019. *See* OC ¶¶ 231–234, 386–443, 459–467, 471–474, 1141.

vi.   Rite Aid Pharmacy (**Rite Aid**), which previously operated a pharmacy in the City, dispensed a substantial amount of prescription opioids. In 2022, Rite Aid paid approximately $30 million to resolve a lawsuit alleging that it contributed to an oversupply of prescription opioids. Rite Aid pharmacies purchased over 2 million opioid units in the City during 2006–2019. *See* OC ¶¶ 227–230, 280, 386–443, 468–474.

u. Drug cartels, drug dealers, and drug traffickers—as ongoing discovery will reveal—played and continue to play a substantial role in diverting, importing, and distributing legal and illegal opioids into the City. Each must bear its equitable share of fault. *See* OC ¶ 402; *see also* SAC ¶ 811.

v. Pill mills, rogue pain clinics, and the doctors and other health professionals who work there—as ongoing discovery will reveal—played and continue to play a

substantial role in the alleged inappropriate prescribing and misuse of prescription opioids in the City. Each must bear its equitable share of fault. *See* OC ¶¶ 440, 463, 472, 578.

w.  State and federal government agencies, such as the DEA, FDA, CDC, New York State Department of Health, New York State Education Department, among others, that failed to curb prescription opioid abuse—as ongoing discovery will reveal—played and continue to play a substantial role in the alleged oversupply, inappropriate prescribing, and misuse of prescription opioids in the City. Each must bear its equitable share of fault.

x.  The American Pain Society must also bear its equitable share of fault. The American Pain Society represented to the medical community, including prescribers, pharmacies, and PBMs, that addiction to prescription opioids was rare and low. The City alleges that American Pain Society and similar professional medical organizations were in fact Purdue-funded "front groups" that were paid to publish misinformation about prescription opioids. SAC ¶¶ 336, 338, 417, 641–644. Any such relationships were unknown to the broader medical community, including the FDA, CDC, and the Express Scripts Entities. In fact, as recently as 2016 and 2022, the CDC relied upon studies published by the American Pain Society in its practice guidelines for the use of opioids. To the extent any medical organizations or medical societies such as American Pain Society intentionally misled Express Scripts and the medical community regarding the risks and benefits of prescription opioids, those entities should bear an equitable share of fault. In initial discovery responses, the City itself has recognized the role that the American

Pain Society played in the crisis. *See also* OC ¶¶ 575, 596, 598, 599, 617, 636, 717, 791, 835, 840, 872, 944.

y.   The Express Scripts Entities explicitly reserve the right to amend this Defense to identify additional parties who should be apportioned their equitable share of fault based upon developments in discovery.

### THIRTY-SEVENTH DEFENSE

37.   The City's claims are barred or limited to the extent it seeks to recover multiple times for the same harm, as the New York legislature has developed statutes to avoid double recovery.

### THIRTY-EIGHTH DEFENSE

38.   The City's claims are barred or limited by the principles of informed consent and assumption of the risk, whether primary, express, or implied. For example, the City assumed any risk by agreeing to coverage of prescription opioids under a specific formulary. The City knew the risks and dangers necessarily incident to prescribing opioids, and assumed all the ordinary risks, hazards and dangers involved. Any injuries sustained by the City were the result of hazards, risks or dangers ordinarily assumed by the City, and were well known to the City. Additionally, the City's claims are barred or limited by patients' provision of informed consent.

### THIRTY-NINTH DEFENSE

39.   The City's claims are barred or limited because the City lacks a private right of action to enforce the federal Controlled Substances Act or applicable New York law.

### FORTIETH DEFENSE

40.   The City's claims against ESI Mail Pharmacy are barred or limited as preempted by New York law, which regulates pharmacies and their dispensing of prescription opioids. New York-licensed pharmacies are subject to oversight and regulation by the New York State Board of

Pharmacy, NY Educ. L. § 6804, the New York State Education Department through its Office of the Professions, NY Educ. L. § 6808, and the New York Department of Health, NY Pub. Health L. Article 33. The City cannot usurp authority granted by the state legislature to regulatory agencies.

## FORTY-FIRST DEFENSE

41.     The City's claims are barred or limited by indemnity provisions or limitation-of-liability provisions in contracts relating to the City's health plan(s). According to the Complaints, the City's claims are based on conduct from as early as the 1990s. In the intervening decades, the City has participated in several healthcare plans. Inasmuch as the City alleges that any services provided under agreements with the City caused its alleged injuries, the City's claims are barred or limited by provisions in those agreements.

