# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  June 09, 2025

Mr. Brian D. Boone
Alston & Bird
1120 S. Tryon Street
Suite 300
Charlotte, NC 28203-6818

              Re:  Case No. 25-3429, *In re: OptumRX, Inc., et al*
                    Originating Case No. 1:17-md-02804

Dear Counsel,

    The petition for writ of mandamus or prohibition has been docketed as case number **25-3429** with the caption listed above.  If you have not already done so, you must mail a copy of the petition to the lower court judge and counsel for all the other parties.

    Counsel for petitioner must file an Appearance of Counsel form and, if not admitted, apply for admission to the 6th Circuit Bar by **June 23, 2025**.  The forms are available on the court's website.

    The district court judge to whom this petition refers has been served with this letter.

                    Sincerely yours,

                    s/Jill E. Colyer
                    Case Management Specialist
                    Direct Dial No. 513-564-7024

cc:  Mr. David Andrew Hatchett
     Mr. Christopher George Michel
     Ms. Sandy Opacich
     Mr. Peter H. Weinberger

RECEIVED

06/06/2025

KELLY L. STEPHENS, Clerk

CASE NO. _____

IN THE

**UNITED STATES COURT OF APPEALS**

**FOR THE SIXTH CIRCUIT**

-------------------

In re OptumRx, Inc. and Express Scripts, Inc.,

*Petitioners.*

-------------------

From the United States District Court
Northern District of Ohio, Eastern Division
Case No. 17-MD-2804

-------------------

**PETITION FOR WRIT OF MANDAMUS**

Brian D. Boone
Matthew P. Hooker
ALSTON & BIRD LLP
1120 South Tryon Street
Suite 300
Charlotte, NC 28203
(704) 444-1000
brian.boone@alston.com
matthew.hooker@alston.com

D. Andrew Hatchett
ALSTON & BIRD LLP
1201 West Peachtree Street NW
Suite 4900
Atlanta, GA 30309
(404) 881-7000
andrew.hatchett@alston.com

*Counsel for Petitioner
OptumRx, Inc.*

Christopher G. Michel
Michael J. Lyle
Jonathan G. Cooper
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I St. NW, Suite 900
Washington, DC 20005
(202) 538-8000
christophermichel@quinnemanuel.com
mikelyle@quinnemanuel.com
jonathancooper@quinnemanuel.com

*Counsel for Petitioner Express Scripts,
Inc.*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: _____     Case Name: In re OptumRx, Inc. and Express Scripts, Inc.

Name of counsel:  Alston & Bird LLP _____

Pursuant to 6th Cir. R. 26.1,  OptumRx, Inc. _____
                                         *Name of Party*

makes the following disclosure:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
       identity of the parent corporation or affiliate and the relationship between it and the named
       party:

> Yes. UnitedHealth Group Incorporated is the ultimate parent of OptumRx, Inc. UnitedHealth
> Group Incorporated is a publicly traded corporation.

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
       in the outcome?  If yes, list the identity of such corporation and the nature of the financial
       interest:

> Yes. UnitedHealth Group Incorporated is the ultimate parent of OptumRx, Inc. UnitedHealth
> Group Incorporated is a publicly traded corporation.

---

CERTIFICATE OF SERVICE

I certify that on _____ June 6, 2025 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Brian D. Boone _____
Alston & Bird LLP _____
_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
**DISCLOSURE OF CORPORATE AFFILIATIONS**
**AND FINANCIAL INTEREST**

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed.**

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2) Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: _____          Case Name: In re OptumRx, Inc. and Express Scripts, Inc.

Name of counsel:  Quinn Emanuel Urquhart & Sullivan, LLP _____

Pursuant to 6th Cir. R. 26.1, Express Scripts, Inc. _____
                                               *Name of Party*

makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> Yes. The Cigna Group, a publicly-held corporation traded on the New York stock exchange, holds all interests in Evernorth Health, Inc., which is the parent company of petitioner Express Scripts, Inc.

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> Yes. The Cigna Group, a publicly-held corporation traded on the New York stock exchange, holds all interests in Evernorth Health, Inc., which is the parent company of petitioner Express Scripts, Inc.

---

### CERTIFICATE OF SERVICE

I certify that on _____ June 6, 2025 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Jonathan G. Cooper _____
_____
_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed.**

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2) Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .......................................................................iii

PETITION.......................................................................................... 1

INTRODUCTION ............................................................................... 1

ISSUES PRESENTED ......................................................................... 7

STATEMENT OF FACTS AND PROCEDURAL HISTORY.................... 7

STANDARD FOR GRANTING MANDAMUS ....................................... 18

REASONS THE WRIT SHOULD ISSUE ................................................ 19

I.     JUDGE POLSTER ABUSED HIS DISCRETION BY
FAILING TO RECUSE HIMSELF GIVEN THAT HIS
IMPARTIALITY IS REASONABLY IN QUESTION........... 19

       A.     Michael Kahn's statements would lead a
reasonable observer to question Judge Polster's
impartiality. ................................................ 22

       B.     Judge Polster's resistance to discovery regarding
Michael Kahn's statements further undermines
the appearance of impartiality..................... 29

       C.     Judge Polster is not biased in the PBMs' favor........... 33

II.     THE DISTRICT COURT ABUSED ITS DISCRETION
BY DENYING THE PBMS' REQUESTS FOR
DISCLOSURE OF ALL *EX PARTE*
COMMUNICATIONS. ....................................... 35

       A.     The denials are clearly erroneous as a matter of
law. ............................................................ 36

       B.     Petitioners have no other adequate means of
obtaining relief............................................ 38

i

C.    Mandamus is appropriate under the
circumstances.............................................................38

CONCLUSION ........................................................... 40

CERTIFICATE OF COMPLIANCE ....................................... 42

CERTIFICATE OF SERVICE................................................ 43

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Sheppard,*
856 F.2d 741 (6th Cir. 1988)....................................................... 5

*Edgar v. K.L.,*
93 F.3d 256 (7th Cir. 1996)....................................................... 29

*In re Aetna Cas. & Sur. Co.,*
919 F.2d 1136 (6th Cir. 1990)............................................ 5, 18, 20, 26

*In re Kensington Int'l Ltd.,*
353 F.3d 211 (3d Cir. 2003) ....................................................... 36, 37

*In re Kensington Int'l, Ltd.,*
368 F.3d 289 (3d Cir. 2004) ....................................................... 39

*In re Lott,*
424 F.3d 446 (6th Cir. 2005)....................................................... 38

*In re Nat'l Prescription Opiate Litig.,*
290 F. Supp. 3d 1375 (J.P.M.L. 2017) ................................... 7

*In re Nat'l Prescription Opiate Litig.,*
956 F.3d 838 (6th Cir. 2020)....................................................... 19, 39

*In re Nat'l Prescription Opiate Litig.,*
MDL No. 2804, 2022 U.S. Dist. LEXIS 65760 (J.P.M.L. Apr. 8,
2022) .................................................................................... 7

*In re Nat'l Prescription Opiate Litig.,*
No. 19-3935, 2019 U.S. App. LEXIS 30501 (6th Cir. Oct. 10,
2019) .................................................................................... 19

*In re Sch. Asbestos Litig.,*
977 F.2d 764 (3d Cir. 1992) ....................................................... 6, 26

*In re Univ. of Mich.,*
936 F.3d 460 (6th Cir. 2019)....................................................... 19

*John B. v. Goetz,*
    531 F.3d 448 (6th Cir. 2008) .......................................................... 38, 39

*Liljeberg v. Health Servs. Acquisition Corp.,*
    486 U.S. 847 (1988) ................................................................ 20, 21, 26

*Moody v. Simmons,*
    858 F.2d 137 (3d Cir. 1988) ................................................................ 18

*Roberts v. Bailar,*
    625 F.2d 125 (6th Cir. 1980) .............................................................. 20

*United States v. Barnwell,*
    477 F.3d 844 (6th Cir. 2007) .............................................................. 36

*United States v. Lanier,*
    748 F. App'x 674 (6th Cir. 2018) ....................................................... 36

*United States v. Minsky,*
    963 F.2d 870 (6th Cir. 1992) .......................................................... 1, 21

*United States v. Napue,*
    834 F.2d 1311 (7th Cir. 1987) ............................................................ 36

**RULES**

ABA Model Code of Judicial Conduct, Rule 2.9 ...................................... 36

Code of Conduct of United States Judges, Canon 3(A)(4) ...................... 36

Code of Conduct of United States Judges, Canon 3(A)(4)(d) ................. 27

Federal Rule of Appellate Procedure 21(a) ............................................ 1

**STATUTES**

28 U.S.C. § 1291 ................................................................................... 38

28 U.S.C. § 1651 ..................................................................................... 1

28 U.S.C. § 455(a) ....................................................................... passim

28 U.S.C. § 455(b)(1) .......................................................................... 15

iv

## PETITION

This petition arises from the national opioid multidistrict litigation (**MDL**) in the Northern District of Ohio before Judge Dan Aaron Polster, *In re National Prescription Opiate Litigation*, No. 17-MD-2804. Following the discovery of credible evidence of extensive and unauthorized *ex parte* communications between the District Court and plaintiffs' counsel, Petitioners OptumRx, Inc. and Express Scripts, Inc. (the **PBMs**) petition this Court under 28 U.S.C. § 1651 and Federal Rule of Appellate Procedure 21(a) for a writ of mandamus (1) directing the recusal of Judge Polster from all pending and future proceedings in the MDL involving the PBMs and (2) ordering the disclosure of all past *ex parte* communications between plaintiffs' counsel and the District Court, the Special Masters, or their staff.

## INTRODUCTION

*Ex parte* communications are "a dangerous procedure" that "undermine[] confidence in the impartiality of the court" because no litigant should have "private access to the ear of the court." *United States v. Minsky*, 963 F.2d 870, 874 (6th Cir. 1992). There is credible evidence here—insufficiently addressed by either the District Court or plaintiffs' counsel—that *ex parte* communications have occurred extensively in the

MDL. Earlier this year, the PBMs learned that Michael Kahn—a Florida attorney representing several plaintiffs in the MDL—represented to at least five existing or prospective municipal clients in on-the-record public meetings that his co-counsel, plaintiffs' counsel Peter Weinberger, "is able to pick up the phone literally, and does, every day to talk with [Judge Polster]"—"ex parte"—"about pushing this litigation along." *See, e.g.*, R.6060-5, PageID #673713. Mr. Kahn also represented to those existing and prospective clients that Judge Polster is "a tremendous plaintiff-oriented judge" using "enormous pressure" to "compel settlement from the defendants." *See, e.g.*, *id.*, PageID #673708; R.6060-7, PageID #673807.

Upon learning of Mr. Kahn's statements, the PBMs promptly brought them to Judge Polster's attention (*see* R.5961, PageID #671120–23; R.5962) and moved for disclosure of all *ex parte* communications between plaintiffs' counsel and the District Court, the Special Masters, or their staff (R.5968). Although acknowledging that Mr. Kahn's statements were "very troubling," Judge Polster summarily denied the PBMs' request (R.5986, PageID #671810) and later denied the PBMs' motion for reconsideration of that ruling (R.6001, PageID #672278).

Instead, Judge Polster launched his own "investigation" into Mr. Kahn's statements, scheduling a hearing at which he would question Mr. Kahn under oath before allowing the parties to follow up. R.5986, PageID #671810. Given the obvious conflict of interest, the PBMs moved for a disinterested judge to preside over the hearing. R.5999, PageID #672267. They also moved for an order requiring Mr. Weinberger to sit for questioning if he would not voluntarily address the allegations against him. *Id.*, PageID #672266–67. Judge Polster summarily denied both requests. R.6001.

At the hearing, Mr. Kahn claimed that he "misspoke" when he repeatedly told clients that Mr. Weinberger communicates *ex parte* with Judge Polster. R.6037, PageID #672817–18. But Mr. Kahn's testimony was so riddled with contradictions and suspicious explanations that even Judge Polster acknowledged it was "hard to believe." R.6028, PageID #672734. And although Mr. Kahn stated that he did not personally engage in *ex parte* communications, he testified that he had learned about Mr. Weinberger's *ex parte* communications from others in his litigation consortium—of which Mr. Weinberger is a member—and that he "[a]bsolutely did not" mislead his clients with his description of

3

Mr. Weinberger's relationship with the District Court. R.6037, PageID #672861; *id.*, PageID #672872–73, 672882.

After the hearing, Judge Polster ruled that Mr. Kahn's explanation that he "misspoke" was enough to conclude the "investigation." R.6028. Judge Polster issued a $100,000.00 sanction for Mr. Kahn's statements and concluded that no further action was necessary. *Id.* Nowhere in that sanction order—or in any hearing or order preceding it—did Judge Polster categorically deny that he has communicated *ex parte* with Mr. Weinberger or plaintiffs' counsel.

