# EXHIBIT 2
## TO

**PLAINTIFF'S OPPOSITION TO CERTAIN DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

||| UNCERTIFIED ROUGH DRAFT |||

ROUGH DRAFT TESTIMONY OF ROBERT C. LAHMAN

TAKEN ON 05/29/2025

REPORTER'S NOTE: This unedited rough draft of the proceedings was produced in Realtime instant form and is not certified. The rough draft transcript may not be cited or used in any way or at any time to rebut or contradict the final certified transcription of proceedings. There will be discrepancies between this form and the final form of the transcript, because this Realtime instant-form transcript has not been fully edited, proofread, corrected, finalized, indexed, bound, or certified. There will also be a discrepancy between the page and line numbers appearing on this unedited rough draft and the edited, proofread, corrected, certified final transcript.

Also, please be aware that your Realtime browser screen and/or the unedited, uncertified rough draft transcript may contain untranslated steno, occasional

Page 348

```
 1          ||| UNCERTIFIED ROUGH DRAFT |||
 2                THE WITNESS:  I would say
 3        patient safety always wins.
 4   QUESTIONS BY MR. MIGLIORI:
 5        Q.    Okay.  Let's do Document 134.
 6   We're going to mark this as Exhibit
 7   Number 23, I think.
 8                MR. BOONE:  Was the e-mail to
 9        Kennedy 22, that's what you're saying
10        Don?
11                MR. MIGLIORI:  Yes, it was.
12        Yeah.
13   QUESTIONS BY MR. MIGLIORI:
14        Q.    This is an e-mail exchange
15   between you and David Calabrese.
16                And we're going to start on the
17   third page or the -- we'll start on the
18   second page.  There's an e-mail -- we're
19   going to start on the e-mail from the second
20   page from David to Ed Lagerstrom and you, Ed
21   Lagerstrom was someone you reported to.
22                Correct?
23        A.    Yes.  Yes, that's him.
24        Q.    In 2016.
25                And this is an e-mail -- you
```

DRAFT COPY

Page 349

```
 1            ||| UNCERTIFIED ROUGH DRAFT |||
 2     have no reason to doubt this is a true and
 3     accurate e-mail kept in the ordinary course
 4     of business.
 5               Correct?
 6         A.    Correct.
 7         Q.    Calabrese writes to Ed and you
 8     and says, "Have we ever considered
 9     approaching the manufacturers of opioid
10     products, example given Purdue, to negotiate
11     a contract that would hold them financially
12     liable for patients who grow addicted to
13     their therapies?"
14               Do you see that statement?
15         A.    I'm trying to find it.  You're
16     on what page now?
17         Q.    On page 2, and it's on the
18     screen highlighted.
19         A.    Okay.
20         Q.    Do you remember Calabrese
21     asking you whether or not you could actually
22     enter into a contract with Purdue holding
23     them liable financially for any patients who
24     grow addicted to OxyContin?
25         A.    I remember the e-mail.
```

Page 350

```
 1            ||| UNCERTIFIED ROUGH DRAFT |||
 2       Q.    And you remember your response
 3  to him above, where you just write, "Really,
 4  question mark?"
 5             Do you see that?
 6       A.    Yeah.  Yeah, I see it.
 7       Q.    When did you --
 8       A.    I -- can you scroll up for me?
 9       Q.    Are you roll up, Gina, can you
10  roll up.  We're talking about the next --
11             MR. BOONE:  Bob, do you have a
12        hard copy of this.
13             THE WITNESS:  I do.
14             MR. BOONE:  I mean, if you need
15        to read it, you can take a minute to
16        read it.
17             THE WITNESS:  That's all right.
18             I see my response.
19  QUESTIONS BY MR. MIGLIORI:
20       Q.    And let me -- just so Brian
21  doesn't have keep to -- any time you need to
22  read a document, just go ahead and read it.
23             Okay?
24       A.    Okay.
25       Q.    Now, you asked the question,
```

DRAFT COPY

Page 351

```
 1            ||| UNCERTIFIED ROUGH DRAFT |||
 2     "really, question mark."
 3                Do you remember doing that?
 4          A.    I do.
 5          Q.    And did you -- did you recall
 6     his response to you, "why the hell not?"
 7          A.    Yeah --
 8                MR. BOONE:  Objection to the
 9          form but you didn't read it correctly.
10     QUESTIONS BY MR. MIGLIORI:
11          Q.    He says, "Out of the box, why
12     the hell not?"
13                Do you see that?
14          A.    Do I see that?  Yeah, I see
15     that.
16          Q.    Do you remember the -- the sort
17     of tension building between the two of you
18     about balancing trying to keep Purdue
19     accountable for its contribution to the
20     opioid epidemic versus our -- your
21     responsibility of contracting with them to
22     make sure that -- they're properly on your
23     formularies?
24                MR. BOONE:  Objection to the
25          form.
```

