# EXHIBIT 3
## TO

**PLAINTIFF'S OPPOSITION TO CERTAIN DEFENDANTS'
MOTIONS TO DISMISS
FOR LACK OF PERSONAL JURISDICTION**

Michael Rosen, MD  CONFIDENTIAL - ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE:  NATIONAL
PRESCRIPTION OPIATE
LITIGATION                    MDL No. 2804

_____    Case No.
                                 1:19-op-45853-DAP

THIS DOCUMENT RELATES TO:    Hon. Dan A. Polster
TRACK 12 CASE



CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEO-RECORDED DEPOSITION OF
MICHAEL ROSEN, MD

Heritage Hotel
Executive Boardroom
522 Heritage Road
Southbury, Connecticut

05/08/2025
9:11 a.m. (EDT)

REPORTED BY:  AMANDA GORRONO, CLR
CLR NO. 052005-01
JOB NO. 2208

 1    answer a question that I'm not equipped to

 2    answer because I'm not sure exactly what

 3    types of marketing were out there and how

 4    the opioids were -- were marketed during

 5    that interval.

 6    BY MR. MIGLIORI:

 7         Q.    Well, we'll get into that pretty

 8    extensively.

 9              You remember a program at Purdue

10    called FACETS?

11              MR. BOONE:  Objection to the

12         form.

13         A.    I remember the name, yes.

14    BY MR. MIGLIORI:

15         Q.    And FACETS was a catalog of

16    multiple educational programs that, in

17    fact, UnitedHealth utilized in training

18    its medical directors and case managers,

19    correct?

20              MR. BOONE:  Objection to the

21         form.  Lacks foundation.

22         A.    I -- I don't remember what --

23    how FACETS was used in -- within the

24    organization.

25    BY MR. MIGLIORI:

```
1              MR. MIGLIORI:  A New York Times
2         article describing the plea.
3              MR. BOONE:  So you're marking
4         the article as Exhibit 12.
5              (Whereupon, Rosen Exhibit 12,
6         P-43497, New York Times Article Bates
7         Number P-43497_00001 through 00003,
8         was marked for identification.)
9              MR. MIGLIORI:  Exhibit 12 is
10        P-43497, Exhibit 12, May 10, 2007, New
11        York Times article entitled "In Guilty
12        Plea, OxyContin maker to pay
13        $600 Million."
14    BY MR. MIGLIORI:
15        Q.    Do you remember seeing this
16    article?
17        A.    No.
18        Q.    Barry Meier is the journalist
19    and he writes, May 10th, "The company that
20    makes the narcotic pain killer OxyContin®
21    and three current and former executives
22    pleaded guilty today in federal court here
23    to criminal charges.  They misled
24    regulators, doctors, and patients about
25    the drug risks of addiction and its
```

Case 1:17-md-02804-DAP  Doc #: 6181-5  Filed: 06/12/25  5 of 21.  PageID #: 691012

1    potential to be abused."

2             Were you aware that that was the

3    essence of the plea agreement?

4        A.    Yes.

5        Q.    To resolve criminal and civil

6    changes related to the drug's misbranding,

7    the parent of Purdue Pharma, the company

8    that markets OxyContin, will pay some

9    $600 million in fines and other payments,

10   one of the largest amounts ever paid by a

11   drug company in such a case.

12            Do you remember that being true?

13       A.    Yes.

14       Q.    And your son at this point is at

15   Purdue, correct?

16       A.    Yes.

17       Q.    Do you remember talking to your

18   son about this when it happened?

19       A.    No.

20       Q.    OxyContin -- the fourth

21   paragraph -- is a powerful long-acting

22   narcotic that provides relief of serious

23   pain for up to 12 hours.  Initially Purdue

24   Pharma contended that OxyContin® because

25   of its time-release formulation posed a

1   lower risk of abuse and addiction to

2   patients than do traditional shorter

3   acting painkillers like Percocet or

4   Vicodin.

5          Did you understand that that was

6   part of the misbranding of OxyContin® that

7   led to a plea agreement and $600 million

8   in fines and other payments?

9      A.   Yes.

10     Q.   So going back to the statement

11  in the American Pain Society's book that

12  you ordered and that was used in the

13  supplement of your education, the

14  statement made on Page 39 that "Available

15  data suggest the risk of iatrogenic is

16  low" is not a true statement, at least

17  according to Purdue's voluntary plea

18  agreement admitting it to be false,

19  correct?

20         MR. BOONE:  Objection to the

21     form.

