# EXHIBIT 2

## TO

**PLAINTIFF'S OPPOSITION TO CERTAIN DEFENDANTS'
MOTIONS TO DISMISS
FOR LACK OF PERSONAL JURISDICTION**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE:  NATIONAL
PRESCRIPTION OPIATE
LITIGATION                    MDL No. 2804

_____    Case No.
                           1:19-op-45853-DAP

THIS DOCUMENT RELATES TO:   Hon. Dan A. Polster
TRACK 12 CASE


CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEO-RECORDED DEPOSITION OF
MICHAEL ROSEN, MD

Heritage Hotel
Executive Boardroom
522 Heritage Road
Southbury, Connecticut

05/08/2025
9:11 a.m. (EDT)

REPORTED BY:  AMANDA GORRONO, CLR
CLR NO. 052005-01
JOB NO. 2208

```
 1    answer a question that I'm not equipped to

 2    answer because I'm not sure exactly what

 3    types of marketing were out there and how

 4    the opioids were -- were marketed during

 5    that interval.

 6    BY MR. MIGLIORI:

 7        Q.    Well, we'll get into that pretty

 8    extensively.

 9             You remember a program at Purdue

10    called FACETS?

11             MR. BOONE:  Objection to the

12        form.

13        A.    I remember the name, yes.

14    BY MR. MIGLIORI:

15        Q.    And FACETS was a catalog of

16    multiple educational programs that, in

17    fact, UnitedHealth utilized in training

18    its medical directors and case managers,

19    correct?

20             MR. BOONE:  Objection to the

21        form.  Lacks foundation.

22        A.    I -- I don't remember what --

23    how FACETS was used in -- within the

24    organization.

25    BY MR. MIGLIORI:
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1            record.
 2                 (Recess taken.)
 3                 THE VIDEOGRAPHER:  The time
 4            right now is 1:40 p.m.  We are back on
 5            the record.
 6       BY MR. MIGLIORI:
 7            Q.    Okay.  Dr. Rosen, I'm going to
 8       talk a little bit about -- ask you a
 9       little bit about your involvement with
10       Purdue.  Because we talked about APS, I
11       want to start there.  I'm going to show
12       you -- this is PEC-OPT-1442, which we're
13       going to mark as Exhibit Number 10.
14                 (Whereupon, Rosen Exhibit 10,
15            Bates Number PPLPC028000014884 through
16            028000148845, was marked for
17            identification.)
18       BY MR. MIGLIORI:
19            Q.    This is a document produced to
20       us by Purdue.  I think we established this
21       before, but one of your contacts at Purdue
22       was Laura Randa King, correct?
23            A.    Yes.
24            Q.    And this e-mail chain -- when we
25       do e-mails chains, usually go back to
```

Case 1:17-md-02804-DAP  Doc #: 6216-5  Filed: 07/03/25  5 of 34.  PageID #: 693088
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
1    front, the way the conversations evolve.
2    So to identify the document, this is a
3    Purdue e-mail chain that's dated
4    February 27, 2006, on top.  It has to do
5    with a marketing requests.  And so
6    starting on the bottom of the page, first
7    page, Laura Randa King writes to
8    Lynn Nagorski.
9               Do you know who Lynn Nagorski
10   is?  Have you met her?
11       A.    I don't.
12       Q.    It says, "Marketing request."
13   Do you see that?  Do you see that?
14       A.    Yes.
15       Q.    "Lynn, I'm working with Mike
16   Rosen on some inservice training.  He
17   would like to request 50 copies of the
18   American Pain Society 'Principles of
19   Analgesic Use in the Treatment of Acute
20   Pain and Cancer Pain.'  I need them to be
21   shipped to his admin, Janet E. Myers,
22   UnitedHealth Group,
23   450 Columbus Boulevard, Hartford,
24   Connecticut."
25               Is Janet E. Myers your -- was
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1      she your admin?
 2           A.    Yes.
 3           Q.    And do you have any reason to
 4      doubt that she requested 50 copies of the
 5      APS "Principles of Analgesic Use"?
 6           A.    No.
 7           Q.    And Lynn writes on down the line
 8      to, among other people, Tim Richards.
 9                 Did you ever meet Tim Richards?
10           A.    No.
11           Q.    Do you know who he was?
12           A.    No.
13           Q.    It says, "Do we have these to
14      send to Mr. Rosen and if so you can send
15      them out."
16                 And then up the line, they say,
17      send out 50 pieces of PAP058 sent to Janet
18      Myers at the address below.
19                 Do you recall receive these?
20           A.    No, I don't recall this e-mail
21      exchange at all.
22           Q.    But you don't have any reason to
23      doubt that you requested and received,
24      through Janet Myers, 50 copies of
25      "Principles of Analgesic Use in the
```

