# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF OHIO

### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Cases listed in Exhibits 1-2 | |

## REPLY IN RESPONSE TO THE PBMS' JOINT OPPOSITION TO MOTIONS FOR LEAVE TO AMEND

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ...................................................................................................... 8

I. ALL OF THE ISSUES COMMON TO ALL OR MOST PLAINTIFFS SUPPORT
LEAVE TO AMEND .................................................................................. 8

    A. Plaintiffs Have Demonstrated They Could Not, with
Reasonable Diligence, Have Met the Amendment Deadlines. ........ 8

        1. Discovery in the *JeffCo* Action yielded significant
information that was not available by the
Amendment Deadlines. ........................................................... 10

        2. That certain other plaintiffs asserted claims against
the PBMs before the *JeffCo* documents were made
available does not demonstrate any lack of diligence
by these Plaintiffs. ................................................................... 14

        3. Any "delay" between when Plaintiffs received the
new information and when they sought leave to
amend is neither relevant to, nor demonstrates any
lack of, diligence. .................................................................... 19

        4. Plaintiffs' diligence applies to *all* of the proposed PBM
defendants, including those not sued in the *JeffCo*
Action. ...................................................................................... 24

    B. The PBMs Identify No Cognizable Prejudice Due to the
Proposed Amendments. .................................................................... 26

        1. The mere passage of time does not constitute
cognizable prejudice. ............................................................... 27

        2. Issues regarding litigation holds provide no basis to
deny leave to amend. ............................................................... 32

        3. The "expansion of the MDL" is not a relevant
consideration, and any such expansion would not
constitute cognizable prejudice to the PBMs. ...................... 33

        4. The PBMs are not prejudiced by the amendment
process. ..................................................................................... 37

        5. The PBMs will not be prejudiced in pursuing
"allocation of fault" or "third-party liability." ..................... 39

    C. The PBMs' Objections to the Process Established by the
Court and to Plaintiffs' Compliance with It Fail. ........................... 40

Table of Contents
(continued)

Page

       1.    The motions sufficiently identify Plaintiffs' proposed claims and allegations, in compliance with the Federal Rules...................................................................40

       2.    The motions sufficiently articulate common bases, applicable to all Plaintiffs, for finding good cause to grant leave to amend. ...............................................47

  D.    The PBMs Cannot Establish the Proposed Amendments Are Futile. ...................................................................51

       1.    All Plaintiffs indisputably state at least one claim for relief. ...................................................................52

       2.    All Plaintiffs sufficiently allege their injuries and the PBMs' role in causing them. ....................................53

       3.    The PBMs' statute-of-limitations arguments cannot be resolved at this stage, and lack merit in any event. .............57

           a.    *The PBMs cannot conclusively establish Plaintiffs' RICO claims are time-barred.* ...........................59

           b.    *The PBMs likewise cannot conclusively establish Plaintiffs' public nuisance claims are untimely.* .............61

       4.    The PBMs' challenges to public nuisance claims by Plaintiffs located in five states do not establish futility.......65

II.    DEFENDANTS' PURPORTEDLY CASE-SPECIFIC CHALLENGES PROVIDE NO BASIS TO DENY LEAVE TO AMEND ....................................67

  A.    The PBMs' Fact-Bound Arguments Regarding Their Market Share as Opioid Dispensers Are at Best Premature and Do Not Bear on Good Cause....................................67

  B.    The PBMs' Challenge to Plaintiffs' Purported Lack of "Authorization" Fails. .............................................70

       1.    Rule 16 provides no basis to challenge leave to amend for any purported lack of authorization. ..............................71

       2.    The Court cannot determine the proposed amendments are futile based on fact-dependent questions regarding Plaintiffs' authorization to sue............73

ii

Table of Contents
(continued)

Page

3.     None of the Plaintiffs violated the Court's directive
       that they be prepared "to litigate the case against each
       defendant" should they be chosen as a bellwether.............. 82

C.   The PBMs' Relationships with Certain Plaintiffs Do Not
     Preclude These Amendments. ............................................. 86

     1.     The PBMs' standard contracts did not alert Plaintiffs
            to nuisance or RICO claims. .................................... 86

     2.     Dispute-resolution provisions with ESI do not bar the
            proposed amendments of the two Plaintiffs at issue.......... 88

D.   Purported Deficiencies with Certain Plaintiffs' Fact Sheets
     Do Not Warrant Denying Leave to Amend. .................................... 90

E.   The PBMs' Remaining Arguments Against a Handful of
     Plaintiffs Are Unavailing. ................................................. 97

     1.     Ten Plaintiffs' lawsuits against PBMs outside the
            MDL, which were filed and dismissed without
            prejudice after the subject Amendment Deadlines,
            have no bearing on their diligence. ........................ 97

     2.     The Court's 2023 denials of two Plaintiffs' motions for
            leave to amend do not bar amendment now. ...................... 99

     3.     The PBMs' argument regarding duplicate case listings
            by certain Plaintiffs is moot. ................................ 100

     4.     Cases by sheriff Plaintiffs that the PBMs challenge as
            duplicates are in fact independent actions. ........................ 102

     5.     The PBMs' remaining procedural arguments
            regarding individual Plaintiffs either lack merit or are
            moot. ....................................................... 103

CONCLUSION ................................................................. 104

iii

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Alston v. Hormel Foods Corp.*,
    730 N.W.2d 376 (Neb. 2007).................................................................................64

*Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*,
    839 F.3d 458 (6th Cir. 2016).................................................................................58

*Armatas v. Haws*,
    2021 WL 5356028 (6th Cir. Nov. 17, 2021) .........................................................19

*Asher v. Unarco Material Handling, Inc.*,
    596 F.3d 313 (6th Cir. 2010).................................................................................78

*Estate of Barney v. PNC Bank*,
    714 F.3d 920 (6th Cir. 2013).................................................................................58

*Bear v. United States*,
    2023 WL 1097268 (N.D. Ohio Jan. 30, 2023) ......................................................82

*Begala v. PNC Bank, Ohio, N.A.*,
    214 F.3d 776 (6th Cir. 2000).................................................................................45

*Bennett v. MIS Corp.*,
    607 F.3d 1076 (6th Cir. 2010)...............................................................................51

*Beydoun v. Sessions*,
    871 F.3d 459 (6th Cir. 2017)...........................................................................43, 45

*Brooke Cty. Comm'n v. Purdue Pharma L.P.*,
    2018 WL 11242293 (W. Va. Cir. Ct. Dec. 28, 2018), *writ denied*, No. 19-
    0210 (W. Va. June 4, 2019)...................................................................................66

*Bush Truck Leasing, Inc. v. Cummins, Inc.*,
    2021 WL 9057624 (S.D. Ohio Apr. 13, 2021) ......................................................82

*Cabello v. Fernandez-Larios*,
    402 F.3d 1148 (11th Cir. 2005)..............................................................................63

*Chaz Constr., LLC v. Codell*,
    137 F. App'x 735 (6th Cir. 2005).....................................................................73, 74

3304111.16

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*,
690 F. Supp. 2d 1296 (S.D. Fla. 2010) ................................................................62

*Church v. Gen. Elec. Co.*,
138 F. Supp. 2d 169 (D. Mass. 2001).................................................................64

*In re Cibella*,
560 B.R. 494 (Bankr. N.D. Ohio 2016) ..............................................................79

*City of Bos. v. Express Scripts, Inc.*,
765 F. Supp. 3d 31 (D. Mass. 2025)...............................................................62, 63

*City of Bos. v. Purdue Pharma, LP*,
2020 WL 416406 (Mass. Super. Ct. Jan. 3, 2020) .............................................62

*Clabo v. Johnson & Johnson Health Care Sys., Inc.*,
982 F.3d 989 (6th Cir. 2020) ..............................................................................58

*Consumers Pet. Co. v. Texaco, Inc.*,
804 F.2d 907 (6th Cir. 1986) ..............................................................................68

*Cortez v. Cook Inc.*,
27 F.4th 563 (7th Cir. 2022) ...............................................................................54

*Cranberry Promenade, Inc. v. Cranberry Twp.*,
2011 WL 13364662 (W.D. Pa. Aug. 29, 2011) ..................................................94

*Cunningham Prop. Mgmt. Tr. v. Ascent Res.-Utica, LLC*,
2020 WL 4217962 (S.D. Ohio July 23, 2020) ....................................................44

*In re DePuy Orthopaedics, Inc. ASR Hip Implant Prods. Liab. Litig.*,
953 F.3d 890 (6th Cir. 2020) ..............................................................................54

*DGB, LLC v. Hinds*,
55 So. 3d 218 (Ala. 2010) ...................................................................................62

*Directv, Inc. v. Treesh*,
487 F.3d 471 (6th Cir. 2007) ..............................................................................82

*Discover Bank v. New Vision Fin., LLC*,
2005 WL 1865369 (S.D. Ohio Aug. 1, 2005) .....................................................15

## TABLE OF AUTHORITIES
### (continued)

Page

*Doe v. Carson*,
2020 WL 2611189 (6th Cir. May 6, 2020) ...................................................44

*Dollison v. Antero Res. Corp.*,
2022 WL 16835991 (S.D. Ohio May 4, 2022) ............................................43

*Donahue v. Travelers Cos.*,
2024 WL 4534250 (N.D. Ohio Oct. 21, 2024) .........................................6, 53

*Doraleh Container Terminal SA v. Rep. of Djibouti*,
109 F.4th 608 (D.C. Cir. 2024) .............................................................80, 81

*Duggins v. Steak 'N Shake, Inc.*,
195 F.3d 828 (6th Cir. 1999) ...................................................................28

*Dunomes v. Winter*,
2019 WL 2396608 (W.D. Wash. Feb. 19, 2019) ......................................63

*Ellis v. Evonik Corp.*,
604 F. Supp. 3d 356 (E.D. La. 2022) .......................................................64

*Etsy, Inc. v. Jaddou*,
2023 WL 3689555 (D. Neb. May 25, 2023) ..............................................63

*Evans v. Pearson Enters.*,
434 F.3d 839 (6th Cir. 2006) .............................................................50, 51

*Father Flanagan's Boys Home v. Donlon*,
449 F. Supp. 3d 739 (S.D. Ohio 2020) ....................................................52

*Fraker v. Marysville Exempted Vill. Schs.*,
696 F. Supp. 2d 887 (S.D. Ohio 2010) ................................................28, 29

*Frear v. P.T.A. Indus., Inc.*,
103 S.W.3d 99 (Ky. 2003) .......................................................................77

*Fritz v. Charter Twp. of Comstock*,
592 F.3d 718 (6th Cir. 2010) ...................................................................52

*Garza v. Lansing Sch. Dist.*,
972 F.3d 853 (6th Cir. 2020) ...................................................................28

**TABLE OF AUTHORITIES**
(continued)

Page

*Gaston v. Cuyahoga Community Coll. Chapter,*
2024 WL 3292562 (N.D. Ohio July 2, 2024) ....................................................88

*Gavitt v. Born,*
835 F.3d 623 (6th Cir. 2016) ..........................................................................74

*GGNSC Louisville Hillcreek, LLC v. Estate of Bramer by & through Bramer,*
932 F.3d 480 (6th Cir. 2019) ..........................................................................90

*Glick v. Farm Credit Servs. of Mid-Am., FLCA,*
2010 WL 3118673 (N.D. Ohio Aug. 6, 2010) ...................................................44

*Goldberg. v. Howard Co. Welfare Bd.,*
272 A.2d 397 (Md. 1971) ...............................................................................64

*Grand Traverse Band of Ottawa & Chippewa Indians v.*
*Blue Cross Blue Shield of Mich.,*
2025 WL 2104569 (6th Cir. July 28, 2025) ......................................................51

*Greer v. Strange Honey Farm, LLC,*
114 F.4th 605 (6th Cir. 2024)..........................................................................51

*Harris v. Davidson Cty. Sheriff,*
2019 WL 7573883 (6th Cir. Dec. 11, 2019) .....................................................44

*Hedrick v. Ohio Health Corp.,*
2020 WL 13659064 (S.D. Ohio Oct. 8, 2020) ..................................................30

*Holland v. Florida,*
560 U.S. 631 (2010)........................................................................................23

*Inge v. Rock Fin. Corp.,*
281 F.3d 613 (6th Cir. 2002) ..........................................................................71

*Intera Corp. v. Henderson,*
428 F.3d 605 (6th Cir. 2005) ..........................................................................50

*J&R Passmore, LLC v. Rice Drilling D, LLC,*
2024 WL 111661 (S.D. Ohio Jan. 10, 2024)......................................................13

*Kanagy v. Midlands Millroom Supply, Inc.,*
2020 WL 1275289 (N.D. Ohio Mar. 17, 2020)..................................................29

## TABLE OF AUTHORITIES
### (continued)

Page

*Kaylor v. Radde,*
2005 WL 282851 (N.D. Ohio Feb. 3, 2005) ........................................................................19

*Kernz v. J.L. French Corp.,*
667 N.W.2d 751 (Wis. Ct. App. 2003) ...............................................................................77

*King Cty. v. Express Scripts, Inc.,*
2025 WL 1082130 (W.D. Wash. Apr. 10, 2025) ................................................................62

*Knoll v. Am. Tel. & Tel. Co.,*
176 F.3d 359 (6th Cir. 1999) ..............................................................................................97

*In re Korean Air Lines Co. Antitrust Litig.,*
642 F.3d 685 (9th Cir. 2011) ..............................................................................................46

*Kuyat v. BioMimetic Therapeutics, Inc.,*
747 F.3d 435 (6th Cir. 2014) ........................................................................................44, 45

*Landstar Ranger, Inc. v. City of Delaware, Ohio,*
2022 WL 7322274 (S.D. Ohio Oct. 13, 2022) ...................................................................13

*Langley v. Credit Suisse First Bos. Corp.,*
89 F. App'x 938 (6th Cir. 2004) .................................................................................. *passim*

*Lee Cty., Ala. Comm'n v. CreekWood Res. LLC,*
2022 WL 450810 (M.D. Ala. Feb. 14, 2022) .....................................................................67

*Litz v. Md. Dep't of Env't,*
76 A.3d 1076 (Md. 2013) ...................................................................................................64

*Lozar v. Birds Eye Foods, Inc.,*
2012 WL 12886431 (W.D. Mich. June 6, 2012) ................................................................55

*Maddan v. Okaloosa Cty.,*
358 So. 3d 834 (Fla. Dist. Ct. App. 2023) .........................................................................64

*Magliacane v. City of Gardner,*
138 N.E.3d 347 (Mass. 2020) ............................................................................................62

*Manders v. Lee,*
338 F.3d 1304 (11th Cir. 2003) (en banc) ........................................................................102

## TABLE OF AUTHORITIES
### (continued)

Page

*Mann v. CSX Transp., Inc.,*
  2009 WL 3766056 (N.D. Ohio Nov. 10, 2009) (Polster, J.) ...............................................33

*Mayor & City Council of Baltimore v. Monsanto Co.,*
  2020 WL 1529014 (D. Md. Mar. 31, 2020) ..........................................................................64

*McCarthy v. Amazon.com, Inc.,*
  2023 WL 5793316 (W.D. Wash. Sept. 7, 2023) ...................................................................63

*Ex parte McKesson Corp.,*
  393 So. 3d 1180 (Ala. 2023) .................................................................................................63

*In re McKinsey & Co. Nat'l Prescription Opiate Consultant Litig.,*
  543 F. Supp. 3d 1377 (J.P.M.L. 2021) ..................................................................................35

*Meredith v. The Ionian Trader,*
  279 F.2d 471 (2d Cir. 1960) ............................................................................................80, 81

*Metyk v. KeyCorp,*
  560 F. App'x 540 (6th Cir. 2014) .........................................................................................50

*Milton v. Haywood,*
  393 So. 3d 1156 (Ala. 2023) (Parker, C.J., concurring) ......................................................67

*Monroe Fed. Sav. & Loan Ass'n v. NEA Galtier Parking, LLC,*
  2012 WL 5830250 (S.D. Ohio Nov. 16, 2012).....................................................................52

*Montgomery v. Gove,*
  2021 WL 4859345 (N.D. Ohio Oct. 19, 2021) (Polster, J.).................................................73

*Moore v. City of Paducah,*
  790 F.2d 557 (6th Cir. 1986) ..........................................................................................27, 28

*State ex rel. Morrisey v. AmerisourceBergen Drug Corp.,*
  2014 WL 12814021 (W. Va. Cir. Ct. Dec. 12, 2014),
  *writ denied*, No. 15-1026 (W. Va. Jan. 5, 2016) .................................................................66

*MSPA Claims 1, LLC v. Anda,*
  No. 1:18-op-45526 (N.D. Ohio Sept. 22, 2023) .................................................................103

*Nall v. Par. of Iberville,*
  542 So. 2d 145 (La. Ct. App. 1989).....................................................................................102

- ix-

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Nat'l Prescription Opiate Litig.*,
 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) ...................................................59

*In re Nat'l Prescription Opiate Litig.*,
 2019 WL 2468267 (N.D. Ohio Apr. 1, 2019) .....................................................42

*In re Nat'l Prescription Opiate Litig.*,
 2019 WL 4194296 (N.D. Ohio Sept. 4, 2019) ....................................................65

*In re Nat'l Prescription Opiate Litig.*,
 2024 WL 3387357 (N.D. Ohio Feb. 20, 2024)........................................... *passim*

*In re Nat'l Prescription Opiate Litig.*,
 2024 WL 4910299 (N.D. Ohio Nov. 15, 2024) ............................................32, 93

*In re Nat'l Prescription Opiate Litig.*,
 2024 WL 4912429 (N.D. Ohio Aug. 22, 2024) .......................................... *passim*

*In re Nat'l Prescription Opiate Litig.*,
 290 F. Supp. 3d 1375 (J.P.M.L. 2017)................................................................37

*In re Nat'l Prescription Opiate Litig.*,
 440 F. Supp. 3d 773 (N.D. Ohio 2020)..........................................................55, 58

*In re Nat'l Prescription Opiate Litig. (CVS)*,
 956 F.3d 838 (6th Cir. 2020) ..................................................................20, 46, 47

*In re Nat'l Prescription Opiate Litig. (Meijer)*,
 2022 WL 20701236 (6th Cir. Nov. 10, 2022) .....................................................31

*Neves v. Holder*,
 613 F.3d 30 (1st Cir. 2010)................................................................................63

*NOCO Co. v. Lapidus*,
 2022 WL 1803039 (N.D. Ohio June 2, 2022) (Polster, J.) ................13, 27, 36, 71

*Ohio Sec. Ins. Co. v. Brakefire, Inc.*,
 2024 WL 2816024 (N.D. Ohio June 3, 2024) .....................................................44

*Oper. Eng'rs Loc. 324 Health Care Plan v. Mid Mich. Crushing & Recycling,
 LLC*,
 2012 WL 13018246 (E.D. Mich. Feb. 13, 2012) ................................................68

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Order Denying Distrib. Defs.' Mot. to Dismiss Pls.' Compl.*,
   No. 19-C-1900,  (W. Va. M.L.P. Oct. 31, 2019),
   *writ denied*, *State ex rel. AmerisourceBergen Drug Corp. v. Moats*,
   No. 19-1051 (W. Va. Jan. 30, 2020) ......................................................66

*In re Opioid Litig.*,
   2022 WL 18028767 (W. Va. M.L.P. July 1, 2022)......................................66

*Pac. Sound Res. v. Burlington N. Santa Fe Ry. Corp.*,
   125 P.3d 981 (Wash. Ct. App. 2005)......................................................64

*Peck v. Munson Healthcare*,
   2022 WL 17260807 (W.D. Mich. Nov. 9, 2022) ...................................88

*Pettiford v. City of Yonkers*,
   2021 WL 2556172 (S.D.N.Y. June 21, 2021) .........................................30

*Phelps v. McClellan*,
   30 F.3d 658 (6th Cir. 1994) ..........................................................28, 39

*In re Phenylpropanolamine (PPA) Products Liability Litigation*,
   460 F.3d 1217 (9th Cir. 2006) .............................................48, 49, 50

*Provost v. First Guar. Bank*,
   2019 WL 3412432 (E.D. La. July 29, 2019) .......................................62, 63

*Rapp v. Forest City Techs., Inc.*,
   2021 WL 4713394 (N.D. Ohio June 17, 2021) .....................................14

*Reid v. Baker*,
   499 F. App'x 520 (6th Cir. 2012) .......................................................60

*Rich v. Hersl*,
   2021 WL 2589731 (D. Md. June 24, 2021) ..........................................62

*Roman Cath. Archbishop of Washington v. Doe*,
   330 A.3d 1069 (Md. 2025) ..............................................................63

*Rose v. Hartford Underwriters Ins. Co.*,
   203 F.3d 417 (6th Cir. 2000) ................................................68, 69, 73, 74

**TABLE OF AUTHORITIES**
(continued)

Page

*Salerno v. Family Heritage Life Ins. Co. of Am.*,
2024 WL 2235772 (N.D. Ohio May 17, 2024) ....................................................15

*Salyers v. City of Portsmouth*,
534 F. App'x 454 (6th Cir. 2013) .......................................................................14

*Shane v. Bunzl Distrib. USA, Inc.*,
275 F. App'x 535 (6th Cir. 2008)....................................................................14, 72

*Simplicean v. SSI (US), Inc.*,
2018 WL 6499476 (E.D. Mich. Dec. 11, 2018) ................................................16

*Stanich v. Hissong Grp., Inc.*,
2011 WL 1560650 (S.D. Ohio Apr. 25, 2011) ..................................19, 21, 22

*Suther v. Jefferson Cty. Bd. of Health*,
456 So. 2d 769 (Ala. 1984).........................................................................67, 100

*Tackett v. M & G Polymers, USA, LLC*,
561 F.3d 478 (6th Cir. 2009) ..............................................................................52

*Taygeta Corp. v. Varian Assocs., Inc.*,
763 N.E.2d 1053 (Mass. 2002) ..........................................................................62

*Weaver v. Firestone*,
155 So. 3d 952 (Ala. 2013)..................................................................................63

*Wesley v. Randall Farms, LLC*,
2025 WL 2322770 (N.D. Ohio Aug. 12, 2025) ...........................................15, 83

*Woodruff v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
1989 WL 224581 (D. Neb. July 14, 1989)..........................................................63

*Zlozower v. Rock & Roll Hall of Fame & Museum, Inc.*,
2025 WL 1822570 (N.D. Ohio July 2, 2025) ....................................................51

**Statutes**

28 U.S.C. § 1407 ........................................................................................37, 49

Ala. Code §§ 6-5-155.1, 6-5-155.2........................................................................67

3304111.16

**TABLE OF AUTHORITIES**
(continued)

Page

G.L. c. 260 § 12 .................................................................................................63

KRS 61.805(3) ..................................................................................................76

La. R.S. § 5543 .................................................................................................102

N.Y. Gen. Bus. Law §§ 349 and 350 ..............................................................41

N.Y. Soc. Servs. Law § 145-B ........................................................................67

**Court Rules**

Fed R. Civ. P. 7.................................................................................................50

Fed. R. Civ. P. 8(a) ..........................................................................................55

Fed. R. Civ. P. 8(c) ..........................................................................................15

Fed. R. Civ. P. 9...............................................................................................55

Fed. R. Civ. P. 11.................................................................................13, 16, 18

Fed. R. Civ. P. 12(b)(6) ........................................................................ *passim*

Fed. R. Civ. P. 12(d) ........................................................................................74

Fed. R. Civ. P. 15................................................................................... *passim*

Fed. R. Civ. P. 16................................................................................... *passim*

Fed. R. Civ. P. 37.............................................................................................96

Fed. R. Civ. P. 56......................................................................................69, 74

**Treatises**

BLACK'S LAW DICTIONARY 266 (10th ed. 2014)........................................79

RESTATEMENT (SECOND) OF TORTS § 834 cmt. e ........................................62

**Constitutions**

La. Const. Article 5, § 27...............................................................................102

3304111.16

Amending Plaintiffs ("Plaintiffs")[1] submit this reply in response to the Revised Joint Opposition ("Joint Opposition"), consisting of Part I (Dkt. #6163, "Pt. I Br.") and Part II (Dkt. #6172, "Pt. II Br."), by OptumRx, Inc., Express Scripts, Inc., and affiliated entities (collectively, the "PBMs") to Plaintiffs' motions for leave to amend (Dkt. #5547, "Optum Mot."; Dkt. #5548, "ESI Mot.").[2]

## PRELIMINARY STATEMENT

In their opening briefs, Plaintiffs demonstrated they have met Rule 16's prerequisites—diligence and lack of prejudice—as well as Rule 15's requirement that amendment is in the interest of justice. In a Joint Opposition so long it might make Dickens blush, the PBMs throw out all manner of arguments (no matter how fanciful) to avoid facing liability for their significant and long-running contribution to the nation's opioid crisis. The Court should not mistake quantity for quality. The PBMs mischaracterize the relevant facts and law, rely on pure speculation, raise highly fact-

---

[1] The updated lists of plaintiffs seeking leave to amend to add each of the proposed defendants encompassed by this Reply are attached as Exhibit 1 (re Optum) and Exhibit 2 (re ESI). The total number of Plaintiffs moving to amend is 808. These revised lists replace those attached as Exhibit A to each of the motions for leave to add the PBMs. *See* Dkt. #5547-1 (re Optum); Dkt. #5548-1 (re Express Scripts). Additionally, Exhibit 3 is the revised lists of plaintiffs withdrawing from the subject motions; Exhibit 4 is a list of corrections to case information (case numbers, case names, Plaintiff names, or Plaintiff states) that was inaccurately listed in each Exhibit A to the motions; Exhibit 5 is the Declaration of Rachel Klink ("Klink Decl."); and Exhibits 6 and 6A consist of, respectively, the Declaration of John W. Raggio ("Raggio Decl.") and a copy of a July 8, 2024 e-mail sent on behalf of Plaintiff Lee County, Florida, which counsel for Lee County produced on August 25, 2025 in response to the PBMs' open-records request.

[2] Unless otherwise indicated, terms and abbreviations are retained from Plaintiffs' opening briefs, all emphasis has been added, and all internal citations and quotation marks have been omitted.

based issues not appropriate for resolution at the pleading stage, and attempt to revive arguments that have already been addressed—and rejected—by this Court.

Before turning to those arguments, however, an overarching observation is in order.  Part I of the Joint Opposition purportedly addresses general arguments applicable to all (or substantially all) Plaintiffs, while Part II consists of more than 3,400 pages purportedly devoted to arguments "for why each of the [808] Moving Plaintiffs should be denied leave to amend."  Pt. I Br. at 7.  But like most sequels, "Part II" is a largely superfluous redux; much of it consists of recapitulations of the generalized challenges introduced in Part I, with identical wording pasted *verbatim* into hundreds of sections, confirming that the arguments being parroted over and over again are in no sense individualized or Plaintiff-specific.  Buried within this *Groundhog Day* repetition are a handful of actual Plaintiff-specific arguments, which are easily rejected.

