1           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2              EASTERN DIVISION AT CLEVELAND

3    ------------------------------X
     IN RE:                        :    Case No. 1:17-md-2804
4                                  :
     NATIONAL PRESCRIPTION          :
5    OPIATE LITIGATION             :
                                   :    Wednesday, September 10,
6                                  :    2025
                                   :
7                                  :
                                   :
8                                  :    STATUS CONFERENCE
                                   :
9    ------------------------------X

10

11

12               TRANSCRIPT OF PROCEEDINGS

13

14              BEFORE DAVID R. COHEN

15

16                  SPECIAL MASTER

17

18

19

20   Official Court Reporter:        Heather K. Newman, RMR, CRR
                                     United States District Court
21                                   801 West Superior Avenue
                                     Court Reporters 7-189
22                                   Cleveland, Ohio 44113
                                     (216) 357-7035
23

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.

1    APPEARANCES:

2    For the Plaintiffs Executive Committee:

3         Peter H. Weinberger, Esq.
          Paul T. Farrell, Jr., Esq.
4         Peter J. Mougey, Esq.
          Salvatore C. Badala, Esq.
5         Anthony Irpino, Esq.
          Laura S. Fitzpatrick, Esq.
6         John D. Hurst, Esq.
          Michael E. Elsner, Esq.

7

8    On behalf of OptumRx:

9         Andrew Hatchett, Esq.
          Bradley Harder, Esq.

10

11   On behalf of Express Scripts:

12        Olga M. Suarez Viera, Esq.
          Sage R. Vanden Heuvel, Esq.
13        Matthew K. Wasserman, Esq.
          Elizabeth B. Miller, Esq.

14                          *   *   *   *   *

15

16

17

18

19

20

21

22

23

24

25

1        CLEVELAND, OHIO; WEDNESDAY, SEPTEMBER 10, 2025; 1:55 P.M.

2                            --oOo--

3                     P R O C E E D I N G S

4                SPECIAL MASTER COHEN:  Okay, everybody.  Thank

5        you for coming, and thank you for all your submissions, and

6        thank you for working together as much as you can to resolve

7        the many discovery disputes that you're working through.

8                To help Heather out, our court reporter, I think it

9        would help to continue to identify yourself every time you

10       have anything to say.

11               My plan is to just go through, as I usually do on

12       these agenda -- discovery agendas, item by item, in order,

13       probably skipping, as I indicated, the remuneration issues,

14       which I think are a big issue that should be tackled by

15       itself tomorrow.  We're going to get as far as we can.  I

16       understand that Olga and others have planes to catch.

17       Probably need to head out 4 o'clockish to make a 5:30 flight

18       and be sure that you can get there, so 4 o'clockish is when

19       we'll probably end our time together today and we'll pick up

20       tomorrow at 1:30.

21               Anybody who wants to stay in town, happy to have you

22       here while Cleveland is having some good weather and we'll

23       meet back here.  Otherwise, we've got a Zoom call and folks

24       can participate that way tomorrow.

25               All right.  So let's just --

1             MR. HATCHETT:  Special Master Cohen --

2             SPECIAL MASTER COHEN:  -- jump into it.

3             MR. HATCHETT:  -- this is Andrew Hatchett for

4    OptumRx.

5         Just in terms of our team, unfortunately, the people

6    that will need to argue tomorrow all will need to return

7    home because of scheduling flights and, also, Cleveland

8    apparently is hosting a massive event also here this week,

9    but just even having clothes and other issues but. . . the

10   only -- the only host of our team that is able to stay for

11   tomorrow is Brad Smyer, and he's also not going to be

12   arguing that particular issue.  So it is going to be some

13   in-person, some left behind.  We will feel like we need to

14   leave Brad Smyer behind, but, unfortunately, he then can't

15   catch a flight until Friday, so just would like clarity in

16   terms of is the PEC going to be in person?

17            SPECIAL MASTER COHEN:  They've indicated they

18   are.

19        So, sorry, Brad.  Actually, I'm not sorry because

20   Cleveland is a great town.

21        What's happening -- I don't even know what's happening

22   this weekend.

23            MR. HATCHETT:  Some kind of a world convention

24   it seems like.

25            SPECIAL MASTER COHEN:  Really?

1          UNIDENTIFIED SPEAKER:  Caterpillar is here.

2          SPECIAL MASTER COHEN:  Well, I don't know

3    anything about it.

4          But the answer to your question is that we're going

5    forward in the courtroom tomorrow at 1:30.  People can be

6    here or they can be here by Zoom.  I actually think that's

7    an accommodation, of course, otherwise, I would just say

8    everyone has to be here.  And if you feel as though someone

9    needs to stay behind, that's your choice.  I don't think

10   that that's necessary, but it's up to you.

11         MR. HATCHETT:  And then for presentation --

12   I've seen the PEC has a number of boxes with documents --

13   for people who may be arguing by Zoom, will we have the

14   ability to display those documents on the remote platform?

15         MR. MOUGEY:  This is Peter Mougey.

16         We plan to coordinate with opposing counsel and,

17   obviously, we're not going to have documents here presenting

18   to you without the ability -- without presenting them to the

19   other side.  So yes is the answer.  We'll coordinate with

20   them to make sure they have the same documents that --

21   whatever we have here in the courtroom that will either have

22   on -- have somebody publish them on Zoom or something so

23   they have the opportunity, in real time, to review the docs.

24         SPECIAL MASTER COHEN:  Right.

25         So given, though, that they are going to be on Zoom

1   mostly, I think that would be everyone's preference,

2   including mine.  I'm happy to receive hard copy, but it

3   might just be easier for everyone to have it on Zoom, so to

4   the extent you can do that.

5               MR. MOUGEY:  That's more than fine.  It -- we

6   plan to address that with them, and the boxes of documents

7   that are here today have nothing to do with remuneration.

8   We are just people carrying around a box of documents.

9               SPECIAL MASTER COHEN:  Okay.  That's what

10  attorneys do.

11              MR. MOUGEY:  We're not that organized.

12              SPECIAL MASTER COHEN:  Anything else before we

13  jump in?

14              MR. HATCHETT:  That's it.  Thank you.

15              SPECIAL MASTER COHEN:  All right.  Let's

16  start.

17       So starting at the top, the first agenda item is 444.

18  This has to do with deposition of Purdue.

19       My understanding is that the parties are making

20  progress in getting to where they need with, first of all,

21  the Caremark data, that's been resolved, and also with

22  figuring out both the timing and format of that deposition,

23  there's nothing that I need to resolve today, and so there's

24  nothing more to talk about with --

25              MR. FARRELL:  Special Master Cohen, this is

1    Paul Farrell.

2                   SPECIAL MASTER COHEN:  Go ahead.

3                   MR. FARRELL:  So I feel the need to reiterate,

4    I think I've done so in writing to both the Court and to the

5    parties, I've done so on previous records, and we talked

6    about it briefly with Judge Polster in the prior hearing,

7    there are four aspects to the PEC's Purdue Pharma.

8         Aspect Number 1 is that we do intend to take targeted

9    fact witness depositions.  Purdue knows this.

10        Number 2.  We have documents in which we have an

11   obligation, in order to admit them into -- at trial --

12                  SPECIAL MASTER COHEN:  We're certainly going

13   to get to authentication.

14                  MR. FARRELL:  So I just -- I want to put it on

15   the record so that it's clear.  We intend to ask Purdue to

16   put up witnesses that will establish the authenticity of

17   documents produced by Purdue.  We intend for those witnesses

18   to testify as a Rule 602 witness with personal knowledge to

19   establish the foundation of those documents so that they are

20   admissible at trial.

21        Purdue needs to understand that because based on our

22   prior conversations, you know, they clearly understand we

23   have that intention.

24        Number 3 is that the parties are in the process of

25   identifying prior Purdue Pharma testimony that all of the

1    parties agree are admissible in the future trials.  Even if

2    Optum or ESI or the City of Rochester were not present for

3    those depositions, we're going to enter into an agreement

4    that testimony is admissible at the next trial.

5                    SPECIAL MASTER COHEN:  We is -- who is we?

6                    MR. FARRELL:  The three of us, Express

7    Scripts, Optum, and the PEC are working on that agreement.

8                    SPECIAL MASTER COHEN:  That's good.  Go ahead.

9                    MR. FARRELL:  And then the fourth aspect of it

10   is, is that we are at the point where we're all going to

11   agree we're going to submit written 30(b)(6) questions to

12   Purdue Pharma rather than designate subject matters for

13   Purdue Pharma to put up as a testifying witness.

14                    SPECIAL MASTER COHEN:  Right.

15                    MR. FARRELL:  That's the present outline of

16   where we're at.

17                    SPECIAL MASTER COHEN:  So, two things.

18        First of all, we're going to get into some of the

19   details of that, and some of my suggestions may tweak a

20   little bit of your plan, or not.  That's fine.

21        The second thing is, just to be sure, because

22   Mr. LaFata isn't here and would have no reason to obtain

23   this transcript, I suggest that once you get this

24   transcript, given that you just did that on the record for

25   Purdue to understand, that you make sure that this part of

1    the transcript gets to Mr. LaFata.

2        Make sense?

3            MR. FARRELL:  Yes, Your Honor.

4            SPECIAL MASTER COHEN:  Okay.

5            MR. HATCHETT:  Special Master Cohen, this is

6    Andrew Hatchett for OptumRx.

7        I don't have a lot to add to what Paul said, except

8    for on the third point, about the previous Purdue

9    transcripts, we're involved in those discussions but just

10   haven't taken a position yet because we haven't fully

11   reviewed all the old transcripts.

12            SPECIAL MASTER COHEN:  I understand.  You're

13   working on it.

14            MS. VIERA:  And Special Master Cohen,

15   Olga Viera for Express Scripts.

16       We are working on an authenticity stipulation.  We

17   will not be stipulating to admissibility of documents.  I

18   think that was already made clear, but I just want to make

19   sure that that's clear.  There's some foundational issues

20   we're trying to work through, but not admissibility in its

21   entirety.

22            SPECIAL MASTER COHEN:  I understand.  I think

23   the plaintiffs do too.  Thank you.

24       Okay.  Next topic is 445.

25       There have been some e-mails that have been traded

1    back and forth, as recently as yesterday or the day before,

2    and this has to do with Ms. Warren's custodial file.  And I

3    think the last thing that came in was, I guess, a suggestion

4    from Olga, or a request, as to one way that that could be --

5    that issue could be resolved.

6         I guess, let me ask the plaintiffs, where are you on

7    this right now?

8              MR. BADALA:  Special Master Cohen, this is

9    Salvatore Badala for the plaintiff.

10        We still have the same position that we sent on Sunday

11   when it comes to her custodial file.

12        Can you hear me okay?

13             SPECIAL MASTER COHEN:  Yes.

14             MR. BADALA:  I didn't know if this was

15   working.

16        We still have the same position.  We have those two

17   documents that we said that we would log and put on a

18   privilege log.

19             SPECIAL MASTER COHEN:  Which are the two?

20             MR. BADALA:  One is a spreadsheet and one is a

21   Word document.

22             SPECIAL MASTER COHEN:  Go ahead.

23        And the spreadsheet is the one that you worked on with

24   Sarah Boyce, I think, and the Word document is the one that

25   she created with her own notes.

1           Is that right?

2                    MR. BADALA:  Both are -- both are her own

3     notes.  I think there's a little discrepancy if Sarah Boyce

4     was actually involved in the spreadsheet.  I don't know for

5     a fact exactly, but those are the two documents, yes.

6                    SPECIAL MASTER COHEN:  Go ahead.

7                    MR. BADALA:  And we're happy to put them on a

8     log or we could submit them to you for an in camera review

9     so you can see and determine if they are, in fact,

10    privileged or not and that seems like that would resolve

11    that issue.

12                    SPECIAL MASTER COHEN:  So I think it was

13    Olga's suggestion that if you believed you wouldn't rely on

14    those documents, you didn't even need to do that.  It sounds

15    like you're saying, no, we're going to rely on them.

