1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF OHIO
2                        EASTERN DIVISION AT CLEVELAND

3      ------------------------------X
       IN RE:                        :    Case No. 1:17-md-2804
4                                     :
       NATIONAL PRESCRIPTION          :
5      OPIATE LITIGATION             :
                                      :    Thursday, September 11,
6                                     :    2025
                                      :
7                                     :
                                      :
8                                     :    DISCOVERY DISPUTE HEARING
                                      :
9      ------------------------------X

10

11

12                      TRANSCRIPT OF PROCEEDINGS

13

14                        BEFORE DAVID R. COHEN

15

16                          SPECIAL MASTER

17

18

19

20     Official Court Reporter:          Heather K. Newman, RMR, CRR
                                          United States District Court
21                                        801 West Superior Avenue
                                          Court Reporters 7-189
22                                        Cleveland, Ohio 44113
                                          (216) 357-7035
23

24

25     Proceedings recorded by mechanical stenography; transcript
       produced by computer-aided transcription.

```
 1      APPEARANCES:

 2      For the Plaintiffs Executive Committee:

 3              Peter H. Weinberger, Esq.
                Paul T. Farrell, Jr., Esq.
 4              Peter J. Mougey, Esq.
                Michael E. Elsner, Esq.
 5              Michael Thakur, Esq.
                Marco A. Palmieri, Esq.
 6              Evan M. Janush, Esq.

 7

        On behalf of OptumRx:
 8
                Andrew Hatchett, Esq.
 9              Brandon Springer, Esq.

10

        On behalf of Express Scripts:
11
                Olga M. Suarez Viera, Esq.
12              Sage R. Vanden Heuvel, Esq.
                Matthew K. Wasserman, Esq.
13

14                              *   *   *   *   *

15

16

17

18

19

20

21

22

23

24

25
```

1          CLEVELAND, OHIO; THURSDAY, SEPTEMBER 11, 2025; 1:51 P.M.

2                              --oOo--

3                        P R O C E E D I N G S

4                    SPECIAL MASTER COHEN:  All right.  I think we

5     got there.

6          So I'm coming to you via the microphone in the

7     courtroom and not via Zoom, and we need to run this the same

8     way as we've done before, which is to say that you need to

9     identify yourself when you speak so that Heather can hear

10    you.  She is listening, as she would as we were yesterday,

11    through the courtroom system and also has a laptop in front

12    of her that will display to her the same thing that I see

13    when we look at documents together via Zoom.

14         Heather, it looks like that went dark.

15         (Off-record discussion.)

16                    SPECIAL MASTER COHEN:  Okay.  It's one of

17    those days where tech doesn't work.  My e-mail also is

18    bouncing back, so if you get e-mails from me that isn't from

19    david@specialmaster.law and instead it's david@davidrcohen,

20    it's because my e-mail isn't working properly.

21         All right.  Let's jump into it.

22         First, I had asked the parties to chat and report back

23    to me about, I believe it was, from memory, Agenda Items

24    423, 424, and I saw some e-mail traffic.

25         It sounds like the parties are moving toward each

1    other pretty well, and I had said that I would rule on it if

2    it wasn't resolved, but it sounds like you're very close.

3    And so I'm going to give you the weekend and ask you to

4    continue to confer about that and get back to me on Monday.

5         And I believe that was -- I think it was Sage and

6    Laura who were working on that, but in any event, if you

7    guys would continue to work on that and see if you could

8    come to agreement, I think you're very close.

9         Any questions on that?

10             MR. MOUGEY:  Can we just -- this is

11   Peter Mougey.

12        As a placeholder, can we go ahead and set a time up

13   Monday or Tuesday to pound out any unresolved issues?

14             SPECIAL MASTER COHEN:  That's fine.  One

15   second.

16       (Brief pause in proceedings.)

17             MR. MOUGEY:  We'll respond today.

18             SPECIAL MASTER COHEN:  Let's set a telecon,

19   using my usual telecon numbers, at 1 o'clock Eastern.

20             MR. MOUGEY:  Monday, right, David?

21             SPECIAL MASTER COHEN:  Correct.

22             MR. VANDEN HEUVEL:  Special Master Cohen, this

23   is Sage Vanden Heuvel for Express Scripts.

24             SPECIAL MASTER COHEN:  Can you -- I'm sorry

25   for that, Sage.  Can you speak more loudly, please?

1            MR. VANDEN HEUVEL:  Yes, Special Master Cohen,

2     this is Sage Vanden Heuvel for Express Scripts.

3          That time works for us.

4            SPECIAL MASTER COHEN:  Thank you.

5          Okay.  So the reason we're here today is to talk about

6     Agenda Items 441 and 443 which have to do with opioid

7     remuneration.  And as I indicated earlier in my e-mail to

8     the parties, the PEC has raised that issue with respect both

9     to ESI, and separately, I guess, also to Optum, and it only

10    makes sense to take those defendant by defendant and partly

11    because I think the issues have already sharpened a little

12    bit more with regard to ESI, I'd like to start there.

13         And I want to begin with a request to the PEC, which

14    is that in, I think, it's the most recent submission to me

15    about this topic, there were six items that were listed that

16    you still wanted more information about and -- is that kind

17    of the menu that we're going to be talking about today?

18            MR. THAKUR:  This is Michael Thakur on behalf

19    of the PEC.

20         Special Master Cohen, in our update, we indicated that

21    it's narrowed to three issues, so the first being we're

22    seeking top line figures.

23            SPECIAL MASTER COHEN:  That's Number 1.

24            MR. THAKUR:  That's Number 1, and how they

25    calculated the top line figures for opioid.

1          SPECIAL MASTER COHEN:  Is that Number 2?

2              MR. THAKUR:  No.  That's part of Number 1.

3              SPECIAL MASTER COHEN:  Go ahead.

4              MR. THAKUR:  Number 2 is rebates and admin fee

5    data before 2014.

6              SPECIAL MASTER COHEN:  So that's a part --

7    that's Number 4.

8              MR. THAKUR:  Yeah, I guess that's the new

9    Number 2.

10             SPECIAL MASTER COHEN:  Go ahead.

11             MR. THAKUR:  And Number 3 is we have data

12   fields that we are requesting.

13             SPECIAL MASTER COHEN:  All right.  So what I'm

14   understanding you to say is that old Number 2 read, "Dollar

15   figures for components of opioid remuneration and their data

16   sources."  Are you saying that that is not something that

17   you're still looking for, or is that kind of 1A?

18             MR. THAKUR:  That's sort of 1A.

19             SPECIAL MASTER COHEN:  All right.  So it's --

20   I would call it your old Number 1 and your old Number 2 are

21   still your concern.

22        Number 3, which was "a complete set of manufacturer

23   payment reports," ESI said it did not object and so I assume

24   that's not -- that is why it is not at issue today.

25             MR. THAKUR:  Correct.  I believe they've

1      represented they've completed their production of that.

2                  SPECIAL MASTER COHEN:  Good.

3           And then Number 5, which you didn't mention, is client

4      playbooks and --

5                  MR. THAKUR:  I think they represented they'd

6      provide that.

7                  SPECIAL MASTER COHEN:  Okay.

8           All right.  So we're looking at what I would call 1,

9      2, 4, and 5, and I guess the best way to go through this is

10     one topic at a time, and I'm not actually sure about that.

11          As I was thinking about how to hear all this and make

12     sure that I understood it, I'm not certain whether I want to

13     hear everything you have to say and then everything ESI has

14     to say in response or kind of take it topic by topic.  I

15     think it's probably topic by topic, but I don't want you

16     guys to, you know -- excuse me, I don't want you to be

17     interrupting each other a lot.  I want to kind of hear all

18     of what you have to say on a given topic and then let ESI

19     respond.

20          So given that, why don't you stop -- start with the

21     top line dollar figures.  And I know that there were

22     documents and e-mails that you cited in support of that

23     argument and one of those was an e-mail about, you know, a

24     $60 million figure that somebody came up with, but I never

25     saw who it was and what that was about.  So one of the

1    things I'd like to understand is that, because it seems to

2    be something that you're basing your arguments on, but

3    anything else you want to take me through.

4              MR. THAKUR:  Sure.  And it might help to kind

5    of broaden that because of their August 8th e-mail admitting

6    they can calculate -- meaning Express Scripts can calculate

7    margin on a drug-by-drug basis.

8              SPECIAL MASTER COHEN:  So you need to show me

9    that e-mail, because I'm not sure I took that from anything

10   I saw.

11             MR. THAKUR:  Okay.  That's -- I can share my

12   screen on that.

13        All right.  So this is an August 8th e-mail from

14   Matthew Wasserman, and it indicates -- there's three bullets

15   points.  It says, "In short, Express Scripts does not claim

16   it cannot calculate drug level margin."

17        Take that to the affirmative, they can calculate drug

18   level margin and, therefore, we are asking for that drug

19   level margin on a nationwide basis during all the relevant

20   years.

21        They have given us, previously, rebate and admin fee

22   data for the opioid drugs from 2008, 2009 through the

23   relevant period.  That, obviously, doesn't include spread

24   pricing.

25        Here, they're saying they can calculate it on a

1    drug-by-drug basis.  We don't have that on a nationwide

2    basis.

3                    MS. VIERA:  Special Master Cohen, this is

4    Olga Viera.

5         We are not seeing the rest of the response.

6    Matthew Wasserman responded again to clarify what he meant

7    by drug level margin, and it's exactly what we've been

8    saying all along regarding what the limitations are on the

9    data.

10        So I don't know if you want to just scroll up and see

11   Matt's -- the rest of Matt's e-mail, or if you don't have

12   it, Matt can screen share his e-mail.

13                    SPECIAL MASTER COHEN:  Is it this document,

14   Olga?

15                    MS. VIERA:  It was a response to this, but I

16   don't think it -- I don't know that Mike is showing the

17   right one.  Because when he sent it to you, he didn't send

18   the complete.

19                    SPECIAL MASTER COHEN:  So while you're putting

20   that up, Matthew, let me just ask a quick question.

21        You said that you're seeking this information on a

22   nationwide basis.  Do you already have it on a New York

23   basis or something less than national?

24                    MR. THAKUR:  We have -- we have rebate and

25   admin fee data through 2014 for New York.  And we have --

1    this will kind of get into the data, but we have fields that

2    can show margin, what they've claimed, it's more complicated

3    than that and that's sort of the basis for why we want

4    additional fields.

5              SPECIAL MASTER COHEN:  What did you want to

6    show me, Matthew?

7              MS. VIERA:  So, Matt can jump in if you'd

8    like, but he was clarifying here that what -- the

9    transactional data that we've provided --

10             SPECIAL MASTER COHEN:  Right.

11             MS. VIERA:  -- has already included the fields

12   to calculate that margin number that we've been talking

13   about.

14        So the issue is that they're now seeking more data,

15   but additional data is not going to give them more

16   information regarding this subject matter.

17        The available information and the claims data has

18   already been produced, and it is these two fields that have

19   been specified.  And I can show you, I have a demonstrative

20   account that -- sorry.  Joe Wright's just asked to be

21   admitted into the room -- I have a demonstrative account

22   that I can show you how you can calculate this -- what is

23   this claim -- this drug level margin, but it's not

24   remuneration for opioids on a drug level basis because

25   that's not calculated and there's a lot of complexity to

1    that, and I can also show you that.  I don't want to

2    interrupt the presentation, but I was just pointing out that

3    it was incomplete if you don't include this follow-up

4    e-mail.

5                    SPECIAL MASTER COHEN:  Hard for me to follow

6    this.  Do what you can to help me.

7                    MR. THAKUR:  Sure.

8        First -- first level.  We're asking for nationwide

9    amounts of how much they made on opioids from 2006 through

10   2019.

11       They have previously given nationwide numbers for how

12   much they made on opioid rebates, drug by drug, from about

13   2008 onward, and how much they made on admin fees

14   nationwide, 2008, 2009, onward, on a yearly basis.  What

15   we're saying is the PBMs make money on opioids on more than

16   just rebates and admin fees.  We know they make money on

17   opioids by spread pricing.  Another way to say that is

18   margin on the drugs, the difference between how much they

19   charge their clients -- the paying members -- and how much

20   they pay the pharmacies for the opioids.  They calculate

21   that.  We've sent spreadsheets showing they calculate that

22   on a drug-by-drug basis nationwide.  We have a snapshot of

23   that from 2016 that they did that.

24       Their admission that --

25                    SPECIAL MASTER COHEN:  Was that -- so you have

1    one -- you're telling me you have one spreadsheet from 2016

2    that does what you just said.

3                    MR. THAKUR:  Correct, and we're asking them to

4    produce all the relevant years on a nationwide basis.

5                    SPECIAL MASTER COHEN:  And I'm sure that this

6    has been discussed and maybe I missed it, but why only one?

7    Is that because it was a one-off?  Is it because you think

8    that they have hundreds more that they haven't produced?

9    What's the status?

10                    MR. THAKUR:  I don't know, but I know that

11    they have the fields to calculate it on a nationwide basis,

12    and they've admitted as much, that they can calculate spread

13    on a nationwide basis, drug by drug.  That's what we're

14    asking for.

15                    SPECIAL MASTER COHEN:  So can you show me the

16    2016 spreadsheet?

17                    MR. THAKUR:  Sure, and that is 441L.

18                    SPECIAL MASTER COHEN:  And this is exactly

19    where I need help because as I was reading all of this

20    stuff, this is very hard to ingest.

21                    MR. THAKUR:  Okay.

22        So this -- I'm showing 441L, and for record purposes,

23    this is ESI -- the Bates number is ESI_MDL_000748018.

24        So this was an analysis they did in 2016 for opioids

25    calculating, as you can see, for both home delivery and for

1     the retail network; their ingredient margin per drug,

2     meaning the spread margin per drug; and then their rebate

3     per drug.  And they say up here, "Assume a 17 percent rebate

4     keep."

5          And I'll note, this is significant because this

6     contradicts their own representation that they made in their

7     second supplemental response.  Page 12 they indicated that

8     their keep for rebates on opioids is only 5 percent.  This

9     directly contradicts that during the relevant time period.

10               SPECIAL MASTER COHEN:  All right.  So let's

11    stop here and, Olga, I guess I want to understand if this

12    is -- well, first of all, I want you to tell me what this

13    is, if you think it's not exactly what it appears to be, and

14    also, are there more of these and, if so, where are they

15    and, if not, why not?

16               MS. VIERA:  Okay.  So we discussed this at the

17    last hearing where we had started the opioid remuneration

18    discussion.  This was a spreadsheet created by an analyst

19    named Danny Dyke.  You may recall that we talked about it.

20    We talked about the fact that he created this, and we talked

21    about the possibility of deposing Danny Dyke about this.  We

22    have gone back and spoken to Danny, and I've actually

23    communicated this to the PEC, that he does not recall how he

24    came up with this, he doesn't remember what numbers he

25    plugged in where and how he did it, but we do have testimony

1    from Snezana Mahon, who is the person who was putting

2    together the AOM program, and she testified that this was

3    done kind of back-of-the-napkin to come up with some

4    financial information for the company to determine pricing

5    for AOM and the economic effects of the AOM program.

6         This is not -- this was not intended to come up with a

7    definitive number of how much money was made on opioids,

8    what the exact margins were.  As you can see, it says

9    "assume," not factually this is the rebate.  It's an

10   assumption.  And as far as Danny can remember, this was all

11   just assumptions and numbers that he pulled together.  He

12   doesn't have a recollection.

13        Obviously, they're welcome -- they have 22 depositions

14   left.  They're welcome to depose him about it and he'll

15   testify to whatever he can recall, but when you -- when

16   Snezana was deposed and she was asked these questions about

17   margins, she made it very clear, and they have her

18   testimony -- in fact, Baron & Budd, the attorneys arguing

19   this now, were the attorneys who took -- not the actual

20   attorneys, but their firm, took Snezana's deposition, and

21   she testified that this margin in this case does not mean

22   revenue, it does not mean profits.  Everybody in the room,

23   who's looking at these numbers for the purposes that they

24   were looking at it, understood that margin was not

25   equivalent to revenue or profit.  It was a number, kind of

1    like I said, back-of-the-napkin, taken from the data that

2    they do have.

