# APPENDIX B

## KROGER TRIBAL SETTLEMENT AGREEMENT

     This Kroger Tribal Settlement Agreement dated as of July 17, 2024 (this "*Agreement*") sets forth the terms of settlement between and among the TLC, Participating Tribes, and Kroger (in each case as defined below), to take effect as of the Effective Date (as defined below).

# TABLE OF CONTENTS

Page

I.      Definitions ........................................................................................................1

II.     Release ..............................................................................................................7

III.    Monetary Relief and Payments ......................................................................11

IV.     Allocation and Use of Settlement Funds ......................................................12

V.      Participation by Tribes ...................................................................................18

VI.     Defendants to be Released Upon Meeting Threshold Requirements ............19

VII.    Plaintiffs' Attorneys' Fees and Costs ...........................................................19

VIII.   Dispute Resolution .........................................................................................20

IX.     Miscellaneous .................................................................................................20


EXHIBITS A-1 through A-3:
                Lists of Litigating Tribes, Non-Litigating Tribes and
                Kroger-Specific Litigating Tribes ........................................... A-1 to 3

EXHIBIT B:      Alleged Harms ........................................................................... B

EXHIBIT C:      Interim Tribal Allocation Matrix ............................................... C

EXHIBIT C-1:    Applicable Tribal Allocation Percentages  ............................ C-1

EXHIBIT D:      TAFT X Trust Agreement .......................................................... D

EXHIBIT E:      Tribal Participation Form ........................................................... E

EXHIBIT F:      Kroger Subsidiaries, Affiliates, and Joint Ventures.................... F

EXHIBIT G-1:    Payment Schedule .................................................................. G-1

EXHIBIT G-2:    Allocation Between TAFT and Attorney Fee Fund.................... G-2

# I.    Definitions

Unless otherwise specified, the following definitions apply:

1.    "*Abatement Fund*" or *"TAFT X"* means the Tribal Abatement Fund Trust X, a Delaware Statutory Trust to be formed in accordance with the Tribal Abatement Fund Trust X Trust Agreement, which shall provide for distributions to Participating Tribes to be used for Opioid Remediation.

2.    "*Agreement*" means this Kroger Tribal Settlement Agreement, inclusive of all Exhibits.

3.    "*Alleged Harms*" means the alleged past, present, and future financial, societal and related harms and expenditures arising out of the alleged misuse and abuse of opioid products, non-exclusive examples of which are described in the documents listed on **Exhibit B**, including those expenditures that have allegedly arisen as a result of the physical and bodily injuries sustained by individuals suffering from opioid-related addiction, abuse, death, and other related diseases and disorders, and that have allegedly been caused by Kroger.

4.    "*Attorney Fee Fund*" means a segregated fund within the Kroger Settlement Trust set aside to pay attorneys' fees and reimburse attorneys' costs in accordance with Section IV.B.1 of this Agreement.

5.    "*Claim*" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, fine, penalty, restitution, reimbursement, disgorgement, expenses, judgment, right, obligation, dispute, suit, contract, controversy, agreement, parens patriae claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including but not limited to any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, abatement, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

6.      "*Claim-Over*" means a Claim asserted by a Non-Released Entity against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory relating to a Non-Party Covered Conduct Claim asserted by a Releasor.

7.      "*Covered Conduct*" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) in any line of business arising from or relating in any way to any Product, including without limitation (a) the distribution, dispensing, delivery, monitoring, reporting, supply, sale, prescribing, physical security, warehousing, coverage, purchases, reimbursement, discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, and/or any similar act or failure to act related to any product; or use or abuse of any Product; orders, prescriptions, formularies, guidelines, payments or rebates for any Product; policies, practices and/or operating procedures, statements, contracts, commercial arrangements, insurance, claim or benefit administration, claim adjudication, plan design, data and sales thereof, and any other act or failure to act relating to, any Product; and any system, plan, policy or advocacy relating to any Product, including, but not limited to, any unbranded promotion, marketing, programs, or campaigns relating to any Product; (b) the characteristics, properties, risks, or benefits of any Product; (c) the reporting, disclosure, non-reporting or nondisclosure to federal, state or other regulators of orders, prescriptions, theft, diversion and/or any similar conduct related to any Product and/or class of Products; (d) the purchasing, selling, acquiring, disposing of, importing, exporting, handling, processing, packaging, supplying, distributing, converting, or otherwise engaging in any activity relating to any Product; or (e) controls against diversion including but not limited to diversion control programs, corresponding responsibility, and suspicious order monitoring related to any Product.

8.      "*Effective Date*" means the date that the TLC delivers (or causes to be obtained and delivered) to Kroger the Tribal Participation Forms signed by both (i) 85% of Litigating Tribes (as determined by each Tribe's Tribal Allocation Distribution Percentage as set forth in the Interim Tribal Allocation Matrix attached as Exhibit C, as adjusted to exclude Non-Litigating Tribes) (so that the applicable allocation percentages for purposes of this subparagraph (i) are shown on Exhibit C-1) and (ii) 100% of the Kroger-Specific Litigating Tribes listed in Exhibit A-3 (together, the "Participation Threshold").   The Effective Date shall be no later than December 31, 2024, provided, however, that Kroger shall have the unilateral right in its sole discretion to extend that deadline to a date of its

choosing and/or to proceed with the Agreement even if the Participation Threshold has not been satisfied.  If Kroger exercises its discretion to extend the deadline, the Effective Date shall be no later than whatever new date Kroger chooses.  If Kroger exercises its discretion to proceed with the Agreement even if the Participation Threshold has not been satisfied, the Effective Date shall be the date on which Kroger elects to proceed.

9.  "Eligible Entities" means those Litigating Tribes and Non-Litigating Tribes set out in Exhibit A-1 and Exhibit A-2.

10.  "*Interim Tribal Allocation Matrix*" means the matrix set forth in **Exhibit C** to this Agreement, which shows the interim Tribal Allocation Distribution Percentage for each Tribe.  The Interim Tribal Allocation Matrix is subject to approval or modification by the Tribal Allocation Appointee, following which it shall be the Final Tribal Allocation Matrix.

11.  "*Final Tribal Allocation Matrix*" means the Tribal Allocation Matrix, as approved or modified by the Tribal Allocation Appointee pursuant to Section IV.D.

12.  "*MDL Court*" means the United States District Court for the Northern District of Ohio, Eastern Division.

13.  "*Kroger*" means The Kroger Co.

14.  "*Kroger Settlement Trust*" means the interest-bearing fund to be established by the MDL Court in MDL No. 2804 into which all payments by Kroger will be made, which shall be administered by the Special Master, and which is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended.

15.  "*Kroger-Specific Litigating Tribe*" means a Tribe (or Tribe official asserting the right of or for the Tribe to recover for Alleged Harms to the Tribe and/or its members thereof) that (i) is identified on Exhibit A-3, or (ii) has brought any Released Claims against any Released Entities in any jurisdiction or forum prior to the Effective Date.  For avoidance of doubt, all Kroger-Specific Litigating Tribes are also Litigating Tribes.

16.  "*Litigating Tribe*" means a Tribe (or Tribe official asserting the right of or for the Tribe to recover for Alleged Harms to the Tribe and/or its members thereof) that (i) is identified on Exhibit A-1, or (ii) has brought any Claim against any defendant in any jurisdiction or forum prior to the Effective Date that directly or indirectly is based on, arises out of, or in any way relates to or concerns the Covered Conduct and/or Alleged Harms.  Exhibit A-1 is intended to identify all Litigating Tribes, but may not be exhaustive.

17.  "*Non-Litigating Tribe*" means those Tribes that (i) have not brought any Claim against any defendant in any jurisdiction or forum prior to the Effective Date that directly or indirectly is based on, arises out of, or in any way relates to or concerns the Covered Conduct and/or Alleged Harms, and (ii) are not set forth on Exhibit A-1.  Exhibit A-2 is intended to identify all Non-Litigating Tribes, provided, however, that to the extent there is any conflict between Exhibit A-2 and the definitions of Litigating Tribe and/or Non-Litigating Tribe, the definitions control.

18.  "*Non-Participating Tribe*" means any Tribe that does not execute a Tribal Participation Form within three years of the Effective Date of this Agreement or any Tribe that, within three years of the Effective Date of this Agreement, affirmatively opts out of this settlement and provides written notice to the Special Master, the TLC and Kroger of its intent to litigate its Claims against Kroger.

19.  "*Non-Party Covered Conduct Claim*" means a Claim against any Non-Released Entity involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity).

20.  "*Non-Party Settlement*" means a settlement by any Releasor that settles any Non-Party Covered Conduct Claim and includes a release of any Non-Released Entity.

21.  "*Non-Released Entity*" means an entity that is not a Released Entity.

22.  "*Ongoing Common Benefit Order*" has the meaning set forth in Section III.A.3.

23.  "*Opioid Remediation*" means care, treatment, and other programs and expenditures (including reimbursement for past such programs or expenditures except where this Agreement restricts the use of funds solely to future Opioid Remediation) designed to remediate Alleged Harms, including to (1) address the misuse and abuse of opioid products, (2) treat or mitigate opioid use or related disorders, or (3) mitigate other alleged effects of the opioid abuse crisis, including on those injured as a result of the opioid abuse crisis.  **Schedule B** of the TAFT X TDP provides a list of programs, services and activities that qualify as expenditures for Opioid Remediation.  In addition, **Schedule D** of the TAFT X TDP provides a non-exhaustive list of Tribal Abatement Strategies that also qualify as expenditures for Opioid Remediation.  Qualifying expenditures may include reasonable related administrative expenses.

24.  "*Participating Tribe*" means any Tribe that executes a Tribal Participation Form and uploads the Tribal Participation Form on the Portal within three years of the Effective Date.

4

25.    "*Parties*" means Kroger, the TLC, and Participating Tribes (each, a "*Party*").

26.    "*Portal*" means the Tribal Opioid Settlement Portal at which (a) the Tribal Participation Agreements shall be received and maintained by the TLC for review and approval by Kroger and (b) the information related to the Tribal Allocation Distribution Percentage shall be maintained.

27.    "*Product*" means any chemical substance, whether licit or illicit, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is (1) an opioid or opiate, as well as any product containing any such substance; (2) a benzodiazepine, a muscle relaxer, carisoprodol, zolpidem, or gabapentin; or (3) a combination or "cocktail" of any stimulant or other chemical substance prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. "Product" shall include, but is not limited to, any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, naloxone, naltrexone, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, midazolam, carisoprodol, gabapentin, or any variant of these substances or any similar substance.

28.    "*Released Claims*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct and/or Alleged Harms occurring prior to the Effective Date. Without limiting the foregoing, Released Claims include any Claims that have been asserted against Released Entities, by any Tribe in any federal, state, or local action or proceeding (whether judicial, arbitral, or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct and/or Alleged Harms, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by a Tribe or any Releasors (whether or not such Tribe or Releasor has brought such action or proceeding).  Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct and/or Alleged Harms.  The Parties intend that "Released Claims" be interpreted broadly.  This Agreement does not release Claims by private individuals for any of their own damages for alleged personal injuries arising out of their use of any Product.  But in any action arising from or relating to such Claims or the Covered Conduct and/or Alleged Harms, the Released Entities may assert as a defense or otherwise argue that the payments required herein serve as a measure of compensation for personal injuries or for other legal or equitable claims or demands asserted by private individuals or others.  It is the intent of the

Parties that Claims by private individuals be treated in accordance with applicable law.

29.     "*Released Entities*" has the meaning set forth in Section VI.A.

30.     "*Releasors*" means (1) each Participating Tribe; and (2) without limitation and to the maximum extent of the power of each Participating Tribe to release Claims, (a) the Participating Tribe's departments, agencies, divisions, boards, commissions, subdivisions, districts, instrumentalities of any kind and attorneys, and any person in their official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, and hospital districts, of the Participating Tribes, within the territory governed by a Participating Tribe, and (c) any person or entity acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to a Participating Tribe, whether or not any of them participate in the Agreement.

31.     "*Settlement Fund Escrow*" means the interest-bearing escrow fund established pursuant to Docket No. 4215 in MDL No. 2804.

32.     "*Special Master*" means David R.  Cohen appointed by the MDL Court in MDL No. 2804, and further appointed by the MDL Court to oversee and administer the Attorney Fee Funds as set forth in the Global Tribal Settlement Agreements which, by agreement of the Parties, shall now include this Agreement.  (Docket No. 5212).

33.     "*TAFT X Directors*" or "the *Directors*" means the individuals Mary Smith, Dean Kevin Washburn and Kathy Hannan, or their successors, appointed by the MDL Court in MDL No. 2804.

34.     "*TAFT X Trust Agreement*" means the Tribal Abatement Fund Trust X Trust Agreement and attached exhibits, to be effective as of the Effective Date in substantially in the form attached hereto as **Exhibit D**.

35.     "*TAFT X TDP*" means the Trust Distribution Procedures set forth as **Exhibit 4** of the TAFT X Trust Agreement.

36.     "*TLC*" means the Tribal Leadership Committee appointed by the Court in MDL No. 2804.

37.     "*Total Remediation Amount*" has the meaning set forth in Section IV.B.1.

38. "*Tribal Allocation Appointee*" means David R.  Cohen who will be appointed by the MDL Court to approve or modify the Interim Tribal Allocation Matrix, set forth in **Exhibit C,** in order to determine the Final Tribal Allocation Matrix, pursuant to such procedures as he may establish.

39. "*Tribal Allocation Distribution Percentage*" means a Tribe's allocation percentage as set forth in the Interim Tribal Allocation Matrix or the Final Tribal Allocation Matrix.  The aggregate Tribal Allocation Distribution Percentages of all Tribes shall equal 100%.

40. "*Tribal Opioid Abatement Report*" means an annual report on the Approved Tribal Opioid Abatement Uses, as required under Section 2.5 of the TAFT X Trust Agreement.

41. "*Tribal Participation Form*" means the form attached hereto as **Exhibit E**.

42. "*Tribe*" or "*Tribes*" means either (1) a federally recognized tribe that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C.  § 5130, or (2) a "tribal organization," as defined in 25 U.S.C.  § 5304(I), or an "inter-tribal consortium," as defined in 25 U.S.C.  § 5381(a)(5), that provides health care pursuant to contracts/compacts with the Indian Health Service.

## II.  Release

A. *Scope*.  As of the Effective Date, the Released Entities will be released and forever discharged from all of the Releasors' Released Claims.  Each Participating Tribe (for itself and its Releasors) will absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever.  The releases provided for in this Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of each Releasor to release claims.  The releases shall be a complete bar to any Released Claim.

B. *Claim-Over and Non-Party Settlement*.

1. *Statement of Intent*.  It is the intent of the Parties that:

   a. Released Entities should not seek contribution or indemnification (other than pursuant to an insurance contract) from other parties for their payment obligations under this Agreement;

   b. the payments made under this Agreement shall be the sole payments made by the Released Entities to the Releasors involving, arising out

of, or related to Alleged Harms and/or Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity);

c.    Claims by Releasors against non-Parties should not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and

d.    the Settlement meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties.

e.    The provisions of this Section II.B are intended to be implemented consistent with these principles.  This Agreement and the releases and dismissals provided for herein are made in good faith.

2.    *Contribution/Indemnity Prohibited.*  No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner, provided that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it or with respect to any person or entity that brings any other form of action against Kroger arising out of or related to Covered Conduct.  For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

3.    *Non-Party Settlement.*  To the extent that, on or after the Effective Date, any Releasor enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from Kroger in Section II.B.2, or a release from such Non- Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim-Over.  The obligation to obtain the prohibition and/or release required by this subsection is a material term of this Agreement.

4.    *Claim-Over.*  In the event that any Releasor obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Entity that does not contain a prohibition like that in Section II.B.3, or any Releasor files a Non-Party Covered Conduct Claim against a non- Released Entity in bankruptcy or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in Section II.B.3,

and such Non-Released Entity asserts a Claim-Over against a Released Entity, then Releasor and Kroger shall take the following actions to ensure that the Released Entities do not pay more with respect to Alleged Harms and/or Covered Conduct to Releasors or to Non-Released Entities than the amounts owed under this Agreement by Kroger:

a.      Kroger shall notify that Releasor of the Claim-Over within sixty (60) days of the assertion of the Claim-Over or sixty (60) days of the Effective Date of this Agreement, whichever is later;

b.      Kroger and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that it is not required to pay more with respect to Alleged Harms and/or Covered Conduct than the amounts owed by Kroger under this Agreement;

c.      That Releasor and Kroger shall take steps sufficient and permissible under applicable law to hold Released Entities harmless from the Claim-Over and ensure Released Entities are not required to pay more with respect to Alleged Harms and/or Covered Conduct than the amounts owed by Kroger under this Agreement.  Such steps may include, where permissible:

(1)      Filing of motions to dismiss or such other appropriate motion by Kroger or Released Entities, and supported by Releasors, in response to any claim filed in litigation or arbitration;

(2)      Reduction of that Releasor's Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor may obtain, or has authority to control from such Non-Released Entity;

(3)      Placement into the Settlement Fund Escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

(4)      Return of monies paid by Kroger under this Agreement to the Settlement Fund Escrow not yet distributed to Releasors to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

(5)      Payment of monies to Kroger by that Releasor to ensure it is held harmless from such Claim-Over, up to the amount that Releasor may obtain, or has authority to control from such Non-Released Entity;

(6)     Credit to Kroger under this Agreement to reduce the overall amounts to be paid under the Agreement such that it is held harmless from the Claim-Over; and

(7)     Such other actions as that Releasor and Kroger may devise to hold Kroger harmless from the Claim-Over.

d.     The actions of that Releasor and Kroger taken pursuant to paragraph (c) must, in combination, ensure Kroger is not required to pay more with respect to Alleged Harms and/or Covered Conduct than the amounts owed by Kroger under this Agreement.

e.     In the event of any dispute over the sufficiency of the actions taken pursuant to paragraph (c), that Releasor and Kroger may seek review by the Court.  In the event that the Court's actions do not result in Released Entities being held fully harmless, Kroger shall have a claim for breach of this Agreement by Releasors, with the remedy being payment of sufficient funds to hold Kroger harmless from the Claim-Over.  For the avoidance of doubt, the prior sentence does not limit or eliminate any other remedy that Kroger may have.

5.     To the extent that the Claim-Over is based on a contractual indemnity, the obligations under Section II.B.4 shall extend solely to a Non-Party Covered Conduct Claim against a pharmacy, clinic, hospital or other purchaser or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor.  Kroger shall notify the Participating Tribes, to the extent permitted by applicable law, in the event that any of these types of Non-Released Entities asserts a Claim-Over arising out of contractual indemnity against it.

C.     *General Release*.  In connection with the releases provided for in the Agreement, each Participating Tribe (for itself and its Releasors) expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

**General Release; extent**.  A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may thereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Participating Tribe (for itself and its Releasors) hereby expressly waives and fully, finally, and forever settles, releases, and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do

10

not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Participating Tribes' decision to enter into the Agreement or the Participating Tribes' decision to participate in the Agreement.

D.  *Res Judicata*.  Nothing in the Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in the Agreement, and/or any stipulation of dismissal with prejudice or judgment entered on the Agreement, gives rise to under applicable law.

E.  *Representation and Warranty*.  The signatories hereto on behalf of the Participating Tribes expressly represent and warrant that they have authority to enter this agreement on behalf of the Participating Tribes and that the Participating Tribes will obtain on or before the Effective Date (or have obtained) the authority to settle and release, to the maximum extent of the Tribe's power, all Released Claims of (1) their respective Participating Tribes; and (2) all Releasors of their respective Participating Tribes.

F.  *Effectiveness*.  The releases set forth in the Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors.  Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Kroger Settlement Trust or any portion thereof, or by the enactment of future laws, or by any seizure of the Kroger Settlement Trust or any portion thereof.

G.  *Cooperation*.  Releasors (i) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (ii) will reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal of any and all Released Claims.  Any Participating Tribes shall use best efforts to assist in the stay of any actions brought by Non-Participating Tribes during the three year period following the Effective Date in which the Litigating and Non-Litigating Tribes may execute a Tribal Participation Form pursuant to Section II.E.

H.  *Non-Released Claims*.  Notwithstanding the foregoing or anything in the definition of Released Claims, the Agreement does not waive, release or limit any criminal liability, Claims for any outstanding liability under any tax or securities law, Claims against parties who are not Released Entities, Claims by private individuals and any claims arising under this Agreement for enforcement of this Agreement.

## III.  Monetary Relief and Payments

A.  *Structure of Payments*

1.  All payments under this Section III shall be made into the Kroger Settlement Trust.  The payments in the Kroger Settlement Trust shall be allocated and used only as specified in Section IV of this Agreement.

11

2.     Upon the occurrence of the Effective Date, Kroger shall pay into the Kroger Settlement Trust the sum of $40,464,000.00 beginning on March 31, 2025 in accordance with Exhibits G-1 and G-2 attached hereto and under the terms and conditions of this Agreement, subject to the reductions described in Section IV.E.  In the event that the Effective Date occurs after March 31, 2025, any payments that would have been due prior to the Effective Date will instead be due sixty days after the Effective Date, and all other payments set forth in Exhibits G-1 and G-2 will remain the same.

3.     Kroger's payment into the Kroger Settlement Trust includes the amount necessary to comply with the Ongoing Common Benefit Order (Dkt. #4428) in *In re National Prescription Opiate Litigation*, case No. 1:17-md-2804, pending in the United States District Court for the Northern District of Ohio Eastern Division (the "Ongoing Common Benefit Order").  The Special Master shall hold the amount necessary to ensure compliance with the Ongoing Common Benefit Order pursuant to or until further order by the MDL Court.  It is expressly understood that Kroger's Payment into the Kroger Settlement Trust under III.A.2 fulfills its obligations under the Ongoing Common Benefit Order.

4.     If the Participation Threshold is not met by December 31, 2024 or any extension thereof, such that the Effective Date does not occur, then Kroger shall make no payment, this Agreement will have no further effect, and all releases and other commitments or obligations contained herein will be void, provided, however, that Kroger shall have the unilateral right in its sole discretion to extend that deadline to a date of its choosing and/or to proceed with the Agreement even if the Participation Threshold has not been satisfied.

## IV.     Allocation and Use of Settlement Funds

A.     *Components of Settlement Fund.*  Subject to Section IV.B.3, the Kroger Settlement Trust shall be comprised of funds earmarked for Opioid Remediation and for the Attorney Fee Fund as set forth in Section IV.B.

B.     *Use of Settlement Payments*.

1.     The Special Master shall transfer funds from the Kroger Settlement Trust within 60 days (with one 30 day extension available in his discretion) after receiving the funds from the Settlement Fund Escrow pursuant to Section III.A.2 as follows: 85% of such funds (the "Total Remediation Amount") shall be paid to TAFT X for distribution to Participating Tribes to use for Opioid Remediation in accordance with the TAFT X Trust Agreement and the TAFT X TDP; and 15% of such funds shall be set aside by the Special Master for the Attorney Fee Fund, including the portion to be withheld pursuant to Section III.A.3.

12

2. The TAFT X Directors shall set aside and hold back the funds allocable to each of the following Tribes proportionate to the Tribe's Tribal Allocation Distribution Percentage:

   a. A Non-Litigating Tribe that has not become a Participating Tribe at the time of such distribution, and the provisions of Section IV.E.1 shall apply with respect to such Non-Litigating Tribe.

   b. A Litigating Tribe that has not become a Participating Tribe at the time of such distribution, and the provisions of Section IV.E.2 shall apply with respect to such Litigating Tribe.

3. The Special Master shall deduct the reasonable costs and expenses incurred in the administration of the Kroger Settlement Trust, not to exceed $500,000, out of the interest accrued on the Kroger Settlement Trust and thereafter from the principal of the Kroger Settlement Trust.

4. In no event may less than 85% of Kroger's payments to the Kroger Settlement Trust be spent on Opioid Remediation.  For the avoidance of doubt, the 85% portion of Kroger's payments include any expenses, costs and fees that may be deducted by the Special Master in accordance with Section IV.B.3 and for Directors' expenses, costs and fees pursuant to Section IV.C.2.  The Parties acknowledge and agree that the payments disbursed to the Tribes from TAFT X in accordance with this Section IV and Schedules 1 and 4 of the TAFT X TDP are exclusively for Opioid Remediation.

C. *Duties and Expenses of the Directors*.

   1. The Directors shall have the duties set forth in this Agreement and in the TAFT X Trust Agreement.  For the avoidance of doubt, the Directors will have duties and responsibilities comparable to those the same individuals exercise as trustees as set forth in the proposed Tribal Abatement Fund Trust Agreement filed 08/23/21 (Doc. 3634) with the Fifteenth Plan Supplement under the Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P.  and its Affiliated Debtors (the "*Purdue Plan*"), confirmed by the Bankruptcy Court in *In re Purdue Pharma L.P.,* No. 19-23649 (RDD) (S.D.N.Y) (without regard to the effectiveness of any other orders, documents, agreements or similar authorities that may otherwise be applicable to the Purdue Plan).

   2. Any expenses, costs and fees associated with or arising out of the duties of the Directors shall be paid out of interest accrued on the Abatement Fund and from the principal in the Abatement Fund should such interest prove insufficient.

D. Duties and Expenses of Tribal Allocation Appointee.

1.    David R.  Cohen, in his capacity as Tribal Allocation Appointee, shall review the Interim Tribal Allocation Matrix set forth in **Exhibit C**, which shows the interim Tribal Allocation Distribution Percentage for every Tribe. The Tribal Allocation Appointee shall establish procedures by which he will determine whether (1) to approve the Interim Tribal Allocation Matrix or (2) to modify the Interim Tribal Allocation Matrix.  Upon either such approval or modification by the Tribal Allocation Appointee, the Interim Tribal Allocation Matrix shall become the Final Tribal Allocation Matrix and the Tribal Allocation Distribution Percentages set forth in the Final Tribal Allocation Matrix shall form the basis for the distributions to Participating Tribes in accordance with this Section IV.  For the avoidance of doubt, such procedures to be implemented by the Tribal Allocation Appointee shall include:

   a.    Each Participating Tribe shall have the right to meaningfully participate in the Tribal Allocation Appointee's decision as to whether to approve or modify the Interim Tribal Allocation Matrix and a right to be heard prior to the Tribal Allocation Appointee's final decision.

   b.    The Directors shall provide notice of the Kroger Settlement to the unrepresented Tribes.  The Directors shall coordinate with Special Master David Cohen in his capacity as Tribal Allocation Appointee to set forth the procedures by which notice is provided.

   c.    Unrepresented Participating Tribes shall have the same rights as the represented Participating Tribes within the settlement allocation process.

   d.    Kroger acknowledges and expressly agrees that it has no role whatsoever in the inter-tribal allocation.

