# APPENDIX B

## SUN TRIBE SETTLEMENT AGREEMENT

This Settlement Agreement dated as of April 4, 2025 (this "*Agreement*") sets forth the terms of settlement between and among the TLC, Participating Tribes, and Sun (in each case as defined below), to take effect as of the Effective Date (as defined below).

### Table of Contents

I.      Definitions.................................................................................................................2

II.     Release.....................................................................................................................8

III.    Settlement Payments..............................................................................................13

IV.     Allocation and Use of Settlement Funds ...............................................................16

V.      Participation by Tribes...........................................................................................20

VI.     Defendants to be Released Upon Meeting Threshold Requirements .....................22

VII.    Plaintiffs' Attorneys' Fees and Costs ...................................................................23

VIII.   Dispute Resolution.................................................................................................23

IX.     Miscellaneous ........................................................................................................24


- **EXHIBIT A-1  Litigating Tribes** ...............................................................**A-1-1**

- **EXHIBIT A-2  Non-Litigating Tribes**.......................................................**A-2-1**

- **EXHIBIT B  Alleged Harms** .........................................................................**B-1**

- **EXHIBIT C  List of Tribes and Tribal Allocation Voting Percentages**........................ **C-1**

- **EXHIBIT D  TAFT XVI Trust Agreement (including exhibits)** ................... **D-1**

- **EXHIBIT E  Tribal Participation Form**.......................................................**E-1**

- **EXHIBIT F  Sun Subsidiaries, Affiliates, and Joint Ventures** .......................**F-1**

- **EXHIBIT G-1  Payment Schedule and Product** ..........................................**G-1-1**

- **EXHIBIT G-2  Allocation Between TAFT and Attorney Fee Fund** ...........................**G-2-1**

## I.     Definitions

Unless otherwise specified, the following definitions apply:

1.  "*Abatement Fund*" or "*TAFT XVI*" means the Tribal Abatement Fund Trust VI, a Delaware Statutory Trust to be formed in accordance with the Tribal Abatement Fund Trust XVI Trust Agreement, which shall provide for distributions to Participating Tribes to be used for Opioid Remediation.

2.  "*Agreement*" means this Sun Settlement Agreement, inclusive of all Exhibits.

3.  "*Alleged Harms*" The alleged past, present, and future damages, harms, losses, and related expenditures allegedly incurred by the Participating Tribes arising out of the use of Products, non-exclusive examples of which are described in the documents listed on **Exhibit B**, that have allegedly arisen as a result of the physical and bodily injuries sustained by individuals suffering from opioid-related addiction, death, and other related diseases and disorders, and that have allegedly been caused by Released Entities.

4.  "*Attorney Fee Fund*" means a segregated fund within the Sun Settlement Trust set aside to pay attorneys' fees and reimburse attorneys' costs in accordance with Section IV.B.1 of this Agreement.

5.  "*Claim*" Any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, fine, penalty, restitution, reimbursement, disgorgement, expenses, judgment, right, obligation, dispute, suit, contract, controversy, agreement, *parens patriae* claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state, tribal, or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including but not limited to any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, remediation, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

6.  "*Claim-Over*" means a Claim asserted by a Non-Released Entity against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory relating to a Non-Party Covered Conduct Claim asserted by a Releasor.

7.  "*Covered Conduct*" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, service, work, sale, misstatement, misleading statement, or other activity of any kind whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence

of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, service, work, sale, misstatement, misleading statement, or other activity) arising from or relating in any way to (a) compounding, counseling, and documentation related to any Product or class of Products; (b) the availability, discovery, research, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, relabeling, recall, withdrawal, distribution, delivery, monitoring, reporting, regulatory compliance, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to any Product, or any system, plan, policy, procedure, or advocacy relating to any Product or class of Products, including but not limited to any unbranded or branded promotion, marketing, or advertising, information, patient support or assistance, educational programs, consultancy, research, other programs, or campaigns, lobbying, grants, sponsorships, charitable donations, or other funding relating to any Product or class of Products; (c) the characteristics, properties, risks, or benefits of any Product or class of Products; (d) the monitoring or non-monitoring of orders placed of any Product; (e) reporting, disclosure, non-monitoring, non-reporting or non-disclosure to federal, state or other regulators of orders for any Product placed with any Released Entity; (f) the selective breeding, harvesting, extracting, purifying, exporting, importing, applying for quota for, procuring quota for, handling, promoting, manufacturing, processing, packaging, supplying, distributing, converting, or selling of, or otherwise engaging in any activity relating to, precursor or component Products, including but not limited to natural, synthetic, semi-synthetic or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, or any related intermediate Products; or (g) diversion control programs, suspicious order monitoring, or regulatory compliance related to any Product.

8. *"Effective Date"* means the date that the TLC delivers (or causes to be obtained and delivered) to Sun the Tribal Participation Forms signed by 85% of Litigating Tribes as determined by the Tribal Allocation Voting Percentages set forth in **Exhibit C** to this Agreement. The Effective Date shall be no later than October 31, 2025, provided, however, the deadline may be extended for up to 45 days upon the request of the TLC or any defendant company listed in the Tribal Participation Form.

9. *"Eligible Entities"* has the meaning set forth in Section V.E.

10. "Gross Settlement Amount" is $1,045,053.15 which is comprised of the Abatement Fund and the Attorney Fee Fund, as reflected herein and in **Exhibits G-1** and **G-2** hereto. Notwithstanding any other language or provisions in this or any other agreement, the Gross Settlement Amount is the maximum dollar amount Sun can pay in connection with the Agreement.

11. *"Litigating Tribe"* means a Tribe (or Tribe official asserting the right of or for the Tribe to recover for Alleged Harms to the Tribe and/or its members thereof) that (i) is identified on **Exhibit A-1**, or (ii) has brought any Claims regarding Covered Conduct as of the Effective Date.

12. *"MDL Court"* means the United States District Court for the Northern District of Ohio, Eastern Division in *In re: National Prescription Opiate Litigation*, No. 1:17-md-2804 (N.D. Ohio), or that district court generally if such case is no longer active.

13. *"Non-Litigating Tribes"* means those Tribes that have not brought any Claims regarding Covered Conduct as of the Effective Date and/or are not set forth on **Exhibit A-1**. **Exhibit A-2** is intended to identify all Non-Litigating Tribes, provided, however, that to the extent there is any conflict between **Exhibit A-2** and the definitions of Litigating Tribe and/or Non-Litigating Tribe, the definitions control.

14. *"Non-Participating Tribe"* means any Tribe that does not execute a Tribal Participation Form within three years of the Effective Date of this Agreement or any Tribe that, within three years of the Effective Date of this Agreement, affirmatively opt-outs of this settlement and provides written notice to the Special Master, the TLC and Sun of its intent to litigate its Claims against Sun.

15. "*Non-Party Covered Conduct Claim*" means a Claim against any Non- Released Entity involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity).

16. "*Non-Party Settlement*" means a settlement by any Releasor that settles any Non-Party Covered Conduct Claim and includes a release of any Non- Released Entity.

17. "*Non-Released Entity*" means an entity that is not a Released Entity.

18. *"Ongoing Common Benefit Order"* has the meaning set forth in Section III.A.4.

19. *"Opioid Remediation"* means care, treatment, and other programs and expenditures (including reimbursement for past such programs or expenditures [1] except where this Agreement restricts the use of funds solely to future Opioid Remediation) designed to (1) address the use of opioid products, (2) treat or mitigate opioid use or related disorders, or (3) mitigate other alleged effects of, including on those injured as a result of, the opioid epidemic. **Schedule B** of the TAFT XVI TDP provides a list of programs, services and activities that qualify as expenditures for Opioid Remediation. In addition, **Schedule D** of the TAFT XVI TDP provides a non-exhaustive list of Tribal Abatement expenditures that also qualify as being paid for Opioid Remediation. Qualifying expenditures may include reasonable related administrative expenses in connection with the above.

20. *"Participating Tribe"* means any Tribe that executes a Tribal Participation Form and uploads the Tribal Participation Form on the Portal within three years of the Effective Date. For the avoidance of doubt, a Participating Tribe does not become a Releasor until the Effective Date.

21. *"Parties"* means Sun, the TLC, and Participating Tribes (each, a "*Party*").

---

[1] Reimbursement includes amounts paid to any Participating Tribes for past expenditures or programs.

22. *Payment Date*." The date by which **Sun** makes its Payment pursuant to Section III.A and Exhibit H**G**. The Payment Date shall be July 25, 2025.

23. *"Portal"* means the Tribal Opioid Settlement Portal at which (a) the Tribal Participation Agreements shall be received and maintained by the TLC for review and approval by Sun and (b) the information related to the Tribal Allocation Distribution Percentage shall be maintained.

24. *"Product."* Any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is: (1) an opioid or opiate, as well as any product containing any such substance; (2) benzodiazepine, carisoprodol, or gabapentin; or (3) a combination or "cocktail" of chemical substances prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. "Product" shall include, but is not limited to, any substance consisting of or containing buprenorphine, butorphanol, codeine, diphenoxylate, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, naloxone, naltrexone, oxycodone, oxymorphone, pentazocine, propoxyphene, remifentanil, tapentadol, tramadol, opium, heroin, carfentanil, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triazolam, temazepam, midazolam, carisoprodol, gabapentin, or any variant of these substances or any similar substance. "Product" also includes any natural, synthetic, semi-synthetic or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, and any intermediate products used or created in the manufacturing process for any of the substances described above.

25. *"Released Claims."* Any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct and/or Alleged Harms occurring prior to the Effective Date. Without limiting the foregoing, Released Claims include any Claims that have been asserted against Released Entities by any Tribe in any federal, state, or local action or proceeding (whether judicial, arbitral, or administrative) based on, arising out of, or relating to, in whole or in part, the Covered Conduct and/or Alleged Harms, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by a Tribe or any Releasors (whether or not such Tribe or Releasor has brought such action or proceeding). Released Claims also include all Claims against Released Entities asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims related to Covered Conduct and/or Alleged Harms. The Parties intend that this term, "Released Claims," be interpreted broadly. This Agreement does not release Claims by private individuals. It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law. Released Claims is also used herein to describe claims brought by a non-party Tribe that would have been Released Claims if they had been brought by a Releasor against a Released Entity.

26. *"Released Entities"* has the meaning set forth in Section VI.A.

27. *"Releasors"* With respect to Released Claims, (1) each Participating Tribe; and (2) without limitation and to the maximum extent of the power of each Participating Tribe to release

Claims, (a) the Participating Tribe's departments, agencies, divisions, boards, commissions, subdivisions, districts, instrumentalities of any kind and attorneys, and any person in his or her official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, emergency services districts, school districts, healthcare districts, hospital districts, Sheriffs and law enforcement districts, library districts, coroner's offices, public transportation authorities, and other special districts of the Participating Tribes, including those with the regulatory authority to enforce state, federal and tribal controlled substances acts or the authority to bring Claims related to Covered Conduct seeking money (including abatement (or remediation and/or restitution)) or revoke a pharmaceutical distribution license, within the territory governed by a Participating Tribe, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief, including but not limited to fines, penalties, or punitive damages, on behalf of or generally applicable to the general public with respect to a Participating Tribe, whether or not any of them participate in this Agreement. Each Participating Tribe's [representative] represents that he or she has obtained (or will obtain no later than the Effective Date) the authority set forth in Section II.G (Representation and Warranty). In addition to being a Releasor as provided herein, a Participating Tribe shall also provide the Tribal Participation Form referenced in Section ___ providing for a release to the fullest extent of the Participating Tribe's authority.

28. "*Special Master*" means David R. Cohen appointed by the MDL Court in MDL No. 2804.

29. "*Sun*" means (i) Sun Pharmaceutical Industries Inc., and (ii) all of its respective past and present direct or indirect parents, subsidiaries, divisions, affiliates, joint ventures, predecessors, successors, and assigns.

30. "*Sun Settlement Trust*" means the interest-bearing fund established by the MDL Court in MDL No. 2804 into which all payments by Sun will be made and which shall be administered by the Special Master.

31. "*TAFT XVI Directors*" or "the *Directors*" means the individuals Mary Smith, Dean Kevin Washburn, and Kathy Hannan, or their successors, appointed by the MDL Court in MDL No. 2804.

32. "*TAFT XVI Trust Agreement*" means the Tribal Abatement Fund Trust XV Trust Agreement, to be effective as of the Effective Date in substantially in the form attached hereto as **Exhibit D**.

33. "*TAFT XVI TDP*" means the Trust Distribution Procedures set forth as **Exhibit 4** of the TAFT XVI Trust Agreement.

34. "*TLC*" means the Tribal Leadership Committee appointed by the Court in MDL No. 2804.

35. "*Total Remediation Amount*" has the meaning set forth in Section IV.B.1.

36. *"Tribal Allocation Appointee"* means David R. Cohen who was appointed by the MDL Court to set the procedures by which the inter-tribal allocation was completed and who, jointly with Layn Phillips, determined the final inter-tribal allocation resulting in each Tribe's Tribal Allocation Distribution Percentage.

37. *"Tribal Allocation Distribution Percentage"* means a Tribe's percentage as determined by the Tribal Allocation Appointees pursuant to Section IV.D.  The aggregate Tribal Allocation Distribution Percentages of all Tribes shall equal 100%.

38. *"Tribal Opioid Abatement Report"* means an annual report on the Approved Tribal Opioid Abatement Uses, as required under Section 2.4 of the TAFT XVI Trust Agreement.

39. *"Tribal Participation Form"* means the form attached hereto as **Exhibit E**.

40. *"Tribe"* or "*Tribes*" means one or more Eligible Entity set forth on **Exhibit A-1** or **Exhibit A-2** of this Agreement.

## II.   Release

A.   *Scope*.  As of the Effective Date, the Released Entities are hereby released and forever discharged from all of the Releasors' Released Claims.  Each Participating Tribe (for itself and its Releasors) hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever.  The releases provided for in this Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of each Releasor to release Claims.  The releases shall be a complete bar to any Released Claim.

B.   *Claim-Over and Non-Party Settlement.*

1.   *Statement of Intent.*  It is the intent of the Parties that:

a.  Released Entities should not seek contribution or indemnification (other than pursuant to an insurance contract) from other parties for their payment obligations under this Agreement;

b.  the payments made under this Agreement shall be the sole payments made by the Released Entities to the Releasors involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity);

c.  Claims by Releasors against non-Parties should not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and

d.  the Agreement meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties.

2.  The provisions of this Section II.B are intended to be implemented consistent with these principles.  This Agreement and the releases and dismissals provided for herein are made in good faith.

3.  *Non-Party Settlement*.  To the extent that, on or after the Effective Date, any Releasor enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization, the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from Sun in Section II.B.2, or a release from such Non- Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim-Over.  The obligation to obtain the prohibition and/or release required by this subsection is a material term of this Agreement.

4.  *Claim-Over*.  In the event that any Releasor obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Entity that does not contain a prohibition like that described in Section II.B.3, or any Releasor files a Non-Party Covered Conduct Claim against a Non-Released Entity in bankruptcy or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in Section II.B.3, and such Non-Released Entity asserts a Claim-Over against a Released Entity, the Released Entity shall be relieved of the prohibition in Section II.B.2 with respect to Non-Released Entity and that Releasor and Sun shall take the following actions to ensure that the Released Entities do not pay more with respect to Covered Conduct to the Releasor or to Non-Released Entities than the amounts owed under this Settlement Agreement by Sun:

a.  Sun shall notify that Releasor of the Claim-Over within sixty (60) calendar days of the assertion of the Claim-Over or sixty (60) calendar days of the Effective Date of this Settlement Agreement, whichever is later;

b.  Sun and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that Sun is not required to pay more with respect to Covered Conduct than the amounts owed by Sun to the Releasor under this Agreement;

c.   The Releasor and Sun shall take steps sufficient and permissible under the law of the state of the Releasor to hold Released Entities harmless from the Claim-Over and ensure Released Entities are not

required to pay more with respect to Covered Conduct than the amounts owed by Sun under this Agreement.  Such steps may include, where permissible:

(1)     Filing of motions to dismiss or such other appropriate motion by Sun or Released Entities, and supported by Releasor, in response to any claim filed in litigation or arbitration;

(2)     Reduction of that Releasor's Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(3)     Placement into escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

(4)     Return of monies paid by Sun to the Releasor under this Agreement to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

(5)     Payment of monies to Sun by the Releasor to ensure it is held harmless from such Claim-Over, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(6)     Credit to Sun under this Agreement to reduce the overall amounts to be paid under the Agreement such that it is held harmless from the Claim-Over; and

(7)     Such other actions as that Releasor and Sun may devise to hold Sun harmless from the Claim-Over.

d.  The actions of the Releasor and Sun taken pursuant to paragraph (c) must, in combination, ensure Sun is not required to pay more with respect to Covered Conduct than the amounts owed to the Releasor under this Agreement.

e.  In the event of any dispute over the sufficiency of the actions taken pursuant to paragraph (c), the Releasor and Sun may seek review by the MDL Court.  The MDL Court shall have the authority to require Releasors to implement a remedy that includes one or more of the actions specified in the above paragraph (c) sufficient to hold the Released Entities, including Sun, fully harmless.  In the event that

the MDL Court's actions do not result in Released Entities being held fully harmless, Sun shall have a claim for breach of this Agreement by Releasors, with the remedy being payment of sufficient funds to hold Sun harmless from the Claim-Over up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity.  For the avoidance of doubt, the prior sentence does not limit or eliminate any other remedy that Sun may have.

5. To the extent that the Claim-Over is based on a contractual indemnity, the obligations under Section II.B.4 shall extend solely to a Non-Party Covered Conduct Claim against a pharmacy, clinic, hospital or other purchaser, distributor or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor. Sun shall notify the Participating Tribes, to the extent permitted by applicable law, in the event that any of these types of Non-Released Entities asserts a Claim-Over arising out of contractual indemnity against it.

C. *Indemnification and Contribution Prohibited.* No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory, from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner. For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

D. *General Release.*  In connection with the releases provided for in the Agreement, each Participating Tribe (for itself and its Releasors) expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or tribal or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to §1542 of the California Civil Code, which reads:

**General Release; extent**.  A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Participating Tribe (for itself and its Releasors) hereby expressly waives and fully, finally, and forever settles, releases, and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Participating Tribes' decision to enter into the Agreement or the Participating Tribes' decision to participate in this Agreement.

E. *Res Judicata*.  Nothing in this Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in this Agreement, and/or any stipulation of dismissal with prejudice or judgment entered on this Agreement, gives rise to under applicable law.

F. *Effectiveness*.  The releases set forth in this Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors.  Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Sun Settlement Trust or any portion thereof, or by the enactment of future laws, or by any seizure of the Sun Settlement Trust or any portion thereof.

G. *Representation and Warranty*.  The signatories on behalf of their respective Participating Tribes expressly represent and warrant that they have authority to enter this Agreement on behalf of their respective Participating Tribes and that their respective Participating Tribes will obtain on or before the Effective Date (or have already obtained) the authority to settle and release, to the maximum extent of each Participating Tribe's power, all Released Claims of (1) their respective Participating Tribes; and (2) all Releasors of their respective Participating Tribes.

H. *Assigned Interest Waiver*. To the extent that any Participating Tribe has any direct or indirect interest in any rights of a third-party that is a debtor under the Bankruptcy Code as a result of a claim arising out of Covered Conduct by way of assignment or otherwise, including as a result of being the beneficiary of a trust or other distribution entity, to assert claims against Sun (whether derivatively or otherwise), under any legal or equitable theory, including for indemnification, contribution, or subrogation, the Participating Tribe waives the right to assert any such claim, or to receive a distribution or any benefit on account of such claim and such claim, distribution, or benefit shall be deemed assigned to Sun.

I. *Cooperation*.  Releasors (i) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (ii) will reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal of any and all Released Claims, including suits brought by non-Releasors based on Released Claims. Releasors will meet and confer and make reasonable efforts to resolve any action that is filed by any other Releasor against a Released Entity on or after the Effective Date.  This provision shall not require a Participating Tribe to make any monetary payment or adjustment to allocation or incur other obligation.

J. *Non-Released Claims.*  Notwithstanding the foregoing or anything in the definition of Released Claims, the Agreement does not waive, release or limit any criminal liability, Claims for outstanding liability under any tax or securities law, Claims against parties who are not Released Entities, Claims by private individuals, and any claims arising under this Agreement for enforcement of this Agreement.

## III.    Monetary Relief and Payments

A. *Structure of Payments*

1. All payments under this Section III shall be made into the Sun Settlement Trust. The payments in the Sun Settlement Trust shall be allocated and used only as specified in Section IV of this Agreement.

2. On July 25, 2025, Sun shall pay into the Sun Settlement Trust the sum of $1,045,053.15, under the terms and conditions of this Agreement, subject to the reductions described in Section IV.E.

3. For the avoidance of doubt, Sun shall not be called upon to make any payments pursuant to this Agreement that together exceed the Gross Settlement Amount.

4. Sun's payment into the Sun Settlement Trust includes the amount necessary to comply with the Ongoing Common Benefit Order (Dkt. #4428) in *In re National Prescription Opiate Litigation*, case no. 1:17-md-2804, pending in the United States District Court for the Northern District of Ohio Eastern Division (the "Ongoing Common Benefit Order"). The Special Master shall hold the amount necessary to ensure compliance with the Ongoing Common Benefit Order until further order by the MDL Court. It is expressly understood that Sun's Payment into the Sun Settlement Trust under III.A.2 fulfills its obligations under the Ongoing Common Benefit Order.

B. *Timing of Distributions from the Sun Settlement Trust*

1. Special Master shall transfer funds from the Sun Settlement Trust pursuant to Section IV within 60 days of the dismissal with prejudice of all claims by Participating Litigating Tribes pursuant to Section V.D. For the avoidance of doubt, although the Payment Date predates the Effective Date, no funds may be distributed unless and until the condition of Section V.D is met upon the Effective Date.

2. If 85% of the Litigating Tribes as determined by the Tribal Allocation Voting Percentages set forth in Exhibit C to this Agreement, do not sign the Tribal Participation Form by October 31, 2025, or such later date as it may be extended to pursuant to Section I.8, such that the Effective Date does not occur, then (a) any payments made by Sun to the Sun Settlement Trust shall immediately be refunded to Sun, along with all interest accrued, (b) Sun shall make no further payments, and (c) this Agreement will have no further effect, and all releases and other commitments or obligations contained herein will be void, provided, however, the deadline may be extended for up to 45 days upon the request of the TLC or any defendant company listed in the Tribal Participation Form.

## IV. Allocation and Use of Settlement Funds

A. *Components of Settlement Fund.* Subject to Section IV.B.3, the Sun Settlement Trust shall be comprised of funds earmarked for Opioid Remediation and for the Attorney Fee Fund as set forth in Section IV.B.

B.    *Use of Settlement Payments.*

1. The Special Master shall allocate and transfer funds from the Sun Settlement Trust as follows: 85% of such funds (the "Total Remediation Amount") shall be paid to TAFT XVI for distribution to Participating Tribes to use for Opioid Remediation in accordance with the TAFT XVI Trust Agreement and the TAFT XVI TDP; and 15% of such funds shall be set aside by the Special Master for the Attorney Fee Fund, including the portion to be withheld pursuant to Section III.A.4.

