**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION | ) | CASE NO. 1:17-MD-2804 |
| OPIATE LITIGATION | ) | |
| | ) | SPECIAL MASTER COHEN |
| THIS DOCUMENT RELATES TO: | ) | |
| "*PBM Bellwether Cases*" | ) | |
| | ) | **DISCOVERY RULING REGARDING** |
| | ) | **AGENDA ITEM NOS. 441 & 443:** |
| | ) | **"OPIOID REMUNERATION"** |

In connection with Discovery Agenda Item Numbers 441 and 443, the two Bellwether Plaintiffs (Rochester, New York and City of Ogdensburg, New York) seek in discovery a variety of information from the two PBM Defendants (ESI and OptumRx), all of which falls under the rubric of "opioid remuneration." In connection with this dispute, the undersigned received: (1) numerous letters from the parties; (2) lengthy oral argument; (3) proposed Orders from Plaintiffs (one for each PBM Defendant); and (4) Defendants' responses to the proposals.

Having carefully considered the parties' submissions, the Special Master rules as follows.

**I.   Introduction.**

Over six months ago, the MDL Court addressed the issue of discovery of "information, documents, and data regarding the PBMs' methods of receiving 'remuneration' related to opioids and other drugs, and the amounts of remuneration received." *Order Regarding Remuneration Discovery* at 1-2 (docket no. 6000) ("*Remuneration Order*"). Plaintiffs had "move[d] for leave to file supplemental discovery related to remuneration to ensure 'the PBM defendants produce the full scope'

of materials on this topic." *Id.* at 2. The Court noted that the "remuneration information that Plaintiffs seek is at the very center of the case" and granted Plaintiffs' motion, but "set[] out certain boundaries on the supplemental discovery that PBMs must produce." *Id.* at 3. A principal boundary was that "any agreements the parties reached earlier, and any limitations the Special Master imposed earlier, remain in place. Thus, for example, the Court's instant Order does not work to abrogate or expand the sampling process" the Special Master had arranged. *Id.* at 5. And the PBM Defendants were still allowed to "interpos[e] any appropriate objections." *Id.* at 6. But the Court made clear it would require "both sides [to] produce all discovery necessary to try the Bellwether cases ***on the merits based on a full record***." *Id.* at 7 (emphasis in original); *see id.* (stating the request for supplemental discovery is granted because it "will ensure PBMs respond fully, completely, and transparently regarding the pivotal topic of remuneration").

In the wake of the Court's *Remuneration Order*, Plaintiffs asked the PBM Defendants for additional discovery on opioid remuneration, some of which the PBM Defendants produced and some of which they did not. An example of the former is that Plaintiffs asked ESI to produce "a complete set of Manufacturer Payment Reports," which show "opioid remuneration from manufacturer rebates and administrative fees."[1] ESI agreed to and did produce these Reports, as did OptumRx. *See* Transcript at 6-7, 99-101 (Sept. 14, 2025). An example of the latter is that Plaintiffs asked ESI to produce "[r]elevant data fields to calculate spread pricing for the bellwether." Palmieri Letter at 3. ESI refused, arguing the request contradicted the parties' prior agreement on data production, and also it would be "unduly burdensome and disproportionate to the needs of the case to require Express

---

[1] Letter from Marco Palmieri and Michael Thakur to Olga Vieira (June 27, 2025) at 3-4 (Agenda Exhibit 441-D) ("*Palmieri Letter*").

2

Scripts to pull millions of lines of data a second time."[2] Plaintiffs then asked the undersigned to overrule the PBMs' objections and refusals and require production of the requested discovery.

