# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>*City of Rochester v. Purdue Pharma, L.P., No. 19-op-45853 (Track 12)* | MDL No. 2804<br><br>Case No. 17-MD-2804<br><br>Judge Dan Aaron Polster |

## NON-PARTY WEGMANS FOOD MARKET, INC.'S OBJECTIONS TO RULING REGARDING THIRD-PARTY DISCOVERY FROM WEGMANS (MDL ECF No. 6387)

**INTRODUCTION**

Non-party Wegmans Food Markets, Inc. seeks relief from Special Master David R. Cohen's Ruling Regarding Third-Party Discovery from Wegmans and Kinney (MDL ECF No. 6387) (the "Ruling") under Federal Rule of Civil Procedure Rule 53(f).

The City of Rochester (the "City")'s complaint is unique in that it "marks one of the first pleading[s] in the Country to identify PBMs as among those bearing responsibility for the opioid scheme." Compl. ¶¶ 56, 58, *City of Rochester v. Purdue Pharma*,1:19-op-45853-DAP (N.D. Ohio June 5, 2019) ("*Rochester*"), ECF No. 1-5; *see also id.* ("The novelty of the City of Rochester's approach should not distract from the reality of the PBMs' complicity—indeed, necessity—in the scheme before this Honorable Court.  None of the manufacturers or distributors' wrongdoing would have succeeded without the PBMs' ability to control and move product.").  Indeed, the City's allegations focus on harm to *the City's* residents and the costs *the City* alleges it has and will incur as a result of the PBMs conduct:

> As a direct and foreseeable consequence of Defendants' wrongful conduct, Plaintiff has been required to spend millions of dollars each year in its efforts to combat the public nuisance created by Defendants' deceptive marketing campaign. Plaintiff has incurred and continues to incur costs related to opioid addiction and abuse, including, but not limited to, health care costs, criminal justice and victimization costs, social costs, and lost productivity costs. *Defendants' misrepresentations regarding the safety and efficacy of long-term opioid use proximately caused injury to Plaintiff and its residents*.

*Id.* ¶ 59 (emphasis added); *see also* Am. Compl. ¶¶ 590-91, 720, 752-53, 813, 835, 838 (Mar. 6, 2024), *Rochester* ECF No. 110.

After the City's case was selected as a PBM Bellwether, this Court made clear it did not want the trial to devolve into a replication of the issues that had already been tried as part of the Track 3 Pharmacy cases: "I really do not want and never envisioned that these bellwethers against the PBMs would . . . replicate the pharmacy trials." MDL ECF No. 5265 at 9:23-25 (Dec. 1, 2023).

1

This was based on an overriding concern that replication of those issues would render the PBM Bellwether trials "unworkable" and "unmanageable." *Id.* at 10:1-6.

The City agrees and has assured the Court that its "red flag" dispensing claims arise from "the point-of-sale analysis *that should have been done by the PBMs at the time they are contracted for purposes of payment approval*" and not upon *other pharmacies' conduct*. 1/6/25 Tr. at 19:22-20:3, Ex. 2 to Resp. (emphasis added).[1] Yet, the Ruling disregards the scope of the City's claims and allows the PBMs to hijack the PBM Bellwether trials by compelling production of decades of "cash" prescription and other irrelevant data from non-party Wegmans, which would render the PBM Bellwether trial "unworkable" and "unmanageable." This Ruling is error.

The PBMs seek this irrelevant information not only from Wegmans' lone pharmacy in the City, located at 1750 East Ave, Rochester, NY 14610 (the "East Ave. Pharmacy"), but also from 16 other Wegmans pharmacies in neighboring Monroe County (which has its own separate lawsuit against the PBMs). But, unlike the Track 3 Pharmacy Plaintiffs, the City does not assert a legal theory that prescriptions from Monroe County, or anywhere else, "migrated" to the City. The Ruling therefore erroneously was predicated upon *other plaintiffs'* "migration" claims:

> Evidence *in other cases* has shown that opioid prescriptions dispensed *in a given store often "migrate"* to areas nearby and even far away . . . Indeed, if Wegmans were a party-defendant, *the Court's general rule* would be that the geographic scope of discovery would be the entire State of New York. Accordingly, the rulings below provide that the geographic scope for each Request is Monroe County, unless the parties clearly and explicitly agreed otherwise.

