# EXHIBIT A

**quinn emanuel** trial lawyers | los angeles, ca

865 S. Figueroa St., 10th Floor Los Angeles, California 90017 | TEL (213) 443-3000 FAX (213) 443-3159

WRITER'S DIRECT DIAL NO.
**(213) 443-3159**

WRITER'S EMAIL ADDRESS
ANTHONYALDEN@QUINNEMANUEL.COM

November 7, 2025

**VIA EMAIL**
david@specialmaster.law

Re: *In re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio)
*City of Rochester v. Purdue Pharma L.P.*, No. 19-op-45853 (Track 12)
*City of Ogdensburg v. Purdue Pharma L.P.*, No. 19-op-45852 (Track 22)
Wegmans Food Markets, Inc.'s and Kinney Drugs' Failures to Produce Responsive Data

Dear Special Master Cohen,

I write on behalf of the Express Scripts Defendants and Optum Rx (together, the "PBM Defendants") to request an order compelling Wegmans Food Markets, Inc. ("Wegmans") and KPH Healthcare Services, Inc. d/b/a Kinney Drugs ("Kinney") to produce data and documents responsive to the PBM Defendants' subpoenas. Despite the exchange of proposals and multiple meet and confers since the last hearing involving Wegmans, and your ruling requiring certain other pharmacies to produce DUR data, Wegmans and Kinney refuse to produce the most critical documents and data requested, offering an ever-changing assortment of meritless arguments. At this point, the PBM Defendants need an order directing Wegmans and Kinney to turn over the evidence.

<u>**Background**</u>

**A. Wegmans**

As we have previously explained, Wegmans is a large regional grocery chain that is headquartered in Rochester, New York.[1] Wegmans has 16 pharmacy locations in Rochester alone and, as of 2017, was the third largest employer in the City.[2] Wegmans also has a clear connection to opioid dispensing in Rochester. Publicly available Automation of Reports and Consolidated Orders System ("ARCOS") data used by the Drug Enforcement Administration ("DEA") indicates that Wegmans was the largest pharmacy purchaser of all MDL-8 opioids in the City of Rochester from 2014-2019, responsible for purchasing over 30% of total morphine milligram equivalents and over 30% of total dosage units.

In light of Wegmans' central role in dispensing opioids in Rochester, the PBM Defendants served a document subpoena over a year ago, on July 25, 2024. The parties then met and conferred

---

[1] *See* Wegmans Website, FAQ.

[2] *See* Rochester Democrat & Chronicle News Article.

quinn emanuel urquhart & sullivan, llp

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA-DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE COUNTY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

over a period of several months, and despite the PBM Defendants' attempts to compromise, Wegmans ultimately refused to produce a single document. After the PBM Defendants and Wegmans briefed the Special Master about their dispute—in which the PBM Defendants detailed at length the relevance and importance of each request[3]—the Court held a hearing and instructed Wegmans to "take the first step and come back with a concrete suggestion" for producing responsive documents.[4]

On January 14, 2025 (for Request Nos. 2, 5, 6, and 8-12) and on January 29, 2025 (for Request Nos. 1, 3, 4, and 7), Wegmans provided its proposals setting out the few categories of documents it would be willing to produce.[5] Notably, Wegmans still refused to produce any dispensing data or DUR data. On February 28, 2025, the PBM Defendants accepted Wegmans' proposal on certain requests, and asked for clarification (or sent a counterproposal) for the remaining items.[6] Thereafter, the parties continued to meet and confer, with Wegmans providing the PBM Defendants only with a read-only sample of its dispensing and DUR data for two prescriptions.

After successfully litigating the issue of DUR data against Walgreens, CVS, and Walmart (the "Other Pharmacies") in the ensuing months, the PBM Defendants then reverted to Wegmans in the hopes of avoiding further motion practice. The PBM Defendants asked Wegmans to (a) confirm that it would produce the same scope of DUR data as the Other Pharmacies were ordered to produce; and (b) provide a response to the counterproposals and clarifications in the PBM Defendants' February 28 letter. In response, Wegmans maintained its refusal to produce the requested DUR data, and it sent a letter on October 24 addressing the other requests in the PBM Defendants' February 28 letter. Now that the parties appear at impasse over several requests, the PBM Defendants must enlist the Court again to secure Wegmans' cooperation.

### B. Kinney Drugs

Kinney occupies a similar position in Ogdensburg, as compared to Wegmans in Rochester. Kinney is a large regional pharmacy with over 100 locations in New York and Vermont. It is headquartered in Gouverneur, New York, about 30 miles from the City of Ogdensburg and in the same county.[7] Publicly available ARCOS data indicates that Kinney purchased over 8 million opioid units between 2006 and 2019, accounting for about 44% of the dosage units purchased in the City of Ogdensburg from 2006-2019. This is more than any other pharmacy in the region during that time span.

The PBM Defendants served Kinney with a documents subpoena on May 9, 2025, and they have detailed the relevance of each request during the parties' multiple meet and confers. While

---

[3] *See, e.g.,* Ex. 1, PBM Defs.' 12.13.2024 Ltr. to Wegmans.

[4] *See* Ex. 2, 01.06.2025 Hearing Transcript at 55:13-15; *see also* Ex. 3, 12.20.2024 Email from Special Master Cohen ("[T]he PBMs are probably entitled to discover something more than nothing. Wegmans should please consider and state what it will produce voluntarily in response to the subpoena.").

[5] *See* Ex. 4, Wegmans 01.14.2025 Email to PBM Defs.; Ex. 5, Wegmans 01.29.2025 Ltr. to PBM Defs.

[6] *See* Ex. 6, PBM Defs.' 02.28.2025 Ltr. to Wegmans.

[7] *See* Kinney Drugs Website.

Kinney asserted that it would produce available documents for most requests, like Wegmans, it refuses to produce DUR data.[8]

### Requests for Which Wegmans and the PBM Defendants Appear to be in Agreement

Based on the parties' correspondence, the PBM Defendants understand that Wegmans has agreed to produce a limited number of requested documents.  Because Wegmans has not yet actually produced any of these documents or provided confirmation of its agreement, we set them out below.

- In response to Request No. 6, Wegmans has agreed to "search for any written policies describing when, and under what circumstances, its pharmacist would consult with the NY PMP, and would agree to produce such policies, if any."[9]  The PBM Defendants are willing to accept this production in the interest of compromise.

- In response to Request No. 8, Wegmans has agreed to collect and produce responsive documents from 2006 through July 2024 for employees in the City of Rochester.[10]  The PBM Defendants are willing to accept this production in the interest of compromise.

- In response to Request No. 9, Wegmans has agreed to "to produce DEA Form 106s for the City of Rochester during the period of January 1, 2006 to the date of the subpoena."[11]  The PBM Defendants are willing to accept this production in the interest of compromise.

The PBM Defendants expect that Wegmans will promptly produce these documents, and if not, it should be ordered to do so.

### Wegmans' and Kinney's Refusal to Produce DUR Data

The PBM Defendants' request to Wegmans and Kinney for DUR data and policies is virtually identical to the request sent to Walgreens, CVS, and Wal-Mart on which the Special Master recently ruled.[12]  After the PBM Defendants informed Wegmans and Kinney of this Court's

---

[8]  Kinney recently made its first production, which the PBM Defendants are reviewing.

[9]  *See* Ex. 7, Wegmans' 10.24.2025 Ltr. to PBM Defs.

[10]  *Id.*

[11]  *Id.*

[12]  Ex., 8, PBM Defendants' Request No. 2 to Wegmans seeks "Documents sufficient to show how You and any pharmacists (or other employees involved in dispensing drugs within the Drug Scope) do or do not consider, use, respond to, or interact with communications received from pharmacy benefit managers (including, but not limited to, Express Scripts and OptumRx) at the point of sale, including, but not limited to, communications regarding plan coverage limits (such as prior authorizations, step edits, and quantity limits) and communications regarding health and safety issues (such as concurrent drug utilization review or CDUR messages), from January 1, 1996, to present. Your response should include documents responsive at both the pharmacy and individual employee level, and should include any pertinent policies, procedures, directives, or guidance."

Ex. 9, PBM Defendants' Request 2 to Kinney seeks "Documents sufficient to show how You and any pharmacists employed by You (or other Employees involved in dispensing drugs within the Drug Scope) do or do not

order requiring production of DUR data, both asked for the parties' briefing on the matter so that they could assess the arguments made, and the PBM Defendants promptly provided redacted copies of their briefs and the Court's order.[13] However, both pharmacies insist that the ruling should not apply to them.

The Court's prior decision on DUR data applies with equal force to both Wegmans and Kinney. The Court's order required production of the Other Pharmacies' DUR data for opioid prescriptions filled in Monroe County and St. Lawrence County, where Wegmans and Kinney have more market share, respectively, than any other pharmacy. It would make little sense if the pharmacies purchasing and dispensing the ***most*** opioid prescriptions in these counties were not ordered to produce the same DUR data that pharmacies with smaller market share were ordered to produce. This data is clearly relevant, and the arguments advanced by both Wegmans and Kinney (who appears to be coordinating) have already been rejected by this Court. Any attempts by these pharmacies to distinguish themselves from the Other Pharmacies fail.

*First*, Wegmans argues that, "[u]nlike [the Other Pharmacies], it has not engaged in party discovery in any opioid litigation and has produced no data."[14] But that is irrelevant. The Other Pharmacies were ordered to produce DUR data, even though they had to collect and produce the data from scratch. It was not a reproduction, nor could it be accomplished more easily based on their prior productions.

*Second*, both Wegmans and Kinney contend that the only way to collect its DUR data is to manually search prescription-by-prescription and then have an employee take a picture of each screen of associated data. Because Wegmans—a business with over 53,000 employees and $12.5 billion in annual revenue[15]—purportedly has only one IT employee who can do this, it claims it "lacks the resources to compile extensive DUR files."[16] Respectfully, this is baseless.

Both Wegmans and Kinney use a sophisticated pharmacy management software platform called EnterpriseRx to store their DUR data. The platform is owned by McKesson and prominently advises on its website that it allows for clients to "run comprehensive reports" and "integrate[]

---

consider, use, respond to, or interact with communications received from pharmacy benefit managers(including, but not limited to, the Defendants) at the point of sale, including, but not limited to, communications regarding plan coverage limits (such as prior authorizations, step edits, and quantity limits) and communications regarding health and safety issues (such as concurrent drug utilization review or CDUR messages). Your response should include documents responsive at both the pharmacy- and individual employee level, and should include any pertinent policies, procedures, directives, and guidance and data showing how Your personnel responded to point-of-sale communications Concerning plan coverage limits (such as prior authorizations, step edits, and quantity limits) and health and safety issues (such as concurrent drug utilization review or CDUR messages), Concerning drugs within the Drug Scope, Including any notes (free-text or structured) entered by Your personnel in connection with Your internal drug utilization and prescription review process, as well as all data fields necessary to link this internal review data to the dispensing data addressed in connection with Request #1."

[13]  The PBM Defendants sought to avoid disclosing any information the Other Pharmacies considered confidential so they lightly redacted their submissions for such information and provided both Wegmans' and Kinney's counsel with contact information for the Other Pharmacies' counsel, rather than handing over their submissions.

[14]  *See* Ex. 10, Wegmans' 08.29.2025 Email to PBM Defs.; *see also* Ex. 11, Kinney's 09.18.2025 Email to PBM Defs.

[15]  *See* Wegmans' Forbes Page.

[16]  *See* Ex. 10, Wegmans' 08.29.2025 Email to PBM Defs.

every aspect of [a pharmacy's] business."[17]  And even if Wegmans and Kinney themselves do not have a license to export DUR data in an automated fashion, McKesson itself should be able to do so.  The PBM Defendants asked whether Wegmans and Kinney were willing to request the data from McKesson, and offered to discuss sharing any associated cost.  But both pharmacies refused this option too.[18]  The PBM Defendants are willing to subpoena the DUR data directly from McKesson, if necessary, but they prefer to avoid being further delayed by objections or motions to quash.

*Third,* Wegmans has argued that it is under no obligation to produce the requested DUR data because large-scale DUR reports are not generated or kept in the ordinary course of its business.[19]  However, this does not excuse Wegmans from producing this data.  As one court explained:

> While this court has held that a party should not be required to create completely new documents, that is not the same as requiring a party to query an existing dynamic database for relevant information.  Courts regularly require parties to produce reports from dynamic databases, holding that "the technical burden . . . of creating a new dataset for the instant litigation does not excuse production."

*Apple Inc. v. Samsung Elecs. Co.*, 2013 WL 4426512, at \*3 (N.D. Cal. Aug. 14, 2013) (quoting *In re eBay Seller Antitrust Litig.*, 2009 WL 3613511, at \*2 (N.D. Cal. Oct. 28, 2009)); *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 51 (E.D.N.Y. 2018) (same); *Megatel Homes III, LLC v. Moayedi*, 2025 WL 1638927, at \*7 (N.D. Tex. June 9, 2025) (same).[20]

That Wegmans and Kinney are unwilling to even ask their software vendor to collect the data with potential cost-shifting reveals that their resistance has nothing to do with burden.  And any concern these pharmacies have about their own potential exposure is no legitimate reason to withhold critical evidence necessary to the PBM Defendants' defense.

*Fourth,* Wegmans has argued that Request No. 2 does not encompass all responsive DUR data, but only documents sufficient to show how its pharmacists interacted with POS communications from PBMs.  Wegmans contends it thus satisfied the Request when it provided

---

[17] *See* McKesson's Enterprise Rx Website.

[18] *See* Ex. 12, Wegmans' 10.16.2025 Email to PBM Defs.  Kinney has made similar representations during meet and confers.

[19] *Id.*

[20] Wegmans cites this Court's October 2, 2025 ruling (Dkt. 6307) for the proposition that parties are not required to produce data that is not kept in the ordinary course of business.  However, as the PBM Defendants explained to Wegmans, that misses the point.  In the October 2 ruling, the Court denied the PEC's motion to compel certain remuneration information, in part, because Express Scripts does not maintain it in the ordinary course of business.  By contrast, the data the PBM Defendants seek from Wegmans is utilized and stored in the ordinary course of its business, and can be extracted and produced.

sample screenshots for just two opioids prescriptions, for the limited purpose of advancing the parties' meet-and-confer discussions.[21] This argument fails for several reasons.

As an initial matter, it is worth noting that Wegmans first raised this argument only recently after months of negotiations. More importantly, the pharmacies' position ignores the subpoenas' language. The PBM Defendants' request for documents showing how individual pharmacists respond to, and interact with, communications from PBMs at the point-of-sale, including "documents" at the "individual employee level," plainly encompasses Wegmans' prescription-level data. Those prescription-level records reflect how Wegmans' pharmacists interact with PBM communications about plan coverage for particular prescriptions and are the only responsive records at the individual pharmacist level. Indeed, the Court already rejected this same argument when the Other Pharmacies raised it.[22] There is no reason for the Court to reach a different result here.

Even assuming, however, that Wegmans is correct (and it is not), adopting its position will only cause further needless delay. The parties have been discussing the production of DUR data for months. The arguments have been thoroughly aired and briefed. Revising the language of the request or sending a supplemental subpoena now would only delay this dispute unnecessarily, and given this Court's prior rejection of the same arguments Wegmans advances now, the Court should simply find that Wegmans' recycled arguments are without merit.

*Finally,* Wegmans has argued to the PBM Defendants that it is required to redact PHI in any prescription data productions it is ordered to produce. But the Special Master has already rejected the same argument:

> [T]he Pharmacies can produce the DUR data subject to the existing MDL Protective Orders—in other words, unredacted—as has occurred with similar data before. This can alleviate their concern about PHI. The Pharmacies can choose to redact PHI instead, but must do so at their own expense; and they cannot delay production because of redaction any more than is fully necessary.[23]

There is no reason to deviate from this decision here.[24]

This Court already ordered the production of DUR data from pharmacies with a smaller market share than Wegmans and Kinney, and there is no legitimate basis for them to be subject to

---

[21]  *See* Ex. 13, J. Agins 10.03.2025 Email to PBM Defendants.

[22]  *See* 06.30.2025 Nonparty Pharmacies' Position Paper on ESI Subpoena at 3 (contending that the PBM Defendants' request for DUR data should not be interpreted to encompass DUR records related to all individual prescriptions).

[23]  *See* July 28, 2025 Order from Special Master Cohen.

[24]  Wegmans has also argued that recent breaches of courts' filing systems necessitates redaction. But the PBM Defendants seek only production of the data, not filing. And in any event, Wegmans can redact the data if it so chooses—it just cannot withhold or delay production on that basis.

a different standard.  The production of Wegmans' and Kinney's DUR data should be compelled accordingly.

**Additional Requests to Wegmans That Remain In Dispute**

Request No. 1 (Dispensing Data)

Since their initial request, the PBM Defendants have received prescription dispensing data from the State of New York Department of Health ("NY DOH") Prescription Monitoring Program ("PMP data").  Consequently, the PBM Defendants have narrowed their request to Wegmans to produce only eight fields of data (out of the original 34), limited to only cash purchases of prescriptions opioids.  This should significantly reduce any purported burden.[25]  The eight fields requested are:

- Date Filled
- NDC Number
- Pharmacy NPI or NABP
- Quantity Dispensed
- Days Supply
- Patient paid amount
- Refill Indicator
- Rx Number

Request No. 2 (DUR Policies)

In its prior correspondence, Wegmans agreed to produce policies describing "how Wegmans pharmacists interact with communications received from PBMs at the point of sale."[26] But since making this proposal, it appears that Wegmans has unilaterally decided to limit it solely to policies received from PBMs, rather than Wegmans' own internal policies.  Both PBMs' policies and Wegmans' own internal policies are relevant for the same reasons discussed above—namely, the PBM Defendants are entitled to learn how Wegmans instructed its personnel to undertake the very type of pre-dispensing diligence the City contends was not done.  The Other Pharmacies that were the subject of this Court's prior DUR data order produced these policies voluntarily, and Wegmans should be ordered to make a similar production.  Because these are likely centrally maintained, there should be no material burden.

Request No. 4 (Materials Provided to Pharmacy Employees)

In the spirit of compromise, the PBM Defendants offered to limit the scope of Request No. 4 both temporally and substantively.  As narrowed, the Request seeks any guidance, directives, instructions, publications, alerts, notices, presentations, or other materials Wegmans provided to Employees working in its Rochester stores Concerning Opioids, from January 1, 2006 to

---

[25]  *See* Ex. 12, PBM Defs.' 10.09.2025 Email to Wegmans.

[26]  *See* Ex. 4, Wegmans' 01.14.2025 Email to PBM Defs.

December 31, 2019.[27]  Wegmans recently informed the PBM Defendants that it does not understand how this information is relevant to this case, and does not intend to produce any documents in response to the request.[28]

The relevance of the request documents is obvious.  As the largest dispenser of prescription opioids in the City of Rochester, the instructions that Wegmans' personnel received about dispensing opioids will show what actions Wegmans took (or did not take) in addressing improper opioid prescriptions or diversion.  This information is clearly relevant.  Because Wegmans was responsible for dispensing more opioid prescriptions in Rochester than any other pharmacy, these directives are important in understanding the rules and practices dictating the introduction of prescription opioids into the bellwether jurisdiction.  The PBM Defendants request that Wegmans be ordered to make a production in response to this narrowly tailored request.

<u>Request No. 7 (Efforts to Investigate Improper Prescriptions or Diversion)</u>

In response to Request No. 7, Wegmans previously agreed to "search its archives for interactions with regulators and law enforcement about local prescribers in Rochester."[29]  But this response is both vague and much narrower than the Request, which goes beyond local prescribers in Rochester.  Nonetheless, the PBM Defendants proposed substantially narrowing Request No. 7 by dropping two of the four sub-parts and further limiting the geographic scope, such that it would seek only the following:

> All Documents and Communications Concerning efforts of any kind by You to identify, investigate, or report to any national, state, or local governments, agencies, boards, institutions, associations, law enforcement bodies, health departments, or drug taskforces Concerning any of the following regarding any drug within the Drug Scope, or any other Opioid, from January 1, 1996 to present: (a) improper prescribing or failing to prescribe by doctors or other prescribers in the Monroe County Region; or ([b]) diversion, abuse, misuse, or trafficking of Opioids within the City of Rochester.

In response, Wegmans agreed to produce "Documents and Communications sufficient to identify internal investigations or reporting" to any law enforcement or regulatory body from 2006 through July 2024 concerning improper prescribing by prescribers in Rochester or opioid abuse/diversion in Rochester.[30]  The PBM Defendants are agreeable to this narrowing, with the exception that the PBM Defendants need all documents and communications with the enforcement and regulatory bodies concerning these investigations and reporting, not just documents "sufficient to identify" them.  Wegmans has never articulated why there would be an undue burden in collecting and producing these documents.

---

[27]  As initially drafted, Request No. 4 sought "All Documents and Communications Concerning any guidance, directives, instructions, publications, alerts, notices, presentations, or other materials You provided to Employees Concerning any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to present." *See* Ex. 8.

[28]  *See* Ex. 7, Wegmans' 10.24.2025 Ltr. to PBM Defs.

[29]  *See* Ex. 5, Wegmans' 01.29.2025 Email to PBM Defs.

[30]  *See* Ex. 7, Wegmans' 10.24.2025 Ltr. to PBM Defs.

Request Nos. 10 and 11 (Legal and Regulatory Actions Against Wegmans)

Request Nos. 10 and 11 seek related information about Wegmans' involvement in any opioid-related investigations, actions, or lawsuits.[31]  On January 14, 2025, Wegmans represented that it "has never been the subject of any criminal or regulatory fine or administrative action with respect to its dispensing policies in the City of Rochester or Monroe County."[32]  Nonetheless, it was "in the process of exploring the burden and feasibility of collecting documents—if any— reflecting instances when law enforcement made inquiries to Wegmans about prescribers and/or patients in the City of Rochester and Monroe County."  Without providing any further information on this investigation, Wegmans subsequently stated it would only "produce any documents or communications concerning criminal or regulatory fines imposed or administrative actions against its pharmacies in the City of Rochester with respect to its opioid dispensing policies from January 1, 2006 to the date of the subpoena, to the extent any such documents exist."[33]

Wegmans' proposal is too narrow.  Beyond its latest proposal, Wegmans must also produce (a) what it agreed to investigate—*i.e.*, documents reflecting instances when law enforcement made inquiries to Wegmans about prescribers and/or patients in the City of Rochester and Monroe County; and (b) audits or other documents concerning any investigation by state or federal agencies into policies or practices related to the dispensing of opioids from January 1, 1996 to present, and which would have applied to its stores in the City of Rochester.

Request No. 12 (Agreements Between Wegmans and Manufacturers/Distributors)

Request No. 12 seeks agreements between Wegmans and (i) opioid manufacturers or (ii) opioid distributors from January 1, 1996, to the present.[34]  While Wegmans initially agreed to produce such agreements,[35] it has since backtracked.  It now agrees to produce such contracts only "to the extent they concern Wegmans' pharmacy in the City of Rochester during the January 1, 2006 to the date of the subpoena time frame."[36]  But it is highly unlikely that Wegmans' contracts with opioids and manufacturers and distributors are store-specific.  As such, Wegmans new

---

[31]  Ex. 8, Request No. 10: All Documents and Communications Concerning any Investigation or other inquiry conducted by any state or federal office, agency, department, committee, or program (including the DEA, the Federal Bureau of Investigation, United States Attorney or representative thereof, any government-level department or agency within the State of New York), or any state board (including the New York Medical Board, New York Board of Pharmacy, New York Dental Board, New York Nursing Board, or any medical examiner's office in New York) into any of Your practices related to the prescribing, ordering, dispensing, distributing, administering, or diversion of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

Ex. 8, Request No. 11: Documents sufficient to identify any regulatory, civil, or criminal actions or investigation Concerning any drug within the Drug Scope, or any other Opioids, to which you were a party or participated in any manner, from January 1, 1996 to present.

[32]  *See* Ex. 4, Wegmans' 01.14.2025 Email to PBM Defs.

[33]  *See* Ex. 7, Wegmans' 10.24.2025 Ltr. to PBM Defs.

[34]  Request 12 as drafted seeks "All Documents reflecting contracts, agreements, orders, or other formal documents between You and any manufacturer or distributor of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present." *See* Ex. 8.

[35]  *See* Ex. 4, Wegmans' 01.14.2025 Email to PBM Defs.; *see also* Ex. 6, PBM Defs.' 02.28.2025 Email to Wegmans.

[36]  *See* Ex. 7, Wegmans' 10.24.2025 Ltr. to PBM Defs..

limitation likely results in a null set.  The Court should order Wegmans to abide by its original proposal and produce all of its contracts with prescription opioid manufacturers and distributors.

<div align="center">*     *     *</div>

For the reasons set forth above, the PBM Defendants request an order from the Court (a) compelling Wegmans to produce documents responsive to Request Nos. 1, 2, 4, 7, 10, 11, and 12, as narrowed by the PBM Defendants' compromise proposals described herein; and (b) compelling Kinney to produce documents responsive to Request No. 2.

Sincerely,

Anthony Alden

cc:     Counsel of Record
        Counsel for Wegmans
        Counsel for Kinney

# EXHIBIT 1

**quinn emanuel** trial lawyers | miami

2601 S. Bayshore Drive, Suite 1550, Miami, Florida 33133-5417 | TEL (305) 402-4880 FAX (305) 901-2975

WRITER'S DIRECT DIAL NO.
**(213) 443-3159**

WRITER'S EMAIL ADDRESS
**anthonyalden@quinnemanuel.com**

December 13, 2024

**VIA E-MAIL**
**JZAWODZI@HODGSONRUSS.COM**

Re:    *In re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Oh.)
       *City of Rochester v. Purdue Pharma L.P.*, No. 19-op-45853 (Track 12)

Counsel:

        We write on behalf of the Express Scripts Defendants ("Express Scripts") and OptumRx.,
Inc. (collectively, the "PBM Defendants") in response to your November 19, 2024, letter
concerning Wegmans Food Markets, Inc. ("Wegmans") refusal to produce any documents in
response to a valid subpoena served over four months ago, on July 25, 2024 (the "Subpoena").
The Subpoena is attached as Exhibit A.

        **Background**

        Wegmans is a large grocery chain founded in the City of Rochester, New York, which has
now grown to 109 stores across eight states. It has estimated revenues of $4.67 billion and, as of
2006, it was the 66th largest privately-held company in the United States according to *Forbes*.
Importantly, Wegmans operates several large pharmacies in Plaintiff City of Rochester
("Rochester" or "City"). According to publicly available Automation of Reports and Consolidated
Orders System ("ARCOS") data used by the Drug Enforcement Administration ("DEA"),
***Wegmans Pharmacy was the largest pharmacy purchaser of all MDL-8 opioids in the City of***
***Rochester from 2014-2019, responsible for purchasing over 30% of total morphine milligram***
***equivalents and over 30% of total dosage units***. Wegmans' pharmacies purchased over *82 million*
*opioid units* in Rochester during 2006-2019, more than any other pharmacy. Defendant ESI Mail
Pharmacy Service, Inc. and Optum's home-delivery pharmacy (or "HDP"), by contrast, dispensed
less than 0.4% and 0.03%, respectively, of all prescription opioids in Rochester during 2009–2019.
It is important, then, that the PBM Defendants obtain data and other documents concerning
Wegmans' dispensing of opioids in Rochester.

        Equally as important, one of Rochester's primary theories in the case is that the PBM
Defendants' respective mail order pharmacies contributed to the opioid crisis by ignoring so-called
"red flags" in dispensing prescription opioids. Am. Compl. ¶¶ 546–49. While the PBM
Defendants dispute Rochester's "red flag" theory, because the dispensing of opioids in Rochester

quinn emanuel urquhart & sullivan, llp

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON |
LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO |
SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

is "relevant to a party's claim or defense," the PBM Defendants are entitled to information related to the retail pharmacies on the ground in Rochester, such as Wegmans (the largest purchaser of prescription opioids among such pharmacies). Indeed, Wegmans is currently defending claims in approximately 36 opioid cases pending in New York similar to those brought against the Pharmacy Defendants in Track One-B of the MDL.

The PBM Defendants may similarly pursue information relevant to any defense, including that *they* were not the cause of Rochester's alleged injury—in whole or in part—but rather others, like Wegmans, were. *See* ESI Am. Ansr., Thirty-Sixth Affirmative Defense, ¶ 36(v); Optum Answer, Tenth Defense at 165; *see also Mrakovcic v. Rose Art Indus., Inc.*, 26 A.D.3d 316, 317, 809 N.Y.S.2d 538 (2006) (affirming grant of summary judgment dismissing products liability case where non-party was superseding cause of injury, and therefore named defendant was not liable); *Barth v. City of New York*, 307 A.D. 2d 943, 944, 763 N.Y.S.2d 101 (2003) (finding intervening and superseding acts of non-parties may serve to relieve a defendant of liability); *Marr v. Church*, No. 283342001, 2005 WL 6222920 (N.Y. Sup. Ct. Feb. 18, 2005) (same). The subpoenaed documents and data are critical to those defenses.

Because of the importance of the requested documents, the PBM Defendants have engaged in months of meet and confers with Wegmans, have proposed search terms and narrowed certain requests, and have answered Wegmans' many questions. Regrettably, however, Wegmans still refuses to produce any documents. The reason is simple: Wegmans does not want to produce evidence that could be used to establish its liability in its own cases. But that is not a legitimate reason to defy a validly issued subpoena—particularly where, as here, the evidence is also patently relevant to the requesting party's defense. Indeed, ESI has subpoenaed many other retail pharmacies, such as RiteAid, Walmart, CVS, and K-Mart, which have agreed to produce responsive documents with little fanfare. The PBM Defendants are entitled to the evidence necessary to present their defenses, and Wegmans cannot deprive them of evidence critical to those defenses because of Wegmans' own liability concerns. Wegmans must produce the requested documents and data.

**The Document Requests**

**Request Nos. 1 and 2** seek (a) dispensing data for drugs within the Drug Scope[1] from January 1, 2006; and (b) documents sufficient to show how Wegmans (both its pharmacists and at a corporate level) dealt with point-of-sale ("POS") communications from the PBMs, including any policies, procedures, directives or guidance concerning such POS communications. Although Request No. 2 seeks documents from January 1, 1996, the PBM Defendants are willing to significantly shorten the time period by seeking data and documents from January 1, 2006.

A second central theory in Rochester's case is that the PBM Defendants (in their capacities as PBMs) failed to act on their own data concerning the over-prescription of opioids. *See, e.g.*, Am. Compl. ¶¶ 418, 419, 422, 424. The PBM Defendants are entitled to show that they did in fact

---

[1]  Unless otherwise noted, when the Subpoena requests documents concerning certain drugs, the PBM Defendants are willing to limit the requests to the "Drug Scope" as defined in the Subpoena.

use their data to alert pharmacies, including Wegmans, and to explore whether those pharmacies (a) resolved those alerts, (b) ignored those alerts, or (c) relied on a separate process for identifying potentially risky prescriptions, patients, and prescribers.  Evidence of Wegmans' conduct on those issues will show that the PBM Defendants were not the cause of alleged over-dispensing in Rochester.  *See Mrakovcic*, 26 A.D.3d at 317 ("an intervening act will constitute a superseding cause and will serve to relieve a defendant of liability when the act is . . . so attenuated from the defendant's conduct that responsibility for the injury should not be reasonably attributed to the defendant . . . .").

Wegmans objects to these Requests on the basis that the PBM Defendants already possess ARCOS data produced in discovery and their own claims data.  But the ARCOS data does not contain dispensing information—it tracks distribution only until the opioids reach the pharmacy, ***not what happens to the opioids after the prescription is handed to Wegmans***.  The PBM Defendants are entitled to know whether and how Wegmans acted on their POS communications and whether Wegmans filled prescriptions subject to the same "red flags" that the PEC has identified in discovery.  That information can only be gleaned from Wegmans' dispensing data.

Wegmans further claims the PBM Defendants (in their capacities as PBMs) already possess data reflecting the opioids dispensed by Wegmans, but the PBM Defendants' claims data is only specific as to individual PBM customers and, thus, cannot reflect the full scope of prescriptions dispensed by Wegmans in Rochester.  Nor does that data capture many of the necessary fields that exist only in Wegmans' data.  The PBM Defendants also do not have dispensing data from different pharmacy programs, such as state-funded programs or cash payors.  The PBM Defendants simply do not possess the data Wegmans has concerning its dispensing of opioids in Rochester.  Wegmans' dispensing data is critical for the PBM Defendants to know what was dispensed in the City, to whom, why, and when.

Moreover, despite Wegman's contrary suggestion, the Court's prior discovery orders confirm the requested data is relevant, discoverable, and sufficiently tailored to the needs of the case.  In Track One-B, the MDL Court ordered the Pharmacy Defendants to produce "transactional dispensing data," entering multiple orders governing the scope of that discovery.  For example, MDL ECF No. 3106, addressed a dispute over which data fields the Pharmacy Defendants needed to include in their production, with the MDL Court deciding ***not whether*** the Pharmacy Defendants would be required to produce dispensing data, but ***how much*** data and for what drugs.[2]  The PBM Defendants are seeking only what the MDL Court has already approved—a pharmacy's dispensing data, limited to specific data fields for drugs within the Drug Scope—and they have focused the scope of these Requests to be as non-intrusive as possible.  Wegmans must produce.[3]

---

[2] The Court references the fact that the parties' experts intended to use this dispensing data to conduct competing "red flags" analysis, but, contrary to Wegmans' suggestion, that analysis was not the primary focus of the order.

[3] Wegmans' reliance on MDL ECF No. 3715—in which the Special Master denied Wal-Mart's motion to compel data from non-party Department of Veterans Administration ("VA")—is similarly misplaced.  To begin, unlike the VA, Wegmans *is a retail pharmacy*, and its documents are highly relevant.  Moreover, Wal-Mart sought information regarding the VA's dispensing

Wegmans also complains that it cannot identify its responses to PBMs' POS communications because the Subpoena does not identify the communications. But, Wegmans knows it receives POS communications from PBMs and, in any event, the Subpoena expressly identifies examples of them. *See* Ex. A ("communications regarding plan coverage limits (such as prior authorizations, step edits, and quantity limits) and communications regarding health and safety issues (such as concurrent drug utilization review or CDUR messages))."

Finally, Wegmans argues that producing its dispensing data would require it "to write code that will pull data from disparate sources" and then "compile it in a meaningful way." But, despite repeated requests, Wegmans has never provided any indication or substantiation of how much time and cost would be involved, even after the PBM Defendants agreed to cut off their request at December 31, 2019. And in any event, the argument is misplaced given Wegmans will have to produce this information in its own cases anyway. *See, e.g.*, *Plant Genetic Sys., N.V. v. Northrup King Co.*, 6 F. Supp. 2d 859, 862 (E.D. Mo. 1998) (finding defendant would not be unduly burdened by compliance with a subpoena "because [Defendant] is a party to several of the actions concerning [the relevant] technology pending in the United States, it would seem likely the requested witness and documents have already been or will have to be produced elsewhere"); *Handorf v. Milliman, Inc.*, --- F. Supp. 3d ---, 2024 WL 1827826, at *4-5 (N.D. Iowa Apr. 26, 2024) (noting that "not all third parties are equally above the fray in disputes over subpoenas," and that where a third party was directly involved in issues before the court, burdens imposed by subpoena were not undue).

Wegmans has been under an obligation since at least 2020 to identify custodial and non-custodial sources containing relevant information and to preserve such information for its own cases. It will inevitably be required to search for and produce the relevant data from these sources in those pending cases, among others. The fact that Wegmans happened to have been sued in another venue, in cases that have not *yet* proceeded to discovery, does not negate the fact that Wegmans has presumably already taken many of the steps necessary to produce responsive information. It certainly does not excuse Wegmans' obligation to produce patently relevant data. Indeed, this Court has compelled true third parties to produce voluminous amounts of data and information in this matter. *See, e.g.*, ECF No. 233 (compelling the DEA to produce ARCOS data).

**Request Nos. 3 and 4** seek (a) literature, publications, presentations and other materials provided to Wegmans from any manufacturer regarding the efficacy, addictive qualities, and/or safety of any drugs within the Drug Scope, and (b) guidance, directives, instructions, publications, presentations, notices or alerts that Wegmans provided to its employees concerning those same drugs. The PBM Defendants do not seek every communication between Wegmans and any opioid manufacturer, or among its own employees, concerning opioids. Rather, the PBM Defendants

---

practices to allow the parties "to compare the VA's practices to the standards to which Plaintiffs seek to hold . . . the Pharmacy Defendants in this litigation." The Court denied Wal-Mart's motion because Plaintiffs' claims against it were based on federal law, not on any standards the VA might establish or impose. Here, Wegmans' dispensing data is relevant to show that other actors and events besides the PBM Defendants' alleged conduct caused Rochester's alleged harm and to provide a full picture regarding prescription opioid dispensing in the City of Rochester.

seek only these targeted, enumerated types of communications because they are directly relevant to their defenses.

One of Rochester's key allegations is that the PBM Defendants knew that "that opioids were highly addictive, overused, and heavily abused," yet stood "by while retail pharmacies (as well as their own mail order pharmacies) dispensed wildly excessive quantities of opioid prescriptions." Am. Compl. ¶ 39. The PBM Defendants are thus entitled to seek information showing that retail pharmacies, such as Wegmans, received and shared with their employees the same type of information concerning the efficacy and safety of opioids that the PBMs allegedly did, and that they made independent dispensing decisions based on that information, including potentially to ignore any warnings. The communications sought in these Requests are directly relevant to this defense.

Wegmans objects to Request No. 3 on the basis that "the PBMs served third-party subpoenas to opioid manufacturers like Teva, Johnson & Johnson, Janssen, and Allergen" and it would be more convenient for these parties to the litigation to provide the requested information. But that list includes only certain opioid manufacturers, and those entities would not have the materials Wegmans received from other manufacturers, not to mention that their document retention is likely not coextensive with Wegmans. Moreover, none of these manufacturers would have the documents that Wegmans provided to its own employees. That a sub-set of non-Wegmans-affiliated manufacturers might produce some documents on the same topic does not excuse Wegmans' obligation to respond to a valid subpoena. *See State Farm Mut. Auto. Ins. Co. v. Accurate Med. P.C.*, 2007 WL 2993840, at *1 (E.D.N.Y. Oct. 10, 2007) (denying motion to quash subpoena and finding that a subpoena recipient may not avoid compliance with subpoena by pointing to others who may have responsive documents).

Wegmans also complains about burden. But again, Wegmans has made no particularized showing and, in any event, this argument is a red herring because Wegmans has presumably already taken the steps to identify and preserve these same responsive materials and will have to produce them in its own cases. The PBM Defendants have limited their Requests to a targeted set of communications with a limited temporal scope of January 1, 2006 to December 31, 2019.

**Request Nos. 5, 6, and 7** seek (a) documents sufficient to show suspicious orders that Wegmans identified or for which it received notice in Rochester[4] (Request No. 5); (b) documents and communications concerning Wegmans' use, review, or analysis of data from ARCOS, the New York Prescription Drug Monitoring Program, and the DEA, including communications with these agencies (Request No. 6); and (c) documents and communications concerning Wegmans' efforts to identify, investigate or report improper prescribing, diversion, abuse or misuse of drugs within the Drug Scope in Rochester (Request No. 7).

As discussed above, one of Rochester's central allegations is that the PBM Defendants (in their capacities as PBMs) contributed to the alleged opioid crisis in Rochester by failing to act on

---

[4] As part of their efforts to compromise, the PBM Defendants have already told Wegmans that they would limit the geographic scope to the City of Rochester itself, rather than Monroe County in which Rochester sits.

their own data.  *See, e.g.,* Am. Compl. ¶¶ 418, 419, 422, 424.  The PBM Defendants are entitled to seek information showing that retail pharmacies, including Wegmans, (a) failed to identify potentially risky prescriptions or ignored signs of risk despite the PBM Defendants' POS communications to them, (b) failed to fulfill their obligation to check the data available to them before dispensing opioids, and/or (c) failed to investigate and report opioid abuse, diversion, and misuse (or that others in the chain ignored any such reports, if made).

Wegmans argues that it is "not required to track Suspicious Orders," but that is not responsive to these Requests.  If Wegmans did, in fact, track or otherwise identify Suspicious Orders, as defined in the Subpoena, it must produce responsive documents.  Even if it did not, Wegmans must still produce the documents and external communications responsive to Request No. 7, concerning Wegmans' efforts to identify, investigate, and report the improper prescription, diversion, abuse, misuse, trafficking of opioids.

**Requests No. 8-11** seek documents and communications related to the diversion or misuse of opioids from Wegmans's pharmacies.  Specifically, Request No. 8 seeks all documents and communications related to actions taken by Wegmans against current or former employees for the diversion, misuse, or improper dispensing of drugs within the Drug Scope;[5] Request No. 9 seeks documents related to theft, loss, or diversion of drugs within the Drug Scope from Wegmans' pharmacies in Rochester; Request No. 10 seeks documents related to investigations by law enforcement or regulators into Wegmans' practices regarding drugs within the Drug Scope;[6] and Request No. 11 seeks documents sufficient to identify any regulatory, civil, or criminal actions or investigations to which Wegmans was a party related to such drugs.

Wegmans objects to these Requests as irrelevant.  But the requested documents are directly relevant to the PBM Defendants' defense that others, including Wegmans (the largest dispenser of opioids in Rochester)—not the PBM Defendants—are responsible for Plaintiff's alleged injuries.  *See Palmatier v. Mr. Heater Corp.*, 159 A.D. 3d 1084, 1085, 71 N.Y.S.3d 717 (2018).  As the retail pharmacy that bought approximately 30% of the opioids purchased in Rochester during the relevant time period, the PBM Defendants reasonably anticipate that Wegmans' documents will reflect a commensurate percentage of the diversion and/or misuse of those drugs, providing a fuller picture of the alleged opioid crisis in Rochester.  Further, any documents showing that Wegmans itself acknowledged or was found to have over-dispensed or facilitated the misuse or diversion of opioids would, of course, be critical evidence.  Wegmans is not entitled to withhold such evidence just because it could be damaging.

Finally, **Request No. 12** seeks all contracts, agreements and orders between Wegmans and any opioid manufacturer or distributor.  Wegmans again feigns ignorance as to the relevance of this request, but one of Rochester's central arguments in this case is that the PBM Defendants turned a blind eye to the harms of opioid prescriptions because they were compensated by manufacturers (an allegation that the PBM Defendants strongly dispute).  Am. Compl. ¶ 293 ("The PBM Defendants, however, have financial incentives to give opioids preferential treatment relative

---

[5]  The PBM Defendants have no objection to the anonymization of employee records.

[6]  The PBM Defendants would be willing to limit this Request to only those investigations involving conduct occurring in the State of New York.

to other methods of treating pain (including non- pharmacological methods), and these incentives have made them less likely to mitigate inappropriate opioid usage."). The PBM Defendants are entitled to explore whether Wegmans received payments from opioid manufacturers and thus had the same alleged incentives. Those contracts are likely centrally maintained, meaning Wegmans has likely already collected them under its document-preservation obligations, and Wegmans has made no showing that it would face any burden in producing them, which it will undoubtedly have to do in its own cases.

**The PBM Defendants Have Attempted to Resolve the Parties' Dispute in Good Faith**

The suggestion that the PBM Defendants have not negotiated in good faith is false. At every turn, Wegmans has shifted its position and demanded more from the PBM Defendants—first, asking for an explanation for the self-evident relevance of each Request; then demanding a written explanation of the Requests' relevance before engaging in further meet and confer discussions; then, demanding general authority to support the type and scope of the Requests; and then, demanding supporting authority from within the MDL. It did so without itself providing supporting authority suggesting its demands were justified under the Rules. They are not.

By contrast, the PBM Defendants have offered multiple compromises—on time frame, geographic scope and subject matter—in an effort to get *some* agreement from Wegmans to produce *some* documents responsive to the Subpoena's Requests. Despite the PBM Defendants' attempts to address Wegmans' purported concerns, Wegmans continues to refuse to produce patently relevant information.

**Wegmans Must Produce This Critical Evidence**

The Federal Rules allow for "extensive intrusion into the affairs of both litigants and third parties." *In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919, 941 (6th Cir. 2019) (Guy, Jr., J., concurring in part) (citation omitted). Relevance in terms of discovery, including third party discovery, is "quite broad." *In re CareSource Mgmt. Grp. Co.*, 289 F.R.D. 251, 253 n.2 (S.D. Ohio 2013) (quoting *Lewis v. ACB Bus. Servs., Inc.*, 135 F. 3d 389, 402 (6th Cir. 1998). As the party refusing to comply with a subpoena, Wegmans "bears the burden of establishing that the issued subpoenas violate Rule 45 of the Federal Rules of Civil Procedure." *Recycled Paper Greetings, Inc. v. Davis*, 2008 WL 440458, at *3 (N.D. Ohio Feb. 13, 2008). This is a "heavy" burden." *Linder v. Dep't. of Def.*, 133 F.3d 17, 24 (D.C. Cir. 1998); *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1210 (Fed. Cir. 1987) ("The burden is particularly heavy to support a motion to quash as contrasted to some more limited protection.") (citation omitted); *Hamm v. Cunningham*, 2012 U.S. Dist. LEXIS 200833, at *2-3 (N.D. Ohio, May 16, 2012).

Given Wegmans is by far the single largest dispenser of opioids in Rochester, the discovery sought is "relevant on its face." *Hendricks v. Total Quality Logistics, LLC*, 275 F.R.D. 251, 253 (S.D. Ohio 2011) (cleaned up). If Wegmans would prefer to withhold documents out of concerns for its own liability, that is not a legitimate reason to deny the PBM Defendants critical evidence in their defense. This is particularly so where Wegmans is going to ultimately produce all this evidence in its own opioid cases anyway.

The PBM Defendants will inform the Court the parties are unable to resolve their differences and will request that it order Wegmans to produce all non-privileged documents sought by the Subpoena within 30 days.

Sincerely,

Anthony P. Alden

APA

Encl.:
Subpoena to Wegmans Food Markets, Inc.

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

| | |
|---|---|
| In re: National Prescription Opiate Litigation | ) |
| _Plaintiff_ | ) |
| v. | ) |
| | ) |
| | ) |
| _Defendant_ | ) |

Civil Action No.  **1:17-MD-2804**

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
**Wegmans Food Markets, Inc.**
**100 Wegmans Market Street, Legal Dept., Rochester, NY 14624**

_(Name of person to whom this subpoena is directed)_

✔ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedules A and B

| Place: First Legal Records c/o The Chase Agency LLC<br>28 East Main St, Suite 103,<br>Rochester, NY 14614 | Date and Time:<br><br>08/26/2024 5:00 pm |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  07/25/2024

| _CLERK OF COURT_ | | |
|---|---|---|
| | OR | |
| _Signature of Clerk or Deputy Clerk_ | | /s/ Patrick King<br>_Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ _____
Express Scripts, Inc. _____ , who issues or requests this subpoena, are:

Patrick King, Quinn Emanuel, 700 Louisiana St., Ste. 3900, Houston TX 77002, patrickking@quinnemanuel.com

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  **1:17-MD-2804**

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition*. A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery*. A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions*. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection*.
  **(A)** *Appearance Not Required*. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections*. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena*.
  **(A)** *When Required*. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted*. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative*. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information*. These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents*. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified*. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form*. The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information*. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection*.
  **(A)** *Information Withheld*. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced*. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**HIGHLY CONFIDENTIAL**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | **MDL No. 2804** |
| | **Case No.: 1:17-MD-2804** |
| This document relates to: | |
| | **Judge Dan Aaron Polster** |
| *City of Rochester v. Purdue Pharma L.P.*, Case No. 19-op-45853 (Track 12) | |

## <u>SCHEDULE A TO SUBPOENA</u>

"ARCOS Data" means data reported by DEA Registrants pursuant to 21 U.S.C. § 827 through the Automation of Reports and Consolidated Orders System.

"Communication" means any oral or written statement, dialogue, discussion, exchange, conversation, disclosure, or transmittal of information whether in-person, by telephone, any form of video transmission, mail, e-mail, facsimile, personal delivery, computer transmission, or otherwise.

"Concerning" means regarding, relating to, referring to, reflecting, discussing, describing, analyzing, supporting, evidencing, constituting, comprising, containing, setting forth, showing, disclosing, explaining, summarizing, or mentioning.

"Defendants" means Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Evernorth Health, Inc. (formerly Express Scripts Holding Company), Express Scripts Specialty Distribution Services, Inc.; UnitedHealth Group Incorporated, Optum, Inc., OptumInsight, Inc., OptumInsight Life Sciences, Inc., OptumRx, Inc., OptumRx Discount Card Services, LLC; Optum Perks, LLC; OptumHealth Care Solutions, LLC; OptumHealth Holdings, LLC; and Optum Health Networks, Inc.

"Document" or "Documents" means any information stored in a medium from which the information can be obtained. A Document includes (but is not limited to) any calendar, chart, communication, data, data compilation, database, diary, draft, drawing, electronically stored information, email, fax, floppy disk, graph, hard drive, image, index, instant message, letter, log, magnetic tape, memorandum, note, optical disk, photograph, report, sound recording, spreadsheet, storage device, text message, voicemail, writing, or any other category covered by Federal Rule of Civil Procedure 34(a)(1)(A). Any copy of a Document that differs in any respect from the original of a Document constitutes a separate Document.

"Drug Scope" means the MDL-8 opioids (Fentanyl, Hydrocodone, Hydromorphone, Morphine, Oxycodone, Oxymorphone, Tapentadol, and Methadone) as well as the Relevant Benzodiazepines

1

**HIGHLY CONFIDENTIAL**

(Alprazolam, Chlordiazepoxide, Clobazam, Clonazepam, Clorazepate, Diazepam, Estazolam, Flurazepam, Lorazepam, Midazolam, Oxazepam, Quazepam, Temazepam, and Triazolam) and Relevant Muscle Relaxers (Carisoprodol, Cyclobenzaprine, Orphenadrine, and Tizanidine).

"Employee" includes but is not limited to all current and former employees, independent contractors, and individuals performing work as temporary employees.

"Investigation" means any investigation conducted by any Person of any Person, including but not limited to investigations of any Defendant related to manufacturing, distributing, dispensing, prescribing, using, abusing, trafficking, or diverting Opioids.

"MDL-8 Opioids" means Fentanyl, Hydrocodone, Hydromorphone, Morphine, Oxycodone, Oxymorphone, Tapentadol, and Methadone.

"Opioid(s)" means substances comprised of or containing natural, synthetic, or semisynthetic chemicals that bind to opioid receptors in the brain or body, including heroin, fentanyl, carfentanil, and fentanyl-type analogs, as well as MDL-8 Opioids.

"Person" means any natural or legal person or any entity, including a government officer or agency.

"Relevant Benzodiazepines" means Alprazolam, Chlordiazepoxide, Clobazam, Clonazepam, Clorazepate, Diazepam, Estazolam, Flurazepam, Lorazepam, Midazolam, Oxazepam, Quazepam, Temazepam, and Triazolam.

"Relevant Muscle Relaxers" means Carisoprodol, Cyclobenzaprine, Orphenadrine, and Tizanidine.

"Requests" means the requests for production of documents set forth herein.

"Suspicious Order(s)" means any order of drugs within the Drug Scope, or other Opioids, that (i) You believe, suspect, or contend should have been reported to the United States Drug Enforcement Administration ("DEA") or state authorities, the New York, Medical Board, New York Board of Pharmacy, or New York Dental Board, as "suspicious" within the meaning of 21 C.F.R. § 1301.74(b), (ii) is referred to in a Document as "suspicious" within the meaning of 21 C.F.R. § 1301.74(b), or (iii) that You define as a suspicious order for purposes of Your work.

"Monroe County Region" means Monroe County, New York, as well as all counties in New York bordering on Monroe County, including the Counties of Orleans, Genesee, Livingston, Ontario, and Wayne, including all municipalities, cities, and towns within these counties.

"You," and "Your" means Wegmans Food Markets, Inc., including its Employees, directors, officers, executives, board members, agents and contractors or other Persons acting on behalf of Wegmans Food Markets, Inc.

**HIGHLY CONFIDENTIAL**

Whenever necessary to bring within the scope of these requests documents that might otherwise be construed to be outside their scope:

> (a) the use of a verb in any tense shall be construed as the use of that verb in all other tenses;
>
> (b) the use of a word in its singular form shall be deemed to include within its use the plural form as well;
>
> (c) the use of a word in its plural form shall be deemed to include within its use the singular form as well;
>
> (d) the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all documents that might otherwise be construed to be outside its scope;
>
> (e) the use of any capitalized word shall include the same word uncapitalized, and the use of any uncapitalized word shall include the same word capitalized; and
>
> (f) the terms "all" and "each" shall be construed as all and each.

## INSTRUCTIONS

A.  Produce all documents in the manner in which they are maintained in the usual course of Your business or organize and label the documents to correspond with the categories in this Schedule A. A request for a document shall be deemed to include a request for any and all physical or electronic file folders within which the document was contained, all transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document in addition to the document itself, and for any electronic document any metadata contained in the document, in the file system on which the document is stored, and/or in any active directory, SQL, LDAP, or other indices or databases that provide access, access control, or other security or index information concerning the document.

B.  If and to the extent documents are maintained in a database or other electronic format, produce along with the document(s) software that will enable access to the electronic document(s) or database as You would access such electronic document(s) or database in the ordinary course of Your business.

C.  Produce documents in such fashion as to identify the department, branch or office in which they were located and, where applicable, the natural person in whose possession it was found and the business address of each document's custodian(s).

D.  Any document withheld from production based on a claim of privilege or any similar claim shall be identified by (1) the type of document, (2) the general subject matter of the document, (3) the date of the document, and (4) such other information as is sufficient to identify the document including the author of the document, the addressee of the document, and, where not apparent, the relationship of the author and the addressee to each other. The nature of each claim of privilege shall be set forth.

E.  Documents attached to each other should not be separated.

3

**HIGHLY CONFIDENTIAL**

F.      Documents not otherwise responsive to this discovery request shall be produced if such documents mention, discuss, refer to, or explain the documents which are called for by this subpoena.

G.      In producing documents and other materials, You are requested to furnish all documents or things in Your possession, custody or control, regardless of whether such documents or materials are possessed directly by You or Your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, accountants, investigators, or by Your attorneys or their agents, employees, representatives or investigators.

H.      If You object to any part of any request, state fully in writing the nature of the objection. Notwithstanding any objections, nonetheless comply fully with the other parts of the request to which you are not objecting.

I.      Unless otherwise stated explicitly herein with regard to a particular document request, each document request shall be construed independently and not with reference to any other document request for the purpose of limitation. The use of the singular form of any word includes the plural and vice versa. The past tense shall include the present tense and vice versa.

J.      Responsive electronic documents shall be produced as both (a) native files, including, if necessitated by Paragraph B, the software You used to create and/or view the responsive electronic documents, as well as (b) multi-page, 300dpi group IV TIFF images with extension ".tif" and (c) full text files comprising extracted text (for documents amenable to text extraction) or OCR text files (otherwise), named after the first bates number of the document, with extension ".txt" and (d) a load file with a ".dat" file extension and ASCII 020 and 254 delimiters for column break and text qualifier. The first line shall be the header with field names and each subsequent line shall contain the fielded data for each document. The load file shall include the following metadata, where available:

| Field | Description |
| --- | --- |
| BegBates | Page ID of first page in a document. |
| EndBates | Page ID of last page in a document. |
| BegAttach | BegBates of parent record. |
| EndAttach | BegBates of last attached document in family. |
| From | Author of the e-mail message. |
| To | Main recipient(s) of the e-mail message. |
| CC | Recipient(s) of "Carbon Copies" of the e-mail message. |
| BCC | Recipient(s) of "Blind Carbon Copies" of the e-mail message. |
| DateSent | Sent date of an e-mail message. |
| TimeSent | Time the e-mail message was sent. |
| Email Subject | Subject of the e-mail message. |
| Author | Author field value pulled from metadata of the native file. |
| Title | Title field value extracted from the metadata of the native file. |
| Custodian | Textual value of custodian. |
| DateCreated | Creation date of the native file. |

**HIGHLY CONFIDENTIAL**

| TimeCreated | Creation time of the native file. |
|---|---|
| EntryID | Unique identifier of e-mails in mail stores. |
| FileDescription | File extension or other description of native file type. |
| Filename | Original filename of native file. Contains subject of e-mail message for e-mail records. |
| Filesize | Size of native file, in bytes. |
| MD5Hash | MD5 hash-128-bit output. |
| Attach | Semi-colon delimited string of first level attachments in the e-mail. |
| DateLastMod | Date the native file was last modified. |
| TimeLastMod | Time native file was last modified. |
| PgCount | Number of pages in a document. |
| NativeFile | Logical file path to the native file. |
| OCRPath | Logical file path to the OCR text. |

This instruction – which concerns in part the preparation of a load file that includes metadata – is separate from, and in addition to the directions in:

Instruction A, which requires that You produce native files with all file, file= system, index, and access control metadata intact -and

Instruction B, which requires, for particular electronic documents, the production of software You use(d) in Your ordinary course of business to create and review the native electronic documents.

K.      Responsive paper documents shall be scanned and produced electronically along with an appropriate load file as described in subsections (b), (c), and (d) of Paragraph J.

L.      Unless otherwise stated in a specific request, these requests seek responsive information and documents authored, generated, disseminated, drafted, produced, reproduced, or otherwise created or distributed or related to the period beginning **January 1, 1996 and ending as of Today**.[1]  Whenever a request does specifically refer to a date range, that date range should be construed as beginning on the first moment of the first date in the range and ending on the last moment of the last date in the range.

## <u>DOCUMENTS REQUESTED</u>

1)  Dispensing data reflecting all drugs within the Drug Scope, that You dispensed in the Monroe County Region from January 1, 2006 to present.  The data should include the following fields:

    a)  Drug name

---

[1]  The Special Master in this litigation has ordered discovery back to 1996. If the Court modifies that ruling, we will narrow the temporal scope of the Requests.

**HIGHLY CONFIDENTIAL**

b) NDC number

c) Date filled

d) Quantity dispensed

e) Dosage form

f) Days' supply

g) Prescriber's name

h) Prescriber's DEA number

i) Dispensing pharmacist

j) Patient Zip Code

k) Patient ID # (Unique ID)

l) Quantity prescribed

m) Number of refills authorized (if any)

n) Diagnostic code

o) Method of payment

p) Patient paid amount

q) Whether prescription covered by third-party payor

r) Control / Non Control ratio

s) Pharmacy DEA #

t) Pharmacy Store #

u) Pharmacy address (at the zip code level or finder)

v) Prescriber address (at the zip code level or finder)

w) Prescription Date written

x) Refill indicator (whether the Rx is a refill or the original)

y) Prescriber Specialty

z) Rejection Indicator (Whether the pharmacy rejected to fill)

**HIGHLY CONFIDENTIAL**

  aa) Prescriber's NPI Number

  bb) Patient DOB Year (or age)

  cc) DEA Override

  dd) DEA Schedule (Same as Control/Non-Control)

  ee) Dispense Hour

  ff) Dispense Minute

  gg) Drop Off Hour

  hh) Drop Off Minute

2) Documents sufficient to show how You and any pharmacists employed by You (or other employees involved in dispensing drugs within the Drug Scope) do or do not consider, use, respond to, or interact with communications received from pharmacy benefit managers (including, but not limited to, the Defendants) at the point of sale, including, but not limited to, communications regarding plan coverage limits (such as prior authorizations, step edits, and quantity limits) and communications regarding health and safety issues (such as concurrent drug utilization review or CDUR messages), from January 1, 1996, to present. Your response should include documents responsive at both the pharmacy and individual employee level, and should include any pertinent policies, procedures, directives, or guidance.

3) All Documents and Communications Concerning any literature, publications, presentations, analyses, studies, reports, guidelines, directives, announcements, recommendations, pamphlets, circulars, notices, or other materials provided by any drug manufacturer to You regarding the efficacy, addictive qualities, and/or safety of any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

4) All Documents and Communications Concerning any guidance, directives, instructions, publications, alerts, notices, presentations, or other materials You provided to Employees Concerning any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

5) Documents sufficient to show all Suspicious Orders You identified or for which you received notice in the Monroe County Region, from January 1, 2006 to present.

6) All Documents and Communications Concerning Your use, review, or analysis of ARCOS data, data from the New York Prescription Monitoring Program, or other data relating to Suspicious Orders, including all Communications to or from the U.S. Drug Enforcement Agency or the New York Prescription Monitoring Program Concerning any drug within the Drug Scope, or any other Opioid, from January 1, 2006 to present.

7) All Documents and Communications Concerning efforts of any kind by You to identify, investigate, or report to any national, state, or local governments, agencies, boards, institutions,

**HIGHLY CONFIDENTIAL**

associations, law enforcement bodies, health departments, or drug taskforces Concerning any of the following regarding any drug within the Drug Scope, or any other Opioid, from January 1, 1996 to present: (a) improper prescribing or failing to prescribe by doctors or other prescribers in the Monroe County Region; (b) doctor-shopping, forgery, or counterfeiting of prescriptions by patients in the Monroe County Region; (c) diversion, abuse, misuse, diversion, trafficking; or (d) any other concerns Concerning potentially improper or illegal prescriptions.

8) All Documents and Communications Concerning all actions (including fines, suspensions, revocations, terminations, voluntary agreements not to practice, resignations, and letters or other formal warnings or notices) taken by You against any current or former Employee Concerning any drug within the Drug Scope, or any other Opioid, including for the prescribing, dispensing, failure to prescribe, failure to dispense, diversion, or misuse of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

9) Documents sufficient to show all instances of theft, loss, or diversion of any drug within the Drug Scope, or any other Opioids, from any facility owned, operated, supported by, serviced by, or affiliated with You in the Monroe County Region, from January 1, 1996 to present.

10) All Documents and Communications Concerning any Investigation or other inquiry conducted by any state or federal office, agency, department, committee, or program (including the DEA, the Federal Bureau of Investigation, a United States Attorney or representative thereof, any government-level department or agency within the State of New York), or any state board (including the New York Medical Board, New York Board of Pharmacy, New York Dental Board, New York Nursing Board, or any medical examiner's office in New York) into any of Your practices related to the prescribing, ordering, dispensing, distributing, administering, or diversion of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

11) Documents sufficient to identify any regulatory, civil, or criminal actions or investigation Concerning any drug within the Drug Scope, or any other Opioids, to which you were a party or participated in any manner, from January 1, 1996 to present.

12) All Documents reflecting contracts, agreements, orders, or other formal documents between You and any manufacturer or distributor of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

8

**HIGHLY CONFIDENTIAL**

Dated: July 24, 2024

*/s/ Brian D. Boone*
Brian D. Boone
**ALSTON & BIRD LLP**
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
Tel: (704) 444-1000
brian.boone@alston.com

William H. Jordan
Andrew Hatchett
**ALSTON & BIRD LLP**
1201 West Peachtree Street NW, Suite 4900
Atlanta, GA 30309
Tel.: (404) 881-7000
bill.jordan@alston.com
andrew.hatchett@alston.com

*Attorneys for OptumRx, Inc.*

By:   */s/ Ellison Ward Merkel*
Ellison Ward Merkel
ellisonmerkel@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Ave, 22nd Floor
New York, NY 10010
Telephone: 212-849-7362

*Attorney for Defendants Express Scripts, Inc. and ESI Mail Pharmacy Service, Inc.*

**HIGHLY CONFIDENTIAL**

## <u>AFFIDAVIT</u>

STATE OF _____ )
                                                                )
COUNTY OF_____ )

Before me, the undersigned authority, personally appeared_____, who, being by me duly sworn, deposed as follows:

My name is _____. I am of sound mind, capable of making this Affidavit, and I am personally acquainted with the facts stated herein:

I am the duly authorized Custodian of Records for Wegmans Food Markets, Inc. Attached hereto are _____ pages of records relating to Wegmans Food Markets, Inc. These _____ pages of records are kept by Wegmans Food Markets, Inc. in the regular course of business, and it was the regular course of business of Wegmans Food Markets, Inc. or an employee or representative of Wegmans Food Markets, Inc. with knowledge of the act, event, condition, opinion, or diagnosis recorded to make a record or transmit information thereof to be included in such record; and the record was made at or near the time of the act, event, condition, opinion, or diagnosis. The records attached hereto are the originals or exact duplicates of the originals.


_____

Affiant, Custodian of Records


IN WITNESS WHEREOF I have hereunto subscribed my name and affixed my official seal this _____ day of _____, 2024.


                                                    _____
                                                                    Notary Public

My Commission Expires:

_____

10

# SCHEDULE B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| | Case No. 17-md-2804 |
| This document relates to: | |
| All Cases | Judge Dan Aaron Polster |

## CASE MANAGEMENT ORDER NO ___3___
## REGARDING DOCUMENT AND ELECTRONICALLY STORED INFORMATION PRODUCTION PROTOCOL

### 1. PURPOSE

This Order will govern production of Documents and ESI (as defined below) by Plaintiffs and Defendants (the "Parties") as described in Federal Rules of Civil Procedure 26, 33, and 34. This Order shall apply to the production of hard-copy and electronic documents by the Parties in this litigation.

The production of documents and ESI by the Parties also shall be subject to the provisions of orders concerning confidentiality, privilege, and/or protected health information as agreed to among the Parties and/or entered by the Court.

The Parties reserve all objections under the Federal Rules of Civil Procedure and applicable decision authority other than concerning matters that are addressed in this Order.

Nothing in this Order shall be interpreted to require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity. The Parties do not waive any objections to the discoverability, admissibility, or confidentiality of documents

1

or ESI. Nothing in this Order shall be interpreted to supersede the provisions of orders governing confidentiality, privilege, and/or protected health information entered by the Court in this litigation, unless expressly provided for in such an order.

## 2. DEFINITIONS

a. **"Confidentiality Designation"** means the legend affixed to Documents or ESI for confidential or highly confidential information as defined by, and subject to, the terms of the order concerning confidentiality agreed to an/or entered by the Court in this litigation.

b. **"Document"** is defined to be synonymous in meaning and equal in scope to the usage of this term in Rules 26 and 34 of the Federal Rules of Civil Procedure. The term "document" shall include hard-copy documents, electronic documents, and ESI as defined herein.

c. **"Electronic Document or Data"** means documents or data existing in electronic form at the time of collection, including but not limited to: e-mail or other means of electronic communications, word processing files (e.g., Microsoft Word), computer slide presentations (e.g., PowerPoint or Keynote slides), spreadsheets (e.g., Excel), and image files (e.g., PDF).

d. **"Electronically stored information" or "ESI,"** as used herein, has the same meaning as in Rules 26 and 34 of the Federal Rules of Civil Procedure and includes Electronic Documents or Data, and computer-generated information or data, stored in or on any storage media located on computers, file servers, disks, tape, USB drives, or other real or virtualized devices or media.

e. **"Extracted Full Text"** means the full text that is extracted electronically from native electronic files, and includes all header, footer, and document body

2

information.

f. **"Hard-Copy Document"** means documents existing in paper form at the time of collection.

g. **"Hash Value"** is a unique numerical identifier that can be assigned to a file, a group of files, or a portion of a file, based on a standard mathematical algorithm applied to the characteristics of the data set. The most commonly used algorithms, known as MD5 and SHA, will generate numerical values so distinctive that the chance that any two data sets will have the same Hash Value, no matter how similar they appear, is less than one in one billion.

h. **"Load files"** means an electronic file containing information identifying a set of paper-scanned images, processed ESI, or native format files, as well as the corresponding Extracted Full Text or OCR text files, and containing agreed-upon extracted or user-created metadata, as well as information indicating unitization (i.e., document breaks and document relationships such as those between an email and its attachments) used to load that production set into the document review platform of the Party receiving a production ("Receiving Party"), and correlate its data within that platform. A load file is used to import all image, native, and text files and their corresponding production information into a document database. The Producing Party shall produce a load file for all produced documents with each particular production in accordance with specifications provided herein.

i. **"Media"** means an object or device, real or virtual, including but not limited to a disc, tape, computer, or other device on which data is or was stored.

3

j. **"Metadata"** means: (i) information embedded in or associated with a native file that describes the characteristics, origins, usage, and/or validity of the electronic file; (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system, (iii) information, such as Bates numbers, redaction status, privilege status, or confidentiality status created during the course of processing documents or ESI for production, and (iv) information collected during the course of collecting documents or ESI, such as the name of the media device on which it was stored, or the custodian or non-custodial data source from which it was collected. Nothing in this order shall require any party to manually populate the value for any metadata field.

k. **"Native Format" or "native file"** means the format of ESI in which it was generated and/or used by the Party Producing ESI or documents (the "Producing Party") in the usual course of its business and in its regularly conducted activities. For example, the native format of an Excel workbook is an .xls or .xslx file.

l. **"Optical Character Recognition" or "OCR"** means the optical character recognition technology used to read the text within electronic images of paper Documents and create a file containing a visible, searchable text format of such Documents.

m. **"Searchable Text"** means the native text extracted from an electronic document and any Optical Character Recognition text ("OCR text") generated from the electronic image of a paper Document.

4

## 3. E-DISCOVERY LIAISON

The Parties will identify to each other liaisons who are and will be knowledgeable about and responsible for discussing their respective ESI ("E-discovery Liaisons"). Each Party's designated E-discovery Liaison(s) will be, or will have access to those who are, familiar with their Party's respective electronic systems and capabilities and knowledgeable about the technical aspects of e-discovery, including the location, nature, accessibility, format, collection, search methodologies, and production of ESI in this matter. The Parties will rely on the liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention.

## 4. IDENTIFICATION OF DOCUMENTS AND ESI

a. The Parties agree to meet and confer to discuss (i) the identification of the custodial and noncustodial data sources containing potentially relevant ESI for potential collection, review, and production; (ii) additional parameters for scoping the review and production efforts (e.g., application of date ranges, de-NIST'ing, etc.); (iii) potential use and identification of search terms, tools, or techniques; (iv) the identification and production of documents and ESI from custodial and non-custodial sources that do not require the use of search terms, tools, or techniques; (v) the method each Party proposes to use to identify and de-duplicate duplicate documents, and any exceptions to such de-duplication the Party proposes to implement; and (vi) the treatment of non-responsive documents within parent-child families. The meet and confer between Plaintiffs and each Defendant will take place by the later of seven (7) calendar days following entry of this Order, or ten (10) days after the particular Defendant is served with a first document request herein.

5

b.     The Parties further agree to meet and confer to the extent that this Order imposes any undue burden or expense on any Plaintiff or Defendant with respect to its response to any particular discovery request.

c.     Nothing in this order shall be deemed to be a waiver of any Party's right to reasonably seek agreement from the other Parties, or a Court ruling, to modify proposed or previously agreed-to search terms, techniques, or tools (including any proposed as supplements).

## 5. DEDUPLICATION

a.     To the extent exact duplicate documents reside within a Party's ESI data set, the Party shall produce only a single, deduplicated copy of a responsive document. "Exact duplicate" shall mean bit-for-bit identity of the document content with exact hash value matches; so-called "near duplicates" will not be included within this definition.

b.     To the extent a party de-duplicates its documents, it shall de-duplicate stand-alone documents or entire document families in their ESI sources by the use of MD5, SHA-1, or SHA256 hash values.  Where any such documents have attachments, hash values must be identical for both the document plus-attachment (including associated metadata) as well as for any attachment (including associated metadata) standing alone.

c.     A Producing Party shall de-duplicate documents across custodians and populate a field of data that identifies each custodian who had a copy of the produced document (the "Duplicate Custodian" field) in addition to a separate field of data identifying the custodian whose document is produced; such de-duplicated documents shall be deemed produced from the custodial files of each such identified custodian for all purposes in this litigation, including for use at deposition and trial.  A Producing Party

6

shall use a uniform description of a particular custodian across productions. Multiple custodians in the "Duplicate Custodian" field shall be separated by a semicolon. Entity/departmental custodians should be identified with a description of the entity or department to the extent applicable.

d.      No Party shall identify and/or eliminate duplicates by manual review or some method other than by use of the technical comparison using MD5 or SHA-1 hash values outlined above.

e.      Hard-Copy Documents shall not be eliminated as duplicates of ESI.

f.      If the Producing Party makes supplemental productions following an initial production, that Party also shall provide with each supplemental production an overlay file to allow the Receiving Party to update the "Duplicate Custodian" field. The overlay file shall include all custodians listed in the "Duplicate Custodian" field in prior productions and any custodians newly identified in the current supplemental production.

## 6. PRODUCTION FORMAT AND PROCESSING SPECIFICATIONS

a. Standard Format. Unless otherwise specified in Section 6(b) or pursuant to Section 6(j) below, the Parties shall produce documents in tagged image file format ("TIFF"). TIFFs of ESI shall convey the same information and image as the original document, including all commenting, versioning, and formatting that is visible in any view of the document in its native application. All hidden text will be expanded, extracted, and rendered in the TIFF file and, to the extent possible, the Producing Party will instruct its vendor to force off Auto Date. Any TIFFs produced shall be single-page, 300 DPI, Group IV TIFF files. After initial production in image file format is complete, a party must demonstrate particularized need for production of ESI in its native format.

b. Native Format. Except as provided by Section 6(j) below, the Parties shall produce all spreadsheets, computer slide presentations, audio files, video files, and other file types that cannot be accurately represented in TIFF format in native format, provided, however, that the Parties will meet and confer regarding appropriate format of production for databases and structured data (e.g., Microsoft Access, Oracle, or other proprietary databases). For each document produced in native format, a responding Party shall also produce a corresponding cover page in TIFF image format, specifying that the document has been "produced in native format" and endorsed with the Bates Number and Confidentiality Designation, if applicable, which will be inserted into the image population in place of the native file. When the native file is produced, the Producing Party shall preserve the integrity of the electronic document's contents, i.e., its original formatting and metadata.

c. Color. Documents containing color need not be produced in color, except that (i) word processing documents that contain hidden text, and (ii) certain redacted documents, as further provided in Section 6(j), shall be produced in color in TIFF format. The Producing Party will honor reasonable requests for a color image of a document, if production in color is necessary to understand the meaning or content of the document.

d. Embedded Objects. If documents contain embedded objects, the Parties shall extract the embedded objects as separate documents and treat them like attachments to the document to the extent reasonably possible. To the extent reasonably possible, images embedded in emails shall not be extracted and produced separately.

8

e. <u>Load Files</u>. Each production of ESI and Documents shall be accompanied by Concordance or comma delimited load files (.dat and .opt) containing a field with the full path and filename to files produced in native format and also containing metadata fields identified in Appendix A, to the extent the information is available in the original ESI file and can be extracted without unreasonable burden using standard litigation support processing platforms (except for vendor-generated fields related to the litigation production, such as "BEGDOC", "ENDDOC", bases for redaction, and Confidentiality Designations).

f. <u>.Txt Files</u>. For all documents containing extracted full text or OCR text, the Producing Party shall provide searchable document level .txt files (named using the Bates start/"BEGDOC"), which shall reside in the same file directory as the images for such documents.

g. <u>Bates Numbering and Other Unique Identifiers.</u> Every item or file of ESI that is produced shall be identified by a unique page identifier ("Bates Number") and a Production Volume Number for any storage device (e.g., CD, USB, hard drive) containing such files. All Bates numbers will consist of an Alpha Prefix, followed by a numeric page index. There must be no spaces in any Bates number. Any numbers with less than 8 digits will be front padded with zeros to reach the required 8 digits. All ESI produced in TIFF format shall contain a unique Bates Number on each page of the document, electronically "burned" onto the image at a location that does not obliterate, conceal, or interfere with any information from the source document. If a member of a document family that has otherwise been determined to be responsive cannot be technically processed (e.g., unsupported file format, file corruption, inaccessible

password-protected document), those technical problems shall be identified and disclosed to the Receiving Party by production of a Bates-labeled slip sheet that states "Technical issue—file cannot be processed," along with a log identifying each such file; the associated metadata for the file with the technical problem shall be produced if technically possible. A Receiving Party thereafter may raise with the Producing Party any questions or concerns, and the Parties shall meet and confer to attempt to resolve any issues.

h. Hard-Copy Documents. Except as otherwise set forth in this paragraph, the Parties agree that responsive paper documents shall be converted to single-page TIFF files, and produced following the same protocols set forth in Section 6(a) above, including the production of OCR text that is generated to make such documents searchable. Generally, all paper documents will be scanned and produced electronically, unless a Party establishes good cause for making such documents available via paper and reasonable access is provided to the opposing Party to review the documents directly. In scanning all Hard-Copy Documents, Hard-Copy Documents should be logically unitized. Accordingly, distinct documents should not be merged into a single record, and single documents should not be split into multiple records. In the case of an organized compilation of separate documents (for example, a binder containing several separate documents behind numbered tabs), each of the Hard-Copy Documents should be separately scanned, but the relationship among the documents in the compilation should be reflected in the proper coding of the beginning and ending documents and attachment fields. The Parties will make their best efforts to unitize the documents correctly. Producing Hard-Copy Documents as provided herein does not

10

change their character from Hard-Copy Documents into ESI. For Hard-Copy Documents, the Parties need only populate the following metadata fields: "BEGDOC," "ENDDOC," "PROD VOLUME," "CUSTODIAN," "SOURCE," "CONFIDENTIAL," "REDACTION," and "COMPANY" fields, as well as "BEGATTACH" and "ENDATTACH" fields where applicable.

i.  Confidentiality Designation.  To the extent any Document or ESI (or portion thereof) produced as a TIFF image in accordance with this Order is designated as confidential or highly confidential under the order concerning confidentiality agreed and/or entered in this litigation, the Producing Party will brand the required Confidentiality Designation in a corner of any TIFF images representing the produced item and in a consistent font type and size that does not obscure any part of the underlying image or Bates number, to the extent possible.

j.  Redactions.  A Party may use redactions to protect attorney-client or work product privileges consistent with the order concerning privilege agreed and/or entered in this litigation. Other than as permitted by this Order or the order concerning confidentiality agreed and/or entered in this litigation, no redactions for relevance may be made within a produced document or ESI item. Any redactions shall be clearly indicated on the face of the document, with each redacted portion of the document stating that it has been redacted and the basis for the redaction, and a metadata field shall indicate that the document contains redactions and the basis for redaction (e.g. "A/C Privilege"). Where a responsive document contains both redacted and non-redacted content, the Producing Party shall produce the remainder of the non-redacted portions of the document and the text/OCR corresponding to the non-redacted portions.

Email header information (e.g., date, subject line, etc.) should not be redacted unless it is independently privileged. The production of a document in a redacted form does not affect the Producing Party's obligation to timely assert and substantiate the assertion of privilege over the content in a privilege log. Redacted versions of spreadsheets, computer slide presentations, and word processing files containing hidden text (e.g., track changes, hidden columns, comments, notes, markups, etc.) shall be produced in color in TIFF format. The Parties shall honor reasonable requests for the production of particular redacted documents in other formats where the TIFF image is not reasonably usable.

k. Parent-Child Relationships. The Parties acknowledge and agree that parent-child relationships within a document family (the association between an attachment and its parent document or between embedded documents and their parent) shall be preserved. Responsive non-privileged electronic documents attached to an e-mail or embedded within other electronic documents and hard-copy documents attached or appended to hard-copy documents must be mapped to their parent by the beginning Bates number and immediately follow that parent file in the sequence of the production. Email attachments and embedded files or links "BEGATTACH" and "ENDATTACH" fields listing the unique beginning Bates number of the parent documents and ending number of the last attachment must be populated for each child and parent document.

l. OCR. OCR software shall be set to the highest quality setting during processing.

m. <u>Deviation from Production Specifications</u>. If a particular document or category of documents warrant a different format, the Parties will cooperate in good faith to arrange for a mutually acceptable production format.

n. <u>Productions From Other Proceedings Pursuant to CMO 1.</u> The production of documents made by Defendants in other civil investigations, litigations, and/or administrative actions by federal (including Congressional), state, or local government entities pursuant to CMO 1 shall be made in the format in which they were previously produced, including any previously produced metadata, load files, and accompanying text files.

o. <u>Password Protection</u>. In the event any Document or ESI (or portion thereof) produced is password protected, the Producing Party shall make all reasonable efforts to provide the password needed to access the document or ESI.

p. <u>Use at Deposition</u>. Any document produced in native that a party identifies and/or marks as an exhibit at a deposition must include as part of that identification or exhibit the produced corresponding cover page in TIFF image format, endorsed with document's Bates Number and Confidentiality Designation, as described in Section 6(a), above.

## 7. PRODUCTION MEDIA

The Producing Party shall produce documents on readily accessible, computer or electronic media, including CD-ROM, DVD, external hard drive (with standard PC compatible interface), via secure FTP site, or such other readily accessible computer or electronic media as the Parties may agree (the "Production Media"). Each piece of Production Media shall be encrypted and assigned a production number or other unique

13

identifying label ("Production Volume Number") corresponding to the date of the production of documents on the Production Media as well as the sequence of the material in that production, and shall include (a) the name of the litigation and the case number; (b) the identity of the Producing Party; (c) the production date; (d) the Bates Number range of the materials contained on such Production Media item; and (e) the Production Volume Number of the Production Media. The Producing Party shall accompany all document productions with a transmittal cover letter identifying by Bates number the documents produced. If the Producing Party produces documents via secure FTP site, the Producing Party shall specify the date through which the materials will remain available via the secure FTP site and the Producing Party shall, within a reasonable time, accommodate requests from another Party or Parties that documents be reposted to the FTP site.

## 8. COST SHIFTING

The costs of production pursuant to this Order shall be borne by the Producing Party. However, in agreeing to this Order, no Party waives or relinquishes any right or interest it may have under the Federal Rules of Civil Procedure to seek cost shifting or apportionment for the costs of electronic discovery.

## 9. THIRD-PARTY ESI

a. A Party that issues a non-Party subpoena (the "Issuing Party") shall include a copy of this Order and the order concerning confidentiality agreed and/or entered in this litigation with the subpoena and state that the Parties in the litigation have requested that third-Parties produce documents in accordance with the specifications set forth herein.

b. The Issuing Party shall produce a copy to all other Parties of any

14

documents and ESI (including any metadata) obtained under subpoena to a non-Party.

      c.    If the non-Party production is not Bates-stamped, the Issuing Party will endorse the non-Party production with unique Bates prefixes and numbering scheme prior to reproducing them to all other Parties.

## 10. BEST EFFORTS COMPLIANCE AND DISPUTES

      The Parties agree to use their best efforts to comply with and resolve any differences concerning compliance with any provision/s of this Order. If a Producing Party cannot comply in a particular circumstance with this Order, such Party shall promptly inform the Receiving Party in writing why compliance with the Order is not reasonable or feasible. No Party may seek relief from the Court concerning compliance or non-compliance with the Order until it has met and conferred with the other Party in a good faith effort to resolve or narrow the area of disagreement.

## 11. MODIFICATION

This Order may be modified by a Stipulated Order of the Parties or by the Court for good cause shown.

      IT IS SO ORDERED.

Date:   5/15/18                   /s/Dan Aaron Polster

                                       Hon. Dan Aaron Polster
                                       United States District Judge

## Appendix A: ESI Metadata and Coding Fields

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| BegDoc | Bates number of the first page of the document. | All | Prefix-0000000001 |
| EndDoc | Bates number of the last page of the document. | All | Prefix-0000000002 |
| BegAttach | Bates number of the first page of the first document of the document family. | All | Prefix-0000000001 |
| EndAttach | Bates number of the last page of the last document of the document family. | All | Prefix-0000000004 |
| PageCount | Number of printed pages in the document. | All | 2 |
| Confidential | Confidentiality designation, if any, of the document | All | Confidential Highly Confidential |
| Custodian | Names of all custodians who possessed the document, including deduplicated values, in format: Lastname, Firstname. Where multiple individuals share first and last name, individuals should be distinguished by an initial which is kept constant between productions. For instance: Smith, John A. and Smith, John B. For documents from centralized repositories where custodian name(s) are unavailable, identifying source information should be provided. | All | Doe, John; Smith, John; Smith, Jane |
| Duplicate Custodian | Names of all other custodians who possessed the document. | ESI | |
| Duplicate Custodian File Name | The names of unproduced duplicate copies of files. | ESI | |
| Duplicate Custodians | The file path/directory path correlating to the unproduced | ESI | |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| Directory Path | duplicate copies of files. | | |
| Source | Source shall be used in connection with document obtained from third-Parties and identify the third-Party having provided the particular material. If the third-Party's production of documents included individual custodian information, such information shall also be included in the "CUSTODIAN" field. | | |
| Subject/E-Subject | Subject line of an e-mail. | E-mails | Text of the subject line |
| To | All recipients that were included on the "To" line of the e-mail. | E-mails | John.Doe@e-mail.com |
| From | The name and e-mail address of the sender of the e-mail. | E-mails | Jane.Doe@e-mail.com |
| CC | All recipients that were included on the "CC" line of the e-mail. | E-mails | Bill.Black@email.com |
| BCC | All recipients that were included on the "BCC" line of the e-mail. | E-mails | ceo-gs@email.com |
| DateSent | Date an e-mail was sent. | E-mails | 01/01/2015 |
| TimeSent | Time an e-mail was sent. | E-mails | 12:30:00 |
| DateModified | Date the document was last modified. | E-attachments; Electronic documents | 01/01/2015 |
| TimeModified | Time the document was last modified. | E-attachments; Electronic documents | 12:30:00 |
| DateCreated | Date the document was created. | E-attachments; Electronic documents | 01/01/2015 |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| TimeCreated | Time the document was created. | E-attachments; Electronic documents | 12:30:00 |
| Family Date | Date last modified or, for e-mails, sent date of the parent | Electronic documents; E-attachments | 01/01/2015 |
| Family Time | Time last modified or, for e-mails, sent time of the parent | Electronic documents; E-attachments | 12:30:00 |
| DateReceived | Date email was received. | E-mails | 01/01/2015 |
| TimeReceived | Time email was received. | E-mails | 12:30:00 |
| DateAccessed | Date document last accessed | Electronic documents; E-attachments | 01/01/2015 |
| Date Last Printed | Date the document was last printed. | E-attachments; Electronic documents | 01/01/2015 |
| Time Last Printed | Time the document was last printed. | E-attachments; Electronic documents | 12:30:00 |
| Date Last Saved | Date the document was last saved. | E-attachments; Electronic documents | 01/01/2015 |
| Importance | Level assigned by creator | E-mails | High |
| Conversation | E-mail conversation designation | E-mail | Re: Smith Summary |
| Conversation Index | | E-mail | |
| Title/E-Title | Title of document | E-attachments; Electronic documents | Smith Summary |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| Redaction | Basis for redactions in document. | E-attachments; Electronic documents | |
| FileName | File name of original document | Electronic documents; E-attachments | Microsoft Word 2007/2010 |
| File Type | Application type | Electronic documents; E-attachments | Word |
| File Size | Size of file | All | 40 gb |
| File Extension | The file extension of the document. | E-attachments; Electronic documents | .doc |
| NativeLink | Relative file path to each native file on the production media. | All documents produced in native format | \Natives\Document_12345.doc |
| Author | Document author/creater | E-attachments; Electronic documents | John Doe |
| Company | Party making the production | All | Company X |
| Title | Document Title | E-attachments; Electronic documents | Text of the title line |
| HASH | MD5 or SHA-1 Hash value | Electronic documents; E-attachments; E-mails | |
| Prod Volume | Production Volume | All | Defendant X Volume 1 |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| File Path | | | |
| AttachDocID | | Electronic documents; E-attachments; E-mails | |
| ATTACHNAME | | | |
| ATTACHRANGE | | | |
| FOREIGN LANGUAGE | | | |
| TIME ZONE PROCESSED | | | |
| E-LAST MODIFIED BY | | | |
| MESSAGE TYPE | | | |
| CALENDAR MEETING STOP/START | | | |
| RECORD TYPE | | | |
| HAS HIDDEN DATA | | | |
| HIDDEN COLUMNS | | | |
| HIDDEN NOTES | | | |
| HIDDEN ROWS | | | |
| HIDDEN SHEETS | | | |
| HIDDEN SHEETS COUNT | | | |
| HIDDEN SLIDES | | | |
| HIDDEN TEXT | | | |
| HIDDEN TRACK CHANGES | | | |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| HIDDEN VERY HIDDEN SHEETS | | | |
| HIDDEN VERY HIDDEN SHEETS COUNT | | | |
| HIDDEN WHITE TEXT | | | |
| HIDDEN WORKBOOK | | | |
| HIDDEN WORK BOOK WRITE PROTECTED | | | |
| MESSAGE ID | | | |
| NUMBER OF ATTACHMENTS | | | |
| ORIGINAL FOLDER PATH | | | |
| IS EMBEDDED | | | |
| TextPath | Relative file path to each extracted text/OCR text file on the production media. | All | \Text\Document_12345.txt |

# EXHIBIT 2

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION

 4              ~~~~~~~~~~~~~~~~~~~~
 5
 6    IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
      OPIATE LITIGATION
 7                                    Case No.
                                      17-md-2804
 8
                                      Judge Dan Aaron
 9    This Document Relates To:       Polster
10    City of Rochester v. Purdue
      Pharma, L.P.
11    No. 19-op-45853 (Track 12)
12    County of Webb, Texas v.
      Purdue Pharma, L.P.
13    No. 18-op-45175 (Track 15)
14
                ~~~~~~~~~~~~~~~~~~~~
15
16        Remote Status Conference Call Before
              Special Master David Cohen
17
18                 January 6, 2025
19                    2:00 p.m.
20
21
22
23
24
25           Renee L. Pellegrino, RPR
```

1   REMOTE APPEARANCES:

2

3      Peter H. Weinberger, Esq.

4      Joshua Agins, Esq.

5      Anthony Alden, Esq.

6

7           (Several participants not listed)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1              SPECIAL MASTER COHEN:  So the
2    reason that we're all on the phone together
3    today is that the PBMs have issued a non-party
4    subpoena to Wegmans, which is a food and
5    grocery store in the Rochester area that I
6    think the parties all agree is the largest
7    supplier of opioids to the Rochester area, and
8    Wegmans is not wanting to respond with
9    production of discovery requested by subpoena.
10   There are 12 categories, and the parties have
11   exchanged quite a bit of information, which
12   I've reviewed, and sent me position papers,
13   which I've reviewed.  I've tried to read
14   everything at least twice, but there's a lot
15   there.
16              So what we're going to do is
17   address, I think, the two critical elements to
18   the question of whether and the extent to
19   which Wegmans should produce to the PBMs the
20   subpoena requested information, and as the
21   parties have identified, those elements are
22   the relevance of the information sought and
23   the burden on Wegmans.  And I think that we
24   can probably do that for each of the 12
25   categories of documents that the PBMs request.

Page 4

```
 1            I will add that, as the parties
 2    know, I sent this morning a case which stands
 3    generally for the proposition that one of the
 4    ways the Court can address the burden question
 5    if the subpoenaed party asserts that the
 6    burden is excessive is to have some of that
 7    burden relieved by the requesting party paying
 8    for the production, and so as we go through
 9    these, I want to hear from the parties on how
10    that works, whether that can work here, the
11    extent to which we can use that tool.
12            And rather than go in numerical
13    order, I think I want to touch on some of what
14    I consider may be the easier categories first,
15    and -- I'm just looking at the subpoena.  One
16    second.  So I guess I want to start with what
17    I think might be the simplest, which is
18    category 12, and this is where the PBMs ask
19    Wegmans to produce contracts and agreements
20    that they have with any manufacturer or
21    distributor regarding any of the opioid drugs.
22    And I assume, given what I've read, that
23    Wegmans may not have any contracts with
24    manufacturers but certainly does with
25    distributors.  I don't know that.  I'm
```

Page 5

1   guessing it.  And my guess also is that as
2   opposed to, for example, dispensing data, that
3   the burden on locating and producing those
4   contracts is much, much lower on Wegmans, but
5   nonetheless I'd like to hear, I guess, first
6   from the PBMs, and I'll probably ask the PBMs
7   to go first every time, to explain to me the
8   relevance of those documents, and then you
9   could touch on burden, and then I'll hear from
10  Wegmans.
11          So, again, please identify
12  yourself for the record, and I'd like to hear
13  from the PBMs.
14          MR. ALDEN:  Good afternoon,
15  Special Master Cohen.  Anthony Alden for the
16  Express Scripts Defendants.  And Happy New
17  Year to everyone.
18          With respect to request number 12,
19  I think we tried to lay out the relevance in
20  our December 13 letter, which is essentially
21  that one of the Plaintiffs' core allegations
22  in the case is that the PBM Defendants were
23  motivated to overlook, if you like, alleged
24  excessive opioid use in prescriptions as a
25  result of contractually provided financial

Page 6

1    incentives between the manufacturers.  As part
2    of our superceding causation and apportionment
3    defenses, we think we're entitled to know
4    whether the largest dispenser of opioids in
5    Rochester was subject to some alleged
6    incentives, and those contracts would go to
7    that question.  And, you know, obviously if
8    Wegmans was receiving rebates and financial
9    incentives with respect to the dispensing of
10   opioids, that would feed into our defense that
11   it is indeed -- you know, that Wegmans was
12   that superseding cause or liability should be
13   apportioned to Wegmans.  So that's the reason
14   that we'd like to have these agreements.
15              SPECIAL MASTER COHEN:  Before I
16   hear from Wegmans, let me ask you, so at least
17   with respect to public nuisance -- and I think
18   this -- what I'm about to say applies to many,
19   if not all, of the categories.  With respect
20   to public nuisance, assuming -- and I think
21   it's -- I'm not sure how good an assumption it
22   is, but assuming that New York law is similar
23   to Ohio law and that New York jury
24   instructions would be similar to Ohio jury
25   instructions on public nuisance -- and I

Page 7

1    understand that that's up on appeal in New
2    York, but nonetheless the jury instructions in
3    the MDL trial talked about -- I don't have the
4    exact words in front of me, but being a
5    substantial factor that contributes to the
6    public nuisance.  And there was a lot of
7    discussion in that trial about the extent to
8    which it mattered whether other folks
9    contributed to the public nuisance as far as
10   liability, and indeed even as to damages.  If
11   someone is a substantial factor that
12   contributes to a public nuisance, they can be
13   liable and they can be liable for all of the
14   nuisance, for abating all of that nuisance,
15   even if there are other actors who also
16   substantially contributed.
17           If that's true -- and I'm not
18   certain it is in New York, but let's assume
19   for a moment it is.  If that's true, then how
20   does what you're asking for become relevant?
21   It seems to me it isn't relevant.
22           MR. ALDEN:  Well, I would say we
23   don't think it's true, but regardless of
24   whether it's true, we're facing not just a
25   public nuisance claim, we're facing RICO

Page 8

1  claims, and it's certainly relevant as to
2  those claims whether the Plaintiffs -- it's
3  relevant to whether Plaintiffs can establish
4  proximate causation.
5          SPECIAL MASTER COHEN:  Okay.  May
6  I hear from Wegmans?
7          MR. AGINS:  Thank you, Special
8  Master Cohen.  My name is Josh Agins.  I'm
9  with the law firm Hodgson Russ in Rochester,
10 New York and I represent Wegmans Food Markets,
11 Inc.
12          I think you just put your finger
13 on what we view as the dispositive threshold
14 issue of relevance.  And as we have been
15 writing now for several months, by and large
16 the requests are not relevant because there is
17 no superseding cause defense for a public
18 nuisance claim in New York.
19          Before we even get to that issue,
20 there's the question of whether Wegmans'
21 dispensing conduct even constitutes a public
22 nuisance.  And as you know from our papers, we
23 have an appeal pending to the New York State
24 appellate division on that very issue.  No
25 appellate court in New York has ruled that

Page 9

1   dispensing opioids or other similar conduct

2   can constitute a public nuisance.  To the

3   contrary, the appellate division has held in a

4   case called Sturm that --

5             SPECIAL MASTER COHEN:  I assure

6   you you don't need to repeat anything in your

7   papers.  I promise.  I've read it.  But let me

8   jump off.  So let's say you're correct.  Let's

9   say that the appellate courts in New York

10  conclude that you are correct and there is no

11  public nuisance claim for dispensing opioids,

12  you know -- and I don't know what that would

13  do to the Plaintiffs' case in the MDL.  But

14  let's say that that happens.  As counsel

15  opposite points out, there's still other

16  claims, and it's certain that for those other

17  claims there would be an apportionment of

18  liability in some way.

19            MR. AGINS:  That's a negligence --

20            SPECIAL MASTER COHEN:  Go ahead.

21            MR. AGINS:  I'm sorry to

22  interrupt.  That's a negligence claim.  I

23  think the answer would be no.  Under Article

24  16 under New York law there would not be

25  apportionment.  There would be joint and

Page 10

1   several liability for economic harm.  There
2   would not be an apportionment of any sort
3   under New York law.  And even if there were
4   some tangential argument to apportionment,
5   then the question becomes what is that
6   tangential relevance and how does it weigh
7   against the immense burden.
8              Now, I know we're not getting to
9   burden yet, and I don't think we get past
10  relevance, but under New York law the PBMs
11  have not articulated why there would be an
12  apportionment, they have not cited any
13  authority for that either in their prior
14  submissions or in the e-mail from two hours
15  ago.  And, you know, our position on this --
16  and I know, Special Master Cohen, we're going
17  to go through these, but our position on this
18  would be that if apportionment as a matter of
19  New York law is going to be the justification
20  that opens the door to this type of discovery,
21  that is a critical issue under New York law
22  and that should be briefed fully and decided
23  on.
24             MR. ALDEN:  Special Master, this
25  is Anthony Alden from Express Scripts, for the

Page 11

1    Express Scripts Defendants.

2              I don't think there's any argument

3    or can be any dispute with respect to

4    proximate cause, though.  I mean, that is an

5    element of the remaining claims, and so, you

6    know, even -- you know, I am not prepared on

7    this call to cite you case law on

8    apportionment under New York law.  Regardless,

9    I don't think there can be a dispute that

10   proximate cause is an element of the remaining

11   claims and we are entitled to dispute

12   proximate cause at trial based on third-party

13   evidence from the widest distributor of

14   opioids in Rochester.

15             MR. AGINS:  Let me say two things

16   about that.

17             And, again, this is Josh Agins for

18   Wegmans.

19             Number one, let me speak a little

20   bit to this notion that Wegmans is a large

21   dispenser of opioids in Rochester, New York,

22   because I think it would be helpful in this

23   context to have some context for that.

24             Wegmans is an integral part of the

25   community of Rochester, New York and has been

Page 12

1    for a century.  It's the third largest

2    employer.  It's one of the most longstanding

3    successful companies in this city.

4              SPECIAL MASTER COHEN:  Again --

5              (Simultaneous speaking.)

6              SPECIAL MASTER COHEN:  -- CVS and

7    Walgreens and Walmart has done and it's off

8    topic.  I'm telling you it's not helpful to

9    me, especially since you wrote almost exactly

10   those same words in your letter.

11             MR. AGINS:  And to the point of

12   proximate cause, you know, the PBMs have in

13   their correspondence mentioned that as a

14   concept, and they say, well, we're not

15   prepared to cite any case law.  We've cited

16   case law to the contrary.  Unless they're

17   going to take the position that the

18   superseding cause, meaning Wegmans' conduct,

19   completely cuts off their liability, in order

20   to do that analysis, you would have to look at

21   the allegations in the complaint, the City of

22   Rochester's complaint against the PBMs.  And

23   they want to do everything except talk about

24   the allegations in that complaint.

25             The core allegations against the

Page 13

1   PBMs is that they created the supply.  It's a
2   marketing-based allegation; their
3   collaboration allegedly with Purdue and other
4   manufacturers creating demand; their alleged
5   efforts to proliferate opioids to maintain
6   their rebate revenue, their decisions with
7   respect to prior authorization and formularies
8   and all the rest.  That's the nature of the
9   allegations.  Wegmans' dispensing conduct has
10  nothing to do with those allegations.  It
11  can't go to the issue of proximate cause.  And
12  they have never wanted to have a meaningful
13  discussion about those allegations.
14          SPECIAL MASTER COHEN:  I agree
15  with you that those allegations are very much
16  a part of the complaint, but there are also
17  allegations about the mail order pharmacy
18  aspect of their business.
19          I'm sorry.  Did you want to say
20  something?
21          MR. ALDEN:  I'm sorry.  I didn't
22  mean to interrupt.  This is Anthony Alden from
23  Quinn Emanuel for Express Scripts.
24          I just wanted to state a point,
25  which is that what Mr. Agins said is simply

Page 14

1  not true.  I mean, there are paragraphs and

2  paragraphs in the complaint about the mail

3  order pharmacies as well as, you know, the

4  PBMs' alleged failure to, you know, do

5  anything in the face of prescriptions by

6  third-party pharmacies, which would include

7  Wegmans.  I mean, we're facing red flag

8  analyses that we need to respond to, and, you

9  know, we need the documents and data to be

10  able to respond to those analyses, and the

11  data that Wegmans and documents that Wegmans

12  produces is critical because they're the ones

13  who dispensed a large proportion of the

14  opioids in Rochester.

15          SPECIAL MASTER COHEN:  Let me turn

16  to burden and ask Wegmans to explain to me

17  what the burden would be if the Court were to

18  comply with the subpoena request for category

19  number 12.

20          MR. AGINS:  So putting aside the

21  objection to relevance, I think if number

22  12 -- there are a couple of words in number 12

23  that I think throw this off a little bit, but

24  if number 12 is limited to contracts with

25  distributors, you know, subject to whatever

Page 15

1   third-party notice requirements or
2   confidentiality requirements may be in those
3   contracts, I would agree with the sentiment
4   expressed earlier. As I sit here right now, I
5   don't know that it's particularly burdensome
6   for us to pull those contracts. You know, I
7   take issue with some of the other language in
8   paragraph 12 because, frankly, I'm not sure
9   what it's referring to, you know, or other
10  documents, for example. But if we're talking
11  about contracts with distributors, that is a
12  discrete, ascertainable, identifiable thing
13  that I would not argue is particularly
14  burdensome.
15          SPECIAL MASTER COHEN: Do you mean
16  to be saying, the way you worded that, that
17  you would -- you said distributors. You
18  didn't include manufacturers. I'm trying to
19  understand if you were doing shorthand or you
20  are being purposefully uninclusive of any
21  manufacturer contracts.
22          MR. AGINS: That was not -- I was
23  not trying to intentionally exclude something.
24  My understanding is that the contracts are
25  with distributors, but my answer would be the

Page 16

1    same whether it's distributors or

2    manufacturers.

3                SPECIAL MASTER COHEN:  And my

4    understanding is that in the back and forth,

5    although it didn't lead to very much

6    agreement, there was an agreement that this

7    would be limited and all of these would be

8    limited to, quote, unquote, the drug scope,

9    and it wouldn't include any other opioids,

10   that that was true for all of them.

11               All right.  I think I've heard

12   enough on number 12.

13               Let me jump to -- and I assure you

14   that the ones I'm picking are not necessarily

15   the easy ones.  They're just kind of the way

16   I'm thinking about things.  So number 2 talks

17   about documents that Wegmans and its

18   pharmacists used or considered that it

19   received -- they received from the PBMs, you

20   know, at the point of sale or any other time

21   when they were dispensing opioids.  And I'm

22   going to ask the PBMs to respond to this.

23               So if I understand what you're

24   asking for, you're saying we sent Wegmans and

25   other pharmacies communications, documents, et

Page 17

1    cetera that we believe they should have
2    considered, they were supposed to consider
3    when dispensing opioids, and they may have
4    been, you know, broad policy statements or
5    they may have been patient-specific
6    information.  But whatever.  We sent them a
7    bunch of stuff.  And we want to know now to
8    what extent did you consider the stuff that we
9    sent you when we were discussing, again,
10   whether it was, you know, a broad policy
11   statement or patient-specific information.
12           But it seems to me that the PBMs,
13   A, know what they sent, or should; and, B, can
14   pretty easily infer what Wegmans did by
15   looking at what was dispensed.  So, in other
16   words, if a patient covered by the PBMs came
17   in and got a prescription -- with a
18   prescription I should say, and Wegmans filled
19   it, well, you know that they filled it.  You
20   know that they filled it, let's say, despite
21   whatever it is you sent them.  So I'm not sure
22   why you need it.
23           MR. ALDEN:  This is Anthony Alden
24   again with the Express Scripts Defendants, and
25   I'll let the Optum Defendants weigh in if they

Page 18

1   want to.
2               The reason we need it is because
3   we don't know -- we need to know what
4   decisions Wegmans made.
5               For example, let's say a
6   point-of-sale communication came from the PBMs
7   or a PBM.  First of all, not even necessarily
8   the Defendant PBMs, but let's say it came from
9   a third-party PBM, and said, you know, we're
10  flagging this prescription because it comes
11  from a patient who has had two refills within
12  the past 30 days, right.  Wegmans then goes
13  ahead and fills the prescription.  It may be
14  that Wegmans did an investigation and
15  determined that it was perfectly appropriate
16  to fill that prescription.  The patient may
17  have -- or the doctor may have said, you know
18  what, yes, this patient is having an excessive
19  amount of back pain resulting from surgery, we
20  are going to -- you should go ahead and fill
21  the prescription.  On the other hand, Wegmans
22  may have done nothing and simply filled the
23  prescription, right.  Those are two very
24  different scenarios, the first of which would
25  potentially be defense to a red flag -- to a

Page 19

1   red flag accusation that is being made by the

2   Plaintiffs concerning that prescription.  The

3   second would not necessarily.  And so it is

4   important for us to know what action, if any,

5   Wegmans took prior to dispensing that

6   prescription.  That is information that is

7   used by our experts in the red flag analysis

8   to respond to Plaintiffs' allegations.

9               SPECIAL MASTER COHEN:  Well, the

10  red flag analysis allegations are made against

11  your mail order pharmacy practices, not -- as

12  I understand the allegations, not, you know,

13  your activity as an owner of data or as a PBM.

14              MR. WEINBERGER:  Can I interrupt

15  for a second?  This is Peter Weinberger for

16  the PEC.

17              That's not a correct statement,

18  Special Master Cohen.

19              SPECIAL MASTER COHEN:  Okay.

20              MR. WEINBERGER:  We are --

21              (Simultaneous speaking.)

22              MR. WEINBERGER:  -- a red flag

23  analysis.  The point-of-sale analysis that

24  should -- that should have been done by the

25  PBMs at the time that they are contacted for

1   purposes of payment approval, there is a red

2   flag analysis that we provided with respect to

3   that.

4               SPECIAL MASTER COHEN:  Okay.

5   Thank you for clarifying that.

6               Wegmans, do you want to respond?

7               MR. AGINS:  Thank you.  This is

8   Josh Agins again for Wegmans.

9               Our understanding all along -- and

10  we've asked questions about this of the

11  PBMs -- has been that they have all of the

12  point-of-sale information.

13              And the question that Mr. Alden

14  articulated a few moments ago about, you know,

15  what did the pharmacist do with that

16  prescription, was it filled and was it a

17  prescriber called or what was the rationale,

18  all of that is recorded in their POS system,

19  all of it.  And, in fact, if you look at the

20  prescriber -- the pharmacist manual, the PBM

21  pharmacist manual, it lays out chapter and

22  verse all of the ways that the dispensing

23  pharmacist interacts with that POS system, and

24  all of the actions taken, and even the

25  rationale for those actions is recorded in

Page 21

1    that system.  The claim is not being submitted

2    to the PBM and they won't review it or approve

3    it or pay for it unless that claim is

4    complete.

5              So our understanding all along has

6    been that they have all of that POS

7    information, and we've asked them repeatedly

8    to show us something that explains why they

9    wouldn't have it or be more concrete about

10   what they don't have.  But our understanding

11   is they've got all of it.  And, in fact, in

12   the CMO documentation for the second

13   bellwether in New York, there's an indication

14   there that they've produced all of this data

15   already and it's already being analyzed by the

16   Plaintiffs.  So our view was that was

17   confirmation that they've got all of the

18   information for point of sale that could be

19   relevant to number 2.

20             And then there's this other

21   concept I think built into number 2 about

22   other communications outside of the

23   point-of-sale system.  And we asked the same

24   question that you asked a moment ago, Special

25   Master Cohen, what are those communications,

1   you know, and can you identify them for us.

2           So we don't see what more there is

3   here on number 2.

4           MR. ALDEN:  Special Master, may I

5   respond to that briefly?

6           SPECIAL MASTER COHEN:  Go ahead.

7           MR. ALDEN:  We don't -- I mean,

8   the -- this is Anthony Alden again.  The

9   notion that the PBMs have Wegmans' rationale

10  for dispensing opioids is wrong.  We don't

11  have it.  If Wegmans, for example, has notes

12  as to why a pharmacist overrode a red flag, we

13  don't have that, they have it, and we need

14  that data to be able to properly respond to

15  Plaintiffs' allegations.

16          Now, if they want to tell us they

17  don't maintain any data, any data responding

18  to point-of-sale communications, that's one

19  thing, but that's not what they've said, and

20  they have data that shows their internal

21  responses to our red flag communications that

22  we don't have and they need to produce it.

23  Again, it's important to us to be able to

24  respond.

25          If they have policies, procedures

```
 1   or manuals -- again, I don't know if they do
 2   or not.  That's something that they know.  I
 3   don't know that.  And so we need those
 4   policies, procedures and manuals that talk
 5   about how they should respond to point-of-sale
 6   communications, which I would assume, in terms
 7   of those documents, would not be burdensome to
 8   collect.  I assume they would be centrally
 9   maintained.
10           SPECIAL MASTER COHEN:  I wanted to
11   turn to that briefly and ask you, Josh, about
12   the burden of collecting and producing
13   information that is the subject of number 2,
14   which may be different depending upon what
15   we're talking about.  If they're centrally --
16   you know, if they're centralized documents,
17   pharmacist manuals, whatever it is that you
18   may have, that would, I assume, be different
19   than data entered into a system by a
20   pharmacist when a pharmacist is filling a
21   script regarding what red flag, you know,
22   analysis they undertook, what they decided and
23   why.
24           MR. AGINS:  You know, I'm not in a
25   position -- and I'm looking at number 2.  I'm
```

Page 24

1    not in a position to talk in great detail
2    about policies because the dispenser handbook
3    that is part of our contracts with the PBMs
4    lay out in great detail the steps that a
5    pharmacist takes to submit a claim to a PBM,
6    these two PBMs.  Those documents certainly
7    would not be burdensome to collect, but I
8    suspect the PBMs have those.
9              So beyond that, I don't -- I don't
10   see relevance to other policies of Wegmans
11   pharmacy that go beyond the claims they submit
12   to the PBMs because ultimately what number 2
13   seems to be talking about is Wegmans'
14   interactions with the PBMs.
15             SPECIAL MASTER COHEN:  I'm not
16   sure it is that limited.  I think that what
17   they're going after is Wegmans' activity
18   vis-a-vis filling scripts for patients
19   regardless of whether those are PBM-covered
20   patients or not.
21             Are you saying that Wegmans
22   wouldn't have any manuals or documents like
23   that except those received by the PBMs --
24   excuse me, received from the PBMs?
25             MR. AGINS:  I am not saying that,

```
 1   but what I am saying is I'm not in a position
 2   to speak about that because my understanding
 3   and interpretation of number 2 always has
 4   been, and I think the parties' communications
 5   have confirmed this, that number 2 is about
 6   Wegmans' interactions with the PBMs.  That has
 7   been the focus of the discussion.  So I'm not
 8   saying there's not policies beyond that, but
 9   I'm not in a position to talk about them.
10             SPECIAL MASTER COHEN:  Upon
11   looking more carefully at number 2, I think I
12   agree with you.
13             Okay.  Let me jump to number 5,
14   and on this one the parties were talking past
15   each other a bit, not unusual, not surprising,
16   but this one especially I just didn't
17   understand why there was any argument.  This
18   one asks about suspicious orders.
19             My understanding from what Wegmans
20   wrote is we're not a distributor, we have no
21   suspicious order obligation, we don't know
22   anything about suspicious orders, we ain't got
23   any, and it would be pretty simple to say
24   that, but somehow the communications back and
25   forth -- like I said, people kept talking past
```

Page 26

```
 1    each other, PBMs wanted something more,
 2    something more clear -- I'm not sure what they
 3    wanted, actually -- and/or Wegmans wasn't
 4    clear enough about it not having anything
 5    responsive to that request.
 6                 So I'm going to start with
 7    Wegmans.  It's kind of a yes-or-no question.
 8    If yes, it might be, you know, yes comma but
 9    or yes comma and.  But just yes or no, do you
10    have any suspicious orders that you know
11    about?
12                 MR. AGINS:  The answer is no, and
13    if we weren't clear -- I wish we had
14    articulated it as clearly as you just did,
15    because for the reasons you just said, we're
16    not a distributor, we don't receive orders or
17    have suspicious orders, right, so we have
18    always taken the position that we have nothing
19    with respect to paragraph 5.
20                 SPECIAL MASTER COHEN:  All right.
21    Let me ask the PBMs.  Are we good on that?  Do
22    you need something more than that?  It sounds
23    pretty clean to me.
24                 MR. ALDEN:  Yeah.  This is Anthony
25    Alden again on behalf of Express Scripts.
```

Page 27

1           I think the only clarification we
2    would want is just -- and, again, I don't need
3    to push this hard.  If the answer is the same,
4    the answer is the same, which is, you know, we
5    wanted to make sure that the way that they
6    were defining suspicious order was not nearly
7    the statutory definition, that any form of
8    notification that an order -- that a
9    prescription was suspicious -- if they had
10   some kind of an internal system for flagging,
11   you know, prescriptions that they shouldn't be
12   making, for example, or, you know, tracked
13   patients that had received -- that they
14   believe were receiving an unusual amount of
15   opioids, things like that, we would want that
16   information.  Now, if they don't have any of
17   that, great.  That ends the inquiry.  We just
18   wanted to make sure that we weren't defining
19   the words "suspicious orders" too narrowly.
20           SPECIAL MASTER COHEN:  Well, I
21   mean, you used suspicious orders with capital
22   S capital O, and that is a defined term that's
23   been understood to mean something very certain
24   and specific throughout this litigation, and
25   it sounds to me like you're trying to expand

Page 28

1  the meaning of that.
2                MR. ALDEN:  If I can respond to
3  that.
4                I don't think that's true.  The
5  definition that we used in the subpoena,
6  subsection 3, is what you define as a
7  suspicious order for purposes of your work.
8  So if they tell us, you know, that they don't
9  do that, they don't track suspicious orders,
10  consider it, then that's fine, I don't need to
11  push it.  I just wanted to make sure that that
12  aspect of the definition was included.
13                SPECIAL MASTER COHEN:  All right.
14  I think that will be simple.
15                Number 6, it occurs to me that,
16  again, same story.  Wegmans essentially says
17  we don't have access to ARCOS data, we didn't
18  do any analyses of ARCOS data.  What more is
19  there to talk about?
20                So let me start again by asking
21  Wegmans, is it that simple?
22                MR. AGINS:  It is that simple.  We
23  don't have access to ARCOS data.  And I will
24  point out in fairness --
25                SPECIAL MASTER COHEN:  That's all

Page 29

1    I wanted to hear.  That's all I wanted to
2    hear.
3              So PBMs, despite some sort of
4    caveat that Josh was just going to add, they
5    don't have access to ARCOS data.  What more do
6    you need to know?
7              MR. ALDEN:  What about -- this is
8    again Anthony Alden.  What about data from the
9    New York PMP?
10             SPECIAL MASTER COHEN:  I'll let
11   you answer that, Josh.
12             MR. AGINS:  Yeah.  No.  Thank you.
13   And that was -- I was just going to point out
14   that it does contain the reference to the PMP.
15   The PMP, to the extent pharmacists consult the
16   PMP, the documentation of that, if it's not in
17   the PBM's POS system -- and in many instances
18   it would be if it's a PBM prescription -- it
19   would be script-level information, drilling
20   down into a prescription to see whether
21   there's an annotation on it, and that gets
22   into issues of protected health information,
23   immense burden of collecting script-level
24   information, and that -- so that's an entirely
25   separate discussion.

Page 30

```
 1              SPECIAL MASTER COHEN:  So let's
 2    jump into the hard one, which is number 1,
 3    which is data.
 4              Actually, before we do that, let
 5    me just ask another one that I think is quick.
 6    So is the analysis of category number 4, which
 7    asks for communications that Wegmans had with
 8    its pharmacists, any -- substantially
 9    different than the analysis of number 2?  I
10    mean, for both of them it's like, okay, what
11    did you tell your pharmacists and what did
12    they do with it.  And number 2 had to do with
13    information received from the PBMs.  Number 4
14    has to do with really almost any -- everything
15    else, information that Wegmans
16    (unintelligible) from any other source or
17    created to its pharmacist.  So just from a
18    question of relevance and burden, which is
19    what we've been talking about, do you have any
20    instruction that you would give me that the
21    analysis for number 2 and number 4 are
22    different?
23              MR. ALDEN:  This is Anthony Alden
24    again for the Express Scripts Defendants.
25              The answer to that question is
```

Page 31

```
 1    they are slightly different.  Number 2 goes to
 2    responses to communications both at the
 3    pharmacy and corporate level.  Number 4 goes
 4    to directed or instruction given to -- by
 5    Wegmans to its employees concerning opioids
 6    and documents within the drug scope.
 7              So what we're looking for in
 8    number 4 -- and, again, I think we've tried to
 9    make clear, and I'll make it clear again -- I
10    am not looking -- I don't believe we are
11    looking for every e-mail ever sent to a
12    Wegmans employee concerning an opioid
13    prescription.  What we would be looking for
14    are more, you know, whether it's Rochester
15    storewide or a company-wide directive or
16    instruction or alert as outlined in the
17    subpoena concerning dispensing opioids that
18    would have applied to dispensing opioids in
19    Rochester.
20              And so, again, if they undertake a
21    reasonable search and say we never issued any
22    such guidance or directives, you know, to our
23    employees, then that's the answer, but, you
24    know, we think that they would be capable of
25    undertaking a reasonable search.
```

Page 32

```
 1            I just do want to add on -- I
 2   apologize -- on request number 6 that that
 3   doesn't just go to use of ARCOS or PMP data,
 4   but also communications with those agencies.
 5   I just didn't want that to get lost, but I
 6   realize we're now on your question as to
 7   number 4, and I hope that explains the
 8   distinction.
 9            SPECIAL MASTER COHEN:  Anthony,
10   explain this to me as succinctly as you can.
11   Let's say that I ruled you get everything you
12   want, okay, that Wegmans has to, you know,
13   really drop its kimono and give you everything
14   that you've asked for, all of the
15   communications it's received from these other
16   entities, what it did, its prescription data,
17   the works.  Now it's time for trial.  You
18   know, how do you use it, assuming that it
19   tells you everything you hope it tells you,
20   right?  In other words, it's really kind of
21   best case.  What does that look like at trial?
22   And, obviously, I'm asking a very hypothetical
23   question.  I have no reason to believe that
24   that's how I would rule or that the data would
25   be so wonderful for you, that the information
```

Page 33

1   would be so wonderful for you.  I'm not there

2   at all, but I just want to understand what it

3   is -- kind of why you want all this best case.

4           MR. ALDEN:  Well, look -- again,

5   Anthony Alden speaking -- I don't -- I am not

6   really a trial lawyer so please don't take

7   what I'm saying as the final word on this,

8   buy, you know, for example, as I mentioned

9   before, on the dispensing data and the

10  point-of-sale communication data, that is data

11  that is going to go to our experts who are

12  going to build it into a response to

13  Plaintiffs' red flag analysis.  And I expect,

14  for example, that if -- if the results show

15  that, and you know, bear this out that -- the

16  expert would make some kind of a presentation

17  that said we've analyzed Plaintiffs' red flag

18  presentation, we've analyzed (unintelligible)

19  data, we've analyzed the third-party data, and

20  as to Wegmans we have determined that -- you

21  know, as to Plaintiffs' red flag analysis we

22  have determined that 30 percent of the

23  prescriptions identified by Plaintiffs were

24  issued by Wegmans.  We've also determined that

25  as to whatever, 29 percent of those

Page 34

1   prescriptions -- 75 percent of those

2   prescriptions, there was a point-of-sale

3   communication warning Wegmans as to the

4   prescription of the opioids; and we have

5   determined, based on our analysis of Wegmans'

6   data, that as to 80 percent of those red flag

7   analysis, there was no subsequent follow-up at

8   all.  That would be an example of how we would

9   use those particular sets of data.  And --

10          SPECIAL MASTER COHEN:  That didn't

11  take me all the way to the end.  Comma and

12  therefore what?  Comma and therefore we should

13  be held liable?  Comma and therefore Wegmans

14  is responsible for X percent?

15          MR. ALDEN:  Both.  And, therefore,

16  Plaintiffs have not established proximate

17  cause as to X percentage of prescriptions that

18  they've identified, and that the liability

19  should be apportioned to Wegmans.

20          SPECIAL MASTER COHEN:  Okay.  Let

21  me go to number 1.  It's the hard one.  And

22  part of the reason it's the hard one is

23  because I think it's obvious to everybody on

24  the call that the burden question is more

25  difficult with respect to production of data.

Page 35

1  I'm sure that even the PBMs would be first in

2  line if I said, you know, is it expensive and

3  hard to produce data -- the PBMs would say

4  hell yes.  So -- and this is in part why I

5  sent the case law that stands for the

6  proposition that sometimes that issue, the

7  burden issue, can be addressed by shift in

8  cost.

9         So, again, here's part of what

10  occurs to me.  At least some -- in fact, maybe

11  most of the data that the PBMs are asking for

12  they already have, which is to say for every

13  patient that's covered by the PBMs -- and

14  that's two out of three of the big boys -- not

15  Caremark, but it's got to be a substantial

16  fraction -- for all of those patients, the

17  PBMs know what the prescriptions are already.

18  They helped determine whether there was

19  coverage for those.  And I've said many times,

20  look, it is rarely the case that someone is

21  going to get every bit of what they want.

22  What they're entitled to get is enough to

23  understand the lay of the land.

24         And so with regard to this data, I

25  guess my central question is, for the PBMs,

1   why don't you already have enough data to
2   understand it just by virtue of what you
3   already have part 1 and part 2?  How do you
4   respond to the burden question, which I think
5   in the case of category 1 is, you know, the
6   most easily made out by Wegmans.
7            MR. ALDEN:  This is Anthony Alden
8   again for the Express Scripts Defendants.
9            So we only have data with respect
10  to our individual PBM customers.  We do not
11  have data that pertains to if they're not a
12  customer.  We do not have data, for example,
13  on cash purchases.  We would not have data on
14  state-funded programs.  And so there is an
15  allegation -- the central allegation, the
16  predicate allegation in this case is that
17  there was an opioid epidemic.  Wegmans was
18  responsible we think for 30 percent of the
19  prescriptions of opioids.  We need to see what
20  that looked like because we can't tell what
21  the full picture is just from our own data.
22  And, look, if -- I'm happy to have
23  conversations with Wegmans about the burden
24  involved in producing that data.  Right now
25  all I have is a few lines from an attorney

Page 37

```
 1    letter.  I'm happy to have a conversation
 2    about it.  I'm happy to have a conversation
 3    about ways we could potentially try to
 4    minimize it, but there is data that we don't
 5    have, and we think that we're entitled --
 6    given the core allegations of the case, that
 7    there is an epidemic, we're entitled to see
 8    the prescriptions of opioids in the city.
 9                SPECIAL MASTER COHEN:  Tell me a
10    little bit more about -- and you may not know
11    more about an e-mail that I received just
12    prior to this tele-con suggesting that, for
13    settlement purposes, you believe Wegmans has
14    produced this data, that it's not true that
15    they have never produced data in connection
16    with opioid litigation.
17                MR. ALDEN:  I would actually, you
18    know, respectfully refer that to Wegmans'
19    counsel.  All I know is what was in the
20    letter, which seemed to be, from my reading of
21    the letter, that Wegmans had been ordered to
22    produce data for mediation purposes in New
23    York in at least one New York case.  The scope
24    of that I don't know.
25                SPECIAL MASTER COHEN:  All right.
```

```
                                            Page 38
 1    Let me ask Wegmans' counsel, Josh, to respond.
 2              MR. AGINS:  Josh Agins for
 3    Wegmans.
 4              I'll pick up on that last point.
 5    I appreciate the opportunity to clarify that.
 6              The phrase "dispensing data" in
 7    that letter is probably, unfortunately, a bit
 8    of a misnomer.  In the Akin's pharmacy case,
 9    which was commenced in Yates County and
10    pending in front of Justice Koba, the Court
11    conducted some settlement negotiations with
12    all of the parties and directed all of the
13    pharmacy Defendants to produce some, quote,
14    unquote, dispensing data.  None of that had
15    anything to do with what the PBMs are asking
16    us to produce.  The dispensing data that was
17    produced for settlement purposes in the Akin's
18    case was total MME numbers by plaintiff,
19    meaning what is the total MME dispensed by
20    each pharmacy in each of the plaintiff
21    municipalities, so City of Rochester, how many
22    MMEs did Wegmans and each of the other
23    pharmacies produce for the drugs that were at
24    issue in the Yates County case, which is a
25    narrower set of drugs than the PBMs are asking
```

Page 39

```
 1    us for.  So it's entirely apples and oranges,
 2    and I suspect that probably clears it up.
 3              As for the bigger issue, this is
 4    another one where our position would be if
 5    these general arguments about apportionment or
 6    superseding cause are going to justify this
 7    type of non-party discovery, we really would
 8    like to have that issue briefed thoroughly,
 9    because it is a huge burden, and I recognize
10    that we have not, for example, provided the
11    PBMs with a lengthy, detailed, factual
12    declaration to outline that burden, but, quite
13    frankly, they know the burden.  It is a
14    tremendous burden.
15              And I will point out that the
16    limited data that was produced, these total
17    MME counts that was produced in the Akins
18    case, took us months to pull in a manner that
19    we felt confident was reliable for purposes of
20    producing it to the plaintiffs in that
21    context.  And that took months.  And that was
22    raw numbers.  It wasn't any of the dispensing
23    fields that the PBMs are requesting here.
24              SPECIAL MASTER COHEN:  Are the
25    same plaintiffs --
```

Page 40

```
 1              (Simultaneous speaking.)
 2              SPECIAL MASTER COHEN:  One second,
 3   Josh.
 4              Are the same plaintiffs as are --
 5   I guess I should put it this way:  Is
 6   Rochester suing you in state court also?
 7              MR. AGINS:  The City of
 8   Rochester --
 9              (Simultaneous speaking.)
10              SPECIAL MASTER COHEN:  Yeah.  Go
11   ahead.
12              MR. AGINS:  Sorry to interrupt.
13              The short answer is yes.  The City
14   of Rochester sued Wegmans in that one case
15   that I referred to earlier, the Akin's case;
16   however, the plaintiffs in that case are in
17   the process of trying to discontinue that
18   case, including the City of Rochester.
19              SPECIAL MASTER COHEN:  Why do you
20   suppose that is, to avoid the appellate issue?
21              MR. AGINS:  Well, I'd be
22   speculating a little bit, but I -- frankly, we
23   feel like that's an issue that should be
24   decided by the appellate division.
25              SPECIAL MASTER COHEN:  Right.  I
```

Page 41

1   think I remember you saying that there was an
2   offer to dismiss without prejudice and you
3   said no thank you.  But that's who we're
4   talking about?
5               MR. AGINS:  Yes.  The City of
6   Rochester is among that plaintiff group.  It's
7   three dozen or so plaintiffs that sued Wegmans
8   and some small, you know, mom-and-pop local
9   regional pharmacies, nothing like the -- you
10  know, the national dispenser/distributor
11  pharmacies that have been part of the MDL.
12              MR. ALDEN:  Special Master, this
13  is Anthony Alden again.  Could I just say one
14  thing, which is, you know, this data is
15  sufficiently important to us, the PBM
16  Defendants, that I am willing to have a
17  conversation with Mr. Agins about how we would
18  be able to alleviate the burden, and if there
19  is a cost burden, for him to provide
20  information as to what the cost burden would
21  be for us to consider.  We are open to having
22  that conversation.  I don't think we have
23  sufficient information right now, but this is
24  data that we feel is sufficiently important so
25  that would be something that we are willing to

Page 42

1    consider if we get that information.
2           SPECIAL MASTER COHEN:  What do you
3    think about Josh's suggestion that there be
4    some briefing, perhaps even on an expedited
5    basis, with regard to -- and I've being using
6    apportionment loosely, right.  I mean, there
7    are a lot of related doctrines, but ultimately
8    what they have to deal with is are there other
9    entities that may have an obligation or a
10   share in the liability, whether you call it
11   nuisance -- excuse me, whether you call it
12   apportionment or joint and several liability
13   or anything else.  What about that; that is to
14   say, what about briefing that issue?
15          MR. ALDEN:  You know -- this is
16   Anthony Alden again -- I don't -- I don't
17   think it's necessary.  I think the standard of
18   relevance is sufficiently broad that we have
19   met our relevance easily.  I don't think at
20   this stage we are required -- and I don't
21   think the Plaintiffs have ever been required
22   to explain how they -- you know, or would say
23   that they should be required to explain how
24   they intend to use evidence at trial.  I think
25   that this is -- you know, we have sufficiently

Page 43

1　articulated what the relevance is to obtaining

2　data on opioid prescriptions from the largest

3　opioid prescriber in Rochester, and we've

4　indicated we're willing to have a conversation

5　with them about burden, and, you know,

6　provided they can articulate it. And so, you

7　know, frankly, we've been through rounds of --

8　months of letter writing and briefing and, you

9　know, we would just -- you know, I think we've

10　sufficiently established relevance and we,

11　frankly, just need to get on with getting the

12　documents.

13　　　　　SPECIAL MASTER COHEN: Let me jump

14　to some of these other categories.

15　　　　　Number 3 is essentially materials

16　provided by manufacturers regarding the drugs

17　to Wegmans. Let me start by asking Wegmans

18　about burden, do you think that that's

19　something that's hard to do. And then the

20　other question I have is -- for PBMs it's

21　really more why do you need that, why do you

22　need it from Wegmans. Most of it, almost all

23　of it, has already been produced into the MDL.

24　And so you pretty much know what the

25　manufacturers sent. The only thing that

Page 44

1  getting it from Wegmans would add is, you

2  know, kind of a final crossing of the T

3  showing that they, in fact, got it as opposed

4  to the inference that they got it.

5         But I'll go with, you know, asking

6  Wegmans first what, you know, the burden is in

7  gathering that.

8         MR. AGINS:  Thank you.  Josh Agins

9  for Wegmans.

10         So it would depend on -- on what

11  the data is.  To your point, we've said, okay,

12  what are the communications, and we presume

13  that given their active participation in the

14  MDL, the PBMs have some of these

15  communications readily available to them, they

16  have a plan for them, and they are

17  significant.  If that's the case, tell us what

18  those are.  And if the question were can you

19  confirm that you received these and when and

20  who received them, that may not be

21  particularly burdensome, but, you know, to

22  take request number 3 as written and to say

23  give us all documents and communications

24  concerning those without even identifying

25  those for us, that is a monumental burden, and

Page 45

1  that's sort of where we left it, but that is
2  one of the requests where, you know, I think
3  there's room for meaningful conferral efforts
4  if the PBMs could come back to us and say here
5  are the communications that we think matter,
6  and then we would have an ability to either
7  search for those communications or at least
8  have a better sense of what that burden might
9  look like.
10          SPECIAL MASTER COHEN:  All right.
11  So what I'm hearing is that it would be a lot
12  easier for you to answer a multiple choice
13  question than an essay, and I think that makes
14  sense.
15          Go ahead, Anthony.
16          MR. ALDEN:  If I could just
17  respond to that.  I mean, look, I don't know
18  what Wegmans received so I can't tell him -- I
19  cannot tell Wegmans what, you know -- what to
20  look for.  What I can say is we're not looking
21  for every communication -- if Mr. Agins were
22  to come to me and say, look, we would be
23  required to search 50 custodians over a
24  13-year period, I think our response would be
25  no, we're not looking for that.  On the other

Page 46

1   hand, if there was a person responsible, or
2   people, a handful of people that had been
3   responsible for communicating with the
4   manufacturers over the relevant period, that's
5   a different question, right.  We've provided
6   them search terms at their request and that
7   would be a different conversation.
8               And so, you know, again, I agree
9   with you, this is probably not one of our
10  central requests, but all we've heard today is
11  no, and if the answer would be, look, you
12  know, there are at least five people, we're
13  willing to do limited searches to look for
14  communications, then that may be one thing; if
15  the answer is there are 50 people or we can't
16  do it at all, that's a different thing.  But
17  we don't know.
18               MR. AGINS:  If I could just
19  briefly -- this is Josh Agins for Wegmans.  If
20  I could briefly respond to that.
21               The search terms -- and I don't
22  think, Special Master Cohen, you need the
23  search terms, but they don't meaningfully
24  narrow anything.  The search terms for
25  paragraph 3 are drug scope within 20 of addict

Page 47

1    or E-F-F-I-C or safe and manufacturer or

2    distributor or RDC or Rochester Drug

3    Cooperative.  It's basically using a very

4    broad category to try to justify very broad

5    e-mail searches of Wegmans pharmacy without

6    any real rationale as to what we're shooting

7    for, why it's relevant, or how we could

8    meaningfully pare it down.  And, as I've said,

9    we've asked them to identify the

10   communications.

11           MR. ALDEN:  Can I respond to that?

12   This is Anthony Alden again.

13           What we want and the rationale has

14   been articulated multiple times.  Wegmans

15   asked for search terms.  The way this normally

16   works is you provide search terms and then

17   they come back and say, look, these search

18   terms are going to be too broad because we'd

19   have to run them over 15 people and here's

20   what we would get as a result or an estimate.

21   But we got nothing.  So they asked for search

22   terms and simply said no, they're too broad,

23   we're not giving you anything.

24           So what normally happens, and I

25   believe what should happen here, is they take

Page 48

1   our search terms, they identify the people who

2   would have this, and they come to us and say,

3   look, given the number of people, it would be

4   too burdensome for us, we would propose X, or

5   maybe it's five people and maybe there are

6   5,000 documents and they say that's fine,

7   we'll do Y, we'll do that.  But they have not

8   made the effort to do it because they've just

9   refused to produce any of these documents.

10          So I'm happy to have a

11  conversation about scope and burden, but it

12  has to be based on information, not just

13  simply we haven't provided a relevance

14  rationale, which we have.

15          MR. AGINS:  This is Josh Agins.

16          (Simultaneous speaking.)

17          MR. AGINS:  I'm sorry.

18          SPECIAL MASTER COHEN:  Go ahead.

19          MR. AGINS:  Josh Agins for

20  Wegmans.

21          I was going to say I think it's

22  strong to say that Wegmans asked for search

23  terms.  I mean, within the context of a

24  conferral, there was a discussion about search

25  terms, and we said if you have narrow search

Page 49

1  terms, we'll take a look at them. So it's a
2  little different than saying please send us a
3  bunch of very broad search terms that we'll
4  agree to run without even seeing them. So I
5  just want to clarify that.
6          But number 3 in particular would
7  be much more straightforward if the PBMs would
8  identify the communications at issue, because
9  unless we know what communications we're
10 talking about, we can't even begin to have a
11 meaningful discussion about custodians or
12 search terms.
13         MR. ALDEN: I can -- this is
14 Anthony Alden. I can identify them for you
15 right now. They're listed. We want the
16 communications, publications, presentations,
17 analysis, reports, guidelines, directives,
18 announcements, recommendations, pamphlets,
19 circulars and notices to Wegmans by a
20 manufacturer regarding the efficacy, addictive
21 quality or safety of any --
22         SPECIAL MASTER COHEN: I don't
23 think it's helpful right now to just reread
24 the language from the subpoena which you've
25 been arguing about for four to six months.

Page 50

1    Let's move on.

2              So the parties themselves in the

3    discussion kind of lumped together numbers 8,

4    9, 10 and 11, and I think of 7 as more or less

5    similar, and these all go to communications

6    that Wegmans has received or made to others,

7    including its own employees, about, you know,

8    opioid-related issues, investigations, doctor

9    shopping.  It's what have you said internally

10   and externally about this opioid mess.

11             And I guess I'll start by asking

12   Wegmans to address, you know, all of those.  I

13   think -- you can tell me if I'm wrong -- that

14   they can be addressed together, but both with

15   regard to our two standards, relevance and

16   burden.  And I guess I'm more focused on

17   burden.  I think I understand the arguments

18   that the PBMs would make about relevance.

19             MR. AGINS:  I'm sorry.  Special

20   Master Cohen, would you say those numbers

21   again?

22             SPECIAL MASTER COHEN:  Sure.  It's

23   basically all the ones that are left, which

24   are 7, 8, 9, 10, 11.  And just to repeat, I

25   think of these as all somewhat related because

Page 51

1  they all go to internal or external
2  communications made or received by Wegmans
3  about opioid prescribing, investigations that
4  they undertook, investigations that the DEA
5  may have undertaken of them; you know,
6  conversations that Wegmans had with its own
7  employees about it.  They're all loosely
8  related.
9            MR. AGINS:  So I won't reiterate
10 what we've said, unless you would like us to
11 get into it, but what we've said about
12 relevance on these in writing.
13            Wegmans' prescribing conduct has
14 nothing to do with the claims by the City of
15 Rochester against the PBMs.  And the fact that
16 Wegmans dispenses prescriptions in the City of
17 Rochester is not enough.  So we would not
18 agree that these are relevant.
19            I can speak to the burden issue,
20 and just as a general point, the concept of
21 running broad search terms over custodian
22 sets, we haven't had any discussions with the
23 PBMs about custodians, and in one of the early
24 calls we asked, well, how did you identify
25 custodians.  They have never come to us and

Page 52

1   said here's an example of a custodian we'd
2   like you to run these terms on. So doing
3   broad-brush e-mail discovery is an immense
4   burden. We haven't calculated that at this
5   point because we haven't had a discussion of
6   custodians, but it is going to be an immense
7   burden to do that e-mail discovery. And the
8   PBMs know that. They've engaged in that type
9   of discovery as a party. As a non-party
10  that's not the type of discovery we should be
11  participating in.
12          But having said that, there are
13  discrete elements of some of these where, as
14  opposed to identifying a broad concept, we
15  probably could identify documents or files
16  that are discernible and have a discussion
17  about those.
18          So, as an example, number 7 asks
19  about, you know, interactions -- essentially
20  interactions with law enforcement in Monroe
21  County. And that would be an example where we
22  could go to someone and ask about files of
23  interactions with, for example, local law
24  enforcement or the DEA. And I'm not
25  suggesting we would agree to get into

Page 53

1  broad-based e-mail discovery about that, but
2  in terms of identifying when Wegmans has
3  interacted with law enforcement about local
4  prescribers in Rochester, that is a
5  discernible thing that I think we can have a
6  meaningful conferral effort on.  But we
7  haven't reached that point because it's always
8  been, well, we want all of it, and our
9  relevance argument for why we should get it is
10 very broad brush, and so we haven't had
11 conferral efforts mature to the point where
12 we've discussed these sorts of discrete types
13 of documents that we might be able to produce
14 with a moderate level of burden.
15           SPECIAL MASTER COHEN:  Right.
16           So what you've just put your thumb
17 on is a communications problem, and I think
18 it's real, and I saw it in the e-mails, each
19 side waiting for the other to concede
20 something.  And here's how I think that that
21 can be bridged.  Here's how I suggest you move
22 forward.  So -- and I have a couple more
23 points I want to make after this, but this is
24 important.  As I said in the beginning, and as
25 I now conclude, I think that there is

Page 54

1   something more than nothing that Wegmans is

2   going to have to produce; that is to say that

3   the subpoena isn't asking for only irrelevant

4   matters or only matters regarding which the

5   burden is too onerous.  There are some

6   communications, documents, there are some

7   responsive materials that Wegmans should

8   produce in response to the subpoena.

9             Now, the question is what should

10  it produce.  So, Josh, you just suggested

11  that, you know, with regard to, I think it was

12  number 7 you were talking about, yeah, we can,

13  for example, go to X custodian and ask about Y

14  sort of documents that fall within this

15  category.  You've never really said that

16  before.  You've only said none of it is

17  relevant and it's too broad.  Well, the only

18  way to get past that is to figure out what is

19  relevant, what isn't too broad.  And so what I

20  suggest may be a first step, even while you

21  wait for a ruling from the Court, is to say,

22  okay, as to number 7, here is what I propose

23  we give you.  How is that?  And the PBMs may

24  say, you know what, we're good.  That's

25  enough.  That will give us 80 percent of what

Page 55

1    we're hoping to get and we're never going to
2    get 100 percent.  So we'll take that.  We're
3    good to go.  Run it.  Number 7 is done.
4    Because if you're waiting for the PBMs to come
5    to you with a narrowing, part of the problem
6    with that is that they can't do it because
7    they don't know what you know.  You're the one
8    that I think needs to say here's how I propose
9    I answer that narrower than what you wanted
10   but it should be enough, and then you start a
11   negotiation with something on the table as to
12   each one of these things.
13            So I really want you, Josh, to
14   take the first step and come back with a
15   concrete suggestion.  Some of them may still
16   be, you know what, there just isn't anything
17   we can do that wouldn't be extremely onerous.
18   But some of them you said during this call you
19   can do.  You can at least make a suggestion
20   here's something we can give you, let us know
21   if this is good, if this is enough, and start
22   a negotiation.
23            The other thing that I think that
24   the PBMs need to do is -- so, Anthony, you
25   said, in particular with respect to category

1, this is important.  We really, really,

really think that we need this.  This isn't --

you know, some of them aren't that important.

This one is.  In fact, it's so important we're

willing to consider paying for it.  I think it

would be helpful to identify the ones that are

that important and you're willing to pay for

because the Court and I will take that into

account.  If you say, for example -- I'm just

picking a random number -- number 9 is really

important.  We really want that.  They say

it's an extreme burden to do because of X, Y,

Z and they should have to actually say what X,

Y and Z are.  Okay.  We get that.  We know

that doing that is expensive.  We've had to do

it ourselves.  But we really, really want it.

We're willing to pay for it.  That's something

the Court needs to know.

          So despite your -- you know, your

history of, frankly, kind of not being willing

to talk with each other, you're both talking

past each other and saying the same thing over

and over.  It doesn't help.  I'm suggesting

that if you get on the phone with each other

and think to yourself every time you open your

Page 57

1   mouth what is the solution, not what is the

2   problem, what is the solution that we can come

3   to, how can we solve this, what if we do this,

4   is that a solution?  No.  Okay.  Well, what if

5   we do that?  You need to come up with

6   alternative possibilities instead of just

7   saying no, no, no, not good enough.

8              Now, I've heard a lot.  I can

9   issue an order that nobody would like --

10  certainly nobody would like all of it -- that,

11  in my discretion, chooses things -- and, you

12  know, I'm seeing the word "appeal" used in

13  some of these documents.  It's hard for me to

14  believe that there would be any successful

15  appeal of a discovery matter that is within my

16  discretion as long as I am not

17  (unintelligible).  Usually I'm not.  But what

18  ends up happening then is folks get something

19  they don't like as opposed to something that

20  they negotiated and are okay with.  That's

21  where this is headed.

22             So I'll end with that.  You know,

23  that's just kind of where I see things, and I

24  will start one by one going through this and

25  saying yes, no, yes, no, but in the meantime I

Page 58

1    think it would be great if you could call me
2    up and say number 4 is moot, for example,
3    we've figured out how to deal with it.  If you
4    absolutely just are in complete disagreement
5    on something, then I'll make a call.
6                Any thoughts or suggestions or
7    comments?
8                MR. ALDEN:  I'm sorry.  This is
9    Anthony Alden.
10               Look, I think we're fine to do
11   that, to give it one -- you know, one last
12   shot.  I'm very conscious of the time here
13   with an April 25 fact discovery deadline, but
14   I do think it important that we know quickly
15   from Wegmans what it is willing to do on each
16   of these topics.  I think that will then
17   inform, you know, whether we need to go back
18   to you quickly and say, look, there is no --
19   we're just not going to be able to reach
20   agreement on this, we would like a ruling, or
21   as to these five, you know, we'd like a
22   ruling, but as to the remaining seven we would
23   like to keep negotiating.  I would be open to
24   that, and I would also be open to telling
25   based on that which, you know, if there is,

Page 59

1    you know, a substantiated burden, we would be

2    willing to pay for it, or at least depending

3    on what the cost burden is.

4             SPECIAL MASTER COHEN:  Josh, when

5    do you think you can get something to Anthony?

6    And I'm not even asking for on every single

7    one of these categories, maybe just the -- you

8    know, I'm choosing again kind of a random

9    number -- the five easiest ones, the five ones

10   where you think you know what, here's how I

11   think we can solve this.  This gives you a lot

12   of what you want.  We can do it without a

13   terrible burden or whatever.  And do that

14   fairly quickly.  How soon can you do that?

15            MR. AGINS:  I think we could

16   provide that list by the end of this week,

17   possibly Monday, but we would endeavor to do

18   it by the end of the week.

19            SPECIAL MASTER COHEN:  And you can

20   roll it out.  There might be two that you can

21   do by the end of the day.  I don't mean to

22   push you any harder.  I'm just saying because

23   I think that's fine.  That seems reasonably

24   quick.  But you can roll it out.  You can say,

25   look, here's two that here's what we can do.

Page 60

1   That should be enough.  And et cetera.  And

2   get to the easy ones first.  Get to the ones

3   that you can resolve.  And the stuff at the

4   end that you can't resolve, if there is any, I

5   will.

6           Any other thoughts, comments,

7   suggestions?

8           All right, folks.  Look, it's not

9   easy.  This stuff is hard.  I appreciate

10  everybody's hard work.  You know, as I was

11  reading everybody's position papers, I thought

12  these guys are good.  They're very good

13  writers.  They're very concise.  They're very,

14  you know, to the point on both sides.  So I

15  commend you for that.  And we'll keep working

16  to get it done.

17          So thank you all for your time.

18          MR. ALDEN:  Thank you for your

19  time.

20          MR. AGINS:  Thank you very much.

21

22    (Status conference concluded at 3:18 p.m.)

23              - - - - -

24

25

Page 61

1                         CERTIFICATE

2

3

4              I, Renee L. Pellegrino, RPR, do

5      hereby certify that as such Reporter I took

6      down in Stenotypy all of the proceedings had

7      in the foregoing transcript; that I have

8      transcribed my said stenotype notes to the

9      best of my ability into typewritten form as

10     appears in the foregoing transcript; that said

11     transcript is the complete form of the

12     proceedings had in said cause and constitutes

13     a true and correct transcript therein.

14

15

16

17          _Renee L. Pellegrino_

18

19              Renee L. Pellegrino,

20              Notary Public, within and for the

21              State of Ohio

22

23     My commission expires October 12, 2025.

24

25

**[1 - akin's]** Page 1

| 1 | 3 | a | |
|---|---|---|---|
| **1** 30:2 34:21 36:3,5 56:1 | **3** 28:6 43:15 44:22 46:25 49:6 | **aaron** 1:8 | **agencies** 32:4 |
| **10** 50:4,24 | | **abating** 7:14 | **agins** 2:4 8:7,8 |
| **100** 55:2 | **30** 18:12 33:22 36:18 | **ability** 45:6 61:9 | 9:19,21 11:15 11:17 12:11 |
| **11** 50:4,24 | **3:18** 60:22 | **able** 14:10 | 13:25 14:20 |
| **12** 1:11 3:10,24 4:18 5:18 14:19,22,22,24 15:8 16:12 61:23 | **4** | 22:14,23 41:18 53:13 58:19 | 15:22 20:7,8 23:24 24:25 26:12 28:22 |
| | **4** 30:6,13,21 31:3,8 32:7 58:2 | **absolutely** 58:4 | 29:12 38:2,2 |
| **13** 5:20 45:24 | | **access** 28:17,23 29:5 | 40:7,12,21 41:5,17 44:8,8 |
| **15** 1:13 47:19 | **45175** 1:13 | **account** 56:9 | 45:21 46:18,19 |
| **16** 9:24 | **45853** 1:11 | **accusation** 19:1 | 48:15,15,17,19 |
| **17** 1:7 | **5** | **action** 19:4 | 48:19 50:19 |
| **18** 1:13 | **5** 25:13 26:19 | **actions** 20:24 20:25 | 51:9 59:15 60:20 |
| **19** 1:11 | **5,000** 48:6 | **active** 44:13 | **ago** 10:15 |
| **2** | **50** 45:23 46:15 | **activity** 19:13 24:17 | 20:14 21:24 |
| **2** 16:16 21:19 21:21 22:3 23:13,25 24:12 25:3,5,11 30:9 30:12,21 31:1 36:3 | **6** | **actors** 7:15 | **agree** 3:6 13:14 15:3 25:12 46:8 49:4 51:18 52:25 |
| | **6** 1:18 28:15 32:2 | **actually** 26:3 30:4 37:17 56:13 | |
| | **7** | **add** 4:1 29:4 32:1 44:1 | **agreement** 16:6 16:6 58:20 |
| **20** 46:25 | **7** 50:4,24 52:18 54:12,22 55:3 | **addict** 46:25 | **agreements** 4:19 6:14 |
| **2025** 1:18 61:23 | **75** 34:1 | **addictive** 49:20 | **ahead** 9:20 |
| **2227** 61:18 | **8** | **address** 3:17 4:4 50:12 | 18:13,20 22:6 40:11 45:15 48:18 |
| **25** 58:13 | **8** 50:3,24 | **addressed** 35:7 50:14 | **ain't** 25:22 |
| **2804** 1:6,7 | **80** 34:6 54:25 | **afternoon** 5:14 | **akin's** 38:8,17 40:15 |
| **29** 33:25 | **9** | | |
| **2:00** 1:19 | **9** 50:4,24 56:10 | | |

**[akins - attorney]** Page 2

| | | | |
|---|---|---|---|
| **akins** 39:17 | **analysis** 12:20 | **appears** 61:10 | **articulate** 43:6 |
| **alden** 2:5 5:14 | 19:7,10,23,23 | **appellate** 8:24 | **articulated** |
| 5:15 7:22 | 20:2 23:22 | 8:25 9:3,9 | 10:11 20:14 |
| 10:24,25 13:21 | 30:6,9,21 | 40:20,24 | 26:14 43:1 |
| 13:22 17:23,23 | 33:13,21 34:5 | **apples** 39:1 | 47:14 |
| 20:13 22:4,7,8 | 34:7 49:17 | **applied** 31:18 | **ascertainable** |
| 26:24,25 28:2 | **analyzed** 21:15 | **applies** 6:18 | 15:12 |
| 29:7,8 30:23 | 33:17,18,19 | **apportioned** | **aside** 14:20 |
| 30:23 33:4,5 | **annotation** | 6:13 34:19 | **asked** 20:10 |
| 34:15 36:7,7 | 29:21 | **apportionment** | 21:7,23,24 |
| 37:17 41:12,13 | **announcements** | 6:2 9:17,25 | 32:14 47:9,15 |
| 42:15,16 45:16 | 49:18 | 10:2,4,12,18 | 47:21 48:22 |
| 47:11,12 49:13 | **answer** 9:23 | 11:8 39:5 42:6 | 51:24 |
| 49:14 58:8,9 | 15:25 26:12 | 42:12 | **asking** 7:20 |
| 60:18 | 27:3,4 29:11 | **appreciate** 38:5 | 16:24 28:20 |
| **alert** 31:16 | 30:25 31:23 | 60:9 | 32:22 35:11 |
| **allegation** 13:2 | 40:13 45:12 | **appropriate** | 38:15,25 43:17 |
| 36:15,15,16 | 46:11,15 55:9 | 18:15 | 44:5 50:11 |
| **allegations** | **anthony** 2:5 | **approval** 20:1 | 54:3 59:6 |
| 5:21 12:21,24 | 5:15 10:25 | **approve** 21:2 | **asks** 25:18 30:7 |
| 12:25 13:9,10 | 13:22 17:23 | **april** 58:13 | 52:18 |
| 13:13,15,17 | 22:8 26:24 | **arcos** 28:17,18 | **aspect** 13:18 |
| 19:8,10,12 | 29:8 30:23 | 28:23 29:5 | 28:12 |
| 22:15 37:6 | 32:9 33:5 36:7 | 32:3 | **asserts** 4:5 |
| **alleged** 5:23 6:5 | 41:13 42:16 | **area** 3:5,7 | **assume** 4:22 |
| 13:4 14:4 | 45:15 47:12 | **argue** 15:13 | 7:18 23:6,8,18 |
| **allegedly** 13:3 | 49:14 55:24 | **arguing** 49:25 | **assuming** 6:20 |
| **alleviate** 41:18 | 58:9 59:5 | **argument** 10:4 | 6:22 32:18 |
| **alternative** | **apologize** 32:2 | 11:2 25:17 | **assumption** |
| 57:6 | **appeal** 7:1 8:23 | 53:9 | 6:21 |
| **amount** 18:19 | 57:12,15 | **arguments** | **assure** 9:5 |
| 27:14 | **appearances** | 39:5 50:17 | 16:13 |
| **analyses** 14:8 | 2:1 | **article** 9:23 | **attorney** 36:25 |
| 14:10 28:18 | | | |

**authority**  10:13
**authorization**
  13:7
**available**  44:15
**avoid**  40:20

**b**

**b**  17:13
**back**  16:4
  18:19 25:24
  45:4 47:17
  55:14 58:17
**based**  11:12
  13:2 34:5
  48:12 53:1
  58:25
**basically**  47:3
  50:23
**basis**  42:5
**bear**  33:15
**beginning**
  53:24
**behalf**  26:25
**believe**  17:1
  27:14 31:10
  32:23 37:13
  47:25 57:14
**bellwether**
  21:13
**best**  32:21 33:3
  61:9
**better**  45:8
**beyond**  24:9,11
  25:8

**big**  35:14
**bigger**  39:3
**bit**  3:11 11:20
  14:23 25:15
  35:21 37:10
  38:7 40:22
**boys**  35:14
**bridged**  53:21
**briefed**  10:22
  39:8
**briefing**  42:4
  42:14 43:8
**briefly**  22:5
  23:11 46:19,20
**broad**  17:4,10
  42:18 47:4,4
  47:18,22 49:3
  51:21 52:3,14
  53:1,10 54:17
  54:19
**brush**  52:3
  53:10
**build**  33:12
**built**  21:21
**bunch**  17:7
  49:3
**burden**  3:23
  4:4,6,7 5:3,9
  10:7,9 14:16
  14:17 23:12
  29:23 30:18
  34:24 35:7
  36:4,23 39:9
  39:12,13,14

41:18,19,20
  43:5,18 44:6
  44:25 45:8
  48:11 50:16,17
  51:19 52:4,7
  53:14 54:5
  56:12 59:1,3
  59:13
**burdensome**
  15:5,14 23:7
  24:7 44:21
  48:4
**business**  13:18
**buy**  33:8

**c**

**c**  47:1
**calculated**  52:4
**call**  1:16 11:7
  34:24 42:10,11
  55:18 58:1,5
**called**  9:4 20:17
**calls**  51:24
**capable**  31:24
**capital**  27:21
  27:22
**carefully**  25:11
**caremark**
  35:15
**case**  1:7 4:2
  5:22 9:4,13
  11:7 12:15,16
  32:21 33:3
  35:5,20 36:5

36:16 37:6,23
  38:8,18,24
  39:18 40:14,15
  40:16,18 44:17
**cash**  36:13
**categories**  3:10
  3:25 4:14 6:19
  43:14 59:7
**category**  4:18
  14:18 30:6
  36:5 47:4
  54:15 55:25
**causation**  6:2
  8:4
**cause**  6:12 8:17
  11:4,10,12
  12:12,18 13:11
  34:17 39:6
  61:12
**caveat**  29:4
**central**  35:25
  36:15 46:10
**centralized**
  23:16
**centrally**  23:8
  23:15
**century**  12:1
**certain**  7:18
  9:16 27:23
**certainly**  4:24
  8:1 24:6 57:10
**certificate**  61:1
**certify**  61:5

**[cetera - confirmation]**

**cetera**  17:1
  60:1
**chapter**  20:21
**choice**  45:12
**chooses**  57:11
**choosing**  59:8
**circulars**  49:19
**cite**  11:7 12:15
**cited**  10:12
  12:15
**city**  1:10 12:3
  12:21 37:8
  38:21 40:7,13
  40:18 41:5
  51:14,16
**claim**  7:25 8:18
  9:11,22 21:1,3
  24:5
**claims**  8:1,2
  9:16,17 11:5
  11:11 24:11
  51:14
**clarification**
  27:1
**clarify**  38:5
  49:5
**clarifying**  20:5
**clean**  26:23
**clear**  26:2,4,13
  31:9,9
**clearly**  26:14
**clears**  39:2
**cmo**  21:12

**cohen**  1:16 3:1
  5:15 6:15 8:5,8
  9:5,20 10:16
  12:4,6 13:14
  14:15 15:15
  16:3 19:9,18
  19:19 20:4
  21:25 22:6
  23:10 24:15
  25:10 26:20
  27:20 28:13,25
  29:10 30:1
  32:9 34:10,20
  37:9,25 39:24
  40:2,10,19,25
  42:2 43:13
  45:10 46:22
  48:18 49:22
  50:20,22 53:15
  59:4,19
**collaboration**
  13:3
**collect**  23:8
  24:7
**collecting**
  23:12 29:23
**come**  45:4,22
  47:17 48:2
  51:25 55:4,14
  57:2,5
**comes**  18:10
**comma**  26:8,9
  34:11,12,13

**commenced**
  38:9
**commend**
  60:15
**comments**  58:7
  60:6
**commission**
  61:23
**communicating**
  46:3
**communication**
  18:6 33:10
  34:3 45:21
**communicati...**
  16:25 21:22,25
  22:18,21 23:6
  25:4,24 30:7
  31:2 32:4,15
  44:12,15,23
  45:5,7 46:14
  47:10 49:8,9
  49:16 50:5
  51:2 53:17
  54:6
**community**
  11:25
**companies**  12:3
**company**  31:15
**complaint**
  12:21,22,24
  13:16 14:2
**complete**  21:4
  58:4 61:11

**completely**
  12:19
**comply**  14:18
**con**  37:12
**concede**  53:19
**concept**  12:14
  21:21 51:20
  52:14
**concerning**
  19:2 31:5,12
  31:17 44:24
**concise**  60:13
**conclude**  9:10
  53:25
**concluded**
  60:22
**concrete**  21:9
  55:15
**conduct**  8:21
  9:1 12:18 13:9
  51:13
**conducted**
  38:11
**conference**
  1:16 60:22
**conferral**  45:3
  48:24 53:6,11
**confident**  39:19
**confidentiality**
  15:2
**confirm**  44:19
**confirmation**
  21:17

**[confirmed - depending]** Page 5

**confirmed** 25:5
**connection** 37:15
**conscious** 58:12
**consider** 4:14 17:2,8 28:10 41:21 42:1 56:5
**considered** 16:18 17:2
**constitute** 9:2
**constitutes** 8:21 61:12
**consult** 29:15
**contacted** 19:25
**contain** 29:14
**context** 11:23 11:23 39:21 48:23
**contracts** 4:19 4:23 5:4 6:6 14:24 15:3,6 15:11,21,24 24:3
**contractually** 5:25
**contrary** 9:3 12:16
**contributed** 7:9 7:16
**contributes** 7:5 7:12

**conversation** 37:1,2 41:17 41:22 43:4 46:7 48:11
**conversations** 36:23 51:6
**cooperative** 47:3
**core** 5:21 12:25 37:6
**corporate** 31:3
**correct** 9:8,10 19:17 61:13
**corresponden...** 12:13
**cost** 35:8 41:19 41:20 59:3
**counsel** 9:14 37:19 38:1
**counts** 39:17
**county** 1:12 38:9,24 52:21
**couple** 14:22 53:22
**court** 1:1 4:4 8:25 14:17 38:10 40:6 54:21 56:8,18
**courts** 9:9
**coverage** 35:19
**covered** 17:16 24:19 35:13
**created** 13:1 30:17

**creating** 13:4
**critical** 3:17 10:21 14:12
**crossing** 44:2
**custodian** 51:21 52:1 54:13
**custodians** 45:23 49:11 51:23,25 52:6
**customer** 36:12
**customers** 36:10
**cuts** 12:19
**cvs** 12:6

**d**

**damages** 7:10
**dan** 1:8
**data** 5:2 14:9 14:11 19:13 21:14 22:14,17 22:17,20 23:19 28:17,18,23 29:5,8 30:3 32:3,16,24 33:9,10,10,19 33:19 34:6,9 34:25 35:3,11 35:24 36:1,9 36:11,12,13,21 36:24 37:4,14 37:15,22 38:6 38:14,16 39:16

41:14,24 43:2 44:11
**david** 1:16
**day** 59:21
**days** 18:12
**dea** 51:4 52:24
**deadline** 58:13
**deal** 42:8 58:3
**december** 5:20
**decided** 10:22 23:22 40:24
**decisions** 13:6 18:4
**declaration** 39:12
**defendant** 18:8
**defendants** 5:16,22 11:1 17:24,25 30:24 36:8 38:13 41:16
**defense** 6:10 8:17 18:25
**defenses** 6:3
**define** 28:6
**defined** 27:22
**defining** 27:6 27:18
**definition** 27:7 28:5,12
**demand** 13:4
**depend** 44:10
**depending** 23:14 59:2

**despite** 17:20
29:3 56:19
**detail** 24:1,4
**detailed** 39:11
**determine**
35:18
**determined**
18:15 33:20,22
33:24 34:5
**different** 18:24
23:14,18 30:9
30:22 31:1
46:5,7,16 49:2
**difficult** 34:25
**directed** 31:4
38:12
**directive** 31:15
**directives**
31:22 49:17
**disagreement**
58:4
**discernible**
52:16 53:5
**discontinue**
40:17
**discovery** 3:9
10:20 39:7
52:3,7,9,10
53:1 57:15
58:13
**discrete** 15:12
52:13 53:12
**discretion**
57:11,16

**discussed** 53:12
**discussing** 17:9
**discussion** 7:7
13:13 25:7
29:25 48:24
49:11 50:3
52:5,16
**discussions**
51:22
**dismiss** 41:2
**dispensed**
14:13 17:15
38:19
**dispenser** 6:4
11:21 24:2
41:10
**dispenses** 51:16
**dispensing** 5:2
6:9 8:21 9:1,11
13:9 16:21
17:3 19:5
20:22 22:10
31:17,18 33:9
38:6,14,16
39:22
**dispositive** 8:13
**dispute** 11:3,9
11:11
**distinction** 32:8
**distributor**
4:21 11:13
25:20 26:16
41:10 47:2

**distributors**
4:25 14:25
15:11,17,25
16:1
**district** 1:1,2
**division** 1:3
8:24 9:3 40:24
**doctor** 18:17
50:8
**doctrines** 42:7
**document** 1:9
**documentation**
21:12 29:16
**documents**
3:25 5:8 14:9
14:11 15:10
16:17,25 23:7
23:16 24:6,22
31:6 43:12
44:23 48:6,9
52:15 53:13
54:6,14 57:13
**doing** 15:19
52:2 56:15
**door** 10:20
**dozen** 41:7
**drilling** 29:19
**drop** 32:13
**drug** 16:8 31:6
46:25 47:2
**drugs** 4:21
38:23,25 43:16

| e |
|---|

**e** 10:14 31:11
37:11 47:1,5
52:3,7 53:1,18
**earlier** 15:4
40:15
**early** 51:23
**easier** 4:14
45:12
**easiest** 59:9
**easily** 17:14
36:6 42:19
**eastern** 1:3
**easy** 16:15 60:2
60:9
**economic** 10:1
**efficacy** 49:20
**effort** 48:8 53:6
**efforts** 13:5
45:3 53:11
**either** 10:13
45:6
**element** 11:5
11:10
**elements** 3:17
3:21 52:13
**emanuel** 13:23
**employee** 31:12
**employees** 31:5
31:23 50:7
51:7
**employer** 12:2

**endeavor** 59:17
**ends** 27:17
  57:18
**enforcement**
  52:20,24 53:3
**engaged** 52:8
**entered** 23:19
**entirely** 29:24
  39:1
**entities** 32:16
  42:9
**entitled** 6:3
  11:11 35:22
  37:5,7
**epidemic** 36:17
  37:7
**especially** 12:9
  25:16
**esq** 2:3,4,5
**essay** 45:13
**essentially** 5:20
  28:16 43:15
  52:19
**establish** 8:3
**established**
  34:16 43:10
**estimate** 47:20
**et** 16:25 60:1
**everybody**
  34:23
**everybody's**
  60:10,11
**evidence** 11:13
  42:24

**exact** 7:4
**exactly** 12:9
**example** 5:2
  15:10 18:5
  22:11 27:12
  33:8,14 34:8
  36:12 39:10
  52:1,18,21,23
  54:13 56:9
  58:2
**except** 12:23
  24:23
**excessive** 4:6
  5:24 18:18
**exchanged** 3:11
**exclude** 15:23
**excuse** 24:24
  42:11
**expand** 27:25
**expect** 33:13
**expedited** 42:4
**expensive** 35:2
  56:15
**expert** 33:16
**experts** 19:7
  33:11
**expires** 61:23
**explain** 5:7
  14:16 32:10
  42:22,23
**explains** 21:8
  32:7
**express** 5:16
  10:25 11:1

13:23 17:24
  26:25 30:24
  36:8
**expressed** 15:4
**extent** 3:18
  4:11 7:7 17:8
  29:15
**external** 51:1
**externally**
  50:10
**extreme** 56:12
**extremely**
  55:17

**f**

**f** 47:1,1
**face** 14:5
**facing** 7:24,25
  14:7
**fact** 20:19
  21:11 35:10
  44:3 51:15
  56:4 58:13
**factor** 7:5,11
**factual** 39:11
**failure** 14:4
**fairly** 59:14
**fairness** 28:24
**fall** 54:14
**far** 7:9
**feed** 6:10
**feel** 40:23 41:24
**felt** 39:19

**fields** 39:23
**figure** 54:18
**figured** 58:3
**files** 52:15,22
**fill** 18:16,20
**filled** 17:18,19
  17:20 18:22
  20:16
**filling** 23:20
  24:18
**fills** 18:13
**final** 33:7 44:2
**financial** 5:25
  6:8
**fine** 28:10 48:6
  58:10 59:23
**finger** 8:12
**firm** 8:9
**first** 4:14 5:5,7
  18:7,24 35:1
  44:6 54:20
  55:14 60:2
**five** 46:12 48:5
  58:21 59:9,9
**flag** 14:7 18:25
  19:1,7,10,22
  20:2 22:12,21
  23:21 33:13,17
  33:21 34:6
**flagging** 18:10
  27:10
**focus** 25:7
**focused** 50:16

[folks - identifying]                                                Page 8

**folks**  7:8 57:18
    60:8
**follow**  34:7
**food**  3:4 8:10
**foregoing**  61:7
    61:10
**form**  27:7 61:9
    61:11
**formularies**
    13:7
**forth**  16:4
    25:25
**forward**  53:22
**four**  49:25
**fraction**  35:16
**frankly**  15:8
    39:13 40:22
    43:7,11 56:20
**front**  7:4 38:10
**full**  36:21
**fully**  10:22
**funded**  36:14

**g**

**gathering**  44:7
**general**  39:5
    51:20
**generally**  4:3
**getting**  10:8
    43:11 44:1
**give**  30:20
    32:13 44:23
    54:23,25 55:20
    58:11

**given**  4:22 31:4
    37:6 44:13
    48:3
**gives**  59:11
**giving**  47:23
**go**  4:8,12 5:7
    6:6 9:20 10:17
    13:11 18:20
    22:6 24:11
    32:3 33:11
    34:21 40:10
    44:5 45:15
    48:18 50:5
    51:1 52:22
    54:13 55:3
    58:17
**goes**  18:12 31:1
    31:3
**going**  3:16
    10:16,19 12:17
    16:22 18:20
    24:17 26:6
    29:4,13 33:11
    33:12 35:21
    39:6 47:18
    48:21 52:6
    54:2 55:1
    57:24 58:19
**good**  5:14 6:21
    26:21 54:24
    55:3,21 57:7
    60:12,12
**great**  24:1,4
    27:17 58:1

**grocery**  3:5
**group**  41:6
**guess**  4:16 5:1
    5:5 35:25 40:5
    50:11,16
**guessing**  5:1
**guidance**  31:22
**guidelines**
    49:17
**guys**  60:12

**h**

**h**  2:3
**hand**  18:21
    46:1
**handbook**  24:2
**handful**  46:2
**happen**  47:25
**happening**
    57:18
**happens**  9:14
    47:24
**happy**  5:16
    36:22 37:1,2
    48:10
**hard**  27:3 30:2
    34:21,22 35:3
    43:19 57:13
    60:9,10
**harder**  59:22
**harm**  10:1
**headed**  57:21
**health**  29:22

**hear**  4:9 5:5,9
    5:12 6:16 8:6
    29:1,2
**heard**  16:11
    46:10 57:8
**hearing**  45:11
**held**  9:3 34:13
**hell**  35:4
**help**  56:23
**helped**  35:18
**helpful**  11:22
    12:8 49:23
    56:6
**history**  56:20
**hodgson**  8:9
**hope**  32:7,19
**hoping**  55:1
**hours**  10:14
**huge**  39:9
**hypothetical**
    32:22

**i**

**identifiable**
    15:12
**identified**  3:21
    33:23 34:18
**identify**  5:11
    22:1 47:9 48:1
    49:8,14 51:24
    52:15 56:6
**identifying**
    44:24 52:14
    53:2

**immense**  10:7
29:23 52:3,6
**important**  19:4
22:23 41:15,24
53:24 56:1,3,4
56:7,11 58:14
**incentives**  6:1,6
6:9
**include**  14:6
15:18 16:9
**included**  28:12
**including**  40:18
50:7
**indicated**  43:4
**indication**
21:13
**individual**
36:10
**infer**  17:14
**inference**  44:4
**inform**  58:17
**information**
3:11,20,22
17:6,11 19:6
20:12 21:7,18
23:13 27:16
29:19,22,24
30:13,15 32:25
41:20,23 42:1
48:12
**inquiry**  27:17
**instances**  29:17
**instruction**
30:20 31:4,16

**instructions**
6:24,25 7:2
**integral**  11:24
**intend**  42:24
**intentionally**
15:23
**interacted**  53:3
**interactions**
24:14 25:6
52:19,20,23
**interacts**  20:23
**internal**  22:20
27:10 51:1
**internally**  50:9
**interpretation**
25:3
**interrupt**  9:22
13:22 19:14
40:12
**investigation**
18:14
**investigations**
50:8 51:3,4
**involved**  36:24
**irrelevant**  54:3
**issue**  8:14,19
8:24 10:21
13:11 15:7
35:6,7 38:24
39:3,8 40:20
40:23 42:14
49:8 51:19
57:9

**issued**  3:3
31:21 33:24
**issues**  29:22
50:8

**j**

**january**  1:18
**joint**  9:25
42:12
**josh**  8:8 11:17
20:8 23:11
29:4,11 38:1,2
40:3 44:8
46:19 48:15,19
54:10 55:13
59:4
**josh's**  42:3
**joshua**  2:4
**judge**  1:8
**jump**  9:8 16:13
25:13 30:2
43:13
**jury**  6:23,24
7:2
**justice**  38:10
**justification**
10:19
**justify**  39:6
47:4

**k**

**keep**  58:23
60:15
**kept**  25:25

**kimono**  32:13
**kind**  16:15 26:7
27:10 32:20
33:3,16 44:2
50:3 56:20
57:23 59:8
**know**  4:2,25
6:3,7,11 8:22
9:12,12 10:8
10:15,16 11:6
11:6 12:12
14:3,4,9,25
15:5,6,9 16:20
17:4,7,10,13,19
17:20 18:3,3,9
18:17 19:4,12
20:14 22:1
23:1,2,3,16,21
23:24 25:21
26:8,10 27:4
27:11,12 28:8
29:6 31:14,22
31:24 32:12,18
33:8,15,21
35:2,17 36:5
37:10,18,19,24
39:13 41:8,10
41:14 42:15,22
42:25 43:5,7,9
43:9,24 44:2,5
44:6,21 45:2
45:17,19 46:8
46:12,17 49:9
50:7,12 51:5

52:8,19 54:11
54:24 55:7,7
55:16,20 56:3
56:14,18,19
57:12,22 58:11
58:14,17,21,25
59:1,8,10
60:10,14
**koba** 38:10

**l**

**l** 1:25 61:4,19
**l.p.** 1:10,12
**land** 35:23
**language** 15:7
49:24
**large** 8:15
11:20 14:13
**largest** 3:6 6:4
12:1 43:2
**law** 6:22,23 8:9
9:24 10:3,10
10:19,21 11:7
11:8 12:15,16
35:5 52:20,23
53:3
**lawyer** 33:6
**lay** 5:19 24:4
35:23
**lays** 20:21
**lead** 16:5
**left** 45:1 50:23
**lengthy** 39:11

**letter** 5:20
12:10 37:1,20
37:21 38:7
43:8
**level** 29:19,23
31:3 53:14
**liability** 6:12
7:10 9:18 10:1
12:19 34:18
42:10,12
**liable** 7:13,13
34:13
**limited** 14:24
16:7,8 24:16
39:16 46:13
**line** 35:2
**lines** 36:25
**list** 59:16
**listed** 2:7 49:15
**litigation** 1:6
27:24 37:16
**little** 11:19
14:23 37:10
40:22 49:2
**local** 41:8
52:23 53:3
**locating** 5:3
**long** 57:16
**longstanding**
12:2
**look** 12:20
20:19 32:21
33:4 35:20
36:22 45:9,17

45:20,22 46:11
46:13 47:17
48:3 49:1
58:10,18 59:25
60:8
**looked** 36:20
**looking** 4:15
17:15 23:25
25:11 31:7,10
31:11,13 45:20
45:25
**loosely** 42:6
51:7
**lost** 32:5
**lot** 3:14 7:6
42:7 45:11
57:8 59:11
**lower** 5:4
**lumped** 50:3

**m**

**made** 18:4 19:1
19:10 36:6
48:8 50:6 51:2
**mail** 10:14
13:17 14:2
19:11 31:11
37:11 47:5
52:3,7 53:1
**mails** 53:18
**maintain** 13:5
22:17
**maintained**
23:9

**make** 27:5,18
28:11 31:9,9
33:16 50:18
53:23 55:19
58:5
**makes** 45:13
**making** 27:12
**manner** 39:18
**manual** 20:20
20:21
**manuals** 23:1,4
23:17 24:22
**manufacturer**
4:20 15:21
47:1 49:20
**manufacturers**
4:24 6:1 13:4
15:18 16:2
43:16,25 46:4
**marketing** 13:2
**markets** 8:10
**master** 1:16 3:1
5:15 6:15 8:5,8
9:5,20 10:16
10:24 12:4,6
13:14 14:15
15:15 16:3
19:9,18,19
20:4 21:25
22:4,6 23:10
24:15 25:10
26:20 27:20
28:13,25 29:10
30:1 32:9

| | | **n** | **negotiating** |
|---|---|---|---|
| 34:10,20 37:9 37:25 39:24 40:2,10,19,25 41:12 42:2 43:13 45:10 46:22 48:18 49:22 50:20,22 53:15 59:4,19 | **mentioned** 12:13 33:8 **mess** 50:10 **met** 42:19 **minimize** 37:4 **misnomer** 38:8 **mme** 38:18,19 39:17 | **name** 8:8 **narrow** 46:24 48:25 **narrower** 38:25 55:9 **narrowing** 55:5 **narrowly** 27:19 **national** 1:6 | 58:23 **negotiation** 55:11,22 **negotiations** 38:11 **never** 13:12 31:21 37:15 51:25 54:15 55:1 |

name 8:8
narrow 46:24
48:25
narrower
38:25 55:9
narrowing 55:5
narrowly 27:19
national 1:6
41:10
nature 13:8
nearly 27:6
necessarily
16:14 18:7
19:3
necessary
42:17
need 9:6 14:8,9
17:22 18:2,3
22:13,22 23:3
26:22 27:2
28:10 29:6
36:19 43:11,21
43:22 46:22
55:24 56:2
57:5 58:17
needs 55:8
56:18
negligence 9:19
9:22
negotiated
57:20

34:10,20 37:9
37:25 39:24
40:2,10,19,25
41:12 42:2
43:13 45:10
46:22 48:18
49:22 50:20,22
53:15 59:4,19
materials 43:15
54:7
matter 10:18
45:5 57:15
mattered 7:8
matters 54:4,4
mature 53:11
md 1:7
mdl 1:6 7:3
9:13 41:11
43:23 44:14
mean 11:4
13:22 14:1,7
15:15 22:7
27:21,23 30:10
42:6 45:17
48:23 59:21
meaning 12:18
28:1 38:19
meaningful
13:12 45:3
49:11 53:6
meaningfully
46:23 47:8
mediation
37:22

mentioned
12:13 33:8
mess 50:10
met 42:19
minimize 37:4
misnomer 38:8
mme 38:18,19
39:17
mmes 38:22
moderate 53:14
mom 41:8
moment 7:19
21:24
moments 20:14
monday 59:17
monroe 52:20
months 8:15
39:18,21 43:8
49:25
monumental
44:25
moot 58:2
morning 4:2
motivated 5:23
mouth 57:1
move 50:1
53:21
multiple 45:12
47:14
municipalities
38:21

negotiating
58:23
negotiation
55:11,22
negotiations
38:11
never 13:12
31:21 37:15
51:25 54:15
55:1
new 5:16 6:22
6:23 7:1,18
8:10,18,23,25
9:9,24 10:3,10
10:19,21 11:8
11:21,25 21:13
29:9 37:22,23
non 3:3 39:7
52:9
normally 47:15
47:24
northern 1:2
notary 61:20
notes 22:11
61:8
notice 15:1
notices 49:19
notification
27:8
notion 11:20
22:9
nuisance 6:17
6:20,25 7:6,9
7:12,14,14,25

8:18,22 9:2,11
42:11
**number** 5:18
11:19 14:19,21
14:22,24 16:12
16:16 21:19,21
22:3 23:13,25
24:12 25:3,5
25:11,13 28:15
30:2,6,9,12,13
30:21,21 31:1
31:3,8 32:2,7
34:21 43:15
44:22 48:3
49:6 52:18
54:12,22 55:3
56:10,10 58:2
59:9
**numbers** 38:18
39:22 50:3,20
**numerical** 4:12

**o**

**o** 27:22
**objection** 14:21
**obligation**
25:21 42:9
**obtaining** 43:1
**obvious** 34:23
**obviously** 6:7
32:22
**occurs** 28:15
35:10

**october** 61:23
**offer** 41:2
**ohio** 1:2 6:23
6:24 61:21
**okay** 8:5 19:19
20:4 25:13
30:10 32:12
34:20 44:11
54:22 56:14
57:4,20
**onerous** 54:5
55:17
**ones** 14:12
16:14,15 50:23
56:6 59:9,9
60:2,2
**op** 1:11,13
**open** 41:21
56:25 58:23,24
**opens** 10:20
**opiate** 1:6
**opioid** 4:21
5:24 31:12
36:17 37:16
43:2,3 50:8,10
51:3
**opioids** 3:7 6:4
6:10 9:1,11
11:14,21 13:5
14:14 16:9,21
17:3 22:10
27:15 31:5,17
31:18 34:4
36:19 37:8

**opportunity**
38:5
**opposed** 5:2
44:3 52:14
57:19
**opposite** 9:15
**optum** 17:25
**oranges** 39:1
**order** 4:13
12:19 13:17
14:3 19:11
25:21 27:6,8
28:7 57:9
**ordered** 37:21
**orders** 25:18,22
26:10,16,17
27:19,21 28:9
**outline** 39:12
**outlined** 31:16
**outside** 21:22
**overlook** 5:23
**overrode** 22:12
**own** 36:21 50:7
51:6
**owner** 19:13

**p**

**p.m.** 1:19 60:22
**pain** 18:19
**pamphlets**
49:18
**papers** 3:12
8:22 9:7 60:11

**paragraph**
15:8 26:19
46:25
**paragraphs**
14:1,2
**pare** 47:8
**part** 6:1 11:24
13:16 24:3
34:22 35:4,9
36:3,3 41:11
55:5
**participants**
2:7
**participating**
52:11
**participation**
44:13
**particular** 34:9
49:6 55:25
**particularly**
15:5,13 44:21
**parties** 3:6,10
3:21 4:1,9 25:4
25:14 38:12
50:2
**party** 3:3 4:5,7
11:12 14:6
15:1 18:9
33:19 39:7
52:9,9
**past** 10:9 18:12
25:14,25 54:18
56:22

**[patient - prescribers]** Page 13

**patient** 17:5,11
  17:16 18:11,16
  18:18 35:13
**patients** 24:18
  24:20 27:13
  35:16
**pay** 21:3 56:7
  56:17 59:2
**paying** 4:7 56:5
**payment** 20:1
**pbm** 5:22 18:7
  18:9 19:13
  20:20 21:2
  24:5,19 29:18
  36:10 41:15
**pbm's** 29:17
**pbms** 3:3,19,25
  4:18 5:6,6,13
  10:10 12:12,22
  13:1 14:4
  16:19,22 17:12
  17:16 18:6,8
  19:25 20:11
  22:9 24:3,6,8
  24:12,14,23,24
  25:6 26:1,21
  29:3 30:13
  35:1,3,11,13,17
  35:25 38:15,25
  39:11,23 43:20
  44:14 45:4
  49:7 50:18
  51:15,23 52:8
  54:23 55:4,24

**pec** 19:16
**pellegrino** 1:25
  61:4,19
**pending** 8:23
  38:10
**people** 25:25
  46:2,2,12,15
  47:19 48:1,3,5
**percent** 33:22
  33:25 34:1,6
  34:14 36:18
  54:25 55:2
**percentage**
  34:17
**perfectly** 18:15
**period** 45:24
  46:4
**person** 46:1
**pertains** 36:11
**peter** 2:3 19:15
**pharma** 1:10
  1:12
**pharmacies**
  14:3,6 16:25
  38:23 41:9,11
**pharmacist**
  20:15,20,21,23
  22:12 23:17,20
  23:20 24:5
  30:17
**pharmacists**
  16:18 29:15
  30:8,11

**pharmacy**
  13:17 19:11
  24:11 31:3
  38:8,13,20
  47:5
**phone** 3:2
  56:24
**phrase** 38:6
**pick** 38:4
**picking** 16:14
  56:10
**picture** 36:21
**plaintiff** 38:18
  38:20 41:6
**plaintiffs** 5:21
  8:2,3 9:13 19:2
  19:8 21:16
  22:15 33:13,17
  33:21,23 34:16
  39:20,25 40:4
  40:16 41:7
  42:21
**plan** 44:16
**please** 5:11
  33:6 49:2
**pmp** 29:9,14,15
  29:16 32:3
**point** 12:11
  13:24 16:20
  18:6 19:23
  20:12 21:18,23
  22:18 23:5
  28:24 29:13
  33:10 34:2

38:4 39:15
  44:11 51:20
  52:5 53:7,11
  60:14
**points** 9:15
  53:23
**policies** 22:25
  23:4 24:2,10
  25:8
**policy** 17:4,10
**polster** 1:9
**pop** 41:8
**pos** 20:18,23
  21:6 29:17
**position** 3:12
  10:15,17 12:17
  23:25 24:1
  25:1,9 26:18
  39:4 60:11
**possibilities**
  57:6
**possibly** 59:17
**potentially**
  18:25 37:3
**practices** 19:11
**predicate** 36:16
**prejudice** 41:2
**prepared** 11:6
  12:15
**prescriber**
  20:17,20 43:3
**prescribers**
  53:4

| | | | |
|---|---|---|---|
| **prescribing**<br>51:3,13<br>**prescription**<br>1:6 17:17,18<br>18:10,13,16,21<br>18:23 19:2,6<br>20:16 27:9<br>29:18,20 31:13<br>32:16 34:4<br>**prescriptions**<br>5:24 14:5<br>27:11 33:23<br>34:1,2,17<br>35:17 36:19<br>37:8 43:2<br>51:16<br>**presentation**<br>33:16,18<br>**presentations**<br>49:16<br>**presume** 44:12<br>**pretty** 17:14<br>25:23 26:23<br>43:24<br>**prior** 10:13<br>13:7 19:5<br>37:12<br>**probably** 3:24<br>5:6 38:7 39:2<br>46:9 52:15<br>**problem** 53:17<br>55:5 57:2<br>**procedures**<br>22:25 23:4 | **proceedings**<br>61:6,12<br>**process** 40:17<br>**produce** 3:19<br>4:19 22:22<br>35:3 37:22<br>38:13,16,23<br>48:9 53:13<br>54:2,8,10<br>**produced**<br>21:14 37:14,15<br>38:17 39:16,17<br>43:23<br>**produces** 14:12<br>**producing** 5:3<br>23:12 36:24<br>39:20<br>**production** 3:9<br>4:8 34:25<br>**programs**<br>36:14<br>**proliferate**<br>13:5<br>**promise** 9:7<br>**properly** 22:14<br>**proportion**<br>14:13<br>**propose** 48:4<br>54:22 55:8<br>**proposition** 4:3<br>35:6<br>**protected**<br>29:22 | **provide** 41:19<br>47:16 59:16<br>**provided** 5:25<br>20:2 39:10<br>43:6,16 46:5<br>48:13<br>**proximate** 8:4<br>11:4,10,12<br>12:12 13:11<br>34:16<br>**public** 6:17,20<br>6:25 7:6,9,12<br>7:25 8:17,21<br>9:2,11 61:20<br>**publications**<br>49:16<br>**pull** 15:6 39:18<br>**purchases**<br>36:13<br>**purdue** 1:10,12<br>13:3<br>**purposefully**<br>15:20<br>**purposes** 20:1<br>28:7 37:13,22<br>38:17 39:19<br>**push** 27:3<br>28:11 59:22<br>**put** 8:12 40:5<br>53:16<br>**putting** 14:20 | **q**<br>**quality** 49:21<br>**question** 3:18<br>4:4 6:7 8:20<br>10:5 20:13<br>21:24 26:7<br>30:18,25 32:6<br>32:23 34:24<br>35:25 36:4<br>43:20 44:18<br>45:13 46:5<br>54:9<br>**questions** 20:10<br>**quick** 30:5<br>59:24<br>**quickly** 58:14<br>58:18 59:14<br>**quinn** 13:23<br>**quite** 3:11<br>39:12<br>**quote** 16:8<br>38:13<br>**r**<br>**random** 56:10<br>59:8<br>**rarely** 35:20<br>**rather** 4:12<br>**rationale** 20:17<br>20:25 22:9<br>47:6,13 48:14<br>**raw** 39:22<br>**rdc** 47:2 |

**[reach - result]** Page 15

reach  58:19
reached  53:7
read  3:13 4:22
  9:7
readily  44:15
reading  37:20
  60:11
real  47:6 53:18
realize  32:6
really  30:14
  32:13,20 33:6
  39:7 43:21
  54:15 55:13
  56:1,1,2,10,11
  56:16,16
reason  3:2 6:13
  18:2 32:23
  34:22
reasonable
  31:21,25
reasonably
  59:23
reasons  26:15
rebate  13:6
rebates  6:8
receive  26:16
received  16:19
  16:19 24:23,24
  27:13 30:13
  32:15 37:11
  44:19,20 45:18
  50:6 51:2
receiving  6:8
  27:14

recognize  39:9
recommendat...
  49:18
record  5:12
recorded  20:18
  20:25
red  14:7 18:25
  19:1,7,10,22
  20:1 22:12,21
  23:21 33:13,17
  33:21 34:6
refer  37:18
reference  29:14
referred  40:15
referring  15:9
refills  18:11
refused  48:9
regard  35:24
  42:5 50:15
  54:11
regarding  4:21
  23:21 43:16
  49:20 54:4
regardless  7:23
  11:8 24:19
regional  41:9
reiterate  51:9
related  42:7
  50:8,25 51:8
relates  1:9
relevance  3:22
  5:8,19 8:14
  10:6,10 14:21
  24:10 30:18

42:18,19 43:1
43:10 48:13
50:15,18 51:12
53:9
relevant  7:20
  7:21 8:1,3,16
  21:19 46:4
  47:7 51:18
  54:17,19
reliable  39:19
relieved  4:7
remaining  11:5
  11:10 58:22
remember  41:1
remote  1:16 2:1
renee  1:25 61:4
  61:19
repeat  9:6
  50:24
repeatedly  21:7
reporter  61:5
reports  49:17
represent  8:10
request  3:25
  5:18 14:18
  26:5 32:2
  44:22 46:6
requested  3:9
  3:20
requesting  4:7
  39:23
requests  8:16
  45:2 46:10

required  42:20
  42:21,23 45:23
requirements
  15:1,2
reread  49:23
resolve  60:3,4
respect  5:18
  6:9,17,19 11:3
  13:7 20:2
  26:19 34:25
  36:9 55:25
respectfully
  37:18
respond  3:8
  14:8,10 16:22
  19:8 20:6 22:5
  22:14,24 23:5
  28:2 36:4 38:1
  45:17 46:20
  47:11
responding
  22:17
response  33:12
  45:24 54:8
responses
  22:21 31:2
responsible
  34:14 36:18
  46:1,3
responsive  26:5
  54:7
rest  13:8
result  5:25
  47:20

**[resulting - sit]**                                                              Page 16

**resulting**  18:19
**results**  33:14
**revenue**  13:6
**review**  21:2
**reviewed**  3:12
  3:13
**rico**  7:25
**right**  15:4
  16:11 18:12,23
  26:17,20 28:13
  32:20 36:24
  37:25 40:25
  41:23 42:6
  45:10 46:5
  49:15,23 53:15
  60:8
**rochester**  1:10
  3:5,7 6:5 8:9
  11:14,21,25
  14:14 31:14,19
  38:21 40:6,8
  40:14,18 41:6
  43:3 47:2
  51:15,17 53:4
**rochester's**
  12:22
**roll**  59:20,24
**room**  45:3
**rounds**  43:7
**rpr**  1:25 61:4
**rule**  32:24
**ruled**  8:25
  32:11

**ruling**  54:21
  58:20,22
**run**  47:19 49:4
  52:2 55:3
**running**  51:21
**russ**  8:9

**s**

**s**  27:22
**safe**  47:1
**safety**  49:21
**sale**  16:20 18:6
  19:23 20:12
  21:18,23 22:18
  23:5 33:10
  34:2
**saw**  53:18
**saying**  15:16
  16:24 24:21,25
  25:1,8 33:7
  41:1 49:2
  56:22 57:7,25
  59:22
**says**  28:16
**scenarios**  18:24
**scope**  16:8 31:6
  37:23 46:25
  48:11
**script**  23:21
  29:19,23
**scripts**  5:16
  10:25 11:1
  13:23 17:24
  24:18 26:25

  30:24 36:8
**search**  31:21,25
  45:7,23 46:6
  46:21,23,24
  47:15,16,17,21
  48:1,22,24,25
  49:3,12 51:21
**searches**  46:13
  47:5
**second**  4:16
  19:3,15 21:12
  40:2
**see**  22:2 24:10
  29:20 36:19
  37:7 57:23
**seeing**  49:4
  57:12
**seemed**  37:20
**seems**  7:21
  17:12 24:13
  59:23
**send**  49:2
**sense**  45:8,14
**sent**  3:12 4:2
  16:24 17:6,9
  17:13,21 31:11
  35:5 43:25
**sentiment**  15:3
**separate**  29:25
**set**  38:25
**sets**  34:9 51:22
**settlement**
  37:13 38:11,17

**seven**  58:22
**several**  2:7 8:15
  10:1 42:12
**share**  42:10
**shift**  35:7
**shooting**  47:6
**shopping**  50:9
**short**  40:13
**shorthand**
  15:19
**shot**  58:12
**show**  21:8
  33:14
**showing**  44:3
**shows**  22:20
**side**  53:19
**sides**  60:14
**signature**  61:18
**significant**
  44:17
**similar**  6:22,24
  9:1 50:5
**simple**  25:23
  28:14,21,22
**simplest**  4:17
**simply**  13:25
  18:22 47:22
  48:13
**simultaneous**
  12:5 19:21
  40:1,9 48:16
**single**  59:6
**sit**  15:4

six  49:25
slightly  31:1
small  41:8
solution  57:1,2
  57:4
solve  57:3
  59:11
somewhat
  50:25
soon  59:14
sorry  9:21
  13:19,21 40:12
  48:17 50:19
  58:8
sort  10:2 29:3
  45:1 54:14
sorts  53:12
sought  3:22
sounds  26:22
  27:25
source  30:16
speak  11:19
  25:2 51:19
speaking  12:5
  19:21 33:5
  40:1,9 48:16
special  1:16 3:1
  5:15 6:15 8:5,7
  9:5,20 10:16
  10:24 12:4,6
  13:14 14:15
  15:15 16:3
  19:9,18,19
  20:4 21:24

22:4,6 23:10
24:15 25:10
26:20 27:20
28:13,25 29:10
30:1 32:9
34:10,20 37:9
37:25 39:24
40:2,10,19,25
41:12 42:2
43:13 45:10
46:22 48:18
49:22 50:19,22
53:15 59:4,19
specific  17:5,11
  27:24
speculating
  40:22
stage  42:20
standard  42:17
standards
  50:15
stands  4:2 35:5
start  4:16 26:6
  28:20 43:17
  50:11 55:10,21
  57:24
state  8:23
  13:24 36:14
  40:6 61:21
statement
  17:11 19:17
statements
  17:4

states  1:1
status  1:16
  60:22
statutory  27:7
stenotype  61:8
stenotypy  61:6
step  54:20
  55:14
steps  24:4
store  3:5
storewide
  31:15
story  28:16
straightforward
  49:7
strong  48:22
stuff  17:7,8
  60:3,9
sturm  9:4
subject  6:5
  14:25 23:13
submissions
  10:14
submit  24:5,11
submitted  21:1
subpoena  3:4,9
  3:20 4:15
  14:18 28:5
  31:17 49:24
  54:3,8
subpoenaed
  4:5
subsection  28:6

subsequent
  34:7
substantial  7:5
  7:11 35:15
substantially
  7:16 30:8
substantiated
  59:1
successful  12:3
  57:14
succinctly
  32:10
sued  40:14 41:7
sufficient  41:23
sufficiently
  41:15,24 42:18
  42:25 43:10
suggest  53:21
  54:20
suggested
  54:10
suggesting
  37:12 52:25
  56:23
suggestion  42:3
  55:15,19
suggestions
  58:6 60:7
suing  40:6
superceding
  6:2
superseding
  6:12 8:17
  12:18 39:6

| | | | |
|---|---|---|---|
| **supplier** 3:7 | **takes** 24:5 | 60:17,18,20 | **thinking** 16:16 |
| **supply** 13:1 | **talk** 12:23 23:4 | **thing** 15:12 | **third** 11:12 |
| **suppose** 40:20 | 24:1 25:9 | 22:19 41:14 | 12:1 14:6 15:1 |
| **supposed** 17:2 | 28:19 56:21 | 43:25 46:14,16 | 18:9 33:19 |
| **sure** 6:21 15:8 | **talked** 7:3 | 53:5 55:23 | **thoroughly** |
| 17:21 24:16 | **talking** 15:10 | 56:22 | 39:8 |
| 26:2 27:5,18 | 23:15 24:13 | **things** 11:15 | **thought** 60:11 |
| 28:11 35:1 | 25:14,25 30:19 | 16:16 27:15 | **thoughts** 58:6 |
| 50:22 | 41:4 49:10 | 55:12 57:11,23 | 60:6 |
| **surgery** 18:19 | 54:12 56:21 | **think** 3:6,17,23 | **three** 35:14 |
| **surprising** | **talks** 16:16 | 4:13,17 5:19 | 41:7 |
| 25:15 | **tangential** 10:4 | 6:3,17,20 7:23 | **threshold** 8:13 |
| **suspect** 24:8 | 10:6 | 8:12 9:23 10:9 | **throw** 14:23 |
| 39:2 | **tele** 37:12 | 11:2,9,22 | **thumb** 53:16 |
| **suspicious** | **tell** 22:16 28:8 | 14:21,23 16:11 | **time** 5:7 16:20 |
| 25:18,21,22 | 30:11 36:20 | 21:21 24:16 | 19:25 32:17 |
| 26:10,17 27:6 | 37:9 44:17 | 25:4,11 27:1 | 56:25 58:12 |
| 27:9,19,21 | 45:18,19 50:13 | 28:4,14 30:5 | 60:17,19 |
| 28:7,9 | **telling** 12:8 | 31:8,24 34:23 | **times** 35:19 |
| **system** 20:18 | 58:24 | 36:4,18 37:5 | 47:14 |
| 20:23 21:1,23 | **tells** 32:19,19 | 41:1,22 42:3 | **today** 3:3 46:10 |
| 23:19 27:10 | **term** 27:22 | 42:17,17,19,21 | **together** 3:2 |
| 29:17 | **terms** 23:6 46:6 | 42:24 43:9,18 | 50:3,14 |
| | 46:21,23,24 | 45:2,5,13,24 | **took** 19:5 39:18 |
| **t** | 47:15,16,18,22 | 46:22 48:21 | 39:21 61:5 |
| | 48:1,23,25 | 49:23 50:4,13 | **tool** 4:11 |
| **t** 44:2 | 49:1,3,12 | 50:17,25 53:5 | **topic** 12:8 |
| **table** 55:11 | 51:21 52:2 | 53:17,20,25 | **topics** 58:16 |
| **take** 12:17 15:7 | 53:2 | 54:11 55:8,23 | **total** 38:18,19 |
| 33:6 34:11 | **terrible** 59:13 | 56:2,5,25 58:1 | 39:16 |
| 44:22 47:25 | **texas** 1:12 | 58:10,14,16 | **touch** 4:13 5:9 |
| 49:1 55:2,14 | **thank** 8:7 20:5 | 59:5,10,11,15 | **track** 1:11,13 |
| 56:8 | 20:7 29:12 | 59:23 | 28:9 |
| **taken** 20:24 | 41:3 44:8 | | |
| 26:18 | | | |

**tracked** 27:12
**transcribed**
61:8
**transcript** 61:7
61:10,11,13
**tremendous**
39:14
**trial** 7:3,7
11:12 32:17,21
33:6 42:24
**tried** 3:13 5:19
31:8
**true** 7:17,19,23
7:24 14:1
16:10 28:4
37:14 61:13
**try** 37:3 47:4
**trying** 15:18,23
27:25 40:17
**turn** 14:15
23:11
**twice** 3:14
**two** 3:17 10:14
11:15 18:11,23
24:6 35:14
50:15 59:20,25
**type** 10:20 39:7
52:8,10
**types** 53:12
**typewritten**
61:9

**u**

**ultimately**
24:12 42:7
**under** 9:23,24
10:3,10,21
11:8
**understand** 7:1
15:19 16:23
19:12 25:17
33:2 35:23
36:2 50:17
**understanding**
15:24 16:4
20:9 21:5,10
25:2,19
**understood**
27:23
**undertake**
31:20
**undertaken**
51:5
**undertaking**
31:25
**undertook**
23:22 51:4
**unfortunately**
38:7
**uninclusive**
15:20
**unintelligible**
30:16 33:18
57:17

**united** 1:1
**unquote** 16:8
38:14
**unusual** 25:15
27:14
**use** 4:11 5:24
32:3,18 34:9
42:24
**used** 16:18 19:7
27:21 28:5
57:12
**using** 42:5 47:3
**usually** 57:17

**v**

**v** 1:10,12
**verse** 20:22
**view** 8:13 21:16
**virtue** 36:2
**vis** 24:18,18

**w**

**wait** 54:21
**waiting** 53:19
55:4
**walgreens** 12:7
**walmart** 12:7
**want** 4:9,13,16
12:23 13:19
17:7 18:1 20:6
22:16 27:2,15
32:1,5,12 33:2
33:3 35:21
47:13 49:5,15
53:8,23 55:13

56:11,16 59:12
**wanted** 13:12
13:24 23:10
26:1,3 27:5,18
28:11 29:1,1
55:9
**wanting** 3:8
**warning** 34:3
**way** 9:18 15:16
16:15 27:5
34:11 40:5
47:15 54:18
**ways** 4:4 20:22
37:3
**we've** 12:15
20:10 21:7
30:19 31:8
33:17,18,19,24
43:3,7,9 44:11
46:5,10 47:9
51:10,11 53:12
56:15 58:3
**webb** 1:12
**week** 59:16,18
**wegmans** 3:4,8
3:19,23 4:19
4:23 5:4,10 6:8
6:11,13,16 8:6
8:10,20 11:18
11:20,24 12:18
13:9 14:7,11
14:11,16 16:17
16:24 17:14,18
18:4,12,14,21

[wegmans - z]                                                    Page 20

19:5 20:6,8
22:9,11 24:10
24:13,17,21
25:6,19 26:3,7
28:16,21 30:7
30:15 31:5,12
32:12 33:20,24
34:3,5,13,19
36:6,17,23
37:13,18,21
38:1,3,22
40:14 41:7
43:17,17,22
44:1,6,9 45:18
45:19 46:19
47:5,14 48:20
48:22 49:19
50:6,12 51:2,6
51:13,16 53:2
54:1,7 58:15
**weigh**  10:6
  17:25
**weinberger**  2:3
  19:14,15,20,22
**wide**  31:15
**widest**  11:13
**willing**  41:16
  41:25 43:4
  46:13 56:5,7
  56:17,20 58:15
  59:2
**wish**  26:13
**wonderful**
  32:25 33:1

**word**  33:7
  57:12
**worded**  15:16
**words**  7:4
  12:10 14:22
  17:16 27:19
  32:20
**work**  4:10 28:7
  60:10
**working**  60:15
**works**  4:10
  32:17 47:16
**writers**  60:13
**writing**  8:15
  43:8 51:12
**written**  44:22
**wrong**  22:10
  50:13
**wrote**  12:9
  25:20

|     x     |
|-----------|

**x**  34:14,17 48:4
  54:13 56:12,13

|     y     |
|-----------|

**y**  48:7 54:13
  56:12,14
**yates**  38:9,24
**yeah**  26:24
  29:12 40:10
  54:12
**year**  5:17 45:24
**york**  6:22,23
  7:2,18 8:10,18

8:23,25 9:9,24
10:3,10,19,21
11:8,21,25
21:13 29:9
37:23,23

|     z     |
|-----------|

**z**  56:13,14

# EXHIBIT 3

 Outlook

## Re: PBM Defendants' Request for Conference re Wegmans Subpoena

**From** David R. Cohen (David@SpecialMaster.Law) <david@specialmaster.law>

**Date** Fri 12/20/2024 2:22 PM

**To** Agins, Joshua <JAgins@hodgsonruss.com>; Anthony Alden <anthonyalden@quinnemanuel.com>

**Cc** Zawodzinski, Jr., James J. <JZawodzi@hodgsonruss.com>; Galvin, Jodyann <JGalvin@hodgsonruss.com>; Wells, Claire <CWells@hodgsonruss.com>; ESI-Opioids <esi-opioids@quinnemanuel.com>; AB Optum 3P Subpoenas <AB-Optum-3PSubpoenas@alston.com>; PBM <PBM@listserv.motleyrice.com>; PEC_Optum <PEC_OPTUM@listserv.motleyrice.com>; PEC-ESI-TEAM@simmonsfirm.com <PEC-ESI-TEAM@simmonsfirm.com>

**[EXTERNAL EMAIL from david@specialmaster.law]**

I have reviewed all of the materials submitted. We will have a telecon to discuss all of this on Monday, January 6, at 3:00p EST. Please use the telecon numbers below. If the parties have additional material to submit to me before then (e.g., additional letters to each other), please do so by January 3.

To help you all along, I observe that the PBMs are probably entitled to discover something more than nothing. Wegmans should please consider and state what it will produce voluntarily in response to the subpoena, as opposed to what I or the Court conclude Wegmans should be ordered to produce.

Dial-in Number: 1.888.346.3950
Participant Entry Code: 7763-3882#

-d

=========================
This email sent from:
David R. Cohen Co. LPA
24400 Chagrin Blvd., Suite 300
Cleveland, OH 44122
216-831-0001 tel
866-357-3535 fax
www.SpecialMaster.law

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Tuesday, December 17, 2024 4:55 PM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>; David R. Cohen (David@SpecialMaster.Law)

<david@specialmaster.law>
**Cc:** Zawodzinski, Jr., James J. <JZawodzi@hodgsonruss.com>; Galvin, Jodyann <JGalvin@hodgsonruss.com>; Wells, Claire <CWells@hodgsonruss.com>; ESI-Opioids <esi-opioids@quinnemanuel.com>; AB Optum 3P Subpoenas <AB-Optum-3PSubpoenas@alston.com>; PBM <PBM@listserv.motleyrice.com>; PEC_Optum <PEC_OPTUM@listserv.motleyrice.com>; PEC-ESI-TEAM@simmonsfirm.com <PEC-ESI-TEAM@simmonsfirm.com>
**Subject:** RE: PBM Defendants' Request for Conference re Wegmans Subpoena

Dear Special Master Cohen,

On behalf of non-party Wegmans Food Markets, Inc., I write in response to the PBM Defendants' communication of yesterday evening (below). After almost a month of silence since Wegmans last wrote to the PBM Defendants, on Friday December 13, we received their latest letter, demanding Wegmans make itself available this week for a hearing with you. There is absolutely no reason to require Wegmans, a non-party, to operate in accordance with the PBM Defendants' arbitrary and expedited scheduling request. That type of conduct has typified the PBM Defendants' approach to the parties' conferral efforts over the last four months. Wegmans served its formal objections on August 27, 2024. Since then, the PBM Defendants often would take weeks (or longer) to respond to Wegmans' good-faith requests, only to demand – as they did here – a response from Wegmans on an arbitrary and expedited basis. While the PBM Defendants are actively engaged in opioid litigation and their attention is acutely focused on these proceedings, Wegmans is named as a defendant in New York State actions that have effectively been stayed for the last eighteen months and has not participated in discovery.

In short, the sweeping non-party subpoena served by the PBM Defendants improperly treats Wegmans as if it were a party to these proceedings. The non-party subpoena presents complex legal issues that need to be decided with the requisite formalities to preserve issues for appeal. Although the PBM Defendants note the non-party subpoena has been outstanding since July, the fact of the matter is that Wegmans timely asserted substantive objections. Since then, the parties have held a series of conferrals during which the PBMs refused for months to articulate relevance, claiming flippantly (and contrary to the law in the Sixth Circuit) that the relevance of their demands was "obvious" and they did not wish to expend the cost to articulate relevance. After finally agreeing to do so (as the law requires) and after Wegmans responded to their position, the PBM Defendants' arguments shifted. None of that history or complexity is addressed in the December 13 letter that the PBM Defendants sent to you yesterday evening. Rather, that letter presents a novel theory based on their amended answers, filed months *after* they served the subpoena on Wegmans. Moreover, the PBMs previously stated the documents and information sought in their subpoena are now relevant *for different reasons than stated previously*.

To provide some additional background, we attach the following:

- Wegmans August 27, 2024 Objections; and
- Wegmans November 19, 2024 response to the PBM Defendants' November 11 letter.

We also note that, to the extent it applies to non-parties, the PBM Defendants did not comply with the operative MDL Case Management Order governing discovery disputes. *See* ECF No. 232, Section 9.o. Wegmans was not invited to participate in or included on any "telephone conference-call to Judge Polster's chambers" and was precluded from discussing with the Court "how and when" Wegmans would "present [its] issues to either Judge Polster or Magistrate Judge Ruiz." *Id.* That is because, when they contacted the Court in mid-November to discuss the non-party subpoena, counsel for the PBM Defendants failed to notify Wegmans or ask Wegmans' counsel to participate.

**Wegmans therefore requests that the conference requested by the PBM Defendants, if one is to be held, be scheduled no earlier than the week of January 6.** This will allow for the holidays and provide Wegmans time to review and respond to the new issues raised in the PBM Defendants' December 13 letter.

Sincerely,

**Joshua M. Agins**
Partner
Hodgson Russ LLP

Tel: 585.454.0759
Fax: 585.423.5910
Hodgson Russ LLP
Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

---

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Monday, December 16, 2024 8:02 PM
**To:** david@specialmaster.law
**Cc:** Zawodzinski, Jr., James J. <JZawodzi@hodgsonruss.com>; Agins, Joshua <JAgins@hodgsonruss.com>; Galvin, Jodyann <JGalvin@hodgsonruss.com>; Wells, Claire <CWells@hodgsonruss.com>; ESI-Opioids <esi-opioids@quinnemanuel.com>; AB Optum 3P Subpoenas <AB-Optum-3PSubpoenas@alston.com>; PBM <PBM@listserv.motleyrice.com>; PEC_Optum <PEC_OPTUM@listserv.motleyrice.com>; PEC-ESI-TEAM@simmonsfirm.com
**Subject:** PBM Defendants' Request for Conference re Wegmans Subpoena

External Email - Use Caution

---

Dear Special Master Cohen:

Regrettably, the PBM Defendants have been unable to resolve their disputes with Wegmans Food Markets, Inc. concerning the third-party subpoena they served on it, and they would like to schedule a conference with you for this week. The subpoena was served in July and, with an April 2025 discovery cut-off looming, the PBM Defendants simply cannot afford to wait any longer for Wegmans to comply. The attached letter (which encloses the subpoena) explains the PBM Defendants' position. Kindly advise as to your availability for a conference this week. Counsel for Wegmans is copied.

Thanks,

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in

Case: 1:17-md-02804-DAP Doc #: 6393-1 Filed: 01/06/26 142 of 304. PageID #: 705157

error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

# EXHIBIT 4

 Outlook

---

## RE: PBM Defendants' Request for Conference re Wegmans Subpoena

**From** Agins, Joshua <JAgins@hodgsonruss.com>

**Date** Tue 1/14/2025 6:27 PM

**To**   Anthony Alden <anthonyalden@quinnemanuel.com>; ESI-Opioids <esi-opioids@quinnemanuel.com>; AB
        Optum 3P Subpoenas <AB-Optum-3PSubpoenas@alston.com>

**Cc**   Galvin, Jodyann <JGalvin@hodgsonruss.com>; Zawodzinski, Jr., James J. <JZawodzi@hodgsonruss.com>; Wells,
        Claire <CWells@hodgsonruss.com>

---

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

---

Anthony:

Pursuant to Special Master Cohen's direction to the parties to share their compromise positions with respect to
the PBMs' non-party subpoena to Wegmans in the *City of Rochester* MDL case, Wegmans offers the following
compromise positions. For Subpoena Paragraphs 8, 9, 10, and 11, the scope of the compromise includes
production of documents for Wegmans pharmacies located in the City of Rochester and Monroe County.
Wegmans offers these compromises in furtherance of the parties' efforts to satisfy the non-party subpoena but
without conceding relevance and while preserving its previously served written objections.

- **Subpoena Paragraph 2:** Wegmans will collect and produce all Provider Manuals and Payor Sheets that
  describe how Wegmans pharmacists interact with communications received from PBMs at the point of sale
  ("POS"). If available, and to the extent not contractually prohibited, Wegmans' production would include
  Provider Manuals and Payor Sheets relating to other PBMs (in addition to ESI and Optum) with which
  Wegmans interacted during the relevant timeframe.

  To the extent Subpoena Paragraph 2 is intended to encompass "health and safety" communications
  issued by ESI and/or Optum outside the POS, Wegmans reiterates its request to the PBMs to identify the
  allegedly relevant communications they sent to Wegmans, and, depending on the volume and arguable
  relevance of such communications, Wegmans will endeavor to expand its search to encompass additional
  materials related to those non-POS communications.

- **Subpoena Paragraphs 5-6:** Resolved on the Record during conference with Special Master Cohen that
  Wegmans never was a distributor and therefore has no duty to identify or report Suspicious Orders and
  does not have access to ARCOS data or any obligation to review it.

- **Subpoena Paragraph 8:** Wegmans will collect and produce responsive documents, if any, for the City of
  Rochester and Monroe County. Wegmans will redact any confidential employee and patient information.

- **Subpoena Paragraph 9:** Wegmans will collect and produce DEA Form 106's for its stores in the City of
  Rochester and Monroe County. As you may know, DEA Form 106 is the required documentation to report
  the theft or loss of controlled substances.

- **Subpoena Paragraphs 10-11:** Wegmans has never been the subject of any criminal or regulatory fine or
  administrative action with respect to its dispensing policies in the City of Rochester or Monroe County. We
  are in the process of exploring the burden and feasibility of collecting documents – if any – reflecting

instances when law enforcement made inquiries to Wegmans about prescribers and/or patients in the City of Rochester and Monroe County.

- **Subpoena Paragraph 12**: Wegmans will endeavor to collect and produce all contracts with manufacturers and distributors. If the contracts contain third-party notice or confidentiality provisions, we may need to work through those before producing.

- **Subpoena Paragraphs 3 and 7**: As I advised during our call last Wednesday, our primary client contact was out last week and returned to the office for the first time today. So, we are still exploring the burden and feasibility of a compromise on Paragraphs 3 and 7 and will supplement this response as soon as we are able, likely next week.

Regards,
Josh

**Joshua M. Agins**
Partner
Hodgson Russ LLP

Tel: 585.454.0759
Fax: 585.423.5910
Hodgson Russ LLP
Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

---

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Monday, January 13, 2025 7:46 PM
**To:** David R. Cohen (David@SpecialMaster.Law) <david@specialmaster.law>; Agins, Joshua <JAgins@hodgsonruss.com>
**Cc:** Zawodzinski, Jr., James J. <JZawodzi@hodgsonruss.com>; Galvin, Jodyann <JGalvin@hodgsonruss.com>; Wells, Claire <CWells@hodgsonruss.com>; ESI-Opioids <esi-opioids@quinnemanuel.com>; AB Optum 3P Subpoenas <AB-Optum-3PSubpoenas@alston.com>; PBM <PBM@listserv.motleyrice.com>; PEC_Optum <PEC_OPTUM@listserv.motleyrice.com>; PEC-ESI-TEAM@simmonsfirm.com
**Subject:** RE: PBM Defendants' Request for Conference re Wegmans Subpoena

**External Email - Use Caution**

---

Josh: on our call last Wednesday, you advised me that your client contact was out last week but that you will get us Wegmans' list of proposed compromises (or at least some of them) early this week. Kindly send them by tomorrow so we can keep the discussion moving to resolution.

Thanks,
Anthony

**Anthony Alden**
*Partner*
**Quinn Emanuel Urquhart & Sullivan, LLP**
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017

213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** David R. Cohen (David@SpecialMaster.Law) <david@specialmaster.law>
**Sent:** Monday, January 6, 2025 12:29 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>; Anthony Alden <anthonyalden@quinnemanuel.com>
**Cc:** Zawodzinski, Jr., James J. <JZawodzi@hodgsonruss.com>; Galvin, Jodyann <JGalvin@hodgsonruss.com>; Wells, Claire <CWells@hodgsonruss.com>; ESI-Opioids <esi-opioids@quinnemanuel.com>; AB Optum 3P Subpoenas <AB-Optum-3PSubpoenas@alston.com>; PBM <PBM@listserv.motleyrice.com>; PEC_Optum <PEC_OPTUM@listserv.motleyrice.com>; PEC-ESI-TEAM@simmonsfirm.com
**Subject:** Re: PBM Defendants' Request for Conference re Wegmans Subpoena

[EXTERNAL EMAIL from david@specialmaster.law]

PS Please send me the transcript when you get it.
Thx again


========================
This email sent from:
David R. Cohen Co. LPA
24400 Chagrin Blvd., Suite 300
Cleveland, OH 44122
216-831-0001 tel
866-357-3535 fax
www.SpecialMaster.law


**From:** David R. Cohen (David@SpecialMaster.Law) <david@specialmaster.law>
**Sent:** Monday, January 6, 2025 11:40 AM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>; Anthony Alden <anthonyalden@quinnemanuel.com>
**Cc:** Zawodzinski, Jr., James J. <JZawodzi@hodgsonruss.com>; Galvin, Jodyann <JGalvin@hodgsonruss.com>; Wells, Claire <CWells@hodgsonruss.com>; ESI-Opioids <esi-opioids@quinnemanuel.com>; AB Optum 3P Subpoenas <AB-Optum-3PSubpoenas@alston.com>; PBM <PBM@listserv.motleyrice.com>; PEC_Optum <PEC_OPTUM@listserv.motleyrice.com>; PEC-ESI-TEAM@simmonsfirm.com <PEC-ESI-TEAM@simmonsfirm.com>
**Subject:** Re: PBM Defendants' Request for Conference re Wegmans Subpoena

Greetings.

The parties should please review the attached case — which stands generally for the proposition that the burden on a non-party of producing discovery in response to a subpoena can be alleviated, at least in part, by shifting to the requesting party the cost of production — and be prepared to discuss it this afternoon during our 2:00p telecon.

Thanks,
David


========================
This email sent from:
David R. Cohen Co. LPA
24400 Chagrin Blvd., Suite 300
Cleveland, OH 44122
216-831-0001 tel
866-357-3535 fax
www.SpecialMaster.law

---

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Friday, January 3, 2025 6:20 PM
**To:** David R. Cohen (David@SpecialMaster.Law) <david@specialmaster.law>; Anthony Alden <anthonyalden@quinnemanuel.com>
**Cc:** Zawodzinski, Jr., James J. <JZawodzi@hodgsonruss.com>; Galvin, Jodyann <JGalvin@hodgsonruss.com>; Wells, Claire <CWells@hodgsonruss.com>; ESI-Opioids <esi-opioids@quinnemanuel.com>; AB Optum 3P Subpoenas <AB-Optum-3PSubpoenas@alston.com>; PBM <PBM@listserv.motleyrice.com>; PEC_Optum <PEC_OPTUM@listserv.motleyrice.com>; PEC-ESI-TEAM@simmonsfirm.com <PEC-ESI-TEAM@simmonsfirm.com>
**Subject:** RE: PBM Defendants' Request for Conference re Wegmans Subpoena


Dear Special Master Cohen,


Attached is a letter with Exhibits on behalf of Wegmans Food Markets, Inc. in anticipation of Monday's conference.


Sincerely,


**Joshua M. Agins**
Partner
Hodgson Russ LLP


Tel: 585.454.0759

Fax: 585.423.5910

[www.hodgsonruss.com] Hodgson Russ LLP


Twitter | LinkedIn | [www.hodgsonruss.com]website | e-mail


1800 Bausch & Lomb Place |

Rochester, NY 14604

---

**From:** David R. Cohen (David@SpecialMaster.Law) <david@specialmaster.law>
**Sent:** Friday, December 20, 2024 3:22 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>; Anthony Alden <anthonyalden@quinnemanuel.com>
**Cc:** Zawodzinski, Jr., James J. <JZawodzi@hodgsonruss.com>; Galvin, Jodyann <JGalvin@hodgsonruss.com>; Wells, Claire <CWells@hodgsonruss.com>; ESI-Opioids <esi-opioids@quinnemanuel.com>; AB Optum 3P Subpoenas <AB-Optum-3PSubpoenas@alston.com>; PBM <PBM@listserv.motleyrice.com>; PEC_Optum <PEC_OPTUM@listserv.motleyrice.com>; PEC-ESI-TEAM@simmonsfirm.com
**Subject:** Re: PBM Defendants' Request for Conference re Wegmans Subpoena

---

**External Email - Use Caution**

---

I have reviewed all of the materials submitted. We will have a telecon to discuss all of this on Monday, January 6, at 3:00p EST. Please use the telecon numbers below. If the parties have additional material to submit to me before then (e.g., additional letters to each other), please do so by January 3.


To help you all along, I observe that the PBMs are probably entitled to discover something more than nothing. Wegmans should please consider and state what it will produce voluntarily in response to the subpoena, as opposed to what I or the Court conclude Wegmans should be ordered to produce.


Dial-in Number: 1.888.346.3950

Participant Entry Code: 7763-3882#

-d

========================
This email sent from:
David R. Cohen Co. LPA
24400 Chagrin Blvd., Suite 300
Cleveland, OH 44122
216-831-0001 tel
866-357-3535 fax
www.SpecialMaster.law

---

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Tuesday, December 17, 2024 4:55 PM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>; David R. Cohen (David@SpecialMaster.Law) <david@specialmaster.law>
**Cc:** Zawodzinski, Jr., James J. <JZawodzi@hodgsonruss.com>; Galvin, Jodyann <JGalvin@hodgsonruss.com>; Wells, Claire <CWells@hodgsonruss.com>; ESI-Opioids <esi-opioids@quinnemanuel.com>; AB Optum 3P Subpoenas <AB-Optum-3PSubpoenas@alston.com>; PBM <PBM@listserv.motleyrice.com>; PEC_Optum <PEC_OPTUM@listserv.motleyrice.com>; PEC-ESI-TEAM@simmonsfirm.com <PEC-ESI-TEAM@simmonsfirm.com>
**Subject:** RE: PBM Defendants' Request for Conference re Wegmans Subpoena

Dear Special Master Cohen,

On behalf of non-party Wegmans Food Markets, Inc., I write in response to the PBM Defendants' communication of yesterday evening (below). After almost a month of silence since Wegmans last wrote to the PBM Defendants, on Friday December 13, we received their latest letter, demanding Wegmans make itself available this week for a hearing with you. There is absolutely no reason to require Wegmans, a non-party, to operate in accordance with the PBM Defendants' arbitrary and expedited scheduling request. That type of conduct has typified the PBM Defendants' approach to the parties' conferral efforts over the last four months. Wegmans served its formal objections on August 27, 2024. Since then, the PBM Defendants often would take weeks (or longer) to respond to

Wegmans' good-faith requests, only to demand – as they did here – a response from Wegmans on an arbitrary and expedited basis. While the PBM Defendants are actively engaged in opioid litigation and their attention is acutely focused on these proceedings, Wegmans is named as a defendant in New York State actions that have effectively been stayed for the last eighteen months and has not participated in discovery.

In short, the sweeping non-party subpoena served by the PBM Defendants improperly treats Wegmans as if it were a party to these proceedings. The non-party subpoena presents complex legal issues that need to be decided with the requisite formalities to preserve issues for appeal. Although the PBM Defendants note the non-party subpoena has been outstanding since July, the fact of the matter is that Wegmans timely asserted substantive objections. Since then, the parties have held a series of conferrals during which the PBMs refused for months to articulate relevance, claiming flippantly (and contrary to the law in the Sixth Circuit) that the relevance of their demands was "obvious" and they did not wish to expend the cost to articulate relevance. After finally agreeing to do so (as the law requires) and after Wegmans responded to their position, the PBM Defendants' arguments shifted. None of that history or complexity is addressed in the December 13 letter that the PBM Defendants sent to you yesterday evening. Rather, that letter presents a novel theory based on their amended answers, filed months *after* they served the subpoena on Wegmans. Moreover, the PBMs previously stated the documents and information sought in their subpoena are now relevant *for different reasons than stated previously*.

To provide some additional background, we attach the following:

- Wegmans August 27, 2024 Objections; and

- Wegmans November 19, 2024 response to the PBM Defendants' November 11 letter.

We also note that, to the extent it applies to non-parties, the PBM Defendants did not comply with the operative MDL Case Management Order governing discovery disputes. *See* ECF No. 232, Section 9.o. Wegmans was not invited to participate in or included on any "telephone conference-call to Judge Polster's chambers" and was precluded from discussing with the Court "how and when" Wegmans would "present [its] issues to either Judge Polster or Magistrate Judge Ruiz." *Id.* That is because, when they contacted the Court in mid-November to discuss the non-party subpoena, counsel for the PBM Defendants failed to notify Wegmans or ask Wegmans' counsel to participate.

**Wegmans therefore requests that the conference requested by the PBM Defendants, if one is to be held, be scheduled no earlier than the week of January 6.** This will allow for the holidays and provide Wegmans time to review and respond to the new issues raised in the PBM Defendants' December 13 letter.

Sincerely,

**Joshua M. Agins**
Partner
Hodgson Russ LLP

**Tel:** 585.454.0759

**Fax:** 585.423.5910

Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |

Rochester, NY 14604

---

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Monday, December 16, 2024 8:02 PM
**To:** david@specialmaster.law
**Cc:** Zawodzinski, Jr., James J. <JZawodzi@hodgsonruss.com>; Agins, Joshua <JAgins@hodgsonruss.com>; Galvin, Jodyann <JGalvin@hodgsonruss.com>; Wells, Claire <CWells@hodgsonruss.com>; ESI-Opioids <esi-opioids@quinnemanuel.com>; AB Optum 3P Subpoenas <AB-Optum-3PSubpoenas@alston.com>; PBM <PBM@listserv.motleyrice.com>; PEC_Optum <PEC_OPTUM@listserv.motleyrice.com>; PEC-ESI-TEAM@simmonsfirm.com
**Subject:** PBM Defendants' Request for Conference re Wegmans Subpoena

---

<div style="border:2px solid navy; padding:10px;">

**External Email - Use Caution**

</div>

---

Dear Special Master Cohen:

Regrettably, the PBM Defendants have been unable to resolve their disputes with Wegmans Food Markets, Inc. concerning the third-party subpoena they served on it, and they would like to schedule a conference with you for this week. The subpoena was served in July and, with an April 2025 discovery cut-off looming, the PBM Defendants simply cannot afford to wait any longer for Wegmans to comply. The attached letter (which encloses the subpoena) explains the PBM Defendants' position. Kindly advise as to your availability for a conference this week. Counsel for Wegmans is copied.

Thanks,

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

# EXHIBIT 5



**Joshua M. Agins**
Partner
Direct Dial: 585.454.0759
Direct Facsimile: 585.423.5910
*JAgins@hodgsonruss.com*

January 29, 2025

Anthony P. Alden, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
865 South Figueroa Street
10th Floor
Los Angeles, CA  90017-2543

> Re:    *In re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio)
>        *City of Rochester v. Purdue Pharma L.P.*, No. 19-op-45853 (Track 12)

Dear Anthony:

This supplements my January 14, 2025 email, in which Wegmans explained its proposed compromise position in furtherance of the parties' efforts to narrow the PBMs' overbroad non-party subpoena. Wegmans offers the below supplementation without conceding relevance or proportionality, and while preserving its previously served written objections. This conferral process is not supposed to be one-sided, per Special Master Cohen's direction; and we note that the PBMs have not responded substantively to Wegmans' January 14 communication, which is now 15 days outstanding.

**<u>Subpoena Paragraph 1</u>**:

During the January 6, 2025 Status Conference, Special Master Cohen asked the PBMs how production of the data in Request No. 1 would lead to the discovery of admissible evidence at trial:

> SPECIAL MASTER COHEN: Anthony, explain this to me as succinctly as you can. Let's say that I ruled you get everything you want, okay, that Wegmans has to, you know, really drop its kimono and give you everything that you've asked for, all of the communications it's received from these other entities, what it did, its prescription data, the works. *Now it's time for trial. You know, how do you use it, assuming that it tells you everything you hope it tells you, right? In other words, it's really kind of best case. What does that look like at trial?*

Status Conference Transcript at P. 32:10-21 (emphasis added).

Anthony P. Alden, Esq.
January 29, 2025
Page 2



The PBMs responded to the admissibility question raised by Special Master Cohen as follows:

> MR. ALDEN: Well, look -- again, Anthony Alden speaking -- I don't -- I am not really a trial lawyer so please don't take what I'm saying as the final word on this, but, you know, for example, as I mentioned before, *on the dispensing data and the point-of-sale communication data, that is data that is going to go to our experts who are going to build it into a response to Plaintiffs' red flag analysis.*

Status Conference Transcript at P. 33: 5-13 (emphasis added).

More specifically, the PBMs stated they are looking for data they "don't have" regarding "Wegmans' rationale for dispensing opioids" or "why a [Wegmans] pharmacist overrode a red flag[.]" *Id.* at 22:9-12.

These were curious and revealing admissions by the PBMs that undermine the admissibility of the data sought in Request No. 1 because the data fields requested are not what one would examine to evaluate "Wegmans' rationale for dispending opioids."  The PBMs communicate with Wegmans in the ordinary course of business through the transmittal of Payer Sheet data that conforms with national standards promulgated by the National Counsel for Prescription Drug Programs ("NCPDP").  The NCPDP Payer Sheets contain multiple fields, including Drug Utilization Review ("DUR") fields, that Wegmans routinely completes as part of the claims processing procedures required by a PBM.  The Payer Sheet data reflects some of the relevant fields if the objective is to understand how any "red flag" identified within a dispensed prescription was resolved by a Wegmans pharmacist.  The data fields delineated in Request No. 1 *do not track* the Payer Sheet for each dispensed prescription or seek fields related to DUR.  As a result, the fields in Request No. 1 provide an artificial and **misleading** representation of Wegmans' dispensing conduct because they omit the fields reflecting "Wegmans rationale" for dispensing opioids.  The PBMs' cherry-picked data fields delineated in Request No. 1 requires Wegmans to create a "bespoke" and misleading set of data that the PBMs intend to feed to their experts.  This "litigation" dataset is something that does not exist in the normal course and is inadmissible at trial because it is both incomplete and misleading.

Requiring Wegmans to create a bespoke dataset for the PBMs' experts is outside the scope of permissible discovery because it is not likely to lead to the discovery of admissible evidence; it is misleading because it omits information about the resolution of "red flags," including, for example, DUR data reflected in the completed Payer Sheets that Wegmans submits to PBMs.

Anthony P. Alden, Esq.
January 29, 2025
Page 3



In short, the cherry-picked data set that the PBMs are demanding Wegmans create for their experts does not exist in the normal course and is not even responsive to the purported relevance that the PBMs articulated in the January 6 Status Conference.

Wegmans will not agree to create a skewed and misleading data set for the PBMs, but Wegmans reiterates its prior offer: we understand the PBMs position to be that they "don't have" some of the Wegmans Payer Sheet data from Wegmans claims that they processed. If the PBMs will identify the data they are missing and the prescriptions at issue relating to claims they processed, that information would provide a basis for Wegmans to consider the burden to harvest the data the PBMs say they are missing. **Optum and Express Scripts account for more than 50%** of the prescriptions filled by Wegmans and therefore the Payer Sheet data from the claims they processed is more than adequate to conduct whatever analysis the PBMs wish to conduct.

If the PBMs have no interest in such a compromise, please let us know, as Wegmans intends to reiterate its request for a briefing schedule on this issue. There is no need to continue to avoid a briefing schedule if the PBMs have no intention of considering this compromise.

### Subpoena Paragraph 3

As noted during the January 6 Status Conference, the PBMs already know the material communications issued by manufacturers to pharmacies. As Special Master Cohen correctly observed, "almost all of it[] has already been produced into the MDL. And so [the PBMs] pretty much know what the manufacturers sent." Status Conference Transcript at P. 43. Special Master Cohen is correct; it serves no purpose to impose the burden on Wegmans to comb through hundreds of thousands (or more) emails to harvest communications that the PBMs already possess by virtue of their participation in the MDL. Although Wegmans could properly stand on that objection alone, in the interest of compromise Wegmans again offers the following: if the PBMs will identify *specific* manufacturer communications that are material and relevant to the issues in Track 12, Wegmans will attempt to determine the burden of harvesting those communications (and related ones).

### Subpoena Paragraph 4

This overbroad request effectively seeks every communication between Wegmans and its pharmacists. As the PBMs well know from the claims files they receive and adjudicate in the ordinary course of business, Wegmans pharmacists fill opioid prescriptions through the process *demanded* by the PBMs, including the completion of Payer Sheets, which contain DUR information. The PBMs have never attempted to articulate why their own documents and policies, which Wegmans must follow, do not provide all the information they could reasonably need to know about this topic.

Anthony P. Alden, Esq.
January 29, 2025
Page 4



**Subpoena Paragraph 7**

As suggested during the Status Conference, Wegmans would be willing to search its archives for interactions with regulators and law enforcement about local prescribers in Rochester.

<div align="center">*         *         *</div>

Wegmans will await the PBMs' written response to the substantial compromises that Wegmans has offered above and in my January 14 email to satisfy the non-party subpoena. As the PBMs themselves have done repeatedly, if a compromise cannot be reached, Wegmans will not hesitate to seek appellate relief of any rulings that may be issued. Having said that, however, the significant compromises that Wegmans have offered should satisfy the direction given by Special Master Cohen at the January 6 Status Conference—that "there is something more than nothing that Wegmans is going to have to produce" and the PBMs are not going to receive everything they claim to need.

Sincerely yours,

Joshua M. Agins

JMA/mmp

CC:    ESI-Opioids (esi-opioids@quinnemanuel.com)
        AB Optum 3P Subpoenas (AB-Optum-3PSubpoenas@alstom.com)
        Jodyann Galvin
        James J. Zawodzinski
        Claire E. Wells

# EXHIBIT 6

# ALSTON & BIRD

555 Fayetteville St, Suite 600
Raleigh, NC 27601
919-862-2200 | Fax: 919-862-2260

**Ryan P. Ethridge**          Direct Dial: **+1 919 862 2283**          Email: **ryan.ethridge@alston.com**

February 28, 2025

<u>VIA E-MAIL</u>
<u>JAGINS@HOGSDONRUSS.COM</u>

Josh Agins

Re:    PBM Defendants' Subpoena to Wegmans

Dear Mr. Agins,

I write on behalf of Express Scripts, Inc. and OptumRx, Inc. (collectively, the "PBM Defendants") in response to your January 14, 2025 email and January 29, 2025 letter.  Your January 14, 2025 email contains Wegmans Food Market's belated proposals in response to only some of the requests for documents contained in the Subpoena the PBM Defendants served over six months ago.  Your January 29, 2025 letter addresses the remainder of the PBM Defendants' document requests, but it contains no meaningful compromise proposals and simply reiterates the same positions Wegmans has taken before, including at the hearing itself, along with newly raised excuses attempting to justify Wegmans' continued refusal to produce critical responsive evidence. That it took Wegmans almost a full month to simply re-hash its past positions is yet further evidence of its gamesmanship and transparent attempt to delay.  Nonetheless, in keeping with the Special Master's directives to attempt to compromise, we set forth herein the PBM Defendants' response on each request.

**Request No. 1 (As Narrowed By the PBM Defendants' Prior Compromise Proposals)**: **Dispensing data reflecting all drugs within the Drug Scope, that You dispensed in the [City of Rochester] from January 1, 2006 to present.  The data should include the following [34] fields: [fields omitted]**

As we have explained, the PBM Defendants need Wegmans' dispensing and point-of-sale ("POS") data to adequately defend themselves against the City of Rochester's claims and to counter the Plaintiffs' "Red Flag analysis."   The MDL Court previously ordered the Pharmacy Defendants to produce the same 34 fields of "transactional dispensing data" the PBM Defendants requested from Wegmans—which the Special Master determined was

---

Alston & Bird LLP                                                                 www.alston.com

February 28, 2025
Page 2

"as few data fields as absolutely necessary, while still allowing: (1) Plaintiffs to undertake their 'Red Flag analysis,' and (2) Defendants to counter Plaintiffs' conclusions." (Dkt. 3106 at 2).

Here, the PEC has confirmed that Plaintiff's experts intend to use dispensing data (including from the PBM Defendants' home-delivery pharmacies ("HDPs")) to present red-flag analyses against the PBM Defendants, as to both (1) prescriptions dispensed by the PBM Defendants' HDPs, and (2) prescriptions dispensed by third-party pharmacies, such as Wegmans. (1/6/2025 Hearing Tr. at 19-20). The PBM Defendants have dispensing data for their HDPs (which they have produced)—representing less than 0.5% of the opioids dispensed in Rochester during the relevant period. To adequately defend against the Plaintiff's non-HDP red-flag analysis, however, they need a more complete picture, and representative sample, of the prescription opioids dispensed in Rochester. Dispensing data from Wegmans—which dispensed approximately 30% of all opioids in Rochester during the relevant time—provides exactly that.

Thus, the PBM Defendants seek Wegmans' highly material dispensing and POS data, and they limited their request to the same 34 data fields the Special Master previously determined made up the narrowest possible data production that would allow the Plaintiffs to undertake, and the Defendants to counter, their red-flag analysis. Wegmans contends that producing this data would entail an extraordinary cost burden, but it still has not provided any supporting information sufficient to enable the PBM Defendants to consider how to alleviate any such burden. (1/6/2025 Hearing Tr. at 41). Nevertheless, in the spirit of compromise, and to further alleviate any ostensible burden, the PBM Defendants are willing to drop the following 11 data fields from Request No. 1 in the Subpoena:

1. Dosage form [Subpoena ¶ 1(e)]
2. Dispensing pharmacist [Subpoena ¶ 1(i)]
3. Diagnostic code [Subpoena ¶ 1(n)]
4. Control / Non Control ratio [Subpoena ¶ 1(r)]
5. Refill indicator (whether the Rx is a refill or the original) [Subpoena ¶ 1(x)]
6. Prescriber Specialty [Subpoena ¶ 1(y)]
7. DEA Schedule (Same as Control/Non-Control) [Subpoena ¶ 1(dd)]
8. Dispense Hour [Subpoena ¶ 1(ee)]
9. Dispense Minute [Subpoena ¶ 1(ff)]
10. Drop Off Hour [Subpoena ¶ 1(gg)]
11. Drop Off Minute [Subpoena ¶ 1(hh)]

In addition, the PBM Defendants also included a Prescription Number field in the HDP dispensing data they produced, and they would request that Wegmans do the same. Please confirm Wegmans will produce such data, or we intend to seek a ruling from Special Master Cohen.

February 28, 2025
Page 3

**Request No. 2 (As Narrowed By the PBM Defendants' Prior Compromise Proposals)**:  **Documents sufficient to show how You and any pharmacists employed by You (or other employees involved in dispensing drugs within the Drug Scope) do or do not consider, use, respond to, or interact with communications received from pharmacy benefit managers (including, but not limited to, the Defendants) at the point of sale, including, but not limited to, communications regarding plan coverage limits (such as prior authorizations, step edits, and quantity limits) and communications regarding health and safety issues (such as concurrent drug utilization review or CDUR messages), from January 1, [2006], to present.  Your response should include documents responsive at both the pharmacy and individual employee level, and should include any pertinent policies, procedures, directives, or guidance.**

To clarify a point of confusion in your January 14, 2025 email, this Request is *not* limited to "'health/safety' communications issued by ESI and/or Optum outside the POS."  The subject matter of the Request plainly includes POS communications.  In this regard, while we appreciate Wegmans' belated agreement to produce Provider Manual and Payor Sheets, this is insufficient because (among other reasons) Wegmans acknowledges it may be "contractually prohibited" from producing such documents for any PBMs except the PBM Defendants.  To be clear, the PBM Defendants request that Wegmans produce these documents for all PBMs, and they believe Wegmans' agreements with these PBMs likely include notice provisions that would allow for disclosure as required by court order or after a notice period.  In either case, such documents would not reflect Wegmans' underlined internal drug utilization and prescription review processes, beyond what it submits to PBMs.

Nonetheless, we believe compromise can be reached if Wegmans agrees to produce (1) its centrally-maintained policies, procedures, directives and guidance from January 1, 2006 to the present, concerning how Wegmans' personnel (to include those in its Rochester stores) should respond to POS communications from PBMs; and (2) data showing how Wegmans' personnel in its City of Rochester stores responded to POS communications regarding plan coverage limits (such as prior authorizations, step edits, and quantity limits) and health and safety issues (such as concurrent drug utilization review or CDUR messages), concerning opioids from January 1, 2006, to the present.  This data should include any notes (free-text or structured) entered by Wegmans' personnel in connection with Wegmans' internal drug utilization and prescription review process, as well as all data fields necessary to link this internal review data to the dispensing data addressed above in connection with Request #1.  Please confirm Wegmans will produce such materials, or we intend to seek a ruling from Special Master Cohen

**Request No. 3: (As Narrowed By the PBM Defendants' Prior Compromise Proposals)**:  ~~All Documents and Communications Concerning~~ **[A]ny literature, publications, presentations, analyses, studies, reports, guidelines, directives, announcements, recommendations, pamphlets, circulars, notices, or other materials provided by any drug manufacturer to You regarding the efficacy, addictive qualities,**

February 28, 2025
Page 4

**and/or safety of any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to ~~present~~ [December 31, 2019].**

As stated in our previous correspondence, the PBM Defendants are willing to narrow the timeframe in this request to those data and documents ranging from January 1, 2006, to December 31, 2019.  Further, contrary to your suggestion, the PBM Defendants do not know what communications Wegmans had with opioid manufacturers and thus, as stated repeatedly, are not in a position to identify such communications for Wegmans.  Accordingly, Wegmans' vague and largely meaningless offer to "attempt to determine the burden of harvesting those communications" "if the PBMs will identify specific manufacturer communications that are material and relevant to the issues in Track 12" makes no sense.   Nonetheless, in the spirit of compromise, the PBM Defendants agree to hold this Request in abeyance pending their ongoing discussions with Wegmans regarding the scope of the Subpoena, without waiving (and expressly preserving) their ability to revisit this Request and demand production of responsive documents.

**Request No. 4 (As Narrowed By the PBM Defendants' Prior Compromise Proposals)**:  ~~All Documents and Communications Concerning~~ **[A]ny guidance, directives, instructions, publications, alerts, notices, presentations, or other materials You provided to Employees Concerning ~~any drugs within the Drug Scope, or any other~~ Opioids, from January 1, ~~1996~~ [2006] to ~~present~~ [December 31, 2019].**

As stated in our previous correspondence, the PBM Defendants are willing to narrow the timeframe in this request to those data and documents ranging from January 1, 2006 to December 31, 2019.   Further, your assertion that this Request "effectively seeks every communication between Wegmans and its pharmacists" is plainly wrong given that it is limited on its face to communications about a small subset of drugs.  We have narrowed this further in our prior compromises to a limited set of documents and a specific subject matter.  In the interest of compromise, we are willing to limit the subject matter further to responsive materials related to prescription opioids provided to employees working in your Rochester stores.  Please advise if Wegmans agrees to this greatly reduced scope, or we intend to seek a ruling from the Special Master.

**Request No. 5:  Documents sufficient to show all Suspicious Orders You identified or for which you received notice in the Monroe County Region, from January 1, 2006 to present.**

Given Wegmans' representation that it has no responsive documents, even taking into account the Subpoena's broad definition of the phrase, "Suspicious Order," the PBM Defendants agree that this Request has been resolved.

**Request No. 6**:  **All Documents and Communications Concerning Your use, review, or analysis of ARCOS data, data from the New York Prescription Monitoring Program, or other data relating to Suspicious Orders, including all Communications to or from the U.S. Drug Enforcement Agency or the New York Prescription**

February 28, 2025
Page 5

**Monitoring Program Concerning any drug within the Drug Scope, or any other Opioid, from January 1, 2006 to present.**

Contrary to your assertion, Request No. 6 was not resolved at the hearing. You have represented that Wegmans does not "use, review, or analy[ze] ARCOS data . . . or other data relating to Suspicious Orders." But the Request also seeks "data from the New York Prescription Monitoring Program" ("New York PMP"), as well as "Communications to or from the U.S. Drug Enforcement Agency or the New York [PMP] Concerning any drug within the Drug Scope, or any other Opioid, from January 1, 2006 to present." Wegmans has failed to address these portions of the Request, although it confirmed at the hearing that it possesses "script-level information" reflecting the extent to which its "pharmacists consult the [New York] PMP." (Hearing Tr. at 29).

In the spirit of compromise, the PBM Defendants are willing to limit this portion of the Request to the following categories of Documents and Communications relating solely to opioids: (1) prescription-level information reflecting Wegmans pharmacists' use, review, or analysis of New York PMP data while filling or dispensing an Opioid prescription; (2) its centrally maintained policies, procedures, directives and guidance from January 1, 2006 to the present, concerning how Wegmans' personnel in its Rochester stores should use, review, or analyze New York PMP data while filling or dispensing an opioid prescription; (3) any centrally maintained activity logs or similar materials reflecting Wegmans personnel's use, review or analysis of New York PMP data while filling or dispensing an opioid prescription; and (4) Communications to or from the U.S. Drug Enforcement Agency or the New York PMP concerning opioids, from January 1, 2006 to the present. Please confirm Wegmans will produce such Documents and Communications, or we intend to seek a ruling from Special Master Cohen.

**Request No. 7 (As Narrowed By the PBM Defendants' Prior Compromise Proposals)**: **All Documents and Communications Concerning efforts of any kind by You to identify, investigate, or report to any national, state, or local governments, agencies, boards, institutions, associations, law enforcement bodies, health departments, or drug taskforces Concerning any of the following regarding any drug within the Drug Scope, or any other Opioid, from January 1, 1996 to present: (a) improper prescribing or failing to prescribe by doctors or other prescribers in the Monroe County Region; (b) doctor-shopping, forgery, or counterfeiting of prescriptions by patients in the [the City of Rochester] (c) diversion, abuse, misuse, diversion, trafficking; or (d) any other concerns Concerning potentially improper or illegal prescriptions.**

Your January 29, 2025 letter states that, "[a]s suggested during the Status Conference, Wegmans would be willing to search its archives for interactions with regulators and law enforcement about local prescribers in Rochester." This proposal is both ambiguous and too narrow. The proposal is ambiguous because we do not know what you intend by the phrase "search its archives" or what types of documents those archives contain. Please explain. The proposal is too narrow because it addresses only sub-part (a) of the Request,

while ignoring the remaining subparts.  In the interest of compromise, however, the PBM Defendants are willing to drop subparts (b) and (d) and narrow sub-part (c) as follows: "diversion, abuse, misuse, or trafficking of Opioids within the City of Rochester."  Please advise whether Wegmans will now produce documents in response to this significantly narrowed request.

**Request No. 8:**  **All Documents and Communications Concerning all actions (including fines, suspensions, revocations, terminations, voluntary agreements not to practice, resignations, and letters or other formal warnings or notices) taken by You against any current or former Employee Concerning any drug within the Drug Scope, or any other Opioid, including for the prescribing, dispensing, failure to prescribe, failure to dispense, diversion, or misuse of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.**

Wegman's has agreed to "collect and produce responsive documents, if any, for the City of Rochester and Monroe County.  Wegmans will redact any confidential employee and patient information."  Wegmans' representation resolves this Request, subject to reserving the right to request the production of specific unredacted documents (or less-redacted versions).

**Request No. 9 (As Narrowed By the PBM Defendants' Prior Compromise Proposals):** **Documents sufficient to show all instances of theft, loss, or diversion of any drug within the Drug Scope, or any other Opioids, from any facility owned, operated, supported by, serviced by, or affiliated with You in the [City of Rochester], from January 1, 1996 to present.**

Wegmans states that it "will collect and produce DEA Form 106's for its stores in the City of Rochester and Monroe County."  We appreciate this representation and believe this Request can be resolved if Wegmans also produces any DEA Form 106's for any facility it services in the City of Rochester.

**Request No. 10:**  **All Documents and Communications Concerning any Investigation or other inquiry conducted by any state or federal office, agency, department, committee, or program (including the DEA, the Federal Bureau of Investigation, a United States Attorney or representative thereof, any government-level department or agency within the State of New York), or any state board (including the New York Medical Board, New York Board of Pharmacy, New York Dental Board, New York Nursing Board, or any medical examiner's office in New York) into any of Your practices related to the prescribing, ordering, dispensing, distributing, administering, or diversion of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.**

**Request No. 11:**  **Documents sufficient to identify any regulatory, civil, or criminal actions or investigation Concerning any drug within the Drug Scope, or any other**

February 28, 2025
Page 7

**Opioids, to which you were a party or participated in any manner, from January 1, 1996 to present.**

In your January 14, 2025 email, you represent that "Wegmans has never been the subject of any criminal or regulatory fine or administrative action with respect to its dispensing policies in the City of Rochester or Monroe County." We request confirmation that this representation is intended to include any type of criminal, regulatory, or administrative action or sanction with respect to Wegman's dispensing policies and practices that would have applied to any of its stores in the City of Rochester.

The same letter also states that, "We are in the process of exploring the burden and feasibility of collecting documents – if any – reflecting instances when law enforcement made inquiries to Wegmans about prescribers and/or patients in the City of Rochester and Monroe County." Please advise as to whether Wegmans intends to produce these documents.

Provision of the requested confirmation and production of these documents would resolve Request Nos. 10 and 11.

**Request No. 12: All Documents reflecting contracts, agreements, orders, or other formal documents between You and any manufacturer or distributor of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.**

Wegmans has now agreed to collect and produce all responsive "contracts with manufacturers and distributors." While this is narrower than the scope of the Request, the PBM Defendants are willing to accept this production in the interest of compromise.

*************************

Please let us know when you are available next week to discuss next steps on these narrowed proposals, given the April 25, 2025 fact discovery deadline.

Sincerely,

Ryan P. Ethridge

cc: Counsel for Express Scripts, Inc. (via email)

# EXHIBIT 7



**Joshua M. Agins**
Partner
Direct Dial: 585.454.0759
Direct Facsimile: 585.423.5910
*JAgins@hodgsonruss.com*

October 24, 2025

**VIA E-MAIL**

Ryan P. Ethridge
Alston & Bird
555 Fayetteville St, Suite 600
Raleigh, NC 27601
ryan.ethridge@alston.com

Anthony P. Alden
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
anthonyalden@quinnemanuel.com

> Re:  *In re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio)
> *City of Rochester v. Purdue Pharma L.P.*, No. 19-op-45853 (Track 12)

Dear Ryan and Anthony:

Wegmans Food Markets, Inc. writes this letter in response to the PBMs' recent request for Wegmans' position on the PBMs' proposals regarding all Requests in your Subpoena, as put forth in prior meet and confer letters. After you sent the latest letter, Wegmans and the PBMs spent the spring of 2025 discussing only Request Nos. 1 and 2. Those negotiations culminated on June 2, 2025, with Wegmans providing a 29-page letter to the PBMs. The letter detailed how Wegmans uses the EnterpriseRx Pharmacy Management System to communicate with the PBMs and satisfy the terms of the PBMs' Pharmacy Network Agreements and Pharmacy Provider Manuals. That production also consisted of 56 pages of detailed screenshots of data, as well as a step-by-step discussion of how Wegmans uses EnterpriseRx to receive and review DUR alerts, clinical edits, and clinical messages in its ordinary course of business. The exemplar prescriptions demonstrated how a Wegmans pharmacist considers, uses, responds to, and interacts with point-of-sale communications from the PBMs.

The PBMs then went silent for nearly three months, without any further communications or notice until the end of August, when you resurfaced and demanded Wegmans' immediate response. After having time to review the various communications, as well as work diligently on Wegmans responses to Requests 1 and 2, we respond as follows (except as to Request Nos. 1 and 2, which Wegmans will address in a separate letter in the near future):



Ryan P. Ethridge
Anthony P. Alden
October 24, 2025
Page 2

First, Wegmans agrees to the narrowed geographic scope of the City of Rochester. *See, e.g.*, Ltr. from A. Alden to J. Agins at 1 (Dec. 13, 2024) ("12/13/24 Letter") ("It is important, then, that the PBM Defendants obtain data and other documents concerning Wegmans' dispensing of opioids **in Rochester**." (emphasis added)); *id.* at 2 ("[T]he PBM Defendants are entitled to information related to the retail pharmacies on the ground **in Rochester**, such as Wegmans (the largest purchaser of prescription opioids among such pharmacies." (emphasis added)); *id.* at 3 (Discussing Request Nos. 1 & 2: "Evidence of Wegmans' conduct on those issues will show that the PBM Defendants were not the cause of alleged over-dispensing **in Rochester**." (emphasis added)); *id.* (Discussing Request Nos 1 & 2: "The PBM Defendants simply do not possess the data Wegmans has concerning its dispensing of opioids **in Rochester**. Wegmans' dispensing data is critical for the PBM Defendants to know what was dispensed **in the City**, to whom, why, and when." (emphasis added)); *id.* at 5 n.4 (Discussing Request Nos. 5, 6, & 7: "As part of their efforts to compromise, the ***PBM Defendants have already told Wegmans that they would limit the geographic scope to the City of Rochester itself, rather than Monroe County in which Rochester sits.***" (emphasis added)); *id.* at 6 ("Request No. 9 seeks documents related to theft, loss, or diversion of drugs within the Drug Scope from Wegmans' pharmacies **in Rochester**." (emphasis added)); *id.* (Discussing Request Nos. 8-11: "As the retail pharmacy that bought approximately 30% of the opioids purchased **in Rochester** during the relevant time period, the PBM Defendants anticipate that Wegmans' documents will reflect commensurate percentage of the diversion and/or misuse of those drugs, providing a fuller picture of the alleged opioid crisis **in Rochester**." (emphasis added)).

Second, Wegmans also agrees with the temporal scope from January 1, 2006 through the date of the subpoena to the extent Wegmans has documents that exist within that time frame. *See* 2/28/25 Ltr. at 2, 4, 5 (limiting temporal scope to January 1, 2006 to the present).

Third, Wegmans also will need to redact privileged and/or confidential employee and patient information. Wegmans is not a party to the MDL (or any opioid litigation) and thus any protective order entered in the case or others does not provide adequate protection to Wegmans. Moreover, under federal law, Wegmans is obligated to redact PHI in documents produced that are not necessary to accomplish any of the PBMs' goals.[1] Notably, the PBMs have not articulated why they would need to review any PHI concerning Wegmans' patients.

---

[1] "When using or disclosing protected health information or requesting protected health information from another covered entity . . ., a covered entity [like Wegmans] must make reasonable efforts to limit protected health information to the minimum necessary to accomplish the intended purpose of the use, disclosure, or request." 45 C.F.R. § 164.502(b)(1). Moreover, a recent wave of security breaches on PACER and internal law firm document management systems have caused numerous United States District Courts to change the manner in which sealed documents are submitted to the courts, further reinforces the need for Wegmans to protect any such information with all appropriate redactions. *See, e.g.*, Martin Tully et al., *Protecting Sensitive Court Filings After Recent Cyber Breach*, Law360 (Oct. 6, 2025), https://www.law360.com/articles/2392558/protecting-sensitive-court-filings-after-recent-cyber-

Ryan P. Ethridge
Anthony P. Alden
October 24, 2025
Page 3



Wegmans reproduces each individual Request (except for Nos. 1 and 2) in the Subpoena below and addresses them in turn.

**Subpoena Request 3:** **All Documents and Communications Concerning any literature, publications, presentations, analyses, studies, reports, guidelines, directives, announcements, recommendations, pamphlets, circulars, notices, or other materials provided by any drug manufacturer to You regarding the efficacy, addictive qualities, and/or safety of any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to present.**

Wegmans initially offered to attempt to determine the burden of harvesting specific manufacturer communications identified by the PBMs that are material and relevant to the issues in Track 12. In the PBMs' February 28, 2025 Letter, the PBMs rejected Wegmans' offer stating they did not know what communications Wegmans had with opioid manufacturers. *See* Ltr. from R. Ethridge to J. Agins (Feb. 28, 2025) ("2/28/25 Letter"). The PBMs then agreed to hold this Request in abeyance pending ongoing discussions with Wegmans regarding the scope of the Subpoena. Therefore, Wegmans will hold off discussing this Request at this time.

**Subpoena Request 4:** **All Documents and Communications Concerning any guidance, directives, instructions, publications, alerts, notices, presentations, or other materials You provided to Employees Concerning any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to present.**

On January 29, 2025, Wegmans laid out how the only relevant documents responsive to Request No. 4 would be the PBMs' own documents and policies, which Wegmans must follow.

---

breach (discussing recent cyberattacks on federal and state courts and the need for parties to minimize the sensitive content stored at law firms and filed with courts); Change *to Sealed Document Processing*, W.D.N.Y. (Aug. 22, 2025), https://www.nywd.uscourts.gov/news/change-sealed-document-processing (noting the federal district court encompassing the City of Rochester will no longer allow even case participants to access sealed documents electronically due to recent breaches); Kateyln Polantz & Aileen Graaf, *Federal courts go old school to paper filings after hack to key system*, CNN (Aug. 14, 2025), https://www.cnn.com/2025/08/14/politics/federal-courts-go-to-old-school-paper-filings-after-hack-to-key-system (reporting that some federal courts are deciding to only accept sensitive filings by hardcopy in response to recent cyberattacks); *Cybersecurity Measures Strengthened in Light of Attacks on Judiciary's Case Management System*, U.S. COURTS (Aug. 7, 2025), https://www.uscourts.gov/data-news/judiciary-news/2025/08/07/cybersecurity-measures-strengthened-light-attacks-judiciarys-case-management-system (acknowledging "recent escalated cyberattacks of a sophisticated and persistent nature on [U.S. Courts] case management system"); Staci Zaretsky, *Biglaw Firms Fall Prey To Cyberattacks, With Data Breaches On The Rise*, ABOVE THE LAW (May 23, 2024), https://abovethelaw.com/2024/05/biglaw-firms-fall-prey-to-cyberattacks-with-data-breaches-on-the-rise/ (reporting a rise in cybersecurity incidents at law firms).

Ryan P. Ethridge
Anthony P. Alden
October 24, 2025
Page 4



The PBMs never addressed this concern in their 2/28/25 Letter but merely stated they would narrow the timeframe in this request to January 1, 2006, to December 31, 2019, and limit the subject matter to "request only responsive materials related to prescription opioids provided to employees **working in Wegmans' City of Rochester stores.**" *See* 2/28/25 Ltr. at 4.

Unless the PBMs advise how other types of guidance or directives provided to employees at Wegmans' pharmacies in Rochester are relevant to this case, Wegmans does not agree to provide more in response to this Request.

**Subpoena Request 5:  Documents sufficient to show all Suspicious Orders You identified or for which you received notice in the Monroe County Region, from January 1, 2006 to present.**

Wegmans believes Request No. 5 was resolved on the Record during the January 6, 2025 conference with Special Master Cohen because Wegmans pharmacies have never registered as distributors and therefore have never had a duty to identify or report Suspicious Orders.

The PBMs have agreed that this Request has been resolved by Wegmans' representation that it has no responsive documents.

**Subpoena Request 6:  All Documents and Communications Concerning Your use, review, or analysis of ARCOS data, data from the New York Prescription Monitoring Program, or other data relating to Suspicious Orders, including all Communications to or from the U.S. Drug Enforcement Agency or the New York Prescription Monitoring Program Concerning any drug within the Drug Scope, or any other Opioid, from January 1, 2006 to present.**

Wegmans believes Request No. 6 was resolved on the Record during the January 6, 2025 conference with Special Master Cohen because Wegmans pharmacies have never registered as distributors and therefore have never had access to ARCOS data or any obligation to review it, not had a duty to identify or report Suspicious Orders.  The PBMs, however, assert that this Request has not been resolved with respect to NY PMP data.

In February, the PBMs offered "to limit this portion of the Request to the following categories of Documents and Communications relating solely to opioids: (1) prescription-level information reflecting Wegmans pharmacists' use, review, or analysis of New York PMP data while filling or dispensing an Opioid prescription; (2) its centrally maintained policies, procedures, directives and guidance from January 1, 2006 to the present, concerning how Wegmans' personnel **in its Rochester stores** should use, review, or analyze New York PMP data while filling or dispensing an opioid prescription; (3) any centrally maintained activity logs or similar materials reflecting Wegmans personnel's use, review or analysis of New York PMP data while filling or dispensing an opioid prescription; and (4) Communications to or from the U.S. Drug Enforcement Agency or the New York PMP concerning opioids, from January 1, 2006 to the present."  2/28/25 Ltr. at 5 (emphasis added).

Ryan P. Ethridge
Anthony P. Alden
October 24, 2025
Page 5



Wegmans represents that its pharmacies use the EnterpriseRx Pharmacy Management System to submit certain prescription data fields to the NY PMP daily. New York does not require, and Wegmans does not transmit any DUR alerts, clinical edits, or clinical messages to the New York PMP.

To resolve Request No. 6, Wegmans would agree to search for any written policies describing when, and under what circumstances, its pharmacist would consult with the NY PMP, and would agree to produce such policies, if any.

**Subpoena Request 7: All Documents and Communications Concerning efforts of any kind by You to identify, investigate, or report to any national, state, or local governments, agencies, boards, institutions, associations, law enforcement bodies, health departments, or drug taskforces Concerning any of the following regarding any drug within the Drug Scope, or any other Opioid, from January 1, 1996 to present: (a) improper prescribing or failing to prescribe by doctors or other prescribers in the Monroe County Region; (b) doctor-shopping, forgery, or counterfeiting of prescriptions by patients in the Monroe County Region; (c) diversion, abuse, misuse, diversion, trafficking; or (d) any other concerns Concerning potentially improper or illegal prescriptions.**

The PBMs offered in February "to drop subparts (b) and (d) and narrow sub-part (c) as follows: 'diversion, abuse, misuse, or trafficking of Opioids **within the City of Rochester**.'" 2/28/25 Ltr. at 6 (emphasis added). Wegmans accepts those revisions and requests one more revision to narrow this overbroad Request. As written, Request No. 7 would require Wegmans to sort through voluminous emails to identify any hint of suspicion of diversion by the pharmacy staff. There is no reason why the PBMs need more than internal investigations on potential diversion and/or reporting potential diversion to law enforcement bodies. Thus, Wegmans offers further narrowing Request No. 7 as follows:

> *All Documents and Communications sufficient to identify ~~Concerning efforts of any kind by You to identify, investigate,~~ internal investigations or report~~ing~~ to any national, state, or local governments, agencies, boards, institutions, associations, law enforcement bodies, health departments, or drug taskforces Concerning any of the following regarding any drug within the Drug Scope, or any other Opioid, from January 1, ~~1996~~ 2006 to ~~present~~ the date of the subpoena: (a) improper prescribing or failing to prescribe by doctors or other prescribers in the City of Rochester ~~Monroe County Region~~; ~~(b) doctor-shopping, forgery, or counterfeiting of prescriptions by patients in the Monroe County Region~~; (c) diversion, abuse, misuse, diversion, trafficking within the City of Rochester; ~~or (d) any other concerns Concerning potentially improper or illegal prescriptions~~.*

**Subpoena Request 8: All Documents and Communications Concerning all actions (including fines, suspensions, revocations, terminations, voluntary agreements not to practice, resignations, and letters or other formal warnings or notices) taken by You against any**

Ryan P. Ethridge
Anthony P. Alden
October 24, 2025
Page 6



**current or former Employee Concerning any drug within the Drug Scope, or any other Opioid, including for the prescribing, dispensing, failure to prescribe, failure to dispense, diversion, or misuse of any drug within the Drug Scope, or any other Opioids, from January l, 1996 to present.**

Wegmans will agree to produce responsive documents, if any, for the City of Rochester during the period of January 1, 2006 to the date of the subpoena.  *See* 12/13/24 Ltr. at 6 (arguing documents responsive to this Request to understand the "commensurate percentage of the diversion and/or misuse of [] drugs, providing a fuller picture of the alleged opioid crisis **in Rochester**." (emphasis added)).  As the PBMs have agreed, Wegmans will redact confidential employee and patient information.

**Subpoena Request 9:  Documents sufficient to show all instances of theft, loss, or diversion of any drug within the Drug Scope, or any other Opioids, from any facility owned, operated, supported by, serviced by, or affiliated with You in the Monroe County Region, from January 1, 1996 to present.**

Wegmans will agree to produce DEA Form 106s for the City of Rochester during the period of January 1, 2006 to the date of the subpoena.  The PBMs' past communications indicate this production would satisfy Request No. 9.  *See* 12/13/24 Ltr. at 6 (limiting Request No. 9 to "documents related to theft, loss, or diversion of drugs within the Drug Scope from **Wegmans' pharmacies in Rochester**" (emphasis added); 2/28/25 Ltr. at 6 (agreeing that production of DEA Form 106s are sufficient to satisfy Request No. 9).  Wegmans expects to be able to make this production in the next several weeks.

**Subpoena Requests 10-11:**

**10. All Documents and Communications Concerning any Investigation or other inquiry conducted by any state or federal office, agency, department, committee, or program (including the DEA, the Federal Bureau of Investigation, a United States Attorney or representative thereof, any government-level department or agency within the State of New York), or any state board (including the New York Medical Board, New York Board of Pharmacy, New York Dental Board, New York Nursing Board, or any medical examiner's office in New York) into any of Your practices related to the prescribing, ordering, dispensing, distributing, administering, or diversion of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.**

**11. Documents sufficient to identify any regulatory, civil, or criminal actions or investigation Concerning any drug within the Drug Scope, or any other Opioids, to which you were a party or participated in any manner, from January 1, 1996 to present.**



Ryan P. Ethridge
Anthony P. Alden
October 24, 2025
Page 7

Wegmans will produce any documents or communications concerning criminal or regulatory fines imposed or administrative actions against its pharmacies in the City of Rochester with respect to its opioid dispensing policies from January 1, 2006 to the date of the subpoena, to the extent any such documents exist. *See* 12/13/24 Ltr. at 6 (arguing documents responsive to this Request to understand the "commensurate percentage of the diversion and/or misuse of [] drugs, providing a fuller picture of the alleged opioid crisis **in Rochester**." (emphasis added)).

**Subpoena Request 12:** **All Documents reflecting contracts, agreements, orders, or other formal documents between You and any manufacturer or distributor of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.**

Wegmans had understood the PBMs were no longer interested in this Request given their focus on Requests 1 and 2 and the lengthy passage of time without any feedback from the PBMs between June and August. Nonetheless, Wegmans will collect and produce all contracts with manufacturers and distributors, subject to any third-party notice or confidentiality provisions, to the extent they concern Wegmans' pharmacy in the City of Rochester during the January 1, 2006 to the date of the subpoena time frame. *See* 12/13/24 Ltr. at 6 (arguing documents responsive to this Request to understand the "commensurate percentage of the diversion and/or misuse of [] drugs, providing a fuller picture of the alleged opioid crisis **in Rochester**." (emphasis added)).

Please let us know if you will agree to Wegmans' compromise proposals. We look forward to hearing from you.

Sincerely yours,

Joshua M. Agins

# EXHIBIT 8

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

| | | |
|---|---|---|
| In re: National Prescription Opiate Litigation | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:17-MD-2804 |
| | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:           Wegmans Food Markets, Inc.
           100 Wegmans Market Street, Legal Dept., Rochester, NY 14624

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedules A and B

| Place: First Legal Records c/o The Chase Agency LLC<br>28 East Main St, Suite 103,<br>Rochester, NY 14614 | Date and Time:<br><br>08/26/2024 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:        07/25/2024

*CLERK OF COURT*

                                    OR

_____          /s/ Patrick King
*Signature of Clerk or Deputy Clerk*          _____
                                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Express Scripts, Inc. _____, who issues or requests this subpoena, are:

Patrick King, Quinn Emanuel, 700 Louisiana St., Ste. 3900, Houston TX 77002, patrickking@quinnemanuel.com

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:17-MD-2804

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**HIGHLY CONFIDENTIAL**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br><br>*City of Rochester v. Purdue Pharma L.P.*, Case No. 19-op-45853 (Track 12) | **MDL No. 2804**<br><br>**Case No.: 1:17-MD-2804**<br><br>**Judge Dan Aaron Polster** |

## SCHEDULE A TO SUBPOENA

"ARCOS Data" means data reported by DEA Registrants pursuant to 21 U.S.C. § 827 through the Automation of Reports and Consolidated Orders System.

"Communication" means any oral or written statement, dialogue, discussion, exchange, conversation, disclosure, or transmittal of information whether in-person, by telephone, any form of video transmission, mail, e-mail, facsimile, personal delivery, computer transmission, or otherwise.

"Concerning" means regarding, relating to, referring to, reflecting, discussing, describing, analyzing, supporting, evidencing, constituting, comprising, containing, setting forth, showing, disclosing, explaining, summarizing, or mentioning.

"Defendants" means Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Evernorth Health, Inc. (formerly Express Scripts Holding Company), Express Scripts Specialty Distribution Services, Inc.; UnitedHealth Group Incorporated, Optum, Inc., OptumInsight, Inc., OptumInsight Life Sciences, Inc., OptumRx, Inc., OptumRx Discount Card Services, LLC; Optum Perks, LLC; OptumHealth Care Solutions, LLC; OptumHealth Holdings, LLC; and Optum Health Networks, Inc.

"Document" or "Documents" means any information stored in a medium from which the information can be obtained. A Document includes (but is not limited to) any calendar, chart, communication, data, data compilation, database, diary, draft, drawing, electronically stored information, email, fax, floppy disk, graph, hard drive, image, index, instant message, letter, log, magnetic tape, memorandum, note, optical disk, photograph, report, sound recording, spreadsheet, storage device, text message, voicemail, writing, or any other category covered by Federal Rule of Civil Procedure 34(a)(1)(A). Any copy of a Document that differs in any respect from the original of a Document constitutes a separate Document.

"Drug Scope" means the MDL-8 opioids (Fentanyl, Hydrocodone, Hydromorphone, Morphine, Oxycodone, Oxymorphone, Tapentadol, and Methadone) as well as the Relevant Benzodiazepines

**HIGHLY CONFIDENTIAL**

(Alprazolam, Chlordiazepoxide, Clobazam, Clonazepam, Clorazepate, Diazepam, Estazolam, Flurazepam, Lorazepam, Midazolam, Oxazepam, Quazepam, Temazepam, and Triazolam) and Relevant Muscle Relaxers (Carisoprodol, Cyclobenzaprine, Orphenadrine, and Tizanidine).

"Employee" includes but is not limited to all current and former employees, independent contractors, and individuals performing work as temporary employees.

"Investigation" means any investigation conducted by any Person of any Person, including but not limited to investigations of any Defendant related to manufacturing, distributing, dispensing, prescribing, using, abusing, trafficking, or diverting Opioids.

"MDL-8 Opioids" means Fentanyl, Hydrocodone, Hydromorphone, Morphine, Oxycodone, Oxymorphone, Tapentadol, and Methadone.

"Opioid(s)" means substances comprised of or containing natural, synthetic, or semisynthetic chemicals that bind to opioid receptors in the brain or body, including heroin, fentanyl, carfentanil, and fentanyl-type analogs, as well as MDL-8 Opioids.

"Person" means any natural or legal person or any entity, including a government officer or agency.

"Relevant Benzodiazepines" means Alprazolam, Chlordiazepoxide, Clobazam, Clonazepam, Clorazepate, Diazepam, Estazolam, Flurazepam, Lorazepam, Midazolam, Oxazepam, Quazepam, Temazepam, and Triazolam.

"Relevant Muscle Relaxers" means Carisoprodol, Cyclobenzaprine, Orphenadrine, and Tizanidine.

"Requests" means the requests for production of documents set forth herein.

"Suspicious Order(s)" means any order of drugs within the Drug Scope, or other Opioids, that (i) You believe, suspect, or contend should have been reported to the United States Drug Enforcement Administration ("DEA") or state authorities, the New York, Medical Board, New York Board of Pharmacy, or New York Dental Board, as "suspicious" within the meaning of 21 C.F.R. § 1301.74(b), (ii) is referred to in a Document as "suspicious" within the meaning of 21 C.F.R. § 1301.74(b), or (iii) that You define as a suspicious order for purposes of Your work.

"Monroe County Region" means Monroe County, New York, as well as all counties in New York bordering on Monroe County, including the Counties of Orleans, Genesee, Livingston, Ontario, and Wayne, including all municipalities, cities, and towns within these counties.

"You," and "Your" means Wegmans Food Markets, Inc., including its Employees, directors, officers, executives, board members, agents and contractors or other Persons acting on behalf of Wegmans Food Markets, Inc.

**HIGHLY CONFIDENTIAL**

Whenever necessary to bring within the scope of these requests documents that might otherwise be construed to be outside their scope:

> (a) the use of a verb in any tense shall be construed as the use of that verb in all other tenses;
>
> (b) the use of a word in its singular form shall be deemed to include within its use the plural form as well;
>
> (c) the use of a word in its plural form shall be deemed to include within its use the singular form as well;
>
> (d) the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all documents that might otherwise be construed to be outside its scope;
>
> (e) the use of any capitalized word shall include the same word uncapitalized, and the use of any uncapitalized word shall include the same word capitalized; and
>
> (f) the terms "all" and "each" shall be construed as all and each.

## INSTRUCTIONS

A.     Produce all documents in the manner in which they are maintained in the usual course of Your business or organize and label the documents to correspond with the categories in this Schedule A.  A request for a document shall be deemed to include a request for any and all physical or electronic file folders within which the document was contained, all transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document in addition to the document itself, and for any electronic document any metadata contained in the document, in the file system on which the document is stored, and/or in any active directory, SQL, LDAP, or other indices or databases that provide access, access control, or other security or index information concerning the document.

B.     If and to the extent documents are maintained in a database or other electronic format, produce along with the document(s) software that will enable access to the electronic document(s) or database as You would access such electronic document(s) or database in the ordinary course of Your business.

C.     Produce documents in such fashion as to identify the department, branch or office in which they were located and, where applicable, the natural person in whose possession it was found and the business address of each document's custodian(s).

D.     Any document withheld from production based on a claim of privilege or any similar claim shall be identified by (1) the type of document, (2) the general subject matter of the document, (3) the date of the document, and (4) such other information as is sufficient to identify the document including the author of the document, the addressee of the document, and, where not apparent, the relationship of the author and the addressee to each other.  The nature of each claim of privilege shall be set forth.

E.     Documents attached to each other should not be separated.

3

**HIGHLY CONFIDENTIAL**

F.      Documents not otherwise responsive to this discovery request shall be produced if such documents mention, discuss, refer to, or explain the documents which are called for by this subpoena.

G.      In producing documents and other materials, You are requested to furnish all documents or things in Your possession, custody or control, regardless of whether such documents or materials are possessed directly by You or Your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, accountants, investigators, or by Your attorneys or their agents, employees, representatives or investigators.

H.      If You object to any part of any request, state fully in writing the nature of the objection. Notwithstanding any objections, nonetheless comply fully with the other parts of the request to which you are not objecting.

I.      Unless otherwise stated explicitly herein with regard to a particular document request, each document request shall be construed independently and not with reference to any other document request for the purpose of limitation. The use of the singular form of any word includes the plural and vice versa. The past tense shall include the present tense and vice versa.

J.      Responsive electronic documents shall be produced as both (a) native files, including, if necessitated by Paragraph B, the software You used to create and/or view the responsive electronic documents, as well as (b) multi-page, 300dpi group IV TIFF images with extension ".tif" and (c) full text files comprising extracted text (for documents amenable to text extraction) or OCR text files (otherwise), named after the first bates number of the document, with extension ".txt" and (d) a load file with a ".dat" file extension and ASCII 020 and 254 delimiters for column break and text qualifier. The first line shall be the header with field names and each subsequent line shall contain the fielded data for each document. The load file shall include the following metadata, where available:

| Field | Description |
| --- | --- |
| BegBates | Page ID of first page in a document. |
| EndBates | Page ID of last page in a document. |
| BegAttach | BegBates of parent record. |
| EndAttach | BegBates of last attached document in family. |
| From | Author of the e-mail message. |
| To | Main recipient(s) of the e-mail message. |
| CC | Recipient(s) of "Carbon Copies" of the e-mail message. |
| BCC | Recipient(s) of "Blind Carbon Copies" of the e-mail message. |
| DateSent | Sent date of an e-mail message. |
| TimeSent | Time the e-mail message was sent. |
| Email Subject | Subject of the e-mail message. |
| Author | Author field value pulled from metadata of the native file. |
| Title | Title field value extracted from the metadata of the native file. |
| Custodian | Textual value of custodian. |
| DateCreated | Creation date of the native file. |

**HIGHLY CONFIDENTIAL**

| TimeCreated | Creation time of the native file. |
|---|---|
| EntryID | Unique identifier of e-mails in mail stores. |
| FileDescription | File extension or other description of native file type. |
| Filename | Original filename of native file. Contains subject of e-mail message for e-mail records. |
| Filesize | Size of native file, in bytes. |
| MD5Hash | MD5 hash-128-bit output. |
| Attach | Semi-colon delimited string of first level attachments in the e-mail. |
| DateLastMod | Date the native file was last modified. |
| TimeLastMod | Time native file was last modified. |
| PgCount | Number of pages in a document. |
| NativeFile | Logical file path to the native file. |
| OCRPath | Logical file path to the OCR text. |

This instruction – which concerns in part the preparation of a load file that includes metadata – is separate from, and in addition to the directions in:

Instruction A, which requires that You produce native files with all file, file= system, index, and access control metadata intact -and

Instruction B, which requires, for particular electronic documents, the production of software You use(d) in Your ordinary course of business to create and review the native electronic documents.

K.    Responsive paper documents shall be scanned and produced electronically along with an appropriate load file as described in subsections (b), (c), and (d) of Paragraph J.

L.    Unless otherwise stated in a specific request, these requests seek responsive information and documents authored, generated, disseminated, drafted, produced, reproduced, or otherwise created or distributed or related to the period beginning **January 1, 1996 and ending as of Today**.[1]  Whenever a request does specifically refer to a date range, that date range should be construed as beginning on the first moment of the first date in the range and ending on the last moment of the last date in the range.

## DOCUMENTS REQUESTED

1)  Dispensing data reflecting all drugs within the Drug Scope, that You dispensed in the Monroe County Region from January 1, 2006 to present.  The data should include the following fields:

   a)  Drug name

---

[1]   The Special Master in this litigation has ordered discovery back to 1996. If the Court modifies that ruling, we will narrow the temporal scope of the Requests.

**HIGHLY CONFIDENTIAL**

b) NDC number

c) Date filled

d) Quantity dispensed

e) Dosage form

f) Days' supply

g) Prescriber's name

h) Prescriber's DEA number

i) Dispensing pharmacist

j) Patient Zip Code

k) Patient ID # (Unique ID)

l) Quantity prescribed

m) Number of refills authorized (if any)

n) Diagnostic code

o) Method of payment

p) Patient paid amount

q) Whether prescription covered by third-party payor

r) Control / Non Control ratio

s) Pharmacy DEA #

t) Pharmacy Store #

u) Pharmacy address (at the zip code level or finder)

v) Prescriber address (at the zip code level or finder)

w) Prescription Date written

x) Refill indicator (whether the Rx is a refill or the original)

y) Prescriber Specialty

z) Rejection Indicator (Whether the pharmacy rejected to fill)

**HIGHLY CONFIDENTIAL**

    aa) Prescriber's NPI Number

    bb) Patient DOB Year (or age)

    cc) DEA Override

    dd) DEA Schedule (Same as Control/Non-Control)

    ee) Dispense Hour

    ff)  Dispense Minute

    gg) Drop Off Hour

    hh) Drop Off Minute

2) Documents sufficient to show how You and any pharmacists employed by You (or other employees involved in dispensing drugs within the Drug Scope) do or do not consider, use, respond to, or interact with communications received from pharmacy benefit managers (including, but not limited to, the Defendants) at the point of sale, including, but not limited to, communications regarding plan coverage limits (such as prior authorizations, step edits, and quantity limits) and communications regarding health and safety issues (such as concurrent drug utilization review or CDUR messages), from January 1, 1996, to present.  Your response should include documents responsive at both the pharmacy and individual employee level, and should include any pertinent policies, procedures, directives, or guidance.

3) All Documents and Communications Concerning any literature, publications, presentations, analyses, studies, reports, guidelines, directives, announcements, recommendations, pamphlets, circulars, notices, or other materials provided by any drug manufacturer to You regarding the efficacy, addictive qualities, and/or safety of any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

4) All Documents and Communications Concerning any guidance, directives, instructions, publications, alerts, notices, presentations, or other materials You provided to Employees Concerning any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

5) Documents sufficient to show all Suspicious Orders You identified or for which you received notice in the Monroe County Region, from January 1, 2006 to present.

6) All Documents and Communications Concerning Your use, review, or analysis of ARCOS data, data from the New York Prescription Monitoring Program, or other data relating to Suspicious Orders, including all Communications to or from the U.S. Drug Enforcement Agency or the New York Prescription Monitoring Program Concerning any drug within the Drug Scope, or any other Opioid, from January 1, 2006 to present.

7) All Documents and Communications Concerning efforts of any kind by You to identify, investigate, or report to any national, state, or local governments, agencies, boards, institutions,

**HIGHLY CONFIDENTIAL**

associations, law enforcement bodies, health departments, or drug taskforces Concerning any of the following regarding any drug within the Drug Scope, or any other Opioid, from January 1, 1996 to present: (a) improper prescribing or failing to prescribe by doctors or other prescribers in the Monroe County Region; (b) doctor-shopping, forgery, or counterfeiting of prescriptions by patients in the Monroe County Region; (c) diversion, abuse, misuse, diversion, trafficking; or (d) any other concerns Concerning potentially improper or illegal prescriptions.

8) All Documents and Communications Concerning all actions (including fines, suspensions, revocations, terminations, voluntary agreements not to practice, resignations, and letters or other formal warnings or notices) taken by You against any current or former Employee Concerning any drug within the Drug Scope, or any other Opioid, including for the prescribing, dispensing, failure to prescribe, failure to dispense, diversion, or misuse of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

9) Documents sufficient to show all instances of theft, loss, or diversion of any drug within the Drug Scope, or any other Opioids, from any facility owned, operated, supported by, serviced by, or affiliated with You in the Monroe County Region, from January 1, 1996 to present.

10) All Documents and Communications Concerning any Investigation or other inquiry conducted by any state or federal office, agency, department, committee, or program (including the DEA, the Federal Bureau of Investigation, a United States Attorney or representative thereof, any government-level department or agency within the State of New York), or any state board (including the New York Medical Board, New York Board of Pharmacy, New York Dental Board, New York Nursing Board, or any medical examiner's office in New York) into any of Your practices related to the prescribing, ordering, dispensing, distributing, administering, or diversion of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

11) Documents sufficient to identify any regulatory, civil, or criminal actions or investigation Concerning any drug within the Drug Scope, or any other Opioids, to which you were a party or participated in any manner, from January 1, 1996 to present.

12) All Documents reflecting contracts, agreements, orders, or other formal documents between You and any manufacturer or distributor of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

**HIGHLY CONFIDENTIAL**

Dated: July 24, 2024

/s/ Brian D. Boone

Brian D. Boone
**ALSTON & BIRD LLP**
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
Tel: (704) 444-1000
brian.boone@alston.com

William H. Jordan
Andrew Hatchett
**ALSTON & BIRD LLP**
1201 West Peachtree Street NW, Suite 4900
Atlanta, GA 30309
Tel.: (404) 881-7000
bill.jordan@alston.com
andrew.hatchett@alston.com

*Attorneys for OptumRx, Inc.*

By:   /s/ Ellison Ward Merkel

Ellison Ward Merkel
ellisonmerkel@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Ave, 22nd Floor
New York, NY 10010
Telephone: 212-849-7362

*Attorney for Defendants Express Scripts, Inc. and
ESI Mail Pharmacy Service, Inc.*

**HIGHLY CONFIDENTIAL**

## <u>AFFIDAVIT</u>

STATE OF _____)

) 

COUNTY OF_____ )

     Before me, the undersigned authority, personally appeared_____, who, being by me duly sworn, deposed as follows:

     My name is _____. I am of sound mind, capable of making this Affidavit, and I am personally acquainted with the facts stated herein:

     I am the duly authorized Custodian of Records for Wegmans Food Markets, Inc. Attached hereto are _____ pages of records relating to Wegmans Food Markets, Inc. These _____ pages of records are kept by Wegmans Food Markets, Inc. in the regular course of business, and it was the regular course of business of Wegmans Food Markets, Inc. or an employee or representative of Wegmans Food Markets, Inc. with knowledge of the act, event, condition, opinion, or diagnosis recorded to make a record or transmit information thereof to be included in such record; and the record was made at or near the time of the act, event, condition, opinion, or diagnosis. The records attached hereto are the originals or exact duplicates of the originals.

_____

Affiant, Custodian of Records

     IN WITNESS WHEREOF I have hereunto subscribed my name and affixed my official seal this _____ day of _____, 2024.

_____

Notary Public

My Commission Expires:

_____

# SCHEDULE B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| | Case No. 17-md-2804 |
| This document relates to: | |
| *All Cases* | Judge Dan Aaron Polster |

CASE MANAGEMENT ORDER NO ___3___
REGARDING DOCUMENT AND ELECTRONICALLY STORED INFORMATION
PRODUCTION PROTOCOL

**1. PURPOSE**

This Order will govern production of Documents and ESI (as defined below) by Plaintiffs and Defendants (the "Parties") as described in Federal Rules of Civil Procedure 26, 33, and 34. This Order shall apply to the production of hard-copy and electronic documents by the Parties in this litigation.

The production of documents and ESI by the Parties also shall be subject to the provisions of orders concerning confidentiality, privilege, and/or protected health information as agreed to among the Parties and/or entered by the Court.

The Parties reserve all objections under the Federal Rules of Civil Procedure and applicable decision authority other than concerning matters that are addressed in this Order.

Nothing in this Order shall be interpreted to require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity. The Parties do not waive any objections to the discoverability, admissibility, or confidentiality of documents

or ESI. Nothing in this Order shall be interpreted to supersede the provisions of orders governing confidentiality, privilege, and/or protected health information entered by the Court in this litigation, unless expressly provided for in such an order.

## 2. DEFINITIONS

a. **"Confidentiality Designation"** means the legend affixed to Documents or ESI for confidential or highly confidential information as defined by, and subject to, the terms of the order concerning confidentiality agreed to an/or entered by the Court in this litigation.

b. **"Document"** is defined to be synonymous in meaning and equal in scope to the usage of this term in Rules 26 and 34 of the Federal Rules of Civil Procedure. The term "document" shall include hard-copy documents, electronic documents, and ESI as defined herein.

c. **"Electronic Document or Data"** means documents or data existing in electronic form at the time of collection, including but not limited to: e-mail or other means of electronic communications, word processing files (e.g., Microsoft Word), computer slide presentations (e.g., PowerPoint or Keynote slides), spreadsheets (e.g., Excel), and image files (e.g., PDF).

d. **"Electronically stored information" or "ESI,"** as used herein, has the same meaning as in Rules 26 and 34 of the Federal Rules of Civil Procedure and includes Electronic Documents or Data, and computer-generated information or data, stored in or on any storage media located on computers, file servers, disks, tape, USB drives, or other real or virtualized devices or media.

e. **"Extracted Full Text"** means the full text that is extracted electronically from native electronic files, and includes all header, footer, and document body

information.

f.    **"Hard-Copy Document"** means documents existing in paper form at the time of collection.

g.    **"Hash Value"** is a unique numerical identifier that can be assigned to a file, a group of files, or a portion of a file, based on a standard mathematical algorithm applied to the characteristics of the data set. The most commonly used algorithms, known as MD5 and SHA, will generate numerical values so distinctive that the chance that any two data sets will have the same Hash Value, no matter how similar they appear, is less than one in one billion.

h.    **"Load files"** means an electronic file containing information identifying a set of paper-scanned images, processed ESI, or native format files, as well as the corresponding Extracted Full Text or OCR text files, and containing agreed-upon extracted or user-created metadata, as well as information indicating unitization (i.e., document breaks and document relationships such as those between an email and its attachments) used to load that production set into the document review platform of the Party receiving a production ("Receiving Party"), and correlate its data within that platform.   A load file is used to import all image, native, and text files and their corresponding production information into a document database.  The Producing Party shall produce a load file for all produced documents with each particular production in accordance with specifications provided herein.

i.    **"Media"** means an object or device, real or virtual, including but not limited to a disc, tape, computer, or other device on which data is or was stored.

j.      **"Metadata"** means: (i) information embedded in or associated with a native file that describes the characteristics, origins, usage, and/or validity of the electronic file; (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system, (iii) information, such as Bates numbers, redaction status, privilege status, or confidentiality status created during the course of processing documents or ESI for production, and (iv) information collected during the course of collecting documents or ESI, such as the name of the media device on which it was stored, or the custodian or non-custodial data source from which it was collected.  Nothing in this order shall require any party to manually populate the value for any metadata field.

k.      **"Native Format" or "native file"** means the format of ESI in which it was generated and/or used by the Party Producing ESI or documents (the "Producing Party") in the usual course of its business and in its regularly conducted activities. For example, the native format of an Excel workbook is an .xls or .xslx file.

l.      **"Optical Character Recognition" or "OCR"** means the optical character recognition technology used to read the text within electronic images of paper Documents and create a file containing a visible, searchable text format of such Documents.

m.      **"Searchable Text"** means the native text extracted from an electronic document and any Optical Character Recognition text ("OCR text") generated from the electronic image of a paper Document.

## 3. E-DISCOVERY LIAISON

The Parties will identify to each other liaisons who are and will be knowledgeable about and responsible for discussing their respective ESI ("E-discovery Liaisons"). Each Party's designated E-discovery Liaison(s) will be, or will have access to those who are, familiar with their Party's respective electronic systems and capabilities and knowledgeable about the technical aspects of e-discovery, including the location, nature, accessibility, format, collection, search methodologies, and production of ESI in this matter. The Parties will rely on the liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention.

## 4. IDENTIFICATION OF DOCUMENTS AND ESI

a.     The Parties agree to meet and confer to discuss (i) the identification of the custodial and noncustodial data sources containing potentially relevant ESI for potential collection, review, and production; (ii) additional parameters for scoping the review and production efforts (e.g., application of date ranges, de-NIST'ing, etc.); (iii) potential use and identification of search terms, tools, or techniques; (iv) the identification and production of documents and ESI from custodial and non-custodial sources that do not require the use of search terms, tools, or techniques; (v) the method each Party proposes to use to identify and de-duplicate duplicate documents, and any exceptions to such de-duplication the Party proposes to implement; and (vi) the treatment of non-responsive documents within parent-child families. The meet and confer between Plaintiffs and each Defendant will take place by the later of seven (7) calendar days following entry of this Order, or ten (10) days after the particular Defendant is served with a first document request herein.

b. The Parties further agree to meet and confer to the extent that this Order imposes any undue burden or expense on any Plaintiff or Defendant with respect to its response to any particular discovery request.

c. Nothing in this order shall be deemed to be a waiver of any Party's right to reasonably seek agreement from the other Parties, or a Court ruling, to modify proposed or previously agreed-to search terms, techniques, or tools (including any proposed as supplements).

## 5. DEDUPLICATION

a. To the extent exact duplicate documents reside within a Party's ESI data set, the Party shall produce only a single, deduplicated copy of a responsive document. "Exact duplicate" shall mean bit-for-bit identity of the document content with exact hash value matches; so-called "near duplicates" will not be included within this definition.

b. To the extent a party de-duplicates its documents, it shall de-duplicate stand-alone documents or entire document families in their ESI sources by the use of MD5, SHA-1, or SHA256 hash values. Where any such documents have attachments, hash values must be identical for both the document plus-attachment (including associated metadata) as well as for any attachment (including associated metadata) standing alone.

c. A Producing Party shall de-duplicate documents across custodians and populate a field of data that identifies each custodian who had a copy of the produced document (the "Duplicate Custodian" field) in addition to a separate field of data identifying the custodian whose document is produced; such de-duplicated documents shall be deemed produced from the custodial files of each such identified custodian for all purposes in this litigation, including for use at deposition and trial. A Producing Party

shall use a uniform description of a particular custodian across productions. Multiple custodians in the "Duplicate Custodian" field shall be separated by a semicolon. Entity/departmental custodians should be identified with a description of the entity or department to the extent applicable.

d. No Party shall identify and/or eliminate duplicates by manual review or some method other than by use of the technical comparison using MD5 or SHA-1 hash values outlined above.

e. Hard-Copy Documents shall not be eliminated as duplicates of ESI.

f. If the Producing Party makes supplemental productions following an initial production, that Party also shall provide with each supplemental production an overlay file to allow the Receiving Party to update the "Duplicate Custodian" field. The overlay file shall include all custodians listed in the "Duplicate Custodian" field in prior productions and any custodians newly identified in the current supplemental production.

## 6. PRODUCTION FORMAT AND PROCESSING SPECIFICATIONS

a. <u>Standard Format</u>. Unless otherwise specified in Section 6(b) or pursuant to Section 6(j) below, the Parties shall produce documents in tagged image file format ("TIFF"). TIFFs of ESI shall convey the same information and image as the original document, including all commenting, versioning, and formatting that is visible in any view of the document in its native application. All hidden text will be expanded, extracted, and rendered in the TIFF file and, to the extent possible, the Producing Party will instruct its vendor to force off Auto Date. Any TIFFs produced shall be single-page, 300 DPI, Group IV TIFF files. After initial production in image file format is complete, a party must demonstrate particularized need for production of ESI in its native format.

b. <u>Native Format</u>. Except as provided by Section 6(j) below, the Parties shall produce all spreadsheets, computer slide presentations, audio files, video files, and other file types that cannot be accurately represented in TIFF format in native format, provided, however, that the Parties will meet and confer regarding appropriate format of production for databases and structured data (e.g., Microsoft Access, Oracle, or other proprietary databases). For each document produced in native format, a responding Party shall also produce a corresponding cover page in TIFF image format, specifying that the document has been "produced in native format" and endorsed with the Bates Number and Confidentiality Designation, if applicable, which will be inserted into the image population in place of the native file. When the native file is produced, the Producing Party shall preserve the integrity of the electronic document's contents, i.e., its original formatting and metadata.

c. <u>Color</u>. Documents containing color need not be produced in color, except that (i) word processing documents that contain hidden text, and (ii) certain redacted documents, as further provided in Section 6(j), shall be produced in color in TIFF format. The Producing Party will honor reasonable requests for a color image of a document, if production in color is necessary to understand the meaning or content of the document.

d. <u>Embedded Objects</u>. If documents contain embedded objects, the Parties shall extract the embedded objects as separate documents and treat them like attachments to the document to the extent reasonably possible. To the extent reasonably possible, images embedded in emails shall not be extracted and produced separately.

     e.  <u>Load Files</u>.  Each production of ESI and Documents shall be accompanied by Concordance or comma delimited load files (.dat and .opt) containing a field with the full path and filename to files produced in native format and also containing metadata fields identified in Appendix A, to the extent the information is available in the original ESI file and can be extracted without unreasonable burden using standard litigation support processing platforms (except for vendor-generated fields related to the litigation production, such as "BEGDOC", "ENDDOC", bases for redaction, and Confidentiality Designations).

     f.  <u>.Txt Files</u>.  For all documents containing extracted full text or OCR text, the Producing Party shall provide searchable document level .txt files (named using the Bates start/"BEGDOC"), which shall reside in the same file directory as the images for such documents.

     g.  <u>Bates Numbering and Other Unique Identifiers.</u>  Every item or file of ESI that is produced shall be identified by a unique page identifier ("Bates Number") and a Production Volume Number for any storage device (e.g., CD, USB, hard drive) containing such files.  All Bates numbers will consist of an Alpha Prefix, followed by a numeric page index. There must be no spaces in any Bates number.  Any numbers with less than 8 digits will be front padded with zeros to reach the required 8 digits.  All ESI produced in TIFF format shall contain a unique Bates Number on each page of the document, electronically "burned" onto the image at a location that does not obliterate, conceal, or interfere with any information from the source document.  If a member of a document family that has otherwise been determined to be responsive cannot be technically processed (e.g., unsupported file format, file corruption, inaccessible

password-protected document), those technical problems shall be identified and disclosed to the Receiving Party by production of a Bates-labeled slip sheet that states "Technical issue—file cannot be processed," along with a log identifying each such file; the associated metadata for the file with the technical problem shall be produced if technically possible. A Receiving Party thereafter may raise with the Producing Party any questions or concerns, and the Parties shall meet and confer to attempt to resolve any issues.

h. <u>Hard-Copy Documents</u>. Except as otherwise set forth in this paragraph, the Parties agree that responsive paper documents shall be converted to single-page TIFF files, and produced following the same protocols set forth in Section 6(a) above, including the production of OCR text that is generated to make such documents searchable. Generally, all paper documents will be scanned and produced electronically, unless a Party establishes good cause for making such documents available via paper and reasonable access is provided to the opposing Party to review the documents directly. In scanning all Hard-Copy Documents, Hard-Copy Documents should be logically unitized. Accordingly, distinct documents should not be merged into a single record, and single documents should not be split into multiple records. In the case of an organized compilation of separate documents (for example, a binder containing several separate documents behind numbered tabs), each of the Hard-Copy Documents should be separately scanned, but the relationship among the documents in the compilation should be reflected in the proper coding of the beginning and ending documents and attachment fields. The Parties will make their best efforts to unitize the documents correctly. Producing Hard-Copy Documents as provided herein does not

change their character from Hard-Copy Documents into ESI. For Hard-Copy Documents, the Parties need only populate the following metadata fields: "BEGDOC," "ENDDOC," "PROD VOLUME," "CUSTODIAN," "SOURCE," "CONFIDENTIAL," "REDACTION," and "COMPANY" fields, as well as "BEGATTACH" and "ENDATTACH" fields where applicable.

   i. <u>Confidentiality Designation</u>. To the extent any Document or ESI (or portion thereof) produced as a TIFF image in accordance with this Order is designated as confidential or highly confidential under the order concerning confidentiality agreed and/or entered in this litigation, the Producing Party will brand the required Confidentiality Designation in a corner of any TIFF images representing the produced item and in a consistent font type and size that does not obscure any part of the underlying image or Bates number, to the extent possible.

   j. <u>Redactions</u>. A Party may use redactions to protect attorney-client or work product privileges consistent with the order concerning privilege agreed and/or entered in this litigation. Other than as permitted by this Order or the order concerning confidentiality agreed and/or entered in this litigation, no redactions for relevance may be made within a produced document or ESI item. Any redactions shall be clearly indicated on the face of the document, with each redacted portion of the document stating that it has been redacted and the basis for the redaction, and a metadata field shall indicate that the document contains redactions and the basis for redaction (e.g. "A/C Privilege"). Where a responsive document contains both redacted and non-redacted content, the Producing Party shall produce the remainder of the non-redacted portions of the document and the text/OCR corresponding to the non-redacted portions.

Email header information (e.g., date, subject line, etc.) should not be redacted unless it is independently privileged. The production of a document in a redacted form does not affect the Producing Party's obligation to timely assert and substantiate the assertion of privilege over the content in a privilege log. Redacted versions of spreadsheets, computer slide presentations, and word processing files containing hidden text (e.g., track changes, hidden columns, comments, notes, markups, etc.) shall be produced in color in TIFF format. The Parties shall honor reasonable requests for the production of particular redacted documents in other formats where the TIFF image is not reasonably usable.

   k. <u>Parent-Child Relationships.</u> The Parties acknowledge and agree that parent-child relationships within a document family (the association between an attachment and its parent document or between embedded documents and their parent) shall be preserved. Responsive non-privileged electronic documents attached to an e-mail or embedded within other electronic documents and hard-copy documents attached or appended to hard-copy documents must be mapped to their parent by the beginning Bates number and immediately follow that parent file in the sequence of the production. Email attachments and embedded files or links "BEGATTACH" and "ENDATTACH" fields listing the unique beginning Bates number of the parent documents and ending number of the last attachment must be populated for each child and parent document.

   l. <u>OCR.</u> OCR software shall be set to the highest quality setting during processing.

m. <u>Deviation from Production Specifications</u>. If a particular document or category of documents warrant a different format, the Parties will cooperate in good faith to arrange for a mutually acceptable production format.

n. <u>Productions From Other Proceedings Pursuant to CMO 1.</u> The production of documents made by Defendants in other civil investigations, litigations, and/or administrative actions by federal (including Congressional), state, or local government entities pursuant to CMO 1 shall be made in the format in which they were previously produced, including any previously produced metadata, load files, and accompanying text files.

o. <u>Password Protection</u>. In the event any Document or ESI (or portion thereof) produced is password protected, the Producing Part**y** shall make all reasonable efforts to provide the password needed to access the document or ESI.

p. <u>Use at Deposition</u>. Any document produced in native that a party identifies and/or marks as an exhibit at a deposition must include as part of that identification or exhibit the produced corresponding cover page in TIFF image format, endorsed with document's Bates Number and Confidentiality Designation, as described in Section 6(a), above.

## 7. PRODUCTION MEDIA

The Producing Party shall produce documents on readily accessible, computer or electronic media, including CD-ROM, DVD, external hard drive (with standard PC compatible interface), via secure FTP site, or such other readily accessible computer or electronic media as the Parties may agree (the "Production Media"). Each piece of Production Media shall be encrypted and assigned a production number or other unique

identifying label ("Production Volume Number") corresponding to the date of the production of documents on the Production Media as well as the sequence of the material in that production, and shall include (a) the name of the litigation and the case number; (b) the identity of the Producing Party; (c) the production date; (d) the Bates Number range of the materials contained on such Production Media item; and (e) the Production Volume Number of the Production Media.   The Producing Party shall accompany all document productions with a transmittal cover letter identifying by Bates number the documents produced.   If the Producing Party produces documents via secure FTP site, the Producing Party shall specify the date through which the materials will remain available via the secure FTP site and the Producing Party shall, within a reasonable time, accommodate requests from another Party or Parties that documents be reposted to the FTP site.

## 8.  COST SHIFTING

The costs of production pursuant to this Order shall be borne by the Producing Party.  However, in agreeing to this Order, no Party waives or relinquishes any right or interest it may have under the Federal Rules of Civil Procedure to seek cost shifting or apportionment for the costs of electronic discovery.

## 9.   THIRD-PARTY ESI

a.   A Party that issues a non-Party subpoena (the "Issuing Party") shall include a copy of this Order and the order concerning confidentiality agreed and/or entered in this litigation with the subpoena and state that the Parties in the litigation have requested that third-Parties produce documents in accordance with the specifications set forth herein.

b.   The Issuing Party shall produce a copy to all other Parties of any

documents and ESI (including any metadata) obtained under subpoena to a non-Party.

    c.    If the non-Party production is not Bates-stamped, the Issuing Party will endorse the non-Party production with unique Bates prefixes and numbering scheme prior to reproducing them to all other Parties.

## 10. BEST EFFORTS COMPLIANCE AND DISPUTES

The Parties agree to use their best efforts to comply with and resolve any differences concerning compliance with any provision/s of this Order. If a Producing Party cannot comply in a particular circumstance with this Order, such Party shall promptly inform the Receiving Party in writing why compliance with the Order is not reasonable or feasible. No Party may seek relief from the Court concerning compliance or non-compliance with the Order until it has met and conferred with the other Party in a good faith effort to resolve or narrow the area of disagreement.

## 11. MODIFICATION

This Order may be modified by a Stipulated Order of the Parties or by the Court for good cause shown.

    IT IS SO ORDERED.


Date:   5/15/18                /s/Dan Aaron Polster

                                         Hon. Dan Aaron Polster
                                         United States District Judge

## Appendix A: ESI Metadata and Coding Fields

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| BegDoc | Bates number of the first page of the document. | All | Prefix-0000000001 |
| EndDoc | Bates number of the last page of the document. | All | Prefix-0000000002 |
| BegAttach | Bates number of the first page of the first document of the document family. | All | Prefix-0000000001 |
| EndAttach | Bates number of the last page of the last document of the document family. | All | Prefix-0000000004 |
| PageCount | Number of printed pages in the document. | All | 2 |
| Confidential | Confidentiality designation, if any, of the document | All | Confidential Highly Confidential |
| Custodian | Names of all custodians who possessed the document, including deduplicated values, in format: Lastname, Firstname.<br><br>Where multiple individuals share first and last name, individuals should be distinguished by an initial which is kept constant between productions. For instance: Smith, John A. and Smith, John B.<br><br>For documents from centralized repositories where custodian name(s) are unavailable, identifying source information should be provided. | All | Doe, John; Smith, John; Smith, Jane |
| Duplicate Custodian | Names of all other custodians who possessed the document. | ESI | |
| Duplicate Custodian File Name | The names of unproduced duplicate copies of files. | ESI | |
| Duplicate Custodians | The file path/directory path correlating to the unproduced | ESI | |

16

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| Directory Path | duplicate copies of files. | | |
| Source | Source shall be used in connection with document obtained from third-Parties and identify the third-Party having provided the particular material. If the third-Party's production of documents included individual custodian information, such information shall also be included in the "CUSTODIAN" field. | | |
| Subject/E-Subject | Subject line of an e-mail. | E-mails | Text of the subject line |
| To | All recipients that were included on the "To" line of the e-mail. | E-mails | John.Doe@e-mail.com |
| From | The name and e-mail address of the sender of the e-mail. | E-mails | Jane.Doe@e-mail.com |
| CC | All recipients that were included on the "CC" line of the e-mail. | E-mails | Bill.Black@email.com |
| BCC | All recipients that were included on the "BCC" line of the e-mail. | E-mails | ceo-gs@email.com |
| DateSent | Date an e-mail was sent. | E-mails | 01/01/2015 |
| TimeSent | Time an e-mail was sent. | E-mails | 12:30:00 |
| DateModified | Date the document was last modified. | E-attachments; Electronic documents | 01/01/2015 |
| TimeModified | Time the document was last modified. | E-attachments; Electronic documents | 12:30:00 |
| DateCreated | Date the document was created. | E-attachments; Electronic documents | 01/01/2015 |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| TimeCreated | Time the document was created. | E-attachments; Electronic documents | 12:30:00 |
| Family Date | Date last modified or, for e-mails, sent date of the parent | Electronic documents; E-attachments | 01/01/2015 |
| Family Time | Time last modified or, for e-mails, sent time of the parent | Electronic documents; E-attachments | 12:30:00 |
| DateReceived | Date email was received. | E-mails | 01/01/2015 |
| TimeReceived | Time email was received. | E-mails | 12:30:00 |
| DateAccessed | Date document last accessed | Electronic documents; E-attachments | 01/01/2015 |
| Date Last Printed | Date the document was last printed. | E-attachments; Electronic documents | 01/01/2015 |
| Time Last Printed | Time the document was last printed. | E-attachments; Electronic documents | 12:30:00 |
| Date Last Saved | Date the document was last saved. | E-attachments; Electronic documents | 01/01/2015 |
| Importance | Level assigned by creator | E-mails | High |
| Conversation | E-mail conversation designation | E-mail | Re: Smith Summary |
| Conversation Index | | E-mail | |
| Title/E-Title | Title of document | E-attachments; Electronic documents | Smith Summary |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| Redaction | Basis for redactions in document. | E-attachments; Electronic documents | |
| FileName | File name of original document | Electronic documents; E-attachments | Microsoft Word 2007/2010 |
| File Type | Application type | Electronic documents; E-attachments | Word |
| File Size | Size of file | All | 40 gb |
| File Extension | The file extension of the document. | E-attachments; Electronic documents | .doc |
| NativeLink | Relative file path to each native file on the production media. | All documents produced in native format | \Natives\Document_12345.doc |
| Author | Document author/creater | E-attachments; Electronic documents | John Doe |
| Company | Party making the production | All | Company X |
| Title | Document Title | E-attachments; Electronic documents | Text of the title line |
| HASH | MD5 or SHA-1 Hash value | Electronic documents; E-attachments; E-mails | |
| Prod Volume | Production Volume | All | Defendant X Volume 1 |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| File Path | | | |
| AttachDocID | | Electronic documents; E-attachments; E-mails | |
| ATTACHNAME | | | |
| ATTACHRANGE | | | |
| FOREIGN LANGUAGE | | | |
| TIME ZONE PROCESSED | | | |
| E-LAST MODIFIED BY | | | |
| MESSAGE TYPE | | | |
| CALENDAR MEETING STOP/START | | | |
| RECORD TYPE | | | |
| HAS HIDDEN DATA | | | |
| HIDDEN COLUMNS | | | |
| HIDDEN NOTES | | | |
| HIDDEN ROWS | | | |
| HIDDEN SHEETS | | | |
| HIDDEN SHEETS COUNT | | | |
| HIDDEN SLIDES | | | |
| HIDDEN TEXT | | | |
| HIDDEN TRACK CHANGES | | | |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| HIDDEN VERY HIDDEN SHEETS | | | |
| HIDDEN VERY HIDDEN SHEETS COUNT | | | |
| HIDDEN WHITE TEXT | | | |
| HIDDEN WORKBOOK | | | |
| HIDDEN WORK BOOK WRITE PROTECTED | | | |
| MESSAGE ID | | | |
| NUMBER OF ATTACHMENTS | | | |
| ORIGINAL FOLDER PATH | | | |
| IS EMBEDDED | | | |
| TextPath | Relative file path to each extracted text/OCR text file on the production media. | All | \Text\Document_12345.txt |

# EXHIBIT 9

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

| | |
|---|---|
| In re: National Presciption Opiate Litigation | ) |
| _Plaintiff_ | ) |
| v. | ) |
| | ) |
| | ) |
| _Defendant_ | ) |

Civil Action No.   1:17-MD-2804

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:           KPH Healthcare Services, Inc. d/b/a Kinney Drugs
                29 East Main Street, Gouverneur, NY 13642

_(Name of person to whom this subpoena is directed)_

✔ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Please see attached Schedules A and B.

| | |
|---|---|
| Place:  Burnham Reporting<br>          15 Howardville Road<br>          Canton, NY 13617 | Date and Time:<br><br>06/09/2025 5:00 pm |

❑ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| | |
|---|---|
| Place: | Date and Time: |

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:       05/09/2025

| _CLERK OF COURT_ | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Anthony P. Alden |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ _____
Express Scripts, Inc. _____ , who issues or requests this subpoena, are:
Anthony Alden, Quinn Emanuel, 865 S. Figueroa St., 10th Floor, Los Angeles, CA 90017, anthonyalden@quinnemanuel.com

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  1:17-MD-2804

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION

This document relates to:

*City of Ogdensburg v. Purdue Pharma, L.P.*,
No. 19-op-45852 (Track 22)

**MDL No. 2804**

**Case No.:  1:17-MD-2804**

**Judge Dan Aaron Polster**

## SCHEDULE A TO SUBPOENA

## DEFINITIONS

"**Agreement**" means a contract, arrangement, memorandum or understanding, formal or informal, oral or written, between two or more Persons.

"**City of Ogdensburg**" means City of Ogdensburg, New York, Including its executive and legislative branches, agents, affiliates, agencies, offices, departments, divisions, commissions, committees, subcommittees, working groups, task forces, boards, board members, instrumentalities, vendors, administrators, employees, directors, contractors, attorneys, assigns, elected officials, and other Persons or entities acting on behalf of, or controlled by, City of Ogdensburg.

"**Communication**" means any oral or written statement, dialogue, discussion, exchange, conversation, disclosure, or transmittal of information whether in-person, by telephone, any form of video transmission, mail, e-mail, facsimile, personal delivery, computer transmission, or otherwise.

"**Complaint**" means Plaintiff City of Ogdensburg's State Court Complaint, filed on June 7, 2019 (Case No. 19-op- 45852).

"**Concerning**" means regarding, relating to, referring to, reflecting, discussing, describing, analyzing, supporting, evidencing, constituting, comprising, containing, setting forth, showing, disclosing, explaining, summarizing, or mentioning.

"**Defendants**" means Express Scripts, Inc., ESI Mail Pharmacy Service, Inc., and OptumRx, Inc.

"**Document(s)**" is intended to have the broadest possible meaning under Rule 34 of the Federal Rules of Civil Procedure and means the original or copies of all written, printed, typed, electronically stored, recorded, or graphic matter, photographic matter, or sound production, however produced or reproduced, whether mechanically or electronically recorded, whether published in original, draft, or final form, whether original or a reproduction, whether signed or unsigned, and regardless of whether approved, signed, sent, received, redrafted, or executed, and

whether handwritten, typed, printed, photostated, duplicated, carbon or otherwise copied or produced in any other manner whatsoever. Without limiting the foregoing, the term "Document(s)" Includes correspondence, communications, reports, tests, analyses, studies, contracts, agreements, term sheets, letters, telegrams, mailgrams, memoranda, inter-office or intra-office communications, memoranda for files, memoranda of telephone or other conversations or meetings, any type of transcript (Including conference calls and television interviews), press releases, statements, financial models, calendars, appointment books, schedules, bulletins, checks, invoices, receipts and statements of account, ledgers, notes or notations, notes or memoranda attached to or to be read with any Document, booklets, books, notebooks, work papers, drawings, graphs, charts, photographs, phone records, video or voice recordings, electronic tapes, printouts, data cards, and other data compilations from which information can be obtained, which are in the possession, custody or control of You or Your counsel. "Document(s)" also shall Include all electronic data Including e-mails and any related attachments, electronic files or other data compilations which relate to the categories of Documents listed above, whether stored on a personal computer, network computer system, backup computer tape, server, and/or disk, or by some other storage mechanism or database. Copies of Documents, which are not identical duplications of the originals or which contain additions to or deletions from the originals, copies, or drafts, shall be considered to be separate Documents.

"**Document Requests**" means the requests for production of Documents set forth herein.

"**Drug Scope**" means the MDL-8 opioids, Relevant Benzodiazepines, and Relevant Muscle Relaxers.

"**Employee**" Includes but is not limited to all current and former employees, independent contractors, and individuals performing work as temporary employees.

"**Illicit Drugs**" means heroin, illicit fentanyl, fentanyl-type analogs, carfentanil, cocaine, crack cocaine, marijuana, synthetic cannabinoids, methamphetamine, methylenedioxymethamphetamine (MDMA), hallucinogenic compounds, counterfeit MDL-8 Opioids, any other Schedule I drug.

"**Including**" or "**Include**" means "Including but not limited to."

"**MDL-8 Opioids**" means Fentanyl, Hydrocodone, Hydromorphone, Morphine, Oxycodone, Oxymorphone, Tapentadol, and Methadone.

"**Opioid(s)**" means substances comprised of or containing natural, synthetic, or semisynthetic chemicals that bind to opioid receptors in the brain or body, Including heroin, fentanyl, carfentanil, and fentanyl-type analogs as well as MDL-8 Opioids.

"**Person**" means any natural or legal person or any entity, Including a government officer or agency.

"**Pharmaceutical Company**" means a commercial business licensed to research, discover, develop, market, produce, manufacture, and/or distribute generic and/or brand medications, drugs, and/or pharmaceuticals and/or medical devices to patients with the aim to, among other things, cure, vaccinate, and/or alleviate the symptoms of such patients.

"**Prescription Opioid(s)**" means FDA-approved pain-reducing medications that consist of natural, synthetic, or semisynthetic chemicals that bind to opioid receptors in the brain or body to produce an analgesic effect, including prescription medications containing hydrocodone, oxycodone, fentanyl, hydromorphone, morphine, methadone, tapentadol, and oxymorphone.

"**Present**" means the date on which you receive this subpoena.

"**Relevant Benzodiazepines**" means Alprazolam, Chlordiazepoxide, Clobazam, Clonazepam, Clorazepate, Diazepam, Estazolam, Flurazepam, Lorazepam, Midazolam, Oxazepam, Quazepam, Temazepam, and Triazolam.

"**Relevant Muscle Relaxers**" means Carisoprodol, Cyclobenzaprine, Orphenadrine, and Tizanidine.

"**St. Lawrence County Region**" means St. Lawrence County, New York, as well as all counties in New York bordering on St. Lawrence County, Including the Counties of Hamilton, Lewis, Herkimer, Franklin, and Jefferson, Including all municipalities, cities, and towns within these counties.

"**Suspicious Order(s)**" means any order of drugs within the Drug Scope, or other Opioids, that (i) You believe, suspect, or contend should have been reported to the United States Drug Enforcement Administration ("DEA") or state authorities, the New York, Medical Board, New York Board of Pharmacy, or New York Dental Board, as "suspicious" within the meaning of 21 C.F.R. § 1301.74(b), (ii) is referred to in a Document as "suspicious" within the meaning of 21 C.F.R. § 1301.74(b), or (iii) that You define as a suspicious order for purposes of Your work.

"**You**," or "**Your**," or "**Yours**" means KPH Healthcare Services, Inc. d/b/a Kinney Drugs, Including its Employees, directors, officers, executives, board members, agents and contractors or other Persons acting on behalf of KPH Healthcare Services, Inc. d/b/a Kinney Drugs.

## <u>INSTRUCTIONS</u>

A.  Produce all Documents in the manner in which they are maintained in the usual course of Your business or organize and label the Documents to correspond with the categories in this Schedule A. A request for a Document shall be deemed to include a request for any and all physical or electronic file folders within which the Document was contained, all transmittal sheets, cover letters, exhibits, enclosures, or attachments to the Document in addition to the Document itself, and for any electronic Document any metadata contained in the Document, in the file system on which the Document is stored, and/or in any active directory, SQL, LDAP, or other indices or databases that provide access, access control, or other security or index information concerning the Document.

B.  If Documents are maintained in a database or other electronic format, produce along with the Document(s) software that will enable access to the electronic Document(s) or database as You would access such electronic Document(s) or database in the ordinary course of Your business.

C.   Produce Documents in such fashion as to identify the department, branch or office in which they were located and, where applicable, the natural person in whose possession they were found and the business address of each Document's custodian(s).

D.   Any Document withheld from production based on a claim of privilege or any similar claim shall be identified by (1) the type of Document, (2) the general subject matter of the Document, (3) the date of the Document, and (4) such other information as is sufficient to identify the Document including the author of the Document, the addressee of the Document, and, where not apparent, the relationship of the author and the addressee to each other. The nature of each claim of privilege shall be set forth.

E.   Documents attached to each other should not be separated.

F.   Documents not otherwise responsive to these Document Requests shall be produced if such Documents mention, discuss, refer to, or explain the Documents which are called for by this subpoena.

G.   In producing Documents and other materials, You are requested to furnish all Documents or things in Your possession, custody or control, regardless of whether such Documents or materials are possessed directly by You or Your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, accountants, investigators, or by Your attorneys or their agents, employees, representatives or investigators.

H.   Responsive electronic Documents shall be produced as both (a) native files, including, if necessitated by Paragraph B, the software You used to create and/or view the responsive electronic Documents, as well as (b) multi-page, 300dpi group IV TIFF images with extension ".tif" and (c) full text files comprising extracted text (for Documents amenable to text extraction) or OCR text files (otherwise), named after the first bates number of the Document, with extension ".txt" and (d) a load file with a ".dat" file extension and ASCII 020 and 254 delimiters for column break and text qualifier. The first line shall be the header with field names and each subsequent line shall contain the fielded data for each Document. The load file shall include the following metadata, where available:

| Field | Description |
| --- | --- |
| BegBates | Page ID of first page in a Document. |
| EndBates | Page ID of last page in a Document. |
| BegAttach | BegBates of parent record. |
| EndAttach | BegBates of last attached Document in family. |
| From | Author of the e-mail message. |
| To | Main recipient(s) of the e-mail message. |
| CC | Recipient(s) of "Carbon Copies" of the e-mail message. |
| BCC | Recipient(s) of "Blind Carbon Copies" of the e-mail message. |
| DateSent | Sent date of an e-mail message. |
| TimeSent | Time the e-mail message was sent. |
| Email Subject | Subject of the e-mail message. |
| Author | Author field value pulled from metadata of the native file. |
| Title | Title field value extracted from the metadata of the native file. |

| Field | Description |
|-------|-------------|
| Custodian | Textual value of custodian. |
| DateCreated | Creation date of the native file. |
| TimeCreated | Creation time of the native file. |
| EntryID | Unique identifier of e-mails in mail stores. |
| FileDescription | File extension or other description of native file type. |
| Filename | Original filename of native file. Contains subject of e-mail message for e-mail records. |
| Filesize | Size of native file, in bytes. |
| MD5Hash | MD5 hash-128-bit output. |
| Attach | Semi-colon delimited string of first level attachments in the e-mail. |
| DateLastMod | Date the native file was last modified. |
| TimeLastMod | Time native file was last modified. |
| PgCount | Number of pages in a Document. |
| NativeFile | Logical file path to the native file. |
| OCRPath | Logical file path to the OCR text. |

This instruction – which concerns in part the preparation of a load file that includes metadata – is separate from, and in addition to the directions in: (1) Instruction A, which requires that You produce native files with all file, file= system, index, and access control metadata intact; and (2) Instruction B, which requires, for particular electronic Documents, the production of software You use(d) in Your ordinary course of business to create and review the native electronic Documents.

I.  Responsive paper Documents shall be scanned and produced electronically along with an appropriate load file as described in subsections (b), (c), and (d) of Paragraph H.

J.  Unless otherwise stated in a specific request, these Document Requests seek responsive information and Documents authored, generated, disseminated, drafted, produced, reproduced, or otherwise created or distributed or related to the period beginning **January 1, 1996 through the Present**.[1] Whenever a Document Request specifically refers to a date range, that date range should be construed as beginning on the first moment of the first date in the range and ending on the last moment of the last date in the range.

K.  Whenever necessary to bring Documents within the scope of these Document Requests that might otherwise be construed to be outside their scope:

(a)  the use of a verb in any tense shall be construed as the use of that verb in all other tenses;

(b)  the use of a word in its singular form shall be deemed to include within its use the plural form as well;

---

[1]  The Special Master in this litigation has ordered discovery back to 1996. If the Court modifies that ruling, we will narrow the temporal scope of the Requests.

(c)     unless otherwise stated explicitly herein with regard to a particular Document Request, each Document Request shall be construed independently and not with reference to any other Document Request for the purpose of limitation. The use of the singular form of any word includes the plural and vice versa. The past tense shall include the present tense and vice versa;

(d)     the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a Document Request all Documents that might otherwise be construed to be outside its scope;

(e)     the use of any capitalized word shall include the same word uncapitalized, and the use of any uncapitalized word shall include the same word capitalized; and

(f)     the terms "all" and "each" shall be construed as all and each.

L.     If You object to any part of any Document Request, state fully in writing the nature of the objection. Notwithstanding any objections, nonetheless comply fully with the other parts of the Document Request to which you are not objecting.

## **DOCUMENTS REQUESTED**

1) Dispensing data reflecting all drugs within the Drug Scope that You dispensed or refused to fill in the St. Lawrence County Region from January 1, 2006 to the Present.  The data should include the following fields:

   a) Drug name

   b) NDC number

   c) Prescription number

   d) Date filled

   e) Quantity dispensed

   f) Dosage form

   g) Days' supply

   h) Prescriber's name

   i) Prescriber's DEA number

   j) Dispensing pharmacist

   k) Patient Zip Code

   l) Patient ID # (Unique ID)

   m) Quantity prescribed

   n) Number of refills authorized (if any)

   o) Diagnostic code

   p) Method of payment

   q) Patient paid amount

   r) Whether prescription covered by third-party payor (indicator of third-party payor's coverage decision, and reason for rejection if applicable)

   s) Control / Non Control ratio

   t) Pharmacy DEA #

   u) Pharmacy Store #/NPI

v)   Pharmacy address (at the zip code level or finder)

w)  Prescriber address (at the zip code level or finder)

x)   Prescription Date written

y)   Refill indicator (whether the Rx is a refill or the original)

z)   Prescriber Specialty

aa) Rejection Indicator (indicator of pharmacy's decision to fill, and reason for refusal if different from third party payor's coverage decision)

bb) Prescriber's NPI Number

cc) Patient DOB Year (or age)

dd) DEA Override

ee) DEA Schedule (Same as Control/Non-Control)

ff)  Dispense Hour

gg) Dispense Minute

hh) Drop Off Hour

ii)  Drop Off Minute

jj)  BIN

kk) PCN

ll)  Group ID

mm)      Plan Paid Amount

2)  Documents sufficient to show how You and any pharmacists employed by You (or other Employees involved in dispensing drugs within the Drug Scope) do or do not consider, use, respond to, or interact with communications received from pharmacy benefit managers (including, but not limited to, the Defendants) at the point of sale, including, but not limited to, communications regarding plan coverage limits (such as prior authorizations, step edits, and quantity limits) and communications regarding health and safety issues (such as concurrent drug utilization review or CDUR messages).   Your response should include documents responsive at both the pharmacy- and individual employee level, and should include any pertinent policies, procedures, directives, and guidance and data showing how Your personnel responded to point-of-sale communications Concerning plan coverage limits (such as prior authorizations, step edits, and quantity limits) and health and safety issues (such as concurrent drug utilization review or CDUR messages), Concerning drugs within the Drug Scope,

8

Including any notes (free-text or structured) entered by Your personnel in connection with Your internal drug utilization and prescription review process, as well as all data fields necessary to link this internal review data to the dispensing data addressed in connection with Request #1.

3) Documents sufficient to show all literature, publications, presentations, analyses, studies, reports, guidelines, directives, announcements, recommendations, pamphlets, circulars, notices, and other materials provided by any drug manufacturer to You regarding the efficacy, addictive qualities, and/or safety of any drugs within the Drug Scope, or any other Opioids.

4) Documents and Communications sufficient to show all guidance, directives, instructions, publications, alerts, notices, presentations, or other materials You provided to Employees Concerning any drugs within the Drug Scope, or any other Opioids.

5) Documents showing all policies and procedures and training materials related to the proper dispensing of any drugs within the Drug Scope, the identification of any "red flags" or potential indicia of diversion, the reporting of any "red flag" prescriptions, and compliance with the Controlled Substances Act and all state specific laws and regulations.

6) Documents or data showing any prescriber you refused to fill prescriptions for in New York and each prescription you determined was doubtful, questionable, of suspicious origin, potentially related to diversion, or not issued for a legitimate medical purpose.

7) Documents and Communications sufficient to show Your use, review, or analysis of ARCOS data, data from the New York I-STOP Prescription Monitoring Program, or other data relating to Your decision to dispense prescription drugs within the Drug Scope or any other Opioid, including all Communications to or from the U.S. Drug Enforcement Agency or the New York I-STOP Prescription Monitoring Program, from January 1, 2006 to the Present.

8) Documents and Communications sufficient to show Your efforts of any kind to identify, investigate, or report to any national, state, or local governments, agencies, boards, institutions, associations, law enforcement bodies, health departments, or drug taskforces Concerning any of the following regarding any drug within the Drug Scope, or any other Opioids: (a) improper prescribing or failing to prescribe by doctors or other prescribers in the St. Lawrence County Region; (b) doctor-shopping, forgery, or counterfeiting of prescriptions by patients in the St. Lawrence County Region; (c) diversion, abuse, misuse, diversion, trafficking; or (d) any other concerns Concerning potentially improper or illegal prescriptions.

9) Documents and Communications sufficient to show all actions (including fines, suspensions, revocations, terminations, voluntary agreements not to practice, resignations, and letters or other formal warnings or notices) You have taken against any current or former Employee Concerning any drug within the Drug Scope, or any other Opioids, including for the prescribing, dispensing, failure to prescribe, failure to dispense, diversion, or misuse of any drug within the Drug Scope, or any other Opioids.

10) Documents sufficient to show all instances of theft, loss, and diversion of any drug within the Drug Scope, or any other Opioids, from any facility owned, operated, supported by, serviced by, or affiliated with You in the St. Lawrence County Region.

11) Documents and Communications sufficient to show any investigation or other inquiry conducted by any state or federal office, agency, department, committee, or program (including the Drug Enforcement Agency, the Federal Bureau of Investigation, a United States Attorney or representative thereof, any government-level department or agency within the State of New York), or any state board (including the New York Medical Board, New York Board of Pharmacy, New York Dental Board, New York Nursing Board, or any medical examiner's office in New York) into any of Your practices related to the prescribing, ordering, dispensing, distributing, administering, or diversion of any drug within the Drug Scope, or any other Opioids.

12) Documents sufficient to identify any regulatory, civil, or criminal actions or investigation Concerning any drug within the Drug Scope, or any other Opioids, to which you were a party or participated in any manner.

13) Documents sufficient to show all contracts (including amendments), agreements, and orders between You and any manufacturer or distributor of any drug within the Drug Scope, or any other Opioids.

14) Documents sufficient to show all steps You have taken to prevent or address Opioid abuse, misuse, or diversion in the St. Lawrence County Region.

Dated: May 9, 2025

/s/ Brian D. Boone
Brian D. Boone
brian.boone@alston.com
**ALSTON & BIRD LLP**
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
Tel: (704) 444-1000

William H. Jordan
bill.jordan@alston.com
Andrew Hatchett
andrew.hatchett@alston.com
**ALSTON & BIRD LLP**
1201 West Peachtree Street NW,
Suite 4900
Atlanta, GA 30309
Tel.: (404) 881-7000

*Attorneys for OptumRx, Inc.*

/s/ Anthony P. Alden
Anthony P. Alden
anthonyalden@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel: (213) 433-3159

*Attorney for Defendants Express Scripts, Inc. and ESI Mail Pharmacy Service, Inc.*

## **AFFIDAVIT**

STATE OF NEW YORK )
)
COUNTY OF_____ )

     Before me, the undersigned authority, personally appeared_____, who, being by me duly sworn, deposed as follows:

     My name is _____. I am of sound mind, capable of making this Affidavit, and I am personally acquainted with the facts stated herein:

     I am the duly authorized Custodian of Records for KPH Healthcare Services, Inc. d/b/a Kinney Drugs. Attached hereto are _____ pages of records relating to KPH Healthcare Services, Inc. d/b/a Kinney Drugs. These _____ pages of records are kept by KPH Healthcare Services, Inc. d/b/a Kinney Drugsin the regular course of business, and it was the regular course of business of KPH Healthcare Services, Inc. d/b/a Kinney Drugsor an employee or representative of KPH Healthcare Services, Inc. d/b/a Kinney Drugswith knowledge of the act, event, condition, opinion, or diagnosis recorded to make a record or transmit information thereof to be Included in such record; and the record was made at or near the time of the act, event, condition, opinion, or diagnosis. The records attached hereto are the originals or exact duplicates of the originals.

_____

Affiant, Custodian of Records

     IN WITNESS WHEREOF I have hereunto subscribed my name and affixed my official seal this _____ day of _____, 2025.

_____

                                  Notary Public

My Commission Expires:

_____

# SCHEDULE B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| | Case No. 17-md-2804 |
| This document relates to: | |
| *All Cases* | Judge Dan Aaron Polster |

CASE MANAGEMENT ORDER NO ___3___
REGARDING DOCUMENT AND ELECTRONICALLY STORED INFORMATION
PRODUCTION PROTOCOL

## 1. PURPOSE

This Order will govern production of Documents and ESI (as defined below) by Plaintiffs and Defendants (the "Parties") as described in Federal Rules of Civil Procedure 26, 33, and 34. This Order shall apply to the production of hard-copy and electronic documents by the Parties in this litigation.

The production of documents and ESI by the Parties also shall be subject to the provisions of orders concerning confidentiality, privilege, and/or protected health information as agreed to among the Parties and/or entered by the Court.

The Parties reserve all objections under the Federal Rules of Civil Procedure and applicable decision authority other than concerning matters that are addressed in this Order.

Nothing in this Order shall be interpreted to require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity. The Parties do not waive any objections to the discoverability, admissibility, or confidentiality of documents

1

or ESI. Nothing in this Order shall be interpreted to supersede the provisions of orders governing confidentiality, privilege, and/or protected health information entered by the Court in this litigation, unless expressly provided for in such an order.

## 2. DEFINITIONS

a. **"Confidentiality Designation"** means the legend affixed to Documents or ESI for confidential or highly confidential information as defined by, and subject to, the terms of the order concerning confidentiality agreed to an/or entered by the Court in this litigation.

b. **"Document"** is defined to be synonymous in meaning and equal in scope to the usage of this term in Rules 26 and 34 of the Federal Rules of Civil Procedure. The term "document" shall include hard-copy documents, electronic documents, and ESI as defined herein.

c. **"Electronic Document or Data"** means documents or data existing in electronic form at the time of collection, including but not limited to: e-mail or other means of electronic communications, word processing files (e.g., Microsoft Word), computer slide presentations (e.g., PowerPoint or Keynote slides), spreadsheets (e.g., Excel), and image files (e.g., PDF).

d. **"Electronically stored information" or "ESI,"** as used herein, has the same meaning as in Rules 26 and 34 of the Federal Rules of Civil Procedure and includes Electronic Documents or Data, and computer-generated information or data, stored in or on any storage media located on computers, file servers, disks, tape, USB drives, or other real or virtualized devices or media.

e. **"Extracted Full Text"** means the full text that is extracted electronically from native electronic files, and includes all header, footer, and document body

information.

f.   **"Hard-Copy Document"** means documents existing in paper form at the time of collection.

g.   **"Hash Value"** is a unique numerical identifier that can be assigned to a file, a group of files, or a portion of a file, based on a standard mathematical algorithm applied to the characteristics of the data set. The most commonly used algorithms, known as MD5 and SHA, will generate numerical values so distinctive that the chance that any two data sets will have the same Hash Value, no matter how similar they appear, is less than one in one billion.

h.   **"Load files"** means an electronic file containing information identifying a set of paper-scanned images, processed ESI, or native format files, as well as the corresponding Extracted Full Text or OCR text files, and containing agreed-upon extracted or user-created metadata, as well as information indicating unitization (i.e., document breaks and document relationships such as those between an email and its attachments) used to load that production set into the document review platform of the Party receiving a production ("Receiving Party"), and correlate its data within that platform.   A load file is used to import all image, native, and text files and their corresponding production information into a document database.   The Producing Party shall produce a load file for all produced documents with each particular production in accordance with specifications provided herein.

i.   **"Media"** means an object or device, real or virtual, including but not limited to a disc, tape, computer, or other device on which data is or was stored.

      j.      **"Metadata"** means: (i) information embedded in or associated with a native file that describes the characteristics, origins, usage, and/or validity of the electronic file; (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system, (iii) information, such as Bates numbers, redaction status, privilege status, or confidentiality status created during the course of processing documents or ESI for production, and (iv) information collected during the course of collecting documents or ESI, such as the name of the media device on which it was stored, or the custodian or non-custodial data source from which it was collected. Nothing in this order shall require any party to manually populate the value for any metadata field.

      k.      **"Native Format" or "native file"** means the format of ESI in which it was generated and/or used by the Party Producing ESI or documents (the "Producing Party") in the usual course of its business and in its regularly conducted activities. For example, the native format of an Excel workbook is an .xls or .xslx file.

      l.      **"Optical Character Recognition" or "OCR"** means the optical character recognition technology used to read the text within electronic images of paper Documents and create a file containing a visible, searchable text format of such Documents.

      m.      **"Searchable Text"** means the native text extracted from an electronic document and any Optical Character Recognition text ("OCR text") generated from the electronic image of a paper Document.

**3. E-DISCOVERY LIAISON**

The Parties will identify to each other liaisons who are and will be knowledgeable about and responsible for discussing their respective ESI ("E-discovery Liaisons"). Each Party's designated E-discovery Liaison(s) will be, or will have access to those who are, familiar with their Party's respective electronic systems and capabilities and knowledgeable about the technical aspects of e-discovery, including the location, nature, accessibility, format, collection, search methodologies, and production of ESI in this matter. The Parties will rely on the liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention.

**4. IDENTIFICATION OF DOCUMENTS AND ESI**

a. The Parties agree to meet and confer to discuss (i) the identification of the custodial and noncustodial data sources containing potentially relevant ESI for potential collection, review, and production; (ii) additional parameters for scoping the review and production efforts (e.g., application of date ranges, de-NIST'ing, etc.); (iii) potential use and identification of search terms, tools, or techniques; (iv) the identification and production of documents and ESI from custodial and non-custodial sources that do not require the use of search terms, tools, or techniques; (v) the method each Party proposes to use to identify and de-duplicate duplicate documents, and any exceptions to such de-duplication the Party proposes to implement; and (vi) the treatment of non-responsive documents within parent-child families. The meet and confer between Plaintiffs and each Defendant will take place by the later of seven (7) calendar days following entry of this Order, or ten (10) days after the particular Defendant is served with a first document request herein.

  b.  The Parties further agree to meet and confer to the extent that this Order imposes any undue burden or expense on any Plaintiff or Defendant with respect to its response to any particular discovery request.

  c.  Nothing in this order shall be deemed to be a waiver of any Party's right to reasonably seek agreement from the other Parties, or a Court ruling, to modify proposed or previously agreed-to search terms, techniques, or tools (including any proposed as supplements).

## 5. DEDUPLICATION

  a.  To the extent exact duplicate documents reside within a Party's ESI data set, the Party shall produce only a single, deduplicated copy of a responsive document. "Exact duplicate" shall mean bit-for-bit identity of the document content with exact hash value matches; so-called "near duplicates" will not be included within this definition.

  b.  To the extent a party de-duplicates its documents, it shall de-duplicate stand-alone documents or entire document families in their ESI sources by the use of MD5, SHA-1, or SHA256 hash values.  Where any such documents have attachments, hash values must be identical for both the document plus-attachment (including associated metadata) as well as for any attachment (including associated metadata) standing alone.

  c.  A Producing Party shall de-duplicate documents across custodians and populate a field of data that identifies each custodian who had a copy of the produced document (the "Duplicate Custodian" field) in addition to a separate field of data identifying the custodian whose document is produced; such de-duplicated documents shall be deemed produced from the custodial files of each such identified custodian for all purposes in this litigation, including for use at deposition and trial.  A Producing Party

6

shall use a uniform description of a particular custodian across productions. Multiple custodians in the "Duplicate Custodian" field shall be separated by a semicolon. Entity/departmental custodians should be identified with a description of the entity or department to the extent applicable.

       d.     No Party shall identify and/or eliminate duplicates by manual review or some method other than by use of the technical comparison using MD5 or SHA-1 hash values outlined above.

       e.     Hard-Copy Documents shall not be eliminated as duplicates of ESI.

       f.     If the Producing Party makes supplemental productions following an initial production, that Party also shall provide with each supplemental production an overlay file to allow the Receiving Party to update the "Duplicate Custodian" field. The overlay file shall include all custodians listed in the "Duplicate Custodian" field in prior productions and any custodians newly identified in the current supplemental production.

## 6. PRODUCTION FORMAT AND PROCESSING SPECIFICATIONS

       a.  <u>Standard Format</u>.  Unless otherwise specified in Section 6(b) or pursuant to Section 6(j) below, the Parties shall produce documents in tagged image file format ("TIFF"). TIFFs of ESI shall convey the same information and image as the original document, including all commenting, versioning, and formatting that is visible in any view of the document in its native application. All hidden text will be expanded, extracted, and rendered in the TIFF file and, to the extent possible, the Producing Party will instruct its vendor to force off Auto Date. Any TIFFs produced shall be single-page, 300 DPI, Group IV TIFF files. After initial production in image file format is complete, a party must demonstrate particularized need for production of ESI in its native format.

     b.  <u>Native Format</u>.  Except as provided by Section 6(j) below, the Parties shall produce all spreadsheets, computer slide presentations, audio files, video files, and other file types that cannot be accurately represented in TIFF format in native format, provided, however, that the Parties will meet and confer regarding appropriate format of production for databases and structured data (e.g., Microsoft Access, Oracle, or other proprietary databases).  For each document produced in native format, a responding Party shall also produce a corresponding cover page in TIFF image format, specifying that the document has been "produced in native format" and endorsed with the Bates Number and Confidentiality Designation, if applicable, which will be inserted into the image population in place of the native file.  When the native file is produced, the Producing Party shall preserve the integrity of the electronic document's contents, i.e., its original formatting and metadata.

     c.  <u>Color</u>.  Documents containing color need not be produced in color, except that (i) word processing documents that contain hidden text, and (ii) certain redacted documents, as further provided in Section 6(j), shall be produced in color in TIFF format. The Producing Party will honor reasonable requests for a color image of a document, if production in color is necessary to understand the meaning or content of the document.

     d.  <u>Embedded Objects</u>.  If documents contain embedded objects, the Parties shall extract the embedded objects as separate documents and treat them like attachments to the document to the extent reasonably possible. To the extent reasonably possible, images embedded in emails shall not be extracted and produced separately.

e.  <u>Load Files</u>.  Each production of ESI and Documents shall be accompanied by Concordance or comma delimited load files (.dat and .opt) containing a field with the full path and filename to files produced in native format and also containing metadata fields identified in Appendix A, to the extent the information is available in the original ESI file and can be extracted without unreasonable burden using standard litigation support processing platforms (except for vendor-generated fields related to the litigation production, such as "BEGDOC", "ENDDOC", bases for redaction, and Confidentiality Designations).

f.  <u>.Txt Files</u>.  For all documents containing extracted full text or OCR text, the Producing Party shall provide searchable document level .txt files (named using the Bates start/"BEGDOC"), which shall reside in the same file directory as the images for such documents.

g.  <u>Bates Numbering and Other Unique Identifiers.</u>  Every item or file of ESI that is produced shall be identified by a unique page identifier ("Bates Number") and a Production Volume Number for any storage device (e.g., CD, USB, hard drive) containing such files.  All Bates numbers will consist of an Alpha Prefix, followed by a numeric page index. There must be no spaces in any Bates number.  Any numbers with less than 8 digits will be front padded with zeros to reach the required 8 digits.  All ESI produced in TIFF format shall contain a unique Bates Number on each page of the document, electronically "burned" onto the image at a location that does not obliterate, conceal, or interfere with any information from the source document.  If a member of a document family that has otherwise been determined to be responsive cannot be technically processed (e.g., unsupported file format, file corruption, inaccessible

password-protected document), those technical problems shall be identified and disclosed to the Receiving Party by production of a Bates-labeled slip sheet that states "Technical issue—file cannot be processed," along with a log identifying each such file; the associated metadata for the file with the technical problem shall be produced if technically possible. A Receiving Party thereafter may raise with the Producing Party any questions or concerns, and the Parties shall meet and confer to attempt to resolve any issues.

h. <u>Hard-Copy Documents</u>. Except as otherwise set forth in this paragraph, the Parties agree that responsive paper documents shall be converted to single-page TIFF files, and produced following the same protocols set forth in Section 6(a) above, including the production of OCR text that is generated to make such documents searchable. Generally, all paper documents will be scanned and produced electronically, unless a Party establishes good cause for making such documents available via paper and reasonable access is provided to the opposing Party to review the documents directly. In scanning all Hard-Copy Documents, Hard-Copy Documents should be logically unitized. Accordingly, distinct documents should not be merged into a single record, and single documents should not be split into multiple records. In the case of an organized compilation of separate documents (for example, a binder containing several separate documents behind numbered tabs), each of the Hard-Copy Documents should be separately scanned, but the relationship among the documents in the compilation should be reflected in the proper coding of the beginning and ending documents and attachment fields. The Parties will make their best efforts to unitize the documents correctly. Producing Hard-Copy Documents as provided herein does not

change their character from Hard-Copy Documents into ESI. For Hard-Copy Documents, the Parties need only populate the following metadata fields: "BEGDOC," "ENDDOC," "PROD VOLUME," "CUSTODIAN," "SOURCE," "CONFIDENTIAL," "REDACTION," and "COMPANY" fields, as well as "BEGATTACH" and "ENDATTACH" fields where applicable.

      i. <u>Confidentiality Designation</u>. To the extent any Document or ESI (or portion thereof) produced as a TIFF image in accordance with this Order is designated as confidential or highly confidential under the order concerning confidentiality agreed and/or entered in this litigation, the Producing Party will brand the required Confidentiality Designation in a corner of any TIFF images representing the produced item and in a consistent font type and size that does not obscure any part of the underlying image or Bates number, to the extent possible.

      j. <u>Redactions</u>. A Party may use redactions to protect attorney-client or work product privileges consistent with the order concerning privilege agreed and/or entered in this litigation. Other than as permitted by this Order or the order concerning confidentiality agreed and/or entered in this litigation, no redactions for relevance may be made within a produced document or ESI item. Any redactions shall be clearly indicated on the face of the document, with each redacted portion of the document stating that it has been redacted and the basis for the redaction, and a metadata field shall indicate that the document contains redactions and the basis for redaction (e.g. "A/C Privilege"). Where a responsive document contains both redacted and non-redacted content, the Producing Party shall produce the remainder of the non-redacted portions of the document and the text/OCR corresponding to the non-redacted portions.

Email header information (e.g., date, subject line, etc.) should not be redacted unless it is independently privileged. The production of a document in a redacted form does not affect the Producing Party's obligation to timely assert and substantiate the assertion of privilege over the content in a privilege log. Redacted versions of spreadsheets, computer slide presentations, and word processing files containing hidden text (e.g., track changes, hidden columns, comments, notes, markups, etc.) shall be produced in color in TIFF format. The Parties shall honor reasonable requests for the production of particular redacted documents in other formats where the TIFF image is not reasonably usable.

k. <u>Parent-Child Relationships.</u> The Parties acknowledge and agree that parent-child relationships within a document family (the association between an attachment and its parent document or between embedded documents and their parent) shall be preserved. Responsive non-privileged electronic documents attached to an e-mail or embedded within other electronic documents and hard-copy documents attached or appended to hard-copy documents must be mapped to their parent by the beginning Bates number and immediately follow that parent file in the sequence of the production. Email attachments and embedded files or links "BEGATTACH" and "ENDATTACH" fields listing the unique beginning Bates number of the parent documents and ending number of the last attachment must be populated for each child and parent document.

l. <u>OCR.</u> OCR software shall be set to the highest quality setting during processing.

m. <u>Deviation from Production Specifications</u>.   If a particular document or category of documents warrant a different format, the Parties will cooperate in good faith to arrange for a mutually acceptable production format.

n. <u>Productions From Other Proceedings Pursuant to CMO 1.</u>  The production of documents made by Defendants in other civil investigations, litigations, and/or administrative actions by federal (including Congressional), state, or local government entities pursuant to CMO 1 shall be made in the format in which they were previously produced, including any previously produced metadata, load files, and accompanying text files.

o. <u>Password Protection</u>.   In the event any Document or ESI (or portion thereof) produced is password protected, the Producing Party shall make all reasonable efforts to provide the password needed to access the document or ESI.

p. <u>Use at Deposition</u>.   Any document produced in native that a party identifies and/or marks as an exhibit at a deposition must include as part of that identification or exhibit the produced corresponding cover page in TIFF image format, endorsed with document's Bates Number and Confidentiality Designation, as described in Section 6(a), above.

## 7.  PRODUCTION MEDIA

The Producing Party shall produce documents on readily accessible, computer or electronic media, including CD-ROM, DVD, external hard drive (with standard PC compatible interface), via secure FTP site, or such other readily accessible computer or electronic media as the Parties may agree (the "Production Media").   Each piece of Production Media shall be encrypted and assigned a production number or other unique

identifying label ("Production Volume Number") corresponding to the date of the production of documents on the Production Media as well as the sequence of the material in that production, and shall include (a) the name of the litigation and the case number; (b) the identity of the Producing Party; (c) the production date; (d) the Bates Number range of the materials contained on such Production Media item; and (e) the Production Volume Number of the Production Media. The Producing Party shall accompany all document productions with a transmittal cover letter identifying by Bates number the documents produced. If the Producing Party produces documents via secure FTP site, the Producing Party shall specify the date through which the materials will remain available via the secure FTP site and the Producing Party shall, within a reasonable time, accommodate requests from another Party or Parties that documents be reposted to the FTP site.

## 8. COST SHIFTING

The costs of production pursuant to this Order shall be borne by the Producing Party. However, in agreeing to this Order, no Party waives or relinquishes any right or interest it may have under the Federal Rules of Civil Procedure to seek cost shifting or apportionment for the costs of electronic discovery.

## 9. THIRD-PARTY ESI

a. A Party that issues a non-Party subpoena (the "Issuing Party") shall include a copy of this Order and the order concerning confidentiality agreed and/or entered in this litigation with the subpoena and state that the Parties in the litigation have requested that third-Parties produce documents in accordance with the specifications set forth herein.

b. The Issuing Party shall produce a copy to all other Parties of any

documents and ESI (including any metadata) obtained under subpoena to a non-Party.

c.     If the non-Party production is not Bates-stamped, the Issuing Party will endorse the non-Party production with unique Bates prefixes and numbering scheme prior to reproducing them to all other Parties.

## 10. BEST EFFORTS COMPLIANCE AND DISPUTES

The Parties agree to use their best efforts to comply with and resolve any differences concerning compliance with any provision/s of this Order. If a Producing Party cannot comply in a particular circumstance with this Order, such Party shall promptly inform the Receiving Party in writing why compliance with the Order is not reasonable or feasible. No Party may seek relief from the Court concerning compliance or non-compliance with the Order until it has met and conferred with the other Party in a good faith effort to resolve or narrow the area of disagreement.

## 11. MODIFICATION

This Order may be modified by a Stipulated Order of the Parties or by the Court for good cause shown.

IT IS SO ORDERED.


Date:  5/15/18                          /s/Dan Aaron Polster
                                        Hon. Dan Aaron Polster
                                        United States District Judge

## Appendix A: ESI Metadata and Coding Fields

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| BegDoc | Bates number of the first page of the document. | All | Prefix-0000000001 |
| EndDoc | Bates number of the last page of the document. | All | Prefix-0000000002 |
| BegAttach | Bates number of the first page of the first document of the document family. | All | Prefix-0000000001 |
| EndAttach | Bates number of the last page of the last document of the document family. | All | Prefix-0000000004 |
| PageCount | Number of printed pages in the document. | All | 2 |
| Confidential | Confidentiality designation, if any, of the document | All | Confidential<br>Highly Confidential |
| Custodian | Names of all custodians who possessed the document, including deduplicated values, in format: Lastname, Firstname.<br><br>Where multiple individuals share first and last name, individuals should be distinguished by an initial which is kept constant between productions. For instance: Smith, John A. and Smith, John B.<br><br>For documents from centralized repositories where custodian name(s) are unavailable, identifying source information should be provided. | All | Doe, John; Smith, John; Smith, Jane |
| Duplicate Custodian | Names of all other custodians who possessed the document. | ESI | |
| Duplicate Custodian File Name | The names of unproduced duplicate copies of files. | ESI | |
| Duplicate Custodians | The file path/directory path correlating to the unproduced | ESI | |

16

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| Directory Path | duplicate copies of files. | | |
| Source | Source shall be used in connection with document obtained from third-Parties and identify the third-Party having provided the particular material. If the third-Party's production of documents included individual custodian information, such information shall also be included in the "CUSTODIAN" field. | | |
| Subject/E-Subject | Subject line of an e-mail. | E-mails | Text of the subject line |
| To | All recipients that were included on the "To" line of the e-mail. | E-mails | John.Doe@e-mail.com |
| From | The name and e-mail address of the sender of the e-mail. | E-mails | Jane.Doe@e-mail.com |
| CC | All recipients that were included on the "CC" line of the e-mail. | E-mails | Bill.Black@email.com |
| BCC | All recipients that were included on the "BCC" line of the e-mail. | E-mails | ceo-gs@email.com |
| DateSent | Date an e-mail was sent. | E-mails | 01/01/2015 |
| TimeSent | Time an e-mail was sent. | E-mails | 12:30:00 |
| DateModified | Date the document was last modified. | E-attachments; Electronic documents | 01/01/2015 |
| TimeModified | Time the document was last modified. | E-attachments; Electronic documents | 12:30:00 |
| DateCreated | Date the document was created. | E-attachments; Electronic documents | 01/01/2015 |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| TimeCreated | Time the document was created. | E-attachments; Electronic documents | 12:30:00 |
| Family Date | Date last modified or, for e-mails, sent date of the parent | Electronic documents; E-attachments | 01/01/2015 |
| Family Time | Time last modified or, for e-mails, sent time of the parent | Electronic documents; E-attachments | 12:30:00 |
| DateReceived | Date email was received. | E-mails | 01/01/2015 |
| TimeReceived | Time email was received. | E-mails | 12:30:00 |
| DateAccessed | Date document last accessed | Electronic documents; E-attachments | 01/01/2015 |
| Date Last Printed | Date the document was last printed. | E-attachments; Electronic documents | 01/01/2015 |
| Time Last Printed | Time the document was last printed. | E-attachments; Electronic documents | 12:30:00 |
| Date Last Saved | Date the document was last saved. | E-attachments; Electronic documents | 01/01/2015 |
| Importance | Level assigned by creator | E-mails | High |
| Conversation | E-mail conversation designation | E-mail | Re: Smith Summary |
| Conversation Index | | E-mail | |
| Title/E-Title | Title of document | E-attachments; Electronic documents | Smith Summary |

Case: 1:17-md-02804-DAP Doc #: 3:43 Filed: 05/25/18 15 of 21 PageID #: 5865

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| Redaction | Basis for redactions in document. | E-attachments; Electronic documents | |
| FileName | File name of original document | Electronic documents; E-attachments | Microsoft Word 2007/2010 |
| File Type | Application type | Electronic documents; E-attachments | Word |
| File Size | Size of file | All | 40 gb |
| File Extension | The file extension of the document. | E-attachments; Electronic documents | .doc |
| NativeLink | Relative file path to each native file on the production media. | All documents produced in native format | \Natives\Document_12345.doc |
| Author | Document author/creater | E-attachments; Electronic documents | John Doe |
| Company | Party making the production | All | Company X |
| Title | Document Title | E-attachments; Electronic documents | Text of the title line |
| HASH | MD5 or SHA-1 Hash value | Electronic documents; E-attachments; E-mails | |
| Prod Volume | Production Volume | All | Defendant X Volume 1 |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| File Path | | | |
| AttachDocID | | Electronic documents; E-attachments; E-mails | |
| ATTACHNAME | | | |
| ATTACHRANGE | | | |
| FOREIGN LANGUAGE | | | |
| TIME ZONE PROCESSED | | | |
| E-LAST MODIFIED BY | | | |
| MESSAGE TYPE | | | |
| CALENDAR MEETING STOP/START | | | |
| RECORD TYPE | | | |
| HAS HIDDEN DATA | | | |
| HIDDEN COLUMNS | | | |
| HIDDEN NOTES | | | |
| HIDDEN ROWS | | | |
| HIDDEN SHEETS | | | |
| HIDDEN SHEETS COUNT | | | |
| HIDDEN SLIDES | | | |
| HIDDEN TEXT | | | |
| HIDDEN TRACK CHANGES | | | |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| HIDDEN VERY HIDDEN SHEETS | | | |
| HIDDEN VERY HIDDEN SHEETS COUNT | | | |
| HIDDEN WHITE TEXT | | | |
| HIDDEN WORKBOOK | | | |
| HIDDEN WORK BOOK WRITE PROTECTED | | | |
| MESSAGE ID | | | |
| NUMBER OF ATTACHMENTS | | | |
| ORIGINAL FOLDER PATH | | | |
| IS EMBEDDED | | | |
| TextPath | Relative file path to each extracted text/OCR text file on the production media. | All | \Text\Document_12345.txt |

# EXHIBIT 10

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Friday, August 29, 2025 3:16 AM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

Anthony,

At this time, we are not able to provide you Wegmans' position regarding the DUR data. You sent me Special
Master Cohen's email ruling, but that ruling is not final, and perhaps more importantly, the ruling presumes the
parties' knowledge of the scope of the requests and the arguments made by the parties in their "multiple rounds of
briefing." Without access to the briefing accompanying that ruling (which we do not have), there is no way for
Wegmans to understand precisely what Special Master Cohen has ordered the national pharmacies to produce, or
whether the ruling has any relevance to a pharmacy like Wegmans. If you send the briefing and transcripts, we can
review and get back to you on whether Wegmans' position changes. If Express Scripts believes the July 28 ruling
has any relevance to Wegmans, we see no reason for Express Scripts to withhold the very briefing that would help
us to understand the scope of the ruling and its rationale.

Express Scripts also appears to be ignoring the obvious differences between Wegmans and the national pharmacies. Unlike the national pharmacies, Wegmans has not engaged in party discovery in any opioid litigation and has produced no data. And unlike the national pharmacies, Wegmans lacks the resources to compile extensive DUR files. On June 2, in a good faith effort to help Express Scripts understand how Wegmans maintains its data, we provided you with two exemplar prescription records, including the cDUR and DUR fields, with an extensive discussion of what those prescriptions show and how Wegmans maintains and collected them. As you know from the information we provided, collecting DUR information requires Wegmans to go through a manual, prescription by prescription process, which took approximately 15 minutes for each of the two exemplar prescriptions that we provided to you. Notably, we have heard nothing from Express Scripts since sending you that information almost three months ago. It is simply untenable to think Wegmans could even begin to comply with an order that was intended for the national pharmacies.

Once again, we reiterate our request for copies of the briefing and hearing transcript(s) that led up to Special Master Cohen's July 28 ruling so that Wegmans can understand the context and work with Express Scripts in good faith toward a resolution.

As for the "proposals" mentioned in your email regarding the "other categories," we will need to dig back through the history given the fact that we have heard nothing from you in many months and our prior communications (which last occurred in June) had focused on prescription data, which has been Express Scripts' stated focus during most of our conferral efforts. We will respond regarding the other requests separately.

**Joshua M. Agins**
Partner
Hodgson Russ LLP

Tel:  585.454.0759
Fax:  585.423.5910


Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

---

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Tuesday, August 26, 2025 6:11 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**External Email - Use Caution**

---

Is Wegmans not going to produce the DUR data, as requested?

Can you also let me know Wegmans' position on the other categories we requested?  We made some proposals but don't think we heard back.

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP

865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Tuesday, August 26, 2025 3:01 PM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

Anthony,

Please send a copy of the briefing and any hearing transcripts leading up to Special Master Cohen's ruling.

Thanks,
Josh

**Joshua M. Agins**
Partner
Hodgson Russ LLP

**Tel:**   585.454.0759
**Fax:**   585.423.5910



**Hodgson**
Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Tuesday, August 26, 2025 12:57 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Subject:** Opioids: Wegmans Subpoena

**External Email - Use Caution**

Hi Josh,

3

I just tried your line but got voicemail. As I alluded to in my message, on July 28, 2025, Special Master Cohen in the MDL ordered Walgreens, CVS, and Walmart to produce their electronic DUR data records, including due diligence data, for all opioid prescriptions they dispensed in Monroe and St. Lawrence Counties, New York, including those paid by cash or adjudicated by PBMs other than Express Scripts and OptumRx. The Special Master ordered these productions to be made in response to substantially similar document requests to those contained in the PBM Defendants' subpoena to Wegmans. On August 20, 2025, the Special Master denied these pharmacies' motion for clarification, and their right to object to the ruling has now passed. I attach the Special Master's rulings for reference.

Having studied the sample data Wegmans made available only for viewing, Express Scripts asks that Wegmans produce DUR data consistent with the Special Master's July 28 and August 20 rulings. Absent such confirmation, we intend to seek a corresponding ruling compelling Wegmans to do so. If you would like to discuss the matter, please propose some times this week.

Thanks,
Anthony

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

# EXHIBIT 11

| From: | Zach Mattison <zmattison@sugarmanlaw.com> |
|---|---|
| Sent: | Thursday, September 18, 2025 6:08 PM |
| To: | Anthony Alden; David Graham |
| Cc: | Dana Henshaw; QE-ESI-3PSubpoenas; AB Optum 3P Subpoenas; Cory Schoonmaker; Roshan Rama |
| Subject: | RE: Express Scripts/Optum Subpoena to Kinney Drugs |

**[EXTERNAL EMAIL from zmattison@sugarmanlaw.com]**

 **This message needs your attention**

• Some Recipients have never replied to this person

Anthony,

 Next week I am available Tuesday and Wednesday afternoon.

 However, note that the National Pharmacies that were the subject of Special Master Cohen's decision that you are relying on have not responded to our request for their end of the briefing on this issue. Therefore, we are unable to speak substantively about that that decision without knowing the positions that they took. Specifically, Kinney's data is maintained in a pharmacy management system called EnterpriseRx, and the only way that Kinney can obtain the DUR data is to do a hand search of each prescription and then screenshot each script. I expect that the National Pharmacies did not encounter that problem in responding to your subpoena, and thus didn't raise that substantial burden in their briefing with Special Master Cohen, or the fact that complying with your request number 2 is simply impossible without taking so many resources away from patient care as to bankrupt the company.

 Let me know if you have any questions. Thanks. -Zach.

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Thursday, September 18, 2025 10:59 AM
**To:** Zach Mattison <zmattison@sugarmanlaw.com>; David Graham <davidgraham@quinnemanuel.com>
**Cc:** Dana Henshaw <dhenshaw@sugarmanlaw.com>; QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Cory Schoonmaker <cschoonmaker@sugarmanlaw.com>; Roshan Rama <roshanrama@quinnemanuel.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

Zach: we haven't heard from you. Please provide some times you are available to resume our discussions.

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct

213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Wednesday, September 10, 2025 12:21 PM
**To:** Zach Mattison <zmattison@sugarmanlaw.com>; David Graham <davidgraham@quinnemanuel.com>
**Cc:** Dana Henshaw <dhenshaw@sugarmanlaw.com>; QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Cory Schoonmaker <cschoonmaker@sugarmanlaw.com>; Roshan Rama <roshanrama@quinnemanuel.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

I'd like to aim to talk next week. Can we pencil in something for Thursday or Friday?

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Zach Mattison <zmattison@sugarmanlaw.com>
**Sent:** Wednesday, September 10, 2025 12:18 PM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>; David Graham <davidgraham@quinnemanuel.com>
**Cc:** Dana Henshaw <dhenshaw@sugarmanlaw.com>; QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Cory Schoonmaker <cschoonmaker@sugarmanlaw.com>; Roshan Rama <roshanrama@quinnemanuel.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

**[EXTERNAL EMAIL from zmattison@sugarmanlaw.com]**

Anthony,

We will reach out to them. Once we receive their briefing, we can discuss these issues further. We will let you know once we hear from them.

2

Thanks. -Zach.

---

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Monday, September 8, 2025 5:31 PM
**To:** Zach Mattison <zmattison@sugarmanlaw.com>; David Graham <davidgraham@quinnemanuel.com>
**Cc:** Dana Henshaw <dhenshaw@sugarmanlaw.com>; QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>;
AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Cory Schoonmaker
<cschoonmaker@sugarmanlaw.com>; Roshan Rama <roshanrama@quinnemanuel.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

We don't feel comfortable sending you the pharmacies' submissions because they were not filed on the public docket. Counsel who took the lead for the pharmacies on this issue are Tara Fumerton (tfumerton@jonesday.com), Anthony Ruiz (ARuiz@zuckerman.com), and Matt Ford (Matthew Ford matthew.ford@bartlitbeck.com). Feel free to reach out to them.

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

---

**From:** Zach Mattison <zmattison@sugarmanlaw.com>
**Sent:** Monday, September 8, 2025 2:28 PM
**To:** David Graham <davidgraham@quinnemanuel.com>
**Cc:** Anthony Alden <anthonyalden@quinnemanuel.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>; QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Cory Schoonmaker <cschoonmaker@sugarmanlaw.com>; Roshan Rama <roshanrama@quinnemanuel.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

**[EXTERNAL EMAIL from zmattison@sugarmanlaw.com]**

---

Thank you. Please provide me with all of the submissions from the pharmacies on this issue, and also confirm that the Special Master did not receive any other communications, emails, phone calls, or other information about this issue prior to issuing his rulings.

---

**From:** David Graham <davidgraham@quinnemanuel.com>
**Sent:** Thursday, September 4, 2025 10:52 PM
**To:** Zach Mattison <zmattison@sugarmanlaw.com>
**Cc:** Anthony Alden <anthonyalden@quinnemanuel.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>; QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-

3

3psubpoenas@alston.com>; Cory Schoonmaker <cschoonmaker@sugarmanlaw.com>; Roshan Rama
<roshanrama@quinnemanuel.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

Zach,

The link below contains the Special Master's decision and our briefing on the issue.

https://qe.sharefile.com/public/share/web-se91db5558e9345a5af4138b8bd48cc9d

Thank you,

**David Graham**
Associate
quinn emanuel urquhart & sullivan, llp
Address: 3100 McKinnon Street, Suite 1125/Dallas, TX 75201
Office: 469.902.3614 | Cell: 520.909.5229
Email: davidgraham@quinnemanuel.com

**From:** Zach Mattison <zmattison@sugarmanlaw.com>
**Sent:** Monday, September 1, 2025 3:55 PM
**To:** David Graham <davidgraham@quinnemanuel.com>
**Cc:** Anthony Alden <anthonyalden@quinnemanuel.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>; QE-ESI-
3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-
3psubpoenas@alston.com>; Cory Schoonmaker <cschoonmaker@sugarmanlaw.com>; Roshan Rama
<roshanrama@quinnemanuel.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

**[EXTERNAL EMAIL from zmattison@sugarmanlaw.com]**

Please provide me a copy of all written decisions on this motion, as well as the underlying
briefing/letters/correspondence or anything that makes up the record that was reviewed on this issue, so that I can
evaluate Special Master's decision and basis for the rulings.

**From:** David Graham <davidgraham@quinnemanuel.com>
**Sent:** Wednesday, August 27, 2025 9:08 PM
**To:** Zach Mattison <zmattison@sugarmanlaw.com>
**Cc:** Anthony Alden <anthonyalden@quinnemanuel.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>; QE-ESI-
3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-
3psubpoenas@alston.com>; Cory Schoonmaker <cschoonmaker@sugarmanlaw.com>; Roshan Rama
<roshanrama@quinnemanuel.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

Zach,

On July 28, 2025, Special Master Cohen in the MDL ordered Walgreens, CVS, and Walmart to produce
their electronic DUR data records, including due diligence data, for all opioid prescriptions they
dispensed in Monroe and St. Lawrence Counties, New York, including those paid by cash or adjudicated
by PBMs other than Express Scripts and OptumRx. The Special Master ordered these productions to be
made in response to substantially similar document requests to those contained in the PBM Defendants'
subpoena to Kinney. On August 20, 2025, the Special Master denied these pharmacies' motion for

clarification, and their right to object to the ruling has now passed. I attach the Special Master's rulings for reference.

We request that Kinney confirm that it will produce its DUR data consistent with the Special Master's July 28 and August 20 rulings. Please let us know some times you are available next week to discuss Kinney's DUR production and the outstanding requests we discussed previously.

Thank you,

**David Graham**
Associate
quinn emanuel urquhart & sullivan, llp
Address: 3100 McKinnon Street, Suite 1125/Dallas, TX 75201
Office: 469.902.3614 | Cell: 520.909.5229
Email: davidgraham@quinnemanuel.com

**From:** Zach Mattison <zmattison@sugarmanlaw.com>
**Sent:** Thursday, July 31, 2025 11:51 AM
**To:** Roshan Rama <roshanrama@quinnemanuel.com>
**Cc:** Anthony Alden <anthonyalden@quinnemanuel.com>; David Graham <davidgraham@quinnemanuel.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>; QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Cory Schoonmaker <cschoonmaker@sugarmanlaw.com>
**Subject:** Re: Express Scripts/Optum Subpoena to Kinney Drugs

<mark>[EXTERNAL EMAIL from zmattison@sugarmanlaw.com]</mark>

I can do before 2

-Zach.

On Jul 31, 2025, at 12:39 PM, Roshan Rama <roshanrama@quinnemanuel.com> wrote:

Thank you. Can you do anytime from 12-2:30 pm ET next Wednesday? I will send a calendar invite.

**From:** Zach Mattison <zmattison@sugarmanlaw.com>
**Sent:** Wednesday, July 30, 2025 5:13:42 PM
**To:** Roshan Rama <roshanrama@quinnemanuel.com>; Anthony Alden <anthonyalden@quinnemanuel.com>; David Graham <davidgraham@quinnemanuel.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>
**Cc:** QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Cory Schoonmaker <cschoonmaker@sugarmanlaw.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

<mark>[EXTERNAL EMAIL from zmattison@sugarmanlaw.com]</mark>

I have spoken with them, if you would like to propose dates for next week.

**From:** Roshan Rama <roshanrama@quinnemanuel.com>
**Sent:** Wednesday, July 30, 2025 2:02 PM

**To:** Anthony Alden <anthonyalden@quinnemanuel.com>; Zach Mattison <zmattison@sugarmanlaw.com>; David Graham <davidgraham@quinnemanuel.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>
**Cc:** QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Cory Schoonmaker <cschoonmaker@sugarmanlaw.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

Zach:

We need to push this forward. Have you discussed with your board? Please let us know this week.

Best regards,

**Roshan Rama**
*Associate*
**Quinn Emanuel Urquhart & Sullivan, LLP**

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Roshan Rama
**Sent:** Thursday, July 24, 2025 7:29 AM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>; Zach Mattison <zmattison@sugarmanlaw.com>; David Graham <davidgraham@quinnemanuel.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>
**Cc:** QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Cory Schoonmaker <cschoonmaker@sugarmanlaw.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

Zach:

We are writing to see if you were able to follow up with your board, so we could continue our discussion of the subpoena to Kinney Drugs.

Thank you,

**Roshan Rama**
*Associate*
**Quinn Emanuel Urquhart & Sullivan, LLP**

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Wednesday, July 16, 2025 1:16 PM
**To:** Zach Mattison <zmattison@sugarmanlaw.com>; Roshan Rama <roshanrama@quinnemanuel.com>; David Graham <davidgraham@quinnemanuel.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>
**Cc:** QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Cory Schoonmaker <cschoonmaker@sugarmanlaw.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

Thank you

**From:** Zach Mattison <zmattison@sugarmanlaw.com>
**Sent:** Wednesday, July 16, 2025 10:08 AM
**To:** Roshan Rama <roshanrama@quinnemanuel.com>; David Graham <davidgraham@quinnemanuel.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>
**Cc:** QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Cory Schoonmaker <cschoonmaker@sugarmanlaw.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

**[EXTERNAL EMAIL from zmattison@sugarmanlaw.com]**

Good afternoon,

I have not yet met with my Board to review these issues. I plan to do that shortly. Once that is done, I will contact you to set up a second call.

Thanks. -Zach.

**From:** Roshan Rama <roshanrama@quinnemanuel.com>
**Sent:** Tuesday, July 15, 2025 10:17 AM
**To:** David Graham <davidgraham@quinnemanuel.com>; Zach Mattison <zmattison@sugarmanlaw.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>
**Cc:** QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Alexandra Calhoun <acalhoun@sugarmanlaw.com>; Jennifer D'Alfonso <jdalfonso@sugarmanlaw.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

<image001.jpg> **IRONSCALES couldn't recognize this email as this is the first time you received an email from this sender roshanrama@quinnemanuel.com**

You don't often get email from roshanrama@quinnemanuel.com. Learn why this is important

Zach:

Thank you for meeting to discuss the outstanding subpoena to Kinney Drugs. We are writing to memorialize our discussion. Please let us know if you disagree with any aspect of our summary.

As an initial matter, you indicated that Kinney's document retention policy is seven years. Can you kindly advise whether this policy applies to all documents and communications, and whether Kinney maintains any forms of archives or back-ups.

During our call, we discussed each of the requests in turn.

1. Request 1: While reserving our rights, we agreed to hold off on this request because we have recently received dispensing data from the New York PDMP that we anticipate will be sufficient.

1. Request 2: We discussed at least two components to this request that you intend to discuss with your client:

1. 1) Policies and procedures relating to Kinney Drugs' interactions with point-of-sale ("POS") communications from PBMs. You stated that Kinney does not maintain historic version of policies and procedures but rather updates the active documents over time. Kinney would thus have no versions of its policies and procedures other than those still in effect. Please advise, however, whether Kinney would have historical versions of policies and procedures in emails when such policies were sent or received.

2. 2) Data memorializing and relating to the way Kinney Drugs' personnel interacted with point-of-sale ("POS") communications from PBMs for opioid prescriptions filled in New York.

We affirmed our interest in documents and data commensurate with the discovery period in the case (1996-present) and we ask you advise as to how far back your client maintains documents and data, as discussed above.

1. Request 3: We are interested in any responsive communications with manufacturers regarding opioids entity wide. You indicated that no such communications have occurred since the 1990s but would confirm with your client.

1. Request 4: We are interested in any responsive communications to employees concerning opioids.  You agreed to confirm with your client that it has no responsive documents.

1. Request 5: Like Request No. 2, you stated that Kinney would have only current versions of any responsive policies and procedures and you would check with whether it would agree to produce them. Please advise, however, whether Kinney would have historical versions of policies and procedures in emails when such policies were sent or received.

1. Request 6: We are particularly interested in specific prescribers in St. Lawrence County for whom you refused to fill prescriptions of opioids. You agreed to look into this with your client.

1. Request 7: We are particularly interested in policies and procedures concerning the use of ARCOS and PMP data and communications to and from the DEA and New York PMP. You agreed to look into this with your client.

1. Requests 8, 11 and 12: For each of these requests, you represented that Kinney Drugs has no responsive documents because it has not investigated or reported any opioid misuse, diversion, or trafficking or been the subject of or participated in any criminal or regulatory proceeding concerning opioids.

1. Request No. 9:  You stated that Kinney has no responsive documents because it has never taken any action against a current or former employee in Ogdensburg concerning opioids.

1. Request No. 10:  We did not specifically discuss this request but please advise if Kinney has any responsive documents.

1. Request 13: We are particularly interested in any contracts pursuant to which Kinney received any payments from manufacturers and distributors of in-scope drugs. You agreed to look into this with your client.

1. Request 14: We are interested in any actions the Ogdensburg location has taken to prevent Opioid abuse, which you agreed to look into with your client.

After you have a chance to speak with your client, we agreed to reconvene. Does it make sense to speak on Monday the 21st? We are available from 1:30 pm until 2:30 pm and from 3:00 pm - 3:30pm ET. If those times do not

work, can you please propose times that do on Tuesday the 22<sup>nd</sup> or Wednesday the 23<sup>rd</sup>? We will then coordinate on our end to find a time that works.

We reserve all rights, and we do not intend for the above notes to limit or narrow the contents of the subpoena, which speaks for itself.

Best regards,

**Roshan Rama**
*Associate*
**Quinn Emanuel Urquhart & Sullivan, LLP**

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** David Graham <davidgraham@quinnemanuel.com>
**Sent:** Monday, June 30, 2025 7:46 PM
**To:** Zach Mattison <zmattison@sugarmanlaw.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>
**Cc:** QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Alexandra Calhoun <acalhoun@sugarmanlaw.com>; Jennifer D'Alfonso <jdalfonso@sugarmanlaw.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

Thank you Zach. Just sent the invite.

**David Graham**
Associate
quinn emanuel urquhart & sullivan, llp
Address: 3100 McKinnon Street, Suite 1125/Dallas, TX 75201
Office: 469.902.3614 | Cell: 520.909.5229
Email: davidgraham@quinnemanuel.com

**From:** Zach Mattison <zmattison@sugarmanlaw.com>
**Sent:** Monday, June 30, 2025 5:05 PM
**To:** David Graham <davidgraham@quinnemanuel.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>
**Cc:** QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Alexandra Calhoun <acalhoun@sugarmanlaw.com>; Jennifer D'Alfonso <jdalfonso@sugarmanlaw.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

**[EXTERNAL EMAIL from zmattison@sugarmanlaw.com]**

We can do Thursday that 10<sup>th</sup> at 2 pm.

**From:** David Graham <davidgraham@quinnemanuel.com>
**Sent:** Monday, June 30, 2025 6:03 PM
**To:** Zach Mattison <zmattison@sugarmanlaw.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>
**Cc:** QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Alexandra Calhoun <acalhoun@sugarmanlaw.com>; Jennifer D'Alfonso

<jdalfonso@sugarmanlaw.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

Can we do the same times proposed on Thursday (12, 1, or 2 ET)?

**David Graham**
Associate
quinn emanuel urquhart & sullivan, llp
Address: 3100 McKinnon Street, Suite 1125/Dallas, TX 75201
Office: 469.902.3614 | Cell: 520.909.5229
Email: davidgraham@quinnemanuel.com

**From:** Zach Mattison <zmattison@sugarmanlaw.com>
**Sent:** Monday, June 30, 2025 4:39 PM
**To:** David Graham <davidgraham@quinnemanuel.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>
**Cc:** QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Alexandra Calhoun <acalhoun@sugarmanlaw.com>; Jennifer D'Alfonso <jdalfonso@sugarmanlaw.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

**[EXTERNAL EMAIL from zmattison@sugarmanlaw.com]**

My team is already scheduled for another meeting on Wednesday starting at 12 p.m., and our office is closed on Thursday for the holiday. What is your availability next week?

**From:** David Graham <davidgraham@quinnemanuel.com>
**Sent:** Monday, June 30, 2025 8:20 AM
**To:** Zach Mattison <zmattison@sugarmanlaw.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>
**Cc:** QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Alexandra Calhoun <acalhoun@sugarmanlaw.com>; Jennifer D'Alfonso <jdalfonso@sugarmanlaw.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

Hi Zach, following up on the below. Thank you in advance.

**David Graham**
Associate
quinn emanuel urquhart & sullivan, llp
Address: 3100 McKinnon Street, Suite 1125/Dallas, TX 75201
Office: 469.902.3614 | Cell: 520.909.5229
Email: davidgraham@quinnemanuel.com

**From:** David Graham
**Sent:** Wednesday, June 25, 2025 3:34 PM
**To:** Zach Mattison <zmattison@sugarmanlaw.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>
**Cc:** QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Alexandra Calhoun <acalhoun@sugarmanlaw.com>; Jennifer D'Alfonso <jdalfonso@sugarmanlaw.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

Hi Zach,

We are available next week on Wednesday at 12 or 1 ET, or on Thursday at 12, 1, or 2 ET. Let us know which times work and I will circulate a calendar invite.

Thank you,

**David Graham**
Associate
quinn emanuel urquhart & sullivan, llp
Address: 3100 McKinnon Street, Suite 1125/Dallas, TX 75201
Office: 469.902.3614 | Cell: 520.909.5229
Email: davidgraham@quinnemanuel.com

---

**From:** Zach Mattison <zmattison@sugarmanlaw.com>
**Sent:** Wednesday, June 25, 2025 10:30 AM
**To:** David Graham <davidgraham@quinnemanuel.com>; Dana Henshaw <dhenshaw@sugarmanlaw.com>
**Cc:** QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Alexandra Calhoun <acalhoun@sugarmanlaw.com>; Jennifer D'Alfonso <jdalfonso@sugarmanlaw.com>
**Subject:** RE: Express Scripts/Optum Subpoena to Kinney Drugs

**[EXTERNAL EMAIL from zmattison@sugarmanlaw.com]**

---

Good morning,

I am out of the office this week handling another matter in NYC. If you want to propose some dates, I will check with my subpoena team and see what works best for everyone's schedule.

Thanks. -Zach.

**From:** David Graham <davidgraham@quinnemanuel.com>
**Sent:** Tuesday, June 24, 2025 10:20 AM
**To:** Dana Henshaw <dhenshaw@sugarmanlaw.com>
**Cc:** QE-ESI-3PSubpoenas <qe-esi-3psubpoenas@quinnemanuel.com>; AB Optum 3P Subpoenas <ab-optum-3psubpoenas@alston.com>; Zach Mattison <zmattison@sugarmanlaw.com>; Alexandra Calhoun <acalhoun@sugarmanlaw.com>; Jennifer D'Alfonso <jdalfonso@sugarmanlaw.com>
**Subject:** Express Scripts/Optum Subpoena to Kinney Drugs

 **IRONSCALES couldn't recognize this email as this is the first time you received an email from this sender davidgraham@quinnemanuel.com**

You don't often get email from davidgraham@quinnemanuel.com. Learn why this is important

Hi Dana,

Sending again with a subject line. We received the attached responses and objections to the subpoena issued by Express Scripts and Optum to Kinney Drugs. Can you please let us know some times later this week when you are available to discuss your objections and search for responsive documents?

Thank you,

**David Graham**
Associate
quinn emanuel urquhart & sullivan, llp
Address: 3100 McKinnon Street, Suite 1125/Dallas, TX 75201
Office: 469.902.3614 | Cell: 520.909.5229
Email: davidgraham@quinnemanuel.com

11

# EXHIBIT 12

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Thursday, October 16, 2025 8:24 PM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

Anthony,

First, we will provide language regarding the burden of producing the DUR data the PBMs seek as soon as feasible. We are currently working with our client to provide you a fulsome understanding on this issue. The statement we are working on will explain (1) that Wegmans does not generate such reports in the normal course of its business and *has never done so* for any purpose; (2) the technical limitations to Wegmans' EnterpriseRx system; (3) how Wegmans has never produced or verified the reliability of a report containing "DUR data"; and (4) the immense burden of attempting to produce such reports and verifying the reliability of their contents—even assuming they could be generated (which we believe they cannot). Although we initially discussed providing this information in declaration form, we have since discovered that in their recent briefing to Special Master Cohen, the PBMs addressed similar burden issues in letter form, not via declaration. Wegmans will follow the same approach as the PBMs. We are preparing this narrative with the expectation that the PBMs will review the narrative in good faith and consider withdrawing Request #2 because Wegmans cannot feasibly produce the requested DUR reports.

Second, Wegmans is evaluating the PBMs' most recent position on the scope of the requested data for Request No. 1, some of which was articulated just last Friday, on October 10.

Third, we are working with our client to provide a response to the PBMs' proposals as to all Requests except #1 and #2. We intend to send you that by mid-week.

Fourth, I want to address your reference to "Wegmans' lack of cooperation" in your Oct. 10th email. I strongly disagree. Wegmans has provided meaningful responses to moving targets and months-long stretches of radio silence from the PBMs. Wegmans responded to Request #2 and now the PBMs are attempting to expand the scope of that request. Wegmans is not a party in this MDL, nor has it ever been. Most of your Requests seek information that Wegmans does not produce in the ordinary course of its business and has never been required to produce as part of any litigation.

Finally, I have pasted below your October 10 email with specific responses embedded in red.

First, the New York Department of Health ("DOH") (more specifically, the Bureau of Narcotic Enforcement) declined the PBM Defendants' request for consent to provide Wegmans with the list of the data fields in its PMP data on the basis that it considers the fields to be DOH's intellectual property.  But Wegmans does not actually need this information for at least three reasons: (1) Wegmans knows what data it sent to the DOH, (2) Wegmans already has access to PMP data; and (3) the PBM Defendants are only seeking data that cannot be accessed from the PMP in any event.  [**J. Agins: Wegmans disagrees.  Wegmans does not have a copy and does not have access to any of its data that the PBMs obtained from the State.  Wegmans' communicates with and submits the required PMP data to the DOH using McKesson's EnterpriseRx Pharmacy Management System.**

**Furthermore, the New York PMP does not collect DUR information and Wegmans' reports to the New York PMP do not include DUR alerts, clinical edits, or clinical messages.  Wegmans maintains its prescription data as individual prescription records and does not create any batch DUR data for any reporting purposes.**

**You previously told us that all discovery in the MDL is required to be posted to the MDL document repository.  Have the PBMs posted Wegmans' data to the repository?  If so, what is the justification for refusing to share Wegmans' own data with Wegmans?  To date, you have not provided any documentation or court order that would suggest data produced to the PBMs through the MDL discovery process is confidential or subject to a protective order that would preclude access by Wegmans.  I again ask that you provide the basis for the PBMs' refusal to provide a copy of the data the PBMs contend was submitted to the NY PMP by Wegmans.**

Second, your email states that the geographic scope of the data request has been improperly expanded. This is inaccurate. The initial subpoena request sought dispensing data in Monroe County (as well as all counties surrounding Monroe County), and the PBM Defendants' February 28th letter did not limit its request solely to the City of Rochester. The PBM Defendants have expressed they are willing to limit the scope of this request only to Monroe County, and have not wavered from this position.  [**J.Agins: Wegmans disagrees.  In your December 13, 2024 letter, you stated "the *PBM Defendants have already told Wegmans that they would limit the geographic scope to the City of Rochester itself,* rather than Monroe County in which Rochester sits" and repeated that position numerous times.  12/13/24 Ltr. at 5 n.4.**

**The bellwether is limited to the City of Rochester, anything beyond that is outside the scope of potential relevance]**.

Third, I never stated that I would provide "specificity" regarding the types of reports that the EnterpriseRx system can generate.  I simply agreed to provide any additional detail we had about such reports, and to that end, it is our understanding that EnterpriseRx can generate reports that extract requested fields of data, including DUR data.  McKesson should be able to confirm this is the case.  Please confirm that Wegmans has or will contact McKesson to confirm that DUR data can be extracted either by Wegmans itself or by McKesson on its behalf.  [**J. Agins: Wegmans has no obligation to contact McKesson about this.  We are in the process of compiling the information that will provide further details about Wegmans' inability to generate the DUR data report requested by the PBMs.  As we have discussed, the official prescription record as it is made and kept in the ordinary course of Wegmans' business**

**resides in the EnterpriseRx Pharmacy Management System as a complete, comprehensive record of each prescription Wegmans fills. Wegmans does not and cannot use the EnterpriseRx Pharmacy Management System to export DUR data alerts, clinical edits, or clinical messages in batch form].**

Fourth, your reliance on Special Master Cohen's October 2 ruling (Dkt. 6307) is misplaced. In that ruling, Special Master Cohen denied the PEC's motion to compel certain remuneration data and documents in part because the PEC was seeking opioid-specific profitability information that Express Scripts does not calculate or track in the ordinary course of business. For example, the PEC was seeking profit information specific to opioid medications, but Express Scripts does not track profit on a drug-by-drug basis and would not be able to accurately calculate such a figure. By contrast, the information we are seeking from Wegmans is information that is utilized and stored in the ordinary course of its business. [**J. Agins: That is incorrect. As we have discussed, Wegmans does not create or maintain the prescription data reports that the PBMs seek. They do not exist.**

**Thus, Special Master Cohen's October 2 ruling applies here. The Federal Rules do not require Wegmans to create reports that do not exist in the ordinary course of business—especially when the reports reflect a skewed and incomplete set of information**].

Wegmans sends point-of-sale communications to PBMs and records DUR/diligence data when prescription opioid claims are filled [**J. Agins: That is correct. As you recall, on June 2nd Wegmans produced exemplar prescriptions detailing how Wegmans uses the EnterpriseRx Pharmacy Management System to communicate with the PBMs and satisfy the terms of the PBMs' Pharmacy Network Agreements and Pharmacy Provider Manuals. That production consisted of detailed screenshots of dispensing information, as well as a step-by-step discussion of how Wegmans uses EnterpriseRx to receive and review DUR alerts, clinical edits, and clinical messages. The exemplar prescriptions demonstrated how a Wegmans pharmacist considers, uses, responds to, and interacts with point-of-sale communications from the PBMs.**] and you have never asserted that Wegmans does not maintain this information. To be clear, we are not asking Wegmans to artificially create data that does not exist, as the PEC was doing. [**J. Agins: That is incorrect. If Wegmans needs to review a prior prescription it must view the prescription record in EnterpriseRx in the way that it was created. This is the process illustrated by the exemplar prescriptions produced by Wegmans on June 2nd**].

Instead, we are seeking prescription-specific data similar to the types of data that Express Scripts, Optum, and many opioid defendants have been required to produce. [**J. Agins: Wegmans does not have information about the type or form of data MDL defendants create in the ordinary course of their businesses. As we have discussed, Wegmans does not, and is unable to, generate batch DUR data reports. As stated above, Wegmans is in the process of preparing a statement confirming how it creates, maintains, and accesses prescription data in the course of its business.**]

**Joshua M. Agins**
Partner
Hodgson Russ LLP

Tel: 585.454.0759
Fax: 585.423.5910


Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Friday, October 10, 2025 11:21 AM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

## External Email - Use Caution

Josh,

I respond to the points in your email seriatim.

First, the New York Department of Health ("DOH") (more specifically, the Bureau of Narcotic Enforcement) declined the PBM Defendants' request for consent to provide Wegmans with the list of the data fields in its PMP data on the basis that it considers the fields to be DOH's intellectual property. But Wegmans does not actually need this information for at least three reasons: (1) Wegmans knows what data it sent to the DOH, (2) Wegmans already has access to PMP data; and (3) the PBM Defendants are only seeking data that cannot be accessed from the PMP in any event.

Second, your email states that the geographic scope of the data request has been improperly expanded. This is inaccurate. The initial subpoena request sought dispensing data in Monroe County (as well as all counties surrounding Monroe County), and the PBM Defendants' February 28th letter did not limit its request solely to the City of Rochester. The PBM Defendants have expressed they are willing to limit the scope of this request only to Monroe County, and have not wavered from this position.

Third, I never stated that I would provide "specificity" regarding the types of reports that the EnterpriseRx system can generate. I simply agreed to provide any additional detail we had about such reports, and to that end, it is our understanding that EnterpriseRx can generate reports that extract requested fields of data, including DUR data. McKesson should be able to confirm this is the case. Please confirm that Wegmans has or will contact McKesson to confirm that DUR data can be extracted either by Wegmans itself or by McKesson on its behalf.

Fourth, your reliance on Special Master Cohen's October 2 ruling (Dkt. 6307) is misplaced. In that ruling, Special Master Cohen denied the PEC's motion to compel certain remuneration data and documents in part because the PEC was seeking opioid-specific profitability information that Express Scripts does not calculate or track in the ordinary course of business. For example, the PEC was seeking profit information specific to opioid medications, but Express Scripts does not track profit on a drug-by-drug basis and would not be able to accurately calculate such a figure. By contrast, the information we are seeking from Wegmans is information that is utilized and stored in the ordinary course of its business. Wegmans sends point-of-sale communications to PBMs and records DUR/diligence data when prescription opioid claims are filled, and you have never asserted that Wegmans does not maintain this information. To be clear, we are not asking Wegmans to artificially create data that does not

4

exist, as the PEC was doing. Instead, we are seeking prescription-specific data similar to the types of data that Express Scripts, Optum, and many opioid defendants have been required to produce.

\*     \*     \*

Given Wegmans' stated desire for additional briefing, and intention to appeal any adverse ruling, the PBM Defendants cannot continue to wait for Wegmans to provide the additional requested information or respond to their February 28 proposals. Unless Wegmans follows through on its agreement to provide language regarding the specific alleged burden it faces in producing responsive DUR data, and agrees to produce data and documents such that the scope of outstanding discovery disputes' are meaningfully narrowed by the end of next week, the PBM Defendants intend to raise Wegmans' lack of cooperation with the Special Master.

Thanks,

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

---

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Thursday, October 9, 2025 6:00 PM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

---

Anthony,

**Regarding Dispesing Data (Request No. 1):** As we discussed during our 10/3 conferral, Wegmans expects to receive the spreadsheet containing the data fields that the PBMs obtained from the NYPMP. We see no reason why you would need to obtain such consent—after all, you did not obtain, or even seek, Wegmans consent when you obtained Wegmans' data from the NYPMP. In any event, we understand you will follow up with the Bureau to obtain its consent promptly.

In the meantime, Wegmans will begin to explore whether it is feasible to respond to the revised data request that you presented below. As we understand it, the PBMs obtained what they need to analyze non-cash transactions and are now requesting data fields relating to cash transactions. We will explore whether Wegmans maintains its prescription information in that fashion, and if so, the feasibility of

5

producing it.  Doing so would be a compromise by Wegmans, as harvesting data that does not exist in this fashion in the normal course of business goes beyond Wegmans' discovery obligations.

Finally, your email this morning improperly expands the geographic scope of Request 1 to encompass all of Monroe County.  We have previously discussed the fact that the appropriate geographic scope is the City of Rochester.  The PBMs confirmed this previously, including in your 2/28/2025 letter.

**Regarding DUR Data (Request No. 2)**:  During our 10/3 conferral, you stated you would provide specificity regarding so-called "reports" that the PBMs say can be generated on EnterpriseRX.  The feedback you provided this morning fails to explain what "reports" you think can be generated.  As you know, as a good faith compromise, Wegmans agreed to provide even more information (above and beyond what we previously supplied in our June 2 letter) concerning its technical limitations and the burden of responding to Subpoena Requests No. 1 and 2.  We cannot complete our internal vetting process or provide you with draft language until Wegmans has had an opportunity to understand what "reports" the PBMs claim can be generated on EnterpriseRX.  Specifically, ***what content*** do the PBMs believe can be generated via EnterpriseRX "reports"?

Although the PBMs still have not provided the information you said you would provide, we are working with Wegmans to further flesh out the technical limitations and feasibility of constructing the artificial data set that the PBMs have requested.  Wegmans has committed to providing additional information concerning the technical limitations and burden—even though we have amply addressed those issues in our June 2 letter.  And, as you know, the purpose of this exercise is to provide the PBMs with sufficient understanding and confidence that their continued pursuit of Request 2 is unwarranted.

Our primary client contact on these issues has been traveling this week for a business conference and mostly unavailable to us.  We expect we will have an opportunity to speak with him sometime next week, and it would be helpful to have specific information regarding the above-referenced "reports" before then.

**Special Master Cohen's Recent Discovery Ruling Limiting the PBMs' Discovery Obligations**:  We recently learned the PBMs received a favorable ruling from Special Master Cohen, on October 2, which limits the PBMs' own discovery obligations and should result in the quashing of Requests 1 and 2.  It appears to us that the PBMs are demanding more of Wegmans, a non-party, than they were willing to do themselves as parties to the litigation.  Special Master Cohen ruled that the PBMs are not required to create and produce data sets that do not exist in the normal course of the PBMs' business.  The relevant language from Special Master Cohen's ruling is pasted below.  Special Master Cohen ruled that the PBMs are not required to "merge data from disparate systems" and create data sets that "simply do[] not exist in the form Plaintiffs demand."  That seems to be precisely what the PBMs are demanding of Wegmans.  Please provide us with copies of the parties' briefing, including but not limited to Ms. Vieira's letter as referenced in the portion of the ruling quoted below.  Notably, the PBMs appeared to have briefed the relevant issues to Special Master Cohen via letter by outside counsel—not through a client declaration.  If we're wrong about that, please provide a copy of the ruling declaration that the PBMs submitted to Special Master Cohen on this issue.

**Excerpt from Special Master Cohen's October 2 discovery ruling**:

The Special Master ultimately rests his ruling on this category (and the next) on ESI's repeated insistence that it did not track its remuneration related to opioid drugs separately from other drugs—even though it

could—unless a particular client contract required it to do so. See Letter from Olga Vieira to Special Master at 1 (September 26, 2026) ("Express Scripts actually tracked its financials on a client-by-client, not drug-by-drug, basis"). That is, ESI maintains its remuneration mechanisms are specific to and often change with each of its client contracts; it does not receive or track remuneration related to a specific opioid or class of opioids; and providing Plaintiffs with the "top-line dollar figures" they seek would require ESI to undertake calculations and access data fields in ways it never normally does.7 Accepting these contentions as true, the Special Master concludes Plaintiffs' request for the information sought in category one must be denied. Plaintiffs will instead have to examine ESI's client contracts individually, in conjunction with the financial data provided, to determine the extent to which and mechanisms by which ESI obtained "opioid remuneration." 7 See id. ("Express Scripts negotiates with thousands of plan sponsors and pharmacies, and hundreds of manufacturers, and moneys received and shared to and from these sources are calculated and reconciled at the client level, not on a drug-specific basis. There is no set of consolidated ledgers

or reports isolating "opioid remuneration" across the business. To produce what Plaintiffs now seek would require Express Scripts to merge data from disparate systems and create an entirely artificial allocation methodology for this litigation to attempt to attribute revenue to opioids. That information simply does not exist in the form Plaintiffs demand.")

**Joshua M. Agins**
Partner
Hodgson Russ LLP

Tel: 585.454.0759
Fax: 585.423.5910



Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Thursday, October 9, 2025 10:51 AM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**External Email - Use Caution**

Josh,

Below is a response to your last email, which includes a summary of points discussed on our October 3 meet and confer and some follow-up.

## Dispensing Data (Request No. 1)

You have asked us whether we could share a list of the fields in the PMP data produced to us by the New York Bureau of Narcotics Enforcement ("NY PMP data"). We have no objection in-principle to sharing this information, subject to the Bureau's consent, which we have sought. We are awaiting its response.

As mentioned on our last call, we need certain of Wegmans' dispensing data to allow for analyses of cash purchases, which is not available through the NY PMP data. Because that is the area of interest, we are willing to limit this request to the following data fields for only cash purchases in Monroe County of the drugs referenced in the subpoena:

- Date Filled
- NDC Number
- Pharmacy NPI or NABP
- Quantity Dispensed
- Days Supply
- Method of payment (e.g., Medicare, cash)
- Patient paid amount
- Refill Indicator
- Rx Number

You agreed to consider the production of this more-limited dispensing data and revert to us.

**DUR Data (Request No. 2)**

You agreed that Wegmans would provide a draft declaration (or language that would eventually be included in a declaration), attesting to the burden involved in producing the same scope of DUR data that Special Master Cohen recently ordered other pharmacies (Walgreens, CVS, Wal-Mart) to produce. We again clarified that sharing such language would help us evaluate the merits of Wegmans' burden argument, but we had never agreed to withdraw our request in exchange for such a declaration.

Having spoken with several consultants familiar with EnterpriseRx, it is our understanding that EnterpriseRx would allow Wegmans to generate large-scale reports containing DUR data with relatively little manual effort. EnterpriseRx is a sophisticated pharmacy management software system that is, in fact, designed to host and facilitate interaction with large volumes of pharmacy data. Indeed, McKesson advises on its website that it allows for entities like Wegmans to "run comprehensive reports" and "integrate[] every aspect of [a pharmacy's] business"). It would thus be very surprising if Wegmans could not extract DUR data from EnterpriseRx in an automated fashion. Even assuming that Wegmans' current software configuration does not allow this, we are advised that such data extraction is something McKesson should be able to do for Wegmans at no or minimal incremental cost. Please advise if Wegmans is prepared to make such a request to McKesson, if necessary, or if it would object to the PBM Defendants making such a request (by subpoena, if necessary). As we have stated, the PBM Defendants are willing to consider cost-sharing to the extent such a data extraction would entail addition cost.

**DUR Policies/Guidance (Request No. 2)**

You agreed to confirm that the only responsive documents in Wegmans' possession, custody and control concerning how its personnel communicate with PBMs or interact with PBM point of sale

messages are the manuals provided to Wegmans by PBMs, and that Wegmans does not have any internal policies touching on these subjects. Wegmans has yet to provide an update.

## Remaining Subpoena Requests

You stated that Wegmans still does not have any updates regarding the PBM Defendants' proposals in Alston & Bird's February 28 letter concerning the other subpoena requests. We believe Wegmans has had more than sufficient time to consider these proposals but, given your representations concerning your schedule, we agreed to wait until the week of October 13 for a response.

The PBM Defendants have been more than patient in attempting to cooperate with Wegmans to resolve these outstanding issues. However, as we stated on our call, unless progress is made next week, we will have no choice but re-raise the parties' disputes with the Special Master. Please provide some times you are available to meet and confer next week.

Thanks,
Anthony

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Friday, October 3, 2025 9:16 AM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

Anthony, the summary that you sent on Wednesday morning is incomplete and misstates parts of the discussion. I have interpolated my comments below in red font. The PBMs had three lawyers on our conferral call. With a team of attorneys focused on non-party subpoenas, how can the PBMs take nine days to prepare a simple (and incomplete) summary of our conferral, yet expect Wegmans to prepare an entire declaration in the same timeframe? The double standard is glaring. A call this afternoon is no longer necessary, as I can report on status and answer your questions. First, Wegmans is agreeable to providing a declaration that outlines why it cannot produce the DUR information that the PBMs contend is responsive to Subpoena Request No. 2. Wegmans is engaging in this process with the understanding

that the PBMs will withdraw Request #2 if Wegmans provides a sufficiently detailed declaration setting forth the technical limitations and burdens. I do not know when we will have a draft declaration for your review, but I can assure you that an experienced pharmacist has dedicated many hours to this project and we are working on that declaration as our time permits. Second, see below for the rest of my comments on the PBMs' "summary" of our September 22 call, and Wegmans' response to the new questions/issues you posed on Wednesday.

********************************************************************************************************
********************************

Josh,

Below is a brief summary of our September 22, 2025 meet and confer, with some additional questions it would be helpful to have answered on this week's call. Let us know if any of the below is inaccurate.

Regarding Request No. 1 (concerning dispensing data), you stated that you were unsure whether Wegmans would be able to export specific data fields using EnterpriseRX or any other system, and that the feasibility of any production would depend on the specific fields sought. You stated that to the extent the PBM Defendants identify specific field(s) of interest that they don't already have, Wegmans would be willing to investigate whether it would be feasible to produce that information. You further stated that you believed much of Wegman's data may be held in a cloud-based system operated by McKesson. **[JMA: Immediately after you raised the topic of Request 1, I pointed out that the PBMs had withdrawn Request No. 1 because, to our understanding, they received pharmacy data directly from the NY PMP. In fact, I am aware of your prior email to Kinney's counsel in which the PBMs withdrew Request 1. You are correct that I specifically requested that the PBMs tell Wegmans what data they received from the NY PMP (including the date, geographic scope, and the data fields). Ryan said he did not have this information at his fingertips but could obtain it fairly easily from someone on his team. This critical information has not been provided. When will the PBMs provide this?**

**Unless and until the PBMs provide this information, Wegmans will not engage in further discussion on Request 1. The PBMs will need to explain what they already have, what more they need, and why. *Then, if* the outstanding data is responsive to Request 1, Wegmans would attempt to determine whether Enterprise RX allows it to harvest the data, and if so, the burden of doing so, and whether it is consistent with Rule 26 to do so.]**

Regarding Request No. 2 (concerning DUR data), you stated that Wegmans did not intend to produce DUR data for various reasons despite Special Master Cohen's order regarding the production of DUR data from other pharmacies. Wegmans stated it did not believe that the language of the request covered DUR data [**JMA: this does not accurately characterize Wegmans' position – see below and our letter dated 9/18**], and further stated that it believed that production of DUR data for two prescriptions was adequate to resolve the request. **[JMA: this summary is surprisingly inaccurate in many respects and omits a key part of the discussion and shortchanges Wegmans' position. As I pointed out, Request 2 starts with the phrase, "Documents sufficient to show . . . ." During our last conferral, I asked you at least three times to help me understand how the phrase "Documents sufficient to show" could be construed so broadly as to require the production of *all* DUR data and information. The PBMs cannot articulate any coherent position on this point. That is why, during our correspondence dating back to late 2024, you yourself emphasized how Request 2 sought *only* documents**

10

**"sufficient to show" how Wegmans interacted with the PBMs and took their input internally. *See* PBMs' November 11, 2024 letter to Wegmans. We understand that the national pharmacies agreed to permit the PBMs to retroactively expand the scope of Request 2—likely because the national pharmacies had already participated in opioid litigation for many years and had produced millions of documents and large data sets of the type the PBMs seek. In contrast, as you know, Wegmans produced nothing as a party to any opioid litigation and all cases against it were discontinued. So, the fact that Special Master Cohen ordered national pharmacies to produce some additional data to the PBMs is not applicable here, especially since the PBMs continue to withhold the briefing that led up to his decision – see below. This, plus Wegmans' production of the two exemplar prescriptions discussed below means that Wegmans has more than satisfied any duty to produce in conjunction with Request 2].**

The PBM Defendants stated, as they did in prior briefing which was provided to Wegmans **[JMA: False. The PBMs refused to provide all the briefing to Wegmans. The PBMs supplied only their own briefing *with heavy redactions* but refused to provide the national pharmacies' briefing, claiming it is "confidential." The PBMs cannot pick and choose which parts of the docket they wish to interject into the discussion with Wegmans. As I pointed out during our conferral, it is blatantly hypocritical for the PBMs to hide behind "confidentiality" in this way. The PBMs are asking Wegmans to produce *HIPAA-protected patient information* as a non-party. Where is the PBMs' concern for confidentiality when it comes to Wegmans' federally protected patient information? The PBMs' assertion that mere legal briefs are "confidential" and therefore cannot be provided to Wegmans only further reinforces our view that those same confidentiality concerns should apply with even greater weight to patient data and shield Wegmans' patient data from disclosure to the PBMs. I explained all of this to you again during our conferral.**], that the request does encompass DUR data at the prescription level, *i.e.*, how Wegmans' pharmacists responded to a DUR alert for each opioid prescription. [**JMA: yes, Wegmans understands and acknowledges that Request 2 calls for prescription-level information "*sufficient to show*" how Wegmans responds to input from the PBMs. That is why, more than three months ago, Wegmans provided two exemplar prescription records, i.e., prescription-level information. I also asked you during our conferral to explain why those two exemplar prescriptions are *not* "sufficient to show" how Wegmans communicated about DURs with the PBMs. I even suggested that Wegmans could provide a few more exemplars for additional years so that the PBMs could confirm that those prescriptions accurately represent how Wegmans communicated with the PBMs and handled their input about DURs during the entire timeframe].** The PBM Defendants further stated that, as was made clear by Special Master Cohen's recent order regarding the production of DUR data, the scope of responsive DUR data is all opioid prescriptions dispensed in Monroe County. The PBM Defendants expressed that they were willing to listen to any proposals from Wegmans about the scope of DUR data it was willing to produce, and that they would be willing to consider cost-shifting if appropriate. Wegmans did not provide a response but stated it would discuss the matter internally before responding. **[JMA: as I explained, the PBMs have it backwards. Wegmans has already expended significant time, effort, and resources to comply in full with Request 2 by providing two exemplar prescriptions that are *more than sufficient to show* how Wegmans communicated with the PBMs about DURs. As I said, if the PBMs can articulate why they need something more—for example, additional years—please feel free to do so and Wegmans will take it under consideration. Also, as I explained to you in our conferral, the PBMs suggestion of "cost shifting" is a meaningless, empty "concession" because "cost" is not the issue. As described in Wegmans' September 18 letter, the process by which Wegmans harvests prescription data information is time-consuming and requires a pharmacist's time, thereby detracting from the pharmacy's ability to serve patients. We expounded on this at**

**length in our prior letters and yet the PBMs continue to act as if cost can simply be shifted. You know this is not the case]**.

With respect to purported burden, we asked whether Wegmans would be willing to provide an affidavit from a knowledgeable witness attesting to its assertions. You indicated Wegmans would be willing to do this and had no objection to sending us the proposed language to be included in the affidavit. **[JMA: I said I would need to discuss this concept with Wegmans since the PBMs had never before raised it. I agreed to have that discussion with Wegmans and report back. I was able to do so, and can report that Wegmans is open to this concept, presuming good faith collaboration with the PBMs and their commitment to withdrawing Request 2 if a sufficient declaration is provided. During our last conferral, we discussed the concept of exchanging some draft language so that both sides could gain comfort that we're on the same page with respect to the content of the declaration].** Kindly send that before this week's meet and confer. **[JMA: Wegmans is working on this. We will update you when we are in a position to do so].** In this regard, it is our understanding that EnterpriseRx typically allows for reports to be run that would provide the type of data we are seeking. Kindly advise if Wegmans is currently able to run such reports from EnterpriseRx, and if not, whether it could ask McKesson to do so. [**JMA: what is your "understanding" based on? And what type of "reports" are you referring to? If you would share the basis for your understanding, and what "reports" you are referring to, I can ask Wegmans specifically. But to my knowledge, as we have already explained at length, Enterprise cannot generate mass data "reports" containing the type of data that the PBMs seek. As to your last question: no, Wegmans will not agree to ask McKesson to run reports. As you know, Wegmans has no obligation to do so.]**

Regarding Request No. 2 (concerning DUR policies or guidance), Wegmans stated that the only responsive policies are the manuals provided by PBMs to Wegmans, and that Wegmans does not have any internal policies about how its personnel should communication with PBMs or PBM point of sale messages. [**JMA: I said I would ask Wegmans to confirm this, and am in the process of doing so**]

Regarding the remaining requests, Wegmans stated it was not prepared to discuss them. Wegmans agreed to review the parties' prior correspondence, including the PBM Defendants' February 28, 2025 letter which summarized the parties' negotiations and proposals, and would be prepared to offer its response to our February 28 proposals this week. [**JMA: Wegmans is focusing on your DUR question and preparing a declaration. We understand that's your priority, and so we have made it ours**].

The parties agreed to discuss next steps on October 3, 2025. **[JMA: this email captures the current status; there is nothing more to report]**

Thanks,
Anthony

**Joshua M. Agins**
Partner
Hodgson Russ LLP

Tel: 585.454.0759
Fax: 585.423.5910



Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

---

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Wednesday, October 1, 2025 11:23 AM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

---

### External Email - Use Caution

---

Josh,

Below is a brief summary of our September 22, 2025 meet and confer, with some additional questions it would be helpful to have answered on this week's call. Let us know if any of the below is inaccurate.

Regarding Request No. 1 (concerning dispensing data), you stated that you were unsure whether Wegmans would be able to export specific data fields using EnterpriseRX or any other system, and that the feasibility of any production would depend on the specific fields sought. You stated that to the extent the PBM Defendants identify specific field(s) of interest that they don't already have, Wegmans would be willing to investigate whether it would be feasible to produce that information. You further stated that you believed much of Wegman's data may be held in a cloud-based system operated by McKesson.

Regarding Request No. 2 (concerning DUR data), you stated that Wegmans did not intend to produce DUR data for various reasons despite Special Master Cohen's order regarding the production of DUR data from other pharmacies. Wegmans stated it did not believe that the language of the request covered DUR data, and further stated that it believed that production of DUR data for two prescriptions was adequate to resolve the request. The PBM Defendants stated, as they did in prior briefing which was provided to Wegmans, that the request does encompass DUR data at the prescription level, *i.e*., how Wegmans' pharmacists responded to a DUR alert for each opioid prescription. The PBM Defendants further stated that, as was made clear by Special Master Cohen's recent order regarding the production of DUR data, the scope of responsive DUR data is all opioid prescriptions dispensed in Monroe County. The PBM Defendants expressed that they were willing to listen to any proposals from Wegmans about the scope of DUR data it was willing to produce, and that they would be willing to consider cost-shifting if appropriate. Wegmans did not provide a response but stated it would discuss the matter internally before responding.

With respect to purported burden, we asked whether Wegmans would be willing to provide an affidavit from a knowledgeable witness attesting to its assertions. You indicated Wegmans would be willing to do this and had no objection to sending us the proposed language to be included in the affidavit. Kindly send that before this week's meet and confer. In this regard, it is our understanding that EnterpriseRx typically allows for reports to be run that would provide the type of data we are seeking. Kindly advise if Wegmans is currently able to run such reports from EnterpriseRx, and if not, whether it could ask McKesson to do so.

Regarding Request No. 2 (concerning DUR policies or guidance), Wegmans stated that the only responsive policies are the manuals provided by PBMs to Wegmans, and that Wegmans does not have any internal policies about how its personnel should communication with PBMs or PBM point of sale messages.

Regarding the remaining requests, Wegmans stated it was not prepared to discuss them. Wegmans agreed to review the parties' prior correspondence, including the PBM Defendants' February 28, 2025 letter which summarized the parties' negotiations and proposals, and would be prepared to offer its response to our February 28 proposals this week.

The parties agreed to discuss next steps on October 3, 2025.

Thanks,
Anthony

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Thursday, September 18, 2025 7:43 AM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

Anthony and Ryan,

Please see attached. If you would like to discuss this week, I am currently available tomorrow (Friday) between 2:30-5:00 EST. I also have some availability Monday.

Regards,
Josh

**Joshua M. Agins**
Partner
Hodgson Russ LLP
Tel:  585.454.0759

14

**Fax:**  585.423.5910



Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

---

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Friday, September 12, 2025 8:00 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

---

## External Email - Use Caution

---

Josh: I can be fairly flexible Thursday or Friday.  Please advise.

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

---

**From:** Anthony Alden
**Sent:** Wednesday, September 10, 2025 3:24 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

Josh: please propose some times next week.  We're unwilling to wait beyond then.  You'll have had plenty of time to get anything you're going to get from the other pharmacies and there are issued beyond DUR data to discuss anyway.

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct

213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Wednesday, September 10, 2025 2:49 PM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

Anthony,

We are reaching out to the national pharmacies to request their briefing and will provide you with a substantive response once Wegmans has had an opportunity to review the materials that led up to Special Master Cohen's order. In the meantime, to answer your immediate question: Wegmans Pharmacy uses EnterpriseRX.

In your 9/4 email, you asserted that my email dated 9/3 contains "misstatements," but you did not elaborate. Please identify those alleged misstatements to that I can understand and address what you think was incorrect.

Please note that I will be in depositions and therefore unavailable for the remainder of this week.

Regards,
Josh

**Joshua M. Agins**
Partner
Hodgson Russ LLP

Tel:   585.454.0759
Fax:  585.423.5910



**Hodgson**
Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Wednesday, September 10, 2025 3:24 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>

**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

<div style="border:2px solid red;">

## External Email - Use Caution

</div>

+ Ryan

Josh: I haven't heard from you. Please provide some times we can talk tomorrow or Friday.

**Anthony P. Alden**
Partner
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Anthony Alden
**Sent:** Thursday, September 4, 2025 1:06 PM
**To:** 'Agins, Joshua' <JAgins@hodgsonruss.com>
**Subject:** RE: Opioids: Wegmans Subpoena

Josh,

As requested, please find attached the Express Scripts Defendants' subpoenas to Walgreens, CVS, and Walmart , and below a link to the Express Scripts Defendants' submissions to the Special Master regarding production of the pharmacies' DUR data. We have redacted from the submissions only those few portions that the plaintiffs or pharmacies might consider confidential. Counsel who took the lead for the pharmacies on this issue are Tara Fumerton (tfumerton@jonesday.com), Anthony Ruiz (ARuiz@zuckerman.com), and Matt Ford (Matthew Ford matthew.ford@bartlitbeck.com). Feel free to confirm with them that the Special Master's ruling is final, as I've represented.

I don't see the point in litigating the misstatements in your email. We can discuss them when we next meet and confer if you like. Please propose some times next week. That will give Wegmans ample time to consider the briefing, as well as our prior proposals, which it's had for many months.

Finally, you have not answered my question about the system(s) in which Wegmans maintains its DUR data. Please do so.

Link: https://qe.sharefile.com/public/share/web-se91db5558e9345a5af4138b8bd48cc9d

Thanks,
Anthony

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Wednesday, September 3, 2025 6:17 AM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

Dear Anthony,

Please send (1) a copy of Express Scripts' subpoena to the national pharmacies, and (2) the PBMs' briefing. These materials will allow Wegmans to evaluate the extent to which the Subpoena to Wegmans matches the Subpoena to the national pharmacies and the applicability, if any, of Special Master Cohen's ruling. If you are unable to provide the national pharmacies' briefing, please provide contact information for their counsel, and we will contact them. Once we have had a chance to obtain and evaluate the relevant documents, we will advise you of Wegmans' position.

While I understand you would prefer to speak this week, the fact of the matter is that we will not be in a position to do so until we've had adequate time to review the materials that we requested from you eight days ago and which you have not yet provided. And, since you are unable to provide the national pharmacies' briefing, we will need time to confer with their counsel. The PBMs waited almost three months to contact us since Wegmans' last communication to you on June 2 and cannot reasonably expect Wegmans to respond substantively within a matter of days. If the PBMs were facing time pressures, you could have clued us in on the fact that you were actively briefing these issues in front of Special Master Cohen and you could have responded to our prior communication many months ago. Instead, you chose not to engage any further with Wegmans while you briefed these issues with the national pharmacies. This only further reinforces our view that Wegmans is situated quite differently than the national pharmacies and the Cohen ruling likely is inapplicable to Wegmans.

Further, as we noted, Special Master Cohen's ruling is not final because the email chain that you forwarded to us indicates that the national pharmacies intend to appeal the ruling to Judge Polster.

18

Finally, your assertion that "Wegmans has never provided any evidence to support its contention that it "lacks the resources to compile extensive DUR files" is simply not accurate. On June 2, we sent you a 29-page (single-spaced) communication containing a lengthy discussion of the burden of producing dispensing records. (Note that the header of the communication is dated May 30, but in fact we provided it to you on June 2). Through the process of gathering and providing two exemplar dispensing records, we precisely quantified the burden and showed that the inordinate time required to collect the requested information is prohibitive and, frankly, not possible on a large-scale basis. I attach our prior communication for your convenience and refer you to pages 27-29 under the heading, "The Burden of Producing Dispensing Logs."

We look forward to your prompt provision of the requested materials.

**Joshua M. Agins**
Partner
Hodgson Russ LLP

Tel: 585.454.0759
Fax: 585.423.5910



Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Tuesday, September 2, 2025 7:43 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Subject:** RE: Opioids: Wegmans Subpoena

## External Email - Use Caution

Josh: I am happy to provide you with ESI's submissions to the Special Master concerning our request for DUR data to Walgreens, CVS, and Walmart, but we might have to redact certain portions for information they might consider confidential. We'll get those to you tomorrow. Given the submissions were not publicly filed, we do not feel comfortable giving you the pharmacies' submissions but are happy to provide you with contact details for their counsel should you wish to ask them for it or for permission for us to share the submissions.

As to alleged burden, Wegmans has never provided any evidence to support its contention that it "lacks the resources to compile extensive DUR files." In what system or systems does Wegmans store its DUR data? And why do you say the Special Master's email ruling is not final?

Let's put something on calendar for Thursday or Friday to see if we can reach any agreements on the outstanding items. Given our discovery cut-off, we'll have to go to the Special Master If we cannot reach a compromise. Please propose some times.

**Anthony P. Alden**
Partner
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor

Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Friday, August 29, 2025 3:16 AM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

Anthony,

At this time, we are not able to provide you Wegmans' position regarding the DUR data. You sent me Special Master Cohen's email ruling, but that ruling is not final, and perhaps more importantly, the ruling presumes the parties' knowledge of the scope of the requests and the arguments made by the parties in their "multiple rounds of briefing." Without access to the briefing accompanying that ruling (which we do not have), there is no way for Wegmans to understand precisely what Special Master Cohen has ordered the national pharmacies to produce, or whether the ruling has any relevance to a pharmacy like Wegmans. If you send the briefing and transcripts, we can review and get back to you on whether Wegmans' position changes. If Express Scripts believes the July 28 ruling has any relevance to Wegmans, we see no reason for Express Scripts to withhold the very briefing that would help us to understand the scope of the ruling and its rationale.

Express Scripts also appears to be ignoring the obvious differences between Wegmans and the national pharmacies. Unlike the national pharmacies, Wegmans has not engaged in party discovery in any opioid litigation and has produced no data. And unlike the national pharmacies, Wegmans lacks the resources to compile extensive DUR files. On June 2, in a good faith effort to help Express Scripts understand how Wegmans maintains its data, we provided you with two exemplar prescription records, including the cDUR and DUR fields, with an extensive discussion of what those prescriptions show and how Wegmans maintains and collected them. As you know from the information we provided, collecting DUR information requires Wegmans to go through a manual, prescription by prescription process, which took approximately 15 minutes for each of the two exemplar prescriptions that we provided to you. Notably, we have heard nothing from Express Scripts since sending you that information almost three months ago. It is simply untenable to think Wegmans could even begin to comply with an order that was intended for the national pharmacies.

Once again, we reiterate our request for copies of the briefing and hearing transcript(s) that led up to Special Master Cohen's July 28 ruling so that Wegmans can understand the context and work with Express Scripts in good faith toward a resolution.

As for the "proposals" mentioned in your email regarding the "other categories," we will need to dig back through the history given the fact that we have heard nothing from you in many months and our prior communications

(which last occurred in June) had focused on prescription data, which has been Express Scripts' stated focus during most of our conferral efforts. We will respond regarding the other requests separately.

**Joshua M. Agins**
Partner
Hodgson Russ LLP

**Tel:**  585.454.0759
**Fax:**  585.423.5910



Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Tuesday, August 26, 2025 6:11 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Subject:** RE: Opioids: Wegmans Subpoena

## External Email - Use Caution

Is Wegmans not going to produce the DUR data, as requested?

Can you also let me know Wegmans' position on the other categories we requested?  We made some proposals but don't think we heard back.

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Tuesday, August 26, 2025 3:01 PM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

Anthony,

Please send a copy of the briefing and any hearing transcripts leading up to Special Master Cohen's ruling.

Thanks,
Josh

**Joshua M. Agins**
Partner
Hodgson Russ LLP

Tel:  585.454.0759
Fax:  585.423.5910



Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Tuesday, August 26, 2025 12:57 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Subject:** Opioids: Wegmans Subpoena

## External Email - Use Caution

Hi Josh,

I just tried your line but got voicemail. As I alluded to in my message, on July 28, 2025, Special Master Cohen in the MDL ordered Walgreens, CVS, and Walmart to produce their electronic DUR data records, including due diligence data, for all opioid prescriptions they dispensed in Monroe and St. Lawrence Counties, New York, including those paid by cash or adjudicated by PBMs other than Express Scripts and OptumRx. The Special Master ordered these productions to be made in response to substantially similar document requests to those contained in the PBM Defendants' subpoena to Wegmans. On August 20, 2025, the Special Master denied these pharmacies' motion for clarification, and their right to object to the ruling has now passed. I attach the Special Master's rulings for reference.

Having studied the sample data Wegmans made available only for viewing, Express Scripts asks that Wegmans produce DUR data consistent with the Special Master's July 28 and August 20 rulings. Absent such confirmation, we intend to seek a corresponding ruling compelling Wegmans to do so. If you would like to discuss the matter, please propose some times this week.

Thanks,

Anthony

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

# EXHIBIT 13

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Friday, October 3, 2025 9:16 AM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

Anthony, the summary that you sent on Wednesday morning is incomplete and misstates parts of the discussion. I have interpolated my comments below in red font. The PBMs had three lawyers on our conferral call. With a team of attorneys focused on non-party subpoenas, how can the PBMs take nine days to prepare a simple (and incomplete) summary of our conferral, yet expect Wegmans to prepare an entire declaration in the same timeframe? The double standard is glaring. A call this afternoon is no longer necessary, as I can report on status and answer your questions. First, Wegmans is agreeable to providing a declaration that outlines why it cannot produce the DUR information that the PBMs contend is responsive to Subpoena Request No. 2. Wegmans is engaging in this process with the understanding that the PBMs will withdraw Request #2 if Wegmans provides a sufficiently detailed declaration setting forth the technical limitations and burdens. I do not know when we will have a draft declaration for your review, but I can assure you that an experienced pharmacist has dedicated many hours to this project and we are working on that declaration as our time permits. Second, see below for the rest of my comments on the PBMs' "summary" of our September 22 call, and Wegmans' response to the new questions/issues you posed on Wednesday.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Josh,

1

Below is a brief summary of our September 22, 2025 meet and confer, with some additional questions it would be helpful to have answered on this week's call. Let us know if any of the below is inaccurate.

Regarding Request No. 1 (concerning dispensing data), you stated that you were unsure whether Wegmans would be able to export specific data fields using EnterpriseRX or any other system, and that the feasibility of any production would depend on the specific fields sought. You stated that to the extent the PBM Defendants identify specific field(s) of interest that they don't already have, Wegmans would be willing to investigate whether it would be feasible to produce that information. You further stated that you believed much of Wegman's data may be held in a cloud-based system operated by McKesson. **[JMA: Immediately after you raised the topic of Request 1, I pointed out that the PBMs had withdrawn Request No. 1 because, to our understanding, they received pharmacy data directly from the NY PMP.  In fact, I am aware of your prior email to Kinney's counsel in which the PBMs withdrew Request 1.  You are correct that I specifically requested that the PBMs tell Wegmans what data they received from the NY PMP (including the date, geographic scope, and the data fields).  Ryan said he did not have this information at his fingertips but could obtain it fairly easily from someone on his team.  This critical information has not been provided.  When will the PBMs provide this?**

**Unless and until the PBMs provide this information, Wegmans will not engage in further discussion on Request 1.  The PBMs will need to explain what they already have, what more they need, and why.  *Then, if* the outstanding data is responsive to Request 1, Wegmans would attempt to determine whether Enterprise RX allows it to harvest the data, and if so, the burden of doing so, and whether it is consistent with Rule 26 to do so.]**

Regarding Request No. 2 (concerning DUR data), you stated that Wegmans did not intend to produce DUR data for various reasons despite Special Master Cohen's order regarding the production of DUR data from other pharmacies.  Wegmans stated it did not believe that the language of the request covered DUR data [**JMA: this does not accurately characterize Wegmans' position – see below and our letter dated 9/18**], and further stated that it believed that production of DUR data for two prescriptions was adequate to resolve the request.  **[JMA: this summary is surprisingly inaccurate in many respects and omits a key part of the discussion and shortchanges Wegmans' position.  As I pointed out, Request 2 starts with the phrase, "Documents sufficient to show . . . ."  During our last conferral, I asked you at least three times to help me understand how the phrase "Documents sufficient to show" could be construed so broadly as to require the production of *all* DUR data and information.  The PBMs cannot articulate any coherent position on this point.  That is why, during our correspondence dating back to late 2024, you yourself emphasized how Request 2 sought *only* documents "sufficient to show" how Wegmans interacted with the PBMs and took their input internally.  *See* PBMs' November 11, 2024 letter to Wegmans.  We understand that the national pharmacies agreed to permit the PBMs to retroactively expand the scope of Request 2—likely because the national pharmacies had already participated in opioid litigation for many years and had produced millions of documents and large data sets of the type the PBMs seek.  In contrast, as you know, Wegmans produced nothing as a party to any opioid litigation and all cases against it were discontinued.  So, the fact that Special Master Cohen ordered national pharmacies to produce some additional data to the PBMs is not applicable here, especially since the PBMs continue to withhold the briefing that led up to his decision – see below.  This, plus Wegmans' production of the two exemplar prescriptions discussed below means that Wegmans has more than satisfied any duty to produce in conjunction with Request 2].**

The PBM Defendants stated, as they did in prior briefing which was provided to Wegmans **[JMA: False. The PBMs refused to provide all the briefing to Wegmans. The PBMs supplied only their own briefing *with heavy redactions* but refused to provide the national pharmacies' briefing, claiming it is "confidential." The PBMs cannot pick and choose which parts of the docket they wish to interject into the discussion with Wegmans.  As I pointed out during our conferral, it is blatantly hypocritical for the PBMs to hide behind "confidentiality" in this way. The PBMs are asking Wegmans to produce *HIPAA-protected patient information* as a non-party.  Where is the PBMs' concern for confidentiality when it comes to Wegmans' federally protected patient information?  The PBMs' assertion that mere legal briefs are "confidential" and therefore cannot be provided to Wegmans only further reinforces our view that those same confidentiality concerns should apply with even greater weight to patient data and shield Wegmans' patient data from disclosure to the PBMs.  I explained all of this to you again during our conferral.]**, that the request does encompass DUR data at the prescription level, *i.e.*, how Wegmans' pharmacists responded to a DUR alert for each opioid prescription.  [**JMA: yes, Wegmans understands and acknowledges that Request 2 calls for prescription-level information "*sufficient to show*" how Wegmans responds to input from the PBMs.  That is why, more than three months ago, Wegmans provided two exemplar prescription records, i.e., prescription-level information.  I also asked you during our conferral to explain why those two exemplar prescriptions are *not* "sufficient to show" how Wegmans communicated about DURs with the PBMs.  I even suggested that Wegmans could provide a few more exemplars for additional years so that the PBMs could confirm that those prescriptions accurately represent how Wegmans communicated with the PBMs and handled their input about DURs during the entire timeframe].**  The PBM Defendants further stated that, as was made clear by Special Master Cohen's recent order regarding the production of DUR data, the scope of responsive DUR data is all opioid prescriptions dispensed in Monroe County. The PBM Defendants expressed that they were willing to listen to any proposals from Wegmans about the scope of DUR data it was willing to produce, and that they would be willing to consider cost-shifting if appropriate.  Wegmans did not provide a response but stated it would discuss the matter internally before responding.  **[JMA: as I explained, the PBMs have it backwards.  Wegmans has already expended significant time, effort, and resources to comply in full with Request 2 by providing two exemplar prescriptions that are *more than sufficient to show* how Wegmans communicated with the PBMs about DURs.  As I said, if the PBMs can articulate why they need something more—for example, additional years—please feel free to do so and Wegmans will take it under consideration.  Also, as I explained to you in our conferral, the PBMs suggestion of "cost shifting" is a meaningless, empty "concession" because "cost" is not the issue.  As described in Wegmans' September 18 letter, the process by which Wegmans harvests prescription data information is time-consuming and requires a pharmacist's time, thereby detracting from the pharmacy's ability to serve patients.  We expounded on this at length in our prior letters and yet the PBMs continue to act as if cost can simply be shifted. You know this is not the case].**

With respect to purported burden, we asked whether Wegmans would be willing to provide an affidavit from a knowledgeable witness attesting to its assertions. You indicated Wegmans would be willing to do this and had no objection to sending us the proposed language to be included in the affidavit.  **[JMA: I said I would need to discuss this concept with Wegmans since the PBMs had never before raised it.  I agreed to have that discussion with Wegmans and report back.  I was able to do so, and can report that Wegmans is open to this concept, presuming good faith collaboration with the PBMs and their commitment to withdrawing Request 2 if a sufficient declaration is provided.  During our last conferral, we discussed the concept of exchanging some draft language so that both sides could gain comfort that we're on the same page with respect to the content of the**

3

**declaration].** Kindly send that before this week's meet and confer. **[JMA: Wegmans is working on this. We will update you when we are in a position to do so].** In this regard, it is our understanding that EnterpriseRx typically allows for reports to be run that would provide the type of data we are seeking. Kindly advise if Wegmans is currently able to run such reports from EnterpriseRx, and if not, whether it could ask McKesson to do so. [**JMA: what is your "understanding" based on? And what type of "reports" are you referring to? If you would share the basis for your understanding, and what "reports" you are referring to, I can ask Wegmans specifically. But to my knowledge, as we have already explained at length, Enterprise cannot generate mass data "reports" containing the type of data that the PBMs seek. As to your last question: no, Wegmans will not agree to ask McKesson to run reports. As you know, Wegmans has no obligation to do so.]**

Regarding Request No. 2 (concerning DUR policies or guidance), Wegmans stated that the only responsive policies are the manuals provided by PBMs to Wegmans, and that Wegmans does not have any internal policies about how its personnel should communication with PBMs or PBM point of sale messages. [**JMA: I said I would ask Wegmans to confirm this, and am in the process of doing so**]

Regarding the remaining requests, Wegmans stated it was not prepared to discuss them. Wegmans agreed to review the parties' prior correspondence, including the PBM Defendants' February 28, 2025 letter which summarized the parties' negotiations and proposals, and would be prepared to offer its response to our February 28 proposals this week. [**JMA: Wegmans is focusing on your DUR question and preparing a declaration. We understand that's your priority, and so we have made it ours**].

The parties agreed to discuss next steps on October 3, 2025. **[JMA: this email captures the current status; there is nothing more to report]**

Thanks,
Anthony

**Joshua M. Agins**
Partner
Hodgson Russ LLP

Tel: 585.454.0759
Fax: 585.423.5910



Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Wednesday, October 1, 2025 11:23 AM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**External Email - Use Caution**

Josh,

Below is a brief summary of our September 22, 2025 meet and confer, with some additional questions it would be helpful to have answered on this week's call. Let us know if any of the below is inaccurate.

Regarding Request No. 1 (concerning dispensing data), you stated that you were unsure whether Wegmans would be able to export specific data fields using EnterpriseRX or any other system, and that the feasibility of any production would depend on the specific fields sought. You stated that to the extent the PBM Defendants identify specific field(s) of interest that they don't already have, Wegmans would be willing to investigate whether it would be feasible to produce that information. You further stated that you believed much of Wegman's data may be held in a cloud-based system operated by McKesson.

Regarding Request No. 2 (concerning DUR data), you stated that Wegmans did not intend to produce DUR data for various reasons despite Special Master Cohen's order regarding the production of DUR data from other pharmacies. Wegmans stated it did not believe that the language of the request covered DUR data, and further stated that it believed that production of DUR data for two prescriptions was adequate to resolve the request.  The PBM Defendants stated, as they did in prior briefing which was provided to Wegmans, that the request does encompass DUR data at the prescription level, *i.e.*, how Wegmans' pharmacists responded to a DUR alert for each opioid prescription. The PBM Defendants further stated that, as was made clear by Special Master Cohen's recent order regarding the production of DUR data, the scope of responsive DUR data is all opioid prescriptions dispensed in Monroe County. The PBM Defendants expressed that they were willing to listen to any proposals from Wegmans about the scope of DUR data it was willing to produce, and that they would be willing to consider cost-shifting if appropriate. Wegmans did not provide a response but stated it would discuss the matter internally before responding.

With respect to purported burden, we asked whether Wegmans would be willing to provide an affidavit from a knowledgeable witness attesting to its assertions.  You indicated Wegmans would be willing to do this and had no objection to sending us the proposed language to be included in the affidavit.  Kindly send that before this week's meet and confer.  In this regard, it is our understanding that EnterpriseRx typically allows for reports to be run that would provide the type of data we are seeking.  Kindly advise if Wegmans is currently able to run such reports from EnterpriseRx, and if not, whether it could ask McKesson to do so.

Regarding Request No. 2 (concerning DUR policies or guidance), Wegmans stated that the only responsive policies are the manuals provided by PBMs to Wegmans, and that Wegmans does not have any internal policies about how its personnel should communication with PBMs or PBM point of sale messages.

Regarding the remaining requests, Wegmans stated it was not prepared to discuss them. Wegmans agreed to review the parties' prior correspondence, including the PBM Defendants' February 28, 2025 letter which summarized the parties' negotiations and proposals, and would be prepared to offer its response to our February 28 proposals this week.

The parties agreed to discuss next steps on October 3, 2025.

Thanks,
Anthony

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Thursday, September 18, 2025 7:43 AM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

Anthony and Ryan,

Please see attached. If you would like to discuss this week, I am currently available tomorrow (Friday) between 2:30-5:00 EST. I also have some availability Monday.

Regards,
Josh

**Joshua M. Agins**
Partner
Hodgson Russ LLP

Tel:  585.454.0759
Fax:  585.423.5910



Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Friday, September 12, 2025 8:00 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>

**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

## External Email - Use Caution

Josh: I can be fairly flexible Thursday or Friday. Please advise.

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Anthony Alden
**Sent:** Wednesday, September 10, 2025 3:24 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

Josh: please propose some times next week. We're unwilling to wait beyond then. You'll have had plenty of time to get anything you're going to get from the other pharmacies and there are issued beyond DUR data to discuss anyway.

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

7

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Wednesday, September 10, 2025 2:49 PM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

[EXTERNAL EMAIL from jagins@hodgsonruss.com]

Anthony,

We are reaching out to the national pharmacies to request their briefing and will provide you with a substantive response once Wegmans has had an opportunity to review the materials that led up to Special Master Cohen's order. In the meantime, to answer your immediate question: Wegmans Pharmacy uses EnterpriseRX.

In your 9/4 email, you asserted that my email dated 9/3 contains "misstatements," but you did not elaborate. Please identify those alleged misstatements to that I can understand and address what you think was incorrect.

Please note that I will be in depositions and therefore unavailable for the remainder of this week.

Regards,
Josh

**Joshua M. Agins**
Partner
Hodgson Russ LLP

Tel:  585.454.0759
Fax:  585.423.5910


**Hodgson** |
Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Wednesday, September 10, 2025 3:24 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Cc:** Ethridge, Ryan <ryan.ethridge@alston.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**External Email - Use Caution**

+ Ryan

Josh: I haven't heard from you.  Please provide some times we can talk tomorrow or Friday.

**Anthony P. Alden**
Partner
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

---

**From:** Anthony Alden
**Sent:** Thursday, September 4, 2025 1:06 PM
**To:** 'Agins, Joshua' <JAgins@hodgsonruss.com>
**Subject:** RE: Opioids: Wegmans Subpoena

Josh,

As requested, please find attached the Express Scripts Defendants' subpoenas to Walgreens, CVS, and Walmart , and below a link to the Express Scripts Defendants' submissions to the Special Master regarding production of the pharmacies' DUR data.  We have redacted from the submissions only those few portions that the plaintiffs or pharmacies might consider confidential.  Counsel who took the lead for the pharmacies on this issue are Tara Fumerton (tfumerton@jonesday.com), Anthony Ruiz (ARuiz@zuckerman.com), and Matt Ford (Matthew Ford matthew.ford@bartlitbeck.com).  Feel free to confirm with them that the Special Master's ruling is final, as I've represented.

I don't see the point in litigating the misstatements in your email.  We can discuss them when we next meet and confer if you like.  Please propose some times next week.  That will give Wegmans ample time to consider the briefing, as well as our prior proposals, which it's had for many months.

Finally, you have not answered my question about the system(s) in which Wegmans maintains its DUR data.  Please do so.

Link:  https://qe.sharefile.com/public/share/web-se91db5558e9345a5af4138b8bd48cc9d

Thanks,
Anthony

**Anthony P. Alden**
Partner
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Wednesday, September 3, 2025 6:17 AM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

Dear Anthony,

Please send (1) a copy of Express Scripts' subpoena to the national pharmacies, and (2) the PBMs' briefing. These materials will allow Wegmans to evaluate the extent to which the Subpoena to Wegmans matches the Subpoena to the national pharmacies and the applicability, if any, of Special Master Cohen's ruling. If you are unable to provide the national pharmacies' briefing, please provide contact information for their counsel, and we will contact them. Once we have had a chance to obtain and evaluate the relevant documents, we will advise you of Wegmans' position.

While I understand you would prefer to speak this week, the fact of the matter is that we will not be in a position to do so until we've had adequate time to review the materials that we requested from you eight days ago and which you have not yet provided. And, since you are unable to provide the national pharmacies' briefing, we will need time to confer with their counsel. The PBMs waited almost three months to contact us since Wegmans' last communication to you on June 2 and cannot reasonably expect Wegmans to respond substantively within a matter of days. If the PBMs were facing time pressures, you could have clued us in on the fact that you were actively briefing these issues in front of Special Master Cohen and you could have responded to our prior communication many months ago. Instead, you chose not to engage any further with Wegmans while you briefed these issues with the national pharmacies. This only further reinforces our view that Wegmans is situated quite differently than the national pharmacies and the Cohen ruling likely is inapplicable to Wegmans.

Further, as we noted, Special Master Cohen's ruling is not final because the email chain that you forwarded to us indicates that the national pharmacies intend to appeal the ruling to Judge Polster.

Finally, your assertion that "Wegmans has never provided any evidence to support its contention that it "lacks the resources to compile extensive DUR files" is simply not accurate. On June 2, we sent you a 29-page (single-spaced) communication containing a lengthy discussion of the burden of producing dispensing records. (Note that the header of the communication is dated May 30, but in fact we provided it to you on June 2). Through the process of gathering and providing two exemplar dispensing records, we precisely quantified the burden and showed that the inordinate time required to collect the requested information is prohibitive and, frankly, not possible on a large-scale basis. I attach our prior communication for your convenience and refer you to pages 27-29 under the heading, "The Burden of Producing Dispensing Logs."

We look forward to your prompt provision of the requested materials.

**Joshua M. Agins**
Partner
Hodgson Russ LLP

Tel:  585.454.0759
Fax:  585.423.5910


Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

---

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Tuesday, September 2, 2025 7:43 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Subject:** RE: Opioids: Wegmans Subpoena

### External Email - Use Caution

Josh:  I am happy to provide you with ESI's submissions to the Special Master concerning our request for DUR data to Walgreens, CVS, and Walmart, but we might have to redact certain portions for information they might consider confidential.  We'll get those to you tomorrow.  Given the submissions were not publicly filed, we do not feel comfortable giving you the pharmacies' submissions but are happy to provide you with contact details for their counsel should you wish to ask them for it or for permission for us to share the submissions.

As to alleged burden, Wegmans has never provided any evidence to support its contention that it "lacks the resources to compile extensive DUR files." In what system or systems does Wegmans store its DUR data? And why do you say the Special Master's email ruling is not final?

Let's put something on calendar for Thursday or Friday to see if we can reach any agreements on the outstanding items.  Given our discovery cut-off, we'll have to go to the Special Master If we cannot reach a compromise.  Please propose some times.

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Friday, August 29, 2025 3:16 AM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

Anthony,

At this time, we are not able to provide you Wegmans' position regarding the DUR data. You sent me Special Master Cohen's email ruling, but that ruling is not final, and perhaps more importantly, the ruling presumes the parties' knowledge of the scope of the requests and the arguments made by the parties in their "multiple rounds of briefing." Without access to the briefing accompanying that ruling (which we do not have), there is no way for Wegmans to understand precisely what Special Master Cohen has ordered the national pharmacies to produce, or whether the ruling has any relevance to a pharmacy like Wegmans. If you send the briefing and transcripts, we can review and get back to you on whether Wegmans' position changes. If Express Scripts believes the July 28 ruling has any relevance to Wegmans, we see no reason for Express Scripts to withhold the very briefing that would help us to understand the scope of the ruling and its rationale.

Express Scripts also appears to be ignoring the obvious differences between Wegmans and the national pharmacies. Unlike the national pharmacies, Wegmans has not engaged in party discovery in any opioid litigation and has produced no data. And unlike the national pharmacies, Wegmans lacks the resources to compile extensive DUR files. On June 2, in a good faith effort to help Express Scripts understand how Wegmans maintains its data, we provided you with two exemplar prescription records, including the cDUR and DUR fields, with an extensive discussion of what those prescriptions show and how Wegmans maintains and collected them. As you know from the information we provided, collecting DUR information requires Wegmans to go through a manual, prescription by prescription process, which took approximately 15 minutes for each of the two exemplar prescriptions that we provided to you. Notably, we have heard nothing from Express Scripts since sending you that information almost three months ago. It is simply untenable to think Wegmans could even begin to comply with an order that was intended for the national pharmacies.

Once again, we reiterate our request for copies of the briefing and hearing transcript(s) that led up to Special Master Cohen's July 28 ruling so that Wegmans can understand the context and work with Express Scripts in good faith toward a resolution.

As for the "proposals" mentioned in your email regarding the "other categories," we will need to dig back through the history given the fact that we have heard nothing from you in many months and our prior communications (which last occurred in June) had focused on prescription data, which has been Express Scripts' stated focus during most of our conferral efforts. We will respond regarding the other requests separately.

**Joshua M. Agins**
Partner
Hodgson Russ LLP
Tel: 585.454.0759
Fax: 585.423.5910


Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Tuesday, August 26, 2025 6:11 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Subject:** RE: Opioids: Wegmans Subpoena

## External Email - Use Caution

Is Wegmans not going to produce the DUR data, as requested?

Can you also let me know Wegmans' position on the other categories we requested?  We made some proposals but don't think we heard back.

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Agins, Joshua <JAgins@hodgsonruss.com>
**Sent:** Tuesday, August 26, 2025 3:01 PM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Subject:** RE: Opioids: Wegmans Subpoena

**[EXTERNAL EMAIL from jagins@hodgsonruss.com]**

Anthony,

Please send a copy of the briefing and any hearing transcripts leading up to Special Master Cohen's ruling.

Thanks,

Josh

**Joshua M. Agins**
Partner
Hodgson Russ LLP

Tel: 585.454.0759
Fax: 585.423.5910


Twitter | LinkedIn | website | e-mail

1800 Bausch & Lomb Place |
Rochester, NY 14604

---

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Sent:** Tuesday, August 26, 2025 12:57 PM
**To:** Agins, Joshua <JAgins@hodgsonruss.com>
**Subject:** Opioids: Wegmans Subpoena

## External Email - Use Caution

---

Hi Josh,

I just tried your line but got voicemail.  As I alluded to in my message, on July 28, 2025, Special Master Cohen in the MDL ordered Walgreens, CVS, and Walmart to produce their electronic DUR data records, including due diligence data, for all opioid prescriptions they dispensed in Monroe and St. Lawrence Counties, New York, including those paid by cash or adjudicated by PBMs other than Express Scripts and OptumRx.  The Special Master ordered these productions to be made in response to substantially similar document requests to those contained in the PBM Defendants' subpoena to Wegmans.  On August 20, 2025, the Special Master denied these pharmacies' motion for clarification, and their right to object to the ruling has now passed.  I attach the Special Master's rulings for reference.

Having studied the sample data Wegmans made available only for viewing, Express Scripts asks that Wegmans produce DUR data consistent with the Special Master's July 28 and August 20 rulings.  Absent such confirmation, we intend to seek a corresponding ruling compelling Wegmans to do so.  If you would like to discuss the matter, please propose some times this week.

Thanks,
Anthony

**Anthony P. Alden**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3159 Direct
213-443-3000 Main Office Number
213-443-3100 Fax
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*