# EXHIBIT B



Joshua M. Agins
Partner
Direct Dial: 585.454.0759
Direct Facsimile: 585.423.5910
*JAgins@hodgsonruss.com*

November 21, 2025

***By E-Mail***

David R. Cohen
24400 Chagrin Blvd., Suite 300
Cleveland, OH 44122
www.SpecialMaster.law

> Re: *In re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio)
> *City of Rochester v. Purdue Pharma L.P.*, No. 19-op-45853 (Track 12)

Dear Special Master Cohen:

I write on behalf of Wegmans Food Markets, Inc. in response to Express Scripts and Optum Rx's November 7, 2025 letter-motion to compel Wegmans to produce data and documents pursuant to the PBMs' Third-Party Subpoenas in the *City of Rochester v. Purdue Pharma, L.P. et. al.* No. 19-op-45853 (Track 12).[1]

## I.     Introduction

The City of Rochester sued the PBMs for the creation of a public nuisance arising from *their* conduct as pharmacy benefit managers. Compl., Index No. E2019005178 (Monroe Cnty. Sup. Ct.), NYSCEF Doc. No. 2 (June 5, 2019), attached as **Exhibit 1.** As its counsel has made exceedingly clear, the City's theory of the case and corollary "red flag" analysis "is based on the "**point of sale analysis that . . . should have been done** *by the PBMs* **at the time they are contacted for the purposes of payment approval.**" Remote Status Conf. Call Before Special Master D. Cohen Tr. at 19:22-20:3 (Jan. 6, 2025) ("1/6/25 Transcript") (emphasis added), attached as **Exhibit 2**. The City further contends that the PBMs' failure to conduct an appropriate "red flag" analysis was a cause of a public nuisance in the City. *See* Rochester Suppl. & Am. Allegations ¶¶ 545-83, 1:19-op-45853-DAP, MDL 2804 (N.D. Ohio Mar. 6, 2024), Doc No. 110 ("Amended Complaint"), attached as **Exhibit 3**. The City's public nuisance claims are based upon the PBMs' conduct, not their market share.

The City also sued (and settled with) Walgreens, CVS, and Wal-Mart, (the "National Pharmacies") in this matter, arising from allegations they (1) failed in their duties as Distributors to prevent diversion of opioid drugs and (2) failed in their duty as Dispensers by dispensing "red flag" prescriptions that were issued without a legitimate medical purpose. *See* Ex. 1, Compl. ¶¶ 225-26, 231-35, 386-474, 1105-43.

---

[1] The PBMs' November 7, 2025 letter-motion is referred to herein as the "Motion."



In their Motion, the PBMs define the National Pharmacies as "the Other Pharmacies" as they attempt to convince this Court that Wegmans is the "same," "no different," or has greater "market share" than the National Pharmacies in the City of Rochester.  Mot. at 2, 4 (e.g., "The Court's prior decision on DUR data *applies with equal force* to …[Wegmans]"; "It would make little sense if . . . [Wegmans] . . . was not ordered "to produce *the same DUR* data *that pharmacies with smaller market share* were ordered to produce"; "*Other Pharmacies* had to *collect and produce* the data from scratch" (emphasis added)).

The PBMs' strategy ignores a fundamental difference between the National Pharmacies and Wegmans.  The pharmacy management systems used by the National Pharmacies apparently allowed them to "collect and produce" the requested "DUR data."  Mot. at 4.  Wegmans does not know how the National Pharmacies collect DUR data in their various roles as Distributors, Dispensers, and Defendants in this MDL.  Unlike the National Pharmacies, Wegmans *does not* maintain the requested DUR data as part of a database that it can simply "collect and produce."

In sum, the PBMs ask this Court to do something it has never done in the history of this MDL:  order a third-party to *create* a data set from messages and other information that Wegmans does not maintain for any clinical or business reason, solely for the purpose of this litigation.  As discussed in detail below and reflected in the Appendix attached, Wegmans does not maintain DUR messages as disaggregated data, it does not have a "DUR data set," and does not know if one could be created.

## II.    Wegmans' (Lack of) Role in the Opioid Litigation

Wegmans has never been a defendant in this case, and for good reason.  In fact, Wegmans is not a defendant in any active opioid litigation.

Recognizing the tenuous nature of their subpoena requests, and in an effort to justify the immense burden and intrusion on Wegmans' business, the PBMs grossly overstate Wegmans' "market share" for the purchase of opioids within the City of Rochester. Wegmans operates a single pharmacy in the City, located at 1750 East Avenue.  *See* Ltr. from J. Agins to R. Ethridge & A. Alden at 6 (Sept. 18, 2025) ("9/18/25 Ltr."), attached as **Exhibit 4.**  ARCOS data reflects that this *pharmacy purchased just 5% of all opioids dispensed in the City of Rochester between 2006 and 2019*—hardly the "central" role the PBMs represent to this Court.  *See ARCOS Data Portal*, Univ. Notre Dame, https://arcos.nd.edu/.[2] Wegmans is unable to retrieve market share data for *all* drugs dispensed prior to 2019 at this time, but its currently available data shows that, for the fourth quarter of 2019, Wegmans' total market share in the City for *all drugs* that its pharmacy dispensed was in the range of 23-24%.  *Id.*  This means that Wegmans' 5% share of the opioid market is significantly lower than its overall share of the pharmacy market.  *Id.*

Moreover, Wegmans has never registered as a Distributor or acted as one under the Controlled Substances Act ("CSA").

---

[2]  The PBMs incorrectly state that Wegmans operates 16 pharmacies that have purchased approximately 30% of the opioids within the City of Rochester. Mot. at 1.



Additionally, the PBMs' prominent, yet misleading description of Wegmans—starting at page 1 of their Motion—reflects a fundamental lack of understanding of the important role that Wegmans, and the Wegmans family, play in the economy and health care system in the City of Rochester. *Cf.* Mot. at 1-2. Accordingly, a more accurate description is in order.

Wegmans is a private, family run grocery business, owned and operated by the Wegmans family since its inception in Rochester in 1916.[3] Wegmans is proud to be one of the largest employers in Rochester. It should be no surprise that 85% of Wegmans' business is from grocery sales. In contrast to the PBMs' misleading and inaccurate characterization of Wegmans, less than 4% of the company's profits derive from its pharmacy business.

Wegmans has been one of the most substantial benefactors of the Rochester community over many decades.[4] Among its many charitable contributions, Wegmans has provided Foodlink, a local Feeding America Foodbank, with over $18.5 million of groceries at no cost annually. Wegmans also has supported the education, training, and development of people in need within the Rochester community through more than $160 million in financial support. In addition to financial support to Rochesterians in need, Wegmans has a Work Scholarship Program that has supported over 5,000 at-risk high school students reach a nearly 100% graduation rate through employment, mentorship, and advocacy.

Customers choose Wegmans pharmacy due to the overwhelmingly high quality of its people and level of service. Indeed, Wegmans received recognition as the J.D. Power #1 Supermarket Pharmacy in America in the years 2008, 2009, 2015, 2018, 2019, 2020, and 2025.[5] In the 2025 survey, for example, Wegmans ranked:

- #1 with our people
- #1 Pharmacy offerings meet my needs (medication & health and wellness services)
- #1 Resolving problems or complaints
- #1 Able to get prescriptions how/when I want
- #2 Digital channels (website, mobile app, text)
- #2 Helping me save time or money
- #2 My level of trust with pharmacy

---

[3] *Wegmans: A Family Company Since 1916* at 5, Wegmans, https://images.wegmans.com/is/content/wegmanscsprod/6623167_tmg_GrandOpeningHistorypdf?_gl=1*1w0ly4d*_gcl_au*MjA5MjA2NjI0Ny4xNzU5MTcyNzUz (last accessed Nov. 21, 2025).

[4] *See, e.g., Giving Back, Together*, Wegmans, https://www.wegmans.com/values-in-action/community-giving; Sara Miller, *Wegman Foundation Gives $17 million to University, Univ. of Rochester*, UNIVERSITY OF ROCHESTER (Apr. 1, 2014), https://www.rochester.edu/newscenter/wegman-foundation-gives-17m-to-rochester/.

[5] *See Chain Drug Store Closures Create Big Opportunities for Supermarkets, Mass Merchandisers and Online Pharmacies, J.D. Power Finds*, J.D. POWER (July 29, 2025), https://www.jdpower.com/business/press-releases/2025-us-pharmacy-study.



*Id.* Wegmans pharmacy's Net Promoter score (measured by J.D. Power) currently is the second highest of any pharmacy in the country.[6] This is due in large part to Wegmans' consistent investment in its people, including significant pharmacy investments in central services (e.g., call center), industry-leading staffing of its pharmacy, and the latest digital tools that allow customers to interact with pharmacy teams for the prescription needs through online, text, and home delivery services.

All of this is despite the fact that Wegmans' pharmacy business is largely unprofitable, especially with regard to opioid prescriptions. In fact, Wegmans loses on average approximately $3.58 each time it dispenses an "MDL-8 Opioids" prescription adjudicated by one of the "Big 3" PBMs (Caremark, ESI, and Optum) in Rochester. The low margins and even losses in its pharmacy business—in particular opioids—are in large part the result of predatory reimbursement policies imposed by PBMs.[7] This is because 91% of the prescriptions Wegmans dispenses are in conjunction with the PBMs. **Appendix A ¶** 3.[8] And all too often Wegmans pays more for an "MDL—8 Opioid" drug than it receives in reimbursement from the PBMs.

The PBMs' Motion also reflects their lack of understanding of the health care challenges facing the City. After the recent closure of five Walgreens pharmacies and all Rite Aid locations (due to bankruptcy), the City of Rochester is on the fast track to becoming a pharmacy desert.[9] In contrast, Wegmans is actively onboarding patients displaced by Walgreens' and Rite Aids' departure from the City. Compliance with the Subpoena Requests, as newly interpreted and broadened by the PBMs, would severely burden and interfere with Wegmans pharmacy

---

[6] Net Promoter Score is a market research metric based on a survey asking respondents to rate the likelihood that they would recommend a company, produce, or service to a friend or colleague.

[7] *See, e.g., Skyrocketing Prescription Drug Costs, a "Life or Death Matter," Says Cantwell*, U.S. Sen. Comm. on Commerce, Science, & Transportation (Feb. 17, 2023) https://www.commerce.senate.gov/2023/2/skyrocketing-prescription-drug-costs-a-life-or-death-matter-says-cantwell ("PBMs have the power to dictate how much people pay for their prescriptions, how they can access their prescriptions, and can even dictate what type of treatments people can receive."); Fed. Trade Comm'n, Off. of Policy Planning, *Pharmacy Benefit Managers: the Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, at 1-4, July 2024, https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf ("PBMs also exert substantial influence over independent pharmacies, who struggle to navigate contractual terms imposed by PBMs that they find confusing, unfair, arbitrary, and harmful to their businesses.").

[8] Wegmans submits facts to support its position in Appendix A, attached to this letter. If the Court prefers that Wegmans submits the facts in Appendix A as a sworn declaration, Wegmans can provide such upon request.

[9] *See* Alefiya Presswala, "Pharmacy coalition responds to Rite Aid closures," Rochester Beacon (June 23, 2025), https://rochesterbeacon.com/2025/06/23/pharmacy-coalition-responds-to-rite-aid-closures/.



department operations and adversely affect patient care to a degree that simply cannot be overstated.

The PBMs' Motion also rests on several speculative assumptions about Wegmans technical capabilities that are simply wrong. The PBMs' false assumptions are summarized below and explained in detail in the remainder of this letter and its Appendix A.

- The PBMs state, wrongly, that Wegmans maintains and uses exportable "DUR data" in its normal course of business. Mot. 4-5. This is flatly incorrect, as Wegmans has informed them repeatedly. 9/18/25 Ltr. at 2. Wegmans does not store or extract disaggregated DUR data in its normal course of business. *Id.* Wegmans should not be compelled to create such data sets, for the same reasons that the Court recently adopted when shielding the PBMs from discovery of remuneration information demanded by the City.

- The PBMs speculate that Wegmans should be capable of producing certain data merely because the National Pharmacies did so. Mot. at 2-5. Not so. The National Pharmacies use different, bespoke pharmacy management software systems that they designed themselves from the ground up. 9/18/25 Ltr. at 2. In contrast, Wegmans uses a McKesson system that is designed for clinical use, not for litigation. *See* App'x A ¶¶ 2, 7-14.

## III.   Background on the Subpoena

After the Court held a status conference in January, Wegmans and the PBMs spent the spring of 2025 focusing on Requests Nos. 1 and 2. Those negotiations culminated on June 2, 2025, with Wegmans providing a fulsome explanation of how it uses the EnterpriseRx Pharmacy Management System to communicate with the PBMs and satisfy the terms of the PBMs' Pharmacy Network Agreements and Pharmacy Provider Manuals. *See* 9/18/25 Ltr. (attaching June 2, 2025 correspondence, Ex. 1 to App'x A). Wegmans produced 56 pages of screenshots, as well as the 29-page, step-by-step discussion of how Wegmans uses EnterpriseRx to receive and review DUR alerts, clinical edits, and clinical messages in its ordinary course of business. *Id.* These screenshots demonstrated how a Wegmans pharmacist considers, uses, responds to, and interacts with point-of-sale communications from the PBMs, and therefore satisfied Request No. 2, which seeks only documents "sufficient to show" Wegmans' pharmacists' communications with the PBMs at the point of sale ("POS"). *Id.*

**Request No. 2**

The PBMs then went silent for nearly three months over the entire summer, without any further communications or notice until the end of August, when they resurfaced with a new discovery request based on the Court's recent ruling requiring the National Pharmacies to produce their DUR data. Specifically, the PBMs argued Request No. 2, which seeks documents "sufficient to show" Wegmans' pharmacists' communications with the PBMs at the POS, somehow requires Wegmans to produce *all* DUR data documentation (not just enough "sufficient to show . . ."). *See*



Email from A. Alden to J. Agins (Oct. 1, 2025), Mot. Ex. 12 at 13. When Wegmans requested the briefing on the National Pharmacies' ruling to assess this new request, the PBMs only provided *their* highly redacted briefs—not those from the National Pharmacies.

Nonetheless, based on the PBMs' highly redacted briefing alone, on September 18, 2025, Wegmans sent a letter to the PBMs outlining why the Court's ruling as to the National Pharmacies' DUR data had no application to Wegmans. *See* 9/18/25 Ltr. at 5-8. Specifically, Wegmans explained—and as further detailed below and in Appendix A—it does not create or maintain "DUR data" in bulk or aggregate form in the ordinary course of business. *Id.* It has no clinical or business reason to do so. *Id.* There is no "DUR" database, "dynamic" or otherwise. *Cf.* Mot. at 5.

The parties met and conferred on October 3, 2025. Wegmans agreed to provide a more fulsome explanation as to the burden in producing the DUR data documentation as the PBMs requested. Wegmans was in the process of preparing that additional explanation when the PBMs went completely silent for two weeks, then filed their Motion without any notice or conferral attempts.

### Request No. 1

When the PBMs resurfaced in August after three months, they also explained that they had received Wegmans' dispensing data from the New York Prescription Monitoring Program ("NYPMP"). Request No. 1, which sought Wegmans' dispensing data, therefore became moot. Nonetheless, on October 9, 2025, the PBMs requested Wegmans produce its data concerning the opioid prescriptions it dispensed that were paid for in "cash" (i.e., not through a third-party insurer or a discount card). *See* Mot. Ex. 12 at 7-8.

These "cash" prescriptions, which by definition do not involve PBMs, are clearly outside the scope of the City's "point of sale" claims against the PBMs. The PBMs have not articulated the relevance of cash prescription data, because they cannot. Wegmans was also in the process of preparing a letter outlining its position on why information on "cash" prescriptions dispensed is not relevant to Track 12 when the PBMs filed this Motion without notice.

### Remaining Requests

When the PBMs resurfaced in late August, they also decided to re-assert the subpoena requests they had not raised in any way for five months. *See* Mot. Ex. 10 at 4. The PBMs asked Wegmans to review the compromise proposals Wegmans and the PBMs exchanged in January and February of 2025 and provide its current position. *Id.* at 2. Wegmans provided its position on October 24, 2025. *See* Ltr. from J. Agins to R. Ethridge & A. Alden (Oct. 24, 2025) ("10/24/25 Ltr."), attached as **Exhibit 5**. In that letter, Wegmans agreed to produce documents in response to Request Nos. 3 through 12, with the appropriate geographic and temporal scope. *Id.* Wegmans did not receive a response until the PBMs filed their Motion with no notice or requests for conferral.



The PBMs and Wegmans' positions on each Subpoena request are laid out in the chart below.  Wegmans also lays out its grounds for objecting to certain overbroad and burdensome documents requests below.

| Request No. | PBMs' Current Position | Wegmans' Position |
|---|---|---|
| 1 | Received responsive documents from NY-ISTOP PMP Prescription Monitoring Registry.  Now seeking data for "cash" prescriptions. | By definition, data for "cash" prescriptions Wegmans dispensed has no relevance to Track 12 and would be highly misleading and prejudicial. |
| 2 | Now re-interprets documents "sufficient to show" how Wegmans pharmacists interact with the PBMs at POS to mean *all* DUR data documentation in Monroe County. | Wegmans produced exemplars of how its pharmacists communicate with the PBMs at POS.  These exemplars satisfy Request No. 2.  Wegmans had indicated a willingness to produce another limited set of relevant exemplar prescriptions for additional years but the PBMs appear disinterested in additional exemplars.<br><br>Wegmans will also produce any policies or procedures its pharmacy department has on POS communications from the PBMs from 2006 to July 2024. |
| 3 | Agreement to hold in abeyance. | |
| 4 | Seeks guidance, directives, instructions, publications, alerts, notices, presentations, or other materials Wegmans provided to Employees working in its City of Rochester stores concerning opioids from 2006 through 2019. | Documents sought have no relevance to Track 12.<br><br>Wegmans will produce any policies or procedures its pharmacy department has on POS communications from the PBMs from 2006 to July 2024. |
| 5 | Agreement that Wegmans has no responsive documents. | |
| 6 | **Agreement**: Wegmans will search for any written policies describing when, and under what circumstances, its pharmacist would consult with the NY PMP, and would agree to produce such policies, if any. | |
| 7 | Seeks *all* documents and communications with the law enforcement or regulatory bodies from 2006 through July 2024 concerning improper dispensing by prescribers or opioid abuse/diversion in the City of Rochester. | Will produce documents *sufficient to identify* internal investigations or reporting to law enforcement or regulatory bodies concerning improper dispensing/opioid diversion in the City of Rochester from 2006 to the date of the subpoena, July 2024. |
| 8 | **Agreement**: Wegmans will collect and produce documents concerning actions taken by Wegmans against employees in the City of Rochester concerning relevant opioids from 2006 through July 2024. | |



| 9 | **Agreement**: Wegmans will produce DEA Form 106s and other similar documentation for the City of Rochester from 2006 through July 2024. | |
|---|---|---|
| 10 | Seeks documents/communications concerning criminal or regulatory fines imposed or administrative actions against pharmacies in the City of Rochester, documents reflecting when law enforcement made inquiries to Wegmans about prescribers/patients in the City of Rochester and Monroe County, and audits or other documents concerning any investigation by state or federal agencies into Wegmans' policies/practices related to the dispensing of opioids. | PBMs' request is overbroad. Wegmans will produce any documents/communications concerning regulatory fines imposed or administrative actions against its pharmacies in the City of Rochester with respect to its opioid dispensing policies from 2006 through July 2024, to the extent any exist. |
| 11 | Same as No. 10 | Same as No. 10 |
| 12 | All agreements between Wegmans and opioid manufacturers and/or distributors from 2006 to the present. | All contracts with opioid manufacturers and distributors, subject to any third-party notice or confidentiality provisions, to the extent they concern Wegmans' pharmacy in the City of Rochester between 2006 and July 2024. |

## IV. Scope of Subpoena

### A. Geographic Scope is the City of Rochester.

The Plaintiff in Track 12 is the City of Rochester, not Monroe County. Am. Compl. ¶¶ 99-105. The City characterizes the scope of the opioid epidemic in Rochester as "[p]eople from outside of the community [] traveling to parts of the city to buy and use opioids as well as commit crimes – and the residents and businesses are suffering the consequences."[10] Additionally, the City's alleged injuries are costs for public services expended to combat the opioid epidemic *in the City. See* Am. Compl. ¶¶ 590-591, 720, 752-53, 813, 835, 838.

Monroe County is a separate political body from the City of Rochester. Every Wegmans pharmacy referenced in the PBMs' Motion, with the exception of the East Avenue location, is located within Monroe County, not the City. App'x A ¶ 4. Indeed, Monroe County has filed its own separate lawsuit against the PBMs regarding conduct occurring in Monroe County. *See* Short Form Compl., add. ¶¶ 88-99, *County of Monroe v. Purdue Pharma L.P., et al.,* Index No. 75026/2022 (Westchester Cnty. Sup. Ct.), NYSCEF Doc. No. 58 (April 18, 2024), attached as

---

[10] "City of Rochester: Addressing the Opioid Crisis,"
https://www.cityofrochester.gov/departments/mayors-office/opioid-settlement-spending-plan
(last visited Nov. 11, 2025).



**Exhibit 6**. The case is currently pending in Suffolk County. *See In re Opioid Litig.,* Index No. 400000/2017 (Suffolk Cnty. Sup. Ct.).

Therefore, the PBMs' requests for documents or information concerning matters outside the City of Rochester are overbroad. *See, e.g., City of Ecorse, v. U.S. Steel,* 2007 WL 4239263, at *3 (E.D. Mich. Dec. 3, 2007) (denying motion to compel answering interrogatory to extent it sought information outside the scope of the City of Ecorse, the plaintiff in the case). The PBMs have not articulated a reason for why they need information about opioids dispensed outside the City. In fact, in previous correspondence the PBMs agreed that the scope should be the City of Rochester. Ltr. from A. Alden to J. Agins at 5 n.4 (Dec. 13, 2024) ("12/13/24 Letter"), attached as **Exhibit 7.** For example, last December the PBMs stated: "As part of their efforts to compromise, the ***PBM Defendants have already told Wegmans that they would limit the geographic scope to the City of Rochester itself, rather than Monroe County in which Rochester sits.*" Id.* (emphasis added).[11]

Last, Wegmans has explained that it only has one pharmacy location within the City. 9/18/25 Ltr. at 6 (stating Wegmans' East Ave. location is "*the only* Wegmans pharmacy located in the City of Rochester"). Thus, the PBMs' representation that Wegmans has 16 pharmacy locations in Rochester, Mot. at 1, is wrong. Whether intentionally or by ignorance, the PBMs conflate a "Rochester" mailing address as being within the municipal bounds of the City. *Cf. id.* But the City of Rochester is its own subdivision, shown below, and does not include any Wegmans pharmacies other than the one on East Ave:

---

[11] *See also,* 12/13/24 Letter, Ex. 7 at 1 ("It is important, then, that the PBM Defendants obtain data and other documents concerning Wegmans' dispensing of opioids *in Rochester.*") (emphasis added); *id.* at 2 ("[T]he PBM Defendants are entitled to information related to the retail pharmacies on the ground *in Rochester,* such as Wegmans (the largest purchaser of prescription opioids among such pharmacies.") (emphasis added); *id.* at 3 (Discussing Request Nos. 1 & 2: "Evidence of Wegmans' conduct on those issues will show that the PBM Defendants were not the cause of alleged over-dispensing *in Rochester.*") (emphasis added); *id.* (Discussing Request Nos 1 & 2: "The PBM Defendants simply do not possess the data Wegmans has concerning its dispensing of opioids *in Rochester.* Wegmans' dispensing data is critical for the PBM Defendants to know what was dispensed *in the City,* to whom, why, and when.") (emphasis added); *id.* at 5 n.4 (Discussing Request Nos. 5, 6, & 7: "As part of their efforts to compromise, the ***PBM Defendants have already told Wegmans that they would limit the geographic scope to the City of Rochester itself, rather than Monroe County in which Rochester sits.*") (emphasis added); *id.* at 6 ("Request No. 9 seeks documents related to theft, loss, or diversion of drugs within the Drug Scope from Wegmans' pharmacies *in Rochester.*") (emphasis added); *id.* (Discussing Request Nos. 8-11: "As the retail pharmacy that bought approximately 30% of the opioids purchased *in Rochester* during the relevant time period, the PBM Defendants anticipate that Wegmans' documents will reflect commensurate percentage of the diversion and/or misuse of those drugs, providing a fuller picture of the alleged opioid crisis *in Rochester.*") (emphasis added).





The patient population served by the East Ave. pharmacy is concentrated in the southeastern portion of the City rather than the areas to the north and northwest, which were among the areas of the City impacted the most by opioid use. App'x A ¶ 5. As an example, according to the New York State Opioid Dashboard, for the year 2016, the highest rate of opioid deaths in the City occurred in zip codes 14614, 14604, and 14605.[12] That same year, Wegmans' East Ave. pharmacy dispensed opioid medication to a total of six, sixteen, and seven patients respectively in those hardest-hit City zip codes. *See* App'x A ¶ 6.

### B. Temporal Scope is January 1, 2006 to July 2024.

While the PBMs have generally agreed with this stated temporal scope, some of their requests still seek documents going back to 1996. *See* Mot. at 9 (arguing Wegmans should produce documents in response to Request Nos. 10 and 11 "from January 1, 1996 to present"). The PBMs provide no justification for such an overbroad time frame. Until the PBMs articulate why they need documents going back *nearly thirty years*, Wegmans sees no reason to go through the burdensome task of searching its old records.

---

[12] *New York State Opioid Data Dashboard*, N.Y. State Dep't of Health, (April 2025) https://apps.health.ny.gov/public/tabvis/PHIG_Public/opioid/reports/#county.



### C. Subject Matter of the City of Rochester's Public Nuisance Claim is about the *PBMs' Conduct*, not Wegmans Dispensing Conduct. So too then is the Subpoena.

On June 5, 2019, Rochester filed a Verified Complaint alleging the PBMs participated in the creation of a public nuisance arising from their conduct as pharmacy benefit managers. Compl. ¶ 44. The PBMs' alleged conduct includes: (1) providing favorable placement to opioids on national formularies in exchange for rebates and other fees from opioid manufacturers, (2) limiting the use of utilization management measures for opioids, (3) misrepresenting opioids as "safe and effective," (4) conspiring with opioid manufacturers in deceptive marketing of opioids, (5) using their research and data to expand the opioid market, (6) failing to use their claims data to address overprescribing, abuse, and diversion of opioids, (7) failing to use their formulary offerings and data to provide effective controls against diversion of opioids, and (8) promoted uncontrolled opioid sales through its cash card and discount card businesses. Am. Compl. ¶¶ 269-76, 294-95, 309-21, 330-50, 354, 378, 391-92, 422, 484-85, 500-06.

Rochester *also* contends that the PBMs' conduct as mail-order pharmacies violated the CSA by failing to identify and resolve "red flags" to verify that opioid prescriptions that the PBMs dispensed were written for a "legitimate medical purpose." *Id.* ¶¶ 543-83. In support of its dispensing allegations against the PBMs, Rochester cites the CDC's 2016 recommendations for clinicians who prescribe opioids outside of cancer treatment, palliative care, and end of life care:

> In March 2016, the CDC, to reduce opioid addiction, overdoses, and deaths, published recommendations for clinicians who prescribe opioids outside of cancer treatment, palliative care, and end-of-life care. The CDC recommendations are based on "[s]cientific research [that] has identified high-risk prescribing practices that have contributed to the overdose epidemic (e.g., high-dose prescribing overlapping opioid and benzodiazepine prescriptions, and extended-release/long-acting opioids for acute pain).

*Id.* ¶ 507. Rochester also cites a 2017 report attributing "illegal pharmacy dispensing practices" to have played a role in the opioid epidemic. *Id.* ¶ 508.

In other words, Rochester's dispensing claims are *not* based upon the PBMs' "market share" of prescriptions dispensed in Rochester. Instead, the City's dispensing claims are based upon allegations that the *PBMs* (and no one else) dispensed illegitimate prescriptions by failing to properly exercise their "corresponding responsibility" to:

> recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates the pharmacist *to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing.* A pharmacist's corresponding responsibility extends to the pharmacy itself.

*Id.* ¶ 531 (emphasis added).



At the January status conference, Rochester's counsel, Peter Weinberger, confirmed that the scope of Rochester's "red-flag" dispensing claims is limited to whether the PBMs, and no one else, failed to exercise the PBMs corresponding responsibility to recognize and resolve "red flag" prescriptions. *See* 1/6/25 Tr. at 19:22-20:3 (explaining the City's "red flag" analysis "is based on the "point of sale analysis that . . . should have been done *by the PBMs* at the time they are contacted for the purposes of payment approval." (emphasis added))

In sum, the City's claims rest on the PBMs' *independent* duty to exercise their corresponding responsibility in dispensing prescriptions. Wegmans' conduct has no bearing on the City's claims against the PBMs. Thus, Wegmans sees no reason why it should produce documents that have no bearing on the PBMs' conduct.

## V.  **Wegmans' Position on Subpoena Requests in Dispute**

Wegmans outlines its position as to the remaining disputed Subpoena Requests. Wegmans notes the unfair prejudice it has as a non-party to this MDL. Unlike the PBMs (or the National Pharmacies), Wegmans is blind to discovery disputes not on the public docket. It is therefore in the dark as to how this Court has ruled on all similar discovery disputes. Nonetheless, the discovery pleadings Wegmans has been able to access—along with black letter law—support Wegmans' position.

Wegmans has made reasonable requests to the PBMs for documents necessary to understand this Court's previous rulings. *See, e.g.,* Mot. Ex. 10 at 1-3. Wegmans' requests were to no avail. Wegmans requested (1) the briefing leading up to this Court's July 28, 2025 DUR ruling between the PBMs and the National Pharmacies; (2) the briefing including a letter attachment from Olga Vieira leading up to this Court's October 2, 2024 discovery decision as to the PBMs requirement produce certain remuneration information; (3) a spreadsheet of the NYPMP data the PBMs received, only concerning Wegmans; (4) the protective order or other documentation that provides a basis for the PBMs' refusal to send Wegmans a copy of the data Wegmans apparently submitted to the NYPMP; and (5) information from the PBMs' experts regarding generating reports through EnterpriseRx, as repeatedly referenced by their counsel. Mot. Ex. 10 at 3; Mot. Ex. 12 at 5, 7, 12. Ironically, although they refused to provide copies (except heavily-redacted copies of their briefs in item #1 above) to Wegmans, the PBMs cite to some of the foregoing documents in their Motion. *See, e.g.,* Mot. at 6 n.22 (citing "Nonparty Pharmacies' Position Paper on EDI Subpoena").

Wegmans reproduces the Subpoena Requests in the order in which the PBMs have brought them to Wegmans' attention since late August 2025.

**Subpoena Request 2:  Documents *sufficient to show how You* and any pharmacists employed by You (or other employees involved in dispensing drugs within the Drug Scope) do or do not consider, use, respond to, or *interact with communications received from pharmacy benefit managers* (including, but not limited to, the Defendants) *at the point of sale*, including, but not limited to, communications regarding plan coverage limits (such as prior authorizations, step edits, and quantity limits) and communications regarding health and safety issues (such**



**as concurrent drug utilization review or CDUR messages), from January 1, 1996, to present. Your response should include documents responsive at both the pharmacy and individual employee level, and should include any pertinent policies, procedures, directives, or guidance. (emphasis added)**

After serving their subpoena, the PBMs explained in great and unequivocal detail that Request No. 2 sought only documents *sufficient to show* how Wegmans communicates with the PBMs at the POS. *See* Ltr. from A. Alden to Wegmans' counsel at 2 (Nov. 11, 2024) ("11/11/24 Letter"), attached as **Exhibit 8** ("*To be clear*: the Request does not seek communications with PBMs, but rather *documents sufficient to show Wegmans' use and reaction to such communications*." (emphasis added)). The PBMs served a substantially similar subpoena to another non-party, Kinney Drugs, in the City of Ogdensburg bellwether and again recently confirmed the limitations on the scope of Request No. 2. *See* Mot. Ex. 9. In a July 15, 2025 correspondence, the PBMs advised Kinney that Request 2 sought "data memorializing *the way* Kinney Drugs' personnel interacted with point-of-sale ("POS") communications from PBMs for opioid prescriptions filled in New York." (Emphasis added). Mot. Ex. 11 at 7-9.

After months of negotiations following the January hearing with Special Master Cohen, on June 2, 2025, Wegmans provided a 29-page complete and comprehensive narrative, which enclosed 56 pages of screenshots showing the prescription record for two exemplar prescriptions. *See* 9/18/25 Ltr. (attaching June 2 correspondence, which is Ex. 1 to App'x). The screenshots from the exemplar prescriptions provided a step-by-step explanation of precisely how Wegmans communicates with the PBMs at the POS. 9/18/25 Ltr. attach. Wegmans' June 2 letter described how (1) Wegmans receives and reviews DUR alerts, clinical edits, and clinical messages from the PBMs, (2) Wegmans uses McKesson's EnterpriseRx Pharmacy Management System software to interact and communicate with the PBMs, and (3) a Wegmans pharmacist considers, uses, responds to, and interacts with POS communications with the PBMs in its ordinary course of business. *Id.* These are the procedures Wegmans must follow to satisfy the terms of the PBMs' Pharmacy Network Agreements and Pharmacy Provider Manuals. *Id.* As the PBMs know, Wegmans cannot dispense a prescription managed by the PBMs without submitting a "clean claim" that has been approved by the PBMs, as reflected in the exemplar prescriptions produced in the June 2 letter. *Id.*

Wegmans' June 2 letter was "sufficient to show how [Wegmans and its pharmacists] … consider, use, respond to, or interact with communications received from pharmacy benefit managers… at the point of sale." The PBMs have never indicated otherwise.

After Wegmans satisfied Request No. 2, the PBMs resurfaced in late August and attempted to expand the scope with a novel interpretation of their "sufficient to show" language in Request No. 2. The PBMs now contend Request No. 2 requires Wegmans to *create a data set* of disaggregated DUR messaging that contains *each and every* DUR alert, clinical edit, and clinical message sent to Wegmans pharmacies in Monroe County since 2006. See Mot. at 3-5. The PBMs argue that Special Master Cohen's July 28, 2025 ruling that the National Pharmacies must produce their DUR data requires Wegmans to do the same. *Id.* On September 18, 2025, Wegmans responded to the PBMs' unsupported and contradictory interpretation of the "sufficient to show"



language in Request No. 2 and explained why the ruling as to the National Pharmacies does not apply to Wegmans.  *See* 9/18/25 Ltr.

### A. The PBMs' Revised Request No. 2 is Contrary to its Plain Meaning and Contrary to the PBMs' Repeated Explanations of its Plain Meaning

First, the information and exemplar prescriptions produced on June 2 satisfied the request for documents "sufficient to show" how Wegmans communicates with the PBMs at the POS. 9/18/25 Ltr. at 4-5, 8-9.  And the PBMs' request for *all* DUR data records for prescriptions dispensed in Monroe County went beyond the scope of Request No. 2.  *Id.*  It is axiomatic that the scope of the subpoena is determined by the language set forth therein.  *See, e.g.,* Fed. R. Civ. P. 45(a)(1)(iii) (requiring every subpoena to "produce designated documents" in the third party's possession, custody, or control).

The PBMs have never explained how their revised request is supported by the plain language of Request No. 2.  In fact, during the September 22 meet and confer, counsel for Wegmans specifically asked the PBMs to explain how "documents sufficient to show" could be interpreted to require the production of "all" DUR information.  The PBMs' only explanation was that Special Master Cohen had interpreted a similar request to be consistent with what the PBMs request now of Wegmans.  But that is not accurate.  Although Wegmans was never provided the full briefing, Wegmans understands that the National Pharmacies agreed, as a compromise, to permit the PBMs to expand the scope of the request after the fact, noting that it was, indeed, an expanded scope.  The National Pharmacies likely acquiesced to the expanded scope only because they are already parties to opioid litigation, already have existing structures in place for the litigation, and have pharmacy management systems that allowed them to easily export this information with little to no burden.  Indeed, the National Pharmacies were originally named as defendants in the City of Rochester's complaint.  *See* Compl. ¶¶ 225-26, 231-35 (naming CVS, Walgreens, and Wal-Mart).  That is not the case for Wegmans.

As discussed above, Wegmans' June 2 Letter satisfies Request No. 2 as it is written, and how the PBMs interpreted it themselves prior to the July ruling as to the National Pharmacies.

### B. The PBMs' Request for All DUR Data Records is Overbroad

Second, the PBMs' request for *all* DUR documentation is not only unsupported by the plain language of Request No. 2, it is overbroad.  It far exceeds what the PBMs could possibly need to defend themselves against the City of Rochester in Track 12.  They have admitted they need only DUR records "sufficient to show Wegmans' use and reaction to such communications." 11/11/24 Ltr. at 2.  The PBMs' request for *all* DUR data at this point also runs counter to what this Court warned at the January 6 Status Conference—they are entitled to only "enough to understand the lay of the land," not "every bit of what [the PBMs] want."  1/6/25 Tr. at 35:10-23.

Additionally, the case management order for Track 12 required Plaintiff to identify for the PBMs "the prescriptions they . . . conclude caused them the harm for which they seek relief." Order ¶ F(8), No. 1:19-op-45853 (N.D. Ohio Dec. 28, 2023), Doc. No. 107 ("PBM Bellwether



CMO"). Therefore, only those prescriptions the City produced to the PBMs are at issue in the case. Wegmans sees no reason why it should provide documentation for prescriptions beyond those at issue in this case.

### C. Complying with the PBMs' Request for All DUR Data Records would Impose an Undue Burden on Wegmans

Third, unlike with the National Pharmacies, producing each and every DUR alert, clinical edit, or clinical message, received by Wegmans' pharmacies within the City of Rochester is unduly burdensome. *See* 9/18/25 Ltr. at 5-8. The National Pharmacies have participated in extensive discovery in opioid litigation for many years; *Wegmans has produced no discovery in any opioid litigation—nor will it have to. Id.* at 7-8. Any burden imposed on Wegmans for this data production is solely from the PBMs' subpoena requests. Separate and apart from the consideration of the significant differences between Wegmans and the National Pharmacies, both as companies and their participation in the opioid MDL, the PBMs' request for all of Wegmans' DUR messaging is unduly burdensome for three additional reasons: (a) Wegmans does not keep disaggregated DUR data records in the ordinary course of business; (b) producing unreliable and artificial data in the manner requested by the PBMs is not relevant to the claims against them; and (c) producing the DUR data records in the form kept by Wegmans in its ordinary course of business is untenable. The overwhelming burden is unjustified on its face, and especially so given the undisputed fact that the PBMs already have the majority of this data because ESI and Optum themselves adjudicate the overwhelming majority of Wegmans' prescription transactions. *See* App'x A ¶ 3. In fact, during conferral efforts, they have indicated that their "consultants" had already conducted a review of Wegmans' DUR data from the transactions that they adjudicated.

Non-parties need not respond to subpoenas that subject them to an undue burden. *See* Rule 45(d)(1), (d)(3)(A)(iv). "Undue burden is to be assessed in a case-specific manner considering such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *In re Modern Plastics Corp.*, 890 F.3d 244, 251 (6th Cir. 2018) (internal quotations omitted). "Courts must balance the need for discovery against the burden imposed on the person ordered to produce documents, and the status of that person as a non-party is a factor." *Id.* (internal quotations omitted).

Since receiving the PBMs' revised Request No. 2, counsel has had extensive discussions with senior members of the Wegmans pharmacy leadership and those individuals who are most knowledgeable about the technical capabilities of the pharmacy management tools used by Wegmans. Based on those extensive discussions, Wegmans has prepared Appendix A, a detailed narrative summary to explain that Wegmans does not maintain DUR messages as disaggregated, bulk data, and why creating such a database solely for the purposes of litigation would be unduly burdensome, particularly for a non-party.



*1. Wegmans does not maintain a data set of bulk DUR data records in the ordinary course of business.*

Appendix A contains a detailed explanation of how Wegmans uses the EnterpriseRx User Interface to create prescription records, as well as receive and review DUR messages from PBMs in the ordinary course of its business. *See* App'x A ¶¶ 7-22. Wegmans maintains all DUR alerts, clinical edits, and clinical messages within and as part of the individual prescription record. *Id.* ¶ 9. To retrieve and extract DUR alerts, clinical edits, and clinical messages, Wegmans must manually screenshot the screens with DUR information from within the prescription record as it is maintained within the EnterpriseRx User Interface. *Id.* ¶ 24.

DUR messages are maintained within the individual prescription for clinical reasons. *Id.* It is the individual prescription record that reflects the information available to Wegmans at the time the prescription was dispensed. *Id.* ¶ 75. Wegmans does not extract or use DUR alerts, clinical edits, or clinical messages in bulk data form. *Id.* ¶¶ 68-69, 77-78. There is no clinical reason to do so. *Id* ¶ 76.

The procedure described above is also the same procedure Wegmans uses when responding to requests for prescription records from state and federal regulators or law enforcement officials. *See id.* ¶¶ 70-71. These inquiries typically involve a federal or state agency's investigation into an individual patient and/or individual prescriber, and the agency will often seek information from several pharmacies about that patient or prescriber. *Id.* ¶ 70. Thus, there is no clinical, regulatory, or other business reason for Wegmans to extract or maintain DUR information as a bulk dataset as hypothesized by the PBMs. *Id.* ¶ 76.

Wegmans has never extracted DUR information from individual pharmacy records into a bulk data set. *Id.* ¶¶ 77-78. Wegmans does not even know if it is possible to do so. *Id.* ¶ 78. Indeed, to even *try* to determine whether it was possible, Wegmans would need a data engineer to work with its pharmacy department to develop a query to pull such data. *Id.* ¶ 84-85. That process would take months—and it is not even certain whether it would result in success. *Id.* ¶ 86-90.

The PBMs hypothesize that Wegmans (or McKesson) *could* extract the DUR alerts, clinical edits, and clinical messages *en masse* to circumvent the burdensome process of producing the DUR information in the matter it is kept in the ordinary course of Wegmans' business. Mot. at 4-5. But, as described above, Wegmans is not able to extract the DUR data documentation in bulk. And, prior to January of 2019, important information generated during the drug utilization process was hand-written on paper scripts, scanned, and uploaded as an image to Wegmans' pharmacy management software. App'x A ¶ 92. That handwriting cannot be exported as a data field, as the PBMs incorrectly assume, because it does not exist as a data field. *Id.*

The PBMs point to the Court's ruling against the National Pharmacies. Mot. at 4. But that has no relevance here. Upon information and belief, the National Pharmacies own and operate their own proprietary pharmacy management software systems giving them more flexibility to manipulate and download data. 9/18/25 Ltr. at 6. In contrast, Wegmans uses McKesson's EnterpriseRx pharmacy management system, which is "off the rack" and not proprietary. *See* App'x A ¶ 2.



Regardless, requiring Wegmans, a non-party, to attempt to create a data set (that may not be possible) is completely beyond its discovery obligation under the Federal Rules. *See Harris v. Advance Am. Cash Advance Ctrs. Inc.*, 288 F.R.D. 170 (S.D. Ohio 2012) (a *party* is only required to "produce documents that already exist and a party does not have to create a document in response to a request for production"); *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 168 F.R.D. 630, 633 (N.D. Ill. 1996) (Rule 45 "does not contemplate that a non-party will be forced to create documents that do not exist"); *see also Tucker v. Am. Int'l Grp., Inc.*, 281 F.R.D. 85, 98 (D. Conn. 2010) (denying motion to compel production of non-party ESI where the information was not reasonably accessible and it would incur significant expenses due to the need to obtain additional equipment, staff, and counsel to comply). Seeking "lists or information that is not in document form" that "would require [a] defendant to create responsive documents [is] improper." *Harris*, 288 F.R.D. at 175. This is true even based on an "incorrect conjecture" that such records should exist. *Id.* at 174.

Nor should Wegmans be forced to ask McKesson, its software provider, to provide this information. At this time, Wegmans does not believe McKesson has the capability to extract the DUR information as the PBMs want. App'x A ¶ 91. Even so, Wegmans cannot be compelled to ask another third party to (the extent it is capable) pull data. Wegmans is only required to produce documents in its possession, custody, or control. *See Dyno Nobel, Inc. v. Johnson*, 586 F. Supp. 3d 657, 664 (E.D. Ky. 2022) ("To the extent the Subpoenas seek documents from a particular Respondent and the responsive documents are not in that Respondent's possession, custody, or control, then that Respondent has no obligation to produce those documents.").

Moreover, the cases the PBMs cite for the contention that they are merely asking Wegmans to use a dynamic database and not create new documents involve different circumstances. Mot. at 4. For one, each case involves *parties* to the litigation. And the party being compelled either admitted they could easily extract the data requested or waived the argument. For example, in *Apple Inc. v. Samsung Elecs. Co.*, the court did not require the *plaintiff*, Apple, to produce data, despite Apple admitting it could generate the reports reasonably, because the data requested would be of limited value. 2013 WL 4426512, at *2-3 (N.D. Cal. Aug. 14, 2013). Likewise, in *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, the court compelled a party to "query its own databases to produce data within its control" to produce data within the scope of the litigation since its brief did not even "address the cost, hardship, or burden of production." 325 F.R.D. 35, 51-52 (E.D.N.Y. 2018). Last, in *Megatel Homes III, LLC v. Moayedi*, the *plaintiff* put its own financial picture in controversy so was required to produce its financial records after waiving objections to such production. 2025 WL 1638927, at *7 (N.D. Tex. June 9, 2025).

In fact, the PBMs, who are *parties* to this litigation, successfully resisted doing precisely what they ask non-party Wegmans to do. *See* PBM Bellwether CMO ¶ F(2) ("In producing lists of data fields, PBM defendants are not required to (but may) **create** documents that describe the data in each field."). The PBMs have been shielded from data production for this very reason. *See* Discovery Ruling re Agenda Item Nos. 441 & 443: "Opioid Remuneration," MDL Dkt. No. 6307 (Oct. 2, 2025). The Court recently held that ESI need not produce its "remuneration related to opioid drugs" because it is not something the company tracked. *Id.* at 6. And, producing that

17



information "would require ESI to undertake calculations and access data fields in ways it never normally does." *Id.* The Court reached the same conclusion as to Optum based on the representation of its outside counsel that it did not keep the information the Plaintiffs sought in the ordinary course of its business. *Id.* at 10-11.

On October 10, 2025, the PBMs argued this ruling did not apply to Wegmans based upon their surprisingly off base and mistaken understanding that what the PBMs seek is "information that is utilized and stored in the ordinary course of business." Mot. Ex. 12 at 4. This is not the case, and Wegmans has indicated the exact opposite to counsel for the PBMs. *Id.* at 3. The DUR data set the PBMs seek is *not* kept in the ordinary course of Wegmans' business. App'x A, ¶¶ 77-78. Instead, the PBMs ask Wegmans to produce a data set that does not exist—precisely what the Court shielded the PBMs from producing in their own litigation. *See* Discovery Ruling re Agenda Item Nos. 441 & 443: "Opioid Remuneration," MDL Dkt. No. 6307 (Oct. 2, 2025). The Special Master's October 2 discovery ruling squarely applies to Wegmans, *a non-party*, with even more force than it did to the PBMs. *See Am. Elec. Pwr. Co. v. United States*, 191 F.R.D. 132, 136 (S.D. Ohio 1999) ("[T]he status of a person as a non-party is a factor that weighs against disclosure.").

### 2.  *Producing Unreliable and Artificial Data is Not Relevant.*

Accessing DUR alerts, clinical edits, and clinical messages on a prescription-by-prescription basis requires capturing the full dispensing log for each prescription. App'x A ¶¶ 64-65. Therefore, review of a complete prescription record is required to understand the information that Wegmans had at the time it dispensed the prescription managed by a PBM. *Id.* The individual prescription record contains the information that a Wegmans pharmacist sees, and the actions taken by that pharmacist, when dispensing the drug. *See id.* ¶¶ 13-14. Were Wegmans to attempt to extract a subset of so-called "DUR data" in a manner that avoids reviewing a full dispensing log, it would result in an incomplete and inaccurate set of information—which in turn, produces an unreliable and misleading data set that could only generate unreliable and misleading conclusions about Wegmans' dispensing conduct. *See id.* ¶ 82.

DUR data does not exist in a vacuum. It is helpful to think of each prescription managed by a third-party (such as a PBM) as a conversation that starts with the prescriber and concludes with the dispensing of the prescription by the pharmacy. Appendix A contains a cite for each of these steps, and these steps were described in detail in the two exemplar prescriptions produced on June 2:

1.  Prescriber sends the prescription to the patient;

2.  Patient submits the prescription to the pharmacy;

3.  Pharmacy receives the prescription;

4.  Pharmacy transmits that prescription to the PBM/third-party for review adjudication for payment;



5. The patient's available medical and prescription history is reviewed and analyzed by the First Databank (FDB) MedKnowledge database embedded used by the EnterpriseRx User Interface (as described in Appendix A);

6. The patient's available medical and prescription history is reviewed and analyzed by the PBMs' software;

7. DUR messaging about potential Drug Interactions from both FDB and the PBMs software are exchanged with the pharmacy;

8. The pharmacy reviews and responds to the DUR messaging received from EnterpriseRx and the PBMs;

9. The PBM adjudicates the prescription as a "clean claim"; and

10. The prescription is dispensed to the patient.

Of these generalized 10 steps, the DUR messaging is but a single step, step 7.  App'x A ¶¶ 34, 55, 82.

The PBMs' request for a DUR data set is the equivalent of limiting the transcription of the "prescription" conversation to a list of "step 7."  The incomplete picture presented from one step of the prescription process, separated and disaggregated from the rest of the steps, including the individual patient medical and prescription history, sheds no light on whether the dispensed prescription was medically appropriate.  The data set requested by the PBMs, like a transcript of only "step 7s," would be unintelligible and meaningless.

When data sought is unreliable, it is not relevant.  *See Foley v. Town of Marlborough*, 2022 WL 3716505, at *33 (D. Conn. Aug. 29, 2022).  In *Foley*, the court denied a motion to compel subpoena responses when, among other things, the information sought would have resulted in an incomplete data set regarding job search information, which would inaccurately reflect the job search at issue.  *Id.*  The court found that because that data would be unreliable, it was not even relevant to the job search at issue.  *Id.*  Like in *Foley*, the data the PBMs seek will create an incomplete picture because it will be unreliable and misleading without the full dispensing log.  Because producing the DUR data without the full dispensing log would result in unreliable and misleading data, it would not be relevant to how Wegmans pharmacists communicate with the PBMs at the POS.

> ### 3. *Wegmans is required to redact confidential employee/patient information in its DUR data records.*

The PBMs have advised Wegmans that it need not redact PHI or PII in its DUR data records because the Court's ruling as to the National Pharmacies ruled that was not required.  Respectfully, that ruling does not apply to Wegmans.

Wegmans is not a party to the MDL (or any active opioid litigation) and thus any protective order entered in the case or others does not provide adequate protection to Wegmans.  In contrast,



the National Pharmacies *are* parties to the MDL and thus presumably subject to the protective order. Moreover, federal law *obligates* Wegmans to redact PHI in documents produced that are not necessary to accomplish any of the PBMs' goals. *See* 45 C.F.R. § 164.502(b)(1) ("When using or disclosing protected health information or requesting protected health information from another covered entity . . ., a covered entity [like Wegmans] must make reasonable efforts to limit protected health information to the minimum necessary to accomplish the intended purpose of the use, disclosure, or request."). Notably, the PBMs have not articulated why they would need to review any PHI concerning Wegmans' patients.[13]

> ### 4. *Producing Screenshots of DUR Data Records is Untenable for Wegmans, but Wegmans Remains Willing to Provide Additional Exemplar Prescription Records as a Compromise.*

As Wegmans previously advised, the screen shots for the exemplar prescriptions produced on June 2 took an experienced pharmacist approximately 15 minutes to complete this process for each exemplar prescription. App'x A ¶ 25. Producing each and every DUR alert, clinical edit, and clinical message received by the PBMs from every prescription issued by a pharmacy in the City of Rochester from 2006 through the date of the subpoena would overwhelm Wegmans' pharmacy department, making it unable to serve its patients/customers with their healthcare needs,

---

[13] Moreover, a recent wave of security breaches on PACER and internal law firm document management systems have caused numerous United States District Courts to change the manner in which sealed documents are submitted to the courts, further reinforces the need for Wegmans to protect any such information with all appropriate redactions. *See, e.g.*, Martin Tully et al., *Protecting Sensitive Court Filings After Recent Cyber Breach*, Law360 (Oct. 6, 2025), https://www.law360.com/articles/2392558/protecting-sensitive-court-filings-after-recent-cyber-breach (discussing recent cyberattacks on federal and state courts and the need for parties to minimize the sensitive content stored at law firms and filed with courts); Change *to Sealed Document Processing*, W.D.N.Y. (Aug. 22, 2025), https://www.nywd.uscourts.gov/news/change-sealed-document-processing (noting the federal district court encompassing the City of Rochester will no longer allow even case participants to access sealed documents electronically due to recent breaches); Kateyln Polantz & Aileen Graaf, *Federal courts go old school to paper filings after hack to key system*, CNN (Aug. 14, 2025), https://www.cnn.com/2025/08/14/politics/federal-courts-go-to-old-school-paper-filings-after-hack-to-key-system (reporting that some federal courts are deciding to only accept sensitive filings by hardcopy in response to recent cyberattacks); *Cybersecurity Measures Strengthened in Light of Attacks on Judiciary's Case Management System*, U.S. COURTS (Aug. 7, 2025), https://www.uscourts.gov/data-news/judiciary-news/2025/08/07/cybersecurity-measures-strengthened-light-attacks-judiciarys-case-management-system (acknowledging "recent escalated cyberattacks of a sophisticated and persistent nature on [U.S. Courts] case management system"); Staci Zaretsky, *Biglaw Firms Fall Prey To Cyberattacks, With Data Breaches On The Rise*, ABOVE THE LAW (May 23, 2024), https://abovethelaw.com/2024/05/biglaw-firms-fall-prey-to-cyberattacks-with-data-breaches-on-the-rise/ (reporting a rise in cybersecurity incidents at law firms).



and cause substantial business disruption to Wegmans.[14] *See id.* ¶ 83-91. It would also not provide additional insight as to how Wegmans communicates with the PBMs at the POS. That procedure is set forth in the exemplar prescriptions produced by Wegmans on June 2.

Ultimately, producing all DUR messaging and data received by Wegmans in an accurate way is untenable for Wegmans. As such, the PBMs cannot require Wegmans, a non-party, to endure such a substantial burden on its business. *See, e.g., In re Modern Plastics Corp.*, 890 F.3d at 251 (upholding finding subpoena imposed undue burden on non-party when "complying . . . would involve considerable time and resources [and] implicate significant concerns about customer privacy"); *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 53 (S.D.N.Y. 1996) (finding subpoena imposed undue burden when, among other things, "compliance . . . would subject numerous [company] employees and managers in several branch offices to countless hours of search, analysis, and compilation").

Because the burden imposed on Wegmans to produce *all* DUR messaging and data records for its pharmacies in the City of Rochester far outweighs any probative value, Wegmans will not produce it. *See In re Modern Plastics Corp.*, 890 F.3d at 251; *In re Biovail Corp. Sec. Litig.*, 247 F.R.D. 72, 74 (S.D.N.Y. 2007) (quashing subpoena when "the burden the[] demands place[d] on the subpoenaed non-parties and diversion of their staff to provide it far outweighs any probative value of the information").

Wegmans believes the exemplar prescriptions produced on June 2 satisfy its discovery obligations as to Request No. 2. Nonetheless, as Wegmans advised the PBMs previously, including during the September 22 conferral, Wegmans is willing to discuss the production of an additional, limited set of representative exemplar prescriptions containing DUR alerts, clinical edits, and clinical messages from its pharmacies located within the City of Rochester to show that Wegmans Enterprise Rx system operated the same way in the past as it does now. Unfortunately, the PBMs raced to the Court to file the Motion before Wegmans and the PBMs could work this out without the Court's intervention.

Wegmans has also stated it agrees to produce all Provider Manuals and Payor Sheets describing how Wegmans pharmacists interact with communications received from the PBMs at the POS that were effective between January 1, 2006 to the date Wegmans received the Subpoena.

**Subpoena Request 1: Dispensing data reflecting all drugs within the Drug Scope, that You dispensed in the Monroe County Region from January 1, 2006 to present. The data should include the following fields:**

        a)     **Drug name**
        b)     **NDC number**
        c)     **Date filled**
        d)     **Quantity dispensed**

---

[14] The PBMs' representation that Wegmans has "one IT employee who can do this" is a complete misrepresentation. *Compare* Mot. at 4 *with* App'x A ¶¶ 83-84. This statement is representative of the PBMs' inability to consider the information Wegmans has repeatedly provided the PBMs.



| | |
|---|---|
| e) | Dosage form |
| f) | Days' supply |
| g) | Prescriber's name |
| h) | Prescriber's DEA number |
| i) | Dispensing pharmacist |
| j) | Patient Zip Code |
| k) | Patient ID # (Unique ID) |
| 1) | Quantity prescribed |
| m) | Number of refills authorized (if any) |
| n) | Diagnostic code |
| o) | Method of payment |
| p) | Patient paid amount |
| q) | Whether prescription covered by third-party payor |
| r) | Control / Non Control ratio |
| s) | Pharmacy DEA# |
| t) | Pharmacy Store # |
| u) | Pharmacy address (at the zip code level or finder) |
| v) | Prescriber address (at the zip code level or finder) |
| w) | Prescription Date written |
| x) | Refill indicator (whether the Rx is a refill or the original) |
| y) | Prescriber Specialty |
| z) | Rejection Indicator (Whether the pharmacy rejected to fill) |
| aa) | Prescriber's NPI Number |
| bb) | Patient DOB Year (or age) |
| cc) | DEA Override |
| dd) | DEA Schedule (Same as Control/Non-Control) |
| ee) | Dispense Hour |
| ff) | Dispense Minute |
| gg) | Drop Off Hour |
| hh) | Drop Off Minute |

The PBMs have received all the data submitted by Wegmans to the NYPMP.  Considering this development since the January hearing, Wegmans believes the production of Wegmans' PMP data to the PBMs moots Request No. 1 in its entirety.

Nonetheless, on October 9, 2025, the PBMs for the first time asked Wegmans, under the guise of Request No. 1, to identify prescriptions paid for with "cash" from the larger prescription data set they have already received from the NYPMP for Monroe County.[15]  The PBMs seek "cash

---

[15] Wegmans believes the PBMs' reference to Monroe County is a mistake, as the PBMs previously agreed, repeatedly, that the only dispensing data that could be relevant to Track 12 concerns "Wegmans' dispensing of opioids in *Rochester*" only.  12/13/24 Ltr. at 1 (emphasis added); *see also id.* at 3 ("Wegmans' dispensing data is critical for the PBM Defendants to know what was dispensed *in the City*, to whom, why, and when." (emphasis added)).  As discussed above and in



prescription data" for the following fields: Date Filled; NDC Number; Pharmacy NPI or NABP; Quantity Dispensed; Days Supply; Method of payment (e.g., Medicare, cash); Patient paid amount; Refill Indicator; and Rx Number. *See* Mot. Ex. 12 at 7-8.

By seeking information on cash transactions, the PBMs seek information about prescription drugs dispensed that have *nothing to do with* the PBMs. Indeed, the PBMs cite no authority of explanation of how prescriptions paid for with cash are relevant to the claims brought against them by the City of Rochester. Without demonstrating a *need* for discovery, Wegmans need not produce this information. *See* Fed. R. Civ. P. 26(b)(1) (matters not relevant to any party's claim or defense are not discoverable); *Hendricks v. Total Quality Logistics, LLC*, 275 F.R.D. 251, 253 (S.D. Ohio 2011) ("[T]he scope of discovery under a subpoena is the same as the scope of discovery under Rule 26.").

### A. "Cash" Purchases are not Relevant to Proximate Causation

As discussed above, at the January hearing, counsel for the City of Rochester clarified the scope of the City's "red flag" claims against the PBMs: The City's "red flag" analysis "is based on the "point of sale analysis that . . . should have been done *by the PBMs* at the time they are contacted for the purposes of payment approval." 1/6/25 Tr. at 19:22-20:3 (emphasis added). Therefore, Wegmans' dispensing of prescriptions for cash payments are outside the scope of any "point of sale analysis that *should* have been done by the PBMs," and irrelevant to the City of Rochester's claims against the PBMs.

Even before the PBMs received all of Wegmans' dispensing data submitted to the NYPMP, the Court had expressed skepticism as to the relevance of the data sought in Request No. 1. Focusing on the City of Rochester's public nuisance claim, the Court advised the PBMs:

> If someone is a substantial factor that contributes to a public nuisance, they can be liable and they can be liable for all of the nuisance, for abating all of that nuisance even if there are other actors who also substantially contributed. If that's true…*let's assume for a moment it is, then how does what you're asking for become relevant?*

*Id.* at 7:10-17 (emphasis added). The PBMs did not cite any authority or explanation in response to the Court's observation. Instead, they merely rephrased the question and baldly responded that the data in Request No. 1 was "relevant to whether Plaintiffs can establish proximate causation." *Id.* at 8:2-4.

Not so. In New York, liability arises from the creation and participation in the public nuisance, even where it can be shown that the defendant was not the sole participant in the maintenance of the nuisance. *See City of Rochester v. Premises Located at 10-12 South Washington Street*, 180 Misc.2d 17, 22, 687 N.Y.S.2d 523, 527 (N.Y. Sup. Ct. 1998); *State v. Schenectady Chems., Inc.*, 117 Misc.2d 960, 966, 459 N.Y.S.2d 971, 976 (N.Y. Sup. Ct. 1983).

---

Wegmans' October 24, 2025 letter, the relevant geographic scope is the City of Rochester only. *See also supra* § IV(A).



Thus, as Wegmans stated in its January 3, 2025 Letter to the Court, the PBMs' theory that if it can find evidence of improper dispensing by Wegmans, it can deflect blame away from its own conduct is wrong.[16]  Regardless of Wegmans' conduct (which Wegmans contends was proper), it has no relevance as to question of *the PBMs'* liability for their own alleged contributions to a public nuisance.  In fact, Judge Polster has repeatedly *rejected* similar speculative relevance claims based upon proximate causation theories.  In the context of the National Pharmacy Defendants' attempt to assert third-party claims against Prescribers, Judge Polster stated:

> [T]he Pharmacies . . . maintain that any improper dispensing was done *only* as a result of negligence or intentional misconduct of a Prescriber.  The Pharmacies do not identify any authority imposing on a prescriber liability for a pharmacist's failure to fulfill its corresponding responsibility, or apportioning liability between prescribers and pharmacies for injuries caused by illegitimate prescriptions.  *The Court finds no basis on which the Pharmacies can simply transfer to Prescribers their liability to Plaintiffs for failing to rely upon (or ignoring) information beyond an individual prescription or Prescriber's representations when dispensing opioids.*

Op. & Order at 4-5, MDL Dkt No. 3246 (Mar. 31, 2020) (internal citations omitted) (emphasis added).  The same is true here.  The PBMs have not identified any authority imposing liability on Wegmans for the "point of sale analysis that… should have been done *by the PBMs* at the time they are contacted for the purposes of payment approval."  1/6/25 Tr. at 19:22-20:3 (emphasis added).

In sum, Wegmans' dispensing data for "cash" prescriptions is irrelevant to the Plaintiffs' ability to establish proximate cause arising from the PBMs' "point of sale analysis."  As such it is outside the scope of permissible discovery under Rule 26.

## B.  "Cash" Purchases are not Probative of Improper Dispensing

Additionally, identification of "cash" prescriptions dispensed by Wegmans without more, is not probative of improper dispensing.  While paying for controlled substances in cash can constitute a "red flag" under certain circumstances, that factor alone is insufficient to show improper dispensing.  *See, e.g., Holiday CVS, L.L.C. d/b/a CVS Pharmacy Nos. 219 & 5195; Decision & Order*, 77 Fed. Reg. 62,316, 62,320 (Oct. 12, 2012) (discussing DEA expert's testimony on how *evaluating "red flags" for improper dispensing requires looking at the "totality of the issues that give you reason for concern"* and how "even after eliminating the red flag of

---

[16] "[A]n intervening act will constitute a superseding cause and will serve to relieve a defendant of liability when the act is of *such an extraordinary nature or so attenuated from the defendant's conduct* that responsibility for the injury should not reasonably be attributed to the defendant." *Mrakovcic v. Rose Art Indus., Inc.*, 26 A.D.3d 316, 317, 809 N.Y.S.2d 538 (2d Dept. 2006).  In other words, when a third party takes actions that are "normal and foreseeable," they cannot be an intervening cause.  *Id.*  The PBMs do not contend that Wegmans dispensing prescription medications to patients who paid cash was unforeseeable.



cash payments, there were still other red flags present which could not have been resolved so as to lawfully dispense the prescriptions") (emphasis added).

Important too in the context of the City of Rochester's claims, 11.5% of unemployed residents and 6.4% employed residents are uninsured.[17] These uninsured residents must pay cash for their prescriptions. There is nothing improper about Wegmans dispensing prescriptions to the City's uninsured. These prescriptions are completely irrelevant to the City of Rochester's claims against the PBMs in Track 12.

The PBMs have provided no authority to support their request for production of cherry-picked data fields for cash prescriptions. As discussed in response to Request No. 2, above, the DUR alerts, clinical edits, and clinical messages received by Wegmans are maintained within each individual prescription record. The complete prescription record, not a cherry-picked subset of information, is what constitutes the information available to Wegmans at the time a prescription is dispensed that would indicate whether there was a red flag. *See Holiday CVS, L.L.C.*, 77 Fed. Reg. at 62,320 (requiring looking "totality of the issues" to determine whether red flags present).

As stated in Appendix A, the EnterpriseRx User Interface uses the First Databank (FDB) MedKnowledge database to create and communicate DUR alerts, clinical alerts, and clinical messages to Wegmans pharmacists. App'x A. ¶ 9. FDB's database is regularly updated to contain the latest FDA approvals, drug information, and industry standards. *Id.* When a Wegmans pharmacist or technician enters the information for *any* prescription into the EnterpriseRx User Interface, the system *automatically* checks FDA's database for potential issues with the new prescription. *Id.* ¶ 10. If a potential issue is detected, the system displays an alert to ensure the pharmacist is made aware of the issue and can take appropriate action before the prescription is dispensed. *Id.*

The PBMs' cherry-picked data fields, therefore, present an incomplete and unreliable picture of the decision-making process employed by Wegmans in dispensing prescriptions. As such, the PBMs would not be able to use that incomplete picture of Wegmans' cash purchases to defend against the claims against them, so the data set is irrelevant. *See Foley*, 2022 WL 3716505, at *33 (denying motion to compel subpoena responses when, among other things, it was unclear whether "the data provided would be reliable and produce information [relevant to the claims and defenses]").

## C. The PBMs cannot use "Cash" Purchases to go on a Fishing Expedition

As stated above, the PBMs already have all of Wegmans' prescription data submitted to the NYPMP, and the City's claims are limited to PBM decisions at the POS. Therefore, the PBMs' request for additional cash prescription data amounts to nothing more than an impermissible fishing expedition. *See Damsi v. Tarpstop, LLC*, 2023 WL 9186657, at *6 (N.D. Ohio Oct. 19, 2023) (denying motion to compel subpoena response when "requests amount more to a generalized

---

[17] New York State Community Action Association, "City of Rochester-Poverty Report," https://nyscaa.engagementnetwork.org/poverty-report/?geoid=16000US3663000 (last visited Oct. 14, 2025).



'fishing expedition' than a targeted search in support of a properly pled cause of action"); *id.* at \*4 ("The role of discovery . . . is to find support for properly pleaded claims, not to find the claims themselves."); *Datatrak Int'l, Inc. v. Medidata Sols., Inc.*, 2015 WL 12734894, at \*3 (N.D. Ohio July 10, 2015) (denying motion to compel subpoena response that sought discovery based only on "the party's mere suspicion or speculation."); *see also Toms v. Pizzo*, 4 F. Supp. 2d 178, 186 (W.D.N.Y. 1998) ("The purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists."), *aff'd*, 172 F.3d 38 (2d Cir. 1998).

Judge Polster has repeatedly told the parties he has no interest in expanding the scope of Track 12 beyond the conduct of the PBMs.  *See* MDL ECF No. 5168 at 49:3-5 (stating Rochester Bellwether proceedings were to be "as streamlined and focused as we can because the key litigants are the two PBMs."); *see also* MDL ECF No. 5265 at 9:11-10:6 (warning that the PBM Bellwether trials should not "replicate the pharmacy trials," which would make the trials "unworkable or unmanageable").  And he has explicitly warned against adding pharmacies as third parties. *See id.* at 10:1-14 (expressing wariness of complications that could arise from involving pharmacies and many others as third parties).

Accordingly, the PBMs lack any basis for seeking data concerning prescription drugs paid for by cash at Wegmans' pharmacies within the City of Rochester.  *See, e.g., Damsi*, 2023 WL 9186657, at \*6-7 (denying request to compel discovery when party seeking discovery could not "articulate the possible linkage between the discovery sought and admissible evidence").

### D.  Production of Information on "Cash" Purchases would be Misleading, and Unfairly Prejudicial to Non-Party Wegmans

If Wegmans is required to produce cherry-picked data for cash prescriptions, the PBMs will likely attempt to insinuate during depositions, motion practice and/or at trial that Wegmans was improperly dispensing prescriptions in the City of Rochester.  This would leave Wegmans (a non-party) with no ability to defend itself by providing the complete picture surrounding these prescriptions or an ability to explain why the prescriptions were medically appropriate, therefore prejudicing the company.

Additionally, the cherry-picked and misleading data the PBMs seek would be used in a misleading manner that could damage Wegmans' reputation in its home, the City of Rochester—despite the data being completely irrelevant to the City's claims against the PBMs.  *See Guercia v. Equinox Holdings, Inc.*, 2013 WL 2156496, at \*4 (S.D.N.Y. May 20, 2013) (quashing subpoena on grounds of undue burden when production of documents would result in "annoyance, embarrassment, oppression, or undue burden or expense").[18]  In addition to being misleading and irrelevant to the City's claims arising from the PBMs' POS decision-making, the PBMs should be

---

[18] "Under Federal Rule of Civil Procedure 26(c)(1), a district court may grant a protective order preventing the production of discovery to protect a party or entity from "annoyance, embarrassment, oppression, or undue burden or expense."  *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 235 (6th Cir. 2016).  "[T]he scope of discovery under a subpoena is the same as the scope of discovery under Rule 26."  *Hendricks*, 275 F.R.D. at 253.



prohibited from improperly attempt to sully Wegmans' reputation at trial, especially in its home city—the City of Rochester. The PBMs should not be permitted to use Wegmans' data to divert attention away from the City's claims. Such conduct would be unfair, unduly prejudicial, and should not be tolerated.

For the reasons stated above, Wegmans will not produce any further data in response to Request No. 1.

**Subpoena Request 4: All Documents and Communications Concerning any guidance, directives, instructions, publications, alerts, notices, presentations, or other materials You provided to Employees Concerning any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to present.**

The PBMs argue this Request is relevant because "[a]s the largest dispenser of prescription opioids in the City of Rochester, the instructions that Wegmans' personnel received about dispensing opioids will show what actions Wegmans took (or did not take) in addressing improper opioid prescriptions or diversion." Mot. at 8. This argument fails for several reasons.

First, as discussed above, the Wegmans' pharmacy in the City of Rochester dispensed a mere 5% of the opioids in the City. *See ARCOS Data Portal*, Univ. Notre Dame, https://arcos.nd.edu/. Thus, the PBMs' characterization of Wegmans as "the largest dispenser of prescription opioids in the City of Rochester" is flatly wrong. *See id.*

Second, Wegmans' conduct has nothing to do with Track 12. *See supra* § IV(C). The City of Rochester's claims against the PBMs are about the *PBMs'* conduct—not any other pharmacy. *See id.* To the extent the PBMs argue they are looking for evidence that Wegmans' improper conduct is a superseding or intervening cause, thereby reducing their liability—that is also wrong. The PBMs have no evidence that Wegmans improperly dispensed opioids and any attempt to find such evidence is an improper fishing expedition. *See Damsi*, 2023 WL 9186657, at *6; *Datatrak Int'l, Inc.*, 2015 WL 12734894, at *3; *Toms*, 4 F. Supp. 2d at 186. And even if they did have evidence that Wegmans dispensed improperly (and they do not), it would have no effect on the PBMs' liability in the public nuisance claim. *See supra* § V(Req. 1)(A) (explaining how Wegmans' dispensing conduct does not affect whether the PBMs' conduct was a proximate cause of the injury under New York law).

Therefore, the PBMs have no need for this information in Track 12. As such, Wegmans need not produce this information. *See* Fed. R. Civ. P. 26(b)(1) (matters not relevant to any party's claim or defense are not discoverable).

Finally, the PBMs have never done anything to limit the scope of this Request. On its face, the notion that a non-party should need to identify, collect, and produce literally "all documents and communications" to its employees concerning opioids is overbroad. From the perspective of a non-party, there is no feasible way even to begin to approach this Request.



Wegmans will, however, agree to produce any policies or procedures its pharmacy department has on POS communications from the PBMs from 2006 to July 2024.

**Subpoena Request 7:  All Documents and Communications Concerning efforts of any kind by You to identify, investigate, or report to any national, state, or local governments, agencies, boards, institutions, associations, law enforcement bodies, health departments, or drug taskforces Concerning any of the following regarding any drug within the Drug Scope, or any other Opioid, from January 1, 1996 to present: (a) improper prescribing or failing to prescribe by doctors or other prescribers in the Monroe County Region; (b) doctor-shopping, forgery, or counterfeiting of prescriptions by patients in the Monroe County Region; (c) diversion, abuse, misuse, diversion, trafficking; or (d) any other concerns Concerning potentially improper or illegal prescriptions.**

The PBMs seek *all* documents and communications with the enforcement and regulatory bodies concerning improper dispensing, not just documents sufficient to identify them as Wegmans offered.

Frankly, Wegmans does not believe this Request is relevant to Track 12—and offered the proposal in the spirit of compromise.  Wegmans' communications with law enforcement officials and regulatory bodies have nothing to do with the PBMs' conduct.  Therefore, Wegmans sees no reason why it must go through the burdensome process of sifting through emails and other documentation from the past 20 years to produce documents that have nothing to do with this litigation.  *See In re Modern Plastics Corp.*, 890 F.3d at 251; *In re Biovail Corp. Sec. Litig.*, 247 F.R.D. at 74 (quashing subpoena when "the burden the[] demands place[d] on the subpoenaed non-parties and diversion of their staff to provide it far outweighs any probative value of the information").  As such, Wegmans will not agree to the PBMs' position.  However, to resolve this Request, Wegmans would agree to produce the official forms that are used to track the instances when law enforcement or regulators presented to the East Ave pharmacy to inquire regarding prescribers or patients (subject to HIPAA redactions of patient information).

**Subpoena Requests 10-11:**

**10. All Documents and Communications Concerning any Investigation or other inquiry conducted by any state or federal office, agency, department, committee, or program (including the DEA, the Federal Bureau of Investigation, a United States Attorney or representative thereof, any government-level department or agency within the State of New York), or any state board (including the New York Medical Board, New York Board of Pharmacy, New York Dental Board, New York Nursing Board, or any medical examiner's office in New York) into any of Your practices related to the prescribing, ordering, dispensing, distributing, administering, or diversion of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.**



**11.  Documents sufficient to identify any regulatory, civil, or criminal actions or investigation Concerning any drug within the Drug Scope, or any other Opioids, to which you were a party or participated in any manner, from January 1, 1996 to present.**

Similar to Request No. 7, the PBMs are unsatisfied unless Wegmans scours its emails from the past 20 years to find all communications with law enforcement and/or audits.  Wegmans agreed to produce any documents/communications concerning regulatory fines imposed or administrative actions against its East Ave. pharmacy with respect to opioid dispensing during the relevant time frame, to the extent any existed.

Again, Wegmans does not believe even fines imposed or administrative actions against its pharmacies in Rochester are relevant—they have nothing to do with the PBMs' conduct.  *See supra* § IV(C).  Wegmans offered producing such purely in the spirit of compromise.  Wegmans' communications with law enforcement officials and regulatory bodies have nothing to do with the PBMs' conduct.  Thus, just as with Request No 7, Wegmans sees no reason why it must go through the burdensome process of sifting through emails and other documentation from the past 20 years to produce documents that have nothing to do with this litigation.  *See In re Modern Plastics Corp.*, 890 F.3d at 251; *In re Biovail Corp. Sec. Litig.*, 247 F.R.D. at 74.   As such, Wegmans will not agree to the PBMs' position.

**<u>Subpoena Request 12</u>:  All Documents reflecting contracts, agreements, orders, or other formal documents between You and any manufacturer or distributor of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.**

The PBMs take issue with the fact that Wegmans limits this Request to manufacturer and distributor agreements to the extent they concern Wegmans' pharmacy in the City of Rochester during the relevant time frame.  Wegmans agrees there is a decent chance that its responsive agreements affect all its pharmacy locations in New York—nonetheless, considering the City of Rochester is the plaintiff, to the extent it finds a contract inapplicable to the pharmacy in the City, then Wegmans will not produce it.

Additionally, Wegmans will only produce these responsive documents subject to any third-party notice or confidential provisions in those agreements.

For the reasons set forth above, Wegmans requests the Court deny the PBMs' Motion.


Sincerely yours,

Joshua M. Agins



<u>Enclosures</u>:

- Appendix A with Ex. 1 to App'x
- Exhibits 1 through 8

CC:    Counsel of Record

# EXHIBIT 1

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM          INDEX NO. E2019005178

NYSCEF DOC. NO. 2          Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  33 of 1171  PageID #: 705352          RECEIVED NYSCEF: 06/05/2019

MONROE COUNTY CLERK'S OFFICE                    THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2094575

Book   Page   CIVIL

Return To:                                      No. Pages:  310
PAUL J. NAPOLI
360 Lexington Avenue                            Instrument: MISCELLANEOUS DOCUMENT
11th Floor
New York, NY 10017                              Control #:        201906060014
                                                Index #:          E2019005178

                                                Date: 06/06/2019

THE CITY OF ROCHESTER                           Time: 5:56:16 AM


PURDUE PHARMA L.P.
PURDUE PHARMA INC.
PURDUE FREDERICK COMPANY, INC.
TEVA PHARMACEUTICALS USA, INC.
CEPHALON, INC.


Total Fees Paid:                    $0.00

                                    Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

ADAM J BELLO

MONROE COUNTY CLERK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF MONROE

| | |
|---|---|
| THE CITY OF ROCHESTER, | Index No.: |
| Plaintiff, | **VERIFIED COMPLAINT** |
| -against- | **PLAINTIFF DEMANDS A TRIAL BY JURY** |
| PURDUE PHARMA L.P.; PURDUE PHARMA INC.; PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC F/K/A ACTAVIS PLC; ACTAVIS, INC. F/K/A WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. F/K/A WATSON PHARMA, INC.; INSYS THERAPEUTICS, INC.; MCKESSON CORPORATION; CARDINAL HEALTH INC.; AMERISOURCEBERGEN DRUG CORPORATION; AMERICAN MEDICAL DISTRIBUTORS, INC.; BELLCO DRUG CORP.; BLENHEIM PHARMACAL, INC.; EVEREADY WHOLESALE DRUGS LTD.; KINRAY, LLC; PSS WORLD MEDICAL, INC.; ROCHESTER DRUG COOPERATIVE, INC.; DARBY GROUP COMPANIES, INC.; RAYMOND SACKLER FAMILY; MORTIMER SACKLER FAMILY; RICHARD S. SACKLER; JONATHAN D. SACKLER; MORTIMER D.A. SACKLER; KATHE A. SACKLER; ILENE SACKLER LEFCOURT; BEVERLY SACKLER; THERESA SACKLER; DAVID A. SACKLER; RHODES TECHNOLOGIES; RHODES | |

TECHNOLOGIES INC.; RHODES
PHARMACEUTICALS L.P.; RHODES
PHARMACEUTICALS INC.; TRUST FOR
THE BENEFIT OF MEMBERS OF THE
RAYMOND SACKLER FAMILY; THE P.F.
LABORATORIES, INC.; STUART D.
BAKER; PAR PHARMACEUTICAL, INC.;
PAR PHARMACEUTICAL COMPANIES,
INC.; MALLINCKRODT PLC;
MALLINCKRODT LLC; SPECGX LLC;
MYLAN PHARMACEUTICALS, INC.;
SANDOZ, INC.; WEST-WARD
PHARMACEUTICALS CORP. N/K/A
HIKMA PHARMACEUTICALS, INC.;
AMNEAL PHARMACEUTICALS, INC.;
NORAMCO, INC.; JOHN N. KAPOOR;
ANDA, INC.; DISCOUNT DRUG MART,
INC.; HBC SERVICE COMPANY; MORRIS
& DICKSON CO., LLC; PUBLIX
SUPERMARKETS, INC.; SAJ
DISTRIBUTORS; VALUE DRUG
COMPANY; SMITH DRUG COMPANY; CVS
HEALTH CORPORATION; RITE AID OF
MARYLAND, INC., D/B/A RITE AID MID-
ATLANTIC CUSTOMER SUPPORT
CENTER, INC.; RITE AID CORP.;
WALGREENS BOOTS ALLIANCE, INC.;
WALGREEN EASTERN CO.; WALGREEN,
CO.; WAL-MART INC.; MIAMI-LUKEN,
INC.; THE KROGER CO.; HENRY SCHEIN,
INC.; HENRY SCHEIN MEDICAL
SYSTEMS, INC.; EXPRESS SCRIPTS
HOLDING COMPANY; EXPRESS SCRIPTS,
INC.; CAREMARK RX, L.L.C.;
CAREMARKPCS HEALTH, L.L.C. D/B/A
CVS/CAREMARK; CAREMARK, L.L.C.;
CAREMARKPCS, L.L.C.; UNITEDHEALTH
GROUP INCORPORATED; OPTUM, INC.;
OPTUMRX INC..; PRIME THERAPEUTICS
LLC; NAVITUS HOLDINGS, LLC; AND
NAVITUS HEALTH SOLUTIONS, LLC

Defendants.

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM          INDEX NO. E2019005178

NYSCEF DOC. NO. 2          Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  36 of 1171  PageID #: 705355          RECEIVED NYSCEF: 06/05/2019

# TABLE OF CONTENTS

*INTRODUCTION* ............................................................................2

*JURISDICTION AND VENUE* ........................................................ 16

*PARTIES* .................................................................................... 17

   **A.**    **Plaintiff.** ........................................................................17

   **B.**    **Defendants.** ...................................................................17

*FACTS RELEVANT TO ALL CAUSES OF ACTION* ..................... 92

   **A.**    **Background on Pain Medicine.** .....................................92
      1.   Safe and Effective Treatment of Chronic Pain Centers on Informed Risk Management. ...92
      2.   Opioid Use Is Associated with Known and Substantial Risks. ...........93
      3.   Long-Term Opioid Use Benefits Are Unproven and Contradicted. ..........99
      4.   Defendants' Impact on the Perception and Prescribing of Opioids. ...........102

   **B.**    **Defendants Promoted Their Branded Products Through Direct Marketing to Prescribers and Consumers.** ...........................................................................104
      1.   Defendants Relied Upon Branded Advertisements. ..........104
      2.   Defendants Relied Upon Their Sales Forces and Recruited Physician Speakers. ..........105
      3.   Defendants Directed These Promotional Efforts Through Detailed Marketing Plans. ..........108
         a.   Targeting categories of prescribers ..........108
         b.   Increasing "direct to consumer" marketing ..........109
         c.   Differentiating each brand ..........110
         d.   Moving beyond office visits ..........111
      4.   Defendants Marketed Opioids in the City of Rochester Using the Same Strategies and Messages They Employed Nationwide. ..........111

   **C.**    **Defendants Used "Unbranded" Marketing to Evade Regulations and Consumer Protection Laws.** ..........................................................................112
      1.   Regulations Governing Branded Promotion Require that it Be Truthful, Balanced, and Supported by Substantial Evidence. ..........113
      2.   Defendants Deployed Front Groups and Doctors to Disseminate Unbranded Information on Their Behalf. ..........115
         a.   Defendants' Use of KOLs ..........118
         b.   "Research" That Lacked Supporting Evidence ..........122
         c.   Treatment Guidelines. ..........125
            i.   *FSMB* ..........125
            ii.   *AAPM/APS Guidelines* ..........127
            iii.   *American Geriatrics Society* ..........128
            iv.   *Guidelines That Did Not Receive Defendants' Support* ..........129
         d.   Continuing Medical Education ..........131
         e.   Unbranded Patient Education ..........133
         f.   Defendants' Use of Front Groups ..........133
      3.   Defendants Acted in Concert with KOLs and Front Groups in the Creation, Promotion, and Control of Unbranded Marketing. ..........137
      4.   Defendants Targeted Vulnerable and Lucrative Populations. ..........139
         a.   The Elderly ..........139
         b.   Veterans ..........140

   **D.**    **Why Defendants' Marketing Messages Are Misleading and Unfair** ..........142

i

1. Defendants and Their Third-Party Allies Misrepresented that Opioids Improve Function ...........143
2. Defendants and Their Third-Party Allies Concealed the Truth About the Risk of Addiction from Long-
Term Opioid Use...................................................................................................................................148
3. Defendants and Their Third-Party Allies Misrepresented that Addiction Risk Can Be Avoided or
Managed.................................................................................................................................................157
4. Defendants and Their Third-Party Allies Created Confusion By Promoting the Misleading Term
"Pseudoaddiction." ..............................................................................................................................159
5. Defendants and Their Third-Party Allies Claimed Withdrawal is Simply Managed ...........................161
6. Defendants and Their Third-Party Allies Misrepresented that Increased Doses Pose No Significant
Additional Risks ...................................................................................................................................163
7. Defendants and Their Third-Party Allies Deceptively Omitted or Minimized Adverse Effects of
Opioids and Overstated the Risks of Alternative Forms of Pain Treatment. ......................................165
8. Purdue Misleadingly Promoted OxyContin as Providing 12 Hours of Relief ......................................168

E.    Each Defendant Engaged in Deceptive Marketing, Both Branded and Unbranded, that
Targeted and Reached City prescribers. .........................................................................................172
   1.   Actavis..............................................................................................................................................172
      a.   Actavis' Deceptive Direct Marketing ........................................................................................173
         i.     *Actavis' Deceptive Sales Training*...........................................................................................174
         ii.    *Actavis' Deceptive Speaking Training* ....................................................................................178
      b.   Actavis's Deceptive Statements to Prescribers and Patients in the City of Rochester ...........180
   2.   Cephalon.........................................................................................................................................181
      a.   Cephalon's Deceptive Direct Marketing ...................................................................................182
         i.     *Cephalon's Fraudulent Off-Label Marketing of Actiq and Fentora* .......................................182
            a)    Cephalon launched its fraudulent marketing scheme for Actiq ..........................................182
            b)    October 1, 2006 – Cephalon fraudulently marked Actiq's successor drug, Fentora....................184
            c)    September 2007 – Reports of death and serious side effects led the FDA to issue a public health
            warning for Fentora ...........................................................................................................................186
            d)    May 6, 2008 – The FDA rejected Cephalon's request for expanded approval of Fentora............187
            e)    March 26, 2009 – the FDA's Division of Drug Marketing, Advertising and Communications
            ("DDMAC") warned Cephalon about its misleading advertising of Fentora .....................................188
            f)    Cephalon continues to knowingly, deceptively, and illegally promote Fenotra for off-label uses .189
         ii.    *Cephalon's Misrepresentation of the Risks Associated with the Use of Opioids for the Long-Term Treatment of
         Chronic Pain* ...................................................................................................................................190
      b.   Cephalon's Deceptive Third-Party Statements..........................................................................192
         i.     *FSMB – Responsible Opioid Prescribing* ................................................................................193
         ii.    *APF – Treatment Options: A Guide for People Living with Pain* .........................................194
         iii.   *Key Opinion Leaders and Misleading Science* ........................................................................196
         iv.    *Misleading Continuing Medical Education* .............................................................................197
      c.   Cephalon's Deceptive Third-Party Statements to City prescribers and Patients.....................200
   3.   Endo................................................................................................................................................201
      a.   Endo's Deceptive Direct Marketing ..........................................................................................201
         i.     *Endo's Sales Force and Deceptive Sales Training* ...................................................................202
            a)    Endo's Sales Force Deceptively Minimized the Risks of Addiction Associated with Chronic Opioid
            Therapy.............................................................................................................................................204
            b)    Endo's Sales Force Deceptively Implied that Chronic Opioid Therapy Would Improve Patients'
            Ability to Function................................................................................................................................207
            c)    Endo's Sales Force Deceptively presented the Risks and Benefits of Opioids to Make Them
            Appear Safer Than Other Analgesics...................................................................................................208
         ii.    *Endo's Speakers Bureau Programs Deceptively Minimized the Risks of Addiction Associated with Chronic
         Therapy* ............................................................................................................................................209
         iii.   *Endo's Misleading Journal Supplement* .................................................................................210
         iv.    *Endo's Deceptive Unbranded Advertising* .............................................................................211
      b.   Endo's Deceptive Third-Party Statements.................................................................................212

| | | | | | |
|---|---|---|---|---|---|
| | | i. | *APF* | | 213 |
| | | | a) | Misleading Medical Education | 216 |
| | | | b) | *Painknowledge.com* | 218 |
| | | | c) | *Exit Wounds* | 219 |
| | | ii. | *Other Front Groups: FSMB, AAPM, and AGS* | | 220 |
| | | iii. | *Key Opinion Leaders and Misleading Science* | | 222 |
| | c. | Endo's Deceptive Statements to City prescribers and Patients | | | 225 |
| 4. | **Janssen** | | | | 226 |
| | a. | Janssen's Deceptive Direct Marketing | | | 227 |
| | | i. | *Janssen's Deceptive Sales Training* | | 228 |
| | | ii. | *Janssen's Deceptive Speakers Bureau Programs* | | 230 |
| | | iii. | *Janssen's Deceptive Unbranded Advertising* | | 231 |
| | b. | Janssen's Deceptive Third-Party Statements | | | 231 |
| | | i. | *AAPM and AGS – Finding Relief: Pain Management for Older Adults* | | 231 |
| | | ii. | *AGS – Misleading Medical Education* | | 235 |
| | | iii. | *APF* | | 235 |
| | | | a) | Let's Talk Pain | 236 |
| | | | b) | Exit Wounds | 239 |
| | c. | Janssen's Deceptive Statements to Prescribers and Patients in the City of Rochester | | | 239 |
| | | i. | *Janssen's Deceptive Medical Education Programs in the City of Rochester* | | 239 |
| | | ii. | *Janssen's Deceptive Detailing Practices in the City of Rochester* | | 239 |
| 5. | **Purdue** | | | | 240 |
| | a. | Purdue's Deceptive Direct Marketing | | | 241 |
| | b. | Purdue's Deceptive Third-Party Statements | | | 245 |
| | | i. | *APF* | | 245 |
| | | | a) | Purdue's Control of APF | 245 |
| | | | b) | *A Policymaker's Guide* | 250 |
| | | | c) | *Treatment Options: A Guide for People Living with Pain* | 252 |
| | | ii. | *Purdue's Work with Other Third Party Front Groups and KOLs* | | 253 |
| | | | a) | FSMB – *Responsible Opioid Prescribing* | 253 |
| | | | b) | AGS – *Pharmacological Management of Persistent Pain in Older Persons* | 254 |
| | | | c) | *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes* | 255 |
| | | | d) | *Managing Patient's Opioid Use: Balancing the Need and Risk* | 255 |
| | | | e) | *Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse* | 255 |
| | | | f) | *Overview of Management Options* | 256 |
| | | iii. | *Purdue's Misleading Science* | | 257 |
| | | | a) | Purdue's Deceptive Statements to Prescribers and Patients in the City of Rochester | 257 |
| 6. | **Insys** | | | | 259 |
| **F.** | **The Result of Defendants' Fraudulent Scheme** | | | | **265** |
| 1. | **Defendants' Fraudulent and Deceptive Marketing of Opioids Directly Caused Harm to the City of Rochester** | | | | **265** |
| | a. | Increase in Opioid Prescribing Nationally | | | 266 |
| | b. | The City's Increased Spending on Opioids | | | 272 |
| | | i. | *Defendants' Misrepresentations Were Material* | | 272 |
| | | ii. | *The City's Increased Costs Correlate with Defendants' Promotion* | | 273 |
| 2. | **Defendants' Fraudulent and Deceptive Marketing of Opioids Directly Caused Harm to Consumers in the City of Rochester** | | | | **273** |
| | a. | Increased Opioid Use Has Led to an Increase in Opioid Abuse, Addiction, and Death | | | 273 |
| | b. | Increased Opioid Use Has Increased Costs Related to Addiction Treatment | | | 275 |
| | c. | Increased Opioid Use Has Fueled An Illegal Secondary Market for Narcotics and the Criminals Who Support It | | | 275 |
| 3. | **Defendants' Fraudulent Marketing Has Led to Record Profits** | | | | **277** |

    4.    Defendants Fraudulently Concealed Their Misrepresentations .......................................................277

G. Defendants Entered into and Engaged in a Civil Conspiracy ........................................ 278

H. PBMs Ensured that Opioids Were Regularly Prescribed and Flooded the Market........ 279

I. Defendants Flooded Plaintiff the City of Rochester with Suspiciously Large Amounts of
Opioids. ........................................................................................................................ 285

FIRST CAUSE OF ACTION............................................................................................. 293

SECOND CAUSE OF ACTION ........................................................................................ 295

THIRD CAUSE OF ACTION............................................................................................ 296

FOURTH CAUSE OF ACTION ........................................................................................ 297

FIFTH CAUSE OF ACTION............................................................................................. 298

SIXTH CAUSE OF ACTION ............................................................................................ 299

SEVENTH CAUSE OF ACTION....................................................................................... 300

PRAYER FOR RELIEF ................................................................................................... 302

Plaintiff, the City of Rochester, New York ("Plaintiff," "City," or "Rochester"), by and through their attorneys, against Defendants Purdue Pharma L.P.; Purdue Pharma Inc.; the Purdue Frederick Company, Inc.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals, Inc.; Allergan plc f/k/a Actavis plc; Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.; Watson Laboratories, Inc.; Actavis LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Insys Therapeutics, Inc.; Rhodes Technologies; Rhodes Technologies Inc.; Rhodes Pharmaceuticals L.P.; Rhodes Pharmaceuticals Inc.; The P.F. Laboratories, Inc.; Par Pharmaceutical, Inc.; Par Pharmaceutical Companies, Inc.; Mallinckrodt plc; Mallinckrodt LLC; SpecGx LLC; Mylan Pharmaceuticals, Inc.; Sandoz, Inc.; West-Ward Pharmaceuticals Corp. n/k/a Hikma Pharmaceuticals, Inc.; Amneal Pharmaceuticals, Inc.; Noramco, Inc.; Miami-Luken, Inc.; (Collectively, "Manufacturers," "Manufacturer Defendants," or "Defendants"); McKesson Corporation; Cardinal Health Inc.; AmerisourceBergen Drug Corporation; American Medical Distributors, Inc.; Bellco Drug Corp.; Blenheim Pharmacal, Inc.; Darby Group Companies, Inc.; Eveready Wholesale Drugs Ltd.; Kinray, LLC; PSS World Medical, Inc.; Rochester Drug Cooperative, Inc.; Publix Supermarkets, Inc.; SAJ Distributors; Value Drug Company; Smith Drug Company; CVS Health Corporation; Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc.; Rite Aid Corp.; Walgreens Boots Alliance, Inc.; Walgreen Eastern Co.; Walgreen, Co.; Wal-Mart Inc.; The Kroger Co.; Henry Schein, Inc.; Henry Schein Medical Systems, Inc.; (Collectively, "Distributors," "Distributor Defendants," or "Defendants"); Express Scripts Holding Company; Express Scripts, Inc.; CVS Health Corporation (in its pharmacy benefit management capacity); Caremark Rx, L.L.C.; CaremarkPCS Health, L.L.C. d/b/a CVS/Caremark; Caremark, L.L.C.; CaremarkPCS, L.L.C.; UnitedHealth Group Incorporated; Optum, Inc.; OptumRx Inc.; Prime Therapeutics LLC; Navitus Holdings, LLC; Navitus

1

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM   Index #: E2019005178

NYSCEF DOC. NO. 1   Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  42 of 1171. PageID #: 705361   RECEIVED NYSCEF: 06/05/2019

Health Solutions, LLC (collectively, "PBM Defendants" or "Defendants"); Raymond Sackler Family; Mortimer Sackler Family; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Stuart D. Baker; and John N. Kapoor; (Collectively, "Individual Defendants" or "Defendants"); (collectively, "Defendants") alleges as follows:

## INTRODUCTION

1. This case is about one thing: corporate greed. Defendants put their desire for profits above the health and well-being of consumers in the City of Rochester at the cost of Plaintiff.

2. The City of Rochester spends millions of dollars each year to provide and pay for health care, services, pharmaceutical care and other necessary services and programs on behalf of residents of its City whom are indigent or otherwise eligible for services, including payments through services such as Medicaid for prescription opium painkillers ("opioids") which are manufactured, marketed, promoted, sold, and/or distributed by the Defendants.

3. The City of Rochester also provides a wide range of other services to its residents, including law enforcement, services for families and children, and public assistance.

4. In recent years, the City of Rochester has been forced to expend exorbitant amounts of money, described further below, due to what is commonly referred to as the "opioid epidemic" and as a direct result of the actions of Defendants.

5. Plaintiff is also responsible for either partially or fully funding a medical insurance plan for their employees, including the costs of prescription drugs, including opioids.

2

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 43 of 1171. PageID #: 705362

6.      Addiction is a spectrum of substance use disorders that range from misuse and abuse of drugs to addiction.[1] Throughout this Complaint, "addiction" refers to the entire range of substance abuse disorders. Individuals suffer negative consequences wherever they fall on the substance use disorder spectrum.

7.      Defendants knew that opioids were effective treatments for short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care. Yet they also knew—and had known for years—that opioids were addictive and subject to abuse, particularly when used long-term for chronic non-cancer pain (pain lasting three months or longer, hereinafter referred to as "chronic pain"), and should there not be used except as a last-resort.

8.      Defendants knew that, barring exceptional circumstances, opioids were too addictive and too debilitating for long-term use for chronic non-cancer pain lasting three months or longer.

9.      Defendants further knew—and had known for years—that with prolonged use, the effectiveness of opioids wanes, requiring increases in doses and markedly increasing the risk of significant side effects and addiction.[2, 3]

10.     Defendants also knew that controlled studies of the safety and efficacy of opioids were limited to short-term use (not longer than 90 days), and in managed settings (*e.g.*, hospitals), where the risk of addiction and other adverse outcomes was much less significant.

11.     Indeed, the U.S. Food and Drug Administration ("FDA") has expressly recognized that there have been no long-term studies demonstrating the safety and efficacy of opioids for long-term use.[4]

---

[1] Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-V").

[2] *See, e.g.*, Russell K. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 Progress in Pain Res. & Mgmt. 247 (1994).

[3] The authoritative *Diagnostic and Statistical Manual of Mental Disorders*, (5th ed. 2013) ("DSM-V") classifies addiction as a spectrum of "substance use disorders" that ranges from misuse and abuse of drugs to addiction. Patients suffer negative consequences wherever they fall on the substance use disorder continuum. Throughout this Complaint, "addiction" refers to this range of substance use disorders.

3

12.     Prescription opioids, which include well-known brand-name drugs like OxyContin and Percocet, and generics like oxycodone and hydrocodone, are narcotics. They are derived from or possess properties similar to opium and heroin, which is why they are regulated as controlled substances.[5] Like heroin, prescription opioids work by binding to receptors on the spinal cord and in the brain, dampening the perception of pain. Opioids also can create a euphoric high, which can make them addictive. At certain doses, opioids can slow the user's breathing, causing respiratory depression and death.

13.     In order to expand the market for opioids and realize blockbuster profits, Defendants needed to create a sea of change in the medical and public perception that would permit the use of opioids not just for acute and palliative care, but also for long periods of time to treat more common aches and pains, like lower back pain, arthritis, and headaches.

14.     Defendants, through a sophisticated and highly deceptive and unfair marketing campaign that began in the late 1990s, deepened around 2006, and continues to the present, set out to, and did, reverse the popular and medical understanding of opioids. Chronic opioid therapy—the prescribing of opioids to treat chronic pain long-term—is now commonplace.

---

[4] Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).

[5] Since passage of the Controlled Substances Act ("CSA") in 1970, opioids have been regulated as controlled substances. Controlled substances are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the highest. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally had been categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence. 21 U.S.C. § 812. Schedule II drugs may not be dispensed without an original copy of a manually signed prescription from a doctor, which may not be refilled, and filled by a pharmacist who both must be licensed by their state and registered with the DEA. 21 U.S.C. § 829. Opioids that have been categorized as Schedule II drugs include morphine (Avinza, Embeda, Kadian, MS Contin), fentanyl (Duragesic, Actiq, Fentora), methadone, oxycodone (OxyContin, Percocet, Percodan, Tylox), oxymorphone (Opana), and hydromorphone (Dilaudid, Palladone). Schedule III drugs are deemed to have a lower potential for abuse, but their abuse still may lead to moderate or low physical dependence or high psychological dependence. 21 U.S.C. § 812. Schedule III drugs may not be dispensed without a written or oral prescription, which may not be filled or refilled more than six months after the date of the prescription or be refilled more than five times. 21 U.S.C. § 829. Some opioids had been categorized as Schedule III drugs, including forms of hydrocodone and codeine combined with other drugs, like acetaminophen. However, in October 2013, the FDA, following the recommendation of its advisory panel, reclassified all medications that contain hydrocodone from Schedule III to Schedule II. See 21 C.F.R. § 1308.

4

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 45 of 1171. PageID #: 705364

15.     To accomplish this reversal, Defendants spent hundreds of millions of dollars: (a) developing and disseminating seemingly truthful scientific and educational materials and advertising that misrepresented the risks, benefits, and superiority of opioids long-term use to treat chronic pain (b) deploying sales representatives who visited doctors and other prescribers and delivered misleading messages about the use of opioids (c) recruiting prescribing physicians as paid speakers as a means to secure those physicians' future "brand loyalty" and extend their reach to all physicians; (d) funding, assisting, encouraging, and directing certain doctors, known as "key opinion leaders" ("KOLs"), not only to deliver scripted talks, but also to draft misleading studies, present continuing medical education programs ("CMEs") that were deceptive and lacked balance, and serve on the boards and committees of professional societies and patient advocacy groups that delivered messages and developed guidelines supporting chronic opioid therapy; and (e) funding, assisting, directing, and encouraging seemingly neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups") that developed educational materials and treatment guidelines that were then distributed by Defendants, which urged doctors to prescribe, and patients to use, opioids long-term to treat chronic pain.

16.     These efforts, executed, developed, supported, and directed by Defendants, were designed not to present a fair view of how and when opioids could be safely and effectively used, but rather to convince doctors, patients and others that the benefits of using opioids to treat chronic pain outweighed the risks and that opioids could be used safely by most patients. Defendants and the third parties whom they recruited and supported, all profited handsomely through their dissemination of the deceptive information. KOLs and Front Groups saw their stature in the medical community elevated dramatically due to Defendants' funding, and Defendants saw an equally dramatic rise in their revenues.

5

17.     Working individually, with, and through these Front Groups and KOLs, Defendants pioneered a new and far broader market for their potent and highly addictive drugs— the chronic pain market. Defendants persuaded doctors, patients and others that what they had long understood—that opioids are addictive drugs and unsafe in most circumstances for long-term use— was untrue, and to the contrary, that the compassionate treatment of pain *required* opioids. Ignoring the limitations and cautions in their own drugs' labels, Defendants: (a) overstated the benefits of chronic opioid therapy, promised improvement in patients' function and quality of life, and failed to disclose the lack of evidence supporting long-term use; (b) trivialized or obscured their serious risks and adverse outcomes, including the risk of addiction, overdose, and death; (c) overstated their superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives; and (d) mischaracterized the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms. There was, and is, no reliable scientific evidence to support Defendants' marketing claims, and there was, and is, a wealth of scientific evidence that these claims are simply false. Defendants also deceptively and unfairly marketed the drugs for indications and benefits that were outside of the drugs' labels and not supported by substantial evidence.

18.     Even Defendants' KOLs initially were very cautious about whether opioids were appropriate to treat chronic pain. Some of these same KOLs have since recanted their pro-opioid marketing messages and acknowledged that Defendants' marketing went too far. Yet despite the voices of renowned pain specialists, researchers, and physicians who have sounded the alarm on the overprescribing of opioids to treat chronic pain, Defendants continue to disseminate their misleading and unfair marketing claims to this day.

19.     Defendants' efforts were wildly successful in expanding opioid abuse. The United States is now awash in opioids. In 2012, health care providers wrote 259 million prescriptions for opioid painkillers— enough to medicate every adult in America around the clock for a month. Twenty

6

percent of all doctors' visits in 2010 resulted in the prescription of an opioid, nearly double the rate in 2000. Opioids—once a niche drug—are now the most prescribed class of drugs—more than blood pressure, cholesterol, or anxiety drugs. While Americans represent only 4.6% of the world's population, they consume 80% of the opioids supplied around the world and 99% of the global hydrocodone supply.

20.     Together, opioids generated $8 billion in revenue for drug companies in 2012. Of that amount, $3.1 billion went to Purdue for its OxyContin sales. By 2015, sales of opioids grew further to approximately $9.6 billion.[6]

21.     It was Defendants' marketing—and not any medical breakthrough—that rationalized prescribing opioids for chronic pain and opened the floodgates of opioid use and abuse. The result has been catastrophic.

22.     Indeed, the National Institutes of Health "NIH" not only recognizes the opioid abuse problem, but also identifies Defendants' "aggressive marketing" as a major cause: "Several factors are likely to have contributed to the severity of the current prescription drug abuse problem. They include drastic increases in the number of prescriptions written and dispensed, greater social acceptability for using medications for different purposes, and *aggressive marketing by pharmaceutical companies.*"[7] As shown herein, the "drastic increases in the number of prescriptions written and dispensed" and the "greater social acceptability for using medications for different purposes" are not really independent causative factors but are in fact the direct result of "the aggressive marketing by pharmaceutical companies."

23.     According to the U.S. Centers for Disease Control and Prevention ("CDC"), the nation has been swept up in an opioid-induced "public health epidemic."[8] According to the CDC,

---

[6] D. Crow, *Drugmakers hooked on $10bn opioid habit*, Financial Times (August 10, 2016).

[7] America's Addiction to Opioids: Heroin and Prescription Drug Abuse. Available at http://www.drugabuse.gov/about-nida/legislative-activities/testimony-to-congress/2015/americas-addiction-to-opioids-heroin-prescription-drug-abuse#_ftn2 (accessed August 18, 2017) (emphasis added).

[8] CDC, *Examining the Growing Problems of Prescription Drug and Heroin Abuse* (Apr. 29, 2014),

7

prescription opioid use contributed to 16,651 overdose deaths nationally in 2010; 16,917 in 2011; and 16,007 in 2012. One Defendant's own 2010 internal data shows that it knew that the use of prescription opioids gave rise to 40% of drug-related emergency department visits in 2010 and 40% of drug poisoning deaths in 2008, and that the trend of opioid poisonings was increasing from 1999-2008. For every death, more than 30 individuals are treated in emergency rooms.

24.    Between 1996 and 2006, the New York State consumption of hydrocodone increased from approximately 2,000 milligrams (mgs) per person to 12,000 mgs per person. Oxycodone consumption increased from approximately 1,000 mgs per person to 16,000 mgs per person. At the same time, health care admissions for opioid analgesic abuse has risen both nationally and in New York State at rates of greater than 300%.

25.    The local government and State of New York have taken steps and will foreseeably continue to take steps in efforts to combat the opioid epidemic which has been caused by the actions of the Defendants. These government efforts create an increased cost and spending. As an example, in 2016, Governor Cuomo passed legislation that requires insurance companies to cover inpatient treatment without preapproval, extends emergency room visits from 48 to 72 hours, and adds thousands of addiction treatment slots. All of this creates an increased burden and cost on Medicaid.

26.    Due to the continued rise of the opioid epidemic and deaths, the City of Rochester has taken steps and will continue to take steps to fight the use of opioids and save lives.

27.    The commission of criminal acts to obtain opioids is an inevitable consequence of opioid addiction.

28.    But even these alarming statistics do not fully communicate the toll of prescription opioid abuse on patients and their families.

---

http://www.cdc.gov/washington/testimony/2014/t20140429.htm (accessed May 30, 2017).

8

29.     The dramatic increase in opioid prescriptions to treat common chronic pain conditions has resulted in a population of addicts who seek drugs from doctors. When turned down by one physician, many of these addicts deploy increasingly desperate tactics—including doctor-shopping, use of aliases, and criminal means—to satisfy their cravings.

30.     Efforts by doctors to reverse course for a chronic pain patient already on opioids long-term include managing the physical suffering and psychological distress a patient endures while withdrawing from the drugs. This process is often thwarted by a secondary criminal market well-stocked by a pipeline of drugs that is diverted to supply them. Even though they never would have prescribed opioids in the first place, many doctors feel compelled to continue prescribing opioids to patients who have become dependent on them.

31.     According to the CDC, more than 12 million Americans age 12 or older have used prescription painkillers without a prescription in 2010, and adolescents are abusing opioids in alarming numbers.[9]

32.     Opioid abuse has not displaced heroin, but rather triggered a resurgence in its use, imposing additional burdens on the City and local agencies that address heroin use and addiction. According to the CDC, the percentage of heroin users who also use opioid pain relievers rose from 20.7% in 2002-2004 to 45.2% in 2011-2013. Heroin produces a very similar high to prescription opioids, but is often cheaper. While a single opioid pill may cost $10-$15 on the street, users can obtain a bag of heroin, with multiple highs, for the same price. It is hard to imagine the powerful pull that would cause a law-abiding, middle-aged person who started on prescription opioids for a back injury to turn to buying, snorting, or injecting heroin, but that is the dark side of opioid abuse and addiction.

33.     Dr. Robert DuPont, former director of the National Institute on Drug Abuse, opines that opioids are more destructive than crack cocaine:

---

[9] CDC, *Prescription Painkiller Overdoses in the US* (Nov. 2011),
https://www.cdc.gov/vitalsigns/painkilleroverdoses/ (accessed May 30, 2017).

9

[Opioid abuse] is building more slowly, but it's much larger. And the potential for death, in particular, [is] way beyond anything we saw then. . . . [F]or pain medicine, a one-day dose can be sold on the black market for $100. And a single dose can [be] lethal to a non-patient. There is no other medicine that has those characteristics. And if you think about that combination and the millions of people who are using these medicines, you get some idea of the exposure of the society to the prescription drug problem.[10]

34.     Countless City residents suffer from chronic pain, which takes an enormous toll on their health, their lives, and their families. These residents deserve both appropriate care and the ability to make decisions based on accurate and complete information about treatment risks and benefits. But Defendants' deceptive and unfair marketing practices deprived City residents and their doctors of the ability to make informed medical decisions and, instead, caused important, sometimes life-or-death decisions to be made based not on science, but on hype. Defendants deprived patients, their doctors, and health care payors of the chance to exercise informed judgment and subjected them to enormous costs and suffering.

35.     Defendants' actions are not permitted or excused by the fact that their labels (with the exception of Cephalon's labels for Fentora and Actiq) may have allowed, or did not exclude, the use of opioids for chronic non-cancer pain. The FDA's approval did not give Defendants license to misrepresent the risks, benefits, or superiority of opioids. Indeed, what makes Defendants' efforts particularly nefarious—and dangerous—is that, unlike other prescription drugs marketed unlawfully in the past, opioids are highly addictive controlled substances. Defendants deceptively and unfairly

---

[10] Transcript, *Use and Abuse of Prescription Painkillers*, The Diane Rehm Show (Apr. 21, 2011), http://thedianerehmshow.org/shows/2011-04-21/use-and-abuse-prescription-painkillers/transcript (accessed May 30, 2017).

engaged a patient base that—physically and psychologically—could not turn away from their drugs, many of whom were not helped by the drugs or were profoundly damaged by them.

36.    Nor is Defendants' causal role broken by the involvement of doctors. Defendants' marketing efforts were both ubiquitous and highly persuasive; their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions. Defendants targeted not only pain specialists, but also primary care physicians (PCPs), nurse practitioners, physician assistants, and other non-pain specialists who were even less likely to be able to assess the companies' misleading statements. Defendants were also able to callously manipulate what doctors wanted to believe—namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

37.    By 2014, nearly two million Americans were either abusing opioid medications or were dependent on opioids.[11] According to the CDC, opioids have created a "public health epidemic" as of 2016.[12]

38.    Defendants' marketing campaign has been extremely harmful and has cost American lives – including lives of residents of the City of Rochester. Deaths from prescription opioids have quadrupled since 1999. From 2000 to 2014 nearly 500,000 people died from such overdoses; seventy-eight Americans die every day from opioid overdoses.[13]

39.    It is estimated that, in 2012, 2.1 million people in the United States suffered from substance use disorders related to prescription opioid pain relievers.[14]

---

[11] CDC, Injury Prevention & Control: Opioid Overdose, Prescription Opioids, Addiction and Overdose. Available at http://www.cdc.gov/drugoverdose/opioids/prescribed.html (accessed May 30, 2017).
[12] CDC, *Examining the Growing Problems of Prescription Drug and Heroin Abuse*, (Apr. 29, 2014), http://www.cdc.gov/washington/testimony/2014/ts0140429.htm (accessed May 30, 2017).
[13] CDC, Injury Prevention & Control: Opioid Overdose, Understanding the Epidemic.
[14] Substance Abuse and Mental Health Services Administration, *Results from the 2012 National Survey on Drug Use and Health: Summary of National Findings*, NSDUH Series H- 46, HHS Publication No. (SMA) 13-4795. Rockville, MD: Substance Abuse and Mental Health Services Administration, 2013.

40.    The rising numbers of persons addicted to opioids have led not only to an increase in health care costs to the City, and specifically the Plaintiff, but also a major increase in issues such as drug abuse, diversion,[15] and crimes related to obtaining opioid medications. The City of Rochester has been severely and negatively impacted due to the fraudulent misrepresentations and omissions by Defendants regarding the use and risk related to opioids. In fact, upon information and belief, Defendants have been and continue to be aware of the high levels of diversion of their product.

41.    The actions of Defendants have created an environment where select physicians have sought to profit at the expense of their patients who become addicted to opioid pain medications, often accepting cash payments and ordering unnecessary medical tests, again at the expense of the City.

42.    Prescription drug manufacturers, wholesalers/distributors and pharmacy benefit managers ("PBMs") have created this epidemic. The manufacturers make the opioids and lie about their efficacy and addictive properties. The wholesalers distribute the opioids from the point of manufacture to the point of delivery to the patient. And the PBMs control, through their formularies, which drugs go where and how they are paid for.

43.    PBMs are a necessary party to any discussion of opioid-related misconduct committed by pharmaceutical supply chain actors, and its ramifications. Neither courts nor the governmental entities left to clean up the opioid crisis can address the flow of opioids or the costs of abatement without including the parties that are in fact capable of controlling that flow, across all manufacturers and distributors, i.e. the PBMs.

44.    PBMs are the gatekeepers to the vast majority of opioid prescriptions filled in the United States. Caremark, Express Scripts, and OptumRx (all named defendants here) manage the drug benefits for approximately ninety-five percent (95%) of the United States' population or 253 million

---

[15] The CDC defines using or obtaining opioids illegally as "diversion."

American lives.[16] PBMs control drug formularies which set the criteria and terms under which pharmaceutical drugs are reimbursed. In this way, PBMs control prescription drug utilization overall.

45.     PBMs' complicity in the overall fraudulent scheme is purposeful given the nature of the financial arrangements between PBMs and drug manufacturers and others in the supply chain. Drug manufacturers compete for PBM formulary placement (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to avoid pre-authorization requirements that would slow down flow.

46.     PBMs require, and receive, incentives from Manufacturer Defendants to keep certain drugs on and off formularies. These incentives include the payment of rebates by Manufacturers Defendants to PBMs based on utilization, bonuses for moving product and hitting volume targets, and the payment of lucrative administrative fees to maximize PBM profits. Much of this activity is not transparent to anyone, including those who in good faith hire PBMs to manage their benefits.

47.     PBMs are the middlemen between the manufacture and the availability of opioids. The PBM formularies determine what drugs (a) will be available (or not available) to patients; (b) for what diagnosis, efficacious or otherwise; (c) in what quantities; (d) at what co-pay; (e) what level of authorization will be required; and (f) what beneficial drugs will not be available. PBMs collude with Manufacturers who pay fees in the form of rebates, administrative fees and other, in order to ensure good placement on the formulary to the financial benefit of the PBMs. This leads to more prescriptions and more pills available to the general public, many of which find their way to the black market. PBMs have in their exclusive power the ability to limit the number of pills available for legitimate and illegitimate consumption. Even though PBMs were well aware of the effect of their decisions about formulary placement, they chose to make decisions purely for their own financial gain.

---

[16] Brittany Hoffman-Eubanks, The Role of Pharmacy Benefit Managers in American Health Care: Pharmacy Concerns and Perspectives: Part 1, PHARMACY TIMES, Nov. 14, 2017, http://www.pharmacytimes.com/news/the-role-ofpharmacy-benefit-mangers-in-american-health-care-pharmacy-concerns-and-perspectives-part-1

13

48.     PBMs not only control the majority of this country's prescriptions through their formularies, they generate massive profits from that work. "[N]early one third of all expenditures on branded drugs in 2015 were eventually rebated back. And, most of these rebates directly benefited the PBM."[17]

49.     PBMs can extract rebates and other incentives from Manufacturer Defendants because of the PBMs' market power. Today, PBMs have leveraged their position as the middlemen and now impact almost every aspect of the prescription drug marketplace.

50.     "The position of the three major PBMs at the center of the drug distribution system appears to be unassailable for now. Last year CalPERS, California's public employee benefits system, awarded OptumRx a five-year, $4.9-billion contract to manage prescriptions for nearly 500,000 members and their families enrolled in non-HMO health plans. The only other finalists in the bidding were CVS Caremark and Express Scripts,"[18] all defendants here.

51.     The power of the PBMs has evolved over time. Originally mere claims processors, PBMs now play a major role in managing pharmaceutical spending and enhancing health benefits for end-users. [19]

52.     PBMs quietly became an integral part of the pharmaceutical supply chain—that is, the path a drug takes from the manufacturing facility to a bathroom medicine cabinet—following the passage of the Medicare Modernization Act in 2003.[20]

53.     Because PBMs are the intermediary between drug manufacturers, pharmacies, and ultimately patients, these companies control everything from pharmacy reimbursements, to what drugs

---

[17] Wayne Winegarden, To Improve Pharmaceutical Pricing, Reform PBMs And Fix Health Care's Systemic Problems, FORBES, Apr. 4, 2017, https://www.forbes.com/sites/econostats/2017/04/04/to-improve-pharmaceutical-pricingreform-pbms-and-fix-health-cares-systemic-problems/#4da58c5a3322

[18] Michael Hiltzik, How 'price cutting' middlemen are making crucial drugs vastly more expensive, LOS ANGELES TIMES, Jun. 9, 2017, http://www.latimes.com/business/hiltzik/la-fi-hiltzik-pbm-drugs-20170611-story.html

[19] Zacks Equity Research, PBM Industry Shows Strength: 3 Stocks in Focus, NASDAQ, Dec. 13, 2017, http://www.nasdaq.com/article/pbm-industry-shows-strength-3-stocks-in-focus-cm891506

[20] Jessica Wapner, Understanding the Hidden Villain of Big Pharma: Pharmacy Benefit Managers, NEWSWEEK, Mar. 17. 2017, http://www.newsweek.com/big-pharma-villain-pbm-569980

14

are covered under formularies.[21] In these ways, the PBMs control which drugs enter the marketplace. Their fingerprints are on nearly every opioid prescription filled and they profit in myriad ways on every pill.

54.    The harm caused by the PBMs is not just monetary: "[t]he PBMs and insurers are harming the health of patients with chronic and rare diseases by limiting access and charging them retail for drugs they buy at deep discounts."[22]

55.    MedPageToday, a source for clinical and policy coverage that directly affects the lives and practices of health care professionals, describes the PBMs' complicity in the opioid crisis this way:

> If you are looking for someone to blame for the opioid epidemic, you can certainly blame physicians. You can blame pharmaceutical companies. But while you are at it, don't forget to include payers [PBMs]. This conclusion should not be surprising. We live in a world where payers -- not physicians -- determine what drugs and treatments patients receive. If patients have a life-threatening condition, it is not unusual for a payer to demand that a physician first prescribe a cheaper and less effective alternative. Physicians know that the drugs they are allowed to use may not work very well, but frequently, payers demand that they be tried first anyway.
>
> What happens if the patient doesn't respond to the cheap drug? Often, the physician continues to prescribe it, because -- to gain access to the more effective drug -- physicians need to go through a painful process of preauthorization. For many practitioners, it isn't worth it.
> So we spend more for healthcare than any other country in the world, but Americans do not get the care they need. There is a simple reason. Treatment decisions are not being driven based on a physician's knowledge or judgment. They are being driven by what payers are willing to pay for.[23]

56.    Upon information and belief, this City of Rochester complaint marks one of the first pleading in the Country to identify PBMs as among those bearing responsibility for the opioid scheme.

---

[21] Matthew Kandrach, PBM stranglehold on prescription drug market demands reform, THE HILL, May 2, 2017, http://thehill.com/blogs/pundits-blog/healthcare/331601-pbm-stranglehold-on-prescription-drug-market-demandsreform

[22] Jonathan Wilcox, PBMs Must Put Patients First, HUFFINGTON POST, Feb. 28, 2017, https://www.huffingtonpost.com/entry/pbms-must-put-patients-first_us_58b60bd8e4b02f3f81e44dcc

[23] Milton Packer MD, Are Payers the Leading Cause of Death in the United States?, MEDPAGETODAY, Nov. 1, 2017, https://www.medpagetoday.com/blogs/revolutionandrevelation/68935

15

The omission of PBMs from most legal efforts to address the opioid crisis has been noted. "Drugmakers, pharmaceutical distributors, pharmacies and doctors have come under intense scrutiny in recent years, but the role that insurers — and the pharmacy benefit managers that run their drug plans — have played in the opioid crisis has received less attention."[24]

57.     As one news outlet described it, "[o]ne overlooked culprit worsening the epidemic, however, comes straight from our health care system: pharmacy benefit managers, or PBMs. To improve their bottom line, they're blocking access to prescriptions that can help prevent overdoses."[25]

58.     The novelty of the City of Rochester's approach should not distract from the reality of the PBMs' complicity—indeed, necessity—in the scheme before this Honorable Court. None of the manufacturers' or distributors' wrongdoing would have succeeded without the PBMs' ability to control and move product.

59.     As a direct and foreseeable consequence of Defendants' wrongful conduct, Plaintiff has been required to spend millions of dollars each year in its efforts to combat the public nuisance created by Defendants' deceptive marketing campaign. Plaintiff has incurred and continues to incur costs related to opioid addiction and abuse, including, but not limited to, health care costs, criminal justice and victimization costs, social costs, and lost productivity costs. Defendants' misrepresentations regarding the safety and efficacy of long-term opioid use proximately caused injury to Plaintiff and its residents.

## JURISDICTION AND VENUE

---

[24] Katie Thomas and Charles Ornstein, Amid Opioid Crisis, Insurers Restrict Pricey, Less Addictive Painkillers, THE NEW YORK TIMES, Sep. 17, 2017, https://www.nytimes.com/2017/09/17/health/opioid-painkillers-insurancecompanies.html?mwrsm=Email
[25] Peter J. Pitts, Pharmacy benefit managers are driving the opioid epidemic, SW NEWS MEDIA, Nov. 21, 2017, http://www.swnewsmedia.com/shakopee_valley_news/news/opinion/guest_columns/pharmacy-benefit-managersare-driving-the-opioid-epidemic/article_2f6be2a1-c7a3-5f8d-9f3e-, 61d29d25c84b.html

16

60.     This Court has jurisdiction over this action pursuant to New York Constitution, article VI, § 7(a) and CPLR 301 and 302.

61.     Venue is proper in Monroe County pursuant to CPLR 503(a).

62.     This action is non-removable because there is incomplete diversity of residents and no substantial federal question is presented.

## PARTIES

### A. Plaintiff.

63.     The City of Rochester is a City within the State of New York, Monroe County, of about 208,000 residents.

### B. Defendants.

64.     Purdue Pharma L.P. is a limited partnership organized under the laws of Delaware with its principal place of business in Stamford Connecticut. Purdue Pharma Inc. is a New York corporation with its principal place of business in Stamford, Connecticut, and The Purdue Frederick Company, Inc. is a New York corporation with its principal place of business in Stamford, Connecticut (collectively, "Purdue").

65.     Purdue is primarily engaged in the manufacture, promotion, sale, and distribution of opioids nationally and within the City of Rochester, including the following:

       a.  OxyContin (oxycodone hydrochloride extended release) is a Schedule II opioid agonist[26] tablet first approved in 1995 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to

---

[26] An opioid agonist is a drug that activates certain opioid receptors in the brain. An antagonist, by contrast, blocks the receptor and can also be used in pain relief or to counter the effect of an opioid overdose.

17

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 58 of 1171. PageID #: 705377

April 2014,[27] OxyContin was indicated for the "management of moderate to severe pain when a continuous, around-the- clock opioid analgesic is needed for an extended period of time."

b.  MS Contin (morphine sulfate extended release) is a Schedule II opioid agonist tablet first approved in 1987 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to April 2014, MS Contin was indicated for the "management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time."

c.  Dilaudid (hydromorphone hydrochloride) is a Schedule II opioid agonist first approved in 1984 (injection) and 1992 (oral solution and tablet) and indicated for the "management of pain in patients where an opioid analgesic is appropriate."

d.  Dilaudid-HP (hydromorphone hydrochloride) is a Schedule II opioid agonist injection first approved in 1984 and indicated for the "relief of moderate-to-severe pain in opioid-tolerant patients who require larger than usual doses of opioids to provide adequate pain relief."

---

[27]  The labels for OxyContin and other long-acting opioids were amended in response to a 2012 citizens' petition by doctors. The changes were intended to clarify the existing obligation to "make an individualized assessment of patient needs." The petitioners also successfully urged that the revised labels heighten the requirements for boxed label warnings related to addiction, abuse, and misuse by changing "Monitor for signs of misuse, abuse, and addiction" to "[Drug name] exposes users to risks of addiction, abuse, and misuse, which can lead to overdose and death." Letter from Bob Rappaport, Dir. Ctr. for Drug Evaluations & Res., *Labeling Supplement and PMR [Post-Marketing Research] Required* (Sept. 10, 2013), http://www.fda.gov/downloads/Drugs/DrugSafety/InformationbyDrugClass/UCM367697.pdf (accessed May 30, 2017).\

e.   Butrans (buprenorphine) is a Schedule III opioid partial agonist transdermal patch first approved in 2010 and indicated for the "management of pain severe enough to require daily, around- the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to April 2014, Butrans was indicated for the "management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time."

f.   Hysingla ER (hydrocodone bitrate) is a Schedule II opioid agonist tablet first approved in 2014 and indicated for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

g.   Targiniq ER (oxycodone hydrochloride and naloxone hydrochloride) is a Schedule II combination product of oxycodone, an opioid agonist, and naloxone, an opioid antagonist, first approved in 2014 and indicated for the management of pain severe enough to require daily, around- the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

66.   OxyContin is Purdue's largest-selling opioid. Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (*i.e.*, painkillers).

67.   In 2007, Purdue settled criminal and civil charges against it for misbranding OxyContin and agreed to pay the United States $635 million—at the time one of the largest settlements with a

19

drug company for marketing misconduct.[28] Pursuant to its settlement, Purdue operated under a Corporate Integrity Agreement with the Office of Inspector General of the U.S. Department of Health and Human Services, which required the company, *inter alia*, to ensure that its marketing was fair and accurate, and to monitor and report on its compliance with the Agreement.

68.    Purdue's conspiring with PBMs to drive opioid use is well established. As described in an October 28, 2016 article from Psychology Today entitled America's Opioid Epidemic:

> …Purdue actively misled prescribers about the strength and safety of the painkiller [OxyContin]. To undermine the policy of requiring prior authorization, they offered lucrative rebates to middlemen such as Merck Medco [now Express Scripts, a defendant herein] and other pharmacy benefits managers, on condition that they eased availability of the drug and lowered co-pays. The records were part of a case brought by the state of West Virginia against both drug makers alleging inappropriate and illegal marketing of the drug as a cause of widespread addiction. … One reason the documents are so troubling is that, in public at least, the drug maker was carefully assuring authorities that it was working with state authorities to curb abuse of OxyContin. Behind the scenes, however, as one Purdue official openly acknowledged, the drug maker was working with Medco (PBM) [now Express Scripts] to try to make parameters [for prescribing] less stringent. [29]

69.    Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Whales, Pennsylvania. Teva USA is a wholly owned subsidiary of Teva Pharmaceutical Industries, Ltd. ("Teva Ltd."), an Israeli corporation.

70.    Defendant Cephalon, Inc. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. In 2011, Teva Ltd. acquired Cephalon, Inc.

71.    Teva USA and Cephalon, Inc. work together closely to market, manufacture, distribute and sell Cephalon products in the United States. Teva USA conducts Teva Ltd.'s sales and marketing

---

[28]  https://oig.hhs.gov/publications/docs/press/2007/SemiannualRelfall2007E.pdf (accessed May 30, 2017).
[29]  American Society of Addiction Medicine, America's Opioid Epidemic – Court released documents show drug makers blocked efforts to curb prescribing, PSYCHOLOGY TODAY, Oct. 28, 2016, https://www.psychologytoday.com/ blog/side-effects/201610/america-s-opioid-epidemic

activities for Cephalon in the United States and has done so since Teva Ltd.'s October 2011 acquisition of Cephalon. Teva USA holds out Actiq and Fentora as Teva products to the public. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. The FDA approved prescribing information and medication guide, which is distributed with Cephalon opioids marketed and sold in Plaintiffs' areas, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events. (Teva USA and Cephalon, Inc. collectively are referred to herein as "Cephalon.")

72.     Cephalon has been in the business of manufacturing, selling, and distributing the following opioids, nationally and within the City of Rochester:

a.  Actiq (fentanyl citrate) is a Schedule II opioid agonist lozenge (lollipop) first approved in 1998 and indicated for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."

b.  Fentora (fentanyl citrate) is a Schedule II opioid agonist buccal tablet (similar to plugs of smokeless tobacco) first approved in 2006 and indicated for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."

73.     In November 1998, the FDA granted restricted marketing approval for Actiq, limiting its lawful promotion to cancer patients experiencing pain. The FDA specified that Actiq should not be marketed for off-label uses, stating that the drug must be prescribed solely to cancer patients. In 2008, Cephalon pleaded guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs, and agreed to pay $425 million in fines, damages, and penalties.

21

74.     The FDA requested that Endo remove Cephalon's Opana ER from the market in June 2017. The FDA relied on postmarketing data in reaching its conclusion based on the concern that the benefits of the drug may no longer outweigh its risk of abuse.[30]

75.     Teva USA was in the business of selling generic opioids, including a generic form of OxyContin from 2005 through 2009 nationally and within the City of Rochester.

76.     On September 29, 2008, Cephalon entered into a five-year Corporate Integrity Agreement with the Office of Inspector General of the U.S. Department of Health and Human Services.[31] The agreement, *inter alia*, required Cephalon to send doctors a letter advising them of the settlement terms and gave them a means to report questionable conduct of its sales representatives; disclose payments to doctors on its web site; and regularly certify that the company has an effective compliance program.

77.     Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of Johnson & Johnson, a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Janssen Pharmaceuticals, Inc. was formerly known as ("f/k/a") Ortho-McNeil- Janssen Pharmaceuticals, Inc., which in turn was formerly known as Janssen Pharmaceutica Inc. Defendant Ortho-Mcneil-Janssen Pharmaceuticals, Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. Janssen Pharmaceutica, Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. Johnson & Johnson is the only company that owns more than 10% of Janssen Pharmaceuticals, Inc.'s stock, and it corresponds with the FDA regarding Janssen's products. Upon

---

[30]  FDA requests removal of OPANA ER for risks related to abuse. Available at: https://www.fda.gov/newsevents/newsroom/pressannouncements/ucm562401.htm (accessed August 17, 2017).
[31]  https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html (accessed May 30, 2017).

22

information and belief, Johnson & Johnson controls the sale and development of Janssen Pharmaceutical's drugs, and Janssen Pharmaceuticals, Inc.'s profits inure to Johnson & Johnson's benefit. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and Johnson & Johnson collectively are referred to herein as "Janssen.")

78.     Janssen manufactures, sells, and distributes a range of medical devices and pharmaceutical drugs in the City of Rochester, and the rest of the nation, including Duragesic (fentanyl), which is a Schedule II opioid agonist transdermal patch first approved in 1990 and indicated for the "management of pain in opioid-tolerant patients, severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."

79.     Until January 2015, Janssen also developed, marketed, and sold Nucynta and Nucynta ER:

      a.  Nucynta ER (tapentadol extended release) is a Schedule II opioid agonist tablet first approved in 2011 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to April 2014, Nucynta ER was indicated for the "management of moderate to severe chronic pain in adults [and] neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults." The DPN indication was added in August 2012.

      b.  Nucynta (tapentadol) is a Schedule II opioid agonist tablet and oral solution first approved in 2008 and indicated for the "relief of moderate to severe acute pain in patients 18 years of age or older."

23

80.     Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.[32] Prior to 2009, Duragesic accounted for at least $1 billion in annual sales.

81.     Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals, Inc. is a wholly-owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc. collectively are referred to herein as "Endo.")

82.     Endo develops, markets, and sells prescription drugs, including the following opioids, in the City of Rochester, and nationally:

> a. Opana ER (oxymorphone hydrochloride extended release) is a Schedule II opioid agonist tablet first approved in 2006 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to April 2014, Opana ER was indicated for the "relief of moderate to severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time." On June 8, 2017, the FDA requested that Endo Pharmaceuticals remove its opioid medication, reformulated Opana ER (oxymorphone hydrochloride), from the market.[33]

---

[32] http://www.prnewswire.com/news-releases/depomed-announces-closing-of-acquisition-of-us-rights-to-nucynta-tapentadol-nucynta-er-tapentadol-extended-release-tablets-and-nucynta-tapentadol-oral-solution-from-janssen-pharmaceuticals-inc-for-105-billion-300060453.html (accessed May 30, 2017)

[33] *FDA Requests Removal of Opana ER for Risks Related to Abuse.*
https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm562401.htm.

24

b. Opana (oxymorphone hydrochloride) is a Schedule II opioid agonist tablet first approved in 2006 and indicated for the "relief of moderate to severe acute pain where the use of an opioid is appropriate."

c. Percodan (oxycodone hydrochloride and aspirin) is a Schedule II opioid agonist tablet first approved in 1950 and first marketed by Endo in 2004 and indicated for the "management of moderate to moderately severe pain."

d. Percocet (oxycodone hydrochloride and acetaminophen) is a Schedule II opioid agonist tablet first approved in 1999 and first marketed by Endo in 2006 and indicated for the "relief of moderate to moderately severe pain."[34]

83. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded revenue of $1.15 billion from 2010 to 2013, and alone accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids nationally and in the City of Rochester, both itself and through its subsidiary, Qualitest Pharmaceuticals, Inc., including generic oxycodone, oxymorphone, hydromorphone, and hydrocodone products.

84. Allergan plc is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Actavis plc acquired Allergan plc in March 2015, and the combined company changed its name to Allergan plc in March 2015. Prior to that, Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012; the combined company changed its name to Actavis, Inc. in January 2013 and then to Actavis plc in October 2013. Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly owned subsidiary of Allergan plc (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). Actavis Pharma, Inc. (f/k/a

---

[34] In addition, Endo marketed Zydone (hydrocodone bitartrate and acetaminophen), a Schedule III opioid agonist tablet indicated for the "relief of moderate to moderately severe pain," from 1998 through 2013. The FDA's website indicates this product is currently discontinued, but it appears on Endo's own website.

25

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 66 of 1171. PageID #: 705385

Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey, and was formerly known as Watson Pharma, Inc. Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by Allergan plc, which uses them to market and sell its drugs in the United States. Upon information and belief, Allergan plc exercises control over these marketing and sales efforts, and profits from the sale of Allergan/Actavis products ultimately inure to its benefit. (Allergan plc, Actavis plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. hereinafter collectively are referred to as "Actavis.")[35]

85. Actavis engages in the business of marketing and selling opioids in the City of Rochester, and across the country, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana. Kadian (morphine sulfate extended release) is a Schedule II opioid agonist capsule first approved in 1996 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to April 2014, Kadian was indicated for the "management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time." Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc., on December 30, 2008 and began marketing Kadian in 2009.

86. Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its principal place of business in Chandler, Arizona.

---

[35] The list of Allergan-related entities shall be understood to incorporate all affiliates that owned, manufactured, distributed, monitored, or sold opioid medicines at issue, including: Allergan Finance, LLC; Allergan Sales, LLC; Allergan USA, Inc.; Warner Chilcott Company, LLC; Watson Laboratories, Inc.; Actavis Elizabeth LLC; Actavis Pharma, Inc.; Actavis LLC; Actavis Mid Atlantic LLC; Actavis Kadian LLC; Actavis Totowa LLC; Actavis South Atlantic LLC; Actavis Laboratories UT, Inc.; and Actavis Laboratories FL, Inc.

26

87.     Insys develops, markets, and sells prescription drugs, including Subsys, a sublingual spray of fentanyl, in the City of Rochester and nationally.

88.     Defendant McKesson Corporation ("McKesson") is a Delaware corporation with its principal place of business in San Francisco, California.

89.     Defendant McKesson had a net income in excess of $1.5 Billion in 2015.

90.     Defendant McKesson distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including New York State and the City of Rochester.

91.     Upon information and belief, Defendant McKesson is a pharmaceutical distributor licensed to do business in New York State.

92.     Defendant McKesson is the largest pharmaceutical distributor in North America.

93.     Upon information and belief, Defendant McKesson delivers one-third of all pharmaceuticals used in North America.

94.     Defendant McKesson does substantial business in the State of New York and the City of Rochester.

95.     Defendant Cardinal Health Inc. ("Cardinal") is an Ohio Corporation with its principal place of business in Dublin, Ohio.

96.     Defendant Cardinal distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including New York and the City of Rochester.

97.     Upon information and belief, Defendant Cardinal is a pharmaceutical distributor licensed to do business in New York State.

98.     Defendant Cardinal does substantial business in the State of New York and the City of Rochester.

99.     Upon information and belief, Defendant Cardinal is one of the largest distributors of opioid pain medications in the City of Rochester.

100.    Upon information and belief, Defendant AmerisourceBergen Drug Corporation ("Amerisource") is a Delaware Corporation with its principal place of business in Chesterbrook, Pennsylvania.

101.    Defendant Amerisource does substantial business in the State of New York and the City of Rochester.

102.    Upon information and belief, Defendant Amerisource is a pharmaceutical distributor licensed to do business in New York State.

103.    Defendant Amerisource distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including New York State and the City of Rochester.

104.    Upon information and belief, Defendant Amerisource is one of the largest distributors of opioid pain medications in the Country, including the City of Rochester.

105.    Upon information and belief, Defendant American Medical Distributors, Inc. ("American Medical Distributors") is a New York Corporation with its principal place of business in North Amityville, New York.

106.    Defendant American Medical Distributors does substantial business in the State of New York and the City of Rochester.

107.    Upon information and belief, Defendant American Medical Distributors is a pharmaceutical distributor licensed to do business in New York State.

108.    Defendant American Medical Distributors distributes pharmaceuticals to retail pharmacies and institutional providers to customers in New York State and in the City of Rochester.

109.    Upon information and belief, Defendant American Medical Distributors is one of the distributors of opioid pain medications in New York State.

28

110. Upon information and belief, American Medical Distributors is a subsidiary of Bellco Drug Corp.

111. Upon information and belief, Defendant Bellco Drug Corp. ("Bellco") is a New York Corporation with its principal place of business in Amityville, New York.

112. Defendant Bellco does substantial business in the State of New York and the City of Rochester.

113. Upon information and belief, Defendant Bellco is a pharmaceutical distributor licensed to do business in New York State.

114. Defendant Bellco distributes pharmaceuticals to retail pharmacies and institutional providers to customers in New York State and in the City of Rochester.

115. Upon information and belief, Defendant Bellco is one of the distributors of opioid pain medications in New York State.

116. Upon information and belief, Bellco is a subsidiary of AmeriSource.

117. Upon information and belief, Defendant Blenheim Pharmacal, Inc. ("Blenheim") is a New York Corporation with its principal place of business in North Blenheim, New York.

118. Defendant Blenheim does substantial business in the State of New York and the City of Rochester.

119. Upon information and belief, Defendant Blenheim is a pharmaceutical distributor licensed to do business in New York State.

120. Defendant Blenheim distributes pharmaceuticals to retail pharmacies and institutional providers to customers in New York State and in the City of Rochester.

121. Upon information and belief, Defendant Blenheim is one of the distributors of opioid pain medications in New York State.

29

122. Upon information and belief, Defendant Darby Group Companies, Inc. ("Darby") is a New York Corporation with its principal place of business in Jericho, New York.

123. Defendant Darby does substantial business in the State of New York and the City of Rochester.

124. Upon information and belief, Defendant Darby is a pharmaceutical distributor licensed to do business in New York State.

125. Defendant Darby distributes pharmaceuticals to retail pharmacies and institutional providers to customers in New York State and in the City of Rochester.

126. Upon information and belief, Defendant Darby is one of the distributors of opioid pain medications in New York State.

127. Upon information and belief, Defendant Eveready Wholesale Drugs Ltd. ("Eveready") is a New York Corporation with its principal place of business in Port Washington, New York.

128. Defendant Eveready does substantial business in the State of New York and the City of Rochester.

129. Upon information and belief, Defendant Eveready is a pharmaceutical distributor licensed to do business in New York State.

130. Defendant Eveready distributes pharmaceuticals to retail pharmacies and institutional providers to customers in New York State and in the City of Rochester.

131. Upon information and belief, Defendant Eveready is one of the distributors of opioid pain medications in New York State.

132. Upon information and belief, Defendant Kinray, LLC ("Kinray") is a New York Corporation with its principal place of business in Whitestone, New York.

133. Defendant Kinray does substantial business in the State of New York and the City of Rochester.

134. Upon information and belief, Defendant Kinray is a pharmaceutical distributor licensed to do business in New York State.

135. Defendant Kinray distributes pharmaceuticals to retail pharmacies and institutional providers to customers in New York State and in the City of Rochester.

136. Upon information and belief, Defendant Kinray is one of the distributors of opioid pain medications in New York State.

137. Kinray is a subsidiary of Cardinal.[36]

138. Upon information and belief, Defendant PSS World Medical, Inc. ("PSS World") is a Florida Corporation with its principal place of business in Jacksonville, Florida.

139. Defendant PSS World does substantial business in the State of New York and the City of Rochester.

140. Upon information and belief, Defendant PSS World is a pharmaceutical distributor licensed to do business in New York State.

141. Defendant PSS World distributes pharmaceuticals to retail pharmacies and institutional providers to customers in New York State and in the City of Rochester.

142. Upon information and belief, Defendant PSS World is one of the distributors of opioid pain medications in New York State.

143. PSS World is a subsidiary of McKesson.[37]

144. Upon information and belief, Defendant Rochester Drug Cooperative, Inc. ("Rochester Drug") is a New York Corporation with its principal place of business in Rochester, New York.

---

[36] https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-10-million-civil-penalty-recovery-against-new-york.

[37] http://investor.mckesson.com/press-release/mckesson-completes-acquisition-pss-world-medical.

31

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM
NYSCEF DOC. NO. 2

INDEX NO. E2019005178

Index #: E2019005178

RECEIVED NYSCEF: 06/05/2019

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 72 of 1171. PageID #: 705391

145. Defendant Rochester Drug does substantial business in the State of New York and the City of Rochester.

146. Upon information and belief, defendant Rochester Drug is a pharmaceutical distributor licensed to do business in New York State.

147. Defendant Rochester Drug distributes pharmaceuticals to retail pharmacies and institutional providers to customers in New York State and in the City of Rochester.

148. Upon information and belief, Defendant Rochester Drug is one of the distributors of opioid pain medications in New York State.

149. The Purdue-Related Additional Defendants are entities and individuals associated with Purdue Pharma L.P. ("PPLP"), Purdue Pharma Inc. ("PPI"), and The Purdue Frederick Company, Inc. ("PFC") (collectively "Purdue"). These three entities are members of a worldwide group of associated companies all of which are owned and controlled, directly or indirectly through family trusts and holding companies, 50% by the widow and descendants of Mortimer D. Sackler ("Mortimer Sackler Family") and 50% by the widow and descendants of Raymond R. Sackler ("Raymond Sackler Family") (together the Mortimer Sackler Family and the Raymond Sackler Family are referred to as the "Sackler Families"). At all relevant times, the Sackler Families jointly managed and controlled all of the associated companies that the two families owned. Each of the Purdue-related individuals and entities named herein as Additional Defendants knowingly aided, abetted, participated in, and benefitted from the wrongdoing of Purdue as alleged in the Complaint; none is named merely because of his, her, or its status as a shareholder, limited partner, member of a limited liability company, or beneficiary of a trust.

150. Purdue has been sued by many plaintiffs for the role it played in creating the opioid epidemic. The three Purdue entities originally sued, PPLP, PPI, and PFC, may, however, lack sufficient assets to satisfy their liabilities to those plaintiffs, other creditors, and Plaintiff, because billions of dollars of profits from Purdue's sale of opioids has been distributed to the Sackler Families since the

32

1980s. Accordingly, by this pleading, Plaintiff is adding as defendants those members of the Sackler Families and their controlled entities who knowingly participated in the wrongdoing of Purdue as alleged in the Complaint, and who knowingly received the benefits of that wrongdoing.

151. Defendant Richard S. Sackler is a natural person residing in Travis County, Texas. He is a son of Raymond Sackler and, beginning in the 1990's, served as a member of the Board of Directors of Purdue and Purdue-related entities.

152. Defendant Jonathan D. Sackler is a natural person residing in Fairfield County, Connecticut. He is a son of Raymond Sackler and has been a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

153. Defendant Mortimer D.A. Sackler is a natural person residing in New York County, New York. He is the son of Mortimer Sackler and has been a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

154. Defendant Kathe A. Sackler is a natural person residing in Fairfield County, Connecticut. She is the daughter of Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

155. Defendant Ilene Sackler Lefcourt is a natural person residing in New York County, New York. She is the daughter of Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

156. Defendant Beverly Sackler is a natural person residing in Fairfield County, Connecticut. She is the widow of Raymond Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

157. Defendant Theresa Sackler is a natural person residing in New York County, New York. She is the widow of Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

33

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 74 of 1171. PageID #: 705393

158. Defendant David A. Sackler is a natural person residing in New York County, New York. He is the son of Richard Sackler (and thus grandson of Raymond Sackler) and has served as a member of the board of directors of Purdue and Purdue-related entities since 2012.

159. Defendant Rhodes Technologies ("Rhodes Tech") is a Delaware general partnership formed on April 12, 2005 with its principal place of business in Coventry, R.I. At relevant times, Rhodes Tech or its predecessor has manufactured and supplied Purdue with oxycodone, the active pharmaceutical ingredient in OxyContin, for use in the manufacture of pharmaceutical preparations.

160. Defendant Rhodes Technologies Inc. ("Rhodes Tech Inc.") is a Delaware corporation formed January 28, 1999 with its principal place of business in Coventry, R.I. Rhodes Tech Inc. is a general partner of Rhodes Tech. At relevant times, Rhodes Tech Inc. has manufactured and supplied Purdue with oxycodone, the active pharmaceutical ingredient in OxyContin, for use in the manufacture of pharmaceutical preparations or has managed Rhodes Tech or its predecessor in doing so.

161. Defendant Rhodes Pharmaceuticals L.P. ("Rhodes Pharma") is a Delaware limited partnership formed November 9, 2007 with its principal place of business in Coventry, R.I. At all relevant times, Rhodes Pharma has marketed a generic form of OxyContin which is manufactured by Purdue Pharmaceuticals L.P. ("PPNC"), a Delaware limited partnership, which is a subsidiary of Defendant PPLP and which owns and operates a pharmaceutical manufacturing facility in Wilson, North Carolina.

162. Defendant Rhodes Pharmaceuticals Inc. ("Rhodes Pharma Inc.") is a New York corporation formed on November 9, 2007. Rhodes Pharma Inc. is a general partner of Rhodes Pharma. At all relevant times, Rhodes Pharma Inc. has marketed a generic form of OxyContin which is manufactured by PPNC.

34

163. Defendant Trust for the Benefit of Members of the Raymond Sackler Family (the "Raymond Sackler Trust") is a trust of which Defendants Beverly Sackler, Richard S. Sackler, and/or Jonathan D. Sackler are trustees. It is the 50% direct or indirect beneficial owner of Purdue and the Purdue-related Additional Defendants and the recipient of 50% of the profits from the sale of opioids by Purdue and the Purdue-related Additional Defendants.

164. Defendant The P.F. Laboratories, Inc. ("PF Labs") is a New Jersey corporation with its principal place of business located in Totowa, New Jersey. It was, at relevant times, engaged in the business of manufacturing OxyContin for Purdue. At all relevant times, PF Labs has been beneficially owned, managed, and controlled by Defendant Sackler Family members.

165. Defendant Stuart D. Baker is a natural person residing in Suffolk County, New York. He has served as a senior executive of, and/or counsel to, Purdue, Purdue-related entities, and members of the Sackler Families since the 1990s.

166. Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc.

167. Defendant Par Pharmaceutical Companies, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York (Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are referred to collectively as "Par Pharmaceutical"). Par Pharmaceutical is an affiliate of Defendants Endo Health Solutions Inc. ("EHS") and Endo Pharmaceuticals, Inc. ("EPI). EHS, EPI, and Par Pharmaceutical, and their DEA registrant subsidiaries and affiliates (collectively, "Endo"), manufacture opioids sold throughout the United States including in and around the City of Rochester.

168. Defendant Mallinckrodt plc is an Irish public limited company with its headquarters in Staines-Upon-Thames, Surrey, United Kingdom. Mallinckrodt plc was incorporated in January 2013

35

for the purpose of holding the pharmaceuticals business of Covidien plc, which was fully transferred to Mallinckrodt plc in June of that year. Mallinckrodt plc also operates under the registered business name Mallinckrodt Pharmaceuticals, with its U.S. headquarters in Hazelwood, Missouri.

169.    Defendant Mallinckrodt LLC is a Delaware corporation with its headquarters in Hazelwood, Missouri, and registered to do business in Plaintiffs' geographic area.

170.    Defendant SpecGx LLC is a Delaware limited liability company with its headquarters in Clayton, Missouri and is a wholly-owned subsidiary of Mallinckrodt plc. Mallinckrodt plc, Mallinckrodt LLC, and SpecGx LLC and their DEA registrant subsidiaries and affiliates (together, "Mallinckrodt") manufacture, market, sell and distribute pharmaceutical drugs throughout the United States. Mallinckrodt is the largest U.S. supplier of opioid pain medications and among the top ten generic pharmaceutical manufacturers in the United States, based on prescriptions.

171.    Defendant Mylan Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business located in Canonsburg, Pennsylvania. It manufacturers, promotes, markets, distributes and sells opioids in the City of Rochester and throughout the nation. This includes many Schedule II controlled substances such as Oxycodone and Propoxy-N. Mylan conducts its pharmaceutical business operations through various entities, including Mylan Specialty, L.P. and Mylan Pharms, Inc. (collectively "Mylan".)

172.    Defendant Sandoz, Inc. is a Colorado corporation with its principal place of business located in Princeton, New Jersey. It manufacturers, promotes, markets, distributes and sells opioids in the City of Rochester and throughout the nation.

173.    Defendant West-Ward Pharmaceuticals Corp. n/k/a Hikma Pharmaceuticals, Inc. ("West-Ward") is a Delaware corporation with its principal place of business located in Eatontown, New Jersey. It manufacturers, promotes, markets, distributes and sells opioids in the City of Rochester and throughout the nation.

36

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM
NYSCEF DOC. NO. 2

INDEX NO. E2019005178
Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 77 of 1171. PageID #: 705396
RECEIVED NYSCEF: 06/05/2019

174. Defendant Amneal Pharmaceuticals, Inc. ("Amneal") is a Delaware corporation with its principal place of business located in New Jersey. It manufacturers, promotes, markets, distributes and sells opioids in the City of Rochester and throughout the nation.

175. Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its principal place of business in Chandler, Arizona. Insys develops, markets, and sells prescription drugs, including Subsys, a sublingual spray of fentanyl, in the City of Rochester and nationally.

176. Insys was co-founded in 2002 by Dr. John Kapoor, a serial pharmaceutical industry entrepreneur "known for applying aggressive marketing tactics and sharp price increases on older drugs."

177. In 2012, Insys received U.S. Food and Drug Administration approval for Subsys, a fentanyl sublingual spray product designed to treat breakthrough cancer pain. However, Insys encountered significant obstacles due to insurers employing a process known as prior authorization. Prior authorization prevents the over prescription and abuse of powerful and expensive drugs. The prior authorization process requires "additional approval from an insurer or its pharmacy benefit manager before dispensing…" and may also impose step therapy which requires beneficiaries to first use less expensive medications before moving on to a more expensive approach.

178. Insys circumvented this process by forming a prior authorization unit, known at one point as the Insys Reimbursement Center ("IRC"), to facilitate the process using aggressive and likely illegal marketing techniques. Insys published education articles that praised their products' non-addictive nature; and funded patient advocacy groups who unknowingly promoted Insys' agenda of raising the profile of pain so that drugs could be prescribed to treat it. Furthermore, Insys' former sales representatives, motivated by corporate greed, paid off medical practitioners to prescribe Subsys in spite of any medical need. Insys employees were pressured internally and received significant monetary incentives to increase the rate of prescription approvals.

37

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM
NYSCEF DOC. NO. 1

INDEX #: E2019005178
Index #: E2019005178
RECEIVED NYSCEF: 06/05/2019

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 78 of 1171. PageID #: 705397

179. According to a federal indictment and ongoing congressional investigation by Sen. Claire McCaskill, IRC employees pretended to be with doctors' offices and falsified medical histories of patients. The report, acquired by McCaskill's investigators, includes transcripts and an audio recording of employees implementing these techniques in order to obtain authorization from insurers and pharmacy benefit managers. The transcript reveals an Insys employee pretending to call on behalf of a doctor and inaccurately describes the patient's medical history. For example, Insys employees would create the impression that the patient had cancer, without explicitly saying so, because cancer was a requirement for prior clearance to prescribe Subsys. Insys was warned by a consultant that it lacked needed policies for governing such activities, but the executives failed to implement corrective internal procedures.

180. In a class action law suit against Insys, it was revealed that management "was ware that only about 10% of prescriptions approved through the Prior Authorization Department were for cancer patients," and an Oregon Department of Justice Investigation found that 78% of preauthorization forms submitted by Insys on behalf of Oregon patients were for off-label uses. Physicians are allowed to prescribe medications for indications outside of FDA guidelines if they see fit, but it is illegal for pharmaceutical companies to market a drug for off-label use.

181. In 2008, biopharmaceutical company Cephalon settled with the U.S. Government for 425 million in a suit against the company that alleged it marketed drugs for unapproved uses (off-label). The FDA approved the drug only for opioid tolerant cancer patients. According to the Oregon settlement and class-action lawsuit, at least three employees involved in sales and/or marketing at Cephalon had moved over to Insys Therapeutics.

182. Additionally, Insys created a "legal speaker program" which turned out to be a scam. The Justice Department commented on the program and stated:

38

183.    The Speaker Programs, which were typically held at high-end restaurants, were ostensibly designed to gather licensed healthcare professionals who had the capacity to prescribe Subsys and educate them about the drug. In truth, the events were usually just a gathering of friends and co-workers, most of whom did not have the ability to prescribe Subsys, and no educational component took place. "Speakers" were paid a fee that ranged from $1,000 to several thousand dollars for attending these dinners. At times, the sign-in sheets for the Speaker Programs were forged so as to make it appear that the programs had an appropriate audience of healthcare professionals.

184.    Insys paid hundreds of thousands of dollars to doctors in exchange for prescribing Subsys and three top prescribers have already been convicted of taking bribes.

185.    Fentanyl products are considered to be the most potent and dangerous opioids on the market and up to 50 times more powerful than heroine.

186.    In an internal presentation dated 2012 and entitles, "2013 SUBSYS Brand Plan," Insys identified one of six "key strategic imperatives" as "Mitigate Prior Authorization barriers." On a later slide, the company identified several tasks associated with this effort, including "Build internal [prior authorization] assistance infrastructure," "Establish an internal 1-800 reimbursement assistance hotline," and "Educate field force on [prior authorization] process and facilitation."

187.    Additional materials produced by Insys to the minority staff suggest, however, that Insys did not match these efforts with sufficient compliance processes to prevent fraud and was internally aware of the danger of problematic practices. Specifically, on February 18, 2014, Compliance Implementation Services (CIS)—a healthcare consultant—issued a draft report to Insys titled, "Insys Call Note, Email, & IRC Verbatim Data Audit Report." The introduction to the report explained that "CIS was approached by INSYS' legal representative … on behalf of the Board of Directors for Insys to request that CIS support in review of certain communications with Health Care Professionals (HCPs) and INSYS employees, and report how there were being documented." Insys had expressed

39

concerns "with respect to communications with HCPs by INSYS employees being professional in nature and in alignment with INSYS approved topics regarding off or on-label promotion of an INSYS product, and general adherence to INSYS documentation requirements." An additional concern "stemmed from the lack of monitoring of commercial activities where these types of interactions could occur."

188.    Given these issues, Insys requested that CIS review—in part—"the general communications from the INSYS Reimbursement Center (IRC) to HCPs, their office staff or representatives, as well as health insurance carriers … to ensure they were appropriate in nature with respect to specific uses of SUBSYS, INSYS' commercially marketed product."

189.    According to the findings CIS issued, Insys lacked formal policies governing the actions of its prior authorization unit. For example, "[n]o formal and approved policy on appropriate communications between IRC employees and HCPs, their staff, [health care insurers (HCIs)], or patients exists…that governs the support function of obtaining a prior authorization for the use of SUBSYS."

190.    In addition, the report noted that "there were also gaps in formally approved foundational policies, procedures, and [standard operating procedures] with respect to required processes specifically within the IRC."

191.    In fact, "[t]he majority of managerial directives, changes to controlled documents or templates, as well as updates or revisions to processes were not formally approved, documented, and disseminated for use, and were sent informally via email blast."

192.    Although four informal standard operating procedures existed with regarded to IRC functions, these documents "lacked a formal review and approval" and failed to "outline appropriately the actions performed within the IRC."

40

193.    The report also explains that Insys lacked procedures for auditing interactions between IRC employees and outside entities. According to CIS, "no formal, documented, or detailed processes by which IRC representatives' calls via telephone were audited for proper communication with HCPs or HCIs in any fashion [existed] other than random physical review of a call in a very informal and sporadic manner."

194.    More broadly, the report notes that "no formal and documented auditing and monitoring or quality control policy, process, or function exists between IRC employee communications and HCPs, HCP staff, HCIs, or patients."

195.    At the end of the report, CIS provided a number of recommendations concerning IRC activities. First, CIS suggested that IRC management "formally draft and obtain proper review and approval of an IRC specific policy detailing the appropriate communications that should occur while performing the IRC associate job functions and interacting with HCPs."

196.    Similarly, IRC management was urged to formally draft IRC-specific standard operating procedures "specific to each job function within the IRC," accompanied by "adequate training and understanding of these processes." To ensure compliance with IRC standards, Insys was also directed to create an electronic system to allow management "to monitor both live and anonymously IRC employee communications both incoming and outgoing." Finally, CIS recommended that Insys institute a formal process for revising and updating "IRC documentation used for patient and HCP data."

197.    The CIS report concluded by noting, in part, that a review of ten conversations between IRC employees and healthcare providers, office staff, and insurance carriers revealed "that all IRC staff was professional in communication, and in no instance was inaccurate or off-label usage of SUBSYS communicated."

198.     Yet within a year of this conclusion, according to the recording transcribed below, an Insys IRC employee appears to have misled a PBM representative regarding the IRC employee's affiliation and the diagnosis applicable to Sarah Fuller. The alleged result, in that case, was death due to inappropriate and excessive Subsys prescriptions.

199.     One former Insys sales representative described the motto of this approach to patients as "Start them high and hope they don't die."

200.     Defendant Noramco, Inc. ("Noramco") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J and its manufacturer of active pharmaceutical ingredients until July 2016 when J&J sold its interests to SK Capital.

201.     Defendant John N. Kapoor is a resident of Phoenix, Arizona and was the founder and owner of Insys Therapeutics, Inc. He held various executive positions at Insys including Chairman of the Board of Directors and CEO. In 2013, *Forbes* Magazine listed him as a billionaire following the success of Insys' initial public offering. In 2017, Kapoor, along with other Insys executives, was arrested and charged by the Office of the United States Attorney for the District of Massachusetts, with multiple felonies in connection with an alleged conspiracy to bride practitioners to prescribe Subsys and defraud insurance companies.

202.     Defendant Kapoor personally directed the activities of Insys, including, upon information and belief, the payment of fraudulent kickbacks to prescribers in the City of Rochester, and directed the misrepresentations to third party payors to obtain off-label coverage of Subsys.

203.     Defendant Anda, Inc. ("Anda"), is a Florida corporation with its principal office located in Olive Branch, Mississippi and is registered to do business in and around the City of Rochester. Through its various DEA registrant subsidiaries and affiliated entities, Anda is the fourth largest distributor of generic pharmaceuticals in the United States. In October 2016, Defendant Teva Pharmaceuticals USA, Inc. ("Teva") acquired Anda for $500 million in cash. At all times relevant to

42

this Complaint, Anda distributed prescription opioids throughout the United States, including in and/or around the City of Rochester.

204. Defendant Discount Drug Mart, Inc. ("Discount Drug") is an Ohio corporation with its principal place of business in Medina, Ohio. Discount Drug, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. Discount Drug also operates retail stores, including in and around the City of Rochester, that sell prescription medicines, including opioids.

205. At all times relevant to this Complaint, Discount Drug distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in and around the City of Rochester.

206. Defendant HBC Service Company ("HBC") is an operating division of Giant Eagle, Inc. ("Giant Eagle"). HBC operated as a licensed distributor wholesaler in the City of Rochester, duly licensed by the State. Giant Eagle is a Pennsylvania corporation with its principal place of business in Washington, Pennsylvania. At all times relevant to this Complaint, HBC distributed prescription opioids in the City of Rochester. HBC, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. Giant Eagle also operates retail stores, including in and around the City of Rochester, that sell prescription medicines, including opioids.

207. At all times relevant to this Complaint, HBC distributed prescription opioids and Giant Eagle engaged in the retail selling of opioids throughout the United States, including in and around the City of Rochester.

208. Defendant Kinray, LLC ("Kinray") is a New York corporation with its principal place of business in Whitestone, New York. Kinray, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor.

43

209.    At all times relevant to this Complaint, Kinray distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in and around the City of Rochester.

210.    Kinray is a subsidiary of co-defendant Cardinal Health.

211.    On December 19, 2016, Preet Bharara, the former United States Attorney for the Southern District of New York, and James Hunt, Special Agent in Charge for the DEA, announced the filing and settlement of a civil lawsuit involving Controlled Substances Act ("CSA") claims brought by the United States against Kinray.[38]

212.    On December 22, 2016, Kinray agreed to pay $10 million to the United States, and admitted and accepted responsibility for failing to inform the DEA, as required by CSA regulations, of Kinray's receipt of suspicious orders for certain controlled substances during the time period between January 1, 2011 and May 14, 2012.[39]

213.    As alleged, during the period from January 1, 2011 to May 14, 2012, the DEA investigated pharmacies in New York City and elsewhere that had placed orders for shipments of oxycodone or hydrocodone (both Schedule II controlled substances) from Kinray that were of unusual size and/or unusual frequency.[40] For example, the DEA's internal tracking system revealed that during the relevant period, Kinray had shipped oxycodone or hydrocodone to more than 20 New York-area pharmacy locations that placed orders for a quantity of controlled substances many times greater than Kinray's average sales of controlled substances to all of its customers.[41] Such orders should have triggered "red flags" in Kinray's ordering system, and Kinray should have reported the suspicious

---

[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*

44

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  85 of 1171.  PageID #: 705404

orders to the DEA. But for most of this time period, Kinray did not report a single suspicious order to the DEA.[42]

214.   Defendant Morris & Dickson Co., LLC ("Morris & Dickson") is a Louisiana corporation with its principal place of business in Shreveport, Louisiana. Morris & Dickson, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor.

215.   At all times relevant to this Complaint, Morris & Dickson distributed prescription opioids throughout the United States, including in and around the City of Rochester.

216.   Defendant Publix Supermarkets, Inc. ("Publix") is a Florida corporation with its principal place of business in Lakeland, Florida. Publix, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. Publix also operates retail stores, including in and around the City of Rochester, that sell prescription medicines, including opioids.

217.   At all times relevant to this Complaint, Publix distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in and around the City of Rochester.

218.   Defendant SAJ Distributors ("SAJ") is a Arkansas corporation with its principal place of business in Pine Bluff, Arkansas. SAJ, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor.

219.   At all times relevant to this Complaint, SAJ distributed prescription opioids throughout the United States, including in and around the City of Rochester.

---

[42] *Id.*

45

220.     Defendant Value Drug Company ("Value Drug") is a Pennsylvania corporation with its principal place of business in Pennsylvania. Value Drug, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor.

221.     At all times relevant to this Complaint, Value Drug distributed prescription opioids throughout the United States, including in and around the City of Rochester.

222.     Value Drug paid $4,000,000 in settlement claims due to failure to report suspicious orders of Oxycodone to pharmacies in Maryland and Pennsylvania in 2014.

223.     Defendant Smith Drug Company ("Smith Drug") is a South Carolina corporation with its principal place of business in South Carolina. Smith Drug, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor.

224.     At all times relevant to this Complaint, Smith Drug distributed prescription opioids throughout the United States, including in and around the City of Rochester.

225.     Defendant CVS Health Corporation ("CVS") is a Delaware corporation with its principal place of business in Rhode Island. CVS, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. CVS also operates retail stores, including in and around the City of Rochester, that sell prescription medicines, including opioids.

226.     At all times relevant to this Complaint, CVS distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in and around the City of Rochester.

227.     Defendant Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc. is a Delaware corporation with its principal offices located in Camp Hill, Pennsylvania.

228.     Defendant Rite Aid Corp. is a Delaware corporation with its principal offices located in Camp Hill, Pennsylvania. Together, Rite Aid of Maryland, Inc. and Rite Aid Corp. are referred to as "Rite Aid."

46

229.     Rite Aid, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. Rite-Aid also operates retail stores, including in and around the City of Rochester, that sell prescription medicines, including opioids.

230.     At all times relevant to this Complaint, Rite Aid, through its various DEA registered subsidiaries and affiliated entities, distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in and around the City of Rochester.

231.     Defendant Walgreens Boots Alliance, Inc., is a Delaware corporation with its principal place of business in Illinois.

232.     Defendant Walgreen Eastern Co. is a subsidiary of Walgreens Boots Alliance, Inc. that is engaged in the business of distributing pharmaceuticals, including prescription opioids. Defendant Walgreen, Co. is a subsidiary of Walgreens Boots Alliance that operates retail drug stores.

233.     Together, Walgreens Boots Alliance, Inc., Walgreen Eastern Co. and Walgreen Co. are referred to as "Walgreens."

234.     Walgreens, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Complaint, Walgreens distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in and around the City of Rochester.

235.     Defendant Wal-Mart Inc. ("Wal-Mart"), is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart, through its various DEA registered affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Complaint, Wal-Mart distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in and around the City of Rochester.

236.     Defendant Miami-Luken, Inc. ("Miami-Luken") is an Ohio corporation with its headquarters and principal place of business in Springboro, Ohio. At all times relevant to this

47

Case 1.17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 88 of 1171. PageID #: 705407

Complaint, Miami-Luken distributed prescription opioids throughout the United States, including in and around the City of Rochester.

237.   Defendant The Kroger Co. ("Kroger) is an Ohio corporation with headquarters in Cincinnati, OH. Kroger operates 2,268 pharmacies in the United States. At all times relevant to this Complaint, Kroger distributed prescription opioids throughout the United States, including in and around the City of Rochester.

238.   Henry Schein, Inc. describes its business as providing a comprehensive product and services offerings to integrated health systems, designed specifically for and focused exclusively on, the non-acute care space. Henry Schein, Inc. is incorporated in Delaware, with its principal place of business is located in Melville, New York.

239.   Henry Schein, Inc. distributes, among other things, branded and generic pharmaceuticals to customers that include dental practitioners, dental laboratories, animal health practices and clinics, and office-based medical practitioners, ambulatory surgery centers, and other institutions.

240.   Henry Schein Medical Systems, Inc. ("Henry Schein Medical") is a subsidiary of Henry Schein, Inc., that provides practice management, electronic medical records, and document management for medical groups.

241.   Henry Schein Medical Systems Inc. has been registered to do business with the State of Ohio since at least 1987. In November of 2014, Henry Schein Medical and Cardinal Health entered into a strategic partnership, which consolidated Cardinal Health's physician office sales organization into Henry Schein Medical. Henry Schein took responsibility for serving physician offices, and through its "symbiotic" arrangement with Cardinal Health, gained access to over 25,000 physical offices as

48

customer locations.[43] As a result of this agreement, Henry Schein Medical added more than $300 million in annual sales.

242. Henry Schein, Inc. and Henry Schein Medical Systems Inc. are referred to as "Henry Schein." At all relevant times, Henry Schein was in the business of distributing, and redistributing, pharmaceutical products to consumers within New York.

243. In 2015, Henry Schein reported that its sales reached a record $10.4 billion and that it had grown at a compound annual rate of approximately 16 percent since becoming a public company in 1995. Overall, it is the world's largest provider of health care products and services to office-based dental, animal health, and medical practitioners.

244. The Pharmacy Benefit Manager Defendants ("PBM Defendants") are defined below. At all relevant times the PBM Defendants acted as the gatekeepers of prescription drugs including opioids. Pharmacy benefit managers ("PBMs") negotiate with drug manufacturers to offer preferred drug formulary placement for the manufacturers' drugs. PBMs establish reimbursement rates for the drugs dispensed. PBMs earn revenue from at least the following sources: fees from health plans and insurers, rebates and other incentives such as volume target bonuses negotiated with drug manufacturers, and fees from maintaining pharmacy networks.[44]

245. Defendant, Express Scripts Holding Company ("ESHC"), is a Delaware corporation with its principal place of business in St. Louis, Missouri. ESHC is registered to do business in New York thru its subsidiary Express Scripts Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts Sales Operations, Inc., Express Scripts Services Company and Express Scripts Utilization Management Co.

---

[43] Raymond Davis, Henry Schein and Cardinal, The J. of Healthcare Contracting, Feb. 12, 2018, http://www.jhconline.com/henry-schein-and-cardinal.html.

[44] Health Policy Brief, On behalf of payers, pharmacy benefit managers negotiate rebates from drug makers in exchange for preferred formulary placement, HEALTH AFFAIRS, Sep. 14, 2017, https://www.healthaffairs.org/do/10.1377/hpb20171409.000178/full/

49

246. Defendant, Express Scripts, Inc. ("ESI"), is incorporated in the State of Delaware with its principal place of business located in St. Louis, Missouri, is a pharmacy benefit management company, and is a wholly owned subsidiary of ESHC. ESI has been registered to do business in New York and may be served through its registered agent: Corporation Service Company, 80 State Street, Albany, New York, 12207-2543.

247. ESHC and ESI are collectively referred to as "Express Scripts".

248. In 2012, ESI acquired its rival, Medco Health Solutions Inc., in a \$29.1 billion deal. As a result of the merger, ESHC was formed and became the largest PBM in the nation, filing a combined 1.4 billion prescriptions for employers and insurers.[45]

249. According to the Pharmacy Benefit Management Institute, in 2015, Express Scripts was the top ranking PBM nationwide with twenty-six percent (26%) of the industry market share.[46]

250. Express Scripts derives substantial revenue managing pharmacy benefits in New York and the City of Rochester through several different means.

251. At all times relevant hereto, Express Scripts has operated offices throughout New York, including the City of Rochester. ESI publishes employment vacancies related to its New York PBM business activities on its website.[47]

252. Defendant, Caremark Rx, L.L.C., is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. On information and belief, CVS Health is the direct parent company of Caremark Rx, L.L.C. According to CVS Health's 2016 Annual Report, Defendant Caremark Rx, L.L.C. is "the parent of [CVS Health]'s pharmacy services subsidiaries, is the immediate or indirect parent of many mail order, pharmacy benefit management,

---

[45] Peter Frost, Express Scripts closes \$29.1-billion purchase of Medco, LOS ANGELES TIMES (Apr. 3, 2012), http://articles.latimes.com/2012/apr/03/business/la-fi-medco-20120403

[46] PBM Market Share, by Total Prescription Claims, 2015, PHARMACY BENEFIT MANAGEMENT INSTITUTE, INDUSTRY RESEARCH, https://www.pbmi.com/PBMI/Research/Industry_Research/PBMI/Research/PBMI___ Industry _Research .aspx?hkey=22023612-80c4-4ada-a17e-85e7dfcbc1f8

[47] https://careers.express-scripts.com/us/en/search-results

50

infusion, Medicare Part D, insurance, specialty mail and retail specialty pharmacy subsidiaries, all of which operate in the United States and its territories." Caremark Rx, L.L.C. may be served through its registered agent: C T Corporation System, 28 Liberty St., New York, New York, 10005.

253.    Defendant, CaremarkPCS Health, L.L.C., is a Delaware limited liability company doing business as CVS/Caremark and CVS Caremark in New York and whose principal place of business is at the same location as CVS Health. On information and belief, CVS Health is the direct or indirect parent company of CaremarkPCS Health, L.L.C. CaremarkPCS Health, L.L.C. is registered to do business in New York and may be served in New York through its registered agent: C T Corporation System, 28 Liberty St., New York, New York, 10005.

254.    Defendant, Caremark, L.L.C., is a California limited liability company whose principal place of business is at the same location as CVS Health. Defendant, Caremark PCS, L.L.C., is a Delaware limited liability company formerly known as AdvancePCS Inc., which was founded in 1996 and is based in Irving, Texas. On information and belief, Caremark RX, L.L.C. is the sole member of both Caremark, L.L.C. and Caremark PCS, L.L.C. Both Caremark, L.L.C. and Caremark PCS, L.L.C. are registered to do business in New York and may be served by their registered agent: C T Corporation System, 28 Liberty St. New York, New York, 10005.

255.    Defendants Caremark RX, L.L.C., CaremarkPCS Health, L.L.C., Caremark, L.L.C. and Caremark PCS, L.L.C. are collectively referred to as "Caremark."

256.    CVS Health describes itself in a September 3, 2014 press release as a "pharmacy innovation company helping people on their path to better health. Through our 7,700 retail pharmacies, 900 walk-in medical clinics, a leading pharmacy benefits manager with nearly 65 million plan members, and expanding specialty pharmacy services, we enable people business and communities to manage health in more affordable, effective ways. This unique integrated model

51

increases access to care, delivers better health outcomes and lowers overall health care costs." In 2016, CVS Health reported an operating income of $10 billion.

257.    In the above-referenced September 3, 2014 press release CVS Health announced its change of name from CVS Caremark Corporation to CVS Health. CVS Health explained that it was changing its name "to reflect its broader health care commitment and its expertise in driving the innovations needed to shape the future of health." CVS Health explained that the newly-named company included "its pharmacy benefit management business, which is known as CVS/Caremark." In that same press release, CVS Health touted, "[f]or our patients and customers, **health is everything** and…we are advising on prescriptions [and]helping manage chronic and specialty conditions." [emphasis supplied].

258.    According to the Pharmacy Benefit Management Institute, CVS Health (Caremark) was the second highest ranking PBM in 2015 with twenty-five percent (25%) of the industry market share.[48]

259.    At all times relevant hereto, CVS Health and Caremark offered pharmacy benefit management services nationwide and maintained a national formulary or formularies that are used nationwide, including in New York and the City of Rochester.

260.    At all times relevant hereto, CVS Health, through Caremark, derives substantial revenue providing pharmacy benefits in New York and in the City of Rochester through several different means and has reimbursed for opioids throughout New York, including in the City of Rochester.

261.    Defendant, UnitedHealth Group Incorporated ("UnitedHealth"), a Delaware corporation with its principal place of business located in Minnetonka, Minnesota, is a diversified managed health care company with two business platforms. UnitedHealth serves approximately 115

---

[48] Pharmacy Benefit Management Institute, Industry Research, supra note 31.

million individuals throughout the United States, including the state of New York and the City of Rochester. For 2016, UnitedHealth reported an operating income of $12.9 billion.

262.    UnitedHealth, though its subsidiary United HealthCare Services, LLC., is registered to do business in New York and may be served in New York through its registered agent: C T Corporation System, 28 Liberty St. New York, New York, 10005.

263.    Defendant, Optum, Inc., is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing the subsidiaries that administer UnitedHealth's pharmacy benefits, including OptumRX, Inc. On information and belief, Optum, Inc. is a subsidiary of UnitedHealth.

264.    Defendant, Optum, Inc., is a Delaware corporation with its principal place of business located in Irvine, California. OptumRx operates as a subsidiary of OptumRx Holdings, LLC, which in turn operates as a subsidiary of Optum, Inc. OptumRx operates as the PBM for UnitedHealth.

265.    UnitedHealth and Optum, Inc. may be served through their registered agent: C T Corporation System, Inc., C T Corporation System, 28 Liberty St., New York, New York, 10005.

266.    OptumRx is registered to do business in New York and may be served through its registered agent CT Corporation System, C T Corporation System, 28 Liberty St., New York, New York, 10005.

267.    At all times relevant hereto, OptumRx derives substantial revenue providing pharmacy benefits in New York and in the City of Rochestert through several different means.

268.    According to the Pharmacy Benefit Management Institute, OptumRx (UnitedHealth) was the third highest ranking PBM in 2015 with twenty-two (22%) of the industry market share.[49]

269.    In one case, OptumRx, which is owned by UnitedHealth, suggested that a member taking Butrans consider switching to a "lower cost alternative," such as OxyContin or extended-release

---

[49] Pharmacy Benefit Management Institute, Industry Research, supra note 35.

53

morphine, according to a letter provided by the member. Mr. Wiggin, the UnitedHealthcare spokesman, said the company's rules and preferred drug list "are designed to ensure members have access to drugs they need for acute situations, such as post-surgical care or serious injury, or ongoing cancer treatment and end of life care, as well as for long-term use after alternatives are tried."[50]

270. "UnitedHealthcare places morphine on its lowest-cost drug coverage tier with no prior permission required, while in many cases excluding Butrans. And it places Lyrica, a nonopioid, brand-name drug that treats nerve pain, on its most expensive tier, requiring patients to try other drugs first."[51]

271. Defendant, Prime Therapeutics LLC ("Prime Therapeutics"), a limited liability company organized under the laws of Delaware with its principal place of business located in Eagan, Minnesota, provides pharmacy benefit management solutions for health plans, employers, and government programs in New York and in the City of Rochester.

272. Prime Therapeutics may be served in New York through: Corporation Service Company, 80 State Street, Albany, New York, 12207.

273. Prime Therapeutics does substantial business in New York and in the City of Rochester.

274. Defendant, Navitus Holdings, LLC, is a limited liability company organized under the laws of Wisconsin with its principal place of business located in Madison Wisconsin. Navitus Holdings, LLC may be served through its registered agent: CT Corporation System, 301 South Bedford Street, Suite 1, Madison, Wisconsin 53703.

275. Defendant, Navitus Health Solutions, LLC, a pharmacy benefit manager, is a limited liability company organized under the law of Wisconsin with its principal place of business located in

---

[50] Katie Thomas and Charles Ornstein, *Amid Opioid Crisis, Insurers Restrict Pricey, Less Addictive Painkillers*, THE NEW YORK TIMES, Sep. 17, 2017, https://www.nytimes.com/2017/09/17/health/opioid-painkillers-insurancecompanies.html?mwrsm=Email

[51] *Id.*

54

Madison, Wisconsin and is a wholly owned subsidiary of Navitus Holdings, LLC. Navitus Health Solutions, LLC is registered to do business in New York and may be served in New York through its registered agent: C T Corporation System, 28 Liberty St., New York, New York, 10005.

276.    Navitus Holdings, LLC and Navitus Health Solutions, LLC are collectively referred to as "Navitus."

277.    Navitus derives substantial revenue managing pharmacy benefits in New York and in the City of Rochester through the services it provides and the formulary it maintains in its relationships with health plans.

278.    The Navitus pharmacy directory denotes numerous pharmacies located in New York and in the City of Rochester.[52]

279.    The opioids at issue in this case were reimbursed by the PBM Defendants. Without the PBM Defendant reimbursement for the opioids at issue herein, the opioids would not have entered the marketplace and the entire scheme would have failed.

280.    To the extent they are sued with respect to their activities as retail sellers of prescription opioids, CVS, Rite-Aid, Walgreens, and Wal-Mart are referred to herein as "Retail Chain Pharmacies" or "Retail Chain Pharmacy Defendants." The allegations pertaining to the Retail Chain Pharmacies that form the basis of Plaintiff's claims against these defendants are set forth below.

281.    At all relevant times, the Sackler Families – in particular, as detailed below, Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Kathe Sackler, Beverly Sackler, Theresa Sackler, Ilene Sackler Lefcourt, David Sackler, and Raymond Sackler Trust ("Sackler Defendants") – controlled Purdue and its associated companies. Purdue is part of a complicated web of entities through which the Sackler Families operate. PPI is the managing general partner of PPLP and of many of the various Purdue-related entities. Its status as managing general partner of the various entities ensures PPI's

---

[52] Navitus Pharmacy Directory, https://www.navitus.com/Misc-Pages/PDF-Form-Viewer.aspx?FormID=9cc570be73ce-4402-a2bc-1af32e88f461

control of those entities. In turn, at all relevant times, all of the members of the board of PPI have been members of the Sackler Families or Sackler-family retainers. The Purdue-related Additional Defendants that are not controlled by the Sackler Defendants through PPI are controlled by them through different entities unknown to Plaintiff.

282.    Because the Sackler Families control of the board of PPI, the officers of PPI and PPLP reported to them. This ensured Sackler control of PPI and PPLP, even when the officers of those entities were not themselves members of the Sackler Families.

283.    The Sackler Defendants are beneficial owners of, and exercise complete control over, all four Rhodes Defendants and PF Labs.

284.    The Sackler Defendants made the decision that the Sackler Families should enter the generic market for OxyContin in or about 2008 and that it should do so through Rhodes Pharma, a Sackler-owned entity created for that purpose.

285.    The Sackler Defendants caused Purdue and other associated companies that they beneficially owned and controlled to distribute to the Sackler Families hundreds of millions of dollars of profits earned by Purdue and its associated companies from the sale of opioids.

286.    Each of the Sackler Defendants named herein has served on the board of directors of, or as an officer of, Purdue and one or more Purdue-related Additional Defendants.

287.    The Sackler Defendants beneficially own and control all of the entities owned by the Sackler Families, including PF Labs and the Rhodes Defendants, in substantially the same way as they control PPLP and its affiliates, although they may do so using different holding companies and trusts than those used to control PPLP.

288.    At all relevant times, Richard Sackler played an active and central role in the management of Purdue and the Purdue-related Additional Defendants. He began working for Purdue as Assistant to the President (his father, Raymond) in the 1970s. He later served as Vice President of

56

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 97 of 1171. PageID #: 705416

Marketing and Sales. In the early 1990s he became Senior Vice President, which was the position he held at the time OxyContin was launched in 1996. In 1999, he became President, and he served in that position until 2003.

289.    Richard Sackler resigned as President in 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, he continued to serve, with his uncle Mortimer, as Co-Chair of the Board of Purdue. In that way, among others, the family maintained control over their family business, even though they were no longer officers, because the officers reported to them.

290.    As a senior executive of Purdue, Richard Sackler was actively involved in the invention, development, marketing, promotion, and sale of Purdue's opioid products, including OxyContin. He worked tirelessly to make OxyContin a blockbuster, telling colleagues how devoted he was to the drug's success. Along with his father (Raymond) and his uncle (Mortimer), he launched OxyContin with one of the biggest pharmaceutical marketing campaigns in history, deploying many persuasive techniques pioneered by his uncle Arthur. Within five years of its introduction, OxyContin was generating a billion dollars a year. When OxyContin met with resistance, Richard participated in Purdue's efforts to counter that resistance.

291.    At all relevant times, Richard Sackler served as a trustee of one or more trusts that beneficially own and control Purdue and the Purdue-related Additional Defendants.

292.    Richard Sackler is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue and the Purdue-related Additional Defendants named herein as additional defendants from the sale of opioids.

293.    Jonathan Sackler was a Vice President of Purdue in 1991, and by 2000 he was a Senior Vice President. Like his brother Richard, he resigned that position in or after 2003, apparently due to a

57

concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, he continued to serve on the board of Purdue.

294. At all relevant times, Jonathan Sackler served as a trustee or one or more trusts that beneficially owns and control Purdue and the Purdue-related Additional Defendants.

295. Jonathan Sackler is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids.

296. Mortimer D.A. Sackler served as a Vice President of Purdue during the period of the development, launch, and promotion of OxyContin. He resigned that position in or after 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, he continued to serve on the Board of Purdue.

297. Mortimer D.A. Sackler is the direct or indirect beneficiary of 7.14% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids.

298. Kathe A. Sackler was a Vice President of Purdue in 1991, and by 2000 she was a Senior Vice President. She resigned that position in or about 2003 due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, she continued to serve on the Board of Purdue.

299. Kathe A. Sackler is the direct or indirect beneficiary of 7.14% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids.

300. Ilene Sackler Lefcourt served as Vice President of Purdue during the period of the development, launch, and promotion of OxyContin. She resigned that position in or after 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, she continued to serve on the Board of Purdue.

301. Ilene Sackler Lefcourt is the direct or indirect beneficiary of 7.14% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids.

58

302. At all relevant times, Beverly Sackler served as a trustee of one or more trusts that beneficially own and control Purdue and the Purdue-related Additional Defendants and to which 50% of the profits of Purdue and the Purdue-related Additional Defendants from the sale of opioids has been conveyed. She has also served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

303. Beverly Sackler is the direct or indirect beneficiary of some portion of 50% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids.

304. Theresa Sackler is the direct or indirect beneficiary of 50% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids. She has also served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

305. David A. Sackler is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids. He has also served as a member of the board of directors of Purdue and Purdue-related entities since 2012.

306. Stuart Baker joined Purdue in 1994 as Executive Vice President of PPLP and as Vice President of PF Co. He served as legal counsel to the entire Purdue organization and the Sackler Families. He also served as an officer of other Sackler-owned, Purdue-related entities. He served as a trustee of one or more trusts that beneficially own and control Purdue and the Purdue-related Additional Defendants. He served as Corporate Secretary for Purdue, and as such he gained direct knowledge of the wrongdoing alleged in the Complaint. In his capacity as an officer, director, and lawyer, he knowingly aided, abetted, participated in, and benefitted from the wrongdoing of Purdue as alleged in the Complaint and knowingly aided and abetted the Sackler Families, and the Purdue-related Additional Defendants, to structure their personal affairs and the personal and business organizations they beneficially owned and controlled in such a way as to attempt to evade personal liability for the

59

wrongdoing in which he knew they had engaged and in which he knew they intended to continue to engage.

307.    The Sackler Families are the sole beneficial owners of Purdue and its associated companies and the Purdue-related Additional Defendants. All of Purdue's and its associated companies' profits go to Sackler-family trusts and entities.

308.    Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Kathe Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David Sackler, Rhodes Tech, Rhodes Tech Inc., Rhodes Pharma, Rhodes Pharma Inc., the Raymond Sackler Trust (through its trustees), P.F. Labs, and Stuart D. Baker each knowingly aided, abetted, participated in, and benefitted from the wrongdoing of Purdue as alleged in the Complaint.

309.    As set forth in the Complaint, before the defendants in this action began their marketing campaign for prescription opioids, generally accepted standards of medical practice dictated that opioids should only be used short-term, for instance, for acute pain, pain relating to recovery from surgery, or for cancer or palliative care. In those instances, the risks of addiction are low or of little significance. The commercial success of prescription opioids thus would not have been possible without a fundamental shift in prescribers' perception of the risks and benefits of long-term opioid use.

310.    As it turned out, Purdue was uniquely positioned to execute just such a maneuver, thanks to the legacy of Arthur Sackler, the (now-deceased) brother of Raymond and Mortimer Sackler.

311.    Arthur Sackler created the pharmaceutical advertising industry as we know it—laying the groundwork for the OxyContin promotion that would make the Sacklers billionaires.

312.    Arthur Sackler, a psychiatrist turned "ad man," was both a psychiatrist and a marketing executive, and, by many accounts, a brilliant and driven man. He pursued two careers simultaneously, as a psychiatrist at Creedmoor State Hospital in New York and the president of an advertising agency

60

called William Douglas McAdams. Arthur pioneered both print advertising in medical journals and promotion through physician "education" in the form of seminars and continuing medical education courses. He understood the persuasive power of recommendations from fellow physicians, and did not hesitate to manipulate information when necessary. For example, one promotional brochure produced by his firm for Pfizer showed business cards of physicians from various cities as if they were testimonials for the drug, but when a journalist tried to contact these doctors, he discovered that they did not exist.

313.     Arthur Sackler revolutionized medical marketing in the 1950's and 60's by creating the very marketing ploys his family later used to perpetuate the massive fraud alleged in this action. In striving to make Pfizer (with its blockbuster drug, valium) a household name among physicians, Arthur Sackler recognized that "selling new drugs requires a seduction of not just the patient but the doctor who writes the prescription," and he maximized influence over physician prescribing by developing the following marketing ploys to disseminate pharmaceutical messaging to the masses under the guise of science and truth:

a.   contacting prescribers directly with a variety of perks, benefits and even job offers;

b.   publishing seemingly neutral articles in medical journals, citing scientific studies (frequently underwritten by the pharmaceutical companies whose products he was marketing);

c.   marketing illnesses (i.e., lamenting and marketing the under treatment of purported illnesses and the corresponding under-utilization of drugs he was promoting);

d.   paying prominent physicians to endorse his products; and

61

e.  funding continuing medical education programs ("CME's"), controlling the messaging of key opinion leaders, and maximizing influence over physician prescribing practices.

314.    In the 1960s, Arthur Sackler made Valium into the first hundred0-million-dollar drug, so popular it became known as "Mother's Little Helper." His expertise as a psychiatrist was one of the keys to his success. When Arthur's client, Roche, developed Valium, it already had a similar drug, Librium, another benzodiazepine, on the market for treatment of anxiety. So Arthur invented a condition he called "psychic tension"—essentially stress—and pitched Valium as the solution. The campaign, for which Arthur was compensated based on volume of pills sold, was a remarkable success.

315.    In marketing tranquilizers Librium and Valium, Arthur Sackler broadened his customer base to potentially include everyone. For example, one campaign encouraged doctors to prescribe Valium to people with no psychiatric symptoms whatsoever, urging doctors to "consider the usefulness of Valium" in patients with *no* demonstrable pathology. Such marketing led one physician, writing in the journal *Psychosomatics* in 1965, to ask, "When do we *not* use this drug?"

316.    As the line between medical education and medical marketing became very deliberately blurred, Valium became the pharmaceutical industry's first hundred-million-dollar, and then billion-dollar, drug. For his design and creation of these medical marketing strategies, he was posthumously inducted into the Medical Advertising Hall of Fame, but as succinctly put by Allen Frances, the former chair of psychiatry at Duke University School of Medicine: "'*Most of the questionable practices that propelled the pharmaceutical industry into the scourge it is today can be attributed to Arthur Sackler.*'"

317.    In other precursors of the current crisis, Arthur Sackler promoted these drugs despite the lack of any studies of their addictive potential. Additionally, he started his own newspaper, the *Medical Tribune*, despite concerns that a pharmaceutical advertiser should not be publishing a medical periodical directed at doctors. He paid Key Opinion Leaders ("KOLs"), including for example, Henry

62

Welch (then chief of FDA's antibiotics division), almost $300,000 in exchange for his help in promoting pharmaceutical drugs. By the 1970's, doctors were prescribing more than 100 million tranquilizer prescriptions annually, creating what Sen. Edward Kennedy called "'a nightmare of dependence and addiction.'"

318. The Sackler brothers—Arthur, Mortimer, and Raymond—purchased a small patent-medicine company called the Purdue Frederick Company ("PF Co.") in 1952.

319. PF Co. had been formed in 1892 by Dr. John Purdue Gray and George Frederick Bingham and incorporated in New York on June 29, 1911.

320. After Arthur's death, Mortimer and Raymond bought out his share. Since that time PF Co. and its associated companies have all been owned by the Raymond Sackler Family and the Mortimer Sackler Family.

321. PF Co. is no longer an active New York corporation, having been merged into PF Labs on May 7, 2004.

322. At all relevant times, PF Co. and PF Labs have been beneficially owned by the Sackler Families and controlled by them through Defendant Sackler Family members.

323. After the Sackler brothers acquired PF Co. in 1952, they sold products ranging from earwax remover to antiseptic, and it became a profitable business. As an advertising executive, Arthur was not involved, on paper at least, in running the family business because that would have been a conflict of interest. Raymond became the head executive of the family's US business while Mortimer ran the UK side of the business.

324. Beginning in the 1980s PF Co. and its associated companies engaged in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling or distributing opioids throughout the United States.

63

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 104 of 1171. PageID #: 705423

325.     In the 1980s, the Sackler Families, through a UK affiliate, acquired a Scottish drug producer that had developed a sustained-release technology suitable for morphine. PF Co. marketed this extended-release morphine as MS Contin. It quickly became the Sackler Families' best seller. As the patent expiration for MS Contin loomed, the Sackler Families searched for a drug to replace it. Around that time, Richard Sackler had become more involved in the management of the families' businesses. Richard had grand ambitions for the family business; according to a long-time Purdue sales representative, "Richard really wanted Purdue to be big—I mean *really* big." Richard believed Purdue should develop another use for its "Contin" timed-release system.

326.     In 1990, Purdue's VP of clinical research, Robert Kaiko, sent a memo to Richard and other executives recommending that the company work on a pill containing oxycodone. At the time, oxycodone was perceived as less potent than morphine, largely because it was most commonly prescribed as Percocet, the relatively weak oxycodone-acetaminophen combination pill, or Percodan, where it was blended with aspirin. By contrast, the oxycodone pill developed by Purdue – OxyContin -- was pure oxycodone in a time-release formula similar to MS Contin, and it was more potent than morphine. Purdue also decided to produce pills with as much as 160 milligrams of oxycodone, far in excess of any other prescription opioid.

327.     OxyContin was created by PF Co., but responsibility for designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling, and distributing OxyContin and other opioid products was shared among PF Co., Purdue, PF Labs, and other Purdue-related companies.

328.     At relevant times, OxyContin was manufactured by PF Labs.

329.     MS Contin had always been limited by the stigma associated with morphine. Oxycodone did not have that problem, and what is more, it was sometimes mistakenly called "oxycodeine," which also contributed to a false perception of relatively lower potency, because

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM

NYSCEF DOC. NO. 2
INDEX NO. E2019005178

RECEIVED NYSCEF: 06/05/2019

codeine is weaker than morphine. Purdue acknowledged using this false perception to its advantage when it eventually pled guilty to criminal charges of "misbranding" in 2007, admitting that it was "well aware of the incorrect view held by many physicians that oxycodone was weaker than morphine" and "did not want to do anything 'to make physicians think that oxycodone was stronger or equal to morphine' or to 'take any steps . . . that would affect the unique position that OxyContin'" held among physicians.

330.    Even though oxycodone did not have the same stigma as morphine, in focus groups conducted before OxyContin's release, Purdue learned that doctors were concerned about the abuse potential of opioids. The focus group concluded that the perceived abuse potential of opioids was the "'biggest negative' that might prevent widespread use of the drug."

331.    For Purdue and OxyContin to be "*really* big," Purdue needed to both distance its new product from the traditional view of narcotic addiction risk, and broaden the drug's uses beyond cancer pain and hospice care. A marketing memo sent to Purdue's top sales executives in March 1995 recommended that if Purdue could show that the risk of abuse was lower with OxyContin than with traditional immediate-release narcotics, sales would increase. As discussed below, Purdue did not find or generate any such evidence, but this did not stop Purdue from making that claim regardless.

332.    Despite the fact that there has been little or no change in the amount of pain reported in the U.S. over the last twenty years, Purdue recognized an enormous untapped market for its new drug. As Dr. David Haddox, a Senior Medical Director at Purdue, declared on the Early Show, a CBS morning talk program, "There are 50 million patients in this country who have chronic pain that's not being managed appropriately every single day. OxyContin is one of the choices that doctors have available to them to treat that."

333.    The members of the board of Purdue were intimately involved in the activities of the entities that they managed, often on a weekly or even daily basis.

65

334.    Purdue, PF Co., PF Labs, and the Sackler Families launched OxyContin with one of the biggest pharmaceutical marketing campaigns in history, deploying many persuasive techniques pioneered by Arthur. They trained and armed a force of approximately 1,000 sales representatives with charts showing OxyContin's purported benefits. A major thrust of the sales campaign was that OxyContin should be prescribed not merely for the kind of severe short-term pain associated with surgery or for cancer pain but also for less acute, longer-lasting pain, such as arthritis, back pain, sports injuries, fibromyalgia. The number of conditions that OxyContin could treat seemed almost unlimited.

335.    The training included "training in 'overcoming objections' from clinicians." "If a doctor inquired about addiction," the representative was instructed to respond thus: "'The delivery system is believed to reduce the abuse liability of the drug.'" Another sales representative said that Purdue executives "told us to say things like it is 'virtually' non-addicting."

336.    Purdue sales representatives were provided with studies and literature provided by other physicians. Purdue had a speakers' bureau through which it paid several thousand doctors to attend medical conferences and deliver presentations about OxyContin's merits. "Doctors were offered all-expenses-paid trips to pain-management seminars in places like Boca Raton." Internal documents reflect that doctors who attended these seminars wrote OxyContin prescriptions more than twice as often as those who didn't.

337.    Purdue also advertised in medical journals and produced promotional videos featuring not just satisfied patients but also doctor's testimonials. "The marketing of OxyContin relied on an empirical circularity: the company convinced doctors of the drug's safety with literature that had been produced by doctors who were paid, or funded, by the company."

338.    According to a former OxyContin sales representative, Richard Sackler was "'the dude that made it happen.'" Richard Sackler himself was tireless in his dedication to OxyContin's success. When benefit plans began citing OxyContin abuse as an excuse not to pay, Richard Sackler sent an

66

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 107 of 1171. PageID #: 705426

email to sales representatives stating that, for insurers, "'addiction' may be a convenient way to just say 'NO.'"

339.     Members of the Sackler family were daily on site at Purdue's headquarters, controlling the management of their family business and all of its employees.

340.     Richard Sackler is named as inventor on some 50 patents relating to oxycodone and other pain medications, including several patents apparently issued as late as 2016. Virtually all such patents invented by Richard Sackler were assigned to Purdue.

341.     In 1997, both Richard and Kathe Sackler were part of a conspiracy to deceive physicians into believing that oxycodone was half as strong as morphine, when in fact the opposite was true; this deception was known by Purdue to ease the fears of well-meaning and careful physicians about prescribing OxyContin for non-cancer pain uses.

342.     In the late 1990s Richard, Jonathan and Kathe Sackler participated in an unlawful attempt to deceive European drug regulators into classifying OxyContin as totally uncontrolled, i.e., capable of being obtained without a prescription, despite the fact that all of these family members were by then well aware of the abuse liability of the drug in the U.S.

343.     In 2001, Kathe Sackler attended a talk given by the chief medical officer of Sikorsky Aircraft, in which the speaker expressed grave concern about the risks associated with OxyContin; instead of acknowledging this fact to the medical officer, Kathe Sackler instead remained silent and returned to the Purdue headquarters, where employees were directed to find ways to undercut and deflect the Sikorsky medical officer's concerns.

344.     In the period around 1999-2003, Purdue developed a method to cause company emails to self-destruct at a pre-determined time; this was an attempt to create a system where potentially incriminating documents would automatically self-destruct, even after receipt by unrelated third-parties. Richard, Jonathan and Kathe Sackler all were directly aware and supportive of this project.

67

345. That prescription opioids would lead to addiction, and specifically that OxyContin could be, and was being, abused has been known to Purdue and to the members of the Sackler Families involved in running the family business since at least the summer of 1999.

346. In summer of 1999, a Purdue sales representative wrote to the President of Purdue reporting widespread abuse of OxyContin. As a result of that memo, a secretary at Purdue, Maureen Sara, was tasked with doing research on the Internet to learn about the nature and scope of the abuse, specifically to learn about how recreational drug users were misusing OxyContin.

347. In order to carry out her assignment, Ms. Sara began visiting drug-user Internet "news groups" or "chat rooms" on a daily basis. Two groups in particular that Ms. Sara visited were alt.drugs and alt.drugs.hard. For a period of time, in the late summer and early fall of 1999, Ms. Sara would forward screen shots from these news groups on a daily basis to Howard Udell, then General Counsel of Purdue.

348. In October or November, 1999, Ms. Sara prepared a memo summarizing her research into misuse of OxyContin. The memo described how users would remove the coating on the OxyContin pills, crush them, cook them, and snort or shoot them. Ms. Sara sent the memo containing the details of OxyContin abuse by drug users not only to the President of Purdue and to its General Counsel, but also to Purdue's then-medical director, and directly to members of the Sackler Families involved in the management of the company, including Richard Sackler, Jonathan Sackler, and Kathe Sackler.

349. Purdue, Richard Sackler, Jonathan Sackler, and Kathe Sackler were thus all aware of the risk and abuse potential and reality of OxyContin long before Purdue acknowledged the same to government, the healthcare community or the public. In sworn testimony before the U.S. House of Representatives in 2001, Purdue President Michael Friedman, in the presence of Purdue General Counsel Howard R. Udell, swore that the first the companies knew of widespread abuse of OxyContin

68

was in the year 2000. This was, of course, patently inconsistent with what the members of the Sackler Families knew from the Sara memo they had received in 1999. No member of the Sackler Families at any time tried to correct the false narrative promulgated far and wide about the abuse liability of OxyContin, nor corrected the false statement about when Purdue became aware of this problem with the drug.

350. Richard Sackler, Kathe Sackler, Jonathan Sackler, Theresa Sackler, Mortimer D.A. Sackler, and Ilene Sackler have been aware since at least 1999 of potential liability for Purdue, and those acting in concert with Purdue, because of the addictive nature of OxyContin. With the intention of shielding from creditors the proceeds of their wrongdoing, they have stripped out of Purdue and the Purdue-related Additional Defendants each and every year hundreds of millions of dollars of profits from the sales of OxyContin and other opioid-containing medications, including a generic form of OxyContin sold by Rhodes Pharma. All such transfers were and are fraudulent within the meaning of applicable fraudulent transfer statutes and case law; all such transfers unjustly enriched the recipients; and all such transferred funds should be clawed back from the Sackler Defendants in order to satisfy the opioid-related liabilities of the companies from which they were transferred.

351. From 2001 to 2007, Purdue was investigated by 26 states and the U.S. Department of Justice. Beginning in or about 2003, advised by Baker, who served as legal counsel to the entire Purdue organization and the Sackler Families, all of the Sacklers who served as executive officers of Purdue resigned out of concern that they might be held personally liable for conduct on behalf of Purdue in which they had previously engaged and in which they expected and intended to continue to engage after their respective resignations.

352. In 2007, PFC agreed to pay nearly $700 million and pleaded guilty to a felony for misleading doctors and patients about opioids. Purdue admitted that its supervisors and employees, "with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less

69

subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications." At the same time, Purdue executive officers Michael Friedman (the CEO), Howard Udell (Vice President and General Counsel), and Paul Goldenheim (Chief Medical Officer) pleaded guilty to criminal charges that they let Purdue deceive doctors and patients about its opioids.

353. As part of the plea agreement in 2007, Purdue agreed to a detailed Corporate Integrity Agreement with the U.S. government. The Agreement required Purdue to appoint a Compliance Officer who would "be a member of senior management of Purdue," "make periodic (at least quarterly) reports regarding compliance matters directly to the Board of Directors," and "be authorized to report on such matters to the Board of Directors at any time." The Corporate Integrity Agreement was built on the idea that the directors would ensure that Purdue never deceived doctors and patients again.

354. The Corporate Integrity Agreement included the directors as "Covered Persons" from 2007 through 2012. All Covered Persons, including the directors and CEO, were required to comply with rules that prohibit deception about Purdue opioids. The directors were required to undergo hours of training to ensure that they understood the rules. The directors were required to report all violations of the rules. The directors were warned that they could face consequences if they failed to comply with the rules. The directors certified that they had read and understood the rules and would comply with them.

355. The directors were acutely aware of their obligations under the Corporate Integrity Agreement because, in 2009, Purdue had to report to the Inspector General of the U.S. Department of Health and Human Services that it had not immediately trained a new director on the Agreement. Purdue reported: "a new Director was appointed to Purdue's Board of Directors, without timely notice to either Corporate Compliance or the Office of General Counsel, as otherwise required by policy, resulting in failure to timely launch the training assignment to this new Board member." Purdue

70

assured the U.S. government that it had trained the new director: "Relevant personnel were reminded of existing policy to notify Corporate Compliance and the Office of General Counsel of changes to the Board of Directors. In both instances, these individuals completed their training assignments within 1 day of Corporate Compliance learning of this issue." Purdue promised the government that the director's training had addressed "the proper methods of promoting, marketing, selling, and disseminating information about Purdue's products," so Purdue would never deceive doctors and patients again.

356. Every year since the 2007 guilty plea and Corporate Integrity Agreement, Purdue's directors received warning signs about Purdue's ongoing misconduct and opportunities to stop it.

357. In 2008, more Americans died from opioid overdoses than ever before.

358. In 2009, the *American Journal of Public Health* published an article about Purdue's opioid marketing entitled, "The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy." The article detailed Purdue's use of sales representatives, targeting of high-prescribers, and deception about addiction. That same year, CDC reported that deaths from opioids had recently tripled.

359. In 2010, *Time* magazine published a story about Purdue's opioids entitled, "The New Drug Crisis: Addiction by Prescription." Overdoses were the leading cause of accidental death in 15 states. By the spring of 2010, Purdue's directors had been told that Purdue could not get product liability insurance to cover OxyContin.

360. In 2011, the White House announced that prescription drug abuse was the nation's fastest-growing drug problem and called for "educating healthcare providers about prescription drug abuse … so they will not over-prescribe[.]" The CDC announced that prescription opioid overdoses had reached epidemic levels and called out Purdue's opioids by name. That same year, *Fortune* magazine interviewed Purdue executives, including Vice President Alan Must. *Fortune* published a story

71

about Purdue, the Sackler Families, and evidence that they profited from opioid addiction. Mr. Must admitted that Purdue was "well aware" of concerns about its conduct: "We are well aware of detractors. For those individuals who think we're evil … I don't think there's anything we can do that is going to change their opinion."

361.    In 2012, the U.S. Senate launched an investigation into whether Purdue was deceiving doctors and patients about opioids. In a letter to the CEO of Purdue, the Senators warned of "an epidemic of accidental deaths and addiction resulting from the increased sale and use of powerful narcotic painkillers." The Senate letter warned Purdue specifically of the danger of patients taking higher doses: "over the last decade, the number of prescriptions for the strongest opioids has increased nearly fourfold, with only limited evidence of their long-term effectiveness or risks while data suggest that hundreds of thousands of patients nationwide may be on potentially dangerous doses." The Senate letter also warned about Purdue misleading doctors and patients: "There is growing evidence pharmaceutical companies that manufacture and market opioids may be responsible, at least in part, for this epidemic by promoting misleading information about the drugs' safety and effectiveness." The Senate put the directors on notice that they were under scrutiny, demanding that Purdue produce to investigators a set of "presentations, reports, and communications to Purdue's management team or board of directors from 2007 to the present."

362.    In 2013, the *Los Angeles Times* revealed that Purdue had been compiling a list for the past decade of 1,800 doctors suspected of recklessly prescribing its opioids, but Purdue had reported only 8% of them to authorities. Purdue attorney Robin Abrams gave multiple interviews to the newspaper. Abrams was a Vice President of Purdue, and she signed Purdue's 2007 settlement agreement. In 2013, she admitted that Purdue had the list, and said Purdue would not agree to disclose it to authorities because, "I don't really want to open up an opportunity for folks come in here and start looking and second-guessing."

363.     Abrams and Purdue's directors knew they had reason to fear scrutiny. The state of Kentucky was prosecuting a lawsuit against Purdue for deceiving doctors and patients about opioids. Purdue's lawyers surveyed residents who could be on the jury. One-third knew someone who overdosed or was seriously hurt taking a Purdue opioid, and 29 percent knew someone who died. Purdue itself filed those statistics in court.

364.     In 2014, Edward Mahony, the Executive Vice President, CFO, and Treasurer of Purdue stated that the Kentucky lawsuit was so significant that it could "jeopardize Purdue's long-term viability." That same year, the Governor of Massachusetts declared the opioid crisis a public health emergency.

365.     In 2016, the CDC published the *CDC Guideline for Prescribing Opioids for Chronic Pain* to try to stop dangerous opioid prescribing.

366.     In 2017, the President of the United States declared the opioid crisis a national public health emergency.

367.     PPI's directors knew or should have known about these warnings and many others.

368.     The directors knew about, allowed, and directed Purdue's deception. They oversaw Purdue's scheme to send sales representatives to visit doctors thousands of times. They oversaw Purdue's scheme to hire top prescribers to promote its opioids. They oversaw Purdue's effort to get more patients on higher doses of opioids for longer periods. They were aware of, allowed and directed the content of the messages conveyed in Purdue's marketing.

369.     The directors of PPI controlled PPLP. The quarterly reports distributed to the directors of PPI demonstrate that the directors in fact controlled both PPI and PPLP. The reports and minutes make clear that the directors of PPI were kept fully informed of the activities of Purdue in the areas "Finance," "Sales & Marketing," "Manufacturing & Supply Chain," "Quality," "Research & Development," "Discovery Research," "Licensing & Business Development," "Corporate

73

Compliance," "External Affairs," "Health Policy," "Human Resources," and "Information Technology" — all of which were overseen by the directors.

370. The directors oversaw Purdue's sales representatives. Richard Sackler testified that the sales representatives were the main way that Purdue promoted its opioids. He testified that the key to getting doctors to prescribe and keep prescribing Purdue opioids was regular visits from the sales force. The board tracked the exact number of sales representatives and the exact number of visits they made to urge doctors to prescribe Purdue opioids. The board knew which drugs were promoted; how many visits sales representatives averaged per workday; how much each visit cost Purdue; and the company's plan for sales visits in each upcoming quarter. The Board approved specific plans to hire new sales representatives, hire and promote new District and Regional managers, and create sales "territories" in which representatives would target doctors.

371. The directors oversaw the tactics that sales representatives used to push opioids. A board report analyzed a Purdue initiative to use iPads during sales visits, which increased the average length of the sales meeting with the doctor to "16.7 minutes in front of the customer."

372. The directors oversaw promotional claims that representatives presented to doctors during sales visits. They received reports, for example, that a "review of call notes" recorded by Purdue sales representatives "suggested potential comparative claims of superiority of Purdue products relative to competitors," and deceptive promotion of opioids as treatment for "minor pain," including hundreds of examples of deceptive marketing that required "extensive remedial actions."

373. The directors oversaw Purdue's research, including research that contradicted its marketing. The board received reports about studies of Purdue opioids in "opioid-naïve" patients and patients with osteoarthritis, down to the details of the strategy behind the studies and the enrollment of the first patients.

74

374.     The directors oversaw Purdue's improper response to signs of "abuse and diversion" by high-prescribing doctors. The board was told exactly how many "Reports Of Concern" Purdue sales representatives submitted to the company about doctors they visited to promote opioids (572 Reports Of Concern in the July 2007 board report); how many "field inquiries" Purdue had decided to conduct in response to the reports (21 inquiries in response to 572 Reports Of Concern); and even that six Reports Of Concern were submitted in Massachusetts.

375.     The directors even monitored sales representatives' emails. Purdue held thousands of face-to-face sales meetings with doctors, but the company prohibited its sales representatives from writing emails to doctors, which could create evidence of Purdue's misconduct. When Purdue found that some sales representatives had emailed doctors, the company conducted an "investigation" and reported to the board that sales representatives had been disciplined and that their emails would be discussed at the board meeting.

376.     The directors also oversaw Purdue's strategy to pay high prescribers to promote Purdue opioids. A report for the board listed the exact number of conferences and dinner meetings, with attendance figures, and assured the directors: "We are tracking the prescribing trends of these attendees following the programs and will report the results in future reports." The board was told the amounts paid to certain doctors, and they received detailed reports on the Return on Investment that Purdue gained from paying doctors to promote its drugs. The board was told that Purdue would allow a "spending limit for gifts" of $750 per doctor per year; and that the directors should personally report when they gave money, meals, or gifts to doctors to promote Purdue drugs. The board was told explicitly that paying doctors to promote opioids was "a high risk activity, in view of the potential for off-label or other improper promotional conduct by third parties during such activities." When Congress required disclosure of drug company payments to doctors, the board was told there were "significant compliance implications" for Purdue.

75

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 116 of 1171. PageID #: 705435

377.    The directors also oversaw Purdue's strategy to push patients to higher doses of opioids — which are more dangerous, more addictive, and more profitable. The board routinely received reports on Purdue's efforts to push patients to higher doses. A report alerted the board that "Net sales of the 40 and 80 mg strengths of OxyContin" had fallen below Purdue's targets in the fall of 2010 and were $85 million below budget. By summer, the board learned that income was $500 million below budget "mainly due to declining sales in 40 mg and 80 mg strengths. By fall, the board reviewed an assessment that Purdue had lost more than $800 million in revenue because patients weren't taking enough 40 mg and 80 mg doses. The board dug into the issue. Multiple reports to the board identified as a "threat" an initiative by public health authorities to save lives by requiring doctors to consult with pain specialists before prescribing opioid doses higher than 80mg/day. The CEO and directors oversaw Purdue's effort to push back against that public health "threat." Executives were pleased to report to the directors in 2013 that "initiatives to validate increased total daily doses are having impact in the field."

378.    The directors also oversaw Purdue's scheme to use higher doses of opioids to keep patients on drugs for longer periods of time. The board received detailed reports of how many patients stayed on Purdue's opioids for long periods (for example, longer than 35 days), along with Purdue's internal research showing that getting patients on higher doses keeps them on the drugs longer — all of which puts patients at greater risk of addiction and death. The board received the confidential results of a study of 57,000 patients that Purdue performed explicitly to determine how opioid dose "influences patient length of therapy." The results showed that patients on the highest doses "are the most persistent." The "Recommended Actions" presented to the board included "additional workshops for the sales force" and "specific direction" to the sales representatives about using higher doses to keep patients on drugs longer.

379.    The board was told in writing that encouraging higher doses "is a focal point of our promotion," and that sales representatives would "emphasize the importance" of increasing patients' opioid doses, as soon as 3 days after starting treatment. The board even tracked specific sales materials, such as "two new patient profiles designed to improve patient identification and titration" – to get more opioid-naïve and elderly patients on higher doses of opioids for longer periods of time. The board was told the exact research behind the sales strategy: higher doses would keep patients on drugs longer because Purdue had found that "83% of patients who discontinued were never titrated to higher doses." The directors knew or should have known that Purdue's sales strategy was deceptive and that putting patients on opioids at higher doses and for longer periods increased the risk of addiction, overdose, and death.

380.    The directors also oversaw Purdue's strategy of using "savings cards" to get patients on Purdue opioids for longer periods. The board knew how many thousands of cards were used each quarter, how the company calculated the Return On Investment, and that the explicit goal of the program was to hook patients to "remain on therapy longer."

381.    The directors also oversaw Purdue's strategy to target prescribers who did not have special training in opioids (primary care doctors, nurse practitioners, and physician assistants) because they "show the highest responsiveness" to Purdue's sales push. Purdue continued that strategy even though the DEA had expressed concern that Purdue was promoting opioids to clinicians who were not adequately trained in pain management. The directors also oversaw Purdue's strategy to target elderly patients by promotion "targeted to HCPs that practice in the long term care setting," even down to the details of advertising that "leverages images of older patients." The directors knew or should have known that Purdue's sales strategy was deceptive and that targeting primary care doctors and elderly patients increased the risk of addiction, overdose, and death.

77

382. The directors also oversaw Purdue's push to steer patients away from safer alternatives. They tracked the company's effort to emphasize "the true risk and cost consequence of acetaminophen-related liver toxicity." The board even oversaw Purdue's deceptive websites, and received reports about the specific section that was found to be deceptive by the New York Attorney General.

383. The directors also oversaw Purdue's response to signs that patients were being harmed. Reports of harm came in by the hundreds and even thousands. One board report explained that "in excess of 5,000 cases with alleged adverse events have already been received and processed by Drug Safety and the Litigation Support group" during a single quarter.

384. Each of the reports described above was sent to every Sackler Defendant on the board at the time they were prepared.

385. Stuart Baker also received all of the reports described above.

386. The Retail Chain Pharmacies earned enormous profits by flooding the country with prescription opioids.

387. The Retail Chain Pharmacies are all engaged in the business of selling opioids at retail. The failure of the Retail Chain Pharmacies to effectively monitor and report suspicious orders of prescription opioids at the retail level and to implement measures to prevent diversion through improper prescriptions greatly contributed to the vast increase in opioid overdose and addiction.

388. The Retail Chain Pharmacies' conduct directly caused a public health and law-enforcement crisis across this country, including in the City of Rochester.

389. Each of the Retail Chain Pharmacies does substantial business throughout the United States. This business includes the distribution and retail sales of prescription opioids.

390. The Retail Chain Pharmacies distributed and sold at retail substantial quantities of prescription opioids, including fentanyl, hydrocodone, and oxycodone in New York. In addition, they distributed and sold at retail substantial quantities of prescription opioids in other states, and these

78

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 119 of 1171. PageID #: 705438

drugs were diverted from these other states to the City of Rochester. The Retail Chain Pharmacies failed to take meaningful action to stop this diversion despite their knowledge of it, and contributed substantially to the diversion problem.

391.    Each participant in the supply chain of opioid distribution, including the Retail Chain Pharmacies, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring, and reporting suspicious activity.

392.    As sellers of substances known to be dangerous and addictive, the Retail Chain Pharmacies owe a common law duty to act with care in selling at retail these dangerous drugs. In particular, because the risks to public health of uncontrolled distribution of these substances are well-known, the Retail Chain Pharmacies are obliged to use reasonable care to prevent diversion of dangerous drugs.

393.    Defendants' common-law duties parallel their obligations under state and federal law, which inform, and provide the standard of care for, these common law duties.

394.    The Retail Chain Pharmacies, like manufacturers and wholesale distributors, are registrants under the federal Controlled Substances Act ("CSA"). 21 C.F.R. § 1301.11. Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." *See* 21 C.F.R. § 1301.71(a). In addition, 21 C.F.R. § 1306.04(a) states, "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." Because pharmacies themselves are registrants under the CSA, the duty to prevent diversion lies with the pharmacy entity, not the individual pharmacist alone.

395.    The DEA, among others, has provided extensive guidance to pharmacies concerning their duties to the public. The guidance advises pharmacies how to identify suspicious orders and other evidence of diversion.

79

396.   Suspicious pharmacy orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern and/or orders of unusual frequency and duration, among others.

397.   Additional types of suspicious orders include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances compared to other practitioners in the area; (2) prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; (3) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions that look "too good" or where the prescriber's handwriting is too legible; (5) prescriptions with quantities or doses that differ from usual medical usage; (6) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (7) photocopied prescriptions; or (8) prescriptions containing different handwriting. Most of the time, these attributes are not difficult to detect and should be easily recognizable by pharmacies.

398.   Suspicious pharmacy orders are red flags for if not direct evidence of diversion.

399.   Other signs of diversion can be observed through data gathered, consolidated, and analyzed by the Retail Chain Pharmacies themselves. That data allows them to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.

400.   According to industry standards, if a pharmacy finds evidence of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

401.   Despite their legal obligations under the common law (and under the CSA), the Retail Chain Pharmacies failed to meet their obligations and allowed widespread diversion to occur—and they did so knowingly.

80

402. The Retail Chain Pharmacies' failure to adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into whether a prescription is legitimate, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal, or when suspicious circumstances are present, including when prescriptions are procured and pills supplied for the purpose of illegal diversion and drug trafficking.

403. The Retail Chain Pharmacies also failed to adequately use data available to them to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids, or to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.

404. The Retail Chain Pharmacies failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

405. The Retail Chain Pharmacies also failed to conduct adequate internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if they conducted such audits, they failed to take any meaningful action as a result.

406. The Retail Chain Pharmacies were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas patently absurd;

81

yet, they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances.

407.     The Retail Chain Pharmacies were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as both distributors and retail sellers. Yet, instead of taking any meaningful action to stem the flow of opioids into communities and prevent diversion, they continued to participate in the oversupply and profit from it.

408.     The Retail Chain Pharmacies developed and maintained extensive data on opioids they distributed and sold in their retail stores. Through this data, Retail Chain Pharmacies had direct knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in communities throughout the country, and in the City of Rochester. They used the data to evaluate their own sales activities and workforce. The Retail Chain Pharmacies also provided other defendants with data regarding, *inter alia*, individual doctors in exchange for rebates or other forms of consideration. The Retail Chain Pharmacies' data is a valuable resource that they could have used to help stop diversion, but failed to do so.

409.     Performance metrics and prescription quotas adopted by the Retail Chain Pharmacies for their retail stores contributed to their failure to perform their duties.

410.     The performance metric systems rate the pharmacist employees at the stores operated by Retail Chain Pharmacies based solely on productivity. These requirements place significant and unrealistic time pressures on the pharmacists.

411.     The Retail Chain Pharmacies measure how many and how quickly prescriptions are filled daily based on store volume. Many of the Retail Chain Pharmacies' locations require pharmacists to fill one prescription every three minutes. The programs may also measure how many telephone calls are made to customers to refill and/or pick up prescriptions; how many flu shots are given; as well as

82

other pharmacy tasks. All measurements focus on productivity with the end goal of maximizing retail defendants' profits.

412.     In addition to the pharmacist's other duties, Retail Chain Pharmacies required their employee pharmacists to fill more than 600 prescriptions per work shift.

413.     For example, CVS maintains a "Metrics System" to evaluate performance in its pharmacists. Under CVS's Metrics System, pharmacists are directed to meet high goals that make it difficult, if not impossible, to comply with applicable laws and regulations. There is no measurement for pharmacy accuracy or customer safety. Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year. Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacists are able to fill within a year.

414.     At the same time that Retail Chain Pharmacies increased demands for productivity, they cut the hours of pharmacy technicians, leaving pharmacists severely understaffed and unable to provide all necessary services.

415.     Retail Chain Pharmacies' high-volume and increased-profits business model led to a greater number of errors in dispensing prescriptions, which can result in substantial harm to pharmacy customers.

416.     A survey conducted by the Institute for Safe Medication Practices ("ISMP") of 673 pharmacists revealed that 83% believed that distractions due to performance metrics or measured wait times contributed to dispensing errors, and that 49% felt specific time measurements were a significant contributing factor.

417.     Further, the National Association of Boards of Pharmacy found that performance metrics, which measure the speed and efficiency of prescription work flow—using such parameters as prescription wait times, percentage of prescriptions filled within a specified time period, number of

83

prescriptions verified, and number of immunizations given per pharmacist shift—may distract pharmacists and impair professional judgment.

418.    The practices of applying performance metrics or quotas to pharmacists in the practice of pharmacy may cause distractions that could potentially decrease pharmacists' ability to perform drug utilization review, interact with patients, and maintain attention to detail, which could ultimately lead to unsafe conditions at a pharmacy.

419.    The Retail Chain Pharmacies productivity policies are directly at odds with their performance of due diligence obligations required to be performed in conjunction with federal and state law, especially given the higher duty of care associated with the prescription of narcotic opioids.

420.    The Retail Chain Pharmacies were negligent in failing to ensure, or even permit, pharmacists in their stores to exercise the reasonable care necessary under the circumstances to detect and prevent diversion.

421.    The Retail Chain Pharmacies failed to adequately train their pharmacists and pharmacy techs on how to properly and adequately handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into whether a prescription is legitimate, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phone, false, forged, or otherwise illegal.

422.    The Retail Chain Pharmacies failed to instruct their pharmacists and pharmacy techs on how to address situations in which they are forced to decline filling a prescription for a customer who submitted a prescription which a pharmacist has identified as suspicious.

423.    The Retail Chain Pharmacies have failed to train their pharmacists and pharmacy techs on how to properly exercise their judgment with respect to determinations about whether a prescription is one that should be filled, or whether, under the law, the pharmacists should refuse to fill it.

84

424. The Retail Chain Pharmacies failed to adequately use data available to them to identify doctors that were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids.

425. The Retail Chain Pharmacies failed to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that contributed to the opioid crisis. The Retail Chain Pharmacies failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

426. The Retail Chain Pharmacies failed to conduct internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly.

427. The Retail Chain Pharmacies failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

428. The Retail Chain Pharmacies violated the Controlled Substances Act by failing to have in place policies and procedures to avoid the diversion of opioids.

429. The Retail Chain Pharmacies failed to speak with prescribing physicians prior to dispensing opioids.

430. The Retail Chain Pharmacies failed to takes steps such as investigating whether a prescription was written within a prescriber's scope of practice.

431. The Retail Chain Pharmacies failed to investigate whether an opioid prescription was appropriate for the diagnosis.

85

432.     The Retail Chain Pharmacies failed to investigate whether a therapeutic regimen is within the standard of care.

433.     The Retail Chain Pharmacies failed to investigate and consider the length of an opioid prescription prior to dispensing.

434.     The Retail Chain Pharmacies failed to review State Prescription Drug Monitoring databases prior to dispensing.

435.     The Retail Chain Pharmacies failed to abide by internal company policies in the dispensing of opioids.

436.     The Retail Chain Pharmacies have long been on notice of their failure to abide by state and federal law and regulations governing the distribution and dispensing of prescription opioids. Indeed, several of the Retail Chain Pharmacies have been repeatedly penalized for their illegal prescription opioid practices. Based upon the widespread nature of these violations, these enforcement actions are the product of, and confirm, national policies and practices of the Retail Chain Pharmacies.

437.     Numerous state and federal drug diversion prosecutions have occurred in which prescription opioid pills were procured from Retail Chain Pharmacies. The allegations in this Complaint do not attempt to identify all these prosecutions, and the information above is merely by way of example.

438.     The litany of state and federal actions against the Retail Chain Pharmacies demonstrate that they routinely, and as a matter of standard operation procedure, violated their legal obligations that govern the distribution and dispensing of prescription opioids.

439.     Throughout the country and in the City of Rochester in particular, the Retail Chain Pharmacies were or should have been aware of numerous red flags of potential suspicious activity and diversion.

86

440.    From the vantage point of their retail pharmacy operations, the Retail Chain Pharmacies knew or reasonably should have known about the disproportionate flow of opioids into the City of Rochester and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for if not direct evidence of illicit supply and diversion. Additional information was provided by news reports, and state and federal regulatory actions, including prosecutions of pill mills in the area.

441.    The Retail Chain Pharmacies knew or reasonably should have known about the devastating consequences of the oversupply and diversion of prescription opioids, including spiking opioid overdose rates in Plaintiff's community.

442.    Because of (among other sources of information) regulatory and other actions taken against the Retail Chain Pharmacies directly, actions taken against others pertaining to prescription opioids obtained from their retail stores, complaints and information from employees and other agents, and the massive volume of opioid prescription drug sale data that they developed and monitored, the Retail Chain Pharmacies were well aware that their distribution and dispensing activities fell far short of legal requirements.

443.    The Retail Chain Pharmacies ' actions and omission in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have contributed significantly to the opioid crisis by enabling, and failing to prevent, the diversion of opioids.

444.    CVS is one of the largest companies in the world, with annual revenue of more than $150 billion. According to news reports, it manages medications for nearly 90 million customers at 9,700 retail locations.

445.    CVS is a repeat offender and recidivist: the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States Department of Justice ("DOJ"). It nonetheless treated these fines as the cost of doing business and has allowed its

pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA.

446. As recently as July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances.

447. This fine was preceded by numerous others throughout the country.

448. In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that from 2008-2012, CVS stores and pharmacists in Maryland violated their duties under the CSA and filling prescriptions with no legitimate medical purpose.

449. In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut failed to maintain proper records in accordance with the CSA.

450. In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.

451. In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances—mostly addictive painkillers—more than 500 times between 2011 and 2014.

452. In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for

88

hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe that drug. Additionally, the government alleged that CVS had recordkeeping deficiencies.

453.    In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."

454.    In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations it filled prescriptions written by a doctor whose controlled-substance registration had expired.

455.    In August 2013, CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area.

456.    Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.

457.    CVS has had knowledge and/or notice of the opioid problem since at least 2002.

458.    At any time since CVS had knowledge and/or notice of the opioid problem it could have unilaterally taken steps to curtail and prevent expansion of the problem, but it failed to do so.

459.    Walgreens is the second-largest pharmacy store chain in the United States behind CVS, with annual revenue of more than $118 billion. According to its website, Walgreens operates more than 8,100 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in fiscal 2017.

460.    Walgreens also has been penalized for serious and flagrant violations of the CSA. Indeed, Walgreens agreed to the largest settlement in DEA history—$80 million—to resolve

89

allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription opioids to be diverted for abuse and illegal black market sales.

461. The settlement resolved investigations into and allegations of CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

462. Walgreens' Florida operations at issue in this settlement highlight its egregious conduct regarding diversion of prescription opioids. Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011—more than ten times the average amount.

463. They increased their orders over time, in some cases as much as 600% in the space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period. Yet Walgreens corporate officers turned a blind eye to these abuses. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens' attitude that profit outweighed compliance with the CSA or the health of communities.

464. Defendant Walgreens' settlement with the DEA stemmed from the DEA's investigation into Walgreens' distribution center in Jupiter, Florida, which was responsible for significant opioid diversion in Florida. According to the Order to Show Cause, Defendant Walgreens' corporate headquarters pushed to increase the number of oxycodone sales to Walgreens' Florida pharmacies, and provided bonuses for pharmacy employees based on number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July 2010, Defendant Walgreens ranked all of its Florida stores by number of oxycodone prescriptions dispensed in June of that year, and found that

90

the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center.

465. Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).

466. The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk.

467. In January 2017, an investigation by the Massachusetts Attorney General found that some Walgreens pharmacies failed to monitor patients' drug use patterns and didn't use sound professional judgment when dispensing opioids and other controlled substances—despite the context of soaring overdose deaths in Massachusetts. Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.

468. With approximately 4,600 stores in 31 states and the District of Columbia, including 133 in New York, Rite Aid is the largest drugstore chain on the East Coast and the third-largest in the United States, with annual revenue of more than $21 billion.

469. In 2009, as a result of a multi-jurisdictional investigation by the DOJ, Rite Aid and nine of its subsidiaries in eight states were fined $5 million in civil penalties for its violations of the CSA.

470. The investigation revealed that from 2004 onwards, Rite Aid pharmacies across the country had a pattern of non-compliance with the requirements of the CSA and federal regulations that lead to the diversion of prescription opioids in and around the communities of the Rite Aid pharmacies investigated. Rite Aid also failed to notify the DEA of losses of controlled substances in violation of 21 USC 842(a)(5) and 21 C.F.R 1301.76(b).

471. The Retail Chain Pharmacies' failure to control the supply chain and prevent diversion adversely affected communities throughout the United States. Once diverted opioids do not stay put.

91

Rather, diverted opioids move from areas of high supply to areas of high demand, traveling across state lines in a variety of ways.

472.    First, prescriptions written in one state may, under some circumstances, be filled in a different state. But even more significantly, individuals transported opioids from one jurisdiction specifically to sell them in another. When authorities in some states cracked down on opioid suppliers, suppliers in other states filled the gaps. Florida in particular assumed a prominent role, as its lack of regulatory oversight created a fertile ground for pill mills. Residents of other states would simply drive to Florida, stock up on pills from a pill mill, and transport them back to home to sell. The practice became so common that authorities dubbed these individuals "prescription tourists."

473.    Thus, once diverted into the illegal market in one location, prescription opioids could then flow freely into the City of Rochester and elsewhere. In particular, the I-95 corridor was one route by which diverted prescription opioids travelled from Florida northward to other states.

474.    For this reason, the Retail Chain Pharmacies' negligence in failing to prevent in diversion in Florida, and throughout the United States, substantially contributed to the opioid crisis in the City of Rochester.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

### A.  Background on Pain Medicine.

#### 1.  Safe and Effective Treatment of Chronic Pain Centers on Informed Risk Management.

475.    The practice of medicine centers on informed risk management. Prescribers must weigh the potential risks and benefits of each treatment option, as well as the risk of non-treatment.

476.    Accordingly, the safe and effective treatment of chronic pain requires that a physician be able to weigh the relative risks of prescribing opioids against both (a) the relative benefits that may be expected during the course of opioid treatment and (b) the risks and benefits of alternatives.

477.     This bedrock principle of full disclosure is particularly important in the context of chronic opioid therapy because of the risk that patients will become physically and psychologically dependent on the drugs, finding it difficult to manage or terminate their use.

478.     The FDA-approved drug labels on each of Defendants' opioids do not attempt to advise physicians how to maximize the benefits and minimize the risks for patients on long-term chronic opioid therapy. The labels contain no dosing cap above which it would be unsafe for any doctor to prescribe to any patient. Nor do any of the labels provide a duration limit, after which the risks to a patient might increase. Thus, doctors and patients rely more heavily on educational materials such as treatment guidelines, CMEs, and scientific and patient education articles and websites to inform their treatment decisions.

**2.  Opioid Use Is Associated with Known and Substantial Risks.**

479.     Opium has been recognized as a tool to relieve pain for millennia; so has the magnitude of its potential for abuse, addiction and its dangers. Opioids are related to illegal drugs like opium and heroin. In fact, types of fentanyl, a widely-distributed opioid in the United States, have now been made illegal in China.

480.     During the Civil War, opioids, then known as "tinctures of laudanum," gained popularity among doctors and pharmacists for their ability to reduce anxiety and relieve pain – particularly on the battlefield – and they were popularly used in a wide variety of commercial products ranging from pain elixirs to cough suppressants and beverages. By 1900, an estimated 300,000 people were addicted to opioids in the United States.[53] Many doctors prescribed opioids solely to avoid patients' withdrawal. Both the numbers of opioid addicts and the difficulty in weaning patients from opioids made clear their highly addictive nature.

---

[53] Substance Abuse and Mental Health Services Administration, Medication-Assisted Treatment for Opioid Addiction in Opioid Treatment Programs, Treatment Improvement Protocol (TIP Services), No. 43 (2005).

93

481. Beginning in the late 20th century and continuing through today, the pharmaceutical industry acted to dramatically expand the marketplace for opioids. As set forth below, pharmaceutical actors facilitated this expansion in three ways. First, pharmaceutical manufacturers engaged in a misinformation campaign which altered public perception of opioids, and deceived doctors, federal regulators, and the general public about their addictive qualities. Second, PBMs ensured that opioids were widely available, regularly prescribed and reimbursed. Third, opioid manufacturers and wholesalers/distributors flouted their federally imposed requirements to report suspicious opioid orders to the DEA and state agencies. These facilitated an explosion in the illegitimate marketplace for prescription opioids.

482. Due to concerns about their addictive properties, opioids have been regulated at the federal level as controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970. The labels for scheduled opioid drugs carry black box warnings of potential addiction and "[s]erious, life-threatening, or fatal respiratory depression," as the result of an excessive dose.

483. Studies and articles from the 1970s and 1980s also made the reasons to avoid opioids clear. Scientists observed negative outcomes from long-term opioid therapy in pain management programs; opioids' mixed record in reducing pain long-term and failure to improve patients' function; greater pain complaints as most patients developed tolerance to opioids; opioid patients' diminished ability to perform basic tasks; their inability to make use of complementary treatments like physical therapy due to the side effects of opioids; and addiction. Leading authorities discouraged, and even prohibited, the use of opioid therapy for chronic pain.

484. Discontinuing opioids after more than just a few weeks of therapy will cause most patients to experience withdrawal symptoms. These withdrawal symptoms include: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other

94

serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the patient had been using opioids.

485. When under the continuous influence of opioids over time, patients grow tolerant to their analgesic effects. As tolerance increases, a patient typically requires progressively higher doses to obtain the same levels of pain reduction to which he or she has become accustomed – up to and including doses that are "frighteningly high."[54] At higher doses, the effects of withdrawal are more substantial, thus leaving a patient at a much higher risk of addiction. A patient can take the opioids at the continuously escalating dosages to match pain tolerance and still overdose at recommended levels.

486. Dr. Andrew Kolodny, Chief Medical Officer for Phoenix House, a national addiction treatment program, has explained the effect of opioids as akin to "hijack[ing] the brain's reward system," which in turn convinces a user that "the drug is needed to stay alive."[55] A patient's fear of the unpleasant effects of discontinuing opioids combined with the negative reinforcement during a period of actual withdrawal can drive a patient to seek further opioid treatment—even where ineffective or detrimental to quality of life—simply to avoid the deeply unpleasant effects of withdrawal.

487. Patients that receive high doses of opioids as part of long-term opioid therapy are three to nine times more likely to suffer an overdose from opioid-related causes than those on low doses. As compared to available alternative pain remedies, scholars have suggested that tolerance to the respiratory depressive effects of opioids develops at a slower rate than tolerance to analgesic effects. Accordingly, the practice of continuously escalating doses to match pain tolerance can, in fact, lead to an overdose even when opioids are taken as recommended.

488. Further, "a potential side effect from chronic use [of opioids] can be abuse and addiction . . . . [i]n fact, correct use and abuse of these agents are not polar opposites—they are

---

[54] M. Katz, Long-term Opioid Treatment of Nonmalignant Pain: A Believer Loses His
Faith, 170(16) Archives of Internal Med. 1422 (2010).

[55] David Montero, *Actor's Death Sows Doubt Among O.C.'s Recovering Opioid Addicts*, The Orange Cnty. Reg. (Feb. 3, 2014), http://www.ocregister.com/articles/heroin-600148-shaffer-hoffman.html (accessed May 30, 2017).

complex, inter-related phenomena."[56] It is very difficult to tell whether a patient is physically dependent, psychologically dependent, or addicted. Drug-seeking behaviors, which are signs of addiction, will exist and emerge when opioids are suddenly not available, the dose is no longer effective, or tapering of a dose is undertaken too quickly.

489.    Studies have shown that between 30% and 40% of long-term users of opioids experience problems with opioid use disorders.[57]

490.    Each of these risks and adverse effects—dependence, tolerance, and addiction—is fully disclosed in the labels for each of Defendants' opioids (though, as described below, not in Defendants' marketing).[58] Prior to Defendants' deceptive marketing scheme, each of these risks was well-recognized by doctors and seen as a reason to use opioids to treat chronic pain sparingly and only after other treatments had failed.

491.    Opioids vary by duration. Long-acting opioids, such as Purdue's OxyContin and MS Contin, Janssen's Nucynta ER and Duragesic, Endo's Opana ER, and Actavis's Kadian, are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, 12 hours. Short-acting opioids, such as Cephalon's Actiq and Fentora, are designed to be taken in addition to long-acting opioids to address "episodic pain" and provide fast-acting, supplemental opioid therapy lasting approximately 4 to 6 hours.

492.    Defendants promoted the idea that pain should be treated by taking long-acting opioids continuously and supplementing them with short-acting, rapid- onset opioids for episodic pain.

---

[56] Wilson M. Compton & Nora D. Volkow, *Major Increases in Opioid Analgesic Abuse in the United States: Concerns and Strategies*, 81(2) Drug & Alcohol Dependence 103, 106 (2006).

[57] Joseph A. Boscarino et al., *Risk factors for drug dependence among out-patients on opioid therapy in a large US health-care system*, 105(10) Addiction 1776 ( 2010); Joseph A. Boscarino et al., *Prevalence of Prescription Opioid-Use Disorder Among Chronic Pain Patients: Comparison of the DSM-5 vs. DSM-4 Diagnostic Criteria*, 30(3) Journal of Addictive Diseases 185 (2011).

[58] For example, Purdue's OxyContin label (October 5, 2011) states: "Physical dependence and tolerance are not unusual during chronic opioid therapy."

493.    Defendant Purdue was aware that its drug OxyContin did not provide pain relief for up to 12 hours. Purdue was also aware of the risk that patients would then take additional pain medications, beyond what was prescribed, to make up for that gap in time. Despite this knowledge, Purdue continued to market OxyContin as lasting for 12 hours.

494.    While it was once thought that long-acting opioids would not be as susceptible to abuse and addiction as short-acting ones, this view has been discredited. OxyContin's label now states, as do all labels of Schedule II long-acting opioids, that the drug "exposes users to risks of addiction, abuse, and misuse, which can lead to overdose and death." The FDA has required extended release and long-acting opioids to adopt "Risk Evaluation Mitigation Strateg[ies]" on the basis that they present "a serious public health crisis of addiction, overdose, and death."[59]

495.    In 2013, in response to a petition to restrict the labels of long-acting opioid products, the FDA noted the "grave risks" of opioids, "the most well-known of which include addiction, overdose, and even death."[60] The FDA further warned that "[e]ven proper use of opioids under medical supervision can result in life-threatening respiratory depression, coma, and death."[61] The FDA required that—going forward—opioid makers of long-acting formulations clearly communicate these risks in their labels. Thus, the FDA confirmed what had previously been accepted practice in the treatment of pain— that the adverse outcomes from opioid use include "addiction, unintentional overdose, and death" and that long-acting or extended release opioids "should be used **only when alternative treatments are inadequate**."[62]

---

[59] FDA, *Risk Evaluation and Mitigation Strategy (REMS) for Extended-Release and Long-Acting Opioids* (last updated Oct. 9, 2014), http://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm163647.htm (accessed May 30, 2017).

[60] Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).

[61] *Id.*

[62] *Id.* at 7 (emphasis in original).

97

Case 1:17-md-02804-DAP   Doc #: 6393-2   Filed: 01/06/26   138 of 1171   PageID #: 705457

496.    Notably, in reaching its conclusion, the FDA did not rely on new or otherwise previously unavailable scientific studies regarding the properties or effects of opioids.

497.    The FDA-approved labels on each of Defendant's opioids do not attempt to advise physicians on how to maximize the benefits and minimize the risks for patients on long term opioid therapy. The labels contain no dosage cap above which it would be unsafe to prescribe to any patient. Nor do they provide a duration limit. Doctors and patients rely heavily on education materials, such as treatment guidelines, CMEs, and scientific and patient education articles and websites, to inform their treatment decisions.

498.    On July 25, 2012, the Physician For Responsible Opioid Prescribing ("PROP"), a non-profit organization made up of doctors and other health care professionals, petitioned the FDA to change the labeling of opioid medications. The petition was signed by thirty-seven physicians located nationwide. In its letter to the FDA, the group stated that "an increasing body of medical literature suggests that long term-use of opioids may be neither safe nor effective for many patients, especially when prescribed in high doses."[63]

499.    In its petition, PROP also stated that "many clinicians are under the false impression that chronic opioid therapy (COT) is an evidence-based treatment for chronic non-cancer pain" and that "these misconceptions lead to overprescribing and high dose prescribing." It was also their opinion that "the current label on opioid analgesics does not comply with [FDA law]".

500.    As the basis for its petition, PROP provided "Statements of Scientific Basis for Petition" which provided a list of detailed reports and studies proving the risks of opioid medications, the high risk of addiction, the exaggerated and false benefits, and further medically backed reasons to change the labelling of opioid medications to reduce prescribing.

---

[63] July 25, 2012 letter from PROP to FDA, accessed at http://www.citizen.org/documents/2048.pdf on May 30, 2017.

98

501.    In 2013, in response to a petition to require manufacturers to strengthen warnings on the labels of long-acting opioid products, the FDA warned of the "grave risks" of opioids, including "addiction, overdose, and even death." The FDA further warned, "[e]ven proper use of opioids under medical supervision can result in life- threatening respiratory depression, coma, and death." Because of those grave risks, the FDA said that long-acting or extended release opioids "should be used only when alternative treatments are inadequate."[64] The FDA required that – going forward – opioid makers of long-acting formulations clearly communicate these risks on their labels.

502.    In 2016, the FDA expanded its warnings for immediate-release opioid pain medications, requiring similar changes to the labeling of immediate-release for opioid pain medications as it had for extended release opioids in 2013. The FDA also required several additional safety-labeling changes across all prescription opioid products to include additional information on the risk of these medications.[65]

503.    The facts on which the FDA relied in 2013 and 2016 were well known to Defendants for many years since they began marketing these drugs.

### 3.   Long-Term Opioid Use Benefits Are Unproven and Contradicted.

504.    Despite the fact that opioids are now routinely prescribed, there has never been evidence of their safety and efficacy for long-term use.

505.    Defendants have always been aware of these gaps in knowledge. While promoting opioids to treat chronic pain, Defendants have failed to disclose the lack of evidence to support their long-term use and have failed to disclose the contradictory evidence that chronic opioid therapy actually makes patients sicker.

---

[64] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. *Physicians for Responsible Opioid Prescribing,* Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013) (emphasis in original).
[65] FDA announces enhanced warnings for immediate-release opioid pain medications related to risks of misuse, abuse, addiction, overdose and death. Available at
http://www.fda.gov/newsevents/newsroom/pressannouncements/ucm491739.htm (accessed May 30, 2017).

506.     There are no controlled studies of the use of opioids beyond 16 weeks, and no evidence that opioids improve patients' pain and function long-term. The first random, placebo-controlled studies appeared in the 1990s, and revealed evidence only for short-term efficacy and only in a minority of patients.[66]

507.     A 2004 report reviewed 213 randomized, controlled trials of treatments for cancer pain and showed that, while opioids had short-term efficacy, the data was insufficient to establish long-term effectiveness. Subsequent reviews of the use of opioids for cancer and non-cancer pain consistently note the lack of data to assess long-term outcomes. For example, a 2007 systematic review of opioids for back pain concluded that opioids have limited, if any, efficacy for back pain and that evidence did not allow judgments regarding long-term use. Similarly, a 2011 systematic review of studies for non-cancer pain found that evidence of long-term efficacy is poor. One year later, a similar review reported poor evidence of long-term efficacy for morphine, tramadol, and oxycodone, and fair evidence for transdermal fentanyl (approved only for use for cancer pain).

508.     On the contrary, evidence exists to show that opioid drugs are not effective to treat chronic pain, and may worsen patients' health. A 2006 study-of-studies found that opioids as a class did not demonstrate improvement in functional outcomes over other non-addicting treatments. Most notably, it stated: "For functional outcomes, the other analgesics were significantly more effective than were opioids."[67] Another review of evidence relating to the use of opioids for chronic pain found that up to 22.9% of patients in opioid trials dropped out before the study began because of the intolerable effects of opioids, and that the evidence of pain relief over time was weak.

---

[66] Nathaniel Katz, *Opioids: After Thousands of Years, Still Getting to Know You*, 23(4) Clin J. Pain 303 (2007); Roger Chou et al., *Research Gaps on Use of Opioids for Chronic Noncancer Pain*, 10(2) J. Pain 147 (2009).

[67] Andrea D. Furlan et al., *Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects*, 174(11) Can. Med. Ass'n J. 1589 (2006). This same study revealed that efficacy studies do not typically include data on opioid addiction. In many cases, patients who may be more prone to addiction are pre-screened out of the study pool. This does not reflect how doctors actually prescribe the drugs, because even patients who have past or active substance use disorders tend to receive higher doses of opioids. Karen H. Seal, *Association of Mental Health Disorders With Prescription Opioids and High-Risk Opioids in US Veterans of Iraq and Afghanistan*, 307(9) J. Am. Med. Ass'n 940 (2012).

509.    Endo's own research shows that patients taking opioids, as opposed to other prescription pain medicines, report higher rates of obesity (30% to 39%); insomnia (9% to 22%); and self-described fair or poor health (24% to 34%).

510.    Increasing duration of opioid use is strongly associated with an increasing prevalence of mental health conditions (depression, anxiety, post-traumatic stress disorder, or substance abuse), increased psychological distress, and greater health care utilization.

511.    As a pain specialist noted in an article titled *Are We Making Pain Patients Worse?*, "[O]pioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."[68]

512.    This is true both generally and for specific pain-related conditions. Studies of the use of opioids long-term for chronic lower back pain have been unable to demonstrate an improvement in patients' function. Conversely, research consistently shows that long-term opioid therapy for patients who have lower back injuries does not help patients return to work or to physical activity. This is due partly to addiction and other side effects.

513.    As many as 30% of patients who suffer from migraines have been prescribed opioids to treat their headaches. Users of opioids had the highest increase in the number of headache days per month, scored significantly higher on the Migraine Disability Assessment (MIDAS), and had higher rates of depression, compared to non-opioid users. A survey by the National Headache Foundation found that migraine patients who used opioids were more likely to experience sleepiness, confusion, and rebound headaches, and reported a lower quality of life than patients taking other medications.

514.    The lack of evidence for the efficacy of opioid use long-term has been well-documented nationally in the context of workers' compensation claims, where some of the most

---

[68] Andrea Rubenstein, *Are we making pain patients worse?*, Sonoma Medicine (Fall 2009).

101

detailed data exists. Claims involving workers who take opioids are almost four times as likely to reach costs of over $100,000 than claims without opioids, as these patients suffer greater side effects and are slower to return to work. Even adjusting for injury severity and self-reported pain score, taking an opioid for more than seven days and receiving more than one opioid prescription increased the risk that the patient would be on work disability one year later. A prescription for opioids, as the first treatment for a workplace injury, doubled the average length of the claim.

### 4. Defendants' Impact on the Perception and Prescribing of Opioids.

515. Before Defendants began the marketing campaign complained of herein, generally accepted standards of medical practice dictated that opioids should only be used short-term, for instance, for acute pain, pain relating to recovery from surgery, or for cancer or palliative care. In those instances, the risks of addiction are low or of little significance.

516. In 1986, the World Health Organization ("WHO") published an "analgesic ladder" for the treatment of cancer pain.[69] The WHO recommended treatment with over-the- counter or prescription acetaminophen or non-steroidal anti-inflammatory drugs ("NSAIDs") first, and then the use of unscheduled or combination opioids, and then stronger (Schedule II or III) opioids if pain persisted. The WHO ladder pertained only to the treatment of cancer pain, and did not contemplate the use of narcotic opioids for chronic pain—because the use of opioids for chronic pain was not considered appropriate medical practice at the time.

517. Studies and articles from the 1970s and 1980s made the reasons to avoid opioids clear. Scientists observed negative outcomes from long-term opioid therapy in pain management programs: opioids' mixed record in reducing pain long-term and failure to improve patients' function; greater pain complaints as most patients developed tolerance to opioids; opioid patients' diminished ability to perform basic tasks; their inability to make use of complementary treatments like physical therapy due

---

[69] http://apps.who.int/iris/bitstream/10665/43944/1/9241561009_eng.pdf (accessed May 30, 2017)

102

to the side effects of opioids; and addiction. Leading authorities discouraged, or even prohibited, the use of opioid therapy for chronic pain.

518.    In 1986, Dr. Russell Portenoy, who later became Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, while at the same time serving as a top spokesperson for drug companies, published an article reporting that "[f]ew substantial gains in employment or social function could be attributed to the institution of opioid therapy."[70]

519.    Writing in 1994, Dr. Portenoy described the prevailing attitudes regarding the dangers of long-term use of opioids:

> The traditional approach to chronic nonmalignant pain does not accept the long-term administration of opioid drugs. This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction. According to conventional thinking, the initial response to an opioid drug may appear favorable, with partial analgesia and salutary mood changes, but adverse effects inevitably occur thereafter. It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life. *Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects. There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.*[71]

According to Portenoy, these problems could constitute "compelling reasons to reject long term opioid administration as a therapeutic strategy in all but the most desperate cases of chronic nonmalignant pain."[72]

520.    For the reasons outlined by Dr. Portenoy, and in the words of one researcher from the Harvard Medical School, "it did not enter [doctors'] minds that there could be a significant number of

---

[70] Russell K. Portenoy & Kathleen M. Foley, *Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of 38 cases*, 25(2) Pain 171 (1986).
[71] Russell K. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 Progress in Pain Res. & Mgmt. 247 (1994) (emphasis added).
[72] *Id.*

103

chronic pain patients who were successfully managed with opioids."[73] Defendants changed that perception.

### B. Defendants Promoted Their Branded Products Through Direct Marketing to Prescribers and Consumers.

521.    Defendants' direct marketing proceeded on two tracks, serving two related purposes. First, Defendants worked through branded and unbranded marketing to build confidence in long-term opioid use by overstating its benefits and downplaying its risks, thereby expanding the chronic pain market. In addition, Defendants worked through their own staffs of sales representatives, physician speakers whom those representatives recruited, and advertising in medical journals to claim their share of that broader market. Defendants directed all of this activity through carefully designed marketing plans that were based on extensive research into prescriber habits and the efficacy of particular sales approaches and messages.

### 1.    Defendants Relied Upon Branded Advertisements.

522.    Defendants engaged in widespread advertising campaigns touting the benefits of their branded drugs. Defendants published print advertisements in a broad array of medical journals, ranging from those aimed at specialists, such as the *Journal of Pain* and *Clinical Journal of Pain*, to journals with wider medical audiences, such as the *Journal of the American Medical Association*. Defendants' advertising budgets peaked in 2011, when they collectively spent more than $14 million on the medical journal advertising of opioids, nearly triple what they spent in 2001. The 2011 total includes $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.[74]

523.    A number of these branded advertisements deceptively portrayed the benefits of opioid therapy for chronic pain. As just one example, a 2005 Purdue advertisement for OxyContin that ran in

---

[73] Igor Kissin, *Long-term opioid treatment of chronic nonmalignant pain: unproven efficacy and neglected safety?*, 6 J. Pain Research 513, 514 (2013) (quoting Loeser JD, *Five crises in pain management*, 20(1) Pain Clinical Updates 1-4 (2012).

[74] In 2011, Actavis spent less than $100,000 on such advertising, and Cephalon spent nothing. These companies' medical journal advertising peaked earlier, with Actavis spending $11.7 million in 2005, and Cephalon spending about $2 million in each of 2007 and 2008.

the *Journal of Pain* touted the drug as an "around-the-clock analgesic . . . for an extended period of time." The advertisement featured a man and boy fishing and proclaimed that "There Can Be Life With Relief." This depiction falsely implied that OxyContin provides both effective long-term pain relief and functional improvement, claims that, as described below, are unsubstantiated and contradicted in medical literature.

### 2. Defendants Relied Upon Their Sales Forces and Recruited Physician Speakers.

524. Each Defendant promoted the use of opioids for chronic pain through "detailers"— sales representatives who visited individual physicians and their staff in their offices—and small group speaker programs. By establishing close relationships with doctors, Defendants' sales representatives were able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to differentiate their opioids and to address individual prescribers' concerns about prescribing opioids for chronic pain. Representatives were trained on techniques to build these relationships, with Actavis even rolling out an "Own the Nurse" kit as a "door opener" to time with doctors.

525. Defendants developed sophisticated plans to select prescribers for sales visits based on their specialties and prescribing habits. In accordance with common industry practice, Defendants purchase and closely analyze prescription sales data from IMS Health. This data allows them to precisely track the rates of initial prescribing and renewal by individual doctors, which in turn allows them to target, tailor, and monitor the impact of their appeals.

526. Defendants, in particular, relied upon "influence mapping," *i.e.*, using decile rankings or similar breakdowns to identify the high-volume prescribers on whom detailing would have the greatest sales impact. Endo, for example, identified prescribers representing 30% of its nationwide sales volume and planned to visit these physicians three times per month. Defendants also closely monitored doctors' prescribing after a sales representative's visit to allow them to refine their planning and messaging and to evaluate and compensate their detailers.

105

527.    Defendants' sales representatives have visited hundreds of thousands of doctors, including thousands of visits to prescribers in the City of Rochester, and as described herein, spread misinformation regarding the risks, benefits, and superiority of opioids for the treatment of chronic pain. This misinformation includes deceptive and unfair claims regarding the risks of opioids for chronic pain, particularly the risks of addiction, withdrawal, and high doses, as well as the benefits.

528.    Each Defendant carefully trained its sales representatives to deliver company-approved messages designed to generate prescriptions of that company's drugs specifically, and opioids in general. Pharmaceutical companies exactingly direct and monitor their sales representatives—through detailed action plans, trainings, tests, scripts, role-plays, supervisor tag-alongs, and other means—to ensure that individual detailers actually deliver the desired messages and do not veer off-script. Pharmaceutical companies likewise require their detailers to deploy sales aids reviewed, approved, and supplied by the company and forbid them to use, in industry parlance, "homemade bread"—*i.e.*, promotional materials not approved by the company's marketing and compliance departments. Sales representatives' adherence to their corporate training is typically included in their work agreements. Departing from their company's approved messaging can, and does, lead to severe consequences including termination of employment.

529.    Besides carefully training their sales representatives, Defendants used surveys of physicians—conducted by third-party research firms—to assess how well their core messages came across to prescribers.

530.    In addition to making sales calls, Defendants' detailers also identified doctors to serve, for payment, on Defendants' speakers' bureaus and to attend programs with speakers and meals paid for by Defendants. Defendants almost always selected physicians who were "product loyalists," as they were sure to be asked whether they prescribe the drug themselves. Endo, for instance, sought to use specialists in pain medicine—including high prescribers of its drugs—as local "thought leaders" to

106

market Opana ER to primary care doctors. Such invitations are lucrative to the physicians selected for these bureaus; honorarium rates range from $800 to $2,000 per program, depending on the type of event, speaker training is typically compensated at $500 per hour.

531. These speaker programs and associated speaker trainings serve three purposes: they provide an incentive to doctors to prescribe, or increase their prescriptions of, a particular drug; a forum in which to further market to the speaker him or herself; and an opportunity to market to the speaker's peers. Defendants grade their speakers and future opportunities are based on speaking performance, post-program sales, and product usage. Defendants also track the prescribing of event attendees, with Endo noting that "physicians who came into our speaker programs wrote more prescriptions for Opana ER after attending than before." It would make little sense for Defendants to devote significant resources to programs that did not increase their sales.

532. Like the sales representatives who select them, speakers are expected to stay "on message"—indeed, they agree in writing to follow the slide decks provided to them. Endo's speaker rules, for example, provide that "all slides must be presented in their entirety and without alterations . . . and in sequence." This is important because the FDA regards promotional talks as part of product labeling, and requires their submission for review. Speakers thus give the appearance of providing independent, unbiased presentations on opioids, when in fact they are presenting a script prepared by Defendants' marketing departments. Although these meal-based speaker events are more expensive to host, and typically have lower attendance than CMEs, they are subject to less professional scrutiny and thus afford Defendants greater freedom in the messages they present.

533. Defendants devoted massive resources to these direct sales contacts with prescribers. In 2014, Defendants collectively spent $168 million on detailing branded opioids to physicians nationwide. This figure includes $108 million spent by Purdue, $34 million by Janssen, $13 million by Cephalon, $10 million by Endo, and $2 million by Actavis. The total figure is more than double

107

Defendants' collective spending on detailing in 2000. Detailers' role in Defendants' overall promotional efforts was also carefully calibrated; Endo, for example, found that devoting 61% of its marketing budget to sales representatives reflected an "[a]ppropriate combination of personal . . . and non-personal . . . selling initiatives."

534.     Defendants have spent hundreds of millions of dollars promoting their opioids through their respective sales forces because they understand that detailers' sales pitches are effective. Numerous studies indicate that marketing can and does impact doctors' prescribing habits,[75] and face-to-face detailing has the highest influence on intent to prescribe. Defendants could see this phenomenon at work not only in the aggregate, as their sales climbed with their promotional spending, but also at the level of individual prescribers whom they targeted for detailing, and who responded by prescribing more of Defendants' drugs.

### 3. Defendants Directed These Promotional Efforts Through Detailed Marketing Plans.

535.     Defendants guided their efforts to expand opioid prescribing through comprehensive marketing and business plans for each drug. These documents, based on the companies' extensive market research, laid out ambitious plans to bring in new prescribers and increase overall prescribing of Defendants' opioids.

#### a.   Targeting categories of prescribers

536.     Defendants targeted, by zip codes and other local boundaries, individual health care providers for detailing. Defendants chose their targets based on the potential for persuading a provider

---

[75] *See, e.g.,* Puneet Manchanda & Pradeep K. Chintagunta, *Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis,* 15 (2-3) Mktg. Letters 129 (2004) (detailing has a positive impact on prescriptions written); Ian Larkin, *Restrictions on Pharmaceutical Detailing Reduced Off-Label Prescribing of Antidepressants and Antipsychotics in Children,* 33(6) Health Affairs 1014 ( 2014) (finding academic medical centers that restricted direct promotion by pharmaceutical sales representatives resulted in a 34% decline in on-label use of promoted drugs); *see also* Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy,* 99(2) Am J. Pub. Health 221 (2009) (correlating an increase of OxyContin prescriptions from 670,000 annually in 1997 to 6.2 million in 2002 to a doubling of Purdue's sales force and trebling of annual sales calls).

to prescribe, ease of in-person access, and the likelihood of higher numbers of prescriptions at higher doses, with no correlation to demonstrated need or demand for opioid therapy, or to risk of abuse.

537.    Collectively, Defendants' marketing plans evince dual strategies, which often operated parallel to one another. Defendants' sales representatives continued to focus their detailing efforts on pain specialists and anesthesiologists, the highest-volume prescribers of opioids and, as a group, more educated than other practitioners about opioids' risks and benefits. Seeking to develop market share and expand sales, however, Defendants also targeted increasing numbers and types of prescribers for marketing.

538.    This expanded market of prescribers was, as a group, less informed about opioids and, as market research concluded, more susceptible to Defendants' marketing messages. These prescribers included nurse practitioners and physician assistants who, a 2012 Endo business plan noted, were "share acquisition" opportunities because they were "3x times more responsive than MDs to details" and wrote "96% of [their] prescriptions . . . without physician consult."

539.    The expanded market also included internists and general practitioners who were low- to mid-volume prescribers. Actavis, for example, rolled out a plan in 2008 to move beyond "Kadian loyalists" to an "expanded audience" of "low morphine writers."

   b.   Increasing "direct to consumer" marketing

540.    Defendants knew that physicians were more likely to prescribe their branded medications when patients asked for those medications. Endo's research, for example, found that such communications resulted in greater patient "brand loyalty," with longer durations of Opana ER therapy and fewer discontinuations. Defendants thus increasingly took their opioid sales campaigns directly to consumers, including through patient-focused "education and support" materials. These took the form of pamphlets, videos, or other publications that patients could view in their physician's office, as well as employer and workers' compensation plan initiatives to, as Endo put it, "[d]rive

109

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM
NYSCEF DOC. NO. 2

INDEX NO. E2019005178
Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 150 of 1171. PageID #: 705469
RECEIVED NYSCEF: 06/05/2019

demand for access through the employer audience by highlighting cost of disease and productivity loss."

541.    Defendants also knew that one of the largest obstacles to patients starting and remaining on their branded opioids—including by switching from a competitor's drug—was out- of-pocket cost. They recognized they could overcome this obstacle by providing patients financial assistance with their insurance co-payments, and each of the Defendants did so through vouchers and coupons distributed during detailing visits with prescribers. A 2008 Actavis business review, for example, highlighted co-pay assistance, good for up to $600 per patient per year, as a way to drive conversions to Kadian from competitor drugs like Avinza and MS Contin. In 2012, Janssen planned to distribute 1.5 million savings cards worth $25 each.

      c.    <u>Differentiating each brand</u>

542.    Purdue's OxyContin was the clear market leader in prescription opioid therapy, with 30% of the market for analgesic drugs in 2012. However, by 2010, Defendants had begun facing increasing pushback from the medical community and regulators based on the growing problems of opioid addiction and abuse. Both market conditions prompted Defendants to pursue product differentiation strategies—particularly an emphasis on their products being less subject to diversion, abuse, and addiction—as a means of grabbing market share from Purdue and other competitors.

543.    Endo, for example, tracked in detail prescriber "switching" from OxyContin to Opana ER. Actavis and Janssen did the same for switches to Kadian and Nucynta ER, respectively. Pressure to stand out among other drugs resulted in Defendants identifying marketing themes that thereafter were reflected in Defendants' deceptive and harmful messages to physicians and consumers. A 2008 Janssen plan emphasized "value" messaging in support of Nucynta ER, including claims of less dose escalation, lower toxicity, fewer withdrawal symptoms, and less dependence, and a 2009 Opana ER

market research report focused on greater potency and lower abuse potential of Opana ER vis-à-vis OxyContin.

      d.   <u>Moving beyond office visits</u>

544.     Defendants sought to reach additional prescribers by expanding beyond traditional sales calls and speaker events to new channels for their messages. For their sales forces, these included marketing to prescribers through voice mail, postcards, and email—so- called "e-detailing." Defendants also created new platforms for their speakers by implementing "peer to peer" programs such as teleconferences and webinars that were available to prescribers nationally. These programs allowed Defendants to use this more seemingly credible vehicle to market to, among other hard-to-reach audiences, prescribers at hospitals, academic centers, and other locations that limit or prohibit in-person detailing. Employing these new approaches, each Defendant relied heavily on speakers to promote its drugs.

### 4. Defendants Marketed Opioids in the City of Rochester Using the Same Strategies and Messages They Employed Nationwide.

545.     Defendants employed the same marketing plans and strategies and deployed the same messages in the City of Rochester as they did nationwide.

546.     Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that Defendants' messages are accurately and consistently delivered across marketing channels—including detailing visits, speaker events, and advertising—and in each sales territory. Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

547.     Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide

111

decks, and sales training materials; and nationally coordinated advertising. Defendants' sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide desks, and supervisors traveled with them periodically to check on both their performance and compliance.

548. As they did nationwide, Defendants extensively tracked the prescribing behavior of City-area health care providers and used that data to target their detailing and speaker- recruiting efforts. Top prescribers were profiled at the city, region, zip code, and sometimes facility levels, with information about their specialty, prescribing patterns (including product and dose), product loyalty and refill history. Providers' prescribing volume was ranked and sorted into deciles.

549. As described herein, misrepresentations and deceptions regarding the risks, benefits, and superiority of opioid use to treat chronic pain were part and parcel of Defendants' marketing campaigns in the City of Rochester.

## C. Defendants Used "Unbranded" Marketing to Evade Regulations and Consumer Protection Laws.

550. In addition to their direct marketing efforts, Defendants used unbranded, third- party marketing, which they deployed as part of their national marketing strategies for their branded drugs. Each Defendant executed these strategies through a network of third-party KOLs and Front Groups, with which it acted in concert by funding, assisting, encouraging, and directing their efforts. At the same time, Defendants exercised substantial control over the content of the messages third parties generated and disseminated, and distributed certain of those materials themselves. As with their other marketing strategies, Defendants' unbranded marketing created, and relied upon, an appearance of independence and credibility that was undeserved but central to its effectiveness. Unlike their direct promotional activities, Defendants' unbranded marketing allowed them to evade the oversight of federal regulators and gave them greater freedom to expand their deceptive messages.

112

### 1. Regulations Governing Branded Promotion Require that it Be Truthful, Balanced, and Supported by Substantial Evidence.

551.    Drug companies that make, market, and distribute opioids are subject to generally applicable rules requiring truthful marketing of prescription drugs. A drug company's branded marketing, which identifies and promotes a specific drug, must: (a) be consistent with its label and supported by substantial scientific evidence; (b) not include false or misleading statements or material omissions; and (c) fairly balance the drug's benefits and risks.[76] The regulatory framework governing the marketing of specific drugs reflects a public policy designed to ensure that drug companies, which are best suited to understand the properties and effects of their drugs, are responsible for providing prescribers with the information they need to accurately assess the risks and benefits of drugs for their patients.

552.    Further, the Federal Food, Drug, and Cosmetic Act ("FDCA") prohibits the sale in interstate commerce of drugs that are "misbranded." A drug is "misbranded" if it lacks "adequate directions for use" or if the label is false or misleading "in any particular."[77] "Adequate directions for use" are directions "under which the layman can use a drug safely and for the purposes for which it is intended."[78] "Labeling" includes more than the drug's physical label; it also includes "all . . . other written, printed, or graphic matter . . . accompanying" the drug, including promotional material.[79] "The term "accompanying" is interpreted broadly to include promotional materials—posters, websites, brochures, books, and the like—disseminated by or on behalf of the manufacturer of the drug.[80] Thus, Defendants' promotional materials are part of their drugs' labels and are required to be accurate, balanced, and not misleading.

---

[76] 21 U.S.C. § 352(a); 21 C.F.R. §§ 1.21(a), 202.1(e)(3), 202.1(e)(6).
[77] 21 U.S.C. §§ 352.
[78] 21 C.F.R. § 201.5.
[79] 21 U.S.C. § 321(m).
[80] *See id.*

113

553.    Labeling is misleading if it is not based on substantial evidence, if it materially misrepresents the benefits of the drug, or if it omits material information about or minimizes the frequency or severity of a product's risks. "The most serious risks set forth in a product's labeling are generally material to **any** presentation of efficacy." The FDA notes that "[b]ecause people expect to see risk information, there is no reason for them to imagine that the product has important risks that have been omitted . . . especially if some risks are included."[81] Promotion that fails to present the most important risks of the drug as prominently as its benefits lacks fair balance and is therefore deceptive.

554.    It is also illegal for drug companies to distribute materials that exclude contrary evidence or information about the drug's safety or efficacy or present conclusions that "clearly cannot be supported by the results of the study."[82] Further, drug companies must not make comparisons between their drugs and other drugs that represent or suggest that "a drug is safer or more effective than another drug in some particular when it has not been demonstrated to be safer or more effective in such particular by substantial evidence or substantial clinical experience."[83]

555.    While the FDA must approve a drug's label, it is the drug company's responsibility to ensure that the material in its label is accurate and complete and is updated to reflect any new information.[84] Promotional materials also must be submitted to the FDA when they are first used or disseminated. The FDA does not have to approve these materials in advance; if, upon review, the FDA determines that materials marketing a drug are misleading, it can issue an untitled letter or warning letter. The FDA uses untitled letters for violations such as overstating the effectiveness of the

---

[81] FDA, *Draft Guidance for Industry, Presenting Risk Information in Prescription Drug and Medical Device Promotion*, May 2009, at 14.
[82] 21 C.F.R. § 99.101(a)(4).
[83] 21 C.F.R. § 202.1(e)(6)(ii).
[84] *See* 21 C.F.R. § 201.56 (providing general requirements for prescription drug labeling); *see also Wyeth v. Levine*, 555 U.S. 555 (2009) (holding that a drug company bears responsibility for the content of its drug labels at all times); 21 C.F.R. § 314.70(c)(6) (iii)(A-C) (allowing manufacturers to make changes that "strengthen . . . a warning, precaution, or adverse reaction" or "strengthen a statement about drug abuse, dependence, psychological effect, or overdosage").

drug or making claims without context or balanced information. Warning letters address promotions involving safety or health risks and indicate the FDA may take further enforcement action.

### 2. Defendants Deployed Front Groups and Doctors to Disseminate Unbranded Information on Their Behalf.

556.    Drug companies market both directly and indirectly, using third party validators (such as scientists, physicians, patient or professional organizations) that appear to be independent and therefore more credible. The FDA has made clear that its promotional requirements apply to both forms of marketing:

> FDA's regulation of prescription drug product promotion extends both to promotional activities that are carried out by the firm itself, and to promotion conducted on the firm's behalf.
>
> . . . .
>
> Therefore, a firm is responsible for the content generated by its employees or any agents acting on behalf of the firm who promote the firm's product. For example, if an employee or agent of a firm, such as a medical science liaison or paid speaker (e.g., a key opinion leader) acting on the firm's behalf, comments on a third- party site about the firm's product, the firm is responsible for the content its employee or agent provides. A firm is also responsible for the content on a blogger's site if the blogger is acting on behalf of the firm.[85]

557.    In addition to being carried out directly or through third parties, drug companies' promotional activity can be branded or unbranded; unbranded marketing refers not to a specific drug, but more generally to a disease state or treatment. By using unbranded communications, drug companies can sidestep the extensive regulatory framework governing branded communications.

558.    Defendants disseminated many of their false, misleading, imbalanced, and unsupported statements indirectly, through KOLs and Front Groups, and in unbranded marketing materials. These KOLs and Front Groups were important elements of Defendants' marketing plans, which specifically

---

[85] FDA, *Draft Guidance for Industry on Fulfilling Regulatory Requirements for Postmarketing Submissions of Interactive Promotional Media for Prescription Human and Animal Drugs and Biologics*, January 2014, at 1, 4, http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm381352.pdf (accessed May 30, 2017).

115

contemplated their use, because they seemed independent and therefore outside FDA oversight. Through unbranded materials, Defendants, with their own knowledge of the risks, benefits and advantages of opioids, presented information and instructions concerning opioids generally that were contrary to, or at best, inconsistent with information and instructions listed on Defendants' branded marketing materials and drug labels. Defendants did so knowing that unbranded materials typically are not submitted to or reviewed by the FDA.

559. Even where such unbranded messages were channeled through third-party vehicles, Defendants adopted these messages as their own when they cited to, edited, approved, and distributed such materials knowing they were false, misleading, unsubstantiated, unbalanced, and incomplete. Unbranded brochures and other materials that are "disseminated by or on behalf of [the] manufacturer" constitute drug "labeling" that may not be false or misleading in any particular. *See* 21. C.F.R. 202.1(e)(7)(l)(2).[86] Defendants' sales representatives distributed third-party marketing material that was deceptive to Defendants' target audiences. Defendants are responsible for these materials.

560. Moreover, Defendants took an active role in guiding, reviewing, and approving many of the misleading statements issued by these third parties, ensuring that Defendants were consistently aware of their content. By funding, directing, editing, and distributing these materials, Defendants exercised control over their deceptive messages and acted in concert[87] with these third parties to fraudulently promote the use of opioids for the treatment of chronic pain.

---

[86] This regulation provides: "Brochures, booklets, mailing pieces, detailing pieces, file cards, bulletins, calendars, price lists, catalogs, house organs, letters, motion picture films, film strips, lantern slides, sound recordings, exhibits, literature, and reprints and similar pieces of printed, audio, or visual matter descriptive of a drug and the references published . . . containing drug information supplied by the manufacturer, packer, or distributor of the drug and which are disseminated by or on behalf of its manufacturer, packer, or distributor are hereby determined to be labeling, as defined in section 201(m) of the act." As labeling, such third party-created content distributed by a drug company may not be misleading and must meet the accuracy, substantiation, and fair balance requirements in the FDCA.

[87] As used in this Complaint, the allegation that Defendants "acted in concert" with third parties is intended to mean *both* that they conspired with these third parties to achieve some end and that they aided and abetted these third parties in the commission of acts necessary to achieve it.

561.     For example, drug companies have been admonished for making functional claims in FDA-reviewed branded materials if there is no evidence for such claims. Thus, drug companies were put on notice that the FDA would not allow such claims in branded materials. Defendants instead created and disseminated these same unsupported claims—that opioids allow patients to sleep, return to work, or walk more easily—through *unbranded* marketing materials.

562.     The third-party publications Defendants assisted in creating and distributing did not include the warnings and instructions mandated by their FDA-required drug labels and consistent with the risks and benefits known to Defendants. For example, these publications either did not disclose the risks of addiction, abuse, misuse, and overdose, or affirmatively denied that patients faced a serious risk of addiction.

563.     By acting through third parties, Defendants were able to both avoid FDA scrutiny and give the false appearance that the messages reflected the views of independent third parties. Later, Defendants would cite to these sources as "independent" corroboration of their own statements. As one physician adviser to Defendants noted, third-party documents not only had greater credibility, but broader distribution as doctors did not "push back" at having materials from, for example, the non-profit American Pain Foundation ("APF") on display in their offices, as they might with first party, drug company pieces. Nevertheless, the independence of these materials was a ruse—Defendants were in close contact with these third parties, paid for and were aware of the misleading information they were disseminating about the use of opioids to treat chronic pain, and regularly helped them to tailor and distribute their misleading, pro-opioid messaging.

564.     As part of a strategic marketing scheme, Defendants spread and validated their deceptive messages through the following vehicles: (a) KOLs, who could be counted upon to write favorable journal articles and deliver supportive CMEs; (b) a body of biased and unsupported scientific literature; (c) treatment guidelines; (d) CMEs; (e) unbranded patient education materials; and (f) Front

117

Group patient-advocacy and professional organizations, which exercised their influence both directly and through Defendant-controlled KOLs who served in leadership roles in those organizations.

a. <u>Defendants' Use of KOLs</u>

565. Defendants cultivated a small circle of doctors who, upon information and belief, were selected and sponsored by Defendants solely because they favored the aggressive treatment of chronic pain with opioids. Defendants' support helped these doctors become respected industry experts. In return, these doctors repaid Defendants by touting the benefits of opioids to treat chronic pain.

566. Pro-opioid doctors have been at the hub of Defendants' promotional efforts, presenting the appearance of unbiased and reliable medical research supporting the broad use of opioid therapy for chronic pain. KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs supportive of chronic opioid therapy. They have served on committees that developed treatment guidelines that strongly encourage the use of opioids to treat chronic pain (even while acknowledging the lack of evidence in support of that position) and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. Defendants were able to exert control of each of these modalities through their KOLs.

567. In return, the KOLs' association with Defendants provided not only money, but prestige, recognition, research funding, and avenues to publish. This positioned them to exert even more influence in the medical community.

568. Although some KOLs initially may have advocated for more permissive opioid prescribing with honest intentions, Defendants cultivated and promoted only those KOLs who could be relied on to help broaden the chronic opioid therapy market. Defendants selected, funded, and elevated those doctors whose public positions were unequivocal and supportive of using opioids to

118

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 159 of 1171. PageID #: 705478

treat chronic pain.[88] These doctors' professional reputations were then dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by the drug companies.

569.    Defendants cited and promoted favorable studies or articles by these KOLs. By contrast, Defendants did not support, acknowledge, or disseminate the publications of doctors critical of the use of chronic opioid therapy. Indeed, one prominent KOL sponsored by Defendants, Russell Portenoy, stated that he was told by a drug company that research critical of opioids (and the doctors who published that research) would never obtain funding. Some KOLs have even gone on to become direct employees and executives of Defendants, like Dr. David Haddox, Purdue's Vice President of Risk Management, or Dr. Bradley Galer, Endo's former Chief Medical Officer.

570.    Defendants provided substantial opportunities for KOLs to participate in research studies on topics Defendants suggested or chose, with the predictable effect of ensuring that many favorable studies appeared in the academic literature. As described by Dr. Portenoy, drug companies would approach him with a study that was well underway and ask if he would serve as the study's author. Dr. Portenoy regularly agreed.

571.    Defendants also paid KOLs to serve as consultants or on their advisory boards and give talks or present CMEs, typically over meals or at conferences. Since 2000, Cephalon, for instance, has paid doctors more than $4.5 million for programs relating to its opioids.

572.    These KOLs were carefully vetted to ensure that they were likely to remain on-message and supportive of a pharmaceutical industry agenda. One measure was a doctor's prior work for trusted Front Groups.

---

[88] Opioid-makers were not the first to mask their deceptive marketing efforts in purported science. The tobacco industry also used KOLs in its effort to persuade the public and regulators that tobacco was not addictive or dangerous. For example, the tobacco companies funded a research program at Harvard and chose as its chief researcher a doctor who had expressed views in line with industry's views. He was dropped when he criticized low-tar cigarettes as potentially more dangerous, and later described himself as a pawn in the industry's campaign.

573.     Defendants kept close tabs on the content of the misleading materials published by these KOLs. In many instances, they also scripted what these KOLs said—as they did with all their recruited speakers. The KOLs knew, or deliberately ignored, the misleading way in which they portrayed the use of opioids to treat chronic pain to patients and prescribers, but they continued to publish those misstatements to benefit themselves and Defendants, all the while causing harm to City prescribers and patients.

574.     Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom Defendants identified and promoted to further their marketing campaign. Dr. Portenoy received research support, consulting fees, and honoraria from Cephalon, Endo, Janssen, and Purdue (among others), and was a paid consultant to Cephalon and Purdue.

575.     Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society ("APS") / American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1997 and again in 2009. He was also a member of the board of APF, an advocacy organization almost entirely funded by Defendants.

576.     Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations. He appeared on *Good Morning America* in 2010 to discuss the use of opioids long-term to treat chronic pain. On this widely watched program, broadcast in the City of Rochester and across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in

120

the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[89]

577. Dr. Portenoy has recently admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true." These lectures falsely claimed that fewer than 1% of patients would become addicted to opioids. According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks. Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."[90] Portenoy candidly stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did."[91]

578. Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President in 2013 and is a current board member of AAPM, a front group that ardently supports chronic opioid therapy.[92] He is a Senior Editor of *Pain Medicine*, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue. At the same time, Dr. Webster was receiving significant funding from Defendants (including nearly $2 million from Cephalon).

579. Dr. Webster had been under investigation for overprescribing by the DEA, which raided his clinic in 2010. More than 20 of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses. Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-

---

[89] Good Morning America television broadcast, ABC News (Aug. 30, 2010).

[90] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall St. J., Dec. 17, 2012.

[91] *Id.*

[92] Journal supplements are paid for by drug manufacturers and, although they may be designed to blend into the rest of the journal, are not peer-reviewed and constitute drug company advertising.

121

sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen, and Purdue. In 2011, Dr. Webster presented, via webinar, a program sponsored by Purdue titled, *Managing Patient's Opioid Use: Balancing the Need and the Risk*. Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach City doctors.

580.    Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to *increase* a patient's dose of opioids. As he and his co-author wrote in a book entitled *Avoiding Opioid Abuse While Managing Pain* (2007), when faced with signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response." Endo distributed this book to doctors. Years later, Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[93]

b.    "Research" That Lacked Supporting Evidence

581.    Rather than find a way to actually test the safety and efficacy of opioids for long- term use, Defendants led people to believe that they already had. Defendants created a body of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of long-term use; (b) appeared to be the result of independent, objective research; and (c) was thus more likely to shape the perceptions of prescribers, patients and payors. This literature was, in fact, marketing material focused on persuading doctors and consumers that the benefits of long-term opioid use outweighed the risks.

---

[93] John Fauber & Ellen Gabler, *Networking Fuels Painkiller Boom*, Milwaukee Wisc. J. Sentinel (Feb. 19, 2012).

122

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM INDEX NO. E2019005178

NYSCEF DOC. NO. 2 Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 163 of 1171. PageID #: 705482 RECEIVED NYSCEF: 06/05/2019

582.    To accomplish this, Defendants—sometimes through third-party consultants and/or advocacy organizations—commissioned, edited, and arranged for the placement of favorable articles in academic journals. Defendants' internal documents reveal plans to submit research papers and "studies" to long lists of journals, including back-up options and last resort, "fast-track" application journals, that they could use if the pending paper was rejected everywhere else.

583.    Defendants coordinated the timing and publication of manuscripts, abstracts, posters/oral presentations, and educational materials in peer-reviewed journals and other publications to support the launch and sales of their drugs. The plans for these materials did not originate in the departments within the Defendant organizations that were responsible for research, development or any other area that would have specialized knowledge about the drugs and their effects on patients, but in Defendants' marketing departments and with Defendants' marketing and public relations consultants. Defendants often relied on "data on file" or presented posters, neither of which are subject to peer review. They also published their articles not through a competitive process, but in paid journal supplements, which allowed Defendants to publish, in nationally circulated journals, studies supportive of their drugs.

584.    Defendants also made sure that favorable articles were disseminated and cited widely in the medical literature, even where references distorted the significance or meaning of the underlying study. Most notably, Purdue promoted a 1980 reference in the well-respected *New England Journal of Medicine*: J. Porter & H. Jick, *Addiction Rare in Patients Treated with Narcotics*, 302(2) *New Eng. J. Med.* 123 (1980) ("Porter-Jick Letter"). It is cited 856 times in Google Scholar, and 86 times since 2010. It also appears as a reference in two CME programs in 2012 sponsored by Purdue and Endo.[94] Defendants and those acting on their behalf fail to reveal that this "article" is actually a letter-to-the-editor, not a

---

[94] AAPM, Safe Opioid Prescribing Course, February 25-26, 2012, sponsored by Purdue and Endo; "Chronic Pain Management and Opioid Use," October 11, 2012, sponsored by Purdue. Each CME is available for online credit, including to prescribers in Gennessee City.

123

peer-reviewed study (or any kind of study at all). The Porter-Jick Letter, reproduced in full below, describes a review of the charts of hospitalized patients who had received opioids. (Because it was a 1980 study, standards of care almost certainly would have limited opioids to acute or end-of-life situations, not chronic pain.)

---

### ADDICTION RARE IN PATIENTS TREATED WITH NARCOTICS

*To the Editor:* Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients[1] who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients,[2] Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

JANE PORTER
HERSHEL JICK, M.D.
Boston Collaborative Drug
Surveillance Program

Waltham, MA 02154       Boston University Medical Center

1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D. Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical patients. J Clin Pharmacol. 1978; 18:180-8.

---

585.     The Porter-Jick Letter notes that, when these patients' records were reviewed, it found almost no references to signs of addiction, though there is no indication that caregivers were instructed to assess or document signs of addiction. None of these serious limitations is disclosed when Defendants, or those acting on their behalf, cite the Porter-Jick Letter, typically as the sole scientific support for the proposition that opioids are rarely addictive, even when taken long-term. In fact, Dr. Jick later complained that his letter had been distorted and misused.

586.     Defendants worked not only to create or elevate favorable studies in the literature, but to discredit or bury negative information. Defendants' studies and articles often targeted articles that contradicted Defendants' claims or raised concerns about chronic opioid therapy. In order to do so, Defendants—often with the help of third-party consultants—targeted a broad range of media to get

124

their message out, including negative review articles, letters to the editor, commentaries, case-study reports, and newsletters.

587.    Defendants' strategies—first, to plant and promote supportive literature and then, to cite the pro-opioid evidence in their promotional materials, while failing to disclose evidence that contradicts those claims—are in dereliction of their legal obligations. The strategies were intended to, and did, knowingly and intentionally distort the truth regarding the risks, benefits and superiority of opioids for chronic pain relief resulting in distorted prescribing patterns.

### c.    Treatment Guidelines

588.    Treatment guidelines have been particularly important in securing acceptance for chronic opioid therapy. They are relied upon by doctors, especially the general practitioners and family doctors targeted by Defendants, who are otherwise not experts, nor trained, in the treatment of chronic pain. Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications. Furthermore, Endo's internal documents indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

#### i.    FSMB

589.    The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States. The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians. The FSMB finances opioid- and pain-specific programs through grants from Defendants.

590.    In 1998, the FSMB developed *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain* ("FSMB Guidelines"), which FSMB admitted was produced "in collaboration with

125

pharmaceutical companies."[95] The FSMB Guidelines taught not that opioids could be appropriate in limited cases or after other treatments had failed, but that opioids were "essential" for treatment of chronic pain, including as a first prescription option. The FSMB Guidelines failed to mention risks relating to respiratory depression and overdose, and they discussed addiction only in the sense that "inadequate understandings" of addiction can lead to "inadequate pain control."

591.    A 2004 iteration of the FSMB Guidelines and the 2007 book adapted from the 2004 guidelines, *Responsible Opioid Prescribing*, also make these same claims. These guidelines were posted online and were available to and intended to reach City physicians.

592.    The publication of *Responsible Opioid Prescribing* was backed largely by drug manufacturers, including Cephalon, Endo, and Purdue. The FSMB financed the distribution of *Responsible Opioid Prescribing* by its member boards by contracting with drug companies, including Endo and Cephalon, for bulk sales and distribution to sales representatives (for distribution to prescribing doctors).

593.    In all, 163,131 copies of *Responsible Opioid Prescribing* were distributed to state medical boards (and through the boards, to practicing doctors), and the FSMB benefitted by earning approximately $250,000 in revenue and commissions from their sale. The FSMB website describes the book as the "leading continuing medication education (CME) activity for prescribers of opioid medications."

594.    Drug companies relied on FSMB guidelines to convey the message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription decisions were documented. FSMB turned doctors' fear of discipline on its head—doctors, who used to believe that they would be

---

[95] FSMB, "Position of the FSMB in Support of Adoption of Pain Management Guidelines" (1998).

126

disciplined if their patients became addicted to opioids, were taught that they would be punished instead if they failed to prescribe opioids to their patients with pain.

595. FSMB, more recently, has moderated its stance. Although the 2012 revision of *Responsible Opioid Prescribing* continued to teach that "pseudoaddiction" is real and that opioid addiction risk can be managed through risk screening, it no longer recommended chronic opioid therapy as a first choice after the failure of over-the-counter medication and has heightened its addiction and risk warnings.

ii. *AAPM/APS Guidelines*

596. AAPM and the APS are professional medical societies, each of which received substantial funding from Defendants from 2009 to 2013 (with AAPM receiving over $2 million).

597. They issued a consensus statement in 1997, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low.[96] The co-author of the statement, Dr. Haddox, was, at the time, a paid speaker for Purdue. Dr. Portenoy was the sole consultant. The consensus statement, which also formed the foundation of the FSMB Guidelines, remained on AAPM's website until 2011. The statement was taken down from AAPM's website only after a doctor complained, though it lingers on the internet elsewhere.[97]

598. AAPM and APS issued their own guidelines in 2009 ("2009 Guidelines" or "Consensus Recommendations") and continued to recommend the use of opioids to treat chronic pain.[98] Fourteen of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Cephalon, Endo, and Purdue.

---

[96] Consensus statement, *The Use of Opioids for the Treatment of Chronic Pain*, APS & AAPM (1997), *available at* http://opi.areastematicas.com/generalidades/OPIOIDES.DOLORCRONICO.pdf (accessed May 30, 2017).
[97] *Id.*
[98] Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, 10(2) The Journal of Pain: Official Journal of the American Pain Society 113-130 (2009)

127

599.     The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited 732 times in academic literature, were disseminated in the City of Rochester during the relevant time period, are still available online, and were reprinted in the *Journal of Pain*.

600.     Defendants widely referenced and promoted the 2009 Guidelines without disclosing the acknowledged lack of evidence to support them.

    iii.     *American Geriatrics Society*

601.     The American Geriatrics Society ("AGS"), a nonprofit organization serving health care professionals who work with the elderly, disseminated guidelines regarding the use of opioids for chronic pain in 2002 (*The Management of Persistent Pain in Older Persons*, hereinafter "2002 AGS Guidelines") and 2009 (*Pharmacological Management of Persistent Pain in Older Persons*, hereinafter "2009 AGS Guidelines"). The 2009 AGS Guidelines included the following recommendations: "All patients with moderate to severe pain . . . should be considered for opioid therapy (low quality of evidence, strong recommendation)," and "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse."[99] These recommendations, which continue to appear on

---

[99] Pharmacological Management of Persistent Pain in Older Persons, 57 J. Am. Geriatrics Soc'y 1331, 1339, 1342 (2009), *available at* http://onlinelibrary.wiley.com/doi/10.1111/j.1526-4637.2009.00699.x/full (accessed May 30, 2017).

AGS's website, are not supported by any study or other reliable scientific evidence. Nevertheless, they have been cited 278 times in Google Scholar since their 2009 publication.

602.    AGS contracted with Defendants Endo, Purdue, and Janssen to disseminate the 2009 Guidelines, and to sponsor CMEs based on them. These Defendants were aware of the content of the 2009 Guidelines when they agreed to provide funding for these projects. The 2009 Guidelines were first published online on July 2, 2009. AGS submitted grant requests to Defendants including Endo and Purdue beginning July 15, 2009. Internal AGS discussions in August 2009 reveal that it did not want to receive up-front funding from drug companies, which would suggest drug company influence, but would instead accept commercial support to disseminate the publication. However, by drafting the guidelines knowing that pharmaceutical company funding would be needed, and allowing these companies to determine whether to provide support only after they had approved the message, AGS ceded significant control to these companies. Endo, Janssen, and Purdue all agreed to provide support to distribute the guidelines.

603.    According to one news report, AGS has received $344,000 in funding from opioid makers since 2009.[100] Five of 10 of the experts on the guidelines panel disclosed financial ties to Defendants, including serving as paid speakers and consultants, presenting CMEs sponsored by Defendants, receiving grants from Defendants, and investing in Defendants' stock. The Institute of Medicine recommends that, to ensure an unbiased result, fewer than 50% of the members of a guidelines committee should have financial relationships with drug companies.

    iv.    *Guidelines That Did Not Receive Defendants' Support*

604.    The extent of Defendants' influence on treatment guidelines is demonstrated by the fact that independent guidelines—the authors of which did not accept drug company funding—reached very different conclusions. The 2012 *Guidelines for Responsible Opioid Prescribing in Chronic Non-*

---

[100] John Fauber & Ellen Gabler, *Narcotic Painkiller Use Booming Among Elderly*, Milwaukee J. Sentinel, May 30, 2012.

129

*Cancer Pain*, issued by the American Society of Interventional Pain Physicians ("ASIPP"), warned that "[t]he recent revelation that the pharmaceutical industry was involved in the development of opioid guidelines as well as the bias observed in the development of many of these guidelines illustrate that the model guidelines are not a model for curtailing controlled substance abuse and may, in fact, be facilitating it." ASIPP's Guidelines further advise that "therapeutic opioid use, specifically in high doses over long periods of time in chronic non-cancer pain starting with acute pain, not only lacks scientific evidence, but is in fact associated with serious health risks including multiple fatalities, and is based on emotional and political propaganda under the guise of improving the treatment of chronic pain." ASIPP recommends long-acting opioids in high doses only "in specific circumstances with severe intractable pain" and only when coupled with "continuous adherence monitoring, in well-selected populations, in conjunction with or after failure of other modalities of treatments with improvement in physical and functional status and minimal adverse effects."[101]

605.    Similarly, the 2011 *Guidelines for the Chronic Use of Opioids*, issued by the American College of Occupational and Environmental Medicine, recommend against the "routine use of opioids in the management of patients with chronic pain," finding "at least moderate evidence that harms and costs exceed benefits based on limited evidence," while conceding there may be patients for whom opioid therapy is appropriate.[102]

606.    The *Clinical Guidelines on Management of Opioid Therapy for Chronic Pain*, issued by the U.S. Department of Veterans Affairs ("VA") and Department of Defense ("DOD") in 2010, notes that their review:

---

[101] Laxmaiah Manchikanti, et al., American Society of Interventional Pain Physicians (ASIPP) *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain: Part 1, Evidence Assessment*, 15 Pain Physician (Special Issue) S1-S66; *Part 2 – Guidance*, 15 Pain Physician (Special Issue) S67-S116 (2012).
[102] *American College of Occupational and Environmental Medicine's Guidelines for the Chronic Use of Opioids*, (2011), *available at*: https://www.nhms.org/sites/default/files/Pdfs/ACOEM%202011-Chronic%20Pain%20Opioid%20.pdf (accessed May 30, 2017).

130

revealed the lack of solid evidence based research on the efficacy of long-term opioid therapy. Almost all of the randomized trials of opioids for chronic non-cancer pain were short-term efficacy studies. Critical research gaps . . . include: lack of effectiveness studies on long-term benefits and harms of opioids . . .; insufficient evidence to draw strong conclusions about optimal approaches to risk stratification . . .; lack of evidence on the utility of informed consent and opioid management plans . . .; and treatment of patients with chronic non-cancer pain at higher risk for drug abuse or misuse.[103]

d.  Continuing Medical Education

607.  CMEs are ongoing professional education programs provided to doctors. Doctors are required to attend a certain number and, often, type of CME programs each year as a condition of their licensure. These programs are delivered in person, often in connection with professional organizations' conferences, online, or through written publications. Doctors rely on CMEs not only to satisfy licensing requirements, but to get information on new developments in medicine or to deepen their knowledge in specific areas of practice. Because CMEs are typically delivered by KOLs who are highly respected in their fields, and are thought to reflect these physicians' medical expertise, they can be especially influential with doctors.

608.  The countless doctors and other health care professionals who participate in accredited CMEs constitute an enormously important audience for opioid reeducation. As one target, Defendants aimed to reach general practitioners, whose broad area of focus and lack of specialized training in pain management made them particularly dependent upon CMEs and, as a result, especially susceptible to Defendants' deceptions.

609.  In all, Defendants sponsored CMEs that were delivered thousands of times, promoting chronic opioid therapy and supporting and disseminating the deceptive and biased messages described in this Complaint. These CMEs, while often generically titled to relate to the treatment of chronic pain,

---

[103] Management of Opioid Therapy for Chronic Pain Working Group, VA/DoD Clinical Practice Guideline for Management of Opioid Therapy for Chronic Pain (May 2010), *available at* http://www.healthquality.va.gov/guidelines/Pain/cot/COT_312_Full-er.pdf (accessed May 30, 2017).

131

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 172 of 1171. PageID #: 705491

focused on opioids to the exclusion of alternative treatments, inflated the benefits of opioids, and frequently omitted or downplayed their risks and adverse effects.

610.    The American Medical Association ("AMA") has recognized that support from drug companies with a financial interest in the content being promoted "creates conditions in which external interests could influence the availability and/or content" of the programs and urges that "[w]hen possible, CME[s] should be provided without such support or the participation of individuals who have financial interests in the educational subject matter."[104]

611.    Dozens of CMEs that were available to and attended or reviewed by City doctors during the relevant time period did not live up to the AMA's standards.

612.    The influence of Defendants' funding on the content of these CMEs is clear. One study by a Georgetown University Medical Center professor compared the messages retained by medical students who reviewed an industry-funded CME article on opioids versus another group who reviewed a non-industry-funded CME article. The industry-funded CME did not mention opioid-related death once; the non-industry-funded CME mentioned opioid-related death 26 times. Students who read the industry-funded article more frequently noted the impression that opioids were underused in treating chronic pain. The "take-aways" of those reading the non- industry-funded CME mentioned the risks of death and addiction much more frequently than the other group. Neither group could accurately identify whether the article they read was industry-funded, making clear the difficulty health care providers have in screening and accounting for source bias.[105]

613.    By sponsoring CME programs presented by Front Groups like APF, AAPM, and others, Defendants could expect messages to be favorable to them, as these organizations were otherwise dependent on Defendants for other projects. The sponsoring organizations honored this

[104] Opinion 9.0115, *Financial Relationships with Industry in CME*, Am. Med. Ass'n (Nov. 2011), *available at* http://eo2.commpartners.com/users/ama/downloads/120328_Opinion_E-9_0115.pdf (accessed May 30, 2017).
[105] Adriane Fugh-Berman, *Marketing Messages in Industry-Funded CME*, PharmedOut (June 25, 2010), *available at* pharmedout.galacticrealms.com/Fugh-BermanPrescriptionforConflict6-25-10.pdf.

principle by hiring pro-opioid KOLs to give talks that supported chronic opioid therapy. Defendant-driven content in these CMEs had a direct and immediate effect on prescribers' views on opioids. Producers of CMEs and Defendants measured the effects of CMEs on prescribers' views on opioids and their absorption of specific messages, confirming the strategic marketing purpose in supporting them.

### e. Unbranded Patient Education

614.    Pharmaceutical industry marketing experts see patient-focused advertising, including direct-to-consumer marketing, as particularly valuable in "increas[ing] market share . . . by bringing awareness to a particular disease that the drug treats."[106] Evidence also demonstrates that physicians are willing to acquiesce to patient demands for a particular drug— even for opioids and for conditions for which they are not generally recommended.[107] An Actavis marketing plan, for example, noted that "[d]irect-to-consumer marketing affects prescribing decisions." Recognizing this fact, Defendants put their relationships with Front Groups to work to engage in largely unbranded patient education about opioid treatment for chronic pain.

615.    The drug companies expect that they will recoup their investment in direct-to-consumer advertisements by capturing at least some of any additional prescriptions that result from patients "asking their doctor" about drugs that can treat their pain. Doctors also may review direct-to-consumer materials sales representatives give them to distribute to patients.

### f. Defendants' Use of Front Groups

---

[106] Kanika Johar, *An Insider's Perspective: Defense of the Pharmaceutical Industry's Marketing Practices*, 76 Albany L. Rev. 299, 308 (2013).

[107] Prescribers often accede to patient requests. According to one study, nearly 20% of sciatica patients requesting oxycodone would receive a prescription for it, compared with 1% making no request. More than half of patients requesting a strong opioid received one. J.B. McKinlay et al., *Effects of Patient Medication Requests on Physician Prescribing Behavior*, 52(2) Med. Care 294 (2014).

133

616.    As noted above, Defendants Cephalon, Endo, Janssen, and Purdue entered into arrangements with numerous organizations to promote opioids. These organizations depend upon Defendants for significant funding and, in some cases, for their survival. They were involved not only in generating materials and programs for doctors and patients that supported chronic opioid therapy, but also in assisting Defendants' marketing in other ways—for example, responding to negative articles and advocating against regulatory changes that would constrain opioid prescribing. They developed and disseminated pro-opioid treatment guidelines; conducted outreach to groups targeted by Defendants, such as veterans and the elderly; and developed and sponsored CMEs that focused exclusively on use of opioids to treat chronic pain. Defendants funded these Front Groups in order to ensure supportive messages from these seemingly neutral and credible third parties, and their funding did, in fact, ensure such supportive messages.

617.    Several representative examples of such Front Groups are highlighted below, but there are others, too, such as APS, AGS, FSMB, American Chronic Pain Association ("ACPA"), AAPM, American Society of Pain Educators ("ASPE"), NPF, and PPSG.

i.    *American Pain Foundation*

618.    The most prominent of Defendants' Front Groups was APF, which received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. Endo alone provided more than half of that funding; Purdue was next, at $1.7 million.

619.    APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes—including death—among returning soldiers. APF also engaged in a significant multimedia campaign—through radio, television and the internet—to educate

134

patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach City residents.

620. In addition to Perry Fine, Russell Portenoy, and Scott Fishman, who served on APF's Board and reviewed its publications, another board member, Lisa Weiss, was an employee of a public relations firm that worked for both Purdue and APF.

621. In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies out of total income of about $3.5 million. By 2011, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit. As one of its board members, Russell Portenoy, explained, the lack of funding diversity was one of the biggest problems at APF.

622. APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors. It was often called upon to provide "patient representatives" for Defendants' promotional activities, including for Purdue's *Partners Against Pain* and Janssen's *Let's Talk Pain*. As laid out below, APF functioned largely as an advocate for the interests of Defendants, not patients. Indeed, as early as 2001, Purdue told APF that the basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

623. In practice, APF operated in close collaboration with opioid makers. On several occasions, representatives of the drug companies, often at informal meetings at Front Group conferences, suggested activities and publications APF could pursue. APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

135

624.    APF assisted in other marketing projects for drug companies. One project funded by another drug company—*APF Reporter's Guide: Covering Pain and Its Management* (2008)[108]—recycled text that was originally created as part of the company's training document.

625.    The same drug company made general grants, but even then, it directed how APF used them. In response to an APF request for funding to address a potentially damaging state Medicaid decision related to pain medications generally, the company representative responded, "I provided an advocacy grant to APF this year—this would be a very good issue on which to use some of that. How does that work?"

626.    The close relationship between APF and the drug company was not unique, but in fact mirrors the relationships between APF and Defendants. APF's clear lack of independence—in its finances, management, and mission—and its willingness to allow Defendants to control its activities and messages, support an inference that each Defendant that worked with APF was able to exercise editorial control over its publications.

627.    Indeed, the U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to APF's credibility as an objective and neutral third party and Defendants stopped funding it. Within days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."[109]

ii.    *The American Academy of Pain Medicine*

628.    The American Academy of Pain Medicine, with the assistance, prompting, involvement, and funding of Defendants, issued treatment guidelines and sponsored and hosted medical education programs essential to Defendants' deceptive marketing of chronic opioid therapy.

---

[108] https://assets.documentcloud.org/documents/277606/apf-reporters-guide.pdf (accessed May 30, 2017).

[109] http://www.painfoundation.org (last visited May 30, 2017).

136

629.    AAPM has received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintains a corporate relations council, whose members pay $25,000 per year (on top of other funding) to participate. The benefits include allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event—its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors.

630.    Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Defendants Endo, Purdue, Cephalon and Actavis were members of the council and presented deceptive programs to doctors who attended this annual event.

631.    AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications. The conferences sponsored by AAPM heavily emphasized sessions on opioids—37 out of roughly 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs Perry Fine, Russell Portenoy, and Lynn Webster. Dr. Webster was even elected president of AAPM while under a DEA investigation. Another past AAPM president, Dr. Scott Fishman, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[110]

632.    AAPM's staff understood that they and their industry funders were engaged in a common practice. Defendants were able to influence AAPM through both their significant and regular funding, and the leadership of pro-opioid KOLs within the organization.

### 3. Defendants Acted in Concert with KOLs and Front Groups in the Creation, Promotion, and Control of Unbranded Marketing.

---

[110] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), http://www.medscape.org/viewarticle/500829 (accessed May 30, 2017).

137

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  178 of 1171.  PageID #: 705497

633.    Like cigarette manufacturers, which engaged in an industry-wide effort to misrepresent the safety and risks of smoking, Defendants worked with each other and with the Front Groups and KOLs they funded and directed to carry out a common scheme to deceptively present the risks, benefits, and superiority of opioids to treat chronic pain.

634.    Defendants acted through and with the same network of Front Groups, funded the same KOLs, and often used the very same language and format to disseminate the same deceptive messages. These KOLs have worked reciprocally with Defendants to promote misleading messaging regarding the appropriate use of opioids to treat chronic pain. Although participants knew this information was false and misleading, these misstatements were nevertheless disseminated to prescribers and patients in the City of Rochester.

635.    One vehicle for their collective collaboration was Pain Care Forum ("PCF"). PCF began in 2004 as an APF project with the stated goals of offering "a setting where multiple organizations can share information" and to "promote and support taking collaborative action regarding federal pain policy issues." APF President Will Rowe described the Forum as "a deliberate effort to positively merge the capacities of industry, professional associations, and patient organizations."

636.    PCF is comprised of representatives from opioid manufacturers and distributors (including Cephalon, Endo, Janssen, and Purdue); doctors and nurses in the field of pain care; professional organizations (*e.g.*, American Academy of Pain Management, APS, and American Society of Pain Educators); patient advocacy groups (*e.g.*, APF and ACPA); and other like-minded organizations (*e.g.*, FSMB and Wisconsin Pain & Policy Studies Group), almost all of which received substantial funding from Defendants.

138

637.    PCF, for example, developed and disseminated "consensus recommendations" for a Risk Evaluation and Mitigation Strategy ("REMS") for long-acting opioids that the FDA mandated in 2009 to communicate the risks of opioids to prescribers and patients.[111] This was critical as a REMS that went too far in narrowing the uses or benefits, or highlighting the risks of chronic opioid therapy, would deflate Defendants' marketing efforts. The recommendations—drafted by Will Rowe of APF— claimed that opioids were "essential" to the management of pain, and that the REMS "should acknowledge the importance of opioids in the management of pain and should not introduce new barriers."[112] Defendants worked with PCF members to limit the reach and manage the message of the REMS, which enabled them to maintain, and not undermine, their deceptive marketing of opioids for chronic pain.

### 4.  Defendants Targeted Vulnerable and Lucrative Populations.

#### a.  The Elderly

638.    Elderly patients taking opioids have been found to be exposed to elevated fracture risks, a greater risk for hospitalizations, and increased vulnerability to adverse drug effects and interactions, such as respiratory depression, which, as Defendants acknowledge in their labels (but not in their marketing), occurs more frequently in elderly patients. A 2010 paper in the Archives of Internal Medicine reported that elderly patients who used opioids had a significantly higher rate of death, heart attacks, and strokes than users of NSAIDs. Defendants' targeted marketing to the elderly and the absence of cautionary language in their promotional materials flies in the face of scientific evidence and their own labels, and creates a heightened risk of serious injury to elderly patients.

639.    Defendants also promoted the notion—also without adequate scientific foundation— that the elderly are particularly unlikely to become addicted to opioids. AGS's 2009 Guidelines, for

---

[111] The FDA can require a drug maker to develop a REMS—which could entail (as in this case) an education requirement or distribution limitation—to manage serious risks associated with a drug.
[112] Defendants also agreed that short-acting opioids should also be included in REMS as not to disadvantage the long-acting, branded drugs.

example, which Purdue, Endo, and Janssen publicized, described the risk of addiction as "exceedingly low in older patients with no current or past history of substance abuse." Yet, a 2010 study examining overdoses among long-term opioid users found that patients 65 or older were among those with the largest number of serious overdoses.

640.    Defendants' efforts have paid off. Since 2007, prescriptions for the elderly have grown at twice the rate of prescriptions for adults between the ages of 40 and 59.

### b.    Veterans

641.    Veterans, too, are suffering greatly from the effects of Defendants' targeted marketing. A 2008 survey showed that prescription drug abuse among military personnel doubled from 2002 to 2005, and then nearly tripled again over the next three years. In 2009, military doctors wrote 3.8 million prescriptions for narcotic pain pills—four times as many as they did in 2001. Further, one-third of veterans prescribed opioids as of 2012 remained on take-home opioids for more than 90 days. Although many of these veterans are returning from service with traumatic injuries, the increase in opioid prescribing is disproportionate to the population and, in far too many cases, unsuited for their treatment. Among former service members receiving VA services nationally in a single year (2005), 1,013 had died of accidental drug overdoses—double the rate of the civilian population.

642.    The City has a substantial population of veterans who must cope with the consequences of overprescribing opioids.

643.    Opioids are particularly dangerous to veterans. According to a study published in the 2013 Journal of American Medicine, veterans returning from Iraq and Afghanistan who were prescribed opioids have a higher incidence of adverse clinical outcomes, such as overdoses and self-inflicted and accidental injuries; 40% of veterans with post-traumatic stress disorder received opioids and benzodiazepines (anti-anxiety drugs) that, when mixed with alcohol, can cause respiratory depression and death. According to a VA Office of Inspector General Report, despite the risks, 92.6%

140

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 181 of 1171. PageID #: 705500

of veterans who were prescribed opioid drugs were also prescribed benzodiazepines.[113] Again, as with elderly patients, Defendants both purposefully sought to increase opioid prescribing to this vulnerable group and omitted from their promotional materials the known, serious risks opioids pose to them.

644. *Exit Wounds*, a 2009 publication sponsored by Purdue, distributed by APF with grants from Janssen and Endo, and written as a personal narrative of one veteran, describes opioids as "underused" and the "gold standard of pain medications" and fails to disclose the risk of addiction, overdose, or injury. It notes that opioid medications "increase a person's level of functioning" and that "[l]ong experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications." The book also asserts that "[d]enying a person opioid pain medication because he or she has a history of substance abuse or addiction is contrary to the model guidelines for prescribing opioids, published by the U.S. Federation of State Medical Boards." As laid out above, the FSMB itself received support from Defendants during the time it created and published its guidelines.

645. *Exit Wounds* minimizes the risks of chronic opioid therapy and does not disclose the risk that opioids may have fatal interactions with benzodiazepines, which were taken by a significant number of veterans.[114] It is not the unbiased narrative of a returning war veteran. It is pure marketing, sponsored by Purdue, Endo, and Janssen. The American Pain Foundation's name is prominently marked on the book's spine. Dr. Scott Fishman, then-chair of the APF, wrote the book's preface, which touted the APF as "an organization that raises public awareness, provides education, promotes research, and advocates for improved access to effective pain management – answering the unmet needs of our active military and veterans in pain."

---

[113] https://www.va.gov/oig/pubs/VAOIG-14-00895-163.pdf (accessed May 30, 2017).
[114] FDA guidance states that materials designed to target a particular audience should disclose risks particular to that audience. *See* FDA Notice, Guidance for Industry, "Brief Summary and Adequate Directions for Use: Disclosing Risk Information in Consumer-Directed Print Advertisements and Promotional Labeling for Prescription Drugs," August 6, 2015.

646. Janssen, for example, supported the Exit Wounds marketing effort, advocacy of "improved access to effective pain management," and the book's insufficient disclosures, despite acknowledging on the label for its opioid Duragesic that its use with benzodiazepines "may cause respiratory depression, hypotension, and profound sedation or potentially result in coma." A similar warning is found on the labels of other Defendants' opioids.

647. Janssen, for example, supported the Exit Wounds marketing effort, advocacy of "improved access to effective pain management," and the book's insufficient disclosures, despite acknowledging on the label for its opioid Duragesic that its use with benzodiazepines "may cause respiratory depression, hypotension, and profound sedation or potentially result in coma." A similar warning is found on the labels of other Defendants' opioids.

648. The deceptive nature of *Exit Wounds* is obvious in comparing it to guidance on opioids published by the VA and DOD in 2010 and 2011. The VA's *Taking Opioids Responsibly* describes opioids as "dangerous." It cautions against taking extra doses and mentions the risk of overdose and the dangers of interactions with alcohol. The list of side effects from opioids includes decreased hormones, sleep apnea, hyperalgesia, addiction, immune system changes, birth defects and death—none of which is disclosed in *Exit Wounds*.

### D. Why Defendants' Marketing Messages Are Misleading and Unfair

649. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The Manufacturer Defendants and their PBM allies had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers.

142

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 183 of 1171. PageID #: 705502

650. Defendants' marketing of opioids for long-term use to treat chronic pain, both directly and with and through third parties, included information that was false, misleading, contrary to credible scientific evidence and their own labels, and lacked balance and substantiation. Their marketing materials omitted material information about the risks of opioids, and overstated their benefits. Moreover, Defendants inaccurately suggested that chronic opioid therapy was supported by evidence, and failed to disclose the lack of evidence in support of treating chronic pain with opioids.

651. There are seven primary misleading and unfounded representations. Defendants and the third parties with which they teamed:

- misrepresented that opioids improve function;

- concealed the link between long-term use of opioids and addiction;

- misrepresented that addiction risk can be managed;

- masked the signs of addiction by calling them "pseudoaddiction";

- falsely claimed withdrawal is easily managed;

- misrepresented or omitted the greater dangers from higher doses of opioids; and

- deceptively minimized the adverse effects of opioids and overstated the risks of NSAIDs.

652. In addition to these misstatements, Purdue purveyed an eighth deception that OxyContin provides a full 12 hours of pain relief.

653. Exacerbating each of these misrepresentations and deceptions was the collective effort of Defendants and third parties to hide from the medical community the fact that the FDA "is not aware of adequate and well-controlled studies of opioid use longer than 12 weeks."[115]

### 1. Defendants and Their Third-Party Allies Misrepresented that Opioids Improve Function

---

[115] Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).

143

654.     Each of the following materials was created with the expectation that, by instructing patients and prescribers that opioids would improve patients' function and quality of life, patients would demand opioids and doctors would prescribe them. These claims also encouraged doctors to continue opioid therapy in the belief that failure to improve pain, function, or quality of life, could be overcome by increasing doses or prescribing supplemental short-acting opioids to take on an as-needed basis for breakthrough pain.

655.     However, not only is there no evidence of improvement in long-term functioning, a 2006 study-of-studies found that "[f]or functional outcomes . . . other analgesics were significantly more effective than were opioids."[116] Studies of the use of opioids in chronic conditions for which they are commonly prescribed, such as low back pain, corroborate this conclusion and have failed to demonstrate an improvement in patients' function. Instead, research consistently shows that long-term opioid therapy for patients who have lower back injuries does not cause patients to return to work or physical activity.[117] Indeed, one Defendant's own internal marketing plans characterized functional improvement claims as "aspirational." Another acknowledged in 2012 that "[s]ignificant investment in clinical data [was] needed" to establish opioids' effect on mitigating quality of life issues, like social isolation.

656.     The long-term use of opioids carries a host of serious side effects, including addiction, mental clouding and confusion, sleepiness, hyperalgesia, and immune-system and hormonal dysfunction that degrade, rather than improve, patients' ability to function. Defendants often omitted these adverse effects as well as certain risks of drug interactions from their publications.

---

[116] Andrea D. Furlan et al., *Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects*, 174(11) Can. Med. Ass'n J. 1589-1594 (2006). This study revealed that efficacy studies do not typically include data on opioid addiction, such that, if anything, the data overstate effectiveness.

[117] Moreover, users of opioids had the highest increase in the number of headache days per month, scored significantly higher on the Migraine Disability Assessment (MIDAS), and had higher rates of depression, compared to non-opioid users. They also were more likely to experience sleepiness, confusion, and rebound headaches, and reported a lower quality of life than patients taking other medications.

144

657. Yet each of the following statements by Defendants, suggests that the long-term use of opioids improve patients' function and quality of life, and that scientific evidence supports this claim.

| Actavis | a. Documents from a 2010 sales training indicate that Actavis trained its sales force to instruct prescribers that "**most** chronic benign pain patients do have **markedly improved ability to function** when maintained on chronic opioid therapy." (Emphasis added.) |
|---|---|
| | b. Documents from a 2010 sales training indicate that Actavis trained its sales force that increasing and restoring function is an expected outcome of chronic Kadian therapy, including physical, social, vocational, and recreational function. |
| | c. Actavis distributed a product advertisement that claimed that use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and cause patients to enjoy their lives. The FDA warned Actavis that such claims were misleading, writing: "We are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[118] |
| | d. Actavis sales representatives told prescribers in the City of Rochester that prescribing Actavis's opioids would improve their patients' ability to function and improve their quality of life. |

---

[118] Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), *available at* http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/ucm259240.htm.

| | |
|---|---|
| **Cephalon** | e.  Cephalon sponsored the FSMB's Responsible Opioid Prescribing (2007), which taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course." Cephalon also spent $150,000 to purchase copies of the book in bulk and distributed the book through its pain sales force to 10,000 prescribers and 5,000 pharmacists. |
| | f.  Cephalon sponsored the American Pain Foundation's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids, when used properly "give [pain patients] a quality of life we deserve." The *Treatment Options* guide notes that non-steroidal anti-inflammatory drugs have greater risks associated with prolonged duration of use, but there was no similar warning for opioids. APF distributed 17,200 copies in one year alone, according to its 2007 annual report. The publication is also currently available online. |
| | g.  Cephalon sponsored a CME written by key opinion leader Dr. Lynn Webster, titled *Optimizing Opioid Treatment for Breakthrough Pain*, which was offered online by Medscape, LLC from September 28, 2007, to December 15, 2008. The CME taught that Cephalon's Actiq and Fentora improve patients' quality of life and allow for more activities when taken in conjunction with long- acting opioids. |
| | h.  Cephalon sales representatives told prescribers in the City of Rochester that opioids would increase patients' ability to function and improve their quality of life. |

| | |
|---|---|
| **Endo** | i.  Endo sponsored a website, painknowledge.com, through APF and NIPC, which, in 2009, claimed that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it. |
| | j.  A CME sponsored by Endo, titled *Persistent Pain in the Older Patient*, taught that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." |
| | k.  Endo distributed handouts to prescribers that claimed that use of Opana ER to treat chronic pain would allow patients to perform work as a chef. This flyer also emphasized Opana ER's indication without including equally prominent disclosure of the "moderate to severe pain" qualification.[119] |
| | l.  Endo's sales force distributed FSMB's *Responsible Opioid Prescribing* (2007), which taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course." |
| | m. Endo provided grants to APF to distribute *Exit Wounds* to veterans, which taught |

---

[119] FDA regulations require that warnings or limitations be given equal prominence in disclosure, and failure to do so constitutes "misbranding" of the product. 21 C.F.R. § 202.1(e)(3); *see also* 21 U.S.C. §331(a).

146

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  187 of 1171.  PageID #: 705506

| Endo Cont'd | that opioid medications "*increase* your level of functioning" (emphasis in the original). *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder.  n.  Endo sales representatives told prescribers in the City of Rochester that opioids would increase patients' ability to function and improve their quality of life by helping them become more physically active and return to work. |
|---|---|

| Janssen | o.  Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved, and its sales force distributed. This guide features a man playing golf on the cover and lists examples of expected functional improvement from opioids, like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs. The guide states as a "fact" that "opioids may make it *easier* for people to live normally" (emphasis in the original). The myth/fact structure implies authoritative backing for the claims that does not exist. The targeting of older adults also ignored heightened opioid risks in this population.  p.  Janssen sponsored, developed, and approved content of a website, *Let's Talk Pain* in 2009, acting in conjunction with the APF, AAPM, and ASPMN, whose participation in *Let's Talk Pain* Janssen financed and orchestrated. This website featured an interview, which was edited by Janssen personnel, claiming that opioids were what allowed a patient to "continue to function," inaccurately implying her experience would be representative.  q.  Janssen provided grants to APF to distribute *Exit Wounds* to veterans, which taught that opioid medications "*increase* your level of functioning" (emphasis in the original). *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder.  r.  Janssen sales representatives told prescribers in the City of Rochester that opioids would increase patients' ability to function and improve their quality of life by helping them become more physically active and return to work. |
|---|---|

| Purdue | s.  Purdue ran a series of advertisements for OxyContin in 2012 in medical journals titled "Pain vignettes," which were case studies featuring patients, each with pain conditions persisting over several months, recommending OxyContin for each. One such patient, "Paul," is described as a "54-year- old writer with osteoarthritis of the hands," and the vignettes imply that an OxyContin prescription will help him work more effectively.  t.  Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which inaccurately claimed that "multiple clinical studies" had shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients." The sole |
|---|---|

147

| Purdue Cont'd | reference for the functional improvement claim noted the absence of long-term studies and actually stated: "For functional outcomes, the other analgesics were significantly more effective than were opioids." The *Policymaker's Guide* is still available online. |
| | |
| | u. Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids, when used properly, "give [pain patients] a quality of life we deserve." APF distributed 17,200 copies in one year alone, according to its 2007 annual report. The guide is currently available online. |
| | |
| | v. Purdue sponsored APF's *Exit Wounds* (2009), which taught veterans that opioid medications "increase your level of functioning." *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder. |
| | |
| | w. Purdue sponsored the FSMB's *Responsible Opioid Prescribing* (2007), which taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course." Purdue also spent over $100,000 to support distribution of the book. |
| | |
| | x. Purdue sales representatives told prescribers in the City of Rochester that opioids would increase patients' ability to function and improve their quality of life. |

## 2. Defendants and Their Third-Party Allies Concealed the Truth About the Risk of Addiction from Long-Term Opioid Use

658.    The fraudulent representation that opioids are rarely addictive is central to Defendants' scheme. To reach chronic pain patients Defendants, and the Front Groups and KOLs that they directed, assisted, and collaborated with, had to overcome doctors' legitimate fears that opioids would addict their patients. The risk of addiction is an extremely weighty risk—condemning patients to, among other things, dependence, compulsive use, haziness, a lifetime of battling relapse, and a dramatically heightened risk of serious injury or death. But for Defendants' campaign to convince

148

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 189 of 1171. PageID #: 705508

doctors otherwise, finding benefits from opioid use for common chronic pain conditions sufficient to justify that risk would have, and previously had, posed a nearly insurmountable challenge.

659. Through their well-funded, comprehensive marketing efforts, Defendants and their KOLs and Front Groups were able to change prescriber perceptions despite the well-settled historical understanding and clear evidence that opioids taken long-term are often addictive. Defendants and their third-party partners: (a) brazenly maintained that the risk of addiction for patients who take opioids long-term was low; and (b) omitted the risk of addiction and abuse from the list of adverse outcomes associated with chronic opioid use, even though the frequency and magnitude of the risk— and Defendants' own labels—compelled disclosure.

660. Further, in addition to falsely claiming opioids had low addiction risk or omitting disclosure of the risk of addiction altogether, Defendants employed language that conveyed to prescribers that the drugs had lower potential for abuse and addiction. Further, in addition to making outright misrepresentations about the risk of addiction, or failing to disclose that serious risk at all, Defendants used code words that conveyed to prescribers that their opioid was less prone to abuse and addiction. For instance, sales representatives for Actavis, Endo, Janssen, and Purdue promoted their drugs as having "steady-state" properties with the intent and expectation that prescribers would understand this to mean that their drugs caused less of a rush or a feeling of euphoria, which can trigger abuse and addiction. Further, Endo actively promoted its reformulated Opana ER on the basis that it was "designed to be crush-resistant," suggesting both (a) that Endo had succeeded in making the drug harder to adulterate, and (b) that it was less addictive, in consequence. In fact, however, Endo knew that "the clinical significance of INTAC Technology or its impact on abuse/misuse has not been established for Opana ER" and that Opana ER could still be ground and cut into small pieces by those looking to abuse the drug. In the same vein, Janssen denied that Nucynta ER was an opioid and claimed that it was not addictive, and Purdue claimed that its opioids were not favored by addicts and

149

did not produce a buzz, all of which falsely suggested that its opioids were less likely to be abused or addictive.

661.     Each of the following was created with the expectation that, by instructing patients and prescribers that addiction rates are low and that addiction is unlikely when opioids are prescribed for pain, doctors would prescribe opioids to more patients. For example, one publication sponsored exclusively by Purdue—APF's 2011 *A Policymaker's Guide to Understanding Pain & Its Management*— claimed that opioids are not prescribed often enough because of "misconceptions about opioid addiction."[120]

662.     Acting directly or with and through third parties, each of the Defendants claimed that the potential for addiction from its drugs was relatively small, or non-existent, even though there was no scientific evidence to support those claims, and the available research contradicted them. A recent literature survey found that while ranges of "problematic use" of opioids ranged from <1% to 81%,[121] abuse averages between 21% and 29% and addiction between 8% and 12%.[122] These estimates are well in line with Purdue's own studies, showing that between 8% and 13% of OxyContin patients became addicted, but on which Purdue chose not to rely, instead citing the Porter-Jick letter.

663.     The FDA has found that 20% of opioid patients use two or more pharmacies, 26% obtain opioids from two or more prescribers, and 16.5% seek early refills—all potential "red flags" for abuse or addiction.[123] The FDA in fact has ordered manufacturers of long-acting opioids to "[c]onduct one or more studies to provide <u>quantitative estimates of the</u> serious risks of misuse, abuse, addiction,

---

[120] http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf (accessed May 30, 2017).
[121] Cited for the low end of that range was the 1980 Porter-Jick letter in the *New England Journal of Medicine*.
[122] Kevin Vowels et al., *Rates of opioid misuse, abuse, and addiction in chronic pain: a systematic review and data synthesis*, 156 PAIN 569-76 (April 2015).
[123] Len Paulozzi, M.D., "Abuse of Marketed Analgesics and Its Contribution to the National Problem of Drug Abuse," *available at* http://www.fda.gov/downloads/AdvisoryCommittees/ CommitteesMeetingMaterials/Drugs/AnestheticAndLifeSupportDrugsAdvisoryCommittee/UCM233244.pdf (accessed May 30, 2017).

overdose and death associated with long-term use of opioid analgesics for management of chronic pain," in recognition of the fact that it found "high rates of addiction" in the medical literature.[124]

664.    Of course, the significant (and growing) incidence of abuse, misuse, and addiction to opioids is also powerful evidence that Defendants' statements regarding the low risk of addiction were, and are, untrue. This was well-known to Defendants who had access to sales data and reports, adverse event reports, federal abuse and addiction-related surveillance data, and other sources that demonstrated the widening epidemic of opioid abuse and addiction.

665.    Acting directly or through and with third parties, each of the Defendants claimed that the potential for addiction even from long-term use of its drugs was relatively small, or non- existent, despite the fact that the contention was false and there was no scientific evidence to support it. Examples of these misrepresentations are laid out below:

| Actavis | a. | Documents from a 2010 sales training indicate that Actavis trained its sales force that long-acting opioids were less likely to produce addiction than short-acting opioids, although there is no evidence that either form of opioid is less addictive or that any opioids can be taken long-term without the risk of addiction. |
| --- | --- | --- |
| | b. | Actavis had a patient education brochure distributed in 2007 that claimed addiction is possible, but it is "less likely if you have never had an addiction problem." Although the term "less likely" is not defined, the overall presentation suggests the risk is so low as not to be a worry. |
| | c. | Kadian sales representatives told prescribers in the City of Rochester that Kadian was "steady state" and had extended release mechanisms, the implication of which was that it did not produce a rush or euphoric effect, and therefore was less addictive and less likely to be abused. |
| | d. | Kadian sales representatives told prescribers in the City of Rochester that the contents of Kadian could not be dissolved in water if the capsule was opened, implying that Kadian was less likely to be abused—and thereby less addictive—than other opioids. |
| | e. | Kadian sales representatives omitted any discussion of addiction risks related to Actavis's drugs to City prescribers. |

---

[124] September 10, 2013 letter from Bob Rappaport, M.D., to NDA applicants of ER/LA opioid analgesics, *available at* http://www.fda.gov/downloads/Drugs/DrugSafety/InformationbyDrugClass/ UCM367697.pdf (accessed May 30, 2017).; Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).

151

| Cephalon | f. | Cephalon sponsored and facilitated the development of a guidebook, *Opioid Medications and REMS: A Patient's Guide*, which claims, among other things, that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids." |
|---|---|---|
| | g. | Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft. |
| | h. | Cephalon sales representatives omitted any discussion of addiction risks related to Cephalon's drugs to City prescribers. |

| Endo | i. | Endo trained its sales force in 2012 that use of long-acting opioids resulted in increased patient compliance, without any supporting evidence. |
|---|---|---|
| | j. | Endo's advertisements for the 2012 reformulation of Opana ER claimed it was *designed to be crush resistant*, in a way that conveyed that it was less likely to be abused. This claim was false; the FDA warned in a May 10, 2013 letter that there was no evidence Endo's design "would provide a reduction in oral, intranasal or intravenous abuse" and Endo's "post-marketing data submitted are insufficient to support any conclusion about the overall or route-specific rates of abuse." Further, Endo instructed its sales representatives to repeat this claim about "design," with the intention of conveying Opana ER was less subject to abuse. |
| | k. | Endo sponsored a website, painknowledge.com, through APF and NIPC, which, in 2009, claimed that: "[p]eople who take opioids as prescribed usually do not become addicted." Although the term "usually" is not defined, the overall presentation suggests the risk is so low as not to be a concern. The language also implies that, as long as a prescription is given, opioid use will not become problematic. Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it. |
| | l. | Endo sponsored a website, PainAction.com, which stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." |
| | m. | Endo sponsored CMEs published by APF's NIPC, of which Endo was the sole funder, titled *Persistent Pain in the Older Adult* and *Persistent Pain in the Older Patient*. These CMEs claimed that opioids used by elderly patients present "possibly less potential for abuse than in younger patients[,]" which lacks evidentiary support and deceptively minimizes the risk of addiction for elderly patients. |
| | n. | Endo distributed an education pamphlet with the Endo logo titled *Living with Someone with Chronic Pain*, which inaccurately minimized the risk of addiction: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem." |
| | o. | Endo distributed a patient education pamphlet edited by key opinion leader Dr. Russell Portenoy titled *Understanding Your Pain: Taking Oral Opioid Analgesics*. It claimed that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems." This implies that pain patients prescribed opioids will not become addicted, |

152

| Endo Cont'd. | | which is unsupported and untrue. Endo contracted with AGS to produce a CME promoting the 2009 guidelines for the Pharmacological Management of Persistent Pain in Older Persons. These guidelines falsely claim that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." None of the references in the guidelines corroborates the claim that elderly patients are less likely to become addicted to opioids, and there is no such evidence. Endo was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion. |
|---|---|---|
| | p. | Endo sales representatives told prescribers in the City of Rochester that its drugs were "steady state," the implications of which was that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused. |
| | q. | Endo provided grants to APF to distribute Exit Wounds (2009) to veterans, which taught that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications." Although the term "very unlikely" is not defined, the overall presentation suggests that the risk is so low as not to be a concern. |
| | r. | Endo sales representatives omitted discussion of addiction risks related to Endo's drugs. |

| Janssen | s. | Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and which its sales force distributed. This guide described a "myth" that opioids are addictive, and asserts as fact that "[m]any studies show that opioids are *rarely* addictive when used properly for the management of chronic pain." Although the term "rarely" is not defined, the overall presentation suggests the risk is so low as not to be a concern. The language also implies that as long as a prescription is given, opioid use is not a problem. |
|---|---|---|
| | t. | Janssen contracted with AGS to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. These guidelines falsely claim that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." The study supporting this assertion does not analyze addiction rates by age and, as already noted, addiction remains a significant risk for elderly patients. Janssen was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion. |
| | u. | Janssen provided grants to APF to distribute *Exit Wounds* (2009) to veterans, which taught that [l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications." Although the term "very unlikely" is not defined, the overall presentation suggests the risk is so low as not to be a concern. |
| | v. | Janssen currently runs a website, *Prescriberesponsibly.com* (last modified July 2, 2015), which claims that concerns about opioid addiction are "overstated." |
| | w. | A June 2009 Nucynta Training module warns Janssen's sales force that physicians are reluctant to prescribe controlled substances like Nucynta, but this reluctance is unfounded |

153

| Janssen Cont'd. | | |
|---|---|---|
| | | because "the risks . . . are much smaller than commonly believed." |
| | x. | Janssen sales representatives told prescribers in the City of Rochester that its drugs were "steady state," the implication of which was that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused. |
| | y. | Janssen sales representatives told prescribers in the City of Rochester that Nucynta and Nucynta ER were "not opioids," implying that the risks of addiction and other adverse outcomes associated with opioids were not applicable to Janssen's drugs. In truth, however, as set out in Nucynta's FDA-mandated label, Nucynta "contains tapentadol, an opioid agonist and Schedule II substance with abuse liability similar to other opioid agonists, legal or illicit." |
| | z. | Janssen sales representatives falsely told prescribers that Duragesic had anti abuse properties when it had none. |
| | aa. | Janssen's sales representatives told prescribers in the City of Rochester that Nucynta's unique properties eliminated the risk of addiction associated with the drug. |
| | bb. | Janssen sales representatives omitted discussion of addiction risks related to Janssen's drugs. |

| Purdue | | |
|---|---|---|
| | cc. | Purdue published a prescriber and law enforcement education pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which under the heading, "Indications of Possible Drug Abuse," shows pictures of the stigmata of injecting or snorting opioids—skin popping, track marks, and perforated nasal septa. In fact, opioid addicts who resort to these extremes are uncommon; the far more typical reality is patients who become dependent and addicted through oral use.[125] Thus, these misrepresentations wrongly reassure doctors that, as long as they do not observe those signs, they need not be concerned that their patients are abusing or addicted to opioids. |
| | dd. | Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which inaccurately claimed that less than 1% of children prescribed opioids will become addicted. This publication is still available online. This publication also asserted that pain is undertreated due to "misconceptions about opioid addiction." |
| | ee. | Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which asserted that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft. |
| | ff. | A Purdue-funded study with a Purdue co-author claimed that "evidence that the risk of psychological dependence or addiction is low in the absence of a history of substance abuse."[126] The study relied only on the Porter-Jick letter to the editor concerning a chart review of hospitalized patients, not patients taking Purdue's long-acting, take-home opioid. |

---

[125] Purdue itself submitted briefing materials in October 2010 to a meeting of the FDA's Joint Meeting of the Anesthetic and Life Support Drugs Advisory Committee and the Drug Safety and Risk Management Advisory Committee in which it stated that OxyContin was used non-medically by injection 4-17% of the time.

[126] C. Peter N. Watson et al., *Controlled-release oxycodone relieves neuropathic pain: a randomized controlled trial I painful diabetic neuropathy*, 105 Pain 71 (2003).

154

| Purdue Cont'd. | | Although the term "low" is not defined, the overall presentation suggests the risk is so low as not to be a concern. |
|---|---|---|
| | gg. | Purdue contracted with AGS to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. These guidelines falsely claim that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." None of the references in the guidelines corroborates the claim that elderly patients are less likely to become addicted to opioids and the claim is, in fact, untrue. Purdue was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion. |
| | hh. | Purdue sponsored APF's *Exit Wounds* (2009), which counseled veterans that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications." Although the term "very unlikely" is not defined, the overall presentation suggests it is so low as not to be a worry. |
| | ii. | Purdue sales representatives told prescribers in the City of Rochester that its drugs were "steady state," the implication of which was that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused. |
| | jj. | Purdue sales representatives told prescribers in the City of Rochester that Butrans has a lower abuse potential than other drugs because it was essentially tamper-proof and, after a certain point, patients no longer experience a "buzz" from increased dosage. |
| | kk. | Advertisements that Purdue sent to prescribers in the City of Rochester stated that OxyContin ER was less likely to be favored by addicts, and, therefore, less likely to be abused or diverted, or result in addiction. |
| | ll. | Purdue sales representatives omitted discussion of addiction risk related to Purdue's drugs. |

666.     In addition to denying or minimizing the risk of addiction and abuse generally, Defendants also falsely claimed that their particular drugs were safer, less addictive, and less likely to be abused or diverted than their competitors' or predecessor drugs. In making these claims, Defendants said or implied that because their drug had a "steady-state" and did not produce peaks and valleys, which cause drug-seeking behavior—either to obtain the high or avoid the low—it was less likely to be abused or addicting. Endo also asserted in particular that, because a reformulation of Opana ER was (or was designed to be) abuse-deterrent or tamper-resistant, patients were less likely to become addicted to it. Defendants had no evidence to support any of these claims, which, by FDA regulation,

155

must be based on head-to-head trials;[127] the claims also were false and misleading in that they misrepresented the risks of both the particular drug and opioids as a class.

667.    Further, rather than honestly disclose the risk of addiction, Defendants, and the third parties they directed and assisted and whose materials they distributed, attempted to portray those who were concerned about addiction as unfairly denying treatment to needy patients. To increase pressure on doctors to prescribe chronic opioid therapy, Defendants turned the tables; it was doctors who fail to treat their patients' chronic pains with opioids—not doctors who cause their patients to become addicted to opioids—who are failing their patients (and subject to discipline). Defendants and their third-party allies claimed that purportedly overblown worries about addiction cause pain to be under-treated and opioids to be over-regulated and under-prescribed. This mantra of under-treated pain and under-used drugs reinforced Defendants' messages that the risks of addiction and abuse were not significant and were overblown.

668.    For example, Janssen's website, *Let's Talk Pain*, warns in a video posted online that "strict regulatory control has made many physicians reluctant to prescribe opioids. The unfortunate casualty in all of this is the patient, who is often undertreated and forced to suffer in silence." The program goes on to say: "Because of the potential for abusive and/or addictive behavior, many healthcare professionals have been reluctant to prescribe opioids for their patients . . . . This prescribing environment is one of many barriers that may contribute to the undertreatment of pain, a serious problem in the United States."

669.    In the same vein, a Purdue website called *In the Face of Pain* complains, under the heading of "Protecting Access," that, through at least mid-2013, policy governing the prescribing of opioids was "at odds with" best medical practices by "unduly restricting the amounts that can be prescribed and dispensed"; "restricting access to patients with pain who also have a history of

---

[127] *See Guidance for Industry*, "Abuse-Deterrent Opioids—Evaluation and Labeling," April 2015 (describing requirements for premarket and postmarket studies).

substance abuse"; and "requiring special government-issued prescription forms only for the medications that are capable of relieving pain that is severe." This unsupported and untrue rhetoric aims to portray doctors who do not prescribe opioids as uncaring, converting their desire to relieve patients' suffering into a mandate to prescribe opioids.

### 3. Defendants and Their Third-Party Allies Misrepresented that Addiction Risk Can Be Avoided or Managed

670.    To this day, defendants each continue to maintain that most patients can safely take opioids long-term for chronic pain without becoming addicted. Presumably only to explain why doctors encounter so many patients addicted to opioids, Defendants and their third-party allies have come to admit that some patients could become addicted, but that doctors can avoid or manage that risk by using screening tools or questionnaires. These tools, they say, identify those with higher addiction risks (stemming from personal or family histories of substance abuse, mental illness, or abuse) so that doctors can more closely monitor patients at greater risk of addiction.

671.    There are three fundamental flaws in these assurances that doctors can identify and manage the risk of addiction. First, there is no reliable scientific evidence that screening works to accurately predict risk or reduce rates of addiction. Second, there is no reliable scientific evidence that high-risk or addicted patients can take opioids long-term without triggering addiction, even with enhanced monitoring and precautions. Third, there is no reliable scientific evidence that patients without these red flags are necessarily free of addiction risk.

672.    Addiction is difficult to predict on a patient-by-patient basis, and there are no reliable, validated tools to do so. A recent Evidence Report by the Agency for Healthcare Research and Quality ("AHRQ"), which "systematically review[ed] the current evidence on long-term opioid therapy for chronic pain" identified "[n]o study" that had "evaluated the effectiveness of risk mitigation strategies, such as use of risk assessment instruments, opioid management plans, patient education, urine drug

157

screening, prescription drug monitoring program data, monitoring instruments, more frequent monitoring intervals, pill counts, or abuse- deterrent formulations on outcomes related to overdose, addiction, abuse or misuse."[128] Furthermore, attempts to treat high-risk patients, such as those who have a documented predisposition to substance abuse, by resorting to patient contracts, more frequent refills, or urine drug screening are not proven to work in the real world, if busy doctors even in fact attempt them.

673.    Most disturbingly, despite the widespread use of screening tools, patients with past substance use disorders—which every tool rates as a risk factor—receive, on average, higher doses of opioids.

674.    Each Defendant claimed that the risk of addiction could be avoided or managed, claims that are deceptive and without scientific support:

| Actavis | a. Documents from a 2010 sales training indicate that Actavis trained its sales force that prescribers can use risk screening tools to limit the development of addiction. |
|---|---|
| Cephalon | b. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that "opioid agreements" between doctors and patients can "ensure that you take the opioid as prescribed." |
| Endo | c. Endo paid for a 2007 supplement[129] available for continuing education credit in the Journal of Family Practice. This publication, titled Pain Management Dilemmas in Primary Care: Use of Opioids, recommended screening patients using tools like the Opioid Risk Tool or the Screener and Opioid Assessment for Patients with Pain, and advised that patients at high risk of addiction could safely (e.g., without becoming addicted) receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts. |
| Purdue | d. Purdue's unbranded website, In the Face of Pain (inthefaceofpain.com) states that policies that "restrict[] access to patients with pain who also have a history of substance abuse" and "requiring special government-issued prescription forms for the only |

---

[128] *The Effectiveness and Risks of Long-term Opioid Treatment of Chronic Pain*, Agency for Healthcare Res. & Quality (September 19, 2014).

[129] The Medical Journal, *The Lancet* found that all of the supplement papers it received failed peer-review. Editorial, "The Perils of Journal and Supplement Publishing," 375 *The Lancet* 9712 (347) 2010.

158

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM   INDEX NO. E2019005178

NYSCEF DOC. NO. 2   Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 199 of 1171. PageID #: 705518   RECEIVED NYSCEF: 06/05/2019

| Purdue Cont'd | | medications that are capable of relieving pain that is severe" are "at odds with" best medical practices.[130] |
| | e. | Purdue sponsored a 2012 CME program taught by a KOL titled Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes. This presentation recommended that use of screening tools, more frequent refills, and switching opioids could treat a high-risk patient showing signs of potentially addictive behavior. |
| | f. | Purdue sponsored a 2011 webinar taught by Dr. Lynn Webster, titled Managing Patient's Opioid Use: Balancing the Need and Risk. This publication taught prescribers that screening tools, urine tests, and patient agreements have the effect of preventing "overuse of prescriptions" and "overdose deaths." |
| | g. | Purdue sales representatives told prescribers in the City of Rochester that screening tools can be used to select patients appropriate for opioid therapy and to manage the risks of addiction. |

## 4. Defendants and Their Third-Party Allies Created Confusion By Promoting the Misleading Term "Pseudoaddiction."

675. Defendants and their third-party allies developed and disseminated each of the following misrepresentations with the intent and expectation that, by instructing patients and prescribers that signs of addiction are actually the product of untreated pain, doctors would prescribe opioids to more patients and continue to prescribing them, and patients would continue to use opioids despite signs that the patient was addicted. The concept of "pseudoaddiction" was coined by Dr. David Haddox, who went to work for Purdue, and popularized by Dr. Russell Portenoy, who consulted for Cephalon, Endo, Janssen, and Purdue. Much of the same language appears in other Defendants' treatment of this issue, highlighting the contrast between "undertreated pain" and "true addiction," as if patients could not experience both. As KOL Dr. Lynn Webster wrote: "[Pseudoaddiction] obviously became too much of an excuse to give patients more medication... It lead us down a path that caused harm. It is already something we are debunking as a concept."[131]

---

[130] *See In the Face of Pain Fact Sheet: Protecting Access to Pain Treatment*, Purdue Pharma L.P. (Resources verified Mar. 2012), www.inthefaceofpain.com/content/uploads/2011/12/factsheet_ProtectingAccess.pdf (accessed May 30, 2017).

[131] John Fauber & Ellen Gabler, *Networking Fuels Painkiller Boom*, Milwaukee Wisc. J. Sentinel (Feb.19, 2012).

676.     Each of the publications and statements below falsely states or suggests that the concept of "pseudoaddiction" is substantiated by scientific evidence and accurately describes the condition of patients who only need, and should be treated with, more opioids:

| | |
|---|---|
| **Actavis** | a.  Documents from a 2010 sales training indicate that Actavis trained its sales force to instruct physicians that aberrant behaviors like self-escalation of doses constituted "pseudoaddiction." |
| **Cephalon** | b.  Cephalon sponsored FSMB's *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding are all signs of "pseudoaddiction." Cephalon also spent $150,000 to purchase copies of the book in bulk and distributed it through its pain sales force to 10,000 prescribers and 5,000 pharmacists. |
| **Endo** | c.  Endo distributed copies of a book by KOL Dr. Lynn Webster entitled *Avoiding Opioid Abuse While Managing* Pain (2007). Endo's internal planning documents describe the purpose of distributing this book as to "[i]ncrease the breadth and depth of the Opana ER prescriber base." The book claims that when faced with signs of aberrant behavior, the doctor should regard it as "pseudoaddiction" and thus, increasing the dose *in most cases . . . should be the clinician's first response.*" (emphasis added). |
| | d.  Endo spent $246,620 to buy copies of FSMB's *Responsible Opioid Prescribing* (2007), which was distributed by Endo's sales force. This book asserted that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of "pseudoaddiction." |
| **Janssen** | e.  From 2009 to 2011 Janssen's website, *Let's Talk Pain*, stated that "pseudoaddiction . . . refers to patient behaviors that may occur when pain is under-treated" and that "[p]seudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management." (emphasis added). |
| **Purdue** | f.  Purdue published a prescriber and law enforcement education pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which described "pseudoaddiction" as a concept that "emerged in the literature to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated." |
| | g.  Purdue distributed to physicians, at least as of November 2006, and posted on its unbranded website, *Partners Against Pain*, a pamphlet copyrighted 2005 and titled *Clinical Issues in Opioid Prescribing*. This pamphlet included a list of conduct, including "illicit drug use and deception" it defined as indicative of "pseudoaddiction" or untreated pain. It also states: "Pseudoaddiction is a term which has been used to describe patient behaviors that may occur when *pain is undertreated.* ... Even such behaviors as illicit drug use and deception |

160

| Purdue Cont'd | | can occur in the patient's efforts to obtain relief. Pseudoaddiction can be *distinguished from true addiction* in that the behaviors resolve when the pain is effectively treated." (Emphasis added.) |
| --- | --- | --- |
| | h. | Purdue sponsored FSMB's *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name, "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of "pseudoaddiction." Purdue also spent over $100,000 to support distribution of the book. |
| | i. | Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which states: "Pseudo-addiction describes patient behaviors that may occur when *pain is undertreated*. . . . Pseudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated." (Emphasis added.) |

### 5. Defendants and Their Third-Party Allies Claimed Withdrawal is Simply Managed

677. Defendants and their third-party allies promoted the false and misleading messages below with the intent and expectation that, by misrepresenting the difficulty of withdrawing from opioids, prescribers and patients would be more likely to start chronic opioid therapy and would fail to recognize the actual risk of addiction.

678. In an effort to underplay the risk and impact of addiction, Defendants and their third-party allies frequently claim that, while patients become "physically" dependent on opioids, physical dependence can be addressed by gradually tapering patients' doses to avoid the adverse effects of withdrawal. They fail to disclose the extremely difficult and painful effects that patients can experience when they are removed from opioids—effects that also make it less likely that patients will be able to stop using the drugs.

679. In reality, withdrawal is prevalent in patients after more than a few weeks of therapy. Common symptoms of withdrawal include: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, and pain. Some symptoms may persist for months, or even years, after a complete withdrawal from opioids, depending on how long the patient had been using

161

opioids. Withdrawal symptoms trigger a feedback loop that drives patients to seek opioids, contributing to addiction.

680. Each of the publications and statements below falsely states or suggests that withdrawal from opioids was not a problem and they should not be hesitant about prescribing or using opioids:

| Actavis | a. | Documents from a 2010 sales training indicate that Actavis trained its sales force that discontinuing opioid therapy can be handled "simply" and that it can be done at home. Actavis's sales representative training claimed opioid withdrawal would take only a week, even in addicted patients. |
|---|---|---|

| Endo | b. | A CME sponsored by Endo, titled *Persistent Pain in the Older Adult*, taught that withdrawal symptoms can be avoided entirely by tapering the dose by 10-20% per day for ten days. |
|---|---|---|

| Janssen | c. | A Janssen PowerPoint presentation used for training its sales representatives titled "Selling Nucynta ER" indicates that the "low incidence of withdrawal symptoms" is a "core message" for its sales force. This message is repeated in numerous Janssen training materials between 2009 and 2011. The studies supporting this claim did not describe withdrawal symptoms in patients taking Nucynta ER beyond 90 days or at high doses and would therefore not be representative of withdrawal symptoms in the chronic pain population. Patients on opioid therapy long-term and at high doses will have a harder time discontinuing the drugs and are more likely to experience withdrawal symptoms. In addition, in claiming a low rate of withdrawal symptoms, Janssen relied upon a study that only began tracking withdrawal symptoms in patients two to four days after discontinuing opioid use; Janssen knew or should have known that these symptoms peak earlier than that for most patients. Relying on data after that initial window painted a misleading picture of the likelihood and severity of withdrawal associated with chronic opioid therapy. Janssen also knew or should have known that the patients involved in the study were not on the drug long enough to develop rates of withdrawal symptoms comparable to rates of withdrawal suffered by patients who use opioids for chronic pain—the use for which Janssen promoted Nucynta ER. |
|---|---|---|
|  | d. | Janssen sales representatives told prescribers in the City of Rochester that patients on Janssen's drugs were less susceptible to withdrawal than those on other opioids. |

| Purdue | e. | Purdue sponsored *APF's A Policymaker's Guide to Understanding Pain & Its Management*, which taught that "Symptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," but did not disclose the significant hardships that often accompany cessation of use. |
| | f. | Purdue sales representatives told prescribers in the City of Rochester that the effects of withdrawal from opioid use can be successfully managed. |
| | g. | Purdue sales representatives told prescribers in the City of Rochester that the potential for withdrawal on Butrans was low due to Butrans' low potency and its extended release mechanism. |

### 6. Defendants and Their Third-Party Allies Misrepresented that Increased Doses Pose No Significant Additional Risks

681.    Each of the following misrepresentations was created with the intent and expectation that, by misrepresenting and failing to disclose the known risks of high dose opioids, prescribers and patients would be more likely to continue to prescribe and use opioids, even when they were not effective in reducing patients' pain, and not to discontinue opioids even when tolerance required them to reach even higher doses.

682.    Defendants and their third-party allies claimed that patients and prescribers could increase doses of opioids indefinitely without added risk, even when pain was not decreasing or when doses had reached levels that were "frighteningly high," suggesting that patients would eventually reach a stable, effective dose. Each of Defendants' claims also omitted warnings of increased adverse effects that occur at higher doses, and misleadingly suggested that there was no greater risk to higher dose opioid therapy.

683.    These claims are false. Patients receiving high doses of opioids as part of long-term opioid therapy are three to nine times more likely to suffer an overdose from opioid-related causes than those on low doses. As compared to available alternative pain remedies, scholars have suggested that tolerance to the respiratory depressive effects of opioids develops at a slower rate than tolerance

163

to analgesic effects. Accordingly, the practice of continuously escalating doses to match pain tolerance can, in fact, lead to overdose even where opioids are taken as recommended. The FDA has itself acknowledged that available data suggest a relationship between increased doses and the risk of adverse effects. Moreover, it is harder for patients to terminate use of higher-dose opioids without severe withdrawal effects, which contributes to a cycle of continued use, even when the drugs provide no pain relief and are causing harm—the signs of addiction.

684. Each of the following claims suggests that high-dose opioid therapy is safe:

| Actavis | a. | Documents from a 2010 sales training indicate that Actavis trained its sales force that "individualization" of opioid therapy depended on increasing doses "until patient reports adequate analgesia" and to "set dose levels on [the] basis of patient need, not on [a] predetermined maximal dose." Actavis further counseled its sales representatives that the reasons some physicians had for not increasing doses indefinitely were simply a matter of physician "comfort level," which could be overcome or used as a tool to induce them to switch to Actavis's opioid, Kadian. |
|---------|-----|-------------|

| Cephalon | b. | Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claimed that some patients "need" a larger dose of their opioid, regardless of the dose currently prescribed. |
|----------|-----|-------------|
| | c. | Cephalon sponsored a CME written by KOL Dr. Lynn Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, which was offered online by Medscape, LLC from September 28, 2007 through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids that include aspirin and acetaminophen are less effective to treat breakthrough pain because of dose limitations. |
| | d. | Cephalon sales representatives assured prescribers in the City of Rochester that opioids were safe, even at high doses. |

| Endo | e. | Endo sponsored a website, painknowledge.com, through APF and NIPC, which, in 2009, claimed that opioids may be increased until "you are on the right dose of medication for your pain," and once that occurred, further dose increases would not occur. Endo funded the site, which was a part of Endo's marketing plan, and tracked visitors to it. |
|------|-----|-------------|
| | f. | Endo distributed a patient education pamphlet edited by KOL Dr. Russell Portenoy titled *Understanding Your Pain: Taking Oral Opioid Analgesics*. In Q&A format, it asked: "If I take the opioid now, will it work later when I really need it?" The response was: "The dose can be increased . . . . You won't 'run out' of pain relief." |

164

| Janssen | g. | Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved an its sales force distributed. This guide listed dose limitations as "disadvantages" of other pain medicines and omitted any discussion of risks of increased doses of opioids. The publication also falsely claimed that it is a "myth" that "opioid doses have to be bigger over time." |

| Purdue | h. | Purdue's *In the Face of Pain* website, along with initiatives of APF, promoted the notion that if a patient's doctor does not prescribe them what—in their view—is a sufficient dose of opioids, they should find another doctor who will. In so doing, Purdue exerted undue, unfair, and improper influence over prescribers who face pressure to accede to the resulting demands. |
| | i. | Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, which taught that dose escalations are "sometimes necessary," even indefinitely high ones. This suggested that high dose opioids are safe and appropriate and did not disclose the risks from high dose opioids. This publication is still available online. |
| | j. | Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which taught that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. The guide also claimed that some patients "need" a larger dose of the drug, regardless of the dose currently prescribed. This language fails to disclose heightened risks at elevated doses. |
| | k. | Purdue sponsored a CME issued by the American Medical Association in 2003, 2007, 2010, and 2013. The CME, Overview of Management Options, was edited by KOL Dr. Russell Portenoy, among others, and taught that other drugs, but not opioids, are unsafe at high doses. The 2013 version is still available for CME credit. |
| | l. | Purdue sales representatives told prescribers in the City of Rochester that opioids were just as effective for treating patients long-term and omitted any discussion that increased tolerance would require increasing, and increasingly dangerous, doses. |

### 7. Defendants and Their Third-Party Allies Deceptively Omitted or Minimized Adverse Effects of Opioids and Overstated the Risks of Alternative Forms of Pain Treatment.

685.     Each of the following misrepresentations was created with the intent and expectation that, by omitting the known, serious risks of chronic opioid therapy, including the risks of addiction, abuse, overdose, and death, and emphasizing or exaggerating risks of competing products, prescribers and patients would be more likely to choose opioids. Defendants and their third-party allies routinely ignored the risks of chronic opioid therapy. These include (beyond the risks associated with misuse, abuse, and addiction): hyperalgesia, a "known serious risk associated with chronic opioid analgesic

165

therapy in which the patient becomes more sensitive to certain painful stimuli over time;"[132] hormonal dysfunction; decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly; neonatal abstinence syndrome (when an infant exposed to opioids prenatally withdraws from the drugs after birth); and potentially fatal interactions with alcohol or benzodiazepines, which are used to treat post-traumatic stress disorder and anxiety (disorders frequently coexisting with chronic pain conditions).[133]

686.    Despite these serious risks, Defendants asserted, or implied, that opioids were appropriate first-line treatments and safer than alternative treatments, including NSAIDs such as ibuprofen (Advil, Motrin) or naproxen (Aleve). While NSAIDs can pose significant gastrointestinal, renal, and cardiac risks, particularly for elderly patients, Defendants' exaggerated descriptions of those risks were deceptive in themselves, and also made their omissions regarding the risks of opioids all the more striking and misleading. Defendants and their third-party allies described over-the-counter NSAIDs as life-threatening and falsely asserted that they were responsible for 10,000-20,000 deaths annually (more than opioids), when in reality the number is closer to 3,200. This description of NSAIDs starkly contrasted with their representation of opioids, for which the listed risks were nausea, constipation, and sleepiness (but not addiction, overdose, or death). Compared with NSAIDs, opioids are responsible for roughly four times as many fatalities annually.

687.    As with the preceding misrepresentations, Defendants' false and misleading claims regarding the comparative risks of NSAIDs and opioids had the effect of shifting the balance of opioids' risks and purported benefits. While opioid prescriptions have exploded over the past two decades, the use of NSAIDs has declined during that same time.

---

[132] Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).

[133] Several of these risks do appear in the FDA-mandated warnings. *See, e.g.,* the August 13, 2015 OxyContin Label, Section 6.2, identifying adverse reactions including: "abuse, addiction … death, … hyperalgesia, hypogonadism . . . mood altered . . . overdose, palpitations (in the context of withdrawal), seizures, suicidal attempt, suicidal ideation, syndrome of inappropriate antidiuretic hormone secretion, and urticaria [hives]."

688. Each of the following reflects Defendants' deceptive claims and omissions about the risks of opioids, including in comparison to NSAIDs:

| Actavis | |
|---|---|
| | a. Documents from a 2010 sales training indicate that Actavis trained its sales force that the ability to escalate doses during long-term opioid therapy, without hitting a dose ceiling, made opioid use safer than other forms of therapy that had defined maximum doses, such as acetaminophen or NSAIDs |
| | b. Actavis also trained physician-speakers that "maintenance therapy with opioids can be safer than long-term use of other analgesics," including NSAIDs, for older persons. |
| | c. Kadian sales representatives told prescribers in the City of Rochester that NSAIDs were more toxic than opioids. |

| Cephalon | |
|---|---|
| | d. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. The publication attributed 10,000 to 20,000 deaths annually to NSAID overdose. *Treatment Options* also warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. |
| | e. Cephalon sales representatives told City prescribers that NSAIDs were more toxic than Cephalon's opioids |

| Endo | |
|---|---|
| | f. Endo distributed a "case study" to prescribers titled *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*. The study cites an example, meant to be representative, of a patient "with a massive upper gastrointestinal bleed believed to be related to his protracted use of NSAIDs" (over eight years), and recommends treating with opioids instead. |
| | g. Endo sponsored a website, painknowledge.com, through APF and NIPC, which contained a flyer called *"Pain: Opioid Therapy."* This publication included a list of adverse effects from opioids that omitted significant adverse effects like hyperalgesia, immune and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death. Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it. |
| | h. Endo provided grants to APF to distribute *Exit Wounds* (2009), which omitted warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids. |
| | i. Endo sales representatives told prescribers in the City of Rochester that NSAIDs were more toxic than opioids. |

167

| Janssen | | |
|---|---|---|
| | j. | Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and its sales force distributed. This publication described the advantages and disadvantages of NSAIDs on one page, and the "myths/facts" of opioids on the facing page. The disadvantages of NSAIDs are described as involving "stomach upset or bleeding," "kidney or liver damage if taken at high doses or for a long time," "adverse reactions in people with asthma," and "can increase the risk of heart attack and stroke." The only adverse effects of opioids listed are "upset stomach or sleepiness," which the brochure claims will go away, and constipation. |
| | k. | Janssen sponsored APF's *Exit Wounds* (2009), which omits warnings of the risk of interactions between opioids and benzodiazepines. Janssen's label for Duragesic, however, states that use with benzodiazepines "may cause respiratory depression, [low blood pressure], and profound sedation or potentially result in coma. *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids. |
| | l. | Janssen sales representatives told prescribers in the City of Rochester that Nucynta was not an opioid, making it a good choice for chronic pain patients who previously were unable to continue opioid therapy due to excessive side effects. This statement was misleading because Nucynta is, in fact, an opioid and has the same effects as other opioids. |

| Purdue | | |
|---|---|---|
| | a. | Purdue sponsored APF's *Exit Wounds* (2009), which omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids. |
| | b. | Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which advised patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. The publication attributes 10,000 to 20,000 deaths annually to NSAID overdose. *Treatment Options* also warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. |
| | c. | Purdue sponsored a CME issued by the American Medical Association in 2003, 2007, 2010, and 2013; The 2013 version is still available for CME credit. The CME, Overview of Management Options, was edited by KOL Dr. Russell Portenoy, among others, and taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses. |
| | d. | Purdue sales representatives told prescribers in the City of Rochester that NSAIDs were more toxic than opioids. |

### 8. Purdue Misleadingly Promoted OxyContin as Providing 12 Hours of Relief

689.     In addition to making the deceptive statements above, Purdue also dangerously misled doctors and patients about OxyContin's duration and onset of action.

168

690. Purdue promotes OxyContin as an extended-release opioid, but the oxycodone does not enter the body on a linear rate. OxyContin works by releasing a greater proportion of oxycodone into the body upon administration, and the release gradually tapers, as illustrated in the following chart, which was, upon information and belief, adapted from Purdue's own sales materials:[134]

## OxyContin PI Figure, Linear y-axis



Figure 1

The reduced release of the drug over time means that the oxycodone no longer provides the same level of pain relief; as a result, in many patients, OxyContin does not last for the 12 hours for which Purdue promotes it—a fact that Purdue has known at all times relevant to this action.

691. OxyContin tablets provide an initial absorption of approximately 40% of the active medicine. This has a two-fold effect. First, the initial rush of nearly half of the powerful opioid— OxyContin is roughly twice as powerful as morphine—triggers a powerful psychological response. OxyContin thus behaves more like an immediate release opioid, which Purdue itself once claimed was more addicting in its original 1995 FDA-approved drug label. Second, the initial burst of oxycodone

---

[134] Jim Edwards, "*How Purdue Used Misleading Charts to Hide OxyContin's Addictive Power*," *CBSNews.com*, Sept. 28, 2011, http://www.cbsnews.com/news/how-purdue-used-misleading-charts-to- hide-oxycontins-addictive-power/ (accessed May 30, 2017). The 160 mg dose is no longer marketed. Purdue's promotional materials in the past displayed a logarithmic scale, which gave the misleading impression the concentration remained constant.

169

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 210 of 1171. PageID #: 705529

means that there is less of the drug at the end of the dosing period, which results in the drug not

lasting for a full 12 hours and precipitates withdrawal symptoms in patients, a phenomenon known as

"end of dose" failure. (The FDA found in 2008 that a "substantial number" of chronic pain patients

will experience "end-of-dose failure" with OxyContin.) The combination of fast onset and end-of-dose

failure makes OxyContin particularly addictive, even compared with other opioids.

692.     Purdue nevertheless has falsely promoted OxyContin as if it were effective for a full 12

hours. Its advertising in 2000 included claims that OxyContin provides "Consistent Plasma Levels

Over 12 Hours." That claim was accompanied by a chart depicting plasma levels on a logarithmic

scale. The chart minimized the rate of end-of-dose failure by depicting 10 mg in a way that it appeared

to be half of 100 mg in the table's y-axis. That chart, shown below, depicts the same information as the

chart above, but does so in a way that makes the absorption rate appear more consistent:



693.     More recently, other Purdue advertisements also emphasized "Q12h" (meaning twice-

daily) dosing. These include an advertisement in the February 2005 *Journal of Pain* and 2006 *Clinical

Journal of Pain* featuring an OxyContin logo with two pill cups, reinforcing the twice-a-day message.

170

Other advertisements that ran in the 2005 and 2006 issues of the *Journal of Pain* depict a sample prescription for OxyContin, with "Q12h" handwritten for emphasis.

694.    The information that OxyContin did not provide pain relief for a full 12 hours was known to Purdue, and Purdue's competitors, but was not disclosed to general practitioners. Purdue's knowledge of some pain specialists' tendency to prescribe OxyContin three times per day instead of two (which would have compensated for end-of-dose failure) was set out in Purdue's internal documents as early as 1999 and is apparent from MEDWATCH Adverse Event reports for OxyContin.[135] Even Purdue's competitor, Endo, was aware of the problem; Endo attempted to position its Opana ER drug as offering "durable" pain relief, which Endo understood to suggest a contrast to OxyContin. Opana ER advisory board meetings featured pain specialists citing lack of 12-hour dosing as a disadvantage of OxyContin. Endo even ran advertisements for Opana ER referring to "real" 12-hour dosing.

695.    Purdue's failure to disclose the prevalence of end-of-dose failure meant that prescribers in the City of Rochester were not informed of risks relating to addiction, and that they received the misleading message that OxyContin would be effective for treating chronic pain for the advertised duration. Furthermore, doctors would compensate by increasing the dose or prescribing "rescue" opioids, which had the same effect as increasing the amount of opioids prescribed to a patient.[136, 137]

---

[135] MEDWATCH refers to the FDA's voluntary adverse event reporting system.

[136] Purdue's *Clinical Issues in Opioid Prescribing*, put out in 2005 under Purdue's unbranded *Partners Against Pain* banner, states that "it is recommended that a supplementary immediate-release medication be provided to treat exacerbations of pain that may occur with stable dosing." References to "rescue" medication appear in publications Purdue sponsored such as APF's *A Policymaker's Guide* (2011) and the 2013 CME *Overview of Pain Management Options*.

[137] The Connecticut Attorney General's office filed a citizens' petition with the FDA on January 27, 2004, requesting that the OxyContin label be amended with a warning not to prescribe the drug more than twice daily as a means of compensating for end-of-dose failure. The FDA denied this request on September 11, 2008. The FDA found that the state had failed to present sufficient evidence that more frequent dosing caused adverse outcomes, but the FDA did not challenge the Connecticut finding that end-of-dose failure of OxyContin was prevalent. Indeed, the FDA found that end-of-dose failure affected a "substantial" number of chronic pain patients prescribed OxyContin.

171

### E. Each Defendant Engaged in Deceptive Marketing, Both Branded and Unbranded, that Targeted and Reached City prescribers.

696. Defendants—and the Front Groups and KOLs who depended on and worked alongside them—were able to affect a sea change in medical opinion in favor of accepting opioids as a medically necessary long-term treatment for chronic pain. As set forth below, each Defendant contributed to that result through a combination of both direct marketing efforts and third-party marketing efforts over which that Defendant exercised editorial control. These deceptive and misleading statements were directed to, and reached, City prescribers and patients, with the intent of distorting their views on the risks, benefits, and superiority of opioids for treatment of chronic pain.

697. Defendants engaged in their deceptive marketing campaign, both nationwide and in the City of Rochester, using a number of strategies. Defendants trained their sales forces and recruited physician speakers to deliver these deceptive messages and omissions, and they in turn conveyed them to prescribers. Defendants also broadly disseminated promotional messages and materials, both by delivering them personally to doctors during detailing visits and by mailing deceptive advertisements directly to prescribers. Because they are disseminated by Defendant drug manufacturers and relate to Defendants' drugs, these materials are considered "labeling" within the meaning of 21 C.F.R. § 1.3(a), which means Defendants are liable for their content.

698. As described below, the City has located a number of City-area prescribers who received Defendants' misrepresentations. Each of the misrepresentations received by these doctors constitutes an integral piece of a centrally directed marketing strategy to change medical perceptions regarding the use of opioids to treat chronic pain. Defendants were aware of each of these misrepresentations, and Defendants approved of them and oversaw their dissemination at the national, corporate level.

### 1. Actavis

172

a. <u>Actavis' Deceptive Direct Marketing</u>

699.    To help devise its marketing strategy for Kadian, Actavis commissioned a report from one of its consultants in January 2005 about barriers to market entry. The report concluded that two major challenges facing opioid manufacturers in 2005 were (i) overcoming "concerns regarding the safety and tolerability" of opioids, and (ii) the fact that "physicians have been trained to evaluate the supporting data before changing their respective practice behavior." To address these challenges, the report advocated a "[p]ublication strategy based on placing in the literature key data that influence members of the target audience" with an "emphasis . . . on ensuring that the message is believable and relevant to the needs of the target audience." This would entail the creation of "effective copy points . . . backed by published references" and "developing and placing publications that demonstrate [the] efficacy [of opioids] and [their] safety/positive side effect profile." According to the report, this would allow physicians to "reach[] a mental agreement" and change their "practice behavior" without having first evaluated supporting data—of which Actavis (and other Defendants) had none.

700.    The consulting firm predicted that this manufactured body of literature "w[ould], in turn, provide greater support for the promotional message and add credibility to the brand's advocates" based on "either actual or **perceived** 'scientific exchange'" in relevant medical literature. (emphasis added). To this end, it planned for three manuscripts to be written during the first quarter of 2005. Of these, "[t]he neuropathic pain manuscript will provide evidence demonstrating KADIAN is as effective in patients with presumptive neuropathic pain as it is in those with other pain types"; "[t]he elderly subanalysis . . . will provide clinicians with evidence that KADIAN is efficacious and well tolerated in appropriately selected elderly patients" and will "be targeted to readers in the geriatrics specialty"; and "[t]he QDF/BID manuscript will . . . .call attention to the fact that KADIAN is the only sustained-release opioid to be labeled for [once or twice daily] use." In short, Actavis knew exactly what each study would show—and how that study would fit into its marketing plan—before it was

173

published. Articles matching Actavis's descriptions later appeared in the *Journal of Pain* and the *Journal of the American Geriatrics Society*.

701.     To ensure that messages based on this science reached individual physicians, Actavis deployed sales representatives, or detailers, to visit prescribers in the City of Rochester and across the country. At the peak of Actavis's promotional efforts in 2011, the company spent $6.7 million on detailing.

702.     To track its detailers' progress, Actavis's sales and marketing department actively monitored the prescribing behavior of physicians. It tracked the Kadian prescribing activity of individual physicians, and assessed the success of its marketing efforts by tabulating how many Kadian prescriptions a prescriber wrote after he or she had been detailed. As described below, Kadian monitored numerous City physicians.

703.     Actavis also planned to promote Kadian by giving presentations at conferences of organizations where it believed it could reach a high concentration of pain specialists. Its choice of conferences was also influenced by the host's past support of opioids. For example, Actavis documents show that Actavis presented papers concerning Kadian at an annual meeting of AGS because AGS's guidelines "support the use of opioids."

704.     Actavis targeted prescribers using both its sales force and recruited physician speakers, as described below.

i.     *Actavis' Deceptive Sales Training*

705.     Actavis's sales representatives targeted physicians to deliver sales messages that were developed centrally and deployed uniformly across the country. These sales representatives were critical in delivering Actavis's marketing strategies and talking points to individual prescribers.

706.     Actavis's strategy and pattern of deceptive marketing is evident in its internal training materials. A sales education module titled "Kadian Learning System" trained Actavis's sales

174

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM
NYSCEF DOC. NO. 2

INDEX NO. E2019005178
Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 215 of 1171. PageID #: 705534
RECEIVED NYSCEF: 06/05/2019

representatives on the marketing messages—including deceptive claims about improved function, the risk of addiction, the false scientific concept of "pseudoaddiction," and opioid withdrawal—that sales representatives were directed and required, in turn, to pass on to prescribers, nationally and in the City of Rochester.

707.    The sales training module, dated July 1, 2010, includes the misrepresentations documented in this Complaint, starting with its promise of improved function. The sales training instructed Actavis sales representatives that "most chronic benign pain patients do have markedly improved ability to function when maintained on chronic opioid therapy," when, in reality, available data demonstrate that patients on chronic opioid therapy are *less likely* to participate in daily activities like work. The sales training also misleadingly implied that the dose of prescription opioids could be escalated without consequence and omitted important facts about the increased risks of high dose opioids. First, Actavis taught its sales representatives, who would pass the message on to doctors, that pain patients would not develop tolerance to opioids, which would have required them to receive increasing doses: "Although tolerance and dependence do occur with long-term use of opioids, many studies have shown that tolerance is limited in most patients with [Chronic pain]." Second, Actavis instructed its sales personnel that opioid "[d]oses are titrated to pain relief, and so no ceiling dose can be given as to the recommended maximal dose." Actavis failed to explain to its sales representatives and, through them, to doctors, the greater risks associated with opioids at high doses.

708.    Further, the 2010 sales training module highlighted the risks of alternate pain medications without providing a comparable discussion of the risks of opioids, painting the erroneous and misleading impression that opioids are safer. Specifically, the document claimed that "NSAIDs prolong the bleeding time by inhibiting blood platelets, which can contribute to bleeding complications" and "can have toxic effects on the kidney." Accordingly, Actavis coached its sales representatives that "[t]he potential toxicity of NSAIDs limits their dose and, to some extent, the

175

duration of therapy" since "[t]hey should only be taken short term." By contrast, the corresponding section related to opioids neglects to include a *single* side effect or risk associated with the use of opioids, including from long-term use.

709. This sales training module also severely downplayed the main risk associated with Kadian and other opioids—addiction. It represented that "there is no evidence that simply taking opioids for a period of time will cause substance abuse or addiction" and, instead, "[i]t appears likely that most substance-abusing patients in pain management practices had an abuse problem before entering the practice." This falsely suggests that few patients would become addicted, that only those with a prior history of abuse are at risk of opioid addiction, and that doctors could screen for those patients and safely prescribe to others. To the contrary, opioid addiction affects a significant population of patients; while patients with a history of abuse may be more prone to addiction, all patients are at risk, and doctors may not be able to identify, or safely prescribe to, patients at greater risk.

710. The sales training also noted that there were various "signs associated with substance abuse," including past history or family history of substance or alcohol abuse, frequent requests to change medication because of side effects or lack of efficacy, and a "social history of dysfunctional or high-risk behaviors including multiple arrests, multiple marriages, abusive relationships, etc." This is misleading, as noted above, because it implies that only patients with these kinds of behaviors and history become addicted to opioids.

711. Further, the sales training neglected to disclose that no risk-screening tools related to opioids have ever been scientifically validated. The AHRQ recently issued an Evidence Report that could identify "[n]o study" that had evaluated the effectiveness of various risk mitigation strategies—including the types of patient screening implied in Actavis's sales training—on outcomes related to overdose, addiction, abuse or misuse.

176

712. The sales training module also directed representatives to counsel doctors to be on the lookout for the signs of "[p]seudoaddiction," which were defined as "[b]ehaviors (that mimic addictive behaviors) exhibited by patients with inadequately treated pain." However, the concept of "pseudoaddiction" is unsubstantiated and meant to mislead doctors and patients about the risks and signs of addiction.

713. Finally, the 2010 national training materials trivialized the harms associated with opioid withdrawal by explaining that "[p]hysical dependence simply requires a tapered withdrawal should the opioid medication no longer be needed." This, however, overlooks the fact that the side effects associated with opiate withdrawal are severe and a serious concern for *any person* who wishes to discontinue long-term opioid therapy.

714. The Kadian Learning System module dates from July 2010, but Actavis sales representatives were passing deceptive messages on to prescribers even before then. A July 2010 "Dear Doctor" letter issued by the FDA indicated that "[b]etween June 2009 and February 2010, Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]." Certain risks that were misrepresented included the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid agonists have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion." The FDA also took issue with an advertisement for misrepresenting Kadian's ability to help patients "live with less pain and get adequate rest with less medication," when the supporting study did not represent "substantial evidence or substantial clinical experience."

715. Actavis's documents also indicate that the company continued to deceptively market its drugs after 2010. Specifically, a September 2012 Kadian Marketing Update, and the "HCP Detail" aid contained therein, noted that Kadian's "steady state plasma levels" ensured that Kadian "produced higher trough concentrations and a smaller degree of peak-to-trough fluctuations" than other opioids.

177

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM
NYSCEF DOC. NO. 2

INDEX NO. E2019005178
Index #: E2019005178

RECEIVED NYSCEF: 06/05/2019

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 218 of 1171. PageID #: 705537

716. Actavis also commissioned surveys of prescribers to ensure Kadian sales representatives were promoting the "steady-state" message. That same survey—paid for and reviewed by Actavis—found repeated instances of prescribers being told by sales representatives that Kadian had low potential of abuse or addiction. This survey also found that prescribers were influenced by Actavis's messaging. A number of Kadian prescribers stated that they prescribed Kadian because it was "without the addictive potential" and wouldn't "be posing high risk for addiction." As a result, Actavis's marketing documents celebrated a "perception" among doctors that Kadian had "low abuse potential".

717. Finally, the internal documents of another Defendant, Endo, indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed the AAPM/APS Guidelines with doctors during detailing visits. These guidelines deceptively concluded that the risk of addiction is manageable for patients regardless of past abuse histories.

ii.    *Actavis' Deceptive Speaking Training*

718. Actavis also increasingly relied on speakers—physicians whom Actavis recruited to market opioids to their peers—to convey similar marketing messages. Actavis set a goal to train 100 new Kadian speakers in 2008 alone, with a plan to set up "power lunch teleconferences" connecting speakers to up to 500 participating sites nationwide. Actavis sales representatives, who were required to make a certain number of sales visits each day and week, saw the definition of sales call expanded to accommodate these changes; such calls now included physicians' "breakfast & lunch meetings with Kadian advocate/speaker."

719. A training program for Actavis speakers included training on many of the same messages found in the Kadian Learning System, as described below. The deceptive messages in Actavis's speakers' training are concerning for two reasons: (a) the doctors who participated in the training were, themselves, prescribing doctors, and the training was meant to increase their

178

prescriptions of Kadian; and (b) these doctors were trained, paid, and directed to deliver these messages to other doctors who would write prescriptions of Kadian.

720.    Consistent with the training for sales representatives, Actavis's speakers' training falsely minimized the risk of addiction posed by long-term opioid use. Actavis claimed, without scientific foundation, that "[o]pioids can be used with minimal risk in chronic pain patients without a history of abuse or addiction." The training also deceptively touted the effectiveness of "Risk Tools," such as the Opioid Risk Tool, in determining the "risk for developing aberrant behaviors" in patients being considered for chronic opioid therapy. In recommending the use of these screening tools, the speakers' training neglected to disclose that none of them had been scientifically validated.

721.    The speakers' training also made reference to "pseudoaddiction" as a "[c]ondition characterized by behaviors, such as drug hoarding, that outwardly mimic addiction but are in fact driven by a desire for pain relief and usually signal undertreated pain." It then purported to assist doctors in identifying those behaviors that *actually* indicated a risk of addiction from those that did not. Behaviors it identified as "[m]ore suggestive of addiction" included "[p]rescription forgery," "[i]njecting oral formulations," and "[m]ultiple dose escalations or other nonadherence with therapy despite warnings." Identified as "[l]ess suggestive of addiction" were "[a]ggressive complaining about the need for more drugs," "[r]equesting specific drugs," "[d]rug hoarding during periods of reduced symptoms," and "[u]napproved use of the drug to treat another symptom." By portraying the risks in this manner, the speakers' training presentation deceptively gave doctors a false sense of security regarding the types of patients who can become addicted to opioids and the types of behaviors these patients exhibit.

722.    The speakers' training downplayed the risks of opioids, while focusing on the risks of competing analgesics like NSAIDs. For example, it asserted that "Acetaminophen toxicity is a major health concern." The slide further warned that "Acetaminophen poisoning is the most common cause

of acute liver failure in an evaluation of 662 US Subjects with acute liver failure between 1998-2003," and was titled "Opioids can be a safer option than other analgesics." However, in presenting the risks associated with opioids, the speakers' training focused on nausea, constipation, and sleepiness, and ignored the serious risks of hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, and dizziness; increased falls and fractures in the elderly, neonatal abstinence syndrome, and potentially fatal interactions with alcohol or benzodiazepines. As a result, the training exaggerated the risks of NSAIDs, both absolutely and relative to opioids, to make opioids appear to be a more attractive first-line treatment for chronic pain.

723. The speakers' training also misrepresented the risks associated with increased doses of opioids. For example, speakers were instructed to "[s]tart low and titrate until patient reports adequate analgesia" and to "[s]et dose levels on [the] basis of patient need, not on predetermined maximal dose." However, the speakers' training neglected to warn speakers (and speakers bureau attendees) that patients on high doses of opioids are more likely to suffer adverse events.

   b. <u>Actavis's Deceptive Statements to Prescribers and Patients in the City of Rochester</u>

724. The misleading messages and training materials Actavis provided to its sales force and speakers were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, without complete and accurate information about the risks, benefits, and alternatives. This deception was national in scope and included the City of Rochester. Actavis's nationwide messages reached prescribers in the City of Rochester in a number of ways. For example, they were carried into the City of Rochester by Actavis's sales representatives during detailing visits as well as made available to City patients and prescribers through websites and ads, including ads in prominent medical journals. They have also been delivered to City prescribers by Actavis's paid speakers, who were required by Actavis policy and by FDA regulations to stay true to Actavis's nationwide messaging.

725.    Once trained, Actavis's sales representatives and speakers were directed to, and did, visit potential prescribers in the City of Rochester, as elsewhere, to deliver their deceptive messages. These contacts are demonstrated by Actavis's substantial effort in tracking the habits of individual City physicians prescribing Kadian, and by the direct evidence of Actavis detailing City prescribers.

726.    Actavis tracked, in substantial detail, the prescribing behavior of the City of Rochester area physicians.

### 2. Cephalon

727.    At the heart of Cephalon's deceptive promotional efforts was a concerted and sustained effort to expand the market for its branded opioids, Actiq and Fentora, far beyond their FDA-approved use in opioid-tolerant cancer patients. Trading on their rapid-onset formulation, Cephalon touted its opioids as the answer to "breakthrough pain"—a term its own KOL allies planted in the medical literature—whether cancer pain or not. Cephalon promoted this message through its sales force, paid physician speakers, advertisements, and CMEs, even after the FDA issued the company warnings and rejected an expanded drug indication.

728.    Even as it promoted Actiq and Fentora off-label, Cephalon also purveyed many of the deceptive messages described above. It did so both directly—through detailing visits and speaker programs—and through the publications and CMEs of its third-party partners. These messages included misleading claims about functional improvement, addiction risk, pseudoaddiction, and the safety of alternatives to opioids.

729.    Based on the highly coordinated and uniform nature of Cephalon's marketing, Cephalon conveyed these deceptive messages to prescribers in the City of Rochester. The materials that Cephalon generated in collaboration with third-parties were also distributed or made available in the City of Rochester. Cephalon distributed these messages, or facilitated their distribution, in the City

181

of Rochester with the intent that prescribers and/or consumers in the City of Rochester would rely on them in choosing to use opioids to treat chronic pain.

### a. Cephalon's Deceptive Direct Marketing

730. Like the other Defendants, Cephalon directly engaged in misleading and deceptive marketing of its opioids through its sales force and branded advertisements. These messages were centrally formulated and intended to reach prescribers nationwide, including those practicing in the City of Rochester area. Cephalon also spent the money necessary to aggressively promote its opioid drugs, setting aside $20 million to market Fentora in 2009 alone.

#### i. *Cephalon's Fraudulent Off-Label Marketing of Actiq and Fentora*

731. Chief among Cephalon's direct marketing efforts was its campaign to deceptively promote its opioids for off-label uses. Cephalon reaps significant revenue from selling its opioids for treatment of chronic non-cancer pain. However, neither of its two opioid drugs— Actiq or Fentora— is approved for this purpose. Instead, both have indications that are very clearly and narrowly defined to limit their use to a particular form of cancer pain. Despite this restriction, and in order to claim its piece of the broader chronic non-cancer pain market, Cephalon deceptively and unlawfully marketed Actiq and then Fentora for patients and uses for which they were not safe, effective, or allowed. This resulted in prescriptions written and paid and, grievously, caused patients to be injured and die. Cephalon's efforts to expand the market for its drugs beyond cancer pain extended to prescribers in the City of Rochester.

##### a) Cephalon launched its fraudulent marketing scheme for Actiq

182

732.    Cephalon's Actiq is a powerful opioid narcotic that is delivered to the bloodstream by a lollipop lozenge that dissolves slowly in the mouth. As described by one patient, Actiq "tastes like the most delicious candy you ever ate."[138]

733.    Actiq is appropriately used only to treat "breakthrough" cancer pain that cannot be controlled by other medications. Breakthrough pain is a short-term flare of moderate-to- severe pain in patients with otherwise stable persistent pain. Actiq is a rapid-onset drug that takes effect within 10-15 minutes but lasts only a short time. It is also an extremely strong drug, considered to be at least 80 times more powerful than morphine. Fentanyl, a key ingredient in Actiq, has been linked to fatal respiratory complications in patients. Actiq is not safe in any dose for patients who are not opioid tolerant, meaning patients who have taken specific doses of opioids for a week or longer and whose systems have acclimated to the drugs.

734.    In 1998, the FDA approved Actiq "**ONLY** for the management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[139] (emphasis in FDA document). Because of Actiq's dangers, wider, off-label uses—as the FDA label makes clear—are not permitted:

> This product **must not** be used in opioid non-tolerant patients because life-threatening respiratory depression and death could occur at any dose in patients not on a chronic regimen of opioids. For this reason, ACTIQ is contraindicated in the management of acute or postoperative pain.[140]

735.    Actiq and Fentora are thus intended to be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of, and skilled in, the use of Schedule II opioids to treat cancer pain. Unlike other drugs, of which off-label uses are permitted but cannot be

---

[138] *See* John Carreyrou, *Narcotic 'Lollipop' Becomes Big Seller Despite FDA Curbs*, Wall St. J., Nov. 3, 2006.
[139] FDA Approval Letter for NDA 20-747 (Nov. 4, 1998) at 5, http://www.accessdata.fda.gov/drugsatfda_docs/appletter/1998/20747ltr.pdf (accessed May 30, 2017)
[140] Actiq Drug Label, July 2011. The 1998 version does not substantively differ: "Because life-threatening hypoventilation could occur at any dose in patients not taking chronic opiates, *Actiq* is contra- indicated in the management of acute or postoperative pain. This product **must not** be used in opioid non-tolerant patients." (emphasis in original).

promoted by the drug maker, Actiq and Fentora are so potent that off- label use for opioid naïve patients is barred by the FDA, as their labels make clear.

736.     Notwithstanding the drug's extreme potency and related dangers, and the FDA's explicit limitations, Cephalon actively promoted Actiq for chronic non-cancer pain—an unapproved, off-label use. Cephalon marketed Actiq as appropriate for the treatment of various conditions including back pain, headaches, pain associated with sports-related injuries, and other conditions not associated with cancer and for which it was not approved, appropriate, or safe.

737.     Actiq's initial sales counted in the tens of millions of dollars, corresponding to its limited patient population. But by 2005, Actiq sales reached $412 million, making it Cephalon's second-highest selling drug. As a result of Cephalon's deceptive, unlawful marketing, sales exceeded $500 million by 2006.

> b)  October 1, 2006 – Cephalon fraudulently marked Actiq's successor drug, Fentora

738.     Actiq was set to lose its patent protection in September 2006. To replace the revenue stream that would be lost once generic competitors came to market, Cephalon purchased a new opioid drug, Fentora, from Cima Labs and, in August 2005, submitted a New Drug Application ("NDA") to the FDA for approval. Like Actiq, Fentora is an extremely powerful and rapid-onset opioid. It is administered by placing a tablet in the mouth until it disintegrates and is absorbed by the mucous membrane that lines the inside of the mouth.

739.     On September 25, 2006, the FDA approved Fentora, like Actiq, only for the treatment of breakthrough cancer pain in cancer patients who were already tolerant to around- the-clock opioid therapy for their underlying persistent cancer pain. Fentora's unusually strong and detailed black box warning label—the most serious medication warning required by the FDA—makes clear that, among other things:

184

Fatal respiratory depression has occurred in patients treated with FENTORA, including following use in opioid non-tolerant patients and improper dosing. The substitution of FENTORA for any other fentanyl product may result in fatal overdose.

Due to the risk of respiratory depression, FENTORA is contraindicated in the management of acute or postoperative pain including headache/migraine and in opioid non-tolerant patients.[141]

740.    When Cephalon launched Fentora on October 1, 2006, it picked up the playbook it had developed for Actiq and simply substituted in Fentora. Cephalon immediately shifted 100 general pain sales representatives from selling Actiq to selling Fentora to the very same physicians for uses that would necessarily and predictably be off-label. Cephalon's marketing of Actiq therefore "primed the market" for Fentora. Cephalon had trained numerous KOLs to lead promotional programs for Fentora, typically including off-label uses for the drug. Cephalon billed Fentora as a major advance that offered a significant upgrade in the treatment of breakthrough pain generally—not breakthrough cancer pain in particular—from Actiq. Cephalon also developed a plan in 2007 to target elderly chronic pain patients via a multi-city tour with stops at AARP events, YMCAs, and senior living facilities.

741.    On February 12, 2007, only four months after the launch, Cephalon CEO Frank Baldino told investors:

> [W]e've been extremely pleased to retain a substantial portion, roughly 75% of the `rapid onset opioid market. We executed our transition strategy and the results in our pain franchise have been better than we expected. With the successful launch of FENTORA and the progress in label expansion program, we are well positioned to grow our pain franchise for many years to come.[142]

742.    On May 1, 2007, just seven months after Fentora's launch, Cephalon's then-Executive Vice President for Worldwide Operations, Bob Roche, bragged to financial analysts that Fentora's reach would exceed even Actiq's. He described the company's successful and "aggressive" launch of

---

[141] Fentora Drug Label, February 2013, http://www.accessdata.fda.gov/drugsatfda_docs/label/2013/021947s008lbl.pdf (accessed May 30, 2017)

[142] *See Cephalon Q4 2006 Earnings Call Transcript,* Seeking Alpha (February 12, 2007, 8:48 PM EST) at 5, http://seekingalpha.com/article/26813-cephalon-q4-2006-earnings-call-transcript (accessed May 30, 2017)

185

Fentora that was persuading physicians to prescribe Fentora for ever broader uses. He identified two

"major opportunities"—treating breakthrough cancer pain and:

> The other opportunity of course is the prospect for FENTORA
> outside of cancer pain, in indications such as breakthrough lower
> back pain and breakthrough neuropathic pain. . . .
> . . . .
> We believe that a huge opportunity still exists as physicians and
> patients recognize FENTORA as their first choice rapid onset
> opioid medication. . . . [opioids are] widely used in the treatment
> of. . . non-cancer patients . . . .
> . . . .
> Of all the patients taking chronic opioids, 32% of them take that
> medication to treat back pain, and 30% of them are taking their
> opioids to treat neuropathic pain. In contrast only 12% are taking
> them to treat cancer pain, 12%.
>
> We know from our own studies that breakthrough pain episodes
> experienced by these non-cancer sufferers respond very well to
> FENTORA. And for all these reasons, we are tremendously
> excited about the significant impact FENTORA can have on
> patient health and wellbeing and the exciting growth potential
> that it has for Cephalon.
>
> In summary, we have had a strong launch of FENTORA and
> continue to grow the product aggressively. Today, that growth is
> coming from the physicians and patient types that we have
> identified through our efforts in the field over the last seven years.
> In the future, with new and broader indications and a much
> bigger field force presence, the opportunity that FENTORA
> represents is enormous.[143]

        c)   September 2007 – Reports of death and serious side effects led the
FDA to issue a public health warning for Fentora

743.    On September 10, 2007, Cephalon sent letters to doctors warning of deaths and other

"serious adverse events" connected with the use of Fentora, indicating that "[t]hese deaths occurred as

a result of improper patient selection (e.g., use in opioid non-tolerant patients), improper dosing,

---

[143] *See Cephalon Q1 2007 Earnings Call Transcript,* Seeking Alpha (May 1, 2007, 8:48 PM EST) at 23,
http://seekingalpha.com/article/34163-cephalon-q1-2007-earnings-call-transcript?page=1 (accessed May 30, 2017)

and/or improper product substitution."[144] The warning did not mention Cephalon's deliberate role in the "improper patient selection."

744. Two weeks later, the FDA issued its own Public Health Advisory. The FDA emphasized, once again, that Fentora should be prescribed only for approved conditions and that dose guidelines should be carefully followed. The FDA Advisory made clear that several Fentora-related deaths had occurred in patients who were prescribed the drug for off-label uses. The FDA Advisory warned that Fentora should not be used for any off-label conditions, including migraines, post-operative pain, or pain due to injury, and that it should be given only to patients who have developed opioid tolerance. The Advisory reiterated that, because Fentora contains a much greater amount of fentanyl than other opiate painkillers, it is not a suitable substitute for other painkillers.[145]

745. Notwithstanding the regulatory scrutiny, Cephalon's off-label marketing continued. Cephalon's 2008 internal audit of its Sales & Marketing Compliance Programs concluded that marketing and tactical documents, as written, may be construed to promote off-label uses. The same report acknowledged that Cephalon lacked a process to confirm that speakers' program participants were following Cephalon's written, formal policies prohibiting off-label promotion, and that "non-compliant [Cephalon Speaker Programs] may be taking place." Moreover, the report acknowledged that Cephalon's "call universe" may include "inappropriate prescribers"— prescribers who had nothing to do with cancer pain.

> d) May 6, 2008 – The FDA rejected Cephalon's request for expanded approval of Fentora

---

[144] Letter from Jeffrey M. Dayno, M.D., Vice President, Medical Services, Cephalon, Inc. to Healthcare Providers (Sept. 10, 2007), http://www.fda.gov/downloads/Safety/MedWatch/SafetyInformation/
SafetyAlertsforHumanMed icalProducts/UCM154439.pdf (accessed May 30, 2017).
[145] FDA Public Health Advisory, *Important Information for the Safe Use of Fentora (fentanyl buccal tablets)* (Sept. 26, 2007), http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm051273.htm (accessed May 30, 2017)

746. Cephalon filed a supplemental new drug application, ("sNDA"), asking the FDA to approve Fentora for the treatment of non-cancer breakthrough pain. Cephalon admitted that Fentora already had been heavily prescribed for non-cancer pain, but argued that such widespread use demonstrated why Fentora should be approved for these wider uses.[146] Cephalon's application also conceded that "[t]o date, no medication has been systematically evaluated in clinical studies or approved by the FDA for the management of [breakthrough pain] in patients with chronic persistent non-cancer-related pain." *Id.*

747. In response to Cephalon's application, the FDA presented data showing that 95% of all Fentora use was for treatment of non-cancer pain.[147] By a vote of 17-3, the relevant Advisory Committee—a panel of outside experts—voted against recommending approval of Cephalon's sNDA for Fentora, citing the potential harm from broader use. On September 15, 2008, the FDA denied Cephalon's application and requested, in light of Fentora's already off- label use, that Cephalon implement and demonstrate the effectiveness of proposed enhancements to Fentora's Risk Management Program. In December 2008, the FDA followed that request with a formal request directing Cephalon to submit a Risk Evaluation and Mitigation Strategy for Fentora.

  e) March 26, 2009 – the FDA's Division of Drug Marketing, Advertising and Communications ("DDMAC") warned Cephalon about its misleading advertising of Fentora

748. Undeterred by the rejection of its sNDA, Cephalon continued to use its general pain sales force to promote Fentora off-label to pain specialists as an upgrade of Actiq for the treatment of non-cancer breakthrough pain. Deceptively and especially dangerously, Cephalon also continued to

---

[146] *See Fentora CII: Advisory Committee Briefing Document,* U.S. FDA Anesthetic & Life Support Drugs Advisory Comm. & Drug Safety & Risk Mgmt. Advisory Comm. (May 6, 2008), http://www.fda.gov/ohrms/dockets/ac/08/briefing/2008-4356b2-02-Cephalon.pdf (accessed May 30, 2017)

[147] *See* Yoo Jung Chang & Lauren Lee, *Review of Fentora and Actiq Adverse Events from the Adverse Event Reporting System ("AERS") Database,* U.S. FDA Anesthetic & Life Support Drugs Advisory Comm. & Drug Safety & Risk Mgmt. Advisory Comm. (May 6, 2008), http://www.fda.gov/ohrms/dockets/ac/08/slides/2008-4356s2-02-FDAcorepresentations.ppt#289,1 (accessed May 30, 2017).

188

promote Fentora for use by all cancer patients suffering breakthrough cancer pain, and not only those who were opioid tolerant.

749. On March 26, 2009, DDMAC issued a Warning Letter to Cephalon, telling Cephalon that its promotional materials for Fentora amounted to deceptive, off-label promotion of the drug.[148] Specifically, the Warning Letter asserted that a sponsored link on Google and other search engines for Fentora, which said "[l]earn about treating breakthrough pain in patients with cancer,"[149] was improper because it "misleadingly broaden[ed] the indication for Fentora by implying that any patient with cancer who requires treatment for breakthrough pain is a candidate for Fentora therapy . . . when this is not the case."

750. DDMAC emphasized that Fentora's label was limited to cancer patients with breakthrough pain **"who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."** (emphasis in original). DDMAC explained that the advertisement was "especially concerning given that Fentora **must not** be used in opioid non-tolerant patients because life-threatening hypoventilation and death could occur at any dose in patients not on a chronic regimen of opioids." (Emphasis in original). DDMAC also warned Cephalon that, based on a review of Cephalon-sponsored links for Fentora on internet search engines, the company's advertisements were "misleading because they make representations and/or suggestions about the efficacy of Fentora, but fail to communicate **any** risk information associated with the use" of the drug. (emphasis in original).

    f) Cephalon continues to knowingly, deceptively, and illegally promote Fenotra for off-label uses

---

[148] Letter from Michael Sauers, Regulatory Review Officer, Division of Drug Marketing, Advertising and Communications, to Carole S. Marchione, Senior Director and Group Leader, Regulatory Affairs (March 26, 2009), http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM166238.pdf (accessed May 30, 2017).

[149] Screen shots of the sponsored link are available here: http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM166240.pdf (accessed May 30, 2017).

189

751.     Cephalon's own market research studies confirm that its Fentora promotions were not focused on physicians who treat breakthrough cancer pain. Cephalon commissioned several market research studies to determine whether oncologists provided an "adequate" market potential for Fentora. These studies' central goal was to determine whether oncologists treat breakthrough cancer pain themselves, or whether they refer such patients to general pain specialists. The first study, completed in 2007, reported that 90% of oncologists diagnose and treat breakthrough cancer pain themselves, and do not refer their breakthrough cancer pain patients to pain specialists. The second study, completed in 2009, confirmed the results of the 2007 study, this time reporting that 88% of oncologists diagnose and treat breakthrough cancer pain themselves and rarely, if ever, refer those patients to general pain specialists. (One reason that general pain specialists typically do not treat oncological pain is that the presence of pain can, in itself, be an indicator of a change in the patient's underlying condition that should be monitored by the treating oncologist.)

752.     Cephalon was well aware that physicians were prescribing Fentora for off-label uses.

753.     Cephalon was also aware that its detailing had an impact on prescription rates.

754.     In 2011, Cephalon wrote and copyrighted an article titled "2011 Special Report: An Integrated Risk Evaluation and Risk Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA®) and Oral Transmucosal Fentanyl Citrate (ACTIQ®)" that was published in *Pain Medicine News*.[150] The article promoted Cephalon's drugs for off-label uses by stating that the "judicious use of opioids can facilitate effective and safe management of chronic pain" and noted that Fentora "has been shown to be effective in treatment of [break through pain] associated with multiple causes of pain," not just cancer.[151]

ii.     *Cephalon's Misrepresentation of the Risks Associated with the Use of Opioids for the Long-Term Treatment of Chronic Pain*

---

[150] http://www.pharmacytimes.com/publications/issue/2012/january2012/r514-jan-12-rems (accessed May 30, 2017)
[151] *Id.*

190

755. Cephalon's conduct in marketing Actiq and Fentora for chronic non-cancer pain, despite their clear (and deadly) risks and unproved benefits, was an extension, and reaped the benefits, of Cephalon's generally deceptive promotion of opioids for chronic pain.

756. There is insufficient scientific evidence to corroborate a link between chronic opioid therapy and increased functionality. There is however, sufficient evidence to show increased risks of overdose and addiction .[152]

757. Along with deploying its sales representatives, Cephalon used speakers bureaus to help reach prescribers. The company viewed each treating physician as a vehicle to generate prescriptions – whether written by that physician directly or caused indirectly by his or her influence over other physicians.

758. Having determined that speakers were an effective way to reach prescribers, Cephalon set to work ensuring that its speakers would disseminate its misleading messages. Cephalon did not disclose to speakers that, even when these tools are applied, they are unable to control for the risk of addiction.

759. As with the other Defendants, Cephalon deployed the made-up concept of "pseudoaddiction" to encourage prescribers to address addictive behavior in the worst way possible— with more opioids.

760. Working with FSMB, Cephalon also trained its speakers to turn doctors' fear of discipline on its head—doctors, who believed that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with pain. Through this messaging, Cephalon aimed to normalize the prescribing of

---

[152] Thomas R. Frieden & Debra Houry, *Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline*, 347 New Eng. J. Med. 1501-04 (2016).

opioids for chronic pain and failed to acknowledge the serious risks of long-term opioid use and its inappropriateness as a front-line treatment for pain.

761.    Finally, Cephalon also developed a guidebook called *Opioid Medications and REMS: A Patient's Guide*, which deceptively minimized the risks of addiction from the long-term use of opioids. Specifically, the guidebook claimed that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids," which is dangerously false. Cephalon distributed the guidebook broadly, and it was available to, and intended to reach, prescribers in the City of Rochester.

762.    The misleading messages and materials Cephalon provided to its sales force and its speakers were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, without complete and accurate information about the risks, benefits, and alternatives. This deception was national in scope and included the City of Rochester. Cephalon's nationwide messages have reached prescribers in the City of Rochester in a number of ways. For example, they were delivered by Cephalon's sales representatives in detailing visits and made available to City patients and prescribers through websites and ads, including ads in prominent medical journals. They have also been delivered to City prescribers by Cephalon's paid speakers, who were required by Cephalon policy to stay true to the company's nationwide messaging.

b.    Cephalon's Deceptive Third-Party Statements

763.    Like the other Defendants, Cephalon also relied on third parties to disseminate its messages through deceptive publications and presentations. By funding, developing and reviewing the content, and distributing and facilitating the distribution of these messages, Cephalon exercised editorial control over them. Cephalon, in some instances, used its sales force to directly distribute certain publications by these Front Groups and KOLs, rendering those publications "labeling" within

192

the meaning of § 21 C.F.R. § 1.3(a) and making Cephalon responsible for their contents. Cephalon also deployed its KOLs as speakers for talks and CMEs to selected groups of prescribers.

764. Cephalon's relationships with several such Front Groups and KOLs—and the misleading and deceptive publications and presentations those relationships generated—are described below.

        i.    *FSMB – Responsible Opioid Prescribing*

765. In 2007, for example, Cephalon sponsored and distributed through its sales representatives FSMB's *Responsible Opioid Prescribing*, which was drafted by Dr. Fishman. Dr. Fishman was frequently hired by a consulting Firm, Conrad & Associates LLC, to write pro-opioid marketing pieces disguised as science. Dr. Fishman's work was reviewed and approved by drug company representatives, and he felt compelled to draft pieces that he admits distorted the risks and benefits of chronic opioid therapy in order to meet the demands of his drug company sponsors.

766. *Responsible Opioid Prescribing* was a signature piece of Dr. Fishman's work and contained a number of deceptive statements. This publication claimed that, because pain had a negative impact on a patient's ability to function, relieving pain—alone—would "reverse that effect and improve function." However, the truth is far more complicated; functional improvements made from increased pain relief can be offset by a number of problems, including addiction.

767. *Responsible Opioid Prescribing* also misrepresented the likelihood of addiction by mischaracterizing drug-seeking behavior as "pseudoaddiction." It explained that "requesting drugs by name," engaging in "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding were all signs of "pseudoaddiction" and are likely the effects of undertreated pain, rather than true addiction. There is no scientific evidence to support the concept of "pseudoaddiction," and any suggestion that addictive behavior masquerades as "pseudoaddiction" is false.

193

768.     Cephalon spent $150,000 to purchase copies of *Responsible Opioid Prescribing* in bulk. It then used its sales force to distribute these copies to 10,000 prescribers and 5,000 pharmacists nationwide. These were available to, and intended to, reach prescribers and pharmacists in the City of Rochester.

        ii.     *APF – Treatment Options: A Guide for People Living with Pain*

769.     Cephalon also exercised considerable control over the Front Group APF, which published and disseminated many of the most egregious falsehoods regarding chronic opioid therapy. Their relationship, and several of the APF publications, are described in detail below.

770.     Documents indicate that Cephalon provided APF with substantial assistance in publishing deceptive information regarding the risks associated with the use of opioids for chronic pain. An April 3, 2008 Fentora Assessment Strategy Tactics Team Meeting presentation outlines Cephalon's strategy to prepare for a meeting at which the FDA Advisory Committee would consider expanding the indication of Fentora to include chronic, non-cancer pain. Cephalon prepared by "reaching out to third-party organizations, KOLs, and patients to provide context and, where appropriate, encourage related activity." First among the Front Groups listed was APF.

771.     Cephalon was among the drug companies that worked with APF to "educate" the Institute of Medicine of the National Academies (IOM) on issues related to chronic opioid therapy. APF President Will Rowe circulated a document to Cephalon and other drug company personnel that contained key message points and suggested that they "[c]onsider using this document in your communications with the members of the IOM Committee." According to Rowe, recipients should "consider this a working document which you can add to or subtract from." Rowe also advised that, if recipients "have an ally on that Committee," they should "consider sharing this document with that person."

194

772.     Cephalon personnel responded enthusiastically, with Cephalon's Associate Director for Alliance Development stating her belief that "the document does a good job of bringing together many important ideas." Cephalon reviewed and directed changes to this document, with the Cephalon Associate Director thanking Rowe "for incorporating the points we had raised." The close collaboration between Cephalon and APF on this project demonstrates their agreement to work collaboratively to promote the use of opioids as an appropriate treatment for chronic pain.

773.     Cephalon's influence over APF's activities was so pervasive that APF's President, Will Rowe, even reached out to Defendants—including Cephalon—rather than his own staff, to identify potential authors to answer a 2011 article critical of opioids that had been published in the Archives of Internal Medicine.

774.     Starting in 2007, Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain*.[153] It is rife with misrepresentations regarding the risks, benefits, and superiority of opioids.

775.     For example, *Treatment Options* deceptively asserts that the long-term use of opioids to treat chronic pain could help patients function in their daily lives by stating that, when used properly, opioids "give [pain patients] a quality of life [they] deserve." There is no scientific evidence corroborating that statement, and such statements are, in fact, false. Available data demonstrate that patients on chronic opioid therapy are actually *less likely* to participate in life activities like work.

776.     *Treatment Options* also claims that addiction is rare and is evident from patients' conduct in self-escalating their doses, seeking opioids from multiple doctors, or stealing the drugs. *Treatment Options* further minimizes the risk of addiction by claiming that it can be avoided through the use of screening tools, like "opioid agreements," which can "ensure [that patients] take the opioid as prescribed." Nowhere does *Treatment Options* explain to patients and prescribers that neither "opioid

---

[153] https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf (accessed May 30, 2017)

195

agreements" nor any other screening tools have been scientifically validated to decrease the risks of addiction, and the publication's assurances to the contrary are false and deceptive.

777.    *Treatment Options* also promotes the use of opioids to treat chronic pain by painting a misleading picture of the risks of alternate treatments, most particularly NSAIDs. *Treatment Options* notes that NSAIDs can be dangerous at high doses, and attributes 10,000 to 20,000 deaths a year annually to NSAID overdose. According to *Treatment Options*, NSAIDs are different from opioids because opioids have "no ceiling dose," which is beneficial since some patients "need" larger doses of painkillers than they are currently prescribed. These claims misleadingly suggest that opioids are safe even at high doses and omit important information regarding the risks of high-dose opioids.

778.    Additionally, *Treatment Options* warns that the risks associated with NSAID use increase if NSAIDs are "taken for more than a period of months," but deceptively omits any similar warning about the risks associated with the long-term use of opioids. This presentation paints a misleading picture of the risks and benefits of opioid compared with alternate treatments.

779.    APF distributed 17,200 copies of *Treatment Options* in 2007 alone. It is currently available online and was intended to reach prescribers and pharmacists in the City of Rochester.

iii.    *Key Opinion Leaders and Misleading Science*

780.    Cephalon also knew that its misleading messages would be more likely to be believed by prescribers if they were corroborated by seemingly neutral scientific support.

781.    Employing these tactics, Cephalon caused the term "breakthrough pain"—a term it seeded in the medical literature—to be used in articles published by practitioners and clinicians it supported. With funding from Cephalon, for example, Dr. Portenoy wrote an article that purported to expand the definition of breakthrough cancer pain to non-cancer indications, vastly expanding the marketing potential of Cephalon's Fentora. The article was published in the nationally circulated *Journal of Pain* in 2006 and helped drive a surge in Fentora prescriptions.

196

782.    The concept of "breakthrough pain" ultimately formed the sole basis for the central theme of promotional messages Cephalon cited to support the approval and marketing of Actiq and Fentora, rapid-acting opioids which begin to work very quickly but last only briefly. Neither of these drugs had a natural place in the treatment of chronic pain before Cephalon's marketing campaign changed medical practice. A recent literature survey of articles describing non-cancer breakthrough pain calls into question the validity of the concept, suggesting it is not a distinct pain condition but a hypothesis to justify greater dosing of opioids. In other words, Cephalon conjured the science of breakthrough pain in order to sell its drugs.

783.    As one scholar has pointed out, references to breakthrough pain in articles published on the MEDLINE bibliographic database spiked in 1998 and again in 2006.[154] These spikes coincide with FDA's approval of Actiq and Fentora.

### iv.    *Misleading Continuing Medical Education*

784.    Cephalon developed sophisticated plans for the deployment of its KOLs, broken down by sub-type and specialty, to reach targeted groups of prescribers through CMEs. Cephalon used the CME programs it sponsored to deceptively portray the risks related to the use of opioids to treat chronic non-cancer pain and promote the off-label use of Actiq and Fentora.

785.    In 2007 and 2008, Cephalon sponsored three CMEs that each positioned Actiq and Fentora as the only "rapid onset opioids" that would provide effective analgesia within the time period during which "breakthrough pain" was at its peak intensity. Although the CMEs used only the generic names of the drugs, the description of the active ingredient and means of administration means that a physician attending the CME knew it referred only to Actiq or Fentora.

---

[154] Adriane Fugh-Berman, *Marketing Messages in Industry-Funded CME*, PharmedOut, Georgetown U. Med. Ctr. (June 25, 2010), *available at* pharmedout.galacticrealms.com/Fugh BermanPrescriptionforConflict6-25-10.pdf (accessed May 30, 2017).

197

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 238 of 1171. PageID #: 705557

786.    The CMEs each taught attendees that there was no sound basis for the distinction between cancer and non-cancer "breakthrough pain," and one instructed patients that Actiq and Fentora were commonly used in non-cancer patients, thus effectively endorsing this use. Optimizing Opioid Treatment for Breakthrough Pain, offered online by Medscape, LLC from September 28, 2007, through December 15, 2008, was prepared by KOL Dr. Webster and M. Beth Dove. It recommends prescribing a "short-acting opioid" (e.g., morphine, hydromorphone, oxycodone) "when pain can be anticipated," or a rapid-onset opioid when it cannot. The only examples of rapid-onset opioids then on the market were oral transmucosal fentanyl citrate (i.e., Actiq) or fentanyl effervescent buccal tablet (i.e., Fentora): "Both are indicated for treatment of [breakthrough pain] in opioid-tolerant cancer patients and are frequently prescribed to treat [breakthrough pain] in noncancer patients as well."

787.    Optimizing Opioid Treatment for Breakthrough Pain not only deceptively promoted Cephalon's drugs for off-label use, but also misleadingly portrayed the risks, benefits, and superiority of opioids for the treatment of chronic pain. For example, the CME misrepresented that Actiq and Fentora would help patients regain functionality by advising that they improve patients' quality of life and allow for more activities when taken in conjunction with long-acting opioids. The CME also minimized the risks associated with increased opioid doses by explaining that NSAIDs were less effective than opioids for the treatment of breakthrough pain because of their dose limitations, without disclosing the heightened risk of adverse events on high-dose opioids.

788.    Around the same time, Dr. Webster was receiving nearly $2 million in funding from Cephalon.

789.    Optimizing Opioid Treatment for Breakthrough Pain was available online and was intended to reach City prescribers.

790.    Cephalon similarly used an educational grant to sponsor the CME *Breakthrough Pain: Improving Recognition and Management*, which was offered online between March 31, 2008, and March 31,

198

2009, by Medscape, LLC. The direct result of Cephalon's funding was a purportedly educational document that echoed Cephalon's marketing messages. The CME deceptively omitted Actiq's and Fentora's tolerance limitations, cited examples of patients who experienced pain from accidents, not from cancer, and, like Cephalon's *Optimizing Opioid Treatment* CME, taught that Actiq and Fentora were the only products on the market that would take effect before the breakthrough pain episode subsided. This CME was available online and was intended to reach City prescribers.

791.     Lastly, KOL Dr. Fine authored a CME, sponsored by Cephalon, titled *Opioid-Based Management of Persistent and Breakthrough Pain*, with KOLs Dr. Christine A. Miaskowski and Michael J. Brennan, M.D. Cephalon paid to have this CME published in a supplement of Pain Medicine News in 2009.[155] It instructed prescribers that "clinically, broad classification of pain syndromes as either cancer- or noncancer-related has limited utility," and recommended dispensing "rapid onset opioids" for "episodes that occur spontaneously" or unpredictably, including "oral transmucosal fentanyl," *i.e.*, Actiq, and "fentanyl buccal tablet," *i.e.*, Fentora, including in patients with chronic non-cancer pain. Dr. Miaskowski disclosed in 2009, in connection with the APS/AAPM Opioid Treatment Guidelines, that she served on Cephalon's speakers bureau.[156] Dr. Fine also received funding from Cephalon for consulting services.

792.     *Opioid-Based Management of Persistent and Breakthrough Pain* was available to and was intended to reach City prescribers.

793.     Cephalon's control over the content of these CMEs is apparent based on its advance knowledge of their content. A December 2005 Cephalon launch plan set forth key "supporting messages" to position Fentora for its product launch. Among them was the proposition that "15-minute onset of action addresses the unpredictable urgency of [breakthrough pain]." Years later, the

---

[155] https://www.yumpu.com/en/document/view/11409251/opioid-based-management-of-persistent-and-breakthrough-pain (accessed May 30, 2017).

[156] 14 of 21 panel members who drafted the AAPM/APS Guidelines received support from Janssen, Cephalon, Endo, and Purdue.

same marketing messages reappeared in the Cephalon-sponsored CMEs described above. Echoing the Cephalon launch plan, Optimizing Opioid Treatment for Breakthrough Pain stated that "[t]he unpredictability of [breakthrough pain] will strongly influence the choice of treatment" and that Fentora "delivers an onset of analgesia that is similar to [Actiq] at ≤ 15 minutes." Similarly, Opioid-Based Management of Persistent and Breakthrough Pain defined "breakthrough pain" as "unpredictable," over a table describing both cancer and non-cancer "breakthrough pain."

794. Cephalon tracked the effectiveness of its deceptive marketing through third parties, demonstrating that Cephalon not only planned for, but depended upon, their activities as a key element of its marketing strategy. These programs were available to prescribers in the City of Rochester and, based on the uniform and nationwide character of Cephalon's marketing, featured the same deceptive messages described above.

### c. Cephalon's Deceptive Third-Party Statements to City prescribers and Patients

795. Cephalon used various measures to disseminate its deceptive statements regarding the risks of off-label use of Actiq and Fentora and the risks, benefits, and superiority of opioids to City patients and prescribers.

796. Cephalon's speakers regularly held talks for City prescribers. These talks followed the same deceptive talking points covered in Cephalon's speakers' training.

797. Cephalon also targeted City prescribers through the use of its sales force.

798. Given that Cephalon's own studies demonstrated that the overwhelming majority of oncologists diagnose and treat breakthrough cancer pain themselves, Cephalon knew the only purpose of representatives meeting with these prescribers was to promote off-label use. Based on the uniform and nationwide character of Cephalon's marketing, Cephalon's deceptive messages would have been disseminated to City prescribers by Cephalon's sales representatives during these events.

200

799.    Sales representatives, and the misrepresentations on which they were trained, drove significant Fentora sales.

### 3. Endo

800.    Endo promoted its opioids through the full array of marketing channels. The company deployed its sales representatives, paid physician speakers, journal supplements, and advertising in support of its branded opioids, principally Opana and Opana ER. Misleading claims about the purportedly lower abuse potential of Opana ER featured prominently in this campaign. Endo also made many other deceptive statements and omissions. These included deceptive messages about functional improvement, addiction risk, "pseudoaddiction," addiction screening tools, and the safety of alternatives to opioids.

801.    At the same time, Endo also relied on third-party partners to promote the safety, efficacy, and superiority of opioids generally, through a combination of CMEs, websites, patient education pamphlets, and other publications. These materials echoed the misrepresentations described above, and also made deceptive statements about withdrawal symptoms and the safety of opioids at higher doses.

802.    Through the highly coordinated and uniform nature of Endo's marketing, Endo conveyed these deceptive messages to City prescribers. The materials that Endo generated in collaboration with third-parties also were distributed or made available in the City of Rochester. Endo distributed these messages, or facilitated their distribution, in the City of Rochester with the intent that City prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

    a.    Endo's Deceptive Direct Marketing

201

803. Like the other Defendants, Endo used deceptive direct marketing to increase the sales of its dangerous opioids. As set forth below, Endo conveyed these deceptive messages in training of its sales force and recruited speakers, who in turn conveyed them to physicians; in a misleading journal supplement; and in unbranded advertising.

   i.   *Endo's Sales Force and Deceptive Sales Training*

804. Endo's promotion of Opana ER relied heavily on in-person marketing, including to City prescribers. Endo had an aggressive detailing program. In the first quarter of 2010 alone, sales representatives made nearly 72,000 visits to prescribers nationwide to detail Opana ER. Between 2007 and 2013, Endo spent between $3 million and $10 million each quarter to promote opioids through its sales force.

805. Endo's sales representatives, like those of the other Defendants, targeted physicians to deliver sales messages that were developed centrally and deployed uniformly across the country. These sales representatives were critical in transmitting Endo's marketing strategies and talking points to individual prescribers.

806. Endo specifically directed its sales force to target physicians who would prescribe its drugs to treat chronic pain. For example, an Opana Brand Tactical Plan dated August, 2007 aimed to increase "Opana ER business from [the Primary Care Physician] community" more than 45% by the end of that year. Indeed, Endo sought to develop strategies that would be most persuasive to primary care doctors—strategies that sought to influence the prescribing behavior of primary care physicians through the use of subject matter experts. A February 2011 Final Report on Opana ER Growth Trends, for example, predicted that Endo's planned "[u]se of Pain Specialists as local thought leaders should affect increased primary care adoption."

807. Endo trained its sales force to make a number of misrepresentations to physicians nationwide, including to physicians in the City of Rochester. Endo's sales representatives were trained

to represent to these prescribers that Opana ER would help patients regain function they had lost to chronic pain; that Endo opioids had a lower potential for abuse because they were "designed to be crush resistant," despite the fact that "clinical significance of INTAC Technology or its impact on abuse/misuse ha[d] not been established for Opana ER;" and that drug seeking behavior was a sign of undertreated pain rather than addiction.

808.    Endo knew that its marketing reached physicians repeatedly because it tracked their exposure. Internal Endo documents dated August 23, 2006 demonstrate that the following percentages of physicians would view an Endo journal insert (or paid supplement) at least 3 times in an 8 month period: 86% of neurologists; 86% of rheumatologists; 85% of oncologists; 85% of anesthesiologists; 70% of targeted primary care physicians; and 76% of OB/GYNs.

809.    Endo was not only able to reach physicians through its marketing, but also successfully impart its marketing messages. The company found that its promotional materials tripled prescribers' ability to recall the sales message and doubled their willingness to prescribe Opana ER in the future. This was true of marketing that contained deceptions.

810.    For example, according to internal Endo documents, up to 10% of physicians it detailed were able to recall, without assistance, the message that Opana ER had "Minimal/less abuse/misuse" potential than other drugs. The Endo message that prescribers retained was a plain misrepresentation: that use of Opana ER was unlikely to lead to abuse and addiction. Although Opana ER always has been classified under Schedule II as a drug with a "high potential for abuse", the largest single perceived advantage of Opana ER, according to a survey of 187 physicians who reported familiarity with the drug, was "perceived low abuse potential," cited by 15% of doctors as an advantage. Low abuse potential was among the deceptive messages that City prescribers received, and retained, from Endo sales representatives.

INDEX NO. E2019005178
RECEIVED NYSCEF: 06/05/2019

811. Endo's own internal documents acknowledged the misleading nature of these statements, conceding that "Opana ER has an abuse liability similar to other opioid analgesics as stated in the [FDA-mandated] box warning." A September 2012 Opana ER Business Plan similarly stated that Endo needed a significant investment in clinical data to support comparative effectiveness, scientific exchange, benefits and unmet need, while citing lack of "head-to-head data" as a barrier to greater share acquisition.

812. Nevertheless, Endo knew that its marketing was extremely effective in turning physicians into prescribers. Nationally, the physicians Endo targeted for in-person marketing represented approximately 84% of all prescribers of Opana ER in the first quarter of 2010. Endo also observed that the prescribers its sales representatives visited wrote nearly three times as many prescriptions per month for Opana ER as those physicians who were not targeted for Endo's marketing—7.4 prescriptions per month versus 2.5. The most heavily targeted prescribers wrote nearly 30 prescriptions per month. Internal Endo documents from May 2008 indicate that Endo expected that each of its sales representatives would generate 19.6 prescriptions per week by the end of 2008. As summarized by a February 2011 report on Opana ER growth trends, Endo's "[a]ggressive detailing [is] having an impact."

813. More broadly, Endo's sales trainings and marketing plans demonstrate that its sales force was trained to provide prescribers with misleading information regarding the risks of opioids when used to treat chronic pain. Foremost among these messages were misleading claims that the risks of addiction, diversion, and abuse associated with opioids—and Endo's products in particular—were low, and lower than other opioids.

  a) Endo's Sales Force Deceptively Minimized the Risks of Addiction Associated with Chronic Opioid Therapy.

814. By way of illustration, Endo's Opana ER INTAC Technology Extended-Release Sell Sheet Implementation Guide, which instructs Endo sales personnel how to effectively "support key messages" related to the marketing of Opana ER, states that it is an "approved message" for sales representatives to stress that Opana ER was "designed to be crush resistant," even though this internal document conceded that "the clinical significance of INTAC Technology or its impact on abuse/misuse has not been established for Opana ER."

815. Other Endo documents acknowledged the limitations on Opana ER's INTAC technology, conceding that while Opana ER may be resistant to pulverization, it can still be "ground" and "cut into small pieces" by those looking to abuse the drug.

816. Endo's claims about the crush-resistant design of Opana ER also made their way to the company's press releases. A January 2013 article in *Pain Medicine News*, based in part on an Endo press release, described Opana ER as "crush-resistant." This article was posted on the *Pain Medicine News* website, which was accessible to City patients and prescribers.

817. The only reason to promote the crush resistance of Opana ER was to persuade doctors that there was less risk of abuse, misuse, and diversion of the drug. The idea that Opana ER was less addictive than other drugs was the precise message that City prescribers took from Endo's marketing.

818. On May 10, 2013, the FDA warned Endo that there was no evidence that Opana ER's design "would provide a reduction in oral, intranasal, or intravenous abuse" and that the post-marketing data Endo had submitted to the FDA "are insufficient to support any conclusion about the overall or route-specific rates of abuse." Even though it was rebuked by the FDA, Endo continued to market Opana ER as having been ***designed*** to be crush resistant, knowing that this would (falsely) imply that Opana actually ***was*** crush resistant and that this crush-resistant quality would make Opana ER less likely to be abused.

205

819. Endo's sales training and the promotional materials distributed by its sales representatives also minimized the risk of addiction. Endo also circulated education materials that minimized the risk of addiction. For example, Endo circulated an education pamphlet with the Endo logo titled "Living with Someone with Chronic Pain," which implied, to persons providing care to chronic pain patients, that addiction was not a substantial concern by stating that "[m]ost health care providers who treat people with pain agree that most people do not develop an addiction problem." This pamphlet was downloadable from Endo's website and accessible to City prescribers.

820. Endo's sales training also misrepresented the risks of addiction associated with Endo's products by implying that Opana's prolonged absorption would make it less likely to lead to abuse. For example, a presentation titled "Deliver the Difference for the Opana Brand in POA II" sets out that one of the "[k]ey [m]essages" for the Endo sales force was that Opana ER provides "[s]table, steady-state plasma levels for true 12-hour dosing that lasts." Endo's sales representatives used this messaging to imply to City prescribers that Opana ER provided "steady state" pain relief, making Opana less likely to incite euphoria in patients and less likely to lead to addiction.

821. Endo further instructed its sales force to promote the misleading concept of "pseudoaddiction,"—i.e., that drug-seeking behavior was not cause for alarm, but merely a manifestation of undertreated pain. In a sales training document titled "Understanding the Primary Care MD and their use of Opioids," Endo noted that the "biggest concerns" among primary care physicians were "prescription drug abuse (84.2%), addiction (74.9%), adverse effects (68%), tolerance (60.7%), and medication interaction (32%)." In response to these concerns, Endo instructed its sales representatives to ask whether their customers were "confus[ing] 'pseudo-addiction' with 'drug-seekers'" and how confident they were that their health care providers "know these differences (Tolerance, Dependence, Addiction, Pseudo- Addiction . . .)."

b) Endo's Sales Force Deceptively Implied that Chronic Opioid Therapy Would Improve Patients' Ability to Function.

822. In addition to their deceptive messages regarding addiction, Endo's promotional materials and sales trainings also misleadingly claimed that patients using opioids for the long- term treatment of chronic pain would experience improvements in their daily function. In reality, long-term opioid use has not been shown to, and does not, improve patients' function, and, in fact, is often accompanied by serious side effects that degrade function. Endo's own internal documents acknowledged that claims about improved quality of life were unsubstantiated "off label claims."

823. Nevertheless, Endo distributed product advertisements that suggested that using Opana ER to treat chronic pain would allow patients to perform demanding tasks like work as a chef. One such advertisement states prominently on the front: "Janice is a 46-year-old chef with chronic low back pain. She needs a treatment option with true 12-hour dosing." The advertisement does not mention the "moderate to severe pain" qualification in Opana ER's indication, except in the fine print. These advertisements were mailed to prescribers and distributed by Endo's sales force in detailing visits, which would have included Endo representatives' visits to prescribers.

824. In a 2007 sales tool that was intended to be shown by Endo sales personnel to physicians during their detailing visits, Endo highlighted a hypothetical patient named "Bill," a 40-year-old construction worker who was reported to suffer from chronic low back pain. According to the sales tool, Opana ER will make it more likely that Bill can return to work and support his family.

825. Similarly, training materials for sales representatives from March 2009 ask whether it is true or false that "[t]he side effects of opioids prevent a person from functioning and can cause more suffering than the pain itself." The materials indicate that this is "[f]alse" because "[t]he overall effect of treatment with opioids is very favorable in most cases."

826. A sales training video dated March 8, 2012 that Endo produced and used to train its sales force makes the same types of claims. A patient named Jeffery explains in the video that he suffers from chronic pain and that "chronic pain [ . . .] reduces your functional level." Jeffery claims that after taking Opana ER, he "can go out and do things" like attend his son's basketball game and "[t]here's no substitute for that." This video was shown to Endo's sales force, which adopted its misleading messaging in its nationwide sales approach, including the approach it used in the City of Rochester.

827. Claims of improved functionality were central to Endo's marketing efforts for years. A 2012 Endo Business Plan lists ways to position Opana ER, and among them is the claim that Opana ER will help patients "[m]aintain[] normal functionality, sleep, [and] work/life/performance productivity" and have a positive "[e]ffect on social relationships." Indeed, that business plan describes the "Opana ER Vision" as "[t]o make the Opana franchise (Opana ER, Opana, Opana Injection) the choice that maximizes improvement in functionality and freedom from the burden of moderate-to-severe pain."

c) Endo's Sales Force Deceptively presented the Risks and Benefits of Opioids to Make Them Appear Safer Than Other Analgesics

828. Endo further misled patients and prescribers by downplaying the risks of opioids in comparison to other pain relievers. For example, in the City of Rochester and elsewhere, Endo distributed a presentation titled *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*. This study held out as a representative example one patient who had taken NSAIDs for more than eight years and, as a result, developed "a massive upper gastrointestinal bleed." The presentation recommended treating this patient with opioids instead. By focusing on the adverse side effects of NSAIDs, while omitting discussion of serious side effects associated with opioids, this presentation misleadingly portrayed the comparative risks and benefits of these drugs.

208

829. Endo distributed *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain* to 116,000 prescribers in 2007, including primary care physicians.

ii. *Endo's Speakers Bureau Programs Deceptively Minimized the Risks of Addiction Associated with Chronic Opioid Therapy*

830. In addition to its sales representatives' visits to doctors, Endo also used deceptive science and speaker programs to spread its deceptive messages.

831. Endo leaned heavily on its speakers' bureau programs. In 2008 alone, Endo spent nearly $4 million to promote up to 1,000 speakers programs around the country. Endo contracted with a medical communications firm to operate its speakers bureau program, planning to hold a total of 500 "fee-for-service . . . peer-to-peer promotional programs" for Opana ER in just the second half of 2011, including dinners, lunches and breakfasts. These programs were attended by sales representatives, revealing their true purpose as marketing, rather than educational, events.

832. Endo's internal reporting stated that the "return on investment" turned positive 8-12 weeks after such programs. Endo measured that return on investment in numbers of prescriptions written by physicians who attended the events. One internal Endo document concluded: "[w]e looked at the data for [the] 2011 program and the results were absolutely clear: physicians who came into our speaker programs wrote more prescriptions for Opana ER after attending than they had before they participated. You can't argue with results like that."

833. These speakers' bureau presentations included the very same misrepresentations Endo disseminated through its sales representatives. A 2012 speaker slide deck for Opana ER— on which Endo's recruited speakers were trained and to which they were required to adhere to in their presentations—misrepresented that the drug had low abuse potential, in addition to suggesting that as many as one-quarter of the adult population could be candidates for opioid therapy.

834. In addition, a 2013 training module directed speakers to instruct prescribers that "OPANA ER with INTAC is the only oxymorphone designed to be crush resistant" and advised that "[t]he only way for your patients to receive oxymorphone ER in a formulation designed to be crush resistant is to prescribe OPANA ER with INTAC." This was a key point in distinguishing Opana ER from competitor drugs. Although Endo mentioned that generic versions of oxymorphone were available, it instructed speakers to stress that "[t]he generics are not designed to be crush resistant." This was particularly deceptive given that Opana ER was not actually crush-resistant.

835. In 2009, Endo wrote a talk titled *The Role of Opana ER in the Management of Chronic Pain*. The talk included a slide titled "Use of Opioids is Recommended for Moderate to Severe Chronic Noncancer Pain," which cited the AAPM/APS Guidelines—and their accompanying misstatements regarding the likelihood of addiction (by claiming that addiction risks were manageable regardless of patients' past abuse histories) while omitting their disclaimer regarding the lack of supporting evidence in favor of that position. This dangerously misrepresented to doctors the force and utility of the 2009 Guidelines.

836. The misleading messages and materials Endo provided to its sales force and its speakers were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, irrespective of the risks, benefits, and alternatives. This deception was national in scope and included the City of Rochester. Endo's nationwide messages would have reached City prescribers in a number of ways. For example, they were carried into the City of Rochester by Endo's sales representatives during detailing visits as well as made available to City patients and prescribers through websites and ads. They also have been delivered to City prescribers by Endo's paid speakers, who were required by Endo policy and by FDA regulations to stay true to Endo's nationwide messaging.

    iii.   *Endo's Misleading Journal Supplement*

210

837.   In 2007, Endo commissioned the writing, and paid for the publishing of a supplement available for CME credit in the Journal of Family Practice called Pain Management Dilemmas in Primary Care: Use of Opioids, and it deceptively minimized the risk of addiction by emphasizing the effectiveness of screening tools. Specifically, it recommended screening patients using tools like the Opioid Risk Tool or the Screener and Opioid Assessment for Patients with Pain. It also falsely claimed that, through the use of tools like toxicology screens, pill counts, and a "maximally structured approach," even patients at high risk of addiction could safely receive chronic opioid therapy. Endo distributed 96,000 copies of this CME nationwide, and it was available to, and was intended to, reach City prescribers.

iv.    *Endo's Deceptive Unbranded Advertising*

838.   Endo also used unbranded advertisements to advance its goals. By electing to focus on unbranded marketing, Endo was able to make claims about the benefits of its opioids that the FDA would never allow in its branded materials. The chart below compares an Endo unbranded statement with one of Endo's FDA-regulated, branded statements:

| Living with Someone with Chronic Pain (2009)(Unbranded) | Opana ER Advertisement (2011/2012/2013) (Branded) |
|---|---|
| Patient education material created by Endo | Endo advertisement |

211

| "Most health care providers who treat people with pain agree that **most people do not develop an addiction problem**." | "[C]ontains oxymorphone, an opioid agonist and Schedule II controlled substance with an abuse liability similar to other opioid agonists, legal or illicit." |
| | "All patients treated with opioids require careful monitoring for signs of abuse and addiction, since **use of opioid analgesic products carries the risk of addiction even under appropriate medical use**." |

### b. Endo's Deceptive Third-Party Statements

839. Endo's efforts were not limited to directly making misrepresentations through its marketing materials, its speakers, and its sales force. Endo believed that support for patient advocacy and professional organizations would reinforce Endo's position as "the pain management company."

840. Prior to, but in contemplation of, the 2006 launch of Opana ER, Endo developed a "Public Stakeholder Strategy." Endo identified "tier one" advocates to assist in promoting the approval and acceptance of its new extended release opioid. Endo also intended to enlist the support of organizations that would be "favorable" to schedule II opioids from a sales perspective and that engaged in, or had the potential to advocate for, public policy. Endo sought to develop its relationships with these organizations through its funding. In 2008, Endo spent $1 million per year to attend conventions of these pro-opioid medical societies, including meetings of AAPM, APS, and the American Society of Pain Management Nursing ("ASPMN").

841. APF's ability to influence professional societies and other third parties is demonstrated by its approach to responding to a citizens' petition filed with the FDA by the Physicians for Responsible Opioid Prescribing (the "PROP Petition"). The PROP petition, filed by a group of prescribers who had become concerned with the rampant prescribing of opioids to treat chronic

212

pain, asked the FDA to require dose and duration limitations on opioid use and to change the wording of the approved indication of various long-acting opioids to focus on the severity of the pain they are intended to treat.

842.    The PROP Petition set off a flurry of activity at Endo. It was understood that Endo would respond to the petition but Endo personnel wondered "[s]hould we [ . . . ] consider filing a direct response to this [citizens' petition] or do you think we are better served by working through our professional society affiliations?" One Endo employee responded: "My sense is the societies are better placed to make a medical case than Endo." Endo's Director of Medical Science agreed that "a reply from an external source would be most impactful." These communications reflected Endo's absolute confidence that the professional societies would support its position.

                    i.    *APF*

843.    One of the societies with which Endo worked most closely was APF. Endo provided substantial assistance to, and exercised editorial control, over the deceptive and misleading messages that APF conveyed through its National Initiative on Pain Control ("NIPC"). Endo was one of APF's biggest financial supporters, providing more than half of the $10 million APF received from opioid manufacturers during its lifespan. Endo spent $1.1 million on the NIPC program in 2008 alone, funding earmarked in part, for the creation of CME materials that were intended to be used repeatedly.

844.    Endo's influence over APF's activities was so pervasive that APF President Will Rowe reached out to Defendants—including Endo—rather than his own staff, to identify potential authors to answer a 2011 article critical of opioids that had been published in the Archives of Internal Medicine. Personnel from Defendants Purdue, Endo, Janssen, and Cephalon worked with Rowe to formulate APF's response which was ultimately published.

845. Documents also indicate that Endo personnel were given advance notice of the materials APF planned to publish on its website and provided an opportunity to comment on the content of those materials before they were published. For example, in early July of 2009, APF's Director of Strategic Development wrote to Endo personnel to give them advance notice of content that APF planned to be "putting . . . up on the website but it's not up yet." The Endo employee assured the sender that she "w[ould] not forward it to anyone at all" and promised that she would "'double delete it' from [her] inbox." In response, APF's Director of Strategic Development replied internally with only four words: "And where's the money?"

846. At no time was Endo's relationship with APF closer than during its sponsorship of the NIPC. Before being taken over by APF, the NIPC was sponsored by Professional Postgraduate Services which the Accreditation Council for Continuing Medical Education determined to be a "commercial interest" and could no longer serve as a sponsor. In response, Endo reached out to APF. An August 2009 document titled "A Proposal for the American Pain Foundation to Assume Sponsorship of the National Initiative on Pain Control," pointed out that "[f]or the past 9 years, the NIPC has been supported by unrestricted annual grants from Endo Pharmaceuticals, Inc." According to this document, APF's sponsorship of the NIPC "[o]ffers the APF a likely opportunity to generate new revenue, as Endo has earmarked substantial funding: $1.2 million in net revenue for 2010 to continue the NIPC." Further, sponsorship of the APF would "[p]rovide[] numerous synergies to disseminate patient education materials," including "[h]andouts to attendees at all live events to encourage physicians to drive their patients to a trusted source for pain education—the APF website."

847. A September 14, 2009 presentation to APF's board contained a materially similar discussion of NIPC sponsorship, emphasizing the financial benefit to APF from assuming the role of administering NIPC. The proposal "offer[ed] a solution to continue the development and

214

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 255 of 1171. PageID #: 705574

implementation of the NIPC initiative as non-certified . . . yet independent education to physicians and healthcare professionals in the primary care setting, while providing the APF with a dependable, ongoing source of grant revenue." A number of benefits related to NIPC sponsorship were listed, but chief among them was "a likely opportunity [for APF] to generate new revenue, as Endo has earmarked substantial funding: $1.2 million in net revenue for 2010 to continue the NIPC."

848.    Internal Endo scheduling documents indicate that "NIPC module curriculum development, web posting, and live regional interactive workshops" were Endo promotional tasks in 2010. Endo emails indicate that Endo personnel reviewed the content created by NIPC and provided feedback.

849.    Behind the scenes, Endo exercised substantial control over NIPC's work. Endo exerted its control over NIPC by funding NIPC and APF projects; developing, specifying, and reviewing content; and taking a substantial role in the distribution of NIPC and APF materials, which in effect determined which messages were actually delivered to prescribers and consumers. As described below, Endo projected that it would be able to reach tens of thousands of prescribers nationwide through the distribution of NIPC materials.

850.    From 2007 until at least 2011, Endo also meticulously tracked the distribution of NIPC materials, demonstrating Endo's commercial interest in, and access to, NIPC's reach. Endo knew exactly how many participants viewed NIPC webinars and workshops and visited its website, Painknowledge.com. Endo not only knew how many people viewed NIPC's content, but what their backgrounds were (e.g., primary care physicians or neurologists). Endo's access to and detailed understanding of the composition of the audience at these events demonstrates how deeply Endo was involved in NIPC's activities. Moreover, Endo tracked the activities of NIPC—ostensibly a third party—just as it tracked its own commercial activity.

851.    Endo worked diligently to ensure that the NIPC materials it helped to develop would have the broadest possible distribution. Endo's 2008 to 2012 Opana Brand Tactical Plan indicates that it sought to reach 1,000 prescribers in 2008 through live NIPC events, and also to "[l]everage live programs via enduring materials and web posting." Endo also planned to disseminate NIPC's work by distributing two accredited newsletters to 60,000 doctors nationwide for continuing education credit and by sponsoring a series of 18 NIPC regional case-based interactive workshops. Endo had earmarked more than one million dollars for NIPC activities in 2008 alone.

852.    In short, NIPC was a key piece of Endo's marketing strategy. Indeed, internal APF emails question whether it was worthwhile for APF to continue operating NIPC given that NIPC's work was producing far more financial benefits for Endo than for APF. Specifically, after Endo approved a $244,337.40 grant request to APF to fund a series of NIPC eNewsletters, APF personnel viewed it as "[g]reat news," but cautioned that "the more I think about this whole thing, [Endo's] making a lot of money on this with still pretty slender margins on [APF's] end." APF's commitment to NIPC's "educational" mission did not figure at all in APF's consideration of the value of its work, nor was Endo's motive or benefit in doubt.

a)    Misleading Medical Education

853.    NIPC distributed a series of eNewsletter CMEs focused on "key topic[s] surrounding the use of opioid therapy" sponsored by Endo. These newsletters were edited by KOL Dr. Fine and listed several industry-backed KOLs, including Dr. Webster, as individual authors. Endo estimated that roughly 60,000 prescribers viewed each one. These CMEs were available to, and would have been accessed by, City prescribers. Before-and-after surveys, summarized in the chart below, showed that prescriber comfort with prescribing opioids ranged from 27% to 62% before exposure to the CME, and from 76% to 92% afterwards:

| Topic | Comfort level *prior* to reading the article | Comfort level *after* reading the article |
|---|---|---|
| Patient Selection and Initiation of Opioid Therapy as a Component of Pain Treatment | 47% | 87% |
| Informed Consent and Management Plans to Optimize Opioid Therapy for Chronic Pain | 48% | 81% |
| Risk Stratification and Evaluation of High-Risk Behaviors for Chronic Opioid Therapy | 28% | 76% |
| Integration of Nonpharmacologic and Multidisciplinary Therapies Into the Opioid Treatment Plan | 42% | 85% |
| Addressing Patients' Concerns Associated With Chronic Pain Treatment and Opioid Use | 62% | 92% |
| Opioid Therapy in Patients With a History of Substance Use Disorders | 35% | 85% |
| Urine Drug Testing: An Underused Tool | 54% | 86% |
| Appropriate Documentation of Opioid Therapy: The Emergence of the 4As and Trust and Verify as the Paradigm | 44% | 86% |
| Opioid Rotation | 27% | 92% |
| Discontinuing Opioid Therapy: Developing and Implementing an "Exit Strategy" | 37% | 90% |

854. Endo documents made it clear that the persuasive power of NIPC speakers was directly proportional to their perceived objectivity. Accordingly, Endo personnel directed that, when giving Endo-sponsored talks, NIPC faculty would not appear to be "Endo Speakers." Nevertheless, the two parties understood that Endo and NIPC shared a common "mission to educate physicians" and working "through the APF . . . [wa]s a great way to work out . . . problems that could have been there without the APF's participation and support."

855. The materials made available on and through NIPC included misrepresentations. For example, Endo worked with NIPC to sponsor a series of CMEs titled *Persistent Pain in the Older Patient* and *Persistent Pain in the Older Adult*. These CMEs misrepresented the prevalence of addiction by stating that opioids have "possibly less potential for abuse" in elderly patients than in younger patients, even though there is no evidence to support such an assertion. Moreover, whereas withdrawal symptoms are always a factor in discontinuing long-term opioid therapy, *Persistent Pain in the Older Adult* also misleadingly indicated that such symptoms can be avoided entirely by tapering the patient's does by

217

10-20% per day for ten days. *Persistent Pain in the Older Patient*, for its part, made misleading claims that opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." NIPC webcast these CMEs from its own website, where they were available to, and were intended to reach, City prescribers.

b) *Painknowledge.com*

856. Working with NIPC enabled Endo to make a number of misleading statements through the NIPC's website, *Painknowledge.com*. Endo tracked visitors to *PainKnowledge.com* and used *Painknowledge.com* to broadcast notifications about additional NIPC programming that Endo helped to create.

857. APF made a grant request to Endo to create an online opioid "tool-kit" for NIPC and to promote NIPC's website, *Painknowledge.com*. In so doing, APF made clear that it planned to disseminate Defendants' misleading messaging. The grant request expressly indicated APF's intent to make misleading claims about functionality, noting: "Some of these people [in chronic pain] may be potential candidates for opioid analgesics, which can improve pain, function, and quality of life." Endo provided $747,517 to fund the project.

858. True to APF's word, *Painknowledge.com* misrepresented that opioid therapy for chronic pain would lead to improvements in patients' ability to function. Specifically, in 2009 the website instructed patients and prescribers that, with opioids, a patient's "level of function should improve" and that patients "may find [they] are now able to participate in activities of daily living, such as work and hobbies, that [they] were not able to enjoy when [their] pain was worse."

859. *Painknowledge.com* also deceptively minimized the risk of addiction by claiming that "[p]eople who take opioids as prescribed usually do not become addicted." *Painknowledge.com* did not stop there. It deceptively portrayed opioids as safe at high doses and also misleadingly omitted

218

serious risks, including the risks of addiction and death, from its description of the risks associated with the use of opioids to treat chronic pain.

860.  Endo was the sole funder of Painknowledge.com, and it continued to provide that funding despite being aware of the website's misleading contents.

### c)  *Exit Wounds*

861.  Finally, Endo also sponsored APF's publication and distribution of *Exit Wounds*, a publication aimed at veterans that also contained a number of misleading statements about the risks, benefits, and superiority of opioids to treat chronic pain. *Exit Wounds* was drafted by Derek Mcginnis." Derek Mcginnis was frequently hired by a consulting Firm, Conrad & Associates LLC, to write pro-opioid marketing pieces disguised as science. Derek Mcginnis's work was reviewed and approved by drug company representatives, and he felt compelled to draft pieces that he admits distorted the risks and benefits of chronic opioid therapy in order to meet the demands of his drug company sponsors.

862.  *Exit Wounds* is a textbook example of Derek Mcginnis's authorship on drug companies' behalf. The book misrepresented the functional benefits of opioids by stating that opioid medications "*increase* your level of functioning" (emphasis in original).

863.  *Exit Wounds* also misrepresented that the risk of addiction associated with the use of opioids to treat chronic pain was low. It claimed that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications."

864.  Finally, *Exit Wounds* misrepresented the safety profile of using opioids to treat chronic pain by omitting key risks associated with their use. Specifically, it omitted warnings of the risk of interactions between opioids and benzodiazepines—a warning sufficiently important to be included on Endo's FDA-required labels. *Exit Wounds* also contained a lengthy discussion of the dangers of

using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids—a particular risk for veterans.

865.   As outlined above, Endo exercised dominance over APF and the projects it undertook in an effort to promote the use of opioids to treat chronic pain. In addition, as outlined above, Derek Mcginnis's work was being reviewed and approved by drug company representatives, motivating him to draft pro-opioid propaganda masquerading as science. Combined, these factors gave Endo considerable influence over the work of Derek Mcginnis and over APF. Further, by paying to distribute *Exit Wounds*, Endo endorsed and approved its contents.

ii.   *Other Front Groups: FSMB, AAPM, and AGS*

866.   In addition to its involvement with APF, Endo worked closely with other third-party Front Groups and KOLs to disseminate deceptive messages regarding the risks, benefits, and superiority of opioids for the treatment of chronic pain. As with certain APF publications, Endo in some instances used its sales force to directly distribute certain publications by these Front Groups and KOLs, making those publications "labeling" within the meaning of 21 C.F.R.§ 1.3(a).

867.   In 2007, Endo sponsored FSMB's *Responsible Opioid Prescribing*, which in various ways deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain. *Responsible Opioid Prescribing* was drafted by "Dr. Fishman."

868.   Endo spent $246,620 to help FSMB distribute *Responsible Opioid Prescribing*. Endo approved this book for distribution by its sales force. Based on the uniform and nationwide character of Endo's marketing campaign, and the fact that Endo purchased these copies specifically to distribute them, these copies were distributed to physicians nationwide, including physicians in the City of Rochester.

869.   In December 2009, Endo also contracted with AGS to create a CME to promote the 2009 guidelines titled the *Pharmacological Management of Persistent Pain in Older Persons* with a $44,850

220

donation. These guidelines misleadingly claimed that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse," as the study supporting this assertion did not analyze addiction rates by age. They also stated, falsely, that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy (low quality of evidence, strong recommendation)" when in reality, opioid therapy was only an appropriate treatment for a subset of those patients, as recognized by Endo's FDA-mandated labels.

870.   AGS's grant request to Endo made explicit reference to the CME that Endo was funding. Endo thus knew full well what content it was paying to distribute, and was in a position to evaluate that content to ensure it was accurate, substantiated, and balanced before deciding whether or not to invest in it. After having sponsored the AGS CME, Endo's internal documents indicate that Endo's pharmaceutical sales representatives discussed the AGS guidelines with doctors during individual sales visits.

871.   Endo also worked with AAPM, which it viewed internally as "Industry Friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications.

872.   A talk written by Endo in 2009 and approved by Endo's Medical Affairs Review Committee,[157] titled *The Role of Opana ER in the Management of Chronic Pain,* includes a slide titled *Use of Opioids is Recommended for Moderate to Severe Chronic Noncancer Pain.* That slide cites the AAPM/APS Guidelines, which contain a number of misstatements and omits their disclaimer regarding the lack of supporting evidence.  This talk dangerously misrepresented to doctors the force and utility of the 2009

---

[157] Although they were given slightly different names by each Defendant, each Defendant employed a committee that could review and approve materials for distribution. These committees included representatives from all relevant departments within Defendants' organizations, including the legal, compliance, medical affairs, and marketing departments. The task of these review committees was to scrutinize the marketing materials Defendants planned to distribute and to ensure that those materials were scientifically accurate and legally sound. Tellingly, these committees were called to review only materials that created a potential compliance issue for the company, an implicit recognition by defendants that they ultimately would be responsible for the content under review.

Guidelines. Furthermore, Endo's internal documents indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

### iii.    *Key Opinion Leaders and Misleading Science*

873.   Endo also sought to promote opioids for the treatment of chronic pain through the use of key opinion leaders and biased, misleading science.

874.   Endo's 2010 publication plan for Opana ER identified a corporate goal of making Opana ER the second-leading branded product for the treatment of moderate-to-severe chronic pain (after OxyContin). Endo sought to achieve that goal by providing "clinical evidence for the use of Opana ER in chronic low back pain and osteoarthritis," and subsequently successfully had articles on this topic published.[158]

875.   In the years that followed, Endo sponsored articles authored by Endo consultants and Endo employees, which argued that the metabolic pathways utilized by Opana ER, compared with other opioids, were less likely to result in drug interactions in elderly low back and osteoarthritis pain patients. In 2010, Endo directed its publication manager to reach out to a list of consultants conducting an ongoing Endo-funded study, to assess their willingness to respond to an article[159] that Endo believed emphasized the risk of death from opioids, "without [] fair balance."[160]

876.   Endo's reliance on flawed, biased research is also evident in its 2012 marketing materials and strategic plans. A 2012 Opana ER slide deck for Endo's speakers bureaus—on which these recruited physician speakers were trained and to which they were required to adhere—

---

[158] These studies suffered from the limitations common to the opioid literature—and worse. None of the comparison trials lasted longer than three weeks. Endo also commissioned a six-month, open label trial during which a full quarter of the patients failed to find a stable dose, and 17% of patients discontinued, citing intolerable effects. In open label trials, subjects know which drug they are taking; such trials are not as rigorous as double-blind, controlled studies in which neither the patients nor the examiners know which drugs the patients are taking.

[159] Susan Okie, *A Flood of Opioids, a Rising Tide of Deaths*, 363 New Engl. J. Med. 1981 (2010), finding that opioid overdose deaths and opioid prescriptions both increased by roughly 10-fold from 1990 to 2007.

[160] Endo did manage to get a letter written by three of those researchers, which was not published.

222

misrepresented that the drug had low abuse potential and suggested that as many as one-quarter of the adult population could be candidates for opioid therapy. Although the FDA requires such speaker slide decks to reflect a "fair balance" of information on benefits and risks, Endo's slides reflected one-sided and deeply biased information. The presentation's 28 literature citations were largely to "data on file" with the company, posters, and research funded by, or otherwise connected to, Endo. Endo's speakers relayed the information in these slides to audiences that were unaware of the skewed science on which the information was based.

877.   A 2012 Opana ER Strategic Platform Review suffered from similar defects. Only a small number of the endnote referenced in the document, which it cited to indicate "no gap" in scientific evidence for particular claims, were to national-level journals. Many were published in lesser or dated journals, and written or directly financially supported by opioid manufacturers. Where the strategy document did cite independent, peer-reviewed research, it did so out of context. For example, it cited a 2008 review article on opioid efficacy for several claims, including that "treatment of chronic pain reduces pain and improves functionality," but it ignored the article's overall focus on the lack of consistent effectiveness of opioids in reducing pain and improving functional status.[161]

878.   Notwithstanding Endo's reliance upon dubious or cherry-picked science, in an Opana ER brand strategy plan it internally acknowledged the continuing need for a significant investment in clinical data to support comparative effectiveness. Endo also cited a lack of "head-to-head data" as a barrier to greater share acquisition, and the "lack of differentiation data" as a challenge to addressing the "#1 Key Issue" of product differentiation. This acknowledged lack of support did not stop Endo from directing its sales representatives to tell prescribers that its drugs were less likely to be abused or be addictive than other opioids.

---

[161] Andrea M. Trescot et al., Opioids in the management of non-cancer pain: an Update of American Society of the Interventional Pain Physicians, Pain Physician 2008 Opioids Special Issue, 11:S5-S62.

879.   Endo also worked with various KOLs to disseminate various misleading statements about chronic opioid therapy. For example, Endo distributed a patient education pamphlet edited by KOL Dr. Russell Portenoy titled *Understanding your Pain: Taking Oral Opioid Analgesics*. This pamphlet deceptively minimized the risks of addiction by stating that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems," implying that patients who are taking opioids for pain are not at risk of addiction.

880.   *Understanding your Pain: Taking Oral Opioid Analgesics* also misleadingly omitted any description of the increased risks posed by higher doses of opioid medication. Instead, in a Q&A format, the pamphlet asked "[i]f I take the opioid now, will it work later when I really need it?" and responded that "[t]he dose can be increased... [y]ou won't 'run out' of pain relief."

881.   Dr. Portenoy received research support, consulting fees, and honoraria from Endo for editing *Understanding Your Pain* and other projects.

882.   *Understanding Your Pain* was available on Endo's website during the time period of this Complaint and was intended to reach City prescribers.

883.   Endo similarly distributed a book written by Dr. Lynn Webster titled Avoiding *Opioid Abuse While Managing Pain*, which stated that in the face of signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response."

884.   A slide from an Opana ER business plan contemplated distribution of the book as part of Endo's efforts to "[i]ncrease the breadth and depth of the OPANA ER prescriber base via targeted promotion and educational programs." The slide indicates that the book would be particularly effective "for [the] PCP audience" and instructed "[s]ales representatives [to] deliver[ the book] to participating health care professionals." The slide, shown below, demonstrates Endo's express incorporation of this book by a KOL into its marketing strategy:

224



885.   Endo Documents indicate that, around 2007, the company purchased at least 50,000 copies of the book for distribution. Internal Endo documents Demonstrate that the book had been approved for distribution by Endo's sales force, and that Endo had fewer than 8,000 copies on hand in March of 2013. Based on the nationwide and uniform character of Endo's marketing, and the book's approval for distribution, this book was available to and was intended to reach prescribers.

c.   Endo's Deceptive Statements to City prescribers and Patients

886.   Endo also directed the dissemination of the misstatements described above to City patients and prescribers, including through its sales force, speakers bureaus, CMEs, and the *Painknowledge.com* website.

887.   Consistent with their training, Endo's sales representatives delivered all of these deceptive messages to City prescribers.

888.   Endo also directed misleading marketing to City prescribers and patients through the APF/NIPC materials it sponsored, reviewed, and approved. For example, Endo hired a New York-based KOL to deliver a CME titled *Managing Persistent Pain in the Older Patient* on April 27, 2010. As described above, this CME misrepresented the prevalence of addiction in older patients and made

225

INDEX NO. E2019005178
RECEIVED NYSCEF: 06/05/2019

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 266 of 1171. PageID #: 705585

misleading claims that chronic opioid therapy would improve patients' ability to function. An email invitation to the event and other NIPC programs was sent to "all healthcare professionals" in APF's database.

889.   The significant response to *Painknowledge.com* also indicates that those websites were viewed by City prescribers, who were exposed to the site's misleading information regarding the effect of opioids on patients' ability to function and the deceptive portrayal of the risks of opioids. As of September 14, 2010, *Painknowledge.com* had 10,426 registrants, 86,881 visits, 60,010 visitors, and 364,241 page views. Upon information and belief, based on the site's nationwide availability, among the site's visitors were City patients and prescribers who were exposed to the site's misleading information regarding the effect of opioids on patients' ability to function and the deceptive portrayal of the risks of opioids.

890.   Endo knew that the harms from its deceptive marketing would be felt in the City of Rochester. It saw workers' compensation programs as a lucrative opportunity, and it promoted the use of opioids for chronic pain arising from work-related injuries, like chronic lower back pain. Endo developed plans to "[d]rive demand for access through the employer audience by highlighting cost of disease and productivity loss in those with pain; [with a] specific focus on high-risk employers and employees." In 2007, Endo planned to reach 5,000 workers' compensation carriers to ensure that Opana ER would be covered under disability insurance plans. Endo knew or should have known that claims for its opioids would be paid for by the City's workers' compensation program.

**4.  Janssen**

891.   Janssen promoted its branded opioids, including Duragesic, Nucynta, and Nucynta ER, through its sales representatives and a particularly active speakers program. Deceptive messages regarding low addiction risk and low prevalence of withdrawal symptoms were a foundation of this

226

marketing campaign. Janssen also conveyed other misrepresentations including that its opioids could safely be prescribed at higher doses and were safer than alternatives such as NSAIDs.

892.   Janssen supplemented these efforts with its own unbranded website, as well as third-party publications and a Front Group website, to promote opioids for the treatment of chronic pain. These materials likewise made deceptive claims about addiction risk, safety at higher doses, and the safety of alternative treatments. They also claimed that opioid treatment would result in functional improvement, and further masked the risk of addiction by promoting the concept of pseudoaddiction.

893.   Based on the highly coordinated and uniform nature of Janssen's marketing, Janssen conveyed these deceptive messages to City prescribers. The materials that Janssen generated in collaboration with third-parties also were distributed or made available in the City of Rochester. Janssen distributed these messages, or facilitated their distribution, in the City of Rochester with the intent that City prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

### a.   Janssen's Deceptive Direct Marketing

894.   Janssen joined the other Defendants in propagating deceptive branded marketing that falsely minimized the risks and overstated the benefits associated with the long-term use of opioids to treat chronic pain. Like the other Defendants, Janssen sales representatives visited targeted physicians to deliver sales messages that were developed centrally and deployed identically across the country. These sales representatives were critical in transmitting Janssen's marketing strategies and talking points to individual prescribers. In 2011, at the peak of its effort to promote Nucynta ER, Janssen spent more than $90 million on detailing.

895.   Janssen's designs to increase sales through deceptive marketing are apparent on the face of its marketing plans. For example, although Janssen knew that there was no credible scientific

227

evidence establishing that addiction rates were low among patients who used opioids to treat chronic

pain, its Nucynta Business Plans indicated that one of the "drivers" to sell more Nucynta among

primary care physicians was the "[l]ow perceived addiction and/or abuse potential" associated with

the drug. However, there is no evidence that Nucynta is any less addictive or prone to abuse than

other opioids, or that the risk of addiction or abuse is low. Similarly, Janssen knew that there were

severe symptoms associated with opioid withdrawal including, severe anxiety, nausea, vomiting,

hallucinations, and delirium, but Janssen touted the ease with which patients could come off opioids.

i.   *Janssen's Deceptive Sales Training*

896.   Janssen's sales force was compensated based on the number of Nucynta prescriptions

written in each sales representative's territory. Janssen encouraged these sales representatives to

maximize sales of Nucynta and meet their sales targets by relying on the false and misleading

statements described above.

897.   For example, Janssen's sales force was trained to trivialize addiction risk. A June 2009

Nucynta training module warns that physicians are reluctant to prescribe controlled substances like

Nucynta because of their fear of addicting patients, but this reluctance is unfounded because "the

risks . . . are [actually] much smaller than commonly believed." Janssen also encouraged its sales

force to misrepresent the prevalence of withdrawal symptoms associated with Nucynta. A Janssen

sales training PowerPoint titled "Selling Nucynta ER and Nucynta" indicates that the "low incidence

of opioid withdrawal symptoms" is a "core message" for its sales force. The message was touted at

Janssen's Pain District Hub Meetings, in which Janssen periodically gathered its sales force

personnel to discuss sales strategy.

898.   This "core message" of a lack of withdrawal symptoms runs throughout Janssen's

sales training materials. For example, Janssen's "Licensed to Sell" Facilitator's Guide instructs those

conducting Janssen sales trainings to evaluate trainees, in part, on whether they remembered that

228

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 269 of 1171. PageID #: 705588

"[w]ithdrawal symptoms after abrupt cessation of treatment with NUCYNTA ER were mild or moderate in nature, occurring in 11.8% and 2% of patients, respectively" and whether they were able to "accurately convey" this "core message." Janssen further claimed in 2008 that "low incidence of opioid withdrawal symptoms" was an advantage of the tapentadol molecule.

899.   Similarly, a Nucynta Clinical Studies Facilitator's Guide instructs individuals training Janssen's sales representatives to ask trainees to describe a "key point"—that "83% of patients reported no withdrawal symptoms after abruptly stopping treatment without initiating alternative therapy"—"as though he/she is discussing it with a physician."

900.   This misrepresentation regarding withdrawal was one of the key messages Janssen imparted to employees in the "Retail ST 101 Training" delivered to Nucynta sales representatives.

901.   Indeed, training modules between 2009 and 2011 instruct training attendees that "most patients [who discontinued taking Nucynta] experienced no withdrawal symptoms" and "[n]o patients experienced moderately severe or severe withdrawal symptoms."

902.   During the very time Janssen was instructing its sales force to trivialize the risks of addiction and withdrawal associated with the use of Nucynta to treat chronic pain, it knew or should have known, that significant numbers of patients using opioids to treat chronic pain experienced issues with addiction. Janssen knew or should have known that its studies on withdrawal were flawed and created a misleading impression of the rate of withdrawal symptoms and, as a result, the risk of addiction.

903.   The misleading messages and materials Janssen provided to its sales force were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, irrespective of the risks, benefits, and alternatives. This deception was national in scope and included the City of Rochester. Janssen's nationwide messages reached City prescribers in a number of ways, including through its sales force in detailing visits, as well as through websites and ads. They were also

delivered to City prescribers by Janssen's paid speakers, who were required by Janssen policy and by FDA regulations to stay true to Janssen's nationwide messaging.

        ii.    *Janssen's Deceptive Speakers Bureau Programs*

904.    Janssen did not stop at disseminating its misleading messages regarding chronic opioid therapy through its sales force. It also hired speakers to promote its drugs and trained them to make the very same misrepresentations made by its sales representatives.

905.    Janssen's speakers worked from slide decks—which they were required to present—reflecting the deceptive information about the risks, benefits, and superiority of opioids outlined above. For example, a March 2011 speaker's presentation titled *A New Perspective For Moderate to Severe Acute Pain Relief: A Focus on the Balance of Efficacy and Tolerability* set out the following adverse events associated with use of Nucynta: nausea, vomiting, constipation, diarrhea, dizziness, headache, anxiety, restlessness, insomnia, myalgia, and bone pain. It completely omitted the risks of misuse, abuse, addiction, hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, and other known, serious risks associated with chronic opioid therapy. The presentation also minimized the risks of withdrawal by stating that "more than 82% of subjects treated with tapentadol IR reported no opioid withdrawal symptoms."

906.    An August 2011 speaker presentation titled *New Perspectives in the Management of Moderate to Severe Chronic Pain* contained the same misleading discussion of the risks associated with chronic opioid therapy. It similarly minimized the risks of withdrawal by reporting that 86% of patients who stopped taking Nucynta ER "abruptly without initiating alternative opioid therapy" reported no withdrawal symptoms whatsoever. The same deceptive claims regarding risks of adverse events and withdrawal appeared in a July 2012 speaker's presentation titled *Powerful Pain Management: Proven Across Multiple Acute and Chronic Pain Models.*

230

907. These speakers presentations were part of Janssen's nationwide marketing efforts. Upon information and belief, a number of these events were available to and were intended to reach prescribers in the City of Rochester.

### iii. *Janssen's Deceptive Unbranded Advertising*

908. Janssen was aware that its branded advertisements and speakers programs would face regulatory scrutiny that would not apply to its unbranded materials, so Janssen also engaged in direct, unbranded marketing.

909. One such unbranded project was Janssen's creation and maintenance of *Prescriberesponsibly.com* (last updated July 2, 2015), a website aimed at prescribers and patients that claims that concerns about opioid addiction are "overstated." A disclaimer at the bottom of the website states that the "site is published by Janssen Pharmaceuticals, Inc., which is solely responsible for its content." This website was available to and intended to reach City prescribers and patients.

### b. Janssen's Deceptive Third-Party Statements

910. Janssen's efforts were not limited to directly making misrepresentations through its sales force, speakers' bureau, and website. To avoid regulatory constraints and give its efforts an appearance of independence and objectivity, Janssen obscured its involvement in certain marketing activities by "collaborat[ing] with key patient advocacy organizations" to release misleading information about opioids.

### i. *AAPM and AGS – Finding Relief: Pain Management for Older Adults*

911. Janssen worked with AAPM and AGS to create a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009). In doing so, Janssen contracted with a medical publishing firm, Conrad & Associates, LLC. The content was drafted by a writer ("Medical Writer X") hired by Conrad & Associates and funded by Janssen. These materials were reviewed, in detail,

231

by Janssen's medical-legal review team, which conducted detailed reviews and gave him editorial feedback on his drafts, which was adopted in the published version.

912. Medical Writer X understood, without being explicitly told, that since his work was funded and reviewed by Janssen, the materials he was writing should aim to promote the sale of more drugs by overcoming the reluctance to prescribe or use opioids to treat chronic pain. He knew that the publication was undertaken in connection with the launch of a new drug and was part of its promotional effort. Medical Writer X knew of the drug company's sponsorship of the publication, and he would go to the company's website to learn about the drug being promoted. He also knew that his clients—including Janssen—would be most satisfied with his work if he emphasized that: (a) even when used long-term, opioids are safe and the risk of addiction is low; (b) opioids are effective for chronic pain; and (c) opioids are under-prescribed because doctors are hesitant, confused, or face other barriers.[162]

913. *Finding Relief* is rife with the deceptive content. *Finding Relief* misrepresents that opioids increase function by featuring a man playing golf on the cover and listing examples of expected functional improvement from opioids, like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs. The guide states as a "fact" that "opioids may make it *easier* for people to live normally" (emphasis in the original). The functional claims contained in *Finding Relief* are textbook examples of Defendants' use of third parties to disseminate messages the FDA would not allow them to say themselves. Compare, e.g.:

---

[162] Medical Writer X now acknowledges that the lists of adverse effects from chronic opioid use in the publications he authored, which excluded respiratory depression, overdose, and death and minimized addiction, were, "ridiculous" and "prime examples" of leaving out facts that the pharmaceutical company sponsors and KOLs knew at the time were true. His writings repeatedly described the risk of addiction as low. Medical Writer X stated that he understood that the goal was to promote opioids and, as a result, discussing addiction would be "counterproductive."

| Branded Advertisement That Triggers an FDA Warning Letter (2008)[163] |
| --- |
| Improvement in Daily Activities Includes:<br>• Walking on a flat surface<br>• Standing or sitting<br>• Climbing stairs<br>• Getting in and out of bed or bath<br>• Ability to perform domestic duties |

with:

| Seemingly Independent Publication: "Finding Relief: Pain Management for Older Adults" (Final Authority, Janssen 2009): |
| --- |
| Your recovery will be measured by how well you reach functional goals such as<br>• Sleeping without waking from pain<br>• Walking more, or with less pain<br>• Climbing stairs with less pain<br>• Returning to work<br>• Enjoying recreational activities<br>• Having sex<br>• Sleeping in your own bed |

914. *Finding Relief* also trivialized the risks of addiction describing as a "myth" that opioids are addictive, and asserting as fact that "[m]any studies show that opioids are *rarely* addictive when used properly for the management of chronic pain."

915. *Finding Relief* further misrepresented that opioids were safe at high doses by listing dose limitations as "disadvantages" of other pain medicines and omitting any discussion of risks from increased doses of opioids. The publication also falsely claimed that it is a "myth" that "opioid doses have to be bigger over time."

---

[163] This advertisement drew an FDA Warning Letter dated March 24, 2008. Though the advertisement was by drug company King, it is used here to demonstrate the types of claims that the FDA regarded as unsupported.

233

916.    Finally, *Finding Relief* deceptively overstated the risks associated with alternative forms of treatment. It juxtaposed the advantages and disadvantages of NSAIDs on one page, with the "myths/facts" of opioids on the facing page. The disadvantages of NSAIDs are described as involving "stomach upset or bleeding," "kidney or liver damage if taken at high doses or for a long time," "adverse reactions in people with asthma," and "increase[d] . . .risk of heart attack and stroke." Conversely, the only adverse effects of opioids listed by *Finding Relief* are "upset stomach or sleepiness," which the brochure claims will go away, and constipation. The guide never mentions addiction, overdose, abuse, or other serious side effects of opioids.

917.    Janssen was not merely a passive sponsor of *Finding Relief*. Instead, Janssen exercised control over its content and provided substantial assistance to AGS and AAPM to distribute it. A "Copy Review Approval Form" dated October 22, 2008 indicates that key personnel from Janssen's Advertising & Promotion, Legal, Health Care Compliance, Medical Affairs, Medical Communications, and Regulatory Departments reviewed and approved *Finding Relief*. All six Janssen personnel approving the publication checked the box on the approval form indicating that *Finding Relief* was "Approved With Changes." After the publication was modified at the behest of Janssen personnel, Janssen paid to have its sales force distribute 50,000 copies of *Finding Relief* throughout the nation. Thus, *Finding Relief* is considered labeling for Janssen's opioids within the meaning of 21 C.F.R. § 1.3(a).

918.    AAPM purchased and distributed copies of *Finding Relief* to all of its members, including those who reside in the City of Rochester.

919.    *Finding Relief's* author, Medical Writer X, later said it was clear, from his position at the intersection of science and marketing, that the money paid by drug companies to the KOLs and professional and patient organizations with which he worked, distorted the information provided to doctors and patients regarding opioids. The money behind these and many other "educational"

efforts also, he believes, led to a widespread lack of skepticism on the part of leading physicians about the hazards of opioids. It also led these physicians to accept, without adequate scrutiny, published studies that, while being cited to support the safety of opioids, were, in fact, of such poor methodological quality that they would not normally be accepted as adequate scientific evidence.

ii.    *AGS – Misleading Medical Education*

920.   Janssen also worked with AGS on another project—AGS's CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. These guidelines falsely claimed that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse" although the study supporting this assertion did not analyze addiction rates by age. They also stated falsely, that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy (low quality of evidence, strong recommendation)." Based on Janssen's control over AGS's *Finding Relief*, Janssen also would have exercised control over this project as well.

iii.   *APF*

921.   Janssen also worked with APF to carry out its deceptive marketing campaign. Documents obtained from one of Janssen's public relations firms, Ketchum, indicate that Janssen and the firm enlisted APF as part of an effort to "draft media materials and execute [a] launch plan" for Janssen's drugs at an upcoming meeting of the AAPM. Janssen also drew on APF publications to corroborate claims in its own marketing materials and its sales training. Janssen personnel participated in a March 2011 call with APF's "Corporate Roundtable," in which they worked with APF and drug company personnel to develop strategies to promote chronic opioid therapy. APF personnel spoke with Janssen employees who "shar[ed] expertise from within their company for [a] public awareness campaign."

922.   Their joint work on the "Corporate Roundtable" demonstrates the close collaboration between Janssen and APF in promoting opioids for the treatment of chronic pain. APF President

235

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM    Index #: E2019005178

NYSCEF DOC. NO. 2    Case: 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  276 of 1171.  PageID #: 705595    RECEIVED NYSCEF: 06/05/2019

Will Rowe also reached out to Defendants—including Janssen— rather than his own staff, to identify potential authors to answer a 2011 article critical of opioids that had been published in the Archives of Internal Medicine. Additional examples of APF's collaboration with Janssen are laid out below:

a) Let's Talk Pain

923. Most prominent among these efforts was the *Let's Talk Pain* website. Janssen sponsored *Let's Talk Pain* in 2009, acting in conjunction with APF, American Academy of Pain Management, and American Society of Pain Management Nursing. Janssen financed and orchestrated the participation of these groups in the website.

924. Janssen exercised substantial control over the content of the *Let's Talk Pain* website. Janssen's internal communications always referred to *Let's Talk Pain* as promoting tapentadol, the molecule it sold as Nucynta and Nucynta ER. Janssen regarded *Let's Talk Pain* and another website—*Prescriberesponsibly.com*— as integral parts of Nucynta's launch:



925. Janssen documents also reveal that Janssen personnel viewed APF and AAPM as "coalition members" in the fight to increase market share.

926. To this end, Janssen and APF entered into a partnership to "keep pain and the importance of responsible pain management top of mind" among prescribers and patients. They agreed to work to reach "target audiences" that included patients, pain management physicians, primary care physicians, and KOLs. One of the roles Janssen assumed in the process was to "[r]eview, provide counsel on, and approve materials." Janssen did in fact review and approve material for the *Let's Talk Pain* website, as evidenced by the following edits by a Janssen executive to the transcript of a video that was to appear on the site:

2

edit out of video

Shaffer: This is what has allowed me to continue to function. It is what allowed me to have somewhat of a normal life, is the opioids. ~~But, and I do have a concern about the risk, but I also know that if I take them as directed by my physician, and I let them know of any adverse reactions that I might feel promptly, that I'm safe.~~

Anderson: ~~And that is true.~~ The job of the physician that's prescribing

927. The final version of the video on *Let's Talk Pain* omitted the stricken language above.

928. This review and approval authority extended to the *Let's Talk Pain* website. Emails between Janssen personnel and a consultant indicate that, even though the *Let's Talk Pain* website was hosted by APF, Janssen had approval rights over its content. Moreover, emails describing Janssen's review and approval rights related to *Let's Talk Pain* indicate that this right extended to "major changes and video additions."

929. As a 2009 Janssen memo conceded, "[t]he *Let's Talk Pain Coalition* is sponsored by Pricara, a Division of Ortho-McNeil-Janssen Pharmaceuticals, Inc." and "[t]he Coalition and Pricara **maintain editorial control of all *Let's Talk Pain* materials and publications**" (emphasis added).

237

930. A 2011 Consulting Agreement between Janssen and one of APF's employees, relating to the dissemination of national survey data, demonstrates the near-total control Janssen was empowered to exercise over APF in connection with the *Let's Talk Pain* website, including requiring APF to circulate and post Janssen's promotional content. The agreement required APF to "participate in status calls between Janssen, APF, AAPM, ASPMN, and Ketchum as requested by Janssen" and required APF to "respond to requests to schedule status calls **within 48 hours** of the request" (emphasis in original). APF also was required to "[r]eview and provide feedback to media materials, including a press release, pitch email, a key messages document, and social media messages, **within one week** of receipt" (emphasis in original).

931. The agreement further required APF to provide a summary of the survey results in APF's PAIN MONITOR e-newsletter, post a link to the survey results on APF's Facebook page, send out tweets related to the survey, serve as a spokesperson available for media interviews, "[s]hare information with any media contacts with whom APF has existing relationships to promote the announcement of the national survey findings," identify at least two patient spokespersons to talk about the survey data, and include the survey results in "any future APF materials, as appropriate." Tellingly, "any ideas made or conceived by [APF] in connection with or during the performance" of the Agreement "shall be the property of, and belong to, [Janssen]."

932. Janssen also exercised its control over *Let's Talk Pain*. Janssen was able to update the *Let's Talk Pain* website to describe its corporate restructuring and Janssen personnel asserted their control over "video additions" by reviewing and editing the interview touting the functional benefits of opioids. Given its editorial control over the content of *Let's Talk Pain*, Janssen was, at all times, fully aware of—and fully involved in shaping—the website's content.[164]

---

[164] It bears noting that Janssen does not publicly identify its role in creating *Let's Talk Pain*'s content. Instead, *Let's Talk Pain* represents that "coalition members" develop the content that appears on the website and lists Janssen as the only sponsor of that coalition.

238

933.    Let's Talk Pain contained a number of misrepresentations.

934.    For example, *Let's Talk Pain* misrepresented that the use of opioids for the treatment of chronic pain would lead to patients regaining functionality. Let's Talk Pain featured an interview claiming that opioids were what allowed a patient to "continue to function."

935.    In 2009, *Let's Talk Pain* also promoted the concept of "pseudoaddiction," which it described as patient behaviors that may occur when pain is under-treated" but differs "from true addiction because such behaviors can be resolved with effective pain management" (emphasis added). *Let's Talk Pain* was available to, and was intended to, reach patients and prescribers in the City of Rochester.

b) Exit Wounds

936.    Janssen also engaged in other promotional projects with and through APF. One such project was the publication and distribution of *Exit Wounds*, which, as described above, deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain. *Exit Wounds* was drafted by "Medical Writer X." It is fully representative of his work on behalf of drug companies.

937.    Janssen gave APF substantial assistance in distributing *Exit Wounds* in the City of Rochester and throughout the nation by providing grant money and other resources.

c.    Janssen's Deceptive Statements to Prescribers and Patients in the City of Rochester

938.    Janssen also directed the misstatements described above to patients and prescribers in the City of Rochester, including through CMEs, its sales force, and recruited physician speakers.

i.    *Janssen's Deceptive Medical Education Programs in the City of Rochester*

939.    Janssen sponsored CMEs and talks attended by City prescribers.

ii.    *Janssen's Deceptive Detailing Practices in the City of Rochester*

940.    The experiences of specific prescribers confirm both that Janssen's national marketing campaign included the misrepresentations, and that the company disseminated these same

239

misrepresentations to prescribers and consumers in the City of Rochester. In particular, these prescriber accounts reflect that Janssen detailers claimed that Nucynta was "not an opioid" because it worked on an "alternate receptor";[165] claimed that Janssen's drugs would be less problematic for patients because they had anti-abuse properties and were "steady state"; claimed that patients on Janssen's drugs were less susceptible to withdrawal; omitted or minimized the risk of opioid addiction; claimed or implied that opioids were safer than NSAIDs; and overstated the benefits of opioids, including by making claims of improved function.

### 5. Purdue

941. Purdue promoted its branded opioids—principally, Oxycontin, Butrans, and Hysingla—and opioids generally in a campaign that consistently mischaracterized the risk of addiction and made deceptive claims about functional improvement. Purdue did this through its sales force, branded advertisements, promotional materials, and speakers, as well as a host of materials produced by its third-party partners, most prominently APF. Purdue's sales representatives and advertising also misleadingly implied that OxyContin provides a full 12 hours of pain relief, and its allied Front Groups and KOLs conveyed the additional deceptive messages about opioids' safety at higher doses, the safety of alternative therapies, and the effectiveness of addiction screening tools.

942. Based on the highly coordinated and uniform nature of Purdue's marketing, Purdue conveyed these deceptive messages to prescribers in the City of Rochester . The materials that Purdue generated in collaboration with third parties also were distributed or made available in the City of Rochester. Purdue distributed these messages, or facilitated their distribution, in the City of Rochester with the intent that prescribers and/or consumers in the City of Rochester would rely on them in choosing to use opioids to treat chronic pain.

---

[165] The FDA-approved labels for both Nucynta and Nucynta ER describe the tapentadol molecule as an "opioid agonist and a Schedule II controlled substance that can be abused in a manner similar to other opioid agonists, legal or illicit."

a. <u>Purdue's Deceptive Direct Marketing</u>

943.    Like the other Defendants, Purdue directly disseminated deceptive branded and unbranded marketing focused on minimizing the risks associated with the long-term use of opioids to treat chronic pain. Purdue directed these messages to prescribers and consumers through its sales force and branded advertisements.

944.    Purdue engaged in in-person marketing to doctors in the City of Rochester. Purdue had 250 sales representatives in 2007, of whom 150 were devoted to promoting sales of OxyContin full time. Like the other Defendants' detailers, Purdue sales representatives visited targeted physicians to deliver sales messages that were developed centrally and deployed, identically, across the country. These sales representatives were critical in delivering Purdue's marketing strategies and talking points to individual prescribers.[166] Indeed, Endo's internal documents indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed the AAPM/APS Guidelines, which as discussed above deceptively concluded that the risk of addiction is manageable for patients regardless of past abuse histories, with doctors during individual sales visits.

945.    Purdue's spending on detailing reached its nadir in 2006 and 2007, as the company faced civil and criminal charges for misbranding OxyContin. Since settling those charges in 2007, however, Purdue has sharply increased its quarterly spending on promotion through its sales force, from under $5 million in 2007 to more than $30 million by the end of 2014.

946.    Purdue also marketed its drugs through branded advertisements which relied on, among other deceptive tactics, misleading statements about the efficacy and onset of OxyContin. Purdue marketed its drug as effective for 12 hours while knowing that these claims were misleading because, for many patients, the pain relief lasted for as little as eight hours, leading to end-of-dose

---

[166] But Purdue did not stop there. It also tracked around 1,800 doctors whose prescribing patterns demonstrated a probability that they were writing opioid prescriptions for addicts and drug dealers. Purdue kept the program secret for nine years and, when it finally did report information about these suspicious doctors to law enforcement authorities, it only did so with respect to 8% of them.

failure and withdrawal symptoms. This prompted doctors to prescribe, or patients to take, higher or more frequent doses of opioids, all of which increased the risk of abuse and addiction.

947. For example, a "Conversion and Titration Guide" submitted to the FDA and distributed to physicians by Purdue, prominently referred to "Q12h OxyContin Tablets," meaning that each tablet was intended to "offer . . . every-twelve-hour dosing." Other marketing materials directed at physicians and disseminated across the country in 2006 touted that OxyContin's "12-hour AcroContin Delivery System" was "designed to deliver oxycodone over 12 hours," which offered patients "life with Q12H relief." Those same marketing materials included a timeline graphic with little white paper pill cups at "8AM" and, further down the line, at "8PM" only. They also proclaimed that OxyContin provided "Consistent Plasma Levels Over 12 Hours" and set forth charts demonstrating absorption measured on a logarithmic scale, which fraudulently made it appear that levels of oxycodone in the bloodstream slowly taper over a 12-hour time period.

948. Purdue advertisements that ran in 2005 and 2006 issues of the *Journal of Pain* depicted a sample prescription for OxyContin with "Q12h" handwritten. Another advertisement Purdue ran in 2005 in the *Journal of Pain* touted OxyContin's "Q12h dosing convenience" and displayed two paper dosing cups, one labeled "8 am" and one labeled "8 pm," implying that OxyContin is effective for the 12-hour period between 8 a.m. and 8 p.m. Similar ads appeared in the March 2005 *Clinical Journal of Pain*.

949. Purdue continued to include prominent 12-hour dosing instructions in its branded advertising, such as in a 2012 Conversion and Titration Guide, which states: "Because each patient's treatment is personal / Individualize the dose / Q12h OxyContin Tablets."

950. As outlined above, however, these statements are misleading because they fail to make clear that a 12-hour dose does not equate to 12 hours of pain relief. Nevertheless, Purdue's direct marketing materials have misleadingly claimed OxyContin offers 12 hour "dosing convenience."

242

951. As described below, these deceptive statements regarding the efficacy of OxyContin were also carried into the City of Rochester by Purdue's detailers.

952. Purdue's direct marketing materials also misrepresented that opioids would help patients regain functionality and make it easier for them to conduct everyday tasks like walking, working, and exercising.

953. For example, in 2012, Purdue disseminated a mailer to doctors titled "Pain vignettes." These "vignettes" consisted of case studies describing patients with pain conditions that persisted over a span of several months. One such patient, "Paul," is described as a "54-year-old writer with osteoarthritis of the hands," and the vignettes imply that an OxyContin prescription will help him work. None of these ads, however, disclosed the truth—that there is no evidence that opioids improve patients' lives and ability to function and that there was substantial evidence to the contrary.

954. Some of the greatest weapons in Purdue's arsenal, however, were unbranded materials it directly funded and authored. These were in addition to the unbranded materials, described below, that Purdue channeled through third parties.

955. In 2011, Purdue published a prescriber and law enforcement education pamphlet titled *Providing Relief, Preventing Abuse*, which deceptively portrayed the signs—and therefore prevalence—of addiction. However, Purdue knew, as described above, that OxyContin was used non-medically by injection less than less than 17% of the time. Yet, *Providing Relief, Preventing Abuse* prominently listed side effects of injection like skin popping and track marks as "Indications of Possible Drug Abuse"—downplaying much more prevalent signs of addiction associated with OxyContin use such as asking for early refills, making it seem as if addiction only occurs when opioids are taken illicitly.

956. *Providing Relief, Preventing Abuse* also deceptively camouflaged the risk of addiction by falsely supporting the idea that drug-seeking behavior could, in fact, be a sign of "pseudoaddiction"

243

rather than addiction itself. Specifically, it noted that the concept of "pseudoaddiction" had "emerged in the literature" to describe "[drug-seeking behaviors] in patients who have pain that has not been effectively treated." Nowhere in *Providing Relief, Preventing Abuse* did Purdue disclose the lack of scientific evidence justifying the concept of "pseudoaddiction," or that the phrase itself had been coined by a Purdue vice president.

957. *Providing Relief, Preventing Abuse* was available nationally and was intended to reach prescribers in the City of Rochester. As described below, the deceptive statements in *Providing Relief, Preventing Abuse* regarding addiction were the very same messages Purdue directed at prescribers in the City of Rochester through its sales force.

958. Purdue also disseminated misrepresentations through two of its unbranded websites, *In the Face of Pain* and *Partners Against Pain*.

959. Consistent with Purdue's efforts to portray opioid treatment as "essential" for the proper treatment of chronic pain and label skepticism related to chronic opioid therapy as an "inadequate understanding" that leads to "inadequate pain control," *In the Face of Pain* criticized policies that limited access to opioids as being "at odds with best medical practices" and encouraged patients to be "persistent" in finding doctors who will treat their pain. This was meant to imply that patients should keep looking until they find a doctor willing to prescribe opioids.

960. *In the Face of Pain* was available nationally and was intended to reach prescribers in the City of Rochester.

961. Purdue also used its unbranded website *Partners Against Pain* to promote the same deceptive messages regarding risk of addiction and delivered by its sales representatives. On this website, Purdue posted *Clinical Issues in Opioid Prescribing*, a pamphlet that was copyrighted in 2005. Purdue also distributed a hard-copy version of this pamphlet. *Clinical Issues in Opioid Prescribing* claimed that "illicit drug use and deception" were not indicia of addiction, but rather indications that a

244

patient's pain was undertreated. The publication indicated that "[p]seudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated." In other words, Purdue suggested that when faced with drug-seeking behavior from their patients, doctors should prescribe more opioids—turning evidence of addiction into an excuse to sell and prescribe even more drugs.

962.    Purdue's misleading messages and materials were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, irrespective of the risks, benefits, and alternatives. This deception was national in scope and included the City of Rochester. As described above, Purdue's nationwide messages would have reached City prescribers in a number of ways. For example, they were carried into the City of Rochester by Purdue's sales representatives during detailing visits as well as made available to patients and prescribers in the City of Rochester through websites and ads, including ads in prominent medical journals. They would have also been delivered to prescribers in the City of Rochester by Purdue's paid speakers, who were required by Purdue policy and by FDA regulations to stay true to Purdue's nationwide messaging.

   b.   Purdue's Deceptive Third-Party Statements

963.    Purdue's efforts were not limited to making misrepresentations through its own sales force and its own branded and unbranded marketing materials. As described above, Purdue knew that regulatory constraints restricted what it could say about its drugs through direct marketing. For this reason, like the other Defendants, Purdue enlisted the help of third parties to release misleading information about opioids. The most prominent of these was APF.

   i.   *APF*

      a)   Purdue's Control of APF

964. Purdue exercised considerable control over APF, which published and disseminated many of the most blatant falsehoods regarding chronic opioid therapy. Their relationship, and several of the APF publications, is described in detail below.

965. Purdue exercised its dominance over APF over many projects and years. Purdue was APF's second-biggest donor, with donations totaling $1.7 million. Purdue informed APF that the grant money reflected Purdue's effort to "strategically align its investments in nonprofit organizations that share [its] business interests," making clear that Purdue's funding depended upon APF continuing to support Purdue's business interests. Indeed, Purdue personnel participated in a March 2011 call with APF's "Corporate Roundtable," where they suggested that APF "[s]end ambassadors to talk about pain within companies and hospitals." Thus, Purdue suggested what role APF could play that would complement its own marketing efforts. On that call, Purdue personnel also committed to provide APF with a list of "industry state advocates" who could help promote chronic opioid therapy, individuals and groups that, upon information and belief, APF reached out to. Purdue personnel remained in constant contact with their counterparts at APF.

966. This alignment of interests was expressed most forcefully in the fact that Purdue hired APF to provide consulting services on its marketing initiatives. Purdue and APF entered into a "Master Consulting Services" Agreement on September 14, 2011. That agreement gave Purdue substantial rights to control APF's work related to a specific promotional project. Moreover, based on the assignment of particular Purdue "contacts" for each project and APF's periodic reporting on their progress, the agreement enabled Purdue to be regularly aware of the misrepresentations APF was disseminating regarding the use of opioids to treat chronic pain in connection with that project. The agreement gave Purdue—but not APF—the right to end the project (and, thus, APF's funding) for any reason. This agreement demonstrates APF's lack of independence and its willingness to

246

surrender to Purdue's control and commercial interests, which would have carried across all of APF's work.

967. Purdue used this agreement to conduct work with APF on the *Partners Against Pain* website. *Partners Against Pain* is a Purdue-branded site, and Purdue holds the copyright.

968. However, its ability to deploy APF on this project illustrates the degree of control Purdue exercised over APF. In 2011, it hired an APF employee to consult on the *Partners Against Pain* rollout, to orchestrate the media campaign associated with the launch of certain content on the website, and to make public appearances promoting the website along with a celebrity spokesperson. Purdue contemplated paying this consultant $7,500 in fees and expenses for 26 hours of work. Purdue would require this consultant to "to discuss and rehearse the delivery of [Purdue's] campaign messages" and Purdue committed that "[m]essage points will be provided to [the] Consultant in advance and discussed on [a planned] call." At all times, decisions regarding the final content on the *Partners Against Pain* website were "at the sole discretion of Purdue."

969. APF also volunteered to supply one of its staff (a medical doctor or a nurse practitioner) to assist Purdue as a consultant and spokesperson for the launch of one of Purdue's opioid-related projects, *Understanding & Coping with Lower Back Pain*, which appeared on *Partners Against Pain*. One of the consultants was APF's paid employee, Mickie Brown. The consultant's services would be provided in return for a $10,000 consulting fee for APF and $1,500 in honoraria for the spokesperson. All documents used by the consultant in her media appearances would be reviewed and approved by individuals working for Purdue. It was not until later that APF worried about "how Purdue sees this program fitting in with our [existing] grant request."

970. Given the financial and reputational incentives associated with assisting Purdue in this project and the direct contractual relationship and editorial oversight, APF personnel were acting under Purdue's control at all relevant times with respect to *Partners Against Pain*.

247

971. APF acquiesced to Purdue's frequent requests that APF provide "patient representatives" for *Partners against Pain*. Moreover, APF staff and board members and Front Groups ACPA and AAPM, among others (such as Dr. Webster), appear on *Inthefaceofpain.com* as "Voices of Hope"—"champions passionate about making a difference in the lives of people who live with pain" and providing "inspiration and encouragement" to pain patients. APF also contracted with Purdue for a project on back pain in which, among other things, it provided a patient representative who agreed to attend a Purdue-run "media training session."

972. According to an Assurance of Voluntary Compliance ("AVC") entered into between the New York Attorney General and Purdue Pharma on August 19, 2015, *Inthefaceofpain.com* received 251,648 page views between March 2014 and March 2015. With the exception of one document linked to the website, *Inthefaceofpain.com* makes no mention of opioid abuse or addiction. Purdue's copyright appears at the bottom of each page of the website, indicating its ownership and control of its content. There is no other indication that 11 of the individuals who provided testimonials on *Inthefaceofpain.com* received payments, according to the AVC, of $231,000 for their participation in speakers programs, advisory meetings and travel costs between 2008 and 2013. The New York Attorney General found Purdue's failure to disclose its financial connections with these individuals had the potential to mislead consumers.

973. Nowhere was Purdue's influence over APF so pronounced as it was with the APF's "Pain Care Forum" ("PCF"). PCF was and continues to be run not by APF, but by Defendant Purdue's in-house lobbyist, Burt Rosen. As described by a former drug company employee, Rosen exercised full control of PCF, telling them "what to do and how to do it." This control allowed him, in turn, to run APF as, in accordance with Rosen's thinking, "PCF was APF, which was Purdue." PCF meets regularly in-person and via teleconference, and shares information through an email listserv.

248

974. In 2011, APF and another third-party advocacy group, the Center for Practical Bioethics, were considering working together on a project. Having reviewed a draft document provided by the Center for Practical Bioethics, the APF employee cautioned that "this effort will be in cooperation with the efforts of the PCF" and acknowledged that "I know you have reservations about the PCF and pharma involvement, but I do believe working with them and keeping the lines of communications open is important." The Center for Practical Bioethics CEO responded by indicating some confusion about whom to speak with, asking "[i]s Burt Rosen the official leader" and reflecting what other sources have confirmed.

975. In 2007, the PCF Education Subgroup, consisting of drug companies Purdue and Alpharma, and Front Groups APF and ACPA (self-described as "industry-funded" groups), developed a plan to address a perceived "lack of coordination" among the industry and pro-opioid professional and patient organizations. PCF members agreed to develop simplified "key" messages" to use for public education purposes. Their messages were reflected in programs like NIPC's *Let's Talk Pain* (put together by Endo and APF), and Purdue's *In the Face of Pain*.

976. When the FDA required drug companies to fund CMEs related to opioid risks in accordance with its 2009 REMS, Purdue, along with these Front Groups, worked through the PCF to ensure that, although it was mandatory for drug companies to fund these CMEs, it would not be mandatory for prescribers to attend them. A survey was circulated among Defendants Endo, Janssen, and Purdue, which predicted that the rates of doctors who would prescribe opioids for chronic pain would fall by 13% if more than four hours of mandatory patient education were required in accordance with the REMS. With a push from PCF, acting under Purdue's direction, the CMEs were not made mandatory for prescribers.

977. APF showed its indebtedness to Purdue and its willingness to serve Purdue's corporate agenda when APF chairman Dr. James N. Campbell testified on the company's behalf at a July 2007

hearing before the Senate Judiciary Committee "evaluating the propriety and adequacy of the OxyContin criminal settlement."[167] Despite its ostensible role as a patient advocacy organization, APF was willing to overlook substantial evidence—resulting in the jailing of Purdue executives—that Purdue blatantly, despite its clear knowledge to the contrary, told physicians and patients that OxyContin was "rarely" addictive and less addictive than other opioids. Like Purdue, APF ignored the truth about opioids and parroted Purdue's deceptive messaging. Dr. Campbell testified on Purdue's behalf that addiction was a "rare problem" for chronic pain patients and asserted: "[T]he scientific evidence suggests that addiction to opioids prescribed by legitimate chronic non-cancer pain patients without prior histories of substance abuse using the medication as directed is rare. Furthermore, no causal effect has been demonstrated between the marketing of OxyContin and the abuse and diversion of the drug." There was, and is, no scientific support for those statements.

978.   APF President Will Rowe reached out to Defendants—including Purdue—rather than his own staff, to identify potential authors to answer a 2011 article critical of opioids that had been published in the Archives of Internal Medicine..

979.   Purdue's control over APF shaped, and was demonstrated by specific APF, pro-opioid publications. These publications had no basis in science and were driven (and can only be explained) by the commercial interest of pharmaceutical companies—Purdue chief among them.

b)   *A Policymaker's Guide*

980.   Purdue provided significant funding to and was involved with APF's creation and dissemination of *A Policymaker's Guide to Understanding Pain & Its Management*, originally published in

---

[167] *Evaluating the Propriety and Adequacy of the Oxycontin Criminal Settlement: Before the S. Comm. On the Judiciary*, 110th Cong. 46-50, 110-116 (2007) (statements of Dr. James Campbell, Chairman, APF), https://www.judiciary.senate.gov/imo/media/doc/Campbell%20Testimony%20073107.pdf (accessed May 30, 2017). Purdue was also able to exert control over APF through its relationships with APF's leadership. Purdue-sponsored KOLs Russell Portenoy and Scott Fishman chaired APF's board. Another APF board member, Perry Fine, also received consulting fees from Purdue. APF board member Lisa Weiss was an employee of a public relations firm that worked for both Purdue and APF. Weiss, in her dual capacity, helped vet the content of the Purdue-sponsored *Policymaker's Guide*, which is described below.

2011 and still available online. *A Policymaker's Guide to Understanding Pain & Its Management* misrepresented that there were studies showing that the use of opioids for the long-term treatment of chronic pain could improve patients' ability to function.

981. Specifically, *A Policymaker's Guide to Understanding Pain & Its Management* claimed that "multiple clinical studies" demonstrated that "opioids . . . are effective in improving [d]aily function, [p]sychological health [and] [o]verall health-related quality of life for people with chronic pain" and implied that these studies established that the use of opioids long-term led to functional improvement. The study cited in support of this claim specifically noted that there were no studies demonstrating the safety of opioids long-term and noted that "[f]or functional outcomes, the other [studied] analgesics were significantly more effective than were opioids."[168]

982. The *Policymaker's Guide* also misrepresented the risk of addiction. It claimed that pain had generally been "undertreated" due to "[m]isconceptions about opioid addiction" and that "less than 1% of children treated with opioids become addicted."

983. Moreover, the *Policymaker's Guide* attempted to distract doctors from their patients' drug-seeking behavior by labeling it as "pseudoaddiction," which, according to the guide, "describes patient behaviors that may occur when pain is undertreated." Like *Partners Against Pain*, *A Policymaker's Guide* noted that "[p]seudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated." The similarity between these messages regarding "pseudoaddiction" highlights the common, concerted effort behind Purdue's deceptive statements.

984. The *Policymaker's Guide* further misrepresented the safety of increasing doses of opioids and deceptively minimized the risk of withdrawal. For example, the *Policymaker's Guide* claimed that "[s]ymptoms of physical dependence" on opioids in long-term patients "can often be ameliorated by gradually decreasing the dose of medication during discontinuation" while omitting the significant

---

[168] Andrea D. Furlan *et al.*, *Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects*, 174(11) Can. Med. Ass'n J. 1589 (2006).

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM
NYSCEF DOC. NO. 2

INDEX NO. E2019005178
Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 292 of 1171. PageID #: 705611
RECEIVED NYSCEF: 06/05/2019

hardship that often accompanies cessation of use. Similarly, the *Policymaker's Guide* taught that even indefinite dose escalations are "sometimes necessary" to reach adequate levels of pain relief while completely omitting the safety risks associated with increased doses.

985. Purdue provided substantial monetary assistance toward the creation and dissemination of the *Policymaker's Guide*, providing APF with $26,000 in grant money. APF ultimately disseminated *Policymaker's Guide* on behalf of Defendants, including Purdue. Purdue was not only kept abreast of the content of the guide as it was being developed, but, based on the periodic reports APF provided to Purdue regarding its progress on the *Policymaker's Guide*, had editorial input of the contents.

986. The *Policymaker's Guide* was posted online and was available to, and intended to reach prescribers and consumers in the City of Rochester. As described below, the deceptive statements in *Policymaker's Guide* regarding addiction and functionality were the very same messages Purdue directed at the City of Rochester through its own sales force.

c) *Treatment Options: A Guide for People Living with Pain*

987. Purdue's partnership with APF did not end with the *Policymaker's Guide*. Purdue also substantially assisted APF by sponsoring *Treatment Options: A Guide for People Living with Pain*, starting in 2007. Based on Purdue's control of other APF projects, Purdue also would have exercised control over *Treatment Options*.

988. *Treatment Options* is rife with misrepresentations regarding the safety and efficacy of opioids. For example, *Treatment Options* misrepresents that the long-term use of opioids to treat chronic pain could help patients function in their daily lives by stating that, when used properly, opioids "give [pain patients] a quality of life [they] deserve."

989. Further, as outlined above, *Treatment Options* claims that addiction is rare and that, when it does occur, it involves unauthorized dose escalations, patients who receive opioids from multiple doctors, or theft, painting a narrow and misleading portrait of opioid addiction.

252

990.  *Treatment Options* also promotes the use of opioids to treat long-term chronic pain by denigrating alternate treatments, most particularly NSAIDs. *Treatment Options* notes that NSAIDs can be dangerous at high doses and inflates the number of deaths associated with NSAID use, distinguishing opioids as having less risk. According to *Treatment Options*, NSAIDs are different from opioids because opioids have "no ceiling dose." This lack of ceiling is considered to be beneficial as some patients "need" larger doses of painkillers than they are currently prescribed. *Treatment Options* warns that the risks associated with NSAID use increased if NSAIDs are "taken for more than a period of months," but deceptively omits any similar warning about the risks associated with the long-term use of opioids.

991.  *Treatment Options* was posted online and remains online today. It was available to and intended to reach prescribers and patients in the City of Rochester. As described below, the deceptive statements in *Treatment Options* regarding addiction and functionality echo the messages Purdue directed at the City of Rochester through its own sales force. Purdue also engaged in other promotional projects with and through APF. One such project was the publication and distribution of *Exit Wounds*, which, as described above, deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain.

992.  Purdue provided APF with substantial assistance in distributing *Exit Wounds* in the City of Rochester and throughout the nation by providing grant money and other resources.

ii.  *Purdue's Work with Other Third Party Front Groups and KOLs*

993.  Purdue also provided other third-party Front Groups with substantial assistance in issuing misleading statements regarding the risks, benefits, and superiority of opioids for the long-term treatment of chronic pain.

a)  FSMB – *Responsible Opioid Prescribing*

253

994. In 2007, Purdue sponsored FSMB's *Responsible Opioid Prescribing*, which, as described above, deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain. *Responsible Opioid Prescribing* also was drafted by Dr. Scott Fishman.

995. Purdue spent $150,000 to help FSMB distribute *Responsible Opioid Prescribing*. The book was distributed nationally, and was available to and intended to reach prescribers in the City of Rochester.

b) AGS – *Pharmacological Management of Persistent Pain in Older Persons*

996. Along with Janssen, Purdue worked with the AGS on a CME to promote the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. As discussed above, these guidelines falsely claimed that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse" as the study supporting this assertion did not analyze addiction rates by age. They also stated, falsely, that "[a]ll patients with moderate to severe pain should be considered for opioid therapy (low quality of evidence, strong recommendation)."

997. Controversy surrounding earlier versions of AGS guidelines had taught AGS that accepting money directly from drug companies to fund the guidelines' development could lead to allegations of bias and "the appearance of conflict." Accordingly, AGS endeavored to eliminate "the root cause of that flack" by turning down commercial support to produce the 2009 Guidelines. Having determined that its veneer of independence would be tarnished if it accepted drug company money to create the content, AGS decided to develop the guidelines itself and turn to the drug companies for funding to *distribute* the pro-drug company content once it had been created. As explained by AGS personnel, it was AGS's "strategy that we will take commercial support to disseminate [the 2009 Guidelines] if such support is forthcoming." AGS knew that it would be difficult to find such support unless the report was viewed favorably by opioid makers.

254

998. AGS sought and obtained grants from Endo and Purdue to distribute *Pharmacological Management of Persistent Pain in Older Persons*. As a result, the publication was distributed nationally, and was available to and was intended to reach prescribers in the City of Rochester. Indeed, internal documents of another Defendant, Endo, indicate that pharmaceutical sales representatives employed by Purdue discussed treatment guidelines that minimized the risk of addiction to opioids with doctors during individual sales visits.[169]

      c) *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*

999. Purdue sponsored a 2012 CME program called *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*. The presentation deceptively instructed doctors that, through the use of screening tools, more frequent refills, and other techniques, high-risk patients showing signs of addictive behavior could be treated with opioids. This CME was presented at various locations in the United States and is available online today.

      d) *Managing Patient's Opioid Use: Balancing the Need and Risk*

1000. Purdue also sponsored a 2011 CME taught by KOL Lynn Webster via webinar titled *Managing Patient's Opioid Use: Balancing the Need and Risk*. This presentation also deceptively instructed prescribers that screening tools, patient agreements, and urine test prevented "overuse of prescriptions" and "overdose deaths." At the time, Dr. Webster was receiving significant funding from Purdue. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Purdue (and other Defendants). The webinar was available to and was intended to reach prescribers in the City of Rochester.

      e) *Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse*

---

[169] As described above, Purdue also provided substantial support for the AAPM/APS guidelines. The 1997 AAPM and APS consensus statement *The Use of Opioids for the Treatment of Chronic Pain* was authored by one of its paid speakers, and 14 out of 21 panel members who drafted the AAPM/APS Guidelines received support from Defendants Janssen, Cephalon, Endo, and Purdue.

255

1001. Purdue also sponsored a CME program entitled *Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse*. *Path of the Patient* was devoted entirely to the message of treating chronic pain with opioids. Although the program purported to instruct a treating physician how to manage chronic pain in younger adults at risk for abuse, it does no such thing.

1002. This "educational" program, addressing treatment of a population known to be particularly susceptible to opioid addiction, presents none of the alternative treatment options available, only discussing treatment of chronic pain with opioids.

1003. In a role-play in *Path of the Patient*, a patient who suffers from back pain tells his doctor that he is taking twice as many hydrocodone pills as directed. The doctor reports that the pharmacy called him because of the patient's early refills. The patient has a history of drug and alcohol abuse. Despite these facts, the narrator notes that, because of a condition known as "pseudoaddiction," the doctor should not assume his patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor in the role-play treats this patient by prescribing a high-dose, long-acting opioid. This CME was available online and was intended to reach City prescribers.

f)   *Overview of Management Options*

1004. Purdue also sponsored a CME titled *Overview of Management Options* issued by the American Medical Association in 2003, 2007, and 2013 (the latter of which is still available for CME credit). The CME was edited by KOL Russel Portenoy, among others. It deceptively instructs physicians that NSAIDs and other drugs, but not opioids, are unsafe at high doses. In reality, the data indicates that patients on high doses of opioids are more likely to experience adverse outcomes than patients on lower doses of the drugs. Dr. Portenoy received research support, consulting fees, and

honoraria from Purdue (among others), and was a paid Purdue consultant. This CME was presented online in the United States and was available to prescribers in the City of Rochester.

iii.     *Purdue's Misleading Science*

1005. Purdue also misrepresented the risks associated with long-term opioid use by promoting scientific studies in a deceptive way. In 1998, Purdue funded two articles by Dr. Lawrence Robbins, which showed that between 8% and 13% of the patients he studied became addicted to opioids—a troubling statistic for Purdue, whose market, and marketing, depended upon the claim that opioids were rarely addictive.[170] Purdue had these articles placed in headache-specific journals where they would be less likely to be encountered by pain specialists or general practitioners. The first of these articles has been cited a mere 16 times; the second does not even appear on Google scholar. Five years later, Purdue funded a study of OxyContin in diabetic neuropathy patients, which was published in 2003. Notwithstanding the fact that that Purdue-funded studies, testing Purdue's own drugs, had previously indicated that addiction rates were between 8% and 13%, Purdue's 2003 article reached back to the 1980 Porter-Jick Letter to support its claim that OxyContin was not commonly addictive. This article was placed in a prominent pain journal and has been cited 487 times.[171] While this article was drafted over a decade ago, it continues to be relied upon to further the misrepresentations that opioids are not addictive.

a)  Purdue's Deceptive Statements to Prescribers and Patients in the City of Rochester

1006. Purdue directed the dissemination of the misstatements described above to patients and prescribers in the City of Rochester through the Front Groups, KOLs, and publications described above, as well as through its sales force in the City of Rochester and through

---

[170] Lawrence Robbins, *Long-Acting Opioids for Severe Chronic Daily Headache*, 10(2) Headache Q. 135 (1999); Lawrence Robbins, *Works in Progress: Oxycodone CR, a Long-Acting Opioid, for Severe Chronic Daily Headache*, 19 Headache Q. 305 (1999).

[171] C. Peter N. Watson et al., *Controlled-release oxycodone relieves neuropathic pain: a randomized controlled trial I painful diabetic neuropathy*, 105 Pain 71 (2003).

advertisements in prominent medical journals. The deceptive statements distributed through each of these channels reflect a common theme of misrepresenting the benefits of Purdue's opioids, unfairly portraying the risks of addiction associated with their use, and deceptively implying that they would improve patients' ability to function.

1007. The deceptive message that OxyContin provided 12 hours of pain relief was not only available to, and intended to, reach prescribers in the City of Rochester through nationally circulated advertising, but was also carried directly into the offices of doctors in the City of Rochester by Purdue's sales representatives.

1008. Likewise, the deceptive messages minimizing addiction were not only directed at patients and prescribers in the City of Rochester through the publications circulated above, but were also disseminated directly by Purdue's sales force.

1009. Purdue also used its sales force to disseminate misleading statements about the ability of opioids to improve functionality.

1010. Purdue's national marketing campaign included the misrepresentations described above and the company disseminated these same misrepresentations to prescribers and consumers in the City of Rochester. In particular, these prescriber accounts reflect that Purdue detailers omitted or minimized the risk of opioid addiction; claimed that Purdue's drugs would be less problematic for patients because they had extended release mechanisms, were tamper proof, and were "steady state"; claimed that OxyContin would provide 12 hours of pain relief; represented that screening tools could help manage the risk of addiction; minimized the symptoms of withdrawal; claimed or implied that opioids were safer than NSAIDs; and overstated the benefits of opioids, including by making claims of improved function.

1011. A survey of a sample of physicians, who reported the messages that they retained from detailing visits and other promotional activity, documented that Purdue sales representatives from at

258

least between 2008 and 2012, promoted OxyContin as being effective for a full 12 hours. Purdue sales representatives also promoted OxyContin as improving patients' sleep (an unsubstantiated functional improvement) to an orthopedic surgeon in 2006 and to a physicians' assistant in 2013. Purdue sales representatives also told internists that the reformulation of OxyContin prevented illegal drug use and that the formulation was 'less addicting," rather than being harder to adulterate. In 2011, Purdue sales representatives also claimed that the sustained-release property of OxyContin reduced patient "buzz," which is neither based on scientific evidence nor true.

1012. The same survey indicated that Purdue sales representatives promoted its Schedule III opioid Butrans as having low or little abuse potential.

### 6. Insys

1013. Insys was co-founded in 2002 by Dr. John Kapoor, a serial pharmaceutical industry entrepreneur "known for applying aggressive marketing tactics and sharp price increases on older drugs."[172]

1014. In 2012, Insys received U.S. Food and Drug Administration approval for Subsys, a fentanyl sublingual spray product designed to treat breakthrough cancer pain. However, Insys encountered significant obstacles due to insurers employing a process known as prior authorization. Prior authorization prevents the over prescription and abuse of powerful and expensive drugs. The prior authorization process requires "additional approval from an insurer or its pharmacy benefit manager before dispensing…" and may also impose step therapy which requires beneficiaries to first use less expensive medications before moving on to a more expensive approach. [173]

---

[172] U.S. senate Homeland Security & Governmental Affairs Committee, *Insys Therapeutics and the Systemic Manipulation of Prior Authorization* (quoting *Fentanyl Billionaire Comes Under Fire as Death Toll Mounts From Prescription Opioids*, Wall Street Journal (Nov. 22, 2016) (www.wsj.com/articles/fentanylbillionaire-comes-under-fire-as-death-toll-mounts-from-prescription-opioids-1479830968)).

[173] Senate Permanent Subcommittee on Investigations, *Combatting the Opioid Epidemic: A Review of Anti-Abuse Efforts in Medicare and Private Health Insurance Systems*; see also Department of Health and Human Services, Centers for Medicare & Medicaid Services, *How Medicare Prescription Drug Plans & Medicare Advantage Plans with Prescription Drug Coverage Use Pharmacies, Formularies, & Common Coverage Rules.*

259

1015. Insys circumvented this process by forming a prior authorization unit, known at one point as the Insys Reimbursement Center ("IRC"), to facilitate the process using aggressive and likely illegal marketing techniques. Insys published education articles that praised their products' non-addictive nature; and funded patient advocacy groups who unknowingly promoted Insys' agenda of raising the profile of pain so that drugs could be prescribed to treat it. Furthermore, Insys' former sales representatives, motivated by corporate greed, paid off medical practitioners to prescribe Subsys in spite of any medical need.[174] Insys employees were pressured internally and received significant monetary incentives to increase the rate of prescription approvals.[175]

1016. According to a federal indictment and ongoing congressional investigation by Sen. Claire McCaskill, IRC employees pretended to be with doctors' offices and falsified medical histories of patients. The report, acquired by McCaskill's investigators, includes transcripts and an audio recording of employees implementing these techniques in order to obtain authorization from insurers and pharmacy benefit managers. The transcript reveals an Insys employee pretending to call on behalf of a doctor and inaccurately describes the patient's medical history. [176] For example, Insys employees would create the impression that the patient had cancer, without explicitly saying so, because cancer was a requirement for prior clearance to prescribe Subsys. Insys was warned by a consultant that it lacked needed policies for governing such activities, but the executives failed to implement corrective internal procedures.

1017. In a class action law suit against Insys, it was revealed that management "was ware that only about 10% of prescriptions approved through the Prior Authorization Department were for

---

[174] Lopez, Linette. "It's been a brutal week for the most shameless company in the opioid crisis- and it's about to get worse," *Business Insider,* http://www.businessinsider.com/opioid-addiction-drugmaker-insys-arrests-justice-department-action-2017-7

[175] Boyd, Roddy. *Murder Incorporated: Insys Therapeutics. Part 1.* Southern Investigative Reporting Foundation. http://sirf-online.org/2015/12/03/murder-incorporated-the-insys-therapeutics-story/; see also Indictment. *United States v. Babich, et al.,* D. Mass. (No. 1;16 CR 10343).

[176] U.S. Senate Homeland Security & Governmental Affairs Committee, *Fueling an Epidemic: Insys Therapeutics and the Systematic Manipulation of Prior Authorization, see p. 7-10.*

260

cancer patients," and an Oregon Department of Justice Investigation found that 78% of preauthorization forms submitted by Insys on behalf of Oregon patients were for off-label uses. [177] Physicians are allowed to prescribe medications for indications outside of FDA guidelines if they see fit, but it is illegal for pharmaceutical companies to market a drug for off-label use.

1018. In 2008, biopharmaceutical company Cephalon settled with the U.S. Government for 425 million in a suit against the company that alleged it marketed drugs for unapproved uses (off-label). The FDA approved the drug only for opioid tolerant cancer patients. According to the Oregon settlement and class-action lawsuit, at least three employees involved in sales and/or marketing at Cephalon had moved over to Insys Therapeutics.[178]

1019. Additionally, Insys created a "legal speaker program" which turned out to be a scam. The Justice Department commented on the program and stated:

> The Speaker Programs, which were typically held at high-end restaurants, were ostensibly designed to gather licensed healthcare professionals who had the capacity to prescribe Subsys and educate them about the drug. In truth, the events were usually just a gathering of friends and co-workers, most of whom did not have the ability to prescribe Subsys, and no educational component took place. "Speakers" were paid a fee that ranged from $1,000 to several thousand dollars for attending these dinners. At times, the sign-in sheets for the Speaker Programs were forged so as to make it appear that the programs had an appropriate audience of healthcare professionals.

1020. Insys paid hundreds of thousands of dollars to doctors in exchange for prescribing Subsys and three top prescribers have already been convicted of taking bribes.

1021. Fentanyl products are considered to be the most potent and dangerous opioids on the market and up to 50 times more powerful than heroine.[179]

---

[177] Gusovsky, Dina. The Pain Killer: *A drug Company Putting Profits Above Patients,* CNBC (https://www.cnbc.com/2015/11/04/the-deadly-drug-appeal-of-insys-pharmaceuticals.html)
[178] *Id.*
[179] U.S. Department of Justice. Drug Enforcement Administration. *A Real Threat to Law Enforcement: Fentanyl.* https://www.dea.gov/druginfo/DEA%20Targets%20Fentanyl%20%20A%20Real%20Threat%20to%20Law%20Enforcement%20(2016).pdf

1022. In an internal presentation dated 2012 and entitles, "2013 SUBSYS Brand Plan," Insys identified one of six "key strategic imperatives" as "Mitigate Prior Authorization barriers."[180] On a later slide, the company identified several tasks associated with this effort, including "Build internal [prior authorization] assistance infrastructure," "Establish an internal 1-800 reimbursement assistance hotline," and "Educate field force on [prior authorization] process and facilitation."[181]

1023.  Additional materials produced by Insys to the minority staff suggest, however, that Insys did not match these efforts with sufficient compliance processes to prevent fraud and was internally aware of the danger of problematic practices. Specifically, on February 18, 2014, Compliance Implementation Services (CIS)—a healthcare consultant—issued a draft report to Insys titled, "Insys Call Note, Email, & IRC Verbatim Data Audit Report."[182] The introduction to the report explained that "CIS was approached by INSYS' legal representative … on behalf of the Board of Directors for Insys to request that CIS support in review of certain communications with Health Care Professionals (HCPs) and INSYS employees, and report how there were being documented."[183] Insys had expressed concerns "with respect to communications with HCPs by INSYS employees being professional in nature and in alignment with INSYS approved topics regarding off or on-label promotion of an INSYS product, and general adherence to INSYS documentation requirements."[184] An additional concern "stemmed from the lack of monitoring of commercial activities where these types of interactions could occur."[185]

---

[180] U.S. senate Homeland Security & Governmental Affairs Committee, *Insys Therapeutics and the Systemic Manipulation of Prior Authorization* (quoting Insys Therapeutics, Inc., *2013 Subsys Brand Plan, 2012 Assessment* (2012) (INSYS_HSGAC_00007472)).

[181] *Id.* at INSYS_HSGAC_00007765.

[182] U.S. senate Homeland Security & Governmental Affairs Committee, *Insys Therapeutics and the Systemic Manipulation of Prior Authorization* (quoting Compliance Implementation Services, Insys Call Note, Email & IRC Verbatim Data Audit Report (Feb. 18, 2014) (INSYS_HSGAC_00007763)).

[183] *Id.* at INSYS_HSGAC_00007765.

[184] *Id.*

[185] *Id.*

1024. Given these issues, Insys requested that CIS review—in part—"the general communications from the INSYS Reimbursement Center (IRC) to HCPs, their office staff or representatives, as well as health insurance carriers ... to ensure they were appropriate in nature with respect to specific uses of SUBSYS, INSYS' commercially marketed product."[186]

1025. According to the findings CIS issued, Insys lacked formal policies governing the actions of its prior authorization unit. For example, "[n]o formal and approved policy on appropriate communications between IRC employees and HCPs, their staff, [health care insurers (HCIs)], or patients exists...that governs the support function of obtaining a prior authorization for the use of SUBSYS."[187]

1026. In addition, the report noted that "there were also gaps in formally approved foundational policies, procedures, and [standard operating procedures] with respect to required processes specifically within the IRC."[188]

1027. In fact, "[t]he majority of managerial directives, changes to controlled documents or templates, as well as updates or revisions to processes were not formally approved, documented, and disseminated for use, and were sent informally via email blast."[189]

1028. Although four informal standard operating procedures existed with regarded to IRC functions, these documents "lacked a formal review and approval" and failed to "outline appropriately the actions performed within the IRC."[190]

1029. The report also explains that Insys lacked procedures for auditing interactions between IRC employees and outside entities. According to CIS, "no formal, documented, or detailed processes by which IRC representatives' calls via telephone were audited for proper communication

---

[186] Id.
[187] Id. at INSYS_HSGAC_00007770.
[188] Id. at INSYS_HSGAC_00007768.
[189] Id. at INSYS_HSGAC_00007771.
[190] Id. at INSYS_HSGAC_00007770.

263

with HCPs or HCIs in any fashion [existed] other than random physical review of a call in a very informal and sporadic manner."[191]

1030. More broadly, the report notes that "no formal and documented auditing and monitoring or quality control policy, process, or function exists between IRC employee communications and HCPs, HCP staff, HCIs, or patients."[192]

1031. At the end of the report, CIS provided a number of recommendations concerning IRC activities. First, CIS suggested that IRC management "formally draft and obtain proper review and approval of an IRC specific policy detailing the appropriate communications that should occur while performing the IRC associate job functions and interacting with HCPs."[193]

1032. Similarly, IRC management was urged to formally draft IRC-specific standard operating procedures "specific to each job function within the IRC," accompanied by "adequate training and understanding of these processes."[194] To ensure compliance with IRC standards, Insys was also directed to create an electronic system to allow management "to monitor both live and anonymously IRC employee communications both incoming and outgoing."[195] Finally, CIS recommended that Insys institute a formal process for revising and updating "IRC documentation used for patient and HCP data."[196]

1033. The CIS report concluded by noting, in part, that a review of ten conversations between IRC employees and healthcare providers, office staff, and insurance carriers revealed "that all IRC staff was professional in communication, and in no instance was inaccurate or off-label usage of SUBSYS communicated."[197]

---

[191] *Id.* at INSYS_HSGAC_00007769.
[192] *Id.* at INSYS_HSGAC_00007771.
[193] *Id.* at INSYS_HSGAC_00007770.
[194] *Id.* at INSYS_HSGAC_00007771.
[195] *Id.*
[196] *Id.*
[197] *Id.* at INSYS_HSGAC_00007772.

1034. Yet within a year of this conclusion, according to the recording transcribed below, an Insys IRC employee appears to have misled a PBM representative regarding the IRC employee's affiliation and the diagnosis applicable to Sarah Fuller. The alleged result, in that case, was death due to inappropriate and excessive Subsys prescriptions.

1035. One former Insys sales representative described the motto of this approach to patients as "Start them high and hope they don't die."[198]

## F. The Result of Defendants' Fraudulent Scheme

1036. Through their direct promotional efforts, along with those of the third-party Front Groups and KOLs they assisted and controlled, and whose seemingly objective materials they distributed, Defendants accomplished exactly what they set out to do: change the institutional and public perception of the risk-benefit assessments and standard of care for treating patients with chronic pain. As a result, doctors in the City of Rochester began prescribing opioids long-term to treat chronic pain—something most would never have considered prior to Defendants' campaign.

1037. But for the misleading information disseminated by Defendants, doctors would not, in most instances, have prescribed opioids as medically necessary or reasonably required to address chronic pain.

### 1. Defendants' Fraudulent and Deceptive Marketing of Opioids Directly Caused Harm to the City of Rochester.

1038. In the first instance, the City was damaged directly, through its payments of false claims for chronic opioid therapy by (a) partially funding a medical insurance plan for its employees and (b) its workers' compensation program.

1039. Defendants' marketing of opioids caused health care providers to prescribe, and the City, through partially funding a medical insurance plan for its employees and its workers'

---

[198] Amended Class Action Complaint, *Larson v. Insys Therapeutics Inc.* (D. Ariz. Oct. 27, 2014.)

compensation program, to pay for prescriptions of opioids to treat chronic pain. Because of Defendants' unbranded marketing, health care providers wrote and the City paid for prescriptions of opioids for chronic pain that were filled not only with their drugs, but with opioids sold by other manufacturers. All of these prescriptions were caused by Defendants' fraudulent marketing and therefore all of them constitute false claims. Because, as laid out below, the City is obligated to cover medically necessary and reasonably required care, it had no choice but to pay for these false and fraudulent claims.

1040. The fact that the City would pay for these ineligible prescriptions was both the foreseeable and intended consequence of Defendants' fraudulent marketing scheme. Defendants set out to change the medical and general consensus supporting chronic opioid therapy with the intention of encouraging doctors to prescribe, and government payors such as the City of Rochester, to pay for long-term prescriptions of opioids to treat chronic pain despite the absence of genuine evidence supporting chronic opioid therapy and the contrary evidence regarding the significant risks and limited benefits from long-term use of opioids.

a. Increase in Opioid Prescribing Nationally

1041. Defendants' scheme to change the medical consensus regarding opioid therapy for chronic pain was greatly successful. During the year 2000, outpatient retail pharmacies filled 174 million prescriptions for opioids nationwide, rising to 257 million in 2009.[199]

1042. Opioid prescriptions increased even as the percentage of patients visiting doctors for pain remained constant. A study of 7.8 million doctor visits between 2000 and 2010 found that

---

[199] Office of National Drug Control Policy, *2011 Prescription Drug Abuse Prevention Plan*, Whitehouse.gov, (no longer available on whitehouse.gov), https://obamawhitehouse.archives.gov/ondcp/prescription-drug-abuse1 (accessed May 30, 2017).

opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID and acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline of NSAID use.[200]

1043. Approximately 20% of the population between the ages of 30 and 44 and nearly 30% of the population over 45 have used opioids. Indeed, "[o]pioids are the most common means of treatment for chronic pain."[201] From 1980 to 2000, opioid prescriptions for chronic pain visits doubled. This resulted not from an epidemic of pain, but an epidemic of prescribing. A study of 7.8 million doctor visits found that prescribing for pain increased by 73% between 2000 and 2010—even though the number of office visits in which patients complained of pain did not change and prescribing of non-opioid pain medications *decreased*. For back pain alone—one of the most common chronic pain conditions—the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs or acetaminophen declined and referrals to physical therapy remained steady—and climbing.

1044. This increase corresponds with, and was caused by, Defendants' massive marketing push. As reflected in the chart below, according to data obtained from a marketing research company, Defendants' spending on marketing of opioids nationwide—including all of the drugs at issue here—stood at more than $20 million per quarter and $91 million annually in 2000. By 2011, that figure hit its peak of more than $70 million per quarter and $288 million annually, an increase of more than three-fold. By 2014, the figures dropped to roughly $45 million per quarter and $182 million annually, as Defendants confronted increasing concerns regarding opioid addiction, abuse, and diversion, and as Janssen, which accounted for most of the spending reduction, prepared to sell its U.S. rights to Nucynta and Nucynta ER. Even so, Defendants still spent double what they spent in 2000 on opioid marketing.

---

[200] Matthew Daubresse et al., *Ambulatory* Diagnosis *and Treatment of Nonmalignant Pain in the United States, 2000-2010*, 51(10) Med. Care 870 (2013).

[201] Deborah Grady et al., *Opioids for Chronic Pain,* 171(16) Arch. Intern. Med. 1426 ( 2011).



1045. Defendants' opioid detailing visits to individual doctors made up the largest component of this spending, with total detailing expenditures more than doubling between 2000 and 2014 to $168 million annually.

1046. Each Defendant's promotional spending reflects its participation in this marketing blitz. Between 2000 and 2011:

> • Actavis's promotional spending, which was virtually nonexistent in the 2004–2008 period, began to sharply rise 2009. The third quarter of 2011 saw a peak of $3 million at one point in 2011 and nearly $7 million for the year, as shown below:

268

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM   INDEX NO. E2019005178

NYSCEF DOC. NO. 2   Case: 1:17-md-02804-DAP   Doc #: 6393-2  Filed: 01/06/26  309 of 1171  PageID #: 705628   RECEIVED NYSCEF: 06/05/2019



- Cephalon's quarterly spending steadily climbed from below $1 million in 2000 to more than $4 million in 2014 (and more than $13 million for the year), including a peak, coinciding with the launch of Fentora, of nearly $9 million half way through 2007 (and more than $27 million for the year), as shown below:



269

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM      INDEX NO. E2019005178

NYSCEF DOC. NO. 2      Case: 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  310 of 1171  PageID #: 705629      RECEIVED NYSCEF: 06/05/2019

- Endo's quarterly spending went from the $2 million to $4 million range from 2000 to 2004 to more than $10 million following the launch of Opana ER in mid-2006 (and more than $38 million for the year in 2007) and more than $8 million coinciding with the launch of a reformulated version in 2012 (and nearly $34 million for the year):



- Janssen's quarterly spending dramatically rose from less than $5 million in 2000 to more than $30 million in 2011, coinciding with the launch of Nucynta ER (with yearly spending at $142 million for 2011) as shown below:

270

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM INDEX #: E2019005178

NYSCEF DOC. NO. 2 Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 311 of 1171 PageID #: 705630 RECEIVED NYSCEF: 06/05/2019



- Purdue's quarterly spending notably decreased from 2000 to 2007, as Purdue came under investigation by the Department of Justice, but then spiked to above $25 million in 2011 (for a total of $110 million that year), and continued to rise, as shown below:



271

### b. The City's Increased Spending on Opioids

1047.   As a direct and foreseeable consequence of Defendants' wrongful conduct, Plaintiff has been required to spend millions of dollars each year in its efforts to combat the public nuisance created by Defendants' deceptive marketing campaign. Plaintiff has incurred, and continues to incur, costs related to opioid addiction and abuse, including, but not limited to, health care costs, criminal justice and victimization costs, social costs, and lost productivity costs. Defendants' misrepresentations regarding the safety and efficacy of long-term opioid use proximately caused injury to Plaintiff and its residents.

#### i.   *Defendants' Misrepresentations Were Material*

1048.   Defendants' misrepresentations were material to, and influenced, the City's decisions to pay claims for opioids for chronic pain (and, therefore, to bear its consequential costs in treating overdose, addiction, and other side effects of opioid use). In the first instance, the City would not have been presented with, or paid, claims for opioids that would not have been written but for Defendants' fraudulent and deceptive marketing. Second, the City has demonstrated that Defendants' marketing is material by taking further steps to ensure that the opioids are only prescribed and covered when medically necessary or reasonably required.

1049.   As laid out above, Defendants' misrepresentations related to the City's requirement that medical treatments be medically necessary or reasonably required – a condition of payment for any medical treatment under the City's health plans and workers' compensation program. But for Defendants' fraudulent and deceptive marketing, prescribers would have accurately understood the risks and benefits of opioids and would not have prescribed opioids where not medically necessary or reasonably required to treat chronic pain. Misrepresentations as to, for example, whether patients were likely to become addicted to the drug, would be able to resume life activities, and would

272

experience long-term relief were not minor or insubstantial matters, but the core of prescribers' decision-making.

1050. It is the City's practice not to pay claims that are not medically necessary or reasonably required. However, the City would not have known whether a prescriber had made an informed judgment that a particular claim for opioids was medically necessary or reasonably required, or, conversely had acted under the influence of Defendants' fraudulent and deceptive marketing. It is not clear from the face of a claim whether: (1) the patient suffered from cancer or another terminal condition, for example, where long-term prescribing was medically necessary or appropriate; or (2) the prescriber was exposed to Defendants' marketing materials, treatment guidelines, or education programs, or visited by a drug representative who engaged in affirmative misrepresentations or omissions, for example.

    ii.    *The City's Increased Costs Correlate with Defendants' Promotion*

1051. The City's spending in connection with opioids rose along with Defendants' spending to promote opioids. That spending was directly impacted by opioid use (and its consequences in abuse, addiction, and overdose) in the City of Rochester.

1052. It is also distressing (and a sign of further problems ahead) that the drop in opioid prescribing beginning in 2014 has been accompanied by a corresponding increase in Defendants' promotional spending, which is headed towards a new high, despite evidence of the grave toll that opioids are taking on law enforcement, public health, and individual lives.

    **2. Defendants' Fraudulent and Deceptive Marketing of Opioids Directly Caused Harm to Consumers in the City of Rochester.**

        a.  <u>Increased Opioid Use Has Led to an Increase in Opioid Abuse, Addiction, and Death</u>

1053. Nationally, the sharp increase in opioid use has led directly to a dramatic increase in opioid abuse, addiction, overdose, and death. Scientific evidence demonstrates a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and opioid abuse. "Deaths from opioid overdose have risen steadily since 1990 in parallel with increasing prescription of these drugs."[202] Prescription opioid use contributed to 16,917 overdose deaths nationally in 2011—more than twice as many deaths as heroin and cocaine combined; drug poisonings now exceed motor vehicle accidents as a cause of death. More Americans have died from opioid overdoses than from participation in the Vietnam War.

1054. Contrary to Defendants' misrepresentations, most of the illicit use stems from *prescribed* opioids; in 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from drug dealers or the internet. According to the CDC, the 80% of opioid patients who take low-dose opioids from a single prescriber (in other words, who are not illicit users or "doctor-shoppers") account for 20% of all prescription drug overdoses.

1055. Death statistics represent only the tip of the iceberg. According to 2009 data, for every overdose death that year, there were nine abuse treatment admissions, 30 emergency department visits for opioid abuse or misuse, 118 people with abuse or addiction problems, and 795 non-medical users. Nationally, there were more than 488,000 emergency room admissions for opioids other than heroin in 2008 (up from almost 173,000 in 2004).

1056. Emergency room visits tied to opioid use likewise have sharply increased in the City of Rochester.

1057. Widespread opioid use and abuse in the City of Rochester are problems even when they do not result in injury or death. Opioid addiction is affecting residents of all ages, ethnicities, and socio-economic backgrounds in the City. Many addicts start with a legal opioid prescription—chronic

---

[202] Deborah Grady et al., *Opioids for Chronic Pain,* 171(16) Arch. Intern. Med. 1426 ( 2011).

274

back pain, fibromyalgia, or even dental pain—and do not realize they are addicted until they cannot stop taking the drugs.

1058. These glaring omissions, described consistently by counselors and patients, mirror and confirm Defendants' drug representatives' own widespread practice, as described above, of omitting any discussion of addiction from their sales presentations to physicians or in their "educational" materials.

b.  Increased Opioid Use Has Increased Costs Related to Addiction Treatment

1059. The City of Rochester has opioid treatment programs, Substance Alternative Clinics, that provide a comprehensive treatment program for persons addicted to heroin or other opioids.

1060. In addition to intense counseling, many treatment programs prescribe additional drugs to treat opioid addiction. Nationally, in 2012, nearly 8 billion prescriptions of the two drugs commonly used to treat opioid addiction—buprenorphine/naloxone and naltrexone—were written and paid for. Studies estimate the total medical and prescription costs of opioid addiction and diversion to public and private healthcare payors to be $72.5 billion.

c.  Increased Opioid Use Has Fueled An Illegal Secondary Market for Narcotics and the Criminals Who Support It

1061. Defendants' success in extending the market for opioids to new patients and chronic conditions has created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury. Defendants' scheme supplies both ends of the secondary market for opioids—producing both the inventory of narcotics to sell and the addicts to buy them. One researcher who has closely studied the public health consequences of opioids has found, not surprisingly, that a "substantial increase in the nonmedical use of opioids is a predictable adverse

275

effect of substantial increases in the extent of prescriptive use."[203] It has been estimated that the majority of the opioids that are abused come, directly or indirectly, through doctors' prescriptions.

1062. A significant black market in prescription opioids also has arisen, not only creating and supplying additional addicts, but fueling other criminal activities.

1063. In addition, because heroin is cheaper than prescription painkillers, many prescription opioid addicts migrate to heroin. Self-reported heroin use nearly doubled between 2007 and 2012, from 373,000 to 669,000 individuals. In 2010, more than 3,000 people in the U.S. died from heroin overdoses, also nearly double the rate in 2006. Nearly 80% of those who used heroin in the past year had previously abused prescription opioids. Patients become addicted to opioids and then move on to heroin because these prescription drugs are roughly four times more expensive than heroin on the street. In the words of one federal DEA official, "Who would have ever thought in this country it would be cheaper to buy heroin than pills . . . [t]hat is the reality we're facing."[204]

1064. That reality holds true in the City of Rochester. According to addiction programs, a typical course sees addicts requesting more and more opioids from their doctors, who eventually cut them off. Many addicts then doctor-shop for additional prescriptions, and when that source runs out, turn to the streets to buy opioids illicitly. A significant number become heroin addicts. Addiction treatment programs, whose patient populations vary, reported rates of patients who had switched from prescription opioids to heroin ranging from half to 95%. Those addicts who do reach treatment centers often do so when their health, jobs, families and relationships reach the breaking point, or after turning to criminal activity such as prostitution and theft to sustain their addiction. Unfortunately, few are successful in getting and staying clean; repeated relapse is common.

---

[203] G. Caleb Alexander et al., *Rethinking Opioid Prescribing to Protect Patient Safety and Public Health*, 308(18) JAMA 1865 (2012).

[204] Matt Pearce & Tina Susman, *Philip Seymour Hoffman's death calls attention to rise in heroin use*, L.A. Times, Feb. 3, 2014, http://articles.latimes.com/2014/feb/03/nation/la-na-heroin-surge-20140204 (accessed May 30, 2017).

### 3. Defendants' Fraudulent Marketing Has Led to Record Profits

1065. While the use of opioids has taken an enormous toll on the City of Rochester and its residents, Defendants have gained blockbuster profits. In 2012, health care providers wrote 259 million prescriptions for opioid painkillers nationally[205]—roughly one prescription per American adult. Opioids generated $8 billion in revenue for drug companies just in 2010.

1066. Financial information—where available—indicates that Defendants each experienced a material increase in sales, revenue, and profits from the fraudulent, misleading, and unfair market activities laid out above. Purdue's OxyContin sales alone increased from $45 million in 1996 to $3.1 billion in 2010.

### 4. Defendants Fraudulently Concealed Their Misrepresentations

1067. At all times relevant to this Complaint, Defendants took steps to avoid detection of, and fraudulently conceal, their deceptive marketing and conspiratorial behavior.

1068. First, and most prominently, Defendants disguised their own roles in the deceptive marketing of chronic opioid therapy by funding and working through patient advocacy and professional front organizations and KOLs. Defendants purposefully hid behind these individuals and organizations to avoid regulatory scrutiny and to prevent doctors and the public from discounting their messages.

1069. While Defendants were listed as sponsors of many of the publications described in this Complaint, they never disclosed their role in shaping, editing, and exerting final approval over their content. Defendants exerted their considerable influence on these promotional and "educational" materials.

---

[205] Press Release, Center for Disease Control, Opioid painkiller prescribing varies widely among states: Where you live makes a difference (July 1, 2014), https://www.cdc.gov/media/releases/2014/p0701-opioid-painkiller.html (accessed May 30, 2017).

1070. In addition to hiding their own role in generating the deceptive content, Defendants manipulated their promotional materials and the scientific literature to make it appear as if they were accurate, truthful, and supported by substantial scientific evidence. Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions they did not actually support. The true lack of support for Defendants' deceptive messages was not apparent to the medical professionals who relied upon them in making treatment decisions, nor could they have been detected by the City.

1071. Thus, while the opioid epidemic was evident, Defendants, in furtherance of their respective marketing strategies, intentionally concealed their own role in causing it. Defendants successfully concealed from the medical community, patients, and health care payers facts sufficient to arouse suspicion of the existence of claims that the City now asserts. The City was not alerted to the existence and scope of Defendants industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

1072. Through their public statements, marketing, and advertising, Defendants' deceptions deprived the City of actual or presumptive knowledge of facts sufficient to put them on notice of potential claims.

## G. Defendants Entered into and Engaged in a Civil Conspiracy

1073. Defendants entered into a conspiracy to engage in the wrongful conduct complained of herein, and intended to benefit both independently and jointly from their conspiratorial enterprise.

1074. Each of the Defendants either actively participated and/or aided and abetted in the pursuance of this common purpose. Each of the participants in the opioid promotion enterprise described herein received substantial revenue from the scheme, in the form of sales for Manufacturer Defendants, sales and kickbacks for Distributor Defendants who reached particular monthly goals, and rebates or other financial incentives for PBM Defendants who placed opioids in a preferred place

278

on a formulary or otherwise made opioids available for improper use—all in an effort to maximize profits.

1075. Defendants reached an agreement between themselves to set up, develop, and fund an unbranded promotion and marketing network to promote the use of opioids for the management of pain in order to mislead physicians, patients, and others through misrepresentations or omissions regarding the appropriate uses, risks and safety of opioids.

1076. At all relevant times, each Defendants was aware of the enterprise's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct in the form of increased sales, distributions, and prescriptions of opioids. In fact, Distributor Defendants received kick-backs from Manufacturer Defendants if they reached particular monthly goals and PBM Defendants received rebates and other financial incentives to promote the Manufacturer Defendants' drugs to ensure they were widely sold.

1077. This network is interconnected, interrelated and relied upon Defendants' collective use of and reliance upon unbranded marketing materials, such as KOLs, scientific literature, CMEs, patient education materials, and Front Groups. These materials were developed and funded collectively by Defendants, and Defendants relied upon the materials to intentionally mislead consumers and medical providers of the appropriate uses, risks and safety of opioids.

1078. By knowingly misrepresenting the appropriate uses, risks, and safety of opioids, Defendants committed overt acts in furtherance of their conspiracy.

**H. PBMs Ensured that Opioids Were Regularly Prescribed and Flooded the Market**

1079. PBMs are brokers between payers (representing patients), drug manufacturers, and retailers and they influence which drug products are used most frequently and set prices for pharmacies.

279

1080. The big three PBMs manage the drug benefits for nearly 95% of the population.[206] They control what drugs are covered by virtually all health insurance providers for over 260 million people. PBMs made almost $260 billion last year.[207] In 2015 they covered most of the 4 billion retail prescriptions that were covered in the United States.[208] They are key participants and play a crucial role in the administration of prescription drugs.[209]

1081. PBM influence is notable especially considering the lack of competition in the PBM space. Market concentration is an important indicator of a company's ability to earn extraordinary returns, and several segments in the United States pharmaceutical distribution system are highly concentrated.[210]

1082. With this kind of monopolistic structure, the top three PBMs have almost exclusive control over the dissemination of opioids. In concert with drug manufacturers who give them rebates as an incentive,[211] they choose which drugs will be on a health insurance company's formulary, thus determining which drugs will be covered. If an insurance plan does not cover a drug, that drug will not enter the marketplace to be abused.

1083. People with chronic pain are at the mercy of PBMs, yet PBMs make it more difficult to get pain medication that is less addictive and easier to get opioids, because opioids are generally cheaper than non-opioid alternatives. According to a study by the New York Times and ProPublica

---

[206] Brittany Hoffman-Eubanks, The Role of Pharmacy Benefit Managers in American Health Care: Pharmacy Concerns and Perspectives: Part 1, PHARMACY TIMES, Nov. 14, 2017, http://www.pharmacytimes.com/news/the-role-ofpharmacy-benefit-mangers-in-american-health-care-pharmacy-concerns-and-perspectives-part-1
[207] John Breslin, Health care experts call for more transparency into PBMs, PATIENTDAILY, Dec. 20, 2017, https://patientdaily.com/stories/511298841-health-care-experts-call-for-more-transparency-into-pbms
[208] Lydia Ramsey and Skye Gould, A huge pharma middleman just lost its biggest customer — and it shows how drug pricing really works, BUSINESS INSIDER, Apr. 25, 2017, http://www.businessinsider.com/express-scripts-esrx-anthemnot-renewing-pbm-2017-4
[209] Health Policy Brief, supra note 33.
[210] Neeraj Sood, Tiffany Shih, Karen Van Nuys, Dana Goldman, Follow the Money: The Flow of Funds In the Pharmaceutical Distribution System, HEALTH AFFAIRs, Jun. 13, 2017, https://www.healthaffairs.org/do/10.1377/hblog20170613.060557/full/
[211] Health Policy Brief, supra note 33.

280

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 321 of 1171. PageID #: 705640

of 35.7 million people on Medicare prescription drug plans, in the second quarter of 2017 only one-third of them had access to pain medication less addictive than opioids.[212]

1084. The Manufacturer and PBM Defendants and their co-conspirators engaged in a conspiracy to increase the use of the least expensive, most addictive opioid by controlling the drugs' placement on the formulary. The PBM formularies are a critical piece of the enterprise described herein. The enterprise would not have succeeded absent the opioids' placement on the formulary. The formulary controlled which opioids were paid for, reimbursed, and covered by public and private pharmacy benefit plans.

1085. The PBM and Manufacturer Defendants coordinated to ensure that the PBM Defendants got the maximum profit at the expense of patients.

1086. Even when they were asked to limit accessibility to opioids, PBMs refused. The seeds of the opioid epidemic were sown with early overprescription of OxyContin. In 2001, when officials in the West Virginia state employee health plan tried to get Purdue, which manufactured OxyContin, to require pre-authorization, Purdue refused.[213] Using the financial quid pro quo it had with the state's PBM, it paid Merck Medco (now Express Scripts) to prevent insurers from limiting access to the drug:

> The strategy to pay Merck Medco extended to other big pharmacy benefit managers and to many other states, according to a former Purdue official responsible for ensuring favorable treatment for OxyContin. The payments were in the form of "rebates" paid by Purdue to the companies. In return, the pharmacy benefit managers agreed to make the drug available without prior authorization and with low copayments.
>
> "That was a national contract," Bernadette Katsur, the former Purdue official, who negotiated contracts with pharmacy benefit managers, said in an interview. "We would negotiate a certain rebate percentage for keeping it on a certain tier related to copay or whether

---

[212] Thomas and Ornstein, supra note 45.

[213] David Armstrong, Drug maker thwarted plan to limit OxyContin prescriptions at dawn of opioid epidemic, STAT, Oct. 26, 2016, https://www.statnews.com/2016/10/26/oxycontin-maker-thwarted-limits/

281

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM
NYSCEF DOC. NO. 2

INDEX #: E2019005178
Index #: E2019005178
RECEIVED NYSCEF: 06/05/2019

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 322 of 1171. PageID #: 705641

it has prior authorization. We like to keep prior authorization off of any drug."[214]

1087. PBMs are "driving patients to opioids, away from abuse-deterrent form (ADF) and less addictive forms of opiates through formulary and pricing strategies."[215]

1088. Not only do PBMs place roadblocks in the way of limiting excessive opioid prescriptions, they also make it more difficult to obtain Abuse Deterrent Formula (ADF) opioids. These pills are more difficult to physically alter (crushing to snort or dissolving to inject) and therefore are less prone to abuse.[216] The three major PBMs carry at most 3 of the 10 FDA approved ADF opioids, while CVS Caremark, which has nearly 90 million members, carries none.[217] A study by Tufts CSSD found that ninety-six percent (96%) of all prescription opioids were non-ADF in 2015.[218]

1089. This denial was endorsed by the Institute for Clinical and Economic Review, a private organization funded in part by some of the largest health plans and PBMs, that claimed that ADF opioids provided neither financial or societal benefits, even though they were given data showing that ADF OxyContin could prevent 4,300 cases of abuse and save $300 million over a five-year period.[219]

> ICER ignored research that demonstrated abuse deterrent Oxy reduced abuse by 20 percent and reduced the average daily dose of OxyContin from 80mg to 60mg. Perhaps even more important, it reduced sharing and selling of the drug for getting high ("diversion") by nearly 90 percent. The diversion of generic painkillers is responsible for as many as 63 percent of fatal prescription drug

---

[214] Id.

[215] Charles L. Bennett MD PhD MPP, Do you have pain, cancer, or diabetes? Your PBM may now be your doctor for these illnesses, COLLABRX, Dec. 27, 2017, http://www.collabrx.com/pain-cancer-diabetes-pbm-may-now-doctorillnesses/

[216] Peter J. Pitts, Pharmacy benefit managers are driving the opioid epidemic, SW NEWS MEDIA, Nov. 21, 2017, http://www.swnewsmedia.com/shakopee_valley_news/news/opinion/guest_columns/pharmacy-benefit-managersare-driving-the-opioid-epidemic/article_2f6be2a1-c7a3-5f8d-9f3e-, 61d29d25c84b.html

[217] Charles L. Bennett MD PhD MPP, Do you have pain, cancer, or diabetes? Your PBM may now be your doctor for these illnesses, COLLABRX, Dec. 27, 2017, http://www.collabrx.com/pain-cancer-diabetes-pbm-may-now-doctorillnesses/

[218] Pitts, supra note 214.

[219] Robert Goldberg & Peter Pitts, ICER Perpetuates the Opioid Crisis, Morning Consult, MORNING CONSULT, May 11, 2017, https://morningconsult.com/opinions/icer-perpetuates-opioid-crisis/

282

overdoses. ICER consciously decided to ignore the human cost of this deadly behavior.

What the ICER report ignores entirely is that one of the factors driving abuse and addiction is the inappropriate use of generic opioids for conditions that have non-opioid, on-label options. Fifty-two percent of patients diagnosed with osteoarthritis receive an opioid pain medicine as first-line treatment, as do 43 percent of patients diagnosed with fibromyalgia and 42 percent of patients with diabetic peripheral neuropathy.[220]

1090. What is inconceivable is that PBMs, while making it easy to obtain generic highly addictive opioids, make it **harder** to obtain **treatment**. The NY Times/ProPublica study found that insurers have erected more hurdles to approving addiction treatments than for the addictive substances themselves.[221] Only after being subject to much public pressure and congressional investigations did some insurers remove the barriers to addiction treatment.

1091. A 2008 study by the Mayo Clinic[222] found that patients who were weaned off opioids and followed a non-drug treatment experienced less pain than when they were on opioids and had improved functioning. Some plans cover these costs but other do not.[223]

1092. PBM Defendants fraudulently hid their financial relationship with Manufacturer Defendants, making it impossible for the City of Rochester to discover the PBM Defendants' role in promoting opioids through reasonable diligence.

1093. The Manufacturer Defendants knowingly and intentionally financially incentivized the PBM Defendants to place their opioids on the PBMs formularies irrespective of medical necessity, resulting in widespread and unnecessary overuse.

---

[220] Id.
[221] Thomas and Ornstein, supra note 45.
[222] Available at https://www.ncbi.nlm.nih.gov/pubmed/18804915
[223] Barry Meier and Abby Goodnough, New Ways To Treat Pain Meet Resistance, THE NEW YORK TIMES, Jun. 22, 2016, https://www.nytimes.com/2016/06/23/business/new-ways-to-treat-pain-without-opioids-meet-resistance.html ?mcubz=1.

283

1094. The PBM Defendants knowingly and intentionally chose to include opioids on their formularies that were more addictive to users because they generated greater profits. This failure led directly to the increased likelihood of addiction.

1095. The PBM Defendants knowingly and intentionally chose to include opioids that were easier to misuse (for example, by crushing them into powder and mixing them with liquid in order to inject them) instead of Abuse Deterrent Formulations ("ADFs") which tended to be more expensive. This choice directly led to the ease with which the pills could be misused.

1096. The PBM Defendants knowingly and intentionally made it more expensive or more difficult to obtain knowingly efficacious non-opioid medications for pain. This led directly to the increased sale and use of opioids.

1097. The PBM Defendants knowingly and intentionally chose not to include certain medications that would prevent overdoses or made them more difficult or expensive to obtain.

1098. The PBM Defendants chose not to cover or provide less coverage for drug treatment.

1099. The PBM Defendants knowingly and intentionally created their formularies to ensure that an excessive number of pills were made available to users for use and abuse.

1100. The PBM Defendants made deceptive representations about using opioids to treat chronic pain and/or omitting or concealing material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. Each PBM Defendant's omissions rendered even their seemingly truthful statements about opioids deceptive.

1101. The efforts to artificially increase the number of opioids prescriptions, implemented by PBMs, directly and predictably caused a corresponding increase in opioid abuse. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and **has increased**

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 325 of 1171. PageID #: 705644

in parallel with [opioid] overdoses."[224] Many abusers start with legitimate prescriptions. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "[t]o reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[225] The PBMs' role in increasing prescriptions played an enormous role in the current opioid epidemic.

1102. The PBM Defendants also had the power to shut off the supply of illicit opioids into the City.

1103. The PBM Defendants had the power to minimize the sale and use of less effective, more addictive and more divertible opioids. They could have prohibited doctors from prescribing opioids for non-chronic pain when other non-opioid options were available. They could have responded favorably to direct requests from governmental payors attempting to control opioid flow. They could have made it easier for patients to access less addictive, less dangerous drugs.

1104. There are steps the PBMs could take. They could make it easier to access other nonaddictive forms of pain relief. They could require doctors to start treating pain first with non-opioid pain medications as recommended by the CDC and turn to opioids as a last resort. They could cover alternative, non-medication treatments for pain. They could make addiction treatment more accessible. They could make their pricing more transparent so everyone could see if they were being improperly influenced by manufacturers to make choices for financial, not medical reasons. No single actor is to blame for this epidemic, but PBMs have a unique role to play.

## I. Defendants Flooded Plaintiff the City of Rochester with Suspiciously Large Amounts of Opioids.

1105. The Distributor Defendants are opioid distributors in the City.

---

[224] 3 Rose A Rudd, et al., Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014, MORBIDITY AND MORTALITY WKLY REP., Jan. 1, 2016, https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm (emphasis added)
[225] Id.

1106. The Distributor Defendants purchased opioids from manufacturers, such as the named defendants herein, and sold them to pharmacies throughout the City.

1107. The Distributor Defendants played an integral role in the chain of opioids being distributed throughout the City.

1108. Pursuant to Section 80.22 of the New York Codes, Rules and Regulations, entitled "Suspicious Orders," the Defendants are required to:

> [E]stablish and operate a system to disclose to the licensee suspicious orders for controlled substances and inform the department of such suspicious orders. Suspicious orders shall include, but not be limited to, orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

1109. The Defendants were each on notice that the controlled substances they manufactured and distributed were the kinds that were susceptible to diversion for illegal purposes, abused, overused, and otherwise sought for illegal, unhealthy and problematic purposes.

1110. The Defendants were each on notice that there was an alarming and suspicious rise in manufacturing and distributing opioids to retailers within the City during this time period.

1111. As entities involved in the manufacture and distribution of opioid medications, Defendants were engaged in abnormally and/or inherently dangerous activity and had a duty of care under New York Law.

1112. The Defendants had a duty to notice suspicious or alarming orders of opioid pharmaceuticals and to report suspicious orders to the proper authorities and governing bodies including the DEA and the New York State Department of Health.

1113. The Defendants knew or should have known that they were supplying vast amounts of dangerous drugs to the City that were already facing abuse, diversion, misuse, and other problems associated with the opioid epidemic.

1114. The Defendants failed in their duty to take any action to prevent or reduce the distribution of these drugs.

286

1115. The Defendants were in a unique position and had a duty to inspect, report, or otherwise limit the manufacture and flow of these drugs to the City.

1116. The Defendants, in the interest of their own massive profits, intentionally failed in this duty.

1117. The Defendants have displayed a continuing pattern of failing to submit suspicious order reports.

1118. In 2008, McKesson paid a $13.25 million fine to settle similar claims regarding suspicious orders from internet pharmacies.[226]

1119. Despite these prior penalties, McKesson's pattern of failing to report suspicious orders continued for many years.

1120. According to the DEA, McKesson "supplied various U.S. pharmacies an increasing amount of oxycodone and hydrocodone pills" during the time in question, and "frequently misused products that are part of the current opioid epidemic."[227]

1121. On January 17, 2017, the DEA announced that McKesson had agreed to pay a record $150 million fine and suspend the sale of controlled substances from distribution centers in several states.[228]

1122. In 2008, defendant Cardinal paid a $34 million penalty to resolve allegations that it failed to report suspicious opioid orders.[229]

---

[226] http://www.wvgazettemail.com/news-health/20161218/suspicious-drug-order-rules-never-enforced-by-state (accessed May 30, 2017).

[227] https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders (accessed May 30, 2017).

[228] *Id.*

[229] https://www.justice.gov/usao-wdwa/pr/united-states-reaches-34-million-settlement-cardinal-health-civil-penalties-under-0 (access May 30, 2017).

287

1123. Despite this past penalty, in 2017, it was announced that defendant Cardinal agreed to a $44 million fine to "resolve allegations that it failed to alert the Drug Enforcement Agency to suspicious orders of powerful narcotics by pharmacies in Florida, Maryland, and New York.[230]

1124. Defendant Amerisource faced a criminal inquiry "into its oversight of painkiller sales" in 2012.[231] They have paid out fines for similar claims to the state of West Virginia.

1125. Despite the charges, fines, and penalties brought against the Distributor Defendants in the past, they continued to fail to report suspicious orders or prevent the flow of prescription opioids, including into the City.

1126. The Distributor Defendants are also members of the Healthcare Distribution Management Association ("HDMA"). The HDMA created "Industry Compliance Guidelines" which stressed the critical role of each member of the supply chain in distributing controlled substances. The HDMA guidelines provided that "[a]t the center of a sophisticated supply chain, Distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

1127. Between the years in question, including 2007 through 2016, the Distributor Defendants have shipped millions of doses of highly addictive controlled opioid pain killers into the City.

1128. Many of these orders should have been stopped, or at the very least, investigated as potential suspicious orders.

---

[230] https://www.washingtonpost.com/national/health-science/cardinal-health-fined-44-million-for-opioid-reporting-violations/2017/01/11/4f217c44-d82c-11e6-9a36-1d296534b31e_story.html?utm_term=.7049c4431465 (accessed on May 30, 2017).

[231] http://www.nytimes.com/2013/06/12/business/walgreen-to-pay-80-million-settlement-over-painkiller-sales.html (accessed on May 30, 2017).

288

1129. The sheer volume of the increase in opioid pain medications, including OxyCodone, being distributed to retailers, should have put the Defendants on notice to investigate and report such orders.

1130. The Defendants manufactured and delivered an excessive and unreasonable amount of opioid pain medications to retailers in the City.

1131. Upon information and belief, the Defendants did not refuse to manufacture, ship, or supply any opioid medications to any pharmacy in the City from 2007 to the present.

1132. The Defendants knew or should have known that they were manufacturing and distributing levels of opioid medications that far exceeded the legitimate needs of the City.

1133. The Defendants also paid their sales force bonuses and commissions on the sale of most or all of the highly addictive opioid pain medications within the City.

1134. The Defendants made substantial profits from the opioids sold in the City.

1135. The Defendants violated New York State Department of Health rules and regulations for manufacturers and distributors, including the aforementioned section 80.22, by failing to properly report suspicious orders.

1136. By the actions and inactions described above, the Defendants showed a reckless disregard for the safety of the residents of the City.

1137. By the actions and inactions described above, the Defendants caused great harm to the City.

1138. On December 27, 2007, the U.S. Department of Justice, Drug Enforcement Administration, sent a letter to Cardinal stating, "This letter is being sent to every entity in the United States registered with the Drug Enforcement Agency (DEA) to manufacture or distribute controlled substances. The purpose of this letter is to reiterate the responsibilities of controlled substance

289

manufacturers and distributors to inform DEA of suspicious orders in accordance with 21 C.F.R. § 1301.74(b)."

1139. The DEA has provided briefings to each of the Defendant Distributors and conducted a variety of conferences regarding their duties under federal law.

1140. The DEA sent a letter to each of the Defendant Distributors on September 26, 2006, warning that it would use its authority to revoke and suspend registrations when appropriate. The letter expressly states that a distributor, in addition to reporting suspicious orders, has a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels." The DEA warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."

1141. The DEA sent a second letter to each of the Defendant Distributors on December 27, 2007. This letter reminded the Defendant Distributors of their statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances." The letter further explains:

> The regulation also requires that the registrant inform the local DEA Division Office of suspicious orders when discovered by the registrant. Filing a monthly report of completed transactions (e.g., "excessive purchase report" or "high unity purchases") does not meet the regulatory requirement to report suspicious orders. Registrants are reminded that their responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels. Reporting an order as suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted.

> The regulation specifically states that suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency. These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a registrant need not wait for a "normal pattern" to develop over time before determining whether a particular order is suspicious. The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the

290

order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer, but also on the patterns of the registrant's customer base and the pattern throughout the segment of the regulated industry.

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor. Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially. Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communication with DEA that the registrant is actually characterizing an order as suspicious. Daily, weekly, or monthly reports submitted by registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."

Lastly, registrants that routinely report suspicious orders, yet fill these orders without first determining that order is not being diverted into other than legitimate medical, scientific, and industrial channels, may be failing to maintain effective controls against diversion. Failure to maintain effective controls against diversion is inconsistent with the public interest as that term is used in 21 U.S.C. §§ 823 and 824, and may result in the revocation of the registrant's DEA Certificate of Registration.

1142. As a result of the decade-long refusal by the Defendant Distributors to abide by federal law, the DEA has repeatedly taken administrative action to force compliance. The United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions, reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012. The Office of Administrative Law Judges issued a recommended decision in a total of 177 registrant actions before the DEA issued its final decision, including 76 actions involving orders to show cause and 41 actions involving immediate suspension orders. The Drug Enforcement Administration's Adjudication of Registrant Actions, United States Department of Justice, Office of the Inspector

291

General, Evaluation and Inspections Divisions, I-2014-003 (May 2014). The public record reveals

many of these actions:

> On April 24, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the AmerisourceBergen Orlando, Florida distribution center (Orlando Facility) alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement which resulted in the suspension of its DEA registration;
> On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Auburn, Washington Distribution Center (Auburn Facility) for failure to maintain effective controls against diversion of hydrocodone;

> On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center (Lakeland Facility) for failure to maintain effective controls against diversion of hydrocodone;

> On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Swedesboro, New Jersey Distribution Center (Swedesboro Facility) for failure to maintain effective controls against diversion of hydrocodone;

> On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Stafford, Texas Distribution Center (Stafford Facility) for failure to maintain effective controls against diversion of hydrocodone;

> On May 2, 2008, McKesson Corporation entered into an Administrative Memorandum of Agreement (2008 MOA) with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

> On September 30, 2008, Cardinal Health entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility, and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia (McDonough Facility), Valencia, California (Valencia Facility) and Denver, Colorado (Denver Facility);

> On February 2, 2012, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center

292

(Lakeland Facility) for failure to maintain effective controls against diversion of oxycodone;

On June 11, 2013, Walgreens paid $80 million in civil penalties for dispensing violations under the CSA regarding the Walgreens Jupiter Distribution Center and six Walgreens retail pharmacies in Florida;

On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

On January 5, 2017, McKesson Corporation entered into an Administrative Memorandum Agreement with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora, CO; Aurora, IL; Delran, NJ; La Crosse, WI; Lakeland, FL; Landover, MD; La Vista, NE; Livonia, MI; Methuen, MA; Santa Fe Springs, CA; Washington Courthouse, OH; and West Sacramento, CA.

1143. Rather than abide by these public safety statutes, the Defendant Distributors, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any violations of law before a suspension order can be issued.[232]

**FIRST CAUSE OF ACTION**

---

[232] *See* Lenny Bernstein and Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, WASH. POST (Oct. 22, 2016), https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic- grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html?utm_term=.d84d374ef062; Lenny Bernstein and Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, WASH. POST (Mar. 6, 2017), https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea- enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html?utm_term=.b44410552cde.

## DECEPTIVE ACTS AND PRACTICES
## NEW YORK GENERAL BUSINESS LAW §349
## (AGAINST ALL DEFENDANTS)

1144. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

1145. Defendants' acts were consumer oriented.

1146. Defendants' acts and/or practices are "deceptive or misleading in a material way" and include but are not limited to:

   a. misrepresenting the truth about how opioids lead to addiction;

   b. misrepresenting that opioids improve function;

   c. misrepresenting that addiction risk can be managed;

   d. misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction;"

   e. falsely claiming that withdrawal is simply managed;

   f. misrepresenting that increased doses pose no significant additional risks;

   g. falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

1147. Defendants' acts and/or practices caused actual harm to the City.

1148. The City has been injured as a result of Defendants' acts and/or practices.

1149. New York General Business Law § 349 declares unlawful any deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the state, and allows any person who has been injured by reason of any violation of that statute to bring an action to recover actual damages.

1150. Defendants violated New York General Business Law § 349, because they engaged in false advertising in the conduct of a business, trade or commerce in this state.

294

1151. Plaintiff and its residents have been injured by reason of Defendants' violation of § 349.

1152. Plaintiff is entitled to recover its damages caused by the violation of New York General Business Law § 349 by the defendants in an amount to be determined at trial, subject to trebling, plus attorneys' fees.

## SECOND CAUSE OF ACTION

### FALSE ADVERTISING
### NEW YORK GENERAL BUSINESS LAW §350
### (AGAINST ALL DEFENDANTS)

1153. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

1154. Defendants violated New York General Business Law § 350, because they engaged in false advertising in the conduct of a business, trade or commerce in this state.

1155. Defendants' acts were consumer oriented and triggered reliance by patients, physicians and others.

1156. Defendants' acts and/or practices are "deceptive or misleading in a material way" and include but are not limited to:

    a.  Misrepresenting the truth about how opioids lead to addiction;

    b.  misrepresenting that opioids improve function;

    c.  misrepresenting that addiction risk can be managed;

    d.  misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction;"

    e.  falsely claiming that withdrawal is simply managed;

    f.  misrepresenting that increased doses pose no significant additional risks;

295

    g.   falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

1157.  Defendants' acts and/or practices caused actual harm to the City.

1158.  The City has been injured as a result of Defendants' acts and/or practices.

1159.  Plaintiff and its residents have been injured by reason of Defendants' violation of § 350.

1160.  Plaintiff is entitled to recover its damages caused by the violation of New York General Business Law § 349 by the Defendants in an amount to be determined at trial, subject to trebling, plus attorneys' fees

### THIRD CAUSE OF ACTION

### PUBLIC NUISANCE
### (AGAINST ALL DEFENDANTS)

1161.  Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

1162.  Defendants, individually and acting through their employees and agents, and in concert with each other, have intentionally, recklessly, or negligently engaged in conduct or omissions which endanger or injure the property, health, safety or comfort of a considerable number of persons in the City of Rochester by their production, promotion, and marketing of opioids for use by residents of the City of Rochester.

1163.  Defendants' conduct and subsequent sale of its opioid products is not only unlawful and unreasonable, but has also resulted in substantial and unreasonable interference with the public health, and the public's enjoyment of its right not to be defrauded or negligently injured.

1164.  Defendants' conduct is not insubstantial or fleeting. In fact, defendants' unlawful conduct has so severely impacted public health on every geographic and demographic level that the

296

public nuisance perpetrated by defendants' conduct is commonly referred to as a "crisis" or an "epidemic." It has caused deaths, serious injuries, and a severe disruption of public peace, order and safety; it is ongoing, and it is producing permanent and long-lasting damage.

1165. Defendants' conduct constitutes a public nuisance.

1166. Defendants' nuisance-causing activities are not outweighed by the utility of Defendants' behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimate societal interest in the Manufacturer Defendants' dissemination of false "scientific" facts and advice in their pursuit of increased profits. There is no legitimate societal interest in the Distributor Defendants failing to identify, halt, and report suspicious opioid transactions. There is no legitimate societal interest in the PBM Defendants promoting and reimbursing for pills that are more addictive and easier to divert purely for financial reasons by giving such drugs prime position on their formularies.

1167. Defendants' conduct directly and proximately caused injury to Plaintiff and its residents.

1168. Plaintiff and its residents suffered special injuries distinguishable from those suffered by the general public.

1169. Plaintiff is entitled to recover its damages caused by Defendants' creation of this public nuisance in an amount to be determined at trial, plus costs and attorneys' fees.

### FOURTH CAUSE OF ACTION

### VIOLATION OF NEW YORK SOCIAL SERVICES LAW § 145-B
### (AGAINST ALL DEFENDANTS)

1170. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

297

1171.  Defendants violated Social Services Law § 145-b, because they knowingly, by means of a false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of themselves or others, attempted to obtain or obtained payment from public funds for services or supplies furnished or purportedly furnished pursuant to Chapter 55 of the Social Services Law.

1172.  Plaintiff is a "political subdivision" of the State of New York as that term is used in § 145- b (1) (b) and a "local social services district" as that term is used in § 145-b (2).

1173.  As set forth herein, Defendants have knowingly set forth false statements or representations, deliberately concealed material facts, and/or perpetuated a fraudulent scheme, in attempts to obtain payment for opioids from public funds for services or supplies furnished by Plaintiff pursuant to Chapter 55.

1174.  By reason of Defendants' violation of § 145-b, Plaintiff has been damaged.

1175.  Plaintiff is entitled to recover its damages caused by Defendants' violation of § 145-b in an amount to be determined at trial and subject to the apportionment provisions of § 145-b.

## FIFTH CAUSE OF ACTION

### FRAUD
### (AGAINST ALL DEFENDANTS)

1176.  Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

1177.  Defendants, individually and acting through their employees and agents, and in concert with each other, knowingly made material misrepresentations and omissions of facts to Plaintiff and its residents to induce them to purchase, administer, and consume opioids as set forth in detail above.

1178.  Defendants knew at the time that they made their misrepresentations and omissions that they were false.

298

1179. Defendants intended that Plaintiff, its residents and others would rely on their misrepresentations and omissions.

1180. Plaintiff, its residents and others reasonably relied upon Defendants' misrepresentations and omissions.

1181. In the alternate, the Defendants recklessly disregarded the falsity of their representations regarding opioids.

1182. By reason of their reliance on Defendants' misrepresentations and omissions of material fact Plaintiff and its residents suffered actual pecuniary damage.

1183. Defendants' conduct was willful, wanton, and malicious and was directed at the public generally.

1184. Plaintiff is entitled to recover its damages caused by defendants' fraud in an amount to be determined by trial.

## SIXTH CAUSE OF ACTION

### UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

1185. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

1186. Defendants acted willfully, wantonly, and with conscious disregard of the rights of the Plaintiff and its residents.

1187. As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from opioid purchases made by Plaintiff and its residents.

1188. In exchange for the opioid purchases, and at the time Plaintiff and its residents made these payments, Plaintiff and its residents expected that Defendants had provided all of the necessary

and accurate information regarding those risks and had not misrepresented any material facts regarding those risks.

1189. Defendants, through the wrongful conduct described above, have been unjustly enriched at the expense of Plaintiff.

1190. In equity and good conscience, it would be unjust and inequitable to permit defendants to enrich themselves at the expense of the Plaintiff and its residents.

1191. By reason of the foregoing, Defendants must disgorge its unjustly acquired profits and other monetary benefits resulting from its unlawful conduct and provide restitution to the Plaintiff.

## SEVENTH CAUSE OF ACTION

### NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

1192. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

1193. Defendants have a duty to exercise reasonable care in the distribution of opioids.

1194. Defendants breached this duty by failing to take any action to prevent or reduce the distribution of the opioids.

1195. As a proximate result, Defendants and its agents have caused the City of Rochester to incur excessive costs related to diagnosis, treatment, and cure of addiction or risk of addiction to opioids, the City has borne the massive costs of these illnesses and conditions by having to provide necessary resources for care, treatment facilities, and law enforcement services for City Residents and using City resources in relation to opioid use and abuse.

1196. Defendants were negligent in failing to monitor and guard against third-party misconduct and participated and enabled such misconduct.

300

1197.   Defendants were negligent in disclosing to the City of Rochester suspicious orders for opioids pursuant to Section 80.22 of the New York Codes, Rules and Regulations.

1198.   Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

1199.   Defendants are in a class of a limited number of parties that can legally manufacture and distribute opioids, which places it in a position of great trust by the City.

1200.   The trust placed in Defendants by the City of Rochester through the license to manufacture and distribute opioids in the City of Rochester creates a duty on behalf of Defendants to prevent diversion of the medications it supplies to illegal purposes.

1201.   A negligent and/or intentional violation of this trust poses distinctive and significant dangers to the City and its residents from the diversion of opioids for non-legitimate medical purposes and addiction to the same by consumers.

1202.   Defendants were negligent in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent and/or ameliorate such distinctive and significant dangers.

1203.   Defendants are required to exercise a high degree of care and diligence to prevent injury to the public from the diversion of opioids during manufacture and distribution.

1204.   Defendants breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business.

1205.   Defendants are in exclusive control of the management of the opioids it manufactured and distributed in the City of Rochester.

1206.   The City of Rochester is without fault and the injuries to the City and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the manufacture and distribution of opioids.

301

FILED: MONROE COUNTY CLERK 06/05/2019 04:47 PM    INDEX NO. E2019005178

NYSCEF DOC. NO. 2    Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 342 of 1171 PageID #: 705661    RECEIVED NYSCEF: 06/05/2019

1207.   Plaintiff is entitled to recover its damages caused by defendants' fraud in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants, jointly and severally, as to the FIRST, SECOND, THIRD, FOURTH, FIFTH, SIXTH, and SEVENTH Causes of Action, awarding Plaintiff in amounts that exceed the jurisdiction of all lower Courts:

i.      Compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff for all damages;

ii.     Treble damages, penalties, and costs pursuant to Social Services Law §145-b;

iii.    Treble damages, penalties and costs pursuant to General Business Law §§349(h) and 350-3(3);

iv.     Punitive damages;

v.      Attorney's fees

vi.     Interest, costs and disbursements;

vii.    Such and further relief as this Court may deem just and proper.

Dated:   June 5, 2019
         Rochester, New York


         /s/Paul J. Napoli
         Paul J. Napoli
         Salvatore C. Badala
         Joseph L. Ciaccio
         Shayna E. Sacks
         NAPOLI SHKOLNIK PLLC
         400 Broadhollow Road, Suite 305
         Melville, New York 11747

         *Attorneys for Plaintiff*

302

# EXHIBIT 2

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF OHIO

3                     EASTERN DIVISION

4

                   ~~~~~~~~~~~~~~~~~~~~

5

6    IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
     OPIATE LITIGATION

7                                    Case No.
                                     17-md-2804

8

                                     Judge Dan Aaron

9    This Document Relates To:       Polster

10   City of Rochester v. Purdue
     Pharma, L.P.

11   No. 19-op-45853 (Track 12)

12   County of Webb, Texas v.
     Purdue Pharma, L.P.

13   No. 18-op-45175 (Track 15)

14

                   ~~~~~~~~~~~~~~~~~~~~

15

16      Remote Status Conference Call Before
              Special Master David Cohen

17

18                 January 6, 2025

19                    2:00 p.m.

20

21

22

23

24

25           Renee L. Pellegrino, RPR

Page 2

```
 1  REMOTE APPEARANCES:
 2
 3    Peter H. Weinberger, Esq.
 4    Joshua Agins, Esq.
 5    Anthony Alden, Esq.
 6
 7      (Several participants not listed)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1        SPECIAL MASTER COHEN:  So the
 2  reason that we're all on the phone together
 3  today is that the PBMs have issued a non-party
 4  subpoena to Wegmans, which is a food and
 5  grocery store in the Rochester area that I
 6  think the parties all agree is the largest
 7  supplier of opioids to the Rochester area, and
 8  Wegmans is not wanting to respond with
 9  production of discovery requested by subpoena.
10  There are 12 categories, and the parties have
11  exchanged quite a bit of information, which
12  I've reviewed, and sent me position papers,
13  which I've reviewed.  I've tried to read
14  everything at least twice, but there's a lot
15  there.
16        So what we're going to do is
17  address, I think, the two critical elements to
18  the question of whether and the extent to
19  which Wegmans should produce to the PBMs the
20  subpoena requested information, and as the
21  parties have identified, those elements are
22  the relevance of the information sought and
23  the burden on Wegmans.  And I think that we
24  can probably do that for each of the 12
25  categories of documents that the PBMs request.
```

Page 4

```
 1        I will add that, as the parties
 2  know, I sent this morning a case which stands
 3  generally for the proposition that one of the
 4  ways the Court can address the burden question
 5  if the subpoenaed party asserts that the
 6  burden is excessive is to have some of that
 7  burden relieved by the requesting party paying
 8  for the production, and so as we go through
 9  these, I want to hear from the parties on how
10  that works, whether that can work here, the
11  extent to which we can use that tool.
12        And rather than go in numerical
13  order, I think I want to touch on some of what
14  I consider may be the easier categories first,
15  and -- I'm just looking at the subpoena.  One
16  second.  So I guess I want to start with what
17  I think might be the simplest, which is
18  category 12, and this is where the PBMs ask
19  Wegmans to produce contracts and agreements
20  that they have with any manufacturer or
21  distributor regarding any of the opioid drugs.
22  And I assume, given what I've read, that
23  Wegmans may not have any contracts with
24  manufacturers but certainly does with
25  distributors.  I don't know that.  I'm
```

Page 5

```
 1  guessing it.  And my guess also is that as
 2  opposed to, for example, dispensing data, that
 3  the burden on locating and producing those
 4  contracts is much, much lower on Wegmans, but
 5  nonetheless I'd like to hear, I guess, first
 6  from the PBMs, and I'll probably ask the PBMs
 7  to go first every time, to explain to me the
 8  relevance of those documents, and then you
 9  could touch on burden, and then I'll hear from
10  Wegmans.
11        So, again, please identify
12  yourself for the record, and I'd like to hear
13  from the PBMs.
14        MR. ALDEN:  Good afternoon,
15  Special Master Cohen.  Anthony Alden for the
16  Express Scripts Defendants.  And Happy New
17  Year to everyone.
18        With respect to request number 12,
19  I think we tried to lay out the relevance in
20  our December 13 letter, which is essentially
21  that one of the Plaintiffs' core allegations
22  in the case is that the PBM Defendants were
23  motivated to overlook, if you like, alleged
24  excessive opioid use in prescriptions as a
25  result of contractually provided financial
```

2 (Pages 2 - 5)

Page 6

1  incentives between the manufacturers.  As part
2  of our superceding causation and apportionment
3  defenses, we think we're entitled to know
4  whether the largest dispenser of opioids in
5  Rochester was subject to some alleged
6  incentives, and those contracts would go to
7  that question.  And, you know, obviously if
8  Wegmans was receiving rebates and financial
9  incentives with respect to the dispensing of
10 opioids, that would feed into our defense that
11 it is indeed -- you know, that Wegmans was
12 that superseding cause or liability should be
13 apportioned to Wegmans.  So that's the reason
14 that we'd like to have these agreements.
15        SPECIAL MASTER COHEN:  Before I
16 hear from Wegmans, let me ask you, so at least
17 with respect to public nuisance -- and I think
18 this -- what I'm about to say applies to many,
19 if not all, of the categories.  With respect
20 to public nuisance, assuming -- and I think
21 it's -- I'm not sure how good an assumption it
22 is, but assuming that New York law is similar
23 to Ohio law and that New York jury
24 instructions would be similar to Ohio jury
25 instructions on public nuisance -- and I

Page 7

1  understand that that's up on appeal in New
2  York, but nonetheless the jury instructions in
3  the MDL trial talked about -- I don't have the
4  exact words in front of me, but being a
5  substantial factor that contributes to the
6  public nuisance.  And there was a lot of
7  discussion in that trial about the extent to
8  which it mattered whether other folks
9  contributed to the public nuisance as far as
10 liability, and indeed even as to damages.  If
11 someone is a substantial factor that
12 contributes to a public nuisance, they can be
13 liable and they can be liable for all of the
14 nuisance, for abating all of that nuisance,
15 even if there are other actors who also
16 substantially contributed.
17        If that's true -- and I'm not
18 certain it is in New York, but let's assume
19 for a moment it is.  If that's true, then how
20 does what you're asking for become relevant?
21 It seems to me it isn't relevant.
22        MR. ALDEN:  Well, I would say we
23 don't think it's true, but regardless of
24 whether it's true, we're facing not just a
25 public nuisance claim, we're facing RICO

Page 8

1  claims, and it's certainly relevant as to
2  those claims whether the Plaintiffs -- it's
3  relevant to whether Plaintiffs can establish
4  proximate causation.
5        SPECIAL MASTER COHEN:  Okay.  May
6  I hear from Wegmans?
7        MR. AGINS:  Thank you, Special
8  Master Cohen.  My name is Josh Agins.  I'm
9  with the law firm Hodgson Russ in Rochester,
10 New York and I represent Wegmans Food Markets,
11 Inc.
12        I think you just put your finger
13 on what we view as the dispositive threshold
14 issue of relevance.  And as we have been
15 writing now for several months, by and large
16 the requests are not relevant because there is
17 no superseding cause defense for a public
18 nuisance claim in New York.
19        Before we even get to that issue,
20 there's the question of whether Wegmans'
21 dispensing conduct even constitutes a public
22 nuisance.  And as you know from our papers, we
23 have an appeal pending to the New York State
24 appellate division on that very issue.  No
25 appellate court in New York has ruled that

Page 9

1  dispensing opioids or other similar conduct
2  can constitute a public nuisance.  To the
3  contrary, the appellate division has held in a
4  case called Sturm that --
5        SPECIAL MASTER COHEN:  I assure
6  you you don't need to repeat anything in your
7  papers.  I promise.  I've read it.  But let me
8  jump off.  So let's say you're correct.  Let's
9  say that the appellate courts in New York
10 conclude that you are correct and there is no
11 public nuisance claim for dispensing opioids,
12 you know -- and I don't know what that would
13 do to the Plaintiffs' case in the MDL.  But
14 let's say that that happens.  As counsel
15 opposite points out, there's still other
16 claims, and it's certain that for those other
17 claims there would be an apportionment of
18 liability in some way.
19        MR. AGINS:  That's a negligence --
20        SPECIAL MASTER COHEN:  Go ahead.
21        MR. AGINS:  I'm sorry to
22 interrupt.  That's a negligence claim.  I
23 think the answer would be no.  Under Article
24 16 under New York law there would not be
25 apportionment.  There would be joint and

3 (Pages 6 - 9)

1 several liability for economic harm.  There
2 would not be an apportionment of any sort
3 under New York law.  And even if there were
4 some tangential argument to apportionment,
5 then the question becomes what is that
6 tangential relevance and how does it weigh
7 against the immense burden.
8        Now, I know we're not getting to
9 burden yet, and I don't think we get past
10 relevance, but under New York law the PBMs
11 have not articulated why there would be an
12 apportionment, they have not cited any
13 authority for that either in their prior
14 submissions or in the e-mail from two hours
15 ago.  And, you know, our position on this --
16 and I know, Special Master Cohen, we're going
17 to go through these, but our position on this
18 would be that if apportionment as a matter of
19 New York law is going to be the justification
20 that opens the door to this type of discovery,
21 that is a critical issue under New York law
22 and that should be briefed fully and decided
23 on.
24        MR. ALDEN:  Special Master, this
25 is Anthony Alden from Express Scripts, for the

1 Express Scripts Defendants.
2        I don't think there's any argument
3 or can be any dispute with respect to
4 proximate cause, though.  I mean, that is an
5 element of the remaining claims, and so, you
6 know, even -- you know, I am not prepared on
7 this call to cite you case law on
8 apportionment under New York law.  Regardless,
9 I don't think there can be a dispute that
10 proximate cause is an element of the remaining
11 claims and we are entitled to dispute
12 proximate cause at trial based on third-party
13 evidence from the widest distributor of
14 opioids in Rochester.
15        MR. AGINS:  Let me say two things
16 about it.
17        And, again, this is Josh Agins for
18 Wegmans.
19        Number one, let me speak a little
20 bit to this notion that Wegmans is a large
21 dispenser of opioids in Rochester, New York,
22 because I think it would be helpful in this
23 context to have some context for that.
24        Wegmans is an integral part of the
25 community of Rochester, New York and has been

1 for a century.  It's the third largest
2 employer.  It's one of the most longstanding
3 successful companies in this city.
4        SPECIAL MASTER COHEN:  Again --
5        (Simultaneous speaking.)
6        SPECIAL MASTER COHEN:  -- CVS and
7 Walgreens and Walmart has done and it's off
8 topic.  I'm telling you it's not helpful to
9 me, especially since you wrote almost exactly
10 those same words in your letter.
11        MR. AGINS:  And to the point of
12 proximate cause, you know, the PBMs have in
13 their correspondence mentioned that as a
14 concept, and they say, well, we're not
15 prepared to cite any case law.  We've cited
16 case law to the contrary.  Unless they're
17 going to take the position that the
18 superseding cause, meaning Wegmans' conduct,
19 completely cuts off their liability, in order
20 to do that analysis, you would have to look at
21 the allegations in the complaint, the City of
22 Rochester's complaint against the PBMs.  And
23 they want to do everything except talk about
24 the allegations in that complaint.
25        The core allegations against the

1 PBMs is that they created the supply.  It's a
2 marketing-based allegation; their
3 collaboration allegedly with Purdue and other
4 manufacturers creating demand; their alleged
5 efforts to proliferate opioids to maintain
6 their rebate revenue, their decisions with
7 respect to prior authorization and formularies
8 and all the rest.  That's the nature of the
9 allegations.  Wegmans' dispensing conduct has
10 nothing to do with those allegations.  It
11 can't go to the issue of proximate cause.  And
12 they have never wanted to have a meaningful
13 discussion about those allegations.
14        SPECIAL MASTER COHEN:  I agree
15 with you that those allegations are very much
16 a part of the complaint, but there are also
17 allegations about the mail order pharmacy
18 aspect of their business.
19        I'm sorry.  Did you want to say
20 something?
21        MR. ALDEN:  I'm sorry.  I didn't
22 mean to interrupt.  This is Anthony Alden from
23 Quinn Emanuel for Express Scripts.
24        I just wanted to state a point,
25 which is that what Mr. Agins said is simply

Page 14

1 not true.  I mean, there are paragraphs and
2 paragraphs in the complaint about the mail
3 order pharmacies as well as, you know, the
4 PBMs' alleged failure to, you know, do
5 anything in the face of prescriptions by
6 third-party pharmacies, which would include
7 Wegmans.  I mean, we're facing red flag
8 analyses that we need to respond to, and, you
9 know, we need the documents and data to be
10 able to respond to those analyses, and the
11 data that Wegmans and documents that Wegmans
12 produces is critical because they're the ones
13 who dispensed a large proportion of the
14 opioids in Rochester.
15       SPECIAL MASTER COHEN:  Let me turn
16 to burden and ask Wegmans to explain to me
17 what the burden would be if the Court were to
18 comply with the subpoena request for category
19 number 12.
20       MR. AGINS:  So putting aside the
21 objection to relevance, I think if number
22 12 -- there are a couple of words in number 12
23 that I think throw this off a little bit, but
24 if number 12 is limited to contracts with
25 distributors, you know, subject to whatever

Page 15

1 third-party notice requirements or
2 confidentiality requirements may be in those
3 contracts, I would agree with the sentiment
4 expressed earlier.  As I sit here right now, I
5 don't know that it's particularly burdensome
6 for us to pull those contracts.  You know, I
7 take issue with some of the other language in
8 paragraph 12 because, frankly, I'm not sure
9 what it's referring to, you know, or other
10 documents, for example.  But if we're talking
11 about contracts with distributors, that is a
12 discrete, ascertainable, identifiable thing
13 that I would not argue is particularly
14 burdensome.
15       SPECIAL MASTER COHEN:  Do you mean
16 to be saying, the way you worded that, that
17 you would -- you said distributors.  You
18 didn't include manufacturers.  I'm trying to
19 understand if you were doing shorthand or you
20 are being purposefully uninclusive of any
21 manufacturer contracts.
22       MR. AGINS:  That was not -- I was
23 not trying to intentionally exclude something.
24 My understanding is that the contracts are
25 with distributors, but my answer would be the

Page 16

1 same whether it's distributors or
2 manufacturers.
3       SPECIAL MASTER COHEN:  And my
4 understanding is that in the back and forth,
5 although it didn't lead to very much
6 agreement, there was an agreement that this
7 would be limited and all of these would be
8 limited to, quote, unquote, the drug scope,
9 and it wouldn't include any other opioids,
10 that that was true for all of them.
11       All right.  I think I've heard
12 enough on number 12.
13       Let me jump to -- and I assure you
14 that the ones I'm picking are not necessarily
15 the easy ones.  They're just kind of the way
16 I'm thinking about things.  So number 2 talks
17 about documents that Wegmans and its
18 pharmacists used or considered that it
19 received -- they received from the PBMs, you
20 know, at the point of sale or any other time
21 when they were dispensing opioids.  And I'm
22 going to ask the PBMs to respond to this.
23       So if I understand what you're
24 asking for, you're saying we sent Wegmans and
25 other pharmacies communications, documents, et

Page 17

1 cetera that we believe they should have
2 considered, they were supposed to consider
3 when dispensing opioids, and they may have
4 been, you know, broad policy statements or
5 they may have been patient-specific
6 information.  But whatever.  We sent them a
7 bunch of stuff.  And we want to know now to
8 what extent did you consider the stuff that we
9 sent you when we were discussing, again,
10 whether it was, you know, a broad policy
11 statement or patient-specific information.
12       But it seems to me that the PBMs,
13 A, know what they sent, or should; and, B, can
14 pretty easily infer what Wegmans did by
15 looking at what was dispensed.  So, in other
16 words, if a patient covered by the PBMs came
17 in and got a prescription -- with a
18 prescription I should say, and Wegmans filled
19 it, well, you know that they filled it.  You
20 know that they filled it, let's say, despite
21 whatever it is you sent them.  So I'm not sure
22 why you need it.
23       MR. ALDEN:  This is Anthony Alden
24 again with the Express Scripts Defendants, and
25 I'll let the Optum Defendants weigh in if they

5 (Pages 14 - 17)

Page 18

1 want to.
2         The reason we need it is because
3 we don't know -- we need to know what
4 decisions Wegmans made.
5         For example, let's say a
6 point-of-sale communication came from the PBMs
7 or a PBM. First of all, not even necessarily
8 the Defendant PBMs, but let's say it came from
9 a third-party PBM, and said, you know, we're
10 flagging this prescription because it comes
11 from a patient who has had two refills within
12 the past 30 days, right. Wegmans then goes
13 ahead and fills the prescription. It may be
14 that Wegmans did an investigation and
15 determined that it was perfectly appropriate
16 to fill that prescription. The patient may
17 have -- or the doctor may have said, you know
18 what, yes, this patient is having an excessive
19 amount of back pain resulting from surgery, we
20 are going to -- you should go ahead and fill
21 the prescription. On the other hand, Wegmans
22 may have done nothing and simply filled the
23 prescription, right. Those are two very
24 different scenarios, the first of which would
25 potentially be defense to a red flag -- to a

Page 19

1 red flag accusation that is being made by the
2 Plaintiffs concerning that prescription. The
3 second would not necessarily. And so it is
4 important for us to know what action, if any,
5 Wegmans took prior to dispensing that
6 prescription. That is information that is
7 used by our experts in the red flag analysis
8 to respond to Plaintiffs' allegations.
9         SPECIAL MASTER COHEN: Well, the
10 red flag analysis allegations are made against
11 your mail order pharmacy practices, not -- as
12 I understand the allegations, not, you know,
13 your activity as an owner of data or as a PBM.
14         MR. WEINBERGER: Can I interrupt
15 for a second? This is Peter Weinberger for
16 the PEC.
17         That's not a correct statement,
18 Special Master Cohen.
19         SPECIAL MASTER COHEN: Okay.
20         MR. WEINBERGER: We are --
21         (Simultaneous speaking.)
22         MR. WEINBERGER: -- a red flag
23 analysis. The point-of-sale analysis that
24 should -- that should have been done by the
25 PBMs at the time that they are contacted for

Page 20

1 purposes of payment approval, there is a red
2 flag analysis that we provided with respect to
3 that.
4         SPECIAL MASTER COHEN: Okay.
5 Thank you for clarifying that.
6         Wegmans, do you want to respond?
7         MR. AGINS: Thank you. This is
8 Josh Agins again for Wegmans.
9         Our understanding all along -- and
10 we've asked questions about this of the
11 PBMs -- has been that they have all of the
12 point-of-sale information.
13         And the question that Mr. Alden
14 articulated a few moments ago about, you know,
15 what did the pharmacist do with that
16 prescription, was it filled and was it a
17 prescriber called or what was the rationale,
18 all of that is recorded in their POS system,
19 all of it. And, in fact, if you look at the
20 prescriber -- the pharmacist manual, the PBM
21 pharmacist manual, it lays out chapter and
22 verse all of the ways that the dispensing
23 pharmacist interacts with that POS system, and
24 all of the actions taken, and even the
25 rationale for those actions is recorded in

Page 21

1 that system. The claim is not being submitted
2 to the PBM and they won't review it or approve
3 it or pay for it unless that claim is
4 complete.
5         So our understanding all along has
6 been that they have all of that POS
7 information, and we've asked them repeatedly
8 to show us something that explains why they
9 wouldn't have it or be more concrete about
10 what they don't have. But our understanding
11 is they've got all of it. And, in fact, in
12 the CMO documentation for the second
13 bellwether in New York, there's an indication
14 there that they've produced all of this data
15 already and it's already being analyzed by the
16 Plaintiffs. So our view was that was
17 confirmation that they've got all of the
18 information for point of sale that could be
19 relevant to number 2.
20         And then there's this other
21 concept I think built into number 2 about
22 other communications outside of the
23 point-of-sale system. And we asked the same
24 question that you asked a moment ago, Special
25 Master Cohen, what are those communications,

6 (Pages 18 - 21)

Page 22

1 you know, and can you identify them for us.
2        So we don't see what more there is
3 here on number 2.
4        MR. ALDEN:  Special Master, may I
5 respond to that briefly?
6        SPECIAL MASTER COHEN:  Go ahead.
7        MR. ALDEN:  We don't -- I mean,
8 the -- this is Anthony Alden again.  The
9 notion that the PBMs have Wegmans' rationale
10 for dispensing opioids is wrong.  We don't
11 have it.  If Wegmans, for example, has notes
12 as to why a pharmacist overrode a red flag, we
13 don't have that, they have it, and we need
14 that data to be able to properly respond to
15 Plaintiffs' allegations.
16        Now, if they want to tell us they
17 don't maintain any data, any data responding
18 to point-of-sale communications, that's one
19 thing, but that's not what they've said, and
20 they have data that shows their internal
21 responses to our red flag communications that
22 we don't have and they need to produce it.
23 Again, it's important to us to be able to
24 respond.
25        If they have policies, procedures

Page 23

1 or manuals -- again, I don't know if they do
2 or not.  That's something that they know.  I
3 don't know that.  And so we need those
4 policies, procedures and manuals that talk
5 about how they should respond to point-of-sale
6 communications, which I would assume, in terms
7 of those documents, would not be burdensome to
8 collect.  I assume they would be centrally
9 maintained.
10        SPECIAL MASTER COHEN:  I wanted to
11 turn to that briefly and ask you, Josh, about
12 the burden of collecting and producing
13 information that is the subject of number 2,
14 which may be different depending upon what
15 we're talking about.  If they're centrally --
16 you know, if they're centralized documents,
17 pharmacist manuals, whatever it is that you
18 may have, that would, I assume, be different
19 than data entered into a system by a
20 pharmacist when a pharmacist is filling a
21 script regarding what red flag, you know,
22 analysis they undertook, what they decided and
23 why.
24        MR. AGINS:  You know, I'm not in a
25 position -- and I'm looking at number 2.  I'm

Page 24

1 not in a position to talk in great detail
2 about policies because the dispenser handbook
3 that is part of our contracts with the PBMs
4 lay out in great detail the steps that a
5 pharmacist takes to submit a claim to a PBM,
6 these two PBMs.  Those documents certainly
7 would not be burdensome to collect, but I
8 suspect the PBMs have those.
9        So beyond that, I don't -- I don't
10 see relevance to other policies of Wegmans
11 pharmacy that go beyond the claims they submit
12 to the PBMs because ultimately what number 2
13 seems to be talking about is Wegmans'
14 interactions with the PBMs.
15        SPECIAL MASTER COHEN:  I'm not
16 sure it is that limited.  I think that what
17 they're going after is Wegmans' activity
18 vis-a-vis filling scripts for patients
19 regardless of whether those are PBM-covered
20 patients or not.
21        Are you saying that Wegmans
22 wouldn't have any manuals or documents like
23 that except those received by the PBMs --
24 excuse me, received from the PBMs?
25        MR. AGINS:  I am not saying that,

Page 25

1 but what I am saying is I'm not in a position
2 to speak about that because my understanding
3 and interpretation of number 2 always has
4 been, and I think the parties' communications
5 have confirmed this, that number 2 is about
6 Wegmans' interactions with the PBMs.  That has
7 been the focus of the discussion.  So I'm not
8 saying there's not policies beyond that, but
9 I'm not in a position to talk about them.
10        SPECIAL MASTER COHEN:  Upon
11 looking more carefully at number 2, I think I
12 agree with you.
13        Okay.  Let me jump to number 5,
14 and on this one the parties were talking past
15 each other a bit, not unusual, not surprising,
16 but this one especially I just didn't
17 understand why there was any argument.  This
18 one asks about suspicious orders.
19        My understanding from what Wegmans
20 wrote is we're not a distributor, we have no
21 suspicious order obligation, we don't know
22 anything about suspicious orders, we ain't got
23 any, and it would be pretty simple to say
24 that, but somehow the communications back and
25 forth -- like I said, people kept talking past

7 (Pages 22 - 25)

Page 26

1 each other, PBMs wanted something more,
2 something more clear -- I'm not sure what they
3 wanted, actually -- and/or Wegmans wasn't
4 clear enough about it not having anything
5 responsive to that request.
6         So I'm going to start with
7 Wegmans.  It's kind of a yes-or-no question.
8 If yes, it might be, you know, yes comma but
9 or yes comma and.  But just yes or no, do you
10 have any suspicious orders that you know
11 about?
12         MR. AGINS:  The answer is no, and
13 if we weren't clear -- I wish we had
14 articulated it as clearly as you just did,
15 because for the reasons you just said, we're
16 not a distributor, we don't receive orders or
17 have suspicious orders, right, so we have
18 always taken the position that we have nothing
19 with respect to paragraph 5.
20         SPECIAL MASTER COHEN:  All right.
21 Let me ask the PBMs.  Are we good on that?  Do
22 you need something more than that?  It sounds
23 pretty clean to me.
24         MR. ALDEN:  Yeah.  This is Anthony
25 Alden again on behalf of Express Scripts.

Page 27

1         I think the only clarification we
2 would want is just -- and, again, I don't need
3 to push this hard.  If the answer is the same,
4 the answer is the same, which is, you know, we
5 wanted to make sure that the way that they
6 were defining suspicious order was not nearly
7 the statutory definition, that any form of
8 notification that an order -- that a
9 prescription was suspicious -- if they had
10 some kind of an internal system for flagging,
11 you know, prescriptions that they shouldn't be
12 making, for example, or, you know, tracked
13 patients that had received -- that they
14 believe were receiving an unusual amount of
15 opioids, things like that, we would want that
16 information.  Now, if they don't have any of
17 that, great.  That ends the inquiry.  We just
18 wanted to make sure that we weren't defining
19 the words "suspicious orders" too narrowly.
20         SPECIAL MASTER COHEN:  Well, I
21 mean, you used suspicious orders with capital
22 S capital O, and that is a defined term that's
23 been understood to mean something very certain
24 and specific throughout this litigation, and
25 it sounds to me like you're trying to expand

Page 28

1 the meaning of that.
2         MR. ALDEN:  If I can respond to
3 that.
4         I don't think that's true.  The
5 definition that we used in the subpoena,
6 subsection 3, is what you define as a
7 suspicious order for purposes of your work.
8 So if they tell us, you know, that they don't
9 do that, they don't track suspicious orders,
10 consider it, then that's fine, I don't need to
11 push it.  I just wanted to make sure that that
12 aspect of the definition was included.
13         SPECIAL MASTER COHEN:  All right.
14 I think that will be simple.
15         Number 6, it occurs to me that,
16 again, same story.  Wegmans essentially says
17 we don't have access to ARCOS data, we didn't
18 do any analyses of ARCOS data.  What more is
19 there to talk about?
20         So let me start again by asking
21 Wegmans, is it that simple?
22         MR. AGINS:  It is that simple.  We
23 don't have access to ARCOS data.  And I will
24 point out in fairness --
25         SPECIAL MASTER COHEN:  That's all

Page 29

1 I wanted to hear.  That's all I wanted to
2 hear.
3         So PBMs, despite some sort of
4 caveat that Josh was just going to add, they
5 don't have access to ARCOS data.  What more do
6 you need to know?
7         MR. ALDEN:  What about -- this is
8 again Anthony Alden.  What about data from the
9 New York PMP?
10         SPECIAL MASTER COHEN:  I'll let
11 you answer that, Josh.
12         MR. AGINS:  Yeah.  No.  Thank you.
13 And that was -- I was just going to point out
14 that it does contain the reference to the PMP.
15 The PMP, to the extent pharmacists consult the
16 PMP, the documentation of that, if it's not in
17 the PBM's POS system -- and in many instances
18 it would be if it's a PBM prescription -- it
19 would be script-level information, drilling
20 down into a prescription to see whether
21 there's an annotation on it, and that gets
22 into issues of protected health information,
23 immense burden of collecting script-level
24 information, and that -- so that's an entirely
25 separate discussion.

8 (Pages 26 - 29)

Page 30

1      SPECIAL MASTER COHEN: So let's
2  jump into the hard one, which is number 1,
3  which is data.
4      Actually, before we do that, let
5  me just ask another one that I think is quick.
6  So is the analysis of category number 4, which
7  asks for communications that Wegmans had with
8  its pharmacists, any -- substantially
9  different than the analysis of number 2? I
10 mean, for both of them it's like, okay, what
11 did you tell your pharmacists and what did
12 they do with it. And number 2 had to do with
13 information received from the PBMs. Number 4
14 has to do with really almost any -- everything
15 else, information that Wegmans
16 (unintelligible) from any other source or
17 created to its pharmacist. So just from a
18 question of relevance and burden, which is
19 what we've been talking about, do you have any
20 instruction that you would give me that the
21 analysis for number 2 and number 4 are
22 different?
23     MR. ALDEN: This is Anthony Alden
24 again for the Express Scripts Defendants.
25     The answer to that question is

Page 31

1  they are slightly different. Number 2 goes to
2  responses to communications both at the
3  pharmacy and corporate level. Number 4 goes
4  to directed or instruction given to -- by
5  Wegmans to its employees concerning opioids
6  and documents within the drug scope.
7      So what we're looking for in
8  number 4 -- and, again, I think we've tried to
9  make clear, and I'll make it clear again -- I
10 am not looking -- I don't believe we are
11 looking for every e-mail ever sent to a
12 Wegmans employee concerning an opioid
13 prescription. What we would be looking for
14 are more, you know, whether it's Rochester
15 storewide or a company-wide directive or
16 instruction or as outlined in the
17 subpoena concerning dispensing opioids that
18 would have applied to dispensing opioids in
19 Rochester.
20     And so, again, if they undertake a
21 reasonable search and say we never issued any
22 such guidance or directives, you know, to our
23 employees, then that's the answer, but, you
24 know, we think that they would be capable of
25 undertaking a reasonable search.

Page 32

1      I just do want to add on -- I
2  apologize -- on request number 6 that
3  doesn't just go to use of ARCOS or PMP data,
4  but also communications with those agencies.
5  I just didn't want that to get lost, but I
6  realize we're now on your question as to
7  number 4, and I hope that explains the
8  distinction.
9      SPECIAL MASTER COHEN: Anthony,
10 explain this to me as succinctly as you can.
11 Let's say that I ruled you get everything you
12 want, okay, that Wegmans has to, you know,
13 really drop its kimono and give you everything
14 that you've asked for, all of the
15 communications it's received from these other
16 entities, what it did, its prescription data,
17 the works. Now it's time for trial. You
18 know, how do you use it, assuming that it
19 tells you everything you hope it tells you,
20 right? In other words, it's really kind of
21 best case. What does that look like at trial?
22 And, obviously, I'm asking a very hypothetical
23 question. I have no reason to believe that
24 that's how I would rule or that the data would
25 be so wonderful for you, that the information

Page 33

1  would be so wonderful for you. I'm not there
2  at all, but I just want to understand what it
3  is -- kind of why you want all this best case.
4      MR. ALDEN: Well, look -- again,
5  Anthony Alden speaking -- I don't -- I am not
6  really a trial lawyer so please don't take
7  what I'm saying as the final word on this,
8  buy, you know, for example, as I mentioned
9  before, on the dispensing data and the
10 point-of-sale communication data, that is data
11 that is going to go to our experts who are
12 going to build it into a response to
13 Plaintiffs' red flag analysis. And I expect,
14 for example, that if -- if the results show
15 that, and you know, bear this out that -- the
16 expert would make some kind of a presentation
17 that said we've analyzed Plaintiffs' red flag
18 presentation, we've analyzed (unintelligible)
19 data, we've analyzed the third-party data, and
20 as to Wegmans we have determined that -- you
21 know, as to Plaintiffs' red flag analysis we
22 have determined that 30 percent of the
23 prescriptions identified by Plaintiffs were
24 issued by Wegmans. We've also determined that
25 as to whatever, 29 percent of those

9 (Pages 30 - 33)

Page 34

1  prescriptions -- 75 percent of those
2  prescriptions, there was a point-of-sale
3  communication warning Wegmans as to the
4  prescription of the opioids; and we have
5  determined, based on our analysis of Wegmans'
6  data, that as to 80 percent of those red flag
7  analysis, there was no subsequent follow-up at
8  all.  That would be an example of how we would
9  use those particular sets of data.  And --
10       SPECIAL MASTER COHEN:  That didn't
11  take me all the way to the end.  Comma and
12  therefore what?  Comma and therefore we should
13  be held liable?  Comma and therefore Wegmans
14  is responsible for X percent?
15       MR. ALDEN:  Both.  And, therefore,
16  Plaintiffs have not established proximate
17  cause as to X percentage of prescriptions that
18  they've identified, and that the liability
19  should be apportioned to Wegmans.
20       SPECIAL MASTER COHEN:  Okay.  Let
21  me go to number 1.  It's the hard one.  And
22  part of the reason it's the hard one is
23  because I think it's obvious to everybody on
24  the call that the burden question is more
25  difficult with respect to production of data.

Page 35

1  I'm sure that even the PBMs would be first in
2  line if I said, you know, is it expensive and
3  hard to produce data -- the PBMs would say
4  hell yes.  So -- and this is in part why I
5  sent the case law that stands for the
6  proposition that sometimes that issue, the
7  burden issue, can be addressed by shift in
8  cost.
9       So, again, here's part of what
10  occurs to me.  At least some -- in fact, maybe
11  most of the data that the PBMs are asking for
12  they already have, which is to say for every
13  patient that's covered by the PBMs -- and
14  that's two out of three of the big boys -- not
15  Caremark, but it's got to be a substantial
16  fraction -- for all of those patients, the
17  PBMs know what the prescriptions are already.
18  They helped determine whether there was
19  coverage for those.  And I've said many times,
20  look, it is rarely the case that someone is
21  going to get every bit of what they want.
22  What they're entitled to get is enough to
23  understand the lay of the land.
24       And so with regard to this data, I
25  guess my central question is, for the PBMs,

Page 36

1  why don't you already have enough data to
2  understand it just by virtue of what you
3  already have part 1 and part 2?  How do you
4  respond to the burden question, which I think
5  in the case of category 1 is, you know, the
6  most easily made out by Wegmans.
7       MR. ALDEN:  This is Anthony Alden
8  again for the Express Scripts Defendants.
9       So we only have data with respect
10  to our individual PBM customers.  We do not
11  have data that pertains to if they're not a
12  customer.  We do not have data, for example,
13  on cash purchases.  We would not have data on
14  state-funded programs.  And so there is an
15  allegation -- the central allegation, the
16  predicate allegation in this case is that
17  there was an opioid epidemic.  Wegmans was
18  responsible we think for 30 percent of the
19  prescriptions of opioids.  We need to see what
20  that looked like because we can't tell what
21  the full picture is just from our own data.
22  And, look, if -- I'm happy to have
23  conversations with Wegmans about the burden
24  involved in producing that data.  Right now
25  all I have is a few lines from an attorney

Page 37

1  letter.  I'm happy to have a conversation
2  about it.  I'm happy to have a conversation
3  about ways we could potentially try to
4  minimize it, but there is data that we don't
5  have, and we think that we're entitled --
6  given the core allegations of the case, that
7  there is an epidemic, we're entitled to see
8  the prescriptions of opioids in the city.
9       SPECIAL MASTER COHEN:  Tell me a
10  little bit more about -- and you may not know
11  more about an e-mail that I received just
12  prior to this tele-con suggesting that, for
13  settlement purposes, you believe Wegmans has
14  produced this data, that it's not true that
15  they have never produced data in connection
16  with opioid litigation.
17       MR. ALDEN:  I would actually, you
18  know, respectfully refer that to Wegmans'
19  counsel.  All I know is what was in the
20  letter, which seemed to be, from my reading of
21  the letter, that Wegmans had been ordered to
22  produce data for mediation purposes in New
23  York in at least one New York case.  The scope
24  of that I don't know.
25       SPECIAL MASTER COHEN:  All right.

10 (Pages 34 - 37)

Page 38

1 Let me ask Wegmans' counsel, Josh, to respond.
2           MR. AGINS:  Josh Agins for
3 Wegmans.
4           I'll pick up on that last point.
5 I appreciate the opportunity to clarify that.
6           The phrase "dispensing data" in
7 that letter is probably, unfortunately, a bit
8 of a misnomer.  In the Akin's pharmacy case,
9 which was commenced in Yates County and
10 pending in front of Justice Koba, the Court
11 conducted some settlement negotiations with
12 all of the parties and directed all of the
13 pharmacy Defendants to produce some, quote,
14 unquote, dispensing data.  None of that had
15 anything to do with what the PBMs are asking
16 us to produce.  The dispensing data that was
17 produced for settlement purposes in the Akin's
18 case was total MME numbers by plaintiff,
19 meaning what is the total MME dispensed by
20 each pharmacy in each of the plaintiff
21 municipalities, so City of Rochester, how many
22 MMEs did Wegmans and each of the other
23 pharmacies produce for the drugs that were at
24 issue in the Yates County case, which is a
25 narrower set of drugs than the PBMs are asking

Page 39

1 us for.  So it's entirely apples and oranges,
2 and I suspect that probably clears it up.
3           As for the bigger issue, this is
4 another one where our position would be if
5 these general arguments about apportionment or
6 superseding cause are going to justify this
7 type of non-party discovery, we really would
8 like to have that issue briefed thoroughly,
9 because it is a huge burden, and I recognize
10 that we have not, for example, provided the
11 PBMs with a lengthy, detailed, factual
12 declaration to outline that burden, but, quite
13 frankly, they know the burden.  It is a
14 tremendous burden.
15           And I will point out that the
16 limited data that was produced, these total
17 MME counts that was produced in the Akins
18 case, took us months to pull in a manner that
19 we felt confident was reliable for purposes of
20 producing it to the plaintiffs in that
21 context.  And that took months.  And that was
22 raw numbers.  It wasn't any of the dispensing
23 fields that the PBMs are requesting here.
24           SPECIAL MASTER COHEN:  Are the
25 same plaintiffs --

Page 40

1           (Simultaneous speaking.)
2           SPECIAL MASTER COHEN:  One second,
3 Josh.
4           Are the same plaintiffs as are --
5 I guess I should put it this way:  Is
6 Rochester suing you in state court also?
7           MR. AGINS:  The City of
8 Rochester --
9           (Simultaneous speaking.)
10           SPECIAL MASTER COHEN:  Yeah.  Go
11 ahead.
12           MR. AGINS:  Sorry to interrupt.
13           The short answer is yes.  The City
14 of Rochester sued Wegmans in that one case
15 that I referred to earlier, the Akin's case;
16 however, the plaintiffs in that case are in
17 the process of trying to discontinue that
18 case, including the City of Rochester.
19           SPECIAL MASTER COHEN:  Why do you
20 suppose that is, to avoid the appellate issue?
21           MR. AGINS:  Well, I'd be
22 speculating a little bit, but I -- frankly, we
23 feel like that's an issue that should be
24 decided by the appellate division.
25           SPECIAL MASTER COHEN:  Right.  I

Page 41

1 think I remember you saying that there was an
2 offer to dismiss without prejudice and you
3 said no thank you.  But that's who we're
4 talking about?
5           MR. AGINS:  Yes.  The City of
6 Rochester is among that plaintiff group.  It's
7 three dozen or so plaintiffs that sued Wegmans
8 and some small, you know, mom-and-pop local
9 regional pharmacies, nothing like the -- you
10 know, the national dispenser/distributor
11 pharmacies that have been part of the MDL.
12           MR. ALDEN:  Special Master, this
13 is Anthony Alden again.  Could I just say one
14 thing, which is, you know, this data is
15 sufficiently important to us, the PBM
16 Defendants, that I am willing to have a
17 conversation with Mr. Agins about how we would
18 be able to alleviate the burden, and if there
19 is a cost burden, for him to provide
20 information as to what the cost burden would
21 be for us to consider.  We are open to having
22 that conversation.  I don't think we have
23 sufficient information right now, but this is
24 data that we feel is sufficiently important so
25 that would be something that we are willing to

11 (Pages 38 - 41)

Page 42

1  consider if we get that information.
2        SPECIAL MASTER COHEN:  What do you
3  think about Josh's suggestion that there be
4  some briefing, perhaps even on an expedited
5  basis, with regard to -- and I've being using
6  apportionment loosely, right.  I mean, there
7  are a lot of related doctrines, but ultimately
8  what they have to deal with is are there other
9  entities that may have an obligation or a
10  share in the liability, whether you call it
11  nuisance -- excuse me, whether you call it
12  apportionment or joint and several liability
13  or anything else.  What about that; that is to
14  say, what about briefing that issue?
15        MR. ALDEN:  You know -- this is
16  Anthony Alden again -- I don't -- I don't
17  think it's necessary.  I think the standard of
18  relevance is sufficiently broad that we have
19  met our relevance easily.  I don't think at
20  this stage we are required -- and I don't
21  think the Plaintiffs have ever been required
22  to explain how they -- you know, or would say
23  that they should be required to explain how
24  they intend to use evidence at trial.  I think
25  that this is -- you know, we have sufficiently

Page 43

1  articulated what the relevance is to obtaining
2  data on opioid prescriptions from the largest
3  opioid prescriber in Rochester, and we've
4  indicated we're willing to have a conversation
5  with them about burden, and, you know,
6  provided they can articulate it.  And so, you
7  know, frankly, we've been through rounds of --
8  months of letter writing and briefing and, you
9  know, we would just -- you know, I think we've
10  sufficiently established relevance and we,
11  frankly, just need to get on with getting the
12  documents.
13        SPECIAL MASTER COHEN:  Let me jump
14  to some of these other categories.
15        Number 3 is essentially materials
16  provided by manufacturers regarding the drugs
17  to Wegmans.  Let me start by asking Wegmans
18  about burden, do you think that that's
19  something that's hard to do.  And then the
20  other question I have is -- for PBMs it's
21  really more why do you need that, why do you
22  need it from Wegmans.  Most of it, almost all
23  of it, has already been produced into the MDL.
24  And so you pretty much know what the
25  manufacturers sent.  The only thing that

Page 44

1  getting it from Wegmans would add is, you
2  know, kind of a final crossing of the T
3  showing that they, in fact, got it as opposed
4  to the inference that they got it.
5        But I'll go with, you know, asking
6  Wegmans first what, you know, the burden is in
7  gathering that.
8        MR. AGINS:  Thank you.  Josh Agins
9  for Wegmans.
10        So it would depend on -- on what
11  the data is.  To your point, we've said, okay,
12  what are the communications, and we presume
13  that given their active participation in the
14  MDL, the PBMs have some of these
15  communications readily available to them, they
16  have a plan for them, and they are
17  significant.  If that's the case, tell us what
18  those are.  And if the question were can you
19  confirm that you received these and when and
20  who received them, that may not be
21  particularly burdensome, but, you know, to
22  take request number 3 as written and to say
23  give us all documents and communications
24  concerning those without even identifying
25  those for us, that is a monumental burden, and

Page 45

1  that's sort of where we left it, but that is
2  one of the requests where, you know, I think
3  there's room for meaningful conferral efforts
4  if the PBMs could come back to us and say here
5  are the communications that we think matter,
6  and then we would have an ability to either
7  search for those communications or at least
8  have a better sense of what that burden might
9  look like.
10        SPECIAL MASTER COHEN:  All right.
11  So what I'm hearing is that it would be a lot
12  easier for you to answer a multiple choice
13  question than an essay, and I think that makes
14  sense.
15        Go ahead, Anthony.
16        MR. ALDEN:  If I could just
17  respond to that.  I mean, look, I don't know
18  what Wegmans received so I can't tell him -- I
19  cannot tell Wegmans what, you know -- what to
20  look for.  What I can say is we're not looking
21  for every communication -- if Mr. Agins were
22  to come to me and say, look, we would be
23  required to search 50 custodians over a
24  13-year period, I think our response would be
25  no, we're not looking for that.  On the other

12 (Pages 42 - 45)

Page 46

1  hand, if there was a person responsible, or
2  people, a handful of people that had been
3  responsible for communicating with the
4  manufacturers over the relevant period, that's
5  a different question, right. We've provided
6  them search terms at their request and that
7  would be a different conversation.
8        And so, you know, again, I agree
9  with you, this is probably not one of our
10  central requests, but all we've heard today is
11  no, and if the answer would be, look, you
12  know, there are at least five people, we're
13  willing to do limited searches to look for
14  communications, then that may be one thing; if
15  the answer is there are 50 people or we can't
16  do it at all, that's a different thing. But
17  we don't know.
18        MR. AGINS: If I could just
19  briefly -- this is Josh Agins for Wegmans. If
20  I could briefly respond to that.
21        The search terms -- and I don't
22  think, Special Master Cohen, you need the
23  search terms, but they don't meaningfully
24  narrow anything. The search terms for
25  paragraph 3 are drug scope within 20 of addict

Page 47

1  or E-F-F-I-C or safe and manufacturer or
2  distributor or RDC or Rochester Drug
3  Cooperative. It's basically using a very
4  broad category to try to justify very broad
5  e-mail searches of Wegmans pharmacy without
6  any real rationale as to what we're shooting
7  for, why it's relevant, or how we could
8  meaningfully pare it down. And, as I've said,
9  we've asked them to identify the
10  communications.
11        MR. ALDEN: Can I respond to that?
12  This is Anthony Alden again.
13        What we want and the rationale has
14  been articulated multiple times. Wegmans
15  asked for search terms. The way this normally
16  works is you provide search terms and then
17  they come back and say, look, these search
18  terms are going to be too broad because we'd
19  have to run them over 15 people and here's
20  what we would get as a result or an estimate.
21  But we got nothing. So they asked for search
22  terms and simply said no, they're too broad,
23  we're not giving you anything.
24        So what normally happens, and I
25  believe what should happen here, is they take

Page 48

1  our search terms, they identify the people who
2  would have this, and they come to us and say,
3  look, given the number of people, it would be
4  too burdensome for us, we would propose X, or
5  maybe it's five people and maybe there are
6  5,000 documents and they say that's fine,
7  we'll do Y, we'll do that. But they have not
8  made the effort to do it because they've just
9  refused to produce any of these documents.
10        So I'm happy to have a
11  conversation about scope and burden, but it
12  has to be based on information, not just
13  simply we haven't provided a relevance
14  rationale, which we have.
15        MR. AGINS: This is Josh Agins.
16  (Simultaneous speaking.)
17        MR. AGINS: I'm sorry.
18        SPECIAL MASTER COHEN: Go ahead.
19        MR. AGINS: Josh Agins for
20  Wegmans.
21        I was going to say I think it's
22  strong to say that Wegmans asked for search
23  terms. I mean, within the context of a
24  conferral, there was a discussion about search
25  terms, and we said if you have narrow search

Page 49

1  terms, we'll take a look at them. So it's a
2  little different than saying please send us a
3  bunch of very broad search terms that we'll
4  agree to run without even seeing them. So I
5  just want to clarify that.
6        But number 3 in particular would
7  be much more straightforward if the PBMs would
8  identify the communications at issue, because
9  unless we know what communications we're
10  talking about, we can't even begin to have a
11  meaningful discussion about custodians or
12  search terms.
13        MR. ALDEN: I can -- this is
14  Anthony Alden. I can identify them for you
15  right now. They're listed. We want the
16  communications, publications, presentations,
17  analysis, reports, guidelines, directives,
18  announcements, recommendations, pamphlets,
19  circulars and notices to Wegmans by a
20  manufacturer regarding the efficacy, addictive
21  quality or safety of any --
22        SPECIAL MASTER COHEN: I don't
23  think it's helpful right now to just reread
24  the language from the subpoena which you've
25  been arguing about for four to six months.

13 (Pages 46 - 49)

Page 50

1 Let's move on.
2        So the parties themselves in the
3 discussion kind of lumped together numbers 8,
4 9, 10 and 11, and I think of 7 as more or less
5 similar, and these all go to communications
6 that Wegmans has received or made to others,
7 including its own employees, about, you know,
8 opioid-related issues, investigations, doctor
9 shopping.  It's what have you said internally
10 and externally about this opioid mess.
11        And I guess I'll start by asking
12 Wegmans to address, you know, all of those.  I
13 think -- you can tell me if I'm wrong -- that
14 they can be addressed together, but both with
15 regard to our two standards, relevance and
16 burden.  And I guess I'm more focused on
17 burden.  I think I understand the arguments
18 that the PBMs would make about relevance.
19        MR. AGINS:  I'm sorry.  Special
20 Master Cohen, would you say those numbers
21 again?
22        SPECIAL MASTER COHEN:  Sure.  It's
23 basically all the ones that are left, which
24 are 7, 8, 9, 10, 11.  And just to repeat, I
25 think of these as all somewhat related because

Page 51

1 they all go to internal or external
2 communications made or received by Wegmans
3 about opioid prescribing, investigations that
4 they undertook, investigations that the DEA
5 may have undertaken of them; you know,
6 conversations that Wegmans had with its own
7 employees about it.  They're all loosely
8 related.
9        MR. AGINS:  So I won't reiterate
10 what we've said, unless you would like us to
11 get into it, but what we've said about
12 relevance on these in writing.
13        Wegmans' prescribing conduct has
14 nothing to do with the claims by the City of
15 Rochester against the PBMs.  And the fact that
16 Wegmans dispenses prescriptions in the City of
17 Rochester is not enough.  So we would not
18 agree that these are relevant.
19        I can speak to the burden issue,
20 and just as a general point, the concept of
21 running broad search terms over custodian
22 sets, we haven't had any discussions with the
23 PBMs about custodians, and in one of the early
24 calls we asked, well, how did you identify
25 custodians.  They have never come to us and

Page 52

1 said here's an example of a custodian we'd
2 like you to run these terms on.  So doing
3 broad-brush e-mail discovery is an immense
4 burden.  We haven't calculated that at this
5 point because we haven't had a discussion of
6 custodians, but it is going to be an immense
7 burden to do that e-mail discovery.  And the
8 PBMs know that.  They've engaged in that type
9 of discovery as a party.  As a non-party
10 that's not the type of discovery we should be
11 participating in.
12        But having said that, there are
13 discrete elements of some of these where, as
14 opposed to identifying a broad concept, we
15 probably could identify documents or files
16 that are discernible and have a discussion
17 about those.
18        So, as an example, number 7 asks
19 about, you know, interactions -- essentially
20 interactions with law enforcement in Monroe
21 County.  And that would be an example where we
22 could go to someone and ask about files of
23 interactions with, for example, local law
24 enforcement or the DEA.  And I'm not
25 suggesting we would agree to get into

Page 53

1 broad-based e-mail discovery about that, but
2 in terms of identifying when Wegmans has
3 interacted with law enforcement about local
4 prescribers in Rochester, that is a
5 discernible thing that I think we can have a
6 meaningful conferral effort on.  But we
7 haven't reached that point because it's always
8 been, well, we want all of it, and our
9 relevance argument for why we should get it is
10 very broad brush, and so we haven't had
11 conferral efforts mature to the point where
12 we've discussed these sorts of discrete types
13 of documents that we might be able to produce
14 with a moderate level of burden.
15        SPECIAL MASTER COHEN:  Right.
16        So what you've just put your thumb
17 on is a communications problem, and I think
18 it's real, and I saw it in the e-mails, each
19 side waiting for the other to concede
20 something.  And here's how I think that that
21 can be bridged.  Here's how I suggest you move
22 forward.  So -- and I have a couple more
23 points I want to make after this, but this is
24 important.  As I said in the beginning, and as
25 I now conclude, I think that there is

14 (Pages 50 - 53)

1  something more than nothing that Wegmans is
2  going to have to produce; that is to say that
3  the subpoena isn't asking for only irrelevant
4  matters or only matters regarding which the
5  burden is too onerous.  There are some
6  communications, documents, there are some
7  responsive materials that Wegmans should
8  produce in response to the subpoena.
9       Now, the question is what should
10  it produce.  So, Josh, you just suggested
11  that, you know, with regard to, I think it was
12  number 7 you were talking about, yeah, we can,
13  for example, go to X custodian and ask about Y
14  sort of documents that fall within this
15  category.  You've never really said that
16  before.  You've only said none of it is
17  relevant and it's too broad.  Well, the only
18  way to get past that is to figure out what is
19  relevant, what isn't too broad.  And so what I
20  suggest may be a first step, even while you
21  wait for a ruling from the Court, is to say,
22  okay, as to number 7, here is what I propose
23  we give you.  How is that?  And the PBMs may
24  say, you know what, we're good.  That's
25  enough.  That will give us 80 percent of what

1  we're hoping to get and we're never going to
2  get 100 percent.  So we'll take that.  We're
3  good to go.  Run it.  Number 7 is done.
4  Because if you're waiting for the PBMs to come
5  to you with a narrowing, part of the problem
6  with that is that they can't do it because
7  they don't know what you know.  You're the one
8  that I think needs to say here's how I propose
9  I answer that narrower than what you wanted
10  but it should be enough, and then you start a
11  negotiation with something on the table as to
12  each one of these things.
13       So I really want you, Josh, to
14  take the first step and come back with a
15  concrete suggestion.  Some of them may still
16  be, you know what, there just isn't anything
17  we can do that wouldn't be extremely onerous.
18  But some of them you said during this call you
19  can do.  You can at least make a suggestion
20  here's something we can give you, let us know
21  if this is good, if this is enough, and start
22  a negotiation.
23       The other thing that I think that
24  the PBMs need to do is -- so, Anthony, you
25  said, in particular with respect to category

1  1, this is important.  We really, really,
2  really think that we need this.  This isn't --
3  you know, some of them aren't that important.
4  This one is.  In fact, it's so important we're
5  willing to consider paying for it.  I think it
6  would be helpful to identify the ones that are
7  that important and you're willing to pay for
8  because the Court and I will take that into
9  account.  If you say, for example -- I'm just
10  picking a random number -- number 9 is really
11  important.  We really want that.  They say
12  it's an extreme burden to do because of X, Y,
13  Z and they should have to actually say what X,
14  Y and Z are.  Okay.  We get that.  We know
15  that doing that is expensive.  We've had to do
16  it ourselves.  But we really, really want it.
17  We're willing to pay for it.  That's something
18  the Court needs to know.
19       So despite your -- you know, your
20  history of, frankly, kind of not being willing
21  to talk with each other, you're both talking
22  past each other and saying the same thing over
23  and over.  It doesn't help.  I'm suggesting
24  that if you get on the phone with each other
25  and think to yourself every time you open your

1  mouth what is the solution, not what is the
2  problem, what is the solution that we can come
3  to, how can we solve this, what if we do this,
4  is that a solution?  No.  Okay.  Well, what if
5  we do that?  You need to come up with
6  alternative possibilities instead of just
7  saying no, no, no, not good enough.
8       Now, I've heard a lot.  I can
9  issue an order that nobody would like --
10  certainly nobody would like all of it -- that,
11  in my discretion, chooses things -- and, you
12  know, I'm seeing the word "appeal" used in
13  some of these documents.  It's hard for me to
14  believe that there would be any successful
15  appeal of a discovery matter that is within my
16  discretion as long as I am not
17  (unintelligible).  Usually I'm not.  But what
18  ends up happening then is folks get something
19  they don't like as opposed to something that
20  they negotiated and are okay with.  That's
21  where this is headed.
22       So I'll end with that.  You know,
23  that's just kind of where I see things, and I
24  will start one by one going through this and
25  saying yes, no, yes, no, but in the meantime I

Page 58

1  think it would be great if you could call me
2  up and say number 4 is moot, for example,
3  we've figured out how to deal with it.  If you
4  absolutely just are in complete disagreement
5  on something, then I'll make a call.
6         Any thoughts or suggestions or
7  comments?
8         MR. ALDEN:  I'm sorry.  This is
9  Anthony Alden.
10        Look, I think we're fine to do
11 that, to give it one -- you know, one last
12 shot.  I'm very conscious of the time here
13 with an April 25 fact discovery deadline, but
14 I do think it important that we know quickly
15 from Wegmans what it is willing to do on each
16 of these topics.  I think that will then
17 inform, you know, whether we need to go back
18 to you quickly and say, look, there is no --
19 we're just not going to be able to reach
20 agreement on this, we would like a ruling, or
21 as to these five, you know, we'd like a
22 ruling, but as to the remaining seven we would
23 like to keep negotiating.  I would be open to
24 that, and I would also be open to telling
25 based on that which, you know, if there is,

Page 59

1  you know, a substantiated burden, we would be
2  willing to pay for it, or at least depending
3  on what the cost burden is.
4         SPECIAL MASTER COHEN:  Josh, when
5  do you think you can get something to Anthony?
6  And I'm not even asking for on every single
7  one of these categories, maybe just the -- you
8  know, I'm choosing again kind of a random
9  number -- the five easiest ones, the five ones
10 where you think you know what, here's how I
11 think we can solve this.  This gives you a lot
12 of what you want.  We can do it without a
13 terrible burden or whatever.  And do that
14 fairly quickly.  How soon can you do that?
15        MR. AGINS:  I think we could
16 provide that list by the end of this week,
17 possibly Monday, but we would endeavor to do
18 it by the end of the week.
19        SPECIAL MASTER COHEN:  And you can
20 roll it out.  There might be two that you can
21 do by the end of the day.  I don't mean to
22 push you any harder.  I'm just saying because
23 I think that's fine.  That seems reasonably
24 quick.  But you can roll it out.  You can say,
25 look, here's two that here's what we can do.

Page 60

1  That should be enough.  And et cetera.  And
2  get to the easy ones first.  Get to the ones
3  that you can resolve.  And the stuff at the
4  end that you can't resolve, if there is any, I
5  will.
6         Any other thoughts, comments,
7  suggestions?
8         All right, folks.  Look, it's not
9  easy.  This stuff is hard.  I appreciate
10 everybody's hard work.  You know, as I was
11 reading everybody's position papers, I thought
12 these guys are good.  They're very good
13 writers.  They're very concise.  They're very,
14 you know, to the point on both sides.  So I
15 commend you for that.  And we'll keep working
16 to get it done.
17        So thank you all for your time.
18        MR. ALDEN:  Thank you for your
19 time.
20        MR. AGINS:  Thank you very much.
21
22  (Status conference concluded at 3:18 p.m.)
23        - - - - -
24
25

Page 61

1          CERTIFICATE
2
3
4         I, Renee L. Pellegrino, RPR, do
5  hereby certify that as such Reporter I took
6  down in Stenotypy all of the proceedings had
7  in the foregoing transcript; that I have
8  transcribed my said stenotype notes to the
9  best of my ability into typewritten form as
10 appears in the foregoing transcript; that said
11 transcript is the complete form of the
12 proceedings had in said cause and constitutes
13 a true and correct transcript therein.
14
15
16
17
18  *Renee L. Pellegrino*
19 Renee L. Pellegrino,
20 Notary Public, within and for the
21 State of Ohio
22
23 My commission expires October 12, 2025.
24
25

16 (Pages 58 - 61)

**[1 - akin's]**                                                        Page 1

| 1 | 3 | a | |
|---|---|---|---|
| **1**  30:2 34:21 36:3,5 56:1 | **3**  28:6 43:15 44:22 46:25 49:6 | **aaron**  1:8 | **agencies**  32:4 |
| **10**  50:4,24 | | **abating**  7:14 | **agins**  2:4 8:7,8 9:19,21 11:15 |
| **100**  55:2 | **30**  18:12 33:22 36:18 | **ability**  45:6 61:9 | 11:17 12:11 13:25 14:20 |
| **11**  50:4,24 | **3:18**  60:22 | **able**  14:10 22:14,23 41:18 53:13 58:19 | 15:22 20:7,8 23:24 24:25 |
| **12**  1:11 3:10,24 4:18 5:18 14:19,22,22,24 15:8 16:12 61:23 | **4** | **absolutely**  58:4 | 26:12 28:22 29:12 38:2,2 40:7,12,21 |
| | **4**  30:6,13,21 31:3,8 32:7 58:2 | **access**  28:17,23 29:5 | 41:5,17 44:8,8 45:21 46:18,19 |
| **13**  5:20 45:24 | **45175**  1:13 | **account**  56:9 | 48:15,15,17,19 48:19 50:19 |
| **15**  1:13 47:19 | **45853**  1:11 | **accusation**  19:1 | 51:9 59:15 60:20 |
| **16**  9:24 | **5** | **action**  19:4 | **ago**  10:15 20:14 21:24 |
| **17**  1:7 | **5**  25:13 26:19 | **actions**  20:24 20:25 | **agree**  3:6 13:14 15:3 25:12 46:8 49:4 51:18 52:25 |
| **18**  1:13 | **5,000**  48:6 | **active**  44:13 | |
| **19**  1:11 | **50**  45:23 46:15 | **activity**  19:13 24:17 | |
| **2** | **6** | **actors**  7:15 | |
| **2**  16:16 21:19 21:21 22:3 23:13,25 24:12 25:3,5,11 30:9 30:12,21 31:1 36:3 | **6**  1:18 28:15 32:2 | **actually**  26:3 30:4 37:17 56:13 | **agreement**  16:6 16:6 58:20 |
| | **7** | | **agreements**  4:19 6:14 |
| | **7**  50:4,24 52:18 54:12,22 55:3 | **add**  4:1 29:4 32:1 44:1 | **ahead**  9:20 18:13,20 22:6 40:11 45:15 48:18 |
| **20**  46:25 | **75**  34:1 | **addict**  46:25 | |
| **2025**  1:18 61:23 | **8** | **addictive**  49:20 | |
| **2227**  61:18 | **8**  50:3,24 | **address**  3:17 4:4 50:12 | |
| **25**  58:13 | **80**  34:6 54:25 | **addressed**  35:7 50:14 | **ain't**  25:22 |
| **2804**  1:6,7 | **9** | | **akin's**  38:8,17 40:15 |
| **29**  33:25 | **9**  50:4,24 56:10 | **afternoon**  5:14 | |
| **2:00**  1:19 | | | |

**akins** 39:17
**alden** 2:5 5:14
 5:15 7:22
 10:24,25 13:21
 13:22 17:23,23
 20:13 22:4,7,8
 26:24,25 28:2
 29:7,8 30:23
 30:23 33:4,5
 34:15 36:7,7
 37:17 41:12,13
 42:15,16 45:16
 47:11,12 49:13
 49:14 58:8,9
 60:18
**alert** 31:16
**allegation** 13:2
 36:15,15,16
**allegations**
 5:21 12:21,24
 12:25 13:9,10
 13:13,15,17
 19:8,10,12
 22:15 37:6
**alleged** 5:23 6:5
 13:4 14:4
**allegedly** 13:3
**alleviate** 41:18
**alternative**
 57:6
**amount** 18:19
 27:14
**analyses** 14:8
 14:10 28:18

**analysis** 12:20
 19:7,10,23,23
 20:2 23:22
 30:6,9,21
 33:13,21 34:5
 34:7 49:17
**analyzed** 21:15
 33:17,18,19
**annotation**
 29:21
**announcements**
 49:18
**answer** 9:23
 15:25 26:12
 27:3,4 29:11
 30:25 31:23
 40:13 45:12
 46:11,15 55:9
**anthony** 2:5
 5:15 10:25
 13:22 17:23
 22:8 26:24
 29:8 30:23
 32:9 33:5 36:7
 41:13 42:16
 45:15 47:12
 49:14 55:24
 58:9 59:5
**apologize** 32:2
**appeal** 7:1 8:23
 57:12,15
**appearances**
 2:1

**appears** 61:10
**appellate** 8:24
 8:25 9:3,9
 40:20,24
**apples** 39:1
**applied** 31:18
**applies** 6:18
**apportioned**
 6:13 34:19
**apportionment**
 6:2 9:17,25
 10:2,4,12,18
 11:8 39:5 42:6
 42:12
**appreciate** 38:5
 60:9
**appropriate**
 18:15
**approval** 20:1
**approve** 21:2
**april** 58:13
**arcos** 28:17,18
 28:23 29:5
 32:3
**area** 3:5,7
**argue** 15:13
**arguing** 49:25
**argument** 10:4
 11:2 25:17
 53:9
**arguments**
 39:5 50:17
**article** 9:23

**articulate** 43:6
**articulated**
 10:11 20:14
 26:14 43:1
 47:14
**ascertainable**
 15:12
**aside** 14:20
**asked** 20:10
 21:7,23,24
 32:14 47:9,15
 47:21 48:22
 51:24
**asking** 7:20
 16:24 28:20
 32:22 35:11
 38:15,25 43:17
 44:5 50:11
 54:3 59:6
**asks** 25:18 30:7
 52:18
**aspect** 13:18
 28:12
**asserts** 4:5
**assume** 4:22
 7:18 23:6,8,18
**assuming** 6:20
 6:22 32:18
**assumption**
 6:21
**assure** 9:5
 16:13
**attorney** 36:25

| | | | |
|---|---|---|---|
| **authority** 10:13 | **big** 35:14 | 41:18,19,20 | 36:16 37:6,23 |
| **authorization** | **bigger** 39:3 | 43:5,18 44:6 | 38:8,18,24 |
| 13:7 | **bit** 3:11 11:20 | 44:25 45:8 | 39:18 40:14,15 |
| **available** 44:15 | 14:23 25:15 | 48:11 50:16,17 | 40:16,18 44:17 |
| **avoid** 40:20 | 35:21 37:10 | 51:19 52:4,7 | **cash** 36:13 |
| **b** | 38:7 40:22 | 53:14 54:5 | **categories** 3:10 |
| | **boys** 35:14 | 56:12 59:1,3 | 3:25 4:14 6:19 |
| **b** 17:13 | **bridged** 53:21 | 59:13 | 43:14 59:7 |
| **back** 16:4 | **briefed** 10:22 | **burdensome** | **category** 4:18 |
| 18:19 25:24 | 39:8 | 15:5,14 23:7 | 14:18 30:6 |
| 45:4 47:17 | **briefing** 42:4 | 24:7 44:21 | 36:5 47:4 |
| 55:14 58:17 | 42:14 43:8 | 48:4 | 54:15 55:25 |
| **based** 11:12 | **briefly** 22:5 | **business** 13:18 | **causation** 6:2 |
| 13:2 34:5 | 23:11 46:19,20 | **buy** 33:8 | 8:4 |
| 48:12 53:1 | **broad** 17:4,10 | **c** | **cause** 6:12 8:17 |
| 58:25 | 42:18 47:4,4 | | 11:4,10,12 |
| **basically** 47:3 | 47:18,22 49:3 | **c** 47:1 | 12:12,18 13:11 |
| 50:23 | 51:21 52:3,14 | **calculated** 52:4 | 34:17 39:6 |
| **basis** 42:5 | 53:1,10 54:17 | **call** 1:16 11:7 | 61:12 |
| **bear** 33:15 | 54:19 | 34:24 42:10,11 | **caveat** 29:4 |
| **beginning** | **brush** 52:3 | 55:18 58:1,5 | **central** 35:25 |
| 53:24 | 53:10 | **called** 9:4 20:17 | 36:15 46:10 |
| **behalf** 26:25 | **build** 33:12 | **calls** 51:24 | **centralized** |
| **believe** 17:1 | **built** 21:21 | **capable** 31:24 | 23:16 |
| 27:14 31:10 | **bunch** 17:7 | **capital** 27:21 | **centrally** 23:8 |
| 32:23 37:13 | 49:3 | 27:22 | 23:15 |
| 47:25 57:14 | **burden** 3:23 | **carefully** 25:11 | **century** 12:1 |
| **bellwether** | 4:4,6,7 5:3,9 | **caremark** | **certain** 7:18 |
| 21:13 | 10:7,9 14:16 | 35:15 | 9:16 27:23 |
| **best** 32:21 33:3 | 14:17 23:12 | **case** 1:7 4:2 | **certainly** 4:24 |
| 61:9 | 29:23 30:18 | 5:22 9:4,13 | 8:1 24:6 57:10 |
| **better** 45:8 | 34:24 35:7 | 11:7 12:15,16 | **certificate** 61:1 |
| **beyond** 24:9,11 | 36:4,23 39:9 | 32:21 33:3 | **certify** 61:5 |
| 25:8 | 39:12,13,14 | 35:5,20 36:5 | |

**[cetera - confirmation]**                                              Page 4

**cetera**  17:1
  60:1
**chapter**  20:21
**choice**  45:12
**chooses**  57:11
**choosing**  59:8
**circulars**  49:19
**cite**  11:7 12:15
**cited**  10:12
  12:15
**city**  1:10 12:3
  12:21 37:8
  38:21 40:7,13
  40:18 41:5
  51:14,16
**claim**  7:25 8:18
  9:11,22 21:1,3
  24:5
**claims**  8:1,2
  9:16,17 11:5
  11:11 24:11
  51:14
**clarification**
  27:1
**clarify**  38:5
  49:5
**clarifying**  20:5
**clean**  26:23
**clear**  26:2,4,13
  31:9,9
**clearly**  26:14
**clears**  39:2
**cmo**  21:12

**cohen**  1:16 3:1
  5:15 6:15 8:5,8
  9:5,20 10:16
  12:4,6 13:14
  14:15 15:15
  16:3 19:9,18
  19:19 20:4
  21:25 22:6
  23:10 24:15
  25:10 26:20
  27:20 28:13,25
  29:10 30:1
  32:9 34:10,20
  37:9,25 39:24
  40:2,10,19,25
  42:2 43:13
  45:10 46:22
  48:18 49:22
  50:20,22 53:15
  59:4,19
**collaboration**
  13:3
**collect**  23:8
  24:7
**collecting**
  23:12 29:23
**come**  45:4,22
  47:17 48:2
  51:25 55:4,14
  57:2,5
**comes**  18:10
**comma**  26:8,9
  34:11,12,13

**commenced**
  38:9
**commend**
  60:15
**comments**  58:7
  60:6
**commission**
  61:23
**communicating**
  46:3
**communication**
  18:6 33:10
  34:3 45:21
**communicati...**
  16:25 21:22,25
  22:18,21 23:6
  25:4,24 30:7
  31:2 32:4,15
  44:12,15,23
  45:5,7 46:14
  47:10 49:8,9
  49:16 50:5
  51:2 53:17
  54:6
**community**
  11:25
**companies**  12:3
**company**  31:15
**complaint**
  12:21,22,24
  13:16 14:2
**complete**  21:4
  58:4 61:11

**completely**
  12:19
**comply**  14:18
**con**  37:12
**concede**  53:19
**concept**  12:14
  21:21 51:20
  52:14
**concerning**
  19:2 31:5,12
  31:17 44:24
**concise**  60:13
**conclude**  9:10
  53:25
**concluded**
  60:22
**concrete**  21:9
  55:15
**conduct**  8:21
  9:1 12:18 13:9
  51:13
**conducted**
  38:11
**conference**
  1:16 60:22
**conferral**  45:3
  48:24 53:6,11
**confident**  39:19
**confidentiality**
  15:2
**confirm**  44:19
**confirmation**
  21:17

**confirmed**  25:5
**connection**
  37:15
**conscious**
  58:12
**consider**  4:14
  17:2,8 28:10
  41:21 42:1
  56:5
**considered**
  16:18 17:2
**constitute**  9:2
**constitutes**
  8:21 61:12
**consult**  29:15
**contacted**
  19:25
**contain**  29:14
**context**  11:23
  11:23 39:21
  48:23
**contracts**  4:19
  4:23 5:4 6:6
  14:24 15:3,6
  15:11,21,24
  24:3
**contractually**
  5:25
**contrary**  9:3
  12:16
**contributed**  7:9
  7:16
**contributes**  7:5
  7:12

**conversation**
  37:1,2 41:17
  41:22 43:4
  46:7 48:11
**conversations**
  36:23 51:6
**cooperative**
  47:3
**core**  5:21 12:25
  37:6
**corporate**  31:3
**correct**  9:8,10
  19:17 61:13
**corresponden...**
  12:13
**cost**  35:8 41:19
  41:20 59:3
**counsel**  9:14
  37:19 38:1
**counts**  39:17
**county**  1:12
  38:9,24 52:21
**couple**  14:22
  53:22
**court**  1:1 4:4
  8:25 14:17
  38:10 40:6
  54:21 56:8,18
**courts**  9:9
**coverage**  35:19
**covered**  17:16
  24:19 35:13
**created**  13:1
  30:17

**creating**  13:4
**critical**  3:17
  10:21 14:12
**crossing**  44:2
**custodian**
  51:21 52:1
  54:13
**custodians**
  45:23 49:11
  51:23,25 52:6
**customer**  36:12
**customers**
  36:10
**cuts**  12:19
**cvs**  12:6

**d**

**damages**  7:10
**dan**  1:8
**data**  5:2 14:9
  14:11 19:13
  21:14 22:14,17
  22:17,20 23:19
  28:17,18,23
  29:5,8 30:3
  32:3,16,24
  33:9,10,10,19
  33:19 34:6,9
  34:25 35:3,11
  35:24 36:1,9
  36:11,12,13,21
  36:24 37:4,14
  37:15,22 38:6
  38:14,16 39:16

  41:14,24 43:2
  44:11
**david**  1:16
**day**  59:21
**days**  18:12
**dea**  51:4 52:24
**deadline**  58:13
**deal**  42:8 58:3
**december**  5:20
**decided**  10:22
  23:22 40:24
**decisions**  13:6
  18:4
**declaration**
  39:12
**defendant**  18:8
**defendants**
  5:16,22 11:1
  17:24,25 30:24
  36:8 38:13
  41:16
**defense**  6:10
  8:17 18:25
**defenses**  6:3
**define**  28:6
**defined**  27:22
**defining**  27:6
  27:18
**definition**  27:7
  28:5,12
**demand**  13:4
**depend**  44:10
**depending**
  23:14 59:2

[despite - employer]                                              Page 6

**despite**  17:20
  29:3 56:19
**detail**  24:1,4
**detailed**  39:11
**determine**
  35:18
**determined**
  18:15 33:20,22
  33:24 34:5
**different**  18:24
  23:14,18 30:9
  30:22 31:1
  46:5,7,16 49:2
**difficult**  34:25
**directed**  31:4
  38:12
**directive**  31:15
**directives**
  31:22 49:17
**disagreement**
  58:4
**discernible**
  52:16 53:5
**discontinue**
  40:17
**discovery**  3:9
  10:20 39:7
  52:3,7,9,10
  53:1 57:15
  58:13
**discrete**  15:12
  52:13 53:12
**discretion**
  57:11,16

**discussed**  53:12
**discussing**  17:9
**discussion**  7:7
  13:13 25:7
  29:25 48:24
  49:11 50:3
  52:5,16
**discussions**
  51:22
**dismiss**  41:2
**dispensed**
  14:13 17:15
  38:19
**dispenser**  6:4
  11:21 24:2
  41:10
**dispenses**  51:16
**dispensing**  5:2
  6:9 8:21 9:1,11
  13:9 16:21
  17:3 19:5
  20:22 22:10
  31:17,18 33:9
  38:6,14,16
  39:22
**dispositive**  8:13
**dispute**  11:3,9
  11:11
**distinction**  32:8
**distributor**
  4:21 11:13
  25:20 26:16
  41:10 47:2

**distributors**
  4:25 14:25
  15:11,17,25
  16:1
**district**  1:1,2
**division**  1:3
  8:24 9:3 40:24
**doctor**  18:17
  50:8
**doctrines**  42:7
**document**  1:9
**documentation**
  21:12 29:16
**documents**
  3:25 5:8 14:9
  14:11 15:10
  16:17,25 23:7
  23:16 24:6,22
  31:6 43:12
  44:23 48:6,9
  52:15 53:13
  54:6,14 57:13
**doing**  15:19
  52:2 56:15
**door**  10:20
**dozen**  41:7
**drilling**  29:19
**drop**  32:13
**drug**  16:8 31:6
  46:25 47:2
**drugs**  4:21
  38:23,25 43:16

| e |
| --- |
**e**  10:14 31:11
  37:11 47:1,5
  52:3,7 53:1,18
**earlier**  15:4
  40:15
**early**  51:23
**easier**  4:14
  45:12
**easiest**  59:9
**easily**  17:14
  36:6 42:19
**eastern**  1:3
**easy**  16:15 60:2
  60:9
**economic**  10:1
**efficacy**  49:20
**effort**  48:8 53:6
**efforts**  13:5
  45:3 53:11
**either**  10:13
  45:6
**element**  11:5
  11:10
**elements**  3:17
  3:21 52:13
**emanuel**  13:23
**employee**  31:12
**employees**  31:5
  31:23 50:7
  51:7
**employer**  12:2

**endeavor** 59:17
**ends** 27:17
  57:18
**enforcement**
  52:20,24 53:3
**engaged** 52:8
**entered** 23:19
**entirely** 29:24
  39:1
**entities** 32:16
  42:9
**entitled** 6:3
  11:11 35:22
  37:5,7
**epidemic** 36:17
  37:7
**especially** 12:9
  25:16
**esq** 2:3,4,5
**essay** 45:13
**essentially** 5:20
  28:16 43:15
  52:19
**establish** 8:3
**established**
  34:16 43:10
**estimate** 47:20
**et** 16:25 60:1
**everybody**
  34:23
**everybody's**
  60:10,11
**evidence** 11:13
  42:24

**exact** 7:4
**exactly** 12:9
**example** 5:2
  15:10 18:5
  22:11 27:12
  33:8,14 34:8
  36:12 39:10
  52:1,18,21,23
  54:13 56:9
  58:2
**except** 12:23
  24:23
**excessive** 4:6
  5:24 18:18
**exchanged** 3:11
**exclude** 15:23
**excuse** 24:24
  42:11
**expand** 27:25
**expect** 33:13
**expedited** 42:4
**expensive** 35:2
  56:15
**expert** 33:16
**experts** 19:7
  33:11
**expires** 61:23
**explain** 5:7
  14:16 32:10
  42:22,23
**explains** 21:8
  32:7
**express** 5:16
  10:25 11:1

13:23 17:24
  26:25 30:24
  36:8
**expressed** 15:4
**extent** 3:18
  4:11 7:7 17:8
  29:15
**external** 51:1
**externally**
  50:10
**extreme** 56:12
**extremely**
  55:17

### f

**f** 47:1,1
**face** 14:5
**facing** 7:24,25
  14:7
**fact** 20:19
  21:11 35:10
  44:3 51:15
  56:4 58:13
**factor** 7:5,11
**factual** 39:11
**failure** 14:4
**fairly** 59:14
**fairness** 28:24
**fall** 54:14
**far** 7:9
**feed** 6:10
**feel** 40:23 41:24
**felt** 39:19

**fields** 39:23
**figure** 54:18
**figured** 58:3
**files** 52:15,22
**fill** 18:16,20
**filled** 17:18,19
  17:20 18:22
  20:16
**filling** 23:20
  24:18
**fills** 18:13
**final** 33:7 44:2
**financial** 5:25
  6:8
**fine** 28:10 48:6
  58:10 59:23
**finger** 8:12
**firm** 8:9
**first** 4:14 5:5,7
  18:7,24 35:1
  44:6 54:20
  55:14 60:2
**five** 46:12 48:5
  58:21 59:9,9
**flag** 14:7 18:25
  19:1,7,10,22
  20:2 22:12,21
  23:21 33:13,17
  33:21 34:6
**flagging** 18:10
  27:10
**focus** 25:7
**focused** 50:16

**[folks - identifying]**

**folks** 7:8 57:18 60:8
**follow** 34:7
**food** 3:4 8:10
**foregoing** 61:7 61:10
**form** 27:7 61:9 61:11
**formularies** 13:7
**forth** 16:4 25:25
**forward** 53:22
**four** 49:25
**fraction** 35:16
**frankly** 15:8 39:13 40:22 43:7,11 56:20
**front** 7:4 38:10
**full** 36:21
**fully** 10:22
**funded** 36:14

**g**

**gathering** 44:7
**general** 39:5 51:20
**generally** 4:3
**getting** 10:8 43:11 44:1
**give** 30:20 32:13 44:23 54:23,25 55:20 58:11

**given** 4:22 31:4 37:6 44:13 48:3
**gives** 59:11
**giving** 47:23
**go** 4:8,12 5:7 6:6 9:20 10:17 13:11 18:20 22:6 24:11 32:3 33:11 34:21 40:10 44:5 45:15 48:18 50:5 51:1 52:22 54:13 55:3 58:17
**goes** 18:12 31:1 31:3
**going** 3:16 10:16,19 12:17 16:22 18:20 24:17 26:6 29:4,13 33:11 33:12 35:21 39:6 47:18 48:21 52:6 54:2 55:1 57:24 58:19
**good** 5:14 6:21 26:21 54:24 55:3,21 57:7 60:12,12
**great** 24:1,4 27:17 58:1

**grocery** 3:5
**group** 41:6
**guess** 4:16 5:1 5:5 35:25 40:5 50:11,16
**guessing** 5:1
**guidance** 31:22
**guidelines** 49:17
**guys** 60:12

**h**

**h** 2:3
**hand** 18:21 46:1
**handbook** 24:2
**handful** 46:2
**happen** 47:25
**happening** 57:18
**happens** 9:14 47:24
**happy** 5:16 36:22 37:1,2 48:10
**hard** 27:3 30:2 34:21,22 35:3 43:19 57:13 60:9,10
**harder** 59:22
**harm** 10:1
**headed** 57:21
**health** 29:22

**hear** 4:9 5:5,9 5:12 6:16 8:6 29:1,2
**heard** 16:11 46:10 57:8
**hearing** 45:11
**held** 9:3 34:13
**hell** 35:4
**help** 56:23
**helped** 35:18
**helpful** 11:22 12:8 49:23 56:6
**history** 56:20
**hodgson** 8:9
**hope** 32:7,19
**hoping** 55:1
**hours** 10:14
**huge** 39:9
**hypothetical** 32:22

**i**

**identifiable** 15:12
**identified** 3:21 33:23 34:18
**identify** 5:11 22:1 47:9 48:1 49:8,14 51:24 52:15 56:6
**identifying** 44:24 52:14 53:2

**immense** 10:7
29:23 52:3,6
**important** 19:4
22:23 41:15,24
53:24 56:1,3,4
56:7,11 58:14
**incentives** 6:1,6
6:9
**include** 14:6
15:18 16:9
**included** 28:12
**including** 40:18
50:7
**indicated** 43:4
**indication**
21:13
**individual**
36:10
**infer** 17:14
**inference** 44:4
**inform** 58:17
**information**
3:11,20,22
17:6,11 19:6
20:12 21:7,18
23:13 27:16
29:19,22,24
30:13,15 32:25
41:20,23 42:1
48:12
**inquiry** 27:17
**instances** 29:17
**instruction**
30:20 31:4,16

**instructions**
6:24,25 7:2
**integral** 11:24
**intend** 42:24
**intentionally**
15:23
**interacted** 53:3
**interactions**
24:14 25:6
52:19,20,23
**interacts** 20:23
**internal** 22:20
27:10 51:1
**internally** 50:9
**interpretation**
25:3
**interrupt** 9:22
13:22 19:14
40:12
**investigation**
18:14
**investigations**
50:8 51:3,4
**involved** 36:24
**irrelevant** 54:3
**issue** 8:14,19
8:24 10:21
13:11 15:7
35:6,7 38:24
39:3,8 40:20
40:23 42:14
49:8 51:19
57:9

**issued** 3:3
31:21 33:24
**issues** 29:22
50:8

### j

**january** 1:18
**joint** 9:25
42:12
**josh** 8:8 11:17
20:8 23:11
29:4,11 38:1,2
40:3 44:8
46:19 48:15,19
54:10 55:13
59:4
**josh's** 42:3
**joshua** 2:4
**judge** 1:8
**jump** 9:8 16:13
25:13 30:2
43:13
**jury** 6:23,24
7:2
**justice** 38:10
**justification**
10:19
**justify** 39:6
47:4

### k

**keep** 58:23
60:15
**kept** 25:25

**kimono** 32:13
**kind** 16:15 26:7
27:10 32:20
33:3,16 44:2
50:3 56:20
57:23 59:8
**know** 4:2,25
6:3,7,11 8:22
9:12,12 10:8
10:15,16 11:6
11:6 12:12
14:3,4,9,25
15:5,6,9 16:20
17:4,7,10,13,19
17:20 18:3,3,9
18:17 19:4,12
20:14 22:1
23:1,2,3,16,21
23:24 25:21
26:8,10 27:4
27:11,12 28:8
29:6 31:14,22
31:24 32:12,18
33:8,15,21
35:2,17 36:5
37:10,18,19,24
39:13 41:8,10
41:14 42:15,22
42:25 43:5,7,9
43:9,24 44:2,5
44:6,21 45:2
45:17,19 46:8
46:12,17 49:9
50:7,12 51:5

**[know - master]** Page 10

52:8,19 54:11
54:24 55:7,7
55:16,20 56:3
56:14,18,19
57:12,22 58:11
58:14,17,21,25
59:1,8,10
60:10,14
**koba** 38:10

**l**

**l** 1:25 61:4,19
**l.p.** 1:10,12
**land** 35:23
**language** 15:7
49:24
**large** 8:15
11:20 14:13
**largest** 3:6 6:4
12:1 43:2
**law** 6:22,23 8:9
9:24 10:3,10
10:19,21 11:7
11:8 12:15,16
35:5 52:20,23
53:3
**lawyer** 33:6
**lay** 5:19 24:4
35:23
**lays** 20:21
**lead** 16:5
**left** 45:1 50:23
**lengthy** 39:11

**letter** 5:20
12:10 37:1,20
37:21 38:7
43:8
**level** 29:19,23
31:3 53:14
**liability** 6:12
7:10 9:18 10:1
12:19 34:18
42:10,12
**liable** 7:13,13
34:13
**limited** 14:24
16:7,8 24:16
39:16 46:13
**line** 35:2
**lines** 36:25
**list** 59:16
**listed** 2:7 49:15
**litigation** 1:6
27:24 37:16
**little** 11:19
14:23 37:10
40:22 49:2
**local** 41:8
52:23 53:3
**locating** 5:3
**long** 57:16
**longstanding**
12:2
**look** 12:20
20:19 32:21
33:4 35:20
36:22 45:9,17

45:20,22 46:11
46:13 47:17
48:3 49:1
58:10,18 59:25
60:8
**looked** 36:20
**looking** 4:15
17:15 23:25
25:11 31:7,10
31:11,13 45:20
45:25
**loosely** 42:6
51:7
**lost** 32:5
**lot** 3:14 7:6
42:7 45:11
57:8 59:11
**lower** 5:4
**lumped** 50:3

**m**

**made** 18:4 19:1
19:10 36:6
48:8 50:6 51:2
**mail** 10:14
13:17 14:2
19:11 31:11
37:11 47:5
52:3,7 53:1
**mails** 53:18
**maintain** 13:5
22:17
**maintained**
23:9

**make** 27:5,18
28:11 31:9,9
33:16 50:18
53:23 55:19
58:5
**makes** 45:13
**making** 27:12
**manner** 39:18
**manual** 20:20
20:21
**manuals** 23:1,4
23:17 24:22
**manufacturer**
4:20 15:21
47:1 49:20
**manufacturers**
4:24 6:1 13:4
15:18 16:2
43:16,25 46:4
**marketing** 13:2
**markets** 8:10
**master** 1:16 3:1
5:15 6:15 8:5,8
9:5,20 10:16
10:24 12:4,6
13:14 14:15
15:15 16:3
19:9,18,19
20:4 21:25
22:4,6 23:10
24:15 25:10
26:20 27:20
28:13,25 29:10
30:1 32:9

| | | n | negotiating |
|---|---|---|---|

34:10,20 37:9
37:25 39:24
40:2,10,19,25
41:12 42:2
43:13 45:10
46:22 48:18
49:22 50:20,22
53:15 59:4,19
**materials**  43:15
54:7
**matter**  10:18
45:5 57:15
**mattered**  7:8
**matters**  54:4,4
**mature**  53:11
**md**  1:7
**mdl**  1:6 7:3
9:13 41:11
43:23 44:14
**mean**  11:4
13:22 14:1,7
15:15 22:7
27:21,23 30:10
42:6 45:17
48:23 59:21
**meaning**  12:18
28:1 38:19
**meaningful**
13:12 45:3
49:11 53:6
**meaningfully**
46:23 47:8
**mediation**
37:22

**mentioned**
12:13 33:8
**mess**  50:10
**met**  42:19
**minimize**  37:4
**misnomer**  38:8
**mme**  38:18,19
39:17
**mmes**  38:22
**moderate**  53:14
**mom**  41:8
**moment**  7:19
21:24
**moments**  20:14
**monday**  59:17
**monroe**  52:20
**months**  8:15
39:18,21 43:8
49:25
**monumental**
44:25
**moot**  58:2
**morning**  4:2
**motivated**  5:23
**mouth**  57:1
**move**  50:1
53:21
**multiple**  45:12
47:14
**municipalities**
38:21

**n**

**name**  8:8
**narrow**  46:24
48:25
**narrower**
38:25 55:9
**narrowing**  55:5
**narrowly**  27:19
**national**  1:6
41:10
**nature**  13:8
**nearly**  27:6
**necessarily**
16:14 18:7
19:3
**necessary**
42:17
**need**  9:6 14:8,9
17:22 18:2,3
22:13,22 23:3
26:22 27:2
28:10 29:6
36:19 43:11,21
43:22 46:22
55:24 56:2
57:5 58:17
**needs**  55:8
56:18
**negligence**  9:19
9:22
**negotiated**
57:20

**negotiating**
58:23
**negotiation**
55:11,22
**negotiations**
38:11
**never**  13:12
31:21 37:15
51:25 54:15
55:1
**new**  5:16 6:22
6:23 7:1,18
8:10,18,23,25
9:9,24 10:3,10
10:19,21 11:8
11:21,25 21:13
29:9 37:22,23
**non**  3:3 39:7
52:9
**normally**  47:15
47:24
**northern**  1:2
**notary**  61:20
**notes**  22:11
61:8
**notice**  15:1
**notices**  49:19
**notification**
27:8
**notion**  11:20
22:9
**nuisance**  6:17
6:20,25 7:6,9
7:12,14,14,25

8:18,22 9:2,11
42:11
**number**  5:18
11:19 14:19,21
14:22,24 16:12
16:16 21:19,21
22:3 23:13,25
24:12 25:3,5
25:11,13 28:15
30:2,6,9,12,13
30:21,21 31:1
31:3,8 32:2,7
34:21 43:15
44:22 48:3
49:6 52:18
54:12,22 55:3
56:10,10 58:2
59:9
**numbers**  38:18
39:22 50:3,20
**numerical**  4:12

**o**

**o**  27:22
**objection**  14:21
**obligation**
25:21 42:9
**obtaining**  43:1
**obvious**  34:23
**obviously**  6:7
32:22
**occurs**  28:15
35:10

**october**  61:23
**offer**  41:2
**ohio**  1:2 6:23
6:24 61:21
**okay**  8:5 19:19
20:4 25:13
30:10 32:12
34:20 44:11
54:22 56:14
57:4,20
**onerous**  54:5
55:17
**ones**  14:12
16:14,15 50:23
56:6 59:9,9
60:2,2
**op**  1:11,13
**open**  41:21
56:25 58:23,24
**opens**  10:20
**opiate**  1:6
**opioid**  4:21
5:24 31:12
36:17 37:16
43:2,3 50:8,10
51:3
**opioids**  3:7 6:4
6:10 9:1,11
11:14,21 13:5
14:14 16:9,21
17:3 22:10
27:15 31:5,17
31:18 34:4
36:19 37:8

**opportunity**
38:5
**opposed**  5:2
44:3 52:14
57:19
**opposite**  9:15
**optum**  17:25
**oranges**  39:1
**order**  4:13
12:19 13:17
14:3 19:11
25:21 27:6,8
28:7 57:9
**ordered**  37:21
**orders**  25:18,22
26:10,16,17
27:19,21 28:9
**outline**  39:12
**outlined**  31:16
**outside**  21:22
**overlook**  5:23
**overrode**  22:12
**own**  36:21 50:7
51:6
**owner**  19:13

**p**

**p.m.**  1:19 60:22
**pain**  18:19
**pamphlets**
49:18
**papers**  3:12
8:22 9:7 60:11

**paragraph**
15:8 26:19
46:25
**paragraphs**
14:1,2
**pare**  47:8
**part**  6:1 11:24
13:16 24:3
34:22 35:4,9
36:3,3 41:11
55:5
**participants**
2:7
**participating**
52:11
**participation**
44:13
**particular**  34:9
49:6 55:25
**particularly**
15:5,13 44:21
**parties**  3:6,10
3:21 4:1,9 25:4
25:14 38:12
50:2
**party**  3:3 4:5,7
11:12 14:6
15:1 18:9
33:19 39:7
52:9,9
**past**  10:9 18:12
25:14,25 54:18
56:22

**[patient - prescribers]**                                                      Page 13

**patient**  17:5,11
  17:16 18:11,16
  18:18 35:13
**patients**  24:18
  24:20 27:13
  35:16
**pay**  21:3 56:7
  56:17 59:2
**paying**  4:7 56:5
**payment**  20:1
**pbm**  5:22 18:7
  18:9 19:13
  20:20 21:2
  24:5,19 29:18
  36:10 41:15
**pbm's**  29:17
**pbms**  3:3,19,25
  4:18 5:6,6,13
  10:10 12:12,22
  13:1 14:4
  16:19,22 17:12
  17:16 18:6,8
  19:25 20:11
  22:9 24:3,6,8
  24:12,14,23,24
  25:6 26:1,21
  29:3 30:13
  35:1,3,11,13,17
  35:25 38:15,25
  39:11,23 43:20
  44:14 45:4
  49:7 50:18
  51:15,23 52:8
  54:23 55:4,24

**pec**  19:16
**pellegrino**  1:25
  61:4,19
**pending**  8:23
  38:10
**people**  25:25
  46:2,2,12,15
  47:19 48:1,3,5
**percent**  33:22
  33:25 34:1,6
  34:14 36:18
  54:25 55:2
**percentage**
  34:17
**perfectly**  18:15
**period**  45:24
  46:4
**person**  46:1
**pertains**  36:11
**peter**  2:3 19:15
**pharma**  1:10
  1:12
**pharmacies**
  14:3,6 16:25
  38:23 41:9,11
**pharmacist**
  20:15,20,21,23
  22:12 23:17,20
  23:20 24:5
  30:17
**pharmacists**
  16:18 29:15
  30:8,11

**pharmacy**
  13:17 19:11
  24:11 31:3
  38:8,13,20
  47:5
**phone**  3:2
  56:24
**phrase**  38:6
**pick**  38:4
**picking**  16:14
  56:10
**picture**  36:21
**plaintiff**  38:18
  38:20 41:6
**plaintiffs**  5:21
  8:2,3 9:13 19:2
  19:8 21:16
  22:15 33:13,17
  33:21,23 34:16
  39:20,25 40:4
  40:16 41:7
  42:21
**plan**  44:16
**please**  5:11
  33:6 49:2
**pmp**  29:9,14,15
  29:16 32:3
**point**  12:11
  13:24 16:20
  18:6 19:23
  20:12 21:18,23
  22:18 23:5
  28:24 29:13
  33:10 34:2

  38:4 39:15
  44:11 51:20
  52:5 53:7,11
  60:14
**points**  9:15
  53:23
**policies**  22:25
  23:4 24:2,10
  25:8
**policy**  17:4,10
**polster**  1:9
**pop**  41:8
**pos**  20:18,23
  21:6 29:17
**position**  3:12
  10:15,17 12:17
  23:25 24:1
  25:1,9 26:18
  39:4 60:11
**possibilities**
  57:6
**possibly**  59:17
**potentially**
  18:25 37:3
**practices**  19:11
**predicate**  36:16
**prejudice**  41:2
**prepared**  11:6
  12:15
**prescriber**
  20:17,20 43:3
**prescribers**
  53:4

**prescribing**
51:3,13
**prescription**
1:6 17:17,18
18:10,13,16,21
18:23 19:2,6
20:16 27:9
29:18,20 31:13
32:16 34:4
**prescriptions**
5:24 14:5
27:11 33:23
34:1,2,17
35:17 36:19
37:8 43:2
51:16
**presentation**
33:16,18
**presentations**
49:16
**presume**  44:12
**pretty**  17:14
25:23 26:23
43:24
**prior**  10:13
13:7 19:5
37:12
**probably**  3:24
5:6 38:7 39:2
46:9 52:15
**problem**  53:17
55:5 57:2
**procedures**
22:25 23:4

**proceedings**
61:6,12
**process**  40:17
**produce**  3:19
4:19 22:22
35:3 37:22
38:13,16,23
48:9 53:13
54:2,8,10
**produced**
21:14 37:14,15
38:17 39:16,17
43:23
**produces**  14:12
**producing**  5:3
23:12 36:24
39:20
**production**  3:9
4:8 34:25
**programs**
36:14
**proliferate**
13:5
**promise**  9:7
**properly**  22:14
**proportion**
14:13
**propose**  48:4
54:22 55:8
**proposition**  4:3
35:6
**protected**
29:22

**provide**  41:19
47:16 59:16
**provided**  5:25
20:2 39:10
43:6,16 46:5
48:13
**proximate**  8:4
11:4,10,12
12:12 13:11
34:16
**public**  6:17,20
6:25 7:6,9,12
7:25 8:17,21
9:2,11 61:20
**publications**
49:16
**pull**  15:6 39:18
**purchases**
36:13
**purdue**  1:10,12
13:3
**purposefully**
15:20
**purposes**  20:1
28:7 37:13,22
38:17 39:19
**push**  27:3
28:11 59:22
**put**  8:12 40:5
53:16
**putting**  14:20

**q**

**quality**  49:21
**question**  3:18
4:4 6:7 8:20
10:5 20:13
21:24 26:7
30:18,25 32:6
32:23 34:24
35:25 36:4
43:20 44:18
45:13 46:5
54:9
**questions**  20:10
**quick**  30:5
59:24
**quickly**  58:14
58:18 59:14
**quinn**  13:23
**quite**  3:11
39:12
**quote**  16:8
38:13

**r**

**random**  56:10
59:8
**rarely**  35:20
**rather**  4:12
**rationale**  20:17
20:25 22:9
47:6,13 48:14
**raw**  39:22
**rdc**  47:2

**[reach - result]**

reach  58:19
reached  53:7
read  3:13 4:22
  9:7
readily  44:15
reading  37:20
  60:11
real  47:6 53:18
realize  32:6
really  30:14
  32:13,20 33:6
  39:7 43:21
  54:15 55:13
  56:1,1,2,10,11
  56:16,16
reason  3:2 6:13
  18:2 32:23
  34:22
reasonable
  31:21,25
reasonably
  59:23
reasons  26:15
rebate  13:6
rebates  6:8
receive  26:16
received  16:19
  16:19 24:23,24
  27:13 30:13
  32:15 37:11
  44:19,20 45:18
  50:6 51:2
receiving  6:8
  27:14

recognize  39:9
recommendat...
  49:18
record  5:12
recorded  20:18
  20:25
red  14:7 18:25
  19:1,7,10,22
  20:1 22:12,21
  23:21 33:13,17
  33:21 34:6
refer  37:18
reference  29:14
referred  40:15
referring  15:9
refills  18:11
refused  48:9
regard  35:24
  42:5 50:15
  54:11
regarding  4:21
  23:21 43:16
  49:20 54:4
regardless  7:23
  11:8 24:19
regional  41:9
reiterate  51:9
related  42:7
  50:8,25 51:8
relates  1:9
relevance  3:22
  5:8,19 8:14
  10:6,10 14:21
  24:10 30:18

42:18,19 43:1
43:10 48:13
50:15,18 51:12
53:9
relevant  7:20
  7:21 8:1,3,16
  21:19 46:4
  47:7 51:18
  54:17,19
reliable  39:19
relieved  4:7
remaining  11:5
  11:10 58:22
remember  41:1
remote  1:16 2:1
renee  1:25 61:4
  61:19
repeat  9:6
  50:24
repeatedly  21:7
reporter  61:5
reports  49:17
represent  8:10
request  3:25
  5:18 14:18
  26:5 32:2
  44:22 46:6
requested  3:9
  3:20
requesting  4:7
  39:23
requests  8:16
  45:2 46:10

required  42:20
  42:21,23 45:23
requirements
  15:1,2
reread  49:23
resolve  60:3,4
respect  5:18
  6:9,17,19 11:3
  13:7 20:2
  26:19 34:25
  36:9 55:25
respectfully
  37:18
respond  3:8
  14:8,10 16:22
  19:8 20:6 22:5
  22:14,24 23:5
  28:2 36:4 38:1
  45:17 46:20
  47:11
responding
  22:17
response  33:12
  45:24 54:8
responses
  22:21 31:2
responsible
  34:14 36:18
  46:1,3
responsive  26:5
  54:7
rest  13:8
result  5:25
  47:20

**[resulting - sit]**

**resulting**  18:19
**results**  33:14
**revenue**  13:6
**review**  21:2
**reviewed**  3:12
  3:13
**rico**  7:25
**right**  15:4
  16:11 18:12,23
  26:17,20 28:13
  32:20 36:24
  37:25 40:25
  41:23 42:6
  45:10 46:5
  49:15,23 53:15
  60:8
**rochester**  1:10
  3:5,7 6:5 8:9
  11:14,21,25
  14:14 31:14,19
  38:21 40:6,8
  40:14,18 41:6
  43:3 47:2
  51:15,17 53:4
**rochester's**
  12:22
**roll**  59:20,24
**room**  45:3
**rounds**  43:7
**rpr**  1:25 61:4
**rule**  32:24
**ruled**  8:25
  32:11

**ruling**  54:21
  58:20,22
**run**  47:19 49:4
  52:2 55:3
**running**  51:21
**russ**  8:9

**s**

**s**  27:22
**safe**  47:1
**safety**  49:21
**sale**  16:20 18:6
  19:23 20:12
  21:18,23 22:18
  23:5 33:10
  34:2
**saw**  53:18
**saying**  15:16
  16:24 24:21,25
  25:1,8 33:7
  41:1 49:2
  56:22 57:7,25
  59:22
**says**  28:16
**scenarios**  18:24
**scope**  16:8 31:6
  37:23 46:25
  48:11
**script**  23:21
  29:19,23
**scripts**  5:16
  10:25 11:1
  13:23 17:24
  24:18 26:25

  30:24 36:8
**search**  31:21,25
  45:7,23 46:6
  46:21,23,24
  47:15,16,17,21
  48:1,22,24,25
  49:3,12 51:21
**searches**  46:13
  47:5
**second**  4:16
  19:3,15 21:12
  40:2
**see**  22:2 24:10
  29:20 36:19
  37:7 57:23
**seeing**  49:4
  57:12
**seemed**  37:20
**seems**  7:21
  17:12 24:13
  59:23
**send**  49:2
**sense**  45:8,14
**sent**  3:12 4:2
  16:24 17:6,9
  17:13,21 31:11
  35:5 43:25
**sentiment**  15:3
**separate**  29:25
**set**  38:25
**sets**  34:9 51:22
**settlement**
  37:13 38:11,17

**seven**  58:22
**several**  2:7 8:15
  10:1 42:12
**share**  42:10
**shift**  35:7
**shooting**  47:6
**shopping**  50:9
**short**  40:13
**shorthand**
  15:19
**shot**  58:12
**show**  21:8
  33:14
**showing**  44:3
**shows**  22:20
**side**  53:19
**sides**  60:14
**signature**  61:18
**significant**
  44:17
**similar**  6:22,24
  9:1 50:5
**simple**  25:23
  28:14,21,22
**simplest**  4:17
**simply**  13:25
  18:22 47:22
  48:13
**simultaneous**
  12:5 19:21
  40:1,9 48:16
**single**  59:6
**sit**  15:4

six  49:25
slightly  31:1
small  41:8
solution  57:1,2
    57:4
solve  57:3
    59:11
somewhat
    50:25
soon  59:14
sorry  9:21
    13:19,21 40:12
    48:17 50:19
    58:8
sort  10:2 29:3
    45:1 54:14
sorts  53:12
sought  3:22
sounds  26:22
    27:25
source  30:16
speak  11:19
    25:2 51:19
speaking  12:5
    19:21 33:5
    40:1,9 48:16
special  1:16 3:1
    5:15 6:15 8:5,7
    9:5,20 10:16
    10:24 12:4,6
    13:14 14:15
    15:15 16:3
    19:9,18,19
    20:4 21:24

22:4,6 23:10
24:15 25:10
26:20 27:20
28:13,25 29:10
30:1 32:9
34:10,20 37:9
37:25 39:24
40:2,10,19,25
41:12 42:2
43:13 45:10
46:22 48:18
49:22 50:19,22
53:15 59:4,19
specific  17:5,11
    27:24
speculating
    40:22
stage  42:20
standard  42:17
standards
    50:15
stands  4:2 35:5
start  4:16 26:6
    28:20 43:17
    50:11 55:10,21
    57:24
state  8:23
    13:24 36:14
    40:6 61:21
statement
    17:11 19:17
statements
    17:4

states  1:1
status  1:16
    60:22
statutory  27:7
stenotype  61:8
stenotypy  61:6
step  54:20
    55:14
steps  24:4
store  3:5
storewide
    31:15
story  28:16
straightforward
    49:7
strong  48:22
stuff  17:7,8
    60:3,9
sturm  9:4
subject  6:5
    14:25 23:13
submissions
    10:14
submit  24:5,11
submitted  21:1
subpoena  3:4,9
    3:20 4:15
    14:18 28:5
    31:17 49:24
    54:3,8
subpoenaed
    4:5
subsection  28:6

subsequent
    34:7
substantial  7:5
    7:11 35:15
substantially
    7:16 30:8
substantiated
    59:1
successful  12:3
    57:14
succinctly
    32:10
sued  40:14 41:7
sufficient  41:23
sufficiently
    41:15,24 42:18
    42:25 43:10
suggest  53:21
    54:20
suggested
    54:10
suggesting
    37:12 52:25
    56:23
suggestion  42:3
    55:15,19
suggestions
    58:6 60:7
suing  40:6
superceding
    6:2
superseding
    6:12 8:17
    12:18 39:6

**[supplier - track]**                                                  Page 18

| | | | |
|---|---|---|---|
| **supplier** 3:7 | **takes** 24:5 | 60:17,18,20 | **thinking** 16:16 |
| **supply** 13:1 | **talk** 12:23 23:4 | **thing** 15:12 | **third** 11:12 |
| **suppose** 40:20 | 24:1 25:9 | 22:19 41:14 | 12:1 14:6 15:1 |
| **supposed** 17:2 | 28:19 56:21 | 43:25 46:14,16 | 18:9 33:19 |
| **sure** 6:21 15:8 | **talked** 7:3 | 53:5 55:23 | **thoroughly** |
| 17:21 24:16 | **talking** 15:10 | 56:22 | 39:8 |
| 26:2 27:5,18 | 23:15 24:13 | **things** 11:15 | **thought** 60:11 |
| 28:11 35:1 | 25:14,25 30:19 | 16:16 27:15 | **thoughts** 58:6 |
| 50:22 | 41:4 49:10 | 55:12 57:11,23 | 60:6 |
| **surgery** 18:19 | 54:12 56:21 | **think** 3:6,17,23 | **three** 35:14 |
| **surprising** | **talks** 16:16 | 4:13,17 5:19 | 41:7 |
| 25:15 | **tangential** 10:4 | 6:3,17,20 7:23 | **threshold** 8:13 |
| **suspect** 24:8 | 10:6 | 8:12 9:23 10:9 | **throw** 14:23 |
| 39:2 | **tele** 37:12 | 11:2,9,22 | **thumb** 53:16 |
| **suspicious** | **tell** 22:16 28:8 | 14:21,23 16:11 | **time** 5:7 16:20 |
| 25:18,21,22 | 30:11 36:20 | 21:21 24:16 | 19:25 32:17 |
| 26:10,17 27:6 | 37:9 44:17 | 25:4,11 27:1 | 56:25 58:12 |
| 27:9,19,21 | 45:18,19 50:13 | 28:4,14 30:5 | 60:17,19 |
| 28:7,9 | **telling** 12:8 | 31:8,24 34:23 | **times** 35:19 |
| **system** 20:18 | 58:24 | 36:4,18 37:5 | 47:14 |
| 20:23 21:1,23 | **tells** 32:19,19 | 41:1,22 42:3 | **today** 3:3 46:10 |
| 23:19 27:10 | **term** 27:22 | 42:17,17,19,21 | **together** 3:2 |
| 29:17 | **terms** 23:6 46:6 | 42:24 43:9,18 | 50:3,14 |
| | 46:21,23,24 | 45:2,5,13,24 | **took** 19:5 39:18 |
| **t** | 47:15,16,18,22 | 46:22 48:21 | 39:21 61:5 |
| | 48:1,23,25 | 49:23 50:4,13 | **tool** 4:11 |
| **t** 44:2 | 49:1,3,12 | 50:17,25 53:5 | **topic** 12:8 |
| **table** 55:11 | 51:21 52:2 | 53:17,20,25 | **topics** 58:16 |
| **take** 12:17 15:7 | 53:2 | 54:11 55:8,23 | **total** 38:18,19 |
| 33:6 34:11 | **terrible** 59:13 | 56:2,5,25 58:1 | 39:16 |
| 44:22 47:25 | **texas** 1:12 | 58:10,14,16 | **touch** 4:13 5:9 |
| 49:1 55:2,14 | **thank** 8:7 20:5 | 59:5,10,11,15 | **track** 1:11,13 |
| 56:8 | 20:7 29:12 | 59:23 | 28:9 |
| **taken** 20:24 | 41:3 44:8 | | |
| 26:18 | | | |

**tracked** 27:12
**transcribed** 61:8
**transcript** 61:7 61:10,11,13
**tremendous** 39:14
**trial** 7:3,7 11:12 32:17,21 33:6 42:24
**tried** 3:13 5:19 31:8
**true** 7:17,19,23 7:24 14:1 16:10 28:4 37:14 61:13
**try** 37:3 47:4
**trying** 15:18,23 27:25 40:17
**turn** 14:15 23:11
**twice** 3:14
**two** 3:17 10:14 11:15 18:11,23 24:6 35:14 50:15 59:20,25
**type** 10:20 39:7 52:8,10
**types** 53:12
**typewritten** 61:9

**u**

**ultimately** 24:12 42:7
**under** 9:23,24 10:3,10,21 11:8
**understand** 7:1 15:19 16:23 19:12 25:17 33:2 35:23 36:2 50:17
**understanding** 15:24 16:4 20:9 21:5,10 25:2,19
**understood** 27:23
**undertake** 31:20
**undertaken** 51:5
**undertaking** 31:25
**undertook** 23:22 51:4
**unfortunately** 38:7
**uninclusive** 15:20
**unintelligible** 30:16 33:18 57:17

**united** 1:1
**unquote** 16:8 38:14
**unusual** 25:15 27:14
**use** 4:11 5:24 32:3,18 34:9 42:24
**used** 16:18 19:7 27:21 28:5 57:12
**using** 42:5 47:3
**usually** 57:17

**v**

**v** 1:10,12
**verse** 20:22
**view** 8:13 21:16
**virtue** 36:2
**vis** 24:18,18

**w**

**wait** 54:21
**waiting** 53:19 55:4
**walgreens** 12:7
**walmart** 12:7
**want** 4:9,13,16 12:23 13:19 17:7 18:1 20:6 22:16 27:2,15 32:1,5,12 33:2 33:3 35:21 47:13 49:5,15 53:8,23 55:13

56:11,16 59:12
**wanted** 13:12 13:24 23:10 26:1,3 27:5,18 28:11 29:1,1 55:9
**wanting** 3:8
**warning** 34:3
**way** 9:18 15:16 16:15 27:5 34:11 40:5 47:15 54:18
**ways** 4:4 20:22 37:3
**we've** 12:15 20:10 21:7 30:19 31:8 33:17,18,19,24 43:3,7,9 44:11 46:5,10 47:9 51:10,11 53:12 56:15 58:3
**webb** 1:12
**week** 59:16,18
**wegmans** 3:4,8 3:19,23 4:19 4:23 5:4,10 6:8 6:11,13,16 8:6 8:10,20 11:18 11:20,24 12:18 13:9 14:7,11 14:11,16 16:17 16:24 17:14,18 18:4,12,14,21

**[wegmans - z]**                                                    Page 20

19:5 20:6,8
22:9,11 24:10
24:13,17,21
25:6,19 26:3,7
28:16,21 30:7
30:15 31:5,12
32:12 33:20,24
34:3,5,13,19
36:6,17,23
37:13,18,21
38:1,3,22
40:14 41:7
43:17,17,22
44:1,6,9 45:18
45:19 46:19
47:5,14 48:20
48:22 49:19
50:6,12 51:2,6
51:13,16 53:2
54:1,7 58:15
**weigh**   10:6
  17:25
**weinberger**   2:3
  19:14,15,20,22
**wide**   31:15
**widest**   11:13
**willing**   41:16
  41:25 43:4
  46:13 56:5,7
  56:17,20 58:15
  59:2
**wish**   26:13
**wonderful**
  32:25 33:1

**word**   33:7
  57:12
**worded**   15:16
**words**   7:4
  12:10 14:22
  17:16 27:19
  32:20
**work**   4:10 28:7
  60:10
**working**   60:15
**works**   4:10
  32:17 47:16
**writers**   60:13
**writing**   8:15
  43:8 51:12
**written**   44:22
**wrong**   22:10
  50:13
**wrote**   12:9
  25:20

**x**

**x**   34:14,17 48:4
  54:13 56:12,13

**y**

**y**   48:7 54:13
  56:12,14
**yates**   38:9,24
**yeah**   26:24
  29:12 40:10
  54:12
**year**   5:17 45:24
**york**   6:22,23
  7:2,18 8:10,18

8:23,25 9:9,24
10:3,10,19,21
11:8,21,25
21:13 29:9
37:23,23

**z**

**z**   56:13,14

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>**This document relates to:**<br><br>**Case Track 12:** *City of Rochester v. Purdue Pharma, L.P.*, No. 19-op-45853 | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Judge Dan Aaron Polster<br><br>**PLAINTIFF THE CITY OF ROCHESTER, NEW YORK'S SUPPLEMENTAL AND AMENDED ALLEGATIONS TO BE ADDED TO THE VERIFIED COMPLAINT AND JURY DEMAND**<br><br>**(Jury Trial Demanded)** |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................. 2

II.   JURISDICTION AND VENUE ............................................. 43

III.  PARTIES ............................................................................. 44

    A.    Plaintiff ...................................................................... 44

    B.    Defendants................................................................. 45

        1.    The Express Scripts Defendants ................................. 45

        2.    The Optum Defendants ................................................ 52

IV.  THE ROLE OF PBMS IN PRESCRIPTION DRUG TRANSACTIONS................................................................. 63

    A.    PBMs Operate on All Sides of Prescription Drug Transactions ............................................................. 63

    B.    PBMs Use Their Formularies as Leverage to Negotiate with Drug Manufacturers ....................................... 66

        1.    Express Scripts' Formularies ..................................... 72

        2.    Optum's Formularies.................................................. 74

    C.    PBMs' Drug UM Programs ..................................... 75

    D.    PBMs Contract with Pharmacies ........................... 77

V.   THE PBM DEFENDANTS' ROLE IN CAUSING THE OPIOID CRISIS.................................................................. 79

    A.    The PBM Defendants and the Opioid Manufacturers Colluded to Ensure Virtually Unfettered Access to Opioids .............. 79

        1.    The PBM Defendants Negotiated with the Opioid Manufacturers to Give Opioids Favorable Placement on National Formularies in Exchange for Rebates and Other Fees....................................... 79

## TABLE OF CONTENTS

Page

2.  The PBM Defendants and the Opioid
    Manufacturers Used Parity to Limit the Use of
    Utilization Management Measures for Opioids ...................... 93

3.  The PBM Defendants Misrepresented that They
    Were Using Their Formularies to Promote Safe Use
    and Appropriate Prescribing of Opioids .................................. 99

B.  During the Early Years of the Epidemic, the PBM
    Defendants Conspired with the Opioid Manufacturers to
    Expand the Opioid Market and Increase Opioid
    Utilization ............................................................................. 102

C.  For Two Decades after the PBM Defendants Knew the
    Opioid Epidemic Was Occurring, the PBM Defendants
    Continued to Conspire with the Opioid Manufacturers in
    the Deceptive Marketing of Opioids .................................... 105

    1.  The PBM Defendants Disseminated the Opioid
        Manufacturers' Deceptive Propaganda .................................. 108

    2.  The PBM Defendants' Affiliated Entities Provided
        Research, Data, and Consulting to the Opioid
        Manufacturers to Expand the Opioid Market ....................... 116

D.  The PBM Defendants Had Access to Real-Time Data
    Regarding Drug Utilization Which Gave Them a Unique
    Vantage Point into the Opioid Epidemic ........................... 125

    1.  The PBM Defendants track every prescription
        claim they process across all the health plans they
        service which provided them with uniquely
        granular and comprehensive data. ....................................... 125

    2.  The PBM Defendants had knowledge about the
        opioid epidemic and about abuse and diversion. ................... 130

    3.  The PBM Defendants Failed to Timely Undertake
        Actions to Address the Opioid Epidemic that They
        Helped Create. ...................................................................... 143

## **TABLE OF CONTENTS**

Page

a. The PBM Defendants chose not to use their claims data and their formulary and UM offerings to address overprescribing, abuse, and diversion ................................................................. 145

b. The PBM Defendants chose not to use their "Drug Utilization Review" tools to address overprescribing, abuse and diversion .......................... 165

c. The PBM Defendants failed to use their vast stores of data, their formulary and UM offerings, and their DURs to provide effective controls against diversion and/or to prevent the diversion and abuse of opioids ............................. 170

E. Two Decades After They Knew Opioids Were Causing a Public Health Crisis, Express Scripts and Optum Finally Implemented Protocols to Address the Opioid Epidemic ................. 172

F. Even After Implementing its Opioid Risk Management Program, Optum Continued Promoting Uncontrolled Opioid Sales Through Its Cash Card and Discount Card Businesses ...................................................................... 178

VI. AS MAIL ORDER PHARMACIES, EXPRESS SCRIPTS AND OPTUM DISPENSED OPIOIDS IN VIOLATION OF THE CONTROLLED SUBSTANCES ACT. ........................................................ 181

A. The Applicable Statutes ................................................................... 181

1. The Controlled Substances Act ................................................ 182

2. Pharmacies Are Obligated Not to Fill Prescriptions Until All Red Flags Are Resolved ........................................... 187

3. The CSA Applies to All Persons Who Dispense Controlled Substances ............................................................ 190

B. Defendants Violated the Controlled Substances Act ........................ 193

VII. EXPRESS SCRIPTS AND OPTUM CONTRIBUTED TO THE PUBLIC HEALTH CRISIS IN PLAINTIFF'S COMMUNITY .................... 206

## **TABLE OF CONTENTS**

Page

VIII. FACTS PERTAINING TO THE FORMULARY & UM
ENTERPRISE ................................................................. 208

    A.    Formation of the Formulary & UM Enterprise ................. 214

    B.    The Common Purpose and Fraudulent Scheme of the
Formulary & UM Enterprise ............................................ 226

    C.    Conduct and Participation of the Formulary & UM
Enterprise Through a Pattern of Racketeering Activity ................. 242

IX. PLAINTIFF'S CLAIMS ARE TIMELY ............................. 249

X. DEFENDANTS ENTERED INTO AND ENGAGED IN A CIVIL
CONSPIRACY ................................................................. 253

XI. SUCCESSOR LIABILITY ............................................... 256

XII. ALTER EGO LIABILITY ............................................... 257

XIII. CLAIMS FOR RELIEF ................................................. 257

FIRST CLAIM FOR RELIEF—CREATION OF A PUBLIC NUISANCE ........... 257

    (Brought by Plaintiff against All Defendants) ................................. 257

SECOND CLAIM FOR RELIEF --VIOLATION OF FEDERAL CIVIL
RICO, 18 U.S.C. 1961, *ET SEQ.*; 1964(c) ..................................... 275

    (Brought by Plaintiff against All Defendants) ................................. 275

THIRD CLAIM FOR RELIEF—NEGLIGENCE AND GROSS
NEGLIGENCE ................................................................. 286

    (Brought by Plaintiff against All Defendants) ................................. 286

FOURTH CLAIM FOR RELIEF— DECEPTIVE ACTS AND
PRACTICES: NEW YORK GENERAL BUSINESS LAW §349 ................. 292

(Brought by Plaintiff against All Defendants) ................................. 292

FIFTH CLAIM FOR RELIEF— FALSE ADVERTISING: ................................. 295

NEW YORK GENERAL BUSINESS LAW §350 ................................. 295

# **TABLE OF CONTENTS**

Page

(Brought by Plaintiff against All Defendants) ..............................................295

SIXTH CLAIM FOR RELIEF— VIOLATION OF NEW YORK SOCIAL
SERVICES LAW § 145-B ..............................................297

(Brought by Plaintiff against All Defendants) ..............................................297

XIV. PRAYER FOR RELIEF ..............................................298

XV. JURY DEMAND ..............................................299

Plaintiff The City of Rochester, New York, by and through the undersigned attorneys ("Plaintiff") hereby supplements and amends its Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5) in this action against Defendants Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Evernorth Health, Inc. (formerly Express Scripts Holding Company), and Express Scripts Specialty Distribution Services, Inc. (collectively, "Express Scripts"); and UnitedHealth Group, Inc., Optum, Inc., OptumInsight, Inc., OptumInsight Life Sciences, Inc., OptumRx, Inc., Optum Discount Card Services, LLC; Optum Perks, LLC; OptumHealth Care Solutions, LLC; OptumHealth Holdings, LLC; and Optum Health Networks, Inc., (collectively "Optum").[1] Together Express Scripts and Optum are referred to herein as "Defendants" or "the PBM Defendants."

*In addition to the allegations set forth herein, Plaintiff expressly adopts and incorporates by reference the allegations and claims set forth in its Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5), including all claims and allegations against other Defendants named in that Verified Complaint.*

---

[1] The newly added defendants in this pleading are: Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Express Scripts Specialty Distribution Services, Inc., OptumInsight, Inc., OptumInsight Life Sciences, Inc., Optum Discount Card Services, LLC; Optum Perks, LLC; OptumHealth Care Solutions, LLC; OptumHealth Holdings, LLC; and Optum Health Networks, Inc. Additionally, Defendant Express Scripts Holding Company is now known as Evernorth Health, Inc.

Plaintiff alleges as follows:

## I. Introduction

1. This case arises from a devastating epidemic of human creation—the over-prescription, over-supply, misuse, diversion, and abuse of opioids—and the central role that two of the nation's largest Pharmacy Benefit Managers ("PBMs"), Express Scripts and OptumRx, and their affiliates, have played in that epidemic.[2]

2. The opioid epidemic was created and sustained by a wide array of actors in the opioid supply and payment chain: the opioid manufacturers, distributors, and pharmacies, as well as by the PBM Defendants. Express Scripts' and Optum's role in stoking the opioid epidemic has been, until recently, largely concealed from public scrutiny. It is has now become clear that the PBM Defendants have, for at least the last two decades, had a central role in facilitating the oversupply of opioids through conduct that has the intended purpose of ignoring necessary safeguards for purposes of increasing the prescribing, dispensing and sales of prescription opioids. These defendants intentionally inserted themselves into the chain of distribution and dispensing of prescription opioids thereby assuming duties to act reasonably while comporting with the CSA.

3. The PBM Defendants sit at the center of prescription drug dispensing because they contract with the manufacturers who make the drugs, the pharmacies

---

[2] In its Order Concerning the PBM Bellwether Process, dated October 27, 2023 (MDL Doc. No. 5231), the Court ordered that four bellwether cases would proceed only against the Optum and Express Scripts Defendant Families. Accordingly, Plaintiff addresses these supplemental and amended allegations only to those defendants.

who dispense them, and the third-party payors who pay for them. The PBM Defendants' conduct that drove the increases and led to oversupply included: (a) colluding with, and aiding and abetting, Purdue Pharma and other opioid manufacturers in the fraudulent and deceptive marketing and oversupply of opioids; (b) colluding with Purdue Pharma and other opioid manufacturers to increase opioid sales through favorable placement on national formularies in exchange for rebates and fees; (c) colluding with Purdue Pharma and other opioid manufacturers to eliminate or limit utilization management measures on national formularies that would have restricted opioid prescribing; (d) deliberately failing properly and diligently to implement effective drug utilization review measures after undertaking to do; (e) electing not to act on the vast stores of information they had about the epidemic to limit the flood of opioids into communities across the Unites States, including Plaintiff's Community; and (f) dispensing huge quantities of prescription opioids through their mail-order pharmacies without proper controls against diversion, as required by the Controlled Substances Act and New York law.

4.     The PBM Defendants are legally responsible for their role in causing, contributing to, and maintaining the opioid epidemic because, *inter alia*:  (a) their conduct in colluding with the opioid manufacturers to increase the supply of opioids through false and fraudulent misrepresentations was intentional and/or negligent,  and unlawful; (b) their knowing and/or negligent failure to offer formularies, utilization management protocols, and drug utilization review measures that would ensure safe and appropriate use of opioid medications was wrongful

because they undertook to, and represented that they would, do so, but instead worked with the opioid manufacturers to increase the supply of opioids without regard to the safety or appropriateness of the drugs; (c) they intentionally and/or negligently decided, acted, and continued to offer only formularies, utilization management protocols, and drug utilization measures that placed no meaningful restrictions on the prescribing and use of opioids despite knowing, through the vast stores of data they had, that (i) such unrestricted access to opioids was causing, and foreseeably would continue to cause, harm (including the foreseeable harm of diversion) to Plaintiffs' communities, and (ii) those harms could be addressed through measures that the PBM Defendants intentionally decided not to make available; (d) their conduct with respect to opioid prescribing and dispensing was unlawful as well as intentional and/or negligent because they failed to comply with the Controlled Substances Act and New York law, both in their own dispensing through their mail-order pharmacies and in their other activities that increased the risks of diversion; and (e) they unlawfully controlled association-in-fact enterprises with opioid manufacturers and others through a pattern of racketeering activity, as defined in the federal Racketeer-Influenced and Corrupt Organizations Act ("RICO")").

5.     The PBM Defendants' role in the opioid epidemic was made possible by their unique combination of knowledge and power that gave them an extraordinary ability to control the opioid supply throughout the United States.

6.     One of the PBM Defendants' own executives recognized that no other actor in the healthcare system had a greater ability to affect the opioid crisis, boasting

that "*[n]o component of our healthcare system is in a better position to deliver more immediate and more impactful changes to the current course of this crisis than our nation's PBMs...*"[3]

7.　The executive highlighted the PBMs' powerful position not only from an information perspective ("robust point-of-dispensing screening and intervention"), but also as "an intermediary between the physician, pharmacist, patient, pharmaceutical manufacturer, health systems, and other components of the industry," which situates the PBM Defendants "in an ideal position to drive improvements in education and awareness of the dangers of opioid therapy[.]"[4]

8.　PBMs provide services to prescription drug benefit plans sponsored by health insurers, self-insured employers, and state and federal government agencies. The PBM Defendants collect and maintain (and sell) unprecedented amounts of data about the extent of opioid prescribing, far exceeding what any individual manufacturer, distributor, or pharmacy chain has access to. For as long as they have been PBMs, Express Scripts and Optum have received, analyzed, and tracked detailed claims data for the billions of prescriptions they process each year, including opioid prescriptions. Controlling prescription drug benefits for 160+ million Americans, the PBM Defendants are in possession of detailed information about every prescription they process, regardless of which company manufactured the drug, which doctor prescribed it, what pharmacy it was filled at, or which state it was

---

[3] OPTUMRX_JEFFCO_0000014980 (9/16/17) (emphasis added).

[4] *Id.*

dispensed in. They know when patients whose benefits they manage fill opioid prescriptions written by multiple doctors, and when they fill them at multiple pharmacies. They know how many times every opioid prescription they cover is refilled and they know when a patient who was prescribed opioids is later treated for substance use disorder. They know if one of their covered lives is having prescriptions filled for opioids, benzodiazepines, and sleep aids concurrently. In short, the PBM Defendants have had a unique vantage point on opioid use and prescribing patterns and associated misuse. These Defendants quite literally tracked the opioid epidemic, pill by pill, as it unfolded over the last two decades.

9. The PBM Defendants are not only in possession of massive amounts of information about opioid prescribing, they also have the power to encourage and/or drive prescribing, dispensing, and sales of prescription drugs.

10. The PBM Defendants are able to encourage and influence prescribing, dispensing, and sales primarily through the national formularies they offer to pharmacy benefit plans and through what they choose to offer in terms of standard "utilization management" ("UM") rules. Formularies are lists of drugs covered by a pharmacy benefit plan. Formularies control which drugs are available to the PBMs' covered lives. They are often constructed in tiers, where drugs listed on higher tiers require larger copays, or as so-called exclusionary formularies, where preferred brand drugs are included and nonpreferred drugs are not included. Standard UM programs include various protocols for managing access and use of particular drugs, including: (i) step therapy, where a beneficiary is required to try a different drug or therapy first

before trying the restricted drug; (ii) quantity limits, which are limits on the dosage or days' supply that a patient may receive for any given prescription(s); and (iii) prior authorizations, or ("PAs"), which are rules that require a physician to confirm that a given prescription is therapeutically appropriate before the drug is dispensed. Data shows that, when implemented, disfavored formulary placement and UM reduce inappropriate prescribing by making non-preferred drugs and/or drugs subject to UM restrictions more difficult and more costly to obtain. By contrast, the PBM Defendants and the opioid manufacturers knew that favorable formulary placement and the absence of UM restrictions create a scenario where prescriptions are written and dispensed with ease and frequency, at the expense of public safety.

11.     Through their formulary and UM tools, and the other powers at their disposal, the PBM Defendants, in conjunction with opioid manufacturers, are and have been uniquely situated to influence and control the prescribing and dispensing of opioids to their 160+ million covered lives. Indeed, opioids that are preferred on PBM formularies have significantly greater sales than drugs that are either excluded or disadvantaged. In this sense, the PBM Defendants act as the gatekeepers to the opioid market.

12.     The PBM Defendants have used their hugely profitable roles to grow into vertically integrated colossuses that have come to dominate access to prescription drugs—currently sitting at fifth (OptumRx) and twelfth (Express Scripts) on the Fortune 500 list ranking of the largest corporations in America by revenue. Defendant Express Scripts surpassed $100 billion of annual revenue as

early as 2017. Defendant OptumRx has also seen its revenue grow, reaching nearly $100 billion in 2022.

13. These two corporate leviathans are: (1) two of the three largest PBMs in the United States, collectively managing prescription drug coverage for 160+ million covered lives and processing more than 1.5 billion claims per year; (2) two of the top five dispensing pharmacies in the United States; (3) owned by two of the largest insurance companies in the world (UnitedHealth Group and Cigna); and (4) among the largest healthcare data, consulting, and analytics companies in the United States.

14. Instead of using their vast stores of information and extensive power to do what they promised their clients and represented to the public—*i.e.*, manage the floodgates of opioid prescribing and limit abuse of these dangerous drugs—the PBM Defendants worked together and with the opioid manufacturers to negotiate contracts and structure formulary and UM offerings that encouraged opioid prescribing, while facilitating easy and inexpensive dispensing and sales of those drugs. The result is that the market for prescription opioids grew, prescribing, dispensing and sales increased, and the PBM Defendants and opioid manufacturers reaped the profits of their contracts and relationships. For the PBM Defendants, the profits came from rebates and fees they earned from the branded opioid manufacturers by making opioids freely available and from pricing spreads and fees they captured from generic opioid sales. Profits also came through the sale of critical data and access to and about PBM covered lives and the health care providers who cared for them.

8

15.     Not only did the PBM Defendants aid and abet the manufacturers through their pro-opioid formulary and UM offerings, they also colluded with the manufacturers in spreading fraudulent misrepresentations about the risks and benefits of opioids. The PBM Defendants fraudulently induced doctors to write more opioid prescriptions, and then they made sure it would be easy for patients to fill those prescriptions, thus ensuring an unfettered flow of opioids into communities across America.

16.     The PBM Defendants' conduct represented a change of course. Prior to 1997, the PBM Defendants had recognized the dangers of opioids and had installed various routine controls on quantity and access. At that time, opioids were prescribed infrequently and generally only for either acute pain, calling for very short-term use, or for end-of-life cancer pain.

17.     In the mid-1990's, Purdue Pharma ("Purdue") introduced OxyContin and began a campaign fraudulently to portray OxyContin as safe and effective for a variety of conditions, including chronic non-cancer pain calling for long-term use. Purdue set out to convince doctors, the medical establishment, and the public generally that opioids are not addictive when taken for pain, regardless of the dose or duration of the therapy. Over time, other opioid manufacturers introduced similar products, first branded opioid drugs and then generic ones, and joined in the campaign fraudulently to increase opioid prescribing.

18.     OptumRx's predecessor Prescription Solutions initially refused to put OxyContin on its commercial formularies due to concerns regarding abuse.

9

19.     Express Scripts' predecessor Medco, which was, in the late 1990's, the largest customer for Purdue's opioids, initially put a strict quantity limit (80 mg/day) on OxyContin when it was introduced in 1996 and sent letters to prescribers stating that it would not pay for prescriptions for non-cancer pain treatment ("Medco prescriber letters").

20.     The Medco prescriber letters were a serious threat to Purdue and to other opioid manufacturers. The opioid manufacturers knew that they could not expand the opioid market and flood communities with their products without preferred, unrestricted access to their opioids on the PBM Defendants' formularies.

21.     Recognizing the unique role that the PBM Defendants play as the gatekeepers of the pharmaceutical market, Purdue set out to change the PBM Defendants' policies about OxyContin and about opioids generally. Purdue did this not (or not primarily) by convincing the PBM Defendants that OxyContin was safe and effective for the treatment of chronic non-cancer pain—which it is not—but rather by convincing them that they could make vast amounts of money by allowing unrestricted access to opioids.

22.     In a January 1997 email to Purdue's president Dr. Richard Sackler (and others) responding to the Medco prescriber letters, Michael Friedman, who would later become Purdue's CEO, stated, "This is a serious matter that we cannot ignore and that we must discuss. . . We cannot go on ignoring *the reality of [the PBM Defendants'] economic proof requirements* . . . If we are to stay in business we need *proof of economic performance*." (Emphasis added.) Purdue thus understood that for

OxyContin to succeed, it would have to show the PBM Defendants that increasing opioid use would be to their economic benefit.

23.     This was a critical moment in the spread of the epidemic. If Medco—Purdue's largest customer—had excluded OxyContin from its formularies or restricted its use to palliative care and/or cancer pain in 1997 (as it should have), OxyContin would never have become widely available, other branded opioids and generics never would have followed the OxyContin wave, and the epidemic likely never would have happened.

24.     Medco, however, failed to take such actions. Rather, Medco and the other PBM Defendants became knowing and willing partners with Purdue and the other opioid manufacturers at this critical juncture because they realized that increasing opioid use would indeed be profitable for them. The PBM Defendants were able to profit from such increased use because their agreements with the opioid manufacturers provided for rebates and "administrative fees" to be paid to the PBM Defendants for each rebate-eligible opioid prescription adjudicated by that PBM. Thus, every dollar spent on opioids would put money in the PBM Defendants' pockets. When a drug was given "preferred" status on a formulary, the rebates would be higher.

25.     Within months of sending its prescriber letters warning about the dangers of OxyContin, Medco completely reversed course and informed Purdue that it had become "very interested in partnering with Purdue." Medco doubled its initial quantity limits from 80 mg/day to 160 mg/day within the first year of OxyContin's

release. By 2000, Medco again doubled this limit to 320 mg/day (*four times* the limit that Medco originally determined was medically appropriate for OxyContin). To make its formulary changes more effective, Medco worked "behind the scenes" with Purdue to persuade several of Medco's largest clients (including Optum's affiliate insurer UHC) to lift any restrictions they had (such as prior authorizations and quantity limits) on OxyContin sales.

26.     But it wasn't enough for Medco to just lift restrictions on the filling of prescriptions (open the floodgates); it also worked with Purdue to increase the number of prescriptions being written (increase the flow of water at the source). To that end, it joined forces with Purdue on numerous marketing campaigns, assisting Purdue in its dissemination of fraudulent misrepresentations about the safety and efficacy of prescription opioids for a wide variety of conditions for which the drugs had previously been understood to be dangerous and unsuitable. This included mailings to prescribers fraudulently promoting OxyContin as safe and effective and only very rarely leading to abuse and/or addiction.

27.     Medco was not alone. Abandoning their initial resistance to OxyContin, the other PBM Defendants quickly recognized the profit potential associated with it and began partnering with Purdue and other opioid manufacturers to expand the pain treatment market.

28.     For years Express Scripts worked directly with Purdue to disseminate misinformation about OxyContin. These efforts included Express Scripts using its own "proprietary database" to locate high prescribers of opioids and then "blasting"

12

these physicians with materials created by Purdue-paid front groups that promoted myths about the use of opioids that they knew had no basis in fact. They did this to overcome the resistance doctors had to prescribing dangerous opioids. In a particularly telling exchange, Express Scripts informed Purdue that these efforts were necessary "so that [Express Scripts] may squelch the anti-OxyContin pushback from [Express Scripts] clients . . . due in large part to the [negative] national media attention OxyContin is receiving."[5]

29.    OptumRx (then known as Prescription Solutions) initially excluded OxyContin from its formularies, but it reversed course and by the mid-2000s it was receiving $70 million per year in rebates from Purdue in exchange for preferring OxyContin on its commercial formularies.

30.    In addition, Optum's affiliated research and consulting entities, OptumInsight and OptumHealth, worked hand-in-hand with Purdue and the other opioid manufacturers for decades to reshape the pain treatment market. OptumInsight provided the opioid manufacturers a full range of services including research, data, consulting, and marketing to deceive patients, prescribers, and payors into believing that opioids are effective, and even necessary, to treat chronic pain, are beneficial (both from a cost and clinical perspective), and are not likely to lead to addiction, even for patients in long term opioid therapy.

31.    None of this was true and the PBM Defendants knew it. In fact, opioids are highly addictive, even in patients taking them for pain, and the risk of abuse

---

[5] PPLPC029000040033.

increases at higher doses and longer durations. Moreover, opioid therapy is not, in fact, particularly effective for chronic pain. Increased prescribing of opioids, for longer periods and at higher doses, and without the scrutiny that would accompany use of a drug whose risks were properly understood, would inevitably lead to increases in the number of individuals suffering from opioid use disorder ("OUD"), the clinical name encompassing the condition sometimes referred to popularly as addiction.

32. The PBM Defendants' partnership with Purdue to expand the opioid market was successful: in the years following its release, OxyContin sales exploded—growing from $48 million in 1996 to $1.6 billion by 2003—and drove a huge nationwide spike in overall opioid prescribing. During this same time, the annual number of OxyContin prescriptions for non-cancer pain increased nearly tenfold, from about 670,000 in 1997 to about 6.2 million in 2002.

33. As a direct result of the PBM Defendants' and Purdue's coordinated efforts, opioid use and abuse escalated to epidemic levels by the mid-2000s, devastating communities across the country, including Plaintiff's Community. Plaintiff has been dealing with the public health crisis caused by the PBM Defendants' misconduct for the past two decades.

34. Making matters worse, having helped launch the epidemic, the PBM Defendants then failed to close the floodgates despite knowing that opioids were causing a public health crisis. Their data told them what was happening, and they had the tools to fix it. But for years, the PBM Defendants failed to address the epidemic they helped create. Even as the federal government starting requiring

certain controls be put in place in federal health plans, the PBM Defendants deliberately chose not to offer similar controls to their commercial clients with the full knowledge that such a choice would lead to continued opioid oversupply, diversion and death.

35.     As the opioid epidemic spread throughout the country, including Plaintiff's community, the PBM Defendants intentionally chose not to undertake actions that they knew would have drastically reduced the inappropriate prescribing and dispensing of opioids, such as enacting effective UM protocols or disadvantaging opioids on their formularies. For example, for nearly every year for the past 20+ years, Express Scripts has preferred OxyContin on its formularies over safer, more effective, forms of pain treatment.

36.     The PBM Defendants chose not to limit access to prescription opioids—including both branded and generic drugs—because together and with the opioid manufacturers, they had formed an agreement to do everything in their power to grow the market for prescription opioids without regard for public safety in order to profit from the sales of these drugs generated for each PBM Defendant and opioid manufacturer. Over at least the last two decades, the PBM Defendants have received millions of dollars in rebate payments from the opioid manufacturers in exchange for actions and omissions that incentivized and facilitated easy prescribing of prescription opioids (via favorable formulary and UM decisions), and led to unrestricted dispensing of those same drugs (through DUR decisions).

37.    The PBM Defendants now publicly admit that they were "uniquely situated" to stop the opioid epidemic and that they can create UM protocols that can "ensure that physician prescribing and pharmacy dispensing is in line with the most-up-date scientific evidence and national consensus guidelines." The power that they now admit possessing is the same power that allowed them to aid and abet with the opioid manufacturers to drive the oversupply of opioids through increases in prescribing and dispensing.

38.    The PBM Defendants have always had the ability to offer and the power to employ interventions that would minimize inappropriate opioid prescribing, dispensing, use, and abuse and thereby to prevent the progression of the opioid epidemic. Yet they failed to do so, not only at the outset of the opioid crisis, in the 1990's, but for two decades after that, as they watched the opioid crisis steadily unfold.

39.    Despite knowing that opioids were highly addictive, overused, and heavily abused, for over two decades the PBM Defendants intentionally did little to curb inappropriate prescribing, diversion, and abuse—instead standing by while retail pharmacies (as well as their own mail order pharmacies) dispensed wildly excessive quantities of opioid prescriptions.

40.    From their own data alone, the PBM Defendants could see that opioids were far more addictive and dangerous than they, along with Purdue and the other opioid manufacturers, had been telling the medical community and the public. They could see from their own data that the drugs required greater restrictions on access

16

than they had led their clients to believe. But the PBM Defendants had much more than just their own data to tell them that what they had been saying, and the false narrative that had been guiding their formulary and UM offerings, was untrue (even assuming they had ever believed it): in May, 2007, Purdue pleaded guilty to federal charges of criminal misbranding with respect to OxyContin. It paid a $635 million fine and entered into a Corporate Integrity Agreement that required it to ensure that its marketing of OxyContin would be fair and accurate. (Following its entry into this agreement, Purdue promptly contracted with McKinsey & Co. for advice as to how to continue to increase OxyContin sales.) As part of its plea agreement, in an agreed statement of facts, Purdue agreed that it had "with the intend to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion and less likely to cause tolerance and withdrawal than other pain medications. . . ." The agreed statement of facts detailed the ways in which Purdue's marketing had been false and misleading.

41. Thus, regardless of what they knew before Purdue entered into its plea agreement in May 2007, once that agreement was made public, the PBM Defendants had certain knowledge that the marketing activities on which they had colluded with Purdue (and with other opioid manufacturers) were fraudulent, leading to dangerous opioid oversupply and death. They also had certain knowledge that any supposed justifications for their formulary and UM offerings regarding prescription opioids— that the drugs were appropriate for prescription with minimal scrutiny, that they should be made available for a wide variety of conditions and for extended, long-term

therapy without intensive scrutiny and review—were lies. Yet it would be *ten more years* before the PBM Defendants changed their national formulary and UM offerings to place meaningful restrictions on drugs they certainly knew were too dangerous to be prescribed, dispensed, and used as freely as the PBM Defendants and Purdue had led people to believe they could be.

42.     Rather than use their granular claims data to limit problematic opioid use or investigate outlier prescribing patterns, Defendants sold their data to third-party vendors who in turn resold the data to opioid manufacturers, including Purdue, who used the data to aid their marketing, so that they could continue to stoke increased prescribing of opioid drugs.

43.     The PBM Defendants played an additional role in creating the opioid crisis. By virtue of operating their huge mail-order pharmacies, the PBM Defendants were often themselves the entity that dispensed the drugs (that is, filled prescriptions), a role that imposed on them affirmative duties to provide controls against diversion of these dangerous drugs. The data in their possession, both from their dispensing activities and from their prescription management activities across virtually every retailer pharmacy in the nation (over 60,000 in each of their networks), provided sufficient information and insight into patterns of prescribing to enable them to provide the controls that were required by law. They failed, however, to use this data to implement such controls. Instead, the PBM Defendants sold the data to the opioid manufacturers for them to use in their marketing efforts to *increase*

sales of prescription opioids, without regard to the effects of such increases on the potential diversion of these drugs.

44.     Defendants' mail-order pharmacies have each operated within the federally-regulated closed system for controlled substances. Despite their obligations under the Controlled Substances Act to provide controls against diversion and to dispense opioids only pursuant to valid prescriptions issued for a legitimate medical purpose, they dispensed tens of billions of morphine milligram equivalents ("MMEs") (the standard measure used when measuring quantities of opioids of different strengths) of opioids into communities across the country, often without adequate due diligence to ensure that the prescriptions involved were valid and not likely to be diverted.

45.     This is especially true in the case of OptumRx, which is a single entity with multiple roles.  OptumRx is, and at all relevant times has been, registered with the DEA as a dispenser.   DEA registrants are required to provide effective controls against diversion.  But OptumRx's business practices as a PBM, as described herein, intentionally and/or negligently ignored the risks of diversion and even, at times, increased them.  OptumRx's failure to implement effective controls against diversion across all of its activities that affect dispensing, whether as a mail-order pharmacy or otherwise, is a violation of its CSA duties.

46.     Similarly to OptumRx, Express Scripts, too, is registered with the DEA and as a registrant, is required to provide effective controls against diversion.  It, too failed to provide the requisite controls with respect to all of its activities that affect

dispensing. It too, in its role as a PBM, intentionally and/or negligently ignored the risks of diversion and even, at times, increased them. Even though Express Scripts used separate entities to perform mail-order pharmacy and PBM functions, it, too, was required by the CSA to provide effective controls against diversion across all of its activities that affect dispensing, whether as a mail-order pharmacy or otherwise. Its failure to do so was in violation of the CSA.

47. The PBM Defendants thus have not been mere bystanders in the opioid crisis; rather they colluded with the opioid manufacturers, placed profits over safety, and engaged in a clandestine and fraudulent scheme to increase the sale of prescription opioids, despite the known dangers of these drugs.

48. It was only well after the opioid epidemic reached its peak, and after the U.S. Senate and state governments began to investigate Express Scripts' and Optum's role in causing the opioid epidemic, that the PBM Defendants finally began to implement UM measures to address the public health crisis behind which they were a driving force.

49. Notably, when Express Scripts and Optum finally took meaningful steps to address the epidemic by enacting opioid management programs in 2017 and 2018, the results were significant. Both Express Scripts' and Optum's own data show that, following the implementation of the PBM Defendants' opioid management programs, opioid prescribing and use, as measured by multiple metrics, significantly decreased across the populations of lives that each PBM Defendant respectively covers.

50. The PBM Defendants could have implemented those same opioid management measures at any point over the past two decades. Had they put in place the tools that they knew would have reduced opioid overuse—such as those implemented in 2017—when they first knew these drugs were causing a public health crisis, they would have had a substantial impact on addressing the opioid epidemic.

51. Express Scripts' own marketing material shows with shocking precision the effect that Express Scripts' delay had on its covered lives. A March 2017 Express Scripts PowerPoint titled "Comprehensive Opioid Solution: What is Express Scripts Doing to Combat this Epidemic?" included the following slide that detailed Express Scripts' calculation of how many of its own covered lives would die in the future if Express Scripts did nothing to combat the opioid epidemic:



52.     Express Scripts said nothing about the covered lives that had *already* been lost through its inaction over the decade or more that Express Scripts sat idly by and watched the opioid epidemic escalate across the country and in Plaintiff's Community. But its ability to calculate with such precision the number of such lives going forward speaks volumes both about its earlier failures to act and about the likely scale of the losses attributable to that failure.

53. Defendants' scheme has had far-reaching public health consequences, the costs of which have been borne by communities across the United States, including Plaintiff's Community.

54. According to the United States Centers for Disease Control and Prevention ("CDC"), prescription opioids have directly and indirectly accounted for more than 80% of overdose deaths in the United States, a toll that has quadrupled over the past two decades. More people have died from opioid-related causes than from car accidents or guns. More than 175 people die every day from opioid overdoses—as if an airplane were to crash, killing everyone on board, every day.

55. The epidemic's economic costs for healthcare, lost productivity, addiction treatment, and criminal justice involvement is estimated at $1.02 trillion a year.

56. The devastating human toll of opioid abuse cannot be overstated. After years of decreasing death rates in the United States, these rates are now on the rise, fueled in no small part by an increase in opioid-related drug overdose deaths. Drug overdoses are now the leading cause of death for Americans under the age of fifty. The number of Americans who died of drug overdose deaths in 2017 alone was roughly equal to the number of Americans who died in the Vietnam, Iraq, and Afghanistan wars combined.

57. From 1999 through the present, over 1,000,000 people have died from an overdose involving opioids. Well over half of those deaths involved opioids prescribed by doctors to treat pain. These opioids include brand-name prescription

medications like OxyContin, Opana ER, Nucynta, Duragesic, Subsys, Actiq, and Fentora, which were manufactured respectively by Purdue, Endo, Janssen/J&J, Insys, and Teva/Cephalon. The drugs also include generic opioids such as hydrocodone, oxycodone, fentanyl, hydromorphone, morphine, methadone, tapentadol, and oxymorphone manufactured by Teva, Mallinckrodt and other generic drug makers.

58.     The opioid epidemic rages on to this day and continues to worsen each year. A staggering 110,000 people died of opioid overdoses in 2022 alone.

59.     For many of the people whose lives were cut short by opioid overdoses, even if the drug used at the time of overdose was a non-prescription opioid such as heroin or illicit fentanyl, their opioid use began with prescription pills. Many opioid users, having become addicted to, but no longer able to obtain prescription opioids, turn to heroin. According to the American Society of Addiction Medicine, 80% of the people who initiated heroin use in the past decade started with prescription painkillers—which, at the molecular level and in their effect, closely resemble heroin. Both heroin and oxycodone, for example, are semisynthetic derivatives of naturally occurring alkaloids found in opium; heroin—or diacetylmorphine—is derived from morphine. Unsurprisingly, people who are addicted to prescription painkillers are 40 times more likely to become addicted to heroin. The CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. In recent years, individuals have become addicted to even stronger opioids, often turning to illicit fentanyl, with even more lethal effects.

60.    According to Robert Anderson, who oversees death statistics at the CDC: "I don't think we've ever seen anything like this. Certainly not in modern times." On October 27, 2017, then-President Trump declared the opioid epidemic a public health emergency. On December 22, 2022, Health and Human Services Secretary Xavier Becerra renewed the determination that the "opioid public health emergency exists nationwide."

61.    The State of New York has been hard hit by the opioid epidemic. Plaintiff, located in New York and the seat of Monroe County, has also been severely negatively impacted by the opioid epidemic. Plaintiff had a population of approximately 209,000 people as of July 1, 2022.[6]

62.    As in many other communities in the United States, opioid use has been and continues to be at crisis levels in Plaintiff's Community. "According to the National Center for Health Statistics of the Centers for Disease Control and Prevention (CDC), between 2010 and 2017, deaths from drug overdoses grew 83 percent nationally and 152 percent in New York, peaking at almost 4,000 deaths in New York in 2017."[7]

---

[6] https://www.census.gov/quickfacts/fact/table/rochestercitynewyork/PST045222.

[7] Continuing Crisis, Drug Overdose Deaths in New York, November 2022, New York State Comptroller Thomas P. DiNapoli, https://www.osc.ny.gov/reports/continuing-crisis-drug-overdose-deaths-new-york (citing Centers for Disease Control and Prevention (CDC), National Center for Health Statistics, National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database, released in 2021. Data are from the Multiple Cause of Death Files, 1999-2020, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program, accessed July 11, 2022, at http://wonder.cdc.gov/mcd-icd10.html.)

63.     Since that time, the opioid epidemic in New York, and specifically City of Rochester, has grown substantially worse. "In 2021, the number of deaths surged to nearly 107,000 nationally and more than 5,800 in New York."[8] "At the core of this crisis is a shocking rise in opioid-related deaths, which grew by almost 300 percent between 2010 and 2020 to comprise 85 percent of all drug overdose deaths in New York in 2020."[9] "In 2020, opioid overdose deaths increased 38 percent nationally and 44 percent in New York and, according to provisional counts, grew by 17 percent nationally and in New York to 80,401 and 4,946, respectively, in 2021. The increase in opioid overdose deaths in New York between 2019 and 2021 was about 68 percent."[10] "The share of drug overdose deaths in New York involving opioids increased to 85 percent in both 2020 and 2021, from 69 percent in 2010."[11] "In 2021, 30 New Yorkers per 100,000 died from drug overdoses; 25 per 100,000 New Yorkers died from opioid overdoses in that year, compared to 5 in 2010. New York's opioid overdose death rates exceeded national rates in both 2020 and 2021."[12] "Fatalities and death rates grew across all racial and ethnic groups, increasing nearly five-fold for Black New Yorkers, quadrupling for Hispanic or Latino New Yorkers, and tripling

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

for White New Yorkers. In 2020, death rates were highest for White New Yorkers at 28.7 per 100,000 people."[13]

64.    The following figure represents New York and U.S. Opioid Overdose Death Rates, 2010 – 2021[14]



**FIGURE 4: New York and U.S. Opioid Overdose Death Rates, 2010 – 2021**

* The 2021 rates reflect provisional counts of opioid overdose deaths for the 12-month period ending December 2021, and are subject to change.
Note: Rates are age-adjusted per 100,000 population.
Source: Centers for Disease Control and Prevention, National Center for Health Statistics.

65.    The following figure represents County Drug Overdose Death Rates, 2010 and 2020.[15] Plaintiff City of Rochester is located within Monroe County, and Monroe County's rate in 2020 was 36.7, which exceeded the statewide average of 25.4 deaths per 100,000 population.[16]

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*



**FIGURE 5: County Drug Overdose Death Rates, 2010 and 2020**

Note: Rates are age-adjusted per 100,000 population.

Source: Centers for Disease Control and Prevention, National Center for Health Statistics.

66.     The following figures represents New York Drug Overdose Deaths and Death Rates by Race, 2010 – 2020[17]

**FIGURE 6: New York Drug Overdose Deaths and Death Rates by Race, 2010 – 2020**

Note: Rates are age-adjusted per 100,000 population.

Source: Centers for Disease Control and Prevention, National Center for Health Statistics.

---

[17] *Id.*

28

67. The burden of the opioid crisis has been particularly heavy in Monroe County. In 2020, the 16 counties with opioid burden (including opioid overdose deaths, non-fatal outpatient ED visits and hospital discharges involving opioid overdose, abuse, dependence, and unspecified use) in the highest quartile (crude rates greater than or equal to 236.4 per 100,000 population) were: Chautauqua, Sullivan, Bronx, Ulster, Dutchess, Niagara, Schenectady, Greene, Broome, New York, Orange, Suffolk, Chemung, Richmond, Monroe, and Albany, as illustrated by the following figure.[18]

---

[18] *Id.*

**Figure 3.2 Opioid burden (including opioid overdose deaths, non-fatal outpatient ED visits and hospital discharges involving opioid overdose, abuse, dependence, and unspecified use), crude rate per 100,000 population, by county, New York State, 2020\***

\*The discharge volume for 2020 were impacted by COVID-19 and do not represent a typical year for discharges.

Data sources: NYS Excl NYC death data from New York State Department of Health, Bureau of Vital Statistics, as of January 2022; NYC death data from CDC WONDER, as of April 2022; ED Visits and Hospital Discharges from New York State Department of Health Statewide Planning and Research Cooperative System (SPARCS), as of April 2022

For complete data, see Appendix: Data Table 3.2.

68.　　In 2020, among counties with ten or more hospital discharges involving heroin overdose, the eleven counties with the highest crude rates were Bronx, Richmond, Onondaga, Monroe, Suffolk, Rensselaer, New York, Dutchess, Orange, Kings, and Albany.[19]

69.　　In 2020, the 16 counties in the highest quartile (crude rates greater than or equal to 82.3 per 100,000 population) for ED visits due to any opioid overdose were

---

[19] *Id.*

Chautauqua, Sullivan, Ulster, Monroe, Niagara, Schenectady, Bronx, Onondaga, Broome, Chemung, Dutchess, Erie, Cattaraugus, Seneca, Greene, and Suffolk.[20]

70.    In 2020, there were 863 (116 per 100,000 population) emergency department visits (including outpatients and admitted patients) involving any opioid overdose, in Monroe County.[21] This rate is higher than the region and state averages. Additionally, "[a]mong NYS residents in 2020, there were 13,976 hospital discharges for opioid use (including overdose, abuse, dependence, and unspecified use). This represented a crude rate of 71.5 per 100,000 population."[22] "In 2020, there were 12,245 visits to EDs due to an opioid overdose among NYS residents, a 13.8 percent increase from 2019 (10,762 visits). The crude rate per 100,000 increased from 55.1 in 2019 to 62.7 in 2020."[23] Statewide, the crude rate of admissions to OASAS-certified substance use disorder treatment programs for any opioid increased 25.5 percent between 2010 (602.4 per 100,000) and 2016 (755.8 per 100,000).[24]

71.    Among NYS residents, the number of newborns with Neonatal Abstinence Syndrome (NAS) and/or affected by maternal use of drugs of addiction increased 5.8 percent from 1,632 in 2019 to 1,726 in 2020, and the crude rate per 1,000 newborn discharges increased from 7.9 to 8.8.[25]

---

[20] *Id.*

[21] https://apps.health.ny.gov/public/tabvis/PHIG_Public/opioid/reports/#state

[22] www.health.ny.gov/statistics/opioid/data/pdf/nys_opioid_annual_report_2022.pdf

[23] *Id.*

[24] *Id.*

[25] www.health.ny.gov/statistics/opioid/data/pdf/nys_opioid_annual_report_2022.pdf

72.     The Hope Dealers community volunteer organization estimated that it had cleaned up more than 120,000 needles in and around Plaintiff's Community from 2017-2020 alone.[26]

73.     Drug overdoses have regularly been among the highest causes of death in New York, with opioids involved in most overdose deaths. Due to incomplete reporting, these grim numbers likely understate the number of New York residents lost to this scourge.

74.     As in many other communities in the United States, opioid use has been and continues to be at crisis levels in Plaintiff's community. The rate of drug-involved deaths in the Plaintiff's community climbed over 15 percent, from 71 to 83 fatal overdose deaths 2019-2020,[27] and most of that increase is attributable to opioids. Opioid overdose deaths exceeded overdose deaths from other substances by a wide margin each year. Between 2010 and 2017, New York's proportion of opioid-related drug overdose deaths grew from 69 percent to 82 percent of overdose deaths, and opioid overdoses grew by 200 percent during this time period.[28]

---

[26] https://www.democratandchronicle.com/in-depth/news/2020/02/25/hope-dealers-remove-needles-in-rochester-ny-north-clinton-addicts/4716364002/

[27] Fatal and Nonfatal Overdoses Known to Law Enforcement: 2020 Project CLEAN Overdose Data, Janelle Duda-Banwar, RIT, Center for Public Safety Initiatives, February 3, 2021 https://www.rit.edu/liberalarts/sites/rit.edu.liberalarts/files/docs/CRIM%20Resources/WP%20CLEAN%202021-01_%202020%20Overdose%20Data%20in%20the%20Project%20CLEAN%20Target%20Area.pdf

[28] Continuing Crisis, Drug Overdose Deaths in New York, November 2022, New York State Comptroller Thomas P. DiNapoli, https://www.osc.ny.gov/reports/continuing-crisis-drug-overdose-deaths-new-york (citing Centers for Disease Control and

75.     Since 2019, the number of overdose deaths has grown on an exponential scale, jumping by over 15 percent between 2019 and 2020 in Plaintiff's community.[29] Opioid overdose deaths in Monroe County, in which Rochester is the largest city, rose from 181 opioid deaths in 2019 to 293 opioid deaths in 2021.[30]

76.     The following figure identifies the number of New York Overdose Deaths by Drug or Drug Class 2018-2022.[31]

---

Prevention (CDC), National Center for Health Statistics, National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database, released in 2021. Data are from the Multiple Cause of Death Files, 1999-2020, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program, accessed July 11, 2022, at http://wonder.cdc.gov/mcd-icd10.html.)

[29] Fatal and Nonfatal Overdoses Known to Law Enforcement: 2020 Project CLEAN Overdose Data, Janelle Duda-Banwar, RIT, Center for Public Safety Initiatives, February                                 3,                                 2021 https://www.rit.edu/liberalarts/sites/rit.edu.liberalarts/files/docs/CRIM%20Resourc es/WP%20CLEAN%202021-01_%202020%20Overdose%20Data%20in%20the%20Project%20CLEAN%20Target %20Area.pdf

[30]                         https://www.monroecounty.gov/files/health/health-action/Heroin-fentanyl%20deaths%20in%20MC%20investigated%20by%20the%20MCOME%202 021_vfinal.pdf   Heroin/fentanyl deaths in Monroe County in 2021, Office of the Medical Examiner Monroe County, New York.

[31] https://oasas.ny.gov/overdose-death-dashboard



77. Drug overdose deaths in NY counties for 2018-2022 are depicted in the following figure, with Monroe County having 2,321 deaths.[32]

---

[32] *Id.*



78.     The following figure identifies Drug Overdose Deaths in NY Counties for 2022.  Monroe County is identified as having 341 overdose deaths.[33]

---

[33] *Id.*



79.      The following figure identifies the crude death rate per 100,000 people

of Drug Overdose Deaths in NY Counties, 2022.  Monroe County has one of the

highest crude death rates in the state at 79.7 for the drug types identified in the figure

below.



80. In 2020, Monroe County was among the ten counties with the highest age-adjusted overdose deaths rates in New York. Most of these counties, including Monroe, observed increases in the rates of overdose deaths involving any opioid in 2020 as compared to 2019.[34]

81. As of November 28, 2023, the fatalities potentially due to overdoses is at 232 for the year 2023 so far.[35] Total overdoses for the year 2023 so far total 2,549.[36] While all of New York and Monroe County have been devastated by the opioid

---

[34]

https://www.health.ny.gov/statistics/opioid/data/pdf/nys_opioid_annual_report_2022.pdf

[35] Monroe County Opioid Overdose Dashboard (arcgis.com).

[36] *Id.*

37

epidemic, Plaintiff was particularly impacted as evidenced by the density of death

that continues today within the Plaintiff's community, as illustrated by the following

figures:





82. Due to incomplete reporting, these grim numbers likely understate the number of residents of Plaintiff's Community lost to this scourge.

83. Defendants' conduct has had severe and far-reaching consequences for public health, social services, and criminal justice, including the fueling of addiction and overdose from illicit drugs such as heroin. The costs are borne by Plaintiff and other governmental entities. These necessary and costly responses to the nationwide opioid crisis include the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarcerations, treating opioid-dependent newborns in neonatal intensive care units, burying the dead, and placing thousands of children in foster care placement, among others.

84. Government entities, including Plaintiff, have been strained to the breaking point by this public health crisis, which has an impact on all of the services they provide their citizens. The burdens imposed on Plaintiff are not the normal or typical burdens of governmental programs and services. Rather, these are extraordinary costs and losses that are directly related to Defendants' conduct.

85. The losses inflicted have cut across ages and generations. Many who have succumbed to overdoses have overdosed more than once. Family members, including young children, have watched their loved ones lose consciousness or die. Young children, including toddlers, also have been the direct victims of overdoses themselves after coming into contact with opiates, often being addicted at birth from an addicted mother.

86.     The resulting plague has meant that hundreds of children have been displaced from their homes and have been raised by relatives or placed in public care due to their parents' addiction. Others lose the chance to go home. Unable to be discharged from the hospital with their mothers, hundreds of babies who have been born addicted to opioids due to prenatal exposure have been placed in the care of public resources or local citizens or non-profits who do their best to comfort them through the pain of withdrawal. Additionally, "[a]mong NYS residents, the number of newborns with Neonatal Abstinence Syndrome (NAS) and/or affected by maternal use of drugs of addiction increased 5.8 percent from 1,632 in 2019 to 1,726 in 2020, and the crude rate per 1,000 newborn discharges increased from 7.9 to 8.8."[37]

87.     Individually, and colluding with each other and with opioid manufacturers, Express Scripts and Optum each caused, contributed to, and maintained the opioid crisis and now must abate the ongoing public nuisance they created in communities across America.

88.     Individually, and colluding with each other and with opioid manufacturers, the PBM Defendants' conduct was a substantial contributing factor in the creation of the opioid crisis, which to this day continues to unreasonably interfere with the public health, safety, and welfare and is therefore a public nuisance.

---

[37]https://www.health.ny.gov/statistics/opioid/data/pdf/nys_opioid_annual_report_2022.pdf

89.     Express Scripts and Optum colluded together in, and aided and abetted, the fraudulent marketing of prescription opioids.

90.     The PBM Defendants and opioid manufacturers formed an association-in-fact enterprise, the "Formulary & UM Enterprise." The common purpose of the Formulary & UM Enterprise was to profit from the increased and unrestricted prescribing, dispensing, and sale of prescription opioids without regard for public safety. The PBM Defendants conducted, and participated in the conduct of, the Formulary & UM Enterprise by agreeing to not take action that would undercut each other's business; agreeing to work together with the opioid manufacturers; agreeing to take and taking formulary action that would motivate and facilitate increased opioid prescribing; agreeing to take and taking UM actions that would facilitate easier and increased opioid dispensing and sales; working together with opioid manufacturers to disseminate the false marketing and to support their detailing of prescription opioids to prescribers; and failing to uphold their distribution and dispensing obligations under the Controlled Substances Act and its implementing regulations. All of this conduct furthered the underlying fraudulent scheme of the Formulary & UM Enterprise because it served to deprive people of money and property by means of an underlying fraudulent scheme, including taking actions that directly contradicted the public representations they made about their conduct as well as the promises they made to their clients. Furthermore, Express Scripts and Optum have engaged in additional illegal conduct, including filing false statements about their revenue with the Securities and Exchange Commission ("SEC").

91.     Express Scripts and Optum undertook and assumed a duty to create formularies and UM programs based on the health and safety of the public and of the lives covered by the benefit plans that were their clients. Express Scripts and Optum represented to the public, as well as to their clients, that their formulary and UM offerings were based on the health and safety of the public and the lives their clients insured, when in fact they were doing the exact opposite and the PBMs were acting to maximize their own revenue in concert with the opioid manufacturers. Optum and Express Scripts knew, at the time that they made these representations to the public and to their clients, that they would not base their formulary and UM offerings on the health and safety of the covered lives involved, nor of the public, but rather that they would make, and were already making, formulary and UM decisions, and taking formulary and UM actions, designed solely (or at least primarily) to increase profits to the PBM Defendants.

92.     The opioid manufacturers—with whom the PBM Defendants colluded in creating the opioid crisis—have themselves faced substantial civil and criminal liability for their roles and have agreed to pay billions of dollars to assist with the generational devastation caused by their scheme. A few examples include:

(a) In October 2020, the Department of Justice announced that Purdue entered into a federal settlement of more than $8 billion to resolve pending criminal and civil allegations regarding Purdue's role in causing the opioid epidemic;

(b) In February 2022, Janssen/J&J agreed to finalize a proposed $5 billion settlement resolving claims by states and local governments that they helped fuel the U.S. opioid epidemic;

42

    (c) In July 2022, Teva announced it would pay up to $4.25 billion as part of a nationwide settlement to end litigation over its alleged role in the U.S. opioid crisis; and

    (d) In August 2022, Endo agreed to pay $450 million to states to resolve opioid lawsuits across the country.

93. The PBM Defendants, too, should be required to bear the costs of abating the devastating nuisance that they, along with the other entities, brought about.

94. Plaintiff brings this suit to hold Defendants accountable for the devastating opioid crisis they caused, contributed to, and maintained.

## II.   Jurisdiction and Venue

95. This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and, as explained herein, the Plaintiff is of a different citizenship than Defendants.

96. This Court also has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 because Plaintiff's claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, raise a federal question. This Court has supplemental jurisdiction over the Plaintiff's state-law claims under 28 U.S.C. § 1367 because those claims are so related to the RICO claim as to form part of the same case or controversy.

97. This Court has personal jurisdiction over Defendants because the causes of action alleged in this Complaint arise out of Defendants' transacting business in New York, contracting to supply services or goods in this state, causing tortious injury by an act or omission in this state, and because Defendants regularly do or solicit

business or engage in a persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in this state. Defendants have purposefully directed their actions towards New York and/or have the requisite minimum contacts with New York to satisfy any statutory or constitutional requirements for personal jurisdiction. In the alternative, the Court has personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b) as to Plaintiff's RICO claims and pendant personal jurisdiction over all Defendants as to Plaintiff's other claims, all of which arise out of a common nucleus of operative facts.

98.     Venue is proper in this district pursuant to 28 U.S.C. § 1407.

## III.    Parties

## A.    Plaintiff

99.     Plaintiff is a county organized under the laws of the State of New York.

100.     Plaintiff provides a wide range of services on behalf of its residents, including services for families and children, public health, public assistance, law enforcement, and emergency care.

101.     Plaintiff has all the powers possible for a city to have under the constitution of the State of New York and the laws of the State of New York.

102.     Plaintiff has standing to bring this action to protect the public health, safety, and welfare of its citizens.

103.     Defendants' intentional, negligent, and/or unlawful conduct, alleged more fully herein, has created a serious public health crisis of opioid abuse, addiction, morbidity, and mortality and is a public nuisance in Plaintiff's Community.

104.    Plaintiff directly and foreseeably sustained all economic damages alleged more fully herein. Plaintiff, like any other local government, endeavors in good faith to provide a wide variety of necessary services on a limited budget funded with taxpayer dollars. Defendants' conduct has imposed an extraordinary burden on Plaintiff's limited resources and services for which it seeks relief.

105.    Defendants' conduct is beyond anything Plaintiff could have prepared for, predicted or avoided. It is a repeated course of conduct that did, does, and will— given the realities of addiction—continue to result in recurring and ongoing harm to Plaintiff and Plaintiff's Community. Defendants' conduct is especially pernicious when one considers the harm it has wreaked on governmental entities such as Plaintiff who, in good faith, endeavor to provide a wide variety of necessary services on a limited budget funded with taxpayer dollars. The magnitude of Defendants' scheme is neither discrete nor of a sort that a local government, including Plaintiff, could reasonably expect to have to respond to at any time during its existence as such. It would be unreasonable, unjust, and inequitable not to allocate the additional governmental expenses, and any other costs associated with the harms Defendants' wrongful conduct has caused, to the actual parties responsible for creating the need for the resources to be expended as they are and were.

## B.    Defendants

### 1.    The Express Scripts Defendants

106.    **Defendant Evernorth Health, Inc.** (f/k/a Express Scripts Holding Company) ("Evernorth") is a Delaware corporation Evernorth Health, Inc.'s principal place of business is at 1 Express Way, St. Louis, Missouri 63121.

107. Evernorth is the parent company to all of the Express Scripts entities named as Defendants. Evernorth, through its executives and employees, controls the enterprise-wide policies that inform all of Express Scripts' lines of business in order to maximize profits across the corporate family.

108. Evernorth's conduct had a direct effect in New York, including Plaintiff's Community.

109. **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth Health, Inc. Express Scripts, Inc.'s principal place of business is at 1 Express Way, St. Louis, Missouri 63121.

110. Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout New York that engaged in the conduct which gives rise to this Complaint.

111. During the relevant time period, Express Scripts Inc. was directly involved in the PBM and mail order services businesses, including with respect to the at-issue drugs, as well as Express Scripts' data and research services.

112. **Defendant Express Scripts Administrators, LLC,** is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth Health, Inc. Express Scripts Administrators, LLC's principal place of business is at the same location as Express Scripts, Inc.

113. Express Scripts Administrators, LLC is registered to do business in New York and may be served through its registered agent CT Corporation System, 28 Liberty Street, New York, NY 10005.

114.   During the relevant time period, Express Scripts Administrators, LLC provided and/or offered PBM services in New York, including Plaintiff's Community, alleged in this complaint.

115.   **Defendant Medco Health Solutions, Inc.** (f/k/a Merck-Medco) ("Medco") is a Delaware Corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey, and is a wholly-owned subsidiary of Evernorth Health, Inc. Medco Health Solutions, Inc. was previously known as Merck-Medco. Merck-Medco was acquired in the early 1990s by Merck & Co. as its pharmacy benefit manager subsidiary. In 2002, Merck & Co. spun off Merck-Medco into a publicly traded company, defendant Medco Health Solutions, Inc.

116.   Medco Health Solutions, Inc. is registered to do business in New York and may be served through its registered agent: CT Corporation Syste, 28 Liberty Street, New York, NY 10005.

117.   **Defendant ESI Mail Order Processing, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth Health, Inc.

118.   During the relevant time period, ESI Mail Order Processing, Inc. provided and/or offered mail order pharmacy services in New York, including Plaintiff's Community, alleged in this Complaint, which gives rise to the causes of action herein.

119.   **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth Health, Inc. ESI Mail

Pharmacy Service, Inc.'s principal place of business is at the same location as Express Scripts, Inc.

120. ESI Mail Pharmacy Service, Inc. d/b/a Express Scripts, Inc., does business in New York and may be served through Express Scripts' registered agent: CT Corporation System, 28 Liberty Street, New York, NY 10005.

121. During the relevant time period, ESI Mail Pharmacy Service provided mail order pharmacy services in New York, including Plaintiff's Community, as alleged in this Complaint, which gives rise to the causes of action herein.

122. **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth Health, Inc. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Express Scripts, Inc.

123. Express Scripts Pharmacy, Inc. is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, NY 10005.

124. Express Scripts Pharmacy, Inc. holds active licenses with the New York State Board of Pharmacy.

125. During the relevant time period, Express Scripts Pharmacy, Inc. provided and/or offered mail order pharmacy services in New York, including Plaintiff's Community, alleged in this Complaint, which gives rise to the causes of action herein.

126.    Express Scripts Pharmacy, Inc. and ESI Mail Pharmacy Service, Inc. are referred to herein collectively as "Express Scripts Mail Order Pharmacy."

127.    In 2021, Express Scripts Mail Order Pharmacy was the third largest dispensing pharmacy in the United States and reported $54.4 billion in prescription revenues.

128.    From 2006 to 2014, Express Scripts Mail Order Pharmacy bought over 22.9 billion MMEs of opioids spread over 1.1 billion opioid dosage units.

129.    **Defendant Express Scripts Specialty Distribution Services, Inc**. is a Delaware corporation and is a wholly owned subsidiary of Evernorth Health, Inc. Express Scripts Specialty Distribution Services, Inc.'s principal place of business is at the same location as Express Scripts, Inc.

130.    During the relevant time period, as alleged in more detail herein, Express Scripts Specialty Distribution Services, Inc. worked directly with the opioid manufacturers to expand the opioid market, including with Purdue and Endo to administer and dispense opioids through these opioid manufacturers' Patient Assistance Programs, including in New York.

131.    Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts Specialty Distribution Services, Inc., including all predecessor and successor entities, are referred to as "Express Scripts" or "ESI."

132.     Express Scripts is named as a Defendant in its capacities as a: (1) PBM; (2) data, analytics, and research provider; and (3) mail order pharmacy. During the relevant time period, Express Scripts contracted directly with the opioid manufacturers in each of these capacities. At all relevant times, Express Scripts performed these services in New York and Plaintiff's Community.

133.     In 2019, Express Scripts merged with Cigna, Inc. Prior to merging with Cigna, Express Scripts was the largest independent PBM in the United States.

134.     In 2012, Express Scripts acquired Medco in a $29.1 billion deal.

135.     Prior to 2012, Express Scripts and Medco were separate companies. Standing alone, these companies were two of the largest PBMs in the country and had been since at least the mid-1990s.

136.     As a result of the merger, the combined Express Scripts was formed and became the largest PBM in the nation.

137.     Following the merger, all of Medco's PBM and data and research functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's clients becoming Express Scripts' clients and Medco's top executives becoming Express Scripts executives.

138.   The chart represents the consolidation of PBM entities that that are now all part of Express Scripts today:



139.   Express Scripts is now the largest PBM in the United States, with annual revenue (as of 2022) of over $100 billion. Express Scripts provides pharmacy benefit service to more than 100 million Americans, filling 1.4 billion prescriptions per year.

140.   At all times relevant hereto, Express Scripts offered pharmacy benefit management services nationwide and maintained standard, national formularies that were offered to and used by Express Scripts' clients nationwide, including in New York and Plaintiff's community. Express Scripts' national formularies include its National Preferred Formulary, Basic Formulary, High Performance Formulary, and Prime Formulary. These Express Scripts formularies were utilized by prescription drug benefit plans in Plaintiff's Community throughout the relevant time period. At times relevant hereto, those formularies dictated the terms of reimbursement for opioids dispensed in New York and Plaintiff's Community.

141.    Express Scripts offers pharmacy benefit services to a variety of plan sponsors with covered lives in the Plaintiff's Community, including both large national companies and local/regional businesses.

142.    Express Scripts (and/or its predecessors) processed claims for opioids dispensed pursuant to Express Scripts' national formularies and standard UM guidelines in Plaintiff's Community throughout the opioid epidemic.

### 2.    The Optum Defendants

143.    **Defendant UnitedHealth Group, Inc**. ("UnitedHealth Group" or "UHG") is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

144.    UnitedHealth Group may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

145.    UHG is registered to do business in New York and may be served through its registered agents: Griffin Michael, 914 3rd Avenue, Ste #126, Brooklyn, NY 11232 and Corporate Filings of New York, 90 State Street, Ste 700, Office 40, Albany, NY 12207.

146.    UnitedHealth Group, Inc. is a Fortune 5 diversified managed healthcare company. In 2022, UnitedHealth Group listed revenue in excess of $324 billion. UnitedHealth Group, Inc. offers a spectrum of products and services including health insurance plans and pharmacy benefits through its wholly-owned subsidiaries.

147.    UnitedHealth Group operates through two connected divisions—Optum and UnitedHealthcare ("UHC"). As discussed in greater detail below, Optum provides

PBM services; mail order pharmacy services; and data, analytics, consulting, and research services. UHC provides health insurance and health benefit services.

148.    UnitedHealth Group, through its executives and employees, control the enterprise-wide policies that inform both UHC and Optum's lines of business in order to maximize profits across the corporate family.

149.    UnitedHealth Group's conduct had a direct effect in New York, including Plaintiff's Community.

150.    **Defendant Optum, Inc**. is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

151.    Optum, Inc. is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty St., New York, NY 10005.

152.    Optum, Inc. is a health services company managing the subsidiaries that administer UnitedHealth Group's pharmacy benefits, including OptumRx, Inc.

153.    Since 2005, Optum, Inc. has been a part of the UnitedHealth Group. UnitedHealth Group has two major segments of its business: UnitedHealth Care ("UHC") which is its medical insurance arm and Defendant Optum, Inc., which includes UHG's PBM and research, data, and consulting arms. In 2022, UHC insured over 46 million Americans and generated $249 billion in revenue.

154.    Optum, Inc. is engaged in five types of business activities: (1) data analytics; (2) pharmacy benefit management; (3) healthcare services; (4) mail-order pharmacy dispensing; and (5) medical discount card services.

155. **Defendant OptumInsight, Inc.** (f/k/a Ingenix, Inc.) is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. OptumInsight was formerly known as Ingenix, Inc. The name change came after the State of New York investigated Ingenix related to a scheme to defraud consumers by manipulating reimbursement rates, resulting in a $50 million settlement with the State and giving rise to U.S. Congressional hearings.

156. OptumInsight, Inc. is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, NY 10005.

157. OptumInsight, Inc. holds an active Third Party Administrator and Independent Adjuster license with the New York Department of Finance.

158. **Defendant OptumInsight Life Sciences, Inc.** (f/k/a QualityMetric, Inc.) is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. OptumInsight Life Sciences, Inc. is a wholly-owned subsidiary of UnitedHealth Group ("UHG"). Prior to 2011, OptumInsight Life Sciences, Inc. was known as QualityMetric.

159. OptumInsight, Inc., OptumInsight Life Sciences, Inc., as well as their predecessors, successors, affiliates, including but not limited to Innovus, Innovus Research, i3, QualityMetric, HTAnalysts, ChinaGate, and CanReg, are referred to herein as "OptumInsight." OptumInsight is the Optum group that engages in data analytics.

160.    OptumInsight emerged from a collection of entities acquired by the UnitedHealth Group over the years. Those legacy entities include Innovus, QualityMetric, HTAnalysts, ChinaGate, CanReg, Ingenix, and the Lewin Group.



161.    As discussed more fully below, OptumInsight partnered with various opioid manufacturers to create studies, marketing, educational programs, and even identifying algorithms to simultaneously downplaying opioids' addictive properties and expand its use and availability throughout the country, including in New York.

162.   **Defendant OptumRx, Inc. ("OptumRx")** is a California corporation with its principal place of business at 2300 Main St., Irvine, California, 92614. OptumRx is the arm of Optum that provides PBM and pharmacy dispensing services.

163.   OptumRx is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty St., New York, NY 10005.

164.   OptumRx, Inc. entities (Optum Care Networks, Inc., Optum Services (Puerto Rico) LLC, OptumHealth Care Solutions Inc, OptumHealth Care Solutions LLC, and OptumInsight, Inc.) hold 4 active licenses with the New York State Department of Finance.

165.   Prior to 2011, OptumRx was known as Prescription Solutions. In addition, as depicted in the PBM Consolidation Chart below, OptumRx grew as a result of numerous mergers and acquisitions. For example, in 2012, a large PBM, SXC Health Solutions, bought one of its largest rivals, Catalyst Health Solutions Inc. in a roughly $4.14 billion deal. Shortly thereafter, SXC Health Solutions Corp. renamed the company Catamaran Corp. Following this, UHG bought Catamaran Corp. in a deal worth $12.8 billion and merged Catamaran with OptumRx.

166.   Prior to merging with OptumRx (or being renamed), Prescription Health Solutions, Catalyst Health Solutions, Inc., and Catamaran Corp. engaged in the at-issue PBM and mail-order activities alleged more fully herein.

167. OptumRx now provides both PBM and mail-order dispensing services. At relevant times to this Complaint, OptumRx provided and/or offered PBM services for entities and/or persons in Plaintiff's Community.

168. At relevant times to this Complaint, OptumRx has sold and continues to sell prescription opioids through its mail order pharmacies in New York, including in Plaintiff's Community.

169. OptumRx and all of its predecessors, including but not limited to Prescription Solutions, Catalyst Health Solutions, Inc., SXC Health Solutions Corp., and Catamaran Corp. are referred to herein as "OptumRx."

170. The consolidations that led to the emergence of OptumRx in its current form are shown on the chart below:



171. **Defendant OptumRx Discount Card Services, LLC** is a Delaware limited liability company with its principal place of business at 1423 Red Ventures Drive Building RV4, 3rd Floor, Fort Mill, South Carolina 29707.

172. OptumRx Discount Card Services, LLC is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty St., New York, NY 10005 and at 111 eighth Avenue, New York, NY 10011.

173. OptumRx Discount Card Services, LLC (f/k/a HealthTran, Inc., Catamaran PBM of Colorado, LLC, and Catamaran Discount Card Services, LLC) contracts with third-party businesses to administer prescription discount cards on their behalf. For example, the AARP's prescription discount card program is "endorsed" by the AARP, but is otherwise run by Optum Discount Card Services, which pays the AARP a royalty fee to the AARP for use of its intellectual property.

174. **Defendant Optum Perks, LLC** is a Delaware limited liability company with its principal place of business in Livonia, Michigan.

175. Optum Perks offers a free pharmacy discount card in New York.[38]

176. Optum Perks, LLC (f/k/a Script Relief, LLC) is a discount card program that originally started as a joint venture between Loeb Enterprises, LLC, and Catalyst, where by 2012 Catalyst had a 47% ownership interest. Per Catamaran's 2012 10-K, "Script Relief is a variable interest entity with Catamaran being the primary beneficiary, as the Company's underlying PBM and pharmacy contracts represent Script Relief's key business operations and the Company has the power to direct these activities."

177. By 2019, OptumRx, Inc. had fully acquired Script Relief and renamed the program Optum Perks.

---

[38] *See* https://perks.optum.com/NYSHTA?utm_source=asp&utm_campaign=redirect&utm_medium=offline&utm_content=nyshta&utm_term=asp.

178.    **Defendant OptumHealth Care Solutions, LLC** is a Delaware limited liability company with its principal place of business at 11000 Optum Cir., Eden Prairie, Minnesota 55344.

179.    OptumHealth Care Solutions, LLC is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty St., New York, NY.

180.    Additionally, OptumHealth Care Solutions, LLC holds an active license with the New York State Department of Finance.

181.    OptumHealth for a number of years partnered with Purdue to educate many case managers, nurse practitioners, and medical directors throughout UnitedHealth Group's various enterprises. These programs were specifically endorsed and coordinated through one of Optum Health's national medical directors. The content of these programs targeted pain as an undertreated disease, among other issues, and contained the similar dangerous messaging regarding the use of OxyContin that Purdue plead guilty to in 2007.

182.    **Defendant OptumHealth Holdings, LLC** is a Delaware limited liability company with its principal place of business at 11000 Optum Cir., Eden Prairie, Minnesota 55344.

183.    **Defendant Optum Health Networks, Inc.** is a Delaware corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.

184.    Optum Health Networks, Inc. is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty St., New York, NY.

185.    Optum Health Networks, Inc. provides care services to enrolled members of its subsidiaries and parents that includes care management services, arranging for delivery of services, and managing client relationships and contracts for access to said services.

186.    Together, OptumHealth Care Solutions, LLC, Optum Health Holdings, LLC, and OptumHealth Networks, Inc. are referred to herein as "OptumHealth."

187.    OptumHealth is a healthcare service provider that includes specialty health services, health banking services, ancillary care networks, and health education and information services to both individuals and health care professionals. It does this through four main lines of business: Care Solutions, Behavioral Solutions, Specialty Benefits, and Financial Services. In 2022, OptumHealth served 102 million individuals.

188.    Relevant to the opioid epidemic and Plaintiff's claims—detailed *infra*—OptumHealth partnered with Purdue throughout the 2000s to provide "education" to health care providers, including medical directors, nurse practitioners, case managers, and care advisors throughout the country regarding the so-called "undertreatment" of pain and expanding the use of opioids.

189.    Collectively, OptumRx, Optum, Inc., Optum Discount Card Services, LLC, Optum Perks, LLC, OptumHealth Care Services, LLC, OptumHealth Holdings,

LLC, Optum Health Networks, Inc., and OptumInsight are referred to herein as "Optum."

190.   Optum is named as a Defendant in its capacities as a: (1) PBM; (2) data, analytics, consulting, and research provider; and (3) mail-order pharmacy. During the relevant time period, Optum contracted directly with opioid manufacturers in each of these capacities. At times relevant to this Complaint, Optum performed these services and derived substantial revenue in New York, including in Plaintiff's Community.

191.   Optum, Inc. is a health services company comprising three sectors— OptumRx, which manages pharmacy benefits for both UHC and third party clients; OptumHealth, which provides medical services as well as education and support for individuals throughout the country; and OptumInsight, which is the data, research, and consulting sector.

192.   OptumRx is the third largest PBM in the United States. It provides PBM services to more than 65 million people.

193.   OptumRx offered pharmacy benefit management services nationwide and maintained standard, national formularies that were offered to and used OptumRx's clients both across the country and in Plaintiff's Community. At all times relevant hereto, those formularies included opioids, including those at issue in this case. OptumRx national formularies include the Essential Health Benefits, Generic Centric, Core Standard, Core Choice, Select Standard, Select Choice, Premium Standard, and Premium Choice.

194.    Optum (and/or its predecessors) processed claims for opioids dispensed pursuant to Optum's standard, national formularies and utilization management guidelines in Plaintiff's Community throughout the opioid epidemic.

195.    In addition to its pharmacy benefit services, Optum entities also provide services related to pharmaceutical reimbursement and dispensing that generate revenue and benefit from a lack of opioid controls.

196.    At times relevant hereto, Optum offered mail-order pharmacy services and dispensed opioids in New York, including Plaintiff's Community.

197.    In 2021, Optum's mail order pharmacy was the fourth largest dispensing pharmacy in the United States and received $34.2 billion in prescription revenues.

198.    From 2006 to 2014, Optum's mail order pharmacy bought over 4.5 billion MMEs of opioids spread over 252 million opioid dosage units.

199.    OptumInsight, Optum's data, research, and consulting arm, is one of the largest health information, technology, and consulting companies in the world. It collects, processes, sells and profits from the vast data all managed lives—which in 2011 covered over 75 million lives.  It also provides clinical research, consulting, marketing advisory services, and analytics tools to its clients.

200.    OptumInsight is an integral part of the conduct that gives rise to Plaintiff's causes of action. As alleged in detail herein, throughout the relevant time period, OptumInsight worked directly with opioid manufacturers to convince

patients, prescribers, payors and the public that long term opioid use was appropriate for the treatment of chronic pain and that opioids were not addictive.

201.  Each opioid manufacturer had dedicated executives assigned to work with OptumInsight. The opioid manufacturers used their relationships with OptumInsight to deepen their ties to the overall Optum corporate family.

202.  OptumInsight was paid tens of millions of dollars by the opioid manufacturers during the relevant time period for its work to expand the opioid market.

## IV.    The Role of PBMs in Prescription Drug Transactions

## A.    PBMs Operate on All Sides of Prescription Drug Transactions

203.  PBMs such as Express Scripts and OptumRx contract with insurers, self-insured employers, and state and federal government agencies (referred to by the PBMs as their "clients") to provide pharmacy benefit management services. One of the services the PBMs provide is to create standard, national formularies and UM programs. The PBMs offer these standard formularies and UM programs to their clients, and most clients adopt these standard offerings for their prescription drug plans without modification. In crafting these standard formularies and UM programs, PBMs review and make determinations regarding which medications are effective or appropriate. PBMs also review and pay claims for the drugs dispensed to their covered lives.  As a result, PBMs exert significant influence over prescriptions dispensed in the United States and in New York, including influencing the quantity, dosage strength, duration, and refill availability for each prescription. PBMs also collect and maintain all of the data associated with all of the prescriptions dispensed

to their covered lives, giving them granular insight into the ongoing health and pharmaceutical patterns of these patients. This data is available to the PBMs when they craft their standard formularies, implement standard UM programs and even informs standard "retrospective utilization" programs that offer services to patients after a prescription has been filled.

204.     Although PBMs contract with third-party payors to provide pharmacy benefit management services, they also contract with drug manufacturers and with pharmacies. They are paid by their clients to make safe and effective drug therapies available to their covered lives. But, as described below, they are also paid by drug manufacturers to provide the greatest access to their products, so as to increase sales, with little to no regard for safety or efficacy. And they are paid by the pharmacies where the plan beneficiaries' prescriptions are filled, to verify coverage but also to assist the pharmacy in ensuring that a prescription is appropriate. Thus, in any given transaction, a PBM may be receiving money from both the payor and the pharmacy to exercise independent judgment about whether to authorize payment for a prescription, while also receiving money from the manufacturer to ensure that the sale is made.

205.     The business model that PBMs, including the PBM Defendants, use is thus rife with conflicts of interest and self-dealing through which they have enriched themselves at the expense of their clients and the public. Inherent in the services offered by the PBM Defendants in their agreements with the opioid manufacturers (and with pharmacies) are the same services for which they are already ostensibly

receiving payment from their clients, albeit with the incentives often running in the opposite direction.

206.    This chart illustrates the central role the PBM Defendants play in the prescription drug market:[39]



207.    It is in part because of the multiple roles that PBMs play in prescription drug transactions that they have access to, and collect, the vast amounts of data they have. No other party has access to so much data because no other party is so

---

[39] The Commonwealth Fund, *Pharmacy Benefit Managers and Their Role in Drug Spending* (Apr. 22, 2019), https://www.commonwealthfund.org/publications/explainer/2019/apr/pharmacy-benefit-managers-and-their-role-drug-spending.

thoroughly embedded into every aspect of prescription drug prescribing and dispensing.

208. Yet rather than use their vast data resources to craft formulary and UM offerings that would address the dangers of opioids and help reduce utilization of these dangerous drugs, the PBM Defendants instead worked with opioid manufacturers to adopt policies and offerings that drove opioid utilization and helped fuel the epidemic. In pursuit of opioid profits, the PBM Defendants intentionally disregarded their obligations, to the detriment of communities around the country, including Plaintiff's Community.

## B. PBMs Use Their Formularies as Leverage to Negotiate with Drug Manufacturers

209. Formularies are a central tool that PBMs, including the PBM Defendants, offer to clients for use in designing, managing and publicly identifying the extent of the coverage and benefits provided to their covered lives. Because formulary listing affects how much a patient pays for a drug, formulary placement makes a prescriber more likely to prescribe, and a patient more likely to pay for, certain drugs over others. Indeed, driving drug utilization is one of the key purposes and functions of formulary design, implementation, and management.

210. Moreover, the PBMs' clients rely upon the PBM Defendants' formularies. The Pharmaceutical Care Management Association ("PCMA"), the PBM trade association, testified to the Pennsylvania House of Representatives that even

sophisticated clients rely almost entirely on PBMs to manage their drug benefit.[40] Indeed, it is their expertise that the PBMs are marketing to their clients, so it makes sense that most clients rely on that expertise and, lacking their own expertise, have little choice but to do so. Many PBM clients utilize the PBMs' standard national formularies. Even though there may be a few large, sophisticated clients that ostensibly use "custom" formularies, in reality, these formularies often either mirror the PBMs' standard formularies or were constructed in large part by the PBMs.

211. Since the PBM Defendants' standard formulary offerings heavily influence drug reimbursement terms for 160+ million covered lives, the PBMs have significant leverage when negotiating with brand drug manufacturers. The PBM Defendants use this leverage to maximize the amount of rebates paid to them by brand drug manufacturers, including opioid manufacturers. These rebates are paid to the PBMs on every eligible drug dispensed; thus, the more the PBMs drive utilization, the more rebates are paid by opioid manufacturers to the PBMs.

212. Rebate eligibility is a critical factor. In a typical PBM rebate contract with an opioid manufacturer, eligibility for rebate payments is tied to the way a particular drug is treated on the formulary and whether the drug is or is not "restricted" by UM. Put differently, if a drug is placed on a non-preferred tier, or if the drug is restricted by UM programs, rebates will either be adversely impacted or not paid at all.

---

[40] Letter from Barbara Levy, Vice President of PCMA to Matthew E. Baker, Pennsylvania House of Representatives, Comm. on Health.

213. Thus, the PBM Defendants are incentivized to structure their standard formulary and UM offerings in ways that enhance and do not restrict opioid utilization so that they can maximize the rebate payments for which they will be eligible.

214. PBMs do at times share manufacturer rebates with their clients. But the PBM Defendants generally pass through only a portion of these rebates to their clients and retain the rest as profit. As a result, the PBM Defendants have profited handsomely from rebates received from drug makers, including opioid manufacturers, for each brand drug sold.

215. In addition, if a PBM can generate higher volume (more sales) for manufacturers, it can then negotiate higher rebates that the manufacturer will pay to the PBM (which in turn increases the PBMs' profit).

216. PBMs also make money other ways by increasing the volume of prescriptions that are sold to their covered lives. One way is through money that the PBMs earn on "spread pricing." Spread pricing is where a PBM will charge its client a higher price for a prescription than what the PBM pays the pharmacy for the same drug. The PBM will then pocket the difference in this price spread as profit. Spread pricing is particularly profitable for the PBMs for generic drugs, including generic opioids. Put simply, the more generic opioid prescriptions dispensed to the PBMs' covered lives, the higher profit the PBM earns through this spread pricing.

217. Ultimately, PBMs are very much incentivized to keep sales volumes high for both generic and brand opioids.

218.  As a result, PBMs—including Defendants here—have a monetary interest in ensuring that favored drugs are covered, prescribed, and dispensed.

219.  The structure of the pharmacy benefit market also aids the PBM Defendants' efforts to maximize opioid manufacturer rebates. PBM Defendants became a major force in the late 1980s, expanding from solely processing pharmacy claims to a business model that invited drug manufacturers to negotiate prices in several drug categories.  Because of market consolidation, the PBM Defendants control a significant portion of the pharmacy benefit market. The PBM market is thus highly concentrated, both within New York and throughout the United States.

220.  In contrast, the market for their clients is much less concentrated, with the largest companies accounting for less than two-thirds of the business in 2014. For brand-name drug manufacturers, thirteen companies account for 90% of the U.S. pharmaceutical market. Thus, it is typical to have one of the (large) PBMs negotiating with the (large) opioid manufacturers on behalf of a number of relatively small clients.

221.  The small world consisting of the PBM Defendants and approximately ten opioid manufacturers facilitated collusive negotiations that benefitted the manufacturers and the PBM Defendants at the expense of patient health and safety. For example, PBMs have typically used their clout to negotiate master rebate agreements on behalf of all their covered lives. Rather than negotiate with respect to, or on behalf of, particular clients or particular plans, they enter into master agreements that will apply across the board. As a result, in the world of drug price

negotiation, market power is most highly concentrated among the PBM Defendants, who have more negotiating leverage than any individual drug manufacturer or health plan on either side of a transaction.

222. These negotiations can be of such great financial importance to pharmaceutical companies and the PBM Defendants that they are often attended by senior executives up to and including the chief executives, which has also facilitated the formation of personal business relationships and an understanding of the common purpose of the negotiations between the PBM Defendants and the opioid manufacturers.

223. Because the PBM Defendants are paid based on the volume of prescriptions, including for opioids, that flow through their formularies, restricting this flow would cause the PBM Defendants to lose substantial revenue.

224. Moreover, rebate payments are only part of the payments PBM Defendants receive from opioid manufacturers. In addition to rebates, drug manufacturers, including opioid manufacturers, have paid the PBM Defendants substantial amounts of various "administrative fees" and "service fees" in exchange for, among other things, ensuring a given drug's formulary placement and providing various services to the drug makers—the same services they are already being paid to provide to their clients.

225. For example, Express Scripts' standard form of contract discloses that it receives "administrative fees" for, among other things, providing opioid manufacturers access to "drug utilization data, and receives "service fees" (which are

explicitly described as separate from both rebates and administrative fees) for "formulary compliance initiatives, clinical services, therapy managements services, education services, medical benefit management services, including, for example, formulary compliance initiatives, clinical services, therapy management services, education services, medical benefit management services, and the sale of non-patient identifiable claim information":

> ESI provides administrative services to formulary rebate contracted manufacturers, which include, for example, maintenance and operation of the systems and other infrastructure necessary for managing and administering the PBM formulary rebate process and access to drug utilization data, as allowed by law, for purposes of verifying and evaluating the rebate payments and for other purposes related to the manufacturer's products. ESI receives administrative fees from the participating manufacturers for these services. These administrative fees are calculated based on the price of the rebated drug or supplies along with the volume of utilization and do not exceed the greater of (i) 4.58% of the average wholesale price, or (ii) 5.5% of the wholesale acquisition cost of the products. In its capacity as a PBM company, ESI also may receive service fees from manufacturers as compensation for the performance of various services, including, for example, formulary compliance initiatives, clinical services, therapy management services, education services, medical benefit management services, and the sale of non-patient identifiable claim information. These service fees are not part of the formulary rebates or associated administrative fees.[41]

226. The PBM Defendants are able to minimize the portion of monies from drug manufacturers that they pass along to their clients in part through misleading labeling of the various payments. This lack of transparency, and the PBM Defendants' central role in ensuring it, has allowed the PBM Defendants to conceal their collusion with the opioid manufacturers from their own clients and from the public.

---

[41] ESI_JEFFCOMO_000231588 (1/1/14).

227.   As industry expert Linda Cahn observed, "[i]f a PBM enters into contracts with drug manufacturers and chooses to give rebates another name—like administrative fees or health management fees or grants—the PBM will arguably eliminate its obligation to pass through the financial benefits to its clients."[42]

228.   Administrative fees can make up a substantial portion of the total dollar amount of drug company payments to a PBM. According to pharmacy-benefits consultant David Dross, administrative fees can amount to 25-30% of total payments from drug companies like Purdue.

### 1.   Express Scripts' Formularies

229.   Express Scripts develops its operative national formularies utilizing three committees—Therapeutic Assessment Committee ("TAC"), Pharmacy & Therapeutics Committee ("P&T"), and the Value Assessment Committee ("VAC"). The TAC reviews the clinical properties of new drugs and pre-existing drugs (to the extent new or developing clinical information warranted such review) and prepares research memoranda discussing the benefits and drawbacks for each drug. The TAC also makes recommendations regarding whether any particular drug under review should or should not be included on Express Scripts' national formularies. The TAC's research memoranda and recommendations are then provided to the Express Scripts' P&T Committee.

---

[42] Jeanne Pinder, "Don't Get Trapped By PBM's Rebate Labeling Games: Managed Care magazine by Linda Cahn" *Clear Health Costs* (Feb. 26, 2018), https://clearhealthcosts.com/blog/2018/02/dont-get-trapped-pbms-rebate-labeling-games-managed-care-magazine/.

230. The P&T Committee consists of outside, third-party medical providers who were not employees of Express Scripts. Express Scripts claims that the P&T is fully independent and exercises its own clinical judgment. Express Scripts further claims that "the P&T Committee considers the drug's *safety and efficacy*," and the company "fully compl[ies] with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of *safety and efficacy*."[43]

231. The P&T reviews the research memoranda provided by TAC. The P&T then places each drug it reviewed into one of three categories: "must include," which meant that the drug must be included on Express Scripts' national formularies; "must exclude," which meant the drug could *not* be included on Express Scripts' national formularies; and "optional," which meant that the drug could or could not be included on national formularies, at the discretion of yet a third committee.

232. This third committee is known as the VAC. Like the TAC, the VAC also consists of Express Scripts employees. But, in important other respects, the VAC is different. Notably, while Express Scripts represents that neither the TAC nor the P&T is supposed to consider any financial or economic factors, the VAC expressly considers financial factors. The financial factors considered by the VAC include rebates and administrative fees paid by manufacturers, including the opioid manufacturers. At all times Express Scripts has benefited from these rebates and administrative fees, because Express Scripts retains some portion of them. After

---

[43] Eichholz Dep. 33-39. (emphasis added).

giving consideration to these financial factors, the VAC is then the committee that actually constructs the Express Scripts' national formularies, and determines on which tier a drug is placed. The lower the tier, the greater the access/utilization.

### 2. Optum's Formularies

233. OptumRx develops its formularies through a process primarily involving the following committees: the Clinical Programs Subcommittee ("CPS"); Drug Intelligence; the National Pharmacy and Therapeutics Committee ("P&T"); and the Business Implementation Committee ("BIC").

234. The CPS is an advisory subcommittee of the P&T. CPS's role is to: (1) review and approve treatment guidelines for patients with specific conditions; (2) review and approve clinical algorithms for disease state management and other clinical activities; (3) review and approve prior authorization algorithms and decision support tools; (4) provide expert guidance to the P&T regarding national and local guidelines for medical care; (5) review certain UM for medications and make recommendations to the BIC committee based on those reviews.

235. OptumRx's P&T committee's role is to: (1) review PBM formularies and PDLs at least annually for drug inclusions/exclusions; (2) review and approve clinical guidelines and/or criteria and procedures related to the timely use of and access to medications annually; (3) create procedures that guide UM tools and formulary management activities; and (4) advise on clinical education programs for plan sponsors' members, health care provider networks, plan participants, and pharmacy providers.

236.   OptumRx's P&T committee creates recommendations on formulary inclusion, UM, and clinical programs that are then provided to the BIC. The BIC determines the tiering and UM for the OptumRx national formularies. The BIC's recommendations are informed by "financial analysis." When determining clinical program, or UM strategies, the BIC also considers economic and pharmacoeconomic evidence.

237.   Once the BIC has made its final recommendations regarding formulary placement and utilization management for medications, it communicates those to OptumRx. The final formularies are then provided to the client.

## C.   PBMs' Drug UM Programs

238.   In connection with their formulary development, PBMs, including the PBM Defendants, also create standard drug UM programs and rules, which they offer to their clients and which most clients adopt.

239.   One example of UM offered by the PBM Defendants since at least the late 1990s is a "quantity limit," or QL, which is a utilization management tool that limits the total dosage of a particular drug that a beneficiary may receive. Another example is a "step edit" or "step therapy," which requires a patient to try a different drug (designated by the PBM) before the patient can receive the drug they were prescribed. Another is a "prior authorization," or PA, which is a tool that requires a clinical follow-up with the prescribing physician prior to the drug being dispensed to double-check and make sure the prescription is appropriate for the patient beneficiary.

240.    Studies, including those conducted by the PBM Defendants themselves, have shown that implementing PAs can reduce the utilization of dangerous and addictive drugs like OxyContin. Thus, like their standard formulary offerings, standard UM offerings are another tool the PBM Defendants use to steer patients. UM tools, if used as intended, should act as an impediment to patients gaining access to drugs that are susceptible to oversupply and abuse, or that are more costly than others.

241.    Express Scripts and OptumRx's business is set up on a model of standardization. While clients have the option to design their own programs, most clients accept the PBM Defendants' standard formularies and UM programs, like step therapy, prior authorizations and drug utilization review ("DUR") edits. Thus, it is the manner in which Express Scripts and OptumRx construct their standard formularies and programs (outside of any client interaction) that has an enormous influence on drug utilization.

242.    The amount of influence that each PBM Defendant had over drug utilization was a frequent topic of discussion between the PBM Defendants and the opioid manufacturers that was central in the parties' discussions about rebates and administrative fees. The more a PBM Defendant could drive market share to or away from a drug by controlling formulary and UM decisions, the more an opioid manufacturer was willing to pay.

243.    Notably, the PBM Defendants leverage their ability to steer drug utilization to generate substantial profits. Indeed, Express Scripts and Optum profit from every branded and generic opioid sold in myriad ways.

244.    Express Scripts and OptumRx have always had the ability to provide baseline opioid UM controls for its clients, which they did on September 1, 2017 (when Express Scripts offered its Advanced Opioid Management program) and January 1, 2018 (when it kicked off its Opioid Risk Management Program).

### D.    PBMs Contract with Pharmacies

245.    As noted above, PBMs, including the PBM Defendants, also contract directly with retail pharmacies to dispense drugs to a patient.

246.    Express Scripts contracts with approximately 65,000 retail pharmacies, representing over 98% of all retail pharmacies in the United States. These pharmacies become part of Express Scripts' network for coverage purposes.

247.    Similarly, Optum contracts with a network of more than 70,000 retail pharmacies and multiple delivery facilities.

248.    When a pharmacy is in the network with Express Scripts and Optum (and generally with both), a covered life pays out-of-pocket for a small portion of the prescription and the PBM arranges for direct payment to the pharmacy of the remainder of the cost of the prescription. In this way, covered lives need not advance the cost of their prescriptions and seek reimbursement afterwards.

249.    In connection with contractual arrangements with their network pharmacies, the PBM determines the patient's copay and how much it will reimburse pharmacies for each medication covered under the drug plan. PBMs generally pre-

determine how much each drug covered under their standard formularies should cost, and this determination affects the amount they reimburse to the pharmacies. Critically, the PBM Defendants also receive real-time claims data from pharmacies at the point of sale, as part of their electronic adjudication of claims, which includes determining eligibility for reimbursement and conducting concurrent drug utilization review ("cDUR," discussed in detail below).

250. As described below, pursuant to its contracts with its network of pharmacies, Express Scripts undertakes to perform "drug utilization review" and to provide mechanisms to ensure safe dispensing. Express Scripts claims that it uses drug utilization review to "review prescriptions for safety and effectiveness, in real-time, electronically and systematically, when presented to our pharmacies or submitted for coverage by network pharmacies, and alert the dispensing pharmacy to detected issues. Issues not adequately addressed at the time of dispensing may also be communicated to the prescriber retrospectively."[44]

251. Through its contracts with its network pharmacies, Optum similarly undertakes to perform services, including drug utilization review, to ensure safe dispensing.

---

[44] *Id.*

## V.     The PBM Defendants' Role in Causing the Opioid Crisis

## A.     The PBM Defendants and the Opioid Manufacturers Colluded to Ensure Virtually Unfettered Access to Opioids

### 1.     The PBM Defendants Negotiated with the Opioid Manufacturers to Give Opioids Favorable Placement on National Formularies in Exchange for Rebates and Other Fees

252.    As noted above, PBMs have significantly more market power than the drug manufacturers with whom they negotiate drugs prices and formulary placement. The vast market power of the PBM Defendants compared to their clients has allowed the PBM Defendants to negotiate deals with the opioid manufacturers for the payment of additional rebates and other fees that the opioid manufacturers pay to the PBMs that induced the cooperation of the PBM Defendants and the opioid manufacturers to work together in a fraudulent scheme.

253.    The terms of the agreements between opioid manufacturers and the PBM Defendants are considered extremely confidential by the PBM Defendants and are not even disclosed to their health plan clients. As a result, until key highly confidential documents were recently obtained in discovery in *In re: National Prescription Opiate Litigation*, Case No. 1:17-md-2804-DAP (N.D. Ohio), and other opioids litigation, there has been little public insight into how these agreements affected the volume of opioids flooding American households.

254.    From the time it first released OxyContin, Purdue pushed its sales force to "*Sell, Sell, Sell* OxyContin."[45] In an early sales memo in 1996, Purdue's head of

---

[45] PDD1503490547.

sales stressed that his team should "[r]emain focused on positioning OxyContin as the opioid to start with and stay with in chronic malignant and non-malignant pain states. In addition, continue to aggressively position OxyContin for use in osteoarthritis, low back pain, post neuropathic neuralgia and post-surgical applications."[46]

255. Purdue's aggressive marketing campaign worked, and OxyContin sales exploded in the years following its release, reaching almost $2 billion in annual sales by 2003. In addition, during this same time period the annual number of OxyContin prescriptions for noncancer pain increased nearly tenfold, from about 670,000 in 1997 to about 6.2 million in 2002.

256. During this time of rapidly expanding OxyContin sales, Medco was the largest customer of Purdue products. For example, in 1996, Medco was the largest PBM in the country and received over one-third of the rebates paid by Purdue for all opioid sales. By 2001 and 2002, Medco's gross sales of Purdue opioids totaled $250.4 million and $281 million respectively, "making [Medco Purdue's] largest customer."[47]

257. When OxyContin was first released, Medco made several attempts to restrict its utilization. For example, in early 1996, Medco established a "ceiling dose" quantity limit for OxyContin of 80 mgs/day because of the potential for abuse for that drug.

---

[46] *Id.*

[47] PPLPC012000064369.

258.    In January 1997, Purdue received notice from "pain clinic doctors" that Medco was sending letters to prescribers because of a "concern[] about abuse potential" in patients taking OxyContin for chronic non-malignant pain.[48] Medco's concerns were forwarded up to several high ranking Purdue executives, including the president of the company, Richard Sackler. James Lang, head of marketing and sales at Purdue, explained, "Our success with OxyContin is starting to create concerns amongst the large PBMs as you already know because they recognize we are targeting non cancer pain. This goes beyond their initial perception that [OxyContin] was primarily a cancer pain medication."[49]

259.    While this issue was originally presented as a concern about addiction and abuse, a number of Purdue executives saw this as pretextual, and thought that Medco's true intentions were focused on cost and extracting larger rebates.

260.    For example, when Purdue's medical director Paul Goldenheim suggested, "[w]e need to talk to Medco and others about addiction," Purdue's president Richard Sackler responded, "we should consider that 'addiction' may be a convenient way to 'just say 'NO' and when this objection is obliterated, [Medco] will fall back on the question of cost."[50]

261.    Mark Alfonso, Purdue's vice-president of marketing, also weighed in: "My impression of this issues is that there are several major products . . . that are

---

[48] E513_00045035.

[49] *Id.*

[50] *Id.*

growing at a great rate and [managed health care][51] organizations are not slowing them. . . I also believe that a lot of what [Purdue's Managed Care Account Executives] hear from their accounts is with the intention of softening them up before the [managed health care] asks for more aggressive rebates. They are told 'I am going to drop you from the formulary' for several months and then one day they are told if you give me higher rebate you can keep OxyContin in the formulary."[52]

262.   Purdue executives did, however, recognize the substantial threat this posed to OxyContin's success—if Purdue did not take immediate action to address Medco's economic concerns it could be an existential threat to Purdue's business. Sales and marketing executive Michael Friedman (who would later become Purdue's CEO), stated, "If we do not do [demonstrate the economic value of OxyContin], I can promise you that we will eventually be shut out. . . This is a serious matter that we cannot ignore and that we must discuss . . . We cannot go on ignoring the reality of [the PBMs'] economic proof requirements . . . If we are to stay in business we need this proof of economic performance."[53]

263.   Purdue's own data shows the impact that a major payor (such as Medco) moving OxyContin from a preferred formulary tier to an excluded product has on utilization:[54]

---

[51] Purdue refers to payors, such as the PBM Defendants, as "managed care."

[52] E513_00006452.

[53] E513_00045035.

[54] PPLPC030000773368.



264. Ultimately, in response to Medco's actions in 1996, Purdue determined that it needed to expand the OxyContin market by demonstrating the economic value of OxyContin in chronic non-cancer pain use to Medco and other PBMs. As Paul Goldenheim, Purdue's medical director, explained to Richard Sackler: "We have the tiger by the tail, and I wonder if we should add more muscle. Let's discuss over live sushi!"[55]

265. Importantly, had Medco in 1997—Purdue's largest customer at that time—excluded OxyContin from its formularies or put in place hard UM edits (i.e.

---

[55] E513_00045035.

prior authorizations) to restrict OxyContin use in non-cancer pain treatment it would have had a substantial impact on the success of OxyContin and would possibly have driven the drug off the market. Other major payors at that time, such as Cigna, had excluded OxyContin from their formularies. OptumRx (then known as Prescription Solutions) also refused to put OxyContin on its commercial formularies in 1997, due to concerns regarding the abuse potential of oxycodone (the active ingredient in OxyContin), especially considering its limited comparative effectiveness to morphine sulphate.

266. Medco, however, did not take action to exclude or restrict the sales of OxyContin. To the contrary, within three months of this exchange between Purdue executives, as detailed in this May 1997 Purdue memo, Medco had completely reversed course and "become very interested in 'partnering with Purdue'" on numerous projects to expand opioid use into the chronic pain market:[56]

---

[56] PPLPC025000003668.

---

## Managed Care

To:    Jim Lang                                    From:    Tim Richards
         Ernie Merlino

Subject:   Medco                           Date:    May 4, 1997

Per our discussion on Medco on Friday, May 2, 1997 the following is a summary of information that has surfaced since the meeting with Medco in August, 1996.

*     Along with Isaac Schulman, Mel Grayson has been calling on Joe DaBronzo, Pharm.D., who was promoted to Director of Utilization Management at Medco. Mr. DaBronzo feels that Medco's physician network is not properly trained on the basics of assessment and management of pain. It was Mr. Dabronzo's and Mr. Schulman's opinion that internally, Medco health care professionals needed education on pain assessment and management. Mel has set up a speaker program with Dr. Elizabeth Narcessian at Medco for May 13, 1997.

*     Pertaining to discussions at the August, 1996 meeting at Medco and accentuated by Mr. DaBronzo's recent promotion, decision makers at Medco have become very interested in "partnering with Purdue" on pain assessment and management. Mr. DaBronzo is interested in developing the following materials with the help of Purdue:

    *   Medco specific pain protocols for not only cancer pain, but for chronic non-malignant pain.

    *   Purdue to initiate retrospective outcome pharmacoeconomic studies using and partnering with Medco data.

    *   Purdue's consideration of Medco intervention for Purdue products and a negotiation of market share/performance-based contracts from this intervention.

    *   Education materials (CME disease state related) for physicians, case workers, nurses and pharmacists in the Medco system.

    *   Disease related patient education on pain assessment and chronic pain patient care.

With the above list, and the scheduled speaker program, Medco would like to move forward with Purdue in partnering for pain management into the future. Medco has requested of Mel Grayson for Purdue to move forward quickly in deciding whether Medco's partnering ideas are of any interest.

---

267.    Notably, within three years of this memo, Joe DaBronzo, Medco's Director of Utilization Management, took a position as an executive director at Purdue.

268.    As a first step reflecting its new "partnership" with Purdue, Medco significantly raised its quantity limits on OxyContin. As discussed above, Medco

initially implemented an 80 mg/day quantity limit at the release of OxyContin. However, within five months of the release and following further discussions with Purdue, Medco doubled it to 160 mg/day by May 1996. And by at least 2001, Medco again doubled this quantity limit and the "most restrictive [quantity limit] that Medco would recommend is for 320mg/day as per [Purdue's] platform."[57] For comparison, Express Scripts' current Advance Opioid Program has a 90 MME/day opioid quantity limit for opioid naïve patients. Medco's 320mg/day is equivalent to 480 MME/day—over *four times* the limit that Medco originally placed on OxyContin upon its release, as well as over *five times* the limit that Express Scripts now imposes on the drug.

269. This covert collusion between the PBM Defendants and the opioid manufacturers opened the flood gates to the unfettered formulary access for their opioids in exchange for rebates and other fees.

270. The PBM Defendants' influence over formulary positioning has been a key contributor to the ongoing relationship with the opioid manufacturers, because the manufacturers pay rebates and other fees based on the PBM Defendants' ability to deliver favorable drug placement within their standard formulary offerings. Because favorable formulary status is likely to increase a drug's usage and sales, and formulary exclusion (or a downgrade in formulary position) is likely to reduce a drug's usage and sales, the rebates and other fees are conditioned on a drug's formulary status. As Cottingham & Butler (a national insurance broker) noted in a client

---

[57] PPLPC012000064369.

presentation, PBMs have "unilateral control . . . over formularies and tiering—driving greater profits for PBMs through rebates[.]"[58]

271.   The PBM Defendants and the opioid manufacturers regularly discussed and agreed about which, if any, UM measures would be utilized for particular opioid drugs.

272.   As discussed above, the PBM Defendants maintain internal committees that determine which drugs are placed on their formularies. These committees are comprised of company personnel. In addition, the PBM Defendants have trade relations employees who are responsible for negotiating rebate agreements with drug manufacturers. Express Scripts refers to this committee as the Trade Relations Group and Optum refers to this committee as the Industry Relations Group.

273.   Years ago, the PBMs devised and managed what were known as "open" formularies: formularies that offered varying degrees of plan coverage and benefits for virtually all available FDA-approved drugs. Consequently, with open formularies, drug companies strived to have their drugs placed by PBMs on the portion of the formulary that allowed the easiest (and least expensive) access to their drugs.

274.   By the 2000s, however, the PBM Defendants began shifting to "closed" formularies as the standard offerings to their clients. "Closed" formularies provide tiered benefits, but unlike open formularies, they restrict the overall number of drugs

---

[58] Nancy Daas, "Prescription Drug Plan Strategies," *Cottingham & Butler* (Mar. 2017) https://www.cottinghambutler.com/wp-content/uploads/2017/03/Prescription-Drug-Strategies.pdf.

that are on the formulary. For the past two decades, most PBM covered lives have been governed by closed formularies.

275. As noted above, the PBM Defendants have greatly influenced access to opioids through formulary placement. Preferential formulary placement, such as being listed on a lower cost tier, increases a drug's utilization. Additionally, the PBM Defendants have influenced access to opioids through UM measures they utilize (or elect not to utilize) as part of their standard formularies. When implemented properly, UM measures could have restricted much of the flow of opioids entering the market.

276. Since at least 2000, opioid manufacturers have paid rebates and other fees to Express Scripts and Optum in exchange for preferred formulary placement for their opioid products.

277. The opioid manufacturers early on recognized that Express Scripts and Optum would provide unrestricted formulary status on their standard formularies in exchange for rebates and other fees. For example, in a candid February 15, 2000 email exchange, Purdue Managed Care Account Executive David Wallen explained that he could get Express Scripts "to steer [OxyContin] prescriptions" to retail pharmacies because of the rebates it received.[59] According to Wallen, "Express Scripts makes their money from the rebate, so they cannot make any money on this account if they do not get rebates."[60] In a later February 25, 2000 email, Wallen explained that

---

[59] PPLPC024000012498 (2/28/00).

[60] *Id.*

Express Scripts pressured its clients to put OxyContin on its formularies without restrictions: "[Express Scripts puts] pressure on [their client] to put OxyContin on formulary . . . because they make their money from rebates, and they do not get rebates if OxyContin is [subject to UM restrictions that reduce prescriptions]."[61]

278. For almost every year since 2001, Express Scripts and Medco granted OxyContin preferred formulary placement in its standard, national formularies.

279. Internal Express Scripts documents show that by 2013, some within Express Scripts believed that, with respect to OxyContin, Express Scripts was "out of alignment with the rest of the PBM/Health Plans in . . . putting this drug on a preferred tier (and) that other organizations have leaned more towards taking a harder stance on this highly abused medication."[62]

280. By the time of the Express Scripts-Medco merger, internal Purdue meeting notes reflect that in a meeting between Express Scripts/Medco and Purdue, Express Scripts/Medco representatives stated that "when Medco reviewed the drug spend for 2013, OxyContin was at the top of the list . . . *OxyContin use at Medco is out of control compared with [the other large PBMs] . . . Patients are selecting Medco because Medco [has] OxyContin in a preferred position*."[63]

281. After the merger (and years after it knew OxyContin was a heavily abused drug), Express Scripts was still pushing Purdue for more rebate dollars in

---

[61] *Id*.

[62] ESI_JEFFCOMO_000265250 (4/19/13).

[63] PPLPC012000373022.

exchange for granting OxyContin preferred positions on its standard formularies. In 2014, Express Scripts reached out to Purdue requesting a higher rebate rate for OxyContin to maintain its preferred position. Purdue executives agreed given the importance of the Express Scripts relationship to OxyContin sales, stating: "[Express Scripts/Medco commercial is 20-25% of our total OxyContin gross business, and the spillover effect of a negative move by [Express Scripts] on OxyContin in 2015 cannot be underestimated . . . Given the importance and impact of this customer on OxyContin sales . . . I approve [the decision to increase OxyContin rebate rates]."[64] Express Scripts celebrated this rebate increase as a win: "we got $20M in incremental from Purdue on OxyContin . . . Not too bad considering likely not doing anything."

282.    Notably at the same time (2014) that Express Scripts was pushing Purdue for more rebates to continue preferring OxyContin on its formularies, Express Scripts was also preparing the press releases and sales communications for its "Nation in Pain" report (discussed above).[65] Thus, on one hand Express Scripts was releasing a report for marketing purposes on the opioid epidemic in 2014 to "highlight the power of Express Scripts data and clinical expertise, and our commitment to identifying ways to make the use of prescription opiates safer and more effective," while on the other hand Express Scripts was receiving millions of dollars in extra rebates in order to continue to preferring the drug that started the opioid epidemic (OxyContin) on its standard formularies.

---

[64] PPLPC012000475266; PPLPC035000217128; Zilocchi Dep. Ex. 13.

[65] Nowak Dep. Ex. 10.

283.    Despite its knowledge of the nationwide opioid health crisis, and despite its knowledge of the impact that preferred formulary placement and the lack of UM restrictions had on increasing opioid sales, through at least 2017, Express Scripts continued granting OxyContin on the most preferred brand formulary tier, with no UM restrictions, on nearly all Express Scripts' standard formulary offerings.

284.    Likewise, for most of the relevant time period, OptumRx also granted OxyContin unrestricted, preferred formulary status for most of its standard formularies. Along with the aforementioned lack of prior authorization, OptumRx refused to put effective quantity limits on opioids.

285.    Up until 2017 OptumRx allowed OxyContin to have a quantity limit (QL) of four tablets a day of any strength, including 80mg strengths.

286.    Quantity limits were only NDC specific, meaning a member could get the quantity limit of multiple NDCs (that is, different opioids or different formulations of the same opioid) at a time. In 2010, Purdue would still pay rebates to OptumRx so long as its covered lives were able to obtain—whether through multiple NDCs or four tablets of 80mg OxyContin a day—320mg per day of OxyContin.

287.    The 320mg limit did not apply to short-acting opioids. In fact, OptumRx increased its quantity limits for short-acting opioids between 2007 and 2012. For example, the quantity limit for Opana was 12 tablets a day, or 1080 tabs for a 90 day supply. In mid-2014, Optum had the following Quantity Limits for opioids: MS Contin at 120 tablets a month, with the 200mg strength at 90 tablets a month; Nucynta 100mg at 210 tablets per month, with lesser strengths at 180 tablets per month;

Opana was 180 tablets per month; OxyContin was at 270 tablets per month. Of note is none of these opioids featured a prior authorization.

288.    In 2015 and 2016, OptumRx increased the QL on United commercial plans. Hydromorphone limits were for 2mg and 4mg strengths from six to eight tablets a day; MS Contin from three to four tablets a day for the 30 and 60 mg strengths and from one to two tablets a day for the 200 mg strength due to "PA volume" to override the current QL.[66] The morphine dose equivalent maximum was 360 tablets for United commercial plans.

289.    Express Scripts and Optum have been so successful in working with the opioid manufacturers to optimize their common purpose between formulary placement/utilization management and rebates and other fees that payments have reached as high as 70% to 80% off wholesale acquisition cost for some opioid drugs.

290.    To make matters worse, as the market shifted from branded opioids to generics in the mid-2000s, Express Scripts and Optum continued to grant generic opioids unrestricted and preferred placement on their standard formularies because of the profits these drugs generated for the PBM Defendants through spread pricing and in other ways. Indeed, OptumRx's own internal presentation from 2013 touts generic utilization as a "high driver of revenue and profit," even more so than brand rebates.[67]

---

[66] OPTUMRX_JEFFCO_0000661986.

[67] OPTUMRX_JEFFCO_0594849.

291. Thus, from the late 1990s through 2018, Express Scripts, Medco, and Optum granted both brand and generic opioids, including OxyContin, preferred positions on its standard formulary offerings, which was critical to the success of the opioid manufacturers increasing utilization and expanding the opioid market both nationally and in Plaintiff's Community.[68]

## 2. The PBM Defendants and the Opioid Manufacturers Used Parity to Limit the Use of Utilization Management Measures for Opioids

292. If they had been implemented earlier, the PBM Defendants' UM measures would have helped control the flow of opioid drugs into every community in America. These measures include days' supply quantity and daily dosage limits, refill-too-soon limits, prior authorizations (which require additional approval before drug is dispensed) and step edits (which could require that a patient try a different, safer drug before being given a more dangerous one).

293. The PBM Defendants, however, have financial incentives to give opioids preferential treatment relative to other methods of treating pain (including non-pharmacological methods), and these incentives have made them less likely to mitigate inappropriate opioid usage. While the PBM Defendants have represented that they use UM measures to ensure only the safe and effective use of

---

[68] Since 2014, Purdue has had a distribution and supply agreement with Teva Pharmaceuticals USA, Inc. pursuant to which Purdue supplied oxycodone to Teva and Teva labeled and sold it as a generic Teva product. Admitted trial exhibit P-25038, P-25038 Distribution and Supply Agreement By and Between Purdue Pharma L.P. and Teva Pharmaceuticals USA, Ic. Dated as of December 18, 2014, TEVA_MDL_A_03434545.

pharmaceuticals, behind closed doors they had entered into confidential agreements with the opioid manufacturers to bargain away the use of these measures which would have limited dispensing to only medically appropriate uses.

294. Instead of placing limits on the inappropriate use of these dangerous drugs, the PBM Defendants bartered the use of UM measures which would have helped control the widespread abuse and diversion of opioids in Plaintiff's Community and in communities throughout the country.

295. Throughout their confidential negotiations with the opioid manufacturers, in exchange for rebates and other fees, the PBM Defendants have agreed that they would not "disadvantage" their opioid drugs, nor would they place UM restrictions on their use within their standard offerings. Effectively, this has meant that the PBM Defendants have bartered away application of UM measures, which opened the floodgates to these dangerous drugs. Thus, the parties agreed that none of the opioid drugs would be disadvantaged and that they all would have the same UM restrictions as other drugs that did not have the propensity for abuse inherent in opioid drugs. These parity and "no disadvantage" contract terms had the effect of the PBM Defendants and the opioid manufacturers sharing a common purpose of ensuring the unfettered access to opioids across the entire class of opioid drugs.

296. Express Scripts' standard rebate agreements defined the term "disadvantage" as any time when the opioid manufacturer's product is "subject to prior authorization, NDC blocks, counter-detailing, co-pay differentials, or a step edit

that negatively had to have affects the reimbursement and/or Formulary status of the Product as compared to other products in its designated [competitive product category] . . . ."[69]

297.    Optum's template rebate agreements had similar language tying payment of rebates to common treatment of all other opioids in the formulary's therapeutic category. Its agreements' language stated that rebates would only be payable if the opioid manufacturer's product is not "subject to Disadvantaging including, but not limited to: prior authorization, NDC blocks, counter-detailing, co-pay differentials, dispensing restrictions, or endorsed targeted messages (electronic edits)."[70]

298.    Express Scripts and Purdue's 2002 contract included language stating Purdue would not pay rebates if its opioids were restricted. Likewise in 2009, Purdue would only pay rebates if its opioids were "unrestricted on the preferred brand tier." Again in 2014, Purdue would only pay rebates on OxyContin if it was on "lowest preferred brand tier, without restrictions, including no prior authorization or step therapy." Even as late as 2016, Express Scripts acknowledged that if it tried to put any restrictions on OxyContin (such as restricting opioid use to acute pain, blocking opioids unless the use was for cancer or other approved uses, or requiring prior authorization) that it would violate its rebate agreements with Purdue and would result in a loss of rebates.

---

[69] ESI_JEFFCOMO_000250248 (1/1/16).

[70] OPTUMRX_JEFFCO_0000473712 (3/20/14).

299.    Another example occurred in 2010. During negotiations between Janssen and Medco (Express Scripts' predecessor) regarding the formulary placement of the fentanyl drug Nucynta, the parties agreed Janssen would only pay rebates so long there were no step edit restrictions and agreed that Nucynta would be protected from "being disadvantaged vs. any branded agent in our defined market basket" of short-acting opioid ("SAOs").[71]

300.    Likewise, in 2012 negotiations between Express Scripts and Endo the parties agreed that "Endo Products are 'not disadvantaged to any other brand name pharmaceutical product in the same [competitive product category]'" and that this disadvantaged language meant any UM restrictions must apply to all products in the competitive class.[72]

301.    The same parity terms are included in Optum agreements. For example, the 2011 Rebate Agreement between OptumRx (then known as Prescription Solutions) and Johnson & Johnson for Nucynta (and other J&J drugs) required that it not be "disadvantaged as compared to other Branded or specialty Drugs within the Manufacturer Drug's Defined Drug Market . . ."[73]

302.    The 2012 Catamaran (now part of OptumRx) rebate agreement with Reckitt Benckiser for Suboxone Film required that it "not be subject to Disadvantaging including, but not limited to: prior authorization, NDC blocks,

---

[71] JAN-NYDFS-00001455181 (2/25/10).

[72] ENDO-OPIOID_MDL-07228036 (4/22/10).

[73] OPTUMRX_JEFFCO_0000006804 (1/1/11).

counter-detailing, co-pay differentials, dispensing restrictions, therapeutic conversion programs, therapeutic substitution, other access or reimbursement restrictions, or endorsed targeted messages (electronic edits)."[74]

303. Likewise, in 2012 negotiations between OptumRx and the drug maker Covidien with regard to tiering of its opioid drug, the parties agreed to use the OptumRx "boilerplate disadvantaging language."[75]

304. The same was true for Teva's 2015 agreement with OptumRx, which required unrestricted access and "parity" between its fentanyl drug Fentora and other drugs in its "Defined Drug Market," meaning that there would be no prior authorization limits unless it is applied to all "competing drugs" as well.[76]

305. The 2016 agreement between OptumRx and Depomed with regard to Nucynta required that "[p]rior authorization shall not be allowed unless applied to all other single source branded Drugs in the Defined Drug Market that are on Formulary . . . ."[77]

306. The lockstep parity terms that each PBM Defendant and opioid manufacturer negotiated served and furthered the common purpose of the Formulary & UM Enterprise (described in greater detail below) because it normalized the use of UM measures across the entire class of opioids and guaranteed that the overall market for prescription opioids would not diminish because of utilization

---

[74] OPTUMRX_JEFFCO_0000473712 (3/20/14).

[75] OPTUMRX_JEFFCO_0000140266 (6/1/12).

[76] TEVA_CAOC_08826718 (1/12/17).

[77] OPTUM_JEFFCO_0000011106 (4/1/16).

management. The rebate agreements conditioned payment on each opioid manufacturer not being disadvantaged with regard to applying UM measures unless the entire market basket of all competing drugs was treated the same. The parity terms therefore ensured that no single opioid manufacturer would be disadvantaged against the other and then, each could be free to compete outside of the Formulary & UM Enterprise for market share of their drug within the fraudulently increased system. The opioid manufacturers knew that UM presented a slippery slope—if more UM were employed, it would ultimately lead to the adoption of restrictions across the entire class of drugs.

307.  Indeed, this is precisely what happened. As summarized in a 2017 Express Scripts document, "Opioid management is currently a hot button issue. Express Scripts clients are demanding a solution as CMS and states implement requirements around appropriate opioid management (i.e. 3 states took action on prescriber 1st fill day supply restrictions; 12 additional states in process of implementing restrictions around morphine equivalent dose edits etc.) . . . We anticipate our opioid retail margin to be at risk over the next two to five years as states and federal government continue to intervene and prescribing practices change."[78] This was obviously a significant issue to Express Scripts, which made roughly $60 million in margin on opioids in 2016.[79]

---

[78] ESI_JEFFCOMO_000029922 (3/9/17).

[79] ESI_JEFFCOMO_000178613 (3/1/17) ("If we were to implement either the 7 day or the 10 limit on short acting opioids which are most profitable for us we are looking to lose $10-$20 Million in margin assuming 100% of patients get their first fill and

308. As alleged more fully herein, each member of the Formulary & UM Enterprise thus conducted and participated in the conduct of their enterprise through a pattern of racketeering activity—including mail and wire fraud—in which they formed a common purpose of growing the unfettered use of opioid drugs.

### 3. The PBM Defendants Misrepresented that They Were Using Their Formularies to Promote Safe Use and Appropriate Prescribing of Opioids

309. Rather than provide transparency into their dealings with the opioid manufacturers, Express Scripts and Optum represented to their clients, patients, and the public that they used their market power to design formulary offerings to promote the safe use and appropriate prescribing of opioids. These representations were false. Express Scripts and Optum instead have constructed standard formularies that garnered significant rebates and other fees in exchange for often unfettered access for "preferred" opioids.

310. For years the PBMs have represented that they promote better health and are dedicated to making the use of prescription drugs safer. For example:

- For years between 2000 and 2010, Express Scripts represented in its SEC filings that it "works with clients, manufacturers, pharmacists and physicians to . . . improve members' health outcomes and satisfaction."

  - During these same years, Express Scripts also represented in its SEC filings that it "is a company dedicated to making the use of

---

then 50% of patients get their 2nd, 3rd 4th fill. Based on the NY data we looked at since their state mandate went in 25% of members shifted from short acting to long acting opioids where we make the least money on and we are already seeing a hit on NY clients. . . . If we don't take any action in the next 1-3 years all states will move this and we will lose this margin anyway with a lost opportunity to charge for it now.").

prescription drugs safer and more affordable for plan sponsors and over 50 million members and their families."

- During the same time period Medco represented in its SEC filings that "[Medco] capitalize[s] on our clinical expertise and advanced information technology infrastructure . . . to improve safety and the quality of care for patients. We do this by developing action-oriented clinical programs and services based on clinical rationale. . ."

- In its 2008 annual report, Medco represented that "[a]t Medco innovation, precision, and advocacy are in our DNA. We strive to make all of medicine smarter and as a result make healthcare better."

- In a 2013 interview, Express Scripts CIO Gary Wimberly represented that "by filling 1.4 billion prescriptions per year, we have over 10 petabytes of useful data from which we can gain insights and for which we can develop solutions . . . [to] improve the health of patients." In addition, Mr. Wimberly stated, "[Express Scripts] has researchers and scientists whose sole job is to interpret and analyze the data to identify opportunities to improve health outcomes."

- In 2002 Prescription Solutions represented in public filings: "We recognize the treatment value of prescription medications. Our goal is . . . to increase the appropriate use of prescription medications. Getting the right medication to the right person at the right time is the best approach for everyone concerned."

- In 2007 Prescription Solutions represented – "Our goal is to promote the appropriate use of prescription medications. By focusing on clinical quality and total patient care, we help our clients and members improve outcomes."

- In its 2008 Annual Report, Optum represented– "Beyond the data and technology, and beyond the numbers and networks, our businesses are made up of people who strive, every day, to fulfill our mission by helping people live healthier lives."

- UnitedHealth Group's 2009 Annual Report stated "Information technology has the power to transform health care. UnitedHealth Group built a $2 billion business, Ingenix [OptumInsight predecessor], around that idea. Ingenix is committed to using the power of health information and analytics to help save lives, improve care and modernize the health care system."

100

- In UnitedHealth Group's 2011 Annual Report it stated "OptumRx is dedicated to helping people achieve optimal health . . . improving quality and safety, increasing compliance and adherence, and reducing fraud and waste."

311. Similarly, in a September 2013 letter to the Pennsylvania House of Representatives Committee on Health, Express Scripts stated that "[o]ur company's mission is to make prescription drugs safer . . ."[80]

312. Likewise, OptumRx's parent company, UnitedHealth Group, represented in its 2013 Annual Report that "UnitedHealth is advancing strategies to improve the way health care is delivered and financed . . .."[81]

313. In a 2013 interview, Express Scripts CIO Gary Wimberly summed it up: "Everything we do every day focuses on health outcomes."

314. As alleged more fully herein, despite the PBM Defendants' acknowledgement that they are supposed to construct formulary and UM offerings that promote safe and affordable drugs for their members, the PBM Defendants have not actually done so. To the contrary, the PBM Defendants have used their power to negotiate rebates and other fees, to control the offered formulary structures, to refrain from implementing or offering UM measures, all in an effort to allow the opioid

---

[80] Letter from David Dederichs, Sr. Dir. Express Scripts to Matthew Baker, Pennsylvania House of Representatives, Comm. on Health, *Re Opposition to HB 746*, at 1 (Sep. 4, 2013) https://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2013_0159_0011_TSTMNY.pdf.

[81] UnitedHealth Group 2013 SEC Form 10-K, at p. 2 (Dec. 31, 2013) https://www.sec.gov/Archives/edgar/data/731766/000073176614000008/unh2013123110-k.htm.

manufacturers unfettered access to their formularies so that the number of opioids prescribed and sold could continue to grow and generate more profits for the PBM Defendants and the opioid manufacturers, thereby bringing the opioid epidemic to the doorstep of nearly every household in America.

## B. During the Early Years of the Epidemic, the PBM Defendants Conspired with the Opioid Manufacturers to Expand the Opioid Market and Increase Opioid Utilization

315.    Not content merely to *permit* access to opioids, the PBM Defendants colluded with opioid manufacturers affirmatively to increase opioid prescribing. Since the release of OxyContin, the PBM Defendants have conspired with Purdue in several crucial ways to expand opioid market and increase the sales and prescribing of OxyContin.

316.    Medco partnered with Purdue on therapeutic exchange programs to increase OxyContin utilization during the years immediately following the drug's release. For example, in 1997-1998, Medco worked with Purdue to develop a "switch program" where pharmacies would switch out a competing product for OxyContin at the pharmacy counter. Purdue executive Michael Friedman explained the value of this program: "Medco is a huge customer and the potential gain from this effort could dwarf that of many other opportunities."[82]

317.    In addition, during key years in the growth of OxyContin utilization, Medco also worked with Purdue "behind the scenes" to get large health plans to lift restrictions—such as prior authorizations and quantity limits—on OxyContin

---

[82] E513_00022558.

utilization. For example, a 2002 email reveals Medco and Purdue working together to prevent the implementation of a prior authorization (PA) that would have reduced the supply of opioids:[83]

> **To:** Radlund, Julia[/O=PURDUE/OU=PURDUE US/CN=Sales and Marketing - Field/cn=DCB07D6C]
> **Cc:** Nagorski, Lynn[/O=PURDUE/OU=PURDUE US/CN=Sales and Marketing - Field/cn=9F4581F2]; Richards, Tim[/O=PURDUE/OU=PURDUE US/CN=RECIPIENTS/CN=CBCEAB1F]
> **From:** Grayson, Mel
> **Sent:** Wed 3/13/2002 9:31:10 PM
> **Subject:** Concerns at MMMC
>
> To All;
>
> I met today with Ed Adamcik of MMMC. His major concern is to negotiate a new rebate contract. Ed says that the reason they have been able to keep various clients from placing a PA on Oxy has been the value of the rebates to them. If this is suddenly reduced, there may be more clients who might want to place a PA, or some other type of restriction on OxyContin.

318.    To that end, in a telling exchange in 2002, when Highmark Blue Cross Blue Shield decided it would put a 300mg daily limit on OxyContin, Medco pushed back because this meant that Medco would lose rebates from Purdue. At the time, Purdue warned Medco that "[o]ur platform for rebates is to permit the patient to reach 320 mg/day of OxyContin," so if Highmark adopted a 300mg a day limit, Medco "will be loosing [sic] rebates for a mere 20mg/day differential." In order to rectify the situation, Ed Adamcik, Medco's Vice President of Contracting, then intervened and convinced Highmark to drop its daily dosage limit.

319.    During this same time period, internal Purdue emails show how the data that Purdue received from Medco helped eliminate potential UM restrictions

---

[83] PPLPC029000064034 (3/13/02).

and further strengthen the partnership between these two companies. In 2003, Purdue's Medco Account Representative Bernadette Katsur stated:

> "I do see tremendous value in the data that [Medco] is willing to provide. As he explained to me the large MCO's could be identified by number, and then he would be willing to discuss opportunities or concerns on a plan sponsor by plan sponsor basis. He would then be willing to work with me to develop individualized strategy for that account. That would mean pulling in Medco Client Manager as well as the local account executive. This type of working relationship has proven to be extremely successful with AdvancePCS. *We have eliminated many attempts to [prior authorization] and place [quantity limits] on product through this type of process. We have not had that degree of intimacy with Medco, and I think that Ed [Adamcik] would be willing to take that leap with the understanding that the extra percentage is being paid for that purpose.*"[84]

320.    An exchange between Medco, Medco's largest client (UHC), and Purdue that same year, 2003, exemplified the ideas in Ms. Katsur's email above. In early 2003, Medco worked again behind the scenes with Purdue to convince UHC to double a contemplated quantity limit from 60 tablets per prescription to 124 tablets per prescription. Given the amount of OxyContin that was sold through UHC plans in 2003 and the years thereafter—both nationally and in Plaintiff's Community— convincing UHC to double its quantity limit to 124 tablets likely resulted in a substantial increase in OxyContin sales during crucial years when the opioid epidemic was taking hold.

321.    Rather than implement standard protocols that they knew would limit OxyContin to narrow, appropriate usage, the PBM Defendants engaged in a pattern of deception (working in conjunction with the opioid manufacturers and often using

---

[84] PPLPC012000067648 (emphasis added).

manufacturer-created data and information) in order to increase opioid utilization and their own profits.

## C. For Two Decades after the PBM Defendants Knew the Opioid Epidemic Was Occurring, the PBM Defendants Continued to Conspire with the Opioid Manufacturers in the Deceptive Marketing of Opioids

322.  Beginning the late 1990s, opioid manufacturers—including, but not only Purdue—engaged in a multifaceted campaign to expand the opioid market by creating and disseminating misinformation about the safety and efficacy of opioids used in chronic pain treatment and the risks of opioid addiction.

323.  The PBM Defendants knew that there has never been reliable evidence demonstrating opioids were safe or effective at treating chronic pain long term. The PBM Defendants further knew that opioids, particularly when used long term to treat chronic pain carry serious risks of addiction. And yet, starting shortly after the release of OxyContin and continuing for years after the opioid epidemic was spreading throughout the country, the PBM Defendants worked with the opioid manufacturers in numerous capacities in furtherance of these efforts. In particular: (1) the PBM Defendants disseminated the opioid manufacturers' false messages about chronic pain and addiction to high prescribers and patients, and (2) the PBM Defendants provided research, data, and consulting services to the opioid manufacturers to assist in expanding the opioid market.

324.  As one type of example, PBM Defendant Express Scripts (along with its subsidiaries – e.g., Express Scripts Specialty Distribution Service; Express Scripts SDS; HealthBridge, United BioSource LLC; Curascript, Inc.) partnered and/or

collaborated with opioid manufacturers (e.g., Purdue, Endo) on Patient Assistance Programs ("PAPs") – which provide free or low-cost medications to eligible individuals based on factors such as low-income and/or lack of health insurance. PAPs are "a triple boon for manufacturers" as they "increase demand, allow companies to charge higher prices, and provide public-relations benefits."[85]

325.   For more than two decades, from the mid-1990s through 2017, Express Scripts and/or its subsidiaries partnered and/or collaborated with Purdue on its PAP - which is significant in multiple respects: a) as Purdue's partner mail order pharmacy, Express Scripts dispensed 100 million+ opioid pills specifically for Purdue's PAP and it repeatedly did so in violation of the Controlled Substances Act ("CSA") (as discussed in greater detail below); b) since 2002 Express Scripts also administered Purdue's PAP, further establishing its collaboration and critical role in this early, continuing, and very successful marketing effort to increase utilization, drive volume, and facilitate access relative to OxyContin and other Purdue opioid products; and c) as a result of Express Scripts' integral involvement with Purdue's PAP, it was well aware of the addiction, abuse and diversion issues surrounding OxyContin and other opioids since the mid-1990s.

326.   Express Scripts and/or its subsidiaries played multiple roles (e.g., partner mail order pharmacy, program administrator, etc.) in Purdue's and Endo's respective PAP marketing schemes.  The importance of Express Scripts is evident

---

[85] Howard, David H., *Drug Companies' Patient-Assistance Programs – Helping Patients or Profits?* New England J. Med, 97, 97-99 (2014), *available at* https://www.nejm.org/doi/pdf/10.1056/NEJMp1401658

from internal emails. For example, a 1996 email outlined how Purdue's "IPAP useage[sic] has sky rocketed since [Purdue] instituted the Express Script policy," noting that "utilization has nearly quadrupeled[sic]." [86] In a subsequent email in the chain, a Purdue employee stated that "Express Scripts has made it much easier to get the free product, thus, some may be using it that wouldn't be before. For example, I can remember several instances where we were having difficulty getting retailers to participate in the program before Express Scripts."[87] Moreover, as a result of Express Scripts' collaboration and work, Purdue's and Endo's respective PAPs were highly successful in increasing utilization, driving volume, and facilitating access relative to Purdue's and Endo's opioids, especially OxyContin and Opana.

327. The PBM Defendants' participation in the increasing opioid utilization and the fraudulent marketing of opioids continued even after Purdue pleaded guilty to criminal misbranding of OxyContin in 2007, as described above. Thus, even after Purdue acknowledged the falsity of its claims, the PBM Defendants, in collaboration with opioid manufacturers including Purdue, continued to spread the same misrepresentations about the safety and efficacy of opioids.

328. The PBM Defendants' participation in the fraudulent marketing of opioids continued long after their own data told them that the huge increases in opioid prescribing were creating a crisis of addiction, overdose, and death across the United States.

---

[86] PPLPC008000000530.

[87] *Id.*

329.    Regardless of what the PBM Defendants knew or did not know at the outset of their marketing activities, they continued to engage in fraudulent marketing of opioids long past the point where they had actual knowledge of the falsity of the representations they were disseminating.

### 1.    The PBM Defendants Disseminated the Opioid Manufacturers' Deceptive Propaganda

330.    Starting in the late 1990s—after granting Purdue's opioids preferred, unrestricted formulary placement in their standard offerings—the PBM Defendants partnered with Purdue and other opioid manufacturers to spread false information about opioids in order to increase opioid sales and expand the market.

331.    For example, in 1999, Medco arranged for its pharmacists to be trained by Purdue's speaker consultants regarding chronic pain management and the use of OxyContin.

332.    In 2003, internal Purdue documents show "[o]pportunities have been presented by Medco to work more closely with targeted clients within the marketplace on a client-by-client basis." These "opportunities" included developing educational programs to "stave off any formulary restrictions," disseminating Purdue created "educational" materials—including "New Perspectives on the Pharmacology of Opioids and Their Use in Chronic Pain" and Drug Diversion and Abuse: The Facts, Legal and Ethical Issues Affecting Pain Management: Fact or Fiction." Purdue

provided this information to Medco to "be used with employers and managed care plans on the appropriate utilization of [Purdue's] products."[88]

333.  During these same years, along with Medco, Express Scripts was also one of Purdue's largest customers. Notably, Medco and Express Scripts remained Purdue's largest customers for OxyContin for the years up to and following the 2012 merger of these companies.

334.  And in similar fashion to Medco, Express Scripts also worked directly with Purdue in the critical years of OxyContin growth to expand the pain treatment market through the dissemination of misinformation about the use of opioids to treat chronic non-cancer pain.

335.  For example, in 2000 and 2001, Express Scripts worked together on numerous programs to disseminate "educational" materials to tens of thousands of patients and high prescribers of OxyContin advocating for opioids in chronic pain treatment and downplaying the risks of addiction. These programs included Express Scripts engaged in mass mailings of Purdue created propaganda such as "Dispelling the Myths about Opioids," "The Impact of Chronic Pain: An Interdisciplinary Perspective CME booklet," "Overcoming Barriers to Effective Pain Management," and "Use of Opioids in Chronic Noncancer Pain CME booklet."[89] These documents contained false information downplaying the risk of addiction and promoting the use of opioids in long term chronic pain treatment.

---

[88] PPLPC012000064369.

[89]      PPLPC029000016774;     PPLPC029000020703;     PPLPC009000021694; PPLPC009000021695; PPLPC029000040033; PPLPC029000040028.

336.    In one particularly telling internal Purdue "call note," a Purdue executive discussed "developing a piece on Opioid guidelines, [New England Journal of Medicine (NEJM)] quotes, and addiction terms." Notably, the "NEJM quotes" likely refer to a one-paragraph letter that was published in the *New England Journal of Medicine* reporting an observed low rate of addiction in patients prescribed opioids for short periods in an in-patient hospital setting. (Purdue and other opioid manufacturers misrepresented this letter as a "study" and claimed that it demonstrated that the risk of addiction to opioids was low when the drugs were prescribed for long-term, outpatient use.)  The Purdue executive continued: "[l]egal has stated that [Purdue] representatives cannot utilize this [NEJM] piece. My thoughts are that this piece may be sent out by Express Scripts. Express Scripts and Purdue could target [family practitioner physicians and internal medicine physicians] who are the high writers of [DEA Schedule II and III drugs]. The mailer was intended to  educate the physician on the beneficial uses of OxyContin and the preferred formulary status."[90]

337.    A number of these joint programs between Express Scripts and Purdue were prompted by Express Scripts' desire to work with Purdue to address the negative attention that OxyContin was receiving related to abuse and diversion in the early 2000s. For example, a March 14, 2001 letter from Express Scripts to Purdue explained "[c]learly with the market turbulence surrounding OxyContin you and your organization have significant demands on your time . . . there are several strategic

---

[90] PPLPC009000021694; PPLPC009000021695.

initiatives where Express Scripts can support Purdue Pharma in your efforts to educate the market on the prescribing, administration and consumption of OxyContin."[91]

338.    These "strategic initiatives" proposed by Express Scripts included sending 15,000 "targeted" mailings to physicians which included a letter written by Express Scripts' Medical director summarizing key principles of the Purdue front group, American Pain Society, and included the Purdue-created brochures "The Patient Bill of Rights for Pain Management" and "Dispelling the Myths about Opioids" which contained misinformation about OxyContin risks, such as "addiction risk also appears to be low when opioids are does properly for chronic noncancer pain."[92]

339.    An April 2001 Purdue memo further described the reasons behind Express Scripts and Purdue's collaborations at that time: "[Express Scripts] has told us that this mailing is necessary so that [Express Scripts] may squelch the anti-OxyContin pushback from their clients (Managed Care Organizations and Employer Groups) due in large part to the national media attention OxyContin is receiving."[93]

340.    Purdue's and Express Scripts' joint efforts to expand the opioid market continued in the summer of 2001, when they used an Express Scripts "proprietary database" to identify the top 1,900 physicians with high prescribing rates for

---

[91] PPLPC028000031679.

[92] PPLPC028000031679.

[93] PPLPC029000040033; PPLPC029000040028.

Schedule 2 narcotics and then mailed these 1,900 physicians materials created by the front-group American Pain Society ("APS").[94] The mailed APS material promoted use of pain scales and the debunked, industry-advocated concept of pseudo-addiction.

341.    Express Scripts and Purdue's collaboration continued through 2004, when Express Scripts and Purdue developed a series of pain management presentations for an Express Scripts' clients, to be conducted by Purdue's Medical Liaisons, who were doctors and medical professionals employed by Purdue to promote opioid therapy.

342.    During these same years, Purdue also conspired with Optum to spread misinformation about the use of opioids to treat chronic pain and the risks of opioid addiction. One example occurred in February 2003, when UHC and OptumInsight met with Purdue to give a presentation on "Managing Chronic Pain Associated with Lower Back Pain." The goal of this presentation was to develop a comprehensive plan between Purdue, UHC, and OptumInsight to re-educate physicians on opioid use for the treatment of chronic pain and low back pain. The program included "[t]argeting physicians not aligning with UHG clinical objectives [for treating chronic pain] to modify behavior."

343.    As a result of this meeting, in 2004 OptumInsight and Purdue executed a Master Services Agreement to roll out this program in 2004-2005. The program would include Purdue, UHC, and OptumInsight working together to identify

---

[94] PDD8801134968;        PPLPC036000005057;        PPLPC036000005058; PPLPC029000045118; PPLPC021000012726.

physicians from UHC and OptumInsight's database and then developing comprehensive education materials on the effectiveness of opioids in chronic pain treatment to send to these physicians.

344.    OptumInsight and Purdue delivered this information through a series of teleconferences, newsletters, faxes, live meetings, case study monographs, letters, and website and web-based programming directly to physicians.

345.    The project, referred to as the United Healthcare Physician Education program, included the following false and misleading messages targeted at UHC prescribing physicians:

- Opioid use is associated with some moderate side effects, but the risk of drug dependence is low;

- Concerns about abuse, addiction, and diversion should not prevent the proper management of chronic and low back pain;

- Opioids are the most effective way to treat pain;

- Opioid addiction does not occur in the chronic pain patient; and

- Certain signs of dependence that sometimes can be confused with addiction are actually "pseudoaddiction."

346.    To assist in the marketing efforts of opioid manufacturers, Express Scripts and Optum have for years provided multiple opioid manufacturers with lists of all their plan clients as well as the names of physicians who were participating in the plan's provider networks. The manufacturers used this information to target the highest opioid prescribers with pull-through marketing.

347.   For example, according to one 2011 email, Endo sales representatives were instructed to "[m]aximize pull-through with key managed care plans," "[d]rive brand awareness across top [Opana ER] prescribers," and promote favorable Opana ER formulary positioning.[95] Sales representatives were also told to focus on providers "that have the most potential" and not "waste time" on other physicians.[96] Sales representatives also were dispatched to (and did) promote Opana ER formulary status to prescribers.

348.   In another example, after Endo had negotiated a favorable Tier 2 formulary deal with Optum in 2010, sales representatives were told to "present the great information" to prescribers and take advantage of the Opana ER "opportunity" for "pull through" sales.[97]

> **4. Only when all this is done should you present the great information that now,** OPANA ER is 2T, Lowest Branded Co-Pay for UHC Commercial (and Part D) patients! **Get commitment first that OPANA ER is the right choice...then show how easy it is to provide OPANA ER for these patients!**

349.   In addition, beginning in 2006, Express Scripts and Purdue entered into an ongoing "Participating Manufacturer Agreement" under which, in return for "administrative fees," Express Scripts would ██████████████████ ████████████████████████████████████████

---

[95] ENDO_OPIOID_OHAG-00030138 (1/14/11).

[96] ENDO_TXMDL_00448429 (10/4/09).

[97] ENDO-OPIOID_MDL-00719759 (3/3/10).

114

█████████████████████████████████████████████████████ Express Scripts

would also █████████████████████████████████████████████ And,

Express Scripts agreed it would provide numerous deliverables to Purdue, including

████████████████████████████████████████████ which enabled Purdue

to more effectively pull through its drugs' formulary status to physicians. The

"administrative fees" Express Scripts received were tied to the number of opioids it

sold—*i.e.*, the more opioids it sold, the more it made. This agreement was strictly

confidential. Express Scripts and Purdue renewed this agreement on at least three

occasions, and it was in place until at least the end of 2010.

350.    In 2011 and 2012, Express Scripts and Purdue collaborated on false and

misleading guidelines for workers' compensation patients to promote "safe and

effective chronic opioid therapy."[98]

351.    In fact, as late as 2017, Express Scripts gave educational presentations

on pain management that treated the risk of addiction to opioids as minimal. In a

presentation regarding "The Management of Persistent Pain in Older Persons,"

Express Scripts Vice President Andrew Behm asserted that psychological dependence

to narcotic analgesics was "rare" and that "Addiction associated with the appropriate

use of opioid analgesics is uncommon."[99] The presentation also described "physical

---

[98] *See* PPLPC012000368690 (3/8/12); PPLPC012000368687 (3/8/12).

[99] ESI_JEFFCOMO_000012632, at slide 56 (4/24/17).

dependence" as "common" and a "state of adaptation to chronic opioid therapy," and recommended fentanyl for chronic pain in older adults.[100]

352.   OptumRx also participated in a Purdue advisory board in 2013 for the "abuse deterrent" version of OxyContin, which was focused on payers in managed care. In 2016, OptumRx conducted studies for Purdue to assess the economic impact of reformulated OxyContin.

353.   OptumRx affiliates also marketed their data analytics capabilities to Purdue for research projects related to opioids, proposing, for example, to sell medical and pharmacy claims data from its "Cliniformatics DataMart" to Purdue,[101] to study patient disenrollment in Medicare Advantage plans that discontinued coverage of OxyContin ER, and to research overdoses associated with OxyContin.

## 2.   The PBM Defendants' Affiliated Entities Provided Research, Data, and Consulting to the Opioid Manufacturers to Expand the Opioid Market

354.   In addition to assisting the opioid manufacturers in spreading false information about opioids, for years the PBM Defendants and their affiliated companies provided the manufacturers with data, research, and consulting services needed to expand the opioid market.

355.   For example, in the late 1990s and early 2000s, Express Scripts' affiliate research entity, Practice Patterns Sciences, Inc. ("PPS"), and Medco's Institute for Effectiveness Research provided research and studies for Purdue in to aid its efforts

---

[100] *Id.*

[101] PPLPC018000829180 (6/6/13).

to expand the opioid market. One example occurred in 2001, when Express Scripts/PPS developed a study for Purdue on "The Value of OxyContin Therapy in Patients with Moderate to Severe Pain due to Osteoarthritis."[102]

356.   In addition, from the early 2000s until 2015, OptumInsight, a sister company of OptumRx, also helped Purdue generate clinical studies, educational materials, and marketing programs to downplay the addictive properties of OxyContin and expand its use throughout the country.

357.   In order to do so, OptumInsight was paid by Purdue to reverse engineer studies to achieve desired outcomes; create algorithms to identify potential pain patients to suggest OxyContin prescriptions; and create large-scale marketing plans to convince payors that long-term opioid usage was not only useful for many types of pain and did not lead to serious addiction for long-term opioid users.

358.   For example, in 2000 and 2001, OptumInsight (then known as Ingenix) worked with Purdue to develop algorithms and studies to identify chronic pain patients. One was an algorithm that would mine UHC's claims data called "the chronic pain patient identification algorithm."[103] The other was called "Profiling the OxyContin Patient."[104] The purpose of this study was to assist Purdue in shifting formulary discussions with PBMs/health plans from a purely per-member fiscal discussion to an overall "clinical and fiscal" benefits discussion. Purdue paid for this

---

[102] PDD8801105525.

[103] PPLPC028000016640.

[104] PKY181047060.

study, in part, to counter the recent focus in the market on "cases of diversion" and "premium pricing" of OxyContin. Purdue's goal of this study was to use the OptumInsight's "data/evidence" to demonstrate from a payer and patient perspective the clinical/financial benefit of OxyContin given the overall costs associated with the undermanagement of pain.[105]

359.   In October of 2002, OptumInsight proposed a "Chronic Pain Management" study and education initiative to present a series of teleconferences to providers in the UHG/UHC network. The purpose of this educational initiative was to "optimize patient care in the treatment of chronic pain." One of the themes of this report is that "[m]ost specialists in pain medicine and addiction agree that patients with prolong opioid therapy . . . do not usually develop addictive behavior" and to convince the providers that "[o]pioids are effective, have a low addiction potential, and may have fewer long-term side effects than other pain treatments."[106]

360.   This clinical initiative was launched by UHG that same year; UHG requested $200,000 to implement the initiative and begin targeting plans for the program. Purdue stated that while that was a big investment, that the return would be high. The study did with UHG proved overall to "significantly improve the relationship with this client" and would "provide outcomes data that can prove

---

[105] PKY181047060.

[106] PPLPC036000014773.

valuable in the future with regard to placement and pull-through for United and other major HMOs."[107]

361.   In February 2003, UHC threatened to implement a stricter quantity limit on OxyContin and other Purdue products. Purdue worked with OptumInsight to provide "new data" for June 2003.[108]. Based on the joint efforts of Purdue and OptumInsight, UHC subsequently doubled its quantity limit (to a level that Purdue stated was high enough that it should not affect OxyContin sales).

362.   In March of 2005, OptumInsight prepared an Executive Summary to Purdue for "A Usual Care, Multicenter, Open-label, Randomized, 4-month Parallel Group Trial to Compare the Impact of Therapy with OxyContin on Health Outcomes and Research Utilization in Subjects with Moderate to Severe Osteoarthritis Pain of the Hip or Knee." The purpose of the study was to present evidence to "health-system decision-makers" of the cost effectiveness of treating osteoarthritis with OxyContin.[109] OptumInsight went on to present this study on behalf of Purdue at the International Society for Pharmacoeconomics and Outcomes Research annual meeting in 2005 where it won an award.

363.   Because these studies were reverse engineered and constructed in order to advance Purdue's market share of OxyContin, in certain instances, members of the

---

[107] PPLPC035000032658.

[108] PPLPC012000057093; PPLPC012000057095.

[109] PPLPC018000065660 (this study was performed by Innovus Research Inc. As noted above, Innovus subsequently merged with Ingenix and then later was renamed "OptumInsight").

medical/health care community pushed back on Purdue's and OptumInsight's joint medical journal publications. When that occurred, the two companies worked together to respond.

364.    From 2011 through at least 2015, Purdue and OptumInsight worked together to build a comprehensive, multi-step "aspirational statement" and "evidence-generated" strategies for Butrans, OxyContin, Intermezzo, Targin, and hydromorphone.[110] The goal of this coordinated effort was to identify the best way to position these drugs with the public, patients, providers, and payors to increase utilization and maximize sales.

365.    The first phase occurred in April 2012. It included a "Product Review" for each Purdue drug to "complete a focused review of product, literature, and on-line information to establish the likely interplay between the product, competitors, and the market access and reimbursement environment."[111]

366.    The second phase occurred simultaneously in April 2012 and included "Event Mapping" which was an in-person workshop for the "Satellite [Purdue-OptumInsight] Team." The purpose of Event Mapping was to identify "significant events that will affect future evidence generation strategies."[112]

---

[110] The examples below represent OptumInsight's effort with respect to OxyContin. OptumInsight produced similar documents for Purdue for Butrans, OxyContin, Intermezzo, Targin, and Hydromorphone.

[111] PPLPC019000666914.

[112] PPLPC019000665555; PPLPC019000665974.

367.   The third phase occurred in June 2012; it was called the "Aspirational Value Proposition" phase. During this time, the group would create the "ideal value proposition statement" which "is concise, appeals to payers' strongest decision-making drivers and is evidence based to: (1) identify the burden and unmet need that OxyContin will fulfill; (2) describe the solution provided by OxyContin compared to existing treatments; (3) describe the risks of OxyContin compared to existing treatments; and (4) delineate the economic benefit of OxyContin compared to existing treatments." OptumInsight's OxyContin "value statement" was targeted at moderate to severe pain and to endorse the reformulated OxyContin as lowering abuse, addiction, and diversion rates.[113]

368.   The fourth phase occurred in September 2012. It included a "Semi Structured Payer Interview Guide for Hydrocodone, Oxycontin, Butrans to gather insight re: market access and reimbursement considerations."[114]

369.   The fifth phase, occurring in November 2012 included reviewing "Results from Payer Interviews Oxycontin, Butrans, Hydrocodone."[115]

370.   The next month, the group started the sixth phase, called "Evidence Generation Plan for OxyContin. Recommendations for a value evidence generation plan to support aspirational value proposition evidence base." OptumInsight relied on this evidence to revise the "Aspirational Value Proposition." One notable change—

---

[113] PPLPC018000697326.

[114] PPLPC020000610710.

[115] PPLP004148372; PPLPC018000742542.

removing the value proposition that "Abuse of prescription opioids (primary and secondary) has substantial impact on society." The reason behind removal was "Payers value pain management. They perceive tamper resistance and abuse deterrence as societal benefits which they cannot further impact unless all products are tamper resistant." OptumInsight's motivation behind the "Payers value pain management" was financially motivated based on aspirational statement #1 "annual total and direct costs of moderate to severe chronic pain in the US are 2- to 3-fold higher than the economic burden posed by other major conditions such as diabetes, heart disease and obesity.

371. From 2003 to at least 2012, OptumInsight conducted similar studies for other opioid manufacturers. For example, in 2012, OptumInsight did an analysis attempting to show that Suboxone film vs. a tablet formulation was superior to prevent diversion/abuse/misuse.[116]

372. Alongside the studies OptumInsight was producing for Purdue to further legitimize the proliferation of opioids without adequate controls throughout the United States, OptumHealth, a subsidiary of UnitedHealth Care ("UHC"), began

---

[116] RBP-00030919. In 2019, Reckitt Benckiser/Indivior was fined $1.4 billion for marketing of Suboxone as less-divertible and less-abusable and safer around children, families, and communities than other buprenorphine drugs, even though such claims have never been established. Indivior made these claims publicly, including to the Massachusetts Medicaid program. OptumInsight provided Reckitt Benckiser/Indivior "data/evidence" related to these marketing efforts, as well as other "data/evidence."

an "educational partnership" campaign in the early 2000s to educate nurses and case managers throughout the country on the undertreatment of pain.[117]

373. In 2004, David Rosen, an employee at Purdue, connected his father, Dr. Michael Rosen, a National Medical Director at OptumHealth from 1996-2021, with Account Executives at Purdue to begin educating the UHC and client clinical staff on how to effectively manage pain. Dr. Rosen was not only the head medical director at OptumHealth, but UHC's P&T Committee directly reported to him. His son was on the marketing team at Purdue and utilized his connection with his father to connect Purdue with OptumHealth and UHC.

374. In January 2005, Dr. Rosen coordinated with Purdue to present two major Continuing Education Programs to be given to case managers at UHC. The next month, the educational initiatives were implemented.

375. Part of the program targeted nurse practitioners, and included a presentation called "Communication to Enhance Collaboration and Outcomes."[118] The presentation was wholly endorsed and coordinated with Optum's Dr. Michael Rosen.[119] The PowerPoint presentation emphasized the "Possible Adverse Effects of Undertreated Pain" and had speaker notes to quote during the presentation that advocated for increased opioid use and stated "[i]f we continue to provide pain care as it has always been provided, patients will continue to suffer needlessly."[120] The

---

[117] PPLPC021000066876; PPLPC022000059801.

[118] PPLPC028000120866; PPLPC028000130521.

[119] *See* PPLPC020000038112; PPLPC022000050740; PPLPC022000050741.

[120] PPLPC022000051750.

same presentation was given to case managers, then expanded to UHC affiliated groups throughout the country, including to risk managers, telephone triage nurses, and every case manager.

376.   In 2006 and 2007, Dr. Rosen and Purdue worked together on multiple programs, including a program called "UHC Educate the Educator."[121]

377.   In 2009, Dr. Rosen worked with Purdue to roll out a six month "chronic pain mgmt. program" that would directly link to Purdue's "Partners Against Pain" website.[122] The program would focus on case managers for Optum throughout the country and would focus on Purdue's FACETS modules. The series would be presented by Optum Medical Directors and some Purdue employees.[123] In March 2009, Optum employees reached out to Purdue to facilitate Medical Director Faculty Forum presentations regarding pain. One of the faculty presentations was about how to treat lower back pain with opioids using one of the FACETS topics. Optum distributed the literature for the topic to medical directors. Following this, Purdue held multiple educational seminars with the Medical Directors at Optum to then disseminate this information to hundreds of case managers throughout the country via seminars and literature.

378.   In sum, the opioid manufacturers' efforts to disseminate misinformation about opioid addiction, opioid use for chronic pain, and opioids as a first-line therapy

---

[121] PPLPC012000105112; PPLPC029000207366.

[122] PPLPC028000245007; PPLPC022000260832; PPLPR001000287899.

[123] *Id.*

inappropriately expanded the opioid market. And since the 1990s, the PBM Defendants collaborated with Purdue to spread this misinformation in an effort to increase opioid utilization and sales. The result of these joint efforts (in Express Scripts own words) was the "opiate explosion: vast increase in prescribing [and] more potent formulations [of opioids]."[124]

## D. The PBM Defendants Had Access to Real-Time Data Regarding Drug Utilization Which Gave Them a Unique Vantage Point into the Opioid Epidemic

379. Express Scripts and Optum have had a front row seat to the spread of the opioid epidemic. They have watched as the number of opioids prescribed and dispensed has exploded. They were made aware of opioid epidemic through the vast amount of data they have had, the knowledge gained through their clients, manufacturers, and other entities in the health care arena, and through clinical evaluations for things such as formulary placement.

### 1. The PBM Defendants track every prescription claim they process across all the health plans they service which provided them with uniquely granular and comprehensive data.

380. Because of their business model, Express Scripts and Optum have access to an extraordinary amount of data. Express Scripts and Optum can see detailed information on individual prescribers and pharmacies, but can also aggregate that data across manufacturers, patients, pharmacies, and payors. Their visibility into these data is thus both uniquely granular and comprehensive.

---

[124] ESI_JEFFCOMO_000032900.

381. These data include information such as the volume, nature, dosage, and conditions for which health care providers are prescribing opioids to individual patients and on an aggregate basis; the volume of opioids obtained by individual patients and by geography; the pharmacies at which opioids were dispensed and the volume of opioids dispensed by geographic area, among other data. Express Scripts and Optum also had data from their own mail order pharmacies.

382. For the past two decades, Express Scripts has processed 8 to 10 million prescription claims per day—1.4 billion claims per year—for its members with hundreds of data points for each transaction. At all times since the 1990s, Express Scripts has had as much—if not more—detailed claims data on opioid utilization and prescribing than any other entity in the pharmaceutical industry.

383. Express Scripts not only collected prescription data, but also analyzed it to track utilization patterns. Since 1997 Express Scripts has compiled in-depth drug utilization analyses of its own claims data from millions of Express Scripts' members across the country in its Drug Trend Reports. Starting in at least 1999, Express Scripts Drug Trend reports reflected both Express Scripts' knowledge of increasing OxyContin and opioid utilization, as well as its understanding of the dangers of these drugs.

384. Express Scripts' ability to monitor and analyze opioid prescription data is exemplified by its 2014 "A Nation in Pain" report focusing on the opioid epidemic. The report reviewed 36 million pharmacy claims from 2009 to 2013, which illustrated the widespread opioid epidemic. In the report, ESI demonstrated its ability to identify

opioid use trends by geography, age, and gender, as well as by the prevalence of doctor and pharmacy shopping and drug cocktail use.

385. Optum (and/or its predecessors) have had access to data for its 66 million UHC and OptumRx covered lives for the duration of the relevant time period as well, processing 3.8 million prescription claims per day, or 1.4 billion a year. Before 2011, Optum had access to claims for over 75 million individuals nationwide. Since its inception, Optum has been able to track how many opioids its millions of members were receiving, including the quantity of pills, the dosing strengths, the combination of drugs being dispensed, and the travel distance of members to acquire prescription opioids. Additionally, Optum has access to clinical information for millions of patients, which includes clinical files and over 4.5 billion text notes from a member's clinical records.

386. In a presentation touting the effectiveness of Optum's opioid management program, Optum's Senior Vice President of Clinical Engagement described the power that Optum has to not only track data, but to use it to stop inappropriate opioid utilization at the pharmacy counter:

> "I have billions of claims, literally billions of claims. Every claim that we go through goes through an algorithm. This is all happening in realtime at the pharmacy. When you go to the pharmacy, in microseconds, I know if my patients are on a concurrent benzo. I know what the dose is. I know what the day's supply is. I know what other drugs they're taking, and I can have realtime [point of sale] edits going through making sure everything is happening appropriately."[125]

---

[125] Beshara Dep. 61:9-62:3 (Sept. 12, 2023).

387.    Similarly, Optum has touted its ability to use "near-real-time data feeds to integrate medical claims data into our intelligent claims engine," and boasts that "[o]ur data capabilities are structured in order to flag these individuals using both our own pharmacy claims data plus medical claims data."[126] Furthermore, OptumRx claims "[w]hen it comes to identifying at-risk patients, we get maximum leverage out of our claims-paying role as a PBM. In this capacity, we have direct insight into which patients are getting which drugs." Before 2007, Prescription Solutions (OptumRx's predecessor) had the ability to review every claim submitted by its members and "look for problem patterns and intervene with prescribers closer to the point of a member's care," including being able to identify both doctor shopping and pharmacy shopping by patients as well as other red flags such as early refills or suspicious drug combinations.[127]

388.    OptumRx has described its "comprehensive retrospective drug utilization review" ("RDUR") as "specifically designed to look for problem patterns and intervene with prescribers closer to the point of a member's care," including being able to identify both doctor shopping and pharmacy shopping by patients as well as other red flags such as early refills or suspicious drug combinations.[128] Furthermore, OptumRx claims:

> When it comes to identifying at-risk patients, we get maximum leverage out of our claims-paying role as a PBM. In this capacity, we have direct

---

[126] OPTUMRX_JEFFCO_0000004463 (8/25/20).

[127] *Id.*, at p. 5.

[128] *Id.*, at p. 5.

insight into which patients are getting which drugs. This insight feeds our RDUR capability.

The RDUR clinical opportunities directly contribute preventing progression to chronic use. For example, retrospective data helps identify "shoppers," those that are using multiple physicians, pharmacies, and/or multiple prescriptions. This is key, because when patients are using multiple prescriptions it is not uncommon to see dose escalation over time, putting them at higher risk for overdose.

The system is also looking for other patterns of high risk behavior, such as early refills, or those who are using dangerous combinations of products.[129]

389.  Optum's ability to control drug utilization was best stated by Dr. David Calabrese, Optum's Chief Clinical Officer, "we drive the ship in terms of how their drugs get used, not [the opioid manufacturers]."[130]

390.  Because of all of data they had, the PBM Defendants were aware that the volume of opioids being prescribed in the United States, and in the Plaintiffs' jurisdiction, far exceeded an amount that could possibly be justified as medically necessary or appropriate.  They knew that opioids were being overprescribed and used inappropriately, and that the Plaintiffs' communities were being flooded with an oversupply of these dangerous drugs.

391.  To make matters worse, rather than use their data to stop the public health crisis that they were watching unfold, since at least 1997, the PBM Defendants sold their detailed claims data, as well as their clients' formulary and health plan information, to Purdue and other opioid manufacturers. The opioid manufacturers

---

[129] *Id.*

[130] OPTUMRX_JEFFCO_0000360074.

then used this data to gain insight into the pharmacies and health care providers who were dispensing and prescribing their opioids (as well as their competitor's products) *and more importantly* those pharmacies and prescribers who were *not* prescribing and dispensing their products. This allowed sales representatives of Purdue and the other opioid manufacturers to have laser precision targeting high prescribers and pharmacies in order to aggressively push opioids onto the market.

392.    For as long as they have been PBMs, Express Scripts and Optum have received, compiled, and analyzed massive amounts of prescription claims data demonstrating that opioids were being over-utilized, abused, and diverted. Indeed, these PBMs had more data on and awareness of the opioid epidemic unfolding than any other entity in the pharmaceutical industry. They knew or certainly should have known for decades that opioids were causing a public health crisis.

## 2. The PBM Defendants had knowledge about the opioid epidemic and about abuse and diversion.

393.    According to the CDC, the rise in opioid overdose deaths can be outlined in three distinct waves.[131] As the CDC explains: "The first wave began with increased prescribing of opioids in the 1990s, with overdose deaths involving prescription opioids (natural and semi-synthetic opioids and methadone) increasing since at least 1993. The second wave began in 2010, with rapid increases in overdose deaths involving heroin. The third wave began in 2013, with significant increases in overdose

---

[131] Centers for Disease Control and Prevention, *Understanding the Opioid Overdose Epidemic* (Aug. 8, 2023), https://www.cdc.gov/opioids/basics/epidemic.html#three-waves.

deaths involving synthetic opioids, particularly those involving illicitly manufactured fentanyl."[132]

394.   Very recently, as of September 2023, the United States has entered the Fourth Wave of the Opioid Epidemic. A study[133] released by the Center for Social Medicine and Humanities, University of California, Los Angeles, California, USA, found that "recently, scholars have argued that the 'fourth wave' of the US overdose crisis has begun, in recognition of rapidly rising polysubstance overdose deaths involving illicitly manufactured fentanyl, with stimulants playing a key role. By 2021, methamphetamine and cocaine were the only leading co-involved substances as depicted below. This represents current 2021 trends, a culmination of a long road of crisis level addiction beginning with *prescription opioid abuse***.**

---

[132] *Id.*

[133] Friedman, J, Shover, CL, Charting the fourth wave: Geographic, temporal, race/ethnicity and demographic trends in polysubstance fentanyl overdose deaths in the United States, 2010–2021, 118 ADDICTION 12 (Dec. 2023), https://doi.org/10.1111/add.16318.



395. The following chart, depicting "Geographic, temporal, race/ethnicity and demographic trends in polysubstance fentanyl overdose deaths in the United States, 2010–2021" shows the four waves of the epidemic:



396. Express Scripts own marketing material explicitly recognized this evolution in the national opioid crisis:[134]



397. Likewise, Optum's promotional material also acknowledged these progressive stages of the opioid epidemic:[135]



---

[134] ESI_JEFFCOMO_000032900.

[135] OPTUMRX_JEFFCO_0000341787.

398. Long before the second wave of the crisis started in 2010, both Express Scripts and Optum knew that opioid abuse and misuse posed serious problems.

399. The PBM Defendants knew that opioids were addictive and carried a significant risk of serious injury or death, and they have known this for at least the past 20 years.

400. For example, both Medco and Prescription Solutions informed Purdue that they had concerns about the potential for abuse in OxyContin right out of the gate in 1997. A few years later, in early 2001, an executive of Optum's parent company, UHG, wrote to Purdue to discuss the "whole OxyContin overuse issue . . . which has been brought about by the 'heightened marketing skills of Purdue." The email continued, "I believe Purdue has acted irresponsibly in over-promoting the use of oxycodone . . . the activity has resulted in the overuse of morphine, an increase in the abuse of this narcotic, unnecessary and significant increases in pharmacy trend, and most importantly, an increase in patient morbidity and mortality."[136] In other words, Optum/UHG recognized that OxyContin was being overused and killing people in increasing numbers over two decades ago.

401. Similarly, starting in at least the early 2000s, certain Express Scripts and Medco clients also began to express concern to them about abuse and diversion issues related to OxyContin. Upon hearing from their clients, Express Scripts and Medco would often reach out to Purdue directly seeking help to quash these concerns.

---

[136] PKY181977016.

Purdue often worked with the PBM Defendants by providing research and "educational" materials downplaying the risks associated with opioid use.

402.    For example, in 2002, internal Purdue emails describe a call with Medco regarding clients who "had concerns about tablet restrictions and proper utilization of OxyContin."[137] Medco informed Purdue that "an overview of the abuse and diversion issue surrounding OxyContin would be helpful for [Medco] to respond to their customers questions/concerns."[138]

403.    In 2003, Medco's largest client, UHC, expressed concerns that "there were patients taking 960-1000 tabs of OxyContin per month" and stated that it wanted to take action "to reduce the abuse and diversion issues." Following this, Medco and Purdue worked together to compile research and data to provide to this client to alleviate these concerns.[139]

404.    Also in 2003, an Express Scripts employee gave a presentation at a 2003 conference in which that employee, while discussing OxyContin, stated, "This is a narcotic. All narcotics are addictive. In addition, this is a controlled release narcotic, so when someone would crush it up and either ingest it or inject it there was a potential for serious injury or even death."[140] This same Express Scripts employee also indicated that because patients were becoming tolerant, chronic use of opioids

---

[137] PPLPC029000063491.

[138] E01_00004716.

[139]    PPLPC028000078492;    PPLPC012000057093;    PPLPC012000057095; PPLPC029000087372; PPLPC012000064369.

[140] *See* PPLPC012000061345, 13486 (6/5/03) (family).

was occurring and patients were taking increasingly higher doses over time (sometimes referred to as "dose-creep" or "dose-creeping").[141] Following a study of opioid use in a private plan that revealed this pattern, Express Scripts conducted an internal study and "found that similar patterns were occurring . . . across ESI's book of business."[142]

405. The PBM Defendants also knew or had reason to know that opioids were being improperly marketed. They were aware, for example, that the price of at least some opioids (including OxyContin) increased as dosage increased. And when describing this dose-creeping phenomenon during the 2003 conference, an Express Scripts employee suggested that this phenomenon is not merely attributable to tolerance from chronic use—he said dose-creeping "may be reflective of detailing for this drug."[143] Indeed, a Purdue employee who attended this conference said in an email to other Purdue personnel that "[Express Scripts] is looking at the detailing of the drug. [Express Scripts] implied that there may be improper detailing by the manufacturer."[144]

406. The PBM Defendants also knew that opioids were being improperly marketed because, in 2007, Purdue pleaded guilty to criminal misbranding of OxyContin. The plea agreement identified specific representations that Purdue acknowledged were false. The PBM Defendants knew that these same

---

[141] *Id.*

[142] *Id.*

[143] *Id.*

[144] *Id.*

misrepresentations were still being used by Purdue and others in the marketing of prescription opioids. Yet they failed to use their standard formulary and UM offering to counteract the effects of this fraudulent marketing.

407.   In 2006, Express Scripts executives again recognized the abuse risk opiates posed. But Express Scripts was reluctant to implement more robust monitoring for fear of customer blowback and loss of prescription volume:[145]

| From: | Behm, Andrew (BLM) |
|---|---|
| Sent: | Monday, August 14, 2006 2:08 PM |
| To: | Gross, Amy (BLM); Colby, Andrew J. (STL) |
| Subject: | RE: Retro DUR Addictive Substances question |

No Stadol. We previously targeted all controlled substances plus Tramadol, Soma, and combos of those products.

When we enhanced the targeting, CPMs were only really interested in the opiates from an abuse perspective. I suppose we could revisit the targeting --- especially if you're aware of any new feedback --- but that will definitely impact the number of letters and volume.

408.   As early as 2008, Express Scripts acknowledged the acute diversion risk with opioids. For example, Express Scripts employee Adam Kautzner (now its President) noted the "improved street value" of brand name narcotics:[146]

**From:** Kautzner, Adam W. (EHQ)
**Sent:** Tuesday, November 04, 2008 11:32 AM
**To:** Gross, Amy (BLM); Martin, Jason (STL)
**Cc:** Boike, Jackie L. (BLM)
**Subject:** RE: file on temp transfer drive

I was afraid this was going to be your response!
Brand name narcotics may especially be interesting with their improved street value.
I will dig in my email archives for requests but haven't had many lately. Especially for QLLs.

---

[145] ESI_JEFFCOMO_000260226 (8/14/06).

[146] ESI_JEFFCOMO_000273681 (11/4/08).

409. The following slide was included in a client-facing presentation discussing the 2008 Express Scripts Drug Trend Report. The slide included speaker notes acknowledging Express Scripts' own awareness that in 2008 it needed to do something about OxyContin abuse: "We all know the abuse potential for [Oxycontin] and we knew that a solution needed to be offered to all of you here if you wanted to address it:"[147]



410. In 2009, Express Scripts received an email from a client stating, "Houston, we have a problem, and its name is Oxycontin."[148] That same year another

---

[147] ESI_JEFFCOMO_000278190; ESI_JEFFCOMO_000278192.

[148] Gross Dep. 55-56, Ex. 4; *see also* Gross Dep. 74 (discussing exhibit in same time period where ESI clinical personnel observed that "there has been quite a bit of client buzz around increasing Oxycontin use")).

large client reached out to Express Scripts regarding its desire to put into place an "aggressive PA policy" on opioids to combat "rampant abuse and inappropriate" opioid use.[149]

411.    Another example occurred in 2011, when Express Scripts Vice President of Clinical Evaluation & Policy wrote to the chair of one of Express Scripts formulary committees, stating:

> I think the overutilization of opiates continue to be a significant problem. From what I've heard, there are thoughts out there that the opiates are being greatly over-utilized by patients with chronic non-cancer pain . . . MDs should be pushing for more non-opiate pharmacotherapies and non-pharmacologic options.[150]

412.    Not only that, but the PBM Defendants were well aware for years that as many as 80% of users of illicit opioids started out using a prescription opioid. Below is a slide from a presentation by OptumRx Chief Pharmacy Officer Calabrese, quoting from a 2014 CDC study in this regard:[151]

---

[149] ESI_JEFFCOMO_000259907.

[150] ESI_JEFFCOMO_000299137.

[151] OPTUMRX_JEFFCO_0000374488 (5/8/18).



413. In 2013 Express Scripts put together the following client-facing marketing poster utilizing its own data, as well as outside sources, that not only recognized that opioid abuse was "deadlier than cocaine and heroin combined" but also recognized the pivotal role that Express Scripts plays in "collaborating to end the epidemic":



414. Express Scripts' 2014 report, "A Nation in Pain," concluded, among other things, that "[p]rescription rates for opioids increased dramatically in the past two decades . . ." and that "[o]pioid abuse is an epidemic in the U.S."[152] "A Nation in Pain" also referenced a separate ESI study that found that 40% of opioid prescriptions filled by members with employer-sponsored drug coverage between 2011 and 2012 were written by only 5% of prescribers.[153]

---

[152] "A Nation in Pain: Focusing on U.S. Opioid Trends for Treatment of Short-Term and Longer-Term Pain, An Express Scripts Report," (Dec. 2014), https://d11tr245s7jfj6.cloudfront.net/2019-08/Opioid%20Report_0.pdf.

[153] ESI_JEFFCOMO_000003092 (12/9/14).

415.   The PBM Defendants knew about the epidemic not only from their own data, but from other sources as well. One of these sources was almost surely their own P&T committees. These committees have historically been concerned with "the documented safety and efficacy of new drug formulations."[154] P&T committees are typically "comprised of physicians, pharmacists, and other clinicians" that meet regularly to keep up with the fast pace of pharmaceutical innovation.[155] Express Scripts, for example, describes its P&T Committee as "a panel of independent physicians and pharmacists in active clinical practice, representing a variety of specialties and practice settings and typically with major academic affiliations."[156]

416.   The University of Wisconsin-Madison Division of Pharmacy Professional Development lists, among its "5 Best Practices for P&T Committee Members," the need for committee members to "be informed," "be objective," and "emphasize patient-focused outcomes."[157] In particular, to stay informed, "[t]hey should regularly seek out information from reputable sources, including peer-

---

[154] Zhixiao Wang et al., "Cost-Effectiveness Analysis and the Formulary Decision-Making Process," *Journal of Managed Care Pharmacy,* Vol. 10, no. 1, pp 48–59 at p. 48 (Jan./Feb. 2004).

[155] Peri Iz, "Study of Pharmaceutical Benefit Management," PricewaterhouseCoopers HCFA Contract No. 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/0097, p. 79 (June 2001).

[156] Express Scripts Holding Company, 2017 SEC Form 10-K, at p. 5 (Dec. 31, 2017) https://www.sec.gov/Archives/edgar/data/1532063/000153206318000004/esrx-12312017x10k.htm.

[157] UW-Madison School of Pharmacy, Division of Pharmacy Professional Development, *5 Best Practices for P&T Committee Members*, (Sep. 25, 2023), https://ce.pharmacy.wisc.edu/blog/5-best-practices-for-pt-committee-members/.

reviewed journals, industry thought-leaders and the FDA."[158] With respect to being objective, the Division notes that "[f]ormulary decisions are objective and evidence-based."[159] When discussing the focus on patient outcomes, P&T committee members "should be focused on the quality, efficacy, and safety of the treatment patients receive."[160]

417.    Given this responsibility to stay informed, P&T committee members knew or should have known of the nationally available information regarding the risks of opioids. And through these P&T committees, the PBM Defendants knew or should have known that information throughout the relevant time period.

### 3.    The PBM Defendants Failed to Timely Undertake Actions to Address the Opioid Epidemic that They Helped Create.

418.    The PBM Defendants not only had knowledge of the dangers of opioids, they had the ability and the opportunity to rein in opioid access, but chose not to.

419.    As early as 2007, Prescription Solutions, OptumRx's predecessor, identified patients engaging in doctor and pharmacy shopping for opioid analgesics as part of its Narcotic DUR program. However, the scope of the Narcotic DUR was extremely narrow: to be identified by the program, a patient had to see four or more prescribers for the exact same opioid analgesic, or fill prescriptions for the exact same opioid analgesic at three or more pharmacies, within a three-month period. And even when patients were identified under these limited criteria, the action taken was

---

[158] *Id.*

[159] *Id.*

[160] *Id.*

minimal. The prescribers involved received a fax or mailing with the patient drug utilization information and materials on "appropriate opioid use"—based on guidelines by the American Pain Society and the Federation of State Medical Boards, pro-opioid front groups working closely with the opioid manufacturers.[161] These mailings, unsurprisingly, did little to change prescribing patterns; if a prescriber chose to respond, he or she could simply state that the medication use was appropriate. And if the prescriber responded that further monitoring for that patient was not needed, Prescription Solutions would exclude that patient from any subsequent reports. The program did nothing to limit the quantity of opioids the prescribers could provide, nor did it identify prescriber-level red flags, such as writing the same controlled substance prescription repeatedly or writing a high ratio of controlled substance prescriptions compared to other drugs.

420.    In a 2013 email, an OptumInsight Life Sciences consultant forwarded an article to opioid manufacturer Endo indicating that CVS was cutting opioid access for "risky" prescribers and that OptumInsight could do the same: "Within our data, we can track the physicians, their # of prescriptions within the Optum database, their patients comorbidities and conditions (e.g. do their patients have pain issues?). . .  We can also track the pharmacies as well."[162]

421.    In 2013, Catamaran, a PBM that subsequently became part of Optum, promoted its ability to identify "current as well as future at-risk patients and drive

---

[161] *See id.* at 90557 and 90560.

[162] ENDO-OPIOID_MDL-02875114 (8/26/13).

interventions in our clinical programming" based on a "dynamic rules engine that continuously scans patient data." Catamaran claimed it could identify these risks "in real time" based on just 30 days of prescription data.[163]

### a. The PBM Defendants chose not to use their claims data and their formulary and UM offerings to address overprescribing, abuse, and diversion

422. Claims data available to the PBM Defendants gave them the ability to identify opioid abuse and fraud. Having individually identifiable information for patients, physicians, and retail pharmacies allowed the PBM Defendants to analyze opioid utilization, patterns, and abuse. Yet despite having an array of available, commonly used tools to detect physician overprescribing and manage patient drug utilization, the PBM Defendants failed to timely implement opioid limits that would have drastically reduced the inappropriate prescribing and dispensing of opioids, and failed to reveal what they knew from the data they collected and analyzed so informed decisions could be made about ongoing dispensing practices and system-wide abuses. Moreover, the PBM Defendants were at the same time contracting with opioid manufacturers for payments of rebates and fees based on utilization, without restriction, of opioids.

423. The PBM Defendants have been on notice for decades that they needed to and had the ability to address the overutilization of prescription opioids, which was contributing significantly to the growing opioid crisis.

---

[163] OPTUMRX_JEFFCO_0000026040 (1/24/13).

424.    For instance, *Express Scripts' own studies dating back to at least 2002* demonstrated the effectiveness that UM tools such as prior authorizations had at decreasing inappropriate opioid overutilization.

425.    In 2002, Express Scripts researchers conducted a study to "examine the clinical and economic outcomes associated with a prior authorization (PA) requirement for OxyContin." The results of the study were: "post (PA) implementation PMPM claims and expenditures for OxyContin decreased significantly without an increase in PMPM trend. The PMPM trend in claims for other C-2 narcotics slowed. Results indicated that those who obtained PA approval were more likely to have had a pain-related diagnosis than those who did not attempt PA approval but there was no difference in pain-related health services use between the groups after PA implementation." In other words, Express Scripts' own research conducted in 2002 demonstrated that prior authorization significantly decreased inappropriate OxyContin utilization.

426.    In response to this study, Purdue executives expressed concern that the study may decrease OxyContin utilization: "The emphasis [that the study] placed on statements about areas of tolerance, safety, abuse and detailing of the product may have left the impression that other ESI Medicaid and commercial clients should consider implementation of a similar restriction on OxyContin."[164]

427.    That same year, in 2003, describing how opioids were dispensed to Medicaid patients in the State of Georgia, one Express Scripts employee noted how

---

[164] Henderson Dep. Ex. 18; Henderson Dep. Ex. 19.

the deployment of a prior authorization process significantly curtailed OxyContin use

in that state:

> Now for this particular program there was a special kind of PA [prior authorization] [for opioids] and it included quantity level limits. So what was happening in this PA was that a patient would call-in for the approval and at that time depending on their indication for short-term pain such as a fracture or long-term pain such as cancer, they would get the length of the amount of refills they get. So for the short-term they would be allotted two one-month refills for the drug. For the long-term pain they would get up to six one-month refills for the drug. So . . . we looked at the outcomes and in this case we examined pain related emergency room visits. Now understandably this is not the best way to assess a pain outcome, but we had limited data, we had to do a retrospective analysis. If we had been able to do it prospectively we would have looked at things such as quality of life and activities of daily living.[165]

428.    The result of this PA program was that, "For this client, this plan,

Oxycontin went from ranked number seven to number 14 in drugs spent after the PA

implementation."[166]  Importantly, Express Scripts "found that [these] patients who

did not receive the Oxycontin did not have a greater use of medical services[,] so there

was not an unintended medical consequence from this program."[167] And not only did

Express Scripts "think this [Georgia] program worked," but it also declared that "this

isn't just exclusive to [Express Scripts], but any PBM should be doing these things."[168]

Unfortunately, it was not until fourteen years later that Express Scripts started to

push clients to implement systemic opioid management tools.

---

[165] PPLPC012000061348 (6/4/03).

[166] *Id.*

[167] *Id.*

[168] *Id.*

429.    In 2006, Express Scripts again conducted a study on its Medicaid population that showed the effectiveness of PA's on reducing Oxycontin utilization. Specifically, a state-run Medicaid program had been concerned about the chronic use and potential abuse of OxyContin™, a Class 2 narcotic. Express Scripts also noted that "media and legislators had raised questions regarding potential abuse of OxyContin. Express Scripts implemented a prior authorization to "limit the medication to only those patients with a demonstrated medical need" and incorporated a quantity limit. At the end of a year of this program, Express Scripts found that "patients who requested a prior authorization were more likely to have a pain-related diagnosis than those members who did not request a prior authorization after being denied at the pharmacy." Express Scripts also concluded that the "prior authorization program addressed this Medicaid program's goal of fostering appropriate pain management while not increasing the use of emergency services for pain."[169]

430.    Despite knowing for decades that prior authorizations were a best practice for preventing opioid overutilization and abuse, Express Scripts failed to create or offer a standard prior authorization protocol on opioids to its clients until 2017—after the Senate had contacted Express Scripts (twice) regarding its role in the opioid epidemic.

431.    To make matters worse, Express Scripts had considered implementing a prior authorization on opioids as early as 2007. Internal Express Scripts documents

---

[169] ESI_JEFFCOMO_000306081.

reveal that Express Scripts had received "requests in 2007 for [point of sale] programs for inappropriate narcotic utilization . . . [because] a more robust standard program covering all narcotics was desired."[170] Express Scripts elected not to pursue this program.

432.    Indeed, when the FDA in 2013 removed the indication for use of long-acting narcotics to treat moderate pain, Express Scripts admitted, "we don't really have a standard OxyContin PA program. Our current UM strategies are more focused on driving preferred products and managing quantities."[171]

433.    Prior to 2017, whenever Express Scripts was questioned by federal or state governments or its own clients on what it was doing to combat opioid abuse, it pointed to its step therapy policy on long-acting opioids (LAO). This policy required a patient to try a generic opioid before the patient could be dispensed a brand opioid.

434.    However, Express Scripts knew its LAO step policy was not created to address opioid overutilization or abuse. Rather, it was merely a cost containment and stockpiling/waste measure. In fact, in 2011, Express Scripts Vice President of Clinical Evaluation & Policy, Andrew Behm, wrote to Express Scripts Clinical Director Amy Gross asking whether the following statement in the draft Drug Trend Report was true: "Possible abuse continues to concern plan sponsors. In 2010, Express Scripts initiated a long-acting opioid strategy designed to ensure that published pain-treatment guidelines are followed." Amy Gross responded:

---

[170] ESI_JEFFCOMO_000273099; ESI_JEFFCOMO_000273100.

[171] ESI_JEFFCOMO_000169781 (9/11/13).

What??? The [long acting opioid step therapy policy] has nothing to do with pain treatment guidelines. It is just generic before brand. Then we updated the OxyContin [Drug Quantity Management] to include the other long-acting meds. But again not to ensure published treatment guidelines were follow. I HATE this sentence . . .The [Step Therapy] and [Drug Quantity Management] are in place for cost-containment (generic before brand) and stockpiling/waste.[172]

435.    On its face, it is clear Express Scripts' long-acting step therapy policy was never intended to limit opioid overutilization or abuse. Generic versions of the long-acting opioids are just as addictive as the brand versions. Stepping from a generic version to a brand did not promote effective use of opioids; rather it opened the gates to the use of generic long-acting opioid given that for the most part generic versions of these drugs were unrestricted, Tier 1 status on Express Scripts' standard formularies.

436.    Express Scripts could have created a policy where the Step 1 drug for certain patients was a non-opiate product. Indeed, the same year that Express Scripts implemented its LAO step policy, Express Scripts Vice President of Clinical Evaluation & Policy, Andrew Behm acknowledged that "overutilization of opiates continue to be significant problem" and recognized that "non-opiate pharmacotherapies" should be promoted.[173] Yet, Express Scripts failed to offer a non-opiate step and opted instead to create a policy that substituted an opioid for another opioid.

---

[172] Gross Dep. Ex. 4.

[173] ESI_JEFFCOMO_000299137.

437.   Express Scripts also failed to implement this policy during crucial years when the opioid epidemic was taking root as brand opioids (such as when OxyContin which was released in 1996) were expanding the pain treatment market and were being heavily abused and diverted. Had Express Scripts implemented a step therapy policy in the early 2000s that shifted utilization from brand opioids to non-opioid pain treatments it could have had a significant impact on the opioid epidemic. But Express Scripts failed to do so.

438.   By the time that Express Scripts enacted its long-acting opioid step policy, its financial incentives with respect to opioids had shifted and Express Scripts was making more money on generic opioids.

439.   Therefore, while Express Scripts long-acting opioid policy did nothing to address the opioid epidemic, it did shift utilization from addictive brand opioids to equally addictive generic opioids that were more profitable for Express Scripts.

440.   To make matters worse, prior to 2017, Express Scripts knew that the programs it ostensibly had in place to address opioid overutilization were failing. For example, a 2015 email from the head of Express Scripts' eFWA program to Express Scripts Vice President of Clinical Evaluation & Policy stated:

> [Express Scripts Fraud, Waste, and Abuse Department] have been seeing way to many egregious drug seeking activity over the years. So much so that it is hard to defend how our systems would allow 68 control scripts by 47 physicians, and 28 pharmacies in a year for one patient. *This is one of many that we use as examples*. My thought is to try to fix this issue as well as the patient safety concern on the front end. Who could I work with around the control substance logic at POS edit? There has to be something to stop this proactively.[174] (Emphasis added).

---

[174] Nader Dep. Ex. 10.

441.    In another example, an Express Scripts fraud, waste and abuse investigation using its data mining and analytics tools for its client ███████ benefit plan found that one plan member filled 49 opioid prescriptions from 14 prescribers at 6 pharmacy locations in 14 months' time. Another ███████ member had filled 36 opioid prescriptions in just one year's time, including some 1,898 dosage units (749 days' worth) in just one year. Yet another ███████ member filled 29 opioid prescriptions in just 5 months' time. Despite these clear examples of gross over-dispensing, Express Scripts refused to change course and implement programs that it knew would have reduced inappropriate opioid utilization such as prior authorizations.

442.    Had Express Scripts created and offered a robust prior authorization program on opioids in 2007 it likely would have resulted in tens (if not hundreds) of millions of fewer opioids being dispensed throughout the country, including in Plaintiff's Community and in New York.

443.    For years, Optum also expressed concerns regarding implementing prior authorizations and offering other Utilization Management protocols because of lost profits.

444.    For example, OptumRx would frequently put PAs on opioid products that did not offer high enough rebates, and thus use the PA to steer use to "preferred" opioids—typically OxyContin products.

445.    The best example of this occurred in 2013, OptumRx created a "pay to avoid PA" program on long-acting opioids. This was not a clinical PA; instead, it was

a threat to extract higher rebates from the opioid manufacturers. The strategy was simple, make the opioid manufacturers "Pay to avoid a PA."[175] The PA only required documentation of failure of multiple other preferred opioids.[176]

446.    Clinically appropriate prior authorizations were not placed on Optum's highest selling long-acting Opioids for OptumRx until January 1, 2018, because the profitability of long-acting opioids would necessitate that *any* edit would need to be "thoroughly reviewed."[177] This required OptumRx to renegotiate all its current rebate agreements with opioid manufacturers.[178]

447.    OptumRx did not offer a standard prior authorization program targeting short-acting opioids until the launch of its Opioid Risk Management Program in late 2017, despite Optum being aware that opioid abuse was driven primarily by short acting generic opioids.

448.    Beyond prior authorizations, by no later than 2011, the PBM Defendants had been put on notice by the Centers for Medicare and Medicaid Services ("CMS") that all actors involved in delivery of healthcare in the United States needed to take steps to address the overutilization of prescription opioids, which was contributing significantly to the growing opioid crisis.

---

[175]        OPTUMRX_JEFFCO_0603451;        OPTUMRX_JEFFCO_0000014268; OPTUMRX_JEFFCO_0000184961.

[176] *Id.*

[177] OPTUMRX_JEFFCO_0000360057.

[178] Note, at this time Optum began offering its discount card partnership to these same manufacturers.

449.    In September 2011, CMS sent a memorandum to "All Part D Sponsors" (which included the PBM Defendants and/or their predecessors-in-interest) describing the agency's desire to work with them to develop policies and procedures to significantly reduce opioid abuse. This notice advised all recipients that Medicare data show overutilization of prescription opioids that is "highly indicative of drug seeking behavior due to drug abuse or diversion."[179] The PBM Defendants received the notice and were aware of the need to take action to address the opioid crisis through the use of utilization management tools. While CMS acknowledged that some Part D sponsors were employing "claim-level" controls to try to prevent opioid misuse, CMS advised that these measures do not adequately address the opioid overutilization that concerned CMS and suggested that "beneficiary-level controls" are needed, including clinical upper thresholds for appropriate dosing, beneficiary-level utilization reports that identify unusual patterns of opioid use, and denial of payment for any claims that reflect amounts in excess of appropriate clinical thresholds that cannot be justified after review.

450.    In response to feedback generated by the September 2011 notice, CMS issued another notice in December 2011. CMS assured sponsors in this notice that prompt pay regulations are not an impediment to their efforts to reduce overutilization and diversion of opioids because those regulations only apply to "clean claims" while prescriptions that raise concerns—for example, because they would

---

[179] *Id.* at 1.

exceed appropriate clinical thresholds—are not "clean."[180] This notice also encouraged sponsors, including the PBM Defendants, to self-report instances of potential fraud or abuse (*e.g.*, drug-seeking behavior) and noted that mandatory reporting may be the subject of future rule-making. And CMS also advised sponsors that, while wholesale prior authorization requirements may not be implemented for "protected class drugs," sponsors can "conduct retrospective reviews on . . . protected class drugs," and where such a review reveals that opioids are being diverted or misused, the sponsor "can require documentation to determine medical necessity and may deny payment for subsequent claims if insufficient evidence is obtained to substantiate" the legitimacy of the prior opioid prescriptions. This notice further reminded sponsors, including the PBM Defendants, that they "may conduct appropriate consultations with physicians regarding treatment options and outcomes."[181] Finally, the December 2011 CMS notice suggested that sponsors should "encourage prescribers to prescribe in less than 30 days supplies" and "promote less than 30 day prescribing of drugs that are more susceptible to abuse or diversion, especially opioids."[182]

451. Likewise, in June 2012, CMS issued a draft guidance on improving drug utilization review controls. In this guidance, CMS explained that, because of sponsor comments seeking clarification of what is expected, CMS was providing a "sample

---

[180] *Id.* at 1-2.

[181] *Id.* at 2.

[182] *Id.*at 3.

program" and "additional detail" on "how such a program could be implemented."[183] This sample program called for, among other things:

- Written policies and procedures that are updated and reviewed by plan's P&T Committee;

- Establishment of "methodology to identify potential opioid overutilizers based on drug claims data through clinical thresholds and prescription patterns set by the P&T committee that would trigger case management";

- A protocol to exclude from retrospective review persons who truly need significant amounts of opioids (cancer patients, palliative care);

- Regular communication with prescribers and beneficiaries about case management actions;

- A process for data sharing among sponsors when beneficiary/patient disenrolls voluntarily from a plan; and

- Policies and procedures for reporting to appropriate agencies when overutilization occurs.[184]

452. The CMS guidance also included sample form communications that sponsors can use in implementing programs to prevent overutilization and diversion of opioids.

453. However, even with CMS calling attention to PBM Defendants' role and responsibility to prevent opioid misuse, Defendants' internal resistance to implementing policies and procedures to significantly reduce opioid abuse continued for years. For instance, in a February 6, 2017 email, Nathan Merrill, the OptumRx Manager of Clinical UM Operations, wrote to David Calabrese, the OptumRx Chief

---

[183] *Id.* at 1.

[184] *Id.* at 2-6.

Pharmacy Officer, highlighting concerns with placing prior authorization limits on the opioids Embeda (Pfizer), OxyContin (Purdue), and Opana ER (Endo) because "these are preferred products that are tied to 'significant' rebates," and that "[b]y adding a [prior authorization] to these products we jeopardize any rebates we have contracted with the manufacturer."[185]

> **From:** Merrill, Nathan <Nathan.Merrill@optum.com>
> **Date:** Monday, Feb 06, 2017, 4:09 PM
> **To:** Calabrese, David <David.Calabrese@optum.com>
> **Subject:** RE: BIC
>
> David,
>
> Venkat had concerns about adding a PA to Embeda, Oxycontin, and Opana ER since these are preferred products that are tied to "significant" rebates. By adding a PA to these products we jeopardize any rebates we have contracted with the manufacturer. I wasn't in a position to argue so I just explained that we anticipated there would likely be concerns within this class that we would address later. With BIC scheduled for this Wednesday do you think you would be able to attend to go to battle for us on this one? I know Venkat is going to say we cannot put a PA on those 3 products and I'm not sure there is anything more I can say or do to get around this. I appreciate any feedback you might have.
>
> Thank you,

454. In a later 2017 email chain, Optum employees internally discussed whether they should implement a hard limit to morphine equivalent dosing ("MED") on OxyContin 80mg to align with the 2016 CDC Prescribing guidelines if it would mean loss of rebates. In an April 14, 2017 email from Brian Sabin, the Manager of Industry Relations, he responded they should delay implementing the formulary CDC MED limits on OxyContin 80mg to "ensure we protect rebates" because "we cannot sacrifice rebates on only the 80mg strength here" as that would mean Optum would "sacrifice rebates on *all* OxyContin scripts."[186]

---

[185] OPTUMRX_JEFFCO_0000366595 (2/6/17).

[186] OPTUMRX_JEFFCO_0000107098 (4/14/17).

> Based solely on the Purdue contract, **I would highly suggest delaying the MED implementation on all clients until 1/1/2018** – as we are doing with the new criteria – so we have time to ensure we can protect rebates. Purude has a clause built into their agreement that mandates that ALL strengths be unrestricted. So we cannot sacrifice rebates on only the 80mg strength here. We would sacrifice rebates on *all* Oxycontin scripts.

455.  Even as of 2019, Optum was still profiting from keeping OxyContin on its standard formularies. In a March 2019 email exchange, Optum Director of Industry Relations Brian Sabin asked Senior Director of Industry Relations Venkat Vadlamudi whether Optum should remove OxyContin from its formularies altogether, "rebate losses be damned," noting that Purdue "basically caused the Opioid epidemic" and Optum's continued inclusion of OxyContin on its formularies was "essentially rewarding their bad behavior." He added, "From a purely PR perspective, I think it would look good on us."[187]

> **From:** Sabin, Brian
> **Sent:** Friday, March 01, 2019 8:32 AM
> **To:** Vadlamudi, Venkat
> **Subject:** Purdue
>
> I wanted to run a possible scenario past you....
>
> What do you think, rebate losses be damned, about removing Oxycontin from OptumRx PDLs? We have a branded long-acting oxycodone available on the market. Purdue has looked awful in the news since basically 2008, they basically caused the Opioid epidemic, and we're essentially rewarding their bad behavior.
>
> From a purely PR perspective, I think it would look good on us. But I also know we don't like to announce these types of decisions.
>
> **Regards,**
> **Brian Sabin**
> Director, Industry Relations | OptumRx
> 17900 Von Karman, Irvine, CA 92614
> Office 949/988-6314
> M/S#CA016-0202
> Brian.Sabin@Optum.com
> www.optumrx.com
>
> *Our* United Culture. The way forward.
>
> ▪ Integrity ▪ Compassion ▪ Relationships ▪ Innovation ▪ Performance

---

[187] OPTUMRX_JEFFCO_0000506200 (3/4/19).

456.    Senior Director Vadlamudi replied, "We as a company looked into this, but the amount of utilization on Oxycontin and the rebates we collect prevented us from doing it."[188]  Vadlamudi then adds that "maybe we can change" if Sabin "can look into it and model the scenarios":[189]

> **From:** Vadlamudi,Venkat
> **Sent:** Friday, March 01, 2019 9:44 AM
> **To:** Sabin, Brian
> **Subject:** RE: Purdue
>
> Brian,
> Valid point. We as a company looked into this, but the amount of utilization on Oxycontin and the rebates we collect prevented us from doing it.
>
> But times are different now, if you can look into it and model the scenarios, maybe we can change..
>
> Thank You,
>
> Venkat Vadlamudi

457.    Express Scripts likewise resisted limits that threatened rebates and other fees. For example, in a 2017 email chain, several Express Scripts employees derided the fact that the effort to put a prior authorization limit on OxyContin had been overruled by the ESI Value Assessment Committee. Janelle Kuntz, the Express Scripts Clinical Director for the Office of Clinical Evaluation & Policy, stated that the decision "[w]as not sitting well with me at all," and wanted it escalated "to ensure that the rebate gain outweighs the likely erosion of our reputation." Nancy Pehl, Senior Director, Drug Evaluation Unit Office of Clinical Evaluation & Policy at

---

[188] *Id.*

[189] *Id.*

Express Scripts, responded the same day that the decision "is really sad, really disheartening" and made "[n]o clinical sense to say the least."[190]

458.  For years, Express Scripts' executives observed that efforts to address opioid overutilization with respect to Medicare  were not being offered or implemented on the commercial side. In 2014, Snezana Mahon and Amanda Dwyer commented about the fact that "what is available in Medicare is not fully available in Commercial."[191] Ms. Mahon commented that Express Scripts knew that it scored poorly in these areas and have been filling out response to an RFP for the last couple years to that effect. In response, Amanda Dwyer commented that it is "unfortunate that what is available in Medicare is not fully available in Commercial, and [Express Scripts] continue[s] to just be okay with lacking in these areas."[192] Ms. Mahon echoed these comments in 2016 during Express Scripts' "Opioid Summit" in discussing what Express Scripts needed to do to address inappropriate opioid utilization, stating, "CMS put in requirements that were [opioid] solutions that were not put into commercial because we didn't invest in the other lines of business."[193]

459.  In sum, in exchange for lucrative financial benefits from the opioid manufacturers, Express Scripts and Optum have stoked the fires of the opioid epidemic by allowing unfettered access on their standard formularies to dangerous, highly addictive opioids with minimal, if any, restrictions.

---

[190] ESI_JEFFCOMO_000029940 (3/23/17).

[191] ESI_JEFFCOMO_000095166.

[192] Id.

[193] ESI_JEFFCOMO_000109001

460. That reality, however, has not deterred PBMs from publicly touting their unique ability to alter the course of the opioid epidemic.

461. On February 18, 2018, Snezana Mahon, Express Scripts Vice President of Clinical Product Development, testified before the United States Senate Committee on Health, Education, Labor and Pensions hearing titled, "The Opioid Crisis: The Role of Technology and Data in Preventing and Treating Addiction." During the hearing, Ms. Mahon testified about out how Express Scripts had the ability to "minimize early opioid exposure and prevent progression to overuse and abuse." Ms. Mahon further testified to Congress:

> Because Express Scripts interacts with patients, pharmacies, prescribers, and payers, our company is uniquely situated to collect data when patients receive and fill a prescription for an opioid under their pharmacy benefit. *We can leverage that data across the care continuum in order to design interventions aimed at preventing opioid addiction from beginning in the first place.* With 2 million Americans addicted to prescription narcotics, and more than 1,000 people treated daily in emergency departments for misusing prescription opioids, this is a $53 billion public health crisis.[194]

462. Likewise, in 2017, OptumRx announced, "By leveraging OptumRx's clinical, analytics and administrative services and its deep connections to those who can effect change—patients, providers and pharmacists—the company is uniquely positioned to help address the opioid epidemic."[195]

---

[194] Snezana Mahon, PharmD, *The Opioid Crisis: The Role of Technology and Data in Preventing and Treating* Addiction (February 27, 2018), https://www.help.senate.gov/imo/media/doc/Mahon.pdf (emphasis added).

[195] Optum, *OptumRx Opioid Risk Management Program Leads to Better Outcomes for Patients and Clients,* (Aug. 22, 2017), https://www.optum.com/about/news/optumrx-risk-management-program-leads-to-better-outcomes.html.

463.    Optum's Chief Pharmacy Officer, David Calabrese, has made similar statements: "PBMs are uniquely positioned to connect and partner with physicians, pharmacists, patients, pharmaceutical manufacturers, health systems and other components of the industry and therefore are better able to drive improvements in education surrounding the dangers of opioid therapy, as well as the various tools available for constituents to positively change the course of this epidemic." Calabrese added, "Our nation's indiscriminate prescribing, dispensing, demand for, and consumption of prescription opioid drugs has led to a scenario in which we now consume more than 80% of the world's supply of prescription opioids and a corresponding death toll due to opioid overdose which is one of the highest in the world."[196]

464.    In March 2017, Calabrese gave a talk at a PBM trade association conference titled "Confronting the Crisis We Brought Upon Ourselves: America's Opioid Abuse Epidemic," admitting that "[w]e are all accountable . . . and all part of the solution . . .":[197]

---

[196] Managed Healthcare, *Four PBM programs poised to rein in the opioid epidemic*, (Jan. 1, 2018), https://www.managedhealthcareexecutive.com/view/four-pbm-programs-poised-rein-opioid-epidemic.

[197] OPTUMRX_JEFFCO_0000017988 (3/24/17).



465. Calabrese's presentation discusses the "most effective" way to "[c]lose the [f]loodgates" on opioid abuse would be to "capitalize on the enormous powers we have as a PBM in benefit management . . . to deploy much more aggressive interventions that limit exposure to these drugs . . . right out of the gate":[198]

So now the HOW...

From my own chair, the most effective way that I believe we can make the most immediate and most substantial impact on the rising prevalence of dependence and addiction is by capitalizing on the enormous powers we have as a PBM in benefit management, UM and POS claims adjudication edits to deploy much more aggressive interventions that limit exposure to these drugs, particularly in the opioid naïve patient, right out of the gate.

To often we see patients going home from the doctor's office after minor acute injuries, outpt procedures, and even dental visits with excessive supplies of opioid meds.

This entails...

NOT days supply limits...why?...because a 7-day supply of a drug like Percocet or Vicodin (dosed 1-2 tabs Q 3-4 hrs) still can put >100 tabs/caps into the hands of pts at max dosage
PA:
requiring PA on all opiate-naïve pts who receive a long-acting agent regardless of qty
PA on any opiate for a pt who is pregnant (concomitant prenatal vitamins)
Limiting access to long-acting opioid drugs for only select med conditions where benefits may outweigh risks

---

[198] *Id.*

466.    Among the tools Calabrese suggests is the use of OptumRx's "predictive modeling capabilities [to identify at-risk patients and monitor physician prescribing patterns] that will allow us much greater leverage in getting ahead of the problems for our members, before it is too late."[199]

467.    The data in Calabrese's presentation, which showed the severity of the epidemic and rampant noncompliance with the CDC's 2016 recommendations on opioid prescribing, were from Optum's own claims data.

468.    Speaker notes from an OptumRx sales presentation from the same time period characterize the PBM response to the opioid crisis as a "delayed reaction," declaring that "we can no longer sit idly by and watch":

> Today we are in the midst of one of the most significant healthcare crises in our nation's history, and that is our nation's opioid abuse epidemic. …

> Sadly, *unlike other crises we've faced before, this one is unique in that it is one that we have largely brought upon ourselves*. How? Through the over-promotion and over-prescribing of these drugs by our pharm mfgs and physicians; *our delayed reaction in intervening as PBMs and MCOs as our death toll rose substantially*; and our lax attitudes as a society as a whole with regard to the acceptance; consumption; sharing; storage and propere [sic] disposal of these agents when prescribed to ourselves and our family members.

> Because we all share accountability, we at OptumRx, believe we are in a unique position now (unlike that of any of our competitors) to leverage the broad capabilities across our enterprise (Rx, BH, analytics, CM, etc...) and deliver the type of end-to-end solution suite that will deliver a positive impact in decreasing *the prevalence of OUD and the fatality rate that we can no longer sit idly by and watch to continue*.[200]

---

[199] *Id.*

[200] OPTUMRX_JEFFCO_0000206573 (3/8/17) (emphasis supplied).

164

469. Despite having been "uniquely positioned" to change the trajectory of the opioid epidemic, the PBM Defendants instead sat "idly by" for years. Even when they began to take some steps to ostensibly address the crisis, Defendants themselves recognized that these measures were ineffective. For example, a July 2016 internal ESI memorandum about the upcoming "Opioid Summit" indicated that while ESI had "several tools and solutions to identify and manage opioids . . . our solutions are sometimes disjointed and lack coordinated approaches."[201] Similarly, a 2017 presentation described ESI's existing opioid solutions as "fragmented," "disjointed" and having "no clear value prop."[202] And although Optum mailed notice letters to "outlier prescribers" in late 2016, no providers were dismissed from the network as a result of the investigation, and Optum never conducted any follow-up analysis to determine whether the letters had any impact on prescribing.

### b. The PBM Defendants chose not to use their "Drug Utilization Review" tools to address overprescribing, abuse and diversion

470. The PBM Defendants also had available to them their Drug Utilization Review ("DUR") programs to control the flow of opioids but chose not to use this tool either. Internal documents from the PBM Defendants show that rebate monies had a direct impact on how the PBM Defendants managed access to opioids, including their obligations to monitor on a real-time basis through concurrent drug utilization review that only safe and appropriate opioid prescriptions would be filled.

---

[201] ESI_JEFFCOMO_000028723 (7/4/16).

[202] ESI_JEFFCOMO_000179506 (3/31/17).

471.    "Concurrent DUR" or "cDUR" involves the real-time evaluation of drug therapy and intervention, if necessary, while the patient is undergoing therapy, including screening at the point of sale for potential drug therapy problems due to therapeutic duplication, age/gender-related contraindications, over-utilization and under-utilization, drug-drug interactions, incorrect drug dosage or duration of drug therapy, drug-allergy contraindications, and clinical abuse/misuse.

472.    But they refused to use cDUR to control opioid misuse because doing so would have impacted their revenue, including receipt of rebates, income generated from opioid dispensing, and other fees. For years, the PBM Defendants have failed to deploy cDUR initiatives to ensure that only appropriate opioid prescriptions were being dispensed in pharmacies across the country (including in their own mail order pharmacies). This intentional refusal by the PBM Defendants permitted the dramatic increase in medically inappropriate prescribing and dispensing of prescription opioids that contributed to the fueling of the opioid epidemic.

473.    Even when some clients attempted to place cDUR dosage limits on excessive use of opioids, Express Scripts and Optum colluded with the opioid manufacturers to push back.

474.    Even when the FDA in 2013 removed the indication for use of long-acting narcotics to treat moderate pain, Express Scripts saw no reason to change its cDUR program, acknowledging that its strategy was "more focused on driving

preferred products and managing quantities."[203] One Express Scripts employee at the time described the FDA change as "kind of a non-event."[204]

475. Several years later, in 2016 when ESI tried to implement cDUR limits on Purdue's drugs, the manufacturer pushed back, reminding ESI that the cDUR limits (which would have restricted opioid use to acute pain, blocked opioids unless the use was for cancer or other approved uses, or required prior authorization for all opioids) would be in violation of its rebate agreement.

476. Optum, too, was unwilling to implement robust cDUR restrictions because doing so would impact its receipt of rebates. In 2017, when OptumRx tried to implement changes which would have used cDUR to control inappropriate opioid usage, there was pushback because it would mean the loss of rebates. In response to these concerns, on March 24, 2017, SVP Calabrese raised the question whether, "[i]f our opioid mfg industry partners can't appreciate the magnitude of the problem we are facing [and] the immediacy of the need for intervention[,] . . . I would question whether they are the right partner for us longer term":[205]

---

[203] ESI_JEFFCOMO_000169781 (9/11/13).

[204] *Id.*

[205] OPTUMRX_JEFFCO_0000235659 (3/24/17).

From: Calabrese, David [mailto:David.Calabrese@optum.com]
Sent: Friday, March 24, 2017 7:19 AM
To: Rogers, Kent D
Cc: Gilbertson, Jenna M [From Catamaran]; Lahman, Robert C
Subject: RE: Morphine Equivalent Dosing (MED) Edits & Trade Implications

OK. Thanks.

If our opioid mfg industry partners can't appreciate the magnitude of the problem we are facing; the immediacy of the need for intervention; and the clinical value of our efforts here, I would question whether they are the right partner for us longer term.

477. Later that same day, Robert Lahman, OptumRx SVP Industry Relations, responded that "I agree with you but you also have to be mindful of our [rebate] contracts." Lahman also warned Calabrese to "[s]top with the attitude and help us make sure we are compliant with our contracts."[206]

478. Frustrated that OptumRx would delay the changes to its use of cDUR limits resulting from what he saw as "gross overprescribing and overpromotion of these medications . . . , and the countless deaths," Calabrese later that day sent an irate response to Lahman, telling him: "Maybe you should be the one to take a step back and look at the bigger picture here. I need you on board with doing your job and convincing the [manufacturers] that we drive the ship here in terms of how their drugs get used, not them!"[207]

---

[206] *Id.*

[207] *Id.*

479.   Even when products like Opana ER were being withdrawn from the market, OptumRx refused to put a PA in place that would have prevented new patients from starting on the drug because it would "put [Optum's] rebates at risk."[208]

**From:** Calabrese, David [mailto:David.Calabrese@optum.com]
**Sent:** Thursday, July 13, 2017 10:38 AM
**To:** Lahman, Robert C; Dutta, Sumit [From Catamaran]; Rogers, Kent D
**Subject:** RE: Clinical News Summary - Opana ER market withdrawal, NovoPen Echo recall, DepoCyt discontinuation, Alkeran first-time generic

The drug is being removed from the market for clinical safety reasons.

Why, in the best interest of the patients we serve, would we allow any new patient start on this drug between now and then??

**From:** Lahman, Robert C
**Sent:** Thursday, July 13, 2017 1:24 PM
**To:** Calabrese, David <David.Calabrese@optum.com>; Dutta, Sumit <Sumit.Dutta@optum.com>; Rogers, Kent D <kent.rogers@optum.com>

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    OPTUMRX_JEFFCO_0000430032

**Subject:** RE: Clinical News Summary - Opana ER market withdrawal, NovoPen Echo recall, DepoCyt discontinuation, Alkeran first-time generic

We currently get rebates and that would put our rebates at risk.  Why would we do this before 1/1?

Bob

**From:** Calabrese, David [mailto:David.Calabrese@optum.com]
**Sent:** Thursday, July 13, 2017 5:38 AM
**To:** Dutta, Sumit [From Catamaran]; Lahman, Robert C; Rogers, Kent D
**Subject:** FW: Clinical News Summary - Opana ER market withdrawal, NovoPen Echo recall, DepoCyt discontinuation, Alkeran first-time generic
**Importance:** High

Want to deploy an off-cycle PA ASAP to prevent any new starts from going on this product?  All good with that?

---

[208] OPTUMRX_JEFFCO_0000430032 (7/19/17).

        **c.**     **The PBM Defendants failed to use their vast stores of data, their formulary and UM offerings, and their DURs to provide effective controls against diversion and/or to prevent the diversion and abuse of opioids**

480. The PBM Defendants were uniquely situated to control against the abuse and diversion of opioids, but as described above, chose not to do so.

481. As described more fully below, OptumRx provides both PBM and mail-order dispensing services. In its capacity as a mail-order dispenser, OptumRx is (and is required to be) registered with the federal Drug Enforcement Agency ("DEA"). The Controlled Substances Act ("CSA") and its implementing regulations require all registrants to provide "effective controls" against the diversion of controlled substances. 21 C.F.R. § 1301.71(a). Nothing in the CSA suggests that this obligation is limited to only certain aspects of a registrant's business. A retail pharmacy, for example, cannot satisfy its obligations by exercising controls at its dispensing counter if it is maintaining an open-air illegal drug market in its parking lot. The obligation to maintain effective controls against diversion applies to all of a registrant's activities.

482. OptumRx failed to maintain effective controls against diversion in the operation of its PBM services. On the contrary, as detailed above, at every turn OptumRx used its standard formularies, UM tools, and DUR programs to increase the supply of opioids, without regard to abuse or diversion of these drugs. OptumRx's operation of its standard formularies, UM tools, and DUR programs was thus in violation of its obligations as a CSA registrant to provide "effective controls" against diversion. This is especially true because, as detailed above, OptumRx *knew* that its

policies resulted in diversion and *knew* that changes that it declined to make would have reduced oversupply and diversion.

483. Express Scripts used different corporate entities to operate its PBM and mail-order dispensing businesses. But Express Scripts knew that prescription opioids presented serious risks of abuse and diversion and knew that its mail-order pharmacy was required by the CSA to provide effective controls against diversion. Express Scripts also knew that it was in possession of massive amounts of data that could be used to provide such effective controls, and also knew that it had a panoply of tools at its disposal – standard formularies, UM tools, and DUR programs – all of which could be used to reduce diversion. Even if the Express Scripts entities that provide PBM services are not themselves subject to DEA oversight, those entities had parallel responsibilities to operate their PBM services with appropriate care in light of the dangers of diversion that the CSA is designed to guard against. Any controls that Express Scripts Pharmacy, Inc.; ESI Mail Pharmacy, Inc. and Express Scripts Specialty Distribution Services, Inc. (all DEA registrants) provided (assuming there were any) could not be effective while its sister companies conducted their PBM activities so as to maximize the volume of opioid sales. Either way, Express Scripts had a duty to operate its PBM business in such a way as to minimize or reduce the risks that these dangerous drugs would be diverted. All of the data available to Express Scripts was also available to its mail-order dispensing affiliates, and those entities had a duty to use that data in maintaining effective controls against diversion, but they failed to do so.

### E. Two Decades After They Knew Opioids Were Causing a Public Health Crisis, Express Scripts and Optum Finally Implemented Protocols to Address the Opioid Epidemic

484.    After decades of working to increase opioid utilization, in 2017, due to mounting pressure from their clients and the federal government, Express Scripts and Optum finally implemented programs aimed at addressing opioid overutilization and abuse. Express Scripts' Advanced Opioid Management ("AOM") program started on September 1, 2017, and Optum's Opioid Risk Management ("ORM") program was offered starting in January 2018.

485.    As discussed above, as major PBMs, Express Scripts and Optum undoubtedly had knowledge of the opioid crisis years, if not two decades, earlier.

486.    Moreover, for years prior to actually implementing these programs, Express Scripts and Optum publicly touted their ability to translate the incredible amount of data it received into solutions to address pressing problems in healthcare. For example, in 2013 Forbes article titled "How Express Scripts Uses Analytics to Improve Patient Outcomes," Express Scripts Chief Information Officer, Gary Wimberly stated, "By filling 1.4 billion prescriptions per year, we have over 10 petabytes of useful data from which we can gain insights and for which we can develop solutions."[209]

487.    Express Scripts client-facing presentations echoed Mr. Wimberly's statements:

---

[209] Stacy Dep. Ex. 8.



488.     Yet, despite having access to petabytes of data for over a decade prior to rolling out the AOM (as discussed above) showing opioid overutilization and despite the PBM Defendants publicly promoting themselves as bastions of public health for years, the AOM program did not roll out to plan sponsors until 2017, at which point plans had to "buy up" to receive the program. Said another way, Express Scripts did not take action for *17 years after* it was aware of the prescription drug opioid crisis and not until after Express Scripts received an investigation inquiry from the United States Senates related to opioid overutilization and the CDC declared that addiction could occur between five days and one month.

489.     As debuted on September 1, 2017, Express Scripts's AOM 1.0 program finally provided tools (such as prior authorizations) at the pharmacy level (referred

to as "point of sale" or "POS") that Express Scripts should have been offering for decades prior. Notably, the AOM program was the first time ESI had taken any direct steps to limit the quantity or flow of short acting opioids. AOM's new POS rules included the following:

- 200 MME[210] cumulative per day limit for opioid Rx's;

- Above 200 MME requires a prior authorization (PA);

- Pharmacist is alerted at 90 MME.

490.    The limits were "cumulative" across all opioid medications prescribed to the patient/member and limiting opioid naïve patients to 7-day supply for short acting opioid (SAO) prescriptions. Further, the Enhanced Prior Approval applied across all Long-Acting Opioids (LAO), whether generic or brand. In addition, a new patient required first fill of a short acting opioid before using a long-acting opioid. AOM also included non-utilization management elements such as proactive member education (letter after first fill), Opioid Disposal Bags, and Physician care alerts (messaging via EMR on MED and other issues).

491.    Express Scripts stated that its AOM program was "designed to align with the [2016] Centers for Disease Control and Prevention Guidelines for Prescribing Opioids for Chronic Pain."[211] The program, however, did not align with the 2016 CDC Guidelines and in fact the featured limits were excessive and

---

[210] Notably, these limits were still more than twice the limits recommended by the CDC in 2016.

[211] Blair Dep. Ex. 21.

dangerous when compared to the CDC Guidelines. Nonetheless, Express Scripts claimed the following successes in first six months of the program:

- 59.5% reduction in average days' supply of opioids for first time users;

- 95.9% of prescriptions that were reprocessed because of UM edits were filled for 7-day supply or less;

- only 4.1% of prescriptions were filled for more than 7 days after prior authorization process was complete;

- 87% of new opioid prescriptions written for an LAO were subsequently filled with an SAO due to new enhanced PA program.[212]

492. As of September 2019, two years after the initial AOM rollout, Express Scripts claimed the following successes:

- 1.4 million fewer days' supply of opioids have been dispensed, while directing patients to safer, short-acting alternatives;[213]

- 40.6% reduction in average MME for new opioid users;

- 77% of patients prescribed an LAO as initial therapy were redirected to an SAO;

- 95.8% "success rate" of new members being dispensed an opioid claim at or below 90 MME.[214]

493. Subsequent AOM enhancements added new limits on fentanyl products and opioid adjacent therapy quantity limits, as well as:

- "Initial fill days' supply rule for adults initiating opioid therapy limited to a 7-days' supply for members' first 4 fills, requiring a

---

[212] Stettin Dep. Ex. 5.

[213] Express Scripts, *17.4 Million Americans Protected from a Nationwide Health Crisis,* https://www.express-scripts.com/corporate/solutions/improving-health#advanced-opioid-management (last accessed Nov. 14, 2023).

[214] Stettin Dep. Ex 12.

> prior authorization to exceed 28-days' supply in a 60-day period."[215]

- "[L]imiting the morphine equivalent dosing to 90 MME for patients starting on opioids. Existing users are limited to 200 MME, unless they receive a prior authorization for a higher dosage."[216]

494. By 2019, 17.4 million Express Scripts covered lives were enrolled in the AOM.

495. Optum began rolling out its own program in mid-2017, although key features did not launch until January 2018 due to concerns about OxyContin rebate impact. Optum's Opioid Risk Management offered a "Base Offering" which was the standard program that applied to all PBM clients at no additional fee.[217] There was no opt-in required. *Id.*

496. The ORM also included optional "Add-On components" which included narrow refill limits, hard edits as opposed to soft edits that were included in the Base Offering, and additional quantity limits on all LAOs.

497. The ORM Buy Up Clinical Programs consisted of targeted clinical programs that supplement the previous ORM components to ensure "maximum oversight and prevention of abuse or misuse." These programs each had an accompanying fee and included:

- Educational support for identified members;

---

[215] Blair Dep. Ex. 21.

[216] *Id.*

[217] OPTUMRX_JEFFCO_0000392019.

- Retrospective abused medication review, which included a daily claims review for concerning utilization patterns; and

- Intensive case management, which identified the highest risk members with potential for abuse.[218]

498. The ORM had a significant impact on opioid utilization across OptumRx's book of business. Five months after the soft launch of the ORM program, it achieved:

- 21% reduction in first-fill prescriptions exceeding the CDC dosing guidelines of <50 MED per day. This translated to a 93% compliance rate with CDC safe dosing recommendations;

- 11% reduction in first-fill acute opioid prescriptions written for durations in excess of CDC-recommended 7-day supply maximum, translating to a 92 percent compliance to safe duration;

- 5% decrease in opioid prescriptions for current chronic opioid utilizers issued for >90mg MED resulting in 97 percent compliance to safe dosing;

- 14% reduction in average dose across all short-acting opioid prescriptions; and

- 12% reduction in overall volume of short-acting opioid prescriptions.[219]

499. Notably, Express Scripts and Optum could have implemented these opioid reducing measures at any point over the past two decades as they tracked the opioid epidemic unfolding across the country. Quantity limits and prior authorizations have been used to control drug utilization since before Express Scripts and Optum were PBM. And the PBM Defendants have been using step therapy since the late 1990s.

---

[218] *Id.*

[219] *Id.*

500.    Yet, Express Scripts and Optum failed to implement their opioid programs for over a decade after their own reports, studies, and clients were alerting them to the need for an "aggressive" policy to address "rampant abuse and inappropriate" opioid use. Had Express Scripts and Optum created effective protocols to address the opioid overutilization—such as those implemented in 2017—when they first knew these drugs were causing a public health crisis, they could have significantly reduced the amount of opioids dispensed throughout the country, including in Plaintiff's Community, and reduced the harm caused by the opioid epidemic.

**F.    Even After Implementing its Opioid Risk Management Program, Optum Continued Promoting Uncontrolled Opioid Sales Through Its Cash Card and Discount Card Businesses**

501.    Optum also collects set administrative fees for every opioid paid for with either its own discard cash service or by one of its administered cash cards—which are governed by either Optum Perks, LLC or Optum Discount Card Services, LLC. Cash cards do not have to adhere to formularies, nor do they have traditional utilization management controls. Cash cards played a significant role in the opioid epidemic, as they allowed patients that submitted prescriptions which exceeded their insurance plan limits a cheaper way to access opioids.[220] Cash cards could be used by anyone to purchase opioids—including individuals who do not receive benefits from Optum or UnitedHealth Group. Optum counts individuals not receiving benefits from

---

[220] Kelly Ayotte, THE HILL, *Shut the Back Door to America's Opioid Epidemic* (July 3 2018), https://thehill.com/opinion/healthcare/395401-shut-the-back-door-to-americas-opioid-epidemic/; TEVA_WV_00077495.

Optum nor United, but still utilizing its administered cash cards, as "members" of Optum. Optum receives administrative fees and other revenue from each opioid prescription paid for with an Optum-administered cash card. Optum issues cash cards for opioids despite knowing that this allows individuals an "end run around" controls built into Optum and other payors' formularies. Further, and most importantly, cash cards are not subject to any limits, exclusions or Prior Authorization controls since members pay the entire amount of the discounted claim.

502.    Optum's cash card business focus took root in approximately 2015 when it realized that an expanded Cash Card/Pharmacy Discount service was an opportunity for revenue growth (and coinciding with the Catamaran acquisition since Catamaran had a significant cash card business). This included partnering with manufacturers, including opioid manufacturers, to further empower its cash card business.[221] They explicitly communicated that their cash card business included a lack of opioid controls. Collegium, an opioid manufacturer, declined to participate in Optum's cash card program due to the lack of opioid controls. *Id.*

503.    At the same time, Optum was advertising and encouraging individuals—whether they were Optum or United members or not—to use its various administered cash card and discount programs to purchase opioids.

504.    In 2017, while OptumRx was publicly touting its new Opioid Risk Management Program, internal documents showed that Optum was unwilling to control any prescriptions administered by Optum Perks or Optum Discount Card

---

[221] OPTUMRX_JEFFCO_0000516126; OPTUMRX_JEFFCO_0000502380.

Services, and wanted to show that there were "no restrictions on cash cards, ever."[222] When presented with the opportunity to block opioids on its cash cards in 2017, Optum calculated that it would cost the business $26 million per year and as a result, decided not to block the use of cash cards for opioid claims. By 2018, Optum served over 3.6 million cash card "members."

505.    Despite Optum's public-facing commitment to fighting the opioid epidemic, in June 2018, Optum refused to block opioid adjudication on its suite of cash cards. This included a refusal by Optum, its affiliates, and its marketing partners to cease advertising the use of Optum's suite of discount card pricing tools to pay for opioid prescriptions.[223] The stated reason for this refusal was it would "cut into it [sic] revenue/the admin fees Optum collects regarding opioids."[224]

506.    Optum was fully aware its cash cards were being used to abuse, divert, and misuse opioids at that time. For example, in 2019, David Calabrese wanted to know Optum's exposure when the FBI charged dozens of medical practitioners and pharmacies throughout the country for the illegal prescribing of opioids.[225] An analysis of those "exposure" claims showed a large number of these were cash card claims administered by OptumRx.[226]

---

[222] OPTUMRX_JEFFCO0000236339.

[223] OPTUMRX_JEFFCO_00006830937.

[224] OPTUMRX_JEFFCO_00006830937.

[225] OPTUMRX_JEFFCO_0000604618.

[226] OPTUMRX JEFFCO 0000604271.

## VI.    As Mail Order Pharmacies, Express Scripts and Optum Dispensed Opioids in Violation of the Controlled Substances Act.

### A.    The Applicable Statutes

507.    In March 2016, the CDC, in order to reduce opioid addiction, overdoses, and deaths, published specific recommendations for clinicians who prescribe opioids outside of cancer treatment, palliative care, and end-of-life care. The CDC recommendations are based on "[s]cientific research [that] has identified high-risk prescribing practices that have contributed to the overdose epidemic (*e.g.*, high-dose prescribing, overlapping opioid and benzodiazepine prescriptions, and extended-release/long-acting opioids for acute pain)."[227]

508.    Congress has found that pharmacies share responsibility for the crisis: "The opioid epidemic . . . has arisen, in part, from the diversion of prescription opioids through illegal dispensing practices at pharmacies."[228]

509.    Defendants knowingly violated their duties under the federal Controlled Substances Act ("CSA") and its implementing regulations and the New York State Controlled Substances Act ("NYCSA") and New York state pharmacy laws and regulations including but not limited to 21 U.S.C.A. §§ 829, 841, 842; 21 C.F.R. §§

---

[227] *Id*. at 3.

[228] U.S. Senate Homeland Sec. & Governmental Aff. Comm., Ranking Member's Off., *Fueling an Epidemic: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement,* at p. 4 (July 12, 2017) https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/REPORT-Fueling%20an%20Epidemic-A%20Flood%20of%201.6%20Billion%20Doses%20of%20Opioids%20into%20Missouri%20and%20the%20Need%20for%20Stronger%20DEA%20Enforcement.pdf.

1301.71, 1306.04, 1306.06; and 10 N.Y.C.R.R § 80, *et seq.,* ignoring their obligation to provide effective controls against diversion.

### 1. The Controlled Substances Act

510.    The CSA and its implementing regulations govern the manufacture, distribution, and dispensation of controlled substances in the United States. From the outset, Congress recognized the importance of preventing the diversion of drugs from legitimate to illegitimate uses. The CSA accordingly establishes a closed regulatory system under which it is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.

511.    The CSA categorizes controlled substances in five "Schedules."

512.    Schedule II (also called herein CII) contains drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence," but nonetheless have "a currently accepted medical use in treatment."[229]

513.    Schedule III contains drugs in which, although the abuse potential is less than a Schedule II drug, such abuse may lead to moderate "physical dependence or high psychological dependence." Schedule III drugs also have "a currently accepted medical use."[230]

---

[229] 21 U.S.C. § 812(b)(2).

[230] 21 U.S.C. § 812(b)(3).

514.     Schedule IV contains drugs that, although having a lower abuse potential than Schedule III drugs, still may lead to a physical or psychological dependence when abused.[231]

515.     Schedule V contains drugs that, although having a lower abuse potential than Schedule IV drugs, still may lead to a physical or psychological dependence when abused.

516.     The CSA makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" except as specifically authorized.[232]

517.     Accordingly, the CSA requires those who manufacture, distribute, or dispense controlled substances to obtain a registration from the DEA.[233] A registrant is only permitted to dispense or distribute controlled substances "to the extent authorized by their registration and in conformity with the [CSA]."[234]

518.     An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription within the meaning and intent of the CSA.

519.     At all times relevant to this Complaint, Defendants have registered their mail order pharmacies with the DEA in Schedule II–V controlled substances. Those DEA registrations authorize Defendants'-owned pharmacies to "dispense"

---

[231] 21 U.S.C. § 812(b)(4).

[232] 21 U.S.C. § 841(a)(1).

[233] 21 U.S.C. § 822(a).

[234] 21 U.S.C. § 822(b).

controlled substances, which "means to deliver a controlled substance to an ultimate user … by, or pursuant to the lawful order of, a practitioner."[235]

520.    In the case of Express Scripts, the entities that are registered with the DEA are Express Scripts Pharmacy, Inc.; ESI Mail Pharmacy, Inc. and Express Scripts Specialty Distribution Services, Inc. In the case of Optum, the registered entity is OptumRx, the same entity that performs PBM services.

521.    Agents and employees of a registered manufacturer, distributor, or dispenser of controlled substances, such as a pharmacist employed by a registered mail order pharmacy like those owned by Defendants, are not  required to register with the DEA "if such agent or employee is acting in the usual course of his business or employment."[236]

522.    Under the CSA, the lawful dispensing of controlled substances is governed by 28 U.S.C. § 829 and more specifically in Part 1306 of the CSA's implementing regulations.

523.    Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician, except in an emergency. Similarly, unless directly dispensed, no Schedule III or IV controlled substance may be dispensed without a written or oral prescription from a practitioner.

---

[235] 21 U.S.C. § 802(10), *accord* 21 U.S.C. § 823(f).

[236] 21 U.S.C. § 822(c)(1).

524.     Such a prescription for a controlled substance may only be issued by an individual who is (a) "authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession" and (b) registered with the DEA.[237]

525.     A prescription, whether written or oral, is legally valid under the CSA *only* if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."[238] Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment … is not a prescription within the meaning and intent of [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."[239]

526.     As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."[240] Thus, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

---

[237] 21 U.S.C. § 822; 21 C.F.R. § 1306.03.

[238] 21 C.F.R. § 1306.04(a).

[239] *Id.*

[240] *Id.*

527.    Moreover, "[a] prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually, or employed in a registered pharmacy…."[241]

528.    Pharmacists are therefore permitted to dispense a controlled substance in any given instance if, *but only if*, such dispensing would be in accordance with a generally accepted, objective standard of practice—*i.e.,* "the usual course of his [or her] professional practice" of pharmacy.[242]

529.    Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose.

530.    Unlawful dispensing of controlled substances by a pharmacist may subject the pharmacy or pharmacist to criminal actions and to civil enforcement actions for money penalties or injunctions.

531.    A pharmacy also needs to know there is a corresponding responsibility for the pharmacist who fills the prescription. The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing.  A pharmacist's corresponding responsibility extends to the pharmacy itself.

---

[241] 21 C.F.R. § 1306.06.

[242] *Id.*

532.  A pharmacy's registration can be revoked because its pharmacists have violated the corresponding responsibility rule and both the pharmacy and pharmacists may be the subject of further discipline.

533.  In addition to the CSA, Defendants were also required to comply with New York State Controlled Substances Act and pharmacy regulations, including, but not limited to, 10 N.Y.C.R.R § 80, *et seq.*  Express Scripts and Optum failed to meet these obligations.

## 2. Pharmacies Are Obligated Not to Fill Prescriptions Until All Red Flags Are Resolved

534.  A pharmacy cannot ignore red flags indicative of abuse and diversion. On the contrary, "a pharmacist is obligated to refuse to fill a prescription if he knows or has reason to know that the prescription was not written for a legitimate medical purpose."[243] "[W]hen prescriptions are clearly not issued for legitimate medical purposes, a pharmacist may not intentionally close his eyes and thereby avoid actual knowledge of the real purpose of the prescriptions."[244] Thus, § 1306.064 requires "pharmacists [to] use common sense and professional judgment," which includes paying attention to the "number of prescriptions issued, the number of dosage units prescribed, the duration and pattern of the alleged treatment," the number of doctors writing prescriptions and whether the drugs prescribed have a high rate of abuse or

---

[243] Medic-Aid Pharmacy, Revocation of Registration, 55 Fed. Reg. 30,043-01, 30,044, 1990 WL 328750 (Dep't of Just. July 24, 1990).

[244] East Main Street Pharmacy, Affirmance of Suspension Order, 75 Fed. Reg. 66,149-01, 66,150, 2010 WL 4218766 (Dep't of Just. Oct. 27, 2010).

diversion.[245] "When [pharmacists'] suspicions are aroused as reasonable professionals," they must at least verify the prescription's propriety, and if not satisfied by the answer they must "refuse to dispense."[246]

535. Courts, too, have recognized the obligation of pharmacies not to dispense until red flags are resolved.[247] In *Medicine Shoppe-Jonesborough*, the Sixth Circuit affirmed a pharmacy's liability for filling false or fraudulent prescriptions for controlled substances, concluding that the pharmacy violated § 829 of the CSA and 21 C.F.R. § 1306.04. The Court held "[t]he CSA forbids a pharmacy to dispense a Schedule II, III, or IV controlled substance without a prescription, 21 U.S.C. § 829(a)-(b), which 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice,' 21 C.F.R. § 1306.04(a)."[248] Prescriptions that "involved excessive" quantities of drugs and "remedies outside the prescriber's ordinary area of practice" "should have raised red

---

[245] Ralph J. Bertolino, d/b/a Ralph J. Bertolino Pharmacy, Inc., Revocation of Registration, 55 Fed. Reg. 4,729-01, 4,730, 1990 WL 352775 (Dep't of Just. Feb. 9, 1990).

[246] *Id.*; *see also* Townwood Pharmacy, Revocation of Registration, 63 Fed. Reg. 8,477-04, 1998 WL 64863 (Dep't of Justice Feb. 19, 1998); Grider Drug No. 1 & Grider Drug No. 2, Decision & Order, 77 Fed. Reg. 44,070-01, 2012 WL 3027634 (Dep't of Justice July 26, 2012); The Medicine Dropper, Revocation of Registration 76 Fed. Reg. 20,039-01, 2011 WL 1343276 (Dep't of Justice Apr. 11, 2011); Medicine Shoppe-Jonesborough, Revocation of Registration, 73 Fed. Reg. 364-01, 2008 WL 34619 (Dep't of Justice Jan. 2, 2008); United Prescriptions Services, Inc., Revocation of Registration, 72 Fed. Reg. 50,397- 01, 50,407-8, 2007 WL 2455578 (Dep't of Just. Aug. 31, 2007).

[247] *See Med. Shoppe-Jonesborough v. Drug Enf't Admin.*, 300 F. App'x 409, 413-14 (6th Cir. 2008); *United States v. Henry*, 727 F.2d 1373, 1378-79 (5th Cir. 1984); *Holiday CVS, L.L.C. v. Holder*, 839 F.Supp.2d 145, 160 (D.D.C. 2012).

[248] *Med. Shoppe-Jonesborough*, 300 F. App'x at 412.

flags at Medicine Shoppe."[249] "By filling these prescriptions anyway. . . the pharmacy not only violated its duties under federal (and state) law to ensure that only proper prescriptions were filled but also put public health and safety at risk."[250]

536. The MDL Court has addressed this very issue. The Court unequivocally stated that "[t]here is no question that dispensers of controlled substances are obligated to check for and conclusively resolve red flags of possible diversion prior to dispensing those substances."[251]

537. In fact, the MDL Court found that the corporate parents of chain pharmacies have an affirmative obligation under the CSA to "design and implement systems, policies, or procedures to identify red flag prescriptions."[252] The Court reasoned that pharmacies "cannot collect data as required by the statute, employ a licensed pharmacist as required by the statute, identify red flags as required by Agency decisions, but then do nothing with their collected data and leave their pharmacist-employees with the sole responsibility to ensure only proper prescriptions are filled. Possessing, yet doing nothing with, information about possible diversion would actually facilitate diversion, and thus violate the CSA's fundamental mandate that '[a]ll applicants and registrants shall provide effective controls and procedures

---

[249] *Id*. at 413.

[250] *Id.*

[251] *In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. 3d 613, 629 (N.D. Ohio 2020), clarified on denial of reconsideration, No. 1:17-MD-2804, 2020 WL 5642173 (N.D. Ohio Sept. 22, 2020). *See also City and Cnty. Of San Francisco v. Purdue Pharma L.P.*, 620 F.Supp.3d 936, 960 (N.D. Cal. 2022).

[252] *In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. at 630.

to guard against theft and diversion of controlled substances.'" 21 C.F.R. § 1301.71(a) (emphasis added)."[253]

### 3. The CSA Applies to All Persons Who Dispense Controlled Substances

538. Courts have found that because the plain language of § 842 extends its requirements to "all persons," registrants and non-registrants alike are responsible for complying with the law.[254] Importantly, in those cases, the courts found that because the pharmacy owners, who were not registrants, essentially operated the facilities on a day-to-day basis, they were not exempted from the requirements of Section 842.[255]

539. At least one court has explicitly held that a non-registrant pharmacy owner can be held liable for dispensing controlled substances without valid prescriptions. In *United States v. City Pharmacy*, the court found that the owner of the pharmacy could be held liable in his personal capacity for violations of Section

---

[253] *Id.*

[254] *See United States v. Blanton*, 730 F.2d 1425, 1434 (11th Cir. 1984) (Section 842(a)(5) applied to a physician who was not properly registered with the DEA); *United States v. Clinical Leasing Serv., Inc.*, 759 F. Supp. 310, 313-14 (E.D. La. 1990), *aff'd*, 925 F.2d 120 (5th Cir. 1991) ("Had Congress intended to limit the applicability of § 842(a)(5) to registrants only, it would have done so"); *United States v. Stidham*, 938 F. Supp. 808, 814 (S.D. Ala. 1996); *United States v. Poulin*, 926 F. Supp. 246, 250, 253 (D. Mass. 1996).

[255] *Stidman*, 938 F. Supp. at 809, 814 (the owner of a clinic, who was not a registrant, could be liable because he "shouldered [the] responsibility [to provide a system for the control of drug traffic and to prevent the abuse of drugs] and derived the benefits and profits from operating a methadone clinic."); *Poulin*, 926 F. Supp. at 249, 253 ("Although Mattapoisett Pharmacy, Inc. was listed as the registrant, the statute specifically makes the stated obligations to produce required records applicable to all persons, not simply to registrants.").

190

842(a)(1) even though he was not a registrant and the pharmacies he owned were separately incorporated.[256] The United States brought an action alleging that City Pharmacy LLC and City Pharmacy of Charles Town, Inc. violated Section 842(a)(1) by filling illegitimate prescriptions for controlled substances that raised one or more red flags, such as customers traveling long distances or customer receiving drug cocktails.[257]

540. The court held that Section "842(a)(1) applies to non-registrants."[258] The court continued, explaining that "because part C of the CSA applies broadly to all persons involved in the manufacture, distribution, and dispensing of controlled substances, including lay-persons, defendant Lewis may potentially be held liable for his conduct."[259] To support its conclusion, the court concentrated on defendant Lewis' involvement with the pharmacies at issue, looking specifically at his investment of the funds to organize and open the pharmacy, the active role he played in the management of the pharmacies, including overseeing the finances of the pharmacies, managing personnel, and delivering prescriptions to customers.

541. The *City Pharmacy* court also found that the individual defendant could not use the pharmacies' separate incorporation to shield himself from CSA liability. Evaluating various legal mechanisms for piercing the corporate form, the court

---

[256] *United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2016 WL 9045859, at *4 (N.D. W.Va. Dec. 19, 2016).

[257] *Id*. at *1.

[258] *Id*. at *2 (citing *United States v. Moore*, 423 U.S. 122, 134 n.11 (1975) and *United States v. Stidham*, 938 F.Supp. 808, 813-814 (S.D. Ala. 1996)).

[259] *Id*. at *3.

191

concluded that the pharmacies "were being used to evade the legal requirements within and undermine the public policy foundations of the CSA."[260] Thus, the court held, "given the nature of these criminally-grounded allegations, it is not a defense to liability in this case for defendant Lewis to assert that he is shielded by the corporate form. [The pharmacies] were allegedly the entities used to evade and subvert the requirements of the CSA."[261]

542.     Just like the defendant in *City Pharmacy*, as alleged more fully herein, Defendants have invested the funds to organize and open their mail order pharmacies and play a very active role in the management of those pharmacies, including overseeing the finances of the pharmacies, managing personnel, and delivering prescriptions to customers.

---

[260] *Id*. at *4.

[261] *Id*.; *see also Poulin*, 926 F. Supp. at 253 ("Mattapoisett Pharmacy, Inc. is also the alter ego of its sole owner, David Poulin, and thus David Poulin cannot use the corporate name to shield himself from personal liability."); S & S Pharmacy, Denial of Registration, 46 Fed. Reg. 13,051-03, 13,052, 1981 WL 96125 (Dep't of Justice Feb. 19, 1981) ("[T]he Administrator has in the past looked behind the corporate-veil to revoke or deny a registration when a responsible official of a corporate registrant has been convicted of violating the laws relating to controlled substances."); *United States v. Robinson*, No. 12-20319-CIV, 2012 WL 3984786, at *7 (S.D. Fla. Sept. 11, 2012), (finding a non-registrant owner of a pharmacy could be held liable for violations of Section 842 because the defendant was "alleged to have had responsibility over the controlled substances" and holding that "[w]here corporate officers have been in a position to prevent or correct the violations at issue, courts have found that there is individual liability under the [Section 842], which plainly applies to all 'persons.'"); *United States v. Ahmad*, No. 4:15CV-181-JM, 2016 WL 11645908, at *3 (E.D. Ark. May 2, 2016), *aff'd sub nom. United States v. United Pain Care, Ltd.*, 747 F. App'x 439 (8th Cir. 2019) (an owner receiving the "benefits and profit" of a pharmacy, but who was not a registrant or a medical professional, can be liable for violations of the CSA because he was still "responsible for making sure that [CSA] requirements were met.").

## B. Defendants Violated the Controlled Substances Act

543. At all times material hereto, DEA registrants like the PBM Defendants had the duty to "provide effective controls and procedures to guard against theft and diversion of controlled substances."[262] Diversion includes the use of medication outside the usual course of professional practice.

544. The DEA has repeatedly emphasized that, as DEA registrants, pharmacies like those owned by the PBM Defendants are required to implement systems that will detect and prevent abuse and diversion and must monitor for red flags of abuse and diversion. The DEA has also repeatedly affirmed the obligations of pharmacies to maintain effective controls against abuse and diversion in regulatory action after regulatory action. According to the DEA, pharmacists are the "[l]ast line of defense."[263]

545. The framework of state and federal statutes and regulations, along with industry guidelines, make clear that pharmacies like those the PBM Defendants own are expected to use specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription narcotics and of the risks and dangers of the abuse and diversion of prescription narcotics when dispensing of medications outside the usual course of professional practice.

---

[262] 21 C.F.R. § 1301.71(a).

[263] *See* Thomas W. Prevoznik, *Birmingham Pharmacy Diversion Awareness Conference, DEA Perspective: Pharmaceutical Use & Abuse,* at 139-40 (Mar. 28-29, 2015), https://web.archive.org/web/20160418074249/https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/conf_2015/march_2015/prevoznik.pdf.

546.    Defendants were on notice that case law and administrative proceedings interpreting the CSA clearly required that their pharmacies must recognize and resolve all "red flags" indicating addiction, abuse and diversion, such as criminal, civil, or administrative actions pending against the prescriber, pattern prescribing, pharmacy shopping, doctor shipping, high abuse potential prescriptions, drug cocktails, *etc.*

547.    It is not just the single red flags that make the suspicious prescriptions unresolvable, but frequently the fact that there are multiple red flags at one time. So, rather than just looking for unresolvable single red flags, Defendants should have been looking for instances when there are multiple red flags in combination, which would make these truly unresolvable. According to *Holiday CVS*:

> Professor Doering specifically identified such red flags as. . . ; the respective locations of the patient and the prescriber . . . ; that a prescriber writes for certain combinations or patterns of drugs. . . .; and multiple patients presenting "prescriptions for the same drugs, the same quantities . . . from the same doctor without any kind of variability or change considering the different patients that come into the pharmacy," thus suggesting that the physician prescribes in a "factory like manner." *Id.* Professor Doering reviewed the various spreadsheets of the prescriptions dispensed by Respondents and testified regarding whether Respondents could have lawfully dispensed various prescriptions given the red flags they presented.[264]

548.    Nor would Defendants be able to dispense a prescription with multiple red flags by simply making a call to the prescriber. According to *Holiday CVS*:

> Doering explained that the pharmacist examines multiple red flags collectively, and testified that, in his opinion, contacting the prescribing physician and/or obtaining a diagnosis code would not resolve these red flags to a degree where the medications should have been dispensed. Tr. 792–93. Doering agreed that he did not know what

---

[264] *Holiday CVS*, 77 Fed. Reg. at 62,318.

measures, if any, the Respondents' pharmacists took to resolve any conflicts, or whether a patient history screen was consulted prior to the dispensing event. Tr. 868, 873. When pressed on whether the distance red flags were potentially explainable under various hypothetical scenarios involving vacation and travel, Doering had this to say: "The kinds of medications that we're talking about here are for chronic health problems and not acute health problems. So, it would be unlikely that someone comes to Florida on vacation, breaks a leg, and has to get oxycodone in these quantities and in these strengths. So it just doesn't add up."[265]

549.    At all times material hereto, Defendants have been in the position to recognize those red flags listed above. All or some of those red flags were frequently present in hundreds of thousands of prescriptions its pharmacies received during the relevant time period and should have caused the PBM Defendants' mail order pharmacies to refuse to fill prescriptions and/or report the behavior. However, Defendants failed to do so.

550.    The PBM Defendants, as sophisticated owners of multiple mail order pharmacies, had the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations. Each PBM, including Defendants, tracks every prescription claim it processes across all the health plans it services. Furthermore, Defendants could aggregate these data across various entities in the pharmaceutical supply chain, including drug manufacturer, pharmacies, insurers, and patients. Their own data would have allowed Defendants to observe patterns or instances of dispensing that are potentially

---

[265] *Id*. at 62,334.

suspicious, of oversupply in particular stores or geographic areas, and of prescribers or facilities that seem to engage in improper prescribing.

551. Rather than use their data to limit problematic opioid utilization or investigate outlier prescribers, Defendants sold the data to third-party vendors who in turn resold the data to drug makers like Purdue Pharmaceuticals. Drug makers used these data to stoke increased sales of opioid drugs to physicians throughout America to treat the "fifth vital sign"—requiring healthcare providers to ask every patient about their pain, given the perception at the time that pain was undertreated. Since that time, the U.S. has experienced a surge in opioid prescriptions—and, subsequently, an increase in overdoses and deaths tied to these painkillers.

552. Yet, Defendants did little to leverage their resources and troves of information to stop or further question the wildly inappropriate prescriptions being written by prescribers until well after the opioid epidemic had reached its peak.

553. Defendants did little to fulfill their duties as the last line of defense and failed to ensure that the prescriptions they were filling were issued to legitimate patients for legitimate medical purposes by practitioners acting in the usual course of professional practice, as is evident by the copious amounts of opioids being dispensed by Defendants' mail order pharmacies throughout the United States.

554. The absence of controls against diversion is not surprising, given how the PBM Defendants' mail-order pharmacies operated to push virtually all prescriptions out the door, with little or no attempts at identifying or resolving red

flags. The pressure on its pharmacists to fill large volumes of prescription made the performance of appropriate due diligence difficult, if not impossible.

555.    For instance, employees at Express Scripts and Optum mail order pharmacies routinely complain of being under significant pressure to fill as many prescriptions as possible in as short amount of time as possible. In this vein, Express Scripts instituted a "point system" that governed the prescription-filling process in its mail order facilities. Under the point system, employees were awarded points for each prescription processed, and were given daily, weekly, or monthly point targets to reach. Employees would be able to leave early if a daily point threshold was reached and were penalized if specific point targets were not reached. Continuous point shortfalls would result in employees being placed on a "termination plan" or resulted in receiving other types of reprimands, up to and including termination.

556.    This point system has acted as a carrot and stick for Express Scripts' pharmacists and technicians to fill as many opioid prescriptions as possible in as little time as possible, despite legal requirements to properly and adequately identify and resolve red flags.

557.    Activities such as placing calls to physicians or patients to verify prescription information were also strictly monitored for timing and efficiency, which came at the expense of meeting industry safety standards. For prescriptions that required phone calls to verify certain information, Express Scripts required employees to make and complete 12 calls per hour (or 1 call every 5 minutes) to meet certain point goals. Employees who engaged in calls that exceeded acceptable time

197

limits were often berated or penalized by management. Employees expressed feeling extreme pressure to fill prescriptions at all costs, which reflected Express Scripts' goal of trying to fill everything it could as quickly as possible.

558.    Optum's mail order pharmacies had many of the same problems. Many pharmacists and technicians were fielding upwards of 100 calls a day regarding things like prior authorizations. Even though not all calls dealt specifically with opioids, the sheer volume and pace of the calls hindered pharmacists' ability to vet each prescription carefully, as required by law.

559.    Optum also required its prior authorization pharmacists to adhere to strict metrics concerning the number of cases per hour. The minimum number of cases to complete was set at seven cases per hour. This number of cases is unrealistic for a pharmacist to complete accurately and put undue pressure on pharmacists.

560.    Optum prior authorization pharmacists described a pressure-filled environment to meet prior authorization quotas and address the queue of prior authorization requests. Prior authorization pharmacists were timed based on how many they reviewed per day and were ranked based on the number of requests they reviewed.

561.    The pressure on mail order pharmacists was compounded by the constant threat of audits at Optum. Pharmacists were always under pressure because they were subjected to weekly audits to ensure they were meeting the required metrics. The audit would document not only total cases worked during the week, but there would be comments on mistakes, what cases were incorrect, or if any wrong

decisions were made. The consequences of a bad audit often included termination for the pharmacist.

562.  In 2017, OptumRx SVP David Calabrese emailed his colleagues that unless OptumRx addressed its mail-order opioid dispensing, "[w]e are only contributing to the worsening of the problem."[266] He noted that OptumRx was dispensing "220K opioid Rx's out of our mail facilities annually at an average number of units per Rx of 187" and warned that "[w]e are talking out of both sides of our mouths if we allow this to continue as it is."[267] Calabrese wrote, "I strongly believe this needs Exec level attention."[268]

563.  An OptumRx presentation from 2018 admits that it is a "[c]hallenge for individual rphs to identify controlled substance diversion in mail order setting," and that, prior to implementing a drug of concern review in 2018, OptumRx's pharmacists had "[n]o visibility of possible diversion indicators such as: Multiple patients with same shipping address [and] Multiple patients with same email address."[269] The document also acknowledged, "Due to lack of visibility diversion activity may occur repeatedly for an extended period of time."[270]

564.  Given that Optum and Express Scripts' mail order dispensing policies prioritized speed and efficiency above all else, some employees reported complete

---

[266] OPTUMRX_JEFFCO_0000366858 (3/10/17).

[267] *Id.*

[268] *Id.*

[269] OPTUMRX_JEFFCO_0000385779 (7/11/18).

[270] *Id.*

mental and physical exhaustion, continuous fear of disciplinary action, and an unrelenting pressure to fill higher volumes of prescriptions in even shorter amounts of time.

565. Defendants' mail-order pharmacy entities were subject to DEA regulatory action for their failures to implement appropriate controls on dispensing. For instance, on May 15, 2012, Express Scripts Pharmacy Services, Inc. agreed to pay the United States $2.75 million to resolve allegations under the Controlled Substance Act.[271] Among the allegations was that from 2002 through 2006, drug diversion occurred at several Express Scripts mail order facilities, including facilities in Bensalem, PA and Harrisburg, PA. Express Scripts experienced theft by employees of controlled substances, had inventory discrepancies, and failed to report in-transit losses to the DEA. According to the DOJ press release, from 2004 through 2009, Express Scripts employees utilized invalid DEA numbers in Express Scripts' computerized prescription processing system in order to process certain controlled substances prescriptions at all of its mail order facilities.

566. As part of the settlement, Express Scripts was required to develop a comprehensive Controlled Substances Security Compliance Plan that included diversion protection measures far beyond those required by law, including improved physical security, enhanced inventories, reconciliations and audits, employee

---

[271] Press Release, *United States Settles With Express Scripts Over Diversion Of Controlled Substances And Use Of Improper DEA Numbers*, U.S. Attorney's Office, E.D. PA. (May 15, 2012), https://www.justice.gov/archive/usao/pae/News/2012/May/esi_release.htm.

background checks, and mandatory training for employees who have contact with controlled substances. Express Scripts executives, including the General Manager of Pharmacy Operations and the Chief Compliance Officer, were required to certify compliance with the terms of the Plan. In addition to the measures to protect against diversion of controlled substances, Express Scripts was also required to cease use of phony DEA numbers and agreed to set up an automated system to check the validity of prescribers' DEA and NPI (National Physician Identifier) numbers against a national registry.

567. In addition, as discussed above, starting in the 1990s and continuing for decades, Express Scripts and/or its subsidiaries (e.g., Express Scripts Specialty Distribution Services, Inc.; Express Scripts SDS; HealthBridge, United BioSource LLC; Curascript) also worked as the administrator (e.g., processing applications, patient enrollment, patient approval, handling appeals, tracking and analyzing program data, adverse event reporting, etc.) and/or mail order pharmacy for manufacturers' opioid Patient Assistance Programs ("PAPs"), including for the troubled Purdue (OxyContin, OxyIR) and Endo (Opana) PAPs. In connection with its PAP dispensing for Purdue and Endo, Express Scripts routinely violated the CSA by failing to ensure that only valid prescriptions were filled, failing to provide effective controls against diversion, and/or purporting to delegate its CSA responsibilities to the manufacturers funding the respective PAPs.

568. In connection with its opioid PAP and mail order dispensing and administration, Express Scripts routinely ignored clear indications of diversion, filled

suspicious prescriptions, and/or improperly made opioid dispensing determinations at the direction of and/or with the inappropriate input/approval from the manufacturers funding the respective PAPs. The extent to which manufacturers controlled and/or had improper input into Express Scripts' dispensing practices is illustrated by the fact that the parameters for the opioid PAP created by Purdue and Express Scripts allowed a single patient to receive an astonishing 360 tablets of OxyContin and 3,000 tablets of OxyIR a month.

569. Express Scripts' administration and improper dispensing practices relative to Purdue's and Endo's PAPs helped make the respective programs very successful marketing tools to increase opioid use, drive volume, and facilitate access to opioids including OxyContin, Opana, as well as other opioid products - resulting in Express Scripts filling 1 million+ opioid prescriptions and dispensing 100 million+ opioid pills throughout the country through these PAPs. As an illustration, in the early 2000s, Express Scripts was enrolling over 3,000 new patients per month for Purdue's PAP. Moreover, from at least the early 2000s, Express Scripts knew or should have known about the ongoing and growing misuse and diversion of opioids, and/or that its opioid PAP work was causing opioid over-prescribing, over-dispensing, addiction and/or abuse, as well as the fact that it was a proximate cause of opioid diversion.

570. The Purdue and Endo PAPs, and Express Scripts' administration and dispensing practices relative to same, raised numerous red flags, including dispensing large amounts of opioid to individuals, failing to conduct proper due

diligence on patients, inappropriately recording deaths, and rerouting prescriptions to get around state laws.

571. For example, in 2010 Purdue audited Express Scripts' administration of this program and found numerous failures by Express Scripts to properly vet PAP applicants, including failing to verify patient-doctor relationship, failing to notice obvious inconsistencies in applications, and failing to process IRS information to determine accuracy and legitimacy of the information. In fact, Purdue found that during a period of just a few months in 2010 Express Scripts dispensed more than 17,000 OxyContin pills to fraudulent PAP enrollees/applicants. Similarly, a 2010 email exchange between Purdue and Express Scripts employees outlined how a Purdue PAP patient was reportedly "selling [his PAP opioid prescriptions] on the street."[272]

572. As a result of a whistleblower lawsuit brought by two former Las Vegas mail order pharmacists, in 2006 Medco agreed to a $155 million settlement to resolve claims with the United States related to its dispensing of drugs at its mail order pharmacies. The government's complaint alleged Medco accepted payments from drug makers to favor their drugs and submitted false claims for mail order prescription drugs provided to millions of federal employees, retirees and their families. Among the allegations was that Medco's mail order pharmacies failed to conduct adequate cDUR for all prescriptions in order to identify potential adverse drug interactions. The government alleged that, as a result of the pressures to meet

---

[272] PPLPC034000383800.

quotas, Medco's cDUR employees regularly: a) fabricated physician call records so as to maintain hourly call quota rates; b) completed physician calls without ever having pharmacists verify the information with the physician's office; c) changed prescriptions without a pharmacist's intervention; and/or d) falsified records to indicate cDUR calls were made to physicians when in fact these calls had not been made.

573. At all times material hereto, the PBM Defendants' mail order pharmacies have dispensed huge quantities of opioids. For example, during the 2006 to 2014 time period alone, Express Scripts and Optum pharmacies purchased more than 27 billion MMEs, spread over more than 1.4 billion dosage units according to the DEA's Automated Reports and Consolidated Ordering System ("ARCOS").

574. The DEA ARCOS database reveals that over 49% of the over 46 billion MMEs moved through the PBM mail order channel was purchased by Express Scripts pharmacies. Specifically, during the 2006 to 2014 time period, Express Scripts mail order pharmacies bought over 22.9 billion MMEs spread over 1.1 billion opioid dosage units.

575. Not surprisingly, given their lengthy collaboration with regard to OxyContin, over 26% of Express Scripts pharmacies' MME purchases were for Purdue opioids.

576. 23.63% of Express Scripts pharmacies' opioid purchases were for Teva opioids; 14.38% were for Mallinckrodt opioids; 8.34% were for Endo opioids; and 4.59% were for Mylan opioids. Express Scripts pharmacies dispensed these opioid

products by mail to patients nationwide, including in New York and Plaintiff's Community.

577.     The DEA ARCOS database also reveals that 9.6% of the over 46 billion mail-order MMEs were purchased by Optum's pharmacies. Specifically, during the 2006 to 2014 time period, Optum pharmacies bought and sold over 4.5 billion MMEs spread over 252 million opioid dosage units.

578.     21.75% of Optum's pharmacy opioid purchases were for Mallinckrodt opioids; 17.27% were for Teva opioids; 15.76% were for Purdue opioids; and 11.83% were for Endo opioids. Optum dispensed these opioid products by mail to patients nationwide, including in New York and Plaintiff's Community.

579.     From at least 2008 to the present (and ongoing), Defendants violated the CSA, New York controlled substances laws (including the New York State CSA), and the United States and state (including New York) pharmacy laws and regulations by dispensing controlled substances in violation of their corresponding responsibility under 21 C.F.R. § 1306.04(a) and outside the usual course of pharmacy practice under 21 C.F.R. § 1306.06.

580.     Defendants violated the CSA, New York controlled substances laws (including the New York State CSA), and the United States and state (including New York) pharmacy laws and regulations each time their mail order pharmacies filled a controlled substance prescription without identifying and resolving those red flags because, *inter alia*:

- They were knowingly filled outside the usual course of professional practice and not for a legitimate medical purpose; therefore, they were not pursuant to a valid prescription under 21 U.S.C. § 829 and thereby violated 21 U.S.C. § 842(a)(1); and

- They were knowingly and intentionally dispensed outside the usual course of professional pharmacy practice in violation of 21 C.F.R. 1306.06, and therefore such dispensing and delivering of controlled substances was not authorized by the CSA, and thereby violated 21 U.S.C. § 841(a)

581.   The opioid crisis alleged herein is a direct and foreseeable result of Defendants' actions and inactions. And it was reasonably foreseeable that Plaintiff and Plaintiff's Community would be damaged thereby.

582.   Defendants failed to maintain effective controls against abuse and diversion or conduct due diligence to ensure opioids were not diverted, resulting in the gross over-dispensing of opioids. Defendants thus directly contributed to today's opioid epidemic and corresponding harm to Plaintiff and Plaintiff's Community.

583.   The opioid crisis alleged herein is a direct and foreseeable result of Defendants' actions and inactions. And it was foreseeable that Plaintiff and its community would be damaged thereby.

## VII.   Express Scripts and Optum Contributed to the Public Health Crisis in Plaintiff's Community

584.   By conspiring with and aiding and abetting the opioid manufacturers, facilitating the overprescribing and overuse of opioids, failing to address evidence of the misuse, abuse, and addiction to opioids, and failing to prevent diversion in their

mail order dispensing and in their pharmacy networks, Optum and Express Scripts contributed to the oversupply of opioids in New York and Plaintiff's Community, and the resulting damages and public nuisance.

585.  According to the CDC, the nation is experiencing an opioid-induced "public health epidemic." The CDC reports that over 1,000,000 people died from an overdose involving opioids from 1999 until present. Based on the latest data, approximately 3 million Americans met criteria for prescription opioid abuse and dependence in 2022. Since 1999, the amount of prescription opioids dispensed in the United States and the number of overdose deaths involving opioids have both quadrupled.

586.  In addition to the toll on families and loved ones, opioid use imposes significant economy-wide costs. The U.S. Congress Joint Economic Committee estimates the opioid epidemic cost nearly $1.5 trillion in 2020 alone, up 37% from 2017 when the CDC last measured the cost. The rise in fatal opioid overdoses in 2022 suggests the total cost is likely to continue to increase.

587.  As alleged previously herein, New York is experiencing a drug overdose epidemic which is causing devastating socio and economic consequences. In recent years, nearly 4000 New York residents have died each year from opioid overdoses.[273]

---

[273] Continuing Crisis, Drug Overdose Deaths in New York, November 2022, New York State Comptroller Thomas P. DiNapoli, https://www.osc.ny.gov/reports/continuing-crisis-drug-overdose-deaths-new-york (citing Centers for Disease Control and Prevention (CDC), National Center for Health Statistics, National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database, released in 2021. Data are from the Multiple Cause of Death Files, 1999-2020, as compiled from data

New York drug overdose deaths involving opioids increased to 85 percent in both 2020 and 2021, up from 69 percent in 2010.[274]

588.    As alleged in detail above, Plaintiff has been particularly hard hit by the opioid epidemic that Defendants caused, contributed, and maintained.

589.    While Express Scripts and Optum were reaping millions of dollars in profits from their wrongful conduct, Plaintiff has been required to allocate substantial public monies and resources to combat the opioid crisis and cope with its fallout.

590.    Plaintiff has incurred and continues to incur substantial costs because of Optum's and Express Scripts' conduct including, but not limited to, costs of increased services with respect to law enforcement and first responders, such as Plaintiff's community outreach programs; equipment and supplies; victim services support; intervention programs; and increased costs associated with its own employee benefits plan, together with general societal and lost productivity costs.

591.    Plaintiff has had to allocate extraordinary additional resources through staffing at departments providing all of the services listed above; has incurred substantial increases in overtime; and has had to re-allocate personnel.

## VIII.  Facts Pertaining to the Formulary & UM Enterprise

592.    As alleged above more fully *infra*, Express Scripts, Optum, both of their mail order pharmacies and each of the opioid manufacturers (including Allergan,

---

provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program, accessed July 11, 2022, at http://wonder.cdc.gov/mcd-icd10.html.)

[274] *Id*. at p. 1.

Johnson & Johnson/Janssen, Endo, Insys, Mallinckrodt, Purdue, and Teva/Cephalon, referred to collectively as the "Opioid Enterprise Manufacturers" for the purposes of this Section)formed an association in fact enterprise, the "Formulary & UM Enterprise."

593. The Formulary & UM Enterprise was characterized by a common purpose, relationships among members of the Formulary & UM Enterprise, and sufficient longevity to accomplish the common purpose thereof. The PBM Defendants each conducted and participated in the conduct of the Formulary & UM Enterprise through a pattern of racketeering activity.

594. Each member of the Formulary & UM Enterprise knew that prescription opioids were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain. Each member of the Formulary & UM Enterprise was also aware that use of prescription opioids carried risks such as addiction, opioid use disorder, overdose, and death. Nevertheless, each member of the Formulary & UM Enterprise joined together into an association-in-fact enterprise for the common purpose of profiting from an expansion of the market for prescription opioids, and increased prescribing, dispensing, and sales of those drugs.

595. That each member of the Formulary & UM Enterprise is a for-profit company and may legally pursue profits is not in dispute. However, each member of the Formulary & UM Enterprise sought to fulfill common purpose through a pattern of mail and wire fraud, and felonious manufacture, importation, receiving,

concealment, buying, selling or otherwise dealing in controlled substances. Specifically, each member of the Formulary & UM Enterprise supported each other member in perpetrating a fraudulent scheme on the consumers who received prescriptions for prescription opioids, on the American public, and on the PBM Defendants' clients. Each member of the Formulary & UM Enterprise also supported each other member in feloniously possessing and dispensing controlled substances in Schedules II through IV in manners that were not authorized by the CSA.

596. Each member of the Formulary & UM Enterprise knew that prescription opioids were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain. Each member of the Formulary & UM Enterprise was also aware that use of prescription opioids carried risks such as addiction, opioid use disorder, overdose, and death. Therefore, each member of the Formulary & UM Enterprise knew that they needed to engage in a fraudulent scheme if they were going to increase the market for prescription opioids and increase their profits from prescribing, dispensing, and sales of prescription opioids.

597. For their part, the Opioid Enterprise Manufacturers" illegal marketing and false statements regarding prescription opioids have been well documented. They knew that prescriptions were dangerous and addictive and, nevertheless, marketed them as safe and non-addictive. These representations furthered the common purpose of the Formulary & UM Enterprise.

598.    The PBM Defendants, for their part, made representations alleged, *supra*, that their businesses were committed to making decisions about their formulary and UM offerings that were driven by a commitment to the health and safety of their covered lives and were focused on delivering safe healthcare.

599.    PBM Defendants and opioid manufacturers also knew that the PBM Defendants' mail-order pharmacies were receiving prescriptions that were not for lawful orders of a practitioner. PBM Defendants and opioid manufacturers knew that the PBM Defendants' mail-order pharmacies were filling illegitimate prescriptions.

600.    By these strategies, and the activities alleged *supra* and *infra*, both the PBM Defendants and the Opioid Enterprise Manufacturers agreed to further the common purpose of the Formulary & UM Enterprise through a fraudulent scheme and felonious possession and dispensing of controlled substances, and to grow the market for prescription opioids by increasing prescribing, dispensing, and sales of prescription opioids.

601.    As an example, the Opioid Enterprise Manufacturers contracted and agreed with each PBM Defendant to coordinate unfettered formulary placement (with no or limited) UM measures regarding each opioid drug on the PBM Defendant's standard offerings, such that there would be as little impediment as possible to opioid prescribing and dispensing. From their agreements, each member of the Formulary & UM Enterprise stood to reap significant profits from ever-increasing prescribing, dispensing, and sale of prescription opioids: the Opioid Enterprise Manufacturers from sales of their drugs and the PBM Defendants from rebates and other fees. As

part of these agreements, the PBM Defendants gave each of the Opioid Enterprise Manufacturers parity terms, ensuring that no Opioid Enterprise Manufacturer's opioid was disadvantaged against within each class of opioid analgesics, and provided the Opioid Enterprise Manufacturers with data about the lives that they managed, the prescriptions written by doctors on their plans, and assistance with pull through contracts to assist them in pulling through the formulary decisions which would continue to increase prescribing and sales.

602. These contracts, and further information described below, evidence an agreement between the PBM Defendants, their mail-order pharmacies, and the Opioid Enterprise Manufacturers. Each PBM Defendant and each Opioid Enterprise Manufacturer understood that the PBM Defendants were going to operate on a fundamentally fraudulent basis. As alleged more fully *infra*, the PBM Defendants promised their clients they would take actions that would ensure that opioid prescribing and dispensing were safe and cost effective. The PBM Defendants also represented to legislative bodies and the public that their conduct was intended to maximize health, safety, and cost-effective healthcare for their covered lives. However, the PBM Defendants had agreed with each other and the Opioid Enterprise Manufacturers that their conduct would have the opposite effect. Instead of prioritizing health, safety, and cost-effectiveness, the Formulary & UM Enterprise and its members intended to obtain money and property from the prescribing, dispensing, and sale of prescription opioids that they would not otherwise have

received had they been honest and conducted their businesses along the lines of their public representations.

603.    Importantly, some of the conduct alleged, above and below, may appear to be the behavior of competitors working against each other, or of opposing parties working to secure advantage at the expense of ether other. However, each PBM Defendant worked with each Opioid Enterprise Manufacturer in negotiations that were intended to maximize the amount of profit for the PBM Defendants and the Opioid Enterprise Manufacturers. As an example described earlier, discussion of formulary status and prior authorization were always a vehicle for discussion about the amount of rebates and administrative fees. As the Opioid Enterprise Manufacturers and PBM Defendants knew and intended, the end result was always the same—agreements for favorable formulary status without UM so that prescribing, dispensing, and sales could continue to increase.

604.    The similarity of conduct by each PBM Defendant, including similar contract terms, pull-through marketing, facilitating dissemination of the Opioid Enterprise Manufacturers' marketing messages, favorable formulary status, as little UM as possible, research on behalf of the Opioid Enterprise Manufacturers, and free-flowing dispensing of prescription opioids, further evidences the existence of the Formulary & UM Enterprise. Each PBM Defendant knew of the other's conduct and refrained from commenting on or revealing the behavior, and continued to engage in the same conduct so that all members of the Formulary & UM Enterprise could continue to profit from ever-increasing prescribing, dispensing, and sales.

605. That the PBM Defendants may have competed with each other for clients, or negotiated sharply with the Opioid Enterprise Manufacturers for increasing rebates and administrative fees did not undercut the common purpose of the Formulary & UM Enterprise because it did not slow or decrease the overall prescribing, dispensing, and sale of prescription opioids in the market as a whole. Similarly, competition among the Opioid Enterprise Manufacturers for increasing market share of their drug against a competitor's drug did not undercut the common purpose of the Formulary & UM Enterprise. For example, Purdue's competition with Endo for market share of OxyContin over Opana did not slow or decrease the prescribing, dispensing, or sale of prescription opioids as a class of drugs. Furthermore, each member of the Formulary & UM Enterprise knew that there would be competition in the market, but each member also knew that their participation in the Formulary & UM Enterprise was necessary to continue growing the market and agreed to work together towards that goal.

606. As alleged more fully herein, the Formulary & UM Enterprise caused direct injury to Plaintiff's money and property.

## A. Formation of the Formulary & UM Enterprise

607. The Formulary & UM Enterprise was formed primarily in two ways, including: the forced dealing of the members with each other in the closed system of controlled substance manufacture, distribution, and dispensing, as well as the members work together in trade associations and industry working groups like the PCMA and other informal groups described below.

608. First, the formation of the Formulary & UM Enterprise occurred, in part, through the parties' dealings with each other required by the closed system imposed by the CSA. The pharmaceutical industry is extremely insular and part of a "closed system" open only to those who register to do so. Other than their CSA obligations as mail order pharmacies, the PBM Defendants are some of the very few participants in controlled substance manufacturing, distribution and dispensing that are not required to register with the DEA. However, in their efforts to secure cost-effective access to controlled substances on behalf of their clients, the PBM Defendants were forced to work closely with the Opioid Enterprise Manufacturers.

609. Over at least the last two decades, the consolidation and acquisition of pharmacy benefit management companies into ever-larger entities has led to the formation of close personal business relationships between the few remaining PBMs and the Opioid Enterprise Manufacturers that were based on a shared interest in and the common purpose of ensuring the widespread dispensing of opioids.

610. There can be no doubt that the PBM Defendants and the Opioid Enterprise Manufacturers maintain interpersonal relationships with each other. As business entities, they have been negotiating with each other since the mid-1990s. And, as alleged above, the negotiations between the Opioid Enterprise Manufacturers and PBM Defendants often took place at, and/or involved, high level executives at both companies, a multitude of emails and phone calls, including personal calls between executives to iron out details. The contractual dealings between the Opioid Enterprise Manufacturers and the PBM Defendants created relationships and

provided context in which the common purpose of the Formulary & UM Enterprise could develop. Documents produced by the Opioid Enterprise Manufacturers and the PBM Defendants reveal that there have been decades of contract negotiations over rebate agreements, amendments, re-negotiations, payment discussions, and rebate invoicing. These contract negotiations were always geared towards maximizing the number of prescriptions written for the PBM Defendants' clients and ensure the most optimal formulary placement and least amount of UM under the PBM Defendants' standard offerings so that the prescribing, dispensing and sales could continue to grow.

611. The earliest indications of the existence of the Formulary & UM Enterprise can be found in the PBM Defendants' negotiations with Purdue, their work together on disseminating the Opioid Enterprise Manufacturers' marketing messages about prescription opioids, the presence of Purdue-paid speakers at the PBM Defendants' offices, and the PBM Defendants' research work supporting the Opioid Enterprise Manufacturers. Although the earliest indications of the Formulary & UM Enterprise's existence begin with Purdue and the predecessors of the PBM Defendants, the allegations above indicate that the Formulary & UM Enterprise grew to include all of the Opioid Enterprise Manufacturers and the consolidated PBMs now named as PBM Defendants.

612. As alleged more fully herein, various documents indicate that the Formulary & UM Enterprise found its beginnings with Purdue-sponsored doctors speaking at PBM offices, in the late 1990s, all across the country, and rebate contract

216

negotiations between the Opioid Enterprise Manufacturers and the PBM Defendants that began around the same time and have continued through the present.

613.    The formation of the Formulary & UM Enterprise did not happen solely within the formation of the rebate contracts between the Opioid Enterprise Manufacturers and the PBM Defendants. The Formulary & UM Enterprise also continued to develop through regular non-contractual interactions, including through the use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme in: (1) interactions about the administration of the rebate contracts; (2) pull-through marketing and assistance therewith; and (3) joint participation in trade associations and informal coalitions.

614.    Trade associations and informal coalitions and forums not only provide a basis for the formation of the Formulary & UM Enterprise, but also serve as central conduits for the conduct of and participation in the Formulary & UM Enterprise. The prime example of a trade association through which the Formulary & UM Enterprise developed and operated is the PBM's trade association, the Pharmaceutical Care Management Association ("PCMA").

615.    PCMA describes itself as "lead[ing] the effort in promoting PBMs and the proven tools they utilize, which are recognized by consumers, employers, policymakers, and others as key drivers in lowering prescription drug costs and increasing access."[275]

---

[275] About PCMA, https://www.pcmanet.org/about/ (last visited Oct. 11, 2023).

616. While PCMA boasts of being the national association representing America's pharmacy benefit managers, it actually has a much broader membership base and focus. As evident from the PCMA website, PCMA membership includes member PBMs[276] and so-called "Affiliate" drug manufacturers and other entities, including numerous of the Opioid Enterprise Manufacturers as current or former members.[277]

617. As repeatedly mentioned in the PCMA's annual conference materials, the drug manufacturers are the PBMs' most notable business partners.[278]



618. The PBM Defendants are members of PCMA, and due to their leadership positions, have substantial control over PCMA. Indeed, PCMA is governed by PBM executives. The current (as of December 2023) board of PCMA includes Adam Kautzner, Pharm.D. (President of PBM Defendant Express Scripts); and Dr. Patrick Conway (CEO of PBM Defendant OptumRx).

619. An image illustrating the membership in the PCMA is as follows:[279]

---

[276] PCMA Members, https://www.pcmanet.org/members/ (last visited Oct. 11, 2023).

[277] PCMA Affiliates, https://www.pcmanet.org/affiliates/ (last visited Oct. 11, 2023).

[278] PCMA Annual Meeting 2016 Conference Program Book, https://www.pcmanet.org/events/past-events/2016-annual-meeting/ (last visited Dec. 5, 2023).

[279] PCMA Annual Meeting 2016 Conference Program Book, https://www.pcmanet.org/events/past-events/2016-annual-meeting/ (last visited Dec. 5, 2023).



620.    Active control over the PCMA Board of Directors is important to the PBM Defendants and clearly conditioned on current employment by the PBM. As an example, in 2022, former Express Scripts President Amy Bricker was the former Chair of the PCMA Board of Directors and the only Express Scripts employee on the Board. But, when Ms. Bricker left Express Scripts in late 2022/early 2023, she was removed from the PCMA Board. On February 3, 2023, PCMA issued a press release, naming Mr. Kautzner to the Board and as its Chair.

621.    Each year during the relevant period, PCMA has regularly held industry conferences, including its Annual Meeting and Business Forum conferences.

622.    Every year, high-level representatives and corporate officers from both the PBM Defendants and the Opioid Enterprise Manufacturers have attended these

conferences to meet in person and engage in discussions, including those in furtherance of the Formulary & UM Enterprise.

623. In fact, many of the Opioid Enterprise Manufacturers have been "Partners," "Platinum Sponsors," or "Presidential Sponsors" of these PCMA conferences.

624. Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, as Presidential Sponsors of these conferences, the Opioid Enterprise Manufacturers were permitted to host "private meeting rooms" that offer "excellent opportunities for interactions between PBM members, drug manufacturers, and other industry partners."[280]

625. Representatives from each PBM Defendant and the Opioid Enterprise Manufacturers have routinely met during the Annual Meetings and Business Forum conferences that PCMA holds (and the manufacturers sponsor) each year.

626. In addition, all PCMA members, including Affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community."[281]

---

[280] PCMA, *The PCMA Annual Meeting 2021 Will Take Place at the Broadmoor in Colorado Springs, CO September 20 and 21,* https://www.pcmanet.org/pcma-event/annual-meeting-2021/ (an event "tailored specifically for senior executives from PBMs and their affiliated business partners" with "private reception rooms" and "interactions between PBM members, drug manufacturers, and other industry partners") (last visited Oct. 11, 2023).

[281] PCMA, *PCMA-Connect,* https://www.pcmanet.org/contact/pcma-connect/ (last visited Oct. 11, 2023).

627. As PCMA members and Affiliates, the PBM Defendants and the Opioid Enterprise Manufacturers utilized both PCMA-Connect, as well as the meetings facilitated by PCMA (including at conferences), to exchange information and to reach agreements in furtherance of the Formulary & UM Enterprise.

628. Thus, PCMA served as a conduit of information between the Opioid Enterprise Manufacturers and the PBM Defendants on subjects like access to prescription opioids.

629. That the PCMA served as a conduit for the sharing of information, and the formation of collaborative partnerships is not reasonably disputable. PCMA hosts regular meetings during which PBMs and Opioid Enterprise Manufacturers, or "Pharma" as they are called by the PBMs, can discuss their coordinated and shared objectives/strategies. PCMA's website posts programs for its regular meetings that highlight the close and "[i]mperative" collaboration and partnership between the PBMs and the Opioid Enterprise Manufacturers. Some examples from the program agendas and/or booklets currently available on PCMA's website include:

- Hot Topics and Trends Impacting Today's PBM and Pharma Strategies;[282]

- Meeting Patients Where They Are: Pharma and PBMs working to close gaps in care in the post pandemic era;[283]

---

[282] PCMA Business Forum 2023, Conference Program Agenda for Monday, February 27, available at https://www.pcmanet.org/events/past-events/pcma-business-forum-2023/ (last accessed on December 1, 2023)

[283] PCMA Annual Meeting 2022, Conference Program Book at p. 4, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2022/ (last accessed on December 1, 2023).

- Unlocking the Value of PBM and Small Manufacturer Relationships;[284]

- Manufacturers and PBMs Working Together to Reward Innovation;[285]

- PBM & Pharma Priorities, Opportunities and Challenges in 2022 and Beyond;[286]

- PBM and Pharma Collaboration: Focusing on Patients and Value;[287]

- Collaboration Imperative—Identifying the Shared Interests of PBMs and Pharma;[288]

- Market Dynamics Driving the PBM and Pharma Relationship;[289]

- The Future of PBM-Pharma Relations and Negotiations;[290]

---

[284] PCMA Business Forum 2022, Conference Program Book at p. 6, available at https://www.pcmanet.org/events/past-events/pcma-business-forum-2022/ (last accessed on December 1, 2023).

[285] PCMA Annual Meeting 2022, Conference Program Book at p. 6, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2022/ (last accessed on December 1, 2023).

[286] PCMA Annual Meeting 2021, Conference Program Agenda for Tuesday, September 21, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2021/ (last accessed on December 1, 2023).

[287] sPCMA Business Forum 2020, Conference Program Book at p. 3, available at https://www.pcmanet.org/events/past-events/spcma-business-forum-2020/ (last accessed on December 1, 2023). Although this event was cancelled due to the pandemic, it still corroborates the view shared by PBMs and Opioid Manufacturers that they are collaborating.

[288] PCMA Annual Meeting 2019, Conference Program Book at p. 4, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2019/ (last accessed on December 1, 2023).

[289] PCMA Annual Meeting 2019, Conference Program Book at p. 6, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2019/ (last accessed on December 1, 2023).

[290] sPCMA Business Forum 2019, Conference Program Book at p. 4, available at https://www.pcmanet.org/events/past-events/business-forum-2019/ (last accessed on December 1, 2023).

- How Health Care Companies are Using Data and Predictive Algorithms to Identify and Address the Opioid Crisis;[291]

- State of the PBM-Manufacturer Partnership;[292]

- Confronting the Crisis We Brought Upon Ourselves: America's Opioid Abuse Epidemic;[293]

- The PBM/Pharma Relationship in the Era of High Price Drugs;[294] and

- PBMs, Specialty Pharmacies and Pharma Program Alignment—Affordability, Adherence and Outcomes.[295]

630.    Notably, PCMA only publishes the agendas and booklets from its regular meetings going back to 2014. Plaintiff is informed and believes that similar meetings would have been held, and topics discussed throughout the entirety of the relevant discovery period.

631.    Given the foregoing, it is not surprising that Purdue viewed PCMA as a valuable source of information and coordination on subjects regarding prescription opioids and OxyContin. As examples, Purdue employees were notified about meetings

---

[291] sPCMA Business Forum 2018, Conference Program Book at p. 2, available at https://www.pcmanet.org/events/past-events/business-forum-2018/ (last accessed on December 1, 2023).

[292] PCMA Annual Meeting 2017, Conference Program Book at p. 3, available at https://www.pcmanet.org/events/past-events/annual-meeting-2017/ (last accessed on December 1, 2023).

[293] sPCMA Business Forum 2017, Conference Program Book at p. 3, available at https://www.pcmanet.org/events/past-events/business-forum-2017/ (last accessed on December 1, 2023).

[294] PCMA Annual Meeting 2016, Conference Program Book at p. 3, available at https://www.pcmanet.org/events/past-events/2016-annual-meeting/ (last accessed on December 1, 2023).

[295] PCMA Annual Meeting 2014, Conference Program Book at p. 10, available at https://www.pcmanet.org/events/past-events/2014-annual-meeting/ (last accessed on December 1, 2023).

at the PCMA conference in 2001 that discussed "oxy attacks as a predatory action on the part of the media or one of your competitors," and Burt Rosen (another Purdue employee) reached out to PCMA in 2014 to find the right person to connect with "on opioids."[296]

632.     More broadly, produced documents show that PCMA (including through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme) served as a clearinghouse for communication, discussion, consensus building and speaking on behalf of the PBM Defendants and the Opioid Enterprise Manufacturers who were Affiliate members. Documents confirm that PCMA was a conduit through which discussions occurred and consensus could be reached (including discussion between the PBM Defendants outside of official PCMA correspondence) and that specific discussions and work took place around efforts to curb opioid abuse (which would have worked against the common purpose of the Formulary & UM Enterprise).

633.     PCMA was not the only way in which the PBM Defendants and the Opioid Enterprise Manufacturers collaborated. Additional documents show that the members of the Formulary & UM Enterprise knew how to, and did form, ongoing informal coalitions that for years met regularly to work on issues of common concern and advance their common interests. These documents show that a Controlled Substances Stakeholder's Coalition was formed in October 2013 in order to "further collaborate on interprofessional efforts to combat the United States opioid epidemic."

---

[296] PDD8801103934 (3/16/01); PPLPC018001107944 (10/2/14).

At the time of the Coalition meeting in December 2016, these meetings had been ongoing for at least three years with each organization providing "updates for increasing awareness and decreasing misuse and diversion."[297]

634. Express Scripts claimed that it was making recommendations to physicians that had substantially decreased opioid prescriptions and taking actions to increase depository sites for drug disposal.[298] As alleged more fully herein, however, documents confirm that Express Scripts and OptumRx were at the same time, in order to protect their shares of rebates and other fees, actively working with the Opioid Enterprise Manufacturers in the Formulary & UM Enterprise to avoid taking actions that would have reduced prescribing, thus ignoring their obligations to reduce unsafe and inappropriate prescribing.

635. Finally, documents will show that groups like PCMA supported the formation of the Formulary & UM Enterprise and agreements within it:

- "The Coalition discusses the terms 'drug abuse' and 'addiction' versus 'substance use disorder,' . . . and agreed";

- "Members then discussed the purpose of the slide deck . . . and agreed";

- "Additionally, the Coalition discussed various communication strategies . . . . Members agreed"; and

---

[297] *Id.*

[298] *Id.*

- "Members unanimously agreed that further meetings were necessary to ensure that continued progress would be made."[299]

636.    Members of the Formulary & UM Enterprise also participated in similar stakeholder meetings directly and/or through PCMA regarding topics like red flags and warning signs related to prescribing and dispensing controlled substances. The express purpose of these stakeholder meetings was to foster open channels of communication, foster understandings, and to discuss collaborative actions.  Notably, membership in some stakeholders meetings and working groups included some of the Opioid Enterprise Manufacturers' front groups and trade association (PhRMA), opioid distributors, the National Association of Chain Drug Stores, and other PBMs and pharmacies.

637.    The foregoing facts, and as alleged in more detail herein, demonstrate that the Formulary & UM Enterprise arose from personal business relationships developed between the enterprise members in various ways over the course of at least the last two decades.

## B.    The Common Purpose and Fraudulent Scheme of the Formulary & UM Enterprise

638.    The personal business relationships that formed the Formulary & UM Enterprise also allowed for the formation of a common purpose between the Opioid Enterprise Manufacturers and PBM Defendants in the Formulary & UM Enterprise. Specifically, the Formulary & UM Enterprise was formed for the common purpose of

---

[299] *Id.*

illegally and fraudulently profiting from an expansion of the market for prescription opioids, and increased prescribing, dispensing, and sales of those drugs. As alleged more fully herein, the fraudulent scheme that furthered the common purpose of the Formulary & UM Enterprise relied on fraudulent representations from each PBM Defendant to each one of its clients and to the public that it would structure formulary offerings and perform cDUR benefit services in the interests of its clients and patients to ensure that opioids were prescribed and dispensed only for safe and legitimate reasons. Instead of providing standard formulary and UM offerings that were in their clients' best interests or for safe and legitimate reasons, the PBM Defendants made decisions that gave the Opioid Enterprise Manufacturers and their prescription opioids unfettered and preferred formulary access, without utilization management, and did not disadvantage any opioid compared with another in the same class or formulary tier, agreed to parity treatment for opioids within the same class and/or formulary, supported the Opioid Enterprise Manufacturers' pull-though marketing, pocketed enormous rebates and other fees, and (through its mail order pharmacies) dispensed prescription opioids without conducting the necessary due diligence.

639. Each member of the Formulary & UM Enterprise played a part and furthered the common purpose of the Formulary & UM Enterprise.

640. For their part, the Opioid Enterprise Manufacturers have been engaged in fraudulent conduct related to the marketing of prescription opioids beginning in the mid-1990s. As alleged by multiple entities and proven through extensive briefing, the Opioid Enterprise Manufacturers engaged in a fraudulent scheme, including

through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme, to grow the market for prescription opioids through the use of branded and unbranded marketing materials, key opinion leaders ("KOLs") to give speaker presentations and publish about prescription opioids, and front groups which would contribute to and publish books, articles, documents, etc., all of which misrepresented the benefits and risks of prescription opioid use.

641. The Opioid Enterprise Manufacturers commonly made the same misrepresentations through common KOLs and Front Groups. For example, each of the Opioid Enterprise Manufacturers made repeated misrepresentations about the risks and benefits of prescription opioids, including:

    (a) The risk of addiction from chronic opioid therapy is low;

    (b) To the extent there is a risk of addiction, it can be easily identified and managed;

    (c) Signs of addictive behavior are "pseudoaddiction," requiring more opioids;

    (d) Opioid withdrawal can be avoided by tapering;

    (e) Opioid doses can be increased without limit;

    (f) Long-term opioid use improves functioning;

    (g) Alternative forms of pain relief pose greater risks than opioids;

    (h) OxyContin provides twelve hours of pain relief; and

    (i) New formulations of certain opioids, labeled abuse deterrent, successfully deter abuse.

642.     Each of the Opioid Enterprise Manufacturers made nearly identical representations about their branded drugs and/or unbranded prescription opioids as a class of drugs during the relevant time period.

643.     Each of the Opioid Enterprise Manufacturers used similar Front Groups to promote prescription opioid use. As examples, multiple of the Opioid Enterprise Manufacturers used Front Groups including, as examples, the following: the American Pain Foundation, the American Academy of Pain Medicine, the American Pain Society, Federation of State Medical Boards, the Alliance for Patient Access, the United States Pain Foundation, the American Geriatric Society, and the National Initiative on Pain Control.

644.     The Opioid Enterprise Manufacturers took an active role in guiding, reviewing, and approving many of the false and misleading statements issued by the Front Groups, ensuring that the Opioid Enterprise Manufacturers were consistently in control of their content and that it stayed on message in favor of more opioid prescribing. The Opioid Enterprise Manufacturers exercised control over and adopted their false and deceptive messages and acted in concert with the Front Groups and, through the Front Groups, with each other to deceptively promote the use of prescription opioids.

645.     Each of the Opioid Enterprise Manufacturers used similar Key Opinion Leaders and the strategy of paying opinion leaders and speakers who favored aggressive treatment of pain with prescription opioids. Pro-opioid doctors have been at the hub of the Opioid Enterprise Manufacturers' well-funded, pervasive marketing

scheme since its inception and were used to create the grave misperception that opioids were safe and efficacious. As examples, multiple Opioid Enterprise Manufacturers used similar Key Opinion Leaders including, but not limited to: Dr. Russell Portenoy, Dr. Lynn Webster, Dr. Perry Fine, and Dr. Scott Fishman.

646.   Each of these Key Opinion Leaders and numerous other, lower profile doctors, were paid to speak on behalf of prescription opioids as an unbranded class of drugs. They were used extensively to present the appearance that unbiased and reliable medical research supported the broad use of prescription opioids. These pro-opioid doctors also began to write, consult on, edit, and lend their names to books and articles, they gave speeches, they served on committees, etc., all the while encouraging the use of prescription opioids.

647.   The Opioid Enterprise Manufacturers' marketing conduct did not end with the KOLs and Front Groups—they were merely one of the vehicles for the dissemination of the misrepresentations. The Opioid Enterprise Manufacturers also used branded and unbranded advertising and marketing; funded, edited and distributed pro-opioid publications; speakers bureaus and continuing education programs. Examples of speakers bureaus and continuing medical education events occurring at the PBM Defendants' facilities are found throughout document productions from the Opioid Enterprise Manufacturers.  Furthermore, as alleged above, the PBM Defendants often facilitated and/or disseminated the Opioid Enterprise Manufacturers' marketing messages directly to doctors who prescribed for patients covered by the PBM Defendants' clients.

230

648. One of the primary means by which the Opioid Enterprise Manufacturers disseminated their messaging about prescription opioids was through drug detailing: the practice of sending out pharmaceutical company representatives to provide details about specific branded products in order to persuade prescribers to begin writing (or write more) prescriptions for a specific product.

649. The Opioid Enterprise Manufacturers adopted detailing as a key component of their prescription opioids strategy early on to capitalize on the fraudulent unbranded marketing—developing carefully crafted marketing messages and tactics to deliver messages to prescribers through close relationships with sales representatives.

650. Drug detailing is data driven, requiring identification of the prescribers who are writing high or low volumes of prescriptions, targeting places where additional messaging might be affecting and to test the effectiveness of messaging. In accordance with common industry practice, the Opioid Enterprise Manufacturers purchased and closely analyzed prescription sales data from companies like IMS Health (now IQVIA) and the PBM Defendants which allowed them to track— precisely—the rates of initial and renewal prescribing by individual prescribers.

651. The nexus between data and detailing helped drive the formation of the common purpose of the Formulary & UM Enterprise. In return for data and unfettered formulary placement from the PBM Defendants, the Opioid Enterprise Manufacturers were willing to pay higher rebates and other fees to each PBM Defendant.

652. Once that occurred, the PBM Defendants once again supported the Opioid Enterprise Manufacturers' fraudulent marketing regarding prescription opioids. After the Opioid Enterprise Manufacturers obtained the PBM Defendants' data and favorable formulary placement, the Opioid Enterprise Manufacturers' sales personnel immediately began to analyze their managed care or PBM data in order to "pull through" the formulary placement in order to drive increased sales. Documents produced from the Opioid Enterprise Manufacturers and PBM Defendants are replete with examples of pull-through initiatives touting the beneficial formulary placement of Opioid Enterprise Manufacturers' drugs to drive increased sales and use of the PBM Defendants' data to maximize the pull through effort.

653. These documents make clear that the formulary placement was viewed as a "win" and an opportunity to make the rebate agreements profitable by pulling through sales. Sophisticated presentations outlining the exact steps a sales representative should take were often included in the sales training materials. The impact of these agreements and the ability to pull-through increased sales using the PBM data was dramatic:



300

654.    Using the "Best Practices Identified" of: 1. Identifying the local UHC MC Opportunity; 2. Targeting the Right UHC Customer; 3. Hyper Targeting; 4. Delivering the Right Message; and 5. Consistent Cross-Functional Communication[301] – the Pittsburgh District experienced dramatic growth in sales, as described by Endo:

---

[300] ENDO-CHI_LIT-00046379, slide 7.

[301] *Id.* at slide 10.



302

655.    Formulary wins were a boon for each member of the Formulary & UM Enterprise. Each prescription opioid that enjoyed a favorable formulary placement, or continued to enjoy prescribing and dispensing without UM, ensured that all prescription opioids would continue to enjoy unrestricted sales due to the privity clauses that the PBM Defendants agreed to with each Opioid Enterprise Manufacturers. And, as indicated by the graph cited above, these wins increased sale. And, by increasing sales, the wins increased profits for the Opioid Enterprise Manufacturers whose drugs were sold and for the PBM who received rebates and administrative fees tied to sales. From that perspective, the graph above is literally evidence of the Formulary & UM Enterprise and its common purpose.

656.    As alleged in more detail herein, the PBM Defendants took on obligations to perform and made representations that they would conduct point-of-

---

302 *Id.* at slide 9.

sale review and take actions to ensure that only safe and legitimate prescriptions were being filled when they had no intention of doing so. Had the PBM Defendants taken the actions they had promised their clients, it would have dramatically reduced medically inappropriate prescribing, sales and dispensing of prescription opioids. As alleged more fully herein, the PBM Defendants' failure to do so had a significant role in allowing opioids to flood into communities across America, including into Plaintiff's Community.

657.    The PBM Defendants also paid lip service to their commitment to taking action about prescription opioids. For example, Express Scripts represented in 2013 that it was "leading the fight against prescription drug fraud, waste and abuse."[303] Optum submitted its opioid use/risk management plan for consideration by the National Alliance of Healthcare Purchaser Coalitions, claiming that its program focuses on preventing misuse by educating care providers and consumers, minimizing early exposure and promoting alternative treatments for pain while advancing best practices and made multiple representations about itself and its programs during the presentation. Similar representations were made on OptumRx's website, touting its expertise and commitment to fight the opioid epidemic and demonstrating expertise in opioid management: "Optum Rx® implements a multi-dimensional Opioid Risk

---

[303] PPLPC019000862211 (11/18/13).

Management solution to help curb the rising tide of opioid abuse across the United States . . . as part of its commitment to drive opioid safety and prevention."[304]

658.    But the PBM Defendants' claims that they were addressing fraud, waste, and abuse were only empty promises. For example, one former Fraud, Waste and Abuse investigator for Express Scripts from 2013 to 2019, Confidential Informant No. 1 (CI-1), explained that even when they identified blatant instances of pill seekers and pill mill doctors, nothing happened. "No one really cared," he said. "No one really followed up on anything. The members were just like a number. We'd totally forget this was a human being because it was just a case number. We'd just look at it, type it up and it was gone. They never got the help they needed. I never heard this person is in rehab."

659.    Moreover, as far as CI-1 knew, none of his findings were ever shared with law enforcement, even if it involved well documented pill mill doctors or pill seekers.

660.    CI-1 explained that, when he was hired, he thought he would be investigating "serious major fraud, all of these people writing all of these false prescriptions," he said. "I just thought it was more investigation stuff." They would re-run patients and doctors' names every five months, he said. "We'd see the same people over and over," he said. "Just because we identified the behavior didn't mean it stopped. We'd just call the doctors, and they didn't even care. They just felt this

---

[304] Optum, "White Paper: Working to end the opioid epidemic" at. 7 (2018) https://www.optum.com/content/dam/optum3/optum/en/resources/white-papers/opioid-whitepaper-wf914999.pdf  (last visited Oct. 11, 2023).

patient was in pain, but we're not going to do anything about it. It wouldn't be rare to have [the bad doctors] written up twice in a year. . . . I'd say 90 percent of the reports never got read in my opinion. . . . Let's say I spent months, sometimes weeks on a report—it's being written for the manager. It really doesn't go anywhere else."

661. Similarly, PCMA and some of its PBM members participated in coalitions or external activities indicating that they were "increasing awareness and decreasing misuse."[305] However, the internal documents produced by the PBM Defendants show a different story and uncover the fraudulent nature of the PBM Enterprises. The PBM Defendants did not make decisions based on the terms of the contracts with their clients or in order to fight drug abuse and/or diversion. Rather, the PBM Defendants made decisions in order to protect their rebates and generate profit, despite concerns about prescription opioids and the companies that sold them.

662. The PBM Defendants hid these facts from their clients. In a telling exchange in 2002, when Highmark Blue Cross Blue Shield decided it would put a 300mg daily limit on a drug, Medco pushed back because this meant that Medco would lose Purdue rebates if there was a limit below 320mg per day. Here, as alleged, was evidence that an action could have been taken to drastically limit inappropriate prescribing, sales and dispensing, but it was ignored in favor of the action that advanced the common purpose of the Formulary & UM Enterprise. Instead of taking action to limit medically unnecessary and inappropriate prescribing, sales and

---

[305] CAH_MDL2804_01524873 (12/15/16) (also indicating that Express Scripts had "[d]eveloped a matrix for making recommendations).

dispensing, an August 18, 2002, email from Purdue National Account Director Bernadette Katsur reveals that a Medco Vice President convinced its client— Highmark—to drop its daily dosage limit.

663. Documents created in the mid-2010s confirm that the PBM Defendants regularly delayed taking actions that could have dramatically reduced medically inappropriate prescribing, sales and dispensing despite promises from the PBM Defendants to do the same.

664. As an example, a November 3, 2016, email from Bob Lahman, Trade Relations VP at OptumRx explained that OptumRx had agreed to forego measures that would have used prior authorization as a tool to control the prescription of opioids. The explanation reveals how closely each Opioid Enterprise Manufacturer worked with each PBM Defendant: "It was not unusual for any manufacturer to not want a PA on their product, especially if it was a small molecule product, and very few would have agreed to a rebate where they did not have unrestricted access (no PAs or steps (sic) edits)."[306] Emails like this, and others cited throughout this complaint, demonstrate that the PBM Defendants and the Opioid Enterprise Manufacturers all had an understanding of the game—the end goal was increasing prescribing, dispensing, and sales through favorable formulary access without UM, and the means to that end goal was pay rebates and administrative fees.

665. When the pressure began mounting to limit access to prescription opioids by use of UM measures like prior authorization, step edit, or days' supply

---

[306] OPTUMRX_JEFFCO_0000446761 (11/3/16).

limits, there were serious concerns expressed in 2017 within OptumRx about the impact on the "significant" rebates being received from the drug makers:

> **From:** Merrill, Nathan <Nathan.Merrill@optum.com>
> **Date:** Monday, Feb 06, 2017, 4:09 PM
> **To:** Calabrese, David <David.Calabrese@optum.com>
> **Subject:** RE: BIC
>
> David,
>
> Venkat had concerns about adding a PA to Embeda, Oxycontin, and Opana ER since these are preferred products that are tied to "significant" rebates. By adding a PA to these products we jeopardize any rebates we have contracted with the manufacturer. I wasn't in a position to argue so I just explained that we anticipated there would likely be concerns within this class that we would address later. With BIC scheduled for this Wednesday do you think you would be able to attend to go to battle for us on this one? I know Venkat is going to say we cannot put a PA on those 3 products and I'm not sure there is anything more I can say or do to get around this. I appreciate any feedback you might have.
>
> Thank you,
> _____
>
> Nathan Merrill, PharmD, CGP | OptumRx
> Manager, Clinical UM Operations

[307]

666. Later, OptumRx employees discussed whether they would be willing to put a hard limit on morphine equivalent dosing (MED) on OxyContin 80mg to align with the 2016 CDC Prescribing Guidelines. The discussion was immediately interrupted by Brian Sabin, Manager of Industry Relations, who explained that they needed to delay implementation to "ensure we protect rebates" because "we cannot sacrifice rebates on only the 80mg strength here" as that would mean OptumRx would "sacrifice rebates on *all* OxyContin scripts."[308]

---

[307] OPTUMRX_JEFFCO_0000206377. (2/7/17).

[308] OPTUMRX_JEFFCO_0000261777 (6/9/17).

> Based solely on the Purdue contract, **I would highly suggest delaying the MED implementation on all clients until 1/1/2018** – as we are doing with the new criteria – so we have time to ensure we can protect rebates. Purude has a clause built into their agreement that mandates that ALL strengths be unrestricted. So we cannot sacrifice rebates on only the 80mg strength here. We would sacrifice rebates on *all* Oxycontin scripts.

309

667. Here, again, a PBM Defendant did not take an action that it could have taken to block inappropriate prescription opioid dispensing.

668. As another example, despite their contractual obligations and their public representations, it was not until 2019 that OptumRx even began to consider exclusion of OxyContin from its formularies.

669. An email exchange in March 2019 between Brian Sabin, Optum Director of Industry Relations, and Venkat Vadlamudi, Optum, raises the question whether they should remove OxyContin from its formularies altogether, "rebate losses be damned," arguing that Purdue caused the opioid epidemic and Optum's continued inclusion of OxyContin on its formularies was "rewarding their bad behavior." He argues that, "[f]rom a purely PR perspective, I think it would look good on us." In response, Vadlamudi states that "[w]e as a company looked into this," but the amount of OxyContin rebates Optum collected "prevented us from doing it." As even Vadlamudi then goes on to admit, "[b]ut times are different now. [I]f you can look into it and model the scenarios <u>maybe</u> we can change."[310]

---

309 *Id.*

310 OPTUMRX_JEFFCO_0000506200 (3/4/19).

670. Even as Purdue explored bankruptcy and OptumRx became aware of the potential for lost rebates, the answer was not to discontinue OxyContin's preferred formulary position, but instead to move other drugs into preferred positions in order to ensure the free flow of prescription opioids from another Opioid Enterprise Manufacturer in the Formulary & UM Enterprise.[311]

671. Express Scripts went through similar issues with OxyContin prescribing. In a March 2017 email, there were several employees from Express Scripts who derided the decision by the Express Scripts Value Added Committee to overrule the prior authorization limit on OxyContin, stating that the decision did not sit well with them at all.[312] As Express Scripts employees noted, this decision made no clinical sense.[313] Without question, the prior authorization limit would have dramatically reduced medically inappropriate prescribing, sales, and dispensing which would have impacted "rebate gain."[314]

672. But the PBM Defendants' involvement did not end there. As alleged more fully herein, Express Scripts and Optum each own and operate a mail order pharmacy. As alleged above, each of the PBM Defendants' mail order pharmacies dispensed massive amounts of branded and generic opioids without performing the requisite due diligence on prescriptions or refusing to fill prescriptions that could not be resolved through due diligence. As such, the mail order pharmacies provided

---

[311] OPTUMRX_JEFFCO_0000089527 (9/4/19).

[312] ESI_JEFFCOMO_000029940 (3/23/17).

[313] *Id.*

[314] *Id.*

another mechanism for the goal of the Formulary & UM Enterprise—*i.e.*, the unrestricted increase in prescribing and dispensing of prescription opioids for the profit of the Opioid Enterprise Manufacturers and the PBM Defendants.

673. By dispensing branded and generic prescription opioids without performing the requisite due diligence on prescriptions or refusing to fill prescriptions that could not be resolved through due diligence, the PBM Defendants' mail-order pharmacies furthered the common purpose of the Formulary & UM Enterprise. They continued to facilitate the increased dispensing and sale of prescriptions opioids. However, this also violated the law governing dispensing controlled substances in Schedules II through IV in ways that are punishable as felonies.

674. As alleged more fully herein, the Formulary & UM Enterprise maintained a common purpose from the late 1990s through to the present day, creating sufficient longevity in their personal business relationships for them to pursue the common purpose of the Formulary & UM Enterprise.

## C. Conduct and Participation of the Formulary & UM Enterprise Through a Pattern of Racketeering Activity

675. The common purpose of the Formulary & UM Enterprise alleged more fully herein was perpetrated through a fraudulent scheme fulfilled by multiple acts of mail fraud and wire fraud, and by felonious possession and dispensing of controlled substances. PBM Defendants predicate acts of racketeering, constituting a pattern of racketing activity.

676. The pattern of racketeering activity used by the PBM Defendants and their mail order pharmacies likely involved thousands of separate instances of the

use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme through which the common purpose was achieved.

677.  Use of the mail and wire facilities began with the formation of the Formulary & UM Enterprise. Negotiations and communications about the contracts between the PBM Defendants and the Opioid Enterprise Manufacturers occurred through interstate mail and wire facilities and involved meetings, communications, and negotiations about contracts between the PBM Defendants and the Opioid Enterprise Manufacturers, the Opioid Enterprise Manufacturers' marketing and the PBM Defendants assistance therewith, and pull-through marketing which required the transmission of large volumes of data.

678.  As alleged more fully herein, the Opioid Enterprise Manufacturers and the PBM Defendants regularly and continuously communicated through the use of the U.S. Mail and interstate wire facilities in furtherance of the common purpose of the Formulary & UM Enterprise and their fraudulent scheme, including discussions of formulary placement, prior authorization limits, step edits, preferred formulary status and their impact on opioid prescribing and dispensing and, relatedly, rebates and other fees. Importantly, rarely mentioned during these discussions was the impact of the burgeoning opioid epidemic. These discussions were clearly intended to further the common purpose of the Formulary & UM Enterprise, happened over at least the last two decades (beginning with Purdue's work with predecessors of Optum and Express Scripts and continuing to involve more Opioid Enterprise Manufacturers

over time), and reveal the ongoing personal business relationships that developed between the members of the Formulary & UM Enterprise.

679. Similarly, each PBM Defendant engaged in significant pull-through marketing assistance with each Opioid Enterprise Manufacturer. As revealed by documents cited herein, each of the PBM Defendants, through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme, agreed to provide the Opioid Enterprise Manufacturers with preferred formulary placement and prescribing data. This ensured that the unfettered formulary access (granted despite the PBM Defendants' contrary representations to the public and their clients), would facilitate unrestricted opioid prescribing and dispensing. Documents confirm these facts and evidence that unrestricted formulary access was a boon for each Opioid Enterprise Manufacturers marketing efforts and that "pull through" efforts were undertaken after each formulary announcement "win" in order to drive the Opioid Enterprise Manufacturers' profitability. The PBM Defendants were not only aware of this pull through marketing, they actively joined in efforts with the Opioid Enterprise Manufacturers by creating reports about the "value proposition" of unrestricted use of prescription opioids as alleged more fully herein.

680. Finally, each PBM Defendant and the Opioid Enterprise Manufacturers regularly (and through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme) participated in trade industry associations and informal coalitions that provided recurring non-contractual opportunities and forums

in which to continue developing personal business relations and in which they form a common purpose of growing the unfettered use of opioid drugs.

681. The PBM Defendants each engaged in essentially uniform conduct with the Opioid Enterprise Manufacturers whereby the PBM Defendants granted the Opioid Enterprise Manufacturers' drugs unfettered formulary access (including preferred formulary placement coupled with refraining from UM) despite their public promises and contractual obligations to make formulary and UM decisions in their clients' best interests, and facilitated their pull through marketing and/or directly facilitated the dissemination of their marketing messages. The PBM Defendants also provided the Opioid Enterprise Manufacturers with PBM data so that they could pull through the formulary "wins" and drive increased prescribing. At the back end of the fraudulent scheme, the PBM Defendants profited from their fraud by receiving rebates and other fees while the Opioid Enterprise Manufacturers enjoyed increased sales through pull through marketing and unfettered formulary access.

682. The fraudulent scheme was advanced through mailings and interstate wire transmissions that constitute racketeering activity. Collectively, these violations constitute a pattern of racketeering activity, through which the PBM Defendants and their mail order pharmacies and the Opioid Enterprise Manufacturers defrauded and intended to defraud consumers in New York and Plaintiff's Community, the State, and other intended victims.

683. The PBM Defendants and their mail order pharmacies devised and knowingly carried out an illegal and fraudulent scheme using materially false or

fraudulent pretenses, representations, promises, or omissions regarding their conduct. Specifically, as alleged more fully herein, the PBM Defendants promised to perform pharmacy benefit management services, including cDURs, formulary decisions, and UM decisions in their clients' best interests and in ways that would ensure safe and effective prescribing. As alleged herein, the PBM Defendants further represented to their clients and the public that they were committed to preventing and addressing misuse, abuse, and diversion of prescription opioids. These promises were made in person, in publications, and through the mail and the wires.

684.   The PBM Defendants and their mail order pharmacies did not intend to comply with their contractual obligations, the promises to their clients, or their public representations. The PBM Defendants and their mail order pharmacies intended to continue to make decisions and take actions that benefitted the members of the Formulary & UM Enterprise and its common purpose by: failing to perform cDURs, granting unfettered formulary access, and blocking implementation of any UM measures. All told, the PBM Defendants and their mail order pharmacies intended to take actions that directly contradicted their promises, contractual obligations and public promises because they supported increased prescribing, sale, and dispensing of prescription opioids with as little inhibition or impediments as possible.

685.   The PBM Defendants and their mail order pharmacies intended that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities intentionally and knowingly with the specific intent to advance and for the purpose of executing the illegal and fraudulent scheme.

686.    By engaging in their intended conduct, as alleged more fully herein, the PBM Defendants and their mail order pharmacies engaged in fraudulent and unlawful conduct constituting a pattern of racketeering activity.

687.    The PBM Defendants and their mail order pharmacies used the U.S. Mail and interstate wire facilities to perpetrate the fraudulent scheme of the Formulary & UM Enterprise with thousands of communications, publications, representations, statements, electronic transmissions, and payments including, but not limited to:

(a) Contracts negotiated and circulated between members of the Formulary & UM Enterprise;

(b) Contracts negotiated and circulated between PBM Defendants and their clients;

(c) Public representations by the Opioid Enterprise Manufacturers and the PBM Defendants about their commitment to addressing misuse, abuse, and diversion of prescription opioids;

(d) Marketing materials about prescription opioids transmitted between the Opioid Enterprise Manufacturers and the PBM Defendants that were later disseminated by the PBM Defendants;

(e) Communications between the PBM Defendants and their clients about their commitment to following the terms of their respective contracts;

(f) Communications between the Opioid Enterprise Manufacturers and the PBM Defendants regarding formulary changes;

(g) Communications between the Opioid Enterprise Manufacturers and the PBM Defendants regarding and including PBM prescribing data;

(h) Transmission of rebate payments; and

(i) Transmission of payments from the clients of the PBM Defendants.

688.     To achieve the common purpose of the Formulary & UM Enterprise, the PBM Defendants and their mail order pharmacies and the Opioid Enterprise Manufacturers hid from their clients, patients, regulators and Plaintiff: (a) the fraudulent nature of the scheme; (b) the fraudulent nature of their representations; (c) their intention to ignore their contractual cDUR obligations; (d) intent to make formulary and UM decisions that failed to limit the medically unnecessary and inappropriate prescribing, sales, or dispensing of prescription opioids or address misuse, abuse, and diversion; and (e) the true nature of the association between each member of the Formulary & UM Enterprise.

689.     Each member of the Formulary & UM Enterprise, including the PBM Defendants and their mail order pharmacies, agreed with the overall objective of the Formulary & UM Enterprise's fraudulent schemes and participated by taking action that furthered the common purpose of the Formulary & UM Enterprise, including in the common course of conduct to commit acts of fraud and indecency.

690.     The pattern of racketeering activity involving the felonious possession and dispensing of controlled substances in Schedules II through IV likely involved thousands, if not millions, if improperly dispensed prescriptions for branded and generic prescription opioids in violation of the CSA and PBM Defendants' registrations as mail-order pharmacies. PBM Defendants knowingly and intentional possessed and dispensed branded and generic prescription opioids for reasons that were not authorized by the CSA.

691.    The predicate acts of the Formulary & UM Enterprise all had the purpose of furthering the opioid epidemic that substantially injured Plaintiff's business and property, while simultaneously generating billion-dollar revenue for the PBM Defendants and their mail order pharmacies. The predicate acts were committed, and/or caused to be committed, by the PBM Defendants and their mail order pharmacies through their participation in the Formulary & UM Enterprise and in furtherance of the fraudulent schemes, felonious possession and dispensing of controlled substances, and common purpose thereof.

## IX.    Plaintiff's Claims Are Timely

692.    Defendants' wrongful conduct is still ongoing and has caused Plaintiff repeated injuries and/or a continuous injury over many years.

693.    The nuisance caused, contributed to, and/or maintained by Defendant's conduct continues to exist. The nuisance caused, contributed to, and/or maintained by Defendant's conduct is abatable.

694.    A reasonably prudent person in Plaintiff's position would not have known, or been placed on inquiry notice, not just of the Defendants' wrongful conduct, but that substantial, non-transient damage had resulted and was capable of ascertainment. Plaintiff did not learn that it had been injured by Defendants' actions, the source of those injuries, or that those injuries were part of a pattern of conduct until only recently, until documents revealing those facts were produced in discovery by various entities in *In re: National Prescription Opiate Litigation*, Case No. 1:17-md-2804-DAP (N.D. Ohio) and other opioids litigation, including the documents cited, quoted, and relied on throughout this complaint. These documents—and the facts

they contain—have never before been made public, nor have they ever before been in Plaintiff's possession, and not otherwise available to Plaintiff before being produced in discovery. Thus, any applicable limitations period did not begin to run when Defendants committed their wrongful acts but when the damage resulting from Defendants' wrongful acts was sustained and capable of ascertainment by Plaintiff, which did not occur until the documents revealing those facts were produced in discovery.

695. Defendants are equitably estopped from relying upon a statute of limitations defense and/or any applicable statutes of limitation are equitably tolled because Defendants undertook active efforts to deceive or mislead Plaintiff and to purposefully conceal their unlawful conduct.

696. Defendants undertook efforts, including through the use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme, to purposefully conceal their wrongful conduct by: (1) manipulating and distorting public information, knowledge, and facts; (2) misrepresenting their role in the pharmaceutical market as promoting safe use and appropriate opioid dispensing; (3) assuring the public and governmental authorities that they were complying with their obligations and were acting to prevent diversion and drug abuse; (4) hiding the true nature of their relationships with the Opioid Manufacturers; (5) failing to make public or otherwise produce nonpublic information, over which Defendants had exclusive possession, dominion, and control, that would have revealed the truth; (6) entering into overly broad confidentiality agreements with any entity in the supply

chain with whom they contracted; (7) suing governmental and other entities to block the release of details in their agreements with the Opioid Manufacturers and pharmacies; and (8) by deliberately and fraudulently concealing the truth.

697.    Defendants knew of their wrongful acts and had material information pertinent to their discovery, but concealed that information from the public, including from the Plaintiff.

698.    Defendants fraudulently concealed from Plaintiff the existence of Plaintiff's causes of action. Defendants' public misrepresentations about their role in the pharmaceutical market, and that they were ensuring the safe use and appropriate opioid dispensing, and preventing diversion and drug abuse, prevented Plaintiff from investigating Defendants' fraud.

699.    Defendants also concealed from Plaintiff the existence of Plaintiff's claims by misrepresenting to the public, as well as to their clients, that they used their market power to create formularies and UM programs based on the health and safety of the public and of the lives covered by the benefit plans that were their clients. As alleged herein, Defendants repeatedly represented that they were working to ensure that opioids were prescribed and dispensed only for safe and legitimate reasons. These misrepresentations were made in person, in client contracts, on Defendants' websites, in publications and in Congressional testimony. Defendants told the public, their clients and Congress that they were experts who were committed to preventing and addressing misuse, abuse, and diversion of prescription opioids.

700.   The PBM Defendants and their mail order pharmacies hid from their clients, patients, regulators and Plaintiff: (a) the fraudulent nature of their relationship with the Opioid Manufacturers; (b) the fraudulent nature of their representations; (c) their intention to ignore their contractual cDUR obligations; (d) intent to make formulary and Utilization Management decisions that failed to limit the medically unnecessary and inappropriate prescribing, sales, or dispensing of prescription opioids or address misuse, abuse, and diversion; and (e) the true nature of the association between each member of each PBM Enterprise.

701.   Plaintiff did not discover the nature, scope and magnitude of Defendants' misconduct, and its full impact on Plaintiff's Community, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

702.   Defendants intended that their actions and omissions would be relied upon, including by Plaintiff and Plaintiff's Community. Plaintiff and Plaintiff's Community did not know and did not have the means to know the truth, due to Defendants' actions and omissions.

703.   Plaintiff and Plaintiff's Community reasonably relied on Defendants' affirmative statements alleged herein, including those regarding Defendants' commitment to preventing and addressing the misuse, abuse, and diversion of opioids.

704.   Through their public statements, marketing, and advertising, Defendants' deceptions deprived the Plaintiff of actual or presumptive knowledge of facts sufficient to put them on notice of potential claims.

705. Only Defendants knew of their widespread misinformation campaign and of their repeated, intentional failures to prevent opioid overutilization and diversion.

706. Due in large part to their deceptive, intentional, and fraudulent conduct, the full scope of Defendants' wrongful conduct and their central role in the opioid epidemic has not yet come to light.

## X. Defendants Entered into and Engaged in a Civil Conspiracy

707. Defendants' conspiracy and acts in furtherance thereof are alleged in detail in these Supplemental and Amended Allegations to Plaintiff's Verified Complaint, as well as each and every allegation set forth in all other paragraphs of its Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5), as if fully set forth herein, including without limitation, all paragraphs addressing the PBM Defendants' agreements and concerted action with the opioid manufacturers, all paragraphs addressing Defendants' enterprises, and all racketeering counts. These allegations are specifically incorporated herein.

708. As alleged in these paragraphs, the PBM Defendants and the opioid manufacturers engaged in concerted action to accomplish an unlawful objective, or to accomplish a lawful objective by unlawful means: the unfettered sale and dispensing of vast quantities of opioids in Plaintiff's Community without regard to patient safety, the impact on the community, or their obligations and duties under federal and state law. Each of the Defendants either actively participated and/or aided and abetted in the pursuance of this common purpose.

253

709. Specifically, opioid manufacturers contracted and agreed with PBMs, including the PBM Defendants, to coordinate unfettered formulary placement with no or limited UM measures regarding each opioid drug such that there would be as little an impediment as possible to opioid prescribing and dispensing. These contracts relied on an underlying fraudulent scheme designed to ensure unfettered access to PBM formularies. The opioid manufacturers understood that the PBM Defendants were going to operate on a fundamentally fraudulent basis. As alleged more fully herein, even though the PBM Defendants promised their clients they would take actions that would ensure the safety of opioid prescribing and dispensing, the PBM Defendants had no intention of taking actions regarding the opioid manufacturers' branded and generic drugs that would have ensured safety, because those actions would have dramatically reduced their receipt of rebates, revenue from opioid dispensing, and other fees. At the same time, the PBM Defendants operated their mail-order pharmacies in such a way that they did not stop obviously illegitimate prescriptions from being dispensed.

710. As detailed herein and in Plaintiff's Verified Complaint, as well as each and every allegation set forth in all other paragraphs of its Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5), the PBM Defendants and the opioid manufacturers committed numerous overt acts to further the conspiracy's objectives that were unlawful under federal and/or State law.

711. At all relevant times, each Defendants was aware of the enterprise's conduct, was a knowing and willing participant in that conduct, and reaped profits

from that conduct in the form of increased sales, distributions, and prescriptions of opioids.

712.    By knowingly misrepresenting the appropriate uses, risks, and safety of opioids, Defendants committed overt acts in furtherance of their conspiracy.

713.    As an intended result of the intentional wrongful conduct as set forth herein, the PBM Defendants have profited and benefitted from the opioid epidemic they caused, thus harming Plaintiff and Plaintiff's Community.

714.    As a proximate result of the PBM Defendants' and their co-conspirators, the opioid manufacturers', intentional wrongful conduct, Plaintiff has incurred substantial costs including, but not limited to, law enforcement action for opioid-related to drug crimes, for addiction treatment, and other services necessary for the treatment of people addicted to prescription opioids, and the other harms alleged herein. Similarly, abating the vast societal harms Defendants and their co-conspirators caused will require extensive efforts and substantial resources. These costs and harms are addressed in more detail in the paragraphs addressing Plaintiff's racketeering and public nuisance counts. These allegations are specifically incorporated herein.

715.    Plaintiff seeks to impute liability for Plaintiff's other claims on the PBM Defendants for the wrongful conduct of their co-conspirators, the opioid manufacturers, and to hold the PBM Defendants jointly and severally liable for that conduct.

716.    Additionally, as discussed above and in Plaintiff's Verified Complaint, dated June 5, 2019 (1:19-op-45853, Doc #: 1-5), the conduct of Defendants and their co-conspirators, the opioid manufacturers, was willful, wanton, and malicious, was directed at the public generally, constituted a gross and wanton fraud upon the public, and/or constituted gross negligence. For this reason, Plaintiff seeks to recover punitive/exemplary damages.

## XI.    Successor Liability

717.    To the extent that the wrongful acts or omissions alleged herein where committed or omitted by predecessor entities, their respective successor entities are liable for those acts or omissions because (1) they expressly or impliedly assumed the predecessor's liability, (2) there was a consolidation or merger of predecessor and successor, or (3) the surviving entity was a mere continuation of the predecessor. To the extent there was no formal merger of predecessor and successor, the respective successor entities are also liable for the wrongful acts or omissions of their respective predecessors based on the doctrine of de facto merger based on the factors of (a) continuity of ownership; (b) cessation of ordinary business and dissolution of the predecessor; (c) assumption by the successor of liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; (d) continuity of management, personnel, physical location, assets and general business operation of the predecessor, and (e) assumption of an identical or nearly identical name. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

## XII.  Alter Ego Liability

718.    To the extent that the wrongful acts or omissions alleged herein where committed or omitted by wholly-owned or majority-owned entities, the parent entities are liable for those acts or omissions as alter egos because (1) they dominated and controlled the wholly-owned or majority-owned entity and (2) exercised that domination and control to perpetrate a wrong or injustice. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

## XIII.  Claims for Relief [315]

### FIRST CLAIM FOR RELIEF—CREATION OF A PUBLIC NUISANCE
### (Brought by Plaintiff against All Defendants)

719.    Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to Plaintiff's Verified Complaint, as well as each and every allegation set forth in all other paragraphs of its Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5), as if fully set forth herein, and further alleges as follows:

720.    Defendants intentionally and/or negligently and recklessly caused, created, contributed to, and/or maintained a public nuisance which interfered with

---

[315] Plaintiff's Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5) asserted an Unjust Enrichment claim and a Fraud claim against all Defendants. Plaintiff here withdraws its Unjust Enrichment claim and Fraud claim as to the PBM Defendants only.  Those claims and all other claims are still asserted as to all other Defendants.

public rights, including the public rights to health and safety, in Plaintiff's Community.

721.    Each Defendant is liable for the public nuisance because its conduct has caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of, and/or substantial factor leading to, Plaintiff's injury. *See* Restatement Second, Torts §821B.

722.    Defendants, by colluding with manufacturers to make opioids more available and ignoring evidence of addiction and misuse found in their own claims data and/or other actions and inactions described herein, created and maintained the opioid epidemic in Plaintiff's Community, which is harmful and disruptive to, and unreasonably annoys, injures, endangers, and interferes with the public health, public safety, public peace, public comfort, and/or public convenience. The public nuisance caused by Defendants has significantly harmed, and continues to significantly harm, the Plaintiff and a considerable number of the residents of Plaintiff's Community.

723.    Each Defendant gathered enormous amounts of data about the opioid prescriptions and opioid-related claims of their members in Plaintiff's Community and across the country. Defendants used this data to enhance their profitability but opted not to use it to inform their marketing practices, identify and prevent diversion, or identify and prevent the dispensing and sale of unreasonably large quantities of opioids, and "cocktails" of opioids and other drugs, in Plaintiff's Community and the surrounding communities.

724. Defendants have created and maintained a public nuisance through their ongoing intentional and/or negligent and reckless conduct, including, but not limited to: undertaking to administer prescription drug benefits and dispensing in the public interest and in conformity with public health and safety, and then electing not to (and/or failing to) appropriately carry out these obligations; fraudulently and/or falsely promoting the use of opioids for conditions and in circumstances where they are neither safe nor effective; misrepresenting to the public and the medical community that opioids could be taken at high does and for long durations with minimal risk of addiction; electing not to (and/or failing to) use the wealth of data available to them to identify and address signs of over-prescribing, illegitimate and dangerous use of opioids, misuse, abuse, and diversion; facilitating and encouraging the use of dangerously addictive opioids by colluding with manufacturers to place opioid drugs on standard formulary offerings with preferred status; declining to impose limits on their approval for use of opioids in exchange for payments and fees from manufacturers; electing not to (and/or failing to) provide controls against diversion in their PBM services; and violating the Controlled Substances Act, and State controlled substances and pharmacy laws and regulations, by failing to detect and guard against diversion when dispensing opioids, and "cocktails" of opioids and other drugs, through their mail order pharmacies, and in their provision of PBM services. Their conduct caused prescriptions and sales of opioids to skyrocket, and Defendants failed to limit their use even as evidence of the epidemic mounted, including Plaintiff's Community, flooding Plaintiff's Community with opioids and

facilitating and encouraging the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to Plaintiff's Community and its residents.

725. Defendants knew, or were substantially certain, or reasonably should have known that their intentional and/or negligent, unreasonable, reckless, and/or unlawful conduct would and did cause opioids to be used and possessed illegally and that their conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental and unreasonable effect upon the public health, welfare, safety, peace, comfort, and convenience of Plaintiff and the residents of Plaintiff's Community.

726. Defendants' conduct has injuriously affected rights common to the general public, specifically including the rights of the people of Plaintiff's Community to public health, safety, peace, comfort, and convenience. The public nuisance caused by Defendants' actions has caused substantial annoyance, inconvenience, and injury to the public.

727. The interference is unreasonable because Defendants' nuisance-creating conduct:

    (a) Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

    (b) At all relevant times was and is proscribed by state and federal laws and regulations; and/or

    (c) Is of a continuing nature and, as Defendants know, has had and is continuing to have a significant effect upon rights common to the

general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

728. The significant interference with rights common to the general public is described in detail herein and in Plaintiff's its Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5), and includes but is not limited to:

(a) The creation and fostering of an illegal, secondary market for prescription opioids;

(b) Easy access to prescription opioids by children and teenagers;

(c) A staggering increase in opioid abuse, addiction, overdose, injuries, and deaths;

(d) Infants being born dependent on, or addicted to, opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

(e) Employers having lost the value of productive and healthy employees; and

(f) Increased costs and expenses for Plaintiff relating to healthcare services, law enforcement, the criminal justice system, social services, and education systems.

729. Defendants knowingly, intentionally, recklessly, negligently, and/or unlawfully pushed as many opioids, and "cocktails" of opioids and other drugs, onto the market as possible, fueling addiction to and diversion of these powerful narcotics, resulting in increased addiction and abuse, an elevated level of crime, death and injuries to the residents of Plaintiff's Community, a higher level of fear, discomfort and inconvenience to the residents of Plaintiff's Community, and direct costs to Plaintiff and the residents of its community.

730.    Defendants are liable for creating the public nuisance because the intentional and/or negligent, and unreasonable and/or unlawful conduct of each Defendant was a substantial factor in producing the public nuisance and harm to Plaintiff.

731.    At all relevant times, Defendants were (or reasonably should have been) aware of, and understood, their legal obligations under the federal Controlled Substances Act (21 U.S.C. § 801, *et seq.*), the New York State Controlled Substance Act (10 N.Y.C.R.R § 80, *et seq.*) and applicable New York pharmacy laws and regulations regarding the dispensing of prescription opioids.

732.    In their sale and dispensation of opioids, and "cocktails" of opioids and other drugs, in the State and in Plaintiff's Community, Defendants violated federal law, including, but not limited to, 21 U.S.C.A. §§ 829, 841, 842 and 21 C.F.R. §§ 1301.71, 1306.04, 1306.06, and New York law, including, but not limited to, New York State Controlled Substance Act and applicable New York pharmacy laws and regulations Defendants' violations of these laws were committed knowingly and/or negligently and recklessly.

733.    Defendants' intentional (and/or negligent and reckless), unlawful, and unreasonable conduct that created, continued, and/or maintained the public nuisance in Plaintiff's Community, for which the gravity of the harm outweighs the utility of the conduct, is described herein and in Plaintiff's its Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5) and includes, but is not limited to:

(a) Knowingly and intentionally (and/or negligently and recklessly) colluding with the opioid manufacturers in deceptive marketing

262

schemes that were designed to, and successfully did, change the perception of opioids and cause opioid prescribing and sales to skyrocket;

(b) Knowingly and intentionally (and/or negligently and recklessly) facilitating the increased use of opioids by giving opioids unwarranted preferred formulary status in standard offerings in exchange for profiting from payments from the opioid manufacturers;

(c) Intentionally (and/or negligently and recklessly) maintaining preferred formulary status for OxyContin and other highly abused opioids in standard offerings, despite knowing, or being substantially certain, from their own extensive data, that addiction, abuse, and illegitimate prescribing of such drugs were rampant;

(d) Deliberately (and/or negligently and recklessly) electing not to undertake timely actions utilizing their real-time data that would have drastically reduced the inappropriate prescribing and dispensing of Opioids, such as requiring prior authorization, step therapy, limiting days of supply, or excluding OxyContin from its standard formulary offerings;

(e) Deliberately (and/or negligently and recklessly) electing not to impose prior authorization requirements or limits on the availability of opioids in standard formulary offerings in exchange for payments from the opioid manufacturers;

(f) Deliberately (and/or negligently and recklessly) electing not to maintain adequate safeguards to dispense opioids in a safe and effective manner and to maintain effective controls against diversion of opioids through their mail-order pharmacies; and

(g) Deliberately (and/or negligently and recklessly) electing not to report suspicious prescribers and pharmacies.

734. When Defendants engaged in this conduct, they knew, or were substantially certain, or reasonably should have known, that, *inter alia*: (i) increasing the availability of opioids would increase the number of opioids that would be abused, misused, and diverted into the illegal, secondary market and would be obtained by persons with criminal purposes; (ii) the marketing by manufacturers with which they

colluded was deceptive and that Defendants' conduct served to increase opioid sales; (iii) many of the opioid prescriptions they dispensed, or facilitated the dispensing of, were not issued for a legitimate medical purpose and were likely to be diverted; and (iv) by failing to act reasonably and lawfully with respect to the sale and dispensing of opioids, and "cocktails" of opioids and other drugs, and by participating in the false marketing of opioids, in Plaintiff's Community, diversion and the associated harms and resulting interference with public health, safety, and welfare would occur.

735. At all relevant times, Defendants knew or reasonably should have known that opioids were dangerous because, *inter alia*, these drugs are defined under federal and state law, and are generally recognized, as substances posing a high potential for abuse, addiction, and death.

736. Indeed, prescription opioids are essentially medical grade heroin. Defendants' wrongful and unreasonable conduct of pushing as many opioids, and "cocktails" of opioids and other drugs, onto the market as possible led directly to the public nuisance and harm to Plaintiff—exactly as would be expected when medical-grade heroin in the form of prescription opioids flood the community and are diverted into an illegal, secondary market.

737. It was reasonably foreseeable to Defendants that their conduct would result in the public nuisance and unreasonable harm to Plaintiff described herein.

738. Defendants owe Plaintiff and the public a duty to employ reasonable standards of care in the sale, delivery, dispensing, promotion, and gatekeeping

control of the supply of highly addictive, dangerous opioids. This includes a duty to not create a foreseeable risk of harm or injury.

739. The degree of care the law requires is commensurate with the risk of harm the conduct creates. Defendants' conduct in selling, delivering, dispensing, promoting, and gatekeeping control of the supply of highly addictive and dangerous opioids requires a high degree of care and places them in a position of great trust and responsibility. Their duty cannot be delegated.

740. Defendants, by promoting opioid over-use and by facilitating access to opioids through their formularies and UM and mail-order pharmacies, set in motion a force that created an unreasonable and foreseeable risk of harm for Plaintiff and its community.

741. Defendants also undertook and assumed a duty to create standard formulary and UM offerings based on the health and safety of the public and of the lives covered by the benefit plans that were their clients. *See* Restatement (Second) of Torts § 324A. Defendants represented to the public, as well as to their clients, that they were structuring their standard formulary and UM offerings based on the health and safety of the public and the lives their clients insured, when in fact they were doing the exact opposite and doing it to maximize their own revenue in concert with the opioid manufacturers. Defendants knew, at the time that they made these representations to the public and to their clients, that they would not base their formulary and UM offerings on the health and safety of the covered lives involved, nor of the public, but rather that they would make, and were already making,

formulary and utilization management decisions designed solely (or at least primarily) to increase profits to Defendants.

742.    Defendants undertook to render services which Defendants should have recognized (and in fact did know) were necessary for the protection of persons, including the public, residents of Plaintiff's Community, and Plaintiff, and failed to exercise reasonable care such that it increased the risk of harm to the public, residents of Plaintiff's Community, and the Plaintiff. In so undertaking, Defendants assumed a duty to the public, residents of Plaintiff's Community, and the Plaintiff.

743.    Defendants knew or reasonably should have known of the over-use and over-supply of opioids because of their access to claims and other data which they developed and maintained. Defendants also had the ability to curtail the over-use and over-supply of prescription opioids because of their unique gatekeeping function in the pharmaceutical supply chain. Yet, despite this knowledge and ability, Defendants refused and failed to take necessary and appropriate actions to prevent the harms which were the foreseeable consequence of their failures, actions, and inactions.

744.    Defendants, having facilitated and set in motion the over-use and over-supply of opioids, had a duty to use reasonable care to prevent and curtail the spreading opioid crisis.

745.    Defendants breached this duty by failing to exercise reasonable care or skill with respect to their opioid-related conduct. Collectively and individually, Defendants made highly addictive prescription opioids available to the marketplace with the knowledge that they were likely being used for non-medical purposes and/or

posed an inherent danger especially to patients who were using opioids for chronic pain not associated with active cancer, end-of-life or palliative care. Defendants knew or reasonably should have known that their breach would foreseeably cause harm to Plaintiff and local governments nationwide.

746.   Defendants were negligent in failing to abide their duties to conduct themselves with the requisite care and skill and faithfulness.

747.   Defendants placed their profit motives above their legal duties and enabled, encouraged, and caused the over-use and over-supply of opioids.

748.   Defendants are highly sophisticated and knowledgeable actors in the health care marketplace, well informed of the highly addictive nature of prescription opioids and likelihood of foreseeable harm to communities from prescription opioid addiction and diversion. Defendants breached their duties when they failed to act with reasonable care in their respective roles, roles which positioned each of them to help abate the opioid epidemic if they elected to use their power for good, instead of profit.

749.   Violating these duties poses distinctive and significant dangers to Plaintiff.

750.   Defendants knew or in the exercise of reasonable diligence should have known under the circumstances of this case that the public nuisance and the harms suffered by Plaintiff were the reasonably foreseeable consequences of Defendants' failures, actions, and inactions.

751. It was also reasonably foreseeable to Defendants that their conduct would create a new secondary market for opioids—providing both the supply of narcotics to sell and the demand of addicts to buy them. The result of Defendants' deceptive and improper conduct is not only an explosion of prescription opioids on the black market, but also—predictably—a marked increase in the availability of heroin and synthetic opioids.

752. The health, safety, and welfare of the citizens of Plaintiff's Community, including those who use, have used, or will use opioids, as well as those affected by opioid users, is a matter of great public interest and legitimate concern to the citizens and residents of Plaintiff's Community. It was reasonably foreseeable to Defendants that the burden of the opioid crisis would fall to communities like Plaintiff in the form of social and economic costs.

753. The public nuisance created by Defendants' intentional, negligent, and/or reckless conduct is substantial and unreasonable. It has caused and continues to cause significant harm to Plaintiff and the residents of Plaintiff's Community, and the harm inflicted greatly outweighs any offsetting benefit.

754. The injuries to Plaintiff would not have happened in the ordinary course of events had Defendants exercised the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of their business in the sale, delivery, dispensing, promotion, and gatekeeping control of opioids.

755. Defendants' conduct is widespread and persistent and creates substantial and ongoing harm. The harm inflicted outweighs any offsetting benefit.

Defendants' conduct has caused deaths, serious injuries, and a severe disruption of public peace, health, order and safety. Defendants' ongoing and persistent misconduct is producing permanent and long-lasting damage.

756.    Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used in Plaintiff's Community. Because of Defendants' actions in using their unique position to increase the availability of opioids in the marketplace and inflate opioid sales, because of their collusion with manufacturers in the deceptive marketing of opioids, and because of Defendants' special position within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

757.    Defendants had control over their conduct in and affecting Plaintiff's Community as is described herein, and that conduct has had an adverse effect on the public. Defendants had sufficient control over, and responsibility for, the public nuisance they created. Defendants were in control of the "instrumentality" of the nuisance, namely the dissemination of prescription opioids, their collusion with manufacturers in promoting opioids, and standard formulary and drug utilization management offerings that increased utilization of opioids as described herein.

758.    Plaintiff does not allege that the opioid drugs are inherently defective, nor that the FDA-approved warning labels are inadequate, and Plaintiff does not seek a remedy under theories of product defect or failure to warn.

759.   Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

760.   Defendants' scheme to optimize profits and opioid utilization regardless of the harm that was substantially certain to occur to Plaintiff's Community was done knowingly and intentionally and/or negligently and recklessly.

761.   But for Defendants' actions, opioid use—and, ultimately, misuse and abuse—would not be as widespread as it is today, and the opioid epidemic that currently exists would have been averted or greatly curtailed.

762.   As a direct and proximate cause of Defendants' intentional and/or negligent and reckless conduct creating or assisting in the creation of a public nuisance, Plaintiff, its community, and its residents have sustained and will continue to sustain substantial injuries.

763.   Plaintiff has authority under New York common law to abate a public nuisance.

764.   Plaintiff brings this action to promote the public welfare, for the benefit of all who live in and around Plaintiff's Community, the public generally, and the State.

765.   In addition, Plaintiff has sustained injury to its property and resources because of the public nuisance described herein.

766.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's

existence. Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

767.    Defendants' misconduct alleged in this case is ongoing and persistent, as is the nuisance to which they substantially contributed.

768.    As a direct and proximate result of Defendants' intentional and/or negligent and reckless conduct and the public nuisance created by Defendants, Plaintiff has incurred, and will continue to incur, excessive costs to treat the opioid epidemic in its community including, but not limited to, increased costs of police, emergency, health, prosecution, corrections, rehabilitation, and other services. These costs are over and above Plaintiff's ordinary public services.

769.    As a direct and proximate result of Defendants' intentional and/or negligent and reckless conduct and the public nuisance created by Defendants, public resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resources which would otherwise be used to serve the public at large in Plaintiff's Community.

770.    Plaintiff seeks to abate the nuisance created by Defendants' unreasonable, unlawful, intentional and/or negligent, reckless, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public.

771.    The public nuisance in Plaintiff's Community—*i.e.*, the opioid epidemic—created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be prevented. However,

Defendants lack the infrastructure and expertise needed to abate the public nuisance they created, contributed to, and/or maintained in Plaintiff's Community. Defendants' conduct – including their lack of regard for the well-being of the citizens of Plaintiff's Community by elevating their own business interests and profit over the safety and health of the communities in which they marketed, promoted, dispensed, and sold opioids – also renders them unfit to oversee the abatement of the public nuisance they created, contributed to, and/or maintained.

772.   Plaintiff seeks a judgment that Defendants fund the abatement of the ongoing public nuisance caused by their unreasonable, unlawful, intentional and/or negligent, reckless, ongoing, continuing, and persistent actions and omissions and their substantial and unreasonable interference with rights common to the general public.

773.   Each Defendant created or assisted in creating the opioid epidemic, and each Defendant is jointly and severally liable for its abatement. Furthermore, each Defendant should be enjoined from continuing to create, perpetuate, or maintain said public nuisance in Plaintiff's Community. Additionally, Defendants should compensate Plaintiff for the funds it has expended and continues to expend for increased costs of, *inter alia*, social services, health systems, law enforcement, judicial system, and treatment facilities.

774.   Plaintiff has suffered, and will continue to suffer, unique harms as described herein, which are of a different kind and degree than those suffered by the

citizens of the State and Plaintiff's Community at large. These are harms that can only be suffered by Plaintiff.

775.    Plaintiff is acting in its governmental capacity to vindicate the rights of the public and abate a public nuisance within its community. Its claims are not based upon or derivative of the rights of others.

776.    The tortious conduct of Defendants was a substantial factor in producing harm to Plaintiff.

777.    Plaintiff has suffered an indivisible injury as a result of the tortious conduct of Defendants.

778.    Defendants' conduct was willful, wanton, and malicious, was directed at the public generally, constituted a gross and wanton fraud upon the public, and/or constituted gross negligence.  Defendants acted with conscious disregard of the rights of the Plaintiff and its residents. For this reason, Plaintiff seeks to recover punitive/exemplary damages.

779.    Defendants' conduct was wanton, in that it was committed with reckless disregard of the Plaintiff's and public's rights or the consequences of said conduct.

780.    Defendants acted with malice. Defendants specifically intended to cause substantial injury or harm to Plaintiff because they either desired to cause the consequences of their actions or omissions or believed that the consequences were substantially certain to result from their actions or omissions. Specifically, Defendants knew that their conduct was resulting in, or was substantially certain to

result in, an unreasonable and substantial interference with the public health, welfare, and safety in Plaintiff's Community.

781. Defendants' conduct was fraudulent. Defendants acted in concert with opioid manufacturers to promote false and fraudulent messaging about the treatment of pain and the addictive nature of opioids. Defendants also created the false and misleading impression to regulators, prescribers, their clients, and the public, that they rigorously carried out their legal duties, including their duty to implement effective controls against diversion and to exercise due diligence to prevent the dispensing of opioid prescriptions that are illegitimate and/or likely to be diverted. Defendants further created the false impression that they worked voluntarily to prevent opioid abuse, misuse, oversupply, and diversion as a matter of corporate responsibility to the communities their business practices would necessarily impact.

782. Defendants' actions and omissions were grossly negligent. They had actual, subjective awareness that, viewed objectively from their viewpoint at the time, their conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Defendants knew of the dangerous and addictive nature of prescription opioids and also knew the risks associated with the oversupply and diversion of such drugs. Yet they nevertheless proceeded with conscious and/or reckless indifference to the rights, safety, or welfare of Plaintiff and its citizens by and through their conduct described herein. For this reason, Plaintiff seeks to recover punitive/exemplary damages.

783.    Plaintiff seeks all legal and equitable relief as allowed by law for the intentional and/or negligent creation of a public nuisance, including, *inter alia*, injunctive relief, abatement, compensatory and exemplary/punitive damages, and all other damages allowed by law to be paid by Defendants, attorneys' fees and costs, pre- and post-judgment interest, and such other relief as this Court deems appropriate.

## SECOND CLAIM FOR RELIEF –VIOLATION OF FEDERAL CIVIL RICO, 18 U.S.C. 1961, *ET SEQ.*; 1964(c)
### (Brought by Plaintiff against All Defendants)

784.    Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to Plaintiff's Verified Complaint, as well as each and every allegation set forth in all other paragraphs of its Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5), as if fully set forth herein, and further alleges as follows:

785.    At all relevant times, Express Scripts and Optum were each a "person" under 18 U.S.C. § 1961(3) because they were both capable of holding, and do hold, legal or beneficial interests in property.

786.    As alleged more fully herein, the PBM Defendants formed an association-in-fact enterprise with each of the Opioid Enterprise Manufacturers, described above as the Formulary & UM Enterprise, for the purpose of carrying out a fraudulent scheme and felonious possession and dispensing of controlled substances to maximize profits for themselves and the Opioid Enterprise Manufacturers from increasing sales of prescription opioids through unfettered and preferential

formulary access without UM in the PBM Defendants' standard offerings, despite the PBM Defendants' promises, representations and contractual obligations to take actions, including through cDUR, formulary decisions and UM decisions that were in their clients' best interests, to ensure safe and medically appropriate opioids were being dispensed, and to address opioid abuse, misuse and diversion.

787.   As alleged more fully herein, the Formulary & UM Enterprise consisted of personal business relationships formed through contractual negotiations over decades and participation in and through the PCMA and other informal coalitions and working groups. Evidence of the existence of the Formulary & UM Enterprise can be found in the way in which each PBM Defendant took nearly identical action towards formulary and UM offerings, in the research they performed for the Opioid Enterprise Manufacturers, the contracts they negotiated with the Opioid Enterprise Manufacturers that gave them preferential formulary positions prohibited the implementation of UM, the research that each PBM Defendant performed for Opioid Enterprise Manufacturers, pull-through marketing and PBM data exchange, failure to comply with the dispensing requirements of the CSA and New York law, and interactions through PCMA and other informal coalitions..

788.   At all relevant times, the Formulary & UM Enterprise (a) had an existence separate and distinct from each of the members; (b) was separate and distinct from the pattern of racketeering in which the members engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the members; (d) was characterized by interpersonal business relationships among the

members; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as continuing units.

789. Each member of the Formulary & UM Enterprise conducted, and participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding profits.

790. The PBM Defendants carried out, or attempted to carry out, a scheme to defraud by knowingly conducting and participating in the conduct of the Formulary & UM Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) that made use of the mail and wire facilities in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

791. The PBM Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the Formulary & UM Enterprise members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Formulary & UM Enterprise members' regular use of the facilities, services, distribution channels, and employees of the Formulary & UM Enterprise. The PBM Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

792.     PBM Defendants also conducted and participated in the conduct of the affairs of the Formulary & UM Enterprise through a pattern of racketeering activity by the felonious manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in controlled, punishable under any law of the United States.

793.     PBM Defendants committed crimes that are punishable as felonies under the laws of the United States. Specifically, 21 U.S.C. § 841 makes it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance except as authorized by Subchapter I of the CSA. A violation of § 841 in the case of controlled substances on Schedule II is punishable by not more than 20 years of imprisonment, or not less than 20 years imprisonment if death or seriously bodily injury results from the use of such substance.[316] Similarly, a violation of § 841 in the case of controlled substances on Schedule III is punishable by not more than 10 years imprisonment, or not less than 15 year imprisonment if death or seriously bodily injury results from the use of such substance. Similarly, a violation of § 841 in the case of controlled substances in Schedule IV is punishable by note more than 5 years imprisonment.[317] All three violations of § 841 are felonies.

794.     Each of PBM Defendants' mail order pharmacies is a registrant as defined in the CSA. Their status as registrants imposes obligations on them to ensure

---

[316] 21 U.S.C. § 841(b)(1)(C).

[317] 21 U.S.C. § 851(b)(2).

that they only dispense "to the extent authorized by their registration and in conformity with the [CSA]."[318]

795.   PBM Defendants registered their mail order pharmacies with the DEA to dispense Schedule II-V controlled substances. Their DEA registrations only authorized Defendants' owned pharmacies to "dispense" controlled substances, which "means to deliver a controlled substance to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner."[319]

796.   The Formulary & UM Enterprise's predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

(a) Mail Fraud: The Formulary & UM Enterprise violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme of the Formulary & UM Enterprise.

(b) Wire Fraud: The Formulary & UM Enterprise violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme of the Formulary & UM Enterprise.

(c) Felony Controlled Substance Violations: The PBM Defendants violated 21 U.S.C. § 841 by knowingly or intentionally possessing and dispensing controlled substances for reasons and purposes not authorized by the Controlled Substance Act.

797.   The Formulary & UM Enterprise conducted their pattern of racketeering activity in this jurisdiction and throughout the United States.

---

[318] 21 U.S.C. § 822(b).

[319] 21 U.S.C. § 802(10); 21 U.S.C. § 829(a)-(b) (stating no Schedule II, III or IV drug may be dispensed without the written prescription of a practitioner, and that no Schedule V drug may be dispensed other than for a medical purpose); *accord* 21 U.S.C. § 823(f)

798. The Formulary & UM Enterprise aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses and the 21 U.S.C. § 841 offense.

799. The members of the Formulary & UM Enterprise, with knowledge and intent, agreed to the overall objective of the Formulary & UM Enterprise, including the fraudulent scheme and felonious possession and dispensing of controlled substances, and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing, distributing, and dispensing prescription opioids.

800. Indeed, for the Formulary & UM Enterprise's fraudulent scheme to work, each member of the Formulary & UM Enterprise had to agree to implement their necessary portion of the Formulary & UM Enterprise's activities in the manner alleged above.

801. As alleged more fully herein, the Formulary & UM Enterprise engaged in a pattern of related and continuous predicate acts for years. The predicate acts were each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

802. The predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiff's business and property, while simultaneously generating billion-dollar revenue and profits for the Formulary & UM Enterprise.

The predicate acts were conducted by members of the Formulary & UM Enterprise and in furtherance of its fraudulent scheme.

803.   The pattern of racketeering activity alleged more fully herein, and the Formulary & UM Enterprise are separate and distinct from each other. Likewise, the PBM Defendants are distinct from the Formulary & UM Enterprise.

804.   The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

805.   Many of the precise dates of the Formulary & UM Enterprise's actions at issue here have been hidden by the PBM Defendants and the members of the Formulary & UM Enterprise and cannot be alleged without complete access to the PBM Defendants' books, records, and dispensing data. Indeed, an essential part of the successful operation of the Formulary & UM Enterprise alleged herein depended upon secrecy.

806.   It was foreseeable to the PBM Defendants and members of the Formulary & UM Enterprise that Plaintiff would be harmed when they engaged in the fraudulent scheme that forms the common purpose of the Formulary & UM Enterprise and the pattern of racketeering activities alleged herein.

807.   The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

808.   The Formulary & UM Enterprise members' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury in its business and property.

809.   The Formulary & UM Enterprise members' pattern of racketeering activity logically, substantially and foreseeably has caused an opioid epidemic. Plaintiff was injured by the Formulary & UM Enterprise's pattern of racketeering activity and the opioid epidemic that its members created through their actions.

810.   Members of the Formulary & UM Enterprise knew that the prescription opioids at the center of their pattern of racketeering activity were extremely dangerous, highly addictive, prone to diversion, abuse and misuse, and often cause overdose and death. They were also aware that placing those drugs in favorable formulary positions with UM controls in place would grow the market for prescription opioids through increased prescribing, dispensing and sales. They were also aware that the growth in prescribing, dispensing and sales would be driven, in large part, by oversupply, addiction, and misuse and abuse. Members of the Formulary & UM Enterprise also knew that the oversupply, addiction, misuse and abuse would result in the writing of illegitimate prescriptions about which the PBM Defendants' mail-order pharmacies would need to conduct due diligence or refuse to fill.

811.   Nevertheless, members of the Formulary & UM Enterprise engaged in a scheme of deception, which utilized the mail and wires as part of their fraud, in order to increase prescribing of prescription opioids, and providing the Opioid Enterprise Manufacturers' drugs unfettered formulary access without limits from

UM. Members of the Formulary & UM Enterprise also engaged in felonious possession and dispensing of controlled substances by filling prescriptions without performing due diligence and failing to refuse to fill prescriptions, thereby providing the Formulary & UM Enterprise with unfettered and illegal possession and dispensing by PBM Defendants' mail order pharmacies.

812.    Plaintiff was and continues to be damaged in its business and property by reason and as a result of the Defendants' conduct of the Enterprise through the pattern and practice of racketeering activity described herein, which was a logical, direct, foreseeable and substantial cause of the opioid epidemic.

813.    Specifically, Plaintiff's injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include:

    (a) Losses caused by purchasing and/or paying reimbursements for the Formulary & UM Enterprise Defendants' prescription opioids, that Plaintiff would not have paid for or purchased but for the Formulary & UM Enterprise Defendants' conduct;

    (b) Losses caused by the decrease in funding available for Plaintiff's public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic;

    (c) Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

    (d) Costs of training emergency and/or first responders in the proper treatment of drug overdoses;

    (e) Costs associated with providing police officers, firefighters, and emergency and/or first responders with naloxone, an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

(f) Costs associated with emergency response by police officers, firefighters, and emergency and/or first responders to opioid overdoses;

(g) Costs for providing treatment of infants born with opioid-related medical conditions, or born addicted to opioids due to drug use by a mother during pregnancy;

(h) Costs for providing mental health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

(i) Costs associated with law enforcement and public safety relating to the opioid epidemic, including but not limited to attempts to stop the flow of opioids into local communities, to arrest and prosecute street-level dealers, to prevent the opioid epidemic from spreading and worsening, and to deal with the increased levels of crimes that have directly resulted from the increased homeless and drug-addicted population;

(j) Loss of tax revenue due to the decreased efficiency and size of the working population in Plaintiff's Community;

(k) Losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root; and

(l) Losses caused by diminished property values in the form of decreased business investment and tax revenue.

814.    Plaintiff's injuries were proximately caused by the PBM Defendants' racketeering activities because they were a logical, substantial, and foreseeable cause of Plaintiff's injuries. But for the opioid-addiction epidemic created by the PBM Defendants' conduct, Plaintiff would not have lost money or property.

815.    Plaintiff's injuries were directly caused by the pattern of racketeering activities by the members of the Formulary & UM Enterprise.

816.    Plaintiff is most directly harmed and there are no other Plaintiffs better suited to seek a remedy for the economic harms at issue here.

817. Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia*, actual damages; treble damages; equitable and/or injunctive relief in the form of court supervised corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest, including, *inter alia*:

(a) Actual damages and treble damages, including pre-suit and post-judgment interest;

(b) An order enjoining any further violations of RICO;

(c) An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

(d) An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

(e) An order enjoining any future marketing or misrepresentations;

(f) An order enjoining future decisions by the PBM Defendants to prioritize rebates and profits over patient safety and proper, clinically based, decision making regarding the formulary status, prior authorization, step therapy or utilization management measures related to prescription opioids;

(g) An order enjoining the PBM Defendants' mail order pharmacy from dispensing prescriptions without conducting proper due diligence and documenting that due diligence before dispensing prescriptions;

(h) An order compelling Defendants to make corrective advertising statements that shall be made in the form, manner and duration as determined by the Court;

(i) An order enjoining any future lobbying or legislative efforts regarding the manufacture, marketing, distribution, prescription, or use of opioids;

(j) An order requiring the PBM Defendants to disclose publicly all documents, communications, records, data, information, research or studies concerning the health risks or benefits of opioid use;

(k) An order establishing a national foundation for education, research, publication, scholarship, and dissemination of information regarding the health risks of opioid use and abuse to be financed by the PBM Defendants in an amount to be determined by the Court;

(l) An order enjoining any diversion of opioids or any failure to monitor, identify, investigate, report and halt suspicious prescribing, dispensing, abuse, or diversion of opioids;

(m)An order requiring all PBM Defendants to publicly disclose to law federal and state endorsement all documents, communications, records, information, or data, regarding any prescriber, facility, pharmacy, clinic, hospital, manufacturer, distributor, person, entity or association regarding prescribing, dispensing, abuse, or diversion of opioids;

(n) An order divesting each PBM Defendant of any interest in, and the proceeds of any interest in, the Formulary & UM Enterprise, including any interest in property associated therewith;

(o) Dissolution and/or reorganization of any trade industry organization, or any other entity or association associated with the Formulary & UM Enterprise identified in this Complaint, as the Court sees fit;

(p) Dissolution and/or reorganization of any Defendant named in this Complaint as the Court sees fit;

(q) Suspension and/or revocation of the license, registration, permit, or prior approval granted to Defendants, entities, associations or enterprises named in the Complaint regarding the prescribing of opioids;

(r) Forfeiture as deemed appropriate by the Court; and

(s) Attorney's fees and all costs and expenses of suit.

## THIRD CLAIM FOR RELIEF—NEGLIGENCE AND GROSS NEGLIGENCE
### (Brought by Plaintiff against All Defendants)

818. Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to Plaintiff's Verified Complaint, as well as each and every allegation set forth in all

other paragraphs of its Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5), as if fully set forth herein, and further alleges as follows:

819.    Defendants owe Plaintiff a duty to employ reasonable standards of care in the sale, delivery, dispensing, promotion, and gatekeeping control of the supply of highly addictive, dangerous opioids. This includes a duty to not create a foreseeable risk of harm or injury.

820.    The degree of care the law requires is commensurate with the risk of harm the conduct creates. Defendants' conduct in selling, delivering, dispensing, promoting, and gatekeeping control of the supply of highly addictive and dangerous opioids requires a high degree of care and places them in a position of great trust and responsibility. Their duty cannot be delegated.

821.    Defendants, by promoting opioid over-use and by facilitating access to opioid through their standard formulary and UM offerings and their mail-order pharmacies, set in motion a force that created an unreasonable and foreseeable risk of harm for Plaintiff and its community.

822.    Defendants also undertook and assumed a duty to create formulary and UM offerings based on the health and safety of the public and of the lives covered by the benefit plans that were their clients. See Restatement (Second) of Torts § 324A Defendants represented to the public, as well as to their clients, that they were structuring formulary and UM offerings based on the health and safety of the public and the lives their clients insured, when in fact they were doing the exact opposite and doing it to maximize their own revenue in concert with the opioid manufacturers.

Defendants knew, at the time that they made these representations to the public and to their clients, that they would not base their formulary and their UM offerings on the health and safety of the covered lives involved, nor of the public, but rather that they would structure, and were already structuring, formulary and UM offerings solely (or at least primarily) to increase profits to Defendants.

823.    Defendants undertook to render services which Defendants should have recognized (and in fact did know) were necessary for the protection of persons, including the public, residents of Plaintiff's Community, and Plaintiff, and failed to exercise reasonable care in such a manner that Defendants increased the risk of harm to the public, residents of Plaintiff's Community, and the Plaintiff.  In so undertaking, Defendants assumed a duty to the public, residents of Plaintiff's Community, and the Plaintiff.

824.    Defendants had actual or, at the very least, constructive knowledge of the over-use and over-supply of opioids because of their access to claims and other data which they developed and maintained. Defendants also had the ability to curtail the over-use and over-supply of prescription opioids because of their unique gatekeeping function in the pharmaceutical supply chain. Yet, despite this knowledge and ability, Defendants refused and failed to take necessary and appropriate actions to prevent the harms which were the foreseeable consequence of their failures, actions, and inactions.

825. Defendants, having facilitated and set in motion the over-use and over-supply of opioids, had a duty to use reasonable care to prevent and curtail the spreading opioid crisis.

826. Defendants breached this duty by failing to exercise reasonable care or skill with respect to their opioid-related conduct. Collectively, and individually, Defendants made highly addictive prescription opioids available to the marketplace with the knowledge that they were likely being used for non-medical purposes and/or posed an inherent danger especially to patients who were using opioids for chronic pain not associated with active cancer, end-of-life or palliative care. Defendants knew or reasonably should have known that their breach would foreseeably cause harm to Plaintiff.

827. Defendants were negligent in failing to abide their duties to conduct themselves with the requisite care and skill and faithfulness.

828. Defendants placed their profit motives above their legal duties and enabled, encouraged, and caused the over-supply and over-use of opioids.

829. Defendants are highly sophisticated and knowledgeable actors in the health care marketplace, well informed of the highly addictive nature of prescription opioids and likelihood of foreseeable harm to communities from prescription opioid addiction and diversion. Defendants breached their duties when they failed to act with reasonable care in their respective roles, roles which positioned each of them to help abate the opioid epidemic if they elected to use their power for good, instead of profit.

830.    Violating these duties poses distinctive and significant dangers to Plaintiff.

831.    At all times, Defendants each had the ability and obligation to control the opioid access and utilization that led to this human-made epidemic. Defendants controlled and were responsible for the operation of the instrumentality of the harm in this case—their promotion of opioid over-use and facilitation of access to opioids through their formularies and UM offerings and their mail order pharmacies. Defendants failed to take appropriate precautions to avoid injuries to Plaintiff caused by Defendants' failures, actions and inactions.

832.    Defendants knew or in the exercise of reasonable diligence should have known under the circumstances of this case that the harms suffered by Plaintiff were the reasonably foreseeable consequences of Defendants' failures, actions, and inactions.

833.    Defendants' conduct also foreseeably created a new secondary market for opioids—providing both the supply of narcotics to sell and the demand of addicts to buy them. The result of Defendants' deceptive and improper conduct is not only an explosion of prescription opioids on the black market, but also—predictably—a marked increase in the availability of heroin and synthetic opioids.

834.    The health, safety, and welfare of the citizens of Plaintiff's Community, including those who use, have used, or will use opioids, as well as those affected by opioid users, is a matter of great public interest and legitimate concern to the citizens and residents of Plaintiff's Community and to Plaintiff. It was reasonably foreseeable

to Defendants that the burden of the opioid crisis would fall to communities like Plaintiff in the form of social and economic costs. Defendants' negligence was a substantial factor in producing harm to Plaintiff and Plaintiff's Community.

835.   As a direct and proximate result of Defendants' negligent conduct, Plaintiff has incurred, and will continue to incur, excessive costs to treat the opioid epidemic in Plaintiff's Community including, but not limited to, increased costs of police, emergency, health, prosecution, corrections, rehabilitation, and other services. These costs are over and above Plaintiff's ordinary public services.

836.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

837.   The injuries to Plaintiff would not have happened in the ordinary course of events had Defendants exercised the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of their business in the sale, delivery, dispensing, promotion, and gatekeeping control of opioids.

838.   Plaintiff is asserting its own rights and interests and Plaintiff's claims are not based upon or derivative of the rights of others.

839.   Defendants' conduct was also grossly negligent. They had actual, subjective awareness that, viewed objectively from their viewpoint at the time, their conduct involved an extreme degree of risk, considering the probability and

magnitude of the potential harm to others. Defendants knew of the dangerous and addictive nature of prescription opioids and also knew the risks associated with the oversupply and diversion of such drugs. Yet they nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiff and the residents of Plaintiff's Community by and through their conduct described herein. For this reason, Plaintiff seeks to recover punitive/exemplary damages.

840. Plaintiff seeks all legal and equitable relief as allowed by New York law for negligence and gross negligence, including, *inter alia*, compensatory damages, exemplary/punitive damages, and all damages allowed by law to be paid by Defendants, attorneys' fees and costs, pre- and post-judgment interest, and such other relief as this Court deems appropriate.

### FOURTH CLAIM FOR RELIEF— DECEPTIVE ACTS AND PRACTICES: NEW YORK GENERAL BUSINESS LAW §349 (Brought by Plaintiff against All Defendants)

841. Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to Plaintiff's Verified Complaint, as well as each and every allegation set forth in all other paragraphs of its Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5), as if fully set forth herein, and further alleges as follows:

842. Defendants' acts were consumer oriented.

843. The PBM Defendants added, abetted, and/or otherwise colluded and conspired with opioid manufacturers to commit the wrongful acts and practices which are "deceptive or misleading in a material way" and include but are not limited to:

(a) misrepresenting the truth about how opioids lead to addiction;

(b) misrepresenting that opioids improve function;

(c) misrepresenting that addiction risk can be managed;

(d) misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction;"

(e) falsely claiming that withdrawal is simply managed;

(f) misrepresenting that increased doses pose no significant additional risks;

(g) falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

844. Plaintiff expressly incorporates the racketeering and conspiracy allegations stated through these Supplemental and Amended Allegations to Plaintiff's Verified Complaint, as well as each and every allegation set forth in all other paragraphs of its Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5), as if fully set forth herein.

845. Furthermore, PBM Defendants committed additional acts and/or practices in a "deceptive or misleading in a material way" including but are not limited to:

(a) Facilitating the increased use of opioids by giving opioids unwarranted preferred formulary status in standard offerings in exchange for profiting from payments from the opioid manufacturers;

(b) Maintaining preferred formulary status for OxyContin and other highly abused opioids in standard offerings, despite knowing, or being substantially certain, from their own extensive data, that addiction, abuse, and illegitimate prescribing of such drugs were rampant;

(c) Electing not to undertake timely actions utilizing their real-time data that would have drastically reduced the inappropriate prescribing and

dispensing of Opioids, such as requiring prior authorization, step therapy, limiting days of supply, or excluding OxyContin from its standard formulary offerings;

(d) Electing not to impose prior authorization requirements or limits on the availability of opioids in its standard formulary offerings in exchange for payments from the opioid manufacturers;

(e) Electing not to maintain adequate safeguards to dispense opioids in a safe and effective manner and to maintain effective controls against diversion of opioids through their mail-order pharmacies; and

(f) Electing not to report suspicious prescribers and pharmacies.

846. The materially deceptive acts and practices alleged herein undermined consumers' ability to assess the benefits and dangers of prescription opioids and to make informed decisions as to the efficacy and safety of opioid therapy, including but not limited to as a treatment for chronic pain.

847. Defendants' acts and/or practices caused actual harm to the Plaintiff.

848. The Plaintiff has been injured as a result of Defendants' acts and/or practices.

849. New York General Business Law § 349 declares unlawful any deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the state, and allows any person who has been injured by reason of any violation of that statute to bring an action to recover actual damages.

850. Defendants violated New York General Business Law § 349, because they engaged in false advertising in the conduct of a business, trade or commerce in this state.

851.    Plaintiff and its residents have been injured by reason of Defendants' violation of § 349.

852.    Plaintiff is entitled to recover its damages caused by the violation of New York General Business Law § 349 by the defendants in an amount to be determined at trial, subject to trebling, plus attorneys' fees.

### FIFTH CLAIM FOR RELIEF— FALSE ADVERTISING: NEW YORK GENERAL BUSINESS LAW §350 (Brought by Plaintiff against All Defendants)

853.    Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to Plaintiff's Verified Complaint, as well as each and every allegation set forth in all other paragraphs of its Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5), as if fully set forth herein, and further alleges as follows:

854.    Defendants violated New York General Business Law § 350, because they engaged in false advertising in the conduct of a business, trade or commerce in this state.

855.    Defendants' acts were consumer oriented and triggered reliance by patients, physicians and others.

856.    The PBM Defendants added, abetted, and/or otherwise colluded and conspired with opioid manufacturers to commit the wrongful acts and practices which are "deceptive or misleading in a material way" and include but are not limited to:

(a) misrepresenting the truth about how opioids lead to addiction;

(b) misrepresenting that opioids improve function;

(c) misrepresenting that addiction risk can be managed;

(d) misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction;"

(e) falsely claiming that withdrawal is simply managed;

(f) misrepresenting that increased doses pose no significant additional risks;

(g) falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

857. Plaintiff expressly incorporates the racketeering and conspiracy allegations stated through these Supplemental and Amended Allegations to Plaintiff's Verified Complaint, as well as each and every allegation set forth in all other paragraphs of its Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5), as if fully set forth herein.

858. The materially deceptive acts and practices alleged herein undermined consumers' ability to assess the benefits and dangers of prescription opioids and to make informed decisions as to the efficacy and safety of opioid therapy, including but not limited to as a treatment for chronic pain.

859. Defendants' false advertising dramatically increased consumer demand for and consumption of prescription opioids, and that it created public misperception about the safety and efficacy of such prescription drugs.

860. Defendants' acts and/or practices caused actual harm to the Plaintiff.

861. Plaintiff has been injured as a result of Defendants' acts and/or practices.

862. Plaintiff and its residents have been injured by reason of Defendants' violation of § 350.

863.    Plaintiff is entitled to recover its damages caused by the violation of New York General Business Law § 350 by the Defendants in an amount to be determined at trial, subject to trebling, plus attorneys' fees.

## SIXTH CLAIM FOR RELIEF— VIOLATION OF NEW YORK SOCIAL SERVICES LAW § 145-B
### (Brought by Plaintiff against All Defendants)

864.    Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to Plaintiff's Verified Complaint, as well as each and every allegation set forth in all other paragraphs of its Verified Complaint dated June 5, 2019 (1:19-op-45853, Doc #: 1-5), as if fully set forth herein, and further alleges as follows:

865.    Defendants violated Social Services Law § 145-b, because they knowingly, by means of a false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of themselves or others, attempted to obtain or obtained payment from public funds for services or supplies furnished or purportedly furnished pursuant to Chapter 55 of the Social Services Law.

866.    Plaintiff is a "political subdivision" of the State of New York as that term is used in § 145- b (1) (b) and a "local social services district" as that term is used in § 145-b (2).

867.    As set forth herein, Defendants have knowingly set forth false statements or representations, deliberately concealed material facts, and/or

perpetuated a fraudulent scheme, in attempts to obtain payment for opioids from public funds for services or supplies furnished by Plaintiff pursuant to Chapter 55.

868.    By reason of Defendants' violation of § 145-b, Plaintiff has been damaged.

869.    Plaintiff is entitled to recover its damages caused by Defendants' violation of § 145-b in an amount to be determined at trial and subject to the apportionment provisions of § 145-b.

## XIV.  Prayer for Relief

WHEREFORE, Plaintiff respectfully requests the Court order the following relief, including:

(a) abatement of nuisance;

(b) actual damages;

(c) treble or multiple damages and civil penalties as allowed by statute;

(d) punitive damages;

(e) exemplary damages;

(f) disgorgement of unjust enrichment;

(g) equitable and injunctive relief in the form of Court-enforced corrective action, programs, and communications;

(h) forfeiture disgorgement, restitution and/or divestiture of proceeds and assets;

(i) attorneys' fees;

(j) costs and expenses of suit;

(k) pre- and post-judgment interest; and

(l) such other and further relief as this Court deems appropriate.

## XV.  Jury Demand

Plaintiff demands a jury trial on all issues so triable.

Dated: December 15, 2023

Respectfully submitted,

*Plaintiffs' Co-Lead Counsel*

 /s/ Jayne Conroy
Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
jconroy@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR  00907
(304) 654-8281
paul@farrellfuller.com

*Plaintiffs' Liaison Counsel*

 */s/ Peter Weinberger*
Peter Weinberger
SPANGENBERG SHIBLEY & LIBER, LLP
1001 Lakeside Avenue, E, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com


New York, New York     */s Hunter J. Shkolnik*
Hunter J. Shkolnik
Paul J. Napoli
NS PR LAW SERVICES, LLC
1302 Avenida Ponce de Leon
Santurce, Puerto Rico 00907
(787) 493-5088
hunter@nsprlaw.com
pnapoli@nsprlaw.com

*/s Salvatore C. Badala*
Salvatore C. Badala
Shayna E. Sacks
Joseph L. Ciaccio
Napoli Shkolnik PLLC
400 Broadhollow Road
Melville, New York 11747
(212) 397-1000
sbadala@napolilaw.com
ssacks@napolilaw.com
jciaccio@napolilaw.com

*Counsel for Plaintiff*

300

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 6th day of March, 2024, I have electronically filed the foregoing with the Clerk of Court using the CM/ECF System. Copies will be served upon counsel of record by, and may be obtained through, the Court's CM/ECF System.

s/Peter H. Weinberger
Peter H. Weinberger

# EXHIBIT 4



**Joshua M. Agins**
Partner
Direct Dial: 585.454.0759
Direct Facsimile: 585.423.5910
*JAgins@hodgsonruss.com*

September 18, 2025

**VIA E-MAIL**

Ryan P. Ethridge
Alston & Bird
555 Fayetteville St, Suite 600
Raleigh, NC 27601
ryan.ethridge@alston.com

Anthony P. Alden
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
anthonyalden@quinnemanuel.com

> Re:  *In re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio)
> *City of Rochester v. Purdue Pharma L.P.*, No. 19-op-45853 (Track 12)

Dear Ryan and Anthony:

I write in response to your recent request on behalf of Express Scripts, Inc. ("Express Scripts") and OptumRx, Inc. ("Optum"; jointly the "PBMs") for Wegmans' DUR data for Monroe County. For the reasons detailed below, Wegmans has satisfied this Request and sees no reason to produce additional DUR data beyond what it already sent you on June 2, 2025.

Wegmans' June 2 response provided a thorough and lengthy description of how its pharmacy management system—EnterpriseRx—handles PBMs' DURs. As illustrated in its "step-by-step," cradle-to-grave documentation of two exemplar prescriptions, Wegmans provided 56 pages of documentation and accompanying narratives "***sufficient to show how [Wegmans interacts]…*** with communications received from **pharmacy managers**… **at the point of sale**…." That documentation and accompanying explanations is sufficient to satisfy the requirements of Request No. 2.

Rather than respond to Wegmans' June 2 response, the PBMs went completely silent as to Wegmans, and spent more than three months engaging in extensive briefing and litigation over the sufficiency of Walgreens, CVS, and Wal-Mart's (the "National Pharmacies") response to Request No. 2. Wegmans was not given notice of that briefing or litigation and had no opportunity to take part in it. Now, after three months of extensive briefing with the National Pharmacies, and more than three months after Wegmans' June 2 response, the PBMs resurface with a ruling imposing additional discovery obligations on the National Pharmacies and demand Wegmans produce

Ryan P. Ethridge
Anthony P. Alden
September 18, 2025
Page 2



documents pursuant to that inapplicable ruling, while failing to acknowledge the months of negotiations between Wegmans and the PBMs, culminating with Wegmans' extensive June 2 response.

It is Wegmans' understanding, however, that Special Master Cohen's decision as to the National Pharmacies was based on vastly different circumstances than here. **First**, the burden that the PBMs seek to impose on Wegmans is immense and fundamentally different from the National Pharmacies. It is Wegmans' understanding that the National Pharmacies have access to all of their cDUR data because their data is maintained "in-house" by their own internal pharmacy management systems. In contrast, and as described in Wegmans' June 2 response, Wegmans' data is maintained in a pharmacy management system maintained by an outside vendor, EnterpriseRx. Wegmans does not maintain prescription data, including cDUR data, in-house.

Wegmans provided a thorough and complete explanation of how Wegmans can access its prescription data in its June 2 response. As stated in that letter, Wegmans' prescription data is maintained in its vendor's data warehouse, and the only way that Wegmans may access documentation associated with historic cDUR data is through the manual, prescription-by-prescription screenshot retrieval process. Wegmans' June 2 response provided a detailed explanation and exemplar prescriptions that illustrated the "screenshot by screenshot" process required to access documentation concerning prescription data, including the handling of and interaction with the PBMs' DURs, in EnterpriseRx's user interface.

**Second**, another fundamental difference between Wegmans and the National Pharmacies is that Wegmans has neither conducted discovery in opioid litigation nor will it have to in the future. To that end, Wegmans promptly asked the PBMs to provide copies of the briefing that led up to Special Master Cohen's July 28, 2025 ruling, so that we could understand the ruling and its context. Indeed, the ruling itself is written in a way that presupposes the parties' familiarity with the briefing. In response, and after initially refusing, the PBMs provided only a heavily redacted version of their own briefing and refused to provide *any* of the National Pharmacies' briefing—on the stated ground that such materials were "confidential" and "non-public." The PBMs' stated justification for withholding their own and the National Pharmacies' briefing from Wegmans rings hollow given the fact that the PBMs want Wegmans to produce highly confidential, HIPAA-protected patient information and would share it with consultants, the plaintiffs, and, as we understand it, with anyone who has access to the MDL document repository. The PBMs' refusal to provide us with the full briefing history leading up to Special Master Cohen's ruling has only caused further delay to this process.

Wegmans has only cursory visibility into the issues raised by the National Pharmacies or the extent of their prior subpoena responses. It is Wegmans' understanding that there are vast differences between the National Pharmacies and Wegmans, a regional pharmacy. Given the three months that the PBMs let pass since our last communication, Wegmans—a non-party—is certainly entitled to take time to assess the circumstances surrounding Special Master Cohen's ruling as to

Ryan P. Ethridge
Anthony P. Alden
September 18, 2025
Page 3



the National Pharmacies.    Therefore, Wegmans reserves the right to amend its arguments after reviewing the unredacted documents provided by the PBMs and the National Pharmacies' briefing which it has requested but not yet received, as well as conducting a further analysis into the issue.

### PBMs' Request No. 2

The PBMs served a subpoena requesting twelve categories of documents from non-party Wegmans in *City of Rochester v. Purdue Pharma L.P.*, No. 19-op-45853 (Track 12).  Request No. 2 seeks:

> Documents ***sufficient to show how*** You….**interact** with communications received from **pharmacy managers**… **at the point of sale**, including but not limited to communications regarding plan coverage limits (such as prior authorizations, step edits, and quantity limits) **and communications regarding health and safety issues (such as the concurrent drug utilization review or CDUR messages)**…Your response should include documents responsive at both the pharmacy and individual employee level, and should include any pertinent policies, procedures, directives or guidance.

Wegmans served its objections, which included various specific objections to Request No. 2 including, among others, that it was overly broad, unduly burdensome, and sought confidential information.

During the various correspondence between the PBMs and Wegmans in late 2024, the PBMs *themselves* emphasized how Request No. 2 sought documents "sufficient to show" how Wegmans interacted with PBMs—not that it requested *all* documents of any kind.  For example, your November 11, 2024 letter stated: "To be clear: the Request [no. 2] does not seek communications with the PBMs, but rather documents *sufficient to show* Wegmans' use and reaction to such communications."  (emphasis added).  The PBMs' December 13, 2024 letter also explained how Request No. 2 sought "documents *sufficient to show how* Wegmans . . . dealt with point-of-sale ("POS") communications from the PBMs . . ." (emphasis added).

After Special Master Cohen requested the PBMs and Wegmans provide compromise proposals on the various Requests, the PBMs' February 28, 2025 letter explained that, in response to Request No. 2, Wegmans could produce:

> (1) its centrally-maintained policies, procedures, directives and guidance from January 1, 2006 to the present, concerning how Wegmans' personnel (to include **those** in its Rochester stores) should respond to POS communications from PBMs; and

Ryan P. Ethridge
Anthony P. Alden
September 18, 2025
Page 4



(2) **data showing** *how* **Wegmans' personnel in its** *City of Rochester stores* **responded to POS communications** regarding plan coverage limits (such as prior authorizations, step edits, and quantity limits) and health and safety issues (such as concurrent drug utilization review or CDUR messages), concerning opioids from January 1, 2006 to the present. . . .

Wegmans also understands that after the PBMs served a substantially similar subpoena to non-party Kinney Drugs in the City of Ogdensburg bellwether, they later confirmed the limitations on the scope of Request No. 2 in a similar manner. Specifically, in a recent correspondence dated July 15, 2025, the PBMs advised Kinney that, along with the policies and procedures, Request No. 2 requested "data memorializing and relating to *the way* **Kinney Drugs' personnel interacted with point-of-sale ("POS") communications from PBMs** for opioid prescriptions filled in New York."

The PBMs now attempt to improperly expand the scope of Request 2—more than one year after serving the subpoena to Wegmans.

**<u>Wegmans Already Provided Sufficient Documentation and Accompanying Narratives that Satisfy Request No. 2</u>**

On June 2, 2025, Wegmans sent the PBMs the entire records, including all the DUR interactions with the PBM DURs for two exemplar prescriptions dispensed by *the only* Wegmans pharmacy located in the City of Rochester, New York **(attached)**. This followed extensive discussions and communications between Wegmans and the PBMs regarding their compromise positions.

During all of that time, the PBMs were focused on Request No. 1. After these detailed and lengthy communications, Wegmans produced 56 pages describing its EnterpriseRx pharmacy management software (owned by McKesson), complete with dozens of screenshots of two exemplar prescriptions, which document the data and information exchanged between the PBM and Wegmans regarding those prescriptions. Among many other things, Wegmans' letter explained how before it may dispense a prescription managed and administered by any PBM, it must submit a "clean claim" for each prescription. A clean claim is one that documents medically accepted indications in accordance with the format promulgated by the National Council for Prescription Drug Programs ("NCPDP"). Wegmans submits prescription claims to the PBMs through the transmittal of Payer Sheets that conform with national standards promulgated by the NCPDP—and these Payer Sheets contain several fields, including DUR fields, that Wegmans must complete before dispensing a controlled substance.

The workflow logs for the two exemplar prescriptions in the June 2 letter begin with electronic receipt of the prescription by Wegmans, reflect the review, adjudication, and approval by the PBM, the cDURs conducted by both Wegmans and the PBM, and the dispensing of both

Ryan P. Ethridge
Anthony P. Alden
September 18, 2025
Page 5



prescriptions by Wegmans to the patient.  Consequently, these exemplars document how Wegmans interacts with the PBMs at the POS level through the cDUR process in EnterpriseRx and therefore satisfy Request No. 2.

Further, as described in the June 2 letter in detail, there is no way for Wegmans to quickly download and produce the documentation associated with the DUR data using this software. Instead, to produce such documentation, Wegmans' pharmacy department must manually screenshot the DUR messages from EnterpriseRx.  As an example, it took a very experienced Wegmans pharmacy manager **approximately *15 minutes* to gather the record for *one prescription* dispensed.**

After sending the PBMs these two exemplars and accompanying, lengthy narratives explaining the cDUR interaction process with the PBMs, Wegmans did not hear back from the PBMs for almost three months.  The PBMs finally resurfaced and have demanded that Wegmans' counsel meet and confer on very short notice.  Having done absolutely *nothing* to advance the discussions with Wegmans for three months, the PBMs now spring out of the weeds and claim they find themselves in a time-crunch and have demanded an immediate response from Wegmans. If the PBMs are indeed in a time crunch, that is entirely of their own doing, and Wegmans will not be prejudiced or shortchanged in its ability to gather a fulsome understanding of Special Master Cohen's ruling before discussing the matter further with the PBMs.

### Special Master Cohen's Ruling on the National Pharmacies Does Not Apply to Wegmans

Rather than follow up on the lengthy June 2 explanations and exemplars and respond to Wegmans, the PBMs shifted focus and concentrated on a target more easily able to produce DUR data:  the National Pharmacies that have extensively participated in opioid litigation and have their own customized and proprietary resources and software systems geared to comply with onerous discovery requests.  The PBMs now argue that Special Master Cohen's July 2025 ruling requiring the National Pharmacies to produce all of their DUR data for Monroe County and St. Lawrence County compels Wegmans to produce its DUR data from Monroe County.  But that ruling was based on the circumstances concerning the National Pharmacies—which are wholly different than those facing Wegmans, as described below.[1]

**Substantial Burden.**  First, the National Pharmacies use vastly different pharmacy management software systems than the EnterpriseRx systems that Wegmans utilizes.  Upon

---

[1] Wegmans also maintains that Special Master Cohen's ruling as to the National Pharmacies is not yet final—Judge Polster has not yet ruled upon it.

Ryan P. Ethridge
Anthony P. Alden
September 18, 2025
Page 6



information and belief, the National Pharmacies own and operate their own proprietary pharmacy management software systems, which gives them more flexibility to manipulate and download data.[2] This is evidenced by the fact that the National Pharmacies' only stated burden (according to the PBMs) on this subject was the need to manually redact DUR data for PHI. But for Wegmans, it will need to *manually screenshot all of the documentation for each prescription using the standard EnterpriseRx system,* as well as redact it.[3] EnterpriseRx is a generic, "off the rack"

---

[2] *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 790, 798 (N.D. Ohio 2022) (describing how RxConnect is a "computer system CVS provides to its pharmacists"); *Pacult v. Walgreen Co.*, 2011 WL 13209584, at *4 (W.D. Wis. June 14, 2011) ("All Walgreens pharmacy stores nationwide use a computer system called 'Intercom Plus' to fill and to bill prescriptions. Intercom Plus was programmed under the control and direction of Walgreen and it is Walgreen's exclusive property."); *Equal Emp't Opportunity Comm'n v. Wal-Mart Stores, Inc.*, 2008 WL 11509343, at *3 (D. Md. Mar. 10, 2008) (describing Connexus, the prescription filling system Wal-Mart instituted in 2002 that "was designed to make inputting and filling prescriptions easier and more accurate").

[3] Wegmans understands that Special Master Cohen ruled the National Pharmacies did not need to redact their DUR data for PHI since they could produce it consistent with the MDL protective order. As an immediate matter, Wegmans is not currently involved *any* opioid litigation and does not have any Protective Order provisions available to it. Additionally, Wegmans intends to redact PHI in documents produced, due to the highly confidential health information regarding patients' opioid use. A recent wave of security breaches on PACER and internal law firm document management systems, which have caused numerous United States District Courts to recently change the manner in which sealed documents are submitted to the courts, obligates Wegmans to protect any such information with all appropriate redactions. *See, e.g.*, *Change to Sealed Document Processing*, W.D.N.Y. (Aug. 22, 2025), https://www.nywd.uscourts.gov/news/change-sealed-document-processing (noting the federal district court encompassing the City of Rochester will no longer allow even case participants to access sealed documents electronically due to recent breaches); Kateyln Polantz & Aileen Graaf, *Federal courts go old school to paper filings after hack to key system*, CNN (Aug. 14, 2025), https://www.cnn.com/2025/08/14/politics/federal-courts-go-to-old-school-paper-filings-after-hack-to-key-system (reporting that some federal courts are deciding to only accept sensitive filings by hardcopy in response to recent cyberattacks); *Cybersecurity Measures Strengthened in Light of Attacks on Judiciary's Case Management System*, U.S. COURTS (Aug. 7, 2025), https://www.uscourts.gov/data-news/judiciary-news/2025/08/07/cybersecurity-measures-strengthened-light-attacks-judiciarys-case-management-system (acknowledging "recent escalated cyberattacks of a sophisticated and persistent nature on [U.S. Courts] case management system"); Staci Zaretsky, *Biglaw Firms Fall Prey To Cyberattacks, With Data Breaches On The Rise*, ABOVE THE LAW (May 23, 2024), https://abovethelaw.com/2024/05/biglaw-firms-fall-prey-to-cyberattacks-with-data-breaches-on-the-rise/ (reporting a rise in cybersecurity incidents at law firms).

Ryan P. Ethridge
Anthony P. Alden
September 18, 2025
Page 7



pharmacy management system utilized by regional pharmacies like Wegmans and Kinney. As discussed above, it will take a pharmacy department employee approximately 15 minutes per prescription to generate the prescription history and notes. Ultimately, to require Wegmans to produce all of the documents the PBMs seek would overwhelm Wegmans' pharmacy department and make it unable to serve the roughly 26,500 patients/customers it assists in their health care needs. Wegmans' Pharmacy Department is very efficient, runs at minimal margins and has no extra support to handle the multitude of opioid litigation and investigations faced by the National Pharmacies. This is in direct contrast to the National Pharmacies, which Express Scripts *itself* described in its July 3, 2025 brief as "the largest and most sophisticated pharmacy operators in the United States, with substantial resources and experience in responding to discovery requests in complex litigation."[4]

Moreover, the National Pharmacies have had extensive involvement in opioid litigation, including significant discovery. The PBMs' June 6, 2025 letter to Special Master Cohen makes that clear, arguing that Walgreens "is no stranger to opioid litigation. Walgreens was a defendant in a prior MDL track where it produced more than two million documents."[5]  According to

---

[4] In contrast, publicly available information reflects that the national pharmacies employ hundreds of thousands of employees to service thousands of pharmacy locations across the country.

[5] Publicly available information reveals that the National Pharmacies have entered numerous global settlements with various governments and tribes on opioid claims *and* with the DEA for violations of the Controlled Substances Act. *See, e.g.*, *CVS & Walgreens announce opioid settlements totaling $10* billion, NPR (Nov. 2, 2022), https://www.npr.org/2022/11/02/1133523740/cvs-health-agrees-to-a-5-billion-settlement-in-opioid-lawsuits; *Walmart Reaches Opioid Settlement Agreements with all 50 States*, Walmart (Dec. 20, 2022), https://corporate.walmart.com/news/2022/12/20/walmart-reaches-opioid-settlement-agreements-with-all-50-states; *CVS Pharmacy, Inc. to pay $1.5 million to settle Civil Penalty Claims for violation [of] the Controlled Substance Act*, DEA (June 28, 2018), https://www.dea.gov/press-releases/2018/06/28/cvs-pharmacy-inc-pay-15-million-settle-civil-penalty-claims-violation-0; *CVS Pharmacy Inc. Pays $5m To Settle Alleged Violations of the Controlled Substance Act*, DEA (July 11, 2017), https://www.dea.gov/press-releases/2017/07/11/cvs-pharmacy-inc-pays-5m-settle-alleged-violations-controlled-substance; *DEA Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances*, DEA (Feb. 12, 2016), https://www.dea.gov/press-releases/2016/02/12/dea-reaches-8-million-settlement-agreement-cvs-unlawful-distribution; *Walgreens Agrees to Pay Up to $350M for Illegally Filling Unlawful Opioid Prescriptions and for Submitting False Claims to the Federal Government*, Dept. of Justice (Apr. 21, 2025), https://www.justice.gov/opa/pr/walgreens-agrees-pay-350m-illegally-filling-unlawful-opioid-prescriptions-and-submitting; *Walgreens Agrees to Pay a Record Settlement of $80 Million of Civil Penalties Under The Controlled Substances Act*, DEA (June 11, 2013), https://www.dea.gov/press-releases/2013/06/11/walgreens-agrees-pay-

Ryan P. Ethridge
Anthony P. Alden
September 18, 2025
Page 8



ProPublica, Wal-Mart has produced "1 million pages of documents and over 6 million prescriptions with the Justice Department investigation."[6] In contrast, *Wegmans has produced no discovery in opioid litigation—nor will it have to.* Soon after the January 6, 2025 conference with Special Master Cohen, the New York municipalities that had pursued improper dispensing claims against Wegmans voluntarily discontinued their claims. With this voluntary dismissal, the prospect of Wegmans needing to collect and produce data concerning its dispensing in litigation where it was a party evaporated. Therefore, should the PBMs force non-party Wegmans to produce DUR data as requested, it will be the *first* and *only* time Wegmans is expending extensive time and resources to screenshot the large swaths of DUR documentation and produce them. As extensively noted in previous communications, the nominal relevance of the PBMs' Requests is outweighed by the enormous burden they impose on Wegmans, particularly in light of the extensive June 2 production and explanation provided by the company.

As the PBMs are aware, "[c]ourts must 'balance the need for discovery against the burden imposed on the person ordered to produce the documents' and the status of that person as a non-party is a factor." *In re Modern Plastics Corp.*, 890 F.3d 244, 251 (6th Cir. 2018). Moreover, parties may only obtain discovery that is "proportional to the needs of the case, considering the importance of the issues at stake in the action, . . . and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *Mid Am. Sols. LLC v. Vantiv, Inc.*, 2016 WL 1611381, at *5 (S.D. Ohio Apr. 20, 2016) (explaining subpoenas under Rule 45 are "subject to the same discovery limitations as those set out in Rule 26"). As discussed above, producing all DUR data for Monroe County is untenable for Wegmans. Thus, to the extent this documentation is relevant (which Wegmans disputes), it still does not compel a non-party to have its pharmacy employees working around the clock—ignoring their regular job responsibilities—to comply with the PBMs' onerous request. Rather, Request No. 2 requires, *at most*, Wegmans produce "documents sufficient" to show *how* it interacts with PBMs' DUR messages—which it did in the June 2 letter. Indeed, not only did the company produce such documentation, it also provided dozens of pages of accompanying narratives answering this inquiry.

**Scope of Request No. 2.** In the subpoena dispute with the National Pharmacies, the PBMs argued Request No. 2 covered the production of *all* DUR data. However, the PBMs' request for *all* DUR data from Monroe County exceeds the scope of Request No. 2, which seeks "*Documents*

---

record-settlement-80-million-civil-penalties-under; MOA between DEA & Wal-Mart Stores, Inc. (Mar. 17, 2011), available at https://embed.documentcloud.org/documents/6818269-Walmart-MOA-03-17-2011-Final/. Wegmans has done neither.

[6] Jesse Eisinger, *Walmart Hid That It Was Under Criminal Investigation for its Opioid Sales, Lawyers Say*, PROPUBLICA (Apr. 13, 2020), https://www.propublica.org/article/walmart-hid-that-it-was-under-criminal-investigation-for-its-opioid-sales-lawyers-say.

Ryan P. Ethridge
Anthony P. Alden
September 18, 2025
Page 9



*sufficient to show how* Wegmans' personnel in its *City of Rochester stores responded to . . . health and safety issues (such as concurrent drug utilization review or CDUR messages),* concerning opioids." In sum, Request No. 2 does not seek *all* documents showing how Wegmans' personnel in *all* Monroe County stores responded to these issues.

The two exemplar prescriptions Wegmans sent the PBMs on June 2, 2025 therefore satisfy Request No. 2 (except as to the request for Wegmans' policies and procedures on POS communications from PBMs, which Wegmans is happy to meet and confer on as to the scope of such). To the extent the PBMs seek more than documents "sufficient to show" how Wegmans interacted with the PBMs, Wegmans requests the PBMs serve a new subpoena with a new Request seeking additional documents responsive to such a significantly expanded Request.

## Other Subpoena Requests

In the latest correspondence, the PBMs indicate they want the Company's position on the remaining categories of documents sought in the subpoena put forward several months ago. My recollection is that at the discovery hearing before Special Master Cohen on January 6, 2025, Wegmans and the PBMs were directed to propose compromise positions. On January 14, 2025, Wegmans offered the PBMs compromise proposals on requests 2, 5, 6, 8, 9, 10, 11, and 12. After failing to receive a substantive response to its initial compromise proposals, Wegmans sent additional compromise proposals to the PBMs on the remaining four subpoena requests on January 29, 2025. One month later, on February 28, 2025, the PBMs submitted their compromise proposals. Thereafter, the PBMs then entered into protracted discussions and communications with Wegmans focused on Requests 1 and 2.

That process culminated with Wegmans June 2 production of 56 pages of screenshots of the two exemplar prescriptions and the accompanying, detailed narratives explaining the interaction between the PBMs and Wegmans regarding the various DURs. *See* **attached**. The PBMs have to this date failed to acknowledge this lengthy production and accompanying explanations.

The subpoenas that ESI served on the National Pharmacies only contained Requests Nos. 1 and 2. Wegmans is unclear why the PBMs seek the additional information only from Wegmans (and Kinney). Please explain. If you want to re-engage on the compromise proposals sent by Wegmans and the PBMs, we are happy to do so. Please let us know whether the PBMs' positions have changed since early this year.



Ryan P. Ethridge
Anthony P. Alden
September 18, 2025
Page 10

Sincerely yours,

Joshua M. Agins

Encl: Copy of Wegmans' June 2, 2025 Response with Exemplar Prescriptions

# EXHIBIT 5



**Joshua M. Agins**
Partner
Direct Dial: 585.454.0759
Direct Facsimile: 585.423.5910
*JAgins@hodgsonruss.com*

October 24, 2025

**Via E-Mail**

Ryan P. Ethridge
Alston & Bird
555 Fayetteville St, Suite 600
Raleigh, NC 27601
ryan.ethridge@alston.com

Anthony P. Alden
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
anthonyalden@quinnemanuel.com

>           Re:      *In re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio)
>                    *City of Rochester v. Purdue Pharma L.P.*, No. 19-op-45853 (Track 12)

Dear Ryan and Anthony:

Wegmans Food Markets, Inc. writes this letter in response to the PBMs' recent request for Wegmans' position on the PBMs' proposals regarding all Requests in your Subpoena, as put forth in prior meet and confer letters. After you sent the latest letter, Wegmans and the PBMs spent the spring of 2025 discussing only Request Nos. 1 and 2. Those negotiations culminated on June 2, 2025, with Wegmans providing a 29-page letter to the PBMs. The letter detailed how Wegmans uses the EnterpriseRx Pharmacy Management System to communicate with the PBMs and satisfy the terms of the PBMs' Pharmacy Network Agreements and Pharmacy Provider Manuals. That production also consisted of 56 pages of detailed screenshots of data, as well as a step-by-step discussion of how Wegmans uses EnterpriseRx to receive and review DUR alerts, clinical edits, and clinical messages in its ordinary course of business. The exemplar prescriptions demonstrated how a Wegmans pharmacist considers, uses, responds to, and interacts with point-of-sale communications from the PBMs.

The PBMs then went silent for nearly three months, without any further communications or notice until the end of August, when you resurfaced and demanded Wegmans' immediate response. After having time to review the various communications, as well as work diligently on Wegmans responses to Requests 1 and 2, we respond as follows (except as to Request Nos. 1 and 2, which Wegmans will address in a separate letter in the near future):

Ryan P. Ethridge
Anthony P. Alden
October 24, 2025
Page 2



First, Wegmans agrees to the narrowed geographic scope of the City of Rochester. *See, e.g.*, Ltr. from A. Alden to J. Agins at 1 (Dec. 13, 2024) ("12/13/24 Letter") ("It is important, then, that the PBM Defendants obtain data and other documents concerning Wegmans' dispensing of opioids **in Rochester**." (emphasis added)); *id.* at 2 ("[T]he PBM Defendants are entitled to information related to the retail pharmacies on the ground **in Rochester**, such as Wegmans (the largest purchaser of prescription opioids among such pharmacies." (emphasis added)); *id.* at 3 (Discussing Request Nos. 1 & 2: "Evidence of Wegmans' conduct on those issues will show that the PBM Defendants were not the cause of alleged over-dispensing **in Rochester**." (emphasis added)); *id.* (Discussing Request Nos 1 & 2: "The PBM Defendants simply do not possess the data Wegmans has concerning its dispensing of opioids **in Rochester**. Wegmans' dispensing data is critical for the PBM Defendants to know what was dispensed **in the City**, to whom, why, and when." (emphasis added)); *id.* at 5 n.4 (Discussing Request Nos. 5, 6, & 7: "As part of their efforts to compromise, the ***PBM Defendants have already told Wegmans that they would limit the geographic scope to the City of Rochester itself, rather than Monroe County in which Rochester sits.***" (emphasis added)); *id.* at 6 ("Request No. 9 seeks documents related to theft, loss, or diversion of drugs within the Drug Scope from Wegmans' pharmacies **in Rochester**." (emphasis added)); *id.* (Discussing Request Nos. 8-11: "As the retail pharmacy that bought approximately 30% of the opioids purchased **in Rochester** during the relevant time period, the PBM Defendants anticipate that Wegmans' documents will reflect commensurate percentage of the diversion and/or misuse of those drugs, providing a fuller picture of the alleged opioid crisis **in Rochester**." (emphasis added)).

Second, Wegmans also agrees with the temporal scope from January 1, 2006 through the date of the subpoena to the extent Wegmans has documents that exist within that time frame. *See* 2/28/25 Ltr. at 2, 4, 5 (limiting temporal scope to January 1, 2006 to the present).

Third, Wegmans also will need to redact privileged and/or confidential employee and patient information. Wegmans is not a party to the MDL (or any opioid litigation) and thus any protective order entered in the case or others does not provide adequate protection to Wegmans. Moreover, under federal law, Wegmans is obligated to redact PHI in documents produced that are not necessary to accomplish any of the PBMs' goals.[1] Notably, the PBMs have not articulated why they would need to review any PHI concerning Wegmans' patients.

---

[1] "When using or disclosing protected health information or requesting protected health information from another covered entity . . ., a covered entity [like Wegmans] must make reasonable efforts to limit protected health information to the minimum necessary to accomplish the intended purpose of the use, disclosure, or request." 45 C.F.R. § 164.502(b)(1). Moreover, a recent wave of security breaches on PACER and internal law firm document management systems have caused numerous United States District Courts to change the manner in which sealed documents are submitted to the courts, further reinforces the need for Wegmans to protect any such information with all appropriate redactions. *See, e.g.*, Martin Tully et al., *Protecting Sensitive Court Filings After Recent Cyber Breach*, Law360 (Oct. 6, 2025), https://www.law360.com/articles/2392558/protecting-sensitive-court-filings-after-recent-cyber-

Ryan P. Ethridge
Anthony P. Alden
October 24, 2025
Page 3



Wegmans reproduces each individual Request (except for Nos. 1 and 2) in the Subpoena below and addresses them in turn.

**Subpoena Request 3:** **All Documents and Communications Concerning any literature, publications, presentations, analyses, studies, reports, guidelines, directives, announcements, recommendations, pamphlets, circulars, notices, or other materials provided by any drug manufacturer to You regarding the efficacy, addictive qualities, and/or safety of any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to present.**

Wegmans initially offered to attempt to determine the burden of harvesting specific manufacturer communications identified by the PBMs that are material and relevant to the issues in Track 12. In the PBMs' February 28, 2025 Letter, the PBMs rejected Wegmans' offer stating they did not know what communications Wegmans had with opioid manufacturers. *See* Ltr. from R. Ethridge to J. Agins (Feb. 28, 2025) ("2/28/25 Letter"). The PBMs then agreed to hold this Request in abeyance pending ongoing discussions with Wegmans regarding the scope of the Subpoena. Therefore, Wegmans will hold off discussing this Request at this time.

**Subpoena Request 4:** **All Documents and Communications Concerning any guidance, directives, instructions, publications, alerts, notices, presentations, or other materials You provided to Employees Concerning any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to present.**

On January 29, 2025, Wegmans laid out how the only relevant documents responsive to Request No. 4 would be the PBMs' own documents and policies, which Wegmans must follow.

---

breach (discussing recent cyberattacks on federal and state courts and the need for parties to minimize the sensitive content stored at law firms and filed with courts); Change *to Sealed Document Processing*, W.D.N.Y. (Aug. 22, 2025), https://www.nywd.uscourts.gov/news/change-sealed-document-processing (noting the federal district court encompassing the City of Rochester will no longer allow even case participants to access sealed documents electronically due to recent breaches); Kateyln Polantz & Aileen Graaf, *Federal courts go old school to paper filings after hack to key system*, CNN (Aug. 14, 2025), https://www.cnn.com/2025/08/14/politics/federal-courts-go-to-old-school-paper-filings-after-hack-to-key-system (reporting that some federal courts are deciding to only accept sensitive filings by hardcopy in response to recent cyberattacks); *Cybersecurity Measures Strengthened in Light of Attacks on Judiciary's Case Management System*, U.S. COURTS (Aug. 7, 2025), https://www.uscourts.gov/data-news/judiciary-news/2025/08/07/cybersecurity-measures-strengthened-light-attacks-judiciarys-case-management-system (acknowledging "recent escalated cyberattacks of a sophisticated and persistent nature on [U.S. Courts] case management system"); Staci Zaretsky, *Biglaw Firms Fall Prey To Cyberattacks, With Data Breaches On The Rise*, ABOVE THE LAW (May 23, 2024), https://abovethelaw.com/2024/05/biglaw-firms-fall-prey-to-cyberattacks-with-data-breaches-on-the-rise/ (reporting a rise in cybersecurity incidents at law firms).

Ryan P. Ethridge
Anthony P. Alden
October 24, 2025
Page 4



The PBMs never addressed this concern in their 2/28/25 Letter but merely stated they would narrow the timeframe in this request to January 1, 2006, to December 31, 2019, and limit the subject matter to "request only responsive materials related to prescription opioids provided to employees **working in Wegmans' City of Rochester stores.**" *See* 2/28/25 Ltr. at 4.

Unless the PBMs advise how other types of guidance or directives provided to employees at Wegmans' pharmacies in Rochester are relevant to this case, Wegmans does not agree to provide more in response to this Request.

**Subpoena Request 5:  Documents sufficient to show all Suspicious Orders You identified or for which you received notice in the Monroe County Region, from January 1, 2006 to present.**

Wegmans believes Request No. 5 was resolved on the Record during the January 6, 2025 conference with Special Master Cohen because Wegmans pharmacies have never registered as distributors and therefore have never had a duty to identify or report Suspicious Orders.

The PBMs have agreed that this Request has been resolved by Wegmans' representation that it has no responsive documents.

**Subpoena Request 6:  All Documents and Communications Concerning Your use, review, or analysis of ARCOS data, data from the New York Prescription Monitoring Program, or other data relating to Suspicious Orders, including all Communications to or from the U.S. Drug Enforcement Agency or the New York Prescription Monitoring Program Concerning any drug within the Drug Scope, or any other Opioid, from January 1, 2006 to present.**

Wegmans believes Request No. 6 was resolved on the Record during the January 6, 2025 conference with Special Master Cohen because Wegmans pharmacies have never registered as distributors and therefore have never had access to ARCOS data or any obligation to review it, not had a duty to identify or report Suspicious Orders.  The PBMs, however, assert that this Request has not been resolved with respect to NY PMP data.

In February, the PBMs offered "to limit this portion of the Request to the following categories of Documents and Communications relating solely to opioids: (1) prescription-level information reflecting Wegmans pharmacists' use, review, or analysis of New York PMP data while filling or dispensing an Opioid prescription; (2) its centrally maintained policies, procedures, directives and guidance from January 1, 2006 to the present, concerning how Wegmans' personnel **in its Rochester stores** should use, review, or analyze New York PMP data while filling or dispensing an opioid prescription; (3) any centrally maintained activity logs or similar materials reflecting Wegmans personnel's use, review or analysis of New York PMP data while filling or dispensing an opioid prescription; and (4) Communications to or from the U.S. Drug Enforcement Agency or the New York PMP concerning opioids, from January 1, 2006 to the present."  2/28/25 Ltr. at 5 (emphasis added).

Ryan P. Ethridge
Anthony P. Alden
October 24, 2025
Page 5



Wegmans represents that its pharmacies use the EnterpriseRx Pharmacy Management System to submit certain prescription data fields to the NY PMP daily. New York does not require, and Wegmans does not transmit any DUR alerts, clinical edits, or clinical messages to the New York PMP.

To resolve Request No. 6, Wegmans would agree to search for any written policies describing when, and under what circumstances, its pharmacist would consult with the NY PMP, and would agree to produce such policies, if any.

**Subpoena Request 7: All Documents and Communications Concerning efforts of any kind by You to identify, investigate, or report to any national, state, or local governments, agencies, boards, institutions, associations, law enforcement bodies, health departments, or drug taskforces Concerning any of the following regarding any drug within the Drug Scope, or any other Opioid, from January 1, 1996 to present: (a) improper prescribing or failing to prescribe by doctors or other prescribers in the Monroe County Region; (b) doctor-shopping, forgery, or counterfeiting of prescriptions by patients in the Monroe County Region; (c) diversion, abuse, misuse, diversion, trafficking; or (d) any other concerns Concerning potentially improper or illegal prescriptions.**

The PBMs offered in February "to drop subparts (b) and (d) and narrow sub-part (c) as follows: 'diversion, abuse, misuse, or trafficking of Opioids **within the City of Rochester**.'" 2/28/25 Ltr. at 6 (emphasis added). Wegmans accepts those revisions and requests one more revision to narrow this overbroad Request. As written, Request No. 7 would require Wegmans to sort through voluminous emails to identify any hint of suspicion of diversion by the pharmacy staff. There is no reason why the PBMs need more than internal investigations on potential diversion and/or reporting potential diversion to law enforcement bodies. Thus, Wegmans offers further narrowing Request No. 7 as follows:

> *All Documents and Communications sufficient to identify ~~Concerning efforts of any kind by You to identify, investigate,~~ internal investigations or reporting to any national, state, or local governments, agencies, boards, institutions, associations, law enforcement bodies, health departments, or drug taskforces Concerning any of the following regarding any drug within the Drug Scope, or any other Opioid, from January 1, ~~1996~~ 2006 to ~~present~~ the date of the subpoena: (a) improper prescribing or failing to prescribe by doctors or other prescribers in the City of Rochester ~~Monroe County Region~~; ~~(b) doctor-shopping, forgery, or counterfeiting of prescriptions by patients in the Monroe County Region;~~ (c) diversion, abuse, misuse, diversion, trafficking within the City of Rochester; ~~or (d) any other concerns Concerning potentially improper or illegal prescriptions~~.*

**Subpoena Request 8: All Documents and Communications Concerning all actions (including fines, suspensions, revocations, terminations, voluntary agreements not to practice, resignations, and letters or other formal warnings or notices) taken by You against any**

Ryan P. Ethridge
Anthony P. Alden
October 24, 2025
Page 6



**current or former Employee Concerning any drug within the Drug Scope, or any other Opioid, including for the prescribing, dispensing, failure to prescribe, failure to dispense, diversion, or misuse of any drug within the Drug Scope, or any other Opioids, from January l, 1996 to present.**

Wegmans will agree to produce responsive documents, if any, for the City of Rochester during the period of January 1, 2006 to the date of the subpoena. *See* 12/13/24 Ltr. at 6 (arguing documents responsive to this Request to understand the "commensurate percentage of the diversion and/or misuse of [] drugs, providing a fuller picture of the alleged opioid crisis **in Rochester**." (emphasis added)).  As the PBMs have agreed, Wegmans will redact confidential employee and patient information.

**Subpoena Request 9:  Documents sufficient to show all instances of theft, loss, or diversion of any drug within the Drug Scope, or any other Opioids, from any facility owned, operated, supported by, serviced by, or affiliated with You in the Monroe County Region, from January 1, 1996 to present.**

Wegmans will agree to produce DEA Form 106s for the City of Rochester during the period of January 1, 2006 to the date of the subpoena.  The PBMs' past communications indicate this production would satisfy Request No. 9.  *See* 12/13/24 Ltr. at 6 (limiting Request No. 9 to "documents related to theft, loss, or diversion of drugs within the Drug Scope from **Wegmans' pharmacies in Rochester**" (emphasis added); 2/28/25 Ltr. at 6 (agreeing that production of DEA Form 106s are sufficient to satisfy Request No. 9).  Wegmans expects to be able to make this production in the next several weeks.

**Subpoena Requests 10-11:**

**10. All Documents and Communications Concerning any Investigation or other inquiry conducted by any state or federal office, agency, department, committee, or program (including the DEA, the Federal Bureau of Investigation, a United States Attorney or representative thereof, any government-level department or agency within the State of New York), or any state board (including the New York Medical Board, New York Board of Pharmacy, New York Dental Board, New York Nursing Board, or any medical examiner's office in New York) into any of Your practices related to the prescribing, ordering, dispensing, distributing, administering, or diversion of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.**

**11. Documents sufficient to identify any regulatory, civil, or criminal actions or investigation Concerning any drug within the Drug Scope, or any other Opioids, to which you were a party or participated in any manner, from January 1, 1996 to present.**

Ryan P. Ethridge
Anthony P. Alden
October 24, 2025
Page 7



Wegmans will produce any documents or communications concerning criminal or regulatory fines imposed or administrative actions against its pharmacies in the City of Rochester with respect to its opioid dispensing policies from January 1, 2006 to the date of the subpoena, to the extent any such documents exist. *See* 12/13/24 Ltr. at 6 (arguing documents responsive to this Request to understand the "commensurate percentage of the diversion and/or misuse of [] drugs, providing a fuller picture of the alleged opioid crisis **in Rochester**." (emphasis added)).

**Subpoena Request 12: All Documents reflecting contracts, agreements, orders, or other formal documents between You and any manufacturer or distributor of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.**

Wegmans had understood the PBMs were no longer interested in this Request given their focus on Requests 1 and 2 and the lengthy passage of time without any feedback from the PBMs between June and August. Nonetheless, Wegmans will collect and produce all contracts with manufacturers and distributors, subject to any third-party notice or confidentiality provisions, to the extent they concern Wegmans' pharmacy in the City of Rochester during the January 1, 2006 to the date of the subpoena time frame. *See* 12/13/24 Ltr. at 6 (arguing documents responsive to this Request to understand the "commensurate percentage of the diversion and/or misuse of [] drugs, providing a fuller picture of the alleged opioid crisis **in Rochester**." (emphasis added)).

Please let us know if you will agree to Wegmans' compromise proposals. We look forward to hearing from you.

Sincerely yours,

Joshua M. Agins

# EXHIBIT 6

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 708 of 1171. PageID #: 706027

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

COUNTY OF  MONROE          ,

           **Plaintiff,**

    **-against-**

PURDUE PHARMA L.P., et al.,

        **Defendants,**

INDEX NO. 75026/2022

**SHORT FORM COMPLAINT** - Supplemental

## SUPPLEMENTAL SHORT FORM COMPLAINT AND JURY DEMAND

Plaintiff incorporates by reference Plaintiffs' Master Long Form Complaint, filed on October 6, 2017. Pursuant to Order of this Court dated September 28, 2017, the following Short Form Complaint is approved for use in this action.

Plaintiff selects and indicates by checking off the appropriate spaces those claims that are specific to its case. Where certain claims require specific pleadings or case-specific facts and individual information, Plaintiff shall add and include them herein.

1.    Plaintiff County of **Monroe**                    , New York states and brings this civil action before the Supreme Court for the State of New York, County of Suffolk as a coordinated action in the *In Re Opioid Litigation*. Plaintiff is filing this Short Form Complaint as permitted and approved by Order of Honorable Jerry Garguilo, dated September 28, 2017, and adopts and incorporates by reference those allegations in the Plaintiff's Master Long Form Complaint and any and all amendments thereto.

2.    Venue is proper pursuant to the New York Litigation Coordinating Panel. (*See* Dkt. No. 1.)

3.    Plaintiff is a New York County and claims injuries and damages as set forth in the in the Master Long Form Complaint and below.

1

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 709 of 1171. PageID #: 706028

## SPECIFIC DEFENDANTS AND CAUSES OF ACTION

4.     Plaintiff defines "Defendants" as collectively including the Defendants selected in the following subcategories identified as "Manufacturer Defendants," Distributor Defendants", and "Individual Defendants."

a.     Plaintiff defines the subcategory "Manufacturer Defendants" as including the following (check all that apply):

☐ Purdue Pharma L.P.

☐ Purdue Pharma Inc.

☐ The Purdue Frederick Company, Inc.

☐ Teva Pharmaceuticals USA, Inc.

☐ Cephalon, Inc.

☐ Johnson & Johnson

☐ Janssen Pharmaceuticals, Inc.

☐ Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc.

☐ Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.

☐ Endo Health Solutions Inc.

☐ Endo Pharmaceuticals, Inc.

☐ Allergan plc f/k/a Actavis plc

☐ Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.

☐ Watson Laboratories, Inc.

☐ Actavis LLC

☐ Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.

☐ Insys Therapeutics, Inc.

☑ Other:  See Addendum

2

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 710 of 1171. PageID #: 706029

b. Plaintiff defines the subcategory "Distributor Defendants" as including the following

(check all that apply):

☐ McKesson Corporation

☐ Cardinal Health Inc.

☐ Amerisource Drug Corporation

☐ American Medical Distributors, Inc.

☐ Bellco Drug Corp.

☐ Blenheim Pharmacal, Inc.

☐ Darby Group Companies, Inc.

☐ Eveready Wholesale Drugs Ltd.

☐ Kinray, LLC

☐ PSS World Medical, Inc.

☐ Rochester Drug Cooperative, Inc.

☑ Other: **See Addendum**

c. Plaintiff defines the subcategory "Individual Defendants" as including the following

(check all that apply):

☐ Russell Portenoy

☐ Perry Fine

☐ Scott Fishman

☐ Lynn Webster

☐ Other:

3

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  711 of 1171.  PageID #: 706030

5.      The following causes of actions are asserted by Plaintiff in its Master Long Form

Complaint and are herein adopted by reference (check all that apply):

☑ **FIRST CAUSE OF ACTION – DECEPTIVE ACTS AND PRACTICES**
   **NEW YORK GENERAL BUSINESS LAW §349 against:**

   ☐ Manufacturer Defendants

   ☐ Individual Defendants

   ☐ Distributor Defendants

   ☑ Other:  See Addendum

☑ **SECOND CAUSE OF ACTION – FALSE ADVERTISING**
   **NEW YORK GENERAL BUSINESS LAW §350 against:**

   ☐ Manufacturer Defendants

   ☐ Individual Defendants

   ☐ Distributor Defendants

   ☑ Other:  See Addendum

☑ **THIRD CAUSE OF ACTION – PUBLIC NUISANCE against:**

   ☐ Manufacturer Defendants

   ☐ Individual Defendants

   ☐ Distributor Defendants

   ☑ Other:  See Addendum

☑ **FOURTH CAUSE OF ACTION – VIOLATION OF NEW YORK**
   **SOCIAL SERVICES LAW §145-b against:**

   ☐ Manufacturer Defendants

   ☐ Individual Defendants

   ☐ Distributor Defendants

   ☑ Other: See Addendum

4

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 712 of 1171. PageID #: 706031

☑ **FIFTH CAUSE OF ACTION – FRAUD against:**

☐ Manufacturer Defendants

☐ Individual Defendants

☐ Distributor Defendants

☑ Other: See Addendum

☑ **SIXTH CAUSE OF ACTION – UNJUST ENRICHMENT against:**

☐ Manufacturer Defendants

☐ Individual Defendants

☐ Distributor Defendants

☑ Other: See Addendum

☑ **SEVENTH CAUSE OF ACTION – NEGLIGENCE against:**

☐ Manufacturer Defendants

☐ Individual Defendants

☐ Distributor Defendants

☑ Other: See Addendum

5

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 713 of 1171. PageID #: 706032

Plaintiff asserts the following additional causes of action, case-specific pleadings, case-specific facts, and/or Defendants *[attach additional pages as necessary]*:

The claims asserted against each additional defendant, along with the bases therefor, are set forth in the Addendum.

To the extent they are not already included, Plaintiff asserts all case-specific pleadings and case-specific facts included in its Complaint, County of Monroe v. Purdue Pharma L.P., et al. Index 2018-561 (Monroe Cty Sup. Ct.), and in its Short Form Complaint and Jury Demand, Monroe v. Purdue Pharma L.P., et al. Index 400017/2018 (Suffolk Cty Sup. Ct.).

Plaintiff asserts claims against additional defendants, as set forth in the attached Addendum. The additional defendants are: Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Evernorth Health, Inc. (formerly Express Scripts Holding Company), and Express Scripts Specialty Distribution Services, Inc. (collectively, "Express Scripts"); and UnitedHealth Group, Inc., Optum, Inc., OptumInsight, Inc., OptumInsight Life Sciences, Inc., OptumRx, Inc., Optum Discount Card Services, LLC,; Optum Perks, LLC,; OptumHealth Care Solutions, LLC;, OptumHealth Holdings, LLC,; and Optum Health Networks, Inc.

The claims asserted against each additional defendant, along with the bases therefor, are set forth in the Addendum.

Plaintiff designates Monroe County as the place of trial based on CPLR 503 and 509. This action is being filed in Westchester County because the State of New York Litigation Coordinating Panel, in In re Opioid Litigation, LCP Index No. 0001/2021, Suffolk County Index No. 400000/2017, Westchester County Index No. 75000/2022, NYSCEF Doc. No. 1 (5/17/2022), ordered that all Opioid Litigation subject to coordination pursuant to previous Litigation Coordination Panel orders (other than Track 1 Cases) shall be coordinated by a Coordinating Judge in Supreme Court, Westchester County, and therefore if this were filed in Monroe County it would have to be transferred to Westchester County for coordination.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 714 of 1171. PageID #: 706033

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants, jointly and severally, as to the Causes of Action specifically referenced in paragraph 5 herein, awarding Plaintiff in amounts that exceed the jurisdiction of all lower Courts:

i.    compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff for all damages;

ii.    treble damages, penalties, and costs pursuant to Social Services Law §145-b;

iii.    treble damages, penalties and costs pursuant to General Business Law §§349(h) and 350-3(3);

iv.    punitive damages;

v.    attorneys' fees

vi.    interest, costs and disbursements;

vii.    such and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all claims in this action.

Dated: March 18, 2024.        Respectfully submitted,

/s/ Jayne Conroy
Jayne Conroy
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY 10016-7416

**ADDENDUM**
**To Plaintiff's Supplemental Short Form Complaint and Jury Demand**

**Table of Contents**

I.      INTRODUCTION ........................................................................ 1

II.     JURISDICTION AND VENUE ............................................... 31

III.    PARTIES .................................................................................. 35

        A.      Plaintiff ...................................................................... 35

        B.      Defendants.................................................................. 38

                1.      The Express Scripts Defendants.................... 38

                2.      The Optum Defendants .................................. 44

IV.     THE ROLE OF PBMS IN PRESCRIPTION DRUG
        TRANSACTIONS.................................................................... 55

        A.      PBMs Operate on All Sides of Prescription Drug
                Transactions ............................................................... 55

        B.      PBMs Use Their Formularies as Leverage to Negotiate
                with Drug Manufacturers .......................................... 58

                1.      Express Scripts' Formularies ....................... 64

                2.      Optum's Formularies.................................... 66

        C.      PBMs' Drug UM Programs ....................................... 67

        D.      PBMs Contract with Pharmacies .............................. 69

V.      THE PBM DEFENDANTS' ROLE IN CAUSING THE OPIOID
        CRISIS.................................................................................... 70

        A.      The PBM Defendants and the Opioid Manufacturers
                Colluded to Ensure Virtually Unfettered Access to Opioids .............. 70

                1.      The PBM Defendants Negotiated with the Opioid
                        Manufacturers to Give Opioids Favorable
                        Placement on National Formularies in Exchange
                        for Rebates and Other Fees....................................... 70

i

2.      The PBM Defendants and the Opioid
        Manufacturers Used Parity to Limit the Use of
        Utilization Management Measures for Opioids ...................... 85

3.      The PBM Defendants Misrepresented that They
        Were Using Their Formularies to Promote Safe Use
        and Appropriate Prescribing of Opioids .................................. 91

B.   During the Early Years of the Epidemic, the PBM
     Defendants Conspired with the Opioid Manufacturers to
     Expand the Opioid Market and Increase Opioid
     Utilization ............................................................................... 94

C.   For Two Decades after the PBM Defendants Knew the
     Opioid Epidemic Was Occurring, the PBM Defendants
     Continued to Conspire with the Opioid Manufacturers in
     the Deceptive Marketing of Opioids .................................... 97

     1.     The PBM Defendants Disseminated the Opioid
            Manufacturers' Deceptive Propaganda ................................. 100

     2.     The PBM Defendants' Affiliated Entities Provided
            Research, Data, and Consulting to the Opioid
            Manufacturers to Expand the Opioid Market ...................... 108

D.   The PBM Defendants Had Access to Real-Time Data
     Regarding Drug Utilization Which Gave Them a Unique
     Vantage Point into the Opioid Epidemic .......................................... 117

     1.     The PBM Defendants track every prescription
            claim they process across all the health plans they
            service which provided them with uniquely
            granular and comprehensive data. ......................................... 117

     2.     The PBM Defendants had knowledge about the
            opioid epidemic and about abuse and diversion. .................... 122

     3.     The PBM Defendants Failed to Timely Undertake
            Actions to Address the Opioid Epidemic that They
            Helped Create. ....................................................................... 135

            a.      The PBM Defendants chose not to use their
                    claims data and their formulary and UM

offerings to address overprescribing, abuse, and diversion ................................................................. 137

b.  The PBM Defendants chose not to use their "Drug Utilization Review" tools to address overprescribing, abuse and diversion .......................... 157

c.  The PBM Defendants failed to use their vast stores of data, their formulary and UM offerings, and their DURs to provide effective controls against diversion and/or to prevent the diversion and abuse of opioids .............................. 162

E.  Two Decades After They Knew Opioids Were Causing a Public Health Crisis, Express Scripts and Optum Finally Implemented Protocols to Address the Opioid Epidemic ................. 164

F.  Even After Implementing its Opioid Risk Management Program, Optum Continued Promoting Uncontrolled Opioid Sales Through Its Cash Card and Discount Card Businesses .......................................................................... 170

VI.  AS MAIL ORDER PHARMACIES, EXPRESS SCRIPTS AND OPTUM DISPENSED OPIOIDS IN VIOLATION OF THE CONTROLLED SUBSTANCES ACT. ......................................................... 173

A.  The Applicable Statutes ..................................................................... 173

1.  The Controlled Substances Act ............................................... 174

2.  Pharmacies Are Obligated Not to Fill Prescriptions Until All Red Flags Are Resolved ........................................... 179

3.  The CSA Applies to All Persons Who Dispense Controlled Substances ............................................................ 182

B.  Defendants Violated the Controlled Substances Act ......................... 185

VII.  EXPRESS SCRIPTS AND OPTUM CONTRIBUTED TO THE PUBLIC HEALTH CRISIS IN PLAINTIFF'S COMMUNITY .................... 198

VIII.  FACTS PERTAINING TO THE FORMULARY & UM ENTERPRISE ........................................................................................ 200

iii

A.     Formation of the Formulary & UM Enterprise ................................. 206

B.     The Common Purpose and Fraudulent Scheme of the
Formulary & UM Enterprise .............................................. 218

C.     Conduct and Participation of the Formulary & UM
Enterprise Through concerted unlawful action ................................ 233

IX.    PLAINTIFF'S CLAIMS ARE TIMELY ........................................ 237

X.     DEFENDANTS ENTERED INTO AND ENGAGED IN A CIVIL
CONSPIRACY .................................................................... 241

XI.    SUCCESSOR LIABILITY ....................................................... 243

XII.   ALTER EGO LIABILITY ........................................................ 244

XIII.  CAUSES OF ACTION .......................................................... 244

FIRST CAUSE OF ACTION — DECEPTIVE ACTS AND PRACTICES:
NEW YORK GENERAL BUSINESS LAW §349 ........................................... 244

SECOND CAUSE OF ACTION — FALSE ADVERTISING:NEW
YORK GENERAL BUSINESS LAW §350 ................................................. 247

THIRD CAUSE OF ACTION—CREATION OF A PUBLIC NUISANCE............. 248

FOURTH CAUSE OF ACTION — VIOLATION OF NEW YORK
SOCIAL SERVICES LAW § 145-B............................................. 266

FIFTH CAUSE OF ACTION — FRAUD ............................................... 267

SIXTH CAUSE OF ACTION — UNJUST ENRICHMENT.................................. 268

SEVENTH CAUSE OF ACTION—NEGLIGENCE AND GROSS
NEGLIGENCE.................................................................... 269

XIV.  PRAYER FOR RELIEF .......................................................... 274

XV.   JURY DEMAND .................................................................. 275

iv

1. Plaintiff, the County of Monroe, New York ("Plaintiff"), by and through the undersigned attorneys, submits its Supplemental Short Form Complaint against Defendants Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Evernorth Health, Inc. (formerly Express Scripts Holding Company), and Express Scripts Specialty Distribution Services, Inc. (collectively, "Express Scripts") and UnitedHealth Group, Inc., Optum, Inc., OptumInsight, Inc., OptumInsight Life Sciences, Inc., OptumRx, Inc., Optum Discount Card Services, LLC, Optum Perks, LLC, OptumHealth Care Solutions, LLC, OptumHealth Holdings, LLC, and Optum Health Networks, Inc. (collectively "Optum") (together Express Scripts and Optum are referred to herein as "Defendants" or "the PBM Defendants").

2. Plaintiff expressly incorporates by reference the allegations of Plaintiffs' Master Long Form Complaint, filed on October 6, 2017.

## I. Introduction

3. This case arises from a devastating epidemic of human creation—the over-prescription, over-supply, misuse, diversion, and abuse of opioids—and the central role that two of the nation's largest Pharmacy Benefit Managers ("PBMs"), Express Scripts and OptumRx, and their affiliates, have played in that epidemic.

4. The opioid epidemic was created and sustained by a wide array of actors in the opioid supply and payment chain: the opioid manufacturers, distributors, and pharmacies, as well as by the PBM Defendants. Express Scripts' and Optum's role in stoking the opioid epidemic has been, until recently, largely concealed from public

1

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 720 of 1171. PageID #: 706039

scrutiny. It is has now become clear that the PBM Defendants have, for at least the last two decades, had a central role in facilitating the oversupply of opioids through conduct that had the intended purpose of ignoring necessary safeguards for purposes of increasing the prescribing, dispensing, and sales of prescription opioids. These defendants intentionally inserted themselves into the chain of distribution and dispensing of prescription opioids thereby assuming duties to act reasonably while comporting with the Controlled Substances Act ("CSA").

5.     The PBM Defendants sit at the center of prescription drug dispensing because they contract with the manufacturers who make the drugs, the pharmacies who dispense them, and the third-party payors who pay for them. The PBM Defendants' conduct that drove the increases and led to oversupply included: (a) colluding with, and aiding and abetting, Purdue Pharma and other opioid manufacturers in the fraudulent and deceptive marketing and oversupply of opioids; (b) colluding with Purdue Pharma and other opioid manufacturers to increase opioid sales through favorable placement on national formularies in exchange for rebates and fees; (c) colluding with Purdue Pharma and other opioid manufacturers to eliminate or limit utilization management measures on national formularies that would have restricted opioid prescribing; (d) deliberately failing properly and diligently to implement effective drug utilization review ("DUR") measures after undertaking to do; (e) electing not to act on the vast stores of information they had about the epidemic to limit the flood of opioids into communities across the United States, including Plaintiff's Community; and (f) dispensing huge quantities of

prescription opioids through their mail-order pharmacies without proper controls against diversion, as required by the CSA and New York law.

6.     The PBM Defendants are legally responsible for their role in causing, contributing to, and maintaining the opioid epidemic because, *inter alia*:  (a) their conduct in colluding with the opioid manufacturers to increase the supply of opioids through false and fraudulent misrepresentations was intentional and/or negligent,  and unlawful; (b) their knowing and/or negligent failure to offer formularies, utilization management protocols, and DUR measures that would ensure safe and appropriate use of opioid medications was wrongful because they undertook to, and represented that they would, do so, but instead worked with the opioid manufacturers to increase the supply of opioids without regard to the safety or appropriateness of the drugs; (c) they intentionally and/or negligently decided, acted, and continued to offer only formularies, utilization management protocols, and drug utilization measures that placed no meaningful restrictions on the prescribing and use of opioids despite knowing, through the vast stores of data they had, that (i) such unrestricted access to opioids was causing, and foreseeably would continue to cause, harm (including the foreseeable harm of diversion) to Plaintiffs' communities, and (ii) those harms could be addressed through measures that the PBM Defendants intentionally decided not to make available; (d) their conduct with respect to opioid prescribing and dispensing was unlawful as well as intentional and/or negligent because they failed to comply with the CSA and New York law, both in their own dispensing through their mail-order pharmacies and in their other activities that

increased the risks of diversion; and (e) they unlawfully controlled association-in-fact enterprises with opioid manufacturers and others through concerted unlawful action.

7. The PBM Defendants' role in the opioid epidemic was made possible by their unique combination of knowledge and power that gave them an extraordinary ability to control the opioid supply throughout the United States.

8. One of the PBM Defendants' own executives recognized that no other actor in the healthcare system had a greater ability to affect the opioid crisis, boasting that "*[n]o component of our healthcare system is in a better position to deliver more immediate and more impactful changes to the current course of this crisis than our nation's PBMs….*"[1]

9. The executive highlighted the PBMs' powerful position not only from an information perspective ("robust point-of-dispensing screening and intervention"), but also as "an intermediary between the physician, pharmacist, patient, pharmaceutical manufacturer, health systems, and other components of the industry," which situates the PBM Defendants "in an ideal position to drive improvements in education and awareness of the dangers of opioid therapy[.]"[2]

10. PBMs provide services to prescription drug benefit plans sponsored by health insurers, self-insured employers, and state and federal government agencies. The PBM Defendants collect and maintain (and sell) unprecedented amounts of data about the extent of opioid prescribing, far exceeding what any individual

---

[1] OPTUMRX_JEFFCO_0000014980 (9/16/17) (emphasis added).

[2] *Id.*

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 723 of 1171. PageID #: 706042

manufacturer, distributor, or pharmacy chain has access to. For as long as they have been PBMs, Express Scripts and Optum have received, analyzed, and tracked detailed claims data for the billions of prescriptions they process each year, including opioid prescriptions. Controlling prescription drug benefits for 160+ million Americans, the PBM Defendants are in possession of detailed information about every prescription they process, regardless of which company manufactured the drug, which doctor prescribed it, what pharmacy it was filled at, or which state it was dispensed in. They know when patients whose benefits they manage fill opioid prescriptions written by multiple doctors, and when they fill them at multiple pharmacies. They know how many times every opioid prescription they cover is refilled and they know when a patient who was prescribed opioids is later treated for substance use disorder. They know if one of their covered lives is having prescriptions filled for opioids, benzodiazepines, and sleep aids concurrently. In short, the PBM Defendants have had a unique vantage point on opioid use and prescribing patterns and associated misuse. These Defendants quite literally tracked the opioid epidemic, pill by pill, as it unfolded over the last two decades.

11.     The PBM Defendants are not only in possession of massive amounts of information about opioid prescribing, they also have the power to encourage and/or drive prescribing, dispensing, and sales of prescription drugs.

12.     The PBM Defendants are able to encourage and influence prescribing, dispensing, and sales primarily through the national formularies they offer to pharmacy benefit plans and through what they choose to offer in terms of standard

"utilization management" ("UM") rules. Formularies are lists of drugs covered by a pharmacy benefit plan. Formularies control which drugs are available to the PBMs' covered lives. They are often constructed in tiers, where drugs listed on higher tiers require larger copays, or as so-called exclusionary formularies, where preferred brand drugs are included and nonpreferred drugs are not included. Standard UM programs include various protocols for managing access and use of particular drugs, including: (i) step therapy, where a beneficiary is required to try a different drug or therapy first before trying the restricted drug; (ii) quantity limits, which are limits on the dosage or days' supply that a patient may receive for any given prescription(s); and (iii) prior authorizations, or ("PAs"), which are rules that require a physician to confirm that a given prescription is therapeutically appropriate before the drug is dispensed. Data shows that, when implemented, disfavored formulary placement and UM reduce inappropriate prescribing by making non-preferred drugs and/or drugs subject to UM restrictions more difficult and more costly to obtain. By contrast, the PBM Defendants and the opioid manufacturers knew that favorable formulary placement and the absence of UM restrictions create a scenario where prescriptions are written and dispensed with ease and frequency, at the expense of public safety.

13. Through their formulary and UM tools, and the other powers at their disposal, the PBM Defendants, in conjunction with opioid manufacturers, are and have been uniquely situated to influence and control the prescribing and dispensing of opioids to their 160+ million covered lives. Indeed, opioids that are preferred on PBM formularies have significantly greater sales than drugs that are either excluded

6

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 725 of 1171. PageID #: 706044

or disadvantaged. In this sense, the PBM Defendants act as the gatekeepers to the opioid market.

14.     The PBM Defendants have used their hugely profitable roles to grow into vertically integrated colossuses that have come to dominate access to prescription drugs—currently sitting at fifth (OptumRx) and twelfth (Express Scripts) on the Fortune 500 list ranking of the largest corporations in America by revenue. Defendant Express Scripts surpassed $100 billion of annual revenue as early as 2017. Defendant OptumRx has also seen its revenue grow, reaching nearly $100 billion in 2022.

15.     These two corporate leviathans are: (1) two of the three largest PBMs in the United States, collectively managing prescription drug coverage for 160+ million covered lives and processing more than 1.5 billion claims per year; (2) two of the top five dispensing pharmacies in the United States; (3) owned by two of the largest insurance companies in the world (UnitedHealth Group and Cigna); and (4) among the largest healthcare data, consulting, and analytics companies in the United States.

16.     Instead of using their vast stores of information and extensive power to do what they promised their clients and represented to the public—*i.e.*, manage the floodgates of opioid prescribing and limit abuse of these dangerous drugs—the PBM Defendants worked together and with the opioid manufacturers to negotiate contracts and structure formulary and UM offerings that encouraged opioid prescribing, while facilitating easy and inexpensive dispensing and sales of those drugs. The result is that the market for prescription opioids grew, prescribing,

INDEX NO. 75026/2022
RECEIVED NYSCEF: 03/18/2024

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 726 of 1171. PageID #: 706045

dispensing and sales increased, and the PBM Defendants and opioid manufacturers reaped the profits of their contracts and relationships. For the PBM Defendants, the profits came from rebates and fees they earned from the branded opioid manufacturers by making opioids freely available and from pricing spreads and fees they captured from generic opioid sales. Profits also came through the sale of critical data and access to and about PBM covered lives and the health care providers who cared for them.

17.     Not only did the PBM Defendants aid and abet the manufacturers through their pro-opioid formulary and UM offerings, they also colluded with the manufacturers in spreading fraudulent misrepresentations about the risks and benefits of opioids. The PBM Defendants fraudulently induced doctors to write more opioid prescriptions, and then they made sure it would be easy for patients to fill those prescriptions, thus ensuring an unfettered flow of opioids into communities across America.

18.     The PBM Defendants' conduct represented a change of course. Prior to 1997, the PBM Defendants had recognized the dangers of opioids and had installed various routine controls on quantity and access. At that time, opioids were prescribed infrequently and generally only for either acute pain, calling for very short-term use, or for end-of-life cancer pain.

19.     In the mid-1990's, Purdue Pharma ("Purdue") introduced OxyContin and began a campaign fraudulently to portray OxyContin as safe and effective for a variety of conditions, including chronic non-cancer pain calling for long-term use.

8

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 727 of 1171. PageID #: 706046

Purdue set out to convince doctors, the medical establishment, and the public generally that opioids are not addictive when taken for pain, regardless of the dose or duration of the therapy. Over time, other opioid manufacturers introduced similar products, first branded opioid drugs and then generic ones, and joined in the campaign fraudulently to increase opioid prescribing.

20.     OptumRx's predecessor Prescription Solutions initially refused to put OxyContin on its commercial formularies due to concerns regarding abuse.

21.     Express Scripts' predecessor Medco, which was, in the late 1990's, the largest customer for Purdue's opioids, initially put a strict quantity limit (80 mg/day) on OxyContin when it was introduced in 1996 and sent letters to prescribers stating that it would not pay for prescriptions for non-cancer pain treatment ("Medco prescriber letters").

22.     The Medco prescriber letters were a serious threat to Purdue and to other opioid manufacturers. The opioid manufacturers knew that they could not expand the opioid market and flood communities with their products without preferred, unrestricted access to their opioids on the PBM Defendants' formularies.

23.     Recognizing the unique role that the PBM Defendants play as the gatekeepers of the pharmaceutical market, Purdue set out to change the PBM Defendants' policies about OxyContin and about opioids generally. Purdue did this not (or not primarily) by convincing the PBM Defendants that OxyContin was safe and effective for the treatment of chronic non-cancer pain—which it is not—but

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 728 of 1171. PageID #: 706047

rather by convincing them that they could make vast amounts of money by allowing unrestricted access to opioids.

24. In a January 1997 email to Purdue's president Dr. Richard Sackler (and others) responding to the Medco prescriber letters, Michael Friedman, who would later become Purdue's CEO, stated, "This is a serious matter that we cannot ignore and that we must discuss. . . We cannot go on ignoring *the reality of [the PBM Defendants'] economic proof requirements* . . . If we are to stay in business we need *proof of economic performance*." (Emphasis added.) Purdue thus understood that for OxyContin to succeed, it would have to show the PBM Defendants that increasing opioid use would be to their economic benefit.

25. This was a critical moment in the spread of the epidemic. If Medco—Purdue's largest customer—had excluded OxyContin from its formularies or restricted its use to palliative care and/or cancer pain in 1997 (as it should have), OxyContin would never have become widely available, other branded opioids and generics never would have followed the OxyContin wave, and the epidemic likely never would have happened.

26. Medco, however, failed to take such actions. Rather, Medco and the other PBM Defendants became knowing and willing partners with Purdue and the other opioid manufacturers at this critical juncture because they realized that increasing opioid use would indeed be profitable for them. The PBM Defendants were able to profit from such increased use because their agreements with the opioid manufacturers provided for rebates and "administrative fees" to be paid to the PBM

Defendants for each rebate-eligible opioid prescription adjudicated by that PBM. Thus, every dollar spent on opioids would put money in the PBM Defendants' pockets. When a drug was given "preferred" status on a formulary, the rebates would be higher.

27.     Within months of sending its prescriber letters warning about the dangers of OxyContin, Medco completely reversed course and informed Purdue that it had become "very interested in partnering with Purdue." Medco doubled its initial quantity limits from 80 mg/day to 160 mg/day within the first year of OxyContin's release. By 2000, Medco again doubled this limit to 320 mg/day (*four times* the limit that Medco originally determined was medically appropriate for OxyContin). To make its formulary changes more effective, Medco worked "behind the scenes" with Purdue to persuade several of Medco's largest clients (including Optum's affiliate insurer UHC) to lift any restrictions they had (such as prior authorizations and quantity limits) on OxyContin sales.

28.     But it wasn't enough for Medco to just lift restrictions on the filling of prescriptions (open the floodgates); it also worked with Purdue to increase the number of prescriptions being written (increase the flow of water at the source). To that end, it joined forces with Purdue on numerous marketing campaigns, assisting Purdue in its dissemination of fraudulent misrepresentations about the safety and efficacy of prescription opioids for a wide variety of conditions for which the drugs had previously been understood to be dangerous and unsuitable. This included

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 730 of 1171. PageID #: 706049

mailings to prescribers fraudulently promoting OxyContin as safe and effective and only very rarely leading to abuse and/or addiction.

29.     Medco was not alone. Abandoning their initial resistance to OxyContin, the other PBM Defendants quickly recognized the profit potential associated with it and began partnering with Purdue and other opioid manufacturers to expand the pain treatment market.

30.     For years Express Scripts worked directly with Purdue to disseminate misinformation about OxyContin. These efforts included Express Scripts using its own "proprietary database" to locate high prescribers of opioids and then "blasting" these physicians with materials created by Purdue-paid front groups that promoted myths about the use of opioids that they knew had no basis in fact. They did this to overcome the resistance doctors had to prescribing dangerous opioids. In a particularly telling exchange, Express Scripts informed Purdue that these efforts were necessary "so that [Express Scripts] may squelch the anti-OxyContin pushback from [Express Scripts] clients . . . due in large part to the [negative] national media attention OxyContin is receiving."[3]

31.     OptumRx (then known as Prescription Solutions) initially excluded OxyContin from its formularies, but it reversed course and by the mid-2000s it was receiving $70 million per year in rebates from Purdue in exchange for preferring OxyContin on its commercial formularies.

---

[3] PPLPC029000040033.

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  731 of 1171.  PageID #: 706050

32.     In addition, Optum's affiliated research and consulting entities, OptumInsight and OptumHealth, worked hand-in-hand with Purdue and the other opioid manufacturers for decades to reshape the pain treatment market. OptumInsight provided the opioid manufacturers a full range of services including research, data, consulting, and marketing to deceive patients, prescribers, and payors into believing that opioids are effective, and even necessary, to treat chronic pain, are beneficial (both from a cost and clinical perspective), and are not likely to lead to addiction, even for patients in long term opioid therapy.

33.     None of this was true and the PBM Defendants knew it. In fact, opioids are highly addictive, even in patients taking them for pain, and the risk of abuse increases at higher doses and longer durations. Moreover, opioid therapy is not, in fact, particularly effective for chronic pain. Increased prescribing of opioids, for longer periods and at higher doses, and without the scrutiny that would accompany use of a drug whose risks were properly understood, would inevitably lead to increases in the number of individuals suffering from opioid use disorder ("OUD"), the clinical name encompassing the condition sometimes referred to popularly as addiction.

34.     The PBM Defendants' partnership with Purdue to expand the opioid market was successful: in the years following its release, OxyContin sales exploded—growing from $48 million in 1996 to $1.6 billion by 2003—and drove a huge nationwide spike in overall opioid prescribing. During this same time, the annual number of OxyContin prescriptions for non-cancer pain increased nearly tenfold, from about 670,000 in 1997 to about 6.2 million in 2002.

35.    As a direct result of the PBM Defendants' and Purdue's coordinated efforts, opioid use and abuse escalated to epidemic levels by the mid-2000s, devastating communities across the country, including Plaintiff's Community. Plaintiff has been dealing with the public health crisis caused by the PBM Defendants' misconduct for the past two decades.

36.    Making matters worse, having helped launch the epidemic, the PBM Defendants then failed to close the floodgates despite knowing that opioids were causing a public health crisis. Their data told them what was happening, and they had the tools to fix it. But for years, the PBM Defendants failed to address the epidemic they helped create. Even as the federal government starting requiring certain controls be put in place in federal health plans, the PBM Defendants deliberately chose not to offer similar controls to their commercial clients with the full knowledge that such a choice would lead to continued opioid oversupply, diversion and death.

37.    As the opioid epidemic spread throughout the country, including Plaintiff's community, the PBM Defendants intentionally chose not to undertake actions that they knew would have drastically reduced the inappropriate prescribing and dispensing of opioids, such as enacting effective UM protocols or disadvantaging opioids on their formularies. For example, for nearly every year for the past 20+ years, Express Scripts has preferred OxyContin on its formularies over safer, more effective, forms of pain treatment.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 733 of 1171. PageID #: 706052

38.     The PBM Defendants chose not to limit access to prescription opioids—including both branded and generic drugs—because together and with the opioid manufacturers, they had formed an agreement to do everything in their power to grow the market for prescription opioids without regard for public safety in order to profit from the sales of these drugs generated for each PBM Defendant and opioid manufacturer. Over at least the last two decades, the PBM Defendants have received millions of dollars in rebate payments from the opioid manufacturers in exchange for actions and omissions that incentivized and facilitated easy prescribing of prescription opioids (via favorable formulary and UM decisions), and led to unrestricted dispensing of those same drugs (through DUR decisions).

39.     The PBM Defendants now publicly admit that they were "uniquely situated" to stop the opioid epidemic and that they can create UM protocols that can "ensure that physician prescribing and pharmacy dispensing is in line with the most-up-date scientific evidence and national consensus guidelines." The power that they now admit possessing is the same power that allowed them to aid and abet with the opioid manufacturers to drive the oversupply of opioids through increases in prescribing and dispensing.

40.     The PBM Defendants have always had the ability to offer and the power to employ interventions that would minimize inappropriate opioid prescribing, dispensing, use, and abuse and thereby to prevent the progression of the opioid epidemic. Yet they failed to do so, not only at the outset of the opioid crisis, in the

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 734 of 1171. PageID #: 706053

1990's, but for two decades after that, as they watched the opioid crisis steadily unfold.

41.     Despite knowing that opioids were highly addictive, overused, and heavily abused, for over two decades the PBM Defendants intentionally did little to curb inappropriate prescribing, diversion, and abuse—instead standing by while retail pharmacies (as well as their own mail order pharmacies) dispensed wildly excessive quantities of opioid prescriptions.

42.     From their own data alone, the PBM Defendants could see that opioids were far more addictive and dangerous than they, along with Purdue and the other opioid manufacturers, had been telling the medical community and the public. They could see from their own data that the drugs required greater restrictions on access than they had led their clients to believe. But the PBM Defendants had much more than just their own data to tell them that what they had been saying, and the false narrative that had been guiding their formulary and UM offerings, was untrue (even assuming they had ever believed it): in May, 2007, Purdue pleaded guilty to federal charges of criminal misbranding with respect to OxyContin. It paid a $635 million fine and entered into a Corporate Integrity Agreement that required it to ensure that its marketing of OxyContin would be fair and accurate. (Following its entry into this agreement, Purdue promptly contracted with McKinsey & Co. for advice as to how to continue to increase OxyContin sales.) As part of its plea agreement, in an agreed statement of facts, Purdue agreed that it had "with the intend to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and

diversion and less likely to cause tolerance and withdrawal than other pain medications. . . ." The agreed statement of facts detailed the ways in which Purdue's marketing had been false and misleading.

43.     Thus, regardless of what they knew before Purdue entered into its plea agreement in May 2007, once that agreement was made public, the PBM Defendants had certain knowledge that the marketing activities on which they had colluded with Purdue (and with other opioid manufacturers) were fraudulent, leading to dangerous opioid oversupply and death. They also had certain knowledge that any supposed justifications for their formulary and UM offerings regarding prescription opioids—that the drugs were appropriate for prescription with minimal scrutiny, that they should be made available for a wide variety of conditions and for extended, long-term therapy without intensive scrutiny and review—were lies. Yet it would be *ten more years* before the PBM Defendants changed their national formulary and UM offerings to place meaningful restrictions on drugs they certainly knew were too dangerous to be prescribed, dispensed, and used as freely as the PBM Defendants and Purdue had led people to believe they could be.

44.     Rather than use their granular claims data to limit problematic opioid use or investigate outlier prescribing patterns, Defendants sold their data to third-party vendors who in turn resold the data to opioid manufacturers, including Purdue, who used the data to aid their marketing, so that they could continue to stoke increased prescribing of opioid drugs.

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  736 of 1171.  PageID #: 706055

45.     The PBM Defendants played an additional role in creating the opioid crisis. By virtue of operating their huge mail-order pharmacies, the PBM Defendants were often themselves the entity that dispensed the drugs (that is, filled prescriptions), a role that imposed on them affirmative duties to provide controls against diversion of these dangerous drugs. The data in their possession, both from their dispensing activities and from their prescription management activities across virtually every retailer pharmacy in the nation (over 60,000 in each of their networks), provided sufficient information and insight into patterns of prescribing to enable them to provide the controls that were required by law. They failed, however, to use this data to implement such controls. Instead, the PBM Defendants sold the data to the opioid manufacturers for them to use in their marketing efforts to *increase* sales of prescription opioids, without regard to the effects of such increases on the potential diversion of these drugs.

46.     Defendants' mail-order pharmacies have each operated within the federally-regulated closed system for controlled substances. Despite their obligations under the Controlled Substances Act to provide controls against diversion and to dispense opioids only pursuant to valid prescriptions issued for a legitimate medical purpose, they dispensed tens of billions of morphine milligram equivalents ("MMEs") (the standard measure used when measuring quantities of opioids of different strengths) of opioids into communities across the country, often without adequate due diligence to ensure that the prescriptions involved were valid and not likely to be diverted.

18

47.     This is especially true in the case of OptumRx, which is a single entity with multiple roles.  OptumRx is, and at all relevant times has been, registered with the DEA as a dispenser.  DEA registrants are required to provide effective controls against diversion.  But OptumRx's business practices as a PBM, as described herein, intentionally and/or negligently ignored the risks of diversion and even, at times, increased them.  OptumRx's failure to implement effective controls against diversion across all of its activities that affect dispensing, whether as a mail-order pharmacy or otherwise, is a violation of its CSA duties.

48.     Similarly to OptumRx, Express Scripts, too, is registered with the DEA and as a registrant, is required to provide effective controls against diversion.  It, too failed to provide the requisite controls with respect to all of its activities that affect dispensing.  It too, in its role as a PBM, intentionally and/or negligently ignored the risks of diversion and even, at times, increased them.  Even though Express Scripts used separate entities to perform mail-order pharmacy and PBM functions, it, too, was required by the CSA to provide effective controls against diversion across all of its activities that affect dispensing, whether as a mail-order pharmacy or otherwise.  Its failure to do so was in violation of the CSA.

49.     The PBM Defendants thus have not been mere bystanders in the opioid crisis; rather they colluded with the opioid manufacturers, placed profits over safety, and engaged in a clandestine and fraudulent scheme to increase the sale of prescription opioids, despite the known dangers of these drugs.

19

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 738 of 1171. PageID #: 706057

50.     It was only well after the opioid epidemic reached its peak, and after the U.S. Senate and state governments began to investigate Express Scripts' and Optum's role in causing the opioid epidemic, that the PBM Defendants finally began to implement UM measures to address the public health crisis behind which they were a driving force.

51.     Notably, when Express Scripts and Optum finally took meaningful steps to address the epidemic by enacting opioid management programs in 2017 and 2018, the results were significant. Both Express Scripts' and Optum's own data show that, following the implementation of the PBM Defendants' opioid management programs, opioid prescribing and use, as measured by multiple metrics, significantly decreased across the populations of lives that each PBM Defendant respectively covers.

52.     The PBM Defendants could have implemented those same opioid management measures at any point over the past two decades. Had they put in place the tools that they knew would have reduced opioid overuse—such as those implemented in 2017—when they first knew these drugs were causing a public health crisis, they would have had a substantial impact on addressing the opioid epidemic.

53.     Express Scripts' own marketing material shows with shocking precision the effect that Express Scripts' delay had on its covered lives. A March 2017 Express Scripts PowerPoint titled "Comprehensive Opioid Solution: What is Express Scripts Doing to Combat this Epidemic?" included the following slide that detailed Express Scripts' calculation of how many of its own covered lives would die in the future if Express Scripts did nothing to combat the opioid epidemic:

20

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 739 of 1171. PageID #: 706058



54. Express Scripts said nothing about the covered lives that had *already* been lost through its inaction over the decade or more that Express Scripts sat idly by and watched the opioid epidemic escalate across the country and in Plaintiff's Community. But its ability to calculate with such precision the number of such lives going forward speaks volumes both about its earlier failures to act and about the likely scale of the losses attributable to that failure.

55. Defendants' scheme has had far-reaching public health consequences, the costs of which have been borne by communities across the United States, including Plaintiff's Community.

56. According to the United States Centers for Disease Control and Prevention ("CDC"), prescription opioids have directly and indirectly accounted for more than 80% of overdose deaths in the United States, a toll that has quadrupled over the past two decades. More people have died from opioid-related causes than from car accidents or guns. More than 175 people die every day from opioid overdoses—as if an airplane were to crash, killing everyone on board, every day.

57. The epidemic's economic costs for healthcare, lost productivity, addiction treatment, and criminal justice involvement is estimated at $1.02 trillion a year.

58. The devastating human toll of opioid abuse cannot be overstated. After years of decreasing death rates in the United States, these rates are now on the rise, fueled in no small part by an increase in opioid-related drug overdose deaths. Drug overdoses are now the leading cause of death for Americans under the age of fifty. The number of Americans who died of drug overdose deaths in 2017 alone was roughly equal to the number of Americans who died in the Vietnam, Iraq, and Afghanistan wars combined.

59. From 1999 through the present, over 1,000,000 people have died from an overdose involving opioids. Well over half of those deaths involved opioids prescribed by doctors to treat pain. These opioids include brand-name prescription

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 741 of 1171. PageID #: 706060

medications like OxyContin, Opana ER, Nucynta, Duragesic, Subsys, Actiq, and Fentora, which were manufactured respectively by Purdue, Endo, Janssen/J&J, Insys, and Teva/Cephalon. The drugs also include generic opioids such as hydrocodone, oxycodone, fentanyl, hydromorphone, morphine, methadone, tapentadol, and oxymorphone manufactured by Teva, Mallinckrodt and other generic drug makers.

60.    The opioid epidemic rages on to this day and continues to worsen each year. A staggering 110,000 people died of opioid overdoses in 2022 alone.

61.    For many of the people whose lives were cut short by opioid overdoses, even if the drug used at the time of overdose was a non-prescription opioid such as heroin or illicit fentanyl, their opioid use began with prescription pills. Many opioid users, having become addicted to, but no longer able to obtain prescription opioids, turn to heroin. According to the American Society of Addiction Medicine, 80% of the people who initiated heroin use in the past decade started with prescription painkillers—which, at the molecular level and in their effect, closely resemble heroin. Both heroin and oxycodone, for example, are semisynthetic derivatives of naturally occurring alkaloids found in opium; heroin—or diacetylmorphine—is derived from morphine. Unsurprisingly, people who are addicted to prescription painkillers are 40 times more likely to become addicted to heroin. The CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. In recent years, individuals have become addicted to even stronger opioids, often turning to illicit fentanyl, with even more lethal effects.

62.  According to Robert Anderson, who oversees death statistics at the CDC: "I don't think we've ever seen anything like this. Certainly not in modern times." On October 27, 2017, then-President Trump declared the opioid epidemic a public health emergency. On December 22, 2022, Health and Human Services Secretary Xavier Becerra renewed the determination that the "opioid public health emergency exists nationwide."

63.  The following figure represents New York and U.S. Opioid Overdose Death Rates, 2010 − 2021[4]



**FIGURE 4: New York and U.S. Opioid Overdose Death Rates, 2010 − 2021**

* The 2021 rates reflect provisional counts of opioid overdose deaths for the 12-month period ending December 2021, and are subject to change.

Note: Rates are age-adjusted per 100,000 population.

Source: Centers for Disease Control and Prevention, National Center for Health Statistics.

64.  The following figures represents New York Drug Overdose Deaths and Death Rates by Race, 2010 − 2020[5]

---

[4] *Id.*

[5] *Id.*

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 743 of 1171. PageID #: 706062



FIGURE 6: New York Drug Overdose Deaths and Death Rates by Race, 2010 – 2020

Note: Rates are age-adjusted per 100,000 population.

Source: Centers for Disease Control and Prevention, National Center for Health Statistics.

65.     Drug overdoses have regularly been among the highest causes of death in New York, with opioids involved in most overdose deaths. Due to incomplete reporting, these grim numbers likely understate the number of New York residents lost to this scourge.

66.     Between 2010 and 2017, New York's proportion of opioid-related drug overdose deaths grew from 69 percent to 82 percent of overdose deaths, and opioid overdoses grew by 200 percent during this time period.[6]

---

[6] Continuing Crisis, Drug Overdose Deaths in New York, November 2022, New York State Comptroller Thomas P. DiNapoli, https://www.osc.ny.gov/reports/continuing-crisis-drug-overdose-deaths-new-york (citing Centers for Disease Control and Prevention (CDC), National Center for Health Statistics, National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database, released in 2021. Data are from the Multiple Cause of Death Files, 1999-2020, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program, accessed July 11, 2022, at http://wonder.cdc.gov/mcd-icd10.html.)

67.     The following figure identifies the number of New York Overdose Deaths by Drug or Drug Class 2018-2022.[7]



68.     Defendants' conduct has had severe and far-reaching consequences for public health, social services, and criminal justice, including the fueling of addiction and overdose from illicit drugs such as heroin. The costs are borne by Plaintiff and other governmental entities. These necessary and costly responses to the nationwide opioid crisis include the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarcerations, treating opioid-dependent newborns in neonatal intensive care

---

[7] https://oasas.ny.gov/overdose-death-dashboard

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 745 of 1171. PageID #: 706064

units, burying the dead, and placing thousands of children in foster care placement, among others.

69.     Government entities, including Plaintiff, have been strained to the breaking point by this public health crisis, which has an impact on all of the services they provide to people in their Communities. The burdens imposed on Plaintiff are not the normal or typical burdens of governmental programs and services. Rather, these are extraordinary costs and losses that are directly related to Defendants' conduct.

70.     The losses inflicted have cut across ages and generations. Many who have succumbed to overdoses have overdosed more than once. Family members, including young children, have watched their loved ones lose consciousness or die. Young children, including toddlers, also have been the direct victims of overdoses themselves after coming into contact with opiates, often being addicted at birth from an addicted mother.

71.     The resulting plague has meant that hundreds of children have been displaced from their homes and have been raised by relatives or placed in public care due to their parents' addiction. Others lose the chance to go home. Unable to be discharged from the hospital with their mothers, hundreds of babies who have been born addicted to opioids due to prenatal exposure have been placed in the care of public resources or local citizens or non-profits who do their best to comfort them through the pain of withdrawal.  Additionally, "[a]mong NYS residents, the number of newborns with Neonatal Abstinence Syndrome (NAS) and/or affected by maternal

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 746 of 1171. PageID #: 706065

use of drugs of addiction increased 5.8 percent from 1,632 in 2019 to 1,726 in 2020, and the crude rate per 1,000 newborn discharges increased from 7.9 to 8.8."[8]

72.     Individually, and colluding with each other and with opioid manufacturers, Express Scripts and Optum each caused, contributed to, and maintained the opioid crisis and now must abate the ongoing public nuisance they created in communities across America.

73.     Individually, and colluding with each other and with opioid manufacturers, the PBM Defendants' conduct was a substantial contributing factor in the creation of the opioid crisis, which to this day continues to unreasonably interfere with the public health, safety, and welfare and is therefore a public nuisance.

74.     Express Scripts and Optum colluded together in, and aided and abetted, the fraudulent marketing of prescription opioids.

75.     The PBM Defendants and opioid manufacturers formed an association-in-fact enterprise, the "Formulary & UM Enterprise." The common purpose of the Formulary & UM Enterprise was to profit from the increased and unrestricted prescribing, dispensing, and sale of prescription opioids without regard for public safety. The PBM Defendants conducted, and participated in the conduct of, the Formulary & UM Enterprise by agreeing to not take action that would undercut each other's business; agreeing to work together with the opioid manufacturers; agreeing

---

[8]https://www.health.ny.gov/statistics/opioid/data/pdf/nys_opioid_annual_report_2022.pdf

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 747 of 1171. PageID #: 706066

to take and taking formulary action that would motivate and facilitate increased opioid prescribing; agreeing to take and taking UM actions that would facilitate easier and increased opioid dispensing and sales; working together with opioid manufacturers to disseminate the false marketing and to support their detailing of prescription opioids to prescribers; and failing to uphold their distribution and dispensing obligations under the Controlled Substances Act and its implementing regulations. All of this conduct furthered the underlying fraudulent scheme of the Formulary & UM Enterprise because it served to deprive people of money and property by means of an underlying fraudulent scheme, including taking actions that directly contradicted the public representations they made about their conduct as well as the promises they made to their clients. Furthermore, Express Scripts and Optum have engaged in additional illegal conduct, including filing false statements about their revenue with the Securities and Exchange Commission ("SEC").

76.     Express Scripts and Optum undertook and assumed a duty to create formularies and UM programs based on the health and safety of the public and of the lives covered by the benefit plans that were their clients. Express Scripts and Optum represented to the public, as well as to their clients, that their formulary and UM offerings were based on the health and safety of the public and the lives their clients insured, when in fact they were doing the exact opposite and the PBMs were acting to maximize their own revenue in concert with the opioid manufacturers. Optum and Express Scripts knew, at the time that they made these representations to the public and to their clients, that they would not base their formulary and UM offerings on

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 748 of 1171. PageID #: 706067

the health and safety of the covered lives involved, nor of the public, but rather that they would make, and were already making, formulary and UM decisions, and taking formulary and UM actions, designed solely (or at least primarily) to increase profits to the PBM Defendants.

77. The opioid manufacturers—with whom the PBM Defendants colluded in creating the opioid crisis—have themselves faced substantial civil and criminal liability for their roles and have agreed to pay billions of dollars to assist with the generational devastation caused by their scheme. A few examples include:

(a) In October 2020, the Department of Justice announced that Purdue entered into a federal settlement of more than $8 billion to resolve pending criminal and civil allegations regarding Purdue's role in causing the opioid epidemic;

(b) In February 2022, Janssen/J&J agreed to finalize a proposed $5 billion settlement resolving claims by states and local governments that they helped fuel the U.S. opioid epidemic;

(c) In July 2022, Teva announced it would pay up to $4.25 billion as part of a nationwide settlement to end litigation over its alleged role in the U.S. opioid crisis; and

(d) In August 2022, Endo agreed to pay $450 million to states to resolve opioid lawsuits across the country.

78. The PBM Defendants, too, should be required to bear the costs of abating the devastating nuisance that they, along with the other entities, brought about.

79. Plaintiff brings this suit to hold Defendants accountable for the devastating opioid crisis they caused, contributed to, and maintained.

30

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  749 of 1171.  PageID #: 706068

## II.    Jurisdiction and Venue

80.    This Court has jurisdiction over this action pursuant to New York Constitution article VI, Section 7(a) and CPLR 301 and 302.

81.    Venue is proper pursuant to the New York Litigation Coordinating Panel.

82.    This action is non-removable under 28 U.S.C. § 1332 because there is incomplete diversity of residents and no substantial federal question is presented.

83.    Plaintiff does not challenge conduct within any federal agency's exclusive domain or conduct under a federal officer, nor does it seek relief from any Defendant that is governed by or available pursuant to any claim(s) involving a federal officer associated with any federal health benefits plan.

84.    Plaintiff hereby disclaims all federal claims. This lawsuit does not seek damages related to the federal government or for conduct undertaken pursuant to contracts with the federal government, nor does it challenge the creation of custom formularies for, or on behalf of, a federal government agency or federal officer, such as for any Federal Employees Health Benefits Act ("FEHBA"), TRICARE-governed health benefits plan or any other federal plan. Furthermore, it does not seek to recover moneys paid by the federal government pursuant to such plans. As such, the Complaint does not seek relief from any PBM Defendant that is available pursuant to any claim(s) involving a federal government agency, federal officer or federal government contracting officer associated with any FEHBA or TRICARE-governed health benefits plan or federal health insurance program; nor pharmacy care services provided to the federal government; nor remedies that would interfere with or

31

otherwise affect any federal plan, including but not limited to any remedies that would interfere with or affect the formularies, utilization management policies and programs, or administration of any Federal Plan; the uniform administration of the TRICARE program or the provision of healthcare services to U.S. military servicemembers, veterans, and their beneficiaries; or services provided under a contract that requires the exclusive use of any federal government formulary, including the Department of Defense's Uniform Formulary, that specifies the drugs authorized, sets requirements for prior authorization and utilization reviews, and/or assures medical necessity, clinical appropriateness and/or cost-effectiveness, and/or establishes a prescription restriction program for TRICARE federal health insurance program members and/or beneficiaries.

85.    This lawsuit does not contain claims against the Defendants that are federal in character related to prescriptions adjudicated or processed under any federal program or federal contract, including OptumRx's contract with the Veterans Health Administration or pharmacy care services provided to the federal government, Express Script's contracts with the U.S. Department of Defense, the TRICARE health care program, and other health plans participating in the FEHBP overseen or administered by the federal government; nor does it include requests for relief governed by, or available pursuant to claims associated with any FEHBP or TRICARE-governed health benefits plan; nor claims against Defendants involving beneficiaries under federal healthcare programs or federal plans; nor federal prescription claims adjudicated or processed for plans controlled or sponsored by

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 751 of 1171. PageID #: 706070

federal government agencies or entities or those processed according to a federal formulary design or Medicare Part D plans; nor conduct as a fiscal intermediary on behalf of the federal government; nor conduct governed or managed by a federal officer or federal government contracting offer, or basic governmental tasks fulfilled or carried out by a Defendant on behalf of the federal government; nor determinations as to the appropriateness of restrictions on a TRICARE member's prescriptions, which are to be determined by a federal officer; nor conduct considered to be undertaken by any Defendant as a statutorily authorized alter ego of the federal government; nor any contract that provides and/or requires federal government subjection, guidance and/or control over a Defendant's performance and/or the prescription drugs included in formularies. Plaintiff further disclaims any claims herein regarding: (1) conduct related to prescription claims for federal plans that may or may not have caused an oversupply of prescription opioids or caused or contributed to the harms for which Plaintiff seeks recovery, (2) Express Scripts' pharmacy benefits management or mail order pharmacy work for the Department of Defense under any TRICARE Contract and pertaining to health plans under FEHBA, including the operation of mail order pharmacies in accordance with contractual guidelines set by the federal government; and (3) OptumRx's work for the Veterans Health Administration and/or the federal government.

86.     Plaintiff disavows any cause of action or claim for recovery related to opioids distributed to military personnel, veterans, federal customers or health plan beneficiaries under the authority or direction of a federal officer, federal agency, or

pursuant to any federal contract; or any statutory mandate to provide health care to beneficiaries of federal plans, military personnel or veterans and/or their beneficiaries through the TRICARE federal health insurance program; contracts pertaining to pharmacy benefit management and mail order pharmacy services for federal employees, including pertaining to the TRICARE Home Delivery/Mail Order Pharmacy, or programs such as Meds by Mail; or federal contracts where a federal officer or agency directed or exercised guidance and control over Defendants' conduct as described generally in this lawsuit; the operation or management of a TRICARE mail order pharmacy; or federal contracts pertaining to dispensing by mail order pharmacies to beneficiaries of federal plans, military personnel or veterans and/or their beneficiaries; or prescription claims under a contract between Defendants and the federal government.

87.     Plaintiff expressly disclaims and disavows any and all federal claims or questions related to opioids at issue in this lawsuit and disavows any cause of action or claim for recovery related to opioids at issue that could give rise to federal subject matter jurisdiction under either 28 U.S.C. § 1331 (federal question) or 28 U.S.C. § 1442 (a)(1) (federal officer). Plaintiff is not seeking relief for any and all claims for damages against any Defendant whose conduct whether by omission or commission, was engaged in at the behest of the United States or any agency or person acting under him or under color of such office to the extent that such a claim would implicate federal court jurisdiction under 28 U.S.C. § 1442(a)(1), predicated on preemption by the TRICARE statute and the FEHBA or the government contractor's defense

articulated in Boyle v. United Technologies Corp., 487 U.S. 500 (1998). All such claims that legitimately implicate such defenses, in the unlikely event that they exist and are factually supported, are not asserted and are hereby expressly and preemptively disclaimed. Plaintiff hereby puts any Defendant who may nonetheless assert such defenses as a basis for federal jurisdiction over this case on notice that Plaintiff seeks no recovery for injuries as a result of conduct that meets the three-prong Boyle test and constitutes actions of a federal officer sufficient to trigger jurisdiction under 28 U.S.C. § 1442(a)(1). Plaintiff specifically advises all Defendants of their position that such an express, clear and unequivocal disclaiming of exposures and of claims implicating the Boyle defense, as well as any other claims that legitimately implicate 28 U.S.C. § 1442(a)(1), render any potential future removal of this case to federal court on one of these clearly-disclaimed bases objectively unreasonable under Martin v. Franklin Capital Corp., 546 U.S. 132 (2005).

## III. Parties

### A. Plaintiff

88. Plaintiff is a county organized under the laws of the State of New York.

89. Plaintiff provides a wide range of services on behalf of its residents, including services for families and children, public health, public assistance, law enforcement, and emergency care.

90. Plaintiff has all the powers possible for a county to have under the constitution of the State of New York and the laws of the State of New York.

91. Plaintiff has standing to bring this action to protect the public health, safety, and welfare of its citizens.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 754 of 1171. PageID #: 706073

92.     Plaintiff spends millions of dollars each year to provide or pay for the health care, pharmaceutical care, and other necessary services and programs on behalf of indigents and otherwise eligible residents, including payments for prescription opioids.

93.     Plaintiff also provides a wide range of other services on behalf of its residents, including services for families and children, public health, public assistance, emergency and ambulatory services and law enforcement.

94.     Plaintiff funds its own health insurance plan for the benefit of its employees, through which it pays part or all of its employees' health care costs, including the cost of prescription drugs, including opioids.

95.     Plaintiff also funds workers compensation and provides disability care programs for its employees participating in the healthcare plan.

96.     The economic impact of prescription opioid overdoses in Plaintiff's community is well in line with national trends. As a direct and foreseeable consequence of Defendants' wrongful conduct, the County paid, and continues to pay, millions of dollars for health care costs that stem from prescription opioid dependency. These costs include unnecessary and excessive opioid prescriptions, substance abuse treatment services, ambulatory services, emergency department services, and inpatient hospital services, investigative autopsy costs, among others. Defendants' conduct also caused Plaintiff to incur substantial economic, administrative, and social costs relating to opioid addiction and abuse, including criminal justice costs, victimization costs, lost productivity costs, education and

36

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 755 of 1171. PageID #: 706074

prevention program costs, forensic costs, and Narcan rescue drug costs, among others.

97.   Defendants' intentional, negligent, and/or unlawful conduct, alleged more fully herein, has created a serious public health crisis of opioid abuse, addiction, morbidity, and mortality and is a public nuisance in Plaintiff's Community.

98.   Plaintiff directly and foreseeably sustained all economic damages alleged more fully herein. Plaintiff, like any other local government, endeavors in good faith to provide a wide variety of necessary services on a limited budget funded with taxpayer dollars. Defendants' conduct has imposed an extraordinary burden on Plaintiff's limited resources and services for which it seeks relief.

99.   Defendants' conduct is beyond anything Plaintiff could have prepared for, predicted or avoided. It is a repeated course of conduct that did, does, and will— given the realities of addiction—continue to result in recurring and ongoing harm to Plaintiff and Plaintiff's Community. Defendants' conduct is especially pernicious when one considers the harm it has wreaked on governmental entities such as Plaintiff who, in good faith, endeavor to provide a wide variety of necessary services on a limited budget funded with taxpayer dollars. The magnitude of Defendants' scheme is neither discrete nor of a sort that a local government, including Plaintiff, could reasonably expect to have to respond to at any time during its existence as such. It would be unreasonable, unjust, and inequitable not to allocate the additional governmental expenses, and any other costs associated with the harms Defendants'

wrongful conduct has caused, to the actual parties responsible for creating the need for the resources to be expended as they are and were.

## B. Defendants

### 1. The Express Scripts Defendants

100. **Defendant Evernorth Health, Inc.** (f/k/a Express Scripts Holding Company) ("Evernorth") is a Delaware corporation Evernorth Health, Inc.'s principal place of business is at 1 Express Way, St. Louis, Missouri 63121.

101. Evernorth is the parent company to all of the Express Scripts entities named as Defendants. Evernorth, through its executives and employees, controls the enterprise-wide policies that inform all of Express Scripts' lines of business in order to maximize profits across the corporate family.

102. Evernorth's conduct had a direct effect in New York, including Plaintiff's Community.

103. **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth Health, Inc. Express Scripts, Inc.'s principal place of business is at 1 Express Way, St. Louis, Missouri 63121.

104. Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout New York that engaged in the conduct which gives rise to this Complaint.

105. During the relevant time period, Express Scripts Inc. was directly involved in the PBM and mail order services businesses, including with respect to the at-issue drugs, as well as Express Scripts' data and research services.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 757 of 1171. PageID #: 706076

106.    **Defendant Express Scripts Administrators, LLC,** is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth Health, Inc. Express Scripts Administrators, LLC's principal place of business is at the same location as Express Scripts, Inc.

107.    Express Scripts Administrators, LLC is registered to do business in New York and may be served through its registered agent CT Corporation System, 28 Liberty Street, New York, NY 10005.

108.    During the relevant time period, Express Scripts Administrators, LLC provided and/or offered PBM services in New York, including Plaintiff's Community.

109.    **Defendant Medco Health Solutions, Inc.** (f/k/a Merck-Medco) ("Medco") is a Delaware Corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey, and is a wholly-owned subsidiary of Evernorth Health, Inc. Medco Health Solutions, Inc. was previously known as Merck-Medco. Merck-Medco was acquired in the early 1990s by Merck & Co. as its pharmacy benefit manager subsidiary. In 2002, Merck & Co. spun off Merck-Medco into a publicly traded company, defendant Medco Health Solutions, Inc.

110.    Medco Health Solutions, Inc. is registered to do business in New York and may be served through its registered agent: CT Corporation Syste, 28 Liberty Street, New York, NY 10005.

111.    **Defendant ESI Mail Order Processing, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth Health, Inc.

112. During the relevant time period, ESI Mail Order Processing, Inc. provided and/or offered mail order pharmacy services in New York, including Plaintiff's Community.

113. **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth Health, Inc. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Express Scripts, Inc.

114. ESI Mail Pharmacy Service, Inc. d/b/a Express Scripts, Inc., does business in New York and may be served through Express Scripts' registered agent: CT Corporation System, 28 Liberty Street, New York, NY 10005.

115. During the relevant time period, ESI Mail Pharmacy Service provided mail order pharmacy services in New York, including Plaintiff's Community.

116. **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth Health, Inc. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Express Scripts, Inc.

117. Express Scripts Pharmacy, Inc. is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, NY 10005.

118. Express Scripts Pharmacy, Inc. holds active licenses with the New York State Board of Pharmacy.

40

119.   During the relevant time period, Express Scripts Pharmacy, Inc. provided and/or offered mail order pharmacy services in New York, including Plaintiff's Community.

120.   Express Scripts Pharmacy, Inc. and ESI Mail Pharmacy Service, Inc. are referred to herein collectively as "Express Scripts Mail Order Pharmacy."

121.   In 2021, Express Scripts Mail Order Pharmacy was the third largest dispensing pharmacy in the United States and reported $54.4 billion in prescription revenues.

122.   From 2006 to 2014, Express Scripts Mail Order Pharmacy bought over 22.9 billion MMEs of opioids spread over 1.1 billion opioid dosage units.

123.   **Defendant Express Scripts Specialty Distribution Services, Inc**. is a Delaware corporation and is a wholly owned subsidiary of Evernorth Health, Inc. Express Scripts Specialty Distribution Services, Inc.'s principal place of business is at the same location as Express Scripts, Inc.

124.   During the relevant time period, as alleged in more detail herein, Express Scripts Specialty Distribution Services, Inc. worked directly with the opioid manufacturers to expand the opioid market, including with Purdue and Endo to administer and dispense opioids through these opioid manufacturers' Patient Assistance Programs, including in New York.

125.   Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc.,

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 760 of 1171. PageID #: 706079

and Express Scripts Specialty Distribution Services, Inc., including all predecessor and successor entities, are referred to as "Express Scripts" or "ESI."

126.    Express Scripts is named as a Defendant in its capacities as a: (1) PBM; (2) data, analytics, and research provider; and (3) mail order pharmacy. During the relevant time period, Express Scripts contracted directly with the opioid manufacturers in each of these capacities. At all relevant times, Express Scripts performed these services in New York and Plaintiff's Community.

127.    In 2019, Express Scripts merged with Cigna, Inc. Prior to merging with Cigna, Express Scripts was the largest independent PBM in the United States.

128.    In 2012, Express Scripts acquired Medco in a $29.1 billion deal.

129.    Prior to 2012, Express Scripts and Medco were separate companies. Standing alone, these companies were two of the largest PBMs in the country and had been since at least the mid-1990s.

130.    As a result of the merger, the combined Express Scripts was formed and became the largest PBM in the nation.

131.    Following the merger, all of Medco's PBM and data and research functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's clients becoming Express Scripts' clients and Medco's top executives becoming Express Scripts executives.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 761 of 1171. PageID #: 706080

132. The chart represents the consolidation of PBM entities that that are now all part of Express Scripts today:



133. Express Scripts is now the largest PBM in the United States, with annual revenue (as of 2022) of over $100 billion. Express Scripts provides pharmacy benefit service to more than 100 million Americans, filling 1.4 billion prescriptions per year.

134. At all times relevant hereto, Express Scripts offered pharmacy benefit management services nationwide and maintained standard, national formularies that were offered to and used by Express Scripts' clients nationwide, including in New York and Plaintiff's community. Express Scripts' national formularies include its National Preferred Formulary, Basic Formulary, High Performance Formulary, and Prime Formulary. These Express Scripts formularies were utilized by prescription drug benefit plans in Plaintiff's Community throughout the relevant time period. At times relevant hereto, those formularies dictated the terms of reimbursement for opioids dispensed in New York and Plaintiff's Community.

43

135.    Express Scripts offers pharmacy benefit services to a variety of plan sponsors with covered lives in Plaintiff's Community, including both large national companies and local/regional businesses.

136.    Express Scripts (and/or its predecessors) processed claims for opioids dispensed pursuant to Express Scripts' national formularies and standard UM guidelines in Plaintiff's Community throughout the opioid epidemic.

### 2.    The Optum Defendants

137.    **Defendant UnitedHealth Group, Inc**. ("UnitedHealth Group" or "UHG") is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

138.    UnitedHealth Group may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

139.    UHG is registered to do business in New York and may be served through its registered agents: Griffin Michael, 914 3rd Avenue, Ste #126, Brooklyn, NY 11232 and Corporate Filings of New York, 90 State Street, Ste 700, Office 40, Albany, NY 12207.

140.    UnitedHealth Group, Inc. is a Fortune 5 diversified managed healthcare company. In 2022, UnitedHealth Group listed revenue in excess of $324 billion. UnitedHealth Group, Inc. offers a spectrum of products and services including health insurance plans and pharmacy benefits through its wholly-owned subsidiaries.

141.    UnitedHealth Group operates through two connected divisions—Optum and UnitedHealthcare ("UHC"). As discussed in greater detail below, Optum provides

44

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 763 of 1171. PageID #: 706082

PBM services; mail order pharmacy services; and data, analytics, consulting, and research services. UHC provides health insurance and health benefit services.

142.    UnitedHealth Group, through its executives and employees, control the enterprise-wide policies that inform both UHC and Optum's lines of business in order to maximize profits across the corporate family.

143.    UnitedHealth Group's conduct had a direct effect in New York, including Plaintiff's Community.

144.    **Defendant Optum, Inc**. is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

145.    Optum, Inc. is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty St., New York, NY 10005.

146.    Optum, Inc. is a health services company managing the subsidiaries that administer UnitedHealth Group's pharmacy benefits, including OptumRx, Inc.

147.    Since 2005, Optum, Inc. has been a part of the UnitedHealth Group. UnitedHealth Group has two major segments of its business: UnitedHealth Care ("UHC") which is its medical insurance arm and Defendant Optum, Inc., which includes UHG's PBM and research, data, and consulting arms. In 2022, UHC insured over 46 million Americans and generated $249 billion in revenue.

148.    Optum, Inc. is engaged in five types of business activities: (1) data analytics; (2) pharmacy benefit management; (3) healthcare services; (4) mail-order pharmacy dispensing; and (5) medical discount card services.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 764 of 1171. PageID #: 706083

149.    **Defendant OptumInsight, Inc.** (f/k/a Ingenix, Inc.) is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. OptumInsight was formerly known as Ingenix, Inc. The name change came after the State of New York investigated Ingenix related to a scheme to defraud consumers by manipulating reimbursement rates, resulting in a $50 million settlement with the State and giving rise to U.S. Congressional hearings.

150.    OptumInsight, Inc. is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, NY 10005.

151.    OptumInsight, Inc. holds an active Third Party Administrator and Independent Adjuster license with the New York Department of Finance.

152.    **Defendant OptumInsight Life Sciences, Inc.** (f/k/a QualityMetric, Inc.) is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. OptumInsight Life Sciences, Inc. is a wholly-owned subsidiary of UnitedHealth Group ("UHG"). Prior to 2011, OptumInsight Life Sciences, Inc. was known as QualityMetric.

153.    OptumInsight, Inc., OptumInsight Life Sciences, Inc., as well as their predecessors, successors, affiliates, including but not limited to Innovus, Innovus Research, i3, QualityMetric, HTAnalysts, ChinaGate, and CanReg, are referred to herein as "OptumInsight." OptumInsight is the Optum group that engages in data analytics.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 765 of 1171. PageID #: 706084

154. OptumInsight emerged from a collection of entities acquired by the UnitedHealth Group over the years. Those legacy entities include Innovus, QualityMetric, HTAnalysts, ChinaGate, CanReg, Ingenix, and the Lewin Group.



155. As discussed more fully below, OptumInsight partnered with various opioid manufacturers to create studies, marketing, educational programs, and even identifying algorithms to simultaneously downplaying opioids' addictive properties and expand its use and availability throughout the country, including in New York.

47

156. **Defendant OptumRx, Inc. ("OptumRx")** is a California corporation with its principal place of business at 2300 Main St., Irvine, California, 92614. OptumRx is the arm of Optum that provides PBM and pharmacy dispensing services.

157. OptumRx is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty St., New York, NY 10005.

158. OptumRx, Inc. entities (Optum Care Networks, Inc., Optum Services (Puerto Rico) LLC, OptumHealth Care Solutions Inc, OptumHealth Care Solutions LLC, and OptumInsight, Inc.) hold 4 active licenses with the New York State Department of Finance.

159. Prior to 2011, OptumRx was known as Prescription Solutions. In addition, as depicted in the PBM Consolidation Chart below, OptumRx grew as a result of numerous mergers and acquisitions. For example, in 2012, a large PBM, SXC Health Solutions, bought one of its largest rivals, Catalyst Health Solutions Inc. in a roughly $4.14 billion deal. Shortly thereafter, SXC Health Solutions Corp. renamed the company Catamaran Corp. Following this, UHG bought Catamaran Corp. in a deal worth $12.8 billion and merged Catamaran with OptumRx.

160. Prior to merging with OptumRx (or being renamed), Prescription Health Solutions, Catalyst Health Solutions, Inc., and Catamaran Corp. engaged in the at-issue PBM and mail-order activities alleged more fully herein.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 767 of 1171. PageID #: 706086

161. OptumRx now provides both PBM and mail-order dispensing services. At relevant times to this Complaint, OptumRx provided and/or offered PBM services for entities and/or persons in Plaintiff's Community.

162. At relevant times to this Complaint, OptumRx has sold and continues to sell prescription opioids through its mail order pharmacies in New York, including in Plaintiff's Community.

163. OptumRx and all of its predecessors, including but not limited to Prescription Solutions, Catalyst Health Solutions, Inc., SXC Health Solutions Corp., and Catamaran Corp. are referred to herein as "OptumRx."

164. The consolidations that led to the emergence of OptumRx in its current form are shown on the chart below:



165. **Defendant OptumRx Discount Card Services, LLC** is a Delaware limited liability company with its principal place of business at 1423 Red Ventures Drive Building RV4, 3rd Floor, Fort Mill, South Carolina 29707.

166. OptumRx Discount Card Services, LLC is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty St., New York, NY 10005 and at 111 eighth Avenue, New York, NY 10011.

49

167. OptumRx Discount Card Services, LLC (f/k/a HealthTran, Inc., Catamaran PBM of Colorado, LLC, and Catamaran Discount Card Services, LLC) contracts with third-party businesses to administer prescription discount cards on their behalf. For example, the AARP's prescription discount card program is "endorsed" by the AARP, but is otherwise run by Optum Discount Card Services, which pays the AARP a royalty fee to the AARP for use of its intellectual property.

168. **Defendant Optum Perks, LLC** is a Delaware limited liability company with its principal place of business in Livonia, Michigan.

169. Optum Perks offers a free pharmacy discount card in New York.[9]

170. Optum Perks, LLC (f/k/a Script Relief, LLC) is a discount card program that originally started as a joint venture between Loeb Enterprises, LLC, and Catalyst, where by 2012 Catalyst had a 47% ownership interest. Per Catamaran's 2012 10-K, "Script Relief is a variable interest entity with Catamaran being the primary beneficiary, as the Company's underlying PBM and pharmacy contracts represent Script Relief's key business operations and the Company has the power to direct these activities."

171. By 2019, OptumRx, Inc. had fully acquired Script Relief and renamed the program Optum Perks.

---

[9]    *See* https://perks.optum.com/NYSHTA?utm_source=asp&utm_campaign=redirect&utm_medium=offline&utm_content=nyshta&utm_term=asp.

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 769 of 1171. PageID #: 706088

172. **Defendant OptumHealth Care Solutions, LLC** is a Delaware limited liability company with its principal place of business at 11000 Optum Cir., Eden Prairie, Minnesota 55344.

173. OptumHealth Care Solutions, LLC is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty St., New York, NY.

174. Additionally, OptumHealth Care Solutions, LLC holds an active license with the New York State Department of Finance.

175. OptumHealth for a number of years partnered with Purdue to educate many case managers, nurse practitioners, and medical directors throughout UnitedHealth Group's various enterprises. These programs were specifically endorsed and coordinated through one of Optum Health's national medical directors. The content of these programs targeted pain as an undertreated disease, among other issues, and contained the similar dangerous messaging regarding the use of OxyContin that Purdue plead guilty to in 2007.

176. **Defendant OptumHealth Holdings, LLC** is a Delaware limited liability company with its principal place of business at 11000 Optum Cir., Eden Prairie, Minnesota 55344.

177. **Defendant Optum Health Networks, Inc.** is a Delaware corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.

Case: 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  770 of 1171.  PageID #: 706089

178.   Optum Health Networks, Inc. is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty St., New York, NY.

179.   Optum Health Networks, Inc. provides care services to enrolled members of its subsidiaries and parents that includes care management services, arranging for delivery of services, and managing client relationships and contracts for access to said services.

180.   Together, OptumHealth Care Solutions, LLC, Optum Health Holdings, LLC, and OptumHealth Networks, Inc. are referred to herein as "OptumHealth."

181.   OptumHealth is a healthcare service provider that includes specialty health services, health banking services, ancillary care networks, and health education and information services to both individuals and health care professionals. It does this through four main lines of business: Care Solutions, Behavioral Solutions, Specialty Benefits, and Financial Services. In 2022, OptumHealth served 102 million individuals.

182.   OptumHealth partnered with Purdue throughout the 2000s to provide "education" to health care providers, including medical directors, nurse practitioners, case managers, and care advisors throughout the country regarding the so-called "undertreatment" of pain and expanding the use of opioids.

183.   Collectively, OptumRx, Optum, Inc., Optum Discount Card Services, LLC, Optum Perks, LLC, OptumHealth Care Services, LLC, OptumHealth Holdings,

LLC, Optum Health Networks, Inc., and OptumInsight are referred to herein as "Optum."

184.    Optum is named as a Defendant in its capacities as a: (1) PBM; (2) data, analytics, consulting, and research provider; and (3) mail-order pharmacy. During the relevant time period, Optum contracted directly with opioid manufacturers in each of these capacities. At times relevant to this Complaint, Optum performed these services and derived substantial revenue in New York, including in Plaintiff's Community.

185.    Optum, Inc. is a health services company comprising three sectors—OptumRx, which manages pharmacy benefits for both UHC and third party clients; OptumHealth, which provides medical services as well as education and support for individuals throughout the country; and OptumInsight, which is the data, research, and consulting sector.

186.    OptumRx is the third largest PBM in the United States. It provides PBM services to more than 65 million people.

187.    OptumRx offered pharmacy benefit management services nationwide and maintained standard, national formularies that were offered to and used OptumRx's clients both across the country and in Plaintiff's Community. At all times relevant hereto, those formularies included opioids, including those at issue in this case. OptumRx national formularies include the Essential Health Benefits, Generic Centric, Core Standard, Core Choice, Select Standard, Select Choice, Premium Standard, and Premium Choice.

188.   Optum (and/or its predecessors) processed claims for opioids dispensed pursuant to Optum's standard, national formularies and utilization management guidelines in Plaintiff's Community throughout the opioid epidemic.

189.   In addition to its pharmacy benefit services, Optum entities also provide services related to pharmaceutical reimbursement and dispensing that generate revenue and benefit from a lack of opioid controls.

190.   At times relevant hereto, Optum offered mail-order pharmacy services and dispensed opioids in New York, including Plaintiff's Community.

191.   In 2021, Optum's mail order pharmacy was the fourth largest dispensing pharmacy in the United States and received $34.2 billion in prescription revenues.

192.   From 2006 to 2014, Optum's mail order pharmacy bought over 4.5 billion MMEs of opioids spread over 252 million opioid dosage units.

193.   OptumInsight, Optum's data, research, and consulting arm, is one of the largest health information, technology, and consulting companies in the world. It collects, processes, sells and profits from the vast data all managed lives—which in 2011 covered over 75 million lives.  It also provides clinical research, consulting, marketing advisory services, and analytics tools to its clients.

194.   OptumInsight is an integral part of the conduct that gives rise to Plaintiff's causes of action. As alleged in detail herein, throughout the relevant time period, OptumInsight worked directly with opioid manufacturers to convince

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 773 of 1171. PageID #: 706092

patients, prescribers, payors and the public that long term opioid use was appropriate for the treatment of chronic pain and that opioids were not addictive.

195. Each opioid manufacturer had dedicated executives assigned to work with OptumInsight. The opioid manufacturers used their relationships with OptumInsight to deepen their ties to the overall Optum corporate family.

196. OptumInsight was paid tens of millions of dollars by the opioid manufacturers during the relevant time period for its work to expand the opioid market.

## IV. The Role of PBMs in Prescription Drug Transactions

### A. PBMs Operate on All Sides of Prescription Drug Transactions

197. PBMs such as Express Scripts and OptumRx contract with insurers, self-insured employers, and state and federal government agencies (referred to by the PBMs as their "clients") to provide pharmacy benefit management services. One of the services the PBMs provide is to create standard, national formularies and UM programs. The PBMs offer these standard formularies and UM programs to their clients, and most clients adopt these standard offerings for their prescription drug plans without modification. In crafting these standard formularies and UM programs, PBMs review and make determinations regarding which medications are effective or appropriate. PBMs also review and pay claims for the drugs dispensed to their covered lives. As a result, PBMs exert significant influence over prescriptions dispensed in the United States and in New York, including influencing the quantity, dosage strength, duration, and refill availability for each prescription. PBMs also collect and maintain all of the data associated with all of the prescriptions dispensed

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 774 of 1171. PageID #: 706093

to their covered lives, giving them granular insight into the ongoing health and pharmaceutical patterns of these patients. This data is available to the PBMs when they craft their standard formularies, implement standard UM programs and even informs standard "retrospective utilization" programs that offer services to patients after a prescription has been filled.

198.    Although PBMs contract with third-party payors to provide pharmacy benefit management services, they also contract with drug manufacturers and with pharmacies. They are paid by their clients to make safe and effective drug therapies available to their covered lives. But, as described below, they are also paid by drug manufacturers to provide the greatest access to their products, so as to increase sales, with little to no regard for safety or efficacy. And they are paid by the pharmacies where the plan beneficiaries' prescriptions are filled, to verify coverage but also to assist the pharmacy in ensuring that a prescription is appropriate. Thus, in any given transaction, a PBM may be receiving money from both the payor and the pharmacy to exercise independent judgment about whether to authorize payment for a prescription, while also receiving money from the manufacturer to ensure that the sale is made.

199.    The business model that PBMs, including the PBM Defendants, use is thus rife with conflicts of interest and self-dealing through which they have enriched themselves at the expense of their clients and the public. Inherent in the services offered by the PBM Defendants in their agreements with the opioid manufacturers (and with pharmacies) are the same services for which they are already ostensibly

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 775 of 1171. PageID #: 706094

receiving payment from their clients, albeit with the incentives often running in the opposite direction.

200. This chart illustrates the central role the PBM Defendants play in the prescription drug market:[10]



201. It is in part because of the multiple roles that PBMs play in prescription drug transactions that they have access to, and collect, the vast amounts of data they have. No other party has access to so much data because no other party is so

---

[10] The Commonwealth Fund, *Pharmacy Benefit Managers and Their Role in Drug Spending* (Apr. 22, 2019), https://www.commonwealthfund.org/publications/explainer/2019/apr/pharmacy-benefit-managers-and-their-role-drug-spending.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 776 of 1171. PageID #: 706095

thoroughly embedded into every aspect of prescription drug prescribing and dispensing.

202.    Yet rather than use their vast data resources to craft formulary and UM offerings that would address the dangers of opioids and help reduce utilization of these dangerous drugs, the PBM Defendants instead worked with opioid manufacturers to adopt policies and offerings that drove opioid utilization and helped fuel the epidemic. In pursuit of opioid profits, the PBM Defendants intentionally disregarded their obligations, to the detriment of communities around the country, including Plaintiff's Community.

## B.    PBMs Use Their Formularies as Leverage to Negotiate with Drug Manufacturers

203.    Formularies are a central tool that PBMs, including the PBM Defendants, offer to clients for use in designing, managing and publicly identifying the extent of the coverage and benefits provided to their covered lives. Because formulary listing affects how much a patient pays for a drug, formulary placement makes a prescriber more likely to prescribe, and a patient more likely to pay for, certain drugs over others. Indeed, driving drug utilization is one of the key purposes and functions of formulary design, implementation, and management.

204.    Moreover, the PBMs' clients rely upon the PBM Defendants' formularies. The Pharmaceutical Care Management Association ("PCMA"), the PBM trade association, testified to the Pennsylvania House of Representatives that even

FILED: WESTCHESTER COUNTY CLERK 03/18/2024 10:23 AM INDEX NO. 75026/2022

NYSCEF DOC. NO. 120 Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 777 of 1171. PageID #: 706096 RECEIVED NYSCEF: 03/18/2024

sophisticated clients rely almost entirely on PBMs to manage their drug benefit.[11] Indeed, it is their expertise that the PBMs are marketing to their clients, so it makes sense that most clients rely on that expertise and, lacking their own expertise, have little choice but to do so. Many PBM clients utilize the PBMs' standard national formularies. Even though there may be a few large, sophisticated clients that ostensibly use "custom" formularies, in reality, these formularies often either mirror the PBMs' standard formularies or were constructed in large part by the PBMs.

205. Since the PBM Defendants' standard formulary offerings heavily influence drug reimbursement terms for 160+ million covered lives, the PBMs have significant leverage when negotiating with brand drug manufacturers. The PBM Defendants use this leverage to maximize the amount of rebates paid to them by brand drug manufacturers, including opioid manufacturers. These rebates are paid to the PBMs on every eligible drug dispensed; thus, the more the PBMs drive utilization, the more rebates are paid by opioid manufacturers to the PBMs.

206. Rebate eligibility is a critical factor. In a typical PBM rebate contract with an opioid manufacturer, eligibility for rebate payments is tied to the way a particular drug is treated on the formulary and whether the drug is or is not "restricted" by UM. Put differently, if a drug is placed on a non-preferred tier, or if the drug is restricted by UM programs, rebates will either be adversely impacted or not paid at all.

---

[11] Letter from Barbara Levy, Vice President of PCMA to Matthew E. Baker, Pennsylvania House of Representatives, Comm. on Health.

207. Thus, the PBM Defendants are incentivized to structure their standard formulary and UM offerings in ways that enhance and do not restrict opioid utilization so that they can maximize the rebate payments for which they will be eligible.

208. PBMs do at times share manufacturer rebates with their clients. But the PBM Defendants generally pass through only a portion of these rebates to their clients and retain the rest as profit. As a result, the PBM Defendants have profited handsomely from rebates received from drug makers, including opioid manufacturers, for each brand drug sold.

209. In addition, if a PBM can generate higher volume (more sales) for manufacturers, it can then negotiate higher rebates that the manufacturer will pay to the PBM (which in turn increases the PBMs' profit).

210. PBMs also make money other ways by increasing the volume of prescriptions that are sold to their covered lives. One way is through money that the PBMs earn on "spread pricing." Spread pricing is where a PBM will charge its client a higher price for a prescription than what the PBM pays the pharmacy for the same drug. The PBM will then pocket the difference in this price spread as profit. Spread pricing is particularly profitable for the PBMs for generic drugs, including generic opioids. Put simply, the more generic opioid prescriptions dispensed to the PBMs' covered lives, the higher profit the PBM earns through this spread pricing.

211. Ultimately, PBMs are very much incentivized to keep sales volumes high for both generic and brand opioids.

212. As a result, PBMs—including Defendants here—have a monetary interest in ensuring that favored drugs are covered, prescribed, and dispensed.

213. The structure of the pharmacy benefit market also aids the PBM Defendants' efforts to maximize opioid manufacturer rebates. PBM Defendants became a major force in the late 1980s, expanding from solely processing pharmacy claims to a business model that invited drug manufacturers to negotiate prices in several drug categories. Because of market consolidation, the PBM Defendants control a significant portion of the pharmacy benefit market. The PBM market is thus highly concentrated, both within New York and throughout the United States.

214. In contrast, the market for their clients is much less concentrated, with the largest companies accounting for less than two-thirds of the business in 2014. For brand-name drug manufacturers, thirteen companies account for 90% of the U.S. pharmaceutical market. Thus, it is typical to have one of the (large) PBMs negotiating with the (large) opioid manufacturers on behalf of a number of relatively small clients.

215. The small world consisting of the PBM Defendants and approximately ten opioid manufacturers facilitated collusive negotiations that benefitted the manufacturers and the PBM Defendants at the expense of patient health and safety. For example, PBMs have typically used their clout to negotiate master rebate agreements on behalf of all their covered lives. Rather than negotiate with respect to, or on behalf of, particular clients or particular plans, they enter into master agreements that will apply across the board. As a result, in the world of drug price

61

Case: 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  780 of 1171.  PageID #: 706099

negotiation, market power is most highly concentrated among the PBM Defendants, who have more negotiating leverage than any individual drug manufacturer or health plan on either side of a transaction.

216.  These negotiations can be of such great financial importance to pharmaceutical companies and the PBM Defendants that they are often attended by senior executives up to and including the chief executives, which has also facilitated the formation of personal business relationships and an understanding of the common purpose of the negotiations between the PBM Defendants and the opioid manufacturers.

217.  Because the PBM Defendants are paid based on the volume of prescriptions, including for opioids, that flow through their formularies, restricting this flow would cause the PBM Defendants to lose substantial revenue.

218.  Moreover, rebate payments are only part of the payments PBM Defendants receive from opioid manufacturers. In addition to rebates, drug manufacturers, including opioid manufacturers, have paid the PBM Defendants substantial amounts of various "administrative fees" and "service fees" in exchange for, among other things, ensuring a given drug's formulary placement and providing various services to the drug makers—the same services they are already being paid to provide to their clients.

219.  For example, Express Scripts' standard form of contract discloses that it receives "administrative fees" for, among other things, providing opioid manufacturers access to "drug utilization data, and receives "service fees" (which are

explicitly described as separate from both rebates and administrative fees) for "formulary compliance initiatives, clinical services, therapy managements services, education services, medical benefit management services, including, for example, formulary compliance initiatives, clinical services, therapy management services, education services, medical benefit management services, and the sale of non-patient identifiable claim information":

> ESI provides administrative services to formulary rebate contracted manufacturers, which include, for example, maintenance and operation of the systems and other infrastructure necessary for managing and administering the PBM formulary rebate process and access to drug utilization data, as allowed by law, for purposes of verifying and evaluating the rebate payments and for other purposes related to the manufacturer's products. ESI receives administrative fees from the participating manufacturers for these services. These administrative fees are calculated based on the price of the rebated drug or supplies along with the volume of utilization and do not exceed the greater of (i) 4.58% of the average wholesale price, or (ii) 5.5% of the wholesale acquisition cost of the products. In its capacity as a PBM company, ESI also may receive service fees from manufacturers as compensation for the performance of various services, including, for example, formulary compliance initiatives, clinical services, therapy management services, education services, medical benefit management services, and the sale of non-patient identifiable claim information. These service fees are not part of the formulary rebates or associated administrative fees.[12]

220. The PBM Defendants are able to minimize the portion of monies from drug manufacturers that they pass along to their clients in part through misleading labeling of the various payments. This lack of transparency, and the PBM Defendants' central role in ensuring it, has allowed the PBM Defendants to conceal their collusion with the opioid manufacturers from their own clients and from the public.

---

[12] ESI_JEFFCOMO_000231588 (1/1/14).

221.  As industry expert Linda Cahn observed, "[i]f a PBM enters into contracts with drug manufacturers and chooses to give rebates another name—like administrative fees or health management fees or grants—the PBM will arguably eliminate its obligation to pass through the financial benefits to its clients."[13]

222.  Administrative fees can make up a substantial portion of the total dollar amount of drug company payments to a PBM. According to pharmacy-benefits consultant David Dross, administrative fees can amount to 25-30% of total payments from drug companies like Purdue.

## 1.  Express Scripts' Formularies

223.  Express Scripts develops its operative national formularies utilizing three committees—Therapeutic Assessment Committee ("TAC"), Pharmacy & Therapeutics Committee ("P&T"), and the Value Assessment Committee ("VAC"). The TAC reviews the clinical properties of new drugs and pre-existing drugs (to the extent new or developing clinical information warranted such review) and prepares research memoranda discussing the benefits and drawbacks for each drug. The TAC also makes recommendations regarding whether any particular drug under review should or should not be included on Express Scripts' national formularies. The TAC's research memoranda and recommendations are then provided to the Express Scripts' P&T Committee.

---

[13] Jeanne Pinder, "Don't Get Trapped By PBM's Rebate Labeling Games: Managed Care magazine by Linda Cahn" *Clear Health Costs* (Feb. 26, 2018), https://clearhealthcosts.com/blog/2018/02/dont-get-trapped-pbms-rebate-labeling-games-managed-care-magazine/.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 783 of 1171. PageID #: 706102

224.     The P&T Committee consists of outside, third-party medical providers who were not employees of Express Scripts. Express Scripts claims that the P&T is fully independent and exercises its own clinical judgment. Express Scripts further claims that "the P&T Committee considers the drug's *safety and efficacy*," and the company "fully compl[ies] with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of *safety and efficacy*."[14]

225.     The P&T reviews the research memoranda provided by TAC. The P&T then places each drug it reviewed into one of three categories: "must include," which meant that the drug must be included on Express Scripts' national formularies; "must exclude," which meant the drug could *not* be included on Express Scripts' national formularies; and "optional," which meant that the drug could or could not be included on national formularies, at the discretion of yet a third committee.

226.     This third committee is known as the VAC. Like the TAC, the VAC also consists of Express Scripts employees. But, in important other respects, the VAC is different. Notably, while Express Scripts represents that neither the TAC nor the P&T is supposed to consider any financial or economic factors, the VAC expressly considers financial factors. The financial factors considered by the VAC include rebates and administrative fees paid by manufacturers, including the opioid manufacturers. At all times Express Scripts has benefited from these rebates and administrative fees, because Express Scripts retains some portion of them. After

---

[14] Eichholz Dep. 33-39. (emphasis added).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 784 of 1171. PageID #: 706103

giving consideration to these financial factors, the VAC is then the committee that actually constructs the Express Scripts' national formularies, and determines on which tier a drug is placed. The lower the tier, the greater the access/utilization.

## 2. Optum's Formularies

227. OptumRx develops its formularies through a process primarily involving the following committees: the Clinical Programs Subcommittee ("CPS"); Drug Intelligence; the National Pharmacy and Therapeutics Committee ("P&T"); and the Business Implementation Committee ("BIC").

228. The CPS is an advisory subcommittee of the P&T. CPS's role is to: (1) review and approve treatment guidelines for patients with specific conditions; (2) review and approve clinical algorithms for disease state management and other clinical activities; (3) review and approve prior authorization algorithms and decision support tools; (4) provide expert guidance to the P&T regarding national and local guidelines for medical care; (5) review certain UM for medications and make recommendations to the BIC committee based on those reviews.

229. OptumRx's P&T committee's role is to: (1) review PBM formularies and PDLs at least annually for drug inclusions/exclusions; (2) review and approve clinical guidelines and/or criteria and procedures related to the timely use of and access to medications annually; (3) create procedures that guide UM tools and formulary management activities; and (4) advise on clinical education programs for plan sponsors' members, health care provider networks, plan participants, and pharmacy providers.

66

230. OptumRx's P&T committee creates recommendations on formulary inclusion, UM, and clinical programs that are then provided to the BIC. The BIC determines the tiering and UM for the OptumRx national formularies. The BIC's recommendations are informed by "financial analysis." When determining clinical program, or UM strategies, the BIC also considers economic and pharmacoeconomic evidence.

231. Once the BIC has made its final recommendations regarding formulary placement and utilization management for medications, it communicates those to OptumRx. The final formularies are then provided to the client.

## C. PBMs' Drug UM Programs

232. In connection with their formulary development, PBMs, including the PBM Defendants, also create standard drug UM programs and rules, which they offer to their clients and which most clients adopt.

233. One example of UM offered by the PBM Defendants since at least the late 1990s is a "quantity limit," or QL, which is a utilization management tool that limits the total dosage of a particular drug that a beneficiary may receive. Another example is a "step edit" or "step therapy," which requires a patient to try a different drug (designated by the PBM) before the patient can receive the drug they were prescribed. Another is a "prior authorization," or PA, which is a tool that requires a clinical follow-up with the prescribing physician prior to the drug being dispensed to double-check and make sure the prescription is appropriate for the patient beneficiary.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 786 of 1171. PageID #: 706105

234.     Studies, including those conducted by the PBM Defendants themselves, have shown that implementing PAs can reduce the utilization of dangerous and addictive drugs like OxyContin. Thus, like their standard formulary offerings, standard UM offerings are another tool the PBM Defendants use to steer patients. UM tools, if used as intended, should act as an impediment to patients gaining access to drugs that are susceptible to oversupply and abuse, or that are more costly than others.

235.     Express Scripts and OptumRx's business is set up on a model of standardization. While clients have the option to design their own programs, most clients accept the PBM Defendants' standard formularies and UM programs, like step therapy, prior authorizations and DUR edits. Thus, it is the manner in which Express Scripts and OptumRx construct their standard formularies and programs (outside of any client interaction) that has an enormous influence on drug utilization.

236.     The amount of influence that each PBM Defendant had over drug utilization was a frequent topic of discussion between the PBM Defendants and the opioid manufacturers that was central in the parties' discussions about rebates and administrative fees. The more a PBM Defendant could drive market share to or away from a drug by controlling formulary and UM decisions, the more an opioid manufacturer was willing to pay.

237.     Notably, the PBM Defendants leverage their ability to steer drug utilization to generate substantial profits. Indeed, Express Scripts and Optum profit from every branded and generic opioid sold in myriad ways.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 787 of 1171. PageID #: 706106

238.    Express Scripts and OptumRx have always had the ability to provide baseline opioid UM controls for its clients, which they did on September 1, 2017 (when Express Scripts offered its Advanced Opioid Management program) and January 1, 2018 (when it kicked off its Opioid Risk Management Program).

**D.    PBMs Contract with Pharmacies**

239.    As noted above, PBMs, including the PBM Defendants, also contract directly with retail pharmacies to dispense drugs to a patient.

240.    Express Scripts contracts with approximately 65,000 retail pharmacies, representing over 98% of all retail pharmacies in the United States. These pharmacies become part of Express Scripts' network for coverage purposes.

241.    Similarly, Optum contracts with a network of more than 70,000 retail pharmacies and multiple delivery facilities.

242.    When a pharmacy is in the network with Express Scripts and Optum (and generally with both), a covered life pays out-of-pocket for a small portion of the prescription and the PBM arranges for direct payment to the pharmacy of the remainder of the cost of the prescription. In this way, covered lives need not advance the cost of their prescriptions and seek reimbursement afterwards.

243.    In connection with contractual arrangements with their network pharmacies, the PBM determines the patient's copay and how much it will reimburse pharmacies for each medication covered under the drug plan. PBMs generally pre-determine how much each drug covered under their standard formularies should cost, and this determination affects the amount they reimburse to the pharmacies. Critically, the PBM Defendants also receive real-time claims data from pharmacies

69

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  788 of 1171.  PageID #: 706107

at the point of sale, as part of their electronic adjudication of claims, which includes

determining eligibility for reimbursement and conducting concurrent drug utilization

review ("cDUR," discussed in detail below).

244. As described below, pursuant to its contracts with its network of

pharmacies, Express Scripts undertakes to perform "drug utilization review" and to

provide mechanisms to ensure safe dispensing. Express Scripts claims that it uses

drug utilization review to "review prescriptions for safety and effectiveness, in real-

time, electronically and systematically, when presented to our pharmacies or

submitted for coverage by network pharmacies and alert the dispensing pharmacy to

detected issues. Issues not adequately addressed at the time of dispensing may also

be communicated to the prescriber retrospectively."[15]

245. Through its contracts with its network pharmacies, Optum similarly

undertakes to perform services, including drug utilization review, to ensure safe

dispensing.

## V. The PBM Defendants' Role in Causing the Opioid Crisis

## A. The PBM Defendants and the Opioid Manufacturers Colluded to Ensure Virtually Unfettered Access to Opioids

### 1. The PBM Defendants Negotiated with the Opioid Manufacturers to Give Opioids Favorable Placement on National Formularies in Exchange for Rebates and Other Fees

246. As noted above, PBMs have significantly more market power than the

drug manufacturers with whom they negotiate drugs prices and formulary

---

[15] *Id.*

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  789 of 1171.  PageID #: 706108

placement. The vast market power of the PBM Defendants compared to their clients has allowed the PBM Defendants to negotiate deals with the opioid manufacturers for the payment of additional rebates and other fees that the opioid manufacturers pay to the PBMs that induced the cooperation of the PBM Defendants and the opioid manufacturers to work together in a fraudulent scheme.

247.    The terms of the agreements between opioid manufacturers and the PBM Defendants are considered extremely confidential by the PBM Defendants and are not even disclosed to their health plan clients. As a result, until key highly confidential documents were recently obtained in discovery in *In re: National Prescription Opiate Litigation*, Case No. 1:17-md-2804-DAP (N.D. Ohio), and other opioids litigation, there has been little public insight into how these agreements affected the volume of opioids flooding American households.

248.    From the time it first released OxyContin, Purdue pushed its sales force to "*Sell, Sell, Sell* OxyContin."[16] In an early sales memo in 1996, Purdue's head of sales stressed that his team should "[r]emain focused on positioning OxyContin as the opioid to start with and stay with in chronic malignant and non-malignant pain states. In addition, continue to aggressively position OxyContin for use in osteoarthritis, low back pain, post neuropathic neuralgia and post-surgical applications."[17]

---

[16] PDD1503490547.

[17] *Id.*

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 790 of 1171. PageID #: 706109

249.     Purdue's aggressive marketing campaign worked, and OxyContin sales explode in the years following its release, reaching almost $2 billion in annual sales by 2003. In addition, during this same time period the annual number of OxyContin prescriptions for noncancer pain increased nearly tenfold, from about 670,000 in 1997 to about 6.2 million in 2002.

250.     During this time of rapidly expanding OxyContin sales, Medco was the largest customer of Purdue products. For example, in 1996, Medco was the largest PBM in the country and received over one-third of the rebates paid by Purdue for all opioid sales. By 2001 and 2002, Medco's gross sales of Purdue opioids totaled $250.4 million and $281 million respectively, "making [Medco Purdue's] largest customer."[18]

251.     When OxyContin was first released, Medco made several attempts to restrict its utilization. For example, in early 1996, Medco established a "ceiling dose" quantity limit for OxyContin of 80 mgs/day because of the potential for abuse for that drug.

252.     In January 1997, Purdue received notice from "pain clinic doctors" that Medco was sending letters to prescribers because of a "concern[] about abuse potential" in patients taking OxyContin for chronic non-malignant pain.[19] Medco's concerns were forwarded up to several high ranking Purdue executives, including the president of the company, Richard Sackler. James Lang, head of marketing and sales at Purdue, explained, "Our success with OxyContin is starting to create concerns

---

[18] PPLPC012000064369.

[19] E513_00045035.

amongst the large PBMs as you already know because they recognize we are targeting non cancer pain. This goes beyond their initial perception that [OxyContin] was primarily a cancer pain medication."[20]

253.   While this issue was originally presented as a concern about addiction and abuse, a number of Purdue executives saw this as pretextual, and thought that Medco's true intentions were focused on cost and extracting larger rebates.

254.   For example, when Purdue's medical director Paul Goldenheim suggested, "[w]e need to talk to Medco and others about addiction," Purdue's president Richard Sackler responded, "we should consider that 'addiction' may be a convenient way to 'just say 'NO' and when this objection is obliterated, [Medco] will fall back on the question of cost."[21]

255.   Mark Alfonso, Purdue's vice-president of marketing, also weighed in: "My impression of this issues is that there are several major products . . . that are growing at a great rate and [managed health care][22] organizations are not slowing them. . . I also believe that a lot of what [Purdue's Managed Care Account Executives] hear from their accounts is with the intention of softening them up before the [managed health care] asks for more aggressive rebates. They are told 'I am going to drop you from the formulary' for several months and then one day they are told if you give me higher rebate you can keep OxyContin in the formulary."[23]

---

[20] *Id.*

[21] *Id.*

[22] Purdue refers to payors, such as the PBM Defendants, as "managed care."

[23] E513_00006452.

256.    Purdue executives did, however, recognize the substantial threat this posed to OxyContin's success—if Purdue did not take immediate action to address Medco's economic concerns it could be an existential threat to Purdue's business. Sales and marketing executive Michael Friedman (who would later become Purdue's CEO), stated, "If we do not do [demonstrate the economic value of OxyContin], I can promise you that we will eventually be shut out. . . This is a serious matter that we cannot ignore and that we must discuss . . . We cannot go on ignoring the reality of [the PBMs'] economic proof requirements . . . If we are to stay in business we need this proof of economic performance."[24]

257.    Purdue's own data shows the impact that a major payor (such as Medco) moving OxyContin from a preferred formulary tier to an excluded product has on utilization:[25]

---

[24] E513_00045035.

[25] PPLPC030000773368.

Case 1:19-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 793 of 1171. PageID #: 706112



258. Ultimately, in response to Medco's actions in 1996, Purdue determined that it needed to expand the OxyContin market by demonstrating the economic value of OxyContin in chronic non-cancer pain use to Medco and other PBMs. As Paul Goldenheim, Purdue's medical director, explained to Richard Sackler: "We have the tiger by the tail, and I wonder if we should add more muscle. Let's discuss over live sushi!"[26]

259. Importantly, had Medco in 1997—Purdue's largest customer at that time—excluded OxyContin from its formularies or put in place hard UM edits (i.e.

---

[26] E513_00045035.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 794 of 1171. PageID #: 706113

prior authorizations) to restrict OxyContin use in non-cancer pain treatment it would have had a substantial impact on the success of OxyContin and would possibly have driven the drug off the market. Other major payors at that time, such as Cigna, had excluded OxyContin from their formularies. OptumRx (then known as Prescription Solutions) also refused to put OxyContin on its commercial formularies in 1997, due to concerns regarding the abuse potential of oxycodone (the active ingredient in OxyContin), especially considering its limited comparative effectiveness to morphine sulphate.

260. Medco, however, did not take action to exclude or restrict the sales of OxyContin. To the contrary, within three months of this exchange between Purdue executives, as detailed in this May 1997 Purdue memo, Medco had completely reversed course and "become very interested in 'partnering with Purdue'" on numerous projects to expand opioid use into the chronic pain market:[27]

---

[27] PPLPC025000003668.

## Managed Care

To: Jim Lang
Ernie Merlino

From: Tim Richards

Subject: Medco

Date: May 4, 1997

Per our discussion on Medco on Friday, May 2, 1997 the following is a summary of information that has surfaced since the meeting with Medco in August, 1996.

* Along with Isaac Schulman, Mel Grayson has been calling on Joe DaBronzo, Pharm.D., who was promoted to Director of Utilization Management at Medco. Mr. DaBronzo feels that Medco's physician network is not properly trained on the basics of assessment and management of pain. It was Mr. Dabronzo's and Mr. Schulman's opinion that internally, Medco health care professionals needed education on pain assessment and management. Mel has set up a speaker program with Dr. Elizabeth Narcessian at Medco for May 13, 1997.

* Pertaining to discussions at the August, 1996 meeting at Medco and accentuated by Mr. DaBronzo's recent promotion, decision makers at Medco have become very interested in "partnering with Purdue" on pain assessment and management. Mr. DaBronzo is interested in developing the following materials with the help of Purdue:

   * Medco specific pain protocols for not only cancer pain, but for chronic non-malignant pain.

   * Purdue to initiate retrospective outcome pharmacoeconomic studies using and partnering with Medco data.

   * Purdue's consideration of Medco intervention for Purdue products and a negotiation of market share/performance-based contracts from this intervention.

   * Education materials (CME disease state related) for physicians, case workers, nurses and pharmacists in the Medco system.

   * Disease related patient education on pain assessment and chronic pain patient care.

With the above list, and the scheduled speaker program, Medco would like to move forward with Purdue in partnering for pain management into the future. Medco has requested of Mel Grayson for Purdue to move forward quickly in deciding whether Medco's partnering ideas are of any interest.

261. Notably, within three years of this memo, Joe DaBronzo, Medco's Director of Utilization Management, took a position as an executive director at Purdue.

262. As a first step reflecting its new "partnership" with Purdue, Medco significantly raised its quantity limits on OxyContin. As discussed above, Medco

77

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 796 of 1171. PageID #: 706115

initially implemented an 80 mg/day quantity limit at the release of OxyContin. However, within five months of the release and following further discussions with Purdue, Medco doubled it to 160 mg/day by May 1996. And by at least 2001, Medco again doubled this quantity limit and the "most restrictive [quantity limit] that Medco would recommend is for 320mg/day as per [Purdue's] platform."[28] For comparison, Express Scripts' current Advance Opioid Program has a 90 MME/day opioid quantity limit for opioid naïve patients. Medco's 320mg/day is equivalent to 480 MME/day—over *four times* the limit that Medco originally placed on OxyContin upon its release, as well as over *five times* the limit that Express Scripts now imposes on the drug.

263. This covert collusion between the PBM Defendants and the opioid manufacturers opened the flood gates to the unfettered formulary access for their opioids in exchange for rebates and other fees.

264. The PBM Defendants' influence over formulary positioning has been a key contributor to the ongoing relationship with the opioid manufacturers, because the manufacturers pay rebates and other fees based on the PBM Defendants' ability to deliver favorable drug placement within their standard formulary offerings. Because favorable formulary status is likely to increase a drug's usage and sales, and formulary exclusion (or a downgrade in formulary position) is likely to reduce a drug's usage and sales, the rebates and other fees are conditioned on a drug's formulary status. As Cottingham & Butler (a national insurance broker) noted in a client

---

[28] PPLPC012000064369.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 797 of 1171. PageID #: 706116

presentation, PBMs have "unilateral control . . . over formularies and tiering—driving greater profits for PBMs through rebates[.]"[29]

265. The PBM Defendants and the opioid manufacturers regularly discussed and agreed about which, if any, UM measures would be utilized for particular opioid drugs.

266. As discussed above, the PBM Defendants maintain internal committees that determine which drugs are placed on their formularies. These committees are comprised of company personnel. In addition, the PBM Defendants have trade relations employees who are responsible for negotiating rebate agreements with drug manufacturers. Express Scripts refers to this committee as the Trade Relations Group and Optum refers to this committee as the Industry Relations Group.

267. Years ago, the PBMs devised and managed what were known as "open" formularies: formularies that offered varying degrees of plan coverage and benefits for virtually all available FDA-approved drugs. Consequently, with open formularies, drug companies strived to have their drugs placed by PBMs on the portion of the formulary that allowed the easiest (and least expensive) access to their drugs.

268. By the 2000s, however, the PBM Defendants began shifting to "closed" formularies as the standard offerings to their clients. "Closed" formularies provide tiered benefits, but unlike open formularies, they restrict the overall number of drugs

---

[29] Nancy Daas, "Prescription Drug Plan Strategies," *Cottingham & Butler* (Mar. 2017) https://www.cottinghambutler.com/wp-content/uploads/2017/03/Prescription-Drug-Strategies.pdf.

that are on the formulary. For the past two decades, most PBM covered lives have been governed by closed formularies.

269.   As noted above, the PBM Defendants have greatly influenced access to opioids through formulary placement. Preferential formulary placement, such as being listed on a lower cost tier, increases a drug's utilization. Additionally, the PBM Defendants have influenced access to opioids through UM measures they utilize (or elect not to utilize) as part of their standard formularies. When implemented properly, UM measures could have restricted much of the flow of opioids entering the market.

270.   Since at least 2000, opioid manufacturers have paid rebates and other fees to Express Scripts and Optum in exchange for preferred formulary placement for their opioid products.

271.   The opioid manufacturers early on recognized that Express Scripts and Optum would provide unrestricted formulary status on their standard formularies in exchange for rebates and other fees. For example, in a candid February 15, 2000 email exchange, Purdue Managed Care Account Executive David Wallen explained that he could get Express Scripts "to steer [OxyContin] prescriptions" to retail pharmacies because of the rebates it received.[30] According to Wallen, "Express Scripts makes their money from the rebate, so they cannot make any money on this account if they do not get rebates."[31] In a later February 25, 2000 email, Wallen explained that

---

[30] PPLPC024000012498 (2/28/00).

[31] *Id.*

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 799 of 1171. PageID #: 706118

Express Scripts pressured its clients to put OxyContin on its formularies without restrictions: "[Express Scripts puts] pressure on [their client] to put OxyContin on formulary . . . because they make their money from rebates, and they do not get rebates if OxyContin is [subject to UM restrictions that reduce prescriptions]."[32]

272. For almost every year since 2001, Express Scripts and Medco granted OxyContin preferred formulary placement in its standard, national formularies.

273. Internal Express Scripts documents show that by 2013, some within Express Scripts believed that, with respect to OxyContin, Express Scripts was "out of alignment with the rest of the PBM/Health Plans in . . . putting this drug on a preferred tier (and) that other organizations have leaned more towards taking a harder stance on this highly abused medication."[33]

274. By the time of the Express Scripts-Medco merger, internal Purdue meeting notes reflect that in a meeting between Express Scripts/Medco and Purdue, Express Scripts/Medco representatives stated that "when Medco reviewed the drug spend for 2013, OxyContin was at the top of the list . . . *OxyContin use at Medco is out of control compared with [the other large PBMs] . . . Patients are selecting Medco because Medco [has] OxyContin in a preferred position.*"[34]

275. After the merger (and years after it knew OxyContin was a heavily abused drug), Express Scripts was still pushing Purdue for more rebate dollars in

---

[32] *Id.*

[33] ESI_JEFFCOMO_000265250 (4/19/13).

[34] PPLPC012000373022.

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 800 of 1171. PageID #: 706119

exchange for granting OxyContin preferred positions on its standard formularies. In 2014, Express Scripts reached out to Purdue requesting a higher rebate rate for OxyContin to maintain its preferred position. Purdue executives agreed given the importance of the Express Scripts relationship to OxyContin sales, stating: "[Express Scripts/Medco commercial is 20-25% of our total OxyContin gross business, and the spillover effect of a negative move by [Express Scripts] on OxyContin in 2015 cannot be underestimated . . . Given the importance and impact of this customer on OxyContin sales . . . I approve [the decision to increase OxyContin rebate rates]."[35] Express Scripts celebrated this rebate increase as a win: "we got $20M in incremental from Purdue on OxyContin . . . Not too bad considering likely not doing anything."

276. Notably at the same time (2014) that Express Scripts was pushing Purdue for more rebates to continue preferring OxyContin on its formularies, Express Scripts was also preparing the press releases and sales communications for its "Nation in Pain" report (discussed above).[36] Thus, on one hand Express Scripts was releasing a report for marketing purposes on the opioid epidemic in 2014 to "highlight the power of Express Scripts data and clinical expertise, and our commitment to identifying ways to make the use of prescription opiates safer and more effective," while on the other hand Express Scripts was receiving millions of dollars in extra rebates in order to continue to preferring the drug that started the opioid epidemic (OxyContin) on its standard formularies.

---

[35] PPLPC012000475266; PPLPC035000217128; Zilocchi Dep. Ex. 13.

[36] Nowak Dep. Ex. 10.

277. Despite its knowledge of the nationwide opioid health crisis, and despite its knowledge of the impact that preferred formulary placement and the lack of UM restrictions had on increasing opioid sales, through at least 2017, Express Scripts continued granting OxyContin on the most preferred brand formulary tier, with no UM restrictions, on nearly all Express Scripts' standard formulary offerings.

278. Likewise, for most of the relevant time period, OptumRx also granted OxyContin unrestricted, preferred formulary status for most of its standard formularies. Along with the aforementioned lack of prior authorization, OptumRx refused to put effective quantity limits on opioids.

279. Up until 2017 OptumRx allowed OxyContin to have a quantity limit (QL) of four tablets a day of any strength, including 80mg strengths.

280. Quantity limits were only NDC specific, meaning a member could get the quantity limit of multiple NDCs (that is, different opioids or different formulations of the same opioid) at a time. In 2010, Purdue would still pay rebates to OptumRx so long as its covered lives were able to obtain—whether through multiple NDCs or four tablets of 80mg OxyContin a day—320mg per day of OxyContin.

281. The 320mg limit did not apply to short-acting opioids. In fact, OptumRx increased its quantity limits for short-acting opioids between 2007 and 2012. For example, the quantity limit for Opana was 12 tablets a day, or 1080 tabs for a 90 day supply. In mid-2014, Optum had the following Quantity Limits for opioids: MS Contin at 120 tablets a month, with the 200mg strength at 90 tablets a month; Nucynta 100mg at 210 tablets per month, with lesser strengths at 180 tablets per month;

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 802 of 1171. PageID #: 706121

Opana was 180 tablets per month; OxyContin was at 270 tablets per month. Of note is none of these opioids featured a prior authorization.

282.  In 2015 and 2016, OptumRx increased the QL on United commercial plans. Hydromorphone limits were for 2mg and 4mg strengths from six to eight tablets a day; MS Contin from three to four tablets a day for the 30 and 60 mg strengths and from one to two tablets a day for the 200 mg strength due to "PA volume" to override the current QL.[37] The morphine dose equivalent maximum was 360 tablets for United commercial plans.

283.  Express Scripts and Optum have been so successful in working with the opioid manufacturers to optimize their common purpose between formulary placement/utilization management and rebates and other fees that payments have reached as high as 70% to 80% off wholesale acquisition cost for some opioid drugs.

284.  To make matters worse, as the market shifted from branded opioids to generics in the mid-2000s, Express Scripts and Optum continued to grant generic opioids unrestricted and preferred placement on their standard formularies because of the profits these drugs generated for the PBM Defendants through spread pricing and in other ways. Indeed, OptumRx's own internal presentation from 2013 touts generic utilization as a "high driver of revenue and profit," even more so than brand rebates.[38]

---

[37] OPTUMRX_JEFFCO_0000661986.

[38] OPTUMRX_JEFFCO_0594849.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 803 of 1171. PageID #: 706122

285. Thus, from the late 1990s through 2018, Express Scripts, Medco, and Optum granted both brand and generic opioids, including OxyContin, preferred positions on its standard formulary offerings, which was critical to the success of the opioid manufacturers increasing utilization and expanding the opioid market both nationally and in Plaintiff's Community.[39]

## 2. The PBM Defendants and the Opioid Manufacturers Used Parity to Limit the Use of Utilization Management Measures for Opioids

286. If they had been implemented earlier, the PBM Defendants' UM measures would have helped control the flow of opioid drugs into every community in America. These measures include days' supply quantity and daily dosage limits, refill-too-soon limits, prior authorizations (which require additional approval before drug is dispensed) and step edits (which could require that a patient try a different, safer drug before being given a more dangerous one).

287. The PBM Defendants, however, have financial incentives to give opioids preferential treatment relative to other methods of treating pain (including non-pharmacological methods), and these incentives have made them less likely to mitigate inappropriate opioid usage. While the PBM Defendants have represented that they use UM measures to ensure only the safe and effective use of

---

[39] Since 2014, Purdue has had a distribution and supply agreement with Teva Pharmaceuticals USA, Inc. pursuant to which Purdue supplied oxycodone to Teva and Teva labeled and sold it as a generic Teva product. Admitted trial exhibit P-25038, P-25038 Distribution and Supply Agreement By and Between Purdue Pharma L.P. and Teva Pharmaceuticals USA, Ic. Dated as of December 18, 2014, TEVA_MDL_A_03434545.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 804 of 1171. PageID #: 706123

pharmaceuticals, behind closed doors they had entered into confidential agreements with the opioid manufacturers to bargain away the use of these measures which would have limited dispensing to only medically appropriate uses.

288.   Instead of placing limits on the inappropriate use of these dangerous drugs, the PBM Defendants bartered the use of UM measures which would have helped control the widespread abuse and diversion of opioids in Plaintiff's Community and in communities throughout the country.

289.   Throughout their confidential negotiations with the opioid manufacturers, in exchange for rebates and other fees, the PBM Defendants have agreed that they would not "disadvantage" their opioid drugs, nor would they place UM restrictions on their use within their standard offerings. Effectively, this has meant that the PBM Defendants have bartered away application of UM measures, which opened the floodgates to these dangerous drugs. Thus, the parties agreed that none of the opioid drugs would be disadvantaged and that they all would have the same UM restrictions as other drugs that did not have the propensity for abuse inherent in opioid drugs. These parity and "no disadvantage" contract terms had the effect of the PBM Defendants and the opioid manufacturers sharing a common purpose of ensuring the unfettered access to opioids across the entire class of opioid drugs.

290.   Express Scripts' standard rebate agreements defined the term "disadvantage" as any time when the opioid manufacturer's product is "subject to prior authorization, NDC blocks, counter-detailing, co-pay differentials, or a step edit

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 805 of 1171. PageID #: 706124

that negatively had to have affects the reimbursement and/or Formulary status of the Product as compared to other products in its designated [competitive product category] . . . ."[40]

291. Optum's template rebate agreements had similar language tying payment of rebates to common treatment of all other opioids in the formulary's therapeutic category. Its agreements' language stated that rebates would only be payable if the opioid manufacturer's product is not "subject to Disadvantaging including, but not limited to: prior authorization, NDC blocks, counter-detailing, co-pay differentials, dispensing restrictions, or endorsed targeted messages (electronic edits)."[41]

292. Express Scripts and Purdue's 2002 contract included language stating Purdue would not pay rebates if its opioids were restricted. Likewise in 2009, Purdue would only pay rebates if its opioids were "unrestricted on the preferred brand tier." Again in 2014, Purdue would only pay rebates on OxyContin if it was on "lowest preferred brand tier, without restrictions, including no prior authorization or step therapy." Even as late as 2016, Express Scripts acknowledged that if it tried to put any restrictions on OxyContin (such as restricting opioid use to acute pain, blocking opioids unless the use was for cancer or other approved uses, or requiring prior authorization) that it would violate its rebate agreements with Purdue and would result in a loss of rebates.

---

[40] ESI_JEFFCOMO_000250248 (1/1/16).

[41] OPTUMRX_JEFFCO_0000473712 (3/20/14).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 806 of 1171. PageID #: 706125

293.    Another example occurred in 2010. During negotiations between Janssen and Medco (Express Scripts' predecessor) regarding the formulary placement of the fentanyl drug Nucynta, the parties agreed Janssen would only pay rebates so long there were no step edit restrictions and agreed that Nucynta would be protected from "being disadvantaged vs. any branded agent in our defined market basket" of short-acting opioid ("SAOs").[42]

294.    Likewise, in 2012 negotiations between Express Scripts and Endo the parties agreed that "Endo Products are 'not disadvantaged to any other brand name pharmaceutical product in the same [competitive product category]'" and that this disadvantaged language meant any UM restrictions must apply to all products in the competitive class.[43]

295.    The same parity terms are included in Optum agreements. For example, the 2011 Rebate Agreement between OptumRx (then known as Prescription Solutions) and Johnson & Johnson for Nucynta (and other J&J drugs) required that it not be "disadvantaged as compared to other Branded or specialty Drugs within the Manufacturer Drug's Defined Drug Market . . ."[44]

296.    The 2012 Catamaran (now part of OptumRx) rebate agreement with Reckitt Benckiser for Suboxone Film required that it "not be subject to Disadvantaging including, but not limited to: prior authorization, NDC blocks,

---

[42] JAN-NYDFS-00001455181 (2/25/10).

[43] ENDO-OPIOID_MDL-07228036 (4/22/10).

[44] OPTUMRX_JEFFCO_0000006804 (1/1/11).

88

counter-detailing, co-pay differentials, dispensing restrictions, therapeutic conversion programs, therapeutic substitution, other access or reimbursement restrictions, or endorsed targeted messages (electronic edits)."[45]

297.    Likewise, in 2012 negotiations between OptumRx and the drug maker Covidien with regard to tiering of its opioid drug, the parties agreed to use the OptumRx "boilerplate disadvantaging language."[46]

298.    The same was true for Teva's 2015 agreement with OptumRx, which required unrestricted access and "parity" between its fentanyl drug Fentora and other drugs in its "Defined Drug Market," meaning that there would be no prior authorization limits unless it is applied to all "competing drugs" as well.[47]

299.    The 2016 agreement between OptumRx and Depomed with regard to Nucynta required that "[p]rior authorization shall not be allowed unless applied to all other single source branded Drugs in the Defined Drug Market that are on Formulary . . . ."[48]

300.    The lockstep parity terms that each PBM Defendant and opioid manufacturer negotiated served and furthered the common purpose of the Formulary & UM Enterprise (described in greater detail below) because it normalized the use of UM measures across the entire class of opioids and guaranteed that the overall market for prescription opioids would not diminish because of utilization

---

[45] OPTUMRX_JEFFCO_0000473712 (3/20/14).

[46] OPTUMRX_JEFFCO_0000140266 (6/1/12).

[47] TEVA_CAOC_08826718 (1/12/17).

[48] OPTUM_JEFFCO_0000011106 (4/1/16).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 808 of 1171. PageID #: 706127

management. The rebate agreements conditioned payment on each opioid manufacturer not being disadvantaged with regard to applying UM measures unless the entire market basket of all competing drugs was treated the same. The parity terms therefore ensured that no single opioid manufacturer would be disadvantaged against the other and then, each could be free to compete outside of the Formulary & UM Enterprise for market share of their drug within the fraudulently increased system. The opioid manufacturers knew that UM presented a slippery slope—if more UM were employed, it would ultimately lead to the adoption of restrictions across the entire class of drugs.

301. Indeed, this is precisely what happened. As summarized in a 2017 Express Scripts document, "Opioid management is currently a hot button issue. Express Scripts clients are demanding a solution as CMS and states implement requirements around appropriate opioid management (i.e. 3 states took action on prescriber 1st fill day supply restrictions; 12 additional states in process of implementing restrictions around morphine equivalent dose edits etc.) . . . We anticipate our opioid retail margin to be at risk over the next two to five years as states and federal government continue to intervene and prescribing practices change."[49] This was obviously a significant issue to Express Scripts, which made roughly $60 million in margin on opioids in 2016.[50]

---

[49] ESI_JEFFCOMO_000029922 (3/9/17).

[50] ESI_JEFFCOMO_000178613 (3/1/17) ("If we were to implement either the 7 day or the 10 limit on short acting opioids which are most profitable for us we are looking to lose $10-$20 Million in margin assuming 100% of patients get their first fill and

302. As alleged more fully herein, each member of the Formulary & UM Enterprise thus conducted and participated in the conduct of their enterprise through concerted unlawful action in which they formed a common purpose of growing the unfettered use of opioid drugs.

### 3. The PBM Defendants Misrepresented that They Were Using Their Formularies to Promote Safe Use and Appropriate Prescribing of Opioids

303. Rather than provide transparency into their dealings with the opioid manufacturers, Express Scripts and Optum represented to their clients, patients, and the public that they used their market power to design formulary offerings to promote the safe use and appropriate prescribing of opioids. These representations were false. Express Scripts and Optum instead have constructed standard formularies that garnered significant rebates and other fees in exchange for often unfettered access for "preferred" opioids.

304. For years the PBMs have represented that they promote better health and are dedicated to making the use of prescription drugs safer. For example:

- For years between 2000 and 2010, Express Scripts represented in its SEC filings that it "works with clients, manufacturers, pharmacists and physicians to . . . improve members' health outcomes and satisfaction."

    o During these same years, Express Scripts also represented in its SEC filings that it "is a company dedicated to making the use of

---

then 50% of patients get their 2nd, 3rd 4th fill. Based on the NY data we looked at since their state mandate went in 25% of members shifted from short acting to long acting opioids where we make the least money on and we are already seeing a hit on NY clients. . . . If we don't take any action in the next 1-3 years all states will move this and we will lose this margin anyway with a lost opportunity to charge for it now.").

prescription drugs safer and more affordable for plan sponsors and over 50 million members and their families."

- During the same time period Medco represented in its SEC filings that "[Medco] capitalize[s] on our clinical expertise and advanced information technology infrastructure . . . to improve safety and the quality of care for patients. We do this by developing action-oriented clinical programs and services based on clinical rationale. . ."

- In its 2008 annual report, Medco represented that "[a]t Medco innovation, precision, and advocacy are in our DNA. We strive to make all of medicine smarter and as a result make healthcare better."

- In a 2013 interview, Express Scripts CIO Gary Wimberly represented that "by filling 1.4 billion prescriptions per year, we have over 10 petabytes of useful data from which we can gain insights and for which we can develop solutions . . . [to] improve the health of patients." In addition, Mr. Wimberly stated, "[Express Scripts] has researchers and scientists whose sole job is to interpret and analyze the data to identify opportunities to improve health outcomes."

- In 2002 Prescription Solutions represented in public filings: "We recognize the treatment value of prescription medications. Our goal is . . . to increase the appropriate use of prescription medications. Getting the right medication to the right person at the right time is the best approach for everyone concerned."

- In 2007 Prescription Solutions represented – "Our goal is to promote the appropriate use of prescription medications. By focusing on clinical quality and total patient care, we help our clients and members improve outcomes."

- In its 2008 Annual Report, Optum represented– "Beyond the data and technology, and beyond the numbers and networks, our businesses are made up of people who strive, every day, to fulfill our mission by helping people live healthier lives."

- UnitedHealth Group's 2009 Annual Report stated "Information technology has the power to transform health care. UnitedHealth Group built a $2 billion business, Ingenix [OptumInsight predecessor], around that idea. Ingenix is committed to using the power of health information and analytics to help save lives, improve care and modernize the health care system."

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 811 of 1171. PageID #: 706130

- In UnitedHealth Group's 2011 Annual Report it stated "OptumRx is dedicated to helping people achieve optimal health . . . improving quality and safety, increasing compliance and adherence, and reducing fraud and waste."

305. Similarly, in a September 2013 letter to the Pennsylvania House of Representatives Committee on Health, Express Scripts stated that "[o]ur company's mission is to make prescription drugs safer . . ."[51]

306. Likewise, OptumRx's parent company, UnitedHealth Group, represented in its 2013 Annual Report that "UnitedHealth is advancing strategies to improve the way health care is delivered and financed . . .."[52]

307. In a 2013 interview, Express Scripts CIO Gary Wimberly summed it up: "Everything we do every day focuses on health outcomes."

308. As alleged more fully herein, despite the PBM Defendants' acknowledgement that they are supposed to construct formulary and UM offerings that promote safe and affordable drugs for their members, the PBM Defendants have not actually done so. To the contrary, the PBM Defendants have used their power to negotiate rebates and other fees, to control the offered formulary structures, to refrain from implementing or offering UM measures, all in an effort to allow the opioid

---

[51] Letter from David Dederichs, Sr. Dir. Express Scripts to Matthew Baker, Pennsylvania House of Representatives, Comm. on Health, *Re Opposition to HB 746*, at 1 (Sep. 4, 2013) https://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2013_0159_0011_TSTMNY. pdf.

[52] UnitedHealth Group 2013 SEC Form 10-K, at p. 2 (Dec. 31, 2013) https://www.sec.gov/Archives/edgar/data/731766/000073176614000008/unh201312 3110-k.htm.

manufacturers unfettered access to their formularies so that the number of opioids prescribed and sold could continue to grow and generate more profits for the PBM Defendants and the opioid manufacturers, thereby bringing the opioid epidemic to the doorstep of nearly every household in America.

### B. During the Early Years of the Epidemic, the PBM Defendants Conspired with the Opioid Manufacturers to Expand the Opioid Market and Increase Opioid Utilization

309. Not content merely to *permit* access to opioids, the PBM Defendants colluded with opioid manufacturers affirmatively to increase opioid prescribing. Since the release of OxyContin, the PBM Defendants have conspired with Purdue in several crucial ways to expand opioid market and increase the sales and prescribing of OxyContin.

310. Medco partnered with Purdue on therapeutic exchange programs to increase OxyContin utilization during the years immediately following the drug's release. For example, in 1997-1998, Medco worked with Purdue to develop a "switch program" where pharmacies would switch out a competing product for OxyContin at the pharmacy counter. Purdue executive Michael Friedman explained the value of this program: "Medco is a huge customer and the potential gain from this effort could dwarf that of many other opportunities."[53]

311. In addition, during key years in the growth of OxyContin utilization, Medco also worked with Purdue "behind the scenes" to get large health plans to lift restrictions—such as prior authorizations and quantity limits—on OxyContin

---

[53] E513_00022558.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 813 of 1171. PageID #: 706132

utilization. For example, a 2002 email reveals Medco and Purdue working together to prevent the implementation of a prior authorization (PA) that would have reduced the supply of opioids:[54]

> **To:** Radlund, Julia[/O=PURDUE/OU=PURDUE US/CN=Sales and Marketing - Field/cn=DCB07D6C]
> **Cc:** Nagorski, Lynn[/O=PURDUE/OU=PURDUE US/CN=Sales and Marketing - Field/cn=9F4581F2]; Richards, Tim[/O=PURDUE/OU=PURDUE US/CN=RECIPIENTS/CN=CBCEAB1F]
> **From:** Grayson, Mel
> **Sent:** Wed 3/13/2002 9:31:10 PM
> **Subject:** Concerns at MMMC
>
> To All;
>
> I met today with Ed Adamcik of MMMC. His major concern is to negotiate a new rebate contract. Ed says that the reason they have been able to keep various clients from placing a PA on Oxy has been the value of the rebates to them. If this is suddenly reduced, there may be more clients who might want to place a PA, or some other type of restriction on OxyContin.

312. To that end, in a telling exchange in 2002, when Highmark Blue Cross Blue Shield decided it would put a 300mg daily limit on OxyContin, Medco pushed back because this meant that Medco would lose rebates from Purdue. At the time, Purdue warned Medco that "[o]ur platform for rebates is to permit the patient to reach 320 mg/day of OxyContin," so if Highmark adopted a 300mg a day limit, Medco "will be loosing [sic] rebates for a mere 20mg/day differential." In order to rectify the situation, Ed Adamcik, Medco's Vice President of Contracting, then intervened and convinced Highmark to drop its daily dosage limit.

313. During this same time period, internal Purdue emails show how the data that Purdue received from Medco helped eliminate potential UM restrictions

---

[54] PPLPC029000064034 (3/13/02).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 814 of 1171. PageID #: 706133

and further strengthen the partnership between these two companies. In 2003, Purdue's Medco Account Representative Bernadette Katsur stated:

> "I do see tremendous value in the data that [Medco] is willing to provide. As he explained to me the large MCO's could be identified by number, and then he would be willing to discuss opportunities or concerns on a plan sponsor by plan sponsor basis. He would then be willing to work with me to develop individualized strategy for that account. That would mean pulling in Medco Client Manager as well as the local account executive. This type of working relationship has proven to be extremely successful with AdvancePCS. *We have eliminated many attempts to [prior authorization] and place [quantity limits] on product through this type of process. We have not had that degree of intimacy with Medco, and I think that Ed [Adamcik] would be willing to take that leap with the understanding that the extra percentage is being paid for that purpose.*"[55]

314. An exchange between Medco, Medco's largest client (UHC), and Purdue that same year, 2003, exemplified the ideas in Ms. Katsur's email above. In early 2003, Medco worked again behind the scenes with Purdue to convince UHC to double a contemplated quantity limit from 60 tablets per prescription to 124 tablets per prescription. Given the amount of OxyContin that was sold through UHC plans in 2003 and the years thereafter—both nationally and in Plaintiff's Community—convincing UHC to double its quantity limit to 124 tablets likely resulted in a substantial increase in OxyContin sales during crucial years when the opioid epidemic was taking hold.

315. Rather than implement standard protocols that they knew would limit OxyContin to narrow, appropriate usage, the PBM Defendants engaged in a pattern of deception (working in conjunction with the opioid manufacturers and often using

---

[55] PPLPC012000067648 (emphasis added).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 815 of 1171. PageID #: 706134

manufacturer-created data and information) in order to increase opioid utilization and their own profits.

**C.     For Two Decades after the PBM Defendants Knew the Opioid Epidemic Was Occurring, the PBM Defendants Continued to Conspire with the Opioid Manufacturers in the Deceptive Marketing of Opioids**

316.   Beginning the late 1990s, opioid manufacturers—including, but not only Purdue—engaged in a multifaceted campaign to expand the opioid market by creating and disseminating misinformation about the safety and efficacy of opioids used in chronic pain treatment and the risks of opioid addiction.

317.   The PBM Defendants knew that there has never been reliable evidence demonstrating opioids were safe or effective at treating chronic pain long term. The PBM Defendants further knew that opioids, particularly when used long term to treat chronic pain carry serious risks of addiction. And yet, starting shortly after the release of OxyContin and continuing for years after the opioid epidemic was spreading throughout the country, the PBM Defendants worked with the opioid manufacturers in numerous capacities in furtherance of these efforts. In particular: (1) the PBM Defendants disseminated the opioid manufacturers' false messages about chronic pain and addiction to high prescribers and patients, and (2) the PBM Defendants provided research, data, and consulting services to the opioid manufacturers to assist in expanding the opioid market.

318.   As one type of example, PBM Defendant Express Scripts (along with its subsidiaries – e.g., Express Scripts Specialty Distribution Service; Express Scripts SDS; HealthBridge, United BioSource LLC; Curascript, Inc.) partnered and/or

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 816 of 1171. PageID #: 706135

collaborated with opioid manufacturers (e.g., Purdue, Endo) on Patient Assistance Programs ("PAPs") – which provide free or low-cost medications to eligible individuals based on factors such as low-income and/or lack of health insurance. PAPs are "a triple boon for manufacturers" as they "increase demand, allow companies to charge higher prices, and provide public-relations benefits."[56]

319. For more than two decades, from the mid-1990s through 2017, Express Scripts and/or its subsidiaries partnered and/or collaborated with Purdue on its PAP - which is significant in multiple respects: a) as Purdue's partner mail order pharmacy, Express Scripts dispensed 100 million+ opioid pills specifically for Purdue's PAP and it repeatedly did so in violation of the Controlled Substances Act ("CSA") (as discussed in greater detail below); b) since 2002 Express Scripts also administered Purdue's PAP, further establishing its collaboration and critical role in this early, continuing, and very successful marketing effort to increase utilization, drive volume, and facilitate access relative to OxyContin and other Purdue opioid products; and c) as a result of Express Scripts' integral involvement with Purdue's PAP, it was well aware of the addiction, abuse and diversion issues surrounding OxyContin and other opioids since the mid-1990s.

320. Express Scripts and/or its subsidiaries played multiple roles (e.g., partner mail order pharmacy, program administrator, etc.) in Purdue's and Endo's respective PAP marketing schemes. The importance of Express Scripts is evident

---

[56] Howard, David H., *Drug Companies' Patient-Assistance Programs – Helping Patients or Profits?* New England J. Med., 97, 97-99 (2014), *available at* https://www.nejm.org/doi/pdf/10.1056/NEJMp1401658

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 817 of 1171. PageID #: 706136

from internal emails. For example, a 1996 email outlined how Purdue's "IPAP useage[sic] has sky rocketed since [Purdue] instituted the Express Script policy," noting that "utilization has nearly quadrupeled[sic]." [57] In a subsequent email in the chain, a Purdue employee stated that "Express Scripts has made it much easier to get the free product, thus, some may be using it that wouldn't be before. For example, I can remember several instances where we were having difficulty getting retailers to participate in the program before Express Scripts." [58] Moreover, as a result of Express Scripts' collaboration and work, Purdue's and Endo's respective PAPs were highly successful in increasing utilization, driving volume, and facilitating access relative to Purdue's and Endo's opioids, especially OxyContin and Opana.

321. The PBM Defendants' participation in the increasing opioid utilization and the fraudulent marketing of opioids continued even after Purdue pleaded guilty to criminal misbranding of OxyContin in 2007, as described above. Thus, even after Purdue acknowledged the falsity of its claims, the PBM Defendants, in collaboration with opioid manufacturers including Purdue, continued to spread the same misrepresentations about the safety and efficacy of opioids.

322. The PBM Defendants' participation in the fraudulent marketing of opioids continued long after their own data told them that the huge increases in opioid prescribing were creating a crisis of addiction, overdose, and death across the United States.

---

[57] PPLPC008000000530.

[58] *Id.*

323.    Regardless of what the PBM Defendants knew or did not know at the outset of their marketing activities, they continued to engage in fraudulent marketing of opioids long past the point where they had actual knowledge of the falsity of the representations they were disseminating.

### 1.    The PBM Defendants Disseminated the Opioid Manufacturers' Deceptive Propaganda

324.    Starting in the late 1990s—after granting Purdue's opioids preferred, unrestricted formulary placement in their standard offerings—the PBM Defendants partnered with Purdue and other opioid manufacturers to spread false information about opioids in order to increase opioid sales and expand the market.

325.    For example, in 1999, Medco arranged for its pharmacists to be trained by Purdue's speaker consultants regarding chronic pain management and the use of OxyContin.

326.    In 2003, internal Purdue documents show "[o]pportunities have been presented by Medco to work more closely with targeted clients within the marketplace on a client-by-client basis." These "opportunities" included developing educational programs to "stave off any formulary restrictions," disseminating Purdue created "educational" materials—including "New Perspectives on the Pharmacology of Opioids and Their Use in Chronic Pain" and Drug Diversion and Abuse: The Facts, Legal and Ethical Issues Affecting Pain Management: Fact or Fiction." Purdue

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 819 of 1171. PageID #: 706138

provided this information to Medco to "be used with employers and managed care plans on the appropriate utilization of [Purdue's] products."[59]

327.   During these same years, along with Medco, Express Scripts was also one of Purdue's largest customers. Notably, Medco and Express Scripts remained Purdue's largest customers for OxyContin for the years up to and following the 2012 merger of these companies.

328.   And in similar fashion to Medco, Express Scripts also worked directly with Purdue in the critical years of OxyContin growth to expand the pain treatment market through the dissemination of misinformation about the use of opioids to treat chronic non-cancer pain.

329.   For example, in 2000 and 2001, Express Scripts worked together on numerous programs to disseminate "educational" materials to tens of thousands of patients and high prescribers of OxyContin advocating for opioids in chronic pain treatment and downplaying the risks of addiction. These programs included Express Scripts engaged in mass mailings of Purdue created propaganda such as "Dispelling the Myths about Opioids," "The Impact of Chronic Pain: An Interdisciplinary Perspective CME booklet," "Overcoming Barriers to Effective Pain Management," and "Use of Opioids in Chronic Noncancer Pain CME booklet."[60] These documents contained false information downplaying the risk of addiction and promoting the use of opioids in long term chronic pain treatment.

---

[59] PPLPC012000064369.

[60]      PPLPC029000016774;      PPLPC029000020703;      PPLPC009000021694;
   PPLPC009000021695; PPLPC029000040033; PPLPC029000040028.

FILED: WESTCHESTER COUNTY CLERK 03/18/2024 10:23 AM INDEX NO. 75026/2022

NYSCEF DOC. NO. 20 Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 820 of 1171 PageID #: 706139 RECEIVED NYSCEF: 03/18/2024

330.    In one particularly telling internal Purdue "call note," a Purdue executive discussed "developing a piece on Opioid guidelines, [New England Journal of Medicine (NEJM)] quotes, and addiction terms." Notably, the "NEJM quotes" likely refer to a one-paragraph letter that was published in the *New England Journal of Medicine* reporting an observed low rate of addiction in patients prescribed opioids for short periods in an in-patient hospital setting. (Purdue and other opioid manufacturers misrepresented this letter as a "study" and claimed that it demonstrated that the risk of addiction to opioids was low when the drugs were prescribed for long-term, outpatient use.)  The Purdue executive continued: "[l]egal has stated that [Purdue] representatives cannot utilize this [NEJM] piece. My thoughts are that this piece may be sent out by Express Scripts. Express Scripts and Purdue could target [family practitioner physicians and internal medicine physicians] who are the high writers of [DEA Schedule II and III drugs]. The mailer was intended to  educate the physician on the beneficial uses of OxyContin and the preferred formulary status."[61]

331.    A number of these joint programs between Express Scripts and Purdue were prompted by Express Scripts' desire to work with Purdue to address the negative attention that OxyContin was receiving related to abuse and diversion in the early 2000s. For example, a March 14, 2001 letter from Express Scripts to Purdue explained "[c]learly with the market turbulence surrounding OxyContin you and your organization have significant demands on your time . . . there are several strategic

---

[61] PPLPC009000021694; PPLPC009000021695.

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  821 of 1171.  PageID #: 706140

initiatives where Express Scripts can support Purdue Pharma in your efforts to educate the market on the prescribing, administration and consumption of OxyContin."[62]

332.    These "strategic initiatives" proposed by Express Scripts included sending 15,000 "targeted" mailings to physicians which included a letter written by Express Scripts' Medical director summarizing key principles of the Purdue front group, American Pain Society, and included the Purdue-created brochures "The Patient Bill of Rights for Pain Management" and "Dispelling the Myths about Opioids" which contained misinformation about OxyContin risks, such as "addiction risk also appears to be low when opioids are does properly for chronic noncancer pain."[63]

333.    An April 2001 Purdue memo further described the reasons behind Express Scripts and Purdue's collaborations at that time: "[Express Scripts] has told us that this mailing is necessary so that [Express Scripts] may squelch the anti-OxyContin pushback from their clients (Managed Care Organizations and Employer Groups) due in large part to the national media attention OxyContin is receiving."[64]

334.    Purdue's and Express Scripts' joint efforts to expand the opioid market continued in the summer of 2001, when they used an Express Scripts "proprietary database" to identify the top 1,900 physicians with high prescribing rates for

---

[62] PPLPC028000031679.

[63] PPLPC028000031679.

[64] PPLPC029000040033; PPLPC029000040028.

Schedule 2 narcotics and then mailed these 1,900 physicians materials created by the front-group American Pain Society ("APS").[65] The mailed APS material promoted use of pain scales and the debunked, industry-advocated concept of pseudo-addiction.

335.   Express Scripts and Purdue's collaboration continued through 2004, when Express Scripts and Purdue developed a series of pain management presentations for an Express Scripts' clients, to be conducted by Purdue's Medical Liaisons, who were doctors and medical professionals employed by Purdue to promote opioid therapy.

336.   During these same years, Purdue also conspired with Optum to spread misinformation about the use of opioids to treat chronic pain and the risks of opioid addiction. One example occurred in February 2003, when UHC and OptumInsight met with Purdue to give a presentation on "Managing Chronic Pain Associated with Lower Back Pain." The goal of this presentation was to develop a comprehensive plan between Purdue, UHC, and OptumInsight to re-educate physicians on opioid use for the treatment of chronic pain and low back pain. The program included "[t]argeting physicians not aligning with UHG clinical objectives [for treating chronic pain] to modify behavior."

337.   As a result of this meeting, in 2004 OptumInsight and Purdue executed a Master Services Agreement to roll out this program in 2004-2005. The program would include Purdue, UHC, and OptumInsight working together to identify

---

[65] PDD8801134968;          PPLPC036000005057;          PPLPC036000005058;
PPLPC029000045118; PPLPC021000012726.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 823 of 1171. PageID #: 706142

physicians from UHC and OptumInsight's database and then developing comprehensive education materials on the effectiveness of opioids in chronic pain treatment to send to these physicians.

338. OptumInsight and Purdue delivered this information through a series of teleconferences, newsletters, faxes, live meetings, case study monographs, letters, and website and web-based programming directly to physicians.

339. The project, referred to as the United Healthcare Physician Education program, included the following false and misleading messages targeted at UHC prescribing physicians:

- Opioid use is associated with some moderate side effects, but the risk of drug dependence is low;

- Concerns about abuse, addiction, and diversion should not prevent the proper management of chronic and low back pain;

- Opioids are the most effective way to treat pain;

- Opioid addiction does not occur in the chronic pain patient; and

- Certain signs of dependence that sometimes can be confused with addiction are actually "pseudoaddiction."

340. To assist in the marketing efforts of opioid manufacturers, Express Scripts and Optum have for years provided multiple opioid manufacturers with lists of all their plan clients as well as the names of physicians who were participating in the plan's provider networks. The manufacturers used this information to target the highest opioid prescribers with pull-through marketing.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 824 of 1171. PageID #: 706143

341.   For example, according to one 2011 email, Endo sales representatives were instructed to "[m]aximize pull-through with key managed care plans," "[d]rive brand awareness across top [Opana ER] prescribers," and promote favorable Opana ER formulary positioning.[66] Sales representatives were also told to focus on providers "that have the most potential" and not "waste time" on other physicians.[67] Sales representatives also were dispatched to (and did) promote Opana ER formulary status to prescribers.

342.   In another example, after Endo had negotiated a favorable Tier 2 formulary deal with Optum in 2010, sales representatives were told to "present the great information" to prescribers and take advantage of the Opana ER "opportunity" for "pull through" sales.[68]

> **4. Only when all this is done should you present the great information that now,** OPANA ER is 2T, Lowest Branded Co-Pay for UHC Commercial (and Part D) patients! **Get commitment first that OPANA ER is the right choice...then show how easy it is to provide OPANA ER for these patients!**

343.   In addition, beginning in 2006, Express Scripts and Purdue entered into an ongoing "Participating Manufacturer Agreement" under which, in return for "administrative fees," Express Scripts would make ███████████████

███████████████████████████████████████████

---

[66] ENDO_OPIOID_OHAG-00030138 (1/14/11).

[67] ENDO_TXMDL_00448429 (10/4/09).

[68] ENDO-OPIOID_MDL-00719759 (3/3/10).

████████████████████████████████████ Express Scripts would also ████████████████████████████████ And, Express Scripts agreed it would provide numerous deliverables to Purdue, including ████████████████████████████████ which enabled Purdue to more effectively pull through its drugs' formulary status to physicians. The "administrative fees" Express Scripts received were tied to the number of opioids it sold—*i.e.*, the more opioids it sold, the more it made. This agreement was strictly confidential. Express Scripts and Purdue renewed this agreement on at least three occasions, and it was in place until at least the end of 2010.

344. In 2011 and 2012, Express Scripts and Purdue collaborated on false and misleading guidelines for workers' compensation patients to promote "safe and effective chronic opioid therapy."[69]

345. In fact, as late as 2017, Express Scripts gave educational presentations on pain management that treated the risk of addiction to opioids as minimal. In a presentation regarding "The Management of Persistent Pain in Older Persons," Express Scripts Vice President Andrew Behm asserted that psychological dependence to narcotic analgesics was "rare" and that "Addiction associated with the appropriate use of opioid analgesics is uncommon."[70] The presentation also described "physical

---

[69] *See* PPLPC012000368690 (3/8/12); PPLPC012000368687 (3/8/12).

[70] ESI_JEFFCOMO_000012632, at slide 56 (4/24/17).

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 826 of 1171. PageID #: 706145

dependence" as "common" and a "state of adaptation to chronic opioid therapy," and recommended fentanyl for chronic pain in older adults.[71]

346. OptumRx also participated in a Purdue advisory board in 2013 for the "abuse deterrent" version of OxyContin, which was focused on payers in managed care. In 2016, OptumRx conducted studies for Purdue to assess the economic impact of reformulated OxyContin.

347. OptumRx affiliates also marketed their data analytics capabilities to Purdue for research projects related to opioids, proposing, for example, to sell medical and pharmacy claims data from its "Cliniformatics DataMart" to Purdue,[72] to study patient disenrollment in Medicare Advantage plans that discontinued coverage of OxyContin ER, and to research overdoses associated with OxyContin.

### 2. The PBM Defendants' Affiliated Entities Provided Research, Data, and Consulting to the Opioid Manufacturers to Expand the Opioid Market

348. In addition to assisting the opioid manufacturers in spreading false information about opioids, for years the PBM Defendants and their affiliated companies provided the manufacturers with data, research, and consulting services needed to expand the opioid market.

349. For example, in the late 1990s and early 2000s, Express Scripts' affiliate research entity, Practice Patterns Sciences, Inc. ("PPS"), and Medco's Institute for Effectiveness Research provided research and studies for Purdue in to aid its efforts

---

[71] *Id.*

[72] PPLPC018000829180 (6/6/13).

to expand the opioid market. One example occurred in 2001, when Express Scripts/PPS developed a study for Purdue on "The Value of OxyContin Therapy in Patients with Moderate to Severe Pain due to Osteoarthritis."[73]

350.    In addition, from the early 2000s until 2015, OptumInsight, a sister company of OptumRx, also helped Purdue generate clinical studies, educational materials, and marketing programs to downplay the addictive properties of OxyContin and expand its use throughout the country.

351.    In order to do so, OptumInsight was paid by Purdue to reverse engineer studies to achieve desired outcomes; create algorithms to identify potential pain patients to suggest OxyContin prescriptions; and create large-scale marketing plans to convince payors that long-term opioid usage was not only useful for many types of pain and did not lead to serious addiction for long-term opioid users.

352.    For example, in 2000 and 2001, OptumInsight (then known as Ingenix) worked with Purdue to develop algorithms and studies to identify chronic pain patients. One was an algorithm that would mine UHC's claims data called "the chronic pain patient identification algorithm."[74] The other was called "Profiling the OxyContin Patient."[75] The purpose of this study was to assist Purdue in shifting formulary discussions with PBMs/health plans from a purely per-member fiscal discussion to an overall "clinical and fiscal" benefits discussion. Purdue paid for this

---

[73] PDD8801105525.

[74] PPLPC028000016640.

[75] PKY181047060.

study, in part, to counter the recent focus in the market on "cases of diversion" and "premium pricing" of OxyContin. Purdue's goal of this study was to use the OptumInsight's "data/evidence" to demonstrate from a payer and patient perspective the clinical/financial benefit of OxyContin given the overall costs associated with the undermanagement of pain.[76]

353. In October of 2002, OptumInsight proposed a "Chronic Pain Management" study and education initiative to present a series of teleconferences to providers in the UHG/UHC network. The purpose of this educational initiative was to "optimize patient care in the treatment of chronic pain." One of the themes of this report is that "[m]ost specialists in pain medicine and addiction agree that patients with prolong opioid therapy . . . do not usually develop addictive behavior" and to convince the providers that "[o]pioids are effective, have a low addiction potential, and may have fewer long-term side effects than other pain treatments."[77]

354. This clinical initiative was launched by UHG that same year; UHG requested $200,000 to implement the initiative and begin targeting plans for the program. Purdue stated that while that was a big investment, that the return would be high. The study did with UHG proved overall to "significantly improve the relationship with this client" and would "provide outcomes data that can prove

---

[76] PKY181047060.

[77] PPLPC036000014773.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 829 of 1171. PageID #: 706148

valuable in the future with regard to placement and pull-through for United and other major HMOs."[78]

355.  In February 2003, UHC threatened to implement a stricter quantity limit on OxyContin and other Purdue products. Purdue worked with OptumInsight to provide "new data" for June 2003.[79]. Based on the joint efforts of Purdue and OptumInsight, UHC subsequently doubled its quantity limit (to a level that Purdue stated was high enough that it should not affect OxyContin sales).

356.  In March of 2005, OptumInsight prepared an Executive Summary to Purdue for "A Usual Care, Multicenter, Open-label, Randomized, 4-month Parallel Group Trial to Compare the Impact of Therapy with OxyContin on Health Outcomes and Research Utilization in Subjects with Moderate to Severe Osteoarthritis Pain of the Hip or Knee." The purpose of the study was to present evidence to "health-system decision-makers" of the cost effectiveness of treating osteoarthritis with OxyContin.[80] OptumInsight went on to present this study on behalf of Purdue at the International Society for Pharmacoeconomics and Outcomes Research annual meeting in 2005 where it won an award.

357.  Because these studies were reverse engineered and constructed in order to advance Purdue's market share of OxyContin, in certain instances, members of the

---

[78] PPLPC035000032658.

[79] PPLPC012000057093; PPLPC012000057095.

[80] PPLPC018000065660 (this study was performed by Innovus Research Inc.  As noted above, Innovus subsequently merged with Ingenix and then later was renamed "OptumInsight").

medical/health care community pushed back on Purdue's and OptumInsight's joint medical journal publications. When that occurred, the two companies worked together to respond.

358. From 2011 through at least 2015, Purdue and OptumInsight worked together to build a comprehensive, multi-step "aspirational statement" and "evidence-generated" strategies for Butrans, OxyContin, Intermezzo, Targin, and hydromorphone.[81] The goal of this coordinated effort was to identify the best way to position these drugs with the public, patients, providers, and payors to increase utilization and maximize sales.

359. The first phase occurred in April 2012. It included a "Product Review" for each Purdue drug to "complete a focused review of product, literature, and on-line information to establish the likely interplay between the product, competitors, and the market access and reimbursement environment."[82]

360. The second phase occurred simultaneously in April 2012 and included "Event Mapping" which was an in-person workshop for the "Satellite [Purdue-OptumInsight] Team." The purpose of Event Mapping was to identify "significant events that will affect future evidence generation strategies."[83]

---

[81] The examples below represent OptumInsight's effort with respect to OxyContin. OptumInsight produced similar documents for Purdue for Butrans, OxyContin, Intermezzo, Targin, and Hydromorphone.

[82] PPLPC019000666914.

[83] PPLPC019000665555; PPLPC019000665974.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 831 of 1171. PageID #: 706150

361. The third phase occurred in June 2012; it was called the "Aspirational Value Proposition" phase. During this time, the group would create the "ideal value proposition statement" which "is concise, appeals to payers' strongest decision-making drivers and is evidence based to: (1) identify the burden and unmet need that OxyContin will fulfill; (2) describe the solution provided by OxyContin compared to existing treatments; (3) describe the risks of OxyContin compared to existing treatments; and (4) delineate the economic benefit of OxyContin compared to existing treatments." OptumInsight's OxyContin "value statement" was targeted at moderate to severe pain and to endorse the reformulated OxyContin as lowering abuse, addiction, and diversion rates.[84]

362. The fourth phase occurred in September 2012. It included a "Semi Structured Payer Interview Guide for Hydrocodone, Oxycontin, Butrans to gather insight re: market access and reimbursement considerations."[85]

363. The fifth phase, occurring in November 2012 included reviewing "Results from Payer Interviews Oxycontin, Butrans, Hydrocodone."[86]

364. The next month, the group started the sixth phase, called "Evidence Generation Plan for OxyContin. Recommendations for a value evidence generation plan to support aspirational value proposition evidence base." OptumInsight relied on this evidence to revise the "Aspirational Value Proposition." One notable change—

---

[84] PPLPC018000697326.

[85] PPLPC020000610710.

[86] PPLP004148372; PPLPC018000742542.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 832 of 1171. PageID #: 706151

removing the value proposition that "Abuse of prescription opioids (primary and secondary) has substantial impact on society." The reason behind removal was "Payers value pain management. They perceive tamper resistance and abuse deterrence as societal benefits which they cannot further impact unless all products are tamper resistant." OptumInsight's motivation behind the "Payers value pain management" was financially motivated based on aspirational statement #1 "annual total and direct costs of moderate to severe chronic pain in the US are 2- to 3-fold higher than the economic burden posed by other major conditions such as diabetes, heart disease and obesity.

365.    From 2003 to at least 2012, OptumInsight conducted similar studies for other opioid manufacturers. For example, in 2012, OptumInsight did an analysis attempting to show that Suboxone film vs. a tablet formulation was superior to prevent diversion/abuse/misuse.[87]

366.    Alongside the studies OptumInsight was producing for Purdue to further legitimize the proliferation of opioids without adequate controls throughout the United States, OptumHealth, a subsidiary of UnitedHealth Care ("UHC"), began

---

[87] RBP-00030919. In 2019, Reckitt Benckiser/Indivior was fined $1.4 billion for marketing of Suboxone as less-divertible and less-abusable and safer around children, families, and communities than other buprenorphine drugs, even though such claims have never been established. Indivior made these claims publicly, including to the Massachusetts Medicaid program. OptumInsight provided Reckitt Benckiser/Indivior "data/evidence" related to these marketing efforts, as well as other "data/evidence."

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 833 of 1171. PageID #: 706152

an "educational partnership" campaign in the early 2000s to educate nurses and case managers throughout the country on the undertreatment of pain.[88]

367.    In 2004, David Rosen, an employee at Purdue, connected his father, Dr. Michael Rosen, a National Medical Director at OptumHealth from 1996-2021, with Account Executives at Purdue to begin educating the UHC and client clinical staff on how to effectively manage pain. Dr. Rosen was not only the head medical director at OptumHealth, but UHC's P&T Committee directly reported to him. His son was on the marketing team at Purdue and utilized his connection with his father to connect Purdue with OptumHealth and UHC.

368.    In January 2005, Dr. Rosen coordinated with Purdue to present two major Continuing Education Programs to be given to case managers at UHC. The next month, the educational initiatives were implemented.

369.    Part of the program targeted nurse practitioners, and included a presentation called "Communication to Enhance Collaboration and Outcomes."[89] The presentation was wholly endorsed and coordinated with Optum's Dr. Michael Rosen.[90] The PowerPoint presentation emphasized the "Possible Adverse Effects of Undertreated Pain" and had speaker notes to quote during the presentation that advocated for increased opioid use and stated "[i]f we continue to provide pain care as it has always been provided, patients will continue to suffer needlessly."[91] The

---

[88] PPLPC021000066876; PPLPC022000059801.

[89] PPLPC028000120866; PPLPC028000130521.

[90] *See* PPLPC020000038112; PPLPC022000050740; PPLPC022000050741.

[91] PPLPC022000051750.

same presentation was given to case managers, then expanded to UHC affiliated groups throughout the country, including to risk managers, telephone triage nurses, and every case manager.

370.   In 2006 and 2007, Dr. Rosen and Purdue worked together on multiple programs, including a program called "UHC Educate the Educator."[92]

371.   In 2009, Dr. Rosen worked with Purdue to roll out a six month "chronic pain mgmt. program" that would directly link to Purdue's "Partners Against Pain" website.[93] The program would focus on case managers for Optum throughout the country and would focus on Purdue's FACETS modules. The series would be presented by Optum Medical Directors and some Purdue employees.[94] In March 2009, Optum employees reached out to Purdue to facilitate Medical Director Faculty Forum presentations regarding pain. One of the faculty presentations was about how to treat lower back pain with opioids using one of the FACETS topics. Optum distributed the literature for the topic to medical directors. Following this, Purdue held multiple educational seminars with the Medical Directors at Optum to then disseminate this information to hundreds of case managers throughout the country via seminars and literature.

372.   In sum, the opioid manufacturers' efforts to disseminate misinformation about opioid addiction, opioid use for chronic pain, and opioids as a first-line therapy

---

[92] PPLPC012000105112; PPLPC029000207366.

[93] PPLPC028000245007; PPLPC022000260832; PPLPR001000287899.

[94] *Id.*

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 835 of 1171. PageID #: 706154

inappropriately expanded the opioid market. And since the 1990s, the PBM Defendants collaborated with Purdue to spread this misinformation in an effort to increase opioid utilization and sales. The result of these joint efforts (in Express Scripts own words) was the "opiate explosion: vast increase in prescribing [and] more potent formulations [of opioids]."[95]

## D. The PBM Defendants Had Access to Real-Time Data Regarding Drug Utilization Which Gave Them a Unique Vantage Point into the Opioid Epidemic

373.    Express Scripts and Optum have had a front row seat to the spread of the opioid epidemic. They have watched as the number of opioids prescribed and dispensed has exploded. They were made aware of opioid epidemic through the vast amount of data they have had, the knowledge gained through their clients, manufacturers, and other entities in the health care arena, and through clinical evaluations for things such as formulary placement.

### 1.    The PBM Defendants track every prescription claim they process across all the health plans they service which provided them with uniquely granular and comprehensive data.

374.    Because of their business model, Express Scripts and Optum have access to an extraordinary amount of data. Express Scripts and Optum can see detailed information on individual prescribers and pharmacies, but can also aggregate that data across manufacturers, patients, pharmacies, and payors. Their visibility into these data is thus both uniquely granular and comprehensive.

---

[95] ESI_JEFFCOMO_000032900.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 836 of 1171. PageID #: 706155

375.    These data include information such as the volume, nature, dosage, and conditions for which health care providers are prescribing opioids to individual patients and on an aggregate basis; the volume of opioids obtained by individual patients and by geography; the pharmacies at which opioids were dispensed and the volume of opioids dispensed by geographic area, among other data. Express Scripts and Optum also had data from their own mail order pharmacies.

376.    For the past two decades, Express Scripts has processed 8 to 10 million prescription claims per day—1.4 billion claims per year—for its members with hundreds of data points for each transaction. At all times since the 1990s, Express Scripts has had as much—if not more—detailed claims data on opioid utilization and prescribing than any other entity in the pharmaceutical industry.

377.    Express Scripts not only collected prescription data, but also analyzed it to track utilization patterns. Since 1997 Express Scripts has compiled in-depth drug utilization analyses of its own claims data from millions of Express Scripts' members across the country in its Drug Trend Reports. Starting in at least 1999, Express Scripts Drug Trend reports reflected both Express Scripts' knowledge of increasing OxyContin and opioid utilization, as well as its understanding of the dangers of these drugs.

378.    Express Scripts' ability to monitor and analyze opioid prescription data is exemplified by its 2014 "A Nation in Pain" report focusing on the opioid epidemic. The report reviewed 36 million pharmacy claims from 2009 to 2013, which illustrated the widespread opioid epidemic. In the report, ESI demonstrated its ability to identify

118

opioid use trends by geography, age, and gender, as well as by the prevalence of doctor and pharmacy shopping and drug cocktail use.

379.  Optum (and/or its predecessors) have had access to data for its 66 million UHC and OptumRx covered lives for the duration of the relevant time period as well, processing 3.8 million prescription claims per day, or 1.4 billion a year. Before 2011, Optum had access to claims for over 75 million individuals nationwide. Since its inception, Optum has been able to track how many opioids its millions of members were receiving, including the quantity of pills, the dosing strengths, the combination of drugs being dispensed, and the travel distance of members to acquire prescription opioids. Additionally, Optum has access to clinical information for millions of patients, which includes clinical files and over 4.5 billion text notes from a member's clinical records.

380.  In a presentation touting the effectiveness of Optum's opioid management program, Optum's Senior Vice President of Clinical Engagement described the power that Optum has to not only track data, but to use it to stop inappropriate opioid utilization at the pharmacy counter:

> "I have billions of claims, literally billions of claims. Every claim that we go through goes through an algorithm. This is all happening in realtime at the pharmacy. When you go to the pharmacy, in microseconds, I know if my patients are on a concurrent benzo. I know what the dose is. I know what the day's supply is. I know what other drugs they're taking, and I can have realtime [point of sale] edits going through making sure everything is happening appropriately."[96]

---

[96] Beshara Dep. 61:9-62:3 (Sept. 12, 2023).

381.    Similarly, Optum has touted its ability to use "near-real-time data feeds to integrate medical claims data into our intelligent claims engine," and boasts that "[o]ur data capabilities are structured in order to flag these individuals using both our own pharmacy claims data plus medical claims data."[97] Furthermore, OptumRx claims "[w]hen it comes to identifying at-risk patients, we get maximum leverage out of our claims-paying role as a PBM. In this capacity, we have direct insight into which patients are getting which drugs." Before 2007, Prescription Solutions (OptumRx's predecessor) had the ability to review every claim submitted by its members and "look for problem patterns and intervene with prescribers closer to the point of a member's care," including being able to identify both doctor shopping and pharmacy shopping by patients as well as other red flags such as early refills or suspicious drug combinations.[98]

382.    OptumRx has described its "comprehensive retrospective drug utilization review" ("RDUR") as "specifically designed to look for problem patterns and intervene with prescribers closer to the point of a member's care," including being able to identify both doctor shopping and pharmacy shopping by patients as well as other red flags such as early refills or suspicious drug combinations.[99] Furthermore, OptumRx claims:

> When it comes to identifying at-risk patients, we get maximum leverage out of our claims-paying role as a PBM. In this capacity, we have direct

---

[97] OPTUMRX_JEFFCO_0000004463 (8/25/20).

[98] *Id.*, at p. 5.

[99] *Id.*, at p. 5.

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 839 of 1171. PageID #: 706158

insight into which patients are getting which drugs. This insight feeds our RDUR capability.

The RDUR clinical opportunities directly contribute preventing progression to chronic use. For example, retrospective data helps identify "shoppers," those that are using multiple physicians, pharmacies, and/or multiple prescriptions. This is key, because when patients are using multiple prescriptions it is not uncommon to see dose escalation over time, putting them at higher risk for overdose.

The system is also looking for other patterns of high risk behavior, such as early refills, or those who are using dangerous combinations of products.[100]

383.    Optum's ability to control drug utilization was best stated by Dr. David Calabrese, Optum's Chief Clinical Officer, "we drive the ship in terms of how their drugs get used, not [the opioid manufacturers]."[101]

384.    Because of all of data they had, the PBM Defendants were aware that the volume of opioids being prescribed in the United States, and in Plaintiffs' Community, far exceeded an amount that could possibly be justified as medically necessary or appropriate.  They knew that opioids were being overprescribed and used inappropriately, and that Plaintiff's Community was being flooded with an oversupply of these dangerous drugs.

385.    To make matters worse, rather than use their data to stop the public health crisis that they were watching unfold, since at least 1997, the PBM Defendants sold their detailed claims data, as well as their clients' formulary and health plan information, to Purdue and other opioid manufacturers. The opioid manufacturers

---

[100] *Id.*

[101] OPTUMRX_JEFFCO_0000360074.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 840 of 1171. PageID #: 706159

then used this data to gain insight into the pharmacies and health care providers who were dispensing and prescribing their opioids (as well as their competitor's products) *and more importantly* those pharmacies and prescribers who were *not* prescribing and dispensing their products. This allowed sales representatives of Purdue and the other opioid manufacturers to have laser precision targeting high prescribers and pharmacies in order to aggressively push opioids onto the market.

386.    For as long as they have been PBMs, Express Scripts and Optum have received, compiled, and analyzed massive amounts of prescription claims data demonstrating that opioids were being over-utilized, abused, and diverted. Indeed, these PBMs had more data on and awareness of the opioid epidemic unfolding than any other entity in the pharmaceutical industry. They knew or certainly should have known for decades that opioids were causing a public health crisis.

### 2.    The PBM Defendants had knowledge about the opioid epidemic and about abuse and diversion.

387.    According to the CDC, the rise in opioid overdose deaths can be outlined in three distinct waves.[102] As the CDC explains: "The first wave began with increased prescribing of opioids in the 1990s, with overdose deaths involving prescription opioids (natural and semi-synthetic opioids and methadone) increasing since at least 1993. The second wave began in 2010, with rapid increases in overdose deaths involving heroin. The third wave began in 2013, with significant increases in overdose

---

[102] Centers for Disease Control and Prevention, *Understanding the Opioid Overdose Epidemic* (Aug. 8, 2023), https://www.cdc.gov/opioids/basics/epidemic.html#three-waves.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 841 of 1171. PageID #: 706160

deaths involving synthetic opioids, particularly those involving illicitly manufactured fentanyl."[103]

388.    Very recently, as of September 2023, the United States has entered the Fourth Wave of the Opioid Epidemic. A study[104] released by the Center for Social Medicine and Humanities, University of California, Los Angeles, California, USA, found that "recently, scholars have argued that the 'fourth wave' of the US overdose crisis has begun, in recognition of rapidly rising polysubstance overdose deaths involving illicitly manufactured fentanyl, with stimulants playing a key role. By 2021, methamphetamine and cocaine were the only leading co-involved substances as depicted below. This represents current 2021 trends, a culmination of a long road of crisis level addiction beginning with *prescription opioid abuse*.

---

[103] *Id.*

[104] Friedman, J, Shover, CL, Charting the fourth wave: Geographic, temporal, race/ethnicity and demographic trends in polysubstance fentanyl overdose deaths in the United States, 2010–2021, 118 ADDICTION 12 (Dec. 2023), https://doi.org/10.1111/add.16318.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 842 of 1171. PageID #: 706161



389.   The following chart, depicting "Geographic, temporal, race/ethnicity and demographic trends in polysubstance fentanyl overdose deaths in the United States, 2010–2021" shows the four waves of the epidemic:



Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 843 of 1171. PageID #: 706162

390.    Express Scripts own marketing material explicitly recognized this evolution in the national opioid crisis:[105]



391.    Likewise, Optum's promotional material also acknowledged these progressive stages of the opioid epidemic:[106]



---

[105] ESI_JEFFCOMO_000032900.

[106] OPTUMRX_JEFFCO_0000341787.

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 844 of 1171. PageID #: 706163

392.    Long before the second wave of the crisis started in 2010, both Express Scripts and Optum knew that opioid abuse and misuse posed serious problems.

393.    The PBM Defendants knew that opioids were addictive and carried a significant risk of serious injury or death, and they have known this for at least the past 20 years.

394.    For example, both Medco and Prescription Solutions informed Purdue that they had concerns about the potential for abuse in OxyContin right out of the gate in 1997. A few years later, in early 2001, an executive of Optum's parent company, UHG, wrote to Purdue to discuss the "whole OxyContin overuse issue . . . which has been brought about by the 'heightened marketing skills of Purdue." The email continued, "I believe Purdue has acted irresponsibly in over-promoting the use of oxycodone . . . the activity has resulted in the overuse of morphine, an increase in the abuse of this narcotic, unnecessary and significant increases in pharmacy trend, and most importantly, an increase in patient morbidity and mortality."[107] In other words, Optum/UHG recognized that OxyContin was being overused and killing people in increasing numbers over two decades ago.

395.    Similarly, starting in at least the early 2000s, certain Express Scripts and Medco clients also began to express concern to them about abuse and diversion issues related to OxyContin. Upon hearing from their clients, Express Scripts and Medco would often reach out to Purdue directly seeking help to quash these concerns.

---

[107] PKY181977016.

126

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 845 of 1171. PageID #: 706164

Purdue often worked with the PBM Defendants by providing research and "educational" materials downplaying the risks associated with opioid use.

396.    For example, in 2002, internal Purdue emails describe a call with Medco regarding clients who "had concerns about tablet restrictions and proper utilization of OxyContin."[108] Medco informed Purdue that "an overview of the abuse and diversion issue surrounding OxyContin would be helpful for [Medco] to respond to their customers questions/concerns."[109]

397.    In 2003, Medco's largest client, UHC, expressed concerns that "there were patients taking 960-1000 tabs of OxyContin per month" and stated that it wanted to take action "to reduce the abuse and diversion issues." Following this, Medco and Purdue worked together to compile research and data to provide to this client to alleviate these concerns.[110]

398.    Also in 2003, an Express Scripts employee gave a presentation at a 2003 conference in which that employee, while discussing OxyContin, stated, "This is a narcotic. All narcotics are addictive. In addition, this is a controlled release narcotic, so when someone would crush it up and either ingest it or inject it there was a potential for serious injury or even death."[111] This same Express Scripts employee also indicated that because patients were becoming tolerant, chronic use of opioids

---

[108] PPLPC029000063491.

[109] E01_00004716.

[110]    PPLPC028000078492;    PPLPC012000057093;    PPLPC012000057095; PPLPC029000087372; PPLPC012000064369.

[111] *See* PPLPC012000061345, 13486 (6/5/03) (family).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 846 of 1171. PageID #: 706165

was occurring and patients were taking increasingly higher doses over time (sometimes referred to as "dose-creep" or "dose-creeping").[112] Following a study of opioid use in a private plan that revealed this pattern, Express Scripts conducted an internal study and "found that similar patterns were occurring . . . across ESI's book of business."[113]

399.  The PBM Defendants also knew or had reason to know that opioids were being improperly marketed. They were aware, for example, that the price of at least some opioids (including OxyContin) increased as dosage increased. And when describing this dose-creeping phenomenon during the 2003 conference, an Express Scripts employee suggested that this phenomenon is not merely attributable to tolerance from chronic use—he said dose-creeping "may be reflective of detailing for this drug."[114] Indeed, a Purdue employee who attended this conference said in an email to other Purdue personnel that "[Express Scripts] is looking at the detailing of the drug. [Express Scripts] implied that there may be improper detailing by the manufacturer."[115]

400.  The PBM Defendants also knew that opioids were being improperly marketed because, in 2007, Purdue pleaded guilty to criminal misbranding of OxyContin.  The plea agreement identified specific representations that Purdue acknowledged were false.  The PBM Defendants knew that these same

---

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.*

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 847 of 1171. PageID #: 706166

misrepresentations were still being used by Purdue and others in the marketing of prescription opioids. Yet they failed to use their standard formulary and UM offering to counteract the effects of this fraudulent marketing.

401. In 2006, Express Scripts executives again recognized the abuse risk opiates posed. But Express Scripts was reluctant to implement more robust monitoring for fear of customer blowback and loss of prescription volume:[116]

| | |
|---|---|
| **From:** | Behm, Andrew (BLM) |
| **Sent:** | Monday, August 14, 2006 2:08 PM |
| **To:** | Gross, Amy (BLM); Colby, Andrew J. (STL) |
| **Subject:** | RE: Retro DUR Addictive Substances question |

No Stadol. We previously targeted all controlled substances plus Tramadol, Soma, and combos of those products.

When we enhanced the targeting, CPMs were only really interested in the opiates from an abuse perspective. I suppose we could revisit the targeting --- especially if you're aware of any new feedback --- but that will definitely impact the number of letters and volume.

402. As early as 2008, Express Scripts acknowledged the acute diversion risk with opioids. For example, Express Scripts employee Adam Kautzner (now its President) noted the "improved street value" of brand name narcotics:[117]

**From:** Kautzner, Adam W. (EHQ)
**Sent:** Tuesday, November 04, 2008 11:32 AM
**To:** Gross, Amy (BLM); Martin, Jason (STL)
**Cc:** Boike, Jackie L. (BLM)
**Subject:** RE: file on temp transfer drive

I was afraid this was going to be your response!
Brand name narcotics may especially be interesting with their improved street value.
I will dig in my email archives for requests but haven't had many lately. Especially for QLLs.

---

[116] ESI_JEFFCOMO_000260226 (8/14/06).

[117] ESI_JEFFCOMO_000273681 (11/4/08).

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 848 of 1171. PageID #: 706167

403. The following slide was included in a client-facing presentation discussing the 2008 Express Scripts Drug Trend Report. The slide included speaker notes acknowledging Express Scripts' own awareness that in 2008 it needed to do something about OxyContin abuse: "We all know the abuse potential for [Oxycontin] and we knew that a solution needed to be offered to all of you here if you wanted to address it:"[118]



404. In 2009, Express Scripts received an email from a client stating, "Houston, we have a problem, and its name is Oxycontin."[119] That same year another

---

[118] ESI_JEFFCOMO_000278190; ESI_JEFFCOMO_000278192.

[119] Gross Dep. 55-56, Ex. 4; *see also* Gross Dep. 74 (discussing exhibit in same time period where ESI clinical personnel observed that "there has been quite a bit of client buzz around increasing Oxycontin use")).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 849 of 1171. PageID #: 706168

large client reached out to Express Scripts regarding its desire to put into place an "aggressive PA policy" on opioids to combat "rampant abuse and inappropriate" opioid use.[120]

405.    Another example occurred in 2011, when Express Scripts Vice President of Clinical Evaluation & Policy wrote to the chair of one of Express Scripts formulary committees, stating:

> I think the overutilization of opiates continue to be a significant problem. From what I've heard, there are thoughts out there that the opiates are being greatly over-utilized by patients with chronic non-cancer pain . . . MDs should be pushing for more non-opiate pharmacotherapies and non-pharmacologic options.[121]

406.    Not only that, but the PBM Defendants were well aware for years that as many as 80% of users of illicit opioids started out using a prescription opioid. Below is a slide from a presentation by OptumRx Chief Pharmacy Officer Calabrese, quoting from a 2014 CDC study in this regard:[122]

---

[120] ESI_JEFFCOMO_000259907.

[121] ESI_JEFFCOMO_000299137.

[122] OPTUMRX_JEFFCO_0000374488 (5/8/18).

131

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 850 of 1171. PageID #: 706169



407. In 2013 Express Scripts put together the following client-facing marketing poster utilizing its own data, as well as outside sources, that not only recognized that opioid abuse was "deadlier than cocaine and heroin combined" but also recognized the pivotal role that Express Scripts plays in "collaborating to end the epidemic":

132

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 851 of 1171. PageID #: 706170



408.   Express Scripts' 2014 report, "A Nation in Pain," concluded, among other things, that "[p]rescription rates for opioids increased dramatically in the past two decades . . ." and that "[o]pioid abuse is an epidemic in the U.S."[123] "A Nation in Pain" also referenced a separate ESI study that found that 40% of opioid prescriptions filled by members with employer-sponsored drug coverage between 2011 and 2012 were written by only 5% of prescribers.[124]

---

[123] "A Nation in Pain: Focusing on U.S. Opioid Trends for Treatment of Short-Term and Longer-Term Pain, An Express Scripts Report," (Dec. 2014), https://d11tr245s7jfj6.cloudfront.net/2019-08/Opioid%20Report_0.pdf.

[124] ESI_JEFFCOMO_000003092 (12/9/14).

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 852 of 1171. PageID #: 706171

409. The PBM Defendants knew about the epidemic not only from their own data, but from other sources as well. One of these sources was almost surely their own P&T committees. These committees have historically been concerned with "the documented safety and efficacy of new drug formulations."[125] P&T committees are typically "comprised of physicians, pharmacists, and other clinicians" that meet regularly to keep up with the fast pace of pharmaceutical innovation.[126] Express Scripts, for example, describes its P&T Committee as "a panel of independent physicians and pharmacists in active clinical practice, representing a variety of specialties and practice settings and typically with major academic affiliations."[127]

410. The University of Wisconsin-Madison Division of Pharmacy Professional Development lists, among its "5 Best Practices for P&T Committee Members," the need for committee members to "be informed," "be objective," and "emphasize patient-focused outcomes."[128] In particular, to stay informed, "[t]hey should regularly seek out information from reputable sources, including peer-

---

[125] Zhixiao Wang et al., "Cost-Effectiveness Analysis and the Formulary Decision-Making Process," *Journal of Managed Care Pharmacy,* Vol. 10, no. 1, pp 48–59 at p. 48 (Jan./Feb. 2004).

[126] Peri Iz, "Study of Pharmaceutical Benefit Management," PricewaterhouseCoopers HCFA Contract No. 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/0097, p. 79 (June 2001).

[127] Express Scripts Holding Company, 2017 SEC Form 10-K, at p. 5 (Dec. 31, 2017) https://www.sec.gov/Archives/edgar/data/1532063/000153206318000004/esrx-12312017x10k.htm.

[128] UW-Madison School of Pharmacy, Division of Pharmacy Professional Development, *5 Best Practices for P&T Committee Members*, (Sep. 25, 2023), https://ce.pharmacy.wisc.edu/blog/5-best-practices-for-pt-committee-members/.

134

Case: 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  853 of 1171.  PageID #: 706172

reviewed journals, industry thought-leaders and the FDA."[129] With respect to being objective, the Division notes that "[f]ormulary decisions are objective and evidence-based."[130] When discussing the focus on patient outcomes, P&T committee members "should be focused on the quality, efficacy, and safety of the treatment patients receive."[131]

411.  Given this responsibility to stay informed, P&T committee members knew or should have known of the nationally available information regarding the risks of opioids. And through these P&T committees, the PBM Defendants knew or should have known that information throughout the relevant time period.

### 3. The PBM Defendants Failed to Timely Undertake Actions to Address the Opioid Epidemic that They Helped Create.

412.  The PBM Defendants not only had knowledge of the dangers of opioids, they had the ability and the opportunity to rein in opioid access, but chose not to.

413.  As early as 2007, Prescription Solutions, OptumRx's predecessor, identified patients engaging in doctor and pharmacy shopping for opioid analgesics as part of its Narcotic DUR program. However, the scope of the Narcotic DUR was extremely narrow: to be identified by the program, a patient had to see four or more prescribers for the exact same opioid analgesic, or fill prescriptions for the exact same opioid analgesic at three or more pharmacies, within a three-month period. And even when patients were identified under these limited criteria, the action taken was

---

[129] *Id.*

[130] *Id.*

[131] *Id.*

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 854 of 1171. PageID #: 706173

minimal. The prescribers involved received a fax or mailing with the patient drug utilization information and materials on "appropriate opioid use"—based on guidelines by the American Pain Society and the Federation of State Medical Boards, pro-opioid front groups working closely with the opioid manufacturers.[132] These mailings, unsurprisingly, did little to change prescribing patterns; if a prescriber chose to respond, he or she could simply state that the medication use was appropriate. And if the prescriber responded that further monitoring for that patient was not needed, Prescription Solutions would exclude that patient from any subsequent reports. The program did nothing to limit the quantity of opioids the prescribers could provide, nor did it identify prescriber-level red flags, such as writing the same controlled substance prescription repeatedly or writing a high ratio of controlled substance prescriptions compared to other drugs.

414.    In a 2013 email, an OptumInsight Life Sciences consultant forwarded an article to opioid manufacturer Endo indicating that CVS was cutting opioid access for "risky" prescribers and that OptumInsight could do the same: "Within our data, we can track the physicians, their # of prescriptions within the Optum database, their patients comorbidities and conditions (e.g. do their patients have pain issues?). . .  We can also track the pharmacies as well."[133]

415.    In 2013, Catamaran, a PBM that subsequently became part of Optum, promoted its ability to identify "current as well as future at-risk patients and drive

---

[132] *See id.* at 90557 and 90560.

[133] ENDO-OPIOID_MDL-02875114 (8/26/13).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 855 of 1171. PageID #: 706174

interventions in our clinical programming" based on a "dynamic rules engine that continuously scans patient data." Catamaran claimed it could identify these risks "in real time" based on just 30 days of prescription data.[134]

### a. The PBM Defendants chose not to use their claims data and their formulary and UM offerings to address overprescribing, abuse, and diversion

416. Claims data available to the PBM Defendants gave them the ability to identify opioid abuse and fraud. Having individually identifiable information for patients, physicians, and retail pharmacies allowed the PBM Defendants to analyze opioid utilization, patterns, and abuse. Yet despite having an array of available, commonly used tools to detect physician overprescribing and manage patient drug utilization, the PBM Defendants failed to timely implement opioid limits that would have drastically reduced the inappropriate prescribing and dispensing of opioids, and failed to reveal what they knew from the data they collected and analyzed so informed decisions could be made about ongoing dispensing practices and system-wide abuses. Moreover, the PBM Defendants were at the same time contracting with opioid manufacturers for payments of rebates and fees based on utilization, without restriction, of opioids.

417. The PBM Defendants have been on notice for decades that they needed to and had the ability to address the overutilization of prescription opioids, which was contributing significantly to the growing opioid crisis.

---

[134] OPTUMRX_JEFFCO_0000026040 (1/24/13).

418.    For instance, *Express Scripts' own studies dating back to at least 2002* demonstrated the effectiveness that UM tools such as prior authorizations had at decreasing inappropriate opioid overutilization.

419.    In 2002, Express Scripts researchers conducted a study to "examine the clinical and economic outcomes associated with a prior authorization (PA) requirement for OxyContin." The results of the study were: "post (PA) implementation PMPM claims and expenditures for OxyContin decreased significantly without an increase in PMPM trend. The PMPM trend in claims for other C-2 narcotics slowed. Results indicated that those who obtained PA approval were more likely to have had a pain-related diagnosis than those who did not attempt PA approval but there was no difference in pain-related health services use between the groups after PA implementation." In other words, Express Scripts' own research conducted in 2002 demonstrated that prior authorization significantly decreased inappropriate OxyContin utilization.

420.    In response to this study, Purdue executives expressed concern that the study may decrease OxyContin utilization: "The emphasis [that the study] placed on statements about areas of tolerance, safety, abuse and detailing of the product may have left the impression that other ESI Medicaid and commercial clients should consider implementation of a similar restriction on OxyContin."[135]

421.    That same year, in 2003, describing how opioids were dispensed to Medicaid patients in the State of Georgia, one Express Scripts employee noted how

---

[135] Henderson Dep. Ex. 18; Henderson Dep. Ex. 19.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 857 of 1171. PageID #: 706176

the deployment of a prior authorization process significantly curtailed OxyContin use in that state:

> Now for this particular program there was a special kind of PA [prior authorization] [for opioids] and it included quantity level limits. So what was happening in this PA was that a patient would call-in for the approval and at that time depending on their indication for short-term pain such as a fracture or long-term pain such as cancer, they would get the length of the amount of refills they get. So for the short-term they would be allotted two one-month refills for the drug. For the long-term pain they would get up to six one-month refills for the drug. So . . . we looked at the outcomes and in this case we examined pain related emergency room visits. Now understandably this is not the best way to assess a pain outcome, but we had limited data, we had to do a retrospective analysis. If we had been able to do it prospectively we would have looked at things such as quality of life and activities of daily living.[136]

422. The result of this PA program was that, "For this client, this plan, Oxycontin went from ranked number seven to number 14 in drugs spent after the PA implementation."[137] Importantly, Express Scripts "found that [these] patients who did not receive the Oxycontin did not have a greater use of medical services[,] so there was not an unintended medical consequence from this program."[138] And not only did Express Scripts "think this [Georgia] program worked," but it also declared that "this isn't just exclusive to [Express Scripts], but any PBM should be doing these things."[139] Unfortunately, it was not until fourteen years later that Express Scripts started to push clients to implement systemic opioid management tools.

---

[136] PPLPC012000061348 (6/4/03).

[137] *Id.*

[138] *Id.*

[139] *Id.*

423. In 2006, Express Scripts again conducted a study on its Medicaid population that showed the effectiveness of PA's on reducing Oxycontin utilization. Specifically, a state-run Medicaid program had been concerned about the chronic use and potential abuse of OxyContin™, a Class 2 narcotic. Express Scripts also noted that "media and legislators had raised questions regarding potential abuse of OxyContin. Express Scripts implemented a prior authorization to "limit the medication to only those patients with a demonstrated medical need" and incorporated a quantity limit. At the end of a year of this program, Express Scripts found that "patients who requested a prior authorization were more likely to have a pain-related diagnosis than those members who did not request a prior authorization after being denied at the pharmacy." Express Scripts also concluded that the "prior authorization program addressed this Medicaid program's goal of fostering appropriate pain management while not increasing the use of emergency services for pain."[140]

424. Despite knowing for decades that prior authorizations were a best practice for preventing opioid overutilization and abuse, Express Scripts failed to create or offer a standard prior authorization protocol on opioids to its clients until 2017—after the Senate had contacted Express Scripts (twice) regarding its role in the opioid epidemic.

425. To make matters worse, Express Scripts had considered implementing a prior authorization on opioids as early as 2007. Internal Express Scripts documents

---

[140] ESI_JEFFCOMO_000306081.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 859 of 1171. PageID #: 706178

reveal that Express Scripts had received "requests in 2007 for [point of sale] programs for inappropriate narcotic utilization . . . [because] a more robust standard program covering all narcotics was desired."[141] Express Scripts elected not to pursue this program.

426. Indeed, when the FDA in 2013 removed the indication for use of long-acting narcotics to treat moderate pain, Express Scripts admitted, "we don't really have a standard OxyContin PA program. Our current UM strategies are more focused on driving preferred products and managing quantities."[142]

427. Prior to 2017, whenever Express Scripts was questioned by federal or state governments or its own clients on what it was doing to combat opioid abuse, it pointed to its step therapy policy on long-acting opioids (LAO). This policy required a patient to try a generic opioid before the patient could be dispensed a brand opioid.

428. However, Express Scripts knew its LAO step policy was not created to address opioid overutilization or abuse. Rather, it was merely a cost containment and stockpiling/waste measure. In fact, in 2011, Express Scripts Vice President of Clinical Evaluation & Policy, Andrew Behm, wrote to Express Scripts Clinical Director Amy Gross asking whether the following statement in the draft Drug Trend Report was true: "Possible abuse continues to concern plan sponsors. In 2010, Express Scripts initiated a long-acting opioid strategy designed to ensure that published pain-treatment guidelines are followed." Amy Gross responded:

---

[141] ESI_JEFFCOMO_000273099; ESI_JEFFCOMO_000273100.

[142] ESI_JEFFCOMO_000169781 (9/11/13).

Case: 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  860 of 1171.  PageID #: 706179

What??? The [long acting opioid step therapy policy] has nothing to do with pain treatment guidelines. It is just generic before brand. Then we updated the OxyContin [Drug Quantity Management] to include the other long-acting meds. But again not to ensure published treatment guidelines were follow. I HATE this sentence . . .The [Step Therapy] and [Drug Quantity Management] are in place for cost-containment (generic before brand) and stockpiling/waste.[143]

429.    On its face, it is clear Express Scripts' long-acting step therapy policy was never intended to limit opioid overutilization or abuse. Generic versions of the long-acting opioids are just as addictive as the brand versions. Stepping from a generic version to a brand did not promote effective use of opioids; rather it opened the gates to the use of generic long-acting opioid given that for the most part generic versions of these drugs were unrestricted, Tier 1 status on Express Scripts' standard formularies.

430.    Express Scripts could have created a policy where the Step 1 drug for certain patients was a non-opiate product. Indeed, the same year that Express Scripts implemented its LAO step policy, Express Scripts Vice President of Clinical Evaluation & Policy, Andrew Behm acknowledged that "overutilization of opiates continue to be significant problem" and recognized that "non-opiate pharmacotherapies" should be promoted.[144] Yet, Express Scripts failed to offer a non-opiate step and opted instead to create a policy that substituted an opioid for another opioid.

---

[143] Gross Dep. Ex. 4.

[144] ESI_JEFFCOMO_000299137.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 861 of 1171. PageID #: 706180

431.   Express Scripts also failed to implement this policy during crucial years when the opioid epidemic was taking root as brand opioids (such as when OxyContin which was released in 1996) were expanding the pain treatment market and were being heavily abused and diverted. Had Express Scripts implemented a step therapy policy in the early 2000s that shifted utilization from brand opioids to non-opioid pain treatments it could have had a significant impact on the opioid epidemic. But Express Scripts failed to do so.

432.   By the time that Express Scripts enacted its long-acting opioid step policy, its financial incentives with respect to opioids had shifted and Express Scripts was making more money on generic opioids.

433.   Therefore, while Express Scripts long-acting opioid policy did nothing to address the opioid epidemic, it did shift utilization from addictive brand opioids to equally addictive generic opioids that were more profitable for Express Scripts.

434.   To make matters worse, prior to 2017, Express Scripts knew that the programs it ostensibly had in place to address opioid overutilization were failing. For example, a 2015 email from the head of Express Scripts' eFWA program to Express Scripts Vice President of Clinical Evaluation & Policy stated:

> [Express Scripts Fraud, Waste, and Abuse Department] have been seeing way to many egregious drug seeking activity over the years. So much so that it is hard to defend how our systems would allow 68 control scripts by 47 physicians, and 28 pharmacies in a year for one patient. *This is one of many that we use as examples.* My thought is to try to fix this issue as well as the patient safety concern on the front end. Who could I work with around the control substance logic at POS edit? There has to be something to stop this proactively.[145] (Emphasis added).

---

[145] Nader Dep. Ex. 10.

435. In another example, an Express Scripts fraud, waste and abuse investigation using its data mining and analytics tools for its client ███████ benefit plan found that one plan member filled 49 opioid prescriptions from 14 prescribers at 6 pharmacy locations in 14 months' time. Another ██████ member had filled 36 opioid prescriptions in just one year's time, including some 1,898 dosage units (749 days' worth) in just one year. Yet another ██████ member filled 29 opioid prescriptions in just 5 months' time. Despite these clear examples of gross over-dispensing, Express Scripts refused to change course and implement programs that it knew would have reduced inappropriate opioid utilization such as prior authorizations.

436. Had Express Scripts created and offered a robust prior authorization program on opioids in 2007 it likely would have resulted in tens (if not hundreds) of millions of fewer opioids being dispensed throughout the country, including in Plaintiff's Community and in New York.

437. For years, Optum also expressed concerns regarding implementing prior authorizations and offering other Utilization Management protocols because of lost profits.

438. For example, OptumRx would frequently put PAs on opioid products that did not offer high enough rebates, and thus use the PA to steer use to "preferred" opioids—typically OxyContin products.

439. The best example of this occurred in 2013, OptumRx created a "pay to avoid PA" program on long-acting opioids. This was not a clinical PA; instead, it was

144

a threat to extract higher rebates from the opioid manufacturers. The strategy was simple, make the opioid manufacturers "Pay to avoid a PA."[146] The PA only required documentation of failure of multiple other preferred opioids.[147]

440.   Clinically appropriate prior authorizations were not placed on Optum's highest selling long-acting Opioids for OptumRx until January 1, 2018, because the profitability of long-acting opioids would necessitate that *any* edit would need to be "thoroughly reviewed."[148] This required OptumRx to renegotiate all its current rebate agreements with opioid manufacturers.[149]

441.   OptumRx did not offer a standard prior authorization program targeting short-acting opioids until the launch of its Opioid Risk Management Program in late 2017, despite Optum being aware that opioid abuse was driven primarily by short acting generic opioids.

442.   Beyond prior authorizations, by no later than 2011, the PBM Defendants had been put on notice by the Centers for Medicare and Medicaid Services ("CMS") that all actors involved in delivery of healthcare in the United States needed to take steps to address the overutilization of prescription opioids, which was contributing significantly to the growing opioid crisis.

---

[146]      OPTUMRX_JEFFCO_0603451;      OPTUMRX_JEFFCO_0000014268; OPTUMRX_JEFFCO_0000184961.

[147] *Id.*

[148] OPTUMRX_JEFFCO_0000360057.

[149] Note, at this time Optum began offering its discount card partnership to these same manufacturers.

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 864 of 1171. PageID #: 706183

443.   In September 2011, CMS sent a memorandum to "All Part D Sponsors" (which included the PBM Defendants and/or their predecessors-in-interest) describing the agency's desire to work with them to develop policies and procedures to significantly reduce opioid abuse. This notice advised all recipients that Medicare data show overutilization of prescription opioids that is "highly indicative of drug seeking behavior due to drug abuse or diversion."[150] The PBM Defendants received the notice and were aware of the need to take action to address the opioid crisis through the use of utilization management tools. While CMS acknowledged that some Part D sponsors were employing "claim-level" controls to try to prevent opioid misuse, CMS advised that these measures do not adequately address the opioid overutilization that concerned CMS and suggested that "beneficiary-level controls" are needed, including clinical upper thresholds for appropriate dosing, beneficiary-level utilization reports that identify unusual patterns of opioid use, and denial of payment for any claims that reflect amounts in excess of appropriate clinical thresholds that cannot be justified after review.

444.   In response to feedback generated by the September 2011 notice, CMS issued another notice in December 2011. CMS assured sponsors in this notice that prompt pay regulations are not an impediment to their efforts to reduce overutilization and diversion of opioids because those regulations only apply to "clean claims" while prescriptions that raise concerns—for example, because they would

---

[150] *Id.* at 1.

Case: 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  865 of 1171.  PageID #: 706184

exceed appropriate clinical thresholds—are not "clean."[151] This notice also encouraged sponsors, including the PBM Defendants, to self-report instances of potential fraud or abuse (*e.g.*, drug-seeking behavior) and noted that mandatory reporting may be the subject of future rule-making. And CMS also advised sponsors that, while wholesale prior authorization requirements may not be implemented for "protected class drugs," sponsors can "conduct retrospective reviews on . . . protected class drugs," and where such a review reveals that opioids are being diverted or misused, the sponsor "can require documentation to determine medical necessity and may deny payment for subsequent claims if insufficient evidence is obtained to substantiate" the legitimacy of the prior opioid prescriptions. This notice further reminded sponsors, including the PBM Defendants, that they "may conduct appropriate consultations with physicians regarding treatment options and outcomes."[152] Finally, the December 2011 CMS notice suggested that sponsors should "encourage prescribers to prescribe in less than 30 days supplies" and "promote less than 30 day prescribing of drugs that are more susceptible to abuse or diversion, especially opioids."[153]

445. Likewise, in June 2012, CMS issued a draft guidance on improving drug utilization review controls. In this guidance, CMS explained that, because of sponsor comments seeking clarification of what is expected, CMS was providing a "sample

---

[151] *Id.* at 1-2.

[152] *Id.* at 2.

[153] *Id.* at 3.

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  866 of 1171.  PageID #: 706185

program" and "additional detail" on "how such a program could be implemented."[154]

This sample program called for, among other things:

- Written policies and procedures that are updated and reviewed by plan's P&T Committee;

- Establishment of "methodology to identify potential opioid overutilizers based on drug claims data through clinical thresholds and prescription patterns set by the P&T committee that would trigger case management";

- A protocol to exclude from retrospective review persons who truly need significant amounts of opioids (cancer patients, palliative care);

- Regular communication with prescribers and beneficiaries about case management actions;

- A process for data sharing among sponsors when beneficiary/patient disenrolls voluntarily from a plan; and

- Policies and procedures for reporting to appropriate agencies when overutilization occurs.[155]

446. The CMS guidance also included sample form communications that sponsors can use in implementing programs to prevent overutilization and diversion of opioids.

447. However, even with CMS calling attention to PBM Defendants' role and responsibility to prevent opioid misuse, Defendants' internal resistance to implementing policies and procedures to significantly reduce opioid abuse continued for years. For instance, in a February 6, 2017 email, Nathan Merrill, the OptumRx Manager of Clinical UM Operations, wrote to David Calabrese, the OptumRx Chief

---

[154] *Id.* at 1.

[155] *Id.* at 2-6.

Pharmacy Officer, highlighting concerns with placing prior authorization limits on the opioids Embeda (Pfizer), OxyContin (Purdue), and Opana ER (Endo) because "these are preferred products that are tied to 'significant' rebates," and that "[b]y adding a [prior authorization] to these products we jeopardize any rebates we have contracted with the manufacturer."[156]

> **From:** Merrill, Nathan <Nathan.Merrill@optum.com>
> **Date:** Monday, Feb 06, 2017, 4:09 PM
> **To:** Calabrese, David <David.Calabrese@optum.com>
> **Subject:** RE: BIC
>
> David,
>
> Venkat had concerns about adding a PA to Embeda, Oxycontin, and Opana ER since these are preferred products that are tied to "significant" rebates. By adding a PA to these products we jeopardize any rebates we have contracted with the manufacturer. I wasn't in a position to argue so I just explained that we anticipated there would likely be concerns within this class that we would address later. With BIC scheduled for this Wednesday do you think you would be able to attend to go to battle for us on this one? I know Venkat is going to say we cannot put a PA on those 3 products and I'm not sure there is anything more I can say or do to get around this. I appreciate any feedback you might have.
>
> Thank you,

448. In a later 2017 email chain, Optum employees internally discussed whether they should implement a hard limit to morphine equivalent dosing ("MED") on OxyContin 80mg to align with the 2016 CDC Prescribing guidelines if it would mean loss of rebates. In an April 14, 2017 email from Brian Sabin, the Manager of Industry Relations, he responded they should delay implementing the formulary CDC MED limits on OxyContin 80mg to "ensure we protect rebates" because "we cannot sacrifice rebates on only the 80mg strength here" as that would mean Optum would "sacrifice rebates on *all* OxyContin scripts."[157]

---

[156] OPTUMRX_JEFFCO_0000366595 (2/6/17).

[157] OPTUMRX_JEFFCO_0000107098 (4/14/17).

> Based solely on the Purdue contract, **I would highly suggest delaying the MED implementation on all clients until 1/1/2018** — as we are doing with the new criteria — so we have time to ensure we can protect rebates. Purdue has a clause built into their agreement that mandates that ALL strengths be unrestricted. So we cannot sacrifice rebates on only the 80mg strength here. We would sacrifice rebates on *all* Oxycontin scripts.

449. Even as of 2019, Optum was still profiting from keeping OxyContin on its standard formularies. In a March 2019 email exchange, Optum Director of Industry Relations Brian Sabin asked Senior Director of Industry Relations Venkat Vadlamudi whether Optum should remove OxyContin from its formularies altogether, "rebate losses be damned," noting that Purdue "basically caused the Opioid epidemic" and Optum's continued inclusion of OxyContin on its formularies was "essentially rewarding their bad behavior." He added, "From a purely PR perspective, I think it would look good on us."[158]

> **From:** Sabin, Brian
> **Sent:** Friday, March 01, 2019 8:32 AM
> **To:** Vadlamudi, Venkat
> **Subject:** Purdue
>
> I wanted to run a possible scenario past you....
>
> What do you think, rebate losses be damned, about removing Oxycontin from OptumRx PDLs? We have a branded long-acting oxycodone available on the market. Purdue has looked awful in the news since basically 2008, they basically caused the Opioid epidemic, and we're essentially rewarding their bad behavior.
>
> From a purely PR perspective, I think it would look good on us. But I also know we don't like to announce these types of decisions.
>
> **Regards,**
> **Brian Sabin**
> Director, Industry Relations | OptumRx
> 17900 Von Karman, Irvine, CA 92614
> Office 949/988-6314
> M/S#CA016-0202
> Brian.Sabin@Optum.com
> www.optumrx.com
>
> ***Our*** United Culture. The way forward.
>
> ▪ Integrity ▪ Compassion ▪ Relationships ▪ Innovation ▪ Performance

---

[158] OPTUMRX_JEFFCO_0000506200 (3/4/19).

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 869 of 1171. PageID #: 706188

450.    Senior Director Vadlamudi replied, "We as a company looked into this, but the amount of utilization on Oxycontin and the rebates we collect prevented us from doing it."[159]  Vadlamudi then adds that "maybe we can change" if Sabin "can look into it and model the scenarios":[160]

> **From:** Vadlamudi,Venkat
> **Sent:** Friday, March 01, 2019 9:44 AM
> **To:** Sabin, Brian
> **Subject:** RE: Purdue
>
> Brian,
> Valid point. We as a company looked into this, but the amount of utilization on Oxycontin and the rebates we collect prevented us from doing it.
>
> But times are different now, if you can look into it and model the scenarios, maybe we can change..
>
> Thank You,
>
> Venkat Vadlamudi

451.    Express Scripts likewise resisted limits that threatened rebates and other fees. For example, in a 2017 email chain, several Express Scripts employees derided the fact that the effort to put a prior authorization limit on OxyContin had been overruled by the ESI Value Assessment Committee. Janelle Kuntz, the Express Scripts Clinical Director for the Office of Clinical Evaluation & Policy, stated that the decision "[w]as not sitting well with me at all," and wanted it escalated "to ensure that the rebate gain outweighs the likely erosion of our reputation." Nancy Pehl, Senior Director, Drug Evaluation Unit Office of Clinical Evaluation & Policy at

---

[159] *Id.*

[160] *Id.*

Express Scripts, responded the same day that the decision "is really sad, really disheartening" and made "[n]o clinical sense to say the least."[161]

452.   For years, Express Scripts' executives observed that efforts to address opioid overutilization with respect to Medicare  were not being offered or implemented on the commercial side. In 2014, Snezana Mahon and Amanda Dwyer commented about the fact that "what is available in Medicare is not fully available in Commercial."[162] Ms. Mahon commented that Express Scripts knew that it scored poorly in these areas and have been filling out response to an RFP for the last couple years to that effect. In response, Amanda Dwyer commented that it is "unfortunate that what is available in Medicare is not fully available in Commercial, and [Express Scripts] continue[s] to just be okay with lacking in these areas."[163] Ms. Mahon echoed these comments in 2016 during Express Scripts' "Opioid Summit" in discussing what Express Scripts needed to do to address inappropriate opioid utilization, stating, "CMS put in requirements that were [opioid] solutions that were not put into commercial because we didn't invest in the other lines of business."[164]

453.   In sum, in exchange for lucrative financial benefits from the opioid manufacturers, Express Scripts and Optum have stoked the fires of the opioid epidemic by allowing unfettered access on their standard formularies to dangerous, highly addictive opioids with minimal, if any, restrictions.

---

[161] ESI_JEFFCOMO_000029940 (3/23/17).

[162] ESI_JEFFCOMO_000095166.

[163] *Id.*

[164] ESI_JEFFCOMO_000109001

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 871 of 1171. PageID #: 706190

454. That reality, however, has not deterred PBMs from publicly touting their unique ability to alter the course of the opioid epidemic.

455. On February 18, 2018, Snezana Mahon, Express Scripts Vice President of Clinical Product Development, testified before the United States Senate Committee on Health, Education, Labor and Pensions hearing titled, "The Opioid Crisis: The Role of Technology and Data in Preventing and Treating Addiction." During the hearing, Ms. Mahon testified about out how Express Scripts had the ability to "minimize early opioid exposure and prevent progression to overuse and abuse." Ms. Mahon further testified to Congress:

> Because Express Scripts interacts with patients, pharmacies, prescribers, and payers, our company is uniquely situated to collect data when patients receive and fill a prescription for an opioid under their pharmacy benefit. *We can leverage that data across the care continuum in order to design interventions aimed at preventing opioid addiction from beginning in the first place.* With 2 million Americans addicted to prescription narcotics, and more than 1,000 people treated daily in emergency departments for misusing prescription opioids, this is a $53 billion public health crisis.[165]

456. Likewise, in 2017, OptumRx announced, "By leveraging OptumRx's clinical, analytics and administrative services and its deep connections to those who can effect change—patients, providers and pharmacists—the company is uniquely positioned to help address the opioid epidemic."[166]

---

[165] Snezana Mahon, PharmD, *The Opioid Crisis: The Role of Technology and Data in Preventing and Treating* Addiction (February 27, 2018), https://www.help.senate.gov/imo/media/doc/Mahon.pdf (emphasis added).

[166] Optum, *OptumRx Opioid Risk Management Program Leads to Better Outcomes for Patients and Clients,* (Aug. 22, 2017), https://www.optum.com/about/news/optumrx-risk-management-program-leads-to-better-outcomes.html.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 872 of 1171. PageID #: 706191

457.   Optum's Chief Pharmacy Officer, David Calabrese, has made similar statements: "PBMs are uniquely positioned to connect and partner with physicians, pharmacists, patients, pharmaceutical manufacturers, health systems and other components of the industry and therefore are better able to drive improvements in education surrounding the dangers of opioid therapy, as well as the various tools available for constituents to positively change the course of this epidemic." Calabrese added, "Our nation's indiscriminate prescribing, dispensing, demand for, and consumption of prescription opioid drugs has led to a scenario in which we now consume more than 80% of the world's supply of prescription opioids and a corresponding death toll due to opioid overdose which is one of the highest in the world."[167]

458.   In March 2017, Calabrese gave a talk at a PBM trade association conference titled "Confronting the Crisis We Brought Upon Ourselves: America's Opioid Abuse Epidemic," admitting that "[w]e are all accountable . . . and all part of the solution . . .":[168]

---

[167] Managed Healthcare, *Four PBM programs poised to rein in the opioid epidemic*, (Jan. 1, 2018), https://www.managedhealthcareexecutive.com/view/four-pbm-programs-poised-rein-opioid-epidemic.

[168] OPTUMRX_JEFFCO_0000017988 (3/24/17).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 873 of 1171. PageID #: 706192



459.    Calabrese's presentation discusses the "most effective" way to "[c]lose the [f]loodgates" on opioid abuse would be to "capitalize on the enormous powers we have as a PBM in benefit management . . . to deploy much more aggressive interventions that limit exposure to these drugs . . . right out of the gate":[169]

> So now the HOW...
>
> From my own chair, the most effective way that I believe we can make the most immediate and most substantial impact on the rising prevalence of dependence and addiction is by capitalizing on the enormous powers we have as a PBM in benefit management, UM and POS claims adjudication edits to deploy much more aggressive interventions that limit exposure to these drugs, particularly in the opioid naïve patient, right out of the gate.
>
> To often we see patients going home from the doctor's office after minor acute injuries, outpt procedures, and even dental visits with excessive supplies of opioid meds.
>
> This entails...
>
> NOT days supply limits...why?...because a 7-day supply of a drug like Percocet or Vicodin (dosed 1-2 tabs Q 3-4 hrs) still can put >100 tabs/caps into the hands of pts at max dosage
> PA:
> requiring PA on all opiate-naïve pts who receive a long-acting agent regardless of qty
> PA on any opiate for a pt who is pregnant (concomitant prenatal vitamins)
> Limiting access to long-acting opioid drugs for only select med conditions where benefits may outweigh risks

---

[169] *Id.*

460. Among the tools Calabrese suggests is the use of OptumRx's "predictive modeling capabilities [to identify at-risk patients and monitor physician prescribing patterns] that will allow us much greater leverage in getting ahead of the problems for our members, before it is too late."[170]

461. The data in Calabrese's presentation, which showed the severity of the epidemic and rampant noncompliance with the CDC's 2016 recommendations on opioid prescribing, were from Optum's own claims data.

462. Speaker notes from an OptumRx sales presentation from the same time period characterize the PBM response to the opioid crisis as a "delayed reaction," declaring that "we can no longer sit idly by and watch":

> Today we are in the midst of one of the most significant healthcare crises in our nation's history, and that is our nation's opioid abuse epidemic. …

> Sadly, *unlike other crises we've faced before, this one is unique in that it is one that we have largely brought upon ourselves*. How? Through the over-promotion and over-prescribing of these drugs by our pharm mfgs and physicians; *our delayed reaction in intervening as PBMs and MCOs as our death toll rose substantially*; and our lax attitudes as a society as a whole with regard to the acceptance; consumption; sharing; storage and propere [sic] disposal of these agents when prescribed to ourselves and our family members.

> Because we all share accountability, we at OptumRx, believe we are in a unique position now (unlike that of any of our competitors) to leverage the broad capabilities across our enterprise (Rx, BH, analytics, CM, etc...) and deliver the type of end-to-end solution suite that will deliver a positive impact in decreasing *the prevalence of OUD and the fatality rate that we can no longer sit idly by and watch to continue*.[171]

---

[170] *Id.*

[171] OPTUMRX_JEFFCO_0000206573 (3/8/17) (emphasis supplied).

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 875 of 1171. PageID #: 706194

463.    Despite having been "uniquely positioned" to change the trajectory of the opioid epidemic, the PBM Defendants instead sat "idly by" for years. Even when they began to take some steps to ostensibly address the crisis, Defendants themselves recognized that these measures were ineffective. For example, a July 2016 internal ESI memorandum about the upcoming "Opioid Summit" indicated that while ESI had "several tools and solutions to identify and manage opioids . . . our solutions are sometimes disjointed and lack coordinated approaches."[172] Similarly, a 2017 presentation described ESI's existing opioid solutions as "fragmented," "disjointed" and having "no clear value prop."[173] And although Optum mailed notice letters to "outlier prescribers" in late 2016, no providers were dismissed from the network as a result of the investigation, and Optum never conducted any follow-up analysis to determine whether the letters had any impact on prescribing.

### b.    The PBM Defendants chose not to use their "Drug Utilization Review" tools to address overprescribing, abuse and diversion

464.    The PBM Defendants also had available to them their Drug Utilization Review ("DUR") programs to control the flow of opioids but chose not to use this tool either. Internal documents from the PBM Defendants show that rebate monies had a direct impact on how the PBM Defendants managed access to opioids, including their obligations to monitor on a real-time basis through concurrent drug utilization review that only safe and appropriate opioid prescriptions would be filled.

---

[172] ESI_JEFFCOMO_000028723 (7/4/16).

[173] ESI_JEFFCOMO_000179506 (3/31/17).

465.   "Concurrent DUR" or "cDUR" involves the real-time evaluation of drug therapy and intervention, if necessary, while the patient is undergoing therapy, including screening at the point of sale for potential drug therapy problems due to therapeutic duplication, age/gender-related contraindications, over-utilization and under-utilization, drug-drug interactions, incorrect drug dosage or duration of drug therapy, drug-allergy contraindications, and clinical abuse/misuse.

466.   But they refused to use cDUR to control opioid misuse because doing so would have impacted their revenue, including receipt of rebates, income generated from opioid dispensing, and other fees. For years, the PBM Defendants have failed to deploy cDUR initiatives to ensure that only appropriate opioid prescriptions were being dispensed in pharmacies across the country (including in their own mail order pharmacies). This intentional refusal by the PBM Defendants permitted the dramatic increase in medically inappropriate prescribing and dispensing of prescription opioids that contributed to the fueling of the opioid epidemic.

467.   Even when some clients attempted to place cDUR dosage limits on excessive use of opioids, Express Scripts and Optum colluded with the opioid manufacturers to push back.

468.   Even when the FDA in 2013 removed the indication for use of long-acting narcotics to treat moderate pain, Express Scripts saw no reason to change its cDUR program, acknowledging that its strategy was "more focused on driving

preferred products and managing quantities."[174] One Express Scripts employee at the time described the FDA change as "kind of a non-event."[175]

469.    Several years later, in 2016 when ESI tried to implement cDUR limits on Purdue's drugs, the manufacturer pushed back, reminding ESI that the cDUR limits (which would have restricted opioid use to acute pain, blocked opioids unless the use was for cancer or other approved uses, or required prior authorization for all opioids) would be in violation of its rebate agreement.

470.    Optum, too, was unwilling to implement robust cDUR restrictions because doing so would impact its receipt of rebates. In 2017, when OptumRx tried to implement changes which would have used cDUR to control inappropriate opioid usage, there was pushback because it would mean the loss of rebates. In response to these concerns, on March 24, 2017, SVP Calabrese raised the question whether, "[i]f our opioid mfg industry partners can't appreciate the magnitude of the problem we are facing [and] the immediacy of the need for intervention[,] . . . I would question whether they are the right partner for us longer term":[176]

---

[174] ESI_JEFFCOMO_000169781 (9/11/13).

[175] *Id.*

[176] OPTUMRX_JEFFCO_0000235659 (3/24/17).

> **From:** Calabrese, David [mailto:David.Calabrese@optum.com]
> **Sent:** Friday, March 24, 2017 7:19 AM
> **To:** Rogers, Kent D
> **Cc:** Gilbertson, Jenna M [From Catamaran]; Lahman, Robert C
> **Subject:** RE: Morphine Equivalent Dosing (MED) Edits & Trade Implications
>
> OK. Thanks.
>
> If our opioid mfg industry partners can't appreciate the magnitude of the problem we are facing; the immediacy of the need for intervention; and the clinical value of our efforts here, I would question whether they are the right partner for us longer term.

471.  Later that same day, Robert Lahman, OptumRx SVP Industry Relations, responded that "I agree with you but you also have to be mindful of our [rebate] contracts." Lahman also warned Calabrese to "[s]top with the attitude and help us make sure we are compliant with our contracts."[177]

472.  Frustrated that OptumRx would delay the changes to its use of cDUR limits resulting from what he saw as "gross overprescribing and overpromotion of these medications . . . , and the countless deaths," Calabrese later that day sent an irate response to Lahman, telling him: "Maybe you should be the one to take a step back and look at the bigger picture here. I need <u>you on board with doing your job</u> and convincing the [manufacturers] that we drive the ship here in terms of how their drugs get used, not them!"[178]

---

[177] *Id.*

[178] *Id.*

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 879 of 1171. PageID #: 706198

473. Even when products like Opana ER were being withdrawn from the market, OptumRx refused to put a PA in place that would have prevented new patients from starting on the drug because it would "put [Optum's] rebates at risk."[179]



> **From:** Calabrese, David [mailto:David.Calabrese@optum.com]
> **Sent:** Thursday, July 13, 2017 10:38 AM
> **To:** Lahman, Robert C; Dutta, Sumit [From Catamaran]; Rogers, Kent D
> **Subject:** RE: Clinical News Summary - Opana ER market withdrawal, NovoPen Echo recall, DepoCyt discontinuation, Alkeran first-time generic
>
> The drug is being removed from the market for clinical safety reasons.
>
> Why, in the best interest of the patients we serve, would we allow any new patient start on this drug between now and then??
>
> **From:** Lahman, Robert C
> **Sent:** Thursday, July 13, 2017 1:24 PM
> **To:** Calabrese, David <David.Calabrese@optum.com>; Dutta, Sumit <Sumit.Dutta@optum.com>; Rogers, Kent D <kent.rogers@optum.com>
>
> HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY        OPTUMRX_JEFFCO_0000430032
>
> **Subject:** RE: Clinical News Summary - Opana ER market withdrawal, NovoPen Echo recall, DepoCyt discontinuation, Alkeran first-time generic
>
> We currently get rebates and that would put our rebates at risk. Why would we do this before 1/1?
>
> Bob
>
> **From:** Calabrese, David [mailto:David.Calabrese@optum.com]
> **Sent:** Thursday, July 13, 2017 5:38 AM
> **To:** Dutta, Sumit [From Catamaran]; Lahman, Robert C; Rogers, Kent D
> **Subject:** FW: Clinical News Summary - Opana ER market withdrawal, NovoPen Echo recall, DepoCyt discontinuation, Alkeran first-time generic
> **Importance:** High
>
> Want to deploy an off-cycle PA ASAP to prevent any new starts from going on this product? All good with that?

---

[179] OPTUMRX_JEFFCO_0000430032 (7/19/17).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 880 of 1171. PageID #: 706199

c.   **The PBM Defendants failed to use their vast stores of data, their formulary and UM offerings, and their DURs to provide effective controls against diversion and/or to prevent the diversion and abuse of opioids**

474.   The PBM Defendants were uniquely situated to control against the abuse and diversion of opioids, but as described above, chose not to do so.

475.   As described more fully below, OptumRx provides both PBM and mail-order dispensing services. In its capacity as a mail-order dispenser, OptumRx is (and is required to be) registered with the federal Drug Enforcement Agency ("DEA"). The Controlled Substances Act ("CSA") and its implementing regulations require all registrants to provide "effective controls" against the diversion of controlled substances. 21 C.F.R. § 1301.71(a). Nothing in the CSA suggests that this obligation is limited to only certain aspects of a registrant's business. A retail pharmacy, for example, cannot satisfy its obligations by exercising controls at its dispensing counter if it is maintaining an open-air illegal drug market in its parking lot. The obligation to maintain effective controls against diversion applies to all of a registrant's activities.

476.   OptumRx failed to maintain effective controls against diversion in the operation of its PBM services. On the contrary, as detailed above, at every turn OptumRx used its standard formularies, UM tools, and DUR programs to increase the supply of opioids, without regard to abuse or diversion of these drugs. OptumRx's operation of its standard formularies, UM tools, and DUR programs was thus in violation of its obligations as a CSA registrant to provide "effective controls" against diversion. This is especially true because, as detailed above, OptumRx *knew* that its

162

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 881 of 1171. PageID #: 706200

policies resulted in diversion and *knew* that changes that it declined to make would have reduced oversupply and diversion.

477. Express Scripts used different corporate entities to operate its PBM and mail-order dispensing businesses. But Express Scripts knew that prescription opioids presented serious risks of abuse and diversion and knew that its mail-order pharmacy was required by the CSA to provide effective controls against diversion. Express Scripts also knew that it was in possession of massive amounts of data that could be used to provide such effective controls, and also knew that it had a panoply of tools at its disposal – standard formularies, UM tools, and DUR programs – all of which could be used to reduce diversion. Even if the Express Scripts entities that provide PBM services are not themselves subject to DEA oversight, those entities had parallel responsibilities to operate their PBM services with appropriate care in light of the dangers of diversion that the CSA is designed to guard against. Any controls that Express Scripts Pharmacy, Inc.; ESI Mail Pharmacy, Inc. and Express Scripts Specialty Distribution Services, Inc. (all DEA registrants) provided (assuming there were any) could not be effective while its sister companies conducted their PBM activities so as to maximize the volume of opioid sales. Either way, Express Scripts had a duty to operate its PBM business in such a way as to minimize or reduce the risks that these dangerous drugs would be diverted. All of the data available to Express Scripts was also available to its mail-order dispensing affiliates, and those entities had a duty to use that data in maintaining effective controls against diversion, but they failed to do so.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 882 of 1171. PageID #: 706201

E.      **Two Decades After They Knew Opioids Were Causing a Public Health Crisis, Express Scripts and Optum Finally Implemented Protocols to Address the Opioid Epidemic**

478.    After decades of working to increase opioid utilization, in 2017, due to mounting pressure from their clients and the federal government, Express Scripts and Optum finally implemented programs aimed at addressing opioid overutilization and abuse. Express Scripts' Advanced Opioid Management ("AOM") program started on September 1, 2017, and Optum's Opioid Risk Management ("ORM") program was offered starting in January 2018.

479.    As discussed above, as major PBMs, Express Scripts and Optum undoubtedly had knowledge of the opioid crisis years, if not two decades, earlier.

480.    Moreover, for years prior to actually implementing these programs, Express Scripts and Optum publicly touted their ability to translate the incredible amount of data it received into solutions to address pressing problems in healthcare. For example, in 2013 Forbes article titled "How Express Scripts Uses Analytics to Improve Patient Outcomes," Express Scripts Chief Information Officer, Gary Wimberly stated, "By filling 1.4 billion prescriptions per year, we have over 10 petabytes of useful data from which we can gain insights and for which we can develop solutions."[180]

481.    Express Scripts client-facing presentations echoed Mr. Wimberly's statements:

---

[180] Stacy Dep. Ex. 8.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 883 of 1171. PageID #: 706202



482. Yet, despite having access to petabytes of data for over a decade prior to rolling out the AOM (as discussed above) showing opioid overutilization and despite the PBM Defendants publicly promoting themselves as bastions of public health for years, the AOM program did not roll out to plan sponsors until 2017, at which point plans had to "buy up" to receive the program. Said another way, Express Scripts did not take action for *17 years after* it was aware of the prescription drug opioid crisis and not until after Express Scripts received an investigation inquiry from the United States Senates related to opioid overutilization and the CDC declared that addiction could occur between five days and one month.

483. As debuted on September 1, 2017, Express Scripts's AOM 1.0 program finally provided tools (such as prior authorizations) at the pharmacy level (referred

165

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 884 of 1171. PageID #: 706203

to as "point of sale" or "POS") that Express Scripts should have been offering for decades prior. Notably, the AOM program was the first time ESI had taken any direct steps to limit the quantity or flow of short acting opioids. AOM's new POS rules included the following:

- 200 MME[181] cumulative per day limit for opioid Rx's;

- Above 200 MME requires a prior authorization (PA);

- Pharmacist is alerted at 90 MME.

484. The limits were "cumulative" across all opioid medications prescribed to the patient/member and limiting opioid naïve patients to 7-day supply for short acting opioid (SAO) prescriptions. Further, the Enhanced Prior Approval applied across all Long-Acting Opioids (LAO), whether generic or brand. In addition, a new patient required first fill of a short acting opioid before using a long-acting opioid. AOM also included non-utilization management elements such as proactive member education (letter after first fill), Opioid Disposal Bags, and Physician care alerts (messaging via EMR on MED and other issues).

485. Express Scripts stated that its AOM program was "designed to align with the [2016] Centers for Disease Control and Prevention Guidelines for Prescribing Opioids for Chronic Pain."[182] The program, however, did not align with the 2016 CDC Guidelines and in fact the featured limits were excessive and

---

[181] Notably, these limits were still more than twice the limits recommended by the CDC in 2016.

[182] Blair Dep. Ex. 21.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 885 of 1171. PageID #: 706204

dangerous when compared to the CDC Guidelines. Nonetheless, Express Scripts

claimed the following successes in first six months of the program:

- 59.5% reduction in average days' supply of opioids for first time users;

- 95.9% of prescriptions that were reprocessed because of UM edits were filled for 7-day supply or less;

- only 4.1% of prescriptions were filled for more than 7 days after prior authorization process was complete;

- 87% of new opioid prescriptions written for an LAO were subsequently filled with an SAO due to new enhanced PA program.[183]

486. As of September 2019, two years after the initial AOM rollout, Express

Scripts claimed the following successes:

- 1.4 million fewer days' supply of opioids have been dispensed, while directing patients to safer, short-acting alternatives;[184]

- 40.6% reduction in average MME for new opioid users;

- 77% of patients prescribed an LAO as initial therapy were redirected to an SAO;

- 95.8% "success rate" of new members being dispensed an opioid claim at or below 90 MME.[185]

487. Subsequent AOM enhancements added new limits on fentanyl products

and opioid adjacent therapy quantity limits, as well as:

- "Initial fill days' supply rule for adults initiating opioid therapy limited to a 7-days' supply for members' first 4 fills, requiring a

---

[183] Stettin Dep. Ex. 5.

[184] Express Scripts, *17.4 Million Americans Protected from a Nationwide Health Crisis,* https://www.express-scripts.com/corporate/solutions/improving-health#advanced-opioid-management (last accessed Nov. 14, 2023).

[185] Stettin Dep. Ex 12.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 886 of 1171. PageID #: 706205

> prior authorization to exceed 28-days' supply in a 60-day period."[186]

- "[L]imiting the morphine equivalent dosing to 90 MME for patients starting on opioids. Existing users are limited to 200 MME, unless they receive a prior authorization for a higher dosage."[187]

488. By 2019, 17.4 million Express Scripts covered lives were enrolled in the AOM.

489. Optum began rolling out its own program in mid-2017, although key features did not launch until January 2018 due to concerns about OxyContin rebate impact. Optum's Opioid Risk Management offered a "Base Offering" which was the standard program that applied to all PBM clients at no additional fee.[188] There was no opt-in required. *Id.*

490. The ORM also included optional "Add-On components" which included narrow refill limits, hard edits as opposed to soft edits that were included in the Base Offering, and additional quantity limits on all LAOs.

491. The ORM Buy Up Clinical Programs consisted of targeted clinical programs that supplement the previous ORM components to ensure "maximum oversight and prevention of abuse or misuse." These programs each had an accompanying fee and included:

- Educational support for identified members;

---

[186] Blair Dep. Ex. 21.

[187] *Id.*

[188] OPTUMRX_JEFFCO_0000392019.

- Retrospective abused medication review, which included a daily claims review for concerning utilization patterns; and

- Intensive case management, which identified the highest risk members with potential for abuse.[189]

492. The ORM had a significant impact on opioid utilization across OptumRx's book of business. Five months after the soft launch of the ORM program, it achieved:

- 21% reduction in first-fill prescriptions exceeding the CDC dosing guidelines of <50 MED per day. This translated to a 93% compliance rate with CDC safe dosing recommendations;

- 11% reduction in first-fill acute opioid prescriptions written for durations in excess of CDC-recommended 7-day supply maximum, translating to a 92 percent compliance to safe duration;

- 5% decrease in opioid prescriptions for current chronic opioid utilizers issued for >90mg MED resulting in 97 percent compliance to safe dosing;

- 14% reduction in average dose across all short-acting opioid prescriptions; and

- 12% reduction in overall volume of short-acting opioid prescriptions.[190]

493. Notably, Express Scripts and Optum could have implemented these opioid reducing measures at any point over the past two decades as they tracked the opioid epidemic unfolding across the country. Quantity limits and prior authorizations have been used to control drug utilization since before Express Scripts and Optum were PBM. And the PBM Defendants have been using step therapy since the late 1990s.

---

[189] *Id.*

[190] *Id.*

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 888 of 1171. PageID #: 706207

494.    Yet, Express Scripts and Optum failed to implement their opioid programs for over a decade after their own reports, studies, and clients were alerting them to the need for an "aggressive" policy to address "rampant abuse and inappropriate" opioid use. Had Express Scripts and Optum created effective protocols to address the opioid overutilization—such as those implemented in 2017—when they first knew these drugs were causing a public health crisis, they could have significantly reduced the amount of opioids dispensed throughout the country, including in Plaintiff's Community, and reduced the harm caused by the opioid epidemic.

## F.    Even After Implementing its Opioid Risk Management Program, Optum Continued Promoting Uncontrolled Opioid Sales Through Its Cash Card and Discount Card Businesses

495.    Optum also collects set administrative fees for every opioid paid for with either its own discard cash service or by one of its administered cash cards—which are governed by either Optum Perks, LLC or Optum Discount Card Services, LLC. Cash cards do not have to adhere to formularies, nor do they have traditional utilization management controls. Cash cards played a significant role in the opioid epidemic, as they allowed patients that submitted prescriptions which exceeded their insurance plan limits a cheaper way to access opioids.[191] Cash cards could be used by anyone to purchase opioids—including individuals who do not receive benefits from Optum or UnitedHealth Group. Optum counts individuals not receiving benefits from

---

[191] Kelly Ayotte, THE HILL, *Shut the Back Door to America's Opioid Epidemic* (July 3 2018), https://thehill.com/opinion/healthcare/395401-shut-the-back-door-to-americas-opioid-epidemic/; TEVA_WV_00077495.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 889 of 1171. PageID #: 706208

Optum nor United, but still utilizing its administered cash cards, as "members" of Optum. Optum receives administrative fees and other revenue from each opioid prescription paid for with an Optum-administered cash card. Optum issues cash cards for opioids despite knowing that this allows individuals an "end run around" controls built into Optum and other payors' formularies. Further, and most importantly, cash cards are not subject to any limits, exclusions or Prior Authorization controls since members pay the entire amount of the discounted claim.

496. Optum's cash card business focus took root in approximately 2015 when it realized that an expanded Cash Card/Pharmacy Discount service was an opportunity for revenue growth (and coinciding with the Catamaran acquisition since Catamaran had a significant cash card business). This included partnering with manufacturers, including opioid manufacturers, to further empower its cash card business.[192] They explicitly communicated that their cash card business included a lack of opioid controls. Collegium, an opioid manufacturer, declined to participate in Optum's cash card program due to the lack of opioid controls. *Id.*

497. At the same time, Optum was advertising and encouraging individuals—whether they were Optum or United members or not—to use its various administered cash card and discount programs to purchase opioids.

498. In 2017, while OptumRx was publicly touting its new Opioid Risk Management Program, internal documents showed that Optum was unwilling to control any prescriptions administered by Optum Perks or Optum Discount Card

---

[192] OPTUMRX_JEFFCO_0000516126; OPTUMRX_JEFFCO_0000502380.

Services, and wanted to show that there were "no restrictions on cash cards, ever."[193]
When presented with the opportunity to block opioids on its cash cards in 2017,
Optum calculated that it would cost the business $26 million per year and as a result,
decided not to block the use of cash cards for opioid claims. By 2018, Optum served
over 3.6 million cash card "members."

499.    Despite Optum's public-facing commitment to fighting the opioid
epidemic, in June 2018, Optum refused to block opioid adjudication on its suite of
cash cards. This included a refusal by Optum, its affiliates, and its marketing
partners to cease advertising the use of Optum's suite of discount card pricing tools
to pay for opioid prescriptions.[194] The stated reason for this refusal was it would "cut
into it [sic] revenue/the admin fees Optum collects regarding opioids."[195]

500.    Optum was fully aware its cash cards were being used to abuse, divert,
and misuse opioids at that time. For example, in 2019, David Calabrese wanted to
know Optum's exposure when the FBI charged dozens of medical practitioners and
pharmacies throughout the country for the illegal prescribing of opioids.[196] An
analysis of those "exposure" claims showed a large number of these were cash card
claims administered by OptumRx.[197]

---

[193] OPTUMRX_JEFFCO0000236339.

[194] OPTUMRX_JEFFCO_00006830937.

[195] OPTUMRX_JEFFCO_00006830937.

[196] OPTUMRX_JEFFCO_0000604618.

[197] OPTUMRX JEFFCO 0000604271.

172

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 891 of 1171. PageID #: 706210

## VI.  As Mail Order Pharmacies, Express Scripts and Optum Dispensed Opioids in Violation of the Controlled Substances Act.

### A.  The Applicable Statutes

501.  In March 2016, the CDC, in order to reduce opioid addiction, overdoses, and deaths, published specific recommendations for clinicians who prescribe opioids outside of cancer treatment, palliative care, and end-of-life care. The CDC recommendations are based on "[s]cientific research [that] has identified high-risk prescribing practices that have contributed to the overdose epidemic (*e.g.*, high-dose prescribing, overlapping opioid and benzodiazepine prescriptions, and extended-release/long-acting opioids for acute pain)."[198]

502.  Congress has found that pharmacies share responsibility for the crisis: "The opioid epidemic . . . has arisen, in part, from the diversion of prescription opioids through illegal dispensing practices at pharmacies."[199]

503.  Defendants knowingly violated their duties under the federal Controlled Substances Act ("CSA") and its implementing regulations and the New York State Controlled Substances Act ("NYCSA") and New York state pharmacy laws and regulations including but not limited to 21 U.S.C.A. §§ 829, 841, 842; 21 C.F.R. §§

---

[198] *Id*. at 3.

[199] U.S. Senate Homeland Sec. & Governmental Aff. Comm., Ranking Member's Off., *Fueling an Epidemic: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement,* at p. 4 (July 12, 2017) https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/REPORT-Fueling%20an%20Epidemic-A%20Flood%20of%201.6%20Billion%20Doses%20of%20Opioids%20into%20Missouri%20and%20the%20Need%20for%20Stronger%20DEA%20Enforcement.pdf.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 892 of 1171. PageID #: 706211

1301.71, 1306.04, 1306.06; and 10 N.Y.C.R.R § 80, *et seq.,* ignoring their obligation to provide effective controls against diversion.

### 1. The Controlled Substances Act

504.    The CSA and its implementing regulations govern the manufacture, distribution, and dispensation of controlled substances in the United States. From the outset, Congress recognized the importance of preventing the diversion of drugs from legitimate to illegitimate uses. The CSA accordingly establishes a closed regulatory system under which it is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.

505.    The CSA categorizes controlled substances in five "Schedules."

506.    Schedule II (also called herein CII) contains drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence," but nonetheless have "a currently accepted medical use in treatment."[200]

507.    Schedule III contains drugs in which, although the abuse potential is less than a Schedule II drug, such abuse may lead to moderate "physical dependence or high psychological dependence." Schedule III drugs also have "a currently accepted medical use."[201]

---

[200] 21 U.S.C. § 812(b)(2).

[201] 21 U.S.C. § 812(b)(3).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 893 of 1171. PageID #: 706212

508. Schedule IV contains drugs that, although having a lower abuse potential than Schedule III drugs, still may lead to a physical or psychological dependence when abused.[202]

509. Schedule V contains drugs that, although having a lower abuse potential than Schedule IV drugs, still may lead to a physical or psychological dependence when abused.

510. The CSA makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" except as specifically authorized.[203]

511. Accordingly, the CSA requires those who manufacture, distribute, or dispense controlled substances to obtain a registration from the DEA.[204] A registrant is only permitted to dispense or distribute controlled substances "to the extent authorized by their registration and in conformity with the [CSA]."[205]

512. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription within the meaning and intent of the CSA.

513. At all times relevant to this Complaint, Defendants have registered their mail order pharmacies with the DEA in Schedule II–V controlled substances. Those DEA registrations authorize Defendants'-owned pharmacies to "dispense"

---

[202] 21 U.S.C. § 812(b)(4).

[203] 21 U.S.C. § 841(a)(1).

[204] 21 U.S.C. § 822(a).

[205] 21 U.S.C. § 822(b).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 894 of 1171. PageID #: 706213

controlled substances, which "means to deliver a controlled substance to an ultimate user … by, or pursuant to the lawful order of, a practitioner."[206]

514.    In the case of Express Scripts, the entities that are registered with the DEA are Express Scripts Pharmacy, Inc.; ESI Mail Pharmacy, Inc. and Express Scripts Specialty Distribution Services, Inc. In the case of Optum, the registered entity is OptumRx, the same entity that performs PBM services.

515.    Agents and employees of a registered manufacturer, distributor, or dispenser of controlled substances, such as a pharmacist employed by a registered mail order pharmacy like those owned by Defendants, are not  required to register with the DEA "if such agent or employee is acting in the usual course of his business or employment."[207]

516.    Under the CSA, the lawful dispensing of controlled substances is governed by 28 U.S.C. § 829 and more specifically in Part 1306 of the CSA's implementing regulations.

517.    Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician, except in an emergency. Similarly, unless directly dispensed, no Schedule III or IV controlled substance may be dispensed without a written or oral prescription from a practitioner.

---

[206] 21 U.S.C. § 802(10), *accord* 21 U.S.C. § 823(f).

[207] 21 U.S.C. § 822(c)(1).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 895 of 1171. PageID #: 706214

518.    Such a prescription for a controlled substance may only be issued by an individual who is (a) "authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession" and (b) registered with the DEA.[208]

519.    A prescription, whether written or oral, is legally valid under the CSA *only* if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."[209] Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment … is not a prescription within the meaning and intent of [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."[210]

520.    As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."[211] Thus, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

---

[208] 21 U.S.C. § 822; 21 C.F.R. § 1306.03.

[209] 21 C.F.R. § 1306.04(a).

[210] *Id.*

[211] *Id.*

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 896 of 1171. PageID #: 706215

521.    Moreover, "[a] prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually, or employed in a registered pharmacy…."[212]

522.    Pharmacists are therefore permitted to dispense a controlled substance in any given instance if, *but only if*, such dispensing would be in accordance with a generally accepted, objective standard of practice—*i.e.,* "the usual course of his [or her] professional practice" of pharmacy.[213]

523.    Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose.

524.    Unlawful dispensing of controlled substances by a pharmacist may subject the pharmacy or pharmacist to criminal actions and to civil enforcement actions for money penalties or injunctions.

525.    A pharmacy also needs to know there is a corresponding responsibility for the pharmacist who fills the prescription. The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing.  A pharmacist's corresponding responsibility extends to the pharmacy itself.

---

[212] 21 C.F.R. § 1306.06.

[213] *Id.*

526.   A pharmacy's registration can be revoked because its pharmacists have violated the corresponding responsibility rule and both the pharmacy and pharmacists may be the subject of further discipline.

527.   In addition to the CSA, Defendants were also required to comply with New York State Controlled Substances Act and pharmacy regulations, including, but not limited to, 10 N.Y.C.R.R § 80, *et seq.*  Express Scripts and Optum failed to meet these obligations.

### 2.   Pharmacies Are Obligated Not to Fill Prescriptions Until All Red Flags Are Resolved

528.   A pharmacy cannot ignore red flags indicative of abuse and diversion. On the contrary, "a pharmacist is obligated to refuse to fill a prescription if he knows or has reason to know that the prescription was not written for a legitimate medical purpose."[214] "[W]hen prescriptions are clearly not issued for legitimate medical purposes, a pharmacist may not intentionally close his eyes and thereby avoid actual knowledge of the real purpose of the prescriptions."[215] Thus, § 1306.064 requires "pharmacists [to] use common sense and professional judgment," which includes paying attention to the "number of prescriptions issued, the number of dosage units prescribed, the duration and pattern of the alleged treatment," the number of doctors writing prescriptions and whether the drugs prescribed have a high rate of abuse or

---

[214] Medic-Aid Pharmacy, Revocation of Registration, 55 Fed. Reg. 30,043-01, 30,044, 1990 WL 328750 (Dep't of Just. July 24, 1990).

[215] East Main Street Pharmacy, Affirmance of Suspension Order, 75 Fed. Reg. 66,149-01, 66,150, 2010 WL 4218766 (Dep't of Just. Oct. 27, 2010).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 898 of 1171. PageID #: 706217

diversion.[216] "When [pharmacists'] suspicions are aroused as reasonable professionals," they must at least verify the prescription's propriety, and if not satisfied by the answer they must "refuse to dispense."[217]

529. Courts, too, have recognized the obligation of pharmacies not to dispense until red flags are resolved.[218] In *Medicine Shoppe-Jonesborough*, the Sixth Circuit affirmed a pharmacy's liability for filling false or fraudulent prescriptions for controlled substances, concluding that the pharmacy violated § 829 of the CSA and 21 C.F.R. § 1306.04. The Court held "[t]he CSA forbids a pharmacy to dispense a Schedule II, III, or IV controlled substance without a prescription, 21 U.S.C. § 829(a)-(b), which 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice,' 21 C.F.R. § 1306.04(a)."[219] Prescriptions that "involved excessive" quantities of drugs and "remedies outside the prescriber's ordinary area of practice" "should have raised red

---

[216] Ralph J. Bertolino, d/b/a Ralph J. Bertolino Pharmacy, Inc., Revocation of Registration, 55 Fed. Reg. 4,729-01, 4,730, 1990 WL 352775 (Dep't of Just. Feb. 9, 1990).

[217] *Id.*; *see also* Townwood Pharmacy, Revocation of Registration, 63 Fed. Reg. 8,477-04, 1998 WL 64863 (Dep't of Justice Feb. 19, 1998); Grider Drug No. 1 & Grider Drug No. 2, Decision & Order, 77 Fed. Reg. 44,070-01, 2012 WL 3027634 (Dep't of Justice July 26, 2012); The Medicine Dropper, Revocation of Registration 76 Fed. Reg. 20,039-01, 2011 WL 1343276 (Dep't of Justice Apr. 11, 2011); Medicine Shoppe-Jonesborough, Revocation of Registration, 73 Fed. Reg. 364-01, 2008 WL 34619 (Dep't of Justice Jan. 2, 2008); United Prescriptions Services, Inc., Revocation of Registration, 72 Fed. Reg. 50,397- 01, 50,407-8, 2007 WL 2455578 (Dep't of Just. Aug. 31, 2007).

[218] *See Med. Shoppe-Jonesborough v. Drug Enf't Admin.*, 300 F. App'x 409, 413-14 (6th Cir. 2008); *United States v. Henry*, 727 F.2d 1373, 1378-79 (5th Cir. 1984); *Holiday CVS, L.L.C. v. Holder*, 839 F.Supp.2d 145, 160 (D.D.C. 2012).

[219] *Med. Shoppe-Jonesborough*, 300 F. App'x at 412.

flags at Medicine Shoppe."[220] "By filling these prescriptions anyway. . . the pharmacy not only violated its duties under federal (and state) law to ensure that only proper prescriptions were filled but also put public health and safety at risk."[221]

530.  The MDL Court has addressed this very issue. The Court unequivocally stated that "[t]here is no question that dispensers of controlled substances are obligated to check for and conclusively resolve red flags of possible diversion prior to dispensing those substances."[222]

531.  In fact, the MDL Court found that the corporate parents of chain pharmacies have an affirmative obligation under the CSA to "design and implement systems, policies, or procedures to identify red flag prescriptions."[223] The Court reasoned that pharmacies "cannot collect data as required by the statute, employ a licensed pharmacist as required by the statute, identify red flags as required by Agency decisions, but then do nothing with their collected data and leave their pharmacist-employees with the sole responsibility to ensure only proper prescriptions are filled. Possessing, yet doing nothing with, information about possible diversion would actually facilitate diversion, and thus violate the CSA's fundamental mandate that '[a]ll applicants and registrants shall provide effective controls and procedures

---

[220] *Id*. at 413.

[221] *Id*.

[222] *In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. 3d 613, 629 (N.D. Ohio 2020), clarified on denial of reconsideration, No. 1:17-MD-2804, 2020 WL 5642173 (N.D. Ohio Sept. 22, 2020). *See also City and Cnty. Of San Francisco v. Purdue Pharma L.P.*, 620 F.Supp.3d 936, 960 (N.D. Cal. 2022).

[223] *In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. at 630.

FILED: WESTCHESTER COUNTY CLERK 03/18/2024 10:23 AM    INDEX NO. 75026/2022
NYSCEF DOC. NO. 120    RECEIVED NYSCEF: 03/18/2024

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 900 of 1171. PageID #: 706219

to guard against theft and diversion of controlled substances.'" 21 C.F.R. § 1301.71(a) (emphasis added)."[224]

### 3. The CSA Applies to All Persons Who Dispense Controlled Substances

532. Courts have found that because the plain language of § 842 extends its requirements to "all persons," registrants and non-registrants alike are responsible for complying with the law.[225] Importantly, in those cases, the courts found that because the pharmacy owners, who were not registrants, essentially operated the facilities on a day-to-day basis, they were not exempted from the requirements of Section 842.[226]

533. At least one court has explicitly held that a non-registrant pharmacy owner can be held liable for dispensing controlled substances without valid prescriptions. In *United States v. City Pharmacy*, the court found that the owner of the pharmacy could be held liable in his personal capacity for violations of Section

---

[224] *Id.*

[225] *See United States v. Blanton*, 730 F.2d 1425, 1434 (11th Cir. 1984) (Section 842(a)(5) applied to a physician who was not properly registered with the DEA); *United States v. Clinical Leasing Serv., Inc.*, 759 F. Supp. 310, 313-14 (E.D. La. 1990), *aff'd*, 925 F.2d 120 (5th Cir. 1991) ("Had Congress intended to limit the applicability of § 842(a)(5) to registrants only, it would have done so"); *United States v. Stidham*, 938 F. Supp. 808, 814 (S.D. Ala. 1996); *United States v. Poulin*, 926 F. Supp. 246, 250, 253 (D. Mass. 1996).

[226] *Stidman*, 938 F. Supp. at 809, 814 (the owner of a clinic, who was not a registrant, could be liable because he "shouldered [the] responsibility [to provide a system for the control of drug traffic and to prevent the abuse of drugs] and derived the benefits and profits from operating a methadone clinic."); *Poulin*, 926 F. Supp. at 249, 253 ("Although Mattapoisett Pharmacy, Inc. was listed as the registrant, the statute specifically makes the stated obligations to produce required records applicable to all persons, not simply to registrants.").

182

842(a)(1) even though he was not a registrant and the pharmacies he owned were separately incorporated.[227] The United States brought an action alleging that City Pharmacy LLC and City Pharmacy of Charles Town, Inc. violated Section 842(a)(1) by filling illegitimate prescriptions for controlled substances that raised one or more red flags, such as customers traveling long distances or customer receiving drug cocktails.[228]

534.   The court held that Section "842(a)(1) applies to non-registrants."[229] The court continued, explaining that "because part C of the CSA applies broadly to all persons involved in the manufacture, distribution, and dispensing of controlled substances, including lay-persons, defendant Lewis may potentially be held liable for his conduct."[230] To support its conclusion, the court concentrated on defendant Lewis' involvement with the pharmacies at issue, looking specifically at his investment of the funds to organize and open the pharmacy, the active role he played in the management of the pharmacies, including overseeing the finances of the pharmacies, managing personnel, and delivering prescriptions to customers.

535.   The *City Pharmacy* court also found that the individual defendant could not use the pharmacies' separate incorporation to shield himself from CSA liability. Evaluating various legal mechanisms for piercing the corporate form, the court

---

[227] *United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2016 WL 9045859, at *4 (N.D. W.Va. Dec. 19, 2016).

[228] *Id*. at *1.

[229] *Id*. at *2 (citing *United States v. Moore*, 423 U.S. 122, 134 n.11 (1975) and *United States v. Stidham*, 938 F.Supp. 808, 813-814 (S.D. Ala. 1996)).

[230] *Id*. at *3.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 902 of 1171. PageID #: 706221

concluded that the pharmacies "were being used to evade the legal requirements within and undermine the public policy foundations of the CSA."[231] Thus, the court held, "given the nature of these criminally-grounded allegations, it is not a defense to liability in this case for defendant Lewis to assert that he is shielded by the corporate form. [The pharmacies] were allegedly the entities used to evade and subvert the requirements of the CSA."[232]

536.   Just like the defendant in *City Pharmacy*, as alleged more fully herein, Defendants have invested the funds to organize and open their mail order pharmacies and play a very active role in the management of those pharmacies, including overseeing the finances of the pharmacies, managing personnel, and delivering prescriptions to customers.

---

[231] *Id*. at *4.

[232] *Id*.; *see also Poulin*, 926 F. Supp. at 253 ("Mattapoisett Pharmacy, Inc. is also the alter ego of its sole owner, David Poulin, and thus David Poulin cannot use the corporate name to shield himself from personal liability."); S & S Pharmacy, Denial of Registration, 46 Fed. Reg. 13,051-03, 13,052, 1981 WL 96125 (Dep't of Justice Feb. 19, 1981) ("[T]he Administrator has in the past looked behind the corporate-veil to revoke or deny a registration when a responsible official of a corporate registrant has been convicted of violating the laws relating to controlled substances."); *United States v. Robinson*, No. 12-20319-CIV, 2012 WL 3984786, at *7 (S.D. Fla. Sept. 11, 2012), (finding a non-registrant owner of a pharmacy could be held liable for violations of Section 842 because the defendant was "alleged to have had responsibility over the controlled substances" and holding that "[w]here corporate officers have been in a position to prevent or correct the violations at issue, courts have found that there is individual liability under the [Section 842], which plainly applies to all 'persons.'"); *United States v. Ahmad*, No. 4:15CV-181-JM, 2016 WL 11645908, at *3 (E.D. Ark. May 2, 2016), *aff'd sub nom. United States v. United Pain Care, Ltd.*, 747 F. App'x 439 (8th Cir. 2019) (an owner receiving the "benefits and profit" of a pharmacy, but who was not a registrant or a medical professional, can be liable for violations of the CSA because he was still "responsible for making sure that [CSA] requirements were met.").

184

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 903 of 1171. PageID #: 706222

## B.    Defendants Violated the Controlled Substances Act

537.    At all times material hereto, DEA registrants like the PBM Defendants had the duty to "provide effective controls and procedures to guard against theft and diversion of controlled substances."[233] Diversion includes the use of medication outside the usual course of professional practice.

538.    The DEA has repeatedly emphasized that, as DEA registrants, pharmacies like those owned by the PBM Defendants are required to implement systems that will detect and prevent abuse and diversion and must monitor for red flags of abuse and diversion. The DEA has also repeatedly affirmed the obligations of pharmacies to maintain effective controls against abuse and diversion in regulatory action after regulatory action. According to the DEA, pharmacists are the "[l]ast line of defense."[234]

539.    The framework of state and federal statutes and regulations, along with industry guidelines, make clear that pharmacies like those the PBM Defendants own are expected to use specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription narcotics and of the risks and dangers of the abuse and diversion of prescription narcotics when dispensing of medications outside the usual course of professional practice.

---

[233] 21 C.F.R. § 1301.71(a).

[234] *See* Thomas W. Prevoznik, *Birmingham Pharmacy Diversion Awareness Conference, DEA Perspective: Pharmaceutical Use & Abuse,* at 139-40 (Mar. 28-29, 2015), https://web.archive.org/web/20160418074249/https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/conf_2015/march_2015/prevoznik.pdf.

540. Defendants were on notice that case law and administrative proceedings interpreting the CSA clearly required that their pharmacies must recognize and resolve all "red flags" indicating addiction, abuse and diversion, such as criminal, civil, or administrative actions pending against the prescriber, pattern prescribing, pharmacy shopping, doctor shipping, high abuse potential prescriptions, drug cocktails, *etc.*

541. It is not just the single red flags that make the suspicious prescriptions unresolvable, but frequently the fact that there are multiple red flags at one time. So, rather than just looking for unresolvable single red flags, Defendants should have been looking for instances when there are multiple red flags in combination, which would make these truly unresolvable. According to *Holiday CVS*:

> Professor Doering specifically identified such red flags as. . . ; the respective locations of the patient and the prescriber . . . ; that a prescriber writes for certain combinations or patterns of drugs. . . .; and multiple patients presenting "prescriptions for the same drugs, the same quantities . . . from the same doctor without any kind of variability or change considering the different patients that come into the pharmacy," thus suggesting that the physician prescribes in a "factory like manner." *Id.* Professor Doering reviewed the various spreadsheets of the prescriptions dispensed by Respondents and testified regarding whether Respondents could have lawfully dispensed various prescriptions given the red flags they presented.[235]

542. Nor would Defendants be able to dispense a prescription with multiple red flags by simply making a call to the prescriber. According to *Holiday CVS*:

> Doering explained that the pharmacist examines multiple red flags collectively, and testified that, in his opinion, contacting the prescribing physician and/or obtaining a diagnosis code would not resolve these red flags to a degree where the medications should have been dispensed. Tr. 792–93. Doering agreed that he did not know what

---

[235] *Holiday CVS*, 77 Fed. Reg. at 62,318.

measures, if any, the Respondents' pharmacists took to resolve any conflicts, or whether a patient history screen was consulted prior to the dispensing event. Tr. 868, 873. When pressed on whether the distance red flags were potentially explainable under various hypothetical scenarios involving vacation and travel, Doering had this to say: "The kinds of medications that we're talking about here are for chronic health problems and not acute health problems. So, it would be unlikely that someone comes to Florida on vacation, breaks a leg, and has to get oxycodone in these quantities and in these strengths. So it just doesn't add up."[236]

543. At all times material hereto, Defendants have been in the position to recognize those red flags listed above. All or some of those red flags were frequently present in hundreds of thousands of prescriptions its pharmacies received during the relevant time period and should have caused the PBM Defendants' mail order pharmacies to refuse to fill prescriptions and/or report the behavior. However, Defendants failed to do so.

544. The PBM Defendants, as sophisticated owners of multiple mail order pharmacies, had the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations. Each PBM, including Defendants, tracks every prescription claim it processes across all the health plans it services. Furthermore, Defendants could aggregate these data across various entities in the pharmaceutical supply chain, including drug manufacturer, pharmacies, insurers, and patients. Their own data would have allowed Defendants to observe patterns or instances of dispensing that are potentially

---

[236] *Id*. at 62,334.

suspicious, of oversupply in particular stores or geographic areas, and of prescribers or facilities that seem to engage in improper prescribing.

545. Rather than use their data to limit problematic opioid utilization or investigate outlier prescribers, Defendants sold the data to third-party vendors who in turn resold the data to drug makers like Purdue Pharmaceuticals. Drug makers used these data to stoke increased sales of opioid drugs to physicians throughout America to treat the "fifth vital sign"—requiring healthcare providers to ask every patient about their pain, given the perception at the time that pain was undertreated. Since that time, the U.S. has experienced a surge in opioid prescriptions—and, subsequently, an increase in overdoses and deaths tied to these painkillers.

546. Yet, Defendants did little to leverage their resources and troves of information to stop or further question the wildly inappropriate prescriptions being written by prescribers until well after the opioid epidemic had reached its peak.

547. Defendants did little to fulfill their duties as the last line of defense and failed to ensure that the prescriptions they were filling were issued to legitimate patients for legitimate medical purposes by practitioners acting in the usual course of professional practice, as is evident by the copious amounts of opioids being dispensed by Defendants' mail order pharmacies throughout the United States.

548. The absence of controls against diversion is not surprising, given how the PBM Defendants' mail-order pharmacies operated to push virtually all prescriptions out the door, with little or no attempts at identifying or resolving red

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 907 of 1171. PageID #: 706226

flags. The pressure on its pharmacists to fill large volumes of prescription made the performance of appropriate due diligence difficult, if not impossible.

549. For instance, employees at Express Scripts and Optum mail order pharmacies routinely complain of being under significant pressure to fill as many prescriptions as possible in as short amount of time as possible. In this vein, Express Scripts instituted a "point system" that governed the prescription-filling process in its mail order facilities. Under the point system, employees were awarded points for each prescription processed, and were given daily, weekly, or monthly point targets to reach. Employees would be able to leave early if a daily point threshold was reached and were penalized if specific point targets were not reached. Continuous point shortfalls would result in employees being placed on a "termination plan" or resulted in receiving other types of reprimands, up to and including termination.

550. This point system has acted as a carrot and stick for Express Scripts' pharmacists and technicians to fill as many opioid prescriptions as possible in as little time as possible, despite legal requirements to properly and adequately identify and resolve red flags.

551. Activities such as placing calls to physicians or patients to verify prescription information were also strictly monitored for timing and efficiency, which came at the expense of meeting industry safety standards. For prescriptions that required phone calls to verify certain information, Express Scripts required employees to make and complete 12 calls per hour (or 1 call every 5 minutes) to meet certain point goals. Employees who engaged in calls that exceeded acceptable time

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 908 of 1171. PageID #: 706227

limits were often berated or penalized by management. Employees expressed feeling extreme pressure to fill prescriptions at all costs, which reflected Express Scripts' goal of trying to fill everything it could as quickly as possible.

552. Optum's mail order pharmacies had many of the same problems. Many pharmacists and technicians were fielding upwards of 100 calls a day regarding things like prior authorizations. Even though not all calls dealt specifically with opioids, the sheer volume and pace of the calls hindered pharmacists' ability to vet each prescription carefully, as required by law.

553. Optum also required its prior authorization pharmacists to adhere to strict metrics concerning the number of cases per hour. The minimum number of cases to complete was set at seven cases per hour. This number of cases is unrealistic for a pharmacist to complete accurately and put undue pressure on pharmacists.

554. Optum prior authorization pharmacists described a pressure-filled environment to meet prior authorization quotas and address the queue of prior authorization requests. Prior authorization pharmacists were timed based on how many they reviewed per day and were ranked based on the number of requests they reviewed.

555. The pressure on mail order pharmacists was compounded by the constant threat of audits at Optum. Pharmacists were always under pressure because they were subjected to weekly audits to ensure they were meeting the required metrics. The audit would document not only total cases worked during the week, but there would be comments on mistakes, what cases were incorrect, or if any wrong

decisions were made. The consequences of a bad audit often included termination for the pharmacist.

556.   In 2017, OptumRx SVP David Calabrese emailed his colleagues that unless OptumRx addressed its mail-order opioid dispensing, "[w]e are only contributing to the worsening of the problem."[237] He noted that OptumRx was dispensing "220K opioid Rx's out of our mail facilities annually at an average number of units per Rx of 187" and warned that "[w]e are talking out of both sides of our mouths if we allow this to continue as it is."[238] Calabrese wrote, "I strongly believe this needs Exec level attention."[239]

557.   An OptumRx presentation from 2018 admits that it is a "[c]hallenge for individual rphs to identify controlled substance diversion in mail order setting," and that, prior to implementing a drug of concern review in 2018, OptumRx's pharmacists had "[n]o visibility of possible diversion indicators such as: Multiple patients with same shipping address [and] Multiple patients with same email address."[240] The document also acknowledged, "Due to lack of visibility diversion activity may occur repeatedly for an extended period of time."[241]

558.   Given that Optum and Express Scripts' mail order dispensing policies prioritized speed and efficiency above all else, some employees reported complete

---

[237] OPTUMRX_JEFFCO_0000366858 (3/10/17).

[238] *Id.*

[239] *Id.*

[240] OPTUMRX_JEFFCO_0000385779 (7/11/18).

[241] *Id.*

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 910 of 1171. PageID #: 706229

mental and physical exhaustion, continuous fear of disciplinary action, and an unrelenting pressure to fill higher volumes of prescriptions in even shorter amounts of time.

559. Defendants' mail-order pharmacy entities were subject to DEA regulatory action for their failures to implement appropriate controls on dispensing. For instance, on May 15, 2012, Express Scripts Pharmacy Services, Inc. agreed to pay the United States $2.75 million to resolve allegations under the Controlled Substance Act.[242] Among the allegations was that from 2002 through 2006, drug diversion occurred at several Express Scripts mail order facilities, including facilities in Bensalem, PA and Harrisburg, PA. Express Scripts experienced theft by employees of controlled substances, had inventory discrepancies, and failed to report in-transit losses to the DEA. According to the DOJ press release, from 2004 through 2009, Express Scripts employees utilized invalid DEA numbers in Express Scripts' computerized prescription processing system in order to process certain controlled substances prescriptions at all of its mail order facilities.

560. As part of the settlement, Express Scripts was required to develop a comprehensive Controlled Substances Security Compliance Plan that included diversion protection measures far beyond those required by law, including improved physical security, enhanced inventories, reconciliations and audits, employee

---

[242] Press Release, *United States Settles With Express Scripts Over Diversion Of Controlled Substances And Use Of Improper DEA Numbers*, U.S. Attorney's Office, E.D. PA. (May 15, 2012), https://www.justice.gov/archive/usao/pae/News/2012/May/esi_release.htm.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 911 of 1171. PageID #: 706230

background checks, and mandatory training for employees who have contact with controlled substances. Express Scripts executives, including the General Manager of Pharmacy Operations and the Chief Compliance Officer, were required to certify compliance with the terms of the Plan. In addition to the measures to protect against diversion of controlled substances, Express Scripts was also required to cease use of phony DEA numbers and agreed to set up an automated system to check the validity of prescribers' DEA and NPI (National Physician Identifier) numbers against a national registry.

561.   In addition, as discussed above, starting in the 1990s and continuing for decades, Express Scripts and/or its subsidiaries (e.g., Express Scripts Specialty Distribution Services, Inc.; Express Scripts SDS; HealthBridge, United BioSource LLC; Curascript) also worked as the administrator (e.g., processing applications, patient enrollment, patient approval, handling appeals, tracking and analyzing program data, adverse event reporting, etc.) and/or mail order pharmacy for manufacturers' opioid Patient Assistance Programs ("PAPs"), including for the troubled Purdue (OxyContin, OxyIR)  and Endo (Opana) PAPs.  In connection with its PAP dispensing for Purdue and Endo, Express Scripts routinely violated the CSA by failing to ensure that only valid prescriptions were filled, failing to provide effective controls against diversion, and/or purporting to delegate its CSA responsibilities to the manufacturers funding the respective PAPs.

562.   In connection with its opioid PAP and mail order dispensing and administration, Express Scripts routinely ignored clear indications of diversion, filled

193

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 912 of 1171. PageID #: 706231

suspicious prescriptions, and/or improperly made opioid dispensing determinations at the direction of and/or with the inappropriate input/approval from the manufacturers funding the respective PAPs. The extent to which manufacturers controlled and/or had improper input into Express Scripts' dispensing practices is illustrated by the fact that the parameters for the opioid PAP created by Purdue and Express Scripts allowed a single patient to receive an astonishing 360 tablets of OxyContin and 3,000 tablets of OxyIR a month.

563. Express Scripts' administration and improper dispensing practices relative to Purdue's and Endo's PAPs helped make the respective programs very successful marketing tools to increase opioid use, drive volume, and facilitate access to opioids including OxyContin, Opana, as well as other opioid products - resulting in Express Scripts filling 1 million+ opioid prescriptions and dispensing 100 million+ opioid pills throughout the country through these PAPs. As an illustration, in the early 2000s, Express Scripts was enrolling over 3,000 new patients per month for Purdue's PAP. Moreover, from at least the early 2000s, Express Scripts knew or should have known about the ongoing and growing misuse and diversion of opioids, and/or that its opioid PAP work was causing opioid over-prescribing, over-dispensing, addiction and/or abuse, as well as the fact that it was a proximate cause of opioid diversion.

564. The Purdue and Endo PAPs, and Express Scripts' administration and dispensing practices relative to same, raised numerous red flags, including dispensing large amounts of opioid to individuals, failing to conduct proper due

diligence on patients, inappropriately recording deaths, and rerouting prescriptions to get around state laws.

565. For example, in 2010, Purdue audited Express Scripts' administration of this program and found numerous failures by Express Scripts to properly vet PAP applicants, including failing to verify patient-doctor relationship, failing to notice obvious inconsistencies in applications, and failing to process IRS information to determine accuracy and legitimacy of the information. In fact, Purdue found that during a period of just a few months in 2010 Express Scripts dispensed more than 17,000 OxyContin pills to fraudulent PAP enrollees/applicants. Similarly, a 2010 email exchange between Purdue and Express Scripts employees outlined how a Purdue PAP patient was reportedly "selling [his PAP opioid prescriptions] on the street."[243]

566. As a result of a whistleblower lawsuit brought by two former Las Vegas mail order pharmacists, in 2006 Medco agreed to a $155 million settlement to resolve claims with the United States related to its dispensing of drugs at its mail order pharmacies. The government's complaint alleged Medco accepted payments from drug makers to favor their drugs and submitted false claims for mail order prescription drugs provided to millions of federal employees, retirees and their families. Among the allegations was that Medco's mail order pharmacies failed to conduct adequate cDUR for all prescriptions in order to identify potential adverse drug interactions. The government alleged that, as a result of the pressures to meet

---

[243] PPLPC034000383800.

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  914 of 1171.  PageID #: 706233

quotas, Medco's cDUR employees regularly: a) fabricated physician call records so as to maintain hourly call quota rates; b) completed physician calls without ever having pharmacists verify the information with the physician's office; c) changed prescriptions without a pharmacist's intervention; and/or d) falsified records to indicate cDUR calls were made to physicians when in fact these calls had not been made.

567.    At all times material hereto, the PBM Defendants' mail order pharmacies have dispensed huge quantities of opioids. For example, during the 2006 to 2014 time period alone, Express Scripts and Optum pharmacies purchased more than 27 billion MMEs, spread over more than 1.4 billion dosage units according to the DEA's Automated Reports and Consolidated Ordering System ("ARCOS").

568.    The DEA ARCOS database reveals that over 49% of the over 46 billion MMEs moved through the PBM mail order channel was purchased by Express Scripts pharmacies. Specifically, during the 2006 to 2014 time period, Express Scripts mail order pharmacies bought over 22.9 billion MMEs spread over 1.1 billion opioid dosage units.

569.    Not surprisingly, given their lengthy collaboration with regard to OxyContin, over 26% of Express Scripts pharmacies' MME purchases were for Purdue opioids.

570.    23.63% of Express Scripts pharmacies' opioid purchases were for Teva opioids; 14.38% were for Mallinckrodt opioids; 8.34% were for Endo opioids; and 4.59% were for Mylan opioids. Express Scripts pharmacies dispensed these opioid

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 915 of 1171. PageID #: 706234

products by mail to patients nationwide, including in New York and Plaintiff's Community.

571. The DEA ARCOS database also reveals that 9.6% of the over 46 billion mail-order MMEs were purchased by Optum's pharmacies. Specifically, during the 2006 to 2014 time period, Optum pharmacies bought and sold over 4.5 billion MMEs spread over 252 million opioid dosage units.

572. 21.75% of Optum's pharmacy opioid purchases were for Mallinckrodt opioids; 17.27% were for Teva opioids; 15.76% were for Purdue opioids; and 11.83% were for Endo opioids. Optum dispensed these opioid products by mail to patients nationwide, including in New York and Plaintiff's Community.

573. From at least 2008 to the present (and ongoing), Defendants violated the CSA, New York controlled substances laws (including the New York State CSA), and the United States and state (including New York) pharmacy laws and regulations by dispensing controlled substances in violation of their corresponding responsibility under 21 C.F.R. § 1306.04(a) and outside the usual course of pharmacy practice under 21 C.F.R. § 1306.06.

574. Defendants violated the CSA, New York controlled substances laws (including the New York State CSA), and the United States and state (including New York) pharmacy laws and regulations each time their mail order pharmacies filled a controlled substance prescription without identifying and resolving those red flags because, *inter alia*:

197

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 916 of 1171. PageID #: 706235

- They were knowingly filled outside the usual course of professional practice and not for a legitimate medical purpose; therefore, they were not pursuant to a valid prescription under 21 U.S.C. § 829 and thereby violated 21 U.S.C. § 842(a)(1); and

- They were knowingly and intentionally dispensed outside the usual course of professional pharmacy practice in violation of 21 C.F.R. 1306.06, and therefore such dispensing and delivering of controlled substances was not authorized by the CSA, and thereby violated 21 U.S.C. § 841(a)

575. The opioid crisis alleged herein is a direct and foreseeable result of Defendants' actions and inactions. And it was reasonably foreseeable that Plaintiff and Plaintiff's Community would be damaged thereby.

576. Defendants failed to maintain effective controls against abuse and diversion or conduct due diligence to ensure opioids were not diverted, resulting in the gross over-dispensing of opioids. Defendants thus directly contributed to today's opioid epidemic and corresponding harm to Plaintiff and Plaintiff's Community.

577. The opioid crisis alleged herein is a direct and foreseeable result of Defendants' actions and inactions. And it was foreseeable that Plaintiff and its community would be damaged thereby.

## VII. Express Scripts and Optum Contributed to the Public Health Crisis in Plaintiff's Community

578. By conspiring with and aiding and abetting the opioid manufacturers, facilitating the overprescribing and overuse of opioids, failing to address evidence of the misuse, abuse, and addiction to opioids, and failing to prevent diversion in their

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 917 of 1171. PageID #: 706236

mail order dispensing and in their pharmacy networks, Optum and Express Scripts contributed to the oversupply of opioids in New York and Plaintiff's Community, and the resulting damages and public nuisance.

579.   According to the CDC, the nation is experiencing an opioid-induced "public health epidemic." The CDC reports that over 1,000,000 people died from an overdose involving opioids from 1999 until present. Based on the latest data, approximately 3 million Americans met criteria for prescription opioid abuse and dependence in 2022. Since 1999, the amount of prescription opioids dispensed in the United States and the number of overdose deaths involving opioids have both quadrupled.

580.   In addition to the toll on families and loved ones, opioid use imposes significant economy-wide costs. The U.S. Congress Joint Economic Committee estimates the opioid epidemic cost nearly $1.5 trillion in 2020 alone, up 37% from 2017 when the CDC last measured the cost. The rise in fatal opioid overdoses in 2022 suggests the total cost is likely to continue to increase.

581.   As alleged previously herein, New York is experiencing a drug overdose epidemic which is causing devastating socio and economic consequences. In recent years, nearly 4000 New York residents have died each year from opioid overdoses.[244]

---

[244] Continuing Crisis, Drug Overdose Deaths in New York, November 2022, New York State Comptroller Thomas P. DiNapoli, https://www.osc.ny.gov/reports/continuing-crisis-drug-overdose-deaths-new-york (citing Centers for Disease Control and Prevention (CDC), National Center for Health Statistics, National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database, released in 2021. Data are from the Multiple Cause of Death Files, 1999-2020, as compiled from data

New York drug overdose deaths involving opioids increased to 85 percent in both 2020 and 2021, up from 69 percent in 2010.[245]

582.    As alleged in detail above, Plaintiff has been particularly hard hit by the opioid epidemic that Defendants caused, contributed, and maintained.

583.    While Express Scripts and Optum were reaping millions of dollars in profits from their wrongful conduct, Plaintiff has been required to allocate substantial public monies and resources to combat the opioid crisis and cope with its fallout.

584.    Plaintiff has incurred and continues to incur substantial costs because of Optum's and Express Scripts' conduct including, but not limited to, costs of increased services with respect to law enforcement and first responders, such as Plaintiff's community outreach programs; equipment and supplies; victim services support; intervention programs; and increased costs associated with its own employee benefits plan, together with general societal and lost productivity costs.

585.    Plaintiff has had to allocate extraordinary additional resources through staffing at departments providing all of the services listed above; has incurred substantial increases in overtime; and has had to re-allocate personnel.

## VIII.  Facts Pertaining to the Formulary & UM Enterprise

586.    As alleged above more fully *infra*, Express Scripts, Optum, both of their mail order pharmacies and each of the opioid manufacturers (including Allergan,

---

provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program, accessed July 11, 2022, at http://wonder.cdc.gov/mcd-icd10.html.)

[245] *Id*. at p. 1.

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 919 of 1171. PageID #: 706238

Johnson & Johnson/Janssen, Endo, Insys, Mallinckrodt, Purdue, and Teva/Cephalon, referred to collectively as the "Opioid Enterprise Manufacturers" for the purposes of this Section)formed an association in fact enterprise, the "Formulary & UM Enterprise."

587.  The Formulary & UM Enterprise was characterized by a common purpose, relationships among members of the Formulary & UM Enterprise, and sufficient longevity to accomplish the common purpose thereof. The PBM Defendants each conducted and participated in the conduct of the Formulary & UM Enterprise through concerted unlawful action.

588.  Each member of the Formulary & UM Enterprise knew that prescription opioids were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain. Each member of the Formulary & UM Enterprise was also aware that use of prescription opioids carried risks such as addiction, opioid use disorder, overdose, and death. Nevertheless, each member of the Formulary & UM Enterprise joined together into an association-in-fact enterprise for the common purpose of profiting from an expansion of the market for prescription opioids, and increased prescribing, dispensing, and sales of those drugs.

589.  That each member of the Formulary & UM Enterprise is a for-profit company and may legally pursue profits is not in dispute. However, each member of the Formulary & UM Enterprise sought to fulfill common purpose through a concerted unlawful action relating to the manufacture, importation, receiving,

concealment, buying, selling or otherwise dealing in controlled substances. Specifically, each member of the Formulary & UM Enterprise supported each other member in perpetrating a fraudulent scheme on the consumers who received prescriptions for prescription opioids, on the American public, and on the PBM Defendants' clients. Each member of the Formulary & UM Enterprise also supported each other member in possessing and dispensing controlled substances in Schedules II through IV in manners that were not authorized by the CSA.

590. Each member of the Formulary & UM Enterprise knew that prescription opioids were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain. Each member of the Formulary & UM Enterprise was also aware that use of prescription opioids carried risks such as addiction, opioid use disorder, overdose, and death. Therefore, each member of the Formulary & UM Enterprise knew that they needed to engage in a fraudulent scheme if they were going to increase the market for prescription opioids and increase their profits from prescribing, dispensing, and sales of prescription opioids.

591. For their part, the Opioid Enterprise Manufacturers" illegal marketing and false statements regarding prescription opioids have been well documented. They knew that prescriptions were dangerous and addictive and, nevertheless, marketed them as safe and non-addictive. These representations furthered the common purpose of the Formulary & UM Enterprise.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 921 of 1171. PageID #: 706240

592.    The PBM Defendants, for their part, made representations alleged, *supra*, that their businesses were committed to making decisions about their formulary and UM offerings that were driven by a commitment to the health and safety of their covered lives and were focused on delivering safe healthcare.

593.    PBM Defendants and opioid manufacturers also knew that the PBM Defendants' mail-order pharmacies were receiving prescriptions that were not for lawful orders of a practitioner. PBM Defendants and opioid manufacturers knew that the PBM Defendants' mail-order pharmacies were filling illegitimate prescriptions.

594.    By these strategies, and the activities alleged *supra* and *infra*, both the PBM Defendants and the Opioid Enterprise Manufacturers agreed to further the common purpose of the Formulary & UM Enterprise through a fraudulent scheme and unlawful possession and dispensing of controlled substances, and to grow the market for prescription opioids by increasing prescribing, dispensing, and sales of prescription opioids.

595.    As an example, the Opioid Enterprise Manufacturers contracted and agreed with each PBM Defendant to coordinate unfettered formulary placement (with no or limited) UM measures regarding each opioid drug on the PBM Defendant's standard offerings, such that there would be as little impediment as possible to opioid prescribing and dispensing. From their agreements, each member of the Formulary & UM Enterprise stood to reap significant profits from ever-increasing prescribing, dispensing, and sale of prescription opioids: the Opioid Enterprise Manufacturers from sales of their drugs and the PBM Defendants from rebates and other fees. As

part of these agreements, the PBM Defendants gave each of the Opioid Enterprise
Manufacturers parity terms, ensuring that no Opioid Enterprise Manufacturer's
opioid was disadvantaged against within each class of opioid analgesics, and provided
the Opioid Enterprise Manufacturers with data about the lives that they managed,
the prescriptions written by doctors on their plans, and assistance with pull through
contracts to assist them in pulling through the formulary decisions which would
continue to increase prescribing and sales.

596.   These contracts, and further information described below, evidence an
agreement between the PBM Defendants, their mail-order pharmacies, and the
Opioid Enterprise Manufacturers. Each PBM Defendant and each Opioid Enterprise
Manufacturer understood that the PBM Defendants were going to operate on a
fundamentally fraudulent basis. As alleged more fully *infra*, the PBM Defendants
promised their clients they would take actions that would ensure that opioid
prescribing and dispensing were safe and cost effective. The PBM Defendants also
represented to legislative bodies and the public that their conduct was intended to
maximize health, safety, and cost-effective healthcare for their covered lives.
However, the PBM Defendants had agreed with each other and the Opioid Enterprise
Manufacturers that their conduct would have the opposite effect. Instead of
prioritizing health, safety, and cost-effectiveness, the Formulary & UM Enterprise
and its members intended to obtain money and property from the prescribing,
dispensing, and sale of prescription opioids that they would not otherwise have

204

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 923 of 1171. PageID #: 706242

received had they been honest and conducted their businesses along the lines of their public representations.

597. Importantly, some of the conduct alleged, above and below, may appear to be the behavior of competitors working against each other, or of opposing parties working to secure advantage at the expense of ether other. However, each PBM Defendant worked with each Opioid Enterprise Manufacturer in negotiations that were intended to maximize the amount of profit for the PBM Defendants and the Opioid Enterprise Manufacturers. As an example described earlier, discussion of formulary status and prior authorization were always a vehicle for discussion about the amount of rebates and administrative fees. As the Opioid Enterprise Manufacturers and PBM Defendants knew and intended, the end result was always the same—agreements for favorable formulary status without UM so that prescribing, dispensing, and sales could continue to increase.

598. The similarity of conduct by each PBM Defendant, including similar contract terms, pull-through marketing, facilitating dissemination of the Opioid Enterprise Manufacturers' marketing messages, favorable formulary status, as little UM as possible, research on behalf of the Opioid Enterprise Manufacturers, and free-flowing dispensing of prescription opioids, further evidences the existence of the Formulary & UM Enterprise. Each PBM Defendant knew of the other's conduct and refrained from commenting on or revealing the behavior, and continued to engage in the same conduct so that all members of the Formulary & UM Enterprise could continue to profit from ever-increasing prescribing, dispensing, and sales.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 924 of 1171. PageID #: 706243

599.    That the PBM Defendants may have competed with each other for clients, or negotiated sharply with the Opioid Enterprise Manufacturers for increasing rebates and administrative fees did not undercut the common purpose of the Formulary & UM Enterprise because it did not slow or decrease the overall prescribing, dispensing, and sale of prescription opioids in the market as a whole. Similarly, competition among the Opioid Enterprise Manufacturers for increasing market share of their drug against a competitor's drug did not undercut the common purpose of the Formulary & UM Enterprise. For example, Purdue's competition with Endo for market share of OxyContin over Opana did not slow or decrease the prescribing, dispensing, or sale of prescription opioids as a class of drugs. Furthermore, each member of the Formulary & UM Enterprise knew that there would be competition in the market, but each member also knew that their participation in the Formulary & UM Enterprise was necessary to continue growing the market and agreed to work together towards that goal.

600.    As alleged more fully herein, the Formulary & UM Enterprise caused direct injury to Plaintiff's money and property.

## A.    Formation of the Formulary & UM Enterprise

601.    The Formulary & UM Enterprise was formed primarily in two ways, including: the forced dealing of the members with each other in the closed system of controlled substance manufacture, distribution, and dispensing, as well as the members work together in trade associations and industry working groups like the PCMA and other informal groups described below.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 925 of 1171. PageID #: 706244

602. First, the formation of the Formulary & UM Enterprise occurred, in part, through the parties' dealings with each other required by the closed system imposed by the CSA. The pharmaceutical industry is extremely insular and part of a "closed system" open only to those who register to do so. Other than their CSA obligations as mail order pharmacies, the PBM Defendants are some of the very few participants in controlled substance manufacturing, distribution and dispensing that are not required to register with the DEA. However, in their efforts to secure cost-effective access to controlled substances on behalf of their clients, the PBM Defendants were forced to work closely with the Opioid Enterprise Manufacturers.

603. Over at least the last two decades, the consolidation and acquisition of pharmacy benefit management companies into ever-larger entities has led to the formation of close personal business relationships between the few remaining PBMs and the Opioid Enterprise Manufacturers that were based on a shared interest in and the common purpose of ensuring the widespread dispensing of opioids.

604. There can be no doubt that the PBM Defendants and the Opioid Enterprise Manufacturers maintain interpersonal relationships with each other. As business entities, they have been negotiating with each other since the mid-1990s. And, as alleged above, the negotiations between the Opioid Enterprise Manufacturers and PBM Defendants often took place at, and/or involved, high level executives at both companies, a multitude of emails and phone calls, including personal calls between executives to iron out details. The contractual dealings between the Opioid Enterprise Manufacturers and the PBM Defendants created relationships and

207

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 926 of 1171. PageID #: 706245

provided context in which the common purpose of the Formulary & UM Enterprise could develop. Documents produced by the Opioid Enterprise Manufacturers and the PBM Defendants reveal that there have been decades of contract negotiations over rebate agreements, amendments, re-negotiations, payment discussions, and rebate invoicing. These contract negotiations were always geared towards maximizing the number of prescriptions written for the PBM Defendants' clients and ensure the most optimal formulary placement and least amount of UM under the PBM Defendants' standard offerings so that the prescribing, dispensing and sales could continue to grow.

605. The earliest indications of the existence of the Formulary & UM Enterprise can be found in the PBM Defendants' negotiations with Purdue, their work together on disseminating the Opioid Enterprise Manufacturers' marketing messages about prescription opioids, the presence of Purdue-paid speakers at the PBM Defendants' offices, and the PBM Defendants' research work supporting the Opioid Enterprise Manufacturers. Although the earliest indications of the Formulary & UM Enterprise's existence begin with Purdue and the predecessors of the PBM Defendants, the allegations above indicate that the Formulary & UM Enterprise grew to include all of the Opioid Enterprise Manufacturers and the consolidated PBMs now named as PBM Defendants.

606. As alleged more fully herein, various documents indicate that the Formulary & UM Enterprise found its beginnings with Purdue-sponsored doctors speaking at PBM offices, in the late 1990s, all across the country, and rebate contract

negotiations between the Opioid Enterprise Manufacturers and the PBM Defendants that began around the same time and have continued through the present.

607. The formation of the Formulary & UM Enterprise did not happen solely within the formation of the rebate contracts between the Opioid Enterprise Manufacturers and the PBM Defendants. The Formulary & UM Enterprise also continued to develop through regular non-contractual interactions in furtherance of the fraudulent scheme in: (1) interactions about the administration of the rebate contracts; (2) pull-through marketing and assistance therewith; and (3) joint participation in trade associations and informal coalitions.

608. Trade associations and informal coalitions and forums not only provide a basis for the formation of the Formulary & UM Enterprise, but also serve as central conduits for the conduct of and participation in the Formulary & UM Enterprise. The prime example of a trade association through which the Formulary & UM Enterprise developed and operated is the PBM's trade association, the Pharmaceutical Care Management Association ("PCMA").

609. PCMA describes itself as "lead[ing] the effort in promoting PBMs and the proven tools they utilize, which are recognized by consumers, employers, policymakers, and others as key drivers in lowering prescription drug costs and increasing access."[246]

610. While PCMA boasts of being the national association representing America's pharmacy benefit managers, it actually has a much broader membership

---

[246] About PCMA, https://www.pcmanet.org/about/ (last visited Oct. 11, 2023).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 928 of 1171. PageID #: 706247

base and focus. As evident from the PCMA website, PCMA membership includes member PBMs[247] and so-called "Affiliate" drug manufacturers and other entities, including numerous of the Opioid Enterprise Manufacturers as current or former members.[248]

611. As repeatedly mentioned in the PCMA's annual conference materials, the drug manufacturers are the PBMs' most notable business partners.[249]



The PCMA Annual Meeting is the industry's premier executive conference. The event is tailored specifically for senior executives from PBMs and their affiliated business partners — most notably drug manufacturers. We've designed the Annual Meeting to be an invaluable mix of core business strategy and one aspect of that industry value...

612. The PBM Defendants are members of PCMA, and due to their leadership positions, have substantial control over PCMA. Indeed, PCMA is governed by PBM executives. The current (as of December 2023) board of PCMA includes Adam Kautzner, Pharm.D. (President of PBM Defendant Express Scripts); and Dr. Patrick Conway (CEO of PBM Defendant OptumRx).

613. An image illustrating the membership in the PCMA is as follows:[250]

---

[247] PCMA Members, https://www.pcmanet.org/members/ (last visited Oct. 11, 2023).

[248] PCMA Affiliates, https://www.pcmanet.org/affiliates/ (last visited Oct. 11, 2023).

[249] PCMA Annual Meeting 2016 Conference Program Book, https://www.pcmanet.org/events/past-events/2016-annual-meeting/ (last visited Dec. 5, 2023).

[250] PCMA Annual Meeting 2016 Conference Program Book, https://www.pcmanet.org/events/past-events/2016-annual-meeting/ (last visited Dec. 5, 2023).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 929 of 1171. PageID #: 706248



614. Active control over the PCMA Board of Directors is important to the PBM Defendants and clearly conditioned on current employment by the PBM. As an example, in 2022, former Express Scripts President Amy Bricker was the former Chair of the PCMA Board of Directors and the only Express Scripts employee on the Board. But, when Ms. Bricker left Express Scripts in late 2022/early 2023, she was removed from the PCMA Board. On February 3, 2023, PCMA issued a press release, naming Mr. Kautzner to the Board and as its Chair.

615. Each year during the relevant period, PCMA has regularly held industry conferences, including its Annual Meeting and Business Forum conferences.

616. Every year, high-level representatives and corporate officers from both the PBM Defendants and the Opioid Enterprise Manufacturers have attended these

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 930 of 1171. PageID #: 706249

conferences to meet in person and engage in discussions, including those in furtherance of the Formulary & UM Enterprise.

617. In fact, many of the Opioid Enterprise Manufacturers have been "Partners," "Platinum Sponsors," or "Presidential Sponsors" of these PCMA conferences.

618. Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, as Presidential Sponsors of these conferences, the Opioid Enterprise Manufacturers were permitted to host "private meeting rooms" that offer "excellent opportunities for interactions between PBM members, drug manufacturers, and other industry partners."[251]

619. Representatives from each PBM Defendant and the Opioid Enterprise Manufacturers have routinely met during the Annual Meetings and Business Forum conferences that PCMA holds (and the manufacturers sponsor) each year.

620. In addition, all PCMA members, including Affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community."[252]

---

[251] PCMA, *The PCMA Annual Meeting 2021 Will Take Place at the Broadmoor in Colorado Springs, CO September 20 and 21,* https://www.pcmanet.org/pcma-event/annual-meeting-2021/ (an event "tailored specifically for senior executives from PBMs and their affiliated business partners" with "private reception rooms" and "interactions between PBM members, drug manufacturers, and other industry partners") (last visited Oct. 11, 2023).

[252] PCMA, *PCMA-Connect,* https://www.pcmanet.org/contact/pcma-connect/ (last visited Oct. 11, 2023).

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 931 of 1171. PageID #: 706250

621.    As PCMA members and Affiliates, the PBM Defendants and the Opioid Enterprise Manufacturers utilized both PCMA-Connect, as well as the meetings facilitated by PCMA (including at conferences), to exchange information and to reach agreements in furtherance of the Formulary & UM Enterprise.

622.    Thus, PCMA served as a conduit of information between the Opioid Enterprise Manufacturers and the PBM Defendants on subjects like access to prescription opioids.

623.    That the PCMA served as a conduit for the sharing of information, and the formation of collaborative partnerships is not reasonably disputable. PCMA hosts regular meetings during which PBMs and Opioid Enterprise Manufacturers, or "Pharma" as they are called by the PBMs, can discuss their coordinated and shared objectives/strategies. PCMA's website posts programs for its regular meetings that highlight the close and "[i]mperative" collaboration and partnership between the PBMs and the Opioid Enterprise Manufacturers. Some examples from the program agendas and/or booklets currently available on PCMA's website include:

- Hot Topics and Trends Impacting Today's PBM and Pharma Strategies;[253]

- Meeting Patients Where They Are: Pharma and PBMs working to close gaps in care in the post pandemic era;[254]

---

[253] PCMA Business Forum 2023, Conference Program Agenda for Monday, February 27, available at https://www.pcmanet.org/events/past-events/pcma-business-forum-2023/ (last accessed on December 1, 2023)

[254] PCMA Annual Meeting 2022, Conference Program Book at p. 4, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2022/ (last accessed on December 1, 2023).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 932 of 1171. PageID #: 706251

- Unlocking the Value of PBM and Small Manufacturer Relationships;[255]

- Manufacturers and PBMs Working Together to Reward Innovation;[256]

- PBM & Pharma Priorities, Opportunities and Challenges in 2022 and Beyond;[257]

- PBM and Pharma Collaboration: Focusing on Patients and Value;[258]

- Collaboration Imperative—Identifying the Shared Interests of PBMs and Pharma;[259]

- Market Dynamics Driving the PBM and Pharma Relationship;[260]

- The Future of PBM-Pharma Relations and Negotiations;[261]

---

[255] PCMA Business Forum 2022, Conference Program Book at p. 6, available at https://www.pcmanet.org/events/past-events/pcma-business-forum-2022/ (last accessed on December 1, 2023).

[256] PCMA Annual Meeting 2022, Conference Program Book at p. 6, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2022/ (last accessed on December 1, 2023).

[257] PCMA Annual Meeting 2021, Conference Program Agenda for Tuesday, September 21, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2021/ (last accessed on December 1, 2023).

[258] sPCMA Business Forum 2020, Conference Program Book at p. 3, available at https://www.pcmanet.org/events/past-events/spcma-business-forum-2020/ (last accessed on December 1, 2023). Although this event was cancelled due to the pandemic, it still corroborates the view shared by PBMs and Opioid Manufacturers that they are collaborating.

[259] PCMA Annual Meeting 2019, Conference Program Book at p. 4, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2019/ (last accessed on December 1, 2023).

[260] PCMA Annual Meeting 2019, Conference Program Book at p. 6, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2019/ (last accessed on December 1, 2023).

[261] sPCMA Business Forum 2019, Conference Program Book at p. 4, available at https://www.pcmanet.org/events/past-events/business-forum-2019/ (last accessed on December 1, 2023).

- How Health Care Companies are Using Data and Predictive Algorithms to Identify and Address the Opioid Crisis;[262]

- State of the PBM-Manufacturer Partnership;[263]

- Confronting the Crisis We Brought Upon Ourselves: America's Opioid Abuse Epidemic;[264]

- The PBM/Pharma Relationship in the Era of High Price Drugs;[265] and

- PBMs, Specialty Pharmacies and Pharma Program Alignment—Affordability, Adherence and Outcomes.[266]

624. Notably, PCMA only publishes the agendas and booklets from its regular meetings going back to 2014. Plaintiff is informed and believes that similar meetings would have been held, and topics discussed throughout the entirety of the relevant discovery period.

625. Given the foregoing, it is not surprising that Purdue viewed PCMA as a valuable source of information and coordination on subjects regarding prescription opioids and OxyContin. As examples, Purdue employees were notified about meetings

---

[262] sPCMA Business Forum 2018, Conference Program Book at p. 2, available at https://www.pcmanet.org/events/past-events/business-forum-2018/ (last accessed on December 1, 2023).

[263] PCMA Annual Meeting 2017, Conference Program Book at p. 3, available at https://www.pcmanet.org/events/past-events/annual-meeting-2017/ (last accessed on December 1, 2023).

[264] sPCMA Business Forum 2017, Conference Program Book at p. 3, available at https://www.pcmanet.org/events/past-events/business-forum-2017/ (last accessed on December 1, 2023).

[265] PCMA Annual Meeting 2016, Conference Program Book at p. 3, available at https://www.pcmanet.org/events/past-events/2016-annual-meeting/ (last accessed on December 1, 2023).

[266] PCMA Annual Meeting 2014, Conference Program Book at p. 10, available at https://www.pcmanet.org/events/past-events/2014-annual-meeting/ (last accessed on December 1, 2023).

at the PCMA conference in 2001 that discussed "oxy attacks as a predatory action on the part of the media or one of your competitors," and Burt Rosen (another Purdue employee) reached out to PCMA in 2014 to find the right person to connect with "on opioids."[267]

626.  More broadly, produced documents show that PCMA  served as a clearinghouse for communication, discussion, consensus building and speaking on behalf of the PBM Defendants and the Opioid Enterprise Manufacturers who were Affiliate members. Documents confirm that PCMA was a conduit through which discussions occurred and consensus could be reached (including discussion between the PBM Defendants outside of official PCMA correspondence) and that specific discussions and work took place around efforts to curb opioid abuse (which would have worked against the common purpose of the Formulary & UM Enterprise).

627.  PCMA was not the only way in which the PBM Defendants and the Opioid Enterprise Manufacturers collaborated. Additional documents show that the members of the Formulary & UM Enterprise knew how to, and did form, ongoing informal coalitions that for years met regularly to work on issues of common concern and advance their common interests. These documents show that a Controlled Substances Stakeholder's Coalition was formed in October 2013 in order to "further collaborate on interprofessional efforts to combat the United States opioid epidemic." At the time of the Coalition meeting in December 2016, these meetings had been

---

[267] PDD8801103934 (3/16/01); PPLPC018001107944 (10/2/14).

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 935 of 1171. PageID #: 706254

ongoing for at least three years with each organization providing "updates for increasing awareness and decreasing misuse and diversion."[268]

628. Express Scripts claimed that it was making recommendations to physicians that had substantially decreased opioid prescriptions and taking actions to increase depository sites for drug disposal.[269] As alleged more fully herein, however, documents confirm that Express Scripts and OptumRx were at the same time, in order to protect their shares of rebates and other fees, actively working with the Opioid Enterprise Manufacturers in the Formulary & UM Enterprise to avoid taking actions that would have reduced prescribing, thus ignoring their obligations to reduce unsafe and inappropriate prescribing.

629. Finally, documents will show that groups like PCMA supported the formation of the Formulary & UM Enterprise and agreements within it:

- "The Coalition discusses the terms 'drug abuse' and 'addiction' versus 'substance use disorder,' . . . and agreed";

- "Members then discussed the purpose of the slide deck . . . and agreed";

- "Additionally, the Coalition discussed various communication strategies . . . . Members agreed"; and

- "Members unanimously agreed that further meetings were necessary to ensure that continued progress would be made."[270]

---

[268] *Id.*

[269] *Id.*

[270] *Id.*

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  936 of 1171.  PageID #: 706255

630.  Members of the Formulary & UM Enterprise also participated in similar stakeholder meetings directly and/or through PCMA regarding topics like red flags and warning signs related to prescribing and dispensing controlled substances. The express purpose of these stakeholder meetings was to foster open channels of communication, foster understandings, and to discuss collaborative actions.  Notably, membership in some stakeholders meetings and working groups included some of the Opioid Enterprise Manufacturers' front groups and trade association (PhRMA), opioid distributors, the National Association of Chain Drug Stores, and other PBMs and pharmacies.

631.  The foregoing facts, and as alleged in more detail herein, demonstrate that the Formulary & UM Enterprise arose from personal business relationships developed between the enterprise members in various ways over the course of at least the last two decades.

## B.  The Common Purpose and Fraudulent Scheme of the Formulary & UM Enterprise

632.  The personal business relationships that formed the Formulary & UM Enterprise also allowed for the formation of a common purpose between the Opioid Enterprise Manufacturers and PBM Defendants in the Formulary & UM Enterprise. Specifically, the Formulary & UM Enterprise was formed for the common purpose of illegally and fraudulently profiting from an expansion of the market for prescription opioids, and increased prescribing, dispensing, and sales of those drugs. As alleged more fully herein, the fraudulent scheme that furthered the common purpose of the Formulary & UM Enterprise relied on fraudulent representations from each PBM

Defendant to each one of its clients and to the public that it would structure formulary offerings and perform cDUR benefit services in the interests of its clients and patients to ensure that opioids were prescribed and dispensed only for safe and legitimate reasons. Instead of providing standard formulary and UM offerings that were in their clients' best interests or for safe and legitimate reasons, the PBM Defendants made decisions that gave the Opioid Enterprise Manufacturers and their prescription opioids unfettered and preferred formulary access, without utilization management, and did not disadvantage any opioid compared with another in the same class or formulary tier, agreed to parity treatment for opioids within the same class and/or formulary, supported the Opioid Enterprise Manufacturers' pull-though marketing, pocketed enormous rebates and other fees, and (through its mail order pharmacies) dispensed prescription opioids without conducting the necessary due diligence.

633. Each member of the Formulary & UM Enterprise played a part and furthered the common purpose of the Formulary & UM Enterprise.

634. For their part, the Opioid Enterprise Manufacturers have been engaged in fraudulent conduct related to the marketing of prescription opioids beginning in the mid-1990s. As alleged by multiple entities and proven through extensive briefing, the Opioid Enterprise Manufacturers engaged in a fraudulent scheme in furtherance of the fraudulent scheme, to grow the market for prescription opioids through the use of branded and unbranded marketing materials, key opinion leaders ("KOLs") to give speaker presentations and publish about prescription opioids, and front groups which

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 938 of 1171. PageID #: 706257

would contribute to and publish books, articles, documents, etc., all of which misrepresented the benefits and risks of prescription opioid use.

635. The Opioid Enterprise Manufacturers commonly made the same misrepresentations through common KOLs and Front Groups. For example, each of the Opioid Enterprise Manufacturers made repeated misrepresentations about the risks and benefits of prescription opioids, including:

(a) The risk of addiction from chronic opioid therapy is low;

(b) To the extent there is a risk of addiction, it can be easily identified and managed;

(c) Signs of addictive behavior are "pseudoaddiction," requiring more opioids;

(d) Opioid withdrawal can be avoided by tapering;

(e) Opioid doses can be increased without limit;

(f) Long-term opioid use improves functioning;

(g) Alternative forms of pain relief pose greater risks than opioids;

(h) OxyContin provides twelve hours of pain relief; and

(i) New formulations of certain opioids, labeled abuse deterrent, successfully deter abuse.

636. Each of the Opioid Enterprise Manufacturers made nearly identical representations about their branded drugs and/or unbranded prescription opioids as a class of drugs during the relevant time period.

637. Each of the Opioid Enterprise Manufacturers used similar Front Groups to promote prescription opioid use. As examples, multiple of the Opioid Enterprise Manufacturers used Front Groups including, as examples, the following: the

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 939 of 1171. PageID #: 706258

American Pain Foundation, the American Academy of Pain Medicine, the American Pain Society, Federation of State Medical Boards, the Alliance for Patient Access, the United States Pain Foundation, the American Geriatric Society, and the National Initiative on Pain Control.

638.  The Opioid Enterprise Manufacturers took an active role in guiding, reviewing, and approving many of the false and misleading statements issued by the Front Groups, ensuring that the Opioid Enterprise Manufacturers were consistently in control of their content and that it stayed on message in favor of more opioid prescribing. The Opioid Enterprise Manufacturers exercised control over and adopted their false and deceptive messages and acted in concert with the Front Groups and, through the Front Groups, with each other to deceptively promote the use of prescription opioids.

639.  Each of the Opioid Enterprise Manufacturers used similar Key Opinion Leaders and the strategy of paying opinion leaders and speakers who favored aggressive treatment of pain with prescription opioids. Pro-opioid doctors have been at the hub of the Opioid Enterprise Manufacturers' well-funded, pervasive marketing scheme since its inception and were used to create the grave misperception that opioids were safe and efficacious. As examples, multiple Opioid Enterprise Manufacturers used similar Key Opinion Leaders including, but not limited to: Dr. Russell Portenoy, Dr. Lynn Webster, Dr. Perry Fine, and Dr. Scott Fishman.

640.  Each of these Key Opinion Leaders and numerous other, lower profile doctors, were paid to speak on behalf of prescription opioids as an unbranded class of

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 940 of 1171. PageID #: 706259

drugs. They were used extensively to present the appearance that unbiased and reliable medical research supported the broad use of prescription opioids. These pro-opioid doctors also began to write, consult on, edit, and lend their names to books and articles, they gave speeches, they served on committees, etc., all the while encouraging the use of prescription opioids.

641.  The Opioid Enterprise Manufacturers' marketing conduct did not end with the KOLs and Front Groups—they were merely one of the vehicles for the dissemination of the misrepresentations. The Opioid Enterprise Manufacturers also used branded and unbranded advertising and marketing; funded, edited and distributed pro-opioid publications; speakers bureaus and continuing education programs. Examples of speakers bureaus and continuing medical education events occurring at the PBM Defendants' facilities are found throughout document productions from the Opioid Enterprise Manufacturers.  Furthermore, as alleged above, the PBM Defendants often facilitated and/or disseminated the Opioid Enterprise Manufacturers' marketing messages directly to doctors who prescribed for patients covered by the PBM Defendants' clients.

642.  One of the primary means by which the Opioid Enterprise Manufacturers disseminated their messaging about prescription opioids was through drug detailing: the practice of sending out pharmaceutical company representatives to provide details about specific branded products in order to persuade prescribers to begin writing (or write more) prescriptions for a specific product.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 941 of 1171. PageID #: 706260

643. The Opioid Enterprise Manufacturers adopted detailing as a key component of their prescription opioids strategy early on to capitalize on the fraudulent unbranded marketing—developing carefully crafted marketing messages and tactics to deliver messages to prescribers through close relationships with sales representatives.

644. Drug detailing is data driven, requiring identification of the prescribers who are writing high or low volumes of prescriptions, targeting places where additional messaging might be affecting and to test the effectiveness of messaging. In accordance with common industry practice, the Opioid Enterprise Manufacturers purchased and closely analyzed prescription sales data from companies like IMS Health (now IQVIA) and the PBM Defendants which allowed them to track— precisely—the rates of initial and renewal prescribing by individual prescribers.

645. The nexus between data and detailing helped drive the formation of the common purpose of the Formulary & UM Enterprise. In return for data and unfettered formulary placement from the PBM Defendants, the Opioid Enterprise Manufacturers were willing to pay higher rebates and other fees to each PBM Defendant.

646. Once that occurred, the PBM Defendants once again supported the Opioid Enterprise Manufacturers' fraudulent marketing regarding prescription opioids. After the Opioid Enterprise Manufacturers obtained the PBM Defendants' data and favorable formulary placement, the Opioid Enterprise Manufacturers' sales personnel immediately began to analyze their managed care or PBM data in order to

223

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 942 of 1171. PageID #: 706261

"pull through" the formulary placement in order to drive increased sales. Documents produced from the Opioid Enterprise Manufacturers and PBM Defendants are replete with examples of pull-through initiatives touting the beneficial formulary placement of Opioid Enterprise Manufacturers' drugs to drive increased sales and use of the PBM Defendants' data to maximize the pull through effort.

647.    These documents make clear that the formulary placement was viewed as a "win" and an opportunity to make the rebate agreements profitable by pulling through sales. Sophisticated presentations outlining the exact steps a sales representative should take were often included in the sales training materials. The impact of these agreements and the ability to pull-through increased sales using the PBM data was dramatic:



271

648.    Using the "Best Practices Identified" of: 1. Identifying the local UHC MC Opportunity; 2. Targeting the Right UHC Customer; 3. Hyper Targeting; 4.

---

271 ENDO-CHI_LIT-00046379, slide 7.

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 943 of 1171. PageID #: 706262

Delivering the Right Message; and 5. Consistent Cross-Functional Communication[272]

– the Pittsburgh District experienced dramatic growth in sales, as described by Endo:



273

649. Formulary wins were a boon for each member of the Formulary & UM Enterprise. Each prescription opioid that enjoyed a favorable formulary placement, or continued to enjoy prescribing and dispensing without UM, ensured that all prescription opioids would continue to enjoy unrestricted sales due to the privity clauses that the PBM Defendants agreed to with each Opioid Enterprise Manufacturers. And, as indicated by the graph cited above, these wins increased sale. And, by increasing sales, the wins increased profits for the Opioid Enterprise Manufacturers whose drugs were sold and for the PBM who received rebates and administrative fees tied to sales. From that perspective, the graph above is literally evidence of the Formulary & UM Enterprise and its common purpose.

---

[272] *Id*. at slide 10.

[273] *Id*. at slide 9.

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  944 of 1171.  PageID #: 706263

650.  As alleged in more detail herein, the PBM Defendants took on obligations to perform and made representations that they would conduct point-of-sale review and take actions to ensure that only safe and legitimate prescriptions were being filled when they had no intention of doing so. Had the PBM Defendants taken the actions they had promised their clients, it would have dramatically reduced medically inappropriate prescribing, sales and dispensing of prescription opioids. As alleged more fully herein, the PBM Defendants' failure to do so had a significant role in allowing opioids to flood into communities across America, including into Plaintiff's Community.

651.  The PBM Defendants also paid lip service to their commitment to taking action about prescription opioids. For example, Express Scripts represented in 2013 that it was "leading the fight against prescription drug fraud, waste and abuse."[274] Optum submitted its opioid use/risk management plan for consideration by the National Alliance of Healthcare Purchaser Coalitions, claiming that its program focuses on preventing misuse by educating care providers and consumers, minimizing early exposure and promoting alternative treatments for pain while advancing best practices and made multiple representations about itself and its programs during the presentation. Similar representations were made on OptumRx's website, touting its expertise and commitment to fight the opioid epidemic and demonstrating expertise in opioid management: "Optum Rx® implements a multi-dimensional Opioid Risk

---

[274] PPLPC019000862211 (11/18/13).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 945 of 1171. PageID #: 706264

Management solution to help curb the rising tide of opioid abuse across the United States . . . as part of its commitment to drive opioid safety and prevention."[275]

652.     But the PBM Defendants' claims that they were addressing fraud, waste, and abuse were only empty promises. For example, one former Fraud, Waste and Abuse investigator for Express Scripts from 2013 to 2019, Confidential Informant No. 1 (CI-1), explained that even when they identified blatant instances of pill seekers and pill mill doctors, nothing happened. "No one really cared," he said. "No one really followed up on anything. The members were just like a number. We'd totally forget this was a human being because it was just a case number. We'd just look at it, type it up and it was gone. They never got the help they needed. I never heard this person is in rehab."

653.     Moreover, as far as CI-1 knew, none of his findings were ever shared with law enforcement, even if it involved well documented pill mill doctors or pill seekers.

654.     CI-1 explained that, when he was hired, he thought he would be investigating "serious major fraud, all of these people writing all of these false prescriptions," he said. "I just thought it was more investigation stuff." They would re-run patients and doctors' names every five months, he said. "We'd see the same people over and over," he said. "Just because we identified the behavior didn't mean it stopped. We'd just call the doctors, and they didn't even care. They just felt this

---

[275] Optum, "White Paper: Working to end the opioid epidemic" at. 7 (2018) https://www.optum.com/content/dam/optum3/optum/en/resources/white-papers/opioid-whitepaper-wf914999.pdf  (last visited Oct. 11, 2023).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 946 of 1171. PageID #: 706265

patient was in pain, but we're not going to do anything about it. It wouldn't be rare to have [the bad doctors] written up twice in a year. . . . I'd say 90 percent of the reports never got read in my opinion. . . . Let's say I spent months, sometimes weeks on a report—it's being written for the manager. It really doesn't go anywhere else."

655. Similarly, PCMA and some of its PBM members participated in coalitions or external activities indicating that they were "increasing awareness and decreasing misuse."[276] However, the internal documents produced by the PBM Defendants show a different story and uncover the fraudulent nature of the PBM Enterprises. The PBM Defendants did not make decisions based on the terms of the contracts with their clients or in order to fight drug abuse and/or diversion. Rather, the PBM Defendants made decisions in order to protect their rebates and generate profit, despite concerns about prescription opioids and the companies that sold them.

656. The PBM Defendants hid these facts from their clients. In a telling exchange in 2002, when Highmark Blue Cross Blue Shield decided it would put a 300mg daily limit on a drug, Medco pushed back because this meant that Medco would lose Purdue rebates if there was a limit below 320mg per day. Here, as alleged, was evidence that an action could have been taken to drastically limit inappropriate prescribing, sales and dispensing, but it was ignored in favor of the action that advanced the common purpose of the Formulary & UM Enterprise. Instead of taking action to limit medically unnecessary and inappropriate prescribing, sales and

---

[276] CAH_MDL2804_01524873 (12/15/16) (also indicating that Express Scripts had "[d]eveloped a matrix for making recommendations).

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  947 of 1171.  PageID #: 706266

dispensing, an August 18, 2002, email from Purdue National Account Director Bernadette Katsur reveals that a Medco Vice President convinced its client—Highmark—to drop its daily dosage limit.

657.  Documents created in the mid-2010s confirm that the PBM Defendants regularly delayed taking actions that could have dramatically reduced medically inappropriate prescribing, sales and dispensing despite promises from the PBM Defendants to do the same.

658.  As an example, a November 3, 2016, email from Bob Lahman, Trade Relations VP at OptumRx explained that OptumRx had agreed to forego measures that would have used prior authorization as a tool to control the prescription of opioids. The explanation reveals how closely each Opioid Enterprise Manufacturer worked with each PBM Defendant: "It was not unusual for any manufacturer to not want a PA on their product, especially if it was a small molecule product, and very few would have agreed to a rebate where they did not have unrestricted access (no PAs or steps (sic) edits)."[277]  Emails like this, and others cited throughout this complaint, demonstrate that the PBM Defendants and the Opioid Enterprise Manufacturers all had an understanding of the game—the end goal was increasing prescribing, dispensing, and sales through favorable formulary access without UM, and the means to that end goal was pay rebates and administrative fees.

659.  When the pressure began mounting to limit access to prescription opioids by use of UM measures like prior authorization, step edit, or days' supply

---

[277] OPTUMRX_JEFFCO_0000446761 (11/3/16).

limits, there were serious concerns expressed in 2017 within OptumRx about the impact on the "significant" rebates being received from the drug makers:

**From:** Merrill, Nathan <Nathan.Merrill@optum.com>
**Date:** Monday, Feb 06, 2017, 4:09 PM
**To:** Calabrese, David <David.Calabrese@optum.com>
**Subject:** RE: BIC

David,

Venkat had concerns about adding a PA to Embeda, Oxycontin, and Opana ER since these are preferred products that are tied to "significant" rebates. By adding a PA to these products we jeopardize any rebates we have contracted with the manufacturer. I wasn't in a position to argue so I just explained that we anticipated there would likely be concerns within this class that we would address later. With BIC scheduled for this Wednesday do you think you would be able to attend to go to battle for us on this one? I know Venkat is going to say we cannot put a PA on those 3 products and I'm not sure there is anything more I can say or do to get around this. I appreciate any feedback you might have.

Thank you,

_____

Nathan Merrill, PharmD, CGP | OptumRx
Manager, Clinical UM Operations

[278]

660. Later, OptumRx employees discussed whether they would be willing to put a hard limit on morphine equivalent dosing (MED) on OxyContin 80mg to align with the 2016 CDC Prescribing Guidelines. The discussion was immediately interrupted by Brian Sabin, Manager of Industry Relations, who explained that they needed to delay implementation to "ensure we protect rebates" because "we cannot sacrifice rebates on only the 80mg strength here" as that would mean OptumRx would "sacrifice rebates on *all* OxyContin scripts."[279]

---

[278] OPTUMRX_JEFFCO_0000206377. (2/7/17).

[279] OPTUMRX_JEFFCO_0000261777 (6/9/17).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 949 of 1171. PageID #: 706268

> Based solely on the Purdue contract, **I would highly suggest delaying the MED implementation on all clients until 1/1/2018** – as we are doing with the new criteria – so we have time to ensure we can protect rebates. Purude has a clause built into their agreement that mandates that ALL strengths be unrestricted. So we cannot sacrifice rebates on only the 80mg strength here. We would sacrifice rebates on *all* Oxycontin scripts.

280

661.   Here, again, a PBM Defendant did not take an action that it could have taken to block inappropriate prescription opioid dispensing.

662.   As another example, despite their contractual obligations and their public representations, it was not until 2019 that OptumRx even began to consider exclusion of OxyContin from its formularies.

663.   An email exchange in March 2019 between Brian Sabin, Optum Director of Industry Relations, and Venkat Vadlamudi, Optum, raises the question whether they should remove OxyContin from its formularies altogether, "rebate losses be damned," arguing that Purdue caused the opioid epidemic and Optum's continued inclusion of OxyContin on its formularies was "rewarding their bad behavior." He argues that, "[f]rom a purely PR perspective, I think it would look good on us." In response, Vadlamudi states that "[w]e as a company looked into this," but the amount of OxyContin rebates Optum collected "prevented us from doing it." As even Vadlamudi then goes on to admit, "[b]ut times are different now. [I]f you can look into it and model the scenarios <u>maybe</u> we can change."[281]

---

[280] *Id.*

[281] OPTUMRX_JEFFCO_0000506200 (3/4/19).

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 950 of 1171 PageID #: 706269

664. Even as Purdue explored bankruptcy and OptumRx became aware of the potential for lost rebates, the answer was not to discontinue OxyContin's preferred formulary position, but instead to move other drugs into preferred positions in order to ensure the free flow of prescription opioids from another Opioid Enterprise Manufacturer in the Formulary & UM Enterprise.[282]

665. Express Scripts went through similar issues with OxyContin prescribing. In a March 2017 email, there were several employees from Express Scripts who derided the decision by the Express Scripts Value Added Committee to overrule the prior authorization limit on OxyContin, stating that the decision did not sit well with them at all.[283] As Express Scripts employees noted, this decision made no clinical sense.[284] Without question, the prior authorization limit would have dramatically reduced medically inappropriate prescribing, sales, and dispensing which would have impacted "rebate gain."[285]

666. But the PBM Defendants' involvement did not end there. As alleged more fully herein, Express Scripts and Optum each own and operate a mail order pharmacy. As alleged above, each of the PBM Defendants' mail order pharmacies dispensed massive amounts of branded and generic opioids without performing the requisite due diligence on prescriptions or refusing to fill prescriptions that could not be resolved through due diligence. As such, the mail order pharmacies provided

---

[282] OPTUMRX_JEFFCO_0000089527 (9/4/19).

[283] ESI_JEFFCOMO_000029940 (3/23/17).

[284] *Id.*

[285] *Id.*

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 951 of 1171. PageID #: 706270

another mechanism for the goal of the Formulary & UM Enterprise—*i.e.*, the unrestricted increase in prescribing and dispensing of prescription opioids for the profit of the Opioid Enterprise Manufacturers and the PBM Defendants.

667.  By dispensing branded and generic prescription opioids without performing the requisite due diligence on prescriptions or refusing to fill prescriptions that could not be resolved through due diligence, the PBM Defendants' mail-order pharmacies furthered the common purpose of the Formulary & UM Enterprise. They continued to facilitate the increased dispensing and sale of prescriptions opioids. However, this also violated the law governing dispensing controlled substances in Schedules II through IV.

668.  As alleged more fully herein, the Formulary & UM Enterprise maintained a common purpose from the late 1990s through to the present day, creating sufficient longevity in their personal business relationships for them to pursue the common purpose of the Formulary & UM Enterprise.

## C.  Conduct and Participation of the Formulary & UM Enterprise Through concerted unlawful action

669.  The common purpose of the Formulary & UM Enterprise alleged more fully herein was perpetrated through a fraudulent scheme fulfilled by multiple unlawful acts relating to the distribution and  dispensing of controlled substances.

670.  The PBM Defendants each engaged in essentially uniform conduct with the Opioid Enterprise Manufacturers whereby the PBM Defendants granted the Opioid Enterprise Manufacturers' drugs unfettered formulary access (including preferred formulary placement coupled with refraining from UM) despite their public

promises and contractual obligations to make formulary and UM decisions in their clients' best interests, and facilitated their pull through marketing and/or directly facilitated the dissemination of their marketing messages. The PBM Defendants also provided the Opioid Enterprise Manufacturers with PBM data so that they could pull through the formulary "wins" and drive increased prescribing. At the back end of the fraudulent scheme, the PBM Defendants profited from their fraud by receiving rebates and other fees while the Opioid Enterprise Manufacturers enjoyed increased sales through pull through marketing and unfettered formulary access.

671. Collectively, these violations constitute concerted unlawful action, through which the PBM Defendants and their mail order pharmacies and the Opioid Enterprise Manufacturers defrauded and intended to defraud consumers in New York and Plaintiff's Community, the State, and other intended victims.

672. The PBM Defendants and their mail order pharmacies devised and knowingly carried out an illegal and fraudulent scheme using materially false or fraudulent pretenses, representations, promises, or omissions regarding their conduct. Specifically, as alleged more fully herein, the PBM Defendants promised to perform pharmacy benefit management services, including cDURs, formulary decisions, and UM decisions in their clients' best interests and in ways that would ensure safe and effective prescribing. As alleged herein, the PBM Defendants further represented to their clients and the public that they were committed to preventing and addressing misuse, abuse, and diversion of prescription opioids. These promises were made in person, in publications, and through the mail and the wires.

673.    The PBM Defendants and their mail order pharmacies did not intend to comply with their contractual obligations, the promises to their clients, or their public representations. The PBM Defendants and their mail order pharmacies intended to continue to make decisions and take actions that benefitted the members of the Formulary & UM Enterprise and its common purpose by: failing to perform cDURs, granting unfettered formulary access, and blocking implementation of any UM measures. All told, the PBM Defendants and their mail order pharmacies intended to take actions that directly contradicted their promises, contractual obligations and public promises because they supported increased prescribing, sale, and dispensing of prescription opioids with as little inhibition or impediments as possible.

674.

675.    By engaging in their intended conduct, as alleged more fully herein, the PBM Defendants and their mail order pharmacies engaged in fraudulent and unlawful conduct constituting concerted unlawful action.

676.    The PBM Defendants and their mail order pharmacies perpetrated the fraudulent scheme of the Formulary & UM Enterprise with thousands of communications, publications, representations, statements, electronic transmissions, and payments including, but not limited to:

   (a) Contracts negotiated and circulated between members of the Formulary & UM Enterprise;

   (b) Contracts negotiated and circulated between PBM Defendants and their clients;

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 954 of 1171. PageID #: 706273

    (c) Public representations by the Opioid Enterprise Manufacturers and the PBM Defendants about their commitment to addressing misuse, abuse, and diversion of prescription opioids;

    (d) Marketing materials about prescription opioids transmitted between the Opioid Enterprise Manufacturers and the PBM Defendants that were later disseminated by the PBM Defendants;

    (e) Communications between the PBM Defendants and their clients about their commitment to following the terms of their respective contracts;

    (f) Communications between the Opioid Enterprise Manufacturers and the PBM Defendants regarding formulary changes;

    (g) Communications between the Opioid Enterprise Manufacturers and the PBM Defendants regarding and including PBM prescribing data;

    (h) Transmission of rebate payments; and

    (i) Transmission of payments from the clients of the PBM Defendants.

677. To achieve the common purpose of the Formulary & UM Enterprise, the PBM Defendants and their mail order pharmacies and the Opioid Enterprise Manufacturers hid from their clients, patients, regulators and Plaintiff: (a) the fraudulent nature of the scheme; (b) the fraudulent nature of their representations; (c) their intention to ignore their contractual cDUR obligations; (d) intent to make formulary and UM decisions that failed to limit the medically unnecessary and inappropriate prescribing, sales, or dispensing of prescription opioids or address misuse, abuse, and diversion; and (e) the true nature of the association between each member of the Formulary & UM Enterprise.

678. Each member of the Formulary & UM Enterprise, including the PBM Defendants and their mail order pharmacies, agreed with the overall objective of the Formulary & UM Enterprise's fraudulent schemes and participated by taking action

that furthered the common purpose of the Formulary & UM Enterprise, including in the common course of conduct to commit acts of fraud and indecency.

679.   The actions of the Formulary & UM Enterprise all had the purpose of furthering the opioid epidemic that substantially injured Plaintiff's business and property, while simultaneously generating billion-dollar revenue for the PBM Defendants and their mail order pharmacies. The actions were committed, and/or caused to be committed, by the PBM Defendants and their mail order pharmacies through their participation in the Formulary & UM Enterprise and in furtherance of the concerted unlawful action and common purpose thereof.

## IX.   Plaintiff's Claims Are Timely

680.   Defendants' wrongful conduct is still ongoing and has caused Plaintiff repeated injuries and/or a continuous injury over many years.

681.   The nuisance caused, contributed to, and/or maintained by Defendant's conduct continues to exist. The nuisance caused, contributed to, and/or maintained by Defendant's conduct is abatable.

682.   A reasonably prudent person in Plaintiff's position would not have known, or been placed on inquiry notice, not just of the Defendants' wrongful conduct, but that substantial, non-transient damage had resulted and was capable of ascertainment. Plaintiff did not learn that it had been injured by Defendants' actions, the source of those injuries, or that those injuries were part of a pattern of conduct until only recently, until documents revealing those facts were produced in discovery by various entities in *In re: National Prescription Opiate Litigation*, Case No. 1:17-md-2804-DAP (N.D. Ohio) and other opioids litigation, including the documents cited,

quoted, and relied on throughout this complaint. These documents—and the facts they contain—have never before been made public, nor have they ever before been in Plaintiff's possession, and not otherwise available to Plaintiff before being produced in discovery. Thus, any applicable limitations period did not begin to run when Defendants committed their wrongful acts but when the damage resulting from Defendants' wrongful acts was sustained and capable of ascertainment by Plaintiff, which did not occur until the documents revealing those facts were produced in discovery.

683. Defendants are equitably estopped from relying upon a statute of limitations defense and/or any applicable statutes of limitation are equitably tolled because Defendants undertook active efforts to deceive or mislead Plaintiff and to purposefully conceal their unlawful conduct.

684. Defendants purposefully concealed their wrongful conduct by: (1) manipulating and distorting public information, knowledge, and facts; (2) misrepresenting their role in the pharmaceutical market as promoting safe use and appropriate opioid dispensing; (3) assuring the public and governmental authorities that they were complying with their obligations and were acting to prevent diversion and drug abuse; (4) hiding the true nature of their relationships with the Opioid Manufacturers; (5) failing to make public or otherwise produce nonpublic information, over which Defendants had exclusive possession, dominion, and control, that would have revealed the truth; (6) entering into overly broad confidentiality agreements with any entity in the supply chain with whom they contracted; (7) suing

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 957 of 1171. PageID #: 706276

governmental and other entities to block the release of details in their agreements with the Opioid Manufacturers and pharmacies; and (8) by deliberately and fraudulently concealing the truth.

685.    Defendants knew of their wrongful acts and had material information pertinent to their discovery, but concealed that information from the public, including from Plaintiff.

686.    Defendants fraudulently concealed from Plaintiff the existence of Plaintiff's causes of action. Defendants' public misrepresentations about their role in the pharmaceutical market, and that they were ensuring the safe use and appropriate opioid dispensing, and preventing diversion and drug abuse, prevented Plaintiff from investigating Defendants' fraud.

687.    Defendants also concealed from Plaintiff the existence of Plaintiff's claims by misrepresenting to the public, as well as to their clients, that they used their market power to create formularies and UM programs based on the health and safety of the public and of the lives covered by the benefit plans that were their clients. As alleged herein, Defendants repeatedly represented that they were working to ensure that opioids were prescribed and dispensed only for safe and legitimate reasons. These misrepresentations were made in person, in client contracts, on Defendants' websites, in publications and in Congressional testimony. Defendants told the public, their clients and Congress that they were experts who were committed to preventing and addressing misuse, abuse, and diversion of prescription opioids.

688. The PBM Defendants and their mail order pharmacies hid from their clients, patients, regulators and Plaintiff: (a) the fraudulent nature of their relationship with the Opioid Manufacturers; (b) the fraudulent nature of their representations; (c) their intention to ignore their contractual cDUR obligations; (d) intent to make formulary and Utilization Management decisions that failed to limit the medically unnecessary and inappropriate prescribing, sales, or dispensing of prescription opioids or address misuse, abuse, and diversion; and (e) the true nature of the association between each member of each PBM Enterprise.

689. Plaintiff did not discover the nature, scope and magnitude of Defendants' misconduct, and its full impact on Plaintiff's Community, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

690. Defendants intended that their actions and omissions would be relied upon, including by Plaintiff and Plaintiff's Community. Plaintiff and Plaintiff's Community did not know and did not have the means to know the truth, due to Defendants' actions and omissions.

691. Plaintiff and Plaintiff's Community reasonably relied on Defendants' affirmative statements alleged herein, including those regarding Defendants' commitment to preventing and addressing the misuse, abuse, and diversion of opioids.

692. Through their public statements, marketing, and advertising, Defendants' deceptions deprived Plaintiff of actual or presumptive knowledge of facts sufficient to put them on notice of potential claims.

Case: 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 959 of 1171. PageID #: 706278

693.  Only Defendants knew of their widespread misinformation campaign and of their repeated, intentional failures to prevent opioid overutilization and diversion.

694.  Due in large part to their deceptive, intentional, and fraudulent conduct, the full scope of Defendants' wrongful conduct and their central role in the opioid epidemic has not yet come to light.

## X.  Defendants Entered into and Engaged in a Civil Conspiracy

695.  The PBM Defendants and the opioid manufacturers engaged in concerted action to accomplish an unlawful objective, or to accomplish a lawful objective by unlawful means: the unfettered sale and dispensing of vast quantities of opioids in Plaintiff's Community without regard to patient safety, the impact on the community, or their obligations and duties under federal and state law. Each of the Defendants either actively participated and/or aided and abetted in the pursuance of this common purpose.

696.  Specifically, opioid manufacturers contracted and agreed with PBMs, including the PBM Defendants, to coordinate unfettered formulary placement with no or limited UM measures regarding each opioid drug such that there would be as little an impediment as possible to opioid prescribing and dispensing. These contracts relied on an underlying fraudulent scheme designed to ensure unfettered access to PBM formularies. The opioid manufacturers understood that the PBM Defendants were going to operate on a fundamentally fraudulent basis. As alleged more fully herein, even though the PBM Defendants promised their clients they would take actions that would ensure the safety of opioid prescribing and dispensing, the PBM

241

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  960 of 1171.  PageID #: 706279

Defendants had no intention of taking actions regarding the opioid manufacturers'
branded and generic drugs that would have ensured safety, because those actions
would have dramatically reduced their receipt of rebates, revenue from opioid
dispensing, and other fees. At the same time, the PBM Defendants operated their
mail-order pharmacies in such a way that they did not stop obviously illegitimate
prescriptions from being dispensed.

697.    The PBM Defendants and the opioid manufacturers committed
numerous overt acts to further the conspiracy's objectives that were unlawful under
federal and/or State law.

698.    At all relevant times, each Defendants was aware of the enterprise's
conduct, was a knowing and willing participant in that conduct, and reaped profits
from that conduct in the form of increased sales, distributions, and prescriptions of
opioids.

699.    By knowingly misrepresenting the appropriate uses, risks, and safety of
opioids, Defendants committed overt acts in furtherance of their conspiracy.

700.    As an intended result of the intentional wrongful conduct as set forth
herein, the PBM Defendants have profited and benefitted from the opioid epidemic
they caused, thus harming Plaintiff and Plaintiff's Community.

701.    As a proximate result of the PBM Defendants' and their co-conspirators,
the opioid manufacturers', intentional wrongful conduct, Plaintiff has incurred
substantial costs including, but not limited to, law enforcement action for opioid-
related to drug crimes, for addiction treatment, and other services necessary for the

242

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 961 of 1171. PageID #: 706280

treatment of people addicted to prescription opioids, and the other harms alleged herein. Similarly, abating the vast societal harms Defendants and their co-conspirators caused will require extensive efforts and substantial resources.

702.    Plaintiff seeks to impute liability for Plaintiff's other claims on the PBM Defendants for the wrongful conduct of their co-conspirators, the opioid manufacturers, and to hold the PBM Defendants jointly and severally liable for that conduct.

703.    Additionally, the conduct of Defendants and their co-conspirators, the opioid manufacturers, was willful, wanton, and malicious, was directed at the public generally, constituted a gross and wanton fraud upon the public, and/or constituted gross negligence. For this reason, Plaintiff seeks to recover punitive/exemplary damages.

## XI.    Successor Liability

704.    To the extent that the wrongful acts or omissions alleged herein where committed or omitted by predecessor entities, their respective successor entities are liable for those acts or omissions because (1) they expressly or impliedly assumed the predecessor's liability, (2) there was a consolidation or merger of predecessor and successor, or (3) the surviving entity was a mere continuation of the predecessor. To the extent there was no formal merger of predecessor and successor, the respective successor entities are also liable for the wrongful acts or omissions of their respective predecessors based on the doctrine of de facto merger based on the factors of (a) continuity of ownership; (b) cessation of ordinary business and dissolution of the predecessor; (c) assumption by the successor of liabilities ordinarily necessary for the

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 962 of 1171. PageID #: 706281

uninterrupted continuation of the business of the predecessor; (d) continuity of management, personnel, physical location, assets and general business operation of the predecessor, and (e) assumption of an identical or nearly identical name. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

## XII.  Alter Ego Liability

705.  To the extent that the wrongful acts or omissions alleged herein where committed or omitted by wholly-owned or majority-owned entities, the parent entities are liable for those acts or omissions as alter egos because (1) they dominated and controlled the wholly-owned or majority-owned entity and (2) exercised that domination and control to perpetrate a wrong or injustice. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

## XIII.  Causes of Action

### FIRST CAUSE OF ACTION — DECEPTIVE ACTS AND PRACTICES: NEW YORK GENERAL BUSINESS LAW §349
### (Brought by Plaintiff against All Defendants)

706.  Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

707.  Defendants' acts were consumer oriented.

244

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 963 of 1171. PageID #: 706282

708. The PBM Defendants added, abetted, and/or otherwise colluded and conspired with opioid manufacturers to commit the wrongful acts and practices which are "deceptive or misleading in a material way" and include but are not limited to:

(a) misrepresenting the truth about how opioids lead to addiction;

(b) misrepresenting that opioids improve function;

(c) misrepresenting that addiction risk can be managed;

(d) misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction;"

(e) falsely claiming that withdrawal is simply managed;

(f) misrepresenting that increased doses pose no significant additional risks;

(g) falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

709. Furthermore, PBM Defendants committed additional acts and/or practices in a "deceptive or misleading in a material way" including but are not limited to:

(a) Facilitating the increased use of opioids by giving opioids unwarranted preferred formulary status in standard offerings in exchange for profiting from payments from the opioid manufacturers;

(b) Maintaining preferred formulary status for OxyContin and other highly abused opioids in standard offerings, despite knowing, or being substantially certain, from their own extensive data, that addiction, abuse, and illegitimate prescribing of such drugs were rampant;

(c) Electing not to undertake timely actions utilizing their real-time data that would have drastically reduced the inappropriate prescribing and dispensing of Opioids, such as requiring prior authorization, step therapy, limiting days of supply, or excluding OxyContin from its standard formulary offerings;

245

(d) Electing not to impose prior authorization requirements or limits on the availability of opioids in its standard formulary offerings in exchange for payments from the opioid manufacturers;

(e) Electing not to maintain adequate safeguards to dispense opioids in a safe and effective manner and to maintain effective controls against diversion of opioids through their mail-order pharmacies; and

(f) Electing not to report suspicious prescribers and pharmacies.

710.    The materially deceptive acts and practices alleged herein undermined consumers' ability to assess the benefits and dangers of prescription opioids and to make informed decisions as to the efficacy and safety of opioid therapy, including but not limited to as a treatment for chronic pain.

711.    Defendants' acts and/or practices caused actual harm to Plaintiff.

712.    Plaintiff has been injured as a result of Defendants' acts and/or practices.

713.    New York General Business Law § 349 declares unlawful any deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the state, and allows any person who has been injured by reason of any violation of that statute to bring an action to recover actual damages.

714.    Defendants violated New York General Business Law § 349, because they engaged in false advertising in the conduct of a business, trade or commerce in this state.

715.    Plaintiff and its residents have been injured by reason of Defendants' violation of § 349.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 965 of 1171. PageID #: 706284

716. Plaintiff is entitled to recover its damages caused by the violation of New York General Business Law § 349 by the defendants in an amount to be determined at trial, subject to trebling, plus attorneys' fees.

## SECOND CAUSE OF ACTION — FALSE ADVERTISING:NEW YORK GENERAL BUSINESS LAW §350
### (Brought by Plaintiff against All Defendants)

717. Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

718. Defendants violated New York General Business Law § 350, because they engaged in false advertising in the conduct of a business, trade or commerce in this state.

719. Defendants' acts were consumer oriented and triggered reliance by patients, physicians and others.

720. The PBM Defendants added, abetted, and/or otherwise colluded and conspired with opioid manufacturers to commit the wrongful acts and practices which are "deceptive or misleading in a material way" and include but are not limited to:

(a) misrepresenting the truth about how opioids lead to addiction;

(b) misrepresenting that opioids improve function;

(c) misrepresenting that addiction risk can be managed;

(d) misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction;"

(e) falsely claiming that withdrawal is simply managed;

(f) misrepresenting that increased doses pose no significant additional risks;

247

(g) falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

721.   The materially deceptive acts and practices alleged herein undermined consumers' ability to assess the benefits and dangers of prescription opioids and to make informed decisions as to the efficacy and safety of opioid therapy, including but not limited to as a treatment for chronic pain.

722.   Defendants' false advertising dramatically increased consumer demand for and consumption of prescription opioids, and that it created public misperception about the safety and efficacy of such prescription drugs.

723.   Defendants' acts and/or practices caused actual harm to Plaintiff.

724.   Plaintiff has been injured as a result of Defendants' acts and/or practices.

725.   Plaintiff and its residents have been injured by reason of Defendants' violation of § 350.

726.   Plaintiff is entitled to recover its damages caused by the violation of New York General Business Law § 350 by the Defendants in an amount to be determined at trial, subject to trebling, plus attorneys' fees.

## THIRD CAUSE OF ACTION—CREATION OF A PUBLIC NUISANCE
### (Brought by Plaintiff against All Defendants)

727.   Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

728.   Defendants intentionally and/or negligently and recklessly caused, created, contributed to, and/or maintained a public nuisance which interfered with

248

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 967 of 1171. PageID #: 706286

public rights, including the public rights to health and safety, in Plaintiff's Community.

729.   Each Defendant is liable for the public nuisance because its conduct has caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of, and/or substantial factor leading to, Plaintiff's injury.

730.   Defendants, by colluding with manufacturers to make opioids more available and ignoring evidence of addiction and misuse found in their own claims data and/or other actions and inactions described herein, created and maintained the opioid epidemic in Plaintiff's Community, which is harmful and disruptive to, and unreasonably annoys, injures, endangers, and interferes with the public health, public safety, public peace, public comfort, and/or public convenience. The public nuisance caused by Defendants has significantly harmed, and continues to significantly harm, Plaintiff and a considerable number of people in Plaintiff's Community.

731.   Each Defendant gathered enormous amounts of data about the opioid prescriptions and opioid-related claims of their members in Plaintiff's Community and across the country. Defendants used this data to enhance their profitability but opted not to use it to inform their marketing practices, identify and prevent diversion, or identify and prevent the dispensing and sale of unreasonably large quantities of opioids, and "cocktails" of opioids and other drugs, in Plaintiff's Community and the surrounding communities.

732. Defendants have created and maintained a public nuisance through their ongoing intentional and/or negligent and reckless conduct, including, but not limited to: undertaking to administer prescription drug benefits and dispensing in the public interest and in conformity with public health and safety, and then electing not to (and/or failing to) appropriately carry out these obligations; fraudulently and/or falsely promoting the use of opioids for conditions and in circumstances where they are neither safe nor effective; misrepresenting to the public and the medical community that opioids could be taken at high does and for long durations with minimal risk of addiction; electing not to (and/or failing to) use the wealth of data available to them to identify and address signs of over-prescribing, illegitimate and dangerous use of opioids, misuse, abuse, and diversion; facilitating and encouraging the use of dangerously addictive opioids by colluding with manufacturers to place opioid drugs on standard formulary offerings with preferred status; declining to impose limits on their approval for use of opioids in exchange for payments and fees from manufacturers; electing not to (and/or failing to) provide controls against diversion in their PBM services; and violating the Controlled Substances Act, and State controlled substances and pharmacy laws and regulations, by failing to detect and guard against diversion when dispensing opioids, and "cocktails" of opioids and other drugs, through their mail order pharmacies, and in their provision of PBM services. Their conduct caused prescriptions and sales of opioids to skyrocket, and Defendants failed to limit their use even as evidence of the epidemic mounted, including Plaintiff's Community, flooding Plaintiff's Community with opioids and

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 969 of 1171. PageID #: 706288

facilitating and encouraging the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to Plaintiff and those in Plaintiff's Community.

733. Defendants knew, or were substantially certain, or reasonably should have known that their intentional and/or negligent, unreasonable, reckless, and/or unlawful conduct would and did cause opioids to be used and possessed illegally and that their conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental and unreasonable effect upon the public health, welfare, safety, peace, comfort, and convenience of Plaintiff and the public in Plaintiff's Community.

734. Defendants' conduct has injuriously affected rights common to the general public, specifically including the rights of the public in Plaintiff's Community to public health, safety, peace, comfort, and convenience. The public nuisance caused by Defendants' actions has caused substantial annoyance, inconvenience, and injury to the public.

735. The interference is unreasonable because Defendants' nuisance-creating conduct:

(a) Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

(b) At all relevant times was and is proscribed by state and federal laws and regulations; and/or

(c) Is of a continuing nature and, as Defendants know, has had and is continuing to have a significant effect upon rights common to the

general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

736. The significant interference with rights common to the general public includes but is not limited to:

(a) The creation and fostering of an illegal, secondary market for prescription opioids;

(b) Easy access to prescription opioids by children and teenagers;

(c) A staggering increase in opioid abuse, addiction, overdose, injuries, and deaths;

(d) Infants being born dependent on, or addicted to, opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

(e) Employers having lost the value of productive and healthy employees; and

(f) Increased costs and expenses for Plaintiff relating to healthcare services, law enforcement, the criminal justice system, social services, and education systems.

737. Defendants knowingly, intentionally, recklessly, negligently, and/or unlawfully pushed as many opioids, and "cocktails" of opioids and other drugs, onto the market as possible, fueling addiction to and diversion of these powerful narcotics, resulting in increased addiction and abuse, an elevated level of crime, death and injuries to people in Plaintiff's Community, a higher level of fear, discomfort and inconvenience to people in Plaintiff's Community, and direct costs to Plaintiff and the public in Plaintiff's Community.

738. Defendants are liable for creating the public nuisance because the intentional and/or negligent, and unreasonable and/or unlawful conduct of each

Defendant was a substantial factor in producing the public nuisance and harm to Plaintiff.

739.   At all relevant times, Defendants were (or reasonably should have been) aware of, and understood, their legal obligations under the federal Controlled Substances Act (21 U.S.C. § 801, *et seq*.), the New York State Controlled Substance Act (10 N.Y.C.R.R § 80, *et seq*.) and applicable New York pharmacy laws and regulations regarding the dispensing of prescription opioids.

740.   In their sale and dispensation of opioids, and "cocktails" of opioids and other drugs, in the State and in Plaintiff's Community, Defendants violated federal law, including, but not limited to, 21 U.S.C.A. §§ 829, 841, 842 and 21 C.F.R. §§ 1301.71, 1306.04, 1306.06, and New York law, including, but not limited to, New York State Controlled Substance Act and applicable New York pharmacy laws and regulations Defendants' violations of these laws were committed knowingly and/or negligently and recklessly.

741.   Defendants' intentional (and/or negligent and reckless), unlawful, and unreasonable conduct that created, continued, and/or maintained the public nuisance in Plaintiff's Community, for which the gravity of the harm outweighs the utility of the conduct and includes, but is not limited to:

    (a) Knowingly and intentionally (and/or negligently and recklessly) colluding with the opioid manufacturers in deceptive marketing schemes that were designed to, and successfully did, change the perception of opioids and cause opioid prescribing and sales to skyrocket;

    (b) Knowingly and intentionally (and/or negligently and recklessly) facilitating the increased use of opioids by giving opioids unwarranted

preferred formulary status in standard offerings in exchange for profiting from payments from the opioid manufacturers;

(c) Intentionally (and/or negligently and recklessly) maintaining preferred formulary status for OxyContin and other highly abused opioids in standard offerings, despite knowing, or being substantially certain, from their own extensive data, that addiction, abuse, and illegitimate prescribing of such drugs were rampant;

(d) Deliberately (and/or negligently and recklessly) electing not to undertake timely actions utilizing their real-time data that would have drastically reduced the inappropriate prescribing and dispensing of Opioids, such as requiring prior authorization, step therapy, limiting days of supply, or excluding OxyContin from its standard formulary offerings;

(e) Deliberately (and/or negligently and recklessly) electing not to impose prior authorization requirements or limits on the availability of opioids in standard formulary offerings in exchange for payments from the opioid manufacturers;

(f) Deliberately (and/or negligently and recklessly) electing not to maintain adequate safeguards to dispense opioids in a safe and effective manner and to maintain effective controls against diversion of opioids through their mail-order pharmacies; and

(g) Deliberately (and/or negligently and recklessly) electing not to report suspicious prescribers and pharmacies.

742. When Defendants engaged in this conduct, they knew, or were substantially certain, or reasonably should have known, that, *inter alia*: (i) increasing the availability of opioids would increase the number of opioids that would be abused, misused, and diverted into the illegal, secondary market and would be obtained by persons with criminal purposes; (ii) the marketing by manufacturers with which they colluded was deceptive and that Defendants' conduct served to increase opioid sales; (iii) many of the opioid prescriptions they dispensed, or facilitated the dispensing of, were not issued for a legitimate medical purpose and were likely to be diverted; and

(iv) by failing to act reasonably and lawfully with respect to the sale and dispensing of opioids, and "cocktails" of opioids and other drugs, and by participating in the false marketing of opioids, in Plaintiff's Community, diversion and the associated harms and resulting interference with public health, safety, and welfare would occur.

743. At all relevant times, Defendants knew or reasonably should have known that opioids were dangerous because, *inter alia*, these drugs are defined under federal and state law, and are generally recognized, as substances posing a high potential for abuse, addiction, and death.

744. Indeed, prescription opioids are essentially medical grade heroin. Defendants' wrongful and unreasonable conduct of pushing as many opioids, and "cocktails" of opioids and other drugs, onto the market as possible led directly to the public nuisance and harm to Plaintiff—exactly as would be expected when medical-grade heroin in the form of prescription opioids flood the community and are diverted into an illegal, secondary market.

745. It was reasonably foreseeable to Defendants that their conduct would result in the public nuisance and unreasonable harm to Plaintiff described herein.

746. Defendants owe Plaintiff and the public a duty to employ reasonable standards of care in the sale, delivery, dispensing, promotion, and gatekeeping control of the supply of highly addictive, dangerous opioids. This includes a duty to not create a foreseeable risk of harm or injury.

747. The degree of care the law requires is commensurate with the risk of harm the conduct creates. Defendants' conduct in selling, delivering, dispensing,

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 974 of 1171. PageID #: 706293

promoting, and gatekeeping control of the supply of highly addictive and dangerous opioids requires a high degree of care and places them in a position of great trust and responsibility. Their duty cannot be delegated.

748. Defendants, by promoting opioid over-use and by facilitating access to opioids through their formularies and UM and mail-order pharmacies, set in motion a force that created an unreasonable and foreseeable risk of harm for Plaintiff and its community.

749. Defendants also undertook and assumed a duty to create standard formulary and UM offerings based on the health and safety of the public and of the lives covered by the benefit plans that were their clients. *See* Restatement (Second) of Torts § 324A. Defendants represented to the public, as well as to their clients, that they were structuring their standard formulary and UM offerings based on the health and safety of the public and the lives their clients insured, when in fact they were doing the exact opposite and doing it to maximize their own revenue in concert with the opioid manufacturers. Defendants knew, at the time that they made these representations to the public and to their clients, that they would not base their formulary and UM offerings on the health and safety of the covered lives involved, nor of the public, but rather that they would make, and were already making, formulary and utilization management decisions designed solely (or at least primarily) to increase profits to Defendants.

750. Defendants undertook to render services which Defendants should have recognized (and in fact did know) were necessary for the protection of the public in

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 975 of 1171. PageID #: 706294

Plaintiff's Community and of Plaintiff, and failed to exercise reasonable care such that it increased the risk of harm to the public in Plaintiff's Community and Plaintiff. In so undertaking, Defendants assumed a duty to the public in Plaintiff's Community and to Plaintiff.

751. Defendants knew or reasonably should have known of the over-use and over-supply of opioids because of their access to claims and other data which they developed and maintained. Defendants also had the ability to curtail the over-use and over-supply of prescription opioids because of their unique gatekeeping function in the pharmaceutical supply chain. Yet, despite this knowledge and ability, Defendants refused and failed to take necessary and appropriate actions to prevent the harms which were the foreseeable consequence of their failures, actions, and inactions.

752. Defendants, having facilitated and set in motion the over-use and over-supply of opioids, had a duty to use reasonable care to prevent and curtail the spreading opioid crisis.

753. Defendants breached this duty by failing to exercise reasonable care or skill with respect to their opioid-related conduct. Collectively and individually, Defendants made highly addictive prescription opioids available to the marketplace with the knowledge that they were likely being used for non-medical purposes and/or posed an inherent danger especially to patients who were using opioids for chronic pain not associated with active cancer, end-of-life or palliative care. Defendants knew or reasonably should have known that their breach would foreseeably cause harm to Plaintiff and local governments nationwide.

Case: 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  976 of 1171.  PageID #: 706295

754.   Defendants were negligent in failing to abide their duties to conduct themselves with the requisite care and skill and faithfulness.

755.   Defendants placed their profit motives above their legal duties and enabled, encouraged, and caused the over-use and over-supply of opioids.

756.   Defendants are highly sophisticated and knowledgeable actors in the health care marketplace, well informed of the highly addictive nature of prescription opioids and likelihood of foreseeable harm to communities from prescription opioid addiction and diversion. Defendants breached their duties when they failed to act with reasonable care in their respective roles, roles which positioned each of them to help abate the opioid epidemic if they elected to use their power for good, instead of profit.

757.   Violating these duties poses distinctive and significant dangers to Plaintiff.

758.   Defendants knew or in the exercise of reasonable diligence should have known under the circumstances of this case that the public nuisance and the harms suffered by Plaintiff were the reasonably foreseeable consequences of Defendants' failures, actions, and inactions.

759.   It was also reasonably foreseeable to Defendants that their conduct would create a new secondary market for opioids—providing both the supply of narcotics to sell and the demand of addicts to buy them. The result of Defendants' deceptive and improper conduct is not only an explosion of prescription opioids on the

black market, but also—predictably—a marked increase in the availability of heroin and synthetic opioids.

760. The health, safety, and welfare of persons in Plaintiff's Community, including those who use, have used, or will use opioids, as well as those affected by opioid users, is a matter of great public interest and legitimate concern to the public in Plaintiff's Community. It was reasonably foreseeable to Defendants that the burden of the opioid crisis would fall to communities like Plaintiff in the form of social and economic costs.

761. The public nuisance created by Defendants' intentional, negligent, and/or reckless conduct is substantial and unreasonable. It has caused and continues to cause significant harm to Plaintiff and the public in Plaintiff's Community, and the harm inflicted greatly outweighs any offsetting benefit.

762. The injuries to Plaintiff would not have happened in the ordinary course of events had Defendants exercised the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of their business in the sale, delivery, dispensing, promotion, and gatekeeping control of opioids.

763. Defendants' conduct is widespread and persistent and creates substantial and ongoing harm. The harm inflicted outweighs any offsetting benefit. Defendants' conduct has caused deaths, serious injuries, and a severe disruption of public peace, health, order and safety. Defendants' ongoing and persistent misconduct is producing permanent and long-lasting damage.

259

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 978 of 1171. PageID #: 706297

764.    Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used in Plaintiff's Community. Because of Defendants' actions in using their unique position to increase the availability of opioids in the marketplace and inflate opioid sales, because of their collusion with manufacturers in the deceptive marketing of opioids, and because of Defendants' special position within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

765.    Defendants had control over their conduct in and affecting Plaintiff's Community as is described herein, and that conduct has had an adverse effect on the public. Defendants had sufficient control over, and responsibility for, the public nuisance they created. Defendants were in control of the "instrumentality" of the nuisance, namely the dissemination of prescription opioids, their collusion with manufacturers in promoting opioids, and standard formulary and drug utilization management offerings that increased utilization of opioids as described herein.

766.    Plaintiff does not allege that the opioid drugs are inherently defective, nor that the FDA-approved warning labels are inadequate, and Plaintiff does not seek a remedy under theories of product defect or failure to warn.

767.    Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 979 of 1171. PageID #: 706298

768. Defendants' scheme to optimize profits and opioid utilization regardless of the harm that was substantially certain to occur to Plaintiff's Community was done knowingly and intentionally and/or negligently and recklessly.

769. But for Defendants' actions, opioid use—and, ultimately, misuse and abuse—would not be as widespread as it is today, and the opioid epidemic that currently exists would have been averted or greatly curtailed.

770. As a direct and proximate cause of Defendants' intentional and/or negligent and reckless conduct creating or assisting in the creation of a public nuisance, Plaintiff, its community, and its residents have sustained and will continue to sustain substantial injuries.

771. Plaintiff has authority under New York common law to abate a public nuisance.

772. Plaintiff brings this action to promote the public welfare, for the benefit of all who live and work in and around Plaintiff's Community, the public generally, and the State.

773. In addition, Plaintiff has sustained injury to its property and resources because of the public nuisance described herein.

774. Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

775.   Defendants' misconduct alleged in this case is ongoing and persistent, as is the nuisance to which they substantially contributed.

776.   As a direct and proximate result of Defendants' intentional and/or negligent and reckless conduct and the public nuisance created by Defendants, Plaintiff has incurred, and will continue to incur, excessive costs to treat the opioid epidemic in its community including, but not limited to, increased costs of police, emergency, health, prosecution, corrections, rehabilitation, and other services. These costs are over and above Plaintiff's ordinary public services.

777.   As a direct and proximate result of Defendants' intentional and/or negligent and reckless conduct and the public nuisance created by Defendants, public resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resources which would otherwise be used to serve the public at large in Plaintiff's Community.

778.   Plaintiff seeks to abate the nuisance created by Defendants' unreasonable, unlawful, intentional and/or negligent, reckless, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public.

779.   The public nuisance in Plaintiff's Community—*i.e.*, the opioid epidemic—created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be prevented. However, Defendants lack the infrastructure and expertise needed to abate the public nuisance they created, contributed to, and/or maintained in Plaintiff's Community.

Defendants' conduct – including their lack of regard for the well-being of the public in Plaintiff's Community by elevating their own business interests and profit over the safety and health of the communities in which they marketed, promoted, dispensed, and sold opioids – also renders them unfit to oversee the abatement of the public nuisance they created, contributed to, and/or maintained.

780.    Plaintiff seeks a judgment that Defendants fund the abatement of the ongoing public nuisance caused by their unreasonable, unlawful, intentional and/or negligent, reckless, ongoing, continuing, and persistent actions and omissions and their substantial and unreasonable interference with rights common to the general public.

781.    Each Defendant created or assisted in creating the opioid epidemic, and each Defendant is jointly and severally liable for its abatement. Furthermore, each Defendant should be enjoined from continuing to create, perpetuate, or maintain said public nuisance in Plaintiff's Community. Additionally, Defendants should compensate Plaintiff for the funds it has expended and continues to expend for increased costs of, *inter alia*, social services, health systems, law enforcement, judicial system, and treatment facilities.

782.    Plaintiff has suffered, and will continue to suffer, unique harms as described herein, which are of a different kind and degree than those suffered by the citizens of the State and Plaintiff's Community at large. These are harms that can only be suffered by Plaintiff.

783. Plaintiff is acting in its governmental capacity to vindicate the rights of the public and abate a public nuisance within its community. Its claims are not based upon or derivative of the rights of others.

784. The tortious conduct of Defendants was a substantial factor in producing harm to Plaintiff.

785. Plaintiff has suffered an indivisible injury as a result of the tortious conduct of Defendants.

786. Defendants' conduct was willful, wanton, and malicious, was directed at the public generally, constituted a gross and wanton fraud upon the public, and/or constituted gross negligence. Defendants acted with conscious disregard of the rights of Plaintiff and the public in Plaintiff's Community. For this reason, Plaintiff seeks to recover punitive/exemplary damages.

787. Defendants' conduct was wanton, in that it was committed with reckless disregard of Plaintiff's and public's rights or the consequences of said conduct.

788. Defendants acted with malice. Defendants specifically intended to cause substantial injury or harm to Plaintiff because they either desired to cause the consequences of their actions or omissions or believed that the consequences were substantially certain to result from their actions or omissions. Specifically, Defendants knew that their conduct was resulting in, or was substantially certain to result in, an unreasonable and substantial interference with the public health, welfare, and safety in Plaintiff's Community.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 983 of 1171. PageID #: 706302

789. Defendants' conduct was fraudulent. Defendants acted in concert with opioid manufacturers to promote false and fraudulent messaging about the treatment of pain and the addictive nature of opioids. Defendants also created the false and misleading impression to regulators, prescribers, their clients, and the public, that they rigorously carried out their legal duties, including their duty to implement effective controls against diversion and to exercise due diligence to prevent the dispensing of opioid prescriptions that are illegitimate and/or likely to be diverted. Defendants further created the false impression that they worked voluntarily to prevent opioid abuse, misuse, oversupply, and diversion as a matter of corporate responsibility to the communities their business practices would necessarily impact.

790. Defendants' actions and omissions were grossly negligent. They had actual, subjective awareness that, viewed objectively from their viewpoint at the time, their conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Defendants knew of the dangerous and addictive nature of prescription opioids and also knew the risks associated with the oversupply and diversion of such drugs. Yet they nevertheless proceeded with conscious and/or reckless indifference to the rights, safety, or welfare of Plaintiff and the public in Plaintiff's Community by and through their conduct described herein. For this reason, Plaintiff seeks to recover punitive/exemplary damages.

791. Plaintiff seeks all legal and equitable relief as allowed by law for the intentional and/or negligent creation of a public nuisance, including, *inter alia*, injunctive relief, abatement, compensatory and exemplary/punitive damages, and all

265

other damages allowed by law to be paid by Defendants, attorneys' fees and costs, pre- and post-judgment interest, and such other relief as this Court deems appropriate.

### FOURTH CAUSE OF ACTION — VIOLATION OF NEW YORK SOCIAL SERVICES LAW § 145-B
### (Brought by Plaintiff against All Defendants)

792. Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

793. Defendants violated Social Services Law § 145-b, because they knowingly, by means of a false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of themselves or others, attempted to obtain or obtained payment from public funds for services or supplies furnished or purportedly furnished pursuant to Chapter 55 of the Social Services Law.

794. Plaintiff is a "political subdivision" of the State of New York as that term is used in § 145- b (1) (b) and a "local social services district" as that term is used in § 145-b (2).

795. As set forth herein, Defendants have knowingly set forth false statements or representations, deliberately concealed material facts, and/or perpetuated a fraudulent scheme, in attempts to obtain payment for opioids from public funds for services or supplies furnished by Plaintiff pursuant to Chapter 55.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 985 of 1171. PageID #: 706304

796. By reason of Defendants' violation of § 145-b, Plaintiff has been damaged.

797. Plaintiff is entitled to recover its damages caused by Defendants' violation of § 145-b in an amount to be determined at trial and subject to the apportionment provisions of § 145-b.

## FIFTH CAUSE OF ACTION — FRAUD
### (Brought by Plaintiff against All Defendants)

798. Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

799. Defendants, individually and acting through their employees and agents, and in concert with each other, knowingly made material misrepresentations and omissions of facts to Plaintiff and their residents to induce them to purchase, administer, and consume opioids as set forth in detail above.

800. Defendants knew at the time that they made their misrepresentations and omissions that they were false.

801. Defendants intended that Plaintiff, its residents and others would rely on their misrepresentations and omissions.

802. Plaintiff, its residents and others reasonably relied upon Defendants' misrepresentations and omissions.

803. In the alternate, the Defendants recklessly disregarded the falsity of their representations regarding opioids.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 986 of 1171. PageID #: 706305

804.   By reason of their reliance on Defendants' misrepresentations and omissions of material fact Plaintiff and their residents suffered actual pecuniary damage.

805.   Defendants' conduct was willful, wanton, and malicious and was directed at the public generally.

806.   Plaintiff is entitled to recover its damages caused by defendants' fraud in an amount to be determined by trial.

## SIXTH CAUSE OF ACTION — UNJUST ENRICHMENT
### (Brought by Plaintiff against All Defendants)

807.   Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

808.   Defendants acted willfully, wantonly, and with conscious disregard of the rights of the Plaintiff and their residents.

809.   As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from opioid purchases made by Plaintiff and their residents.

810.   In exchange for the opioid purchases, and at the time Plaintiff and their residents made these payments, Plaintiff and their residents expected that Defendants had provided all of the necessary and accurate information regarding those risks and had not misrepresented any material facts regarding those risks.

811.   Defendants, through the wrongful conduct described above, have been unjustly enriched at the expense of Plaintiff.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 987 of 1171. PageID #: 706306

812.    In equity and good conscience, it would be unjust and inequitable to permit defendants to enrich themselves at the expense of Plaintiff and their residents.

813.    By reason of the foregoing, Defendants must disgorge its unjustly acquired profits and other monetary benefits resulting from its unlawful conduct and provide restitution to the Plaintiff.

### SEVENTH CAUSE OF ACTION—NEGLIGENCE AND GROSS NEGLIGENCE
### (Brought by Plaintiff against All Defendants)

814.    Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

815.    Defendants owe Plaintiff a duty to employ reasonable standards of care in the sale, delivery, dispensing, promotion, and gatekeeping control of the supply of highly addictive, dangerous opioids. This includes a duty to not create a foreseeable risk of harm or injury.

816.    The degree of care the law requires is commensurate with the risk of harm the conduct creates. Defendants' conduct in selling, delivering, dispensing, promoting, and gatekeeping control of the supply of highly addictive and dangerous opioids requires a high degree of care and places them in a position of great trust and responsibility. Their duty cannot be delegated.

269

817.   Defendants, by promoting opioid over-use and by facilitating access to opioid through their standard formulary and UM offerings and their mail-order pharmacies, set in motion a force that created an unreasonable and foreseeable risk of harm for Plaintiff and its community.

818.   Defendants also undertook and assumed a duty to create formulary and UM offerings based on the health and safety of the public and of the lives covered by the benefit plans that were their clients. See Restatement (Second) of Torts § 324A Defendants represented to the public, as well as to their clients, that they were structuring formulary and UM offerings based on the health and safety of the public and the lives their clients insured, when in fact they were doing the exact opposite and doing it to maximize their own revenue in concert with the opioid manufacturers. Defendants knew, at the time that they made these representations to the public and to their clients, that they would not base their formulary and their UM offerings on the health and safety of the covered lives involved, nor of the public, but rather that they would structure, and were already structuring, formulary and UM offerings solely (or at least primarily) to increase profits to Defendants.

819.   Defendants undertook to render services which Defendants should have recognized (and in fact did know) were necessary for the protection of the public in Plaintiff's Community and of Plaintiff, and failed to exercise reasonable care in such a manner that Defendants increased the risk of harm to the public in Plaintiff's Community and to Plaintiff.  In so undertaking, Defendants assumed a duty to the public in Plaintiff's Community and to Plaintiff.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 989 of 1171. PageID #: 706308

820.    Defendants had actual or, at the very least, constructive knowledge of the over-use and over-supply of opioids because of their access to claims and other data which they developed and maintained. Defendants also had the ability to curtail the over-use and over-supply of prescription opioids because of their unique gatekeeping function in the pharmaceutical supply chain. Yet, despite this knowledge and ability, Defendants refused and failed to take necessary and appropriate actions to prevent the harms which were the foreseeable consequence of their failures, actions, and inactions.

821.    Defendants, having facilitated and set in motion the over-use and over-supply of opioids, had a duty to use reasonable care to prevent and curtail the spreading opioid crisis.

822.    Defendants breached this duty by failing to exercise reasonable care or skill with respect to their opioid-related conduct. Collectively, and individually, Defendants made highly addictive prescription opioids available to the marketplace with the knowledge that they were likely being used for non-medical purposes and/or posed an inherent danger especially to patients who were using opioids for chronic pain not associated with active cancer, end-of-life or palliative care. Defendants knew or reasonably should have known that their breach would foreseeably cause harm to Plaintiff.

823.    Defendants were negligent in failing to abide their duties to conduct themselves with the requisite care and skill and faithfulness.

FILED: WESTCHESTER COUNTY CLERK 03/18/2024 10:23 AM INDEX NO. 75026/2022

NYSCEF DOC. NO. 20    Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  990 of 1171.  PageID #: 706309  RECEIVED NYSCEF: 03/18/2024

824.   Defendants placed their profit motives above their legal duties and enabled, encouraged, and caused the over-supply and over-use of opioids.

825.   Defendants are highly sophisticated and knowledgeable actors in the health care marketplace, well informed of the highly addictive nature of prescription opioids and likelihood of foreseeable harm to communities from prescription opioid addiction and diversion. Defendants breached their duties when they failed to act with reasonable care in their respective roles, roles which positioned each of them to help abate the opioid epidemic if they elected to use their power for good, instead of profit.

826.   Violating these duties poses distinctive and significant dangers to Plaintiff and the public in Plaintiff's Community.

827.   At all times, Defendants each had the ability and obligation to control the opioid access and utilization that led to this human-made epidemic. Defendants controlled and were responsible for the operation of the instrumentality of the harm in this case—their promotion of opioid over-use and facilitation of access to opioids through their formularies and UM offerings and their mail order pharmacies. Defendants failed to take appropriate precautions to avoid injuries to Plaintiff caused by Defendants' failures, actions and inactions.

828.   Defendants knew or in the exercise of reasonable diligence should have known under the circumstances of this case that the harms suffered by Plaintiff were the reasonably foreseeable consequences of Defendants' failures, actions, and inactions.

Case 1:17-md-02804-DAP Doc #: 6393-2 Filed: 01/06/26 991 of 1171. PageID #: 706310

829.    Defendants' conduct also foreseeably created a new secondary market for opioids—providing both the supply of narcotics to sell and the demand of addicts to buy them. The result of Defendants' deceptive and improper conduct is not only an explosion of prescription opioids on the black market, but also—predictably—a marked increase in the availability of heroin and synthetic opioids.

830.    The health, safety, and welfare of people in Plaintiff's Community, including those who use, have used, or will use opioids, as well as those affected by opioid users, is a matter of great public interest and legitimate concern to people in Plaintiff's Community and to Plaintiff. It was reasonably foreseeable to Defendants that the burden of the opioid crisis would fall to communities like Plaintiff in the form of social and economic costs. Defendants' negligence was a substantial factor in producing harm to Plaintiff and Plaintiff's Community.

831.    As a direct and proximate result of Defendants' negligent conduct, Plaintiff has incurred, and will continue to incur, excessive costs to treat the opioid epidemic in Plaintiff's Community including, but not limited to, increased costs of police, emergency, health, prosecution, corrections, rehabilitation, and other services. These costs are over and above Plaintiff's ordinary public services.

832.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

833.    The injuries to Plaintiff would not have happened in the ordinary course of events had Defendants exercised the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of their business in the sale, delivery, dispensing, promotion, and gatekeeping control of opioids.

834.    Plaintiff is asserting its own rights and interests and Plaintiff's claims are not based upon or derivative of the rights of others.

835.    Defendants' conduct was also grossly negligent. They had actual, subjective awareness that, viewed objectively from their viewpoint at the time, their conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Defendants knew of the dangerous and addictive nature of prescription opioids and also knew the risks associated with the oversupply and diversion of such drugs. Yet they nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiff and the public in Plaintiff's Community by and through their conduct described herein. For this reason, Plaintiff seeks to recover punitive/exemplary damages.

836.    Plaintiff seeks all legal and equitable relief as allowed by New York law for negligence and gross negligence, including, *inter alia*, compensatory damages, exemplary/punitive damages, and all damages allowed by law to be paid by Defendants, attorneys' fees and costs, pre- and post-judgment interest, and such other relief as this Court deems appropriate.

## XIV.  Prayer for Relief

WHEREFORE, Plaintiff respectfully requests the Court order the following relief, including:

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  993 of 1171.  PageID #: 706312

(a) abatement of nuisance;

(b) actual damages;

(c) treble or multiple damages and civil penalties as allowed by statute;

(d) punitive damages;

(e) exemplary damages;

(f) disgorgement of unjust enrichment;

(g) equitable and injunctive relief in the form of Court-enforced corrective action, programs, and communications;

(h) forfeiture disgorgement, restitution and/or divestiture of proceeds and assets;

(i) attorneys' fees;

(j) costs and expenses of suit;

(k) pre- and post-judgment interest; and

(l) such other and further relief as this Court deems appropriate.

## XV. Jury Demand

Plaintiff demands a jury trial on all issues so triable.

March 18, 2024

/s/ Jayne Conroy
Jayne Conroy
Andrea Bierstein
Thomas I. Sheridan, III
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY 10016
(212) 784-6402
jconroy@simmonsfirm.com
abierstein@simmonsfirm.com
tsheridan@simmonsfirm.com

275

Case 1:17-md-02804-DAP  Doc #: 6393-2  Filed: 01/06/26  994 of 1171  PageID #: 706313

-and-

Sarah S. Burns
SIMMONS HANLY CONROY LLC
One Court Street
Alton, IL 62002
(618) 259-2222
sburns@simmonsfirm.com

*Attorneys for Plaintiff*

# EXHIBIT 7

**quinn emanuel** trial lawyers | miami

2601 S. Bayshore Drive, Suite 1550, Miami, Florida 33133-5417 | TEL (305) 402-4880 FAX (305) 901-2975

WRITER'S DIRECT DIAL NO.
**(213) 443-3159**

WRITER'S EMAIL ADDRESS
**anthonyalden@quinnemanuel.com**

December 13, 2024

**VIA E-MAIL**
**JZAWODZI@HODGSONRUSS.COM**

Re:     *In re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Oh.)
        *City of Rochester v. Purdue Pharma L.P.*, No. 19-op-45853 (Track 12)

Counsel:

        We write on behalf of the Express Scripts Defendants ("Express Scripts") and OptumRx., Inc. (collectively, the "PBM Defendants") in response to your November 19, 2024, letter concerning Wegmans Food Markets, Inc. ("Wegmans") refusal to produce any documents in response to a valid subpoena served over four months ago, on July 25, 2024 (the "Subpoena"). The Subpoena is attached as Exhibit A.

        **Background**

        Wegmans is a large grocery chain founded in the City of Rochester, New York, which has now grown to 109 stores across eight states. It has estimated revenues of $4.67 billion and, as of 2006, it was the 66th largest privately-held company in the United States according to *Forbes*. Importantly, Wegmans operates several large pharmacies in Plaintiff City of Rochester ("Rochester" or "City"). According to publicly available Automation of Reports and Consolidated Orders System ("ARCOS") data used by the Drug Enforcement Administration ("DEA"), ***Wegmans Pharmacy was the largest pharmacy purchaser of all MDL-8 opioids in the City of Rochester from 2014-2019, responsible for purchasing over 30% of total morphine milligram equivalents and over 30% of total dosage units***. Wegmans' pharmacies purchased over *82 million opioid units* in Rochester during 2006-2019, more than any other pharmacy. Defendant ESI Mail Pharmacy Service, Inc. and Optum's home-delivery pharmacy (or "HDP"), by contrast, dispensed less than 0.4% and 0.03%, respectively, of all prescription opioids in Rochester during 2009–2019. It is important, then, that the PBM Defendants obtain data and other documents concerning Wegmans' dispensing of opioids in Rochester.

        Equally as important, one of Rochester's primary theories in the case is that the PBM Defendants' respective mail order pharmacies contributed to the opioid crisis by ignoring so-called "red flags" in dispensing prescription opioids. Am. Compl. ¶¶ 546–49. While the PBM Defendants dispute Rochester's "red flag" theory, because the dispensing of opioids in Rochester

**quinn emanuel urquhart & sullivan, llp**

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON |
LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO |
SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

is "relevant to a party's claim or defense," the PBM Defendants are entitled to information related to the retail pharmacies on the ground in Rochester, such as Wegmans (the largest purchaser of prescription opioids among such pharmacies). Indeed, Wegmans is currently defending claims in approximately 36 opioid cases pending in New York similar to those brought against the Pharmacy Defendants in Track One-B of the MDL.

The PBM Defendants may similarly pursue information relevant to any defense, including that *they* were not the cause of Rochester's alleged injury—in whole or in part—but rather others, like Wegmans, were. *See* ESI  Am. Ansr., Thirty-Sixth Affirmative Defense, ¶ 36(v); Optum Answer, Tenth Defense at 165; *see also Mrakovcic v. Rose Art Indus., Inc.*, 26 A.D.3d 316, 317, 809 N.Y.S.2d 538 (2006) (affirming grant of summary judgment dismissing products liability case where non-party was superseding cause of injury, and therefore named defendant was not liable); *Barth v. City of New York*, 307 A.D. 2d  943, 944, 763 N.Y.S.2d 101 (2003) (finding intervening and superseding acts of non-parties may serve to relieve a defendant of liability); *Marr v. Church*, No. 283342001, 2005 WL 6222920 (N.Y. Sup. Ct. Feb. 18, 2005) (same).  The subpoenaed documents and data are critical to those defenses.

Because of the importance of the requested documents, the PBM Defendants have engaged in months of meet and confers with Wegmans, have proposed search terms and narrowed certain requests, and have answered Wegmans' many questions. Regrettably, however, Wegmans still refuses to produce any documents. The reason is simple:  Wegmans does not want to produce evidence that could be used to establish its liability in its own cases.  But that is not a legitimate reason to defy a validly issued subpoena—particularly where, as here, the evidence is also patently relevant to the requesting party's defense.  Indeed, ESI has subpoenaed many other retail pharmacies, such as RiteAid, Walmart, CVS, and K-Mart, which have agreed to produce responsive documents with little fanfare.  The PBM Defendants are entitled to the evidence necessary to present their defenses, and Wegmans cannot deprive them of evidence critical to those defenses because of Wegmans' own liability concerns.  Wegmans must produce the requested documents and data.

**The Document Requests**

**Request Nos. 1 and 2** seek (a) dispensing data for drugs within the Drug Scope[1] from January 1, 2006; and (b) documents sufficient to show how Wegmans (both its pharmacists and at a corporate level) dealt with point-of-sale ("POS") communications from the PBMs, including any policies, procedures, directives or guidance concerning such POS communications. Although Request No. 2 seeks documents from January 1, 1996, the PBM Defendants are willing to significantly shorten the time period by seeking data and documents from January 1, 2006.

A second central theory in Rochester's case is that the PBM Defendants (in their capacities as PBMs) failed to act on their own data concerning the over-prescription of opioids. *See, e.g.*, Am. Compl. ¶¶ 418, 419, 422, 424.  The PBM Defendants are entitled to show that they did in fact

---

[1]  Unless otherwise noted, when the Subpoena requests documents concerning certain drugs, the PBM Defendants are willing to limit the requests to the "Drug Scope" as defined in the Subpoena.

use their data to alert pharmacies, including Wegmans, and to explore whether those pharmacies (a) resolved those alerts, (b) ignored those alerts, or (c) relied on a separate process for identifying potentially risky prescriptions, patients, and prescribers. Evidence of Wegmans' conduct on those issues will show that the PBM Defendants were not the cause of alleged over-dispensing in Rochester. *See Mrakovcic*, 26 A.D.3d at 317 ("an intervening act will constitute a superseding cause and will serve to relieve a defendant of liability when the act is . . . so attenuated from the defendant's conduct that responsibility for the injury should not be reasonably attributed to the defendant . . . .").

Wegmans objects to these Requests on the basis that the PBM Defendants already possess ARCOS data produced in discovery and their own claims data. But the ARCOS data does not contain dispensing information—it tracks distribution only until the opioids reach the pharmacy, ***not what happens to the opioids after the prescription is handed to Wegmans***. The PBM Defendants are entitled to know whether and how Wegmans acted on their POS communications and whether Wegmans filled prescriptions subject to the same "red flags" that the PEC has identified in discovery. That information can only be gleaned from Wegmans' dispensing data.

Wegmans further claims the PBM Defendants (in their capacities as PBMs) already possess data reflecting the opioids dispensed by Wegmans, but the PBM Defendants' claims data is only specific as to individual PBM customers and, thus, cannot reflect the full scope of prescriptions dispensed by Wegmans in Rochester. Nor does that data capture many of the necessary fields that exist only in Wegmans' data. The PBM Defendants also do not have dispensing data from different pharmacy programs, such as state-funded programs or cash payors. The PBM Defendants simply do not possess the data Wegmans has concerning its dispensing of opioids in Rochester. Wegmans' dispensing data is critical for the PBM Defendants to know what was dispensed in the City, to whom, why, and when.

Moreover, despite Wegman's contrary suggestion, the Court's prior discovery orders confirm the requested data is relevant, discoverable, and sufficiently tailored to the needs of the case. In Track One-B, the MDL Court ordered the Pharmacy Defendants to produce "transactional dispensing data," entering multiple orders governing the scope of that discovery. For example, MDL ECF No. 3106, addressed a dispute over which data fields the Pharmacy Defendants needed to include in their production, with the MDL Court deciding ***not whether*** the Pharmacy Defendants would be required to produce dispensing data, but ***how much*** data and for what drugs.[2] The PBM Defendants are seeking only what the MDL Court has already approved—a pharmacy's dispensing data, limited to specific data fields for drugs within the Drug Scope—and they have focused the scope of these Requests to be as non-intrusive as possible. Wegmans must produce.[3]

---

[2] The Court references the fact that the parties' experts intended to use this dispensing data to conduct competing "red flags" analysis, but, contrary to Wegmans' suggestion, that analysis was not the primary focus of the order.

[3] Wegmans' reliance on MDL ECF No. 3715—in which the Special Master denied Wal-Mart's motion to compel data from non-party Department of Veterans Administration ("VA")—is similarly misplaced. To begin, unlike the VA, Wegmans *is a retail pharmacy*, and its documents are highly relevant. Moreover, Wal-Mart sought information regarding the VA's dispensing

Wegmans also complains that it cannot identify its responses to PBMs' POS communications because the Subpoena does not identify the communications. But, Wegmans knows it receives POS communications from PBMs and, in any event, the Subpoena expressly identifies examples of them. *See* Ex. A ("communications regarding plan coverage limits (such as prior authorizations, step edits, and quantity limits) and communications regarding health and safety issues (such as concurrent drug utilization review or CDUR messages))."

Finally, Wegmans argues that producing its dispensing data would require it "to write code that will pull data from disparate sources" and then "compile it in a meaningful way." But, despite repeated requests, Wegmans has never provided any indication or substantiation of how much time and cost would be involved, even after the PBM Defendants agreed to cut off their request at December 31, 2019. And in any event, the argument is misplaced given Wegmans will have to produce this information in its own cases anyway. *See, e.g.*, *Plant Genetic Sys., N.V. v. Northrup King Co.*, 6 F. Supp. 2d 859, 862 (E.D. Mo. 1998) (finding defendant would not be unduly burdened by compliance with a subpoena "because [Defendant] is a party to several of the actions concerning [the relevant] technology pending in the United States, it would seem likely the requested witness and documents have already been or will have to be produced elsewhere"); *Handorf v. Milliman, Inc.*, --- F. Supp. 3d ---, 2024 WL 1827826, at *4-5 (N.D. Iowa Apr. 26, 2024) (noting that "not all third parties are equally above the fray in disputes over subpoenas," and that where a third party was directly involved in issues before the court, burdens imposed by subpoena were not undue).

Wegmans has been under an obligation since at least 2020 to identify custodial and non-custodial sources containing relevant information and to preserve such information for its own cases. It will inevitably be required to search for and produce the relevant data from these sources in those pending cases, among others. The fact that Wegmans happened to have been sued in another venue, in cases that have not *yet* proceeded to discovery, does not negate the fact that Wegmans has presumably already taken many of the steps necessary to produce responsive information. It certainly does not excuse Wegmans' obligation to produce patently relevant data. Indeed, this Court has compelled true third parties to produce voluminous amounts of data and information in this matter. *See, e.g.*, ECF No. 233 (compelling the DEA to produce ARCOS data).

**Request Nos. 3 and 4** seek (a) literature, publications, presentations and other materials provided to Wegmans from any manufacturer regarding the efficacy, addictive qualities, and/or safety of any drugs within the Drug Scope, and (b) guidance, directives, instructions, publications, presentations, notices or alerts that Wegmans provided to its employees concerning those same drugs. The PBM Defendants do not seek every communication between Wegmans and any opioid manufacturer, or among its own employees, concerning opioids. Rather, the PBM Defendants

---

practices to allow the parties "to compare the VA's practices to the standards to which Plaintiffs seek to hold . . . the Pharmacy Defendants in this litigation." The Court denied Wal-Mart's motion because Plaintiffs' claims against it were based on federal law, not on any standards the VA might establish or impose. Here, Wegmans' dispensing data is relevant to show that other actors and events besides the PBM Defendants' alleged conduct caused Rochester's alleged harm and to provide a full picture regarding prescription opioid dispensing in the City of Rochester.

seek only these targeted, enumerated types of communications because they are directly relevant to their defenses.

One of Rochester's key allegations is that the PBM Defendants knew that "that opioids were highly addictive, overused, and heavily abused," yet stood "by while retail pharmacies (as well as their own mail order pharmacies) dispensed wildly excessive quantities of opioid prescriptions." Am. Compl. ¶ 39.  The PBM Defendants are thus entitled to seek information showing that retail pharmacies, such as Wegmans, received and shared with their employees the same type of information concerning the efficacy and safety of opioids that the PBMs allegedly did, and that they made independent dispensing decisions based on that information, including potentially to ignore any warnings.  The communications sought in these Requests are directly relevant to this defense.

Wegmans objects to Request No. 3 on the basis that "the PBMs served third-party subpoenas to opioid manufacturers like Teva, Johnson & Johnson, Janssen, and Allergen" and it would be more convenient for these parties to the litigation to provide the requested information. But that list includes only certain opioid manufacturers, and those entities would not have the materials Wegmans received from other manufacturers, not to mention that their document retention is likely not coextensive with Wegmans.  Moreover, none of these manufacturers would have the documents that Wegmans provided to its own employees. That a sub-set of non-Wegmans-affiliated manufacturers might produce some documents on the same topic does not excuse Wegmans' obligation to respond to a valid subpoena. *See State Farm Mut. Auto. Ins. Co. v. Accurate Med. P.C.*, 2007 WL 2993840, at *1 (E.D.N.Y. Oct. 10, 2007) (denying motion to quash subpoena and finding that a subpoena recipient may not avoid compliance with subpoena by pointing to others who may have responsive documents).

Wegmans also complains about burden.  But again, Wegmans has made no particularized showing and, in any event, this argument is a red herring because Wegmans has presumably already taken the steps to identify and preserve these same responsive materials and will have to produce them in its own cases.  The PBM Defendants have limited their Requests to a targeted set of communications with a limited temporal scope of January 1, 2006 to December 31, 2019.

**Request Nos. 5, 6, and 7** seek (a) documents sufficient to show suspicious orders that Wegmans identified or for which it received notice in Rochester[4] (Request No. 5); (b) documents and communications concerning Wegmans' use, review, or analysis of data from ARCOS, the New York Prescription Drug Monitoring Program, and the DEA, including communications with these agencies (Request No. 6); and (c) documents and communications concerning Wegmans' efforts to identify, investigate or report improper prescribing, diversion, abuse or misuse of drugs within the Drug Scope in Rochester (Request No. 7).

As discussed above, one of Rochester's central allegations is that the PBM Defendants (in their capacities as PBMs) contributed to the alleged opioid crisis in Rochester by failing to act on

---

[4]  As part of their efforts to compromise, the PBM Defendants have already told Wegmans that they would limit the geographic scope to the City of Rochester itself, rather than Monroe County in which Rochester sits.

5

their own data. *See, e.g.,* Am. Compl. ¶¶ 418, 419, 422, 424.  The PBM Defendants are entitled to seek information showing that retail pharmacies, including Wegmans, (a) failed to identify potentially risky prescriptions or ignored signs of risk despite the PBM Defendants' POS communications to them, (b) failed to fulfill their obligation to check the data available to them before dispensing opioids, and/or (c) failed to investigate and report opioid abuse, diversion, and misuse (or that others in the chain ignored any such reports, if made).

Wegmans argues that it is "not required to track Suspicious Orders," but that is not responsive to these Requests.  If Wegmans did, in fact, track or otherwise identify Suspicious Orders, as defined in the Subpoena, it must produce responsive documents.  Even if it did not, Wegmans must still produce the documents and external communications responsive to Request No. 7, concerning Wegmans' efforts to identify, investigate, and report the improper prescription, diversion, abuse, misuse, trafficking of opioids.

**Requests No. 8-11** seek documents and communications related to the diversion or misuse of opioids from Wegmans's pharmacies. Specifically, Request No. 8 seeks all documents and communications related to actions taken by Wegmans against current or former employees for the diversion, misuse, or improper dispensing of drugs within the Drug Scope;[5] Request No. 9 seeks documents related to theft, loss, or diversion of drugs within the Drug Scope from Wegmans' pharmacies in Rochester; Request No. 10 seeks documents related to investigations by law enforcement or regulators into Wegmans' practices regarding drugs within the Drug Scope;[6] and Request No. 11 seeks documents sufficient to identify any regulatory, civil, or criminal actions or investigations to which Wegmans was a party related to such drugs.

Wegmans objects to these Requests as irrelevant.  But the requested documents are directly relevant to the PBM Defendants' defense that others, including Wegmans (the largest dispenser of opioids in Rochester)—not the PBM Defendants—are responsible for Plaintiff's alleged injuries. *See Palmatier v. Mr. Heater Corp.*, 159 A.D. 3d 1084, 1085, 71 N.Y.S.3d 717 (2018).  As the retail pharmacy that bought approximately 30% of the opioids purchased in Rochester during the relevant time period, the PBM Defendants reasonably anticipate that Wegmans' documents will reflect a commensurate percentage of the diversion and/or misuse of those drugs, providing a fuller picture of the alleged opioid crisis in Rochester. Further, any documents showing that Wegmans itself acknowledged or was found to have over-dispensed or facilitated the misuse or diversion of opioids would, of course, be critical evidence. Wegmans is not entitled to withhold such evidence just because it could be damaging.

Finally, **Request No. 12** seeks all contracts, agreements and orders between Wegmans and any opioid manufacturer or distributor.  Wegmans again feigns ignorance as to the relevance of this request, but one of Rochester's central arguments in this case is that the PBM Defendants turned a blind eye to the harms of opioid prescriptions because they were compensated by manufacturers (an allegation that the PBM Defendants strongly dispute). Am. Compl. ¶ 293 ("The PBM Defendants, however, have financial incentives to give opioids preferential treatment relative

---

[5]  The PBM Defendants have no objection to the anonymization of employee records.

[6]  The PBM Defendants would be willing to limit this Request to only those investigations involving conduct occurring in the State of New York.

to other methods of treating pain (including non- pharmacological methods), and these incentives have made them less likely to mitigate inappropriate opioid usage."). The PBM Defendants are entitled to explore whether Wegmans received payments from opioid manufacturers and thus had the same alleged incentives. Those contracts are likely centrally maintained, meaning Wegmans has likely already collected them under its document-preservation obligations, and Wegmans has made no showing that it would face any burden in producing them, which it will undoubtedly have to do in its own cases.

### The PBM Defendants Have Attempted to Resolve the Parties' Dispute in Good Faith

The suggestion that the PBM Defendants have not negotiated in good faith is false. At every turn, Wegmans has shifted its position and demanded more from the PBM Defendants— first, asking for an explanation for the self-evident relevance of each Request; then demanding a written explanation of the Requests' relevance before engaging in further meet and confer discussions; then, demanding general authority to support the type and scope of the Requests; and then, demanding supporting authority from within the MDL. It did so without itself providing supporting authority suggesting its demands were justified under the Rules. They are not.

By contrast, the PBM Defendants have offered multiple compromises—on time frame, geographic scope and subject matter—in an effort to get *some* agreement from Wegmans to produce *some* documents responsive to the Subpoena's Requests. Despite the PBM Defendants' attempts to address Wegmans' purported concerns, Wegmans continues to refuse to produce patently relevant information.

### Wegmans Must Produce This Critical Evidence

The Federal Rules allow for "extensive intrusion into the affairs of both litigants and third parties." *In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919, 941 (6th Cir. 2019) (Guy, Jr., J., concurring in part) (citation omitted). Relevance in terms of discovery, including third party discovery, is "quite broad." *In re CareSource Mgmt. Grp. Co.*, 289 F.R.D. 251, 253 n.2 (S.D. Ohio 2013) (quoting *Lewis v. ACB Bus. Servs., Inc.*, 135 F. 3d 389, 402 (6th Cir. 1998). As the party refusing to comply with a subpoena, Wegmans "bears the burden of establishing that the issued subpoenas violate Rule 45 of the Federal Rules of Civil Procedure." *Recycled Paper Greetings, Inc. v. Davis*, 2008 WL 440458, at *3 (N.D. Ohio Feb. 13, 2008). This is a "heavy" burden." *Linder v. Dep't. of Def.*, 133 F.3d 17, 24 (D.C. Cir. 1998); *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1210 (Fed. Cir. 1987) ("The burden is particularly heavy to support a motion to quash as contrasted to some more limited protection.") (citation omitted); *Hamm v. Cunningham*, 2012 U.S. Dist. LEXIS 200833, at *2-3 (N.D. Ohio, May 16, 2012).

Given Wegmans is by far the single largest dispenser of opioids in Rochester, the discovery sought is "relevant on its face." *Hendricks v. Total Quality Logistics, LLC*, 275 F.R.D. 251, 253 (S.D. Ohio 2011) (cleaned up). If Wegmans would prefer to withhold documents out of concerns for its own liability, that is not a legitimate reason to deny the PBM Defendants critical evidence in their defense. This is particularly so where Wegmans is going to ultimately produce all this evidence in its own opioid cases anyway.

The PBM Defendants will inform the Court the parties are unable to resolve their differences and will request that it order Wegmans to produce all non-privileged documents sought by the Subpoena within 30 days.

Sincerely,

Anthony P. Alden

APA

Encl.:
Subpoena to Wegmans Food Markets, Inc.

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Ohio

| | |
|---|---|
| In re: National Prescription Opiate Litigation | ) |
| _Plaintiff_ | ) |
| v. | )    Civil Action No.  **1:17-MD-2804** |
| | ) |
| | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:         **Wegmans Food Markets, Inc.**
**100 Wegmans Market Street, Legal Dept., Rochester, NY 14624**

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedules A and B

| Place: First Legal Records c/o The Chase Agency LLC<br>28 East Main St, Suite 103,<br>Rochester, NY 14614 | Date and Time:<br><br>08/26/2024 5:00 pm |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     07/25/2024

| _CLERK OF COURT_ | | |
|---|---|---|
| | OR | /s/ Patrick King |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ _____
**Express Scripts, Inc.** _____ , who issues or requests this subpoena, are:

Patrick King, Quinn Emanuel, 700 Louisiana St., Ste. 3900, Houston TX 77002, patrickking@quinnemanuel.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  **1:17-MD-2804**

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____**0.00**____ .

I declare under penalty of perjury that this information is true.

Date: _____      _____
                                                                    *Server's signature*

                                                _____
                                                                    *Printed name and title*

                                                _____
                                                                    *Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition*. A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery*. A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions*. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection*.
**(A)** *Appearance Not Required*. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections*. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena*.
**(A)** *When Required*. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted*. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative*. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information*. These procedures apply to producing documents or electronically stored information:
**(A)** *Documents*. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified*. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form*. The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information*. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection*.
**(A)** *Information Withheld*. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced*. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**HIGHLY CONFIDENTIAL**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | **MDL No. 2804** |
| | |
| This document relates to: | **Case No.: 1:17-MD-2804** |
| | |
| *City of Rochester v. Purdue Pharma L.P.*, Case No. 19-op-45853 (Track 12) | **Judge Dan Aaron Polster** |

## SCHEDULE A TO SUBPOENA

"ARCOS Data" means data reported by DEA Registrants pursuant to 21 U.S.C. § 827 through the Automation of Reports and Consolidated Orders System.

"Communication" means any oral or written statement, dialogue, discussion, exchange, conversation, disclosure, or transmittal of information whether in-person, by telephone, any form of video transmission, mail, e-mail, facsimile, personal delivery, computer transmission, or otherwise.

"Concerning" means regarding, relating to, referring to, reflecting, discussing, describing, analyzing, supporting, evidencing, constituting, comprising, containing, setting forth, showing, disclosing, explaining, summarizing, or mentioning.

"Defendants" means Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Evernorth Health, Inc. (formerly Express Scripts Holding Company), Express Scripts Specialty Distribution Services, Inc.; UnitedHealth Group Incorporated, Optum, Inc., OptumInsight, Inc., OptumInsight Life Sciences, Inc., OptumRx, Inc., OptumRx Discount Card Services, LLC; Optum Perks, LLC; OptumHealth Care Solutions, LLC; OptumHealth Holdings, LLC; and Optum Health Networks, Inc.

"Document" or "Documents" means any information stored in a medium from which the information can be obtained. A Document includes (but is not limited to) any calendar, chart, communication, data, data compilation, database, diary, draft, drawing, electronically stored information, email, fax, floppy disk, graph, hard drive, image, index, instant message, letter, log, magnetic tape, memorandum, note, optical disk, photograph, report, sound recording, spreadsheet, storage device, text message, voicemail, writing, or any other category covered by Federal Rule of Civil Procedure 34(a)(1)(A). Any copy of a Document that differs in any respect from the original of a Document constitutes a separate Document.

"Drug Scope" means the MDL-8 opioids (Fentanyl, Hydrocodone, Hydromorphone, Morphine, Oxycodone, Oxymorphone, Tapentadol, and Methadone) as well as the Relevant Benzodiazepines

1

**HIGHLY CONFIDENTIAL**

(Alprazolam, Chlordiazepoxide, Clobazam, Clonazepam, Clorazepate, Diazepam, Estazolam, Flurazepam, Lorazepam, Midazolam, Oxazepam, Quazepam, Temazepam, and Triazolam) and Relevant Muscle Relaxers (Carisoprodol, Cyclobenzaprine, Orphenadrine, and Tizanidine).

"Employee" includes but is not limited to all current and former employees, independent contractors, and individuals performing work as temporary employees.

"Investigation" means any investigation conducted by any Person of any Person, including but not limited to investigations of any Defendant related to manufacturing, distributing, dispensing, prescribing, using, abusing, trafficking, or diverting Opioids.

"MDL-8 Opioids" means Fentanyl, Hydrocodone, Hydromorphone, Morphine, Oxycodone, Oxymorphone, Tapentadol, and Methadone.

"Opioid(s)" means substances comprised of or containing natural, synthetic, or semisynthetic chemicals that bind to opioid receptors in the brain or body, including heroin, fentanyl, carfentanil, and fentanyl-type analogs, as well as MDL-8 Opioids.

"Person" means any natural or legal person or any entity, including a government officer or agency.

"Relevant Benzodiazepines" means Alprazolam, Chlordiazepoxide, Clobazam, Clonazepam, Clorazepate, Diazepam, Estazolam, Flurazepam, Lorazepam, Midazolam, Oxazepam, Quazepam, Temazepam, and Triazolam.

"Relevant Muscle Relaxers" means Carisoprodol, Cyclobenzaprine, Orphenadrine, and Tizanidine.

"Requests" means the requests for production of documents set forth herein.

"Suspicious Order(s)" means any order of drugs within the Drug Scope, or other Opioids, that (i) You believe, suspect, or contend should have been reported to the United States Drug Enforcement Administration ("DEA") or state authorities, the New York, Medical Board, New York Board of Pharmacy, or New York Dental Board, as "suspicious" within the meaning of 21 C.F.R. § 1301.74(b), (ii) is referred to in a Document as "suspicious" within the meaning of 21 C.F.R. § 1301.74(b), or (iii) that You define as a suspicious order for purposes of Your work.

"Monroe County Region" means Monroe County, New York, as well as all counties in New York bordering on Monroe County, including the Counties of Orleans, Genesee, Livingston, Ontario, and Wayne, including all municipalities, cities, and towns within these counties.

"You," and "Your" means Wegmans Food Markets, Inc., including its Employees, directors, officers, executives, board members, agents and contractors or other Persons acting on behalf of Wegmans Food Markets, Inc.

**HIGHLY CONFIDENTIAL**

Whenever necessary to bring within the scope of these requests documents that might otherwise be construed to be outside their scope:

(a) the use of a verb in any tense shall be construed as the use of that verb in all other tenses;

(b) the use of a word in its singular form shall be deemed to include within its use the plural form as well;

(c) the use of a word in its plural form shall be deemed to include within its use the singular form as well;

(d) the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all documents that might otherwise be construed to be outside its scope;

(e) the use of any capitalized word shall include the same word uncapitalized, and the use of any uncapitalized word shall include the same word capitalized; and

(f) the terms "all" and "each" shall be construed as all and each.

## <u>INSTRUCTIONS</u>

A.     Produce all documents in the manner in which they are maintained in the usual course of Your business or organize and label the documents to correspond with the categories in this Schedule A. A request for a document shall be deemed to include a request for any and all physical or electronic file folders within which the document was contained, all transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document in addition to the document itself, and for any electronic document any metadata contained in the document, in the file system on which the document is stored, and/or in any active directory, SQL, LDAP, or other indices or databases that provide access, access control, or other security or index information concerning the document.

B.     If and to the extent documents are maintained in a database or other electronic format, produce along with the document(s) software that will enable access to the electronic document(s) or database as You would access such electronic document(s) or database in the ordinary course of Your business.

C.     Produce documents in such fashion as to identify the department, branch or office in which they were located and, where applicable, the natural person in whose possession it was found and the business address of each document's custodian(s).

D.     Any document withheld from production based on a claim of privilege or any similar claim shall be identified by (1) the type of document, (2) the general subject matter of the document, (3) the date of the document, and (4) such other information as is sufficient to identify the document including the author of the document, the addressee of the document, and, where not apparent, the relationship of the author and the addressee to each other. The nature of each claim of privilege shall be set forth.

E.     Documents attached to each other should not be separated.

3

**HIGHLY CONFIDENTIAL**

F.   Documents not otherwise responsive to this discovery request shall be produced if such documents mention, discuss, refer to, or explain the documents which are called for by this subpoena.

G.   In producing documents and other materials, You are requested to furnish all documents or things in Your possession, custody or control, regardless of whether such documents or materials are possessed directly by You or Your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, accountants, investigators, or by Your attorneys or their agents, employees, representatives or investigators.

H.   If You object to any part of any request, state fully in writing the nature of the objection. Notwithstanding any objections, nonetheless comply fully with the other parts of the request to which you are not objecting.

I.   Unless otherwise stated explicitly herein with regard to a particular document request, each document request shall be construed independently and not with reference to any other document request for the purpose of limitation.  The use of the singular form of any word includes the plural and vice versa. The past tense shall include the present tense and vice versa.

J.   Responsive electronic documents shall be produced as both (a) native files, including, if necessitated by Paragraph B, the software You used to create and/or view the responsive electronic documents, as well as (b) multi-page, 300dpi group IV TIFF images with extension ".tif" and (c) full text files comprising extracted text (for documents amenable to text extraction) or OCR text files (otherwise), named after the first bates number of the document, with extension ".txt" and (d) a load file with a ".dat" file extension and ASCII 020 and 254 delimiters for column break and text qualifier. The first line shall be the header with field names and each subsequent line shall contain the fielded data for each document. The load file shall include the following metadata, where available:

| Field | Description |
| --- | --- |
| BegBates | Page ID of first page in a document. |
| EndBates | Page ID of last page in a document. |
| BegAttach | BegBates of parent record. |
| EndAttach | BegBates of last attached document in family. |
| From | Author of the e-mail message. |
| To | Main recipient(s) of the e-mail message. |
| CC | Recipient(s) of "Carbon Copies" of the e-mail message. |
| BCC | Recipient(s) of "Blind Carbon Copies" of the e-mail message. |
| DateSent | Sent date of an e-mail message. |
| TimeSent | Time the e-mail message was sent. |
| Email Subject | Subject of the e-mail message. |
| Author | Author field value pulled from metadata of the native file. |
| Title | Title field value extracted from the metadata of the native file. |
| Custodian | Textual value of custodian. |
| DateCreated | Creation date of the native file. |

**HIGHLY CONFIDENTIAL**

| TimeCreated | Creation time of the native file. |
|---|---|
| EntryID | Unique identifier of e-mails in mail stores. |
| FileDescription | File extension or other description of native file type. |
| Filename | Original filename of native file. Contains subject of e-mail message for e-mail records. |
| Filesize | Size of native file, in bytes. |
| MD5Hash | MD5 hash-128-bit output. |
| Attach | Semi-colon delimited string of first level attachments in the e-mail. |
| DateLastMod | Date the native file was last modified. |
| TimeLastMod | Time native file was last modified. |
| PgCount | Number of pages in a document. |
| NativeFile | Logical file path to the native file. |
| OCRPath | Logical file path to the OCR text. |

This instruction – which concerns in part the preparation of a load file that includes metadata – is separate from, and in addition to the directions in:

Instruction A, which requires that You produce native files with all file, file= system, index, and access control metadata intact -and

Instruction B, which requires, for particular electronic documents, the production of software You use(d) in Your ordinary course of business to create and review the native electronic documents.

K.   Responsive paper documents shall be scanned and produced electronically along with an appropriate load file as described in subsections (b), (c), and (d) of Paragraph J.

L.   Unless otherwise stated in a specific request, these requests seek responsive information and documents authored, generated, disseminated, drafted, produced, reproduced, or otherwise created or distributed or related to the period beginning **January 1, 1996 and ending as of Today**.[1]  Whenever a request does specifically refer to a date range, that date range should be construed as beginning on the first moment of the first date in the range and ending on the last moment of the last date in the range.

## DOCUMENTS REQUESTED

1)  Dispensing data reflecting all drugs within the Drug Scope, that You dispensed in the Monroe County Region from January 1, 2006 to present.  The data should include the following fields:

   a)  Drug name

---

[1]   The Special Master in this litigation has ordered discovery back to 1996. If the Court modifies that ruling, we will narrow the temporal scope of the Requests.

**HIGHLY CONFIDENTIAL**

b) NDC number

c) Date filled

d) Quantity dispensed

e) Dosage form

f) Days' supply

g) Prescriber's name

h) Prescriber's DEA number

i) Dispensing pharmacist

j) Patient Zip Code

k) Patient ID # (Unique ID)

l) Quantity prescribed

m) Number of refills authorized (if any)

n) Diagnostic code

o) Method of payment

p) Patient paid amount

q) Whether prescription covered by third-party payor

r) Control / Non Control ratio

s) Pharmacy DEA #

t) Pharmacy Store #

u) Pharmacy address (at the zip code level or finder)

v) Prescriber address (at the zip code level or finder)

w) Prescription Date written

x) Refill indicator (whether the Rx is a refill or the original)

y) Prescriber Specialty

z) Rejection Indicator (Whether the pharmacy rejected to fill)

**HIGHLY CONFIDENTIAL**

    aa) Prescriber's NPI Number

    bb) Patient DOB Year (or age)

    cc) DEA Override

    dd) DEA Schedule (Same as Control/Non-Control)

    ee) Dispense Hour

    ff) Dispense Minute

    gg) Drop Off Hour

    hh) Drop Off Minute

2) Documents sufficient to show how You and any pharmacists employed by You (or other employees involved in dispensing drugs within the Drug Scope) do or do not consider, use, respond to, or interact with communications received from pharmacy benefit managers (including, but not limited to, the Defendants) at the point of sale, including, but not limited to, communications regarding plan coverage limits (such as prior authorizations, step edits, and quantity limits) and communications regarding health and safety issues (such as concurrent drug utilization review or CDUR messages), from January 1, 1996, to present.  Your response should include documents responsive at both the pharmacy and individual employee level, and should include any pertinent policies, procedures, directives, or guidance.

3) All Documents and Communications Concerning any literature, publications, presentations, analyses, studies, reports, guidelines, directives, announcements, recommendations, pamphlets, circulars, notices, or other materials provided by any drug manufacturer to You regarding the efficacy, addictive qualities, and/or safety of any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

4) All Documents and Communications Concerning any guidance, directives, instructions, publications, alerts, notices, presentations, or other materials You provided to Employees Concerning any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

5) Documents sufficient to show all Suspicious Orders You identified or for which you received notice in the Monroe County Region, from January 1, 2006 to present.

6) All Documents and Communications Concerning Your use, review, or analysis of ARCOS data, data from the New York Prescription Monitoring Program, or other data relating to Suspicious Orders, including all Communications to or from the U.S. Drug Enforcement Agency or the New York Prescription Monitoring Program Concerning any drug within the Drug Scope, or any other Opioid, from January 1, 2006 to present.

7) All Documents and Communications Concerning efforts of any kind by You to identify, investigate, or report to any national, state, or local governments, agencies, boards, institutions,

**HIGHLY CONFIDENTIAL**

associations, law enforcement bodies, health departments, or drug taskforces Concerning any of the following regarding any drug within the Drug Scope, or any other Opioid, from January 1, 1996 to present: (a) improper prescribing or failing to prescribe by doctors or other prescribers in the Monroe County Region; (b) doctor-shopping, forgery, or counterfeiting of prescriptions by patients in the Monroe County Region; (c) diversion, abuse, misuse, diversion, trafficking; or (d) any other concerns Concerning potentially improper or illegal prescriptions.

8) All Documents and Communications Concerning all actions (including fines, suspensions, revocations, terminations, voluntary agreements not to practice, resignations, and letters or other formal warnings or notices) taken by You against any current or former Employee Concerning any drug within the Drug Scope, or any other Opioid, including for the prescribing, dispensing, failure to prescribe, failure to dispense, diversion, or misuse of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

9) Documents sufficient to show all instances of theft, loss, or diversion of any drug within the Drug Scope, or any other Opioids, from any facility owned, operated, supported by, serviced by, or affiliated with You in the Monroe County Region, from January 1, 1996 to present.

10) All Documents and Communications Concerning any Investigation or other inquiry conducted by any state or federal office, agency, department, committee, or program (including the DEA, the Federal Bureau of Investigation, a United States Attorney or representative thereof, any government-level department or agency within the State of New York), or any state board (including the New York Medical Board, New York Board of Pharmacy, New York Dental Board, New York Nursing Board, or any medical examiner's office in New York) into any of Your practices related to the prescribing, ordering, dispensing, distributing, administering, or diversion of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

11) Documents sufficient to identify any regulatory, civil, or criminal actions or investigation Concerning any drug within the Drug Scope, or any other Opioids, to which you were a party or participated in any manner, from January 1, 1996 to present.

12) All Documents reflecting contracts, agreements, orders, or other formal documents between You and any manufacturer or distributor of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present.

8

**HIGHLY CONFIDENTIAL**

Dated: July 24, 2024

/s/ Brian D. Boone
Brian D. Boone
**ALSTON & BIRD LLP**
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
Tel: (704) 444-1000
brian.boone@alston.com

William H. Jordan
Andrew Hatchett
**ALSTON & BIRD LLP**
1201 West Peachtree Street NW, Suite 4900
Atlanta, GA 30309
Tel.: (404) 881-7000
bill.jordan@alston.com
andrew.hatchett@alston.com

*Attorneys for OptumRx, Inc.*

By:   /s/ Ellison Ward Merkel
Ellison Ward Merkel
ellisonmerkel@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Ave, 22nd Floor
New York, NY 10010
Telephone: 212-849-7362

*Attorney for Defendants Express Scripts, Inc. and ESI Mail Pharmacy Service, Inc.*

**HIGHLY CONFIDENTIAL**

## **AFFIDAVIT**

STATE OF _____ )

COUNTY OF_____ )

Before me, the undersigned authority, personally appeared_____, who, being by me duly sworn, deposed as follows:

My name is _____. I am of sound mind, capable of making this Affidavit, and I am personally acquainted with the facts stated herein:

I am the duly authorized Custodian of Records for Wegmans Food Markets, Inc. Attached hereto are _____ pages of records relating to Wegmans Food Markets, Inc. These _____ pages of records are kept by Wegmans Food Markets, Inc. in the regular course of business, and it was the regular course of business of Wegmans Food Markets, Inc. or an employee or representative of Wegmans Food Markets, Inc. with knowledge of the act, event, condition, opinion, or diagnosis recorded to make a record or transmit information thereof to be included in such record; and the record was made at or near the time of the act, event, condition, opinion, or diagnosis. The records attached hereto are the originals or exact duplicates of the originals.

_____

Affiant, Custodian of Records

IN WITNESS WHEREOF I have hereunto subscribed my name and affixed my official seal this _____ day of _____, 2024.

_____

Notary Public

My Commission Expires:

_____

10

# SCHEDULE B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| This document relates to: | Case No. 17-md-2804 |
| *All Cases* | Judge Dan Aaron Polster |

## CASE MANAGEMENT ORDER NO    3
## REGARDING DOCUMENT AND ELECTRONICALLY STORED INFORMATION PRODUCTION PROTOCOL

### 1. PURPOSE

This Order will govern production of Documents and ESI (as defined below) by Plaintiffs and Defendants (the "Parties") as described in Federal Rules of Civil Procedure 26, 33, and 34. This Order shall apply to the production of hard-copy and electronic documents by the Parties in this litigation.

The production of documents and ESI by the Parties also shall be subject to the provisions of orders concerning confidentiality, privilege, and/or protected health information as agreed to among the Parties and/or entered by the Court.

The Parties reserve all objections under the Federal Rules of Civil Procedure and applicable decision authority other than concerning matters that are addressed in this Order.

Nothing in this Order shall be interpreted to require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity. The Parties do not waive any objections to the discoverability, admissibility, or confidentiality of documents

or ESI. Nothing in this Order shall be interpreted to supersede the provisions of orders governing confidentiality, privilege, and/or protected health information entered by the Court in this litigation, unless expressly provided for in such an order.

## 2. DEFINITIONS

a. **"Confidentiality Designation"** means the legend affixed to Documents or ESI for confidential or highly confidential information as defined by, and subject to, the terms of the order concerning confidentiality agreed to an/or entered by the Court in this litigation.

b. **"Document"** is defined to be synonymous in meaning and equal in scope to the usage of this term in Rules 26 and 34 of the Federal Rules of Civil Procedure. The term "document" shall include hard-copy documents, electronic documents, and ESI as defined herein.

c. **"Electronic Document or Data"** means documents or data existing in electronic form at the time of collection, including but not limited to: e-mail or other means of electronic communications, word processing files (e.g., Microsoft Word), computer slide presentations (e.g., PowerPoint or Keynote slides), spreadsheets (e.g., Excel), and image files (e.g., PDF).

d. **"Electronically stored information" or "ESI,"** as used herein, has the same meaning as in Rules 26 and 34 of the Federal Rules of Civil Procedure and includes Electronic Documents or Data, and computer-generated information or data, stored in or on any storage media located on computers, file servers, disks, tape, USB drives, or other real or virtualized devices or media.

e. **"Extracted Full Text**" means the full text that is extracted electronically from native electronic files, and includes all header, footer, and document body

2

information.

 f. **"Hard-Copy Document"** means documents existing in paper form at the time of collection.

 g. **"Hash Value"** is a unique numerical identifier that can be assigned to a file, a group of files, or a portion of a file, based on a standard mathematical algorithm applied to the characteristics of the data set. The most commonly used algorithms, known as MD5 and SHA, will generate numerical values so distinctive that the chance that any two data sets will have the same Hash Value, no matter how similar they appear, is less than one in one billion.

 h. **"Load files"** means an electronic file containing information identifying a set of paper-scanned images, processed ESI, or native format files, as well as the corresponding Extracted Full Text or OCR text files, and containing agreed-upon extracted or user-created metadata, as well as information indicating unitization (i.e., document breaks and document relationships such as those between an email and its attachments) used to load that production set into the document review platform of the Party receiving a production ("Receiving Party"), and correlate its data within that platform. A load file is used to import all image, native, and text files and their corresponding production information into a document database. The Producing Party shall produce a load file for all produced documents with each particular production in accordance with specifications provided herein.

 i. **"Media"** means an object or device, real or virtual, including but not limited to a disc, tape, computer, or other device on which data is or was stored.

3

j. **"Metadata"** means: (i) information embedded in or associated with a native file that describes the characteristics, origins, usage, and/or validity of the electronic file; (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system, (iii) information, such as Bates numbers, redaction status, privilege status, or confidentiality status created during the course of processing documents or ESI for production, and (iv) information collected during the course of collecting documents or ESI, such as the name of the media device on which it was stored, or the custodian or non-custodial data source from which it was collected.  Nothing in this order shall require any party to manually populate the value for any metadata field.

k. **"Native Format" or "native file"** means the format of ESI in which it was generated and/or used by the Party Producing ESI or documents (the "Producing Party") in the usual course of its business and in its regularly conducted activities. For example, the native format of an Excel workbook is an .xls or .xslx file.

l. **"Optical Character Recognition" or "OCR"** means the optical character recognition technology used to read the text within electronic images of paper Documents and create a file containing a visible, searchable text format of such Documents.

m. **"Searchable Text"** means the native text extracted from an electronic document and any Optical Character Recognition text ("OCR text") generated from the electronic image of a paper Document.

## 3. E-DISCOVERY LIAISON

The Parties will identify to each other liaisons who are and will be knowledgeable about and responsible for discussing their respective ESI ("E-discovery Liaisons"). Each Party's designated E-discovery Liaison(s) will be, or will have access to those who are, familiar with their Party's respective electronic systems and capabilities and knowledgeable about the technical aspects of e-discovery, including the location, nature, accessibility, format, collection, search methodologies, and production of ESI in this matter. The Parties will rely on the liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention.

## 4. IDENTIFICATION OF DOCUMENTS AND ESI

a. The Parties agree to meet and confer to discuss (i) the identification of the custodial and noncustodial data sources containing potentially relevant ESI for potential collection, review, and production; (ii) additional parameters for scoping the review and production efforts (e.g., application of date ranges, de-NIST'ing, etc.); (iii) potential use and identification of search terms, tools, or techniques; (iv) the identification and production of documents and ESI from custodial and non-custodial sources that do not require the use of search terms, tools, or techniques; (v) the method each Party proposes to use to identify and de-duplicate duplicate documents, and any exceptions to such de-duplication the Party proposes to implement; and (vi) the treatment of non-responsive documents within parent-child families. The meet and confer between Plaintiffs and each Defendant will take place by the later of seven (7) calendar days following entry of this Order, or ten (10) days after the particular Defendant is served with a first document request herein.

b.     The Parties further agree to meet and confer to the extent that this Order imposes any undue burden or expense on any Plaintiff or Defendant with respect to its response to any particular discovery request.

c.     Nothing in this order shall be deemed to be a waiver of any Party's right to reasonably seek agreement from the other Parties, or a Court ruling, to modify proposed or previously agreed-to search terms, techniques, or tools (including any proposed as supplements).

## 5. DEDUPLICATION

a.     To the extent exact duplicate documents reside within a Party's ESI data set, the Party shall produce only a single, deduplicated copy of a responsive document. "Exact duplicate" shall mean bit-for-bit identity of the document content with exact hash value matches; so-called "near duplicates" will not be included within this definition.

b.     To the extent a party de-duplicates its documents, it shall de-duplicate stand-alone documents or entire document families in their ESI sources by the use of MD5, SHA-1, or SHA256 hash values. Where any such documents have attachments, hash values must be identical for both the document plus-attachment (including associated metadata) as well as for any attachment (including associated metadata) standing alone.

c.     A Producing Party shall de-duplicate documents across custodians and populate a field of data that identifies each custodian who had a copy of the produced document (the "Duplicate Custodian" field) in addition to a separate field of data identifying the custodian whose document is produced; such de-duplicated documents shall be deemed produced from the custodial files of each such identified custodian for all purposes in this litigation, including for use at deposition and trial. A Producing Party

6

shall use a uniform description of a particular custodian across productions. Multiple custodians in the "Duplicate Custodian" field shall be separated by a semicolon. Entity/departmental custodians should be identified with a description of the entity or department to the extent applicable.

     d.    No Party shall identify and/or eliminate duplicates by manual review or some method other than by use of the technical comparison using MD5 or SHA-1 hash values outlined above.

     e.    Hard-Copy Documents shall not be eliminated as duplicates of ESI.

     f.    If the Producing Party makes supplemental productions following an initial production, that Party also shall provide with each supplemental production an overlay file to allow the Receiving Party to update the "Duplicate Custodian" field. The overlay file shall include all custodians listed in the "Duplicate Custodian" field in prior productions and any custodians newly identified in the current supplemental production.

## 6. PRODUCTION FORMAT AND PROCESSING SPECIFICATIONS

     a.  Standard Format.  Unless otherwise specified in Section 6(b) or pursuant to Section 6(j) below, the Parties shall produce documents in tagged image file format ("TIFF").  TIFFs of ESI shall convey the same information and image as the original document, including all commenting, versioning, and formatting that is visible in any view of the document in its native application.  All hidden text will be expanded, extracted, and rendered in the TIFF file and, to the extent possible, the Producing Party will instruct its vendor to force off Auto Date.  Any TIFFs produced shall be single-page, 300 DPI, Group IV TIFF files.  After initial production in image file format is complete, a party must demonstrate particularized need for production of ESI in its native format.

b. <u>Native Format</u>.  Except as provided by Section 6(j) below, the Parties shall produce all spreadsheets, computer slide presentations, audio files, video files, and other file types that cannot be accurately represented in TIFF format in native format, provided, however, that the Parties will meet and confer regarding appropriate format of production for databases and structured data (e.g., Microsoft Access, Oracle, or other proprietary databases).  For each document produced in native format, a responding Party shall also produce a corresponding cover page in TIFF image format, specifying that the document has been "produced in native format" and endorsed with the Bates Number and Confidentiality Designation, if applicable, which will be inserted into the image population in place of the native file.  When the native file is produced, the Producing Party shall preserve the integrity of the electronic document's contents, i.e., its original formatting and metadata.

c. <u>Color</u>.  Documents containing color need not be produced in color, except that (i) word processing documents that contain hidden text, and (ii) certain redacted documents, as further provided in Section 6(j), shall be produced in color in TIFF format. The Producing Party will honor reasonable requests for a color image of a document, if production in color is necessary to understand the meaning or content of the document.

d. <u>Embedded Objects</u>.  If documents contain embedded objects, the Parties shall extract the embedded objects as separate documents and treat them like attachments to the document to the extent reasonably possible. To the extent reasonably possible, images embedded in emails shall not be extracted and produced separately.

e. Load Files. Each production of ESI and Documents shall be accompanied by Concordance or comma delimited load files (.dat and .opt) containing a field with the full path and filename to files produced in native format and also containing metadata fields identified in Appendix A, to the extent the information is available in the original ESI file and can be extracted without unreasonable burden using standard litigation support processing platforms (except for vendor-generated fields related to the litigation production, such as "BEGDOC", "ENDDOC", bases for redaction, and Confidentiality Designations).

f. .Txt Files. For all documents containing extracted full text or OCR text, the Producing Party shall provide searchable document level .txt files (named using the Bates start/"BEGDOC"), which shall reside in the same file directory as the images for such documents.

g. Bates Numbering and Other Unique Identifiers. Every item or file of ESI that is produced shall be identified by a unique page identifier ("Bates Number") and a Production Volume Number for any storage device (e.g., CD, USB, hard drive) containing such files. All Bates numbers will consist of an Alpha Prefix, followed by a numeric page index. There must be no spaces in any Bates number. Any numbers with less than 8 digits will be front padded with zeros to reach the required 8 digits. All ESI produced in TIFF format shall contain a unique Bates Number on each page of the document, electronically "burned" onto the image at a location that does not obliterate, conceal, or interfere with any information from the source document. If a member of a document family that has otherwise been determined to be responsive cannot be technically processed (e.g., unsupported file format, file corruption, inaccessible

9

password-protected document), those technical problems shall be identified and disclosed to the Receiving Party by production of a Bates-labeled slip sheet that states "Technical issue—file cannot be processed," along with a log identifying each such file; the associated metadata for the file with the technical problem shall be produced if technically possible. A Receiving Party thereafter may raise with the Producing Party any questions or concerns, and the Parties shall meet and confer to attempt to resolve any issues.

h. Hard-Copy Documents. Except as otherwise set forth in this paragraph, the Parties agree that responsive paper documents shall be converted to single-page TIFF files, and produced following the same protocols set forth in Section 6(a) above, including the production of OCR text that is generated to make such documents searchable. Generally, all paper documents will be scanned and produced electronically, unless a Party establishes good cause for making such documents available via paper and reasonable access is provided to the opposing Party to review the documents directly. In scanning all Hard-Copy Documents, Hard-Copy Documents should be logically unitized. Accordingly, distinct documents should not be merged into a single record, and single documents should not be split into multiple records. In the case of an organized compilation of separate documents (for example, a binder containing several separate documents behind numbered tabs), each of the Hard-Copy Documents should be separately scanned, but the relationship among the documents in the compilation should be reflected in the proper coding of the beginning and ending documents and attachment fields. The Parties will make their best efforts to unitize the documents correctly. Producing Hard-Copy Documents as provided herein does not

change their character from Hard-Copy Documents into ESI. For Hard-Copy Documents, the Parties need only populate the following metadata fields: "BEGDOC," "ENDDOC," "PROD VOLUME," "CUSTODIAN," "SOURCE," "CONFIDENTIAL," "REDACTION," and "COMPANY" fields, as well as "BEGATTACH" and "ENDATTACH" fields where applicable.

i. Confidentiality Designation. To the extent any Document or ESI (or portion thereof) produced as a TIFF image in accordance with this Order is designated as confidential or highly confidential under the order concerning confidentiality agreed and/or entered in this litigation, the Producing Party will brand the required Confidentiality Designation in a corner of any TIFF images representing the produced item and in a consistent font type and size that does not obscure any part of the underlying image or Bates number, to the extent possible.

j. Redactions. A Party may use redactions to protect attorney-client or work product privileges consistent with the order concerning privilege agreed and/or entered in this litigation. Other than as permitted by this Order or the order concerning confidentiality agreed and/or entered in this litigation, no redactions for relevance may be made within a produced document or ESI item. Any redactions shall be clearly indicated on the face of the document, with each redacted portion of the document stating that it has been redacted and the basis for the redaction, and a metadata field shall indicate that the document contains redactions and the basis for redaction (e.g. "A/C Privilege"). Where a responsive document contains both redacted and non-redacted content, the Producing Party shall produce the remainder of the non-redacted portions of the document and the text/OCR corresponding to the non-redacted portions.

11

Email header information (e.g., date, subject line, etc.) should not be redacted unless it is independently privileged. The production of a document in a redacted form does not affect the Producing Party's obligation to timely assert and substantiate the assertion of privilege over the content in a privilege log. Redacted versions of spreadsheets, computer slide presentations, and word processing files containing hidden text (e.g., track changes, hidden columns, comments, notes, markups, etc.) shall be produced in color in TIFF format. The Parties shall honor reasonable requests for the production of particular redacted documents in other formats where the TIFF image is not reasonably usable.

k. Parent-Child Relationships. The Parties acknowledge and agree that parent-child relationships within a document family (the association between an attachment and its parent document or between embedded documents and their parent) shall be preserved. Responsive non-privileged electronic documents attached to an e-mail or embedded within other electronic documents and hard-copy documents attached or appended to hard-copy documents must be mapped to their parent by the beginning Bates number and immediately follow that parent file in the sequence of the production. Email attachments and embedded files or links "BEGATTACH" and "ENDATTACH" fields listing the unique beginning Bates number of the parent documents and ending number of the last attachment must be populated for each child and parent document.

l. OCR. OCR software shall be set to the highest quality setting during processing.

m. Deviation from Production Specifications. If a particular document or category of documents warrant a different format, the Parties will cooperate in good faith to arrange for a mutually acceptable production format.

n. Productions From Other Proceedings Pursuant to CMO 1. The production of documents made by Defendants in other civil investigations, litigations, and/or administrative actions by federal (including Congressional), state, or local government entities pursuant to CMO 1 shall be made in the format in which they were previously produced, including any previously produced metadata, load files, and accompanying text files.

o. Password Protection. In the event any Document or ESI (or portion thereof) produced is password protected, the Producing Party shall make all reasonable efforts to provide the password needed to access the document or ESI.

p. Use at Deposition. Any document produced in native that a party identifies and/or marks as an exhibit at a deposition must include as part of that identification or exhibit the produced corresponding cover page in TIFF image format, endorsed with document's Bates Number and Confidentiality Designation, as described in Section 6(a), above.

## 7. PRODUCTION MEDIA

The Producing Party shall produce documents on readily accessible, computer or electronic media, including CD-ROM, DVD, external hard drive (with standard PC compatible interface), via secure FTP site, or such other readily accessible computer or electronic media as the Parties may agree (the "Production Media"). Each piece of Production Media shall be encrypted and assigned a production number or other unique

13

identifying label ("Production Volume Number") corresponding to the date of the production of documents on the Production Media as well as the sequence of the material in that production, and shall include (a) the name of the litigation and the case number; (b) the identity of the Producing Party; (c) the production date; (d) the Bates Number range of the materials contained on such Production Media item; and (e) the Production Volume Number of the Production Media. The Producing Party shall accompany all document productions with a transmittal cover letter identifying by Bates number the documents produced. If the Producing Party produces documents via secure FTP site, the Producing Party shall specify the date through which the materials will remain available via the secure FTP site and the Producing Party shall, within a reasonable time, accommodate requests from another Party or Parties that documents be reposted to the FTP site.

## 8. COST SHIFTING

The costs of production pursuant to this Order shall be borne by the Producing Party. However, in agreeing to this Order, no Party waives or relinquishes any right or interest it may have under the Federal Rules of Civil Procedure to seek cost shifting or apportionment for the costs of electronic discovery.

## 9. THIRD-PARTY ESI

a. A Party that issues a non-Party subpoena (the "Issuing Party") shall include a copy of this Order and the order concerning confidentiality agreed and/or entered in this litigation with the subpoena and state that the Parties in the litigation have requested that third-Parties produce documents in accordance with the specifications set forth herein.

b. The Issuing Party shall produce a copy to all other Parties of any

14

documents and ESI (including any metadata) obtained under subpoena to a non-Party.

c. If the non-Party production is not Bates-stamped, the Issuing Party will endorse the non-Party production with unique Bates prefixes and numbering scheme prior to reproducing them to all other Parties.

## 10. BEST EFFORTS COMPLIANCE AND DISPUTES

The Parties agree to use their best efforts to comply with and resolve any differences concerning compliance with any provision/s of this Order. If a Producing Party cannot comply in a particular circumstance with this Order, such Party shall promptly inform the Receiving Party in writing why compliance with the Order is not reasonable or feasible. No Party may seek relief from the Court concerning compliance or non-compliance with the Order until it has met and conferred with the other Party in a good faith effort to resolve or narrow the area of disagreement.

## 11. MODIFICATION

This Order may be modified by a Stipulated Order of the Parties or by the Court for good cause shown.

IT IS SO ORDERED.

Date: 5/15/18 _____          /s/Dan Aaron Polster _____

Hon. Dan Aaron Polster
United States District Judge

15

## Appendix A: ESI Metadata and Coding Fields

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| BegDoc | Bates number of the first page of the document. | All | Prefix-0000000001 |
| EndDoc | Bates number of the last page of the document. | All | Prefix-0000000002 |
| BegAttach | Bates number of the first page of the first document of the document family. | All | Prefix-0000000001 |
| EndAttach | Bates number of the last page of the last document of the document family. | All | Prefix-0000000004 |
| PageCount | Number of printed pages in the document. | All | 2 |
| Confidential | Confidentiality designation, if any, of the document | All | Confidential<br>Highly Confidential |
| Custodian | Names of all custodians who possessed the document, including deduplicated values, in format: Lastname, Firstname.<br><br>Where multiple individuals share first and last name, individuals should be distinguished by an initial which is kept constant between productions. For instance: Smith, John A. and Smith, John B.<br><br>For documents from centralized repositories where custodian name(s) are unavailable, identifying source information should be provided. | All | Doe, John; Smith, John; Smith, Jane |
| Duplicate Custodian | Names of all other custodians who possessed the document. | ESI | |
| Duplicate Custodian File Name | The names of unproduced duplicate copies of files. | ESI | |
| Duplicate Custodians | The file path/directory path correlating to the unproduced | ESI | |

16

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| Directory Path | duplicate copies of files. | | |
| Source | Source shall be used in connection with document obtained from third-Parties and identify the third-Party having provided the particular material. If the third-Party's production of documents included individual custodian information, such information shall also be included in the "CUSTODIAN" field. | | |
| Subject/E-Subject | Subject line of an e-mail. | E-mails | Text of the subject line |
| To | All recipients that were included on the "To" line of the e-mail. | E-mails | John.Doe@e-mail.com |
| From | The name and e-mail address of the sender of the e-mail. | E-mails | Jane.Doe@e-mail.com |
| CC | All recipients that were included on the "CC" line of the e-mail. | E-mails | Bill.Black@email.com |
| BCC | All recipients that were included on the "BCC" line of the e-mail. | E-mails | ceo-gs@email.com |
| DateSent | Date an e-mail was sent. | E-mails | 01/01/2015 |
| TimeSent | Time an e-mail was sent. | E-mails | 12:30:00 |
| DateModified | Date the document was last modified. | E-attachments; Electronic documents | 01/01/2015 |
| TimeModified | Time the document was last modified. | E-attachments; Electronic documents | 12:30:00 |
| DateCreated | Date the document was created. | E-attachments; Electronic documents | 01/01/2015 |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| TimeCreated | Time the document was created. | E-attachments; Electronic documents | 12:30:00 |
| Family Date | Date last modified or, for e-mails, sent date of the parent | Electronic documents; E-attachments | 01/01/2015 |
| Family Time | Time last modified or, for e-mails, sent time of the parent | Electronic documents; E-attachments | 12:30:00 |
| DateReceived | Date email was received. | E-mails | 01/01/2015 |
| TimeReceived | Time email was received. | E-mails | 12:30:00 |
| DateAccessed | Date document last accessed | Electronic documents; E-attachments | 01/01/2015 |
| Date Last Printed | Date the document was last printed. | E-attachments; Electronic documents | 01/01/2015 |
| Time Last Printed | Time the document was last printed. | E-attachments; Electronic documents | 12:30:00 |
| Date Last Saved | Date the document was last saved. | E-attachments; Electronic documents | 01/01/2015 |
| Importance | Level assigned by creator | E-mails | High |
| Conversation | E-mail conversation designation | E-mail | Re: Smith Summary |
| Conversation Index | | E-mail | |
| Title/E-Title | Title of document | E-attachments; Electronic documents | Smith Summary |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| Redaction | Basis for redactions in document. | E-attachments; Electronic documents | |
| FileName | File name of original document | Electronic documents; E-attachments | Microsoft Word 2007/2010 |
| File Type | Application type | Electronic documents; E-attachments | Word |
| File Size | Size of file | All | 40 gb |
| File Extension | The file extension of the document. | E-attachments; Electronic documents | .doc |
| NativeLink | Relative file path to each native file on the production media. | All documents produced in native format | \Natives\Document_12345.doc |
| Author | Document author/creater | E-attachments; Electronic documents | John Doe |
| Company | Party making the production | All | Company X |
| Title | Document Title | E-attachments; Electronic documents | Text of the title line |
| HASH | MD5 or SHA-1 Hash value | Electronic documents; E-attachments; E-mails | |
| Prod Volume | Production Volume | All | Defendant X Volume 1 |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| File Path | | | |
| AttachDocID | | Electronic documents; E-attachments; E-mails | |
| ATTACHNAME | | | |
| ATTACHRANGE | | | |
| FOREIGN LANGUAGE | | | |
| TIME ZONE PROCESSED | | | |
| E-LAST MODIFIED BY | | | |
| MESSAGE TYPE | | | |
| CALENDAR MEETING STOP/START | | | |
| RECORD TYPE | | | |
| HAS HIDDEN DATA | | | |
| HIDDEN COLUMNS | | | |
| HIDDEN NOTES | | | |
| HIDDEN ROWS | | | |
| HIDDEN SHEETS | | | |
| HIDDEN SHEETS COUNT | | | |
| HIDDEN SLIDES | | | |
| HIDDEN TEXT | | | |
| HIDDEN TRACK CHANGES | | | |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| HIDDEN VERY HIDDEN SHEETS | | | |
| HIDDEN VERY HIDDEN SHEETS COUNT | | | |
| HIDDEN WHITE TEXT | | | |
| HIDDEN WORKBOOK | | | |
| HIDDEN WORK BOOK WRITE PROTECTED | | | |
| MESSAGE ID | | | |
| NUMBER OF ATTACHMENTS | | | |
| ORIGINAL FOLDER PATH | | | |
| IS EMBEDDED | | | |
| TextPath | Relative file path to each extracted text/OCR text file on the production media. | All | \Text\Document_12345.txt |

# EXHIBIT 8

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3159**

WRITER'S EMAIL ADDRESS
**anthonyalden@quinnemanuel.com**

November 11, 2024

**VIA E-MAIL**
JZawodzi@hodgsonruss.com
JAgins@hodgsonruss.com
JGalvin@hodgsonruss.com
CWells@hodgsonruss.com

Re:   *In re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio)
      *City of Rochester v. Purdue Pharma L.P.*, No. 19-op-45853 (Track 12)
      Letter Memorializing November 6 Meet and Confer on Wegmans Subpoena

Counsel:

        We write on behalf of Express Scripts, Inc. and OptumRx, Inc. (collectively, the **PBM Defendants**) to memorialize the meet and confer with Wegmans Food Markets, Inc. (**Wegmans**) on November 6, 2024.  The meet and confer concerned Wegmans' relevance and burden objections to a subpoena served by the PBM Defendants on July 25, 2024 (the **Subpoena**) and the document requests therein (the **Requests**).

        The meet and confer was a continuation of the PBM Defendants' ongoing efforts to resolve Wegmans' objections to the Requests.  Through our several previous communications, both emails and calls, the PBM Defendants have offered to narrow the Requests to address Wegmans' ostensible concerns, including providing proposed search terms, narrowing the geographical scope, the temporal scope,[1] and the drug scope, among other things.  During the meet and confer, the PBM Defendants spent approximately one hour explaining the relevance of each Request, a summary of which is included below.  To date, Wegmans has not agreed to produce any documents in response to the Requests.

_____

[1] The PBM Defendants limit their Requests to documents and data generated, sent, or received on or before December 31, 2019.  This corrects the date included in our October 16, 2024 email, which inadvertently limited the Requests to "on or before January 1, 2019."  This correction mirrors the date range the PBM Defendants have agreed to with regards to their own discovery in this matter.

quinn emanuel urquhart & sullivan, llp

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON |
LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO |
SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

Request No. 1:

Request No. 1 asks Wegmans to produce "[d]ispensing data reflecting all drugs within the Drug Scope, that You dispensed in the Monroe County Region from January 1, 2006 to present. The data should include the following fields: [fields excluded]."

Wegmans asked if the PBM Defendants have produced similar dispensing data in the MDL. They have. The PBM Defendants have produced data from 2009 (ESI) and 2010 (OptumRx) through 2019, including mail-order pharmacy data fields similar to those in Request No. 1 (to the extent reasonably available). The fields in Request No. 1 also align with what Special Master Cohen previously ordered retail pharmacy defendants to produce in the MDL. (See Ex. 1).

Wegmans also stated that, to the extent the PBM Defendants already possessed ARCOS data, there was no need to seek such data from Wegmans. But the PBM Defendants clarified that the requested dispensing data offers far more information than what is available on ARCOS, including, for example, whether a pharmacy refused to fill a prescription. ARCOS data is high-level, only tracking the flow of a prescription opioids from the manufacturer to pharmacies. ARCOS data does not shed light on the flow of drugs from pharmacy to patient. Because the PBM Defendants do not have dispending data beyond what is in ARCOS, they need such data from Wegmans.

Request No. 2:

Request No. 2 asks Wegmans to produce "[d]ocuments sufficient to show how You and any pharmacists employed by You (or other employees involved in dispensing drugs within the Drug Scope) do or do not consider, use, respond to, or interact with communications received from pharmacy benefit managers (including, but not limited to, the Defendants) at the point of sale, including, but not limited to, communications regarding plan coverage limits (such as prior authorizations, step edits, and quantity limits) and communications regarding health and safety issues (such as concurrent drug utilization review or CDUR messages), from January 1, 1996, to present. Your response should include documents responsive at both the pharmacy and individual employee level, and should include any pertinent policies, procedures, directives, or guidance."

The PBM Defendants and Wegmans discussed the scope of communications involving Wegmans and the PBM Defendants. Wegmans asked the PBM Defendants to identify the specific types of communications that are being sought. The PBM Defendants stated that they would not provide specific communications because the PBM Defendants do not intend to limit the Request to a specific set of communications. To be clear: the Request does not seek communications with PBMs, but rather documents sufficient to show Wegmans' use and reaction to such communications. These are documents that the PBM Defendants obviously do not have. Nonetheless, the PBM Defendants are willing to agree to the use of search terms regarding this Request.

As to Wegmans' relevance concerns, the PBM Defendants clarified that, to the extent PBMs provided Wegmans with information on opioids, the way that Wegmans and its employees

used or considered that information is likely to support the PBM Defendants defenses against the allegations in the Amended Complaint.  For example, Plaintiff alleges that PBMs, including the PBM Defendants, contracted directly with retail pharmacies to further the oversupply of opioids.  (*See* MDL Dkt. 5346 Ex. 1 ¶¶ 245–51 (Rochester Redacted Supplemental Amended Complaint)).  Wegmans' response to communications from PBMs will allow the PBM Defendants to test this allegation.

Request No. 3:

Request No. 3 asks Wegmans to produce "[a]ll Documents and Communications Concerning any literature, publications, presentations, analyses, studies, reports, guidelines, directives, announcements, recommendations, pamphlets, circulars, notices, or other materials provided by any drug manufacturer to You regarding the efficacy, addictive qualities, and/or safety of any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to present."

Wegmans raised a concern that the PBM Defendants already possess this information.  The PBM Defendants explained that they do not possess documents and communications manufacturers sent to pharmacies directly, bypassing PBMs, and there are varying retention policies among different entities.  Wegmans inquired whether the PBM Defendants have made similar requests to manufacturers.  While we fail to see the relevance of the inquiry—different entities will maintain different documents—we confirm that the PBM Defendants have served third-party subpoenas to manufacturers, such as Teva, Johnson & Johnson, Janssen, and Allergan.

As to Wegmans' relevance concerns, the PBM Defendants emphasized that communications from drug manufacturers to Wegmans are relevant to understand the information Wegmans received from manufacturers independently of PBMs, which is likely to support the PBM Defendants' defenses against the allegations in the Amended Complaint.  For example, the Amended Complaint alleges that opioid manufacturers conspired with the PBM Defendants to disseminate the manufacturers' deceptive propaganda.  (*See* MDL Dkt. 5346 Ex. 1 ¶¶ 330–53).  The requested documents will test this allegation by revealing manufacturer communications *independent of the PBMs*.

Request No. 4:

Request No. 4 asks Wegmans to produce "[a]ll Documents and Communications Concerning any guidance, directives, instructions, publications, alerts, notices, presentations, or other materials You provided to Employees Concerning any drugs within the Drug Scope, or any other Opioids, from January 1, 1996 to present."

Wegmans questioned the relevance of its internal communications with employees regarding opioids.  The PBM Defendants explained that these discussions help establish the role PBMs played, or did not play, in influencing dispensing behavior.  To the extent Wegmans was instructing its employees on opioids, that is likely to support the PBM Defendants defenses against the allegations in the Amended Complaint.

Request Nos. 5 & 6:

Request No. 5 asks Wegmans to produce "[d]ocuments sufficient to show all Suspicious Orders You identified or for which you received notice in the Monroe County Region, from January 1, 2006 to present."

Request No. 6 asks Wegmans to produce "[a]ll Documents and Communications Concerning Your use, review, or analysis of ARCOS data, data from the New York Prescription Monitoring Program, or other data relating to Suspicious Orders, including all Communications to or from the U.S. Drug Enforcement Agency or the New York Prescription Monitoring Program Concerning any drug within the Drug Scope, or any other Opioid, from January 1, 2006 to present."

Wegmans confirmed it does not receive "orders" as a distributor would, and therefore claimed that these Requests do not apply.  The PBM Defendants noted that they do not seek documents that do not exist and trust Wegmans' counsel's representation as officers of the court that Wegmans does not have this data.  The PBM Defendants clarified, however, that if Wegmans has any responsive records related to, for example, monitoring or tracking suspicious orders, those documents would be responsive to the Request and should be produced.  Please advise as to whether Wegmans has such documents.

Request Nos. 7–11:

Request No. 7 asks Wegmans to produce "[a]ll Documents and Communications Concerning efforts of any kind by You to identify, investigate, or report to any national, state, or local governments, agencies, boards, institutions, associations, law enforcement bodies, health departments, or drug taskforces Concerning any of the following regarding any drug within the Drug Scope, or any other Opioid, from January 1, 1996 to present: (a) improper prescribing or failing to prescribe by doctors or other prescribers in the Monroe County Region; (b) doctor-shopping, forgery, or counterfeiting of prescriptions by patients in the Monroe County Region; (c) diversion, abuse, misuse, diversion, trafficking; or (d) any other concerns Concerning potentially improper or illegal prescriptions."

Request No. 8 asks Wegmans to produce "[a]ll Documents and Communications Concerning all actions (including fines, suspensions, revocations, terminations, voluntary agreements not to practice, resignations, and letters or other formal warnings or notices) taken by You against any current or former Employee Concerning any drug within the Drug Scope, or any other Opioid, including for the prescribing, dispensing, failure to prescribe, failure to dispense, diversion, or misuse of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present."

Request No. 9 asks Wegmans to produce "[d]ocuments sufficient to show all instances of theft, loss, or diversion of any drug within the Drug Scope, or any other Opioids, from any facility owned, operated, supported by, serviced by, or affiliated with You in the Monroe County Region, from January 1, 1996 to present."

4

Request No. 10 asks Wegmans to produce "[a]ll Documents and Communications Concerning any Investigation or other inquiry conducted by any state or federal office, agency, department, committee, or program (including the DEA, the Federal Bureau of Investigation, a United States Attorney or representative thereof, any government-level department or agency within the State of New York), or any state board (including the New York Medical Board, New York Board of Pharmacy, New York Dental Board, New York Nursing Board, or any medical examiner's office in New York) into any of Your practices related to the prescribing, ordering, dispensing, distributing, administering, or diversion of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present."

Request No. 11 asks Wegmans to produce "[d]ocuments sufficient to identify any regulatory, civil, or criminal actions or investigation Concerning any drug within the Drug Scope, or any other Opioids, to which you were a party or participated in any manner, from January 1, 1996 to present."

Wegmans expressed concern about the breadth of these Requests, suggesting they were a "fishing expedition." The PBM Defendants clarified that these are targeted Requests, and the PBM Defendants have already made many concessions to assuage Wegmans' ostensible concerns, such as providing search terms, limiting the temporal scope, limiting the geographic scope, and limiting the drug scope.

As to Wegmans' relevance concerns, the PBM Defendants clarified that our Requests are relevant to understanding Wegmans' role in the opioid distribution landscape given its large market share (approximately 37.5% based on ARCOS data) in the relevant jurisdiction, which relates directly to the PBM Defendants' defenses. The PBM Defendants have served similar Requests on other third parties that have yielded relevant information, such as national pharmacies (e.g., CVS Pharmacy, Inc.; Walgreen Co.; Target Corporation; K Mart Corporation; The Medicine Shoppe Pharmacy; and Rite Aid Corporation), major manufacturers, and state and local entities. The national pharmacies have agreed to produce documents requested, including dispensing data.

Request No. 12:

Request No. 12 asks Wegmans to produce "[a]ll Documents reflecting contracts, agreements, orders, or other formal documents between You and any manufacturer or distributor of any drug within the Drug Scope, or any other Opioids, from January 1, 1996 to present."

Wegmans inquired whether the PBM Defendants are specifically seeking contracts or other types of documents. The PBM Defendants confirmed that they are seeking contracts and records such as memoranda of understanding, invoices, purchase orders, and/or receipts related to manufacturer and distributor interactions with Wegmans.

\*\*\*

At the end of our call, the PBM Defendants and Wegmans agreed that the PBM Defendants will provide preliminary responses to Wegmans's additional questions by Monday, November 11,

2024, which we have now done.  Wegmans agreed to advise as to the scope of documents it is willing to produce, such as identifying easily accessible non-custodial documents to expedite production, and the timeline on which it will complete its production, by Friday, November 15, 2024.  The PBM Defendants made clear that, absent an agreement as to the scope and timing of production by November 15, 2024, the PBM Defendants would declare impasse and seek Court intervention given the delay and pending deadlines.

Additionally, during the course of the call, Wegmans' counsel pointed the PBM Defendants to an order in the MDL that quashed a subpoena issued by Walmart to the Department of Veterans Affairs (VA).  (MDL Dkt. 3715).  But that order actually supports the PBM Defendants' position.  There, the Court denied the motion to compel because the VA, a federal agency, operates outside the retail pharmacy framework and thus lacked comparable practices: "(t)o state the obvious, the VA is not a retail pharmacy."  (*Id.* at 2).  On the other hand, Wegmans is a major retail pharmacy in Rochester, New York, and its information is directly relevant to the allegations in the Amended Complaint.

Nothing in this letter limits or waives PBM Defendants' objections, rights, or remedies.  We reserve the right to seek information and documents responsive to all of our Requests.

Sincerely,


    /Anthony P. Alden/
Anthony Alden

# Exhibit 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: NATIONAL PRESCRIPTION      )      CASE NO. 1:17-MD-2804
OPIATE LITIGATION                 )
                                  )      SPECIAL MASTER COHEN
THIS DOCUMENT RELATES TO:         )
"*Track One-B Cases*"             )
                                  )
                                  )      DISCOVERY RULING REGARDING
                                  )      PHARMACY DATA PRODUCTION

The MDL Court earlier entered two Orders setting out the scope of discovery of transactional

dispensing data from the Pharmacy Defendants in Track One-B. *See* docket no. 3055 (ordering the

Defendants to "roll out" transactional dispensing data for the entire United States from 2006

forward, first locally, then regionally, then nationally); docket no. 2976 at 2 ("Special Master Cohen

will oversee this discovery"). The Pharmacy Defendants have filed a petition for writ of mandamus

challenging these orders, *see* docket no. 3092; however, unless and until the appellate court

overrules or modifies the Court's rulings, the parties must move forward with discovery as ordered.

Accordingly, the undersigned met with the parties to determine exactly which "data fields" from the

Defendants' databases must be produced.

Plaintiffs initially sought over 160 specific data fields, including many details that qualify

as "protected health information" under HIPAA, up to and including patients' full names and

addresses.[1] The Court's discovery orders allowed discovery of much of this information. *See, e.g.*,

---

[1] *See* 45 C.F.R. §164.514(b)(2) (listing 18 categories of "identifiers" of individuals, such as
their names, telephone numbers, social security numbers, photographs, and so on).

docket no. 3055 at 2 ("The Court has put into place numerous protective orders specifically addressing health information protected under the Health Insurance Portability and Accountability Act ('HIPAA'), such as patient prescriptions."); docket no. 1421 at 2 (granting *Defendants'* request that "Track One *plaintiffs* will produce all opioid-related claims data not implicated by Title 42, Part 2 of the Code of Federal Regulations ('Part 2), with individual-identifying information.") (emphasis added). Nonetheless, the undersigned urged the parties to agree as much as possible to discovery of as few data fields as absolutely necessary, while still allowing: (1) Plaintiffs to undertake their "Red Flag analysis," and (2) Defendants to counter Plaintiffs' conclusions.[2]

During the course of the Special Master's discovery conference with the parties, Plaintiffs agreed to drop their request for all but 34 data fields. The Special Master overruled Defendants' objection to production of a few of these data fields (e.g., patient's birth year). The parties' negotiations and the Special Master's rulings were all on the record. The Special Master now documents the results of this process by attaching to this *Ruling* as Exhibit A the list of data fields the Defendants must produce. Notably, only a fraction of these 34 fields contain patient protected health information, and the most private identifiers will not be produced. Thus, for example: (1) a patient's name and social security number will be withheld, but she will be given a new, unique identifying number across databases to allow cross-reference; (2) her street address will not be produced, but her zip code will be; (3) her full date of birth will not be produced, but her birth year will be; and so on. The end result is that no person who obtains the data will learn what medications

---

[2] Plaintiffs seek to conduct a "Red Flag analysis" by having their experts examine each Defendant's data and opine whether certain prescriptions or prescription patterns should have raised a "Red Flag," such that the Defendant had an obligation to investigate the validity of the prescriptions. Defendants intend to use the same data to show Plaintiffs' analysis is faulty and/or that they did undertake all necessary and appropriate investigations.

2

any identifiable individual has received.

\*  \*  \*  \*  \*

In addition to the data fields, the parties further agreed on the list of *opioid* drugs for which prescription data would be produced.[3] The parties could not agree fully during the status conference, however, on the extent of data production for *non-opioid* drugs. Defendants did acquiesce to provide Plaintiffs with limited prescription data for (i) a single type of sedative drug known as alprazolam, and (ii) a single type of muscle relaxant known as carisoprodol[4] – because it is known that patients receiving all three of these drugs together are more likely to be opioid addicts engaged in "doctor shopping" and in presentation of questionable or suspicious prescriptions.[5] But Defendants insist they should not be required to produce data for other non-opioid drugs.

Specifically, the Pharmacy Defendants submit that their obligations regarding non-opioid prescriptions should

---

[3] Actually, the parties agreed much earlier, during litigation of Track 1A, on the list of opioids regarding which each Defendant would respond. *See, e.g.*, Walgreens' Amended Objections and Responses to Plaintiffs' First Set of Requests for Production of Documents at 6 ¶4; Walmart's Amended and Supplemental Objections and Responses to Plaintiffs' First Set Of Requests for Production, Appendix A.  The same lists continue to apply.  Buprenorphine is *not* on these lists, although Plaintiffs sought to include it in Exhibit B.

[4] Alprazolam is a type of benzodiazepine and is the active ingredient in Xanax. Carisoprodol is the active ingredient in Soma.

[5] The three drugs together are known colloquially as the "Holy Trinity" or the "Houston Cocktail." *See* Pharmacy Times, *The Perfect Storm: Opioid Risks and 'The Holy Trinity*,' http://bit.ly/HolyTrinityMDL ("'The Holy Trinity' is a drug regimen that includes at least [one] opioid, a benzodiazepine, and carisoprodol.  This combination has been rising in popularity and is commonly prescribed by 'pill mills.'"); Superior HealthPlan, *Deadly Drug Combination: The Houston Cocktail*, http://bit.ly/HoustonCocktailMDL ("The Houston Cocktail, also known as the Holy Trinity, is made up of a combination of hydrocodone, alprazolam [a benzodiazepine], and carisoprodol that, when taken together, can be lethal for patients.  The combination of these medications do not show clinical benefits and may be viewed as drug-seeking behavior.").

be limited to data concerning the "Trinity" or "Holy Trinity" combinations, described by DEA in the context of enforcement efforts and by the Ohio Board of Pharmacy, as consisting of (1) alprazolam; (2) carisoprodol; and (3) either oxycodone or hydrocodone. The Pharmacy Defendants further submit that any dispensing data concerning this combination of drugs must be limited to that which is (1) filled on the same day at the same store, (2) for the same patient, (3) prescribed by the same prescriber, and (4) dispensed in 2013 and later.

Position Paper from Tara Fumerton to Special Master at 1 (Jan. 27, 2020). Defendants support their position with, among other materials, position papers and presentations made by the DEA, FDA, and Ohio Board of Pharmacy.[6] Defendants also note correctly that every addition to their data production increases their discovery cost and to some extent the invasion of their customers' privacy.

Plaintiffs argue, however, that: (a) it is not only the specific three-drug combinations listed by Defendants that can raise "Red Flags;" and (b) the limitations of same day / same store / same prescriber are too narrow. Plaintiffs assert, for example, that if a "Red Flag" is present when a patient obtains three same-*day* prescriptions for Oxycontin (opioid), Soma (carisoprodol), and Xanax (benzodiazepine), then a "Red Flag" is equally present for a patient obtaining three same-*week* prescriptions for Oxymorphone (different opioid), Soma (carisoprodol), and Valium (different benzodiazepine). Plaintiffs assert they should be allowed to discover *all* dispensing data for prescriptions of 14 types of benzodiazapines, 4 muscle relaxants, and 11 sleep aids, because it is known that patients receiving any combination of these categories of drugs (including only just two-drug combinations) are very often also drug-seeking; therefore, these prescriptions are all necessary

---

[6] *See, e.g.*, DEA PowerPoint presentation, "DEA Perspective: Pharmaceutical Use & Abuse" (2013) (referring to the "Cocktail" or "Trinity" as being composed of "Hydrocodone, Soma®/carisoprodol, [and] Alprazolam/Xanax®").

for a full "Red Flag" analysis. *See* Exhibit B (Plaintiffs' list of drugs they want for a "Red Flag" analysis). Plaintiffs support their position with, among other material, Defendants' own documents.[7]

The Special Master has reviewed all of the materials submitted by the parties and considered carefully the extent to which the discovery Plaintiffs seek is proportional to the needs of the case, including patient privacy interests. *See* Fed. R. Civ. P. 26(b)(1). The Special Master concludes as follows:

- In addition to producing the 34 fields of transactional dispensing data for the relevant opioid drugs, Defendants shall produce data for: (i) the 14 benzodiazepines, and (ii) the 4 muscle relaxers, that are listed by Plaintiffs in Exhibit B. Defendants need not produce transactional

---

[7] *See, e.g.*, "Walgreens Pharmacist GFD [Good Faith Dispensing] Review Coaching Opportunities" PowerPoint Presentation at 13 (2013) (areas of concern include "Cocktails identified as an Opiate *or* Hydrocodone, Benzodiazepine and Carisoprodol, where the Benzodiazepine and Carisoprodol (*or* Gabapentin) *were both dispensed within 12 days plus of the Opiate dispensing date*.") (emphasis added). *See also Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 & 5195 Decision and Order*, 77 Fed. Reg. 62,316 at n.102 (DEA Oct. 12, 2012) ("The Respondents contend that the [two-drug] oxycodone-alprazolam combination was not a red flag in 2010, when most of the allegedly wrongful dispensing occurred. \* \* \* Contrary to this contention, [Diverson Investigator] Langston testified that the combination of oxycodone and Xanax (the brand name for alprazolam) was a red flag of diversion for at least "[a] couple of years ago.").

Notably, Defendants' Position Paper cites a video produced by the Ohio Board of Pharmacy to support their argument that "Red Flags" are raised *only* by the *two* combinations of: (1) alprazolam, (2) carisoprodol, and (3)(a) hydrocodone or (b) oxycodone. In fact, however, the Board's video, "Red Flags of Prescription Drug Diversion," states: "Drug addicts will often combine prescription medicines to intensify the effect. This is referred to as a 'drug cocktail,' and *involves mixing an opiate with a benzodiazepine and a muscle relaxant*."

*See* https://www.youtube.com/watch?v=WY2I2JE3Hqs at 5:55-6:00 (emphasis added). The video goes on to note that addicts use street names to refer to certain cocktails, such as "Trio" or "Trinity" for hydrocodone-alprazolam-carisoprodol, and "Holy Trinity" for oxycodone-alprazolam-carisoprodol. *Id.* at 6:00-6:20. But the video clearly states that the "Trinity" and "Holy Trinity" combinations are not the only "Red Flags." Further, the same video shows that limiting data to prescriptions from the same prescriber or filled on the same day is inappropriate. *Id.* at 7:22-7:52 (showing that multiple prescribers can be a "Red Flag" for doctor shopping, and that addicts present prescriptions for cocktail drugs over several days).

dispensing data for the 11 sleep aid medications requested by Plaintiffs. To quote again the Ohio Board of Pharmacy, the most glaring "Red Flag" prescription combinations involve "mixing an opiate with a benzodiazepine and a muscle relaxant." *See* footnote 7. The materials submitted to the Special Master do not support inclusion of sleep aid combinations in the "Red Flag cocktail menu."

- Each Defendant may choose to simply produce all of its data for benzodiazepine and muscle relaxer prescriptions, without limitation; or instead produce only data for such prescriptions where it dispensed a benzodiazepine or muscle relaxer to a patient and also dispensed an opioid to the same patient within 14 days (before or after).[8]

\* \* \* \* \*

Finally, the Special Master rules as follows regarding the timing of Defendants' data production and Plaintiffs' identification of "Red Flag" prescriptions.

- Defendants shall produce all of the required data on or before March 2, 2020.
- As soon as possible thereafter, but no later than March 30, 2020, Plaintiffs shall identify for

---

[8] In other words, each Defendant has two choices. First, it may simply produce data for *all* of its prescriptions for the listed benzodiazepines and muscle relaxers, and let Plaintiffs figure out which were given to patients who also received recent prescriptions for opioids. Second, a Defendant may instead filter its data and produce only its prescriptions for the listed benzodiazepines and muscle relaxers that it dispensed to a patient who *also* received from it a prescription for opioids within a 14-day plus-or-minus window. This gives each Pharmacy Defendant options to tailor, in part, its own discovery burden. That said, the deadlines discussed below may limit a Defendant's choice, if applying the data filter causes data production to take longer.

The Special Master adds that giving Defendants the option of a more complicated filter, such as producing non-opioid prescriptions only when the patient received *both* a benzodiazepine *and* a muscle relaxer within a 14-day plus-or-minus window of an opioid prescription, is not warranted and possibly unworkable. Last, as stated earlier, all prescription data shall date back to 2006. *See* docket no. 3055.

Defendants the prescriptions they (and their experts) conclude should have been "Red Flagged" as suspicious, and investigated or not filled.

• As soon as possible thereafter, but no later than 14 days from the date of Plaintiffs' "Red Flag" identification, Defendants shall produce, for all earlier-supplied prescriptions, any additional data fields upon which they or their experts intend to rely in defending against Plaintiffs' claims.[9]

\*       \*       \*       \*       \*

Any objection to this *Ruling* must be filed on or before January 30, 2020. Unless and until the Court sustains an objection, or this *Ruling* is affected by an Order issued by the Sixth Circuit Court of Appeals in response to the Defendants' petition for writ of mandamus, the parties must proceed in accordance with this *Ruling*. A successful objection must demonstrate abuse of discretion. *See* Fed. R. Civ. P. 53(f)(5); *Order of Appointment* (docket no. 69) at 5.

**RESPECTFULLY SUBMITTED,**

/s/ David R. Cohen
**David R. Cohen**
**Special Master**

**Dated:** January 27, 2020

---

[9] At the discovery conference, Defendants stated they might want to produce ***more than*** the agreed-upon 34 data fields, in order to defend themselves, depending on the results of Plaintiffs' "Red Flag" analysis; but they would not know their position until after having received the analysis. Accordingly, the parties agreed that: (1) Defendants could amend their data production with additional fields for all prescriptions in response to Plaintiffs' list of "Red Flag" prescriptions; and (2) when countering Plaintiffs' claims as the case goes forward, Defendants would not be allowed to rely upon any data fields they did not produce.

7

Exhibit A – List of Data Fields the Pharmacy Defendants Must Produce

| No. | Data Field |
|-----|-----------|
| 1 | Drug name |
| 2 | NDC number |
| 3 | Date filled |
| 4 | Quantity dispensed |
| 5 | Dosage form |
| 6 | Days' supply |
| 7 | Prescriber's name |
| 8 | Prescriber's DEA number |
| 9 | Dispensing pharmacist |
| 10 | Patient Zip Code |
| 11 | Patient ID # (Unique ID) |
| 12 | Quantity prescribed |
| 13 | Number of refills authorized (if any) |
| 14 | Diagnostic code |
| 15 | Method of payment |
| 16 | Patient paid amount |
| 17 | Whether prescription covered by third-party payor |
| 18 | Control / Non-Control ratio |
| 19 | Pharmacy DEA # |
| 20 | Pharmacy Store # |
| 21 | Pharmacy address (at the zip code level or finer) |
| 22 | Prescriber address (at the zip code level or finer) |
| 23 | Prescription Date written |
| 24 | Refill indicator (whether the Rx is a refill or the original) |
| 25 | Prescriber Specialty |
| 26 | Rejection indicator (whether the pharmacy rejected to fill) |
| 27 | Prescriber's NPI Number |
| 28 | Patient DOB Year (or age) |
| 29 | DEA Override |
| 30 | DEA Schedule (Same as Control/Non-Control) |
| 31 | Dispense Hour |
| 32 | Dispense Minute |
| 33 | Drop Off Hour |
| 34 | Drop Off Minute |

|   | A | B |
|---|---|---|
| 1 | **Drug Category** | **Base Drug** |
| 2 | Benzodiazepines | alprazolam |
| 3 | Benzodiazepines | chlordiazepoxide |
| 4 | Benzodiazepines | clobazam |
| 5 | Benzodiazepines | clonazepam |
| 6 | Benzodiazepines | clorazepate |
| 7 | Benzodiazepines | diazepam |
| 8 | Benzodiazepines | estazolam |
| 9 | Benzodiazepines | flurazepam |
| 10 | Benzodiazepines | lorazepam |
| 11 | Benzodiazepines | midazolam |
| 12 | Benzodiazepines | oxazepam |
| 13 | Benzodiazepines | quazepam |
| 14 | Benzodiazepines | temazepam |
| 15 | Benzodiazepines | triazolam |
| 16 | Muscle relaxers | Carisoprodol |
| 17 | Muscle relaxers | Cyclobenzaprine |
| 18 | Muscle relaxers | orphenadrine |
| 19 | Muscle relaxers | tizanidine |
| 20 | Opioid | Codeine |
| 21 | Opioid | Dihydrocodeine |
| 22 | Opioid | Fentanyl |
| 23 | Opioid | Hydrocodone |
| 24 | Opioid | Hydromorphone |
| 25 | Opioid | Levorphanol |
| 26 | Opioid | Meperidine |
| 27 | Opioid | Morphine |
| 28 | Opioid | Opium |
| 29 | Opioid | Oxycodone |
| 30 | Opioid | Oxymorphone |
| 31 | Opioid | Tapentadol |
| 32 | Opioid Treatment | Buprenorphine |
| 33 | Opioid Treatment | Methadone |
| 34 | Sleep Aid | doxepin |
| 35 | Sleep Aid | estazolam |
| 36 | Sleep Aid | eszopiclone |
| 37 | Sleep Aid | flurazepam hydrochloride |
| 38 | Sleep Aid | ramelteon |
| 39 | Sleep Aid | suvorexant |
| 40 | Sleep Aid | temazepam |
| 41 | Sleep Aid | trazodone |
| 42 | Sleep Aid | triazolam |
| 43 | Sleep Aid | zaleplon |
| 44 | Sleep Aid | zolpidem tartrate |

## APPENDIX A

1.      Wegmans submits the following description of its pharmacy management software and the burden of complying with the Pharmacy Benefit Manager Defendants ("PBMs")'s Subpoena.  This Appendix has been prepared over the course of extensive investigation by Wegmans pharmacy representatives and represents Wegmans' best effort and current understanding of the technical feasibility and burden of complying with the PBMs' Subpoena, in particular Request No. 2.

2.      EnterpriseRx Pharmacy Management System is a pharmacy management system designed, maintained, and sold by McKesson.  Wegmans utilizes EnterpriseRx to process and dispense customer prescriptions.

3.      More than 91% of prescriptions dispensed by Wegmans are managed, administrated, and approved by PBMs through real-time communications with Wegmans using the EnterpriseRx Pharmacy Management System.

4.      Wegmans has one pharmacy in the City of Rochester located at 1750 East Avenue, Rochester, NY 14610.

5.      Most City residents filling opioid prescriptions at the East Avenue location live in zip codes closest to the pharmacy.  For example, in 2016, the zip code with the largest number of residents filling their opioid prescriptions at the East Avenue pharmacy (162 patients) reside in the *same* zip code as the pharmacy (14610).

6.      In contrast, in 2016 the East Avenue pharmacy dispensed opioid prescriptions to 6 patients living in zip code 14614, 16 patients living in zip code 14604, and 7 patients living in zip

code 14605. These three zip codes also had some of the highest rates of opioid deaths in the City of Rochester in 2016.[1]

**Wegmans uses the EnterpriseRx Pharmacy Management System to Communicate with PBMs**

7.      Wegmans uses the EnterpriseRx User Interface to communicate with the PBMs and satisfy the terms of the PBMs' Pharmacy Network Agreements and Pharmacy Provider Manuals.

8.      In accordance with those Agreements, Wegmans uses the EnterpriseRx User Interface to submit prescription claims to the PBMs through the transmittal of Payer Sheets that conform with national standards promulgated by the National Council for Prescription Drug Programs ("NCPDP"). The NCPDP Payer Sheets contain several fields, including Drug Utilization Review ("DUR") fields, that Wegmans utilizes to communicate with the PBM before dispensing a prescription.

**Wegmans' Use of the EnterpriseRx User Interface to Receive and Review DUR Alerts, Clinical Edits, and Clinical Messages**

9.      DUR alerts, clinical edits, and clinical messages are created by the EnterpriseRx User Interface and software utilized by the PBMs to alert Wegmans pharmacists to potential issues with a new prescription. Examples of DUR alerts include duplicate therapies, age or gender-related contraindications, overutilization or underutilization, drug-drug interactions, drug dosage alerts or duration of drug therapy, drug-allergy contraindications, and clinical abuse or misuse. These DUR alerts are also commonly referred to as cDUR alerts, clinical edits and clinical messages.

10.      The EnterpriseRx User Interface uses The First Databank ("FDB") MedKnowledge database to create and communicate DUR alerts, clinical alerts, and clinical messages to Wegmans

---

[1] https://apps.health.ny.gov/public/tabvis/PHIG_Public/opioid/reports/#county.

pharmacists.  FDB's database is regularly updated to contain the latest FDA approvals, drug information, and industry standards.

11.     When a Wegmans pharmacist or technician enters prescription information into the EnterpriseRx User Interface, the system automatically checks FDB's database for potential issues with the new prescription.  If a potential issue is detected, the system displays an alert to ensure the pharmacist is made aware of the issue and can take appropriate action before the prescription is dispensed.

12.     The PBMs also employ software that generates DUR alerts, clinical edits, and clinical messages.  Wegmans pharmacists receive and review DUR alerts generated by the PBMs through the EnterpriseRx User Interface.

13.     When DUR clinical edits or clinical messages are generated by PBMs or the FDB database within the EnterpriseRx User Interface, they are captured and become a part of each official prescription record.

14.     Wegmans pharmacists exercise their clinical knowledge and expertise in reviewing DUR alerts, clinical edits, and clinical messages before dispensing a prescription to an individual patient.  Each individual prescription record contains the information that a Wegmans pharmacist sees, and the actions taken by that pharmacist, when dispensing the drug.

**Wegmans uses the EnterpriseRx User Interface to Create Prescription Records and Communicate with the PBMs**

15.     The EnterpriseRx User Interface creates a Transaction Details Log which contains a "Workflow Log" that is the roadmap reflecting each step in Wegmans' dispensing process.

16.     The Workflow Log begins upon receipt of each prescription.  The information for each step in the Workflow Log exists in different pages in the EnterpriseRx User Interface.

17.     The Transaction Details View ("TX Details Data View") contains four screens containing the documentation associated with DUR alerts, clinical edits, and clinical messages: the "Claim Information View," the "Drug Utilization Review View," the "Claim Detail Data View," and the "Workflow Log."

18.     The "Claim Information View" reflects the interaction between Wegmans and the PBM during the adjudication, review, and approval of the prescription by the PBM.

19.     The "Drug Utilization Review View" displays the PBMs' and the EnterpriseRx software's DUR alerts, clinical edits, and clinical messages.  It provides the details for the reasons a PBM may have submitted a DUR through EnterpriseRx.  If the PBM rejects the claim based on the DUR, information regarding the pharmacist's review of the "Reject Codes" appears in the Claim Information View.

20.     The "Claim Detail Data View" displays the steps the Wegmans pharmacists took in response to a PBM DUR alert, clinical edit, or clinical messages, including any "Reject Codes" sent by the PBM for the prescription.

21.     The "Workflow Log" displays each step the prescription went through to the final verification and dispensing to the patient.

22.     Depending on the information contained in the "Claim Information View," the "Drug Utilization View," the "Claim Detail Data View," or the "Tx Details Data View"—for example, if another prescription is referenced for a potential drug-drug interaction—the pharmacist may need to reference information associated with another prescription record.

**Review of Two Exemplar Prescriptions Adjudicated and Approved by UHC United Healthcare ("UHC") through Communications with Wegmans using the EnterpriseRx User Interface**

23.     A Wegmans pharmacist was tasked with compiling two exemplar prescription records to be shared with the PBMs in response to their subpoena to Wegmans.

24.     To extract a prescription record and share it with an outside party, a Wegmans employee must manually screenshot each of the individual screens within the Workflow Log within the EnterpriseRx User Interface.

25.     It took an experienced Wegmans pharmacist approximately 15 minutes to complete this process for each of the two exemplars.  The length of this process depends on the complexity of the patient's prescription records and could easily take longer for certain patients with longer prescription histories at Wegmans.

26.     While the exemplar prescriptions reflect Wegmans' communications with UHC, the process reflected in these two prescriptions reflects how Wegmans uses the EnterpriseRx User Interface to communicate with PBMs in dispensing prescriptions.  Specifically, these prescriptions show how a Wegmans pharmacist considers, uses, responds to, and interacts with point-of-sale communications from PBMs—which is called the adjudication process.

27.     The first exemplar prescription is for 120 Diazepam 5 mg, (the "diazepam prescription"), and the second prescription is for 60 hydrocodone-acetaminophen (NORCO) 7.5-325 (the "hydrocodone prescription").

28.     The diazepam and hydrocodone prescriptions were issued to the same patient and written by the same prescriber.  Wegmans received both prescriptions electronically on the same day, at approximately 2:30 p.m.  The information and data for these two prescriptions, as it is

5

maintained by Wegmans in the ordinary course of its business, consists of more than 56 pages of individual screenshots.  All 56 pages of individual screenshots are attached as **Exhibit 1**.

29.     The 56 pages of screenshots document the workflow for each prescription, including the data and information exchanged between UHC and Wegmans using the EnterpriseRx User Interface.  The Workflow Logs for both prescriptions include information concerning (1) electronic receipt of the prescription by Wegmans, (2) the DUR alerts, clinical edits, and clinical messages communications between Wegmans and UHC through the EnterpriseRx User Interface, (3) the review, adjudication, and approval of both prescriptions by UHC through the EnterpriseRx User Interface, (4) the DUR alerts, clinical edits, and clinical messages communicated to Wegmans by FDB, (5) the dispensing of both prescriptions by Wegmans to the patient, and (6) the amounts paid by UHC and the customer for each prescription.

30.     Based on Wegmans' investigation of its historic practices over the last two decades, the company believes these two prescription records demonstrate the process used to communicate with PBMs since approximately 2008, the year that Wegmans finished implementing the EnterpriseRx system's prescription record histories.

**A.   The Diazepam Prescription**

31.     The following two screenshots depict the information initially received from the prescriber by Wegmans for the diazepam prescription:



**Rx Image**

Rx Image from PPI

1 of 1

New Rx from PPI

**Written: diazepam (VALIUM) 5 MG tablet**

Written: 12/05/2019
Qty: 120 Tablet          Refills: 0     Days Supply:
DAW: 0 No Product Selection Indicated.

TAKE 1 TABLET q 6 hrs prn MDD= 4 tab no alcohol

Zoe Gravitz MD                    Kevin Kless MD
777 S Clinton Ave                 777 S Clinton Ave
Ste 300                           Ste 300
Rochester, NY 146201448           Rochester, NY 146201448
(585) 279-4700                    (585) 279-4700

DEANumber: AU4158033-5059         NPI: 1932336518
NPI: 1598290561

Electronically Signed By (SPI): 2780016658001

7



**Wegmans Workflow Log**

32.    The Workflow Log is the roadmap reflecting each step in the dispensing process.  The Workflow Log begins upon receipt of each prescription.  For the diazepam prescription, screenshots from the Workflow Log, are depicted below and reflect the following actions:





33.    The information for each step in the Workflow Log exists in different pages in the User Interface.

34.    For the diazepam prescription, the Workflow Log reflects:

A.  The prescription was received electronically by Wegmans at 2:29 p.m.

B.  It was prepared for submission to the PBM by 2:39 p.m.

C.  The PBM for UHC Medicare Part D adjudicated and approved the claim.  Adjudication began at 2:46 p.m. and was completed by 5:06 p.m.

    i.    The information reflecting the PBM's adjudication is maintained by Wegmans in several tabs of the User Interface:

        a.  The Claim Information View

        b.  The Drug Utilization View

        c.  The Claim Detail View

        d.  The Tx View

D.  The PBM approved and paid the claim at 5:06 p.m.

E.  Wegmans completed its Drug Utilization Review at 5:10 p.m.

10

F.  Wegmans submitted the prescription for product dispensing at 5:23 p.m.

G.  The prescription was verified by Wegmans at 5:30 p.m.

H.  Wegmans dispensed the prescription to the patient at 5:58 p.m.

**The Claim Information View**

35.    The Claim Information View reflects the EnterpriseRx User Interface communication between Wegmans and UHC during the adjudication, review, and approval of the diazepam.

36.    The Claim Information View shows that the diazepam prescription was initially rejected by UHC and was submitted by Wegmans two times before it was accepted and approved as a "clean claim," and paid, by UHC.  Two issues were raised by UHC and resolved by Wegmans during the adjudication process: (1) UHC did not have the DEA number on file for the prescriber, Dr. Zoe Gravitz and (2) there was a potential Drug-Drug Interaction between the diazepam prescription and the hydrocodone prescription (DUR Reject Code 88), which were both submitted at the same time.  Wegmans resolved each issue as described below.

**Issue 1: DEA Number of the Prescriber Not in UHC Database**

37.    The DEA number of the prescriber, Dr. Zoe Gravitz, was not in the UHC database as depicted below:

A.  Reject Code (511-FB) 44 = Plan's prescriber database indicates the prescriber DEA number is not found.

B.  Additional Message Information (526-FQ) Presc does not have a DEA, sbmt SCC 43 ("prescriber does not have DEA number, submit Submission Clarification Code "CC" 43).



38.     Wegmans then clarified Dr. Gravitz's DEA number and resolved this basis for this PBM rejection by 2:46 p.m., as reflected in the screenshot depicted below, which reflects that Wegmans submitted code SCC-43 (43 = Prescribers' DEA is "active with DEA Authorized Prescriptive Right").

39.     Prescriber Dr. Zoe Gravitz was likely a new resident working under the supervision of Dr. Kevin Kless, and her DEA number had not yet been added into the PBM's "system."

**Issue 2: DUR Reject Code 88-Potential Drug Interaction: Diazepam and Hydrocodone**

40.     After Wegmans clarified the validity of Dr. Gravitz's DEA number, UHC rejected the prescription again at 2:46 p.m., as reflected in the screenshots depicted below, the PBMs provided the following reject codes:

**Reject Code (511-FB) DUR-88 Reject Error**



41.     UHC provided "Additional Message Information" (526-FQ) to explain the basis for the rejections:

> A.  Not Part D Covered for ESRD [End Stage Renal Disease] Related Use
>
> B.  DUR1-Benzo + OpioidHx; 569 Appeals Rights

**The Concurrent Drug Utilization Review**

42.     UHC's Concurrent Drug Utilization Review data and information provides the details of the basis for DUR Reject Code 88 from the Claim Information View.

43.     The screenshots below reflect the DUR alerts generated by UHC's software.  These are depicted in blue and identified as "Third Party DUR" for the potential drug interaction between the diazepam and hydrocodone prescriptions.

44.     The screenshots also reflect the DUR alerts generated by FDB.  These alerts are depicted in yellow.

45.     The potential drug-drug interaction was flagged by UHC's software and FDB.





**The Claim Detail Data View**

46.     The Claim Detail data field for the diazepam prescription confirms that Wegmans resolved the rejection based upon the potential "drug-drug interaction" between the hydrocodone and diazepam prescriptions in the DUR process (identified by both FDB and the PBM).

47.     The DUR rejection was resolved through the pharmacist's consultation with the prescriber and then dispensing the prescriptions "With Prescriber Approval."  (Reason for Service Code (439-E4) DD=Drug-Drug Interaction, Professional Service Code (440-E5) MO-Prescriber consulted, and Result of Service Code (441-E6) 1G=Dispensed, With Prescriber Approval).

48.     The EnterpriseRx User Interface is also used to prepare the prescription to be transmitted to a PBM like UHC.  That information is transmitted from EnterpriseRx to the PBM

15

via a switch such as RelayHealth.  The switch then sends response messages from the PBM back to the switch.  EnterpriseRx displays the response messages from the switch in the User Interface.

49.     The Claim Detail page for the diazepam prescription reflects the outcome of the DUR process for the drug-drug interaction concerns between the Diazepam and Hydrocodone prescriptions:



**The Tx Details Data View**

  50. The Tx Details data for the diazepam prescription reflects that the prescription was

approved and "paid" by the PBM at 5:06 p.m., as shown below:



  51. The Tx Details reflects the status as "paid" and includes the payment details for the

medication.  For the diazepam the total price was $16.96. The Third Party UHC paid $15.71, and

the patient paid $1.25.  Of course, these numbers do not reflect Wegmans' costs, such as cost of

goods, labor, and related costs that significantly reduce Wegmans' margin on these drugs, and, in

the case of most opioid prescriptions adjudicated by PBMs, result in very low or negative margins

for Wegmans.

**B.  The Hydrocodone Prescription**

52.     Two screenshots reproduced below depict the information initially received by Wegmans from the prescriber for the hydrocodone prescription.





**Wegmans Workflow Log**

53.    Receipt of the prescription is the first step in Wegmans' Workflow Log, which is generated for each prescription.  The Workflow Log is the roadmap reflecting each step in the dispensing process.

54.    For the hydrocodone prescription, the Workflow Log reflected the following actions:





55. The above Workflow Log for the hydrocodone prescription reflects the following:

A.  The prescription was received electronically by Wegmans at 2:29 p.m.

B.  It was prepared for submission to the PBM by 2:38 p.m.

     i.  The PBM for UHC Medicare Part D conducted its adjudication and approval of the claim, which was first conducted at 2:46 p.m.

  ii. The data reflecting the PBM's adjudication is maintained by Wegmans in several data fields

   a. The Claim Information View

   b. The Drug Utilization View

   c. The Claim Detail View

   d. The Tx View

 C. Wegmans completed its Drug Utilization Review at 2:56 p.m.

 D. Wegmans submitted the prescription for product dispensing at 3:31 p.m.

 E. The prescription was verified by Wegmans at 3:54 p.m.

 F. Wegmans dispensed the prescription to the patient at 5:58 p.m.

**The Claims Detail Data View**

  56. The Claims Detail Screen reflects the result of UHC' adjudication process.  For the hydrocodone prescription, UHC noted that the DEA number for the prescriber, Dr. Gravitz, was "not in the processor's system" and the "Paid" claim was flagged for "retrospective review."  (See Approved Message Code 548-6F).



57.    The Claims Detail View subsequently reflects that Wegmans responded to UHC with "Submission Clarification Code (420-DK, 43=Prescriber's DEA is active with DEA Authorized Prescriber Right":



**The Tx Details Data View**

58.    The Tx Details View reflects the claim status as "paid," and includes the payment details for the medication.  In this case the total price was $21.55, the Third Party, UHC paid $20.55, and the patient paid $1.25 (again, this is not Wegmans far lower or negative margin):



**Wegmans Drug Utilization Review**

59. *After* the prescription claim was adjudicated and approved by UHC, but *before* it was dispensed, FDB conducted its own DUR. This included reviewing certain safety or drug interaction concerns prior to releasing the prescription for dispensing.

60. That information is contained and maintained by Wegmans in the Drug Utilization Review Screen.

61. For the hydrocodone prescription, the FDB identified a potential drug-drug interaction with the diazepam prescription, which is depicted in yellow:



62.     The FDB DUR was the *same* drug-drug alert that was identified by both the UHC software and FDB during the DUR processes for the diazepam prescription discussed in greater detail below.

63.     UHC software *also* identified DUR concerns about the potential drug-drug interaction between the hydrocodone and diazepam prescriptions. These issues are documented in the Drug Utilization View for the diazepam prescription as "Third Party DUR" depicted in blue. The resolution of these DUR concerns—i.e., by directly contacting the prescriber—is also described above as part of the diazepam prescription discussion.

64.     In order to reliably analyze whether a particular prescription was properly dispensed, the full dispensing log must be captured in the manner depicted in the above screenshots that comprise the entire dispensing file.  These screens in the EnterpriseRx User Interface are what a Wegmans pharmacist sees and does when dispensing the drug.

65.     The dispensing log reflects how Wegmans prepares, submits, and maintains information concerning each prescription are maintained within the EnterpriseRx User Interface.

66.     More than 91% of all prescriptions are dispensed after communications with UHC and other PBMs concerning DUR alerts, clinical edits, and clinical messages.  These DUR alerts,

24

clinical edits, and clinical alerts are communicated in real-time with the PBMs through the EnterpriseRx User Interface.

67.    The official prescription record as it is made and kept in Wegmans' ordinary course of business exists in the EnterpriseRx User Interface as a complete, comprehensive record for each prescription that Wegmans fills.

68.    A Wegmans pharmacy employee may produce DUR information and related notes/documentation by manually retrieving the prescription record associated with a single prescription through that prescription's Workflow Log in the EnterpriseRx User Interface.

69.    If Wegmans needs to review a prior prescription, it must view the prescription record in the Workflow Log within the EnterpriseRx User Interface.  Wegmans cannot use the EnterpriseRx User Interface to export prescription records in batch form.  The EnterpriseRx User Interface does allow Wegmans to generate some predefined base reports, but to the best of Wegmans' knowledge, and after extensive evaluation, the company does not believe those reports include DUR alerts, clinical edits, or clinical messages.

**Wegmans' use of the EnterpriseRx User Interface in Response to Regulatory or Law Enforcement Agencies**

70.    Wegmans can produce records from the EnterpriseRx user interface in response to inquiries from state and federal regulators and law enforcement officials using the same retrieval procedure described in paragraphs 23-69 above.  These inquiries typically involve investigation into an individual patient and/or individual prescriber.

71.    In response to inquiries from regulators or law enforcement officials, Wegmans has provided three categories of information from EnterpriseRx: (1) the "Customer Statement" printout, (2) screenshots of the relevant screens from the Workflow Log in EnterpriseRx following

the process described in paragraphs 23-69 above, and (3) an image of the complete prescription e-script (electronic prescription).

**Wegmans' use of EnterpriseRx User Interface to produce a "Customer Statement"**

72. Wegmans pharmacists may use the EnterpriseRx User Interface to produce a "Customer Statement" printout. A "Customer Statement" is created when the pharmacy needs to review the history pertaining to a specific patient.

73. To generate a "Customer Statement," a pharmacist generates this report in the EnterpriseRx User Interface by inputting an individual patient's name or patient ID number.

74. A "Customer Statement" does not include the DUR clinical edits or clinical messages that may have been issued as part of the customer's prior prescription records.

75. The DUR alerts, clinical edits, or clinical messages may only be reviewed and captured by taking a screenshot of those portions or each individual prescription record from the Workflow Log in the EnterpriseRx User Interface.

76. The clinical purpose of DUR alerts, clinical edits, and clinical message is to provide information to the Wegmans pharmacist as part of the decision-making process to dispense an individual prescription. DUR alerts, edits, and messages serve no clinical purpose, and they may be misleading, if they are untethered or disaggregated from the individual prescription record.

**The McKesson Data Warehouse Does Not Allow Wegmans to Generate the Data Reports Requested by the PBMs**

77. The type of data sets requested by the PBMs—involving numerous prescription data fields and DUR information—currently do not exist. Wegmans does not maintain its prescription records in this manner. Wegmans also does not extract or maintain DUR alerts, clinical edits, or clinical messages as disaggregated bulk data.

78.     Based on extensive investigation as part of its response to the Subpoena, Wegmans believes it has never created such data sets and does not sufficiently understand the system architecture of the EnterpriseRx Data Warehouse in order to create them.

79.     The New York Prescription Monitoring Program ("PMP") does not collect DUR information.  Wegmans' reports to the New York PMP do not include DUR alerts, clinical edits, or clinical messages.

80.     McKesson offers an additional EnterpriseRx reporting module called Data Insights available for purchase through a subscription model.  Wegmans does not subscribe to this service, as Wegmans has purchased and developed its own analytics tool called 1010data.

81.     1010data is a separate tool that Wegmans has loaded with data from the McKesson data warehouse to develop Wegmans' own reports and analysis.  The data available in 1010data is limited to data that Wegmans has worked with Wegmans' IT department's software engineers to understand, extract, evaluate, and certify.

82.     The data available in 1010data does not duplicate all the data in the McKesson Data Warehouse and to date does not include any data related to DURs because Wegmans has never had a business reason to extract or validate DUR data from the EnterpriseRx Data Warehouse.  Extraction and validation are required to create an accurate and reliable data set.  Without appropriate validation, a patient's prescription record or prescription data could be incomplete or inaccurate, resulting in an unreliable and misleading data set.

83.     Until very recently, McKesson utilized an Oracle data warehouse to store pharmacies' data.  Wegmans understands that McKesson has been attempting to migrate pharmacies' data to a cloud-based solution.

27

84.     It is Wegmans' understanding that the McKesson Data Warehouse contains mostly disaggregated data at the data's lowest, most granular level.  This makes extracting data from McKesson's data warehouse a complicated and highly cumbersome process.

85.     This process would require Wegmans to enlist software engineers to write structured query language ("SQL") queries.  SQL is, for lack of a better term, a computer programming language that is used to interact with relational databases.

86.     The only data engineers at Wegmans are in its IT department.  The process of having a data engineer work with pharmacy staff to understand the prescription data, and then creating code to create a query to extract pharmacy data, would take weeks or months, depending on the complexity of the query.

87.     Knowing how to write effective SQL queries is just one step in communicating with the McKesson Data Warehouse.  The corollary step is to understand the underlying data architecture and database-specific behaviors so that the SQL queries produce accurate results—meaning, they extract the data that Wegmans intended to extract with the organizational structure that Wegmans intended.

88.     Failure to fully understand the organizational structure of the data warehouse—even if the SQL query is appropriate—can produce a misleading and unreliable data set that does not tell the full and accurate story of any particular transaction.  In fact, a common issue with data extracts performed by someone who does not fully understand the data structures is that those data extracts contain missing or inaccurate information due to not connecting all relevant datapoints, since they are separated in varying tables.

89.     To extract data from the Data Warehouse, Wegmans would first need to write the SQL query.  Second, the data would need to be extracted.  Third, the data would need to be validated to ensure that it makes sense and represents the exact set of data intended to be extracted.

90.     Because Wegmans does not have information about how the DUR messages are organized in McKesson's EnterpriseRx Data Warehouse, Wegmans is unable to provide an estimate as to the amount of time or how Wegmans could write the queries necessary to extract DUR messages from the Data Warehouse.  And then, once the SQL queries are written, the data must be extracted and validated.

91.     Wegmans understands the PBMs have asked Wegmans to inquire whether McKesson may assist with the creation of the requested data set.  Wegmans does not know if McKesson can do so from a technical perspective, but in any event, Wegmans should not be forced to utilize its vendor resources to create a data set that does not currently exist, serves no business purpose, and is being requested solely for litigation.  Doing so would adversely impact the pharmacy's clinical operations.  Infrequently, Wegmans relies on McKesson to assist with extracting data from EnterpriseRx when Wegmans has a clinical reason to do so.  For example, in February of 2025, Wegmans requested that McKesson extract and provide data from *incoming* electronic prescriptions in order to evaluate the data for possible enhancements to simplify and improve the quality of the data entry step.  It took McKesson's data architects and engineers almost nine months to provide an initial dataset, which is currently under review by Wegmans and may require modifications and follow up inquiries between Wegmans and McKesson.  Wegmans should not be compelled to reallocate its vendor resources away from clinical needs to prioritize the creation of data sets that serve no legitimate purpose and are requested solely for litigation.

92.     Finally, there is another significant limitation to the data available in the EnterpriseRx Data Warehouse. Prior to approximately February 2019, it was Wegmans' practice to annotate prescriptions in instances when a pharmacist had questions about a particular prescription during the DUR process. The pharmacist would print the prescription, annotate it by hand, scan it, and then upload it to EnterpriseRx. That process was manual because, at the time, EnterpriseRx was not configured to allow the pharmacist to electronically annotate the prescription. McKesson reconfigured the system to allow the pharmacist to do so. For this reason, prior to approximately February 2019, asking McKesson to pull all the "DUR data" from the EnterpriseRx Data Warehouse—if McKesson could do so—would not reflect a complete prescription trail. Individual images of each prescription with pharmacists' handwriting would also need to be compiled in order to capture the entire DUR process. These individual prescriptions with handwritten annotations cannot be exported into a spreadsheet as data fields because they only exist as individual prescription images, not raw data. This is further reason why, in order for Wegmans to prepare a fully integrated and complete representation of the DUR process for any particular prescription, it must go through the comprehensive process explained in paragraphs 23-69 above.

# EXHIBIT 1

**2332101-018 (11:57)**







Confidential Protected Health Information

2

















Confidential Protected Health Information



**Claim Detail [2332101 - 018]**

Third Party Plan:  UHC MEDICARE PART D
Segment Navigation:  Request Header  ▼   Claim Type:  Billing  ▼

| Segment Name/Field | Request | Response |
|---|---|---|
| **Response Header** | | |
| Version Release Number ( 102-A2 ) | | D0=Version D.0 |
| Transaction Code ( 103-A3 ) | | B1=Billing |
| Transaction Count ( 109-A9 ) | | 1=One Occurrence |
| Header Response Status ( 501-F1 ) | | A=Accepted |
| Service Provider ID Qualifier ( 202-B2 ) | | 01=National Provider Identifier (NPI) |
| Service Provider ID ( 201-B1 ) | | 1851374052 |
| Date Of Service ( 401-D1 ) | | 12/05/2019 |
| **Response Status** | | |
| Transaction Response Status ( 112-AN ) | | P=Paid |
| Authorization Number ( 503-F3 ) | | 193394194028091998 |
| Approved Message Code Count ( 547-5F ) | | 1 |

MedicarePartD Results   Print   Close



**Claim Detail [2332101 - 018]**

Third Party Plan:  UHC MEDICARE PART D
Segment Navigation:  Request Header  ▼   Claim Type:  Billing  ▼

| Segment Name/Field | Request | Response |
|---|---|---|
| **Response Status** | | |
| Transaction Response Status ( 112-AN ) | | P=Paid |
| Authorization Number ( 503-F3 ) | | 193394194028091998 |
| Approved Message Code Count ( 547-5F ) | | 1 |
| Approved Message Code ( 548-6F ) | | 021=Prescriber DEA number in the processor's system is inactive/expired. Paid claim flagged for retrospective review |
| Additional Message Information Count ( 130-UF ) | | 01 |
| Additional Message Information Qualifier ( 132-UH ) | | 01=Used for first line of free form text with no pre-defined structure |
| Additional Message Information ( 526-FQ ) | | Total MME 15.00MO |
| **Claim** | | |
| Prescription/Service Reference Number Qualifier ( 455-EM ) | 1=Rx Billing | |
| Prescription/ Service Reference Number ( 402-D2 ) | 2332101 | |

MedicarePartD Results   Print   Close

Confidential Protected Health Information



**Claim Detail [2332101 - 018]**

Third Party Plan:  UHC MEDICARE PART D

Segment Navigation:  Request Header  Claim Type:  Billing

| Segment Name/Field | Request | Response |
|---|---|---|
| **Claim** | | |
| Prescription/Service Reference Number Qualifier ( 455-EM ) | 1=Rx Billing | |
| Prescription/ Service Reference Number ( 402-D2 ) | 2332101 | |
| Product Service ID Qualifier ( 436-E1 ) | 03=National Drug Code (NDC) | |
| Product Service ID ( 407-D7 ) | 00406012401 | |
| Quantity Dispensed ( 442-E7 ) | 60.000 | |
| Fill Number ( 403-D3 ) | 00 | |
| Days Supply ( 405-D5 ) | 30 | |
| Compound Code ( 406-D6 ) | 1=Not a Compound | |
| DAW/Product Selection Code ( 408-D8 ) | 0=No Product Selection Indicated | |
| Date Prescription Written ( 414-DE ) | 12/05/2019 | |
| Number of Refills Authorized ( 415-DF ) | 00 | |

MedicarePartD Results    Print    Close



**Claim Detail [2332101 - 018]**

Third Party Plan:  UHC MEDICARE PART D

Segment Navigation:  Request Header  Claim Type:  Billing

| Segment Name/Field | Request | Response |
|---|---|---|
| Prescription Origin Code ( 419-DJ ) | 3=Electronic | |
| Submission Clarification Code Count ( 354-NX ) | 1 | |
| Submission Clarification Code ( 420-DK ) | 43=Prescriber's DEA is active with DEA Authorized Prescriptive Right. | |
| Other Coverage Code ( 308-C8 ) | 0=Not Specified by patient | |
| Special Packaging Indicator ( 429-DT ) | 1=Not Unit Dose | |
| Originally Prescribed Product/Service ID Qualifier ( 453-EJ ) | 03=National Drug Code (NDC) | |
| Originally Prescribed Product/Service Code ( 445-EA ) | 52544016201 | |
| Originally Prescribed Quantity ( 446-EB ) | 60.000 | |
| Scheduled Prescription ID Number ( 454-EK ) | EEEEEEEE | |
| Pharmacy Service Type ( 147-U7 ) | 1=Community/Retail Pharmacy Services | |
| **Response Claim** | | |

MedicarePartD Results    Print    Close

Confidential Protected Health Information





Confidential Protected Health Information

10



**Claim Detail [2332101 - 018]**

Third Party Plan:  UHC MEDICARE PART D
Segment Navigation:  Request Header    Claim Type:  Billing

| Segment Name/Field | Request | Response |
|---|---|---|
| **Response Insurance** | | |
| Plan ID ( 524-FO ) | | PART-D |
| Network Reimbursement ID ( 545-2F ) | | 00256 |
| Cardholder ID ( 302-C2 ) | | ▮801 |
| **Prescriber** | | |
| Prescriber ID Qualifier ( 466-EZ ) | 01=National Provider Identifier (NPI) | |
| Prescriber ID (411-DB) | 1598290561 | |
| Prescriber Last Name ( 427-DR ) | GRAVITZ | |
| **Pricing** | | |
| Ingredient Cost Submitted ( 409-D9 ) | $46.21 | |
| Dispensing Fee Submitted ( 412-DC ) | $2.00 | |
| Usual and Customary Charge ( 426-DQ ) | $43.49 | |

MedicarePartD Results    Print    Close

**Claim Detail [2332101 - 018]**

Third Party Plan:  UHC MEDICARE PART D
Segment Navigation:  Request Header    Claim Type:  Billing

| Segment Name/Field | Request | Response |
|---|---|---|
| Gross Amount Due ( 430-DU ) | $48.21 | |
| Basis of Cost Determination ( 423-DN ) | 01=AWP (Average Wholesale Price) | |
| **Response Pricing** | | |
| Patient Pay Amount ( 505-F5 ) | | $1.25 |
| Ingredient Cost Paid ( 506-F6 ) | | $21.35 |
| Dispensing Fee Paid ( 507-F7 ) | | $0.20 |
| Flat Sales Tax Amount Paid ( 558-AW ) | | $0.00 |
| Percentage Sales Tax Amount Paid ( 559-AX ) | | $0.00 |
| Incentive Amount ( 521-FL ) | | $0.00 |
| Total Amount Paid ( 509-F9 ) | | $20.30 |
| Basis of Reimbursement Determination ( 522-FM ) | | 06=MAC Pricing Ingredient Cost Paid |
| Accumulated Deductible Amount ( 512-FC ) | | $99999.99 |

MedicarePartD Results    Print    Close



**Claim Detail [2332101 - 018]**

Third Party Plan: UHC MEDICARE PART D

Segment Navigation: Request Header    Claim Type: Billing

| Segment Name/Field | Request | Response |
|---|---|---|
| Dispensing Fee Paid ( 507-F7 ) | | $0.20 |
| Flat Sales Tax Amount Paid ( 558-AW ) | | $0.00 |
| Percentage Sales Tax Amount Paid ( 559-AX ) | | $0.00 |
| Incentive Amount ( 521-FL ) | | $0.00 |
| Total Amount Paid ( 509-F9 ) | | $20.30 |
| Basis of Reimbursement Determination ( 522-FM ) | | 06=MAC Pricing Ingredient Cost Paid |
| Accumulated Deductible Amount ( 512-FC ) | | $99999.99 |
| Remaining Benefit Amount ( 514-FE ) | | $99999.99 |
| Amount Of Copay ( 518-FI ) | | $1.25 |
| Benefit Stage Count ( 392-MU ) | | 1 |
| Benefit Stage Qualifier ( 393-MV ) | | 02=Initial Benefit |
| Benefit Stage Amount ( 394-MW ) | | $21.55 |

Medicare Part D Resp    Print   Close



**Patient Notes**

**Sarah Deibel**                    02/19/2020 10:27 AM
PER PT- NO LONGER USING WEGMANS PHARMACY

**Lori Niver**                      01/06/2020 7:47 PM
PT IS NO LONGER USING FHD

**Tracy Engel**                     02/21/2019 10:12 AM
PT REQUESTED REMOVE RANITIDINE FROM ERP, HE
DOESN'T ALWAYS TAKE BID AND HAS A STOCKPILE

Add    Remove

Save   Cancel



**Patient Notes** ✕

**Christine Domicello**          **12/23/2018 8:47 AM**

DEACTIVATED CC 5389 VIA WEB REQUEST

**Lori Niver**          **11/04/2018 9:26 AM**

PT WANTS ERP AT FHD

**Lori Niver**          **11/04/2018 9:23 AM**

HE WANTS ALL ACUTE MEDICATIONS FILLED AT EAST AVE.
ALL OTHER RXS ARE TO BE FILLED AT FHD. IF MD SENDS
MEDS OTHER THAN ACUTE TO EAST AVE- PLEASE
TRANSFER RX TO FHD.

Add    Remove

Save    Cancel

Confidential Protected Health Information



**Patient Notes**                                          ✕

**Lori Niver**                          11/04/2018 9:23 AM

HE WANTS ALL ACUTE MEDICATIONS FILLED AT EAST AVE.
ALL OTHER RXS ARE TO BE FILLED AT FHD. IF MD SENDS
MEDS OTHER THAN ACUTE TO EAST AVE- PLEASE
TRANSFER RX TO FHD.

**Lori Niver**                          11/04/2018 9:18 AM

DEACTIVATED DC 0656 PER WEB REQUEST

**Olga Verhoef**                        10/19/2018 1:41 PM

PT NEEDS FHS FOR HIS MEDICATION DUE TO LACK OF
TRANSPORTATION

                                            Add    Remove

                                            Save   Cancel



## Rx Image from PPI

New Rx from PPI

**Written: HYDROcodone-acetaminophen (NORCO) 7.5-325 MG**     **7.5-325**
**per tablet**

Written: 12/05/2019                     Earliest Fill Date:12/05/2019
Qty: 60  Tablet           Refills: 0        Days Supply:
DAW: 0  No Product Selection Indicated.

Take 1 tablet by mouth 2 times daily as needed for Pain Max daily
dose: 2 tablets

Zoe Gravitz MD                   Kevin Kless MD
777 S Clinton Ave                 777 S Clinton Ave
Ste 600                             Ste 600
Rochester, NY  146201448        Rochester, NY  146201448
(585) 279-4620                    (585) 279-4620

DEANumber: AU4158033-5060      NPI: 1932336518
NPI: 1598290561

Electronically Signed By (SPI):  2780016658001

Diagnosis Code:

Electronically Transmitted To:              NCPDP: 3370163
Wegmans East Avenue Pharmacy #018  #018      Phone: (585) 244-0220
1750 East Ave., East Ave                    Signed Date: 12/05/2019
Rochester, NY 14610                  Time 02:27:45 PM  Eastern Standard
Prescriber Order #: 348495541:1622331051

Image Type:  Rx Image

## 4595109-018 (9:25)





Confidential Protected Health Information



Rx Details

| | | | |
|---|---|---|---|
| Rx#-Store#: | 4595109-016 | Last Fill: | 12/05/2019 | Written Date: | 12/05/2019 |
| Rx Expiration Date: | 06/05/2020 | Linked To: | | Linked From: |
| | | Replaced By: | | Replaces: |

Scheduled Rx Serial #: EEEEEEEE     Transfer In: No

**Diagnosis Code**
Code Type:          Code:
Description:

Written Quantity:         120   Refills Allowed:   0     Quantity Remaining:  0
Refills Remaining:         0   Last Fill Quantity: 120     Patient Pay Amount:  $1.25

**Written Product**
Product:        DIAZEPAM 5 MG TABLET
NDC#:          00172-3926-70
Distributor:    TEVA USA
Schedule:       IV
Compound:      No

**Dispensed Product**
Product:        DIAZEPAM 5 MG TABLET
NDC#:          00172-3926-70
Distributor:    TEVA USA
Schedule:       IV
Compound:      No

**Prescriber**
Name:          ZOE GRAVITZ
Address:        777 SOUTH CLINTON AVE REFILL...
               ROCHESTER, NY 14620
Phone:          (585) 279-4820
DEA#:           AU4158033
NPI#:           1598290561
Supervising Prescriber:
DEA #:
NPI #:

**SIG**                                    Language: ENGLISH
TAKE ONE TABLET BY MOUTH EVERY 6 HOURS AS
NEEDED, MAXIMUM DAILY DOSE OF 4 PER DAY. NO
ALCOHOL

Rx Privacy Status: ---------- [12-05-2019] ☐ Letter on File

Document Type ▲          Received DateTime
                        12/05/2019 02:29 PM

[ Transfer Out ] [ Transfer In ] [ Transfer History ] [ Rx Notes ] [ Tx Profile ] [ Counseling Notes ] [ Privacy Status ] [ Print Options ] [ HIPAA ]     Save     Close











Confidential Protected Health Information







**Transaction Notes** ✕

**Quinn Weisenreder**
**12/05/2019 5:57 PM**
ID CHECKED PICED UP BY PATIENT

**Sabrina Newman**
**12/05/2019 5:22 PM**
X2 1 20

Save   Cancel

Confidential Protected Health Information





Confidential Protected Health Information







Claim Detail [4595109 - 018]

Third Party Plan: UHC MEDICARE PART D

Segment Navigation: Request Header    Claim Type: Billing

| Segment Name/Field | Request | Response |
|---|---|---|
| Additional Message Information Qualifier ( 132-UH ) | | 03=Used for third line of free form text with no pre-defined structure |
| Additional Message Information ( 526-FQ ) | | DDI-DD-MD-APPROVAL |
| Additional Message Information Qualifier ( 132-UH ) | | 04=Used for fourth line of free form text with no pre-defined structure |
| Additional Message Information ( 526-FQ ) | | Submitted DUR/PPS code 1 PPS ACCPT: |
| Additional Message Information Continuity (131-UG ) | | +=Current text continues |
| Additional Message Information Qualifier ( 132-UH ) | | 05=Used for fifth line of free form text with no pre-defined structure |
| Additional Message Information ( 526-FQ ) | | DDI-DD-MD-APPROVAL |
| **Claim** | | |
| Prescription/Service Reference Number Qualifier ( 455-EM ) | 1=Rx Billing | |
| Prescription/ Service Reference Number ( 402-D2 ) | 4595109 | |

MedicarePartD Results    Print    Close



Claim Detail [4595109 - 018]

Third Party Plan: UHC MEDICARE PART D

Segment Navigation: Request Header    Claim Type: Billing

| Segment Name/Field | Request | Response |
|---|---|---|
| **Claim** | | |
| Prescription/Service Reference Number Qualifier ( 455-EM ) | 1=Rx Billing | |
| Prescription/ Service Reference Number ( 402-D2 ) | 4595109 | |
| Product Service ID Qualifier ( 436-E1 ) | 03=National Drug Code (NDC) | |
| Product Service ID ( 407-D7 ) | 00172392670 | |
| Quantity Dispensed ( 442-E7 ) | 120.000 | |
| Fill Number ( 403-D3 ) | 00 | |
| Days Supply ( 405-D5 ) | 30 | |
| Compound Code ( 406-D6 ) | 1=Not a Compound | |
| DAW/Product Selection Code ( 408-D8 ) | 0=No Product Selection Indicated | |
| Date Prescription Written ( 414-DE ) | 12/05/2019 | |
| Number of Refills Authorized ( 415-DF ) | 00 | |

MedicarePartD Results    Print    Close

Confidential Protected Health Information











**Claim Detail [4595109 - 018]**

Third Party Plan:  UHC MEDICARE PART D
Segment Navigation: Request Header    Claim Type:  Billing

| Segment Name/Field | Request | Response |
|---|---|---|
| Gross Amount Due ( 430-DU ) | $25.94 | |
| Basis of Cost Determination ( 423-DN ) | 01=AWP (Average Wholesale Price) | |
| **Response Pricing** | | |
| Patient Pay Amount ( 505-F5 ) | | $1.25 |
| Ingredient Cost Paid ( 506-F6 ) | | $16.76 |
| Dispensing Fee Paid ( 507-F7 ) | | $0.20 |
| Flat Sales Tax Amount Paid ( 558-AW ) | | $0.00 |
| Percentage Sales Tax Amount Paid ( 559-AX ) | | $0.00 |
| Incentive Amount ( 521-FL ) | | $0.00 |
| Total Amount Paid ( 509-F9 ) | | $15.71 |
| Basis of Reimbursement Determination ( 522-FM ) | | 03=Ingredient Cost Reduced to AWP Less X% Pricing |
| Accumulated Deductible Amount ( 512-FC ) | | $99999.99 |

Medicare Part D Results    Print    Close



**Claim Detail [4595109 - 018]**

Third Party Plan:  UHC MEDICARE PART D
Segment Navigation: Request Header    Claim Type:  Billing

| Segment Name/Field | Request | Response |
|---|---|---|
| Remaining Benefit Amount ( 514-FE ) | | $99999.99 |
| Amount Of Copay ( 518-FI ) | | $1.25 |
| Benefit Stage Count ( 392-MU ) | | 1 |
| Benefit Stage Qualifier ( 393-MV ) | | 02=Initial Benefit |
| Benefit Stage Amount ( 394-MW ) | | $16.96 |
| **DUR/PPS** | | |
| DUR/PPS Code Counter ( 473-7E ) | 1 | |
| Reason for Service Code ( 439-E4 ) | DD=Drug-Drug Interaction | |
| Professional Service Code ( 440-E5 ) | M0=Prescriber consulted | |
| Result of Service Code ( 441-E6 ) | 1G=Dispensed, With Prescriber Approval | |
| **Response DUR/PPS** | | |
| DUR/PPS Response Code Counter ( 567-J6 ) | | 1 |

Medicare Part D Results    Print    Close



**Claim Detail [4595109 - 018]**

Third Party Plan: UHC MEDICARE PART D
Segment Navigation: Request Header ▾   Claim Type: Billing ▾

| Segment Name/Field | Request | Response |
|---|---|---|
| Professional Service Code ( 440-E5 ) | M0=Prescriber consulted | |
| Result of Service Code ( 441-E6 ) | 1G=Dispensed, With Prescriber Approval | |
| **Response DUR/PPS** | | |
| DUR/PPS Response Code Counter ( 567-J6 ) | | 1 |
| Reason for Service Code ( 439-E4 ) | | DC=Drug-Disease (Inferred) |
| Clinical Significance Code ( 528-FS ) | | 3=Minor |
| Other Pharmacy Indicator ( 529-FT ) | | 1=Your Pharmacy |
| Previous Date of Fill ( 530-FU ) | | 12/05/2019 |
| Quantity of Previous Fill ( 531-FV ) | | 60.000 |
| Database Indicator ( 532-FW ) | | 2=Medi-Span Product Line |
| Other Prescriber Indicator ( 533-FX ) | | 1=Same Prescriber |
| DUR Free Text Message ( 544-FY ) | | HYDROCO/APAP TAB 7.5-325 |

Medicare Part D Review   Print   Close

---



**Claim Information View**

Third Party Selector: All Third Party Plans ▾   ◂ 1 of 3 ▸

**Response Status**

| | | | | | |
|---|---|---|---|---|---|
| Header Response Status: | Accepted | Transaction Code: | B1 | Number of Times Submitted: | 3 |
| Transaction Response Status: | Rejected | Authorization Number: | 193394197597049999 | Claim Format Name: | D.0 037 |
| Submission Time: | 12/05/2019 02:39:36 PM | Transaction Type: | Billing | Financial Feed Tx Number: | |

| **Patient Information:** | | **Third Party Information** | | **Rx Information** | |
|---|---|---|---|---|---|
| NY 146 | Third Party Plan Name: | UHC MEDICARE PART D | Dispensed Product: | DIAZEPAM 5 MG TABLET | |
| | Third Party Code: | UHCMPD | NDC Number: | 00172-3926-70 | |
| | Group Number: | PDPIND | Quantity Dispensed: | 120.0 | |
| | BIN Number: | 610097 | Days Supply: | 30 | |
| | PCN: | 9999 | Rx Number: | 4595109 | |
| | Pharmacy NPI: | 1851374052 | Tx Number: | 0002901026 | |
| | Date of Service: | 12/05/2019 | Store Number: | 018 | |

Segment Navigation: Request Header ▾   Claim Type: Billing ▾

| Segment Name/Field | Request | Response |
|---|---|---|
| **Request Header** | | |
| BIN Number ( 101-A1 ) | 610097 | |
| Version Release Number ( 102-A2 ) | D0=Version D.0 | |
| Transaction Code ( 103-A3 ) | B1=Billing | |
| Processor Control Number ( 104-A4 ) | 9999 | |
| Transaction Count ( 109-A9 ) | 1=One Occurrence | |
| Service Provider ID Qualifier ( 202-B2 ) | 01=National Provider Identifier (NPI) | |
| Service Provider ID ( 201-B1 ) | 1851374052 | |
| Date Of Service ( 401-D1 ) | 12/05/2019 | |
| Software Vendor/Certification ID ( 110-AK ) | V5HXQ | |
| **Response Header** | | |

Close





**Claim Information View**

Third Party Selector: All Third Party Plans ▾ ◄ 1 of 3 ►

**Response Status**

| | | | | |
|---|---|---|---|---|
| Header Response Status: | **Accepted** | Transaction Code: | **B1** | Number of Times Submitted: **3** |
| Transaction Response Status: | **Rejected** | Authorization Number: | **193394197597049999** | Claim Format Name: **D.0 037** |
| Submission Time: | **12/05/2019 02:39:36 PM** | Transaction Type: | **Billing** | Financial Feed Tc Number: |

**Patient Information:** / **Third Party Information** / **Rx Information**

| Third Party Plan Name: | UHC MEDICARE PART D | Dispensed Product: | DIAZEPAM 5 MG TABLET |
|---|---|---|---|
| Third Party Code: | UHCMPD | NDC Number: | 00172-3926-70 |
| Group Number: | PDPIND | Quantity Dispensed: | 120.0 |
| BIN Number: | 610097 | Days Supply: | 30 |
| PCN: | 9999 | Rx Number: | 4595109 |
| Pharmacy NPI: | 1851374052 | Tx Number: | 0002901026 |
| Date of Service: | 12/05/2019 | Store Number: | 018 |

Segment Navigation: Request Header ▾  Claim Type: Billing ▾

| Segment Name/Field | Request | Response |
|---|---|---|
| Reject Count ( 510-FA ) | | 02 |
| Reject Code ( 511-FB ) | | 44 =Plan's prescriber data base indicates the prescriber DEA number is not found |
| Reject Code ( 511-FB ) | | 569=Provide Notice: Medicare Prescription Drug Coverage and Your Rights |
| Additional Message Information Count ( 130-UF ) | | 05 |
| Additional Message Information Qualifier ( 132-UH ) | | 01=Used for first line of free form text with no pre-defined structure |
| Additional Message Information ( 526-FQ ) | | Presc does not have a DEA, Sbmt SCC 43 |
| Additional Message Information Qualifier ( 132-UH ) | | 02=Used for second line of free form text with no pre-defined structure |
| Additional Message Information ( 526-FQ ) | | Provide Exception Process Printed Notice |
| Additional Message Information Qualifier ( 132-UH ) | | 03=Used for third line of free form text with no pre- |

Close



**Claim Information View**

Third Party Selector: All Third Party Plans | 1 of 3

**Response Status**

| | | | | |
|---|---|---|---|---|
| Header Response Status: | **Accepted** | Transaction Code: | **B1** | Number of Times Submitted: **3** |
| Transaction Response Status: | **Rejected** | Authorization Number: | **19339419759794999** | Claim Format Name: **D.0 037** |
| Submission Time: | **12/05/2019 02:39:36 PM** | Transaction Type: | **Billing** | Financial Feed Tx Number: |

**Patient Information:**

| Third Party Information | | Rx Information | |
|---|---|---|---|
| Third Party Plan Name: | UHC MEDICARE PART D | Dispensed Product: | DIAZEPAM 5 MG TABLET |
| Third Party Code: | UHCMPD | NDC Number: | 00172-3926-70 |
| Group Number: | PDPIND | Quantity Dispensed: | 120.0 |
| BIN Number: | 610097 | Days Supply: | 30 |
| PCN: | 9999 | Rx Number: | 4595109 |
| Pharmacy NPI: | 1851374052 | Tx Number: | 0002901026 |
| Date of Service: | 12/05/2019 | Store Number: | 018 |

Segment Navigation: Request Header | Claim Type: Billing

| Segment Name/Field | Request | Response |
|---|---|---|
| Additional Message Information ( 526-FQ ) | | NOT PART D COVERED FOR ESRD RELATED USE |
| Additional Message Information Qualifier ( 132-UH ) | | 04=Used for fourth line of free form text with no pre-defined structure |
| Additional Message Information ( 526-FQ ) | | Prescriber is not authorized for drug's |
| Additional Message Information Qualifier ( 132-UH ) | | 05=Used for fifth line of free form text with no pre-defined structure |
| Additional Message Information ( 526-FQ ) | | DEA Class |
| **Claim** | | |
| Prescription/Service Reference Number Qualifier ( 455-EM ) | 1=Rx Billing | |
| Prescription/ Service Reference Number ( 402-D2 ) | 4595109 | |
| Product Service ID Qualifier ( 436-E1 ) | 03=National Drug Code (NDC) | |

Close

Confidential Protected Health Information













| Claim Information View | | | | | | | X |
|---|---|---|---|---|---|---|---|
| | | | | Third Party Selector: | All Third Party Plans | ▼ | ◄ 2 of 3 ► |

**Response Status**
| Header Response Status: | **Accepted** | Transaction Code: | **B1** | Number of Times Submitted: **3** |
|---|---|---|---|---|
| Transaction Response Status: | **Rejected** | Authorization Number: | 193394197597049998 | Claim Format Name: **D.0 037** |
| Submission Time: | **12/05/2019 02:46:55 PM** | Transaction Type: | **Billing** | Financial Feed Tx Number: |

| **Patient Information:** | **Third Party Information** | **Rx Information** |
|---|---|---|

| | Third Party Plan Name: UHC MEDICARE PART D | Dispensed Product: DIAZEPAM 5 MG TABLET |
|---|---|---|
| | Third Party Code: UHCMPD | NDC Number: 00172-3926-70 |
| | Group Number: PDPIND | Quantity Dispensed: 120.0 |
| | BIN Number: 610097 | Days Supply: 30 |
| | PCN: 9999 | Rx Number: 4595109 |
| | Pharmacy NPI: 1851374052 | Tx Number: 0002901026 |
| | Date of Service: 12/05/2019 | Store Number: 018 |

Segment Navigation: Request Header ▼    Claim Type: Billing ▼

| Segment Name/Field | Request | Response |
|---|---|---|
| **Request Header** | | |
| BIN Number ( 101-A1 ) | 610097 | |
| Version Release Number ( 102-A2 ) | D0=Version D.0 | |
| Transaction Code ( 103-A3 ) | B1=Billing | |
| Processor Control Number ( 104-A4 ) | 9999 | |
| Transaction Count ( 109-A9 ) | 1=One Occurrence | |
| Service Provider ID Qualifier ( 202-B2 ) | 01=National Provider Identifier (NPI) | |
| Service Provider ID ( 201-B1 ) | 1851374052 | |
| Date Of Service ( 401-D1 ) | 12/05/2019 | |
| Software Vendor/Certification ID ( 110-AK ) | V5HXQ | |
| **Response Header** | | |

Close

















Claim Information View

Third Party Selector: All Third Party Plans    2 of 3

**Response Status**

| | | | | |
|---|---|---|---|---|
| Header Response Status: | Accepted | Transaction Code: | B1 | Number of Times Submitted: 3 |
| Transaction Response Status: | Rejected | Authorization Number: | 193394197597049998 | Claim Format Name: D.0 037 |
| Submission Time: | 12/05/2019 02:46:55 PM | Transaction Type: | Billing | Financial Feed Tx Number: |

**Third Party Information** | **Rx Information**

Third Party Plan Name: UHC MEDICARE PART D
Third Party Code: UHCMPD
Group Number: PCPIND
BIN Number: 610097
PCN: 9999
Pharmacy NPI: 1851374052
Date of Service: 12/05/2019

Dispensed Product: DIAZEPAM 5 MG TABLET
NDC Number: 00172-3926-70
Quantity Dispensed: 120.0
Days Supply: 30
Rx Number: 4595109
Tx Number: 0002901026
Store Number: 018

Segment Navigation: Request Header    Claim Type: Billing

| Segment Name/Field | Request | Response |
|---|---|---|
| **Insurance** | | |
| Cardholder ID ( 302-C2 ) | 0801 | |
| Group ID ( 301-C1 ) | PDPIND | |
| Patient Relationship Code ( 306-C6 ) | 1=Cardholder | |
| **Response Insurance** | | |
| Plan ID ( 524-FO ) | | PART-D |
| Network Reimbursement ID ( 545-2F ) | | 00256 |
| Cardholder ID ( 302-C2 ) | | 0801 |
| **Prescriber** | | |
| Prescriber ID Qualifier ( 466-EZ ) | 01=National Provider Identifier (NPI) | |
| Prescriber ID ( 411-DB ) | 1598290561 | |

Close

Confidential Protected Health Information







**Claim Information View**                                                                                               ✕

Third Party Selector: All Third Party Plans  ▼  ◄ 2 of 3 ►

**Response Status**

| Header Response Status: | **Accepted** | Transaction Code: | **B1** | Number of Times Submitted: | **3** |
| Transaction Response Status: | **Rejected** | Authorization Number: | **193394197597049998** | Claim Format Name: | **D.0 037** |
| Submission Time: | **12/05/2019 02:46:55 PM** | Transaction Type: | **Billing** | Financial Feed Tx Number: | |

**Patient Information:** | **Third Party Information** | **Rx Information**

| | Third Party Plan Name: UHC MEDICARE PART D | Dispensed Product: DIAZEPAM 5 MG TABLET |
| | Third Party Code: UHCMPD | NDC Number: 00172-3926-70 |
| | Group Number: PDPIND | Quantity Dispensed: 120.0 |
| | BIN Number: 610097 | Days Supply: 30 |
| | PCN: 9999 | Rx Number: 4595109 |
| | Pharmacy NPI: 1851374052 | Tx Number: 0002901026 |
| | Date of Service: 12/05/2019 | Store Number: 018 |

Segment Navigation: Request Header  ▼    Claim Type: Billing ▼

| Segment Name/Field | Request | Response |
|---|---|---|
| Other Prescriber Indicator ( 533-FX ) | | 1=Same Prescriber |
| DUR Free Text Message ( 544-FY ) | | HYDROCO/APAP TAB 7.5-325 |
| DUR Additional Text ( 570-NS ) | | onset=DELAYED; Documentation=SUSPECTED |
| DUR/PPS Response Code Counter ( 567-J6 ) | | 2 |
| Reason for Service Code ( 439-E4 ) | | DD=Drug-Drug Interaction |
| Clinical Significance Code ( 528-FS ) | | 3=Minor |
| Other Pharmacy Indicator ( 529-FT ) | | 3=Other Pharmacy |
| Previous Date of Fill ( 530-FU ) | | 09/20/2019 |
| Quantity of Previous Fill ( 531-FV ) | | 90.000 |
| Database Indicator ( 532-FW ) | | 2=Medi-Span Product Line |
| Other Prescriber Indicator ( 533-FX ) | | 1=Same Prescriber |

Close



**Claim Information View**

Third Party Selector: All Third Party Plans — 2 of 3

**Response Status**

| | | | |
|---|---|---|---|
| Header Response Status: | **Accepted** | Transaction Code: | B1 |
| Transaction Response Status: | **Rejected** | Authorization Number: | 19339419759704998 |
| Submission Time: | 12/05/2019 02:46:55 PM | Transaction Type: | **Billing** |

Number of Times Submitted: 3
Claim Format Name: D.0 037
Financial Feed Tx Number:

**Patient Information:**

**Third Party Information**

| | |
|---|---|
| Third Party Plan Name: | UHC MEDICARE PART D |
| Third Party Code: | UHCMPD |
| Group Number: | PDPIND |
| BIN Number: | 610097 |
| PCN: | 9999 |
| Pharmacy NPI: | 1851374052 |
| Date of Service: | 12/05/2019 |

**Rx Information**

| | |
|---|---|
| Dispensed Product: | DIAZEPAM 5 MG TABLET |
| NDC Number: | 00172-3926-70 |
| Quantity Dispensed: | 120.0 |
| Days Supply: | 30 |
| Rx Number: | 4595109 |
| Tx Number: | 0002901020 |
| Store Number: | 018 |

Segment Navigation: Request Header        Claim Type: Billing

| Segment Name/Field | Request | Response |
|---|---|---|
| DUR Free Text Message ( 544-FY ) | | METOPROL SUC TAB 100MG ER |
| DUR Additional Text ( 570-NS ) | | onset=DELAYED; Documentation=POSSIBLE |
| DUR/PPS Response Code Counter ( 567-J6 ) | | 3 |
| Reason for Service Code ( 439-E4 ) | | DC=Drug-Disease (Inferred) |
| Clinical Significance Code ( 528-FS ) | | 3=Minor |
| Other Pharmacy Indicator ( 529-FT ) | | 1=Your Pharmacy |
| Previous Date of Fill ( 530-FU ) | | 12/05/2019 |
| Quantity of Previous Fill ( 531-FV ) | | 60.000 |
| Database Indicator ( 532-FW ) | | 2=Medi-Span Product Line |
| Other Prescriber Indicator ( 533-FX ) | | 1=Same Prescriber |
| DUR Free Text Message ( 544-FY ) | | HYDROCO/APAP TAB 7.5-325 |

Close

Confidential Protected Health Information



Claim Information View

Third Party Selector: All Third Party Plans   1 of 3

**Response Status**

| | | | | |
|---|---|---|---|---|
| Header Response Status: | **Accepted** | Transaction Code: | **B1** | Number of Times Submitted: 3 |
| Transaction Response Status: | **Rejected** | Authorization Number: | 193394197597049999 | Claim Format Name:   **D.0 037** |
| Submission Time: | 12/05/2019 02:39:36 PM | Transaction Type: | **Billing** | Financial Feed Tx Number: |

| **Patient Information:** | **Third Party Information** | **Rx Information** |
|---|---|---|

| | | | |
|---|---|---|---|
| | Third Party Plan Name: UHC MEDICARE PART D | Dispensed Product: | DIAZEPAM 5 MG TABLET |
| | Third Party Code: UHCMPD | NDC Number: | 00172-3926-70 |
| | Group Number: PDPIND | Quantity Dispensed: | 120.0 |
| | BIN Number: 610097 | Days Supply: | 30 |
| | PCN: 9999 | Rx Number: | 4595109 |
| | Pharmacy NPI: 1851374052 | Tx Number: | 0002901026 |
| | Date of Service: 12/05/2019 | Store Number: | 018 |

Segment Navigation: Request Header   Claim Type: Billing

| Segment Name/Field | Request | Response |
|---|---|---|
| Product Service ID ( 407-D7 ) | 00172392670 | |
| Quantity Dispensed ( 442-E7 ) | 120.000 | |
| Fill Number ( 403-D3 ) | 00 | |
| Days Supply ( 405-D5 ) | 30 | |
| Compound Code ( 406-D6 ) | 1=Not a Compound | |
| DAW/Product Selection Code ( 408-D8 ) | 0=No Product Selection Indicated | |
| Date Prescription Written ( 414-DE ) | 12/05/2019 | |
| Number of Refills Authorized ( 415-DF ) | 00 | |
| Prescription Origin Code ( 419-DJ ) | 3=Electronic | |
| Other Coverage Code ( 308-C8 ) | 0=Not Specified by patient | |
| Special Packaging Indicator ( 429-DT ) | 1=Not Unit Dose | |

Close

**Response Prior Authorization**

| | | |
|---|---|---|
| Prior Authorization Processed Date ( 498-PR ) | | 12/05/2019 |

Close



**Patient Notes**

| Sarah Deibel | 02/19/2020 10:27 AM |
|---|---|

PER PT- NO LONGER USING WEGMANS PHARMACY

| Lori Niver | 01/06/2020 7:47 PM |
|---|---|

PT IS NO LONGER USING FHD

| Tracy Engel | 02/21/2019 10:12 AM |
|---|---|

PT REQUESTED REMOVE RANITIDINE FROM ERP, HE
DOESN'T ALWAYS TAKE BID AND HAS A STOCKPILE

Add    Remove

Save    Cancel

Confidential Protected Health Information

54



**Patient Notes**                                              ✕

**Christine Domicello**                    **12/23/2018 8:47 AM**

DEACTIVATED CC 5389 VIA WEB REQUEST

**Lori Niver**                              **11/04/2018 9:26 AM**

PT WANTS ERP AT FHD

**Lori Niver**                              **11/04/2018 9:23 AM**

HE WANTS ALL ACUTE MEDICATIONS FILLED AT EAST AVE.
ALL OTHER RXS ARE TO BE FILLED AT FHD. IF MD SENDS
MEDS OTHER THAN ACUTE TO EAST AVE- PLEASE
TRANSFER RX TO FHD.

[Add]  [Remove]

[Save]  [Cancel]

Confidential Protected Health Information



**Patient Notes**  ✕

**Lori Niver**                    **11/04/2018 9:23 AM**

HE WANTS ALL ACUTE MEDICATIONS FILLED AT EAST AVE.
ALL OTHER RXS ARE TO BE FILLED AT FHD. IF MD SENDS
MEDS OTHER THAN ACUTE TO EAST AVE- PLEASE
TRANSFER RX TO FHD.

**Lori Niver**                    **11/04/2018 9:18 AM**

DEACTIVATED DC 0656 PER WEB REQUEST

**Olga Verhoef**                    **10/19/2018 1:41 PM**

PT NEEDS FHS FOR HIS MEDICATION DUE TO LACK OF
TRANSPORTATION

Add | Remove

Save | Cancel

Confidential Protected Health Information

56

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

This document is in furtherance of our meet and confer discussions over the past several weeks.

The PBMs do not need dispensing data from Wegmans, a non-party pharmacy, to defend against Plaintiffs' remuneration claims that are at the "heart" of Plaintiffs' case against the PBMs.  The PBMs' targeted campaign against Wegmans is a fishing expedition, and for reasons explained below, the information sought by the PBMs will not help their cause.

There also remains a lack of clarity as to whether the PBMs already possess much of what they demand from Wegmans and whether they have produced it themselves.  Wegmans has been asking whether the PBMs themselves incurred the significant burden of harvesting and producing their own concurrent drug utilization review information corresponding with Wegmans prescriptions that they adjudicated in relation to prescriptions dispensed in the City of Rochester.  After months without a direct response to that question, Mr. Alden advised us by email dated April 4 that "Express Scripts has looked and has not been able to find responses to CDUR POS messages sent by pharmacies."  Express Scripts has not explained what steps it took to "look" for such information or why it was unable to harvest *any* cDUR information for the tens of thousands (or more) Wegmans prescriptions that it adjudicates every single year.  Given the enormous burden that Wegmans is being asked to incur as a non-party, it is certainly fair game for Wegmans to understand the scope of the efforts the PBMs undertook to harvest some of the very same information that they are requesting from Wegmans.  In the event this dispute goes before Special Master Cohen again, Wegmans intends to raise this issue, including what the PBMs did to harvest their own data, and if it no longer exists, why.

Having said that, it is Wegmans hope and expectation that the parties will be able to work through these issues.  The remainder of this document focuses on the issue of dispensing information, which the PBMs have prioritized in all of our communications.  Below Wegmans explains the process by which its dispensing information is generated, and how it is maintained in the normal course of business.  As you may know, Express Scripts and Optum adjudicate more than half of the prescriptions dispensed by Wegmans, including opioids.  This means that if Wegmans dispensed an opioid in Rochester, New York, Express Scripts or Optum (or another PBM) adjudicated and approved the claim after receiving much of the information that the PBMs now seek via their subpoena.  For this reason, any dispensing information produced by Wegmans will show the PBMs' close involvement with the dispensing process and their own contemporaneous knowledge of the various pieces of information that they used to adjudicate claims. We remain skeptical that this information could possibly be relevant to the PBMs' defense—much less helpful.

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

To explain the Wegmans dispensing process and the PBMs' adjudication of opioid prescriptions, we refer below to two exemplar prescriptions, which are illustrated by numerous screenshots. These screenshots will confirm that the PBMs already possess—or previously possessed but failed to preserve—much of the information they now seek from Wegmans. Further, the exemplar prescriptions will demonstrate the immense burden of complying with the subpoena. Producing even a modest sample set of prescriptions would be time prohibitive due to the time needed to collect screenshots from Wegmans dispensing system and perform the required HIPAA redaction analysis. The discussion below will also demonstrate why the burden cannot be offset through cost shifting.

I.  **THE PBMS' REQUEST FOR PRESCRIPTION-LEVEL DATA**

The PBMs' February 28 letter largely ignores what Wegmans said in its prior communications regarding prescription-level data. Nonetheless, Wegmans has spent considerable time digesting the Subpoena Requests and their purported rationale.

A.  **Express Scripts and Optum Managed and Adjudicated and Approved Most of the Prescriptions Dispensed by Wegmans in Rochester**

As Wegmans stated in its January 29, 2025 letter, virtually all of its prescriptions are dispensed pursuant to a PBM Pharmacy Network Agreement, and in accordance with PBM Pharmacy Manuals. So, before prescriptions are dispensed by Wegmans, they are *reviewed and approved* by the PBMs. In total, more than 98% of prescriptions dispensed by Wegmans in Rochester are managed, administrated, and approved by pharmacy benefits managers of some variety. *More than half of the prescriptions dispensed by Wegmans in Rochester are managed and administered by Express Scripts and Optum.*

The PBMs' review and approval process for prescriptions dispensed by Wegmans in Rochester is reflected by the terms of the Pharmacy Network Agreements and Pharmacy Provider Manuals. Before Wegmans may dispense a prescription managed and administered by any pharmacy benefits manager, including Express Scripts and Optum, Wegmans must submit a "clean claim" for each prescription. A clean claim is one that documents medically accepted indications in accordance with the format promulgated by the National Council for Prescription Drug Programs ("NCPDP"). For example, Optum's 2024 Pharmacy Benefit Manual's defines "clean claim" as follows:

Clean Claim:

Prepared in accordance with the standard formats promulgated by the National Council for Prescription Drug Programs, electronic, batch, and on paper, which contains all of the information necessary for processing (including, without

limitation, the Member identification number, the Member's name and date of birth, Drug Product NDC number, **drug quantity, days' supply, health care provider Drug Enforcement Administration (DEA)/NPI number**, Pharmacy National Council for the Prescription Drug Programs (NCPDP)/NPI number, date of service, Submitted Cost Amount and the U&C. Claims submitted in non-NCPDP standard format may not be considered a Clean Claim and may be subject to an additional Claim processing charge. **Prescription claims with active ingredients which are not being used for a documentable medically accepted indication or for which the Prescriber is unable to provide adequate documentation for the basis of use may not be considered a Clean Claim. For example, a claim that utilizes atypical directions for drug products which conflict with typical drug information available in pharmacy systems for patient education without medical necessity and of limited clinical value.  A Claim shall not be considered a "Clean Claim" if at Administrator's sole discretion it determines that such Claim is (i) discrepant, false and/or fraudulent ..."**

2024 Optum Pharmacy Manual at p. 11 (emphasis added).

Wegmans submits prescription claims to the PBMs through the transmittal of Payer Sheets that conform with national standards promulgated by the NCPDP.  The NCPDP Payer Sheets contain several fields, including Drug Utilization Review ("DUR") fields, that Wegmans is required to complete.  The data in the completed Payer Sheet reflects how any "red flag" identified within a dispensed prescription was resolved by a Wegmans pharmacist.

In sum, it is an indisputable fact that: (1) with respect to the majority of opioid drugs dispensed by Wegmans in the City of Rochester, Express Scripts or Optum adjudicated the claim and deemed it to be a "clean claim," meaning it was not false or fraudulent, and that it was medically necessary; and (2) Express Scripts and Optum should already have vast amounts of data from Wegmans' claim submissions.  Since last summer, Wegmans has repeatedly asked whether the PBMs have harvested and produced that data, and we have yet to have a clear answer from either Express Scripts or Optum.  Mr. Alden's April 4 disclosure that "Express Scripts has looked and has not been able to find responses to CDUR POS messages sent by pharmacies" causes one to wonder what Express Scripts did to search for such information, why such information could not be found, and whether Express Scripts should have preserved such information if it did not do so.

    B. **The Data Fields in the Subpoena Do Not Track the Fields in the Payer Sheets, and their Production Would Represent an Incomplete, Highly Misleading Perspective on Dispensing Information**

As noted in Wegmans' prior letters, "the data fields delineated in Request No. 1 *do not track* the Payer Sheet for each dispensed prescription or seek fields related to DUR." As a result, the fields in Request No. 1 would provide an artificial and misleading portrayal of Wegmans' dispensing conduct because they omit many of the fields reflecting "Wegmans rationale" for dispensing opioids.  The PBMs have not responded to that issue and the corollary point that the data they seek is not reasonably calculated to lead to the discovery of admissible evidence.  Instead, the PBMs' "compromise" position is to eliminate even more fields—like diagnostic code and prescriber specialty—that are necessary to understand the DUR process and undertake any legitimate "red flag" analysis.  The subpoena fields also exclude important information from Payer Sheets that Wegmans *and the PBMs* review before any medication is dispensed.

Rather than addressing the concerns in Wegmans' prior communications, the PBMs assert that Special Master Cohen's January 27, 2020 ruling that you cite in support of the "data fields" in Request No. 1 (MDL ECF No. 3106) served as an endorsement of and determination that the 34 fields outlined in the subpoena are the minimum fields necessary for the PEC to undertake a red flag analysis and for Defendants to counter Plaintiffs' conclusions. This is false.  During the 2020 proceedings, the PEC and Pharmacy Defendants agreed to the 34 fields; the Special Master made no such endorsement or determination that the 34 fields were the "narrowest possible data production" necessary to conduct and counter a red flag analysis.  MDL ECF No. 3106 at 2 ("During the course of the Special Master's discovery conference with the parties, *Plaintiffs agreed to drop their request for all but 34 data fields.*").  Additionally, the Court was not asked, and therefore made no determination, that the 34 fields at issue in 2020 accurately reflect the DUR decision-making process or reliable "red flag" analysis.

Furthermore, Wegmans is different than CVS and Walgreens, which were defendants and agreed to the scope of the 34 data fields in 2020. As you know, CVS Health is vertically integrated with its own PBM (CVS Caremark).

Wegmans, in contrast, is a regional, dispenser-only pharmacy that participates in the PBMs' networks.  Express Scripts and Optum reviewed and approved most of Wegmans dispensed prescriptions in Rochester.  Optum and Express Scripts may not now disavow their review and approval of "30% of all opioids in Rochester"—the dispensing statistic that you attribute to Wegmans.[1]  Given the PBMs intimate involvement in the

---

[1] This 30% figure is inaccurate.  The PBMs appear to have derived this number from ARCOS data based on all Wegmans stores with a Rochester mailing address, but Wegmans has *only a single pharmacy within the City of Rochester proper*.  That store (the East Avenue store)

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

review and approval process through their pharmacy network agreements with Wegmans, it is disingenuous to now suggest that Express Scripts and Optum "need a more complete picture and representative sample, of the prescription opioids dispensed in Rochester." In fact, pharmacy benefits managers, which require the use of the NCPDP Payer Sheets and employ a virtually identical DUR process, must approve 98% of the prescriptions before they are dispensed by Wegmans.

As stated in Wegmans letter of January 29, 2025, many of the data fields delineated in Request No. 1 are different from and do _not_ track the data contained in the Payer Sheets submitted to the PBMs by Wegmans. The requested data fields also omit important contextual information from Payer Sheets that the PBMs and Wegmans review before approving every prescription that is ultimately dispensed to a patient.

For example, the Optum Pharmacy Provider Manual describes the concurrent drug utilization review that is applied at the time any prescription drug administered and approved by Optum undergoes an adjudication. As Optum states, such reviews are conducted, and prescription are screened for such things as "duplicate therapies, age or gender-related contraindications, overutilization or underutilization, drug-drug interactions, incorrect drug dosage or duration of drug therapy, drug-allergy contraindications, and clinical Abuse or misuse." 2024 Optum Pharmacy Provider Manual at p. 51. Optum goes on to state that "dispensing Pharmacists should exercise their clinical knowledge and expertise in reviewing and overriding warning messages if deemed medically appropriate." *Id*. Prescriptions maintained by Wegmans in the ordinary course of its business contain the information provided, and required, by Optum and other PBMs as part of the concurrent drug utilization review. Request No. 1 does not contain any of the data fields or information reflecting this review.

Optum, ESI, and other pharmacy benefits managers use NCPDP DUR/PPS fields and corresponding codes to reflect the concurrent drug utilization review:

> [Optum] ... utilizes NCPDP defined DUR/Pharmacy Payment Service (PPS) Coding (Conflict, Intervention and Outcomes Codes) and Submission Clarification Codes. The following reject edits allow Network Pharmacy Providers to be able to review and override certain DUR rejections/interactions by

---

accounts for approximately 5% of opioid shipments to the City of Rochester proper as reflected in the ARCOS data used by the PBMs. This is important because the bellwether case against the PBMs is brought by the City of Rochester, so stores outside the City are only tangentially relevant, at best, to the *City of Rochester* case in which the Subpoena is issued.

> identifying and entering the appropriate conflict, intervention and outcome codes for each component.

2024 Optum Pharmacy Provider Manual at p. 51

The NCPDP DUR/PPS Codes apply to prescriptions that are identified as potentially containing therapeutic duplications.  The Optum Pharmacy Provider Manual reflects the comprehensive, patient by patient, prescription by prescription "safety edit" process to ensure that each dispensed prescription is dispensed for an appropriate medical purpose:

> Reason code of Therapeutic Duplication (TD) requires the pharmacy to review the flagged medications and resolve any duplication in the system. This TD is a safety edit in the pharmacy system that looks at the Member's current medication and compares them to the drug being processed...
>
> 1. Review the patient profile to identify why the system identified the Member with a therapeutic duplication. There may be claims from other pharmacies that resulted in the soft reject. When the pharmacy system flags a medication for TD, it produces a soft reject. The following steps explain how you review an override for a soft reject.
>
> 2. Consult with the Member to confirm current medications.
>
> 3. If the Member is unsure or insists they should be taking both medications or if you have additional questions, ask the prescriber to confirm.
>
> 4. If you do not recommend the prescription, do not fill it. Ask the Member to contact the prescriber. Do not submit a claim for the prescription.
>
> 5. If you approve the prescription fill, override the rejection. Identify and enter the appropriate Reason, Professional and Result code for each field.

Select the appropriate professional and Results Code from the following list.

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**



| OVERLAP: | | |
|---|---|---|
| Identifies claims where a Member is filling overlapping claims for specified drugs. | | |
| **Medicare** | | |
| **Reason for Service Code** | **Professional Service Code** | **Result of Service Code** |
| TD (Therapeutic Duplication) | M0 (Prescriber Consulted) | 1G (Filled,Prescriber Approvl)<br>4B (Filled,Palliative Care)<br>4C (Filled,Hospice)<br>4D (Filled,Cancer Treatment)<br>4K (Pscbr Expt-Cancer/PalCare)<br>4L (Pscbr Exmpt-Hospice) |
| | MR (Medication Review) | 4D (Filled,Cancer Treatment) |
| | R0 (Pharmacist Consulted Othr) | 4B (Filled,Palliative Care)<br>4C (Filled,Hospice)<br>4D (Filled,Cancer Treatment)<br>4K (Pscbr Expt-Cancer/PalCare)<br>4L (Pscbr Exmpt-Hospice) |
| **Commercial / Medicaid** | | |
| **Reason for Service Code** | **Professional Service Code** | **Result of Service Code** |
| TD (Therapeutic Duplication) | M0 (Prescriber Consulted) | 1G (Filled, Prescriber Approvl) |
| | R0 (Pharmacist Consulted Othr) | 1B (Filled Prescription As Is) |

*Id*. at page 52.

Optum, ESI, and other pharmacy benefits managers also require Wegmans to select and identify professional and results codes for prescriptions that are identified as "high dose" or potentially prescriptions for "drug-drug interaction"—the resolution of which similarly require a patient by patient, prescription by prescription review and documentation before the medications are dispensed:

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

Select the appropriate professional and Results Code from the following list.

**THERDOSE:**
Assesses the total daily dose to include the single incoming claim along with overlapping claims in the Member's history based on specific ingredient. The edit will be triggered if the total daily dose exceeds the FDA-defined maximum daily dose.

| Reason for Service Code | Professional Service Code | Result of Service Code |
|---|---|---|
| HD (High Dose Alert) | M0 (Prescriber Consulted) | 1G (Filled, Prescriber Approvl)<br>1B (Filled Prescription As Is)<br>1C (Filled, Different Dose)<br>1D (Filled, Different Directns)<br>1F (Filled, Different Quantity)<br>1G (Filled, Prescriber Approvl)<br>2A (Prescription Not Filled)<br>3C (Discontinued Drug)<br>3D (Regimen Changed)<br>3E (Therapy Changed) |
| | P0 (Patient Consulted) | 1A (Filled As Is, False Positv)<br>3K (Instructions Understood) |
| | R0 (Pharmacist Consulted Othr) | 1A (Filled As Is, False Positv)<br>1B (Filled Prescription As Is)<br>1C (Filled, Different Dose)<br>1D (Filled, Different Directns)<br>1F (Filled, Different Quantity)<br>2A (Prescription Not Filled)<br>3C (Discontinued Drug)<br>3D (Regimen Changed)<br>3E (Therapy Changed) |

**OVERLAP:**
Identifies claims where a Member is filling overlapping claims for specified drugs.

| Medicare | | |
|---|---|---|
| Reason for Service Code | Professional Service Code | Result of Service Code |
| TD (Therapeutic Duplication) | M0 (Prescriber Consulted) | 1G (Filled, Prescriber Approvl)<br>4B (Filled, Palliative Care)<br>4C (Filled, Hospice)<br>4D (Filled, Cancer Treatment)<br>4K (Pscbr Expt-Cancer/PalCare)<br>4L (Pscbr Exmpt-Hospice) |
| | MR (Medication Review) | 4D (Filled, Cancer Treatment) |
| | R0 (Pharmacist Consulted Othr) | 4B (Filled, Palliative Care)<br>4C (Filled, Hospice)<br>4D (Filled, Cancer Treatment)<br>4K (Pscbr Expt-Cancer/PalCare)<br>4L (Pscbr Exmpt-Hospice) |
| Commercial / Medicaid | | |
| Reason for Service Code | Professional Service Code | Result of Service Code |
| TD (Therapeutic Duplication) | M0 (Prescriber Consulted) | 1G (Filled, Prescriber Approvl) |
| | R0 (Pharmacist Consulted Othr) | 1B (Filled Prescription As Is) |

*Id.* at page 53.

In sum, the fields in Request No. 1 do not reflect cDUR information, including the Reason for Service Codes, even though the PBMs require Wegmans to submit this data *before* approving the dispensing of a prescription submitted by Wegmans.  It is as if the

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

PBMs wish to conduct a distorted "red flag" analysis of Wegmans' prescriptions while ignoring the fact that the PBMs approved those prescriptions. This distorted analysis also excludes the information fields that would be relevant to any meaningful drug utilization review. The PBMs' approach is manipulative and incapable of leading to admissible evidence. Any legitimate analysis must examine (1) how Wegmans maintains its dispensing data in the normal course of business, (2) what information is used during the PBM adjudication process, and (3) Express Scripts and Optum's *close and substantive role* in the dispensing process.

### Detailed Review of Two Exemplar Prescriptions

To illustrate the point, but without conceding relevance, Wegmans is providing information from the dispensing file for two exemplar prescriptions that were reviewed, adjudicated, and approved by the PBM for UHC Medicare Part D and dispensed by Wegmans. Wegmans maintains its dispensing files in the normal course of business on a prescription-by-prescription basis in a fully integrated user interface from which it must take screenshots in order to collect all of the pertinent information in the manner in which it is kept.

The first exemplar prescription is for 120 Diazepam 5 mg, (the "diazepam prescription"), and the second prescription is for 60 hydrocodone-acetaminophen (NORCO) 7.5-325 (the "hydrocodone prescription").

The diazepam and hydrocodone prescriptions were issued to the same patient and written by the same prescriber. Wegmans received both prescriptions electronically on the same day, at approximately 2:30 p.m. The information and data for these two prescriptions, as it is maintained by Wegmans in the ordinary course of its business, consists of more than 56 pages of individual screenshots.

The 56 pages of screenshots document the workflow for each prescription, including the data and information exchanged between the PBM and Wegmans. The Workflow logs for both prescriptions begin with electronic receipt of the prescription by Wegmans, reflects the review, adjudication, and approval by the PBM, the cDURs conducted by both Wegmans and the PBM, and the dispensing of both prescriptions by Wegmans to the patient.

A. **The Diazepam Prescription**

The following two screenshots depict the information initially received from the prescriber by Wegmans for the diazepam prescription:

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**



**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**



**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

### Wegmans Workflow Log

The Workflow Log is the roadmap reflecting each step in the dispensing process. The Workflow Log begins upon receipt of each prescription. For the diazepam prescription, screenshots from the Workflow Log, are depicted below and reflect the following actions:





**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

The information for each step in the Workflow Log exists in different pages in the User Interface.

For the diazepam prescription, the Workflow Log reflects:

1. The prescription was received electronically by Wegmans at 2:29 p.m.

2. It was prepared for submission to the PBM by 2:39 p.m.

3. The PBM for UHC Medicare Part D adjudicated and approved the claim.  Adjudication began at 2:46 p.m. and was completed by 5:06 p.m.

    a. The information reflecting the PBM's adjudication is maintained by Wegmans in several tabs of the User Interface:

        i.   The Claim Information View

        ii.  The Drug Utilization View

        iii. The Claim Detail View

        iv.  The Tx View

4. The PBM approved and paid the claim at 5:06 p.m.

5. Wegmans completed its Drug Utilization Review at 5:10 p.m.

6. Wegmans submitted the prescription for product dispensing at 5:23 p.m.

7. The prescription was verified by Wegmans at 5:30 p.m.

8. Wegmans dispensed the prescription to the patient at 5:58 p.m.

**<u>The Claim Information View</u>**

The Claim Information View reflects the interaction between Wegmans and the PBM during the adjudication, review, and approval of the prescription.

The Claim Information View shows that the diazepam prescription was initially rejected by the PBM and was submitted by Wegmans three times before it was accepted and approved

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

as a paid claim by the PBM.  Three issues were raised by the PBM and resolved by Wegmans during the adjudication process.

1. The PBM did not have the DEA number of the prescriber, Dr. Zoe Gravitz, in its database.  The initial rejection is reflected in the screenshot depicted below.

    a. Reject Code (511-FB) 44 = Plan's prescriber database indicates the prescriber DEA number is not found.

    b. Additional Message Information (526-FQ) Presc does not have a DEA, sbmt SCC 43 ("prescriber does not have DEA number, submit Submission Clarification Code "CC" 43).



Wegmans then clarified Dr. Gravitz's DEA number and resolved this basis for this PBM rejection by 2:46 p.m., as reflected in the screenshot depicted below, which reflects that

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

Wegmans submitted code SCC-43 (43 = Prescribers' DEA is "active with DEA Authorized Prescriptive Right").[3]

> ### 2. DUR Reject Code 88-Potential Drug Interaction Between the Diazepam and Hydrocodone Prescriptions

After Wegmans clarified the validity of Dr. Gravitz's DEA number, the PBM rejected the prescription again at 2:46 p.m., as reflected in the screenshots depicted below,  The PBM provided the following reject codes:

> ### 2. Reject Code (511-FB) DUR-88 Reject Error



---

[3] Upon information and belief, at the time, prescriber Dr. Zoe Gravitz was a new resident working under the supervision of Dr. Kevin Kless, and her DEA number had not yet been added into the PBM's "system."

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

The PBM provided "Additional Message Information" (526-FQ) to explain the basis for the rejections:

1.  Not Part D Covered for ESRD [End Stage Renal Disease] Related Use

2.  DUR1-Benzo + OpioidHx; 569 Appeals Rights

**The Concurrent Drug Utilization Review (cDUR)**

The PBM's Concurrent Drug Utilization Review data and information provides the details of the basis for cDUR Reject Code 88 from the Claim Information View.

The screenshots below reflect the PBM's cDUR review for the potential drug interaction between the diazepam and hydrocodone prescriptions.  The potential drug-drug interaction was flagged by *both* the PBM *and* Wegmans:



**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**



### The Claim Detail Data View

The Claim Detail data field for the diazepam prescription confirms that Wegmans resolved the rejection based upon the potential "drug-drug interaction" between the hydrocodone and diazepam prescriptions in the cDUR process (identified by both Wegmans and the PBM).  The cDUR rejection was resolved through the pharmacist's consultation with the prescriber and then dispensing the prescriptions "With Prescriber Approval."  (Reason for Service Code (439-E4) DD=Drug-Drug Interaction, Professional Service Code (440-E5) MO-Prescriber consulted, and Result of Service Code (441-E6) 1G=Dispensed, With Prescriber Approval).

The misleading data set requested by the PBMs for their so-called "red flag analysis" would exclude the fact that the pharmacist, before dispensing this drug, consulted directly with the prescriber regarding the potential drug-drug interaction that was flagged by Wegmans and the PBM.  Confirmation that the pharmacist consulted with the prescriber before dispensing was communicated back to the PBM *in real time*, as was necessary before the PBM would approve the claim. The PBMs should already have this information in their own

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

systems and have not adequately explained why they cannot harvest this information themselves, or why they failed to preserve it for litigation.

The Claim Detail page for the diazepam prescription reflects the outcome of the cDUR process for the drug-drug interaction concerns between the Diazepam and Hydrocodone prescriptions:



**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

**The Tx Details Data View**

The Tx Details data for the diazepam prescription reflects that the prescription was approved and "paid" by the PBM at 5:06 p.m., as shown below:



The Tx Details reflects the status as "paid" and includes the payment details for the medication.  For the diazepam the total price was $16.96. The Third Party (PBM) paid $15.71, and the patient paid $1.25.

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

B. **The Hydrocodone Prescription**

Two screenshots reproduced below depict the information initially received by Wegmans from the prescriber for the hydrocodone prescription.



**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**



**Wegmans Workflow Log**

Receipt of the prescription is the first step in Wegmans' Workflow Log, which is generated for each prescription.  The Workflow Log is the roadmap reflecting each step in the dispensing process.

For the hydrocodone prescription, the Workflow Log reflected the following actions:

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**





The above Workflow Log reflects the following:

1. The prescription was received electronically by Wegmans at 2:29 p.m.

2. It was prepared for submission to the PBM by 2:38 p.m.

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

      a. The PBM for UHC Medicare Part D conducted its adjudication and approval of the claim, which was first conducted at 2:46 p.m.

      b. The data reflecting the PBM's adjudication is maintained by Wegmans in several data fields

            i. The Claim Information View

            ii. The Drug Utilization View

            iii. The Claim Detail View

            iv. The Tx View

3. Wegmans completed its Drug Utilization Review at 2:56 p.m.

4. Wegmans submitted the prescription for product dispensing at 3:31 p.m.

5. The prescription was verified by Wegmans at 3:54 p.m.

6. Wegmans dispensed the prescription to the patient at 5:58 p.m.

**The Claims Detail Data View**

    The Claims Detail Screen reflects the result of the PBM adjudication process.  For the hydrocodone prescription, the PBM noted that the DEA number for the prescriber, Dr. Gravitz, was "not in the processor's system" and the "Paid" claim was flagged for "retrospective review."  (See Approved Message Code 548-6F).

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**



The Claims Detail View subsequently reflects that Wegmans responded to the PBM with "Submission Clarification Code (420-DK, 43=Prescriber's DEA is active with DEA Authorized Prescriber Right":



**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

**The Tx Details Data View**

The Tx Details View reflects the claim status as "paid," and includes the payment details for the medication.  In this case the total price was $21.55, the Third Party (PBM) paid $20.55, and the patient paid $1.25:



**The Concurrent Drug Utilization Review (cDUR)**

*After* the claim was adjudicated and approved by the PBM, but *before* it was dispensed, Wegmans conducted its own DUR.  This included reviewing certain safety or drug interaction concerns prior to releasing the prescription for dispensing.  That information is contained and maintained by Wegmans in the Drug Utilization Review Screen.

For the hydrocodone prescription, Wegmans identified a potential drug-drug interaction with the diazepam prescription:

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**



As discussed in detail above, the *same* drug interaction issue was flagged during the cDUR and DUR processes for the diazepam prescription.

The PBM *also* identified cDUR concerns about the potential drug-drug interaction between the hydrocodone and diazepam prescriptions. These issues are documented in the Drug Utilization View for the diazepam prescription as "Third Party DUR." The resolution of these cDUR concerns—i.e., by directly contacting the prescriber—is also described above as part of the diazepam prescription discussion.

**<u>Conclusions as to the Inappropriateness of the Subpoena's Data Request</u>**

As the above discussion illustrates, the data fields requested by the PBMs are woefully inadequate if the purpose is to reliably assess *why* Wegmans filled a particular prescription. Any analysis yielded by the limited data fields in Request No. 1 would result in unreliable and highly misleading data. In order to reliably analyze whether a particular prescription was properly dispensed, the full dispensing log must be captured in the manner depicted in the above screenshots that comprise the entire dispensing file. These screens are what a Wegmans pharmacist sees and does when dispensing the drug.

The dispensing log reflects how Wegmans prepares, submits, and maintains information concerning each prescription in the ordinary course of business. Wegmans is permitted to produce information concerning the prescriptions that it dispensed as that information it is maintained in the ordinary course of business. FRCP 45(e)(1)(A), (B).

Wegmans is not required to produce its prescription dispensing records according to the cherry-picked subset of data fields identified by the PBMs that exclude information that is required to conduct an accurate and reliable analysis. Request No. 1 asks for data that is outside the scope of the NCPDP payer sheet and also omits information contained within the NCPDP payer sheet and available to Wegmans as part of its DUR. For those

reasons, Wegmans is not required to produce prescription data in accordance with the fields in Request No. 1.  If Wegmans were required to produce anything at all, it would be appropriate to produce screenshots of its complete dispensing log for a set of prescriptions, rather than create a set of raw data that *does not exist in the normal course of business* and would represent a skewed, artificial, and misleading portrayal of Wegmans' dispensing process.

**The Burden of Producing Dispensing Logs**

The PBMs well know the that harvesting and producing dispensing information imposes a tremendous burden, as Special Master Cohen acknowledged at the January 6 conference.  This is why we have repeatedly asked the PBMs what data of their own they have harvested and produced.  During prior discussions, we were led to believe that Express Scripts and Optum have themselves incurred the time and expense of harvesting their own cDUR information for prescriptions that they adjudicated within the City of Rochester.  On April 4, however, Mr. Alden advised us that "Express Scripts has looked and has not been able to find responses to CDUR POS messages sent by pharmacies."  Express Scripts has not explained what it did so "look" for such information or why it "has not been able to find" its own cDUR record for the millions of opioid prescriptions that it has adjudicated in the City of Rochester.  The inability (or unwillingness) of Express Scripts to go through the burden of harvesting its own cDUR data is shocking in its own right—particularly when contrasted with the burden that Express Scripts is seeking to impose on Wegmans.

In an effort to quantify the burden, Wegmans provides the following information.  The two exemplar prescriptions discussed above, took an experienced pharmacist approximately 15 minutes *each* to gather and begin to redact certain protected health information.

After Wegmans gathers dispensing records, it must engage in a complex review and redaction process in order to comply with its obligations under the Health Insurance Portability and Accountability Act (HIPAA) of 1996.  In order to provide the two exemplar prescriptions, Wegmans was required to retain an experienced HIPAA lawyer to review and opine on the pharmacy's legal obligations under HIPAA.  While other parties to the litigation may have given their HIPAA obligations short shrift, Wegmans is not willing—and cannot be compelled—to give its customers anything less than that to which they are entitled under HIPAA.

Under certain enumerated circumstances, "covered entities" under FERPA can disclose protected health information ("PHI") without an express authorization from the patient.  When doing so, covered entities have an obligation to disclose only the "minimum necessary (PHI) to accomplish the intended purpose for the use, disclosure or request.  45 CFR § 164.502(b)(1).

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

Wegmans takes seriously its obligation to protect PHI and under the circumstances here must redact the following information from its dispensing records:

1. Name;
2. All geographic subdivisions smaller than a state, including street address, city, county, precinct, the last two digits of the zip code;
3. All elements of dates (except year), and except where such dates are essential to remaining responsive;
4. Patient telephone numbers;
5. Patient email address;
6. Social Security Numbers;
7. Health plan beneficiary numbers, except for (i) group number and (ii) last four digits of beneficiary number;
8. Patient signature, which would fall within "any other unique identifying number, characteristic, or code."

As reflected in the redactions in the various screenshots contained in this letter, such fields are displayed throughout a patient's dispensing record and must be redacted on a prescription by prescription basis.

Moreover, there may be occasions when a patient's record contains references to *other* prescriptions that are outside the drug scope.  Those instances would require a case-by-case assessment of whether the other prescription should be redacted or not.  In some instances, the other prescription would be wholly irrelevant to the opioid dispensing process and therefore would need to be redacted under HIPAA.  In other instances, the existence of the other prescription might have been relevant to the pharmacist's DUR rationale because it might give insight into a particular course of treatment that made the opioid medically appropriate.  An attorney performing the redaction process would be required to consult with a pharmacist in order to make such relevancy determinations during the redaction process.

Based on this exercise, Wegmans estimates it would take tens of thousands of hours to collect and properly redact the dispensing records for the year 2019 alone within the City of Rochester.  And it is not simply a matter of cost that can be mitigated by the PBMs; it is a matter of manpower that will impose a tremendous burden on pharmacists, who should be focused on patient care rather than responding to a blatant fishing expedition by the PBMs.

Moreover, Wegmans urges you to reconsider, in light of the discussion above, what the Wegmans dispensing information will reveal.  Most Wegmans prescriptions were adjudicated by Express Scripts or Optum, with the remainder through some other PBM.  They were adjudicated in accordance with *your clients'* processes and systems as required by *your clients'* published manuals.  The dispensing information will confirm that

**May 30, 2025 Meet and Confer Communication**
**Attorneys' Eyes Only – Not for Filing or Circulation**
**Subject to Protective Order**

Wegmans did not dispense medication unless your clients deemed the documentation to constitute a "Clean Claim."  In all instances, a particular prescription passed two levels of DUR—the PBM cDUR as well as the Wegmans DUR.  The documents will reflect that in many instances, your clients conducted retrospective audits with the goal of clawing back previously paid claims.  In other words, the PBMs had at least two opportunities to approve or reject the majority of Wegmans prescriptions filled in the City of Rochester.