## FORTY-SECOND DEFENSE

42.     The government-contractor defense bars or limits the City's claims. Inasmuch as the Express Scripts Entities provide pharmacy care services to any federal agency or entity, the federal government approved reasonably precise specifications for providing those services, including the highly precise directives contained in the lengthy TRICARE contracts with the DoD and in contracts with FEHBA plans under OPM's specific requirements and supervision. The Express Scripts Entities' work product conformed to those specifications, including those in the TRICARE contracts and FEHBA plan contracts. And the Express Scripts Entities did not have any greater awareness than the federal government did of the dangers of prescription opioids. Among other things, the TRICARE contracts required exclusive use of the DoD formulary and implementation of the government's Prescription Restriction Program, both of which conflict with the core state-law duties asserted by the City. There is a similar conflict between the asserted state-law duties and the Express Scripts Entities' obligations under their contracts with FEHBA plans.

Those conflicts make it impossible for the Express Scripts Entities to comply with the state-law duties alleged by the City while also fulfilling their obligations under their federal contracts.

### FORTY-THIRD DEFENSE

43.     The Express Scripts Entities' liability, if any, is limited by operation of NY CPLR Article 16.

### FORTY-FOURTH DEFENSE

44.     The City's claims are barred, in whole or in part, under the doctrines of abstention, exhaustion, and primary jurisdiction, and this Court should accordingly defer to the FDA, DEA, and appropriate state agencies to adjudicate the City's claims. The issues in this case—including but not limited to the safety, efficacy, and necessity of prescription opioids—are outside the conventional experience of judges and/or jurors and particularly within the expertise of the FDA, DEA, and appropriate state agencies.

### FORTY-FIFTH DEFENSE

45.     The City's claims are barred, in whole or in part, because any alleged damages sustained by the City were caused by the acts, omissions, negligence, and/or fault of other persons and entities, which operated as the superseding, intervening, and proximate cause of the damage alleged or damages allegedly sustained by the City. These actors were not under the Express Scripts Entities' control or authority, and thus the Express Scripts Entities may not be held responsible for their acts. These actors include, but are not limited to, prescribers, other health care professionals, patients, opioid manufacturers, distributors, pharmacies, pharmacists, drug dealers, drug users, federal and state government regulators, third-party payors, and others who played a role in the marketing, dispensing, sale, diversion, or abuse of prescription opioid medications and illicit opioid drugs in the City. Their conduct was entirely unforeseeable.

## FORTY-SIXTH DEFENSE

46.     The conduct alleged in the Complaints regarding the Express Scripts Entities conformed with all state and federal statutes, regulations, and industry standards based on the state of knowledge at the relevant time(s) alleged in the Complaints.

## FORTY-SEVENTH DEFENSE

47.     The Express Scripts Entities' liability, if any, is limited by the doctrine of *damnum absque injuria* to the extent that plaintiff's damages were not caused by the tortious misconduct of the Express Scripts Entities.

## RESERVATION OF RIGHTS

The Express Scripts Entities assert all applicable defenses under NY CPLR § 3018, as investigation and discovery proceed. Additional facts that support additional defenses may come to light through discovery or further investigation. The Express Scripts Entities reserve the right to assert new affirmative or other defenses in the future based on discovery or further investigation. The Express Scripts Entities also reserve the right to add additional defenses as they learn more about the City's liability and remedial theories or as the City's liability or remedial theories change.

## DEMAND FOR JURY TRIAL

The Express Scripts Entities hereby demand a jury trial as to all issues or claims for which a jury trial is allowed.

## DEMAND FOR RELIEF

The Express Scripts Entities pray that (a) judgment be entered dismissing Plaintiff's Complaints with prejudice, and (b) this Court grant the Express Scripts Entities such other relief as it deems just and appropriate, including costs and reasonable attorneys' fees.

Dated: April 30, 2025

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By: ___/s/ Jonathan G. Cooper___
Michael Lyle (*pro hac vice*)
Jonathan G. Cooper (*pro hac vice*)
Eric C. Lyttle (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
mikelyle@quinnemanuel.com
jonathancooper@quinnemanuel.com
ericlyttle@quinnemanuel.com


*Attorneys for Defendants Express Scripts, Inc.,*
*and ESI Mail Pharmacy Service, Inc.*