The PBMs moved for Judge Polster's recusal from future proceedings involving the PBMs given (1) the overwhelming appearance of partiality created by Mr. Kahn's repeated public statements, (2) his testimony at the hearing failing to rebut those statements (and maintaining that they were not misleading), and (3) Judge Polster's response to the statements, including failing to require Mr. Weinberger to address the allegations under oath. R.6060. Judge Polster denied the motion, insisting that he had cleared up any basis to suspect partiality.

That position is not tenable, and this Court should not accept it. "Any justice, judge, or magistrate judge of the United States shall

4

disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The rule is mandatory: "[R]ecusal is required when a reasonable person would harbor doubts about the judge's impartiality." *In re Aetna Cas. & Sur. Co.*, 919 F.2d 1136, 1143 (6th Cir. 1990) (en banc). On this record, no reasonable observer would believe that Judge Polster can serve as a fair or neutral arbiter over future PBM proceedings in this MDL. Judge Polster has failed to provide any credible explanation for the repeated public statements of an experienced attorney—statements that attorney testified under oath were not misleading—that revealed (among other troubling aspects of partiality) that Judge Polster engages in extensive *ex parte* communications with plaintiffs' counsel. Having been sounded repeatedly, that bell cannot be unrung. This Court should issue a writ of mandamus, ordering Judge Polster's recusal from the PBM cases in the MDL and immediate disclosure of all plaintiffs' counsels' *ex parte* communications concerning the MDL.

The PBMs do not file this petition lightly. But the "requirement of neutrality in adjudicative proceedings" is absolute. *Anderson v. Sheppard*, 856 F.2d 741, 745–46 (6th Cir. 1988). A district judge "may

not sit where his or her partiality may reasonably be questioned"—even "to shepherd [an] extraordinarily complicated and protracted litigation to its conclusion and out of concern about creating additional delay." *In re Sch. Asbestos Litig.*, 977 F.2d 764, 784-85 (3d Cir. 1992).

This rule applies equally to MDL proceedings. In *In re School Asbestos*, the Third Circuit granted a mandamus petition seeking recusal of a district judge presiding over a class action involving more than 30,000 plaintiffs that had been transferred to an MDL. *Id.* at 769–70. That petition—which came nine years into the litigation—was grounded in the appearance of partiality created by the judge's attendance at an *ex parte* conference with plaintiffs' expected expert witnesses. *Id.* There, as here, the petition carried implications about the management of the remaining proceedings. But the Third Circuit understood that the recusal statute does not bend for efficiency's sake. After ordering the judge's recusal, the litigation was reassigned to another judge. The same result is necessary here.[1]

---

[1] Concerns about disrupting the MDL are fading at best because the Judicial Panel on Multidistrict Litigation (**JPML**) has already closed the MDL to new cases.

## ISSUES PRESENTED

1.    Whether this Court should issue a writ of mandamus directing Judge Polster's recusal under 28 U.S.C. § 455(a) because a reasonable observer would question his impartiality.

2.    Whether this Court should issue a writ of mandamus ordering the disclosure of all *ex parte* communications between plaintiffs' counsel and the District Court, the Special Masters, or their staff.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

In December 2017, the JPML created the opioid MDL and assigned it to Judge Polster. *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375 (J.P.M.L. 2017). Soon after, Judge Polster appointed Peter Weinberger as one of the plaintiffs' co-liaison counsel. *See* R.34, PageID #351; R.37. Over the last seven-plus years, Mr. Weinberger has been actively involved in litigating plaintiffs' claims and regularly appears before Judge Polster and the Special Masters. On April 8, 2022, the JPML closed the MDL to new cases, explaining that the MDL court had "complete[d] its primary tasks." *In re Nat'l Prescription Opiate Litig.*, MDL No. 2804, 2022 U.S. Dist. LEXIS 65760, at *2–3 (J.P.M.L. Apr. 8, 2022).

7

In May 2024, two years after the JPML closed the MDL to new cases, the Plaintiffs' Executive Committee (**PEC**) moved Judge Polster to lift a moratorium on substantive filings so plaintiffs that filed their cases seven years earlier could seek leave to amend their complaints to add the PBMs as defendants. R.5411. Judge Polster granted the motion (R.5455) in an order he later surmised "planted" the "seeds" of the PBMs' recusal motion (although the PBMs did not uncover credible evidence of *ex parte* communications until months later).

In July 2024, the PEC filed two 18-page "omnibus" motions on behalf of more than 2,000 plaintiffs seeking to add the PBMs and affiliated entities to their cases. R.5547, R.5548. Most of those plaintiffs are municipalities.

After filing their opposition in January 2025 (R.5885; R.5885-1), the PBMs learned from another MDL filing that certain plaintiffs listed in the motions did not authorize their counsel to join the motions. The PBMs began sending public-records requests to government plaintiffs for documents showing authorization to seek to add the PBMs as defendants. The responses confirmed that many plaintiffs never authorized claims

against the PBMs, leading hundreds to withdraw from the motions to amend.

The public-records requests also revealed an even more concerning issue: Improper *ex parte* communications between the PEC and Judge Polster. The first indications of that impropriety came when, in response to one public-records request, the City of Deltona, Florida produced records from a June 3, 2019 city council meeting. At the meeting, which was recorded on video, attorneys Michael Kahn and Jim Vickaryous pitched the city on hiring their litigation group (a self-described "consortium" of law firms and attorneys including Peter Weinberger) to pursue claims in the MDL. Mr. Kahn told the city that Mr. Weinberger was key to their success, describing him as someone with a "direct relationship professionally with the judge" who "can literally pick up the phone and talk to the judge any day." R.6060-5, PageID #673713.

Mr. Kahn left no doubt about whether this "direct relationship" was normal in litigation, turning to the Deltona city attorney and remarking that "as [he] knows, that's called *ex parte* communications, and it's generally disallowed in any litigation." *Id.* But Mr. Kahn told the city that "multidistrict litigation is different" and "you can have a situation

9

where Peter Weinberger . . . is able to pick up the phone, literally, *and does, every day* to talk with [Judge Polster] about pushing this litigation along." *Id.* (emphasis added).

The PBMs searched for public video recordings from other public meetings with Mr. Weinberger's clients. They discovered that Mr. Kahn, joined by other members of Mr. Weinberger's consortium, repeatedly represented to Florida governments participating in or considering opioid litigation that Mr. Weinberger had special access to Judge Polster. *See* R.6060-2, PageID #673609; R.6060-3, PageID #673648; R.6060-6, PageID #673758; R.6060-4, PageID #673690.[2] For example, Mr. Kahn told the City of Palm Bay at a public meeting that Mr. Weinberger had "total access to Judge Polster" and that the interactions were "unlike [those in] any other litigation where you can't communicate with the judge singly. Mr. Weinberger can on behalf of his clients, one of whom is us." R.6060-2, PageID #673609. Mr. Kahn likewise told the City of Oviedo that

---

[2] Certified transcripts of Mr. Kahn's presentations were filed as exhibits to the PBMs' motion for recusal. Video recordings of the statements are available on the Florida municipalities' websites, accessible through the links in the PBMs' memorandum of law in support of their recusal motion. *See* R.6060-1, PageID #673593.

Mr. Weinberger "talks to the judge every day. It's an unusual circumstance. . . . So, every day, Peter is on the phone with the judge or his assistant." R.6060-3, PageID #673648. And Mr. Kahn told Clay County that Mr. Weinberger "is able to talk to the judge on a daily basis, unlike every case usually," and stated that "[w]e are very privileged to have him as a member of our group" because "that means we get inside information, as much as Mr. Weinberger can give us." R.6060-6, PageID #673758. Mr. Kahn emphasized that Mr. Weinberger's conversations with Judge Polster were "unusual" because they were true "ex parte communications" of the kind "generally disallowed in any litigation." R.6060-3, PageID #673648; R.6060-5, PageID #673713; *see also* R.6060-2, PageID #673609; R.6060-6, PageID #673758; R.6060-4, PageID #673690.

Mr. Kahn also assured his listeners that Judge Polster was on the plaintiffs' side, describing him as "a tremendous plaintiff-oriented judge" who was using his "great power and specific intent to try to compel settlement[s] from the defendants" through "enormous pressure." *See, e.g.*, R.6060-5, PageID #673708; R.6060-7, PageID #673807.

Upon discovering Mr. Kahn's remarks, the PBMs promptly moved for disclosure of all *ex parte* communications between plaintiffs' counsel

11

and the District Court, the Special Masters, or their staff. R.5968. The following day, at a previously scheduled emergency hearing on the PEC's motion to enjoin the PBMs' public-records investigation, Judge Polster acknowledged that Mr. Kahn's statements were "very troubling," "cast doubt on the integrity of the Court," and "created a real problem." R.5986, PageID #671810; *see also* R.5969, PageID #671284. Yet he orally denied the PBMs' motion for disclosure of *ex parte* communications without explanation. R.5986, PageID #671810. Instead, Judge Polster said that he would "get to the bottom of it" by requiring Mr. Kahn to appear for questioning "first by the Court" and then by the PEC and defense attorneys. *Id.*; *see also* R.5969, PageID #671284.

The PBMs moved for reconsideration of Judge Polster's ruling denying disclosure of the *ex parte* communications. They also sought two additional forms of relief: (1) that a disinterested judge preside over the evidentiary hearing and (2) that Mr. Weinberger, the attorney accused of *ex parte* communications, sit for questioning to address the allegations. R.5999. The PBMs filed their motion at the close of business on March 4, 2025. *Id.* The next morning, at 8:28 AM, Judge Polster again summarily denied the PBMs' requested relief, describing Mr. Kahn's statements as

12

"unsupported hearsay" insufficient to justify disclosure of *ex parte* communications. R.6001.

On March 12, 2025, Mr. Kahn appeared for the hearing. Judge Polster led the questioning. Mr. Kahn testified that he was an attorney with nearly 50 years' experience whom Mr. Weinberger's litigation group had hired "to present . . . to different subdivisions, both cities and counties" in Florida. R.6037, PageID #672809, 672811, 672814, 672817.

Mr. Kahn testified that he "misspoke" when he repeatedly told government officials that Mr. Weinberger regularly communicates *ex parte* with Judge Polster. *See id.*, PageID #672817–18. He claimed that he used the phrase "*ex parte* communications" in what he called the "colloquial sense" and meant to convey that the communications occurred in the presence of *select* (as opposed to all) plaintiffs' *and defense* attorneys. *Id.*, PageID #672818, 672820–21. That dubious testimony initially failed to convince Judge Polster, who dismissed Mr. Kahn's explanation as unbelievable given that even a law student knows that *ex parte* communications describe when "only one side to a dispute is meeting privately or speaking privately to the Court." *Id.*, PageID #672821–23. Judge Polster also recognized that Mr. Kahn's audience did

13

not need a law degree to know what he meant: "[A]nyone who was there and heard those statements" would think "this Attorney Kahn and his group has a real in with the Court. This is sort of a slam dunk, and we better sign up with him." *Id.*, PageID #672821–22.

Despite claiming that he misspoke in certain respects, Mr. Kahn also insisted that he had a basis for his statements, stating on cross-examination that he had learned about Mr. Weinberger's *ex parte* communications "from someone in [his] group or several people in [his] group." *Id.*, PageID #672861. He also testified that he "[a]bsolutely did not" mislead his clients and made no effort to correct his statements. *Id.*, PageID #672882, 672872–73.

As for his characterization of Judge Polster as a "tremendous plaintiff-oriented judge" intent on "compel[ling] settlement," Mr. Kahn claimed that he meant to say that Judge Polster was "encouraging" settlement, rather than "compelling" it. *Id.*, PageID #672824–27. But as Judge Polster recognized, that explanation was again not credible given that "[l]awyers choose their words carefully." *Id.*, PageID #672827.

Given the holes in Mr. Kahn's testimony and Mr. Weinberger's distinctive ability to address the serious allegations against him, the

PBMs renewed their request to examine Mr. Weinberger under oath. *Id.*, PageID #672889. Judge Polster again denied the request, and Mr. Weinberger declined to offer any explanation voluntarily.

Following the hearing, Judge Polster entered an order sanctioning Mr. Kahn. Although Judge Polster acknowledged that parts of Mr. Kahn's testimony were "hard to believe" (R.6028, PageID #672734), he concluded that Mr. Kahn's testimony, standing alone, was sufficient to close the inquiry because Mr. Kahn's original statements were "unsubstantiated" and because Mr. Kahn "admitted" that he did not have personal knowledge of *ex parte* communications. *Id.*, PageID #672733–34. In that order, Judge Polster did not deny having ever engaged in *ex parte* communications with Mr. Weinberger.

On April 2, 2025, the PBMs moved for Judge Polster's recusal under 28 U.S.C. § 455(a) & (b)(1) based on Mr. Kahn's statements and testimony as well as Judge Polster's resistance to a fulsome investigation into the existence of *ex parte* communications. R.6060. The PBMs pointed out that neither Judge Polster nor Mr. Weinberger had denied engaging in *ex parte* communications. R.6060-1, PageID #673600. The PBMs also

15

sought, for a third time, an order requiring disclosure of all *ex parte* communications. *Id.*, PageID #673602.