DRAFT COPY

Page 352

1          ||| UNCERTIFIED ROUGH DRAFT |||
2              THE WITNESS:  I don't remember
3      any balanced conversations, right.
4   QUESTIONS BY MR. MIGLIORI:
5      Q.     You don't remember any what,
6   I'm sorry?
7      A.     I was never asked to remove
8   Purdue from our formularies.
9      Q.     All right.
10     A.     Never -- never told -- and just
11  so you kind of understand my response here.
12  Like, hey, David, you've got this idea, how
13  would we do that.
14     Q.     Right.
15             Well, your response is
16  actually, oh, I don't know, one, why would
17  they enter into an agreement on this, two,
18  how would we define addiction, and three, how
19  would we track it.  That was your response to
20  David.
21             Right?
22     A.     I think those are three -- I
23  think those are three pretty good questions.
24     Q.     Rite and he responds with three
25  answers.

DRAFT COPY

1      ||| UNCERTIFIED ROUGH DRAFT |||
2             "The risk of us tightening the
3      shit out of the access to the products."
4             Do you see that?
5      A.     Yes.
6      Q.     That's one leverage point to
7      answer Question Number 1.
8             Question 2 he said, "Be medical
9      claims data, anyone who ends up in ER,
10     hospitalization or enrollment on controlled
11     prescription management program, is how he
12     would define addiction.
13            Do you see that?
14     A.     Yeah, except we don't medical
15     claims in the PBM.
16     Q.     Well, it --
17     A.     We're a pharmacy benefit
18     management company.  We're not a health plan,
19     so our ability to even get the medical claims
20     for these patients would be -- could be zero.
21     Q.     Your largest customer is
22     UnitedHealthcare.
23     A.     David was not asking about
24     that.  He's asking about OptumRx.
25     Q.     No.

DRAFT COPY

1          ||| UNCERTIFIED ROUGH DRAFT |||
2          A.    I work at OptumRx.  I don't
3    work at United.  If he wanted United to do
4    this, then he should have gone to United.
5    I'm a PBM.  I don't even have access to
6    medical claims.
7          Q.    You talk about and you leverage
8    of size of UnitedHealthcare when it benefits
9    the contracting, but you're disclaiming it
10   here?
11               MR. BOONE:  Objection to the
12         form.
13               THE WITNESS:  I can tell you.
14               MR. BOONE:  Let me finish my
15         objection, Bob.
16               Mischaracterizes his testimony.
17   QUESTIONS BY MR. MIGLIORI:
18         Q.    The third answer to his
19   clinical analytics, "With or without support
20   from Optum Insight."
21               Optum Insight is another Optum
22   segment, right?
23         A.    And I remember what -- I've got
24   to go back to what the third question was.
25         Q.    The question was, how do you

Page 355

 1          ||| UNCERTIFIED ROUGH DRAFT |||
 2     track it, Optum Insight had all of that data.
 3     You said you didn't have the data.
 4          A.    So from --
 5                MR. BOONE:  Objection to the
 6          form.
 7                THE WITNESS:  Well, first of
 8          all, we're a PBM.  We don't get
 9          medical claims, and Optum Insight
10          could not pull medical claims other
11          than United.
12                So for David even to be asking
13          me this, if he -- if this is something
14          he thought was a good idea and he
15          wanted to do, it might be applicable
16          to United, but not applicable to the
17          OptumRx book of business.
18     QUESTIONS BY MR. MIGLIORI:
19          Q.    You tell him in response, "It
20     never would really happen.  If you want to
21     build it out, I would be more than happy to
22     take it to pharma.  I would start with
23     clinical as to how we tighten the shit out of
24     the class.  Let me know how you progress."
25                You encouraged him to go to