22     A.   I'm actually struggling with a

23  significant portion of the discussion that

24  we're having.  And it is -- bothers me to

25  some extent because a lot of what we're

1        MR. MIGLIORI:  You asked for it,

2     I didn't offer it to you.

3        MR. BOONE:  You were

4     describing it --

5        MR. MIGLIORI:  Counsel, I didn't

6     asked for him to look at that

7     document.  You stopped me to see if I

8     had it and I had it.

9        MR. BOONE:  Okay.

10        MR. MIGLIORI:  You asked for it,

11     not me.

12        MR. BOONE:  All right.

13  BY MR. MIGLIORI:

14     Q.    So, Dr. Rosen, a simple

15  question, I want you to assume that The

16  New York Times didn't misreport the nature

17  of the plea agreement in May of 2007.  And

18  if they did, then there's no foul.  But I

19  want you for the purpose of this question,

20  I want you to assume that Barry Meier and

21  The New York Times accurately reported

22  that one of the bases for Purdue entering

23  into a plea agreement was saying that it

24  did, in fact, falsely brand OxyContin® in

25  part because it suggested that it had a

Case 1:17-md-02804-DAP  Doc #: 6181-5  Filed: 06/12/25  8 of 21.  PageID #: 691015

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
1    lower rate of addiction.

2              That would be inconsistent with

3    what's in this APS pamphlet, correct?

4         A.    Right.  And that's -- what's the

5    date of this APS pamphlet?

6         Q.    Well, you requested it in 2006.

7    This particular iteration -- I'm being

8    told it's 2003.

9              MR. BOONE:  I don't see a date

10        on it.

11             MR. MIGLIORI:  Second

12        printing --

13        A.    I don't see a date.

14   BY MR. MIGLIORI:

15        Q.    If you look on Page 2 -- your

16   counsel wants me to work; I'll work --

17   there is a copyright date of 2003 American

18   Pain Society second printing.

19             Do you see that?

20        A.    Uh-huh.

21        Q.    Yes?

22        A.    Yes.

23        Q.    And this is the title of the

24   book that you requested Purdue send you 50

25   copies of, correct?
```

```
 1            A.    Right, right.

 2            Q.    Correct?

 3            A.    Yes.

 4            Q.    And in 2003, the American Pain

 5      Society suggested that the risk of

 6      iatrogenic addiction is low with opioid

 7      use, correct?

 8            A.    Right.

 9            Q.    Correct?

10            A.    Yes.

11            Q.    And if The New York Times

12      article is accurate, that was part of the

13      false information provided by Purdue to

14      the FDA about OxyContin®, correct?

15            A.    And that was in 2007?

16            Q.    Correct.  Yeah.

17            A.    Right.

18            Q.    So this -- I'm not - I know that

19      you're -- you've described yourself as

20      irked.  I'm not trying to put you in the

21      story.  I'm trying to ask you the question

22      whether or not the statement that is in

23      this book, Purdue eventually admitted.