```
 1       Treatment of Acute Pain," correct?
 2            A.    It seems that way, yes.
 3            Q.    Okay.  Let's go to the next
 4       document, which is the actual book
 5       pamphlet, the American Pain Society that
 6       you requested.
 7                  It's going to be Exhibit Number
 8       11.  And the PEC-OPT number is 1446.
 9                  (Whereupon, Rosen Exhibit 11,
10            Principles of Analgesic Use in the
11            Treatment of Acute Pain and Cancer
12            Pain, Bates Number PKY183144108
13            through 183144150, was marked for
14            identification.)
15       BY MR. MIGLIORI:
16            Q.    So the reason you requested
17       those books was to use them in your
18       training, correct?
19                  MR. BOONE:  Objection to the
20            form.  Lacks foundation.
21            A.    The -- it was actually to be
22       used as a supplement to -- to training
23       presentations.
24       BY MR. MIGLIORI:
25            Q.    If you look at the cover of this
```

Case 1:17-md-02804-DAP Doc #: 6216-3 Filed: 07/03/25 8 of 34. PageID #: 693091

```
 1    exhibit number --
 2            MR. MIGLIORI:  Is it 11?
 3    BY MR. MIGLIORI:
 4        Q.    "Principles of Analgesic Use in
 5    the Treatment of Acute Pain and Cancer
 6    Pain, Fifth Edition, American Pain
 7    Society."
 8            We just talked about the
 9    American Pain Society, correct?
10        A.    Yes.
11        Q.    That's the society, at for the
12    United States Finance Committee deemed to
13    be a front group to various opioid
14    manufacturers, correct?
15        A.    In 2012 and 2020?
16        Q.    Yes.
17        A.    Yes.
18        Q.    Okay.  And I want to direct your
19    attention to Pages 38 and 39 of the
20    pamphlet that you requested as a
21    supplement to your training.  The Item 12
22    on 38, the title is "Do not diagnose
23    patients with an opioid addiction based
24    only on the presence of opioid
25    dependence."
```

Case 1:17-md-02804-DAP  Doc #: 6216-5  Filed: 07/03/25  9 of 34.  PageID #: 693092

1          Do you see that title?

2     A.     Yes.

3     Q.     And further elaboration on 39,

4  the first full paragraph, it says,

5  "Available data suggests that the risk of

6  iatrogenic addiction is low and the fear

7  of opioid addiction should not be a

8  primary concern when implementing

9  appropriate opioid therapy for acute pain

10  and cancer pain."

11          It gives a citation.

12          Do you see that?

13     A.     Yes.

14     Q.     What is iatrogenic addiction?

15     A.     It's -- iatrogenic means caused

16  by the -- a condition caused by the

17  treatment itself.

18     Q.     Is that a true statement,

19  Doctor?

20          MR. BOONE:  Objection to the

21     form.

22  BY MR. MIGLIORI:

23     Q.     That iatrogenic addiction is low

24  among opioid users?

25     A.     I don't have the data to say

Case 1:17-md-02804-DAP   Doc #: 6216-3   Filed: 07/03/25   10 of 34.   PageID #: 693093

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1   one -- one way or another.  I just don't

2   know.

3      Q.    Are you aware of the fact that

4   the plea agreement in 2007, that Purdue

5   voluntarily entered into was, in part,

6   premised on the misrepresentation that the

7   risk of iatrogenic addiction is low in

8   OxyContin®?