While the PBMs' flood-the-zone tactic was no doubt intended to convince the Court that resolving these motions is a Sisyphean endeavor that requires hundreds of disparate determinations, in reality these motions turn largely on questions common to all or most Plaintiffs, which the Court can—and should—address together.  Nor will doing so undermine the individual nature of each case; it merely reflects the substantial similarities that led to this MDL's creation in the first place.  Accordingly, to aid the Court, Section I below addresses the questions common to all Plaintiffs or, in some instances, to large groups of readily identified Plaintiffs—e.g., issues of state law equally applicable to all Plaintiffs from a particular state; and Section II addresses the relatively small number of Plaintiff-specific issues.

2

Stripped of its repetition, the PBMs' Joint Opposition raises four questions that are common to all (or to identifiable groups of) Plaintiffs, and which the Court can address in a common fashion:

1. Have Plaintiffs demonstrated "good cause" for leave to amend by showing that they could not, with reasonable diligence, have met their respective Amendment Deadlines because the facts they needed to assert their claims were not produced to them until January 2023?  As summarized below and addressed more fully in Section I.A, the answer is "Yes."[3]

2. Would Defendants suffer cognizable prejudice if Plaintiffs were permitted to amend now, rather than by their respective Amendment Deadlines, given that each Plaintiff's case has been stayed since 2018?  As summarized below and addressed more fully in Section I.B, the answer is "No."

3. Do Plaintiffs' motions—which detail the proposed amendments, the bases for them, and the grounds for good cause to amend that apply equally to each case—comply with the Federal Rules, Sixth Circuit precedent, and this Court's May 23, 2024 Order allowing Plaintiffs to seek leave to amend (Dkt. #5455, "May 2024 Order")?  As summarized below and addressed more fully in Section I.C, the answer is "Yes."

4. Can the PBMs establish that the proposed amendments are futile based on arguments common to all (or readily identifiable groups of) Plaintiffs—i.e., that (a) Plaintiffs fail to specify their injuries or the PBMs' role in causing them, (b) RICO *damages* claims or public nuisance claims are time-barred, and (c) the laws of certain states preclude the contemplated public nuisance claims?  As summarized below and addressed more fully in Section I.D, the answer is "No."

*First*, regarding Plaintiffs' diligence, as shown in Plaintiffs' moving papers, Plaintiffs *did not have the facts* giving rise to the claims they now seek to bring until late January 2023 at the earliest, when the PBMs produced in the MDL the documents they

---

[3] Plaintiffs refer to the amendment deadlines applicable to their respective cases—the earliest of which was March 16, 2019, and the latest was January 3, 2023—as the "Amendment Deadlines."

had previously produced in the *Jefferson County* action (the "*JeffCo* Action" or "*JeffCo*").[4] That was past the Amendment Deadline for even the last-filed Plaintiff.  The PBMs' assertion that much of the information in the *JeffCo* production was contained in documents previously produced by Purdue or other defendants is beside the point: as of March 2019, those productions consisted of more than *120 million pages*.  Without knowing what they were looking for, Plaintiffs could not have identified the relevant information buried in all those pages.  No construction of "reasonable diligence" requires a party to blindly scour that much material in the hopes of discovering facts that would support a claim.  Indeed, just last year the Court determined that bellwether plaintiffs— including City of Rochester, whose operative pleading (No. 1:19-op-45853, Dkt. #110 (the "*Rochester* Complaint")) forms the basis for the presently proposed amendments— sufficiently alleged their diligence for statute-of-limitations purposes based on the revelation of new facts about the PBMs through the *JeffCo* discovery produced in the MDL.  The same MDL discovery that revealed to Rochester what it could not, even with reasonable diligence, have learned earlier led these Plaintiffs to seek leave to amend just several months after Rochester amended its pleading.

The PBMs' criticisms of Plaintiffs' diligence, and their reference to the early claims filed by a limited number of other plaintiffs, ring hollow given that as late as May 2021, the PBMs contended Jefferson County had committed *sanctionable misconduct* by asserting

---

[4] *Jefferson Cty., Mo. v. Dannie E. Williams, M.D.*, No. 20-JE-CC00029
(Jefferson Cty. Cir. Ct., Mo.).

3304111.16

such claims against them with no evidentiary basis.  *See* Dkt. #5547-2 (Conrod Decl.), ¶ 11.  In other words, the PBMs now assert these Plaintiffs should have brought claims as early as 2019 that the PBMs said were unsubstantiated *years later*.  Indeed, even in *2024*, the PBMs attacked the bellwether plaintiffs' RICO allegations as "frivolous."  Dkt. #5289 (PBM Defs.' Opp. to Bellwether Pls.' Mot. for Leave to Amend) at 10.

*Second*, as Plaintiffs have already shown, the PBMs cannot demonstrate prejudice due to the proposed amendments because these cases have been stayed for more than seven years and the PBMs are thus in precisely the same position they would have been in had they been added by the Amendment Deadlines.  *See* Dkt. #5547 (Optum Mot.) at 14-16; Dkt. #5548 (ESI Mot.) at 13-15.  None of the PBMs' arguments demonstrates any prejudice cognizable under Rule 16 or Rule 15.

Contrary to the PBMs' assertion, the mere passage of time does not constitute cognizable prejudice.  Nor does their speculation regarding evidence they claim was "almost certainly" lost due to any Plaintiff's failure to timely institute a litigation hold (Pt. I Br. at 56).  Further, the Court has already rejected the PBMs' protestations regarding the "expansion of the MDL" due to their inclusion in additional cases, as well as their professed concerns about the ability to pursue claims against third parties.  And nothing about the amendment process has caused cognizable prejudice to the PBMs.  In short, the only "prejudice" to the PBMs is the burden of having to litigate additional cases (though even that will likely not occur for some time, given the Court-imposed moratorium).  As this Court has recognized, such ordinary obligations—which *all* litigants face—do not amount to the type of prejudice that warrants denying leave to amend.

5

3304111.16

*Third*, Plaintiffs' motions fully comply with the Federal Rules and the Court's May 2024 Order.  The PBMs' suggestion that it is necessary, in all instances, for a plaintiff seeking leave to amend to attach a proposed complaint conflicts with established law.  Here, Plaintiffs have pointed to the 300-page *Rochester* Complaint as the template for the proposed amendments.  That pleading asserts federal RICO, public nuisance, and other claims against the PBMs; there is no mystery regarding the basis for those claims or any defenses by the PBMs.  Moreover, Plaintiffs have made clear that the allegations and claims in the *Rochester* Complaint will supplement Plaintiffs' existing complaints, which contain jurisdiction-specific facts and state-law claims.  This accords with the Court's directives, which themselves are consistent the Federal Rules and Sixth Circuit authority.  Indeed, as the Court of Appeals has made clear, this Court has wide latitude in determining how to efficiently address issues in these proceedings.  That is especially so where, as here, the principal arguments for and against leave to amend are common to all Plaintiffs.

*Fourth*, the PBMs fall far short of demonstrating the proposed amendments are futile.  As the PBMs acknowledge, under the Court's prior rulings, RICO claims for equitable relief are not subject to a statute of limitations.  And untimeliness is the only ground—other than lack of particularity in pleading Plaintiffs' injuries for all claims, which is meritless—on which the PBMs assert futility as to RICO claims.  For this reason alone, the PBMs "have not met their burden of establishing that the proposed amendments would be futile *in their entirety*."  *Donahue v. Travelers Cos.*, 2024 WL 4534250, at *3 (N.D. Ohio Oct. 21, 2024).  Any further merits challenges "are better presented in a

later filed Rule 12 motion to dismiss that fully addresses all of the allegations and applicable legal standards." *Id.*

The PBMs' other general futility arguments are also unavailing.  Plaintiffs sufficiently allege their injuries and how the PBMs contributed to them, the proposed amended pleadings are not time-barred on their face, and the PBMs' arguments about the contours of certain state laws do not establish futility as to any Plaintiff.[5]

With those common questions resolved in Plaintiffs' favor, the Court can readily dispose of the discrete challenges the PBMs raise against particular Plaintiffs based on facts or circumstances specific to them.  These arguments include factual disputes about the PBMs' market share in particular jurisdictions, the sufficiency of certain Plaintiffs' Fact Sheets, objections to the procedures through which certain Plaintiffs authorized their counsel to seek leave to amend, and procedural or other specific attacks on the claims of discrete Plaintiff groups or individual Plaintiffs.  As shown in Section II below, none of these arguments provides a basis to deny leave to amend to any Plaintiff: some are beyond the scope of (and irrelevant to) a motion for leave to amend; some turn on incomplete or misleading information; and as to others, the PBMs are simply wrong on the law, the facts, or both.

---

[5] Plaintiffs acknowledge that Ohio and Oklahoma law, as articulated by their respective state supreme courts, do not support pursuit of a public nuisance claim in this litigation. But Ohio and Oklahoma Plaintiffs have other claims they intend to assert, including under RICO.  As discussed below, public nuisance claims are not precluded for Plaintiffs from any other states, *see infra* I.D.4; but even if the PBMs' contrary arguments were correct, those Plaintiffs also have other viable claims.

In sum, the PBMs' common arguments against Plaintiffs' motion fail, and their case-specific objections likewise lack merit.  As detailed below and in Plaintiffs' initial submissions, the Court should grant leave to amend as to all Plaintiffs.[6]

## ARGUMENT

**I.    ALL OF THE ISSUES COMMON TO ALL OR MOST PLAINTIFFS SUPPORT LEAVE TO AMEND**

### A.    Plaintiffs Have Demonstrated They Could Not, with Reasonable Diligence, Have Met the Amendment Deadlines.

In their opening briefs, Plaintiffs explained how discovery in the *JeffCo* Action—which was produced in the MDL pursuant to DR-22, but not until late January 2023[7]—provided new information that was unavailable at the time of the Amendment Deadlines. Dkt. #5547 (Optum Mot.) at 3-9; Dkt. #5548 (ESI Mot.) at 3-9.  In particular, it was only after reviewing the *JeffCo* documents that Plaintiffs understood the extent to which the rebate contracts with opioid manufacturers impeded the implementation of restrictions on opioids.  And without the *JeffCo* documents Plaintiffs did not know the PBMs colluded with Purdue to expand prescription opioids' use and availability; nor did Plaintiffs know the extent of the data and knowledge the PBMs had regarding the opioid crisis.  *See* Dkt.

---

[6] The Court previously expressed concern about the number of plaintiffs seeking leave to amend and skepticism at the prospect of granting leave to all of those movants.  Since then, more than 1,000 plaintiffs have withdrawn from these motions, leaving 808 Plaintiffs that seek to amend.  Plaintiffs respectfully submit that each of these Plaintiffs has sufficiently demonstrated good cause under Rule 16 and has met the requirements of Rule 15 to warrant granting leave.

[7] Before the *JeffCo* documents were produced in the MDL, they were subject to a protective order and not available to the MDL plaintiffs.  *See* Dkt. #5547-2 (Conrod Decl.), ¶ 10.

#5547 (Optum Mot.) at 7-10; Dkt. #5548 (ESI Mot.) at 7-10; Dkt. #5547-2 (Conrod Decl.), ¶¶ 15, 20-22.

As noted above, last year the Court determined the *Rochester* Complaint sufficiently alleges diligence for statute-of-limitations purposes with respect to claims against the PBMs.  Rochester argued "that, until they obtained discovery from other defendants in this MDL, it was not possible to know of the PBMs' role in fomenting the opioid crisis or causing the Plaintiffs' injuries, and Plaintiff's counsel'[s] diligence in MDL discovery only recently"—i.e., as of 2023—"revealed the PBMs' role."  *In re Nat'l Prescription Opiate Litig.*, 2024 WL 4912429, at *8 (N.D. Ohio Aug. 22, 2024); *see also* Dkt. #5277 at 5 (stating City of Rochester moved to amend to, *inter alia*, "make use of information that was not available at the time the existing complaints were filed" and to "assert claims under the federal RICO statute, and claims specific to [the PBM] Defendants' mail-order pharmacy business").  The Court "conclude[d] that, at this stage of the litigation, Plaintiffs ha[d] adequately pleaded the due diligence requirement of the fraudulent concealment doctrine."  *Id.* at *9.  The same MDL discovery that caused Rochester to seek leave to amend in December 2023 led these Plaintiffs, whose cases had remained stayed since 2018, to seek leave just months later.  The Court's analysis and conclusion with respect to Rochester's diligence thus likewise apply to Plaintiffs here.

The PBMs assert Plaintiffs were not diligent because (1) they could have obtained this information from other documents produced in the MDL, (2) other plaintiffs sued the PBMs earlier, (3) Plaintiffs waited too long to seek leave to amend once the *JeffCo*

discovery became available, and (4) the *JeffCo* documents did not provide information about PBM entities not named in that litigation.  The PBMs are wrong on all counts.

### 1. Discovery in the *JeffCo* Action yielded significant information that was not available by the Amendment Deadlines.

The PBMs spill substantial ink arguing the information in the *JeffCo* production was not "new."  *See* Pt. I Br. § II.A.  They primarily contend Plaintiffs should have been aware of the information reflected in documents produced by Purdue and others, and they highlight the *Rochester* Complaint's reliance on such documents as well as media articles that were publicly available years earlier.  These arguments are unavailing.

By March 2019, more than *21 million documents*—consisting of more than *121 million pages*—had been produced in the MDL by various defendants, including more than 50 million pages by Purdue alone.  *See* Ex. 5 (Klink Decl.) ¶ 4.  It was simply not reasonable to expect even teams of Plaintiffs' lawyers to have analyzed all of that material with an eye toward the PBMs' liability, much less to have done so before the PBMs' productions were uploaded to the MDL document repository in late January 2023.  Even if Plaintiffs' counsel had attempted to review those documents specifically for clues about additional culpable parties, they would not have known what to look for, because they did not yet have sufficient information about the PBMs' connections to other defendants to know what to search for with respect to the PBMs' possible misconduct.

As Plaintiffs explained in their moving papers, they may have been aware that the PBMs entered into rebate agreements, but until Plaintiffs obtained discovery from the *JeffCo* Action, they did not have information about the extent of the PBMs' relationships

with the manufacturers or the extent of the data the PBMs possessed that gave them visibility up and down the opioid supply chain.  *See* Dkt. #5547 (Optum Mot.) at 7-10; Dkt. #5548 (ESI Mot.) at 7-10; Dkt. #5547-2 (Conrod Decl.), ¶¶ 13-15, 21.  That some of this information was buried in the millions of documents produced by Purdue or others does not mean Plaintiffs were not reasonably diligent in pursuing the present claims against the PBMs.  Indeed, as the Court is aware, even today there are ongoing discovery disputes between the PEC and the PBMs regarding the PBMs' failure to fully disclose the nature and extent of the remuneration they received from manufacturers and third-party pharmacies, which the plaintiffs now believe drove the profit motive that influenced the PBMs' formulary decisions.

After the PBMs produced their documents in the *JeffCo* Action, Plaintiffs' counsel, armed with the knowledge gleaned from that production, were able to tailor searches in the MDL production and find the discrete PBM information contained in the repository. Many of those documents are indeed cited in the *Rochester* Complaint, but the PBMs' assertion that Plaintiffs could have and should have found them without the information from the 2023 *JeffCo* production is belied by the record.  Essentially, Plaintiffs would have been looking for needles in an enormous haystack, without even knowing whether any such needles in fact existed.  What with perfect hindsight might appear inevitable was in real time plainly not.

For this reason, the PBMs' elaborate tables concerning the *Rochester* Complaint's allegations and the documents cited in it (Pt. I Br. at 41-46) are beside the point.  There is no dispute that, *once plaintiffs had seen the JeffCo production*, it revealed that previously

11

produced documents contained important evidentiary support for Plaintiffs' now-asserted allegations. But the PBMs do not show how anyone who did not already know what they were looking for reasonably could have identified the documents cited in the *Rochester* Complaint to discover the extent of the PBMs' relationships with Purdue and other manufacturers, the extent of the rebate agreements through which manufacturers paid the PBMs for favorable formulary treatment, or the PBMs' involvement in Purdue's campaign of misinformation through fraudulently marketing their opioid products.

Additionally, as Jefferson County's counsel has attested in a declaration the PBMs do not refute, depositions of PBM witnesses taken in 2023 revealed more facts that support claims against the PBMs. Dkt. # 5547-2 (Conrod Decl.), ¶¶ 12-16. For example, during his October 18, 2023 deposition, OptumRx's corporate representative on issues related to opioid manufacturer rebate agreements testified regarding the provisions in rebate contracts mandating that if opioids were restricted (such as by imposing quantity limits), the manufacturer would not pay rebates. *Id.* ¶¶ 13-14; *see also id.* ¶ 15 ("Q: . . . And so what this contract is telling us is that if there is a quantity limit that restricts Oxycontin to less than 480 morphine milligram equivalents per day, then it is going to be considered restrictive, correct, that's what the document says?" [Objection omitted.] "A: That makes sense, what you're describing.") (quoting Millar Dep. 69:21-70:10, 72:10-20). This and related testimony is significant to allegations included in the *Rochester* Complaint, which Plaintiffs intend to adopt, regarding the structuring of OptumRx's rebate agreements to provide that manufacturers would only be required to pay rebates if opioids were not restricted by utilization management tools or prior authorization

restrictions and only so long as opioids were not "disadvantaged" as compared to other drugs.  *Id.* ¶ 21.  Such testimony provided important corroboration and clarity to Plaintiffs' analysis of PBM documents, which convinced many plaintiffs to proceed with claims against the PBMs.

That bits of information had also been publicly reported in some media sources (*see* Pt. I Br. at 28, 36) likewise does not show a lack of diligence or negate the importance of the *JeffCo* document productions and testimony.  Plaintiffs had no reason to be aware of an isolated article in *Pharmacy Times* or *Psychology Today*.  Nor are Plaintiffs presumed to know every piece of publicly available information as it appears, as in a "fraud on the market" securities case.  And even if they were aware, as discussed below, reasonable diligence does not require a plaintiff to commence a lawsuit based on nothing but a handful of media articles (even though Rule 11 might well permit such a filing).

Given the facts discussed above and more fully detailed in their opening briefs (Dkt. #5547 (Optum Mot.) at 7-14; Dkt. #5548 (ESI Mot.) at 7-13), Plaintiffs exercised reasonable diligence in seeking leave to amend in 2024.  And even if this were a close question, "possession of the relevant information prior to the amendment deadline is only one factor tending to show a lack of diligence" and may be outweighed by other considerations.  *Landstar Ranger, Inc. v. City of Delaware, Ohio*, 2022 WL 7322274, at *3 (S.D. Ohio Oct. 13, 2022); *see also J&R Passmore, LLC v. Rice Drilling D, LLC*, 2024 WL 111661, at *2 (S.D. Ohio Jan. 10, 2024) (same); *NOCO Co. v. Lapidus*, 2022 WL 1803039, at *2 (N.D. Ohio June 2, 2022) (Polster, J.) (defendant "incorrectly treat[ed] the time at which certain

13

information became available to [plaintiff] as dispositive of diligence, rather than as a factor to be considered").

> **2.** **That certain other plaintiffs asserted claims against the PBMs before the *JeffCo* documents were made available does not demonstrate any lack of diligence by these Plaintiffs.**

As Plaintiffs have pointed out, where the moving party learned of the facts supporting its proposed amendment after the deadline, diligence will generally be found. *See Rapp v. Forest City Techs., Inc.*, 2021 WL 4713394, at *3 (N.D. Ohio June 17, 2021) (where evidence was "not reasonably available" to the plaintiff until after the amendment deadline, plaintiff showed "good cause" to grant leave to amend); Dkt. #5565 (Corr. Roadmap) at 7-9.  The PBMs contend Plaintiffs had the relevant information they needed to bring these claims before the Amendment Deadlines because other plaintiffs had named PBMs as defendants as of January 2018.  They highlight, in particular, a reference by counsel for Webb County, Texas to the PBMs as a "critical defendant group."  *See* Pt. I Br. at 29.  The PBMs also refer to various media sources that had printed assertions about the PBMs and their business practices.  But the PBMs overstate what Plaintiffs actually knew and what these sources conveyed.

The existence of some relatively undetailed complaints and a few media reports containing unsubstantiated accusations against the PBMs did not necessarily inform Plaintiffs of the *facts* supporting claims against those entities.  *Cf. Salyers v. City of Portsmouth*, 534 F. App'x 454, 461 (6th Cir. 2013) (leave to amend denied when "Plaintiff *knew of the facts and law undergirding th[e] proposed amendment* long before the district court's deadline for amending pleadings"); *Shane v. Bunzl Distrib. USA, Inc.*, 275 F. App'x

14

535, 537 (6th Cir. 2008) (plaintiff knew relevant facts years before seeking leave to amend). Nor would examination of those pleadings or articles have provided such facts or necessarily persuaded Plaintiffs of the merits of potential claims against the PBMs. Plaintiffs do not question that litigants who sued the PBMs sooner had a good-faith basis for doing so.  But given the relative paucity of those claims and the fact that their allegations relied primarily on publicly available information, the existence of those lawsuits does not mean Plaintiffs failed to exercise reasonable diligence in asserting their claims later.  To the contrary, Plaintiffs' decision to seek leave to amend after learning of specific facts regarding the PBMs' conduct through discovery was eminently reasonable.

"A party may show good cause to amend even when discovery confirms prior suspicions that may not have allowed a party to meet the Rule 8(c) pleading standard in good faith when originally filed."  *Salerno v. Family Heritage Life Ins. Co. of Am.*, 2024 WL 2235772, at *3 (N.D. Ohio May 17, 2024); *see also Discover Bank v. New Vision Fin., LLC*, 2005 WL 1865369, at *3 (S.D. Ohio Aug. 1, 2005) (plaintiff was reasonably diligent where "discovery apparently confirmed its suspicions sufficiently so that the company could assert claims against the three parties it s[ought] to add in good faith").  Accordingly, "even if Plaintiffs had a suspicion," based on the smattering of lawsuits against PBM entities, that the PBMs had committed actionable misconduct, "they have more recently received actual evidence they reasonably characterize as supporting their request to amend their complaint[s]."  *Wesley v. Randall Farms, LLC*, 2025 WL 2322770, at *5 (N.D. Ohio Aug. 12, 2025).

This is especially so because even as of May 2021, OptumRx's counsel threatened Jefferson County and its counsel with *sanctions*, asserting "it [wa]s clear that the County had no evidentiary basis for suing OptumRx."  Dkt. #5547-2 (Conrod Decl.), Ex. 1 at 2-3; *see also id.* at 5 (describing "the County's allegations about PBMs" as "sparing").  While Plaintiffs dispute that characterization of Jefferson County's allegations, the PBMs cannot credibly claim these Plaintiffs failed to exercise reasonable diligence by not suing them as early as *2019* when these very defendants were, even years later, arguing plaintiffs who had filed then lacked even a good-faith basis for doing so.  And no new information was provided in the MDL between Optum Rx's May 2021 threat of sanctions and the production of the *JeffCo* documents in the MDL in 2023.

In any event, a plaintiff might reasonably decline to bring suit based only on the minimum threshold to avoid sanctions—all the more so if it is a governmental subdivision that might not wish to proceed on lightly substantiated allegations.  Contrary to the PBMs' assertion, "reasonable diligence" does not require a plaintiff to bring any claim that would not subject it to sanctions; the Rule 11 and Rule 16 standards are not coextensive.  *See Simplicean v. SSI (US), Inc.*, 2018 WL 6499476, at *6 (E.D. Mich. Dec. 11, 2018) (denying motion for leave to add allegations that were "not substantiated," but also denying motion for sanctions because counsel was not objectively unreasonable in bringing original complaint).  And, as noted above, the PBMs' conflation of Rules 11 and 16 is especially unavailing (and ironic) given their threats of sanctions against plaintiffs who *did* sue them earlier.  Accordingly, even if Plaintiffs could have sued before the Amendment Deadlines based solely on the knowledge that other litigants had done so,

16

the timing of that knowledge is outweighed by the sparsity of what Plaintiffs actually knew then (including the information available in the complaints on file) and the wealth of information implicating the PBMs that emerged through the *JeffCo* discovery in 2023, after the Amendment Deadlines had passed.

The cases on which the PBMs rely are not to the contrary. *Glazer v. Chase Home Finance LLC*, for example, does not implicate Rule 16's good cause standard at all; it addresses Rule 15. 704 F.3d 453, 459 (6th Cir. 2013), *abrogated on other grounds by Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466 (2019). Moreover, the Sixth Circuit there assessed the time that elapsed after plaintiff learned the very facts on which he belatedly sought leave to amend. The Court of Appeals had no occasion to assess whether plaintiff should have proceeded earlier based on sparser, but arguably sufficient, information.

Additionally, while *Profitt v. Highlands Hospital Corp.* does address a plaintiff's diligence under Rule 16, it is no more helpful to the PBMs. The plaintiff there brought a medical negligence case arising from an emergency Caesarian delivery and the death, two days later, of the infant. 2024 WL 3622448, at *1-3 (6th Cir. Aug. 1, 2024). Plaintiff sued the doctors who treated her, but not the pediatrician who treated the infant after delivery. *Id.* Five months after the close of discovery, plaintiff sought leave to assert claims against the pediatrician based on information learned in the pediatrician's deposition. *Id.* The district court denied the motion, and the Sixth Circuit affirmed because the medical records produced in the case well before the amendment deadline repeatedly identified the pediatrician and noted the doctor's intimate involvement in the baby's care. *Id.* at *3-4. The Court of Appeals' detailed description of the medical records'

17

contents, the number of times the pediatrician was referenced, and the specific information about her actions in caring for the baby, *id.* at *4, confirm that the details and circumstances of what was known, and not merely the date on which some knowledge was acquired, are relevant in assessing a plaintiff's diligence.

The plaintiff in *Thurmond v. Bayer Healthcare Pharmaceuticals, Inc.* waited until three months after the close of fact discovery to seek leave to add certain foreign affiliates of the defendant.  649 F. App'x 1003, 1006 (11th Cir. 2016).  Moreover, plaintiff's position in the parties' joint discovery plan, which was filed well before the amendment deadline, expressly stated the defendant's outsourcing of certain tasks would "necessitat[e] the addition of foreign defendants and foreign discovery."  *Id.*  Thus, the court reasoned, plaintiff already knew she needed to add these parties but waited too long to do so.  *Id. Thurmond*, like *Profitt*, instructs that courts must assess what a plaintiff actually knew before the amendment deadline and consider the overall circumstances of the particular case.  In light of the circumstances detailed above, this Court can and should conclude that mere knowledge of the existence of other lawsuits did not require these Plaintiffs to file copycat claims before the Amendment Deadlines.