16                    MR. BADALA:  No.  I should -- we're not going

17    to rely on them for the case or anything, those two

18    documents, no.

19                    SPECIAL MASTER COHEN:  Does that get you,

20    Olga, where you need to be, or not?

21                    MS. VIERA:  I don't think so -- Olga Viera for

22    Express Scripts.

23         I don't think that gets us exactly where we need to be

24    because her testimony was that she's done research and she's

25    been looking into this issue and trying to determine how

1    revenues were affected by the opioid crisis and then how

2    expenditures were affected by the opioid crisis.

3         Before she testified to that, at the last hour of the

4    deposition, she had said there was no way to make that

5    determination.

6              SPECIAL MASTER COHEN:  I read it, and I read

7    her transcript.

8              MS. VIERA:  Right.  So I think we're entitled

9    to the communications that she had with Sarah about this

10   issue and how she was trying to make that determination.

11   That's relevant to the issues in this case.  How was the

12   City of Rochester damaged and if they claim that that is

13   evidenced somehow from the budget documents, and the budget

14   director has made that analysis and testified to it --

15   because she continued to testify about it for an hour

16   without objection that this was attorney-client or work

17   product privilege, she was even cross-examined on that -- on

18   that testimony -- I think we're entitled to see her

19   communications about it.

20             SPECIAL MASTER COHEN:  So how -- I mean, it is

21   curious that plaintiffs seem to be now asserting that

22   it's -- that these materials are worthy of being put on a

23   privilege log when it wasn't, I think, until I asked in an

24   e-mail whether these were materials that might be

25   attorney-client privileged.  It certainly wasn't raised it

1    depo.

2                    MR. BADALA:  Well, Special Master Cohen, we

3    disagree with that because it was raised in our letter and

4    it was raised in the deposition and the transcript here is

5    265, lines 2 to 5, and she mentions about working with the

6    attorneys about this -- and the question is --

7                    SPECIAL MASTER COHEN:  She did, but counsel

8    said nothing.

9                    MR. BADALA:  Right, because there was no

10   discussion about what the documents actually say.  The fact

11   that you looked at a document or created something, you

12   know, but the fact of what's in the documents, we believe,

13   is privileged because it was done at the request of the

14   attorneys.

15                   SPECIAL MASTER COHEN:  All right.  Well --

16                   MR. BADALA:  But like I said, we're not going

17   to -- we're not relying on those documents for putting

18   together any type of damages analysis or anything like that.

19                   SPECIAL MASTER COHEN:  And so the work that

20   she did isn't something that you would give to an expert

21   ever?

22                   MR. BADALA:  No.

23                   SPECIAL MASTER COHEN:  Why was she doing it?

24                   MR BADALA:  Well, the documents -- like we

25   said in our communication on Sunday -- if you recall, we had

1    to supplement Interrogatory Number 39 -- this is back in

2    March -- and in supplementing that interrogatory, she

3    provided us with information that we then put into that

4    specific response of the interrogatory.  So they have the

5    information.  It was spelled out for them in Interrogatory

6    Number 39.  They just never asked her about it during the

7    deposition.

8         It was a seven-hour deposition.  They never asked her

9    about the interrogatory.

10         SPECIAL MASTER COHEN:  All right.  Here's how

11   we'll do this:

12         So you can either produce it or put it on a privilege

13   log.  If you think it's privileged, you need to submit it to

14   me.  They can challenge it and I'll do the same thing I've

15   done with every other privilege document that's been

16   challenged and decide whether I think that the privilege

17   is -- well, the claim of privilege is well taken.

18         There were five different things that PBMs requested

19   and some of them -- well, let's just go through them.

20         I'm not going to agree that Sarah Boyce should be

21   designated as an additional custodian.  That's especially

22   true because the PBMs already selected five custodians from

23   budget and finance and also the plaintiff already produced

24   all the responsive e-mails and documents exchanged by Boyce

25   and Warren.  So I don't think that's necessary.  That was

1     Number 2 of the 5.

2          Number 4 of the 5 is some -- produce documents not

3     publicly available on something called OpenGov, and the

4     plaintiffs already said they would go ahead and do that, so

5     that request is granted as unopposed.

6          Number 5, plaintiff said that it has already searched

7     and produced relevant documents from the OMB share drive as

8     well as agreed upon custodians' H-drives.  The request was

9     that additional non-custodian analysts' H-drive be searched.

10    That's denied.  I don't think that's necessary.  It's

11    overreach.

12         And so that leaves. . . updating Mrs. Warren's

13    custodial file and -- to the present.

14         Tell me, plaintiffs, why you think that is not

15    appropriate.  And don't give me the tit for tat because I

16    agree with the PBMs that this is kind of a -- that there is

17    a difference between what they agreed to and what you have

18    and that the materials we're talking about are forward

19    looking.

20              MR. BADALA:  I think based -- sorry.  Again,

21    this is Salvatore Badala.

22         Based on your ruling about us putting those two

23    documents on the privilege log, those are the documents that

24    she talked about, so having to update her entire custodial

25    file wouldn't make sense when we're going to put those

1    documents on the privilege log or provide it to them, I

2    guess we'll decide on that specifically, and they'll have a

3    chance to either challenge them or receive those documents.

4         That's what she spoke about.  So there's no point in

5    updating it when the last production -- I think going back

6    to our letter, documents from her custodial file were

7    produced up until March of 2024.

8                   SPECIAL MASTER COHEN:  Any response?

9                   MS. VIERA:  Yes, Olga Viera for Express

10   Scripts.

11        So the issue is this is a fact witness and she is the

12   current budget director.  She has testified that she went

13   back and did some analysis regarding the harms caused by

14   opioids, and that's fact testimony that we now have and we

15   don't have any of her communications to substantiate it.

16        If their position is they are not going to seek

17   damages beyond March 2024, then I can see that their

18   objection to producing documents beyond that might make

19   sense, but here, my understanding is they are going to

20   request damages through the present and into the future and

21   so the budget director's custodial file, and her analysis of

22   how the City, from a fact perspective, was damaged by

23   opioids as she analyzes prior budgets and goes back into

24   time to make those determinations, all of that is relevant

25   from a fact perspective.  And we've been asking for this

1      information since the beginning of this case.  There's

2      several interrogatories, request for production.  None of

3      her analysis, none of her thoughts on this were discovered,

4      and we didn't even know she had done it until the last hour

5      of her deposition.

6           So we do believe that she -- her custodial file should

7      come to present and those two documents that they are now

8      claiming privilege over, which we'll discuss once they make

9      their log, that's not all we need.  We need all of her

10     communications and her file that is relevant to this case.

11               SPECIAL MASTER COHEN:  Would your argument

12     stand for the proposition that she should update it the day

13     of trial?

14               MS. VIERA:  Well, certainly before then

15     because we need to be analyzing what she's thinking and what

16     she's doing and, from a fact perspective, how she's

17     analyzing damage to the City.

18          I don't know at what point the City's going to

19     disclaim any future damage -- or any damage that has been

20     caused at that point, but I'm certain it wasn't March 2024.

21     So it's on them on what cutoff they're going to give to

22     their damage claim.

23               SPECIAL MASTER COHEN:  Olga, then you're

24     arguing that no matter when trial is, the day before, you

25     should be allowed to depose her or, of course, ask her

1    questions at trial.

2              MS. VIERA:  Well, at some point there will be

3    a cutoff but it's -- we're looking at trial maybe in two

4    years in this case and this -- she's the current budget

5    director and she's now testified to something that we

6    haven't gotten documents for.  So, certainly this may not

7    apply to everyone, but their case goes on.

8         If they're -- again, it's their case and their

9    position.  If they're going to say that it's cut off at some

10   point, then I think we would all welcome that, but I don't

11   think that's what they're saying.  They're saying that the

12   damage continues and they're going to seek remedies for --

13   abatement for future damages.  So the files of their current

14   budget director and how she's looking at damages from the

15   opioid epidemic is relevant.  And so I think it does --

16   there is a continuing obligation in discovery to supplement

17   your responses and to supplement discovery.  And so, yeah,

18   at some point it will stop, but it's not now, and it's

19   certainly not March of last year.

20             MR. BADALA:  Special Master Cohen, I --

21             MR. FARRELL:  Yeah.  This is Paul Farrell.

22        A couple of things have merged together.

23        This witness has been working with the lawyers to

24   create damage models.

25             SPECIAL MASTER COHEN:  Okay.  Then put it all

1    in a privilege log and they won't get it.

2              MR. FARRELL:  Right, that's number one.

3         Number two, anything that we are going to present as

4    RICO damages, we understand we have to disclose.  It's on

5    us.  And if we don't disclose it, it will be excluded.

6    That's your rule.  That's Judge Polster's rule.  That's --

7    we understand the obligation.

8         So with regard to RICO damages incurred by the City,

9    we get we have to disclose it and it has to come, but with

10   regard to the abatement -- right? -- the City of Rochester

11   is not seeking private damages in public nuisance, it's

12   bringing an abatement case on behalf of the general public.

13        So, we continue to get these different things mixed

14   up.  The --

15             SPECIAL MASTER COHEN:  I apologize for not

16   knowing this, but isn't there a RICO claim?

17             MR. FARRELL:  Yes.  As I said, number one, if

18   we have a RICO case, we know we have to disclose the

19   damages -- right? -- that we incurred.  That will be through

20   expert witnesses.  Anything in our expert witness reliance

21   materials we have to disclose.

22        I don't think anybody has asked us to draw a line in

23   the sand yet as to when or where we're -- the RICO damages

24   stop.

25        We do have to have a basis to show a present and

1     ongoing hazard to public health and safety.  So as this

2     proceeds, we understand our obligations to supplement, we

3     understand we have to disclose that we have incurred

4     damages, but I believe a lot of this is premature.

5                    SPECIAL MASTER COHEN:  Well, this is how we're

6     going to deal with this at this point:

7          The documents that are contemplated by this agenda

8     item, which may include only the spreadsheet and the Word

9     document but may include something else, you need to decide

10    what to produce or put on a privilege log and if you put

11    them on a privilege log, then I'll examine them.  All right?

12         And that includes not just the two sheets, but

13    everything that is contemplated in this e-mail.

14         You understand?

15                    MR. BADALA:  Yes.

16                    SPECIAL MASTER COHEN:  Okay.

17         Moving on to Agenda Item 430 and 432, the most recent

18    e-mail was that the plaintiffs have complied -- I think

19    there's nothing to rule on with regard to these.  Tell me if

20    I'm wrong.

21                    MS. VIERA:  Olga Viera on behalf of Express

22    Scripts.

23         That's correct.

24                    SPECIAL MASTER COHEN:  Thank you.

25         Okay.  So the reason I'm hesitating is because the

1    motion for additional 30(b)(6) time is so closely linked to

2    the authentication issue.  I know that it's not only that,

3    but it's largely that.  I guess we might as well jump into

4    it.

5         So, I'm going to make some suggestions and then you

6    all can tell me if they -- how much you hate them.

7         The first thing is I think the PEC does need to finish

8    serving all of its 30(b)(6) notices.  I think I read that

9    there's one left.  I think that you should go through the

10   process whereby the PBMs serve objections,

11   counter-proposals.  I think that all of that needs to come

12   together with all of the 30(b)(6)s.  You need to work on

13   narrowing topics.

14        It seems to me true that, you know, the plaintiffs are

15   already asking for more 30(b)(6) time, but have only used a

16   small percentage.  I get that -- of what's already been

17   allowed.  I get that you are already predicting you're going

18   to need a lot more, but I think it makes sense to get a

19   better understanding, a better handle on how much you need,

20   what topics there are.  I want you to go through all that

21   process.  We'll pick it up after you do.

22        And for what it's worth, I think I read that the

23   plaintiffs said that Express Scripts does now have all 12

24   topics.  It says that there's only one left for Optum.  So

25   you need to finish that process.