3         So going back a little bit, the data we've produced,

4    which was based on negotiations with counsel for months and

5    based on limitations that -- Special Master Cohen, that you

6    imposed on the data production and the dates available at

7    the time, we produced the amount that the client paid us and

8    the amount that we paid the pharmacy.  If you subtract those

9    two amounts, you get a margin, you get a spread.

10        Our point is that beyond that, there is a bunch of

11   client reconciliations and if I -- I don't know if you want

12   me to interrupt his presentation, but I have my own

13   presentation of an example of why this is not a simple,

14   straightforward calculation based on those two numbers in

15   the claims data.

16                  SPECIAL MASTER COHEN:  Well, hold on.

17                  MS. VIERA:  But the claims data --

18                  SPECIAL MASTER COHEN:  Hold on.  Let me

19   interrupt you, Olga, or let me stop you.

20        So this spreadsheet, which you say -- and I apologize,

21   it's not easy to hear you through the system here, but I

22   think you said a fellow named Dan did it -- so is the data

23   that he would have used to create this spreadsheet only and

24   all of what has been produced to the plaintiffs?

25                  MS. VIERA:  No, because this is -- this

1     appears to be -- again, we're not sure where it comes from

2     and what data was pulled, but this does appear to be broader

3     than New York.

4          You know, again, when we had the discussions about

5     data and what was going to be produced, the ruling was that

6     we were going to produce the claims data for the state of

7     New York, which we have done.  We've gone beyond that, and

8     that was another dispute, some months ago, for the

9     remuneration response on rebates, to ask for nationwide

10    information, but our position, and the Court's ruling, and

11    what we've been doing for years now, has been the claims

12    data of the state of New York.  And so they have that, and

13    they can calculate the margin in defense of what we paid the

14    pharmacy and what the client paid us, that delta, they can

15    calculate that for the state of New York based on the data

16    that they have for the years that they have it.

17                 SPECIAL MASTER COHEN:  Let me ask kind of a

18    different question, Olga.

19         So you're producing, or have produced, a whole bunch

20    of contracts with clients, and also contracts with

21    manufacturers.  Well, first, are those client contracts --

22    they are, I think -- all New York contracts?

23                 MS. VIERA:  We've produced contracts for the

24    client sample.

25                 SPECIAL MASTER COHEN:  Right.  And those are

1    all New York clients, are they not?

2                    MS. VIERA:  Yes.

3                    SPECIAL MASTER COHEN:  And have you produced

4    data that would allow the plaintiffs to go through those

5    contracts and see -- calculate themselves, let's say, all of

6    what they are seeking, which is the amount of rebates, the

7    amount of administration fees associated with that contract,

8    the amount of the spread pricing or margin that was

9    connected to those contracts?  Because mostly what you've

10   been saying is, look, we've given you guys the contracts,

11   you have everything you need to figure this out.  But that's

12   only true if they have all the data that's associated with

13   each of those contracts.

14                   MS. VIERA:  Yes.  I believe they do have all

15   of the data that is associated with those contracts and can

16   make some of this -- can make some of these calculations on

17   their own.

18        There is one -- just to be totally transparent, at

19   some point they asked us for the AWP number that is used in

20   some of these calculations.  That is a publicly available

21   number that they can pull from a site called the First

22   Databank.

23                   SPECIAL MASTER COHEN:  Well, so can you.  If

24   they can, then you can, and you can produce it.  So that's

25   easy.

1                    MS. VIERA:  Sure.

2          I mean, it's equally available to both sides.

3                    SPECIAL MASTER COHEN:  Let me go back to the

4    plaintiffs.

5                    UNIDENTIFIED SPEAKER:  Special Master Cohen --

6                    SPECIAL MASTER COHEN:  One second, please.

7    Let me go back to the plaintiffs first.

8          I don't know who's speaking because I can't tell, but

9    I'll get back to you in just a minute.

10         So what about that?  What about the concept of you're

11   asking for nationwide, or all of New York, but if you have a

12   sample of contracts that you chose from New York clients,

13   and have all the data, I get that it becomes work that you

14   may prefer they do instead of you or that you want a broader

15   universe, but would that not give you everything you need to

16   get at what you need to get at?

17                    MR. THAKUR:  No.

18         I'll let my colleague Marco Palmieri speak to the data

19   that we received and we're requesting, but for the

20   nationwide data, we've got to prove this case, and we've got

21   to show motive, or we'll attempt to show motive through this

22   evidence, and the evidence is incomplete that they've given

23   us.

24         They've given us some rebate information nationwide,

25   so the admin fee data, but clearly this -- these documents

1    show they make money from opioids from more than that.  It

2    includes spread pricing, which is a significant component of

3    their revenue when it comes to opioids.  They have the easy

4    ability to calculate this nationwide during the relevant

5    time frame.  That is what we're seeking.

6                        MR. WEINBERGER:  If I may -- Peter Weinberger.

7        And we're comparing apples with oranges when it comes

8    to what prior orders have entailed regarding nationwide

9    versus statewide data.

10       The prior orders had to do with dispensing data --

11                       SPECIAL MASTER COHEN:  Are you talking

12   about --

13                       MR. WEINBERGER:  -- whereas this data --

14                       SPECIAL MASTER COHEN:  Are you talking about

15   former bellwethers?

16                       MR. WEINBERGER:  Yes.  Yes.

17                       SPECIAL MASTER COHEN:  Go ahead.

18                       MR. WEINBERGER:  Regarding limitations of a

19   particular state within which the bellwether exists.  In

20   this particular case, we're talking about attempting to

21   demonstrate what -- what is the amount of money, from a lot

22   of different sources, that the PBMs make.  And what they

23   make on a nationwide basis is important to how they deal

24   with national formularies and negotiations, you know,

25   standard negotiations with their clients, not just what

1      happens in New York.

2           I mean, there isn't a -- I'm certain there isn't a

3      New York, you know, sort of standard policy that they use to

4      do this.  This is a nationwide policy.  This is their

5      nationwide marketing department that interacts with the

6      clients.  And, so, you know, that's why we need this --

7      these nationwide figures, because that's an appropriate

8      piece of evidence for us to present to the jury.

9                     SPECIAL MASTER COHEN:  Did you want to talk

10     about data?

11                    MR. PALMIERI:  Yes.

12          Do you mind if I stand, Special Master.  It's just

13     kind of --

14                    SPECIAL MASTER COHEN:  You need to talk into a

15     microphone.

16                    MR. PALMIERI:  Oh, that's fine.  I can stay

17     here.

18          So I think it's important to kind of set the context

19     here.  We are talking about -- I thought a lot about our

20     last hearing and Ms. Viera's recommendation and I think this

21     is being made more complex, quite candidly, than it needs to

22     be.  I want to take a step back.

23           There are two universes of data that we're talking

24     about.  There is the claims data that Ms. Viera keeps

25     referencing saying that we've produced to them, and we've

1  given them, everything they need to calculate margin and

2  spread pricing.  And they keep asserting that over and over

3  again, saying we have everything that we need.  And they

4  also say that, well, you can't just use that because you got

5  to go to the contracts and it's a very complex process.

6  Right?

7          There's a separate universe of information and data

8  that we have come across in the form of discovery that my

9  colleague has shared, and that's in the form of those

10  spreadsheets that we've sent that --

11              SPECIAL MASTER COHEN:  Spreadsheet.

12              MR. PALMIERI:  Well, at least regard to this

13  one, the spreadsheet that references margin pricing that,

14  based on representations, what I understand ESI is saying,

15  this was a one-off and, you know, it was a discreet

16  modeling.  We don't know, and it doesn't sound like they

17  know either, where it came from.  Right?

18          And from what I understand, the witness that they're

19  referring to didn't actually testify on this spreadsheet,

20  never actually saw it.  They were asked a question about the

21  top level e-mail.  But I'm going to put that aside for a

22  second.

23          We have this spreadsheet, that's one universe of data,

24  and then the claims data -- right? -- that they have

25  produced to us.

1          Here's the problems with what they're saying about the

2     claims data.  They keep going back and saying, we gave you

3     these two fields, bill net, check them out, payment, check

4     them out, that's all you need to calculate spread pricing,

5     stop asking us for more.

6          That's not correct.

7          Number one, they're asking us essentially to rely and

8     trust that ESI's representations about these data fields

9     contain everything we need.  We don't know that unless we

10    have the full scope of data.  What they're representing to

11    us is those fields are aggregate algorithms of all the other

12    fields that you're asking for.

13         I don't know that.  We don't know that.  And in

14    10 years that I've been -- that I prosecuted defendants, I

15    never once went to them and asked them to give me their

16    evidence of guilt.  Right?  We do our own investigation.

17         So we would submit that we're entitled to that to

18    verify what they're saying.

19         But more importantly, Ms. Viera has said, you need to

20    go to the contracts.

21         The contracts refer not just to AWP pricing.  Right?

22    We've taken a look at some of those contracts.  In order to

23    try to determine the proper spread on those, they also refer

24    to other variables that we don't have.  Maximum allowable

25    cost is one of them.  Right?  Maximum reimbursement amount.

1    There are other variables that are referenced in those

2    agreements that are included in the additional fields that

3    we are asking for that our experts that we're talking to

4    tell us they need in order to accurately calculate spread.

5        We didn't pull these 96 fields out of thin air.  All

6    right?  I went to the people, and we went to the people, who

7    are really good at math and we asked them, what do you need,

8    and this is what they gave us, and this is what they're

9    telling us that they need in order to do the calculation.

10            SPECIAL MASTER COHEN:  So to bounce around a

11   bit, what about the fact that there was a negotiation on

12   data fields a long time ago and many of these, all of

13   these -- I don't want to say all, but I think all -- weren't

14   requested, and this was after having litigated in

15   Jefferson County for a while so that you kind of knew what

16   these were about.

17            MR. PALMIERI:  Well, to the extent that we had

18   any prior information about them, what I would submit to

19   you, Special Master, is that we were negotiating with a

20   blindfold on.  That's just the reality.

21       Number one, we didn't know what we needed because we

22   didn't have the contracts.  Right?

23       They tell us, well, you need -- in order to do this

24   accurately, you need to go look at the contracts.  We didn't

25   have them.  So how can we possibly be put to our mettle to

1    know what we are supposed to know in terms of those

2    variables when we actually hadn't had a complete set of

3    those agreements?  Now that we've started to go through them

4    and we see these additional variables -- right? -- now we

5    know and have a little bit more refined understanding about

6    what we need in terms of data fields.

7        But there's another variable here that I think it's

8    important to discuss, and that is, in Mr. Wasserman's e-mail

9    from August 8th he says, by their own admission, just using

10   these two data fields that we provide to you will not give

11   you an accurate reflection of ESI's profitability.  Right?

12   That is because you have to take into account

13   client-specific reconciliations -- this is his e-mail --

14   pricing guarantees, and other factors that are not

15   calculated or tracked on a drug-by-drug basis.

16       In addition to this e-mail, in their discovery

17   responses about remuneration, they include these vague

18   references that "we don't just make money on spread, we get

19   it from other sources."  That's why we want the data.

20       And I think it's important to kind of dovetail with

21   our discussion yesterday, Medco, ESI's legacy company, they

22   settled a case with DOJ because they had these side

23   agreements.  They weren't making money off spread or

24   rebates.  That was the whole purpose of those -- of the

25   corporate integrity agreement and all of those settlements,

1    the allegations that were settled apart is that they had all

2    these side agreements where they were collecting admin fees,

3    data fees, educational grants.  So if ESI had these other

4    types of agreements and there are other fees that were tied

5    to these agreements where they were making money, which

6    would be in line with everything that they're telling us,

7    those additional data fields would tell us that.

8         If you go through those 96 data fields that are

9    Appendix A, there's one that is called Other Billable

10   Amount.  Right?  If you look at them, it says, admin fee,

11   there's other fees, there's ingredient costs.  There's a

12   field in there that just says "bill other fee," and it's

13   just a generic reference to some other fee that the client

14   may have been billed for whatever reason.  We don't know

15   what that is, and if that's additional remuneration, that's

16   relevant to our case and we're entitled to it.

17              SPECIAL MASTER COHEN:  So a couple questions.

18   One is, this corporate integrity agreement and settlement

19   that you're referring to, when was that?  I'm sorry.

20              MR. PALMIERI:  I believe that was 2012.

21              SPECIAL MASTER COHEN:  I assume that that

22   wasn't opioid-related only.

23              MR. PALMIERI:  I'm just using that

24   anecdotally.

25              SPECIAL MASTER COHEN:  No.  I'm -- I'm asking.

1              MR. PALMIERI:  Yeah.

2              SPECIAL MASTER COHEN:  It was not.  Am I

3     correct?

4              MS. VIERA:  Special Master Cohen, Olga Viera.

5        It had nothing to do with opioids.

6              SPECIAL MASTER COHEN:  No.  So -- and that

7     leads to this question:

8        Part of -- I think part of ESI's problem is having to

9     break out the opioid portion of all of your questions.  And

10    it seems to me that some of your questions almost don't need

11    to be opioid specific, in other words, if you can show that

12    there were -- I'm just choosing something random -- rebates

13    in a contract for all drugs, which, by definition, includes

14    opioids, then you're kind of learning what you need to know.

15       If there are admin fees for all drugs with a client,

16    irrelevant of whether those drugs are opioids, then you're

17    getting information that you need and maybe is sufficient

18    for trial.

19       So I'm trying -- part of what I'm trying to do is

20    figure out whether the plaintiffs' request for

21    opioid-specific information, which I think the defendants

22    are saying we don't -- we just don't keep it that way, you

23    know, we work with a client and we get a rebate on, you

24    know, a class of drugs or all the drugs, we get an admin fee

25    on the whole thing, not just opioids, so we can't get give

1     you what you're asking for the way you're asking for it.

2     Well, maybe you don't need it because if it applies to all

3     drugs, it applies to opioids.

4          Can you talk to me about that?

5                    MR. PALMIERI:  Within the context of this

6     specific data, these fields, if I understand it correctly,

7     within the -- there's -- within the commonality for all the

8     claims data there is an NDC number.  So we can calculate, at

9     the claim level and isolate for all the opioid drugs that

10    are relevant in this case.  And so that's why we're asking

11    for this data, because they do include a field that would

12    allow us to zero in on the opioid-specific drugs.

13                   SPECIAL MASTER COHEN:  In the claims data now?

14                   MR. PALMIERI:  Yes.

15         It's the NDC number.

16                   MS. VIERA:  Special Master Cohen, this is

17    Olga Viera.

18         I just want to make sure that I'm going to have a

19    chance to respond to all of this because there's so much

20    mixing of apples and oranges and inaccurate statements that

21    I just want to make sure that I have a chance to properly

22    explain the finances and how it all works.

23                   SPECIAL MASTER COHEN:  Go ahead, Olga.  It's

24    your turn.  Go ahead.

25                   MS. VIERA:  Okay.  So --

1              SPECIAL MASTER COHEN:  And can I ask you to

2     move close to your computer or your mic.  It's -- I think it

3     might help.

4          Thank you.

5              MS. VIERA:  Sorry.  I'm not even sure where my

6     mic is on my computer.

7          Is this better if I'm this close?

8              SPECIAL MASTER COHEN:  I think so.

9              MS. VIERA:  Okay.

10         So where to start?

11         The data fields.

12         So we provided the PEC with I want to say -- and

13    Matthew will correct me if I'm wrong -- but I want to say it

14    was over a thousand fields with definitions, with

15    descriptions of what was in the fields.  They had a chance

16    to analyze it.  They had a chance to show it to their

17    experts.  They had client contracts, because we had been in

18    litigation for years in Jefferson County, again, Baron &

19    Budd was involved in that case, so -- and so were other

20    members of the PEC.  So they had client contracts and they

21    had all of the fields.  The fact that they didn't do the

22    work when they had the opportunity to do the work when we

23    were negotiating those fields is not a reason to double the

24    number of fields produced in this case.