2.    Any expenses, costs and fees associated with or arising out of the duties of David R.  Cohen in his capacity as Tribal Allocation Appointee (including expenses of retaining experts or other professionals to assist him on allocation issues including BrownGreer PLC, JoJo Tan, and any trust counsel), shall be agreed to by the Special Master consistent with Section IV.B.3 and paid out of the interest accrued on the Settlement Fund Escrow and, after the Effective Date, from the interest accrued on the Kroger Settlement Trust.  Thereafter, all such expenses, costs and fees shall be paid from the principal of that portion of the Kroger Settlement Trust which, under Section IV.B.1, will be allocated to and paid to TAFT X, provided that, the Special Master may estimate the amount necessary to pay such allocation-related expenses, costs and fees reasonably expected to be incurred for one year after the Effective Date and reserve that amount from payment to TAFT X, to be held by the Kroger Settlement Trust to cover such allocation-related expenses, costs and fees for one year after the

Effective Date, following which the balance, if any, remaining of any such reserved amount shall be paid to TAFT X.

E.  *Treatment of Non-Participating Tribes*.

1.  <u>Non-Litigating Tribes</u>.  Non-Litigating Tribes shall have a period of three years after the Effective Date to execute a Tribal Participation Form.  If a Non-Litigating Tribe executes a Tribal Participation Form within three years after the Effective Date, it shall receive the amount (including accumulated holdback amounts) allocable to its Tribal Allocation Distribution Percentage from the Abatement Fund.  If a Non-Litigating Tribe does not execute a Tribal Participation Form within three years after the Effective Date, the amount (including accumulated holdback amounts) allocable to its Tribal Allocation Distribution Percentage will be reallocated and paid to all Participating Tribes pro rata at the end of the three year period following the Effective Date, provided however that if a Non-Litigating Tribe does not execute a Tribal Participation Form within three years after the Effective Date but files Released Claims against one or more Released Entities anytime in that same three-year period, the amount (including accumulated holdback amounts) allocable to such Non-Litigating Tribe pursuant to its Tribe Allocation Distribution Percentage shall revert to Kroger, to be paid to Kroger within sixty (60) days after the third anniversary of the Effective Date, and the Annual Payment for each future Payment Year as reflected in Exhibit G-1 shall also be reduced by such Non-Litigating Tribe's Tribal Distribution Allocation Percentage.

2.  <u>Litigating Tribes</u>.  Any Litigating Tribe that does not execute a Tribal Participation Form within three years after the Effective Date of this Agreement or any Litigating Tribe that affirmatively opt-outs of this settlement and provides written notice to the Special Master, the TLC, and Kroger of its intent to litigate any Released Claims against any Released Entities shall forego its right to participate in distributions contemplated by this Agreement, in which case the amount (including accumulated holdback amounts) allocable to such Litigating Tribe pursuant to its Tribal Allocation Distribution Percentage shall revert to Kroger, to be paid to Kroger within sixty (60) days after the third anniversary of the Effective Date, and the Annual Payment for each future Payment Year as reflected in Exhibit G-1 shall also be reduced by such Litigating Tribe's Tribal Distribution Allocation Percentage.

F.  *Provisions Regarding Abatement Fund*.

1.  The funds distributed by TAFT X to each Participating Tribe shall be used solely for Opioid Remediation.

2.  The TAFT X Directors shall, in consultation with the TLC, design and implement a system of annual reporting by Participating Tribes relating to

Opioid Remediation expenditures made using funds received from TAFT X. The TAFT X Directors shall provide an annual Tribal Opioid Abatement Report to Kroger and the Special Master, which annual report will be filed by the Special Master, in his discretion, with the MDL Court.

G.   *Nature of Payment*.

1.   Kroger and the TLC acknowledge and agree that notwithstanding anything to the contrary in this Agreement, including, but not limited to, the scope of the Released Claims:

a.   Kroger has entered into this Agreement to avoid the delay, expense, inconvenience, and uncertainty of further litigation;

b.   Tribes sought restitution and remediation for alleged damage or harm caused by the potential violation of a law (within the meaning of 26 U.S.C. § 162(f)(2)(A) and 26 C.F.R. § 1.162-21(e)(4)(i)) as damages for the Alleged Harms allegedly suffered by the Tribes;

c.   By executing the Tribal Participation Form, the Participating Tribes acknowledge that: (a) the Total Remediation Amount is no greater than the amount, in the aggregate, of the Alleged Harms allegedly suffered by the Participating Tribes; and (b) the portion of the Total Remediation Amount received by each Participating Tribe is no greater than the amount of the Alleged Harms allegedly suffered by such Participating Tribe;

d.   The payment of the Total Remediation Amount by Kroger constitutes, and is paid for, restitution and remediation for alleged damage or harm caused by the potential violation of a law (within the meaning of 26 U.S.C. § 162(f)(2)(A) and 26 C.F.R. § 1.162-21(e)(4)(i)) (as compensation for alleged damage or harm arising out of alleged bodily injury) allegedly caused by Kroger;

e.   The Total Remediation Amount is being paid as restitution and remediation (within the meaning of 26 U.S.C. § 162(f)(2)(A) and 26 C.F.R. § 1.162-21(e)(4)(i)) in order to restore, in whole or in part, the Participating Tribes and persons to the same position or condition that they would be in had the Participating Tribes and person not suffered the Alleged Harms and constitutes restitution and remediation for damage or harm allegedly caused by the potential violation of a law and/or is an amount paid to come into compliance with the law;

f.   For the avoidance of doubt: (a) no portion of the Total Remediation Amount represents reimbursement to any Participating Tribe, or other person or entity, for the costs of any investigation or litigation, including without limitation attorneys' fees, (b) the entire Total

16

Remediation Amount is properly characterized as described in Section IV.G.1.e, and (c) none of the amounts paid by Kroger under Section III constitutes disgorgement or is paid for or in place of any fine, penalty, punitive damages, or other punitive assessments; and

g. The Muscogee (Creek) Nation (or the designated "appropriate official" within the meaning of Treasury Regulation Section 1.6050X-1(f)(1)(ii)(B)), on behalf of all Participating Tribes (the "Form 1098-F Filer") shall complete and file Form 1098-F with the Internal Revenue Service on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the Effective Date occurs.  On the Form 1098-F, the Form 1098-F Filer shall identify the entire Total Remediation Amount as remediation/restitution.  The Form 1098-F Filer shall also, on or before January 31 of the year following the calendar year in which the Effective Date occurs, furnish Copy B of such Form 1098-F (or an acceptable substitute statement) to Kroger.

2. Tax Reporting and Cooperation

a. Each Participating Tribe shall cooperate in good faith with Kroger with respect to any tax claim, dispute, investigation, audit, examination, contest, litigation, or other proceeding relating to this Agreement.

b. Upon request by Kroger, the Participating Tribes (and any respective designated "appropriate official" within the meaning of Treasury Regulation Section 1.6050X-1(f)(1)(ii)(B)) agree to perform such further acts and to execute and deliver such further documents as may be reasonably necessary for Kroger to establish the statements set forth in Section IV.G to the satisfaction of their tax advisors, their independent financial auditors, the Internal Revenue Service, or any other governmental authority, including as contemplated by 26 C.F.R § 1.162-21(b)(3)(ii) and any subsequently proposed or finalized relevant regulations or administrative guidance.

c. Pursuant to 26 C.F.R.. § 1.6050X-1(a) and (b), the Muscogee (Creek) Nation shall designate one of its officers or employees to act as the "appropriate official" within the meaning of Treasury Regulation Section 1.6050X-1(f)(1)(ii)(B).

d. For the avoidance of doubt, except as explicitly set forth in this Agreement, neither Kroger, the TLC, any Participating Tribe, or counsel to any of the foregoing make any warranty or representation as to the tax consequences of the payment of the Total Remediation Amount (or any portion thereof).

17

V.    **Participation by Tribes**

A.    *Presentation of Aggregated Settlement Offer, Informed Consent and Compliance with Ethical Rules*.  The TLC believes the gross settlement amount and term of years to be reasonable and recommend moving forward to present this Agreement and informed consent documentation to all Litigating Tribes identified on **Exhibit A-1** and all Non-Litigating Tribes identified on **Exhibit A-2**, and if applicable, to their counsel.  Kroger, the Released Entities, and the TLC recognize the ultimate decision to settle rests with each Tribe.  The TLC will work with all counsel to present the proposed aggregate settlement and allocation procedures to all Tribes and will use best efforts to secure 100% participation.

B.    *Notice to Unrepresented Tribes*.  The Directors shall provide notice of the settlement to each Non-Litigating Tribe, each of which shall have the same rights as the Litigating Tribes to determine the final Tribal Allocation Distribution Percentage for that Tribe.

C.    *Tribal Participation Form*.  Attached hereto as **Exhibit E** is the Tribal Participation Form.  A Tribe's executed Participation Form is evidence of its status as a Party to this Agreement, and the executed Participation Forms and their terms are incorporated herein by reference.

D.    *Dismissal of Claims*.  Each Participating Tribe, either directly or through its counsel, shall provide a dismissal with prejudice of all Released Claims by that Tribe against Released Entities.  Dismissal of a Litigating Tribe's complaint against Released Entities shall be filed only upon the occurrence of the Effective Date.  The Parties will coordinate a streamlined dismissal process with the MDL Court that will allow for a bulk filing of the agreed dismissal.

E.    Calculating Tribal Allocation Percentages for Tribal Health Organizations and Inter-Tribal Consortia.

1.    In Alaska: For purposes of determining whether the Participation Threshold has been met, the full amount of the Tribal Allocation Distribution Percentage as listed in the Interim Inter-Tribal Allocation Matrix shall be used for each litigating Alaska Tribal Health Organization, litigating Alaska inter-tribal consortium, or litigating Alaska Tribe which is participating in the Kroger Settlement.  In the event that a litigating Alaska Tribe which is not listed in the Interim Inter-Tribal Allocation Matrix**,** and which is a member of a listed Alaska Tribal Health Organization or Alaska inter-tribal consortium, affirmatively decides not to participate in the Kroger Settlement, then the Tribal Allocation Distribution Percentage, as computed pursuant to the footnote set forth in **Exhibit C**, of that nonparticipating Alaska Tribe shall be calculated and deducted from the Tribal Allocation Distribution Percentage of its Tribal Health Organization or inter-tribal consortium for purposes of determining whether the Participation Threshold has been met.

      2.     <u>Outside of Alaska</u>: Litigating Tribal Health Organizations and inter-tribal consortia outside of Alaska have no Tribal Allocation Distribution Percentage listed in the Interim Inter-Tribal Allocation Matrix in **Exhibit C,** and accordingly their participation in the settlement shall not count toward the Participation Threshold.

F.     Deadline for the Participation Threshold.  If the Participation Threshold has not been satisfied by December 31, 2024, this Agreement will have no further effect and all releases and other commitments or obligations contained herein will be void, provided, however, that Kroger shall have the unilateral right in its sole discretion to extend that deadline to a date of its choosing and/or to proceed with the Agreement even if the Participation Threshold has not been satisfied.

## VI.    Defendants to be Released Upon Meeting Threshold Requirements

A.     The following are to be Released Entities and shall be released and claims against them to be dismissed with prejudice upon the Effective Date: (i) Kroger ("*Kroger*" as defined in Section I.13 of the Defined Terms); (ii) all of its past and present, direct or indirect: parents, subsidiaries, divisions, affiliates, joint ventures, predecessors, successors, assigns and insurers (in their capacity as such) and all of its past and present, direct or indirect, parents, subsidiaries, divisions, affiliates, joint ventures, predecessors, successors, assigns and insurers (in their capacity as such); and (iii) the past and present officers, directors, members, direct or indirect shareholders (solely in their capacity as shareholders of the foregoing entities), partners, trustees, employees, agents, attorneys and insurers of each of the foregoing entities and persons referenced in clauses (i) through (ii) above for actions or omissions that occurred during and related to their work for, or employment with, any of the foregoing entities with respect to the Released Claims. An illustrative list of Released Entities is annexed to this Agreement as **Exhibit F**.

## VII.    Plaintiffs' Attorneys' Fees and Costs

A.     The procedures to allocate and disburse the Attorney Fee Fund to Litigating Tribes' counsel shall be set forth by the Special Master consistent with the terms of this Agreement.  Kroger shall have no involvement concerning these procedures.  Any costs incurred in allocating and disbursing the Attorney Fee Fund shall be borne by the Attorney Fee Fund.

B.     An attorney representing the Participating Tribes may not receive any payment from the Attorney Fee Fund unless such attorney presents this settlement to each tribal opioid client in good faith and uses best efforts to secure participation as set forth in Section V.A above.

C.     For the avoidance of doubt, the TLC shall propose and receive approval from the MDL Court for any funds to be paid to the Common Benefit Fund, as defined in Judge Polster's May 9, 2022 Order (ECF No. 4428), such that Kroger is under no

obligation to hold back any funds for any Common Benefit Assessment. Any funds owed to the Common Benefit Fund shall be paid from the Attorney Fee Fund.

## VIII. Dispute Resolution

A. Any disputes arising out of this Agreement shall be heard before Special Master David Cohen or his successor as the arbitrator designated by the parties to resolve disputes through binding arbitration governed by the rules of the American Arbitration Association.

## IX. Miscellaneous

A. *No Admission*. Kroger does not admit liability or wrongdoing. This Agreement shall not be considered, construed, or represented to be (1) an admission, concession, or evidence of liability or wrongdoing or (2) a waiver or any limitation of any defense otherwise available to Kroger.

B. *Third-Party Beneficiaries*. Except as expressly provided in this Agreement, no portion of this Agreement shall provide any rights to, or be enforceable by, any person or entity that is not a Participating Tribe or Released Entity. No Participating Tribe may assign or otherwise convey any right to enforce any provision of this Agreement and no entity except the TLC shall have the right to enforce any provision of this Agreement on behalf of all Participating Tribes. Nothing in this Agreement extends to the TLC or Participating Tribes the authority to enforce injunctive terms provided in state-court consent judgments implementing Kroger's national settlement with state and local governments, which shall be enforceable only as provided therein; however, Kroger acknowledges that said injunctive terms apply equally on tribal and non-tribal lands within a State.

C. *Construction*. None of the Parties and no Tribe shall be considered to be the drafter of this Agreement or of any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement. The headings of the provisions of this Agreement are not binding and are for reference only and do not limit, expand, or otherwise affect the contents or meaning of this Agreement.

D. *Cooperation*. Each Party agrees to use its best efforts and to cooperate with the other Parties to cause this Agreement to become effective, to obtain all necessary approvals, consents and authorizations, if any, and to execute all documents and to take such other action as may be appropriate in connection herewith. Consistent with the foregoing, each Party agrees that it will not directly or indirectly assist or encourage any challenge to this Agreement by any other person, and will support the integrity and enforcement of the terms of this Agreement.

E. *Entire Agreement*. This Agreement, its Exhibits and any other attachments, embodies the entire agreement and understanding between and among the Parties relating to the subject matter hereof and supersedes (1) all prior agreements and understandings relating to such subject matter, whether written or oral and (2) all

purportedly contemporaneous oral agreements and understandings relating to such subject matter.

F.  *Execution.*  This Agreement may be executed in counterparts and by different signatories on separate counterparts, each of which shall be deemed an original, but all of which shall together be one and the same Agreement.  One or more counterparts of this Agreement may be delivered by facsimile or electronic transmission with the intent that it or they shall constitute an original counterpart thereof.  One or more counterparts of this Agreement may be signed by electronic signature.

G.  *Good Faith and Voluntary Entry*.  Each Party warrants and represents that it negotiated the terms of this Agreement in good faith.  Each of the Parties and signatories to this Agreement warrants and represents that it freely and voluntarily entered into this Agreement without any degree of duress or compulsion.  The Parties state that no promise of any kind or nature whatsoever (other than the written terms of this Agreement) was made to them to induce them to enter into this Agreement.

H.  *No Prevailing Party*.  The Parties each agree that they are not the prevailing party in this action, for purposes of any claim for fees, costs, or expenses as prevailing parties arising under common law or under the terms of any statute, because the Parties have reached a good faith settlement.  The Parties each further waive any right to challenge or contest the validity of this Agreement on any ground, including, without limitation, that any term is unconstitutional or is preempted by, or in conflict with, any current or future law.

I.  *Non-Admissibility*.  The settlement negotiations resulting in this Agreement have been undertaken by the Parties in good faith and for settlement purposes only, and no evidence of negotiations or discussions underlying this Agreement shall be offered or received in evidence in any action or proceeding for any purpose.  This Agreement shall not be offered or received in evidence in any action or proceeding for any purpose other than in an action or proceeding arising under or relating to this Agreement, except that Released Entities may file or use this Agreement in any action (1) involving a determination regarding insurance coverage; (2) involving a determination of the taxable income or tax liability of any Released Entities; (3) to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good-faith settlement, judgment bar or reduction or on any other theory of claim preclusion or issue preclusion or similar defense or counterclaim; (4) to support a claim for contribution and/or indemnification; or (5) to support any other argument or defense by a Released Entity that the Remediation Payments provide a measure of compensation for asserted harms or otherwise satisfy the relief sought.

J.  *Notices*.  All notices or other communications under this Agreement shall be in writing (including but not limited to electronic communications) and shall be given to the recipients indicated below:

For the Tribal Leadership Committee:

Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller & Monkman, LLP
510 L Street, Suite 310
Anchorage, AK 99501
lloyd@sonosky.net
dsimon@sonosky.com
whitney@sonosky.net
(907) 258-6377

Geoffrey Strommer / Caroline Mayhew / Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP
215 SW Washington St., Suite 200
Portland, OR 97204
gstrommer@hobbsstraus.com
cmayhew@hobbsstraus.com
egoodman@hobbsstraus.com
(503) 242-1745

Tara Sutton / Tim Purdon
Robins Kaplan LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
TSutton@RobinsKaplan.com
TPurdon@RobinsKaplan.com
(612) 349-8500

Lynn Sarko
Keller Rohrback, L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
lsarko@kellerrohrback.com
(206) 623.1900

Roe Frazer
Frazer PLC
30 Burton Hills Blvd, Suite 450
Nashville, TN 37215
roe@frazer.law
(615) 647-6464

Peter Mougey
Levin, Papantonio, Rafferty, Proctor,
Buchanan, O'Brien, Barr & Mougey, P.A.

316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
pmougey@levinlaw.com
(850) 435-7068

Elizabeth J.  Cabraser / Dan Drachler / Eric B.
Fastiff
Lieff Cabraser Heimann & Bernstein LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
ecabraser@lchb.com
ddrachler@lchb.com
efastiff@lchb.com
(415) 956-1000

Steve Skikos/Mark Crawford
Skikos, Crawford, Skikos & Joseph LLP
One Sansome Street, Suite 2830
San Francisco, CA 94104
sskikos@skikos.com
mcrawford@skikos.com
415.546.7300


For Kroger:

Chantale Fiebig
Dan Nadratowski

Weil, Gotshal & Manges LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Chantale.fiebig@weil.com
daniel.nadratowski@weil.com

(202) 682-7130 Direct

Kroger or the TLC may change or add the contact information of the persons designated to receive notice on its behalf by notice given (effective upon the giving of such notice) as provided in this subsection.

K.  *No Waiver*.  The waiver of any rights conferred hereunder shall be effective only if made by written instrument executed by the waiving Party or Parties.  The waiver by any Party of any breach of this Agreement shall not be deemed to be or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, nor shall such waiver be deemed to be or construed as a waiver by any other Party.

L.   *Preservation of Privilege.*  Nothing contained in this Agreement, and no act required to be performed pursuant to this Agreement, is intended to constitute, cause, or effect any waiver (in whole or in part) of any attorney-client privilege, work product protection, or common interest/joint defense privilege, and each Party agrees that it shall not make or cause to be made in any forum any assertion to the contrary.

M.   *Successors.*  This Agreement shall be binding upon, and inure to the benefit of, Kroger and its respective successors and assigns.  Kroger shall not sell the majority of its voting stock or substantially all its assets without obtaining the acquiror's agreement that it will constitute a successor with respect to Kroger's obligations under this Agreement.

N.   *Modification, Amendment, Alteration.*  After the Effective Date, any modification, amendment, or alteration of this Agreement by the Parties shall be binding only if evidenced in writing signed by Kroger along with the signatures of the Tribal Leadership Committee.

O.   *Termination.*

   1.   Unless otherwise agreed to by Kroger and the Tribe in question, this Agreement and all of its terms shall be canceled and terminated with respect to the Tribe, and the Agreement shall become null and void and of no effect if one or more of the following conditions applies:

      a.   The Tribe in question does not sign the Tribal Participation Form; or

      b.   An insufficient number of Tribes sign the Tribal Participation Form, consistent with Section V.G. unless Kroger exercises its unilateral right in its sole discretion to extend the deadline and/or to proceed with the Agreement even if the Participation Threshold has not been satisfied.

   2.   If this Agreement is terminated with respect to the Tribes pursuant to Section IX.O.1., then:

      a.   An applicable statute of limitation or any similar time requirement (excluding any statute of repose) shall be tolled from the date of this Agreement until the later of the time permitted by applicable law or for 120 days from the date of such termination, with the effect that Kroger and the Participating Tribe in question shall be in the same position with respect to the statute of limitation as they were at the time the Participating Tribe filed its action; and

      b.   Kroger and the Participating Tribe in question shall jointly move the relevant court of competent jurisdiction for an order reinstating the actions and claims dismissed pursuant to the terms of this

24

Agreement governing dismissal, with the effect that Kroger and the Tribe in question shall be in the same position with respect to those actions and claims as they were at the time the action or claim was stayed or dismissed.

3.    Unless Kroger and the TLC agree otherwise, this Agreement shall terminate as to all Parties as of the final payment date, provided that Kroger has performed its payment obligations under this Agreement as of that date.  For avoidance of doubt, all releases under this Agreement shall remain in place forever, including after termination.

P.    *Governing Law.*  Except (1) as otherwise provided in the Agreement or (2) as necessary, in the sole judgment of Special Master David Cohen, to promote uniformity of interpretation for matters, this Agreement shall be governed by and interpreted in accordance with the respective laws of the State of Ohio without regard to the conflict of law rules of such State.  Notwithstanding any other provision in this subsection on governing law, the United States District Court for the Northern District of Ohio shall retain jurisdiction to enforce this Agreement.  Notwithstanding any other provision in this subsection on governing law, any disputes relating to the Settlement Fund Escrow shall be governed by and interpreted in accordance with the law of the State where the escrow agent has its primary place of business.

Q.    *Severability.*  In the event any one or more immaterial provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement.

For the Tribal Leadership Committee:

_____

Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller &
Monkman, LLP


_____

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP


_____

Tara Sutton / Tim Purdon
Robins Kaplan LLP


_____

Lynn Sarko
Keller Rohrback, L.L.P.

_____

Roe Frazer
Frazer PLC


_____

Peter Mougey
Levin Papantonio Rafferty Proctor,
Buchanan, O'Brien, Barr & Mougey, P.A.


_____

Elizabeth J.  Cabraser / Dan Drachler /
Eric Fastiff
Lieff Cabraser Heimann & Bernstein LLP

_____

Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP


For Kroger:

_____

Chantale Fiebig
Weil, Gotshal & Manges LLP

26

For the Tribal Leadership Committee:

_____
Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller &
Monkman, LLP

_____
Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP

_____
Tara Sutton / Tim Purdon
Robins Kaplan LLP

_____
Lynn Sarko
Keller Rohrback, L.L.P.

_____
Roe Frazer
Frazer PLC

_____
Peter Mougey
Levin Papantonio Rafferty Proctor,
Buchanan, O'Brien, Barr & Mougey, P.A.

_____
Elizabeth J. Cabraser / Dan Drachler /
Eric Fastiff
Lieff Cabraser Heimann & Bernstein LLP

_____
Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

For Kroger:

_____
Chantale Fiebig
Weil, Gotshal & Manges LLP

26

For the Tribal Leadership Committee:

_____

Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller &
Monkman, LLP


_____

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP


_____

Tara Sutton / Tim Purdon
Robins Kaplan LLP


_____

Lynn Sarko
Keller Rohrback, L.L.P.


_____

Roe Frazer
Frazer PLC


_____

Peter Mougey
Levin Papantonio Rafferty Proctor,
Buchanan, O'Brien, Barr & Mougey, P.A.

_____

Elizabeth J.  Cabraser / Dan Drachler /
Eric Fastiff
Lieff Cabraser Heimann & Bernstein LLP


_____

Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP


For Kroger:

_____

Chantale Fiebig
Weil, Gotshal & Manges LLP

26

For the Tribal Leadership Committee:

_____
Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller &
Monkman, LLP

_____
Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP

_____
Tara Sutton / Tim Purdon
Robins Kaplan LLP

_____
Lynn Sarko
Keller Rohrback, L.L.P.

_____
Roe Frazer
Frazer PLC

_____
Peter Mougey
Levin Papantonio Rafferty Proctor,
Buchanan, O'Brien, Barr & Mougey, P.A.

_____
Elizabeth J. Cabraser / Dan Drachler /
Eric Fastiff
Lieff Cabraser Heimann & Bernstein LLP

_____
Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

For Kroger:

_____
Chantale Fiebig
Weil, Gotshal & Manges LLP

26

For the Tribal Leadership Committee:

_____

Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller &
Monkman, LLP

_____

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP

_____

Tara Sutton / Tim Purdon
Robins Kaplan LLP

_____

Lynn Sarko
Keller Rohrback, L.L.P.

_____

Roe Frazer
Frazer PLC

_____

Peter Mougey
Levin Papantonio Rafferty Proctor,
Buchanan, O'Brien, Barr & Mougey, P.A.

_____

Elizabeth J.  Cabraser / Dan Drachler /
Eric Fastiff
Lieff Cabraser Heimann & Bernstein LLP

_____

Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

For Kroger:

_____

Chantale Fiebig
Weil, Gotshal & Manges LLP

26

For the Tribal Leadership Committee:

_____

Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller &
Monkman, LLP

_____

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP

_____

Tara Sutton / Tim Purdon
Robins Kaplan LLP

_____

Lynn Sarko
Keller Rohrback, L.L.P.