2. The TAFT XVI Directors shall set aside and hold back the funds allocable to each of the following Tribes proportionate to the Tribe's Tribal Allocation Distribution Percentage:

   a. A Non-Litigating Tribe that has not become a Participating Tribe at the time of such distribution, and the provisions of Section IV.E.1 shall apply with respect to such Non-Litigating Tribe.

   b. A Litigating Tribe that has not become a Participating Tribe at the time of such distribution, and the provisions of Section IV.E.2 shall apply with respect to such Litigating Tribe.

3. The Special Master shall deduct the costs and expenses incurred in the administration of the Sun Settlement Trust out of the interest accrued on the Sun Settlement Trust and thereafter from the principal of the Sun Settlement Trust.

4. In no event may less than 85% of Sun's payments to the Sun Settlement Trust be spent on Opioid Remediation.  The Parties acknowledge and agree that the payments disbursed to the Tribes from TAFT XVI in accordance with this Section IV and Schedules B and D of the TAFT XVI TDP are exclusively for Opioid Remediation..

C.    *Duties and Expenses of the Directors.*

1. The Directors shall have the duties set forth in this Agreement and in the TAFT XVI Trust Agreement. For the avoidance of doubt, the Directors will have duties and responsibilities comparable to those the same individuals exercise as trustees as set forth in the proposed Tribal Abatement Fund Trust Agreement filed 08/23/21 (Doc. 3634) with the Fifteenth Plan Supplement under the Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors (the "*Purdue Plan*"), confirmed by the Bankruptcy Court in *In re Purdue Pharma L.P.,* No. 19-23649 (RDD) (S.D.N.Y) (without regard to the effectiveness of any other orders, documents, agreements or similar authorities that may otherwise be applicable to the Purdue Plan).

2. Any expenses, costs and fees associated with or arising out of the duties of the Directors shall be paid out of interest accrued on the Abatement Fund and from the principal in the Abatement Fund should such interest prove insufficient.

D.     *Duties and Expenses of Tribal Allocation Appointees.*

    1.   David R. Cohen and Layn Phillips, in their capacities as Tribal Allocation Appointees, conducted a process with regard to the Janssen Tribal Master Settlement Agreement by which Tribal Allocation Distribution Percentages were determined, which shall also form the basis for the distributions to Participating Tribes in accordance with this Section IV.  A copy of those Allocation Distribution Percentages is attached hereto as **Exhibit C**.  For the avoidance of doubt, such process included:

        a.   Each Participating Tribe had the right to meaningfully participate in the final allocation process and a right to be heard prior to entry of the final allocation order specific to this opioid crisis.

        b.   The Directors provided notice of the settlement to the unrepresented tribes.  The Directors coordinated with Special Master David Cohen and Layn Phillips in their capacities as Tribal Allocation Appointees to set forth the procedures by which notice was provided.

        c.   Unrepresented Participating Tribes had the same rights as the represented tribes within the settlement allocation process.

    2.   Sun acknowledges and expressly agrees that it had no role whatsoever in the inter-tribal allocation, the inter-tribal allocation matrix, or the underlying metrics and methodology used to determine the allocation. The application of the inter-tribal allocation to this Agreement shall not constitute a position by Sun, nor shall it restrict Sun's ability to take positions in contexts unrelated to this Agreement.

    3.   For the avoidance of doubt, any expenses, costs, and fees associated with or arising out of the duties of David R. Cohen in his capacity as Tribal Allocation Appointee (including expenses of retaining experts or other professionals to assist him in the allocation issues including BrownGreer and trust counsel), shall be paid from the Gross Settlement Amount and Sun shall have no further obligation to pay such costs.

E.     *Treatment of Non-Participating Tribes.*

    1.   <u>Non-Litigating Tribes</u>.  Non-Litigating Tribes shall have a period of three years after the Effective Date to execute a Tribal Participation Form.  If a Non-Litigating Tribe executes a Tribal Participation Form within three years after the Effective Date, it shall receive the amount (including accumulated holdback amounts) allocable to its Tribal Allocation Distribution Percentage from the Abatement Fund.  If a Non-Litigating Tribe does not execute a Tribal Participation Form within three years after the Effective Date, the amount (including accumulated holdback amounts) allocable to its Tribal Allocation Distribution Percentage will be reallocated and paid to all Participating Tribes

pro rata at the end of the three year period following the Effective Date, provided however that if a Non-Litigating Tribe does not execute a Tribal Participation Form within three years after the Effective Date but files Released Claims against one or more Released Entities anytime in that same three-year period, the amount (including accumulated holdback amounts) allocable to such Non-Litigating Tribe pursuant to its Tribal Allocation Distribution Percentage shall revert to Sun, to be paid to Sun within sixty (60) days after the third anniversary of the Effective Date.

2. <u>Litigating Tribes</u>.  Any Litigating Tribe that does not execute a Tribal Participation Form within three years after the Effective Date of this Agreement or any Litigating Tribe that affirmatively opt-outs of this settlement and provides written notice to the Special Master, the TLC and Sun of its intent to litigate any Released Claims against any Released Entities shall forego its right to participate in distributions contemplated by this Agreement, in which case the amount (including accumulated holdback amounts) allocable to such Litigating Tribe pursuant to its Tribal Allocation Distribution Percentage shall revert to Sun, to be paid to Sun within sixty (60) days after the third anniversary of the Effective Date.

F.  *Provisions Regarding Abatement Fund.*

1. The funds distributed by TAFT XVI to each Participating Tribe shall be used solely for Opioid Remediation.

2. The TAFT XVI Directors shall, in consultation with the TLC, design and implement a system of annual reporting by Participating Tribes relating to Opioid Remediation expenditures made using funds received from TAFT XVI. The TAFT XVI Directors shall provide an annual Tribal Opioid Abatement Report to Sun and the Special Master, which annual report may be filed by the Special Master, in his discretion, with the MDL Court.

G.  *Nature of Payment.*

1. Sun and the TLC acknowledge and agree that notwithstanding anything to the contrary in this Agreement, including, but not limited to, the scope of the Released Claims:

   a. Sun has entered into this Agreement to avoid the delay, expense, inconvenience, and uncertainty of further litigation;

   b. Tribes sought restitution and remediation (within the meaning of 26 U.S.C. § 162(f)(2)(A)) as damages for the Alleged Harms allegedly suffered by the Tribes;

   c. By executing the Tribal Participation Form, the Participating Tribes acknowledge that: (a) the Total Remediation Amount is no greater than the amount, in the aggregate, of the Alleged Harms allegedly suffered by

the Participating Tribes; and (b) the portion of the Total Remediation Amount received by each Participating Tribe is no greater than the amount of the Alleged Harms allegedly suffered by such Participating Tribe;

    d.  The payment of the Total Remediation Amount by Sun constitutes, and is paid for, restitution and remediation (within the meaning of 26 U.S.C. § 162(f)(2)(A)) for alleged damage or harm (as compensation for alleged damage or harm arising out of alleged bodily injury) allegedly caused by Sun;

    e.  The Total Remediation Amount is being paid as restitution and remediation (within the meaning of 26 U.S.C. § 162(f)(2)(A)) in order to restore, in whole or in part, the Participating Tribes and persons to the same position or condition that they would be in had the Participating Tribes and persons not suffered the Alleged Harms and constitutes restitution and remediation for damage or harm allegedly caused by the potential violation of a law and/or is an amount paid to come into compliance with the law;

    f.  For the avoidance of doubt: (a) no portion of the Total Remediation Amount represents reimbursement to any Participating Tribe, or other person or entity, for the costs of any investigation or litigation, including without limitation attorneys' fees, (b) the entire Total Remediation Amount is properly characterized as described in Section IV.G.1.e, and (c) none of the amounts paid by Sun under Section III constitutes disgorgement or is paid for or in place of any fine, penalty, punitive damages, other punitive assessments, or attorneys' fees; and

    g.  The Muscogee (Creek) Nation, (or the designated "appropriate official" within the meaning of Treasury Regulation Section 1.6050X-1(f)(1)(ii)(B)), on behalf of all Participating Tribes (the "Form 1098-F Filer") shall complete and file Form 1098-F with the Internal Revenue Service on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the Effective Date occurs.  On the Form 1098-F, the Form 1098-F Filer shall identify the entire Total Remediation Amount as remediation/restitution.  The Form 1098-F Filer shall also, on or before January 31 of the year following the calendar year in which the Effective Date occurs, furnish Copy B of such Form 1098-F (or an acceptable substitute statement) to Sun

2.  Tax Reporting and Cooperation

    a.  Each Participating Tribe shall cooperate in good faith with Sun with respect to any tax claim, dispute, investigation, audit, examination, contest, litigation, or other proceeding relating to this Agreement.

b. Upon request by Sun, the Participating Tribes (and any respective designated "appropriate official" within the meaning of Treasury Regulation Section 1.6050X-1(f)(1)(ii)(B)) agree to perform such further acts and to execute and deliver such further documents as may be reasonably necessary for Sun to establish the statements set forth in Section IV.G to the satisfaction of their tax advisors, their independent financial auditors, the Internal Revenue Service, or any other governmental authority, including as contemplated by 26 C.F.R § 1.162-21(b)(3)(ii) and any subsequently proposed or finalized relevant regulations or administrative guidance.

c. Pursuant to 26 C.F.R. § 1.6050X-1(a) and (b), the Muscogee (Creek) Nation shall designate one of its officers or employees to act as the "appropriate official" within the meaning of Treasury Regulation Section 1.6050X-1(f)(1)(ii)(B).

d. For the avoidance of doubt, except as explicitly set forth in this Agreement, neither Sun, the TLC, any Tribe, or counsel to any of the foregoing make any warranty or representation as to the tax consequences of the payment of the Total Remediation Amount (or any portion thereof).

## V.  Participation by Tribes

A. *Presentation of Aggregated Settlement Offer, Informed Consent and Compliance with Ethical Rules.*  The TLC, on behalf of the Tribes, negotiated the terms of this Agreement with Sun and believes the Gross Settlement Amount and term of years to be reasonable and recommends moving forward to present this Agreement and informed consent documentation to all Litigating Tribes identified on **Exhibit A-1** and all Non-Litigating Tribes identified on **Exhibit A-2**, and if applicable, to their counsel. Sun, the Released Entities, and the TLC recognize the ultimate decision to settle rests with each Tribe.  The TLC will work with all counsel to present the proposed aggregate settlement and allocation procedures to all Tribes and will use best efforts to secure 100% participation. At all times, including in the roll out and presentation of this Agreement to the Tribes, each Tribe's attorney's duty of loyalty and disclosure is to his or her tribal clients.

B. *Notice to Unrepresented Tribes*.  The Directors shall provide notice of the settlement to each Non-Litigating Tribe.

C. *Tribal Participation Form*.  Attached hereto as **Exhibit E** is the Tribal Participation Form.  A Tribe's executed Participation Form is evidence of its status as a Party to this Agreement, and the executed Participation Forms and their terms are incorporated herein by reference.

D.   *Dismissal of Claims*.  Each Participating Litigating Tribe, either directly or through its counsel, shall provide a dismissal with prejudice of all Released Claims by that Tribe against Released Entities.  Dismissal of a Litigating Tribe's complaint against Released Entities shall be filed only upon the occurrence of the Effective Date.  The Parties will coordinate a streamlined dismissal process with the MDL Court that has been approved in previous tribal global settlements, that allows for a bulk filing of the agreed dismissals with prejudice.

E.   *Eligible Entities*.  **Exhibits A-1** and **A-2** together set forth all entities eligible to participate in this Agreement ("*Eligible Entities*"):

   1.  Each entity listed on **Exhibit A-1** is either (1) a federally recognized tribe that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130, and that has filed an opioid case in MDL No. 2804, in federal court outside the MDL, or in State court, or (2) a "tribal organization," as defined in 25 U.S.C. § 5304(I), or an "inter-tribal consortium," as defined in 25 U.S.C. § 5381(a)(5), that provides health care pursuant to contracts/compacts with the Indian Health Service, and that has filed an opioid case in MDL No. 2804, in federal court outside the MDL, or in State court.  **Exhibit A-1** includes the filing docket number and counsel of record for the listed entity.  Each entity listed on **Exhibit A-1** is entitled to participate in the settlement.

   2.  **Exhibit A-2** includes entities that are federally recognized tribes that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130, and that have not filed an opioid case in MDL No. 2804, in federal court outside the MDL, or in State court.  **Exhibit A-2** also includes Alaska Native "tribal organizations," as defined in 25 U.S.C. § 5304(I) and "inter-tribal consortia," as defined in 25 U.S.C. § 5381(a)(5), that provide health care pursuant to contracts/compacts with the Indian Health Service, and that have not filed an opioid case in MDL No. 2804, in federal court outside the MDL, or in State court.  Each entity listed on Exhibit A-2 is entitled to participate in the settlement.

F.   *Calculating Tribal Allocation Voting Percentages for Tribal Health Organizations and Inter-Tribal Consortia.*

   1.  In Alaska: For purposes of determining whether the 85% participation threshold has been met, the full amount of the Tribal Allocation Voting Percentage as listed on **Exhibit C** shall be used for each litigating Alaska Tribal Health Organization, litigating Alaska inter-tribal consortium, or litigating Alaska Tribe which is participating in the settlement.  In the event that a litigating Alaska Tribe which is not listed in **Exhibit C**, and which is a member of a listed Alaska Tribal Health Organization or Alaska inter-tribal consortium, affirmatively decides not to participate in the settlement, then the Tribal Allocation Voting Percentage, as computed pursuant to the footnote set forth in **Exhibit C**, of that nonparticipating Alaska Tribe shall be calculated and

deducted from the Tribal Allocation Voting Percentage of its Tribal Health Organization or inter-tribal consortium for purposes of determining whether the 85% participation threshold has been met.

2. <u>Outside of Alaska</u>: Litigating Tribal Health Organizations and inter-tribal consortia outside of Alaska have no Tribal Allocation Voting Percentage listed on **Exhibit C** and accordingly their participation in the settlement shall not count toward the Participation Threshold.

G. *Deadline for the 85% participation threshold.*  If the 85% participation threshold, as determined by the Tribal Allocation Voting Percentages set forth in **Exhibit C** to this Agreement, has not been satisfied by October 31, 2025, this Agreement will have no further effect and all releases and other commitments or obligations contained herein will be void, provided, however, the deadline may be extended for up to 45 days, upon the request of the TLC or any defendant company listed in the Tribal Participation Form.

## VI. Defendants to be Released Upon Meeting Threshold Requirements

A. The following are to be Released Entities and shall be released and claims against them to be dismissed with prejudice upon the Effective Date: Sun and (1) all past and present subsidiaries, divisions, affiliates, predecessors, successors, and assigns (in each case, whether direct or indirect) of Sun; (2) all past and present subsidiaries and divisions (in each case, whether direct or indirect) of any entity described in subsection (1); (3) the respective past and present officers, directors, members, trustees, and employees of any of the foregoing (each for actions that occurred during and related to their work for, or employment with, any of Sun or the foregoing entities); (4) all past and present joint ventures (whether direct or indirect) of Sun or its subsidiaries, including in any subsidiary's capacity as a participating member in such joint venture; (5) all direct or indirect parents and shareholders of Sun (solely in their capacity as parents or shareholders of Sun with respect to Covered Conduct); and (6) any insurer of Sun or any person or entity otherwise described in subsections (1)-(5) (solely in its role as insurer of such person or entity and subject to the last sentence of Section X.C). A list of Sun's joint ventures, subsidiaries and affiliates and predecessor entities is set forth in Exhibit F. Any person or entity described in subsections (3)-(6) shall be a Released Entity solely in the capacity described in such clause and shall not be a Released Entity with respect to its conduct in any other capacity. Any entity acquired, or joint venture entered into, by Sun after the Effective Date is not a Released Entity. Further and notwithstanding anything else in this paragraph, no entity sued in *In re: National Prescription Opiate Litigation*, No. 1:17-md-2804 (N.D. Ohio) is included as a Released Entity other than the entities listed on Exhibit F.

## VII. Plaintiffs' Attorneys' Fees and Costs

A. The procedures to allocate and disburse the Attorney Fee Fund to Litigating Tribes' counsel shall be the subject of a separate document to which Sun and the Released Entities shall not be parties, but which shall be consistent with Section III.A.2 of this

Agreement.  Any costs incurred in allocating and disbursing the Attorney Fee Fund shall be borne by the Attorney Fee Fund.

B.    An attorney representing the Participating Tribes may not receive any payment from the Attorney Fee Fund unless such attorney presents this settlement to each tribal opioid client in good faith and uses best efforts to secure participation as set forth in Section V.A above.

C.    For the avoidance of doubt, the TLC shall propose and receive any necessary approval from the MDL Court for any funds to be paid to the appropriate Attorney Fee Fund or Common Benefit Fund, as set forth in Judge Polster's May 9, 2022 Order (ECF No. 4428), such that Sun is under no obligation to hold back any funds for any Common Benefit Assessment.  Any funds owed to the Common Benefit Fund shall be paid from the Attorney Fee Fund.  The Allocation of Common Benefit Funds will be determined by the Fee Panel.

## VIII.   Dispute Resolution

A.    Any disputes arising out of this Agreement shall be heard before Special Master David Cohen as the arbitrator designated by the parties to resolve disputes through binding arbitration.

## IX.    Miscellaneous

A.    *No Admission*.  Sun does not admit liability or wrongdoing.  This Agreement shall not be considered, construed, or represented to be (1) an admission, concession, or evidence of liability or wrongdoing or (2) a waiver or any limitation of any defense otherwise available to Sun.

B.    *Third-Party Beneficiaries*.  Except as expressly provided in this Agreement, no portion of this Agreement shall provide any rights to, or be enforceable by, any person or entity that is not a Participating Tribe or Released Entity. No Participating Tribe may assign or otherwise convey any right to enforce any provision of this Agreement and no entity except the TLC shall have the right to enforce any provision of this Agreement on behalf of all Participating Tribes.  Nothing in this Agreement extends to the TLC or Participating Tribes the authority to enforce injunctive terms provided in state-court consent judgments implementing Sun's national settlement with state and local governments, which shall be enforceable only as provided therein; however, Sun acknowledges that said injunctive terms apply equally on tribal and non-tribal lands within a State.

C.    *Construction*.  None of the Parties and no Participating Tribe shall be considered to be the drafter of this Agreement or of any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement.  The headings of the provisions of this Agreement are not binding and are for reference only and do not limit, expand, or otherwise affect the contents or meaning of this Agreement.

D.    *Cooperation*.  Each Party agrees to use its best efforts and to cooperate with the other Parties to cause this Agreement to become effective, to obtain all necessary approvals, consents and authorizations, if any, and to execute all documents and to take such other action as may be appropriate in connection herewith.  Consistent with the foregoing, each Party agrees that it will not directly or indirectly assist or encourage any challenge to this Agreement by any other person, and will support the integrity and enforcement of the terms of this Agreement.

E.    *Entire Agreement*.  This Agreement, its Exhibits and any other attachments, embody the entire agreement and understanding between and among the Parties relating to the subject matter hereof and supersedes (1) all prior agreements and understandings relating to such subject matter, whether written or oral and (2) all purportedly contemporaneous oral agreements and understandings relating to such subject matter.

F.    *Execution.*  This Agreement may be executed in counterparts and by different signatories on separate counterparts, each of which shall be deemed an original, but all of which shall together be one and the same Agreement.  One or more counterparts of this Agreement may be delivered by facsimile or electronic transmission with the intent that it or they shall constitute an original counterpart hereof.  One or more counterparts of this Agreement may be signed by electronic signature.

G.    *Good Faith and Voluntary Entry*.  Each Party warrants and represents that it negotiated the terms of this Agreement in good faith.  Each of the Parties and signatories to this Agreement warrants and represents that it freely and voluntarily entered into this Agreement without any degree of duress or compulsion.  The Parties state that no promise of any kind or nature whatsoever (other than the written terms of this Agreement) was made to them to induce them to enter into this Agreement.

H.    *No Prevailing Party*.  The Parties each agree that they are not the prevailing party in this action, for purposes of any claim for fees, costs, or expenses as prevailing parties arising under common law or under the terms of any statute, because the Parties have reached a good faith settlement.

I.    *Waive Challenge*. The Parties each further waive any right to challenge or contest the validity of this Agreement on any ground, including, without limitation, that any term is unconstitutional or is preempted by, or in conflict with, any current or future law.

J.    *Non-Admissibility*.  The settlement negotiations resulting in this Agreement have been undertaken by the Parties in good faith and for settlement purposes only, and no evidence of negotiations or discussions underlying this Agreement shall be offered or received in evidence in any action or proceeding for any purpose.  This Agreement shall not be offered or received in evidence in any action or proceeding for any purpose other than in an action or proceeding arising under or relating to this Agreement, except that Released Entities may file or use this Agreement in any action (1) involving a determination regarding insurance coverage; (2) involving a determination of the taxable income or tax liability of any Released Entities; (3) to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good-

faith settlement, judgment bar or reduction or on any other theory of claim preclusion or issue preclusion or similar defense or counterclaim; (4) to support a claim for contribution and/or indemnification; or (5) to support any other argument or defense by a Released Entity that the Remediation Payments provide a measure of compensation for asserted harms or otherwise satisfy the relief sought.

K.    *Notices*.  All notices or other communications under this Agreement shall be in writing (including but not limited to electronic communications) and shall be given to the recipients indicated below:

For the Tribal Leadership Committee:

Lloyd Miller/Don Simon/Whitney Leonard
Sonosky, Chambers, Sachse, Miller & Monkman, LLP
510 L Street, Suite 310
Anchorage, AK 99501
lloyd@sonosky.net
dsimon@sonosky.com
whitney@sonosky.net
(907) 258-6377

Geoffrey Strommer/Caroline Mayhew/Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP
215 SW Washington St., Suite 200
Portland, OR 97204
gstrommer@hobbsstraus.com
cmayhew@hobbsstraus.com
egoodman@hobbsstraus.com
(503) 242-1745

Tara Sutton/Tim Purdon
Robins Kaplan LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
TSutton@RobinsKaplan.com
TPurdon@RobinsKaplan.com
(612) 349-8500

Lynn Sarko
Keller Rohrback, L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
lsarko@kellerrohrback.com
(206) 623.1900

Roe Frazer
Frazer PLC

30 Burton Hills Blvd, Suite 450
Nashville, TN 37215
roe@frazer.law
(615) 647-6464

Peter Mougey
Levin, Papantonio, Rafferty, Proctor,
Buchanan, O'Brien, Barr & Mougey, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
pmougey@levinlaw.com
(850) 435-7068

Elizabeth Cabraser/Dan Drachler/Eric Fastiff
Lieff Cabraser Heimann & Bernstein LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
ecabraser@lchb.com
ddrachler@lchb.com
efastiff@lchb.com
(415) 956-1000

Steve Skikos/Mark Crawford
Skikos, Crawford, Skikos & Joseph LLP
One Sansome Street, Suite 2830
San Francisco, CA 94104
sskikos@skikos.com
mcrawford@skikos.com
(415) 546-7300

For Sun:

Michael Connelly
Hyung Steele
501 Grant St., Suite 300
Union Trust Building
Pittsburgh, PA 15219
michael.connelly@troutman.com
hyung.steele@troutman.com
(412) 454-5810

Any Party or the TLC may change or add the contact information of the persons designated to receive notice on its behalf by notice given (effective upon the giving of such notice) as provided in this subsection.

L.    *No Waiver*.  The waiver of any rights conferred hereunder shall be effective only if made by written instrument executed by the waiving Party or Parties.  The waiver by

any Party of any breach of this Agreement shall not be deemed to be or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, nor shall such waiver be deemed to be or construed as a waiver by any other Party.