Plaintiffs acknowledged, however, that the parties had made some progress in resolving their disputes. Thus, as of September 10, 2025, when the parties appeared before the undersigned for oral argument, Plaintiffs had "narrowed their dispute concerning [ESI's] responses" to four categories of information. Proposed ESI Order at 1; *see* Transcript at 5-7 (Sept. 14, 2025) *and* Agenda Exhibit 441-D at 1.[3] Similarly, Plaintiffs acknowledged they had "narrowed their dispute concerning the OptumRx Defendants' responses" to five categories of information. Proposed OptumRx Order at 1; *see* Transcript at 73 (Sept. 14, 2025).[4]

In their proposed Orders, however, Plaintiffs now ask for more information categories than they did just before and during the September 10 hearing.[5] The Special Master will not address in this *Ruling* the additional categories Plaintiffs seek. The Special Master did not receive discussion regarding these categories during oral argument and is not prepared to address them at this juncture.

---

[2] Letter from Olga Vieira to Special Master at 4 (July 8, 2025) (Agenda Exhibit 441-F).

[3] In contrast, the letter that Plaintiffs sent to ESI four months earlier listed over 20 putative deficiencies regarding ESI's responses to discovery on opioid remuneration. *See* Agenda Exhibit 441-B at 15-17.

[4] In contrast, the letter that Plaintiffs sent to OptumRx two months earlier listed dozens of putative deficiencies regarding OptumRx's responses to discovery on opioid remuneration. *See generally* Agenda Exhibit 443-B.

[5] After oral argument, on September 16, 2025, the Special Master sent an email to the parties, stating: "As I am going through the transcript, it occurs to me it would be helpful if [Plaintiffs] provided an updated roadmap or list or even proposed order of what exactly they seek. [Plaintiffs] earlier provided letters listing what discovery they want, but during our colloquy stated they no longer seek some of the bullet points, or at least do not believe those points are as important. At the same time, [Plaintiffs] seemed to suggest details regarding other aspects of requested discovery that were not highlighted in [Plaintiffs'] earlier letters." Plaintiffs responded with a proposed order for each PBM Defendant.

3

Moreover, the Special Master's invitation to submit a proposed Order was not meant to ***expand*** the parties' dispute, after they had narrowed it.

With that proviso, the Special Master rules below on each of Plaintiffs' requests. As did the Court in its *Remuneration Order*, the Special Master has conscientiously considered and applied Rule 26(b)(1) of the Federal Rules of Civil Procedure, which sets forth the factors the Court must weigh when determining the scope of discovery a party is allowed to pursue. The Special Master has especially considered "whether the burden or expense of the proposed discovery outweighs its likely benefit."[6] In this regard, the Special Master also weighed whether Plaintiffs can obtain some or all of the discovery they seek through less burdensome means. In particular, Plaintiffs have stated they intend to ask the Court for additional time for 30(b)(6) depositions. *See generally* Agenda Issue Numbers 448 & 454. The Special Master believes that, if Plaintiffs can obtain some of the information they seek through 30(b)6) depositions, that fact weighs against granting their request for additional more-expensive and more-time-consuming document discovery—even if it means more 30(b)(6) time may be required.

---

[6] Rule 26(b)(1) states:
> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering [1] the importance of the issues at stake in the action, [2] the amount in controversy, [3] the parties' relative access to relevant information, [4] the parties' resources, [5] the importance of the discovery in resolving the issues, and [6] whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Here, all of the requested discovery is relevant; the essential question is whether it is proportional to the needs of the case. Factors 1, 3, 4, & 5 (as labeled above) all weigh in Plaintiffs' favor. Factor 2 is neutral or in plaintiffs' favor. The key, then, is how the requested discovery balances under factor 6, and how the sum of the factors then preponderates on proportionality.

## II. Plaintiffs' Proposed Order Regarding ESI.

Plaintiffs ask for an Order requiring ESI to produce numerous categories of information. The Special Master rules on each category below.