Ruling at 4 (emphasis added).[2]

---

[1] The PBMs' Motion to Compel (the "Motion") and its exhibits are attached as **Exhibit A**. Wegmans' Response (the "Response") and its exhibits are attached as **Exhibit B**. The PBMs' Reply (the "Reply") and its exhibits are attached as **Exhibit C**. *See* appended Index of Exhibits.

[2] The Ruling expanding the scope of the City's claims beyond the City itself likely comes from Discovery Ruling No. 3 (MDL ECF No. 762), which was "designed to limit the burden on

2

The Ruling's improper expansion of the geographic scope to include Monroe County was compounded by its adoption of the PBMs' definition of "Rochester" to include pharmacy locations in Monroe County. These errors caused the Special Master to incorrectly conclude Wegmans was the *largest dispenser* of opioids *in the City*: "The PBMs are entitled to show a jury what actions were taken and not taken *by the largest dispenser of opioids in Rochester*. This evidence is relevant to causation and potential allocation of fault." Ruling at 3 (emphasis added).

In addition to applying a geographic scope that exceeds the City's limits and Wegmans' East Ave. Pharmacy, the Ruling improperly compels Wegmans, a non-party, to affirmatively collaborate with a settled defendant to assemble and then produce a misleading set of data that does not exist in Wegmans' normal course of business and is beyond the scope of the subpoena. This result amounts to a mandatory injunction, which is improper and contrary to settled law.

The Ruling also incorrectly concludes—without any analysis—the materials sought are relevant, even though New York law establishes they are not.

For these reasons, explained in detail below, the Court should reverse the Ruling as to Subpoena Request Nos. 1, 2, 4, 7, 10, and 11.

## BACKGROUND

The PBMs served a subpoena duces tecum on non-party Wegmans seeking twelve categories of documents concerning potential diversion and dispensing of opioids by Wegmans pharmacies (the "Subpoena"). Ex. 8 to Mot. Wegmans timely served its objections to the Subpoena asserting, *inter alia*, the information sought was not relevant to the City's claims against

---

defendants *while still allowing plaintiffs to fully pursue their factual and legal theories, including the theory that opioids "migrate" between cities, counties, and States*." *Id.* at 2 (emphasis added). But in contrast to the Track 3 Plaintiffs, the City does not assert any "migration" claims, likely because those claims would overlap with the separate Monroe County case.

3

the PBMs and complying with the Subpoena would be unduly burdensome.  Wegmans' Objs. to Subpoena, **Exhibit D**.  The PBMs and Wegmans met and conferred throughout the fall of 2024, resulting in a conference before Special Master Cohen on January 6, 2025.  *See* 1/6/25 Tr.  During the Status Conference, the Special Master expressed doubt as to whether the Subpoena Requests were relevant, *id.* at 6:15-21, but ultimately advised the PBMs and Wegmans to exchange compromise proposals to narrow the Requests.  *See id.* at 51:9-60:5.  However, he acknowledged agreement with Wegmans' position as to Request No. 2 (seeking "[d]ocuments sufficient to show how [Wegmans pharmacists] consider, use, respond to, or interact with communications received from [PBMs] . . . at the point of sale ['POS'] . . . .") and that the scope of the Request related solely to Wegmans' interactions with the PBMs.  *See id.* at 24:9-25:12.  Inexplicably, the Special Master reversed himself on this point in his Ruling.

After exchanging proposals in early 2025, the PBMs focused through the Spring on Request Nos. 2 and 1 (Wegmans' dispensing data).  These negotiations culminated on June 2, 2025, when Wegmans produced 56 pages of screenshots and related narratives to demonstrate how Wegmans considers, uses, responds to, and interacts with POS communications from the PBMs. *See* Ex. 1 to App'x A to Resp.  This production satisfied the scope of Request No. 2.

After this production, the PBMs went silent for three months.  At the end of August 2025, the PBMs resurfaced and demanded *all* of Wegmans' DUR data in response to **Request No. 2** (far exceeding the scope of its "sufficient to show" language) based on a recent ruling against settling defendants CVS, Walgreens, and Walmart ("the National Pharmacies").  *See* Ex. 10 to Mot. Wegmans explained how the ruling against the National Pharmacies had no bearing on non-party Wegmans and how producing "all" DUR data documentation would be an undue burden on

4

Wegmans.  *See* Ex. 4 to Resp.  After the PBMs requested more specifics on that undue burden, counsel worked extensively with Wegmans to prepare Appendix A to the Response.