Judge Polster denied the PBMs' motion. R.6123. He concluded that Mr. Kahn made his original statements "without any factual basis." *Id.*, PageID #682825, 682829. Ignoring the impact of his multiple orders limiting the PBMs' inquiry, Judge Polster faulted the PBMs for "adduc[ing] at the hearing **no** non-hearsay evidence of **actual** *ex parte* communications" or proving that "**any** attorney told Mr. Kahn [he] had the 'power and specific intent' to pressure and compel defendants to settle." *Id.*, PageID #682827–28 (emphasis in original). Despite previously finding that Mr. Kahn's explanations were "hard to believe" (R.6028, PageID #672734), Judge Polster then found that Mr. Kahn's retractions were "especially credible." R.6123, PageID #682833.

Although Judge Polster purported to "again reaffirm[] that [he] has never engaged in *ex parte* communications with Mr. Weinberger or any other attorney," he acknowledged that at least some *ex parte* communications occurred "during the early, smaller settlement conferences to which *all* parties gave prior consent." *Id.*, PageID #682828

16

(emphasis added). But the PBMs have been parties to the MDL since 2018 and have never consented to any *ex parte* settlement discussions.

There is also reason to doubt that all *ex parte* communications have been limited to settlement discussions. In at least one instance, another plaintiffs' lawyer submitted an *ex parte* letter to Special Master Cohen outlining liability theories against the PBMs. R.5012. The PBMs learned about that submission only after the same attorney inadvertently attached it to a status report. *Id.*, PageID #611984.

Judge Polster also defended his investigation into Mr. Kahn's statements as "thorough and fair." *Id.*, PageID #682832. He claimed that the PBMs had offered "no hint that a different, 'disinterested judge' would have done a better job" with Mr. Kahn's examination and that "any reasonable observer would believe" that "Mr. Kahn 'came clean' and confessed he had exaggerated and misrepresented in 2019." *Id.*, PageID #682832–33. Judge Polster did not acknowledge Mr. Kahn's testimony that others in his litigation group had told him about Mr. Weinberger's *ex parte* communications. Nor did he address that Mr. Kahn repeatedly made his many original statements in the presence of other lawyers in Mr. Weinberger's consortium without once being corrected.

17

Judge Polster concluded his order with commentary on two additional points, asserting (without support) that (1) other defendants in the MDL would "likely" have joined the PBMs' motion "if there was any valid basis for recusal;" and (2) "any bias shown here . . . was in favor of Optum[Rx], not against it," because Judge Polster recently overruled the PBMs' objections to one of the Special Master's discovery rulings *without prejudice* to "allow Optum[Rx] to 'present new evidence to'" the Special Master—in violation of his "own, long-standing rule" precluding consideration of new evidence in an objection to a discovery ruling. *Id.*, PageID #682834–35. As to the second point, Judge Polster reasoned that his decision on OptumRx's objection to the discovery ruling would be "relevant" to the recusal inquiry under § 455(a) because a reasonable person might consider "how the Court has actually treated the party bringing the accusation of bias, especially right before that party levied the accusation." *Id.*, PageID #682834.

## STANDARD FOR GRANTING MANDAMUS

"[M]andamus is the proper remedy to vacate the orders of a judge who acted when he should have recused." *In re Aetna*, 919 F.2d at 1142 (quoting *Moody v. Simmons*, 858 F.2d 137, 143 (3d Cir. 1988)). This

Court reviews the denial of a motion to recuse for an abuse of discretion. *In re Nat'l Prescription Opiate Litig.*, No. 19-3935, 2019 U.S. App. LEXIS 30501, at \*3 (6th Cir. Oct. 10, 2019).

For a writ of mandamus to issue for other conduct by a district court, a petitioner "must (1) have no other adequate means of obtaining relief, (2) demonstrate a right to issuance that is clear and indisputable, and (3) show that issuance of the writ is appropriate under the circumstances." *In re Univ. of Mich.*, 936 F.3d 460, 466 (6th Cir. 2019).

## <u>REASONS THE WRIT SHOULD ISSUE</u>

Mandamus allows this Court to correct "a judicial usurpation of power or a clear abuse of discretion." *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 842 (6th Cir. 2020). Here, Judge Polster twice abused his discretion: Once by declining to recuse himself and again by (repeatedly) denying the PBMs' request for disclosure of *ex parte* communications. The Court should issue a writ to remedy both errors.

## I. JUDGE POLSTER ABUSED HIS DISCRETION BY FAILING TO RECUSE HIMSELF GIVEN THAT HIS IMPARTIALITY IS REASONABLY IN QUESTION.

"Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might

19

reasonably be questioned." 28 U.S.C. § 455(a). "The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860, 865 (1988). "[R]ecusal is required when a reasonable person would harbor doubts about the judge's impartiality." *In re Aetna*, 919 F.2d at 1143. The inquiry is an "objective" one: "It asks what a reasonable person knowing all the relevant facts would think about the impartiality of the judge." *Roberts v. Bailar*, 625 F.2d 125, 129 (6th Cir. 1980). "Even where the question is close, the judge whose impartiality might reasonably be questioned must recuse himself . . . ." *Id.*

The question is not close here. A reasonable person knowing all the relevant facts would harbor serious doubts about Judge Polster's impartiality. Over the course of many months, Mr. Kahn represented to at least five existing or prospective clients in formal public meetings that Judge Polster regularly engages in "unusual" and "generally disallowed" "*ex parte*" communications "singly" with Mr. Weinberger to discuss "pushing the litigation along." R.6060-3, PageID #673648; R.6060-5, PageID #673713; R.6060-2, PageID #673609; R.6060-6, PageID #673758;

20

R.6060-4, PageID #673690. Those representations, which have not been credibly rebutted by any of the involved parties—and which Mr. Kahn testified under oath were not misleading—require recusal.

Judge Polster's reaction to the revelation of Mr. Kahn's statements confirms that he cannot continue presiding over the PBM litigation. Since learning of the statements, the PBMs have (1) moved three times for disclosure of *ex parte* communications between plaintiffs' counsel and the District Court, (2) twice moved for permission to examine Mr. Weinberger under oath, and (3) moved for a disinterested judge to preside over the evidentiary hearing. Judge Polster denied each of those motions, limiting the record and asserting control over the investigation into his own alleged misconduct while inexplicably shielding Mr. Weinberger from questioning.

The law is clear: "[J]ustice must satisfy the appearance of justice" (*Liljeberg*, 486 U.S. at 864), and *ex parte* communications are "a gross breach" of that appearance (*Minsky*, 963 F.2d at 874). Because a reasonable observer viewing the record would harbor doubts about Judge Polster's impartiality, recusal is required.

**A.    Michael Kahn's statements would lead a reasonable observer to question Judge Polster's impartiality.**

The evidence of *ex parte* communications here is among the more striking that this Court is likely to encounter. Mr. Kahn—an attorney with over 45 years' experience—over the course of 10 months appeared before at least 5 municipalities at recorded public meetings and touted on the record Mr. Weinberger's "total access" to Judge Polster. R.6060-2, PageID #673609. To Mr. Kahn and his litigation group, Mr. Weinberger's ability to funnel "inside information" to plaintiffs vis-à-vis his *ex parte* dealings with Judge Polster was not something to be taken lightly (R.6060-6, PageID #673758); it was a unique value they could offer to potential clients. Judge Polster perhaps described the impact of those statements best: "[A]nyone who was there and heard those statements" would think "this Attorney Kahn and his group has a real in with the Court. This is sort of a slam dunk, and we better sign up with him." R.6037, PageID #672821–22.

When examined under oath, Mr. Kahn admitted that someone in his litigation group told him about Mr. Weinberger's daily *ex parte* conversations with Judge Polster. *Id.*, PageID #672861. He testified that he believed his statements to be true when he made them and still does

22

not believe the statements misled his listeners. He also testified that he has taken no action to correct the public record. *Id.*, PageID #672863, 672872–73, 672882.

Mr. Kahn later characterized his public statements as using the term *ex parte* in the "colloquial sense," which he defined as conversations with the District Court with only *select* counsel for each side present. But that explanation is not credible. First, if Mr. Kahn truly meant that, he would not have represented that Mr. Weinberger could communicate with Judge Polster "singly." R.6060-2, PageID #673609. Second, he would not have represented that the *ex parte* communications were of the type "generally disallowed in any litigation" (R.6060-5, PageID #673713)—something that is not true of the joint conferences that Mr. Kahn now claims to have been referencing. Third, none of the members of Mr. Kahn's litigation group who appeared alongside him for his public presentations (R.5968, PageID #671205, 671207–08)—at least one of whom is a former Florida state court judge (R.6060-4, PageID #673690)—interjected to clarify the nature of the *ex parte* communications that Mr. Kahn described. Fourth, Judge Polster himself conceded that he has "never heard an attorney use the term 'ex parte' in the way Mr. Kahn

23

testified he intended it to mean." R.6028, PageID #672734. Fifth, Mr. Kahn is an experienced lawyer unlikely to have made such a basic error in describing *ex parte* communications. A reasonable observer would see an appearance of partiality on the face of that record.

Constrained by those facts, in his recusal order, Judge Polster resorted to mischaracterizing the record and the law. Ignoring the implausibility of the testimony, he accused the PBMs of "ignor[ing] virtually everything Mr. Kahn, himself, said at the hearing," and specifically, Mr. Kahn's testimony that "he did not know of any ex parte communications between any attorney and the Court." R.6123, PageID #682827. But whether Mr. Kahn *personally* knew the details of specific *ex parte* communications says nothing about whether he had a reasonable basis to believe that *ex parte* communications were occurring. If anything, it is Judge Polster's account that ignores key portions of Mr. Kahn's testimony. Nowhere in his order does he mention Mr. Kahn's testimony that someone in his consortium told him about Mr. Weinberger's *ex parte* communications or that he still does not believe his statements were misleading to his clients.

On that selective reading of the record, Judge Polster found Mr. Kahn's testimony "especially credible" and stated that he "believes . . . that Mr. Kahn 'came clean' and confessed he had exaggerated and misrepresented." *Id.*, PageID #682833. But that credibility finding does not square with Judge Polster's sanction order, in which he described Mr. Kahn's testimony as "hard to believe" and inconsistent with any other attorneys' (or even "third-year law student[s']") understanding of how *ex parte* communications work. R.6028, PageID #672734; R.6037, PageID #672823.

Judge Polster also claimed that the "PBMs adduced at the hearing *no* non-hearsay evidence of *actual ex parte* communications . . . between any attorney and the Court, the Special Masters, or their staff." R.6123, PageID #682827–28 (emphasis in original). He called the PBMs' cited cases "entirely distinguishable" because, "[i]n every one of those cases, it was *undisputed* that the judge *did* receive *ex parte* communications," whereas "[h]ere, the entire basis for the PBMs' recusal motion were Mr. Kahn's hearsay assertions." *Id.*, PageID #682828–29. But the PBMs could not obtain additional evidence because of Judge Polster's rulings denying their disclosure and shielding Mr. Weinberger from questioning.

More importantly, Section 455(a) does not require proof of actual bias or partiality (even though Mr. Kahn's statements meet that standard). The mere *appearance* of partiality requires disqualification because that appearance severely damages the public's trust in the judiciary. *Liljeberg*, 486 U.S. at 859–60, 865; *see In re Sch. Asbestos Litig.*, 977 F.2d at 782 (disqualification required following *ex parte* conference because, "regardless of [the judge's] actual impartiality, a reasonable person might perceive bias to exist"). If a reasonable person would question the judicial officer's impartiality, recusal is required. *In re Aetna*, 919 F.2d at 1143. And on the existing record, a reasonable person would question Judge Polster's impartiality.

Finally, Judge Polster is simply incorrect that there is no evidence of actual *ex parte* communications. Judge Polster himself acknowledged that he communicated *ex parte* with plaintiffs' counsel at least for purposes of "settlement conferences." R.6123, PageID #682828. He defends those *ex parte* discussions because "all parties gave prior consent." *Id.* That is untrue. The PBMs have been defendants in the MDL since January 2018. They have never consented to *ex parte* communications of any kind.

26

Later in the order, Judge Polster clarified that he engaged in *ex parte* settlement discussions "with the consent of the *participating* parties." *Id.*, PageID #682830. But that qualifier is not allowed by the Code of Judicial Conduct or any other authority. After all, the problem with *ex parte* communications is not the participating party's consent but the *non*-participating party's exclusion. *See* Code of Conduct of United States Judges, Canon 3(A)(4)(d) (*ex parte* communications for settlement-related purposes allowed only "with the consent of *the parties*" (emphasis added)).

Judge Polster further defended his participation in those communications, remarking that they have been in the record and "known for years." R.6123, PageID #682831. He reasoned that those incidents, if improper, were improper at the time they occurred, and "[t]he PBMs' recent discovery of Mr. Kahn's statements does not now convert those earlier circumstances into grounds for disqualification." *Id.*, PageID #682829–31. But the PBMs have not "known for years" that *ex parte* communications were occurring outside of one *ex parte* report relating to the PBM cases. The PBMs promptly moved for appropriate relief upon learning the facts surrounding that *ex parte* communication,

27

as they did upon uncovering Mr. Kahn's statements and observing Judge Polster's response to them.