Page 356

1               ||| UNCERTIFIED ROUGH DRAFT |||
2       clinical, right?
3            A.    I do.  This would be a program
4       that would be requested from clinical.
5            Q.    And so he responds by saying,
6       "If you see the first section in the DUR
7       interventions of the attached draft I
8       developed, but the entire document reflects a
9       direction we need to head in, I'm meeting
10      with folks from Optum BH, Optum Insights,
11      Optum CSG and others next week to explore a
12      precedent-setting approach to this epidemic.
13                 Do you see at least that David
14      was trying to get Optum as a company to start
15      thinking outside the box, that you just
16      focusing and start choose the fork in the
17      road toward patient safety?  Do you see that?
18                 MR. BOONE:  Objection to the
19           form.  Mischaracterizes the document.
20                 THE WITNESS:  I had total
21           respect for David in regards to the
22           fact that he was trying to get the
23           organization to move in a direction to
24           tighten up opioids.  The problem was
25           is that, you know, David had these big

```
 1        ||| UNCERTIFIED ROUGH DRAFT |||
 2        ideas, but there wasn't really
 3        anything built around them.
 4               And the things that he was
 5        bringing to me were things that were
 6        outside of -- of what I could do
 7        within the organization.
 8               So it's like, David, if you
 9        want to do this, then why are you
10        coming to me.  I'm not that -- I'm not
11        that person.  You want to start
12        getting medical claims involved and
13        all that, United might be interested
14        in doing that, but it's not OptumRx.
15               (Lahman Exhibit 24 marked for
16        identification.)
17   QUESTIONS BY MR. MIGLIORI:
18        Q.    If you go to 1895, this will be
19   Exhibit Number 24.  This is a continuation of
20   that e-mail chain.
21               He says to you -- and you say,
22   "Let me know your progress."
23               He says to you, "If you're not
24   bought in, then obviously it will never fly.
25   I won't waste my time."
```

Page 358

```
 1         ||| UNCERTIFIED ROUGH DRAFT |||
 2              Do you remember him telling you
 3   that he's not going to waste his time trying
 4   to do this if you're not going to buy into
 5   it?
 6       A.    I don't really remember that.
 7   I see it right in front of me.
 8       Q.    You respond to him on June 2,
 9   2016, "David, just to be clear, I appreciate
10   your passion around the subject and agree
11   with you that we need to do everything
12   possible to help in controlling this
13   epidemic."
14              You recall feeling that way in
15   2016?
16       A.    I do.
17       █         ████████████████████████
    ██████████████████████████████████████████
19              Is that a true at the same
20   time?
21       A.    It is.
22       Q.    "My point is that this is not a
23   place for value-based contracting."
24              We talked about value-based
25   contracting earlier, right?
```

DRAFT COPY

```
 1            ||| UNCERTIFIED ROUGH DRAFT |||
 2       A.    We did.
 3       Q.    "Everyone feels VBC is part of
 4   the answer to a lot of issues, but trust me,
 5   it's not -- would not fly with if you
 6   remember no matter what we threatened them
 7   with.  The risk would be much greater than
 8   any reward of being on our PDLs and they're
 9   not going to take on that much risk."
10             The risk here is losing the
11   rebates, right?
12             MR. BOONE:  Objection to the
13        form.
14             THE WITNESS:  No.  I don't
15        think there's a single word in here
16        about losing rebates.
17   QUESTIONS BY MR. MIGLIORI:
18       Q.    What risks are there?
19       A.    Well, first of all, you're not
20   going to get this done.  David has never done
21   a VBC agreement in his life.  So his
22   understanding of a value-based contract and
23   what's going to get done, my point is if
24   this -- this isn't going to fly.  To do a
25   value-based agreement, you have to have a
```

```
 1             ||| UNCERTIFIED ROUGH DRAFT |||
 2     willing partner, and I don't see Purdue as
 3     being a willing partner.
 4         Q.    Let's go to --
 5         A.    It was a kind of -- a pie in
 6     the sky kind of idea from David, and quite
 7     frankly, I was really, really busy in the job
 8     that I had, and I understood what David was
 9     trying to do, but he was just barking up the
10     wrong tree.  That would have never happened,
11     no matter what.  Even United would have told
12     him, who had capability to do some of this,
13     that -- that it was -- that it was a pie in
14     the sky idea, was not going to fly.
15         Q.    Isn't it true that United took
16     them off their formulary?
17         A.    I believe they eventually did.
18         Q.    And to -- through the time you
19     left, they were always on your formulary,
20     right, at Optum?
21         A.    If I remember correctly, they
22     were.
23              (Lahman Exhibit 25 marked for
24              identification.)
25                        DRAFT COPY
```