24      After you requested in 2006, 50 copies of

25      it, Purdue a year later admitted that that
```

1    representation about low risk of addiction

2    was a false statement by them, by Purdue.

3              That's a correct statement,

4    correct?

5         A.    Correct.

6         Q.    All right.  Also on that page,

7    it says, "the fear of opioid addiction

8    should not be a primary concern with

9    implementing appropriate opioid therapy

10    for acute pain and cancer pain."

11              Are you familiar with the

12    concept of pseudoaddiction?

13         A.    I am.

14         Q.    Do you still think

15    pseudoaddiction is a real thing?

16              MR. BOONE:  Objection to the

17         form.

18         A.    You asked me two questions.  You

19    asked me am I familiar with

20    pseudoaddiction.  Then you jumped to say

21    do you still --

22    BY MR. MIGLIORI:

23         Q.    All right.  Fair enough.

24         A.    That's not --

25         Q.    I'll ask another question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1                THE WITNESS:  No.
 2                MR. MIGLIORI:  Yeah, let's get
 3        this done.
 4                THE WITNESS:  I want to get this
 5        over as soon as possible.
 6                MR. MIGLIORI:  Yeah, absolutely.
 7        PEC-OPT 1243.  It's Exhibit Number 32.
 8                (Whereupon, Rosen Exhibit 32,
 9        E-mail chain Bates Number
10        PPLPC028000245007, was for marked
11        identification.)
12    BY MR. MIGLIORI:
13        Q.    Do you recall this -- that
14    Partners Against Pain is a Purdue
15    educational product, right?
16        A.    Yes.
17        Q.    And this e-mail exchange from
18    Purdue is between Rhonda Clark and Tim
19    Richards, March 17, 2009.  It says, "Tim,
20    I'm working on Optum Health (Dr. Rosen's
21    group) on a chronic pain management
22    program that will roll out to the case
23    managers.  Lori Ladd and Maribeth Kowalski
24    are assisting.  They would like to link to
25    our partnershipagainstpain.com website.
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Is there anything special we need to do?"

2              Do you see that?

3        A.    Yes.

4        Q.    This is in 2009, correct?

5        A.    Yes.

6        Q.    And do you recall asking to do

7    that?

8        A.    No.

9              MR. MIGLIORI:  Let's go to

10        PEC-OPT_1428 Exhibit Number 33.  1428.

11              (Whereupon, Rosen Exhibit 33,

12        11/12/2013 e-mail

13        OPTUMHEALTH_MDL_000019376, was marked

14        for identification.)

15   BY MR. MIGLIORI:

16        Q.    This is a November 12, 2013,

17   e-mail produced by Optum Health between

18   Lisa Eckroth and you.  It says,

19   "Follow-Up" -- first of all, that's your

20   e-mail, correct?

21        A.    Yes.

22        Q.    Yes?

23        A.    Yes.

24        Q.    And you have no reason to doubt

25   this is a true and accurate copy, correct?

Michael Rosen, M.D.   CONFIDENTIAL - SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

1    A.    Yes.

2    Q.    This is -- "Dr. Rosen," Lisa

3  writes, on November 12, 2013, "Great to

4  see you last week in Texas.  I wanted to

5  thank you for helping coordinate the

6  meeting on Friday morning.  As you

7  requested, I am sending the Partners

8  Against Pain website link for your review

9  and consideration for use.

10  Www.partnershipsagainstpain.com.  I look

11  forward to the next steps with the group

12  where we can share a number of resources

13  that may be beneficial for the case

14  managers."

15         Do you see that?

16    A.    Yes.

17    Q.    Do you recall, in 2013, writing

18  with Lisa Eckroth, the national account

19  executive at Purdue Pharma, about you

20  putting Partners Against Pain on the

21  UnitedHealthcare website?

22    A.    I see the e-mail, but I don't

23  recall it.

24    Q.    Okay.  You respond back same

25  day, "Hi, Julia.  I believe the website

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    helpful for nurses and -- and other

2    clinicians.

3    BY MR. MIGLIORI:

4        Q.    And you said to her, your nurse,

5    a request to approve the "Partners Against

6    Pain" website, correct?

7        A.    No.  I asked her if it was

8    already approved.

9        Q.    Okay.  And you recall the

10   "Partners Against Pain" was on the group

11   that was on the -- that produced the

12   FACETS catalog, correct?

13       A.    Yes, they were associated with

14   them.

15       Q.    Okay.  Let's go to PEC-OPT_1438,

16   last documents on this topic.

17            MR. BOONE:  After this, we'll

18       take a break, Don.

19            MR. MIGLIORI:  Yep.  And I'll

20       finish after that.  I've just got a

21       very short.

22            MR. BOONE:  Do you need to take

23       a break now or do you --

24            THE WITNESS:  I don't need one.

25            MR. BOONE:  We'll do it right

```
 1          after this one.
 2                  MR. MIGLIORI:  And we will get
 3          this done.
 4                  (Whereupon, Rosen Exhibit 34,
 5          Approved Resources Updates Bates
 6          Number OPTUMHEALTH_MDL_000038257
 7          through 000038290, was marked for
 8          identification.)
 9      BY MR. MIGLIORI:
10          Q.    I just want to show you.  This
11      is an Optum document produced to us
12      with -- and in it is a listing of approved
13      resources and updates.
14                  You see that -- is this
15      something that your nurse would be
16      responsible for contributing to?
17          A.    Yes.
18          Q.    All right.  And you'll see if
19      you go to page -- the page that ends in
20      38277, there is a date of November 25,
21      2013.  And it says "new websites" on the
22      bottom of the page.
23                  Do you see that?  And then on
24      the next page, it says "disease
25      resources."
```

1    A.    Right.

2    Q.    Just two months after the

3  e-mail, you ask your nurse about this that

4  Partners Against Pain was approved and

5  added to the website.

6         Do you see that?

7         MR. BOONE:  Objection to the

8     form.

9    A.    No, that's actually not

10 necessarily what was -- it may have been

11 approved already.  I just asked her

12 whether it was approved.  I don't remember

13 what her answer is, but clearly, it was

14 one of our approved websites.

15 BY MR. MIGLIORI:

16    Q.    Okay.  So I know.  But you wrote

17 to her.  You requested it in November of

18 2013.  You asked the nurse on

19 November 13th of 2013 if it was approved,

20 and two weeks later, in this document,

21 Exhibit Number 34, it's listed as a new

22 website, approved website.  That is all

23 I'm asking.

24    A.    Is this -- I don't see the

25 heading.  Where does it say it's in the --

CONFIDENTIAL - SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