9        MR. BOONE:  Objection to the

10     form.  Do you want to show him the

11     plea agreement?

12       MR. MIGLIORI:  I'd be happy to.

13   BY MR. MIGLIORI:

14      Q.    Do you want to see it?

15      A.    Yes.

16       MR. MIGLIORI:  Do you want to

17     start with the article?

18       I will mark as Exhibit 12,

19     P-43497-0001.

20       MS. FITZPATRICK:  P-49497.

21       MR. MIGLIORI:  I don't have it

22     here.  Sorry, trying to accommodate

23     your request.

24       THE TECH:  43497.

25       MS. FITZPATRICK:  P-43497.

1          MR. MIGLIORI:  A New York Times
2      article describing the plea.
3          MR. BOONE:  So you're marking
4      the article as Exhibit 12.
5          (Whereupon, Rosen Exhibit 12,
6      P-43497, New York Times Article Bates
7      Number P-43497_00001 through 00003,
8      was marked for identification.)
9          MR. MIGLIORI:  Exhibit 12 is
10      P-43497, Exhibit 12, May 10, 2007, New
11      York Times article entitled "In Guilty
12      Plea, OxyContin maker to pay
13      $600 Million."
14   BY MR. MIGLIORI:
15      Q.    Do you remember seeing this
16   article?
17      A.    No.
18      Q.    Barry Meier is the journalist
19   and he writes, May 10th, "The company that
20   makes the narcotic pain killer OxyContin®
21   and three current and former executives
22   pleaded guilty today in federal court here
23   to criminal charges.  They misled
24   regulators, doctors, and patients about
25   the drug risks of addiction and its

```
 1    potential to be abused."

 2              Were you aware that that was the

 3    essence of the plea agreement?

 4         A.    Yes.

 5         Q.    To resolve criminal and civil

 6    changes related to the drug's misbranding,

 7    the parent of Purdue Pharma, the company

 8    that markets OxyContin, will pay some

 9    $600 million in fines and other payments,

10    one of the largest amounts ever paid by a

11    drug company in such a case.

12              Do you remember that being true?

13         A.    Yes.

14         Q.    And your son at this point is at

15    Purdue, correct?

16         A.    Yes.

17         Q.    Do you remember talking to your

18    son about this when it happened?

19         A.    No.

20         Q.    OxyContin -- the fourth

21    paragraph -- is a powerful long-acting

22    narcotic that provides relief of serious

23    pain for up to 12 hours.  Initially Purdue

24    Pharma contended that OxyContin® because

25    of its time-release formulation posed a
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1    lower risk of abuse and addiction to

 2    patients than do traditional shorter

 3    acting painkillers like Percocet or

 4    Vicodin.

 5            Did you understand that that was

 6    part of the misbranding of OxyContin® that

 7    led to a plea agreement and $600 million

 8    in fines and other payments?

 9        A.    Yes.

10        Q.    So going back to the statement

11    in the American Pain Society's book that

12    you ordered and that was used in the

13    supplement of your education, the

14    statement made on Page 39 that "Available

15    data suggest the risk of iatrogenic is

16    low" is not a true statement, at least

17    according to Purdue's voluntary plea

18    agreement admitting it to be false,

19    correct?

20            MR. BOONE:  Objection to the

21        form.