The same is true for Plaintiffs represented by counsel who filed claims against PBMs on behalf of other clients.[8]  To the extent a diligent plaintiff may choose not to assert a weak or tenuous claim that may not survive a motion to dismiss—and that even may

---

[8] The PBMs assert in their Part II brief that 355 Plaintiffs were on "prior notice through counsel" because they are represented by counsel who filed claims against PBMs on behalf of other clients.  *E.g.*, Pt. II Br. at 157.  The PBMs repeat virtually identical boilerplate language to assert this argument hundreds of times.

lead to threats of sanctions—its counsel's willingness to file such claims on behalf of other plaintiffs is beside the point. So, too, is counsel's knowledge of the basis on which such a claim could, consistent with Rule 11, be filed. To the extent the PBMs seek to impute to Plaintiffs the knowledge of their counsel, such imputation is irrelevant. Plaintiffs do not dispute that they either knew or could have discovered that other plaintiffs had sued the PBMs, regardless of whether it was their own counsel or some other lawyer who filed those lawsuits; the issue is whether that knowledge was sufficient to *require* a diligent plaintiff to assert its own claim. As discussed above, it was not.

### 3. Any "delay" between when Plaintiffs received the new information and when they sought leave to amend is neither relevant to, nor demonstrates any lack of, diligence.

The PBMs assert generally that under Rule 16, Plaintiffs must show "they could not have sought leave to amend before the deadline *or any earlier than they did*." Pt. I Br. at 23; *see also id.* at 51-52.[9] They are wrong. "Good cause [under Rule 16] is primarily measured by a party's due diligence in attempting to meet the case management conference deadlines," *Kaylor v. Radde*, 2005 WL 282851, at *2 (N.D. Ohio Feb. 3, 2005); *see also Armatas v. Haws*, 2021 WL 5356028, at *3 (6th Cir. Nov. 17, 2021), "not how quickly counsel moved to amend once he became aware of th[e] information," *Stanich v. Hissong Grp., Inc.*, 2011 WL 1560650, at *4 (S.D. Ohio Apr. 25, 2011). The cases the PBMs cite do not hold otherwise. In *Leary v. Daeschner*, the Sixth Circuit instructed that "modification

---

[9] The PBMs repeat a boilerplate version of this argument for each Plaintiff in Part II of their opposition, which does not differ in any substantive way from the PBMs' Part I argument.

is permitted under Rule 16 if Plaintiffs can demonstrate 'good cause' for their failure to comply with the original schedule, by showing that despite their diligence *they could not meet the original deadline*."   349 F.3d 888, 907 (6th Cir. 2003).   The Court of Appeals reiterated this principle in connection with these proceedings.  *In re Nat'l Prescription Opiate Litig.* (*CVS*), 956 F.3d 838, 843 (6th Cir. 2020).  The PBMs' attempt to manufacture an additional hurdle—that Plaintiffs could not have sought leave to amend "any earlier than they did"—is contrary to law.

The PBMs again rely—unsuccessfully—on *Glazer*.  Beyond not addressing Rule 16 at all, the case says nothing about diligence in moving *after* a deadline has passed, much less in cases that have been stayed in the interim.  More importantly, although the Sixth Circuit did say the plaintiff had waited too long after learning the information on which he based an amended pleading, it reasoned that in the meantime the defendant had moved to dismiss the complaint, the motion had been fully briefed, and the magistrate judge had recommended granting it.  704 F.3d at 458.  Permitting amendment under those circumstances "would work against the intent of the Federal Rules of Civil Procedure by permitting a plaintiff to use the magistrate-referral process to test out his pleading and discover defects before seeking to amend them away in response to the magistrate's recommendation," and would "encourage delay and bad faith on the part of plaintiffs and prejudice defendants who would have wasted time and expense attacking a hypothetical complaint."  *Id.* at 458-59.  *Glazer* is thus a case about prejudice and bad faith, not about the mere passage of time after a party learns relevant information.

20

The PBMs' other authorities are similarly inapposite.  In *Johnstone v. CrossCountry Mortgage, LLC,* plaintiffs' failure to seek leave "for over eight months" after obtaining new information "indicate[d] undue delay and a lack of diligence."  2024 WL 1530803, at *6 (N.D. Ohio Apr. 9, 2024).  But those plaintiffs moved for leave "[o]n the last day of class discovery" and "acknowledged that they knew" the facts giving rise to their proposed claim eight months before filing the motion, yet they "submitted no evidence or argument to excuse or explain their dilatory failure to seek leave."  *Id.* at *2, *6, *7.  None of those considerations applies here.[10]

Additionally, the court in *MSP Recovery Claims, Series LLC v. Nationwide Mutual Insurance Co.* recognized "[t]he primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements."  2023 WL 6795420, at *3 (S.D. Ohio Oct. 13, 2023), *appeal dismissed*, 2024 WL 2115491 (6th Cir. Mar. 29, 2024).  It determined plaintiffs were not diligent in attempting to meet the deadline in the case management order because, although they sought leave to amend based on new information learned in discovery, they did not even serve their first discovery request until after the deadline had run.  *Id.*[11]  Nor did plaintiffs

---

[10] Plaintiffs respectfully disagree with *Johnstone* that any delay after the amendment deadline had passed is relevant to assessing diligence under Rule 16, rather than under Rule 15.  *See supra* at 19.  Given the facts of that case, however, there is no reason to expect the court would have ruled differently in applying Rule 15.

[11] Ironically, here it was *the PBMs* who lacked diligence in producing the *JeffCo* discovery to parties in the MDL (and in producing it in the *JeffCo* Action in the first place).  Had the PBMs promptly produced those materials in the MDL, as they were required to do under DR-22, it is possible that at least some Plaintiffs would have had access to them prior to their respective Amendment Deadlines.

move to extend the deadline when it was clear they had not yet commenced the discovery they would need.  *Id.* at *4.  While the court noted the additional delay between when the plaintiffs learned the information and when they sought leave, *id.*, that discussion is *dicta* in light of the court's holding concerning plaintiffs' failures to meet the original deadline and its citation to Sixth Circuit authority articulating the correct Rule 16 standard.

Even assuming for argument's sake the PBMs' standard were correct, factual context matters.  While a months-long span between when information became available and when the movant sought leave might weigh against good cause in an actively litigated case, where any significant delay could threaten to upend the proceedings and cause prejudice to the existing parties, there is no such issue in a case that has been stayed for seven years.  Given how the parties and the Court have handled these massive and complex proceedings—actively engaging in bellwether cases, sequenced over multiple years by defendant types, and staying these (and other) actions in the meantime—and given the impracticality of burdening the Court with hundreds of separate, uncoordinated motions for relief from the stay to seek leave to amend—Plaintiffs did not unreasonably delay in seeking to assert claims against the PBMs.

Indeed, even if Plaintiffs had sought leave sooner than they did, it is not clear that the Court would have permitted it then.  In granting City of Rochester's (as well as Lincoln County's) motion for leave to amend to assert claims against additional PBM entities, the Court—in August 2024—addressed whether those plaintiffs "exercised due diligence in pursuing their amendments," as required to invoke equitable tolling of the applicable statutes of limitations.  *Nat'l Prescription Opiate*, 2024 WL 4912429, at *11.

22

The plaintiffs argued "that, given the Court's moratorium, it was selection of their cases as bellwethers that provided the earliest opportunity to amend." *Id.*  The PBMs responded "that Plaintiffs had ample opportunity to at least **try** to amend their complaints before then, but they did not even make an attempt"; for example, the PBMs posited, "Plaintiffs could have sought leave from the moratorium before being chosen as bellwethers." *Id.* (emphasis in original).  The Court agreed with the plaintiffs.

The Court explained, "The simple fact is . . . that some Plaintiffs did seek leave from the moratorium, *but the Court never granted it.*" *Id.* (citing *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387357, at *1 n.2 (N.D. Ohio Feb. 20, 2024)).  The Court further noted "that, during several status conferences over the years, the PEC regularly (if informally) took the Court's temperature on lifting its moratorium to permit MDL plaintiffs to move to . . . amend [their] complaints," but "[u]ntil recently"—i.e., in issuing its May 2024 Order allowing these Plaintiffs to seek leave to amend—"the Court always demurred." *Id.* at 11 n.14 (citing Dkt. #5455).  The plaintiffs thus "acted with reasonable diligence in pursuing amendment of their complaints to add the New [PBM] Defendants and did so promptly at their first opportunity." *Id.*  The Court's reasoning with respect to the timeliness of Rochester's claims equally supports a determination that any "delay" between when the *JeffCo* discovery became available to Plaintiffs and when they sought leave to amend was reasonable.  Similar to Rule 16, "'[t]he diligence required for equitable tolling purposes is 'reasonable diligence,' not 'maximum feasible diligence.'" *Id.* (quoting *Holland v. Florida*, 560 U.S. 631, 653 (2010)).  Plaintiffs have exercised sufficient diligence in pursuing their claims against the PBMs.

### 4. Plaintiffs' diligence applies to *all* of the proposed PBM defendants, including those not sued in the *JeffCo* Action.

The PBMs argue that even if good cause existed for leave to amend to add the specific Optum and Express Scripts entities named in the *JeffCo* Action, there would still not be good cause to add the other proposed PBM defendants. *See* Pt. I Br. § II.A.4 (at 48-51). They are wrong. Once the *JeffCo* production pointed Plaintiffs to the culpability of some of the PBM entities, it was incumbent on Plaintiffs to identify other members of the Optum and ESI corporate families that might be implicated. Plaintiffs seek to add all of the PBM family entities that may share liability with the particular entities named in the *JeffCo* Action. Doing so *exemplifies*, not refutes, diligence.[12]

Plaintiffs have also shown they could not, in exercising reasonable diligence, have asserted claims against these entities by the Amendment Deadlines. As Plaintiffs noted in their opening briefs, the business practices of the PBMs are "opaque." Dkt. #5547 (Optum Mot.) at 9; Dkt. #5548 (ESI Mot.) at 9. Their corporate structures, as well as the division of responsibility among the various corporate entities, is equally so. Indeed, as of March 2024 the Court noted it "has had difficulty understanding clearly the PBMs' complicated corporate structure and complex business model." *Nat'l Prescription Opiate*, 2024 WL 4912429, at *19. Given that (as detailed above) Plaintiffs could not bring these amendments by the Amendment Deadlines against the indisputably relevant PBM

---

[12] In City of Rochester's case, the parties were able to reach agreement to reduce the number of corporate entities for each PBM defendant family. While a similar agreement may be possible in these cases, that prospect does not obviate the need for Plaintiffs to name all potentially liable entities in each corporate family in their complaints.

entities, it is even more apparent they could not have sued the related holding companies, parent companies, or other related entities at that time.  For the same reasons, Plaintiffs who already sued some PBM entities (such as Express Scripts, Inc. and OptumRx, Inc.) in their MDL cases did not have sufficient knowledge before their respective Amendment Deadlines to sue the additional PBM entities they seek to add now.  *See, e.g.*, Pt. II Br. at 1597 (arguing lack of diligence due to Plaintiff's MDL allegations against some but not all PBM entities).

Nor are the PBMs correct that Plaintiffs could have and should have brought *dispensing* claims by the Amendment Deadlines, even if they could not yet have brought claims based on the PBMs' benefit management practices or their participation in marketing fraud.  *See* Pt. I Br. at 50.  There is no dispute that the PBMs' mail-order dispensing market share is relatively small and Plaintiffs were not aware of the PBMs' role in dispensing at their in-network pharmacies; Plaintiffs had no reason to bring those claims when dispensing would have been the sole basis for liability.

The PBMs also suggest that because Jefferson County disclaimed dispensing claims in its case, these Plaintiffs should be precluded from asserting them.  *See id.*  But their conclusion does not follow from the premise.  The CT1 plaintiffs disclaimed their dispensing claims against the major chain pharmacies and were precluded from later amending to add those claims.  But that did not preclude the CT3 plaintiffs, or any other plaintiffs, from pursuing those claims.  As Plaintiffs seeking leave to amend to add various chain pharmacies have explained, none of the MDL plaintiffs was in a position to understand or appreciate the dispensing claims in the absence of distribution before

3304111.16

they were developed in CT3 and CT4.  *See, e.g.*, Dkt. #6211 (JOCP Reply) at 14-16.  This was especially important in providing plaintiffs with a good-faith basis to sue dispensers that, like the PBM mail-order pharmacies,[13] did not engage in distribution activities as well as those that (again, like the PBMs) were not the subject of DEA enforcement actions with respect to their dispensing.  *See id.* at 15.  It would be illogical to permit Plaintiffs to add the PBMs as defendants but preclude them from pursuing all available claims simply because Jefferson County did not have sufficient information to bring dispensing claims.

### B.    The PBMs Identify No Cognizable Prejudice Due to the Proposed Amendments.

The PBMs have not shown they will be prejudiced in any way by the filing of amended pleadings now, rather than by the Amendment Deadlines.  Nor could they, for the simple reason that *these cases have been stayed since before the Amendment Deadlines.*  Throughout that time, there has been *no* discovery, *no* motion practice, and *no* other proceedings of any kind.  The PBMs thus stand in exactly the same position they would have been in had they been added to Plaintiffs' cases by the Amendment Deadlines.  The PBMs nonetheless contend they are prejudiced by the mere passage of time.  *See* Pt. I Br. at 53.  But as demonstrated below, Sixth Circuit precedent makes clear that mere delay, without actual prejudice, is insufficient to defeat a motion for leave to amend.

The PBMs also purport to identify several specific types of prejudice they believe they will suffer.  None can withstand scrutiny.  Indeed, as this Court has recognized,

---

[13] Because the PBMs operate only mail-order pharmacies, in which drugs are shipped directly to the consumer, they do not engage in distribution to individual brick-and-mortar stores, as wholesalers and self-distributing pharmacy chains do.

because "all amended pleadings result in at least some prejudice to the non-moving party who will have to defend the claims on the merits," the relevant question for these motions is whether the PBMs have identified "*unique harm* that justifie[s] denying the Motion[s]." *NOCO*, 2022 WL 1803039, at *3.  Neither the PBMs' invocation of mere delay nor their more specific challenges come close to demonstrating cognizable prejudice.

### 1. The mere passage of time does not constitute cognizable prejudice.

Notwithstanding their insistence elsewhere that in analyzing Rule 16's good cause standard, the Court must consider the specific circumstances of *these cases*, the PBMs purport to find a general rule—based on other, *dissimilar* cases—precluding leave to amend "months after the amendment deadline—let alone years."  Pt. I Br. at 53.  Based on that illusory standard, they contend the passage of time here is "inherently prejudicial." *Id.*  But no such temporal prohibition exists.  The Sixth Circuit long ago held, in the context of Rule 15, that mere delay, in the absence of actual prejudice, is *not* a sufficient basis to deny leave to amend.  *Moore v. City of Paducah*, 790 F.2d 557, 559-62 (6th Cir. 1986); *see also Langley v. Credit Suisse First Bos. Corp.*, 89 F. App'x 938, 944 (6th Cir. 2004).  And in directing that Rule 16's "good cause" standard requires a court to consider prejudice to the opposing side, the Court of Appeals repeatedly cited its holding in *Moore* with respect to analyzing prejudice.  *Leary*, 349 F.3d at 906-09.[14]

---

[14] Defendants' observation that Plaintiffs "have not identified a *single* case in any jurisdiction where a court has permitted plaintiffs to amend more than five years after the original amendment deadline," Pt. I Br. at 53 (emphasis in original), is irrelevant, as there *is* no litigation like this one.  The length of time Plaintiffs' cases have been stayed (because of the complexity of the litigation and the variety of different types of parties, as well as additional delays caused by the COVID-19 pandemic) is certainly unusual.  In

Significantly, under Rule 16, the *timing* issue is addressed through the diligence analysis; *Leary* recognized the prejudice analysis, as set forth in *Moore*, as a further factor bearing on "good cause."  Nothing in *Moore* or *Leary*—or any subsequent authority— suggests that mere delay, without actual prejudice, is a sufficient basis to deny leave to amend.  And indeed, Sixth Circuit jurisprudence shows the type of concrete prejudice at issue in assessing whether a plaintiff should be given leave to amend: re-deposition of individuals already deposed and other additional discovery, *see Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 880 (6th Cir. 2020); significant additional resources to conduct discovery and prepare for trial, or significant delay in the resolution of the dispute, *see Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir. 1994); or new pleadings after the discovery and dispositive-motion deadlines had passed and a motion for summary judgment had been filed, *see Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999); *accord Fraker v. Marysville Exempted Vill. Schs.*, 696 F. Supp. 2d 887, 893 (S.D. Ohio 2010).  As noted above, nothing of the sort is present here.

The Sixth Circuit's reasoning in *Church Joint Venture, L.P. v. Blasingame*, which the PBMs cite, only proves this point.  While noting it "requires at least some significant showing of prejudice to deny a motion to amend based solely upon delay," the Court of Appeals observed that the plaintiff moved for leave to amend to add a new legal theory "after discovery and dispositive motions were complete and the remaining matters set

---

light of the highly extraordinary nature of this litigation, the timing of Plaintiffs' requests for leave is reasonable.  And more to the immediate point, neither the record nor the PBMs' Joint Opposition demonstrates any cognizable prejudice to them resulting from these amendments.

for trial." 947 F.3d 925, 934 (6th Cir. 2020).  Nor did plaintiff advance a sound reason for its years-long delay; it simply "did not realize that claims based on the [subject] trusts being self-settled were included in the claims [plaintiff] purchased from the bankruptcy estate" five years earlier.  *Id.*  On those specific facts, the Sixth Circuit held plaintiff's failure to realize it could have brought the new claim long before was "not an adequate reason for a nearly five-year delay." *Id.*  Further, defendants would suffer "apparent and substantial" prejudice "because (1) the delay was so long, (2) *the deadlines for discovery had long passed*, and (3) the matter *was already scheduled for trial*." *Id.*  Thus, this decision (like others by the Sixth Circuit) reflects that courts must consider the particular circumstances animating a motion for leave rather than set arbitrary rules about how long is too long to move—in other words, the exact opposite of what the PBMs urge here.

The PBMs contend they would suffer prejudice "by having to conduct belated discovery, attempt to prove their defenses, and pursue potential claims against third parties in stale cases with lost and spoliated evidence."  Pt. I Br. at 54.  But they point to no *facts* to support those assertions, and the record reveals none.  The PBMs are only now conducting discovery in bellwether cases filed before the Amendment Deadlines; even if Plaintiffs had added the PBMs then, there would still be no discovery in Plaintiffs' cases, as all cases other than the bellwethers remain stayed.

The PBMs posit that evidence "may have been lost or gone stale."  Pt. I Br. at 54-55.  Their inability to state that evidence *has been lost* is telling—and dispositive, as "unsupported speculations do not rise to the level of articulable prejudice." *Kanagy v. Midlands Millroom Supply, Inc.*, 2020 WL 1275289, at *2 (N.D. Ohio Mar. 17, 2020); *see also*

*Hedrick v. Ohio Health Corp.*, 2020 WL 13659064, at *4 (S.D. Ohio Oct. 8, 2020) (plaintiff's argument that allowing defendant to amend its answer after the deadline could cause "the resolution of th[e] case [to] be delayed and require [plaintiff] to expend additional resources" was "not well-developed and relie[d] exclusively on speculation"); *Pettiford v. City of Yonkers*, 2021 WL 2556172, at *4 (S.D.N.Y. June 21, 2021) ("With the exception of circumstances involving bad faith, the potential effect of the passage of time on witness memories does not necessitate denial of leave to amend.").  Nor do the PBMs explain how the situation would be any different had they been added as defendants by the Amendment Deadlines.

By contrast, in *Pethtel v. Tennessee Department of Children's Services*, which the PBMs cite, the plaintiffs sought amendment with "only . . . thirty (30) days left until the close of discovery" and after "[s]ignificant discovery had already begun," and "adding more defendants and facts would require delay as the parties would have to become acquainted with the case, file their own motions to dismiss, and continue the discovery process."  2020 WL 6827791, at *28 (E.D. Tenn. Nov. 20, 2020).  Given that context, the court noted that because the events giving rise to the claims "occurred over a decade" earlier, it was "unlikely that many of the new parties still ha[d] documentation or records from the time period."  *Id.*  Further, the proposed new defendants "ha[d] been uninvolved in th[e] case for the years it ha[d] been pending," such that "[t]o add them . . . would result in incredible prejudice."  *Id.* at *29.

None of those circumstances exists here.  These cases have been stayed since 2018, and virtually no active litigation has occurred in them.  As the Sixth Circuit explained in

rejecting Meijer, Inc.'s challenge to its addition as a defendant in this MDL, the PBMs would be "added to th[ese] case[s] before discovery ever started." *In re Nat'l Prescription Opiate Litig. (Meijer)*, 2022 WL 20701236, at *1 (6th Cir. Nov. 10, 2022).  And in contrast to the proposed defendants in *Pethtel*, the PBMs are well familiar with the nature of these cases, having actively litigated bellwethers for years.  Similar to Meijer, the PBMs "ha[ve] been . . . part[ies] to the MDL since at least 201[8]."  *Meijer*, 2022 WL 20701236, at *1. Further, "the only prejudice [the PBMs] identif[y] is [their] litigation costs," which they "ha[ve] known [they] could suffer since [they] w[ere] added to the MDL in 201[8]."  *Id.*

Indeed, if the PBMs' argument evokes a sense of déjà vu, it is because they already pressed it, unsuccessfully, last year.  Seeking to preclude bellwether plaintiffs that—like these Plaintiffs—moved to amend to "add various allegations, claims, and related PBM family defendants," the PBMs argued the amendments would impose undue burden on them.  *See Nat'l Prescription Opiate*, 2024 WL 3387357, at *3.  While noting "[i]t is true, of course, that litigation expenditures are a burden on litigants," the Court observed "the PBMs do not and cannot explain how a related entity being named as a new defendant prior to the commencement of discovery is any more burdensome than it being named in an original complaint."  *Id.*  There is, the Court added, "no more burden on the PBM Defendants in these bellwether cases than on any other defendant named in any other opioid case."  *Id.*  The same reasoning applies with respect to these cases.

That some of the individual Optum or Express Scripts entities have not yet appeared in the MDL does not alter this conclusion.  Rejecting the PBMs' argument to the contrary, for which they cited *Meijer*, the Court explained the Sixth Circuit's ruling "cuts

*against* the PBMs," as "Meijer was a completely different entity from all other defendants that were in Track Seven prior to amendment," whereas "the PBM subsidiary entities are functional parts of the PBMs' broader umbrella of operations." *Id.* (emphasis in original). Further, "the Court has already stated that ***some discovery*** would almost certainly be permitted into these related PBM family entities—regardless of whether amendment was permitted—to allow Plaintiffs, and a jury, to understand how the PBMs work." *Id.* (emphasis in original).  Accordingly, "[t]he case for adding these parties . . . is much stronger than it was for Meijer, and the litigation burden . . . largely exists whether or not the amendments are allowed." *Id.*  So too, here.

### 2.    Issues regarding litigation holds provide no basis to deny leave to amend.

The PBMs contend the purported prejudice from (hypothetical) lost evidence "is exacerbated by" some Plaintiffs' failure to timely implement litigation holds.  Pt. I Br. at 55.  But "[t]his Court has already stated that whether a plaintiff implemented a litigation hold is not a precondition to allowing amendment."  *In re Nat'l Prescription Opiate Litig.*, 2024 WL 4910299, at *1 (N.D. Ohio Nov. 15, 2024); *see also* Dkt. #5517.  With good reason: nothing in the record suggests any failure to institute a litigation hold has resulted in the destruction of any information relevant to Plaintiffs' proposed claims, let alone whether any such destruction would materially impact the PBMs' ability to pursue any available defenses.  *See* Dkt. #5763 (PEC's Opp. to PBMs' Mot. to Strike) at 6-12 (discussing lack of evidence of spoliation).

The PBMs urge the ultimate sanction on Plaintiffs—effectively a dismissal of their claims—based solely on unfounded conjecture and without any finding regarding spoliation or the degree of any fault.  *See Mann v. CSX Transp., Inc.*, 2009 WL 3766056, at *6 (N.D. Ohio Nov. 10, 2009) (Polster, J.) (to warrant sanctions, "the destruction of evidence must have caused prejudice to the party alleging spoliation," which "occurs where the [non-movant]'s actions impair the [movant]'s ability to go to trial or threaten to interfere with the rightful decision of the case," and "the severity of the sanctions should correspond with the degree of fault").  The Court should reject the PBMs' baseless speculation.

### 3.    The "expansion of the MDL" is not a relevant consideration, and any such expansion would not constitute cognizable prejudice to the PBMs.

The PBMs next decry the "dramatic expansion of this MDL" should the Court grant these motions.  Pt. I Br. at 56.  But neither Rule 16 nor Rule 15 considers the growth of the litigation a relevant factor in evaluating prejudice.  This makes sense given that nearly *every* amendment, by definition, *expands* the proceedings.  And once again, the Court has already addressed, and rejected, the PBMs' argument.

In opposing the bellwether plaintiffs' December 2023 motions to amend (referenced above), the PBMs asserted that because those motions came "[f]our years after filing suit and after almost a year spent selecting bellwether cases," the proposed amendments would impose "clear" prejudice on the PBMs.  Dkt. #5289 at 8.  The PBMs emphasized that the proposed amendments "introduce[d] new claims under different legal and regulatory frameworks," added "eleven new parties [i.e., Optum and Express

3304111.16

Scripts entities]," and "implicate dozens of third parties who may need to be added to the bellwethers as parties." *Id.* Those amendments, the PBMs protested, would "dramatically expand the scope of these PBM bellwethers." *Id.*

The Court explained that the PBMs' argument "misconstrue[d] a concern the Court has itself voiced several times: that ***trials*** with many defendants, many theories of liability, and many causes of action will be too long, too complicated, and unintelligible to a jury." *Nat'l Prescription Opiate*, 2024 WL 3387357, at *2 (emphasis in original). The Court observed that "[v]irtually every case in this MDL contains at least a score of defendants and nearly as many alleged causes of actions," and "[d]espite the inherent complexity of these cases, the Court has always managed successfully to tailor representative, meaningful, and triable bellwether cases using its severance authority under the Federal Rules." *Id.* Accordingly, "regardless of which allegations, claims, or defendants the PBM Bellwether Plaintiffs seek to add, and regardless of which . . . claims, allegations, or third-party defendants the PBM Defendants may themselves seek to implead, this Court can still create a manageable, workable trial." *Id.* Allowing those plaintiffs to amend their complaints thus "d[id] not automatically make the bellwether cases irretrievably unworkable, nor cause undue prejudice to the PBM Defendants." *Id.* at 5. The same is true in these cases.