1          Now, there were a few reasons that the plaintiffs were

2     suggesting they thought they needed more 30(b)(6) time.  One

3     is that -- just all of the -- the breadth of the topics and,

4     like I said, that needs to become a little bit more ripe.

5     The other one -- the other reason that I think is ripe, and

6     that Judge Polster touched on, was the authentication issue.

7     And it sounded like he suggested something similar to what I

8     did earlier.

9          So, of course, there's a difference between not being

10    willing to authenticate a document because you don't have it

11    in your files, I understand that, on the one hand and, on

12    the other hand, having. . . call it affirmative evidence or

13    reason to believe that it is not authentic, that it's a

14    forgery, that it's not what it purports to be, and those are

15    big differences.  And, you know, I am trying to get things

16    in shape for not just Judge Polster and me and you all, but

17    the transferee judge on remand so that you don't have to be

18    fighting a lot of things.

19         And for what it's worth, I also think that it would be

20    unhelpful to the PBMs to assert, time after time after time,

21    that a document isn't authentic, have the trial judge rule

22    on it, and have the jury see that mess.  I don't think that

23    would help the PBMs, so I'm not sure what the thinking is.

24         But the way we're going to resolve that, and I'm

25    including what Judge Polster said is -- so, Paul, I get that

1 what you think is necessary for trial is to have affirmative

2 evidence that the document is authentic -- we're talking

3 about from Purdue mostly -- but we're also going to have, on

4 the record, a statement from the PBMs if they think a

5 document is inauthentic as opposed to you just won't say

6 that it is authentic.  There is that difference.  And you

7 suggested a motion in limine.  I suggested a, you know,

8 series of letters.  Judge Polster, I think, suggested a

9 slightly different order in that series of letters.  So

10 we're going to do something, and the question is, what

11 should that be, and we can just stick with what I wrote in

12 my letter or we can tweak that a little bit.

13   We should make it as easy as we can for everybody.  I

14 know that you said it's only seven documents or four

15 documents or whatever.  I don't believe that.  I think those

16 are emblematic and there are probably hundreds of documents

17 that the same issue arises to, they've just come up with

18 respect to those documents so far and that's why plaintiffs

19 believe that they need to undertake all of these

20 depositions.

21   So that's the skeletal structure of how we're going to

22 go forward and now I'd like to hear from the parties on the

23 best, easiest, quickest, least expensive way to get there.

24       MR. WEINBERGER:  So I -- this is

25 Pete Weinberger.

1            I don't think that we can look at expenses or

2      expediency when it comes to this issue, and the reason is

3      that -- that as much as the Court and the Special Master

4      want to believe that we can reach agreements, that has been

5      a challenge.  And so I think our feeling on this score is

6      that we want formalize as much as possible what we're doing

7      so that when you reach a decision, the procedural way in

8      which you got to that point is not subject to attack.

9                  SPECIAL MASTER COHEN:  So do you think, Pete,

10     that the letters that I suggested, with a ruling by me, a

11     discovery ruling, is insufficiently formal --

12                  MR. WEINBERGER:  Yes.

13                  SPECIAL MASTER COHEN:  -- such that you

14     need --

15                  MR. WEINBERGER:  I'm concerned -- it isn't for

16     us, but I'm concerned -- I mean, when the judge indicated

17     what his ruling was going to be, the first thing I saw was

18     defense counsel on the other side get up and object and

19     preserve those objections.

20                  SPECIAL MASTER COHEN:  Right.

21                  MR. WEINBERGER:  And so, you know, we have to

22     anticipate that that's how things are going to go from here

23     over the next 18 months.  And so that's why I think, you

24     know, we do it in the form of an offensive -- we file a

25     motion in limine, using it offensively, using the parameters

1    that you have, and the judge have, discussed, lay it out in

2    a process, as the judge suggested, and have the Court then

3    rule on this motion in limine.

4                    SPECIAL MASTER COHEN:  Well, that's fine.  I

5    think --

6                    MR. WEINBERGER:  When I say the Court, I mean

7    you and then subject to objections and then finalization.

8                    SPECIAL MASTER COHEN:  I understand.

9         Look, it's -- to some extent, it's just a question of

10   how formal the process is.  You think it should be more

11   formal, that's fine.  The formal way, of course, is to file

12   a motion.  And so it seems to me the way to do that -- and

13   by the way, I think the PBMs have generally argued that it

14   should be more formal.  I think the best way for you to do

15   it is for you to file a motion identifying the documents,

16   all of them, regarding which you would like a ruling on

17   authentication, just a list.

18        The defendants will respond saying whether they have

19   any reason to believe they are not authentic, which is

20   different, and I'll say it again, from agreeing that they

21   are authentic, it's just -- the defendants will say we have

22   reason to believe this is not authentic.

23        The plaintiffs will then respond with their

24   affirmative -- and by the way, as to those documents you do

25   have reason to think it is not authentic, what the evidence

1    is, what your basis for saying so is.  The plaintiffs will

2    respond with their evidence that it is authentic, which may

3    include affidavits or testimony from Purdue or whatever else

4    it is.  Anybody can point to whatever evidence they have,

5    and then I'll rule and then anybody wants to object, they

6    take it to the judge.

7        The judge, of course, is correct that any transferee

8    judge doesn't have to follow the rulings that I make or this

9    Court makes.

10       The manual for complex litigation has something to say

11   about that, but nonetheless, I've seen that happen.  In

12   fact, I think it happened to plaintiffs, in their favor, by

13   Judge Breyer, and you've seen it happen in West Virginia.

14   So we all know that that occurs, you know, what, maybe 10,

15   20 percent of the time, something like that, I don't know.

16       So when plaintiffs reserve their right, they're only

17   reserving their right to something we already know can

18   happen despite what the manual for complex litigation says.

19   Judges are their own --

20                 MR. WEINBERGER:  I think the defendants say

21   they're preserving their right.

22                 SPECIAL MASTER COHEN:  I'm sorry, correct.

23       So that's how we're going to go forward.  Now it's

24   just a matter of timing.

25                 MR. HATCHETT:  Can I add one thing, Special

1    Master Cohen?

2         Andrew Hatchett for OptumRx.

3                   SPECIAL MASTER COHEN:  Go ahead.

4                   MR. HATCHETT:  Just in terms of reaching an

5    agreement, I actually don't think we've had a ton of

6    conversations with the plaintiff for this.  We haven't ever

7    been provided an all-encompassing list.  The way this has

8    been presented to us is through the form of rolling request

9    for admission.  And so what we've done in response to

10   request for admission, which is a procedural vehicle, is

11   said, you know, admit or deny whether or not we can say it's

12   authentic.  And so what we've done to date is simply say,

13   for those that we can't confirm authenticity because it's

14   not our document, you know, our position has been that we

15   lack the information to admit or deny.

16        Obviously, there's a bunch of nuances in there.

17   There's a bunch that we've looked at and we found a -- even

18   though it's a Purdue document -- we found a copy in our

19   version, in our files, and so we've said yes, that appears

20   to be authentic.  We had a basis for saying that it's

21   authentic.

22                   SPECIAL MASTER COHEN:  Correct.

23                   MR. HATCHETT:  On most of these, there are --

24   there may be some and so that's why we need a whole list.

25   And I think that what I would propose is let's do that first

1    before we even file a motion.  Just give us a list, let us

2    look at it, not as an RFA or some kind of weird procedural

3    vehicle, just give us a full list, let us identify, these

4    are the ones we can say "yes" to for sure, these are the

5    ones that we're not going to take a position on authentic or

6    not authentic, and maybe there will be some that we'll say,

7    hey, we have -- we're skeptical about this document, but

8    before we do a motion, I think we could do that.  But if

9    they want to do a motion, I'm also fine, if we want to just

10   go that route.  It just seems that could be -- make work

11   because I do think that we are narrowing the universe when

12   they come to us, even through those RFAs, it seems to me we

13   ought to just do it all at one time.

14              SPECIAL MASTER COHEN:  If you all -- we don't

15   need to get into this.  If you all can figure out a way to

16   do it without a formal motion, I'm perfectly happy for that

17   to happen.  Unfortunately, there's been. . . I don't want to

18   call it distrust, but skepticism that has built up between

19   the two sides that may prevent that from happening.

20       I would love --

21              MR. HATCHETT:  And there may need to be a

22   motion eventually.  I'm sure there will be some we don't

23   agree on.

24              SPECIAL MASTER COHEN:  Right.

25              MR. HATCHETT:  I'm just -- I just don't think

1    we've been given a full list and been able to narrow it,

2    other than through these RFA vehicles --

3                   SPECIAL MASTER COHEN:  Well --

4                   MR. HATCHETT:  -- where we're going one by

5    one, and that's the first time we're learning about a

6    request for that particular document is in an RFA.

7                   SPECIAL MASTER COHEN:  Right.  This is a

8    mechanism to make that happen.

9                   MR. WEINBERGER:  So we're going to go ahead

10   and file the motion and the -- I respect what Mr. Hatchett

11   has said.  The RFA procedure hasn't worked.

12       Certainly the element that Judge Polster and that you

13   have talked about in terms of not just an answer that, you

14   know, we've searched our files and we can't find and we've

15   talked to a few people and we can't find somebody that knows

16   anything about the document, it -- I think, from what I

17   heard from Judge Polster and from you, is that it takes more

18   than that in terms of an answer once we make a prima facie

19   case that it's an authentic document.

20       And these are critical documents for use at

21   deposition.  We can identify some depositions that we can

22   take immediately or over the next month or so that -- where

23   we don't need -- necessarily need these documents, but

24   certainly as we go towards finishing our discovery

25   depositions of the defendants, we are going to need this

1    process to have taken place.

2              SPECIAL MASTER COHEN:  Understood.

3         Well, then we need to get it teed up quick and. . .

4              MR. WEINBERGER:  Peter, was there anything you

5    wanted to say?

6              MR. MOUGEY:  I do.

7         One thing that I'm catching -- Peter Mougey for the

8    plaintiffs.

9         One thing that I -- I think this process sounds

10   perfect, other than the exhaustive list, is that we are

11   still, at this point, what, 45 days from the close of

12   discovery pursuant to the CMO for -- I think we're really

13   close, but I think the initial rulings on these will help

14   any further discussions, but I don't want to represent, and

15   I'm a little worried that if we get things moving -- because

16   we need to move so we can get the 30(b)(6)s taken, as Pete

17   indicated, that we believe there are three, four, five

18   30(b)(6) topics we can move forward on now.

19             SPECIAL MASTER COHEN:  Right.  So what you're

20   suggesting is more than one wave.

21             MR. MOUGEY:  There might need to be a second

22   motion.  There might need to be some add-on documents.  I

23   mean, I just don't want to say that this is going to be the

24   last time that this happens.

25             SPECIAL MASTER COHEN:  Right.  In fact, I

1     would prefer that you -- let's understand that there may be

2     more than one such motion, and I would prefer that we go

3     forward with the understanding that you put, in your first

4     motion, the ones you most need.

5          In other words, if you give me a thousand documents,

6     then I'm going to take longer.  If you give me the 50 you

7     most need right now rulings on, I can get to those and we

8     can get to the other ones later.

9          Make sense?

10                    MR. MOUGEY:  Yes.

11                    MR. WEINBERGER:  Fair enough.

12                    SPECIAL MASTER COHEN:  All right.  There may

13    be more subtopics under the rubric of need more 30(b)(6)

14    time, but I don't want to get bogged down on that and so I'm

15    asking everyone who cares to put a pin in it and if we don't

16    get to it by the end of the day, to come back to it.

17                    MR. FARRELL:  This is Paul Farrell.

18         I think it's important, and we need to talk about it,

19    so I would like to put a pin in it, but make sure we circle

20    back to it.

21                    SPECIAL MASTER COHEN:  It's your job to do

22    that.