25             Once again, all of the issues that they are referring

1    to that are unique to the client contracts are not going to

2    be captured in individual client fields, plain fields.

3    These are done on a client by client level.

4         So the way that the contracts work -- and I'm talking

5    about spread pricing -- again, the conversation just now

6    confused spread pricing with rebates, and those are two very

7    different things.

8         On spread pricing, you have a contract that will

9    have -- with a client that will say we guarantee you will

10   pay "X" per prescription -- okay? -- then we go to the

11   pharmacy and we negotiate with the pharmacy what we're going

12   to pay them per prescription.  That number may vary between

13   all of the different pharmacies.  So if you go to CVS, you

14   may pay -- we may be paying CVS "X" for that prescription.

15   If you go to Walgreens, we may be paying them "Y" for that

16   prescription.  If you go to an independent pharmacy, we may

17   be paying them "Z" for that prescription.

18        You're paying a set amount.

19        At the end of the year, we don't go drug by drug, what

20   did you pay here, what did they pay there, it's a guaranteed

21   amount for the entire client book.  And so there's a true-up

22   at the end, or in the quarter -- depending on the client,

23   they have different time frames when they want to true up

24   the amounts that were paid for for prescriptions and then --

25   Matt -- thank you -- Matt is showing my demonstrative that I

1   forgot about -- and then the -- there's a true-up that will

2   show how -- whether we paid too much, or too little, and

3   then there's reimbursements back and forth.  There may also

4   be reimbursements with the pharmacy when the pharmacy --

5   when we have a pharmacy agreement that guarantees an amount.

6        So just using the data and those fields, which is what

7   we provided, gives you a simple number, but it's not the

8   whole picture, and the whole picture is not captured by the

9   claims data.

10       We can produce 96 fields -- not that we're agreeing to

11  do that -- but that's still not going to give you the

12  numbers that you would calculate in the true-ups on a client

13  level.  It's just not done at the drug-specific level.

14       As you've pointed out, they have found one spreadsheet

15  where a calculation was made.

16       By the way, you gave them the ability -- you gave them

17  permission, if they needed that, to depose Danny Dyke, I

18  think it was over a month ago now, and they have not

19  requested his deposition.  Probably because I told them he

20  doesn't remember anything about it, but they had that

21  chance.  They could have deposed him and they could have had

22  his answers to the questions about that spreadsheet if they

23  wanted it.

24       But the fact that there's only one line of -- you

25  know, in the -- in the 30 years of production, there's only

1        one spreadsheet making that calculation about margin and

2        making those assumptions is indicative of the fact that we

3        just don't do this.  We don't operate in the way that they

4        operate.

5            Spread pricing does not affect formulary decisions.

6        It does not affect where things are placed on the formulary,

7        so their theory that these decisions on formulary

8        placement -- which is the liability theory -- right? --

9        what's relevant here -- is dependent on spread pricing is

10       just -- it doesn't -- it doesn't carry forward.  That's not

11       the way it works.

12           So here's the example of MVP, which is one of the

13       largest clients in Rochester, and the data that they have

14       will give them the carrier name, the claim ID -- the rows

15       that you see here -- and then "A" is the bill net check

16       amount and "B" is the bill net -- pay net check amount.  So

17       what we bill the clients, what we pay the pharmacy, and then

18       there will be a difference -- right? -- in some cases.  In

19       this case, in MVP, it was a passthrough.  There was no

20       margin, no money was made based on the sale or on the

21       dispensing of that one prescription.

22           If you go to the next example, Excellus.  Excellus was

23       also a very large client in the Rochester area.  Here, you

24       have a different scenario where the client has agreed to a

25       spread arrangement and, as you can see, at the bottom, you

1    see a prescription for oxycodone where the claim level

2    margin is $0.73 and then you see another prescription for

3    hydrocodone where the claim level margin is a negative

4    $6.88.

5         Above, in the blue box, it shows what is in the

6    contract about how this -- the guarantees that are applied.

7    So once, at the end of the year, or in the quarter, or

8    whenever this client wants these true-ups, we go back to

9    what we've guaranteed them and all of the numbers that you

10   see in the claim level margin are added up -- right -- and

11   so Excellus Commercial will have "X" amount of margin that

12   it would have made and then that is compared to these

13   guaranteed numbers and then if they have paid too much, we

14   have to reimburse them.  If they've paid too little, they

15   have to reimburse us.

16        On the other hand, it's not shown here, but there's a

17   pharmacy contract which will have similar guarantees.  If

18   we've paid them too much, based on guarantees and provisions

19   of our agreement, we'd have to pay them the difference.  If

20   we've paid them too little -- or if we've paid them too

21   much, they reimburse us.  If we've paid them too little, we

22   make up the difference.  So the amount, at the end of the

23   day, that is made on spread is calculated at the client

24   level, and you'll see -- I'm sure they're going to show you

25   some spreadsheets where you've seen that -- but it's done at

1    the end once all of these reconciliations are done.

2         That is not maintained in a data field or in any

3    number of data fields that you can combine to get that

4    number.  If we had that, we would have done that a long time

5    ago.  It's just not done that way because the guarantees

6    vary by clients and it's not done at the drug level basis.

7                   SPECIAL MASTER COHEN:  Let me ask you --

8                   MS. VIERA:  Do you have any questions on that?

9    Does that make sense?

10                  SPECIAL MASTER COHEN:  Olga, let me ask you

11   about this, the document that I'm looking at.  So, the claim

12   level margin for those two, on one I assume drug, not just

13   transaction, but that drug, every transaction for that drug,

14   there was a $0.73 difference, and that was to the benefit of

15   ESI, right?

16                  MS. VIERA:  No.  Not right.

17        And so, first of all, this is this one claim, okay, so

18   the numbers change -- can change throughout the year, and it

19   depends on the pharmacy.  So what we paid a pharmacy for a

20   particular claim could be different.

21        Similarly, what the client paid could be different

22   based on the plan, based on the different provisions in the

23   plan.

24                  SPECIAL MASTER COHEN:  So just this

25   transaction, you made $0.73, so far.  I understand that

1    there are other things that have to be figured out, but this

2    transaction is to the benefit, by $0.73, to ESI; correct?

3                    MS. VIERA:  Well, at this moment in time,

4    but --

5                    SPECIAL MASTER COHEN:  Yes, I'm getting there.

6    I will finish --

7                    MS. VIERA:  -- eventually, when it's trued

8    up --

9                    SPECIAL MASTER COHEN:  I will finish.  I want

10   to take it through.

11        And the transaction below that, there was actually a

12   loss to ESI of 6,088 cents, on that transaction at that

13   moment.

14        Am I following it?

15                    MS. VIERA:  Correct.  Yes.

16                    SPECIAL MASTER COHEN:  Okay.  And so there are

17   then millions of transactions, each with claim level margin

18   that you add up at the end of the year.  And let's say that

19   when you add all of those up, that ESI made an average on --

20   across all transactions all year of $0.15 per transaction.

21   Okay?  How does that compare -- that $0.15, all transactions

22   over the course of the year -- to the numbers in the blue

23   rectangle box above?

24        In other words, how does the true-up happen?

25                    MS. VIERA:  Okay.  So then it depends -- and

1    I'm sorry but I would have to -- I'm not an expert on

2    this -- right? -- so my understanding is likely limited, and

3    obviously they are free to depose somebody to talk about

4    these things in more detail --

5            SPECIAL MASTER COHEN:  Okay.  I got --

6            MS. VIERA:  -- but my understanding --

7        Okay.  So my understanding is that there will be a

8    guaranteed amount per prescription that they will say this

9    was a guarantee per prescription and they may have

10   something -- as you can see here, they have a brand

11   guarantee and a generic guarantee, an effective rate, and

12   they'll compare that to the numbers that they have and then

13   they will -- they'll come up with the difference and either

14   pay it or get it reimbursed.

15           SPECIAL MASTER COHEN:  I see.

16       So, again, just using my numbers, there's a difference

17   for the ESI National Plus Network of 15 percent and

18   17 percent of 2 percent and that 2 percent gets moved on

19   the. . . brand drugs.

20       Am I halfway correct?

21           MS. VIERA:  I'm not -- I'm not following you.

22           SPECIAL MASTER COHEN:  So in your -- in your

23   blue rectangle box, under Minimum Brand Effective Rate, it

24   says AWP 17 percent for the ESI National Plus Network.

25       Do you see me?

1          MS. VIERA:  Yes.

2          SPECIAL MASTER COHEN:  And my example was if

3     you add every transaction, every year, for that network, and

4     it was $0.15 per dollar or $0.15 margin, then the difference

5     is 2 percent, and that's the true-up.

6          I'm just trying to understand how this all works in an

7     imperfect world.

8          MR. WASSERMAN:  Special Master Cohen, this is

9     Matt Wasserman for Express Scripts.

10         So what this is saying in the blue box is for drugs

11    filled through one of these networks, the client will

12    receive a drug price, which is AWP minus 17 percent, or AWP

13    minus (unintelligible) percent.  At the end of the year, we

14    look at all the drugs that were fall drugs that were filled

15    in that network and try to ensure that the client, in the

16    end, for all drugs, only paid AWP minus 17 percent.

17         SPECIAL MASTER COHEN:  I see.

18         MR. WASSERMAN:  And the point we're making

19    with this slide is that the plaintiffs already have all this

20    information.  They have, at the bottom, the claims fields to

21    calculate claim level margin.  They have the contract, which

22    is what's in the blue box, to be able to calculate sort of

23    how the calculations happen, and then they have -- we've

24    produced the true-ups, the end-of-year reconciliation

25    reports, that we have found for each of the sample clients.

1    So they are able to actually see the true-ups.  They don't

2    have to imagine how the math is calculated.

3         Our point is simply, asking for more data fields isn't

4    going to change any of this.  They already have all the data

5    fields they need to be able to do this calculation.

6                   SPECIAL MASTER COHEN:  In all of the stuff

7    that's gone back and forth -- this is a question for

8    plaintiffs -- have you given me a list of the data fields

9    that correspond with the contractual terms you say are

10    referenced and not produced yet?

11                  MR. PALMIERI:  They are Appendix A to our

12    June 20, 2025, letter.  Those include --

13                  SPECIAL MASTER COHEN:  Can you pull that up

14    and show it to me?

15       (Brief pause in proceedings.)

16                  MR. PALMIERI:  So just by way of a few

17    examples, Special Master Cohen, you have there, Line Number

18    1, which references the APW unit cost, my Number 62.

19                  SPECIAL MASTER COHEN:  I'm seeing it as

20    Line 1.

21                  MR. PALMIERI:  Line Number 1 refers to the APW

22    unit cost.

23                  SPECIAL MASTER COHEN:  Right.

24                  MR. PALMIERI:  Line Number 62. . .

25                  SPECIAL MASTER COHEN:  Bill max unit cost

1    amount?

2              MR. PALMIERI:  Yes.

3         That refers to the maximum allowable cost that are --

4    that I referred to earlier, that that is one of the

5    variables that's referenced in the contracts.

6              SPECIAL MASTER COHEN:  Okay.  So explain to

7    me -- Matthew says you don't need those.  Tell me why you

8    do, and I'm going to ask him, tell me why he thinks you

9    don't.

10             MR. PALMIERI:  Well, I think this goes back

11   to, number one, the defendants are trying to define for us

12   how we're going to calculate spread.  They're saying this is

13   how we want you to do it.  I think, from a starting

14   position, that's not how this should work.

15        We are entitled to discovery, and what I understand

16   from our experts is that when they've gone through the data

17   and then they've gone through the contracts, they're the

18   ones -- and what I'm representing to this Court and to the

19   Special Master, is they're saying they need this data.  What

20   I hear the defendants saying is, no, you don't, and I hear a

21   lot of testimony from ESI attorneys, and a lot of it has to

22   do with, number one, we don't have to accept their

23   methodology.  We're in the discovery phase.  Maybe we do at

24   the end of the day calculate margin spread based on those

25   two fields, but we're entitled to do our own analysis.

1          Secondly, they're asking us to accept their

2     representations that those fields are accurate when,

3     frankly, based on the record so far, this "trust us" is not

4     sufficient, because they've been wrong before.  And I'm not

5     accusing -- I'm not saying Ms. Viera or ESI attorneys are

6     intentionally misleading us, but I don't know if their

7     client's telling them the whole truth or telling them

8     everything they need to know.  But that's why we have

9     discovery.

10         And so that's why we need these additional -- we need

11    those additional variables, so we can do a full and

12    complete -- and I think it's important to refer back to

13    Judge Polster's March order --

14                SPECIAL MASTER COHEN:  I know what he said.

15    You don't need to go there.

16                MR. WEINBERGER:  I think there's a --

17    Peter Weinberger.

18         There's one other point that I want to correct about

19    what Ms. Viera said.  She said, you know, what they're

20    looking for is what was the motive for placing a drug on the

21    formulary.  That's incorrect.  What we're trying to derive

22    from this is what was the -- looking at all the sources of

23    potential revenue, what was their revenue generated per

24    bill.  Because it is our theory, as it was in all other

25    cases, that increased volume equals, you know, diversion and

1    abuse and if increased volume increases revenue, that's an

2    important part of this case.

3              MS. VIERA:  Special Master Cohen --

4              MR. PALMIERI:  May I add one more thing,

5    Special Master Cohen?  Just one more.

6              SPECIAL MASTER COHEN:  Sorry, Olga.  One

7    second, please.

8              MR. PALMIERI:  And, again, I just want to

9    underscore, this is all within our discussion of why we want

10   the data for spread pricing.  There's another relevant

11   reason why we want these data fields, and that's to explore

12   whether or not there were other avenues of remuneration and

13   those fields may well lead us to there, but we don't know.

14       And to the point -- if they're saying -- if their

15   whole point is you don't need it, you have everything you

16   need, what's the big deal?  Why not just -- if they're being

17   transparent --

18              SPECIAL MASTER COHEN:  It's time and money

19   that's the big deal.

20              MR. PALMIERI:  Well, we're about to extend, if

21   I understand correctly, the discovery deadline here.

22              SPECIAL MASTER COHEN:  That's something on,

23   first of all, your all proposal and, second of all, what

24   happens here.  And so --

25              MR. PALMIERI:  And I understand that.

1          SPECIAL MASTER COHEN:  -- one of the things

2     that I have to be very conscious of is time and money.

3          MR. PALMIERI:  But we also asked for

4     these things a long -- we would have had them by now if we

5     had gotten them, I think, when we originally asked for them,

6     at least with respect to the admin and rebate data, but

7     Judge Polster's order, as you know, says that remuneration

8     is a critical issue, critical issue in this case.  So I

9     don't think cost really is a basis.

10         Thank you.

11         SPECIAL MASTER COHEN:  Go ahead, Olga.

12         MS. VIERA:  Okay.  So there's so much to say.

13         Discovery has to be valid.  It's not make the

14    defendant spend every single dime they have to answer

15    questions that have no relevance to the case.

16         The fact that there's one spreadsheet in 30 years that

17    we've been able to find where someone did a margin

18    calculation related to opioids is indicative of the fact

19    that this was not something we were doing on a regular basis

20    to make decisions about how we were adjudicating opioid

21    claims.  I think that's kind of the end game here, is were

22    we doing this analysis, and was it influencing our actions.

23    The answer to that is clearly no.  I mean, there's just no

24    question about that.

25         So what they're trying to do is have us create

1    analysis that we never created, that we never relied on,

2    that we never used for any purpose so that they can use it

3    at trial to say that somehow that that motivated us, but

4    that -- it's completely backwards.