_____

Roe Frazer
Frazer PLC

_____

Peter Mougey
Levin Papantonio Rafferty Proctor,
Buchanan, O'Brien, Barr & Mougey, P.A.

_____

Elizabeth J. Cabraser / Dan Drachler /
Eric Fastiff
Lieff Cabraser Heimann & Bernstein LLP

_____

Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

For Kroger:

_____

Chantale Fiebig
Weil, Gotshal & Manges LLP

26

For the Tribal Leadership Committee:

_____

Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller &
Monkman, LLP

_____

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP

_____

Tara Sutton / Tim Purdon
Robins Kaplan LLP

_____

Lynn Sarko
Keller Rohrback, L.L.P.

_____

Roe Frazer
Frazer PLC

_____

Peter Mougey
Levin Papantonio Rafferty Proctor,
Buchanan, O'Brien, Barr & Mougey, P.A.

_____

Elizabeth J.  Cabraser / Dan Drachler /
Eric Fastiff
Lieff Cabraser Heimann & Bernstein LLP

_____

Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

For Kroger:

_____

Chantale Fiebig
Weil, Gotshal & Manges LLP

26

**EXHIBIT A-1[1]**

Litigating Tribes

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Akiak Native Community | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Alaska Native Tribal Health Consortium | Hobbs Straus Dean & Walker | 1:18-op-46293-DAP |
| Aleutian Pribilof Islands Association | Hobbs Straus Dean & Walker | 1:19-op-45024-DAP |
| Apache Tribe of Oklahoma | The Bruehl Law Firm, PLLC | 1:19-op-46119-DAP |
| Arctic Slope Native Association | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Aroostook Band of Micmacs | Greene Ketchum Farrell Bailey & Tweel LLP | 1:19-op-45349-DAP |
| Asa'carsarmiut Tribe | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | Frazer PLC | 1:19-op-45256-DAP 1:19-op-45270-DAP 1:19-op-45297-DAP |
| Bay Mills Indian Community, Michigan | Skikos | 1:19-op-45287-DAP |
| Bear River Band of the Rohnerville Rancheria, California | Lieff Cabraser Heimann & Bernstein, LLP | 1:18-op-46362-DAP |
| Big Sandy Rancheria of Western Mono Indians of California | Ceiba Legal, LLP | 1:18-op-45923-DAP |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | Ceiba Legal, LLP | 1:18-op-45922-DAP |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | Powell & Majestro, PLLC | 1:18-op-45749-DAP |
| Bristol Bay Area Health Corporation | Hobbs Straus Dean & Walker | 1:19-op-46175-DAP |

---

[1] Kroger is relying on the representations of the TLC regarding the accuracy of this list.  Any ambiguity or inaccuracy should be construed against the TLC.

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Cahto Tribe of the Laytonville Rancheria | Frazer PLC | 1:19-op-45038-DAP |
| Catawba Indian Nation | Fields PLLC | 1:20-op-45234-DAP |
| Cayuga Nation | Robins Kaplan LLP | 1:20-op-45153-DAP |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | Frazer PLC | 1:19-op-45038-DAP |
| Cherokee Nation | Boies Schiller Whitten Burrage Fields law Filed | 1:18-OP-45695-DAP |
| Cheyenne and Arapaho Tribes, Oklahoma | Frazer PLC | 1:19-op-45231-DAP |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | Domina Law Group | 1:19-op-45114-DAP |
| Chickasaw Nation | Whitten Burrage | 1:19-op-45066-DAP 1:20-op-45201-DAP |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | Skikos | 1:19-op-45395-DAP |
| Chitimacha Tribe of Louisiana | Frazer PLC | 1:18-op-45825-DAP |
| Choctaw Nation of Oklahoma | Whitten Burrage | 1:19-op-45065-DAP 1:20-op-45202-DAP |
| Chugachmiut | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Citizen Potawatomi Nation, Oklahoma | The Bruehl Law Firm, PLLC | 1:19-op-46013-DAP |
| Cloverdale Rancheria of Pomo Indians of California | Robins Kaplan LLP | 1:18-op-46241-DAP |
| Coeur D'Alene Tribe | Skikos | 1:19-op-45115-DAP |
| Comanche Nation, Oklahoma | Skikos | 1:19-op-45442-DAP |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45364-DAP |
| Confederated Tribes and Bands of the Yakama Nation | Askman Law Firm LLC | 1:18-op-46202-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Confederated Tribes of the Colville Reservation | Skikos | 1:19-op-45312-DAP |
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | Frazer PLC | 1:19-op-45972-DAP |
| Confederated Tribes of the Grand Ronde Community of Oregon | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45097-DAP |
| Confederated Tribes of the Umatilla Indian Reservation | Skikos | 1:18-op-45541-DAP |
| Confederated Tribes of the Warm Springs Reservation of Oregon | Skikos | 1:19-op-45069-DAP |
| Consolidated Tribal Health Project, Inc. | Ceiba Legal, LLP; Beggs & Lane | 1:18-op-45919-DAP |
| Copper River Native Association | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Coquille Indian Tribe | Frazer PLC | 1:19-op-45970-DAP |
| Coushatta Tribe of Louisiana | Levin Papantonio | 1:19-op-45438-DAP |
| Cow Creek Band of Umpqua Tribe of Indians | Robins Kaplan LLP | 1:18-op-45417-DAP |
| Coyote Valley Band of Pomo Indians of California | Ceiba Legal, LLP | 1:18-op-45918-DAP |
| Delaware Nation, Oklahoma | The Bruehl Law Firm, PLLC | 1:19-op-46011-DAP |
| Dry Creek Rancheria Band of Pomo Indians, California | Skikos | 1:20-op-45147-DAP |
| Eastern Aleutian Tribes | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Eastern Band of Cherokee Indians | Baron & Budd | 1:18-op-45098-DAP |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | Skikos | 1:19-op-45412-DAP |
| Ely Shoshone Tribe of Nevada | Frazer PLC | 1:18-op-46003-DAP |
| Ewiiaapaayp Band of Kumeyaay Indians, California | Frazer PLC | 1:19-op-45038-DAP |
| Feather River Tribal Health, Inc. | Berkey Williams; Leiff Cabraser | 1:19-op-45334-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Flandreau Santee Sioux Tribe of South Dakota | Robins Kaplan LLP | 1:18-op-45095-DAP |
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | Frazer PLC | 1:18-op-46146-DAP 1:18-op-46295-DAP 1:20-op-45250-DAP |
| Forest County Potawatomi Community, Wisconsin | Robins Kaplan LLP | 1:18-op-46342-DAP |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45364-DAP |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45366-DAP |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45078-DAP |
| Guidiville Rancheria of California | Ceiba Legal, LLP | 1:18-op-45917-DAP |
| Ho-Chunk Nation of Wisconsin | Frazer PLC | 1:19-op-45076-DAP |
| Hoopa Valley Tribe, California | Lieff Cabraser Heimann & Bernstein, LLP | 1:18-op-46361-DAP |
| Hopi Tribe of Arizona | Keller Rohrback LLP | 1:20-op-45204-DAP |
| Hopland Band of Pomo Indians, California | Ceiba Legal, LLP | 1:18-op-45913-DAP |
| Houlton Band of Maliseet Indians | Farrell Law | 1:19-op-45315-DAP |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | Robins Kaplan LLP | 1:19-op-45004-DAP |
| Indian Health Council | Hobbs Straus Dean & Walker | 1:18-op-46316-DAP |
| Iowa Tribe of Kansas and Nebraska | Skikos | 1:20-op-45099-DAP |
| Jamestown S'Klallam Tribe | Hobbs Straus Dean & Walker | 1:18-op-45271-DAP |
| Jicarilla Apache Nation, New Mexico | Skikos | 1:19-op-45385-DAP |
| Kenaitze Indian Tribe | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Keweenaw Bay Indian Community | Cooper Elliott | 1:20-op-45150-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Kickapoo Traditional Tribe of Texas | Frazer PLC | 1:20-op-45104-DAP |
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | Skikos | 1:19-op-45381-DAP |
| Klamath Tribes | Weitz & Luxenberg | 1:19-op-45786-DAP |
| Kodiak Area Native Association | Hobbs Straus Dean & Walker | 1:18-op-46260-DAP |
| Koi Nation of Northern California | Frazer PLC | 1:19-op-45038-DAP |
| Kootenai Tribe of Idaho | Robins Kaplan LLP | 1:18-op-46153-DAP |
| La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | Skikos | 1:19-op-45397-DAP |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | Frazer PLC | 1:18-op-45932-DAP |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | Frazer PLC | 1:18-op-45502-DAP |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | Skikos | 1:18-op-46239-DAP |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | Lockridge Grindal Nauen | 1:18-op-45052-DAP |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | Greene Ketchum Farrell Bailey & Tweel LLP | 1:19-op-45350-DAP |
| Lower Sioux Indian Community in the State of Minnesota | Robins Kaplan LLP | 1:18-op-45976-DAP |
| Lummi Tribe of the Lummi Reservation | Keller Rohrback LLP | 1:18-op-45955-DAP |
| Lytton Rancheria of California | Levin Papantonio | 1:19-op-45580-DAP |
| Makah Indian Tribe of the Makah Indian Reservation | Keller Rohrback LLP | 1:18-op-46022-DAP |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | Frazer PLC | 1:19-op-45038-DAP |
| Mashantucket Pequot Indian Tribe | Skikos | 1:19-op-45405-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Mechoopda Indian Tribe of Chico Rancheria, California | Skikos | 1:19-op-45403-DAP |
| Menominee Indian Tribe of Wisconsin | Robins Kaplan LLP | 1:18-op-45426-DAP |
| Mentasta Traditional Council | Frazer PLC | 1:20-op-45024-DAP |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | Skikos | 1:19-op-45317-DAP |
| Miccosukee Tribe of Indians | The Moskowitz Law Firm | 1:19-op-45121-DAP |
| Mille Lacs Band of Ojibwe | Lockridge Grindal Nauen | 1:19-op-45978-DAP |
| Mississippi Band of Choctaw Indians | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45279-DAP |
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | Lockridge Grindal Nauen | 1:19-op-45650-DAP |
| Modoc Nation | Robins Kaplan LLP | 1:19-op-45439-DAP |
| Mohegan Tribe of Indians of Connecticut | Frazer PLC | 1:20-op-45164-DAP |
| Muckleshoot Indian Tribe | Skikos | 1:19-op-45213-DAP |
| Muscogee (Creek) Nation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:18-op-45459-DAP |
| Narragansett Indian Tribe | Frazer PLC | 1:20-op-45047-DAP |
| Native Village of Afognak | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Native Village of Port Heiden | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Navajo Nation, Arizona, New Mexico & Utah | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:18-op-45496-DAP |
| Nez Perce Tribe | Keller Rohrback LLP | 1:18-op-45730-DAP |
| Nisqually Indian Tribe | Robins Kaplan LLP | 1:18-op-45412-DAP |
| Northern Arapaho Tribe of the Wind River Reservation | Burg Simpson | 1:18-op-45438-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | Lockridge Grindal Nauen | 1:19-op-45010-DAP |
| Northwestern Band of the Shoshone Nation | Porteous Hainkel & Johnson | 1:20-op-45032-DAP |
| Norton Sound Health Corporation | Hobbs Straus Dean & Walker | 1:18-op-46261-DAP |
| Oglala Lakota Sioux Tribe | Robins Kaplan LLP | 1:18-op-45353-DAP |
| Omaha Tribe of Nebraska | Krupnick Campbell Malone Buser Slama Hancock, P.A. | 1:18-op-45621-DAP |
| Oneida Nation | Levin Papantonio | 1:18-op-46034-DAP |
| Osage Nation | The Bruehl Law Firm, PLLC | 1:19-op-45821-DAP |
| Otoe-Missouria Tribe of Indians, Oklahoma | Skikos | 1:19-op-45402-DAP |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | Frazer PLC | 1:18-op-45697-DAP |
| Pala Band of Mission Indians | Hobbs Straus Dean & Walker | 1:21-op-45052-DAP |
| Pascua Yaqui Tribe of Arizona | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45366-DAP |
| Passamaquoddy Tribe Indian Township | Weitz & Luxenberg | 1:18-op-45876-DAP |
| Passamaquoddy Tribe Pleasant Point | Weitz & Luxenberg | 1:19-op-45100-DAP |
| Pawnee Nation of Oklahoma | The Bruehl Law Firm, PLLC | 1:19-op-46017-DAP |
| Pinoleville Pomo Nation, California | Frazer PLC | 1:19-op-45974-DAP |
| Poarch Band of Creeks | Frazer PLC | 1:20-op-45231-DAP 1:20-op-45285-DAP 1:20-op-45286-DAP 1:20-op-45294-DAP |
| Ponca Tribe of Indians of Oklahoma | The Bruehl Law Firm, PLLC | 1:18-op-45327-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Ponca Tribe of Nebraska | Krupnick Campbell Malone Buser Slama Hancock, P.A. | 1:18-op-45557-DAP |
| Port Gamble S'Klallam Tribe | Hobbs Straus Dean & Walker | 1:18-op-45271-DAP |
| Potter Valley Tribe, California | Frazer PLC | 1:19-op-45038-DAP |
| Prairie Band Potawatomi Nation | Skikos | 1:20-op-45139-DAP |
| Prairie Island Indian Community in the State of Minnesota | Robins Kaplan LLP | 1:18-op-45975-DAP |
| Pueblo of Pojoaque, New Mexico | Frazer PLC | 1:19-op-45975-DAP |
| Puyallup Tribe of the Puyallup Reservation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45660-DAP |
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | Frazer PLC | 1:18-op-45696-DAP |
| Quapaw Nation | Greene Ketchum Farrell Bailey & Tweel LLP | 1:19-op-45264-DAP |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | Skikos | 1:20-op-45108-DAP |
| Quileute Tribe of the Quileute Reservation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:20-op-45196-DAP |
| Quinault Indian Nation | Robins Kaplan LLP | 1:18-op-46154-DAP |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | Frazer PLC | 1:18-op-46116-DAP |
| Red Lake Band of Chippewa Indians, Minnesota | Baron & Budd | 1:18-op-45959-DAP |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | Ceiba Legal, LLP | 1:18-op-45916-DAP |
| Reno-Sparks Indian Colony, Nevada | Frazer PLC | 1:18-op-45699-DAP |
| Resighini Rancheria, California | Frazer PLC | 1:19-op-45038-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | Robins Kaplan LLP | 1:18-op-46151-DAP |
| Riverside San Bernardino County Indian Health Inc. | Berkey Williams; Lieff Cabraser | 1:19-op-45025-DAP |
| Robinson Rancheria | Ceiba Legal, LLP | 1:18-op-45912-DAP |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | Robins Kaplan LLP | 1:18-op-45095-DAP |
| Round Valley Indian Tribes, Round Valley Reservation, California | Ceiba Legal, LLP | 1:18-op-45915-DAP |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | Skikos | 1:20-op-45161-DAP |
| Sac & Fox Nation, Oklahoma | The Bruehl Law Firm, PLLC | 1:19-op-46012-DAP |
| Saginaw Chippewa Indian Tribe of Michigan | Robins Kaplan LLP | 1:19-op-45841-DAP |
| Saint Regis Mohawk Tribe | Keller Rohrback LLP | 1:19-op-45018-DAP |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45366-DAP |
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | Skikos | 1:20-op-45163-DAP |
| Santee Sioux Nation, Nebraska | Krupnick Campbell Malone Buser Slama Hancock, P.A. | 1:18-op-45621-DAP |
| Sault Ste.  Marie Tribe of Chippewa Indians, Michigan | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45078-DAP |
| Scotts Valley Band of Pomo Indians of California | Ceiba Legal, LLP | 1:18-op-45914-DAP |
| Seminole Tribe of Florida | The Moskowitz Law Firm | 1:19-op-45912-DAP |
| Seneca Nation of Indians | McHugh Fuller Law Group | 1:18-op-45746-DAP |
| Shakopee Mdewakanton Sioux Community of Minnesota | Robins Kaplan LLP | 1:18-op-45977-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Shinnecock Indian Nation | Frazer PLC | 1:18-op-46142-DAP |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | Skikos | 1:19-op-45373-DAP |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | Robins Kaplan LLP | 1:18-op-45095-DAP |
| Sokaogon Chippewa Community, Wisconsin | Skikos | 1:19-op-45410-DAP |
| Southcentral Foundation | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Southeast Alaska Regional Health Corporation | Hobbs Straus Dean & Walker | 1:18-op-46149-DAP |
| Spirit Lake Tribe, North Dakota | Robins Kaplan LLP | 1:18-op-45520-DAP |
| Squaxin Island Tribe of the Squaxin Island Reservation | Robins Kaplan LLP | 1:18-op-45531-DAP |
| St.  Croix Chippewa Indians of Wisconsin | Frazer PLC | 1:18-op-45367-DAP |
| Standing Rock Sioux Tribe of North & South Dakota | Robins Kaplan LLP | 1:18-op-45220-DAP |
| Stockbridge Munsee Community, Wisconsin | Skikos | 1:19-op-45032-DAP |
| Suquamish Indian Tribe of the Port Madison Reservation | Hobbs Straus Dean & Walker | 1:18-op-45271-DAP |
| Swinomish Indian Tribal Community | Lieff Cabraser Heimann & Bernstein | 1:21-op-45033-DAP |
| Sycuan Band of the Kumeyaay Nation | Robins Kaplan LLP | 1:19-op-45582-DAP |
| Tanana Chiefs Conference (including Council of Athabascan Tribal Governments) | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) | Frazer PLC | 1:18-op-46017-DAP |
| Thlopthlocco Tribal Town | The Bruehl Law Firm, PLLC | 1:19-op-46021-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | Skikos | 1:19-op-45376-DAP |
| Tohono O'odham Nation of Arizona | Skikos | 1:19-op-45411-DAP |
| Tonto Apache Tribe of Arizona | Skikos | 1:19-op-45398-DAP |
| Torres Martinez Desert Cahuilla Indians, California | Robins Kaplan LLP | 1:18-op-46152-DAP |
| Tulalip Tribes of Washington | Keller Rohrback LLP | 1:18-op-45589-DAP |
| Tule River Indian Tribe of the Tule River Reservation, California | Skikos | 1:19-op-45579-DAP |
| Tunica-Biloxi Indian Tribe | Simmons Hanly Conroy | 1:18-op-45996-DAP |
| Turtle Mountain Band of Chippewa Indians of North Dakota | Robins Kaplan LLP | 1:18-op-45521-DAP |
| United Keetoowah Band of Cherokee Indians in Oklahoma | McHugh Fuller Law Group | 1:19-op-45600-DAP |
| Upper Sioux Community, Minnesota | Robins Kaplan LLP | 1:18-op-45974-DAP |
| Walker River Paiute Tribe, Nevada | Frazer PLC | 1:18-op-45698-DAP |
| Wampanoag Tribe of Gay Head (Aquinnah) | Frazer PLC | 1:19-op-45844-DAP 1:20-op-45170-DAP |
| White Earth Band of the Minnesota Chippewa Tribe, Minnesota | Hill Peterson Carper Bee & Deitzler | 1:19-op-45357-DAP |
| White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | Fields PLLC | 1:20-op-45243-DAP |
| Winnebago Tribe of Nebraska | Krupnick Campbell Malone Buser Slama Hancock, P.A. | 1:18-op-45621-DAP |
| Wyandotte Nation | Levin Papantonio | 1:19-op-45601-DAP |
| Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | Feazell & Tighe LLP | 1:18-op-46355-DAP |
| Yukon Kuskokwim Health Corporation | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Yurok Tribe of the Yurok Reservation, California | Lieff Cabraser Heimann & Bernstein | 1:21-op-45026-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Zuni Tribe of the Zuni Reservation, New Mexico | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:20-op-45114-DAP |

**EXHIBIT A-2[2]**

Non-Litigating Tribes

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Absentee-Shawnee Tribe of Indians of Oklahoma | | |
| *Agdaagux Tribe of King Cove\** | | |
| Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | | |
| Ak-Chin Indian Community | | |
| *Akiachak Native Community* | | |
| Alabama-Coushatta Tribe of Texas | | |
| Alabama-Quassarte Tribal Town | | |
| *Alatna Village* | | |
| *Algaaciq Native Village (St. Mary's)* | | |
| *Allakaket Village* | | |
| Alturas Indian Rancheria, California | | |
| *Alutiiq Tribe of Old Harbor [previously listed as Native Village of Old Harbor and Village of Old Harbor]* | | |
| *Angoon Community Association* | | |
| *Anvik Village* | | |
| *Arctic Village (See Native Village of Venetie Tribal Government)* | | |
| Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana | | |
| Augustine Band of Cahuilla Indians, California | | |
| *Beaver Village* | | |
| Berry Creek Rancheria of Maidu Indians of California | | |
| Big Lagoon Rancheria, California | | |
| Big Pine Paiute Tribe of the Owens Valley | | |

---

[2] Kroger is relying on the representations of the TLC regarding the accuracy of this list.  Any ambiguity or inaccuracy should be construed against the TLC.