M.  *Preservation of Privilege*.  Nothing contained in this Agreement, and no act required to be performed pursuant to this Agreement, is intended to constitute, cause, or effect any waiver (in whole or in part) of any attorney-client privilege, work product protection, or common interest/joint defense privilege, and each Party agrees that it shall not make or cause to be made in any forum any assertion to the contrary.

N.  *Successors*.  This Agreement shall be binding upon, and inure to the benefit of, Sun and its respective successors and assigns.

O.  *Modification, Amendment, Alteration*.  After the Effective Date, any modification, amendment, or alteration of this Agreement by the Parties shall be binding only if evidenced in writing signed by Sun along with the signatures of the Tribal Leadership Committee. In the event the TLC or Sun concludes prior to the Effective Date that technical corrections are required to this Agreement, the TLC and Sun shall meet and confer in good faith and make such amendments as they agree are appropriate.

P.  *Termination.*

    1.  Unless otherwise agreed to by Sun and the Tribe in question, this Agreement and all of its terms shall be canceled and terminated with respect to that Tribe, and the Agreement shall become null and void and of no effect with respect to that Tribe, if one or more of the following conditions applies:

        a.  The Tribe in question does not sign the Tribal Participation Form; or

        b.  An insufficient number of Tribes sign the Tribal Participation Form, consistent with Section V.G. such that the Effective Date does not occur.

    2.  If this Agreement is terminated with respect to any or all Tribes, then:

        a.  An applicable statute of limitation or any similar time requirement (excluding any statute of repose) shall be tolled from the date of this Agreement until the later of the time permitted by applicable law or for one year from the date of such termination, with the effect that Sun and the Participating Tribe in question shall be in the same position with respect to the statute of limitation as they were at the time the Participating Tribe filed its action; and

        b.  Sun and the Participating Tribe in question shall jointly move the relevant court of competent jurisdiction for an order reinstating the actions and claims dismissed pursuant to the terms of this Agreement governing dismissal, with the effect that Sun and the Tribe in question shall be in the same position with respect to those actions and claims as they were at the time the action or claim was stayed or dismissed.

Q.   *Governing Law.*   Except (1) as otherwise provided in the Agreement or (2) as necessary, in the sole judgment of Special Master David Cohen, to promote uniformity of interpretation for matters, this Agreement shall be governed by and interpreted in accordance with the respective laws of the State of Ohio without regard to the conflict of law rules of such State.  Notwithstanding any other provision in this subsection on governing law, the United States District Court for the Northern District of Ohio shall retain jurisdiction to enforce this Agreement.

R.   *Severability.*   In the event any one or more immaterial provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement.

For the Tribal Leadership Committee:

Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller &
Monkman, LLP

Steve Skikos / Mark Crawford
Skikos, Crawford, Skikos & Joseph LLP

For Sun as to form:

*/s/ Michael Connelly*
Michael Connelly / Hyung Steele
Troutman Pepper Locke LLP
Counsel for Sun

A-1-25

**EXHIBIT A-1[2]**
Litigating Tribes

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Akiak Native Community | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Alaska Native Tribal Health Consortium | Hobbs Straus Dean & Walker | 1:18-op-46293-DAP |
| Aleutian Pribilof Islands Association | Hobbs Straus Dean & Walker | 1:19-op-45024-DAP |
| Apache Tribe of Oklahoma | The Bruehl Law Firm, PLLC | 1:19-op-46119-DAP |
| Arctic Slope Native Association | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Aroostook Band of Micmacs | Greene Ketchum Farrell Bailey & Tweel LLP | 1:19-op-45349-DAP |
| Asa'carsarmiut Tribe | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | Frazer PLC | 1:19-op-45256-DAP 1:19-op-45270-DAP 1:19-op-45297-DAP |
| Bay Mills Indian Community, Michigan | Skikos | 1:19-op-45287-DAP |
| Bear River Band of the Rohnerville Rancheria, California | Lieff Cabraser Heimann & Bernstein, LLP | 1:18-op-46362-DAP |
| Big Sandy Rancheria of Western Mono Indians of California | Ceiba Legal, LLP | 1:18-op-45923-DAP |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | Ceiba Legal, LLP | 1:18-op-45922-DAP |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | Powell & Majestro, PLLC | 1:18-op-45749-DAP |
| Bristol Bay Area Health Corporation | Hobbs Straus Dean & Walker | 1:19-op-46175-DAP |
| Cahto Tribe of the Laytonville Rancheria | Frazer PLC | 1:19-op-45038-DAP |

---

[2] Sun is relying on the representations of the TLC regarding the accuracy of this list.  Any ambiguity or inaccuracy should be construed against the TLC.

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Catawba Indian Nation | Fields PLLC | 1:20-op-45234-DAP |
| Cayuga Nation | Robins Kaplan LLP | 1:20-op-45153-DAP |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | Frazer PLC | 1:19-op-45038-DAP |
| Cherokee Nation | Boies Schiller Whitten Burrage Fields law Filed | 1:18-OP-45695-DAP |
| Cheyenne and Arapaho Tribes, Oklahoma | Frazer PLC | 1:19-op-45231-DAP |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | Domina Law Group | 1:19-op-45114-DAP |
| Chickasaw Nation | Whitten Burrage | 1:19-op-45066-DAP 1:20-op-45201-DAP |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | Skikos | 1:19-op-45395-DAP |
| Chitimacha Tribe of Louisiana | Frazer PLC | 1:18-op-45825-DAP |
| Choctaw Nation of Oklahoma | Whitten Burrage | 1:19-op-45065-DAP 1:20-op-45202-DAP |
| Chugachmiut | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Citizen Potawatomi Nation, Oklahoma | The Bruehl Law Firm, PLLC | 1:19-op-46013-DAP |
| Cloverdale Rancheria of Pomo Indians of California | Robins Kaplan LLP | 1:18-op-46241-DAP |
| Coeur D'Alene Tribe | Skikos | 1:19-op-45115-DAP |
| Comanche Nation, Oklahoma | Skikos | 1:19-op-45442-DAP |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45364-DAP |
| Confederated Tribes and Bands of the Yakama Nation | Askman Law Firm LLC | 1:18-op-46202-DAP |
| Confederated Tribes of the Colville Reservation | Skikos | 1:19-op-45312-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | Frazer PLC | 1:19-op-45972-DAP |
| Confederated Tribes of the Grand Ronde Community of Oregon | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45097-DAP |
| Confederated Tribes of the Umatilla Indian Reservation | Skikos | 1:18-op-45541-DAP |
| Confederated Tribes of the Warm Springs Reservation of Oregon | Skikos | 1:19-op-45069-DAP |
| Consolidated Tribal Health Project, Inc. | Ceiba Legal, LLP; Beggs & Lane | 1:18-op-45919-DAP |
| Copper River Native Association | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Coquille Indian Tribe | Frazer PLC | 1:19-op-45970-DAP |
| Coushatta Tribe of Louisiana | Levin Papantonio | 1:19-op-45438-DAP |
| Cow Creek Band of Umpqua Tribe of Indians | Robins Kaplan LLP | 1:18-op-45417-DAP |
| Coyote Valley Band of Pomo Indians of California | Ceiba Legal, LLP | 1:18-op-45918-DAP |
| Delaware Nation, Oklahoma | The Bruehl Law Firm, PLLC | 1:19-op-46011-DAP |
| Dry Creek Rancheria Band of Pomo Indians, California | Skikos | 1:20-op-45147-DAP |
| Eastern Aleutian Tribes | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Eastern Band of Cherokee Indians | Baron & Budd | 1:18-op-45098-DAP |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | Skikos | 1:19-op-45412-DAP |
| Ely Shoshone Tribe of Nevada | Frazer PLC | 1:18-op-46003-DAP |
| Ewiiaapaayp Band of Kumeyaay Indians, California | Frazer PLC | 1:19-op-45038-DAP |
| Feather River Tribal Health, Inc. | Berkey Williams; Lieff Cabraser | 1:19-op-45334-DAP |
| Flandreau Santee Sioux Tribe of South Dakota | Robins Kaplan LLP | 1:18-op-45095-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | Frazer PLC | 1:18-op-46146-DAP 1:18-op-46295-DAP 1:20-op-45250-DAP |
| Forest County Potawatomi Community, Wisconsin | Robins Kaplan LLP | 1:18-op-46342-DAP |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45364-DAP |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45366-DAP |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45078-DAP |
| Guidiville Rancheria of California | Ceiba Legal, LLP | 1:18-op-45917-DAP |
| Ho-Chunk Nation of Wisconsin | Frazer PLC | 1:19-op-45076-DAP |
| Hoopa Valley Tribe, California | Lieff Cabraser Heimann & Bernstein, LLP | 1:18-op-46361-DAP |
| Hopi Tribe of Arizona | Keller Rohrback LLP | 1:20-op-45204-DAP |
| Hopland Band of Pomo Indians, California | Ceiba Legal, LLP | 1:18-op-45913-DAP |
| Houlton Band of Maliseet Indians | Farrell Law | 1:19-op-45315-DAP |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | Robins Kaplan LLP | 1:19-op-45004-DAP |
| Indian Health Council | Hobbs Straus Dean & Walker | 1:18-op-46316-DAP |
| Iowa Tribe of Kansas and Nebraska | Skikos | 1:20-op-45099-DAP |
| Jamestown S'Klallam Tribe | Hobbs Straus Dean & Walker | 1:18-op-45271-DAP |
| Jicarilla Apache Nation, New Mexico | Skikos | 1:19-op-45385-DAP |
| Kenaitze Indian Tribe | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Keweenaw Bay Indian Community | Cooper Elliott | 1:20-op-45150-DAP |
| Kickapoo Traditional Tribe of Texas | Frazer PLC | 1:20-op-45104-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | Skikos | 1:19-op-45381-DAP |
| Klamath Tribes | Weitz & Luxenberg | 1:19-op-45786-DAP |
| Kodiak Area Native Association | Hobbs Straus Dean & Walker | 1:18-op-46260-DAP |
| Koi Nation of Northern California | Frazer PLC | 1:19-op-45038-DAP |
| Kootenai Tribe of Idaho | Robins Kaplan LLP | 1:18-op-46153-DAP |
| La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | Skikos | 1:19-op-45397-DAP |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | Frazer PLC | 1:18-op-45932-DAP |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | Frazer PLC | 1:18-op-45502-DAP |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | Skikos | 1:18-op-46239-DAP |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | Lockridge Grindal Nauen | 1:18-op-45052-DAP |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | Greene Ketchum Farrell Bailey & Tweel LLP | 1:19-op-45350-DAP |
| Lower Sioux Indian Community in the State of Minnesota | Robins Kaplan LLP | 1:18-op-45976-DAP |
| Lummi Tribe of the Lummi Reservation | Keller Rohrback LLP | 1:18-op-45955-DAP |
| Lytton Rancheria of California | Levin Papantonio | 1:19-op-45580-DAP |
| Makah Indian Tribe of the Makah Indian Reservation | Keller Rohrback LLP | 1:18-op-46022-DAP |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | Frazer PLC | 1:19-op-45038-DAP |
| Mashantucket Pequot Indian Tribe | Skikos | 1:19-op-45405-DAP |
| Mechoopda Indian Tribe of Chico Rancheria, California | Skikos | 1:19-op-45403-DAP |

A-1-30

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Menominee Indian Tribe of Wisconsin | Robins Kaplan LLP | 1:18-op-45426-DAP |
| Mentasta Traditional Council | Frazer PLC | 1:20-op-45024-DAP |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | Skikos | 1:19-op-45317-DAP |
| Miccosukee Tribe of Indians | The Moskowitz Law Firm | 1:19-op-45121-DAP |
| Mille Lacs Band of Ojibwe | Lockridge Grindal Nauen | 1:19-op-45978-DAP |
| Mississippi Band of Choctaw Indians | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45279-DAP |
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | Lockridge Grindal Nauen | 1:19-op-45650-DAP |
| Modoc Nation | Robins Kaplan LLP | 1:19-op-45439-DAP |
| Mohegan Tribe of Indians of Connecticut | Frazer PLC | 1:20-op-45164-DAP |
| Muckleshoot Indian Tribe | Skikos | 1:19-op-45213-DAP |
| Muscogee (Creek) Nation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:18-op-45459-DAP |
| Narragansett Indian Tribe | Frazer PLC | 1:20-op-45047-DAP |
| Native Village of Afognak | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Native Village of Port Heiden | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Navajo Nation, Arizona, New Mexico & Utah | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:18-op-45496-DAP |
| Nez Perce Tribe | Keller Rohrback LLP | 1:18-op-45730-DAP |
| Nisqually Indian Tribe | Robins Kaplan LLP | 1:18-op-45412-DAP |
| Northern Arapaho Tribe of the Wind River Reservation | Burg Simpson | 1:18-op-45438-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | Lockridge Grindal Nauen | 1:19-op-45010-DAP |
| Northwestern Band of the Shoshone Nation | Porteous Hainkel & Johnson | 1:20-op-45032-DAP |
| Norton Sound Health Corporation | Hobbs Straus Dean & Walker | 1:18-op-46261-DAP |
| Oglala Lakota Sioux Tribe | Robins Kaplan LLP | 1:18-op-45353-DAP |
| Omaha Tribe of Nebraska | Krupnick Campbell Malone Buser Slama Hancock, P.A. | 1:18-op-45621-DAP |
| Oneida Nation | Levin Papantonio | 1:18-op-46034-DAP |
| Osage Nation | The Bruehl Law Firm, PLLC | 1:19-op-45821-DAP |
| Otoe-Missouria Tribe of Indians, Oklahoma | Skikos | 1:19-op-45402-DAP |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | Frazer PLC | 1:18-op-45697-DAP |
| Pala Band of Mission Indians | Hobbs Straus Dean & Walker | 1:18-op-46341-DAP |
| Pascua Yaqui Tribe of Arizona | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45366-DAP |
| Passamaquoddy Tribe Indian Township | Weitz & Luxenberg | 1:18-op-45876-DAP |
| Passamaquoddy Tribe Pleasant Point | Weitz & Luxenberg | 1:19-op-45100-DAP |
| Pawnee Nation of Oklahoma | The Bruehl Law Firm, PLLC | 1:19-op-46017-DAP |
| Pinoleville Pomo Nation, California | Frazer PLC | 1:19-op-45974-DAP |
| Poarch Band of Creeks | Frazer PLC | 1:20-op-45231-DAP 1:20-op-45285-DAP 1:20-op-45286-DAP 1:20-op-45294-DAP |
| Ponca Tribe of Indians of Oklahoma | The Bruehl Law Firm, PLLC | 1:18-op-45327-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Ponca Tribe of Nebraska | Krupnick Campbell Malone Buser Slama Hancock, P.A. | 1:18-op-45557-DAP |
| Port Gamble S'Klallam Tribe | Hobbs Straus Dean & Walker | 1:18-op-45271-DAP |
| Potter Valley Tribe, California | Frazer PLC | 1:19-op-45038-DAP |
| Prairie Band Potawatomi Nation | Skikos | 1:20-op-45139-DAP |
| Prairie Island Indian Community in the State of Minnesota | Robins Kaplan LLP | 1:18-op-45975-DAP |
| Pueblo of Pojoaque, New Mexico | Frazer PLC | 1:19-op-45975-DAP |
| Puyallup Tribe of the Puyallup Reservation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45660-DAP |
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | Frazer PLC | 1:18-op-45696-DAP |
| Quapaw Nation | Greene Ketchum Farrell Bailey & Tweel LLP | 1:19-op-45460-DAP |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | Skikos | 1:20-op-45108-DAP |
| Quileute Tribe of the Quileute Reservation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:20-op-45196-DAP |
| Quinault Indian Nation | Robins Kaplan LLP | 1:18-op-46154-DAP; 1:19-op-45948 |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | Frazer PLC | 1:18-op-46116-DAP |
| Red Lake Band of Chippewa Indians, Minnesota | Baron & Budd | 1:18-op-45959-DAP |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | Ceiba Legal, LLP | 1:18-op-45916-DAP |
| Reno-Sparks Indian Colony, Nevada | Frazer PLC | 1:18-op-45699-DAP |
| Resighini Rancheria, California | Frazer PLC | 1:19-op-45038-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | Robins Kaplan LLP | 1:18-op-46151-DAP |
| Riverside San Bernardino County Indian Health Inc. | Berkey Williams; Lieff Cabraser | 1:19-op-45025-DAP |
| Robinson Rancheria | Ceiba Legal, LLP | 1:18-op-45912-DAP |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | Robins Kaplan LLP | 1:18-op-45095-DAP |
| Round Valley Indian Tribes, Round Valley Reservation, California | Ceiba Legal, LLP | 1:18-op-45915-DAP |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | Skikos | 1:20-op-45161-DAP |
| Sac & Fox Nation, Oklahoma | The Bruehl Law Firm, PLLC | 1:19-op-46012-DAP |
| Saginaw Chippewa Indian Tribe of Michigan | Robins Kaplan LLP | 1:19-op-45841-DAP |
| Saint Regis Mohawk Tribe | Keller Rohrback LLP | 1:19-op-45018-DAP |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45366-DAP |
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | Skikos | 1:20-op-45163-DAP |
| Santee Sioux Nation, Nebraska | Krupnick Campbell Malone Buser Slama Hancock, P.A. | 1:18-op-45621-DAP |
| Sault Ste. Marie Tribe of Chippewa Indians, Michigan | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45078-DAP |
| Scotts Valley Band of Pomo Indians of California | Ceiba Legal, LLP | 1:18-op-45914-DAP |
| Seminole Tribe of Florida | The Moskowitz Law Firm | 1:19-op-45912-DAP |
| Seneca Nation of Indians | McHugh Fuller Law Group | 1:18-op-45746-DAP |
| Shakopee Mdewakanton Sioux Community of Minnesota | Robins Kaplan LLP | 1:18-op-45977-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Shinnecock Indian Nation | Frazer PLC | 1:18-op-46142-DAP |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | Skikos | 1:19-op-45373-DAP |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | Robins Kaplan LLP | 1:18-op-45095-DAP |
| Sokaogon Chippewa Community, Wisconsin | Skikos | 1:19-op-45410-DAP |
| Southcentral Foundation | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Southeast Alaska Regional Health Corporation | Hobbs Straus Dean & Walker | 1:18-op-46149-DAP |
| Spirit Lake Tribe, North Dakota | Robins Kaplan LLP | 1:18-op-45520-DAP |
| Squaxin Island Tribe of the Squaxin Island Reservation | Robins Kaplan LLP | 1:18-op-45531-DAP |
| St. Croix Chippewa Indians of Wisconsin | Frazer PLC | 1:18-op-45367-DAP |
| Standing Rock Sioux Tribe of North & South Dakota | Robins Kaplan LLP | 1:18-op-45220-DAP |
| Stockbridge Munsee Community, Wisconsin | Skikos | 1:19-op-45032-DAP |
| Suquamish Indian Tribe of the Port Madison Reservation | Hobbs Straus Dean & Walker | 1:18-op-45271-DAP |
| Swinomish Indian Tribal Community | Lieff Cabraser Heimann & Bernstein | 1:18-op-45892-DAP |
| Sycuan Band of the Kumeyaay Nation | Robins Kaplan LLP | 1:19-op-45582-DAP |
| Tanana Chiefs Conference (including Council of Athabascan Tribal Governments) | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) | Frazer PLC | 1:18-op-46017-DAP; 1:18-op-46016; 1:20-op-45165 |
| Thlopthlocco Tribal Town | The Bruehl Law Firm, PLLC | 1:19-op-46021-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | Skikos | 1:19-op-45376-DAP |
| Tohono O'odham Nation of Arizona | Skikos | 1:19-op-45411-DAP |
| Tonto Apache Tribe of Arizona | Skikos | 1:19-op-45398-DAP |
| Torres Martinez Desert Cahuilla Indians, California | Robins Kaplan LLP | 1:18-op-46152-DAP |
| Tulalip Tribes of Washington | Keller Rohrback LLP | 1:18-op-45589-DAP |
| Tule River Indian Tribe of the Tule River Reservation, California | Skikos | 1:19-op-45579-DAP |
| Tunica-Biloxi Indian Tribe | Simmons Hanly Conroy | 1:18-op-45996-DAP |
| Turtle Mountain Band of Chippewa Indians of North Dakota | Robins Kaplan LLP | 1:18-op-45521-DAP |
| United Keetoowah Band of Cherokee Indians in Oklahoma | McHugh Fuller Law Group | 1:19-op-45600-DAP |
| Upper Sioux Community, Minnesota | Robins Kaplan LLP | 1:18-op-45974-DAP |
| Walker River Paiute Tribe, Nevada | Frazer PLC | 1:18-op-45698-DAP |
| Wampanoag Tribe of Gay Head (Aquinnah) | Frazer PLC | 1:19-op-45844-DAP 1:20-op-45170-DAP |
| White Earth Band of the Minnesota Chippewa Tribe, Minnesota | Hill Peterson Carper Bee & Deitzler | 1:19-op-45357-DAP |
| White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | Fields PLLC | 1:20-op-45243-DAP |
| Winnebago Tribe of Nebraska | Krupnick Campbell Malone Buser Slama Hancock, P.A. | 1:18-op-45621-DAP |
| Wyandotte Nation | Levin Papantonio | 1:19-op-45601-DAP |
| Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | Feazell & Tighe LLP | 1:18-op-46355-DAP |
| Yukon Kuskokwim Health Corporation | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Yurok Tribe of the Yurok Reservation, California | Lieff Cabraser Heimann & Bernstein | 1:18-op-45311-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Zuni Tribe of the Zuni Reservation, New Mexico | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:20-op-45114-DAP |

**EXHIBIT A-2**[3]

Non-Litigating Tribes

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Absentee-Shawnee Tribe of Indians of Oklahoma | | |
| *Agdaagux Tribe of King Cove*\* | | |
| Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | | |
| Ak-Chin Indian Community | | |
| *Akiachak Native Community* | | |
| Alabama-Coushatta Tribe of Texas | | |
| Alabama-Quassarte Tribal Town | | |
| *Alatna Village* | | |
| *Algaaciq Native Village (St. Mary's)* | | |
| *Allakaket Village* | | |
| Alturas Indian Rancheria, California | | |
| *Alutiiq Tribe of Old Harbor [previously listed as Native Village of Old Harbor and Village of Old Harbor]* | | |
| *Angoon Community Association* | | |
| *Anvik Village* | | |
| *Arctic Village (See Native Village of Venetie Tribal Government)* | | |
| Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana | | |
| Augustine Band of Cahuilla Indians, California | | |
| *Beaver Village* | | |
| Berry Creek Rancheria of Maidu Indians of California | | |
| Big Lagoon Rancheria, California | | |
| Big Pine Paiute Tribe of the Owens Valley | | |
| *Birch Creek Tribe* | | |

---

[3] Sun is relying on the representations of the TLC regarding the accuracy of this list.  Any ambiguity or inaccuracy should be construed against the TLC.