### 1. Top-line Yearly Opioid Remuneration Amounts Nationwide and for the State of New York.

Plaintiffs seek "[t]op-line dollar figures for opioid remuneration for each year from 2006 to 2019 nationwide and for the state of New York and the methodology used to calculate it." Agenda Exhibit 441-D at 2. Plaintiffs point to a 2017 email where an ESI director stated ESI "made ~$60 million in margin on opioids in 2016." *Id.* (quoting ESI_JEFFCOMO_000178613). Plaintiffs conclude that "ESI is thus clearly capable of computing this overall opioid remuneration number on a yearly basis, has a business interest in doing so, and needs to produce this information and the method for calculating this figure (i.e., what types/sources of remuneration went into calculating opioid margin and which databases did this pull from)." *Id.*

ESI responds that the 2017 email was a one-time, "back of the envelope" calculation and that ESI does not, in the ordinary course of its business, keep track of its remuneration related to *opioid* drugs separately from other drugs. *See* Agenda Exhibit 441-F at 3 ("Express Scripts does not track remuneration or profitability on a drug-by-drug basis or a drug category basis."). ESI also insists it has given Plaintiffs all of the data and contracts that Plaintiffs need for Plaintiffs to calculate the top-line amounts on their own, at least for a representative sample of clients. *See* Transcript at 16-18 (Sept. 14, 2025). And ESI asserts that, to produce all of the information requested, it would have to access and produce data fields beyond what the parties agreed to in 2022. (This point is discussed in more detail in subsection 5, below.)

5

The "top-line amount" information requested in this category, and the related information discussed immediately below in category two, is certainly relevant. The question becomes whether the additional increment of information Plaintiffs seek, beyond what ESI has already produced, is: (1) unduly burdensome and disproportionate to the needs of the case, and/or (2) beyond the boundary of agreements the parties reached earlier or limitations the Special Master earlier imposed.

This is a close call. The Special Master ultimately rests his ruling on this category (and the next) on ESI's repeated insistence that it did not track its remuneration related to opioid drugs separately from other drugs—even though it could—unless a particular client contract required it to do so. *See* Letter from Olga Vieira to Special Master at 1 (September 26, 2026) ("Express Scripts actually tracked its financials on a client-by-client, not drug-by-drug, basis"). That is, ESI maintains its remuneration mechanisms are specific to and often change with each of its client contracts; it does not receive or track remuneration related to a specific opioid or class of opioids; and providing Plaintiffs with the "top-line dollar figures" they seek would require ESI to undertake calculations and access data fields in ways it never normally does.[7]

Accepting these contentions as true, the Special Master concludes Plaintiffs' request for the information sought in category one must be denied. Plaintiffs will instead have to examine ESI's client contracts individually, in conjunction with the financial data provided, to determine the extent to which and mechanisms by which ESI obtained "opioid remuneration."

---

[7] *See id*. ("Express Scripts negotiates with thousands of plan sponsors and pharmacies, and hundreds of manufacturers, and moneys received and shared to and from these sources are calculated and reconciled at the client level, not on a drug-specific basis. There is no set of consolidated ledgers or reports isolating "opioid remuneration" across the business. To produce what Plaintiffs now seek would require Express Scripts to merge data from disparate systems and create an entirely artificial allocation methodology for this litigation to attempt to attribute revenue to opioids. That information simply does not exist in the form Plaintiffs demand.")

6

That said, contained within this category is a request that ESI provide an explanation for "the methodology used to calculate" any remuneration figures that ESI has already produced. The Special Master believes this is fair and appropriate. Accordingly, ESI will produce an explanation in accord with the directives set out in subsection III.E below.

2. **Dollar Figures for Components of Opioid Remuneration and Their Data Sources.**

This second category of information is essentially a subset of category one. That is, Plaintiffs here request the details of the "components" and "data sources" that ESI would use to calculate the "top line amounts" requested in category one. Proposed Order at 1, 2. For the same reasons, the Special Master concludes Plaintiffs' request for the information sought in category two must be denied.