Soon after inquiring about all DUR data documentation, the PBMs also asked Wegmans for its position on its proposals concerning **Request Nos. 3-12** they had sent in February 2025.  *See id.*; Resp. at 6.  Wegmans agreed and sent a letter outlining its positions, which included several compromises, on October 24, 2025.  Ex. 7 to Mot.  Wegmans did not hear a response until the PBMs filed their Motion.  There was no "impasse" as the Ruling suggests.  Ruling at 2.

On October 9, 2025, the PBMs advised they had received Wegmans' dispensing data from the New York Prescription Monitoring Program ("NYPMP"), thereby mooting **Request No. 1**; but they still wanted Wegmans' data concerning the opioid prescriptions it dispensed that were paid for in "cash" (i.e., not through a third-party insurer or a discount card).  *See* Ex. 12 to Mot.

The PBMs moved to compel Wegmans on November 7, 2025.  Wegmans responded on November 21, 2025 and objected to Request Nos. 1, 2, 4, 7, 10, 11, & 12 on various grounds, including that the geographic and temporal scope were overbroad, but explained it was willing to produce certain documents in response to most of those Requests.  In their Reply, the PBMs ignored Wegmans' non-party status, ignored the legal standard for compelling discovery against a non-party, and made misstatements of fact to the Special Master.

The PBMs' most egregious misstatement was, after conflating the East Ave. Pharmacy with pharmacy locations throughout Monroe County: "[t]he fact remains that, from 2014 to 2019, Wegmans was the largest pharmacy purchaser of all MDL-8 opioids *in the City of Rochester*."  Reply at 2 (emphasis added).  The Special Master adopted and applied this misstatement to his Ruling despite the fact that Wegmans provided a detailed clarification in its Response, confirming East Avenue is its only location in the City, which ARCOS data reflected constituted only 5% of

5

all opioids dispensed in the City from 2006 to 2019.  Resp. at 2.[3]

Based on a 1500+ page record and extensive briefing, the Special Master issued his informal rulings two days later, on December 11, 2025.  Upon Wegmans' request, he formalized his rulings on December 17, 2025, which are summarized in the chart in **Exhibit E**.  The Ruling determined that, unless the parties agreed otherwise, the proper geographic scope was *Monroe County* and the temporal scope was 1996 to the present.  Ruling at 4-5.  Exhibit E indicates when the parties agreed to use a geographic or temporal scope narrower than this Ruling.

## LEGAL STANDARD

The Court should review the Special Master's conclusions *de novo*.  Fed. R. Civ. P. 53(f)(3)-(4); *see also* MDL ECF No. 69 at 4-5.  "Demonstrating relevance is the burden of the party seeking discovery."  *Am. Elec. Pwr. Co. v. United States*, 191 F.R.D. 132, 136 (S.D. Ohio 1999); *Ft. Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 102 (S.D.N.Y. 2013).[4]  "Courts are required to balance the need for discovery against the burden imposed on the

---

[3] The PBMs also misrepresented the scope of Wegmans' initial relevancy objections to the Subpoena.  Reply at 3.  The PBMs ignored Wegmans' objections, which were timely served more than a year ago.  *See* **Ex. D** at 2.  Worse, they mischaracterized the very correspondence cited, not to mention a long series of ensuing communications where Wegmans repeatedly disputed the scope and relevance of the PBMs' Requests.  *See* Ex. 1 to Reply ("Wegmans asks for a description of the relevance of each of these Requests because it is not readily apparent why much of the requested information is relevant to the claims in the MDL Litigation . . . .").

[4] Because the place of compliance with the Subpoena would be the United States District Court for the Western District of New York, where Wegmans is headquartered and its relevant store is located, any appeal of this Court's order would go to the United States Court of Appeals for the Second Circuit.  *See U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am., Inc.*, 444 F.3d 462, 467-68 (6th Cir. 2006) (explaining that when an MDL court's order compelling discovery on a nonparty located in a foreign district is appealed, such appeals "go to the circuit court of appeals embracing the deposition or discovery district"); *In re Corrugated Container Antitr. Litig.*, 644 F.2d 70 (2d Cir. 1981) (concluding it was the proper forum to hear appeal over S.D. Tex. MDL non-party witness's contempt appeal).  For this reason, Second Circuit law should apply to this discovery dispute.  However, because the law is unclear on this matter, *compare In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 241 F.R.D. 435, 439 (S.D.N.Y. 2009), *with In re ZF-TWR*

person ordered to produce documents, *and the status of a person as a non-party is a factor that weighs against disclosure.*"  *Am. Elec. Pwr.*, 191 F.R.D. at 136 (emphasis added); *see also Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 49 (S.D.N.Y. 1996) (explaining how a non-party is entitled to extra consideration regarding expense and inconvenience).