Even taking Judge Polster at his word that his *ex parte* conversations were limited to settlement, it remains unclear whether Judge Polster also learned additional *ex parte* information through the Special Masters. In December 2022, one plaintiffs' attorney sent Special Master Cohen an *ex parte* report regarding the PBM cases, which the PBMs discovered after the attorney *inadvertently* disclosed it in a later submission to the District Court. R.5012. The PEC claims that its *ex parte* conversations with the Special Masters are so numerous that it would be "burdensome" to produce them all.[3] R.6084, PageID #674809.

Judge Polster also contended that other defendant groups' silence regarding the PBMs' recusal motion indicates that it has no merit, given that those defendant groups were actively litigating claims in the MDL

---

[3] The PEC argued below that those *ex parte* conversations are allowed under the Special Master Appointment Order. R.6084, PageID #674808 (citing R.69, PageID #445). But the PBMs were not parties to the MDL when the Appointment Order was entered and did not participate in the appointment process. Inasmuch as the Appointment Order allows for *ex parte* communications in limited, administrative circumstances, those circumstances do not include the types of conversations Mr. Kahn described.

when Mr. Kahn made his statements and so, the theory goes, "would have far more reason to be concerned, if there was any valid basis for recusal." R.6123, PageID #682834. As a threshold matter, there is no requirement that all potentially aggrieved parties join in a motion for recusal; Section 455(a) requires recusal based on reasonable questions of partiality to protect the judicial system itself. And the PBMs seek Judge Polster's recusal only as to their cases. In any event, there is a plausible explanation for other defendants' declining to do the same: Those defendants, after enduring years of litigation under a "tremendous plaintiff-oriented judge," would rather not reattract the court's attention. Judge Polster's focus on other defendant groups does not alter the conclusion that a reasonable observer would question his impartiality given Mr. Kahn's statements and Judge Polster's reaction to them.

## B. Judge Polster's resistance to discovery regarding Michael Kahn's statements further undermines the appearance of impartiality.

Independently, Judge Polster's resistance and approach to discovery regarding the statements would cause a reasonable observer to harbor strong doubts about his impartiality. *See, e.g.*, *Edgar v. K.L.*, 93 F.3d 256, 258, 262 (7th Cir. 1996) (issuing writ of mandamus to

remove district judge from case based on *ex parte* communications after judge "blocked discovery from other participants and has declined to state on the record his own memories of what happened").

The PBMs three times requested disclosure of all *ex parte* communications—Judge Polster summarily denied the first two requests within a day of their filing. R.5986, PageID #671810; R.6001. The PBMs twice requested that Mr. Weinberger sit for questioning—Judge Polster denied those requests, too. R.6001; R.6037, PageID #672889. And the PBMs requested that Judge Polster not preside over the hearing with Mr. Kahn given that his own misconduct was at issue—Judge Polster issued yet another denial. R.6001, PageID #672279.

Judge Polster claims that the inquiry into Mr. Kahn's statements was "thorough and fair." R.6123, PageID #682832. He faults the PBMs for "point[ing] to no unfair question by the Court, no unreasonable ruling on an objection, no hint that a different, 'disinterested judge' would have done a better job." *Id.* But the record shows that Judge Polster repeatedly cut the PBMs' counsels' questioning short. R.6037, PageID #672838, 672851–52, 672857, 672867. And it is not the PBMs' burden to articulate how possible *ex parte* conversations—the details of which are unknown

30

to *them*—might have shaped Judge Polster's approach to the hearing. If those conversations took place, *Judge Polster* knows the details of them and was able to shape the hearing accordingly. Likewise, Mr. Weinberger would know the details of the conversations—as well as the background for Mr. Kahn's statements—but he declined to explain himself on the record, and Judge Polster did not require him to do so.

In Judge Polster's view, "[i]t cannot be true that, just because a person accuses the Court of engaging in improper *ex parte* communications, the Court must immediately order disclosure and require counsel to testify." R.6123, PageID #682832. But this is not a case in which a party manufactured allegations of *ex parte* communications to obtain discovery or some "person" lodged facially implausible accusations against the Court. The PBMs' *opponents' counsel*—who is in a position to know about his co-counsel's interactions with the Court and has no reason to misrepresent those interactions—publicly represented on multiple occasions that the plaintiffs have a direct line to Judge Polster. This was no slip of the tongue; Mr. Kahn repeated his statements at least five times in on-the-record meetings and stated under oath that he does

31

not believe his statements were misleading. If that is not enough to warrant disclosure of *ex parte* communications, then almost nothing is.

Nor was the discovery the PBMs sought overly burdensome. If no *ex parte* communications existed, it should have been easy to order disclosure. Similarly, the Court was already hearing from Mr. Kahn, and it would have required little additional effort to hear from Mr. Weinberger.

According to Judge Polster, a party can obtain discovery of *ex parte* communications only if an accusation is brought forward, "tested and found colorable." *Id.* By that logic, disclosure is warranted only when evidence of an *ex parte* communication is in the record. But that would require (1) the accusing party to provide evidence of a conversation from which they were inappropriately excluded, or (2) the accused to voluntarily admit misconduct.

The surest way to test the truth of Mr. Kahn's statements was not a hearing led by the judge his statements implicated; it was to order disclosure of *ex parte* communications, allow a disinterested judge to preside over the hearing, and allow an opportunity to question the persons accused of participating in those communications. Judge

Polster's refusal to take those simple steps would only further undermine the appearance of impartiality in the mind of a reasonable observer. Like Mr. Kahn's statements themselves, Judge Polster's response to the statements compels recusal.

### C. Judge Polster is not biased in the PBMs' favor.

Judge Polster also relied on a recent order to conclude that, if anything, he is biased "in favor of Optum[Rx], not against it." R.6123, PageID #682834–35. In Judge Polster's view, because the test for recusal "asks what a reasonable person *knowing all the relevant facts* would think about the impartiality of the judge," "a reasonable person might look to the 'relevant fact' of how the Court has actually treated the party bringing the accusation of bias, especially right before the party levied the accusation." *Id.*, PageID #682834 (emphasis in original). That led Judge Polster to his Order Regarding Optum's Objection to Discovery Ruling 14, Part 34 (R.6031), which he identified as the order "closest in time to the PBMs' recusal motion." R.6123, PageID #682834. That order sustained the Special Master's ruling rejecting OptumRx's assertions of privilege over certain documents "without prejudice" to allow OptumRx to present new evidence supporting its privilege claim. *Id.*, PageID

33

#682835. Judge Polster contended that in so ruling, he "broke [his] own, long-standing rule and gave Optum[Rx] a second chance to prove its documents were privileged," which is evidence that "if there is any bias shown here, it was in favor of Optum, not against it." *Id.*

That does not pass muster. First, a single ruling in a years-long MDL does not show bias, even if it was the ruling closest in time to the discovery of credible evidence of *ex parte* communications. Just as an adverse ruling does not entitle a party to seek judicial recusal, the existence of one favorable ruling does not block recusal where the standards are otherwise satisfied.

Second, the order Judge Polster cited related only to OptumRx. Judge Polster failed to mention his recent ruling on Express Scripts' privilege claim over similar documents, in which he overruled Express Scripts' objection to the Special Master's ruling, necessitating a separate mandamus petition to this Court. R.5850.

Third, Judge Polster's choice of words in the recusal order belies any suggestion that he is biased in favor of the PBMs. According to Judge Polster, the "seed for the PBMs' recusal motion was planted" in May 2024 when he gave plaintiffs an opportunity to file motions to amend their

complaints (R.6123, PageID #682814)—even though the PBMs did not uncover Mr. Kahn's statements until eight months later. And he uses charged language to describe the PBMs' "campaign of filing public records requests" (*id.*)—even though those requests were entirely proper and have yielded crucial discovery regarding *ex parte* communications and the omnibus motions for leave to amend. Indeed, as of the filing of this petition, nearly 1,000 plaintiffs have withdrawn from the omnibus motions following the PBMs' public-records investigation.

## II.     THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING THE PBMS' REQUESTS FOR DISCLOSURE OF ALL *EX PARTE* COMMUNICATIONS.

Judge Polster compounded the problem by denying the PBMs' requests for disclosure of all *ex parte* communications between the District Court and plaintiffs' counsel. Those denials were a clear abuse of discretion. This Court should grant the PBMs' petition and direct an order compelling disclosure of all *ex parte* communications (including notes, logs, or records of those communications) between plaintiffs and the District Court, the Special Masters, or their staff.[4]

---

[4] OptumRx's counsel have also sent notices to certain members of the PEC (including Mr. Weinberger) reminding them of their obligation to

## A.    The denials are clearly erroneous as a matter of law.

The PBMs are entitled to know everything there is to know about any *ex parte* communications that occurred between plaintiffs' counsel and Judge Polster, the Special Masters, or their staff. Judge Polster said the PBMs' request for disclosure of those *ex parte* communications was "extraordinary." R.6001, PageID #672278. But this Court has made clear that a district court "should endeavor to disclose . . . ex parte communication[s] to the parties as soon as possible." *United States v. Lanier*, 748 F. App'x 674, 678 (6th Cir. 2018). Other courts and judicial ethics codes agree. *See In re Kensington Int'l Ltd.*, 353 F.3d 211, 223 (3d Cir. 2003); Code of Conduct of United States Judges, Canon 3(A)(4); ABA Model Code of Judicial Conduct, Rule 2.9. Disclosure of *ex parte* communications is essential to rooting out the harm to the integrity of the underlying proceeding. *United States v. Barnwell*, 477 F.3d 844, 853 (6th Cir. 2007); *United States v. Napue*, 834 F.2d 1311, 1318–19 (7th Cir. 1987).

---

preserve all documents and records related to *ex parte* communications with Judge Polster, the Special Masters, or their staff.

Mr. Kahn represented to at least five municipalities that Mr. Weinberger engaged in regular *ex parte* communications with Judge Polster to "push[] this litigation along." R.6060-5*,* PageID #673713–14; *see also* R.6060-3, PageID #673648; R.6060-6, PageID #673758; R.6060-4, PageID #673690. Those statements were not bald speculation—they are statements by a senior member of Mr. Weinberger's legal team, while standing shoulder-to-shoulder with other members of Mr. Weinberger's consortium, none of whom questioned or corrected his assertions. And although Mr. Kahn testified that he did not have personal knowledge of *ex parte* communications, he admitted that he learned about them from members of his litigation group. R.6037, PageID #672861–63. Mr. Kahn also testified that he believed his statements to be true when he made them and that they "[a]bsolutely did not" mislead his clients. *Id.*, PageID #672863–64, 672882.

Those facts—coupled with Mr. Kahn's contradictory and "hard to believe" explanation of the intended meaning of his statements (R.6028, PageID #672734)—provide more than ample support for the disclosure the PBMs' sought. *See In re Kensington*, 353 F.3d at 223 (discovery of *ex parte* communications was required to "know all the circumstances").

**B.    Petitioners have no other adequate means of obtaining relief.**

Absent judicial intervention, the PBMs will learn nothing more about the *ex parte* communications that Mr. Kahn described. Judge Polster's rulings on the PBMs' motions for disclosure of *ex parte* communications are not final and thus not immediately appealable under 28 U.S.C. § 1291. And waiting for review until after a final judgment is a grossly "inadequate remedy" because the prejudice from *ex parte* communications and their lack of disclosure will have already shaped the litigation. *In re Lott*, 424 F.3d 446, 451 (6th Cir. 2005). Because the *ex parte* communications are discoverable only through judicial intervention, it is "clear that [the PBMs] have no other adequate means to attain the relief they desire." *John B. v. Goetz*, 531 F.3d 448, 457 (6th Cir. 2008) (citation omitted).

**C.    Mandamus is appropriate under the circumstances.**

In deciding whether to grant mandamus relief, this Court considers whether (1) a "petitioner will be damaged or prejudiced in a way not correctable on appeal" and (2) the "district court's order raises new and important problems, or issues of law of first impression." *In re Lott*, 424 F.3d at 449. Each of these considerations compels mandamus relief.

The prejudice from a lack of disclosure of *ex parte* communication is readily apparent. By denying the PBMs' requests for disclosure, Judge Polster has forced the PBMs to continue litigating while evidence suggests that plaintiffs' counsel have engaged in *ex parte* communications, the details of which the PBMs do not know. *See In re Kensington Int'l, Ltd.*, 368 F.3d 289, 309 (3d Cir. 2004).

And this Court has not had occasion to consider an attorney's public statements about *ex parte* communications, their effect on the appearance of impartiality, or the appropriate way to investigate such statements. Although mandamus relief would be appropriate to address those fundamental issues in any case, the concerns here "present[] 'important problems' that . . . evade appellate review" because they have arisen "in the MDL context especially." *See In re Nat'l Prescription Opiate Litig.*, 956 F.3d at 845–46. The PBMs are defendants in 84 cases in the MDL, and hundreds of additional plaintiffs are seeking to amend their complaints to add claims against the PBMs. "Addressing these issues now serves to provide district courts with guidance on such matters in the future." *John B.*, 531 F.3d at 461.