```
 1          Q.    On the bottom of the previous
 2     page --
 3               MR. MIGLIORI:  We'll go back,
 4          Mike.
 5     BY MR. MIGLIORI:
 6          Q.    -- it says:  New websites --
 7          A.    Okay.
 8          Q.    -- cancer resources.  And under
 9     disease resources, it says:  Pain,
10     Partners Against Pain, it was approved.
11               Do you see that?
12          A.    Okay.
13          Q.    Okay.  So it was approved, and
14     it was put up.  And then I just want to
15     direct you now to the page that ends in
16     38263.
17               Before I get to that, once an
18     approved site, who would have access to
19     that website?
20               MR. BOONE:  Objection to the
21          form.
22          A.    It's --
23     BY MR. MIGLIORI:
24          Q.    Go ahead.
25          A.    -- the -- basically any of our
```

1   clinical people would have access to it.

2       Q.    Including your case managers?

3       A.    Yes.

4       Q.    And including your medical

5   directors?

6       A.    Yes.

7       Q.    And anybody who's in the medical

8   care side of business, right?

9           MR. BOONE:  Objection to the

10      form.  Lacks foundation.

11  BY MR. MIGLIORI:

12      Q.    Correct?

13      A.    That's correct.

14      Q.    And that's throughout the UH --

15  UnitedHealth Group, correct?

16          MR. BOONE:  Objection to the

17      form.  Lacks foundation.

18      A.    I don't know.  I mean, it was --

19  there was a -- we -- we had a central

20  database that was accessible via the

21  company website that basically had a whole

22  conglomeration of clinical resources.  And

23  these approved websites -- approved --

24  approved websites were part of that

25  central file or master file of documents,

```
 1    and so it would be accessible to any
 2    employee.
 3         Q.    Of UnitedHealth Group?
 4         A.    Yeah.
 5               MR. BOONE:  Objection to the
 6         form.  Lacks foundation.
 7    BY MR. MIGLIORI:
 8         Q.    UnitedHealth Group, correct?
 9               MR. BOONE:  Same objection.
10         A.    To anybody who had access to
11    that master file.  I don't know if it was
12    universal or not.
13    BY MR. MIGLIORI:
14         Q.    Well, I think before the
15    objection, you said yes to my question to
16    UnitedHealth Group.  Is it yes or no?  I
17    just want to make a clean answer.
18         A.    I'm not -- yes.  I'm not sure it
19    was UnitedHealth.  I'm not sure if it was
20    limited to -- if it was available to
21    everyone or just segments of the company.
22         Q.    And it certainly covered your
23    case managers and your medical directors,
24    correct?
25         A.    Yes, they would have access.
```

Michael Rosen, M.D.                    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1        Q.    All right.  And then if you flip
 2   back to Page 8263 in February of 2017,
 3   you'll see under "Removed Websites"
 4   "Partners Against Pain" on Pages 8263 and
 5   8264.
 6             So Partners Against Pain was
 7   removed as of the -- February 10, 2017.
 8             Do you see that?  Do you see
 9   that?
10        A.    Yeah, I see that.
11        Q.    Do you know why it was removed?
12        A.    I don't.
13        Q.    Do you know if the Optum
14   statement about the opioid epidemic around
15   the same time had any impact on removing
16   this website?
17             MR. BOONE:  Objection to the
18        form.  Vague.
19        A.    I have no idea.
20   BY MR. MIGLIORI:
21        Q.    Do you know when the first
22   lawsuits were filed against Optum for its
23   role potentially in -- or allegedly in the
24   opioid crisis?
25             MR. BOONE:  Objection to the
```

```
 1          form.
 2          A.    I don't.
 3     BY MR. MIGLIORI:
 4          Q.    Okay.  So you don't know why
 5     that was removed in 2017?
 6          A.    I don't.
 7          Q.    And you weren't part of that
 8     decision, correct?
 9          A.    It was one of -- you know, it
10     would have been removed by -- the approved
11     websites go through a yearly review.  So,
12     you know, it was removed.  I'm not sure
13     what the reasons were.
14              MR. MIGLIORI:  Okay.  Let's take
15          that break, and then we're going to
16          finish.
17              THE VIDEOGRAPHER:  The time
18          right now is 5:01 p.m.  We're off the
19          record.
20              (Recess taken.)
21              THE VIDEOGRAPHER:  The time
22          right now is 5:15 p.m.  We're back on
23          the record.
24     BY MR. MIGLIORI:
25          Q.    Dr. Rosen, we talked a little
```