22        A.    I'm actually struggling with a

23    significant portion of the discussion that

24    we're having.  And it is -- bothers me to

25    some extent because a lot of what we're
```

Case 1:17-md-02804-DAP Doc #: 6216-3 Filed: 07/03/25 14 of 34. PageID #: 69309

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1            MR. MIGLIORI:  You asked for it,
 2       I didn't offer it to you.
 3            MR. BOONE:  You were
 4       describing it --
 5            MR. MIGLIORI:  Counsel, I didn't
 6       asked for him to look at that
 7       document.  You stopped me to see if I
 8       had it and I had it.
 9            MR. BOONE:  Okay.
10            MR. MIGLIORI:  You asked for it,
11       not me.
12            MR. BOONE:  All right.
13  BY MR. MIGLIORI:
14       Q.   So, Dr. Rosen, a simple
15  question, I want you to assume that The
16  New York Times didn't misreport the nature
17  of the plea agreement in May of 2007.  And
18  if they did, then there's no foul.  But I
19  want you for the purpose of this question,
20  I want you to assume that Barry Meier and
21  The New York Times accurately reported
22  that one of the bases for Purdue entering
23  into a plea agreement was saying that it
24  did, in fact, falsely brand OxyContin® in
25  part because it suggested that it had a
```

Case 1:17-md-02804-DAP Doc #: 6216-3 Filed: 07/03/25 15 of 34. PageID #: 69309 CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    lower rate of addiction.

2            That would be inconsistent with

3    what's in this APS pamphlet, correct?

4        A.    Right.  And that's -- what's the

5    date of this APS pamphlet?

6        Q.    Well, you requested it in 2006.

7    This particular iteration -- I'm being

8    told it's 2003.

9            MR. BOONE:  I don't see a date

10        on it.

11            MR. MIGLIORI:  Second

12        printing --

13        A.    I don't see a date.

14    BY MR. MIGLIORI:

15        Q.    If you look on Page 2 -- your

16    counsel wants me to work; I'll work --

17    there is a copyright date of 2003 American

18    Pain Society second printing.

19            Do you see that?

20        A.    Uh-huh.

21        Q.    Yes?

22        A.    Yes.

23        Q.    And this is the title of the

24    book that you requested Purdue send you 50

25    copies of, correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
1        A.     Right, right.

2        Q.     Correct?

3        A.     Yes.

4        Q.     And in 2003, the American Pain

5   Society suggested that the risk of

6   iatrogenic addiction is low with opioid

7   use, correct?

8        A.     Right.

9        Q.     Correct?

10       A.     Yes.

11       Q.     And if The New York Times

12  article is accurate, that was part of the

13  false information provided by Purdue to

14  the FDA about OxyContin®, correct?

15       A.     And that was in 2007?

16       Q.     Correct.  Yeah.

17       A.     Right.

18       Q.     So this -- I'm not - I know that

19  you're -- you've described yourself as

20  irked.  I'm not trying to put you in the

21  story.  I'm trying to ask you the question

22  whether or not the statement that is in

23  this book, Purdue eventually admitted.

24  After you requested in 2006, 50 copies of

25  it, Purdue a year later admitted that that
```

1    representation about low risk of addiction

2    was a false statement by them, by Purdue.

3              That's a correct statement,

4    correct?

5         A.    Correct.

6         Q.    All right.  Also on that page,

7    it says, "the fear of opioid addiction

8    should not be a primary concern with

9    implementing appropriate opioid therapy

10   for acute pain and cancer pain."

11             Are you familiar with the

12   concept of pseudoaddiction?

13        A.    I am.

14        Q.    Do you still think

15   pseudoaddiction is a real thing?

16             MR. BOONE:  Objection to the

17        form.

18        A.    You asked me two questions.  You

19   asked me am I familiar with

20   pseudoaddiction.  Then you jumped to say

21   do you still --

22   BY MR. MIGLIORI:

23        Q.    All right.  Fair enough.

24        A.    That's not --

25        Q.    I'll ask another question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1        A.    That's not an appropriate

 2   sequence.

 3        Q.    Fair enough.  That's a

 4   completely fair comment.

 5             You're familiar with

 6   pseudoaddiction, correct?

 7        A.    That's correct.

 8        Q.    You have in time -- I'll say

 9   before the plea agreement, in your own

10   words suggested that pseudoaddiction is a

11   real concept, correct?

12             MR. BOONE:  Objection to the

13        form.

14        A.    Yes.

15   BY MR. MIGLIORI:

16        Q.    Do you still believe that

17   pseudoaddiction is an accurate description

18   of how some people fear becoming addicted

19   when really what they need is more

20   treatment?

21        A.    I think --

22             MR. BOONE:  Objection to the

23        form.  Vague.

24             THE WITNESS:  Yeah.

25        A.    I think that pseudoaddiction is
```