The PBMs' reference to the JPML's determination "to no longer add new *actions*" to these proceedings (Pt. I Br. at 56) is misplaced. As the Court noted in previously rejecting this argument with respect to the bellwether plaintiffs' motion to amend, "[a]lthough some new claims and defendants are being added by amendment to

34

Plaintiffs' complaints, that does not make these new MDL cases."  *Nat'l Prescription Opiate*, 2024 WL 3387357, at *3.  The JPML "plainly believed this Court could continue to achieve the just and efficient conduct of the litigation with the cases it already has, using all of the tools available under the Federal Rules of Civil Procedure," which "is precisely" what the Court would be doing in allowing Plaintiffs to add the PBMs to these cases.  *Id.*

The JPML's decision to create a new MDL for claims against McKinsey also offers no support to the PBMs.  The Panel determined that notwithstanding the factual overlap among claims against McKinsey and existing claims in these proceedings, McKinsey—as a defendant *new to the MDL*—would "be prejudiced by having to join" this litigation, which at that time was already more than three years old.  *In re McKinsey & Co. Nat'l Prescription Opiate Consultant Litig.*, 543 F. Supp. 3d 1377, 1379 (J.P.M.L. 2021).  But as discussed above, the PBMs have long been parties to this MDL.  They are thus not "new defendants" (Pt. I Br. at 57).  Any discovery relating to the PBMs likewise would not "expand" the MDL, as these Plaintiffs are already asserting claims against existing defendants—and, to reiterate, no discovery has yet proceeded against *any* defendant in these cases.  Further, to the extent the PBMs relied on the purportedly fixed nature of these proceedings "to shape their litigation strategy" (*id.*), they acted too hastily given the relative infancy of these cases.  In any event, whether a proposed amendment will disrupt a potential defendant's litigation strategy is not in itself a basis for denying leave under the Federal Rules.

Nor does the fact that the PBMs may be "force[d] . . . to expend significant additional resources," or that adding them could "significantly delay the resolution of

the dispute" (*id.* at 58), warrant denying leave. As an initial matter, the PBMs will not need to devote any "additional" resources to these cases for the foreseeable future, as the stay remains in place. And any "delay" in these cases is not unique to claims against the PBMs; it is the natural product of how the parties and the Court have proceeded in litigating and trying claims in this MDL—prioritizing bellwether cases and holding others in abeyance during those proceedings. This is practical, efficient, and common MDL practice.

Plaintiffs also expect the discovery directed at the PBMs in these cases will largely or entirely overlap with discovery the PBMs are already providing in the bellwethers. And while the PBMs broadly claim "[e]ach Moving Plaintiff is differently situated factually and legally," *id.*, in reality the nature of the respective claims and the injuries Plaintiffs' suffered overlap considerably. Additionally, in protesting against having "to litigate state-specific tort claims under the laws of 44 jurisdictions across the country," *id.*, the PBMs ignore the numerous procedural mechanisms at the Court's disposal—including severance of claims and stays, which it has consistently employed in this litigation—to manage the cases and ease the parties' burdens. Moreover, none of these issues arises from adding the PBMs to these cases now rather than by the Amendment Deadlines. The PBMs would have had to litigate state-specific tort claims under the laws of multiple states regardless of when they were added as defendants.

In short, the record demonstrates that bringing these amendments now poses no "*unique harm*" to PBMs that would justify denying the motions. *NOCO*, 2022 WL 1803039, at *3. The Court should permit these claims to proceed.

36

### 4.    The PBMs are not prejudiced by the amendment process.

The PBMs also contend they would suffer prejudice in having to address the claims against them in a single MDL rather than in more than 800 individual cases around the country.  Indeed, they assert "[t]here is *no question*" the latter approach "is the proper and least prejudicial course."  Pt. I Br. at 59-60.  We beg to differ.

While the PBMs would no doubt revel in balkanizing these indisputably similar cases, overtaxing the army of federal or state courts it would take to separately adjudicate them, and inviting potentially inconsistent rulings, the Federal Rules and 28 U.S.C. § 1407 counsel otherwise.  In forming this MDL, the JPML specifically determined centralization of these cases "w[ould] serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation" in light of the "common fact questions as to the allegedly improper marketing and widespread diversion of prescription opiates into states, counties and cities across the nation."  *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1378-79 (J.P.M.L. 2017).  Plain common sense dictates that retaining these cases before a court that (a) is presently overseeing bellwether cases involving these same defendants and (b) has unparalleled experience in how to efficiently manage opioids cases will cause less prejudice than the alternative.  Nor do the PBMs articulate why dispersing all of these cases to various corners of the country would cause less prejudice than keeping them here.  Their silence says it all.

Like the PBMs' other cited authorities, the circumstances in *In re Motor Fuel Temperature Sales Practices Litigation* bear no resemblance to these.  The court overseeing those putative class cases denied certain existing plaintiffs' motion "to intervene as

3304111.16

plaintiffs in underlying cases in which they did not previously sue" and for "new plaintiffs to intervene in underlying cases."  261 F.R.D. 577, 583 (D. Kan. 2009).  But because plaintiffs there had moved for class certification, it was possible that "some or all of the proposed new plaintiffs w[ould] fall within the class and be content to have their claims asserted thereunder."  *Id.* at 584.  This MDL, by contrast, involves no class case that could encompass all of these Plaintiffs' claims.  Further, unlike here, plaintiffs in *Motor Fuel* did "not explain[] their delay in seeking leave to amend" or "show[] good cause for their failure to comply with the deadline for filing motions for leave to join additional parties."  *Id.*  And in that case, "[f]act discovery [wa]s set to close" just four months after the court's decision, *id.* at 586, whereas fact discovery has not even begun in these cases.

Finally, while the order in *Motor Fuel* "d[id] not dispose of any claims," as "the would-be intervening plaintiffs [we]re free to assert their claims in separate lawsuits," *id.* at 583, the denial of the instant motions could effectively dispose of Plaintiffs' claims against the PBMs.  While Plaintiffs believe they have strong arguments that filing their claims in other jurisdictions would not render them untimely, the PBMs contest that position.  Indeed, the PBMs already assert (though erroneously) that many of Plaintiffs' claims are untimely *even as asserted here*.  There is thus a risk that precluding Plaintiffs from suing the PBMs in these proceedings would sound the death knell for those claims.  No doubt that is why the PBMs prefer that course.  But any "prejudice" they might suffer from being held accountable for their malfeasance in connection with the opioid epidemic is not cognizable under Rules 15 or 16.  To the contrary, among the factors bearing on

38

prejudice is whether denying leave to amend would "prevent the [P]laintiff[s] from bringing a timely action in another jurisdiction."  *Phelps v. McClellan*, 30 F.3d 658, 662-63 (6th Cir. 1994).  That risk exists here.

### 5.    The PBMs will not be prejudiced in pursuing "allocation of fault" or "third-party liability."[15]

As an outgrowth of their baseless spoliation argument, the PBMs contend state laws governing the proposed claims allow for "allocation of liability with other parties and third parties," which the PBMs say they "are prejudiced" from pursuing because of the hypothetical loss of evidence due to Plaintiffs' "delay."  *See* Pt. I Br. at 68.  But as discussed above, the PBMs point to no actual evidence of any spoliation, let alone that the loss of any evidence would impair their ability to mount defenses or pursue remedies against third parties.

Additionally, the Court has already rejected the PBMs' assertion that any claims against third parties "would cause the MDL to dramatically expand" and thus "undermine the MDL's manageability and contravene the JPML's and this Court's determinations that the MDL should be winding down" (*id.*).  In its February 2024 Order granting bellwether plaintiffs' motion to amend as to the PBMs, the Court noted the steps it has taken to efficiently and effectively manage claims against other defendants.  For example, after pharmacy bellwether plaintiffs amended their complaints, the Court

---

[15] In light of the significant overlap among the PBMs' general and purportedly case-specific arguments, this section responds in part to Sections II.B.1.a ("Evidence will have been lost over time.") and III.A.6 ("The PBMs are prejudiced in their ability to argue allocation of fault and third-party liability.") of the Part I Brief.  *See* Dkt. #6163.

granted their motion "to sever and stay non-pharmacy defendants and non-nuisance claims" over the pharmacy defendants' objection.  *Nat'l Prescription Opiate*, 2024 WL 3387357, at *2.  Thus, as with the numerous other opioids cases the Court has managed, permitting the bellwether plaintiffs to amend "d[id] not automatically make the bellwether cases irretrievably unworkable, nor cause undue prejudice to the PBM Defendants."  *Id.*  The same conclusion is warranted here.[16]

### C.    The PBMs' Objections to the Process Established by the Court and to Plaintiffs' Compliance with It Fail.

The PBMs contend that in presenting the basis for the proposed amendments, Plaintiffs have violated the Federal Rules, Sixth Circuit precedent, and the May 2024 Order (as well as the Court's comments preceding it).  *See* Pt. I Br. § I.  They also attack the process the Court established for evaluating whether leave to amend is warranted. The PBMs are wrong on all counts.

### 1.    The motions sufficiently identify Plaintiffs' proposed claims and allegations, in compliance with the Federal Rules.

In stark contrast to the PBMs' regurgitation of the same arguments that apply to scores of similarly situated movants, Plaintiffs have organized their motions to identify, with respect to "each individual case," (1) each case/Plaintiff that seeks to add the PBMs;

---

[16] The PBMs also argue it is improper for *the Court* to consider the possibility of settlement in deciding whether to grant these motions.  *See* Part I Br. at 60.  But Plaintiffs have never suggested settlement leverage is a factor in the Rule 16 "good cause" analysis, and indeed it is not.  On the other hand, *Plaintiffs* cannot be *penalized* for taking the prospect of settlement into account in deciding whether to bring additional claims against the PBMs. Any considerations regarding settlement thus weigh neither for nor against permitting these amendments.

(2) which bellwether allegations and claims each Plaintiff proposes to incorporate, i.e., the "specific factual allegations pertinent to" each of the cases; and (3) why good cause exists for these amendments.  *See* Exs. 1, 2 (revised lists of Plaintiffs seeking leave to add Optum and ESI); Dkt. #5547, Ex. A; (original Plaintiff chart for Optum); Dkt. #5548, Ex. A (original Plaintiff chart for Express Scripts); Dkt. #5565 (Corr. Roadmap); Dkt. #5565-2 (Mougey Decl.); Dkts. #5547-2, #5548-2 (Conrod Decls.).    Additionally, by expressly incorporating the *Rochester* Complaint, Plaintiffs have made clear they intend to assert those same claims for (1) public nuisance, (2) violations of RICO, (3) negligence and gross negligence, and (4) state-specific analogues of the state statutory claims asserted in the *Rochester* Complaint (such as Sections 349 and 350 of New York's General Business Law), except where any of those claims are expressly barred by the law of the Plaintiff's home state (for example, Ohio with respect to public nuisance claims).[17]  And of course, each Plaintiff already has a case on file in this MDL; to the extent those actions assert state-law claims appropriate for each Plaintiff's jurisdiction, the PBMs are further on notice of the specific state-law claims and Plaintiff-specific facts each Plaintiff intends to assert.  *E.g.*, *Broward Cty., Fla. v. Purdue Pharma L.P.*, No. 18-op-45332-DAP, Dkt. #88 (2d Am. Compl.), ¶¶ 812-1000.  This approach fully complies with the May 2024 Order and Sixth Circuit precedent.

---

[17] In Part II of their Joint Opposition, the PBMs argue every Plaintiff not from New York lacks standing to assert the New York state claims in the *Rochester* Complaint.  *E.g.*, Pt. II Br. at 159.  But non-New York Plaintiffs do not seek to assert New York claims, they seek to assert the jurisdiction-specific claims set forth in each of their underlying operative pleadings, which their amended complaints will supplement, not replace.  *See* Dkt. #5565 (Corr. Roadmap) at 3.

In light of the information provided in the motions and supporting materials, the PBMs plainly do not lack "detail about the claims that each plaintiff intends to assert" (Pt. 1 Br. at 18). This is especially so because, as the Court has noted, the PBMs "know very well" what RICO and public nuisance claims against them "look like," as "[they]'ve got them in the [multiple] bellwethers." Dkt. #5471 at 25. Accordingly, "the focus" of these motions is "not . . . the specific allegations in the complaint" but rather "the good cause for adding a given Defendant in 2024 when the case has been pending for four or five or six or more years." *Id.* at 26. That, of course, *is* the proper focus under Rule 16.

The PBMs also protest that Plaintiffs did not identify "the specific entities the claims will be asserted against" (Pt. I Br. at 18), which presumably refers to each of the Optum or Express Scripts affiliates identified in the *Rochester* Complaint. As it has done throughout this litigation with respect to other defendants, the Court very recently rejected the PBMs' argument that dismissal of City of Rochester and Ogdensburg's claims was warranted because they "grouped and referred to the two OptumInsight Defendants together when describing the allegations against them." Dkt. #6235 at 7. Notwithstanding the PBMs' insistence on "keeping separate the identities and functions of each Optum corporate subsidiary," the Court "conclude[d], as it did before, that 'where multiple defendants are alleged to have engaged in the same pattern of conduct or conspired in a fraudulent scheme,' a plaintiff need not 'reiterate its allegations against each defendant individually.'" *Id.* at 9 (quoting *In re Nat'l Prescription Opiate Litig.*, 2019 WL 2468267, at *13 (N.D. Ohio Apr. 1, 2019)). The Court's well-founded holdings regarding group pleading apply equally to these motions. To the extent there are

jurisdictional or other issues with respect to a particular PBM affiliate in a specific case, the parties can collaborate to resolve them or the relevant PBM entities can move to dismiss when the Court lifts the litigation stay.

The PBMs also contend Plaintiffs fail to provide "jurisdiction-specific facts" to support their claims, "the relief they intend to seek," the "state-law authority purportedly giving each Moving Plaintiff the right to assert its claims," when each Plaintiff "learned of its claimed injury for limitations-period purposes," or when those injuries "first occurred."  Pt. I Br. at 18.  But jurisdiction-specific information, as well as information regarding Plaintiffs' injuries and the relief they seek, is already included in their existing complaints or in the *Rochester* Complaint.  Further, the PBMs cite no caselaw, and we are aware of none, holding a complaint must provide the "state-law authority" that affords Plaintiffs "the right to assert [their] claims."  And Plaintiffs "have no duty to plead the absence of affirmative defenses, including limitation periods."  *Dollison v. Antero Res. Corp.*, 2022 WL 16835991, at *3 (S.D. Ohio May 4, 2022).  In any event, as detailed in Section I.D.3 below, the PBMs' statute-of-limitations arguments all lack merit.[18]

The PBMs further suggest the motions are deficient because Plaintiffs do not "include any proposed amended complaints."  Pt. I Br. at 19.  But Sixth Circuit precedent requires only that a movant provide the "substance of the proposed amendment."  *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017).  While a court "does not abuse its discretion by denying leave where the plaintiff fails to submit a proposed amended

---

[18] As discussed in Section II.B below, the PBMs' arguments regarding Plaintiffs' lack of authority also fail.

43

complaint *or otherwise disclose what amendments he intends to make*," *Glick v. Farm Credit Servs. of Mid-Am., FLCA*, 2010 WL 3118673, at *1 (N.D. Ohio Aug. 6, 2010), there is no general requirement that a movant submit a proposed complaint.  *See Cunningham Prop. Mgmt. Tr. v. Ascent Res.-Utica, LLC*, 2020 WL 4217962, at *4 (S.D. Ohio July 23, 2020) ("Although a copy of the amended complaint normally accompanies a request for leave to file an amended complaint, a district [court] may be able to determine whether justice requires the amendment so long as the substance of the proposed amendment is available for the court's review.").  The PBMs' own caselaw, as they describe it, confirms this.  *See, e.g., Ohio Sec. Ins. Co. v. Brakefire, Inc.*, 2024 WL 2816024, at *9 (N.D. Ohio June 3, 2024) (cited in Pt. I Br. at 21 as "denying leave to amend because plaintiff failed to provide 'a copy of a proposed amended complaint, *or otherwise adequately inform the Court of the nature of its proposed amendment*'").[19]

The court in *Black v. Ohio Industrial Commission* rejected the exact argument the PBMs press.  Although defendants argued the plaintiff was required to provide the proposed amended complaint, the court held a movant "may provide the substance of the proposed amendment without providing the exact proposed language to be changed

---

[19] What the PBMs attempt to cast as "directives" from the Sixth Circuit are plainly not. The Court of Appeals has observed that "*[n]ormally*, a party seeking an amendment *should*—not *must*—"attach a copy of the amended complaint."  *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014); *see also Doe v. Carson*, 2020 WL 2611189, at *1 (6th Cir. May 6, 2020) (affirming denial of leave to amend where plaintiff "merely assert[ed] in her motion to amend that the defendants had other statutory duties falling outside disability law"); *Harris v. Davidson Cty. Sheriff*, 2019 WL 7573883, at *4 (6th Cir. Dec. 11, 2019) (affirming denial of leave where plaintiff "failed to clearly present *the nature of his proposed amendments or supplements*").

or added to the complaint."  2021 WL 4399736 at *2 (S.D. Ohio Sept. 27, 2021).  Plaintiffs here provide far more than the movant in *Black*, who merely stated that were the court to grant the defendants' motion to dismiss, she "would clarify some of the original allegations" relevant to the timeliness of her claims.  *Id.*  By expressly referring to the *Rochester* Complaint, the present motions identify the specific claims and allegations Plaintiffs intend to assert, as well as the entities against whom Plaintiffs will assert them—in short, the "substance of the proposed amendment."[20]

Beyond challenging the motions themselves, the PBMs attack the entire process the Court established for addressing leave to amend.  No doubt attempting to manufacture a basis for yet another in a series of meritless mandamus petitions, the PBMs contend the process "improperly minimizes the individual character of hundreds of MDL cases," in violation of the Sixth Circuit's admonition that "the district court's decision whether to grant a motion to amend in an individual case depends on the record *in that*

---

[20] The PBMs' other authorities do not demand more.  The plaintiff in *Beydoun* "made an oral motion asking for leave to amend his complaint if the district court 'were in any way inclined to grant defendants' motion to dismiss,'" and "never informed the district court of what facts he would use to supplement his claims."  871 F.3d at 470.  And the plaintiff in *Bey v. WalkerHealthCareIT, LLC* did "not propose[] an amendment," but rather "want[ed] assurance that she w[ould] be given thirty days to file a motion for leave to amend *if* the Court f[ound] any of Defendants' arguments [for dismissal] persuasive." 2017 WL 10992207, at *2 (S.D. Ohio July 25, 2017) (emphasis in original).  *Bey*, like *Beydoun*, echoes the well-established principle that plaintiffs "[are] not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies."  *Id.* (alteration in original) (quoting *Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 784 (6th Cir. 2000)).  That circumstance is not present here. Nor does this case resemble *Kuyat*, where plaintiffs made a "one-sentence request" for leave to amend at the end of their opposition to the defendant's motion to dismiss.  747 F.3d at 444.

3304111.16

*case* and not others." Pt. I Br. at 2 (emphasis in original) (quoting *CVS*, 956 F.3d at 845). The Court's streamlining of the present amendment process by coordinating briefing on indisputably common issues is neither encompassed by nor inconsistent with the Sixth Circuit's directive in *CVS*.

The Sixth Circuit held there that in granting CT1 plaintiff counties' motions to amend to add dispensing claims against chain pharmacies, this Court erroneously found good cause under Rule 16 based on considerations of efficiency rather than whether plaintiffs exercised reasonable diligence. 956 F.3d at 843-44. The Court of Appeals noted "[n]either the Counties nor the district court . . . even attempted to show that the Counties demonstrated diligence" and "the Counties did not bring their dispensing claims earlier because they *expressly chose not to bring them*." *Id.* at 843 (emphasis in original). The circumstances surrounding the present motions do not remotely resemble those in *CVS*.

Indeed, while it reversed this Court's specific ruling as to CVS, the Sixth Circuit reiterated the longstanding principle that "an MDL court has broad discretion to create efficiencies and avoid duplication—of both effort and expenditure—across cases within the MDL." *Id.* at 841. To that end, "[i]n discretionary matters going to the phasing, timing, and coordination of the cases, the power of the MDL court is at its peak." *CVS*, 956 F.3d at 845 (quoting *In re Korean Air Lines Co. Antitrust Litig.*, 642 F.3d 685, 700 (9th Cir. 2011)). This Court acted well within its discretion in organizing these motions to avoid needless duplication.

To be sure, as *CVS* instructs, promoting efficiency cannot substitute for applying the proper legal standards in each of the MDL's constituent cases. The May 2024 Order

makes clear the Court will apply the Federal Rules, including Rule 16's good cause standard, for "*each individual* case."  Dkt. #5455 at 2 (emphasis in original).  And the Court has stated it will issue "a specific ruling for each and every one of those cases." Dkt. #5471 at 16.  What the PBMs deride as a mere "nod" to *CVS* (Pt. I Br. at 16) is in fact an express recognition of the proper contours of the Court's authority in addressing these motions.  The process the Court established is both legally sound and logical.

>    2.    **The motions sufficiently articulate common bases, applicable to all Plaintiffs, for finding good cause to grant leave to amend.**

Plaintiffs also "stat[e] with particularity the reasons amendment should be permitted in *each individual* case."  Dkt. #5455 at 2 (emphasis in original).  As the motions and accompanying submissions make clear, the good cause argument is *the same* for each Plaintiff: documents and testimony that shed new light on the PBMs' conduct with respect to the opioids crisis and their liability were not reasonably available to any of the Plaintiffs before the Amendment Deadlines.  The PBMs assert that because Plaintiffs have not undertaken the repetitive and unnecessary process of restating the same position hundreds of times, they have failed to comply with the Court's directive.  That argument is nonsensical.

The PBMs highlight the Sixth Circuit's previous observations that "a district court's decision whether to grant a motion to amend in an individual case depends on the record in that case and not others" and that "the cases within an MDL retain their separate identities."  *CVS*, 956 F.3d at 845.  But the fact that each Plaintiff has the same basis to support good cause for allowing amendment neither infringes on the cases'

separate identities nor conflates the records in the respective cases.  It merely reflects the obvious similarities among these cases—the very reason they are proceeding together.

The PBMs' reliance on the Ninth Circuit's statement in *In re Phenylpropanolamine (PPA) Products Liability Litigation* that "due process and fundamental fairness may not be sacrificed to provide assembly-line justice," 460 F.3d 1217, 1250 (9th Cir. 2006) ("*PPA*"), is also misplaced.  The district court in that MDL dismissed the claims of plaintiffs who failed to comply with its case management orders.  While upholding most of the dismissals, the Ninth Circuit reversed two of them due to the district court's failure to consider less-drastic sanctions given the specific circumstances in those cases.  The court of appeals reasoned that "when a party's conduct is not egregious or when a party receives insufficient warning, the failure to consider any alternatives at all limits the deference we give a MDL court," and in those instances the district court failed to apply "individualized consideration."  *Id.*

Here, by contrast, the *same* considerations apply to the good-cause analysis for each Plaintiff—specifically, as discussed above, whether (1) the documents and testimony elicited in 2023 constituted a sufficiently new development to warrant Plaintiffs seeking to assert claims against the PBMs after the Amendment Deadlines; and (2) allowing these amendments now will impose cognizable prejudice on the PBMs.  As all Plaintiffs are similarly situated with respect to these issues, the answer to both of those questions will be the same for "***each individual*** case."  Dkt. #5455 at 2 (emphasis in original).  Moreover, nothing in the process established by the Court, nor in Plaintiffs' motions (or this Reply), precludes the Court from examining truly individual circumstances in an individual case

48

and making an individual finding. To the contrary, Plaintiffs' motions contemplate that, in the end, the Court will need to issue individualized orders reflecting which defendants each Plaintiff is permitted to add to its case.[21]

Further, while the rules governing an MDL "are the same as for ordinary litigation on an ordinary docket," multidistrict litigation "is different because of the large number of cases that must be coordinated, its greater complexity, and the court's statutory charge to promote the just and efficient conduct of the actions." *PPA*, 460 F.3d at 1222 (citing 28 U.S.C. § 1407). As a result, "the considerations that inform the exercise of discretion in multidistrict litigation may be somewhat different, and may tip the balance somewhat differently, from ordinary litigation on an ordinary docket." *Id.* And Rule 16 itself — which "authorizes a court to manage cases so that disposition is expedited, wasteful pretrial activities are discouraged, the quality of the trial is improved, and settlement is facilitated" — recognizes "'the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple

---

[21] Plaintiffs propose that submission of amended pleadings (whether by short-form complaints or otherwise) cannot be accomplished until the Court has ruled on all of the pending motions for leave to amend, since until such time, each Plaintiff will not know against which defendants it will be permitted to assert claims. Once the Court has ruled on all of the motions, each Plaintiff will be in a position to file a single amended pleading or short form that encompasses all defendants and claims. Plaintiffs propose that if the Court grants leave as to any defendant, the relevant Plaintiffs and that defendant should quickly begin to meet and confer to establish an appropriate process to streamline filing of amended pleadings.

parties, difficult legal questions, or unusual proof problems.'"  *Id.* at 1227 (quoting Fed. R. Civ. P. 16(c)(12)).  Plaintiffs' motions fully accord with these principles.[22]

Finally, contrary to the PBMs' assertion, Plaintiffs have complied with Rule 7's requirement that a motion "state with particularity the grounds therefor" (which the Sixth Circuit has held is embedded in Rule 15's analysis regarding leave to amend).  As an initial matter, Rule 7's directive "must" be "liberally constru[ed]."  *Intera Corp. v. Henderson*, 428 F.3d 605, 613 (6th Cir. 2005).  And Plaintiffs have "reasonably specified," even if "in a succinct manner," the grounds for the motions and their proposed amendments.  *Id.*  That is all the Rule requires.  As detailed above, through the motions and accompanying submissions Plaintiffs have amply explained why good cause exists to allow the present amendments.  This is a far cry from "request[ing] leave to amend in a single sentence" without "providing grounds" in support of the request.  *Evans v. Pearson Enters.*, 434 F.3d 839, 853 (6th Cir. 2006); *see also Metyk v. KeyCorp*, 560 F. App'x 540, 543 (6th Cir. 2014) (cited in Pt. I Br. at 23 n.8) (rejecting plaintiffs' argument that "the district court made a mistake by not addressing a single clause in their opposition to the

---

[22] In *Hamer v. LivaNova Deutscheland GmbH*, which the PBMs cite, the district court dismissed the plaintiff's claims for failure to comply with a case management order.  994 F.3d 173, 178-79 (3d Cir. 2001).  But because the dismissal was "*with* prejudice and *without* any discussion of whether, in order to allege a redressable injury, the claims must be predicated on proof of an NTM infection," the court "deprived [plaintiff] of the opportunity to litigate his claims in *any* venue without consideration of how they might fare outside the MDL context.  *Id.* at 179 (emphasis in original).  The plaintiff's substantive rights were thus subverted solely due to his case's inclusion in an MDL, which was improper.  As discussed above, that is not the situation here.

defendants' motion to dismiss" stating plaintiffs should "be granted leave to amend to address any deficiency identified in the Court's ruling").[23]

### D.  The PBMs Cannot Establish the Proposed Amendments Are Futile.

Moving beyond Rule 16's good-cause factors, the PBMs also assert leave should be denied because Plaintiffs' proposed amendments would be futile and are thus precluded by Rule 15.  *See* Pt. I Br. § III.B.  "An amendment is futile if, even with the proposed changes, the complaint still fails to state a claim under Rule 12(b)(6)."  *Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross Blue Shield of Mich.*, 2025 WL 2104569, at *12 (6th Cir. July 28, 2025); *see also Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 617 (6th Cir. 2024).  The Court is charged merely "with determining whether the futility of an amendment is so obvious that it should be disallowed."  *Zlozower v. Rock & Roll Hall of Fame & Museum, Inc.*, 2025 WL 1822570, at *3 (N.D. Ohio July 2, 2025).  The PBMs' general futility challenges—which address (1) the sufficiency of Plaintiffs' allegations of injury and causation, (2) the timeliness of the proposed RICO and public nuisance claims, and (3) whether public nuisance claims are cognizable under certain states' laws—are unavailing.