23                    MR. FARRELL:  Well, it's also -- maybe we'll

24    stick around later then.

25                    SPECIAL MASTER COHEN:  Okay.  So moving on,

1    Agenda Items Number 450 and 451.

2        The e-mail that I got a couple days ago said that the

3    parties believed these would probably be resolved by this

4    time.

5        Is that true?

6            MR. IRPINO:  This is Anthony Irpino for the

7    PEC.

8        Yes, we've been working with Express Scripts on that.

9    Nothing you need to resolve right now.

10           SPECIAL MASTER COHEN:  Thank you very much.

11       Okay.  441 is remuneration.  We're skipping over that

12   for now.

13       Agenda Items 423 and 424.

14       So I sent an e-mail on this, couple days ago, to the

15   parties and, I think, just this morning received an e-mail

16   from the plaintiffs with their suggestion of some language

17   that they would like to see in an order entered by me, which

18   I did read but haven't had time really to think very hard

19   about.

20       Olga, do you want to respond to the proposed language

21   in their e-mail now?

22           MS. VIERA:  Olga Viera for Express Scripts.

23       I'm actually going to defer to other members of my

24   team on this one.

25           SPECIAL MASTER COHEN:  That's fine.

1          MR. VANDEN HEUVEL:  Can you hear me Special

2     Master Cohen?

3          SPECIAL MASTER COHEN:  I can, but I'm not the

4     important one.

5          MR. VANDEN HEUVEL:  This is Sage Vanden Heuvel

6     for Express Scripts.

7          Yes, we have received Ms. Dunning's e-mail yesterday,

8     late yesterday.  We're still reviewing their proposal, so

9     we'd prefer to continue to meet and confer with them and

10    discuss, but we're happy to discuss it now if you'd prefer.

11         SPECIAL MASTER COHEN:  Well, let me just say

12    this:

13         So, you know, I try and read things two or three

14    times.  I've only read this a half a time.  I read it very

15    quickly.  My instinct was, I think there were four proposals

16    and three of them sounded pretty good and the fourth one I

17    wasn't sure about.  I don't even remember which one I wasn't

18    sure about.  My point is that it didn't strike me as,

19    sometimes it does, that they were overreaching or

20    unreasonable upon first read.  So what I suggest is that you

21    do what you just said you should, which is to confer with

22    plaintiffs, especially since you're all here, and see if you

23    can't come to some agreement with them about what language

24    should be included in an order or what you can agree to.

25         My having said that, as I said having read it once

1     quickly, it didn't seem unreasonable.

2          Is that fair?

3               MR. VANDEN HEUVEL:  Yeah, I think that's fair.

4          I think we're pretty close but, you know, a lot of

5     what they're seeking here in this order is close to what we

6     already offered to them last month.

7               SPECIAL MASTER COHEN:  Good.  Okay.

8          I don't have anything more to say on that then unless

9     plaintiffs want to add something, and it looks like they do.

10              MR. FARRELL:  Yes, this is Paul Farrell.

11         This has grown long-haired whiskers on this topic and,

12    so, can we just start with some real basic premise, is, I

13    want the Court to order, in some type of written document,

14    that says if ESI did an investigation into doctors,

15    pharmacies, or patients, in any way related to the City of

16    Rochester, tell us where it is.

17         I think the answer is none.

18         If the answer is something not none, I want them to

19    give me a Bates stamp number so that I can put my eyes on

20    it.  That's what I want.

21         So I don't know what words we need to go back and

22    forth, I don't know how many times we have to go and meet

23    and confer, how many letters I have to write the Court, at

24    some point in time I'm looking for something concrete.

25         Let me see if I can give you an analogy.

1          You will recall the suspicious order monitoring

2     systems with distributors.  We argued that the distributors

3     should have been running programs looking for suspicious

4     orders.  There's a huge fight about what a suspicious order

5     monitoring system, algorithms, all this.  How about this:

6     Give me a list of suspicious orders that were flagged.  Give

7     me the work product of the suspicious orders themselves.

8          That's what I'm asking them is, look, we'll -- I

9     understand we're going to fight for another year about

10     utilization management programs.  Let's just start with

11     this:  Have you, Express Scripts, ever investigated a

12     doctor, a pharmacy, or a patient, at any point in time, in

13     any format, in the City of -- the bellwether jurisdiction?

14     Do you have any evidence that you have a -- that you did any

15     of those investigations; yes or no?

16                    MR. VANDEN HEUVEL:  So Special Master Cohen --

17                    SPECIAL MASTER COHEN:  I think you may be

18     pushing the parties further apart given what Sage said,

19     which was he believed you were close.

20                    MR. FARRELL:  I don't think we are close.

21                    MR. MOUGEY:  Peter Mougey.

22          This is the perpetual merry-go-round of

23     meet-and-confers, and what concerns me about one more round

24     of meet-and-confers --

25                    SPECIAL MASTER COHEN:  You're meeting and

1    conferring before tomorrow.

2              MR. MOUGEY:  Okay.  Well, that works,

3    because our depositions start back up next week and we've

4    got, I don't remember how many, ESI just pulled down one,

5    I'm going to say four or five in the coming four or five

6    weeks and we'll be at 20 depositions and we're still trying

7    to figure out where we are in fairly elementary and I'm

8    worried that we're going to get so far down the road --

9              SPECIAL MASTER COHEN:  If I wasn't clear, I

10   meant tomorrow.  We're getting back together tomorrow.

11   We're going to have agreed language tomorrow or I'm going to

12   rule.

13             MR. VANDEN HEUVEL:  Yeah, and Special Master

14   Cohen, you know, I'm not sitting here as a deponent with

15   Paul Farrell asking me questions but I will say that we have

16   produced investigative reports relating to the bellwether

17   Rochester.  We produced them in November and December of

18   last year.  Apparently, the PEC hasn't found them, but, you

19   know, we're willing to identify those by Bates number.

20         So, you know, like I said, we're very close --

21             SPECIAL MASTER COHEN:  Again, it sounds like

22   there's some agreement to be reached, maybe not all of it.

23   We don't need to spend more time on this because I think

24   everybody understands where we are.  Okay?

25         Thank you.

1      MR. MOUGEY:  Peter Mougey.

2          We are putting a pin in this, and we're going to

3   circle back to this tomorrow in or around the remuneration

4   hearings?

5               SPECIAL MASTER COHEN:  Correct.

6               MR. MOUGEY:  Okay.  Thank you.

7               SPECIAL MASTER COHEN:  All right.

8          The next one is titled "The Shermanator," which is

9   Agenda Item 425.

10          So I'm not sure what to do with this one for the

11  simple reason that what was contained on the agenda for this

12  item last July is the same thing that's contained on this

13  agenda item today.  And so I didn't see any additional

14  movement or argument, except for a response to the e-mail

15  that I sent, which asked how many "Shermanator" -- is it

16  Peter Sherman?  What was his name?

17               MR. FARRELL:  Shermanator.

18               SPECIAL MASTER COHEN:  Documents produced from

19  his files, which are old but -- so I guess I'm asking

20  what -- what's the next step here?

21          Who needs to talk about this?

22               MR. FARRELL:  This is Paul Farrell.

23          I would like there to be a declaration that all of

24  Peter "The Shermanator" Sherman's documents have been

25  produced.

1          I don't think they have, and if they haven't, it is a

2     grounds for us to take a 30(b)(6) topic, because this isn't

3     some --

4                    SPECIAL MASTER COHEN:  Right.  It's not

5     peripheral witness.  I added him as a custodian myself

6     because he's not a peripheral witness.

7          Where are we, Olga?

8                    MR. VANDEN HEUVEL:  Special Master Cohen, this

9     is Sage Vanden Heuvel for Express Scripts again.

10         We are preparing our final production of Peter Sherman

11    documents.  The custodial filed that we obtained for

12    Peter Sherman, who left the company approximately 13 years

13    ago, was very limited.  We've produced, you know, a small

14    number of documents from his custodial file, because his

15    custodial file was so limited, mostly consisted of calendar

16    invites and documents like that.  We also searched for any

17    documents that said Peter Sherman on them from the other

18    agreed custodians and also non-custodial documents we have,

19    and we're producing an additional small set of documents

20    tomorrow.

21                   SPECIAL MASTER COHEN:  So by tomorrow, you

22    will have produced all of the documents responsive to --

23    well, all of the documents -- I'm not sure how to phrase

24    it -- all of the Sherman documents.

25                   MR. VANDEN HEUVEL:  All the responsive

1    Peter Sherman documents.

2         We're not producing every document that he's on

3    because most of the documents that he's on are, like I said,

4    calendar invites --

5                   SPECIAL MASTER COHEN:  That's fine.  I

6    understand.

7         Are you putting any on a privilege doc?

8                   MR. VANDEN HEUVEL:  There will be a few

9    documents on the privilege log.

10                  SPECIAL MASTER COHEN:  Privilege log.

11                  MR. VANDEN HEUVEL:  Yeah.

12                  SPECIAL MASTER COHEN:  And that will be

13   produced tomorrow.

14                  MR. VANDEN HEUVEL:  Tomorrow or Friday.

15   Depending how fast our document vendor can work.

16                  MR. FARRELL:  This is Paul Farrell.

17        Does that include the privilege log supplement?

18                  MR. VANDEN HEUVEL:  Can you clarify?

19                  SPECIAL MASTER COHEN:  He's asking when a

20   privilege log on Sherman documents will be produced.

21                  MR. VANDEN HEUVEL:  Well, typically the

22   privilege logs are due 21 days after production.  We can

23   produce one, you know -- for these specific documents, we

24   can produce one next week.

25                  SPECIAL MASTER COHEN:  Okay.  That sounds like

1      we're advancing the ball a little bit.

2            Let's say, Paul -- you have what you originally asked,

3      which -- or you will, which is an affirmation by them they

4      have produced all documents -- all of Sherman's documents,

5      and we will have a privilege log that you can choose to do

6      with whatever you do.

7                      MR. FARRELL:  In 21 days?

8                      SPECIAL MASTER COHEN:  In seven days.

9                      MR. FARRELL:  Seven days.  Okay.

10                     SPECIAL MASTER COHEN:  Okay?

11           So, is there anything else to talk about on this at

12     this time?  If there isn't, fine.  If there is, then fine,

13     but it sounds like you got what you asked for.

14                     MR. FARRELL:  Yes, this is Paul Farrell.

15           That addresses 425, which bleeds into some other

16     subject matters.

17                     SPECIAL MASTER COHEN:  Okay.

18                     MR. MOUGEY:  This is Peter Mougey.

19           Just for the record, I think it's important to note

20     that I'm reading from an April 18th letter from ESI that

21     says, "We have produced all responsive Peter Sherman-related

22     documents from our custodial and non-custodial document

23     collections."

24           That was in April, and here we are in September, still

25     talking about Shermanator documents and there will be

1    supplemental production.  So, what is that, five, six months

2    later, we're still getting Sherman documents in after we've

3    now taken 12 to 15 depositions on someone that signed

4    critical contracts during the course of this and I -- I'm

5    confident you can pick up the tone from our table, but this

6    six or seven months of "you have everything in April" and

7    we're still getting documents and we're still talking about

8    privilege logs is incredibly difficult to run discovery

9    trial-ready depositions that we're going to have issues with

10   jurisdiction over some of these witnesses, we are running

11   trial-ready depositions and we don't have documents from the

12   signatory and the gentleman that negotiated a lot of the key

13   documents.

14        So just -- I'm trying to explain and give a little

15   color to where we are, but from April, we have everything,

16   to where we are in September, they're still coming.

17             SPECIAL MASTER COHEN:  How do you explain

18   that, Sage?

19             MR. VANDEN HEUVEL:  Special Master Cohen,

20   since that e-mail, you issued your ruling that we were

21   supposed to add him as a custodian, so we searched high and

22   low to find any custodial file we could from him.  We were

23   finally able to find one.  Like I said, it was very limited.