5        The spreadsheet that he showed you with the fields

6    that he now wants, all of that information we provided to

7    them.  It has the name of the field, a descriptor, and then

8    a longer description of what is in that information.  They

9    have that.  They've had that for months.  And we went back

10   and forth for a very long time over what was necessary, what

11   they would want.  If they didn't have their experts retained

12   to look at it, if they didn't go back and look at the

13   Jefferson County contract to decide what they needed, that's

14   on them.  They are now trying to upend two years' worth of

15   discovery and the limitations that this Court has already

16   imposed on them and the agreements that we've made for years

17   to try to check our math.

18       I mean, we've given them what we do, we've given them

19   the contracts that say what we do, and if they want to

20   recalculate, if they want their experts to recalculate it,

21   then go ahead and do it, but they have the information.

22   Like I said, the AWP number they can pull publicly.  They

23   have all of the -- they have what we paid, what the client

24   paid.  The components that go into that at the end of the

25   day are still going to equal what it -- the numbers that we

1    have.  So they have all of the information that they need to

2    get what they want to get.  And this is just -- you know,

3    this is (unintelligible) work at this point.

4                    SPECIAL MASTER COHEN:  We started out -- so

5    we're about a half an hour in.  We started out with the four

6    categories and we've kind of run back and forth through them

7    all.

8         Is there anything else plaintiffs want to talk about

9    with respect to those four?  In other words, what more do

10   you want me to hear?

11                   MR. THAKUR:  I'll just say that, you know,

12   they mention that -- this is Michael Thakur on behalf of the

13   PEC.

14        You know, they're saying that, you know, this is the

15   only time that they have calculated this on an opioid level.

16   We can't answer that question because we don't have the

17   entire custodial file of Danny Dyke, the person who did this

18   analysis.  What we do have is other examples showing that

19   opioid profitability was very much something that they

20   considered, even in formulary decisions, and that's part of

21   one of the spread- -- one of the e-mails and spreadsheets

22   that I sent to you as well.

23                   SPECIAL MASTER COHEN:  So are you talking

24   about the $60 million e-mail or --

25                   MR. THAKUR:  That was one of them, but one of

1    them was from 2015.

2                    SPECIAL MASTER COHEN:  Show me.

3                    MR. THAKUR:  This is 441M, and this is an

4    e-mail where they're deciding what drugs to put on formulary

5    for a subset of their clients.

6         This is -- for Bates number reference purposes --

7    ESI_MDL_00843779, and I'm going to refer to the next page

8    ending in 80.

9         So this is their business analyst team. . .

10                   MR. WEINBERGER:  Can you share that?

11                   MR. THAKUR:  Oh.  Let me see.  Let me share

12   the screen.

13        So this is an e-mail from Arden Arslayan to members of

14   the business analysis team, August 25th, 2015, and if you

15   look at 4- -- and I'm going to scroll down a little bit --

16   4C -- so they're deciding, based on profitability, which

17   drugs should go on their formulary, and here in bold, in 4C,

18   notes 825, hydrocodone APAP, "Karen's analysis determined

19   that this drug is profitable.  Recommendation made to keep

20   formulary at current tier."

21        Then it goes on to another drug.  This drug is

22   generic.  Reprexain, and then in bold it says, "AA notes

23   825, Karen's analysis showed slight negative margin" --

24   meaning negative margin on spread -- "recommendation made to

25   delete from formulary in 2017."

1           SPECIAL MASTER COHEN:  So is --

2           MS. VIERA:  So may I -- can I respond to this,

3    Special Master Cohen?

4           SPECIAL MASTER COHEN:  Yes, in just a minute.

5    Let me ask some questions, please.

6        Is Karen's analysis attached?

7        There's a spreadsheet there.  Is that Karen's

8    analysis?  Is that what they're referring to?

9           MR. THAKUR:  There is an attachment.  I don't

10   know if this is Karen's analysis.  I can share that with

11   you.  This is one of the spread --

12          MS. VIERA:  I can make this pretty simple,

13   Special Master Cohen.

14          SPECIAL MASTER COHEN:  Go ahead, Olga.

15          MS. VIERA:  This is the PDP, which is the --

16   this is an ESI entity, not the PBMs, that is acting as plan

17   sponsor for Medicare, so this is a client perspective

18   analysis of how they're going to make decisions for this own

19   formulary.  So it's confusing because it has ESI's name on

20   it, but that's because there is an ESI independent entity

21   that is running the Medicare PDP program and is making this

22   analysis.

23       This would be the same thing as if Excellus was

24   looking at making its formulary decisions and saying, well,

25   we get paid a lot of rebates.

1           It would be the same thing if the City of Rochester

2      had its data and said, we're going to include this on the

3      formulary because we're making "X" amount of rebates on it,

4      well, we're going to include this, make this margin decision

5      because of how it affects our bottom line.

6           So this is a client perspective analysis, not what is

7      ESI's bottom line, if that -- if you can understand that

8      distinction.

9                   MR. THAKUR:  Special Master Cohen, the reason

10     that doesn't seem reasonable is because they say which drugs

11     are profitable.  A client's perspective wouldn't include

12     profitability on drugs.  Clients don't make money from

13     drugs, only the PBMs do.

14                  MS. VIERA:  You should ask Rochester because

15     they made money from rebates.

16                  SPECIAL MASTER COHEN:  Anything else?

17                  MR. FARRELL:  This is Paul Farrell, and if I

18     could just take a minute and give a little bit of context to

19     why we ended up here, 18 months later.

20          You will recall, personally, that we began this opioid

21     remuneration debate with the very first set of discovery

22     that we served late December of 2023.

23          We spent most of the spring of 2024 with me coming to

24     this Court complaining about the lack of visibility and if

25     we were to go back and read the meet-and-confer letters and

1    the submission to this Court and the transcripts to this

2    Court, you will recall ESI's position initially was that it

3    was impossible to calculate rebates on opioids because

4    that's now how they did it.

5        We pressed them and said you may not have been pulling

6    out special reports, because you haven't produced them, but

7    you have that data.

8        We then went and said we want the admin fees, and they

9    said we can't pull out the admin fees because they're rolled

10   into the total rebate assessment.

11       We filed motions in front of you, and then they were

12   forced to go and carve it out themselves.

13       Each time that we continue to dig in, it has become

14   more and more apparent that they have data fields that get

15   to the core of our discovery requests that have been pending

16   since January.  This is yet another example of our discovery

17   of data fields that aid in our quest to identify the

18   profitability of opioids in their business model.

19       When we say our math people, you know, the people

20   doing math, let's be clear who we're talking about.  These

21   aren't novices that we're talking about, it's SLCG and

22   Craig McCann who, for the past seven years, have taken tasks

23   where the manufacturers, the distributors, and the

24   dispensers say you can't do it and when we got access to the

25   data, it became transparent.

1          What we're asking you to do is we're asking you, based

2     on a good faith basis, to give us data fields that fill in

3     the blanks and if it turns out that these blanks help us add

4     to the picture, I hope this Court remembers and gives us

5     some credence that when we go and look at something and

6     reveal it, then we follow through with what our promise is.

7          We're not wasting time.  We're not --

8               MR. MOUGEY:  One short comment in addition to

9     that on the timing component of this.

10              SPECIAL MASTER COHEN:  Peter Mougey.

11              MR. MOUGEY:  Peter Mougey.

12         Our job here isn't just the first two tracks we have

13    set, so -- but for all -- the pace of bringing this thing

14    for a landing, this is going to extend beyond Rochester and

15    Ogdensburg.  We're putting together a case that can be tried

16    in multiple jurisdictions when these cases get remanded.  So

17    whether this timing for this process can be done in three

18    months, or six months, or extends beyond Rochester, that

19    doesn't mean it's not valuable and if you look at the cost

20    and the burden of what we're looking for -- I wrote down

21    what Olga said, we shouldn't be asking for every single dime

22    ESI has -- I think the ask is tempered for the case, the

23    cases at hand, and the amount of cases, and this is going to

24    be a valuable exercise that extends beyond Rochester and

25    Ogdensburg.

1          SPECIAL MASTER COHEN:  Let me just ask you --

2    and I know, Olga, you want to respond -- but let me ask you,

3    so, you know, we've got two bellwethers teed up in the MDL

4    and in the motion to end briefing, which I haven't looked at

5    really at all except very, very, very, very, very briefly, I

6    remember, I think it was a footnote, that listed litigation

7    against the PBMs pending in other courts, some of which are

8    federal and some of which are state.

9          Am I right so far?

10         And maybe, what, 20 cases, 20 other cases.

11         And what's happening in those cases as far as

12   discovery?  Are we out in front?  Are we way behind?  Are we

13   kind of doing our own thing and they're doing their own

14   thing?

15              MR. FARRELL:  This is Paul Farrell, and the

16   MDL is out in front.

17         We are coordinating with the other cases.  I'm co-lead

18   in West Virginia, and discovery has been served requesting

19   these data fields and yesterday ESI responded.

20         So I'd prefer the MDL to remain out front, and I would

21   ask the Court to give us a little bit of credit that we have

22   followed through for the past seven years, rather

23   effectively, without allegations of us wasting resources.

24   And if we were going to invest resources into anything, I

25   would ask that we continue to invest resources in the

1      abatement of the opioid epidemic.

2          So if we're asking for these data fields and we

3      believe they're important and they're relevant and they

4      provide us insight, I would think that we've earned enough

5      trust that, hey, there's a good basis that these men and

6      women are going to do the right thing by it.

7                  SPECIAL MASTER COHEN:  Well, I appreciate what

8      you're saying and -- look, the Federal Rules of Civil

9      Procedure don't say that I should figure out who I should

10     trust.  There's a lot of other factors that I'm supposed to

11     decide on -- to weigh when we're deciding how much discovery

12     is produced from the parties, but I hear what you're saying.

13         So go ahead, Olga.

14                 MS. VIERA:  Sure.

15         So just to answer your last question first.  Jefferson

16     County is the case that's furthest along and it's ahead of

17     any of the discovery in the MDL but --

18         And I will also point out that McCann, who they

19     reference as their expert, is an expert designated in

20     Jefferson County who also submitted a report.  So they've

21     been working with him on litigation related to the PBMs

22     from, you know, years ago.

23         Once again, and I'm sorry that I sound like a broken

24     record but it's very important, that the discovery that Paul

25     is referring to and the questions that he had starting in

1    December of last year was focused on rebates. And if you

2    can recall, because I find this quote very interesting, he

3    said at the time, I don't want to do math, I don't want to

4    rely on all of the documents they've produced and all of the

5    information that they've provided, I don't want to have to

6    look at data fields, et cetera, I want them to give me the

7    numbers. And they're saying, you know, we've done it now,

8    but we've done it now because you ordered us to do it. We

9    never said that we'd do it in the regular course of

10   business. We never said these are numbers that we

11   calculate.

12        The rebates income and the administrative fee income,

13   we have never said that that's something we cannot

14   calculate. We have always said that we have that. The

15   issue becomes, when you're talking about how much profit or

16   how much revenue, there's a share component, and that shared

17   component is extremely complex by client.

18        We've done the best that we can in the remuneration

19   response that you've seen and that we have produced to

20   calculate the share. It's not the assumption that is relied

21   on by some people and it may not be the published number

22   that has been seen in the past because we have to go back

23   through contracts, we tried to group the different clients

24   to say these clients are passthroughs so they get the entire

25   amount of their rebate, these clients have a guarantee so,

1      initially, we don't pay them any of their rebates and the

2      data shows zero payment of rebates, but at the end of the

3      year we do some kind of a true-up and we pay them whatever

4      it is that we've agreed to pay them.

5           So the rebate share calculation was extremely

6      complicated.  We've estimated it, and whether or not that

7      eventually -- you know, what happens with that from an

8      evidentiary perspective down the road, it is what it is, but

9      we never took the position that we had an issue calculating

10     or providing information about rebate income for the years

11     that we have the data.  We have always said, very

12     consistently, that the shared component was different to

13     calculate and impossible on a nationwide basis, so we've

14     estimated it now, based on the fact that we've been ordered

15     to do so.

16                     SPECIAL MASTER COHEN:  Well, let me ask you --

17                     MS. VIERA:  Setting that aside, that --

18                     SPECIAL MASTER COHEN:  I'm sorry, go ahead.  I

19     didn't mean to interrupt.  Go ahead.

20                     MS. VIERA:  No.  So rebates are only paid on

21     brands -- right? -- and their theory was that, you know, we

22     have a RICO conspiracy with Purdue and other manufacturers

23     and so they're focusing -- they were focusing on rebates so

24     that they could say or prove -- try to prove their theory

25     that we made decisions on formularies so that we could get

1     these rebates, right?  So that was their theory.  That was

2     what they were discovering.  They got the numbers.  The

3     numbers were not what they anticipated and now they're

4     focusing on spread.  Well, there's no evidence that spread

5     pricing, or the amount that was made on spread, at a client

6     level, ever affected drug level decisions.  It's just not

7     the way that the businesses work, and I don't want to speak

8     for Optum, but it's not the way that Express Scripts works.

9          So they're now trying to calculate this number that is

10    disproportionate to the -- you know, on a nationwide basis,

11    that it's disproportionate to what's happening in Rochester

12    or Ogdensburg and it's irrelevant to the case.

13         The Sixth Circuit -- by the way, they've mentioned

14    that, you know, they're trying to conduct discovery for the

15    entire MDL.  Well, that's inappropriate at this point.  The

16    Sixth Circuit has made clear that discovery is limited to

17    the bellwether jurisdictions that we're working -- that

18    we're working towards, not discovery for the entire MDL at

19    this point.  So this should be limited.

20         We've produced extraordinary amounts of information.

21    I think we've produced over a hundred fields.  They're

22    basically trying to double that number and to get

23    information that is irrelevant.

24         We've given them the true-ups.  They don't want to

25    trust our math.  They don't want to trust how we do it.

1     We've given them the documents.  The documents that show the

2     true-ups show what we actually did.  Whether they agree with

3     how we did it or not, like, that's what our contracts and

4     that's how we abided by our contracts as respect with our

5     clients -- right? -- so if anyone's going to challenge that,

6     it would have been our clients and there would have been

7     different true-ups, but they have that documentation so --

8     you know, there's just nothing more for them to do to then

9     say that we should have done it differently and made

10    different analysis for purposes of our motive to adjudicate

11    claims.

12         None of it makes any sense, and it's not relevant to

13    this case, and it's entirely disproportionate to what is

14    actually at issue here.

15              SPECIAL MASTER COHEN:  Let me ask the

16    plaintiffs, so it's ESI's position that because the

17    contracts, from one to the next, are so distinct, that they

18    have different calculations for different clients using

19    different numbers, that one contract might do it this way,

20    the next contract might do it that way.  If all the

21    contracts were the same, it would be easier for you to take

22    the contracts alone and figure out some of what you're

23    trying to figure out.

24         Do you agree?  Do you know so far?  Do you have a

25    sense?

1          I mean, look, ESI's position is that each formulary is

2      different and each client gets to choose what it looks like

3      and your response is yeah, that's not really how it works,

4      there are national formularies and those are presented as

5      defaults and almost all the clients accept the defaults and

6      that's really what's going on even if they have a putative

7      choice.  That's your position as I understand it so far.

8          Well, they're also saying that all these contracts are

9      different.  They've got different terms.  They've got

10     calculations.  They've got different ways of determining

11     revenue and share and admin fees and everything else.

12         Do you agree?  Or is it, in fact, you know, really all

13     of these contracts are pretty similar?

14              MR. PALMIERI:  So, one, I'll respond -- I want

15     to respond to very quickly, Special Master Cohen, Ms. Viera

16     was representing and saying about ESI was not using revenue

17     to make decisions with respect to formulary.  I think the

18     e-mail that we have been talking about shows that they were

19     basing their decisions about utilization management based

20     off of revenue, and that's exactly what that e-mail shows.