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Birch Creek Tribe* | | |
| Bishop Paiute Tribe | | |
| Blue Lake Rancheria, California | | |
| Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | | |
| Bridgeport Indian Colony | | |
| Buena Vista Rancheria of Me-Wuk Indians of California | | |
| Burns Paiute Tribe | | |
| Cabazon Band of Mission Indians, California | | |
| Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | | |
| Caddo Nation of Oklahoma | | |
| Cahuilla Band of Indians | | |
| California Valley Miwok Tribe, California | | |
| Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | | |
| Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California) | | |
| Cedarville Rancheria, California | | |
| *Central Council of the Tlingit & Haida Indian Tribes* | | |
| *Chalkyitsik Village* | | |
| Cheesh-Na Tribe [previously listed as Native Village of Chistochina] | | |
| Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | | |
| *Chevak Native Village* | | |
| Chickahominy Indian Tribe | | |
| Chickahominy Indian Tribe—Eastern Division | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Chickaloon Native Village | | |
| Chicken Ranch Rancheria of Me-Wuk Indians of California | Frazer PLC | |
| *Chignik Bay Tribal Council [previously listed as Native Village of Chignik]* | | |
| *Chignik Lake Village* | | |
| *Chilkat Indian Village (Klukwan)* | | |
| *Chilkoot Indian Association (Haines)* | | |
| *Chinik Eskimo Community (Golovin)* | | |
| *Chuloonawick Native Village* | | |
| *Circle Native Community* | | |
| Cocopah Tribe of Arizona | | |
| Cold Springs Rancheria of Mono Indians of California | | |
| Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | | |
| Confederated Tribes of Siletz Indians of Oregon | | |
| Confederated Tribes of the Chehalis Reservation | | |
| Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | | |
| Cowlitz Indian Tribe | | |
| *Craig Tribal Association [previously listed as Craig Community Association]* | | |
| Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | | |
| Crow Tribe of Montana | | |
| *Curyung Tribal Council* | | |
| Delaware Tribe of Indians | | |
| *Douglas Indian Association* | | |
| Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | | |
| Eastern Shawnee Tribe of Oklahoma | | |
| *Egegik Village* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Eklutna Native Village | | |
| Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | | |
| Elk Valley Rancheria, California | | |
| *Emmonak Village* | | |
| Enterprise Rancheria of Maidu Indians of California | | |
| *Evansville Village (aka Bettles Field)* | | |
| Eyak Native Village | | |
| Federated Indians of Graton Rancheria, California | | |
| Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | | |
| Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | | |
| Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | | |
| Fort McDowell Yavapai Nation, Arizona | | |
| Fort Mojave Indian Tribe of Arizona, California & Nevada | | |
| Fort Sill Apache Tribe of Oklahoma | | |
| *Galena Village (aka Louden Village)* | | |
| Grand Portage Band of the Minnesota Chippewa Tribe, Minnesota | | |
| Greenville Rancheria | | |
| Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | | |
| *Gulkana Village Council [previously listed as Gulkana Village]* | | |
| Habematolel Pomo of Upper Lake, California | | |
| Hannahville Indian Community, Michigan | | |
| Havasupai Tribe of the Havasupai Reservation, Arizona | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Healy Lake Village* | | |
| Hoh Indian Tribe | | |
| *Holy Cross Tribe [previously listed as Holy Cross Village]* | | |
| *Hoonah Indian Association Start Printed Page 7558* | | |
| *Hughes Village* | | |
| *Huslia Village* | | |
| *Hydaburg Cooperative Association* | | |
| *Igiugig Village* | | |
| Iipay Nation of Santa Ysabel, California | | |
| Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | | |
| *Inupiat Community of the Arctic Slope* | | |
| Ione Band of Miwok Indians of California | | |
| Iowa Tribe of Oklahoma | | |
| *Iqugmiut Traditional Council [previously listed as Iqurmuit Traditional Council]* | | |
| *Ivanof Bay Tribe [previously listed as Ivanoff Bay Tribe and Ivanoff Bay Village]* | | |
| Jackson Band of Miwuk Indians | | |
| Jamul Indian Village of California | | |
| Jena Band of Choctaw Indians | | |
| *Kaguyak Village* | | |
| Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | | |
| *Kaktovik Village (aka Barter Island)* | | |
| Kalispel Indian Community of the Kalispel Reservation | | |
| Karuk Tribe | | |
| Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | | |
| *Kasigluk Traditional Elders Council* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Kaw Nation, Oklahoma | | |
| Ketchikan Indian Community | | |
| Kewa Pueblo, New Mexico | | |
| Kialegee Tribal Town | | |
| Kickapoo Tribe of Oklahoma | | |
| *King Island Native Community* | | |
| *King Salmon Tribe* | | |
| Kiowa Indian Tribe of Oklahoma | The Bruehl Law Firm, PLLC | |
| *Klawock Cooperative Association* | | |
| Kletsel Dehe Band of Wintun Indians | | |
| Knik Tribe | | |
| *Kokhanok Village* | | |
| *Koyukuk Native Village* | | |
| La Jolla Band of Luiseno Indians, California | | |
| Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | | |
| *Levelock Village* | | |
| *Lime Village* | | |
| Little River Band of Ottawa Indians, Michigan | | |
| Little Shell Tribe of Chippewa Indians of Montana | Robins Kaplan LLP | |
| Little Traverse Bay Bands of Odawa Indians, Michigan | | |
| Lone Pine Paiute-Shoshone Tribe | | |
| Los Coyotes Band of Cahuilla and Cupeno Indians, California | | |
| Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | | |
| Lower Elwha Tribal Community | | |
| Maniilaq Association | | |
| *Manley Hot Springs Village* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Manokotak Village* | | |
| Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | | |
| Mashpee Wampanoag Tribe | | |
| Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | | |
| *McGrath Native Village* | | |
| Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | | |
| Metlakatla Indian Community | | |
| Miami Tribe of Oklahoma | | |
| Middletown Rancheria of Pomo Indians of California | | |
| Monacan Indian Nation | | |
| Mooretown Rancheria of Maidu Indians of California | | |
| Morongo Band of Mission Indians, California | | |
| Mt.  Sanford Tribal Consortium | | |
| *Naknek Native Village* | | |
| Nansemond Indian Nation | | |
| *Native Village of Akhiok* | | |
| *Native Village of Akutan* | | |
| *Native Village of Aleknagik* | | |
| Native Village of Ambler | | |
| *Native Village of Atka* | | |
| *Native Village of Atqasuk [previously listed as Atqasuk Village (Atkasook)]* | | |
| *Native Village of Barrow Inupiat Traditional Government* | | |
| *Native Village of Belkofski* | | |
| *Native Village of Brevig Mission* | | |
| Native Village of Buckland | | |
| *Native Village of Cantwell* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Native Village of Chenega (aka Chenega)* | | |
| *Native Village of Chignik Lagoon* | | |
| Native Village of Chitina | | |
| *Native Village of Chuathbaluk (Russian Mission, Kuskokwim)* | | |
| *Native Village of Council* | | |
| Native Village of Deering | | |
| *Native Village of Diomede (aka Inalik)* | | |
| *Native Village of Eagle* | | |
| *Native Village of Eek* | | |
| *Native Village of Ekuk* | | |
| *Native Village of Ekwok [previously listed as Ekwok Village]* | | |
| *Native Village of Elim* | | |
| *Native Village of False Pass* | | |
| *Native Village of Fort Yukon* | | |
| *Native Village of Gakona* | | |
| *Native Village of Gambell* | | |
| *Native Village of Georgetown* | | |
| *Native Village of Goodnews Bay* | | |
| *Native Village of Hamilton* | | |
| *Native Village of Hooper Bay* | | |
| *Native Village of Kanatak* | | |
| *Native Village of Karluk* | | |
| Native Village of Kiana | | |
| *Native Village of Kipnuk* | | |
| Native Village of Kivalina | | |
| *Native Village of Kluti Kaah (aka Copper Center)* | | |
| Native Village of Kobuk | | |
| *Native Village of Kongiganak* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Native Village of Kotzebue | | |
| *Native Village of Koyuk* | | |
| *Native Village of Kwigillingok* | | |
| *Native Village of Kwinhagak (aka Quinhagak)* | | |
| *Native Village of Larsen Bay* | | |
| *Native Village of Marshall (aka Fortuna Ledge)* | | |
| *Native Village of Mary's Igloo* | | |
| *Native Village of Mekoryuk* | | |
| *Native Village of Minto* | | |
| *Native Village of Nanwalek (aka English Bay)* | | |
| *Native Village of Napaimute* | | |
| *Native Village of Napakiak* | | |
| *Native Village of Napaskiak* | | |
| *Native Village of Nelson Lagoon* | | |
| *Native Village of Nightmute* | | |
| *Native Village of Nikolski* | | |
| Native Village of Noatak | | |
| *Native Village of Nuiqsut (aka Nooiksut)* | | |
| *Native Village of Nunam Iqua [previously listed as Native Village of Sheldon's Point]* | | |
| *Native Village of Nunapitchuk* | | |
| *Native Village of Ouzinkie* | | |
| *Native Village of Paimiut* | | |
| *Native Village of Perryville* | | |
| *Native Village of Pilot Point* | | |
| Native Village of Point Hope | | |
| *Native Village of Point Lay* | | |
| *Native Village of Port Graham* | | |
| *Native Village of Port Lions* | | |
| *Native Village of Ruby* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Native Village of Saint Michael* | | |
| *Native Village of Savoonga* | | |
| *Native Village of Scammon Bay* | | |
| Native Village of Selawik | | |
| *Native Village of Shaktoolik* | | |
| *Native Village of Shishmaref* | | |
| Native Village of Shungnak | | |
| *Native Village of Stevens* | | |
| *Native Village of Tanacross* | | |
| Native Village of Tanana | | |
| *Native Village of Tatitlek* | | |
| *Native Village of Tazlina* | | |
| *Native Village of Teller* | | |
| *Native Village of Tetlin* | | |
| *Native Village of Tuntutuliak* | | |
| *Native Village of Tununak* | | |
| Native Village of Tyonek | | |
| *Native Village of Unalakleet* | | |
| *Native Village of Unga* | | |
| *Native Village of Venetie Tribal Government (Arctic Village and Village of Venetie)* | | |
| *Native Village of Wales* | | |
| *Native Village of White Mountain* | | |
| *Nenana Native Association* | | |
| *New Koliganek Village Council* | | |
| *New Stuyahok Village* | | |
| *Newhalen Village* | | |
| *Newtok Village* | | |
| *Nikolai Village* | | |
| Ninilchik Village | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Nome Eskimo Community* | | |
| *Nondalton Village* | | |
| Nooksack Indian Tribe | | |
| Noorvik Native Community | | |
| Northfork Rancheria of Mono Indians of California | | |
| *Northway Village* | | |
| Nottawaseppi Huron Band of the Potawatomi, Michigan | | |
| *Nulato Village* | | |
| *Nunakauyarmiut Tribe* | | |
| Ohkay Owingeh, New Mexico | | |
| Oneida Indian Nation | | |
| Onondaga Nation | | |
| *Organized Village of Grayling (aka Holikachuk)* | | |
| *Organized Village of Kake* | | |
| *Organized Village of Kasaan* | | |
| *Organized Village of Kwethluk* | | |
| *Organized Village of Saxman* | | |
| *Orutsararmiut Traditional Native Council [previously listed as Orutsararmuit Native Village (aka Bethel)]* | | |
| *Oscarville Traditional Village* | | |
| Ottawa Tribe of Oklahoma | | |
| Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes) | | |
| Pamunkey Indian Tribe | | |
| Paskenta Band of Nomlaki Indians of California | | |
| *Pauloff Harbor Village* | | |
| Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | | |
| *Pedro Bay Village* | | |
| Penobscot Nation | | |
| Peoria Tribe of Indians of Oklahoma | | |
| *Petersburg Indian Association* | | |
| Picayune Rancheria of Chukchansi Indians of California | | |
| *Pilot Station Traditional Village* | | |
| Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias) | | |
| *Pitka's Point Traditional Council [previously listed as Native Village of Pitka's Point]* | | |
| *Platinum Traditional Village* | | |
| Pokagon Band of Potawatomi Indians, Michigan and Indiana | | |
| *Portage Creek Village (aka Ohgsenakale)* | | |
| *Pribilof Islands Aleut Communities of St.  Paul & St. George Islands (Saint George Island and Saint Paul Island)* | | |
| Pueblo of Acoma, New Mexico | | |
| Pueblo of Cochiti, New Mexico | | |
| Pueblo of Isleta, New Mexico | | |
| Pueblo of Jemez, New Mexico | | |
| Pueblo of Laguna, New Mexico | | |
| Pueblo of Nambe, New Mexico | | |
| Pueblo of Picuris, New Mexico | | |
| Pueblo of San Felipe, New Mexico | | |
| Pueblo of San Ildefonso, New Mexico | | |
| Pueblo of Sandia, New Mexico | | |
| Pueblo of Santa Ana, New Mexico | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Pueblo of Santa Clara, New Mexico | | |
| Pueblo of Taos, New Mexico | | |
| Pueblo of Tesuque, New Mexico | | |
| Pueblo of Zia, New Mexico | | |
| *Qagan Tayagungin Tribe of Sand Point [previously listed as Qagan Tayagungin Tribe of Sand Point Village]* | | |
| *Qawalangin Tribe of Unalaska* | | |
| Quartz Valley Indian Community of the Quartz Valley Reservation of California | | |
| Ramona Band of Cahuilla, California | | |
| *Rampart Village* | | |
| Rappahannock Tribe, Inc. | | |
| Redding Rancheria, California | | |
| Sac & Fox Tribe of the Mississippi in Iowa | | |
| *Saint George Island (See Pribilof Islands Aleut Communities of St. Paul & St. George Islands)* | | |
| *Saint Paul Island (See Pribilof Islands Aleut Communities of St. Paul & St. George Islands)* | | |
| *Salamatof Tribe [previously listed as Village of Salamatoff]* | | |
| Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | | |
| Samish Indian Nation | | |
| San Juan Southern Paiute Tribe of Arizona | | |
| San Manuel Band of Mission Indians, California | | |
| San Pasqual Band of Diegueno Mission Indians of California | | |
| Santa Rosa Band of Cahuilla Indians, California | Robins Kaplan LLP | |
| Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | | |
| Sauk-Suiattle Indian Tribe | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Seldovia Village Tribe | | |
| Seneca-Cayuga Nation | | |
| *Shageluk Native Village* | | |
| Shawnee Tribe | | |
| Sherwood Valley Rancheria of Pomo Indians of California | | |
| Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | | |
| Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | | |
| Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | | |
| *Sitka Tribe of Alaska* | | |
| *Skagway Village* | | |
| Skokomish Indian Tribe | | |
| Skull Valley Band of Goshute Indians of Utah | | |
| Snoqualmie Indian Tribe | | |
| Soboba Band of Luiseno Indians, California | | |
| *South Naknek Village* | | |
| Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | | |
| Spokane Tribe of the Spokane Reservation | | |
| *Stebbins Community Association* | | |
| Stillaguamish Tribe of Indians of Washington | | |
| Summit Lake Paiute Tribe of Nevada | | |
| *Sun'aq Tribe of Kodiak [previously listed as Shoonaq' Tribe of Kodiak]* | | |
| Susanville Indian Rancheria, California | | |
| Table Mountain Rancheria | | |
| *Takotna Village* | | |
| *Tangirnaq Native Village [previously listed as Lesnoi Village (aka Woody Island)]* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Tejon Indian Tribe | | |
| *Telida Village* | | |
| The Seminole Nation of Oklahoma | | |
| Timbisha Shoshone Tribe | | |
| Tolowa Dee-ni' Nation | | |
| Tonawanda Band of Seneca | | |
| Tonkawa Tribe of Indians of Oklahoma | | |
| *Traditional Village of Togiak* | | |
| *Tuluksak Native Community* | | |
| Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | | |
| Tuscarora Nation | | |
| Twenty-Nine Palms Band of Mission Indians of California | | |
| *Twin Hills Village* | | |
| *Ugashik Village* | | |
| *Umkumiut Native Village [previously listed as Umkumiute Native Village]* | | |
| United Auburn Indian Community of the Auburn Rancheria of California | | |
| Upper Mattaponi Tribe | | |
| Upper Skagit Indian Tribe | | |
| Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | | |
| Ute Mountain Ute Tribe | | |
| Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | | |
| *Village of Alakanuk* | | |
| *Village of Anaktuvuk Pass* | | |
| *Village of Aniak* | | |
| *Village of Atmautluak* | | |
| *Village of Bill Moore's Slough* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Village of Chefornak* | | |
| *Village of Clarks Point* | | |
| *Village of Crooked Creek* | | |
| *Village of Dot Lake* | | |
| *Village of Iliamna* | | |
| *Village of Kalskag* | | |
| *Village of Kaltag* | | |
| *Village of Kotlik* | | |
| *Village of Lower Kalskag* | | |
| *Village of Ohogamiut* | | |
| *Village of Red Devil* | | |
| *Village of Sleetmute* | | |
| *Village of Solomon* | | |
| *Village of Stony River* | | |
| *Village of Venetie (See Native Village of Venetie Tribal Government)* | | |
| *Village of Wainwright* | | |
| Washoe Tribe of Nevada & California | | |
| Wichita and Affiliated Tribes, Oklahoma | | |
| Wilton Rancheria, California | | |
| Winnemucca Indian Colony of Nevada | | |
| Wiyot Tribe, California | | |
| *Wrangell Cooperative Association* | | |
| Yakutat Tlingit Tribe | | |
| Yankton Sioux Tribe of South Dakota | | |
| Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | | |
| Yavapai-Prescott Indian Tribe | | |
| Yocha Dehe Wintun Nation, California | | |
| Yomba Shoshone Tribe of the Yomba Reservation, Nevada | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Ysleta del Sur Pueblo | | |
| *Yupiit of Andreafski* | | |

\* Italics indicate tribes that are members of a litigating tribal organization or consortium, whose share will be recovered through the respective organization

**EXHIBIT A-3**

Kroger-Specific Litigating Tribes

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Alaska Native Tribal Health Consortium | Hobbs, Straus, Dean & Walker LLP | 1:18-op-46293-DAP |
| Aleutian Pribilof Islands Associations, Inc. | Hobbs, Straus, Dean & Walker LLP | 1:19-op-45024-DAP |
| Bristol Bay Area Health Corporation | Hobbs, Straus, Dean & Walker LLP | 1:19-op-46175-DAP |
| Poarch Band of Creek Indians | Frazer PLC; Levin Papantonia; Beggs & Lane RLLP; The Kuykendall Group | 1:20-op-45231-DAP |
| Tanana Chiefs Conference | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Arctic Slope Native Association | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Yukon-Kuskokwim Health Corporation | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Chugachmiut, Inc. | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Copper River Native Association | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Southcentral Foundation | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Kenaitze Indian Tribe | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Akiak Native Community | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Asa'carsarmiut Tribe | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Native Village of Afognak | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Native Village of Port Heiden | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Kodiak Area Native Association | Hobbs, Straus, Dean & Walker LLP | 1:18-op-46260-DAP |
| Norton Sound Health Corporation | Hobbs, Straus, Dean & Walker LLP | 1:18-op-46261-DAP |
| Southeast Alaska Regional Health Consortium | Hobbs, Straus, Dean & Walker LLP | 1:18-op-46149-DAP |
| Tonto Apache Tribe | Skikos | 1:19-op-45398-DAP |
| Tohono O'odham Indian Nation, Arizona | Skikos | 1:19-op-45411-DAP |
| The Hualapai Tribe, Arizona | Robins Kaplan LLP | 1:19-op-45004-DAP |
| Seminole Tribe of Florida | Conrad & Scherer LLP; The Moskowitz Law Firm, PLLC | 1:19-op-45912-DAP |
| Shoshone-Bannock Tribes, Idaho | Skikos | 1:19-op-45373-DAP |
| The Tunica Biloxi Tribe of Louisiana | Simmons Hanly Conroy | 1:18-op-45996-DAP |
| Bay Mills Indian Community, Michigan | Skikos | 1:19-op-45287-DAP |
| Blackfeet Tribe of the Blackfeet Indian Reservation | Powell & Majestro PLLC; Baron & Budd; Hill Peterson Carper Bee & Deitzler; Farrell & Fuller; Levin Papantonio | 1:18-op-45749-DAP |
| Battle Mountain Band of the Te-Moak Tribe of Western Shoshone Indians, Nevada | Frazer PLC | 1:18-op-46017-DAP |
| South Fork Band of the Te-Moak Tribe of Western Shoshone Indians, Nevada | Frazer PLC | 1:18-op-46016-DAP |
| Walker River Paiute Tribe of the Walker River Reservation, Nevada | Frazer PLC | 1:18-op-45698-DAP |
| Jicarilla Apache Nation | Skikos | 1:19-op-45385-DAP |
| Modoc Nation f/k/a the Modoc Tribe of Oklahoma | Robins Kaplan LLP | 1:19-op-45439-DAP |
| Cow Creek Band of Umpqua Tribe of Indians | Robins Kaplan LLP | 1:18-op-45417-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
|  |  |  |
| Klamath Tribes, Oregon | Weitz & Luxenberg | 1:19-op-45786-DAP |
| Confederated Tribes of the Colville Reservation | Skikos | 1:19-op-45312-DAP |
| Quinault Indian Nation, Washington | Robins Kaplan LLP | 1:18-op-46154-DAP |
| The Squaxin Island Indian Tribe, Washington | Robins Kaplan LLP | 1:18-op-45531-DAP |
| Eastern Shoshone Tribe, Wyoming | Skikos | 1:19-op-45412-DAP |
| Northern Arapaho Tribe, WY | Burg Simpson Eldridge; Baldwin Crocker & Rudd | 1:18-op-45438-DAP |
| Mescalero Apache Tribe, New Mexico | Skikos | 1:19-op-45317-DAP |
| Lummi Tribe of the Lummi Reservation | Keller Rohrback LLP | 1:18-op-45955-DAP |

**EXHIBIT B**

Alleged Harms

The following expert reports that were filed in connection with the case captioned *In re: National Prescription Opiate Litigation*, No. 1:17-md-2804 (N.D.  Ohio) provide non-exclusive examples of Alleged Harms:

1.      Expert report of G.  Caleb Alexander, dated April 16, 2021.

2.      Expert report of David Cutler, dated April 16, 2021; supplemental expert report of David Cutler, dated April 21, 2021; and second supplemental expert report of David Cutler, dated May 10, 2021.

3.      Expert report of David Herzberg, dated April 16, 2021.

4.      Expert report of Katherine M.  Keyes, Ph.D., dated April 16, 2021; supplemental expert report of Katherine M.  Keyes, Ph.D, dated June 2, 2021.

5.      Expert report of Dr.  Anna Lembke, dated April 16, 2021.

6.      Expert report of Harvey Rosen, dated April 16, 2021.

7.      Expert report of Nancy Young, dated April 16, 2021.

## <u>EXHIBIT C – Interim Tribal Allocation Matrix</u>

| Federally Recognized Tribe Name | Kroger Allocation |
|---|---|
| Absentee-Shawnee Tribe of Indians of Oklahoma | 0.1479% |
| Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | 0.0586% |
| Ak-Chin Indian Community | 0.0917% |
| Akiak Native Community | 0.0000% |
| Alabama-Coushatta Tribe of Texas | 0.0424% |
| Alabama-Quassarte Tribal Town | 0.0029% |
| Alaska Native Tribal Health Consortium | 2.7277% |
| Aleutian Pribilof Islands Association | 0.0973% |
| Alturas Indian Rancheria, California | 0.0012% |
| Apache Tribe of Oklahoma | 0.0354% |
| Arapaho Tribe of the Wind River Reservation, Wyoming | 0.4975% |
| Arctic Slope Native Association | 0.4081% |
| Aroostook Band of Micmacs | 0.0098% |
| Asa'carsarmiut Tribe | 0.0000% |
| Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation, Montana | 0.5473% |
| Augustine Band of Cahuilla Indians, California | 0.0018% |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | 0.2215% |
| Bay Mills Indian Community, Michigan | 0.1031% |
| Bear River Band of the Rohnerville Rancheria, California | 0.0732% |
| Berry Creek Rancheria of Maidu Indians of California | 0.1620% |
| Big Lagoon Rancheria, California | 0.0039% |
| Big Pine Paiute Tribe of the Owens Valley | 0.0462% |
| Big Sandy Rancheria of Western Mono Indians of California | 0.0473% |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | 0.1753% |
| Bishop Paiute Tribe | 0.1504% |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | 0.7768% |
| Blue Lake Rancheria, California | 0.0055% |
| Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | 0.0217% |
| Bridgeport Indian Colony | 0.0037% |
| Bristol Bay Area Health Corporation | 0.6837% |
| Buena Vista Rancheria of Me-Wuk Indians of California | 0.0048% |
| Burns Paiute Tribe | 0.0168% |
| Cabazon Band of Mission Indians, California | 0.0024% |
| Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | 0.0081% |
| Caddo Nation of Oklahoma | 0.0288% |
| Cahto Tribe of the Laytonville Rancheria | 0.0299% |
| Cahuilla Band of Indians | 0.0531% |
| California Valley Miwok Tribe, California | 0.0063% |
| Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | 0.0348% |
| Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California); Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California | 0.0923% |

| | |
|---|---|
| Catawba Indian Nation (aka Catawba Indian Tribe of South Carolina) | 0.1074% |
| Cayuga Nation | 0.0019% |
| Cedarville Rancheria, California | 0.0027% |
| Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | 0.0262% |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | 0.0289% |
| Cherokee Nation | 3.2336% |
| Cheyenne and Arapaho Tribes, Oklahoma | 0.2049% |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | 0.0771% |
| Chickahominy Indian Tribe | 0.0455% |
| Chickahominy Indian Tribe - Eastern Division | 0.0123% |
| Chickaloon Native Village | 0.0152% |
| Chickasaw Nation | 0.5721% |
| Chicken Ranch Rancheria of Me-Wuk Indians of California | 0.0037% |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | 0.3365% |
| Chitimacha Tribe of Louisiana | 0.0502% |
| Choctaw Nation of Oklahoma | 1.4539% |
| Chugachmiut | 0.1524% |
| Citizen Potawatomi Nation, Oklahoma | 0.3891% |
| Cloverdale Rancheria of Pomo Indians of California | 0.0749% |
| Cocopah Tribe of Arizona | 0.0529% |
| Coeur D'Alene Tribe | 0.4138% |
| Cold Springs Rancheria of Mono Indians of California | 0.0157% |
| Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | 0.4022% |
| Comanche Nation, Oklahoma | 0.1854% |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | 0.8726% |
| Confederated Tribes and Bands of the Yakama Nation | 0.9017% |
| Confederated Tribes of Siletz Indians of Oregon | 0.6203% |
| Confederated Tribes of the Chehalis Reservation | 0.1281% |
| Confederated Tribes of the Colville Reservation | 0.6088% |
| Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | 0.0781% |
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | 0.0208% |
| Confederated Tribes of the Grand Ronde Community of Oregon | 0.3547% |
| Confederated Tribes of the Umatilla Indian Reservation | 0.2245% |
| Confederated Tribes of the Warm Springs Reservation of Oregon | 0.4874% |
| Consolidated Tribal Health Project | 0.0000% |
| Copper River Native Association | 0.1332% |
| Coquille Indian Tribe | 0.1338% |
| Coushatta Tribe of Louisiana | 0.0381% |
| Cow Creek Band of Umpqua Tribe of Indians | 0.2213% |
| Cowlitz Indian Tribe | 0.5812% |
| Coyote Valley Band of Pomo Indians of California | 0.0487% |
| Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | 0.0399% |
| Crow Tribe of Montana | 1.0947% |
| Delaware Nation, Oklahoma | 0.0091% |
| Delaware Tribe of Indians | 0.0831% |

2024 05 06 Kroger Tribal Allocation

| | |
|---|---|
| Dry Creek Rancheria Band of Pomo Indians, California | 0.1024% |
| Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | 0.0324% |
| Eastern Aleutian Tribes | 0.1469% |
| Eastern Band of Cherokee Indians | 1.3810% |
| Eastern Shawnee Tribe of Oklahoma | 0.0145% |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | 0.2108% |
| Eklutna Native Village | 0.0181% |
| Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | 0.0146% |
| Elk Valley Rancheria, California | 0.0091% |
| Ely Shoshone Tribe of Nevada | 0.0795% |
| Enterprise Rancheria of Maidu Indians of California | 0.2637% |
| Ewiiaapaayp Band of Kumeyaay Indians, California | 0.0006% |
| Eyak Native Village | 0.0292% |
| Feather River Tribal health | 0.0000% |
| Federated Indians of Graton Rancheria, California | 0.1112% |
| Flandreau Santee Sioux Tribe of South Dakota | 0.0059% |
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | 0.0897% |
| Forest County Potawatomi Community, Wisconsin | 0.0384% |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | 0.2401% |
| Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | 0.0128% |
| Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | 0.0151% |
| Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | 0.0307% |
| Fort McDowell Yavapai Nation, Arizona | 0.1231% |
| Fort Mojave Indian Tribe of Arizona, California & Nevada | 0.2332% |
| Fort Sill Apache Tribe of Oklahoma | 0.0051% |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | 3.7041% |
| Grand Portage Band of the Minnesota Chippewa Tribe, Minnesota | 0.0056% |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | 0.1503% |
| Greenville Rancheria | 0.1361% |
| Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | 0.0369% |
| Guidiville Rancheria of California | 0.0198% |
| Habematolel Pomo of Upper Lake, California | 0.0397% |
| Hannahville Indian Community, Michigan | 0.0402% |
| Havasupai Tribe of the Havasupai Reservation, Arizona | 0.0469% |
| Ho-Chunk Nation of Wisconsin | 0.4032% |
| Hoh Indian Tribe | 0.0046% |
| Hoopa Valley Tribe, California | 0.3824% |
| Hopi Tribe of Arizona | 0.6464% |
| Hopland Band of Pomo Indians, California | 0.1044% |
| Houlton Band of Maliseet Indians | 0.0093% |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | 0.3236% |
| Iipay Nation of Santa Ysabel, California | 0.0197% |
| Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | 0.0012% |
| Indian Health Council | 0.0000% |
| Ione Band of Miwok Indians of California | 0.1755% |