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Bishop Paiute Tribe | | |
| Blue Lake Rancheria, California | | |
| Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | | |
| Bridgeport Indian Colony | | |
| Buena Vista Rancheria of Me-Wuk Indians of California | | |
| Burns Paiute Tribe | | |
| Cabazon Band of Mission Indians, California | | |
| Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | | |
| Caddo Nation of Oklahoma | | |
| Cahuilla Band of Indians | | |
| California Valley Miwok Tribe, California | | |
| Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | | |
| Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California) | | |
| Cedarville Rancheria, California | | |
| *Central Council of the Tlingit & Haida Indian Tribes* | | |
| *Chalkyitsik Village* | | |
| Cheesh-Na Tribe [previously listed as Native Village of Chistochina] | | |
| Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | | |
| *Chevak Native Village* | | |
| Chickahominy Indian Tribe | | |
| Chickahominy Indian Tribe—Eastern Division | | |
| Chickaloon Native Village | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Chicken Ranch Rancheria of Me-Wuk Indians of California | Frazer PLC | |
| *Chignik Bay Tribal Council [previously listed as Native Village of Chignik]* | | |
| *Chignik Lake Village* | | |
| *Chilkat Indian Village (Klukwan)* | | |
| *Chilkoot Indian Association (Haines)* | | |
| *Chinik Eskimo Community (Golovin)* | | |
| *Chuloonawick Native Village* | | |
| *Circle Native Community* | | |
| Cocopah Tribe of Arizona | | |
| Cold Springs Rancheria of Mono Indians of California | | |
| Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | | |
| Confederated Tribes of Siletz Indians of Oregon | | |
| Confederated Tribes of the Chehalis Reservation | | |
| Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | | |
| Cowlitz Indian Tribe | | |
| *Craig Tribal Association [previously listed as Craig Community Association]* | | |
| Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | | |
| Crow Tribe of Montana | | |
| *Curyung Tribal Council* | | |
| Delaware Tribe of Indians | | |
| *Douglas Indian Association* | | |
| Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | | |
| Eastern Shawnee Tribe of Oklahoma | | |
| *Egegik Village* | | |
| Eklutna Native Village | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | | |
| Elk Valley Rancheria, California | | |
| *Emmonak Village* | | |
| Enterprise Rancheria of Maidu Indians of California | | |
| *Evansville Village (aka Bettles Field)* | | |
| Eyak Native Village | | |
| Federated Indians of Graton Rancheria, California | | |
| Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | | |
| Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | | |
| Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | | |
| Fort McDowell Yavapai Nation, Arizona | | |
| Fort Mojave Indian Tribe of Arizona, California & Nevada | | |
| Fort Sill Apache Tribe of Oklahoma | | |
| *Galena Village (aka Louden Village)* | | |
| Grand Portage Band of the Minnesota Chippewa Tribe, Minnesota | | |
| Greenville Rancheria | | |
| Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | | |
| *Gulkana Village Council [previously listed as Gulkana Village]* | | |
| Habematolel Pomo of Upper Lake, California | | |
| Hannahville Indian Community, Michigan | | |
| Havasupai Tribe of the Havasupai Reservation, Arizona | | |
| *Healy Lake Village* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Hoh Indian Tribe | | |
| *Holy Cross Tribe [previously listed as Holy Cross Village]* | | |
| *Hoonah Indian Association Start Printed Page 7558* | | |
| *Hughes Village* | | |
| *Huslia Village* | | |
| *Hydaburg Cooperative Association* | | |
| *Igiugig Village* | | |
| Iipay Nation of Santa Ysabel, California | | |
| Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | | |
| *Inupiat Community of the Arctic Slope* | | |
| Ione Band of Miwok Indians of California | | |
| Iowa Tribe of Oklahoma | | |
| *Iqugmiut Traditional Council [previously listed as Iqurmuit Traditional Council]* | | |
| *Ivanof Bay Tribe [previously listed as Ivanoff Bay Tribe and Ivanoff Bay Village]* | | |
| Jackson Band of Miwuk Indians | | |
| Jamul Indian Village of California | | |
| Jena Band of Choctaw Indians | | |
| *Kaguyak Village* | | |
| Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | | |
| *Kaktovik Village (aka Barter Island)* | | |
| Kalispel Indian Community of the Kalispel Reservation | | |
| Karuk Tribe | | |
| Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | | |
| *Kasigluk Traditional Elders Council* | | |
| Kaw Nation, Oklahoma | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Ketchikan Indian Community | | |
| Kewa Pueblo, New Mexico | | |
| Kialegee Tribal Town | | |
| Kickapoo Tribe of Oklahoma | | |
| *King Island Native Community* | | |
| *King Salmon Tribe* | | |
| Kiowa Indian Tribe of Oklahoma | The Bruehl Law Firm, PLLC | |
| *Klawock Cooperative Association* | | |
| Kletsel Dehe Band of Wintun Indians | | |
| Knik Tribe | | |
| *Kokhanok Village* | | |
| *Koyukuk Native Village* | | |
| La Jolla Band of Luiseno Indians, California | | |
| Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | | |
| *Levelock Village* | | |
| *Lime Village* | | |
| Little River Band of Ottawa Indians, Michigan | | |
| Little Shell Tribe of Chippewa Indians of Montana | Robins Kaplan LLP | |
| Little Traverse Bay Bands of Odawa Indians, Michigan | | |
| Lone Pine Paiute-Shoshone Tribe | | |
| Los Coyotes Band of Cahuilla and Cupeno Indians, California | | |
| Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | | |
| Lower Elwha Tribal Community | | |
| Maniilaq Association | | |
| *Manley Hot Springs Village* | | |
| *Manokotak Village* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | | |
| Mashpee Wampanoag Tribe | | |
| Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | | |
| *McGrath Native Village* | | |
| Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | | |
| Metlakatla Indian Community | | |
| Miami Tribe of Oklahoma | | |
| Middletown Rancheria of Pomo Indians of California | | |
| Monacan Indian Nation | | |
| Mooretown Rancheria of Maidu Indians of California | | |
| Morongo Band of Mission Indians, California | | |
| Mt.  Sanford Tribal Consortium | | |
| *Naknek Native Village* | | |
| Nansemond Indian Nation | | |
| *Native Village of Akhiok* | | |
| *Native Village of Akutan* | | |
| *Native Village of Aleknagik* | | |
| Native Village of Ambler | | |
| *Native Village of Atka* | | |
| *Native Village of Atqasuk [previously listed as Atqasuk Village (Atkasook)]* | | |
| *Native Village of Barrow Inupiat Traditional Government* | | |
| *Native Village of Belkofski* | | |
| *Native Village of Brevig Mission* | | |
| Native Village of Buckland | | |
| *Native Village of Cantwell* | | |
| *Native Village of Chenega (aka Chanega)* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Native Village of Chignik Lagoon* | | |
| Native Village of Chitina | | |
| *Native Village of Chuathbaluk (Russian Mission, Kuskokwim)* | | |
| *Native Village of Council* | | |
| Native Village of Deering | | |
| *Native Village of Diomede (aka Inalik)* | | |
| *Native Village of Eagle* | | |
| *Native Village of Eek* | | |
| *Native Village of Ekuk* | | |
| *Native Village of Ekwok [previously listed as Ekwok Village]* | | |
| *Native Village of Elim* | | |
| *Native Village of False Pass* | | |
| *Native Village of Fort Yukon* | | |
| *Native Village of Gakona* | | |
| *Native Village of Gambell* | | |
| *Native Village of Georgetown* | | |
| *Native Village of Goodnews Bay* | | |
| *Native Village of Hamilton* | | |
| *Native Village of Hooper Bay* | | |
| *Native Village of Kanatak* | | |
| *Native Village of Karluk* | | |
| Native Village of Kiana | | |
| *Native Village of Kipnuk* | | |
| Native Village of Kivalina | | |
| *Native Village of Kluti Kaah (aka Copper Center)* | | |
| Native Village of Kobuk | | |
| *Native Village of Kongiganak* | | |
| Native Village of Kotzebue | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Native Village of Koyuk* | | |
| *Native Village of Kwigillingok* | | |
| *Native Village of Kwinhagak (aka Quinhagak)* | | |
| *Native Village of Larsen Bay* | | |
| *Native Village of Marshall (aka Fortuna Ledge)* | | |
| *Native Village of Mary's Igloo* | | |
| *Native Village of Mekoryuk* | | |
| *Native Village of Minto* | | |
| *Native Village of Nanwalek (aka English Bay)* | | |
| *Native Village of Napaimute* | | |
| *Native Village of Napakiak* | | |
| *Native Village of Napaskiak* | | |
| *Native Village of Nelson Lagoon* | | |
| *Native Village of Nightmute* | | |
| *Native Village of Nikolski* | | |
| Native Village of Noatak | | |
| *Native Village of Nuiqsut (aka Nooiksut)* | | |
| *Native Village of Nunam Iqua [previously listed as Native Village of Sheldon's Point]* | | |
| *Native Village of Nunapitchuk* | | |
| *Native Village of Ouzinkie* | | |
| *Native Village of Paimiut* | | |
| *Native Village of Perryville* | | |
| *Native Village of Pilot Point* | | |
| Native Village of Point Hope | | |
| *Native Village of Point Lay* | | |
| *Native Village of Port Graham* | | |
| *Native Village of Port Lions* | | |
| *Native Village of Ruby* | | |
| *Native Village of Saint Michael* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Native Village of Savoonga* | | |
| *Native Village of Scammon Bay* | | |
| Native Village of Selawik | | |
| *Native Village of Shaktoolik* | | |
| *Native Village of Shishmaref* | | |
| Native Village of Shungnak | | |
| *Native Village of Stevens* | | |
| *Native Village of Tanacross* | | |
| Native Village of Tanana | | |
| *Native Village of Tatitlek* | | |
| *Native Village of Tazlina* | | |
| *Native Village of Teller* | | |
| *Native Village of Tetlin* | | |
| *Native Village of Tuntutuliak* | | |
| *Native Village of Tununak* | | |
| Native Village of Tyonek | | |
| *Native Village of Unalakleet* | | |
| *Native Village of Unga* | | |
| *Native Village of Venetie Tribal Government (Arctic Village and Village of Venetie)* | | |
| *Native Village of Wales* | | |
| *Native Village of White Mountain* | | |
| *Nenana Native Association* | | |
| *New Koliganek Village Council* | | |
| *New Stuyahok Village* | | |
| *Newhalen Village* | | |
| *Newtok Village* | | |
| *Nikolai Village* | | |
| Ninilchik Village | | |
| *Nome Eskimo Community* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Nondalton Village* | | |
| Nooksack Indian Tribe | | |
| Noorvik Native Community | | |
| Northfork Rancheria of Mono Indians of California | | |
| *Northway Village* | | |
| Nottawaseppi Huron Band of the Potawatomi, Michigan | | |
| *Nulato Village* | | |
| *Nunakauyarmiut Tribe* | | |
| Ohkay Owingeh, New Mexico | | |
| Oneida Indian Nation | | |
| Onondaga Nation | | |
| *Organized Village of Grayling (aka Holikachuk)* | | |
| *Organized Village of Kake* | | |
| *Organized Village of Kasaan* | | |
| *Organized Village of Kwethluk* | | |
| *Organized Village of Saxman* | | |
| *Orutsararmiut Traditional Native Council [previously listed as Orutsararmuit Native Village (aka Bethel)]* | | |
| *Oscarville Traditional Village* | | |
| Ottawa Tribe of Oklahoma | | |
| Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes) | | |
| Pamunkey Indian Tribe | | |
| Paskenta Band of Nomlaki Indians of California | | |
| *Pauloff Harbor Village* | | |
| Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | | |
| Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Pedro Bay Village* | | |
| Penobscot Nation | | |
| Peoria Tribe of Indians of Oklahoma | | |
| *Petersburg Indian Association* | | |
| Picayune Rancheria of Chukchansi Indians of California | | |
| *Pilot Station Traditional Village* | | |
| Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias) | | |
| *Pitka's Point Traditional Council [previously listed as Native Village of Pitka's Point]* | | |
| *Platinum Traditional Village* | | |
| Pokagon Band of Potawatomi Indians, Michigan and Indiana | | |
| *Portage Creek Village (aka Ohgsenakale)* | | |
| *Pribilof Islands Aleut Communities of St.  Paul & St. George Islands (Saint George Island and Saint Paul Island)* | | |
| Pueblo of Acoma, New Mexico | | |
| Pueblo of Cochiti, New Mexico | | |
| Pueblo of Isleta, New Mexico | | |
| Pueblo of Jemez, New Mexico | | |
| Pueblo of Laguna, New Mexico | | |
| Pueblo of Nambe, New Mexico | | |
| Pueblo of Picuris, New Mexico | | |
| Pueblo of San Felipe, New Mexico | | |
| Pueblo of San Ildefonso, New Mexico | | |
| Pueblo of Sandia, New Mexico | | |
| Pueblo of Santa Ana, New Mexico | | |
| Pueblo of Santa Clara, New Mexico | | |
| Pueblo of Taos, New Mexico | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Pueblo of Tesuque, New Mexico | | |
| Pueblo of Zia, New Mexico | | |
| *Qagan Tayagungin Tribe of Sand Point [previously listed as Qagan Tayagungin Tribe of Sand Point Village]* | | |
| *Qawalangin Tribe of Unalaska* | | |
| Quartz Valley Indian Community of the Quartz Valley Reservation of California | | |
| Ramona Band of Cahuilla, California | | |
| *Rampart Village* | | |
| Rappahannock Tribe, Inc. | | |
| Redding Rancheria, California | | |
| Sac & Fox Tribe of the Mississippi in Iowa | | |
| *Saint George Island (See Pribilof Islands Aleut Communities of St. Paul & St. George Islands)* | | |
| *Saint Paul Island (See Pribilof Islands Aleut Communities of St. Paul & St. George Islands)* | | |
| *Salamatof Tribe [previously listed as Village of Salamatoff]* | | |
| Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | | |
| Samish Indian Nation | | |
| San Juan Southern Paiute Tribe of Arizona | | |
| San Manuel Band of Mission Indians, California | | |
| San Pasqual Band of Diegueno Mission Indians of California | | |
| Santa Rosa Band of Cahuilla Indians, California | Robins Kaplan LLP | |
| Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | | |
| Sauk-Suiattle Indian Tribe | | |
| Seldovia Village Tribe | | |
| Seneca-Cayuga Nation | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Shageluk Native Village* | | |
| Shawnee Tribe | | |
| Sherwood Valley Rancheria of Pomo Indians of California | | |
| Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | | |
| Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | | |
| Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | | |
| *Sitka Tribe of Alaska* | | |
| *Skagway Village* | | |
| Skokomish Indian Tribe | | |
| Skull Valley Band of Goshute Indians of Utah | | |
| Snoqualmie Indian Tribe | | |
| Soboba Band of Luiseno Indians, California | | |
| *South Naknek Village* | | |
| Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | | |
| Spokane Tribe of the Spokane Reservation | | |
| *Stebbins Community Association* | | |
| Stillaguamish Tribe of Indians of Washington | | |
| Summit Lake Paiute Tribe of Nevada | | |
| *Sun'aq Tribe of Kodiak [previously listed as Shoonaq' Tribe of Kodiak]* | | |
| Susanville Indian Rancheria, California | | |
| Table Mountain Rancheria | | |
| *Takotna Village* | | |
| *Tangirnaq Native Village [previously listed as Lesnoi Village (aka Woody Island)]* | | |
| Tejon Indian Tribe | | |
| *Telida Village* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| The Seminole Nation of Oklahoma | | |
| Timbisha Shoshone Tribe | | |
| Tolowa Dee-ni' Nation | | |
| Tonawanda Band of Seneca | | |
| Tonkawa Tribe of Indians of Oklahoma | | |
| *Traditional Village of Togiak* | | |
| *Tuluksak Native Community* | | |
| Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | | |
| Tuscarora Nation | | |
| Twenty-Nine Palms Band of Mission Indians of California | | |
| *Twin Hills Village* | | |
| *Ugashik Village* | | |
| *Umkumiut Native Village [previously listed as Umkumiute Native Village]* | | |
| United Auburn Indian Community of the Auburn Rancheria of California | | |
| Upper Mattaponi Tribe | | |
| Upper Skagit Indian Tribe | | |
| Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | | |
| Ute Mountain Ute Tribe | | |
| Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | | |
| *Village of Alakanuk* | | |
| *Village of Anaktuvuk Pass* | | |
| *Village of Aniak* | | |
| *Village of Atmautluak* | | |
| *Village of Bill Moore's Slough* | | |
| *Village of Chefornak* | | |
| *Village of Clarks Point* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Village of Crooked Creek* | | |
| *Village of Dot Lake* | | |
| *Village of Iliamna* | | |
| *Village of Kalskag* | | |
| *Village of Kaltag* | | |
| *Village of Kotlik* | | |
| *Village of Lower Kalskag* | | |
| *Village of Ohogamiut* | | |
| *Village of Red Devil* | | |
| *Village of Sleetmute* | | |
| *Village of Solomon* | | |
| *Village of Stony River* | | |
| *Village of Venetie (See Native Village of Venetie Tribal Government)* | | |
| *Village of Wainwright* | | |
| Washoe Tribe of Nevada & California | | |
| Wichita and Affiliated Tribes, Oklahoma | | |
| Wilton Rancheria, California | | |
| Winnemucca Indian Colony of Nevada | | |
| Wiyot Tribe, California | | |
| *Wrangell Cooperative Association* | | |
| Yakutat Tlingit Tribe | | |
| Yankton Sioux Tribe of South Dakota | | |
| Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | | |
| Yavapai-Prescott Indian Tribe | | |
| Yocha Dehe Wintun Nation, California | | |
| Yomba Shoshone Tribe of the Yomba Reservation, Nevada | | |
| Ysleta del Sur Pueblo | | |
| *Yupiit of Andreafski* | | |

* Italics indicate tribes that are members of a litigating tribal organization or consortium, whose share will be recovered through the respective organization

## EXHIBIT B

## Alleged Harms

The following expert reports that were served in connection with the case captioned *In re: National Prescription Opiate Litigation*, No. 1:17-md-2804 (N.D. Ohio) provide non-exclusive examples of Alleged Harms:

1.  Expert report of Professor David Cutler, dated March 25, 2019.

2.  Expert report of Dr. Jeffrey B. Liebman, dated March 25, 2019.

3.  Expert report of Professor Thomas McGuire regarding damages to Bellwethers, dated March 25, 2019.

4.  Report of Professor Thomas McGuire regarding public nuisance, dated March 25, 2019.

5.  Expert reports of G. Caleb Alexander, dated April 16, 2021.

6.  Expert reports of David Cutler, dated April 16, 2019; supplemental expert report of David Cutler, dated April 21, 2021; and second supplemental expert report of David Cutler, dated May 10, 2021.

7.  Expert report of David Herzberg, dated April 16, 2021.

8.  Expert reports of Katherine M. Keyes, Ph.D., dated April 16, 2021; supplemental expert report of Katherine M. Keyes, Ph.D, dated June 2, 2021.

9.  Expert reports of Dr. Anna Lembke, M.D., dated April 16, 2021.

10. Expert report of Harvey Rosen, dated April 16, 2021.

11. Expert report of Nancy Young, dated April 16, 2021.

# EXHIBIT C-1

## List of Tribes and Tribal Allocation Voting Percentages

### RECOMMENDATION OF THE HONORABLE LAYN PHILLIPS REGARDING THE INTERTRIBAL ALLOCATION MATRIX

Native American Tribes participated in the Purdue Mediation process and reached agreement with the other non-Federal Public Claimants on value allocation for the Tribes.

Following the Mediation, the Tribal Leadership Committee ("TLC") contacted me to request an opportunity to present for approval the Intertribal Allocation Matrix. I agreed to hear the presentation and requested materials to review in advance of the presentation. In response to my request, I received the following documents:

1)   PowerPoint summary of the intertribal allocation model

2)   One-page summary of the model titled, "Tribal Allocation Matrix Narrative

3)   Excel spreadsheet with the allocation to the tribes.

In addition, I sent the TLC my preliminary thoughts and inquiries regarding the Intertribal Allocation Matrix for their consideration prior to the presentation that occurred on April 2, 2021.

The TLC presented the Intertribal Allocation Matrix to attorney Clay Cogman and me on April 2, 2021. We had sufficient time to thoroughly discuss the allocation model and the TLC addressed to my satisfaction all questions and issues that were raised.

I note here for context that in a typical mediation setting, I would have had the opportunity to hear from other constituencies for the purpose of assisting me in my analysis by providing me alternative perspectives designed to test the premises and assumptions of the underlying methodology. That did not occur here, as I have only spoken to the TLC about the Matrix.

That said, based on the foregoing, I find that the Intertribal Allocation Matrix provides a satisfactorily reasonable and transparent methodology for the allocation of Purdue settlement funds among Native American Tribes.

Dated: May 11, 2011

By: _____

Layn R. Phillips

## Schedule E
## Tribal Allocation Matrix

The Tribal Nation's allocation matrix is built around six data points:  MMEs (morphine milligram equivalents) imputed to each Tribe; drug and prescription opioid overdose rates imputed to each Tribe; Indian Health Service (IHS) user population for each Tribe; citizenship population for each Tribe; relative poverty rates imputed to each Tribe; and relative cost of living imputed to each Tribe. Data are "imputed" to a Tribe by estimation based on population when the data is only available on a county or statewide basis.  In the case of MMEs and drug overdose rates, the imputation of the data to a tribal population is multiplied by a "disproportionate impact" adjustment reflecting the higher incidence of opioid use disorder and prescription opioid overdose deaths in tribal communities.

Two computations are undertaken for all Tribes, and then combined together.  85% of a Tribe's matrix share is calculated by considering its imputed MME rate (50%), overdose rates (40%), and poverty rate (10%) as applied to its IHS user population.  15% of a Tribe's matrix share is calculated by considering the same three elements, similarly weighted, as applied to the Tribe's citizenship data. Once these two matrix results are combined, the resulting share is further adjusted by each Tribe's relative cost of living. COLA adjustments are done on a regional basis and are weighted at 10%, resulting in modest adjustments ranging from 1.3% down to 2.4% up.

Data for Alaska Tribes was initially computed on a statewide basis, and the resulting matrix share for Alaska was then subdivided among Alaska Tribes and tribal organizations participating in the Alaska Tribal Health Compact (employing the same methodology historically used to allocate certain other tribal health care funds across Alaska tribal health care providers).

The matrix allocates individual amounts to each California Tribe, although four intertribal health care providers in California have also separately filed litigation.  Each such intertribal provider will engage in discussions with its member tribes and agree on an amount that the member tribes will allocate from their funds to the intertribal provider.

Tribal citizenship data used in the matrix was subject to a tribal verification process (except for Alaska, where data was drawn from the U.S. Census).  In instances where IHS user population data for multiple Tribes was not allocated by IHS to individual Tribes, user populations were prorated across the Tribes within an IHS service unit based on the Tribes' relative tribal citizenship.