3. **Sources of Remuneration other than Rebates and Administrative Fees.**

ESI states it is "not aware of any 'other sources of opioid remuneration' from opioid manufacturers" aside from the rebate and administrative fee information that ESI has already produced. Letter from Olga Vieira to Special Master at 1 (September 26, 2026). "Express Scripts, therefore, has no information to produce in response to this request." *Id.*

The Special Master accepts this representation as an adequate response and, accordingly, otherwise denies Plaintiffs' request.

4. **Pre-2014 Rebate and Administrative Fee Data.**

Plaintiffs ask for "rebate and admin fee data *for the state of New York* before 2014." Agenda

7

Exhibit 441-D at 3.  ESI responds it already produced "*nationwide* information on rebates for claims adjudicated by Express Scripts back to 2008 (for Medco) and back to 2009 (for Express Scripts)," and is "willing to provide the same Remuneration Response for the State of New York that it provided for nationwide information" in order to resolve this dispute.  The Special Master agrees this response will resolve this dispute, and asks ESI to please provide it.

### 5. Relevant Data Fields to Calculate Spread Pricing.

In early 2024, the parties negotiated which data fields ESI would produce in discovery.  According to ESI, "[f]ollowing extensive negotiations, Plaintiffs selected approximately 350 data fields, including 119 from the claims adjudication database."  Agenda Exhibit 441-F at 4.  Plaintiffs now ask for production of additional data fields, arguing they could not have known these additional fields were necessary until after they received ESI contracts that "include[d] references to other variables that are not defined in the agreements themselves."  Agenda Exhibit 441-D at 3.  Plaintiffs argue that, "even though Plaintiffs may have agreed to the production of certain data fields previously, any such agreement was based upon representations about what information can be captured by [ESI's] IW database—representations that are now in question—and was reached prior to Defendants identifying the relevant contracts at issue . . . ." *Id.*  ESI replies that Plaintiffs had received similar contracts in earlier state court opioid litigation, so Plaintiffs could and should have known what data fields to ask for during their 2024 negotiations.  Transcript at 28, 42 (Sept. 14, 2025).

If discovery was only now beginning in these cases, the Special Master would easily conclude that Plaintiffs should receive these additional data fields.  The MDL Court earlier ruled, however, that "any agreements the parties reached earlier . . . remain in place." *Remuneration Order* at 5.  Plaintiffs

have not made a compelling showing that their 2024 agreement regarding data fields was premised on an unfair, skewed understanding, or because ESI withheld information on what data fields existed or were important. Accordingly, the Special Master must adhere to the Court's *Remuneration Order* and decline, at this juncture in these bellwether cases, to order ESI to produce the additional requested data fields.

### 6. Opioid Modeling or Forecasting Documents.

This category of information was not included in the discovery Plaintiffs sought after they "narrowed their dispute concerning the ESI Defendants' responses" to discovery on opioid remuneration. Plaintiffs' Proposed Order at 1. The Special Master did not hear oral argument on this topic. Accordingly, the Special Master does not address this category of information in this *Ruling*.

### 7. Audit Related Documents.

This category of information was not included in the discovery Plaintiffs sought after they "narrowed their dispute concerning the ESI Defendants' responses" to discovery on opioid remuneration. Plaintiffs' Proposed Order at 1. The Special Master did not hear oral argument on this topic. Accordingly, the Special Master does not address this category of information in this *Ruling*.

### 8. Data Retention following Medco and ESI Merger.

This category of information was not included in the discovery Plaintiffs sought after they "narrowed their dispute concerning the ESI Defendants' responses" to discovery on opioid remuneration. Plaintiffs' Proposed Order at 1.The Special Master did not hear oral argument on this

topic. Accordingly, the Special Master does not address this category of information in this *Ruling*.

### 9. Consultant, Broker, and Third-Party Administrator Documents.

This category of information was not included in the discovery Plaintiffs sought after they "narrowed their dispute concerning the ESI Defendants' responses" to discovery on opioid remuneration. Plaintiffs' Proposed Order at 1. The Special Master did not hear oral argument on this topic. Accordingly, the Special Master does not address this category of information in this *Ruling*.