## ARGUMENT

Wegmans objects to the Special Master's rulings on **Request Nos. 1, 2, 4, 7, 10, & 11** for the reasons below.

### I. The Ruling's geographic and temporal scope is overbroad.

*Geographic Scope.*  The Ruling ordered the geographic scope of all requests (except where the parties agreed otherwise)[5] to be Monroe County, rather than the City.  Ruling at 4.  The Special Master ruled that "Wegmans' activity in its stores serving the entire Rochester area is relevant" because "[e]vidence in *other cases* has shown that opioid prescriptions dispensed in a given store often 'migrate' to areas nearby and even far away." *Id.* (emphasis added).  But the City's Amended Complaint makes no such claim.

It is true that *other* municipalities in this MDL have alleged opioids have migrated between various municipalities.  *See*, *e.g.*, Suppl. Am. Compl. ¶ 545-55, *County of Lake v. CVS Health Corp.*, No. 1:18op45032 (N.D. Ohio June 5, 2020), ECF No. 19; MDL ECF No. 817.  But nowhere in *this* case does the City allege its residents are leaving to purchase opioids in the County (or elsewhere) and coming back.  *See generally Rochester* ECF No. 110.  To the contrary, the City's

---

*Airbag Control Units Prods. Liab. Litig.*, 2022 WL 19425937, at *6 (C.D. Cal. Apr. 18, 2022), Wegmans cites both Second and Sixth Circuit law as appropriate.

[5] The PBMs, again, attempt to re-write history by arguing their December 23, 2024 letter only limits one request to the City.  Reply at 2 (citing Resp. at 9 n.11).  Not quite.  As laid out in Wegmans' Response, the Dec. 23, 2024 letter argued Request Nos. 1, 2, 5, 6, 7, 8, 9, 10, and 11 were relevant only to conduct *in Rochester* (not Monroe County).  Resp. at 9 n.11 (quoting Ex. 7).

7

website characterizes the scope of the opioid epidemic in Rochester as "[p]eople from outside of the community [] traveling to parts of the city to buy and use opioids as well as commit crimes – and the residents and businesses [*in the City*] are suffering the consequences."[6]  Moreover, the City's alleged injuries are costs for public services expended to combat the opioid epidemic *in the City*.  *See Rochester* ECF No. 110 ¶¶ 590-91, 720, 752-53, 813, 835, 838.

The PBMs do not dispute that Wegmans' East Avenue location is the only pharmacy within the City's boundaries.  Reply at 2.[7]  That Wegmans' website refers informally to its stores in Monroe County as "Rochester stores" is of no legal relevance and cannot form the basis for a legal claim that Wegmans pharmacies located in Monroe County are located within the City.  The PBMs' relevance claims as to documents and information that exceeds the scope of the City's claims is yet another attempt to render the trial of this case "unworkable" and "unmanageable."

Crucially, Monroe County is a separate municipality that filed its own lawsuit against the PBMs.  *See* Ex. 6 to Resp.  Monroe County, not the City, is pursuing alleged injuries for costs for public services expended to combat the opioid epidemic in Monroe County.  The City and Monroe County are separate legal entities with separate cases, and the *City cannot recoup injuries for costs expended by the County*.  The City does not allege any migration of prescriptions from Monroe County; therefore, conduct that occurred outside of the City's borders is not relevant to the City's claims.  *See, e.g.*, *City of Ecorse v. U.S. Steel*, 2007 WL 4239263, at *3 (E.D. Mich. Dec. 2007)

---

[6] City of Rochester Opioids Settlement Spending Plan https://www.cityofrochester.gov/departments/mayors-office/opioid-settlement-spending-plan#funding (last visited Dec. 21, 2025).

[7] The PBMs misled the Special Master in arguing Wegmans never asserted it had only one pharmacy in the City.  *See* Reply at 2-3; Ex. 4 to Resp. (stating Wegmans' East Ave. location is "*the only* Wegmans pharmacy located in the City").  The PBMs also (again) misled him about Wegmans' quote about how the City focuses on people coming *into* the City to purchase and use opioids and commit crimes in the City to mean the opposite of what Wegmans said.  Reply at 2.