## <u>CONCLUSION</u>

Mr. Kahn's statements, and Judge Polster's reaction to them, have struck an irreparable blow to the integrity of the MDL. On the existing record, no reasonable observer would believe the PBMs have a fair and impartial forum if Judge Polster continues presiding over the cases pending against them. This Court should issue a writ of mandamus (1) directing the recusal of Judge Polster from all pending and future proceedings in the MDL involving the PBMs and (2) ordering the disclosure of all *ex parte* communications between plaintiffs' counsel and the District Court, the Special Masters, or their staff. *See* R.5968, PageID #671211–12.

Respectfully submitted, this 6th day of June, 2025.

| | |
|---|---|
| **ALSTON & BIRD LLP** | **QUINN EMANUEL URQUHART & SULLIVAN, LLP** |
| */s/ Brian D. Boone* | */s/ Jonathan G. Cooper* |
| Brian D. Boone | Christopher G. Michel |
| Matthew P. Hooker | Michael J. Lyle |
| 1120 South Tryon Street | Jonathan G. Cooper |
| Suite 300 | 1300 I St. NW, Suite 900 |
| Charlotte, NC 28203 | Washington, DC 20005 |
| (704) 444-1000 | (202) 538-8000 |
| brian.boone@alston.com | christophermichel@quinnemanuel.com |
| matthew.hooker@alston.com | mikelyle@quinnemanuel.com |
| | jonathancooper@quinnemanuel.com |
| D. Andrew Hatchett | |
| 1201 West Peachtree Street NW | *Counsel for Petitioner Express Scripts, Inc.* |
| Suite 4900 | |
| Atlanta, GA 30309 | |
| (404) 881-7000 | |
| andrew.hatchett@alston.com | |
| | |
| *Counsel for Petitioner OptumRx, Inc.* | |

## <u>CERTIFICATE OF COMPLIANCE</u>

This Petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 21(d)(1) because, excluding accompanying documents and the parts of the petition exempted by Rule 32(f), it contains fewer than 7,800 words. This petition complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook

*/s/ Brian D. Boone*

Brian D. Boone

DATED: June 6, 2025.

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2025, the foregoing was filed electronically with the Clerk of Court using the Court's CM/ECF system.

I further certify that on June 6, 2025, a copy of the foregoing was served upon the District Court and on Plaintiffs' Counsel by email. A paper copy will be mailed to the District Court on June 6, 2025.

*/s/ Brian D. Boone*

Brian D. Boone

DATED: June 6, 2025.

# DESIGNATION OF
## RELEVANT DISTRICT COURT DOCUMENTS

| R. No. | Description | PageID# |
|--------|-------------|---------|
| R.34 | Plaintiffs' Renewed Motion to Approve Co-Leads, Co-Liaisons, and Executive Committee | 332–353 |
| R.37 | Marginal Entry Order Granting Plaintiffs' Renewed Motion to Approve Co-Leads, Co-Liaisons, and Executive Committee | 362 |
| R.69 | Special Master Appointment Order | 443–450 |
| R.5012 | OptumRx's Motion to Vacate the Court's April 6, 2023 Order and For Other Relief | 611974–611986 |
| R.5411 | Plaintiffs' Motion to Lift Moratorium on Substantive Filings to Permit Plaintiffs to File Motions for Leave to Amend to Add Defendants | 635512–635515 |
| R.5455 | Order on Motion to Lift Moratorium to Permit Motions to Amend | 637947–637949 |
| R.5547 | Plaintiffs' Omnibus Motion for Leave to Amend to Add Optum Defendants and Memorandum of Law in Support | 640468–640490 |
| R.5548 | Plaintiffs' Omnibus Motion for Leave to Amend to Add Express Scripts Defendants and Memorandum of Law in Support | 640593–640614 |
| R.5850 | Notice Regarding PBM Petition for Writ of Mandamus Regarding Discovery Orders | 659644–659645 |
| R.5885 | The PBMs' Joint Opposition to Plaintiffs' Omnibus Motions for Leave to Amend [Part I] | 660586–660701 |

| R.5885-1 | The PBMs' Joint Opposition to Plaintiffs' Omnibus Motions for Leave to Amend [Part II] | 660702–667211 |
| R.5961 | OptumRx's Opposition to the PEC's Emergency Motion Regarding Public-Records Requests | 671097–671124 |
| R.5962 | Express Scripts' Opposition to Plaintiffs' Emergency Motion for Relief Regarding PBM Counsel's Public Records Requests | 671189–671193 |
| R.5968 | The PBMs' Motion for Disclosure of *Ex Parte* Communications | 671204–671213 |
| R.5969 | Order Regarding Michael Kahn Hearing | 671284 |
| R.5986 | Corrected Transcript of February 25, 2025 Hearing | 671805–671819 |
| R.5999 | PBMs' Motion for Reconsideration of Order Denying Disclosure of *Ex Parte* Communications and for Related Relief Regarding Evidentiary Hearing | 672263–672269 |
| R.6001 | Order Denying PBMs' Motion for Reconsideration | 672278–672279 |
| R.6028 | Order Regarding Attorney Michael Kahn | 672733–672736 |
| R.6031 | Order Regarding OptumRx's Objection to Discovery Ruling 14, Part 34 and Motion for Interlocutory Appeal | 672747–672750 |
| R.6037 | Transcript of March 12, 2025 Hearing Regarding Michael Kahn | 672807–672890 |
| R.6060 | The PBMs' Motion for Recusal and for Renewed Reconsideration of their Motion for Disclosure of All *Ex Parte* Communications | 673584–673585 |
| R.6060-1 | The PBMs' Memorandum of Law Supporting their Motion for Recusal | 673586–673603 |

|  | and for Renewed Reconsideration of their Motion for Disclosure of All *Ex Parte* Communications |  |
|---|---|---|
| R.6060-2 | Ex. A (Transcript of January 3, 2019 Palm Bay City Council Meeting) | 673604–673632 |
| R.6060-3 | Ex. B (Transcript of February 4, 2019 City of Oviedo Council Meeting) | 673633–673672 |
| R.6060-4 | Ex. C (Transcript of March 4, 2019 Fort Pierce, Florida City Commission Meeting) | 673673–673704 |
| R.6060-5 | Ex. D (Transcript of June 3, 2019 Deltona City Commission Meeting) | 673705–673753 |
| R.6060-6 | Ex. E (Transcript of June 11, 2019 Clay County Commissioner Meeting) | 673754– 673798 |
| R.6060-7 | Ex. F (Transcript of October 3, 2019 Palm Bay, Florida Council Meeting) | 673799–673821 |
| R.6084 | The PEC's Opposition to the PBMs' Motion for Recusal and for Renewed Reconsideration of their Motion for Disclosure of All *Ex Parte* Communications | 674794–674810 |
| R.6123 | Order Denying PBMs' Motion for Recusal | 682814–682836 |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION | ) | **CASE NO. 1:17-MD-2804** |
| OPIATE LITIGATION | ) | |
| | ) | **Judge Dan Aaron Polster** |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| *All Cases* | ) | |
| | ) | **ORDER DENYING MOTION FOR** |
| | ) | **RECUSAL** |
| | ) | |

PBM Defendants Optum and ESI move for recusal of the undersigned from this MDL, and also for disclosure of all *ex parte* communications between the Court and any party or counsel. *See* docket no. 6060. For the reasons stated below, this motion is **DENIED**.

## I.    Facts.

The seed for the PBMs' recusal motion was planted when the Court ruled, in May of 2024, that MDL plaintiffs would be given one final opportunity to file motions to amend their complaints, to add defendants. Many hundreds of governmental subdivision plaintiffs (*e.g.*, cities and counties) responded by seeking leave to add Optum and ESI as defendants.

In response, Optum began a campaign of filing public records requests with every such plaintiff. These requests sought any confirmation that the city or county had explicitly authorized its counsel to add the PBMs as defendants—for example, as shown by minutes of a public hearing. *See, e.g.*, docket no. 5958-2 at 1 (public records request to City of Oviedo, Florida seeking, *inter alia*,

"All documents and other records relating to the City of Oviedo's approval to file any complaint in the Opioid Litigation" and "to amend or supplement its complaint in the Opioid Litigation."). The PBMs have asserted that, absent explicit authorization by the governmental subdivision at a public meeting, any motion to amend to add them as defendants is void. *See* docket no. 5961 at 1 (Optum stating the subdivisions "failed to secure the required authorizations from their clients to join the omnibus motions for leave to amend").

In response to these public records requests, many governmental subdivisions provided to the PBMs videos and minutes of public meetings that had occurred in 2019. During that timeframe, numerous plaintiffs' attorneys were meeting with cities and counties across the country, competing to sign them up as clients in opioid litigation. Pertinent to the PBMs' instant motion are public records supplied by five Florida municipalities recording the representation pitches made in 2019 by attorney Michael Kahn. Mr. Kahn's presentations included dramatic statements about the undersigned and also about Peter Weinberger, who is MDL Plaintiffs Liaison Counsel. The PBMs summarize Mr. Kahn's statements as follows:

> On January 3, 2019, Mr. Kahn spoke to the City of Palm Bay, Florida, on behalf of his consortium of lawyers (including Mr. Weinberger) that the City had retained for opioid litigation. Mr. Kahn told the City that it was well positioned to litigate claims in the MDL because Mr. Weinberger has "total access to the judge" and can communicate "singly" with the Court "on behalf of his clients." A month later, while pitching his consortium's legal services to the City of Oviedo, Florida, Mr. Kahn boasted that Mr. Weinberger "talks to the judge every day." And yet another month later, Mr. Kahn bragged to another prospective client—the City of Fort Pierce, Florida—that Mr. Weinberger was one of three Plaintiffs' lawyers who could "pick up the phone and talk to the judge" as often as "every day."
>
> The statements continued. On June 3, 2019, Mr. Kahn told the City of Deltona, Florida (yet another prospective client), that Mr. Weinberger "is able to pick up the phone literally, and does, every day to talk with the judge about pushing this

litigation along." A week later, when pitching his consortium's legal services to Clay
County, Florida, Mr. Kahn said that Mr. Weinberger "is able to talk [to] the judge on
a daily basis" and provides Plaintiffs with "inside information."

Mr. Kahn described Mr. Weinberger's communications with the Court as "ex
parte," telling his audience that they were "unusual" and of the sort that are "generally
disallowed" in litigation. He also told the municipalities that Judge Polster is "a
tremendous plaintiff-oriented judge" who is using his "great power and specific intent
to try to compel settlement[s] from the defendants" through "enormous pressure."

Docket no. 6060-1 ("Motion") at 3-4 (footnotes and citations omitted).[1]

If true, these statements would certainly be grounds for recusal and cause for alarm. Upon

receipt of these public records, the PBMs moved for an order requiring disclosure of all *ex parte*

communications between: (i) "any plaintiffs' counsel" (not just Mr. Weinberger), and (ii) "the Court,

any Special Masters, or their staff" (not just the undersigned). *See Motion for Disclosure of Ex Parte

Communications* at 2 (docket no. 5968). The PBMs did not move for disclosure of *ex parte*

communications of **defense** counsel, even though the PBMs included quotes from Mr. Kahn showing

he believed (and told prospective clients) that certain attorneys for defendants also had "total access"

---

[1]     As the PBMs note, each of Mr. Kahn's statements quoted above were video-recorded and
the recordings can be viewed on the internet. *See* Motion at 4 n.1.

to the judge. *Id.* at 2-4.[2]

The Court addressed the motion for disclosure of *ex parte* communications less than 12 hours later, at a previously-scheduled conference. The Court denied the motion, stating it believed Mr. Kahn's remarks were "fundamentally untrue;"[3] but the Court also immediately set an evidentiary hearing and ordered Mr. Kahn to appear in person to testify regarding "the basis for those statements." Tr. at 6 (docket no. 5986) (Feb. 27, 2025); *see also* tr. at 13 ("I shall get to the bottom

---

[2]     Specifically, at a Palm Bay, Florida City Council meeting, Mr. Kahn boasted:

>       One of our group members, a man by the name of Peter Weinberger, is one of three plaintiffs lawyers who is in a liaison position with Judge Polster. And what that means, this multidistrict litigation is different than any other litigation or any type of even mass tort litigation because these three plaintiffs lawyers have total access to Judge Polster. **Also the defendants have a liaison team**. But we are privileged in this group to have one of three lawyers in the United States **as a liaison to Judge Polster, which means they have total access to the judge.**

Docket no. 6060-2 at 5 (emphasis added). Similarly, at a City of Deltona, Florida Commission meeting, Mr. Kahn stated:

>       Of all of the [plaintiff] litigators in the country—and there's not that many that are working on these cases—there are 20 of them in an executive committee. Of those 20, **there are three individuals who have [a] direct relationship professionally with the judge, that can literally pick up the phone and talk to the judge any day**.
>       And as Skip knows, that's called ex parte communications. And it's generally disallowed in any litigation. However, multidistrict litigation is different. And you can have a situation where Peter Weinberger—and his bio is on Page 7—is able to pick up the phone literally, and does, every day to talk with the judge about pushing this litigation along. **Granted, the defendants also have three individuals**, but it's a privilege for this group to have one of the three individuals in the country that is contacting the judge.