Case 1:17-md-02804-DAP Doc #: 6216-3 Filed: 07/03/25 19 of 34. PageID #: 693102
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

 1    a concept that is still being debated.

 2    BY MR. MIGLIORI:

 3         Q.    My question was of you this

 4    time.  Do you still believe that

 5    pseudoaddiction is a real phenomenon?

 6              MR. BOONE:  Objection to the

 7         form.

 8         A.    I believe that there is a

 9    minority of people who are under -- excuse

10    me -- who are undertreated for their pain,

11    whether by analgesics or any other means,

12    and those people will seek relief.  If you

13    call that pseudoaddiction, then so be it.

14    If you don't, then it is just my

15    description.

16              And I'm familiar with that

17    phenomenon in practice and -- and

18    colleagues of mine have reported it in

19    their practices as well.

20    BY MR. MIGLIORI:

21         Q.    The term was first coined by a

22    Purdue employee; isn't that true?  In a

23    study by Haddox?

24         A.    And Weissman?  I -- I didn't

25    know that they were Purdue employees.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Q.    You're not aware that Haddox was

2  an employee of Purdue?

3    A.    No.

4    Q.    You do accept or you do recall

5  that the first coining of pseudoaddiction

6  came from that study, correct?

7        MR. BOONE:  Objection to the

8    form.

9    A.    Yes, I do know that.

10  BY MR. MIGLIORI:

11    Q.    The article goes on to say,

12  "Pseudoaddiction is a term that has been

13  used to describe patient behaviors that

14  may occur when pain is undertreated,

15  Weissman and Haddox, 1989.  Patients with

16  unrelieved pain may become focused on pain

17  medication, a clock watch, and may

18  otherwise seem inappropriately

19  drug-seeking.  Such behaviors as illicit

20  drug use and deception can become part of

21  the patient's efforts to obtain relief.

22  Pseudoaddiction can be distinguished from

23  true addiction because behaviors resolve

24  when pain is effectively treated."

25        As you sit here today, do you

```
1    still think that that's an adequate
2    description of pseudoaddiction?
3            MR. BOONE:  Objection to the
4        form.
5        A.    Well, that is sort of the
6    definition of pseudoaddiction.  I mean,
7    it's -- so it's got to be the adequate
8    description of pseudoaddiction.
9    BY MR. MIGLIORI:
10       Q.    Is it still a viable
11   description?
12       A.    I don't know.  I don't know.
13       Q.    Will you agree with me that
14   pseudoaddiction is something that is
15   throughout the education materials that
16   you've designed and deployed at
17   UnitedHealth --
18           MR. BOONE:  Objection to the
19       form.
20   BY MR. MIGLIORI:
21       Q.    -- from as early as 1999 through
22   2009?
23           MR. BOONE:  Objection to the
24       form.
25       A.    I -- please repeat that
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    statement again, because I -- I'm not sure

2    I agree with that.

3    BY MR. MIGLIORI:

4        Q.    Your educational materials that

5    you've put together and designed --

6        A.    Yes.

7        Q.    -- used throughout your time at

8    UnitedHealth make reference to

9    pseudoaddiction and encourage medical

10   directors and case managers to be on the

11   look out for pseudoaddiction?

12           MR. BOONE:  Objection to the

13      form.  Lacks foundation.

14   BY MR. MIGLIORI:

15      Q.    Correct?

16      A.    You're -- you're twisting words.

17   So what I -- what I think was that

18   pseudoaddiction was mentioned in the

19   presentations.  And during the time period

20   that those documents were developed,

21   pseudoaddiction was still considered to be

22   an appropriate entity.  In retrospect,

23   it's controversial and questionable.

24      Q.    Okay.  And I'll just show you

25   some examples to see if -- if I've