Beyond their specific infirmities, the PBMs' arguments contravene three bedrock principles: *first*, that the Court must "accept all well-pleaded factual allegations as true and construe the complaint in the light most favorable to plaintiffs," *Bennett v. MIS Corp.*,

---

[23] Further demonstrating the error in PBMs' insistence that Plaintiffs must submit proposed amended complaints, *Evans* makes clear that "providing *grounds* _or_ a proposed amended complaint to support [the] request" is sufficient.  434 F.3d at 853.

607 F.3d 1076, 1091 (6th Cir. 2010); *second*, that "Rule 12(b)(6), besides some minor exceptions, does not permit courts to consider evidence extrinsic to the pleadings," *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 487 (6th Cir. 2009); and *third*, that because "the inquiry on a motion to dismiss is not whether Plaintiff[s] will be successful on the merits, but simply whether [their] pleadings are sufficient to state a claim upon which relief can be granted," *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 726 (6th Cir. 2010), "disputed questions of fact . . . cannot properly be resolved at this time under the motion to dismiss standard," *Father Flanagan's Boys Home v. Donlon*, 449 F. Supp. 3d 739, 746 (S.D. Ohio 2020); *see also Monroe Fed. Sav. & Loan Ass'n v. NEA Galtier Parking, LLC*, 2012 WL 5830250, at *2 n.4 (S.D. Ohio Nov. 16, 2012) ("Arguing disputed facts and evidence is not appropriate for resolution on a motion to dismiss.").  The PBMs' violations of these fundamental precepts pervade their seriatim challenges to particular aspects of Plaintiffs' claims.  Their attacks all miss the mark.

### 1.    All Plaintiffs indisputably state at least one claim for relief.

The PBMs acknowledge, as they must, the Court's prior holdings that a plaintiff may assert a claim for equitable relief under RICO and that such claims are not subject to the statute of limitations.  *See* Pt. I Br. at 79 n.80 ("The PBMs acknowledge that this Court has previously held that equitable RICO claims are permissible and not subject to a statute of limitations."); *Nat'l Prescription Opiate*, 2024 WL 4912429, at *5 ("RICO claims for *equitable* relief are viable and are exempt from the operation of a limitations period."). On this basis alone, the PBMs' futility arguments should be rejected for all Plaintiffs: because every Plaintiff can state at least one claim for (equitable) relief (under RICO), the

PBMs cannot establish "that the proposed amendments would be futile *in their entirety*."

*Donahue*, 2024 WL 4534250, at *3.

To the extent the Court may nonetheless go on to consider the remainder of the PBMs' futility arguments—that all Plaintiffs fail to sufficiently allege their injuries, some Plaintiffs' RICO damages claims and public nuisance claims are time-barred, and the laws of a handful of states preclude nuisance claims—they fail as well.

### 2.  All Plaintiffs sufficiently allege their injuries and the PBMs' role in causing them.

As with the existing defendants, Plaintiffs allege the PBMs engaged in unlawful and unreasonable conduct contributing to the oversupply of opioids that foreseeably fueled the epidemic of addiction, overdose, and related harms, which resulted in significant economic, public health and safety, or other injuries to Plaintiffs.  Plaintiffs will allege the PBMs' unlawful and unreasonable conduct contributing to these conditions and injuries through adopting Rochester's allegations.  The PBMs argue these proposed amendments are futile because Plaintiffs "provide no additional factual support or allegations tailored to each plaintiff" with respect to "how their alleged injuries result from the PBMs' alleged conduct."  Pt. I Br. at 71.  That is incorrect.

Plaintiffs seek leave to amend to "*supplement* their operative pleadings" by adding claims against the PBMs based on their conduct as alleged in the *Rochester* Complaint.  Dkt. #5547 (Optum Mot.) at 1; Dkt. #5548 (ESI Mot.) at 1.  The proposed allegations and claims will thus become part of a single, comprehensive pleading in each case if the Court grants these motions.  This is consistent with the prior practice in this litigation of using

short-form complaints to amend or supplement existing pleadings, which reflects common practice in MDLs and other mass litigation proceedings.  *See, e.g.*, Dkt. #1282 at 4 ("The Short Form may also incorporate by reference the common facts and/or RICO claims alleged in the *Summit County* pleadings and/or incorporate by reference the pleadings in the plaintiff(s)'s existing complaint on file at the time said plaintiff files the Short Form.  The Short Form shall be deemed to supplement rather than supersede the plaintiff(s)'s prior pleadings except as specified herein."); *In re DePuy Orthopaedics, Inc. ASR Hip Implant Prods. Liab. Litig.*, 953 F.3d 890, 893 (6th Cir. 2020); *Cortez v. Cook Inc.*, 27 F.4th 563, 565 (7th Cir. 2022).  The PBMs' attempts to isolate the existing and proposed allegations is improper.

Each Plaintiff's operative pleading alleges the opioid oversupply and epidemic in their community has caused, and continues to cause, economic, public, or other injuries to the Plaintiff.  *E.g.*, *City of Kansas City, Mo. v. Purdue Pharma L.P. et al.*, No. 1:18-op-46029 (N.D. Ohio Aug. 9, 2018), Dkt. #1 ("*Kansas City* Compl."), ¶¶ 2-8, 9, 14, 18, 833, 855 (addressing opioid oversupply and epidemic); *id.* ¶¶ 628-48, 833, 855 (detailing Plaintiff's public health and safety and economic injuries).   And in adopting the *Rochester* Complaint's supplemental allegations, each Plaintiff further alleges the PBMs' formulary, promotion, and dispensing conduct substantially contributed to the opioid oversupply and epidemic that is injuring the Plaintiff in the ways alleged in its operative pleading.  *See Rochester* Compl. ¶¶ 252-583 (detailing PBMs' conduct); *id.* ¶¶ 2, 3, 33-34, 37, 41, 390 (describing PBMs' contribution to opioid oversupply and epidemic in the United States). This is more than enough to allege Plaintiffs' injuries and how the PBMs contribute to

them.  After all, as this Court observed in rejecting other defendants' challenges to allegations relating to causation, "at the pleading stage, a complaint need only set forth a plausible claim for relief and should not be dismissed unless it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *In re Nat'l Prescription Opiate Litig.*, 440 F. Supp. 3d 773, 796 (N.D. Ohio 2020).  Plaintiffs readily meet that standard here.[24]

Apparently recognizing the weakness of their general futility argument against all Plaintiffs, the PBMs pivot, contending the adopted Rochester allegations cannot provide particularized facts showing injury by any *non-municipal* Plaintiff.  They are wrong again. Each Plaintiff—municipal, county, tribal, school district, individual, and third-party payer alike—explains in its operative complaint the opioid oversupply and epidemic in and around its relevant community and the Plaintiff's resulting economic, public, or other injuries.[25]  Thus, when the PBMs argue "City of Rochester's amended complaint cannot

---

[24] The PBMs refer, more than once, to Plaintiffs' purported failure to provide "particularized facts" regarding injury or causation.  Pt. I Br. at 71, 72.  To the extent the PBMs are suggesting allegations of injury and causation must satisfy Rule 9(b)'s particularity requirement or Rule 9(g)'s requirement that "item[s] of special damages . . . must be specifically stated," they are mistaken.  *See, e.g.*, *Lozar v. Birds Eye Foods, Inc.*, 2012 WL 12886431, at *5 (W.D. Mich. June 6, 2012) ("For most claims, Rule 8 only requires 'a short and plain statement of the claim' and 'a demand for the relief sought,' in contrast with special damages, which under Rule 9 'must be specifically stated.'") (quoting Fed. R. Civ. P. 8(a)(2)-(3), Fed. R. Civ. P. 9(g)).  In any event, Plaintiffs' allegations are sufficiently specific, whether under Rule 8 or Rule 9.

[25] *E.g.*, *Kansas City* Compl. ¶¶ 2-9, 14, 18 (opioid oversupply and epidemic), 628-48, 833, 855 (municipal Plaintiff's public health and safety and economic injuries); *Eddy County, NM v. Allegan PLC et al.*, No. 1:22-cv-140 (N.D. Ohio), Dkt. #1 ("*Eddy County* Compl."), ¶¶ 3-10, 15, 20 (opioid oversupply and epidemic), 1079-93, 1247, 1337 (county Plaintiff's public health and safety and economic injuries); *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Purdue Pharma L.P.*, No. 1:18-op-46239 (N.D. Ohio), Dkt. #1 ("*Lac Vieux*

provide fair notice of the potential future allegations of the non-municipal plaintiffs because Rochester's municipal status permeates its allegations of harm," Pt. I Br. at 72, they are looking in the wrong place. The PBMs plainly have fair notice of the proposed claims against them, the basis for each Plaintiff's asserted injuries, and the PBMs' role in harming each Plaintiff.

The PBMs' assertion that Plaintiffs' motions "fail to address the different purported causal chains and alleged harms applicable to each plaintiff," Pt. I Br. at 73, is also baseless. As discussed above, each Plaintiff's operative complaint, as supplemented with the *Rochester* Complaint's allegations, sets forth the Plaintiff's injuries resulting from the opioid epidemic as well as the causal connection between the PBMs' misconduct and those injuries. The causal chain is the same for each Plaintiff: the PBMs' unreasonable opioid formulary, promotion, and dispensing practices contributed to the opioid oversupply and epidemic nationally,[26] which manifested in each Plaintiff's community[27]

---

*Desert Band* Compl."), ¶¶ 51-64 (opioid oversupply and epidemic), 254-67, 277, 301 (tribal plaintiff's public health and safety and economic injuries); *Susanville Elementary School District, et al. v. Cephalon, Inc., et al.*, No. 1:22-op-45021 (N.D. Ohio Oct. 4, 2022), Dkt. #1 ("*Susanville School District* Compl."), ¶¶ 1-3, 8-11, 293, 538 (opioid oversupply and epidemic), 497-502 (school district class action Plaintiffs' public health and safety and economic injuries); *Thomas Wayne Chapman, Individually and as Next of Friend and Guardian of Child V.D.C. v. McKesson Corp., et al.*, No. 1:21-op-45132 (N.D. Ohio), Dkt. #1 ("*Chapman by Child V.D.C.* Compl."), ¶¶ 104-16, 163-73 (opioid oversupply and epidemic), ¶¶ 3, 8, 117-36, 448, 464-65 (personal and economic injuries); *Teamsters Health Services and Insurance Plan Local 404 v. Purdue Pharma L.P., et al.*, No. 1:18-op-45001 (N.D. Ohio), Dkt. #1 ("*Teamsters Local 404* Compl."), ¶¶ 13-25 (opioid oversupply and epidemic), ¶¶ 26, 227, 248, 262, 273 (economic injuries).

[26] *Rochester* Compl. ¶¶ 2-3, 9, 14, 18.

[27] *Rochester* Compl. ¶¶ 62-86, 584; *Kansas City* Compl. ¶¶ 2-9, 14, 18; *Eddy County* Compl. ¶¶ 3-10, 15, 20; *Lac Vieux Desert Band* Compl. ¶¶ 51-64; *Susanville School District* Compl.

and caused *all* Plaintiffs to suffer economic injury,[28] in addition to the public health and safety injuries to *government* Plaintiffs,[29] and other injuries to *individual* Plaintiffs.[30] Accordingly, as in other respects, the proposed amendments would withstand a Rule 12(b)(6) challenge regarding allegations of injury and causation.

### 3. The PBMs' statute-of-limitations arguments cannot be resolved at this stage, and lack merit in any event.

Given the PBMs' acknowledgment of the Court's prior ruling that RICO claims for equitable relief are not subject to a statute of limitations (*see* Pt. I Br. at 79 n.80), their

---

¶¶ 1-3, 8-11, 293, 538; *Chapman by Child V.D.C.* Compl. ¶¶ 104-16, 163-73; *Teamsters Local 404* Compl. ¶¶ 13-25.

[28] *Rochester* Compl. ¶¶ 589-91 (costs of increased municipal services, supplies, employee health benefits, and lost productivity); *Kansas City* Compl. ¶¶ 644-48 (costs of increased municipal and health services, naloxone supply, and employee health benefits); *Eddy County* Compl. ¶¶ 1090-93 (costs of increased municipal and health services, and naloxone supply); *Lac Vieux Desert Band* Compl. ¶¶ 1, 6, 10, 230, 261, 273 (costs of healthcare, treatment, law enforcement, and child services, and lost productivity); *Susanville School District* Compl. ¶¶ 5, 7, 31, 35, 549, 599, 614, 623, 640, 651, 662, 677 (costs of opioid exposure-related educational services, increased costs of employee health and disability benefits); *Chapman by Child V.D.C.* Compl. ¶¶ 136, 446, 464 (costs of opioid exposure-related medical, therapeutic, prescription, counseling, and rehabilitation services); *Teamsters Local 404* Compl. ¶¶ 26, 252, 266 (costs of addiction treatment, emergency care, and excess opioid prescriptions).

[29] *Rochester* Compl. ¶¶ 67-83, 587-88, 726 (epidemic of addiction, fatal and non-fatal overdoses, heroin abuse, and neonatal abstinence syndrome ("NAS") births; *Kansas City* Compl. ¶¶ 628-40 (epidemic of addiction, fatal and non-fatal overdoses, heroin and fentanyl abuse, and NAS births); *Eddy County* Compl. ¶¶ 1079-1085 (epidemic of addiction, fatal and non-fatal overdoses, heroin and fentanyl abuse, and NAS births); *Lac Vieux Desert Band* Compl. ¶¶ 254-66 (epidemic of addiction, fatal and non-fatal overdoses, heroin abuse, child opioid abuse, NAS births, neurological disease, crime, and delinquency); *Susanville School District* Compl. ¶¶ 560, 574 (epidemic of NAS and other opioid exposure-related child developmental harms).

[30] *Chapman by Child V.D.C.* Compl. ¶¶ 1, 3, 479, 487, 493 (NAS-related physical and developmental injuries).

assertion that "many" Plaintiffs' RICO and public nuisance claims are time-barred cannot—even if they had merit (which they do not)—render the proposed amendments futile in their entirety.  The Court thus need not entertain those arguments now.

In any event, the bar is especially high with respect to the PBMs' timeliness challenge, which addresses an affirmative defense:  "Motions to dismiss based on statute-of-limitations grounds should only be granted where undisputed facts 'conclusively establish the defense as a matter of law.'"  *Nat'l Prescription Opiate*, 440 F. Supp. 3d at 787 (quoting *Estate of Barney v. PNC Bank*, 714 F.3d 920, 926 (6th Cir. 2013)).  It is therefore "generally inappropriate to deny a motion to amend on futility grounds because the claims within a complaint are time-barred."  *Clabo v. Johnson & Johnson Health Care Sys., Inc.*, 982 F.3d 989, 995 n.2 (6th Cir. 2020).  Denial is permissible only "if the complaint affirmatively shows that the plaintiff's claims are barred by an applicable statute of limitations."  *Id.*  That is especially true "when there are disputed factual questions related to the accrual date," including "*claims that the defendant fraudulently concealed facts*, thereby preventing the plaintiff from learning of its injury, and *complex issues about whether information in the plaintiff's possession sufficed to alert it of the claim*."  *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 464 (6th Cir. 2016).  Those are precisely the questions in dispute in these cases.

Plaintiffs' proposed pleadings—tracking the exemplar *Rochester* Complaint—would allege (1) they did not and could not have learned that they had been injured by the PBMs' actions until recently, after documents revealing those facts were produced in discovery in 2023 (*see, e.g., Rochester* Compl. ¶¶ 694-701); (2) the PBMs' wrongful conduct

58

has continued and remains ongoing (*see, e.g.*, *id.* ¶¶ 2, 8, 56-57, 194, 205, 232, 270, 274, 276, 394, 579, 753, 835); (3) the PBMs' fraudulent concealment precludes any limitations defense (*see, e.g.*, *id.* ¶¶ 91, 638, 694-706, 741, 781, 784); and (4) equitable tolling operates to suspend the running of the statutes of limitations (*see, e.g.*, *id.* ¶¶ 694-706).  Those allegations suffice to allow the proposed amendments to proceed.  Substantially similar allegations have withstood motions to dismiss throughout these proceedings.  *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *3 (N.D. Ohio Dec. 19, 2018) (holding CT1 plaintiffs' allegations of fraudulent concealment and continuing violations were sufficient "to raise a plausible inference that the applicable limitations periods are subject to tolling").  The Court should thus, "as it has done repeatedly in the course of this litigation, . . . decline[] to dismiss Plaintiffs' claims on statute of limitations grounds at this early stage."  *Nat'l Prescription Opiate*, 2024 WL 4912429, at *9.

### a. *The PBMs cannot conclusively establish Plaintiffs' RICO claims are time-barred.*

The PBMs contend Plaintiffs' *damages* (not equitable-relief) claims under RICO are barred by the four-year statute of limitations.  *See* Pt. I Br. § III.B.4 at 79.  Although, as discussed above, the Court need not reach this argument now, the PBMs are wrong.

The *Rochester* Complaint—the template for these Plaintiffs' proposed amended pleadings—includes allegations of delayed discovery, fraudulent concealment, equitable tolling, and separate accrual.  These allegations, which will appear in Plaintiffs' amended pleadings, preclude the PBMs from conclusively establishing the proposed claims are untimely.  This is all the more true because (as noted in Section I.A.2., *supra*) just last year

3304111.16

the Court rejected the PBMs' nearly identical challenge to RICO claims asserted by City of Rochester—a ruling the PBMs remarkably do not even acknowledge here, let alone attempt to distinguish.

The Court accepted all four of the bases for tolling or extending the limitations period identified above.  As to delayed discovery, the Court explained the bellwether plaintiffs "allege they did not and could not have reasonably discovered their injuries until recently, because 'documents revealing those facts had not yet been produced in discovery in the opioid litigation and were not publicly or otherwise available.'"  *Nat'l Prescription Opiate*, 2024 WL 4912429, at *7 (quoting Dkt. #5448 at 5-6; *Rochester* Compl. ¶ 694).  The Court reasoned:

> Taking Plaintiffs' allegations as true, and without the benefit of a full factual record, the Court is unable to conclude under the injury discovery rule that Plaintiffs' RICO claims accrued for statute of limitations purposes before 2015 (four years before Plaintiffs filed their complaints).  Accordingly, at this juncture, the Court must overrule PBMs' argument that Plaintiffs' claims are time-barred because they knew or should have known of their injury in 2015.

*Id.* (footnote omitted).

The Court similarly held "[t]he RICO statute of limitations is tolled if the plaintiff properly invokes the fraudulent concealment exception."  *Id.* at *7.  It further determined the bellwether plaintiffs "plausibly pleaded the PBMs[] engaged in 'wrongful concealment of their actions.'"  *Id.* at *8 (quoting *Reid v. Baker*, 499 F. App'x 520, 527 (6th Cir. 2012)).

The Court also held the bellwether plaintiffs sufficiently pleaded equitable tolling because they plausibly alleged that they "ha[ve] been pursuing [their] rights diligently" and that "some extraordinary circumstance stood in [their] way and prevented timely filing."  *Id.* at *10.  Specifically, "[i]n the unusual, idiosyncratic circumstances presented here, the Court's own moratorium order prevented Plaintiffs from timely filing claims against New [PBM] Defendants any earlier."  *Id.* at *11.

Finally, the Court held the separate-accrual rule, which would preclude dismissal of any claims that may have accrued within the four-year limitations period, could apply and would preclude dismissal of at least some portion of the claims.  *Id.* at *5.

These rulings apply with equal force to the presently proposed amendments.  Amendment is therefore not futile, as Plaintiffs' claims are not time-barred on their face.

### b.    *The PBMs likewise cannot conclusively establish Plaintiffs' public nuisance claims are untimely.*

The PBMs also contend "[m]any" of Plaintiffs' public nuisance claims are time-barred "for the same reasons" as their RICO claims.  Pt. I Br. at 83.  Addressing claims under Alabama, Florida, Louisiana, Maryland, Massachusetts, Nebraska, and Washington law, the PBMs argue those Plaintiffs failed to "diligently bring their public nuisance claims" based on injuries "pleaded in their original complaints" and do not "allege any facts that would support the application of any tolling doctrine in their individual cases."  *Id.* at 83-87.  But, as discussed above, this Court has held the bellwether plaintiffs alleged facts sufficient to support the applicability of various tolling doctrines.

61

*See also King Cty. v. Express Scripts, Inc.*, 2025 WL 1082130, at *3 (W.D. Wash. Apr. 10, 2025)

(denying PBMs' motions to dismiss public nuisance claims as untimely).[31]

All of the states the PBMs identify recognize fraudulent concealment as a basis to

toll the statute of limitations.[32]  These states similarly recognize equitable tolling where

---

[31] The PBMs do not cite *City of Boston v. Express Scripts, Inc.*, 765 F. Supp. 3d 31 (D. Mass. 2025), a recent ruling in which they prevailed on the statute-of-limitations defense in opioid litigation.  Nevertheless, *City of Boston* does not demonstrate the claims of Massachusetts-based Plaintiffs are time-barred.  The decision in *City of Boston* is currently on appeal before the First Circuit.  No. 25-1258 (1st Cir. Mar. 26, 2025).  Further, the decision is at odds with Massachusetts authority.  *See City of Bos. v. Purdue Pharma, LP*, 2020 WL 416406, at *11 (Mass. Super. Ct. Jan. 3, 2020) (denying motion to dismiss opioid nuisance claims as time-barred based on allegations of delayed discovery); *Commonwealth v. Purdue Pharma, L.P.*, 36 Mass. L. Rptr. 107, 2019 WL 5495716, at *5 (Mass. Super. Ct. Oct. 8, 2019) (denying motion to dismiss opioid nuisance claim as time-barred based on allegations of fraudulent concealment and delayed discovery); *Commonwealth v. Purdue Pharma, L.P.*, 36 Mass. L. Rptr. 56, 2019 WL 5495866, at *6 (Mass. Super. Ct. Sept. 17, 2019) (in light of allegations in the pleading, question of when the plaintiff knew or should have known of the defendant's harmful conduct, and thus when the statute of limitations began to run, was a factual one that could not be resolved on a motion to dismiss); *see also Taygeta Corp. v. Varian Assocs., Inc.*, 763 N.E.2d 1053, 1065 (Mass. 2002) (applying continuing-nuisance doctrine to toll statute of limitations where defendant's activity "resulted in the creation of a physical condition that is of itself harmful after the activity that created it has ceased") (quoting RESTATEMENT (SECOND) OF TORTS § 834 cmt. e at 150-51 (1979)); *contra City of Bos.*, 763 F. Supp. 3d at 40 (denying application of continuing-nuisance doctrine based solely upon failure to allege a "recent act" without also addressing alleged continuing harmful condition).

[32] *See, e.g., DGB, LLC v. Hinds*, 55 So. 3d 218, 225 (Ala. 2010) ("It is well settled [under Alabama law] that a fraudulent concealment of a tort or injury by the defendant will toll the running of the statute of limitations until the tort or injury is discovered or could have been discovered by due diligence."); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 690 F. Supp. 2d 1296, 1306 (S.D. Fla. 2010) (elements of fraudulent concealment under Florida law); *Provost v. First Guar. Bank*, 2019 WL 3412432, at *2 (E.D. La. July 29, 2019) ("The doctrine of fraudulent concealment [under Louisiana law] provides that the limitations period is tolled until the plaintiff discovers, or with reasonable diligence should have discovered, the concealed fraud."); *Rich v. Hersl*, 2021 WL 2589731, at *16 (D. Md. June 24, 2021) (elements of fraudulent concealment under Maryland law); *Magliacane v. City of Gardner*, 138 N.E.3d 347, 357-58 (Mass. 2020) (under

(1) the plaintiff has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in its way as to the filing of his action.[33]  Additionally, each state permits tolling of the statute of limitations for public nuisance claims where, as here, "a wrong or a series of wrongs are considered continuing or ongoing."  *Nat'l Prescription Opiate*, 2024 WL 4912429, at *16.[34]  Finally, Plaintiffs allege the PBMs' tortious conduct—

---

Massachusetts's fraudulent concealment statute, Mass. G.L. c. 260 § 12, fraudulent concealment tolls the statute of limitations "unless the plaintiff has actual knowledge of the claim[,]" which is found only where plaintiff "had actual knowledge of the facts, or had the means to acquire such facts, in circumstances where the probability of wrongdoing was so evident that possession of the means was equivalent to actual knowledge"); *contra City of Bos.*, 765 F. Supp. 3d at 42-43 (rejecting city's fraudulent concealment argument to toll public nuisance statute of limitations where "reasonable diligence" purportedly would have uncovered PBMs' nuisance conduct); *Woodruff v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1989 WL 224581, at *7 (D. Neb. July 14, 1989) (Nebraska law requires "that [plaintiff] exercised due diligence to discover his cause of action before the statute of limitations expired and that the defendant committed some affirmative act of fraudulent concealment which prevented the plaintiff from discovering his cause of action"); *McCarthy v. Amazon.com, Inc.*, 2023 WL 5793316, at *3 (W.D. Wash. Sept. 7, 2023) (Washington law requires "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled").