24        In addition, we went back and we rereviewed what

25   documents we did have with Peter Sherman on them and we took

1    a more expansive view of responsiveness, and not just

2    documents relating to Purdue and opioids, but just documents

3    that seem responsive to the discovery issues in this case,

4    you know, remuneration, you know, those issues, and so

5    that's why we've identified additional documents to produce.

6            SPECIAL MASTER COHEN:  Well, I'm not going to

7    say anything other than that. . . the description of

8    circumstances that I just heard in earlier cases sometimes

9    led to reopening of depositions and shifting of costs.  And

10   so people need to be really careful about any statement that

11   they've completed and produced discovery, which the other

12   side then relies on to take other discovery and depositions

13   and so on and then we find out it's not true.

14        I understand your story.  There was an interim event,

15   and it was my order, but I'm -- I just want everyone to

16   understand that that's an important statement, that we have

17   produced everything.  It shouldn't be made unless you've

18   produced everything.

19        Okay.  That was 425, Agenda Item 425.  The next one is

20   448.

21        Paul, this is what your pin is in, but we're skipping

22   over it again until we continue through some of these.

23            MR. FARRELL:  Now's the right time to talk

24   about this.

25            SPECIAL MASTER COHEN:  Hold on a minute.

1        (Brief pause in proceedings.)

2                    SPECIAL MASTER COHEN:  I'll take your word for

3    it.  Go ahead.

4                    MR. FARRELL:  If you don't mind, may I

5    approach?

6                    SPECIAL MASTER COHEN:  That's fine.

7                    MR. FARRELL:  I'm going to present to the

8    Court a document.  I have copies for everybody.

9        (Brief pause in proceedings.)

10                   MR. FARRELL:  So let me just give a real

11   quick -- I'll make it as brief as I can.

12       This is an administrative fee contract between Medco

13   and Purdue Pharma.  It is dated 2008.  It is signed by

14   Peter Sherman.  Exhibit A is a list of promises Medco made

15   of services they would provide to Purdue Pharma.

16       When I deposed the guy in charge of client contracts

17   and looked at Exhibit A --

18                   SPECIAL MASTER COHEN:  Who is that?

19                   MR. FARRELL:  Jason Zilocchi and Adam Adamcik,

20   the two guys that were in charge of Purdue depositions, and

21   asked them about --

22                   SPECIAL MASTER COHEN:  Sorry.  I just want to

23   be sure I understand.

24       Are those Purdue -- who are they?

25                   MR. FARRELL:  I deposed the two people from

1    custodians from Express Scripts.

2                    SPECIAL MASTER COHEN:  Go ahead.

3                    MR. FARRELL:  That were in charge of this

4    contract, and I asked them to tell me about Appendix A, the

5    list of services, they told me that was lawyer written,

6    you'll have to go see Peter Sherman.

7         I asked for the Shermanator files and have 78 pieces

8    of paper, some of them marked "confidential" that are just

9    pictures of thumbtacks.

10        I want to take a 30(b)(6) where I just say, listen,

11   Express Scripts, for whatever reason, we've missed the

12   Battleship game, I would like for you to go and find

13   somebody at your company knowledgeable on this contract and

14   stick them in a chair so that I can ask somebody questions

15   that have answers.

16        This process is going to be repeated across a whole

17   bunch of documents for this same reason.

18        I'm not asking you to expand the hours right now, nor

19   am I asking and hoping you won't limit me to the hours, I'm

20   bringing to the Court's attention that I have an obligation

21   to create, through -- not only that this document is

22   authentic, but to lay the foundation for its entry into the

23   record under Rule 602 with a witness with knowledge and then

24   to have somebody testify about its contents.  That's our

25   obligation under the Rules of Evidence.

1          This is a process.  It's going to take time.

2          We gave them a list.  We're not just broadly saying a

3     whole bunch of documents.  For a year they've had a list of

4     Medco documents that they produced, Express Scripts

5     documents that they produced.  It's -- we gave them the

6     Bates stamp number, the title, the date.  I want a butt in a

7     chair to raise their right hand and start creating the

8     record and I'm going to go through them one after the other

9     after the other so that when this case gets remanded, like I

10    got remanded back in West Virginia, and the defense stands

11    up and objects on authentication, on foundation, or on

12    sponsoring witness, that I have a record to be able to

13    present to get the documents admitted.

14         So we can play this the slow, long way.  We're ready

15    to go.  It's been pending a year.  I'd like the Court's

16    blessing to start the process.

17              SPECIAL MASTER COHEN:  Is Sherman still

18    around?

19              MR. WASSERMAN:  Special Master Cohen, this is

20    Matthew Wasserman for Express Scripts.

21         No.  He worked at Medco, not Express Scripts, and he

22    left the company in 2012.

23              SPECIAL MASTER COHEN:  Can he -- okay.  So but

24    is he still alive?

25              MR. WASSERMAN:  We have no record of him and

1    have not been able to contact him.

2         He worked at the -- a different company that was

3    acquired by Express Scripts, you know, 13 years ago.

4                   SPECIAL MASTER COHEN:  Can you tie this knot

5    possibly through a third party?

6                   MR. FARRELL:  No.  No.

7         These are -- these are internal decisions that Medco

8    made.

9                   SPECIAL MASTER COHEN:  I mean, here's my

10   concern, Paul, it's the same as some of the authentication.

11   Optum says, we don't have them in our files.  You say, then

12   we'll take a 30(b)(6).  Optum, justifiably, says, that's not

13   going to get you anywhere, we have nobody -- they're not in

14   our files so nobody can testify that they're authentic.  And

15   so my question is similar.

16                  MR. FARRELL:  So these aren't third party

17   documents.

18                  SPECIAL MASTER COHEN:  No, I know.

19                  MR. FARRELL:  These are their documents they

20   gave us.

21                  SPECIAL MASTER COHEN:  Fine, a third party

22   doesn't work, but how does a 30(b)(6) work?

23                  MR. FARRELL:  They have an obligation to put

24   somebody in a -- they have an obligation to prepare somebody

25   to discuss the foundation for the Medco agreement.  And if

1    it comes down to that, yes, we entered into this independent

2    contractor arrangement with Purdue Pharma that we agreed to

3    provide services, including utilization management programs,

4    yes, that's a promise that we made that we got paid for, in

5    this document it sets forth the legal obligations, that's

6    it.  But saying I don't know what it means, I didn't write

7    it, it's not good enough.

8                    SPECIAL MASTER COHEN:  And so what's your

9    specific ask?

10                   MR. FARRELL:  Is I'm asking for your blessing

11   to start taking 30(b)(6) depositions and start the clock

12   rolling, with the understanding, I'm going to be at it for a

13   while.

14                   MS. VIERA:  Special Master Cohen, Olga Viera

15   for Express Scripts.

16        For the record, we are on Number 448 which is

17   regarding the PEC's motion for additional Optum 30(b)(6)

18   time and we're talking about Express Scripts, so I just want

19   to be clear that we are not talking about the topic that

20   we're supposed to be talking about.

21                   SPECIAL MASTER COHEN:  Well, we're just

22   talking about 30(b)(6)s but I appreciate your paying

23   attention to the details, but I think we need to get the

24   substance of it, if you want to respond to that.

25                   MS. VIERA:  Yes.

1          We had a meet-and-confer with the PEC on Friday and we

2     looked at -- again, I think Optum and Express Scripts are

3     differently situated with this and that's why I raised that

4     we're talking about Express Scripts right now.

5          We have 12 notices.  We have 800 documents in those

6     notices.  The notices -- there are two issues, and Paul and

7     I have talked about this multiple times, one thing is

8     authentication and foundation of documents and there's

9     another issue which is substantive questions they want to

10     ask about how the company operates, how things were done.

11     There's a third issue of data which we'll skip for now.

12          So if you look at those, even with those broad

13     buckets, 800 documents and questions about what does this,

14     you know, provision in the document mean for 800 documents,

15     is going to take more than 24 hours, and probably multiples

16     of that.

17          If you just look at their topics on substance, on how

18     does the -- you know, the PNT committee -- well, the PNT is

19     separate -- how does the VAC committee make decisions, how

20     did the TAC committee, what did they do, how did you

21     implement AOM program, there's 12 of these.  So what I have

22     told them is, there's no -- even if the topics are generally

23     okay -- and some of them are, I have no objection to the

24     topic generally -- it's going to take way too long, and

25     we're talking about 30 years' worth of information.

1          So when you say --

2                    SPECIAL MASTER COHEN:  It only needs to take

3     12 more years and you've got the 20-year rule so. . .

4                    MS. VIERA:  So what we talked about was, for

5     some of the substantive topics -- for example, when were

6     these utilization management programs implemented, how were

7     they created, I mean, these are very, very broad, over

8     30 years -- if you have specific documents you want to talk

9     about, to streamline this particular topic, give us the

10    documents and then we'll allocate time based on a small

11    number of documents that we can agree will be covered by the

12    deponent, but just these general questions about how things

13    were done, it would take probably multiple people to talk

14    about it over the 30-year period.

15         So it's really -- we're in a position right now where

16    the topics are extremely broad, there's 800 documents, and

17    there's only 24 hours under the CMO, under both CMOs if you

18    add the Rochester time with the Ogdensburg time.

19                    SPECIAL MASTER COHEN:  Right.

20                    MS. VIERA:  And so what I've been trying to

21    work through with them is streamlining it.

22         At this time, with the number of topics we have, we're

23    looking at 10 witnesses to cover the general topics and,

24    again, that's not getting into all of the specific areas and

25    the different issues within those notices.

1          So --

2                    MR. MOUGEY:  Special Master Cohen, let me make

3     a suggestion on streamlining.  Three 30(b)(6) --

4     Peter Mougey -- three 30(b)(6) that are ready.  They are the

5     Purdue contracts that that 30(b)(6) was served on ESI over a

6     year ago.  Purdue contracts, the corporate integrity

7     agreement, and the merger 30(b)(6).  There's three.  The CIA

8     and the merger are a couple months, two, three months old,

9     meaning that we served them on ESI two, three months ago.

10    There's three.

11         My suggestion would be that let's start with those

12    three and let's get going on these three.  Let's have a

13    witness ready.  ESI has had ample time to prepare for those.

14    They've had ample time to review, get a witness ready.

15    Let's go with those in the next 30 days.  Those are -- end

16    of September.  And let's start there and we'll continue

17    working with Olga through the remaining issues and --

18    including the most recent 30(b)(6)s.

19         But rather than trying to eat this whole elephant all

20    at one time, because this weaves through with the offensive

21    motion in limine and that possibly we can narrow down some

22    of this through the motion in limine.  So my suggestion is

23    the motion in limine, on these three topics, isn't going to

24    shove these to the side.  So let's start with three and get

25    them on parallel tracks on these three, the motions in

1     limine, and let's keep moving and working towards a

2     finality, but we've got to get started, just like in

3     February we said let's just start taking depositions and

4     now, I think, between Optum, ESI offensively, we've taken

5     approximately 30.  There have been 15, 16 defensive

6     depositions in Rochester, so we're pushing 50 depositions.

7     Let's start with three 30(b)(6) with ESI, get the motion in

8     limine process rolling, and work through all these issues

9     over the next 30 to 60 days.  But let's get going.

10                MS. VIERA:  Special Master Cohen, Olga Viera

11    for Express Scripts.

12         The other issue that I wanted to raise is that, for

13    example, this administrative services fee agreement is a

14    document dated January 1st, 2008, between Medco Health and

15    Purdue Pharma.  We may not have anyone -- I think this is

16    where you were going.  We may not have anyone who has any

17    knowledge about this document, which is 17 years old if my

18    math is correct, or 18 -- or whatever number.  It's very

19    old, and it's from Medco, which was a company that we merged

20    with.

21         So there is a very high possibility that some of these

22    documents and some of these transactions -- they mention the

23    Medco merger, they mention the corporate integrity

24    agreement, those are things that happened in the early

25    2000s, 2010s -- we may not have witnesses who can be

1    prepared to testify as to those topics because they just

2    don't exist and the company doesn't have that historical

3    knowledge anymore.  So that's another issue.