21         But to respond to your question --

22              MS. VIERA:  By the client.

23              MR. PALMIERI:  -- I think the sample of

24     contracts, we can't even get off of go, as I understand it

25     from talking to SLCG and our experts, because we do see

1    different pricing formulas that refer to different

2    variables.  So at least from the sample of contracts that

3    I've seen, and based off a small sample of discussions I've

4    had with SLCG, I think there are different pricing formulas,

5    but that dovetails with why we need some of this data

6    because those formulas and pricing formulas and how they're

7    making money refer to some of these variables that are in

8    the data fields.  And that's why we're here, at least part

9    of the reason.  But also, again, to underscore, that there

10   were other avenues of remuneration that those fields show,

11   we believe we're entitled to them for those reasons as well.

12              SPECIAL MASTER COHEN:  One other --

13              MS. VIERA:  And just for the (unintelligible)

14   the PDP is a client, it's a plan sponsor.  It is not Express

15   Scripts PBM analyzing its profitability and, so, you know, I

16   don't want to accuse anyone of misrepresenting, but you need

17   to read the e-mail and see who the custodians are and what

18   they're talking about in the subject line.

19       It is a plan sponsor discussing how that plan

20   sponsor -- just like Rochester did -- is going to make

21   decisions for its formulary.  That is -- not only does it

22   prove a point on the finances, but it proves the point that,

23   Special Master Cohen, you were just mentioning about the

24   clients are the ones making the choices.  So that e-mail

25   needs to be put in the proper context.

 1          MR. THAKUR:  Special Master Cohen, the

 2    question was posed about the importance of spread pricing

 3    nationwide.

 4          That 2016 e-mail, where they're calculating opioid

 5    margin, there's a table there that says 61 million.  59

 6    million of that is from generic opioids, meaning not

 7    rebates, spread pricing.  That's a snapshot showing the

 8    importance of spread pricing, why we need this nationwide.

 9          SPECIAL MASTER COHEN:  Okay.  I need to take a

10    break, my brain is hurting, and I've got to do all of this

11    all again with, of course, Optum.

12          Any last thing that anybody wants to mention, Olga, or

13    PEC?

14          MS. VIERA:  Yes.  Olga Viera.

15          May I just mention on that last point about generic

16    and spread, generics are always in the same position on the

17    formulary.  They are always the first choice because that --

18    those are the most inexpensive drugs.  So brands always are

19    going to come after.

20          So there's no -- spread doesn't affect the placement

21    on the formulary because it's a generic drug and the generic

22    drug is always going to be on top.

23          SPECIAL MASTER COHEN:  Okay.

24          It is, on my computer, 3:06.  Let's say 3:20 we will

25    reconvene.

1              Thank you.

2          (Recess was taken from 3:06 p.m. till 3:24 p.m.)

3                    SPECIAL MASTER COHEN:  Okay.  We can start it

4      up again.

5          Can you folks out in computer world hear me?

6                    MS. VIERA:  Yes, we can hear you.

7                    SPECIAL MASTER COHEN:  Thank you.

8          I want to ask a couple follow-up questions in

9      connection with the discussion we've had.  On ESI, before I

10     switch over to Optum and first, I should mention, I have a

11     note here that says Heather would like you to ask everyone

12     to talk slower -- which is directed at me and she's just

13     being polite -- and we should all try and slow down, I

14     guess.

15         So one question I have for the plaintiffs is this:

16         You know, as you note, you've been working with McCann

17     for quite a while, and you were working with him when you

18     filed these cases and when we chose bellwethers and

19     everything else, and presumably you talked to him even when

20     you were negotiating with ESI in the beginning about data

21     fields.  And so -- thank you, Michael.

22         So what changed?  In other words, you say now that you

23     need all of these new data fields and additional stuff, but

24     why wasn't McCann able to tell you that in the beginning?

25         And I don't know if that's an issue that Peter Mougey

1       would respond or Marco or --

2                      MR. MOUGEY:  I can respond.

3              In almost the entirety of our negotiation with any

4       defendant in this litigation, when we deal with and

5       negotiate with the other side, there's an element of the

6       opposing counsel goes back to the client, gets information,

7       brings it back to us and in order for us to make progress on

8       these meet-and-confers, we have to accept -- I mean, not

9       have to accept, but it would be. . . it would be delay and

10      inefficience for us not to accept.  And I think you've heard

11      ESI's counsel, over and over again today, say this is what

12      the reality is, this is how you calculate it, this is all

13      you need, this is -- it's -- this is all the information

14      that you need.  We went through this over and over again,

15      and this discussion about these extra fields has been going

16      on for several months and the answer always is, it's going

17      to take six more months, six more months.

18             If there's any fault here, what we did was rely on

19      ESI's representations through their counsel about what we

20      needed, and we did that to help facilitate and move this

21      along up front to move litigation.  As we've gotten into the

22      litigation and we've been into the documents, we believe

23      that what we've seen on the documents belie and are

24      different than what we were told by ESI through its counsel.

25      So we're coming back to the Court at this point in time

1    saying what we were told in the beginning, we don't believe

2    is accurate.

3         And I think the really easy part here, Special Master

4    Cohen, is, is what we're asking for relevant?

5         Absolutely, unequivocally, yes.

6         Now, ESI, through its counsel, wants to tell you it's

7    burdensome, this is difficult, we can't do it.

8         Well, then that's fine.  Let's get an order, have them

9    ordered and then let them put an affidavit in or some sworn

10   statement saying we can't do this by X, Y, and Z.

11        So the request for the 30(b)(6), the request for

12   actual statements from the other side, first step, let's get

13   an order; second step, let's have ESI tell us through a

14   sworn statement of why rather than having counsel -- and I

15   understand, it's got to be difficult to be ESI's counsel

16   because at this point, they're only as good as what the

17   information that ESI gives them.

18        So let's go ahead -- no disrespect to Olga, but Olga's

19   not testifying -- let's get an order in, because what we're

20   asking for is clearly relevant --

21             SPECIAL MASTER COHEN:  Right.  We're off

22   topic.

23             MR. MOUGEY:  -- and let ESI tell you why.

24             MS. VIERA:  Special Master Cohen, I think your

25   question was, why didn't they consult with their expert, and

1      I don't think that's what Peter responded to.

2          They did -- apparently did not consult with their

3      expert if their expert is now telling them they need fields

4      that they didn't ask for.  They did not rely on my

5      representations of what they needed.  Of course, I would

6      never tell them you need this or you don't need that.

7          I gave them the fields.  I gave them the definitions.

8      We talked about it.  We had a lot of back and forth about

9      what they wanted, what they needed, and what we -- the

10     position we took about what was reasonable and within the

11     scope and proportional to the needs of the case.  And we

12     pulled that data, within the state -- if you may recall, the

13     dispute, at the beginning was, we said this should only be

14     for the City of Rochester, or the bellwether jurisdictions,

15     and they asked for the entire state, and they got that.

16     That's what Judge Polster ordered.  They'd never asked for

17     nationwide.  Now they are asking for doubling the fields and

18     expanding the jurisdiction from statewide, which is already

19     significantly bigger than the bellwethers, to nationwide.

20         So it's, like, never ending, it's disproportional to

21     the needs of case and, frankly, if they didn't do their

22     homework and ask for what they needed back then, they

23     shouldn't be able to come back to you two years later and

24     ask for it now.

25                 SPECIAL MASTER COHEN:  Do I recall --

1          MS. VIERA:  But again, I don't think it's

2     relevant, and I don't think it's part of what -- the

3     allegations in this case.  None of this has anything to do

4     with their claims that we conspired with Purdue and that we

5     adjudicated opioid claims in order to increase rebates.

6          SPECIAL MASTER COHEN:  Olga, do I recall that

7     in one of your letters you said there were actually some

8     data fields that they're now asking for that you offered and

9     they didn't agree to take back when you originally

10    negotiated it?  Is that true?  Am I making that up?

11         MS. VIERA:  Well, all of -- it's somewhat

12    true.

13         All of the fields on that sheet that you just saw, we

14    provided to them.  They asked us to give them all of our

15    fields and we gave them that list which included all of

16    them.  From there, they streamlined and said we want

17    whatever number of them.  It was not the entirety, it was

18    something smaller, and we went back and forth and whittled

19    it down to what they ended up agreeing to.

20         MR. MOUGEY:  Special Master Cohen, we have

21    been appearing in front of you for seven years on data.

22    Have you ever known my office to say, oh, we don't need that

23    data?  We have taken and asked for as much data as we can to

24    build our case from day one and if you go back in the

25    beginning with ARCOS, you made a series of rulings where we

1    started with small -- I'm sorry, you and Judge Polster, a

2    series of small rulings that we got the data in increments,

3    we got it regionally, we got some drugs but not all.  This

4    is very consistent with exactly what we've done in the rest

5    of the litigation where you and Judge Polster have asked us

6    to take small subsets of data and build.

7        It's the same thing we're doing here, and Olga

8    couldn't tell you, yes, that they offered us data that we

9    didn't take, which is because it didn't happen.  We've taken

10   as much data as we can get and as Olga just said, in a back

11   and forth, we whittled it down.

12       You'll see, if you look through the correspondence,

13   where they repeatedly say that what we've asked for is going

14   to slow everything down, take several months and because of

15   that back and forth and slowing it down several months is

16   why we've narrowed.

17       So that's how we are where we are today.

18                   SPECIAL MASTER COHEN:  Let me ask a question.

19       Go ahead, Marco, briefly, please.

20                   MR. PALMIERI:  I just wanted to very briefly

21   supplement.

22       I wasn't there during the original negotiation.  I've

23   reviewed a lot of e-mail traffic.  What I can say is that to

24   the extent that reviewing the contracts has informed our

25   decision about what additional fields that we need, those

1   were not identified -- I heard Olga say that we had those

2   contracts.

3       It may have been that they were in the million-plus

4   documents, but they did not identify the specific agreements

5   that we went to and looked to that have those variables

6   until April of this year and --

7                   SPECIAL MASTER COHEN:  Right.  So that --

8                   MR. PALMIERI:  If I -- and I looked at the

9   production record, some of the agreements were produced well

10  after.

11                  SPECIAL MASTER COHEN:  All right.  So let me

12  ask about the contracts.

13      So, Olga, you talk about a true-up process and if

14  there is a contract that has all of these terms about

15  rebates and administration fees and spread pricing and

16  whatever all -- AWP, whatever all of those are, and at the

17  end of the year there's a true-up, is it not the case that

18  all of the data related to all of those terms for that

19  client would be transmitted to the client and that there

20  would be a transparency so that both sides could see how the

21  true-up works and what it is so that all of the math is

22  there for every term for every drug for every transaction?

23                  MS. VIERA:  They have the true-ups, but the

24  clients -- I mean, and again, I'm going to point to the City

25  of Rochester.  As the City of Rochester has stated and just

1    responded to discovery, it's not done on a drug-by-drug

2    basis, it's on a client-level basis.

3        So, the client gets, this is your rebates, this is the

4    true-up because you have a guarantee of "X," this is a --

5    you know, and so they get that, they get this is the margin,

6    or this is the amount of drug spend that you -- this is what

7    you paid for drugs, what is what we paid for drugs, these

8    were the guarantees, and so they get that at the client

9    level, but they're not getting -- the true-ups, I don't

10   think -- they're not at the drug level.  They're not a drug

11   by drug claim by claim.  That's just not the way it's done.

12   That's not the way we operate.

13       There is underlying data for rebates, which they have,

14   and there is underlying data for drug pricing, which they

15   have.  The rest of the calculations are done in those

16   true-ups, which they have.

17               SPECIAL MASTER COHEN:  All right.  So the

18   true-up that goes back and forth and has, let's say a top

19   line for rebates, or a top line for admin fees, is

20   nonetheless a summation of all the admin fees or all the

21   rebates for every transaction.  And it sounds like you're

22   saying that the client doesn't get the million-page

23   spreadsheet with all of the data that sums up, it only gets

24   the sums; is that right?

25               MS. VIERA:  Correct.

1           So on the rebate income, that is by claims.  Remember

2      that I've been trying to make that distinction very clear.

3      So rebate income that is the claims data, they do have that

4      and it -- some of the clients do get reports on that

5      information.  There's also, at different points in time --

6      remember we're talking about 30 years -- there has been

7      portals that the client can go into and see some of its

8      specific utilization and some of its specific drug-level

9      information.

10          But -- so the income is one thing.  So now you get --

11     you have all of the different, you know, adjudicated claims,

12     the rebates that came in for those claims.  Now you go to

13     the contract and the contract says we guarantee you're going

14     to get a hundred percent of your rebates -- not per drug,

15     but just in general -- or you're going to get 95 percent of

16     the rebates plus, you know, 10 percent of the administrative

17     fee plus whatever else.  There's a bunch of different things

18     that go into that, and that's all pulled together and

19     provided to the client at the client level, not at, you

20     know, this oxycodone prescription that was adjudicated on

21     this date had all of these different components.  That's

22     just not the way it works.

23                    SPECIAL MASTER COHEN:  Last comment.  Go

24     ahead.

25                    MR. FARRELL:  I don't want to confuse or get

1    into the weeds on this, that's not necessarily how it works.

2    I have a contract with me.  We've studied the contract.

3    This is the level of detail.

4         Express Scripts has confidential contracts with Purdue

5    Pharma, and it doesn't share the terms and the formulas with

6    its clients.  It has confidential contracts with the

7    clients, and doesn't share, with Purdue, the confidential

8    terms.

9         All these transactions are happening in their data set

10   and both parties have rights to do audits of the selected

11   subsets to test out the parameters.

12        So let me give you an example of one particular

13   transaction.

14        You go to the pharmacy and you fill 30 -- three pills

15   a day, 30-day Oxycontin, 90 pills.

16        The first contract is that Express Scripts will agree

17   with your healthcare provider, your healthcare insurance,

18   that they will pay $12.99 as a guaranteed rebate for your

19   claim.  So every individual claim that goes through their

20   system generates a guaranteed payment of a rebate.

21             SPECIAL MASTER COHEN:  To whom?

22             MR. FARRELL:  From Express Scripts to the

23   health insurance company.

24        I promise you, health insurance company, that because

25   of -- for every individual claim I will guarantee -- the

1     exact number is $12.66.  That's on a quarterly basis I'm

2     going to write you checks.  I'm not going to send you checks

3     one at a time, I'm going to aggregate them so at the end of

4     the quarter, Insurance Company A is going to get a rebate

5     guaranteed check from Express Scripts of $12.66 times the

6     number of Oxycontin claims.

7          At the end of the year there's a true-up, and what

8     happens at the end of the year is that Express Scripts will

9     calculate the total rebate from Purdue Pharma.  And that

10    total rebate isn't based on a number of claims, it is $4.19

11    times the ingredient weight limit, times the number of

12    pills.  And let's just say that that number comes to a

13    hundred thousand dollars.  The true-up is that Express

14    Scripts will take the hundred thousand dollars paid by

15    Purdue, subtract all of the guaranteed claims and the margin

16    between the two, Express Scripts and the client splits

17    evenly.

18         So part of this magic here is this:

19         It's in Express Scripts' interest that you reduce the

20    frequency of the claims with larger volumes of pills because

21    it drives up the total rebate and drives down the claim

22    basis.

23         This is one of the reasons why a seven-day limit on

24    claims is a disaster for PBMs because it generates a

25    guaranteed payment on a per claim basis every seven days

1    instead of every 30 days.  This is just a small piece of the

2    puzzle.

3        So for us sitting here thinking how is it possible

4    that you are calculating, to the penny, the rebate owed by

5    Purdue on a gram base, a milligram base, times the AWP

6    which, by the way, the AWP that they calculate in their

7    contracts, the average wholesale price, is done on a daily

8    basis.  So if you fill a prescription on a Tuesday and the

9    average wholesale price of the pill is $4.19 and then

10   someone else fills it on a Wednesday and it's $4.20, they

11   have a data field that keeps track of it.

12       So to pretend like they're not keeping track of this

13   to the penny is just simply not true.  They're the ones that

14   house the data, with confidential contracts where they hold

15   both ends to the piece.