2024 05 06 Kroger Tribal Allocation

C-3

| | |
|---|---|
| Iowa Tribe of Kansas and Nebraska | 0.0762% |
| Iowa Tribe of Oklahoma | 0.0254% |
| Jackson Band of Miwuk Indians | 0.0077% |
| Jamestown S'Klallam Tribe | 0.0496% |
| Jamul Indian Village of California | 0.0119% |
| Jena Band of Choctaw Indians | 0.0168% |
| Jicarilla Apache Nation, New Mexico | 0.4061% |
| Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | 0.0228% |
| Kalispel Indian Community of the Kalispel Reservation | 0.0540% |
| Karuk Tribe | 0.3669% |
| Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | 0.0062% |
| Kaw Nation, Oklahoma | 0.0349% |
| Kenaitze Indian Tribe | 0.2230% |
| Ketchikan Indian Community | 0.1492% |
| Kewa Pueblo, New Mexico | 0.1669% |
| Keweenaw Bay Indian Community, Michigan | 0.1561% |
| Kialegee Tribal Town | 0.0046% |
| Kickapoo Traditional Tribe of Texas | 0.0253% |
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | 0.0838% |
| Kickapoo Tribe of Oklahoma | 0.1485% |
| Kiowa  Indian Tribe of Oklahoma | 0.1158% |
| Klamath Tribes | 0.2566% |
| Kletsel Dehe Band of Wintun Indians | 0.0525% |
| Knik Tribe | 0.0170% |
| Kodiak Area Native Association | 0.2624% |
| Koi Nation of Northern California | 0.0202% |
| Kootenai Tribe of Idaho | 0.0140% |
| La Jolla Band of Luiseno Indians, California | 0.0537% |
| La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | 0.0043% |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | 0.2328% |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | 0.3099% |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | 0.0448% |
| Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | 0.5143% |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | 0.1028% |
| Little River Band of Ottawa Indians, Michigan | 0.1337% |
| Little Shell Tribe of Chippewa Indians of Montana | 0.2922% |
| Little Traverse Bay Bands of Odawa Indians, Michigan | 0.2549% |
| Lone Pine Paiute-Shoshone Tribe | 0.0303% |
| Los Coyotes Band of Cahuilla & Cupeno Indians, California | 0.0227% |
| Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | 0.0249% |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | 0.0132% |
| Lower Elwha Tribal Community | 0.0991% |
| Lower Sioux Indian Community in the State of Minnesota | 0.0062% |
| Lummi Tribe of the Lummi Reservation | 0.3033% |
| Lytton Rancheria of California | 0.0344% |

2024 05 06 Kroger Tribal Allocation

| | |
|---|---|
| Makah Indian Tribe of the Makah Indian Reservation | 0.2647% |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | 0.1183% |
| Maniilaq Association | 0.5815% |
| Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | 0.0066% |
| Mashantucket Pequot Indian Tribe | 0.0098% |
| Mashpee Wampanoag Tribe | 0.0182% |
| Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | 0.0252% |
| Mechoopda Indian Tribe of Chico Rancheria, California | 0.2390% |
| Menominee Indian Tribe of Wisconsin | 0.3735% |
| Mentasta Traditional Council | 0.0000% |
| Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | 0.0487% |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | 0.3977% |
| Metlakatla Indian Community | 0.1016% |
| Miami Tribe of Oklahoma | 0.0136% |
| Miccosukee Tribe of Indians | 0.0389% |
| Middletown Rancheria of Pomo Indians of California | 0.0375% |
| Mille Lacs Band of the Minnesota Chippewa Tribe, Minnesota | 0.0344% |
| Mississippi Band of Choctaw Indians | 0.6558% |
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | 0.0622% |
| Modoc Nation | 0.0014% |
| Mohegan Tribe of Indians of Connecticut | 0.0177% |
| Monacan Indian Nation | 0.0850% |
| Mooretown Rancheria of Maidu Indians of California | 0.2816% |
| Morongo Band of Mission Indians, California | 0.1148% |
| Mt. Sanford Tribal Consortium | 0.0387% |
| Muckleshoot Indian Tribe | 0.4083% |
| Muscogee (Creek) Nation | 0.7603% |
| Nansemond Indian Nation | 0.0103% |
| Narragansett Indian Tribe | 0.0115% |
| Native Village of Afognak | 0.0000% |
| Native Village of Chitina | 0.0166% |
| Native Village of Port Heiden | 0.0000% |
| Native Village of Tanana | 0.0274% |
| Native Village of Tyonek | 0.0209% |
| Navajo Nation, Arizona, New Mexico & Utah | 21.9869% |
| Nez Perce Tribe | 0.3393% |
| Ninilchik Village | 0.0417% |
| Nisqually Indian Tribe | 0.0955% |
| Nooksack Indian Tribe | 0.0714% |
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | 0.3661% |
| Northfork Rancheria of Mono Indians of California | 0.1722% |
| Northwestern Band of the Shoshone Nation | 0.0066% |
| Norton Sound Health Corporation | 0.8565% |
| Nottawaseppi Huron Band of the Potawatomi, Michigan | 0.1062% |
| Oglala Sioux Tribe | 0.2542% |

2024 05 06 Kroger Tribal Allocation

C-5

| | |
|---|---|
| Ohkay Owingeh, New Mexico | 0.3216% |
| Omaha Tribe of Nebraska | 0.1587% |
| Oneida Indian Nation | 0.0210% |
| Oneida Nation | 0.1658% |
| Onondaga Nation | 0.0076% |
| Osage Nation | 0.0795% |
| Otoe-Missouria Tribe of Indians, Oklahoma | 0.0375% |
| Ottawa Tribe of Oklahoma | 0.0078% |
| Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes) | 0.1248% |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | 0.2302% |
| Pala Band of Mission Indians | 0.0945% |
| Pamunkey Indian Tribe | 0.0215% |
| Pascua Yaqui Tribe of Arizona | 0.8708% |
| Paskenta Band of Nomlaki Indians of California | 0.0089% |
| Passamaquoddy Tribe Indian Township | 0.0159% |
| Passamaquoddy Tribe Pleasant Point | 0.0201% |
| Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | 0.0195% |
| Pawnee Nation of Oklahoma | 0.0444% |
| Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | 0.2340% |
| Penobscot Nation | 0.0266% |
| Peoria Tribe of Indians of Oklahoma | 0.0113% |
| Picayune Rancheria of Chukchansi Indians of California | 0.1184% |
| Pinoleville Pomo Nation, California | 0.0389% |
| Pit River Tribe, California | 0.1653% |
| Poarch Band of Creeks | 0.1945% |
| Pokagon Band of Potawatomi Indians, Michigan & Indiana | 0.1730% |
| Ponca Tribe of Indians of Oklahoma | 0.0630% |
| Ponca Tribe of Nebraska | 0.1864% |
| Port Gamble S'Klallam Tribe | 0.1214% |
| Potter Valley Tribe, California | 0.0007% |
| Prairie Band Potawatomi Nation | 0.0983% |
| Prairie Island Indian Community in the State of Minnesota | 0.0008% |
| Pueblo of Acoma, New Mexico | 0.2565% |
| Pueblo of Cochiti, New Mexico | 0.0870% |
| Pueblo of Isleta, New Mexico | 1.3928% |
| Pueblo of Jemez, New Mexico | 0.6811% |
| Pueblo of Laguna, New Mexico | 0.4348% |
| Pueblo of Nambe, New Mexico | 0.0979% |
| Pueblo of Picuris, New Mexico | 0.0214% |
| Pueblo of Pojoaque, New Mexico | 0.0526% |
| Pueblo of San Felipe, New Mexico | 0.2834% |
| Pueblo of San Ildefonso, New Mexico | 0.0743% |
| Pueblo of Sandia, New Mexico | 0.0778% |
| Pueblo of Santa Ana, New Mexico | 0.1756% |
| Pueblo of Santa Clara, New Mexico | 0.1404% |

2024 05 06 Kroger Tribal Allocation

| | |
|---|---|
| Pueblo of Taos, New Mexico | 0.1812% |
| Pueblo of Tesuque, New Mexico | 0.0532% |
| Pueblo of Zia, New Mexico | 0.1640% |
| Puyallup Tribe of the Puyallup Reservation | 0.4999% |
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | 0.3051% |
| Quapaw Nation | 0.0180% |
| Quartz Valley Indian Community of the Quartz Valley Reservation of California | 0.0302% |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | 0.3328% |
| Quileute Tribe of the Quileute Reservation | 0.0643% |
| Quinault Indian Nation | 0.2245% |
| Ramona Band of Cahuilla, California | 0.0023% |
| Rappahannock Tribe, Inc. | 0.0098% |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | 0.0982% |
| Red Lake Band of Chippewa Indians, Minnesota | 0.0884% |
| Redding Rancheria, California | 0.4706% |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | 0.0309% |
| Reno-Sparks Indian Colony, Nevada | 0.6742% |
| Resighini Rancheria, California | 0.0168% |
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | 0.0435% |
| Riverside San Bernardino County Indian Health | 0.0000% |
| Robinson Rancheria | 0.0833% |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | 0.1036% |
| Round Valley Indian Tribes, Round Valley Reservation, California | 0.1884% |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | 0.0095% |
| Sac & Fox Nation, Oklahoma | 0.1270% |
| Sac and Fox Tribe of the Mississippi in Iowa | 0.0173% |
| Saginaw Chippewa Indian Tribe of Michigan | 0.2329% |
| Saint Regis Mohawk Tribe | 0.0839% |
| Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | 0.5330% |
| Samish Indian Nation | 0.0734% |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | 1.4216% |
| San Juan Southern Paiute Tribe of Arizona | 0.0075% |
| San Manuel Band of Mission Indians, California | 0.0307% |
| San Pasqual Band of Dieguено Mission Indians of California | 0.0139% |
| Santa Rosa Band of Cahuilla Indians, California | 0.0235% |
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | 0.0820% |
| Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | 0.0707% |
| Santee Sioux Nation, Nebraska | 0.0588% |
| Sauk-Suiattle Indian Tribe | 0.0059% |
| Sault Ste. Marie Tribe of Chippewa Indians, Michigan | 1.1151% |
| Scotts Valley Band of Pomo Indians of California | 0.0202% |
| Seldovia Village Tribe | 0.0465% |
| Seminole Tribe of Florida | 0.6535% |
| Seneca Nation of Indians | 0.1164% |
| Seneca-Cayuga Nation | 0.0193% |

2024 05 06 Kroger Tribal Allocation

C-7

| | |
|---|---|
| Shakopee Mdewakanton Sioux Community of Minnesota | 0.0010% |
| Shawnee Tribe | 0.0102% |
| Sherwood Valley Rancheria of Pomo Indians of California | 0.0563% |
| Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | 0.0835% |
| Shinnecock Indian Nation | 0.0036% |
| Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | 0.0560% |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | 0.3714% |
| Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | 0.1562% |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | 0.0658% |
| Skokomish Indian Tribe | 0.0711% |
| Skull Valley Band of Goshute Indians of Utah | 0.0045% |
| Snoqualmie Indian Tribe | 0.0387% |
| Soboba Band of Luiseno Indians, California | 0.1721% |
| Sokaogon Chippewa Community, Wisconsin | 0.0172% |
| Southcentral Foundation | 2.1878% |
| Southeast Alaska Regional Health Corporation | 0.8473% |
| Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | 0.1179% |
| Spirit Lake Tribe, North Dakota | 0.0360% |
| Spokane Tribe of the Spokane Reservation | 0.1725% |
| Squaxin Island Tribe of the Squaxin Island Reservation | 0.0684% |
| St. Croix Chippewa Indians of Wisconsin | 0.1040% |
| Standing Rock Sioux Tribe of North & South Dakota | 0.0650% |
| Stillaguamish Tribe of Indians of Washington | 0.0100% |
| Stockbridge Munsee Community, Wisconsin | 0.0948% |
| Summit Lake Paiute Tribe of Nevada | 0.0064% |
| Suquamish Indian Tribe of the Port Madison Reservation | 0.0557% |
| Susanville Indian Rancheria, California | 0.1357% |
| Swinomish Indian Tribal Community | 0.0990% |
| Sycuan Band of the Kumeyaay Nation | 0.0072% |
| Table Mountain Rancheria | 0.0011% |
| Tanana Chiefs Conference | 1.3460% |
| Tejon Indian Tribe | 0.0332% |
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) [Only Wells Band is unrepresented] | 0.2260% |
| The Seminole Nation of Oklahoma | 0.1195% |
| Thlopthlocco Tribal Town | 0.0102% |
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | 0.0576% |
| Timbisha Shoshone Tribe | 0.0088% |
| Tohono O'odham Nation of Arizona | 2.0478% |
| Tolowa Dee-ni' Nation | 0.1951% |
| Tonawanda Band of Seneca | 0.0027% |
| Tonkawa Tribe of Indians of Oklahoma | 0.0103% |
| Tonto Apache Tribe of Arizona | 0.0270% |
| Torres Martinez Desert Cahuilla Indians, California | 0.0716% |

2024 05 06 Kroger Tribal Allocation

| | |
|---|---|
| Tulalip Tribes of Washington | 0.4534% |
| Tule River Indian Tribe of the Tule River Reservation, California | 0.1487% |
| Tunica-Biloxi Indian Tribe | 0.0264% |
| Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | 0.0364% |
| Turtle Mountain Band of Chippewa Indians of North Dakota | 0.1162% |
| Tuscarora Nation | 0.0034% |
| Twenty-Nine Palms Band of Mission Indians of California | 0.0033% |
| United Auburn Indian Community of the Auburn Rancheria of California | 0.4744% |
| United Keetoowah Band of Cherokee Indians in Oklahoma | 0.0483% |
| Upper Mattaponi Tribe | 0.0280% |
| Upper Sioux Community, Minnesota | 0.0015% |
| Upper Skagit Indian Tribe | 0.0362% |
| Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | 0.4832% |
| Ute Mountain Ute Tribe | 0.1948% |
| Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | 0.0044% |
| Walker River Paiute Tribe, Nevada | 0.1332% |
| Wampanoag Tribe of Gay Head (Aquinnah) | 0.0057% |
| Washoe Tribe of Nevada & California (Carson Colony, Dresslerville Colony, Woodfords Community, Stewart Community, & Washoe Ranches) | 0.3490% |
| White Earth Band of the Minnesota Chippewa Tribe, Minnesota | 0.0830% |
| White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | 1.8536% |
| Wichita and Affiliated Tribes (Wichita, Keechi, Waco & Tawakonie), Oklahoma | 0.0280% |
| Wilton Rancheria, California | 0.1104% |
| Winnebago Tribe of Nebraska | 0.2078% |
| Winnemucca Indian Colony of Nevada | 0.0174% |
| Wiyot Tribe, California | 0.0741% |
| Wyandotte Nation | 0.0228% |
| Yakutat Tlingit Tribe | 0.0419% |
| Yankton Sioux Tribe of South Dakota | 0.0345% |
| Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | 0.2372% |
| Yavapai-Prescott Indian Tribe | 0.0669% |
| Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | 0.0789% |
| Yocha Dehe Wintun Nation, California | 0.0132% |
| Yomba Shoshone Tribe of the Yomba Reservation, Nevada | 0.0234% |
| Ysleta del Sur Pueblo | 0.0767% |
| Yukon Kuskokwim Health Corporation | 2.1649% |
| Yurok Tribe of the Yurok Reservation, California | 0.7137% |
| Zuni Tribe of the Zuni Reservation, New Mexico | 0.6402% |

| |
|---|
| **100.0000%** |

2024 05 06 Kroger Tribal Allocation

C-9

**EXHIBIT C-1**

**Applicable Tribal Litigation Percentages**

| Federally Recognized Tribe Name | Kroger Participation Calculation (Litigating Tribes Only) |
|---|---|
| Akiak Native Community | 0.0000% |
| Alaska Native Tribal Health Consortium | 3.4166% |
| Aleutian Pribilof Islands Association | 0.1219% |
| Apache Tribe of Oklahoma | 0.0455% |
| Arapaho Tribe of the Wind River Reservation, Wyoming | 0.6231% |
| Arctic Slope Native Association | 0.5112% |
| Aroostook Band of Micmacs | 0.0126% |
| Asa'carsarmiut Tribe | 0.0000% |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | 0.2774% |
| Bay Mills Indian Community, Michigan | 0.1292% |
| Bear River Band of the Rohnerville Rancheria, California | 0.0917% |
| Big Sandy Rancheria of Western Mono Indians of California | 0.0593% |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | 0.2196% |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | 0.9730% |
| Bristol Bay Area Health Corporation | 0.8563% |
| Cahto Tribe of the Laytonville Rancheria | 0.0375% |
| Catawba Indian Nation (aka Catawba Indian Tribe of South Carolina) | 0.1345% |
| Cayuga Nation | 0.0024% |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | 0.0362% |
| Cherokee Nation | 4.1598% |
| Cheyenne and Arapaho Tribes, Oklahoma | 0.2636% |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | 0.0992% |
| Chickasaw Nation | 0.7360% |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | 0.4215% |
| Chitimacha Tribe of Louisiana | 0.0629% |
| Choctaw Nation of Oklahoma | 1.8703% |
| Chugachmiut | 0.1909% |
| Citizen Potawatomi Nation, Oklahoma | 0.5006% |
| Cloverdale Rancheria of Pomo Indians of California | 0.0938% |
| Coeur D'Alene Tribe | 0.5184% |
| Comanche Nation, Oklahoma | 0.2385% |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | 1.0929% |
| Confederated Tribes and Bands of the Yakama Nation | 1.1294% |
| Confederated Tribes of the Colville Reservation | 0.7625% |
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | 0.0260% |
| Confederated Tribes of the Grand Ronde Community of Oregon | 0.4443% |
| Confederated Tribes of the Umatilla Indian Reservation | 0.2813% |

| | |
|---|---|
| Confederated Tribes of the Warm Springs Reservation of Oregon | 0.6105% |
| Consolidated Tribal Health Project | 0.0000% |
| Copper River Native Association | 0.1669% |
| Coquille Indian Tribe | 0.1676% |
| Coushatta Tribe of Louisiana | 0.0478% |
| Cow Creek Band of Umpqua Tribe of Indians | 0.2771% |
| Coyote Valley Band of Pomo Indians of California | 0.0610% |
| Delaware Nation, Oklahoma | 0.0117% |
| Dry Creek Rancheria Band of Pomo Indians, California | 0.1283% |
| Eastern Aleutian Tribes | 0.1840% |
| Eastern Band of Cherokee Indians | 1.7297% |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | 0.2641% |
| Ely Shoshone Tribe of Nevada | 0.0996% |
| Ewiiaapaayp Band of Kumeyaay Indians, California | 0.0007% |
| Feather River Tribal health | 0.0000% |
| Flandreau Santee Sioux Tribe of South Dakota | 0.0076% |
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | 0.1154% |
| Forest County Potawatomi Community, Wisconsin | 0.0481% |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | 0.3007% |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | 4.6396% |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | 0.1883% |
| Guidiville Rancheria of California | 0.0247% |
| Ho-Chunk Nation of Wisconsin | 0.5050% |
| Hoopa Valley Tribe, California | 0.4789% |
| Hopi Tribe of Arizona | 0.8097% |
| Hopland Band of Pomo Indians, California | 0.1308% |
| Houlton Band of Maliseet Indians | 0.0120% |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | 0.4053% |
| Indian Health Council | 0.0000% |
| Iowa Tribe of Kansas and Nebraska | 0.0954% |
| Jamestown S'Klallam Tribe | 0.0622% |
| Jicarilla Apache Nation, New Mexico | 0.5087% |
| Kenaitze Indian Tribe | 0.2793% |
| Keweenaw Bay Indian Community, Michigan | 0.1955% |
| Kickapoo Traditional Tribe of Texas | 0.0317% |
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | 0.1050% |
| Klamath Tribes | 0.3214% |
| Kodiak Area Native Association | 0.3287% |
| Koi Nation of Northern California | 0.0254% |
| Kootenai Tribe of Idaho | 0.0176% |
| La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | 0.0053% |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | 0.2916% |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | 0.3882% |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | 0.0561% |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | 0.1323% |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | 0.0170% |
| Lower Sioux Indian Community in the State of Minnesota | 0.0080% |

| | |
|---|---|
| Lummi Tribe of the Lummi Reservation | 0.3799% |
| Lytton Rancheria of California | 0.0431% |
| Makah Indian Tribe of the Makah Indian Reservation | 0.3316% |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | 0.1482% |
| Mashantucket Pequot Indian Tribe | 0.0126% |
| Mechoopda Indian Tribe of Chico Rancheria, California | 0.2994% |
| Menominee Indian Tribe of Wisconsin | 0.4678% |
| Mentasta Traditional Council | 0.0000% |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | 0.4981% |
| Miccosukee Tribe of Indians | 0.0487% |
| Mille Lacs Band of the Minnesota Chippewa Tribe, Minnesota | 0.0442% |
| Mississippi Band of Choctaw Indians | 0.8214% |
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | 0.0779% |
| Modoc Nation | 0.0018% |
| Mohegan Tribe of Indians of Connecticut | 0.0227% |
| Muckleshoot Indian Tribe | 0.5114% |
| Muscogee (Creek) Nation | 0.9780% |
| Narragansett Indian Tribe | 0.0149% |
| Native Village of Afognak | 0.0000% |
| Native Village of Port Heiden | 0.0000% |
| Navajo Nation, Arizona, New Mexico & Utah | 27.5398% |
| Nez Perce Tribe | 0.4250% |
| Nisqually Indian Tribe | 0.1196% |
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | 0.4586% |
| Northwestern Band of the Shoshone Nation | 0.0083% |
| Norton Sound Health Corporation | 1.0728% |
| Oglala Sioux Tribe | 0.3270% |
| Omaha Tribe of Nebraska | 0.1987% |
| Oneida Nation | 1.1308% |
| Osage Nation | 0.1023% |
| Otoe-Missouria Tribe of Indians, Oklahoma | 0.0482% |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | 0.2883% |
| Pala Band of Mission Indians | 0.1183% |
| Pascua Yaqui Tribe of Arizona | 1.0907% |
| Passamaquoddy Tribe Indian Township | 0.0205% |
| Passamaquoddy Tribe Pleasant Point | 0.0259% |
| Pawnee Nation of Oklahoma | 0.0571% |
| Pinoleville Pomo Nation, California | 0.0487% |
| Poarch Band of Creeks | 0.2436% |
| Ponca Tribe of Indians of Oklahoma | 0.0811% |
| Ponca Tribe of Nebraska | 0.2335% |
| Port Gamble S'Klallam Tribe | 0.1521% |
| Potter Valley Tribe, California | 0.0009% |
| Prairie Band Potawatomi Nation | 0.1231% |
| Prairie Island Indian Community in the State of Minnesota | 0.0010% |
| Pueblo of Pojoaque, New Mexico | 0.0659% |
| Puyallup Tribe of the Puyallup Reservation | 0.6262% |

| | |
|---|---|
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | 0.3821% |
| Quapaw Nation | 0.0231% |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | 0.4169% |
| Quileute Tribe of the Quileute Reservation | 0.0805% |
| Quinault Indian Nation | 0.2812% |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | 0.1230% |
| Red Lake Band of Chippewa Indians, Minnesota | 0.1138% |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | 0.0387% |
| Reno-Sparks Indian Colony, Nevada | 0.8444% |
| Resighini Rancheria, California | 0.0211% |
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | 0.0544% |
| Riverside San Bernardino County Indian Health | 0.0000% |
| Robinson Rancheria | 0.1043% |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | 0.1333% |
| Round Valley Indian Tribes, Round Valley Reservation, California | 0.2360% |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | 0.0119% |
| Sac & Fox Nation, Oklahoma | 0.1633% |
| Saginaw Chippewa Indian Tribe of Michigan | 0.2917% |
| Saint Regis Mohawk Tribe | 0.1080% |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | 1.7807% |
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | 0.1027% |
| Santee Sioux Nation, Nebraska | 0.0736% |
| Sault Ste. Marie Tribe of Chippewa Indians, Michigan | 1.3968% |
| Scotts Valley Band of Pomo Indians of California | 0.0254% |
| Seminole Tribe of Florida | 0.8185% |
| Seneca Nation of Indians | 0.1497% |
| Shakopee Mdewakanton Sioux Community of Minnesota | 0.0013% |
| Shinnecock Indian Nation | 0.0046% |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | 0.4653% |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | 0.0847% |
| Sokaogon Chippewa Community, Wisconsin | 0.0215% |
| Southcentral Foundation | 2.7403% |
| Southeast Alaska Regional Health Corporation | 1.0613% |
| Spirit Lake Tribe, North Dakota | 0.0463% |
| Squaxin Island Tribe of the Squaxin Island Reservation | 0.0857% |
| St. Croix Chippewa Indians of Wisconsin | 0.1303% |
| Standing Rock Sioux Tribe of North & South Dakota | 0.0836% |
| Stockbridge Munsee Community, Wisconsin | 0.1187% |
| Suquamish Indian Tribe of the Port Madison Reservation | 0.0697% |
| Swinomish Indian Tribal Community | 0.1240% |
| Sycuan Band of the Kumeyaay Nation | 0.0090% |
| Tanana Chiefs Conference | 1.6859% |
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) [Only Wells Band is unrepresented] | 0.2830% |
| Thlopthlocco Tribal Town | 0.0131% |
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | 0.0740% |

| Tohono O'odham Nation of Arizona | 2.5650% |
|---|---|
| Tonto Apache Tribe of Arizona | 0.0338% |

| | **100.0000%** |
|---|---|

**EXHIBIT D**

TAFT X Trust Agreement

**TRIBAL ABATEMENT FUND TRUST X TRUST AGREEMENT**

**DATED AS OF** ⬛⬛⬛⬛⬛

**Pursuant to the Kroger Tribal Settlement Agreement Between the Tribal Leadership Committee and Kroger**

**Dated July 17, 2024**

**TRIBAL ABATEMENT FUND TRUST X**

**TABLE OF CONTENTS**

Page

ARTICLE 1 AGREEMENT OF TRUST ........................................................................................2

Section 1.1     Creation and Name. ...................................................................................2

Section 1.2     Purposes ....................................................................................................2

Section 1.3     Transfer of Assets. ....................................................................................3

Section 1.4     Acceptance of Assets. ...............................................................................3

Section 1.5     Tribe Beneficiaries. ...................................................................................4

Section 1.6     Jurisdiction ...............................................................................................4

ARTICLE 2 POWERS AND TRUST ADMINISTRATION .......................................................4

Section 2.1     Powers. ......................................................................................................4

Section 2.2     General Administration .............................................................................6

Section 2.3     Accounting ................................................................................................6

Section 2.4     Financial Reporting ...................................................................................7

Section 2.5     Tribal Opioid Abatement Reporting .........................................................7

Section 2.6     Beneficiary Reporting ...............................................................................7

Section 2.7     Limitation of the Directors' Authority......................................................8

ARTICLE 3 ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES ......................8

Section 3.1     Accounts ....................................................................................................8

Section 3.2     Investment Guidelines ..............................................................................8

Section 3.3     Payment of TAFT X Operating Expenses. ...............................................8

ARTICLE 4 ABATEMENT DISTRIBUTIONS.........................................................................9

Section 4.1     Abatement Distributions ...........................................................................9

Section 4.2     Manner of Payment of Abatement Distributions .....................................9

Section 4.3     Delivery of Abatement Distributions.......................................................10

ARTICLE 5 DIRECTORS AND DELAWARE TRUSTEE........................................................10

Section 5.1     Number of Directors; Managing Director................................................10

Section 5.2     Term of Service, Successor Directors.......................................................10

Section 5.3     Directors' Meetings. .................................................................................12

Section 5.4     Compensation and Expenses of Directors ....................................................13

Section 5.5     Directors' Independence ..............................................................................13

Section 5.6     Standard of Care; Exculpation. ....................................................................13

Section 5.7     Protective Provisions ...................................................................................14

Section 5.8     Indemnification ............................................................................................15

Section 5.9     Bond ............................................................................................................16

Section 5.10    Delaware Trustee. ........................................................................................16

Section 5.11    Meeting Minutes; Rights of Inspection..........................................................18

Section 5.12    Trust Protector. ...........................................................................................19

ARTICLE 6 GENERAL PROVISIONS .......................................................................................20

Section 6.1     Irrevocability...............................................................................................20

Section 6.2     Term; Termination .......................................................................................20

Section 6.3     Taxes. ..........................................................................................................20

Section 6.4     Modification.................................................................................................21

Section 6.5     Communications ..........................................................................................22

Section 6.6     Severability .................................................................................................22

Section 6.7     Notices. .......................................................................................................22

Section 6.8     Successors and Assigns.................................................................................24

Section 6.9     Limitation on Transferability; Tribe Beneficiaries' Interests .........................24

Section 6.10    Exemption from Registration. .......................................................................25

Section 6.11    Entire Agreement; No Waiver .......................................................................25

Section 6.12    Headings .....................................................................................................25

Section 6.13    Governing Law ............................................................................................25

Section 6.14    Dispute Resolution .......................................................................................26

Section 6.15    Sovereign Immunity......................................................................................26

Section 6.16    Effectiveness................................................................................................26

Section 6.17    Counterpart Signatures.................................................................................26

EXHIBIT 1     PARTICIPATING TRIBES and FINAL TRIBAL ALLOCATION
                DISTRIBUTION PERCENTAGES ................................................................28

EXHIBIT 2     FORM OF CERTIFICATE OF TRUST OF THE TRIBAL ABATEMENT
                FUND TRUST VI.........................................................................................29

EXHIBIT 3    INVESTMENT GUIDELINES ............................................................................30

EXHIBIT 4    TRIBAL ABATEMENT FUND TRUST X TRUST DISTRIBUTION
                 PROCEDURES......................................................................................................33

## TRIBAL ABATEMENT FUND TRUST X AGREEMENT

This Tribal Abatement Fund Trust X ("**TAFT X**" or the "**Trust**") Agreement (together with all Exhibits hereto, this "**Trust Agreement**"), dated and effective as of the Effective Date as defined in Section I.8 of the Kroger Tribal Settlement Agreement (the "Effective Date") is entered into in furtherance of the administration of the Kroger Tribal Settlement Agreement between the Tribal Leadership Committee ("**TLC**"), Participating Tribes and Kroger (the "**Parties**"), dated July 17, 2024 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Kroger Tribal Settlement Agreement**" or "**KTSA**"),[3] in the matter of *In re National Prescription Opiate Litigation,* MDP No. 2804, Case No. 17-md-2804 in the United States District Court for the Northern District of Ohio (the "**Court**").  This Trust Agreement is entered into by the trustees of the Tribal Abatement Fund Trust X who are further identified on the signature pages hereto (together with any successor trustee serving in such capacity, the "**Directors**"),[4] the Delaware Trustee (together with any successor serving in such capacity, the "**Delaware Trustee**") and the Trust Protector, the individual who is further identified on the signature pages hereto (together with any successor serving in such capacity, the "**Trust Protector**").