*Sun acknowledges and expressly agrees that it had no role whatsoever in the inter-tribal allocation, the inter-tribal allocation matrix, or the underlying metrics and methodology used to determine the allocation. The application of the inter-tribal allocation to this Agreement shall not constitute a position by Sun, nor shall it restrict Sun's ability to take positions in contexts unrelated to this Agreement.*

**Allocation of Settlement Among Tribes**

6/18/2021

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Total | 100.0000% |
| Absentee-Shawnee Tribe of Indians of Oklahoma | 0.5575% |
| Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | 0.0406% |
| Ak-Chin Indian Community | 0.0635% |
| Alabama-Coushatta Tribe of Texas | 0.0293% |
| Alabama-Quassarte Tribal Town | 0.0111% |
| ALL Alaskan Tribes | 9.2643% |
|     Alaska Native Tribal Health Consortium | 1.8883% |
|     *Aleutian Pribilof Islands Association | 0.0674% |
|     *Arctic Slope Native Association | 0.2825% |
|     *Bristol Bay Area Health Corporation | 0.4733% |
|     Chickaloon Native Village | 0.0105% |
|     *Chugachmiut | 0.1055% |
|     *Copper River Native Association | 0.0922% |
|     *Eastern Aleutian Tribes | 0.1017% |
|     Ekluuna Native Village | 0.0125% |
|     Eyak Native Village | 0.0202% |
|     *Kodiak Area Native Association | 0.1817% |
|     *Kenaitze Indian Tribe | 0.1544% |
|     *Ketchikan Indian Community | 0.1033% |
|     Knik Tribe | 0.0118% |
|     *Maniilaq Association | 0.4026% |
|     Metlakatla Indian Community | 0.0703% |
|     *Mt. Sanford Tribal Consortium | 0.0268% |
|     *Norton Sound Health Corporation | 0.5929% |
|     *Southcentral Foundation | 1.5145% |
|     *Southeast Alaska Regional Health Corporation | 0.5865% |
|     Seldovia Village Tribe | 0.0322% |
|     *Tanana Chiefs Conference (including Council of Athabascan Tribal Governments) | 0.9318% |
|     Yakutat Tlingit Tribe | 0.0290% |
|     *Yukon Kuskokwim Health Corporation | 1.4987% |
|     Native Village of Chitina | 0.0115% |
|     Ninilchik Village | 0.0289% |
|     Native Village of Tanana | 0.0190% |
|     Native Village of Tyonek | 0.0145% |
| Alturas Indian Rancheria, California | 0.0008% |
| Apache Tribe of Oklahoma | 0.1334% |
| Arapaho Tribe of the Wind River Reservation, Wyoming | 0.3444% |
| Aroostook Band of Micmacs | 0.0370% |
| Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana | 0.3789% |
| Augustine Band of Cahuilla Indians, California | 0.0013% |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | 0.1533% |
| Bay Mills Indian Community, Michigan | 0.0714% |
| Bear River Band of the Rohnerville Rancheria, California | 0.0507% |
| Berry Creek Rancheria of Maidu Indians of California | 0.1121% |
| Big Lagoon Rancheria, California | 0.0027% |
| Big Pine Paiute Tribe of the Owens Valley | 0.0320% |
| Big Sandy Rancheria of Western Mono Indians of California | 0.0328% |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | 0.1214% |
| Bishop Paiute Tribe | 0.1041% |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | 0.5378% |

Allocation of Settlement Among Tribes

p. 1

B-4

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Blue Lake Rancheria, California | 0.0038% |
| Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | 0.0820% |
| Bridgeport Indian Colony | 0.0026% |
| Buena Vista Rancheria of Me-Wuk Indians of California | 0.0034% |
| Burns Paiute Tribe | 0.0116% |
| Cabazon Band of Mission Indians, California | 0.0017% |
| Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | 0.0056% |
| Caddo Nation of Oklahoma | 0.1084% |
| Cahto Tribe of the Laytonville Rancheria | 0.0207% |
| Cahuilla Band of Indians | 0.0368% |
| California Valley Miwok Tribe, California | 0.0044% |
| Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | 0.0241% |
| Catawba Indian Nation | 0.0743% |
| Cayuga Nation | 0.0070% |
| Cedarville Rancheria, California | 0.0019% |
| Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | 0.0181% |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | 0.0200% |
| Cherokee Nation | 12.1894% |
| Cheyenne and Arapaho Tribes, Oklahoma | 0.7723% |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | 0.2906% |
| Chickahominy Indian Tribe | 0.0315% |
| Chickahominy Indian Tribe—Eastern Division | 0.0085% |
| Chickasaw Nation | 2.1567% |
| Chicken Ranch Rancheria of Me-Wuk Indians of California | 0.0026% |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | 0.2330% |
| Chitimacha Tribe of Louisiana | 0.0347% |
| Choctaw Nation of Oklahoma | 5.4805% |
| Citizen Potawatomi Nation, Oklahoma | 1.4669% |
| Cloverdale Rancheria of Pomo Indians of California | 0.0518% |
| Cocopah Tribe of Arizona | 0.0366% |
| Coeur D'Alene Tribe | 0.2865% |
| Cold Springs Rancheria of Mono Indians of California | 0.0108% |
| Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | 0.2784% |
| Comanche Nation, Oklahoma | 0.6989% |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | 0.6040% |
| Confederated Tribes and Bands of the Yakama Nation | 0.6242% |
| Confederated Tribes of Siletz Indians of Oregon | 0.4294% |
| Confederated Tribes of the Chehalis Reservation | 0.0887% |
| Confederated Tribes of the Colville Reservation | 0.4214% |
| Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | 0.0541% |
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | 0.0144% |
| Confederated Tribes of the Grand Ronde Community of Oregon | 0.2456% |
| Confederated Tribes of the Umatilla Indian Reservation | 0.1554% |
| Confederated Tribes of the Warm Springs Reservation of Oregon | 0.3374% |
| Coquille Indian Tribe | 0.0926% |
| Coushatta Tribe of Louisiana | 0.0264% |
| Cow Creek Band of Umpqua Tribe of Indians | 0.1532% |
| Cowlitz Indian Tribe | 0.4024% |
| Coyote Valley Band of Pomo Indians of California | 0.0337% |
| Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | 0.1504% |
| Crow Tribe of Montana | 0.7579% |
| Delaware Nation, Oklahoma | 0.0342% |
| Delaware Tribe of Indians | 0.3134% |

Allocation of Settlement Among Tribes

p. 2

B-5

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Dry Creek Rancheria Band of Pomo Indians, California | 0.0709% |
| Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | 0.0224% |
| Eastern Band of Cherokee Indians | 0.9560% |
| Eastern Shawnee Tribe of Oklahoma | 0.0548% |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | 0.1459% |
| Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | 0.0101% |
| Elk Valley Rancheria, California | 0.0063% |
| Ely Shoshone Tribe of Nevada | 0.0550% |
| Enterprise Rancheria of Maidu Indians of California | 0.1825% |
| Ewiiaapaayp Band of Kumeyaay Indians, California | 0.0004% |
| Federated Indians of Graton Rancheria, California | 0.0770% |
| Flandreau Santee Sioux Tribe of South Dakota | 0.0224% |
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | 0.3382% |
| Forest County Potawatomi Community, Wisconsin | 0.0266% |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | 0.1662% |
| Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | 0.0088% |
| Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | 0.0104% |
| Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | 0.0212% |
| Fort McDowell Yavapai Nation, Arizona | 0.0852% |
| Fort Mojave Indian Tribe of Arizona, California & Nevada | 0.1614% |
| Fort Sill Apache Tribe of Oklahoma | 0.0194% |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | 2.5642% |
| Grand Portage Band of the Minnesota Chippewa Tribe, Minnesota | 0.0211% |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | 0.1041% |
| Greenville Rancheria | 0.0942% |
| Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | 0.0255% |
| Guidiville Rancheria of California | 0.0137% |
| Habematolel Pomo of Upper Lake, California | 0.0275% |
| Hannahville Indian Community, Michigan | 0.0279% |
| Havasupai Tribe of the Havasupai Reservation, Arizona | 0.0325% |
| Ho-Chunk Nation of Wisconsin | 0.2791% |
| Hoh Indian Tribe | 0.0032% |
| Hoopa Valley Tribe, California | 0.2647% |
| Hopi Tribe of Arizona | 0.4475% |
| Hopland Band of Pomo Indians, California | 0.0723% |
| Houlton Band of Maliseet Indians | 0.0350% |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | 0.2240% |
| Iipay Nation of Santa Ysabel, California | 0.0136% |
| Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | 0.0008% |
| Ione Band of Miwok Indians of California | 0.1215% |
| Iowa Tribe of Kansas and Nebraska | 0.0527% |
| Iowa Tribe of Oklahoma | 0.0959% |
| Jackson Band of Miwuk Indians | 0.0054% |
| Jamestown S'Klallam Tribe | 0.0344% |
| Jamul Indian Village of California | 0.0062% |
| Jena Band of Choctaw Indians | 0.0116% |
| Jicarilla Apache Nation, New Mexico | 0.2812% |
| Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | 0.0158% |
| Kalispel Indian Community of the Kalispel Reservation | 0.0374% |
| Karuk Tribe | 0.2540% |
| Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | 0.0043% |
| Kaw Nation, Oklahoma | 0.1314% |
| Kewa Pueblo, New Mexico | 0.1155% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Keweenaw Bay Indian Community, Michigan | 0.1080% |
| Kialegee Tribal Town | 0.0174% |
| Kickapoo Traditional Tribe of Texas | 0.0175% |
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | 0.0580% |
| Kickapoo Tribe of Oklahoma | 0.5597% |
| Kiowa Indian Tribe of Oklahoma | 0.4367% |
| Klamath Tribes | 0.1776% |
| Klettel Dehe Band of Wintun Indians | 0.0363% |
| Koi Nation of Northern California | 0.0140% |
| Kootenai Tribe of Idaho | 0.0097% |
| La Jolla Band of Luiseno Indians, California | 0.0372% |
| La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | 0.0030% |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | 0.1611% |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | 0.2145% |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | 0.0310% |
| Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | 0.3560% |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | 0.3876% |
| Little River Band of Ottawa Indians, Michigan | 0.0925% |
| Little Shell Tribe of Chippewa Indians of Montana | 0.2023% |
| Little Traverse Bay Bands of Odawa Indians, Michigan | 0.1765% |
| Lone Pine Paiute-Shoshone Tribe | 0.0210% |
| Los Coyotes Band of Cahuilla and Cupeno Indians, California | 0.0157% |
| Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | 0.0173% |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | 0.0499% |
| Lower Elwha Tribal Community | 0.0686% |
| Lower Sioux Indian Community in the State of Minnesota | 0.0238% |
| Lummi Tribe of the Lummi Reservation | 0.2100% |
| Lytton Rancheria of California | 0.0238% |
| Makah Indian Tribe of the Makah Indian Reservation | 0.1833% |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | 0.0819% |
| Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | 0.0046% |
| Mashantucket Pequot Indian Tribe | 0.0369% |
| Mashpee Wampanoag Tribe | 0.0687% |
| Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | 0.0175% |
| Mechoopda Indian Tribe of Chico Rancheria, California | 0.1655% |
| Menominee Indian Tribe of Wisconsin | 0.2586% |
| Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | 0.0337% |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | 0.2753% |
| Miami Tribe of Oklahoma | 0.0514% |
| Miccosukee Tribe of Indians | 0.0269% |
| Middletown Rancheria of Pomo Indians of California | 0.0260% |
| Mille Lacs Band of the Minnesota Chippewa Tribe, Minnesota | 0.1295% |
| Mississippi Band of Choctaw Indians | 0.4540% |
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | 0.0431% |
| Modoc Nation | 0.0054% |
| Mohegan Tribe of Indians of Connecticut | 0.0666% |
| Monacan Indian Nation | 0.0588% |
| Mooretown Rancheria of Maidu Indians of California | 0.1949% |
| Morongo Band of Mission Indians, California | 0.0795% |
| Muckleshoot Indian Tribe | 0.2826% |
| Muscogee (Creek) Nation | 2.8659% |
| Nansemond Indian Nation | 0.0071% |
| Narragansett Indian Tribe | 0.0435% |

| Federally Recognized Tribe Name | Division of Funds (Allocation %) |
|---|---|
| Navajo Nation, Arizona, New Mexico & Utah | 15.2207% |
| Nez Perce Tribe | 0.2349% |
| Nisqually Indian Tribe | 0.0661% |
| Nooksack Indian Tribe | 0.0494% |
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | 0.2535% |
| Northfork Rancheria of Mono Indians of California | 0.1192% |
| Northwestern Band of the Shoshone Nation | 0.0046% |
| Nottawaseppi Huron Band of the Potawatomi, Michigan | 0.0735% |
| Oglala Sioux Tribe | 0.9582% |
| Ohkay Owingeh, New Mexico | 0.2226% |
| Omaha Tribe of Nebraska | 0.1098% |
| Oneida Indian Nation | 0.0792% |
| Oneida Nation | 0.6249% |
| Onondaga Nation | 0.0286% |
| Osage Nation | 0.2998% |
| Otoe-Missouria Tribe of Indians, Oklahoma | 0.1412% |
| Ottawa Tribe of Oklahoma | 0.0294% |
| Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes) | 0.0864% |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | 0.1593% |
| Pala Band of Mission Indians | 0.0654% |
| Pamunkey Indian Tribe | 0.0149% |
| Pascua Yaqui Tribe of Arizona | 0.6028% |
| Paskenta Band of Nomlaki Indians of California | 0.0061% |
| Passamaquoddy Tribe Indian Township | 0.0601% |
| Passamaquoddy Tribe Pleasant Point | 0.0758% |
| Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | 0.0135% |
| Pawnee Nation of Oklahoma | 0.1674% |
| Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | 0.1620% |
| Penobscot Nation | 0.1004% |
| Peoria Tribe of Indians of Oklahoma | 0.0425% |
| Picayune Rancheria of Chukchansi Indians of California | 0.0820% |
| Pinoleville Pomo Nation, California | 0.0269% |
| Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias) | 0.1144% |
| Poarch Band of Creeks | 0.1346% |
| Pokagon Band of Potawatomi Indians, Michigan and Indiana | 0.1197% |
| Ponca Tribe of Indians of Oklahoma | 0.2376% |
| Ponca Tribe of Nebraska | 0.1290% |
| Port Gamble S'Klallam Tribe | 0.0841% |
| Potter Valley Tribe, California | 0.0005% |
| Prairie Band Potawatomi Nation | 0.0680% |
| Prairie Island Indian Community in the State of Minnesota | 0.0030% |
| Pueblo of Acoma, New Mexico | 0.1776% |
| Pueblo of Cochiti, New Mexico | 0.0602% |
| Pueblo of Isleta, New Mexico | 0.9641% |
| Pueblo of Jemez, New Mexico | 0.4715% |
| Pueblo of Laguna, New Mexico | 0.3010% |
| Pueblo of Nambe, New Mexico | 0.0678% |
| Pueblo of Picuris, New Mexico | 0.0148% |
| Pueblo of Pojoaque, New Mexico | 0.0364% |
| Pueblo of San Felipe, New Mexico | 0.1962% |
| Pueblo of San Ildefonso, New Mexico | 0.0515% |
| Pueblo of Sandia, New Mexico | 0.0539% |

Allocation of Settlement Among Tribes

p. 5

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Pueblo of Santa Ana, New Mexico | 0.1216% |
| Pueblo of Santa Clara, New Mexico | 0.0972% |
| Pueblo of Taos, New Mexico | 0.1254% |
| Pueblo of Tesuque, New Mexico | 0.0368% |
| Pueblo of Zia, New Mexico | 0.1135% |
| Puyallup Tribe of the Puyallup Reservation | 0.3461% |
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | 0.2112% |
| Quapaw Nation | 0.0677% |
| Quartz Valley Indian Community of the Quartz Valley Reservation of California | 0.0209% |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | 0.2304% |
| Quileute Tribe of the Quileute Reservation | 0.0445% |
| Quinault Indian Nation | 0.1554% |
| Ramona Band of Cahuilla, California | 0.0016% |
| Rappahannock Tribe, Inc. | 0.0068% |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | 0.0680% |
| Red Lake Band of Chippewa Indians, Minnesota | 0.3333% |
| Redding Rancheria, California | 0.3258% |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | 0.0214% |
| Reno-Sparks Indian Colony, Nevada | 0.4667% |
| Resighini Rancheria, California | 0.0117% |
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | 0.0301% |
| Robinson Rancheria | 0.0577% |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | 0.3906% |
| Round Valley Indian Tribes, Round Valley Reservation, California | 0.1304% |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | 0.0066% |
| Sac & Fox Nation, Oklahoma | 0.4786% |
| Sac & Fox Tribe of the Mississippi in Iowa | 0.0652% |
| Saginaw Chippewa Indian Tribe of Michigan | 0.1612% |
| Saint Regis Mohawk Tribe | 0.3164% |
| Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | 0.3690% |
| Samish Indian Nation | 0.0508% |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | 0.9842% |
| San Juan Southern Paiute Tribe of Arizona | 0.0052% |
| San Manuel Band of Mission Indians, California | 0.0212% |
| San Pasqual Band of Diegueno Mission Indians of California | 0.0096% |
| Santa Rosa Band of Cahuilla Indians, California | 0.0163% |
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | 0.0567% |
| Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | 0.0489% |
| Santee Sioux Nation, Nebraska | 0.0407% |
| Sauk-Suiattle Indian Tribe | 0.0041% |
| Sault Ste. Marie Tribe of Chippewa Indians, Michigan | 0.7720% |
| Scotts Valley Band of Pomo Indians of California | 0.0140% |
| The Seminole Nation of Oklahoma | 0.4506% |
| Seminole Tribe of Florida | 0.4524% |
| Seneca Nation of Indians | 0.4387% |
| Seneca-Cayuga Nation | 0.0727% |
| Shakopee Mdewakanton Sioux Community of Minnesota | 0.0040% |
| Shawnee Tribe | 0.0385% |
| Sherwood Valley Rancheria of Pomo Indians of California | 0.0390% |
| Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | 0.0578% |
| Shinnecock Indian Nation | 0.0136% |
| Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | 0.0388% |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | 0.2571% |

Allocation of Settlement Among Tribes

p. 6

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | 0.1081% |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | 0.2481% |
| Skokomish Indian Tribe | 0.0492% |
| Skull Valley Band of Goshute Indians of Utah | 0.0031% |
| Snoqualmie Indian Tribe | 0.0268% |
| Soboba Band of Luiseno Indians, California | 0.1192% |
| Sokaogon Chippewa Community, Wisconsin | 0.0119% |
| Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | 0.0816% |
| Spirit Lake Tribe, North Dakota | 0.1358% |
| Spokane Tribe of the Spokane Reservation | 0.1194% |
| Squaxin Island Tribe of the Squaxin Island Reservation | 0.0474% |
| St. Croix Chippewa Indians of Wisconsin | 0.0720% |
| Standing Rock Sioux Tribe of North & South Dakota | 0.2451% |
| Stillaguamish Tribe of Indians of Washington | 0.0069% |
| Stockbridge Munsee Community, Wisconsin | 0.0656% |
| Summit Lake Paiute Tribe of Nevada | 0.0045% |
| Suquamish Indian Tribe of the Port Madison Reservation | 0.0385% |
| Susanville Indian Rancheria, California | 0.0940% |
| Swinomish Indian Tribal Community | 0.0685% |
| Sycuan Band of the Kumeyaay Nation | 0.0050% |
| Table Mountain Rancheria | 0.0008% |
| Tejon Indian Tribe | 0.0230% |
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) | 0.1564% |
| Thlopthlocco Tribal Town | 0.0385% |
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | 0.2170% |
| Timbisha Shoshone Tribe | 0.0061% |
| Tohono O'odham Nation of Arizona | 1.4176% |
| Tolowa Dee-ni' Nation | 0.1350% |
| Tonawanda Band of Seneca | 0.0103% |
| Tonkawa Tribe of Indians of Oklahoma | 0.0387% |
| Tonto Apache Tribe of Arizona | 0.0187% |
| Torres Martinez Desert Cahuilla Indians, California | 0.0496% |
| Tulalip Tribes of Washington | 0.3139% |
| Tule River Indian Tribe of the Tule River Reservation, California | 0.1030% |
| Tunica-Biloxi Indian Tribe | 0.0183% |
| Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | 0.0252% |
| Turtle Mountain Band of Chippewa Indians of North Dakota | 0.4382% |
| Tuscarora Nation | 0.0127% |
| Twenty-Nine Palms Band of Mission Indians of California | 0.0023% |
| United Auburn Indian Community of the Auburn Rancheria of California | 0.3284% |
| United Keetoowah Band of Cherokee Indians in Oklahoma | 0.1820% |
| Upper Mattaponi Tribe | 0.0194% |
| Upper Sioux Community, Minnesota | 0.0055% |
| Upper Skagit Indian Tribe | 0.0250% |
| Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | 0.3345% |
| Ute Mountain Ute Tribe | 0.1348% |
| Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | 0.0030% |
| Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California) | 0.0639% |
| Walker River Paiute Tribe, Nevada | 0.0929% |
| Wampanoag Tribe of Gay Head (Aquinnah) | 0.0216% |
| Washoe Tribe of Nevada & California | 0.2416% |

Allocation of Settlement Among Tribes

p. 7

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| White Earth Band of the Minnesota Chippewa Tribe, Minnesota | 0.3129% |
| White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | 1.2832% |
| Wichita and Affiliated Tribes, Oklahoma | 0.1054% |
| Wilton Rancheria, California | 0.0764% |
| Winnebago Tribe of Nebraska | 0.1438% |
| Winnemucca Indian Colony of Nevada | 0.0121% |
| Wiyot Tribe, California | 0.0513% |
| Wyandotte Nation | 0.0858% |
| Yankton Sioux Tribe of South Dakota | 0.1301% |
| Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | 0.1642% |
| Yavapai-Prescott Indian Tribe | 0.0463% |
| Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | 0.0546% |
| Yocha Dehe Wintun Nation, California | 0.0091% |
| Yomba Shoshone Tribe of the Yomba Reservation, Nevada | 0.0162% |
| Ysleta del Sur Pueblo | 0.0531% |
| Yurok Tribe of the Yurok Reservation, California | 0.4941% |
| Zuni Tribe of the Zuni Reservation, New Mexico | 0.4432% |

*50% of the allocation to this entity shall be made available to federally recognized tribes served by the entity.