\* \* \* \* \*

## III. Plaintiffs' Proposed Order Regarding OptumRx.

Plaintiffs similarly ask for an Order requiring OptumRx to produce numerous categories of information, several of which are virtually identical to the categories Plaintiffs sought from ESI. The Special Master again rules on each category below. The Special Master's analyses and conclusions are largely the same for OptumRx as for ESI regarding similar categories.

### A. Top-line Yearly Opioid Remuneration Amounts Nationwide and for the State of New York.

The Special Master reaches the same conclusion here as in Section II.1, above, and for the same reasons. The information sought is certainly relevant, and whether OptumRx should be required to produce it as requested is a close call. In the end, however, the Special Master again concludes Plaintiffs' request for the information sought from OptumRx in category A must be denied. Like ESI, OptumRx "does not in the ordinary course of its business track profitability on a drug-by-drug basis."

Letter to Special Master from Brandon Springer at 1 (September 26, 2025). Plaintiffs will instead have to examine OptumRx's client contracts individually, in conjunction with the financial data OptumRx has provided, to determine the extent to which and mechanisms by which OptumRx obtained "opioid remuneration."

That said, OptumRx agreed to a similar proposal as did ESI—"OptumRx remains willing to replicate its rebate response for the State of New York." Springer Letter at 2. Compare section II.4, above. OptumRx should please do so.

### B. Dollar Figures for Components of Opioid Remuneration and Their Data Sources.

For all of the same reasons recited above in Section II.2, the Special Master concludes Plaintiffs' request for the information sought in category B must be denied.

### C. Sources of Remuneration including "Pass-Through" Payments.

This category of information is essentially another subset of category A, above. Plaintiffs ask for an Order requiring OptumRx to "include in its top-line dollar figures all forms of opioid remuneration even if those payments were 'passed through' to the client." Proposed Order at 3. For the same reasons the Special Master denies Plaintiffs' request for category A, the request for category C is also denied. In addition, denial is appropriate because OptumRx asserts it "already included those dollar amounts in its rebate response, so there is nothing to compel." Springer Letter at 6.

### D. Clinical Program Fee Data.

The undersigned earlier ordered OptumRx to provide information about the costs and fees

associated with its opioid-related clinical offerings *for a Rochester-bellwether-specific client sample*. *See* docket no. 6222 at 2.  Plaintiffs' proposed Order asks for this information on a nationwide basis, which would exceed a "limitation the Special Master imposed earlier." *Remuneration Order* at 5. Therefore, the request is denied.

### E. Complete Methodology Documentation.

Plaintiffs ask that OptumRx be ordered to "provide detailed written explanations of all data fields, databases, and calculation methodologies used to generate any remuneration figures produced under this Order," and to provide "sufficient detail to allow Plaintiffs to independently verify and replicate OptumRx's calculations using the same source data." Proposed Order at 4-5.  The Special Master grants this request in part.  To the extent that this request suggests OptumRx must produce additional data to Plaintiffs, it is denied.  It is fair and reasonable, however, for OptumRx to provide Plaintiffs with "detailed written explanations of all data fields, databases, and calculation methodologies used to generate any remuneration figures" that OptumRx has *already produced*.[8] Proposed Order at 4.  This would include explanation of "(1) the specific data sources for each component; (2) all assumptions made in calculations; (3) any limitations or exclusions in the underlying data; and (4) a clear explanation of how OptumRx's various data systems interact to produce final remuneration calculations." *Id.* at 5.  It would also include "sufficient detail to allow

---

[8] The Special Master notes he does not know all the details of what OptumRx has previously provided to Plaintiffs regarding opioid remuneration; so, OptumRx may have previously provided to Plaintiffs some level of explanation of the "data fields, databases, and calculation methodologies used to generate any remuneration figures" that OptumRx has already produced.  This *Ruling* requires OptumRx to provide the explanation if it has not done so already, and/or to supplement its explanation to meet the five requirements listed above, if necessary.