(denying motion to compel answering discovery to extent it sought information outside the scope of the City of Ecorse, the plaintiff).  Considering the City has not made any "migration" claims, it was error for the Special Master to devise a definition of "Rochester" to include Wegmans locations undisputedly located outside of the City.  The scope of the City's claims is limited to the conduct within the City, and Wegmans' only pharmacy in the City is the East Ave. Pharmacy.  The Court should, therefore, reverse the Ruling's finding on geographic scope.

***Temporal Scope.***  The Ruling sets out the general temporal scope to be January 1, 1996 to the "present."  Ruling at 4-5.  The Special Master "reject[ed] the contention that the Court should modify the temporal scope just for Wegmans, because it is not a party to the litigation."  *Id.* at 5.  But the PBMs represented to Wegmans that the scope of discovery for *parties* to this litigation was from 2009 through 2019.  *See* Ex. 8 to Resp. at 1 n.1; *id.* at 2.  Thus, the temporal scope is overbroad in that it forces Wegmans to produce documents beyond what the parties must do.

II.  **Request No. 2: The Ruling improperly requires a non-party to "facilitate the production" of a set of overbroad and unreliable data and improperly expands the scope of the Request.**

The Special Master held that extracting the DUR information as requested by the PBMs is not feasible for Wegmans.  Ruling at 8.  The DUR data residing in a data warehouse is in McKesson's custody, not Wegmans' custody, and Wegmans established that its limited access to that data does not permit the company to generate the types of reports the PBMs seek.  But the Special Master then ordered Wegmans to "undertake[] immediate, reasonable efforts to facilitate the production of this data from [settled defendant] McKesson, which provides EnterpriseRx and maintains a data warehouse" for Wegmans' DUR data.  *Id.*  Specifically, the Ruling ordered that, after the PBMs subpoena McKesson for Wegmans' data, Wegmans "must [] work urgently and in good faith with the PBMs and McKesson" to ensure the PBMs receive its DUR information for

9

all prescriptions dispensed in Monroe County. *Id.* at 9. In other words, the Ruling enjoins Wegmans to affirmatively work with a settling defendant to create an unreliable and disaggregated data set not kept in Wegmans' ordinary course of business.

This ruling is improper for several reasons. *First*, a court may not order a non-party to participate in the compliance of a subpoena directed at a settling defendant. Specifically, a court may not order a party, let alone a non-party, to take affirmative action akin to injunctive relief in response to a third-party document subpoena. *See Parents' Comm. of Pub. Sch. 19 v. Cmty. Sch. Bd. of Cmty. Sch. Dist. No. 14 of the City of New York*, 524 F.2d 1138, 1141-42 (2d Cir. 1975) (overturning discovery order to school board to administer test to students because it was injunctive relief, not permissible discovery). But that is precisely what the Ruling does: it requires Wegmans, a non-party, to affirmatively "work together . . . as much as possible to reach a solution that allows the requested DUR data to be produced." Ruling at 9. This has "little resemblance to a discovery order" and "inclines more to the side of mandatory injunctive relief." *Parents' Comm.*, 524 F.2d at 1141. Because "findings of fact and conclusion of law"—which did not occur here— are necessary to grant an injunction, ordering Wegmans to affirmatively act was error.

*Second*, the Ruling failed to address the fact that Request No. 2 only seeks documents *sufficient to show* how Wegmans communicates with the PBMs at the POS—not *all* documents. Resp. at 21. Special Master Cohen impermissibly re-wrote Request No. 2 to require production of *all* Wegmans' DUR data going back decades. Doing so is clear error.

*Third*, neither the Ruling nor the PBMs ever articulated any basis to support their contention that they *need all* DUR messages (as opposed to DUR messages *sufficient to show* how Wegmans communicates with the PBMs at the POS). *See Oakley v. MSG Networks, Inc.*, 2025 WL 72111, at *2 (S.D.N.Y. Jan. 9, 2025) ("Courts have regularly held that subpoenas seeking 'All

10

Documents' or 'All Communications' on a given issue are 'overbroad,' 'impermissible,' and 'presumptively improper.'"). Indeed, the Track 12 CMO requires the City to identify for the PBMs "the prescriptions they . . . conclude caused them harm for which they seek relief." Order ¶ F(8) (Dec. 28, 2023), *Rochester* ECF No. 107. And the City appears to have identified 250 allegedly improper prescriptions on which its claims are based (along with "100 individuals *in the City*" who were allegedly injured due to the PBMs' actions). Discovery Ruling re Agenda Item No. 431 at 3 (July 29, 2025), MDL ECF No. 6240. Thus, to the extent any DUR information is relevant, it would be the 250 prescriptions the City identified as causing it harm.