Docket no. 6060-5 at 8-9 (emphasis added).

[3]     Thus, PBMs are squarely incorrect when they assert that "no one in a position to deny *ex parte* communications has done so on the record." Motion at 11. *See* also footnote 4, below.

of it directly with Mr. Kahn and see what he has to say."). During the same conference, Mr. Weinberger averred that Mr. Kahn's statements were "not correct."[4]

The PBMs then moved for reconsideration of their motion and added two additional requests: (1) the Court should require Mr. Weinberger to testify under oath at the evidentiary hearing; and (2) a neutral, disinterested judge should preside over the hearing, rather than the undersigned. *See Motion for Reconsideration* at 3 (docket no. 5999). The Court denied this motion as well, noting the entire basis for each of the PBMs' requests was "unsupported hearsay." *Order Regarding Motion for Reconsideration* at 1 (docket no. 6001). The Court explained:

> The PBMs have certainly demonstrated a need to question Mr. Kahn under oath regarding his statements, and the Court has scheduled a hearing to do so on March 12, 2024. But Mr. Kahn's bald, unsworn statements are an insufficient basis to enter the sweeping order the PBMs seek. If Mr. Kahn's testimony demonstrates a basis for questioning any additional witnesses, or to order the production of any documents or

---

[4]     Specifically, Mr. Weinberger stated:

> On the Michael Kahn issue, late last night, as you know, the motion that was filed by PBMs attached the minutes from the City of Deltona, Florida, and the comments [at]tributed to Michael Kahn and another local counsel.
> And I just wanted to put on the record that had I been—had I been at the meeting, I wish I was, had I been at the meeting, I would have corrected what—what I consider to be a very clumsy description by Mr. Kahn of the duties and responsibilities of a liaison counsel. It was not and is not correct.
> It was not and is not the way in which I or any other liaison counsel associated with this case have conducted themselves. I am very bothered by it. I'm bothered by his comments about you, your Honor. They were inappropriate, so I want you to know that and to put that on the record at this time.
> I have not talked to Mike, to Mr. Kahn about this. I believe I met him by Zoom maybe once, and as I said, had I been there and had I known that he was making these statements, I would have corrected them immediately with respect to what went on six years ago.

Tr. at 12-13 (docket no. 5986).

communications, the Court will take appropriate action at that time.

*Id.* at 1-2.

The Court then held the promised hearing, and Mr. Kahn traveled from Melbourne, Florida to Cleveland, Ohio to testify. Mr. Kahn took the witness stand shortly after 1:30 p.m. and answered questions under oath for a total of over two hours: 45 minutes of questioning by the Court, followed by 75 minutes by counsel for the PBMs, followed by 5 minutes by Mr. Weinberger and Mr. Kahn's own counsel, Mr. Alkire.

Because of its central importance, the Court sets forth below a thorough summary of Mr. Kahn's testimony at this hearing, rather than the shorter summaries the parties provide in their briefs.[5]

The Court began the questioning of Mr. Kahn. Mr. Kahn testified he is "generally a trial lawyer," but his activity in this MDL was his "first mass tort case." Tr. at 5 (docket no. 6025). In 2019, because he had "political contacts," he was asked to join a group of attorneys seeking to represent Florida governmental subdivisions in the Opioid MDL. *Id.* at 6. His job was to make presentations to cities and counties, to get "clients." *Id.* at 8.[6]

The Court quickly turned to the matter at hand, asking Mr. Kahn about the statements he made during his initial client presentations:

> [T]he statements that are of concern to the parties in this litigation and to the Court are those in which you told these prospective clients that Plaintiffs' lawyers had the ability and were regularly making *ex parte* communications to the Court. That

---

[5]   The Court has made very minor punctuation changes to some of the transcript quotations in this Order, to improve readability.

[6]   *See also id.* at 24, 26 (Mr. Kahn confirming it was his job only to obtain and sign up clients; he did not know if his clients later participated in settlements or still had claims against any remaining defendants).

6

would be me and/or my staff.

So let's start with those. So did—those statements have been recorded, and you admit you are the one who made the statements. I would like you to explain those statements and provide the basis for those statements.

*Id.* at 10. Mr. Kahn's response was as follows:

[T]he first thing I wanted to say is that I misspoke in the clear sense of the word about "regularly"—I am just going to take the one you just said, "regularly making *ex parte* communications."

I did not use that—I used it in a colloquial term. I can define for the Court why I used it and what I meant.

I am an experienced lawyer and 47 years in, and I should have used another word. I should have described it differently. **I don't know of any** *ex parte* **communications. * * ***

I know of no—I know Peter Weinberger. I just met your Honor and know the other lawyers in the group, and **I know of no** *ex parte* **communications that were made**, and this is my own belief system.

I know that [my co-counsel] group would never make *ex parte* communications. I know your Honor wouldn't, just .... By instinct I know it, just by the character of knowing Peter Weinberger in the times I have met him I know it, and by reputation of both of you, I know it, **and I don't have any evidence of any** *ex parte* **communications.**

**So it was a dumb statement to make**. It was an inartful statement, and to borrow Peter's very gracious way of describing it in the transcript, and he graciously calls it "clumsy." And it was certainly that.

I can describe what I meant by it, but it was not meant as a term of art. **It was meant in its colloquial sense in trying to describe [to] lay people and some lawyers, Peter's role**, which as liaison counsel, which as I was reviewing the booklet [that my group gave to prospective clients]—and then I will stop—in the executive statement in our booklet, it actually perfectly describes his role as liaison counsel, period.

And it was—I misspoke. It was an inartful way of describing it, and after 47 years of an unblemished career, I can't apologize enough for it to all parties.

*Id.* at 11-12 (emphasis added).

7

When the Court sought further explanation, Mr. Kahn testified that: (1) he understood MDL Plaintiffs and MDL Defendants each had three liaison counsel, Mr. Weinberger being one of them, *id.* at 14, 15; (2) any one of these six liaison counsel could arrange a meeting with the Court without all of the hundreds of other client lawyers attending, *id.* at 16; and (3) all of these other client lawyers "were the people who the words '*ex parte*' applied to because they would have a right to be there. And that's why I defined it in the way that I did for your Honor. It may be wrong." *Id.* at 16-17.

The Court confirmed with Mr. Kahn that his "colloquial" use of the term *ex parte* was most certainly wrong, and what he meant was not what he said.[7]

The Court then asked Mr. Kahn to explain his other statements to prospective clients that the

---

[7]    Specifically, the Court responded to Mr. Kahn as follows:

> Q. Well, you understand in legal parlance, legal ethics, "*ex parte*" doesn't mean only some of the people on one side are meeting with the Court, and so it is *ex parte* as to the rest of the people on that side. It means that only one side to a dispute is meeting privately or speaking privately to the Court.
> A. I understand.
> Q. Do you agree that's the common sense definition of that term?
> A. That—I do, your Honor. I understand what the Court is saying to me. * * * I was just trying to go explain as best I could what I meant, but I understand the Court.
> Q. All right. So you were saying correctly in an MDL you don't have a hundred or 200 or 300 lawyers meeting with the Court every time something comes up. Each side has a small number of lawyers who are tasked with working out logistics and administrative details. And you have a small group from the Plaintiffs and a small group from the Defendants, and they meet with the Court regularly?
> A. That's what I was—the best way I can put it to the Court today, that's exactly what I meant to say.
> Q. All right. You appreciate that that is not how—if you ask a third-year law student what does an *ex parte* communication with the Court mean, I don't think he would come up with the definition you just gave.
> A. I agree, Judge.

*Id.* at 16-18.

undersigned "is a Plaintiff-oriented Judge who is pushing all the Defendants to settle and is using my great power and specific intent to try to compel settlements from Defendants." *Id.* at 18. Mr. Kahn responded he "shouldn't have used the words 'Plaintiff-oriented.'" *Id.* But when he made those statements, he knew that the Court: (1) had denied defendants' motion to dismiss, and (2) was encouraging settlement. *Id.* at 18-19. Mr. Kahn continued:

> I should have used another word than "Plaintiff-oriented," but it was based upon the fact that your Honor was encouraging settlement. And obviously, settlement means payment of money or usually means payment of money from Defendants to Plaintiffs, and * * * what I did, your Honor, I said, I juxtaposed this with what was going in state court.
>
> * * * [In my client presentations] I said, unlike the state case that was brought—because, as your Honor knows better than I, there were many states as well as federal cases—unlike the state cases that were brought, and I use the word "languishing," or I am using it now, languishing in state court with pending motions to dismiss, your Honor was encouraging settlement.
>
> And so I felt that that meant something, but what it didn't mean is to misconvey a situation that you were always going to rule for the Plaintiffs or something like that. I should have used another word.

*Id.* at 19-20.

When the Court asked Mr. Kahn whether he had "specific knowledge that I was misusing my great power?", he replied: "Absolutely, not, Judge." *Id.* at 20-21. Asked whether "any of the lawyers in your group or any of the lawyers in the PEC [Plaintiffs Executive Committee] . . . — did any of them say that I was using my power and intent to try to compel settlements from Defendants? Did you get this from someone else?", Mr. Kahn replied: "No, your Honor. The best they said was that you were encouraging settlement." *Id.* at 21.

The Court then invited counsel for the PBMs to examine Mr. Kahn. The principal points of new information that the PBMs' counsel elicited were the following:

9

- Mr. Kahn "misspoke" *repeatedly*, stating numerous times to different prospective clients in public meetings that Mr. Weinberger had *ex parte* communications with the Court and that the Court was plaintiff-oriented. *Id.* at 70.

- Nobody who was with Mr. Kahn when he made his statements during his 2019 client presentations corrected him. *Id.* at 58-59. No member of the MDL Plaintiffs Executive Committee ("PEC") ever corrected him either, although Mr. Kahn did not believe any PEC member (including Mr. Weinberger) knew he made those statements. *Id.* at 59-60.

- Mr. Kahn has not contacted any of this clients to tell them he "misspoke" when he made his 2019 statements. *Id.* at 66.

- Mr. Kahn told one prospective client (Palm Bay City) *in 2019* that he had "really gotten to know the members of [his attorney consortium] group," including Mr. Weinberger. In contrast, Mr. Kahn testified at the hearing on March 12, 2025 that he had actually spoken with Mr. Weinberger only twice before this matter arose—once during a group teleconference and once at a "very short" multi-person meeting, both in 2019. *Id.* at 49-50; *see also id.* at 79-81 (confirming this under questioning by Mr. Weinberger).

Counsel for PBMs also engaged in colloquies with Mr. Kahn that underscored some of his responses to the Court's own earlier questions. For example, Mr. Kahn confirmed his entire role for his consortium was to obtain clients; and that when doing so, he laid it on thick:

> Q. And you are in pitch mode, here [during your client presentation]. You want to win the work.
> A. Excuse me?
> Q. You are in pitch mode, you want to win the work, correct?
> A. That was my job.

*Id.* at 44-45; *see also id.* at 66 ("once I obtained them, again, that was the end of my job").

> Q. Okay. You wanted your pitches to stand out. Is that fair to say?
> A. Yes.
> Q. You wanted your pitches to be the best, correct?
> A. That's true.

*Id.* at 74.

Mr. Kahn also expanded on his incorrect understanding of *ex parte* communications:

10

Q. And what you are talking about is Mr. Weinberger getting inside information from the Court, correct?

* * *

A. No. I was not talking about that. I was talking about the privileged position of having on our team one of three Plaintiffs' members or Plaintiffs' liaison counsel.

There was also three defense liaison counsel, and as I was trying to describe to the Court in the meetings that were held amongst the three or one or how-so-many-ever of the defense liaison would meet with the Plaintiffs' liaison and the Court, we could get information quickly.

But only so much as Peter was permitted to tell us, meaning that there were things that just because of his position he might not be able to tell us things that the Court didn't want anybody to know, and so he was in a very privileged position.

So whatever he could tell us, it was our privilege to have a person who was one of three people in the country representing the Plaintiffs, and there is three representing the Defendants. They would be equally privileged to have that sort of an individual in their group.

*Id.* at 52-53.

Finally, Mr. Weinberger asked a few questions of Mr. Kahn, as did Mr. Kahn's own attorney, Mr. Alkire. The most salient portions are set forth here:

BY MR. WEINBERGER:

Q. Now, at no time did you ever hear from me, Mr. Kahn, that I was able to call the Judge everyday and have an *ex parte* conversation with him, correct?

A. That's correct.

* * *

Q. Before making any of these presentations, did you ever inform me personally that you were going to make the presentations to any of these prospective clients?

A. No.

Q. After you made the presentations to any of these prospective clients, did you ever inform me about those presentations?