```
 1      found the relationship useful, right?
 2              MR. BOONE:  Same objection.
 3      BY MR. MIGLIORI:
 4          Q.    Based on this e-mail?
 5          A.    It appears to be so.
 6          Q.    In fact, if you go to the front
 7      page, they're talking about whether or not
 8      they're blushing over the accolades.  They
 9      seem pretty happy that you're pleased with
10      the relationship.
11              Isn't that a fair statement,
12      based on your read of this e-mail?
13              MR. BOONE:  Objection to the
14          form.
15          A.    They -- they appear to be
16      pleased.
17      BY MR. MIGLIORI:
18          Q.    Say it again.
19          A.    They appear to be pleased.
20          Q.    Okay.  Thank you.
21              All right.  We talked a little
22      bit about Partners Against Pain.  I just
23      want to --
24              MR. BOONE:  Dr. Rosen, do you
25          need a break?
```

```
 1                 THE WITNESS:  No.

 2                 MR. MIGLIORI:  Yeah, let's get

 3        this done.

 4                 THE WITNESS:  I want to get this

 5        over as soon as possible.

 6                 MR. MIGLIORI:  Yeah, absolutely.

 7        PEC-OPT 1243.  It's Exhibit Number 32.

 8                 (Whereupon, Rosen Exhibit 32,

 9        E-mail chain Bates Number

10        PPLPC028000245007, was for marked

11        identification.)

12    BY MR. MIGLIORI:

13        Q.    Do you recall this -- that

14    Partners Against Pain is a Purdue

15    educational product, right?

16        A.    Yes.

17        Q.    And this e-mail exchange from

18    Purdue is between Rhonda Clark and Tim

19    Richards, March 17, 2009.  It says, "Tim,

20    I'm working on Optum Health (Dr. Rosen's

21    group) on a chronic pain management

22    program that will roll out to the case

23    managers.  Lori Ladd and Maribeth Kowalski

24    are assisting.  They would like to link to

25    our partnershipagainstpain.com website.
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Is there anything special we need to do?"

2              Do you see that?

3         A.    Yes.

4         Q.    This is in 2009, correct?

5         A.    Yes.

6         Q.    And do you recall asking to do

7    that?

8         A.    No.

9              MR. MIGLIORI:  Let's go to

10        PEC-OPT_1428 Exhibit Number 33.  1428.

11              (Whereupon, Rosen Exhibit 33,

12        11/12/2013 e-mail

13        OPTUMHEALTH_MDL_000019376, was marked

14        for identification.)

15   BY MR. MIGLIORI:

16        Q.    This is a November 12, 2013,

17   e-mail produced by Optum Health between

18   Lisa Eckroth and you.  It says,

19   "Follow-Up" -- first of all, that's your

20   e-mail, correct?

21        A.    Yes.

22        Q.    Yes?

23        A.    Yes.

24        Q.    And you have no reason to doubt

25   this is a true and accurate copy, correct?

1    A.    Yes.

2    Q.    This is -- "Dr. Rosen," Lisa

3  writes, on November 12, 2013, "Great to

4  see you last week in Texas.  I wanted to

5  thank you for helping coordinate the

6  meeting on Friday morning.  As you

7  requested, I am sending the Partners

8  Against Pain website link for your review

9  and consideration for use.