[33] *See, e.g.*, *Weaver v. Firestone*, 155 So. 3d 952, 957 (Ala. 2013) (Alabama law); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1154 (11th Cir. 2005) (Florida law); *Provost*, 2019 WL 3412432, at *2 (Louisiana law); *Roman Cath. Archbishop of Wash. v. Doe*, 330 A.3d 1069, 1082 (Md. 2025) (recognizing "the 'main thrust' of a statute of limitations 'is to encourage the plaintiff to pursu[e] his rights diligently, and when an extraordinary circumstance prevents him from bringing a timely action, the restriction imposed by the statute of limitations does not further the statute's purpose'") (alteration in original) (quoting *CTS Corp. v. Waldburger*, 573 U.S. 1, 10 (2014)); *Neves v. Holder*, 613 F.3d 30, 36 (1st Cir. 2010) (Massachusetts law); *Etsy, Inc. v. Jaddou*, 2023 WL 3689555, at *10 (D. Neb. May 25, 2023) (Nebraska law); *Dunomes v. Winter*, 2019 WL 2396608, at *3 (W.D. Wash. Feb. 19, 2019) (Washington law).

[34] *See, e.g.*, *Ex parte McKesson Corp.*, 393 So. 3d 1180, 1201–04 (Ala. 2023) (public nuisance claim not time-barred where plaintiff alleged defendant opioid distributors "continue[d]

not merely the effects of past conduct—remains ongoing.  *See Rochester* Compl. ¶¶ 2, 8, 56-57, 194, 205, 232, 270, 274, 276, 394, 579, 753, 835 (allegations demonstrating PBMs' continuing tortious conduct).[35]  Because the continuing-tort doctrine applies to these public nuisance claims "in the same way" as the separate-accrual rule for RICO claims, the claims are all "subject to the same analysis."  *Nat'l Prescription Opiate*, 2024 WL 4912429, at *17.

---

to operate in ways that enable the diversion of prescriptive opioids," committed "a continuing tort," and "did not include any specific allegations stating or suggesting that any of the [defendants'] alleged misconduct had ended . . . before the filing of the complaint"); *Maddan v. Okaloosa Cty.*, 358 So. 3d 834, 838-39 (Fla. Dist. Ct. App. 2023) ("In a continuing tort action, . . . the statute of limitations runs from the last tortious act."); *Ellis v. Evonik Corp.*, 604 F. Supp. 3d 356, 369–70 (E.D. La. 2022) (where plaintiffs alleged defendant's harmful emissions were "ongoing and have not abated" and plaintiffs "[we]re suffering ongoing damages as a result," court determined "plaintiffs' claims against [defendant] involve continuing torts, and are therefore not prescribed"); *Litz v. Md. Dep't of Env't*, 76 A.3d 1076, 1089 (Md. 2013) ("[T]he 'continuing harm' or 'continuing violation' doctrine . . . tolls the statute of limitations in cases where there are continuing violations."); *Church v. Gen. Elec. Co.*, 138 F. Supp. 2d 169, 173-74 (D. Mass. 2001) (concept of continuing nuisance or trespass "allows a plaintiff whose claim otherwise would not be timely to sue where his or her property rights are invaded from time to time because of repeated or recurring wrongs"); *Alston v. Hormel Foods Corp.*, 730 N.W.2d 376, 381 (Neb. 2007) ("[W]hen an individual is subject to a continuing, cumulative pattern of tortious conduct, capable of being terminated and involving continuing or repeated injury, the statute of limitations does not run until the date of the last injury or cessation of the wrongful action," so long as ˝a tortious act . . . falls within the limitation period."); *Pac. Sound Res. v. Burlington N. Santa Fe Ry. Corp.*, 125 P.3d 981, 989 (Wash. Ct. App. 2005) ("When a tort is continuing, the statute of limitations runs from the date each successive cause of action accrues as manifested by actual and substantial damages."). Moreover, political subdivisions of Maryland "are exempt from statutes of limitations in actions 'aris[ing] out of a strictly governmental function.'" *Mayor & City Council of Baltimore v. Monsanto Co.*, 2020 WL 1529014, at *12 (D. Md. Mar. 31, 2020) (quoting *Goldberg. v. Howard Co. Welfare Bd.*, 272 A.2d 397, 400-01 (Md. 1971)).

[35] *See also id.* ¶¶ 33, 58, 60-88, 105, 585-90, 692-93, 724-25, 727, 753, 755, 762, 767, 770-73, 775, 783.

In light of the facts and law discussed above, Plaintiffs plausibly allege multiple bases that support the timeliness of their state-law claims.  It is unlikely these defenses can be resolved even on a motion for *summary judgment*,[36] but in no event do they provide a basis to deny leave to amend.

### 4. The PBMs' challenges to public nuisance claims by Plaintiffs located in five states do not establish futility.

The PBMs also contend Plaintiffs' public nuisance claims fail as a matter of law under the laws of Oklahoma, Ohio, Maine, West Virginia, and Alabama.  *See* Pt. I Br. § III.B.3 at 75-79.  As detailed below, the PBMs cannot establish that public nuisance claims under Maine, West Virginia, and Alabama law are precluded.[37] More fundamentally, the PBMs' limited challenge to claims by Plaintiffs in those states cannot defeat these motions.  As the *Rochester* Complaint makes clear, *all* Plaintiffs seek to assert claims under the federal RICO statute; and in many instances, Plaintiffs have also asserted state-law claims other than public nuisance.  Thus, even if the PBMs were successful in obtaining dismissal of Plaintiffs' nuisance claims—a highly doubtful proposition, at best, for Maine, West Virginia, or Alabama Plaintiffs—their amended pleadings would still survive and they could proceed to litigate other claims, including

---

[36] *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 4194296, at *13 (N.D. Ohio Sept. 4, 2019) (denying motions for summary judgment on statute-of-limitations grounds, reasoning, *inter alia*, "[m]aterial disputed facts that preclude summary judgment include the continuing nature of Defendants' alleged wrongdoing and whether further injury could have been avoided had Defendants ceased their conduct").

[37] As noted above at footnote 5, the Ohio and Oklahoma Plaintiffs acknowledge that existing caselaw does not support nuisance claims in those states.

RICO.  For this reason, their pleadings would not "fail to state a claim on which relief can be granted," Fed. R. Civ. P. 12(b)(6), and the proposed amendments are thus not futile.

In any event, the PBMs fail to demonstrate Plaintiffs cannot state cognizable nuisance claims under Maine, West Virginia, and Alabama law.

<u>Maine</u>.  The PBMs' reliance on the Maine Supreme Judicial Court's recent decision in *Eastern Maine Medical Center v. Walgreen Co.* is misplaced.  The court there specifically distinguished the claims of a *private* entity, such as the plaintiff there, from those brought by a public entity—and indeed affirmed the viability of a claim brought by a "government official or agency with jurisdiction to bring claims for harm caused to public property or resources" arising from the damages opioid sellers and distributors have caused.  331 A.3d 380, 391-93 (Me. 2025).

<u>West Virginia</u>.  West Virginia courts have repeatedly allowed government entities to bring public nuisance claims concerning opioids, with the West Virginia Supreme Court of Appeals declining petitions for writs regarding those rulings.  *See, e.g., State ex rel. Morrisey v. AmerisourceBergen Drug Corp.*, 2014 WL 12814021, at *8-9 & n.9 (W. Va. Cir. Ct. Dec. 12, 2014), *writ denied*, No. 15-1026 (W. Va. Jan. 5, 2016); *Brooke Cty. Comm'n v. Purdue Pharma L.P.*, 2018 WL 11242293, at *2 (W. Va. Cir. Ct. Dec. 28, 2018), *writ denied*, No. 19-0210 (W. Va. June 4, 2019); *In re Opioid Litig.*, 2022 WL 18028767, at *2 n.1, 5 (W. Va. M.L.P. July 1, 2022); *Order Denying Distrib. Defs.' Mot. to Dismiss Pls.' Compl.*, No. 19-

C-1900, at 3 (W. Va. M.L.P. Oct. 31, 2019),[38] *writ denied*, *State ex rel. AmerisourceBergen Drug Corp. v. Moats*, No. 19-1051 (W. Va. Jan. 30, 2020).

<u>Alabama</u>.  Finally, the PBMs' assertion that, under Alabama law, only the State or a city, but not a county, may bring a nuisance claim is based solely on unsupported *dicta* in *Lee County, Alabama Commission v. CreekWood Resources LLC*, 2022 WL 450810, at *3 (M.D. Ala. Feb. 14, 2022), and runs counter to well-established Alabama precedent that does not so limit public nuisance standing.  *See, e.g.*, *Suther v. Jefferson Cty. Bd. of Health*, 456 So. 2d 769, 770 (Ala. 1984); *Milton v. Haywood*, 393 So. 3d 1156, 1162 (Ala. 2023) (Parker, C.J., concurring); *see also* Ala. Code §§ 6-5-155.1, 6-5-155.2 (conferring authority on counties or municipalities to bring claims to abate drug-related nuisances).[39]

## II.  DEFENDANTS' PURPORTEDLY CASE-SPECIFIC CHALLENGES PROVIDE NO BASIS TO DENY LEAVE TO AMEND

### A.  The PBMs' Fact-Bound Arguments Regarding Their Market Share as Opioid Dispensers Are at Best Premature and Do Not Bear on Good Cause.

The PBMs assert they have low opioid prescription-claim or dispensing market share in certain Plaintiffs' jurisdictions, which they contend demonstrates a lack of good cause to amend.  *See* Pt. I Br. at 62-63.  This challenge is both misplaced and meritless.

---

[38]    Available at https://www.courtswv.gov/sites/default/pubfilesmnt/2023-07/OrderDenyingDistributorDefendantsMTD.pdf.

[39] The PBMs also contend 20 New York Plaintiffs (and the remaining non-New York Plaintiffs) lack statutory standing to bring claims under N.Y. Social Services Law § 145-B.  *See* Pt. I Br. at 87-88.  As the PBMs acknowledge, however, Rochester has dropped its claim under § 145-B.  *Id.* (citing Dkt. #5448 at 1 n.3).  Plaintiffs do not seek to add claims Rochester has dropped.  The PBMs' argument on this point is therefore moot.

Because the new information giving rise to Plaintiffs' proposed amendments regarding the PBMs does not relate to market share, whether PBM entities had little or no market share in a particular jurisdiction does not bear on good cause for these motions. Rather, market share relates to the merits question of whether a PBM may have contributed to a Plaintiff's injury. *See, e.g.*, Dkt. #3098 at 3-4 (denying summary judgment based on defendant's purportedly low distribution market share where "Plaintiffs ha[d] produced evidence upon which a jury could reasonably conclude DDM's distribution activities caused Plaintiffs' alleged injuries"). Accordingly, to the extent this merits argument relates at all to these motions, it could only speak to whether the proposed amendments are futile. *See Consumers Pet. Co. v. Texaco, Inc.*, 804 F.2d 907, 913 (6th Cir. 1986) ("In this case, the district court addressed the merits of the claims, so the basis for the denial of Consumers' motion shall be construed as 'futility of amendment.'").[40]

The PBMs' market-share assertions likewise do not demonstrate futility. "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000). Courts thus assess futility based on the allegations in a proposed pleading and treat them as true. *See, e.g.*, *Oper. Eng'rs Loc. 324 Health Care Plan v. Mid Mich. Crushing & Recycling, LLC*, 2012 WL 13018246, at *1 (E.D. Mich. Feb. 13, 2012) (taking "allegations as true, as the Court is required to do on a motion to dismiss/futility argument," and granting motion

---

[40] Market-share information, on the other hand, does bear on good cause for leave to amend against other proposed defendants because, with respect to those entities, Plaintiffs' proposed amendments—and the newly available information on which they rely—turn on ARCOS data. *See, e.g.*, Dkt. #6211.

to amend). Thus, as with Rule 12(b)(6) motions, the Court cannot examine "matter[s] outside the pleading" to determine futility without converting these motions into summary judgment proceedings and affording "'all parties . . . reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'" *Rose*, 203 F.3d at 420-21 (quoting Fed. R. Civ. P. 12(b)(6)).

The PBMs' market-share argument turns entirely on matters outside the pleadings. The PBMs state their purported market-share calculations come from experts who performed calculations based on nationwide opioid prescription-claim and dispensing data that the PBMs provided to them. Pt. I Br. at 62 (citing Dkt. #5894 (Gustafson Decl.), Dkt. #5895 (DeCarlo Decl.); *see also* Gustafson Decl. ¶¶ 6-8 (referencing "OptumRx Dispensing Data to Plaintiff Municipalities" provided to the expert by OptumRx); DeCarlo Decl. ¶¶ 7-9 (referencing Express Scripts "mail order pharmacy dispensing data" and "claims adjudication data" for each Plaintiff's geographic area). This is improper as a ground to deny leave to amend, as the Court recently recognized in granting bellwether plaintiff City of Ogdensburg leave to amend and rejecting the PBMs' arguments regarding low market share. *See* Dkt. #6026 at 2-3; *Rose*, 203 F.3d at 421 ("The test for futility . . . does not depend on whether the proposed amendment could potentially be dismissed on a motion for summary judgment[.]"). Moreover, discovery on these issues is especially important because the PBMs' market-share arguments rely

on (1) an improperly abridged liability period;[41] (2) an improperly truncated list of covered opioid drugs;[42] and (3) municipal boundaries for many Plaintiffs without consideration of pill migration across such boundaries.[43]  The PBMs' market-share challenges thus rest on faulty analysis—all the more reason they should be subject to scrutiny through discovery and cannot support denying leave to amend.

### B.    The PBMs' Challenge to Plaintiffs' Purported Lack of "Authorization" Fails.

The PBMs' attempt to manufacture a basis to deny leave to amend for lack of authorization is unavailing.  *See* Pt. I Br. § III.C at 88-99.  *First*, arguments relating to Plaintiffs' authority do not bear on Rule 16's good-cause standard.  *Second*, the PBMs

---

[41] *Compare* Gustavson Decl. ¶ 4 (Optum expert using data from 2010-2019 as the "relevant period") *and* DeCarlo Decl. ¶¶ 3, 7-8 (ESI expert using data from 2009-2019), *with* Dkt. #5408 (temporal scope for discovery in PBM bellwether cases is 1996-2019).

[42] *Compare* Gustavson Decl. ¶ 4 n.1 (calculations are based on dispensing data for eight opioid drugs) *and* DeCarlo Decl. ¶ 6 (same), *with* Dkt. #233 at 4 *and* Dkt. #668 at 2 (ordering DEA to produce ARCOS data for 14 listed opioid drugs).

[43] *Compare* Gustavson Decl. ¶8(a) *and* DeCarlo Decl. ¶ 5, *with* Dkt. #3753 (June 2, 2021 Hr'g Tr.) at 9:25-10:5 ("[Plaintiffs] are going to have to make a showing . . . as to what is their basis for proceeding against a pharmacy that has zero market share in that county. Now, if there is a large market share in a neighboring county and the stores are close, well, okay.  That would be a good reason.  So I will just let that – we will let that continue.").  It also bears noting in this respect that virtually all of the Plaintiffs the PBMs identify as having low or no market share are municipalities, which have the most compact territory.  The PBMs identify only about a dozen tribal or county Plaintiffs as having zero market share for *either* prescription claims *or* dispensing, and neither Express Scripts nor Optum identifies any tribal or county Plaintiff as having zero market share as to *both* prescription claims *and* dispensing.  *See* Gustavson Decl. ¶ 4 & Ex. A (Dkt. #5894-1) (calculating market share only for Optum's dispensing); DeCarlo Decl. ¶¶ 7-8 & Exs. A-B (Dkt. #5895-1, Dkt. #5895-2) (separate calculations of prescription-claim and dispensing market share, with no overlapping tribal or county Plaintiffs).  And the PBMs also do not even attempt to quantify the market impact of their opioid promotional activity.

cannot demonstrate the proposed amendments are futile, because (a) their authorization arguments raise highly fact-specific questions not appropriately resolved at the pleading stage; (b) the PBMs misrepresent or disregard facts undermining their arguments; and (c) even their inapposite caselaw instructs that where evidence shows a lack of authorization, the appropriate remedy would permit refiling the claim with the proper authority (or, in this case, correcting any defect in authority before the actual filing of the amended pleading).  And *third*, Plaintiffs have complied with the May 2024 Order.

### 1.  Rule 16 provides no basis to challenge leave to amend for any purported lack of authorization.

Straining to frame their baseless "authorization" challenge as a means to reject the proposed amendments, the PBMs contend certain Plaintiffs failed to properly authorize these claims and thus cannot demonstrate good cause under Rule 16.  But as the Court well knows, "'[t]he primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the [scheduling order's] requirements.'"  *NOCO*, 2022 WL 1803039, at *2 (quoting *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002)).  Nothing relating to Plaintiffs' authority to bring the proposed amendments in 2024 bears on whether they acted diligently in not asserting these claims by deadlines that expired in 2019, 2020, 2021, or 2022.

The cases the PBMs cite do not assist them.  In *Shane v. Bunzl Distribution USA*, the Sixth Circuit held the district court did not abuse its discretion in denying leave to amend where "[a]ll of the meetings and letters from which [plaintiff]'s [proposed] third amended complaint attempt[ed] to construct a contract for commissions from [defendant] in

71

perpetuity occurred between 1993 and 1995"—at least six years before the amendment deadline—"and [plaintiff], as the driving force attempting to broker some sort of agreement, assuredly had knowledge of all of these facts long before the pleading deadline." 275 F. App'x at 536-37. The district court thus "could treat the failure to raise these allegations either as carelessness, which is not compatible with a finding of diligence and offers no reason for a grant of relief, or as unwarranted delay." *Id.* As discussed in Section I.A. above, Plaintiffs did not know the facts pertinent to their proposed claims by the Amendment Deadlines. More to the present point, though, Plaintiffs' authority to bring suit has no bearing on their diligence in pursuing facts relating to these claims—which is what matters under Rule 16.

Further, in *Despres v. Moreno*, the court *granted* leave to amend, concluding the plaintiff had demonstrated good cause under Rule 16. 2016 WL 6877100, at *5 (N.D. Ohio Nov. 21, 2016). Noting it had previously said plaintiff "could not assert a claim regarding the sale of the dealership unless he had a good faith basis for believing that a sale occurred," the court determined good cause existed "because plaintiff could not have properly alleged a claim regarding the sale of any dealership before the deadline expired." *Id. Despres* thus affirmatively *supports* Plaintiffs' showing of good cause. And the PBMs do not explain how the "[i]ndifference" referenced in *O'Connell v. Hyatt Hotels*—where the plaintiffs had "stipulated that they would seek to amend the complaint to include allegations against the new defendants within thirty days of the [case's] transfer" yet "waited over a year after the transfer and five months after the scheduling

deadline to act," 357 F.3d 152, 155 (1st Cir. 2004)—is relevant here.  To the contrary, Plaintiffs have continuously reaffirmed their commitment to pursuing these claims.

The PBMs assert Plaintiffs have demonstrated indifference by failing to obtain the proper authorization to sue the PBMs, notwithstanding that "the PEC itself asked the Court to consider municipalities' need to hold open meetings when setting the initial deadline for the omnibus motions."  Pt. I Br. at 92.  As detailed in Section II.B.2 below, however, the PBMs offer no competent evidence that Plaintiffs have pursued these claims without proper authorization.  And in any event, a comment by the PEC's liaison counsel noting that "over the summer, a lot of cities and counties cancel board and council meetings," Dkt. #5471 at 8:23-9:2, does not suggest any Plaintiff lacked such authorization.

> **2.**   **The Court cannot determine the proposed amendments are futile based on fact-dependent questions regarding Plaintiffs' authorization to sue.**

As noted earlier, in evaluating whether the proposed amendments are futile, the Court must—as when addressing a Rule 12(b)(6) motion to dismiss—"[a]ssum[e] . . . that the facts pleaded are true," *Chaz Constr., LLC v. Codell*, 137 F. App'x 735, 739 (6th Cir. 2005), and cannot "properly consider[] . . . matter[s] outside the pleading."  *Rose*, 203 F.3d at 420.  Accordingly, "at this stage, the Court does not decide whether [P]laintiff[s'] allegations are supported by evidence"; rather, "[t]hat will be determined in the context of a motion for summary judgment."  *Montgomery v. Gove*, 2021 WL 4859345, at *2 (N.D. Ohio Oct. 19, 2021) (Polster, J.).  Further, "any doubt" regarding the allegations "must be

construed in favor of the [P]laintiffs." *Chaz Constr.*, 137 F. App'x at 740. The PBMs' futility argument runs headlong into all of these principles.

Specifically, the PBMs contend "any suit filed by counsel without proper authority from the client is a nullity and any resulting judgment may be void." Pt. I Br. at 92. The PBMs' use of "any" and "may" betrays the speculative nature of their authorization challenge, which cannot be resolved at the pleading stage. Moreover, their arguments regarding authorization rely entirely on "matters outside the pleadings," which the Court cannot consider without treating these motions "as one [by the PBMs] for summary judgment under Rule 56" and affording all parties "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).[44] The PBMs' argument is essentially "that [Plaintiffs'] proposed amendment is futile because the . . . [C]ourt would have eventually granted summary judgment in the [PBMs'] favor," but "[t]he test for futility . . . does not depend on whether the proposed amendment could potentially be dismissed on a motion for summary judgment," *Rose*, 203 F.3d at 421 — or, as the PBMs posit, a motion to void an eventual judgment.

The Joint Opposition itself, as well as the PBMs' accompanying declaration and exhibits, demonstrates why resolving these issues as a matter of law on these motions is inappropriate. Part I of the PBMs' opposition cites only one example of a Plaintiff they

---

[44] A court "may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss," but only where such materials "are referred to in the complaint and are central to the claims contained therein." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016). None of the records the PBMs cite with respect to their authorization arguments are referred to in Plaintiffs' complaints or are central to the claims contained in them.

claim actually did not authorize its counsel to add the PBMs: Lee County, Florida.  *See* Pt. I Br. at 98.  But at the time they filed their opposition, the PBMs did not have all the facts— a fuller record shows Lee County *did* authorize adding the PBMs, as explained below. This example provides yet another reason the Court should refrain from making broad pronouncements about Plaintiffs' authorization to sue based on the limited, and in some cases distorted, record the PBMs cite.[45]

On June 28, 2024, Lee County's counsel informed Lee County via email about the final opportunity to amend its pleadings in the opioids litigation.  Ex. 6 (Raggio Decl.) ¶ 2.  But this communication (redacted for privilege in Lee County's production to the PBMs, *see* Dkt. #6164-10, Ex. 1262) did not directly discuss the PBMs.  *Id.*  On July 2, 2024, Lee County responded that it declined to add additional defendants.  *Id.* ¶ 3.  Between July 2, 2024 and July 5, 2024, counsel updated Lee County with additional information regarding potential additional defendants not referenced in the June 28, 2024 correspondence, including the PBMs.  *Id.* ¶ 4.  On July 8, 2024, Lee County responded to its counsel, stating: "We *elect to amend the complaint* to add the additional defendants."  *Id.* ¶ 5; Ex. 6A (Lee County July 8, 2024 email).  In response to the PBMs' public-records request, Lee County initially produced the July 2 email in which the County had previously declined to add defendants, but inadvertently did not produce the July 8 email

---

[45] The PBMs state multiple "plaintiffs" denied their counsel authorization to join these motions, yet cite only Lee County, Florida.  Pt. I Br. at 98.  In the PBMs' voluminous Part II briefing, Plaintiffs have not identified any Plaintiff other than Lee County, Florida that the PBMs assert explicitly denied such authorization.

in which it subsequently authorized the addition of defendants, including the PBMs.[46] Ex. 6 (Raggio Decl.) ¶ 7.  The PBMs' assertion that Lee County did not authorize its counsel to add the PBMs is thus demonstrably incorrect.  Most importantly, the factual nuances of Lee County's authorization demonstrate the inappropriateness of resolving authorization questions at this stage—especially based on limited, contested, and developing factual evidence outside of the pleadings.

The PBMs' objections to Plaintiffs whose authorizations were purportedly defective also suffer from factually incomplete records.  For example, in asserting Plaintiff Anderson County, Kentucky failed to properly authorize the proposed amendments, the PBMs wave away the County Attorney's statement that "[t]he County's consent to file a motion for leave to amend the complaint in the opioid litigation is not an 'action taken' under KRS 61.805(3)," as filing such a motion "is a routine procedural step in ongoing litigation, not a final decision requiring public deliberation or a vote by the Fiscal Court." Dkt. #6164-1 at 1.  The PBMs merely note the County Attorney did not include "any legal citation" with his statement.  Dkt. #6172 at 159-60.  Putting aside the PBMs' own lack of citation for their contrary interpretation, as well as the unlikelihood that separate, formal authorization is required for every motion filed in an ongoing authorized litigation, a full factual record would establish which litigation decisions, in the ordinary course, are decided by a County Attorney in Kentucky and which require formal authorization.  The limited response to an open-records request is not sufficient for this Court to determine

---

[46] Lee County, Florida produced the July 8 email to the PBMs on August 25, 2025. *See* Ex. 6 (Raggio Decl.) ¶ 8.

how the law in Kentucky has been applied in practice, nor what the parties understood or intended the existing retainer agreement with counsel to include.  *See Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105-06 (Ky. 2003) (discussing issues relevant to contractual interpretation).  And, of course, all the evidence regarding the County's actions and its attorney's statements are outside the pleadings.

The PBMs also refer to the 2017 resolution passed by the Board of Supervisors for Plaintiff Marathon County, Wisconsin, authorizing the County Administrator to execute an engagement agreement with outside counsel to represent the County in opioid litigation.  The PBMs contend the agreement "defines the 'scope of services' to include only 'filing a claim against [certain] Opioid Manufacturers' specifically identified in the letter," and the PBMs "were not named in the letter."  Pt. I Br. at 94 (alteration in original).  They add "[t]he same facts apply to more than 40 Wisconsin Moving Plaintiffs represented by the same outside counsel and that passed nearly identical resolutions."  *Id.*  But the PBMs ignore that the engagement agreement expressly states: "Depending upon the results of initial investigations of the facts and circumstances surrounding the potential claim(s), *there may be additional parties sought to be made responsible*."  Dkt. #6164-4 at 1.  This language raises a factual question regarding the scope of what was actually authorized and permitted under the existing contract, which cannot be resolved on the pleadings.  *See, e.g.*, *Kernz v. J.L. French Corp.*, 667 N.W.2d 751, 759-60 (Wis. Ct. App. 2003) (interpretation of contract may require factual investigation of parties' subjective intent).