4         And what I'm concerned about, with Peter's suggestion,

5    and this is why I've been having these conversations with

6    them, is that they say, well, start with these three, but

7    three -- 24 hours will go by very quickly if they're asking

8    about historic documents that we have nobody to talk about

9    and they're getting into specific paragraphs of hundreds of

10   documents, and then they're going to say, well, now we want

11   to know how the company operates, now we want to know how

12   you made decisions regarding opioids, now we want to know

13   how your formularies worked and when you decided that

14   opioids should be on or off formularies, that's what's

15   really at issue here.

16        How Medco merged with ESI, how Medco -- how ESI dealt

17   or Medco dealt with a CIA agreement, none of that is really

18   key to this case and if they waste time on that and come

19   back and say now we really have the important stuff to talk

20   about, frankly, I think somebody's going to give them more

21   time, and that's unfair.

22        We know the topics they want to talk about.  They have

23   a time limit.  They should adhere to it and allocate the

24   time that they need through all of these topics and then we

25   can proceed, but just leaving it out there and taking up

53

1    time on these other topics that were served maybe some time

2    ago really doesn't make sense and it will not advance the

3    ball.  It's only going to get us back in here with their

4    request for more time.

5                SPECIAL MASTER COHEN:  Thank you.

6        So, Paul, what happens if the Court, the judge, says

7    no, this is your 30(b)(6) time?

8        You say, I'm going to be at it a long time.  Well,

9    maybe not.

10       So I think you have to at least think about how you're

11   going to deal with this if this is all you've got.

12               MR. FARRELL:  Yes -- this is Paul Farrell --

13   we understand.

14               SPECIAL MASTER COHEN:  Did you have something

15   that you wanted to say in response to what Olga just said?

16               MR. WEINBERGER:  I do.  May I?

17       Pete Weinberger.

18       I actually think Ms. Viera made our case for us.  I

19   agree with everything she said, except for the fact that she

20   thinks we're going to waste our time.

21       We have a right -- we have a right, within the

22   parameters set by the Court, to engage in the discovery that

23   we think we need to prove the case.  She doesn't have the

24   right to say you're wasting your time on this particular

25   subject or that.

1      We have -- believe me, we are focused on what it's

2      going to take to prove this case and what are the

3      depositions that we need to take.  And what she's -- what

4      she's -- you know, she keeps talking about 30 years ago.

5      Actually, what she -- what I really heard her say is that we

6      are a very complex and complicated company and an example of

7      that, and frankly how the depositions are going, is, we take

8      somebody, for example, who's involved in the contracts with

9      Purdue, or we take somebody -- let's -- better example.  We

10     take somebody who is familiar with formularies and how they

11     get put -- how a drug gets put on formulary lists and

12     whether there's limits to it, and we ask that witness about,

13     well, did you take rebates into account when you were

14     deciding that and they say, well, that's not my department,

15     that's -- that's marketing, that's the department that

16     interfaces with Purdue.  And so, you know, well, so then we

17     show them some deposition -- some e-mails, and their e-mails

18     actually reflect that rebates do have something to do with

19     it.

20         The point is that the way that both of these

21     defendants have set themselves up by departments, by

22     subsidiaries, by related companies, starting 25 years ago

23     and ending now, yes, it is complicated.  We need, and we

24     have a right, to take the depositions so that we can

25     understand how they made decisions, why they made decisions,

1      what was their profit motive and other things and, you know,

2      we're -- believe me, we want to do this as efficiently as

3      possible.

4          If we could look at our 30(b)(6) topics and suggest

5      that maybe some of those should be answered in written

6      questions, here's what we're going to get:  We're going to

7      get the same thing as we get for answers to interrogatories

8      and request for productions and RFAs.  A lot of

9      equivocating.  A lot of, well, we don't understand what

10     you're talking about.  You know, so --

11         And with respect to the other defendants in this case,

12     oftentimes we did have 30(b)(6) topics answered in writing,

13     but we got answers.  That's not what we're getting here and

14     that's why, you know, ultimately, I think we are going to

15     need more time.

16                  MS. VIERA:  Special Master Cohen, Olga Viera

17     for Express Scripts.

18         I'd like to remind Pete Weinberger and the Court that

19     they have 42 fact witness depositions.  There are 22 still

20     outstanding.  So a lot of this information that they want to

21     learn about Express Scripts and how Express Scripts operates

22     can come from fact witnesses.

23         We discussed corporate representative testimony and

24     the limits on that testimony as part of the CMO when all of

25     this started.  We advocated for a much shorter period of

1  time, and the Court granted the 14 hours in Rochester and

2  the 10 hours in Ogdensburg, that was the Court's order.

3  Nothing has changed that, and I submit there's no reason to

4  change that. They still have a lot of depositions that they

5  can take to discover the information they want, and

6  corporate testimony is a particular discovery vehicle that

7  should not be abused.

8       Just like they have a right to discover their case, we

9  have a right to protect our client.

10      Sorry.

11           SPECIAL MASTER COHEN: So I'm not changing the

12  time limits on 30(b)(6) depositions today. I may not change

13  them at all, and I'm not sure it's up to me at all. I

14  probably have something to do with it, but I'm not sure it's

15  entirely up to me.

16      All of that said, everybody's circling the drain. I

17  think it's fine if you want to start taking three 30(b)(6)

18  depositions, then start them up and let's see what starts to

19  happen. And maybe you'll figure out that, you know what, we

20  really don't need all that much more time, we're getting

21  what we need. Or maybe you're going to come back and say,

22  we were wrong, we actually need a hundred more hours and

23  we're not going to get to trial until 2040. And part of

24  what you're asking for, in many of these issues, is a delay

25  of your trial. So obviously that's something you need to

1     think about.  I'm sure you have.

2          But I agree that we need to start playing ball instead

3     of running around on the sidelines, and so start those up.

4          I think that was 448, as far as it went.

5          The next agenda item is 449.

6                    MR. IRPINO:  Anthony Irpino for the PEC.

7          Ms. Viera did correctly point out that was an

8     Optum-related agenda item, and we've talked about the

9     Express Scripts-related component.

10         And I get your ruling, and I get, you know, we need to

11    get off the sidelines on some of these.

12         I think from a starting point, we've got a number of

13    different deposition notices that have been served, that

14    have been served for weeks, or months.  Can we get a

15    timeline from you as to when to get those finalized by or be

16    back in front of you saying we can't get agreement?

17         I mean, can we get two weeks?

18                    SPECIAL MASTER COHEN:  Well, first of all, are

19    you talking about ESI and Optum or just Optum right now?

20                    MR. IRPINO:  I'm talking about the Optum

21    component of it.

22                    SPECIAL MASTER COHEN:  Okay.  And so -- sorry.

23    I just had to change gears and wasn't following entirely

24    what you were saying.  So what is it you are asking for?

25                    MR. IRPINO:  I'm asking for a deadline from

1    which we can either have finality, an agreement on the scope

2    of the written 30(b)(6) notices that have been served on

3    Optum, or be back in front of you and have that done.

4              MR. HATCHETT:  This is Andrew Hatchett for

5    OptumRx.

6         I think we would go back to what you said at the very

7    beginning, which is that -- my understanding is that we have

8    one additional notice to serve.  We'd ask that they serve it

9    and then we will respond.

10             MR. IRPINO:  So that's my point.

11             SPECIAL MASTER COHEN:  I understand the point.

12        Well, I did say, both as to ESI and Optum, that I

13   think the parties need to get all of them served and then to

14   work on finalizing and it doesn't seem to me that it's even

15   ripe to address the question of whether more time is

16   necessary until that process is -- has advanced quite

17   further than it has, but we need to have a deadline for the

18   process to advance further than it has and so --

19             MR. HATCHETT:  Can I add one thing for the

20   record?

21        We have taken one 30(b)(6) deposition already.

22        Sorry.  This is Andrew Hatchett.

23        So we've done the Optum Insight.  30(b)(6) has

24   occurred.  They may have -- I don't know if there's other

25   Optum Insight things that are outstanding or not, but we

1    have done a 30(b)(6).  We've moving forward on them.

2         I understand that we need to respond to the notices.

3    We think it would be helpful to have the final notice that

4    they keep promising and then we can identify it and look at

5    it and respond to the notices.

6              MR. IRPINO:  Well, Special Master Cohen, to be

7    crystal clear, I'm talking about the ones that have been

8    served.  I understand that there is another one that we're

9    talking about regarding data to be served.  I'm not applying

10   a deadline to that, although we'll serve this by a date

11   certain.

12             SPECIAL MASTER COHEN:  Right.  Friday,

13   the 26th, I want to hear back on what the status is of all

14   of that.

15             MR. IRPINO:  Thank you.

16             SPECIAL MASTER COHEN:  Okay.  The next

17   document is -- excuse me.  The next agenda item is 449.  I

18   don't see Debolina here, and I think that's because I

19   resolved that via e-mail.

20        Does everybody agree we don't need to talk about it?

21        Yes?

22             MR. HARDER:  Yes -- for OptumRx, this is

23   Bradley Harder -- that's right, Special Master Cohen.

24             SPECIAL MASTER COHEN:  I see nods from

25   plaintiffs.

1          The next agenda item is 434.

2                    MR. HATCHETT:  Special Master Cohen, this is

3     Andrew Hatchett for OptumRx.

4          And so I know that everybody received more e-mails on

5     this topic than they wanted to receive.

6          Just from our standpoint, at this point, we actually

7     don't really care how you resolve it.  We just ask that

8     however you resolve it, the same order be bilateral and that

9     it apply also to the plaintiffs with respect to our

10    request -- requests related to their formularies.

11                   SPECIAL MASTER COHEN:  Do you have a coin?

12                   MR. HATCHETT:  I'm sorry?

13                   SPECIAL MASTER COHEN:  Do you have a coin?

14                   MR. HATCHETT:  I don't carry coins anymore.

15                   SPECIAL MASTER COHEN:  Don't carry coins.

16                   MS. FITZPATRICK:  Special Master Cohen,

17    Laura Fitzpatrick for the PEC.

18         I will represent for -- to the defendants, and to you,

19    that to the extent that the bellwethers have produced

20    formularies in this case, we will supplement our discovery

21    responses to identify them by Bates.

22                   SPECIAL MASTER COHEN:  So I didn't hear the

23    last part, I'm sorry.

24                   MS. FITZPATRICK:  To the extent that the

25    bellwethers have produced formularies in this case, we will

1    be supplementing our responses to include Bates range

2    citations to those.

3                      SPECIAL MASTER COHEN:  I think that you're

4    agreeing to bilaterality.

5                      MS. FITZPATRICK:  I think -- well, yes.  I

6    think that's correct, yes.

7                      SPECIAL MASTER COHEN:  Okay.  That's my

8    ruling.

9                      MR. HATCHETT:  And it needs to be the

10   operative formularies, the ones that, you know, actually

11   controlled the Rochester health plans, but if that's the

12   case, then I think we can agree to that.

13        I'll talk to Laura and we'll get a format and we'll

14   respond in the same format that they do.

15                      SPECIAL MASTER COHEN:  Really good.  Coin is

16   flipped.

17                      MS. VIERA:  Excuse me, Special Master Cohen,

18   Olga Viera for Express Scripts.

19        I believe one of the issues, with the City of

20   Rochester at least, is that they had to go back to their

21   third-party provider and to their benefits administrator,

22   MVP and Excellus and others, to obtain that information.

23   They have produced some formularies, but they're not clear

24   that they are all of the formularies or that they're the

25   operative formularies.

1          We had an interrogatory.  You referred them to do this

2    work and to produce it, so they presumably have done the

3    work and if they've produced it, we would include all of

4    that also in the -- in the response that is forthcoming.