16       Now one final piece to this is that they're not

17   brokering these deals for the health insurance companies,

18   they own the right, title, and legal interest to the rebates

19   and admin fees and then they separately contract with their

20   clients.  So to say they can't do this on an opioid basis is

21   wrong.  They do it on an NDC code basis.  That's why there's

22   an NDC code in there.

23       So what we're suggesting is that access to this data

24   will allow us to do the calculations that we know they did

25   because they model it out when they make all their pricing

1      models.

2                        MS. VIERA:  Special Master Cohen, Olga Viera

3      for Express Scripts.

4            To quote Paul Farrell, I don't know what other words

5      to use to say that we have provided the information about

6      rebate income.  Everything he just talked about was how much

7      Purdue pays us per claim for -- on rebates and

8      administrative fees.  That number has already been provided.

9      We've never taken the position that that number is difficult

10     to calculate or that we don't have the data for that number.

11     That number is in the data, and we have provided it.

12           When you're talking about rebates, the complexity is

13     on the share.  None of the fields, the 96 fields that the

14     Baron & Budd team now wants, has anything to do with rebates

15     when it comes to how much they paid us.  The rebates that

16     they paid us is in the data, we've provided it, and we've

17     provided that number nationwide for the years that we have

18     it.

19           So apples and oranges.  Again, it's very confusing,

20     and it's taken me a long time to learn it, but it's not the

21     same thing and so saying that you want, down to the penny,

22     what Purdue has paid us, we've given you that and it's in

23     the data.  We've never taken the position that it's not

24     there.

25           Spread pricing is a whole different animal.  It's not

1   even part of the allegations.  It has nothing to do with

2   this case.  It's not something that we base decisions on

3   when it comes to opioids and so we need to set that aside.

4       There was one analysis that they've talked about for

5   the AOM program.  They have all the documents we have.

6   We've produced it.  If there were more analyses like that,

7   we would have produced them.  There are none.  They can

8   depose Danny Dyke, which they've decided not to depose, but

9   they can still depose him.  Snezana Mahon's deposition,

10  she's the one who received these analyses and made decisions

11  based on those analyses or recommendations based on those

12  analyses, her deposition is in October.  They can ask her

13  what she thinks about it, and they already have.  They can

14  ask her more questions because she's allowed to be deposed a

15  second time.

16      So, you know, we keep mixing things up and confusing

17  everybody and that's not moving the ball ahead.  They have

18  the rebate income number.

19              SPECIAL MASTER COHEN:  Hold on one second,

20  please.  I'll be right back.

21      (Brief pause in proceedings.)

22              SPECIAL MASTER COHEN:  Okay.  Olga, I think

23  you've earned a coffee break.

24              MS. VIERA:  Am I the one whose talking too

25  fast?

1       Sorry.

2               SPECIAL MASTER COHEN:  Okay.  We're going to

3       shift gears and instead talk about Optum.

4           So, my review of the Optum documents, as I mentioned

5       when we started, is that gives me -- leaves me with the

6       thought that it seems to be less sharp of a dispute, and the

7       last one was certainly multifaceted and complicated.  And so

8       unlike with ESI where we had six, kind of categories, and

9       narrowed it down to four before we started our discussion,

10      it seems like there are something like 20 categories and

11      that leaves me unsure of how to go through this, to be

12      candid.

13          And I know that, Evan, you're going to talk about it

14      because you've been the one writing letters.

15          Let me -- I will make this observation:  Evan, what

16      you're very good at is reciting the history of a dispute

17      and, you know, you spend a lot of your letter saying, you

18      know, look, this isn't new, the argument that we're bringing

19      this up for the first time isn't true, here are, you know,

20      cites and quotes from letters dating back to "X" time where

21      we raised that.  I've read -- I promise I've read everything

22      more than once, and I don't want to -- and I just don't want

23      to focus on the ground we've plowed.  What I'm trying to

24      figure out is where we are now and, again, you know, what is

25      it you want, what has been produced, what has not been

1    produced, what is produceable, what should be produced, what

2    is not produceable and, so, I'll turn to you, and try and

3    take me through something that is extremely complex as

4    simply as you can.

5              MR. JANUSH:  Thank you, Special Master Cohen.

6    I'll also be joined by Mike Elsner, I'm sure Paul Farrell

7    and Pete Weinberger as well.

8         I'd like to start by picking up on, if I may,

9    addressing the Court's discussion regarding sharpening this

10   dispute.  And you addressed it with Marco and with the PEC

11   ESI team moments ago.

12        I think, in our August 28th letter, we absolutely did

13   seek to sharpen what our ask is, and we did so at pages 5 to

14   6 of that letter, and it's essentially the conclusion, and

15   we asked for five categories tracking very similarly to what

16   the ESI plaintiffs' team was seeking, top line dollar

17   figures for opioid remuneration for each year nationwide and

18   for the state of New York and the methodology, including all

19   data fields used to calculate it, dollar figures; number

20   two, for components of opioid remuneration, their data

21   sources, and the specific methodology employed; three,

22   complete set of manufacturer payment reports; four, all

23   rebate data and administrative fee data; and five, relevant

24   data fields to calculate spread pricing for the bellwether

25   jurisdictions along with an explanation of how these data

1      fields are used to calculate the spread.

2           I also would like to talk about, from a very big

3      picture --

4                     SPECIAL MASTER COHEN:  And just for the

5      record, you're referring to your letter that is

6      Exhibit 443F, pages 5 and 6.

7                     MR. JANUSH:  I believe that is the right

8      exhibit, yes.  It's the August 28th letter?

9                     SPECIAL MASTER COHEN:  Correct.

10                    MR. JANUSH:  Yes.  And you know, I want to try

11     to unwind this a bit, if possible.

12          The ask, at its core -- or let me say it differently.

13     The problem, at its core, we have been given summary charts

14     of rebate data.  That was provided on July 2nd, in

15     supplement -- the fourth supplemental amended discovery

16     responses by Optum and various charts for 2010 through 2019,

17     by manufacturer, showing rebates.

18          It's -- the big problem is we don't know what we have

19     received in those charts, how that was calculated and so we

20     believe the most efficient path forward is to obtain, in

21     writing, an actual response that would provide us with a

22     clear roadmap of how Optum calculated their rebate and

23     administrative fee figures, specifically, we need to

24     understand what data fields did they rely upon; did they use

25     aggregated data field and, if so, what component subfields

1     comprised those aggregated fields.

2                     SPECIAL MASTER COHEN:  All right.  So let's

3     stop there.

4          So was the chart that was given to you an Excel

5     spreadsheet?

6                     MR. JANUSH:  No, the chart was just appended

7     to discovery responses.  It emanates, I think, from an Excel

8     spreadsheet.

9                     SPECIAL MASTER COHEN:  Well, if the

10    spreadsheet that they used to produce the. . . call it pdf

11    that was the exhibit that you're referring to, contains

12    formulae that would reveal everything you just said --

13    here's where the numbers came from, here are the data fields

14    that we used to yield the numbers that are in the chart,

15    would that get you --

16                     MR. JANUSH:  That would be a helpful first

17    starting point, certainly, and, I mean, without seeing what

18    it is, I don't know whether it would complete the answer

19    because it might lead to other questions, like what -- if

20    it's, hypothetically, some component subfields, we might

21    want to test that math and need -- need to test that math

22    and see what component fields were included in the

23    aggregated fields.  And we'd like to know the precise

24    calculation methodology.

25                     SPECIAL MASTER COHEN:  So let me just -- I

1    just want to take it bit by bit to the extent I can.

2        Question for Brandon or Andrew, I think, are the ones

3    that will be speaking on behalf of Optum.  Can you produce

4    an Excel spreadsheet that yielded the document that Evan is

5    referring to?

6            MR. SPRINGER:  Special Master Cohen --

7            SPECIAL MASTER COHEN:  Or if it's not an Excel

8    spreadsheet, can you produce what he has asked for, which is

9    how were these numbers calculated, where are the numbers

10   that were added and subtracted and divided and multiplied

11   that yielded the numbers in the chart, where did they come

12   from?

13           MR. SPRINGER:  Special Master Cohen, this is

14   Brandon Springer with Alston & Bird for OptumRx.

15       Can you hear me okay?

16           SPECIAL MASTER COHEN:  I'll say yes.  It's

17   probably as good as it can get.

18           MR. SPRINGER:  Okay.  I'll try to speak

19   loudly.

20       So the charts that Mr. Janush is referring to stemmed

21   from the remuneration discovery dispute that Ms. Viera was

22   referring to that Paul Farrell teed up last fall relating to

23   nationwide rebate dollars in, administrative fee dollars in,

24   price protection dollars in, all those dollars received by

25   OptumRx and then disbursed to OptumRx's clients.

1        As, I think, Ms. Viera reminded you, that came about

2    because the PEC said they didn't want to do the math on the

3    data that we actually produced for New York and that they

4    wanted to know this information nationwide.  We objected to

5    that and, as Ms. Viera also explained, Judge Polster

6    previously ordered that there would not be production of

7    nationwide data in these cases, and that's consistent with

8    what the Sixth Circuit previously held.

9        So what we did is we put together a response based on

10   the same data fields that we've produced for New York, but

11   we did it nationwide, right?  That shows the dollars that

12   OptumRx received, rebates, administrative fees, price

13   protection, all of the dollars that OptumRx would receive

14   from manufacturers related to in-scope opioid prescriptions.

15       We're happy to give Mr. Janush an Excel spreadsheet of

16   the chart, but there are no formula, you know, that --

17   behind that chart that would give the PEC any more

18   information than what's in the PBM's version that they have,

19   and we would resist and object to being ordered to produce

20   the underlying nationwide data that we were -- that we used

21   to calculate those numbers.

22       That said, we put this in one of our letters back and

23   forth on this issue, they can do this -- the dollars in,

24   they can do that analysis for the New York -- for the state

25   of New York with the data that we've already produced, that

1    shows the rebates and admin fees and price protection

2    dollars that OptumRx received related to in-scope

3    prescriptions.

4         We've also explained that the data show some, but not

5    all, of the discouragements, the dollars that OptumRx pays

6    to its clients related to those prescriptions, and that's

7    because, I think as we've talked about this at the prior

8    discovery conferences, there may be a variety of different

9    ways that a client contracts to receive the value of

10   rebates.  And so what we did in this response was we started

11   with the data in, we subtracted the data out, and then we

12   used information from our client to estimate additional

13   dollars out for those clients.

14        In our response, we said if this is what the PEC is

15   really trying to understand, the data fields that show up in

16   the PEC's letters have nothing do with this response.  The

17   65 new fields that they sprung on us in the last month or so

18   have nothing to do with this because those fields are

19   already incorporated into the data that we've produced for

20   the state of New York.

21        So I will pause there and hear if you have further

22   questions about that?

23             SPECIAL MASTER COHEN:  Well, I'm not sure I

24   got an answer to my question, frankly, because it seems

25   reasonable for the plaintiffs to want to understand how the

1    numbers that they're receiving were derived if they're based

2    on other figures, and whether we're talking about just a

3    contract, or just Rochester, or just New York, or the entire

4    nation, a -- I get that there is reason to maybe not say,

5    yeah, you get the whole country, okay, I've been through

6    this before many times and, you know, we landed on a state

7    plus contiguous and -- or the whole state, or whatever it

8    was in prayer cases you may be familiar, but my point is

9    that, okay, fine, geographic scope is one thing, but that's

10   breadth, now I'm talking about depth and I'm trying to

11   figure out, for a -- let's just take Rochester alone, an

12   explanation that the plaintiffs are asking for as to how all

13   of those numbers are derived, where they come from.  And if

14   it's true that a number in a cell in a chart was derived

15   from the addition and subtraction of other numbers

16   elsewhere, that's something that seems reasonably

17   discoverable.

18            MR. SPRINGER:  Sure.  And Special Master

19   Cohen, we -- I think we also put this in our letter.  If

20   this would resolve the PEC's request on this, we would be

21   willing to replicate this analysis, I think as you just

22   said, for the City of Rochester, to do it -- and I can share

23   my screen and just remind you what this looks like, but it's

24   essentially collected rebates, collected administrative

25   fees, disbursed rebates, disbursed rebate fees, and estimate

 1    of --

 2                    SPECIAL MASTER COHEN:  Okay.  Why don't you

 3    show me.

 4                    MR. SPRINGER:  -- retention by manufacturer by

 5    year.

 6         And I'll share my screen so you can see it.

 7         (Brief pause in proceedings.)

 8                    MR. SPRINGER:  Are you able to see this?

 9                    SPECIAL MASTER COHEN:  Not yet.

10         Yes.

11                    MR. SPRINGER:  Okay.  So this shows, I think

12    to the point that Mr. Janush was making, by manufacturer --

13    and this is what the PEC requested last year -- went through

14    an enormous amount of work to put this together with our

15    client -- the collected rebates, disbursed rebates,

16    collected admin fees, disbursed admin fees, and an estimate

17    of retention by manufacturer by year.

18         And so you can see that we put this information

19    together, that the rebate dollars -- so the collected

20    information here, this comes from the same data fields that

21    the PEC already has for the state of New York.  And so we

22    could put this together for the City of Rochester.  It would

23    take us a little bit of time to do that, but we could put

24    that together.  And then the disbursed rebates and disbursed

25    admin fees, some of that comes from the data, and the PEC

1    has that data.  Some of it comes from an estimate based on

2    certain clients.

3         So I think we've explained this to the PEC in prior

4    meet-and-confers, but the largest client of OptumRx is

5    United Healthcare.  Under OptumRx's contract with United

6    Healthcare, United Healthcare receives a hundred percent of

7    rebates that OptumRx gets from a manufacturer, and OptumRx

8    retains the admin fees, to the extent there are admin fees.

9         So United Healthcare, those disbursements do not show

10   up in the data, but what we did in estimating the

11   information for this chart, consistent with what you had

12   instructed last year, we then subtracted the dollars

13   associated with United Healthcare plans that would have been

14   disbursed under the terms of that contract.

15        The PEC has that contract, and the PEC also has, you

16   know, a number of other contracts.  We're working to produce

17   a sample of I believe it's 82 client contracts, and so they

18   can -- they can look at the numbers that we are putting on

19   these charts and they can match them up to the contracts and

20   they can, you know, ask questions at depositions if they

21   have further questions about how the -- these numbers were

22   calculated.

23                   SPECIAL MASTER COHEN:  Who created this chart?

24        Wait.  Wait.  Please put that back up.

25        Who created that chart?

1          MR. SPRINGER:  The chart was created by

2    counsel as requested by the PEC.

3          SPECIAL MASTER COHEN:  So it was a counsel

4    creation and not, you know, somebody at United Healthcare in

5    their tech department, for example; is that right?

6          MR. SPRINGER:  Correct.

7          SPECIAL MASTER COHEN:  Okay.  And so --

8          MR. HATCHETT:  And can I make --

9          SPECIAL MASTER COHEN:  One second.

10          MR. HATCHETT:  -- one point of clarification?

11    It may help, but go ahead.

12          SPECIAL MASTER COHEN:  That's Andrew Hatchett.

13       Hold on a second, please, Andrew.

14       So I'm looking at this chart, and I'm looking at the

15    very first column, and I'm looking at the row that says

16    Purdue Pharma, and it says 133,379,411.

17       So that is presumably the sums, since it's collected

18    rebates, it's the sum of some other figures.  And I guess my

19    simple question is, could the PEC, right now, go to the data

20    it has and derive that number by itself because of --

21    because it has everything that goes into it?

22          MR. HATCHETT:  And Special Master Cohen, this

23    is Andrew Hatchett.