## <u>RECITALS</u>

**WHEREAS**, the Kroger Settlement Trust shall be established pursuant to order of the Court to aid in the administration of the Parties' settlement;

**WHEREAS**, the Parties entered into the KTSA, dated as of ▨▨▨▨▨▨, 2023, subject to certain required participation acceptances by the Tribes as set forth in the KTSA;

**WHEREAS**, the TLC has notified Kroger that the required participation acceptances have occurred and, as a result, the "Tribal Reference Date" under the KTSA has occurred;

**WHEREAS**, the KTSA provides that following the Effective Date, David R.  Cohen (the "**Tribal Allocation Appointee**") will determine the Final Tribal Allocation Distribution Percentages, which shall be incorporated herein as **Exhibit 1** of this Trust Agreement;

**WHEREAS**, David R.  Cohen, Special Master to Judge Polster in MDL No. 2804 (the "**Special Master**") shall be appointed as Trust Administrator of the Kroger Settlement Trust and authorized to receive Kroger's payments under the KTSA and to direct funds to be distributed to the Tribes, as provided in the KTSA;

**WHEREAS**, in accordance with the KTSA, TAFT X has been established for the distribution to and abatement reporting by Tribe Beneficiaries, as defined in Section 1.5(a), in accordance with the terms of the KTSA and this Trust Agreement.

---

[3] Capitalized terms used but not herein defined shall have the meaning ascribed to them in the Kroger Tribal Settlement Agreement or any Exhibits attached hereto, as applicable.

[4] The initial Directors shall be Kevin Washburn, Mary Smith and Kathy Hannan; the initial Trust Protector shall be Professor Stacy Leeds.

**WHEREAS**, pursuant to the KTSA, TAFT X shall (a) receive distributions from the Kroger Settlement Trust, (b) make Abatement Distributions (as defined below) to Tribe Beneficiaries in accordance with this Trust Agreement and the TAFT X TDP attached hereto as **Exhibit 4** (the "**TAFT X TDP**"), and (c) carry out such other matters as are set forth in the Trust Documents (as defined below).

**WHEREAS**, pursuant to the KTSA, the Trust shall (a) distribute Trust Assets in accordance with this Trust Agreement and the TAFT X TDP; (b) pay TAFT X Operating Expenses, as defined in Section 1.2(f)(ii); (c) hold and maintain the TAFT X Operating Reserve, as defined in Section 1.2(f)(ii); and (d) hold, manage, protect and invest all Trust Assets received by the Trust for the benefit of the Tribe Beneficiaries, pending distribution to Tribe Beneficiaries, satisfaction of TAFT X obligations, or payment of TAFT X Operating Expenses.

**WHEREAS**, the Trust is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended (the "**Code**," and such regulations, the "**QSF Regulations**") and corresponding or similar provisions of relevant state or local law.

**NOW**, **THEREFORE**, it is hereby agreed as follows:

## ARTICLE 1
## AGREEMENT OF TRUST

**Section 1.1**     **Creation and Name.**  There is hereby created a trust known as the "**Tribal Abatement Fund Trust VI**" or "**TAFT X**." The Directors may transact the business and affairs of the Trust in the name of TAFT X.  It is the intention of the Parties hereto that the Trust constitutes a statutory trust under Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.*  (the "**Act**") and that this Trust Agreement together with all Exhibits hereto (collectively, the "**Trust Documents**") constitute the governing instruments of the Trust.  The Directors and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

**Section 1.2**     **Purposes**.  The purposes of the Trust are, among other things, to:

(a)     receive distributions from the Kroger Settlement Trust;

(b)     hold, manage, protect and invest the Trust Assets in accordance with the terms of the Trust Documents, for the benefit of the Tribe Beneficiaries;

(c)     engage in any lawful act or activity, including, without limitation, to enter into leasing, financing or other agreements with third parties, that is consistent with, necessary or incidental to the Trust Documents;

(d)     qualify at all times as a "qualified settlement fund" within the meaning of the QSF Regulations and corresponding or similar provisions of relevant state or local law;

(e)     engage in any lawful activity necessary or incidental to the foregoing; and

      (f)     use the Trust Assets to:

          (i)     make Abatement Distributions (as defined below) to Tribe Beneficiaries in accordance with this Trust Agreement and the TAFT X TDP;

          (ii)    hold and maintain reserves to pay the fees and expenses incurred with administering the Trust (including the TAFT X TDP) and managing the Trust Assets (together, the "**TAFT X Operating Expenses**") of the Trust (such reserves, the "**TAFT X Operating Reserve**"), which shall be funded with cash and cash equivalents held by the Trust in accordance with the Trust Documents;

          (iii)   pay TAFT X obligations and the TAFT X Operating Expenses from the TAFT X Operating Reserve; and

          (iv)   replenish periodically, until the dissolution of the Trust, the TAFT X Operating Reserve from cash held or received by the Trust to the extent deemed necessary by the Directors to satisfy and pay estimated future TAFT X Operating Expenses in accordance with the Trust Documents.

**Section 1.3    Transfer of Assets.**  Pursuant to the KTSA, the Trust shall receive distributions from the Kroger Settlement Trust (together with any income or gain earned thereon, collectively, the "**Trust Assets**").  The Trust Assets shall not be subject to attachment, disgorgement or recoupment by any person, except there shall be allowed a reversion of Trust Assets to Kroger only to the extent set forth in Section 4.2.

**Section 1.4    Acceptance of Assets.**

      (a)    In furtherance of the purposes of the Trust, the Directors, in their capacity as trustees, on behalf of the Trust, accept the transfer to the Trust of the initial TAFT X funding from the Kroger Settlement Trust and shall accept the subsequent funding and transfers contemplated by the KTSA, subject to the terms of the Trust Documents.  Except as otherwise provided in Section 4.2, Kroger will have no equitable or legal interest in, or with respect to, the Trust Assets or the Trust.

      (b)    Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the TAFT X TDP shall be construed or implemented in a manner that would cause the Trust to fail to qualify as one or more "qualified settlement funds" within the meaning of the QSF Regulations or under corresponding or similar provisions of relevant state or local law.

      (c)    In this Trust Agreement and the TAFT X TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

**Section 1.5    Tribe Beneficiaries.**

      (a)    The beneficial owners (within the meaning of the Act) of the Trust are the tribes or tribal organizations identified as Participating Tribes on **Exhibit 1** hereto (together with the tribe

or tribal entity organization added to such **Exhibit 1** after the Effective Date in accordance with the KTSA, each, a "**Tribe Beneficiary**" and, collectively, the "**Tribe Beneficiaries**").

(b)     The Tribe Beneficiaries shall have only such rights with respect to the Trust and its assets as are set forth in this Trust Agreement and the TAFT X TDP and no greater or other rights, including upon dissolution, liquidation or winding up of the Trust, shall be deemed to apply to such Tribe Beneficiaries.

(c)     The Tribe Beneficiaries shall be subject to the terms of this Trust Agreement, including, without limitation, Article 4 and the terms of the TAFT X TDP.

**Section 1.6     Jurisdiction.**  The Court shall have continuing jurisdiction over the Trust, provided, however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Trust.

<div align="center">

**ARTICLE 2**

**POWERS AND TRUST ADMINISTRATION**

</div>

**Section 2.1     Powers.**

(a)     The Directors in their capacity as trustees are and shall act as fiduciaries to the Trust in accordance with the provisions of this Trust Agreement.  The Directors shall, at all times, administer the Trust in accordance with the purposes set forth in Section 1.2 above.  Subject to the limitations set forth in the Trust Documents, the Directors shall have the power to take any and all actions that in the judgment of the Directors are necessary or proper to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of Delaware.  In the event of any ambiguity or conflict between the terms of this Trust Agreement and the TAFT X TDP, the TAFT X TDP shall control.

(b)     Except as required by applicable law or the Trust Documents, the Directors need not obtain the order or approval of any court for the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited in the Trust Documents and by applicable law, the Directors shall have the power to:

> (i)     receive and hold the Trust Assets and exercise all rights with respect thereto;
>
> (ii)     invest the monies and other Trust Assets held from time to time by the Trust, subject to the limitations set forth in Section 3.2 below;
>
> (iii)     enter into leasing, financing or other agreements with third parties as deemed by the Directors in their discretion to be useful in carrying out the purposes of the Trust;

<div align="center">D-3</div>

(iv)    determine and pay obligations and liabilities of the Trust and the TAFT X Operating Expenses;

(v)    establish accounts and reasonable reserves within the Trust, as deemed by the Directors in their discretion to be necessary, prudent or useful in administering the Trust;

(vi)    bring any action in any court of competent jurisdiction, including the Court;

(vii)    initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Trust Asset, liability or responsibility of the Trust;

(viii)    supervise and administer the Trust in accordance with the Trust Documents, including, without limitation, to monitor the Abatement Distribution (as defined below) recipients' compliance with the TAFT X TDP requirements for Approved Tribal Opioid Abatement Uses and Approved Administrative Expenses (as defined in the TAFT X TDP);

(ix)    appoint such officers and retain such employees, consultants, advisors, attorneys, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as the Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Directors permit and as the Directors, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement;

(x)    pay reasonable compensation and expenses to any of the Trust's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as the Trust requires;

(xi)    compensate the Directors, Delaware Trustee, the Trust Protector, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Directors, the Delaware Trustee and the Trust Protector for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)    execute and deliver such instruments as the Directors consider necessary or desirable in administering the Trust;

(xiii)    enter into such other arrangements with third parties as are deemed by the Directors to be advisable or necessary in carrying out the purposes of the Trust; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

(xiv)   in accordance with Section 5.8 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.6(a) below) to the maximum extent permitted by law;

(xv)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 5.6 below; provided that such investment advisors and investment managers shall be in compliance with the Investment Guidelines (as defined in Section 3.2) at all times;

(xvi)   make, join, pursue (by litigation or otherwise), abandon, collect, compromise or settle, or otherwise resolve, in the name of the Trust any claim, right, action or cause of action of the Trust, before any court of competent jurisdiction and without approval of the Court;

(xvii)  contract for the establishment and continuing maintenance of (a) a secure method of internet-based communications for the Trust and the Tribe Beneficiaries as described in Section 6.5 herein (the "**Tribal Opioid Settlement Portal**") and (b) a public-facing website to publish all information required to be published under the Trust Documents (the "**Tribal Opioid Settlement Website**"); and

(xviii) exercise any and all rights of the Directors, and take any and all actions as are permitted, in accordance with and subject to the terms of this Trust Agreement.

(d)     The Directors shall not have the power to cause the Trust to guarantee any debt of other persons.

(e)     Except as otherwise set forth in the Trust Documents and KTSA, but without prior or further authorization, the Directors may control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof.  No person dealing with the Trust shall be obligated to inquire into the authority of the Directors in connection with the protection, conservation or disposition of the Trust Assets.

**Section 2.2     General Administration**.  The Directors shall act in accordance with the Trust Documents.  The mailing address of the Trust is Tribal Abatement Fund Trust VI, P.O.  Box 65097, Washington, DC 20035.  The Directors may change the location of the principal office and may establish other offices at other locations.  The Directors shall provide notice to the Tribe Beneficiaries upon establishment of any office by posting such information in the Tribal Opioid Settlement Portal (or by other means approved by the Directors).

**Section 2.3     Accounting**.  The fiscal year of the Trust shall begin on January 1 and shall end on December 31 of each calendar year.  The Directors shall maintain the books and records relating to the Trust Assets and income and the payment of expenses of and liabilities against the Trust.  The detail of these books and records and the duration of time during which the Directors

shall keep such books and records shall be such as to allow the Directors to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of the Trust, including, without limitation, the assets and liabilities of the Trust as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Directors shall maintain such books and records until the wind-up of the Trust's affairs and satisfaction of all of the Trust's liabilities.

**Section 2.4    Financial Reporting**.  The Directors shall engage a firm of independent certified public accountants (the "Independent Auditors") selected by the Directors, to audit the Annual Report.  Within one hundred twenty (120) days following the end of each calendar year, the Directors shall (a) deliver to the Kroger Settlement Trust the Annual Report audited by the Independent Auditors and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements, and (b) publish a copy of such Annual Report on the Tribal Opioid Settlement Website.

**Section 2.5    Tribal Opioid Abatement Reporting.**

(a)    Within one hundred and twenty (120) days following the end of each calendar year, the Directors shall (i) cause to be prepared and delivered to the Kroger Settlement Trust and to Kroger an annual report on the Approved Tribal Opioid Abatement Uses with respect to such period, together with such additional information as the Directors determine necessary or appropriate in their discretion (each, a "**Tribal Opioid Abatement Report**"), and (ii) post a copy of the Tribal Opioid Abatement Report on the Tribal Opioid Settlement Website.

(b)    For the avoidance of doubt, the Directors shall not be required to include in any TAFT X Tribal Opioid Abatement Report any abatement matters except those that pertain to TAFT X exclusively.

**Section 2.6    Beneficiary Reporting.**

(a)    Reporting of Approved Tribal Opioid Abatement Uses by the Tribe Beneficiaries shall be required to the extent set forth in the TAFT X TDP.  The Directors shall establish the form, content, and due dates of periodic reports with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Tribe Beneficiaries (each, a "**Beneficiary Abatement Use Report**") to the Directors through the Tribal Opioid Settlement Portal (or delivered by other means approved by the Directors).  The Directors may prescribe a modified reporting regime for certain Tribe Beneficiaries based upon appropriate standards to be developed by the Directors, provided such modified reporting regime is not inconsistent with the Trust's reporting obligations, as determined by the Directors in their discretion.  The Directors shall endeavor to implement appropriate mechanisms, in their discretion consistent with the Trust Documents, to obtain efficiency in reporting by Tribe Beneficiaries with respect to TAFT X and other comparable opioid abatement trusts benefitting the Tribe Beneficiaries.  Each Beneficiary Abatement Use Report shall contain the information necessary to:

(i)     enable the Trust to satisfy the audited Annual Report requirements described in Section 2.4 above; and

(ii)    enable the Trust to satisfy the Tribal Opioid Abatement Report requirements described in Section 2.5(a) above.

**Section 2.7     Limitation of the Directors' Authority**.  The Directors are not authorized to engage in any trade or business with respect to the Trust Assets or proceeds therefrom.  The foregoing limitation shall not prevent the Directors from managing the investment of the Trust Assets.

## ARTICLE 3

## ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES

**Section 3.1     Accounts.**

(a)     The Directors shall maintain one or more accounts ("**Trust Accounts**") on behalf of the Trust with one or more financial depository institutions (each, a "**Financial Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the Directors any interest in or relationship with Kroger or a named defendant in MDL No. 2804, their affiliated persons, or any Released Entities.  Any such interest or relationship shall not be an automatic disqualification for the position, but the Directors shall take any such interest or relationship into account in selecting a Financial Institution.

(b)     The Directors may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as they may deem necessary, prudent or useful in order to provide for Abatement Distributions (as defined herein) to the Tribe Beneficiaries and the payment of TAFT X Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**").  Any such Trust Subaccounts established by the Directors shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Code or the Treasury Regulations, or a "disputed ownership fund" within the meaning of the Treasury Regulations, or otherwise.

(c)     The Directors may replace any retained Financial Institution with a successor Financial Institution at any time and such successor shall be subject to the considerations set forth in Section 3.1(a).

**Section 3.2     Investment Guidelines**.  The Directors may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 3** (the "**Investment Guidelines**").  Notwithstanding any contrary provision of the Trust Documents, this Section 3.2 and the Investment Guidelines cannot be modified or amended.

**Section 3.3     Payment of TAFT X Operating Expenses.**  All TAFT X Operating Expenses shall be payable out of the TAFT X Operating Reserve.  None of the Directors, the Delaware Trustee, the Trust Protector, the Tribe Beneficiaries, Kroger, nor any of their employees, officers, consultants, advisors, independent contractors, experts or agents shall be personally liable

for the payment of any TAFT X Operating Expense or any other liability of the Trust.  In their discretion, the Directors may incur and pay TAFT X Operating Expenses after making appropriate allocations of common charges that are incurred for the benefit of TAFT X and other tribal opioid abatement entities created prior to or after the Effective Date (for example, the Tribal Opioid Settlement Website).

## ARTICLE 4

## ABATEMENT DISTRIBUTIONS

**Section 4.1    Abatement Distributions**.    The Directors shall make Abatement Distributions only as and to the extent set forth in this Article 4 and the TAFT X TDP (the "**Abatement Distributions**").  Abatement Distributions shall be used by the Tribe Beneficiaries as described in Section 3 of the TAFT X TDP.

**Section 4.2    Manner of Payment of Abatement Distributions.**

(a)    The Directors shall endeavor to provide ten (10) days' notice to the Tribe Beneficiaries of any upcoming Abatement Distribution through the Tribal Opioid Settlement Portal (or by other means approved by the Directors); provided, however, that the Directors may shorten such notice period in their discretion.

(b)    Abatement Distributions shall be made to Participating Tribes in accordance with the Final Tribal Allocation Distribution Percentages to be set forth on **Exhibit 1** hereto.  Abatement Distributions shall be made to Tribes that become Participating Tribes after the Effective Date in accordance with Section IV.E of the KTSA.

(c)    Abatement Distributions may be made by the Directors or by a disbursement agent retained by the Trust to make Abatement Distributions on its behalf (the "**Disbursement Agent**").  Abatement Distributions shall be made in accordance with the TAFT X TDP on the dates approved for distribution by the Directors.

(d)    The Directors may cause Abatement Distributions to be withheld with respect to any Tribe Beneficiary that has failed to deliver timely a completed Beneficiary Abatement Use Report by the applicable due date.  The Directors shall allow for a reasonable period of time to cure any delinquent Beneficiary Abatement Use Report and may continue to withhold distributions to a Tribe Beneficiary until all such delinquent Beneficiary Abatement Use Reports of such Tribe Beneficiary have been cured.

(e)    If the Directors determine, in their discretion, that making the final Abatement Distribution immediately prior to the termination and dissolution of the Trust is not cost-effective with respect to the final amounts to be distributed to the Tribe Beneficiaries, the Directors shall have the authority to direct such final Abatement Distribution, in full, to a tax- exempt organization that has opioid abatement as part of its mission, such as the National Indian Health Board, as selected by the Directors in their discretion.  The Directors shall instruct the tax- exempt organization to use the Abatement Distribution solely for opioid abatement purposes.

(f)     Notwithstanding the foregoing, the Directors shall cause Trust Assets to revert to Kroger only to the extent required by Section IV.E of the KTSA.

(g)     Prior to disbursing funds to any Participating Tribe, the Directors shall obtain from each Participating Tribe any required payment documentation (including, as needed, wire instructions and W-9 forms).

### Section 4.3     Delivery of Abatement Distributions.

(a)     All Abatement Distributions under this Trust Agreement shall be made (i) in accordance with the electronic transfer information or (ii) by check at the address provided by the Tribe Beneficiaries in accordance with the TAFT X TDP.  Changes to such electronic transfer information or address, as applicable, must be provided to the Trust or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date; provided, however, that the Directors and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the Tribe Beneficiaries regarding the transfer information of Abatement Distributions under this Trust Agreement.

(b)     In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Directors have been notified of the then current wire instructions or address, as applicable, as directed by such Tribe Beneficiary, at which time such distribution shall be made without interest.  The Directors shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any Tribe Beneficiary with respect to which any distribution is undeliverable, but shall have no obligation to make further inquiry with respect to designated recipients of such Tribe Beneficiaries.

(c)     No Trust Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

## ARTICLE 5

## DIRECTORS AND DELAWARE TRUSTEE

### Section 5.1     Number of Directors; Managing Director.

(a)     **Number**.  In addition to the Delaware Trustee appointed pursuant to Section 5.10, there shall be three (3) Directors.  The initial Directors shall be those persons named on the signature page hereof.

(b)     **Managing Director**.  At their first meeting, the initial Directors shall designate one of their number to serve as the Managing Director of the Trust, with such administrative duties as the Directors may determine (the "**Managing Director**").  The Directors may change the designation of the individual to serve as Managing Director from time to time as circumstances warrant.  The Managing Director or, in the Managing Director's absence, another Director selected by the Directors shall preside at meetings of the Directors.  The Managing Director, or the Director presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Directors and for performing such other administrative duties and services as shall be assigned

to or required of the Managing Director by the Directors.  The Managing Director shall maintain a list of current Directors, including their addresses and contact information.

Section 5.2     **Term of Service, Successor Directors.**

(a)     **Term**.  Each Director shall serve until the earlier of (i) his or her death, (ii) his or her resignation or removal pursuant to Section 5.2(c) below, or (IV) the termination of the Trust pursuant to the terms of this Trust Agreement.  The term of a newly appointed Director shall commence upon his or her acceptance as such.

(b)     **Appointment of Successor Directors**.

(i)     In the event of a vacancy in the position of one (1) Director for any reason, the vacancy shall be filled by the unanimous vote of the remaining Directors.  In the event that the remaining Directors cannot agree on a successor Director within thirty (30) days, each of the remaining Directors shall propose a Director candidate and the Trust Protector (as defined in Section 5.12(a) below) shall select one such candidate as the Successor Director.

(ii)     In the event of a vacancy in the position of two (2) Directors for any reason, the remaining Director and the Trust Protector shall, after consultation, jointly appoint two (2) successor Directors, both of whom shall each be acceptable to both of the remaining Director and the Trust Protector.  In the event the remaining Director and the Trust Protector cannot agree on two (2) successor Directors, the selection of two (2) successor Directors shall be resolved in accordance with the dispute resolution provisions of Section 6.14.

(iii)     In the event of a vacancy in the position of three (3) Directors for any reason, the Trust Protector shall recommend three (3) successor Directors for the Delaware Court of Chancery to appoint and any costs relating thereto shall be borne by the Trust.

(iv)     Notice of the appointment of any successor Director(s) shall be filed with the Court and shall be published on the Tribal Opioid Settlement Website when it is filed with the Court.

(v)     In filling any vacancy in the position of one or more Directors, the remaining Director(s) and/or the Trust Protector shall apply the following standard to any successor Director: the successor Director shall be a disinterested, independent individual with experience in one or more of the following areas: public policy/public health, tribal health or welfare, tribal self-determination, administration or self-governance, other tribal affairs, ethics and compliance, finance, general business and/or corporate governance.

(vi)    Immediately upon the appointment of any successor Director(s), all rights, titles, duties, powers and authority of the predecessor Director(s) hereunder shall be vested in, and undertaken by, the successor Director (s) without any further act.  No successor Director(s) shall be liable personally for any act or omission of his or her predecessor Director.  No successor Director shall have any duty to investigate the acts or omissions of his or her predecessor Director.

(c)    **Resignation or Removal**.  A Director may resign by giving written notice to either of the other Directors.  Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable.  A Director may be removed by unanimous vote of the remaining Directors in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, <u>provided</u> such Director has received reasonable notice and an opportunity to be heard by the remaining Directors.    Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to the Trust, any substantial failure to comply with the administration of the Trust or a consistent pattern of neglect and failure to perform or participate in performing the duties of a Director hereunder.  For the avoidance of doubt, any removal of a Director pursuant to this Section 5.2(c) shall require the approval of the Court and shall take effect at such time as the Court shall determine.