**EXHIBIT D**

TAFT XVI Trust Agreement

[Attached Below]

**TRIBAL ABATEMENT FUND TRUST XVI TRUST**

**TRUST AGREEMENT**

**DATED AS OF _____**

*Pursuant to the Sun Tribal Settlement Agreement Between*

*the Tribal Leadership Committee and Sun*

**Dated April 4, 2025**

# TRIBAL ABATEMENT FUND TRUST XVI

## TABLE OF CONTENTS

ARTICLE 1 AGREEMENT OF TRUST ...................................................................4

    Section 1.1        Creation and Name. ........................................................... 4

    Section 1.2        Purposes ............................................................................ 4

    Section 1.3        Transfer of Assets. ............................................................ 5

    Section 1.4        Acceptance of Assets. ....................................................... 5

    Section 1.5        Tribe Beneficiaries. .......................................................... 6

    Section 1.6        Jurisdiction. ...................................................................... 6

ARTICLE 2 POWERS AND TRUST ADMINISTRATION ........................................6

    Section 2.1        Powers. .............................................................................. 6

    Section 2.2        General Administration ...................................................... 9

    Section 2.3        Accounting ........................................................................ 9

    Section 2.4        Tribal Opioid Abatement Reporting. ................................. 9

    Section 2.5        Beneficiary Reporting. ...................................................... 9

    Section 2.6        Limitation of the Directors' Authority .............................. 10

ARTICLE 3 ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES .....................10

    Section 3.1        Accounts. ......................................................................... 10

    Section 3.2        Investment Guidelines ..................................................... 10

    Section 3.3        Payment of TAFT XIV Operating Expenses. .................. 11

ARTICLE 4 ABATEMENT DISTRIBUTIONS .....................................................11

    Section 4.1        Abatement Distributions ................................................... 11

    Section 4.2        Manner of Payment of Abatement Distributions. ............. 11

    Section 4.3        Delivery of Abatement Distributions. ............................... 12

ARTICLE 5 DIRECTORS AND DELAWARE TRUSTEE ....................................12

    Section 5.1        Number of Directors; Managing Director ........................ 12

    Section 5.2        Term of Service, Successor Directors. ............................. 13

    Section 5.3        Directors' Meetings. ........................................................ 14

    Section 5.4        Compensation and Expenses of Directors ....................... 15

    Section 5.5        Directors' Independence. ................................................. 16

    Section 5.6        Standard of Care; Exculpation. ....................................... 16

    Section 5.7        Protective Provisions. ...................................................... 17

    Section 5.8        Indemnification. ............................................................... 18

i

Section 5.9        Bond....................................................................................................... 19

Section 5.10       Delaware Trustee. ................................................................................. 19

Section 5.11       Meeting Minutes; Rights of Inspection................................................... 22

Section 5.12       Trust Protector. ...................................................................................... 22

ARTICLE 6 GENERAL PROVISIONS .......................................................................................23

Section 6.1        Irrevocability.......................................................................................... 23

Section 6.2        Term; Termination. ................................................................................ 23

Section 6.3        Taxes. ..................................................................................................... 24

Section 6.4        Modification............................................................................................ 25

Section 6.5        Communications ..................................................................................... 25

Section 6.6        Severability ............................................................................................ 26

Section 6.7        Notices. ................................................................................................... 26

Section 6.8        Successors and Assigns........................................................................... 28

Section 6.9        Limitation on Transferability; Tribe Beneficiaries' Interests ................. 28

Section 6.10       Exemption from Registration.................................................................. 28

Section 6.11       Entire Agreement; No Waiver ................................................................ 28

Section 6.12       Headings ................................................................................................. 29

Section 6.13       Governing Law ....................................................................................... 29

Section 6.14       Dispute Resolution.................................................................................. 29

Section 6.15       Sovereign Immunity................................................................................ 29

Section 6.16       Effectiveness ........................................................................................... 29

Section 6.17       Counterpart Signatures........................................................................... 29

# TRIBAL ABATEMENT FUND

## TRUST XVI AGREEMENT

This Tribal Abatement Fund Trust XVI ("**TAFT XVI**" or the "**Trust**") Agreement (together with all Exhibits hereto, this "**Trust Agreement**"), dated and effective as of October 31, 2025(the "Effective Date"), is entered into in furtherance of the administration of the Sun Tribal Settlement Agreement between the Tribal Leadership Committee ("**TLC**"), Participating Tribes, and Sun (collectively the "**Parties**"), dated April 4, 2025 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Sun Tribal Settlement Agreement**" or "**STSA**"),[4] in the matter of *In re National Prescription Opiate Litigation,* MDL No. 2804, Case No. 17-md-2804 in the United States District Court for the Northern District of Ohio (the "**Court**"). This Trust Agreement is entered into by the trustees of the Tribal Abatement Fund Trust XVI who are further identified on the signature pages hereto (together with any successor trustee serving in such capacity, the "**Directors**"),[5] the Delaware Trustee (together with any successor serving in such capacity, the "**Delaware Trustee**") and the Trust Protector, the individual who is further identified on the signature pages hereto (together with any successor serving in such capacity, the "**Trust Protector**").

## <u>RECITALS</u>

**WHEREAS**, the Sun Settlement Trust has been established pursuant to the sealed order of the Court filed March 11, 2025(the "**Sun QSF Order**"), to aid in the administration of the Parties' settlement;

**WHEREAS**, the Parties entered into the STSA, dated as of April 4, 2025subject to certain required participation acceptances by the Tribes as set forth in the STSA;

**WHEREAS**, the TLC has notified Sun that the required participation acceptances have occurred and, as a result, the "EffectiveDate" under the STSA has occurred;

**WHEREAS**, the STSA provides that following the Effective Date, David R. Cohen and Judge Layn Phillips (the "**Tribal Allocation Appointees**") will determine the Final Tribal Allocation Distribution Percentages, which shall be incorporated herein as **Exhibit 1** of this Trust Agreement;

**WHEREAS**, pursuant to the Sun QSF Order, David R. Cohen, Special Master to Judge Polster in MDL No. 2804 (the "**Special Master**") was appointed as Trust Administrator of the Sun Settlement Trust and is authorized to receive Sun's payments under the STSA and to direct funds to be distributed to the Tribes, as provided in the STSA;

---

[4] Capitalized terms used but not herein defined shall have the meaning ascribed to them in the Sun Tribal Settlement Agreement or any Exhibits attached hereto, as applicable.
[5] The initial Directors shall be Kevin Washburn, Mary Smith and Kathy Hannan; the initial Trust Protector shall be Professor Stacy Leeds.

**WHEREAS**, in accordance with the STSA, TAFT XVI has been established for the distribution to and abatement reporting by Tribe Beneficiaries, as defined in Section 1.5(a), in accordance with the terms of the STSA and this Trust Agreement.

**WHEREAS**, pursuant to the STSA, TAFT XVI shall (a) receive distributions from the Sun Settlement Trust, (b) make Abatement Distributions (as defined below) to Tribe Beneficiaries in accordance with this Trust Agreement and the TAFT XVI  Trust Distribution Procedures ("TDP") attached hereto as **Exhibit 4** (the "**TAFT XVI TDP**"), and (c) carry out such other matters as are set forth in the Trust Documents (as defined below).

**WHEREAS**, pursuant to the STSA, the Trust shall (a) distribute Trust Assets in accordance with this Trust Agreement and the TAFT XVI TDP; (b) pay TAFT XVI Operating Expenses, as defined in Section 1.2(f)(ii); (c) hold and maintain the TAFT XVI Operating Reserve, as defined in Section 1.2(f)(ii); and (d) hold, manage, protect and invest all Trust Assets received by the Trust for the benefit of the Tribe Beneficiaries, pending distribution to Tribe Beneficiaries, satisfaction of TAFT XVI obligations, or payment of TAFT XVI Operating Expenses.

**WHEREAS**, the Trust is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended (the "**Code,**" and such regulations, the "**QSF Regulations**") and corresponding or similar provisions of relevant state or local law.

**NOW**, **THEREFORE**, it is hereby agreed as follows:

# ARTICLE 1
## AGREEMENT OF TRUST

**Section 1.1 Creation and Name**. There is hereby created a trust known as the "**Tribal Abatement Fund Trust VI**" or "**TAFT XVI**." The Directors may transact the business and affairs of the Trust in the name of TAFT XVI. It is the intention of the Parties hereto that the Trust constitutes a statutory trust under Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and that this Trust Agreement together with all Exhibits hereto (collectively, the "**Trust Documents**") constitute the governing instruments of the Trust. The Directors and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

**Section 1.2 Purposes**. The purposes of the Trust are, among other things, to:

(a)      receive distributions from the Sun Settlement Trust;

(b)      hold, manage, protect and invest the Trust Assets in accordance with the terms of the Trust Documents, for the benefit of the Tribe Beneficiaries;

(c)      engage in any lawful act or activity, including, without limitation, to enter into leasing, financing or other agreements with third parties, that is consistent with, necessary or incidental to the Trust Documents;

(d)      qualify at all times as a "qualified settlement fund" within the meaning of the QSF Regulations and corresponding or similar provisions of relevant state or local law;

(e)      engage in any lawful activity necessary or incidental to the foregoing; and

(f)      use the Trust Assets to:

    i.    make Abatement Distributions (as defined below) to Tribe Beneficiaries in accordance with this Trust Agreement and the TAFT XVI TDP;

    ii.    hold and maintain reserves to pay the fees and expenses incurred with administering the Trust (including the TAFT XVI TDP) and managing the Trust Assets (together, the "**TAFT XVI Operating Expenses**") of the Trust (such reserves, the "**TAFT XVI Operating Reserve**"), which shall be funded with cash and cash equivalents held by the Trust in accordance with the Trust Documents;

    iii.    TAFT XVI obligations and the TAFT XVI Operating Expenses from the TAFT XVI Operating Reserve; and

    iv.    replenish periodically, until the dissolution of the Trust, the TAFT XVI Operating Reserve from cash held or received by the Trust to the extent deemed necessary by the Directors to satisfy and pay estimated future TAFT XVI Operating receive distributions from the Sun Settlement Trust;

**Section 1.3 Transfer of Assets**. Pursuant to the STSA, the Trust shall receive distributions from the Sun Settlement Trust (together with any income or gain earned thereon, collectively, the "**Trust Assets**"). The Trust Assets shall not be subject to attachment, disgorgement or recoupment by any person, except there shall be allowed a reversion of Trust Assets to Sun only to the extent set forth in Section 4.2.

**Section 1.4 Acceptance of Assets.**

(a)      In furtherance of the purposes of the Trust, the Directors, in their capacity as trustees, on behalf of the Trust, accept the transfer to the Trust of the initial TAFT XVI funding from the Sun Settlement Trust and shall accept the subsequent funding and transfers contemplated by the STSA, subject to the terms of the Trust Documents. Except as otherwise provided in Section 4.2, Sun will have no equitable or legal interest in, or with respect to, the Trust Assets or the Trust

(b)      Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the TAFT XVI TDP shall be construed or implemented in a manner that would cause the Trust to fail to qualify as one or more "qualified settlement funds" within the meaning of the QSF Regulations or under corresponding or similar provisions of relevant state or local law.

(c)      In this Trust Agreement and the TAFT XVI TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

**Section 1.5 Tribe Beneficiaries.**

(a)  The beneficial owners (within the meaning of the Act) of the Trust are the tribes or tribal organizations identified as Participating Tribes on **Exhibit 1** hereto (together with the tribe or tribal entity organization added to such **Exhibit 1** after the Effective Date in accordance with the STSA, each, a "**Tribe Beneficiary**" and, collectively, the "**Tribe Beneficiaries**").

(b)  The Tribe Beneficiaries shall have only such rights with respect to the Trust and its assets as are set forth in this Trust Agreement and the TAFT XVI TDP and no greater or other rights, including upon dissolution, liquidation or winding up of the Trust, shall be deemed to apply to such Tribe Beneficiaries.

(c)  The Tribe Beneficiaries shall be subject to the terms of this Trust Agreement, including, without limitation, Article 4 and the terms of the TAFT XVI TDP.

**Section 1.6 Jurisdiction**. The Court shall have continuing jurisdiction over the Trust, provided, however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Trust.

## Article 2
## POWERS AND TRUST ADMINISTRATION

**Section 2.1 Powers**.

(a)  The Directors in their capacity as trustees are and shall act as fiduciaries to the Trust in accordance with the provisions of this Trust Agreement. The Directors shall, at all times, administer the Trust in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in the Trust Documents, the Directors shall have the power to take any and all actions that in the judgment of the Directors are necessary or proper to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of Delaware. In the event of any ambiguity or conflict between the terms of this Trust Agreement and the TAFT XVI TDP, the TAFT XVI TDP shall control.

(b)  Except as required by applicable law or the Trust Documents, the Directors need not obtain the order or approval of any court for the exercise of any power or discretion conferred hereunder.

(c)  Without limiting the generality of Section 2.1(a) above, and except as limited in the Trust Documents and by applicable law, the Directors shall have the power to:

i. receive and hold the Trust Assets and exercise all rights with respect thereto;

ii. invest the monies and other Trust Assets held from time to time by the Trust, subject to the limitations set forth in Section 3.2 below;

iii. enter into leasing, financing or other agreements with third parties as deemed by the Directors in their discretion to be useful in carrying out the purposes of the Trust;

iv. determine and pay obligations and liabilities of the Trust and the TAFT XVI Operating Expenses;

v. establish accounts and reasonable reserves within the Trust, as deemed by the Directors in their discretion to be necessary, prudent or useful in administering the Trust;

vi. bring any action in any court of competent jurisdiction, including the Court;

vii. initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Trust Asset, liability or responsibility of the Trust;

viii. supervise and administer the Trust in accordance with the Trust Documents, including, without limitation, to monitor the Abatement Distribution (as defined below) recipients' compliance with the TAFT XVI TDP requirements for Approved Tribal Opioid Abatement Uses and Approved Administrative Expenses (as defined in the TAFT XVI TDP);

ix. appoint such officers and retain such employees, consultants, advisors, attorneys, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as the Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Directors permit and as the Directors, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement;

x. pay reasonable compensation and expenses to any of the Trust's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as the Trust requires;

xi. compensate the Directors, Delaware Trustee, the Trust Protector, and their employees, consultants, advisors, independent contractors, experts and

agents, and reimburse the Directors, the Delaware Trustee and the Trust Protector for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

xii.   execute and deliver such instruments as the Directors consider necessary or desirable in administering the Trust;

xiii.   enter into such other arrangements with third parties as are deemed by the Directors to be advisable or necessary in carrying out the purposes of the Trust; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

xiv.   in accordance with Section 5.8 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.6(a) below) to the maximum extent permitted by law;

xv.   delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 5.6 below; provided that such investment advisors and investment managers shall be in compliance with the Investment Guidelines (as defined in Section 3.2) at all times;

xvi.   make, join, pursue (by litigation or otherwise), abandon, collect, compromise or settle, or otherwise resolve, in the name of the Trust any claim, right, action or cause of action of the Trust, before any court of competent jurisdiction and without approval of the Court;

xvii.   contract for the establishment and continuing maintenance of (a) a secure method of internet-based communications for the Trust and the Tribe Beneficiaries as described in Section 6.5 herein (the "**Tribal Opioid Settlement Portal**") and (b) a public-facing website to publish all information required to be published under the Trust Documents (the "**Tribal Opioid Settlement Website**"); and

xviii.   exercise any and all rights of the Directors, and take any and all actions as are permitted, in accordance with and subject to the terms of this Trust Agreement.

(d) The Directors shall not have the power to cause the Trust to guarantee any debt of other persons.

(e) Except as otherwise set forth in the Trust Documents and WTSASTSA, but without prior or further authorization, the Directors may control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof. No person

dealing with the Trust shall be obligated to inquire into the authority of the Directors in connection with the protection, conservation or disposition of the Trust Assets.

**Section 2.2 General Administration**. The Directors shall act in accordance with the Trust Documents. The mailing address of the Trust is Tribal Abatement Fund Trust XVI, P.O. Box 65097, Washington, DC 20035. The Directors may change the location of the principal office and may establish other offices at other locations. The Directors shall provide notice to the Tribe Beneficiaries upon establishment of any office by posting such information in the Tribal Opioid Settlement Portal (or by other means approved by the Directors).

**Section 2.3 Accounting**. The fiscal year of the Trust shall begin on January 1 and shall end on December 31 of each calendar year. The Directors shall maintain the books and records relating to the Trust Assets and income and the payment of expenses of and liabilities against the Trust. The detail of these books and records and the duration of time during which the Directors shall keep such books and records shall be such as to allow the Directors to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of the Trust, including, without limitation, the assets and liabilities of the Trust as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Directors shall maintain such books and records until the wind-up of the Trust's affairs and satisfaction of all of the Trust's liabilities.

**Section 2.4 Tribal Opioid Abatement Reporting**.

(a)    Within one hundred and twenty (120) days following the end of each calendar year, the Directors shall (i) cause to be prepared and delivered to the Sun Settlement Trust and to Sun an annual report on the Approved Tribal Opioid Abatement Uses with respect to such period, together with such additional information as the Directors determine necessary or appropriate in their discretion (each, a "**Tribal Opioid Abatement Report**"), and (ii) post a copy of the Tribal Opioid Abatement Report on the Tribal Opioid Settlement Website.

(b)    For the avoidance of doubt, the Directors shall not be required to include in any TAFT XVI Tribal Opioid Abatement Report any abatement matters except those that pertain to TAFT XVI exclusively.

**Section 2.5 Beneficiary Reporting**.

(a)    Reporting of Approved Tribal Opioid Abatement Uses by the Tribe Beneficiaries shall be required to the extent set forth in the TAFT XVI TDP. The Directors shall establish the form, content, and due dates of periodic reports with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Tribe Beneficiaries (each, a "**Beneficiary Abatement Use Report**") to the Directors through the Tribal Opioid Settlement Portal (or delivered by other means approved by the Directors). The Directors may prescribe a modified reporting regime for certain Tribe Beneficiaries based

9

upon appropriate standards to be developed by the Directors, provided such modified reporting regime is not inconsistent with the Trust's reporting obligations, as determined by the Directors in their discretion. The Directors shall endeavor to implement appropriate mechanisms, in their discretion consistent with the Trust Documents, to obtain efficiency in reporting by Tribe Beneficiaries with respect to TAFT XVI and other comparable opioid abatement trusts benefitting the Tribe Beneficiaries. Each Beneficiary Abatement Use Report shall contain the information necessary to:

> i. enable the Trust to satisfy the Tribal Opioid Abatement Report requirements described in Section 2.4(a) above.

**Section 2.6 Limitation of Directors' Authority. T**he Directors are not authorized to engage in any trade or business with respect to the Trust Assets or proceeds therefrom. The foregoing limitation shall not prevent the Directors from managing the investment of the Trust Assets.

## ARTICLE 3
## ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES

**Section 3.1 Accounts**.

(a)     The Directors shall maintain one or more accounts ("**Trust Accounts**") on behalf of the Trust with one or more financial depository institutions (each, a "**Financial Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the Directors any interest in or relationship with Sun or a named defendant in MDL No. 2804, their affiliated persons, or any Released Entities. Any such interest or relationship shall not be an automatic disqualification for the position, but the Directors shall take any such interest or relationship into account in selecting a Financial Institution.

(b)     The Directors may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as they may deem necessary, prudent or useful in order to provide for Abatement Distributions (as defined herein) to the Tribe Beneficiaries and the payment of TAFT XVI Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "Trust Subaccounts"). Any such Trust Subaccounts established by the Directors shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Code or the Treasury Regulations, or a "disputed ownership fund" within the meaning of the Treasury Regulations, or otherwise.

(c)     The Directors may replace any retained Financial Institution with a successor Financial Institution at any time and such successor shall be subject to the considerations set forth in Section 3.1(a).

**Section 3.2** Investment Guidelines. The Directors may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 3** (the "**Investment**

**Guidelines**"). Notwithstanding any contrary provision of the Trust Documents, this Section 3.2 and the Investment Guidelines cannot be modified or amended.

**Section 3.3 of TAFT XVI Operating Expenses.** All TAFT XVI Operating Expenses shall be payable out of the TAFT XVI Operating Reserve. None of the Directors, the Delaware Trustee, the Trust Protector, the Tribe Beneficiaries, Sun, nor any of their employees, officers, consultants, advisors, independent contractors, experts or agents shall be personally liable for the payment of any TAFT XVI Operating Expense or any other liability of the Trust. In their discretion, the Directors may incur and pay TAFT XVI Operating Expenses after making appropriate allocations of common charges that are incurred for the benefit of TAFT XVI and other tribal

<div align="center">

**Article 4**
**ABATEMENT DISTRIBUTIONS**

</div>

**Section 4.1 Abatement Distributions**. The Directors shall make Abatement Distributions only as and to the extent set forth in this Article 4 and the TAFT XVI TDP (the "**Abatement Distributions**"). Abatement Distributions shall be used by the Tribe Beneficiaries as described in Section 3 of the TAFT XVI TDP.

**Section 4.2 Manner of Payment of Abatement Distributions**

(a)     The Directors shall endeavor to provide ten (10) days' notice to the Tribe Beneficiaries of any upcoming Abatement Distribution through the Tribal Opioid Settlement Portal (or by other means approved by the Directors); provided, however, that the Directors may shorten such notice period in their discretion.

(b)     Abatement Distributions shall be made to Participating Tribes in accordance with the Final Tribal Allocation Distribution Percentages to be set forth on **Exhibit 1** hereto. Abatement Distributions shall be made to Tribes that become Participating Tribes after the Effective Date in accordance with Section IV.E of the STSA.

(c)     Abatement Distributions may be made by the Directors or by a disbursement agent retained by the Trust to make Abatement Distributions on its behalf (the "**Disbursement Agent**"). Abatement Distributions shall be made in accordance with the TAFT XVI TDP on the dates approved for distribution by the Directors.

(d)     The Directors may cause Abatement Distributions to be withheld with respect to any Tribe Beneficiary that has failed to deliver timely a completed Beneficiary Abatement Use Report by the applicable due date. The Directors shall allow for a reasonable period of time to cure any delinquent Beneficiary Abatement Use Report and may continue to withhold distributions to a Tribe Beneficiary until all such delinquent Beneficiary Abatement Use Reports of such Tribe Beneficiary have been cured.

(e)     If the Directors determine, in their discretion, that making the final Abatement Distribution immediately prior to the termination and dissolution of the Trust is not cost-effective with respect to the final amounts to be distributed to the Tribe

<div align="center">11</div>

Beneficiaries, the Directors shall have the authority to direct such final Abatement Distribution, in full, to a tax-exempt organization that has opioid abatement as part of its mission, such as the National Indian Health Board, as selected by the Directors in their discretion. The Directors shall instruct the tax-exempt organization to use the Abatement Distribution solely for opioid abatement purposes.

(f)     Notwithstanding the foregoing, the Directors shall cause Trust Assets to revert to Sun only to the extent required by Section IV.E of the STSA.

(g)     Prior to disbursing funds to any Participating Tribe, the Directors shall obtain from each Participating Tribe any required payment documentation (including, as needed, wire instructions and W-9 forms).

**Section 4.3 Delivery of Abatement Distributions**

(a)     All Abatement Distributions under this Trust Agreement shall be made (i) in accordance with the electronic transfer information or (ii) by check at the address provided by the Tribe Beneficiaries in accordance with the TAFT XVI TDP. Changes to such electronic transfer information or address, as applicable, must be provided to the Trust or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date; provided, however, that the Directors and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the Tribe Beneficiaries regarding the transfer information  of Abatement Distributions under this Trust Agreement.

(b)     In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Directors have been notified of the then current wire instructions or address, as applicable, as directed by such Tribe Beneficiary, at which time such distribution shall be made without interest. The Directors shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any Tribe Beneficiary with respect to which any distribution is undeliverable, but shall have no obligation to make further inquiry with respect to designated recipients of such Tribe Beneficiaries.

(c)     No Trust Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

<div align="center">

**Article 5**
**DIRECTORS AND DELAWARE TRUSTEE**

</div>

**Section 5.1 Number of Directors; Managing Director**.

(a)     **Number**. In addition to the Delaware Trustee appointed pursuant to Section 5.10, there shall be three (3) Directors. The initial Directors shall be those persons named on the signature page hereof.

(b) **Managing Director**. At their first meeting, the initial Directors shall designate one of their number to serve as the Managing Director of the Trust, with such administrative duties as the Directors may determine (the "**Managing Director**"). The Directors may change the designation of the individual to serve as Managing Director from time to time as circumstances warrant. The Managing Director or, in the Managing Director's absence, another Director selected by the Directors shall preside at meetings of the Directors. The Managing Director, or the Director presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Directors and for performing such other administrative duties and services as shall be assigned to or required of the Managing Director by the Directors. The Managing Director shall maintain a list of current Directors, including their addresses and contact information.

**Section 5.2 Term of Service, Successor Directors.**

(a) **Term**. Each Director shall serve until the earlier of (i) his or her death, (ii) his or her resignation or removal pursuant to Section 5.2(c) below, or (IV) the termination of the Trust pursuant to the terms of this Trust Agreement. The term of a newly appointed Director shall commence upon his or her acceptance as such

(b) **Appointment of Successor Directors**.

i. In the event of a vacancy in the position of one (1) Director for any reason, the vacancy shall be filled by the unanimous vote of the remaining Directors. In the event that the remaining Directors cannot agree on a successor Director within thirty (30) days, each of the remaining Directors shall propose a Director candidate and the Trust Protector (as defined in Section 5.12(a) below) shall select one such candidate as the Successor Director.

ii. In the event of a vacancy in the position of two (2) Directors for any reason, the remaining Director and the Trust Protector shall, after consultation, jointly appoint two (2) successor Directors, both of whom shall each be acceptable to both of the remaining Director and the Trust Protector. In the event the remaining Director and the Trust Protector cannot agree on two (2) successor Directors, the selection of two (2) successor Directors shall be resolved in accordance with the dispute resolution provisions of Section 6.14.

iii. In the event of a vacancy in the position of three (3) Directors for any reason, the Trust Protector shall recommend three (3) successor Directors for the Delaware Court of Chancery to appoint and any costs relating thereto shall be borne by the Trust.

iv. Notice of the appointment of any successor Director(s) shall be filed with the Court and shall be published on the Tribal Opioid Settlement Website when it is filed with the Court.