12

Plaintiffs to independently verify and replicate OptumRx's calculations using the same source data," *id.*, with the caveat that OptumRx is not required to produce any ***additional*** data, beyond what is otherwise required by this *Ruling*. This may mean Plaintiffs are unable to verify and replicate all of OptumRx's calculations, but that is a result of the restrictions set out by the Court in the *Remuneration Order*.

### F.     RxMax Field Production

The Special Master's analysis of and conclusion for this category is essentially the same as in Section II.5 above.  Plaintiffs ask for production of additional data fields, beyond what the parties negotiated in 2024.  Plaintiffs go so far as to assert that OptumRx "concealed specific remuneration-related data fields during discovery negotiations," so the parties' 2024 agreement regarding data fields was unfair.  Agenda Exhibit 443-F at 1.  OptumRx responds that the supposedly concealed data fields are actually fields that: (1) OptumRx offered and produced; or (2) Plaintiffs reviewed and explicitly selected or rejected; or (3) "contain information that is incorporated into the fields OptumRx has already produced."  Agenda Exhibit 443-I at 3.  OptumRx sums up: "the 'new' fields that the PEC identifies would not change the bottom-line numbers as to how much OptumRx received from a given manufacturer or passed through to a given client."  *Id.*

The Special Master concludes that Plaintiffs' request for production of additional data fields is not well-taken, in light of the data agreements the parties reached earlier and OptumRx's explanation for the newly-disclosed data fields. The Special Master remains concerned, however, that about 46 of these new data fields were, in fact, never revealed earlier to Plaintiffs.  This makes it fair for Plaintiffs to ask for explanation of OptumRx's assertion that these fields would not "change the

13

bottom-line numbers." *See* Agenda Exhibit 443-F at 3 ("If OptumRx contends that total opioid remuneration is calculable without using these missing data fields, Defendant should explain . . . .").

Accordingly, the Special Master declines, at this juncture in these bellwether cases, to order OptumRx to produce the additional requested data fields; however, OptumRx shall provide a complete explanation to Plaintiffs of how and why these data fields "would not change the bottom-line numbers as to how much OptumRx received from a given manufacturer or passed through to a given client."

### G. Good Faith Effort and Contractual Cross-References.

Plaintiffs ask for an Order requiring that, if OptumRx "claims information cannot be located or calculated," then "it shall provide detailed explanations of the search methodology employed and the specific obstacles encountered." Proposed Order at 6. The Special Master did not hear oral argument on this topic, and it is clearly an over-reach. This request is denied.

### H. Verification.

Plaintiffs ask for an Order requiring that "OptumRx shall provide a sworn certification that *all* remuneration data from *all* systems has been identified and produced . . . ." Proposed Order at 6 (emphasis added). Again, the Special Master did not hear oral argument on this topic, and it is clearly an over-reach. This request is denied.

## IV. Conclusion.

The Special Master does not believe this *Ruling* brings to a close all disputes regarding the PBM Defendants' obligations to provide discovery regarding "opioid remuneration." For example,

14

the PBM Defendants may have to answer questions on this topic in 30(b)(6) depositions, including regarding the methodology and source materials they used to produce the opioid remuneration information so far provided, and disputes may arise there. But, given the restrictions set by the Court in the *Remuneration Order*, with regard to the information categories addressed above on the merits, Plaintiffs can and must, for the most part, endeavor to prove their claims with the opioid remuneration *document* discovery already provided.

Any objections to this *Ruling* must be filed on or before October 23, 2025.

**RESPECTFULLY SUBMITTED,**

/s/ David R. Cohen
David R. Cohen
Special Master

**Dated:** October 2, 2025