*Last*, to the extent settling defendant McKesson is able to produce Wegmans' DUR data, it will likely be in a disaggregated fashion resulting in an incomplete and misleading data set. *See* Resp. at 18 (citing App'x A). Accordingly, having McKesson potentially pull *all* DUR data information would not even be relevant in showing how Wegmans' pharmacists communicate with the PBMs at the POS. *Id.* (citing *Foley v. Town of* Marlborough, 2022 WL 3716505, at *33 (D. Conn. Aug. 29, 2022)).[8]

### III. Request Nos. 1, 4, 7, 10, & 11: The Ruling as to these Requests are overbroad and constitute an impermissible fishing expedition.

Before a Court can order a non-party (or party) to produce documents, it must determine

---

[8] The PBMs mischaracterized the holding of *Foley* in their Reply. Reply at 12. In *Foley*, the employer in a wrongful termination case subpoenaed the company to obtain information about the employee's job search to show he failed to mitigate his damages following termination. 2022 WL 3716505, at *30. The court denied the employer's motion to compel on various grounds, including that the searches would be unduly burdensome, the employer had not confirmed the employee used Indeed to job search, *and that* "Indeed's Senior Data Risks Analysts state[d] that the 'list of jobs . . . retrieved is *likely unreliable* for a number of reasons'"—which meant it was *uncertain* "the data provided would be reliable and produce information that would allow the [employer] to claim with certainty that relevant jobs existed." *Id.* at *33-34 (emphasis added). So too is the case here. Any data McKesson could potentially elicit would be unreliable and misleading, muddying rather than clarifying whether any improper dispensing occurred.

11

whether the information sought is *relevant* to the litigation.  *See Hendricks v. Total Quality Logistics, LLC*, 275 F.R.D. 251, 253 (S.D. Ohio 2011); *Travelers Indem. Co. v. Metropolitan Life Ins. Co.*, 228 F.R.D. 111, 113 (D. Conn. 2005).  The Ruling concludes "actions [] taken and not taken by the largest dispenser of opioids in Rochester" are "relevant to causation and potential allocation of fault," but does not analyze New York law to support this legal conclusion.  Ruling at 3.  Wegmans is not "the largest dispenser of opioids in Rochester."  Regardless, this Ruling is wrong because, had it analyzed New York law, it would have concluded Wegmans' conduct in Rochester is *not* relevant to the City's causation argument or allocation of fault.

The Special Master could have ordered briefing on how Wegmans' conduct is relevant to causation in the Track 12 Bellwether when Wegmans recommended this course.  *See* 1/6/2025 Tr. at 42:2-43:12.  The PBMs rejected that suggestion, *id.*, waited almost a year to file their Motion, and then used the discovery cutoff as a basis to impose unreasonable deadlines that forced the Special Master to digest more than 1500 pages of briefing within a few days.  The resulting Ruling ignored the complex issues of New York law wrapped into the relevance issue.  This was clear error of law.  *See Hendricks*, 275 F.R.D. at 253; *Travelers Indem. Co.*, 228 F.R.D. at 113.

The PBMs' attempt to paint Wegmans' conduct as relevant to the City's proximate causation argument or as an intervening or superseding cause is misplaced under all of the City's legal theories.  *See*, *e.g.*, 1/6/25 Tr. at 8:2-4; Reply at 14.  The Special Master previously expressed skepticism that Wegmans' conduct could be relevant to proximate cause under a public nuisance theory.  *See* 1/6/25 Tr. at 6:15-7:21.  Indeed, under New York law, the PBMs would be held liable for the creation and participation of a public nuisance, irrespective of any third-party culpability.  *See City of Rochester v. Premises Located at 10-12 S. Wash. St.*, 180 Misc.2d 17, 22, 687 N.Y.S.2d 523, 527 (N.Y. Sup. Ct. 1998).  The PBMs never disputed this.  Resp. at 23-24; Reply at 5.