A. No.

Q. Up until the time that the motion was filed that brought us to today, did you ever inform me that you made these comments that are at issue today to any of

11

these prospective clients?

      A. No.

*Id.* at 81-82.

      BY MR. ALKIRE:

      Q. Mr. Kahn, are you aware of any specific *ex parte* communications between any Plaintiffs' counsel and the Court, Special Masters, or their staff?

      A. No.

      Q. Mr. Kahn, did you ever participate in any *ex parte* communications with the Court, Special Masters, or their staff?

      A. No.

      Q. Lastly, are you aware of any individuals who participated in *ex parte* communications with the Court, Special Masters, or their staff?

      A. No.

*Id.* at 82-83.

After Mr. Kahn stepped down from the witness stand, the Court concluded the hearing. Counsel for the PBMs asked "to have Mr. Weinberger on the stand for a complete record," but the Court overruled this request, stating: "There is no reason to put Mr. Weinberger on the stand because no one has put in any evidence that Mr. Weinberger made any of these statements, knew of them in advance, or for that matter knew of them afterward. So the request is denied." *Id.* at 83.

Three days after the hearing, the Court issued an Order concluding "it must impose a significant sanction upon Mr. Kahn, as his repeated 2019 statements, ***made without any factual basis***, improperly cast aspersions upon the integrity of the Court, Mr. Weinberger, and the entire process of the MDL." *Order Regarding Attorney Michael Kahn* at 3 (docket no. 6028) (emphasis

12

added).[8] The Court fined Mr. Kahn $100,000, which is a small fraction of the $1.8 million in Opioid MDL contingent fees he has received to date. Mr. Kahn did not contest the sanction and paid it on April 11, 2025.

## II.  Applicable Law.

The PBMs cite 28 U.S.C. §§ 455(a) and 455(b)(1) and argue that, in light of the facts set forth above, each section requires this Court to recuse itself.

Section 455(a) states that a federal judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." This language focuses not on whether the judge has any actual prejudice, but on appearances: disqualification may be necessary "even though no actual partiality exists," because "justice must satisfy the appearance of justice." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860, 864 (1988). The test is an objective one, "ask[ing] what a reasonable person **knowing all the relevant facts** would think about the impartiality of the judge." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 7482137 at *1 (6th Cir. Oct. 10, 2019) (quoting *Roberts v. Bailar*, 625 F.2d 125, 129 (6th Cir. 1980) (emphasis added)). "[R]ecusal is required when a reasonable person would harbor doubts about the judge's impartiality." *In re Aetna Cas. & Sur. Co.*, 919 F.2d 1136, 1143 (6th Cir. 1990). A judge's "introspective estimate of his own ability impartially to hear a case" is not the test. *Bailar*, 625 F.2d at 129.

Section 455(b)(1) moves away from appearances and focuses on actual partiality or

---

[8]     The Court also observed that it appeared Mr. Kahn had violated Rule 4-7.13(a)(3) of the Rules Regulating The Florida Bar, which states: "A lawyer may not engage in deceptive or inherently misleading advertising. . . . An advertisement is deceptive or inherently misleading if it . . . implies the existence of a material **nonexistent** fact." *Id.* at 3 n.2 (emphasis added).

knowledge. The statute states a federal judge "shall" disqualify himself "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). When a party challenges the judge's personal bias or prejudice, "the question is whether a reasonable person would be **convinced** the judge was biased." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisc., Inc*., 991 F.2d 1249, 1255 (7th Cir. 1993) (emphasis added).

### III.    Analysis.

The PBMs are unsatisfied with the result of the Court's hearing with Mr. Kahn and with the Court's rulings on their motions for disclosure of *ex parte* communications. The PBMs argue that, at the hearing, "[n]either Mr. Weinberger nor anyone else submitted evidence contradicting Mr. Kahn's [2019] statements, so Mr. Kahn's statements stand unrebutted." Motion at 1. But this assertion purposefully ignores virtually everything Mr. Kahn, himself, said at the hearing.

While **under oath**, Mr. Kahn repeatedly and consistently stated he did not know of any *ex parte* communications between any attorney and the Court. Although Mr. Kahn did repeatedly state during client pitches **in 2019** (**not under oath**) that Plaintiffs' Liaison Counsel engaged in *ex parte* communications, he explained **in 2025** (**under oath**) what he meant when he said that—that is: (1) both Plaintiffs' and Defendants' Liaison Counsel could appear and converse with the Court without all of the other clients' counsel present; and (2) because his consortium included one of the six MDL Liaison Counsel, his clients would benefit. The PBMs adduced at the hearing **no** non-hearsay evidence of **actual** *ex parte* communications—as that term is properly understood—between **any** attorney and the Court, the Special Masters, or their staff. Similarly, the PBMs adduced at the hearing

14

*no* non-hearsay evidence that *any* attorney told Mr. Kahn the undersigned had the "power and specific intent" to pressure and compel defendants to settle.

Moreover, as this Court stated on the record immediately after receiving the PBMs' original motion for disclosure, Mr. Kahn's statements were and are "fundamentally untrue." Tr. at 6 (docket no. 5986). Regardless of the evidence adduced at the hearing, this Court again reaffirms it has never engaged in *ex parte* communications with Mr. Weinberger or any other attorney, except during the early, smaller settlement conferences to which all parties gave prior consent.[9] Similarly, all of the later, global settlements were facilitated by an outside mediator or by the Special Master or his staff, with the prior consent of all mediating parties. In the more than seven years of this MDL, no attorney or party has alleged the Court compelled them to settle, or even tried to do so.

The circumstances presented here are thus entirely distinguishable from every other case the PBMs cite for the proposition that the Court should recuse. In each of those cases, as summarized below, there was undisputed evidence that an unconsented *ex parte* communication **had** occurred, and was acknowledged by the judge. The differences between the circumstances in those cases and this one are stark:

- *ControlSoft, Inc. v. Dow Chem. Co.*, 2024 WL 5400258 (N.D. Ohio July 18, 2024) (Polster, J.): The undersigned recused after plaintiff's counsel unilaterally sent to the Court a settlement position statement without the consent of defendant. This Court concluded "the letter was an improper and unsolicited extrajudicial communication to the Court," leading to a situation where "a reasonable and disinterested observer might question the Court's impartiality on future rulings in this case." *Id.* at *3. This Court granted a motion to recuse even though it was "by no means a situation where recusal is mandatory." *Id.*

---

[9]     The PBMs insist the part about settlement conferences being consented to is not true; the Court addresses this issue below.

- *In re Kensington Int'l, Ltd.*, 368 F.3d 289 (3rd Cir. 2004): In an asbestos case, the district court appointed two neutral advisors and received *ex parte* communications from them. However, the two advisors also "had a duty to act as zealous advocates for the future asbestos claimants" in a related bankruptcy case. *Id.* at 304, 305. This required recusal because there exists "an almost irrebutable presumption that a judge is 'tainted' and must be disqualified where, as here, he surrounds himself with individuals who may not be truly disinterested." *Id.* at 308.

- *In re Sch. Asbestos Litig.*, 977 F.2d 764 (3rd Cir. 1992): The district court attended a conference sponsored by plaintiffs, "his expenses were largely defrayed by the conference sponsors," and "thirteen of the eighteen expert witnesses the plaintiffs were intending to call [at trial] gave presentations [at the conference]." *Id.* at 782. The judge's recusal was required because a "reasonable person might suspect that Judge Kelly's plaintiff-subsidized attendance at the 'preview' of the plaintiffs' case would have predisposed him toward the plaintiffs' position." *Id.*

- *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996): "[T]he district judge appointed a panel of three experts to investigate the state's institutions and programs," and "the panel began to meet in private with the judge." *Id.* at 257. "[A]t least one meeting had covered the merits of the case." *Id.* at 258. Recusal was thus required because a "thoughtful observer aware of all the facts . . . would conclude that [the judge's] preview of evidence by a panel of experts who had become partisans carries an unacceptable potential for compromising impartiality." *Id.* at 259-60.

In every one of these cases, it was ***undisputed*** that the judge ***did*** receive *ex parte* communications—the judge in each case acknowledged this. Here, the entire basis for the PBMs' recusal motion were Mr. Kahn's 2019 hearsay assertions, which he testified under oath were ***misrepresentations***: he knew of and knows of ***no ex parte*** communications. And the Court personally reaffirms there is and was no basis for Mr. Kahn's 2019 statements.

In light of this evidence, the foundation for the PBMs' motion crumbles. Nonetheless, the PBMs try to cobble together alternative grounds. Their faulty logic proceeds as follows:

1.    In late 2022, plaintiffs' attorney Joanne Cicala sent a document to Special Master Cohen, and

not to the PBMs. The Court found this occurred due to "a misunderstanding," and "[i]mmediately after bringing it to the Court's attention, it was cured—Cicala sent the communication to defendants." *Order Denying Motion to Vacate* at 3 (docket no. 5015). The Court also wrote: "Th[is] "*ex parte* communication . . . was a singular, aberrant incident. There has not been, nor will there be, any further, substantive *ex parte* communications from either side." *Id.* The PBMs have known about this incident for over two years, and never moved for recusal or any other relief.

2.      Ignoring the Court's statement that the Cicala memo incident was "singular" and "aberrant," and brushing aside the fact it occurred over two years ago, the PBMs now assert misleadingly that the Court's declaration in 2023 that there will not be any "***further***" *ex parte* communications must mean there had been ***some***. *Reply* at 2, 4 (docket no. 6120). The PBMs contend the Cicala episode revitalizes Mr. Kahn's statements as true—even though he made the statements in 2019, while the single Cicala memo example did not involve Mr. Weinberger and it occurred in 2022.

3.      The PBMs also observe the Court engaged in *ex parte* **settlement** communications with plaintiffs and certain other defendants (not the PBMs), ***with the consent of the participating parties***, until March 2, 2020, when the participating defendants withdrew their prior consent. *See Notice Regarding Ex Parte Communications* (docket no. 3200).[10] The PBMs assert this shows the Court has a "penchant for *ex parte* settlement discussions," *Reply* at 2 (docket no. 6120), and further observe those discussions were not consented to by ***all*** parties—that is, the PBMs did not consent to the Court's settlement dialogue with the PEC and Distributors. But the PBMs never complained before 2025 that they had not consented to these *ex parte* communications, including when the Distributors publicly withdrew their consent. Still, the PBMs again assert this history of ***consensual*** *ex parte* communications shows Mr. Kahn's

---

[10]     In response to the defendants' withdrawal of their consent to *ex parte* settlement discussions, the plaintiffs argued that, "after more than two years of consenting to, and participating in, '*ex parte*' and other communications with the Special Masters and the Court—these defendants have waived any right to withdraw their prior consent." *Plaintiffs' Response to Notice by Certain Defendants Regarding Ex Parte Communications* at 1 (docket no. 3203). The Court found no waiver and honored the defendants' withdrawal. Up to that point, of course, the Court's *ex parte* communications with the parties were allowed. *See* Code of Conduct for U.S. Judges Canon 3, §A(4)(d) ("A judge may: . . . with the consent of the parties, confer separately with the parties and their counsel in an effort to mediate or settle pending matters.").

2019 statements—that ***improper ex parte*** communications occurred regularly—are plausible.

Boiled down, the PBMs point to communications about which the PBMs have known for years as evidence supposedly consistent with Mr. Kahn's 2019 statements. But no defendant, including the PBMs, contemporaneously argued those communications required recusal. If the Cicala memo incident was improper, then it was improper two years ago—but the PBMs did not move for recusal then. And if the Court's *ex parte* communications with parties during settlement talks were improper, then they were improper five years ago—but the PBMs did not move for recusal then. The PBMs' recent discovery of Mr. Kahn's statements does not now convert those earlier circumstances into grounds for disqualification.

In sum, the PBMs' subsequent discovery of Mr. Kahn's unsupported misrepresentations, which he retracted under oath, does not combine with anything else the PBMs have long known about to suggest the Court's impartiality might reasonably be questioned, nor to show the Court has a personal bias or prejudice. The picture the PBMs attempt to draw with their connect-the-distant-dots logic is shapeless.

The PBMs also insist the Court's entire approach to their discovery of Mr. Kahn's statements creates an appearance of impartiality. Specifically, the Court: (1) did not immediately give credence to Mr. Kahn's 2019 statements; (2) denied without prejudice the PBMs' request to place Mr. Weinberger under oath, stating it would consider that possibility only after Mr. Kahn was questioned; (3) similarly denied the PBMs' request to immediately order disclosure of all *ex parte* communications, stating it would consider that possibility only after Mr. Kahn was questioned; (4) denied the PBMs' request to have a disinterested judge preside over the hearing with Mr. Kahn; and (5) itself led off the questioning of Mr. Kahn. The PBMs assert this course of action, pursued after

18

denying all of the PBMs' procedural requests, raises "serious questions about the impartiality of the process." Motion at 11.