10  Www.partnershipsagainstpain.com.  I look

11  forward to the next steps with the group

12  where we can share a number of resources

13  that may be beneficial for the case

14  managers."

15         Do you see that?

16    A.    Yes.

17    Q.    Do you recall, in 2013, writing

18  with Lisa Eckroth, the national account

19  executive at Purdue Pharma, about you

20  putting Partners Against Pain on the

21  UnitedHealthcare website?

22    A.    I see the e-mail, but I don't

23  recall it.

24    Q.    Okay.  You respond back same

25  day, "Hi, Julia.  I believe the website

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

 1    below is approved.  Am I correct?"

 2              So you wrote to Julia

 3    Keiter-Gasper within Optum.  I assume that

 4    she's somebody that would be approving

 5    putting this on the website, correct?

 6              MR. BOONE:  Objection to the

 7         form.  Lacks foundation.

 8         A.    No.  Julia was a member of our

 9    group.  She was a RN, and she was

10    responsible for reviewing websites.  And

11    she was a stickler for websites, basically

12    having certain characteristics that would

13    include things like, you know,

14    regularly -- regular updating schedule; no

15    promotional materials or advertising; a

16    list of who the contributors were to the

17    website, you know, which we did not accept

18    material on websites that was anonymous.

19    We needed names and the professional

20    credentials of individuals who contributed

21    to websites.

22              So she was a nurse who basically

23    went through and either approved or did

24    not approve websites that were either

25    suggested by the clinical team as being

1   helpful for nurses and -- and other

2   clinicians.

3   BY MR. MIGLIORI:

4       Q.    And you said to her, your nurse,

5   a request to approve the "Partners Against

6   Pain" website, correct?

7       A.    No.  I asked her if it was

8   already approved.

9       Q.    Okay.  And you recall the

10  "Partners Against Pain" was on the group

11  that was on the -- that produced the

12  FACETS catalog, correct?

13      A.    Yes, they were associated with

14  them.

15      Q.    Okay.  Let's go to PEC-OPT_1438,

16  last documents on this topic.

17          MR. BOONE:  After this, we'll

18      take a break, Don.

19          MR. MIGLIORI:  Yep.  And I'll

20      finish after that.  I've just got a

21      very short.

22          MR. BOONE:  Do you need to take

23      a break now or do you --

24          THE WITNESS:  I don't need one.

25          MR. BOONE:  We'll do it right

```
 1        after this one.
 2               MR. MIGLIORI:  And we will get
 3        this done.
 4               (Whereupon, Rosen Exhibit 34,
 5        Approved Resources Updates Bates
 6        Number OPTUMHEALTH_MDL_000038257
 7        through 000038290, was marked for
 8        identification.)
 9   BY MR. MIGLIORI:
10        Q.    I just want to show you.  This
11   is an Optum document produced to us
12   with -- and in it is a listing of approved
13   resources and updates.
14               You see that -- is this
15   something that your nurse would be
16   responsible for contributing to?
17        A.    Yes.
18        Q.    All right.  And you'll see if
19   you go to page -- the page that ends in
20   38277, there is a date of November 25,
21   2013.  And it says "new websites" on the
22   bottom of the page.
23               Do you see that?  And then on
24   the next page, it says "disease
25   resources."
```

 1          A.    Right.

 2          Q.    Just two months after the

 3     e-mail, you ask your nurse about this that

 4     Partners Against Pain was approved and

 5     added to the website.

 6                Do you see that?

 7                MR. BOONE:  Objection to the

 8          form.

 9          A.    No, that's actually not

10     necessarily what was -- it may have been

11     approved already.  I just asked her

12     whether it was approved.  I don't remember

13     what her answer is, but clearly, it was

14     one of our approved websites.