Similar factual questions arise from the PBMs' suggestion that a Plaintiff's production of "retainer agreements executed at the outset of the MDL" in response to

open-records requests indicates the Plaintiff did not properly authorize the presently proposed amendments.  Pt. I Br. at 93.  It is entirely possible—indeed, likely—those Plaintiffs (similar to Marathon County) understood the initial engagement agreements to encompass bringing claims against additional defendants at a later time.  While the PBMs simply assume that was either not true or improper, their baseless speculation cannot prevail at this (or any) stage.

In short, the limited record to date gives rise to numerous questions that would entail gathering additional facts, potentially including witness testimony, and evaluating those facts under the relevant states' laws.[47]  These questions cannot be answered definitively at this point.  The PBMs nonetheless ask this Court to hold, as a matter of law and without discovery or other further proceedings, that the state open-records statutes they cite "apply to the decision to amend a complaint to add new defendants," based solely on federal caselaw instructing "'that an amendment which adds a new party creates a new cause of action.'"  Pt. I Br. at 90 (quoting *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010)).  But the PBMs baselessly assume both that federal

---

[47] There are also multiple legal issues that would involve fact-based assessments on a complete record.  These include: (1) Were the subject Plaintiffs legally required to hold an open, or any, meeting to authorize seeking leave to amend in a case they already had authorized counsel to bring?; (2) If any Plaintiff did not initially authorize the filing of these motions on its behalf in accordance with relevant state law, could the Plaintiff subsequently rectify the lack of authorization or ratify any legally deficient authorization it may have given?; (3) In the event any Plaintiff failed to authorize claims against the PBMs and could not, or did not, later rectify the deficiency, would any judgment in its case be void or merely voidable?; and (4) If the Court ultimately determines sufficient evidence of a lack of authorization exists for any Plaintiff, can the Plaintiff remedy the deficiency either before actually filing the amended complaint or at some point after it is filed?

law addressing what constitutes "a new cause of action" governs the interpretation of state open-records statutes and that simply asserting a new *cause of action*, as opposed to commencing an entirely new litigation, requires specific authorization. *See In re Cibella*, 560 B.R. 494, 497 (Bankr. N.D. Ohio 2016) ("A cause of action is '[a] group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person[.]'") (alterations in original) (quoting BLACK'S LAW DICTIONARY 266 (10th ed. 2014)). Such a far-reaching determination would be plainly inappropriate on such a limited record.

The cases the PBMs cite expressly undermine their attempt to have the Court resolve these issues now. In *Pueblo of Santa Rosa v. Fall*, the defendant submitted an answer "denying the allegations of the bill and alleging, among other things, that the so-called pueblo had never authorized the suit or ratified or approved the acts of the attorneys in bringing or prosecuting it," and thus filed a motion to dismiss along with supporting affidavits. 273 U.S. 315, 316 (1927). But "[a]fter a hearing upon the motion, the trial court postponed a decision until final hearing; and the taking of testimony was proceeded with." *Id.* After the trial court dismissed the case, concluding the plaintiff "had never authorized the bringing or maintenance of the suit," the court of appeals "disapproved" the district court's holding on authorization, "on the ground that a challenge to the right of counsel to appear is a preliminary matter, to be disposed of before proceeding to the merits" (though the court of appeals affirmed on the merits). *Id.* at 318-19. The Supreme Court determined that ruling was error. Noting the question of counsel's authority was raised by a motion to dismiss filed with defendant's answer, the

Court observed "[t]here was a hearing on the motion, but the trial court of its own accord postponed a decision upon it until final hearing on the merits," which was "clearly within its discretion." *Id.* at 319.

Similarly, in *Desert Mountain Energy Corp. v. City of Flagstaff*, which the PBMs highlight, Desert Mountain moved for summary judgment, arguing the city's claims were "null and void" because it "violated the open-meeting law and did not timely ratify its vote." 566 P.3d 333, 336 (Ariz. Ct. App. 2025). The trial court denied summary judgment, "concluding there were material fact issues about ratification." *Id.* Desert Mountain "then deposed the City Council members who voted to authorize th[e] litigation and the former City Attorney who advised the City Council on open-meeting law compliance." *Id.* At that point, Desert Mountain again moved for summary judgment, which the trial court again denied. *Id.* While the Arizona Court of Appeals reversed the denial of summary judgment, the significant point for present purposes is that it did so on a full record. *See also Doraleh Container Terminal SA v. Rep. of Djibouti*, 109 F.4th 608, 617 (D.C. Cir. 2024) (explaining that "[g]iven the limited briefing on the complicated issues involved," the court of appeals would "remand for the district court to determine Quinn Emanuel's authority in the first instance"); *Meredith v. The Ionian Trader*, 279 F.2d 471, 472 (2d Cir. 1960) (recounting that "*[a]fter a trial* [t]he court ruled . . . that the original libel filed in the name of the Government of Pakistan was a nullity because the insurance policy did not give the underwriters authority to bring suit in the name of the insured").

Thus, even the PBMs' marquee cases make clear that a court need not resolve questions regarding a party's authorization to sue at the pleading stage. Rather, this

Court has wide discretion to postpone considering these questions until the record is fully developed.  It should reject the PBMs' attempt to foreclose Plaintiffs' claims based solely on the limited, one-sided, and misleading record the PBMs have manufactured—all of which is outside the pleadings.[48]

---

[48] *Doraleh* is also factually inapposite.  That case involved "a long-running dispute between the Republic of Djibouti and Doraleh Container Terminal" in which Doraleh obtained a substantial arbitral award against Djibouti, after which Djibouti "nationalized a majority interest in Doraleh, and a Djiboutian court appointed a provisional administrator to manage the company."  109 F.4th at 611.  When a law firm (Quinn Emanuel) "[p]urporting to represent Doraleh" sought to enforce the award in district court, "the administrator said she did not authorize the filing, and Djibouti asked the district court to dismiss the case."  *Id.*  The district court entered judgment for Doraleh, reasoning that the law firm's authority was "irrelevant," or in the alternative, that Djibouti had forfeited the argument.  *Id.*  The court of appeals vacated the district court's judgment and remanded for the district court to determine the law firm's authority to represent Doraleh.  *Id.*  Thus, in *Doraleh*, unlike here, *the party's own representative* challenged its counsel's authority.

Additionally, in *Meredith*, the appellant—an assignee of underwriters that had insured cargo belonging to the Government of Pakistan, which was damaged while on a ship (the Ionian Trader)—asserted "that at the time suit was filed in the name of the Government of Pakistan, the underwriters had a sufficient interest in the Government's claim against the Ionian Trader as potential subrogees of that claim to have given them the right to sue the Ionian Trader on their own behalf," notwithstanding that the underwriters had not yet made payment to the government under the applicable insurance policy.  279 F.2d at 474.  While the district court allowed the underwriters' assignee to substitute himself as the claimant in place of the government, the court dismissed the suit on statute-of-limitations grounds, reasoning "that the original [claim] filed in the name of the Government of Pakistan was a nullity because the insurance policy did not give the underwriters authority to bring suit in the name of the [government]" and "the underwriters had no interest in the [government]'s claim . . . prior to their payment to the [government]."  279 F.2d at 472-73.  The Second Circuit affirmed.  Unlike in *Meredith*, there is no dispute here that Plaintiffs' counsel are authorized to act on behalf of Plaintiffs; rather, the PBMs merely challenge the scope of that authorization—which, as detailed above, would entail a fact-specific inquiry on a complete record.

Finally, even if the Court were to conclude any Plaintiff lacked authority to sue the PBMs, a dismissal "should . . . be[], not upon the merits, but without prejudice to a suit, if properly brought." *Pueblo of Santa Rosa*, 273 U.S. at 321 (holding the rulings of both the district court and the court of appeals were "erroneous," and remanding the case to the district court "with directions to dismiss the bill, on the ground that the suit was brought by counsel without authority, but without prejudice to the bringing of any other suit hereafter, by and with the authority of the alleged pueblo of Santa Rosa").  Any such deficiency thus cannot, by definition, render Plaintiffs' proposed amendments futile.  *See Bush Truck Leasing, Inc. v. Cummins, Inc.*, 2021 WL 9057624, at *1 (S.D. Ohio Apr. 13, 2021) ("[L]eave to amend should not be denied on Rule 15 futility grounds 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'") (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)); *cf. Bear v. United States*, 2023 WL 1097268, at *2 (N.D. Ohio Jan. 30, 2023) (affirming magistrate judge's report and recommendation "that the court grant summary judgment in favor of [the United States] and dismiss [plaintiff]'s Petition without prejudice so that he may exhaust his administrative remedies").

### 3. None of the Plaintiffs violated the Court's directive that they be prepared "to litigate the case against each defendant" should they be chosen as a bellwether.

Failing to demonstrate any violation of state law with respect to Plaintiffs' authority to bring the proposed claims, the PBMs attempt to manufacture a violation of the May 2024 Order.  They contend that because some Plaintiffs stated they have no documents responsive to the PBMs' open-records requests, or "produced only years-old

82

retainer agreements executed at the outset of the MDL," those Plaintiffs necessarily violated state laws regarding authorization and thus ran afoul of the Court's directive that "both counsel and plaintiff-client are prepared to spend the time and money necessary to litigate the case against each defendant" if its case is later selected as a bellwether.  Pt. I Br. at 88, 93.  As discussed above, however, nothing in the record indicates any Plaintiff failed to comply with state law in bringing these motions, and at the very least there are questions of fact and law that cannot be resolved now.

Further, the fact that a Plaintiff has (or has produced) "*no documentation whatsoever regarding a suit against the PBMs,*" *id.* at 93 (emphasis in original), is neither concerning nor indicative of any lack of authorization.  Once again, the PBMs simply assume that a Plaintiff's authority to sue them turns on whether it passed a resolution or otherwise engaged in formal action expressly referring to these claims, or that a Plaintiff's productions or lack thereof in response to the PBMs' ethically questionable requests provide a complete record of all relevant facts.  The PBMs thus ask the Court to accept, based on matters outside the pleadings, their version of disputed facts and state law and to make all inferences in their favor.  The Federal Rules and governing caselaw expressly forbid this; to the contrary, the Court must "construe[] the complaint[s] in the light most favorable to the *plaintiff[s].*"  *Wesley*, 2025 WL 2322770, at *6.

The PBMs also assert that because certain Plaintiffs recently posted "draft resolutions concerning the PBMs to be considered and voted on at public meetings," or held meetings to vote on claims against the PBMs, those Plaintiffs "unequivocally failed

to demonstrate compliance with the Court's [May 2024] Order" as well as state law.  Pt. I Br. at 94-95.  The PBMs are wrong again.

Most striking, the PBMs blatantly misrepresent the draft resolutions issued by Plaintiff Marathon County and other Wisconsin-based Plaintiffs, which the PBMs characterize as "trying to retroactively correct their error . . . by belatedly authorizing litigation against the PBMs" (*id.* at 94).  But the text of the draft resolution states "the County believes the engagement agreement with the Law Firms provided the Law Firms with adequate authority to add additional parties to be held responsible."[49]  It explains that certain parties to be added to Marathon's case, including the PBMs, "questioned that authority" and thus, "*for the avoidance of doubt,*" the Board "*confirms and ratifies* the authority" of outside counsel to add parties, including the PBMs.[50]  Thus, contrary to the PBMs' assertion, this and similar draft resolutions plainly do not reflect an acknowledgement of error in authorizing these Plaintiffs to sue the PBMs.

Moreover, even if a Plaintiff were trying to correct a previous error, doing so would not contravene the May 2024 Order.[51]  The failure of any Plaintiff (assuming *arguendo* there was any failure) to validly authorize bringing suit against the PBMs before these motions were filed in July 2024 would not automatically mean the Plaintiff was not

---

[49] *See* https://www.marathoncounty.gov/home/showpublisheddocument/15349/638826434 936870000.

[50] *Id.*

[51] For the same reasons, the PBMs' argument that any such "curing" demonstrates a lack of diligence under Rule 16 also lacks merit.

84

"prepared to spend the time and money necessary to litigate the case against each defendant" (Dkt. #5455 at 2).  To the contrary, Plaintiffs have consistently demonstrated their commitment to pursuing these claims, even in the face of the PBMs' repeated, and in some cases ongoing, harassment under the guise of an open-records "investigation" (Pt. I Br. at 97).  This is all the more true because of the repeated opportunities Plaintiffs have been given to withdraw from the motions, including following the Court's directive earlier this year that the PEC coordinate with outside counsel to determine whether any Plaintiff wished to withdraw.  *See, e.g.*, Dkt. #6038 (Mar. 12, 2025 Hr'g Tr.) at 90:24-91:3.

Finally, in light of other prior movants' voluntary withdrawal from the motions in response to the Court's order, the PBMs claim "the result of [their] investigation to date speaks for itself."  Pt. I Br. at 98.  We agree, but like most witch hunts, the results say more about the proponents than their targets.  It is no surprise that a relentless campaign of harassment—which in some, or perhaps many, instances violated legal ethics requirements[52]—dissuaded some movants from proceeding.  But it attests just as forcefully to the continued resolve of the remaining 808 Plaintiffs who seek to hold the PBMs accountable for their misconduct in helping to create and perpetuate one of the most serious public health crises in this country's history.

---

[52] *See, e.g.*, Dkt. #5989 (PEC's Opp. to PBMs' Mots. to Strike) at 8 & 19 n.12.

## C. The PBMs' Relationships with Certain Plaintiffs Do Not Preclude These Amendments.

### 1. The PBMs' standard contracts did not alert Plaintiffs to nuisance or RICO claims.

The PBMs also assert that some Plaintiffs who contracted with the PBMs were not diligent because they should have known about their claims as soon as they read the contracts. Pt. I Br. at 63-64.[53] The PBMs' argument assumes their contracts' "explanation of the use of formularies, utilization management tools, and the application of rebates from manufacturers," *id.*, was sufficient to advise Plaintiffs that the PBMs would abuse their positions by knowingly facilitating a nationwide opioid epidemic for profit, including by participating in a racketeering enterprise, which caused a public nuisance in Plaintiffs' jurisdictions.

The contracts' standard terms do not reveal the existence of public nuisance or RICO claims. (If they did, it would suggest fundamental problems with the PBMs' business model.) The *Rochester* Complaint allegations the PBMs cite as examples of facts Plaintiffs should have learned from their contracts make this clear. The contractual terms would not enable Plaintiffs to allege that the PBMs knew from their "own extensive" "real-time data" (which the PBMs did not make available to Plaintiffs) that opioids' "preferred formulary status in standard offerings" was "unwarranted" because "addiction, abuse, and illegitimate prescribing of such drugs were rampant," and that

---

[53] The PBMs raise this argument specifically against only 68 Plaintiffs that ESI identifies as its clients. *See* Dkt. #5896-1. Optum contends the same arguments apply to its clients, but fails to identify them. *See* Pt. I Br. at 63 n.34. If Optum had raised this argument as to any Plaintiffs, it would fail for the same reasons explained here.

utilization management measures "would have drastically reduced the inappropriate prescribing and dispensing of Opioids." *Rochester* Compl. ¶ 733 (cited in Pt. I Br. at 64).

The plaintiff in *Korn v. Paul Revere Life Insurance Co.*, which the PBMs cite, sought to add a claim that the defendant breached a settlement agreement with state regulators, and the plaintiff's knowledge of the agreement informed him of that claim.  382 F. App'x 443, 449-50 (6th Cir. 2010).  Specifically, the agreement on which his proposed claim was based "ha[d] been publicly available since its implementation in January of 2005," and plaintiff "was clearly aware of [the contract] when he asked [defendant's employee] about it in her deposition" more than three years later.  *Id.* at 450.  Yet plaintiff "did not move to add his claim for breach of the [agreement] until . . . after the close of discovery and . . . after the deadline for filing pre-trial motions requiring extensive briefing."  *Id.* He also "d[id] not explain his delay in moving to amend."  *Id.*

Plaintiffs here do not seek to add a breach of contract claim, and unlike in *Korn*, the existence of their contracts is not the basis of the claims they propose to add.  Further, unlike the plaintiff there, these Plaintiffs explain the reason for not meeting the Amendment Deadlines (and they have not sought leave after the discovery or dispositive-motion deadline, which have not yet been set in these cases).  The PBMs cite no case where a standard contract provided one contracting party with knowledge that the other would abuse the contract to create a nuisance or commit racketeering (let alone that the other party would abuse *many* such contracts to fuel a nationwide epidemic).  The PBM contracts provide no basis to find any Plaintiff lacked diligence in seeking to amend.

### 2. Dispute-resolution provisions with ESI do not bar the proposed amendments of the two Plaintiffs at issue.

The PBMs contend Plaintiff City of Portland, Oregon's and Plaintiff Winnebago County, Illinois's contracts with ESI (or its predecessor MedCo) contain provisions that bar them from suing ESI. *See* Pt. II Br. at 923-24, 1200-02; Dkt. #5897 Ex. C (Portland, Oregon contract); Dkt. #5897, Ex. E (Winnebago County, Illinois contract). As an initial matter, the PBMs do not assert these agreements affect these Plaintiffs' motions to add Optum. But the PBMs are wrong as to ESI in any event.

Because the contracts are not referenced in these Plaintiffs' existing complaints or in the proposed allegations against the PBMs, and are not publicly available, the Court cannot consider them on these motions. *See, e.g.*, *Peck v. Munson Healthcare*, 2022 WL 17260807, at *4 (W.D. Mich. Nov. 9, 2022) (declining to consider contract where plaintiff "did not attach [it] to his complaint, meaning that the contract [wa]s outside the pleadings"); *cf. Gaston v. Cuyahoga Community Coll. Chapter*, 2024 WL 3292562, at *3 n.1 (N.D. Ohio July 2, 2024) (court could take judicial notice of collective bargaining agreement that was outside of the pleadings "because it [wa]s publicly available on the State Employment Relations Board's website"). Doing so would be especially problematic because the PBMs "did not provide the entire contract[s]," but rather merely excerpts. *Peck*, 2022 WL 17260807, at *5.

Even if considered, these contracts do not foreclose these Plaintiffs' claims, for several reasons. *First*, the dispute-resolution provisions, by their terms, relate only to disputes "arising from" or "relating to" the agreements. *See* Dkt. #5897, Ex. C § 7.10

(Portland contract's dispute-resolution provision applied only to disputes "arising from or relating to the performance or interpretation of this Agreement"); Dkt. #5897, Ex. E § 14.22 (Winnebago contract's dispute-resolution provision applied only to disputes "relating to this Agreement").  These governmental Plaintiffs' lawsuits invoke their police powers on behalf of the public to remedy the local impacts of a nationwide public nuisance the PBMs helped to create and perpetuate, which also entailed RICO violations and other malfeasance.  Plaintiffs' claims do not arise from their particular contracts with ESI, nor are they limited to the consequences of ESI's work under their contracts.  The dispute-resolution clauses therefore do not apply to these claims.  At the very least, determining whether Plaintiffs' claims arise from or relate to their agreements with the PBMs is a fact-dependent question not susceptible of resolution at the pleading stage.[54]

*Second*, Winnebago County's dispute-resolution provision states that if a dispute arises (related to the agreement, which this dispute is not), each party "*may* demand a meeting regarding the dispute," and 30 days later each party "will retain all rights" to sue.  Dkt. #5897, Ex. E § 14.22.  The words "may" and "retain" indicate this provision provides the parties with the *option* to demand an attempted resolution by "executive negotiations," *id.*, but does not obligate or limit the parties to that approach.

---

[54] The PBMs contend Portland's agreement also includes a forum-selection clause requiring that its case be commenced in the federal district of Oregon (or state court).  Pt. II Br. at 1201-02.  That clause applies only to litigation "arising under this Contract or out of work performed under this Contract," Dkt. #5897, Ex. C at 8, which (as explained above) these claims do not.  Regardless, Portland *did* file its case in the District of Oregon, and its case would be remanded there after these pretrial proceedings.  *See City of Portland, Oregon v. Amerisourcebergen Drug Corp.*, No. 1:18-op-45633, Dkt. #7 (N.D. Ohio May 31, 2018) (JPML order transferring case from District of Oregon to MDL).

*Third*, the PBMs provide no proof that the Winnebago County contract they rely on, which was executed in 2011, remains in effect today.  The agreement's survival clause does not include the dispute-resolution provision among those that would survive the contract's termination.  *See* Dkt. #5897, Ex. E § 14.26.  Without proof that this or any other dispute-resolution provision remains in effect, the PBMs' attempt to enforce such a provision fails.  *See GGNSC Louisville Hillcreek, LLC v. Estate of Bramer by & through Bramer*, 932 F.3d 480, 484 (6th Cir. 2019) (party seeking arbitration bears initial burden to prove operative agreement exists, even if there were prior agreements).

Finally, each contract's dispute-resolution provision explicitly *excludes* claims involving injunctive relief.  *See* Dkt. #5897, Ex. C § 7.10(a) (Portland contract states "either party may pursue immediate injunctive relief via a court of competent jurisdiction" "[n]otwithstanding" the dispute-resolution provision); Dkt. #5897, Ex. E § 14.22 (Winnebago contract's dispute-resolution section does not apply to "matters subject to emergent or injunctive relief").  Because Plaintiffs seek to bring injunctive relief claims against the PBMs, these claims are indisputably excluded from their contracts' dispute-resolution provisions.  *See Rochester* Compl. ¶¶ 783, 817, § XIV (seeking injunctive relief).

### D.  Purported Deficiencies with Certain Plaintiffs' Fact Sheets Do Not Warrant Denying Leave to Amend.

In yet another attempt to create Rule 16 prerequisites that do not appear in the Rule or caselaw applying it, the PBMs ask the Court to deny leave to Plaintiffs (a) that did not provide a Plaintiff Fact Sheet ("PFS") or (b) whose PFS was, in the PBMs' view,

"incomplete." Pt. I Br. at 67. As an initial matter, regarding the "16 Moving Plaintiffs"[55] that the PBMs assert never provided a PFS, *id.*, 10 *did* submit PFSs,[56] and four have withdrawn from these motions.[57] The remaining two (Akron, Ohio and Cleveland, Ohio) are CT1 bellwether plaintiffs that provided discovery and were accordingly excused from

---

[55] The PBMs double-count two Plaintiffs—St. Clair County, Illinois and Board of Education of Bangor, Maine—each of which has two cases listed as joining the original motions. *See* Pt. II Br. at 242, 2002 (St. Clair); *id.* at 2672, 3143-44 (Bangor). As explained in Section II.E.3 below, duplicate case listings have been corrected in Exhibit 4 to this Reply.

[56] The following challenged Plaintiffs in fact did provide PFSs: (i) Mansfield, Ohio (1:18-op-45380); (ii) Sarasota, Florida (seeking amendment in 1:18-op-45513, submitted PFS in 1:22-op-45021); (iii) Norwalk, Ohio (1:18-op-46351); (iv) Rockland County, New York (seeking amendment in 1:18-op-45662, submitted PFS in 1:19-op-05588); (v) Irvine, California (1:18-op-45734); (vi) The Board of Education of the City of Chicago, School District No. 299, Illinois (seeking amendment in 1:18-op-46042, submitted PFS in 1:20-op-45281); (vii) Miami-Dade County Public School District, Florida (1:19-op-45193, corrected case number, *see infra* Section II.E.3); (viii) Coos County, New Hampshire (seeking amendment in 1:18-op-46136, submitted PFS in 1:19-cv-01095); (ix) Carroll County, New Hampshire (seeking amendment in 1:18-op-46137, submitted PFS in 1:19-cv-01097); and (x) Board of Education of Bangor School Department, Maine (1:18-op-45281). Certain of these Plaintiffs filed multiple cases in this MDL against different defendants (not the PBMs) and provided their PFSs under a different case number than the case to which they seek to add the PBMs. Regardless, their PFSs are available to all defendants in the repository (at the time the PBMs filed their opposition, some PFSs were provided to defendants but missing from the repository, but all are now in the repository).

[57] Plaintiffs St. Clair County, Illinois (1:17-op-45048 and 1:19-op-45055) and Port Washington North, New York (1:19-op-46051) have withdrawn from these motions. *See* Ex. 3. The PBMs also assert Plaintiff Board of Education of Bangor School Department, Maine did not provide a PFS in 1:19-op-46042. As explained below, this Plaintiff is not a party to 1:19-op-46042, and has withdrawn that erroneous duplicate case number from the list of cases joining these motions. *See infra* Section II.E.3. Contrary to the PBMs' assertion, this Plaintiff did provide a PFS in its correct case number, 1:20-op-42581, and continues to join these motions through that case. *See* Exs. 1, 2.

the PFS requirement.[58]  The PBMs' argument as to Akron and Cleveland therefore fails, and their challenge as to the other 12 identified Plaintiffs is moot.

The PBMs' arguments regarding Plaintiffs that provided a purportedly "incomplete" PFS likewise fail, for several reasons.

*First*, as the PBMs have not yet been added as parties to these cases, they have no basis to attempt to enforce the PFS requirements that apply to *existing* parties.  The Court's numerous orders regarding PFSs make this clear.  In its initial Fact Sheet Implementation Order, for example, the Court directed that "[f]or all non-Track One trial cases, Plaintiffs that are Governmental Entities shall provide a completed [PFS] in each case," and "Defendants[] not named in a Track One trial case shall provide a completed Defendant Fact Sheet ('DFS')."  Dkt. #638 at 1.  The Order further provides that "[i]f a *Defendant* or *Plaintiff* disputes the sufficiency of any response(s) in a PFS/DFS, Counsel shall notify Opposing Counsel of record of the purported deficiencies in writing via email and allow such Party an additional 21 days to correct the alleged deficiency," and that "[i]f a party does not" timely respond, "the *party* or *parties* who sent the deficiency letter may move for an order to Show Cause why the Court should not take appropriate action, up to and including dismissal of claims or striking of defenses."  *Id.* at 1-2.  By its very terms, then, the Order affords only the parties to a particular case the right to raise issues regarding any deficiencies in a PFS (or a DFS) in that case.

---

[58] *See* Dkt. #232 (CMO-1) at 6 (designating County of Summit, Ohio case, in which City of Akron is a plaintiff, and City of Cleveland case as Track 1 bellwether cases); Dkt. #638 (Fact Sheet Implementation Order) at 1 ("For all *non-Track One trial cases*, Plaintiffs that are Governmental Entities shall provide a completed Plaintiff Fact Sheet[.]").