5                    MR. FARRELL:  This is Paul Farrell.

6          Let's be clear.  The City of Rochester is going to

7    search for, in all of its documents, formularies from its

8    health plan and then produce it and give them Bates stamp

9    numbers.  What she's asking for is for third parties that

10   were hired by the City of Rochester, perhaps, to go and

11   search their stuff.

12         They've subpoenaed the other companies.  Okay.

13         Am I correct there are subpoenas pending on the TPA

14   that you are referencing?

15                    MS. VIERA:  You're incorrect.

16         I believe they've already provided some of their

17   documents.  The -- what I -- my request was the City of

18   Rochester was supposed to go to their benefits managers,

19   their brokers, their people that are within their purview

20   and the people who worked with them --

21                    MR. FARRELL:  Yes.

22                    MS. VIERA:  -- to obtain those as per the

23   Special Master's order to provide that information to us.

24   To the extent that's been done, those should also be

25   catalogued in the response that's forthcoming.

1          MR. FARRELL:  So there's a difference, I

2     think -- there's a failure to communicate here.

3          So within the City -- capital "C" -- of Rochester

4     building, they have employees, and to the extent that within

5     the document production requirement we'll produce the

6     formularies.  But to the extent that those formulary

7     decisions are made by external contractors -- right?  Is

8     that what you're asking us to go get?

9          MS. MILLER:  This is Elizabeth Miller on

10    behalf of Express Scripts.

11         There has been certain disputes throughout this time

12    where certain decisions, the City has said that, no, these

13    documents or these information lies with our third-party

14    benefits administrator or with Excellus and MVP and the

15    Special Master has ordered the PEC to work with those third

16    parties to get that information.  So this is the same

17    situation here.  Where the formularies do not exist in the

18    City's document collection, we are asking the City to work

19    with those third parties with whom they contracted to get

20    the information, those formularies, to identify those

21    formularies, and tell us which ones are the operative

22    formularies.  Because there are document productions that

23    have been made by those third parties, but we don't know

24    which ones actually applied to the City each year.  They

25    could be drafts.  They could just be exchanges.  We're

1     trying to understand which ones are the operative ones.

2               MR. FARRELL:  So we are willing to sign an

3     authorization for you to talk to whoever you need to talk

4     to -- we will assist you in getting that information from

5     the third parties.

6          I don't know that we have any ability to reach that

7     decision internally without the input from the third

8     parties, but to the extent you're looking for -- from the

9     third parties, which formularies were the operable

10    formularies in force at the City of Rochester, we're

11    certainly willing to cooperate with you in your discovery

12    efforts.

13         I think what -- from our perspective, we've exhausted

14    everything we can do within our control.

15              SPECIAL MASTER COHEN:  Let me ask you a

16    question, just because I don't know what you all are

17    referring to.  What is an operative formulary as opposed to

18    a non-operative formulary?

19         I don't know what that means.

20              MR. FARRELL:  Which one was in force at the

21    time.

22              SPECIAL MASTER COHEN:  So you're getting

23    formularies that have nothing to do with it?

24              MR. FARRELL:  No.

25         So the City of Rochester is a public entity that has a

1    self-funded health plan.

2              SPECIAL MASTER COHEN:  Right.

3              MR. FARRELL:  They hire outside people,

4    professionals, to manage this fund.

5              SPECIAL MASTER COHEN:  Right.

6              MR. FARRELL:  They need to go see those

7    professionals.

8              SPECIAL MASTER COHEN:  I understand your

9    point.

10              MR. FARRELL:  And then those professionals may

11    have a variety of plans that people can pick from on

12    formularies, and they want to know which one of the array of

13    formularies were in force for the City of Rochester.

14              SPECIAL MASTER COHEN:  Which are the only

15    relevant ones, aren't they?

16              MR. FARRELL:  Right.

17              SPECIAL MASTER COHEN:  Okay.

18              MS. VIERA:  So that's exactly the issue.

19         They have a range of formularies that they pick from.

20    They made the choice.  They picked one out of the basket.

21    So MVP has given us the basket, but we need to know, from

22    the City of Rochester, what did they choose from the basket.

23              SPECIAL MASTER COHEN:  If they can.  I mean,

24    that's the issue, and I've said before --

25              MS. VIERA:  Right.  If they can't, they can't.

1          SPECIAL MASTER COHEN:  I said -- I mean, I'm

2    not sure what we're fighting about anymore because I said

3    before, you are correct, you guys have to tell Excellus or

4    whatever it is to be cooperative and produce whatever you're

5    asking for, but if they don't have it, they can't identify

6    by Bates numbers the operative ones they don't know, the

7    same way you -- there are documents you don't have.

8          So the best I can tell you is, you have a bilateral

9    agreement, you all have to do the very best you can to

10   identify, by Bates number, for the other side, these

11   formularies.  To the extent you have to go to a third party,

12   you have to go to a third party and each will be cooperative

13   with the other to make that happen.  Okay?

14          MR. HATCHETT:  I think we can continue --

15   sorry.  This is Andrew Hatchett of OptumRx.

16          We'll continue to meet and confer.

17          I appreciate Olga weighing in because she's obviously

18   closer to the issues on the offensive Rochester side, or

19   offensive for us.

20          I think the thing that she is harping on is it doesn't

21   actually help us just to have a list of every formulary that

22   they've ever produced.  We need to know which ones mattered

23   and so that's the purpose of what we are trying to get to in

24   our response, is a list of the formularies that, for

25   Rochester, matter.

1          SPECIAL MASTER COHEN:  Right.  And they should

2     identify those by Bates number to the fullest extent

3     possible.  To the extent they can't, you all should work

4     with the third party to get that done.

5          MS. FITZPATRICK:  Special Master Cohen,

6     Laura Fitzpatrick for the PEC.

7          Given that Optum has already identified them in an

8     e-mail, there's no reason to delay their supplementing their

9     responses to the RFPs so that we can have it, as

10    Mr. Hatchett termed it, in usable form -- usable evidence.

11    I just don't think there's anything further for us to talk

12    about.  We've agreed to do it bilaterally and so I'd --

13         SPECIAL MASTER COHEN:  Both sides should

14    proceed with all do haste.

15         MS. FITZPATRICK:  Thank you.

16         SPECIAL MASTER COHEN:  Is that lawyerly

17    language sufficient?

18         MS. FITZPATRICK:  Perfect.  Thank you.

19         SPECIAL MASTER COHEN:  Okay.  The next agenda

20    item is 437.

21         The parties reported that they were getting -- oh, I'm

22    sorry.  I'm reading wrong.  This is my issue having to do

23    with Optum privilege claims and I can tell you that I'm

24    getting close.  I hope to have a ruling to you soon, very

25    soon.

1          Agenda Item 439.

2          Okay.  So this is another issue where the plaintiffs

3      are asking for more and the defendants are saying if you

4      actually want what you're asking for, you're talking about

5      pushing this trial back another X, six months, one year,

6      whatever it is, two years, whatever it is and. . . that's

7      part one.  Part two is, you're dramatically increasing the

8      burden on us because what you've asked for amounts to 2

9      million new documents.  I'm guessing not all of them are

10     helpful, responsive, admissible, relevant.  And so what I

11     suggested -- and I didn't realize that the statistics we

12     were talking about were, you know, a couple days old, so it

13     makes sense that this hasn't yet been done -- was, hey, you

14     know, start looking at the search terms and how many

15     documents are coming up in response to this word or that

16     propinquity, you know, X within Y, and see if you can't

17     figure out a way to narrow this, and so I asked the parties

18     to do that.  But we're still left with the issue of this is

19     a lot of new documents that are going to have to be reviewed

20     for relevance and privilege and everything else and you guys

21     need to figure out, together, how to make this work.

22          I already ordered that it be done.  Now you see what

23     the result is.  The result seems to be somewhat unworkable.

24     So where do we go from here?

25                    MR. HATCHETT:  Special Master Cohen, this is

1    Andrew Hatchett for OptumRx.

2        I understand in the e-mails, back and forth, one of

3    the things you brought up was the context in which this

4    issue arose.  You raised -- I think you used the word

5    implacable -- is that the right word?

6              SPECIAL MASTER COHEN:  Yes.

7              MR. HATCHETT:  -- on our position kind of at

8    the outset.  Obviously, we did object.

9              SPECIAL MASTER COHEN:  It's my second favorite

10   word after gambit.

11             MR. HATCHETT:  Obviously, at the outset, we

12   objected to new national search terms on principle for a

13   couple of reasons:  ESI wasn't doing them, it was going to

14   create concerns, and we did not negotiate with them about

15   the specifics of the search terms that they were proposing.

16   That was the position that we came in, and you obviously

17   granted their order that they be run.  The terms are

18   extraordinarily broad and, so, we'll obviously meet and

19   confer with them.

20       To give you an example:  ESI is a stand-alone search

21   term.  Express Scripts is a stand-alone search term.

22   Prescription --

23             SPECIAL MASTER COHEN:  I would have crossed

24   those off.

25             MR. HATCHETT:  Prescription solutions is a

1    stand-alone search terms.

2                 SPECIAL MASTER COHEN:  I mean, somebody should

3    have been less implacable and said we're willing to talk

4    about this.

5                 MR. HATCHETT:  And part of it -- I mean, it --

6    I know there was a time frame.  I wasn't directly involved

7    in all those negotiations, but just the way it was coming,

8    the breadth of it, the sweeping nature of it, it just didn't

9    feel like we were going to be able to negotiate to a set and

10   we didn't feel like it was fair in the context of the

11   litigation, but that's where we were.  Understand what

12   happened.

13        Obviously, there's a lot of work to do to get it down

14   to a manageable set, and I don't know what that looks like,

15   but I do think it -- I guess I -- there's clarification that

16   we need on what the order is because the order, as it was

17   originally from you, was to run the search terms as they

18   presented them to us and it sounds like, my understanding is

19   now, the order is to negotiate.

20                 SPECIAL MASTER COHEN:  The order was to run

21   them.  You ran them.  We got the result.  And now I'm saying

22   if that's the result, we may need to work on it.

23                 MR. HURST:  Special Master Cohen, John Hurst

24   for the PEC.

25        Just to kind of give some context to where we are at

1    on this issue, we say that we've now seen, we've still not

2    seen.  The only time we ever hear a number come out of their

3    mouth about the number of documents is when we show up at

4    one of these hearings, this hearing and the last one.

5    They've never provided us with one speck of evidence about

6    what actually the search terms are hitting, what that

7    information involves, so we're kind of working in a black

8    hole here.  We don't know what the terms are that are

9    causing issues, to the extent there are.

10        I would point out that some of the terms -- for

11   example, ESI -- are terms that we are running on our side

12   with our custodians and that these search terms are for

13   custodians who are people who are picked because they would

14   have relevant information.

15              SPECIAL MASTER COHEN:  Well, ESI in your

16   custodial files is quite different than theirs.

17              MR. HURST:  I understand, Your Honor, but,

18   really, this is a situation where what we need is the data.

19   We need the information so we can work together to try to

20   sort through that.

21              SPECIAL MASTER COHEN:  I agree, and I think

22   I've ordered them to produce that data so you can start that

23   process.

24              MR. HATCHETT:  And we will -- we'll provide

25   more information.

1              You said a few days old; it was actually hours old.  I

2      mean, we had literally gotten it that morning, and we

3      understood that we had to notify the Court immediately.

4              I don't know if we need to make a record for it on

5      this hearing -- Brad is here, I'm putting him on the spot --

6      just in terms of the timing --

7                      SPECIAL MASTER COHEN:  No.

8                      MR. HATCHETT:  These systems kind of blow my

9      mind and how it is to get from a big number to numbers

10     tethered to specific strings or terms.  I don't know if

11     we're there yet.

12          (Simultaneous crosstalk.)

13                     SPECIAL MASTER COHEN:  We do not need to go

14     into the details.  What you do need to do is get into the

15     details with opposing counsel.  You need to sit down and

16     figure this out, as has happened many times in other cases.