24       We were right on the same page.  I was listening to

25    Brandon and I thought, this is going to be the one question

1      you're going to have for clarification, is that he said

2      that -- when he highlighted that column on the screen, he

3      said that that's derived from the data.  What he meant is

4      it's pulled from the same data fields that they have.  They

5      can't match it because this is a national number and the

6      data fields that we were ordered to produce was the data

7      field for the state of New York.  And so the offer that we

8      had made in our letter was that we can take this analysis

9      and we can bring it down to the state of New York level so

10     that they would have both the national number and the state

11     of New York number and if they had this analysis for the

12     state of New York, then they would be able to see, under the

13     collected rebates column, it would actually match to the

14     data that's been produced.

15          Right now, the only reason it doesn't match is because

16     we were ordered to provide these numbers --

17                    SPECIAL MASTER COHEN:  I understand.

18                    MR. HATCHETT:  -- instead of producing this

19     data.

20                    SPECIAL MASTER COHEN:  I understand.  Thank

21     you.

22          All right.  Evan?

23                    MR. JANUSH:  I don't even know where to begin.

24     There's so much to respond to here.  I'll start with the

25     following:

1      They produced nationwide charts in their fourth

2  amended supplemental responses, yet they produced New York

3  data for their data production.  When they produced the

4  nationwide supplemental charts, they also produced

5  nationwide rebate charts by year.  We have it.

6      We were able to crosscheck the a math for Purdue

7  alone -- just isolating Purdue, keeping it simple, looking

8  at year by year -- what they show on their charts in their

9  responses to what we see in their produced rebate charts for

10  the year.  The numbers don't match up.  I'm going to show

11  you.  I'm going to share my screen now.

12      Let's see. . . are you able to see my PowerPoint?

13          SPECIAL MASTER COHEN:  Yes.

14          MR. JANUSH:  Okay.  So. . . this is from

15  Optum's fourth amended response at page 14.

16      Now, if you look at Purdue, I've highlighted it,

17  Collected Rebates for 2010, you'll see a loss.  Not sure how

18  that's possible in 2010 during the peak of the opioid

19  crisis, but that's what we see.

20      Then 2011, you'll see 71,434,241.

21      2012, you'll see 65,822,899.

22          SPECIAL MASTER COHEN:  I'm following.

23          MR. JANUSH:  Okay.

24      Now we go to their cross compare it against their own

25  rebate data, that they provided nationally which they just

1    said they refused to produce, and we made a -- our own

2    inconsistency chart.  And you'll see, we have, in 2010 a

3    69 million plus inconsistency; in 2011, a 4.177 million

4    inconsistency; in 2012, a 2.682 million inconsistency; in

5    2013, a 3.378 million inconsistency.  I'll stop just -- I'm

6    making the point.

7         All the source documents are cited here as well, where

8    we pulled from showing you that this is their produced

9    spreadsheets on rebates.  So we're doing our best to try and

10   match it up, and we can't do it.  It's why we're here.  It's

11   what I've been addressing for five months now.  It's

12   absolutely stunning.

13        So how do I make heads or tails over the difference

14   between what we're seeing in their rebate data and what

15   they're giving us in their summary data?

16        It seems really basic and fair to revert back to

17   Judge Polster's March 5th order and in the footnotes, at

18   Footnote 3, when he's addressing what is required to be

19   produced, he cites the plaintiffs; definition of opioid

20   remuneration at Footnote 1, and it includes all the fields

21   we're talking about.

22        So I don't want you to get caught up in 20 issues,

23   that it's messier, that it's different.  It's really one big

24   issue.  We can't figure out what they've done, how they've

25   done it, what they used, and we want an explanation.

1          And if you're unwilling to give us all the data that

2     we seek, the data fields that we seek to try and do the math

3     ourselves, it seems really fair, that as a quick first step

4     so we can see if we're owed that data, is to make them

5     explain all of their methodology on the national chart.

6     They volunteered it, they gave it, they also gave national

7     data that supports the chart or not, and it doesn't, so they

8     can't sit back and say we did it as a favor, we gave

9     national data in a chart, but we're willing to give you the

10    relevant New York chart now.

11               SPECIAL MASTER COHEN:  Well, how would you

12    have them explain it?

13               MR. JANUSH:  They had -- well, listen --

14               SPECIAL MASTER COHEN:  No, I mean --

15               MR. JANUSH:  I don't know how they did it.

16    How did --

17        (Simultaneous crosstalk.)

18               MR. HATCHETT:  This is a pretty easy

19    explanation.

20               SPECIAL MASTER COHEN:  I'm saying, in a

21    30(b)(6)?

22               MR. JANUSH:  Oh, so we'll never get this

23    answer in a 30(b)(6) deposition.

24               SPECIAL MASTER COHEN:  Right.

25               MR. JANUSH:  We need a written response.

1          MR. HATCHETT:  We can give you the -- we can

2    give you the answer right now.

3          MR. JANUSH:  I'm not -- I'm not done,

4    Special Master, in fairness.

5          SPECIAL MASTER COHEN:  I promise, Andrew, you

6    will get your chance.

7          MR. JANUSH:  There is enough confusion on an

8    issue of such magnificent magnitude that we are due a

9    written explanation as to how they made the charts they've

10   given us, how they're doing the math, what fields they're

11   using, what do those fields encompass as subfields, if they

12   do.

13         You asked a very simple question.  We got an answer

14   that was all over the place in terms of whether they can

15   produce the spreadsheet with the formulae that would help

16   answer my very basic question, and it seems that they can't.

17   So we need, I think, in the absence of having formulae, I

18   think we need an order, which really does comport with

19   Judge Polster's March 5th order on supplemental remuneration

20   discovery, I think we need a fulsome explanation, how did

21   you do what you did.

22         And I don't even think it should be limited to

23   New York right now.  I think -- I mean, they've given us a

24   New York chart.  They've given us New York -- they've given

25   us a national chart.  They've given us spreadsheets.  Look

1      at the number of documents I've encompassed in this slide.

2              This is national data.  This isn't New York data.

3              So why don't we stick with it?  Why shouldn't we now

4      get everything national that explains how you did this on a

5      national level?  You've already done the work.

6                  SPECIAL MASTER COHEN:  Let me hear from

7      Andrew, please.

8                  MR. HATCHETT:  Yes.  Special Master Cohen,

9      this is Brandon Springer --

10                  SPECIAL MASTER COHEN:  I'm sorry, Brandon, go

11      ahead.

12                  MR. SPRINGER:  -- for OptumRx.

13              I would like to just -- just to clarify one thing.

14              So first of all, Mr. Janush said that they've been

15      beating this drum for five months.  They sent us this chart

16      about an hour and a half before this hearing started.  They

17      never asked us any of these questions that he's raising

18      today, and if he had, we would have taken it back and been

19      happy to look into it.

20              You know, he makes a big deal out of this number here,

21      but there's really a few simple explanations.  The first

22      is -- and we explained this all the way back when we were

23      negotiating data fields in January of 2024 -- that the data

24      start in 2010, that OptumRx has maintained, and that the

25      older in times get, the data may not be fully populated,

1    right?  And so that's why you see a difference between, you

2    know, the data for 2010 in our rebate response, which is

3    what we were ordered to do.  We were ordered to provide an

4    estimate of the rebate dollars received, and we did that

5    based on the data that we have access to.

6         But when you look at 2011 and 2012 and 2013, the

7    difference is pretty small and this is where Mr. Janush is

8    wrong on the second point, is that their numbers are not

9    calculated from OptumRx's data.  Because we received this

10   just an hour or so before the hearing, I didn't have a

11   chance to look at every single one of these cited documents,

12   but I can tell you the ones that I've looked at are billing

13   records, right?  These are requests -- these are basically

14   billing submissions from OptumRx to Purdue saying here's how

15   much Purdue owes.  And so apparently, the PEC summed all of

16   those up and said, ah-ha, for 2011, OptumRx said Purdue owes

17   $75 million, but OptumRx, in its rebate response, said

18   Purdue only paid $71 million.  Well, that's because Purdue

19   may have only paid $71 million in response to a billing

20   request for $75 million.  That's not surprising, and that's

21   actually -- you know, if the numbers were exactly accurate,

22   I would be surprised that Purdue paid every cent that

23   OptumRx requested because Purdue, as the PEC knows, doesn't

24   want to pay rebates and it is doing its own audits to look

25   behind OptumRx's math and it's looking at the specific

1    formulary that clients are adopting and determining whether

2    a claim is rebate eligible or not and apparently Purdue, you

3    know, basically wrote off some of the bill for those years.

4    And so that's not surprising.

5        But for Mr. Janush to say that they are relying on

6    nationwide data for 2011, 2012, 2013 to reach their numbers

7    is just inaccurate and if they'd talked to us about it

8    before this hearing, we would have explained that.

9        The other thing that I'd like to note is that the --

10   you know, the dollars reflected here are rebates collected,

11   and we know this and the PEC knows this.  The largest

12   dollars here on this chart, and I think throughout the time

13   period, are associated with Medicare Part D plans and I

14   think OIG did an analysis not too long ago showing that

15   99.6 percent of rebates associated with Medicare Part D

16   plans get passed through.

17       So it's not surprising that, you know, of these

18   dollars, that OptumRx would not have retained very many of

19   them.

20                   SPECIAL MASTER COHEN:  Evan, you started out

21   by pointing out that there were five categories of

22   information.  I think we've talked about some of them.  I

23   don't want to cut you off, but I also don't want to ignore

24   the others.

25                   MR. JANUSH:  I appreciate that, and while I'm

1    going to jump to that, if you'll indulge me, I also want to

2    make it clear that -- I have to correct the record on an

3    issue that was stated earlier in the argument by Brandon

4    when he addressed that we've now come forward with -- out of

5    the blue -- these 65 other fields that we're addressing.

6         I want to talk about fundamental fairness here.  We

7    didn't just spring forward with 65 fields; we realized,

8    during the pendency of this motion to compel, how we missed

9    getting offered a data set, a database of 365 fields.  The

10   RX Max rebate database was never offered to us.  We didn't

11   get an Excel file.

12        Notably, by contrast, the claims database that

13   contains 10,636-plus lines of data, and is not client

14   facing -- excuse me, is client facing, so it doesn't include

15   all of the financial machinations on rebates, that database

16   they provided in an Excel file two weeks before we had to

17   select our data fields and at that time, and before then,

18   Mr. GATTI, consistently said, in writing, in e-mail, if what

19   we're selecting doesn't get us all of these fields -- and he

20   enumerated what it is, I know you read it so I'm only going

21   to jump into it for a moment -- all of these fields that

22   we're seeking, you have an obligation to give us, regardless

23   of whether we pick the right fields.

24        At that time, during the entire process, all that they

25   did was in response to their January -- and as part of their

1    January 14th submission -- and I have that as well -- they

2    pulled up -- they gave us -- let's see if I can stop sharing

3    my PowerPoint for a moment.  Go to share.

4        (Brief pause in proceedings.)

5                MR. JANUSH:  My apologies.  I'm trying to pull

6    up exactly what they provided to us because they provided to

7    us 18 fields -- actually, I have it in my PowerPoint.  They

8    provided to us 18 fields, and only 18 fields from the RX Max

9    database.  Because Jeffco had agreed to these 18 fields,

10   these contain the 18 fields that are essential for rebate

11   calculation, this is what we're proposing you agree to as

12   well.

13               SPECIAL MASTER COHEN:  Who is -- who is

14   litigating Jeffco, besides --

15               MR. JANUSH:  Not the PEC.

16               SPECIAL MASTER COHEN:  Was it Budd?  Was it

17   Baron & Budd, or 11 PAP?

18               MR. JANUSH:  I don't believe so.

19               SPECIAL MASTER COHEN:  Was McCann involved?

20               MR. SPRINGER:  I'd like to represent --

21   Special Master Cohen, I'd like to represent that Mark Lanier

22   was part of the Jefferson County litigation until --

23       (Simultaneous crosstalk.)

24               MR. JANUSH:  Mark Lanier is trial counsel.

25         That's nonsense, Special Master Cohen.  Mark Lanier

1    doesn't get into the details of data.  He's not involved in

2    any of this.

3                    SPECIAL MASTER COHEN:  All right.  All right.

4                    MR. JANUSH:  And I wasn't involved in that

5    case whatsoever.  Never appeared.

6                    SPECIAL MASTER COHEN:  I just wanted to know

7    if McCann was involved.

8                    MR. SPRINGER:  I'm just stating for the record

9    that that Mark Lanier was counsel of record for Jefferson

10   County when they selected those data fields.  That's all I'm

11   stating.

12                   SPECIAL MASTER COHEN:  This is --

13                   MR. JANUSH:  That is -- okay.

14                   SPECIAL MASTER COHEN:  Guys --

15                   MR. JANUSH:  I'm going to move on.  I'm going

16   to move on.

17        (Court reporter interruption.)

18                   SPECIAL MASTER COHEN:  Everybody's scared to

19   talk now.

20                   MR. JANUSH:  I'm pulling up my -- I'm trying

21   to pull up my PowerPoint.  That's slide 17.  I'll get there

22   for Your Honor.

23                   SPECIAL MASTER COHEN:  Was McCann involved in

24   Jeffco?

25                   MR. WEINBERGER:  What was the question?

1          SPECIAL MASTER COHEN:  Was McCann involved in

2    Jeffco -- is he involved in Jeffco?

3          MR. WEINBERGER:  Yes, he's one of the experts

4    in Jeffco.

5          MR. JANUSH:  So the point I'm making is

6    that --

7          UNIDENTIFIED SPEAKER:  Special Master Cohen,

8    this is Joe.

9       The Jeffco case was (unintelligible) handled by Joanne

10   and that group that was not working with the MDL at one

11   point in time when Mark got involved and then got out.

12   That's how that case ended up in (unintelligible) appellate

13   practice, and now the case has come back.

14         SPECIAL MASTER COHEN:  Joe, you're hard to

15   hear and I'm past it, but thank you.

16         UNIDENTIFIED SPEAKER:  Okay.

17         MR. JANUSH:  I put up, on my PowerPoint, I

18   hope you can see it, the Optum January 16th letter. . .

19         SPECIAL MASTER COHEN:  Not yet.

20         MR. JANUSH:  Is it not sharing this?  It's on

21   my screen.

22         SPECIAL MASTER COHEN:  It's trying, but I'm

23   not seeing it.

24         MR. JANUSH:  Okay.

25         SPECIAL MASTER COHEN:  It's not working.

```
 1                  MR. JANUSH:  So it's Agenda 443E, Exhibit A.

 2                  SPECIAL MASTER COHEN:  One second.

 3            Exhibit A is their letter dated January 16th?

 4                  MR. JANUSH:  Yes.

 5                  SPECIAL MASTER COHEN:  Go ahead.

 6                  MR. JANUSH:  And it's Appendix -- so it's --

 7       in their letter they address, "Subject to these objections,

 8       enclosed as Exhibit C" -- do you see that?

 9                  SPECIAL MASTER COHEN:  Yes.

10                  MR. JANUSH:  -- "is a chart listing the

11       rebate-related data fields previously produced in Jefferson

12       County.  These 18 fields represent core rebate and

13       administrative fee information about each paid claim that is

14       maintained in Optum's centralized rebate system."

15                  SPECIAL MASTER COHEN:  Slower.

16                  MR. JANUSH:  "The centralized rebate

17       system" --

18                  MR. HATCHETT:  I'm sorry.  Can you -- we don't

19       have it yet.  Can you give us the -- say it one more time,

20       what -- what we're looking at and --

21                  MR. JANUSH:  Agenda 443 --

22            (Simultaneous crosstalk.)

23                  MR. JANUSH:  Agenda 443E, Exhibit A.

24                  SPECIAL MASTER COHEN:  It's roughly page 3599

25       of the agenda.
```

1            MR. HATCHETT:  It actually -- Evan, it would

2     be easier for me, just because I don't have the whole agenda

3     packet, could you say again the date of the letter.  And --

4            MR. JANUSH:  January --

5            MR. HATCHETT:  -- if you'll give us just a

6     second to make sure we all have it on our side before you

7     argue.

8            MR. JANUSH:  January 16, 2024, Agenda 443E,

9     Exhibit A.

10           SPECIAL MASTER COHEN:  And Exhibit A is

11    actually 443F.  Am I correct?