### Section 5.3    Directors' Meetings.

(a)    **Regular Meetings**.  The Directors shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined from time to time by the Directors.  For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Directors contemplated by this Section 5.3.

(b)    **Special Meetings**.  Special meetings of the Directors may be called by any Director by giving written notice to each other Director not less than one (1) business day prior to the date of the meeting.  Any such notice shall include the time, place and purpose of the meeting, given to each Director by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication.  Notice shall be addressed or delivered to each Director at the Director's address as shown upon the records of the Trust or as may have been given to Directors by the Director for purposes of notice.  If a Director's address is not shown on such records or is not readily ascertainable, notice to the Director may be given care of the principal office of the Trust.  Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier.  Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    **Action and Quorum**.  In all matters pertaining to the affairs of the Trust, the Directors shall act by a vote of a majority of the number of Directors then in office, which such majority shall constitute a quorum of the Directors for the transaction of business, except to adjourn as provided in Section 5.3(f).

(d)    **Participation in Meetings by Telephone Conference**.  Directors may participate in a meeting of the Directors by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Directors participating in such meeting can hear one another.  Participation by a Director in a meeting pursuant to this Section 5.3(d) shall constitute presence in person at such meeting.

(e)    **Waiver of Notice**.  Notice of a meeting need not be given to any Director who signs a waiver of notice, whether before or after the meeting.  All such waivers shall be filed with the Trust records or made a part of the minutes of the meeting.  Attendance at a meeting by a Director shall constitute a waiver of notice of such meeting except when the Director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any Director meeting need be specified in any waiver of notice.

(f)    **Adjournment**.  A majority of the Directors present, whether or not a quorum exists, may adjourn any Directors meeting to another time and place.

(g)    **Action by Unanimous Written Consent**.  Any action required or permitted to be taken at any meeting of the Directors may be taken without a meeting, if all of the Directors then in office consent thereto in writing or by Electronic Transmission, which writing may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Directors.  As used herein, "**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

**Section 5.4    Compensation and Expenses of Directors**.  The Directors shall receive compensation from the Trust for their services as Directors.  The Trust shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by each Director in the course of carrying out their duties as Directors in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Directors.  The amounts paid to the Directors for compensation and expenses shall be disclosed in the Annual Report.

**Section 5.5    Directors' Independence.**

(a)    The Directors shall not, during their service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for Kroger or a defendant in MDL No. 2804, their affiliated persons, or any Released Entities.  No Director shall act as an attorney for any Tribe in a matter that (i) directly or indirectly relates to claims arising from the use of opioids by any person, or (ii) is directly adverse to the claims of another Tribe.  For the avoidance of doubt, this provision shall not apply to the Delaware Trustee.

(b)    The Directors, and the Delaware Trustee, shall be indemnified by the Trust in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)     Persons dealing with the Trust, the Directors, and the Delaware Trustee with respect to the affairs of the Trust, shall have recourse only to the Trust Assets to satisfy any liability incurred by the Trust, the Directors, or the Delaware Trustee to such person in carrying out the terms of this Trust Agreement, and neither the Directors, the Delaware Trustee, the Tribe Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

**Section 5.6     Standard of Care; Exculpation.**

(a)     As used herein, the term "**Trust Indemnified Party**" shall mean each Director, the Delaware Trustee, the Trust Protector, the Special Master, the Tribal Allocation Appointee, and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals (collectively, the "**Trust Indemnified Parties**").

(b)     To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of the Trust, except those acts found by a final, non-appealable order by a court of competent jurisdiction (a "**Final Order**") to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the KTSA or the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by a Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.  Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Trust.

(c)     To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the Trust or the Tribe Beneficiaries, it is hereby understood and agreed by the Parties hereto and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that, with respect to the Trust Indemnified Parties other than the Delaware Trustee, the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.6 and its subparts.

(d)     The Trust will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties as determined by the Directors in their discretion.

**Section 5.7     Protective Provisions.**

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.7.

(b)      In the event the Directors retain counsel (including at the expense of TAFT X), the Directors shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Directors be deemed to have waived any right or privilege, including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Directors in the performance of duties hereunder.  A successor to any of the Directors shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Tribe Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all Parties.

(c)      To the extent that, at law or in equity, the Directors have duties (including fiduciary duties) and liabilities relating hereto, to the Trust or to the Tribe Beneficiaries, it is hereby understood and agreed by the Parties and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806 of the Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Directors; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.6 herein.

(d)      No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, gross negligence or fraud as determined by a Final Order.

(e)      No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(f)      In the exercise or administration of the Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

## Section 5.8      Indemnification.

(a)      To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the KTSA or the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by a Final Order to be arising out of their willful misconduct, bad faith, gross

negligence or fraud.  Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Trust.

(b)     Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Trust shall be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by a Final Order of the Court that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the Trust.

(c)     The Directors shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Directors, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)     The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified.  Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time.  In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)     The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

Section 5.9     **Bond**.  The Directors and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Court.

### Section 5.10   Delaware Trustee.

(a)     There shall at all times be a Delaware Trustee.  The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity.  The initial Delaware Trustee shall be Wilmington Trust, National Association.  If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.10, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.10(c) below.  For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder.  The Directors shall have no liability for the acts or omissions of any Delaware Trustee.

(b)     The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Directors set forth herein. The Delaware Trustee shall be a trustee of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on the Trust in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to the Trust or the Tribe Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any trustee or any Director. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith, gross negligence or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Directors or any other person pursuant to the provisions of this Trust Agreement unless the Directors or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Directors and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Directors. The Delaware Trustee may, at the expense of the Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)     The Delaware Trustee shall serve until such time as the Directors remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Directors in accordance with the terms of Section 5.10(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Directors; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Directors in accordance with Section 5.10(d) below; provided, further, that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Directors. If the Directors do not act within such sixty (60) -day period, the Delaware Trustee, at the expense of the Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Directors shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor

Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Directors, and any fees and expenses due to the outgoing Delaware Trustee are paid.  Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement.  The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of TAFT X in accordance with Section 3810 of the Act.

(e)  Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the Parties hereto.

(f)  The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between the Trust and the Delaware Trustee, which compensation shall be paid by the Trust.  Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement.  The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)  The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not an original or a copy of such agreement has been provided to the Delaware Trustee.  The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement.  Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for, nor have any duty to monitor, the performance or any action of the Trust, the Directors or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party.  The Delaware Trustee may assume performance by all such persons of their respective obligations.  The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person.  The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)  The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused directly or indirectly by, circumstances beyond its control, including, without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots;

interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

**Section 5.11    Meeting Minutes; Rights of Inspection.**

(a)    The minutes of proceedings of the Directors shall be kept in written form (which may be electronic) at such place or places designated by the Directors, or, in the absence of such designation, at the principal office of the Trust.

(b)    Every Director shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of the Trust.

**Section 5.12    Trust Protector.**

(a)    Notwithstanding any other provision of this Trust Agreement, there shall at all times be one Trust Protector to serve in accordance with the provisions of this Section 5.12.  The Trust Protector shall be a Trust Indemnified Party.  The initial Trust Protector shall be Dean Stacy Leeds.

(b)    Any Trust Protector acting hereunder may resign at any time (i) by delivering written notice thereof to the Directors then serving; provided that notice to one Director shall constitute notice to all Directors then serving, or (ii) if there are no Directors then serving, by delivering written notice to the Delaware Trustee.

(c)    A Trust Protector may be removed for good reason upon the unanimous consent of three (3) Directors then serving; provided, however, if there are less than three (3) Directors then serving, the Trust Protector shall not be removed except upon order of the Court.  If a vacancy in the position of Trust Protector exists for any reason, the Directors may, upon unanimous consent of the Directors then serving, appoint a new Trust Protector.  If the Directors do not appoint a new Trust Protector within thirty (30) days, then the Directors shall petition the Delaware Court of Chancery to appoint a successor Trust Protector to serve and any costs relating to the petition shall be borne by the Trust; provided, however, that if there are no Directors serving at the time of the Trust Protector vacancy, then the Delaware Trustee shall petition the Delaware Court of Chancery as provided above.  At no time may Kroger or any party related to Kroger or its affiliates be eligible to serve as Trust Protector.  A vacancy in the position of Trust Protector shall not limit the Directors from exercising any powers afforded them under the Trust Documents.

(d)    The Trust Protector shall have only the authority set forth in Section 5.2(b), which authority may not be expanded by an amendment or modification of this Trust Agreement.

(e)    The Trust Protector shall exercise the Trust Protector's authority in a fiduciary capacity and in a way that the Trust Protector reasonably believes to be in accordance with the purposes of this Trust Agreement.  The Trust Protector shall not be under any duty to inquire into or ensure the performance by the Directors of their duties and shall not be liable for any loss to such trust (unless such loss results from actions in bad faith or the willful misconduct of the Trust Protector).

(f)     The Directors shall have no liability for the selection of, or exercise of authority by, the Trust Protector.

(g)     The Trust Protector shall be entitled to:

(i)     receive reasonable compensation and reimbursement for reasonable expenses for serving as Trust Protector;

(ii)    retain advisors to advise and assist in carrying out the duties of the Trust Protector and the costs thereof shall be borne by the Trust; and

(iii)   receive and review minutes of the meetings or other actions of the Directors, but only at such time as the Trust Protector is required to act pursuant to Section 5.2(b).

## ARTICLE 6

## GENERAL PROVISIONS

**Section 6.1     Irrevocability**.  To the fullest extent permitted by applicable law, the Trust is irrevocable.  Subject to Section IV.E of the KTSA (regarding when certain funds will revert to Kroger), Kroger shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund the Trust, and (ii) shall not have any rights or role with respect to the management or operation of the Trust, or the Directors' administration of the Trust.

**Section 6.2     Term; Termination.**

(a)     The term for which the Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)     The Trust shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Court approves the dissolution upon the satisfaction of the purposes of the Trust, wherein (i) all reasonably expected assets have been collected by the Trust, (ii) all Abatement Distributions have been made to the extent set forth in Section 4.2(b), (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining Trust obligations and TAFT X Operating Expenses in a manner consistent with the KTSA and the Trust Documents, and (iv) a final accounting has been filed and approved by the Court (the "**Dissolution Date**").

(c)     On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of the Trust's affairs by the Directors and payment of all of the Trust's liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the Trust shall be distributed to the Tribe Beneficiaries in accordance with Section 4.2(b), except as otherwise provided in Section 4.2(e).

(d)     Following the dissolution and distribution of the assets of the Trust, the Trust shall terminate, and the Directors, or any one of them, shall execute and cause a Certificate of

Cancellation of the Certificate of Trust of TAFT X to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.  A certified copy of the Certificate of Cancellation shall be given to the Delaware Trustee for its records promptly following such filing.

### Section 6.3    Taxes.

(a)    The Trust is intended to qualify as one or more "qualified settlement funds" within the meaning of the **QSF Regulations**, and, to the extent permitted under applicable law, for state and local income tax purposes.  Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the TAFT X TDP shall be construed or implemented in a manner that would cause the Trust to fail to qualify as one or more "qualified settlement funds" within the meaning of the QSF Regulations or under corresponding or similar provisions of relevant state or local law.  The Trust shall be treated as a qualified settlement fund from the earliest date possible, and the Parties agree to any relation-back election required to treat the Trust as a qualified settlement fund from the earliest date possible.

(b)    The Managing Director shall be the "administrator" of the Trust within the meaning of Treasury Regulation Section 1.468B-2(k)(3) and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by the Trust out of the Trust Assets, which assets may be sold by the Directors to the extent necessary to satisfy tax liabilities of the Trust, (ii) be responsible for all tax reporting, filing and withholding requirements for the Trust and comply with all applicable tax reporting, filing and withholding obligations, (iii) send copies of any tax filings and returns of the Trust to Kroger, in accordance with the KTSA, (iv) cooperate in the provision of documentation to Kroger in accordance with Section IV.G.2.a of the KTSA, and (v) obtain federal and state taxpayer identification numbers for the Trust and provide the same to the Directors and Kroger.

(c)    Subject to Section 6.3(a) and (b) above and (d) below, following the Effective Date, the Directors shall be responsible for all of the Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings.  Subject to Section IV.G.2.g of the KTSA, the Directors shall be responsible for causing the Trust to satisfy all requirements necessary to maintain qualification of the Trust as one or more "qualified settlement funds" within the meaning of the QSF Regulations and under corresponding or similar provisions of relevant state or local law.  The Directors shall take no action that could cause the Trust to fail to qualify as one or more "qualified settlement funds" within the meaning of the QSF Regulations or under corresponding or similar provisions of relevant state or local law or that is inconsistent with such treatment.

(d)    The "taxable year" of the Trust shall be the "calendar year" as such terms are defined in Section 441 of the Code.  The Trust shall use the accrual method of accounting as defined in Section 446(c) of the Code.

(e)    Notwithstanding anything in this Trust Agreement or the Kroger Tribal Settlement Agreement to the contrary, neither the Directors nor any other person shall on behalf of or in connection with the Trust seek a private letter ruling, technical advice memorandum or any other

ruling or guidance from the Internal Revenue Service or any other taxing authority on any matter without consulting with and obtaining the prior written consent of Kroger.

### Section 6.4    Modification.

(a)    Material modifications to this Trust Agreement may be made only pursuant to an order of the Court; provided, however, that the Directors may amend this Trust Agreement by unanimous consent of the Directors from time to time without the consent, approval or other authorization of, but with notice to, the Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Directors to effectuate the provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing proviso, no amendment or waiver of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Kroger Tribal Settlement Agreement.  The Directors shall provide to the Tribe Beneficiaries notice of any proposed modification to this Trust Agreement, whether material or minor, through the TAFT Portal at the time of notice to the Court and not less than ten (10) business days before such modification becomes effective; provided, however, that the Directors may shorten such notice period only in the event that a ten (10) -day notice period would be materially adverse to the Trust and the Tribe Beneficiaries.  The Directors shall provide Kroger with a copy of any such notice of any proposed modification to this Trust Agreement at the same time as notice is provided to the Tribe Beneficiaries.

(b)    Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize or impair (i) the Trust's status as a "qualified settlement fund" within the meaning of the QSF Regulations or under corresponding or similar provisions of relevant state or local law, or (ii) the rights, duties, liabilities and obligations of the Delaware Trustee without the written consent of the Delaware Trustee.

### Section 6.5    Communications.  The Directors shall establish and maintain the Tribal Opioid Settlement Portal (or other means of communication approved by the Directors) so as to (a) enable Tribe Beneficiaries to deliver the required documentation under the Beneficiary Abatement Use Reports in an electronic format and (b) enable secure communications between the Directors and the Tribe Beneficiaries.

### Section 6.6    Severability.  If any provision of this Trust Agreement or application thereof to any person or circumstance shall be determined by a Final Order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

### Section 6.7    Notices.

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by

email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Directors:

Dr.  Kathy Hopinkah Hannan
Tribal Abatement Fund Trust VI
P.O.  Box 65097
Washington, DC 20035
Email: Directors@tribalopioidsettlements.com

Mary L.  Smith
Tribal Abatement Fund Trust VI
P.O.  Box 65097
Washington, DC 20035
Email: Directors@tribalopioidsettlements.com

Kevin Washburn
Tribal Abatement Fund Trust VI
P.O.  Box 65097
Washington, DC 20035
Email: Directors@tribalopioidsettlements.com

with a copy (which shall not constitute notice) to:

Brown Rudnick LLP
7 Times Square
New York, NY 11036
Attn:   David J. Molton, Esq.,
        Barbara J. Kelly, Esq.
Email:  dmolton@brownrudnick.com,
        bkelly@brownrudnick.com

To the Delaware Trustee:

Wilmington Trust, N.A.
1100 North Market Street
Wilmington, DE 19890
Attn: Russell L.  Crane
Email: rcrane@wilmingtontrust.com

with a copy (which shall not constitute notice) to:

Morris James, LLP
500 Delaware Avenue,
Suite 1500
Wilmington, DE 19801
Attn: Ross Antonacci, Esq.
Email: RAntonacci@morrisjames.com

To the Trust Protector:

Stacy Leeds
c/o Leeds Consulting LLC
11177 N.  Highway 10
Tahlequah, OK 74464

with a copy (which shall not constitute notice) to:

Brown Rudnick LLP
7 Times Square
New York, NY 11036
Attn:   David J. Molton, Esq.,
        Barbara J. Kelly, Esq.
Email: dmolton@brownrudnick.com,
        bkelly@brownrudnick.com

To Kroger:

Toney Matthews
Senior Litigation Counsel
1014 Vine St, Cincinnati, Ohio, 45202
Telephone:  (513) 762-4623
Email:  toney.matthews@kroger.com

with a copy to Kroger's attorneys at:

Chantale Fiebig
Weil, Gotshal & Manges LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Chantale.fiebig@weil.com

(b)     All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

**Section 6.8     Successors and Assigns**.  The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Trust, the Directors, the Delaware Trustee and their

respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Trust Agreement except, in the case of the Directors, as contemplated by Section 2.1 and Section 5.2 above, and in the case of the Delaware Trustee, as contemplated by Section 5.10 above.

**Section 6.9      Limitation on Transferability; Tribe Beneficiaries' Interests**.  Tribe Beneficiaries' interests in the Trust shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, and any purported assignment, conveyance, pledge or transfer shall be null and void *ab initio*; provided, however, that nothing set forth in this Trust Agreement shall be deemed to preclude Tribe Beneficiaries from directing their Abatement Distribution to a tribal organization or an inter-tribal consortium or from aggregating their Abatement Distributions or otherwise directing their Abatement Distributions for common Approved Tribal Opioid Abatement Uses and/or common Tribal Abatement Strategies; (b) be evidenced by a certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of the Trust or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of a Director, whether by petition to the Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on Abatement Distributions; nor (g) give rise to any rights to seek a partition or division of the Trust Assets.  In accordance with the Act, Tribe Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, Tribe Beneficiaries shall have an undivided beneficial interest only in cash assets of the Trust but only to the extent such cash assets are declared by the Directors to be distributable as Abatement Distributions in accordance with the Trust Documents.  For the avoidance of doubt, Tribe Beneficiaries shall only have such rights as expressly set forth in this Trust Agreement.

**Section 6.10    Exemption from Registration**.  The Parties hereto intend that the rights of the Tribe Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws.

**Section 6.11    Entire Agreement; No Waiver**.  The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof.  No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**Section 6.12    Headings**.  The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**Section 6.13    Governing Law**.  This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction.  For the avoidance of doubt, none of the following provisions of Delaware law shall apply to the extent

inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for Directors, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to Directors, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding Trust Assets, (g) the existence of rights or interests (beneficial or otherwise) in Trust Assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of Directors or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Directors set forth or referenced in this Trust Agreement.  Section 3540 of Title 12 of the Act shall not apply to the Trust.

**Section 6.14   Dispute Resolution**.  The KTSA shall govern the resolution of any dispute under this Trust Agreement.

**Section 6.15   Sovereign Immunity**.  Nothing set forth in the Trust Documents shall be construed as a waiver of a claim of sovereign immunity in any dispute resolution, action or proceeding, including, without limitation, any dispute resolution, action or proceeding occurring after the Effective Date.

**Section 6.16   Effectiveness**.  This Trust Agreement is effective as of the Effective Date.

**Section 6.17   Counterpart Signatures**.  This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.  A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

*[Signature Pages to TAFT X Agreement follow]*

**EXHIBIT 1**

**PARTICIPATING TRIBES and FINAL TRIBAL ALLOCATION
DISTRIBUTION PERCENTAGES**

*[Reserved – to be added post-Effective Date]*

**EXHIBIT 2**

**FORM OF CERTIFICATE OF TRUST OF THE**
**TRIBAL ABATEMENT FUND TRUST VI**

This Certificate of Trust of the TRIBAL ABATEMENT FUND TRUST X (the "*Trust*") is being duly executed and filed by the undersigned Directors of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del.  Code § 3801 *et seq.)* (the "*Act*").

1.　　Name.  The name of the statutory trust formed hereby is: TRIBAL ABATEMENT FUND TRUST X

2.　　Delaware Trustee.  The name and business address of the Delaware Trustee of the Trust in the State of Delaware is: [[To be added]]

3.　　Effective Date.  This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

TRUSTEES:　　　　　　　　　　　　DELAWARE TRUSTEE:


in his/her capacity as a trustee and not　　By: _____
individually.
　　　　　　　　　　　　　　　　　　　　Name:
　　　　　　　　　　　　　　　　　　　　Title:


in his/her capacity as a trustee and not
individually.


in his/her capacity as a trustee and not
individually.

**EXHIBIT 3**

**INVESTMENT GUIDELINES**

<u>**In General**</u>.  Only the following investments will be permitted:

       (i)     Demand and time deposits, such as certificates of deposit, in banks or other savings institutions whose deposits are federally insured;

       (ii)    U.S. Treasury bills, bonds, and notes, including, but not limited to, long-term U.S. Treasury bills, bonds, notes, and other Government Securities as defined under Section 2(a)(16) of the Investment Company Act of 1940, 15 U.S.C. § 80a-2(a)(16), including, but not limited to, Fannie Mae, Freddie Mac, Federal Home Loan Bank, and Federal Farm Credit;

       (iii)   Repurchase agreements for U.S. Treasury bills, bonds, and notes;

       (iv)   Commercial Paper (rated A1/P-1 by Standard & Poor's and Moody's);

       (v)    AA or AAA corporate bonds (with the rating awarded by at least two of the three major rating agencies (Standard & Poor's, Moody's, or Fitch)); or

       (vi)   Open-ended mutual funds owning only assets described in subparts (i) through (v) of this subsection.

The value of bonds of any single company and its affiliates owned by the Trust directly rather than through a mutual fund shall not exceed 10% of the investment portfolio at time of purchase; this restriction does not apply to any of the following: Repurchase Agreements; Money Market Funds; U.S. Treasuries; and U.S. Government Agencies.

Any such investments shall be made consistently with the Uniform Prudent Investor Act. The determination of the rating of any investments shall be made by the Trust's financial advisor on the date of acquisition of any such investment or on the date of re-investment.  The Trust's financial advisor shall reconfirm that all investments of Trust Assets still meet the original rating requirement on a quarterly basis.  If the Trust's financial advisors determine that any particular investment no longer meets the rating requirement, there shall be a substitution of that investment with an investment that meets the ratings requirement as promptly as practicable, but in no event later than the next reporting period.  Previously purchased securities downgraded below AA may be held for a reasonable and prudent period of time if the Trust's financial advisor believes it is in the interest of the Trust to do so.

The borrowing of funds or securities for the purpose of leveraging, shorting, or other investments is prohibited.  Investment in non-U.S. dollar denominated bonds is prohibited.  The standing default investment instruction for all cash in any account or subaccount that holds any Trust Assets in cash shall be invested in the BlackRock Fed Fund (CUSIP 09248U700).

See example fund-level requirements table on following page.