13

v.    In filling any vacancy in the position of one or more Directors, the remaining Director(s) and/or the Trust Protector shall apply the following standard to any successor Director: the successor Director shall be a disinterested, independent individual with experience in one or more of the following areas: public policy/public health, tribal health or welfare, tribal self-determination, administration or self-governance, other tribal affairs, ethics and compliance, finance, general business and/or corporate governance.

vi.    Immediately upon the appointment of any successor Director(s), all rights, titles, duties, powers and authority of the predecessor Director(s) hereunder shall be vested in, and undertaken by, the successor Director (s) without any further act. No successor Director(s) shall be liable personally for any act or omission of his or her predecessor Director. No successor Director shall have any duty to investigate the acts or omissions of his or her predecessor Director.

(c)    **Resignation or Removal**. A Director may resign by giving written notice to either of the other Directors. Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable. A Director may be removed by unanimous vote of the remaining Directors in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided such Director has received reasonable notice and an opportunity to be heard by the remaining Directors. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to the Trust, any substantial failure to comply with the administration of the Trust or a consistent pattern of neglect and failure to perform or participate in performing the duties of a Director hereunder. For the avoidance of doubt, any removal of a Director pursuant to this Section 5.2(c) shall require the approval of the Court and shall take effect at such time as the Court shall determine.

**Section 5.3 Directors' Meetings.**

(a)    **Regular Meetings**. The Directors shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined from time to time by the Directors. For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Directors contemplated by this Section 5.3.

(b)    **Special Meetings.** Special meetings of the Directors may be called by any Director by giving written notice to each other Director not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Director by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or

14

delivered to each Director at the Director's address as shown upon the records of the Trust or as may have been given to Directors by the Director for purposes of notice. If a Director's address is not shown on such records or is not readily ascertainable, notice to the Director may be given care of the principal office of the Trust. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)      **Action and Quorum**. In all matters pertaining to the affairs of the Trust, the Directors shall act by a vote of a majority of the number of Directors then in office, which such majority shall constitute a quorum of the Directors for the transaction of business, except to adjourn as provided in Section 5.3(f).

(d)      **Participation in Meetings by Telephone Conference**. Directors may participate in a meeting of the Directors by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Directors participating in such meeting can hear one another. Participation by a Director in a meeting pursuant to this Section 5.3(d) shall constitute presence in person at such meeting.

(e)      **Waiver of Notice**. Notice of a meeting need not be given to any Director who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with the Trust records or made a part of the minutes of the meeting. Attendance at a meeting by a Director shall constitute a waiver of notice of such meeting except when the Director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Director meeting need be specified in any waiver of notice.

(f)      **Adjournment**. A majority of the Directors present, whether or not a quorum exists, may adjourn any Directors meeting to another time and place.

(g)      **Action by Unanimous Written Consent**. Any action required or permitted to be taken at any meeting of the Directors may be taken without a meeting, if all of the Directors then in office consent thereto in writing or by Electronic Transmission, which writing may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Directors. As used herein, "**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

**Section 5.4 Compensation and Expenses of Directors.** The Directors shall receive compensation from the Trust for their services as Directors. The Trust shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred

by each Director in the course of carrying out their duties as Directors in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Directors. The amounts paid to the Directors for compensation and expenses shall be disclosed in the Annual Report.

**Section 5.5 Directors' Independence.**

(a)      The Directors shall not, during their service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for Sun or a defendant in MDL No. 2804, their affiliated persons, or any Released Entities. No Director shall act as an attorney for any Tribe in a matter that (i) directly or indirectly relates to claims arising from the use of opioids by any person, or (ii) is directly adverse to the claims of another Tribe. For the avoidance of doubt, this provision shall not apply to the Delaware Trustee.

(b)      The Directors, and the Delaware Trustee, shall be indemnified by the Trust in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)      Persons dealing with the Trust, the Directors, and the Delaware Trustee with respect to the affairs of the Trust, shall have recourse only to the Trust Assets to satisfy any liability incurred by the Trust, the Directors, or the Delaware Trustee to such person in carrying out the terms of this Trust Agreement, and neither the Directors, the Delaware Trustee, the Tribe Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

**Section 5.6 Standard of Care; Exculpation.**

(a)      As used herein, the term "**Trust Indemnified Party**" shall mean each Director, the Delaware Trustee, the Trust Protector, the Special Master, the Tribal Allocation Appointees, and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals (collectively, the "**Trust Indemnified Parties**").

(b)      To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of the Trust, except those acts found by a final, non-appealable order by a court of competent jurisdiction (a "Final Order") to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the STSAor the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for

16

any actions or inactions found by a Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Trust.

(c)     To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the Trust or the Tribe Beneficiaries, it is hereby understood and agreed by the Parties hereto and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that, with respect to the Trust Indemnified Parties other than the Delaware Trustee, the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.6 and its subparts.

**Section 5.7 Protective Provisions.**

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.7.

(b)     In the event the Directors retain counsel (including at the expense of TAFT XVI), the Directors shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Directors be deemed to have waived any right or privilege, including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Directors in the performance of duties hereunder. A successor to any of the Directors shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Tribe Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all Parties.

(c)     To the extent that, at law or in equity, the Directors have duties (including fiduciary duties) and liabilities relating hereto, to the Trust or to the Tribe Beneficiaries, it is hereby understood and agreed by the Parties and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806 of the Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Directors; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.6 herein.

(d)     No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, gross negligence or fraud as determined by a Final Order.

(e)     No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(f)     In the exercise or administration of the Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

**Section 5.8 Indemnification.**

(a)  To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the STSA or the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by a Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Trust.

(b)  Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Trust shall be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by a Final Order of the Court that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the Trust.

(c)  The Directors shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Directors, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)  The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party

18

from the capacity for which such Trust Indemnified Party is indemnified. Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e) The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

**Section 5.9 Bond**. The Directors and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Court.

**Section 5.10** Delaware Trustee.

(a) There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. The initial Delaware Trustee shall be Wilmington Trust, National Association. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.10, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.10(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Directors shall have no liability for the acts or omissions of any Delaware Trustee.

(b) The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Directors set forth herein. The Delaware Trustee shall be a trustee of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on the Trust in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to the Trust or the Tribe Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any trustee or

any Director. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith, gross negligence or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Directors or any other person pursuant to the provisions of this Trust Agreement unless the Directors or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Directors and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Directors. The Delaware Trustee may, at the expense of the Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)     The Delaware Trustee shall serve until such time as the Directors remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Directors in accordance with the terms of Section 5.10(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Directors; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Directors in accordance with Section 5.10(d) below; provided, further, that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Directors. If the Directors do not act within such sixty (60) -day period, the Delaware Trustee, at the expense of the Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Directors shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Directors, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required

20

under the Act, including filing a Certificate of Amendment to the Certificate of Trust of TAFT XVI in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the Parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between the Trust and the Delaware Trustee, which compensation shall be paid by the Trust. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)     The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for, nor have any duty to monitor, the performance or any action of the Trust, the Directors or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person.

(h)     The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.   The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused directly or indirectly by, circumstances beyond its control, including, without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

21

**Section 5.11 Meeting Minutes; Rights of Inspection.**

2.        The minutes of proceedings of the Directors shall be kept in written form (which may be electronic) at such place or places designated by the Directors, or, in the absence of such designation, at the principal office of the Trust.

Every Director shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of the Trust.

**Section 5.12 Trust Protector.**

(a)        Notwithstanding any other provision of this Trust Agreement, there shall at all times be one Trust Protector to serve in accordance with the provisions of this Section 5.12. The Trust Protector shall be a Trust Indemnified Party. The initial Trust Protector shall be Dean Stacy Leeds.

(b)        Any Trust Protector acting hereunder may resign at any time (i) by delivering written notice thereof to the Directors then serving; provided that notice to one Director shall constitute notice to all Directors then serving, or (ii) if there are no Directors then serving, by delivering written notice to the Delaware Trustee.

(c)        A Trust Protector may be removed for good reason upon the unanimous consent of three (3) Directors then serving; provided, however, if there are less than three (3) Directors then serving, the Trust Protector shall not be removed except upon order of the Court. If a vacancy in the position of Trust Protector exists for any reason, the Directors may, upon unanimous consent of the Directors then serving, appoint a new Trust Protector. If the Directors do not appoint a new Trust Protector within thirty (30) days, then the Directors shall petition the Delaware Court of Chancery to appoint a successor Trust Protector to serve and any costs relating to the petition shall be borne by the Trust; provided, however, that if there are no Directors serving at the time of the Trust Protector vacancy, then the Delaware Trustee shall petition the Delaware Court of Chancery as provided above. At no time may Sun or any party related to Sun or its affiliates be eligible to serve as Trust Protector. A vacancy in the position of Trust Protector shall not limit the Directors from exercising any powers afforded them under the Trust Documents.

(d)        The Trust Protector shall have only the authority set forth in Section 5.2(b), which authority may not be expanded by an amendment or modification of this Trust Agreement.

(e)        The Trust Protector shall exercise the Trust Protector's authority in a fiduciary capacity and in a way that the Trust Protector reasonably believes to be in accordance with the purposes of this Trust Agreement. The Trust Protector shall not be under any duty to inquire into or ensure the performance by the Directors of their duties and shall not be liable for any loss to such trust (unless such loss results from actions in bad faith or the willful misconduct of the Trust Protector).

(f)     The Directors shall have no liability for the selection of, or exercise of authority by, the Trust Protector.

(g)     The Trust Protector shall be entitled to:

i.     receive reasonable compensation and reimbursement for reasonable expenses for serving as Trust Protector;

ii.     retain advisors to advise and assist in carrying out the duties of the Trust Protector and the costs thereof shall be borne by the Trust; and

iii.     receive and review minutes of the meetings or other actions of the Directors, but only at such time as the Trust Protector is required to act pursuant to Section 5.2(b).

## ARTICLE 6
## GENERAL PROVISIONS

**Section 6.1 Irrevocability**. To the fullest extent permitted by applicable law, the Trust is irrevocable.  Subject to Section IV.E of the STSA (regarding when certain funds will revert to Sun), Sun shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund the Trust, and (ii) shall not have any rights or role with respect to the management or operation of the Trust, or the Directors' administration of the Trust

**Section 6.2 Term; Termination**.

(a)     The term for which the Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)     The Trust shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Court approves the dissolution upon the satisfaction of the purposes of the Trust, wherein (i) all reasonably expected assets have been collected by the Trust, (ii) all Abatement Distributions have been made to the extent set forth in Section 4.2(b), (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining Trust obligations and TAFT XVI Operating Expenses in a manner consistent with the STSA and the Trust Documents, and (iv) a final accounting has been filed and approved by the Court (the "**Dissolution Date**").

(c)     On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of the Trust's affairs by the Directors and payment of all of the Trust's liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the Trust shall be distributed to the Tribe Beneficiaries in accordance with Section 4.2(b), except as otherwise provided in Section 4.2(e).

(d)      Following the dissolution and distribution of the assets of the Trust, the Trust shall terminate, and the Directors, or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of TAFT XVI to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation. A certified copy of the Certificate of Cancellation shall be given to the Delaware Trustee for its records promptly following such filing.

**Section 6.3 Taxes.**

(a)      The Trust is intended to qualify as one or more "qualified settlement funds" within the meaning of the **QSF Regulations**, and, to the extent permitted under applicable law, for state and local income tax purposes. Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the TAFT XVI TDP shall be construed or implemented in a manner that would cause the Trust to fail to qualify as one or more "qualified settlement funds" within the meaning of the QSF Regulations or under corresponding or similar provisions of relevant state or local law. The Trust shall be treated as a qualified settlement fund from the earliest date possible, and the Parties agree to any relation-back election required to treat the Trust as a qualified settlement fund from the earliest date possible.

(b)      The Managing Director shall be the "administrator" of the Trust within the meaning of Treasury Regulation Section 1.468B-2(k)(3) and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by the Trust out of the Trust Assets, which assets may be sold by the Directors to the extent necessary to satisfy tax liabilities of the Trust, (ii) be responsible for all tax reporting, filing and withholding requirements for the Trust and comply with all applicable tax reporting, filing and withholding obligations, (iii) send copies of any tax filings and returns of the Trust to Sun, in accordance with the STSA, (iv) cooperate in the provision of documentation to Sun in accordance with Section IV.G.2.a of the STSA, and (v) obtain federal and state taxpayer identification numbers for the Trust and provide the same to the Directors and Sun.

(c)      Subject to Section 6.3(a) and (b) above and (d) below, following the Effective Date, the Directors shall be responsible for all of the Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. Subject to Section IV.G.2.g of the STSA, the Directors shall be responsible for causing the Trust to satisfy all requirements necessary to maintain qualification of the Trust as one or more "qualified settlement funds" within the meaning of the QSF Regulations and under corresponding or similar provisions of relevant state or local law.  The Directors shall take no action that could cause the Trust to fail to qualify as one or  more "qualified settlement funds" within the meaning of the QSF Regulations or under corresponding or similar provisions of relevant state or local law or that is inconsistent with such treatment.

24

(d)     The "taxable year" of the Trust shall be the "calendar year" as such terms are defined in Section 441 of the Code.  The Trust shall use the accrual method of accounting as defined in Section 446(c) of the Code.

(e)     Notwithstanding anything in this Trust Agreement or the Sun Tribal Settlement Agreement to the contrary, neither the Directors nor any other person shall on behalf of or in connection with the Trust seek a private letter ruling, technical advice memorandum or any other ruling or guidance from the Internal Revenue Service or any other taxing authority on any matter without consulting with and obtaining the prior written consent of Sun.

**Section 6.4 Modification.**

(a)     Material modifications to this Trust Agreement may be made only pursuant to an order of the Court; provided, however, that the Directors may amend this Trust Agreement by unanimous consent of the Directors from time to time without the consent, approval or other authorization of, but with notice to, the Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Directors to effectuate the provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing proviso, no amendment or waiver of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Sun Tribal Settlement Agreement. The Directors shall provide to the Tribe Beneficiaries notice of any proposed modification to this Trust Agreement, whether material or minor, through the TAFT Portal at the time of notice to the Court and not less than ten (10) business days before such modification becomes effective; provided, however, that the Directors may shorten such notice period only in the event that a ten (10) -day notice period would be materially adverse to the Trust and the Tribe Beneficiaries.  The Directors shall provide Sun with a copy of any such notice of any proposed modification to this Trust Agreement at the same time as notice is provided to the Tribe Beneficiaries.

(b)     Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize or impair (i) the Trust's status as a "qualified settlement fund" within the meaning of the QSF Regulations or under corresponding or similar provisions of relevant state or local law, or (ii) the rights, duties, liabilities and obligations of the Delaware Trustee without the written consent of the Delaware Trustee.

**Section 6.5 Communications.** The Directors shall establish and maintain the Tribal Opioid Settlement Portal (or other means of communication approved by the Directors) so as to (a) enable Tribe Beneficiaries to deliver the required documentation under the Beneficiary Abatement Use Reports in an electronic format and (b) enable secure communications between the Directors and the Tribe Beneficiaries.

**Section 6.6 Severability**. If any provision of this Trust Agreement or application thereof to any person or circumstance shall be determined by a Final Order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

**Section 6.7 Notices**.

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Directors:
Dr. Kathy Hopinkah Hannan
Tribal Abatement Fund Trust XVI
P.O. Box 65097
Washington, DC 20035
Email: Directors@tribalopioidsettlements.com

Mary L. Smith
Tribal Abatement Fund Trust XVI
P.O. Box 65097
Washington, DC 20035
Email: Directors@tribalopioidsettlements.com

Kevin Washburn
Tribal Abatement Fund Trust XVI
P.O. Box 65097
Washington, DC 20035
Email: Directors@tribalopioidsettlements.com

with a copy (which shall not constitute notice) to:
Brown Rudnick LLP
7 Times Square
New York, NY 11036
Attn: David J. Molton, Esq., Barbara J. Kelly, Esq.
Email: dmolton@brownrudnick.com, bkelly@brownrudnick.com

To the Delaware Trustee:

Wilmington Trust, N.A.
1100 North Market Street

Wilmington, DE 19890
Attn: Russell L. Crane
Email: rcrane@wilmingtontrust.com
with a copy (which shall not constitute notice) to:
Morris James, LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Attn: Ross Antonacci, Esq.
Email: RAntonacci@morrisjames.com

To the Trust Protector:

Stacy Leeds
c/o Leeds Consulting LLC
11177 N. Highway 10
Tahlequah, OK 74464

with a copy (which shall not constitute notice) to:
Brown Rudnick LLP
7 Times Square
New York, NY 11036
Attn: David J. Molton, Esq., Barbara J. Kelly, Esq.
Email: dmolton@brownrudnick.com, bkelly@brownrudnick.com

To Sun:

Eric Dowell, Esq.
Sun Pharmaceuticals Industries Ltd.
Senior Director, Head of Litigation
2 Independence Way
Princeton, NJ 08540

with a copy to Sun's attorneys at:

Michael Connelly
Hyung Steele
501 Grant St., Suite 300
Union Trust Building
Pittsburgh, PA 15219
michael.connelly@troutman.com
hyung.steele@troutman.com
(412) 454-5810

All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

**Section 6.8 Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Trust, the Directors, the Delaware Trustee and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Trust Agreement except, in the case of the Directors, as con-templated by Section 2.1 and Section 5.2 above, and in the case of the Delaware Trustee, as con-templated by Section 5.10 above.

**Section 6.9 Limitation on Transferability; Tribe Beneficiaries' Interests**. Tribe Beneficiaries' interests in the Trust shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, and any purported assignment, conveyance, pledge or transfer shall be null and void *ab initio*; provided, however, that nothing set forth in this Trust Agreement shall be deemed to preclude Tribe Beneficiaries from directing their Abatement Distribution to a tribal organization or an inter-tribal consortium or from aggregating their Abatement Distributions or otherwise directing their Abatement Distributions for common Approved Tribal Opioid Abatement Uses and/or common Tribal Abatement Strategies; (b) be evidenced by a certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of the Trust or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of a Director, whether by petition to the Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on Abatement Distributions; nor (g) give rise to any rights to seek a partition or division of the Trust Assets. In accordance with the Act, Tribe Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, Tribe Beneficiaries shall have an undivided beneficial interest only in cash assets of the Trust but only to the extent such cash assets are declared by the Directors to be distributable as Abatement Distributions in accordance with the Trust Documents. For the avoidance of doubt, Tribe Beneficiaries shall only have such rights as expressly set forth in this Trust Agreement.

**Section 6.10 Exemption from Registration**. The Parties hereto intend that the rights of the Tribe Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws.

**Section 6.11 Entire Agreement; No Waiver**. The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

28

**Section 6.12 Headings**. The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**Section 6.13 Governing Law**. Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following provisions of Delaware law shall apply to the extent inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for Directors, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to Directors, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of Trust Assets, (g) the existence of rights or interests (beneficial or otherwise) in Trust Assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of Directors or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Directors set forth or referenced in this Trust Agreement. Section 3540 of Title 12 of the Act shall not apply to the Trust.

**Section 6.14 Dispute Resolution**. The STSA shall govern the resolution of any dispute under this Trust Agreement.

**Section 6.15 Sovereign Immunity**. Nothing set forth in the Trust Documents shall be construed as a waiver of a claim of sovereign immunity in any dispute resolution, action or proceeding, including, without limitation, any dispute resolution, action or proceeding occurring after the Effective Date.

**Section 6.16 Effectiveness**. This Trust Agreement is effective as of the Effective Date.

**Section 6.17 Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument. A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

*[Signature Pages to TAFT XVI Agreement follow]*

**EXHIBIT 1**
**PARTICIPATING TRIBES and FINAL TRIBAL ALLOCATION DISTRIBUTION
PERCENTAGES**

[See Exhibit C from Tribe MSA]

<div align="center">

**EXHIBIT 2**
**FORM OF CERTIFICATE OF TRUST OF THE**
**TRIBAL ABATEMENT FUND TRUST XVI**

</div>

This Certificate of Trust of the TRIBAL ABATEMENT FUND TRUST XVI (the "*Trust*") is being duly executed and filed by the undersigned Directors of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

<u>Name</u>. The name of the statutory trust formed hereby is:

TRIBAL ABATEMENT FUND TRUST XVI

<u>Delaware Trustee</u>. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:

<u>Effective Date</u>. This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

| TRUSTEES: | DELAWARE TRUSTEE: |
|---|---|
| _____<br>in his/her capacity as a trustee and not individually. | |
| _____<br>in his/her capacity as a trustee and not individually. | By: _____<br><br>Name:<br><br>Title: |
| _____<br>in his/her capacity as a trustee and not individually. | |

<div align="center">

32

</div>

# EXHIBIT 3
# INVESTMENT GUIDELINES

**In General**. Only the following investments will be permitted:

(i)      Demand and time deposits, such as certificates of deposit, in banks or other savings institutions whose deposits are federally insured;

(ii)     U.S. Treasury bills, bonds, and notes, including, but not limited to, long-term U.S. Treasury bills, bonds, notes, and other Government Securities as defined under Section 2(a)(16) of the Investment Company Act of 1940, 15 U.S.C. § 80a-2(a)(16), including, but not limited to, Fannie Mae, Freddie Mac, Federal Home Loan Bank, and Federal Farm Credit;

(iii)    Repurchase agreements for U.S. Treasury bills, bonds, and notes;

(iv)    Commercial Paper (rated A1/P-1 by Standard & Poor's and Moody's);

(v)     AA or AAA corporate bonds (with the rating awarded by at least two of the three major rating agencies (Standard & Poor's, Moody's, or Fitch)); or

(vi)    Open-ended mutual funds owning only assets described in subparts (i) through (v) of this subsection.

The value of bonds of any single company and its affiliates owned by the Trust directly rather than through a mutual fund shall not exceed 10% of the investment portfolio at time of purchase; this restriction does not apply to any of the following: Repurchase Agreements; Money Market Funds; U.S. Treasuries; and U.S. Government Agencies.

Any such investments shall be made consistently with the Uniform Prudent Investor Act. The determination of the rating of any investments shall be made by the Trust's financial advisor on the date of acquisition of any such investment or on the date of re-investment. The Trust's financial advisor shall reconfirm that all investments of Trust Assets still meet the original rating requirement on a quarterly basis. If the Trust's financial advisors determine that any particular investment no longer meets the rating requirement, there shall be a substitution of that investment with an investment that meets the ratings requirement as promptly as practicable, but in no event later than the next reporting period. Previously purchased securities downgraded below AA may be held for a reasonable and prudent period of time if the Trust's financial advisor believes it is in the interest of the Trust to do so.

The borrowing of funds or securities for the purpose of leveraging, shorting, or other investments is prohibited. Investment in non-U.S. dollar denominated bonds is prohibited. The standing default investment instruction for all cash in any account or subaccount that holds any Trust Assets in cash shall be invested in the BlackRock Fed Fund (CUSIP 09248U700).

See example fund-level requirements table on following page.