12

Nor is Wegmans' conduct relevant to the City's proximate causation argument under its other claims, including negligence or RICO.  The PBMs have never articulated how Wegmans' conduct could be relevant to these claims.  *See Am. Elec. Pwr.*, 191 F.R.D. at 136 ("Demonstrating relevance is the burden of the party seeking discovery"); *Ft. Worth Emps.' Ret. Fund*, 297 F.R.D. at 102 (same).  Nor could they.  The City's claims focus on the *PBMs'* conduct, not retail pharmacies.  *See Rochester* ECF No. 110 ¶¶ 1-4.  To the extent any other type of entity is implicated, it would be "opioid manufacturers," not retail pharmacies.  *See, e.g.*, *id.* ¶¶ 3-4, 14-15, 36-37, 40-41, 47, 87-92, 707-10, 714-16 (alleging the PBMs colluded with manufacturers).

Further, "an intervening act will constitute a superseding cause and will serve to relieve a defendant of liability when the act is of *such an extraordinary nature or so attenuated from the defendant's conduct* that responsibility for the injury should not reasonably be attributed to the defendant."  *Mrakovcic v. Rose Art Indus., Inc.*, 26 A.D.3d 316, 317, 809 N.Y.S.2d 538 (2d Dept. 2006) (emphasis added).  In other words, when a third party takes actions that are "normal and foreseeable," they cannot be an intervening cause.  *Id.*  The PBMs do not and cannot contend that Wegmans dispensing prescription medications to patients was unforeseeable.

The Court should reject any argument that Wegmans' supposed improper conduct goes to allocation of fault.  This Court has made clear that the Track 12 Bellwether should be "as streamlined and focused as we can because the key litigants are the two PBMs."  MDL ECF No. 5168 at 49:3-5.  And, the Court expressly stated it did *not* want the Track 12 trial to "replicate the pharmacy trial[]," which would make it "unworkable or unmanageable."  MDL ECF No. 5265 at 9:11-10:6.  The City's claims focus on the PBMs' ubiquitous role in every aspect of health care, not on the dispensing conduct of a retail pharmacy.

These Requests also lack relevance to Track 12 for the specific reasons identified below.

13

### A. Request No. 1: "Cash" purchases are not relevant to Track 12 Bellwether.

Dispensing information about prescriptions Wegmans patients paid for in cash are, by definition, not relevant to the PBMs. Counsel for the City made this clear: he explained to Special Master Cohen that the City's claims are not predicated *only* on "the point-of-sale analysis that should have been done by the PBMs at the time they are contracted for purposes of payment approval." 1/6/25 Tr. at 19:22-20:3. The fact that patients paid in cash means Wegmans had no communications with the PBMs at the POS (as it would with patients who use a third-party insurance or discount card).[9] And identification of prescriptions paid for in cash—without more—is not even probative of improper dispensing. While paying for controlled substances in cash *can* constitute a "red flag" under certain circumstances, that factor alone does not show improper dispensing. *See*, *e.g.*, *Holiday CVS, L.L.C. d/b/a CVS Pharm. Nos. 219 & 5195; Decision & Order*, 77 Fed. Reg. 62,316, 62,320 (Oct. 12, 2012) (discussing DEA expert's testimony on how evaluating "red flags" for improper dispensing requires looking at the "totality of the issues that give you reason for concern"). Important too in the context of the City's claims, 11.5% of unemployed City residents and 6.4% employed City residents are uninsured.[10] There is nothing improper about Wegmans dispensing prescriptions to the City's uninsured who must pay cash.

### B. Request No. 4: Guidance/policies Wegmans provided to its pharmacy employees have nothing to do with the PBMs.

Guidance, directives, publications, alerts, notices, presentations, or other materials

---

[9] The PBMs state—without explanation—that cash payments are relevant as they could "be used to evaluate the potential impact of discount programs operated by manufacturers and distributors." Reply at 14. Such speculation is wholly insufficient to satisfy the PBM's burden of establishing the relevance of this data to the City's claims.

[10] New York State Community Action Association, "City of Rochester-Poverty Report," https://nyscaa.engagementnetwork.org/poverty-report/?geoid=16000US3663000 (last visited Oct. 14, 2025).