But the process was thorough and fair. Mr. Kahn was questioned for a total of two hours, more than half of which was by counsel for PBMs. The PBMs point to no unfair question by the Court, no unreasonable ruling on an objection, no hint that a different, "disinterested judge" would have done a better job. And Mr. Kahn was resolute in his sworn testimony that Mr. Weinberger never said he or anyone else on the PEC engaged in any private communications with the Court; that Mr. Weinberger never said the Court pressured any defendant to settle; and that he, Kahn, knew of no *ex parte* communications, and had no basis to believe any had occurred. Mr. Kahn repeatedly explained what he meant by his 2019 statements and he did not change his testimony when the PBMs questioned him. The Court is firmly convinced, and believes any fair and reasonable observer would conclude, that the evidence adduced at the hearing proved a simple fact: during his 2019 client pitches, Mr. Kahn engaged in exaggeration and puffery that crossed the line into misrepresentation and falsehood. If Mr. Kahn breached the rules of ethics with his statements, his actions comprised and revealed only deceptive advertising, not any actual *ex parte* communication or other inappropriate action by the Court.

The PBMs insist the Court **had** to order disclosure of all *ex parte* communications, given what Mr. Kahn said. But it cannot be true that, just because a person accuses the Court of engaging in improper *ex parte* communications, the Court must then immediately order disclosure and require counsel to testify. These unusual and exceptional measures would only be appropriate if the accuser is put under oath and the accusation is tested and found colorable. Here, when the Court did put the accuser to the test and allowed the PBMs to question him, the accuser disavowed the accusation

19

entirely. As reaffirmed earlier, this result is wholly consistent with this Court's own knowledge.

The PBMs also insist Mr. Kahn was not credible and even the Court found him untrustworthy. *See* reply at 3 ("Mr. Kahn's testimony was riddled with contradictions as he tried to reinterpret his repeated representations to his clients, reinterpretations that the Court agreed were unbelievable and lacking any credibility."). The PBMs' comprehension of the Court's assessment is incorrect. During the entirety of Mr. Kahn's testimony, the Court was extremely attentive to his demeanor, word choice, body language, and so on. The Court believes (and concludes any reasonable observer would believe) that Mr. Kahn "came clean" and confessed he had exaggerated and misrepresented in 2019—but he did not accept full responsibility for having done so.[11] Mr. Kahn was especially credible when he admitted his statements went beyond being "inartful," they were "dumb." Tr. at 12 (docket no. 6025).

Having reached this conclusion, the Court fined Mr. Kahn $100,000 for having repeatedly made statements in 2019, "***without any factual basis***, [that] improperly cast aspersions upon the integrity of the Court, Mr. Weinberger, and the entire process of the MDL." *Order Regarding Attorney Michael Kahn* at 3 (docket no. 6028) (emphasis added). That is the Court's final judgment. If the PBMs disagree with that conclusion, they can appeal that judgment. The PBMs are effectively stating the Court should not have sanctioned Mr. Kahn at all, because he only repeated what Mr. Weinberger told him. Even if the Sixth Circuit agrees, no objective, reasonable person ***knowing all the relevant facts*** would conclude the process the Court used or the judgment it reached is the result of bias or prejudice, or that the Court does not appear impartial.

---

[11]     *See* tr. at 76-78 (Mr. Kahn stating he thought his statements, as explained, did not mislead his clients and that he did not regret anything, except the trouble he caused Mr. Weinberger and the Court).

20

The Court's analysis of the PBMs' motion could end here, but the Court adds two more points.

*First*: The PBMs are apparently seeking the Court's recusal from the entire MDL, not just the cases where they are defendants. This is in contrast to their earlier, failed motion to disqualify Special Master Cohen only from "all pending and future proceedings ***that involve [PBMs]***." *In re: OptumRx, Inc.*, case no. 23-3882, *Order Denying Mandamus Petition* at 1 (6th Cir. Nov. 14, 2023) (MDL docket no. 5238) (emphasis added). If the PBMs' motion for disqualification had any merit, it is likely at least ***one*** of the scores of other manufacturer, distributor, and pharmacy defendants who ***continue to litigate*** in this MDL would join the PBMs' motion. Indeed, the claims against the PBMs were not being actively litigated in 2019 when Mr. Kahn made his statements, but the claims against the other defendants were—so these other defendants would have far more reason to be concerned, if there was any valid basis for recusal. Yet no other defendant joined the PBMs' motion.

*Second*: The test for recusal under §455(a) "asks what a reasonable person ***knowing all the relevant facts*** would think about the impartiality of the judge." *Bailar*, 625 F.2d at 129. Thus, a reasonable person might look to the "relevant fact" of how the Court has actually treated the party bringing the accusation of bias, especially right before that party levied the accusation. Here, the docket shows the Court's Order closest in time to the PBMs' recusal motion was its *Order Regarding Optum's Objection to Discovery Ruling 14, Part 34* (docket no. 6031), issued two weeks before the PBMs filed the instant motion. That *Order* reveals that: (1) Optum objected to Special Master Cohen's overruling of its privilege claims; and (2) the Court agreed with the Special Master that Optum "never provided the Special Master with sufficient information or context about the documents" to undertake the review Optum wanted. *Id.* at 1. Although Optum did provide to the

Court, with its objection, "some additional factual context missing from its presentation to the Special

Master," the Court noted this was too late:

> For many years, it has been the practice of the MDL Court not to consider "new evidence, case law, or legal theories [submitted] to the Court" in an objection to a discovery ruling that have not first been presented to the Special Master for his consideration. *See* docket no. 1349 at 2; *see* also docket no. 5053 at 3–4 (providing a detailed procedural history of the long-standing practice). Based on this established practice, the Court should disregard Optum's new details and rule only upon the facts and arguments Optum provided to the Special Master.

*Id.* at 3.

Accordingly, the Court sustained the Special Master's Ruling—but did so without prejudice,

and then ***allowed Optum to "present new evidence to Special Master Cohen***." *Id.* at 4 (emphasis

added). The Court noted this would be "the last time the Court will give any party a second

opportunity to support an overruled privilege claim with new evidence not first submitted to the

Special Master." *Id.* Essentially, the Court broke its own, long-standing rule and gave Optum a

second chance to prove its documents were privileged. *Compare Order Regarding Kroger's*

*Objection to DR 14-32* at 3-4 (docket no. 5053) (refusing to consider new evidence offered by

defendant Kroger and overruling its objection to the Special Master's Ruling).

If there is any bias shown here, it was in favor of Optum, not against it.


**IV.    Conclusion.**

The entire basis for all of the requests contained in the PBMs' motion for recusal is the

collection of statements made by Mr. Kahn in 2019. Once put under oath, Mr. Kahn retracted those

statements and testified that, contrary to what he said in 2019, he had no basis for his assertions that

this Court engaged in any *ex parte* communications with Mr. Weinberger or any other attorney, and had no basis for his assertions that the Court intended to compel defendants to settle. The Court concluded Mr. Kahn's 2019 statements were all misrepresentations and extreme puffery, made for the purpose of securing clients, and Mr. Kahn did not contest this Court's Order directing him to pay a $100,000 fine as a result.

Ultimately, then, the PBMs point to no credible or admissible evidence that this Court engaged in any unconsented *ex parte* communication with anyone; and the Court reaffirms it did not.

"Motions to recuse under 28 U.S.C. § 455(a) must rest on the kind of objective facts that a reasonable person would use to evaluate whether an appearance of impropriety had been created, ***not on . . . unsubstantiated allegations***." *United States v. Martorano*, 866 F.2d 62, 68 (3rd Cir. 1989) (emphasis added). Here, the PBMs allegations are all unsubstantiated. Accordingly, the PBMs' motion for disqualification and for disclosure of *ex parte* communications is denied.

**IT IS SO ORDERED.**

/s/ *Dan Aaron Polster*
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

**Dated:** April 29, 2025

23

## CASE NO. _____

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**
————————

In re OptumRx, Inc. and Express Scripts, Inc.
*Petitioners.*
————————

From the United States District Court
Northern District of Ohio, Eastern Division
Case No. 17-MD-2804
————————

## MOTION FOR EXPEDITED CONSIDERATION

Brian D. Boone
Matthew P. Hooker
ALSTON & BIRD LLP
1120 South Tryon Street
Suite 300
Charlotte, NC 28203
(704) 444-1000
brian.boone@alston.com
matthew.hooker@alston.com

D. Andrew Hatchett
ALSTON & BIRD LLP
1201 West Peachtree Street NW
Suite 4900
Atlanta, GA 30309
(404) 881-7000
andrew.hatchett@alston.com

*Counsel for Petitioner*
*OptumRx, Inc.*

Christopher G. Michel
Michael J. Lyle
Jonathan G. Cooper
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I St. NW, Suite 900
Washington, DC 20005
(202) 538-8000
christophermichel@quinnemanuel.com
mikelyle@quinnemanuel.com
jonathancooper@quinnemanuel.com

*Counsel for Petitioner Express Scripts,*
*Inc.*

In accordance with Sixth Circuit Rule 27(f), Petitioners OptumRx, Inc. and Express Scripts, Inc. (the **PBMs**) move for expedited consideration of their Petition for Writ of Mandamus (1) directing the recusal of Judge Polster from all pending and future proceedings involving the PBMs in *In re National Prescription Opiate Litigation*, No. 17-MD-2804 (N.D. Ohio) (the **MDL**) and (2) ordering the disclosure of all past *ex parte* communications between plaintiffs' counsel and the District Court, the Special Masters, or their staff.

1.    On April 2, 2025, the PBMs moved for Judge Polster's recusal under 28 U.S.C. § 455(a) & (b)(1) based on (1) statements made by plaintiffs' attorney Michael Kahn regarding *ex parte* communications between Mr. Kahn's co-counsel, Peter Weinberger, and Judge Polster, and (2) Judge Polster's resistance to a fulsome investigation into the existence of *ex parte* communications once the PBMs' brought Mr. Kahn's statements to the District Court's attention. R.6060; R.6060-1. In the same motion, the PBMs also sought (for a third time) an order requiring disclosure of all *ex parte* communications. R.6060; R.6060-1. On April 29, 2025, Judge Polster denied the PBMs' motion. R.6123.

2.      The PBMs are defendants in 78 cases before Judge Polster in the MDL. Judge Polster is also presiding over two PBM bellwether cases in the MDL, both of which are in active pre-trial proceedings. The parties' next status conference with Judge Polster is scheduled for July 9, 2025. R.6152, PageID #683616.

3.      Expedited consideration is warranted because Judge Polster's continued involvement in the cases against the PBMs will prejudice them given the clear bases for questioning his impartiality. *Ex parte* communications are "a gross breach of the appearance of justice" and "undermine[] confidence in the impartiality of the court." *United States v. Minsky*, 963 F.2d 870, 874 (6th Cir. 1992). By declining to recuse himself and denying the PBMs' requests for disclosure of *ex parte* communications, Judge Polster has forced the PBMs to continue litigating in a forum that has lost all appearance of neutrality. *See In re Kensington Int'l, Ltd.*, 368 F.3d 289, 309 (3d Cir. 2004). Doubt hangs over all the proceedings and decisions below—even those that are otherwise proper—because of reasonable suspicions that Judge Polster has "already concluded th[e] issue[s]" based on *ex parte* communications. *See In re Sch. Asbestos Litig.*, 977 F.2d 764, 782, 785 (3d Cir. 1992).

2

4.     To avoid those issues, the PBMs respectfully request that this Court consider their Petition as expeditiously as reasonably feasible. The PBMs stand ready to reply to any responsive papers ordered by the Court on short notice.

Respectfully submitted, this 6th day of June, 2025.

| **ALSTON & BIRD LLP** | **QUINN EMANUEL URQUHART & SULLIVAN, LLP** |
|---|---|
| */s/ Brian D. Boone* | */s/ Jonathan G. Cooper* |
| Brian D. Boone | Christopher G. Michel |
| Matthew P. Hooker | Michael J. Lyle |
| 1120 South Tryon Street | Jonathan G. Cooper |
| Suite 300 | 1300 I St. NW, Suite 900 |
| Charlotte, NC 28203 | Washington, DC 20005 |
| (704) 444-1000 | (202) 538-8000 |
| brian.boone@alston.com | christophermichel@quinnemanuel.com |
| matthew.hooker@alston.com | mikelyle@quinnemanuel.com |
| | jonathancooper@quinnemanuel.com |
| D. Andrew Hatchett | |
| 1201 West Peachtree Street NW | *Counsel for Petitioner Express Scripts, Inc.* |
| Suite 4900 | |
| Atlanta, GA 30309 | |
| (404) 881-7000 | |
| andrew.hatchett@alston.com | |
| | |
| *Counsel for Petitioner OptumRx, Inc.* | |

## CERTIFICATE OF SERVICE

I hereby certify that on June 6th, 2025, the foregoing was filed electronically with the Clerk of Court using the Court's CM/ECF system.

I further certify that on June 6th, 2025, a copy of the foregoing was served upon the District Court and on Plaintiffs' Counsel by email. A paper copy will be mailed to the District Court on June 6, 2025.

/s/ *Brian D. Boone*

Brian D. Boone