15     BY MR. MIGLIORI:

16          Q.    Okay.  So I know.  But you wrote

17     to her.  You requested it in November of

18     2013.  You asked the nurse on

19     November 13th of 2013 if it was approved,

20     and two weeks later, in this document,

21     Exhibit Number 34, it's listed as a new

22     website, approved website.  That is all

23     I'm asking.

24          A.    Is this -- I don't see the

25     heading.  Where does it say it's in the --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1        Q.    On the bottom of the previous

 2   page --

 3             MR. MIGLIORI:  We'll go back,

 4        Mike.

 5   BY MR. MIGLIORI:

 6        Q.    -- it says:  New websites --

 7        A.    Okay.

 8        Q.    -- cancer resources.  And under

 9   disease resources, it says:  Pain,

10   Partners Against Pain, it was approved.

11             Do you see that?

12        A.    Okay.

13        Q.    Okay.  So it was approved, and

14   it was put up.  And then I just want to

15   direct you now to the page that ends in

16   38263.

17             Before I get to that, once an

18   approved site, who would have access to

19   that website?

20             MR. BOONE:  Objection to the

21        form.

22        A.    It's --

23   BY MR. MIGLIORI:

24        Q.    Go ahead.

25        A.    -- the -- basically any of our
```

1    clinical people would have access to it.

2         Q.    Including your case managers?

3         A.    Yes.

4         Q.    And including your medical

5    directors?

6         A.    Yes.

7         Q.    And anybody who's in the medical

8    care side of business, right?

9              MR. BOONE:  Objection to the

10        form.  Lacks foundation.

11   BY MR. MIGLIORI:

12        Q.    Correct?

13        A.    That's correct.

14        Q.    And that's throughout the UH --

15   UnitedHealth Group, correct?

16             MR. BOONE:  Objection to the

17        form.  Lacks foundation.

18        A.    I don't know.  I mean, it was --

19   there was a -- we -- we had a central

20   database that was accessible via the

21   company website that basically had a whole

22   conglomeration of clinical resources.  And

23   these approved websites -- approved --

24   approved websites were part of that

25   central file or master file of documents,

1   and so it would be accessible to any

2   employee.

3        Q.    Of UnitedHealth Group?

4        A.    Yeah.

5              MR. BOONE:  Objection to the

6        form.  Lacks foundation.

7   BY MR. MIGLIORI:

8        Q.    UnitedHealth Group, correct?

9              MR. BOONE:  Same objection.

10       A.    To anybody who had access to

11  that master file.  I don't know if it was

12  universal or not.

13  BY MR. MIGLIORI:

14       Q.    Well, I think before the

15  objection, you said yes to my question to

16  UnitedHealth Group.  Is it yes or no?  I

17  just want to make a clean answer.

18       A.    I'm not -- yes.  I'm not sure it

19  was UnitedHealth.  I'm not sure if it was

20  limited to -- if it was available to

21  everyone or just segments of the company.

22       Q.    And it certainly covered your

23  case managers and your medical directors,

24  correct?

25       A.    Yes, they would have access.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

 1        Q.    All right.  And then if you flip

 2   back to Page 8263 in February of 2017,

 3   you'll see under "Removed Websites"

 4   "Partners Against Pain" on Pages 8263 and

 5   8264.

 6             So Partners Against Pain was

 7   removed as of the -- February 10, 2017.

 8             Do you see that?  Do you see

 9   that?

10        A.    Yeah, I see that.

11        Q.    Do you know why it was removed?

12        A.    I don't.

13        Q.    Do you know if the Optum

14   statement about the opioid epidemic around

15   the same time had any impact on removing

16   this website?

17             MR. BOONE:  Objection to the

18        form.  Vague.

19        A.    I have no idea.

20   BY MR. MIGLIORI:

21        Q.    Do you know when the first

22   lawsuits were filed against Optum for its

23   role potentially in -- or allegedly in the

24   opioid crisis?

25             MR. BOONE:  Objection to the