At that time, none of the non-Track One trial cases—which encompass all of these Plaintiffs—included the PBMs as defendants.  And in the more than seven years since, PBM entities appear as defendants in only a relatively small number of cases in this MDL. That Plaintiffs now seek to add the PBMs to their cases does not (yet) render them parties; the PBMs thus have no standing to attempt to enforce Court orders directed only to existing parties.  *Cf. Nat'l Prescription Opiate*, 2024 WL 4910299, at *1 ("The Court notes that the plaintiffs from whom the PBMs seek depositions and fact sheets in their second and third requests have not yet been granted leave to amend, and thus presently have no case pending against the PBMs.").  The PBMs' September 16, 2024 letter "notif[ying]" Plaintiffs of "fact sheet deficiencies" (Pt. I Br. at 67; *see also* Dkt. #5885-3) was thus a nullity, and Plaintiffs had no obligation to respond to it.  If and when the Court permits Plaintiffs to add the PBMs as defendants, the PBMs can raise any issues regarding "deficiencies" in the PFSs through the procedure set forth in the Fact Sheet Implementation Order, and Plaintiffs will respond accordingly.

The PBMs' elliptical references to the Court's April 6, 2023 Order on PFSs ("April 2023 Order") and its May 2024 Order regarding these motions likewise do not support their argument.  In its April 2023 Order, the Court directed that "all government subdivision plaintiffs *who have not submitted a PFS into the PFS Repository* must do so within 45 days of the date of this order, or have their cases **dismissed with prejudice**." Dkt. #4985 at 6 (second emphasis in original); *see also id.* at 5 (reasoning the "Non-Litigating Defendants" (or "NLDs"), which do not include the PBMs, "undoubtedly have been, or will be, prejudiced by . . . plaintiffs' continuing *failure to submit a PFS* to the

Repository"); Dkt. #s 4380, 4670 (identifying the "Non-Litigating Defendants").  The PBMs attempt to extend this "harsh sanction," Dkt. #4985 at 3, to any Plaintiff that has failed to provide (in their view) a *complete* PFS or "failed to supplement outdated information" in its PFS (Pt. I Br. at 67).  But that is plainly not what the April 2023 Order says.  And nothing about an unresolved *discovery* dispute suggests these Plaintiffs "do[] not intend to zealously pursue" the PBMs "in litigation," Pt. I Br. at 67 (quoting Dkt. #5455 at 2).[59]

Given these considerations, and the fact that (as discussed above) in September 2024 the PBMs had no standing as non-parties to object to any PFS "deficiencies" and demand that Plaintiffs respond within 21 days under the Fact Sheet Implementation Order, Plaintiffs have not "refus[ed] to comply with the Court's orders" (Pt. I Br. at 67).  *See Cranberry Promenade, Inc. v. Cranberry Twp.*, 2011 WL 13364662, at *1 (W.D. Pa. Aug. 29, 2011) ("Before addressing whether sanctions . . . are warranted, the Court must look to the Order which was allegedly violated and determine if there was an actual violation of same.").

*Second*, contrary to the PBMs' assertion, they are not "prejudiced" by purported deficiencies in Plaintiffs' PFSs, and any such deficiencies do not demonstrate "lack[ of]

---

[59] Moreover, in its April 2023 Order the Court explained it was concerned about the failure to submit a PFS because the NLDs had "expressed an interest in settling their opioid cases," and "[n]ot having PFSs for all the plaintiffs naming them as defendants ha[d] hampered the NLDs' ability to evaluate the cases filed against them" and "ha[d] hindered the Court's ability to effectuate meaningful settlement discussions."  Dkt. #4985 at 5.  By contrast, these Plaintiffs have not yet filed cases against the PBMs and there are no meaningful settlement discussions for the Court to effectuate at this point.

good cause for leave to amend" (Pt. I Br. at 67).  As detailed in Section I.B.2 above with respect to litigation holds, the PBMs do not, and cannot, demonstrate any actual prejudice due to any purported lack of information in the PFSs.  Additionally, as discussed in Section I.D.2 above, at the pleading stage Plaintiffs need not provide detailed information regarding "the harms [they] allegedly suffered" or "the damages allegedly incurred" (Pt. I Br. at 67).  Nor must Plaintiffs plead facts regarding their "actions as a plan sponsor" (*id.*), even assuming those actions are relevant to Plaintiffs' claims.  Further, as with the asserted litigation-hold deficiencies, the PBMs point to no actual inability to obtain any information missing from the PFSs, whether through supplemental PFS responses or other discovery when the stay is lifted.  The PBMs are merely trying to manufacture an illusory justification, founded solely on their unsupported speculation, to preclude Plaintiffs from even bringing their claims.  That is not a proper basis to deny leave.

This is especially so because, with discrete exceptions, the PBMs fail to specify (either in their Joint Opposition or their September 2024 letter) the purported deficiencies with respect to each PFS.  In particular, they contend that because many Plaintiffs "submitted Fact Sheets before January 1, 2020," those PFSs are "devoid of relevant information for the last four years regarding individuals with knowledge, alleged expenditures with respect to claimed damages, insurance providers, and PBMs, among others."  Dkt. #5885-3 at 4.  The PBMs posit that "many" of these Plaintiffs "may have changed PBMs or insurance carriers" and "incurred new or different costs allegedly related to their damages claims," and that "most, if not all, have new individuals in their municipal government managing relevant departments."  *Id.*  None of this speculation

95

and hypothesizing suffices to articulate cognizable prejudice.  And it plainly does not support "dismissal with prejudice for failure to prosecute" (Pt. I Br. at 67).

*Third*, even taking the PBMs' arguments at face value, none of the purported deficiencies in the PFSs would warrant the drastic remedy of dismissal, or the rough equivalent here of denying leave to amend.  The primary deficiency the PBMs allege involves purported failures to provide complete answers to two of the 26 PFS questions, i.e., numbers I.B.8 and I.B.9, concerning a government plaintiff's health insurers and PBMs or third-party administrators.  *See, e.g.*, Pt. II Br. at 199 ("In its Plaintiff Fact Sheet, Dayton City failed to provide complete answers to Questions I.B.8 and I.B.9[.]"); Dkt. #5885-3 at 3 (referring to alleged "Failure to Answer Questions [I.]B.8 and/or [I.]B.9").  As to these two questions, the PBMs allege differing degrees of purported deficiency, from providing no response to answering "N/A" (which, if correct, is not deficient) to possibly omitting information for two of the 20 years covered by Question I.B.9.  Dkt. #5885-3 at 3.  To the extent any Plaintiff did not respond to these questions or provided incomplete responses, the severe sanction of dismissal or denial of leave to amend is not warranted.

Rule 37 provides for a range of possible remedies based on the nature of a discovery violation—for example, deeming certain facts established or excluding contrary evidence—with the most serious being dismissal of claims.  Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii).  In assessing dismissal as a sanction, a court must consider:

> (1) whether the party's failure is due to willfulness, bad faith or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate would

lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered.

*Knoll v. Am. Tel. & Tel. Co.*, 176 F.3d 359, 363 (6th Cir. 1999).  The sanction of disallowing amendments across the board, which would be tantamount to dismissing those claims, could not be warranted here.  The PBMs cannot show prejudice to their ability to litigate these cases given that they have been stayed since 2018 (*see* Dkt. #371) and virtually no litigation has occurred since their inception.  Moreover, a less-drastic sanction could be tailored in cases where, for example, a Plaintiff did not provide information for two of 20 years covered by one of 26 PFS questions.  The same is true to the extent any Plaintiff failed to appropriately supplement information it had previously provided.  In short, even if there are deficiencies in PFSs submitted by any Plaintiffs, there are no grounds to impose the drastic sanction the PBMs seek.

### E. The PBMs' Remaining Arguments Against a Handful of Plaintiffs Are Unavailing.

#### 1. Ten Plaintiffs' lawsuits against PBMs outside the MDL, which were filed and dismissed without prejudice after the subject Amendment Deadlines, have no bearing on their diligence.

The PBMs contend 16 Plaintiffs' filing of separate opioid cases against the PBMs outside the MDL demonstrate those Plaintiffs possessed facts sufficient to sue the PBMs and thus cannot show diligence to add them to their MDL cases listed in these motions. *See, e.g.*, Pt. I Br. at 75; Pt. II Br. at 1081.  But each of these Plaintiffs filed their non-MDL cases in 2023 or 2024, years *after* their Amendment Deadlines in the MDL; the filing of those cases thus does not speak to whether Plaintiffs could have met the Amendment Deadlines in 2019, 2020, 2021, or 2022.  *See* Pt. II Br. at 149, 153, 197, 243, 598, 1081, 1289,

1737, 1742, 1873, 1877, 2003, 2079, 2298, 2302, 2606 (each referencing a Plaintiff's separate 2023 or 2024 lawsuit against the PBMs); Section I.A.3, *supra* (diligence inquiry looks at whether plaintiff could have met the deadline, not at any subsequent delay).  Six of these 16 Plaintiffs have withdrawn.[60]

The 10 Plaintiffs remaining filed cases against the PBMs outside the MDL in 2023 or 2024, after their Amendment Deadlines—and after the January 2023 production of the *JeffCo* materials—but before this Court granted Plaintiffs' motion to lift the moratorium on filings on May 23, 2024 (*see* Dkt. #5455).[61]  Thus, at the time these Plaintiffs filed their cases against PBMs outside the MDL, they had learned of the facts revealed through the *JeffCo* discovery but had no opportunity to seek amendment in the MDL.  Later, when these Plaintiffs believed this Court would permit them to seek amendment in the MDL (or already had), they voluntarily dismissed their claims against the PBMs outside the

---

[60] The six withdrawals at issue are: Cuyahoga County, Ohio (1:17-op-45004); Toledo, Ohio (1:17-op-4500); Dayton, Ohio (1:17-op-45032); Lorain County, Ohio (1:18-op-45078); and St. Clair County, Illinois, which has withdrawn from both 1:17-op-45048 and 1:19-op-45055.  *See* Ex. 3 (list of withdrawn Plaintiffs).

[61] Of these ten Plaintiffs that filed complaints against the PBMs outside the MDL, five Florida Plaintiffs filed one consolidated complaint on March 17, 2023; four Georgia Plaintiffs filed one consolidated complaint on March 21, 2023; and Albany County, New York filed an individual complaint on May 6, 2024.  *See* Dkt. #1, *Palm Beach Cty., Fla. v. Mylan Pharms., Inc.* No. 9:23-cv-80431 (S.D. Fla. Mar. 17, 2023) (including Plaintiffs Alachua Cty., Florida (MDL case 1:18-op-45685); Levy Cty., Florida (MDL case 1:18-op-46119); Okaloosa Cty., Florida (MDL case 1:19-op- 45894); Palm Beach Cty., Florida (MDL case 1:18-op-46121); and Walton Cty., Florida (MDL case 1:19-op-45420)); Dkt. #1, *City of Atlanta, Ga. v. Mylan Pharm., Inc.* No. 1:23-cv-01193 (N.D. Ga. Mar. 21, 2023) (including Plaintiffs Clayton Cty., Georgia (MDL case 1:18-op-46298); DeKalb Cty., Georgia (MDL case 1:18-op-45503); Forsyth Cty., Georgia (MDL case 1:19-op- 45159); and Rockdale Cty., Georgia (MDL case 1:18-op-46296)); Dkt. #1, *Cty. of Albany, N.Y. v. Express Scripts, Inc.*, No. 904348-24 (N.Y. Sup. Ct. May 6, 2024).

MDL without prejudice.[62]  Such actions were reasonable given the status of the MDL at the time, and did not prejudice the PBMs—if anything, these filings and the dismissals without prejudice put the PBMs on notice of the claims these Plaintiffs might reassert against them.  Because those filings outside the MDL neither implicate Plaintiffs' diligence nor prejudice the PBMs, they do not provide grounds to deny these motions.

### 2. The Court's 2023 denials of two Plaintiffs' motions for leave to amend do not bar amendment now.

On January 24, 2023, two Plaintiffs who had already sued some (but not all) PBM entities in this MDL filed motions for leave from the Court's moratorium, seeking permission to file a motion for leave to sever their existing claims against (some of) the PBMs and for leave to amend their claims against the PBMs.  *See Cty. of Jefferson, N.Y. v. Purdue Pharma, L.P.*, No. 1:19-op-45437, Dkt. #19 (N.D. Ohio Jan. 24, 2023); *Town of Bennington, Vt. v. Mallinckrodt PLC*, No. 1:19-op-45791, Dkt. #35 (N.D. Ohio Jan. 24, 2023).  The Court granted the motions, permitting these Plaintiffs *to file motions* seeking relief

---

[62] The Florida and Georgia Plaintiffs dismissed the PBMs without prejudice on July 31, 2023.  *See* Dkts. #199, 202, *Palm Beach Cty.*, No. 9:23-cv-80431 (S.D. Fla. July 31, 2023); Dkts. #148, 151, *City of Atlanta*, No. 1:23-cv-01193 (N.D. Ga. July 31, 2023).  Based on this Court's July 14, 2023 order granting the PEC's motion to enforce a subpoena on the DEA for production of updated ARCOS data (Dkt. #5115), these Plaintiffs correctly anticipated that such production would lead the Court to permit further amendment for any reason.  Because these Florida and Georgia Plaintiffs preferred to bring their claims against the PBMs within the MDL (and the JPML had prohibited transfer), they dismissed their claims against the PBMs outside the MDL to await the expected amendment process within the MDL.  Albany County dismissed its claims against the PBMs without prejudice on July 14, 2024, after this Court had granted Plaintiffs' motion to lift the moratorium (*see* Dkt. #5455).  *See* Dkt. #23, *Cty. of Albany*, No. 1:24-CV-777 (N.D.N.Y. July 15, 2024).  Regardless, Plaintiffs' basis for dismissal of other claims is not a factor in the analysis of their motions to amend their claims here.

despite the general moratorium—but not necessarily permitting amendment. *See* Non-Document Order, *Jefferson Cty.* (N.D. Ohio Jan. 25, 2023); Non-Document Order, *Bennington* (N.D. Ohio Jan. 25, 2023). These Plaintiffs then filed their motions to sever their existing PBM claims and for leave to amend their claims against the PBMs, attaching proposed complaints. *See Jefferson Cty.*, Dkt. #23 (Feb. 17, 2023); *Bennington*, Dkt. #38 (Feb. 17, 2023). The Court *denied* these motions without prejudice, stating such issues could be raised again "after the PBM bellwether cases are chosen." Non-Document Order, 1:17-md-2804 (N.D. Ohio Mar. 20, 2023). These Plaintiffs understood this denial to apply to both their motions, which were equivalent.

The PBMs contend these Plaintiffs were not diligent in seeking to add claims against them because they "failed to take advantage of" the leave granted by the Court "by ever actually filing a complaint." Pt. II Br. at 2310, 2565. The PBMs are doubly wrong: (1) as noted above, these Plaintiffs *did* file proposed complaints, and (2) this Court *denied* leave to amend (without prejudice) in light of the bellwether process. Their attempts to amend in 2023 certainly do not show any *lack* of diligence—indeed, quite the opposite.

### 3. The PBMs' argument regarding duplicate case listings by certain Plaintiffs is moot.

The PBMs opposed the amendments of certain Plaintiffs that, due to scrivener's errors, listed duplicate or incorrect cases seeking amendment in the motions for leave. *See* Pt. I Br. at 73-74. Each of these errors has been corrected in Exhibits 1 and 2.

*First*, the 34 Plaintiffs that sought amendment in their correct case, *Board of Education of Thornton Township High Schools, District 205 et al. v. Cephalon, Inc.* (No. 1:20-

op-45281), accidentally also listed themselves as seeking amendment in a separate case to which they are not parties, *The Board of Education of the City of Chicago, School District No. 299 v. Cephalon, Inc.* (No. 1:19-op-46042).  Those 34 *Thornton* Plaintiffs have withdrawn their errant duplicate requests to amend in the *Chicago* case.  *See* Ex. 3 (list of withdrawals).

*Second*, two *Thornton* Plaintiffs with similar names have corrected their case information to clarify that they are not duplicate Plaintiffs and to list their correct cases. *See* Ex. 4 (correcting listings for Plaintiffs previously both listed as "Joliet Public Schools" to "Joliet Township High School District (District 204)" and "Joliet Public School District (District 86)").

*Third*, Miami-Dade County Public School District has corrected its listed case from the *Chicago* case, to which it is not a party, to its correct case, *The School Board of Miami-Dade County, Florida v. Endo Health Solutions, Inc.*, No. 1:19-op-45913.  *See* Ex. 4.

*Fourth*, two other Plaintiffs have withdrawn cases the PBMs opposed as duplicates: San Jose, California withdrew its entry for case 1:19-op-45964, and the District Attorney of Rapides Parish, Louisiana withdrew its entry for case 1:20-op-45123.  *See* Ex. 3.

*Fifth*, St. Clair County, Illinois, has withdrawn from both 1:17-op-45048 and 1:19-op-45055.  *See* Ex. 3.[63]

---

[63] Four other Plaintiffs that the PBMs accuse of claim-splitting have also withdrawn: Cuyahoga County, Ohio (1:17-op-45004); Toledo, Ohio (1:17-op-4500); Dayton, Ohio (1:17-op-45032); and Lorain County, Ohio (1:18-op-45078).

Because all of these duplicate cases have been corrected or withdrawn, they pose no barrier to amendment by these Plaintiffs in their operative cases.

### 4. Cases by sheriff Plaintiffs that the PBMs challenge as duplicates are in fact independent actions.

Three Plaintiffs that the PBMs accuse of improper claim-splitting[64] are in fact bringing independent actions.  *See* Pt. II Br. at 1624, 2894, 3097.  Each pair involves one case by a subdivision and another case by the sheriff for that area.  Because relevant state laws provide these sheriffs independent authority to sue separately from their subdivisions, these cases are not duplicates and each Plaintiff can separately amend.

Specifically, the Sheriff of Livingston Parish, Louisiana (1:20-op-45220) is independent from Livingston Parish itself (1:19-op-46140).  Louisiana sheriffs are independently elected apart from any parish or other governing authority.  *See* La. Const. Art. 5, § 27.  Louisiana sheriffs and the staff they control are not employees of the parishes, and sheriffs and parishes can be sued separately.  *See Nall v. Par. of Iberville*, 542 So. 2d 145, 146, 149 (La. Ct. App. 1989).  Louisiana sheriffs expend their own funds to perform services impacted by the opioid epidemic, such as ambulance and emergency rescue services, separate from the County's funds and services.  La. R.S. § 5543.  In light of these facts and law, the Sheriff of Livingston Parish can sue the PBMs independently from the Parish itself.

---

[64] The Sheriff of Laurens County, Georgia has withdrawn from these motions but still properly maintains an action independent of the case filed by Laurens County, Georgia. *See Manders v. Lee*, 338 F.3d 1304, 1310 (11th Cir. 2003) (en banc).

### 5.  The PBMs' remaining procedural arguments regarding individual Plaintiffs either lack merit or are moot.

The PBMs assert Plaintiff St. Clair County, Illinois cannot amend its complaint because its case was remanded.  Pt. I Br. at 74-75; Pt. II Br. at 239.  But St. Clair County has withdrawn from these motions, so the PBMs' argument is moot.  Ex. 3.

The PBMs also contend five Plaintiffs cannot sue them because these Plaintiffs previously dismissed some claims against some PBM entities.  One of these Plaintiffs — Clark County, Nevada — has withdrawn from these motions.  Ex. 3.  The other four Plaintiffs (the "MSPs") are entities that have been assigned the rights to assert the claims of a collection of third-party payers.[65]  The MSPs dismissed the claims of some of their assignors in No. 1:18-op-45526, but did not dismiss the claims of other assignors.  *See* Non-Document Order, *MSPA Claims 1, LLC v. Anda*, No. 1:18-op-45526 (N.D. Ohio Sept. 22, 2023).  Because of the MSPs' unique structure, Plaintiffs do not address these arguments here.  The MSPs may file separate briefing addressing issues specific to them.[66]

Two other Plaintiffs — San Clemente, California and Costa Mesa, California — voluntarily dismissed individual MDL cases in 2019 to refile with one consolidated

---

[65] The PBMs raise this argument against four MSPs seeking to add Express Scripts entities in No. 1:18-op-45526: MSPA Claims 1, LLC; MAO-MSO Recovery II, LLC; MSP Recovery Claims, Series LLC; and MSP Recovery Services LLC.

[66] The PBMs also contend three MSP Plaintiffs inappropriately seek amendment in multiple cases.  *See* Pt. II Br. at 3356, 3359, 3362-63.  Those three MSPs — MSPA Claims 1, LLC; MAO-MSO Recovery II, LLC; and MSPA Recovery Claims, Series LLC — seek to add Express Scripts entities to two cases: No. 1:18-op-45057 and No. 1:18-op-45526.  As noted above, due to the MSPs' unique circumstances, Plaintiffs do not address those arguments here.

complaint. *See City of San Clemente v. Purdue Pharma, L.P.*, No. 1:19-op-45728, Dkt. #29 (N.D. Ohio Sept. 30, 2019) (voluntarily dismissing original San Clemente case); *City of Costa Mesa v. Purdue Pharma L.P.*, No. 1:19-op-45736, Dkt. #27 (N.D. Ohio Oct. 4, 2019) (voluntarily dismissing original Costa Mesa case); *County of Alameda v. Richard S. Sackler*, No. 1:20-op-45055, Dkt. #1, Ex. C (N.D. Ohio Nov. 7, 2019) (consolidated complaint including San Clemente and Costa Mesa). When joining these motions for leave to amend, these two Plaintiffs accidentally listed the case numbers of their original cases, which they voluntarily dismissed, rather than the case numbers for their live cases (1:20-op-45055). These Plaintiffs' case numbers have been corrected on Exhibits 1 and 2 to this Reply. *See also* Ex. 4 (list of corrections). The PBMs assert these two Plaintiffs are seeking to reinstate dismissed cases by amendment, but that is incorrect. Rather, due to a scrivener's error, they listed incorrect case numbers, but seek only to amend their claims in their active consolidated case. This harmless mistake should not bar them from pursuing claims against the PBMs.

## CONCLUSION

After more than a year's worth of briefing that encompasses (due to the PBMs' prolixity) thousands of pages, we end where we began in July 2024: Plaintiffs have shown good cause under Rule 16 and readily meet Rule 15's liberal standard. And the PBMs cannot paper over the fundamental bases warranting leave to amend.

*First*, while the extraordinary nature and scope of this litigation cannot alter the Court's application of the legal principles that govern "ordinary" cases where a plaintiff seeks to amend, those very principles call for a context-specific inquiry. The context here

demonstrates the 808 remaining movants have demonstrated reasonable diligence under Rule 16 based on facts and circumstances common to all of them.  The revelation of information through the *JeffCo* discovery led these Plaintiffs, like the bellwether plaintiffs shortly before them, to pursue allegations and claims against the PBMs that they could not, with reasonable diligence, have asserted earlier given the ocean of documents they were wading through.  And while claims brought by other plaintiffs based on scant publicly available information might have passed Rule 11 scrutiny, Plaintiffs were not unreasonable in waiting to determine whether any suspicions they may have had regarding the PBMs' misconduct could support well-pleaded claims for RICO and other violations.  Indeed, not only did the PBMs think such claims were not sufficiently pleaded, they viewed bringing those claims as *sanctionable* even in 2021 and maintained they were *frivolous* even in *2024*, long after the Amendment Deadlines had passed.

*Second*, the context also demonstrates the PBMs will suffer no cognizable prejudice from having to litigate these claims, given the near-complete absence of any activity in these cases since well before the Amendment Deadlines.  No amount of hypothesizing, speculating, or obfuscating can overcome the PBMs' inability to produce a single *fact* showing they would be in a materially different position in these cases had Plaintiffs sought to sue them by the deadlines.  The timing of these motions thus does not weigh against good cause under Rule 16 or reflect undue delay as contemplated by Rule 15.

*Third*, the manner in which Plaintiffs have presented the substance of the proposed amendments fully complies with the Federal Rules, Sixth Circuit authority, and this Court's May 2024 Order.  Plaintiffs' existing pleadings identify all jurisdiction-specific

aspects of their cases, and the *Rochester* Complaint—which Plaintiffs propose to incorporate—details the grounds for the PBMs' liability.  In short, the PBMs are well aware of the nature of Plaintiffs' claims—which are the very claims the PBMs already have been litigating in the bellwether cases for years.  And the process the Court set for addressing these motions was both well within its ample discretion and entirely logical.

*Fourth*, despite their relentless efforts to manufacture all manner of reasons why the Court should not allow any of the Plaintiffs to bring these claims, the PBMs fail to establish that the proposed amendments are futile in their entirety.  Based on the Court's prior rulings, all Plaintiffs can state cognizable RICO claims for equitable relief.  And the several challenges the PBMs raise against all Plaintiffs (or readily identifiable groups of them)—based on the sufficiency of their allegations of injury and causation, the timeliness of their claims, and the ability to assert specific claims under certain state laws—fail for reasons common to all of the subject Plaintiffs.

*Finally*, the relatively few truly Plaintiff-specific objections the PBMs raise lack merit or are now moot.  None of these objections—which entail fact-driven disputes about PBM entities' market shares in particular jurisdictions; fact-intensive questions (flowing from numerous states' laws) regarding Plaintiffs' authority to bring these claims, which require a full record; and discrete arguments based on Plaintiffs' contracts or PFSs, or involving procedural technicalities—warrants denying leave to amend.  That is especially so because, with very few exceptions, all of these arguments relate to matters outside of the pleadings, which the Court cannot consider at this stage.

Accordingly, for the reasons detailed in this Reply as well as Plaintiffs' opening briefs and accompanying submissions, this Court should grant all Plaintiffs leave to amend to add the PBMs to their existing cases.  Plaintiffs further submit that upon ruling on these motions, the Court should adopt the process they have proposed with respect to the other pending motions, which contemplates having the parties and the Court coordinate on the issuance of individual orders in each case as well as the filing of amended pleadings.  *See, e.g.*, Dkt. #6211 (JOCP Reply) at 51-52.  Plaintiffs contemplate that process would include providing the Court with an agreed-upon list or chart (or, if necessary, seeking the Court's resolution of any disagreements between the parties) showing how its rulings apply with respect to each Plaintiff in each case.

Dated:  August 29, 2025

Respectfully submitted,

*/s/ Jayne Conroy*
Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
jconroy@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
270 Munoz Rivera Avenue, Suite 201
San Juan, PR  00918
(304)654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

/s/ Peter H. Weinberger

Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY &LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2025, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/ Peter H. Weinberger*
Peter H. Weinberger

109

3304111.16