17     Like I said in my e-mail, I've literally had to say no to

18     this term, yes to this term, change that term this way.  And

19     you all can get there, I know you can, because they don't

20     want to be inundated any more than you want to inundate

21     them, right?

22          So there's a lot of room for discussion and

23     negotiation, which I expect to occur with all due haste.

24                     MR. HATCHETT:  Understood.

25                     MR. HURST:  Yes, Special Master Cohen, we're

1    supposed to meet on Friday to try to move some of this

2    along, but I do think it would be helpful to have -- if you

3    would be willing to give us something of a timeline or help

4    us facilitate a timeline on this.

5        Our request to them for that meeting -- and we need to

6    work with reasonable terms here -- is just get a sense of

7    what the total search terms are that are hitting on each

8    block so we know what we're working with, hits by custodian,

9    because it could be a situation where certain -- you could

10   have a certain custodian with a certain term that's going to

11   keep coming up, and to identify terms that they believe are

12   leading to substantial relevant hits, and exemplars, as you

13   mentioned, I believe, in your e-mail, exemplars of how they

14   think those terms are a problem or creating a problem.  We

15   just need some sort of timeline for that because it's been

16   two months since our last meeting working through syntax

17   issues.  We think a timeline would help us get this to a

18   point where we can figure out what those issues are and work

19   this towards a resolution.

20           SPECIAL MASTER COHEN:  That's probably a

21   vendor question.

22           MR. HATCHETT:  Well, that's a Brad Harder

23   question, which is why I was looking to Brad.

24           MR. HARDER:  This is Brad Harder on behalf of

25   OptumRx.

1          Yes, we understand the request for additional

2     statistics and information.  We'll provide that on a rolling

3     basis as soon as it becomes available, exactly along the

4     lines that Andrew was talking about.  As it becomes

5     available, we'll pass it along.

6          I will say that the information we've provided so far

7     is part one of the search terms run across the custodians

8     that we've talked about already, John, in our negotiations,

9     so there will be a part two, there will be additional search

10    terms that will need to be run.

11         For example, we just received signoff from the PEC on

12    Sunday about the syntax errors and so it takes a day, it

13    takes two days sometimes to run these terms across millions

14    of documents.  And so it's not something like we can just

15    press the button and provide the results.  But we will

16    provide them on a rolling basis, including before our

17    conference tomorrow -- excuse me -- on Friday, in advance of

18    the conference on Friday, and continue to do that.

19              MR. HURST:  Yeah, I'm not certain on what the

20    first round of information, unless it was Andrew's e-mail,

21    because we've, to this day, still not had any

22    communications, other than in front of this Court when we

23    show up, about what the numbers are.

24              SPECIAL MASTER COHEN:  What he's saying is

25    he's run -- I understand what's going on.

1          You guys need to talk.  I trust that it will happen

2     with some speed.  I'm watching, so I think you're going to

3     get through this.

4                    MR. HURST:  Thank you, Special Master Cohen.

5                    MR. HARDER:  Understood.

6                    SPECIAL MASTER COHEN:  That was 439.  The next

7     agenda item is 342.

8          This is one that I mentioned in an e-mail.  There were

9     no additional submissions since the last time we were

10    together, and I don't believe there is any issue for me to

11    resolve currently.

12                    MR. HATCHETT:  I'm sorry, what agenda topic

13    did you say?

14                    SPECIAL MASTER COHEN:  442.

15                    MR. HATCHETT:  442.

16                    SPECIAL MASTER COHEN:  Sorry if I misspoke.

17         Am I correct?  Does anybody --

18                    MR. ELSNER:  Special Master Cohen, this is

19    Mike Elsner from Motley Rice on behalf of the PEC.

20         You are correct, there is nothing to resolve today,

21    but we have received a request for an additional extension

22    of time to produce this information and we're coordinating

23    with Optum to provide it and we'll give you an update, but I

24    just want to alert the Court to an issue, which is that, you

25    know, you initially ordered that they provide this

1    information by July 24th.  We agreed, as a compromise, to

2    give them another month in which to do that.  We also had an

3    agreement that they were going to give us, if they could, on

4    a rolling basis, an example of what the answers are going to

5    be so that we didn't get to the end of this process and

6    realize that we were -- need to bring more argument to you.

7    And the whole purpose that you ordered this to be done in

8    such a tight time frame was because we needed it for

9    depositions that are occurring.

10                   SPECIAL MASTER COHEN:  Right.

11                   MR. ELSNER:  And now they're asking us for

12    another extension to the end of October.  I've asked, as a

13    contingency to that, that they produce to us what they had

14    promised on a rolling basis.  We still have not seen any

15    sampling of an answer, even though they said they have a

16    portion of the sample prepared.  And I've also asked that

17    they consider giving us some additional 30(b)(6) time given

18    the difficulties that they've had in collecting this

19    information, the fact that it's contained over -- stored in

20    different places over different periods of time and that

21    there are not one or two witnesses with knowledge about the

22    information over time.

23         So that's sort of where we are.  I just wanted to

24    apprise you of that.  There's nothing necessarily to rule on

25    today, but we are taking depositions and have depositions

1    coming up where those witnesses interacted with the clients

2    about these particular programs and we don't know which

3    programs they implemented or not, so we're taking a

4    deposition sort of fishing around to figure out where they

5    would be and we don't have the answer that we need in order

6    to do it.

7                    SPECIAL MASTER COHEN:  So, two things.

8            First of all, I know that you guys, because I think

9    you said it in a status report, are proposing extension of

10   discovery deadlines, so that gives more room.  Frankly,

11   depending on some of what happens here in these rulings, you

12   may want longer than that, and the Court may give it to you,

13   I don't know, but that's part one.

14           I just want to give you all a little bit of a

15   weathervane that, unsurprisingly, the Court understands that

16   everybody thinks you might need more time after all, but why

17   haven't we rolled anything out yet?

18                    MR. HARDER:  Special Master Cohen, this is

19   Bradley Harder for OptumRx.

20           We will by the time -- by Friday, as we said we would,

21   by the end of this week.

22                    SPECIAL MASTER COHEN:  Okay.  Thank you for

23   your status report, and thank you for promising to get some

24   stuff out by Friday.

25           Okay.  Just because 443 is a little bit more

1    complicated, let me jump over to 428 and come back to it.

2                    MR. HATCHETT:  443 is the one that you're

3    skipping -- right? -- but that's the one that we're

4    reserving for tomorrow?

5                    SPECIAL MASTER COHEN:  Is it?

6         Yes.

7         And 428, I think we talked about.

8                    MR. HATCHETT:  I mean, that's -- it's a

9    discovery request related to RFAs, but the RFAs are

10   authentication-based, so I think we're --

11                   SPECIAL MASTER COHEN:  Okay.

12                   MR. HATCHETT:  My understanding is that it's

13   being resolved on a different channel now.

14                   SPECIAL MASTER COHEN: All right.  So, is it

15   3:30?  Yes.

16        Except for remuneration, is there anything else that

17   anyone wants to raise?

18                   MS. MILLER:  Special Master Cohen, this is

19   Elizabeth Miller on behalf of Express Scripts.

20        On the upcoming items, I don't intend to ask you to

21   rule on them today, but for the first four items on the

22   agenda, that would be 446, 447, 452, and 453, we are still

23   awaiting the City of Rochester's and the City of

24   Ogdensburg's responses to our letters that were the genesis

25   of these agenda items, so we're hoping that while we have

1  everybody in the room today, we can get a commitment on when

2  we can get a response from you on these items.

3              MR. BADALA:  Sure.

4        Special Master Cohen, this is Salvatore Badala for the

5  plaintiff.

6        Just on 446, the 30(b)(6), we sent a communication in

7  May to defendants.  They never responded for about three

8  months.  We had a meet-and-confer about two weeks -- I'm

9  sorry, that would have been two and a half weeks ago, or

10 three weeks.  We'll be getting response on the 30(b)(6) by

11 Friday to them.

12       When it comes to 34 and 35, they should be getting a

13 letter back by Friday -- sorry, I'm looking at some other

14 people, but that they should -- they should be receiving

15 that by Friday or before that.

16       Respond -- 452, we're actually supplementing.  We

17 agreed to supplement, by Friday, 21 and 22, so we were

18 surprised to see that on the agenda.

19       And 453, we're going to respond to, but they just

20 selected their custodians for Ogdensburg when we had that

21 conference, I think it was Friday now at this point, or

22 maybe it was the week before, so we're confused about the

23 delay in production when they just selected those 18

24 custodians that we spoke about a couple weeks ago.

25       And it only came on behalf of Express Scripts, because

1    my understanding is Optum still hasn't produced Ogdensburg,

2    haven't even agreed on search terms or made productions.  So

3    it's unusual it just came from one defendant, but if they

4    would like a written response by us, Ogdensburg will be

5    making their productions and meeting the deadlines.  I can

6    tell you that's what we're going to do.  And especially with

7    the schedule being kicked, I think it's unnecessary to have

8    that on the agenda.

9              SPECIAL MASTER COHEN:  Okay.  Well, you can

10   talk about that.  Given that it's upcoming, I didn't read

11   them and it sounds like you've just committed to doing most

12   of what they asked about by Friday, so I don't think there's

13   anything more I need to say.

14             MS. MILLER:  Thank you.  We look forward to

15   those responses and we'll address it, if needed, with you in

16   the future.

17             SPECIAL MASTER COHEN:  Very good.

18        So we've come to the end of what I wanted to complete

19   today, with the caveat that we're coming back tomorrow to

20   talk about remuneration and also the caveat that we've still

21   got 25 minutes.  So we're going to take at least a

22   five-minute break.  My question really is, does it make

23   sense to start talking about remuneration right now?

24             MR. FARRELL:  This is Paul Farrell.

25             SPECIAL MASTER COHEN:  I'm sorry, let me just

1    add one thing.

2         My intention was to go over the documents once more so

3    I could get it more into my head, but we -- that's not

4    strictly necessary.

5              MR. FARRELL:  This is Paul Farrell.

6         I would think that for this last session it would make

7    more sense to ask for the Court's wisdom and patience to

8    help discuss, with Express Scripts, how we can streamline

9    the admission in laying a foundation with sponsoring witness

10   its on documents, which could resolve a lot of the 30(b)(6)

11   topics.

12             SPECIAL MASTER COHEN:  Well, maybe I'm

13   confused, but I think what comes under the heading of

14   remuneration is far broader than just 30(b)(6).

15             MR. FARRELL:  Right.  Right.  What I'm

16   suggesting is that remuneration, if you want to take time to

17   read what you're talking about reading again, we could spend

18   the last 15 minutes talking amongst ourselves, with the

19   Court's involvement, on how we can get documents produced --

20             SPECIAL MASTER COHEN:  I see.

21             MR. FARRELL:  -- by the PBMs admitted and

22   records on remand.

23        I'm trying to continue to educate, in my own way, the

24   Court, the problems that we have when Judge Polster's not

25   the presiding judge.

1          SPECIAL MASTER COHEN:  Well, except that

2   you're suggesting I have wisdom and patience, and I don't

3   know about that.

4          MR. FARRELL:  The record will not reflect any

5   tone in my statement, just the written words.

6          SPECIAL MASTER COHEN:  Let's take five minutes

7   and we'll come back and figure out how to finish up.

8     (Recess was taken from 3:34 p.m. till 4:01 p.m.)

9          SPECIAL MASTER COHEN:  Everybody, we're done.

10  So if you need to leave, you can leave.

11    (Proceedings adjourned at 4:01 p.m.)

12

13                    **C E R T I F I C A T E**

14     I certify that the foregoing is a correct transcript
    of the record of proceedings in the above-entitled matter
15  prepared from my stenotype notes.

16        */s/ Heather K. Newman*                *9-12-2025*
        HEATHER K. NEWMAN, RMR, CRR                DATE

17

18

19

20

21

22

23

24

25