12           MR. JANUSH:  That's a good question.

13           MR. SPRINGER:  Are you on page 3589 of the

14    agenda?

15           SPECIAL MASTER COHEN:  I am.  I don't know if

16    everybody else is.

17           MR. JANUSH:  I have it online, so forgive me.

18    I mean, I have it electronically and it's not allowing me to

19    screen share.

20           SPECIAL MASTER COHEN:  Just get to your top

21    line.

22           MR. JANUSH:  Yeah, my top line is that these

23    are the 18 fields represented as core rebate and

24    administrative fee information.  We took Optum at their word

25    with respect to that.

1          We later learned that there was a document produced

2      that reflects all of the data fields in RX Max.  All of

3      those data fields, being the 365 data fields I addressed

4      with you, and the 65 remuneration related data fields are

5      within those 360 -- 65 or 64 fields of data.

6          Point is, we didn't spring this on Optum as a new

7      request.  We didn't get the opportunity on the front end to

8      vet those fields.  You will not -- if you ask Optum, can you

9      show an e-mail, a correspondence where you transmitted to

10     the plaintiffs, in the same way you gave the 10,636 line

11     Excel database for the claims database, did you do the same

12     for the rebate database containing a scintilla, a fraction

13     of that number.  Because the answer is unequivocally no.

14         What's stunning about this is that we are repeatedly

15     seeing, in correspondence from Optum, that they gave

16     plaintiffs over 10,600 fields.

17         Yeah.  True.  Irrelevant fields.  Largely irrelevant

18     fields.  Maybe a few of the 10,600 concern rebate or

19     remuneration-related fields.

20         They hid the ball on the rebate database.  Accept what

21     Jeffco plaintiffs accepted; it gives you the core rebate and

22     administrative fee information that you need.

23         So there is absolutely fairness problem here.  We

24     didn't spring this on them.  And there is a problem when

25     defense counsel is representing plaintiffs went into this

1    "eyes wide open."

2         We were blindfolded.  We were the opposite of eyes

3    wide open.

4                   SPECIAL MASTER COHEN:  Take me through your --

5    it's good rhetoric, but I want you to go through --

6                   MR. JANUSH:  It's --

7                   SPECIAL MASTER COHEN:  I get it.  I've read it

8    and I understand it, and I hear what you're saying, but I

9    want to go through the other of the five -- the ones that

10   you haven't addressed.  For example, manufacturer payment

11   reports, we haven't touched that.  In one of their letters

12   they say that's unintelligible.  What do you -- what's --

13   talk to me about that topic.

14                  MR. JANUSH:  There are manufacturer -- and it

15   may be the reports that we were looking at and addressing

16   that they said, oh, those are the -- those are the reports

17   where Purdue may have challenged some of the rebates and not

18   paid entirely, that's a manufacturer payment report.  That's

19   what I think a manufacturer payment report is.

20        I don't understand how that's an unintelligible.

21                  SPECIAL MASTER COHEN:  So are you saying --

22                  MR. JANUSH:  That are reports between a

23   manufacturer and a PBM over sales of drug.  We need the

24   manufacturer by manufacturer reports to be able to

25   crosscheck the data that we're getting.

1          SPECIAL MASTER COHEN:  Do you want to touch on

2     that, somebody from Optum?

3          MR. SPRINGER:  Sure, and I would like to just

4     briefly respond to the data fields point.

5          SPECIAL MASTER COHEN:  Go ahead.

6          MR. SPRINGER:  In that letter that Mr. Janush

7     is referencing, we explicitly said that there are other data

8     fields in RX Max, but that these were the fields that were

9     sufficient for the plaintiffs in Jefferson County and --

10         SPECIAL MASTER COHEN:  Yeah, this is

11    repetitive of what I've read several times, so unless

12    there's something new. . .

13         MR. SPRINGER:  That's fine.

14         So on this point that Mr. Janush is raising, again,

15    they never met and conferred with us about this.  I,

16    frankly, think that he may have copied this from the ESI

17    letter, but as he just discussed, there are a number of

18    documents that we've produced, with manufacturers, including

19    with Purdue, showing the amount that OptumRx billed to

20    Purdue over time and then we've produced the data that

21    showed the amounts that OptumRx actually collected from

22    Purdue.

23         So, it's unclear to us what they think is missing.

24         SPECIAL MASTER COHEN:  Are you saying that

25    you've produced every such document from every such

1    manufacturer?

2                    MR. SPRINGER:  That we have -- that we have

3    found in our custodial and non-custodial files related to

4    these drugs, that's my understanding.

5         The documents -- the documents that Mr. Janush was

6    citing came from a -- you know, a non-custodial source, at

7    least some of them.

8                    MR. JANUSH:  You know, if you go back to the

9    March 5th footnote from Judge Polster's order that I

10   referenced earlier, and I have it almost committed to

11   memory, at Footnote 3, Judge Polster addressed that we

12   should be getting the remuneration data as defined in

13   Footnote 1, plaintiffs' definition that he embraced, for all

14   custodial files and/or for all clients.

15        It wasn't just limited to custodial files.  It says

16   "for all clients" related to these drugs, these opioids.

17   It's all related to remuneration.

18        The notion that we just heard, that this was a

19   custodial file search, is problematic.  It shouldn't just be

20   limited.  There's two components to this, and I would

21   respectfully urge the Court to re-review --

22        (Simultaneous crosstalk.)

23                    MR. JANUSH:  May I finish?

24                    SPECIAL MASTER COHEN:  I thought you were

25   finished.

1          MR. JANUSH:  All right.  I would respectfully

2     urge the Court to review Footnote 3 of the March 5th order

3     in this regard.

4          SPECIAL MASTER COHEN:  What were you saying,

5     Brandon?

6          MR. SPRINGER:  Apologies.  I thought

7     Mr. Janush was fished.

8          To be clear, we searched custodial and non-custodial

9     sources for that, and it's not clear to me why -- what

10    client information he's talking about, how that would relate

11    in any way to a manufacturer in the reports.  What I've said

12    is that we've collected and produced those, as my

13    understanding of what he's defining this to be.

14         SPECIAL MASTER COHEN:  Anything else, Evan?

15         MR. JANUSH:  Yeah.

16    We, to this date, do not have any utilization review

17    data.

18         I spoke with Brandon yesterday.  He acknowledged that.

19    They're still working on it.

20         We need to have all of the utilization review data

21    produced.  We need it.  We need it now.

22         In addition --

23         MR. SPRINGER:  And just --

24         SPECIAL MASTER COHEN:  Go ahead.

25         MR. SPRINGER:  Can I just clarify really

1    quickly on that point, Special Master Cohen?

2                    SPECIAL MASTER COHEN:  Go ahead, Brandon.

3                    MR. SPRINGER:  We have produced the data, to

4    the extent it exists, related to drug utilization review.

5    What I think Mr. Janush is talking about is certain records

6    of payment associated with the Opioid Risk Management

7    Program, and we're working to collect that and produce that.

8                    MR. JANUSH:  I am addressing that as related

9    to any opioid program, anything -- any fees related to any

10   opioid program we should be getting.

11                   M. ELSNER:  I'm sorry, this is Michael Elsner

12   on behalf of the PEC.

13        There were various clinical programs that Optum put in

14   place over time.  They've answered all of those programs in

15   an interrogatory, and that interrogatory, not every program

16   contains the word "opioid."  So we should be entitled to any

17   compensation or any payments that they were paid from

18   clients related to any of that programming to the extent

19   they've identified it as relating to opioids.

20        So, for instance, they had a High Prescriber Narcotic

21   Program.  If a client selected the program, there might have

22   been a fee associated with that.  So Optum earned a fee on

23   operating that program.  So we want to make sure that these

24   clinical programs aren't limited only to the Opioid Risk

25   Management Program, but also to any of the other clinical

1      programs that they identified as relating to opioids, the

2      identification of opioid misuse, or diversion.

3                    SPECIAL MASTER COHEN:  Understood.

4           Any response to that, Brandon?

5                    MR. HATCHETT:  This is --

6                    SPECIAL MASTER COHEN:  Or Andrew?

7                    MR. HATCHETT:  This is Andrew Hatchett.

8           So, obviously, at the last hearing, we were ordered to

9      provide a clinical program response for the Rochester

10     sample, you know, for the RX clients and however many UHC

11     clients and then one of the things that you ordered us to do

12     in connection with that was to -- I'm trying to remember

13     what exactly it was but, you know, the price that it was

14     offered at and the price that it was paid, or whatever the

15     terms of that order are.  That is among the things that has

16     been extraordinarily difficult to gather because it is --

17     there's not a data source for it and so we're having to find

18     that in an enormous array of (unintelligible) all corners of

19     the company.  It would not be something that could be done

20     on a comprehensive basis, but we are doing it on that sample

21     basis as we were ordered do, and that's part of what we've

22     had to go back to the PEC again and ask for more time just

23     because of the extraordinary burden associated with doing

24     that.

25                    MR. ELSNER:  Special Master Cohen, again, this

1     is Michael Elsner.

2          Just to clarify, he's conflating two issues.  You

3     ordered first -- what he's referring to is what the sample

4     clients paid for these clinical programs.  That's what you

5     ordered produced.  What Judge Polster ordered produced was

6     opioid remuneration.  And so what we're seeking is not what

7     the specific clients in Rochester, as part of a sample paid,

8     if any, but what was done on a national basis.  And there

9     are documents that have been introduced as exhibits which

10    say, for the year 2018, the Opioid Risk Management Program

11    earned 17 million; the RDUR program earned 15 million,

12    whatever it is, and there's a listing of all these clinical

13    programs and they calculate what their earnings are in those

14    clinical programs by year.

15         To the extent any of those clinical programs they've

16    identified as being opioid-related in their interrogatory

17    responses, we're seeking the payments that Optum earned on

18    each of those clinical programs.

19         And I've tried to use the documents that I've seen

20    from witnesses from their custodial file with these charts,

21    and the witnesses say, well, I don't know who created that

22    chart, yes, it was in my file but it could have been an

23    estimate, I don't know if that was the final number or not

24    the final number, and I don't have anything else to give me

25    that answer without the production from them of this

1    remuneration data.

2         And this should be the most simple of all.  This is

3    direct programming that they offered to clients related to

4    opioids, and they were earning fees on that.  And they

5    didn't want the public to know they were earning fees on

6    that, according to their CEO John Prince, we want to keep

7    that quiet, but the jury's entitled to know that.  The

8    jury's entitled to know if they were making 20, 30, 40,

9    $60 million on opioid clinical programs.

10                  MR. WEINBERGER:  Pete Weinberger.

11        So that's part of the reason why we want it.  The

12   broader reason is, so they put this -- let's just take the

13   Opioid Risk Management Program.  They put it in place in

14   2016, 2017.  You know, one of the things that we are going

15   to present to the jury is, did they have the capability to

16   put these programs in 10 years before, 15 years before.  Did

17   they have the data, the expertise in order to do that.

18        So -- and what would it have cost for them do it much

19   earlier.

20        Similar to, in CT3, when we -- when the argument was

21   well, we kept updating our software programs for the red

22   flag analysis and it took us -- it cost us -- it would have

23   cost us 30 or $40 million to do that and that's why -- we

24   couldn't get it into the budget and that's why we delayed

25   and the jury found that was extremely relevant and that that

1    undue delay was a reason for liability.

2         Now, in this particular case, they're making money off

3    of it, starting in 2016.  So one would, I think, as a juror

4    would want to know, well, what were the plans getting for

5    this?  Were they actually, you know, monitoring bad

6    prescribers?  Were they actually looking at increased

7    volumes?  Were they actually communicating with their plans

8    that we -- there's a problem here that needs to be

9    corrected, or were they just offering it in order to make

10   more money, which apparently they did.

11        So, you know, I -- look, I want to just say this.

12   This remuneration issue is, in my opinion, just

13   Pete Weinberger, you can disagree with me, we're at the

14   crossroads of this litigation.  Are we going to be able to

15   get, in a transparent way, what they made off of opioids or

16   are we not.

17        Now, why am I skeptical that we're not getting

18   transparency?  Because I think I've read just about

19   everything there is to read publicly about the PBMs, about

20   the criticisms about how they do business, and number one of

21   those criticisms is the lack of transparency.

22        And we're not here to litigate transparency in an

23   isolated way just because, you know, we want to attack the

24   PBMs, but to the extent that it is extremely relevant to

25   what was motivating them to not limit the amount of supply

1    of opioids that they had the capability of doing, it is

2    extremely relevant and so that's why I believe we are at a

3    crossroads, why this is such an important decision for the

4    Court to make and. . . you know, I just urge you to err on

5    the side of transparency.

6         Oh, and one other thing.  If I've heard it once from

7    Mr. Hatchett, I've heard -- and hits team, I've had had it a

8    thousand times, how extraordinarily -- he said there's

9    extraordinary difficulty to gather the information.  You

10   hear that time and again.  It's so burdensome.

11        Well, I would suggest to you that that is an excuse

12   for lack of transparency in this -- in the discovery in this

13   case, and that's why I would urge you to grant what it is

14   that we're requesting.

15        Thank you.

16             MR. HATCHETT:  Special Master Cohen, I'm going

17   to be really quick.

18        I mean, I'm not going to go back and forth on

19   everything that Pete said.  Almost everything Pete said I

20   would say is false, and so I don't think it's productive to

21   go through them one by one.

22        We've been through all the rebate side and Brandon's

23   been going through each of those, the five point list that

24   Mr. Janush has, I think we just talked about manufacturer

25   payment reports.  Brandon explained that to the extent we

1    understand what he's asking for, we've produced them.

2         I think when we got into this most recent colloquy,

3    the question was on clinical program fees and specifically

4    the opioid risk management fees, and that was what Brandon

5    was explaining.  That, to my mind, is the only thing that

6    they've identified that has not yet been produced because it

7    was not initially requested and is now in process, but I'm

8    going to kick it to Brandon to explain where we are on that

9    because from what I've heard, over the last hours we've been

10   on, that's the only category of information that isn't

11   already available to the PEC, but I'm going to kick it to

12   Brandon.

13              MR. SPRINGER:  That's correct, and we're

14   working on that, and we will supplement to provide that

15   information.

16        I'll just note for the record that Mr. Elsner's

17   description of the documents and the testimony is wildly

18   inaccurate with respect to those issues.

19              SPECIAL MASTER COHEN:  I'm going to give him

20   the last word.

21        Okay.  Like I say, my brain was pretty full and now

22   it's very full.  I'm certainly not going to rule right now.

23   There's a lot been said.  There's a lot that I need to

24   re-review, including this transcript.

25        I will move as quickly as I can, but I'm not promising

1    anything -- I'm not going to even set a deadline for myself.

2    It's just going to be -- there's a lot there and it's

3    something I'm going to have to work through so. . .

4        Frankly, it's the most complicated discovery issue I

5    think I've faced in any of the MDLs I've been in.  So I'll

6    do my best, and I thank you all for trying to clarify some

7    very difficult stuff.  And I appreciate that everybody is

8    working very hard and I will do the same.

9        That's it for me.

10                MR. HATCHETT:  May I make one request for the

11   transcript?

12       Just, since the PBMs are not there, I know that

13   there's not a Zoom instance for every member who is in the

14   courtroom and so I'm assuming there was an additional

15   sign-in roll, but if we could just have everybody that was

16   in attendance in person noted on the transcript, we would

17   appreciate that.

18                SPECIAL MASTER COHEN:  That's fine.

19       Thank you.

20       (Proceedings adjourned at 4:39 p.m.)

21                    **C E R T I F I C A T E**

22       I certify that the foregoing is a correct transcript
     of the record of proceedings in the above-entitled matter
23   prepared from my stenotype notes.

24       _/s/ Heather K. Newman_                    _9-14-2025_
         HEATHER K. NEWMAN, RMR, CRR                    DATE

25