**Fund Level Requirements**

1.      OTC Derivatives Counterparty Exposure – Not allowed

2.      Non-U.S. dollar denominated bonds – Not allowed

| TYPE OF INVESTMENT | ELIGIBLE | PROHIBITED | COMMENTS |
|---|---|---|---|
| U.S. Treasury Securities | X | | |
| U.S. Agency Securities | X | | |
| Mortgage-Related Securities | | x | |
| Asset-Backed Securities | | x | |
| Corporate Securities (public) | X | | |
| Municipal bonds | X | | |
| | | | |
| **DERIVATIVES:** | No investment, including futures, options and other derivatives, may be purchased if its return is directly or indirectly determined by an investment prohibited elsewhere in these guidelines. | | |
| Futures | | x | |
| Options | | x | |
| Currency Forwards | | x | |
| Currency Futures | | x | |
| Currency Options | | x | |
| Currency Swaps | | x | |
| Interest Rate Swaps | | x | |
| Total Return Swaps | | x | |
| Structured Notes | | X | |
| Collateralized Debt Obligations | | x | |
| Credit Default Swaps | | X | |
| Mortgage-Related Derivatives | | X | |
| | | | |
| **FOREIGN / NON-U.S. DOLLAR:** | | | |
| Foreign CDs | | X | |
| Foreign U.S. Dollar Denominated Securities | | X | |
| Non-U.S. Dollar Denominated Bonds | | X | |
| Supranational U.S. Dollar Denominated Securities | | X | |
| | | | |
| **COMMINGLED VEHICLES (except STIF):** | | | |
| Collective Funds | | X | |
| Commingled Trust Funds (open ended mutual funds only) | | X | |
| Common Trust Funds | | X | |
| Registered Investment Companies | | X | |
| | | | |
| **MONEY MARKET SECURITIES:** | | | |
| Qualified STIF | | x | |
| Interest Bearing Bank Obligations Insured by a Federal or State Agency | X | | |
| Commercial Paper | | x | |
| Master Note Agreements and Demand Notes | | x | |
| Repurchase Agreements | | x | |

| TYPE OF INVESTMENT | ELIGIBLE | PROHIBITED | COMMENTS |
|---|---|---|---|
|  |  |  |  |
| **OTHER:** |  |  |  |
| Bank Loans |  | x |  |
| Convertibles (e.g., Lyons) |  | x |  |
| Municipal Bonds | X |  |  |
| Preferred Stock |  | x |  |
| Private Placements (excluding 144A) | X |  |  |
| Rule 144A Issues | X |  |  |
| Zero Coupon Bonds | X |  |  |
| Commodities |  | X |  |
| Catastrophe Bonds |  | X |  |

**EXHIBIT 4**

**TRIBAL ABATEMENT FUND TRUST X**
**TRUST DISTRIBUTION PROCEDURES**

| Issue | Description |
|---|---|
| 1. **APPLICABILITY OF AGREEMENT** | These terms shall apply to the consideration received and distributed by (A) the Tribal Abatement Fund Trust X ("**TAFT X**") under the Kroger Tribal Settlement Agreement between the Tribal Leadership Committee ("**TLC**"), Participating Tribes,[5] and Kroger dated July 17, 2024 ("**Kroger Tribal Settlement Agreement**"), entered into in connection with the matter of *In re National Prescription Opiate Litigation*, MDP No. 2804, Case No. 17-md-2804 in the United States District Court for the Northern District of Ohio (the "**Court**"); and (B) any trust where the terms of such trust agreement expressly adopt these Tribal Opioid Litigation Settlement Trust Distribution Procedures ("**TDP**") (each of (A) and (B), a "**Tribe Trust**" and collectively, the "**Tribe Trusts**"). |
| | The Tribe Trusts shall benefit the Tribe Beneficiaries to the extent set forth in the respective trust agreement of the Tribe Trust (with all applicable exhibits and schedules, each a "**Trust Agreement**" and collectively, the "**Trust Agreements**"). |
| | The distributions made pursuant to this TDP are the exclusive distributions that will be made by the Tribe Trusts and the Tribe Beneficiaries will have no further or other recourse against any party other than what is provided for under this TDP. |
| | The terms set forth herein will be deemed incorporated into the Trust Agreements, *provided*, *however*, each Trust Agreement may have a unique **Schedule T** for allocation of distributions among Tribes. |
| | These terms set forth the manner in which the Tribe Trusts shall make Abatement Distributions to the Tribe Beneficiaries, which may be used exclusively on the parameters set forth herein. |
| 2. **PURPOSE** | These TDPs are intended to establish the mechanisms for the distribution and allocation of funds distributed by the Tribe Trusts to the Tribe Beneficiaries. All such funds described in the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the |

---

[5] Capitalized terms used but not herein defined shall have the meaning ascribed to them in the Kroger Tribal Settlement Agreement or the TAFT X Trust Agreement, as applicable.

| Issue | Description |
|---|---|
| | terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe Beneficiary, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under the Trust Agreements shall be used by Tribe Beneficiaries for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund administrative expenses incurred in connection with the spending of Abatement Funds for Approved Tribal Opioid Abatement Uses ("**Approved Administrative Expenses**," and, together with the Approved Tribal Opioid Abatement Uses, "**Approved Uses**").<br><br>For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe Beneficiary, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>The Tribe Trusts shall distribute Abatement Funds to Tribe Beneficiaries for Approved Uses.<br><br>Notwithstanding anything in these TDPs that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribe Beneficiaries, tribal organizations, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3. DISBURSEMENT OF ABATEMENT DISTRIBUTIONS** | The trustees under each Trust Agreement shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on the applicable **Schedule T**. Each Trust Agreement may have its own unique **Schedule T**. |
| **4. ATTORNEYS' FEES AND COSTS FUND** | Reserved. |
| **5. TRIBAL ABATEMENT FUNDING** | 2. The Tribe Beneficiaries will use funds received from the Tribe Trusts for programs on the approved list of abatement strategies (see Schedule B) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the |

| Issue | Description |
|---|---|
| | judgment of a Tribe Beneficiary, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.  A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as Schedule D (the "**Tribal Abatement Strategies**").    The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities. |
| | 3.  The Tribe Beneficiaries agree that Abatement Funds distributed pursuant to the Trust Agreements shall be used to abate the opioid crisis in accordance with the terms of these TDPs. |
| **6.  COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY** | 1.  The trustees of the Tribe Trusts shall impose appropriate reporting requirements on the Tribe Beneficiaries to ensure that Abatement Funds are used only for Approved Uses.  The trustees may authorize modified reporting requirements for Tribe Beneficiaries with allocations below a certain level. |
| | 2.  The Tribe Trusts shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in the Trust Agreements. |
| | 3.  The Court shall have continuing jurisdiction over the Tribe Trusts, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Tribe Trusts. |
| | 4.  The trustees shall have the power to take any and all actions that in the judgment of the trustees are necessary or proper to fulfill the purposes of the Trust Agreements, including the requirement that 100% of the Abatement Funds distributed shall be used to abate the opioid crisis in accordance with the terms hereof. |
| | 5.  Notwithstanding any other provision of these TDPs, the trustees of the Tribe Trusts shall implement these TDPs in accordance with the Indian Self-Determination and Education |

| Issue | Description |
|-------|-------------|
|       | Assistance Act of 1975, 25 U.S.C.  5301 *et seq.*  and, for the avoidance of doubt, a Tribe Beneficiary, tribal organization or inter-tribal consortium may charge its federally- approved indirect cost rate consistent with such Act with respect to opioid abatement programs carried out by such Tribe Beneficiary, tribal organization or inter-tribal consortium. |

**Schedule B**

**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

<div style="border:1px solid">

PART ONE: TREATMENT

</div>

**A.**    **TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[6]:

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

---

[6] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

7. Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8. Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11. Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

**B.** **SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2. Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.      Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.      Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.      Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.      Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.      Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.      Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.     Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.     Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.     Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.     Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.     Create and/or support recovery high schools.

15.     Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

C.    **CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.    Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.    Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.    Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.    Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.    Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.    Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.    Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.    Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.   Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.   Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

**D.**    **ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    1. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

    2. Active outreach strategies such as the Drug Abuse Response Team (DART) model;

    3. "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    4. Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

    5. Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

    6. Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.      Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.      Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

**E.      ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.     Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.     Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.     Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.     Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.     Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.     Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.     Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10.    Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

PART TWO: PREVENTION

**F.     PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.      Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.      Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.      Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.      Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

      1.      Increase the number of prescribers using PDMPs;

      2.      Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

      3.      Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.      Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.      Increase electronic prescribing to prevent diversion or forgery.

8.      Educate Dispensers on appropriate opioid dispensing.

## G.    **PREVENT MISUSE OF OPIOIDS**

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund media campaigns to prevent opioid misuse.

2.      Corrective advertising or affirmative public education campaigns based on evidence.

3.      Public education relating to drug disposal.

4.      Drug take-back disposal or destruction programs.

5.      Fund community anti-drug coalitions that engage in drug prevention efforts.

6.     Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.     Engage non-profits and faith-based communities as systems to support prevention.

8.     Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.     School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.     Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.     Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.     Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

**H.**     **PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)**

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.     Public health entities providing free naloxone to anyone in the community.

3.     Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.    Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.    Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.    Public education relating to emergency responses to overdoses.

7.    Public education relating to immunity and Good Samaritan laws.

8.    Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.    Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.   Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.   Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.   Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.   Support screening for fentanyl in routine clinical toxicology testing.

---

PART THREE: OTHER STRATEGIES

---

I.    **FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1.    Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.    Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

J.   **LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.   Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.   A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.   Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.   Provide resources to staff government oversight and management of opioid abatement programs.

K.   **TRAINING**

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.   Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.   Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

L.   **RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1.      Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.      Research non-opioid treatment of chronic pain.

3.      Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.      Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.      Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.      Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g.  Hawaii HOPE and Dakota 24/7).

7.      Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.      Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.      Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

**Schedule D**

**Tribal Abatement Strategies**

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions.  Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves.  The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe may utilize its share of Abatement Funds.

1.     **Traditional Activities Associated with Cultural Identity and Healing**

   Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction.  These can include, for example:

   - Utilization of traditional healers and spiritual and traditional approaches to healing;

   - Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;

   - Talking circles;

   - Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;

   - Cultural and linguistic immersion programs.

   These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

      Example:  Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research.  Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing.  In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

      Example:  Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder.  Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2.      **Culturally Competent Integrated Treatment Models**

Example:  The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use disorder (OUD).  Didgʷálič provides a full array of medical and social services, utilizing a model of care that centers on and incorporates the Tribe's culture and values.  The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example:  The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction.  In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights.

The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3.      **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI).  It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths- based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture.  It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them.  By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders.  This framework

functions alongside western and medical practices to help individuals overcome their addictions permanently.

**4.      Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for Yurok families suffering from opioid abuse problems.  The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources and expertise of both systems.  It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

**5.      Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people.  Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology.  As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

Example: Part of the Swinomish Tribe's Didgʷálič treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers.

**EXHIBIT E**

**Tribal Participation Form**
**(Kroger Settlement)**

| | |
|---|---|
| Tribal Entity: | |
| Authorized Official: | |
| Address 1: | |
| Address 2: | |
| City, State, Zip: | |
| Phone: | |
| Email: | |

The tribal entity identified above ("**Tribe**"), in order to obtain and in consideration for the benefits provided to the Tribe pursuant to the Kroger Tribal Settlement Agreement dated July 17, 2024 ("**Kroger Settlement**"), and acting through the undersigned authorized official, is an "Eligible Entity" as defined in the Kroger Settlement, and hereby elects to participate in the Kroger Settlement as a "Participating Tribe" as defined by the Kroger Settlement, release all Released Claims against all Released Entities, and agrees as follows.

1. The Tribe is aware of and has reviewed the Kroger Settlement, understands that all terms in this Tribal Participation Form ("Form") have the meanings defined therein, and agrees that by this Form, the Tribe elects to participate in the Kroger Settlement and become a Participating Tribe as provided therein.

2. The Tribe agrees to the terms of the Kroger Settlement pertaining to Tribes as defined therein.

3. By agreeing to the terms of the Kroger Settlement and becoming a Releasor, the Tribe is entitled to the benefits provided therein, including, if applicable, monetary payments beginning after the Effective Date.

4. The Tribe agrees to use any monies it receives through the Kroger Settlement solely for the purposes provided therein.

5. By signing this Participation Form, the Tribe agrees that, pursuant to the Kroger Settlement, Special Master David Cohen as Tribal Allocation Appointee will determine the final inter-tribal allocation according to the terms of the Settlement.

6. The Tribe agrees that any disputes arising out of this Agreement shall be heard before Special Master David Cohen as the arbitrator designated by the parties in the Kroger Settlement to resolve disputes through binding arbitration.

7. The Tribe has the right to enforce the Kroger Settlement as provided therein.

8. The Tribe, as a Participating Tribe, hereby becomes a Releasor for all purposes in the Kroger Settlement, including but not limited to all provisions of Section II (Release), and

along with all departments, agencies, divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, and any person in their official capacity elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, and any other entity identified in the definition of Releasor, provides for a release to the fullest extent of its authority.  As a Releasor, the Tribe hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever.  The releases provided for in the Kroger Settlement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of each Releasor to release claims.  The releases shall be a complete bar to any Released Claim.

9.     In connection with the releases provided for in the Kroger Settlement, each Tribe expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

**General Release; extent.**  A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

10.    A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Participating Tribe (for itself and its Releasors) hereby expressly waives and fully, finally, and forever settles, releases, and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Participating Tribes' decision to enter into the Kroger Settlement or the Participating Tribes' decision to participate in the Kroger Settlement.

11.    Within 30 days of signing the Tribal Participation Form, and prior to the Effective Date set forth in the Kroger Settlement, the Tribe shall cease all litigation activity and provide to Special Master Cohen and his TLC designee a dismissal with prejudice of any Released Claims that it has filed.  Upon the Effective Date, the with-prejudice dismissals shall be provided to Kroger with a stipulation for filing.

12.    Nothing herein is intended to modify in any way the terms of the Kroger Settlement, to which Tribe hereby agrees.  To the extent this Form is interpreted differently from the Kroger Settlement in any respect, the Kroger Settlement controls.

I have all necessary power and authorization to execute this Form on behalf of the Tribe.

Signature: _____

Name: _____

Title: _____

Date: _____

## EXHIBIT F

Released Entities

84.51 HQ Building Company, LLC [Ohio]
84.51 LLC [Ohio]
AD-RX Pharmacy
Alpha Beta Company [California]
America's Beverage Company
Ansonborough Square Investors I, LLC [Delaware]
Ansonborough Square Retail, LLC [South Carolina]
Ascent Health Services LLC [Delaware]
Axium Healthcare Pharmacy Puerto Rico
Axium Ocoee Pharmacy, LLC
Baker's
Baker's Supermarkets
Bay Area Warehouse Stores, Inc.  [California]
Beech Tree Holdings, LLC [Delaware]
Bleecker Ventures LLC [New York]
Bluefield Beverage Company [Ohio]
Box Cutter, Inc.  [New York]
Cala Co.  [Delaware]
Cala Foods, Inc.  [California]
CB&S Advertising Agency, Inc.  [Oregon]
Cheeses of All Nations, Inc.  [New York]
Chef's Choice Catering
City Market
City Market Fuel Center
City Market Pharmacy
Columbus Central Fill
Country Oven Bakery
Country Oven, Inc.  [Ohio]
Crawford Stores, Inc.  [California]
Creedmoor Retail, LLC [North Carolina]
Crossroad Farms Dairy
Dillon Companies, LLC [Kansas]
Dillon Real Estate Co., Inc.  [Kansas]
Dillons
Dillons Marketplace
Dillons Pharmacy
Distribution Trucking Company [Oregon]
Dotto, Inc.  [Indiana]
Edgewood Plaza Holdings, LLC [Ohio]
Embassy International, Inc.  [Ohio]
Econdisc Contracting Solutions, LLC [Delaware]
Farmacia Doral, Inc.  [Puerto Rico]

FM, Inc. [Utah]
FMJ Ecommerce
FMJ, Inc.  [Delaware]
Food 4 Less
Food 4 Less GM, Inc.  [California]
Food 4 Less Holdings, Inc.  [Delaware]
Food 4 Less Merchandising, Inc.  [California]
Food 4 Less Midwest
Food 4 Less of California, Inc.  [California]
Food 4 Less of Southern California, Inc.  [Delaware]
Foods Co.
Foods Plus
Fred Meyer
Fred Meyer Cork & Tap
Fred Meyer Fuel Center
Fred Meyer Fuel Stop
Fred Meyer Jewelers
Fred Meyer Jewelers Mail Order
Fred Meyer Jewelers, Inc.  [California]
Fred Meyer Pharmacy
Fred Meyer Stores, Inc.  [Ohio]
Fred Meyer, Inc.  [Delaware]
fredmeyerjewelers.com
Fresh Distribution Services LLC [Ohio]
Fry's Food Stores
Fry's Marketplace
Fry's Mercado
Gene Maddy Drugs
Gerbes Supermarkets
Glasswing Labs LLC [Ohio]
Glendale/Goodwin Realty I, LLC [Ohio]
Grubstake Investments, LLC [Oregon]
Harris Teeter
Harris Teeter Properties, LLC [North Carolina]
Harris Teeter Supermarkets, Inc.  [North Carolina]
Harris Teeter, LLC [North Carolina]
Harris-Teeter Services, Inc.  [North Carolina]
Healthy Options Inc.  [Delaware]
Henpil, Inc.  [Texas]
Home Chef
Hood-Clayton Logistics LLC [Georgia]
HT Fuel DE, LLC [Delaware]
HT Fuel NC, LLC [North Carolina]
HT Fuel SC, LLC [South Carolina]
HT Fuel VA, LLC [Virginia]
HTGBD, LLC [North Carolina]

HTP Bluffton, LLC [North Carolina]
HTP Plaza LLC [North Carolina]
HTP Relo, LLC [North Carolina]
HTPS, LLC [North Carolina]
HTTAH, LLC [North Carolina]
Hughes Markets, Inc.  [California]
Hughes Realty, Inc.  [California]
I.T.A., Inc.  [Wisconsin]
Inter American Products, Inc.  [Ohio]
Inter-American Foods, Inc.  [Ohio]
Inter-American Products
IRP, LLC [Wisconsin]
ITAC 119, LLC [North Carolina]
ITAC 265, LLC [North Carolina]
J.V.  Distributing, Inc.  [Michigan]
JayC Food Stores
Jondex Corp.  [Wisconsin]
Jubilee Carolina, LLC [North Carolina]
K.  B.  Specialty Foods
KCDE – 2013, LLC [Ohio]
KCDE-2 LLC [Ohio]
KCDE-3 LLC [Ohio]
KCDE-4 LLC [Ohio]
KCDE-5 LLC [Ohio]
KDL
Kee Trans, Inc.  [Wisconsin]
Kenlake Foods
Kentucky Distribution Center
Kessel Food Markets
Kessel Pharmacies
Kettle Merger Sub, Inc.  [Delaware]
KGO LLC [Ohio]
King Soopers
King Soopers Fresh Fare
King Soopers Fuel Center
King Soopers Marketplace
Kiosk Medicine Kentucky, LLC [Kentucky]
Kiosk Medicine Kentucky.  PSC
Kirkpatrick West Retail, LLC [Virginia]
Kitchen 1883
KPF, LLC [Delaware]
KPS, LLC [Ohio]
KRGP LLC [Ohio]
KRLP Inc.  [Ohio]
Kroger
Kroger Community Development Entity, LLC [Ohio]

Kroger Dedicated Logistics Co.  [Ohio]
Kroger Fresh Fare
Kroger Fulfillment Network, LLC [Ohio]
Kroger G.O.  LLC [Ohio]
Kroger Health Navigator LLC [Ohio]
Kroger HQ LLC [Ohio]
Kroger Limited Partnership I [Ohio]
Kroger Limited Partnership II [Ohio]
Kroger LM Real Estate Holdings, LLC [Ohio]
Kroger Management – Corryville, LLC [Ohio]
Kroger Management – NMTC Athens I, LLC [Ohio]
Kroger Management – NMTC Champaign I, LLC [Ohio]
Kroger Management – NMTC Champaign II, LLC [Ohio]
Kroger Management – NMTC Cincinnati I, LLC [Ohio]
Kroger Management – NMTC Danville I, LLC [Ohio]
Kroger Management – NMTC Logansport I, LLC [Ohio]
Kroger Management – NMTC Missouri I, LLC [Ohio]
Kroger Management – NMTC Olney I, LLC [Ohio]
Kroger Management – NMTC Omaha I, LLC [Ohio]
Kroger Management – NMTC Portsmouth I, LLC [Ohio]
Kroger Management Co.  [Michigan]
Kroger Marketplace
Kroger MC Holdings, LLC [Ohio]
Kroger MTL Management, LLC [Ohio]
Kroger NMTC Fremont I, LLC [Ohio]
Kroger Opportunity Fund I, Inc.  [Ohio]
Kroger OZ1 Inc.  [Ohio]
Kroger OZ1 LLC [Ohio]
Kroger OZ2 Inc.  [Ohio]
Kroger OZ2 LLC [Ohio]
Kroger OZ3 LLC [Ohio]
Kroger OZ3 Inc.  [Ohio]
Kroger Pharmacy
Kroger Prescription Plans, Inc.  [Ohio]
Kroger Specialty Infusion AL
Kroger Specialty Infusion AL, LLC [Alabama]
Kroger Specialty Infusion CA
Kroger Specialty Infusion CA, LLC [California]
Kroger Specialty Infusion FL 2
Kroger Specialty Infusion Holdings, Inc.  [Delaware]
Kroger Specialty Infusion TX
Kroger Specialty Infusion TX, LLC [Texas]
Kroger Specialty Pharmacy CA
Kroger Specialty Pharmacy CA 2, LLC
Kroger Specialty Pharmacy CA 3
Kroger Specialty Pharmacy CA 4

Kroger Specialty Pharmacy CA, LLC [Delaware]
Kroger Specialty Pharmacy FL
Kroger Specialty Pharmacy FL 2 LLC [Delaware]
Kroger Specialty Pharmacy Holdings 2, Inc.  [Delaware]
Kroger Specialty Pharmacy Holdings 3, Inc.  [Delaware]
Kroger Specialty Pharmacy Holdings I, Inc.  [Delaware]
Kroger Specialty Pharmacy Holdings, Inc.  [Delaware]
Kroger Specialty Pharmacy LA
Kroger Specialty Pharmacy LA, LLC [Louisiana]
Kroger Specialty Pharmacy MS
Kroger Specialty Pharmacy Puerto Rico
Kroger Specialty Pharmacy TX
Kroger Specialty Pharmacy, Inc.  [Florida]
Kroger Texas L.P.  [Ohio]
KV Anderson, LLC [Delaware]
Latta Village, LLC [North Carolina]
LCGP3 Home Cooking, Inc.  [Delaware]
Littman Jewelers
littmanjewelers.com
Local Mkt LLC [Ohio]
Main & Vine LLC [Ohio]
Main Street Spirits LLC [Ohio]
Mariano's
Mariano's Pharmacy
Matthews Property 1, LLC [North Carolina]
Mega Marts, LLC [Wisconsin]
Metro Market
Michigan Dairy
Michigan Dairy, L.L.C.  [Michigan]
ModernHEALTH Specialty (AD-RX), LLC
Murray's Cheese
Murray's Cheese Bar
Murray's Cheese LLC [Ohio]
Murray's LIC LLC [New York]
Murray's Table
Murray's Table LLC [New York]
Owen's Supermarket
Pace Dairy Foods Company [Ohio]
Pace Dairy of Indiana
Paramount Logistics, LLC [Ohio]
Pay Less Super Markets
Pay Less Super Markets, Inc.  [Indiana]
Peyton's Fountain
Peyton's Phoenix
Peyton's Mid-South Company
Peyton's Northern

Peyton's Southeastern
Peyton's-Southeastern, Inc.  [Tennessee]
Pick 'n Save
Plum Labs LLC [Ohio]
Pontiac Foods, Inc.  [South Carolina]
Postal Prescription Services
Q20 Pub
QFC
QFC Cork & Tap
QFC Fuel Station/Center
QFC Fuel Stop
Quality Food Centers
Queen City Assurance, Inc.  [Vermont]
Ralphs
Ralphs Fresh Fare
Ralphs Grocery Company [Ohio]
RBF, LLC [Wisconsin]
RCK Foods
Relish Labs LLC [Delaware]
Retail Procurement Alliance LLC [Delaware]
RGC Southeast Properties LLC [Ohio]
Rocket Newco, Inc.  [Texas]
Roundy's Acquisition Corp.  [Delaware]
Roundy's Illinois, LLC [Wisconsin]
Roundy's Supermarkets, Inc.  [Wisconsin]
Roundy's, Inc.  [Delaware]
Ruler Foods
Second Story, Inc.  [Washington]
Shop-Rite, LLC [Wisconsin]
Smith's Beverage of Wyoming, Inc.  [Wyoming]
Smith's Express
Smith's Food & Drug
Smith's Food & Drug Centers, Inc.  [Ohio]
Smith's Fuel Centers
Smith's Marketplace
Stallings Investors I, LLC [North Carolina]
Sunrise R&D Holdings, LLC [Ohio]
Sunrise Technology LLC [Ohio]
Swan Island Dairy
The Kroger Co.
The Kroger Co.  of Michigan [Michigan]
The Little Clinic
The Little Clinic LLC [Delaware]
The Little Clinic Management Services LLC [Delaware]
The Little Clinic of Arizona LLC [Delaware]
The Little Clinic of Colorado LLC [Delaware]

The Little Clinic of Florida LLC
The Little Clinic of Georgia LLC
The Little Clinic of IN LLC [Delaware]
The Little Clinic of Kansas LLC [Delaware]
The Little Clinic of MI, LLC
The Little Clinic of Michigan LLC [Delaware]
The Little Clinic of Mississippi LLC [Delaware]
The Little Clinic of Ohio LLC [Ohio]
The Little Clinic of Oregon LLC
The Little Clinic of Tennessee LLC [Delaware]
The Little Clinic of Texas LLC
The Little Clinic of TX LLC [Delaware]
The Little Clinic of VA LLC [Delaware]
The Little Clinic of Virginia LLC
The Little Clinic of Washington LLC [Delaware]
TLC Corporate Services LLC [Delaware]
TLC Immunization Clinic LLC [Delaware]
TLC of Georgia LLC [Delaware]
TLC of MI, LLC [Michigan]
TLC Physician Services of Texas, Inc.
Topvalco, Inc.  [Ohio]
Ultimate Mart, LLC [Wisconsin]
Ultra Mart Foods, LLC [Wisconsin]
Vandervoort Dairy Foods Company
Vine Court Assurance Incorporated [Vermont]
Vitacost.com, Inc.  [Delaware]
Winchester Farms Dairy
Woodmont Holdings, LLC [North Carolina]

**EXHIBIT G-1**

Payment Schedule

| Payment Year | Kroger Settlement Trust – Kroger Contribution to Fee Fund | Kroger Settlement Trust -- | Overall Total Payments (Abatement + Abatement Fees) |
|---|---|---|---|
| Year 1 3/31/2025 | $744,000.00 | $3,272,727.28 | $4,016,727.28 |
| Year 2 3/31/2026 | $744,000.00 | $3,272,727.28 | $4,016,727.28 |
| Year 3 3/31/2027 | $744,000.00 | $3,272,727.28 | $4,016,727.28 |
| Year 4 3/31/2028 | $744,000.00 | $3,272,727.27 | $4,016,727.27 |
| Year 5 3/31/2029 | $744,000.00 | $3,272,727.27 | $4,016,727.27 |
| Year 6 3/31/2030 | $744,000.00 | $3,272,727.27 | $4,016,727.27 |
| Year 7 3/31/2031 | --- | $3,272,727.27 | $3,272,727.27 |
| Year 8 3/31/2032 | --- | $3,272,727.27 | $3,272,727.27 |
| Year 9 3/31/2033 | --- | $3,272,727.27 | $3,272,727.27 |
| Year 10 3/31/2034 | --- | $3,272,727.27 | $3,272,727.27 |
| Year 11 3/31/2035 | --- | $3,272,727.27 | $3,272,727.27 |
| **Total** | **$4,464,000.00** | **$36,000,000.00** | **$40,464,000.00** |

**EXHIBIT G-2**

Allocation Between TAFT and Attorney Fee Fund

| Payment Year | ATTORNEY FEE FUND | TAFT X | Overall Total Payments (Abatement + Abatement Fees) |
|---|---|---|---|
| Year 1 3/31/2025 | $238,266.66 | $3,034,460.62 | $3,272,727.28 |
| Year 2 3/31/2026 | $238,266.66 | $3,034,460.62 | $3,272,727.28 |
| Year 3 3/31/2027 | $238,266.66 | $3,034,460.62 | $3,272,727.28 |
| Year 4 3/31/2028 | $238,266.65 | $3,034,460.62 | $3,272,727.27 |
| Year 5 3/31/2029 | $238,266.65 | $3,034,460.62 | $3,272,727.27 |
| Year 6 3/31/2030 | $238,266.65 | $3,034,460.62 | $3,272,727.27 |
| Year 7 3/31/2031 | --- | $3,272,727.27 | $3,272,727.27 |
| Year 8 3/31/2032 | --- | $3,272,727.27 | $3,272,727.27 |
| Year 9 3/31/20333 | --- | $3,272,727.27 | $3,272,727.27 |
| Year 10 3/31/2034 | --- | $3,272,727.27 | $3,272,727.27 |
| Year 11 3/31/2035 | --- | $3,272,727.27 | $3,272,727.27 |
| **Total** | **$1,429,599.93** | **$34,570,400.07** | **$36,000,000.00** |