## Fund Level Requirements

1. OTC Derivatives Counterparty Exposure – Not allowed
2. Non-U.S. dollar denominated bonds – Not allowed

| TYPE OF INVESTMENT | ELIGIBLE | PROHIBITED | COMMENTS |
|---|---|---|---|
| | | | |
| U.S. Treasury Securities | X | | |
| U.S. Agency Securities | X | | |
| Mortgage-Related Securities | | x | |
| Asset-Backed Securities | | x | |
| Corporate Securities (public) | X | | |
| Municipal bonds | X | | |
| | | | |

33

| DERIVATIVES: | No investment, including futures, options and other derivatives, may be purchased if its return is directly or indirectly determined by an investment prohibited elsewhere in these guidelines. | | |
|---|---|---|---|
| Futures | | x | |
| Options | | x | |
| Currency Forwards | | x | |
| Currency Futures | | x | |
| Currency Options | | x | |
| Currency Swaps | | x | |
| Interest Rate Swaps | | x | |
| Total Return Swaps | | x | |
| Structured Notes | | X | |
| Collateralized Debt Obligations | | x | |
| Credit Default Swaps | | X | |
| Mortgage-Related Derivatives | | X | |
| | | | |
| **FOREIGN / NON-U.S. DOLLAR:** | | | |
| Foreign CDs | | X | |
| Foreign U.S. Dollar Denominated Securities | | X | |
| Non-U.S. Dollar Denominated Bonds | | X | |
| Supranational U.S. Dollar Denominated Securities | | X | |
| | | | |
| **COMMINGLED VEHICLES (except STIF):** | | | |
| Collective Funds | | X | |
| Commingled Trust Funds (open ended mutual funds only) | | X | |
| Common Trust Funds | | X | |
| Registered Investment Companies | | X | |
| | | | |
| **MONEY MARKET SECURITIES:** | | | |
| Qualified STIF | | x | |
| Interest Bearing Bank Obligations Insured by a Federal or State Agency | X | | |
| Commercial Paper | | x | |
| Master Note Agreements and Demand Notes | | x | |
| Repurchase Agreements | | x | |
| | | | |
| **OTHER:** | | | |
| Bank Loans | | x | |
| Convertibles (e.g., Lyons) | | x | |
| Municipal Bonds | X | | |
| Preferred Stock | | x | |
| Private Placements (excluding 144A) | X | | |
| Rule 144A Issues | X | | |
| Zero Coupon Bonds | X | | |
| Commodities | | X | |
| Catastrophe Bonds | | X | |

**EXHIBIT 4**

**TRIBAL ABATEMENT FUND TRUST XVI
TRUST DISTRIBUTION PROCEDURES**

| Issue | Description |
|---|---|
| **1. APPLICABILITY OF AGREEMENT** | These terms shall apply to the consideration received and distributed by (A) the Tribal Abatement Fund Trust XVI ("**TAFT XVI**") under the Sun Tribal Settlement Agreement between the Tribal Leadership Committee ("**TLC**"), Participating Tribes,[6] and Sun dated April 4, 2025("**Sun Tribal Settlement Agreement**"), entered into in connection with the matter of *In re National Prescription Opiate Litigation*, MDL No. 2804, Case No. 17-md-2804 in the United States District Court for the Northern District of Ohio (the "**Court**"); and (B) any trust where the terms of such trust agreement expressly adopt these Tribal Opioid Litigation Settlement Trust Distribution Procedures ("**TDP**") (each of (A) and (B), a "**Tribe Trust**" and collectively, the "**Tribe Trusts**"). |
| | The Tribe Trusts shall benefit the Tribe Beneficiaries to the extent set forth in the respective trust agreement of the Tribe Trust (with all applicable exhibits and schedules, each a "**Trust Agreement**" and collectively, the "**Trust Agreements**"). |
| | The distributions made pursuant to this TDP are the exclusive distributions that will be made by the Tribe Trusts and the Tribe Beneficiaries will have no further or other recourse against any party other than what is provided for under this TDP. |
| | The terms set forth herein will be deemed incorporated into the Trust Agreements, *provided, however*, each Trust Agreement may have a unique **Schedule T** for allocation of distributions among Tribes. |
| | These terms set forth the manner in which the Tribe Trusts shall make Abatement Distributions to the Tribe Beneficiaries, which may be used exclusively on the parameters set forth herein. |
| **2. PURPOSE** | These TDPs are intended to establish the mechanisms for the distribution and allocation of funds distributed by the Tribe Trusts to the Tribe Beneficiaries. All such funds described in the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the |

---

[6] Capitalized terms used but not herein defined shall have the meaning ascribed to them in the Sun Tribal Settlement Agreement or the TAFT XVI Trust Agreement, as applicable.

| Issue | Description |
|---|---|
| | terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe Beneficiary, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. |
| | Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under the Trust Agreements shall be used by Tribe Beneficiaries for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund administrative expenses incurred in connection with the spending of Abatement Funds for Approved Tribal Opioid Abatement Uses ("**Approved Administrative Expenses**," and, together with the Approved Tribal Opioid Abatement Uses, "**Approved Uses**"). |
| | For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe Beneficiary, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. |
| | The Tribe Trusts shall distribute Abatement Funds to Tribe Beneficiaries for Approved Uses. |
| | Notwithstanding anything in these TDPs that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribe Beneficiaries, tribal organizations, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3. DISBURSEMENT OF ABATEMENT DISTRIBUTIONS** | The trustees under each Trust Agreement shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on the applicable **Schedule T**. Each Trust Agreement may have its own unique **Schedule T**. |
| **4. ATTORNEYS' FEES AND COSTS FUND** | Reserved. |
| **5. TRIBAL ABATEMENT FUNDING** | 1. The Tribe Beneficiaries will use funds received from the Tribe Trusts for programs on the approved list of abatement strategies (see Schedule B) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the |

| Issue | Description |
|---|---|
| | judgment of a Tribe Beneficiary, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.  A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as Schedule D (the "**Tribal Abatement Strategies**").  The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities. |
| | 2. The Tribe Beneficiaries agree that Abatement Funds distributed pursuant to the Trust Agreements shall be used to abate the opioid crisis in accordance with the terms of these TDPs. |
| **6. COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY** | 1. The trustees of the Tribe Trusts shall impose appropriate reporting requirements on the Tribe Beneficiaries to ensure that Abatement Funds are used only for Approved Uses.  The trustees may authorize modified reporting requirements for Tribe Beneficiaries with allocations below a certain level. |
| | 2. The Tribe Trusts shall prepare an annual report (an "**Annual Report**"). |
| | 3. The Court shall have continuing jurisdiction over the Tribe Trusts, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Tribe Trusts. |
| | 4. The trustees shall have the power to take any and all actions that in the judgment of the trustees are necessary or proper to fulfill the purposes of the Trust Agreements, including the requirement that 100% of the Abatement Funds distributed shall be used to abate the opioid crisis in accordance with the terms hereof. |
| | 5. Notwithstanding any other provision of these TDPs, the trustees of the Tribe Trusts shall implement these TDPs in accordance with the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C.  5301 *et seq*.  and, for the |

| Issue | Description |
|-------|-------------|
|  | avoidance of doubt, a Tribe Beneficiary, tribal organization or inter-tribal consortium may charge its federally- approved indirect cost rate consistent with such Act with respect to opioid abatement programs carried out by such Tribe Beneficiary, tribal organization or inter-tribal consortium. |

**Schedule B**

**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

<div style="border:1px solid black; text-align:center; padding:10px">PART ONE: TREATMENT</div>

**A.**     **TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[7]:

1.  Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.  Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.  Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.  Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.  Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.  Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

---

[7] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

7. Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8. Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11. Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

**B.** **SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2. Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.    Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.    Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.    Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.    Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.    Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.    Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.    Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.    Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.    Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.    Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.    Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.    Create and/or support recovery high schools.

15.    Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

C.    **CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.    Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.    Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.    Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.    Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.    Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.    Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.    Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.    Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.   Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.   Expand warm hand-off services to transition to recovery services.

12.     Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.     Develop and support best practices on addressing OUD in the workplace.

14.     Support assistance programs for health care providers with OUD.

15.     Engage non-profits and the faith community as a system to support outreach for treatment.

16.     Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

**D.      ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   1.     Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   2.     Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   3.     "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   4.     Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

   5.     Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

   6.     Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.      Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.      Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E.   ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.      Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.      Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.      Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.      Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.      Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.      Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.      Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10.     Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

---

PART TWO: PREVENTION

---

**F.      PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.  Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.  Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.  Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.  Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    1.  Increase the number of prescribers using PDMPs;

    2.  Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    3.  Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.  Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.  Increase electronic prescribing to prevent diversion or forgery.

8.  Educate Dispensers on appropriate opioid dispensing.

**G.**    <u>**PREVENT MISUSE OF OPIOIDS**</u>

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Fund media campaigns to prevent opioid misuse.

2.  Corrective advertising or affirmative public education campaigns based on evidence.

3.  Public education relating to drug disposal.

4.  Drug take-back disposal or destruction programs.

5.  Fund community anti-drug coalitions that engage in drug prevention efforts.

6. Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7. Engage non-profits and faith-based communities as systems to support prevention.

8. Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9. School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10. Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.  **PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)**

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2. Public health entities providing free naloxone to anyone in the community.

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.  Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.  Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.  Public education relating to emergency responses to overdoses.

7.  Public education relating to immunity and Good Samaritan laws.

8.  Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.  Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.  Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.  Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.  Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.  Support screening for fentanyl in routine clinical toxicology testing.

PART THREE: OTHER STRATEGIES

## I.  **FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1.  Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.  Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

**J.**     **LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.     Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.     A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.     Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.     Provide resources to staff government oversight and management of opioid abatement programs.

**K.**     **TRAINING**

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.     Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.     Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

**L.**     **RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g.  Hawaii HOPE and Dakota 24/7).

7. Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8. Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9. Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

## Schedule D

## Tribal Abatement Strategies

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions.  Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves.  The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe may utilize its share of Abatement Funds.

**1.     Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction.  These can include, for example:

Utilization of traditional healers and spiritual and traditional approaches to healing;

Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;

Talking circles;

Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;

Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

Example:  Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research.  Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

Example:  Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2.      **Culturally Competent Integrated Treatment Models**

Example:  The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use disorder (OUD).  Didgʷálič provides a full array of medical and social services, utilizing a model of care that centers on and incorporates the Tribe's culture and values.  The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example:  The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction.  In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights.

The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3.      **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI).  It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths- based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture.  It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them.  By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders.  This framework

functions alongside western and medical practices to help individuals overcome their addictions permanently.

4.    **Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for Yurok families suffering from opioid abuse problems.  The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources and expertise of both systems.  It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5.    **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people.  Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology.  As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

Example: Part of the Swinomish Tribe's Didgʷálič treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers.

**Schedule T**
**PARTICIPATING TRIBES AND TRIBAL ALLOCATION DISTRIBUTION**
**PERCENTAGES**

[Reserved - to be added post-Effective Date]

**EXHIBIT E**

**Tribal Participation Form**
**(Multi-Defendant Settlements Identified Below)**

| | |
|---|---|
| Tribal Entity: | |
| Authorized Official: | |
| Address 1: | |
| Address 2: | |
| City, State, Zip: | |
| Phone: | |
| Email: | |

The tribal entity identified above ("**Tribe**"), in order to obtain and in consideration for the benefits provided to the Tribe pursuant to the Tribal Settlement Agreements identified in Paragraph 13 below (collectively, "**Multi-Defendant Settlements**"), and acting through the undersigned authorized official, is or may be an "Eligible Entity" as defined by the Multi-Defendant Settlements, and hereby elects to participate in all of the Multi-Defendant Settlements as a "Participating Tribe" as defined by the Multi-Defendant Settlements, release all Released Claims against all Released Entities in each of the Multi-Defendant Settlements, and agrees as follows.

1.    The Tribe is aware of and has reviewed all of the Multi-Defendant Settlements identified in Paragraph 13 below, understands that all terms in this Tribal Participation Form ("**Form**") have the meanings defined therein, and agrees that by this Form, the Tribe elects to participate in all of Multi-Defendant Settlements set forth in Paragraph 13 below and become a Participating Tribe as provided therein.

2.    The Tribe agrees to the terms of all of the Multi-Defendant Settlements pertaining to Tribes as defined therein.

3.    By agreeing to the terms of the Multi-Defendant Settlements and becoming a Releasor, the Tribe is entitled to the benefits provided therein, including, if applicable, monetary payments and Settlement Product beginning after the Effective Date.

4.    The Tribe agrees to use any monies it receives through the Multi-Defendant Settlements solely for the purposes provided therein.

5.    By signing this Participation Form, the Tribe agrees that, pursuant to the Multi-Defendant Settlements, Special Master David Cohen as Tribal Allocation Appointee will determine the final inter-tribal allocation according to the terms of the Multi-Defendant Settlements.

6.    The Tribe agrees that any disputes arising out of any Multi-Defendant Settlement shall be heard before Special Master David Cohen as the arbitrator designated by the parties in the Multi-Defendant Settlements to resolve disputes through binding arbitration.

7.    The Tribe has the right to enforce each of the Multi-Defendant Settlements as provided therein.

8.      The Tribe, as a Participating Tribe, hereby becomes a Releasor for all purposes in each of the Multi-Defendant Settlements, including but not limited to all provisions of Section II (Release).  The Tribe as Releasor includes (1) the Tribe; and (2) without limitation and to the maximum extent of the power of the Tribe to release Claims, (a) the Tribe's departments, agencies, divisions, boards, commissions, subdivisions, districts, instrumentalities of any kind and attorneys, and any person in their official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, sheriffs and law enforcement districts, emergency services districts, school districts, healthcare districts, hospital districts, library districts, coroner's offices, public transportation authorities, and other special districts, of the Tribe, including those with the regulatory authority to enforce tribal controlled substances acts or the authority to bring Claims related to Covered Conduct seeking money (including abatement or remediation and/or restitution) or revoke pharmaceutical licenses, within the territory governed by the Tribe, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief, including but not limited to fines, penalties, or punitive damages, on behalf of or generally applicable to the general public with respect to the Tribe. All such entities and any other entity identified in the definition of Releasor provide for a release to the fullest extent of its authority.  As a Releasor, the Tribe (for itself and its Releasors) hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in each of the Multi-Defendant Settlements in any forum whatsoever.  The releases provided for in the Multi-Defendant Settlements are intended by the Parties to be as broad as possible and shall be interpreted so as to give the Released Entities in each of the Multi-Defendant Settlements the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of each Releasor to release its Claims.  The releases shall be a complete bar to any Released Claim.

9.      In connection with the releases provided for in the Multi-Defendant Settlements, the Tribe (for itself and its Releasors) expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or tribal or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

**General Release; extent.**  A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

10.     The Tribe may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but the Tribe (for itself and its Releasors) hereby expressly waives and fully, finally, and forever settles, releases, and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance,

oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Tribe's decision to enter into the Multi-Defendant Settlements or the Tribe's decision to participate in the Multi-Defendant Settlements.

11.    Within 30 days of signing the Tribal Participation Form, and prior to the Effective Date set forth in the Multi-Defendant Settlements, the Tribe shall cease all litigation activity as to each of the Defendants identified in the Multi-Defendant Settlements and provide to Special Master Cohen and his TLC designee a dismissal with prejudice of any Released Claims that it has filed.  Upon the Effective Date, the with-prejudice dismissals shall be provided to the relevant Defendants pursuant to the terms of the Multi-Defendant Settlements with a stipulation for filing.

12.    Nothing herein is intended to modify in any way the terms of any Multi-Defendant Settlement, to which Tribe hereby agrees.  To the extent this Form is interpreted differently from the Multi-Defendant Settlements in any respect, the Multi-Defendant Settlements control.

13.    The Tribe hereby ELECTS TO PARTICIPATE in the following Multi-Defendant Settlements as a Participating Tribe for which it is an Eligible Entity pursuant to the terms of those Multi-Defendant Agreements:

    **a.**    **Settlement Agreement for Alvogen Pharmaceutical Company dated April 4, 2025.**

    **b.**    **Settlement Agreement for Apotex Corp. dated April 4, 2025.**

    **c.**    **Settlement Agreement for Amneal Pharmaceuticals, Inc. dated April 4, 2025.**

    **d.**    **Settlement Agreement for Hikma Pharmaceuticals USA Inc. dated April 4, 2025.**

    **e.**    **Settlement Agreement for Indivior Inc. dated April 4, 2025.**

    **f.**    **Settlement Agreement for Viatris Inc. dated April 4, 2025 ("Mylan Settlement Agreement").**

    **g.**    **Settlement Agreement for Sandoz Inc. dated August 31, 2023.**

    **h.**    **Settlement Agreement for Sun Pharmaceutical Industries Inc. dated April 4, 2025.**

    **i.**    **Settlement Agreement for Zydus Pharmaceuticals (USA) Inc. dated April 4, 2025.**

    **j.**    **Settlement Agreement for The Kroger Co. dated July 17, 2024.**

I have all necessary power and authorization to execute this Form on behalf of the Tribe.

Signature: _____

Name: _____

Title: _____

Date: _____

## EXHIBIT F

## <u>Sun's Subsidiaries, Affiliates, and Joint Ventures</u>

The following includes a list of Sun's indirect parents, subsidiaries, affiliates, and joint ventures. Sun made reasonable efforts to identify all indirect parents, subsidiaries, affiliates, and joint ventures and believes this list is complete.

1. Sun Pharmaceutical Industries, Inc.
2. Sun Pharmaceutical Industries India Ltd.
3. Sun Pharmaceutical Industries Ltd.
4. Sun Pharma Laboratories India Ltd.
5. Sun Pharma de Venezuela CA
6. Sun Pharma Mauritius Holdings
7. Green Eco Development Centre India Limited
8. Softdeal Pharmaceutical Private India Ltd.
9. Faststone Mercantile Company Private India Ltd.
10. Zenotech Laboratories India Ltd.
11. Foundation for Disease Elimination and Control of India
12. Skisen Labs Private India Limited
13. Sun Pharma Netherlands B.V.
14. Sun Pharma Japan Ltd.
15. Sun Pharma Japan Technical Operations Japan Ltd.
16. Sun Pharma Middle East FZ UAE LLC
17. Sun Pharma East Africa Kenya Ltd.
18. Artes Biotechnology Germany GmbH
19. Sonke Pharmaceuticals Pty South Africa Ltd.
20. Sun Pharma ANZ Pty Australia LTD.
21. WRS Bioproducts Pty Australia Ltd.
22. Valstar Luxembourg SA
23. Kemipharm Morocco SA
24. Sun Pharmaceuticals Morocco LLC
25. Sun Pharma de Mexico SA de CV
26. Sun Pharma Canada Inc.
27. Sun Pharma Philippines Inc.
28. Ranbaxy Poland SP z OO
29. Basics Germany GmbH
30. Ranbaxy Pharmaceuticals Pty South African Ltd.
31. Ranbaxy S.A. Proprietary South Africa Ltd.
32. Sun Pharma Italia SPA

F-1

33. Sun Pharma Shanghai China Ltd.
34. Sun Pharmaceutical Peru SAC
35. Sun Pharmaceutical Industries Peru S.A.C.
36. Ranbaxy Farmaceutica Brazil Ltda.
37. Ranbaxy Malaysia SDN BHD
38. Sun Pharma UK Limited
39. Sun Pharma Holdings UK Ltd
40. Surgimatix, Inc
41. Rexcel Egypt LLC
42. Sun Pharma Egypt LLC
43. AO Russia Ranbaxy
44. JSC Russia Biosintez
45. Ranbaxy Pharmaceuticals Ukraine LLC
46. Terapia Romania SA
47. Sun Pharma France SA
48. Sun Pharma Laboratorios Spain SLU
49. Ranbaxy Nigeria Ltd.
50. Ranbaxy Thailand Co Limited
51. Realstone Multitrade Private India Limited
52. S.C. Pharmaceuticals  Inc.
53. PI Real Estate Ventures, LLC
54. Chattem Chemicals Inc.
55. MedInstill LLC
56. SP New Milford Parent LLC
57. SP Housatonic LLC
58. SP Housatonic II LLC
59. SP Housatonic III LLC
60. Sun Pharmaceutical Industries, Inc.
61. Mangrove Cell 29 PC (captive insurance cell)
62. Taro Development Corporation
63. Concert Pharma Ireland Limited
64. Zenotech Inc.
65. Zenotech Farmaceutica do Brasil Ltda.
66. Sun Pharmaceutical Holdings USA, Inc.
67. 2 Independence Way LLC
68. Alchemee Skincare Canada Corporation
69. Caraco Pharmaceuticals Pvt India Ltd
70. Ranbaxy Inc

F-2

71. Taro Pharmaceuticals ON Canada Inc
72. Neetnav Real Estate Private India Limited
73. Sun Pharmaceutical Industries Australia (Pty) Ltd
74. Ranbaxy Signature LLC
75. Ohm Laboratories Inc.
76. Taro International Israel Ltd.
77. Taro Pharmaceuticals U.S.A., Inc.
78. 3 Skyline LLC
79. One Commerce Drive LLC
80. Sun Laboratories Sharjah UAE FZE
81. Taro Pharmaceutical Industries Israel Ltd.
82. Sun Pharmaceutical Industries  Netherlands BV
83. Taro Pharmaceuticals North America, Cayman Islands Inc
84. Taro Pharmaceuticals Europe Netherlands B.V.
85. Alkaloida Chemical Co.Hungary ZRT
86. Sun Farmaceutica do Brasil Ltda.
87. Sun Pharma Switzerland Ltd.
88. Sun Pharmaceuticals Germany GmbH
89. Aditya Acquisition Company Israel Limited
90. Tarsius Pharma Israel Ltd.
91. Proactiv Japan YK
92. The Proactiv Company Japan KK
93. Sun Pharmaceutical Bangladesh Ltd.
94. Sun Pharmaceuticals (EZ) Bangladesh Ltd.
95. Generic Solar Power India LLP
96. Haystackanalytics Private India Limited
97. Remidio Innovative Solutions Pvt India Ltd.
98. Ezerx Health Tech Pvt India Ltd.
99. Taro Pharma Corporation, Inc.
100. Universal Enterprises Pvt India Ltd.
101. Sun Pharmaceutical Medicare India  Ltd.
102. Sun Pharma Distributors India Ltd.
103. Realstone Infra India Ltd.
104. Vivaldis Health and Foods Private India Limited
105. Trumpcard Advisors and Finvest India LLP
106. Agatsa Software Pvt India Ltd.
107. The Proactiv Company Holdings, Inc.
108. Alchemee LLC

F-3

109.  5am Ventures V, LP
110.  5am Ventures IV, LP
111.  Atlas Venture Fund X, L.P.
112.  Atlas Venture Fund XI, L.P.
113.  Frazier Healthcare VII, L.P.
114.  Frazier Life Sciences VIII, L.P.
115.  Frazier Healthcare VII Cayman, L.P.
116.  Versant Venture Capital V, L.P.
117.  Versant Venture Capital V AIV, L.P.

**EXHIBIT G-1**
**Payment Schedule**

| Payment Date | Sun Settlement Trust -- |
|:---:|:---:|
| July 25, 2025 | $1,045,053.15 |
| **Total** | $1,045,053.15 |

**EXHIBIT G-2**
**Allocation Between TAFT and Attorney Fee Fund**

| Payment Date | Attorney Fee and Cost Fund | TAFT XVI | Overall Total Payments (Abatement + Abatement Fees) |
|---|---|---|---|
| July 25, 2025 | $156,757.97 | $888,295.18 | $1,045,053.15 |
| **Total** | $156,757.97 | $888,295.18 | $1,045,053.15 |