14

concerning prescription opioids provided to Wegmans' employees in its Monroe County stores have *nothing to do with the PBMs,* and this request is facially overbroad. The PBMs claim this information is relevant to see if Wegmans "was telling its employees to ignore alerts from PBMs—as evidence shows *some other pharmacies* [not Wegmans] did." Reply at 16. But the PBMs have no evidence or reason to believe *Wegmans* ever directed its employees to ignore alerts from the PBMs. Forcing Wegmans to produce these documents amounts to an improper fishing expedition. *See Damsi*, 2023 WL 9186657, at *4; *Datatrak Int'l,* 2015 WL 12734894, at *3; *Tottenham*, 2002 WL 1967023, at *2.

### C. Request Nos. 7, 10-11: Investigations/actions concerning potential diversion at Wegmans pharmacies have nothing to do with the PBMs.

Request Nos. 7, 10, and 11 concern locating information about potential diversion at Wegmans pharmacies. But as discussed above, to the extent the PBMs could find evidence of improper dispensing, that is not relevant to the Track 12 Bellwether. Thus, the PBMs cannot articulate a reason why Wegmans must go through the burdensome process of searching through its records going back 20 (and in some cases *30* years) for documents relating to diversion investigations, law enforcement inquiries, or other criminal, regulatory, or administrative action concerning Wegmans' dispensing policies at its stores. *See In re Biovail Corp. Sec. Litig.*, 247 F.R.D. 72, 74 (S.D.N.Y. 2007) (quashing subpoena when burden on "subpoenaed non-parties and diversion of their staff to provide it far outweighs any probative value.").

## CONCLUSION

Non-Party Wegmans respectfully requests the Court reverse the Rulings concerning Request Nos. 1, 2, 4, 7, 10, and 11 as discussed herein.

Dated:  December 29, 2025

                          **HODGSON RUSS LLP**
                          *Attorneys for non-party Wegmans Food Markets, Inc.*


                          By: <u>/s/ *Joshua M. Agins*</u>

                          Joshua M. Agins
                          Claire E. Wells
                          1800 Bausch & Lomb Place
                          Rochester, NY 14604
                          585.454.0700

**CERTIFICATE OF SERVICE**

I certify that on December 29, 2025 a copy of the above document was served on all relevant parties to the dispute via email to Judge Polster's chambers with a copy to Special Master Cohen, in accordance with the Special Master's email directive dated December 26, 2025. In further accordance with the Special Master's directive, the above document will be filed and served via CM/ECF once counsel's Notice of Appearance has been approved.

*/s/ Joshua M. Agins*

EXHIBIT INDEX

Exhibit A: PBMs' Motion to Compel with Exhibits (11/07/2025)
    A1—12/13/2024 PBM Letter to Wegmans
    A2—01/06/2025 Status Conference
    A3—12/20/2024 SMC Email to PBMs and Wegmans
    A4—01/14/2025 Wegmans Email to PBMs and SMC
    A5—01/29/2025 Wegmans Letter to PBMs and SMC
    A6—02/28/2025 PBMs Letter to Wegmans
    A7—10/24/2025 Wegmans Letter to PBMs
    A8—07/25/2024 Wegmans Subpoena
    A9—05/09/2025 Kinney Subpoena
    A10—08/29/2025 Wegmans Email to PBMs
    A11—09/18/2025 Kinney Email to PBMs
    A12—10/16/2025 Wegmans Email to PBMs
    A13—10/03/2025 Wegmans Email to PBMs

Exhibit B: Wegmans' Response to PBMs' Motion to Compel (11/21/2025)
    B1—06/05/2019 City of Rochester Original Complaint
    B2—01/06/2025 Status Conference Transcript
    B3—03/06/2024 City of Rochester Amended Complaint
    B4—09/18/2025 Letter from Wegmans to PBMs
    B5—10/24/2025 Letter from Wegmans to PBMs
    B6—03/18/2024 Monroe County Short Form Supplemental Complaint
    B7—12/13/2024 Letter from PBMs to Wegmans
    B8—11/11/2024 Letter from PBMs to Wegmans
    B9—11/21/2025 Appendix A to Wegmans' Response Brief

Exhibit C: PBMs' Reply in Support of Motion to Compel (12/09/2025)
    C1—08/27/2024 Email from Wegmans to PBMs
    C2—08/15/2025 Email from PBMs to Kinney
    C3—10/03/2024 Email from Wegmans to PBMs

Exhibit D: Wegmans' Objections to Subpoena (08/27/2024)

Exhibit E: Chart of Rulings

Exhibit F: Discovery Agenda (12/08/2025)